IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| JOSHUA DUNN, et al., | |
| Plaintiffs, | |
| v. | |
| KIM THOMAS, in his official capacity as Commissioner of the Alabama Department of Corrections, et al., | Civil Action No. 2:14-cv-00601-WKW-TFM |
| Defendants. | |

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION REQUIRING DEFENDANTS TO CONTROL AVAILABILITY OF RAZOR BLADES AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Plaintiffs Howard Carter, Joshua Dunn, Daletrick Hardy, Leviticus Pruitt, and Robert Williams hereby move this Court for a preliminary injunction.  Plaintiffs seek to enjoin the Defendants' unconstitutional policy and practice of failing to protect Plaintiffs and other prisoners suffering from mental illness or mental health crises from engaging in self-harm.  Specifically, Defendants Kim Thomas and Ruth Naglich are deliberately indifferent to the substantial risk of harm that is created by the unrestricted distribution of razor blades to male prisoners in the custody of Alabama Department of Corrections.  Preliminary injunctive relief is warranted here because: (1) there is a substantial likelihood of Plaintiffs' success on the merits; (2) Plaintiffs and those similarly situated will suffer irreparable injury unless the injunction

1

issues; (3) the threatened injury to Plaintiffs outweighs whatever damage the proposed injunction could cause Defendants; and (4) the injunction would not be adverse to the public interest.

Plaintiffs' Motion is supported by the accompanying Memorandum of Points and Authorities, and all exhibits thereto, filed herewith, as well as any additional evidence submitted to this Court for its consideration.

Plaintiffs request expedited discovery on the issues raised herein and a hearing on the Motion.

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................................4

FACTUAL BACKGROUND ...............................................................................................................7

ARGUMENT .....................................................................................................................................18

    A.      Plaintiffs Will Be Able to Show that Defendants are Deliberately Indifferent to the Risk of Serious Harm Caused by Unrestricted Access to Razor Blades........................................................19

            1.      Distributing razor blades to prisoners, without tracking or collecting them, creates a substantial risk of serious harm................................................................21

            2.      Defendants are aware of the substantial risk of serious harm created by their practice of distributing razor blades to prisoners with psychiatric needs............25

            3.      Defendants disregard the substantial risk of harm facing prisoners with psychiatric needs..................................................................................................27

            4.      The injuries suffered by Plaintiffs arise from Defendants' widespread and unrestricted custom of distributing razor blades to prisoners with psychiatric needs.........................................................................................................................30

    B.      Plaintiffs Will Suffer Irreparable Injury in the Absence of a Preliminary Injunction which Limits the Availability of Razor Blades.........................................................................................31

    C.      The Threatened Injury to Plaintiffs from the Widespread Availability of Razor Blades Vastly Outweighs any Harm the Preliminary Injunction May Cause Defendants......................................32

    D.      A Preliminary Injunction is Not Adverse to the Public Interest..........................................33

    E.      The Parties Should be Afforded Limited Expedited Discovery Regarding the Customs and Harms Relating to Razor Blades.........................................................................................34

CONCLUSION...................................................................................................................................34

**MEMORANDUM AND POINTS AND AUTHORITIES**

I.    **INTRODUCTION**

Defendants Thomas and Naglich have created an environment where men in their custody suffering from serious mental illness or mental health crises have essentially unlimited access to razor blades.  Double-edged and disposable razors are distributed freely to male prisoners without any tracking or accounting.  At one prison, a box of razor blades is left out in the dorm for prisoners to come and take what they want.  At another, there is a desk drawer where prisoners come to take razor blades as they wish.  At another, there is a guard shack where prisoners ask for and receive as many razors as they or the guard on duty decide.  Prisoners receive new razor blades but are not required to turn in old ones.  Prisoners in segregation and in Residential Treatment Units ("RTU") are provided with razor blades.  Even prisoners on suicide watch have access to razors.[1]

Prisoners suffering from mental illness and mental health crises have slashed their wrists, sliced their forearms, and cut their throats using state-issued razor blades.  In at least one instance, a prisoner killed himself with a razor blade issued by the state.  Defendants failed to address this problem.

Defendants' continued failure to protect prisoners suffering from mental illness and mental health crises is evident in the stories of two of the Plaintiffs, Joshua Dunn and Robert Williams.

---

[1] Residential Treatment Units house prisoners, within the Alabama Department of Corrections, who have serious mental illnesses and are unable to function in the general prison population. Exhibit 1, AR-633 at 1.

Plaintiff Joshua Dunn was placed in segregation in July 2013 at St. Clair Correctional Facility ("St. Clair").   In August 2013, Plaintiff Dunn began suffering from a serious mental health crisis.  He asked to see mental health, but no one responded to his request.  He had several razor blades in his cell.   After asking for mental health care, he was given yet another single-blade disposable razor in his segregation cell.  He used the razor to slice open his forearm. *See generally* Exhibit 2, Declaration of Joshua Dunn Regarding Razor Blades ("Dunn Decl.").  The injury was severe and required several staples to close the wound.  He called out to a guard for help.  The guard threw his hands up and walked away.   Forty-five minutes later, a second guard passed by while serving dinner in the segregation unit.  Plaintiff Dunn showed the guard that he was bleeding.  The guard responded, "I don't give a f**k.  I got chow to serve." *Id.*  Later that evening, two guards finally took Plaintiff Dunn to the infirmary.  He was subsequently placed in suicide watch for three days.  He received no mental health treatment either in suicide watch or upon returning to segregation.  When he returned to his segregation cell, the blood and razor that he used to cut himself were still there, as were the other razors he had prior to cutting himself.  As a result of his self-harm, Dunn was sentenced to an additional month in segregation.  *Id.*

Over the next seven months, Plaintiff Dunn cut himself with razors on four more occasions.  Each time, he asked for mental health care prior to cutting himself but did not receive any response.  Razors were provided to him in segregation, despite his repeated acts of self-harm and his expressed need for mental health care. *Id.*

In early 2014, Plaintiff Dunn removed the blade from a disposable razor and cut himself so deeply that he severed a tendon in his forearm.  When he called to a guard for help, the guard walked off and ignored him.  A nurse later came by for pill call.  Plaintiff Dunn showed the nurse his bleeding arm.  The nurse told him that they would get to him when they had time.

After more than three hours without assistance, Officer McQueen and Sergeant Hamilton arrived. Sergeant Hamilton responded by yelling, "Why the f**k you keep cutting yourself on my shift? ... I'm going to break you from doing that." Plaintiff Dunn was then handcuffed and taken to the outside yard where he was beaten by Officer McQueen and Sergeant Hamilton. While beating him, Sergeant Hamilton warned Plaintiff Dunn that the next time he cut himself they would "let [his] bitch-ass die." He was then left in the yard for an hour. *Id.*

Plaintiff Dunn was eventually taken to the infirmary four hours after he cut himself. His wound was so severe that the nurse sent him to the hospital. Twelve staples were required to close his wound. Plaintiff Dunn was placed in suicide watch for two days – again without mental health care. While in suicide watch, he was provided razors in the shower. When he returned to segregation, he was placed in a cell with more used razors. Plaintiff Dunn is currently in general population at St. Clair and has unrestricted access to razor blades. *Id.*

Plaintiff Robert "Myniasha" Williams has a history of self-harm that she reported to ADOC at intake.[2] In March 2014, Plaintiff Williams was in segregation at Fountain Correctional Facility ("Fountain"). On or about March 2, 2014, Plaintiff Williams cut herself with a double-edged state-issued razor blade. She was subsequently placed in suicide watch. When she returned to her segregation cell the following day, the razor she had used to cut herself was still in her cell. *See generally* Exhibit 3, Declaration of Robert Williams Regarding Razor Blades ("Williams Decl.").

Approximately one week later, Plaintiff Williams again used a state-issued razor to cut herself. This time, she cut herself in front of a guard. She was placed in suicide watch. In the

---

[2] Plaintiff Williams is a transgendered individual who identifies as female. She was born with male anatomy and is classified as male by the Alabama Department of Corrections. In accordance with her preference, she is referred to herein by female pronouns.

suicide watch cell, she found a razor blade and cut herself again.   She was taken to medical then returned to suicide watch.   The razor that she previously found in suicide watch had not been removed from the cell.   She used the razor blade to cut herself again and was taken to medical.   She was able to bring the razor from suicide watch to the medical unit.   Neither guards nor medical staff attempted to confiscate the razor, which Plaintiff Williams used several times to cut herself.   The razor blade remained in her possession until she voluntarily surrendered it to the nurse.   She was returned to segregation without further mental health treatment.   Plaintiff Williams still has access to razor blades. *Id*.

Plaintiffs ask this Court for a preliminary injunction that will enjoin the Defendants' from distributing razor blades to prisoners in a manner that is unrestricted and entirely void of procedures for tracking or collecting razors.   Defendants' current practice fails to protect Plaintiffs and other prisoners in need of mental health care from engaging in self-harm.

## II.   FACTUAL BACKGROUND

The moving Plaintiffs are prisoners incarcerated in men's facilities of Alabama Department of Corrections ("ADOC").   They suffer from serious mental illness or mental health crises and have a history of self-harm.   Plaintiffs have repeatedly cut themselves while in the custody of ADOC.   Yet, Defendants continue to provide Plaintiffs and those similarly situated with razor blades.   Moreover, the lack of adequate medical care in ADOC facilities exacerbates the risk of harm from the availability of razor blades.

Plaintiff Howard Carter has a long history of mental illness and has repeatedly cut himself while in ADOC custody.   He has used razor blades to attempt suicide at St. Clair, Holman Correctional Facility ("Holman") and Donaldson Correctional Facility ("Donaldson").   ADOC regularly provides him with two disposable razor blades prior to taking a shower.   He is

then allowed to take the razors back to his cell.   On many occasions, he has broken the disposable razor, removed the blade and used it to cut himself.   Currently, Plaintiff Carter is in segregation at St. Clair.   On or about July 30, 2014, he was allowed to take a razor to his cell. The razor was never collected.   Plaintiff Carter currently has access to razor blades. *See generally* Exhibit 4, Declaration of Howard Carter Regarding Razor Blades ("Carter Decl.").

Plaintiff Dunn has a documented history of mental health crises.   He cut himself repeatedly with state-issued razor blades while in segregation at St. Clair.   In August 2013, he cut himself with a razor and was taken to the infirmary for several days.   Staples were required to close his wound.   When he returned to his cell three days later, the blood and razor that he cut himself with were still there.   Between August and March 2014, Plaintiff Dunn cut himself on four more occasions and was taken to suicide watch.   In March 2014, he cut himself so deeply that he severed a tendon in his forearm.   The staff nurse sent him to the hospital five hours after he cut himself.   Twelve staples were required to close his wound.   When he returned to segregation, he was placed in a new cell with someone else's used razor blades.   Plaintiff Dunn is now in general population.   He still has access to razor blades. *See generally* Exhibit 2, Dunn Decl.

Plaintiff Daletrick Hardy is currently housed in segregation at St. Clair.   He has a documented history of mental illness and has repeatedly cut himself while in ADOC custody.[3] Plaintiff Hardy has, on several occasions, used disposable razor blades to cut himself in the shower.   On each occasion, he was able to bring the same razor into the suicide watch cell where he continued to cut himself.   In 2005, Plaintiff Hardy attempted to commit suicide using a razor in segregation at Fountain.   In 2012, he attempted suicide using a razor at Donaldson.   He has

---

[3] The trial court ordered that Plaintiff Hardy receive mental health treatment in ADOC as part of his sentence. Exhibit 5, Hardy Order ¶B.

8

attempted suicide using razor blades approximately eight times.  He now serves as an inmate-runner ("runner") and is responsible for distributing razor blades to prisoners in segregation at St. Clair.  Plaintiff Hardy has unlimited access to razor blades. *See generally* Exhibit 6, Declaration of Daletrick Hardy Regarding Razor Blades ("Hardy Decl.").

Plaintiff Leviticus Pruitt is currently housed in segregation at Holman.  He has a documented history of mental illness and has repeatedly cut himself while in ADOC custody.  In December 2013, he cut himself with a razor blade and was placed in suicide watch.  In early 2014, he cut himself with razors on two more occasions and was placed in suicide watch.  In June 2014, he again cut himself with a razor blade and was placed in suicide watch.  Plaintiff Pruitt is still given razor blades and allowed to keep them in segregation. *See generally* Exhibit 7, Declaration of Leviticus Pruitt Regarding Razor Blades ("Pruitt Decl.").

Plaintiff Williams has a documented history of mental illness and has repeatedly cut herself while in ADOC custody.  In March 2014, Plaintiff Williams cut herself several times using state-issued razor blades.  On one occasion, after being taken to the medical unit for cutting herself, she was returned to segregation where the razor that she used to cut herself was still in her cell.  Shortly thereafter, she cut herself again and was taken to suicide watch.  She found a razor blade in the suicide watch cell and used it to repeatedly cut herself.  Plaintiff Williams still has access to razor blades. *See generally* Exhibit 3, Williams Decl.

ADOC requires male prisoners to be clean shaven at all times. Exhibit 8, Excerpt of Male Inmate Handbook at 10.  Male prisoners are provided with free state-issued razor blades to shave. Exhibit 9, AR-338 at 4.  These razors are issued to prisoners in a nearly unrestricted manner.  Razor blades are issued throughout male facilities and can be found in suicide watch, stabilization units, and RTUs. *See* Exhibit 3, Williams Decl. ¶ 10; Exhibit 6, Hardy Decl. ¶ 8;

Exhibit 10, Declaration of Jonathan Sanford Regarding Razor Blades ("Sanford Decl.") ¶ 14; Exhibit 11, Declaration of Richard Businelle Regarding Razor Blades ("Businelle Decl.") ¶ 10. Razor blades are freely accessible to prisoners regardless of mental health risks. *See generally* Exhibit 4, Carter Decl.; Exhibit 2, Dunn Decl.; Exhibit 5, Hardy Decl.  Prisoners with a history of self-harm are provided with razor blades and repeatedly use them to cause self-inflicted injuries. *Id*.

State-issued razor blades include double-edged razors, which can be attached to a metal staff, and single-blade disposable razors. Exhibit 9, AR-338 at 3.  ADOC allows prisoners to purchase additional twin-blade disposable razors from the canteens. *See* Exhibit 12, Declaration of Walter Bennett Regarding Razor Blades ("Bennett Decl.") ¶ 8; Exhibit 13, Declaration of Timothy Sears Regarding Razor Blades ("Sears Decl.") ¶ 7.  ADOC's written policy allows prisoners to possess six state-issued disposable razors and one state-issued double-edged razor and staff. Exhibit 9, AR-338 at 9, 13.  There is no limit on the number of razors that can be purchased from the canteen. *Id*. at 2.[4]

In practice, prisoners are provided with unrestricted access to razor blades.  *See* Exhibit 14, Declaration of Augustus Smith Regarding Razor Blades ("Smith Decl.") ¶ 8; Exhibit 15, Declaration of Chandler Clements Regarding Razor Blades ("Clements Decl.") ¶ 8; Exhibit 2, Dunn Decl. ¶ 19; Exhibit 16, Declaration of Larry Lay Regarding Razor Blades ("Lay Decl.") ¶ 10; Exhibit 17, Declaration of Maxwell Gray Regarding Razor Blades ("Gray Decl.") ¶¶ 3-5; Exhibit 18, Declaration of Rick Martin Regarding Razor Blades ("Martin Decl.") ¶ 10; Exhibit 19, Declaration of Willie McClendon Regarding Razor Blades ("McClendon Decl.") ¶ 13; Exhibit 20, Declaration of Gary Lee Broyles Regarding Razor Blades ("Broyles Decl.") ¶ 18.

---

[4] The result of ADOC's written policy is that a single prisoner, regardless of his mental health history and without disciplinary consequences, can at one time possess seven state-issued razors and unlimited razors from the canteen.

Razors are distributed by both runners and guards.  Prisoners often receive multiple razors at one time. *See generally id.*

At Staton Correctional Facility ("Staton"), prisoners are issued double-edged razors from the officers' cubicle.[5] They can get two single-blade disposable razors twice a day from laundry and can purchase three 3-packs of twin-blade disposable razors from the canteen. Exhibit 14, Smith Decl. ¶¶ 4-6; Exhibit 15, Clements Decl. ¶¶ 5-6.  In the infirmary, prisoners are given four or five disposable razors at a time. Exhibit 16, Lay Decl. ¶ 5.  At Holman, in segregation, prisoners are distributed razors in the shower and allowed to take them back to their cells. Exhibit 7, Pruitt Decl. ¶ 9; Exhibit 4, Carter Decl. ¶¶ 15-17.  At Limestone Correctional Facility ("Limestone"), prisoners are distributed five disposable razors from the shift office or from the officers' cubicle.  Exhibit 19, McClendon Decl. ¶ 10.

At Easterling Correctional Facility ("Easterling"), one or two disposable razors are passed out by runners every Friday night.  Prisoners can get double-edged razors from the officers' cubicle and can buy three 3-packs of disposable razors from the canteen. Exhibit 21, Declaration of Roger Moseley Regarding Razor Blades ("Moseley Decl.") ¶¶ 4-5, 8; Exhibit 22, Declaration of Marty George Regarding Razor Blades ("George Decl.") ¶¶ 4-6; Exhibit 12, Bennett Decl. ¶¶ 6-8.  In segregation at Easterling, razors are given to prisoners in the shower and often are taken back to prisoners' cells. Exhibit 22, George Decl. ¶¶ 12-13.  In the honor dormitory, prisoners can receive multiple disposable razors a day from a runner and have access to an unlocked desk where disposable razors are stored. Exhibit 21, Moseley Decl. ¶¶ 5-7.  At Donaldson, prisoners are issued disposable razors, but double-edged razors are still available. Exhibit 23, Declaration of William Villar Regarding Razor Blades ("Villar Decl.") ¶¶ 8-9.  At

---

[5] The officers' cubicle is a station located within prison dormitories which is commonly referred as a "cube", "cubicle", or "dorm cubicle."

Ventress Correctional Facility ("Ventress"), prisoners receive two disposable razors from a runner every Saturday night.  They can get multiple disposable razors from the officers' cubicle and can buy twin-blade disposable razors from the canteen. Exhibit 24, Declaration of Charlie Henderson Regarding Razor Blades ("Henderson Decl.") ¶ 4, Exhibit 13, Sears Decl. ¶¶ 5-7.  A box of 20 to 30 disposable razors is often set out in the open dormitory.  Prisoners are allowed to take as many razors as they want. Exhibit 24, Henderson Decl. ¶ 5.

At Hamilton Aged & Infirmed ("Hamilton"), runners distribute single-blade disposable razors on Mondays.  Twin-blade disposable razors can be purchased from the canteen.  Single-blade disposable razors can also be obtained from medical. Exhibit 25, Declaration of Daniel Tooley Regarding Razor Blades ("Tooley Decl.") ¶¶ 4-5; Exhibit 26, Declaration of Zerrick Naylor Regarding Razor Blades ("Naylor Decl. ¶ 3); Exhibit 27, Declaration of Jermaine Mitchell Regarding Razor Blades ("Mitchell Decl.") ¶¶ 5-6.  At St. Clair, prisoners are given as many double-edged or disposable razors as they want from the guard shack.  They can buy twin-blade disposable razors from the canteen. Exhibit 2, Dunn Decl. ¶¶ 19-20; Exhibit 17, Gray Decl. ¶ 5; Exhibit 18, Martin Decl. ¶¶ 6-8.  In segregation at St. Clair, prisoners receive disposable razors from a runner.   Double-edged razors can be taken from general population into segregation. Exhibit 5, Hardy Decl. ¶ 12.  At Bibb Correctional Facility ("Bibb"), prisoners can get disposable razors from the shift office daily.  They can get razors from the guard in laundry twice a week and can buy three 3-packs of twin-blade disposable razors from the canteen each week.  In one dormitory, double-edged razors are not distributed but are still accessible to prisoners.  In other dormitories, double-edged razors can be obtained from I.C.S. Exhibit 28, Declaration of John Maner Regarding Razor Blades ("Maner Decl.") ¶ 7; Exhibit 29, Declaration

of Tedrick Brooks Regarding Razor Blades ("Brooks Decl.") ¶ 8; Exhibit 30, Declaration of Joseph Torres Regarding Razor Blades ("Torres Decl.") ¶ 7.

At Draper Correctional Facility ("Draper"), prisoners receive disposable razors from the guard in laundry daily.  They can get razors from the chapel or buy three 3-packs of twin-blade disposable razors from the canteen. Exhibit 31, Declaration of Julius Bowe Regarding Razor Blades ("Bowe Decl.") ¶¶ 5-7.  At Kilby Correctional Facility ("Kilby"), guards distribute disposable razors to prisoners daily.  Prisoners are allowed to get as many razors as they want from a drawer in the officers' cubicle.  They can buy a 3-pack of twin-blade disposable razors from the canteen each week. Exhibit 32, Declaration of Dwight Hagood Regarding Razor Blades ("Hagood Decl.") ¶¶ 5, 7; Exhibit 33, Declaration of Turner Rogers Regarding Razor Blades ("Rogers Decl.") ¶¶ 5-6.  At Elmore Correctional Facility ("Elmore"), double-edged razors are distributed by runners in the laundry room.  Prisoners can obtain two disposable razors from the officers' cubicle twice a day.  Some guards allow prisoners to get as many razors as they want.  Prisoners can buy two 3-packs of twin-blade disposable razors from the canteen. Exhibit 20, Broyles Decl. ¶¶ 5-9.  At Fountain, in general population, prisoners can obtain single-blade disposable razors from the shift office.  Prisoners are allowed to take as many razors as they want from a box multiple times a day.  In the "hot dorm," prisoners get razors from the guard at the front gate.[6]  Some guards pass out two single-blade disposable razors.  Other guards give prisoners as many razors as they want.  In segregation at Fountain, guards distribute razors to inmates as they enter the shower.  One guard collects razors after prisoners shower when he is on duty.  Most guards, however, allow prisoners to take razors back to their cells.  Double-edged razors are available to barbers and runners.  Exhibit 3, Williams Decl. ¶¶ 11-12.

---

[6] The "hot dorm" houses prisoners with minor disciplinary charges. Exhibit 3, Williams Decl. ¶3.

At Bullock Correctional Facility ("Bullock"), in the mental health dormitory, prisoners can get disposable razors from a runner or guard in the laundry room daily. Disposable razors are distributed by guards in the dormitories or at the shift office daily. Prisoners can buy a 3-pack of twin-blade disposable razors from the canteen each week. Double-edged razors are accessible to prisoners. Razor blades are also accessible in disciplinary segregation and suicide watch cells. Exhibit 34, Declaration of Robert Dillard Regarding Razor Blades ("Dillard Decl.") ¶ 12; Exhibit 10, Sanford Decl. ¶ 14; Exhibit 11, Businelle Decl. ¶ 10. In the RTU, prisoners obtain razor blades from the officers' cubicle. They can buy a 3-pack of twin-blade disposable razors from the canteen. Exhibit 35, Declaration of Richard Terrell Regarding Razor Blades ("Terrell Decl.") ¶¶ 5-6.

ADOC has no way of knowing whether prisoners possess more razors than allowed by written policy. System-wide, ADOC fails to track razors as they are being distributed, and they fail to collect them once distributed. Exhibit 2, Dunn Decl. ¶ 19; Exhibit 4, Carter Decl. ¶¶ 15-17; Exhibit 5, Hardy Decl. ¶ 8; Exhibit 7, Pruitt Decl. ¶ 9. As a result, razor blades are accessible to prisoners everywhere. Double-edged and disposable razor blades are commonly found lying on prisoners' beds, dormitory and cell floors, window sills, within bathrooms and showers, in classrooms, and even on outside grounds. Exhibit 13, Sears Decl. ¶ 12; Exhibit 22, George Decl. ¶ 9; Exhibit 28, Maner Decl. ¶ 13; Exhibit 30, Torres Decl. ¶ 13; Exhibit 30, Bowe Decl. ¶ 11; Exhibit 32, Hagood Decl. ¶ 8; Exhibit 34, Dillard Decl. ¶ 18; Exhibit 10, Sanford Decl. ¶ 14; Exhibit 11, Businelle Decl. ¶ 13; Exhibit 35, Terrell Decl. ¶ 11. Razors lying in the open and clearly abandoned are still not collected. In some facilities, this has resulted in mentally ill prisoners picking up used razors which they subsequently use as their own. Exhibit 22, George Decl. ¶ 11. When prisoners are found with excessive amounts of razor blades, they

are not reprimanded and the razors are not collected. Exhibit 31, Bowe ¶ 11; Exhibit 34, Dillard ¶ 11; Exhibit 10, Sanford Decl. ¶ 13; Exhibit 11, Businelle Decl. ¶ 12.

Defendants Thomas and Naglich are aware that the current policy and practice of razor blade distribution and availability in ADOC facilities fails to protect prisoners suffering from mental health crises from engaging in self-harm.   On January 21, 2011, an incident report was made by ADOC, documenting the death of a prisoner who committed suicide at Limestone using a state-issued razor blade.  The incident was investigated by Investigation & Intelligence ("I&I") and a variety of statements and reports were made.  Exhibit 36, LCF Incident Report.  Defendant Thomas received a copy of these documents and reports.[7]  Exhibit 37, AR-300 at 5.  Razors remained widely available.

In August 2013, Plaintiff Dunn was taken to the infirmary after harming himself with a razor.  He received a disciplinary citation for his self-harm. Exhibit 2, Dunn Decl. ¶ 9.  All disciplinary citations are documented in a written report. Exhibit 38, AR-403 at 3.  Disciplinary charges are investigated at the institutional level or by I&I. *Id.*  Disciplinary reports are received and approved by the Warden and Division Director. *Id.* at 12.  I&I investigations are reported directly to Defendant Thomas. Exhibit 37, AR-300 at 5.

In early 2014, Plaintiff Dunn was taken to the hospital after harming himself with a razor. Exhibit 2, Dunn Decl. ¶ 16.  Incidents involving prisoner hospitalizations are investigated by I&I.  Exhibit 37, AR-300 at 2.  I&I investigations are reported directly to Defendant Thomas.  *Id.* at 5.

---

[7] I&I investigations are directed by the Commissioner or sometimes by the Warden or Division Director.  The Director of I&I is responsible only to the Commissioner of ADOC.  I&I reports are distributed to the Commissioner and Deputy Commissioners. Exhibit 37, AR-300 at 5.

On or about January or February 2014, a prisoner attempted suicide by cutting his throat with a razor blade in segregation.  The prisoner had a history of self-harm. Exhibit 2, Dunn Decl. ¶ 22. ADOC requires that attempted suicides be documented in monthly mental health reports. Exhibit 39, AR-629 at 7.   These reports are provided to ADOC's Office of Health Services ("OHS").  OHS is directed by Defendant Naglich.[8] *Id*.; Exhibit 40, AR-700 at 3; Exhibit 41, MHM Agreement §4.2.

On April 9, 2014, Plaintiffs' counsel sent a letter to Defendant Thomas, notifying him that ADOC was failing to protect prisoners with mental illness and mental health crises from self-harm.[9]  The letter specifically addresses ADOC's policies and practices with regard to razor blades.  It states:

> Perhaps the most egregious area of ADOC's failure to protect is its policies and practices with regard to razor blades.  ADOC provides prisoners with disposable razors in their cells for shaving.  These razors are never collected or accounted for by prison authorities after use.  This is true even in the RTUs, and no exception is made for individuals with a documented history of using the razor in suicide attempts in the past.

Exhibit 42, April 9, 2014 Morris Letter at 24.   The letter further details examples of prisoners who have used razor blades to injure themselves and ADOC's failure to protect these prisoners from harm. *Id*.  The letter was followed by a meeting with Defendants on May 20, 2014.  The meeting specifically addressed the risk of harm relating to razor blades. Exhibit 43, June 6, 2014 Addison Letter at 1.

---

[8] In cases of attempted suicides, form MH-004 is completed.  This form is a detailed review of inmate suicides and life threatening attempts and is formulated to improve the quality of mental health programs within ADOC.  Form MH-004 is provided to the Office of Health Services along with monthly reports. Exhibit 39, AR-629 at 6.

It is believed that the prisoner who attempted suicide in January or February 2014 was taken to an outside hospital for care.  Exhibit 2, Dunn Decl. ¶22.  If taken to the hospital, the incident would have been investigated by I&I and reported to Defendant Thomas. Exhibit 37, AR-300 at 2.

[9] The letter written to ADOC was an extensive report of the findings from Plaintiffs' counsel's inspections of ADOC's major facilities.  Razor blades were one of many failures reported to ADOC in the letter.

On June 6, 2014, ADOC counsel Alyce Robertson Addison responded to the issue of availability of razor blades at the direction of Defendant Thomas.  The response states that ADOC investigated the razor blade issue and "has taken action to remedy" the situation.  *Id*. ADOC's plan consists of no longer ordering double-edged razors for any facilities and "immediately" stopping the distribution of double-edged razors in facilities with RTUs. *Id*.  The letter claims that ADOC will establish a group to formulate a policy that addresses the distribution of razor blades. *Id*. It also promises that "Inmates in closed Residential Treatment Units, Stabilization Units, and on suicide watch will be issued plastic single-edge disposable razors only at shower times with the number of razors issued accounted for and collected immediately after showers."  The letter acknowledges that changes in ADOC's practices are "warranted." *Id*. at 2.

Since June 2014, little has changed to improve ADOC's unrestricted practice of distributing razor blades to prisoners.   At most facilities, prisoners report that double-edged razors continue to be distributed and are accessible to prisoners with a history of self-harm. *See generally* Exhibit 4, Carter Decl.; Exhibit 2, Dunn Decl.; Exhibit 5, Hardy Decl.; Exhibit 7, Pruitt Decl.; Exhibit 3, Williams Decl.  At other men's facilities, there are slight but ineffective changes.

At Donaldson and in parts of Bibb, ADOC recently stopped distributing double-edged razors.  No effort was made to collect double-edged razors already in population. As a result, these razors are still widely available. Exhibit 23, Villar Decl. ¶ 9; Exhibit, Maner Decl. ¶ 7; Exhibit 29, Brooks Decl. ¶ 8.  At Elmore, double-edged razors are no longer distributed at the shift office.  They are still distributed by a runner in the laundry room. Exhibit 20, Broyles Decl. ¶ 17.  At Bullock, a facility with an RTU, double-edged razors are not distributed but widely

accessible.  Double-edged razors that are already in population have not been collected. Exhibit 34, Dillard Decl. ¶ 12; Exhibit 11, Businelle Decl. ¶ 11.   In the mental health dormitories at Bullock, no efforts have been initiated to track or collect razors. Exhibit 10, Sanford Decl. ¶ 9, Exhibit 34, Dillard Decl. ¶¶ 9-11; Exhibit 11, Businelle Decl. ¶¶ 5-6.   Razor blades are still accessible in suicide watch cells. Exhibit 10, Sanford Decl. ¶ 14.   In the RTU at Bullock, there is no consistent process for turning in razor blades. Prisoners are generally allowed to receive new razors without turning in old ones.  Razor blades purchased from the canteen are not collected and entirely unaccounted for. Exhibit 35, Terrell Decl. ¶¶ 5-7.

At Julia Tutwiler Prison for Women ("Tutwiler"), ADOC's distribution of razor blades to female prisoners is vastly different from its distribution of razor blades at men's facilities.   At Tutwiler, only disposable razors are available to prisoners.  Exhibit 44, Declaration of Casey Couch Regarding Razor Blades ("Couch Decl.") ¶ 5.  Razor blades are distributed to prisoners once a month. *Id*.  Prisoners are required to turn in old razors in order to get new ones.  *Id*.  In segregation, female prisoners are not allowed to have razors in their cells.   Prisoners in segregation are given razors as they enter the shower and razors are collected when they exit the shower. *Id*. ¶ 6.   In the RTU, prisoners previously received razors in the same manner as prisoners in general population. *Id*. ¶ 9.   In early August 2014, a female prisoner cut her own throat using a razor blade.  ADOC immediately responded by removing all razors from the RTU. Prisoners in the RTU no longer have access razor blades. *Id*.

## III.   ARGUMENT

Defendants Thomas and Naglich are deliberately indifferent to the substantial risk of serious harm created by their unrestricted distribution of razor blades to male prisoners.  The Defendants have a constitutional obligation to provide adequate medical and mental health care

to the persons in ADOC custody.  *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).

Providing adequate mental health care includes protecting mentally ill persons and persons

suffering from mental health crises from self-harm.  *Belcher v. City of Foley*, 30 F.3d 1390, 1396

(11th Cir. 1994).  Defendants' policies and customs regarding razor blades violate Plaintiffs'

right to adequate medical and mental health care under the Eighth and Fourteenth Amendments.

A federal court has inherent authority to issue an injunction to remedy a violation of

constitutional rights.  *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004).

Preliminary injunctive relief is warranted here because: (1) there is a substantial likelihood that

Plaintiffs  will succeed in demonstrating Defendants' deliberate indifference to the risk of harm

from their policies and customs of making razor blades widely available to prisoners suffering

from mental illness or mental health crises; (2) Plaintiffs and those similarly situated will suffer

irreparable injury unless the injunction issues; (3) the threatened injury to Plaintiff outweighs

whatever damage the proposed injunction could cause Defendants party; and (4) the injunction

would not be adverse to the public interest.  *See McDonald's Corp. v. Robertson*, 147 F.3d 1301,

1306 (11th Cir. 1998).

### A. Plaintiffs Will Be Able to Show that Defendants are Deliberately Indifferent to the Risk of Serious Harm Caused by Unrestricted Access to Razor Blades

A likelihood of success on the merits is generally the most important factor when

considering whether to grant a motion for preliminary injunction.  *Schiavo v. Schiavo*, 357 F.

Supp. 2d 1378, 1383 (M.D. Fla. 2005), *aff'd*, 403 F.3d 1223 (11th Cir. 2005).  The moving party

must establish a showing of "only *likely*, rather than *certain*, success."  *See Home Oil Co., Inc. v.

Sam's E., Inc*., 199 F. Supp. 2d 1236, 1249 (M.D. Ala. 2002).  In cases where the "balance of

equities weighs heavily in favor of granting the injunction, the movant[s] need only show a

substantial case on the merits." *Cent. Alabama Fair Hous. Ctr. v. Magee*, 835 F. Supp. 2d 1165, 1175 (M.D. Ala. 2011); *see also Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. June 1981).

Here, Plaintiffs are likely to succeed on the merits of their claim that Defendants Thomas and Naglich are deliberately indifferent to the mental health needs of Plaintiffs in that they have, for years, allowed the unrestricted distribution of razor blades.  Moreover, the equities weigh heavily in favor of granting an injunction.

Prison officials who display deliberate indifference to the serious psychiatric needs of a prisoner, or deliberate indifference to a "strong likelihood" that a prisoner will take his own life, violate the Eighth Amendment and may be liable under § 1983. *Estelle v. Gamble*, 429 U.S. at 104-05, 97 S.Ct. at 291; *Edwards v. Gilbert*, 867 F.2d at 1274-75 (11th Cir. 1989); *Cagle v. Sutherland*, 334 F.3d 986; *Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1540 (11th Cir. 1994); *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990).

To establish that a prison official is deliberately indifferent, a plaintiff must demonstrate that (1) a substantial risk of serious harm exists; (2) defendants disregard such risk; and (3) there is a causal connection between defendant's indifference and plaintiff's injury. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).

Furthermore, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *Canton*, 489 U.S. at 388).  A causal connection exists "where a policy or custom that [an official] established or utilized results in deliberate indifference to an inmate's constitutional rights." *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986)  (citing *Ancata v. Prison Health*

*Services, Inc.*, 769 F.2d 700, 706 (11th Cir. 1985); *See also Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (defining custom as a "longstanding and widespread practice" authorized by officials) and *Craig v. Floyd County*, 643 F.3d 1306, 1310 (11th Cir. 2011) (noting that because government entities rarely have written or express policies that endorse constitutional violations, plaintiffs must show that defendants had a "custom or practice of permitting the violation" or that the "custom or practice was the moving force" behind the violation).

Here, Plaintiffs will be able to show deliberate indifference on the part of Defendants Thomas and Naglich.

1. <u>Distributing razor blades to prisoners, without tracking or collecting them, creates a substantial risk of serious harm</u>

The distribution of razor blades to prisoners with a documented history of mental illness and mental health crises creates a substantial risk of serious harm.

ADOC provides prisoners with double-edged razor blades that are sharp on both sides. It also provides single-blade disposable razors and access to twin-blade disposable razors. These razors are inherently dangerous. Razors are sharp enough to cut paper, packaging, hair, and food. Exhibit 10, Sanford Decl. ¶ 9; Exhibit 34, Dillard Decl. ¶ 13; Exhibit 33, Rogers Decl. ¶ 9; Exhibit 32, Hagood Decl. ¶ 11; Exhibit 29, Brooks Decl. ¶ 10. Even razors so-called safety razors can cause a great amount of harm. Prisoners frequently remove the blades from disposable razors and use them to inflict injuries. Plaintiffs Dunn, Carter, and Hardy have each used disposable razors to cut themselves. Exhibit 2, Dunn Decl. ¶ 13; Exhibit 4, Carter Decl. ¶ 11; Exhibit 5, Hardy Decl. ¶ 8. Plaintiff Dunn cut himself so deeply with one of these razors that he severed a tendon in his forearm. Exhibit 2, Dunn Decl. ¶ 15.

The dangerous nature of razor blades is heightened by the fact that ADOC provides prisoners with unlimited access to razors.  At Staton and Fountain, prisoners can obtain razor blades multiple times a day.  At most other facilities, prisoners are issued or allowed to get multiple razors at a time.  At Ventress, a box of 20 to 30 razors is regularly left out in order for prisoners to take as many as they want. Exhibit 24, Henderson Decl. ¶ 5.  At Easterling, prisoners have access to a desk drawer where they get as many razors as they want.  At St. Clair, Kilby, Elmore, Fountain, and Ventress, prisoners can obtain numerous razors from the guard shack or officers' cubicle. *See e.g.* Exhibit 3, Williams Decl.; Exhibit 13, Sears Decl.; Exhibit 20, Broyles Decl.; Exhibit 4, Carter Decl.; Exhibit 32, Hagood Decl.

ADOC's custom of distribution is particularly unsafe given that it distributes razor blades without any accounting or collection process.  Runners and guards distribute razors but do not keep logs of how many razors are distributed. *Id*.  They do not require prisoners to return old razors before receiving new ones.  Razors are not collected during searches or shake-downs. Exhibit 13, Sears Decl. ¶ 9.  At Easterling, a guard found eight to ten razors in a prisoner's possession and did not collect them. *Id*.

As a result of there not being a collection process, razors can be found throughout ADOC's prisons.  This creates a serious risk of harm for prisoners suffering from mental illness and mental health crises.[10]  Abandoned razors are commonly picked up and used by mentally ill prisoners. Exhibit 22, George Decl. ¶ 11.  Prisoners find razors abandoned in cells, showers,

---

[10] Most research on prison suicide has found that, among other factors, the vast majority of victims have histories of prior suicides and/or mental illness. A. Daniel, J. Fleming, *Suicides in State Correctional System, 1992-2002: A Review*. 12 J. Correction Health Car 24-35 (2006); X.Y. He, A.R. Felthous, C.E. Holzer, *Factors in Prison Suicide: One Year Study in Texas*, 46 J. Forensic Sci. 896-901 (2001); R.F. Patterson, K. Hughes, *Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004*, 59 Psychiatr. Serv. 676-682 (2008); M. Salive, G. Smith, T. Brewer, *Suicide Mortality in the Maryland State Prison System, 1979 Through 1987*, 262 JAMA 365-369 (1989); T. White, D. Schimmel, National Institute of Corrections, US Department of Justice, *Suicide: An Overview and Guide to Prevention*, 46-57 (1995).

bathrooms and outside. *See e.g.* Exhibit 13, Sears Decl. ¶ 12; Exhibit 22, George Decl. ¶ 9; Exhibit 28, Maner Decl. ¶ 13; Exhibit 30, Torres Decl. ¶ 13.  They can also obtain razors from units with the highest risk for mental illness and suicide.

Razors are commonly found in segregation units and suicide watch cells.  At St. Clair, disposable razors are distributed by runners and double-edged razors can be taken from general population into segregation units. Exhibit 5, Hardy Decl. ¶ 12; Exhibit 46, Declaration of Christopher Jackson ¶ 11.  At Holman, Easterling, and Fountain, disposable razors are distributed in the shower, but prisoners are allowed to take razors back to their cells. Exhibit 7, Pruitt Decl. ¶ 9, Exhibit 22, George Decl. ¶¶ 12-13; Exhibit 3, Williams Decl. ¶ 11.  At Bullock, loose blades can be found in suicide watch and segregation cells in the RTU. Exhibit 10, Sanford Decl. ¶ 14.  This practice creates a substantial risk of harm to prisoners with a history of injuring themselves.  It is well-known throughout the corrections industry that "a disproportionate number of suicides take place in segregation units."[11]  Providing prisoners in segregation with unrestricted access to razor blades creates a strong likelihood that self-inflicted injuries will occur.

There is also a strong likelihood that prisoners will engage in self-harm when razors are distributed and not collected in mental health units and RTUs.  These units house prisoners with the most serious mental illnesses. Exhibit 1, AR-633 at 1, 4.  Still, ADOC issues razors to these prisoners without regard for obvious risks associated with mental health.  At Bullock, in the mental health dormitories, prisoners are issued disposable razors multiple times a day. Exhibit 10, Sanford Decl. ¶¶  5-6. Some prisoners possess 10 to 15 razors at one time. Exhibit 11, Businelle Decl. ¶ 7.  These razors are issued but not collected.  In the RTU at Bullock, prisoners

---

[11] Hayes, Lindsay M. "Toward a Better Understanding of Suicide Prevention in Correctional Facilities." Handbook of Correctional Mental Health 2nd Ed. p241, 2010; Exhibit 45, Declaration of Eldon Vail ("Vail Decl.") ¶14.

are given razors at the officers' cubicle.  These razors are generally not collected.  Exhibit 35, Terrell ¶ 5.  Prisoners in the RTU can also purchase razors at the canteen.  These razors are never collected. *Id*. ¶ 6.  The result is that prisoners who want to hurt themselves have easy access to razor blades.  Exhibit 11, Businelle  ¶ 11.  On or about August 22, 2014, a prisoner in the RTU used the blade from a disposable razor to cut his arm.  The injury left blood throughout the hallway and 10 stitches were needed to close his wound. Exhibit 34, Dillard Decl. ¶ 14; Exhibit 35, Terrell Decl. ¶ 9.

In early August 2014, a prisoner in the Bullock RTU cut himself using a disposable razor. Guards responded by giving him a band aid. Exhibit 35, Terrell Decl. ¶ 9.  In June 2014, a prisoner in the Bullock RTU cut himself 10 times with a disposable razor.  He told a guard that he would do so just before doing it.  The guard said, "You better not," but failed to take away the prisoner's razor. Exhibit 11, Businelle ¶ 9.  In May 2014, a prisoner in the Bullock RTU cut himself multiple times down the front of his arms.  He showed his injuries to a guard.  The guard responded by saying, "Wipe off that blood and go back to your dorm." *Id*.  In February 2014, a prisoner cut himself with a disposable razor in the Bullock RTU. Exhibit 34, Dillard Decl. ¶ 14. In November 2013, an inmate cut both of his wrists with a disposable razor blade after the guard issued him a razor and did not collect it. *Id*. ¶ 16.  A prisoner in the Bullock RTU cut his wrist in suicide watch with a razor given to him by a guard. Exhibit 34, Businelle ¶ 10.

The risk of harm is further heightened by Defendants' failure to provide adequate medical care.  A prisoner died in 2011 after being found some time after cutting himself once he had lost so much blood he could not be saved.  Exhibit 36, LCF Incident Report.   After Plaintiff Dunn cut his arm and severed his tendon, he was allowed to bleed for about five hours before he was taken to the hospital to have his wounds stapled shut.  Exhibit 2, Dunn Decl. ¶¶ 13-15.

2. <u>Defendants are aware of the substantial risk of serious harm created by their practice of distributing razor blades to prisoners with psychiatric needs</u>

Defendants have long known that their custom of providing razor blades to prisoners creates a substantial risk of serious harm.  Defendants have knowledge of actual harm caused to prisoners and the risk of future harm is obvious.

To establish deliberate indifference, an official must have subjective knowledge that prisoners face a risk of harm. *Caldwell v. Warden*, *FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014); *Hope v. Pelzer*, 536 U.S. 730, 737-738 (2002).  Subjective knowledge can be inferred where the risk of harm is obvious.  *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir.1990); *Ancata*, 769 F.2d at 704; *City of Canton,* 489 U.S. at 396.

Here, the risk of harm to Plaintiffs is obvious.  Plaintiffs suffer from known mental health crises and have a documented history of self-harm.  Plaintiffs and other prisoners have repeatedly cut themselves with razor blades in ADOC's custody.  Plaintiff Hardy attempted to commit suicide eight times using razor blades.  Exhibit 5, Hardy Decl. ¶ 16.  Plaintiff Dunn cut his wrists five times over a period of seven months. Exhibit 2, Dunn Decl. ¶¶ 6, 8, 11.  Plaintiff Pruitt cut himself four times over a period of six months. *See generally* Pruitt Decl.  Plaintiff Williams cut herself four times within one month, including twice while in suicide watch. Exhibit 3, Williams Decl. ¶¶ 9-10.

It is clear that Plaintiffs exhibit consistent patterns of cutting themselves with razor blades.  If ADOC continues its unrestricted practice of distributing razors to prisoners, it is foreseeable that Plaintiffs and other prisoners with mental health crises will continue to engage in self-harm.

Defendants also have actual knowledge that ADOC's practices result in harm to prisoners, and in one instance, death.  On January 21, 2011, an ADOC incident report

documented the death of a prisoner who committed suicide using a state-issued razor blade.  The prisoner cried out for medical attention before cutting his wrists.  The incident was investigated and reported to Defendant Thomas. Exhibit 36, LCF Incident Report; Exhibit 37, AR-300 at 5.  Defendant Thomas, therefore, has actual knowledge that ADOC's distribution of razor blades creates a serious risk of harm for prisoners with mental health crises.

Since the razor-related suicide in 2011, ADOC has continued its practice of distributing razor blades to prisoners without supervision, tracking, or collection.  The result is that several prisoners have harmed themselves using state-issued razors.  Defendants are aware of many of these incidents.

In early 2014, Plaintiff Dunn cut himself so deeply that he was taken to the hospital.  Exhibit 2, Dunn Decl. ¶ 16.   Also in early 2014, another prisoner at St. Clair had to go to the hospital when he attempted suicide by cutting his throat with a razor.   These incidents were documented and reported to Defendants Thomas and Naglich. Exhibit 37, AR-300 at 5; Exhibit 39, AR-629 at 7; Exhibit 40, AR-700 at 3; Exhibit 41, MHM Agreement §4.2.

In August 2013, Plaintiff Dunn received a disciplinary citation for cutting himself.  Exhibit 2, Dunn Decl. ¶ 9.  The disciplinary action was documented and reported to Defendant Thomas.  Exhibit 38, AR-403 at 3; Exhibit 37, AR-300 at 5.

On April 9, 2014, Defendant Thomas was notified in writing that ADOC's custom of distributing razor blades was harmful to prisoners suffering from mental illness and prisoners with a history of self-harm.  The letter detailed several accounts of prisoners who cut themselves with razor blades. Exhibit 42, April 9, 2014 Morris Letter at 24.  On May 20, 2014, Plaintiffs' counsel met with Defendants and further discussed the harm being caused by razor blades.

Plaintiffs' counsel requested that Defendants immediately address the issue. Exhibit 43, June 6, 2014 Addison Letter at 1.

On June 6, 2014, Defendant Thomas agreed that changes in ADOC's custom of distributing razor blades were warranted and promised to take immediate action.   Despite Defendants' acknowledgment of the risk, no meaningful action has been taken. *Id.* at 2.

3.   Defendants disregard the substantial risk of harm facing prisoners with psychiatric needs

Despite knowledge of the problem and widespread recognition within the corrections industry of the risk of suicide, Defendants have failed for years to take necessary steps to control razors within the ADOC prisons.

Completed suicides and attempts that are serious enough to require a visit to the emergency room should prompt a review process looking into:

> (1) the circumstances surrounding the incident; (2) institutional procedures relevant to the incident; (3) all relevant training received by involved staff; (4) pertinent medical and mental health services/reports involving the victim; (5) possible precipitating factors leading to the suicide or attempt; and (6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.[12]

Similarly, the American Correctional Association, one of the primary accrediting bodies for correctional healthcare, considers it mandatory that prisons have a suicide prevention plan that includes a process for "critical incident debriefing" regarding the "management of suicidal incidents, suicide watch, assaults, prolonged threats, and death of an offender or staff."[13] However, following the completed suicide in 2011, and the two attempts requiring hospital visits

---

[12] Lindsay M. Hayes, *Toward a Better Understanding of Suicide Prevention in Correctional Facilities*, *In Handbook of Correctional Mental Health* 241 (2d ed.  2010).

[13] American Correctional Association, *Standards for Adult Correctional Institutions*, Suicide Prevention and Intervention, 4-4373 at 110 (4th 2003).

in early 2014 at St. Clair (*see* Exhibit 2, Dunn Decl. ¶¶ 16, 22), there were no reviews resulting in any real changes.

Further, even once ADOC agreed that changes were needed after Plaintiffs brought these issues to their attention, the changes have been minimal.  According to Eldon Vail, the former secretary of the Washington State Department of Corrections, "Despite the assurances in the June 6, 2014 letter from ADOC counsel over two months has passed and *there has not been sufficient change* in practice to protect the prisoners from the misuse of razor blades."[14] Exhibit 45, Vail Decl. at ¶ 8 (emphasis added).

Since promising to change its practice involving razor blades, Defendants have implemented almost no changes in its facilities.  At Easterling, Elmore, Fountain, Hamilton, Limestone, Kilby, Staton, St. Clair, and Ventress, no changes in distribution have been made during the past two months.  At Donaldson and in parts of Bibb, double-edged razors are no longer distributed, but are still widely accessible to prisoners. *See e.g.* Exhibit 23, Villar Decl. ¶ 9; Exhibit 28, Maner Decl. ¶7.  At Bullock, double-edged razors also remain available. Exhibit 10, Sanford Decl. ¶ 8.  At all facilities, razors are neither consistently collected nor accounted for.  Double-edged razors remain in population and are entirely untracked.

Defendants continue to disregard the serious risk of harm that Plaintiffs are suffering.  As recently as July 30, 2014, Plaintiff Carter, who has a long history of self-harm, was able to keep a razor blade in his segregation cell.[15] Exhibit 4, Carter Decl. ¶ 17.  Plaintiff Hardy, who

---

[14] Eldon Vail has nearly thirty-five years of experience working in the field of adult and juvenile corrections.  He has served as a superintendent at three adult prisons, Deputy Secretary to the Washington State Department of Corrections for seven years, and Secretary of the Washington State Department of Corrections for four years. Exhibit 45, Vail Decl. ¶¶ 1-2 .

[15] Defendants disregard standard practices for adult correctional institutions.  It is known throughout the corrections industry that segregation units have higher incidents of suicide. Exhibit 45, Vail Decl. ¶14.  The American Correctional Association ("ACA") recommends that personal care items, such as razors, not be given to prisoners in segregation where there is "danger that an inmate or any other inmate(s) will destroy an item or induce self-injury."

also has a long history of self-harm, not only has access to razors in segregation, ADOC entrusts him with distributing them to other prisoners.  Exhibit 5, Hardy Decl. ¶ 10.  This gives him unlimited access to razors.  The remaining Plaintiffs also continue to receive razor blades that are not tracked or collected.  Prisoners in RTUs are still provided with unrestricted access to razor blades.

Nearly three months have passed since Defendants admitted that change was "warranted," but no real changes have been implemented in male facilities.  Defendants promised immediate action, but no meaningful action has been taken.  Even if the proposed changes had been implemented, they would not be sufficient to satisfy Defendants obligation to protect prisoners from self-inflicted injuries.  According to the expertise of Mr. Vail, "ADOC officials failed to develop and articulate a full solution to the problem of razors and self-harm in their prisons in their letter of June 6, 2014." Exhibit 45, Vail Decl. ¶ 14.

Defendants have had ample time to implement safer processes for distributing and tracking razor blades.  According to the expertise of Mr. Vail, ADOC's current practice of distributing razor blades "could be corrected in a matter of weeks." Exhibit 45, Vail Decl. ¶ 8.  ADOC's ability to make corrections quickly is apparent from its recent change in the distribution of razors at Tutwiler.  In early August 2014, a female prisoner cut her throat in the RTU.  Immediately, razor blades were collected in the RTU and are no longer being distributed to prisoners in that unit. Exhibit 44, Couch ¶ 9.  The immediate response at Tutwiler is evidence that ADOC's practices are problematic but can be corrected swiftly.  It also shows that ADOC's failure to implement swift changes at its male facilities is a matter of disregard.

---

Stand. Adult. Corr. Inst. 4-4261.  Defendants provide razors to prisoners in segregation despite documented histories of self-harm.

4.  <u>The injuries suffered by Plaintiffs arise from Defendants' widespread and unrestricted custom of distributing razor blades to prisoners with psychiatric needs</u>

Defendants' deliberate indifference to Plaintiffs' right to be protected from self-harm results from ADOC's custom of distributing razor blades to prisoners in an unrestricted manner. ADOC has a longstanding and widespread practice of distributing razors to prisoners with a history of self-harm.[16]   Razors are issued but not accounted for or collected at male facilities. This practice occurs system-wide.   At Easterling, Holman, and Bullock, guards occasionally retrieve razors from prisoners in segregation after showers.   But this is not the standard practice. Prisoners are regularly allowed to take razors back to their cells and, as is the case system-wide, these razors are never collected.

ADOC has a written policy allowing prisoners to possess six single-blade disposable razors and possibly a double-edged razor.   ADOC's practice of not controlling, tracking, or collecting razors is unwritten but is the principal custom at all male facilities.   This custom has been repeatedly ratified by Defendants.   Each time that Defendants were made aware that prisoners committed suicide, attempted suicide, and harmed themselves with razors, nothing was done to enforce new or different policies.   The result is that prisoners suffering from mental illness and those with a history of self-harm still have unlimited access to razor blades.   ADOC's custom is the moving force behind Defendants' failure to protect prisoners from self-harm. *See Calton v. Dallas County*, No. #:05-CV-2022-N (unpublished) (N.D. Texas 2006) (finding that

---

[16] There is evidence that suggests that Defendants' custom of distributing razor blades to prisoners with a history of self-harm extends as far back as the 1990s.  In April of 1993, a prisoner suffering from mental health crises committed suicide at St. Clair.  The prisoner attempted suicide twice in February of 1993 by using a razor blade to slash his wrist at Kilby.  The suicide and attempted suicides were documented in reports and the matter was the source of litigation against ADOC in 1994. *See Greffrey v. State of Ala. Dept. of Corrections*, 996 F. Supp. 1368 (N.D. Ala. 1998).

  At Holman, there was once a process for tracking and collecting razors after prisoners showered. Exhibit 7, Pruitt Decl. ¶4.  This practice is no longer followed and appears to have been a short-lived deviation from ADOC's norm.

prison officials were deliberately indifferent to the psychiatric needs of a prisoner with a history of self-harm where they had an "unwritten custom of freely offering shaving razors on a weekly basis without supervision to inmates confined on the psychiatric floor").

## B. Plaintiffs Will Suffer Irreparable Injury in the Absence of a Preliminary Injunction which Limits the Availability of Razors

Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction. "An injury is irreparable if it cannot be undone through monetary remedies" or "if damages would be difficult or impossible to calculate." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (internal quotation and citations omitted). "The existence of a continuing constitutional violation constitutes proof of an irreparable harm [.]" *Laube v. Haley*, 234 F.Supp.2d 1227, 1251 (M.D. Ala. 2002) (quoting *Preston v. Thompson*, 589 F. 2d 300, 303 n.3 (7th Cir. 1978)). Plaintiffs' Eighth and Fourteenth Amendment rights and their rights under §1983 are currently being violated, and will continue to be violated without an injunction.

Each day that goes by, Plaintiffs suffer from Defendants' failure to protect them from self-inflicted injuries. Since Defendants' promise to make immediate changes, Plaintiffs are aware that Plaintiff Pruitt, two prisoners at St. Clair, and at least three prisoners at Bullock have used razor blades to cut themselves. Exhibit 7, Pruitt Decl. ¶ 8; Exhibit 2, Dunn Decl. ¶ 22; Exhibit 11, Businelle Decl. ¶ 9; Exhibit 34, Dillard Decl. ¶ 14; Exhibit 35, Terrell Decl. ¶ 9. It is likely that many more have done so as well. If ADOC continues with its practice, more prisoners will engage in self-harm.

The physical and psychological wounds that prisoners are left with after cutting themselves cannot be quantified or undone with money. The strong likelihood that Plaintiffs will

attempt suicide or die is real.  Without this Court's intervention, the Plaintiffs will continue to suffer from a substantial risk of serious harm.

**C. The Threatened Injury to Plaintiffs from the Widespread Availability of Razors Vastly Outweighs any Harm the Preliminary Injunction May Cause Defendants**

The threat of further injury to Plaintiffs vastly outweighs any harm the preliminary injunction may cause Defendants. There is minimal articulable harm to Defendants from the requested preliminary injunction.  Defendants may incur slight costs by eliminating current inventories of double-edged razor blades.  However, as Defendant Thomas readily admits, "Although the change in product may increase expense to the ADOC, *we believe that this is warranted.*" Exhibit 43, June 6, 2014 Addison letter at 2 (emphasis added).

Also, Defendants have a strong interest in having safe, orderly prisons.  Controlling access to razor blades would limit access not only to an instrument for self-harm, but also to something that can be used as a weapon against other prisoners and on prison staff.  Instituting appropriate measures to reduce the unrestrained availability of razors would not harm Defendants; it would benefit them.

Further, at Tutwiler, Defendants have implemented many policies that would greatly reduce the risk of harm if implemented at other facilities.  At Tutwiler, razors are distributed on a regular schedule, and a prisoner cannot get a new razor unless she turns an old one in.  Exhibit 44, Couch Decl. ¶ 5.   Prisoners in segregation are given razors on their way to the shower, and the razors are collected after the showers.  *Id.* ¶ 6.  In the RTU, prisoners were, until recently, allowed to have razors under the same terms as prisoners in the rest of the facility.  However, following a recent incident of self-harm by a prisoner in the RTU, razors were collected and are

no longer distributed in the RTU.   Defendants' policies and customs at Tutwiler demonstrate that they do not view these policies and customs as detrimental to their interests.

In comparison, the injury to Plaintiffs from Defendants' custom and practice of making razor blades widely available is substantial.   Plaintiffs repeatedly harm themselves, leaving permanent scars from razor blades that Defendants refuse to collect.   Plaintiffs suffer the risk of hospitalization and death.   The potential harm to Defendants from a preliminary injunction is minimal at most.   It is temporary, administrative and monetary.   The potential harm to Plaintiffs from waiting is permanent and deadly.

**D. A Preliminary Injunction is not Adverse to the Public Interest**

The Court's granting of a preliminary injunction in this case would not be adverse to the public interest.   Where civil rights are at stake, an injunction serves the public interest because it "would protect the public interest by protecting those rights to which it too is entitled." *Nat'l Abortion Fed'n v. Metro. Atlanta Rapid Transit Auth.*, 112 F. Supp. 2nd 1320, 1328 (N.D. Ga. 2000); *see also Estelle*, 429 U.S. at 103 ("The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency…"); *Laube*, 234 F. Supp. 2d at 1251 (quoting *Preston*, 589 F.2d at 303 n.3 (the remedy of a "continuing constitutional violation…certainly would serve the public interest")).   Here, an additional public interest is served in that Defendants' current practice creates a substantial risk of harm to both prisoners and correctional staff. Vail Decl. ¶ 8.   Although razor blades inherently pose some risk to safety, they can also be fashioned into contraband and used as dangerous weapons. Exhibit 35, Terrell Decl. ¶ 10; Exhibit 34, Dillard Decl. ¶ 17; Exhibit 10, Sanford Decl. ¶ 12; Exhibit 30, Torres Decl. ¶ 10; Exhibit 28, Maner Decl. ¶ 10; Exhibit 11, Businelle ¶ 8; Exhibit 32, Hagood ¶ 10;

Exhibit 33, Rogers ¶ 8.  This subjects guards and other prisoners to harm.  Protecting these individuals from harm unquestionably serves the public interest.

For all of these reason, the balance of equities weigh heavily in favor of issuing a preliminary injunction.

### E.  The Parties Should be Afforded Limited Expedited Discovery Regarding the Customs and Harms Relating to Razor Blades

Plaintiffs have submitted declarations from prisoners, one expert declaration, and several other documents, in their possession, in support of this Motion.  The issues raised in this Motion are urgent, but the Court would benefit from the presentation of all evidence relevant to this issue.  Evidence might include, for example, policies, incident reports, and communications.

Plaintiffs therefore request that the Court order expedited discovery on the issues raised herein.

## IV.    CONCLUSION

Plaintiffs meet all four factors required for the issuance of a preliminary injunction.  Therefore, Plaintiffs respectfully request that this Court:

(1)    Immediately grant the Plaintiffs limited, expedited discovery related to their preliminary injunction, including depositions of the Defendants and their employees, and access to records including training materials, policies, communications, incident reports and other records relating to razor blades and the harms and serious risk of harm to which prisoners suffering from mental illness and mental health crises are being subjected by Defendants' practices;

(2)    Schedule an evidentiary hearing on this Motion; and

(3)    Based on the evidence presented herewith and at the hearing, order such relief as necessary to protect the prisoners in the custody of ADOC from violations of their Constitutional

34

right to be free from ADOC's deliberately indifferent widespread and unrestricted distribution of razor blades.

Respectfully submitted,

SOUTHERN POVERTY LAW CENTER

By: /s/ Latasha L. McCrary
Latasha L. McCrary

Maria V. Morris (Alabama Bar No. ASB-2198-R64M)
Ebony Howard (Alabama Bar No. ASB-7247-O76H)
Latasha L. McCrary (Alabama Bar No. ASB-1935-L75M)
SOUTHERN POVERY LAW CENTER
400 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 956-8200
Facsimile:  (334) 956-8481
maria.morris@splcenter.org
ebony.howard@splcenter.org
latasha.mccrary@splcenter.org

Miriam Haskell* (Florida Bar No. 069033)
SOUTHERN POVERTY LAW CENTER
P. O. Box 370037
Miami, Florida  33137
Telephone:  (786) 347-2056
Facsimile:  (786) 237-2949
miriam.haskell@splcenter.org
*Admitted *pro hac vice*

William Van Der Pol (ASB-2112-114F)
J. Patrick Hackney (ASB-6971-H51J)
ALABAMA DISABILITIES ADVOCACY
PROGRAM (ADAP)
University of Alabama
500 Martha Parham West
Box 870395
Tuscaloosa, Alabama  35487-0395
Telephone:  (205) 348-6894
Facsimile:  (205)  348-3909
wvanderpoljr@adap.ua.edu
jphackney@adap.ua.edu
*Attorneys for Plaintiffs*

**TABLE OF EXHIBITS**

Exhibit No.     Exhibit Description

1                   ADOC Administrative Regulation 633

2                   Declaration of Joshua Dunn

3                   Declaration of Robert Williams

4                   Declaration of Howard Carter

5                   Sentencing Order of Daletrick Hardy

6                   Declaration of Daletrick Hardy

7                   Declaration of Leviticus Pruitt

8                   ADOC Male Inmate Handbook (excerpt)

9                   ADOC Administrative Regulation 338

10                 Declaration of Jonathan Sanford

11                 Declaration of Richard Businelle

12                 Declaration of Walter Bennett

13                 Declaration of Timothy Sears

14                 Declaration of Augustus Smith

15                 Declaration of Chandler Clements

16                 Declaration of Larry Lay

17                 Declaration of Maxwell Gray

18                 Declaration of Rick Martin

19                 Declaration of Willie McClendon

20                 Declaration of Gary Broyles

21                 Declaration of Roger Moseley

22                 Declaration of Marty George

23                 Declaration of William Villar

| | |
|---|---|
| 24 | Declaration of Charlie Henderson |
| 25 | Declaration of Daniel Tooley |
| 26 | Declaration of Zerrick Naylor |
| 27 | Declaration of Jermaine Mitchell |
| 28 | Declaration of John Maner |
| 29 | Declaration of Tedrick Brooks |
| 30 | Declaration of Joseph Torres |
| 31 | Declaration of Julius Bowe |
| 32 | Declaration of Dwight Hagood |
| 33 | Declaration of Turner Rogers |
| 34 | Declaration of Robert Dillard |
| 35 | Declaration of Richard Terrell |
| 36 | LCF Incident Report (redacted) |
| 37 | ADOC Administrative Regulation 300 |
| 38 | ADOC Administrative Regulation 403 |
| 39 | ADOC Administrative Regulation 629 |
| 40 | ADOC Administrative Regulation 700 |
| 41 | ADOC-MHM Agreement (excerpt) |
| 42 | April 9, 2014 Morris Letter |
| 43 | June 6, 2014 Addison Letter |
| 44 | Declaration of Casey Couch |
| 45 | Declaration of Eldon Vail |
| 46 | Declaration of Christopher Jackson |

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 4th day of September, 2014, served a copy of the

foregoing through the Court's CM/ECF filing system, and that by virtue of this filing notice will

be sent electronically to all counsel of record, including the following opposing counsel:

David Randall Boyd, Esq.
John Garland Smith, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, AL  36101

Michael Leon Edwards, Esq.
Balch & Bingham LLP
Post Office Box 306
Birmingham, AL  35201

Susan Nettles Han, Esq.
Balch & Bingham, LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL  35203

William Richard Lunsford, Esq.
Maynard Cooper & Gale PC
655 Gallatin Street
Huntsville, AL  35801

Alyce Robertson Addison, Esq.
Elizabeth Anne Sees, Esq.
Alabama Department of Corrections
Legal Division
301 South Ripley Street
Montgomery, AL  36130

Mitesh Shah, Esq.
Maynard, Cooper & Gale, PC
1901 6th Avenue North, Suite 2400
Birmingham, AL 35203

/s/ Latasha L. McCrary
Latasha L. McCrary
*Counsel for the Plaintiffs*

38