IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JOSHUA DUNN; CHERRY BAKER; EDWARD BRAGGS; TEDRICK BROOKS; GARY LEE BROYLES; QUANG BUI; RICHARD BUSINELLE; BOBBY COPELAND; HOWARD CARTER; CHANDLER CLEMENTS; ROBERT DILLARD; PAUL FOLSOM; CHRISTOPHER GILBERT; DWIGHT HAGOOD; DALETRICK HARDY; SYLVESTER HARTLEY; CHARLIE HENDERSON; CHRISTOPHER JACKSON; BRANDON JOHNSON; JOHN MANER; RICK MARTIN; WILLIE MCCLENDON; ROGER MCCOY; JERMAINE MITCHELL; KENNETH MONCRIEF; TOMMIE MOORE; MATTHEW MORK; ROGER MOSELEY; ZERRICK NAYLOR; BRADLEY PEARSON; LEVITICUS PRUITT; TURNER ROGERS; JONATHAN SANFORD; TIMOTHY SEARS; BRIAN SELLERS; AUGUSTUS SMITH; RICHARD TERRELL; HUBERT TOLLAR; DANIEL TOOLEY; JOSEPH TORRES; DONALD RAY TURNER; WILLIAM VILLAR; JAMIE WALLACE; ROBERT "MYNIASHA" WILLIAMS, on behalf of themselves and all others similarly situated; and ALABAMA DISABILITIES ADVOCACY PROGRAM, <br><br> Plaintiffs, <br><br> v. <br><br> BILLY SHARP, in his official capacity as Interim Commissioner of the Alabama Department of Corrections; RUTH NAGLICH, in her official capacity as Associate Commissioner of Health Services for the Alabama Department of Corrections; and ALABAMA DEPARTMENT OF CORRECTIONS, <br><br> Defendants. | Civil Action No. 2:14-cv-00601-MHT-TFM <br><br><br><br> [*PROPOSED*] SECOND AMENDED COMPLAINT <br> CLASS ACTION COMPLAINT FOR DECLARATORY <br> AND INJUNCTIVE RELIEF |

## NATURE OF THE ACTION

1.      The prisoner PLAINTIFFS and the Plaintiff Class are incarcerated in Alabama Department of Corrections ("ADOC") prisons.   Plaintiffs bring this case to remedy (a) the defendants' failure to provide constitutionally adequate medical care to persons in the custody of the ADOC; (b) the defendants' failure to provide constitutionally adequate mental health care to persons in ADOC custody; (c) the defendants' failure to provide due process when medicating persons against their will; and (d) the defendants' failure to provide prisoners with disabilities with the accommodations and services to which they are entitled under the Americans with Disabilities Act ("ADA") and section 504 of the Rehabilitation Act of 1973 ("§ 504").   Plaintiffs seek declaratory and injunctive relief for the inhumane and discriminatory practices and conditions they face every day in ADOC custody.

2.      The prisoner PLAINTIFFS and all those in ADOC custody are entirely dependent on DEFENDANTS BILLY SHARP, RUTH NAGLICH and ADOC (collectively, "DEFENDANTS") for medical and mental health care.   Yet the system of care provided by DEFENDANTS SHARP and NAGLICH is grossly inadequate and subjects all prisoners to a substantial risk of serious harm, including unnecessary pain, loss of function, injury and death.

3.      Because of the DEFENDANTS' deliberate indifference to the obvious medical needs of the persons in their custody, plaintiff prisoners go for months or years without appropriate diagnoses of medical conditions.   Numerous prisoners have died from a failure to treat medical conditions from cancer to diabetes to hepatitis.   Others have required emergency surgery or lost the use of legs, arms or eyes, after having been left to suffer with untreated symptoms for lengthy periods. Prisoners with mental illnesses or serious psychological problems are entirely denied mental health care or provided only with medication with little or no medication management, follow-up, or concern for side effects, some of which are debilitating.

Mental health care other than medications is nearly non-existent. Prisoners with a history of self-harm are provided with razor blades.[1]  After one prisoner who had repeatedly requested mental health care cut himself with one of the razors, a correctional officer said to him, "If you die, you die."  DEFENDANTS SHARP and NAGLICH violate the prohibition on Cruel and Unusual Punishments in the Eighth Amendment to the Constitution of the United States.

4.     Prisoners, who do not want to take psychiatric medications, often because they are experiencing serious side effects, are forced to take the medication without any regard for due process.  If they refuse, they may be beaten, placed in segregation or both.  Even when there is a process to determine whether the prisoner is sufficiently ill and dangerous to warrant involuntary medication, the process falls far short of what due process requires.  DEFENDANTS SHARP and NAGLICH violate the Due Process Clause in the Fourteenth Amendment to the Constitution of the United States as it relates to mentally ill prisoners' right to bodily integrity.

5.     Prisoners with physical or mental disabilities face discriminatory and dangerous circumstances throughout the ADOC system.  They are housed in facilities that cannot accommodate them.  They are often housed in prisons or housing units for prisoners with higher security classifications than their own for no reason other than their disabilities.  They are not provided with necessary assistive services or devices, such as functioning wheelchairs or forms that they can read.  They are punished for things they cannot do or do not know how to do because of their disabilities.

6.     The DEFENDANTS SHARP, NAGLICH, and ADOC operate the most overcrowded prisons in the nation and spend among the lowest amount on medical care per

---

[1] The failure to protect the mentally ill from self-harm with razor blades was the subject of a Preliminary Injunction Motion.  The issue has been preliminarily settled, but is in a monitoring phase to determine whether the issue has actually been resolved.

prisoner of any state in the nation. They have long been aware of the unconstitutional and discriminatory practices of which the plaintiffs complain.

7.     PLAINTIFFS seek declaratory and injunctive relief to compel DEFENDANTS SHARP and NAGLICH, both sued in their official capacity (sometimes collectively the "OFFICIAL CAPACITY DEFENDANTS"), and DEFENDANT ADOC to provide constitutionally adequate medical and mental health care to all prisoner PLAINTIFFS and the class members they represent, to desist from medicating mentally ill prisoners against their will without due process, and to comply with the ADA and § 504.

## JURISDICTION

8.     This Court has jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1331 and 1343.  PLAINTIFFS seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201 and 2202, 29 U.S.C. § 794a, and 42 U.S.C. §§ 1983 and 12133.

## VENUE

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as several DEFENDANTS reside in the Middle District of Alabama and all DEFENDANTS reside in Alabama, many of the PLAINTIFFS reside in the Middle District of Alabama, and a substantial number of the events or omissions giving rise to the claims occurred in the Middle District of Alabama.

## PARTIES

10.     PLAINTIFF JOSHUA DUNN has been in the custody of DEFENDANT ADOC since 2010.  He is currently housed at St. Clair Correctional Facility ("St. Clair"). [2]  He has been diagnosed with bi-polar disorder, and he informed ADOC of this diagnosis at intake.

---

[2] ADOC frequently moves prisoners, including named plaintiffs, among its facilities.  Allegations regarding the ADOC facility currently housing each named plaintiff are based on a February 19, 2015 search using the "Search for Inmates" page on ADOC's website (http://www.doc.state.al.us/inmatesearch.aspx).

PLAINTIFF DUNN suffered from acute mental health crises while in segregation, requested mental health care, and repeatedly engaged in self-harm, but received no mental health care and was not provided with timely emergency medical care.  He suffers from headaches and has a cataract due to a previously cracked lens in his right eye.   The OFFICIAL CAPACITY DEFENDANTS have refused to treat PLAINTIFF DUNN's right eye because his left eye is functional.    The OFFICIAL CAPACITY DEFENDANTS have also failed to provide PLAINTIFF DUNN with appropriate medical care after he was stabbed multiple times by prisoners. PLAINTIFF DUNN is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF DUNN is being denied adequate medical and mental health care, and reasonable accommodations for his disabilities under the ADA and § 504.

11.    PLAINTIFF CHERRY BAKER has been in the custody of DEFENDANT ADOC since 1994. She is currently housed at the Tutwiler Correctional Facility ("Tutwiler"). PLAINTIFF BAKER has a history of heart disease and numerous medical problems.  She has a lump in her breast that was not being monitored until approximately September 2014, after PLAINTIFF BAKER was added as a named plaintiff to this lawsuit.  PLAINTIFF BAKER requires the use of a walking cane and has been diagnosed with rheumatoid arthritis, a condition which causes pain, swelling, stiffness, and loss of physical function in her hands.  PLAINTIFF BAKER is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).   PLAINTIFF BAKER is being denied adequate medical care and reasonable accommodations for her disabilities under the ADA and § 504.

12.    PLAINTIFF EDWARD BRAGGS has been in the custody of DEFENDANT ADOC since 1967.  He is currently housed at Hamilton Aged and Infirmed Center ("Hamilton A

& I"), and has previously been housed at Bullock Correctional Facility ("Bullock"), Limestone Correctional Facility ("Limestone"), Easterling Correctional Facility ("Easterling") and Ventress Correctional Facility ("Ventress"). PLAINTIFF BRAGGS is diabetic. In approximately 2004, PLAINTIFF BRAGGS's right leg was amputated at the knee due to lack of medical treatment while in prison. He is currently experiencing the same symptoms in his left leg that led to the amputation of his right leg and the cause of these symptoms is not being treated. PLAINTIFF BRAGGS also has a grapefruit-sized hernia that is not being treated. PLAINTIFF BRAGGS has been diagnosed with anxiety and depression and receives very little mental health care for these conditions. PLAINTIFF BRAGGS is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF BRAGGS is being denied adequate medical and mental health care, and reasonable accommodations for his disabilities under the ADA and § 504.

13.    PLAINTIFF TEDRICK BROOKS entered DEFENDANT ADOC's custody in August 2011. He is currently housed at Bibb County Correctional Facility ("Bibb"). PLAINTIFF BROOKS has a very severe keloid condition that causes him significant pain and difficulty moving. His condition has gone mostly untreated while in ADOC custody. He has been forced to shave, although this makes his condition worse, and he has been punished for not shaving. PLAINTIFF BROOKS is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF BROOKS is being denied adequate medical care and reasonable accommodations for his disabilities under the ADA and § 504.

14.    PLAINTIFF GARY LEE BROYLES has been in the custody of DEFENDANT ADOC since 1989. He is currently housed at Hamilton A & I. He was previously housed at Elmore Correctional Facility ("Elmore"), Draper Correctional Facility ("Draper"), Kilby

Correctional Facility ("Kilby"), St. Clair, and Bullock.   PLAINTIFF BROYLES is hearing impaired, requiring hearing aids for both ears.  He was provided with hearing aids for both ears in or around 1998, but one stopped working in or around 2011.  He has difficulty getting the battery replaced.  PLAINTIFF BROYLES is harassed and discriminated against on the basis of his hearing impairment. PLAINTIFF BROYLES is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF BROYLES is being denied reasonable accommodations for his disabilities under the ADA and § 504.

15.     PLAINTIFF QUANG BUI has been in the custody of DEFENDANT ADOC since 1986. He has been housed at St. Clair since 2005.  He has previously been housed at Holman Correctional Facility ("Holman"), Donaldson Correctional Facility ("Donaldson") and Kilby. PLAINTIFF BUI's English is very limited.  His first language is Vietnamese. Since he has entered the custody of ADOC, his has lost much of his ability to speak Vietnamese. PLAINTIFF BUI has been told by DEFENDANT ADOC that he is mentally ill.  He does not know his diagnosis, but has received shots of Haldol for approximately five years.  He does not want to take the medication but has not been permitted to stop.  He has not been fairly afforded a hearing to determine whether he must be involuntarily medicated.  PLAINTIFF BUI is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF BUI is being denied adequate mental health care and reasonable accommodations for his disabilities under the ADA and § 504, and has had his right to refuse medication violated without due process.

16.     PLAINTIFF RICHARD BUSINELLE has been in the custody of DEFENDANT ADOC since 2003.  Since his initial stay at Kilby, he has been housed at Bullock and most recently at Bibb.  When he arrived at Bullock, he was housed in the mental health dormitory,

until the Mental Health Unit was opened in 2006.  He was moved to the Mental Health Unit when it opened and has been their ever since.  PLAINTIFF BUSINELLE has been diagnosed with paranoid schizophrenia.  He is given an injection of Prolixin every two weeks, takes Cogentin for the side effects, and meets with a counselor for about five minutes every two weeks.  He receives no other mental health treatment.  PLAINTIFF BUSINELLE has experienced severe weight-loss while in DEFENDANT ADOC's custody with no treatment or evaluation to determine the cause. PLAINTIFF BUSINELLE suffered for two and a half years with two teeth that needed to be pulled.  PLAINTIFF BUSINELLE is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF BUSINELLE is being denied adequate medical and mental health care, and reasonable accommodations for his disabilities under the ADA and § 504.

17.    PLAINTIFF HOWARD CARTER has been in the custody of DEFENDANT ADOC since 1994.  He is currently housed in segregation at St. Clair.  He has previously been housed at Kilby, Holman, Bullock, Staton and Donaldson.  PLAINTIFF CARTER is severely mentally ill and was subject to an involuntary medication order in 2011 and 2012.  After being prescribed antipsychotic medications for years, his medication was discontinued in 2013 and he was not receiving any medication at the time this lawsuit commenced. PLAINTIFF CARTER has made several suicide attempts while in DEFENDANT ADOC's custody.  PLAINTIFF CARTER is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF CARTER is being denied adequate medical and mental health care, and reasonable accommodations for his disabilities under the ADA and § 504.

18.    PLAINTIFF CHANDLER CLEMENTS has been in the custody of DEFENDANT ADOC since 2003. He is currently housed at Staton.  PLAINTIFF CLEMENTS

has Chronic Obstructive Pulmonary Disorder (COPD) and, as a result, experiences extreme shortness of breath and low oxygen levels. PLAINTIFF CLEMENTS was persuaded to sign a "Do Not Resuscitate" order ("DNR") to avoid being placed on life support in the prison infirmary.   After he signed the DNR, he was denied breathing treatments and medications because of the DNR.  PLAINTIFF CLEMENTS is being denied adequate medical treatment.

19.     PLAINTIFF BOBBY COPELAND has been in the custody of DEFENDANT ADOC since 2009. He is currently housed at Staton. PLAINTIFF COPELAND is legally blind and deaf. He suffers from congestive heart failure, high blood pressure, diabetes, chronic obstructive pulmonary disorder, asthma, high cholesterol, and kidney failure. PLAINTIFF COPELAND uses a wheelchair most of the time due to his various illnesses. PLAINTIFF COPELAND is routinely denied his medications and does not receive adequate care for his diabetes. Employees of DEFENDANT ADOC refuse to consistently monitor PLAINTIFF COPELAND's blood pressure. DEFENDANT ADOC has also failed to accommodate PLAINTIFF COPELAND's disabilities. PLAINTIFF COPELAND is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF COPELAND is being denied adequate medical care and reasonable accommodations for his disabilities under the ADA and § 504.

20.     PLAINTIFF ROBERT DILLARD has been in the custody of DEFENDANT ADOC since 2005.  He is currently housed in the mental health dormitory in the Main Camp at Bullock.   Following his initial intake at Kilby, he was housed first at the mental health dormitory, then in the Mental Health Unit from when it opened in 2006 until about January 2014, when he was moved back to the mental health dormitory.   PLAINTIFF DILLARD was diagnosed with paranoid schizophrenia at the age of eight.  He takes Haldol, Risperdal, Cogentin

and another medication that has a name and purpose he does not know.  The extent of the counseling he receives is meeting with a mental health counselor one or two times a month for five to ten minutes.  He hears voices in his head.  One of his front teeth is mottled dark brown and black and he has not been given dental care for the tooth.  He likely has an undiagnosed learning or developmental disability and frequently does not understand documents he is given to read and sign.  PLAINTIFF DILLARD is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF DILLARD is being denied adequate medical and mental health care and reasonable accommodations for his disabilities under the ADA and § 504 and has had his right to refuse medication violated without due process.

21.     PLAINTIFF PAUL FOLSOM has been in the custody of DEFENDANT ADOC since in or about 1992.  He is housed at St. Clair. PLAINTIFF FOLSOM suffers from severe headaches.  PLAINTIFF FOLSOM also has a lump in his left breast that has not been examined in over three years.  PLAINTIFF FOLSOM has been told that he has cysts, one in each of his kidneys.  PLAINTIFF FOLSOM is being denied adequate medical treatment.

22.     PLAINTIFF CHRISTOPHER GILBERT has been in the custody of DEFENDANT ADOC since in or about July 2012.  He is housed at Kilby. PLAINTIFF GILBERT has a damaged ankle that resulted in one leg being shorter than the other, and suffers from diabetes.  DEFENDANT ADOC has provided PLAINTIFF GILBERT with insufficient accommodations for his disability that place him for greater risk of medical harm from his diabetes condition. PLAINTIFF GILBERT is also required to stand for long periods of time despite his disability. PLAINTIFF GILBERT experiences sugar lows and highs due to improper treatment for his diabetes. PLAINTIFF GILBERT is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF GILBERT is being denied

adequate medical care and reasonable accommodations for his disabilities under the ADA and §
504.

23.     PLAINTIFF DWIGHT HAGOOD entered the custody of DEFENDANT ADOC
because of a parole violation in 2011.  PLAINTIFF HAGOOD is currently housed at Easterling.
Prior to being transferred to Easterling, he was housed at Kilby and Bullock.   PLAINTIFF
HAGOOD has had diabetes since childhood and suffers from high blood pressure and numerous
other medical conditions.  He has had at least one stroke and other serious medical issues while
in ADOC custody.   As a result of one of these issues, PLAINTIFF HAGOOD is partially
paralyzed on his left side and confined to a wheelchair. He has been denied access to
accommodations for disability. He is also housed in a non-accessible dormitory with a high level
of violence. PLAINTIFF HAGOOD is a person with a disability as defined in 42 U.S.C. § 12102
and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF HAGOOD is being denied adequate medical
care and reasonable accommodations for his disabilities under the ADA and § 504.

24.     PLAINTIFF DALETRICK HARDY has been in the custody of DEFENDANT
ADOC since 2002.  He is currently housed at Donaldson, and has previously been housed at St.
Clair, Kilby, Draper, Bibb, Easterling, Fountain Correctional Facility ("Fountain"), Limestone,
Bullock, and Donaldson.  PLAINTIFF HARDY is severely mentally ill and has a long history of
suicide attempts.  He has received constitutionally inadequate mental health treatment and had
been in segregation at St. Clair since May 2012 before being recently transferred to Donaldson.
PLAINTIFF HARDY is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C.
§ 705(9)(A) and (B). PLAINTIFF HARDY is being denied adequate medical and mental health
care, and reasonable accommodations for his disabilities under the ADA and § 504.

25.     PLAINTIFF SYLVESTER HARTLEY has been in the custody of DEFENDANT ADOC since 1981.  He is currently housed at St. Clair.  PLAINTIFF HARTLEY has a long history of serious mental illness, but does not know his diagnosis.  He is also on dialysis.  He likely has an undiagnosed learning or developmental disability.  PLAINTIFF HARTLEY is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF HARTLEY is being denied adequate mental health care and reasonable accommodations for his disabilities under the ADA and § 504 and has had his right to refuse medication violated without due process.

26.     PLAINTIFF CHARLIE HENDERSON has been in the custody of DEFENDANT ADOC since October 2013. He was previously in ADOC custody from 2005 to 2010. He is currently housed at Hamilton A & I. PLAINTIFF HENDERSON was diagnosed with hepatitis C in 1993, prior to entering ADOC custody. His current diagnosis is hepatitis C, stage 3. PLAINTIFF HENDERSON was also diagnosed with cirrhosis of the liver in 2007 while in ADOC custody. The OFFICIAL CAPACITY DEFENDANTS have not provided PLAINTIFF HENDERSON with any hepatitis C treatment during either of the times he has been in its custody. After PLAINTIFF HENDERSON received his cirrhosis diagnosis, ADOC medical personnel continued to refuse to provide PLAINTIFF HENDERSON with any treatment for hepatitis C claiming that all treatment will negatively impact his liver. ADOC medical personnel persisted in this reasoning despite the availability of hepatitis C treatment that does not have adverse effects on the liver. The lack of treatment for hepatitis C has caused a rise in the ammonia levels in PLAINTIFF HENDERSON's brain. As a result, he suffers from memory loss and general confusion. PLAINTIFF HENDERSON also has a mass on his colon previously identified as cancerous or a symptom of Crohn's disease for which the OFFICIAL CAPACITY

DEFENDANTS refuse to provide treatment. PLAINTIFF HENDERSON is also hearing-impaired and, as a result, often misses meal time, medical appointments, and pill call due to his inability to hear ADOC personnel call for him. DEFENDANT ADOC has not provided PLAINTIFF HENDERSON with a meaningful accommodation in light of his disability. As a result, PLAINTIFF HENDERSON often misses pill call and medical appointments, sometimes resulting verbal reprimands.  PLAINTIFF HENDERSON is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).  PLAINTIFF HENDERSON is being denied adequate medical care and reasonable accommodations for his disabilities under the ADA and § 504.

27.   PLAINTIFF CHRISTOPHER JACKSON has been in the custody of DEFENDANT ADOC since 2006.  He is currently housed in segregation at Donaldson. PLAINTIFF JACKSON was previously on the mental health caseload and was taking Haldol. He was not given any medications for side effects, and in or around April 2014 asked to be taken off Haldol because it made him shake.  He was not offered and informed about any other mental health medication which would be appropriate for his treatment which had a lesser likelihood of side effects.  He has been in segregation since 2007.  He is transferred every few months between the segregation units at Holman, Donaldson and St. Clair.  PLAINTIFF JACKSON is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF JACKSON is being denied adequate medical and mental health care, and reasonable accommodations for his disabilities under the ADA and § 504.

28.   PLAINTIFF BRANDON JOHNSON has been in the custody of DEFENDANT ADOC since 1996.  PLAINTIFF JOHNSON is currently housed in a Residential Treatment Unit at Donaldson.  PLAINTIFF JOHNSON has a significant cognitive disability.  He believes he was

13

diagnosed with traumatic brain injury as a child, following a serious car accident.  He is not receiving any medication or other mental health treatment.  PLAINTIFF JOHNSON also has serious cognitive disabilities stemming from a serious injury when he was a child.  However, he is provided with no assistance in filling out medical forms or understanding rules or disciplinary matters.  PLAINTIFF JOHNSON is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF JOHNSON is being denied adequate mental health care and reasonable accommodations for his disabilities under the ADA and § 504.

29.     PLAINTIFF JOHN MANER entered DEFENDANT ADOC custody in or around June 1998.  He is currently housed in the Bibb. PLAINTIFF MANER suffers from a mobility impairment due to a gunshot wound, and ADOC has required him to choose between accessing programs and services and having necessary accommodations.  He injured himself again in April 2014 after choosing to access programs and services.  DEFENDANT ADOC has declined to treat him.  PLAINTIFF MANER is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF MANER is being denied adequate medical care and reasonable accommodations for his disabilities under the ADA and § 504.

30.     PLAINTIFF RICK MARTIN has been in the custody of DEFENDANT ADOC since 1988.  He is currently housed at St. Clair.  He has previously been housed at Kilby and Donaldson.  PLAINTIFF MARTIN has a long history of heart problems.  He has had a stent in his heart since 2009.  In 2012, he had to get a new stent in his heart, and was not given necessary blood thinners afterward, resulting in his requiring emergency open-heart surgery because his un-thinned blood quickly clogged the stent.  PLAINTIFF MARTIN has been denied adequate medical treatment.

31.    PLAINTIFF WILLIE MCCLENDON has been in the custody of DEFENDANT ADOC since 2007.  He is currently housed at Limestone and has been there since his initial brief intake period at Kilby.  PLAINTIFF MCCLENDON developed an infection in his testicle which went untreated for several days, turned gangrenous, and resulted in his losing the testicle. PLAINTIFF MCCLENDON has been denied adequate medical care.

32.    PLAINTIFF ROGER MCCOY entered DEFENDANT ADOC custody in or around 1994. He is currently housed at the Bibb.  He has previously been housed at Bullock and Limestone.  PLAINTIFF MCCOY has an apparent mental health disorder for which he is treated with medications but little other treatment. PLAINTIFF MCCOY has been physically assaulted by correctional officers.  PLAINTIFF MCCOY is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF MCCOY is being denied adequate medical and mental health care, and reasonable accommodations for his disabilities under the ADA and § 504, and has had his right to refuse medication violated without due process.

33.    PLAINTIFF JERMAINE MITCHELL has been in the custody of DEFENDANT ADOC since 1999.  He is currently housed at Hamilton A & I, and has also been housed at Bibb. PLAINTIFF MITCHELL uses a wheelchair and has limited use of his hands.  He spent a year and a half housed in an infirmary because of his disabilities.  Because he was housed in the infirmary, he was denied access to programs, benefits and services.  PLAINTIFF MITCHELL has been informed that he might be able to walk again if he received physical therapy, but he is not being given physical therapy.  PLAINTIFF MITCHELL is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF MITCHELL is

being denied adequate medical care and reasonable accommodations for his disabilities under the ADA and § 504.

34.    PLAINTIFF KENNETH MONCRIEF has been in the custody of DEFENDANT ADOC since 2010, following a parole violation.  He is currently housed at Easterling and was previously housed at Limestone and in the Mental Health Unit at Bullock.  He has been diagnosed with paranoid schizophrenia, bi-polar disorder, anxiety disorder and major depressive disorder.  He was required to discontinue his psychiatric medications in order to go on parole, because his parole placement was a facility does not accept residents who take psychiatric medications.   Without mental health medication, PLAINTIFF MONCRIEF has difficulty controlling his impulses and anger.  He was not receiving any mental health medications at the time of the filing of the lawsuit.  PLAINTIFF MONCRIEF is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF MONCRIEF is being denied adequate mental health care and reasonable accommodations for his disabilities under the ADA and § 504.

35.    PLAINTIFF TOMMIE MOORE has been in the custody of DEFENDANT ADOC since 2010.  He is housed at the Mobile Work Release Center. He was previously housed at Kilby.  PLAINTIFF MOORE has glaucoma and is legally blind.  He has not been treated for his glaucoma and has been denied the surgery he requires because DEFENDANT ADOC refuses to pay for the procedure.  PLAINTIFF MOORE resided in a dormitory with high incidences of violence solely because his disability only made him eligible for a dormitory of that classification level. Correctional officers have harassed and threatened PLAINTIFF MOORE due to his disability. PLAINTIFF MOORE is a person with a disability as defined in 42 U.S.C. §

12102 and 29 U.S.C. § 705(9)(A) and (B).  PLAINTIFF MOORE is being denied adequate medical care and reasonable accommodations for his disabilities under the ADA and § 504.

36.     PLAINTIFF MATTHEW MORK has been in the custody of DEFENDANT ADOC since 2010.  He is currently housed at Holman.  He has also been housed at Kilby, Limestone, and Ventress.  PLAINTIFF MORK has hepatitis C and is not being treated for it because the OFFICIAL CAPACITY DEFENDANTS refuse to provide the medication PLAINTIFF MORK requires. PLAINTIFF MORK also suffered a serious injury to his arm due the actions of employees of DEFENDANT ADOC and received inadequate treatment for this injury.  PLAINTIFF MORK is being denied adequate medical care.

37.     PLAINTIFF ROGER MOSELEY has been in the custody of DEFENDANT ADOC since 2007.  He currently resides at Easterling.  In 2006, PLAINTIFF MOSELEY suffered two broken legs in a car accident.  PLAINTIFF MOSELEY had four surgeries on each of his knees shortly after the accident, before entering ADOC custody.  He was confined to a wheelchair and had begun physical therapy in order to walk again. DEFENDANT ADOC has refused to provide PLAINTIFF MOSELEY with physical therapy or other appropriate treatment, delaying his recovery and forcing him to unnecessarily remain in a wheelchair while he self-administered physical therapy to re-learn how to walk.  PLAINTIFF MOSELEY is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).  PLAINTIFF MOSELEY is being denied adequate medical care and reasonable accommodations for his disabilities under the ADA and § 504.

38.     PLAINTIFF ZERRICK NAYLOR was incarcerated by DEFENDANT ADOC from 2012 until 2015.  He was most recently  housed at Hamilton A & I, and has previously been housed at Kilby.  PLAINTIFF NAYLOR suffers from keratoconus and is legally blind.  He sees

only vague shadows.  Due to his blindness, he was housed for more than two years in a housing unit that was unduly dangerous and restrictive.  While in ADOC custody, he was denied access to programs, benefits and services because of his blindness.  PLAINTIFF NAYLOR is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF NAYLOR was being denied reasonable accommodations for his disabilities under the ADA and § 504.  PLAINTIFF NAYLOR is no longer in the physical custody of ADOC. However, he was released at the end of the prison-portion of a split sentence.  He is on probation and has a high risk of being readmitted to ADOC custody and facing the same discriminatory practices he faced prior to his release.

39.     PLAINTIFF BRADLEY PEARSON was incarcerated by DEFENDANT ADOC from August 2013 through February 1, 2015.  He was most recently housed at Limestone and was previously housed at Kilby for about a month and then Decatur Work Release Center for 10 days.  He was then excluded from the Work Release Center because he is deaf.  PLAINTIFF PEARSON is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF PEARSON was being denied reasonable accommodations for his disabilities under the ADA and § 504. PLAINTIFF PEARSON is no longer in the physical custody of DEFENDANT ADOC.  However, he was released at the end of the prison-portion of a split sentence.  He is on probation and has a high risk of being readmitted to ADOC custody and facing the same discriminatory practices he faced prior to his release.

40.     PLAINTIFF LEVITICUS PRUITT has been in the custody of DEFENDANT ADOC since 2001.  He is currently housed at Holman.  He has previously been housed at Kilby. PLAINTIFF PRUITT has a history of depression.  Over the last six months, PLAINTIFF PRUITT has repeatedly been placed on suicide watch and has requested mental health treatment,

but has been denied any mental health care.  He recently underwent an assault by other prisoners who threw burning items onto him while he was on suicide watch, but he was not taken to medical staff for more than a day after the assault, when he was taken to the hospital. PLAINTIFF PRUITT was also denied adequate medical treatment after he sustained an injury to his hand caused by correctional officers.  He was also denied medical treatment for four hours after he engaged in self-harm with a razor blade in his segregation cell.  PLAINTIFF PRUITT was denied adequate medical treatment after injuring his back lifting weights.  He is now required to wear a permanent back brace due to limitations caused by the constant pain experienced in his lower back.  PLAINTIFF PRUITT is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).  PLAINTIFF PRUITT is being denied adequate medical and mental health care, and reasonable accommodations for his disabilities under the ADA and § 504.

41.    PLAINTIFF TURNER ROGERS has been in the custody of DEFENDANT ADOC since November 2012.  He currently resides at the Kilby.  PLAINTIFF ROGERS has cataracts and a spot in the white of his eye that protrudes periodically, blocking his vision.  Both conditions are not being treated.  He has been prescribed eyeglasses, but these do not help his vision at all and give him headaches.  PLAINTIFF ROGERS is being denied adequate medical care.

42.    PLAINTIFF JONATHAN SANFORD has been in the custody of DEFENDANT ADOC since 2002.  Since his initial stay at Kilby, he has been housed at Bullock.  When he arrived at Bullock, he was housed in the mental health dormitory, until the Mental Health Unit was opened in 2006.  He was moved to the Mental Health Unit when it opened and has been their ever since.  PLAINTIFF SANFORD has been diagnosed with bi-polar disorder,

schizophrenia, depression and post-traumatic stress disorder (PTSD). PLAINTIFF SANFORD is given mental health medication, but receives little other mental health treatment. PLAINTIFF SANFORD also suffers from a seizure disorder that is untreated and often unaccommodated. PLAINTIFF SANFORD is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF SANFORD is being denied adequate medical and mental health care and reasonable accommodations for his disabilities under the ADA and § 504.

43. PLAINTIFF TIMOTHY SEARS has been in the custody of DEFENDANT ADOC since 1996. He is currently housed at Ventress and was previously housed at Hamilton A & I, St. Clair and Limestone. PLAINTIFF SEARS has scoliosis and unexplained weight loss. Despite needing a shower with grab bars, PLAINTIFF SEARS was placed in a dormitory that was not accessible and was very far from the infirmary where he could shower. PLAINTIFF SEARS has been and continues to be forced to stand for long periods although his disability makes that painful and difficult for him. PLAINTIFF SEARS suffered extreme weight loss that went completely untreated for 10 months and is currently being inadequately treated. PLAINTIFF SEARS is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF SEARS is being denied adequate medical care and reasonable accommodations for his disabilities under the ADA and § 504.

44. PLAINTIFF BRIAN SELLERS has been in the custody of DEFENDANT ADOC since 2001. He is currently housed at St. Clair, but has also been housed at Donaldson, Holman, Ventress, Draper, Easterling and Kilby. He suffers from high blood pressure and heart disease, hepatitis C and has recently had surgery for kidney stones. PLAINTIFF SELLERS was taken off of his blood pressure medication, resulting in a heart attack. Also, DEFENDANT SHARP's predecessor and DEFENDANT NAGLICH delayed more than three years before approving a

PLAINTIFFS SELLERS's surgery for kidney stones.  PLAINTIFF SELLERS is being denied adequate medical care.

45.     PLAINTIFF AUGUSTUS SMITH has been in the custody of DEFENDANT ADOC since 2007.  He is housed at Staton.  PLAINTIFF SMITH came into ADOC custody shortly after doctors gave him a catheter in anticipation of surgery that was to happen within three months.  As of the commencement of this lawsuit, he had not had the surgery and continued required use of the catheter.  He suffered from frequent infections from the catheter. After an approximately seven-year delay, PLAINTIFF SMITH finally had surgery in 2014, after this lawsuit was commenced.  PLAINTIFF SMITH is being denied adequate medical care.

46.     PLAINTIFF RICHARD TERRELL has been in the custody of DEFENDANT ADOC since 1992.  He is currently housed at Bullock in the Mental Health Unit.  He has previously been housed at Kilby, Easterling, and Holman.  He has been in either the mental health dormitory at Bullock or the free-standing Mental Health Unit at Bullock since 1999. PLAINTIFF TERRELL has been diagnosed with bi-polar disorder, schizophrenia, depression and PTSD.  He has been given a shot of either Prolixin or Haldol every two weeks for the last 15 years.  He does not know currently which he is receiving or if he receives the same one every time.  He is also given Benadryl, but receives no other mental health treatment.  PLAINTIFF TERRELL has been assaulted and then denied medical attention.  He has also been denied dental care and is likely to lose his two upper front teeth as a result.  PLAINTIFF TERRELL likely has some form of learning disability or cognitive disability.  PLAINTIFF TERRELL is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF TERRELL is being denied adequate medical and mental health care and reasonable

accommodations for his disabilities under the ADA and § 504 and has had his right to refuse medication violated without due process.

47.    PLAINTIFF HUBERT TOLLAR has been in the custody of DEFENDANT ADOC since 1977. He is currently housed at St. Clair.  In response to an outbreak of tuberculosis at St. Clair in January and February of 2014, PLAINTIFF TOLLAR was given a chest x-ray. There was a spot on his lung.  He had a CT scan in or around late March 2014.  On or about April 14, 2014, PLAINTIFF TOLLAR was told that the CT scan showed that he had cancer and that he would be sent out for a biopsy the following day.  As of May 28, 2014, PLAINTIFF TOLLAR had not been sent out for a biopsy of the cancerous spot on his lung.  PLAINTIFF TOLLAR did not begin chemotherapy until late September 2014.  PLAINTIFF TOLLAR is being denied adequate medical care.

48.    PLAINTIFF DANIEL TOOLEY has been in the custody of DEFENDANT ADOC since 2008.  He is currently housed at Hamilton A & I, and has also been housed at Bullock, Kilby and Easterling.  PLAINTIFF TOOLEY is a prisoner with deafness.  Due to his deafness, PLAINTIFF TOOLEY cannot communicate through spoken language and has some difficulty communicating by writing notes.  For the past six years, DEFENDANT ADOC has never provided PLAINTIFF TOOLEY a certified sign language interpreter. To communicate with PLAINTIFF TOOLEY, DEFENDANT ADOC staff relies on writing notes and another prisoner who knows limited sign language.  PLAINTIFF TOOLEY is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF TOOLEY is being denied reasonable accommodations for his disabilities under the ADA and § 504.

49.    PLAINTIFF JOSEPH TORRES is 20 years old. He entered DEFENDANT ADOC's custody in February 2011 at age 17. PLAINTIFF TORRES was charged when he was

15 years old. He is currently housed at Bibb. He suffers from untreated cataracts and severe headaches. He has been informed that if he does not receive adequate treatment for his cataracts, he will go blind. PLAINTIFF TORRES hurt his knee while playing basketball at Bibb. He was not provided with care, and his knee remained swollen for approximately two years. PLAINTIFF TORRES was given crutches but was not moved to a lower bunk for two weeks. PLAINTIFF TORRES is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF TORRES is being denied adequate medical care and reasonable accommodations for his disabilities under the ADA and § 504.

50.    PLAINTIFF DONALD RAY TURNER has been in DEFENDANT ADOC's custody since 2009. He is currently housed at Limestone, and was previously housed at Kilby. PLAINTIFF TURNER is deaf and is only semi-literate. He was excluded from work release because he is deaf and has high blood pressure. PLAINTIFF TURNER is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). PLAINTIFF TURNER is being denied reasonable accommodations for his disabilities under the ADA and § 504.

51.    PLAINTIFF WILLIAM VILLAR has been in the custody of DEFENDANT ADOC since 2004. PLAINTIFF VILLAR is currently housed at Donaldson, and was previously housed at Holman. PLAINTIFF VILLAR suffered a stroke while incarcerated at Holman and has since been denied adequate medical care. The failure to treat him in the years since his stroke has resulted in the paralysis and other effects from the stroke becoming permanent. Further, the OFFICIAL CAPACITY DEFENDANTS have failed to take the steps necessary to enable him to have cataract surgery and necessary dental work. He has permanently lost the use of his left arm, hand and leg, and vision in his left eye, much of the control of his bowel and

bladder, and two teeth.  His vision in his right eye is severely impaired by untreated cataracts.

PLAINTIFF VILLAR is a person with a disability as defined in 42 U.S.C. § 12102 and 29

U.S.C. § 705(9)(A) and (B).  PLAINTIFF VILLAR is being denied adequate medical care and

reasonable accommodations for his disabilities under the ADA and § 504.

52.     PLAINTIFF JAMIE WALLACE has been in DEFENDANT ADOC's custody

since 2010.  Prior to his conviction, PLAINTIFF WALLACE was initially found incompetent to

stand trial and spent a year at Taylor Hardin, Secure Medical Facility.  He is currently housed in

Residential Treatment Unit at Donaldson and was previously housed in the Mental Health Unit at

Bullock.  PLAINTIFF WALLACE has numerous physical birth defects and has been diagnosed

with ADHD, bi-polar disorder, paranoid schizophrenia and intermittent explosive disorder.  He is

receiving medication but no other mental health treatment.  PLAINTIFF WALLACE is a person

with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).

PLAINTIFF WALLACE is being denied adequate medical and mental health care, and

reasonable accommodations for his disabilities under the ADA and § 504.

53.     PLAINTIFF ROBERT "MYNIASHA" WILLIAMS[3] has been in the custody of

DEFENDANT ADOC since November 2012.  She is housed at Fountain.  PLAINTIFF

WILLIAMS has ADHD, a mood disorder, a history of being sexually abused, and a history of

self-harm.  While at Fountain, PLAINTIFF WILLIAMS repeatedly cut herself with razor blades,

and was not given adequate medical or mental health care.  PLAINTIFF WILLIAMS is a person

with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).

PLAINTIFF WILLIAMS is being denied adequate medical and mental health care, and

reasonable accommodations for her disabilities under the ADA and § 504.

---

[3] PLAINTIFF WILLIAMS is a transgendered individual who identifies as female.  She was born with male anatomy
and is classified as a male by DEFENDANT ADOC.  In accordance with her preference, she is referred to herein by
female pronouns.

54.     PLAINTIFF ALABAMA DISABILITIES ADVOCACY PROGRAM (hereinafter "ADAP") is designated as Alabama's authorized protection and advocacy agency under federal laws designed to protect individuals with disabilities.  ADAP has statutory authority to pursue legal and other appropriate remedies to ensure the protection of persons with mental illness, developmental disabilities, and other disabilities who are or will be receiving care and treatment in the State of Alabama.  42 U.S.C. § 10801 *et seq.*; 42 U.S.C. § 15001 *et seq.*; 29 U.S.C. § 794e; *ADAP v. J.S. Tarwater*, 97 F.3d 492 (11th Cir. 1996).  ADAP is pursuing this action to protect and advocate for the rights and interests of prisoners in ADOC custody who are persons with mental illness and persons with mental or physical disabilities.  Prior to commencement of this lawsuit, ADAP spent significant time and resources advocating on behalf of prisoners with disabilities in ADOC custody, monitoring and investigating the treatment and accommodation of prisoners with disabilities in ADOC custody.  ADAP's prelitigation efforts and expenditures of resources were necessitated by the ADOC policies and practices challenged, which policies and practices serve to frustrate and perceptibly impair ADAP's advocacy efforts and its ability to accomplish the statutory purposes for which it was created.  In bringing this suit, ADAP seeks to vindicate interests central to its purpose.  ADAP thus has organizational standing under Article III based on a "concrete and demonstrable injury to [its] activities – with the consequent drain on [its] resources."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

55.     DEFENDANT BILLY SHARP has served as the Interim Commissioner of the ADOC since January 27, 2015, when his predecessor, originally named DEFENDANT KIM THOMAS, resigned his position as ADOC Commissioner.[4]  DEFENDANT SHARP is sued herein in his official capacity. The Commissioner of the ADOC, including DEFENDANT

---

[4] By operation of *Fed. R. Civ. P.* 25(d), DEFENDANT SHARP was "automatically substituted" in place of DEFENDANT KIM THOMAS, who Plaintiffs sued in his official capacity, upon THOMAS's resignation.

SHARP in his capacity as Interim Commissioner, is responsible for heading the Alabama Department of Corrections, for the independent direction, supervision and control of the Alabama Department of Corrections, and for approving and issuing administrative regulations and changes. Ala. Code. 1975 § 14-1-1.3. (2010). The Commissioner is responsible for providing constitutional conditions of confinement in all facilities. At all times relevant hereto, DEFENDANT SHARP and his predecessor have acted under color of state law.

56.     DEFENDANT RUTH NAGLICH is the Associate Commissioner of Health Services for the ADOC.  DEFENDANT NAGLICH is sued in her official capacity. As Associate Commissioner, DEFENDANT NAGLICH is responsible for establishing, monitoring, and enforcing system-wide health care policies and practices. She is responsible for supervising the provision of adequate medical, mental health, and dental care for all prisoners within ADOC custody, including but not limited to those in Residential Treatment Units, Intensive Stabilization Units and segregation units. At all times relevant hereto, she has acted under color of state law.

57.     DEFENDANT ALABAMA DEPARTMENT OF CORRECTIONS ("ADOC") is the administrative department of the state of Alabama responsible for administering and exercising the direct and effective control over penal and corrections institutions throughout the state of Alabama.  Persons in the in-house custody of DEFENDANT ADOC are housed in 15 major correctional facilities and 13 work camps or work release centers.  DEFENDANT ADOC is an instrumentality of the state of Alabama.  DEFENDANT ADOC receives federal funding.

## FACTUAL ALLEGATIONS

58.     The OFFICIAL CAPACITY DEFENDANTS have long underfunded medical and mental health care as well as compliance with the ADA.  Since at least the 1990s, have

outsourced the medical and mental health care provided through managed care agreements with private companies that purportedly specialize in correctional care.

**DEFENDANTS Systematically Underfunded Medical Care**

59.     Alabama's focus on reducing the cost of caring for the people in its prisons has sacrificed constitutionally adequate care.  By 2003, the ADOC Commissioner acknowledged that Alabama's "underfunded, understaffed, and overcrowded" prison system had, at that time, "the lowest inmate cost per day in the Country."

60.     In 2006, then-Commissioner of ADOC Richard Allen admitted that one of the major problems facing ADOC was "[s]oaring healthcare costs for inmates." He explained "[t]he cost of inmate health care has spiraled in recent years," with costs nearly doubling over the three-year period ending in Fiscal Year 2006."   Then-Commissioner Allen identified four factors leading costs: "(1) the increased number of inmates incarcerated, (2) an increase in the severity of illness and degenerative diseases of inmates received into the systems as a result of a lack of free world health care coverage, (3) improvement in healthcare services as a result of new medical technology including advanced drug treatments, and mandated access to higher levels of care by litigation in federal courts, and (4) physical plant limitations of the institutional health care units do not allow for onsite longterm or advance care services, resulting in a dependency on costly free world community providers."  These factors remain today.

61.     Focusing on cost control rather than the constitutionality of its care, ADOC, under the direction of DEFENDANT NAGLICH, would ultimately pursue a new managed healthcare contract premised on a risk model in which ADOC paid a lower contract price in return for the private contractor bearing virtually all of the risk associated with increased healthcare costs, including the costs of offsite care.

62.     By placing the financial responsibility for each instance in which medical or mental health care is provided on the private providers, DEFENDANTS created a financial incentive for the provider to not provide care.  The incentive grew stronger over the years as DEFENDANTS continually sought to reduce the price paid to the providers for prisoner medical and mental health care.

63.     ADOC's cost-cutting efforts proved highly successful from a dollars-and-cents standpoint, with DEFENDANT ADOC's 2010 Annual Report stating that while "medical and mental health services [costs] increased 295% from the years 2000 to 2005, . . . [s]ince 2006, the cost increases have averaged only 6% per year."  Indeed, in 2011, DEFENDANT SHARP's predecessor recognized that Alabama pays less for health care than other prison systems.

64.     Unsurprisingly, DEFENDANTS' continual effort to cut costs has ensured that the healthcare provided to class members is grossly inadequate.  The failings in the health care system are well documented and known to the DEFENDANTS.  For the years 2000 through 2011, Alabama prisons had among the highest mortality rates in the country, both generally and for illness-related deaths.

65.     DEFENDANTS track medical care costs, including among other things, all deaths in custody, all trips to the emergency room, and all hospital admissions.  DEFENDANTS require their medical provider to give them monthly reports on a wide variety of metrics.  They audit the performance of the medical provider using numerous tools to spot-check the performance of the medical provider.  Since 2007, DEFENDANTS have contracted with Corizon, Inc. k/n/a Corizon, LLC ("Corizon") to provide medical care in the ADOC facilities.[5]  Corizon failed every

---

[5] At the time of the initial contract, Corizon was known as Correctional Medical Services, Inc. ("CMS").  The corporate name change from CMS to Corizon occurred during the initial contract term in conjunction with a 2011 merger or acquisition involving CMS's corporate parent (Valitás Health Services, Inc.) and the corporate parent of another correctional medical provider.

single major performance audit conducted by DEFENDANTS under the initial contract with ADOC. Despite this abysmal performance, DEFENDANTS extended the contract from 2010 to 2012. Corizon continued to fail every major performance audit, but was awarded a new three year contract in 2012.

### DEFENDANTS Systematically Underfunded Mental Health Care

66.    In 2007 and 2008, then-ADOC Commissioner Allen acknowledged that Alabama was "more or less [] criminalizing mental illness," with more than 5,000 of the approximately 25,000 in-custody ADOC inmates in need of mental health treatment. Allen also admitted that 36% of incarcerated women and 20% of incarcerated men were in need of mental health care. This data, according to former Commissioner Allen, served as "a strong indication that in Alabama the prison system has become a default mental health treatment facility," with the mentally ill "coming to prison instead of going to some sort of treatment center."

67.    At roughly the same time, Allen's Deputy Commissioner Vernon Barnett admitted that only about 2,500 inmates – half of the number of persons former Commissioner Allen identified as needing mental health treatment – were actually receiving mental health care.

68.    ADOC's longstanding Mental Health Director Dr. Ronald Cavanaugh, who served under DEFENDANT NAGLICH until early 2014, acknowledged in 2010 that in recent decades, "Alabama prisons have become a surrogate mental health system" and "ADOC has become the State's principal agent for providing substance abuse treatment.

69.    The in-house custody population has remained fairly steady since 2007. The mental health caseload is currently about 3,100. By then-Commissioner Allen's estimates, this likely means that 40% of the in-custody population in need of mental health treatment is not receiving any treatment at all.

70.     Moreover, the evidence is clear that many are not.  During the process of soliciting bids for a comprehensive medical and mental health provider in the summer of 2012, DEFENDANT NAGLICH responded to numerous questions about the provision of care.  She was asked whether persons "in need of mental health/psychiatric services currently residing at Bibb CF, Easterling, CF, Fountain CF, and Birmingham WR be relocated?"  DEFENDANT NAGLICH responded that they would.  They have not been.  Easterling has 120 prisoners on psychiatric medications, including two on involuntary medication orders, and has no coverage by a psychiatrist or psychologist.  Fountain has 64 people on psychiatric medications and no coverage by any psychiatrist or psychologist.  Bibb, which has 133 people classified as MH-1, 29 people classified as MH-2, and one person on an involuntary medication order, has less than a quarter-time psychiatrist and no psychologist.[6]

---

[6] DEFENDANTS' actions also violate international law.  The International Covenant on Civil and Political Rights is binding on the U.S.  S. Treaty Doc. No. 95-20, 6 I.L.M. 368 (1967), 999 U.N.T.S. 171, *entered into force* Mar. 23, 1976. In April 2014, the Human Rights Committee, the body that reviews states' compliance with the covenant, expressed concern over conditions for people in U.S. prisons, particularly those with serious mental illnesses and those held in solitary confinement. UN Human Rights Committee (HRC), Concluding observations of the Human Rights Committee: United States of America, 23 April 2014, CCPR/C/USA/CO/4, available at: http://www.ushrnetwork.org/sites/ushrnetwork.org/files/iccpr_concluding_obs_2014.pdf [accessed 2 July 2014].

The United States has ratified the Convention Against Torture, with the reservation that the Convention's prohibitions against cruel, inhuman or degrading treatment or punishment be understood as defined and prohibited by the U.S. Constitution. U.S. reservations, declarations, and understandings, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Cong. Rec. S17486-01 (daily ed., Oct. 27, 1990). Thus, the United States recognizes the Convention as binding authority on these matters, in addition to the Constitution.  Also, the International Convention on the Elimination of All Forms of Racial Discrimination (CERD), which is binding on the U.S. and applicable in this case because of the racial disparity demonstrated by high rates of incarceration of people of color, prohibits discrimination in the provision of healthcare. CERD, Mar. 7, 1966, 660 U.N.T.S. 195, 5 I.L.M. 352 (1966), *entered into force* 4 Jan. 1969. Additionally, the United Nations, of which the United States is a member, has established minimum rules for the treatment of incarcerated people. While not binding, they provide a guideline for the United States.  These rules require a psychiatrist at every institution, and call for dental care and medical care that "should be organized in close relationship to the general health administration of the community or nation." United Nations, Standard Minimum Rules for the Treatment of Prisoners, 30 August 1955, available at: http://www.refworld.org/docid/3ae6b36e8.html [accessed 2 July 2014].

Finally, the American Declaration of the Rights and Duties of Man, signed by the United States, provides for the right to health and medical care. American Declaration of the Rights and Duties of Man, art. 11, O.A.S. Official Rec., OEA/Ser.L./V./II.23, doc. 21 rev. 6 (1948), reprinted in Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser. L.V/II.82, doc. 6 rev. 1, at 17 (1992).

**DEFENDANTS Systematically Underfund Compliance with the ADA and § 504**

71.     DEFENDANT ADOC has been aware since at least May 2006 that "Almost none of [its] facilities meet the federal Americans with Disabilities Act requirements."  At that time, DEFENDANT ADOC was uncertain as to "the cost of bringing all facilities up to currently accepted codes, including the provisions of the [ADA]," but committed to engaging "an engineering/architectural firm that specializes in correctional facilities to inspect thoroughly our existing physical plant and determine cost effective repairs and renovations that can be accomplished," with the expectation "that some older facilities may not be economically repairable, and will be considered for closing when other bed space is available."  Following receipt of the survey results, DEFENDANT ADOC intended to make repairs and renovations over a seven-to-eightyear period with work "prioritized based on the most urgent needs of the department."

72.     As set forth in its 2007 Annual Report, DEFENDANT ADOC's contracted specialty engineering/architectural determined through a facility survey that "it would cost approximately $94 million to bring all facilities up to currently accepted codes, including the Americans with Disabilities Act."  In the years since DEFENDANT ADOC received this survey report, virtually nothing has been done to pursue ADA compliance.

**The Lack of Care and Accommodation Resulting from the Underfunding Continue Unabated, Despite DEFENDANTS' Knowledge of the Problems**

73.     Admissions by ADOC officials confirm budgetary constraints are a continual factor in ADOC's pervasive health, dental, mental health care deficiencies and longstanding ADA non-compliance. Former Deputy Commissioner Vernon Barnett reported in 2008 that, facing budget cuts, ADOC was "in a crisis as how to exactly stay on course and take care of the inmates," with "inmate health care, mental health care, food, utilities and expenses and personnel

costs" identified as "[t]he only places that the Department can cut." In 2009, Barnett admitted that ADOC was forced to make "Medical Reductions," in response to additional budget cuts, including eliminating nursing staff at work release facilities, and amending its contract to further reduce its payments to Corizon.

74. Moreover, despite the inadequacy of the care provided pursuant to the 2007 contract as demonstrated by the high mortality rate and consistently failed audits, DEFENDANTS NAGLICH negotiated a new contract that would result in further reductions in the amount and quality of health care for prisoners in the custody of the ADOC. The agreed medical care spending for an optional 4th year of the contract was reduced by approximately $2 million through a contract amendment in or around 2009 and a separate price reduction was agreed with regard to the optional 5th year of the contract. The actual annual contract price was then greatly reduced further under the new Corizon contract executed in 2012, with ADOC saving $12 million dollars in the first year over the 2012 contract price, and nearly $24 million total during the three-year contract period.

75. Starting in or around July 2012, PLAINTIFFS' counsel conducted site inspections of most major correctional facilities in ADOC. PLAINTIFFS' counsel provided feedback on many of the obstacles in the facilities for persons with disabilities. DEFENDANT ADOC has not, to PLAINTIFFS' counsel's knowledge, resolved any of the matters raised in that context.

76. Further, starting in the spring of 2014, PLAINTIFFS' counsel raised concerns about a number of individuals. In one instance, DEFENDANT ADOC partially accommodated an individual with a disability that PLAINTIFFS' counsel brought to its attention. In another case, the disabled individual was actually further deprived of necessary accommodations. In

most cases, there was no change whatsoever.  Where PLAINTIFFS' counsel raised concerns about the lack of medical or mental health care, there was no response whatsoever.

77.     PLAINTIFFS' counsel sent DEFENDANT SHARP's predecessor a letter on April 9, 2014 detailing the failures of medical and mental health care and the violations of the ADA and § 504.  PLAINTIFFS' counsel invited DEFENDANT SHARP's predecessor to enter into discussion regarding how to resolve the issues.  Despite the urgency of the issues raised, DEFENDANT SHARP's predecessor set up a meeting for a month and a half later on May 20, 2014.  However, at that meeting, DEFENDANTS had no proposals or plans for resolving any of the issues raised, only a proposal for further meetings.  PLAINTIFFS' counsel agreed, and DEFENDANTS were to schedule these further meetings, but never did.[7]

78.     Fully aware of the serious nature of the federal constitutional deprivations and statutory violations to which PLAINTIFFS are subjected, DEFENDANT SHARP's predecessor was reported in the news media to have given Corizon a "vote of confidence" as part of an August 20, 2014 presentation at Alabama Association of County Commissions' annual meeting. With DEFENDANT SHARP's predecessor having unexpectedly resigned on or about January 27, 2015, DEFENDANTS announced in early February 2015 that Corizon's contract would be renewed for two additional years.

## I. DEFENDANTS ARE DELIBERATELY INDIFFERENT TO THE SERIOUS MEDICAL NEEDS OF PRISONERS IN THEIR CUSTODY.

79.     The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of failing to provide prisoners with adequate health care, and are deliberately indifferent to the fact that the systemic failure to do so results in significant injury and a substantial risk of serious harm.

---

[7] PLAINTIFFS' counsel also asked at the May 20, 2014 meeting that DEFENDANTS immediately address the issue of razor blades being freely available and entirely untracked in all facilities, including in Residential Treatment Units and for individuals who have recently attempted suicide with razor blades.

80.     From 2001 through 2011, ADOC's mortality rate was among the highest of any prison systems in the country.

81.     In 2012, DEFENDANT SHARP's predecessor and DEFENDANT NAGLICH released a request for proposal for a new health care contract.  Applicants were scored on a 3,000-point scale on a number of different criteria.  Out of a possible 3,000 points, contract price accounted for a possible 1,350 points in the assessment of the proposal, whereas "Qualifications/Experience/References Medical" counted for only 100 points.

82.     DEFENDANTS renewed the ADOC contract with Corizon in 2012, even though Corizon had failed every major audit and re-audit of its health care operations in Alabama prisons under its first contract with the state.

**A. DEFENDANTS Routinely And Systematically Fail To Provide Adequate Numbers Of Health Care Professionals.**

83.     The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of not providing adequate medical staff to address the serious medical needs of prisoners in ADOC custody.  DEFENDANT SHARP's predecessor and DEFENDANT NAGLICH put out a request for proposals for the medical care contract for the prisons that included a listing of minimum staffing requirements that set the level of staffing at each facility far below what is needed to provide adequate care.  Further, the request for proposal was explicit in valuing cost containment far more than adequacy of care.  The contract ultimately awarded reflected the importance of cost containment and provides inadequate staffing throughout the ADOC system.

84.     DEFENDANT SHARP's predecessor and DEFENDANT NAGLICH recently negotiated a contract with Corizon to provide medical services to prisoners in the custody of DEFENDANT ADOC.  Corizon contracted to provide 493 medical staff for the entire prison system, including just 19.6 medical doctors and 13 dentists.  As reported by Corizon to

34

DEFENDANT SHARP's predecessor and NAGLICH in its April 2014 report, there were 25,591 prisoners for whom Corizon was providing medical care pursuant to the contract. This means that, if all positions were filled, a doctor's average caseload in the ADOC is 1,395 people, and a dentist's is almost 2,000.  The ratio of total medical staff (including administrative and records staff, nurses and doctors) to prisoners is 1:52. However, all positions are not filled.  In April 2014, Corizon had only 15.2 medical doctors and 12.4 dentists for the entire system, resulting in an average caseload for medical doctors of 1,684 patients and 2,064 patients on average for every dentist.

85.     At Kilby, where the ADOC hospital is located, there are just one-and-a-half full-time doctors on staff to provide treatment to 2,151 prisoners.

86.     The extraordinary understaffing for medical services leads to a host of predictable problems with the delivery of medical care, including delays, failures to diagnose and treat, failures to follow-up, errors, and decisions not to treat seriously ill prisoners.

### B. DEFENDANTS Routinely Deny Medical Care To Prisoners With Serious Medical Conditions.

87.     The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of denying medical care to prisoners with serious medical conditions, or providing such prisoners with care that is so cursory or grossly incompetent that it amounts to a denial of care.

#### 1.  The denial of care has contributed to numerous prisoner deaths.

88.     At Elmore, Javon Alexander had an adverse reaction to some substance on or about May 17, 2014.  He was taken to the infirmary, where he writhed around, repeatedly falling off his bed.  He was returned to his bed, but was not given any treatment.  Two days later, he was finally taken to the hospital.  He died thereafter.

89.     In January 2014 at St. Clair, a prisoner was given a shot of something during dialysis that caused him to go into cardiac arrest.  Although there was a crash cart in the dialysis unit, no one present at the prison knew how to use it.  The prisoner died.

90.     On February 6, 2012, at St. Clair, a prisoner who had recently had surgery began bleeding from his rectum.  He bled through three pairs of pants in a day.  He asked for medical attention.  He was given only antacids.  He died that night.

91.     In January 2011 at Limestone, a prisoner committed suicide using a state-issued razor blade.  According to an ADOC Incident Report, he was found while he was still alive, when was asked why he had cut himself, he responded: "I'm not getting enough medical attention."

**2.   DEFENDANTS routinely deny care to plaintiffs and other prisoners, causing serious harm, pain and risk of harm to prisoners in ADOC custody.**

92.     In or around November 2012, four prisoners entered the dormitory where PLAINTIFF DUNN was housed.  They beat PLAINTIFF DUNN and stabbed him several times with an icepick.  They left, then came back about 30 minutes later and attacked him again.  PLAINTIFF DUNN was taken to medical for a body chart the following day.  He had been stabbed 15 times with the icepick.  His wounds were not cleaned or treated.  He was placed in segregation for three months.  He received no further medical attention.

93.     PLAINTIFF DUNN suffered a cracked lens in his right eye while he was in the county jail prior to coming into ADOC custody.  PLAINTIFF DUNN developed a cataract as a result of the cracked lens, and has suffered from headaches two or three times a week since he cracked the lens in his eye.  Particularly in the evenings, his head feels achy and tired all around his right eye, from the strain of trying to use it.  Even though the cataract is causing PLAINTIFF

DUNN pain, he has been told that he will receive no treatment for the cataract because his other eye is functional.

94.     PLAINTIFF MARTIN has a history of heart problems.  He had a heart attack in 1999, and had a stent placed in his heart in 2009.  From the time he received the stent, he was on blood thinners.  On or about February 18, 2012, PLAINTIFF MARTIN was at an outside hospital for a check-up on the stent.  The doctor found a blockage and put in a new stent. PLAINTIFF MARTIN was returned to St. Clair the following day.  He was returned to his dorm, rather than the infirmary.  He was not given blood thinners, although the surgeon had prescribed them and he had long been on them.  He was not seen by anyone from medical staff until on or about February 23, 2012, at which point he asked why he was not on blood thinners.  The nurse said that she would check, but she did not get back to him.  On or about February 26, 2012, PLAINTIFF MARTIN put in a sick call request, and he was placed on the list to be seen on February 29, 2012.  Correctional officers brought him to the infirmary on or about February 28, 2012 because he had deteriorated so dramatically.  However, nothing was done and he was returned to his dorm.  The following day, he went back to the infirmary and was transferred to the hospital the same day for emergency open heart surgery because the stent was entirely blocked and blood was flowing around it.

95.     In or around March 2012, PLAINTIFF MCCLENDON's scrotum swelled up dramatically.  He put in a sick call slip.  Two days later, a correctional officer was sent to see him and, upon seeing the swelling, immediately brought PLAINTIFF MCCLENDON to the infirmary.  However, this was a Saturday.  No doctor was on duty, no doctor was called, and PLAINTIFF MCCLENDON was not sent to the hospital.  Instead, PLAINTIFF MCCLENDON was sent back to his dormitory with an icepack.  The following Monday, PLAINTIFF

MCCLENDON was supposed to be seen by the doctor, but he was not put on the sick call list. Nonetheless, the correctional officers brought him to the infirmary, and he was then taken to the hospital.  His testicle had become gangrenous and had to be amputated.  He stayed approximately two weeks in the hospital.  After his hospital stay, he was returned to the Limestone infirmary.  However, he developed a staph infection and had to be readmitted to the hospital.

96.    From about 2002 through 2009, PLAINTIFF SELLERS was on medication for his blood pressure.  The medication controlled his blood pressure.  In 2009, while at Easterling, he was taken off his blood pressure medicine.  No medical staff discussed his being taken off the medications with him; he went to pill call one day and was told he no longer had prescriptions for the blood pressure medications.  After being taken off the medications, he felt the effects of his increasing blood pressure.  Since he was taken off the medications, he has suffered from migraines and has frequently felt flushed.  In November 2013, at the age of 40, PLAINTIFF SELLERS suffered a heart attack.

97.    PLAINTIFF MORK is currently housed in segregation.  In mid-April 2014, PLAINTIFF MORK had put his right hand out through the slot in his cell door to get the attention of a correctional officer.  The correctional officer grabbed his arm and yanked it upward, banging it on the top edge of the slot in the door, and then slammed the door against PLAINTIFF MORK's arm.  PLAINTIFF MORK's arm swelled up from this, but he received no medical care.  In late April 2014, the same thing happened again with his left arm.  The bone in his forearm became misshapen from the incident.  A nurse who passed by his cell during rounds said he should have an x-ray.  When he asked to be taken to medical to document any injuries

from the incident, no x-ray was taken, and none has been taken since.  He does not know if the bone is broken.

98.     In the fall of 2013, PLAINTIFF HAGOOD fell ill.  He was having difficulty starting and stopping urinating and it burned when he urinated.  He went to see medical, and provided a urine sample.  The nurse looked at the sample and stated that it looked clear so nothing was wrong.  No tests were done.  For several days, he did not eat because he was too weak to get himself down the hall to the dining area.  One day, he threw up after eating some food another prisoner brought him.  He submitted a sick call slip.  He saw Dr. Sangeeta Doshi three days later.  He told Dr. Doshi about the vomiting, the weakness and the difficulty urinating.  Dr. Doshi did not examine him but told him that nothing was wrong with him and sent him back to his dorm.  He continued throwing up that evening.  That night PLAINTIFF HAGOOD had to be sent to the emergency room at Jackson Hospital.  He was diagnosed with a kidney infection, and kept at the hospital for two days.  He has had no follow-up care for the kidney infection since he returned to the prison.  Since he came out of the hospital, he has been unable to stand.  He told Dr. Doshi of this development, but was never examined to determine the cause of the additional weakness.

99.     On one occasion in the last four years, PLAINTIFF TERRELL was hearing voices and he grew loud responding to them.  A correctional officer beat PLAINTIFF TERRELL, breaking his jaw and his rib, then put him into segregation.  PLAINTIFF TERRELL was not given any medical attention at the time.  Six months later, because he was in pain, he was seen in medical and given x-rays, at which point the broken bones were diagnosed.

100.    In spring 2014, PLAINTIFF TERRELL tried to change the channel of a television in the dormitory.  A correctional officer told him not to, grabbed him and spit in his face.

PLAINTIFF TERRELL tried to get away, and the officer called for back-up.  The officers then beat PLAINTIFF TERRELL, at least one of them using a baton.  He was taken to medical, where a wound on his head was taped up.  He was then sent to segregation for about six weeks.  While in segregation, his head wound was not treated and the dressing was not changed.

101.    PLAINTIFF SANFORD suffers from a seizure disorder.  He was taken off his seizure medication in or around 2010 because he had missed his morning doses on several occasions.  Morning pill call happens at about 4:00 a.m.  PLAINTIFF SANFORD, who takes medication to help him sleep at night, had overslept.  PLAINTIFF SANFORD has had two seizures since he was taken off the seizure medication.  The most recent one occurred in early May 2014.  When he came to after the seizure, he had a large knot on his forehead.  He had been given an icepack, but was never, as far as he knows, given any medical examination.  A nurse stated that he was "faking" the seizure.  Since his seizure, he has had at least one severe headache, although he does not ordinarily suffer from headaches.

102.    PLAINTIFF WILLIAMS has a long history of self-harm with sharp objects.  She is nonetheless provided with razors for shaving, and the razors are left with her in her cell.  On or about March 2, 2014, PLAINTIFF WILLIAMS was housed in segregation at Fountain.  She cut herself with a razor.  After PLAINTIFF WILLIAMS cut herself, she called out to a correctional officer who took her to the medical unit.  PLAINTIFF WILLIAMS's wound was dressed but not cleaned.  Due to the failure to adequately clean the wound, it became infected.

103.    PLAINTIFF VILLAR suffered a stroke on December 6, 2010 while in his cell at Holman.  Because he was unable to stand and reach the door of his cell, he was unable to obtain and submit a sick call slip for four days.  During this period he communicated with the nurses who came by for pill call that he believed he had had a stroke and needed medical attention.

They would not see him, however, without his submission of a sick call slip.  He was ultimately diagnosed with having suffered from a stroke on December 31, 2010.  His condition had significantly worsened in the interim.  As a result of his stroke, PLAINTIFF VILLAR lost the use of his left arm and hand, lost the vision in his left eye, lost much of the strength in his left leg requiring him to use a cane to walk, and lost control of his bowels and bladder. [8]

104.    PLAINTIFF VILLAR is partially paralyzed from a stroke suffered while in ADOC custody.  In late 2011, he was given just three physical therapy sessions.  The physical therapist told him that he needed to see a neurologist.  PLAINTIFF VILLAR has repeatedly asked to see a neurologist, but he has not been to see a neurologist.

105.    PLAINTIFF VILLAR has cataracts in his left eye and his right eye is blurry on and off.  In March 2013, PLAINTIFF VILLAR was sent to see an ophthalmologist at the UAB medical center.  The ophthalmologist confirmed that he had cataracts in his left eye and needed surgery.  A Corizon nurse told PLAINTIFF VILLAR that he would likely not get the surgery because he had one functioning eye.  PLAINTIFF VILLAR has not been provided with any treatment for the cataracts. PLAINTIFF VILLAR has serious dental problems.  Many of his teeth are loose, and two of his teeth fell out over the course of a couple weeks in the spring of 2014. He has been referred to an oral surgeon. The oral surgeon will not provide treatment for PLAINTIFF VILLAR's teeth until he is approved by a cardiologist.   The OFFICIAL CAPACITY DEFENDANTS will not send PLAINTIFF VILLAR to the cardiologist.   As a result, he cannot have the necessary dental work done.

106.    PLAINTIFF SEARS was diagnosed with Hodgkin disease in 1997 and was treated.  However, like many people who have had Hodgkin disease, PLAINTIFF SEARS

---

[8] The foregoing information is provided as background information only.  Only the failure to provide PLAINTIFF VILLAR with adequate medical care after October 1, 2011 is the subject of this lawsuit.

experiences extreme weight loss. While at Hamilton A & I, he received a double tray of food, Ensure (a nutritional supplement) and vitamins to maintain his weight. When he left Hamilton A & I, the double meals, Ensure and vitamins were all discontinued. PLAINTIFF SEARS is six feet tall and, when he arrived at Ventress in May 2013, he weighed 192 pounds. By February 2014, PLAINTIFF SEARS' weight had dropped 54 pounds to just 138 pounds. PLAINTIFF SEARS was then given an order for double portions, but is given only an extra piece of bread at meals. He continues to lose weight, though more slowly. As of the beginning of June 2014, he weighed 135 pounds. He is weak and exhausted. He is extremely gaunt and his head appears too large for his body. He has asked for Ensure and vitamins but been refused.

107.    While PLAINTIFF SEARS was at Hamilton A & I, his health code was a 4. He was transferred to Ventress to participate in a substance abuse program. While at Ventress, his health has deteriorated significantly. In June 2014, despite his continuing weight loss, and just a month after being given a one-year "no prolonged standing" profile, without having seen a doctor, his health code was changed to a 1, indicating that he is "generally healthy" or "stable" in chronic care.

108.    In 2012, PLAINTIFF BUSINELLE began rapidly losing weight. He dropped from 160 pounds to 125 pounds in about three months. He repeatedly asked to see a doctor, but was not permitted to.

109.    PLAINTIFF MOSELEY entered the custody of DEFENDANT ADOC confined to a wheelchair, as the result of a car accident in 2007. PLAINTIFF MOSELEY requested physical therapy but was informed by medical staff at Easterling that ADOC does not provide physical therapy to prisoners. PLAINTIFF MOSELEY began to self-administer physical therapy to teach himself how to walk again using weights, another prisoner's cane, and the advice of

fellow prisoners while at Easterling.  By April 2013, PLAINTIFF MOSELEY had taught himself how to walk, though with a limp. He still has muscle spasms in his legs four to five times a week and is in constant pain. DEFENDANT ADOC has only provided PLAINTIFF MOSELEY with a knee brace.

110.    In or around April 2014, PLAINTIFF MANER injured his left knee.  He was getting down from his bed, which is an upper bunk that has no ladder.  As he jumped down, he landed on his left leg.  He felt a great deal of pain in his knee and he could move the knee back and forth, hearing a pop each time he moved it. PLAINTIFF MANER submitted a sick call request to have his knee examined.  At the sick call, a nurse took is vital signs, gave him ibuprofen, and told him that he would need to see the facility doctor.  PLAINTIFF MANER has not seen the doctor or had any x-rays. PLAINTIFF MANER is currently self-administering physical therapy to his left leg to build strength.

111.    In July 2012, PLAINTIFF TORRES injured his knee.  He went to medical, and was given an ace bandage and crutches, but the knee, which had swollen significantly by the time he was taken to medical, was not examined.  He was not given an x-ray for about two weeks, and despite ongoing swelling for the next two years, he was not provided with any additional diagnostic testing or physical therapy.

112.    PLAINTIFF BROOKS has a severe keloid disorder, with large keloids covering much of his face, neck, chest, shoulders, back, and buttocks.  They have spread dramatically in the time PLAINTIFF BROOKS has been in ADOC custody.  They throb in cold temperatures, and throb and itch in hot temperatures. On one occasion, PLAINTIFF BROOKS passed out due to the pain from the keloids caused by the high temperatures in his dormitory.  The temperature and pressure of the showers in his dormitory cause him a lot of pain.  The many keloids on

43

PLAINTIFF BROOKS's chest, waist, and back prevent from him from stretching.  As a result, he often experiences pain in his chest and feels like his chest is caving inwards. PLAINTIFF BROOKS receives pain medication sometimes, but not consistently.  Medical staff refuse to provide PLAINTIFF BROOKS with anything for the itching caused by the keloids, and refused his request to bathe in the tub in the facility's infirmary to avoid the pain caused by water hitting the keloids in dormitory showers. PLAINTIFF BROOKS is unable to wash between the keloids on his back.  As a result, he relies on prisoners who are willing to clean between the keloids on his back with a cotton swab. When PLAINTIFF BROOKS is unable to clean between the keloids, an odor develops that intensifies in warm temperatures.

113.   PLAINTIFF BROOKS has requested surgery to remove the keloids approximately five times between October 2011 and April 2013.  His requests were denied. Medical staff informed PLAINTIFF BROOKS in December 2013 that he has been approved for a surgery to remove the keloids.  He did not have the treatment.  In or around March or April 2014, PLAINTIFF BROOKS was finally sent to a dermatologist who informed him that the keloids had grown so big that they could only be removed through radiation treatment.  The dermatologist also prescribed a medicinal soap, but medical staff failed to provide the soap to PLAINTIFF BROOKS.

114.   In or around 2012, PLAINTIFF ROGERS was bitten three times by a spider.  The bites developed into large wounds.  PLAINTIFF ROGERS went to the infirmary three or four times to get treatment for the wounds.  Medical staff told ROGERS that he was "nasty" and needed a bath; they did not treat his wounds.  Over the course of three weeks, the wounds grew larger, and PLAINTIFF ROGERS became feverish and began vomiting.  A correctional officer

took him to the infirmary to get him treated.  He was given a cream, medicated soap and gauze to protect the wound, and the wound eventually healed.

115.    PLAINTIFF BRAGGS has a grapefruit-sized hernia. The prison doctor has told PLAINTIFF BRAGGS that he will not recommend surgery because the hernia is not life threatening.

116.    In July 2013, and prior to his placement in ADOC custody for the second time, PLAINTIFF HENDERSON learned that he has a mass on his colon that is either cancerous or a symptom of Crohn's disease. PLAINTIFF HENDERSON entered the custody of ADOC before he could receive medical treatment for the mass. PLAINTIFF HENDERSON informed medical personnel of the mass during his intake examination at Kilby. The personnel told him that the mass is only polyps and that he should not worry about it. PLAINTIFF HENDERSON later showed medical personnel at Ventress his medical records indicating that the polyps are either cancerous or a symptom of Crohn's disease. PLAINTIFF HENDERSON has seen blood in his stool since July 2013 and tested positive for blood in his stool several times in 2014, but has not received any treatment.

117.    PLAINTIFF MITCHELL is in a wheelchair.  He has been informed by a doctor at the University of Alabama Birmingham that he might be able to walk again if he was provided with physical therapy.  PLAINTIFF MITCHELL has made repeated request for physical therapy. He has not had any physical therapy, and has been informed by Hamilton A & I staff that prisoners are not given physical therapy.

118.    PLAINTIFF FOLSOM suffers from severe headaches, which have persisted for approximately five years. PLAINTIFF FOLSOM's headaches have gone unexamined and

untreated for more than four years, despite PLAINTIFF FOLSOM's requests for medical evaluation.

119.    PLAINTIFF FOLSOM also has a lump in his left breast, which has not been treated or removed. Medical staff discovered the lump four years ago. The lump in PLAINTIFF FOLSOM's left breast causes PLAINTIFF FOLSOM a great deal of pain.

120.    In or about 2011, PLAINTIFF FOLSOM learned he had a cyst in his liver. About a year later, PLAINTIFF FOLSOM was told the cyst was not in his liver, but in his kidney. In or about 2014, PLAINTIFF FOLSOM learned he had two cysts, one in each of his kidneys. He has been told neither the cysts nor kidneys need to be removed.

**3.  DEFENDANTS deny treatment for eye problems.**

121.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of not treating cataracts and other eye problems.

122.    PLAINTIFF TORRES was diagnosed with cataracts in both eyes as a child.  In or around 2011, PLAINTIFF TORRES visited the Callahan Eye Clinic in Birmingham, Alabama. Doctors informed him that the vision in his left eye had substantially deteriorated.  Doctors advised PLAINTIFF TORRES that if he does not have surgery on his left eye, he will lose vision in that eye. In or around 2011 and after his visit to the Callahan Clinic, PLAINTIFF TORRES put in a sick call request to see the facility optometrist. The optometrist examined PLAINTIFF TORRES by asking him to read a letter chart only. Afterwards, he informed PLAINTIFF TORRES that ADOC will not pay for his eye surgery and prescribed him a pair of glasses. PLAINTIFF TORRES stopped using the eye glasses after a short time because they did not improve his vision and gave him headaches. The glasses eventually broke and medical staff refused to give him another pair because he discarded the frames.

123.    Since 2011, PLAINTIFF TORRES has experienced increasingly severe headaches that are so painful that they prevent him from sleeping. He experiences strain in his right eye due to the weakening of the left. As time passes, his vision worsens and he sees spots and fog periodically.

124.    PLAINTIFF MOORE developed glaucoma in 2008.  He was in the process of arranging surgery for his glaucoma with the Franklin Clinic in Mobile when he was arrested. After he was arrested, the eye doctor in the Mobile County Jail examined PLAINTIFF MOORE's eyes and stated that he needed surgery for his glaucoma immediately.  The eye doctor said that he was writing this in PLAINTIFF MOORE's records that would go to ADOC.  When PLAINTIFF MOORE came into ADOC custody, he had an appointment with an eye doctor every three months, later reduced to every six months.  He spoke with the eye doctor three or four times about getting surgery to treat his glaucoma.  The eye doctor repeatedly told him that the state would not pay for glaucoma surgery because it did not have the money.  His last appointment with the eye doctor was in the summer of 2013.  In or around February 2014, PLAINTIFF MOORE spoke with the Director of the Pardons and Parole Board who also told him there was inadequate money to pay for his surgery.

125.    PLAINTIFF ROGERS has not been able to see out of his left eye since 2012.  He believes the problem is cataracts.  Also, the white of his eye is swollen and droopy, blocking his vision.  He had cataract surgery on his right eye about eight years ago, but his right eye now has double vision.  He has been given glasses, but they do not help with his eyesight at all.  He has received no other treatment for his eyesight.

126.    Larry Shepherd, then a prisoner in the custody of DEFENDANT ADOC, developed cataracts in both eyes in or around April 2011.  He was unable to read any of the

letters on the eye chart by June 2011.  He was sent out to see an ophthalmologist in November 2011.  The ophthalmologist prescribed that he undergo surgery on the cataracts in both eyes "ASAP."  As of November 2012, he had not had the surgery.  He was released on medical furlough at that time, and was able to have surgery on his right eye in February 2013.

### 4.  DEFENDANTS do not treat hepatitis C.

127.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of not treating hepatitis C.  According to a report provided to DEFENDANTS SHARP's predecessor and DEFENDANT NAGLICH, in April 2014, 2,280 prisoners in the custody of DEFENDANT ADOC had been diagnosed with hepatitis C, but just seven of them were receiving treatment.

128.    The failure to treat prisoners for hepatitis C creates a significant risk of serious harm.  One prisoner at Holman recently died from complications from untreated hepatitis C.  Numerous individuals develop jaundice at Holman and do not receive treatment.  A prisoner at Ventress has untreated hepatitis C and is suffering from liver failure.

129.    PLAINTIFF MORK was diagnosed with hepatitis C shortly before entering ADOC custody.  At that time, the doctors at the University of Alabama at Birmingham hospital were about to start him on medications.  In late 2011 or early 2012, while housed at Limestone, the doctors told him that his hepatitis had progressed far enough that he should begin receiving treatment.  A doctor at Limestone told PLAINTIFF MORK that they did not treat everyone because the medication was too expensive, but that he could submit a request.  PLAINTIFF MORK submitted the request, but never heard back.  PLAINTIFF MORK was subsequently transferred to Holman, where he has not received any treatment.  To the best of his recollection, he has not had his viral load checked for seven or eight months, and his blood is rarely checked.

130.    PLAINTIFF SELLERS has hepatitis C.  He is receiving no treatment for it.  In 2011, he tested positive for tuberculosis (TB) exposure and was given Rifampin.  PLAINTIFF SELLERS developed jaundice and had to discontinue Rifampin.  Since that time, the enzymes in his blood have repeatedly tested high, indicating that his liver is not functioning appropriately.

131.    Michael Kennedy is a prisoner housed at Staton.  He was born with hepatitis C. After he came into ADOC custody in 2012, he was told that he is too sick to be treated for hepatitis C.  Although he is in a great deal of pain and was prescribed Phentanyl, he receives only Tylenol 3 for his pain.  His liver is ordinarily drained every two months, at a hospital, with the use of an ultrasound machine to determine where the draining catheter should be placed. However, in February 2014, this procedure was done at Staton's infirmary, rather than an outside medical facility.  There was no ultrasound used.  Instead, the doctor felt his abdomen and guessed where to place the catheter.  It was significantly more painful than when the procedure was done in the hospital.

132.    PLAINTIFF HENDERSON has made several requests for hepatitis C treatment, including on June 29 and July 9, 2014, but has been denied. In 2007, facility medical staff at Bullock told PLAINTIFF HENDERSON that he did not qualify for the hepatitis C treatment because he had a short time left on his sentence. In 2013, medical personnel at Kilby erroneously told PLAINTIFF HENDERSON that all of the possible treatments for the hepatitis C would harm his liver. In 2014, medical personnel refused to provide PLAINTIFF HENDERSON treatment for hepatitis C due to his liver condition.

133.    While residing at Limestone in 2008, PLAINTIFF HENDERSON learned that the lack of treatment for hepatitis C has led to high levels of ammonia in his brain, causing him to experience confusion, memory loss, and cognitive difficulty.   The medication that

DEFENDANT SHARP's and DEFENDANT NAGLICH offered PLAINTIFF HENDERSON to treat the high ammonia levels causes severe diarrhea.   The OFFICIAL CAPACITY DEFENDANTS have not offered PLAINTIFF HENDERSON treatment to offset the effects of the diarrhea nor an alternate medication that does not have this side effect.

> **5.  DEFENDANTS deny prisoners treatment for diabetes.**

134.   The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of not providing adequate care for diabetes in a number of different ways.

135.   The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of not providing appropriate nutrition and medicine to control diabetes.   For example, PLAINTIFF GILBERT's diabetes has not been well-controlled since he has been in ADOC custody.   Since he has been at Kilby, his blood sugar level in the early mornings is typically around 300 or 400 milligrams per deciliter (mg/dL); the target level before eating is 70-130 mg/dL.   At other points in the day, he feels his blood sugar level dropping, and he gets shaky and breaks out into a sweat. He has passed out from low blood sugar between 15 and 20 times in the two years he has been in ADOC custody.   When he first came to Kilby, snacks were provided to diabetics to keep with them so they could be eaten when needed.   Now, diabetics are called to the cafeteria at some point in the evening for snacks. The snacks must be eaten at the time they are offered, rather than when they are needed.   Prior to coming to ADOC, he was on a long-acting, 24-hour insulin that controlled his diabetes better.   He has asked if he can be put back on the 24-hour insulin, but was told by a doctor that he cannot because it is too expensive.

136.   At Kilby, several times each week, someone has a sufficiently serious diabetic crisis that they must be carried to the infirmary.

137.    In approximately 2004, PLAINTIFF BRAGGS's right leg was amputated at the knee due to lack of medical treatment while in prison. Prior to losing his leg, PLAINTIFF BRAGGS, who has diabetes, complained of numbness and tingling in his foot to prison medical staff for approximately three weeks. Prison medical staff told PLAINTIFF BRAGGS he had athlete's foot.  PLAINTIFF BRAGGS is currently experiencing similar problems with his left foot.  Medical staff at Hamilton A & I have provided PLAINTIFF BRAGGS with a prescription for the foot numbness, but have not addressed the reason his foot is numb and tingling. PLAINTIFF BRAGGS does not know the name of the medicine he has been given for the numbness. When he asked about possible side effects of this medication, a nurse said that PLAINTIFF BRAGGS could "look up" the side effects of his medication.   PLAINTIFF BRAGGS is not aware of any way in which he could look up the side effects.

138.    PLAINTIFF BROYLES also has diabetes that is not well controlled.  While he was at Bullock, he collapsed four times from having low blood sugar. On one occasion, he was in his bed, fell out, and hurt his head.  His sugar blood sugar level was 40 mg/dL.  He was transferred to Elmore in January 2014, and has also collapsed there from low blood sugar.

139.    PLAINTIFF COPELAND has poorly controlled diabetes as well.  His blood sugar levels are generally between 150 and 350 mg/dL.  On one occasion, when his blood sugar level was toward the low end of the target range, 79 mg/dL, a nurse tried to give him insulin anyway. This would have brought his blood sugar level down, likely to a dangerously low level.

140.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of not having diabetic prisoners' toenails clipped for them.  PLAINTIFF HAGOOD, who is diabetic and paralyzed on one side of his body from a stroke, asked to have his toenails clipped.  Clipping his own toenails is dangerous because he can easily give himself a small cut that, because he is

diabetic, creates a risk of infection and amputation. The nurses laughed and told him that they were not in the prison to clip his toenails.

141.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of denying diabetic prisoners appropriate foot care. PLAINTIFF ROGERS has not seen a podiatrist since he came into ADOC custody, although he visited one regularly prior to his incarceration. PLAINTIFF COPELAND's feet and legs are consistently swollen and painful, but he has not seen a podiatrist.

142.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of denying diabetic prisoners appropriate footwear. PLAINTIFF GILBERT was given an orthopedic shoe that rubbed the skin off his toe because the shoe was too small. He asked for a new shoe, but was denied. He had to cut away the top of the shoe. PLAINTIFF HAGOOD asked for diabetic shoes and was told that because he is in a wheelchair, he does not need shoes.

143.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of denying diabetic prisoners appropriate eye examinations and adequate treatment as needed.

**6. DEFENDANTS deny prisoners adequate dental treatment.**

144.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of denying prisoners adequate dental care.

145.    At some facilities, prisoners' teeth are rarely cleaned. Dentists do not generally fill cavities. Once a prisoner's tooth becomes decayed, the only treatment available in most facilities is to have the tooth pulled. Once pulled, the teeth are not replaced unless the prisoner has lost numerous teeth.

146.    PLAINTIFF DILLARD has never had his teeth cleaned in the eight years he has been at Bullock. PLAINTIFF DILLARD's left front tooth turned dark brown in early 2013. He

saw a dentist after the tooth turned brown, and the dentist said that he would see PLAINTIFF DILLARD again about the tooth.  He did not.  After PLAINTIFF DILLARD moved to the mental health dormitory in the main building at Bullock, he saw the dentist again.  The dentist said to "put him on the list."  PLAINTIFF DILLARD saw the dentist again around the end of April 2014.  The dentist did not work on the tooth at either of these appointments.  The dentist said that he would try to save the tooth, but has not yet done anything for the tooth.

147.    PLAINTIFF TERRELL's two upper front teeth are mottled dark brown and black, particularly near the gum line.  They are both loose.  The last time he saw a dentist was, he believes, about one and a half years ago.  He recently asked to see the dentist and was told he is "on the list" but that he could not see the dentist.

148.    PLAINTIFF BROYLES's dentures broke about three years ago.  He has not been provided with new dentures.

### C. DEFENDANTS Routinely And Systematically Delay Diagnosis And Treatment Of Serious Medical Needs.

149.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of delaying diagnosis and treatment to prisoners with serious medical conditions, causing prisoners in Alabama unnecessary pain, suffering, disabilities and sometimes death.  The policy and practice of delaying diagnosis and treatment creates a substantial risk of serious harm.

150.    Numerous prisoners have complained of symptoms for months without anyone addressing their concerns, only to be diagnosed with advanced stage cancer that is terminal by the time it is diagnosed.  For example, Robert Jones, a prisoner who had been treated for prostate cancer in 2006 started showing rapidly rising PSA levels in 2011.  Rising PSA levels are an indication of prostate cancer, requiring additional tests.  He began vomiting, sometimes vomiting blood, on a regular basis.  However, he was not given necessary tests or diagnosed until a year

and a half later in February 2013.  By that time, his prostate cancer had metastasized, spread to his bones, and was terminal.  He died in January 2014.

151.    PLAINTIFF TOLLAR had a chest x-ray in or around February 2014 because of a TB outbreak at St. Clair.  There was a spot on his lung.  He had a CT scan in or around late March 2014.  On or about April 14, 2014, PLAINTIFF TOLLAR was told that the CT scan showed that he had cancer and that he would be sent out for a biopsy the following day.  As of May 28, 2014, PLAINTIFF TOLLAR had not been sent out for a biopsy of the cancerous spot on his lung.  PLAINTIFF TOLLAR did not start chemotherapy until late September 2014.

152.    PLAINTIFF BAKER was diagnosed with a lump in her breast in January 2012, while in ADOC custody.  A biopsy in August 2012 indicated that the lump was not malignant, but outside medical staff instructed her to have annual check-ups to monitor the lump. Despite informing facility medical staff that she needed an annual mammogram,, she did not receive any follow-up care necessary to confirm that the lump had not grown or become malignant, prior to being added as a named plaintiff in this lawsuit.  She received a mammogram in approximately September 2014, more than two years after her biopsy and approximately two months after being added to this lawsuit.

153.    In April 2014, a prisoner at St. Clair had an infection in his left foot that went untreated for long enough that his foot became gangrenous and had to be amputated.  Also in April 2014, a prisoner at Bibb had an infection in his right foot that went untreated for long enough that the front portion of his foot had to be amputated.

154.    PLAINTIFF SMITH came into ADOC custody eight years ago.  He was set to have a surgery in summer 2007 to address an infection in his groin area.  In anticipation of this surgery, doctors required PLAINTIFF SMITH to begin using a catheter.  He was to use the

catheter for three months.  PLAINTIFF SMITH entered ADOC custody before he could have the surgery.  As of the time of filing this lawsuit, he had not had the surgery.  He had frequent infections from the catheter, often requiring hospitalization.  His urine is often a brownish color and may have blood in it.

155.    In February 2014, an infection from PLAINTIFF SMITH's catheter had gotten so bad that he had to be taken to Jackson Hospital for a series of visits.  During these visits it was determined that PLAINTIFF SMITH's bladder was now incapable of holding the normal amount of fluid.  Fluid leaks from PLAINTIFF SMITH's penis and pockets of pus repeatedly form around his groin area. PLAINTIFF SMITH endures pain so severe that he is often unable to sleep.

156.    In late 2014, after a seven-year delay and only a few months after the filing of this lawsuit, PLAINTIFF SMITH was finally given the surgery he needed.

157.    Starting in the summer of 2010, PLAINTIFF SELLERS began to experience pain in his lower back and difficulty urinating, and occasionally saw blood in his urine.  He told medical staff, but was given only Ibuprofen for the back pain.  His pain and urination difficulties increased over the following three years.  By July of 2013, he had blood in his urine every day, and was in so much pain that he could not lay flat on his bed.  Following a heart attack in November 2013, he was transferred to Kilby.  He had an MRI, from which it was discovered that he had kidney stones.  PLAINTIFF SELLERS was placed on a medical hold, so that he could have the kidney stones removed.  He was prescribed Flomax to treat the kidney stones and Norco for pain, and was scheduled for surgery.  However, on December 31, 2013, he was transferred to St. Clair.  His medical records were not transferred to St. Clair.  His diagnosis was not promptly communicated to staff at St. Clair, he was not provided with his medications, and it was months

before his surgery was scheduled.  PLAINTIFF SELLERS finally had kidney surgery on March 7, 2014, more than three and a half years after he began having symptoms from the kidney stones, and more three months after the kidney stones were ultimately diagnosed.

158.    The day of PLAINTIFF SELLERS's surgery for kidney stones, he was returned to his general population housing unit at St. Clair.  Within two days he was feverish from infection.  He asked to be admitted to the infirmary at St. Clair.  In the infirmary, he was left in a storage closet overnight, then returned to his housing unit.

159.    PLAINTIFF PRUITT was splashed in the eyes with disinfectant when he was in suicide watch in December 2013.  He was taken to a hospital the following day.  A doctor there recommended that he see an eye specialist.  He has not seen an eye specialist.  His vision has been cloudy since this incident.

160.    In 2013, PLAINTIFF PRUITT injured his back while lifting weights.  He received a pain medication after the injury but continues to experience pain in his lower back.  At times the pain is so severe that he is unable to get out of bed.  He currently receives ibuprofen and wears a back brace but receives no other treatment for the constant pain. He has not been evaluated by a back specialist.  When he asked to see a doctor in the free world, he was told by medical staff that there was no need to see anyone about his back.

161.    On or about May 1, 2014, PLAINTIFF PRUITT was housed in segregation and the toilet in his cell became stopped up.  On or about May 8, 2014, PLAINTIFF PRUITT was attempting to summon assistance because of the stopped up toilet by sticking his right hand out through the food slot in the door of his cell.  A correctional officer pushed the door of the slot up, forcing his hand up and back.  His hand swelled up immediately.  He was then maced through the slot in the door.  There were no decontamination procedures taken.  He was not taken to

shower, and his cell was not decontaminated.  He only option for decontamination was to use his hands, one of which was injured, to wash his face in the sink that is a single unit with the toilet that had been stopped up for a week.  He was given 20 days of restriction in segregation.  He was not taken to medical that day for his hand.  He was taken the following day and given aspirin.  It was not until four days after the incident that his hand was x-rayed.  He does not know the results.  As of June 16, his hand continues to cause him significant pain and he has difficulty moving his thumb.

162.    In or around June 2012, PLAINTIFF BUSINELLE began complaining of serious tooth pain in two teeth, and asking for the two teeth to be removed.  PLAINTIFF BUSINELLE put in repeated sick call requests relating to the pain from these two teeth for two and a half years, before they were finally extracted in late 2014.

### D. DEFENDANTS Routinely And Systematically Fail To Provide Adequate Emergency Care.

163.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of failing to respond adequately to medical emergencies.  The poor response results in a substantial risk of serious harm, as well as pain, loss of function, and even death.

164.    As discussed above, in January 2014, a prisoner who was injected with something incorrectly during dialysis at St. Clair went into cardiac arrest.  Although there was a crash cart in the dialysis unit, no one present knew how to use it.  The prisoner died.

165.    PLAINTIFF DUNN cut himself with a razor blade on several occasions during a nine-month period in segregation.  On one occasion, on or about March 15, 2014 just before 6:00 p.m., he cut himself so deeply that he cut a tendon in his forearm.  PLAINTIFF DUNN promptly told a sergeant that he had cut himself.  The sergeant responded, "Why do you keep doing this on my shift? Why don't you just go ahead and kill yourself."  Shortly after 6:00 p.m., a nurse came

by, and PLAINTIFF DUNN showed the nurse his arm.  The nurse said he would return when he had time, but did not come back.  At approximately 9:00 p.m., PLAINTIFF DUNN was taken out of his cell and placed in a cell outside.  He was beaten by two officers in the cell, then left there for another hour.  At approximately 10:00 p.m., he was taken to the infirmary.  The nurse at the infirmary attempted to staunch the blood flow from PLAINTIFF DUNN's arm, but was unable to do so.  At approximately 11:00 p.m., PLAINTIFF DUNN was taken to Brookwood Medical Center ("Brookwood"), where several staples were put into his arm to hold the wound closed.  The doctor at Brookwood instructed that PLAINTIFF DUNN should be returned to the hospital for follow-up care if he experienced weakness as a result of the cut in the tendon.  Although PLAINTIFF DUNN did experience weakness in his arm, he received no care for the weakness.

### E.  DEFENDANTS Fail to Adequately Provide And Manage Medications, Medical Supplies, and Medical Devices.

166.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of not consistently providing and managing medications and other medical supplies.  The medical staff in Alabama prisons makes frequent medication errors or otherwise deprive prisoners of prescribed medications.

167.    PLAINTIFF COPELAND takes medication for high blood pressure and diabetes.  Many months his medications run out before he is scheduled to see the doctor again.  When this happens he has to ask to be seen in sick call, first by a nurse, then by a doctor.  The process can take several days.  The longest he has gone without his medications is about two weeks.  When he is not on his medications, he sweats, gets dizzy and suffers from headaches.  Several prisoners describe medications running out before the end of the prescription.

168.   PLAINTIFF ROGERS takes medication for diabetes.   In March 2014, the medication was abruptly discontinued without any discussion with a doctor.   PLAINTIFF ROGERS went for approximately two months without his medication.

169.   PLAINTIFF HAGOOD also takes medication for diabetes.   In or around May 2014, his diabetes medication was cut in half.   His blood sugar levels immediately rose from running at around 98 mg/dL to close to or over 200 mg/dL.

170.   PLAINTIFF BROOKS had a prescription for pain medication for his keloid condition.   He had had the prescription for approximately two years.   In February 2014, the prescription was discontinued.   He had not had any discussion with the doctor about discontinuing the medication.   He only learned of the medication being discontinued when he went to get it at pill call.

171.   Additionally, nearly all prisoners interviewed reported that they did not give informed consent to medications.   They were not informed of the purpose, risks, side effects and benefits of the medications prescribed to them.

172.   On two occasions, PLAINTIFF DILLARD has been given the wrong medicine. On one occasion, he was given the wrong medicine during evening pill call.   He went back to his bed and lay down.   He got up about an hour later, and was unable to talk or walk.   Other prisoners called for correctional officers, and he was escorted to the infirmary where he was given a shot and then brought back to his dormitory and put to bed, where he slept off the medication.   On another occasion, PLAINTIFF DILLARD was given the wrong medication by the nurse.   He saw that he had the wrong medication and told the nurse.   The nurse told him that the doctor had changed his medication.   He said that he would not take the medication because it was not his.   The nurse then gave him the medication he had previously been taking.

173.    PLAINTIFF DILLARD has also witnessed what he perceived as other prisoners having bad reactions to medication on approximately six occasions.  PLAINTIFF DILLARD has witnessed numerous other prisoners look at their pills at the pill call window and tell the nurse they have the wrong medications.   On two occasions, PLAINTIFF DILLARD saw the correctional officers walk up to the prisoners who stated that the medications were wrong, slap them and tell them to take the medications.

174.    PLAINTIFF BAKER takes several medications for heart disease, arthritis, and several mental health conditions.  PLAINTIFF BAKER routinely goes without her medications. Starting in the fall of 2013, she went about eight months without her heart medication, which she is supposed to receive once a month.  PLAINTIFF BAKER has also received improper dosages of folic acid and methotrexate from the pharmacist.

175.    Medical staff have given PLAINTIFF BAKER the wrong medication many times. On one occasion, she suffered a severe reaction to an incorrect medicine that was given to her. She has no recollection of what happened, but has been told by other prisoners that she was completely out of control for several hours.

176.    PLAINTIFF BROYLES has been given the wrong medication at pill call a few times.  He has refused to take medication that was not correct and been harassed by correctional officers for doing so.

177.    PLAINTIFF VILLAR has asked for incontinence protection briefs because, due to his stroke, he often soils his bed at night.  Medical staff has refused to provide the necessary briefs.

178.     Similarly, PLAINTIFF HAGOOD has asked for incontinence protection briefs because, due to his stroke, he cannot feel when he needs to urinate.  Medical staff has refused to provide the necessary briefs.

### F.  DEFENDANTS Have Inadequate Procedures For Preventing And Responding To Outbreaks Of Infectious Diseases In ADOC Prisons.

179.     The OFFICIAL CAPACITY DEFENDANTS have no effective system for preventing or managing infectious diseases.

180.     In recent years, there have been numerous TB outbreaks in Alabama's prisons.  In or around January 2014, there was an outbreak of TB at St. Clair.  Several men have been diagnosed with active TB.  Medical staff at St. Clair have determined that a man who was diagnosed in February 2014 had likely been infectious for a year.  One of the men diagnosed with TB worked in the kitchen until the day he was diagnosed.  Many prisoners at St. Clair did not have a TB test done during their physicals in 2013.

181.     A correctional officer who was known by DEFENDANT SHARP's predecessor and DEFENDANT NAGLICH to have active TB was allowed to continue working at Tutwiler during September 2013.  He was stationed in places in the facility where it was deemed that he would have limited contact with prisoners and other employees and contractors of ADOC, but he was allowed to continue working until he was physically unable to do so.

182.     At Donaldson in the summer of 2012, Dormitory K, which houses 130 men, was under purportedly under quarantine for TB.  The people in Dormitory K mixed freely with the people in the adjacent dormitory and, to a lesser degree, with the prisoners housed in two more dormitories of the same size.

183.     There is an outbreak of scabies at Ventress that has been ongoing for three years or more.  Early on in the Ventress scabies outbreak, prisoners were instructed to place their

mattresses over a fence in the yard during the day to air them out.  When the prisoners collected them at night, there was no way to ensure that each person got the same mattress he had had before.  Such mixing of mattresses creates a high risk of infections spreading from one person to another.

184.    There has also been an outbreak of scabies at St. Clair, Holman and Tutwiler in recent months.

185.    Moreover, the conditions in the prisons make the spread of disease nearly inevitable.  The prisons are grossly overcrowded.  Prisoners in every facility report the presence of vermin, especially rats and spiders. The vermin live in the housing units and in the kitchens. In various prison units, birds enter and leave droppings.

186.    Additionally, the facilities have extensive plumbing problems.  The showers, toilets and sinks are inadequate to meet the needs to twice the number of people the facilities were built to house.  Few if any of the prisons have upgraded the plumbing systems sufficiently to meet the demands of the prisons operating at twice the capacity.

187.    Sewage has overflowed into dormitories at Kilby and St. Clair.  At Ventress, prisoners have been required to carry raw sewage away from the facility to dump on the edges of the facility grounds.  At Hamilton A & I, there is a ditch of sewage near one edge of the property.  The administration of the facility had a footbridge built over the ditch.

### G. DEFENDANTS Deny Care to Terminally Ill Prisoners, Issuing 'Do Not Resuscitate' Or 'Allow Natural Death' Orders Against The Patient's Wishes.

188.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of allowing doctors to discontinue care to terminally ill prisoners against their will. This is a policy and practice that has continued over years and has been reported in these DEFENDANTS' own documents.

189.    One of the most basic health care decisions is when to discontinue treatment for a terminally ill patient.  This is a decision that resides with the patient.  Numerous prisoners have been given "Do Not Resuscitate" orders ("DNR") or "Allow Natural Death" orders ("AND") without their consent or even their knowledge.

190.    In some cases, the doctors have discussed this issue with prisoners, the prisoners have affirmatively declined to be DNR or AND, but have been made DNR or AND regardless of their refusal.  In some cases, individuals have been persuaded to sign DNRs without knowing what they were signing.  The DNRs used by the OFFICIAL CAPACITY DEFENDANTS provide only that in the event of a cardiac arrest, cardiopulmonary resuscitation not be initiated. Nonetheless, the OFFICIAL CAPACITY DEFENDANTS rely on DNRs to deny medical care to prisoners.

191.    At Staton in May 2014, there were five individuals who were on a list of persons who had DNRs who did not know that they were thought to have DNRs.  One of these individuals was PLAINTIFF COPELAND.  PLAINTIFF COPELAND is blind.  No one spoke to him about signing a DNR or ever told him that a document he was being asked to sign was a DNR.  Another prisoner who was listed as having a DNR is Michael Kennedy.  Kennedy had end-stage liver failure from untreated hepatitis C.  In early 2014, Kennedy learned from a doctor at Staton that Dr. Bobby Crocker, the Corizon Regional Medical Director for the state, had placed a DNR order in his file, although Kennedy had not agreed to it.  Kennedy asked to have it removed from his file.  As of May 2014, Kennedy remained on the list of individuals who are considered to have DNRs.  Kennedy has since died.

192.    At Staton, prisoner Roy Heath resides in the facility's infirmary due to his health. He did not sign a DNR. In June 2014, he learned that he has a DNR in his medical file despite

not having signed one. PLAINTIFF CLEMENTS has COPD.  He experiences extreme shortness of breath and low oxygen levels, and has periodic COPD crises that require him to be admitted to the infirmary. Prior to late spring or early summer 2013, medical staff gave PLAINTIFF CLEMENTS a shot of Sodium Metrizoate every six to eight hours whenever he had a COPD crisis, along with a breathing treatment, oxygen, and several inhalers during an COPD crisis.  In or around late spring or early summer 2013, PLAINTIFF CLEMENTS was admitted to the infirmary due to an exacerbation of the COPD.  Several days into his stay in the infirmary, Dr. Crocker asked to see PLAINTIFF CLEMENTS, requiring PLAINTIFF CLEMENTS to temporarily stop using oxygen to meet with Dr. Crocker. Dr. Crocker asked Clements if had considered how he would feel to be on life support if he had a heart attack or was in a coma and told Clements that if he signed a DNR, he could avoid that fate. Having difficulty breathing because he was not using an oxygen mask and believing that the DNR only pertained to life-saving measures in the event of a heart attack or coma, PLAINTIFF CLEMENTS signed the DNR.

193.    In or around August 2013, PLAINTIFF CLEMENTS experienced another bout of extreme breathing difficulty and again went into the infirmary. His oxygen level was 80. During his 30 day stay in the infirmary, medical staff gave PLAINTIFF CLEMENTS only one shot of Sodium Metrizoate. Despite PLAINTIFF CLEMENTS's condition, medical staff did not arrange for his transport to a hospital.

194.    PLAINTIFF CLEMENTS returned to the infirmary again in or around February 2014 experiencing difficulty in breathing. His oxygen level was 92. As he lay in the infirmary, PLAINTIFF CLEMENTS asked the nurse to provide him with some effective treatment. The nurse responded that if he had not signed the DNR, medical staff could do something to help

him. It was at that point that he learned that medical staff was refraining from treating his chronic condition due to the DNR.  Although the DNR is rescindable merely by the prisoner stating that he wants it rescinded, medical staff did not explain this to PLAINTIFF CLEMENTS.  Because he did not know that he could rescind the DNR, PLAINTIFF CLEMENTS requested that medical staff give him pain medication and put him in a closed room in the infirmary to die. Facility physician Mendez ultimately gave Clements several shots of Sodium Metrizoate and antibiotics.

195.    At Kilby, prisoner Larry Shepherd signed a DNR in April 2012 without knowing what he had signed.  Shepherd was blind from untreated cataracts and no one told him about the document he was signing.  When he learned that he had signed a DNR, he asked to have it rescinded.  DEFENDANTS did not rescind it.  To the contrary, DEFENDANTS relied on it in their response to the lawsuit Shepherd had filed seeking to have cataract surgery.

196.    An Incident Report from Hamilton A & I reflects that on September 9, 2009, a prisoner was found in crisis.  Life saving measures were started, and the doctor was called.  The doctor told the staff that was present with the prisoner to "make him a DNR."

197.    Moreover, the OFFICIAL CAPACITY DEFENDANTS cease to provide medical treatment to people with DNRs.  As discussed above, DEFENDANT SHARP's predecessor and DEFENDANT NAGLICH denied prisoner Larry Shepherd cataract surgery based in part on the existence of the DNR.

198.    At Kilby, prisoner Robert Jones was admitted to the infirmary from Jackson Hospital in November 2013.  He did not sign a DNR or a request for hospice care, but was placed on hospice care.

**H. DEFENDANTS Allow Correctional Officers To Interfere With Prisoners' Access To Medical Care.**

199.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of allowing correctional officers to deny or delay access to medical care.   The OFFICIAL CAPACITY DEFENDANTS have not adequately trained security and health care staff on how to handle health care emergencies, and as a result of this failure to respond properly and timely to emergencies, prisoners suffer avoidable harm and injuries, including unnecessary deaths. Correctional staff make critical initial decisions about the medical care needed.

200.    In December 2013, PLAINTIFF PRUITT was on suicide watch.    At approximately 3:00 a.m. on December 13, 2013, another prisoner threw burning fabric into PLAINTIFF PRUITT's cell and the other suicide watch cell, burning PLAINTIFF PRUITT's legs.   Prisoners on the second floor of the unit where the suicide watch cells are located also threw burning items into the cell.   The correctional officers came and put out the fires, but failed to do anything to stop this assault.   The assault continued for approximately three hours.   When PLAINTIFF PRUITT asked to go to see the medical staff, the correctional officers refused, dismissing his injuries as "minute" and "nothing."   He was not taken to see medical staff until the morning of December 14, 2013.

201.    Starting on December 14 or 15, 2013, prisoners started throwing disinfectant onto PLAINTIFF PRUITT.   Some of the disinfectant went into his eyes.   Correctional officers did not take him to get medical attention until the following day.

202.    On June 12, 2014, PLAINTIFF PRUITT was in segregation.   He had been asking for mental health care for months.   He cut himself with a razor on both arms.   When he informed the corrections officer that he was bleeding, the officer ignored him and left him in the cell for approximately four to five hours before taking him to the nurse.

203.    In March 2014, PLAINTIFF WILLIAMS was in segregation at Fountain.  She had an infection from a wound that had not been properly treated by the medical staff.  After she had returned to the infirmary and gotten the infected wound properly cleaned and dressed, medical staff told her she should return to the infirmary twice a day to have it re-dressed. Correctional officers in the segregation unit did not permit her to return to the medical unit, and the wound became infected again.

204.    Corrections officers are often present before or during medical examinations. They sometimes make comments during the examinations suggesting or stating that the prisoner is lying to the medical professional.  PLAINTIFFS ROGERS, BRAGGS and PRUITT have experienced correctional officers interfering in their discussions with medical staff.

## II.  DEFENDANTS FAIL TO PROVIDE ADEQUATE MENTAL HEALTH CARE TO PRISONERS.

205.    The OFFICIAL CAPACITY DEFENDANTS fail to provide constitutionally adequate mental health care in a number of ways. Their mental health care delivery system is severely understaffed, and lacks adequate personnel with sufficient expertise to properly treat the individuals within its care.  The OFFICIAL CAPACITY DEFENDANTS fail to identify, treat and medicate individuals with mental illness.  Additionally, these systematic failures rise to the level of causing significant injuries and the unnecessary and wanton infliction of pain.  Each of these deficiencies, in isolation and in conjunction, result in a violation of the Eighth Amendment.

206.    The OFFICIAL CAPACITY DEFENDANTS recognize that they must "[p]rovide clinically effective mental health services."  ALA. ADMIN. CODE. r. 600 (2005).  The OFFICIAL CAPACITY DEFENDANTS are aware that provision of mental health care includes providing "various levels of care to include a full range of psychiatric and psychological treatments, procedures, programs, institutional staffing and management."  *Id.* r. 700 (2010).  Pursuant to the

OFFICIAL CAPACITY DEFENDANTS' regulations, outpatient mental health assistance, counseling and programs must be offered to all ADOC prisoners.  *Id.* r. 623 (2007).  The OFFICIAL CAPACITY DEFENDANTS are aware that they must "provide crisis intervention for prisoners exhibiting signs of psychological distress" and that the crisis intervention requires the involvement of a psychiatrist.  *Id.* r. 627 (2007).  They are further aware that prisoners who are receiving treatment for serious mental illness must be promptly evaluated when placed in segregation.  *Id.* r. 625 (2004).

207.    The OFFICIAL CAPACITY DEFENDANTS have long been aware that the staffing of mental health professionals is inadequate.  While the OFFICIAL CAPACITY DEFENDANTS have chosen to contract with an outside entity to provide these services, the OFFICIAL CAPACITY DEFENDANTS are aware of the exact staffing at each facility and the extent of medical services provided.  The ADOC mental health provider regularly fails to adequately diagnose and treat the most seriously mentally ill prisoners.  Further, ADOC's policies at even its most intensive mental health treatment facility fail to protect those prisoners most in need of mental health treatment.

208.    ADOC routinely has failed to ensure adequate staffing, both as to gross numbers of mental health professionals, and as to quality and experience, of key mental health professionals.

209.    According to the April 2014 monthly Mental Health Report to DEFENDANT SHARP's predecessor and DEFENDANT NAGLICH, a total of 24,951 individuals were housed in ADOC facilities, of whom 3,059 were receiving some form of mental health treatment (having a classification of MH-1 or greater).  A total of 2,209 prisoners were prescribed psychiatric

medications.  This population was distributed throughout each of the facilities run by ADOC.  At Tutwiler, nearly half the prisoners have a mental health code of MH-1 or greater.

210.    The mental health staffing at ADOC facilities is grossly inadequate.  There are just 6.2 psychiatrists for the entire prison system.  This means that the psychiatrists have an average caseload of 493 mentally ill patients.

211.    At many facilities, a psychiatrist position is not even staffed.

212.    As of April 2014, more than 16,000 prisoners were housed in facilities that have no assigned psychiatrist.  Considering only those individuals on the mental health caseload, 1,474 prisoners resided in a facility with no psychiatric staffing.

213.    As of April 2014, Easterling had 194 people on the mental health caseload.  Of the 194, 120 prisoners are on psychiatric medications, including two on involuntary medication orders.  Easterling had no psychiatrist.

214.    As of April 2014, Fountain had 106 people on the mental health caseload.  Of the 106, 64 are on psychiatric medications.  Fountain had no psychiatrist.

215.    As of April 2014, Holman had 115 people on the mental health caseload.  Of these, 75 were on psychiatric medications, including one person on an involuntary medication order.  Holman had no psychiatrist.

216.    As of April 2014, Limestone had 257 people on the mental health caseload.  Of these, 190 were on psychiatric medications.  Limestone had no psychiatrist.

217.    As of April 2014, Montgomery Women's Facility had 88 people on the mental health caseload.  Of these, 60 were on psychiatric medications.  Montgomery Women's Facility had no psychiatrist.

218.    As of April 2014, St. Clair had 98 people on the mental health caseload.  Of these, 58 were on psychiatric medications, including six people on involuntary medication orders.  St. Clair had no psychiatrist.

219.    As of April 2014, Staton had 303 people on the mental health caseload.  There were another 23 people not on the mental health caseload despite having DSM-IV Axis I diagnoses.  A total of 175 people were on psychiatric medications, including three people on involuntary medication orders.  Staton had no regularly staffed psychiatrist.

220.    As of April 2014, Ventress had 200 people on the mental health caseload.  Of these, 139 were on psychiatric medications, including two people on involuntary medication orders.  Ventress had no psychiatrist.

221.    As of April 2014, there was only one work release center that had any psychiatric coverage at all.  Altogether, the other work release centers housed 113 people on the mental health caseload, of whom 75 were on psychiatric medications.

222.    At other facilities, the level of psychiatric staffing was so low as to be clearly insufficient. As of April 2014, Bibb had 161 people on the mental health caseload.  Of these, 116 people were on psychiatric medications, including one person on an involuntary medication order.  Bibb had less than a quarter-time psychiatrist.

223.    As of April 2014, Hamilton A & I had 79 people on the mental health caseload, as well as seven people not on the mental health caseload despite having DSM-IV Axis I diagnoses. A total of 73 people were on psychiatric medications.  Hamilton A & I had six hours per week of psychiatrist coverage.

224.    The facilities that are designated to house the most seriously mentally ill prisoners in ADOC custody also have very little psychiatric coverage.

225.    Bullock maintains a Residential Treatment Unit ("RTU"), a unit designated for inpatient treatment of mentally ill prisoners. Bullock also maintains an Intensive Stabilization Unit ("SU") for the most acutely mentally ill people in ADOC custody.  As of April 2014, there were 161 people housed in the RTU.  Of these, 148 were prescribed psychiatric medications, including 24 on involuntary medication orders.  There were 11 people housed in the SU.  Of these, eight were prescribed psychiatric medications, including two on involuntary medication orders.  There were an additional 284 people on the mental health caseload in the general population, of whom 201 were prescribed psychiatric medications, including five on involuntary medication orders.  Bullock had one full-time and one half-time psychiatrist.

226.    Donaldson maintains two RTUs.  As of April 2014, Donaldson had 71 prisoners housed in the RTUs.  In the RTUs, 60 people were prescribed psychiatric medications, including 16 on involuntary medication orders.  There were an additional 142 people on the mental health caseload in the general population, of whom 73 were prescribed psychiatric medications, including 3 on involuntary medication orders.  Donaldson had a three-quarters time psychiatrist.

227.    Tutwiler also maintains an RTU and an SU.  As of April 2014, Tutwiler housed 17 people in the RTU and one person in the SU.  All were on psychiatric medications.  Tutwiler had an additional 425 people on the mental health caseload in general population.  Of these, 366 were on psychiatric medications.  Tutwiler had two half-time psychiatrists.

228.    Many prisoners on psychiatric medications do not have periodic reviews by a psychiatrist.

229.    Moreover, as of April 2014, there were only 5.55 psychologists for the entire system. When fully staffed, the OFFICIAL CAPACITY DEFENDANTS provide for a single ADOC psychologist at Tutwiler, Kilby and Donaldson.  These ADOC psychologists play a

mostly administrative role.  The contract between ADOC and MHM provides for a part-time psychologist at Donaldson, Bullock, Limestone and Holman and a full-time psychologist at Tutwiler.  The Tutwiler psychologist position was unfilled in April 2014.  At all other facilities, no psychologist is available.

230.    The only contact that a prisoner often has with any mental health professional is when they are acutely mentally ill and exhibiting suicidal ideations or actions.

231.    When ADOC issued its request for proposals for a mental health services contract in 2013, it identified the minimum staffing need from the provider to be 144.95 full-time equivalent employees.  Under the current contract, MHM Correctional Services ("MHM") is not providing even this inadequate number of mental health staff.  The staffing provided under the new MHM contract is just 126.5 full-time equivalent employees.

232.    The OFFICIAL CAPACITY DEFENDANTS require MHM to provide reports of their staffing and provision of care every month.  In the month of April 2014, these reports showed that MHM had fewer than 120 full-time equivalent employees providing mental health related services.  Of 2,738 prisoners on the outpatient mental health caseload, just 258 were scheduled to participate in any mental health group during the month.

**A. DEFENDANTS Fail To Identify Mentally Ill Prisoners And Understate The Acuity Of Mental Illness Even In Those Identified.**

233.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of under-identifying mentally ill prisoners and understating the acuity of prisoners' mental illness.  As a result, mentally ill prisoners go untreated and severely mentally ill prisoners receive a far lower level of treatment than they need.

234.    Just 12.3 percent of the ADOC population is identified as having a mental health code of MH-1 or greater.  This almost certainly indicates that Alabama is not identifying

prisoners with mental health disorders.  In a 2006 study of prison and jail prisoners throughout the country, the Department of Justice concluded that on average, about half of prisoners in state correctional facilities meet the DSM-IV criteria for a mental illness.

235.   Further, many prisoners who are clearly suffering from a mental health disorder or psychological distress go untreated.  For example, PLAINTIFF PRUITT was been placed in suicide watch three times from December 2013 through March 2014.  On one occasion, he was on suicide watch for approximately 10 days.  He has previously been treated for depression.  He asked for mental health treatment several times since December 2013.  PLAINTIFFS' counsel informed DEFENDANT SHARP's predecessor  and DEFENDANT NAGLICH of PLAINTIFF PRUITT's urgent need for mental health care on May 16, 2014.  PLAINTIFF PRUITT has not been given any treatment or placed on the mental health caseload.

236.   Similarly, PLAINTIFF WILLIAMS engaged in self-harm repeatedly in March 2014.  On one occasion, she continued to cut herself with a razor blade she found in the suicide watch cell.  After her third act of self-harm in a day, she was threatened with forcible medication.  Yet, two weeks later, she asked to be placed on the mental health caseload, and was refused.

237.   Another prisoner, PLAINTIFF DUNN repeatedly asked for mental health treatment while he was in segregation.  He cut himself with a razor on five occasions.  Prior to each incident, he requested mental health treatment.  His requests were denied.  PLAINTIFF DUNN had very limited contacts while he was on suicide watch.  He has never been placed on the mental health caseload and received no follow-up care after being released from suicide watch.

238.   Other prisoners are taken off the mental health caseload without explanation. PLAINTIFF HARDY, who has a history of serious mental illness since childhood, was taken off the mental health caseload without explanation.

239.   Similarly, PLAINTIFF MONCRIEF has been diagnosed with paranoid schizophrenia, bi-polar disorder, anxiety disorder and major depressive disorder. He was taken off all medications.  He was told that mental health staff believed he was "faking it."

240.   PLAINTIFF JOHNSON is obviously severely mentally ill, but not being treated by mental health staff.  PLAINTIFF JOHNSON has also not been sent to a neuropsychologist to determine what, if any, treatment is appropriate to address his possible brain injury.

241.   Further, DEFENDANT SHARP's predecessor and DEFENDANT NAGLICH informed PLAINTIFFS' counsel that they are aware of 30 prisoners who have diagnosed DSM-IV Axis I clinical disorders who are not on the mental health caseload.  Of the 30, 23 are housed at the Elmore, Staton and Draper, complex, facilities that do not have a psychologist or psychiatrist on staff.

242.   The OFFICIAL CAPACITY DEFENDANTS also dramatically understate the level of acuity of those who are mentally ill.  According to ADOC mental health codes, MH-1 and MH-2 are used for prisoners with "mild impairment in mental functioning, such as depressed mood or insomnia," MH-3 is for moderate impairments "such as difficulty in social situations and/or poor behavior control," MH-4 is for severe impairments "such as suicidal ideation and/or poor reality testing," MH-5 is used for severe impairments "such as delusions, hallucinations, or inability to function in most areas of daily living."  MH-6, the code for the most acutely mentally ill, is reserved for prisoners who have been committed to a mental hospital.  As of April 2014, just 242 prisoners in ADOC custody – less than 1 percent – were classified at greater than MH-2.

In contrast, the Department of Justice study cited above found that nationally some 43 percent of state prisoners met the DSM-IV criteria for mania and 15 percent met the criteria for psychotic disorders.

243.    Numerous prisoners who clearly meet the criteria for MH-3 or above are classified as MH-1 or MH-2.

244.    PLAINTIFF MCCOY is acutely mentally ill and has poor reality testing.  He is housed at Bibb.  He is given psychiatric medications against his will.  PLAINTIFF MCCOY is classified as MH-1 or MH-2.

245.    PLAINTIFF DILLARD is classified as MH-1.    He continues to have hallucinations.

246.    Similarly, PLAINTIFF TERRELL is classified as MH-2.  He is housed in the Mental Health Unit at Bullock and has hallucinations.

247.    PLAINTIFF HARTLEY has been in and out of mental hospitals since he was a child.  He has difficulty carrying on a coherent conversation.  He does not know what his diagnosis is or what his mental health code is, but he is housed at St. Clair, where the highest mental health code is MH-3.

248.    The OFFICIAL CAPACITY DEFENDANTS' own documents reflect the understatement of acuity of mental illness.    According to an April 2014 report to DEFENDANTS SHARP's predecessor and NAGLICH, only 230 people in ADOC custody were categorized as MH-3, and just 12 people were classified at higher mental health codes.  Yet 753 people were receiving antipsychotic medications.    Similarly, a March 2013 report to DEFENDANTS SHARP's predecessor  and NAGLICH from MHM showed that 242 people were categorized as MH-3 or higher, but 853 people had psychotic disorders.  Per the OFFICIAL

CAPACITY DEFENDANTS' description of mental health classifications, persons with psychotic disorders would appropriately be classified as MH-4 or MH-5.

**B. DEFENDANTS Deny Mentally Ill Prisoners Access To Necessary Psychotropic Medications And Medication Management.**

249.   The OFFICIAL CAPACITY DEFENDANTS are routinely and systematically failing to prescribe, provide and manage necessary psychiatric medications.

250.   The OFFICIAL CAPACITY DEFENDANTS have designated a total of 3,059 prisoners as having a code of MH-1 or greater.  Only 2,209, or 8.9 percent of the ADOC population actually receive psychotropic medication.  The average monthly expenditure for psychiatric medications for prisoners in the OFFICIAL CAPACITY DEFENDANTS' custody decreased by 30 percent from March 2010 through February 2013, despite the relative stability in prison population.  As of April 2014, for those prisoners receiving psychiatric medication, an average of just $1.33 per day is spent per patient for the totality of the psychiatric medication prescribed.

251.   Further, as discussed above, the OFFICIAL CAPACITY DEFENDANTS provide no psychiatric coverage at all in the majority of facilities.  In those facilities where they do, said coverage is minimal.  Prisoners on mental health medications have very little interaction with the prescribing professional.  For example, PLAINTIFF HARTLEY is severely mentally ill and is on several psychiatric medications, yet he is housed at a facility that has no coverage by a psychiatrist.

252.   PLAINTIFF SANFORD, who is housed in the Bullock RTU, is currently prescribed Zoloft and Tegretol and continues to have auditory hallucinations that are not controlled by the level of care he is receiving.  He sees a psychiatrist for about five minutes about every two months.

253.   PLAINTIFF TERRELL, who is also housed in the Bullock RTU, is currently taking either Prolixin or Haldol and continues to have visual and auditory hallucinations.  He sees a psychiatrist for about five minutes about one time per month.

254.   Many prisoners do not know the name of the medications they take and or their potential side effects.  For example, PLAINTIFF HARTLEY is given a shot every month, and has a prescription for three other medications.  He knows the name of some but not all of these medications and does not know their potential side effects.

255.   PLAINTIFF MCCOY receives a shot once a week by medical staff and sometimes receives additional shots against his will throughout the week.  He knows he has taken Prolixin in the past, but does not know the name or purpose of the medication in the weekly shots or the other shots he receives currently.  He knows that they sometimes make him nauseous and make his arm hurt, but otherwise does not know the potential side effects.

256.   PLAINTIFF TERRELL does not know what medication he is taking.  He thinks it is either Prolixin or Haldol.  PLAINTIFF TERRELL does not recall receiving individualized information about the medications he is taking or giving informed consent.  He took a class years ago called "Know Your Medications" during which various psychiatric medications were discussed.  He understood very little of the class.

257.   PLAINTIFF DILLARD takes two antipsychotic medications (Haldol and Risperdal), a medication for the side effects (Cogentin), and a medication that he does not know the name of nor the reason he takes it.  He had a "Know Your Medication" class in or around 2010, and another when he moved from the Mental Health Unit to the mental health dormitory in or around January 2014.  He does not recall receiving individualized information when being prescribed his medications or giving informed consent.

258.   PLAINTIFF SANFORD has been on a variety of psychiatric medications during the time he has been in ADOC custody.  There have been times when he did not know what medications he was taking, let alone their purpose or side effects.

259.   PLAINTIFF BRAGGS takes three medications for mental health and does not know the names of the medications or their potential side effects.

260.   Some prisoners take medications for years, and are then taken off the medications, and often the mental health caseload, despite still needing treatment.  These include prisoners who continue to exhibit suicidal thoughts and actions.  Despite continued self-injurious actions these prisoners who have been improperly removed from the caseload and been denied needed medication are not even returned to the caseload and their medications reinstated after numerous suicide attempts.   For example, PLAINTIFF CARTER, who has been diagnosed with schizophrenia, bi-polar disorder, ADHD, and intermittent explosive disorder, was prescribed Prolixin and Haldol for years. His mental illness is sufficiently severe that he has been placed at the residential Mental Health Unit at Bullock and Kilby on more than five occasions throughout the period of his incarceration, and from 2011 until 2012 he had a forced medication order. In October 2013, all medications were abruptly discontinued.

261.   PLAINTIFF HARDY has a history of serious mental illness since childhood and has attempted suicide several times while in ADOC custody.  He was previously prescribed Wellbutrin, Trazadone and Prolixin.  He was taken off his medications without explanation in 2012.  He has made approximately six attempts on his own life since being taken off his medications.

262.   PLAINTIFF JACKSON was taking Haldol, a first generation antipsychotic that is well known for causing people to shake.  To his knowledge, he was not given a medication for

the side effects, and the Haldol made him shake.  In early 2014, PLAINTIFF JACKSON asked to be taken off the medication because of the side effects.  He was offered neither the medication for side effects, nor an antipsychotic medication that was less likely to cause him to shake.  He has been without psychiatric medications since.  He tried to commit suicide by setting fire to his cell in the fall of 2013.

263.    PLAINTIFF MONCRIEF, who has long been treated for depression, was taken off Prozac and Trazadone.  He has asked to have medications for his depression since, but has been refused.

264.    PLAINTIFF WALLACE was taking several psychiatric medications, including lithium.  In 2012, the lithium was discontinued without explanation.

265.    Other prisoners simply do not receive medication for their mental health needs.  For example, PLAINTIFF HARTLEY has trouble sleeping.  He sleeps between four and five hours a night  Also, as stated above, there are 30 people DEFENDANT ADOC has identified as not being on the mental health caseload who have Axis I diagnoses.

266.    There is little regard for side effects of psychiatric medications.  The OFFICIAL CAPACITY DEFENDANTS are aware that one of the potentially life-threatening side effects of many psychiatric medications is that they make patients more sensitive to heat and more vulnerable to heat-related illnesses, such as heat stroke.   Yet, prisoners on psychotropic medications that increase heat sensitivity are exposed to levels of heat that pose potentially lethal risks.  Other than the RTUs and SUs, the ADOC facilities which routinely house prisoners taking psychotropic medications are not air conditioned and the ambient air temperatures in the facilities during the summer frequently exceed 85 degrees.

267.    PLAINTIFF DILLARD takes Haldol, Risperdol and Cogentin, all medications that increase sensitivity to heat.  PLAINTIFF DILLARD is in a mental health dormitory, but not the RTU, at Bullock.  There are many other people in the dormitory who are on psychiatric medications, including Haldol, as well.  There is no air conditioning in the dormitory in which PLAINTIFF DILLARD is currently housed, and the dormitory becomes very hot.  Average daytime highs in the summer months in Union Springs, AL where Bullock is located, are in the high 80s and low 90s.

268.    PLAINTIFF TERRELL is taking either Prolixin or Haldol, both of which increase sensitivity to heat.  Although he is in the RTU at Bullock, his dormitory currently does not have air conditioning.    PLAINTIFF TERRELL, who likely has an undiagnosed learning or developmental disorder and has difficulty reading and understanding written material, was asked to sign a paper promising to inform the correctional officers if he is getting too hot.

269.    Other side effects are also inadequately addressed.  For example, PLAINTIFF TERRELL's right hand and wrist shake.  This is a recognized side effect of first-generation antipsychotics, including Haldol and Prolixin.  He told the doctor about the shaking, and the doctor increased the Benadryl to three pills per night.  This has not controlled the shaking but has increased PLAINTIFF TERRELL's sleepiness.  PLAINTIFF TERRELL sometimes sleeps for a day and a half straight.  Sleepiness is a side effect both of Haldol and Prolixin, and of Benadryl.

270.    In or about 2005, PLAINTIFF PRUITT was diagnosed with depression.  He was prescribed Haldol, an antipsychotic used to treat schizophrenia and known to carry a risk of a variety of side effects.  He was given no medications to address the side effects and developed what he describes as "lockjaw" after about a year.  He then asked to be taken off Haldol.  Muscle movements in the jaw and muscular rigidity are known and serious side effects of Haldol.  The

lockjaw lasted on and off for about a year after he stopped taking Haldol. He has not been provided with any mental health care since requesting to be taken off Haldol due to the side effects, although he continues to have suicidal ideations.

271.    Similarly, PLAINTIFF JACKSON was given no medications for the shakiness caused by taking Haldol. When he complained of it, he was offered neither side effect medication nor a different psychiatric medication that carries a lower risk of this particular side effect.

272.    PLAINTIFF BUI takes Haldol. It causes him to shake. He does not, to his knowledge, receive any medications to combat this well-known side effect of Haldol and has not been offered an alternative medication to Haldol that would not cause him to shake.

**C. DEFENDANTS Fail To Provide Mentally Ill Patients With Adequate Care.**

273.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of providing almost no mental health treatment other than medication to mentally ill prisoners.

274.    In April 2014, there were six individuals at St. Clair who have involuntary medication orders. Individuals cannot be given involuntary medication orders unless they have a serious mental illness and are dangerous to themselves or others. St. Clair has neither a psychiatrist nor a psychologist, and there were no psychiatrist or psychologist contacts at St. Clair during the entire month. The same is true for Ventress where there were two individuals with involuntary medication orders.

275.    The OFFICIAL CAPACITY DEFENDANTS maintain a total of 375 beds in RTUs. According to an April 2014 MHM report provided to the OFFICIAL CAPACITY DEFENDANTS, there were 249 individuals in the RTUs. Despite having 249 patients sufficiently ill to warrant inpatient mental health care, there were just 160 individual contacts by

psychiatrists with the patients in the RTUs over the course of the month, 29 individual contacts with a psychologist and 96 contacts with a nurse practitioner. According to another MHM report provided to the OFFICIAL CAPACITY DEFENDANTS, in March 2013, there was one individual in an RTU at Limestone who was in the RTU for the entire month and he was classified as MH-3. MHM reported that, over the course of the month, this individual met with a psychologist two times and a nurse practitioner one time, and had no other mental health contacts.

276.    The OFFICIAL CAPACITY DEFENDANTS also maintain specialized units for the most acutely mentally ill within its control at Bullock and Tutwiler, labeled as the "Intensive Stabilization Units" (SU) with a total capacity of 38. The April 2014 report to the OFFICIAL CAPACITY DEFENDANTS indicates that as of the end of the month, there were 11 men in the SU at Bullock and one woman in the Tutwiler SU. All were classified as MH-5, the highest level mental health designation before DEFENDANTS are required to transfer individuals to a mental health facility. The woman in the SU at Tutwiler was placed on "precautionary watch" in a safe cell for 15 days. The totality of her contacts with mental health during the month of April was two contacts with the psychiatrist and five with a mental health professional.

277.    The contacts with mental health staff are often perfunctory. For example, while he was in the Bullock RTU, PLAINTIFF DILLARD had appointments with a counselor at varying frequencies that lasted roughly 10 minutes. He estimates that he has met with his Treatment Team approximately two times in the nine years he has been incarcerated. He is now in the mental health dormitory at Bullock, where he sees a counselor one or two times a month for five to 10 minutes. He continues to hear voices, and feels he would be helped if he had the chance to talk through his problems more thoroughly. Other than the five to 10 minute

counseling sessions and medication, PLAINTIFF DILLARD receives no additional mental health treatment or programming.  The last time he had mental health programming other than the "Know your Medication" class was in or around September 2013.  To his knowledge there are no mental health groups or programs for prisoners in the mental health dormitory at Bullock.

278.    PLAINTIFF TERRELL is housed in the Bullock RTU.  This is the unit for the most acutely mentally ill prisoners in ADOC custody.  PLAINTIFF TERRELL has been diagnosed with bi-polar disorder, schizophrenia, depression and PTSD.  PLAINTIFF TERRELL experiences auditory and visual hallucinations.  He has great difficulty placing events in relation to each other in time.  He sleeps most of the time, sometimes for a day and a half at a time.  In addition to taking medication, he sees a counselor for about five minutes every two weeks and a psychiatrist for about five minutes once a month.  He receives no other mental health treatment.  He has not been permitted to participate in any programming for several years.

279.    PLAINTIFF WALLACE is in the RTU at Donaldson.  He spent approximately nine months at the Bullock RTU.  He has been diagnosed with schizophrenia, bi-polar, ADHD, and Intermittent Explosive Disorder.  He has auditory hallucinations.  He does not receive any mental health treatment other than his medications.

280.    PLAINTIFF MCCOY appears to be acutely mentally ill.  PLAINTIFF MCCOY struggles to express coherent thoughts and communicate his needs. He suffers from delusions.  He is medicated against his will. He does not know his diagnosis.  His only counseling is with an unlicensed mental health professional.

281.    PLAINTIFF BUSINELLE was housed in the Bullock RTU from the time the facility opened until an unknown point in time after this lawsuit was commenced, at which point PLAINTIFF BUSINELLE was moved to Bibb.  Prior to 2006, he was housed in the Mental

Health Unit within the main building at Bullock.  PLAINTIFF BUSINELLE has been diagnosed with paranoid schizophrenia.  He is given an injection of Prolixin every two weeks and takes Cogentin for the side effects.  He meets with a counselor for about five minutes every two weeks.  He sees a psychiatrist approximately one time per month for about five minutes.  The meetings with the counselor and the psychiatrist amount to, in PLAINTIFF BUSINELLE's words, "hi and goodbye" and a question about how his medications are working.  He receives no other mental health treatment.

282.    Part of PLAINTIFF BUSINELLE's mental illness is that he gets angry and has difficulty controlling his anger.  When he feels this coming on, he puts in a request to see a counselor.  He routinely has to wait several days before seeing a counselor after putting in a request, on one occasion waiting 13 days.  When he does see the counselor, the counselor just refers him to the psychiatrist for a reassessment of his medications.  It then sometimes takes weeks to see the psychiatrist.  During the period of waiting, PLAINTIFF BUSINELLE has to struggle to control the anger that a symptom of his mental illness and is highly dangerous in the prison setting.

283.    PLAINTIFF SANFORD is housed in the Bullock RTU.  At intake, PLAINTIFF SANFORD informed ADOC that he has a history of suicide attempts and hospitalizations in mental health facilities.  PLAINTIFF SANFORD has been diagnosed with bi-polar disorder, schizophrenia, depression and PTSD.  PLAINTIFF SANFORD has been on mental health medications since he was about 16.  He is currently prescribed Zoloft and Tegretol.  PLAINTIFF SANFORD hears voices and they are not controlled by the current level of care he is receiving.  He sees a psychiatrist for about five minutes every two months and a counselor for about five

minutes every three months.  PLAINTIFF SANFORD is not permitted to participate in any programming because he is considered an outpatient in the RTU.

284.   PLAINTIFF HARTLEY is housed at St. Clair.  He was in and out of mental hospitals in the years before he was incarcerated at the age of 22.  PLAINTIFF HARTLEY's thoughts are disjointed and he has difficulty carrying on a coherent conversation.  When PLAINTIFF HARTLEY was housed at Holman from 2001 through 2003, he began to engage in self-harm, cutting his forearms with razor blades.  He has continued to cut himself since, sometimes cutting himself on the leg.  The most recent occurrences began in early 2014.  St. Clair staff acknowledge that PLAINTIFF HARTLEY is mentally ill.  PLAINTIFF HARTLEY is not receiving any mental health care of which he is aware.  From about 2002 to about 2004, PLAINTIFF HARTLEY participated in mental health programming, but has received no counseling, classes or programs to help him cope with his illness since that time.  PLAINTIFF HARTLEY feels like he should be in a mental hospital.

285.   PLAINTIFF BUI has been medicated against his will for years with regular shots of Haldol.  He does not know what his diagnosis is and does not know why he is on the mental health caseload.  He speaks little English.  He does not want to be on medication, and he is not permitted to cease taking medication in order to determine whether he needs to be medicated.  He has never had counseling or treatment with anyone who speaks Vietnamese or with the assistance of a translator.

286.   PLAINTIFF BRAGGS has been diagnosed with anxiety and depression and is currently taking three psychiatric medications, the names of which he does not know.  He sees a mental health professional via a television screen once every two to three months for 15 to 20

minutes.  He does not know whether the person he sees is a psychiatrist.  He has no other contacts with mental health staff.

287.    If prisoners are not prescribed mental health medications, they are often denied access to mental health staff, even when going through a mental health crisis.  PLAINTIFF PRUITT has received no mental health treatment since he asked to be taken off Haldol in or around 2006, after he developed a locked jaw.  PLAINTIFF PRUITT was in segregation from July 2013 through March 2014, and was later returned to segregation where he is now housed.  From December 2013 through June 2014, he went onto suicide watch four times.  He repeatedly requested referral to mental health, but has not been referred to mental health.  On May 16, 2014, PLAINTIFFS' counsel requested that PLAINTIFF PRUITT be seen by mental health.  PLAINTIFF PRUITT still had not been seen by any mental health staff.

288.    PLAINTIFF DUNN was placed into segregation in or around June 2013.  In or around September 2013, PLAINTIFF DUNN felt compelled to harm himself.  While still resisting this compulsion, he asked to see mental health staff, but was denied.  He cut his forearm with a razor that was provided to him for shaving.  He had very limited contacts with mental health staff while on suicide watch.  He was returned to segregation after three days, and then received no follow-up.  This process was repeated four more times during his nine-month stay in segregation, each time preceded by his request to see mental health.  He was never referred to mental health for follow-up care.

289.    Near the end of March 2014, PLAINTIFF WILLIAMS asked to see mental health.  She was told that she had to ask Ms. Nichols, the ADOC psychological associate at Fountain.  She spoke with Ms. Nichols and asked to be placed on the mental health caseload and expressed that she thought she needed psychiatric medication.  PLAINTIFF WILLIAMS has in

the past been on the mental health caseload and has been prescribed psychiatric medications. She repeatedly cut herself earlier in the month and had been threatened with forced medication. Ms. Nichols told her that she did not need medication and did not need to be on the mental health caseload.

290.    In or around 2010, PLAINTIFF MONCRIEF had a mental health code of MH-3. He was taking Prozac and Trazadone.  He saw a psychiatrist occasionally, and he saw a nurse practitioner.  After about a year, his mental health code was reduced to MH-1 and he was taken off all medications.  He currently takes no medication.  He has asked for mental health treatment, but been denied. Without his medication and treatment, he has difficulty controlling his impulses and anger.

291.    PLAINTIFF HARDY has a lengthy history of mental health issues and placements since he was a child.  He suffers from auditory hallucinations that cause him to hurt himself.  The court that sentenced him acknowledged his history and ordered that he be provided with mental health treatment while in ADOC custody.  PLAINTIFF HARDY has been on the mental health caseload much of the time he has been in ADOC custody.  In 2004, his medication was discontinued.  He subsequently attempted suicide by cutting his wrist with a razor.  He then brought a razor with him into suicide watch, where he cut himself further.  He was placed back on the mental health caseload and was prescribed Wellbutrin, Trazadone and Prolixin.  He was again taken off the mental health caseload and his medication discontinued in 2009, and he again attempted suicide using a razor blade, and again bringing the razor into suicide watch where he continued to cut himself.  He has received no mental health care since.  He has attempted suicide several times since being taken off his medications.

292.    PLAINTIFF JACKSON has received no mental health medications since his medications were discontinued in 2014.

293.    PLAINTIFF CARTER also has a long history of mental health problems and has attempted suicide many times in DEFENDANTS's custody.  He was not receiving any form of mental health medication as the time of the filing of the suit.

294.    Mental health care provided on suicide watch is minimal.   For example, PLAINTIFF SANFORD has had multiple episodes of suicidal ideation since he has been at Bullock.  He last felt suicidal in or around October 2013.  He informed the correctional officers and was placed in a suicide watch cell.  Correctional officers came by to check on him every three hours.  A doctor came around once a day for about five minutes and asked if he was alright, but provided no counseling.

295.    On two occasions while in ADOC custody, PLAINTIFF SANFORD actually attempted suicide.  He was placed in suicide watch.  The only mental health care he received was a counselor who asked how he was doing from the cell front, spending about four or five minutes talking with him every day or two, and a doctor who spoke with him for about 10 minutes once or twice.  Both times attempted suicide he was given a punishment with 45 days in segregation and another 45 days without privileges, though he was ultimately not required to spend the time in segregation.

296.    When PLAINTIFF PRUITT was assaulted by other prisoners with flaming cloth in December 2013, he had been on suicide watch for over a week.  He had received no mental health counseling.  Each day, a member of mental health staff would come to the front of the cell and ask if he was still suicidal.  They spent less than five minutes each day with the individuals on suicide watch.  On December 16, 2013, PLAINTIFF PRUITT told the mental health staff

person that he was no longer suicidal, not because of any improvement in his mental state, but because he wanted out of the cell where he had been assaulted.

297.    Each time PLAINTIFF DUNN was placed in suicide watch, he was seen by mental health staff only to determine whether he was still suicidal.

### D. DEFENDANTS Place The Mentally Ill In Segregation Without Regard For Their Mental Health.

298.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of placing mentally ill prisoners in segregation without regard for the harmful effects segregation has on the mentally ill.  The OFFICIAL CAPACITY DEFENDANTS are aware that this is a dangerous practice that can cause harm to mentally ill prisoners.  The OFFICIAL CAPACITY DEFENDANTS have a regulation requiring prompt evaluation and ongoing monitoring of the mental health status of mentally ill prisoners who are placed in segregation.

299.    At St. Clair, Holman and Tutwiler, there are no general mental health checks in the segregation units.

300.    In May 2012, PLAINTIFF HARDY who has a long history of serious mental illness, was taken off the mental health caseload and placed in segregation at St. Clair, where he has remained since.

301.    PLAINTIFF JACKSON, who has been diagnosed with schizophrenia and has auditory hallucinations, has been on the administrative transfer program between the segregation units at St. Clair, Holman, and Donaldson for seven years.

302.    PLAINTIFF CARTER, who has been diagnosed with schizophrenia and several other serious mental health disorders, has been in segregation continuously for last three years. He has been in either an RTU or segregation most of the time he has been in ADOC custody.

303.    PLAINTIFF WALLACE has been in either a RTU or segregation since 2010.

304.    PLAINTIFF TERRELL has been diagnosed with bi-polar disorder, schizophrenia, depression and PTSD.  He estimates that he has been placed in segregation four or five times. Each time, he suffers exacerbated symptoms, including increased auditory and visual hallucinations and increased nightmares.

305.    PLAINTIFF SANFORD has been diagnosed with bi-polar disorder, schizophrenia, depression and PTSD.  He has been placed in segregation.  While in segregation, he becomes more depressed, has greater difficulty sleeping, has increased suicidal thoughts, and hears more voices.

**E.  DEFENDANTS Fail To Adequately Protect Its Most Seriously Mentally Ill Who Exhibit Self-Injurious And Suicidal Actions.[9]**

306.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of not protecting mentally ill prisoners from self-inflicted injuries or suicide.

307.    The OFFICIAL CAPACITY DEFENDANTS distribute razor blades throughout their facilities for prisoners to shave.  They are distributed in the RTUs, mental health dormitories, segregation units and other housing units.  The razors are not collected or accounted for in any way.

308.    On January 21, 2011, a prisoner at Limestone committed suicide using a state-issued razor blade.  The death and instrument used were both reported in an ADOC Incident Report.

309.    Prisoners who have a recent history of using razors to injure themselves are still provided with razors.

310.    PLAINTIFF WILLIAMS has a long history of self-harm with sharp objects.  She is nonetheless provided with razors for shaving, and the razors are left with her in her cell.  On or

---

[9] As noted in a previous footnote, the parties have preliminarily settled Defendants' alleged failure to protect the mentally ill from self-harm with razor blades, subject to a monitoring phase to ensure the issue's actual resolution.

about March 2, 2014, PLAINTIFF WILLIAMS was housed in segregation at Fountain. She cut herself with a razor. After PLAINTIFF WILLIAMS cut herself, she called out to a correctional officer, who took her to the medical unit. PLAINTIFF WILLIAMS's wound was dressed but not cleaned. She was placed in suicide watch until the following day. She was then asked by mental health staff if she was suicidal. Upon her negative response, she was returned to her segregation cell. The razor she had used to cut herself the previous day was still in her cell. She was not provided with any mental health counseling either while in suicide watch or while in segregation afterwards. She continued to be allowed to have razors in her cell.

311. On or about March 10, 2014, PLAINTIFF WILLIAMS again cut herself with a razor blade in her cell, this time in front of a correctional officer. The correctional officer walked to the front of the segregation unit, got a pair of handcuffs, walked back to PLAINTIFF WILLIAMS's cell, and told her to place her hands through the slot in the cell door. She complied, was handcuffed, and was taken to medical. Her new wound was cleaned, stitched up and dressed, and she was placed in suicide watch. In the suicide watch cell, she found a razor blade and again cut herself. She was taken to medical, the wound was cleaned and dressed and she was again returned to the suicide watch cell. The razor blade had not been removed, and she again cut herself, and was taken to medical. She told the correctional officers about the razor blade, but they said they believed she was cutting herself on the sharp edges of the air vents in the suicide watch cell. Because the sharp edges of the air vent in the suicide watch cell are rusty, she was given a tetanus shot. She was told she would be forcibly medicated if she cut herself again. She said she would not, and was returned to the suicide watch cell – the cell that the correctional officers acknowledged knowing had a sharp, rusty air vent that could be used to cut

oneself.   The following day, mental health staff asked if PLAINTIFF WILLIAMS was still suicidal, and upon her negative response, she was returned again to segregation.

312.   PLAINTIFF HARDY has attempted suicide numerous times, always using a razor.   On two occasions, at two different facilities, Fountain and Donaldson, PLAINTIFF HARDY attempted suicide using a razor and then was able to bring his razor into the suicide watch cell, where he again attempted to commit suicide.   PLAINTIFF HARDY continues to be provided with razors.   PLAINTIFF HARDY has no contact with mental health staff other than, when he is in suicide watch and mental health personnel come by to ask if he is still suicidal.

313.   PLAINTIFF DUNN was placed in segregation at St. Clair in or around June 2013. In September, he began to feel compelled to harm himself.  He requested mental health care, but was denied.  Nonetheless, he was provided with a razor blade for shaving.  He used the razor to cut his forearm.  PLAINTIFF DUNN was then taken to suicide watch.  He had limited contacts with mental health staff, primarily asking if he was still suicidal.  On the third day, PLAINTIFF DUNN stated that he was not and he was returned to segregation.  The razor blade he had used to cut himself was still in his cell.  There was no follow up from any mental health staff.  There were also no general rounds by mental health staff in the segregation unit.  PLAINTIFF DUNN remained in segregation until early April 2014.   The same scenario of PLAINTIFF DUNN asking for mental health care, being denied, cutting himself, going to suicide watch, receiving no care on suicide watch other than a check as to whether he remained suicidal, and then a return to the cell, where the razor remained, played out four more times during the months he was in segregation.  A lieutenant said to him after one act of self-harm, "you keep sitting there cutting yourself.  If you die, you die."  On one occasion, his blood was still in his cell when he returned from suicide watch.

314.    PLAINTIFF PRUITT engaged in self-harm on June 12, 2014.  He had been in suicide watch multiple times over the last six months, but had been provided with a razor.  He was in segregation and he cut both his wrists with the razor.  He was eventually taken to medical and then a suicide watch cell.

315.    At Holman, all inmates, including those in segregation or on suicide watch, are given razors each time they shower. Corrections officers do not collect the razors after the showers.

### III. DEFENDANTS ROUTINELY AND SYSTEMATICALLY INVOLUNTARILY MEDICATE MENTALLY ILL PRISONERS WITHOUT DUE PROCESS.

316.    The OFFICIAL CAPACITY DEFENDANTS have a policy and practice of medicating mentally ill prisoners against their will without providing due process to determine whether the individuals can be forced to take medication.

317.    The OFFICIAL CAPACITY DEFENDANTS have a policy setting forth a proceeding to determine whether a person can be medicated against his or her will.  Prisoners cannot be medicated against their will unless they are determined to be seriously mentally ill and a danger to himself or herself or others.  The widespread and pervasive practice is that many prisoners in ADOC custody are denied due process in this deprivation of their right to bodily integrity.

318.    Numerous mental health patients that the OFFICIAL CAPACITY DEFENDANTS have not identified as being seriously mentally ill are being medicated against their will.  In April 2014, there were 23 prisoners on the outpatient mental health caseload with involuntary medication orders.  All but one of them were classified as MH-1 and MH-2, both defined as having a "mild impairment in mental functioning, such as depressed mood or insomnia."  One person on the outpatient mental health caseload who may have an involuntary

medication order is classified as MH-3, which is defined as a moderate impairment, "such as difficulty in social situations and/or poor behavior control."

319.    Further, numerous prisoners have been forcibly medicated under circumstances that do not comport with the requirements of due process or the stated policy of the OFFICIAL CAPACITY DEFENDANTS.

320.    PLAINTIFF HARTLEY occasionally refuses his medications.  When he does, he is placed in what he describes as a "padded cell" in the medical unit.  Usually he spends three to five days in the cell, though sometimes it is longer.  The longest he has spent in the padded cell is seven months.  When he is confined in the padded cell, mental health personnel come to check on him two or three times a week for 15 to 30 minutes.  PLAINTIFF HARTLEY is unaware of having gone through a process to determine whether he can be medicated against his will.

321.    In or around 2009, PLAINTIFF BUI was asked, as he understood it, to volunteer to take a medication.  This medication was Haldol.  At that time, PLAINTIFF BUI agreed to take the medication.  In or around the fall of 2012, PLAINTIFF BUI informed mental health staff that he no longer wanted to take the medication.  He requested to be taken off the medication because it made him shake and he did not want to be medicated.  He was told that he would be placed in segregation if he refused to take the medication.  PLAINTIFF BUI has asked several times to be taken off Haldol and has been refused, often with the threat of segregation.  PLAINTIFF BUI's English is limited and he has little understanding of the hearings in which staff approve involuntary medication orders.   Contrary to ADOC regulations, PLAINTIFF BUI is not permitted to discontinue taking medication for the determination of whether he needs to be involuntarily medicated. The evidence presented at his hearings regarding his need for medication is that, medicated, he is doing well, and prior to being medicated he was not.  Based

on this reasoning, as long as PLAINTIFF BUI does well, he will not be allowed to cease taking involuntary medication.

322.   PLAINTIFF DILLARD has refused his medication.  His medications make him very tired.  Since he arrived at Bullock and was started on Haldol and then Prolixin, he has been shaky.  This is a known side effect of both medicines.  In or around 2010, PLAINTIFF DILLARD refused to take Prolixin because it was making him shaky.  An officer slapped him and wrestled him to the ground.  The officers took him to the shift office and told him that they were going to put him in segregation for refusing his medication.  He was able to explain to them that he needed to see the psychiatrist because he was suffering from side effects from the medication.  The officers agreed to tell the psychiatrist to see him and not to put him in segregation if he took his medicine.  PLAINTIFF DILLARD agreed, but it took 30 days for him to be taken to see the psychiatrist.

323.   PLAINTIFF DILLARD has refused his medication on a number of occasions.  On at least one occasion he has been placed in segregation for refusing his medications.  On all other occasions, he has been told by correctional officers that he will be forcibly held down and given his medication.  He has never had a hearing to determine whether he should be permitted to refuse his medication.

324.   PLAINTIFF DILLARD has witnessed other prisoners refuse to take their medications.  Sometimes they are forcibly held down and given their medication, sometimes the threat of this is enough to cause them to accept the medication, and sometimes they are taken to segregation until they start taking the medication.

325.   PLAINTIFF TERRELL has sometimes refused his medications.  He has never, to his knowledge, been given a hearing to determine whether he can be involuntarily medicated.

When he refuses the officers and nurses get angry with him.  On one occasion, PLAINTIFF TERRELL was written up because he refused his medication.  He had his privileges revoked for 30 days.  He often sees other prisoners taken to segregation for refusing their medications.  He sees one officer routinely threaten to beat people if they refuse their medications.

326.    PLAINTIFF MCCOY has repeatedly refused to take his medications.  When he refuses, he is threatened with being placed in segregation.  There have been many occasions when he has been held down by correctional officers and given a shot.  After the scheduled and unscheduled shots, PLAINTIFF MCCOY suffers stomach aches, feels nauseous, and has pain in his arm from the shot.  To his knowledge, PLAINTIFF MCCOY has never had a hearing to determine whether he can be medicated against his will.

## IV. DEFENDANTS FAIL TO REASONABLY ACCOMMODATE PRISONERS WITH DISABILITIES.

327.    DEFENDANT ADOC discriminates against prisoners with disabilities in numerous ways, including, but not limited to, failing to remove architectural barriers, failing to provide reasonable modifications in policies and procedures, failing to provide auxiliary aids and services necessary for effective communication, improperly segregating prisoners with disabilities, engaging in contractual arrangements that limit access to appropriate health care for prisoners with disabilities.  Further, the constitutional violations alleged with regard to the provision of mental health care, including both the denial of care and involuntary medication without due process, also violate the ADA.  DEFENDANT ADOC receives federal funding.

### A.  DEFENDANT ADOC Has Failed To Remove Architectural Barriers.

328.    DEFENDANT ADOC has not removed architectural barriers that can be done with relative ease and at limited expense.  Moreover, DEFENDANT ADOC does not operate each service, program, or activity in a way that the service, program, or activity, when viewed in

its entirety, is readily accessible to and usable by prisoners with disabilities. To the contrary, DEFENDANT ADOC consistently houses prisoners with mobility impairments in facilities that are not accessible.

329. With the exception of Hamilton A & I, every facility operated by ADOC contains architectural barriers for prisoners with mobility impairments.

330. Bathrooms throughout the ADOC system are not accessible. Toilets at some facilities are on raised platforms. Some dormitories have only showers with controls at the very top of the shower head. Many bathroom areas have a low wall to go into the shower area. Also, access to the outside in many facilities involves going down stairs. While ADOC need not make sure that all its facilities are accessible to persons with mobility impairments, it cannot house those with mobility impairments in locations that are not accessible to them. Wardens indicated, during monitoring visits conducted by Plaintiffs' counsel, that individuals were not housed in dormitories that were not accessible. However, these assertions were repeatedly belied by the presence of prisoners with disabilities in such dormitories and confirmation that they did indeed live there.

331. PLAINTIFF SEARS suffers from scoliosis. He uses a back brace and a cane. Walking is difficult and painful for him, as is standing for long periods. PLAINTIFF SEARS was housed in Hamilton A & I from April 2012 until January 2013. He was then moved to Limestone, where he stayed until May 2013, and then Ventress. Initially, he was housed in Dormitory C at Ventress. The dormitories in Ventress do not have grab bars in the showers, and Dormitory C does not have a shower chair to accommodate people with disabilities. PLAINTIFF SEARS fell in the shower a few weeks after his arrival, and injured his hip. PLAINTIFF SEARS obtained a profile to shower in the infirmary, where there is a shower chair,

though no grab bars, in the shower.  The infirmary is relatively close to Dormitory C.  However, in or about July 2013, PLAINTIFF SEARS was transferred to G Dorm, which is at the opposite corner of the prison from the infirmary.  He was generally not permitted to go to the infirmary to shower until very late at night, often after midnight.  Walking from G Dorm to the infirmary and back was slow and painful, and, during the winter months, very cold.

332.    PLAINTIFF SEARS grieved about being housed so far away from the shower he could use.  He was not provided any relief from the requirement that he trek all the way across the facility in the middle of the night to shower until after PLAINTIFFS' counsel requested that PLAINTIFF SEARS be more appropriately accommodated.  He was then moved to Dormitory A, which is close to the infirmary.   However, Dormitory A is an honor dormitory in which prisoners are not permitted to rest during the day, and, due to PLAINTIFF SEARS' physical disabilities, he needs to be able to rest.  He was then moved to Dormitory B, and then Dormitory C.  He still is housed in a unit that lacks the necessary accommodations for him.

333.    At Easterling, the shower in the infirmary has 3-4 inch wall over which a person must step to enter the shower.  Prisoners who use wheelchairs have been housed in the infirmary.

334.    At Staton, prisoners with mobility impairments must make their way to the infirmary in order to bathe using the "accessible" shower. The shower in the infirmary consists of a small stainless steel cubicle with a plastic lawn chair in the middle and a hose that can be used for bathing. To make matters worse, a prisoner must step up about eight inches to enter the shower. It is extremely difficult, if not physically impossible, for a prisoner who cannot walk

and/or   has   limited   mobility   to   enter   and   use   this   shower   independently.



(Step into Staton infirmary shower)

PLAINTIFF COPELAND is housed in the infirmary because he is in a wheelchair.  He is unable to safely access the infirmary shower without help from another prisoner.  He has fallen numerous times when getting into the shower.

335.   At Kilby, the infirmary bathroom has a purportedly accessible toilet at the end of a narrow area with toilets on one side and urinals on the other.  Prisoners in wheelchairs must navigate between the toilets and urinals to reach the accessible toilet, and there is inadequate space to do so.  The shower has an unstable chair, and several prisoners have reported falling while trying to get in and out of the shower chair.  The ramp to the yard is too steep, resulting in prisoners in wheelchairs being unable to control themselves going down and unable to mount the ramp to return to the infirmary from the yard.  There are frequently prisoners who use wheelchairs who stay in the infirmary.

336.   The Kilby infirmary also has several individual cells.  The toilet and sink in the infirmary cells are a single unit with the sink directly above the toilet.  The toilet and sink are also located in the corner of the cells.  They are inaccessible to prisoners in wheelchairs.  DEFENDANT ADOC has housed prisoners who are in wheelchairs in the cells in the infirmary.  Also at Kilby, wheelchair users who do not need to be in the infirmary are concentrated in Dormitory A.  PLAINTIFF HAGOOD was housed in Dormitory A from around late 2012 until

May 2, 2014.  There were, as of May 1, 2014, 10 wheelchair users in the dorm.  There have been

as many as 17 wheelchair users housed in Dormitory A at one time in the period PLAINTIFF

HAGOOD has been housed there.  There is just one purportedly accessible toilet in the dorm.

Although the toilet has grab bars, it is not accessible because it is at the end of a narrow walkway

with toilets on one side and sinks on the other, not leaving adequate room for maneuvering a

wheelchair.  Moreover, the purportedly accessible toilet was out of order for months at a time.

The bunks in Dormitory A are so close together that PLAINTIFF HAGOOD cannot maneuver

easily through the aisles between the bunks.



(Kilby Dormitory A bathroom, showing garbage can on top of accessible toilet)

337.    At the Fountain chapel, the only bathroom for prisoners has a very narrow door

that a person in a wheelchair would not be able to go through.

**B.  DEFENDANT ADOC Has Not Made Reasonable Modifications In Policies And Procedures.**

338.   DEFENDANT ADOC has not made reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.

### 1. DEFENDANT ADOC discriminates against prisoners with disabilities in the provision of medical care.

339.   DEFENDANT ADOC has a policy that discriminates against prisoners with disabilities by requiring prisoners complete a written form to request medical care.  Some prisoners with vision or intellectual disabilities cannot complete the necessary forms to receive medical care.  There are no systems in place to enable prisoners who cannot read due to vision or intellectual disabilities to request medical care.

340.   PLAINTIFFS NAYLOR, MOORE and COPELAND cannot fill out sick call request forms without assistance from another prisoner or a correctional officer.  There is no system in place for them to avoid having to share confidential medical information in this manner.

341.   PLAINTIFF HENDERSON is hearing impaired, but ADOC has not provided him with a hearing aid or any other meaningful accommodation. As a result, he often misses medical and dentist appointments because he cannot hear his name being called and no one informs him that his name has been called. While on medication for tuberculosis at Ventress, PLAINTIFF HENDERSON missed pill call so often that medical staff required him to remain on the medication for an extra month.  When he missed appointments, the nurses at Ventress told him that it is his responsibility to be on time for appointments. PLAINTIFF HENDERSON also missed meal times because he cannot hear the signal to wake up on time. He has been verbally reprimanded for continuing to walk around the facility during lock-down because he couldn't hear correctional officers' orders.

342.    PLAINTIFF VILLAR is in serious need of dental care.  At least two of his teeth have fallen out over the last year and a half.  Because he suffers from cardiac disease, DEFENDANT ADOC has refused to provide the needed dental care without approval from a cardiologist.  However, PLAINTIFF VILLAR has not been sent to a cardiologist, and has therefore been denied dental treatment.

### 2.  DEFENDANT ADOC discriminates against prisoners with disabilities by failing to issue or honor profiles exempting prisoners from certain requirements of prison life.

343.    DEFENDANT ADOC requires prisoners who need to be exempted from specific tasks or conditions to obtain a "profile."  For example, profiles can exempt prisoners from prolonged standing or walking, from shaving, or from doing certain types of work.  They can also entitle the prisoner to certain benefits, such as diabetic meals or a lower bunk.

344.    However, many prisoners with disabilities are not given profiles for accommodations that they need and that are reasonable.  Further, even when prisoners have profiles, the profiles are not consistently followed by prison staff. PLAINTIFF SEARS has severe scoliosis.  Prolonged standing and walking causes him pain.  From his arrival at Ventress on May 9, 2013 until May 5, 2014, PLAINTIFF SEARS did not have a profile that exempted him from prolonged standing.  PLAINTIFF SEARS routinely had to wait in line at pill call, sometimes for as long as three hours.  On May 5, 2014, PLAINTIFF SEARS was given a "no prolonged standing" profile.  This has reduced the amount he is required to stand.  However, there are several officers who have informed PLAINTIFF SEARS that they will not honor his profile and make him stand for long periods.

345.    As discussed above, in June 2014, PLAINTIFF SEARS was informed that his health code had been changed from 4 to 1.  Because he was a 1, he was told he would be

required to work.  PLAINTIFF SEARS asked if there were jobs he would be able to do sitting down, as he has a "no prolonged standing" profile.  He was told there were not, and that if he did not begin to work, he would be subject to disciplinary action.

346.    Due to the difference in the length of PLAINTIFF GILBERT's legs, standing for lengthy periods of time is painful.  He has a profile from the doctor stating that he should not be required to stand for long periods.  He is nonetheless often required to stand for pill call and in line for food.  Shortly after coming into ADOC custody, he was provided with a single crutch.  This gave some relief, but still left him in significant pain.  PLAINTIFF GILBERT did not receive a wheelchair for eight months after he arrived at the prison.

347.    When PLAINTIFF SANFORD was on the seizure medication, he had a profile ordering that he be in a bottom bunk.  However, the profile expired and could not be renewed because he had been taken off the medication.  PLAINTIFF SANFORD was then assigned a top bunk.  He repeatedly asked for the reasonable accommodation for his seizure disorder of being assigned to a lower bunk because he is afraid that he will have a seizure in bed, and fall off and injure himself.  He was told he could not switch to a lower bunk, because he was not on seizure medication.  A week or so before his most recent seizure, a nurse looked in his file, noted that he has a seizure disorder, and had his bed switched.

348.    PLAINTIFF BROOKS develops keloids at the site of broken skin.  Therefore, PLAINTIFF BROOKS has a profile that allows him to abstain from shaving for extended periods of time.  Despite this profile, ADOC correctional officers often refuse to allow PLAINTIFF BROOKS to eat at meal times because he has not shaved. On at least six or seven occasions, PLAINTIFF BROOKS was ordered to shave before he could eat despite his shaving profile. On all six or seven occasions, PLAINTIFF BROOKS has shaved and cut himself,

causing another keloid to develop. On three of these occasions, PLAINTIFF BROOKS was not allowed to eat even after he shaved.

349.    PLAINTIFF BAKER has a profile for use of a wedge to accommodate her acid reflux.  For a period of time, she was not allowed to use a wedge, even though she had a wedge profile for several years.  PLAINTIFF BAKER began to use extra blankets to substitute for the wedge but the blankets were taken away.  ADOC subsequently refused to give out extra blankets or replace the wedge.  Without the wedge, PLAINTIFF BAKER'S acid reflux became so bad that she developed ulcers in her esophagus and experienced irritation in her voice box. Sometime after suffering these problems, PLAINTIFF BAKER was re-issued a wedge.

350.    PLAINTIFF TORRES fell and injured his knee, requiring him to use crutches for approximately six months.  During the first two weeks, DEFENDANT ADOC would not change his bed assignment, even though he was assigned to an upper bunk.

**3.  DEFENDANT ADOC has numerous housing policies that discriminate against prisoners with disabilities.**

351.    DEFENDANT ADOC has housing policies and procedures that violate the rights of prisoners with disabilities.  Prisoners with disabilities are housed in restrictive and unduly dangerous housing units because of their disabilities.

352.    For example, at Kilby, prisoners who are blind and prisoners who are in wheelchairs are housed in Dormitory A, regardless of the security classification.  DEFENDANT ADOC describes this dormitory as "a dorm in the main hall near the infirmary where others who have disabilities or medical needs, yet are not in need of infirmary care, are placed."  This is a dormitory that also houses violent offenders with high security classifications.  There is a great deal of violence that the blind and wheelchair-bound prisoners are subjected to solely because of their disabilities.  Further, due to the level of violence in the dormitory generally, the dormitory

is often on lockdown.  The prisoners with disabilities are therefore deprived of recreation time and other privileges because of their disabilities.  Also, other than for the prisoners with disabilities, the dormitory is a "transit" dorm, for prisoners coming into ADOC custody and waiting for their assignment to another facility.  As a result, programming is not available for prisoners in Dormitory A.  Prisoners who are assigned to Dormitory A because of their disabilities are therefore excluded from programming because of their disabilities.

353.   PLAINTIFFS NAYLOR and MOORE are both blind and spent many months in Dormitory A because of their disability. Similarly, PLAINTIFF HAGOOD, who is confined to a wheelchair, was assigned to Dormitory A because of his disability.  PLAINTIFFS NAYLOR, MOORE and HAGOOD would all be classified at a security classification of 1 or 2, but for their disability.  Dormitory A is a dormitory that houses prisoners with a security classification of 4.

354.   Also, male prisoners whose kidney function is so impaired they must have dialysis are housed at St. Clair.  PLAINTIFF HARTLEY is a dialysis patient.  This appears to be the reason he is at St. Clair, the primary facility for providing dialysis.  However, St. Clair is not equipped to treat individuals with mental illness as acute as PLAINTIFF HARTLEY's.  There is neither a psychiatrist nor a psychologist on staff at St. Clair.  Because PLAINTIFF HARTLEY needs dialysis, he is being denied adequate mental health care.

355.   PLAINTIFFS TURNER and PEARSON are both deaf.  They are both housed at Limestone.  They have both been determined to have security classifications of 2.  Ordinarily, Limestone is for prisoners with higher security classifications than 2.

356.   Some facilities, including at least Staton and Bibb, house persons with disabilities in infirmaries, regardless of whether they have medical needs requiring placement in the infirmary.  Being confined to the infirmary deprives prisoners of benefits, programs and services.

For example, at Staton, one of the prisons where mobility-impaired prisoners are housed in the infirmary, the yard for the infirmary is extremely small and lacks the recreation equipment found in the ordinary yard. Prisoners housed in infirmaries also have no access to programming. PLAINTIFF MITCHELL was housed in the infirmary at Bibb for 18 months. Correctional staff told him he was housed there because he has limited use of his hands. While in the Bibb infirmary, he was able to leave the infirmary only to go to visitation.

### C. DEFENDANT ADOC Does Not Provide Necessary Assistive Devices And Services.

357. PLAINTIFF GILBERT's legs are two different lengths. He informed a nurse that he required an orthopedic shoe during the intake process and several times thereafter during the fall of 2012. In and after March 2013, he submitted written requests for an orthopedic shoe. He had used such shoes before coming to the prison and they significantly increased his functionality and reduced his pain. He received the shoes after a four-month delay. However, the shoe that was ordered was too small and rubbed the skin off his foot, a particularly dangerous problem for PLAINTIFF GILBERT, as he is diabetic and small wounds on a foot can easily become infected and lead to amputations. He has repeatedly requested an orthopedic shoe that fits properly, but has been denied. He has had to cut out the top of the toe of the shoe to avoid getting sores on his foot.

358. PLAINTIFF HAGOOD is confined to a wheelchair. He is also partially paralyzed on the left side. He has difficulty getting around the prison, does not have an assistant to help him, and is not permitted to obtain assistance from other prisoners. Due to his medical conditions, he has prescriptions for about 15 pills per day. He does not receive his pills consistently because, without assistance, he is sometimes unable to get to the pill call window. When he makes the difficult journey to the pill call window, nurses make fun of him for having

missed pill call previously.  He frequently misses meals because, without assistance, it is difficult for him to get to the dining area.

359.    The bunks in his dormitory at Kilby were so close together that PLAINTIFF HAGOOD could not maneuver easily through the aisles between the bunks, and had to ask other prisoners to move out of the way.  The other prisoners resented this and made fun of PLAINTIFF HAGOOD and threatened him.   When PLAINTIFF HAGOOD complained to correctional officers of the harassment, the officers laughed at him.   PLAINTIFF HAGOOD wrote two requests to the warden asking for an assistant, but no assistant was provided.  On May 1, 2014, PLAINTIFFS' counsel requested that PLAINTIFF HAGOOD be provided with an assistant or transferred to a housing unit where help would be available.  The following day, PLAINTIFF HAGOOD was transferred to Dormitory B, a dormitory that had no accessible toilet, no accessible shower, no ramp to the outside yard.  He was not assigned a helper.  In the new dorm, PLAINTIFF HAGOOD was unable to bathe, get himself to pill call, or go outside.   After PLAINTIFFS' counsel again requested that PLAINTIFF HAGOOD be provided with an assistant or transferred to a housing unit where help would be available, PLAINTIFF HAGOOD was told he would be transferred back to Dormitory A and was assigned an assistant in Dormitory A.  However, PLAINTIFF HAGOOD was not transferred back to Dormitory A, nor was he assigned an assistant in Dormitory B.

360.    Because he was in an inaccessible dormitory and did not have an assistant, from May 2, 2014 through May 23, 2014, PLAINTIFF HAGOOD had no yard time, because he cannot go outside from Dormitory B.  He had four or five showers during this period, because he has to go to Dormitory A to shower and has no assistance to get there.

361.    On or about May 17, 2014, there was a fire in the kitchen at Kilby.  The prison was evacuated.  PLAINTIFF HAGOOD could not evacuate directly from Dormitory B.  He was required to push himself in his wheelchair farther into the prison, against the flow of evacuating prisoners, to get to Dormitory A, and then out through Dormitory A, because only Dormitory A has a ramp.  On or about May 19, 2014, Kilby was again evacuated, this time due to a gas leak in another dorm.  Again, PLAINTIFF HAGOOD had to go farther into the prison, against traffic, to get to Dormitory A to evacuate.

362.    PLAINTIFF BROYLES requires a hearing aid for both ears. In or around 1998, medical staff at St. Clair provided BROYLES with two hearing aids for his left and right ears. In or around January 2011, the hearing aid for the left ear ceased working.  A Corizon physician told PLAINTIFF BROYLES that ADOC will not replace the left hearing aid because BROYLES only needs to hear from one hear.  PLAINTIFF BROYLES often falls when walking because he is off balance due to the difference in hearing between his two ears.

363.    PLAINTIFF BROYLES' right hearing aid began to malfunction in early 2014, creating audible feedback. As a result of the malfunction in the right hearing aid and the loss of the left hearing aid, BROYLES can hear only certain pitches and sounds and only if they are loud, clear, and in complete quiet.  Medical staff often delay in replacing the battery in the right hearing aid, sometimes for as long as three days.  The facility administration requires that he submit a sick call request for new batteries and pay the corresponding fee, and he often must make several such requests to get replacement batteries.

364.    ADOC officials have promised PLAINTIFF BROYLES that he will receive new hearing aids, but he has yet to receive one.

365.    PLAINTIFF PEARSON is deaf.  He has signed up for GED classes.  However, there is no one to provide sign language for him in the class.  He stayed with the class for two months, but ultimately dropped it because, without the reasonable accommodation of a sign language interpreter, he could not understand the material.  PLAINTIFF PEARSON has requested to go to trade school, but has been denied because he does not have a GED.  There is no sign language interpreter at Limestone.  PEARSON was also required to attend classes which all individuals are required to attend shortly before their release to prepare them for a successful transition to life outside the ADOC.  He was unable to understand the information contained in the mandatory training because no sign language interpreter was present.  The facility uses another prisoner to provide sign language interpretation, but he is not qualified and his signs are incomprehensible to PLAINTIFF PEARSON.

366.    PLAINTIFF TURNER is also deaf.  He has tried to go to GED classes and to church, but there are no staff members at Limestone who can communicate with him using sign language.  He was unable to follow the GED classes or the church services without a sign language interpreter.

367.    PLAINTIFF BAKER has rheumatoid arthritis.  Her arthritis frequently causes pain and swelling in her hands.  At times she is unable to perform physical tasks which require use of her hands.  In February 2012, PLAINTIFF BAKER was ordered to fold sheets, blankets, and a pillow case on her bed.  PLAINTIFF BAKER'S hands were visibly swollen and she informed two correctional officers that she was in severe pain and incapable of using her hands to perform the task.  The officers continued to order her to perform the task and failed to offer any assistance or accommodation.   After being threatened with segregation, PLAINTIFF

BAKER attempted to untie her sheets but was in such pain that she could not follow the order. As a result, she received a disciplinary, resulting in loss of privileges and 30 days in segregation.

368.   PLAINTIFF MOSELEY suffered two broken legs in a 2006 car accident, which led to four surgeries on each of his knees and caused him to be confined to a wheelchair.  Prior to ADOC custody in 2007, PLAINTIFF MOSELEY had begun physical therapy in order to walk again, but following his incarceration, DEFENDANT ADOC refused to provide PLAINTIFF MOSELEY with physical therapy or other appropriate treatment, delaying his recovery and forcing him to unnecessarily remain in a wheelchair while he self-administered physical therapy to re-learn how to walk.

### D. DEFENDANT ADOC Excludes Prisoners With Disabilities From Programs, Benefits And Services.

369.   DEFENDANT ADOC has numerous policies that discriminate against prisoners with disabilities by excluding them from important programs, benefits and services.

370.   Prisoners with disabilities are excluded from work release programs due solely to their disabilities.  PLAINTIFF PEARSON was excluded from the Decatur Work Release Center and sent to Limestone because he is deaf.

371.   PLAINTIFF TURNER has high blood pressure, for which he takes medication. The medication controls his blood pressure well. He requested to go to work release, but was denied, being told: "you are deaf and you have high blood pressure."

372.   PLAINTIFF DILLARD is housed in a dormitory in the main facility at Bullock that houses prisoners with less acute mental illness than those in Mental Health Unit.  He currently has the mental health code MH-1, the lowest level of mental health code a prisoner can have and still be on the mental health caseload.  About a year ago, PLAINTIFF DILLARD had a mental health code of MH-3 or MH-4.  He asked to become an outpatient, which he understands

to require being an MH-1, because he will be up for parole in 2015 and cannot be paroled if he is still considered an inpatient.   PLAINTIFF DILLARD is foregoing mental health treatment because otherwise he will be excluded from the possibility of parole.

373.   PLAINTIFF MANER has a disabled leg as a result of a gunshot wound prior to coming into prison.  Prior to 2010, PLAINTIFF MANER had several profiles (accommodations from facility administration in consideration of his disability) that permitted him to: (1) wear shower shoes to prevent falls in the shower, (2) use a cane to assist in walking, (3) abstain from prolonged standing, and (4) sleep on a bottom bunk. PLAINTIFF MANER received these profiles in 1998 when he entered ADOC's custody.

374.   In 2010, PLAINTIFF MANER learned that the various profiles created to accommodate his disability render him ineligible to participate in work release programs or to transfer to facilities designated for prisoners who have made substantial rehabilitative progression, known as honor camps, because the profiles raise his health code level. Participation in work release programs and residence in honor camps results in several benefits to prisoners and serves as evidence of rehabilitation helpful to gain parole.  Because he could not access these benefits if his disability was accommodated through the use of the profiles, PLAINTIFF MANER asked medical staff at his residence facility in 2010, Hamilton A & I, to remove the profiles.

375.   PLAINTIFF NAYLOR was most recently  housed at Hamilton A & I.  There are no programs at Hamilton A & I for prisoners who are blind.  PLAINTIFF NAYLOR requested to participate in the G.E.D. program and was told that the staff would have to "check into it."  He did not receive a response.

376.     PLAINTIFF NAYLOR had a security classification of 2.   Prisoners without disabilities who have a security classification of 2 are eligible for work release.

377.     PLAINTIFF NAYLOR was not eligible for work release because he is blind.

378.     Prior to March 2014, PLAINTIFF NAYLOR was housed at Kilby in Dormitory A because he is blind.   PLAINTIFF MOORE is currently housed in Dormitory A because he is blind.   PLAINTIFF HAGOOD was housed in Dormitory A until May 2014 because he is in a wheelchair.   For prisoners who are not disabled, Dormitory A is a transit dormitory to which prisoners are sent for a short period of time before being sent to a more permanent placement. However, PLAINTIFF NAYLOR spent over two years in Dormitory A, PLAINTIFF MOORE has spent approximately four years in Dormitory A, and PLAINTIFF HAGOOD spent approximately 16 months in Dormitory A.   Because the dormitory has a high level of violence, as is often the case with higher security dormitories, it is often on lockdown, resulting in disabled plaintiffs being denied access to outside recreation.   Also, because Dormitory A is a transit dorm, programming is generally not available to persons housed there.

379.     Mentally ill prisoners housed in the RTU at Bullock are not provided with regular recreation.   They go outside one or two times per week.   The recreation yards for prisoners in the RTU are caged areas roughly 15 feet by 10 feet and no recreational equipment.   When prisoners are allowed out, there are often eight to 15 individuals in these small areas.

**E.  DEFENDANT ADOC Fails To Provide Auxiliary Aids And Services Necessary For Effective Communication.**

380.     ADOC does not provide auxiliary aids and services necessary to achieve effective communication with prisoners with disabilities. Examples of such measures may include large print materials for prisoners with low vision or a sign language interpreter for prisoners with deafness.

381.   PLAINTIFF TOOLEY is deaf.   He has never been offered a sign language interpreter, even though he requested one on numerous occasions. He does not understand certain ADOC policies as they relate to prisoners and cannot participate in any programs offered by the prison due to his lack of ability to communicate. DEFENDANT ADOC often relies on other prisoners with limited sign language ability to "communicate" with PLAINTIFF TOOLEY. In or around January 2014, PLAINTIFF TOOLEY was denied a sign language interpreter for a disciplinary hearing.  He did not understand the proceedings.  He was sentenced to a 30-day segregation term.

382.   PLAINTIFF BROYLES is mostly deaf in both ears.   For a time, he had two hearing aids, but eventually, personnel of both ADOC and Corizon informed him he would only be provided with one hearing aid.  As a result of having only one functioning hearing aid, he loses his balance frequently.  He often has to wait a long time for a replacement battery for the single hearing aid.  On one occasion, he was assaulted by a CERT team member for failing to obey an order that he could not hear.

383.   In or around April 2013, Bullock staff disciplined PLAINTIFF BROYLES twice for missing pill call and not taking his medication for diabetes.  He had missed pill call because he could not hear correctional officers order prisoners to line up for pill call due to his malfunctioning hearing aids. The Corizon physician at Bullock refused to allow PLAINTIFF BROYLES to stay on his medication unless PLAINTIFF BROYLES successfully attended two pill calls. PLAINTIFF BROYLES had trouble accomplishing this task because of the malfunctioning hearing aids and the inconsistent times for pill call. At Draper, PLAINTIFF BROYLES received approximately five disciplinary infractions over a year period for failing to

obey orders that he could not hear. The warden at Draper ultimately rescinded each of these infractions.

384.    DEFENDANT ADOC has refused to provide PLAINTIFF BROYLES with instructional materials to learn sign language.

385.    Several blind prisoners have reported that they are routinely asked to sign documents that they cannot read.  PLAINTIFF COPELAND signed a Do Not Resuscitate order without knowing what it was.  Another prisoner, Larry Shepherd, now deceased, had his hand was placed on the spot where he needed to sign, and believed that he was signing a property sheet relating to his transfer; he later discovered the form was a Do Not Resuscitate order.

386.    In 2013, PLAINTIFF TURNER was accused by another prisoner of using an unauthorized credit card to make telephone calls.  A disciplinary hearing was held without a sign language interpreter.  PLAINTIFF TURNER was not able to understand much of the proceeding, and was unable to present his side of the story.  He received 15 days in segregation as a result.

387.    PLAINTIFF MOORE has asked for books on tape approximately 10 times, but has never been provided any.

388.    PLAINTIFF MOORE cannot go to sick call without filling out a sick call request form.  If PLAINTIFF MOORE needs to go to medical, he must ask another prisoner to write down his medical complaint on a sick call request form.  When PLAINTIFF MOORE goes to sick call or to visit the eye doctor, the doctors and nurses write down notes from the visit but do not explain his diagnosis or treatment.

389.    PLAINTIFF MOORE, who is blind, was written up for the incident described above where he did not stand up promptly because he did not know that the correctional officer telling people to stand for count was speaking to him and the standard practice in the dormitory

was that the prisoners who are blind did not stand for count.  He was not brought to his disciplinary hearing and did not admit to any misconduct or sign the disciplinary report, but the documentation from the disciplinary hearing states that he pled guilty.  He was given a 10-day segregation term.

390.    PLAINTIFF NAYLOR was previously housed at Hamilton A & I.  Hamilton A & I does not have written materials in alternative formats such as books on tape.

391.    PLAINTIFF TERRELL was in Special Education classes starting at the beginning of school.  He completed ninth grade, but does not know his reading level.  Sometimes documents are read to him, sometimes they are not.  Sometimes he understands documents, whether he reads them or they are read to him, sometimes he does not.  PLAINTIFF TERRELL is not being adequately accommodated for his apparent learning or cognitive disability.

392.    PLAINTIFF DILLARD believes he reads at about a sixth grade level.  He attended school up until seventh grade.  He was in Special Education classes for all of his classes throughout his schooling.  He sometimes signs documents without understanding them.  When he is in medical, some of the nurses tell him what is in the documents, others do not.  Some nurses simply say, "how are your medications?" then tell him to sign a paper.

### F.  Prisoners With Disabilities Are Verbally Harassed, Physically Assaulted, And Punished For Their Disabilities.

393.    Several prisoners have reported incidents where they were verbally or physically mistreated due to their disabilities.  In Dormitory A at Kilby, where prisoners who are blind or in wheelchairs have been concentrated, prisoners report correctional officers taunting prisoners about their disabilities.  A blind prisoner reported that correctional officers waive their hands right in front of his face, refer to him as "blind man", and make jokes about the blind train when the blind prisoners line up to lead each other to go to the dining room or pill call.  A prisoner also

reports that the correctional officers say to people in wheelchairs who complain about something, "What are you going to do about it?  You can't get up."

394.   A blind prisoner reports that on one occasion during count he sat up on his bed, which is what he usually does during count.  A correctional officer yelled to stand up, but did not identify the person at whom he was yelling by name, Alabama Institutional Serial number or bed number.  The correctional officer kept yelling, identifying the person only as "you."  The prisoner did not know that he was the person being told to stand up.  The correctional officer assaulted the blind prisoner for disobeying, and then wrote him up.  The prisoner was given a disciplinary report that indicated he had pled guilty to the infraction at the discipline hearing.  He had not pled guilty and no one had told him that the written record of the hearing indicated that he had pled guilty.

395.   A prisoner who is nearly entirely deaf was in his dormitory when a CERT team came in and ordered everyone to stand.  The deaf prisoner was turned away at the time and did not know of the order.  A member of the CERT team hit him on the back of the head for not standing up when ordered to do so.

396.   PLAINTIFF MOORE was housed in Dormitory A at Kilby for many months.  He was provided with no assistance getting around the dormitory or the prison.  PLAINTIFF MOORE and other blind prisoners in Dormitory A assisted each other, but were often mocked by the correctional officers and other prisoners.  The correctional officers call the prisoners who are blind names, such as "blind motherfucker."  When he tried to move around the housing unit, prisoners routinely stood in his way.

397.   On one occasion, PLAINTIFF MOORE was sitting on his bunk.  Correctional officers came in and called out "count time."  Ordinarily, at count, PLAINTIFF MOORE and

other blind prisoners remain seated on their bunks, and PLAINTIFF MOORE did so on this occasion as well.  A correctional officer yelled to stand up.  PLAINTIFF MOORE did not know the correctional officer was yelling at him, until the correctional officer yelled "That goes for you too, blind motherfucker!"  PLAINTIFF MOORE asked the correctional officer not to speak to him that way.  The correctional officer grabbed PLAINTIFF MOORE and slammed him to the ground, then whispered to PLAINTIFF MOORE that he should have killed him.

398.   PLAINTIFF BROYLES is harassed, threatened, and subjected to physical violence by correctional officers and prisoners due to his disability. Correctional officers often yell at PLAINTIFF BROYLES because he does not hear their orders and threaten to physically assault him. Correctional officers also often accuse PLAINTIFF BROYLES of pretending to have hearing limitations. PLAINTIFF BROYLES has had these experiences at Draper, Elmore, Kilby, St. Clair, and Bullock. A correctional officer at Bullock threw a baton at PLAINTIFF BROYLES when PLAINTIFF BROYLES did not respond to the officer, because he did not hear him.

399.   Mentally ill prisoners in the RTU at Bullock are subjected to a great deal of physical violence.  PLAINTIFF MCCOY was brutally beaten by correctional officers while he was housed at the Bullock RTU.  PLAINTIFF BUSINELLE had four teeth knocked out by correctional officers in 2009.  Correctional officers broke PLAINTIFF TERRELL's jaw and rib in one incident when PLAINTIFF TERRELL was in the midst of a psychotic episode, and beat his head with a baton on another occasion.  PLAINTIFF DILLARD was slammed to the ground by correctional officers when he refused his medications because he was having difficulty with the side effects.  Correctional officers knock over bunks in the mornings in the Bullock RTU if

they think the prisoners are not getting up quickly enough in the morning, although many of the prisoners in the RTU take medications that cause them to sleep.

## V. DEFENDANTS RETALIATE AGAINST PRISONERS FOR EXERCISING THEIR CONSTITUTIONAL RIGHTS.

400.    The OFFICIAL CAPACITY DEFENDANTS have established a policy or custom that permits ADOC employees and contractors to engage in retaliatory action against prisoners who exercise their first amendment rights to communicate with counsel and file complaints regarding conditions of confinement.    The OFFICIAL CAPACITY DEFENDANTS act recklessly and with deliberate indifference with regard to permitting ADOC employees and contractors to engage in retaliatory action against these prisoners. Moreover, the OFFICIAL CAPACITY DEFENDANTS knew, or should have known, that ADOC employees would act unlawfully by subjecting these prisoners to retaliatory treatment and failed to stop them.

401.    The OFFICIAL CAPACITY DEFENDANTS retaliate against prisoners who exercise their rights to meet confidentially with counsel and to file complaints regarding the conditions of their confinement.

402.    PLAINTIFF DUNN has repeatedly requested mental health treatment and has engaged in acts of self-harm on five occasions while in the custody of DEFENDANT ADOC. As the first-named plaintiff in this lawsuit, PLAINTIFF DUNN's claims have been the focus of a prominent media campaign. In particular, PLAINTIFF DUNN's claims were featured in local and national press.

403.    On June 28, 2014, a prisoner initiated a fight with PLAINTIFF DUNN. Approximately three days later, PLAINTIFF DUNN, who was confused about why the fight happened, asked Officer Mitchell Sanders to permit him to speak with mental health staff. Officer Sanders responded, "I read about the lawsuit in the newspaper. You're always trying to

manipulate the system. You're not going to see anybody."   Officer Sanders's denial of PLAINTIFF DUNN's request runs contrary to ADOC's Administrative Regulation 609, which provides for self-referrals to mental health to be given to the medical unit and then passed along to a psychologist.

404.   DEFENDANT SHARP's predecessor and DEFENDANT NAGLICH were notified on June 5, 2014 that PLAINTIFF SEARS' "no prolonged standing" medical profile was not being honored consistently.   DEFENDANT SHARP's predecessor and DEFENDANT NAGLICH were informed by counsel of the failure to accommodate PLAINTIFF SEARS' disabilities on June 16, 2014.   DEFENDANT SHARP's predecessor and DEFENDANT NAGLICH were informed in this communication that the actions taken against PLAINTIFF SEARS "appear to be retaliatory."

405.   PLAINTIFF SEARS is housed at Ventress.  Plaintiffs' counsel and legal staff has met with PLAINTIFF SEARS several times since February 11, 2014.   Officer Gwendolyn Pullom facilitates attorney visits at Ventress and is aware of each of PLAINTIFF SEARS' visits with Plaintiffs' counsel. As required throughout ADOC facilities, Plaintiffs' counsel identified themselves to facility staff prior to each meeting with PLAINTIFF SEARS.   Officer Gwendolyn Pullom is married to Officer David Pullom.

406.   On June 20, 2014, three days after the filing of this lawsuit, PLAINTIFF SEARS was showering in the handicapped accessible shower in the infirmary of Ventress, as permitted by his medical profile.   PLAINTIFF SEARS suffers from severe scoliosis and is frail from untreated extreme weight loss.   When PLAINTIFF SEARS finishes his shower, he must ring a bell to receive assistance to return to his dormitory.   PLAINTIFF SEARS rang the bell and called out for assistance for approximately 20 minutes after he finished his shower. Officer David

Pullom came into the infirmary and began yelling at PLAINTIFF SEARS, saying, "You think you're a smart ass. You think you run something. You don't run shit here. You're causing all this trouble around here. Well, you don't scare me. You're a fuck boy. Get on the fucking ground now."  Officer Pullom then forced PLAINTIFF SEARS to the ground, handcuffed him behind his back forcefully, and pushed his face into the floor. Officer Pullom then pushed his knee into PLAINTIFF SEARS' back and ground PLAINTIFF SEARS' face into the floor with his hand, while continuing to yell obscenities at him.  Officer Pullom continued to assault PLAINTIFF SEARS until two prisoners arrived and yelled for him to stop.  Officer Pullom then said, "You think you're a big shot around here, well, you ain't shit to me. You ain't nothing to me and I'm going to show you. Give me your fucking I.D. card. I'm going to write your stupid ass up." Officer Pullom then left the area.  At that point PLAINTIFF SEARS realized that a correctional officer and two Corizon nurses witnessed the assault.  PLAINTIFF SEARS asked the nurses to evaluate him for injuries, but they refused.   PLAINTIFF SEARS also requested that the correctional officer initiate an investigation pursuant to ADOC policy. The correctional officer left the area without responding. Unable to get up because of his physical condition and the handcuffs, PLAINTIFF SEARS remained on the bathroom floor for approximately two hours until a correctional officer returned to escort him back to his dormitory. PLAINTIFF SEARS informed an ADOC lieutenant about the incident and requested that he make a formal report. After receiving PLAINTIFF SEARS's complaint concerning the incident, Ventress's warden found that no excessive forced had been used, but agreed to turn the matter over to I & I. PLAINTIFF SEARS nevertheless received a disciplinary report regarding the incident on or about June 30, 2014 and has received no further information about any I & I investigation or findings.

407.     On or about September 1, 2014, PLAINTIFF SEARS was at the pill call window at 2:00 a.m.  Another prisoner came up to the window, reached around PLAINTIFF SEARS and asked for his medication.  After giving the other prisoner his medication, the nurse yelled at PLAINTIFF SEARS for cutting the line.  PLAINTIFF SEARS said that he did not cut the line, but the nurse continued to yell at him.  A correctional officer started to yell at PLAINTIFF SEARS. Three officers pulled PLAINTIFF SEARS across the yard, leaving PLAINTIFF SEARS' cane behind.  Eventually PLAINTIFF SEARS fell to the ground.  When he was on the ground, he could not get up without his cane.  The officers ordered PLAINTIFF SEARS to get up.  He explained that he could not.  A lieutenant came over and ordered that PLAINTIFF SEARS be handcuffed with his hands behind his back.  The lieutenant then ordered PLAINTIFF SEARS to get up and go to F-Dorm, a disciplinary dorm.  PLAINTIFF SEARS explained that he could not and showed the lieutenant that he had a no standing, no walking profile.  The lieutenant tore the profile in half.  PLAINTIFF SEARS was then picked up, taken to F-Dorm and reassigned to F-Dorm.  PLAINTIFF SEARS was given three disciplinaries for not getting up off the ground when he could not do so, due to his disabilities, as well as two other disciplinaries from this incident.  The disciplinaries were delivered to PLAINTIFF SEARS by leaving them on his bed while he was in the bathroom area, and stated that he had refused to sign, although he had not been given the opportunity to sign.

408.     When PLAINTIFF SEARS came up for parole late in 2014, he was denied and set off for three years.  He believes that the disciplinaries he has received since the filing of the initial complaint in this matter are the reason he was denied parole.  He further believes that the disciplinaries were given to him in retaliation for his participation in this lawsuit.

409.    PLAINTIFF HAGOOD met with Plaintiffs' Counsel at Kilby on February 25, 2014 and May 7, 2014. As required, Plaintiff's Counsel identified themselves to facility staff prior to each meeting with PLAINTIFF HAGOOD.  On May 1, 2014, PLAINTIFF HAGOOD was identified in a letter from counsel to DEFENDANT SHARP's predecessor and DEFENDANT NAGLICH as needing reasonable accommodations for his disabilities.

410.    PLAINTIFF HAGOOD has received insulin injections for diabetes since 1969 and he felt his diabetes was well controlled.  In late May, 2014, facility medical personnel changed PLAINTIFF HAGOOD'S prescription for diabetes from insulin injections to oral medication, requiring him to take six or seven pills a day. This change in prescription was conducted without notice, explanation, or a meeting with medical personnel. PLAINTIFF HAGOOD'S new medication makes him nauseous and gives him headaches.  His blood sugar levels are much higher with the new medication.   In June 2014 PLAINTIFF HAGOOD requested that Dr. Karen Stone, the Corizon Regional Director, reinstate his insulin prescription. Dr. Stone refused this request and taunted PLAINTIFF HAGOOD, saying, "now go back there and tell your lawyer." PLAINTIFF HAGOOD did not report any problems with his insulin medication prior to the change.

411.    Plaintiffs' counsel sent a letter to DEFENDANT SHARP's predecessor and DEFENDANT ADOC on December 21, 2012, informing them that a number of prisoners had complained of retaliation after legal visits.  Plaintiffs' counsel requested that correctional facility staff be reminded of the rules against retaliation and that signs be posted in prominent places in each facility explaining that prisoners should not be retaliated against for speaking with legal counsel.  DEFENDANT SHARP's predecessor acknowledged receipt of the letter, but did not indicate whether or how the matter would be addressed.

412.    Employees of DEFENDANT SHARP who are the subject of investigations into the violations of prisoners' rights are frequently not disciplined and may even be promoted.  For example, following a finding by the United States Department of Justice of numerous constitutional violations, wardens at Tutwiler were transferred to other prisons, where they continued to work, and one warden was even promoted.

413.    ADOC employees and medical staff often threaten retaliation/use the threat of retaliation to control/manipulate.  On or around June 4, 2014, Plaintiffs' Counsel met with PLAINTIFFS BUSINELLE, TERRELL, and SANFORD at Bullock.  While Plaintiffs' Counsel met with PLAINTIFF SANFORD, PLAINTIFFS TERRELL and BUSINELLE sat outside the room in which the meeting was taking place, waiting their turns.  As they waited, an officer walked past them and said to them, "You were waiting to go home, but now you're going to go to jail."  PLAINTIFFS TERRELL and BUSINELLE both understood this as a threat that they would be placed in segregation.

414.    On July 3, 2014, approximately two weeks after this lawsuit was filed, PLAINTIFF MORK was told by a correctional officer that his life and the lives of other plaintiffs were in danger.  DEFENDANT SHARP's predecessor and DEFENDANT NAGLICH were informed by Counsel of this communication on the same day.  As of July 9, 2014, no one had come to speak with PLAINTIFF MORK to investigate this serious matter.

415.    On March 17, 2014, Plaintiffs' counsel informed DEFENDANT SHARP's predecessor of PLAINTIFF SELLERS's need for medical attention.  Shortly thereafter, he was moved from his dormitory to another dormitory in which he had enemies.  He informed ADOC correctional officers of the problem and refused to go.  The officers physically assaulted him and then moved him anyway.  He asked to speak with personnel from the Investigations &

Intelligence Division (I & I) but was not allowed to do so.  After Plaintiffs' Counsel contacted DEFENDANT SHARP's predecessor to request that PLAINTIFF SELLERS speak with personnel from I & I, he was permitted to do so.  The I & I officer asked PLAINTIFF SELLERS the subject of his conversations with Plaintiffs' Counsel.

## CLASS ACTION ALLEGATIONS

### PLAINTIFF Class

416.    All prisoner PLAINTIFFS bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a class of all prisoners who are now, or will in the future be, subjected to the medical care policies and practices of the OFFICIAL CAPACITY DEFENDANTS and ADOC (the "PLAINTIFF Class").

### Numerosity: Fed. R. Civ. P. 23(a)(1)

417.    The class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).  At the time this lawsuit was commenced and at all times since, there have been in excess of 24,000prisoners in in-house custody of the ADOC, all of whom are dependent entirely on the OFFICIAL CAPACITY DEFENDANTS for the provision of health care. Due to policies and practices of the OFFICIAL CAPACITY DEFENDANTS, all in-house ADOC prisoners, numbering tens of thousands annually, receive or are at risk of receiving inadequate health care while in ADOC prisons.

418.    The PLAINTIFF Class members are identifiable using records maintained in the ordinary course of business by the ADOC.

### Commonality: Fed. R. Civ. P. 23(a)(2)

419.    There are questions of law and fact common to the members of the class. Such questions include, but are not limited to:

(a) whether the OFFICIAL CAPACITY DEFENDANTS have a custom, policy, or practice of systematically failing to operate a health care system providing minimally adequate health care that violates the Cruel and Unusual Punishments Clause of the Eighth Amendment,

(b) whether the OFFICIAL CAPACITY DEFENDANTS have a custom, policy, or practice of deliberate indifference to the serious health care needs of class members.

(c) whether ADOC's policies, procedures, and practices reflect deliberate indifference to the serious medical needs of class members such that ADOC has violated their right to be free from cruel and unusual punishment as proscribed by the Eighth Amendment.

(d) whether the OFFICIAL CAPACITY DEFENDANTS' capitated contract system permits improper cost considerations to interfere with treatment of serious medical conditions.

(e) whether the systemic and pervasive deficiencies in care at ADOC facilities have placed class members at unreasonable risk of suffering new or worsening physical injury, illness, mental anguish, emotional distress, and the prospect of premature death.

420. The OFFICIAL CAPACITY DEFENDANTS are expected to raise common defenses to these claims, including denying that their actions violated the law.

Typicality: Fed. R. Civ. P. 23(a)(3)

421. The claims of the named PLAINTIFFS are typical of those of the PLAINTIFF Class. The named PLAINTIFFS' claims arise from the same policies, practices, or courses of

125

conduct as those of the PLAINTIFF Class.  The named PLAINTIFFS' claims are based on the same theory of law as the class's claims.

Adequacy: Fed. R. Civ. P. 23(a)(4)

422.    The named PLAINTIFFS are capable of fairly and adequately protecting the interests of the PLAINTIFF class.  The named PLAINTIFFS do not have any interests antagonistic to the class.  The named PLAINTIFFS, as well as the PLAINTIFF class members, seek to enjoin the unlawful acts and omissions of DEFENDANTS. Finally, the named PLAINTIFFS are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

Fed. R. Civ. P. 23(b)(1)(A) and (B)

423.    This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of current class members is approximately 25,055, and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for the OFFICIAL CAPACITY DEFENDANTS. Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

Fed. R. Civ. P. 23(b)(2)

424.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because DEFENDANTS' policies, practices, actions, and omissions that form the basis of this complaint are common to and apply generally to all members of the class, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the class. All state-wide health care policies are centrally promulgated, disseminated, and enforced from

the central headquarters of ADOC by the OFFICIAL CAPACITY DEFENDANTS.  Medical care is provided pursuant to a single contract with a single medical provider with policies and practices that are centrally promulgated, disseminated, overseen and enforced by the medical provider's Medical Statewide Management team and by the OFFICIAL CAPACITY DEFENDANTS.  The injunctive and declaratory relief sought is appropriate and will apply to all members of the PLAINTIFF class.

### Mental Health Subclass

425.   PLAINTIFFS DUNN, BRAGGS, BUI, BUSINELLE, CARTER, DILLARD, HARDY, HARTLEY, JACKSON, JOHNSON, MCCOY, MONCRIEF, PRUITT, SANFORD, TERRELL, WALLACE, and WILLIAMS bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of all prisoners (hereinafter "Mental Health Subclass") who are now, or will in the future be, subjected to the mental health care policies and practices of the OFFICIAL CAPACITY DEFENDANTS and DEFENDANT ADOC.

### Numerosity: Fed. R. Civ. P. 23(a)(1)

426.   The Mental Health Subclass is so numerous that joinder of all members is impracticable. At the time this lawsuit was commenced and at all times since, there have been in excess of 24,000prisoners in in-house custody of the ADOC, all of whom are dependent entirely on the OFFICIAL CAPACITY DEFENDANTS for the provision of mental health care.  As of April 30, 2014, there were 3,059 prisoners in in-house custody of the ADOC who are on the mental health caseload, as well as 30 prisoners who have been diagnosed with DSM-IV Axis I disorders who are not on the mental health caseload.  Due to the policies and practices of the OFFICIAL CAPACITY DEFENDANTS all ADOC prisoners, numbering tens of thousands

annually, receive or are at risk of receiving inadequate mental health care while in ADOC prisons. The Mental Health Subclass members are identifiable using records maintained in the ordinary course of business by the ADOC.

Commonality: Fed. R. Civ. P. 23(a)(2)

427.    There are questions of law and fact common to the members of the Mental Health Subclass. Such questions include, but are not limited to:

(a) whether the OFFICIAL CAPACITY DEFENDANTS have a custom, policy, or practice of systematically failing to operate a mental health care system providing minimally adequate mental health care that violates the Cruel and Unusual Punishments Clause of the Eighth Amendment,

(b) whether the OFFICIAL CAPACITY DEFENDANTS have a custom, policy, or practice of deliberate indifference to the resulting harm and risk of harm to Mental Health Subclass members who are deprived of minimally adequate mental health care;

(c) whether ADOC's policies, procedures, and practices reflect deliberate indifference to the serious mental health needs of class members such that ADOC has violated their right to be free from cruel and unusual punishment as proscribed by the Eighth Amendment;

(d) whether the OFFICIAL CAPACITY DEFENDANTS' capitated contract system permits improper cost considerations to interfere with treatment of serious mental health conditions;

(e) whether the systemic and pervasive deficiencies in mental health care at ADOC facilities have placed class members at unreasonable risk of suffering new

or worsening mental illness, physical injury, illness, mental anguish, emotional distress, and the prospect of premature death;

(f) whether the policies, practices and courses of conduct in medicating mentally ill prisoners against their will of the OFFICIAL CAPACITY DEFENDANTS violate the Due Process Clause of the Fourteenth Amendment.

428.    The OFFICIAL CAPACITY DEFENDANTS are expected to raise common defenses to these claims, including denying that their actions violated the law.

### Typicality: Fed. R. Civ. P. 23(a)(3)

429.    The claims of the named PLAINTIFFS are typical of those of the Mental Health Subclass, because their claims arise from the same policies, practices, or courses of conduct. The named PLAINTIFFS' claims are based on the same theory of law as the subclass's claims.

### Adequacy: Fed. R. Civ. P. 23(a)(4)

430.    The named PLAINTIFFS are capable of fairly and adequately protecting the interests of the Mental Health Subclass because the named PLAINTIFFS do not have any interests antagonistic to the subclass. The named PLAINTIFFS, as well as the Mental Health Subclass members, seek to enjoin the unlawful acts and omissions of the OFFICIAL CAPACITY DEFENDANTS.   Finally, the named PLAINTIFFS are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

### Fed. R. Civ. P. 23(b)(1)(A) and (B)

431.    Because the number of Mental Health Subclass members is so large, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for the

OFFICIAL CAPACITY DEFENDANTS. Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

Fed. R. Civ. P. 23(b)(2)

432.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because DEFENDANTS' policies, practices, actions, and omissions that form the basis of this complaint are common to and apply generally to all members of the class, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the class. All state-wide health care policies are centrally promulgated, disseminated, and enforced from the central headquarters of ADOC by the OFFICIAL CAPACITY DEFENDANTS.  Mental health care is provided pursuant to a single contract with a single medical provider with policies and practices that are centrally promulgated, disseminated, overseen and enforced by the mental health care providers' statewide Management team and by the OFFICIAL CAPACITY DEFENDANTS.  The injunctive and declaratory relief sought is appropriate and will apply to all members of the Mental Health Subclass.

**ADA Subclass**

433.    PLAINTIFFS DUNN, BAKER, BRAGGS, BROOKS, BROYLES, BUI, BUSINELLE, CARTER, COPELAND, DILLARD, GILBERT, HAGOOD, HARDY, HARTLEY, HENDERSON, JACKSON, JOHNSON, MANER, MCCOY, MITCHELL, MONCRIEF, MOORE, MOSELEY, NAYLOR, PEARSON, PRUITT, SANFORD, SEARS, TERRELL, TOOLEY, TORRES, TURNER, VILLAR, WALLACE, and WILLIAMS bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of all prisoners (hereinafter "ADA Subclass")

who are now, or will in the future be, persons with disabilities as that term is used in the ADA and § 504 and are in the custody of DEFENDANT ADOC.

Numerosity: Fed. R. Civ. P. 23(a)(1)

434.    The ADA Subclass is so numerous that joinder of all members is impracticable. As of March 31, 2014, there were approximately 25,055 prisoners in in-house custody of the ADOC.  As of April 30, 2014, there were at least:

1.  42 prisoners in in-house custody of the ADOC whose kidney function is sufficiently impaired to require dialysis;

2.  1,329 prisoners in in-house custody of the ADOC who are enrolled in the diabetes chronic care clinic; and

3.  3,029 prisoners on the mental health caseload.

There were also numerous prisoners with mobility, vision, hearing and developmental disabilities.

434.    Due to the policies and practices of DEFENDANT ADOC, all ADOC prisoners with disabilities risk being discriminated against on the basis of their disabilities in accessing facilities, programs, benefits and services while in ADOC prisons. The ADA Subclass members are identifiable using records maintained in the ordinary course of business by the ADOC.

Commonality: Fed. R. Civ. P. 23(a)(2)

435.    There are questions of law and fact common to the members of the ADA Subclass. Such questions include, but are not limited to:

(a)    whether DEFENDANT ADOC has failed to make appropriate accommodations in the physical structure and infrastructure of the ADOC facilities in violation of the ADA and § 504;

(b) whether DEFENDANT ADOC has failed to make appropriate accommodations in the policies and procedures in ADOC facilities as they apply to persons with disabilities in violation of the ADA and § 504;

(c) whether DEFENDANT ADOC has discriminated against the members of the ADA Subclass in the provision of and access to programs, benefits, and services.

436. DEFENDANT ADOC is expected to raise common defenses to these claims, including denying that their actions violated the law.

Typicality: Fed. R. Civ. P. 23(a)(3)

437. The claims of the named PLAINTIFFS are typical of those of the ADA Subclass, because their claims arise from the same policies, practices, or courses of conduct. The named PLAINTIFFS' claims are based on the same theory of law as the subclass's claims.

Adequacy: Fed. R. Civ. P. 23(a)(4)

438. The named PLAINTIFFS are capable of fairly and adequately protecting the interests of the ADA Subclass because the named PLAINTIFFS do not have any interests antagonistic to the subclass. The named PLAINTIFFS, as well as the ADA Subclass members, seek to enjoin the unlawful acts and omissions of the OFFICIAL CAPACITY DEFENDANTS and DEFENDANT ADOC. Finally, the named PLAINTIFFS are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

Fed. R. Civ. P. 23(b)(1)(A) and (B)

439. Because the number of ADA Subclass members is so large, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for DEFENDANT ADOC.

Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

Fed. R. Civ. P. 23(b)(2)

440.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because the policies, practices, actions, and omissions of the OFFICIAL CAPACITY DEFENDANTS and DEFENDANT ADOC that form the basis of this complaint are common to and apply generally to all members of the class, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the class. All state-wide policies regarding the treatment and accommodation are centrally promulgated, disseminated, and enforced from the central headquarters of DEFENDANT ADOC.  The budget and planning for modifications to the physical structure of the ADOC facilities are established at the central headquarters by the OFFICIAL CAPACITY DEFENDANTS.  The injunctive and declaratory relief sought is appropriate and will apply to all members of the Mental Health Subclass.

**CLAIMS FOR RELIEF**

**First Cause Of Action: Inadequate Medical Care**
All Prisoner PLAINTIFFS and the PLAINTIFF CLASS v.
DEFENDANTS SHARP and NAGLICH
(42 U.S.C. § 1983; Eighth and Fourteenth Amendments, Cruel and Unusual Punishment)

441.    Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1-440 above.

442.    By their policies and practices described herein, the OFFICIAL CAPACITY DEFENDANTS subject PLAINTIFFS and the Plaintiff Class to a substantial risk of serious harm and injury from inadequate medical care in violation of 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the U.S. Constitution. These policies and practices have been

133

and continue to be implemented by DEFENDANTS and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the PLAINTIFFS' ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

443.    The OFFICIAL CAPACITY DEFENDANTS have been and are aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

**Second Cause Of Action: Inadequate Mental Health Treatment**
PLAINTIFFS DUNN, BRAGGS, BUI, BUSINELLE, CARTER, DILLARD, HARDY, HARTLEY, JACKSON, JOHNSON, MCCOY, MONCRIEF, PRUITT, SANFORD, TERRELL, WALLACE, WILLIAMS; PLAINTIFF ALABAMA DISABILITIES ADVOCACY PROGRAM; the Mental Health Subclass v. DEFENDANTS SHARP and NAGLICH
(42 U.S.C. § 1983; Eighth and Fourteenth Amendments, Cruel and Unusual Punishment)

444.    Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1-440 above.

445.    By their policies and practices described herein, the OFFICIAL CAPACITY DEFENDANTS subject PLAINTIFFS, the client and constituents of PLAINTIFF ALABAMA DISABILITIES ADVOCACY PROGAM, and the Mental Health Subclass to a substantial risk of serious harm and injury from inadequate mental health treatment in violation of 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the U.S. Constitution. These policies and practices have been and continue to be implemented by DEFENDANTS and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the PLAINTIFFS' ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

446.    The OFFICIAL CAPACITY DEFENDANTS have been and are aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

**Third Cause Of Action: Deprivation Of Due Process**
**Prior To Involuntarily Medicating Prisoners**
PLAINTIFFS BUI, DILLARD, HARTLEY, MCCOY, SANFORD, TERRELL; PLAINTIFF
ALABAMA DISABILITIES ADVOCACY PROGRAM; the Mental Health Subclass v.
DEFENDANTS SHARP and NAGLICH
(42 U.S.C. § 1983; Fourteenth Amendment, Due Process)

447.    Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1-440 above.

448.    By their policies and practices described herein, the OFFICIAL CAPACITY DEFENDANTS subject PLAINTIFFS, the client and constituents of PLAINTIFF ALABAMA DISABILITIES ADVOCACY PROGAM, and the Mental Health Subclass of their due process rights by involuntarily medicating prisoners in violation of the Fourteenth Amendment to the U.S. Constitution.

449.    The OFFICIAL CAPACITY DEFENDANTS have been and are aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

**Fourth Cause Of Action: Violation Of The Rights Of Prisoners With Disabilities**
PLAINTIFFS DUNN, BAKER, BRAGGS, BROOKS, BROYLES, BUI, BUSINELLE,
CARTER, COPELAND, DILLARD, GILBERT, HAGOOD, HARDY, HARTLEY,
HENDERSON, JACKSON, JOHNSON, MANER, MCCOY, MITCHELL, MONCRIEF,
MOORE, MOSELEY, NAYLOR, PEARSON, PRUITT, SANFORD, SEARS, TERRELL,
TOOLEY, TORRES, TURNER, VILLAR, WALLACE, WILLIAMS; PLAINTIFF ALABAMA
DISABILITIES ADVOCACY PROGRAM; and the ADA Subclass v. DEFENDANT ADOC
(Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973)

450.    Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1-440 above.

451.   By their policies and practices described herein, DEFENDANT ADOC subjects PLAINTIFFS, the client and constituents of PLAINTIFF ALABAMA DISABILITIES ADVOCACY PROGAM, and the ADA Subclass to regular and systemic discrimination based on their disabilities in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§12131-12134, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. These policies and practices continue to be implemented by DEFENDANT ADOC and its agents, officials, employees, and all persons acting in concert with ADOC under color of state law, in their official capacities, and are the proximate cause of the PLAINTIFFS' ongoing deprivation of rights secured by federal law.

452.   DEFENDANT ADOC has been and is aware of all the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

**Fifth Cause Of Action: Retaliation in Violation of Prisoners' First Amendment Rights to Communicate with Counsel and to File Lawsuits Regarding Conditions of Confinement**
PLAINTIFFS DUNN, HAGOOD, SEARS v. DEFENDANTS SHARP and NAGLICH in their official capacity
(42 U.S.C. § 1983; First and Fourteenth Amendment)

453.   Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1-440 above.

454.   By their policies and practices described herein, the OFFICIAL CAPACITY DEFENDANTS subjected PLAINTIFFS SEARS, DUNN and HAGOOD to retaliation for communicating with attorneys and filing a lawsuit regarding conditions of confinement, in violation of the First and Fourteenth Amendments to the U.S. Constitution.

455.   The OFFICIAL CAPACITY DEFENDANTS have been and are aware of the retaliatory actions complained of herein, and have condoned or been deliberately indifferent to such conduct.

## PRAYER FOR RELIEF

456.    PLAINTIFFS and the classes they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. PLAINTIFFS have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the OFFICIAL CAPACITY DEFENDANTS and DEFENDANT ADOC, as alleged herein, unless PLAINTIFFS and the class they represent are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the United States Constitution and the laws of the United States.

457.    WHEREFORE, the named PLAINTIFFS and the class they represent request that this Court grant them the following relief:

A.    Declare that the suit is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(1) and (2);

B.    Adjudge and declare that the acts, omissions, policies, and practices of the OFFICIAL CAPACITY DEFENDANTS, and their agents, employees, officials, and all persons acting in concert with them under color of state law or otherwise, described herein are in violation of the rights of prisoner PLAINTIFFS and the classes they represent under the Cruel and Unusual Punishment Clause of the Eighth Amendment, which grants constitutional protection to the PLAINTIFFS and the classes they represent;

C.    Preliminarily and permanently enjoin all DEFENDANTS, their agents, employees, officials, and all persons acting in concert with them under color of state law, from subjecting prisoner PLAINTIFFS and the PLAINTIFF Classes to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above.

D.      Order the OFFICIAL CAPACITY DEFENDANTS and DEFENDANT ADOC, their agents, employees, officials, and all persons acting in concert with them under color of state law, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that prisoner PLAINTIFFS and members of the PLAINTIFF Classes suffer due to inadequate medical and mental health care of DEFENDANTS SHARP and NAGLICH, and due to the policies and practices with regard to persons with disabilities of DEFENDANT ADOC. The plan shall include at a minimum the following:

1. Staffing: Staffing shall be sufficient to provide prisoner PLAINTIFFS and the PLAINTIFF Class with timely access to qualified and competent clinicians who can provide routine, urgent, emergent, and specialty health care;

2. Access: Policies and practices that provide timely access to health care;

3. Screening: Policies and practices that reliably screen for medical, dental, and mental health conditions that need treatment;

4. Emergency Response: Timely and competent responses to health care emergencies;

5. Medication and Supplies: Timely prescription and distribution of medications and supplies necessary for medically adequate care;

6. Chronic Care: Timely access to competent care for chronic diseases;

7. Environmental Conditions: Basic sanitary conditions that do not promote the spread or exacerbation of diseases or infections, including but not limited to a smoke-free environment;

8. Mental Health Treatment: Timely access to necessary treatment for serious mental illness, including medication, therapy, inpatient treatment, suicide prevention,

9. Quality Assurance: A regular assessment of health care staff, services, procedures, and activities designed to improve outcomes, and to identify and correct errors or systemic deficiencies;

10. Accommodations: Appropriate accommodations for individuals with disabilities, as required by the ADA and § 504.

E.     Award PLAINTIFFS the costs of this suit, and reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988, and other applicable law;

F.     Retain jurisdiction of this case until all DEFENDANTS have fully complied with the orders of this Court, and there is a reasonable assurance that DEFENDANTS will continue to comply in the future absent continuing jurisdiction; and

G.     Award such other and further relief as the Court deems just and proper.


RESPECTFULLY SUBMITTED this 20the day of February, 2015.

SOUTHERN POVERTY LAW CENTER

By:   /s/ Maria V. Morris
      Maria V. Morris

Maria V. Morris (ASB-2198-R64M)
Ebony G. Howard (ASB-7247-O76H)
Latasha L. McCrary (ASB-1935-L75M)
Valentina Restrepo (ASB-7422-I67Z)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
maria.morris@splcenter.org
latasha.mccrary@splcenter.org

Miriam Haskell* (Florida Bar No. 069033)
SOUTHERN POVERTY LAW CENTER
P.O. Box 370037
Miami, FL 33137
Telephone: (786) 347-2056
Facsimile: (786) 237-2949
miriam.haskell@splcenter.org
*admitted pro hac vice

William Van Der Pol, Jr. (ASB-2112-114F)
J. Patrick Hackney (ASB-6971-H51J)
Alabama Disabilities Advocacy Program (ADAP)
Box 870395
Tuscaloosa, AL  35487

Phone: (205) 348-4928
Fax: (205) 348-3909

Brent L. Rosen
Baker Donelson Bearman Caldwell & Berkowitz PC
614 S. Hull St
Montgomery, AL 36104
334-223-3014
334-263-0960 (fax)
brosen@bakerdonelson.com

William Glassell Somerville, III
Andrew Philip Walsh
Baker Donelson Bearman Caldwell & Berkowitz
420 20th Street North; Suite 1400
Birmingham, AL 35203
205-250-8375
205-488-3775 (fax)
wsomerville@bakerdonelson.com
awalsh@bakerdonelson.com

**ATTORNEYS FOR THE PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of February, 2015, I served a copy of the foregoing to all counsel of record, including the following opposing counsel and the mediator, by e-filing with the Court:

David Randall Boyd, Esq.
John Garland Smith, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, AL 36101

Michael Leon Edwards, Esq.
Balch & Bingham LLP
Post Office Box 306
Birmingham, AL 35201

Susan Nettles Han, Esq.
Balch & Bingham, LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL 35203

William Richard Lunsford, Esq.
Maynard Cooper & Gale PC
655 Gallatin Street
Huntsville, AL 35801

Anne Hill, Esq.
Elizabeth Anne Sees, Esq.
Alabama Department of Corrections
Legal Division
301 South Ripley Street
Montgomery, AL 36130

Mitesh Shah, Esq.
Janine McKinnon McAdory, Esq.
Maynard, Cooper & Gale, PC
1901 6th Avenue North, Suite 2400
Birmingham, AL 35203

Gordon Douglas Jones
Jones & Hawley, P.C.
2001 Park Place; Suite 830
Birmingham, AL 35203

_____/s/ Maria V. Morris_____
Counsel for the Plaintiffs