INTHE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| JOSHUA DUNN, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action Number: |
| v. | ) | |
| | ) | 2:14-cv-00601-MHT-TFM |
| JEFFERSON DUNN, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF**

**TODD RANDALL WILCOX, M.D., M.B.A., C.C.H.P.-A**

I, Todd Randall Wilcox, declare as follows:

1. I have been retained by Plaintiffs' counsel as an expert in medical care in correctional institutions. I have worked as a physician in jail and prison environments for 19 years. A description of my qualifications and my curriculum vitae are in the record at Document 146-1.

2. I was plaintiffs' expert in Parsons v. Ryan, a class action challenging, among other things, the constitutionality of the health care provided by the Arizona Department of Corrections. In that capacity, without HIPAA releases, I reviewed

well over a hundred partial and full healthcare records of Arizona prisoners. In addition, I reviewed documents during the course of my tours of facilities, such as binders and loose filing and notices posted on the walls. During facility tours, I viewed the majority of the clinical and support facilities where medical care was prepared and delivered, including inpatient units, exam rooms, urgent care facilities, medication rooms, medical records rooms, and medical supply rooms. I also witnessed pill call at one facility and I toured one food preparation unit. I reviewed numerous healthcare records, logs, and binders (such as descriptions of medical diet options and medication administration processes).

3. I reviewed several dozen patient healthcare records at every prison I toured. I did not review a random sample; instead, I chose to look at files of specific types of prisoners. This is because when evaluating a healthcare delivery system, it is not generally as helpful to examine care for healthy people as it is to look at the treatment of sick people, particularly those with complex or chronic conditions that require coordination, communication, and judgment. Therefore, I attempted to focus on records of people with diabetes, hypertension, HIV, kidney failure, hepatitis, and infections. I reviewed records for cancer patients and pregnant women, and for people who had been identified on Arizona Department of Corrections's monitoring reports as not receiving tests or specialty care or experiencing other problems with care. I reviewed records for the class

representatives. I also looked through lab reports, diagnostic test logs, and Health Needs Requests on site at each facility to identify patients who had objective findings that were concerning.

4. In Arizona, I spoke to prisoners I encountered on my tours about their healthcare challenges and I routinely reviewed their medical files in order to verify the information they gave me. I asked prisoners about information I heard from staff, and staff about information I heard from prisoners. I was able to verify information I gathered through consulting multiple sources and triangulating the information available to me. The ability to juxtapose the medical record and the patient is critical to understanding the complete clinical picture and determining whether the healthcare meets the standards of care.

5. On tours of institutions, my goal is to observe general living conditions for the patients and the working conditions for medical care staff. I perform a basic check to see if the standard equipment is present and to get a broad sense of how the flow of patient care operates, from screening to sick call to routine appointments and medication administration to chronic care.

6. To review systemic issues in prison care, I look to see if there are patterns of similar serious problems at different locations, both through reviewing documents at particular facilities, and through looking at the care provided to individuals at different facilities over time. I also look at whether those problems

are of a system-wide nature, caused by deficits in organizational structure, staffing, and quality assurance measures that are not the responsibility of individual prisons to develop.

7. Several months ago, I asked the Plaintiffs' counsel in this matter to ask for a sampling of medical records, including records of 20 persons who had died in the past year, and 20 records for each of several specified conditions. As described above in reference to my assessment of the Arizona system, I chose the particular conditions because they are conditions that, in my experience, tend to demonstrate systemic strengths and weaknesses in the provision of medical care.

8. To adequately assess systemic practices, I need to review a significant number of patient records, as well as reviewing lab reports, diagnostic test logs, and Health Needs Requests, as described above.

9. Also very important in assessing systemic care is the ability to interview patients and staff. Interviews with patients and staff provide a mechanism for confirming, and in some cases explaining issues that are not contained within the records. Interviews reveal, for example, obstacles to obtaining sick call slips as well as ways in which prisoners can overcome such obstacles. None of that is likely to be included in the medical records, but such information may be known to both patients and staff.

10. One particular claim in this case highlights the value of interviews. Plaintiffs here have alleged that patients sometimes sign a "do not resuscitate" (DNR) form without adequate information. When I inspected an inpatient care unit at a prison in Arizona, I chose two patients to interview because they were both alert and talkative; I knew nothing about them beforehand. After hearing their medical concerns, I reviewed their healthcare records. Both of their records had on prominent display a blanket cessation of care form. This type of document is commonly called a "do not resuscitate" (DNR) form, but these were far broader: they included a waiver of ongoing care, lab work, intravenous medication and sustenance, and the like. There were no informed consents documented by a physician or competency evaluations by a psychiatrist.

11. I went back to talk to the patients. The first patient acknowledged his signature on the form and identified it as "the form I had to sign before the nurse would give me any pain medications." I asked him to clarify and he told me that when he came to that unit he was in so much pain from his colon cancer that he was crying in bed at night and couldn't sleep. He requested his pain medications and the nurse told him that she was worried that his pain medications might kill him so she wouldn't give him any pain medications until he signed the form.

//

//

//

12. The medical record itself provided some evidence of this problem. However, the ability to speak with the individual involved provided a much more complete picture of the problem. The same type of problem has been alleged in this matter.

I declare under penalty of perjury that the foregoing is true and correct. Executed this the 24th day of April, 2015 at Salt Lake City, Utah.

TODD RANDALL WILCOX