IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| JOSHUA DUNN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | 2:14-cv-00601-WKW-TFM |
| JEFFERSON DUNN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF DR. PETER BLANCK, Ph.D., J.D.**

**REGARDING ADEQUATE FACILITY INSPECTIONS**

I, Peter Blanck, do hereby declare under penalty of perjury the following is true and correct.

**Background**

1. I hold the rank of University Professor, which is the highest faculty rank granted at Syracuse University. I am Chairman of the Burton Blatt Institute ("BBI") at Syracuse University, which advances the civic, economic, and social participation of persons with disabilities worldwide. I have a Juris Doctorate from Stanford University and a Ph.D. in Social Psychology from Harvard University. I have published more than 200 books, chapters, and articles on the Americans with Disabilities Act (ADA and ADAAA), Section 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), disability law, policy, and practice, and social science research methods, in peer-reviewed journals, law reviews and other scholarly venues. I teach disability, law, policy, and practice, including examination of the barriers and discrimination that persons with disabilities face as a result of organizational attitudes, policies, procedures, and practices. I

have taught related graduate courses on social science research methods, and on psychology and law. Across the country, my treatise and casebooks on disability policy and law are used in classes at law and graduate schools (*See, e.g.*, Peter Blanck et al., *Disability Civil Rights Law and Policy* (West 2003, 2005, 2009, 2014)). A further description of my background, and my *Curriculum Vitae* are in the record in this matter at Document 146-3.

2. With particular relevance to issues raised in Plaintiffs' Motion regarding the scope of expert site inspections, from 1995 to 2001, I was the federal court-appointed Facilitator in the settlement of the class action *Chris S. et al. v. Jim Geringer et al.*, 2:94-CV-00311-ABJ (D.Wyo. Dec. 29, 1994). As the court officer in this case, I examined, monitored, and analyzed the development and implementation of state and community services and supports for persons with serious and persistent mental illness, and related conditions. In this capacity, I regularly visited and inspected state facilities and interviewed individuals receiving state services and programs, for instance, individuals housed at forensic units at the Wyoming State Hospital. I interviewed state staff and third-party consultants working in the facilities who provided and were otherwise involved in the provision of services and programs. I reviewed state documents, manuals, logs, health records, and other relevant documents on-site (and off-site) to examine, analyze, and corroborate the information and statements I received from recipients and providers of state services and programs.

3. In addition, from 1991 to 1996, I was appointed by the federal court to monitor compliance in the settlement of the class action *Weston v. Wyoming State Training School*, 2:90-CV-0004 (D.Wyo. Apr. 27, 1994). My monitoring reports were based on regular facility visits, inspections and tours, interviews with persons served by and working for the state, and onsite (and offsite) review and analysis of state policies, funding sources, procedures, practices,

manuals, logs, and other relevant information in accordance with the ADA and Section 504 of the Rehabilitation Act requirements, and related laws.

4. In my appointments as a court officer for the U.S. District Court of Wyoming, I conducted archival, individual case file, statistical, programmatic, and organizational, analyses of information and data from state programs and services serving individuals across the spectrum of disability. This included reviewing and analyzing documents, manuals, logs, and other relevant materials relating to general and specific practices as well as documents and materials relating to individuals participating in state programs and receiving services.

5. In my work as an expert on the ADA and related laws, I have toured and inspected state juvenile and adult facilities in Wyoming, Oklahoma, and South Carolina. During these visits, I have conducted structured and semi-structured interviews with state officials, staff, correctional officials and guards, juveniles and adults residents and prisoners to assess state programs and services for individuals with a range of physical, mental, cognitive, visual, hearing, and other disabilities. I have reviewed relevant information and records on-site (and offsite), including log books and other documents, to ensure the reliability and validity (scientific robustness) of my findings.

**Assignment in this Matter**

6. I have been retained by Plaintiffs' counsel in this matter to review and evaluate the circumstances surrounding the putative ADA sub-class' experiences and alleged claims against defendants, and to provide related expert opinions. I was asked to examine materials pertaining to Plaintiffs' allegations of disability discrimination in violation of the ADA and Section 504 of the Rehabilitation Act. My understanding of the dispute is based on court filings and materials sent to me by Plaintiffs' counsel to date, as well as on my independent review of relevant

research and other publicly available materials, including materials describing the operation of other state prison systems.

7. Plaintiffs with disabilities in this case claim that they have experienced and continue to experience system-wide and programmatic barriers to addressing their needs as individuals with ADA disabilities in the services, programs, and activities offered by Defendants Alabama Department of Corrections ("Defendants" or "ADOC"). Plaintiffs with disabilities allege deficiencies in ADOC programs and services in the areas such as: provision of accommodations, effective communications, medical care, mental health care, medications and medical care supplies, and environmental and sanitary conditions.

**Need for Access to Prisoner Records**

8. In a systematic and scientifically robust effort to fully develop the bases for my opinions, I have reviewed available public materials, pleadings from the present case, deposition and other testimony, ADOC Administrative Regulations ("AR"), policies, procedures, and plans, national prison accreditation standards, and prison jackets and medical records of Plaintiffs with ADA disabilities.

9. In the context of my analysis and review, ADOC uses various methods of administration typically set forth in ARs comprised of written policies and procedures for the system-wide implementation of prison programs and services. These procedures detail the sequence of acceptable, appropriate, and accountable ways in which policies are to be implemented. The means by which administrative procedures are implemented, monitored, assessed, and revised are (or should be) reflected in ADOC's practices. I have reviewed and examined ADOC's AR processes and related outcomes as one measure of organizational performance. I have examined monthly reports by Corizon and MHM to ADOC during the period of January 2012 to October

2014. Additionally, I have reviewed ADOC's Office of Health Services Division ("OHS"), Manual of Policies and Procedures.

10. As part of my review and analysis in this matter, and in accord with well-recognized scientific practice, I requested counsel to arrange for me to review a random sampling of inmate Prison Jacket files and Medical Records for ADOC inmates with a range of ADA disabilities. I understand that Plaintiffs' counsel requested documents from defendants to identify prisoners with ADA disabilities, such as ADA-based visual, hearing, cognitive, and other impairments. Plaintiffs' counsel informed me that Defendants represent that they have no means to identify prisoners with ADA-based disabilities.

11. Reviewing documents and other relevant materials on-site during my facility inspections provides critical information regarding, for example, the procedures and practices by which individuals with ADA disabilities are identified, monitored, and accommodated in practice, and over-time. In accord with recognized research practice, reviewing records where they are kept and filed in the ordinary course of business enables me to asses and analyze the sufficiency, quality, timeliness, and organization, of relevant additional information *in situ* beyond mere review of stated policies. In addition, this type of review enables me to more effectively assess the degree to which current and relevant documents are accessible and timely available to staff and third-party providers and others involved in the accommodation process, and the extent to which cross- and within-facility records and record-keeping practices are developed in accord with system-wide policy and are consistent with each other; for example, prisoners regularly access a range of programs and activities both within a particular facility and across facilities over time. Reviewing records and other relevant materials during site inspections enables me with scientific confidence to determine the extent to which ADA disabilities are appropriately

identified, monitored, and accommodated within reason over time and during the length of an inmate's incarceration at ADOC facilities. This type of analysis and process for reviewing relevant case information and materials bolsters the scientific robustness in my assessment and review of system-wide and facility-specific practices and procedures regarding inmates with ADA disabilities.

12. My well-recognized research methods and sampling techniques are meant to strengthen my scientific confidence in assessing relevant, generalizable (reliable), and scientifically robust (valid) information on putative ADA sub-class representatives, and as compared to those individuals from the general prison population. Moreover, I examine putative ADA sub-class members with consideration of their particular: (a) mobility impairments, (b) deaf and hard of hearing impairments, (c) blind and low vision impairments, (d) psycho-social, mental health conditions, (e) cognitive disabilities (e.g., developmental, intellectual, learning, and print disabilities, traumatic brain injury (TBI), and Post-Traumatic Stress Disorder (PTSD)), and (f) serious diseases and illnesses (e.g., diabetes, hepatitis, high blood pressure, and cancer). Additionally, I consider issues of co-morbidity and co-occurrence among these conditions and disabilities (and across the prisoner experience in different facilities), which has been shown to raise additional health care and programmatic considerations.

13. My review and scientific research methods in this matter, such as employing a random sample of case files from the population of inmates with ADA disabilities and a systematic review of the case files and other materials relevant to putative ADA sub-class members with disabilities, permit me to scientifically strengthen and validate the bases for my opinions and inferences (e.g., as to the differential impact of ADOC programs and services for inmates with varying disabilities, and as a function of facility). This is because, among other reasons, my

research and review methods, along with the other well-recognized scientific methods that I will employ in my analyses (e.g., site inspections and observations, interviews, and archival analyses), strengthens my ability to consider plausible rival hypotheses for the outcomes that I may find (e.g., other than differences based on disability). My approach further reduces potential inmate case selection bias ("cherry-picking" of non-representative general prison case files to compare to the sample of putative ADA sub-class members), and importantly, increases the generality and external validity of my findings as applied in this matter.

**Need for Interviews with Prisoners and Employees**

14. In addition to reviewing files materials and case records, it is standard and recognized practice when assessing a system and procedure to interview persons with disabilities and other persons involved in or responsible for accommodating disabilities. These interviews allow a more complete understanding of how people with disabilities access programs and services and how they seek (and grieve for) accommodations for their disabilities. Much of this information typically is not evident only from record documents. Interviews with state and third-party providers and staff in the facilities thus are important to the scientific robustness of such an analysis. Put simply, often there are different perspectives, and an awareness of different portions of the process for accessing accommodations, that may be gained from onsite interviews and observations. In addition, in the course of such reviews, a more complete understanding of systemic and system-wide knowledge about procedures and practices in the facility(ies) is gained.

**Summary**

15. In summary, my assignment in this matter involves a complex, comprehensive and system-wide review and assessment. It includes review of thousands of pages of documents,

research and other reports, site inspections and observations, case file reviews, interviews with putative ADA sub-class members, and interviews with people who work in the facilities and are involved with the accommodation of the putative ADA sub-class members. My evaluation of ADOC's policies, procedures, practices, and institutional structure and operations as they impact the putative ADA sub-class uses well-accepted evaluation and social science research techniques. Random sampling of the files of prisoners with various disabilities who are not named plaintiffs provides a well-recognized method to further bolster the reliability and validity of my review and analysis of ADOC's services, programs, activities, and treatment of prisoners with ADA disabilities.

* * *

I declare under penalty of perjury the foregoing is true and correct. Executed this the 29th day of April, 2015 in Syracuse, New York.

Peter Blanck

________________________________

DR. PETER BLANCK, Ph.D., J.D.