IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| JOSHUA DUNN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| JEFFERSON S. DUNN, in his | ) | |
| official capacity as | ) | |
| Commissioner of | ) | |
| the Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

## I.  Introduction

The issue currently before the court in this
prison-conditions case is whether the plaintiffs are
entitled, under either Federal Rule of Evidence 501
(specifically as interpreted in Jaffee v. Redmond, 518
U.S. 1 (1998)) or the Protection and Advocacy for
Individuals with Mental Illness Act (PAIMI), 42 U.S.C.
§§ 10801-10807, to the production of quality-assurance

documents by non-party MHM Correctional Services, Inc. (MHM).

One of the plaintiffs in this case is the Alabama Disabilities Advocacy Program (ADAP), which is the State's designated protection and advocacy system (P&A); the function of a P&A is to "protect and advocate the rights of individuals with mental illness [] and investigate incidents of abuse and neglect of individuals with mental illness...." 42 U.S.C.A. § 10803. The other plaintiffs are a group of Alabama prisoners, who seek to represent putative classes of other prisoners.

The defendants are the Alabama Department of Corrections (ADOC), ADOC Commissioner Jefferson S. Dunn, and ADOC Associate Commissioner for Health Services Ruth Naglich. MHM, which is not a party to this case, contracts with ADOC to provide mental-health care to prisoners in ADOC's custody.

As relevant here, the plaintiffs allege: that the defendants' mental-health-care system, as administered by MHM, is constitutionally inadequate and violates the Eighth Amendment's prohibition on cruel and unusual punishment; that the defendants, through MHM, involuntarily medicate mentally ill prisoners without providing the due process required by the Fourteenth Amendment; and that the defendants discriminate against mentally ill prisoners in violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134.

In the course of the discovery process, MHM has refused to produce a number of documents (a few hundred pages worth), with respect to which it has asserted an Alabama state-law 'quality assurance' (alternately referred to as 'peer review') privilege, as codified at 1975 Ala. Code § 22-21-8.[1]   MHM has also--in the

---

1. Section 22-21-8(b) of the 1975 Alabama Code states in relevant part: "All accreditation, quality assurance credentialing and similar materials shall be (continued...)

alternative--urged the court to recognize a similar federal common-law privilege.

The documents at issue, which the court has reviewed in camera, are grouped into three distinct categories by MHM but can all be characterized as audits. As described by MHM itself, in its briefing to this court and its proposal for its ADOC contract, these audits include "random samplings of clinician[s'] credentialing files, patient charts and meeting minutes as well as comparisons of contractually obligated service elements to actual services performed at the facilit[ies]," MHM Brief in Opposition (doc. no. 294)

---

held in confidence and shall not be subject to discovery or introduction in evidence in any civil action against a health care professional or institution arising out of matters which are the subject of evaluation and review for accreditation, quality assurance and similar functions, purposes, or activities." See also 1975 Ala. Code § 22-21-8(a) ("Accreditation, quality assurance and similar materials as used in this section shall include written reports, records, correspondence, and materials concerning the accreditation or quality assurance or similar function or any hospital, clinic, or medical staff.").

at 2 n.1, and also draw on "meetings with [ADOC], mental health, medical and security leadership; meetings with mental health line staff and correctional officers; ... and observation of actual clinical interventions," MHM Proposal (doc. no. 301-1) at 10.

After attempting to mediate, <u>see</u> Order, <u>Dunn v. Dunn</u>, 2015 WL 4661318 (M.D. Ala. July 27, 2015) (Thompson, J.), the plaintiffs filed a motion to compel the production of these documents, arguing that state-law privileges do not apply in federal-question cases, that no federal common-law quality-assurance privilege exists in cases raising civil-rights claims, and that federal statutory law actually mandates the disclosure of the documents at issue to ADAP upon its request.

For the reasons that follow, the court concludes that the asserted privileges are inapplicable in this

5

litigation, and will therefore order MHM to produce the documents at issue.[2]

## II.  State Statutory Law

All of the claims in this case were brought pursuant to federal, rather than state, law.  Federal Rule of Evidence 501 therefore makes clear that federal common law (or a federal statute, if applicable)--not state law--"governs [this] claim of privilege."  1975 Alabama Code § 22-21-8 has no direct bearing here.  Cf. Marshall v. Planz, 145 F. Supp. 2d 1258, 1273 (M.D. Ala. 2001) (Thompson, J.) (recognizing that "Rule 501 no longer prevent[ed] the application of the state-law peer review privilege now that [all federal] claims

_____

2. Because the court rejects MHM's assertion of privilege on the ground that neither the state-law privilege nor an equivalent federal common-law privilege applies here, the court assumes without deciding that the documents at issue would fall within the scope of the state-law privilege being asserted and need not decide whether MHM has, as the plaintiffs contend, waived any quality-assurance privilege by failing to assert it in a timely manner.

ha[d] been dismissed on summary judgment"). Hence, the state-law privilege MHM claims is--as MHM essentially conceded during a telephonic hearing on this motion--not directly applicable.

## II.  Federal Common Law

MHM urges the court, however, to recognize an equivalent privilege under the federal common law.

### A.  Adkins

In Adkins v. Christie, 488 F.3d 1324, 1326-30 (11th Cir. 2007), the Eleventh Circuit applied the test articulated in Jaffee, 518 U.S. at 8, 10-15, in order to determine "whether to recognize the ['medical peer review'] privilege in federal civil rights cases." Although it noted that such a privilege has been implemented in every State,[3] the court expressly

---

3. See Jenkins v. DeKalb Cnty., 242 F.R.D. 652, 661 (N.D. Ga. 2007) (Thrash, J.) ("[W]hile the policies of the 50 states bear[] on the wisdom of a particular (continued...)

declined to recognize a federal common-law peer-review privilege in civil-rights cases.  <u>Adkins</u>, 488 F.3d at 1330.  Indeed, "[i]t appears that every United States Court of Appeals that has addressed the issue of whether there is a federal medical peer review privilege has rejected the claim."  <u>Jenkins v. DeKalb Cnty.</u>, 242 F.R.D. 652, 659 (N.D. Ga. 2007) (Thrash, J.).  Although MHM attempts to distinguish <u>Adkins</u>, on the ground that it involved a claim of employment discrimination to which the peer-review evidence at issue was essential, this court disagrees; the Eleventh Circuit's reasoning is squarely applicable to this case.

As <u>Adkins</u> explained, the relevant factors under <u>Jaffee</u> are: "1) the needs of the public good; 2) whether the privilege is rooted in the imperative need for confidence and trust; 3) the evidentiary benefit of the denial of the privilege; and 4) consensus among the

privilege, an inquiry under Federal Rule of Evidence 501 is not a privilege popularity contest.").

8

states." 488 F.3d at 1328. Because the distinctions MHM attempts to draw relate only to the third and, to a lesser extent, the first factors, the court relies on the discussion of the second and fourth factors in Adkins without rehashing that analysis.


### 1. Evidentiary Value

MHM's first and most strident argument in support of its assertion of privilege is that the documents at issue here are of less evidentiary value than were the documents involved in Adkins, which were "critical" to proving that discrimination had occurred. 488 F.3d at 1329. But Adkins and Jaffee nowhere suggest that evidence over which a purported privilege is asserted must be essential to the claims of the party moving to compel production in order for a court to decline to recognize the privilege (indeed, it is impossible for a court to determine with certainty that any given piece of evidence is the linchpin of a case before hearing

9

the rest of the evidence); rather, the relative value of the evidence is one factor to be considered. <u>See</u> <u>Jaffee</u>, 518 U.S. at 12 (observing, in recognizing a psychotherapist-patient privilege, that "the likely evidentiary benefit that would result from the denial of the privilege is modest").

Although the documents MHM seeks to withhold might not be essential to the plaintiffs' case, their evidentiary value is likely quite significant. These documents draw on source material otherwise unavailable to the plaintiffs, and will likely prove extremely important as they attempt to demonstrate that the defendants' policies and practices towards mentally ill prisoners evince deliberate indifference to their constitutional rights. Moreover, this evidence might well be valuable in determining whether to certify a class or classes and, if liability is proven, how to craft an effective remedy.

10

Contrary to MHM's assertion, the plaintiffs do not otherwise have access to some of the source materials on which the quality-assurance assessments in these documents were based; in particular, they draw on extensive conversations with medical, mental-health, and security staff that plaintiffs' counsel and their experts have not been permitted to conduct and observations of clinical interactions that they have not been allowed to make. See Plaintiffs' Brief in Support (doc. no. 301) at 4; see also Mediation Agreement Pertaining to Discovery (doc. no. 250-1) at 22 ("ADOC will provide an employee of ADOC or its contractors to answer questions any Plaintiffs' expert may have regarding the location or use of any item or portion of any ADOC facility that may be visited. ... However, nothing in this paragraph will required ADOC to respond to questions concerning its programs or the efficacy of the same.); id. at 26 ("Except as set forth above, and as necessary for the purpose of escorting

the experts to the requested areas of the facilities and identifying records to be reviewed or inmates to be met with, counsel for the Plaintiffs and any expert witness retained by them agree to have no contact with any employee or contractor of ADOC during any visit allowed by this agreement.").

Even if the plaintiffs did have all of the source materials on which MHM drew in assessing the care it was providing to prisoners in ADOC custody, MHM's own analysis of that information would have distinct and significant evidentiary value, above and beyond the value of such information in a run-of-the-mill malpractice case. In a medical-malpractice case, peer-review materials are relevant only because they provide an assessment of the quality of care provided to an individual patient; while a provider's acknowledgement of errors may be particularly damning, the plaintiffs' experts' assessment of the care provided goes to the same issue: whether the care was

substandard.   Here, by contrast, MHM's own assessment
of the care it has been providing is likely to be
central to--indeed, perhaps necessary for--the court's
determination of a number of other issues.

As a preliminary note, although MHM contends that
its client, ADOC, does not have access to its
peer-review documents, there appears, on the current
record, to be no basis for this contention.[4]   MHM's
contract with ADOC states that "MHM shall make
available to the ADOC, at the ADOC's request, all
records, documents, and other papers relating to the

_____

4. The court takes pains to acknowledge that it
reaches this conclusion--as it must--based on the
limited record before it.  Specifically, although the
defendants were invited to file a brief in response to
the motion to compel, they declined to file anything.
The defendants are nonetheless free to argue, when this
case is tried on the merits, that they were not able to
access (or believed they were not able to access) MHM's
quality quality-assurance documents; if presented with
additional evidence on this point, the court will
reconsider its conclusion.  However, the plaintiffs
would in any event need to be able to review the
contents of the documents in order to be able
meaningfully to contest such a contention by the
defendants that the documents fall outside the scope of
the contractual provision discussed below.

direct delivery of mental health care services to inmates hereunder." MHM Contract (doc. no. 301-2) at 4. The court has reviewed the documents at issue, and they appear to fall within the plain language of this contractual provision: they "relat[e] to the direct delivery of mental health care," in that they discuss numerous individual cases as well as practices employed by practitioners in administering treatment to patients. More generally, they concern the quality of MHM's direct delivery of services, and are designed to improve it. Furthermore, were there any ambiguity as to the meaning of this provision, evidence extrinsic to the contract appears strongly to suggest that both parties intended the provision to cover quality-assurance documents. MHM stated plainly and repeatedly in its proposal in response to ADOC's request for proposals that it would share its quality-assurance reports with ADOC; indeed, MHM's concerted efforts to share the information gleaned from

14

its quality-assurance activities appears to have been a selling point.  <u>See</u> MHM Proposal (doc. no. 301-1) at 4-6 (stating that "MHM understands and agrees to the requirements" of the portion of the request for proposals that required that a "report of the findings [of the vendor's Comprehensive Quality Improvement (CQI) program] will be presented at the monthly administrative meeting between Vendor and ADOC Director of Treatment"; that MHM will "provide[]" ADOC with "[r]eports from routine monitoring and special studies ... regularly during monthly administrative meetings and quarterly CQI meetings" and "submit[]" "semi-annual and annual reports to the ADOC"; that "[g]uided by the ADOC, the MHM CQI program will continue to collaborate with the Department and the medical contractor, share information and data, as well as actively coordinate and participate in CQI activities"; and that MHM "will ensure that utilization and outcome data as well as the

results of CQI studies and corrective action plans are reported to the ADOC at least quarterly").[5]

The court is faced with a <u>systemic</u> challenge to the quality of mental-health care--specifically, an allegation that the quality is so poor as to constitute cruel and unusual punishment--and a claim that ADOC discriminates against mentally ill prisoners. Both the plaintiffs' Eighth Amendment and ADA claims therefore place at issue not merely ADOC's treatment of individual prisoners but also, much more importantly, its policies and practices with respect to all mentally

---

5. As a side note, the fact that MHM's quality-assurance program is contractually mandated, and the fact that its purported quality is apparently a major selling point, suggest that the second <u>Jaffee</u> factor--"whether the privilege is rooted in the imperative need for confidence and trust"--weighs more strongly in favor of rejecting the privilege in this case than in <u>Adkins</u>. Although it is conceivable that the risk of self-critical disclosure might lead a private hospital to consider cutting back on its quality-assurance programs, it appears that if MHM decided to do so, it would find itself out of business.

ill prisoners.[6]   As other courts have recognized, "evidence of unconstitutional policies and customs may not exist outside of the confines of [such reports]," because "unofficial, defacto practices and customs within the jail are ... difficult to expose[,]" Estate of Belbachir v. Cnty. of McHenry, 2007 WL 2128341, at *6-*7 (N.D. Ill. July 25, 2007) (Mahoney, M.J.); see also Johnson v. Cook Cty., 2015 WL 5144365, at *4 (N.D. Ill. Aug. 31, 2015) (Gilbert, M.J.) (distinguishing medical-malpractice cases, where the policy that

---

6. Somewhat bizarrely, MHM argues that the audits "do not address any issues related to the [ADA] as that is not a function of the audits." MHM Brief in Opposition (doc. no. 294) at 4.  Given that ADOC is required to comply with that law, and that MHM stated in its proposal to ADOC that its quality-assurance program was designed to "ensure[] compliance with ADOC expectations as well as [National Commission on Correctional Health Care] and [American Correctional Association] standards," this assertion is, in itself, noteworthy.  MHM Proposal (doc. no. 301-1) at 4; see also MHM Contract (doc. no. 301-2) at 1 (noting, in a prefatory clause, that "ADOC desires to provide mental health care to inmates in accordance with applicable law").  That aside, an assessment that is not designed to determine compliance with a law or standard may nonetheless be highly relevant to that issue.

17

motivates medical peer-review privilege is "at its strongest" and the impact of the privilege on the plaintiff's ability to prove his case is at is weakest, from cases alleging "systemic failures" and "widespread practice[s] of deliberate indifference," which are "often harder for a plaintiff to prove"; and distinguishing performance evaluations of individual practitioners from reports which "focus[] primarily on systems and processes" (internal quotation marks omitted)); Jenkins, 242 F.R.D. at 660 (recognizing that peer-review reports may contain "nonmedical" information regarding how prison staff identified and responded to problems, which may "at least raise an inference of jail customs or policies").

Indeed, part of the plaintiffs' contention is that "MHM's monitoring of [] care was either inadequate or that the problems found were grossly understated." Plaintiffs' Brief in Support (doc. no. 301) at 6. As they point out--and as any judge who has heard a

prison-conditions case well knows--"monitoring of the system of care is an essential part of the system of care. ... The audits are themselves part of the system of care, and thus relevant to show another aspect of the inadequacy of care." Id. at 6-7. The court need not take the plaintiffs' word for it; MHM's own proposal says, "It is only through monitoring, tracking, trending, and analysis that problem-prone processes can be corrected to produce the most efficient and effective outcomes for inmate mental health." MHM Proposal (doc. no. 301-1) at 4. In a one-off medical-malpractice case, the quality of the quality-assurance process is often irrelevant, but in a challenge to a massive system's provision of care for thousands of incarcerated patients (and especially given that it is a closed system), the efficacy of the system's feedback loop and its capacity for self-correction are critical to this court's assessment of whether they are functioning above the

19

constitutional baseline.  <u>See</u> <u>id</u>. at 140 ("A major focus of our [quality-assurance] Program is to implement corrective actions developed as the result of [quality-assurance] reviews and to monitor the effectiveness of the corrective actions in producing the intended improvements.  If these goals are not achieved, [quality-assurance] activities become only a 'paper' process.").

Furthermore, with respect to their Eighth Amendment claims, the plaintiffs must show not only that they have been denied adequate mental-health care, but that the defendants have been deliberately indifferent to that violation of their rights, meaning that they "kn[e]w[] of and disregard[ed] an excessive risk to inmate health or safety." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).  Although they have not seen the documents at issue here, the plaintiffs identify a number of ways in which they expect to rely on them in attempting to prove deliberate indifference.

First, to the extent that the documents were reviewed by ADOC officials (the record is unresolved as to whether and to what extent they were), the contents could be used to show that prison officials were aware of any problems the documents identify. Second, to the extent that there were--as the plaintiffs allege--significant disparities between ADOC's own audit of MHM care at a particular facility (which revealed serious concerns) and MHM's positive report to the defendants based on its audit of the facility, this evidence could support the assertion that ADOC officials were deliberately indifferent in continuing to rely on the reports provided by MHM, instead of conducting further audits themselves. Third, if ADOC officials renewed MHM's contract in 2013 (shortly after the documents at issue were produced)[7] without reviewing

---

7. MHM also argues that these documents are not relevant because they are outdated; they were created between 2010 and 2012. However, they are, in the court's view, recent enough to be probative of the present state of mental-health care being provided to (continued...)

those documents, this failure could help to show
disregard of the risk that plaintiffs allege MHM posed
to prisoners.[8]

This evidence may also play an important role at
two other junctures in the litigation, one before a
merits adjudication and one after.  First, these
peer-review documents might well be highly relevant to
the court's determination as to whether to certify a
class or classes under Federal Rule of Civil Procedure
23(b)(2), which requires (as a prerequisite under Rule
23(a)) a finding that "there are questions of law or
fact common to the class[,]" as well as a finding that
"the party opposing the class has acted or refused to
act on grounds that apply generally to the class, so

---

prisoners in Alabama, especially in light of the
apparent infrequency of similar assessments.  To be
sure, however, the defendants are free to offer
evidence to show that things have changed.

8. To be clear, the court has not made findings of
fact or conclusions of law on any of these points.
Rather, it concludes only that this is potentially
vital evidence on which the plaintiffs are entitled to
rely in attempting to make their case.

22

that final injunctive relief ... is appropriate respecting the class as a whole." When determining whether to certify a class, the court will need to decide whether there is evidence that the problems the named plaintiffs allege to have occurred have common causes and common solutions--i.e., whether the causes of those problems could feasibly be remedied en masse. MHM's quality-assurance records may be valuable evidence on this question, because their very purpose is to identify, from the view of providers, any systemic problems and solutions. Second, if the court finds liability, these records may prove essential to the crafting of an effective remedy; although the court could potentially appoint a monitor to oversee the implementation of new policies or practices and report the results for the court's consideration, MHM's documents would represent the only available evidence of which remedial measures have already been tried, which have worked, and which have not.

23

## 2.  Public Good

MHM also argues that the Adkins court's decision turned on its view that lawsuits challenging employment discrimination (which the court repeatedly generalizes to "federal civil rights cases") serve important public interests.  488 F.3d at 1329.  But so too do lawsuits challenging allegedly unconstitutional mental-health care in prison and the alleged discrimination against, and failure to provide reasonable accommodations for, mentally ill prisoners.  "[N]early every United States district court that has addressed the issue in the context of section 1983 litigation brought on behalf of jail or prison inmates has rejected the assertion of privilege."  Jenkins, 242 F.R.D. at 659 (citing cases)[9];

_____

9. The Jenkins court identified one case involving at Eighth Amendment prisoner civil rights claim in which the court found the existence of a medical peer-review privilege--Hadix v. Caruso, 2006 WL 2925270, at *2 (W.D. Mich. Oct. 6, 2006) (Enslen, J.)--but did not follow it.  Jenkins, 242 F.R.D. at 660-61 (noting "the extreme difficulty prison inmates (continued...)

see also Francis v. United States, 2011 WL 2224509, at *4 (S.D.N.Y. May 31, 2011) (Fox, M.J.) ("[T]here appears to be consensus among lower courts and in other circuits that no federal privilege protects medical peer review materials in civil rights [actions].").

The importance of public scrutiny of medical and mental-health care is greater in the prison and jail contexts than in an ordinary medical-malpractice case, to which MHM unconvincingly analogizes this case. See Agster v. Maricopa Cnty., 422 F.3d 836, 839 (9th Cir. 2005) ("Whereas in the ordinary hospital it may be that

---

often face in obtaining evidence of jail customs or policies," and in that light rejecting Hadix's contention that "an evaluation of the prisoner's medical records was enough to satisfy the prisoner's discovery requests"; and concluding that "[t]o the extent that Hadix has any persuasive value, it disappears in the context of a section 1983 claim involving more than mere malpractice"). Another court has rejected Hadix as well. See Lowe v. Vadlamudi, 2012 WL 3887177, at *5 (E.D. Mich. Sept. 7, 2012) (Lawson, J.) (distinguishing and rejecting the conclusion in Hadix on the ground that, in Hadix, "the court found that disclosure of such records was not necessary in part because an independent medical monitor had been appointed in that case").

the first object of all involved in patient care is the welfare of the patient, in the prison context the safety and efficiency of the prison may operate as goals affecting the care offered. In these circumstances, it is peculiarly important that the public have access to the assessment by peers of the care provided. Given the demands for public accountability, which seem likely to guarantee that such reviews take place whether they are privileged or not, we are not convinced by the County's argument that such reviews will cease unless kept confidential by a federal peer review privilege."); see also Williams v. City of Phila., 2014 WL 5697204, at *4 (E.D. Pa. Nov. 4, 2014) (Surrick, J.) (agreeing, and distinguishing a prison civil-rights case from a "medical-malpractice action in which the plaintiff seeks monetary damages for the inadequate care of a prison doctor").

The court's conclusion in Adkins rests in no small part on the general "presumption against privileges

26

which may only be overcome when it would achieve a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth[,]" "a high standard, [such that] only the most compelling candidates will overcome the law's weighty dependence on the availability of relevant evidence." 488 F.3d at 1328 (citations and internal quotation marks omitted). This presumption is at its strongest in civil-rights cases. See <u>Estate of Belbachir</u>, 2007 WL 2128341, at *6 ("The interest in protecting the civil rights of individuals has led the courts to take caution before recognizing privileges in federal civil rights actions, where any assertion of privilege must overcome the fundamental importance of a law meant to protect citizens from unconstitutional state action." (citation and internal quotation marks omitted)).

3.  <u>Protective Orders</u>

One other element of the analysis in Adkins further supports its application to this case. The Adkins court explained that the "concerns advanced by the defendants"--that is, that performance evaluations would be less candid and that patient confidentiality might be compromised--"may capably be served in the absence of a medical peer review privilege[,]" because "district courts are well-equipped with a variety of mechanisms to ensure that peer review materials, once furnished through discovery, are not compromised by wayward hands...." 488 F.3d at 1329-30. One of the mechanisms Adkins suggests is the protective order. This court has already entered one such order on MHM's motion, which addresses the concern about patient confidentiality. See Order (doc. no. 279). Moreover, as discussed in greater detail below, this court will enter an additional protective order conditionally deeming the documents at issue confidential, in order to ensure that they are not disclosed to anyone not

28

involved in, or used for any purposes other than, this litigation.

### B.  Non-Party Status

One final point bears mention: MHM has vehemently insisted that its status as a non-party should alter the privilege analysis in its favor.  The court rejects this argument for several reasons.  First, despite having more than one opportunity to brief the issue, MHM has failed to provide any relevant citation for this proposition; the court has been unable to find any support for it in the case law.[10]

---

10. The only appellate reference this court has been able to find even mildly supportive of this position is an old case out of the Ninth Circuit, Dart Indus. Co., Inc. v. Westwood Chem. Co., Inc., 649 F.2d 646 (9th Cir. 1980).  Two judges on the panel suggested that the "'necessary' restriction on discovery may be broader when a non-party is the target of discovery." Id. at 649 (emphasis added).  In so doing, they cited a district court decision, Collins & Aikman Corp. v. J.P. Stevens & Co., Inc., 51 F.R.D. 219, 221 (D.S.C. 1971) (Hemphill, J.), for the proposition that non-party discovery should be more limited in part to protect third parties from "disclosure of confidential (continued...)

Second, the defendants appear to have the right to obtain the documents, and the plaintiffs could therefore have requested that the defendants produce them. See Fed. R. Civ. P. 34(a)(1) (stating that subpoenas may properly request documents "in the responding party's possession, custody, or control"). The defendants might well have agreed to produce them without asserting any privilege; they were invited to file a brief opposing the motion to compel but did not do so. In any event, the ordinary, broad relevance

---

documents." However, Collins & Aikman Corp. was decided one year after the Federal Rules of Civil Procedure were first amended to allow discovery from non-parties, and its discussion on this point was prefaced by an acknowledgement that "it is not at this point clear whether the same broad test for relevance of documents will be utilized with respect to third parties." Id. It does not appear that this view has gained a foothold since. See also Wright & Miller, 9A Fed. Prac. & Proc. Civ. § 2459 (3d ed.) (concluding that although a few courts have "suggest[ed] that a different test of relevancy might apply when the subpoena is directed to a person who is not a party in the action, ... there is no basis for this distinction in the rule's language").

standard set forth in Federal Rule of Civil Procedure 26(b)(1) would indisputably apply to such a request.[11]

Finally, there is a more fundamental problem with MHM's argument concerning its non-party status.  MHM is not formally a party to this suit, but it is hardly a peripheral player whose records are incidentally relevant to the case; rather, it is a major provider of correctional mental-health services, and its contract with ADOC explicitly anticipates its involvement in litigation.  See MHM Contract (doc. no. 301-2) at 5. In fact, while MHM is not a governmental entity, it is

_____

11. If production were burdensome, MHM would, perhaps, have a colorable argument that the defendants should bear that burden.  But this dispute involves only a few hundred pages of already compiled documents, which MHM volunteered to submit to the court for in camera review.  It would presumably be no less burdensome for MHM to send them to the defendants for production to the plaintiffs than for MHM to simply produce them.

serving      a      quintessentially--constitutionally
mandated--state function.[12]

For these reasons, no higher standard of relevance
applies to requests for production by MHM.   Further,
even if a higher standard did apply, the court has
concluded, based upon an in camera review of the
documents, that these documents are highly relevant.

## C.  Federal Privilege Statutes

Although MHM nowhere claims that the documents at
issue fall within any federal statutory privilege, a
brief discussion of the two federal statutes related to
medical peer review helps to illustrate why recognizing

---

12.  In the Eleventh Circuit, private prison
contractors are not subject to liability under Title II
of the ADA, see Edison v. Douberly, 604 F.3d 1307 (11th
Cir. 2010), so some of the claims to which these
documents are relevant could not lie against MHM.   It
would be profoundly unjust, however, if a state
department of corrections could insulate itself from
liability by ensuring that documentation of the medical
or mental-health care provided prisoners was created by
private corporations which were both not subject to
suit and then, by dint of that non-party status,
protected from discovery.

a federal common-law peer-review privilege beyond the narrow bounds of the limited privilege already codified would be inappropriate.

The Supreme Court has made clear that courts should be particularly reluctant to recognize federal common-law privileges in cases where Congress has considered enacting such a privilege and declined to do so. See Univ. of Pa. v. E.E.O.C., 493 U.S. 182, 189 (1990) (rejecting the University's assertion of a federal common-law peer-review privilege, and cautioning courts to be "especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself").

Congress has passed two major pieces of legislation related to medical peer review: the Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. § 11101-11152, and the Patient Safety and Quality

33

Improvement Act of 2005 (PSQIA), 42 U.S.C.
299b-21-299b-26.

As for the HCQIA, courts have concluded with
significant consistency that "[f]ar from creating a
broad privilege, Congress, in enacting the HCQIA,
carefully crafted a very specific privilege, applicable
to peer review material submitted to the Secretary [of
Health and Human Services] pursuant to the dictates of
the mandatory reporting provisions of that statute.
That is as far as Congress went, and that is as far as
this Court should apply the privilege contained
therein." Nilavar v. Mercy Health Sys.-W. Ohio, 210
F.R.D. 597, 602 (S.D. Ohio 2002) (Rice, J.); see also
In re Admin. Subpoena Blue Cross Blue Shield of Mass.,
Inc., 400 F. Supp. 2d 386, 290-91 (D. Mass. 2005)
(Saris, J.); Johnson v. Nyack Hosp., 169 F.R.D. 550,
560 (S.D.N.Y. 1996) (Kaplan, J.); Teasdale v. Marin
Gen. Hosp., 138 F.R.D. 691, 692 (N.D. Cal. 1991)
(Conti, J.).

34

Two decades later, in the PSQIA, Congress again created a "unique and narrow" peer-review privilege for "work product prepared by a patient safety organization or prepared for, and reported to, a patient safety organization." Schlegel v. Kaiser Family Found. Health Plan, 2008 WL 4570619, at *3 (E.D. Cal. Oct. 14, 2008) (Mueller, M.J.). Although the scope of this privilege appears broad at first blush, it is in fact seriously circumscribed by the definition of "patient safety organization": an organization certified by the Secretary of the Department of Health and Human Services the "mission and primary activity of [which] are to conduct activities that are to improve patient safety and the quality of health care delivery" and which "has bona fide contracts ... with more than 1 provider for the purpose of receiving and reviewing patient safety work product." 42 U.S.C. § 299b-24(b)(1). There are currently 81 certified patient safety organizations; MHM, however, is not one

35

of them, and there is no indication that MHM reports to a certified patient safety organization. <u>See</u> "Federally-Listed PSOs," Agency for Healthcare Research and Quality, https://pso.ahrq.gov/listed. MHM's quality-assurance mechanisms are, as it has repeatedly noted, purely internal; the privilege created by the PSQIA covers a particular form of (certified) external review.

As another court has recently recognized, the PSQIA's "drafters made clear that the statute was not intended to provide a blanket protection for all information and communications generated for quality control purposes." <u>Johnson</u>, 2015 WL 5144365, at *6 (citation omitted) (noting that the statute itself "stress[es]" that information that is not <u>developed for the purpose</u> of reporting to a patient safety organization does not become privileged merely because it is in fact reported to one, and citing 42 U.S.C. § 299-b21(7)(B) to that effect). The PSQIA is designed

to incentivize a particular form of external quality-assurance review that Congress deems optimal. It sets up a certification scheme to recognize organizations that provide that sort of review and provides a strong incentive for providers to employ one of them--namely, the privilege. Extending the privilege to other quality-assurance documents not submitted to a certified organization would destroy this incentive and seriously undermine the purpose of Congress's certification scheme.

Given the Supreme Court's warning that courts must be hesitant to create federal common-law privileges outside the bounds of a carefully delineated Congressional pronouncement, and in light of Congress's enactment of the HCQIA and PSQIA, MHM's assertion of a broad federal common-law quality-assurance privilege must be rejected.[13]

---

13. It is true that, "since Congress enacted the PSQIA, [a few] federal [district] courts have recognized some form of a medical peer review privilege (continued...)

under federal common law." Tep v. Southcoast Hosps. Grp., Inc., 2014 WL 6873137, at *5 (D. Mass. Dec. 4, 2014) (Sorokin, J.). These cases, however, differ in significant respects from the case before the court. Nearly all of them involve medical malpractice claims brought under the Federal Tort Claims Act (FTCA)--quintessentially private damages actions in which no public or federal interest is implicated, quite unlike Eighth Amendment and ADA claims--and in some instances involve external review processes by organizations akin to patient safety organizations but not so certified, quite unlike the purely internal review process employed by MHM. See Tep, 2014 WL 6873137, at *3-*5 (recognizing a medical peer-review privilege in a case alleging violations of the Emergency Medical Treatment and Active Labor Act (EMTALA) and state malpractice claims); Sevilla v. United States, 852 F. Supp. 2d 1057, 1058-69 (N.D. Ill. 2012) (Cole, J.) (recognizing the privilege in an FTCA medical malpractice case); Francis, 2011 WL 2224509, at *4-*6 (recognizing the privilege in an FTCA dental malpractice case in light of the fact that the documents at issue were provided to an external entity, the New York State Department of Health, "which, although not listed as a [patient safety organization], meets many of the same qualifying criteria for [patient safety organizations] and performs similar functions, which Congress clearly intended to encourage"); KD ex rel. Dieffenbach v. United States, 715 F. Supp. 2d 587, 590-98 (D. Del. 2010) (Thynge, M.J.) (recognizing the privilege in an FTCA medical malpractice case in light of the fact that the documents at issue were provided to external entities, review bodies within the National Institutes of Health, which, "[w]hether or not [they] meet the technical requirements for listing as [patient safety organizations,] clearly perform the same functions Congress intended the PSQIA to encourage"). (continued...)

### D.   PAIMI

Because the evidence withheld by MHM is not protected by either a state or federal quality-assurance privilege, it is subject to disclosure. Therefore, the court need not reach the merits of the parties' arguments as to whether the Protection and Advocacy for Individuals with Mental Illness Act (PAIMI) provides an independent basis for compelling disclosure of the evidence at issue.[14]

---

This court joins others in concluding that although the PSQIA somewhat expanded the federal statutory peer-review privilege, it does not undermine the Eleventh Circuit's conclusion that no federal common-law peer-review privilege applies in civil-rights cases. See, e.g., Awwad v. Largo Med. Ctr., Inc., 2012 WL 1231982, at *1 & n.2 (M.D. Fla. Apr. 12, 2012) (McCoun, M.J.) (rejecting the defendant's suggestion that Adkins "should be revisited" in light of the PSQIA and concluding that Adkins remained binding).

14. Hence, the court need not address MHM's procedural quibbles--namely, that the plaintiffs' subpoena did not constitute an appropriate request for records pursuant to PAIMI because the subpoena did not cite that statute and because counsel employed by the (continued...)

39

However, as PAIMI provides additional support for the court's conclusion, a brief discussion of its relevance is warranted.

As the plaintiffs point out, Congress has not only declined to privilege, but affirmatively mandated the disclosure of, at least some of the records that MHM has withheld.  PAIMI explains that P&As such as ADAP are designed to "protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes; and investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is

_____

Southern Poverty Law Center (SPLC), rather than ADAP itself, signed the subpoena.  In any event, these arguments are dubious; although it is a non-party, MHM has participated in this litigation enough to be well apprised of the fact that Alabama's P&A, ADAP, is both a party to this litigation and co-counsel with SPLC. Surely MHM, a leading corporate provider of correctional mental-health services, is also well aware that PAIMI authorizes P&As to access mental-health records in the course of their work.

probable cause to believe that the incidents occurred."
42 U.S.C. § 10801(b)(2).

Congress apparently considered access to records to
be essential to these advocacy and investigatory roles,
because it specifically provided P&As "access to all
records of" a variety of categories of individuals with
mental illness.  42 U.S.C. § 10805(a)(4).  As all of
the courts of appeals to address the issue have
concluded, "<u>all</u> records" of an individual means what it
says; PAIMI authorizes access even to quality-assurance
records otherwise protected by state-law privileges.
See <u>Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc.
Servs. Admin.</u>, 603 F.3d 365, 383 (7th Cir. 2010) (en
banc); <u>Prot. & Advocacy for Person with Disabilities v.
Mental Health & Addiction & Advocacy Servs.</u>, 448 F.3d
119, 128 (2d Cir. 2006) (opinion of Sotomayor, J.); <u>Mo.
Prot. & Advocacy Servs. v. Mo. Dep't of Mental Health</u>,
447 F.3d 1021, 1023 (8th Cir. 2006); <u>Ctr. for Legal
Advocacy v. Hammons</u>, 323 F.3d 1262 (10th Cir. 2003);

41

Pa. Prot. & Advocacy, Inc. v. Houstoun, 228 F.3d 423, 428 (3d Cir. 2000) (opinion of Alito, J.).

Moreover, PAIMI expressly preempts state privilege law. See 42 U.S.C. § 10806(b)(2)(C) ("If the laws of a State prohibit an eligible system from obtaining access to the records of individuals with mental illness in accordance with [the provision in PAIMI authorizing such access, that records-access provision] shall not apply to such system before [a grace period of up to two years]."); Pa. Prot. & Advocacy, Inc., 228 F.3d at 428 ("PA[I]MI would preempt a Pennsylvania law that prohibited the disclosure of the peer review reports to [the P&A]."). Further, Federal Rule of Evidence 501--which instructs courts that "[t]he common law ... governs a claim of privilege unless ['a federal statute'] provides otherwise"--would not permit this court to recognize the applicability of a federal common-law peer-review privilege to documents which a federal statute says must be disclosed.

42

The court need not and will not dive into the weeds in order to determine whether all of the hundreds of pages of quality-assurance documents at issue could be obtained by ADAP under PAIMI.[15]   For present purposes,

_____

15. MHM also argues that PAIMI does not cover the records at issue here because a subsection of the statute defines the term "records," and the documents at issue do not fall within that definition.   But the documents at issue do appear to fall within its bounds and, furthermore, the provision that MHM cites is a non-exhaustive list.

The section of the statute at issue is devoted to the confidentiality of mental-health records obtained by P&As; the relevant subsection says that, "As used in this section, the term 'records' includes reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring as such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records."   42 U.S.C. § 10806(b)(3)(A).

However, the requested documents do relate to alleged neglect (and potentially abuse), which are defined extremely broadly in the statute.   See 42 U.S.C. § 10802(5) ("The term 'neglect' means a negligent act or omission by any individual responsible for providing services in a facility rendering care or treatment which caused or may have cause injury or death to a[n] individual with mental illness or which (continued...)

the statute is more generally instructive: Congress, by authorizing unfettered access to "all records," including otherwise protected peer-review documents, manifested its view that access to such records is critical to the efficacy of efforts to protect and

---

placed a[n] individual with mental illness at risk of injury or death, and includes an act or omission such as the failure to establish or carry out an appropriate individual program plan or treatment plan for a[n] individual with mental illness, the failure to provide adequate nutrition, clothing, or health care to a[n] individual with mental illness, or the failure to provide a safe environment for a[n] individual with mental illness, including the failure to maintain adequate numbers of appropriately trained staff."); § 10802(1) ("The term 'abuse' means any act or failure to act by an employee of a facility rendering care or treatment which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which cause, or may have caused, injury or death to a[n] individual with mental illness[.]").

Moreover, the use of the word "includes" in the provision MHM cites indicates that what follows is not an exclusive list of what constitutes "records." See United States v. Whiting, 165 F.3d 631, 633 (8th Cir. 1999) ("When a statute uses the word 'includes' rather than 'means' in defining a term, it does not imply that items not listed fall outside the definition."); United States v. Mass. Bay Transp. Auth., 614 F.2d 27, 28 (1st Cir. 1980) ("'[I]ncludes' is not a finite word of limitation; its use destroys the basis for implying the negative.").

advocate for the mentally ill. Moreover, the statute as a whole reflects Congress's view that such efforts promote important federal interests. PAIMI serves as further support for the court's decision not to recognize a federal common-law quality-assurance or peer-review privilege that would undermine the ability of Alabama's P&A to determine whether mentally ill state prisoners are being mistreated and, if so, to seek remediation.

### III.  <u>Confidentiality After Production</u>

Finally, MHM argues that, even if the court compels disclosure of the records in question, it should issue a protective order deeming them confidential and limiting access to the records to ADAP, due to its status as a P&A. The court declines to enter the sweeping order MHM requests, but will enter a more limited protective order pursuant to Federal Rule of Civil Procedure 26(c).

MHM's contention that any disclosure of its peer-review records should be limited to ADAP was based on its belief that only a P&A (and not its co-counsel) would be entitled to view records obtained pursuant to PAIMI. Whether or not that understanding is correct, the court's decision here relies on the lack of a privilege--and not on the disclosure mandate in PAIMI--so an order that would grant exclusive access to ADAP, and seriously curtail the plaintiffs' ability to use this evidence, is not appropriate.

However, a more limited protective order will not significantly hinder the plaintiffs while simultaneously recognizing the "important interests" served by preventing public disclosure of peer-review documents. Adkins, 488 F.3d at 1328 (describing a medical provider's interests in a peer-review privilege, including interests in encouraging candor in the peer-review process, maintaining patient confidentiality, and avoiding malpractice litigation).

46

While countervailing considerations outweigh MHM's interests in keeping the documents out of this litigation entirely, there is at this time no apparent need for them to be more widely released. At least for the time being, the plaintiffs' ability to use this evidence in developing and presenting their case will not be prejudiced by the entry of a protective order conditionally deeming the documents at issue confidential. The court will revisit this protective order if circumstances arise, in the course of trying or deciding this case, that justify the public disclosure of some or all of the documents at issue.

The question, then, is to whom exactly these documents should be disclosed. As ordered below, MHM and the parties are to draft and submit to the court a proposed protective order, taking into account the following issues:

First, plaintiffs' counsel (including ADAP, which is representing itself as a party) are entitled to

47

access these documents. Second, and for obvious
reasons, the named prisoner plaintiffs should not have
access to these documents, absent some overriding need
not now apparent. Third, the defendants should receive
any of the documents they do not already have. Fourth,
as for defense counsel: MHM has expressed concern that
if counsel for ADOC obtains the documents, they could
be shared with Corizon Correctional Healthcare, a
competitor of MHM's which is represented (including as
a non-party in the discovery portion of this
litigation) by one of the same firms employed by ADOC.
The court is confident that the protective order can be
crafted in such a way as to mitigate this concern.
Fifth, the parties and MHM should identify which of the
parties' experts should have access to the documents
for purposes of rendering their opinions; they should
likewise identify which deponents employed by ADOC and
MHM should be allowed to view (and be questioned about
the contents of) the documents. With respect to this

48

final point, the protective order should permit any expert or deponent to whose opinion or testimony the documents are reasonably relevant to view them, and prohibit disclosure otherwise.

\* \* \*

Because the court concludes, based on its in camera review of the documents that MHM has withheld, that the documents are protected neither by the state-law privilege MHM invoked nor by any other federal common-law or statutory quality-assurance or peer-review privilege, it is ORDERED as follows:

(1) The plaintiffs' motion to compel (doc. no. 290) is granted.

(2) MHM Correctional Services, Inc., is promptly to produce, in accordance with the protective order soon to be entered, the documents identified in its privilege log dated December 23, 2015 (doc. no. 290-3), by the following reference numbers and (inclusive)

ranges: 14, 16, 45-68, 71-82, 96-112, 127-138, and 150-162.

(3) Within seven days of the date of today's order, the parties and MHM are to confer and submit a joint proposed protective order as outlined in the above opinion. If, after making good-faith efforts, the parties and MHM cannot reach an agreement as to the precise terms of that order, they may submit separate proposals.

DONE, this the 27th day of January, 2016.

___/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE