**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **JOSHUA DUNN, ET AL.,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No: 2:14-cv-00601-MHT-TFM** |
| | ) | **(PUTATIVE CLASS ACTION)** |
| | ) | |
| **JEFFERSON DUNN, ET AL.,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

**TABLE OF CONTENTS**

**INTRODUCTION**……………………………………………………………………...1

**STATEMENT OF FACTS**………………………………………………………….2

  **I.**   **NAMED PLAINTIFFS**……………………………………………...............2

  **II.**   **ADOC HAS FAILED TO FULFILL ITS OBLIGATIONS UNDER THE ADA ....9**

      **A. ADOC Has Failed to Create a System to Accommodate Prisoners With Disabilities**……..……………………………………….………...10

          **1. ADOC Has No ADA Accommodations Request or Grievance System**…………………………………………….…...10

          **2. ADOC Has No ADA Coordinators.** …………………………11

          **3. ADOC Has No Identification or Tracking System** ………………16

          **4. ADOC Personnel Have Not Received Meaningful Training on the ADA**…………………………………………………………18

          **5. ADOC Does Not Have an ADA Transition Plan, ADA Policies or Procedures**……………………………………………………19

      **B. ADOC Has Failed to Remove Architectural Barriers in Its Facilities**………21

      **C. ADOC Has Failed to Make Reasonable Accommodations and Modifications for Prisoners with Disabilities in Its Facilities**……………………………..…22

      **D. ADOC Has Failed to Provide Necessary Auxiliary Aids and Services to Prisoners with Disabilities**……………………………………………23

**E. ADOC Has Created Discriminatory Eligibility Criteria for Programming and Services**………………………………………………………………..25


**ARGUMENT**………………………………………………………………………..26


**I.     THE MOVANTS SATISFY THE PREREQUISITES FOR CLASS CERTIFICATION UNDER FED. R. CIV. P. 23(A)**…………………………27

**A. Numerosity: The Size of the Class Makes Joinder of All the Class Members Impracticable**……………………………………………………………27

**B. Commonality: There Are Questions of Law and Fact Common to the Class**…30

**C. Typicality: The Claims of the Movants Are Representative of the Claims of the Proposed ADA Subclass**……………………………………………………..41

**D. Adequacy of Representation: The Movants Will Fairly and Adequately Represent the Interests of the Class.**  …………………………………………43

**1. The Movants' Interests Do Not Conflict with Those of the Proposed ADA Subclass.**  ……………………………………………………44

**2. Plaintiffs Will Vigorously Prosecute This Action Through Qualified and Experienced Counsel**…………………………………………45

**III.   THIS CASE QUALIFIES AS A CLASS ACTION UNDER FED. R. CIV. P. 23(B)(2) BECAUSE ADOC HAS ACTED OR REFUSED TO ACT ON GROUNDS GENERALLY APPLICABLE TO THE CLASS, MAKING FINAL INJUNCTIVE OR DECLARATORY RELIEF APPROPRIATE**…………………………………47


**CONCLUSION**…………………………………………………………………………49

## TABLE OF AUTHORITIES

**Cases:**                                                                                                    **Page(s)**

*Access Now, Inc. v. Ambulatory Surgery Ctr. Group Ltd.,*
    197 F.R.D. 522 (S.D. Fla. 2000) ………………………..…………… 30, 43, 47

*Aris v. Allen,*
    No. 1:05-cv-396-PWG (N.D. Ala) ………………………………..…… 46

*Armstrong v. Brown,*
    No. C 94-2307-CW (N.D. Cal.) ……………………………………………45

*Baker v. Campbell,*
    No. CV-03-1114-M (N.D. Ala. 2003) ……………………………..… 45

*Bussey v. Macon County Greyhound Park, Inc.,*
    562 Fed.Appx. 782 (11th Cir. 2014) ………………………...………..31

*Assoc. for Disabled Americans, Inc. v. Amoco Oil Co.,*
    211 F.R.D. 457 (S.D. Fla. 2002) ……………………………….……… 44

*Baby Neal for and by Kanter v. Casey,*
    43 F.3d 48 (3d Cir. 1994) ……………………………………………… 48

*Bradley v. Haley,*
    No. 92-CV-70-N (M.D. Ala. 1992) …………………………………..… 45

*Bradley v. Harrelson,*
    151 F.R.D. 422 (M.D. Ala. 1993) ……………………………………….28, 31

*Busby v. JRHBW Realty, Inc.,*
    513 F.3d 1314 (11th Cir. 2008) …………………………………………… 41

*Cooper v. Southern Co.,*
    390 F.3d 695 (11th Cir. 2004) ………………………………...…..… 26

*Cox v. Am. Cast Iron Pipe Co.,*
    784 F.2d 1546 (11th Cir. 1986) ………………………………………… 28

*Dockery v. Fischer,*
    2015 WL 5737608 (S.D. Miss. Sept. 29, 2015) ……………………..…… 45

*Evans v. U.S. Pipe & Foundry Co.,*
    696 F.2d 925 (11th Cir. 1983) ……………………………………..…… 28, 29

*Gaddis v. Campbell,*
    No. 03-T-390-N (M.D. Ala. 2003) ……………………………..…… 45

*Gen. Tel. Co. v. Falcon,*
    457 U.S. 147 (1982) …………………………………………..… 26

*Griffin v. Carlin,*
    755 F.2d 1516 (11th Cir. 1985) ………………………………………… 44

*Gurmankin v. Costanzo,*
    626 F.2d 1132 (3d Cir. 1980) …………………………..………… 29

*Henderson v. Thomas,*
    289 F.R.D. 506 (2012) …………………………………….………… 31

*Holmes v. Cont'l Can Co.,*
    706 F.2d 1144 (11th Cir. 1983) ……………………………….…… 48

*Jones v. Diamond,*
    519 F.2d 1090 (5th Cir. 1975) …………………………………..…… 47

*Kilgo v. Bowman Transp., Inc.,*
    789 F.2d 859 (11th Cir. 1986) ………………………………….…… 28

*Klay v. Humana, Inc.,*
    382 F.3d 1241 (11th Cir. 2004) ………………………………..…… 27

*Mack v. General Motors Acceptance Corp.,*
    169 F.R.D. 671 (M.D. Ala. 1996) …………………………………… 44

*P.B. v. Pastorek,*
    No. 2:10-cv-04049 (E.D. La. 2010) …………………………………… 45

*Penson v. Terminal Transp. Co.,*
    634 F.2d 989 (5th Cir. 1981) ………………………………………… 48

*Susan J. v. Riley,*
    No. 2:00-cv-918-F (M.D. Ala.)………………………………………… 46

*Taylor v. Flagstar Bank, FSB,*
    181 F.R.D. 509 (M.D. Ala. 1998) …………………………………… 41

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,*
    350 F.3d 1181 (11th Cir. 2003) …………………………………… 26, 43

*Vega v. T-Mobile U.S.A., Inc.,*
    564 F.3d 1256 (11th Cir. 2009) ……………………………………… 30

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (2011) ………………………………………… 31, 41, 48

*Weiss v. York Hosp.,*
    745 F.2d 786 (3d Cir. 1984) ……………………………………… 48

*Williams v. Mohawk Indus., Inc.,*
    568 F.3d 1350 (11th Cir. 2009) …………………………………… 41

**Statutes:**

28 C.F.R. § 35.107(a)  ……………………………………………..……. 10

**Rules:**

Fed. R. Civ. P. 23 …………………………………………….……… *passim*

**Other:**

Newberg & A. Conte, Newberg on Class Actions…………………………… 28, 48

## INTRODUCTION

The Alabama Department of Corrections maintains prisons throughout the state where it systemically discriminates against many of the most vulnerable people in its custody, those with disabilities, by denying them the access, accommodations and services required by federal law. The ongoing actions of the Alabama Department of Corrections ("ADOC" or "Defendant") violate the Americans with Disabilities Act of 1990 and Section 504 of the Rehabilitation Act (collectively referred to as the "ADA").

ADOC's failures are system-wide and affect incarcerated men and women throughout its prisons. Plaintiffs believe that ADOC's refusal to provide the required services currently harms hundreds and possibly thousands of prisoners in its custody. Rather than addressing each failure individually, which would be impracticable, inefficient, costly and arguably impossible, Plaintiffs seek to represent a subclass[1] consisting of all persons who 1) are or will be in the custody of the ADOC, and 2) are or will be persons with disabilities as the term is used in the ADA.

For the reasons addressed below, Plaintiffs Edward Braggs, Tedrick Brooks, Gary Lee Broyles, Christopher Gilbert, Dwight Hagood, Sylvester Hartley, Charlie Henderson, Brandon Johnson, John Maner, Jermaine Mitchell, Tommie Moore, Roger Moseley, Bradley Pearson, Timothy Sears, Daniel Tooley, Joseph Torres, and Donald Ray Turner respectfully move this

---

[1] Plaintiffs filed their Complaint, which has since been amended, on June 17, 2014.  In the Third Amended Complaint, the class proposed for purposes of this Motion is referred to as the "ADA subclass" (Doc. 210 at 12). Since then, this Court has ordered that the claims in this case be divided into two phases (Doc. 239 at 2).  In its order, the Court notes that in Phase I it "will consider certification of the putative non-mental-health ADA subclass(es)."  *Id*.  For purposes of this motion, Plaintiffs maintain use of the term "subclass."  However, Plaintiffs contend that the Phase I subclass is a stand-alone class regardless of whether the primary putative class is subsequently certified.

Honorable Court to enter an order certifying a class action pursuant to Fed. R. Civ. P. 23 as described herein and appointing Plaintiffs' counsel as class counsel.[2]

## STATEMENT OF FACTS

I.      **NAMED PLAINTIFFS**

      The following Named Plaintiffs move this Honorable Court for class certification of the proposed ADA subclass and if so certified, would be members of the ADA subclass themselves:

### A.  Edward Braggs

      Plaintiff Edward Braggs was first diagnosed with diabetes when his right leg was amputated below the knee in 2004, while incarcerated at Hamilton Aged & Infirm.  *See* Pls. Ex. 5 (Braggs Dep. 19:5–23, Mar. 9, 2015).[3]  Plaintiff Braggs is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).  Plaintiff Braggs is being denied reasonable accommodations for his disabilities under the ADA.

### B.  Tedrick Brooks

      Plaintiff Tedrick Brooks has a serious keloid skin condition in which keloids cover his face, back, shoulders, and chest.  *See* Pls. Ex. 6 (Brooks Dep. 10:11–10:17, Feb. 25, 2015).  He has difficulty moving because of the keloids.  *Id.* (Brooks Dep. 125:1-11).   Plaintiff Brooks is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). Plaintiff Brooks is being denied reasonable accommodations for his disabilities under the ADA.

### C.  Gary Lee Broyles

      Plaintiff Gary Lee Broyles is hearing impaired, has lost most of his hearing in both of his ears, and requires hearing aids for each of his ears.  *See* Pls. Ex. 7 (Broyles Dep. 12:23 – 17:21, Apr. 10, 2015).  ADOC regularly fails to furnish him with hearing aids or to keep his hearing

---

[2] Plaintiffs, by and through their undersigned counsel, hereby incorporate their Motion for Class Certification, simultaneously filed on this date.

[3] Plaintiffs' exhibits are attached to the Evidentiary Submission filed herewith.

aids in working order.  *Id*. Plaintiff Broyles is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). Plaintiff Broyles is being denied reasonable accommodations for his disabilities under the ADA.

### D.  Christopher Gilbert

Plaintiff Christopher Gilbert is housed at Kilby Correctional Facility.  *See* Pls. Ex. 8 (Gilbert Dep. 95:10–21, Jan. 29, 2015).  He suffered an ankle injury which resulted in his right leg being shorter than his left leg, and he uses a cane to assist with his mobility.  *Id.* (Gilbert Dep. 27:6 – 30:14, Jan. 29, 2015).    He is required to stand for long periods of time despite his disability.  *See e.g. id*.  (Gilbert Dep. 104:14 – 105:12, Jan. 29, 2015).  Plaintiff Gilbert also suffers from diabetes.  *Id*. (Gilbert Dep. 12:14–20 and 65:19–25, Jan. 29, 2015) He has passed out on numerous occasions when his blood sugar has bottomed out.  *Id.* (Gilbert Dep. 17:10 – 18:9, Jan. 29, 2015). Plaintiff Gilbert is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).   Plaintiff Gilbert is being denied reasonable accommodations for his disabilities under the ADA.

### E.  Dwight Hagood

Plaintiff Dwight Hagood cannot read or write and is incarcerated at Easterling Correctional Facility.  *See* Pls. Ex. 9 (Hagood Dep. 9:1–9 and 152:7–14, Jan. 28, 2015).  Plaintiff Hagood has suffered multiple strokes and has little to no use of the left side of his body or his left leg.  *Id*. (Hagood Dep. 16:2–25, 75:5 – 76:4, and 178:5–10, Jan. 28, 2015).  He uses a manual wheelchair in prison but used a power wheelchair prior to his incarceration.  *Id*.  (Hagood Dep. 26:8 – 27:21, Jan. 28, 2015). Plaintiff Hagood has been denied access to accommodations for his disability; for instance, he is housed in a dormitory with no accessible shower.  *Id.* (Hagood Dep. 36:6–21, 78:20 – 83:16, 173:2–8, 174:19 – 178:10, 179:3–184:6, and 184:10–189:25, Jan. 28,

2015). Plaintiff Hagood is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).  Plaintiff Hagood is being denied reasonable accommodations for his disabilities under the ADA.

### F.  Sylvester Hartley

Plaintiff Sylvester Hartley has severely impaired kidney function that has gone untreated at times, and he is now on dialysis.  *See* Pls. Ex. 10 (Hartley Dep. 57:16 – 59:3, Dec. 16, 2014).  Plaintiff Hartleyhas been called "crazy" by prison staff and is on the mental health caseload.  *Id*. (Hartley Dep.  66:19-22, 118:5-7).  Because he requires dialysis due to his impaired kidney functioning, he is housed at St. Clair Correctional facility.  Because he is housed at St. Clair due to his disability, he lacks access to appropriate mental health care.  *Id*. (Hartley Dep. 76:24–78:2, Dec. 16, 2014). Plaintiff Hartley is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).  Plaintiff Hartley is being denied reasonable accommodations for his disabilities under the ADA.

### G.  Charlie Henderson

Plaintiff Charlie Henderson has been incarcerated at Hamilton Aged and Infirm since 2013. *See* Pls. Ex. 11 (Henderson Dep. 52:24-53:7, Mar. 11, 2015).  He has constriction of the ligatures in his hands. *Id*. (Henderson Dep. 72:13-73:18).  He also has used a cane for mobility and needs hearing aids. *Id*. (Henderson Dep. 172:8-173:21). Plaintiff Henderson reports losing the use of his cane when ADOC took it from him.  *Id*. (Henderson Dep. 50:9 – 51:25).  Similarly, when the doctor at Hamilton tested his hearing, it was determined that Plaintiff Henderson needed hearing aids, however, he never received these hearing aids. *Id*.  (Henderson Dep. 172:8-173:21). Plaintiff Henderson is a person with a disability as defined in 42 U.S.C. § 12102 and 29

U.S.C. § 705(9)(A) and (B).  Plaintiff Henderson is being denied reasonable accommodations for his disabilities under the ADA.

### H.  Brandon Johnson

Plaintiff Brandon Johnson is incarcerated at Donaldson Correctional Facility.  *See* Pls. Ex. 12. (Johnson Dep. 10:21–11:7, Jan. 13, 2015).  He experienced a traumatic brain injury in a car accident and suffers from its effects.  *See id.* (Johnson Dep. 23:4–23:21, 109:21 – 110:1, and 147:16 – 150:7).  Plaintiff Johnson has been subject to disciplinary hearings without understanding the process and without any accommodation.  *Id.* (Johnson Dep. 94:8 – 95:17).  Other prisoners at Donaldson mistreat Plaintiff Johnson.  *Id.* (Johnson Dep. 11:3 – 12:14).  Plaintiff Johnson is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).  Plaintiff Johnson is being denied reasonable accommodations for his disabilities under the ADA.

### I.  John Maner

Plaintiff John Maner is presently housed at Staton Correctional Facility.  Immediately prior to his incarceration, Plaintiff Maner suffered from a gunshot wound after which a portion of his vertebrae was damaged and from which he sustained a lasting mobility impairment.  *See* Pls. Ex. 13 (Maner Dep. 19:2-17, 21:11-23, Feb. 27, 2015).  He has sought to participate in work release programs and has been denied the opportunity to do so by ADOC.  (Maner Dep. 47:25–48:6, 87:7-13, 120:7-9, 127:3-5).  Because of his mobility impairment, Plaintiff Maner is unable to stand for long periods of time or lift heavy objects, nevertheless ADOC has not provided accommodations for him in its work release programs in the period of his incarceration.  *Id.* Plaintiff Maner is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. §

705(9)(A) and (B).   Plaintiff Maner is being denied reasonable accommodations for his disabilities under the ADA.

### J.  Jermaine Mitchell

Plaintiff Jermaine Mitchell is currently incarcerated at Hamilton Aged and Infirm.  *See* Pls. Ex. 14 (Mitchell Dep. 26:9-12). In 1996, Plaintiff Mitchell was shot causing him to become paralyzed from the waist down. (Mitchell Dep. 12:5-10, 13:17-20). Mr. Mitchell uses a wheelchair.   (Mitchell Dep. 39:20-25).  Plaintiff Mitchell is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). Plaintiff Mitchell is being denied reasonable accommodations for his disabilities under the ADA.

### K.  Tommie Moore

Plaintiff Tommie Moore has been incarcerated at Kilby Correctional Facility and the Mobile Community Work Center.  *See* Pls. Ex. 15 (Moore Dep. 27-28, June 24, 2015). He is legally blind and uses a sighted walking cane for mobility.  (Moore Dep. 6:1–21, 27:5-13, 135:6-7).  Plaintiff Moore would like to learn to read Braille, but has been unable to get any training. (Moore Dep. 15:6-8). Mr. Moore has put in many requests for classes or training on how to read Braille.  *Id*. (Moore Dep., 141:10-17). None of the ADOC facilities at which he has been incarcerated have allowed him to work.  (Moore Dep. 42:8 – 44:13).   Mr. Moore has requested a job multiple times, but has never been assigned one due to his sight impairment. *Id*. (Moore Dep. 42:8-44:13, 139:5-12). Plaintiff Moore is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).   Plaintiff Moore is being denied reasonable accommodations for his disabilities under the ADA.

### L.  Roger Moseley

Plaintiff Roger Moseley is incarcerated at Easterling Correctional Facility. *See* Pls. Ex. 16 (Moseley Dep. 13:7–22). Plaintiff Moseley has required the use of a wheelchair for mobility since 2007. *Id.* (Moseley Dep. 21:25-22:15). Plaintiff Moseley is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). Plaintiff Moseley is being denied reasonable accommodations for his disabilities under the ADA.

### M.  Bradley Pearson

Plaintiff Bradley Pearson was incarcerated by the ADOC from August 2013 through February 1, 2015. Plaintiff Pearson has been deaf his entire life. *See* Pls. Ex. 17 (Pearson Dep. 9:4-7, Nov. 13, 2015). Plaintiff Pearson requested a hearing aid and had significant difficulty obtaining one. *Id*. (Pearson Dep. 37:4-16, 59:9–60:9, Nov. 13, 2015). This meant that Plaintiff Pearson could not hear a fire alarm in case of a fire. *Id.* (Pearson Dep. 205:17-19, Nov. 13, 2015). Plaintiff PEARSON uses sign language to communicate, but was never provided a sign language interpreter while incarcerated. *Id*. (Pearson Dep. 215: 15-21). While in ADOC custody, Plaintiff Pearson was prohibited from taking a body shop class because he is deaf. *Id*. (Pearson Dep. 71:23-72:10, Nov. 13, 2015). Similarly, he was not able to obtain his GED at Limestone Correctional Center either, because the GED program offered to him was not accessible for deaf prisoners. *Id*. (Pearson Dep. 150:13-151:10, Nov. 13, 2015). Plaintiff Pearson is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). Plaintiff Pearson is being denied reasonable accommodations for his disabilities under the ADA.

### N.  Timothy Sears

Plaintiff Timothy Sears has been in ADOC custody since 1996. He is currently housed at Bibb Correctional Facility and previously has been incarcerated at Ventress Correctional Facility, Hamilton Aged and Infirm, St. Clair Correctional Facility, and Limestone Correctional

Facility.  Plaintiff Searshas scoliosis, uses a back brace and a cane.  *See* Pls. Ex. 18 (Sears Dep. 154:17-22, 245:2-14).  He has difficulty both with bodily functions and major life activities such as breathing, lifting, walking, and standing.  *Id.* (Sears Dep. 72:17–73:16).   Additionally, Plaintiff Sears has suffered from significant weight loss while in the custody of ADOC.  *Id.* (Sears Dep. 78:10-23).  Due to his disabling conditions Plaintiff Sears requires a shower chair in the shower; before was provided with a shower chair he had to travel to the facility infirmary in order to use an accessible shower.  *Id.* (Sears Dep. 97:22 – 99:14).  Plaintiff Sears is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).  Plaintiff Sears is being denied reasonable accommodations for his disabilities under the ADA.

### O.  Daniel Tooley

Plaintiff Daniel Tooley is housed at Hamilton Aged and Infirm and has been incarcerated in the custody of ADOC since 2008.  *See* Pls. Ex. 19 (Tooley Dep. 27:22 – 28:1 and 29:1–18, Apr. 29, 2015).  Plaintiff Tooley is deaf and requires a sign language interpreter to communicate.  *Id.* (Tooley Dep. 8:17–9:8).  He needs a deaf interpreter for medical appointments at the prison, and he does not understand written communications with medical personnel.  *Id.* (Tooley Dep. 9:9 – 11:22, 16:21 – 17:11, 23:16 – 24:19, and 31:18 – 32:13). Plaintiff Tooley has complained of the lack of sign language interpreters in medical appointments and disciplinary hearings to ADOC and ADOC still refused to provide a sign language interpreter for him.  *Id.* (Tooley Dep. 111:6–112:14 and 113:4–16).  Plaintiff Tooley is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B Plaintiff Tooley is being denied reasonable accommodations for his disabilities under the ADA.

### P.  Joseph Torres

Plaintiff Joseph Torres is presently housed at Elmore Correctional Facility.  He was previously incarcerated at Bibb Correctional Facility and badly injured his knee while playing basketball there.  *See* Pls. Ex. 20. (Torres Dep. 46:11 – 47:9). For approximately two (2) years in ADOC custody the problems with his injured knee went unresolved *Id*. (Torres Dep. 78:10 – 84:2, Feb. 26, 2015).  Plaintiff Torres suffers from cataracts.  *Id*. (Torres Dep. 84:9–23 and 92:9– 93:17).  He experiences vision problems and headaches because of his cataracts.  *Id*. (Torres Dep. 102:12 – 104:19 and 110:16 – 111:13).  Plaintiff Torres is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).  Plaintiff Torres is being denied reasonable accommodations for his disabilities under the ADA.

### Q.  Donald Ray Turner

Plaintiff Donald Ray Turner has been deaf since birth, cannot speak, and utilizes sign language for communication.  *See* Pls Ex. 21 (Turner Dep. 7:9–13:13, 19:2–8, 30:2–6,  Apr. 6, 2015).  He is incarcerated at Limestone Correctional Facility *Id.* (Turner Dep. 36:22 – 24).  Plaintiff Turner has asked to work inside the prison or outside on work release and has been told "You cannot go to work release because you are deaf."  *Id*. (Turner Dep. 32:5–34:6 and 35:3 – 37:1, *see also* 48:1–15).  Medical staff also has assigned Mr. Turner a health code that disqualifies him from work release.  *Id*.  (Turner Dep. 33:24 – 35:20).  Plaintiff Turner is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B).  Plaintiff Turner is being denied reasonable accommodations for his disabilities under the ADA.

## II.  ADOC HAS FAILED TO FULFILL ITS OBLIGATIONS UNDER THE ADA

Over an almost twenty-five (25) year period, the ADOC has not met its obligations under the ADA with respect to prisoners with disabilities incarcerated in its facilities.  The ADOC's

inattention to its federal statutory obligations starts at the top with the Commissioner and pervades every level of its administrative and facility staff, as well as third-party service providers, such as medical staff.  As ADOC's own ADA expert agreed, "I believe improvements can be made system-wide to correct the issues presented and comply with industry and federally mandated standards of the ADA."  *See* Pls. Ex. 2 (Report of David L. Runnels, Expert Consultant for the ADOC ("Runnels Report"), 8:15-16, Apr. 4, 2016).

### A. ADOC Has Failed to Create a System to Accommodate Prisoners with Disabilities

The ADOC lacks "operational standards that comply with uniformly accepted ADA standards." *See* Pls. Ex. 2 (Runnels Report 9:8-9).  As set forth below, such operational standards complying with ADA standards are noticeably absent throughout ADOC.

### 1. ADOC Has No ADA Accommodations Request or Grievance System.

The implementing regulations for the ADA require the establishment of grievance procedures providing for prompt and equitable resolution of complaints alleging any violations of the ADA.  28 C.F.R. §35.107(b).  Commissioner Dunn does not know whether ADOC has an ADA grievance procedure in place.  *See* Pls. Ex. 25 (Dunn Dep. 275:9-12, Mar. 3, 2016).  Associate Commissioner Ruth Naglich is not aware of an ADOC ADA grievance procedure at any of its facilities.  *See* Pls. Ex. 26 (Naglich Dep. 314:20-23, Dec. 8, 2015). ADOC claims to have ADA grievance procedures only at Tutwiler Prison for Women and Hamilton Aged and Infirm, *see* Pls. Ex. 4 (ADOC's Resp. to Pls. Interrogs. at 17).  However, Plaintiffs' expert found these processes wholly insufficient, "Nowhere in my review of the ADA Grievance processes at Hamilton and Tutwiler did I find that either facility sufficiently addressed their own procedures for inmates requests under the ADA." *See* Pls. Ex. 3 (Blanck Report 33:13-15, Mar. 7, 2015).

Medical personnel working in ADOC's prisons, who are familiar with the medical grievance process and who are the primary actors in determining whether a prisoner will get an accommodation, do not know of an ADOC ADA grievance procedure.  *See e.g.* Pls. Ex. 38 (Baker Dep. 176:6 – 177:21, Jan. 8, 2016); Pls. Ex. 41 (Guice Dep. 118 – 119, Feb. 18, 2016); and Pls. Ex. 44 (Patterson Dep. 109-110, Jan. 7, 2016).  In fact ADOC's ADA expert agrees with Plaintiffs' ADA expert Dr. Peter Blanck that "ADOC does not have a uniform grievance procedure…ADOC primarily relies on an inmate request slip process which is not maintained via an ADOC tracking system." *See* Pls. Ex. 2 (Runnels Report 16:1-4).

A real ADA grievance process would allow a prisoner like PLAINTIFF TURNER to grieve his denial of entry into work release on the grounds that he is deaf.  Such a process also would allow a prisoner like PLAINTIFF HAGOOD to grieve his placement in a dormitory without an accessible shower.

### 2.    ADOC Has No ADA Coordinators.

Pursuant to 28 C.F.R. §35.107(a), ADOC is required to designate a responsible employee to coordinate its efforts to comply with and attend to its responsibilities under the ADA.  In its responses to Plaintiffs' interrogatories regarding whether ADOC had designated such responsible employees, ADOC identified several individuals it asserted were facility "ADA Coordinators." *See* Pls. Ex. 4, (ADOC Resp. to Pls. Interrogs. at 15, Apr. 2, 2015).  However, none of these individuals actually functioned as ADA Coordinators nor had they received any ADA training from ADOC.  The most egregious example of this non-substantive designation, was that of the ADA Coordinator at Elmore Correctional Facility, Aaron Billups, whose role as "ADA Coordinator" warrants review in some detail below.

### a.    Aaron Billups.

For the last five years, Aaron Billups has worked as the maintenance supervisor at Elmore Correctional Facility. *See* Pls. Ex. 45 (Billups Dep. 15). Billups does not believe he has any job responsibility with respect to inmates with disabilities housed at Elmore Correctional Facility. *Id.* (Billups Dep. 16-17). One week prior to his deposition, Billups met with the lawyer for ADOC and was informed that he was the ADA Coordinator for the Elmore Correctional Facility. *Id.* (Billups Dep. 17).

Billups admits that he knows nothing about the ADA, how the ADA relates to ADOC, and that his only knowledge of the ADA was from television commercials he may have seen that show people "with disabilities, wheelchairs, things of that nature, crutches." *Id.* (Billups Dep. 18-19). Billups is not sure the ADA even applies to Elmore Correctional Facility. *Id.* (Billups Dep. 19). Billups admits his only regular exposure to inmates housed at Elmore Correctional Facility are those inmates that work within his maintenance department which is outside the prison fence. *Id.* (Billups Dep. 20).

Billups does not know the responsibilities of an ADA coordinator and had never heard of an ADA Coordinator at Elmore prior to his deposition. *Id.* (Billups Dep. 22).  He admits he does not know who is protected by the ADA. *Id.* No one that works with the ADOC has ever informed Billups that he is the ADA coordinator for Elmore Correctional Facility. *Id.* (Billups Dep. 23). Billups admits he has never had any ADA training. *Id.* (Billups Dep. 26). Billups does not know how many inmates at Elmore Correctional Facility have qualified disabilities under the ADA, and he does not know who is responsible for identifying inmates with disabilities at Elmore. *Id.* (Billups Dep. 27).

Billups admits he was shocked that he was identified as the ADA coordinator for Elmore Correction Facility because he has no qualifications for the position. *Id.* (Billups Dep. 28).

Billups has no idea how his name appeared in interrogatory responses as an ADA coordinator within ADOC. *Id.* (Billups Dep. 30). Billups further admits he has never interacted with inmates with disabilities and his only way of identifying any persons with disabilities at Elmore is by watching which ADOC staff members park their cars in the designated handicap parking spaces. *Id.* (Billups Dep. 31).

Billups has no idea if there is an ADA accommodation request process for Elmore Correctional Facility or if there are any policies or procedures ADOC may have with respect to inmates with disabilities. *Id.* (Billups Dep. 32-33). Billups has not told anyone at Elmore Correctional Facility that he is the ADA Coordinator for that prison. *Id.* (Billups Dep. 36). Billups does not know if ADOC has an ADA Transition Plan nor has he ever any heard of that term. *Id.* (Billups Dep. 33 and 201). Billups also does not know how to address the accommodation needs for inmates with disabilities housed at Elmore Correctional Facility. *Id.* (Billups Dep. 43-44). Billups further admits he has no idea if any other ADOC prisons have ADA coordinators. He does not know if Elmore Correctional Facility provides sign language interpreters for deaf inmates or provides documents in alternate formats such as Braille or large print materials to blind inmates or inmates with vision impairment. *Id.* (Billups Dep. 68 and 70). Billups admits his office is outside the prison fence and is, therefore, not accessible to any prisoners. *Id.* (Billups Dep. 204-205).

### b.  Additional Purported ADA Coordinators.

Other ADA Coordinators identified by ADOC were similarly deficient.  A representative sample of other ADA Coordinators shows that these designations were not real positions within ADOC facilities:

*Ernest Claybon* – Mr. Claybon is the ADA Coordinator at Staton Correctional Facility. Mr. Claybon is unaware of the ADA's architectural requirements. *See* Pls. Ex. 46 (Claybon Dep. 77:16 – 78:7, Oct. 13, 2015). Mr. Claybon is unaware as to whether his facility has an ADA transition plan and does not even know what an ADA transition plan is. *Id*. (Claybon Dep. 56:19 – 57:8). Mr. Claybon stated that, as ADA Coordinator, he has no responsibility to ensure that the prison's programs are accessible to prisoners with disabilities. *Id*. (Claybon Dep. 86:1-7).

*Joel Gilbert* – Mr. Gilbert has been employed at Donaldson Correctional Facility for eighteen (18) years and learned via an email that he had been designated as the ADA Coordinator for the facility. *See* Pls. Ex. 47 (Gilbert Dep. 8 – 9, 18, and 39, Oct. 22, 2015). He has received no training on how to identify prisoners with disabilities or how to effectively communicate with prisoners with disabilities. *Id.* (Gilbert Dep. 54). Gilbert has not been informed of his job duties as ADA Coordinator at Donaldson Correctional Facility. *Id.* (Gilbert Dep. 56). He is not aware of any ADOC policies that relate to inmates with disabilities. *Id.* (Gilbert Dep. 61-62).

*Adrienne Givens* – Ms. Givens was identified as the ADA Coordinator at Tutwiler Prison for Women. In spite of her title, Ms. Givens has never received any ADA training. *See* Pls. Ex. 48 (Givens Dep. 37:3-12, Oct. 26, 2015). She does not know her job responsibilities as ADA Coordinator. *Id*. (Givens Dep. 39:1-23). Ms. Givens agreed that her only job responsibility as ADA Coordinator to date was to attend a deposition as ADA Coordinator. *Id*. (Givens Dep. 112:6 – 115:16).

*Kenneth Peters* – Mr. Peters was named the ADA Coordinator for St. Clair Correctional Facility. *See* Pls. Ex. 49 (Peters Dep. 10). Mr. Peters does not recall receiving any ADA training in the twenty-five (25) years he has been employed with ADOC, nor is he aware of any ADOC

14

policies and procedures regarding the ADA.  (Peters Dep. 13-14, 17, 43).  St. Clair Correctional Facility does have an emergency evacuation plan, but Mr. Peters is unsure if it contains any provision regarding prisoners with disabilities. *Id.* (Peters Dep. 60-61).  Mr. Peters also admits that he does not know how many prisoners housed at St. Clair Correctional Facility have mobility issues or other disabilities. *Id.* (Peters Dep. 49-50).

Like Aaron Billups, these ADA Coordinators did not have actual responsibilities and demonstrated a complete lack of knowledge regarding the very subject matter for which they were given responsibility.

### c. ADOC Staff Lacks Knowledge Regarding ADA Coordinators.

Tellingly, no one working in ADOC's administration or its prisons could identify any of these purported ADA Coordinators or whether such positions even existed.  For example, Commissioner Dunn does not know whether the ADOC has a statewide ADA coordinator.  *Id.* (Dunn Dep. 273:12-22).   Commissioner Dunn does not know whether there are ADA coordinators at any ADOC facilities and has no knowledge of what an ADA coordinator is. *Id.* (Dunn Dep. 274:1-8).   Associate Commissioner Naglich has been told there are ADA coordinators at ADOC facilities, but does not know whether every facility has one or who serves as an ADA coordinator. Pls. Ex. 26 (Naglich Dep. 300:12-16, 301:9-12, 301:16-19)

Even ADOC's expert found the facility ADA Coordinators lacking in training and knowledge: "As related to ADA Coordinators, during each site inspection, there were identified staff who held ADA Coordinator responsibilities, but were unsure of the systemic requirements for the ADA Coordinator position specifically.  In most instances, with the exception of the ADA Coordinator at Hamilton A&I…staff identified as ADA Coordinators stated they had little

training or direction regarding the responsibilities of those duties."  *See* Pls. Ex. 2 (Runnels Dep. 12:13-18).

Medical personnel did not know of any ADA Coordinators working in ADOC prisons. *See e.g.* Pls. Ex. 36 (Darbouze Dep. 132:11 – 133:7, Dec. 4, 2015); Pls. Ex. 39 (Duffell Dep. 221:5–11, 264:6–13, and 269:18–22, Nov. 3, 2015); Pls. Ex. 40 (Ergle Dep. 240:6–21; November 4, 2015); Pls. Ex. 34 (Gams Dep. 44:5 – 44:17, Dec. 8, 2015); Pls. Ex. 41 (Guice Dep. 118 – 119); Pls. Ex. 42 (Johnson Dep. 214 – 215, Jan. 13, 2016); Pls. Ex. 43 (Lovelace Dep. at 229, Dec. 21, 2015); Pls. Ex. 37 (Odom Dep. 100:2–9, Feb. 23, 2016); and (Patterson Dep. 112). Presumably, if the ADA Coordinators actually had responsibilities, the medical staff at each facility would know who the designated ADA Coordinator is.

ADOC's failure to designate real ADA Coordinators at its facilities affects all prisoners with disabilities and disregards applicable law.   A trained, properly functioning ADA Coordinator could, for example, assist PLAINTIFF HARTLEY with finding appropriate housing that both accommodates his disability and provides him with adequate mental health care or help PLAINTIFF BROYLES with timely accessing new batteries for his hearing aids.

### 3.    ADOC Has No Identification or Tracking System

Again, ADOC's inattention to the population of inmates in its prisons with disabilities starts at the top and works its way down.  For example, Commissioner Dunn has no knowledge of whether ADOC tracks the number of prisoners with mobility impairments, vision impairments, hearing impairments or cognitive impairments.   *See* Pls. Ex. 25 (Dunn Dep. 276:17-23 and 277:1-9). Commissioner Dunn also does not know of whether the ADOC has any means to track disability-related accommodation requests made by prisoners with disabilities. *Id.* (Dunn Dep. 275:18-22 and 276:6-16).

16

ADOC's own expert highlighted the urgent need for proper identification and tracking: "ADOC should immediately Master Plan its ADA populations, incorporate classification processes for ADA inmates and ensure those identified ADA inmates are properly housed within ADOC facilities that are able to accommodate their service needs." *See* Pls. Ex. 2 (Runnels Report 12:19-22). ADOC's ADA expert further observes that "ADOC should develop a system to accommodate ADA requests and have the ability to monitor inmates with disabilities to ensure they are reasonably accommodated throughout their incarceration period. Although disability identification is documented during the intake process…there is no ADOC system-wide ability for staff to identify inmates with disabilities." *Id*. (Runnels Report 15:2-7).

Tracking of prisoners with disabilities is nonexistent throughout the ADOC system as evidenced by the testimony of a sampling of facility wardens. In that regard, Warden Jones did not know how many prisoners who use wheelchairs, are blind or deaf were housed at Bullock Correctional Facility. *See* Pls. Ex. 30 (K. Jones Dep. 57:8-23; 58:1-5). Warden Holcomb at Hamilton Aged and Infirm is not notified when a prisoner with a disability is transferred to that facility. *See* Pls. Ex. 31 (Holcomb Dep. 36:13-15, Oct. 19, 2015). Warden Holcomb does not know how many prisoners who use wheelchairs or canes are currently at Hamilton. *Id*. (Holcomb Dep. 55:14-22). Warden Estes at St. Clair Correctional Facility also is not notified when a prisoner with a disability is transferred to the St. Clair Correctional Facility. *See* Pls. Ex. 32 (Estes Dep. 51:2-236). He did not know how many prisoners at St. Clair Correctional Facility who use a wheelchair or who are deaf or blind. *Id*. (Estes Dep. 76:16-23 and 77:1-6). Warden Barrett has no knowledge of the number of prisoners at Tutwiler Correctional Facility who use a wheelchair, or are deaf or blind. *See* Pls. Ex. 33 (Barrett Dep. 85:12-23, 86:1-23). Medical staff

also made the same observation that there is no tracking mechanism to identify prisoners with disabilities. *See e.g.* Pls. Ex. 42  (Johnson Dep. at 206).

Although ADOC has a problem identifying and tracking prisoners, "the more systemic issue" is "ADOC's inability to share the information as it relates to inmates disabilities." *See* Pls. Ex. 2 (Runnels Report 14:7-9).

### 4.  ADOC Personnel Have Not Received Meaningful Training on the ADA

At the highest level, Commissioner Dunn is responsible for ensuring that ADOC employees receive appropriate training.  However, he has no knowledge of whether ADOC employees receive any training on the ADA.  *See* Pls. Ex. 25 (Dunn Dep. 269:5-8, 270:4-13). Associate Commissioner Naglich has not received any ADA training from the ADOC in her time as Associate Commissioner. *See* Pls. Ex. 26 (Naglich Dep. 306:9-12)  ADOC facility Wardens are similarly uncertain about whether they have ever received ADA training.  Warden Holcomb does not recall whether any of his annual training provided by ADOC included information on the ADA. *See* Pls. Ex. 31 (Holcomb Dep. 14:3-6).  Regarding annual training provided to Warden Holcomb, he does not recall receiving any training on accommodation requests. *Id.* (Holcomb Dep. 15:5-15).  Employed by the ADOC since 1983, Warden Estes does not recall receiving any training on the ADA or on accommodating prisoners with disabilities at any time. *See* Pls. Ex. 32 (Estes Dep. 15:5-14, 18:8-15).

Medical personnel working in ADOC facilities also have never received or cannot recall receiving any training on the ADA from Corizon or the ADOC.  *See e.g.* Pls. Ex. 38 (Baker Dep. 170:11 – 173:18 and 175:13 – 176:5); Pls. Ex. 36 (Darbouze Dep. 131:9 – 132:10); Pls. Ex. 39 (Duffell Dep. 62:20 – 63:8); Pls. Ex. 40 (Ergle Dep. 216:18 – 218:3); Pls. Ex. 34 (Gams Dep. 10:13 – 11:4); Pls. Ex. 42 (Johnson Dep. 205 – 207,); Pls. Ex. 43 (Lovelace Dep. 173 – 174); Pls.

Ex. 37 (Odom Dep. 100:10–20); Pls. Ex. 44 (Patterson Dep. 105 – 107) and Pls. Ex. 35 (Pavlakovic Dep. 154:6–18,   Dec. 9, 2015).   Medical personnel are unaware of the proper procedures for conducting medical appointments with deaf or blind inmates.  *See e.g.* Pls. Ex. 34 (Gams Dep. 27:18 – 28:14); Pls. Ex. 41 (Guice Dep. 126 – 129); Pls. Ex. 35 (Pavlakovic Dep. 166:17 – 167:11).

ADA training would teach ADOC employees effective ways to communicate with prisoners disabilities like PLAINTIFF JOHNSON.  Similarly, it would enable ADOC employees to think proactively about accommodations such as promptly providing a shower chair for PLAINTIFF SEARS.   All prisoners with disabilities in the custody of ADOC would benefit from ADOC furnishing training to its staff on the ADA.

### 5.    ADOC Does Not Have an ADA Transition Plan, ADA Policies or Procedures.

#### a.  ADOC Has No Transition Plan.

At ADOC's highest level, Commissioner Dunn has no knowledge of whether the ADOC has an ADA transition plan. *See* Pls. Ex. 25 (Dunn Dep. 270:17-19).  Wardens at ADOC facilities are also uninformed about whether ADOC or their own facilities have a transition plan, except for the few who are aware that their facilities do not have one.  *See* Pls. Ex. 30 (K. Jones Dep. 21:20-23 and 22:1-5); Pls. Ex. 31 (Holcomb Dep. 24:11-23, 25:1-6, and 17:17-19); Pls. Ex. 32 (Estes Dep. 23:5-16); Pls. Ex. 33 (Barrett Dep. 28:15-21, 28:22-23, and 29:1-23).  ADOC's expert confirms, "the ADOC has not developed and implemented and ADA/504 Transition Plan." *See* Pls. Ex. 2 (Runnels Report 11:20-21).  The complete absence of an ADA/504 Transition Plan has a ripple effect because, "[t]he duties and responsibilities of the departmental and facility-specific ADA coordinators should be detailed in the ADA/504 Transition Report or Plan, which, as found, ADOC has not developed." *See* Pls. Ex. 3 (Blanck Report 23:18-20).

19

### b.   ADOC Has No Policies and Procedures.

Commissioner Dunn also does not know if the ADOC has any policies in place as it relates to persons with mobility impairments, vision impairments, hearing impairments, or cognitive impairments. *Id*. (Dunn Dep. 286:1-17). Furthermore, Commissioner Dunn does not know whether ADOC has policies and procedures relating to accommodations for prisoners with disabilities who desire to participate in programs offered at ADOC. *Id*. (Dunn Dep. 291:9-292:10).  Other ADOC administrators are also uninformed in this regard.  Warden Jones, the Warden for Bullock Correctional Facility, has no knowledge of ADOC policies regarding accommodations for prisoners with disabilities. *See* Pls. Ex. 30 (K. Jones Dep. 17:6-22). Likewise, medical personnel working onsite at ADOC facilities do not know specifically whether ADOC or Corizon have any policies or procedures relating to inmates with disabilities. *See e.g.* Pls. Ex. 38 (Baker Dep. 173:19 – 176:5); Pls. Ex. 34 (Gams Dep. 24:4–19), and Pls. Ex. 35 (Pavlakovic Dep. 164:12 – 165:20).

ADOC's ADA expert recognizes the need: "ADOC should have written policies and procedures that comply with uniformly accepted ADA standards." *See* Pls. Ex. 2 (Runnels Report 11:12-13).  ADOC's ADA expert further explained the inherent value of adopting ADA specific policies: "the ADOC should further incorporate policies, procedures and practices as relates to methods to specifically screen and properly identify inmates with disabilities." *Id*. (Runnels Report 13:13-14).

In the rare instance where ADOC does have a policy regarding the ADA, it ignores its own mandate: "Despite the existence of [ADOC's Administrative Regulation] AR 705, in my review I found that rarely, if at all, qualified sign language interpreters actually were provided

for inmates with hearing impairments, or who are deaf, in important interactions such as those described in AR 705." *See* Pls. Ex. 3 (Blanck Report 43:25-27).

### B.  ADOC Has Failed to Remove Architectural Barriers in Its Facilities.

By its own estimation, ADOC has failed to remove architectural barriers in its prisons.  In its annual report in 2009, ADOC admitted, "Almost none of our facilities meet the federal Americans with Disabilities Act requirements.  *See* Pls. Ex. 1.  Seven years later, Commissioner Dunn has no knowledge of whether any ADOC prisons are physically accessible as required by the ADA and does not know who on his executive staff has such knowledge. *See* Pls. Ex. 25 (Dunn Dep. 271:4-15).  When asked whether he was aware of architectural barriers at ADOC facilities that violate the ADA, Commissioner Dunn said "I believe there are barriers…I have visited my facilities, and based on a very general knowledge of ADA, have been told that we're not fully compliant." *Id*. (Dunn Dep. 272:10-23 and 273:1-2).

Commissioner Dunn also does not know whether the ADOC offers its programming in locations that are accessible to prisoners with disabilities. *Id*. (Dunn Dep. 280:7-10 and 282:15-283:6).  Further, he does not know who on his staff has such knowledge or who within ADOC is responsible for ensuring compliance with the ADA in this regard. *Id*. (Dunn Dep. 280:11-14, 280:23-281:5, and 282:15 – 283:6).  Commissioner Dunn does not know whether the ADOC ensures that prisoners with disabilities are not housed in inaccessible locations and does not know who on his staff has the responsibility for ensuring such compliance with the ADA.  *Id*. (Dunn Dep. 283:7-17, Mar. 3, 2016).

Facility wardens also identified architectural barriers in their respective prisons throughout the system that have been left unresolved for years.  Warden Barrett observed that none of the segregation cells in L block and none of the cells on death row at Tutwiler

Correctional Facility have accessible toilets. *See* Pls. Ex. 33 (Barrett Dep. 74:15-23, 75:1-23, and 76:1-6). The faith-based dorms at St. Clair Correctional Facility are inaccessible to prisoners who use wheelchairs. *See* Pls. Ex. 32 (Estes Dep. 29:1-7 and 30:12-18). According to Warden Jones, none of the segregation cells at Bullock Correctional Facility are accessible. *See* Pls. Ex. 30 (K. Jones Dep. 48:8-21).

The problem with architectural barriers is compounded by the fact that there is a "lack of systematic means for tracking adequate housing assignments of inmates with disabilities, and an inadequate number, if any, of specialized cells such as segregation and suicide cells." (Blanck Report 49:7-9). Similarly, ADOC's architectural expert recognized that ADOC houses prisoners with disabilities in housing units with significant architectural barriers. Pls. Ex. 54 (Report of Gina Hilbery, ALA, Expert for the ADOC ("Hilberry Report"), 16-17, Apr. 4, 2016). Thus, any prisoner with a disability within the ADOC system could encounter an architectural barrier in their housing assignment at any time because ADOC does not systematically account for disability status upfront

### C. ADOC Has Failed to Make Reasonable Accommodations and Modifications for Prisoners with Disabilities in Its Facilities.

Commissioner Dunn has no knowledge of ADOC's specific obligations to provide reasonable accommodations to prisoners with disabilities *See* Pls. Ex. 25 (Dunn Dep. 274:22-23 and 275:1-2). He also does not know who on his staff is responsible for knowing ADOC's obligations to provide reasonable accommodations. *Id.* (Dunn Dep. 275:4-8). Commissioner Dunn is responsible for overseeing executive staff to ensure that programs offered by ADOC are accessible to inmates with disabilities. However, he does not know who on his staff is responsible for ensuring such compliance. *Id.* (Dunn Dep. 277:23 and 278:7-16). Commissioner

Dunn also does not know how the ADOC ensures that disaster planning at its facilities accounts for and accommodates prisoners with disabilities. *Id*. (Dunn Dep. 285:1-14).

ADOC facilities are completely unaware of how to accommodate prisoners with disabilities.  For instance, Bullock Correctional Facility does not have policies regarding accommodations for prisoners with disabilities, including requesting, evaluating or providing disability-based accommodations. *See* Pls. Ex. 30 (K. Jones Dep. 21:4-19).  Furthermore, Bullock Correctional Facility does not even track ADA accommodation requests made by prisoners with disabilities. *Id*. (K. Jones Dep. 30:13-15).  And the facility's warden admits that the inmate request slip at Bullock Correctional Facility fails to indicate that the slip should be used by prisoners with disabilities to request accommodations. *Id.* (K. Jones Dep. 60:18-21).

Similarly, Warden Estes, the Warden at St. Clair Correctional Facility, observed that although often identified as the primary means of requesting a disability-based accommodation, the inmate request slip contains no written information indicating that the slip can be used for such purposes. *See* Pls. Ex. 32 (Estes Dep. 54:2-12). Prisoners with disabilities at Tutwiler Prison for Women can request an accommodation through a request slip, but the slip does not contain the word "disability" or "accommodation." *See* Pls. Ex. 33 (Barrett Dep. 88:21-23 and 89:1-4). At Hamilton Aged and Infirm, which houses a substantial population of prisoners with disabilities, prisoners are not informed by the ADOC staff that the request slip can be used to request disability  accommodations. *See* Pls. Ex. 31 (Holcomb Dep. 75:8-18).  St. Clair Correctional Facility does not have an emergency alert system with audible alarms. *See* Pls. Ex. 32 (Estes Dep. 87:7-10).

### D. ADOC Has Failed to Provide Necessary Auxiliary Aids and Services to Prisoners with Disabilities.

Commissioner Dunn has no knowledge of whether ADOC provides sign language interpreters or materials in alternative formats for prisoners with disabilities who desire to attend educational programming.   He also cannot identify who on his staff is responsible having such knowledge. *Id*. (Dunn Dep. 279:9-281:1 and 281:17-282:4).   Commissioner Dunn has no knowledge of whether ADOC has policies relating to the provision of written materials in alternative formats for prisoners with disabilities nor does he know whether ADOC has policies and procedures relating to the accommodation of prisoners who cannot read or write due to a disability.  *Id*. (Dunn Dep. 289:5-15).

"ADOC has not, and does not, regularly provide a qualified sign language interpreter in critical situations (e.g., during intake, health care appointments, educational and trade school programs, and disciplinary hearings) when necessary to ensure effective communication." *See* Pls. Ex. 3 (Blanck Report 47:3-5).   "ADOC does not have a written procedure for tracking specific 'assistive device' incidents and the follow-up actions taken." *See* Pls. Ex. 2 (Runnels Report 9:16-17).   There is a dearth of knowledge within the ADOC's prisons regarding the provision of auxiliary aids and services to prisoners with disabilities.  There is "no evidence that ADA accommodations at reception and classification, such as qualified sign language interpreters and Video Remote Interpreting ("VRI"), were either regularly available or used (or used properly) by ADOC."   *See* Pls. Ex. 3 (Blanck Report 24:16-19).  ADOC's ADA expert agrees with Plaintiffs ADA expert Dr. Peter Blanck that there is no evidence of sign language interpreters or Video Remote Interpreting (VRI) devices available within ADOC. (*See* Runnels Report 13:20-22).

ADOC facility personnel make the same observations about their own institutions. Warden Jones testified that Bullock Correctional Facility has never provided "free world" sign

language interpreter for a prisoner who is deaf, nor would he even know how to go about requesting auxiliary aids and services. *See* Pls. Ex. 30 (K. Jones Dep. 53:1-4).  He further testified that he does not have the authority and does not know who does have the authority to grant a request by a prisoner attending a GED class for a sign language interpreter. *Id.* (K. Jones Dep. 63:18-23).  Warden Estes, the Warden at St. Clair Correctional Facility, is not aware of any ADOC policies regarding when a sign language interpreter should be provided. *See* Pls. Ex. 32 (Estes Dep. 21:6-9).   There are no Braille or large print versions of the inmate handbook available at St. Clair Correctional Facility. *See* Pls. Ex. 32 (Estes Dep. 75:7-12).  Warden Barrett testified during his deposition that a prisoner at Tutwiler Correctional Facility who is deaf has participated in a medical appointment without access to a sign language interpreter.  *See* Pls. Ex. 33 (Barrett Dep. 81:19-23, Feb. 29, 2016).  Throughout ADOC's facilities inmates are routinely denied access to auxiliary aids and services.

Failure to accommodate is not limited to just ADOC staff, no medical personnel working in ADOC facilities recall ever providing medical literature in alternate formats to inmates who are blind or have vision impairments.  *See e.g.* Pls. Ex. 36 (Darbouze Dep. 136:23 – 137:22); Pls. Ex. 39 (Duffell Dep. 269:6–11); Pls. Ex. 40 (Ergle Dep. 230:23 – 231:12); Pls. Ex. 34 (Gams Dep. 26:4 – 27:17); Pls. Ex. 37 (Odom Dep. 96:12 – 97:8); and Pls. Ex. 35 (Pavlakovic Dep. 164:4–11).

### E.  ADOC Has Created Discriminatory Eligibility Criteria for Programming and Services.

By failing to act in the numerous ways described herein, ADOC creates discriminatory eligibility criteria.   "[Because] ADOC does not effectively identify, monitor, and track systematically putative ADA sub-class members, it is not reasonably possible for ADOC staff to have the sufficient and necessary notice, information, and knowledge required to consider the

provision and granting of accommodations that support meaningful participation in ADOC programs, services, and activities."   *See* Pls. Ex. 3 (Blanck Report 19:10-14).   ADOC discriminates by having no basis from which to evaluate the extent and the needs of its population of prisoners with disabilities.   "ADOC's deficiencies unfairly, and in a discriminatory fashion, deny and limit putative ADA sub-class members comparable access to ADOC programs, services, and activities, and as offered to inmates without such conditions." *Id.* (Blanck Report 19:14-16).   Again, it is the absence of any policies at all that unfairly discriminates against prisoners with disabilities in ADOC custody, because effectively there are no criteria of any kind to apply to eligibility determinations.

"ADOC's centralized and institutional prison-level, policies, procedures, and practices are not effective in identifying and eliminating potential barriers to participation in programs, services, and activities for prisoners with mental and physical disabilities (for example, in programs and services in regard to substance abuse, education, and faith-based dormitory living), particularly in overcrowded and inaccessible conditions." *Id.* (Blanck Report 21:3-7).

## <u>Argument</u>

Federal Rule of Civil Procedure 23 "establishes the legal roadmap courts must follow when determining whether class certification is appropriate."   *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003).   Courts have broad discretion to decide matters of class certification so long as the court's reasoning falls within the parameters of Rule 23.   *Cooper v. Southern Co.*, 390 F.3d 695, 711 (11th Cir. 2004).   *Valley Drug Co.*, 350 F.3d at 1188 n.15 (noting that "the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied.") (citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147 (1982)).   Under Rule 23, class certification is appropriate

where one or more plaintiffs satisfy all four requirements of Rule 23(a), and at least one of the standards under Rule 23(b).  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250-51 (11th Cir. 2004) (citations omitted).  Rule 23(a) authorizes one or more plaintiffs to bring suit as representative parties on behalf of a class if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  Under Rule 23(b), a class action may be maintained where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  Because the movants meet all four of the requirements under Rule 23(a) and the requirements of Rule 23(b)(2), this class should be certified.

## I.   THE MOVANTS SATISFY THE PREREQUISITES FOR CLASS CERTIFICATION UNDER FED. R. CIV. P. 23(A)

The moving plaintiffs satisfy the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a).

### A. Numerosity: The Size of the Class Makes Joinder of All the Class Members Impracticable.

In order to satisfy numerosity, Federal Rule of Civil Procedure 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  Here, the proposed subclass consists of all people incarcerated by Alabama Department of Corrections who are now, or will in the future be, persons with disabilities as the term is used in the ADA. As this Court is aware, Plaintiffs have alleged that ADOC fails to adequately identify, track and accommodate people in

its custody with disabilities. Despite that, Plaintiffs can demonstrate that the subclass is numerous, and joinder of all members – current and future – would be impracticable.

This Court has held that "[i]n assessing impracticability, 'courts should take a common-sense approach which takes into account the objectives of judicial economy and access to the legal system.' This common-sense approach has led courts to certify classes in cases … which involve issues of common concern to inmates even when the potential class size is small and somewhat undefined." *Bradley v. Harrelson*, 151 F.R.D. 422, 426 (M.D. Ala. 1993) (quoting 1 Herbert B. Newberg, *Newberg On Class Actions* § 3.03 (2d Ed.1985). The impracticability of joinder is not dependent solely on the number of purported class members. Rather, "[pr]acticability of joinder depends on many factors, including … the size of the class [and] ease of identifying its numbers. *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (citations omitted). In *Kilgo*, as is the case here, the practicability of joinder was further reduced because the class included future members who could not yet be identified. Id.

In order to satisfy the numerosity requirement of Rule 23(a), "a plaintiff need not show the *precise* number of members in the class." *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983) (emphasis added). A class with 40 or more members raises a presumption that the numerosity requirement has been satisfied. *Newberg*, § 3.12 at 198 (5th ed. 2011). Indeed, the number forty has become a benchmark for determining numerosity: "[W]hile there is no fixed numerosity rule, generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." Cox v. Am. Cast Iron Pipe Co., 784 F.2d 1546, 1553 (11th Cir. 1986) (quotation omitted).  Where other factors are present, including the difficulty of identifying future members, lower numbers of demonstrated class members satisfy courts. See, e.g., *Kilgo*, 789 F.2d at 878 (affirming class certification where 31 members

28

were identified and the class included future and deterred job applicants who "cannot be identified"). Additionally, in cases where class-wide discrimination is alleged, courts have found that the numerosity requirement is "less significant." Evans, 696 F.2d at 930 (citing *Gurmankin v. Costanzo*, 626 F.2d 1132, 1134-35 (3d Cir. 1980).

Because ADOC fails to adequately identify, track and accommodate people in its custody with disabilities, ADOC's data significantly underestimates and under-identifies the number of people with disabilities in its custody. Despite that, Plaintiffs can still demonstrate numerosity, as significantly more than 40 people with disabilities are incarcerated in ADOC facilities, the subclass includes members who are not yet and cannot yet be identified (as prisoners may become disabled during the course of their incarceration), and the subclass members are geographically disparate and incarcerated in different facilities around the state.

In September 2014, ADOC identified over 70 people in its custody who were reliant on wheelchairs. Pls. Ex. 54 (Corizon Alabama Highest Acuity Reports, September 2014, March 2015). That same month, there were numerous other incarcerated people whose daily activities were limited by disabilities including blindness, hearing impairment or use of a cane. *Id*. In the most recent Highest Acuity Report available to Plaintiffs, the ADOC identified 100 people using wheelchairs, more than 20 who are hearing impaired, a dozen who are blind, and more than a dozen who use a prosthesis, resulting in a clearly identifiable population of proposed subclass members of well over 100. [4] Id.

Given the lack of accuracy of ADOC's figures, Plaintiffs also ask this Court to examine statewide data to estimate a more accurate figure of people with disabilities in the ADOC in

---

[4] Plaintiffs' calculations do not count individuals more than once. For example, if a person was identified in the Highest Acuity report as both in a wheelchair and hearing impaired, he or she was only counted in one category for purposes of this motion.

considering numerosity. There are approximately 25,000 people in ADOC custody.[5]  The state of Alabama leads the nation in the percentage of its adult population reporting some type of disability at 31.5 percent.[6]  Applying this rate to the population of the ADOC, would result in as nearly 8,000 incarcerated people with disabilities.  According to the Center for Disease Control and Prevention's determined rates of disabilities by state, the lowest rate of any state is 16.4 percent (Minnesota). *Id*. Even applying that lowest rate here still results in a population of more than 4,000 people with a disability incarcerated within the ADOC. A class of people with disabilities ranging in the thousands, whether 4,000 or 8,000, is certainly too numerous to make joinder of class members feasible.  In addition, ADOC's major facilities and work release centers span all three (3) federal jurisdictions of Alabama, thus the proposed ADA subclass is so geographically diverse that joinder of all members is impractical.   Because of the identifiable (albeit a low estimate) size of the proposed subclass, the inability to identify future subclass members and the geographic distance of subclass members, the numerosity requirement has been met.

### B.  Commonality: There Are Questions of Law and Fact Common to the Class.

To meet the commonality requirement of Rule 23(a), there must be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2). This requirement "does not require that all the question of law or fact raised by the dispute be common."  *Vega v. T-Mobile U.S.A., Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009) (citation omitted); *see also Access Now, Inc. v. Ambulatory*

---

[5]  *See*  http://www.doc.state.al.us/docs/MonthlyRpts/2016-01.pdf.   The most recent publicly available data is for January 2016. The Court may take judicial notice of this public record regarding ADOC's own count of its incarcerated population and which is available on ADOC's website pursuant to Fed. R. Evid. 201(b)(2).

[6] *See e.g.* The Center for Disease Control and Prevention's ("CDC") report, "Prevalence of Disability and Disability Types Among Adults, United States – 2013," published July 31, 2015, and available at: http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6429a2.htm?s_cid=mm6429a2_w#tab1. The Court may take judicial notice of this public record regarding a federal agency's census of disability prevalence in the United States and available on the CDC's website pursuant to Fed. R. Evid. 201(b)(2).

*Surgery Ctr. Group Ltd.*, 197 F.R.D. 522, 526 n.2 (S.D. Fla. 2000); *Bradley v. Harrelson*, 151 F.R.D. 422, 426 (M.D. Ala. 1993) (certifying a class of prisoners and reasoning that "[t]hough there certainly may be some factual differences between the individual class members…such individual differences do not defeat certification because there is no requirement that every class member be affected by the institutional practice or condition in the same way."); *Henderson v. Thomas*, 289 F.R.D. 506, 511 (2012) (declining to decertify a class due to factual differences between the disability discrimination alleged plaintiffs).

The commonality requirement does, however, require that plaintiffs "demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (citation omitted). In *Wal-mart*, the court explained that this inquiry is satisfied when plaintiffs' claims "depend on a common contention" that is "of such a nature that it is capable of classwide resolution." *Id.* For purposes of class certification, a class-wide proceeding must be able "to generate common answers apt to drive the resolution of the litigation." *Id.* There need only be "one issue whose resolution will affect all or a significant number of the putative class members." *Bussey v. Macon County Greyhound Park, Inc.*, 562 Fed.Appx. 782, 788 (11th Cir. 2014). Here, there are numerous common questions of law or fact that, when resolved, will affect all the putative members of the subclass.

The overarching question common to the entire proposed ADA subclass is whether the ADOC has violated the ADA by failing to create a system to accommodate prisoners with disabilities. ADOC has a minimal system for identifying individuals with disabilities. (Runnels Report 13:16-20) Pls. Ex. 30 (K. Jones Dep. 60:18-21) See Pls. Ex. 33 (Barrett Dep. 88:21-23 and 89:1-4) Pls Ex. 32 (Estes Dep. 54:2-12). It lacks any system whatsoever for tracking individuals with disabilities over time and transfers between institutions, resulting in repeated

failures to accommodate. Pls. Ex. 3 (Blanck Report 19:10-14; 49:7-9), Pls. Ex. 2 (Runnels Report 13:13-14; 15:2-7, 11-12, 19-21; 16:3-4).

Exacerbating the failure to adequately identify and track individuals with disabilities is the complete lack of any process for requesting an accommodation or grieving the denial of an ADA accommodation. (Runnels Report 16:1-4).   A procedure for "prompt and equitable resolution of complaints" regarding a failure to accommodate is required under the ADA implementing regulations.  28 C.F.R. § 35.107(b).  ADOC does not even claim to have an ADA grievance process at the vast majority of its facilities.[7] Pls. Ex. 4 (ADOC's Resp. to Pls. Interrogs. at 17).  Because a grievance process is a substantive requirement of the ADA that is designed to provide an avenue to obtain an accommodation, the failure to create a grievance system itself is a question common to the class as a whole the resolution of which would address the claims of most subclass members.  It is also a further demonstration of the more general question whether ADOC has failed to create a system to accommodate prisoners with disabilities.

Similarly, the ADOC is required to "designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities" under the ADA.   28 C.F.R. § 35.107(a). This coordinator's duties are to include the "investigation of any complaint communicated to [the ADOC] alleging its noncompliance with [the ADA]."  *Id.*  ADOC has not designated ADA Coordinators for the individual facilities or for the system as a whole.  ADOC claimed in April 2015 to have designated ADA Coordinators at several of its facilities.  Pls. Ex. 4 (ADOC's Resp. to Pls. Interrogs. at 15).  But, at their depositions, the ADA Coordinators testified that they did not know what if any responsibilities they had as ADA Coordinators or what the ADA covered.

---

[7] ADOC has a grievance process at Julia Tutwiler Correctional Facility and Hamilton Correctional Facility for the Aged and Infirm. (Runnels Report 16:1-6).

*See, e.g.*, Pls. Ex. 45 (Billups Dep. 18-19), Pls. Ex. 48 (Givens Dep. 39:1-23), Pls. Ex. 47 (Gilbert Dep. 54); s*ee also* (Runnels Report, 12:13-18).   In several cases, the purported ADA Coordinators testified that they had learned that they were the ADA Coordinators only when they were told they would be deposed. *See, e.g.,* Pls. Ex. 48 (Givens Dep. 35:12-37:30), Pls. Ex. 45 (Billups Dep. 28, 30). One of the ADA Coordinators is an ADOC employee whose office is outside the fence of the facility where he works, preventing prisoners with disabilities from bringing their concerns to him.   Pls. Ex. 45 (Billups Dep. 204-205).   Moreover, there is no employee coordinating the ADOC's efforts to comply with the ADA across facilities. Pls. Ex. 3 (Blanck Report 21:23-25), Pls. Ex. 25 (Dunn Dep. 273:12-22).   The designation of ADA Coordinators, like the creation of a grievance process, is a substantive requirement of the ADA that provides a mechanism for individuals with disabilities to obtain accommodations.   Whether the ADOC has failed to properly designate ADA coordinators is another question that, like the failure to have a grievance process, is itself a question that, when resolved, will affect most members of the subclass.   It also further supports the more general common question of whether ADOC has failed to create a system for accommodating prisoners with disabilities.

Additionally, there are many questions common to the members of the putative subclass regarding how the failure to create a system to accommodate individuals with disabilities results in the failure to accommodate them.   For example:

1. Whether ADOC has violated and continues to violate the ADA by failing to remove architectural barriers inhibiting the accessibility of its prisons for prisoners with disabilities;

2. Whether ADOC has violated and continues to violate the ADA by failing to make accommodations and modifications for prisoners with disabilities;

3. Whether ADOC has violated and continues to violate the ADA by failing to provide necessary auxiliary aids and services to prisoners with disabilities;

4. Whether ADOC has violated and continues to violate the ADA by applying discriminatory eligibility criteria for accessing programming.

Each of these questions has broad applicability to the Named Plaintiffs and the members of the subclass, as described below.

With regard to the failure to remove architectural barriers, almost none of ADOC's facilities comply with the ADA. Pls. Ex. 1 (2009 ADOC Annual Report); Pls. Ex. 25 (Dunn Dep. 272:10-23, 273:1-2).   Although there may be some housing units with accessible features, ADOC houses Named Plaintiffs and many prisoners with disabilities in locations that are not compliant with the ADA:

- Plaintiff Hagood, who uses a wheelchair, is housed in a dormitory that Defendant's expert identifies as having architectural barriers for persons in wheelchairs. Pls. Ex. 54 (Hilberry Report at 17-23).

- Former Plaintiff Copeland has been housed in the Staton infirmary while using a wheelchair. Pls Ex. 22 (Copeland Dep. 69:20-24. 76:19-24).

- The Staton infirmary does not have an accessible shower. Pls. Ex. 54 (Hilberry Report at 23-24).

- Dormitory A at Kilby has housed as many as 16 people in wheelchairs at a time. Pls Ex. 9 (Hagood Dep. 192:3-193:10).  The toilet and urinal area in Dormitory A lacks adequate space for the purportedly accessible toilets. Pls. Ex. 54 (Hilberry Report at 17-23).

- Plaintiff Hagood has been housed in the Kilby infirmary.  Pls. Ex. 9 (Hagood Dec. 72:13-15).   The Kilby infirmary also houses numerous people in wheelchairs.  Pls. Ex. 54 (Corizon Alabama Highest Acuity Reports, September 2014, March 2015).  The Kilby infirmary has a ramp that is too steep by the standards of the ADA.  Pls. Ex. 54 (Hilberry Report at 17-23).

- Plaintiff Sears has been housed at Ventress.   Plaintiff Sears has a mobility impairment due to scoliosis and walks with a cane.  He needs grab bars in the shower.  Pls. Ex. 18. (Sears Dep. 246:25-247:15) None of the dormitories at Ventress have rails in the showers. Pls. Ex. 54 (Hilberry Report at 24-25).  There was at least one other member of the putative subclass at Ventress while Plaintiff Sears was there, a man who used crutches and also would have benefitted from having grab bars in the shower.  Pls. Ex. 18 (Sears Dep. 246:25-247:15).

Whether the ADOC has failed to remove architectural barriers from the locations in which ADOC chooses to house Named Plaintiffs and members of the ADA subclass is a question common to a significant portion of the subclass.

With regard to the failure to make accommodations and modifications for prisoners with disabilities, ADOC has no clear system for prisoners to request accommodations. *See supra* § II.A.1. Prisoners sometimes attempt to make requests for accommodations on sick call or inmate request slips.  Prisoners do not know, however, whether this is the proper avenue for making such a request. *See supra* § II.C. The result is that members of the putative subclass do not receive appropriate accommodations and modifications required by the ADA. For example:

- Plaintiff Gilbert has a mobility impairment as a result of his right leg being shorter than the other.  Pls. Ex.  8  (C. Gilbert Dep. 27:22 - 28:5).  He uses a cane but has

difficulty standing for long periods of time. Prolonged standing causes severe pain in his hip that can be relieved by allowing him to sit down. Pls. Ex. 8(Gilbert Dep. 228:5-22, 230:6-13, 232:16-18).  He complained to staff about the pain caused from standing and made several requests to sit down while waiting in line for medication. Pls. Ex. 8 (Gilbert Dep. 228:23-229:23, 231:24-232:15).  Despite his requests, he did not receive a profile to relieve him from prolonged standing. He has been forced to stand in line for long periods of time on several occasions. Pls. Ex. 8 (Gilbert Dep. 231:24-232:15).

- Plaintiff Hagood has a mobility impairment due to the left side of his body being paralyzed.  He uses a manual wheelchair but has difficulty getting around because he is unable to use one side of his body to operate the wheelchair effectively. While at Kilby Correctional Facility, he requested an aid to assist moving him around the facility. Pls. Ex. 9(Hagood Dep. 159:3-24, 160:1-5). He was not provided with this accommodation nor an alternative. *Id*.  When transferred to Easterling Correctional Facility, he requested and received an aid for a short period of time. Pls. Ex. 9 (Hagood Dep. 159:18-22).  After his aid was housed in segregation and no longer able to assist him, he filled out a sick call slip to request another aid. Pls. Ex. 9 (Hagood Dep. 160:6-17, 161:1-8, 162:6-22). ADOC did not respond to his request. Pls. Ex. 9 (Hagood Dep. 162:6-17).

- Brandon Johnson has a cognitive impairment as a result of a traumatic brain injury that he suffered prior to incarceration. Pls. Ex. 12 (Johnson Dep. 38:8 – 45:24).  While incarcerated, he has received numerous disciplinary citations but does not know why. (Johnson Dep. 94:8-95:10).  ADOC requires him to sign

disciplinary forms without an accommodation for his disability. Pls. Ex. 12 (Johnson Dep. 95:11-17).

Whether the ADOC has failed to make accommodations and modifications for Named Plaintiffs and members of the putative ADA subclass is a question common to the putative subclass.

With regard to the failure to provide necessary auxiliary aids and services to prisoners with disabilities, ADOC does not provide sign-language interpreters or video Remote Interpreting (VRI) for persons with disabilities. Pls. Ex. 2 (Runnels Report 13:20-22), Pls. Ex. 30 (K. Jones Dep. 53:1-4, 63:18-23). These services are not only lacking for daily activities, but are not provided during situations where effective communication is critical and necessary. Pls. Ex. 3 (Blanck Report 47:3-5, Mar. 7, 2016). In addition to not providing sign-language interpreters, ADOC does not provide written materials in braille or large print. See Pls. Ex. 32 (Estes Dep. 75:7-12). These failures prohibit persons with hearing and vision impairments from effectively participating in ADOC programs and services. They also place prisoners with disabilities at risk of harm.

- Plaintiff Turner is a deaf individual who requires a sign-language interpreter to communicate. He has requested that a sign-language interpreter be provided for him during various programming provided by the ADOC. For example, he requested an interpreter for the pre-release program at Limestone Correctional Facility. Pls. Ex. 55 (Declaration of Donald Ray Turner, paragraphs 4-7). He was allowed to attend the program but no interpreter was provided. *Id.* Without a sign-language interpreter he did not understand critical information that was provided during the course. *Id.*

37

- Plaintiff Pearson is a deaf individual who requires hearing aids.  He requested a replacement hearing aid from ADOC repeatedly but was told by staff that they would "look into it."  Pls. Ex.  17 (Pearson Dep. 37:9-16, 59: 9-60:9, Nov. 13, 2015).   A year passed before ADOC responded to his request.  *Id*.   In the meantime, he was unable to hear fire alarms or verbal commands from correctional staff.  *Id*. (Pearson Dep. 18:9-11, 205:17-19).

- Plaintiff Tooley is deaf and requires a sign-language interpreter to communicate. Pls. Ex. 19 (Tooley Dep. 8:17 – 9:8, Apr. 29, 2015).  Without an interpreter he is unable to understand critical information about his health when receiving healthcare. *Id.* (Tooley Dep. 10:23 – 11:5).  On one occasion, he broke his bone but did not understand what the doctor was saying.  *Id.* (Tooley Dep. 18:3-11). On other occasions, he is forced to make ineffective attempts to read a nurse's lips when trying to understand information about his medication. *Id.* (Tooley Dep. 31:21-32:6).  If information is provided to him in writing, he often has questions and does not always understand. *Id.* (Tooley Dep. 8:19-21, 11:23-12:7). Plaintiff Tooley specifically requests an interpreter for healthcare appointments and emergencies. *Id.* (Tooley 9:2-8).

- Plaintiff Broyles is hearing impaired and requires hearing aids for both ears.  See He's repeatedly requested hearing aids from ADOC but experiences significant delays before either receiving new hearing aids or replacement batteries for his existing aids. Pls. Ex. 7 (Broyles Dep. 12:2-14:14, 15:12-22, Apr. 30, 2015). Without hearing aids he cannot hear officer commands nor communications from healthcare staff. *Id*.

- At Tutwiler, at least one putative class member who is deaf has been forced to participate in medical appointments with no access to a sign-language interpreter. *See* Pls. Ex. 33 (Barrett Dep. 81:19-23).

- Plaintiff Moore is blind and uses a sighted walking cane for mobility. Pls. Ex. 15 (Moore Dep. 6:1–21, 19:3-23, 27:4–24).   He's made several requests for assistance in learning to read braille but has not been provided with such an accommodation.   When talking to the warden about learning to read braille, he was informed that ADOC did not have braille materials for him to use. *Id.* (Moore Dep. 5:6-8, 141:7-142:1).

Whether the ADOC has failed to provide necessary auxiliary aids and services to Named Plaintiffs and members of the ADA subclass is a question common to the putative subclass.

With regard to the application of discriminatory eligibility criteria for accessing programming in violation of the ADA, ADOC routinely denies persons with disabilities access to educational and work programs. For example:

- Plaintiff Maner has a mobility impairment and is unable to stand for long periods of time and cannot lift heavy objects.   Due to his disability, ADOC would not provide him with working accommodations that would allow him to participate in the work-release program. Pls. Ex. 13 (Maner Dep. 47:22 – 50:5, 73:20 – 74:11).

- Plaintiff Pearson was denied access to several ADOC programs because he was deaf.   He attempted to get his GED but could not communicate with instructors or understand the materials without the hearing aids that he'd requested. Pls. Ex. 13 (Pearson Dep. 49:20-50:6). He applied for later applied for a body shop course

but was denied entry.  *Id*. He was told that he must complete the GED course in order to receive vocational training. *Id*.

- Plaintiff Turner requested to participate in ADOC's work release program but was denied because he was deaf. Pls. Ex. 21 (Turner Dep. 32:5 – 34:6 and 35:3 – 37:1, *see also* 48:1–15, Apr. 6, 2015).

- Plaintiff Moore requested several job assignments but was never assigned a job due to his blindness. Pls. Ex. 15 (Moore Dep. 42:8 – 44:13, 139:5-12).  He believes learning to read braille would allow him to work but has been denied such an accommodation by ADOC.  Pls. Ex. 13 (Moore Dep. 5:6-8, 141:7-142:1).

Whether the ADOC discriminates against the Named Plaintiffs and putative ADA subclass members with regard to its eligibility criteria for accessing programming is a question common to the putative subclass.

As described above, the situations of Named Plaintiffs and other proposed subclass members illustrate many of obstacles faced by persons with disabilities who are in the custody of the ADOC.  The Named Plaintiffs and the proposed ADA subclass live or will live in similar situations to the plaintiffs described above.  All of the Named Plaintiffs and proposed ADA subclass are in or will be in ADOC custody.   All would benefit from services and accommodations for which they are otherwise eligible, but they are either being denied those services entirely, or are not receiving all of the services and accommodations to which they are entitled.

Common questions of law and fact clearly pervade in this case.  The relevant facts and applicable substantive law are the same for all proposed ADA subclass members.  No subclass

members would need to offer additional proof on individual claims to obtain the relief he or she desires.  Further, the resolution of the Phase I ADA claims as a class action would have immense value to the proposed subclass members because, if the action is resolved in their favor, they would finally receive the services and accommodations they so desperately need, such as accessible medical care, accessible housing, and accessible programs.   Because there are questions of law and fact that are common to all the proposed ADA subclass members in this case, the commonality requirement of Rule 23(a)(2) is met.

### C. Typicality: The Claims of the Movants Are Representative of the Claims of the Proposed ADA Subclass.

To meet the typicality requirement of Rule 23(a), the claims of the Named Plaintiffs must be "typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "Typicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large."  *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1322 (11th Cir. 2008).  It is "somewhat of a low hurdle."  *Taylor v. Flagstar Bank*, FSB, 181 F.R.D. 509, 517 (M.D. Ala. 1998).  "The claim of a class representative is typical if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory."  *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009) (citation omitted).[8]

In the instant case, the Named Plaintiffs' claims are clearly representative of the putative subclass members' claims.   The situations of the Named Plaintiffs and the proposed ADA subclass members are factually similar.   All of them are prisoners with disabilities who are in or

---

[88] The commonality and typicality inquiries required by Rule 23(a) substantially overlap.  *Prado-Steiman v. Bush*, 221 F.3d 1266, 1278 (11th Cir. 2000); *Wal-Mart Stores, Inc., v. Dukes*, 131 S. Ct. 2541, 2552 n.5 (2011).  Commonality focuses on "the group characteristics of the class as a whole," whereas typicality focuses on "the individual characteristics of the Named Plaintiff in relation to the class."  *Prado-Steiman*, 221 F.3d at 1278.  Together, these elements "serve as guideposts for determining whether…maintenance of a class action is economical and whether the Named Plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Id.* (quoting *Falcon*, 457 U.S. at 157 n.13).

will be in ADOC custody.  All are eligible for services and accommodations under the ADA. The Plaintiffs, like the members of the ADA subclass, receive few of the services or accommodations for which they are eligible.  Like Plaintiffs Hagood and Sears, there are other members of the putative subclass who face architectural barriers which prevent them from fully accessing ADOC facilities.  ADOC's failure to remove these architectural barriers has created a systemic problem that touches prisoners throughout its facilities.  Like Plaintiff Hagood, there are approximately 99 other prisoners who use wheelchairs within ADOC. Pls. Ex. 54 (Corizon Alabama Highest Acuity Reports, September 2014, March 2015).  Many of these prisoners face the same architectural barriers as Plaintiff Hagood, making his claims typical of the subclass. Similarly, as evidenced by other Named Plaintiffs such as Plaintiffs Gilbert, Turner, Pearson, Tooley, and Moore, ADOC's failure to create a system to accommodate prisoners with disabilities results in repeated failures to respond to prisoners' disability-related requests.  These failures cause prisoners to go without necessary accommodations such as hearing aids, sign-language interpreters, alternatively formatted documents and simple accommodations such as being able to not stand for long periods of time.  A recent report shows more than 100 persons who are either hearing impaired, blind, or who use a prosthesis. Pls. Ex. 54 (Corizon Alabama Highest Acuity Reports, September 2014, March 2015).  Because ADOC has no system for tracking prisoners with disabilities, there are likely to be many more.  Without a system to accommodate such prisoners, they all face the same discrimination and injury as the Named Plaintiffs in this case.

As a result of being denied appropriate services and accommodations in whole or in part, the Named Plaintiffs and the proposed ADA subclass all have the same claims for same violations of federal law and seek the same injunctive relief.  Because the legal claims of the

Named Plaintiffs are identical to the proposed ADA subclass as a whole, the typicality requirement of Rule 23(a)(3) is met.

### D. Adequacy of Representation: The Movants Will Fairly and Adequately Represent the Interests of the Class.

Adequacy of representation requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).[9] "Adequate representation is usually presumed in the absence of contrary evidence." *Access Now*, 197 F.R.D. at 528. Despite this presumption, the adequacy of representation requirement encompasses two inquiries: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co.,* 350 F.3d at 1189 (citation omitted).

To fail under the first prong of the requirement, "the conflict must be more than merely speculative or hypothetical." *Henderson*, 289 F.R.D. at 512 (citation omitted). Furthermore, "the existence of minor conflicts alone will not defeat a party's claim to class certification." *Valley Drug Co.,* 350 F.3d at 1189. Rather, "the conflict must be a 'fundamental' one going to the specific issues in controversy. *Id.* Typically, no such conflict exists in the case of putative classes seeking injunctive relief "because there are no individual monetary damages sought." *Access Now*, 197 F.R.D. at 528. Instead, "the interests of the representative Plaintiffs do not actually or potentially conflict with those of the Class . . . [because] the named Plaintiffs have allegedly suffered the exact violations of the ADA as other members of the Class and their interests in injunctive enforcement of the ADA are identical." *Id.*,

---

[9] In prison cases, courts have found that "the prospect of future release from confinement is not a valid ground for denying class certification…[Rather] this very prospect supports class certification." *See e.g.*, *Stewart v. Winter*, 669 F.2d 328, 333-334 (5th Cir. 1982)

The second prong of the requirement looks to the "forthrightness and vigor" of the representatives. "[T]he subjective desire to vigorously prosecute the case is supplied by counsel." *Mack v. General Motors Acceptance Corp.*, 169 F.R.D. 671 (M.D. Ala. 1996) (Thompson, J.). In making that inquiry, it is appropriate to consider "whether plaintiffs' counselare qualified, experienced, and generally able to conduct the proposed litigation." *Griffin v. Carlin*, 755 F.2d 1516, 1532 (11th Cir. 1985) (citation omitted).

## 1.    The Movants' Interests Do Not Conflict with Those of the Proposed ADA Subclass.

The interests of the Named Plaintiffs do not conflict with the interests of members of the putative subclass. Indeed, the Named Plaintiffs suffered the exact same injuries as every other member of the putative subclass, namely being denied services and accommodations required under the ADA and remain at risk for further harms. Any measures to remedy the Named Plaintiffs' injuries will "provide substantially equal benefits and relief to all members of the class through increased accessibility and the coordinated removal of physical and communication barriers." *See Assoc. for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 464 (certifying a Fed. R. Civ. P. 23(b)(2) class of persons with disabilities as that term is defined by the ADA" in a case alleging accessibility violations at certain gas stations and convenience stores). The possibility that a conflict exists is further diminished since the Named Plaintiffs do not seek monetary damages, but solely injunctive relief that will equally serve the interests of the Named Plaintiffs and the class as a whole.  Because the Named Plaintiffs suffered injuries that are comparable to those suffered by the class and any relief that would serve the Named Plaintiffs would equally serve the class as a whole, no plausible conflict exists between the Named Plaintiffs and the putative class, much less a "fundamental" conflict that would prevent the Named Plaintiffs from fairly and adequately representing the interests of the class.

**2.    Plaintiffs Will Vigorously Prosecute This Action Through Qualified and Experienced Counsel.**

Plaintiffs' counsel are clearly qualified, experienced, and able to litigate this action.  The putative subclass is represented by attorneys from the Southern Poverty Law Center ("SPLC"), the Alabama Disabilities Advocacy Program ("ADAP"), and Baker, Donelson, Bearman, Caldwell & Berkowitz ("Baker Donelson").   Each firm and its attorneys have extensive experience representing Fed. R. Civ. P. 23(b)(2) classes and together have served as class counsel in many cases claiming violations of the ADA or on behalf of individuals who are incarcerated.

SPLC has a long history of representing Fed. R. Civ. P. 23(b)(2) classes in cases involving the protection of fundamental constitutional or federal statutory rights. SPLC has served as class counsel in dozens of other cases, including cases challenging violations of the ADA and cases brought by classes of people incarcerated in Alabama and throughout the South. *See, e.g.*, *P.B. v. Pastorek*, No. 2:10-cv-04049 (E.D. La. 2010) (two subclasses challenging failure to comply with ADA at charter schools); *Dockery v. Fischer*, No. 3:13-cv-326, 2015 WL 5737608 (S.D. Miss. Sept. 29, 2015). SPLC's Legal Director Rhonda Brownstein has represented classes in numerous class actions including *Bradley v. Haley*, No. 92-CV-70-N (M.D. Ala. 1992), *Gaddis v. Campbell*, No. 03-T-390-N (M.D. Ala. 2003), and *Baker v. Campbell,* Case Number: CV-03-1114-M (N.D. Ala. 2003) (class of chronically ill individuals incarcerated in Alabama), The lead counsel for SPLC, Maria V. Morris is a Senior Supervising Staff Attorney who has practiced for fourteen years. *See* Pls Ex. 51 (Decl. of Maria V. Morris). Ms. Morris has worked on numerous class action matters concerning the rights of incarcerated people. *See id.* at ¶ 7; *Armstrong v. Brown*, No. C 94-cv-2307-CW (N.D. Cal. 1994). In addition,

she has personally served as class counsel at the trial or appellate level in numerous class action lawsuits. *Id.* at ¶ 6.

ADAP is equally qualified to prosecute this action. J. Patrick Hackney, William Van Der Pol, Jr., and Glenn Baxter, are attorneys at ADAP. ADAP serves as the federally-funded protection and advocacy agency for persons with disabilities in the State of Alabama. *See* Pls. Ex. 52 (Decl. of J. Patrick Hackney). Mr. Hackney, ADAP's current legal director, represented plaintiffs in *Susan J. v. Riley*, Case No. 2:00-cv-918-F (M.D. Ala.), a case in which plaintiffs sought community-based Medicaid waiver services and enforcement of their due process rights with respect to said services. *Id.* at ¶ 6. Mr. Hackney also oversaw the monitoring of the settlement in *Aris v. Allen*, 1:05-cv-396-PWG (N.D. Ala.), which concerned ADA access issues at Hamilton Aged and Infirmed. *Id.* One hundred percent of Mr. Hackney's law practice is dedicated to protecting and advancing the federal constitutional and statutory rights of people with disabilities in Alabama. *See id.* The proposed class action is exactly the sort of case that ADAP attorneys have experience with and are qualified to handle.

Baker Donelson is one of the largest law firms in the Southeast with robust class action and pro bono practice areas. *See* Pls. Ex. 53 ¶ 7 (Decl. of William G. Somerville). Baker Donelson has served as primary class counsel in national, regional, and statewide lawsuits, including multi-jurisdictional lawsuits. *Id.* Baker Donelson's pro bono practice spans the southeastern United States and addresses areas including criminal and economic justice and civil and human rights for children and adults. *Id.* In addition, as one of the 64 largest law firms in the United States, Baker Donelson has technical, financial, and personnel resources to rely upon to prosecute this action on behalf of the class. *Id.* Mr. Somerville has worked on numerous complex

class action matters involving a variety of subject areas, including discrimination. *Id.* at ¶ 6. Mr. Somerville and his colleagues at Baker Donelson are extremely qualified.

## II.   THIS CASE QUALIFIES AS A CLASS ACTION UNDER FED. R. CIV. P. 23(B)(2) BECAUSE ADOC HAS ACTED OR REFUSED TO ACT ON GROUNDS GENERALLY APPLICABLE TO THE CLASS, MAKING FINAL INJUNCTIVE OR DECLARATORY RELIEF APPROPRIATE

In addition to meeting the requirements of Rule 23(a), as Plaintiffs have demonstrated above, Plaintiffs must show that the proposed subclass satisfies at least one subset of Federal Rule of Civil Procedure 23(b). Plaintiffs have done so, as Rule 23(b)(2) authorizes certification of a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." In continuously failing to afford prisoners with disabilities the access, accommodations and rights required by the ADA, Defendant ADOC has acted or refused to act in ways that apply to all proposed subclass members.

Rule 23(b)(2) does not require Plaintiffs to demonstrate that each individual subclass member has been harmed by ADOC's conduct. "It does require, however, that the conduct or lack of it which is subject to challenge be premised on a ground that is applicable to the entire class." *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975) (internal cite omitted). In the ADA context specifically, "[t]he requirements of Rule 23(b)(2) are met by the allegations of the Plaintiffs which describe ADA violations and discriminatory practices of the Defendants in which the named Plaintiffs and members of the Class allege that they have been and continue to be subjected." *Access Now, Inc. v. Ambulatory Surgery Ctr. Grp., Ltd.*, 197 F.R.D. 522, 529 (S.D. Fla. 2000). Such is the case here. As discussed above, the failures and practices at issue in this case are common to the entire class, and Plaintiffs have demonstrated commonality and

typicality. Additionally, a remedy that requires ADOC to comply with the ADA would apply and provide relief to the entire subclass.

In this matter, final injunctive relief would be appropriate for the entire proposed subclass of people with disabilities in ADOC custody, as required by Rule 23(b)(2). Injunctive relief is "designed specifically for civil rights cases seeking broad declaratory or injunctive relief for a numerous and often unascertainable or amorphous class of persons." H. Newberg & A. Conte, Newberg on Class Actions § 4.11 at 4-39 (3d ed. 1992). The requirements of Federal Rule of Civil Procedure 23(b)(2) are "almost automatically satisfied in actions primarily seeking injunctive relief." *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994) (citing *Weiss v. York Hosp.*, 745 F.2d 786, 811 (3d Cir. 1984)).

There exists a long history of class-wide discrimination claims brought under Rule 23(b)(2). Indeed, the Eleventh Circuit explained that Rule 23(b)(2) was "intended primarily to facilitate civil rights class actions, where the class representatives typically sought broad injunctive relief against discriminatory practices." *Holmes v. Cont'1 Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983) (quoting *Penson v. Terminal Transp. Co.*, 634 F.2d 989, 993 (5th Cir. 1981); *see also Wal-Mart*, 131 S. Ct. at 2557 (explaining that "'[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what [Rule 23](b)(2) is meant to capture.") (citation omitted). In *Henderson*, this Court specifically held that a class of prisoners alleging discrimination on the basis of disability in violation of the ADA "fits squarely within Rule 23(b)(2)'s history."  289 F.R.D. 506, 512 (M.D. Ala. 2012).

As discussed at length above, the ADOC has acted, has refused to act and has generally failed to meet the requirements of the ADA in such a way that has harmed and continues to harm the proposed subclass of people with disabilities in ADOC custody. These actions and inactions

48

are persistent and widespread. They include failing to provide accommodations for blind or hearing impaired prisoners, denying access to necessary areas of facilities for people who are wheelchair-bound, demonstrating an overall unwillingness to provide necessary education and training on the ADA to employees tasked with working with people with disabilities, failing to make necessary architectural changes, limiting access to programs for people with disabilities – indeed, the list of failures on the part of ADOC to comply with the ADA is long.

Further, the ADOC has demonstrated an inability to address its own failures to comply with the ADA, demonstrating the importance – indeed, the necessity – of class certification. The ADOC has failed to implement a federally required ADA grievance process or put in place effective ADA coordinators, both of which could help identify deficiencies in its operations related to people with disabilities. Because the ADOC has acted and refused to act in a manner generally applicable to the class, and because injunctive and declaratory relief is appropriate in this case, Plaintiffs have satisfied Fed. R. Civ. P. 23(b)(2).

## CONCLUSION

For the aforementioned reasons, plaintiffs satisfy all the requirements of Rule 23(a) and (b)(2).  Accordingly, plaintiffs respectfully request that this Court certify this case as a class action under Rule 23(b) and that plaintiffs not be required to give notice to absent class members.

Dated: April 23, 2016                      Respectfully Submitted,

                                           /s/ Maria V. Morris
                                           Maria V. Morris
                                           Attorney for Plaintiffs
                                           Southern Poverty Law Center

49

400 Washington Avenue
Montgomery, AL 36104

Rhonda Brownstein (ASB-3193-O64R)
Maria V. Morris (ASB-2198-R64M)
Ebony G. Howard (ASB-7247-O76H)
Latasha L. McCrary (ASB-1935-L75M)
Brooke Menschel (ASB-7675-Z61K)
Valentina Restrepo (ASB-7422-I67Z)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
rhonda.brownstein@splcenter.org
maria.morris@splcenter.org
ebony.howard@splcenter.org
latasha.mccrary@splcenter.org
brooke.menschel@splcenter.org
valentina.restrepo@splcenter.org

Miriam Haskell* (FL. Bar No. 069033)
SOUTHERN POVERTY LAW CENTER
P.O. Box 370037
Miami, FL 33137
Telephone: (786) 347-2056
Facsimile: (786) 237-2949
miriam.haskell@splcenter.org
*admitted pro hac vice

Eunice Cho* (GA. Bar No. 632669)
SOUTHERN POVERTY LAW CENTER
1989 College Avenue NE
Atlanta, GA 30317
Telephone: (404) 221-5842
Facsimile: (404) 221-5857
eunice.cho@splcenter.org
*admitted pro hac vice

William Van Der Pol, Jr. (ASB-2112-114F)
J. Patrick Hackney (ASB-6971-H51J)
Glenn N. Baxter (ASB-3825-A41G)
Alabama Disabilities Advocacy Program
Box 870395
Tuscaloosa, AL  35487
Telephone: (205) 348-4928

Facsimile: (205) 348-3909
wvanderpoljr@adap.ua.edu
jphackney@adap.ua.edu
gnbaxter@adap.ua.edu

William Glassell Somerville, III
Andrew Philip Walsh
Dennis Nabors
Patricia Clotfelter
Baker Donelson Bearman Caldwell & Berkowitz PC
420 20th Street North, Suite 1400
Birmingham, AL 35203
Telephone: (205) 250-8375
Facsimile: (205) 488-3775
wsomerville@bakerdonelson.com
awalsh@bakerdonelson.com
dnabors@bakerdonelson.com
pclotfelter@bakerdonelson.com

Gregory M. Zarzaur
Anil A. Mujumdar (ASB-2004-L65M)
Diandra S. Debrosse
Zarzaur Mujumdar & Debrosse
2332 2nd Avenue North
Birmingham, AL 35203
Telephone: (205) 983-7985
Facsimile: (888) 505-0523
gregory@zarzaur.com
anil@zarzaur.com
diandra@zarzaur.com

**ATTORNEYS FOR THE PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this 23rd day of April, 2016, served a copy

of the foregoing to all counsel of record by filing with the Court's CM/ECF electronic filing

system.

David R. Boyd, Esq.
John G. Smith, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, AL  36101

William Richard Lunsford, Esq.
Melissa K. Marler, Esq.
Stephen Rogers, Esq.
Matthew B. Reeves, Esq.
Maynard, Cooper & Gale, P.C.
655 Gallatin Street
Huntsville, AL  35801

Anne Hill, Esq.
Elizabeth Anne Sees, Esq.
Joseph Gordon Stewart, Jr., Esq.
Alabama Department of Corrections
Legal Division
301 South Ripley Street
Montgomery, AL  36130

Michael Leon Edwards, Esq.
Susan Nettles Han, Esq.
John Eric Getty, Esq.
Steven C. Corhern, Esq.
Balch & Bingham LLP
Post Office Box 306
Birmingham, AL  35201

Mitesh Shah, Esq.
Mitchell David Greggs, Esq.
Bryan A. Coleman, Esq.
Evan P. Moltz, Esq.
Maynard, Cooper & Gale, PC
1901 6th Avenue North, Suite 2400
Birmingham, AL  35203

Deana Johnson, Esq.
Brett T. Lane, Esq.
MHM Services, Inc.
1447 Peachtree Street, N.E.
Suite 500
Atlanta, GA  30309

/s/ Maria V. Morris
Counsel for the Plaintiffs

52