# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JOSHUA DUNN, et al.,                    )
                                        )
Plaintiffs,                             )
                                        )        Civil Action No.
v.                                      )
                                        )        2:14-cv-00601-WKW-TFM
JEFFERSON DUNN, in his official capacity as    )
Commissioner of the Alabama Department of      )
Corrections, et al.,                    )
                                        )
Defendants.                             )

**<u>REPORT OF DR. PETER BLANCK, Ph.D., J.D.</u>**

# TABLE OF CONTENTS

I.      Qualifications as an Expert                                    1

II.     Prior Testimony and Rates                                      6

III.    Assignment                                                     7

IV.     Methodology for Research and Analysis                          9

V.      Opinions                                                       15

VI.     Conclusion                                                     55

VII.    Appendix of Exhibits                                           57

        Exhibit 1       Curriculum Vitae of Peter Blanck, Ph.D., J.D.
        Exhibit 2       List of Case Materials

Report of Peter Blanck, Ph.D., J.D.

*I, Peter Blanck, hereby submit the following report pursuant to Federal Rule of Civil Procedure 26(A)(2).*

## I.      QUALIFICATIONS AS AN EXPERT

### A.      Background and Qualifications

I hold the rank of University Professor, which is the highest faculty rank granted at Syracuse University.[1] I am Chairman of the Burton Blatt Institute ("BBI") at Syracuse University, which advances the civic and economic participation of persons with disabilities worldwide.[2] A true and correct copy of my curriculum vitae is attached hereto as Exhibit 1.

I received a Juris Doctorate from Stanford University, where I was President of the *Stanford Law Review*, and a Ph.D. in Social Psychology from Harvard University. I have published books, chapters, and articles on the Americans with Disabilities Act as amended ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act" or "Section 504"), disability law, policy, and practice, and social science research methods, among other areas. My articles and books are published in peer-reviewed journals, law reviews and other scholarly venues. I teach disability, law, policy, and practice, including examination of the barriers and discrimination that persons with disabilities face as a result of organizational attitudes, policies, procedures, and practices. I have taught related graduate courses on social science research methods, and on psychology and law.

I have been invited to give lectures across the country and internationally, and before U.S. federal and state governmental agencies, on persons with physical and mental disabilities in such areas as ADA and Section 504 compliance (e.g., ADA/504 "Transition Plans"[3]), organizational culture and attitudes, reasonable accommodations, and related federal and state disability laws, policies and practices. My treatise and casebooks on disability policy and law are used in classes at law schools across the United States.[4]

I have received millions of dollars in grants from federal agencies, including the U.S. Departments of Education, Labor, Veterans Affairs, and Health & Human Services, the National Council on Disability, and from foundations such as the Annenberg Washington Program, to examine barriers in society facing adults and children with disabilities. I have conducted and participated in dozens of empirical studies on disability law, policy, and practice; for instance, on ADA reasonable accommodations, organizational culture, and best practices for engagement with persons with disabilities in the public and private sectors.[5] My colleagues and I–including researchers at the Job Accommodation Network (JAN)[6]–have conducted quantitative and qualitative studies of Rehabilitation Act and ADA reasonable accommodations and the associated "interactive process" (e.g., meaningful dialogue among the relevant parties).[7] In a series of studies, we examined the accommodation needs, requests, and provision for thousands of people with disabilities in the public and private sectors.[8] The studies demonstrate that many organizations effectively accommodate individuals with physical and mental disabilities, using a variety of accommodation strategies and options, in ways that do not unduly interfere with the programs offered by such organizations or create undue burdens.

My research and teaching examines disability laws, policies, and practices using quantitative and qualitative methods, and evaluation of institutional practices in the identification, assessment, and accommodation of persons across a spectrum of physical, cognitive, mental health, intellectual, and psychiatric disabilities. My research has been conducted in the public and private sectors, and it has examined organizational culture, and policies and practices as related to access to daily living, health care, emergency management, employment, and social programs and services for persons with disabilities.[9]

I also study the damaging effects of discrimination towards persons with physical and mental disabilities. I examine organizational policies (e.g., goal statements), procedures (e.g.,

standards), training (e.g., protocols, guidelines, and manuals), and best practices (e.g., process and substantive outcome measures) that lessen the negative effects of discrimination and bias when public and private organizations offer services, programs, and activities to persons with disabilities.[10] My colleagues and I have examined the accessibility of programs and services offered by public and private entities to persons with disabilities.[11] The findings show that unfounded stereotypes about persons with disabilities often involve unwarranted attitudes about the cost and disruption of accommodations to programs and services.

I have testified before Congress, the Equal Employment Opportunity Commission ("EEOC"), state legislatures and other administrative bodies on disability policy and practice. I have been a Senior Fellow of the Annenberg Washington Program and a member of the President's Committee on Employment of Persons with Disabilities. I am a board member of the Saks Institute for Mental Health Law, Policy, and Ethics, which is a non-profit think tank focused on issues of mental health. I have served as chair of the American Psychological Association's Committee on Standards in Research, and I am a past President of the American Association on Mental Retardation's Legal Process and Advocacy Division. I have been a Commissioner on the American Bar Association's Commission on Mental and Physical Disability Law.

I serve on the editorial boards of leading peer-reviewed scientific journals and as a referee for manuscripts submitted to peer-reviewed scientific journals. I am co-editor of the *Disability Law and Policy* book series published by Cambridge University Press. In these roles, I regularly evaluate the research methods and substantive content of manuscript submissions in the areas of disability research, policy, and practice.[12]

With particular relevance to issues raised in the present matter, from 1995 to 2001, I was appointed as Facilitator by the U.S. District Court of Wyoming, the Honorable Alan B. Johnson

presiding, in the settlement of the class action case *Chris S. et al. v. Jim Geringer et al.*, 2:94-CV-00311-ABJ (D.Wyo. Dec. 29, 1994). As the court officer in this case, I monitored and analyzed the implementation of state and community services and supports for persons with serious and persistent mental illness, and related conditions, to ensure their administration in a manner consistent with the principles of the ADA and related laws. I toured and inspected state facilities and interviewed individuals receiving state services and programs, for instance, individuals housed at forensic units at the Wyoming State Hospital.[13]

In addition, from 1991 to 1996, I was appointed by the U.S. District Court of Wyoming (Judge Alan B. Johnson presiding) as Chairman of the Quality Assurance Committee, and subsequently as a member of the Compliance Advisory Board, in the settlement of the class action case *Weston v. Wyoming State Training School*, 2:90-CV-0004 (D.Wyo. Apr. 27, 1994). In that capacity, I reported to the U.S. District Court on issues facing persons with cognitive and other disabilities in the state provision of services and supports. My reports were based on facility tours, interviews with persons served by the state, and review of state policies, funding sources, procedures, and practices in accordance with the ADA and the Rehabilitation Act requirements, and related laws.[14] I reviewed the implementation of state services and programs to ensure the prevention of discrimination against individuals with disabilities.

In addition to my responsibilities to the U.S. District Court of Wyoming, in 1995, I served as an expert witness for plaintiffs in what was, at that time, among the first ADA class action cases to consider programs and services for juveniles with disabilities incarcerated at state facilities. In that case, *Alexander S. By and Through Bowers v. Boyd*, 876 F.Supp. 773 (1995), the U.S. District Court for the Columbia Division in South Carolina, Honorable Joseph F. Anderson, Jr. presiding, found that conditions of confinement, such as overcrowding, at four

correctional institutions operated by the South Carolina Department of Juvenile Justice deprived plaintiffs of their rights under the ADA and the Rehabilitation Act.

In *Alexander S.*, Defendant South Carolina was found to have housed more juveniles than the facilities were designed to hold. The state consented to an order to alleviate overcrowding and address appropriate staffing levels, and entered into a settlement agreement with the parties to remediate the conditions at the juvenile correctional institutions. In the course of preparing my expert report in *Alexander S.*, I conducted a review of the state's policies, procedures, and practices in the correctional institutions. I also conducted site inspections and interviews with inmates, staff, guards, and state officials. I reviewed operations at the reception and evaluation units, and at the long-term institutions. This included review of the accessibility of the physical plant and of the programs provided at the campuses, such as in classification and placement, cafeteria and food service, educational, medical and dental, and administrative facilities.

My review in *Alexander S.* considered the disciplinary system, which was to control violence and inappropriate behavior, maintain safety and security, and serve as a training tool for correcting behavior.[15] The plaintiffs successfully challenged the state system of discipline, which depended on the use of lock-up units, segregation, and tear gas to punish juveniles for disciplinary infractions, as well the conditions of the lock-up cells and the duration of stay in lock-up facilities.[16] The U.S. District Court found that there was a disproportionately high number of juveniles at the state facilities with disabilities.[17]

In 2015, I was honored to receive the National Distinguished Disability Service Award from NARRTC (formerly known as the National Association of Rehabilitation Research and Training Centers). NARRTC promotes the full inclusion of persons with disabilities in American society through applied research and training. The NARRTC award is given to individuals who have made contributions to the field of disability through research, teaching, service, and

advocacy.[18] It is given for sustained contributions and an accumulation of life-time achievements, and is the highest recognition conferred by NARRTC.

## II.     PRIOR TESTIMONY AND RATES

I have been qualified, and in deposition and trial have testified, in federal and state court proceedings as an expert on the implementation of the ADA and the Rehabilitation Act, as well as on disability programs and services, policies, procedures and practices as offered by public and private entities. In the last four years, I have testified as an expert in trial in *Ross and Ross v. Hatch* (Newport News Circuit Court, Virginia, 2013) (guardianship proceeding involving an individual with cognitive disability), and in *Brooklyn Center for Independence of the Disabled et al. v. Bloomberg* (SD NY, 2013) (emergency preparation for persons with physical and mental disabilities, and in deposition).

I have been deposed as an expert witness in 2012 in *Rivas-Parker v. Attractions Hawaii* (Dist. HI) (organizational policies and procedures in regard to ADA access for a blind individual), in 2014 in *D'Lil v. Riverboat Delta King, Inc.* (ED CA) (organizational policies and procedures in regard to ADA access for individual who used a wheelchair), and in 2014 in *McConnell et al. v. Donahoe et al.* (EEOC) (organizational policies and procedures in regard to ADA accommodations for individuals with disabilities).

My fee in this matter is $350 per hour. I charge for transportation and out-of-pocket expenses.

## III.   ASSIGNMENT

### A.   Overview

I am retained by plaintiffs' counsel in this matter to review and evaluate the circumstances surrounding the putative ADA sub-class's experiences and alleged claims against the defendant, and to provide related expert opinions.[19] I was asked to examine materials pertaining to plaintiffs' allegations of disability[20] discrimination in violation of the ADA and the Rehabilitation Act.[21] As described below, my understanding of the dispute is based on court filings and materials made available to me to date, as well as on my independent review of relevant research and publicly available materials.

As I understand the claims alleged, the putative ADA sub-class claims that they have experienced and continue to experience system-wide and programmatic barriers to addressing their needs as individuals with disabilities[22] in the services, programs, and activities[23] offered by defendant Alabama Department of Corrections ("ADOC").[24] ADOC is the administrative department of the state of Alabama responsible for overseeing and exercising control over corrections institutions in the state of Alabama.[25] Persons in the custody of ADOC are housed in fifteen (15) major correctional facilities and thirteen (13) work camps or work release centers.[26]

The putative ADA sub-class alleges that ADOC's service and program failures have made them, and continue to make them, uniquely vulnerable to the effects of incarceration on the basis of their disabilities, particularly as relative to the general prison population.[27] Putative ADA sub-class plaintiffs are incarcerated in Alabama ADOC prisons.[28] They bring this case to remedy ADOC's alleged failure to provide nondiscriminatory and accessible programs and services on the basis of disability, in accordance with the requirements of the ADA and Section 504; for example, "the affirmative obligation to make benefits, services, and programs accessible to disabled people."[29]

Based on my research, writings, and experience, as Alabama State prisoners, the putative ADA sub-class members satisfy the ADA and Section 504 eligibility requirements for the receipt of programs and services provided by the public entity ADOC.[30] Plaintiffs allege ADOC's deficiencies in facilities, programs, and services is discriminatory on the basis of disability. They allege that throughout the ADOC system they receive inadequate and inferior services and programs that, among other consequences, subject them as prisoners with disabilities to unnecessary exclusion from participation and the denial of (or relegation to inferior) programs, services, and activities as offered to the general prison population.[31] Putative ADA sub-class members allege that this results in a substantial risk to them of serious harm, unnecessary pain, loss of function, injury and death.[32] The putative ADA sub-class alleges that overcrowding,[33] insufficient staffing levels, and deficiencies in staff training in ADOC facilities exacerbate these failures on the basis of their disabilities.

### B.     Nature of Expert Opinions

Based on my understanding and review of the circumstances and materials presented to me (including interviews and site inspections), my prior research, writings, and experience, and relevant social science with which I am familiar and have reviewed, I was asked to provide expert opinions as to the following central topics.

1.     ADA/504 Transition Plan and ADA Coordinators.

2.     Identification, Classification, and Monitoring of Inmates with Disabilities.

3.     Accommodation Requests and Provision for Inmates with Disabilities.

4.     ADOC Staff Training on the ADA and Section 504.

5.     Effective Communication with Inmates with Disabilities.

6.     Access for Inmates with Disabilities to Programs and Services Offered in

ADOC's Prisons.

## IV.   METHODOLOGY FOR RESEARCH AND ANALYSIS

### A.   <u>Methodology</u>

To address the issues identified above, and to develop the bases for my opinions, my research methods included: (1) review of case documents as identified in Exhibit 2 to this report; (2) review of ADOC Administrative Regulations ("ARs") relevant to inmates with disabilities; (3) review of correctional accreditation standards relevant to inmates with disabilities; (4) conducting site inspections of ADOC prison facilities, with onsite interviews and observations; and, (5) review of publicly available media and reports, as well as social science literature on inmates with disabilities.

#### 1.   Review of Case Documents

With regard to case documents, I reviewed deposition testimony, pleading and motions, court orders, inmate prison jackets and medical records, discovery responses from ADOC, documents produced by ADOC, Corizon monthly reports, Corizon High Acuity Reports, MHM monthly reports, Corizon audits, MHM audits, ADOC contract with Corizon, ADOC contract with MHM, and Hamilton A&I ADA Grievances and Logs. These documents allowed me to make a compressive review of ADOC's policies, procedures, and practices as relevant to inmates with disabilities.

As part of my case file review I examined monthly reports by Corizon and MHM to ADOC during the period of January 2012 to October 2014 (see Exhibit 2).[34] I reviewed ADOC's Office of Health Services Division ("OHS"), Manual of Policies and Procedures, which contains administrative regulations as approved by Ruth A. Naglich, Associate Commissioner ADOC, on January 20, 2012.[35]

Report of Peter Blanck, Ph.D., J.D.

I also have examined the "Prison Jacket" files and medical records for the putative ADA sub-class representatives to corroborate the bases for my analysis (see Exhibit 2). I further requested a random sampling of twenty-five inmate Prison Jacket files and medical records for ADOC inmates with a range of mental and physical disabilities as part of my review and analyses.[36] These twenty-five male and female inmates are, or have been, noted on Corizon's Alabama Monthly Highest Acuity Report and accompanying listings.[37]

This selection of twenty-five ADOC inmates was chosen randomly from the Monthly High Acuity Listings pursuant to my *a priori* sampling methodology.[38] The parameters of that method were as follows: (1) select inmates with co-existing physical disabilities, such as individuals who are deaf, blind, wheelchair users, and have prosthetic limbs (i.e., to examine potential individuals with significant ADA impairments); (2) select inmates without primary and significant medical issues and impairments coexisting with ADA disabilities (i.e., to examine inmates representative of the putative ADA subclass, but who do not have predominant medical conditions alone); (3) select these inmates from different ADOC prison facilities and with varying security classifications; and (4) select the cases primarily from the high proportion of male inmates and from the smaller proportion of female inmates.[39]

## 2.  Review of ADOC Administrative Regulations

I considered that ADOC uses various methods of administration set forth in Administrative Regulations ("AR") and operational manuals comprised of written policies and procedures for the system-wide implementation and monitoring of prison programs and services.[40] These statewide, institutional policies and procedures apply to all inmates in ADOC custody with a disability, who have a record of a disability, and who are regarded as having a disability. My review of these administrative regulations allowed me to understand whether

ADOC has in place sufficient policies, procedures, and practices relating to inmates with disabilities.

### 3.  Review of Correctional Accreditation Standards

There are well-recognized organizations engaging in the accreditation of prisons nationally. I reviewed the National Commission on Correctional Health Care ("NCCHC") accreditation standards, as such policies reflect ADOC's position as to operations, and programs and services offered to inmates with disabilities.[41] Particular procedures are instructive for benchmarking the sequence of acceptable ways in which ADOC's policies are to be implemented.[42] These standards establish well-accepted policies and procedures, which should be reflected in ADOC's regulations, procedures and practices.[43] Professional standards organizations, such as the American Correctional Association ("ACA") and the NCCHC, which ADOC recognizes,[44] promulgate compliance and best practice standards against which a state correctional entity such as ADOC should assess its policies, procedures, and practices over time. When an entity like ADOC measures its operations, practices, and activities by professional compliance standards, it typically engages in a certification or accreditation process.[45]

### 4.  Conduct Site Inspections of ADOC Prisons

To further corroborate the bases for my analysis and opinions, I conducted site inspections and interviews with putative ADA sub-class members in ADOC facilities. The guidelines for my observations and interviews during the prison site inspections were informed by relevant research, policy and training materials,[46] and nationally recognized prison standards and inspection programs.[47] The general approach for my prison site visits and interviews were derived from correctional inspection and compliance procedures, such as those promulgated by the ACA and the U.S. Department of Justice National Institute of Corrections ("NIC"). The NIC provides that site inspections should involve a combination of methods and procedures, such as

in-person interviews, review of records and policies. This guidance was used in the development my procedures for conducting the site inspections.[48]

For purposes of the development of my opinions, through observations and interviews, I conducted site inspections at the following ADOC facilities:

A.  *Close Security Facilities*

1.  Kilby (Mt. Meigs, AL): visited July 30, 2015.[49]

2.  Donaldson (Bessemer, AL): visited May 14, 2015.

3.  St. Clair (Springville, AL): visited November 9, 2015.

4.  Tutwiler (women's prison, Wetumpka, AL): visited January 26, 2016.

B.  *Medium Security Facilities*

1.  Hamilton Aged and Infirmed ("A&I") (Hamilton, AL): visited May 13, 2015.

2.  Bullock (co-located with Bullock Mental Health Facility, Union Springs, AL): visited September 29, 2015.[50]

3.  Easterling (Clio, AL): visited September 28, 2015.

4.  Ventress (Clayton, AL): visited February 4, 2016.[51]

These facilities were chosen for my site inspection for the following reasons:

1.  I visited the two ADOC facilities that perform the intake functions (Kilby Correctional Facility[52] and Tutwiler Prison for Women).

2.  Each facility visited was thought to house members of the putative ADA sub-class with a range of disabilities.[53]

3.  Each facility visited was designated by ADOC to provide programs and services for inmates with disabilities (e.g., mental

health services at Bullock, Donaldson, and Tutwiler, aging and infirm services at Hamilton and Tutwiler, dialysis services at St. Clair as well as emergency planning services, rehabilitation and vocational programs, and on-going treatment, substance abuse, Therapeutic Community, and Crime Bill programs at Ventress).

4.    Close (Maximum/High Security) and Medium Security Facilities were visited,[54] noting that Medium custody level prisons house approximately half of the inmate population (51% as of December 2014).[55]

5.    Each facility visited, possibly with the exception of aspects of Hamilton A&I, has been alleged to contain architectural and programmatic barriers for prisoners with mobility impairments.

6.    The facilities that I inspected included men's and women's ADOC prison facilities, are representative of the program and service needs of the putative ADA sub-class, and ranged in size from large to small facilities.[56]

7.    Together, the ADOC prison facilities that I inspected comprise eight of the fifteen (53%) ADOC prison facilities for purposes of the ADA sub-class review, which for the reasons identified above reflect a robust sampling base for purposes of this Report.[57]

I find that these site inspections and the corresponding interviews and observations constitute a representative sampling of housing units, programs and services, and prisoners with disabilities. I was allowed to select and interview ten prisoners at each of the facilities visited.[58]

### 5.     Review Relevant Media, Reports, and Social Science Literature

The additional materials that I have examined for my review in this matter include peer-reviewed scientific journals, government reports, media, ADA title II and U.S. DOJ regulations, guidance materials, white papers, and edited volumes and books of the highest scholarly caliber. In addition, I reviewed relevant information derived from national disability and health surveys, such as from the National Health Interview Survey, United States, 2010.[59]

For example, according to the National Academy of Sciences 2014 Report, *The Growth of INCARCERATION in the United States*, the disabling conditions that I examined for purposes of this report "constitute a growing percentage of correctional health care needs as the result of a confluence of trends, especially the increase in chronic disease among younger Americans and the aging of the correctional population."[60] The National Academy finds that:

> Prisoners with disabilities also tend to be overlooked. Disabilities that are relatively minor in society at large can constitute serious impediments to well-being in prison. Living in correctional facilities entails activities of daily living (ADLs) that pose particular challenges to people with physical or developmental disabilities. For instance, regular ADLs include bathing and dressing, but ADLs in prison also can involve getting on and off an upper bunk, dropping to the floor for alarms, and hearing and promptly following orders against extensive background noise.[61]

### B.     Summary of Methodology and Corresponding Analysis

My review techniques, along with the other well-recognized research methods that I have employed in my analyses, strengthen my ability to consider plausible rival hypotheses for the outcomes I find (e.g., other than differences based on disability). My approach reduces potential inmate case selection bias ("cherry-picking" of non-representative general prison case files to compare to the sample of putative ADA sub-class members), and it increases the generality or "external validity" of my findings as applied to the circumstances in this matter.[62]

My research methods and sampling techniques strengthen my confidence to assess relevant, generalizable, and valid information on putative ADA sub-class representatives, and as

compared to those individuals from the general prison population. I examined putative ADA sub-class members with consideration of their particular: (a) mobility impairments,[63] (b) deaf and hard of hearing impairments,[64] (c) blind and low vision impairments, (d) psycho-social, mental health conditions, (e) cognitive disabilities (e.g., developmental, intellectual, learning, and print disabilities, traumatic brain injury (TBI), and Post-Traumatic Stress Disorder (PTSD)),[65] and (f) serious diseases and illnesses (e.g., diabetes, hepatitis, high blood pressure, and cancer).[66] I consider issues of co-morbidity and co-occurrence among these conditions and disabilities, which has been shown to raise additional health care and programmatic considerations.[67]

In summary, my assignment involved a comprehensive, system-wide review and assessment. It included the review of thousands of pages of documents, empirical research and reports, site inspections and observations, case file reviews, and interviews with putative ADA sub-class members. My opinions are based on my education, writings, and professional experiences, and on social science and relevant research findings of the highest scholarly caliber. My evaluation of ADOC's policies, procedures, practices, and institutional structure and operations as they impact the putative ADA sub-class uses well-accepted evaluation and social science research techniques. My review employs information from multiple sources to corroborate my opinions as to whether ADOC's policies, procedures, and practices comport with the ADA and Section 504. The body of evidence that I have used provides a sound basis for reaching my opinions in this matter.

## V.   OPINIONS

### A.   Introduction

The ADOC Annual Report for Fiscal Year 2014 provides as its statewide mission to "confine, manage, and provide rehabilitative programs for convicted felons in a safe, secure, and humane environment, utilizing professionals who are committed to public safety and to the

positive re-entry of offenders into society."[68] The putative ADA sub-class are subjected to this mission statement, as are all ADOC inmates. As "qualified" beneficiaries of the ADOC system,[69] the putative ADA sub-class may not receive or be subjected to inadequate and inferior services and programs on the basis of their disabilities, or behaviors resulting from their disabilities, to unnecessary exclusion from participation in, or the denial of (or relegation to inferior), confinement and rehabilitation programs, services, and activities as offered to the general prison population.[70] My findings herein show that many putative ADA sub-class members would be "qualified" and eligible to participate in ADOC programs, services, and activities with the provision of reasonable accommodation and appropriately modified policies, procedures, and practices, as subject to legitimate concerns regarding inmate security and safety. For example, putative ADA sub-class members are entitled to appropriate reasonable accommodations and an effective ADA grievance process, effective emergency evacuation, accessible toileting facilities, and effective communication of informational materials, as provided to all ADOC inmates.[71]

Likewise, the National Academy of Sciences, in its 2014 Report, *The Growth of INCARCERATION in the United States*, set forth principles with regard to the use of incarceration in the United States, which have relevance to issues facing ADOC prisoners with disabilities.[72] Among these principles are the values of "proportionality" and "parsimony;" that is, conditions and consequences of imprisonment "that are more severe than is required to achieve valid and applicable purposes is to that extent morally unjustifiable [and] excessive."[73] The National Academy of Sciences finds that "the conditions and consequences of imprisonment should not be so severe or lasting as to violate one's fundamental status as a member of society."[74] Thus:

> The principle of citizenship suggests a rigorous review of the conditions of confinement and of the legal disabilities and restrictions imposed on those who have been incarcerated. In particular, policies and practices that result in long periods of administrative segregation from the general population, deprivation of

> meaningful human contact, overcrowding, and unnecessarily high levels of
> custody all require rigorous review. … Conditions of confinement should be
> reviewed with the objective of increasing prisoners' chances of reentering society
> with social relationships intact and better prepared to make a positive, productive
> transition. Review of these conditions and the policies that regulate them is
> compelling because, with rare exceptions, all those incarcerated in the nation's
> prisons and jails will be released to return to their communities.[75]

The National Academy of Sciences' principle of "social justice" provides that "prisons should be instruments of justice" and promote, not undermine, the "fair distribution of rights, resources, and opportunities."[76] Justice requires meaningful *opportunities* for equivalent program participation by the incarcerated, and not disparate, inferior, and segregated treatment on the basis of disability.[77] The ADA and the Rehabilitation Act incorporate these principles into their statutory schemes.[78]

The putative ADA sub-class is at increased risk for inadequate rehabilitation and safety while incarcerated.[79] Research shows that inmates with disabilities have higher rates of injuries from violence and unintentional causes as compared to the general population of inmates without disabilities.[80] Inmates with comorbid mental health conditions, and psycho-social and cognitive impairments are at a higher risk of being victims of and displaying more violent behaviors relative to inmates without such disabilities.[81] Prior research shows that incarceration is generally associated with greater and deteriorating health conditions.[82]

For these and other reasons, the absence of timely and effective reasonable accommodations (as well as the provision of effective communications and physical accessibility) significantly increases the likelihood of present and future injury and illness facing prisoners with disabilities.[83] Absent reasonable accommodations, inmates with disabilities are less able to engage meaningfully in prison programs, services, and activities as offered to the general population, and they are more vulnerable to present and future injury, illness, misunderstanding, and exploitation by other prisoners and correctional staff. Additionally, the

absence of reasonable accommodations for putative ADA sub-class members with disabilities (e.g., in educational, vocational, and work release programs), is reasonably expected to be associated with increased levels of recidivism. Research supports this conclusion, showing the association between effective accommodations and subsequent academic success of individuals with disabilities.[84] My findings are in accord with others that have been documented in the correctional setting:

> given that Section 504 and Title II require *all* entities that provide public services to act affirmatively to ensure that disabled individuals have meaningful access, prisons seemingly have even more responsibility in this regard, because inmates necessarily rely totally upon corrections departments for all of their needs while in custody and do not have the freedom to obtain such services (or the accommodations that permit them to access those services) elsewhere.[85]

The provision of ADA accommodations by public entities, such as ADOC, may derive from a verbal or written request for an accommodation by an inmate with an ADA-related disability or by that inmate's actions. ADOC's knowledge of a qualified individual's need for an accommodation may be reasonably evident, such that ADOC is on notice of that individual's eligibility to participate equally in benefits, services, and activities offered by the public entity. Thus, the need for an accommodation may be evident to ADOC even though the inmate with the disability does not expressly request an accommodation and does not consider him or herself to be a person with an ADA protected impairment.[86]

Other disabilities may be non-obvious, such a cognitive disability, an intellectual or mental health disability, a traumatic brain injury, or situations in which inmates cannot effectively read, write, and understand informational documents, may require as an accommodation the information to be presented in simpler or alternative formats. In these instances, in the absence of adequate assessment, monitoring, and training, ADOC staff are not able to effectively determine and manage the need for and provision of reasonable accommodations for putative ADA sub-class members.[87]

Thus, in some instances, ADOC is on notice that putative ADA sub-class members require accommodations because it knows (or reasonably should know) that these impairments are apparent and significant, or because the inmate has requested an accommodation.[88] Nonetheless, best practice would not require that an inmate request a specific and particular type of accommodation when the need is explicit or apparent. That is why, the ADA and best practice requires an "interactive process" or meaningful discussion among ADOC staff and the inmate to identify the reasonable accommodation to be provided. This approach is to ensure that putative ADA sub-class members receive the benefits and services as afforded by ADOC to inmates without disabilities.[89]

However, because I find that ADOC does not effectively identify, monitor, and track systematically putative ADA sub-class members, it is not reasonably possible for ADOC staff to have the sufficient and necessary notice, information, and knowledge required to consider the provision and granting of accommodations that support meaningful participation in ADOC programs, services, and activities. For this and other reasons, ADOC's deficiencies unfairly, and in a discriminatory fashion, deny and limit putative ADA sub-class members comparable access to ADOC programs, services, and activities, and as offered to inmates without such conditions.[90]

In my experience, it is also not necessarily the case that the provision of certain reasonable accommodations (e.g., assistive devices and tapping canes for the blind) to inmates with disabilities create safety threats because they may be used as weapons. The provision of such accommodations and assistive devices remain subject to proper use, and appropriate behavior and standards, as dictated by ADOC. I have not been presented with evidence that putative ADA sub-class members have systematically misused or used as a weapon an assistive device that was provided by ADOC as a reasonable accommodation.[91] In addition, I have not

been presented with information that would suggest that ADOC effectively assesses, tracks, and monitors such potential outcomes.

In the absence of effective ADOC system-wide policies, procedures and practices for the ADA accommodation process, I find that putative ADA class members and other inmates with disabilities often are forced to rely on individual "coping mechanisms" and self-directed alternative accommodations.[92] ADOC putative ADA sub-class members and other inmates with disabilities that I have interviewed reported that they often are required to pay other inmates to receive basic accommodations (e.g., paying an inmate to push an inmate's wheelchair),[93] which ADOC is otherwise obligated to provide under the ADA, and which was reported to lead to ancillary health and safety risks to putative ADA sub-class members. Moreover, during my site inspections putative ADA sub-class members reported to me they had been denied meaningful access on the basis of their disabilities to ADOC programs (e.g., to work-release programs, emergency evacuation, physical and programmatic activities).

Nonetheless, however effective such "self-help" strategies may be to aid putative ADA sub-class members to participate in the programs and services ADOC offers, these *ad hoc* and non-systematic approaches to accommodation do not negate ADOC's continuing responsibilities under the ADA and Section 504 to offer programs, services, and facilities that are meaningfully accessible, and to appropriately consider and provide reasonable accommodations and effective communications, to putative ADA sub-class members.[94]

It also is my opinion that the putative ADA sub-class receiving programs and services from ADOC are excluded, warehoused and segregated from participation in, and denied the benefits of, aspects of these programs, services, and activities on the basis of their disabilities. The negative effects of such denial are exacerbated for the putative ADA sub-class, particularly in overcrowded and inaccessible conditions, and as compared to the general prison population. In

2015, ADOC Commissioner Dunn acknowledged that Alabama prison overcrowding and Correctional Officer understaffing lead to violence within facilities such as St. Clair Prison.[95]

It is further my opinion that ADOC's centralized and institutional prison-level, policies, procedures, and practices are not effective in identifying and eliminating potential barriers to participation in programs, services, and activities for prisoners with mental and physical disabilities (for example, in programs and services in regard to substance abuse, education, and faith-based dormitory living), particularly in overcrowded and inaccessible conditions.[96]

ADOC has not implemented centralized and institutional-level policies and procedures (e.g., an ADA/504 Transition Plan) to implement its obligations under the ADA and Section 504 (e.g., using effective ADA coordinators at the central office and prison facilities). The result is a systemic failure to effectively monitor ADOC's methods of administration, at the Departmental and institutional levels, to ensure that its policies, procedures, and practices do not directly, and through contract (e.g., with Corizon and MHM, or with state community colleges), have the effect of defeating or impairing accomplishment of the objectives of ADOC's programs, services, and activities with respect to the putative ADA sub-class.

ADOC's policies, procedures and practices for the request, provision of, and grievance concerning, reasonable accommodations are deficient. This failure includes a lack of policies, procedures, and processes related to identifying individuals with disabilities and their functional limitations, assessment of reasonable accommodations and possible modifications, and effective communications needed by individuals with disabilities, as well as in implementing accommodations and modifications, and monitoring such implementation.[97]

I delineated the above findings into the specific opinions that follow.

**B.    <u>Nature of My Opinions</u>**

It is my opinion that ADOC fails in significant ways to develop and implement policies, procedures, and practices to appropriately and systematically address the needs of putative ADA sub-class members.

### 1.  ADA/504 Transition Plan and ADA Coordinators

ADOC has not developed and implemented a comprehensive and coordinated ADA/Section 504 Transition Plan regarding program and service accessibility for putative ADA sub-class members, as required and as reflective of acceptable practice in this area.[98] I found that ADOC does not have in place system-wide policies and procedures to effectively identify, assess and monitor its services, programs and activities, staff, and third party agents (such as Corizon and MHM) to ensure meaningful access and nondiscriminatory programs for the putative ADA sub-class.[99] Given these circumstances, it would be difficult for ADOC to effectively train staff, and to monitor their activities with accountability, to remedy these deficiencies.[100]

Without an ADA/Section 504 Transition and Self-Evaluation Plan of programs and services as applied to the putative sub-ADA class, ADOC is not able to effectively plan, coordinate, communicate, monitor and track its services and programs for putative ADA sub-class. In the deposition testimony of ADOC ADA Coordinators, there was no meaningful indication that these ADOC representatives identified areas for needed ADA planning improvements to ensure that accessibility issues are acknowledged and implemented.

ADOC uses inmate "profiles" as determined by medical staff to attempt to address the needs of inmates with disabilities.[101] Nonetheless, ADOC does not have effective (appropriately trained, monitored, and accountable) ADA coordinators (or an ADA Review Team) at the departmental and facility levels to appropriately address issues for putative ADA sub-class members' accommodation needs and resultant provisions, and timely grievance procedures. This is a deficiency in program and service planning, identification, and monitoring for putative ADA

sub-class members. In the absence of effectively trained and accountable ADA coordinators system-wide and at the facility level who are charged with ensuring program and service accessibility by ADOC, it is not possible to meaningfully and effectively identify and monitor the accommodation needs of putative ADA sub-class members.

The ADA System Coordinator typically is located at the departmental level, has system-wide responsibility and authority to ensure that policies, procedures, and practices in regard to ADA-related activities (e.g., reasonable accommodations, effective communications, accessible housing) are implemented in timely and appropriate ways system-wide and at each prison facility.[102] This includes responsibility for the prompt identification of disability status and resolution of ADA-related grievances by inmates.

An ADA Coordinator typically is responsible for compiling, maintaining timely information and records regarding the identification and monitoring of inmate accommodations to help ensure that they are not denied access to ADOC programs, services, and activities because of their disabilities. The Departmental ADA Coordinator should serve as liaison for and resource to facility-specific ADA coordinators and relevant staff, and to other state, local, and government agencies (e.g., education and vocational rehabilitation) engaged with ADOC and its obligations to putative ADA sub-class inmates.

The duties and responsibilities of the departmental and facility-specific ADA coordinators should be detailed in the ADA/504 Transition Report or Plan, which, as found, ADOC has not developed. It is the facility ADA coordinator who typically is responsible to ensure that accommodations for putative ADA sub-class members are processed, documented, implemented, and monitored.[103] The ADA accommodation plans should accompany an inmate when he or she is transferred to another ADOC facility so that it may be implemented at the new facility and modified as appropriate given the conditions, programs and services at the new

facility. I have found with no evidence to document the presence of effective ADA Coordinators at the departmental level, as well as ADA Coordinator liaisons at facility-specific levels, nor that a position or individual(s) that has assumed and has conducted the type of activities referenced above and understood best practices.[104]

### 2. Identify, Classify, and Monitor Inmates with Disabilities

I find no indication in the materials that I have reviewed that ADOC has engaged in, and has plans to engage in, a systematic review of its existing policies, procedures, practices, resources, structure, and culture with respect to the identification of putative ADA sub-class members to provide meaningful access to ADOC programs, services, and activities.[105] I find in the materials that I have reviewed that ADOC has failed to meaningfully assess, both from a system-wide perspective and in regard to particular prison facilities, the need for and monitoring of reasonable accommodations for putative ADA sub-class members that they may effectively participate in the programs, services, and activities that ADOC offers to inmates without such impairments.[106]

I first considered methods to screen and identify putative ADA sub-class members for potential impairments. I found no evidence that ADA accommodations at reception and classification, such as qualified sign language interpreters and Video Remote Interpreting ("VRI"), were either regularly available or used (or used properly) by ADOC in the materials that I have reviewed.

I found no evidence that ADOC systematically and in individual cases that I reviewed provided accommodations for putative ADA sub-class members to effectively communicate and understand orientation information programs and activities, which is a complex process that has immediate and long-term implications for the provision of programs, services, and activities during incarceration. For example, the Inmate Handbook and other materials presented during

orientation have not been appropriately communicated, other than orally, for putative ADA sub-class members. In my site inspections, it was reported to me by inmates that ADOC staff regularly did not properly evaluate inmate communication needs nor the effectiveness of the information communicated.

Further, Defendants responded to plaintiffs First Request for the Production of Documents as follows, in pertinent part:

> 26. DOCUMENTS sufficient to identify ALL PRISONERS with a vision DISABLITY.
>
> RESPONSE:  … the State cannot identify a single document or set of documents *(excluding the medical records for each and every individual ever incarcerated within an ADOC facility)* from which the requested information could be derived. Without waiving the foregoing objections, the State will produce ADOC's policies in effect since January 1, 2012 concerning accommodation of prisoners' disabilities for each facility where any named Plaintiff is located and, subject to the entry of an appropriate protective order entered by the Court, the named Plaintiffs' inmate files. (emphasis in original).

In her testimony, ADOC Director of Training Wendy Williams stated that she had no knowledge that ADOC intake staff receive system-wide training on how to identify various disabilities.[107] Ms. Williams had no knowledge of whether ADOC intake forms inquired about an inmate's specific disabilities.[108]

Given that ADOC intake staff do not receive system-wide training on how to identify various disabilities, it would not be possible at intake for staff to effectively evaluate putative ADA sub-class members' need for accommodations at that time. I find no evidence to suggest that at the intake process ADOC had effective policies, procedures, and practices in place to evaluate the need for accommodations by inmates with disabilities.[109]

ADOC AR 400 establishes policies, procedures, and practices for the classification of inmates at Tutwiler Prison for Women and the Receiving and Classification Center ("RCC"), at Kilby Prison, and for reclassification at all institutions.[110] AR 400 provides that inmates are to be

classified by "security level, custody, and program needs" as established in the ADOC

Classification Manual. ADOC establishes a Classification Central Review Board ("CRB")

comprised of Central Classification Division Classification Supervisors to approve, deny, or

amend inmate security level, custody, and placement recommendations as determined by

institutional classification specialists and supervisors.[111] AR 400 establishes the institutional Job

Board, comprised of the Warden or designee, Institutional Classification Committee ("ICC")

members (e.g., to review security level, custody, and placement, including a Psychologist or

Psychologist Associate[112]) and other staff to consider initial inmate job assignments, inmate job

changes, and other institutional inmate assignments.[113]

I find significant and numerous deficiencies in the implementation of ADOC's intake

process as set forth in AR 400, which negatively affect the subsequent incarceration of putative

ADA sub-class members on the basis of their impairments. ADOC's classification process

determines an inmate's security level, his or her access to and type of housing and programs and

services offered, and his or her degree of safety, security, and program and service options and

related accommodations, which is important to vulnerable populations such as those in the

putative ADA sub-class. Contrary to ADOC's intake and classification practices, the Vera

Institute finds that: "High-quality [inmate] screenings are key to making sound decisions about

housing, programming, and work assignments."[114]

Consistent with my findings, research shows that inappropriate, untimely, and cursory

classifications, and the associated lack of accommodations for vulnerable individuals such as

those with disabilities, often exacerbates and creates secondary mental and physical disabilities,

which also is associated with mental health problems, anti-social behavior, decreases in health

and functioning, victimization, negative outcomes for inmate and institutional safety, and

increased risk of recidivism.[115]

Based on my review of the documents presented to me, such as the inmate medical files and prison jackets (see Exhibit 2), I have not discerned information and materials that reflect ADOC's system-wide and facility-specific policies in effect since January 1, 2012, concerning the identification of inmates with disabilities. I have been presented with no information and materials to demonstrate that ADOC has employed its inmate intake and monitoring programs, using ADOC staff and third party health or disability experts, to systematically and meaningfully review its programs, services, and activities to assess the efficacy of its methods of administration and its accommodation and effective communication policies, procedures, and activities affecting putative ADA sub-class members.[116]

In consideration of the deficiencies that I have identified in ADOC services and programs for the putative ADA sub-class, there is an absence of systematic, reliable, and centralized means to identify inmates with disabilities, from intake to incarceration in the prison system, whereby inmates often are housed at multiple facilities and engaged in varying programs, services, and activities over time. For example, in the absence of a tracking system in paper or electronic format, and without training, prison staff are forced to rely on individual observations to determine whether a prisoner with or claiming a disability had a disability covered by the ADA. Moreover, in the absence of timely coordination and monitoring with medical and program staff as to the presence of ADA disabilities, which often are episodic and change with circumstance, time, and age, ADOC is not able to effectively provide services and accommodations for the putative ADA sub-class.

### 3. Accommodation Requests and Provision for Inmates with Disabilities[117]

I have found no information and materials to corroborate that ADOC, on a system-wide and a facility-specific basis from intake to release, systematically identifies and monitors the ongoing need for reasonable accommodations for the putative ADA sub-class.[118] This

fundamental deficiency in ADOC methods of operation not only is inconsistent with research and practice in the area, but also has been admonished when employed in other correctional settings serving individuals with disabilities.[119]

My review of case materials (see Exhibit 2) and my site inspections demonstrate that there are essentially three ways that ADOC claims that an inmate with a disability may request an accommodation: (1) using an inmate request slip; (2) making a request to an ADOC staff member; and/or (3) making a request to a medical staff member. Each of these methods as presently implemented by ADOC present problems for the provision of accommodations. For example, the ADOC inmate request slip does not indicate that it may be used as an ADA accommodation request. In addition, the inmate request slips are not tracked by ADOC and therefore there is a lack of consistency in the provision of accommodations, for example, when a prisoner is transferred. Also, the request for accommodations verbally to staff results in a lack of accountability, follow-up, and consistency in the accommodations requested and provided. Requests for accommodation to medical staff are not adequate, given the lack of coordination in regard to such requests between medical staff and ADOC, as reported to me during my site inspections. In addition, evidence shows that an accommodation request by an inmate to medical staff requires the inmate to make a "co-pay" for sick call, which is discriminatory surcharge for an accommodation request.

ADA accommodation identification and monitoring requires ongoing training for staff, and especially newer staff, third parties, and agents of the state system (or members of an "ADA Review Team") who interact with inmates at all stages of the incarceration and release process. The provision of accommodations require the development and maintenance of informational and training materials, and other resources necessary for ADA compliance.

The identification and monitoring of reasonable accommodations thus requires ADOC

responsibility and accountability for policies and procedures in regard accommodation provision, related grievance processes, as well as appropriate record-keeping, monitoring, and periodic auditing of these practices and their outcomes. I have not found assigned or designated disability rights contact specialists (social workers, case managers, or ADA Coordinators) who have the responsibility to facilitate the identification, provision, and monitoring of accommodations for putative ADA sub-class members. These individuals would be expected to engage with individual inmates with disabilities to identify their impairments, needed accommodations, auxiliary and assistive devices (and qualified interpreters), ensure appropriate and accessible housing and programming, investigate complaints, serve as on-site resources, and implement ADA-related actions and remedial efforts.[120] I have found no evidence to document the presence of ADOC ADA staff and/or review teams, nor a position or individual(s) who has assumed and conducted the type of activities referenced above and understood as best practice in the area.

A system-wide ADA Coordinator and any facility-based ADA staff must effectively and collaboratively engage with medical and mental health staff to develop and implement the identification, provision, and monitoring of reasonable accommodations. In accord with an ADA/504 Transition Plan, this team would evaluate whether an inmate has an ADA disability (e.g., hearing, visual, mobility impairments) and implement reasonable accommodations (e.g., assistive technology and program modifications) when warranted.

Information on the identification, provision, and monitoring of reasonable accommodations should be systematically and centrally documented (preferably electronically), given that prisoners and staff rotate through facilities and programs, and after release former inmates may return to prison. This information must be capable of being accessed by staff at any location, monitored, updated, and tracked. Inmates may be provided access to aspects of this information in that they often are in the best position to report the need for reasonable

accommodations and note the ones that are most effective. One strategy, for example, is to provide putative ADA sub-class members an ADA card and/or accommodation validation form (e.g., similar to, or as part of, the medication Keep on Person card, "KOP") to help ensure that the inmate may provide staff and correctional officers documentation as to the need for and provision of accommodations (e.g., need for a bottom bunk because of a mobility impairment, need to have instructions in writing because of a hearing impairment, which are more detailed than the medical profiles presently issued by Corizon).

ADA accommodation documentation and tracking systems would enable ADOC staff to more appropriately identify, interact with, and monitor the needs of putative ADA sub-class members. It further may help to reduce frustration on the part of inmates who otherwise would have to persuade ADOC staff that they are individuals with ADA disabilities who are entitled to the use of approved accommodations. ADOC lacks an ADA accommodation identification, assessment and provision process for its staff to determine appropriate and nondiscriminatory programs, services, and activities provided to the putative ADA sub-class, and as guided by a written ADA/504 Transition Plan and other required policy and planning measures.

In addition to deficiencies in the reasonable accommodation request process, there are other deficiencies in the provision of accommodations. I have not been provided with information that demonstrates that ADOC has centralized (system-wide) and all facility-specific policies, procedures, and practices to ensure the monitoring of appropriate accommodations for the putative ADA sub-class.[121] It follows that ADOC lacks documented accessible and timely interactive processes for putative ADA sub-class members to request and, when appropriate, to grieve accommodations for their disabilities.[122] The prison ADA Coordinator also would be responsible for consulting with appropriate ADOC staff, facility staff, and medical professionals regarding appropriate accommodations for putative ADA sub-class members. This process

would be documented on an ADA accommodation form, available at the prison, and to ADOC, and it would be conducted in accord with the ADA.

The lack of an ADA accommodations process affects both male and female inmates within ADOC. ADOC Director of Training, Wendy Williams, testified that she was not aware that ADOC had any type of system-wide policy concerning accommodating female inmates with disabilities.[123] I find that a timely and functional ADA accommodation request, monitoring, and grievance system is particularly important to putative ADA sub-class members who may have impairments that impact their immediate health and safety as well as their ability to participate equally in ADOC's services, programs and activities. I also find that ADOC's general service and health grievance process is not appropriate to make determinations about ADA physical and mental disabilities, and accommodation requests, particularly in the absence of consultation with medical and other professional staff (e.g., social workers, educational).[124]

As part of my review of case materials (see Exhibit 2) and site inspections of ADOC's facilities in relation to putative ADA sub-class male inmates, I reviewed Hamilton A&I Prison, "Americans with Disabilities Act Inmate Grievance Procedure," which is for "guidance of initiating grievances and seeking remedies based on the Americans with Disabilities Act for Title II Discrimination."[125] The Hamilton A&I ADA procedural documents contained information inmates with disabilities residing at Hamilton, their associated major life activities (e.g., caring for one's self, seeing, hearing, speaking, learning and working) and the nature of auxiliary aids and effective communication accommodations available to them (e.g., qualified sign language interpreters and readers).[126]

The Hamilton A&I policies reference an ADOC "Departmental ADA Coordinator" (located in ADOC Central Office in Montgomery, Alabama), who is responsible for "reviewing all grievances that are not answered at the institutional level within 30 calendar days or are not

answered to the satisfaction of the grievant."[127] In addition, an "Institutional ADA Coordinator" is identified as responsible for the facility to "review all ADA grievances submitted on the Institutional Grievance Form concerning ADA grievances."[128]

In accord with the Hamilton A&I ADA policies, the Tutwiler Prison ADA Grievance Policy and Procedure stated: "Wardens-will appoint an Institutional ADA Coordinator to evaluate and respond to all grievances submitted by inmates" at the Tutwiler prison.[129] The ADA Coordinator: "will ensure this procedure is followed on the issuing, return, retention, and forwarding of all forms and records. A copy of this procedure and the necessary forms will be posted and retained in the Inmate Law Library for accessibility."[130]

The ADOC ADA Grievance Procedures that I have reviewed as implemented at Hamilton A&I (and as at Tutwiler Prison) require that the ADA accommodation grievance be in writing and include information about the alleged discrimination and the relief requested.[131] Upon written or verbal request, the Administrative Lieutenant is to provide the grievance forms to "persons with disabilities."[132] Within fifteen calendar days after receipt of the grievance, the ADA grievance procedure requires that the Institutional ADA Coordinator is to acknowledge in writing receipt of the grievance and, as possible, suggest a resolution. If further investigation is required, the ADA Coordinator will have an additional fifteen days to meet with the inmate to advise of the need for further time to resolve the issue: "In the case of a vision and or [sic] hearing impairment grievant, a meeting may occur with the inmate to express the response."[133] In cases in which the inmate believes that the ADA Coordinator's response does not resolve the issue, the grievant may request an ADA grievance appeal form from the Institutional ADA Coordinator, or from the designated Captain or Administrative Lieutenant, to file with the Departmental ADA Coordinator.[134]

The ADA Grievance Procedure further provides that the "safety, security, and health of

the inmate and the security of the institution will always be an overriding concern."[135] The ADA Grievance Procedure provides that where the facility "cannot reasonably accommodate the individual with the disability consideration may be given to facilities and programming available at various facilities to accommodate an inmates [sic] particular disability(s)."[136]

I reviewed the actual ADA Grievance Appeal Logs at Hamilton A&I from 2010 to May 2014.[137] These logs provide some information regarding form identification numbers, inmate names and AIS numbers, dates issued and returned, issues presented to ADOC personnel, and the dates submitted and sent to the ADA coordinator. As part of this review, I examined the substance of the inmate grievances for alleged disability discrimination and accommodation at Hamilton A&I. In contrast to the ADA Grievance Appeal Log entries referenced immediately above, I was presented with ADA grievance and appeal forms for two inmates Daniel Tooley and Timothy Sears (each a named plaintiff in this matter) submitted during the calendar years 2009 to 2015.[138] Nowhere in my review of the ADA Grievance processes at Hamilton and Tutwiler did I find that either facility sufficiently addressed their own procedures for inmates requests under the ADA.

Specifically, my review of Daniel Tooley's ADA grievance experiences provides and an example of the systemic problems associated with this process. Daniel Tooley, a named plaintiff in this matter, filed an ADA-related grievance requesting a qualified sign language interpreter. During my site inspection of Hamilton A&I, I interviewed inmate Tooley. In the absence of an interpreter, and with difficulty in effective communication due to the absence of auxiliary aids, Tooley spoke to me in a soft whisper and his speech was generally inaudible.[139] He displayed a limited vocabulary and inability to handwrite notes.[140]

Tooley's deposition testimony (which was conducted with the assistance of a certified sign language interpreter), review of his prison jacket and medical records as well as my in-

person observations, support my conclusion as to the reasonableness of his disability accommodation request and subsequent grievance. For example, Tooley testified that he is requesting an interpreter so that he "can understand. [And that he does] not understand the written communications."[141] His request for an interpreter is not made for all interactions in the prison; "Just for special situations. [For example,] when I would see a doctor." [142] When asked why it is important to have an interpreter when communicating with a doctor, Tooley notes that without an interpreter: "The doctor writes something. I don't understand. There's no interpreter. It's written. And they leave, and I don't feel that it's a complete answer. There's no in-depth explanation. And the captain will say, "Come on, it's time, let's go."[143]

Tooley testified that a second situation in which he needed an interpreter was during disciplinary hearings:

> Q Can you tell me other times since you've been here at Hamilton that you say a sign language interpreter should have been present?
>
> A Anytime there's a hearing, anytime there's some kind of written communication, anytime somebody is writing something to me, a disciplinary hearing, they should bring an interpreter. I would need that for a disciplinary hearing for an interpreter. Just having it written without an interpreter, I don't know what's going on. I can't—they ask me do I understand what they're saying. I don't understand what they're saying. You know, I ask them can they provide an interpreter, the thing that happens out in the free world, can they do that, and they say say no.
>
> Q All right. Well, tell me the times this has happened. Tell me what disciplinary hearings you have had that you say an interpreter should have been there.
>
> A Yes, I've had a disciplinary hearing without an interpreter.
>
> Q Has there been one or more than one?
>
> A Two times. Two times.[144]

Tooley also testified as to problems and limitations in effective communication using the ADOC facility TTY telephone.[145] He testified: "Sometimes I don't understand what my girlfriend says over the TTD [sic]. It's very difficult to get a clear explanation on what's being

said because nothing is being used in sign language. That's what I'm saying; if it was able to be

seen over a video phone it would be clear communication, but I don't understand what's being

talked about over a TTD. It's difficult to use a TTD."[146]

Tooley suggested to ADOC that the use of a video phone would be a more effective

communication method than the limitations posed by the TTY system.[147] Tooley testified:

> A Yes. So, right now I use a TTY where I type. With a video phone, it looks just
> like what this interpreter and I are doing. Except for instead of in real life we'd
> each be on a computer screen. But I would see the interpreter and she would see
> me. And then I could talk to somebody else on the telephone who's hearing, using
> an interpreter instead of typing on the TTY.
>
> Q … is it correct that you're saying as far as you're concerned that that would
> help in a lot of situations where you believe you need a sign language interpreter?
>
> A The video phone would solve the problem of the difficulty of using a TTY. It
> would definitely solve the problem of typing on the TTY. It's easier
> communication signing to make a phone call rather than typing to make a phone
> call. Because when I type on the TTY, sometimes it gets garbled. But if I'm
> making a phone call and I'm using an interpreter, I understand clearly because it's
> a phone call through sign language.[148]

Tooley testified, however, that the video phone would not be effective in a disciplinary

hearing:

> A … You couldn't use the video phone for that. You'd have to bring in a free-
> world interpreter for the disciplinary hearing. The video phone is to make a phone
> call. For the disciplinary hearing, you'd have to bring in a real person. You'd have
> to bring in an interpreter. The video phone is like if I were calling home, like to
> call, you know, my sister or to call a lawyer, it's–a telephone communication
> through sign language. But if the disciplinary hearing, you know, that's here at the
> prison you, you know, when they have a disciplinary meeting, that's here. So you
> would, you would have to bring an interpreter here into the real—from the free
> world. You'd have to bring them here. It would be a real person. But if I needed
> to call him on the telephone, then I would do that with the video phone. It's like
> right now when I make a phone call, I use a TTY. And that–I type and it goes into
> an interpreter who reads the transcript of what I'm typing to the hearing person
> that's listening. And the hearing person that listens to her, then says what they
> want to say, and then she types it and then I read what she types. … So, that
> would all happen with an interpreter on a video phone.
>
> …

Q And couldn't the same procedure be used at a disciplinary hearing?

A No. Like, the interpreters for the disciplinary meeting, no, you couldn't do that. You need a real live free-world interpreter.

Q … Why do you say that?

A Well. the video interpreter, they couldn't see the paper for the disciplinary meeting. There's no way they could see the interpreter. And then I don't know how would they hear the voice because, the interpreter's voice doesn't come through on the video phone.

*During his time at Bullock Prison, Tooley testified:*

A There was problems with communication at Bullock. They didn't have a TTY. They took forever to get it there. It just took forever to get it. They finally did get it. None of the officers signed and they refused to write anything to me at all. And so, I tried to write notes to them about needing a TTY. So, it was similar in nature to this with communication problems. It just took a lot longer. And so, it was that kind of communication problems at Bullock. But when I got here to Hamilton, they had a TTY.

Q Anything else that happened at Bullock?

A … There were no interpreters at Bullock.[149]

In Daniel Tooley case records, I have found corroborating documents such as an inmate request slip identifying problems with TTY phone access.[150] I did not find evidence in Tooley's ADOC case records for his classification summary that accommodations were considered, reviewed, and discussed in regard to his effective communication in the use of the phone and in other prison interactions (e.g., in doctor's appointments and in disciplinary proceedings).[151] In Tooley's case records, there appear to be inconsistent references in his classification documents as to the nature of his hearing and speech impairments.[152] Similar inconsistencies and a lack of accommodations are found in his facility-specific case records.[153]

At ADOC facilities where no formal ADA accommodations process exist, inmates with disabilities often have to "self-accommodate" or pay for accommodations that would otherwise be required to be provided by ADOC. For example, Roger Moseley is a named plaintiff in this matter living at Easterling in a faith-based honor dorm. Moseley testified that his primary ADA

complaint involves that he has not received physical therapy from ADOC at any time during his incarceration.[154] Moseley testified:[155]

> Q. After you arrived at Bullock, did you request physical therapy?
>
> A. Yes, sir.
>
> Q. Who did you request physical therapy from?
>
> A. Dr. Siddiq.
>
> …
>
> Q. Tell me about your conversation with Dr. Siddiq.
>
> A. I asked Dr. Siddiq about physical therapy, and he kind of smirked and said that DOC did not provide physical therapy. That I will not receive physical therapy.[156]

This testimony illustrates ADOC's failures in the identification and classification of the putative ADA sub-class members' ADA impairments for purposes of providing accommodations to ensure program participation. As a result of such failures by ADOC, Moseley's only option was to "self-accommodate" his mobility impairment for program access to ADOC services. Moseley testified that, in the absence of ADOC physical therapy, his attempt at rehabilitation to walk again without the use of a wheelchair involved: "A. I took my foot pegs off of my chair and started using my feet to pedal myself around until I could actually stand up."[157]

In the absence of accommodations and assistive devices, and related programs and services, Moseley was left to his own initiative for self-accommodating physical therapy. Moseley resided in a prison environment that lacked physically accessibility, and when there were elements of accessible showers and toilets, for instance, those facilities often were used by non-disabled inmates resulting in further lack of appropriate and timely access.[158] When Moseley was forced to use his wheelchair due to the lack of appropriate physical therapy, he also was at the mercy of the availability of inmates who would push his wheelchair for pay, with the risk of violating prison policy. Moseley further testified:

Q.  Okay. And what are the reasonable accommodations that you say you were denied for your disability?

A.  At the time I was in the wheelchair, I didn't have adequate access to handicap toilets, showers, et cetera, and stuff like that. Doorways were not big enough for the wheelchair to go through. Sitting areas and chow halls are not equipped to handle wheelchairs, so, at the time I would—my mobility was not as good as it is now.

Q.  When you were actually in the wheelchair, how would you get from place to place on camps?

A.  Someone would either push me or I might wheel myself through there, down the halls and stuff.

Q.  Did you ever have to pay someone to wheel you around?

A.  Yes, sir.

Q.  Okay. And that would have been out of your pocket, correct?

A.  Yes, sir.

Q.  Is there also a rule, to the best of your knowledge, in the ADOC against having people help you with movement in your wheelchair?

A.  Yes.

Q.  Now, it's obvious sitting here today, Roger, you're not in a wheelchair today?

A.  No, sir.[159]

Moseley had no choice but to self-accommodate his mobility impairment due to the failures of ADOC programs and services, and for which he was subject to ADOC disciplinary rules (e.g., inmates not allowed to be paid to assist another inmate). This was an untenable situation made worse by system-wide failures in ADOC's ADA accommodation policies and practices.[160]

### 4.  ADOC Staff Are Not Adequately Trained On ADOC's Obligations under the ADA and Section 504

As a general principle, there is a lack of adequate training of ADOC staff at all levels on

the ADA and Section 504. ADOC makes some relevant efforts to provide ADA training at the ADOC Academy and in continuing education and annual in-service training, which is focused primarily on mental health issues.[161]

I have reviewed the testimony of ADOC Associate Commissioner Grantt Culliver, who is responsible for departmental oversight of men's facilities.[162] I have reviewed the testimony of Wendy Williams, ADOC Director for Training,[163] various ADOC Wardens, facility-specific designated ADA Coordinators, and ADOC staff whose responsibilities include disability-related programs and services.[164] Based on my review of the testimony of these individuals in leadership positions, there is a general lack of knowledge of ADOC's obligations under the ADA. For example, there is a lack of knowledge as to who ADOC has appointed at the departmental level as ADA Coordinators.[165] ADOC has not provided facility staff with adequate training on general ADA principles and best practices.[166]

I have found the following systemic deficiencies with respect to ADOC's ADA training:

- No training for staff on how to assist inmates with disabilities at ADOC Training Academy.[167]

- No mandatory training for staff on interacting with inmates with disabilities.[168]

- No ADA training for ADOC classification specialists at departmental and facility levels.[169]

- No knowledge of training and procedures for staff in assisting inmates with disabilities in the event of a prison facility emergency.[170]

- No staff training on leading, and effectively communicating with, an inmate with a visual impairment at ADOC Training Academy and in-service training.[171]

- No mandatory staff training on accommodating inmates with disabilities.[172]

- No designated ADOC staff to receive and address disability accommodation requests from inmates, other than third party healthcare providers.[173]

- No knowledge by staff or provided to inmates if there is a written policy, consistent procedure, and information in the Prisoner Handbook that addresses how an inmate with a disability may request a disability accommodation.[174]

- No knowledge by staff whether contract mental health staff have input into ADA accommodation request process.[175]

- No knowledge by staff of an ADA accommodation grievance process, other than via healthcare grievance process.[176]

- No basic training for staff on qualified sign language interpreting at the ADOC Training Academy and in-service training.[177]

- No knowledge by staff of whether ADOC provides a qualified sign language interpreter for an inmate who is deaf and subject to a disciplinary hearing.[178]

- No continuing education for staff on interacting with inmates with physical disabilities.[179]

- No continuing education for staff on the use of "people first" language (recognizing individuals with disabilities as people and not by their medical condition).[180]

- No training at the ADOC academy on how to respond when a prisoner cannot read or write and the inmate needs services that require a written form to be completed.

- No training at the ADOC Academy on how to assist inmates in filling out medical call slips.[181]

In the absence of standardized and system-wide ADA training, ADOC staff are to make on-the-spot and *ad hoc* decisions about daily life, safety, and health issues facing putative ADA sub-class members. These individuals already are at risk in the prison environment and are placed in further jeopardy by ADOC's lack of identification, provision, and monitoring of ADA accommodations. Moreover, with the lack of adequate information and training as to the identification of an inmate's disability and appropriate accommodations, it is predictable that staff would be inclined to not allow accommodations for putative ADA sub-class members. Not only do the deficiencies in the ADA accommodation and training process negatively affect ADOC's system-wide provision of programs and services for putative ADA sub-class members, but also these failures make it extremely difficult, or impossible, to make determinations with regard to accommodation provision at the facility level.

### 5.   ADOC Fails to Adequately Provide the Means for Inmates with Disabilities to Communication Effectively

Research and practice show that hearing individuals often misunderstand the communications barriers facing individuals with sensory (e.g., hearing and visual) and cognitive (e.g., intellectual and psych-social) impairments. Hearing individuals, for instance, tend to overestimate the ability of deaf individuals to interact in the English language.[182] In the correctional environment, researchers find that prison staff "often believe that deaf offenders can rely on speech, speech-reading, reading and writing for communication and for obtaining information. However, they report that most deaf inmates cannot use these English avenues."[183] Thus, many deaf individuals do not effectively employ note writing and lipreading to communicate.

In addition, prison staff "often think that the only problem with deaf inmates is that they cannot hear," and they typically ignore the "constellation of unique differences related to

cognition, background knowledge and experiences, cultural differences, and communication and language challenges."[184] Correctional staff frequently believe incorrectly that deaf inmates, and inmates with cognitive impairments, can appropriately read and understand documents presented to them, for example, to review and acknowledge by signature.[185] In the absence of the trainings that I have identified above, prison staff often misunderstand that if they "raise the volume of their voices, a deaf person will hear them," and "that all deaf inmates can read lips (speech-read) and read documents given to them during the booking and intake process, including the inmate handbook."[186]

Therefore, particularly with the absence of ADA and accommodations-related trainings, ADOC staff likely overestimate the English language and reading abilities of putative ADA sub-class members who are deaf, and they ignore or are not aware of the possibilities for effective communication with these inmates. ADOC correctional and other staff also likely overestimate the ability of putative ADA sub-class members with hearing and comorbid impairments (e.g., cognitive and mental health disabilities)[187] to read and understand documents presented to them, and that lip or speech-reading, and exchanging written notes, may alleviate the communication problems, which also may lead to frustration and tension resulting in unwarranted disciplinary actions (e.g., failure to follow verbal instructions and announcements, and alerting bells to emergency circumstances).[188] Examples of such problems are presented in the testimony described earlier and have been reported to me by inmates with disabilities during my prison site inspections in this matter.

Although I found that it does not follow its own regulations, ADOC has Administrative Regulations for hearing impaired inmates ("AR 705") "to provide and implement services within the ADOC for auxiliary aids, hearing assistance and devices for deaf or hearing impaired inmates when clinically indicated."[189] AR 705 provides that: "It is the policy of the ADOC to furnish

appropriate auxiliary aids and services consistent with the Americans with Disabilities Act (ADA) where necessary to afford deaf or hearing impaired inmates an equal opportunity to participate in the benefits of services, programs, or activities."[190]

AR 705 provides ADOC services, programs and activities, by contract or other means, are to be "in compliance with the ADA as related to the deaf or hearing impaired," including at each institution provision of "effective means to ensure that qualified interpreters are available;" for instance, during intake, provision of health care services, educational classes, and disciplinary proceedings.[191] Inmates with hearing impairments are to be assigned to facilities "that can reasonably accommodate access to educational or other programs based on the inmate's classification/security level," subject to valid security and programmatic considerations.[192]

In providing effective communications ADOC is to give "primary consideration" to the communication preferences of the inmate at issue,[193] and honor that preference unless it is shown that another adequate means of communication exists or that the means chosen would constitute an "undue burden."[194] Thus, ADOC's regulations mandate that an "interactive process" occur with respect to the provision of auxiliary aids and services to ensure effective communication. I found no evidence to support that these regulations were implemented system-wide.

The U.S. DOJ Guidance on ADA title II regulations further notes that:

> Although in some circumstances a notepad and written materials may be sufficient to permit effective communication, in other circumstances they may not be sufficient. For example, a qualified interpreter may be necessary when the information being communicated is complex, or is exchanged for a lengthy period of time. Generally, factors to be considered in determining whether an interpreter is required include the context in which the communication is taking place, the number of people involved, and the importance of the communication.[195]

Despite the existence of AR 705, in my review I found that rarely, if at all, qualified sign language interpreters actually were provided for inmates with hearing impairments, or who are deaf, in important interactions such as those described in AR 705. For example, Bradley Pearson

is a putative ADA sub-class member who has been incarcerated by ADOC. Pearson has been deaf his entire life.[196] Pearson communicates in American Sign Language, not English, and he cannot read English well.[197] He testified, through an interpreter, that "Deaf users have a problem with words. And expressive sign language is much clearer than the written word."[198] He can perform limited lip reading, but this depends on the speaker and his or her enunciation.[199]

Pearson testified about ways in which his deafness precluded him from equal access to ADOC programs and services:[200] "I couldn't get my GED or go to vocational training. I had goals. I wanted to go to the body shop to get training. I wanted to get certificates. I wanted to be able to get a hands-on job. And they told me, "Well, you've got to get your GED before you can take these voc training classes." So, I went to the GED classes, but there was no way for me to communicate."[201]

On the basis of his deafness and limited English speaking and writing skills,[202] and due to a lack of a qualified sign language interpreter, Pearson was excluded from numerous ADOC programs and services, such as in English language and GED classes offered by ADOC to inmates, as well as some meals.[203] For example, in attempting to take the ADOC Substance Abuse Program ("SAP"), Pearson testified:

A Yes. Yeah, I graduated [in prison].

…

A Yeah, it helped me. Yeah.

Q And were you able to take that program even if you--even being deaf?

A Well, I mean, there was no communication. It was -- there was some writing and a friend helped me with some of the signs. I taught my friends some sign language when I went in there. They were here and they didn't know any sign language whatsoever, but they were a little motivated. And then they said, after I taught them some sign language, they said they were willing to help me do what I could do to learn and GED or anywhere, and so I tried to get them to go with me, but, I mean, they got transferred and I lost everything.[204]

At Limestone Prison, Pearson was precluded from going to work release because his deafness resulted in a higher health code. Pearson testified that "I had tried to ask [ADOC staff] why I couldn't go to work release, and she said because of your health code.[205] He stated: "I could have liked Limestone if I had been given an interpreter, if I could have had the opportunity to do other things and learn the way other hearing people did. But I didn't have that opportunity. It was really hard. There was no opportunity there."[206]

In regard to prison emergency evacuation, Pearson was put at risk. For example, he testified: "When they would have training, like fire training, sometimes I would be taking a nap and they would pound on my bed and say, "Get out." I would be like, what, what, what? And that happens. And they'd say, "Get out." But I didn't know because I couldn't hear. And the flashing light wasn't—they didn't have that system of flashing lights. … But I never knew it was training. I didn't know anything. I didn't know it was training. … [The other inmates] knew, they were gone. It would be empty. I would be the only one in there and I'd be confused on my bunk. … [The other inmates had heard it] Over the speaker. Over the loud speaker. They would hear it."[207]

Pearson lacked effective and appropriate qualified sign language interpreters to participate in critical ADOC prison programs and activities:

> I think the interpreter is most important. … because I don't understand [written materials]. There are a lot of words, you know, when I see those words, I don't know what those words mean. And it's like, you know, hearing people, I think you have a certain level of reading ability. And I think a lot of hearing people are at a 12th grade level, and some are at a 7th grade level. But I think for deaf people, we're, you know, at a much lower level, and we don't learn as fast as hearing people. And I think hearing people in general learn more than deaf people. And I'm very aware of that, that I am not the same as a hearing person.[208]

He continued:

> I'm asking that I be equal with other hearing prisoners. What hearing can do, deaf can do. And they've told us no, you can't. But, yes, all the hearing people can. And I want equality. That's what I want.[209]

This also means not relying on the kindness of other inmates who may happen to know minimal sign language or finger spelling.[210]

Another putative ADA sub-class member, Donald Turner, cannot hear and speak since birth and requires the use of two properly working hearing aids to hear.[211] Turner is not requesting an interpreter for all programs and activities at prison.[212] However, there were no qualified sign language interpreters available to him.[213] For example, there were no interpreters at Limestone for any types of classes.[214]

ADOC must ensure that there is effective communication by and to putative ADA sub-class members with disabilities that affect communication. For this outcome to be realized, the putative ADA sub-class member must have appropriate proficiency in reading and writing English. However, as mentioned, many deaf people do not use English as their primary language, and there is not necessarily an exact correspondence between American Sign Language ("ASL") signs and words in the English language.

Thus, simply because a hearing inmate voluntarily aids a putative ADA sub-class member who is deaf or who has a hearing impairment does not mean the helping inmate is a qualified sign language interpreter for purposes of the ADA. Alabama, like other states subscribes to state and national certification requirements for qualified sign language interpreters. The requirements are set forth in the Registry of Interpreters for the Deaf ("RID"),[215] which is the national professional organization for qualified sign language interpreters in the United States. RID has chapters in almost every state, including Alabama.[216] Independent certification is necessary to ensure the qualifications of those individuals serving as sign language interpreters for putative ADA sub-class members who are deaf and who use sign language. A qualified sign language interpreter is required to provide effective communication

for those putative ADA sub-class members who use sign language to communicate in a range of circumstances.

ADOC has not, and does not, regularly provide a qualified sign language interpreter in critical situations (e.g., during intake, health care appointments, educational and trade school programs, and disciplinary hearings) when necessary to ensure effective communication. ADOC consistently has violated its own policies by either not providing qualified interpreters or providing non-qualified interpreters who are other inmates or untrained ADOC staff. Similarly, ADOC consistently fails to provide inmates with appropriate auxiliary aids and services necessary for effective communication, such as hearing aids, visual or vibration signaling devices in daily life and in emergencies, and closed or open captioning.[217]

ADOC also consistently fails to provide inmates who are deaf and with hearing impairments reasonable access to telecommunication devices (e.g., TTY phones). Auxiliary aids such as headphones also are beneficial to putative ADA sub-class members with hearing impairments to hear the television (even when closed captioning is available in common areas due to an inmate's lack of reading comprehension) as are telephone amplifiers to aid in use of the telephone.[218]

> Inmate Pearson complained about a lack of equal access to the telephone:
>
> I would want to use the phone at a time that I could talk to them [my family], and I would be told no. So I'd say. Okay. But then I noticed if hearing prisoners wanted to use the phone at a different time, they say, all right, it's fine. And I would say but I want to talk to my family, too. And they said that the phone time was from nine to ten for you, and one time a day. There was just one hour, one time a day, every day, for me.[219]

The phone for deaf inmates was located in the shift office.[220] However, Pearson testified that prior to the filing of this lawsuit, at Limestone:

> when I came to prison, I didn't know that they had the TTY until two months later, and I was in prison and another prisoner told me that we had a TTD [sic]. I was shocked, I was shocked because nobody told me when I first arrived that

there was a phone that I could use. So, later on, I noticed that they got more and more strict with my time that I could use the TTY and the time that I could get into the shift office. And they wouldn't let me go, like, if there was a certain officer there, I would have to ask, and they would say, yes or no. And it was a specific lieutenant. And very often he wouldn't let me use it. And I would say, "But it's there for me to use, why can't I use it?" And they would often say, once I got on the phone and made a connection, they'd say, "Now your time's up. You have to hang up."[221]

Effective communication is also important for inmates who are blind or who have vision impairments. ADOC often communicates in written form, for example, using the Inmate Handbook. However, ADOC generally fails to provide such materials in alternate formats, such as in large print or Braille. This practice prevents inmates with vision impairments and who are blind from obtaining needed information.

Tommie Moore, another named plaintiff in this matter, regularly reported a lack of ADA accommodations. Moore stated that he was not totally blind upon entering the ADOC this time (he had been in ADOC custody at least three previous periods), but he is capable of only seeing vague shadows.[222] While he was at Kilby and Hamilton, Moore requested assistance to learn Braille but he was told by ADOC that it does not provide that service.[223] Moore requested and was denied accommodation for his blindness such as large print documents (for when his failing eyesight), Braille documents, access to a helper or trusted other to read him documents such as medical information and during disciplinary proceedings, audio books, or other assistive devices for reading, and assistance from ADOC staff to complete documents such as sick call slips.[224]

**6. ADOC Fails to ensure that its programs and services offered to inmates, when viewed in their entirety, are accessible to inmates with disabilities in accord with the ADA**

ADOC's system-wide programmatic barriers facing putative ADA sub-class members results in inappropriate and unequal programs and services that unfairly deny and limit access to and equal participation. The failures that I find in ADOC services and programs are pervasive,

and will continue, due to a lack of systemic accountability for policy and procedure implementation, and the means for determining and remedying these deficiencies.

There are systemic deficiencies in an array of program and service areas that are illustrative of ADOC's failures that act to deny equal participation by putative ADA sub-class members on the basis of their disabilities.[225] In addition to those deficiencies described earlier, these include failures in the areas of:

- *Housing*: lack of systematic means for tracking adequate housing assignments of inmates with disabilities, and an inadequate number, if any, of specialized cells such as segregation and suicide cells;[226]

- *Education (GED) and Trade Programs*: exclusion from these programs on the basis of disability due to inaccessible materials and lack of effective communication;[227]

- *Work Release Programs*: exclusion from work release programs on the basis of disability;[228]

- *Emergency Preparedness and Evacuation*: risk of harm from the inability to evacuate safety by individuals with mobility and sensory impairments.[229]

Based on an review and analysis of the materials that I have reviewed, as further informed by my site observations, I conclude that the sum total of ADOC's policies, procedures, and practices as affecting and applied to putative ADA sub-class members, and ADOC correctional and other staff procedures and practices dealing with these inmates, expose members of the putative ADA sub-class to a substantial risk of harm, indignities, humiliation as well as inappropriate programs and services, on the basis of their disabilities.

I assessed the degree to which such ongoing failures and deficiencies by ADOC may be isolated instances or whether they are reflective of system-wide failures that negatively impact the putative ADA sub-class on the basis of their disabilities. I concluded that the failures and

deficiencies that I found are not isolated instances, but rather are evidenced system-wide and at various ADOC prison facilities. In effect, the sum total of ADOC's policies, procedures, and practices as applying to putative ADA sub-class inmates with disabilities expose members of this putative sub-class to a substantial risk of harm and inappropriate programs and services, on the basis of their disabilities. Taken together, the system-wide failures that I found in ADOC's policies, procedures, and practices as applied to the putative ADA sub-class expose members of the ADA sub-class to the denial of participation, program access, and reasonable accommodations, resulting in a substantial risk of present and potential future harm to putative ADA sub-class members.

The failures that I found are systemic to ADOC's existing policies, procedures, and practices in the provision of programs and services, and accommodations, that separately and taken together negatively impact the putative ADA sub-class on the basis of their disability status. I have documented examples of how ADOC lacks significant and well-recognized features in programs and services for inmates such as in the putative ADA sub-class. These failures emanate from deficiencies in identifiable system-wide policies and practices, such as an institutionalized failure to identify, assess, and provide for reasonable accommodations to numbers of the putative ADA sub-class. They also likely exist for, and will affect, many inmates as of yet to be identified with similar physical and mental disabilities as they age in prison (e.g., ADOC inmates tend to be older as compared to other inmates in national samples),[230] and with varying types of ascertainable physical and mental disabilities as defined by the ADA and Section 504.

Putative ADA sub-class members share the common need for appropriate programs and services, and reasonable accommodations, in consideration of their disabilities and of other legitimate prison safety and operational needs. This overarching objective, in large part, may be

addressed and provided for by ADOC comprehensively, with development and implementation of uniform and system-wide policies, procedures, and practices to which all sub-class members are subjected. In the absence of such generally applicable and system-wide operations, putative ADA sub-class members are exposed to discrimination on the basis of their disabilities and to substantial harm as a result of ADOC policies, procedures, and practices that govern the conditions of confinement, programs and services, and accommodations.[231] These system-wide policies and procedures may be appropriately adapted to address facility-specific operational, safety, staffing, and other needs.

In the next section of my Report, I respectfully offer illustrative proposals as to the kinds of changes in ADOC's policies, procedures, and practices that help alleviate the deficiencies that I have found.


### C.      Illustrative Recommendations

There is no single, immediate solution to remedy the systematic ADA noncompliance that I have found within ADOC's prisons. Prisoners with physical and mental disabilities in ADOC custody are systematically excluded, warehoused, and segregated from participation in, or denied the benefits of, programs, services, and activities on the basis of their disabilities.

ADOC's policies, procedures and practices for the provision of accommodations are deficient, disjointed, ineffective, and frequently nonexistent in relation to programs, services, and activities available to putative ADA sub-class members. The lack of system-wide policies, procedures and planning for the putative ADA sub-class has led to, and will continue to lead to, a vicious cycle of life and death consequences for putative ADA sub-class members on the basis of disability. The experiences of the putative ADA sub-class highlight the discrimination that ADA title II was intended to prevent: the provision of programs, services, and activities by ADOC that

result in unnecessary exclusion, segregation, and isolation on the basis of disability.[232] My review and analyses demonstrate the harmful and stigmatizing effects of disability discrimination; that is, treating the putative ADA sub-class negatively and harshly because of their disabilities.

In contrast, the provision of ADA-compliant programs, services, and activities likely will serve to enhance ADOC's operations for the putative ADA sub-class as well as for the general prison population. I have documented in my research, and it has been documented by others, the beneficial "ripple effects" associated with the provision of ADA accommodations. When well-planned and implemented, the provision of ADA-compliant programs and services neither should create nor perpetuate undue programmatic and safety burdens for ADOC. To the contrary, my findings herein are consistent with other social science studies showing the benefits of ADA-compliant programs and services, and from reasonable accommodations and provision of effective communications.[233]

I have identified well-recognized principles and practices to begin to address ADOC's failures in services and programs for the putative ADA sub-class, whose members are among the system's most vulnerable prisoners. ADOC must undertake measures in regard to putative ADA sub-class members, such as:

1. *ADA Self-evaluation plan*: develop and adopt a system-wide and prison facility-specific ADA/Section 504 Self-Evaluation (ADA audit) and Transition Plan.

2. *ADA/Section 504 plan implementation and best practice*: disseminate ADA/504 Plan to all staff and provide training regarding the same.[234]

3. *Disability identification, assessment, and monitoring systems*: coordinate a system-wide and facility-specific electronic information system[235] to identify and track inmates with disabilities, their accommodations, and ADA grievances.[236]

4. *ADA accommodation identification, provision, monitoring*: document and evaluate accommodation requests and grievances,[237] with consideration of the inmate's preferred accommodation.[238]

5. *Accommodation implementation*: implement an "Inmate Helper and/or Aid" certification training program to assist in the provision of accommodations for inmates with disabilities.[239]

6. *ADA Training and Quality Assurance Systems*: provide training at new employee orientation and for current staff,[240] and for third party providers, on the identification of ADA disabilities and provision of accommodations for inmates with disabilities;[241]

7. *ADA Coordinators*: designate ADA coordinators centrally and at each facility with appropriate backgrounds, certification, training, lines of authority, executive and operational oversight, and accountability for monitoring and sustaining ADA-related outcomes.[242]

8. *ADA Notice*: disseminate to all inmates policies and procedures on the rights of inmates with disabilities in postings, brochures, and handbooks in accessible formats.[243]

9. *ADA Accountability*: structure ADOC administrative leadership to create the means for operational accountability within the prison system with respect to the rights of inmates with disabilities under the ADA.[244]

10. *ADA Administrative Regulation*: review all Administrative Regulations[245] pertaining to inmates with disabilities and revise or draft policies and regulations to comply with the ADA, and to implement the ADA/504 Plan.[246]

These measures are important, given the cumulative and escalating effects of individual disability and chronic health conditions in the context of long-term incarceration, and to reduce

the possibility of injury and violence while incarcerated.[247] People with disabilities are more likely to be victims of nonfatal violent crimes than are people without disabilities, and they are more likely to report rape or sexual assault compared with people without disabilities—women are victimized more often than men, and people with cognitive disabilities have high rates of violent victimization. Mental illnesses, such as depression and anxiety, are common concerns for people with disabilities who are less likely to report receiving adequate social and emotional supports.[248] In addition, research shows that the inability to attain and retain employment post-release is associated with an increased risk of re-arrest.[249] Putative ADA sub-class members are denied equal opportunities and appropriate accommodations to engage in ADOC prison work release programs because of their disabilities and thus placed at greater risk for recidivism.

In accord with my prior research and that of others,[250] my review shows that often ADOC staff may misconstrue and misperceive the behaviors associated with an inmate's disability (e.g., deaf or hard of hearing, blind, epilepsy, intellectual disability, psycho-social disabilities, and irrational speech or aberrant behaviors), for instance, as violating ADOC disciplinary codes and prison rules.[251] Punitive consequences and sanctions may be used improperly to address the behaviors of putative ADA sub-class members with mental illness, for instance, which are the result of their illness and are exacerbated due to inappropriate or unmodified mental health care and medication treatment programs and services as well as from a lack of reasonable accommodations.[252]

Social science research also shows people with disabilities generally are susceptible to stereotyping and bias in regard to programs and services offered by public and private entities. Misinformed reliance on biases[253] and stereotypes about people with disabilities, and the behaviors associated with their disabilities (for example, as to the association between mental illness and individual violent behavior),[254] often leads to the unnecessary and inappropriate

actions toward these individuals that may serve to exclude or punish these individuals from receiving programs and services offered by public entities.[255]

When Congress was examining passage of the ADA, its Committee reports expressly showed concern for the importance of the "non-discrimination mandate" by public entities such as ADOC that operate prisons.[256] The changes that are suggested herein, as well as others, are needed if ADOC is to fulfill its responsibilities to inmates with disabilities. Measurements of compliance with ADA-mandated approaches are needed in the provision of services, programs, and activities offered by ADOC to inmates with disabilities. I have offered systemic approaches to the identification, tracking and monitoring, and evaluation of ADOC ADA-related policies, procedures and practices. Many of the suggestions and findings I have made have been successfully implemented in resolving and maintaining sustained and substantial compliance in similar settings in other states.[257]

## VI.    CONCLUSION

It has been said that "[i]ncarceration inherently involves the relinquishment of many privileges; however, prisoners still retain certain civil rights, including protections against disability discrimination."[258] There is no justification in well-recognized research and practice for continued discrimination, segregation, and suffering by the putative ADA sub-class solely on the basis of their disabilities while incarcerated in ADOC facilities.[259] In many instances documented in this report and elsewhere, not only was ADOC aware of its deficiencies in regard to ADA title II compliance, but also ADOC did not take any or appropriate actions to rectify these known deficiencies affecting and injuring putative ADA sub-class members.[260]

Although I have been asked to opine on those issues identified herein as affecting the putative ADA sub-class, in my view system-wide changes at the departmental and institutional

levels are required for ADOC to address the deficiencies as to this sub-class, and as to those similarly-situated inmates who may in the future become disabled. Nonetheless, with safety and rehabilitation as primary objectives of ADOC, system-wide planning, implementation and monitoring by ADOC may appropriately provide the putative ADA sub-class with equitable and reasonable access to the programs, services, and activities that ADOC offers to those in the general prison population.

Deficiencies in ADOC's services, programs, and activities towards inmates with disabilities are not inevitable, and a culture of inaction and acceptance of ADA noncompliance is not unavoidable.[261] To the contrary, with well-recognized and appropriate planning, procedures, and accountability, ADOC's mission for safety and rehabilitation may be accomplished.[262]

* * *

The opinions herein reflect my views to date and may be supplemented by additional information through this matter's discovery process. I respectfully reserve the right to amend, add to, or supplement this report based on such new information. I further state the views contained herein are true and correct to the best of my knowledge and belief.

Dated:  March 7, 2016

_____

Peter Blanck, Ph.D., J.D.

## VII.   APPENDIX OF EXHIBITS

Exhibit 1        Curriculum Vitae of Peter Blanck, Ph.D., J.D.

Exhibit 2        List of Materials Considered

---

[1] I hold other appointments at Syracuse University in the Colleges of Law, Arts and Sciences, Education, and the Falk College, and the Maxwell School of Citizenship and Public Affairs. I am an honorary professor at the National University of Ireland, Galway, at the Centre for Disability Law and Policy.

[2] BBI, takes its name from the late Burton Blatt, who promoted the civil rights of persons with disabilities. *See* http://bbi.syr.edu.

[3] For example, I have been retained by the City of Sioux Falls, South Dakota, to review that City's ADA and Section 504 "Transition Report." This project includes onsite inspections, reviews of services, programs, and activities as relevant to persons with disabilities, review of the physical accessibility of facilities and transportation services, review of website accessibility, and review of effective communications for persons with hearing and visual impairments. *See also* Americans with Disabilities Act Title II Regulations, Nondiscrimination on the Basis of Disability in State and Local Government Services, 28 CFR Part 35 (Sept. 15, 2010) & Appendix A to Part 35— Guidance to Revisions to ADA Regulations on Nondiscrimination on the Basis of Disability in State and Local Government Services.

[4] *See, e.g.,* Peter Blanck et al., *Disability Civil Rights Law and Policy* (West, 2003, 2005, 2009, 2014).

[5] *See, e.g.,* http://bbi.syr.edu. *See also ACA, Working with Special Needs Offenders* (Books I, II, III), *infra* at I-19 - 24.

[6] The Job Accommodation Network (JAN) is a leading source of guidance on accommodations and a service of the U.S. Department of Labor. *See, e.g.,* http://askjan.org/links/about.htm.

[7] *See, e.g.,* Disability Case Study Research Consortium, Conducting and Benchmarking Inclusive Employment Policies, Practices, and Culture (December 19, 2008) (*available at*: http://www.dol.gov/odep/research/CorporateCultureFinalReport.pdf); Lisa Schur, Douglas Kruse, & Peter Blanck, *People with Disabilities: Sidelined or Mainstreamed?* 75-79 (2013). *See also* EEOC Policy Guidance on Executive Order 13164: Establishing Procedures to Facilitate the Provision of Reasonable Accommodation, EEOC Directives Transmittal, No. 915.003 (Oct. 20, 2000); *available at*: http://www.eeoc.gov/policy/docs/accommodation_procedures.html; Peter Blanck et al., Implementing Reasonable Accommodations Using ADR Under The ADA: A Case of a White Collar Employee With Bipolar Mental Illness, 18 *Mental & Physical Disability L. Rep.* 458 (1994); Helen Schartz, Kevin Schartz, D.J. Hendricks, & Peter Blanck, Workplace Accommodations: Empirical Study of Current Employees, 75 *Miss. L.J.* 917 (2006); Helen Schartz, D.J. Hendricks, & Peter Blanck, Workplace Accommodations: Evidence-Based Outcomes, 27 *Work: A Journal of Prevention, Assessment and Rehabilitation* 4, 345 (2006).

[8] *See, e.g.,* Peter Blanck, Americans with Disabilities and their Civil Rights, *University of Pittsburgh Law Review*, 66, 687-719, at 687-719, 706-707 (2005).

[9] I have been involved in research and applied projects on emergency preparedness and response for people with disabilities. I authored "Disaster Mitigation for Persons with Disabilities: Fostering a New Dialogue" when I was a senior fellow of the Annenberg Foundation Washington Program.

---

[10] *Compare generally ACA Standards*, 4th Ed., *infra* at xxiii (fundamentals of performance-based standards); *ACA 2014 Standards Supplement* (2014).

[11] *See, e.g.,* Peter Blanck, "The Right to Live in the World": Disability Yesterday, Today, and Tomorrow, 2008 Jacobus tenBroek Disability Law Symposium, *Texas Journal on Civil Liberties and Civil Rights*, 13, 367-401 (2008).

[12] *See, e.g.,* Peter Blanck, ADA at 25 and People with Cognitive Disabilities: From Voice to Action, *Inclusion*, 3(2), 46-54 (2015).

[13] In my work as an expert on the ADA and related laws, I have inspected state juvenile and adult prison facilities (e.g., in Wyoming, Oklahoma, and South Carolina). During these visits, I have conducted structured and semi-structured interviews with state officials, correctional officials and guards, and juveniles and prisoners to assess state programs and services for individuals with a range of physical, mental, cognitive, visual, hearing, and other disabilities. Prior to my appointment by the U.S. District Court, I was retained by the Wyoming Attorney General's office to aid in resolution of compliance with the ADA and Rehabilitation Act in state programs and services. Before my work in Wyoming, I conducted similar work for the Governor's Office in the State of Oklahoma.

[14] *See, e.g.,* Peter Blanck, On integrating persons with mental retardation: The ADA and ADR, *New Mexico Law Review*, 22(3), 259-76 (1992); Peter Blanck, Empirical study of the employment provisions of the Americans with Disabilities Act: Methods, preliminary findings and implications, *New Mexico Law Review*, 22(3), 119-241 (1992); Peter Blanck, Helen Schartz, & Kevin Schartz, Labor Force Participation and Income of Individuals with Disabilities in Sheltered and Competitive Employment: Cross-Sectional and Longitudinal Analyses of Seven States during the 1980s and 1990s, *William & Mary Law Review*, 44, 1029-1108 (2003). The Americans with Disabilities Act of 1990 (ADA), and as amended the Americans with Disabilities Act Amendments Act of 2008 (ADAAA), and Section 504 of the Rehabilitation Act of 1973 (Section 504 or the Rehabilitation Act) prohibit discrimination against qualified individuals with disabilities in the provision of programs and services provided by public entities such as that of ADOC. *See, e.g.,* Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.; Rehabilitation Act of 1973, 29 U.S.C. § 701.

[15] *See Alexander S.* case referenced *passim*.

[16] The *Alexander S.* Court found (e.g., *supra* at 785-86). *See also Callous and Cruel: Use of Force against Inmates with Mental Disabilities in U.S. Jails and Prisons*, at 1 Mental Health Watch (May 2015) (prison "staff at times have responded with violence when prisoners engage in behavior that is symptomatic of their mental health problems, even if it is minor and non-threatening misconduct such as urinating on the floor, using profane language, or banging on a cell door.").

[17] The *Alexander S.* Court, *supra*, at 788, found these laws (and the Individuals with Disabilities Education Act (IDEA)), apply to the facilities, and programs and services, offered by the state. *See also* Peter Blanck, Americans with Disabilities and their Civil Rights: Past, Present, Future, *University of Pittsburgh Law Review*, 66, 687-719, at 703-04 (2005).

[18] *See* BBI Chairman Peter Blanck to Receive 2015 National Distinguished Disability Service Award; *available at*: http://bbi.syr.edu.

[19] My document and materials review, site inspections and interviews, and activities conducted in this matter are subject to the Consent Protective Order, and its confidentiality provisions, which was filed by the parties on November 24, 2014 (Doc. No. 68). The named ADA sub-class plaintiffs in this matter include: Alex Ball, Augustus Smith, Bradley Pearson, Brandon Johnson, Brian Sellers, Charlie Henderson, Cherry Baker, Christopher Gilbert, Christopher Jackson, Daletrick Hardy, Daniel Tooley, Donald Turner, Dwight Hagood, Edward Braggs, Gary Broyles, Howard Carter, Hubert Tollar, Jamie Wallace, Jermaine Mitchell, John Maner, Jonathan Sanford, Joseph Torres, Joshua Dunn, Kenneth Moncrief, Leviticus Pruitt, Matthew Mork, Quang Bui, Richard Businelle, Richard Terrell, Rick Martin, Robert "Myniasha" Williams, Robert Dillard, Roger McCoy, Roger Moseley, Sylvester Hartley, Tedrick Brooks, Timothy Sears, Tommie Moore, Turner Rogers, William Villar, Willie McClendon.

[20] *See* Dunn et al., v. Sharp, et al., Second Amended Complaint: Class Action Complaint for Declaratory and Injunctive Relief, at 110, para 369, para 433 & *passim* (filed Feb. 20, 2015) [hereinafter "Second Amended Complaint" or "Complaint as amended"] ("a sub-class of prisoners (hereinafter "ADA Subclass") who are now, or will be in the future, persons with disabilities as that term is used in the ADA and § 504 in custody of DEFENDANT ADOC."). *See also* Blanck et al., *Disability Civil Rights Law and Policy*, *supra* at 69 (2014) ("an individual with a [ADA] disability if he or she falls into one of the following categories: An individual with an

actual disability; An individual with a record of a disability; or An individual who is regarded or treated as if he or she has a disability ("regarded as"). 42 U.S.C. § 12102(1)(A)-(C).").

[21] *See* Henderson et al. v. Thomas et al., 913 F. Supp.2d 1267, 1287, n.14 (M.D. Ala., 2012) (ADA and Section 504 of Rehabilitation Act "clearly apply to Alabama's state prisons."). *Id.* at 1287-88 ("[ADA] Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. Section 504 provides that, "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794(a). Claims under both statutes are governed by the same standards. … To state a claim under either statute, the plaintiffs must show: "(1) that [they are] qualified individual[s] with a disability; (2) that [they were] either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or [were] otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff[s'] disability." … Because the same standards govern claims under both statutes, in the interest of brevity, the court will refer to both as "the ADA." … Among the regulations promulgated under Title II of the ADA is the "integration regulation," which provides that, "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." "[T]he most integrated setting appropriate" is defined as "a setting that enables individuals with disabilities to interact with non-disabled persons *to the fullest extent possible*." Consonant with the integration mandate, the Supreme Court has concluded that, "Unjustified isolation ... is properly regarded as discrimination based on disability.")" (emphasis added, citations and endnotes omitted). *Id.* at 1287, n.15 ("The ADA and the Rehabilitation Act define disability as (among other things) "a physical or mental impairment that substantially limits one or more major life activities of such individual." … The ADA Amendments Act of 2008 clarifies that "major life activities" includes "the operation of a major bodily function[s] … .") (citations omitted).

[22] I use the term "disability" to refer to an inmate who meets the definition of disability as set forth in the ADA, 42 U.S.C. § 12102. This Complaint was initiated after amendments to 42 U.S.C. § 12102 were in effect (ADA Amendments Act of 2008, Pub.L. 110–325, §§ 4(a), 8, 122 Stat. 3555 (2008). The ADA Amendments Act in new subsection (1)(C) provides: "(3) Regarded as having such an impairment. For purposes of paragraph (1)(C): (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." (emphasis added). The Congressional Committee Report states this language "restores Congress's original intent by making clear that an individual meets the requirement of "being regarded as having such an impairment" if the individual shows that an action (e.g. disqualification from a job, program, or service) was taken because of an actual or perceived impairment, whether or not that impairment actually limits or is believed to limit a major life activity. H.R.Rep. No. 110–730, pt. 1, at 14 (2008). Putative ADA sub-class members, therefore, only are required to raise a genuine issue of material fact about whether defendants regarded them as having a mental or physical impairment, and are not required to present evidence of how, or to what degree, defendants believed the impairment affected a putative ADA sub-class member. Moreover, regulations promulgated by the U.S. DOJ include drug addiction among conditions qualifying as a "physical or mental impairment," 28 C.F.R. § 35.104(1)(ii) (2011). For discussion of these points, *see* Hilton et al. v. Wright, 673 F.3d 120, at 128-30 (2d Cir. 2014). For purposes of my analyses and report, I consider putative ADA sub-class members as defined by the ADA and Section 504 (*see supra* definition of ADA disability). *See also* Settlement Agreement between the United States of America and Erie County, New York, Regarding the Erie County Holding Center and the Erie County Correctional Facility Under the Americans with Disabilities Act: DJ # 204-53-125 (Dec. 17, 2014); *available at*: http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/23/erie_county_settlement_agreement.pdf [hereinafter "Erie County Settlement"] (United States compliance review of Erie County Holding Center and the Erie County Correctional Facility to determine compliance with ADA Title II (42 U.S.C. §§ 12131-12134, and DOJ's regulation at 28 C.F.R. Part 35). The review was conducted under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and DOJ's implementing regulation, 28 C.F.R. Part 42, Subpart G. DOJ concluded the facility contained architectural barriers to access for persons with disabilities and its programs, services, and activities were not fully accessible to persons with disabilities in violation of the ADA.

[23] *Compare* State of North Carolina Department of Public Safety Prisons, Policy and Procedure, Chapter: E, Section: .2600, Reasonable Accommodation for Inmates with Disabilities, at 4 (Sept. 5, 2013) ("(p) Program–A structured intervention designed to achieve specific goals, values, and objectives. Programs have a curriculum and are typically targeted towards a particular criminogenic need. Programs are made available by Prisons to inmates for the purpose of changing inmates' behavior patterns, aiding in inmates' rehabilitation, enhancing inmates' quality of life, or improving inmates' physical and mental well being. (q) Activity–A planned offering for inmates that provides productive interaction among themselves, staff, and the community. (r) Service–A method of providing inmates with information and resources that are mandated by law or court order, or otherwise provided as a benefit or privilege to the inmates. Services shall also include job and program related activities for inmates, such as inmate orientation, intramural recreations, religious services and visitation or other legitimate Prisons approved services for inmate.").

[24] For a recent overview of the legal cases addressing ADOC's deficiencies in the provision of programs, services, and activities to inmates with and without disabilities, *see* Stefan J. Bachman, An Intersection of Law and Order: Federal Courts, Overcrowded Conditions inside Alabama's Prison System, and the Scope of Possible Remedial Relief After *Brown v. Plata*, Cumberland Law Review, 45, 91-211, at 138 (2014) ("Inhumane prisoner treatment has been a black mark on Alabama's image for a long time. Indeed, it is difficult to find a time period in Alabama's penal history when some level of mistreatment within the State's prison system was not prevalent. Overcrowding, understaffing, and underfunding have been pervasive over the years, and these factors have continually fostered a prison system forged from oppression rather than rehabilitation.").

[25] *See, e.g.,* Henderson et al. v. Thomas et al., 913 F. Supp.2d 1267, 1276 (M.D. Ala., 2012).

[26] ADOC is an instrumentality of the state of Alabama and receives federal funding. *See, e.g.,* Henderson et al. v. Thomas et al., 913 F. Supp.2d 1267, 1287 (M.D. Ala., 2012). I was asked to examine whether and, if so to what extent, ADOC's alleged system-wide and programmatic barriers facing plaintiffs, as individuals with disabilities housed at the fifteen major correctional facilities, results in inappropriate and unequal programs and services that unfairly deny and limit access to and equal participation in programs such as work camps and work release centers.

[27] *Compare* Jennifer Bronson, Laura M. Maruschak, & Marcus Berzofsky, *Disabilities Among Prison and Jail Inmates, 2011–12*, U.S. DOJ, Bureau of Justice Statistics, at 1 (Dec. 2015) (prevalence estimates and characteristics of disabilities among prison inmates reporting six disability types: hearing, vision, cognitive, ambulatory, self-care, and independent living; finding 32% of prisoners reported having at least one disability; prisoners nearly 3 times more likely than general population to report at least one disability; 2 in 10 prisoners reported cognitive disability, which was most common reported disability; female prisoners more likely than males to report cognitive disability, but equally likely to report having other five disabilities; 54% of prisoners with a disability reported a co-occurring chronic condition; compared to those without a disability, prisoners with a disability were 4 times more likely to report past 30-day serious psychological distress; 33% of prisoners with a cognitive disability reported past 30-day serious psychological distress, compared to 11% of prisoners with disability other than cognitive). *See also* Laura M. Maruschak, Medical problems of inmates, *Learning* 21, 20.8: 21-5 (2006) (U.S. DOJ, Bureau of Justice Statistics Special Report, 2002 survey of inmates randomly selected from nationally representative sample of facilities finding: estimated 229,000 inmates reported having current medical problem, reporting: arthritis (13%), hypertension (11%), asthma (10%), heart problems (6%); cancer, paralysis, stroke, diabetes, kidney problems, liver problems, hepatitis, sexually transmitted diseases, tuberculosis (TB), human immunodeficiency virus (HIV) (less than 5%); learning impairment such as dyslexia, attention (22%); mobility impairment requiring cane, walker, wheelchair, aids for daily activities (2%); mental health condition (8%); hearing (6%) and vision (11%) impairments); two or more impairments (15%); medical problems highest among female and older inmates; inmates with impairments had higher rates of injuries, especially inmates with mental impairments).

[28] For purposes herein, I refer to ADOC residents as "prisoners" or "inmates."

[29] *Compare Pierce v. District of Columbia*, 2015 WL 5330369, at *11 (Dist. Colum. 2015) ("Significantly for present purposes, because Congress was concerned that "[d]iscrimination against the handicapped was ... most often the product, not of invidious animus, but rather of thoughtlessness and indifference–of benign neglect[,]"…, the express prohibitions against disability-based discrimination in Section 504 and Title II include *an affirmative obligation* to make benefits, services, and programs accessible to disabled people. That is, an entity that provides services to the public cannot stand idly by while people with disabilities attempt to utilize programs and services designed for the able-bodied; instead, to satisfy Section 504 and Title II, such entities may very well need to act affirmatively to modify, supplement, or tailor their programs and services to make them accessible to persons with disabilities.") (emphasis in original, citations omitted).

[30] *See, e.g.,* Blanck et al. (2014), *supra* at 364-65 & *passim.*

[31] *See, e.g.,* Henderson et al. v. Thomas et al., 913 F.Supp.2d 1267, 1310 (2012) ("In addition to the integration mandate, the ADA prohibits the unnecessary exclusion of disabled individuals. The implementing regulations to the ADA state: "A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." ... "[L]egitimate safety requirements" may be imposed, but only when they are "necessary for safe operation" and "based on actual risks and not mere speculation, stereotypes, or generalizations about individuals with disabilities." ") (citations omitted). *Id.* at 1318 ("how prisoners should be treated based on their [ADA disability] status must depend upon an individual-by-individual assessment of these prisoners that honors each prisoner's rights under the ADA, … . The essential thrust of this court's opinion today is simply that the ADOC must look at each [ADA disabled] prisoner separately and individually based upon that prisoner's particular circumstances."). *See also* Hecker et al., v. California Department of Corrections and Rehabilitation et al., Order for Final Approval of Settlement Agreement, No. 2:05-CV-02441 KJM-DAD (D. Ct. E.D. CA, Sac. Div., Mar. 2, 2015), at 2 (class action approved "with an injunctive relief settlement class consisting of all present and future CDCR inmates with psychiatric conditions that are disabilities as defined by the Americans with Disability Act (ADA) and the Rehabilitation Act, and who are allegedly excluded and/or screened out from any prison program, service, or activity on the basis of their psychiatric disability status."). *Id.* at 4 (court to resolve disputes "regarding allegations of disability discrimination against class members or the exclusion of class members from Defendants' programs and services on the basis of disability" and "address whether the specific systemic policies, practices and procedures identified … violate the ADA and Rehabilitation Act, and if so what prospective relief is appropriate."). *Id.* at Appendix A, at 7-9 (policies, practices, and procedures such as reasonable accommodations and modified policies during heat alerts, for participation in prison programs for jobs and education, housing, and ADA grievance process and requests for accommodations, to provide meaningful access to equivalent programs and services).

[32] For instance, putative ADA sub-class members allege they lack appropriate diagnoses of medical conditions, that some have died from a failure to treat medical conditions such as cancer, diabetes and hepatitis, that some have required emergency surgery, lost use of legs, arms and eyes, from untreated symptoms, some with mental illnesses and serious psychological problems denied mental health care, and have been provided little or no medication management, and mental health care is deficient, and prisoners inappropriately forced to take medication. *See* Complaint as amended, *passim.*

[33] *See, e.g.,* Larry Edward Spencer, A State of Emergency in Alabama: Prison Overcrowding, *SAGE Open* 2(3), 1-5, at 1 (July-Sept. 2012) (compounding ADOC overcrowding "is the fact that prisons are suffering from a lack of adequate funding and staffing."). *Id.* at 2 ("not uncommon for a single correctional officer to supervise up to 250 to 300 medium to higher security inmates for an extended period of time (Fiscal Year, 2008)."). For related media stories concerning Alabama's overcrowded prison system and proposed reforms by the Alabama Prison Reform Task Force, Chairman State Senator Cam Ward of Alabaster, Alabama, and possible actions during the 2015 Alabama State legislative session, *see* Alabama's Prison Reform Task Force Readies Bill For 2015 Legislative Session, Radio Interview with State Senator Cam Ward (Feb. 24, 2015); *available at*: https://www.wbhm.org/News/2015/camwardprisonbill (discussing the need to reduce overcapacity over a five-year period and for new prison construction). *See also* ADOC Commissioner Kim Thomas Resigns, Fox News (Feb. 3, 2015); *available at*: http://www.myfoxal.com/story/27955393/adoc-commissioner-kim-thomas-resigns; Ala. DOC shuffles leadership to make room for reform The state's prisons have long been troubled by overcrowding, currently standing at about 186 percent capacity, CorrectionsOne.com (Feb. 21, 2015) (ADOC "announced this week they will be shuffling key leadership positions in response to the continued criticism of overcrowding and reported violence. The state's prisons have long been troubled by overcrowding, currently standing at about 186 percent capacity. … Ten prison wardens and deputy wardens will be relocated to oversee different correctional facilities within the state effective March 1. The change follows the departure of former Alabama Department of Corrections Commissioner Kim Thomas in January, allowing for reform to move forward and a new leader to take his place. Gov. Robert Bentley announced that Col. Jefferson Dunn, …, would become DOC commissioner after retiring from the Air Force in March. Acting ADOC Commissioner William Sharp said the realignment of DOC wardens is meant to provide new insight into correcting prison procedures. … Sharp said. 'Each correctional facility is unique in day-to-day operations, so it's important for wardens to gain the internal insights throughout the department from safety practices, security operations to inmate classification, treatment programs and support services.'"); *available at*:

http://www.correctionsone.com/alabama/articles/8319598-Ala-DOC-shuffles-leadership-to-make-room-for-reform/. *See also* Editorial, Justice Reform in the Deep South, *NY Times* (May 18, 2015) ("Alabama prisons are stuffed to nearly double capacity, endangering the health and lives of the inmates, and the cost of mass imprisonment is crippling the state budget at no discernible benefit to public safety.").

[34] I further reviewed related public material about Corizon and MHM. *See, e.g.,* Michael Wineripjune, Rikers Island Health Care Provider May Lose Deal With New York, *NY Times* (June 1, 2015); *available at:* http://www.nytimes.com/2015/06/02/nyregion/contract-with-rikers-island-health-care-provider-is-to-be-terminated.html?smprod=nytcore-iphone&smid=nytcore-iphone-share&_r=0 ("A private health care company that has been criticized for doing such a poor job at the Rikers Island jail complex that its medical performance contributed to several inmate deaths is expected to lose its contract with New York City, according to two high-ranking city officials. Corizon, a for-profit company based in Brentwood, Tenn., with a three-year, $126 million contract to run the jails, has been accused by state investigators of repeatedly neglecting and improperly treating inmates, playing a role in at least a dozen deaths at Rikers. In one case that the State Commission of Correction found to "shock the conscience," an inmate was left dying untreated for six days while uniformed officers, doctors, mental health clinicians and nurses made 57 visits to his cell without assisting him.").

[35] ADOC OHS, Manual of Policies and Procedures (Jan. 20, 2012; revised index pending, Sept. 2014), at ADOC000774, *et seq. Id. at* ADOC000774, -84 (AR 700, Health Services—Nov. 8, 2010—IX. Performance requirements, D. and E., adopting NCCHC and ACA standards). *See also* AR 024, Operations—May, 2, 2005—I. General requirements for a standardized system for operation manuals, at ADOC000786; ADOC OHS Services Goals ("Permit an on-going system-wide analysis of inmate health needs."); at ADOC000790. *See generally* ADOC AR; *available at:* http://www.doc.state.al.us/Regulations.aspx. *See also* http://www.doc.state.al.us/ExecutiveBios.aspx ("Commissioner Naglich is responsible for the administration of medical and mental health services to over 26,000 incarcerated individuals with the ADOC's 30 correctional institutions. Commissioner Naglich has more than 21 years of healthcare administration and clinical experience, with 17 years specific to the medical specialty of correctional healthcare. Commissioner Naglich's background includes business development, education and training, public health, and correctional healthcare administration.").

[36] *See also* Dunn v. Dunn, Plaintiffs' Objection to the Magistrate Judge's Order Granting Plaintiffs' Motion to Compel Production of Documents Relating to Non-Plaintiffs (Opposed), Exhibit 3: Declaration of Peter Blanck, Ph.D. J.D., at 9 (M.D. Ala., Apr. 21, 2015) ("Random sampling of the files of prisoners with various disabilities who are not named plaintiffs will provide a further robust basis for analysis of ADOC's treatment of prisoners with disabilities."). *Compare* Justice Reinvestment in Alabama, Justice Center Presentation (Sept. 30, 2014) (examining ADOC records finding prison overcrowding, one in three inmates currently eligible for parole, parole release rate declining). *See also PARCA Quarterly,* at 8 (Public Affairs Research Council of Alabama) (Fall 2014) ("Alabama has the highest level of prison over-crowding in the U.S."); Justice Reinvestment in Alabama, Justice Center: Council of State Governments, 1 (March 12, 2015) ("Alabama's correctional system is in crisis. … The state's incarceration rate is the nation's fourth highest and, as of September 2014, Alabama's prisons—the most crowded in the country—were operating at 195 percent of capacity, with 26,029 people in a system designed to hold 13,318.") (citations omitted); *available at:* http://csgjusticecenter.org/jr/alabama/publications/justice-reinvestment-in-alabama-analysis-and-policy-framework/.

[37] *See, e.g.,* Corizon Highest Acuity Reports, listed *infra* Exhibit 2. These reports are labeled as "Alabama Monthly Special Needs and 30 Sickest [Month and Year] High Acuity Reports." (reports reviewed dated from January 2010 to March 2015).

[38] The twenty-five inmate case file review was generated randomly from Corizon's High Acuity List to choose inmates in accord with the stratifying methods identified in the body of this report; that is, making the selections first from de-identified listings (i.e., without inmate names) and thereafter from identified listings, and from choosing randomly among the remaining listings, and in consideration of sample sizes within the categories of interest, and not including inmates who have been transferred and/or released from ADOC custody, and/or sent to ADOC Work Release Programs.

[39] The resulting 25 inmates selected were as follows: Johnson Woods (Bibb), Luran Harrell (Bibb), Dale Pfalsgraf (Bullock), James George (Donaldson), David Campbell (Draper), Greg Maggard (Draper), Michael Thomas (Easterling), Daniel Weed (Fountain), James Pate (Fountain), Farris Burrell (Hamilton), Randal Kimble (Hamilton), James Gilbert (Hamilton), Jack Henson (Holman), Billy Johnson (Holman), Edward Favor (Holman), Robert Allen (Kilby), Scott Reed (Kilby), Jason Riley (Limestone), Eugene Underwood (St. Clair), Jerry Youngblood (St. Clair),

Charles Hunt (Staton), Dewaun Patt (Staton), Billie Lipscomb (Tutwiler), Connie Johnson (Tutwiler), Mark Loveless (Ventress). *See also* Exhibit 7 (Review Notes of 25 Case Files of ADOC Inmates Randomly Chosen from Corizon's High Acuity Lists). This case file review is in process and will be discussed in any subsequent reports as appropriate.

[40] *See, e.g.,* ADOC AR 8, Research and Planning, at 1 (Mar. 29, 2005) ("establishes responsibilities, policies, and procedures for publication and distribution of the ADOC Monthly and Annual Statistical Report. … [and] to collect statistical data.").

[41] *See Standards for Health Services in Prisons*, *infra* at 10 (National Commission on Correctional Health Care, 2014—NCCHC). *See, e.g., id.* at 3 (standards for access to health care, and avoidance of "unreasonable barriers" to access to health services such as deterring and punishing inmates for seeking health care, and understaffed and poorly organized health care systems). Similar provisions are presented in *Standards for Mental Health Services in Correctional Facilities*, *infra* (National Commission on Correctional Health Care, 2008—NCCHC).

[42] *See Standards for Health Services in Prisons*, *infra* at 10 (NCCHC, 2014).

[43] *See Standards for Health Services in Prisons*, *infra* at 12 (NCCHC, 2014) (need for continuous quality improvement through monitoring of programs and services).

[44] *See, e.g.,* Medical Services Agreement between ADOC and Corizon Health, Inc. (Sept. 12, 2013) (Article III Standard, 3.1 Obligation of Corizon, Corizon's services provided in accordance with ACA and NCCHC health standards); Mental Health Services Agreement between ADOC and MHM Correctional Services, Inc. (Nov. 8, 2012) (Article III Standard, 3.1 Obligation of MHM, MHM's services provided in accordance with ACA and NCCHC health standards). Corizon is a provider of correctional healthcare in the United States. *See, e.g.,* About Corizon Health; *available at*: http://www.corizonhealth.com/About-Corizon/Accreditations-and-Industry-Partners Information on MHM Services Inc.; *available at*: http://www.mhm-services.com/about/index.html.

[45] *See Standards for Health Services in Prisons*, *infra* at xii-xiii (NCCHC, 2014).

[46] *Compare, e.g.,* Erie County Settlement, *supra*; California Department of Corrections & Rehabilitation, Inmates with Disabilities Resource Page (e.g., forms for Notice and Request for Assistance at Parole Proceeding, Request for Reasonable Accommodation–Grievance Process, Developmental Disability Program Screening Results, Disability Placement Program Verification (DPPV), Authorization for Release of Information, Comprehensive Accommodation Chrono (CDCR) Form, Reasonable Modification or Accommodation Request); *available at*: http://www.cdcr.ca.gov/BOPH/Inmates_w_Disabilities_Resource.html; Florida Department of Corrections Reasonable Modification or Accommodation Request; *available at*: https://www.flrules.org/.../readRefFile.asp; Commonwealth of Pennsylvania, Department of Corrections Policy, Inmate Grievance System, DC-ADM 006, Reasonable Accommodations for Inmates with Disabilities; *available at*: http://www.cor.pa.gov/Administration/General%20Information/Documents/DOC%20Policies/804%20Inmate%20G rievances.pdf; State of North Carolina Department of Public Safety & Prisons, Reasonable Accommodation for Inmates with Disabilities; *available at*: http://www.doc.state.nc.us/dop/policy_procedure_manual/e2600.pdf.

[47] *See, e.g.,* U.S. Department of Justice, National Institute of Corrections, *Jail Standards and Inspection Programs: Resource and Implementation Guide*, at 2-7 (April 207) ("Why Jail Standards are Important"); *Id.*, at 39-44 (Appendix A: "Topics of Litigation"); *Id.*, at 45-46 ("Summary of State Standards and Inspection Programs," noting Alabama ADOC has semiannual mandatory standards and inspection programs under enabling statute AL Title 14 [*available at*: http://alisondb.legislature.state.al.us/acas/codeofalabama/1975/coatoc.htm]). U.S. Department of Justice, National Institute of Corrections, *Jail Inspection Basics: Supervisors Guide* (2d ed., March 207) (Chapter 2: Standards; Chapter 3: The Inspection Process; Chapter 4: Facility Design; Chapter 5: Communication; Chapter 6: Government Structures and Processes; Standards; Chapter 7: Resources (e.g., noting: NIC: National Institute of Corrections, NCJRS: National Criminal Justice Reference Service; ACA: American Correctional Association; AJA: American Jail Association; NSA: National Sheriffs' Association). *Core Jail Standards*, American Correctional Association; *available at*: http://www.aca.org/ACA_PROD_IMIS/Docs/Standards%20and%20Accreditation/CoreJailStandards.pdf, at 1 (presentation: Certification: Excellence in Detention—"The entire process has further enhanced our overall operations and is an endeavor I would highly recommend to any local detention center" - Scott Hassell, PhD, Chief of Corrections, Etowah County, Alabama); *Id.* (Standards "Compliance: Indicates complete compliance with the standard at all times and written documentation provides evidence to support the compliance measure"); http://www.bia.gov/cs/groups/public/documents/text/idc012203.pdf (e.g., Core Jail Standards for care, programs and activities, disabled inmates [at 49]); ACA Course: Working with Special Needs Offenders; *available at*:

http://www.aca.org/ACA_Prod_IMIS/ItemDetail?iProductCode=175&Category=PUBS-COURS&WebsiteKey=139f6b09-e150-4c56-9c66-284b92f21e51; *available at*: http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards___Accreditation/Standards/Updates/ACA_Member/Standards_and_Accreditation/Updates_and_Interpretations.aspx?hkey=d8193dbf-92dc-4dfb-b45a-d3152a3843fe (Revisions to 2012 Standards Supplement). ACA, *Working with Special Needs Offenders* (Books I, II, III) (ACA, 1998); National Commission on Correctional Health Care; *available at*: http://www.ncchc.org/standards-guidelines (e.g., Standards for Health Services in Prisons, Standards for Mental Health Services in Correctional Facilities). *But compare, e.g.,* Elizabeth Alexander, What's Wrong with the ACA, The National Prison Project, A Project of the American Civil Liberties Union Foundation, 15(1), at 1 (Summer/Fall 2001) ("The American Correctional Association (ACA) is the largest and best-known organization of correctional staff in the country. It offers higher education programs designed to train correctional professionals and, like a traditional professional association, it certifies persons as members in good standing of the profession. Of course, the major organizational function of the ACA is accreditation of prisons, jails, and juvenile facilities on the basis of published standards that the ACA has promulgated. Unfortunately, the ACA's actual performance of this function does not assure that minimum professional standards are observed. In fact, the ACA's process substitutes the standards and accreditation process for any form of more meaningful corrections oversight. The ACA appears to embrace the deployment of their standards and accreditation process to protect facilities from outside scrutiny."). For my analyses herein, among other documents, I reviewed: ACA's *Standards for Adult Correctional Institutions* (4th edition), *2014 Standards Supplement*, *Mental Health in Corrections*, and *Working with Special Needs Offenders* ("ACA Standards, 4th Ed."). *See also* American Bar Association (ABA), *Standards for Criminal Justice: Treatment of Prisoners* (3d ed. 2011) ("ABA Standards") (tracking ACA, ADA, Section 504 requirements); Society of Correctional Physicians; *available at*: http://societyofcorrectionalphysicians.org/resources/position-statements/restricted-housing-of-mentally-ill-inmates (e.g., position statement on problematic aspects of restricted housing for inmates on the basis of mental health disabilities).

[48] *See, e.g.,* U.S. DOJ, National Institute of Corrections, *Jail Standards and Inspection Programs*, *supra* at 21, 63 (principles and Appendix F illustrative inspection task list); U.S. DOJ, National Institute of Corrections, *Jail Inspection Basics: Supervisors Guide*, *supra* at 25. *See also* United States Department of State, *A Practical Guide to Understanding and Evaluating Prison Systems*, at VIII. Appendix, 38-50, Prison Evaluation Form (May 2012). *Id.* at 45 ("10. Are accommodations made for a person with a physical or mental disability? Mentally disabled prisoners are given more latitude by line staff. Physically disabled prisoners have no ramp access to the recreation yard or cafeteria and must be carried. Showers do not accommodate wheel chairs.").

[49] *See* ADOC, Kilby Correctional Facility; available at: http://www.doc.state.al.us/facility.aspx?loc=36 (Kilby, with capacity for 440 inmates, designed as receiving center for all male inmates, with dormitories, 100 two-man cells, hospital unit, and is a maximum-security prison because all inmates receive evaluation, classification, and assignment to ADOC correctional facilities; Kilby furnishes ADOC system with Hospital Services, including medical and mental health treatment that "provide comprehensive health care," including dental services, mental health care, and medical treatment, "which includes free world specialty care, and all related support services." … "On-site employee training programs are conducted at Kilby for local security and support personnel within the Montgomery area. Inmate programs offered by Kilby includes anger management, NA/AA, a chapter of the Volunteers in Corrections, sex offenders therapy, GED/ABE educational classes; 12-Step alcohol/drug counseling, chaplaincy services, and individual and group therapy offered as part of an on-going mental health program. Kilby also has a correctional industry plant for printing and graphic arts, and maintains an institutional garden for fresh produce.").

[50] *See also* Spencer, *supra* at 2 (statistics showing highest incidence of prison violence (excluding sexual assaults) per 100 inmates in 2011 occurred at Bullock Mental Health Facility).

[51] *See* Ventress Correctional Facility, ADOC; at: http://www.doc.state.al.us/facility.aspx?loc=38 ("opened in August of 1990 with a primary mission to provide alcohol and drug treatment to the Department's growing inmate population. Located in Clayton, the campus-designed Ventress maintains medium or below custody inmates in: One of the six on-going eight-week treatment classes. One of the two 15-week programs for inmates with dual disorders. An 18-month (minimum) Therapeutic Community. A six-month program, which was funded by a crime bill. One of two structured aftercare dormitories. Ventress offers academic and vocation educational programs, which are provided by the nearby Sparks Technical College. In addition, Ventress provides community services to localized city, county and state agencies.").

[52] *See, e.g.,* Kilby Correctional Facility; *available at*: http://www.doc.state.al.us/facility.aspx?loc=36 ("Inmate programs offered by Kilby includes anger management, NA/AA, a chapter of the Volunteers in Corrections, sex offenders therapy, GED/ABE educational classes; 12-Step alcohol/drug counseling, chaplaincy services, and individual and group therapy offered as part of an on-going mental health program. Kilby also has a correctional industry plant for printing and graphic arts, and maintains an institutional garden for fresh produce.").

[53] Prior to and after my site inspections and interviews I reviewed these putative class member medical files, prison jackets, and other relevant information available such as that provided at: ADOC Search for Inmates; *available at*: http://www.doc.state.al.us/InmateSearch.aspx.

[54] *See* Henderson v. Thomas, 891 F.Supp.2d 1296, 1301 (2012) ("Alabama has five levels of prisoner classification: close-custody, medium, minimum-in, minimum-out, and minimum-community. Security classification is a multifactor analysis that includes an individual's criminal history, past convictions, past violence, length of sentence, and pendency of unresolved charges. … Close-custody is "reserved for prisoners who have demonstrated severe behavioral problems, some prisoners sentenced to life without parole, and some detainees awaiting trial or sentencing for capital offenses." Medium-custody prisoners are held at medium- or close-security institutions and are housed in double-occupancy cells or dormitories. Medium custody prisoners may receive work assignments inside a secure facility. The "minimum" classification includes three subparts, all of which permit some type of work outside a secure facility. … only minimum-out and minimum-community inmates may transfer to a work-release center.") (citations omitted). *See also* Henderson et al. v. Thomas et al., 289 F.R.D. 506, 508-09 (M.D. Ala., 2012); Henderson et al. v. Thomas et al., 913 F. Supp.2d 1267, (2012) ("The classification team also evaluates the prisoner's need for educational programs, trade school, substance-abuse treatment, and certain mental-health programs. … this impacts the department's placement decisions. If, for example, a prisoner "needed to participate in a substance abuse program," the classification team would "approve a group of institutions that offered substance abuse treatment, and whichever one had the space available, that's the one he would go to." Finally, each prisoner is subject to a medical and mental assessment, which can further limit the number of facilities for which he is eligible."). *Id.* at 1280 ("any prisoner with a mental-health code that requires special housing is sent to Bullock Correctional Facility (which can house codes three though six) or Donaldson Correctional Facility (which can house codes three and four)."). *Id.* at 1281 ("Limestone has, for instance, a Senior Dorm, which provides a safer and calmer environment. There is also a Faith–Based Honor Dorm, whose prisoners enjoy occasional (though rare) benefits such as a family night, during which family members can visit and bring food. Limestone also offers a Pre–Release Dorm for prisoners who are within 120 days of their end-of-sentence dates. This dorm is designed to provide a supportive atmosphere for prisoners who will soon transition back into the free world. [There also is a] Substance Abuse Program (SAP). … which can last either eight weeks or six months, prisoners live together in a special dorm, take classes together, and eat their meals together. … this "milieu environment" is often "extremely effective" because the "minute-by-minute interaction in the bathroom, in the dorms or in their housing units, [and] at meals" creates an "ongoing dialogue about the sort of issues that are taught" in the program.").

[55] *See, e.g.,* ADOC Monthly Statistical Report for December 2014, Fiscal Year 2015 (Inmate population by custody level: Close 2%, Medium 51%); *available at*: http://www.doc.state.al.us/docs/MonthlyRpts/2014-12.pdf. *See generally* ADOC Statistical Reports (Annual and Monthly); *available at*: http://www.doc.state.al.us/StatReports.aspx.

[56] *See, e.g.,* Angela Browne, Allison Hastings, & Kaitlin Kall, *Keeping Vulnerable Populations Safe under PREA: Alternative Strategies to the Use of Segregation in Prisons and Jails*, at 11-12 (Vera Institute, PREA Resource Center, 2015) (Prison Rape Elimination Act (PREA) ("women are more likely to screen as high-risk for sexual abuse related to past histories of child and adult trauma. For example, women in the criminal justice system report more extensive victimization histories—including lifetime histories of sexual and physical abuse—than women who have not been incarcerated or men who have been incarcerated. … Confined women are less likely to be in jail or prison for violent offenses than men and more likely to suffer from mental health problems.") (citations omitted).

[57] I visited a range of ADOC facilities to corroborate my findings herein. I conducted site inspections and interviews at Kilby and Tutwiler to examine the in-take and evaluation process. As mentioned, Kilby is the receiving and classification center for male inmates. *See* http://www.doc.alabama.gov/facility.aspx?loc=36 (inmate programs offered by Kilby include anger management, GED/ABE educational classes, alcohol/drug counseling, chaplaincy services, individual and group therapy as part of an on-going mental health program; correctional industry plant for printing and graphic arts, and institutional garden for fresh produce). For a related review and site inspection of ADOC prisons in regard to the provision of mental health services, *see* Kathryn Burns, M.D., M.P.H. & Jane

Haddad, Psy.D., Expert Report Mental Health Care in the Alabama Department of Corrections: *Bradley v. Hightower*, at 2 (2000) (conducting site visits of Kilby Correctional Facility, St. Clair Correctional Facility, Donaldson Correctional Facility, Holman Correctional Facility, Bullock Correctional Facility, Easterling Correctional Facility, and Limestone Correctional Facility). *Id.* at 3 ("Site visits are essential for determining the inmates' awareness of how to obtain mental health assistance as well as for ascertaining whether adequate treatment is provided."). Additionally, as referenced in Exhibit 2, I reviewed deposition testimony given by the Wardens of several of these facilities involved in inmate intake and classification for incoming inmates and in the provision of mental health services (e.g., prisons with Rehabilitation Treatment Units (RTUs) and Stabilization Units (SUs)).

58 In the course of my site inspections and interviews, and at my direction, plaintiffs' counsel and ADOC staff photographed various facility areas and services. These photographs are referenced *infra* (and subject to privacy considerations) and serve as an additional reference used in the development of my opinions in this matter. *See also* Dunn et al., v. Dunn et al., Order (M.D. Ala., June 10, 2015) (experts are to speak with prisoners in a manner prescribed in prior Agreement of the parties in this matter signed on May 13, 3015, experts may pose general questions to ADOC employees and healthcare personnel regarding identification and location of items and/or areas in a facility, experts may not pose probing questions to ADOC employees and healthcare personnel during the site inspections, and parties shall continue to conduct site visits in the manner set forth in sections 10 and 14 of the prior Agreement).

59 The National Health Interview Survey (NHIS) monitors the health of the nation on a range of health topics are collected through personal household interviews by the U.S. Census Bureau. *See* National Health Survey; *available at*: http://www.cdc.gov/nchs/nhis.htm. Compare with local information, such as

60 Travis et al., *supra* at 210 ("prevalence of almost all chronic conditions is higher among both prison and jail inmates than in the general population"). *Id.* ("Since not all inmates receive medical screening for chronic conditions, however, these conditions may have been underreported among prisoners."). *See also* David Cloud, *On Life Support: Public Health in the Age of Mass Incarceration*, at 12 (Vera Institute of Justice Nov. 18, 2014) ("Cognitive impairments and physical disabilities make older prisoners extremely vulnerable in correctional environments, putting them at an increased risk of injury, victimization, and cognitive and emotional decompensation."). *Id.* at 11 (disproportionately high rates of chronic physical conditions among correctional populations; nationally representative survey found higher rates of hypertension, asthma, arthritis, cancer, and cervical cancer among correctional populations compared to the general population, even after controlling for a range of socioeconomic factors—citing Ingrid A Binswanger, Patrick M. Krueger, & John F. Steiner, Prevalence of Chronic Medical Conditions Among Jail and Prison Inmates in the United States Compared with the General Population, *Journal of Epidemiology and Community Health* (2009)). *Id.* at 5 (conditions of confinement inside jails and prisons, such as overcrowding, violence, sexual victimization, use of solitary confinement, and lower standards of medical care harmful to physical and mental health of incarcerated individuals).

61 Travis et al., *supra* at 210-11 (citing studies in support). *Id.* at 211-12 ("Older inmates also may have high rates of additional geriatric syndromes, such as cognitive impairment or dementia, and disabilities or impaired ability to perform ADLs. Like inmates with disabilities, older inmates may not be able to drop to the floor as instructed in response to an alarm or, worse, be unable to get back up again after the alarm is over, or have difficulty climbing on or off their assigned bunk."). *Id.* at 212 ("The rapidly increasing population of older adults in correctional facilities underscores the importance of screening and, more important, rescreening, for cognitive impairment, dementia, and disability. Currently, a disability assessment generally is performed only at intake, even if an individual is incarcerated for decades. Older prisoners will best serve their time if placed in correctional housing appropriate to their cognitive and physical abilities.").

62 For the scientific and methodological rationale for random case sampling and review, *see, e.g.,* Thomas D. Cook & Donald T. Campbell, *Quasi-Experimentation: Design & Analysis Issues for Field Settings*, at 37-38, 70-80, 341-83 (1979). *See also* Robert Rosenthal & Peter Blanck, Science and ethics in conducting, analyzing, and reporting social science research: Implications for social scientists, judges and lawyers, *Indiana Law J.*, 68(4), 1209-28 (1993).

63 *Compare* Notice of Proposed Class Action Settlement Regarding Mobility Impaired Inmates in Los Angeles County Jails (Nov. 24, 2014); *available at*: http://www.disabilityrightslegalcenter.org/class-action-settlement-between-sheriffs-department-and-inmates-disabilities-la-county-jails-moves (federal court approved settlement of a class action lawsuit against Los Angeles County Sheriff's Department involving the ADA in which inmates with mobility impairments denied access to programs and services available to inmates without mobility impairments and

not provided reasonable accommodations for alleged disabilities, and remedy to provide for mobility aids such as wheelchairs, walkers, crutches and prostheses, same access to jail programs, services, and activities offered to inmates who did not have mobility impairments, reasonable accommodations, and upgrading medical records to track medical issues facing inmates with mobility impairments).

[64] *See, e.g.,* Jessie L. Krienert, Martha L. Henderson, & Donna V. Vandiver, Inmates with physical disabilities: Establishing a knowledge base, *Southwest Journal of Criminal Justice* 1, 1: 13-23, at 13 (2003) ("prisons contain the most vulnerable members of outside society in relation to race, ethnicity and social class. Add a physical disability to that snapshot and a truly vulnerable population emerges. In 1997, approximately 26 percent of state inmates reported a hearing, vision or physical disability"). *Id.* at 15 (estimated that 35-40 percent of inmates have degree of hearing loss, and 13-20 percent have significant hearing loss). *See also* N. R. Schneider & Bruce D. Sales, Deaf or hard of hearing inmates in prison, *Disability & Society* 19, 1: 77-89, at 79-84 (2004) (inaccessibility of prison programs and services place inmates with hearing impairments at physical, mental, and social risk). *Id.* at 84-85 (accommodations and services for hearing impaired inmates).

[65] Soderstrom, *supra* at 7 (inmates with cognitive and intellective disabilities overrepresented in prison population). *See also* Jennifer Bronson, Laura M. Maruschak, & Marcus Berzofsky, *Disabilities Among Prison and Jail Inmates, 2011–12*, U.S. DOJ, Bureau of Justice Statistics, at 3 (Dec. 2015) ("A cognitive disability is a broad term used to describe a variety of medical conditions affecting different types of mental tasks, such as problem solving, reading comprehension, attention, and remembering. A cognitive disability is not the same as a mental disorder, although they often co-occur and a mental disorder can be considered a disability as well. The main differences are: symptoms of a mental disorder may be cyclical, temporary, or episodic whereas symptoms of a cognitive disability are constant and permanent; symptoms of a mental disorder may be controlled or eliminated by medications, and a person can usually live a normal life with the proper mental health care, but medications cannot fully restore, repair, or alleviate cognitive limitations; symptoms of a mental disorder may include disturbances in perceptions, emotions, and thought processes such as hallucinations or delusions, which are not symptoms associated with most cognitive disabilities. Examples of cognitive disabilities include Down syndrome, autism, dementia, attention deficit disorder, learning disorders, intellectual disabilities, or traumatic brain injury. Examples of mental disorders include depression, anxiety disorders, and schizophrenia.").

[66] *See, e.g.,* John J. Gibbons & Nicholas de B. Katzenbach, Confronting Confinement—A Report of the Commission on Safety and Abuse in America's Prisons, *Washington University Journal Law & Policy* 22: 385 [at 13 in report] (2006) (high rates of disease and illness among prisoners, and inadequate services and programs for health care, endanger prisoners and staff). *Id.* at 59 (psycho-social conditions such as schizophrenia and depression "can make it impossible for a person to cope with the conditions of segregation," particularly for those with suicidal tendencies).

[67] *See, e.g.,* Gloria L. Krahn, Deborah Klein Walker, & Rosaly Correa-De-Araujo, Persons With Disabilities as an Unrecognized Health Disparity Population, *American Journal of Public Health*, Supplement 2, 105(S2), S198-206, at S201 (Feb. 17, 2015) (people with cognitive disabilities significantly more likely to have diabetes than general population; citing studies in support; *e.g.,* Amanda Reichard & Hayley Stolze, Diabetes among adults with cognitive limitations compared to individuals with no cognitive disabilities, *Intellectual and Developmental Disabilities*, 49(3), 141-154, at 146 (2011)); Houser & Belenko, *supra* at 25 (for mental illness and co-occurring conditions important distinction between singular and dual disorders, simultaneous occurrence and implied interaction affect course and prognosis of individual disorders and often intensifying the symptom severity of each, which may help explain increasing presence of mentally ill in the criminal justice system) (citations omitted).

[68] ADOC Annual Report (2013), at 6; *available at*: http://www.doc.state.al.us/docs/AnnualRpts/2014AnnualReport.pdf. *Id.* (ADOC stated values include: "We value the dignity of every human being"). In accordance with this mission, and to become a Correctional Officer with ADOC, among other requirements, candidates must complete requirements of the ADOC Alabama Peace Officers' Standard and Training Commission (APOSTC) and attend a 12-week ADOC Training Academy. *See* Correctional Officer Requirements for Alabama; *available at*: http://www.correctionalofficertraininghq.com/correctional-officer-requirements-for-alabama/ ("The first week you will receive on the job training at an ADOC facility, and eleven weeks at the ADOC Training Academy. You will learn various communication techniques, and receive firearms training; self-defense lessons, and pepper spray/Taser certification. There are academic, physical, and regulatory requirements to meet in order to satisfactorily complete the training, and you will receive APOSTC Certification as a Correctional Officer."). *See also* Williams Deposition, at 14 ("Q. … I believe that you said that the ADOC has a

Correctional Academy; is that correct? A. Yes. Q. Who attends that academy? A. The primary mission for the Alabama Corrections Academy is to train new correctional officer trainees to become certified correctional officers. Q. So is it primarily new correctional officers that attend the academy? A. Yes."). *Id.* at 26-27 ("… do correctional officers have any continuing education requirements? A. Yes. Q. Can you describe those? A. The Peace Officer Standards and Training Commission for Alabama requires a minimum of twelve continuing education units annually. … A. In addition, the Peace Officer Standards and Training Commission requires annual handgun requalification. And separate from POST, our agency requires thirty-six to forty hours of annual in-service training, refresher training, for correctional officers."). *Id.* at 29 (referring to ADOC regional training centers).

[69] *See also supra*, noting that: Americans with Disabilities Act of 1990 (ADA), and as amended Americans with Disabilities Act Amendments Act of 2008 (ADAAA), and Section 504 of the Rehabilitation Act of 1973 (Section 504 or the Rehabilitation Act) prohibit discrimination against "qualified" individuals with disabilities in provision of programs and services provided by public entities, such as ADOC. *See, e.g.,* Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.; Rehabilitation Act of 1973, 29 U.S.C. § 701.

[70] *See, e.g.,* ABA Standards, *supra* at 203-05 ("Standard 23-7.2 Prisoners with disabilities and other special needs (a) If a prisoner with a disability is otherwise qualified to use a correctional facility, program, service, or activity, correctional authorities should provide such a prisoner ready access to and use of the facility, program, service, or activity, and should make reasonable modifications to existing policies, procedures, and facilities if such modifications are necessary. Modifications are not required if they would pose an undue burden to the facility, cause a fundamental alteration to a program, or pose a direct threat of substantial harm to the health and safety of the prisoner or others. Disabled prisoners' access to facilities, programs, services, or activities should be provided in the most integrated setting appropriate. (b) To the extent practicable, a prisoner who does not have a disability but does have special needs that affect the prisoner's ability to participate in a prison program, service, or activity should receive programs, services, and activities comparable to those available to other prisoners. Correctional authorities should assess and make appropriate accommodations in housing placement, medical services, work assignments, food services, and treatment, exercise, and rehabilitation programs for such a prisoner. (c) A prisoner has the right to refuse proffered accommodations related to a disability or other special needs, provided that the refusal does not pose a security or safety risk. (d) There should be no adverse consequences, such as loss of sentencing credit for good conduct, discipline, or denial of parole, for a prisoner who is unable to participate in employment, educational opportunities, or programming due to a disability or other special needs that cannot be accommodated. Such a prisoner should have the opportunity to earn an equal amount of good conduct time credit for participating in alternative activities. (e) Correctional authorities should communicate effectively with prisoners who have disabling speech, hearing, or vision impairments by providing, at a minimum: (i) hearing and communication devices, or qualified sign language interpretation by a non-prisoner, or other communication services, as needed, including for disciplinary proceedings or other hearings, processes by which a prisoner may make requests or lodge a complaint, and during provision of programming and health care; (ii) closed captioning on any televisions accessible to prisoners with hearing impairments; (iii) readers, taped texts, Braille or large print materials, or other necessary assistance for effective written communication between correctional authorities and prisoners with vision impairments, and when a prisoner with a vision impairment is permitted to review prison records, as in preparation for a disciplinary or other hearing; and (iv) fire alarms and other forms of emergency notification that communicate effectively with prisoners with hearing or vision impairments. (f) Correctional authorities should make reasonable attempts to communicate effectively with prisoners who do not read, speak, or understand English. This requirement includes: (i) to the extent practicable, the translation of official documents typically provided to prisoners into a language understood by each prisoner who receives them; (ii) staff who can interpret at all times in any language understood by a significant number of non-English speaking prisoners; and (iii) necessary interpretive services during disciplinary proceedings or other hearings, for processes by which a prisoner may lodge a complaint about staff misconduct or concerns about safety, and during provision of health care.").

[71] *Compare* Holmes v. Godinez, --- F.R.D. ---- (ND ED IL, 2015) (2015 WL 5920750), at 75 ("The vast majority of services and programs that [Plaintiffs with disabilities] complain about do not appear to require any special qualification. For example, all inmates are permitted to participate in the grievance process, all inmates would have the right to be notified of emergency situations, and all inmates would have the right to receive proper medical treatment.") (citations omitted). *Id.* ("Moreover, although inmates may be subject to occasional disciplinary or safety restrictions that could limit their right to use certain services at certain times, these temporary restrictions would not impact their right to seek future injunctive relief since there is a high likelihood that the restriction would be lifted at

some time during their incarceration. We recognize that inmates may be truly ineligible for a program in a handful of cases, but we believe these instances are few and do not defeat typicality where named Plaintiffs' and putative class members share the same legal claims based on the same conduct.") (citations omitted).

[72] Travis et al., supra at 8 ("Even under the best conditions, incarceration can do great harm—not only to those who are imprisoned, but also more broadly to families, communities, and society as a whole. Moreover, the forcible deprivation of liberty through incarceration is vulnerable to misuse, threatening the basic principles that underpin the legitimacy of prisons. The jurisprudence of punishment and theories of social policy have sought to limit public harm by appealing to long-standing principles of fairness and shared social membership.").

[73] Travis et al., *supra* at 326. *Id.* at 8 (noting related principle of "Parsimony: The period of confinement should be sufficient but not greater than necessary to achieve the goals of sentencing policy.").

[74] Travis et al., *supra* at 341.

[75] Travis et al., *supra* at 350.

[76] Travis et al., *supra* at 8.

[77] Travis et al., *supra* at 330.

[78] *See, e.g.,* Blanck et al., 2014, Treatise and Casebooks on the ADA (cited in Exhibit 1).

[79] For instance, those inmates who evidence a range of health impairments and general health problems in addition to their primary disabilities (e.g., comorbidity of physical, sensory, and mental health).

[80] *See, e.g.,* Xiuquan Shi, Krista K. Wheeler, Junxin Shi, Lorann Stallones, Shanthi Ameratunga, Tom Shakespeare, & Huiyun Xiang, Increased risk of unintentional injuries in adults with disabilities: A systematic review and meta-analysis, *Disability & Health Journal* (2014).

[81] *See generally* Shi et al., *supra*; Houser & Belenko, *supra* at 25 (interactive and additive nature of co-morbidity may intensify behavioral problems more than singular disorders, and inmates with co-morbid conditions limited in their capacity to operate independently in the correctional setting, and difficult to treat with severe and persistent mental health disorders and often display symptoms of delusions and hallucinations that create disruptive and erratic behaviors). *See also* Michael Winerip & Michael Schwirtz, Even as Many Eyes Watch, Brutality at Rikers Island Persists, NY Times (Feb. 21, 2015) ("case typifies the Correction Department's struggle in dealing with inmates who have mental illnesses, a group that now accounts for nearly 40 percent of the jail population. It is these inmates—particularly ill suited to the jail's regimen—who tend to behave the most erratically, bringing out some of the worst abuses by guards."); *available at*: http://www.nytimes.com/2015/02/22/nyregion/even-as-many-eyes-watch-brutality-at-rikers-island-persists.html?smprod=nytcore-iphone&smid=nytcore-iphone-share&_r=0.

[82] *See, e.g.,* Emma G. Thomas, Matthew J. Spittal, Faye S. Taxman, & Stuart A. Kinner, Health-related factors predict return to custody in a large cohort of ex-prisoners: new approaches to predicting re-incarceration, *Health & Justice*, 3(1), 1-13, at 1 (2015) (citing studies in support); Lauren Brinkley-Rubinstein, Incarceration as a catalyst for worsening health, *Health & Justice*, 1(1), 3 (2013); doi:10.1186/2194-7899-1-3 (incarceration environment negatively affects inmate health).

[83] In a different context, Professor Bagenstos writes: "A single step in front of a store may not immediately call to mind images of Lester Maddox standing in the door of his restaurant to keep blacks out. But in a crucial respect they are the same, for a step can exclude a person who uses a wheelchair just as surely as a no blacks-allowed rule can exclude a class of people." Samuel Bagenstos, The perversity of limited civil rights remedies: The case of "Abusive" ADA litigation, *UCLA Law Review*, 54, 1-38, at 25 (2006), *cited on other grounds by Antoninetti v. Chipotle Mexican Grill, Inc.* (9th Cir. 2010) 643 F.3d 1165, 1175 [41 NDLR P 224, 10 *Cal. Daily Op. Serv.* 12331, 2010 *Daily Journal D.A.R.* 14868, 2010 WL 3665525].

[84] Won Ho Kim & Juyoung Lee, The Effect of Accommodation on Academic Performance of College Students With Disabilities, *Rehabilitation Counseling Bulletin* (2015): 0034355215605259 (showing relationship between accommodations and academic outcomes).

[85] *Pierce*, 2015 WL 5330369 at *13 (emphasis in original). *Id.* ("The District does not explain how inmates with known communications-related difficulties … are supposed to communicate a need for accommodations, or, for that matter, why the protections of Section 504 and Title II should be construed to be unavailable to such disabled persons unless they somehow manage to overcome their communications-related disability sufficiently enough to convey their need for accommodations effectively. … it would appear that only a specific request for a wheelchair would trigger any duty to accommodate an inmate who cannot walk, and a blind inmate would need to make a specific request for a cane or a guide if he desired to move about the prison grounds; meanwhile, prison officials could sit idly by, taking no affirmative steps to accommodate such disabled prisoners and expecting to be able to

wield the inmate's failure to request accommodation like some sort of talisman that wards off Section 504 and Title II liability in any future legal action. This imagined state of affairs is unquestionably inconsistent with the text and purpose of the Rehabilitation Act and the ADA.").

[86] *See, e.g.,* Robertson v. Las Animas County Sheriff's Dept., 500 F.3d 1185, 1194 (10th Cir. 2007). *Id.* at 1197, n.10 ("Whether the public entity's knowledge derives from an individual's request for an accommodation or an individual's obvious need for an accommodation, the critical component of the entity's knowledge is that it is aware not just that the individual is disabled, but that the individual's disability affects his ability to receive the benefits of the entity's services.").

[87] *See, e.g., Robertson*, 500 F.3d at 1196 ("A public entity cannot know that a modification to its services under the ADA is necessary if it does not first understand that an individual requires such modification because he is disabled."); *Pierce*, WL 5330369 at *14 (public entities like ADOC must take "affirmative steps to *ascertain* what accommodations might be needed, … [and not have] reliance on guesswork and happenstance with respect to the provision of accommodations, when the law clearly requires otherwise.") (emphasis in original).

[88] *Robertson*, 500 F.3d at 1197-98.

[89] *Robertson*, 500 F.3d at 1199 ("Moreover, even if an action, such as obtaining a TTY or TDD, would result in an undue administrative burden, the public entity must "take any *other* action that would not result in ... such burdens but would nevertheless ensure that, *to the maximum extent possible*, individuals with disabilities receive the benefits or services provided by the public entity. … Here, the facility took no action." (emphasis in original and citations omitted)).

[90] *See also Robertson*, 500 F.3d at 1197 ("Once a public entity has knowledge of an individual's disability, the entity must also have knowledge that an individual requires an accommodation to participate in or receive the benefits of its services. In other words, the entity must have knowledge that an individual's disability limits her ability to participate in or receive the benefits of its services." (citations omitted)).

[91] *See, e.g.,* Brie A. Williams, James S. Goodwin, Jacques Baillargeon, Cyrus Ahalt, & Louise C. Walter, Addressing the aging crisis in US criminal justice health care, *Journal of the American Geriatrics Society*, 60(6), 1150-1156, at 1153 (2012) (need for evidence-based practices and not reliance on outdated stigma about disability accommodations).

[92] During my site inspections, several ADOC inmates reported using self-directed accommodations and/or having to pay other inmates to provide basic accommodations.

[93] *See, e.g.,* Gary Lee Broyles, AIS: 00152470 (named plaintiff).

[94] *Compare* American Council of the Blind v. Paulson, 525 F.3d 1256, at 1269-70 (2008) (ADA title II case on meaningful access to U.S. government currency programs); Mason v. Correctional Medical Services, Inc., 559 F.3d 880, at 886 (2009) ("public entity is required to make reasonable accommodations where necessary to give "*meaningful access*" to programs or benefits") (emphasis added). *Id.* at 887 (prison "has a continuing obligation under the ADA to make reasonable accommodations for [inmate], and the substitution of an assistant who is illiterate or not reasonably available, or the failure to procure requested audio materials, would raise different issues [that could violate the ADA and Rehabilitation Act). Thus, ADOC's blanket practice requiring putative ADA sub-class members to rely on other inmates for the provision of potential accommodations is not consistent with research and best practice to afford effective and meaningful accommodations on an individualized basis and with appropriate consideration of undue and safety burdens they may present. *Id.* 888 ("it would be unduly burdensome to require [prison] to furnish [inmate] with a trained handler from outside the prison, because such a person would not be trained in safety and security matters, and would require the escort of a prison guard at all times."). *Id.* at ("Cf. *Chisolm v. McManimon*, 275 F.3d 315, 328 (3d Cir. 2001) ("holding that a reasonable trier of fact could infer that a deaf inmate whose primary form of communication was American Sign Language required an assistant trained in American Sign Language at critical points.").

[95] *See* Lauren Walsh, "ADOC Commissioner: Overcrowding, understaffing breeding violence at St. Clair Prison," ABC 33/40 (Dec. 10, 2015) ("One of the most violent [Alabama] prisons is St. Clair Correctional Facility in Springville, where the security officers are outnumbered. The prison houses 130 percent of the inmates it was designed to hold. It only has 57 percent of the security staff it is authorized for. Department of Corrections Commissioner Jeff Dunn admits St. Clair is a dangerous situation. … Dunn says the situation at St. Clair are indicative of the struggle throughout his department."); *available at*: http://abc3340.com/news/local/adoc-commissioner-overcrowding-understaffing-breeding-violence-at-st-clair-prison. *Id.* ("Dunn says with the resources he has for security, a serious situation may not be avoided next time. "And I can't pinpoint it on a map or on a

calendar, but at some point in the future, I believe something significant will happen and it will be because we haven't made the investment that we need to make now to prevent something like that from happening in the future," said Dunn. St Clair has 57 percent of the security staff it's authorized for. Dunn says the problem is not about recruiting, but about retention.").

[96] *See, e.g.*, ADOC Male Inmate Handbook, at 1 (Aug. 1, 2013) ("There are rules and regulations for inmates committed to the custody of the Alabama Department of Corrections. They are designed to help the inmate population live together as safely and as comfortable as possible. These rules apply to all inmates regardless of the institution to which assigned. Each institution, however, will have additional specific rules and policies that apply only to that institution. You will be made aware of those rules during orientation shortly after your arrival at the institution. You are required to follow the rules in this handbook and the rules of the institution. You can expect that any violation of the rules will result in disciplinary action.").

[97] I note that ADOC AR 222, OPR: Personnel, "Individuals with Disabilities," (Nov. 26, 2003), establishes responsibilities, policies, and procedures for complying with ADA and the Rehabilitation Act of 1973 as applied to ADOC "[e]mployees, contractors, volunteers, vendors, job applicants, customers, visitors, and other persons involved with the Alabama Department of Corrections." AR 222 would not apply to ADOC inmates,

[98] *See, e.g.*, ADOC042868, -2757 (Corizon May, April 2014 Reports) ("re-educate the staff on management of Diabetes").

[99] *Compare* Mark G. Peters, New York City Department of Investigation: Investigation Finds Significant Breakdowns by Corizon Health Inc., the City-Contracted Health Care Provider in the City's Jails, and a Lack of Oversight by the City Correction and Health Departments, at 1-3, n.1, & *passim* (June 2015) (Corizon's "failures should not be seen in isolation. Rather, they have occurred in the context of the failure to engage in proper screening and supervision of staff. Given the huge number of factors that contribute to the delivery of medical and mental health care for inmates, it is difficult, if not impossible, to conclusively demonstrate a direct causal link between poor hiring and quality of care. Nonetheless, DOI reviewed 137 Corizon Mental Health Clinician (MHC) and 48 Mental Health Treatment Aide (MHTA) personnel files. In light of DOI's findings, we have significant concerns about permitting Corizon to continue, on a long term basis, to provide health care services at Rikers Island.").

[100] *Compare* ADOC AR 18, Institutional Standard Operating Procedures, at 1 (Mar. 29, 2005) ("A. Office of Primary Responsibility (OPR): The Office of Primary Responsibility is that Warden/Director, Deputy Commissioner staff unit, office, or activity having functional responsibility for the program, procedure, law, rule, or regulation matter. B. Staff Accountability Log: A record indicating an officer has read, and understands the SOPs for a security assignment. C. Standard Operating Procedure (SOP): Policies and procedures set forth by local orders and implemented by the Warden/Director of each institution/facility."). *Id.* at 3 (SOPs to be updated annually). *See also* ADOC AR, Development of Manuals for Division Operations, at 1-2 (May 2, 2005) ("All ADOC employees shall be required to review the contents of the applicable division manual when assigned to the area. Employees shall be responsible for developing an understanding of assigned tasks and their relationship to the rest of the division.").

[101] *See, e.g.*, Moseley Deposition at 41-44 ("Q.  What profiles do you have? A.  Knee brace profile. Bottom bunk profile. I believe that's it. Q.  Now, a profile is a specific document that's approved by a physician, right? A. Correct. Q.  And profiles in the ADOC system are given to inmates by the physician, and those profiles allow the inmates to deviate from kind of the standardized rules and regulations inside a prison, right? A.  Yes, sir. Q.  So, for example, a bottom bunk profile, that means that the ADOC should assign you to a bottom bunk, right? A. Correct. Q.  And the profile for your knee allows you to use a knee brace, right? A.  Yes, sir. Q.  Have you ever had any other profiles? A.  Yes, sir. Q.  What other profiles have you had? A.  Wellness. Wheelchair. Cane. I think that's about it. Q.  When was the last time you had a cane profile? A.  Bullock.  It's been -- I don't know, it had to be three, four -- three or four years ago. Q.  When is the last time you had a wheelchair profile? A. Bullock.  Q.  When is the last time you had a wellness profile? A.  It just run out. Q.  What is a wellness profile? A.  Where you can eat dietary food. Q.  Why were you placed on a wellness profile? A.  Lose weight.").

[102] *Compare* City of New York Department of Correction, Directive, Reasonable Accommodation for Inmates with Disabilities, at 4 (Dec. 15, 2005); *available at*: http://www.nyc.gov/html/doc/downloads/pdf/3802.pdf.

[103] *Compare* Holmes v. Godinez, --- F.R.D. ---- (ND ED IL, 2015) (2015 WL 5920750), at 15 (inmates keep a copy of their ADA accommodation plan "to show it to prison staff to demonstrate that they are entitled to accommodations" to ensure nondiscrimination in access to ADOC programs, services, and activities).

[104] As presented in Exhibit 2, *infra*, I have reviewed the deposition testimony and related materials of ADOC's designated ADA coordinators and ADA-relevant staff system-wide and at ADOC's prison facilities. *See, e.g.*,

Deposition testimony and related materials of Ernest Claybon, Sergeant at Staton/ADA Coordinator; Michelle Ellington, Captain at Kilby/ADA Coordinator; Aaron Billups, ADA Coordinator at Elmore; Timothy Holcomb, Interim Warden at Hamilton/ADA Coordinator; Guy Noe, ADA Coordinator at Limestone; Kenneth Peters, ADA Coordinator at St. Clair; Joel Gilbert, ADA Coordinator at Donaldson; Veronica Moore, Responsible for TTY/TDD at Limestone; Adrienne Givens, ADA Coordinator at Tutwiler; Wendy Williams, ADOC Director of Training, Manager of women's facility operations Ruth Naglich, Named Defendant/Associate Commissioner of Health Services/ADOC 30(b)(6) representative.

[105] *Compare* Mason v. Correctional Medical Services, Inc., *supra* 559 F.3d 880, at 888 (inmate cited "no authority for the proposition that he is entitled to a general "disability assessment"."). Based on my experience, research, and practice, and that of others, the adequate identification and monitoring of inmates with disabilities is necessary for the appropriate assessment and provision of equivalent accessible programs, services, and activities offered by ADOC to putative ADA sub-class members, as well as for the provision of effective reasonable accommodations. My recommendations discussed *infra* herein illustrate ways in which ADOC may effectively achieve meaningful access to its programs, services and activities for putative ADA sub-class members, for example, through an interactive and individualized accommodation provision and grieving process.

[106] *Compare Pierce v. District of Columbia*, 2015 WL 5330369, at 1 (Dist. Colum. 2015).

[107] Williams Deposition, *supra* at 153.

[108] Williams Deposition, *supra* at 154 (with regard to the identification of female inmates with disabilities at the intake process, Ms. Williams testified: "Q. With respect to female prisoners, does ADOC make any effort to identify prisoners with disabilities when they first come into the ADOC system? A. Through healthcare provider examinations and then also through the interaction that the intake officer has just while verbally observing the inmate. Not verbally, but just by observing the inmate.").

[109] I also note that in regard to ADOC new employee orientation, ADOC AR 204 establishes responsibilities, policies, and procedures for administering orientation programs for new employees to ensure that they understand the department's mission and their responsibilities in the correctional system. *See* ADOC AR 204, New Employee Orientation, at 1 (Feb. 16, 2005). *See also* ADOC AR 222, INDIVIDUALS WITH DISABILITIES (Nov. 26, 2003) (providing detailed awareness of ADA and the Rehabilitation Act provisions and accommodation process in the context of public employment, such as: nondiscrimination on the basis of disability, consideration of reasonable accommodations and of facility physical accessibility; consideration of effective communication and provision of auxiliary aides and services such as providing qualified readers or interpreters, that Wardens and Division Directors are responsible for ensuring compliance with the ADA and Rehabilitation Act, with forms annexed to for physician to complete and an "Essential Functions Checklist."). This information shows that ADOC has available information about the operation of the ADA and the Rehabilitation Act in its Administrative Regulations at least for employment purposes, but it has not applied this information to the provision of services, programs, and activities for inmates. AR 204 provides that prison Wardens and Division Directors are responsible for implementing an orientation program for their units, with information providing by the Personnel Division Director: "All orientation programs shall include: 1. A discussion of the new employee's task and responsibility statements with him/her. … 4. Providing a copy to and discussion of the ADOC Mission and Vision Statements with the employee. … D. Each institution/division shall develop and conduct an orientation program that fulfills that institution/division's unique needs.

[110] ADOC AR, 400 Classification of Inmates, at 1 (Nov. 10, 2004).

[111] ADOC AR, 400 Classification of Inmates, at 1.

[112] ADOC AR, 400 Classification of Inmates, at 3 ("3. The Psychologist or Psychologist Associate are responsible for the following: a. Performing psychometric evaluation of inmates. b. Conducting interviews as appropriate. c. Assembling relevant information to the inmate's probable adjustment. d. Providing recommendations for assignment and treatment. e. Serving as a member of the institutional classification committee.").

[113] ADOC AR, 400 Classification of Inmates, at 2 ("F. Classification: The process of sorting inmates into groups by security level, custody, and program needs using interviews, tests, scoring instruments, and behavior records as well as official court documents and reports from police and other criminal justice agencies. G. Reclassification: The process of periodically reviewing the progress of inmates to determine what, if any, revisions should be made to the placement of inmates within a particular group as to security level, custody, and/or program. H. Security Levels: The rating assigned to the various institutions and placement options within the ADOC and to inmates through classification procedures for the purpose of placement within the ADOC. I. Custody Levels: A level of supervision

required for an inmate at the institution, within the ADOC, where the inmate is confined. An inmate can be assigned a custody level of maximum, close, medium, minimum-in, minimum-out, or community."). *See also* Bradley Pearson, at ADOC024284 (no apparent reference to disability or possible need for accommodation on classification summary).

[114] *See* Angela Browne, Allison Hastings, & Kaitlin Kall, *Keeping Vulnerable Populations Safe under PREA: Alternative Strategies to the Use of Segregation in Prisons and Jails*, at 3-4 (Vera Institute, PREA Resource Center, 2015) (Prison Rape Elimination Act (PREA). *Id.* at 10 ("Mission specific housing" targeted to special needs populations (e.g., those with mental illness, developmental and intellectual disabilities, physical disabilities) has also proven successful in an increasing number of jurisdictions. These housing units have out-of-cell programming and provide individuals with special needs daily opportunities to interact with other inmates and staff during meals, recreation, dayroom, and work activities. Scheduled activities (e.g., recreation) occur on the unit and disciplinary violations are handled on the unit whenever possible to avoid the circulation of inmates through disciplinary segregation. Housing that meets the needs of these populations reduces the number of vulnerable people held in segregation. For maximum effectiveness, these units should be located where it is easiest to hire and retain mental health and social work staff.") (citations omitted). Mission specific housing also would provide accommodations to inmates with disabilities who may, for example, be housed in RTU or SU units.

[115] *See, e.g.,* Angela Browne, Allison Hastings, & Kaitlin Kall, *Keeping Vulnerable Populations Safe under PREA: Alternative Strategies to the Use of Segregation in Prisons and Jails*, at 6, Vera Institute, PREA Resource Center, *supra* at 6 (citing research findings in support).

[116] *See, e.g.,* ADOC Male Inmate Handbook, *supra* at 2 ("RECEPTION PROCESS: Upon arriving at your admitting institution, you will be photographed and finger-printed. You will receive a complete physical and dental examination by medical and dental professionals. Psychological testing and interviews will also be conducted. You will then be interviewed by Classification Specialists who will make the initial custody and placement recommendations based on all information gathered through the interviews and from their research. You will be asked about your criminal history, prior drug or alcohol abuse, education, employment program needs, and other areas. It is important that you respond truthfully and completely in order to ensure that your needs can be met. Any information given by you will be checked for accuracy."). *Compare* MHM's Monthly Operations Report (Feb. 2012), *supra* at ADOC043633-34 (Report of Robert Hunter, M.D., Medical Director, MHM Alabama) ("The CQI study looking at the base rate data of major Axis I and Axis II diagnosis in ADOC was completed and the results are interesting. The prevalence of major Axis I illnesses in our system was fairly congruent with that seen in the correctional setting at large, with mood disorders being the most prevalent (49%), followed by psychotic disorders (32 %) , anxiety disorders (9%), adjustment  disorders (7%) and cognitive/other disorders (3%). In terms of where these diagnoses are---Tutwiler, Limestone, Staton and Ventress have a high rate of mood disorder diagnosis while the high max camps Holman, Donaldson and St Clair have a low rate of mood disorder diagnoses. A similar pattern is noted for anxiety disorder diagnosis. Donaldson and Bullock inpatient and outpatient camps have a high rate of psychotic disorder diagnosis. Holman, Kilby and Easterling have a high rate of Adjustment disorder diagnosis. Hamilton, Staton and Bullock have the highest number of Cognitive disorder diagnosis. There is additional data available from our CQI program subcategorizing each diagnostic category for the interested reader, but in summary this is very useful in seeing what we have and where they are. This in turn will assist in how we allocate resources and programming needs. Our next phase in looking at diagnostic Refinement will focus on psychiatric target symptoms and their importance in driving diagnosis and treatment.").

[117] *See, e.g.,* ABA Standards, *supra* at 91 (citing "ACA requires meals to last at least 20 minutes, ACA, Jail Standards 4-ALDF-2A-01, ACA, Prison Standards 4-4158, which is a reasonable general rule. But if more time is needed by prisoners who are frail or have a disability that slows their eating, that would be a reasonable modification of the meal policy.").

[118] *Compare Pierce*, 2015 WL 5330369 at 1.

[119] *See, e.g., Pierce*, 2015 WL 5330369 at 1-2 (emphasis added) ("when the inmate who was deaf "first arrived at the prison facility, the District's employees and contractors did nothing to evaluate [his] need for accommodation, despite their knowledge that he was disabled. They did not ask [] what type of auxiliary aids he needed. They did not hire an expert to assess [his] ability to communicate through written notes or lipreading as opposed to sign language. They did not even consult the Department of Corrections' own policies to figure out what types of accommodations are ordinarily provided to inmates with hearing disabilities. Instead, they *figuratively shrugged and effectively sat on their hands with respect to this plainly hearing-disabled person in their custody, presumably content to rely on their*

*own uninformed beliefs about how best to handle him and certainly failing to engage in any meaningful assessment of his needs.* … in so doing, the District denied [him] meaningful access to prison services and intentionally discriminated against him on the basis of his disability in violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.").

[120] *Compare* State of North Carolina Department of Public Safety Prisons, Policy and Procedure, *infra* at 3-4 (discussing prison system ADA Coordinator, prison ADA Compliance Specialists and Certified ADA Specialist, Facility ADA Coordinator, Facility Disability Case Managers–Correctional Case Managers).

[121] *See infra* Discussion of accommodation request logs and grievance practices at Hamilton A&I prison.

[122] *Compare* Holmes v. Godinez, --- F.R.D. ---- (ND ED IL, 2015) (2015 WL 5920750), at 13-14.

[123] Williams Deposition, *supra* at 180. *Id.* at 181 (warden authorized to develop standard operating procedures ("SOPS") that may address accommodations for inmates with disabilities). *Id.* at 182-185 (no standard SOPS for accommodating female inmate with blindness or low vision, mobility impairment, deafness (see also *infra* facility examples such as red stencil lettering and laminated card), intellectual disabilities, traumatic brain injury; but for mental illness pertain to mental health provider provisions).

[124] *Compare* ADOC Male Inmate Handbook, *supra* at 31 ("During the new arrival medical, dental, and mental health intake process at the ADOC reception institution, you will be provided an ADOC Health Services Inmate Handbook which will address inmate medical, dental, and mental health services in greater detail. Items such; as how to file a health services grievance or grievance appeal form if necessary, how to request routine sick call services, chronic care clinics conducted, periodic physical examinations completed, etc.").

[125] I also have been presented with information regarding Tutwiler Prison for Women; at ADOC033369 (Tutwiler Prison: Standard operating Procedure, Number 13-15, Jan. 25, 2013) (II. Policy. This Grievance Procedure is established to meet the requirements of the Americans with Disabilities Act. It may be used by Inmates who under the Americans with Disabilities Act [sic] and who are alleging discrimination on the basis of their qualified disability at Tutwiler Prison for Women."). At ADOC033373 et seq. (ADA Grievance Forms and Appeal Forms; ADA Complaint (Grievance) Log). The Hamilton A&I Prison ADA Inmate Grievance Procedure (April 10, 2007; SOP HAIC #222-01), tracks the ADA Grievance Policy and Procedure established at Tutwiler Prison); *see* ADOC033359 et seq. (Captain at Hamilton A&I assigned as Institutional ADA Coordinator; grievance forms and logs not provided for my review).

[126] At ADOC033369-70.

[127] At ADOC033370.

[128] At ADOC033370.

[129] At ADOC033370.

[130] At ADOC033371. *Id.* ("It is the responsibility of all [Tutwiler Prison] employees to ensure compliance with this Standard operating Procedure. … (CMS) Correction [sic; Corizon] Medical Services and (MHM) Mental Health Management Staff [sic; MHM Services] will forward all grievances to the Institutional ADA Coordinator.").

[131] At ADOC033371.

[132] At ADOC033371. *Id.* ("The grievance should be submitted by the grievant and or her designee as soon as possible, but no later than 30 calendar days after the alleged violation. The grievance must sate the disability the inmate believes is not being reasonable accommodated. The grievance must also specify the accommodation or service that the inmate needs. The grievance must be signed in front of a Administrative Lieutenant who will … forward [it] to the Institutional ADA Coordinator.").

[133] At ADOC033371 ("The written and or verbal response will [sic] explain the position of the facility and offer options for substantive resolution of the grievance.").

[134] At ADOC033371-72.

[135] At ADOC033372. *Id.* (records of inmate disability and accommodations are to be transferred with the inmate when transferred to another ADOC facility, with proposed discussion among the Wardens; possible accommodation to convey procedures for inmates with vision and hearing impairments through assistance of staff or inmate law library staff). *Id.* (policy may be suspended during an emergency by Warden for a specific period of time).

[136] At ADOC033362.

[137] *See* ADOC054024 - 025; 026 – 031 (portions were redacted). I initially reviewed these documents during my Hamilton A&I site inspection.

[138] Tooley filed one grievance and Timothy Sears filed two grievances.

[139] *See also* Tooley Depo at 33-34 ("Q And are you also unable to speak today? A Just a little bit. Not much. I don't have much use of my voice. Not a hundred, not like you can, not like you hearing people can. I can say a word here and there. … I was born deaf.").

[140] *See, e.g.,* Tooley Depo at 108-09 ("I need help understanding the [grievance] form.").

[141] Tooley Depo at 8-9.

[142] Tooley Depo at 8-9. *Id.* at 9 ("It's best to have the interpreter so I can understand instead of writing back and forth with a written communication.").

[143] Tooley Depo at 10-11. *Id.* at 23-24, 32. *Id.* at 11-12 ("Q Can you write? A Not well, not in complete sentences. I prefer to communicate in American Sign Language. Q But can you write well enough to tell a doctor what is wrong with you? A No. No. Q Why not? A My skills are poor to fair. I don't understand written English. I communicate in American Sign Language. Q Can you read what others have written? A No. There are words that I don't understand. I need explanation. It would depend on the sentence. I would have to all—I would have to ask what does it mean. I would need an interpreter to clearly understand what the message was.").

[144] Tooley Depo at Depo at 88-89. *See also* Tooley Depo at 112 ("Q What specifically were you saying you wanted a sign language interpreter for, and what specifically did you complain about in your grievance, when you said you wanted a sign language interpreter? A To either have the disciplinary meeting or go to the doctor.").

[145] Tooley Depo at 13 ("I can use American Sign Language to communicate with her [girlfriend] instead of reading. So, and then I'll use a TTY, but occasionally there's problems with that, but I prefer to have a video phone where I could sign, use my native language. We could see each other.").

[146] Tooley Depo at 14.

[147] Tooley Depo at 114-16, 118 ("Q Are you asking for anything in the lawsuit that does not have anything to do with sign language interpreters? In other words, are you asking for other things? And tell me if you don't understand my question. A I'm asking for a video phone to be able to have sign communications on the telephone instead of the TTY. That way I can use an interpreter on the telephone. Q So, you're saying that if there were a video phone here at Hamilton that you would be able to communicate via the video phone with a sign language interpreter? A Right. Q And you're thinking about a situation where you could see the sign language interpreter on the video phone, and the sign language interpreter could see you; is that correct?").

[148] Tooley Depo at 114-16, 118.

[149] Tooley Depo at 122-24.

[150] *See, e.g.,* Inmate request Slip; at ADOC029967-969 (problems with access to TDD phone).

[151] *See, e.g.,* State Department of Corrections: "Classification Summary–"Special Needs: Communication Comments: Subject deaf/mute; Communications Needs: [none listed]." At ADOC029974. Undated. *Compare* ADOC029999. Classification Summary – "Special Needs: Communication Comments: Subject deaf/mute; Communications Needs: Yes." 5/18/2010. *Id.* at ADOC030030; ADOC030046. 5/24/2010; ADOC030062. 7/1/2014; ADOC030085. 6/26/2012; ADOC030096. 6/14/11. Inmate Classification Security Level: "Subject is deaf/mute reports he had special education services as a child." At ADOC029977. *See also* at ADOC029981 [form to sign]. "By your signature below you acknowledge that you have received orientation regarding rules and regulations of this facility. You have received a copy of the orientation, phone list, visiting and funds list form. You were also given the opportunity to ask questions concerning the ADA procedure. By your signature below you acknowledge that you were informed that a copy of this orientation is in the law library for your use." INMATE ORIENTATION TO MENTAL HEALTH SERVICES form; at ADOC029982. "The information on this form has been explained to me and I have received a copy of this information for my future reference." Reference ADOC AR: 604.611.612; ADOC Form MH-002 – November 4, 2005. ORIENTATION FORM: "I attended orientation on [5-1-08-] and was given the opportunity to ask questions regarding the following: Canteen Procedures, Laundry Procedures, Phone Calls, Visitation Procedures, Mail Room Procedures, Funds, Pill Call/Sick Call Procedures, Job Assignments, Classification, Education Programs, Substance Abuse Programs, Psychological Services, Religious Services, Dining Procedures, Law Library Hours, and HIV/AIDS, Wristbands, Smoke Free Institution, and "Hot Dorm"." At ADOC029983.

[152] *See, e.g.,* INMATE IDENTFICATION FORM [no reference to disability]. At ADOC029983. Classification Summary: INMATE CLASSIFICATION RISK ASSESSMENT· (CLAS011). At ADOC029302.  ADOC EASTERLING CORR FACILITY. PERSONAL DATA REPORT FOR TRANSFERRED INMATE. At ADOC029329. Bullock. Inmate Food Service Worker Clearance. At. ADOC030095. "This Inmate's Medical Record has been reviewed and he/she has been examined: … He/she **IS NOT** medically cleared for duty as a food service worker … *due to hearing impaired deaf/mute*." (emphasis in original; italicized means handwritten). 4-30-08. INMATE VISITING/FUNDS FORM. At. ADOC030106. Student Class Transcript for Tooley, all A+.  Job

Review Board. Job Placement and Management Level. At ADOC030198. "Job Skills: None on File." ADOC RECEIPT OF MEDICAL EQUIPMENT/APPLIANCE FORM. At MR014607 ("acknowledge receipt of the following medical equipment or appliance: ( ) Splint ( ) Eyeglasses ( ) Dentures ( ) Prothesis [sic] ( ) Wheelchair ( ) Cane ( ) Crutches (Other) *orthotic ankle book*." 4-7-14. [italicized is handwritten]. *Id.* at MR014609, 611, 612, 618, 620, etc. [crutches; bottom bunk 60 days, wheelchair as needed; report to pill call]. *Id.* at MR014627 [related inmate request slip]. *See also* MR014636 (Harold Bragg, inmate with one arm requesting, Velcro fastening shoes). SPECIAL NEEDS COMMUNICATION FORM; at MR014608 (Naproxen medicine). Corizon. Nursing Encounter Tool. Musculoskeletal; at MR014673 (bottom bunk profile). *Id.* at MR014675 (bottom bunk request: "I am deaf. I need to get profile bottom bunk for my ankle problem and deaf balance." 2.14.15. Sick Call Request; at MR014676 ("I need to get interpreter sign language from Freeworld."). *Id.* at MR014684, 685 ("I'm deaf."). *Id.* at MR014696 (handwritten notes to communicate medical and program questions).

[153] *See also* MENTAL HEALTH SERVICES. Pyschological Evaluation. "f. Easily victimized. Deaf/Mute". At ADOC030041. *Id.* at ADOC030039. "MMPI Welsh Code: deaf/mute." [Welch Code/Grid to visualize results of MMPI.]. *Id.* at ADOC030042. "Is deaf/mute and requires interpreter to communicate with sign language." Dated: 4/23/08.  INMATE AWARENESS ACKNOWLEDGEMENT. Acknowledge that I received an orientation on the prevention, self-protection, reporting, treatment and counseling, relating to Inmate Sexual Offenses and Custodial Sexual Misconduct. At ADOC030052. 6/30/11. *Id.* at ADOC030069. 9/9/2008; ADOC030091. 4/9/08 Kilby. ADOC: SPECIAL NEEDS COMMUNICATION FORM. At ADOC030053. 1/31/11.

[154] Moseley Depo at 15.

[155] *Compare* Moseley Depo at 20 (Q. Have you identified a sick call request form you submitted in which you requested physical therapy? A. No, sir.) *Id.* at 21-23 (Q. Have you at any time during your incarceration requested physical therapy? A. Yes, sir. Q. When was the first time that you requested physical therapy during your incarceration in the ADOC system? A. Speaking with the doctor at Kilby. … Q. So, in July of 2007 you first requested physical therapy, correct? A. Yes, sir. Q. Were you relying on any medical devices at that time like a wheelchair? A. Yes, sir. Q. What were you utilizing? A. Wheelchair. Q. How many hours out of the day were you relying on a wheelchair? A. 24. Q. Were you able to walk at all? A. No, sir. Q. Did you have any casts or splints on any portion of your body? A. No, sir. … Q. And you said you spoke with the physician at Kilby, correct? A. Yes, sir. Q. And that was in July of 2007, correct? A. Yes, sir. Q. Tell me about that conversation. A. He told me that—I asked him about physical therapy. He told me to talk to the doctor at my permanent housing unit. Q. What do you mean your permanent housing unit? A. He said I would be going to another facility.

[156] Moseley Depo at 24-25. *Id.* at 26 (Q. After this conversation with Dr. Siddiq, did you file a medical grievance? A.  No, sir. Q. After this conversation with Dr. Siddiq, did you fill out any sick call request forms requesting physical therapy? A. No, sir. Q. Have you at any time requested physical therapy during your incarceration at Easterling? A. No, sir. Q. And how long have you been incarcerated at Easterling? A. Four years. *Id.* at 85-87 (Q. So, when you first arrived at Easterling you were notified of the existence of a grievance process, correct? A. Correct. Q. Have you ever completed a medical grievance? A. Yes, sir. Q. Do you remember where you were incarcerated when you completed a medical grievance? A. Bullock. Q. Since arriving at Easterling, have you completed a medical grievance? A. No, sir. Q. What did you fill out a medical grievance regarding at Bullock? A. Use of the handicap bathroom. Q. And did you receive a response to that grievance at Bullock? A. No, sir. … Q. Have you ever submitted a grievance related to any request for physical therapy? A. No, sir. Q. So, you weren't even aware of a grievance process before you arrived at Easterling, correct? A. Yes, sir. Q. Are you aware that other inmates at Easterling had filed medical grievances? A. I've heard of it.).

[157] Moseley Depo at 107-08.

[158] Moseley Depo at 137 (Q. If you had a choice between being housed at Bullock and Easterling, where would you prefer to be housed? A. Bullock. Q. Why is that? A. It's a lot more accessible than here. Q. What do you mean it's a lot more accessible? A. The showers, the urinals, toilets, they're all basically pretty much handicapped. They got rails on each side. Pill call line is indoors. You don't have to wait out in the weather. From one housing unit like the dormitory to the chow hall, you don't have to walk two or three miles. It's just right there. It's all close together.). *Id.* at 139-40 (Q. Now, here [at Easterling], right now, do you have trouble using, you know, getting to the toilet? A. No. Q. And using it? A. In our dorm, H dorm, you have two handicap toilets. You have two handicap showers. And you have two handicap urinals. But the—any inmate uses them. It's not just for handicapped, so, yes, it's kind of hard to use one that is being used or you have to wait, like if you have to use the bathroom and both of them is being used, you just have to wait. The rest of them are low to the ground as far as the toilets. And trying to get up off of them without a way to pull up off of them is hard. So, yes, it's, it's pretty hard to get a hold of one whenever you

need to. Q. What about urinals? A. Urinals? Urinals are not quite as bad. I mean, you don't have any handrails on them to hold yourself up or anything like that, but you have—their handicap urinals are shorter, they're down further on the wall. The rest of them are up higher. They are a little easier to use, but you have no way of holding yourself there if you have to. There's no rails or nothing on them. Q. Do you have any trouble getting to the handicap showers in your dorm? A. Sometimes. Not all the time. Q. Is that because others are using them? A. Others are using it, or they are being—someone in front of it using another shower pole.).

[159] Moseley Depo at 146-47.

[160] In Moseley's case records, I have found illustrative documents such as: CMS Health Services Request Form; at MR017629 (4-6-10; "inmates confined to w/c"), MR017630 (ADOC Special Needs Accommodation Form, medical profiles, 4-6-10; e.g., shower in infirmary). Medical Coding Assessment Form; at MR011229 (4-25-11; "wheelchair dependent"). RECEIPT OF MEDICAL EQUIPMENT/APPLIANCE FORM; at MR011248-49 (2-4-14; 5-23-14; knee stabilizing brace).

[161] Williams Deposition, *supra* at 33-34, 38. *Id.* at 59 (for continuing education courses, correctional officers, non-correctional officers, and support staff receive the same courses). *Id.* at 61 (ADOC requires on the job training for a correctional officer that transfers from one facility to another).

[162] Williams Deposition, *supra* at 125-126. *See also* http://www.doc.state.al.us/ExecutiveBios.aspx ("Commissioner Culliver is responsible for ensuring the effective daily operations of male correctional facilities. He supervises the Transfer Division, Institutional Coordinators and the Emergency Response Teams. Mr. Culliver began his career with the Department in 1981 as a Correctional Officer. He was Warden at Atmore CBF, Fountain CF and Holman CF over a 10 year period. He was promoted to Correctional Institutional Coordinator in November of 2009. Culliver has worked as a Technical Resource Provider (TRP) with the National Institute of Corrections. He was promoted to his current position June 1, 2015.").

[163] Williams Deposition, *supra* at 99, 100-101 (Director of ADOC Training Division, oversees ADOC Training Academy and in-service training to ADOC correctional officers, non-uniform and supervisory staff). *See also* http://www.doc.state.al.us/ExecutiveBios.aspx ("Dr. Williams is responsible for ensuring the effective daily operations of Women's Services and the Training Division. Dr. Williams began her career with the Department in 1987 as a Correctional Officer and worked her way through the ranks to Captain at Limestone Correctional Facility and was later appointed to Director of Training for the department in September 2002. Dr. Williams was appointed Deputy Commissioner for Women's Services on April 16, 2014."). Named plaintiffs include female ADOC inmate Cherry Baker, housed at the Tutwiler, with history of heart disease and medical problems, and uses a cane for her condition rheumatoid arthritis, which causes pain, swelling, stiffness, and loss of physical function in her hands. *See* Plaintiffs' Second Amended Complaint, at 5, para. 11.

[164] *See, e.g.,* Deposition Testimony of Veronica Moore, CO at Limestone Prison who is responsible for TTY phone systems at that facility.

[165] Williams Deposition, *supra* at 109. *Id.* at 109-110 (no knowledge of ADA coordinators at ADOC women's facilities).

[166] Williams Deposition, *supra* at 109. *Id.* at 142.

[167] Williams Deposition, *supra* at 94. *Id.* ("Q. At the academy, are there topics, as part of the training, that are specific to prisoners with disabilities? A. There are topics that educate 9 correctional officer trainees on responding to inmates who exhibit unusual or out-of-the-ordinary needs or inabilities to perform functions or get from point A to point B, and then they are instructed on how to follow up and make reports of that to supervision staff, and in cases of medical or mental health.").

[168] Williams Deposition, *supra* at 127-128. *Id.* at 130-131 ("Q. … Does DOC require any training for correctional officers regarding DOC's policies with respect to inmates with disabilities? A. What I do have knowledge of is the on-the-job training provided to correctional officers at the facility, which includes a review of administrative regulations and standard operating procedures specific to the facility that the employee works at. Q. … And when you say at the facility, do you mean both male and female facilities? A. Yes. The OJT is required for both male and female facilities. Q. So you have some knowledge of the OJT at the male facilities? A. The topic areas that are required by training policy are listed on the OJT form that we provided.").

[169] Williams Deposition, *supra* at 123 ("Q. All right. Do you know if ADOC requires any ADA training for classification specialists? A. Not to my knowledge, unless it is provided at the facility level by someone other than training division employees."). *Id.* at 124-125 ("Q. Does staff at Kilby receive any ADA training, other than the training that you have discussed? A. I do not know. Q. And who would know the answer to that question? A. The

Associate Commissioner for Health Services could possibly respond, if there's training provided other than what's provided by the training division."). *Id.* at 145. *Id.* at 146-151 (discussion of intake process and notifications to medical staff of possible inmate impairments). *Id.* at 151 (no knowledge of ADA training to intake staff). *Id.* at 153 (no knowledge if intake staff receive training on how to identify various disabilities).

[170] Williams Deposition, *supra* at 136.

[171] Williams Deposition, *supra* at 95-96, 103.

[172] Williams Deposition, *supra* at 143. *Compare id.* at 156-157 (ADOC accommodates women prisoners with disabilities primarily by contacting medical staff).

[173] Williams Deposition, *supra* at 185-186. *Id.* at 187 (ADOC staff not overrule a health care provider accommodation decision).

[174] Williams Deposition, *supra* at 157-158, 158. *Id.* at 159 (bottom bunk assignment as example of accommodation for inmate with a disability, by contacting medical personnel). *Id.* at 161, 164-65 (no knowledge of accommodation request process for female inmates).

[175] Williams Deposition, *supra* at 159-160.

[176] Williams Deposition, *supra* at 164-168, 170.

[177] Williams Deposition, *supra* at 96, 103. *Id.* at 104-105 (At ADOC women's facilities, training on communicating with inmates with hearing disability include "red stencil" uniforms, versus regular black stencil, and laminated card to inform others the inmate has a hearing impairment; sign language interpreters have been provided for inmates).

[178] Williams Deposition, *supra* at 180.

[179] Williams Deposition, *supra* at 97. *Id.* ("Q. Are correctional officers – do they receive continuing education training on interacting with prisoners with physical disabilities? A. Correctional officers, during in-service training and continuing education refresher courses, are reminded of their responsibility to be observant. And anything that they recognize that's unusual about an inmate that might compromise his or her safety, they are required to report that through supervision channels and, if necessary, to healthcare providers."). *Id.* at 173 (housing accommodations considered for female inmates with mobility impairments by health care provider). *Id.* at 175 ("Q. Do you know whether there are any accessible segregation cells at Tutwiler? A. I just can't say for sure. I feel certain there are.").

[180] Williams Deposition, *supra* at 98, 100, 102, 103-104.

[181] Williams Deposition, *supra* at 63.

[182] *Compare* Tom Holcomb & Joy Kreeft Peyton, *ESL Literacy for a Linguistic Minority: The Deaf Experience* (July 1992); *available at:* http://www.ericdigests.org/1993/deaf.htm ("In spite of concerted efforts by educators to facilitate the development of literacy skills in deaf individuals, most deaf high school graduates read English at roughly a third or fourth grade level as determined by standardized reading assessments. In their writing, they often make vocabulary and structural errors that include omitting or confusing articles, prepositions, and verb tense markers, and they have difficulty with complex structures such as complements and relative clauses.") (citations omitted).

[183] Jean F. Andrews, Cultural and Linguistic Challenges and Comprehending the Inmate Handbook, 36 *Corrections Compendium* 1, 2 (Spring 2011). *Id.* at (citing research finding an overrepresentation of inmates with hearing impairments in state prisons, with approximately 35 to 40 percent of inmates having some hearing impairment).

[184] Jean F. Andrews, Cultural and Linguistic Challenges and Comprehending the Inmate Handbook, 36 *Corrections Compendium* 1, 2 (Spring 2011). *Compare* Holmes v. Godinez, --- F.R.D. ---- (ND ED IL, 2015) (2015 WL 5920750), at 19 (Illinois prison staff inadequately trained to accommodate, understand, and communicate with deaf and hearing impaired offenders; inmate "recalls an incident when he first entered [prison] in which he told correction officers that he was deaf but they nonetheless expected him to answer when they called his name out loud in a group. … [prison] employees often assume that he can hear because he does not know American Sign Language ("ASL") well, and thus they do not take the time to effectively communicate with him.") (citations omitted).

[185] *Compare Pierce*, 2015 WL 5330369, at *6 (given communicate deficiencies and lack of accommodations, deaf inmate believed he had no choice but to sign documents presented to him by correctional staff).

[186] Jean F. Andrews, Cultural and Linguistic Challenges and Comprehending the Inmate Handbook, 36 *Corrections Compendium* 1, 2 (Spring 2011) (citations omitted).

[187] Jean F. Andrews, Cultural and Linguistic Challenges and Comprehending the Inmate Handbook, 36 *Corrections Compendium* 4 (Spring 2011) (for example, increasing comorbidity of hearing disability and cognitive learning and mental health impairments).

[188] *See also* Notice of Proposed Rulemaking regarding ADA Title II regulations, 73 Fed. Reg. 34466, 34476 (June 17, 2008) (exchanging written notes may be an example of an auxiliary aid or service, however, it must be appropriate to the situations). The ADA's legislative history states: "technological advances can be expected to further enhance options for making meaningful and effective opportunities available to individuals with disabilities. Such advances may require public accommodations to provide auxiliary aids and services in the future which today they would not be required because they would be held to impose undue burdens on such entities. …Indeed, the Committee intends that the types of accommodations and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times." *Id*. at 1164, *citing* H.R. Rep. 101–485(II), at 108 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 391.

[189] ADOC AR 705, Hearing Impaired Inmates (Nov. 4, 2005),  *available at*: http://www.doc.state.al.us/Regulations.aspx. AR 705 references AR 602, Mental Health Definitions, for definition of terms such as "Deaf or Hearing-Impaired Person" and "Qualified Interpreter." *See* ADOC AR 602, Mental Health Definitions and Acronyms (Jan. 3, 2007), at ADOC; *available at*: http://www.doc.state.al.us/Regulations.aspx.

[190] *Compare* Texas Department of Criminal Justice, Parole Division, Accommodations for Offenders with Disabilities, PD/POP-3.2.16 (Aug. 30, 2011) (implications of ADA for supervision of offenders and procedures to ensure the availability of effective communications with individuals with disabilities, such as acceptable reception, interview, and conversation etiquette, and guidelines for compliance issues, local resources, and interpreter services). *Id.* at 6 (American Sign Language Interpreters ("ASL") has own syntax and grammatical structure, and level III interpreter is "qualified interpreter" and "is necessary when the information being communicated is complex, is exchanged for a lengthy period of time, or is related to a legal matter. A qualified interpreter is able to interpret effectively, accurately, and impartially, as well as receptively and expressively, using any necessary specialized vocabulary. … factors to be considered in determining whether an interpreter is required include the context in which the communication is taking place, the number of people involved, and the importance of the communication. … it is not the offender's responsibility to provide an ASL interpreter for parole contacts.").

[191] *See also* ADOC AR 431, Inmate Phone System (providing for Telecommunication Device for the Deaf/Teletypewriter (TDD/TTY) services; visual alarms for emergency services, closed-captioned television programming). *Id.* at 1 ("It is the policy of the ADOC to provide an inmate telephone system at each institution t*o maintain constructive family and community ties*, and for controlling unauthorized use of the telephones by inmates.") (emphasis added); at 2 (Warden responsible for developing their institutional SOPs to implement AR 431and "for making accommodations for the deaf or hearing impaired inmates as required by AR 705, Hearing Impaired Inmates.") (emphasis in original); at 2 (institution will distribute the ADOC Form 431 to inmates when received into institution; at 3 (Warden will establish telephone schedule to coincide in accordance with General Population inmates, such that telephones will operate from 8:00 a.m. until 10:00 p.m. Sunday through Thursday. Telephones will operate from 8:00 a.m. until 12:00 p.m. on Friday and Saturday. Duration of call will be 15 minutes. Honor Dorm/Faith Based Programs may be allowed extra time as determined by the Warden.); at 4 ("Calls by deaf or hearing impaired inmates using TDD/TTY equipment shall be allowed four times the duration allowed for voice telephone calls as directed by AR 705, *Hearing Impaired*.") (emphasis in original).

[192] *But see* ADOC Male Inmate Handbook, *supra* at 7-8 ("During classification, you will also be given a score on a risk assessment instrument to determine the security level of the institution you may be assigned. … *Your placement at a specific facility will also depend on your educational and treatment needs and medical/mental health requirements*.") (emphasis added). In instances where classification and placement are based on a putative ADA class-member's disability-status, such determinations would violate the ADA and best practice in the area.

[193] 28 C.F.R. § 35.160(b)(2) ("35.160  General. (a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others. (b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity. (2) In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.").

[194] *See generally* Guidance on ADA Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services Originally Published July 26, 1991 ("DOJ Guidance on Original Title II Regulations"), 28 C.F.R. pt. 35, app. B (2011) at 205; *available at*: http://www.ada.gov/regs2010/titleII_2010/titleII_2010_regulations.pdf) (e.g., "public entity shall honor the choice

[of auxiliary aid] unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under § 35.164.").

[195] DOJ Guidance on Original Title II Regulations, *supra* at 205. *See also* U.S. Department of Justice, Communicating with People Who are Deaf or Hard of Hearing: ADA Guide for Law Enforcement Officers; *available at*: http://www.ada.gov/lawenfcomm.pdf. *See also* DOJ Guidance on Original Title II Regulations, *supra* at 72.

[196] Deposed Nov. 13, 2015, with sign language interpreters (3/20-21). Pearson Depo at 9/4-7 (deaf whole life); at 9/14-16 (learned sign language at Alabama School for the Deaf in Talladega).

[197] Pearson Depo at 10/16-18; 10/19-22.

[198] Pearson Depo at 11/10-12. *See also* Pearson Depo at 37/6-10 ("there was no one to help me as a deaf person [in prison]"; *id.* at 39/7-9 (other than being deaf, considers himself a normal person).

[199] Pearson Depo at 33/23, 34/1-3 (Can read lips "A little bit. It depends on who. If a person enunciates and opens their mouth wide, sometimes I can understand.").

[200] In regard to the lack of effective hearing aids provided by ADOC, Pearson testified ("I did apply for another replacement hearing aid. And they said, okay, we'll look into it. And so about a year went by. And then finally I asked again, and they said soon. And I said, "But I'm getting out in a month." And that's when they finally sent me a new hearing aid and I got one, but I waited a long time. And I think it was about two weeks before I actually went home that I got it, even though I had been asking and asking before. … I can't really use it [a hearing aid] to communicate. I would like to learn." Pearson Depo at 59/22-23, 60/1-9; 61/2-3. Id. at 63/10-19 ("Q Well, was there a particular reason that you wanted to have a hearing aid when you were in prison this last time, given what you've just told me? A So, I could hear what was going on. Because I was trying to learn for the future to do better. I wanted to get a job when I got out. And I kept asking for a hearing aid to help me and they turned me down."). Id. at 64/17-20 ("Q When you are wearing your hearing aid, can you understand people speaking to you in the English language? A No.").

[201] Pearson Depo at: 49/18-23, 50/1-6.

[202] Pearson Depo at 156/5-15.

[203] Pearson Depo at 65/18-23. *See also* Pearson Depo at 71/23, 72/1-10; 93/16-23, 94/1-5, 94/10-20, 99/19-23, 100/1-18.

[204] Pearson Depo at 82/18-23, 83/1-23, 84/1. Pearson Depo at: 146/11-23.

[205] Pearson Depo at 130/23, 131/1-15; Pearson Depo at 136/10-23, 137/1-21. Note AR 431, ADOC Grievance Procedure for Inmates: signed by Pearson (Pearson Depo at: 139/19-23, 1-9).

[206] Pearson Depo at 148/19-23, 149/1-2; Pearson Depo at 150-56.

[207] Pearson Depo at 163/7-20, 164/10-23.

[208] Pearson Depo at: 168/22-23, 169/1-19. *See also* Pearson Depo at 177/3-23, 178/1-5; Pearson Depo at 181/23, 182/1-23.

[209] Pearson Depo at: 184/8-20.

[210] Pearson Depo at 200-218.

[211] Turner Depo at 19, 20-21, 30. *Id.* at 87 (Turner cannot read proficiently). *Id.* at 97 (Turner also is diagnosed with hypertension and diabetes).

[212] Turner Depo at 48. *Id.* at 77-78.

[213] Turner Depo at 113-14.

[214] Turner Depo at 119. *Id.* at 138-39.

[215] *See, e.g.,* Alabama Department of Mental Health and Mental Retardation Administrative Code, Chapter 580-3-24 Certification of Mental Health Interpreters for Persons Who are Deaf, Code of Ala. 1975, 22-50-11; Alabama Licensure for Interpreters and Transliterators Act (ALBIT Licensure Law Section 34 Chapter 16), *id.* at Section 34-16-3. *See also* Dennis Cokely, Interpreting Culturally Rich Realities: Research Implications for Successful Interpretation, *Journal of Interpretation: Millennial Edition* 1-46 (2001) (not necessarily one-to-one correspondence between English words and sign language signs for the deaf).

[216] *See* RID website; *available at*: http://www.rid.org; ALRID; *available at*: http://www.alrid.org.

[217] *See* 28 C.F.R. 35.104 (Qualified Reader who may take notes and write for others).

[218] *Compare* Holmes v. Godinez, --- F.R.D. ---- (ND ED IL, 2015) (2015 WL 5920750), at 22 (parties agree that in the past some inmates required to purchase their auxiliary aids and contest whether that remains Illinois prison's current policy).

[219] *See* Pearson Depo at 52/19-23, 53/1-9. *See also* Pearson Depo at 91/5-23, 92/1-3; 92/8-23, 93/1-12.

[220] Pearson Depo at 53/11-15 (phone for deaf inmates located in the shift office).

[221] Pearson Depo at 53/20-23, 54/1-23, 55/1-8, 55/20-21. *Id.* at 55/18-23, 56/1-2. *Id.* at 56/14-23.  *Id.* at 57/22-23, 58/1-2, 58/3-23, 59/1-8. *See also* Pearson Depo at 94/21-23, 95/1-23, 96/1; at 96/16-19; at 112/7-22.

[222] *See* Moore Depo at 6.

[223] *See also* Moore Depo at 15.

[224] Deposition Transcript of Tommie Lee Moore, at 42-44, 115 (June 24, 2015). *Id.* at 141-44.

[225] *Compare Armstrong*, *supra* at 960 ("prison "violations are systemwide and extensive. They involve the widespread denial of mobility-assistance devices to persons unable to physically function without them, the denial of hearing devices to deaf class members, and the denial of accessibility devices, such as tapping canes, to blind class members. These denials forced disabled class members into the vulnerable position of being dependent on other inmates to enable them to obtain basic services, such as meals, mail, showers, and toilets.").

[226] *See, e.g.,* Deposition of Adrienne Givens, at 92 (ADA coordinator did not know if Tutwiler death row cells were accessible to persons with disabilities).

[227] *See, e.g.,* Deposition Testimony of Kenneth Peters (ADA Coordinator for St. Clair not know if GED program is accessible to prisoners with disabilities); Deposition Testimony of Ernest Claybon (ADA Coordinator at Staton not know if in GED classes materials provided in Braille for prisoners with vision impairments or if qualified sign language interpreters were ever available).

[228] *See, e.g.,* Blanck observations at Easterling site inspection (inmate reported he was disallowed from attending Work Release due to his mobility impairment).

[229] *See, e.g.,* Testimony of Ernst Claybon (ADA Coordinator at Staton testified that a deaf person would know there is a fire alarm by "Either the inmate would tell them, an officer would tell them, or they would just kind of [follow the crowd].").

[230] Greenberg, E., Dunleavy, E., & Kutner, M. (2007). Literacy Behind Bars: Results from the 2003 National Assessment of Adult Literacy Prison Survey (NCES 2007-473), U.S. Department of Education, Washington, DC: National Center for Education Statistics).

[231] *See, e.g., Parsons*, 754 F.3d at 678 (inmates should not be housed in administrative segregation on the basis of their disabilities alone); *Hernandez*, *supra* at 43; Hernandez et al. v. County of Monterey, Order granting Motion for Preliminary Injunction (Case No.: 5:13-cv-2354-PSG, ND CA, San Jose Div., Apr. 14, 2015).

[232] *Compare* Court's opinion in Wyatt ex rel Rawlins v. Sawyer, 219 F.R.D. 529, 531 (2004) ("principles of humane treatment of people with mental illness and mental retardation embodied in this litigation have become part of the fabric of law in this country and, indeed, international law."). *Id.* at 532 ("Patients were housed in inhumane conditions in "barn-like" dormitories plagued by overcrowding, extreme ventilation problems, and fire and other emergency hazards. Wyatt v. Stickney, 334 F.Supp. 1341, 1343 (M.D. Ala., 1971). Hospital staff was under-qualified and stretched thin, and patients did not have individualized treatment plans. *Id.* at 1343–44. "Also contributing to the poor psychological environment [were] the shoddy wearing apparel furnished the patients, the non-therapeutic work assigned the patients ... and the degrading and humiliating admissions procedure which create[d] in the patient an impression of the hospital as a prison or as a 'crazy house.' " *Id.* at 1343.)" *Id.* at 533 ("Wyatt heightened public awareness of the needs of institutionalized people and people with mental illness and mental retardation.").

[233] *See, e.g.,* Lisa Schur, Lisa Nishii, Meera Adya, Douglas Kruse, Susan M. Bruyere, & Peter Blanck, Accommodating Employees With and Without Disabilities, *Human Resource Management*, 53(4), 593-621 (2014).

[234] *See, e.g.,* Tutwiler Settlement 2015, *supra*, at 4. ADOC has endorsed that to implement, revise, update, and comply with policies and procedures, such as in Administrative Regulations, in practice means: "the policy has been drafted and disseminated to all staff responsible for following or applying the policy; all relevant staff have been trained on the policy; compliance with the policy is monitored and tracked through compliance tools; the policy is consistently applied and followed, as demonstrated by the compliance tools; and there are corrective action measures to address lapses in application of the policy."

[235] *Compare* Holmes v. Godinez, --- F.R.D. ---- (ND ED IL, 2015) (2015 WL 5920750), at 12 (use of central database and/or document system to identify and monitor inmates with disabilities and potential accommodations).

[236] *Compare* Tutwiler Settlement 2015, *supra* at 22-25 (e.g., quality improvement systems and data collection requirements to include, for example, information on standard instruments, methods of data collection). *Id.* at 23 ("ADOC and Tutwiler shall ensure that grievance forms are available on all units. ADOC and Tutwiler shall assist inmates … in accessing the grievance system."). *Id.* at 17 (Tutwiler educational and training materials are "conveyed

and made available in formats accessible to all inmates") *Id.* at 19 (requirement risk assessment procedures at intake screening to include whether inmate has a mental, physical, or developmental disability).

[237] *Compare* Tutwiler Settlement 2015, *supra* at 22-25 (e.g., confidentiality, education, lack of retaliation).

[238] Tutwiler Settlement 2015, *supra* at 19 (compare with ADOC risk assessment procedures that screen for risk of victimization and abusiveness, … victims … inmates shall be assessed during an intake screening within 72 hours of arrival. … The intake screening shall include, at a minimum, the following criteria to assess inmates for risk of sexual victimization: 1. Whether the inmate has a mental, physical, or developmental disability."). *Compare* Hernandez et al., v. County of Monterey et al., Settlement Agreement, *supra* at 11-12.

[239] *Compare* Holmes v. Godinez, --- F.R.D. ---- (ND ED IL, 2015) (2015 WL 5920750), at 43 (Illinois prisoners contend "hearing impaired inmates, who cannot hear the auditory announcements, are often forced to rely on the goodwill of fellow inmates, and in some cases miss meals, visitors, church services, medical appointments," with anecdotal examples provided by inmates and prison officials).

[240] *Compare* State of North Carolina Department of Public Safety Prisons, Policy and Procedure, *supra* at 13 ("(j) Training. (1) ADA Training will be provided to all current Department of Public Safety Prisons staff on the policy and procedure regarding the ADA Process for inmates. New employees will be provided ADA Training as part of new employees Orientation. (2) All Department of Public Safety Prisons staff are mandated to annually attend ADA for Inmates Training. (3) All Department of Public Safety Prisons staff will be trained through use of audio and visual methods and will be provided printed educational information on the ADA Policy and Procedures regarding the ADA and inmates.").

[241] *Compare* Commonwealth of Pennsylvania Department of Corrections, Reasonable Accommodations for Inmates with Disabilities, *supra* at 1-2 ("Housing Unit Staff who have primary supervisory responsibility for an affected inmate may obtain out-service training to learn methods of communicating with the inmate and/or managing his/her specific disability in accordance with Department policy 5.1.1, "Staff Development and Training.").

[242] *Compare* Tutwiler Settlement 2015, *supra* at 2. *Compare also* State of North Carolina Department of Public Safety Prisons, Policy and Procedure, *supra* at 3-4 ("(j) Prisons ADA Coordinator–A position at the Prisons Administration level who is responsible for overseeing the implementation and coordination of this policy within Prisons. For purposes of this policy and program that person will be the Social Work Program Director/designee. (k) Prisons ADA Compliance Specialists–Certified ADA Specialist positions at the Prisons Administration level who will assist the Prisons implementation and coordination of this policy and who will be responsible for ensuring that all facilities comply with the ADA law when developing, maintaining and implementing inmate jobs, programs, activities and services. This responsibility will also involve identifying and correcting any non-compliance and/or barriers to compliance. (l) Facility ADA Coordinator–A position designated by the Director of Prisons to ensure compliance and implementation of this policy within a prison facility. For purposes of this policy and program, that position shall be the Assistant Superintendent for Programs at each facility. In the absence of an Assistant Superintendent of Programs, the Facility ADA Coordinator shall be the facility's highest ranking Program staff member under the Facility Head. (m) Facility Disability Case Managers–Correctional Case Managers who have been trained to assist inmates with disabilities that have been identified under the American Disability Act (ADA). Each facility will designate one or more Case Managers as their Disability Case Manager. Although this Case Manager can have other inmates assigned to his or her caseload, all ADA inmates housed at the facility will be assigned to this Case Manager. An inmate who has been flagged as an ADA inmate will be assigned to the case load of a Disability Case Manager. These Case Managers have received specialized training in assisting qualified inmates with disabilities. The Disability Case Manager will document their bi-monthly contact with the ADA inmate on the IP60/61 OPUS screen using case management note type 73 (ADA Offender Management). The Disability Case Manager will document their once a month contact with the DD inmate on the IP60/61 OPUS screen using case management note type 52 (Developmental Disability). When an inmate has been flagged "yes" for both DD and ADA, the rules and practices for DD will be used in providing case management Services for the inmate. (n) Mental Health Social Worker–Mental Health social workers are those social workers in Health Services assigned organizationally under the Director of Mental Health and the Director of Social Work Services."). *See also Callous and Cruel: Use of Force against Inmates with Mental Disabilities in U.S. Jails and Prisons*, *supra* at 15 ("symptoms of some individuals with mental health conditions may be subtle, discernible only to clinicians. Prisoners with serious depression, for example, may appear merely withdrawn and unsociable. The conditions of others may be readily evident: they are agitated, cannot talk coherently, bite themselves aggressively, repeatedly bang their heads

against walls, or call out for help against unseen persecutors. Some live in a world constructed around their delusions.").

243 Tutwiler Agreement 2015, *supra* at 8. *Compare* Commonwealth of Pennsylvania Department of Corrections, Reasonable Accommodations for Inmates with Disabilities, *supra* at 3-1 – 3-2 ("Section 3 – Specific Disabilities. An inmate who is diagnosed as having a qualified disability will receive accommodations so that he/she can properly communicate/participate in the Department's facilities. An inmate will not be denied services solely for reason of his/her disability(ies). A. Local Procedures. Each Facility Manager/designee is to ensure that local procedures are developed, if needed, and maintained to ensure compliance with this policy. Each facility shall also be in compliance with Management Directive 205.32, Hiring Sign Language Interpreters and Transliterators. B. Accommodations for the Deaf and Hard of Hearing. The following is a mandatory list of services that must be provided for an inmate who is qualified as deaf or hard of hearing during emergency evacuation procedures. 1. Fire Alarm/Emergency Notification Systems. Areas housing a deaf or hard of hearing inmate must have a flashing alarm and/or vibrating system and written procedures that direct staff to physically notify the inmate in case of an emergency. Areas such as bathrooms, Security Level 5 Housing Units, and medical isolation cells must be included in the procedures. All facilities shall comply with the National Fire Protection Association Life Safety Code, No. 101. 2. Announcements. Any procedures or directions to an inmate that rely on a loudspeaker system must be modified to alert a deaf or hard of hearing inmate; written procedures must include these provisions. C. Accommodations for the Visually Impaired. A facility shall have proper evacuation procedures to include an audible emergency alarm system and provide a qualified visually impaired inmate with the proper evacuation procedures upon assignment to a facility. A copy of an inmate roster shall be maintained in the control room and used by staff to alert a qualified visually impaired inmate of an emergency. A facility housing qualified visually impaired inmates shall have Braille signage that identifies rooms, spaces, instructions, etc. D. Accommodations for the Mentally and/or Physically Impaired. The Department shall provide an inmate diagnosed with a qualified mental and/or physical impairment assignment to a facility or Special Needs Unit that provides reasonable accommodations for this impairment. However, the Department may refuse access to recreation if participation by the qualified disabled inmate would alter the nature of the program or activity or if it presents a valid safety concern, an undue financial burden or if the inmate is unable to perform the basic function of the activity.") (citations omitted). *Compare* Holmes v. Godinez, --- F.R.D. ---- (ND ED IL, 2015) (2015 WL 5920750), at 7 (need for ADA inserts into inmate orientation handbooks).

244 *Compare Callous and Cruel: Use of Force against Inmates with Mental Disabilities in U.S. Jails and Prisons*, *supra* at 6 ("Effective leadership is required to ensure policies are reflected in practice. Leadership is essential in any institution, but is particularly important in jails and prisons because they are operated as hierarchical organizations subject to a quasi-militaristic chain of command and there is little external pressure for the humane treatment of prisoners."). *See also* Angela Browne, Allison Hastings, & Kaitlin Kall, *Keeping Vulnerable Populations Safe under PREA: Alternative Strategies to the Use of Segregation in Prisons and Jails*, *supra* at 19 (Vera Institute, PREA Resource Center, 2015) (creating and monitoring a zero-tolerance culture that takes verbal and physical harassment seriously towards vulnerable inmates, such as putative ADA sub-class members).

245 *See* http://www.doc.state.al.us/Regulations.aspx.

246 *Compare* Holmes v. Godinez, --- F.R.D. ---- (ND ED IL, 2015) (2015 WL 5920750), at 7 (Illinois prison system "ADA Directive," which among other areas is "to provide instructions to staff for providing accommodations to offenders with disabilities."). *Id.* ("The purpose of the ADA Directive is 'to provide instructions to staff for providing accommodations to offenders with disabilities.'")

247 *See, e.g.,* Gloria L. Krahn, Deborah Klein Walker, & Rosaly Correa-De-Araujo, Persons With Disabilities as an Unrecognized Health Disparity Population, *American Journal of Public Health*, Supplement 2, 105(S2), S198-206, at S201 (Feb. 17, 2015) (adults with disabilities four times more likely to report their health to be fair or poor than people with no disabilities; citing studies in support; using the National Health Interview Survey, United States, 2010, finding cumulative impact of experiences over the life course result in prevalence rates of disability as a proportion of population that increase with age, and majority of people with disabilities are younger than 65 years with one third at ages 44 to 65 years).

248 *See, e.g.,* Krahn, et al., *supra* (citations omitted).

249 *See, e.g.,* Thomas et al., *supra* at 2 (citing studies in support). *Id.* at 9-10 (finding positive association among substance abuse, mental health conditions, and recidivism, and between intellectual disability and recidivism).

[250] *See, e.g.,* Mollie W. Marti & Peter Blanck, Attitudes, Behavior, and the ADA, in Peter Blanck (ed.), *Employment, Disability, and the Americans with Disabilities Act: Issues in Law, Public Policy, and Research*, 356-84 (2000) (citations omitted) ("Persons with physical and mental disabilities are among those minority groups most stigmatized by society"). *See also* Peter Blanck & Mollie W. Marti, Attitudes, Behavior, and the Employment Provisions of the Americans with Disabilities Act, *Villanova Law Review*, 42(2), 345-408 (1997).

[251] *See, e.g.,* Jennifer Skeem & Lynne Bibeau, How Does Violence Potential Relate to Crisis Intervention Team Responses to Emergencies?, *Psychiatric Services*, 58(2), 201-04, at 203 (Feb. 2008) (officers trained in crisis intervention tended to use "force conservatively, even with subjects who posed an extreme risk of violence.").

[252] *See, e.g.,* O'Keefe et al., *supra* at 86 (detrimental effects of medication noncompliance worsened by prison environment, such as lack of accessibility, overcrowding, excessive noise and uncomfortable temperatures).

[253] *See generally* Linda Krieger, The contents of our categories: A cognitive bias approach to discrimination and equal employment opportunity, *Stanford Law Review*, 47, 1161-248 (1995).

[254] *See, e.g.,* Amy C. Watson, Patrick W. Corrigan, & Victor Ottati, Police officers' attitudes toward and decisions about persons with mental illness, *Psychiatric Services*, 55(1), 49-53, at 52 (2004) (schizophrenia label associated with increased perceptions of dangerousness, although may also be reflection of experience with a person with mental illness who became violent). *Id.* at 53 (although persons with mental illness, particularly who are experiencing psychotic symptoms and those abusing drugs and alcohol, have increased rates of violent behavior, most are not violent"). *Id.* ("Skills training in the recognition of mental illness coupled with effective communication and deescalation strategies will assist officers in successfully resolving contacts with persons with mental illness who are in crisis.").

[255] Research, my own and by others, shows bias towards people with disabilities may be mitigated when decision makers are held accountable for their decisions through clear policies, procedures, and best practices. *See, e.g.,* Leonard Sandler & Peter Blanck, Accessibility as a Corporate Article of Faith at Microsoft: Case Study of Corporate Culture and Human Resource Dimensions, *Behavioral Sciences & the Law*, 23(1), 39-64 (2005).

[256] *See* House Comm. Judiciary, H.R. Rep. No. 101-485, pt. 3, at 50 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 473.

[257] *See, e.g.,* Tutwiler Settlement 2015, *supra* at 3. *See also* Hernandez et al., v. County of Monterey et al., Settlement Agreement, at 2 (N.D. Cal., Case No. CV 13 2354 PSG, Sept. 8, 2015) (definition of "substantial compliance with settlement agreement and implementation plan).

[258] *Pierce*, 2015 WL 5330369 at 1 (citations omitted).

[259] The U.S. Department of Justice has noted why regulations are needed in this regard: "Historically, individuals with disabilities have been excluded from [prison] programs [that] are not located in accessible locations, [and] inmates with disabilities have been segregated in units without equivalent programs. In light of the Supreme Court's decision in *Yeskey* and the requirements of [ADA] title II, however, it is critical that public entities provide these opportunities to inmates with disabilities. In proposed § 35.152, the Department sought to clarify that title II required equal access for inmates with disabilities to participate in programs offered to inmates without disabilities." Discussion of 28 C.F.R. Pt. 35, App. A., as revised § 35.152 in Fed. Reg., 75(178), at 56222 (Sept. 15, 2010).

[260] *See, e.g., Robertson*, 500 F.3d at 1199 ("because the [Department of Corrections] facility makes the activity available to detainees in general, it must do so on nondiscriminatory terms.").

[261] *Compare* Holmes v. Godinez, --- F.R.D. ---- (ND ED IL, 2015) (2015 WL 5920750), at 69 (Plaintiffs' expert concluded that Illinois prison "has instilled a culture of accepting non-compliance with the ADA's requirement to provide deaf and hard of hearing inmates with effective communication." …) (citations omitted).

[262] *See, e.g.,* ABA Standards, *supra* at 77 & n.94 (citing U.S. DOJ that "[a]ccessible cells do not compromise the security of prison personnel. In fact, having accessible cells increases security because they allow inmates with mobility disabilities to function independently, minimizing the need for assistance from guards."; quoting U.S. Dep't of Justice, Civil Rights Division, Disability Rights Section, ADA/Section 504 Design Guide: Accessible Cells in Correctional Facilities (Feb. 2005); *available at*: http://www.ada.gov/accessiblecells.htm).

# VITA

# PETER BLANCK

Birth: 27 August 1957.  Elmont, New York, U.S.A.
Married, Wendy; four children, Jason, Daniel, Albert, & Caroline; Harry (dog)

## EDUCATION

| | |
|---|---|
| 1983-1986 | STANFORD UNIVERSITY SCHOOL OF LAW, Stanford, CA.  J.D. President, Volume 38, STANFORD LAW REVIEW. |
| 1982-1983 | HARVARD UNIVERSITY, Department of Psychology and Social Relations, Cambridge, MA.  Post-Doctoral Fellow. |
| 1979-1982 | HARVARD UNIVERSITY, Cambridge, MA.  Ph.D., Social Psychology. |
| | Doctoral Thesis: "Children's ability to decode discrepant and consistent social communications:  Learning how, when, and who to decode." |
| | Minor field:  Organizational Behavior—"Field research in organizations." |
| 1975-1979 | UNIVERSITY OF ROCHESTER, Rochester, N.Y. |
| | B.A.  Magna cum laude, Psychology. |

## EMPLOYMENT

| | |
|---|---|
| 2005-current | *University Professor*, Syracuse University–highest faculty rank granted to eight prior individuals in the history of the University, "honors faculty whose exceptional scholarly and other professional accomplishments merit recognition by peers in the U.S. and abroad." The late U.S. Senator Daniel P. Moynihan was University Professor at Syracuse. |
| | In addition, appointments as professor in the Syracuse University Colleges of Law and of Arts and Sciences, School of Education, Falk College, and the Maxwell School of Citizenship and Public Affairs. |
| 2005-current | *Chairman*, Burton Blatt Institute, Syracuse University |
| 2002-2006 | *Charles M. and Marion Kierscht Professor of Law*, University of Iowa, College of Law |
| 2000-2006 | *Director*, Law, Health Policy & Disability Center, University of Iowa, College of Law |
| 1999-2006 | University of Iowa, College of Public Health, Department of Occupational Medicine and Environmental Health, Professor (by Courtesy) |
| 1997-2006 | University of Iowa, College of Medicine, Department of Preventive Medicine and Environmental Health, Professor (by Courtesy) |

| | |
|---|---|
| 1994-1995 | Princeton University, Woodrow Wilson School of Public and International Affairs, Center of Domestic and Comparative Policy, Fellow |
| 1994-2006 | University of Iowa, Department of Psychology, Professor |
| 1993-2006 | University of Iowa, College of Law, Professor of Law |
| 1990-1993 | University of Iowa, College of Law, Associate Professor of Law |
| 1987-1990 | Covington & Burling.  Associate, Washington, D.C. |
| 1986-1987 | Law Clerk, Judge Carl McGowan, United States Court of Appeals, D.C. Circuit. |
| 1982-1983 | Harvard University, Graduate School of Business. Research Associate and faculty. |

## RESEARCH GRANTS, CONTRACTS, AND MAJOR GIFTS (Illustrative)

For a detailed listing of awards to LHPDC and BBI, see bbi.syr.edu; total more than $65 million.

| | |
|---|---|
| 2015 | From the National Institute on Disability, Independent Living, and Rehabilitation Research (NIDILRR), U.S. Department of Education, Understanding and Increasing Supported Decision-Making's Positive Impact on Community Living and Participation Outcomes, PI, 5 year grant. |
| 2015 | From YMCA Greater Grand Rapids, Mary Free Bed YMCA, Universal by Design, PI. |
| 2014 | From Quality Trust for Persons with Disabilities, Administration on Community Living (HHS), National Resource Center for Supported Decision-Making (NRC-SDM), PI, 5-year agreement. |
| 2014 | From Onondaga Community College, U.S. Dept. Labor, Office of Disability & Employment Policy, Onondaga Pathways to Careers (OPC) Demonstration Project, BBI, 3-year grant. |
| 2013 | From Quality Trust for Persons with Disabilities, Supported Decision-Making as an Alternative to Guardianship, PI, 4-year agreement. |
| 2013 | From Tresness Family, Gift to BBI for Communication, Hope and Assistive Technology (CHAT) Program. |
| 2013 | From Olinsky Law Group, Social Security disability supports, Kelley Bunch and Diana Foote, Project Leads, 5-year agreement. |
| 2012 | From Rehabilitation Engineering and Assistive Technology Society of North America (RESNA), Accessible Technology Action Center (ATAC), Office of Disability Employment Policy (ODEP), U.S. Department of Labor. |
| 2012 | From IMPAQ, Evaluation of One-stop Career Centers' Accessibility to Persons with Disabilities, U.S. Department of Labor, PI, 2 year grant. |

| | |
|---|---|
| 2012 | From Institute for Rehabilitation and Research, National Institute on Disability Research and Rehabilitation (NIDRR), U.S. Department of Education, Community and Work Participating Disparities: A program of the ADA Participatory Action Research Consortium (ADA-PARC), Katherine McDonald BBI PI, 5 year grant. |
| 2011 | From the National Institute on Disability Research and Rehabilitation (NIDRR), U.S. Department of Education, Southeast ADA Center, PI, 5 year grant. |
| 2011 | From the U.S. Department of Veterans Affairs, Veteran Employees in Large U.S. Business, BBI PI, 1 year contract with second year option. |
| 2010 | From the U.S. Department of Labor/Veterans (DOL/VETS), Homeless Veterans Reintegration Project Technical Assistance Center, Gary Shaheen BBI PI, 3 year grant. |
| 2009 | From the National Institute on Disability Research and Rehabilitation (NIDRR), U.S. Department of Education, Center on Effective Delivery of Rehabilitation Technology (CERT) by Vocational Rehabilitation Agencies, 5 year grant. |
| 2009-2011 | From New York State, Office Mental Health, Medicaid Infrastructure Grant (MIG) |
| 2008 | From Rehabilitation Services Administration (RSA), U.S. Department of Education, Southeast Technical Assistance and Continuing Education (TACE) Learning Consortium, 5 year grant. |
| 2008 | Syracuse University Kauffman Foundation Enitiative Grant, Entrepreneurship Bootcamp for Veterans with Disabilities, 2 year grant. |
| 2008 | From the National Institute on Disability Research and Rehabilitation (NIDRR), U.S. Department of Education, Asset Accumulation and Economic Self-Sufficiency for People with Disabilities, 3 year grant. |
| 2007 | From POETA (Partnership in Opportunities for Employment in Technology for the Americas), of The Organization of American States (OAS), for disability research in Latin America. |
| 2007 | From the World Bank, for Global Partnership for Disability and Development (GPDD). |
| 2007 | From YAI/National Disability Institute, for study on corporate attitudes and disability. |
| 2007 | From the Israeli Ministry of Social Welfare, for the BBI/Israel Projects. |
| 2006 | From the National Institute on Disability Research and Rehabilitation (NIDRR), U.S. Department of Education, Southeast Disability Business & Technical Assistance Center (SE DBTAC), 5 year grant. |
| 2006 | From the U.S. Department of Labor, Office of Disability Employment Policy (ODEP), for national consortium on "Disability Case Study Research Consortium on Employer Organizational Practices In Employing People With Disabilities." |

| 2006 | From U.S. Department of Labor, Employment Training Administration (ETA), to evaluate emergency preparedness policies in gulf coast. |
| --- | --- |
| 2006 | From the U.S. Department of Labor, Office of Disability Employment Policy (ODEP), to study Self-Employment with Onondaga County, New York. |
| 2006 | From the Center for International Rehabilitation (CIR), to study international disability rights developments. |
| 2006 | From the U.S. National Institute on Disability Research and Rehabilitation (NIDRR), U.S. Depart. Education, Demand-Side Employment Placement Models for Persons with Disabilities. |
| 2006 | From Destiny Corporation, BBI Project Gift. |
| 2005 | From the Hammerman Family Foundation, BBI Endowment Gift. |
| 2005 | Appropriation in FY 2005 Omnibus Appropriations Bill – Rehabilitation Research and Training Center (RRTC) on Workforce Investment and Employment Policy. |
| 2004 | From the U.S. Dept. Labor and Social Security Administration–research on Workforce Investment Act One-Stops, and Disability Program Navigators. |
| 2004 | From Stan and Gail Richards, LHPDC Endowment Gift. |
| 2003 | From NIDRR, U.S. Dept. Education, Asset Accumulation and Tax Policy for Persons with Disabilities. |
| 2003 | From Merrill Lynch Global Philanthropy, "Corporate Culture and Disability." |
| 2003-2005 | From the Nellie Ball Trust Research Grant, "Stigma and Mental Disability." |
| 2003 | From Guardsmark LLC, gift to establish the Alan Ross Hawley Lecture Series at the Law Health Policy & Disability Center. |
| 2002 | From NIDRR, Technology for Independence: A Community-Based Resource Center. |
| 2002-2007 | From the Job Accommodation Network (JAN), U.S. Department of Labor, research of provision of workplace accommodations. |
| 2002 | From the U.S. Department of Labor, research on Workforce Investment Act. |
| 2002-2006 | From NIDRR, direct Rehabilitation Research and Training Center (RRTC) on Workforce Investment and Employment Policy for Persons with Disabilities |
| 2002 | From Milbank Foundation, research disaster mitigation persons with disabilities. |
| 2001-2007 | From NIDRR, "IT Works," information technology jobs for persons with disabilities. |
| 2001 | From the U.S. Dept. Labor – research on Workforce Investment Act One-Stops. |

| | |
|---|---|
| 2000 | From Microsoft – Research on Corporate disability and employment policy. |
| 2000 | From NIDRR, subcontract with Community Options, Inc., Director, Researchers' Symposium – Qualitative Research Methods research on ADA and employment policy. |
| 1999-2005 | From Robert Wood Johnson Foundation, subcontract with George Washington Univ., research and technical assistance employment policy and persons with disabilities. |
| 1999-2005 | From U.S. Department of Justice, subcontract Great Plains Disability Bus. & Tech. Ass't. Ctr., research, technical assistance on employment policy, persons with disabilities. |
| 1999-2005 | From U.S. Rehabilitation Services Administration (RSA), subcontract with Univ. Missouri, provide technical assistance, employment policy persons with disabilities. |
| 1999 | Polk County Health Services to conduct research and provide technical assistance on employment policy and persons with mental disabilities. |
| 1998-1999 | From U.S. Social Security Administration, subcontract Iowa Dept. Human Services, conduct research employment policy, persons with disabilities. |
| 1998-2004 | From NIDRR, subcontract with Community Options, Inc., conduct research on ADA and employment policy. |
| 1997-1998 | From Iowa CEO, to study the implications of the staffing industry on the employment of persons with disabilities, and case study of Manpower Inc. |
| 1997 | From National Organization on Disability, social participation persons with disabilities. |
| 1997 | Director, Obermann Center for Advanced Studies Fellowship Grant, University of Iowa grant to study ADA. |
| 1997 | From National Council on Disability to Iowa Law, Health Policy and Disability Center, grant to support conference and study of "Socially Assisted Dying." |
| 1994-2006 | Director, Law, Health Policy & Disability Center, Iowa College of Law Foundation. |
| 1992-1996 | From the Annenberg Washington Program, grant to study the ADA. |
| 1991-1996 | From State of Wyoming, to Iowa Law College, Integration Persons with Mental Disabilities. |
| 1990-1994 | From State of Oklahoma, data sharing administered at University of Iowa College of Law, Empirical Study of the Americans with Disabilities Act. |

## RESEARCH and APPLIED EXPERIENCE (Illustrative)

| | |
|---|---|
| 2011- | Advisory Board, Institute on Disability and Public Policy (IDPP) |
| 2011- | Israel Ministry of Welfare and Social Services, Member, Expert Committee on Future of Deinstitutionalization and Community Living in Israel. |

| | |
|---|---|
| 2010- | Saks Center for Law, Mental Health, and Ethics, Board Member, USC, Los Angeles. |
| 2008- | Centre for Disability Law and Policy, Advisory Forum Board, Galway, Ireland. |
| 2008-2012 | National Research Advisory Panel, National Technical Assistance and Research Center to Promote Leadership for Increasing Employment and Economic Independence of Adults with Disabilities (NTAR Leadership Center). |
| 2006- | Faculty Affiliate, Aging Studies Institute, Syracuse University. |
| 2004-2006 | Chair, Blue Ribbon Panel, ADA Impact Study, National Council on Disability. |
| 1995-2001 | U.S. District Court Facilitator, *Chris S. et al. v Geringer et al.,* State of Wyoming. |
| 1994-1996 | Senior Fellow, Annenberg Washington Program–"Communicating the ADA." |
| 1993-1996 | Senior Fellow, Annenberg Washington Program–"Communications Technology for Everyone: Implications for the Classroom and Beyond" |
| 1992-1993 | Fellow, Annenberg Washington Program–"The Americans with Disabilities Act" Annenberg Washington Program–"Communicating with Juries." |
| 1991-1994 | Member, Compliance Advisory Board, *Weston v. WSTS,* State of Wyoming. |
| 1988-1992 | Legal/Program Counsel, Developmental Disabilities Ser. Division, State of Oklahoma. |
| 1982-1983 | Research Associate, Graduate School of Business Administration, Harvard University. |
| 1979-1982 | Research Assistant to Robert Rosenthal, Psychology & Social Rel., Harvard University. |
| 1978-1979 | Research Assistant to Miron Zuckerman, Department of Psychology, Univ. of Rochester. |
| 1977-1978 | Research Assistant to Edward L. Deci, Department of Psychology, Univ. of Rochester. |

## PRIMARY RESEARCH, TEACHING AND PRACTICE INTERESTS

Legal:  Contracts; public law litigation; social science and the law; web and technology accessibility.

Disability Law:  Americans with Disabilities Act law and policy; rights of individuals with disabilities in institutions and community settings; international disability and human rights law; web accessibility and Universal Design.

Psychology and the Law:  Law and ethics in behavioral sciences; verbal and nonverbal communication in applied settings; social science experimental and field research methods.

## TEACHING EXPERIENCE

| | |
|---|---|
| 2009 & 2010 | Syracuse University, Disability Law. |
| 2006-2007 | Syracuse University Undergraduate Honors Program. |

| | |
|---|---|
| 2000-2005 | Law, Health Policy, and Disability Law. |
| 1998-1999 | Learning Disability and the Law. |
| 1995 | Family, Society, and Disability Law, University of Iowa, College of Law. |
| 1991 | Federal Disability Law, University of Iowa, College of Law. |
| 1991-1993 | Litigation, Social Science & Social Change, University of Iowa, College of Law. |
| 1990-1998, 2001 | Contracts I, University of Iowa, College of Law (small and large section classes). |
| 1982 | Social Psychology, Harvard University.  Career Management, Harvard Business School. |
| 1981 | Social Psychology, Harvard University. |
| 1980 | Psychological Statistics, Harvard University. |
| 1978-1979 | Social Psychology, Introductory Psychology, University of Rochester. |

## **HONORS**

| | |
|---|---|
| 2015 | 2015 Distinguished Service Award, NARRTC (formerly known as the National Association of Rehabilitation Research and Training Centers). |
| 2011 | Distinguished Fellow, Institute for Veterans and Military Families, Syracuse University. |
| 2010 | Honorary Professor, Centre for Disability Law & Policy, National University Ireland, Galway; appointed by President James J. Browne. |
| 2009 | Distinguished Visiting Professor, Graduate School of Social Welfare, Hokusei Gakuen University, Sapporo, Japan. |
| 2008 | University of Rochester Sports Hall of Fame–Inducted.  Varsity Squash, four letters, 1975-1979, Co-Captain, 1978-1979. |
| 2007 | Keynote Address, Israeli Knesset, Israeli Disability Day |
| 2004 | Inaugural Lecturer, Thornburgh Family Lecture, Disability Law Policy, Univ. Pittsburgh. |
| 2003-2005 | Recipient, The Nellie Ball Trust Research Grant. |
| 2000 | Switzer Scholar in Rehabilitation, National Rehabilitation Association. |
| 2000-2005 | Center Fellow, University of Iowa Center for Human Rights. |
| 1998-1999 | Advisory Committee, Research Alliance for Wellness at Work, Inc. |
| 1995-1996 | Member, General Accounting Office (GAO) Advisory Board, Report on ADA Title I. |
| 1995-1996 | Chair, Legislative & Social Issues Committee, American Association Mental Retardation. |

| | |
|---|---|
| 1994-2000 | Member, President's Committee on Employment of People with Disabilities. |
| 1993-1996 | Member, Legal & Social Issues Committee, American Association Mental Retardation. |
| 1993-1995 | Commissioner, American Bar Assoc. Commission on Mental & Physical Disability Law. |
| 1993-1996 | Senior Fellow, Washington Annenberg Program |
| 1992-1994 | President, Legal Process and Advocacy Division, Amer. Assoc. on Mental Retardation. |
| 1990 | Order of the Coif, Honorary, University of Iowa, College of Law. |
| 1987 | Society of Experimental Social Psychology, member. |
| 1984 | Irving H. Hellman, Jr. Memorial Fund Grant, <u>Stanford Law Review</u>, Stanford Law. |
| 1981 | Edwin B. Newman Psi-Chi/American Psychological Association Award for Excellence in Graduate Research. |
| 1981 | Sigma Xi, member; Psi-Chi, member. |
| 1977-1979 | Captain, Varsity Squash, University of Rochester. |

## STATE BAR AND COURT ADMITTANCE

Commonwealth of Massachusetts Bar, Admitted January 16, 1987.

District of Columbia Bar, Admitted November 30, 1987.

United States Court of Appeals, District of Columbia Circuit Bar, Admitted January 28, 1987.

United States Court of Appeals, Tenth Circuit Bar, Admitted March 8, 1988.

United States District Court for the District of Columbia, Admitted October 3, 1988.

United States Court of Appeals for the Federal Circuit, Admitted October 13, 1988.

United States Court of Appeals, Fifth Circuit Bar, Admitted February, 2008.

United States Court of Appeals, Eleventh Circuit Bar, Admitted June 2010.

Supreme Court of the United States, Admitted February 20, 1990.

## EDITORIAL BOARDS/JOURNAL & BOOK REFEREE (Illustrative)

Advisory Board, *The Yearbook on European Disability Law & Policy* (2008-)

Advisory Board, *Stone Canoe: A Journal of Arts and Ideas from Upstate New York* (2007-).

Guest Editor, *Assistive Technology Journal* (2006-2007).

Guest Editor, *Inclusion* (2014-2015).

Guest Editor, *Journal of Occupational Rehabilitation* (2015-2017).

Editorial Board, *Inclusion* (2014-).

Editorial Board, *Psychology, Public Policy and Law* (2006-).

Editorial Board, and Guest Editor, *Disability Studies Quarterly* (2004-)

Contributing Editor, In Pursuit: A Blueprint for Disability Law and Policy.  *American Bar Association* (1999).

Advisory Committee, National Organization on Disability, *Disability Agenda* (1998-1999).

Editorial Board, and Guest Editor, *Behavioral Sciences & The Law* (1997, 2014).

Editorial Advisory Board, *Special Education Reporter* (1995-1997).

Associate Editor, Legal Forum, *Spine* (1994-1999).

Editorial Advisory Board, *Mental & Physical Disability Law Reporter* (1993-1997), Chair (1995-1997).

Consulting Editor, *Psychology, Public Policy and Law* (1995-).

Basic and Applied Social Psychology.

Developmental Psychology.

Journal of Personality and Social Psychology.

Journal of Occupational Behavior.

Law & Society Review.

Mental Retardation.

National Science Foundation Grants in Law & Psychology.

Personality & Social Psychology Bulletin.

Social Science & Medicine.

Telecommunications Policy Journal.

University of Nebraska Press; University of Michigan Press.

Journal of Comparative Policy Analysis.

## **PROFESSIONAL ACTIVITIES (Illustrative)**

President and Founding Member, Raising the Floor (RtF) U.S., 2013-.

Chairman, Global Universal Design Commission (GUDC), 2008-.

Consultant, Aging of the Union Army Research Project, University of Chicago, Dr. Robert Fogel, PI, 2000-2006.

Member, Advisory Committee for The Research Alliance for Wellness at Work, Inc. 1998-1999.

Facilitator, The Partnership for Resolution of Mental Health Issues in Wyoming, 1995-2000.

Chairman, Quality Assurance Committee, State of Wyoming, 1995-1996.

Member, State-County Management Committee, Dept. Health & Human Services, State of Iowa, 1994-1996.

Member, Executive Committee, Ctr. International Rural & Environmental Health, University of Iowa, 1992-1993.

Annenberg Washington Program, Convener, Programs on the Americans with Disabilities Act, 1992-1996.

Annenberg Washington Program, Co-Convener, Program on Communicating with Juries, 1992.

Member, Compliance Advisory Board, Weston v. WSTS, Dept. of Human Services, State of Wyoming, 1991-1994.

APA/Committee on Standards in Research (CSR), Chairman, 1990-1992.

APA/Division 41, Core Committee on Amicus Briefs, Member, 1990-1992.

APA/Division 41 Liaison with Coalition for Psychology in the Public Interest (CPPI), 1989-1990.

Amer. Acad. Judicial Ed., Course Fact Finding, Communication in the Courtroom, Harvard Law School, 1990-1993.

Henry Murray Research Center, Radcliffe College, MacArthur Foundation Grant on Longitudinal Studies Mental

    Health, Consultant, 1990-1991.

## LEGAL BRIEF PARTICIPATION, ORAL ARGUMENTS AS COUNSEL AND AMICUS

In re: Guardianship of the Person and Estate of Ryan Keith Tonner, an Incapacitated Person, Seventh Court of

    Appeals, Amarillo, Texas, No. 07-13-00308-CV (2015) (Co-counsel with Jonathan Martinis, Maame
    Gyamfi) (in preparation).

Sherrie Kaw vs. School District of Hillsborough County, United States Court of Appeals for the Fifth Circuit,

    No. 8:07-cv-02222-T-27TGW (2011). Oral Argument for Appellant Kaw (Co-counsel with Matt Dietz).

Santiago Lopez vs. Pacific Maritime Association, United States Court of Appeals for the Ninth Circuit,

    No. 09-55698 (2011, co-author w Claudia Center). Request for rehearing en banc for Amici Curiae.

American Association of Persons with Disabilities v. Holland, United States Court of Appeals for the Eleventh

    Circuit, No. 3:01-cv-01275-J-99 HTS (2010, co-author).  Request for rehearing en banc.

Alexey Korneenkov and Olesya Korneenkov v. Mukasey, United States Court of Appeals for The Fifth Circuit, No.

    07-60712 (2008, co-author).  Made Oral Argument (Aug. 2009).

U.S. v. Georgia, et al. / Goodman, Tony v. Georgia, et al., United States Supreme Court (2005, co-author Brief of

    the Honorable Dick Thornburgh and the National Organization on Disability as Amici Curiae).

Chevron v. Echazabal, No. 00-1406, United States Supreme Court (2002, counsel of record, co-author of Brief of

    the National Council on Disability as Amicus Curiae).

EEOC v. Hertz, Case No. 96-CV-72421 DT, (E.D. Mich. S.D. Oct. 16, 1997).

## TESTIMONY BEFORE CONGRESS, LEGISLATURES, AND ADMINISTRATIVE BODIES (Illustrative)

Social Security Advisory Board, "Social Security Disability: Time for Reform," Written Commentary,

    March 8, 2013.

U.S. House of Representatives, Committee on Government Reform, Subcommittee on Human Rights and Wellness,

    Testimony on "Living with Disabilities in the United States: A Snapshot," June 24, 2004.

U.S. House of Representatives, Subcommittee on Social Security, Testimony on the definition of disability under

    Social Security and the ADA, July 11, 2002.

General Accounting Office (GAO), Testimony on Expert Advisory Panel, The Future of Federal Disability Policies

    and Programs, July 10, 2002.

U.S. House of Representatives, Subcommittee on The Constitution, Testimony on the Application of the ADA's

    Accessibility Requirements to Private Internet Web Sites and Services, February 9, 2000.

U.S. House of Representatives, Committee on Education and the Workforce, Remarks on the ADA, Oct. 1998.

Wyoming Legislature, Select Committee on Mental Health Issues, September & November, 1998.

## MEMBERSHIP PROFESSIONAL ORGANIZATIONS/NON-PROFIT BOARDS (Past and Present)

American Association of Applied & Preventative Psychology, Fellow.

American Bar Association, Member.

Massachusetts Bar Association, Member.

District of Columbia Bar Association, Member.

American Association on Mental Retardation, Member, and past President, Legal Process & Advocacy Division.

American Psychological Association, Member.

  Personality and Social Psychology - - Division 8.

  Psychology and Law - - Division 41.

American Psychological Society, Charter Fellow.

Law and Society Association, Member.

Disability Rights Advocates, Past Board Member (1996-2009).

National Organization on Disability (N.O.D.), Board member (1996-2009).

Disability Rights Law Center, Past Board Member (2005-2009).

YAI/National Institute for People with Disabilities Network, Trustee (2006-2014).

Beit Issie Shapiro, Professional Advisory Committee (2006-2008).

Iowa Children's' Museum, Board Member (2003-2005).

University of Rochester, Board of Rochester Athletics (2007-).

Global Universal Design Commission (GUDC).  Chairman (2008-).

The Sarah Jane Brain Foundation.  Advisory Board (2009).

Red House Arts Center, Syracuse, NY, Board Member (2011-2014).

The Everson Museum of Art, Syracuse, NY, Trustee (2012-).

## UNIVERSITY SERVICE / COMMITTEES

### Syracuse University College of Law

Appointments (2006-2009)

Ad Hoc Committee on Centers and Institutes (Chair, 2006-2007)

Promotion & Tenure (2006-2009)

### Syracuse University

Syracuse University Strategic Plan Working Group—Change: Innovation and Institutional Renewal (2014-2015)

Advisory Board, Syracuse University Hillel (2007-2011)

Strategic Planning Workgroup, "Change: Innovation and institutional renewal–Establishing the culture, structures, and mechanisms to ensure that SU undergoes productive change" (2014-2015)

**Iowa College of Law**

Building & Equipment

Computer (2001-2002, 2003-2004, Chair)

Joint Program, Interdisciplinary Studies & Undergraduate Education

Placement Research & Professional Development

Speakers (2002-2003, Co-Chair)

**Iowa University-Wide**

Member Executive Board, University of Iowa Center on Aging (2001-2005).

Chair, Provost Task Force to Examine Issues Facing Students with Learning Disabilities (1998-1999).

Co-Chair, Task Force on the Health of the Student (1994-1995).

Advisor, Undergraduate Honors Program in Psychology (1993-2005).

Committee for Ethical, Legal and Social Issues for the Human Genome Project (ELSI) (1993-1995).

Research Advisory Committee in the Social Sciences (1993-1994).

## POST-DOCTORAL FELLOWS

David Dawson, Ph.D.                          (1998 – 2000), University of Iowa.

Naomi Schreuer, Ph.D.                        (2008 – 2009), Haifa University, Israel.

Tal Araten Bergman, Ph.D.                    (2008 - 2009 ), Haifa University, Israel.

Michal Soffer, PhD.                          (2008-2010 ), Hebrew University, Israel.

Omolara Funmilola Akinpelu, M.ED., Ph.D.     (2009-2012), University of Ilorin, Nigeria.

## PUBLICATIONS

See also http://bbi.syr.edu for listing of other web-based articles and accessible formats where possible.

1.      Blanck, P.D., Zuckerman, M., DePaulo, B.M., & Rosenthal, R. (1980).  Sibling resemblance in nonverbal skill and style. Journal of Nonverbal Behavior, 4, 219-26.

2.      Zuckerman, M., Blanck, P.D., DePaulo, B.M. & Rosenthal, R. (1980).  Developmental changes in decoding discrepant and nondiscrepant nonverbal cues. Developmental Psychology, 16, 220-28.

3.      Zuckerman, M., Larrance, D.T., Porac, J.F., & Blanck, P.D. (1980).  Effects of fear of success on intrinsic motivation, causal attribution, and choice behavior.  J. Personality & Social Psychology, 39, 503-13.

4.      Blanck, P.D., Rosenthal, R., Snodgrass, S.E., DePaulo, B.M., & Zuckerman, M. (1980).  Longitudinal and cross-sectional age effects in nonverbal decoding skill and style. Resources in Education. November (ERIC Documents).

5.      Blanck, P.D., Rosenthal, R., Snodgrass, S.E., DePaulo, B.M., & Zuckerman, M. (1981). Sex differences in eavesdropping on nonverbal cues: Developmental changes.  Journal of Personality and Social Psychology, 41, 391-96.

6.      Blanck, P.D., Rosenthal, R. (1982).  Developing strategies for decoding "leaky" messages: On learning how and when to decode discrepant and consistent social communications.  In R.S. Feldman (ed.), Development of nonverbal behavior in children.  Pp. 203-29. New York: Springer-Verlag.

7.      Blanck, P.D., Rosenthal, R., Snodgrass, S.E., DePaulo, B.M., & Zuckerman, M. (1982).  Longitudinal and cross-sectional age effects in nonverbal decoding skill and style.  Developmental Psychology, 18, 491-98.

8.      Snodgrass, S.E., Rosenthal, R., & Blanck, P.D. (1982).  Sex role socialization via teacher's behavior and sexually stereotyped materials.  Resources in Education.  (ERIC Documents - - ED209588).

9.      Blanck, P.D., Reis, H.T., & Jackson, L. (1984).  The effects of verbal reinforcement on intrinsic motivation for sex-linked tasks.  Sex Roles, 10, 369-86.

10.     Blanck, P.D. & Rosenthal, R. (1984). The mediation of interpersonal expectancy effects: The counselor's tone of voice.  Journal of Educational Psychology, 76, 418-26.

11.     Rosenthal, R., Blanck, P.D., & Vannicelli, M. (1984). Speaking to and about patients: Predicting therapists' tone of voice.  Journal of Clinical and Consulting Psychology, 52, 679-86.

12.     Blanck, P.D., & Sonnenfeld, J.A. (1984).  The Wane Division of the American Instruments Corporation (A).  In J.A. Sonnenfeld, Managing career systems: Channeling the flow of executive careers. pp. 203-26. Illinois: Irwin.

13.     Blanck, P.D. & Sonnenfeld, J.A. (1984).  The Wane Division of the American Instruments Corporation (B). In J.A. Sonnenfeld, Managing career systems: Channeling the flow of executive careers. pp. 227-41. Illinois: Irwin.

14.     Blanck, P.D., Dowd, J.J., & Sonnenfeld, J.A. (1984).  Patrick J.J. Rich.  In J.A. Sonnenfeld, Managing career systems: Channeling the flow of executive careers. pp. 477-89. Illinois: Irwin.

15.     Blanck, P.D., Rosenthal, R., & Cordell, L.H. (1985).  The appearance of justice: Judges' verbal and nonverbal behavior in criminal jury trials.  38 Stanford Law Review 89-164.

16.     Blanck, P.D., Buck, R., & Rosenthal, R. (1986). General introduction: Nonverbal communication in the clinical context.  In P.D. Blanck, R. Buck, & R. Rosenthal (eds.), Nonverbal communication in the clinical context.  pp. 1-12.  Univ. Park: Penn State Press.

17.     Blanck, P.D., Rosenthal, R., Vannicelli, M., & Lee, D.T. (1986).  Therapists' tone of voice: Descriptive, psychometric, interactional, and competence analyses.  Journal of Social & Clinical Psychology, 4, 154-78.

18.     Blanck, P.D., Rosenthal, R., & Vannicelli, M. (1986).  Talking to and about patients: The therapists' tone
        of voice.  In P.D. Blanck, R. Buck, & R. Rosenthal (eds.).  Nonverbal communication in the clinical
        context. pp. 99-143. University Park: Penn State Press.

19.     Blanck, P.D., & Turner, A.N. (1987). Gestalt research: Clinical field research approaches to studying
        organizations.  In J. Lorsch (ed.), The handbook of organizational behavior. pp. 109-125.  New York:
        Prentice-Hall.

20.     Blanck, P.D. (1987). Off the record: Nonverbal behavior in the courtroom.  Stanford Lawyer, 21 (spring),
        18-23 (Author's Reply-Letters, Stanford Lawyer, 22 (Fall), 84); also reprinted in Student Lawyer (1987,
        December), 16(4), 8-10.

21.     Blanck, P. (1987). The process of field research in the courtroom: A descriptive analysis. Law and Human
        Behavior, 11(4), 337-358.

22.     Blanck, P.D., Rosenthal, R., Hart, A.J., & Bernieri, F. (1990). The measure of the judge: An empirically-
        based framework for exploring trial judges' behavior.  Iowa Law Review, 75(3), 653-684.

23.     Blanck, P.D. (1991).  What empirical research tells us: Studying judges' and juries' behavior.  American
        University Law Review, 40(2), 775-804.

24.     Grisso, T., Baldwin, E., Blanck, P.D., & Rotheram-Borus, M.J. (1991).  Standards in research: APA's
        mechanism for monitoring the challenges.  American Psychologist, 46(7), 758-766.

25.     Blanck, P.D. (1991).  The emerging work force: Empirical study of the Americans with Disabilities Act,
        Journal of Corporation Law, 16(4), 693-803.

26.     Blanck, P.D. (1992).  Psychiatry in a litigious society.  Review of Review of Clinical Psychiatry and the
        Law- Volume 2, Contemporary Psychology, 37(1), 15-16.

27.     Blanck, P.D. (1992).  Empirical study of the employment provisions of the Americans with Disabilities
        Act: Methods, preliminary findings and implications, New Mexico Law Review, 22(3), 119-241.

28.     Blanck, P.D. (1992).  On integrating persons with mental retardation: The ADA and ADR, New Mexico
        Law Review, 22(3), 259-76.

29.     Blanck, P.D. (1992).  Review of Mental health experts and the criminal courts.  Clinical Psychology
        Review, 12, 3-4.

30.     Saks, M.J. & Blanck, P.D. (1992).  Justice Improved: The unrecognized benefits of aggregation and
        sampling in the trial of mass torts, Stanford Law Review, 44, 815-51.

31.     Blanck, P.D., Bellack, A., Rotheram-Borus, M.J., Rosnow, R.L. & Schooler, N. (1992).  Scientific rewards
        and conflicts of ethical choices in human subject research.  American Psychologist, 47(7), 959-65.

32.     Blanck, P.D. & Rosenthal, R. (1992).  Nonverbal behavior in the courtroom.  In Applications of nonverbal
        behavioral theories and research (R. Feldman, ed.) pp. 89-115.  Lawrence Erlbaum Press: New York.

33.     Blanck, P.D. (1993).  The Americans with Disabilities Act: Putting the employment provisions to work,
        The Annenberg Washington Program, White Paper, Washington, D.C.

34.     Blanck, P.D. (1993). Calibrating the scales of justice: Studying judges' behavior in bench trials, Indiana Law Journal, 68(4), 1119-98.

35.     Rosenthal, R. & Blanck, P.D. (1993).  Science and ethics in conducting, analyzing, and reporting social science research: Implications for social scientists, judges and lawyers, Indiana Law J., 68(4), 1209-28.

36.     Rosnow, R.L., Rotheram-Borus, M.J., Ceci, S.J., Blanck, P.D., & Koocher, G.P. (1993).  The Institutional Review Board as a mirror of scientific and ethical standards, American Psychologist, 48(7), 821-26.
        Reprinted in (1998) Methodological Issues & Strategies in Clinical Research, Joan E. Sieber & Alan E. Kazdin (eds.), pp. 603-709.

37.     Blanck, P.D. (1993). Interpersonal expectations in the courtroom.  In P.D. Blanck (ed.), Interpersonal expectations:  Theory, research and applications, pp. 64-87.  Cambridge University Press: New York.

38.     Blanck, P.D. (1994).  The Americans with Disabilities Act: Issues for back and spine-related disability, Spine, 19(1), 103-107.

39.     Blanck, P.D. (1994).  Straight talk on the ADA, Journal of Orthopedic & Sports Physical Ther., 19(1), 1.

40.     Blanck, P.D., Schoenberg, C., & Tenney, J. (Feb. 28, 1994).  AIDS-related benefits equation: Soaring costs times soaring needs divided by federal law, New York Law Journal, 211(38), 1-4.

41.     Blanck, P.D., Schoenberg, C., & Tenney, J. (1994). AIDS-related benefits equation: Soaring costs times soaring needs divided by federal law, AIDS Policy & Law, 9(4), 1-7
        Reprinted in Mealey's Litigation Reports: Americans with Disabilities Act 2(5), 20-28 (June, 1994); expanded version, AIDS Policy & Law, Buraff Publications, Washington, DC (March 4, 1994).

42.     Blanck, P.D. (1994).  Reflections on the law and ethics of the Human Genome initiative.  In Genes and human self-knowledge. pp. 183-88 (S. Lawrence, E. Fales & R. Weir, eds.), University of Iowa Press.

43.     Blanck, P.D. (1994)  Empirical Study of the Americans with Disabilities Act (1990-1993), Journal of Vocational Rehabilitation, 4(3), 211-23.

44.     Blanck, P.D. (1994).  The emerging society and the Americans with Disabilities Act.  Review of Implementing the Americans with Disabilities Act; Rights and responsibilities of all Americans, Contemporary Psychology, 39(6), 596-97.

45.     Blanck, P.D. (1994). Legal Forum, Spine, 19(15), 1653.

46.     Blanck, P.D., Anderson, J.A., Wallach, E.J., & Tenney, J.P. (1994).  Implementing reasonable accommodations using ADR under the ADA: A case of a white collar employee with bipolar mental illness, Mental & Physical Disability Law Reporter, 18(4), 458-64.

47.     Blanck, P.D. (1994).  Communications Technology for Everyone: Implications for the classroom and beyond, The Annenberg Washington Program, Washington, D.C. [Accessible CD Rom Version, 1995].

48.     Blanck, P.D. (1994).  Communicating the Americans with Disabilities Act: Transcending Compliance - - A case report on Sears Roebuck & Co., The Annenberg Washington Program, White Paper, Washington, D.C.  Reprinted (1996).  In Driving Down Health Care Costs (J. Burns, ed.), pp. 209-241, Panel Publishers: New York.

49.     Blanck, P.& Folberg, R. (1994). The Americans with Disabilities Act: Emerging issues for ophthalmologists, Ophthalmology, 101, 1635-40.

50.     Blanck, P.D. (1994).  Review of Implementing the Americans with Disabilities Act: Rights and responsibilities of all Americans, American Journal on Mental Retardation, 99(2), 224-26.

51.     Blanck, P.D. (1994).  Employment integration, economic opportunity and the Americans with Disabilities Act: Empirical Study from 1990 to 1993, Iowa Law Review, 79(4), 853-923.

52.     Wallach, E.J., Tenney, J.P. & Blanck, P.D. (Dec. 19, 1994).  Extending the ADA's reach: Sponsors of self-insured funds may be sued under Title I of the ADA, National Law Journal, B5-B7.

53.     Blanck, P.D. (1994).  Celebrating Communications Technology for Everyone, Federal Communications Law Journal, 47(2), 185-91.

54.     Blanck, P.D. (1995).  Recent developments in ADA case law and implications for spine professionals, Spine, 20(1), 116-19.

55.     Wallach, E.J., Tenney, J.P., & Blanck, P.D. (Apr. 17, 1995).  If Supervisors may be personally liable for ADA discrimination, how should employers respond?, National Law Journal, C2-C3, C17.

56.     Blanck, P.D. (1995).  Resolving disputes under the Americans with Disabilities Act: A case example of an employee with a back impairment, Spine, 20(7), 853-59.

57.     Blanck, P.D. (1995).  Communications technology for everyone: Accessible curriculum, AAMR News & Notes, 7(6), 1&6; 8(1), 1&6.

58.     Blanck, P.D., Wallach, E.J., & Tenney, J.P. (1995).  Supervisor personal liability for ADA discrimination: Emerging issues for physicians, Spine, 20(13), 1528-32.

59.     Wallach, E.J., Tenney, J.P., & Blanck, P.D. (1995).  Employee rights under the ADA, Employment Law Strategist, 2(11), 8,5 (Lender Pub.).

60.     Blanck, P.D. (1995).  Assessing five years of Employment Integration and economic opportunity under the Americans with Disabilities Act, Mental & Physical Disability Law Reporter, 19(3), 385-93.

61.     Blanck, P.D. (1995).  Disaster Mitigation for Persons with Disabilities: Fostering a New Dialogue, The Annenberg Washington Program, Washington, D.C.  Reprinted in AAMR News & Notes (Nov.-Dec. 1995), 8(6), 3-5.

62.     Blanck, P.D. (1995).  Implementing the Americans with Disabilities Act: A Case Report on Sears, Roebuck & Co., Spine, 20(19), 2161-67.

63.     Cate, F.H., Blanck, P.D., & Makoul, G. (1995).  Communications in Medicine: The Annenberg Washington Program and a decade of making a difference, The Annenberg Washington Program, Washington, D.C.

64.     Blanck, P.D. (1995).  Implementing the Americans with Disabilities Act: 1996 Follow-up Report on Sears, Roebuck & Co., Spine, 21(13), 1602-08.

65.     Blanck, P.D. (1996).  The Appearance of Justice revisited, Journal of Criminal Law & Criminology, 86(3), 887-927.

66.     Blanck, P.D. (1996).  Communicating the Americans with Disabilities Act:  Transcending Compliance – 1996 Follow-up report on Sears, Roebuck & Co., The Annenberg Washington Program, Washington, D.C.

67.     Blanck, P.D. (1996).  Empirical Study of the Americans with Disabilities Act: Employment Issues from 1990-1994, Behavioral Sciences & the Law, 14(1), 5-27.

68.     Blanck, P.D. (1996).  Transcending Title I of the Americans with Disabilities Act: A Case Report on Sears, Roebuck & Co., Mental & Physical Disability Law Reporter, 20(2), 278-86.

69.     Moseley, P.L., Blanck, P., & Merritt, R. (1996). Hospital privileges and the Americans with Disabilities Act, Spine, 21(19), 2288-93.

70.     Blanck, P.D. (1996).  Studying the Employment Provisions of the Americans with Disabilities Act, Encyclopedia Britannica: 1997 Medical and Health Annual, 215-19.

71.     Blanck, P.D. & Marti, M.W. (1996).  Genetic Discrimination and the Americans with Disabilities Act: Legal, Health and Policy Implications, Behavioral Sciences and the Law, 14, 411-32.

72.     Blanck, P.D. & Marti, M.W. (1997).  Attitudes, Behavior, and the Employment Provisions of the Americans with Disabilities Act, Villanova Law Review, 42(2), 345-408.

73.     Blanck, P.D. (1997).  Assessing Employment Integration under Title I of the Americans with Disabilities Act.  The Continuing Struggle: Civil Rights and the Clinton Administration (C. Yu & W. Taylor, eds., Citizen's Commission on Civil Rights), 169-76.

74.     Blanck, P.D. (1997).  The Economics of the Employment Provisions of The Americans with Disabilities Act: Part I – Workplace Accommodations, DePaul Law Review, 46(4), 877-914.

75.     Blanck, P.D., Kirschner, K. & Bienen, L. (1997).  Socially-Assisted Dying and People with Disabilities: Some Emerging Legal, Medical, and Policy Implications.  Mental & Physical Disability Law Reporter, 21(4), 538-43.

76.     Blanck, P.D. (1997).  Students with Learning Disabilities, Reasonable Accommodations, and the Rights of Colleges and Universities to Establish and Enforce Academic Standards: Guckenberger v. Boston University.  Mental & Physical Disability Law Reporter, 21(5), 679-86.

77.     Blanck, P. (1998). Debunking Myths about the Employment of Persons with Mental Disabilities, Contemporary Psychology, 43(1), 68-70.

78.     Blanck, P.D. & Butkowski, C. (1998).  Pregnancy-Related Impairments and the Americans with Disabilities Act.  Sorosky, J. (ed.) Obstetrics and Gynecology Clinics of North American, 25(2), 435-445.

79.     Blanck, P.D. (1998).  The Americans with Disabilities Act and the Emerging Workforce: Employment of People with Mental Retardation.  American Association on Mental Retardation, Washington, D.C.

80.     Blanck, P.D. & Steele, P. (1998).  The Emerging Role of the Staffing Industry in the Employment of Persons with Disabilities – A Case Report on Manpower Inc. <u>Iowa CEO and Law, Health Policy and Disability Center</u>, Iowa City, IA.

81.     Berven, H.M. & Blanck, P.D. (1998).  The Economics of the Americans with Disabilities Act: Part II: Patents, Innovations and Assistive Technology.  <u>Notre Dame Journal of Law, Ethics & Public Policy</u>, 12(1), 9-120.

82.     Bienen, L., Kirschner, K., & Blanck, P.D. (1998).  Introduction to Conference on Socially-Assisted Dying. <u>Cornell Journal of Law & Public Policy</u>, 7, 255-66.

83.     Blanck, P.D. (1998).  Job placement for Employees with Disabilities – Manpower Leads the Way, <u>Employment Relations Today</u>, 25, 57-65.

84.     Blanck, P.D. (1998).  Civil Rights, Learning Disability, and Academic Standards, <u>Journal of Gender, Race, & Justice</u>, 2(1), 33-58.

85.     Blanck, P.D. (1999).  Empirical Study of Disability, Employment Policy, and the ADA, <u>Mental & Physical Disability Law Reporter</u>, 23Z(2), 275-80.

86.     Berven, H.M. & Blanck, P.D. (1999).  Assistive Technology Patenting Trends and the Americans with Disabilities Act, <u>Behavioral Sciences & the Law</u>, 17(1), 47-71.

87.     Blanck, P.D. (1999).  Introduction to the Special Section: Employment and the Americans with Disabilities Act, <u>Behavioral Sciences & the Law</u>, 17(1), 3-5.

88.     Blanck, P.D. & Pransky, G. (1999).  Workers with Disabilities, in 14(3) <u>State of the Art Reviews in Occupational Medicine: Special Populations and Occupational Health</u>, 581-93 (Hanley and Belfus Pub., Glenn Pransky & Howard Frumkin, eds.).

89.     Blanck, P.D. & Berven, H.M. (1999).   Evidence of Disability after Daubert, <u>Psychology, Public Policy and Law</u>, 5(1), 16-40.

90.     Schwochau, S. & Blanck, P.D. (2000).  The Economics of the Americans with Disabilities Act: Part III - - Does the ADA Disable the Disabled?, <u>Berkeley Journal of Employment and Labor Law</u>, 21(1), 271-313.

91.     Blanck, P.D. (2000).  Studying Disability, Employment Policy, and the ADA.  In Leslie Francis & Anita Silvers (eds.), <u>Tenth Anniversary of the Americans with Disabilities Act</u> 209-20 (Routledge Press).

92.     Blanck, P.D. & Sandler, L.A. (2000).  ADA Title III and the Internet: Technology and Civil Rights, <u>Mental & Physical Disability Law Reporter</u>, 24(5), 855-59.

93.     Blanck, P.D. (ed.)(2000).  Employment, Disability, and the Americans with Disabilities Act: Issues in Law, Public Policy, and Research, 329-55, Northwestern University Press.

94.     Blanck, P.D. (2000).  The Economics of the ADA, in P. Blanck, (ed.), <u>Employment, Disability, and the Americans with Disabilities Act: Issues in Law, Public Policy, & Research</u>, 201-27, Northwestern U. Press.

95.     Berven, H.M. & Blanck, P.D. (2000).  Unanticipated Economic Gains and the ADA: Assistive Technology Patent Trends, in P.D. Blanck, (ed.), Employment, Disability, and the Americans with Disabilities Act: Issues in Law, Public Policy, and Research, 329-55, Northwestern University Press.

96.     Marti, M.W. & Blanck, P.D. (2000).  Attitudes, Behavior, and the ADA, in P.D. Blanck (ed.), Employment, Disability, and the Americans with Disabilities Act: Issues in Law, Public Policy, and Research, 356-84, Northwestern University Press.

97.     Blanck, P.D., Sandler, L.A., Schmeling, J.L., & Schartz, H.A. (2000).  The Emerging Workforce of Entrepreneurs with Disabilities: Preliminary Study of Entrepreneurship in Iowa, Iowa Law Review, 85, 1583-1670.

98.     Debate - - Blanck, P.D. & Olson, W. (2000).  The Unintended Consequences of the Americans with Disabilities Act [Proceedings], Iowa Law Review, 85, 1811-34.

99.     Blanck, P.D. & Millender, M. (2000).  Before Civil Rights: Civil War Pensions and the Politics of Disability in America, Alabama Law Review, 52, 1-50.

100.    Blanck, P.D. (2001).  Civil War Pensions and Disability. Ohio State Law Journal, 62, 109-249.

101.    Blanck, P.D. & Schartz, H.A. (2001).  Towards Reaching a National Employment Policy for Persons with Disabilities, 1-10, in Emerging Workforce Issues: W.I.A., Ticket to Work, and Partnerships, R. McConnell (ed.), Switzer Seminar Monograph Series, National Rehabilitation Association.

102.    Blanck, P.D., Schartz, H.A. & Schartz, K.M. (2001).  Labor Force Participation and Income of Individuals with Disabilities in Sheltered and Competitive Employment: Cross-Sectional and Longitudinal Analyses from Seven States during the 1980s and 1990s, President's Task Force on Employment of Adults with Disabilities.

103.    Blanck, P.D. & Song, C. (2001).  "With Malice Toward None: With Charity Toward All": Civil War Pensions for Native and Foreign-Born Union Army Veterans, Journal of Transnational Law & Contemporary Problems, 11(1), 1-76.  Portion reprinted in The Civil War Veteran: A Historical Reader, Larry M. Logue & Michael Barton (eds.), New York University Press, 221-26 (2007).

104.    Blanck, P.D. (2001).  Introduction to The Social Construction of Disability: Historical, Contemporary, and Comparative Views, Journal of Transnational Law & Contemporary Problems, 11(1), i-ii.

105.    Blanck, P.D. & Song, C. (2002).  Civil War Pension Attorneys and Disability Politics, University of Michigan Journal of Law Reform, 35(1 & 2), 137-217.

106.    Blanck, P.D. & Schmeling, J.L. (2002).  Americans with Disabilities Act: Recent and Pending U.S. Supreme Court Decisions and Implications for Spine Professionals, Spine, 27(4), 439-443.

107.    Zwerling, C., Whitten, P.S., Sprince, N.L., Davis, C.S., Wallace, R.B., Blanck, P.D., & Heeringa, S.G. (2002).  Workforce Participation by Persons with Disabilities: The National Health Interview Survey Disability Supplement, 1994-5, Journal of Occupational and Environmental Medicine, 44(2), 358-64.

108.    O'Day, B., Schartz, H., & Blanck, P. (eds.)  (2002).  Introduction: Disability, Public Policy and Employment, Behavioral Sciences & the Law, 20(6), 537-39.

109.    Schartz, K., Schartz, H., & Blanck, P.  (2002). Employment of Persons with Disabilities in Information Technology Jobs: A Literature Review for "IT Works," <u>Behavioral Sciences & the Law</u>, 20(6), 637-57.

110.    Blanck, P., Clay, L., Schmeling, J., Morris, M., & Ritchie, H. (2002).  Applicability of the ADA to "Ticket to Work" Employment Networks, <u>Behavioral Sciences & the Law</u>, 20(6), 621-36.

111.    Blanck, P., Linares, C., & Song, C. (2002).  Evolution of Disability in Late Nineteenth Century America: Civil War Pensions for Union Army Veterans with Musculoskeletal Conditions, <u>Behavioral Sciences & the Law</u>, 20(6), 681-97.

112.    Schwochau, S. & Blanck, P.D. (2003).  Does the ADA Disabled the Disabled?: More Comments, <u>Industrial Relations</u>, 42(1), 67-77.

113.    Blanck, P.D. & Song, C. (2003).  "Never Forget What They Did Here": Civil War Pensions for Gettysburg Union Army Veterans and the Politics of Disability in Late Nineteenth Century America, <u>William & Mary Law Review</u>, 44, 1109-71.

114.    Blanck, P., Schartz, H.A., & Schartz, K.M. (2003).  Labor Force Participation and Income of Individuals with Disabilities in Sheltered and Competitive Employment: Cross-Sectional and Longitudinal Analyses of Seven States during the 1980s and 1990s, <u>William & Mary Law Review</u>, 44, 1029-1108.

115.    Odem, N. & Blanck, P. (2003).  Physician Shareholder Practice Groups and ADA Coverage, <u>Spine</u>, 28(3), 319-12 (Feb. 1, 2003).

116.    Schartz, H., O'Day, B., & Blanck, P. (eds.) (2003).  Introduction: Disability, Public Policy, and Technology, <u>Behavioral Sciences & the Law</u>, 21(1), 1-3.

117.    Ritchie, H. & Blanck, P.  (2003).  Promise of the Internet for Disability: Study of Online Services and Accessibility of Centers for Independent Living Web Sites, <u>Behavioral Sciences & the Law</u>, 21(1), 5-26.

118.    Klein, D., Myhill, W., Hansen, L., Asby, G., Michaelson, S., & Blanck, P.  (2003).  Opening Doors to Education:  Iowa School Website Accessibility, <u>Behavioral Sciences & the Law</u>, 21(1), 27-49.

119.    Blanck, P., Ritchie, H., Schmeling, J.A., & Klein, D.  (2003).  Technology for Independence: A Community-Based Resource Center, <u>Behavioral Sciences & the Law</u>, 21(1), 51-62.

120.    Blanck, P.  (2003).  Topic Paper: Righting the ADA--Chevron v. Echazabal: The ADA's "Direct Threat" Defense, Prepared for the National Council on Disability, Washington, DC, at http://www.ncd.gov/newsroom/publications/03publications.html.

121.    Blanck, P.D. & Schartz, H.A. (2003).  Comparative Study of the Emerging Workforce of Persons with Disabilities 347-85, in Different But Equal: <u>The Rights of People with Intellectual Disabilities</u>, S. Herr, H. Koh, & L. Gostin (eds.), Oxford University Press.

122.    Blanck, P., Schartz, H.A., Schartz, K., & Schmeling, J.  (2003).  "IT Works:" Disability and Employment in Information Technology, <u>SCI/Life</u>, Fall 2002/Winter 2003, 26-27.

123.    Blanck, P., Schur, L., Kruse, D., Schwochau, S. & Song. C.  (2003).  Calibrating the Impact of the ADA's Employment Provisions, <u>Stanford Law & Policy Review</u>, 14(2), 267-90.

124.    Zwerling, C., Whitten, P.S., Sprince, N.L., Davis, C.S., Wallace, R.B., Blanck, P., & Heeringa, S.G. (2003).  Workplace Accommodations for People with Disabilities: National Health Interview Survey Disability Supplement, 1994-5, Journal of Occupational and Environmental Medicine, 45(5): 517-525.

125.    Blanck, P., Schwochau, S. & Song. C.  (2003).  Is it Time to Declare the ADA A Failed Law? 301-37, in What is Causing the Decline in the Employment of People with Disabilities? : A Policy Puzzle, David C. Stapleton and Richard V. Burkhauser (eds.), UpJohn Institute.

126.    Blanck, P., Hill, E., Siegal, C., & Waterstone, M.  (2003).  Disability Civil Rights Law and Policy, Thomson/West Publishers.

127.    Logue, L. & Blanck, P.  (2004).  "There Is Nothing That Promotes Longevity Like A Pension:" Public Policy and Mortality of Civil War Union Army Veterans, Wake Forest Law Review, 39, 49-67.

128.    Blanck, P.  (2004).  Justice for All?:  Stories about Americans with Disabilities and their Civil Rights, Journal of Gender, Race & Justice, 8, 1-32.

129.    Blanck, P., Wilichowski, A, & Schmeling, J.  (2004).  Disability Civil Rights Law and Policy: Accessible Courtroom Technology, William and Mary Bill of Rights Journal, 3, 825-42.

130.    Schmeling, J., Schartz, H.A., & Blanck, P.  (2004).  United States Country Report in 2004, in International Disability Rights Monitor, Center for International Rehabilitation, 349-70.

131.    Sewell, R., Song, C., Smith, R., Bauman, N., & Blanck, P.  (2004). Union Army Veterans with Hearing Loss and the Evolution of Disability in America During 1862-1920, The Laryngoscope: Journal for the Triological Society, 114(12), 2147-2153, December.

132.    Schmeling, J., Schartz, H.A., & Blanck, P.  (2005).  The New Disability law and Policy Framework: Implications for Case Managers, 88-121, in Case Management for Rehabilitation Health Professionals (2nd Ed., Vol. 1, Foundational Aspects), edited by Fong Chan, Michael J. Leahy, & Jodi Saunders, Aspen Professional Services Publisher.

133.    Blanck, P. & Schartz, H.  (2005). Special Issue: Corporate Culture and Disability, Behavioral Sciences & the Law, 23(1), 1-2.

134.    Schur, L., Kruse, D., & Blanck, P. (2005).  Corporate Culture and the Employment of Persons with Disabilities, Behavioral Sciences & the Law, 23(1), 3-20.

135.    Sandler, L. & Blanck, P. (2005).  Accessibility As A Corporate Article of Faith at Microsoft: Case Study of Corporate Culture and Human Resource Dimensions, Behavioral Sciences & the Law, 23(1), 39-64.

136.    Klein, D., Schmeling, J., & Blanck, P. (2005).  Emerging Technologies and Corporate Culture at Microsoft: A Methodological Note, Behavioral Sciences & the Law, 23(1), 65-96.

137.    Ball, P., Monaco, G., Schmeling, J., Schartz, H.,  Blanck, P. (2005).  Disability as Diversity in Fortune 100 Companies, Behavioral Sciences & the Law, 23(1), 97-121.

138.    Searcy, M., Duck, S., & Blanck, P.  (2005).  Nonverbal Behavior in the Courtroom and the "Appearance of Justice."  41-61.  In Ronald Riggio & Robert Feldman (Eds.), Applications of Nonverbal Communication, Lawrence Erlbaum Publishers.

139.   Blanck, P.  (2005). Review of the "The Disability Pendulum," <u>Law and Politics Book Review</u>, 15(5) (May), pp. 354-58, available at http://www.bsos.umd.edu/gvpt/lpbr.

140.   Blanck, P., Hill, E., Siegal, C., & Waterstone, M.  (2005).  <u>Disability Civil Rights Law and Policy: Cases and Materials</u>, Thomson/West Publishers.  [Teacher's Manual, 2006.]

141.   Blanck, P. (Ed.)  (2005).  <u>Disability Rights</u>, in the collection of the International Library of Essays on Rights (senior eds. of the library, T.D. Campbell & C. Stuart), Ashgate Publishing Limited [with reprints of Blanck et al. articles].

142.   Blanck, P., Schartz, H.A., Ritchie, H., & Rosenthal, R.  (2005).  Science and Ethics In Conducting, Analyzing, and Reporting Disability Policy Research, 141-59.  In <u>Advances in Social and Organizational Psychology: A Tribute to Ralph Rosnow</u>, Lawrence Erlbaum Publishers.

143.   Blanck, P. (ed.) (Fall 2005).  Introduction: Special Issue on Disability Law and Policy, 25(4) <u>Disability Studies Quarterly</u>, Part 1, available at http://www.dsq-sds.org/_articles_html/2005/fall. (Part 2 co-edited with H. Schartz).

144.   Hendricks, D.J., Batiste, L., Hirsh, A., Dowler, D. Schartz, H., & Blanck, P.  (Fall 2005).  Cost and Effectiveness of Accommodations in the Workplace: Preliminary Results of a Nationwide Study, 25(4) <u>Disability Studies Quarterly</u>, Part 1, available at http://www.dsq-sds.org/_articles_html/2005/fall/.

145.   Ball, P., Morris, Hartnett, J., & Blanck, P.  (2005).  Breaking the Cycle of Poverty: Asset Accumulation by People with Disabilities, 25(4) <u>Disability Studies Quarterly</u>, Part 2; available at http://www.dsq-sds.org/_articles_html/2005/fall/.

146.   Schmeling, J., Schartz, H., Morris, M. & Blanck, P.  (2005).  Tax Credit and Asset Accumulation: Finding from the Harris/NOD Survey of Americans with Disabilities, 25(4) <u>Disability Studies Quarterly</u>, Part 2; available at http://www.dsq-sds.org/_articles_html/2005/fall/.

147.   Blanck, P. (2005).  Americans with Disabilities and their Civil Rights: Past, Present, Future, <u>Workplace Discrimination and the Law in North America</u>, NAFTA Labor Secretariat Publisher, Washington, D.C.

148.   Hill, E., Siegal, C, Waterstone, M., & Blanck, P. (2006).  Anti-Discrimination Law: Judicial Interpretations, Vol. 1: 112-116, in <u>Encyclopedia of Disability</u>, Sage Publishers.

149.   Schwartz, J.A., Siegal, C., Waterstone, M., Hill, E., & Blanck, P. (2006). Disability Policy, Vol. 1: 468-476, in <u>Encyclopedia of Disability</u>, Sage Publishers.

150.   Waterstone, M., Hill, E., Siegal, C., & Blanck, P. (2006). Discrimination Law: United States, Vol. 1: 452-461, in <u>Encyclopedia of Disability</u>, Sage Publishers.

151.   Schmeling, J. & Blanck, P.  (2006).  United States Country Report in 2005, in <u>International Disability Rights Monitor</u>, Center for International Rehabilitation, xxx-xxx.

152.   Blanck, P. & Song, C.  (2005).  "I Don't Believe Any Colored Ex-Soldier Can Get Justice:" Disability, Race and Pensions for Union Army Veterans, Unpublished Manuscript; on file at <u>disability.law.uiowa.edu</u>.

153.   Blanck, P.  (2005).  Americans with Disabilities and their Civil Rights: Past, Present, Future, <u>University of Pittsburgh Law Review</u>, 66, 687-719.

154.   Blanck, P.  (2005).  The Burton Blatt Institute: Centers of Innovation on Disability at Syracuse University, Syracuse Law Review, 56(2), 201-32.

155.   Rich , R.F., Erb, C.T., Prudhomme, T.I., & Blanck, P. (2006).  Disability Claims, Review, Hearings and Appeals Procedures: An Analysis Of Administrative Best Practices; Technical Report submitted to the U.S. Social Security Administration, Disability Research Institute, available at: www.dri.uiuc.edu/research/p04-03c/legal_issues_final_report.doc.

156.   Blanck, P., Hill, E., Siegal, C., & Waterstone, M.  (2006 Supp. to the 1st Ed.).   Disability Civil Rights Law and Policy: Cases and Materials, Thomson/West Publishers.

157.   Schartz, H., Schartz, K., Hendricks, D.J., & Blanck, P.  (2006). Workplace Accommodations: Empirical Study of Current Employees, Mississippi Law Journal, 75, 917-43.

158.   Blanck, P.  (2006).  U.S. Society and Laws Protect the Rights of Persons with Disabilities, e-Journal USA, 5-8, at http://iipdigital.usembassy.gov/st/english/publication/2008/05/20080526235001srenod0.2262384.html#axzz2Mxa3VOw5.

159.   Schartz, H., Hendricks, D.J., & Blanck, P.  (2006). Workplace Accommodations: Evidence-Based Outcomes, Work, 27, 345–354.

160.   Blanck, P. & Malloy, R.P. (Eds.) (2006 - ).  Disability Law and Policy, Book Series for Cambridge University Press.

161.   Reina, M.V., Adya, M. & Blanck, P.  (2007). Defying Double Discrimination, Georgetown Journal of International Affairs, 8, 95-104.

162.   Blanck, P., Adya, M., Myhill, W., Samant, D., & Chen, P.  (2007). Employment of Persons with Disabilities: Twenty-Five Years Back and Forward, Minnesota Law and Inequality: A Journal of Theory and Practice, 25, 323-353.

163.   Blanck, P.  (2007). Enforcing ICT Accessibility Rules, The Accessibility Imperative: Implications of the Convention on the Rights of Persons with Disabilities for Information and Communication Technologies, G3ict, World Times Inc., 186-93.

164.   Myhill, W. N., Samant, D., Klein, D., Kaplan, S., Reina, M. V. & Blanck, P.  (2007). Distance Education Initiatives and Their Early 21st Century Role in the Lives of People with Disabilities, in "Distance Education Research Trends" (ed. E. Bailey, Nova Science Publishers), 1-38.

165.   Logue, L. & Blanck, P.  (2008). "Benefit of the Doubt": African-American Civil War Veterans and Pensions, Journal of Interdisciplinary History, xxxviii: 3 (Winter, 2008), 377–399.

166.   Baker, P., Caves, K. & Blanck, P. (Eds.) (2008).  Special Issue on Disability Policy and Law, Assistive Technology Journal, 20, full issue.

167.   Myhill, W., Cogburn, D.L., Samant, D., Kwasi Addom, B., & Blanck, P.  (2008). Developing Accessible Cyberinfrastructure-Enabled Knowledge Communities in the National Disability Community: Theory, Practice, and Policy, Assistive Technology Journal, 20, 157-74.

168.    Blanck, P.  (2008).  Closing: Special Issue on Disability Policy and Law, Flattening the (In-Accessible) Cyber World for People with Disabilities, <u>Assistive Technology Journal</u>, 20, 175-80.

169.    Blanck, P.  (2008).  "The Right to Live in the World": Disability Yesterday, Today, and Tomorrow, 2008 Jacobus tenBroek Disability Law Symposium, <u>Texas Journal on Civil Liberties and Civil Rights</u>, 13, 367-401.

170.    Adya, M. & Blanck, P.  (2008). Judges' Nonverbal Behavior, in <u>Encyclopedia of Psychology and Law</u>, ed. Brian L. Cutler, Sage, 388-90.

171.    Blanck, P., Myhill, W., Solstad Vedeler, J., Morales, J., & Pearlman, P.  (2009). Individuals with Cancer in the Workforce and their Federal Rights, <u>Work and Cancer Survivors</u> (ed. Michael Feuerstein), Springer, 255-76.

172.    Schur, L., Kruse, D. Blasi, J, & Blanck, P.  (2009). Is Disability Disabling In All Workplaces?: Disability, Workplace Disparities, and Corporate Culture, <u>Industrial Relations</u>, 48(3), 381-410, July.

173.    Blanck, P., Schartz, H., Hendricks, DJ, Schartz, K., & Myhill, W.N.  (2009). Empirical Study of the Americans with Disabilities Act, in <u>Assessing the Employment Provisions of the Americans with Disabilities Act</u>, (BBI Working Paper; at http://bbi.syr.edu).

174.    Blanck, P., Hill, E., Siegal, C., & Waterstone, M.  (2009). <u>Disability Civil Rights Law and Policy</u>, Second Edition, Thomson/West Publishers. [Statutory Supplement & Teacher's Manual, 2009]

175.    Araten-Bergman, T., Solstad Vedeler, J., Myhill, W., & Blanck, P.  (2009). Employment and Labor, In S. Burch (Ed.) Vol. I, <u>Encyclopedia of American Disability History</u>, NY, NY: Facts on File, Inc., 321-27.

176.    Blanck, P. & Myhill, W.  (2009).  Disabilities, Care of Children with: Legal and Public-policy Perspectives; Care for Children with Mental and/or Physical Disabilities from Birth through Adolescence, Shweder, R.A., T.R. Bidell, A.C. Dailey, S.D. Dixon, P.J. Miller, & J. Modell, eds. <u>The Child: An Encyclopedic Companion</u>. Chicago: University of Chicago Press, 275-76.

177.    Schreuer, N.U., Myhill, W., Aratan, T., Samant, D., & Blanck, P.  (2009).  Workplace Accommodations: Occupational Therapists as Mediators in the Interactive Process, <u>Work</u>, 33, 1-12.

178.    Samant, D., Soffer, M., Hernandez, B., Akinpelu, O., Adya, M., Levy, J., Repoli, E., Kramer, M., & Blanck, P.  (2009). Corporate Culture and Employment of People with Disabilities: Role of Social Workers and Service Provider Organizations, <u>Journal of Social Work in Disability & Rehabilitation</u>, 8, 171–188.

179.    Myhill, W. & Blanck, P.  (2009).  Disability and Aging: Historical and Contemporary Challenges, <u>Marquette University Law School Elder's Advisor</u>, 11(1), 47-80.

180.    Logue, L. & Blanck, P.  (2009). Civil War, In S. Burch (Ed.) Vol. I, <u>Encyclopedia of American Disability History</u>, NY, NY: Facts on File, Inc., 181-83.

181.    Blanck, P. & Logue, L.  (2009). Lemon, George, In S. Burch (Ed.) Vol. II, <u>Encyclopedia of American Disability History</u>, NY, NY: Facts on File, Inc., 559-60.

182.    Stein, M.A., Stein, P.J.S. & Blanck, P. (2009). Disability, Vol. 2, <u>Legal History Encyclopedia</u>, NY, NY: Oxford University Press, 334-37.

183.   Hill, E. & Blanck, P.  (2009).  Future of Disability Rights:  Part Three—Statutes of Limitations in Americans with Disabilities Act, "Design and Construct" Cases, <u>Syracuse Law Review</u>, 60, 125-159.

184.   Hill, E. & Blanck, P.  (2009).  Future of Disability Law and Advocacy and "The Right to Live in the World", Second Jacobus tenBroek Disability Law Symposium, <u>Texas Journal on Civil Liberties and Civil Rights</u>, 15, 1-31.

185.   Logue, L. & Blanck, P.  (2010). <u>Race, Ethnicity, and Disability: Veterans and Benefits in Post-Civil War America</u>, Cambridge University Press. [Reviewed in <u>American Historical Review</u>, 116(5), Dec. 2011, at 1504.]

186.   Soffer, M., Rimmerman, A., Blanck, P., & Hill E.  (2010). Media and the Israeli Disability Rights Legislation: Progress or Mixed and Contradictory Images?, <u>Disability and Society</u>, 25(6), 687–700.

187.   Soffer, M., McDonald, K., & Blanck, P.  (2010). Poverty Among Adults with Disabilities: Barriers to Promoting Asset Accumulation in Individual Development Accounts, <u>American Journal of Community Psychology</u>, 46(3-4), 376-385.

188.   Gottlieb, A., Myhill, W., & Blanck, P.  (2010). Employment of People with Disabilities, <u>International Encyclopedia of Rehabilitation</u>, at http://cirrie.buffalo.edu/encyclopedia/en/article/123/.

189.   Blanck, P.  (2010). Disability and Aging: Historical and Contemporary Views, in <u>Disability and Age Discrimination: Perspectives in Law and Psychology</u> (ed. R. Wiener), Springer, 49-70.

190.   Nakagawa, J. & Blanck, P.  (2010). Future of Disability Law in Japan: Employment and Accommodation, <u>Loyola International & Comparative Law Review</u>, 33(1), 173-221.

191.   Ali, M., Schur, L., Kruse, D., & Blanck, P.  (2011).  What Jobs Do People with Disabilities Want? The Same as Anyone Else, Journal of Occupational Rehabilitation, 21(2), 199-210 (2011). Online First Article, 10-6-10 at http://www.springerlink.com/content/8784326332537566/fulltext.pdf.

192.   Blanck, P.  (2012). Disability and Diversity: Historical and Contemporary Influences, Workplace Inclusion of Employees with Disabilities, <u>Managing Diversity in Today's Workplace: Vol. 1: Gender, Race, Sexual Orientation, Ethnicity, and Power</u>, 173-208, in Women and Careers in Management Series, Michele Paludi (ed.) Praeger.

193.   Lord, J., Raja Samant, D., & Blanck, P.  (2013). Beyond the Orthodoxy of Rule of Law and Justice Sector Reform: A Framework for Legal Empowerment and Innovation through the Convention on the Rights of Persons with Disabilities, in <u>World Bank Legal Review</u> (Eds. H. Cisse, S. Muller, C. Thomas & C. Wang), 4: 45-65.

194.   Blanck, P., Goldstein, B., & Myhill, W.  (2013). <u>Legal Rights of Persons with Disabilities: An Analysis of Federal Law</u>: Second Edition, LRP Publications.

195.   Schur, L., Kruse, D., & Blanck, P.  (2013). <u>People with Disabilities: Sidelined or Mainstreamed?</u>, Cambridge University Press.

196.   Blanck, P., Waterstone, M., Myhill, N. & Siegal, C.  (3rd ed., 2014). <u>Disability Civil Rights Law and Policy: Case and Materials</u>, West Publishers.

197. Blanck, P. (Ed.) (2014). Introduction: Disability, Law and Public Policy, and the World Wide Web, Behavioral Sciences & the Law, 32(1), 1-3.

198. Blanck, P. (2014). The Struggle for Web Equality by Persons with Cognitive Disabilities, Behavioral Sciences & the Law, 32(1), 4-32.

199. Schur, L., Nishii, L., Adya, M., Kruse, D., Bruyere, S., & Blanck, P. (2014).  Accommodating Employees With and Without Disabilities, Human Resource Management, 53(4), 593-621.

200. Blanck, P. (2014).  eQuality: The Struggle for Web Accessibility by Persons with Cognitive Disabilities, Cambridge University Press.

    Reviewed by G. Anthony Giannoumis, Articulating a right to the Web for persons with cognitive disabilities, Universal Access to the Information Society; DOI 10.1007/s10209-015-0432-1 (2015).

201. de Paor, A., Quinn, G., & Blanck, P. (Eds.) (2015). Introduction, 1-8, Genetic Discrimination: Transatlantic Perspectives on the Case for a European Level Legal Response, Routledge Press.

202. de Paor, A., Quinn, G., & Blanck, P. (Eds.) (2015). Conclusion, 269-74, Genetic Discrimination: Transatlantic Perspectives on the Case for a European Level Legal Response, Routledge Press.

203. Blanck P. & de Paor, A. (2015). U.S. Legislative and Policy Response–Some Historical Context to GINA, 97-113, Genetic Discrimination: Transatlantic Perspectives on the Case for a European Level Legal Response, Routledge Press.

204. Blanck, P. & Martinis, J. (2015). "The Right to Make Choices": National Resource Center for Supported Decision-Making, Inclusion, 3(1), 24-33.

205. McDonald, K.E., Williamson, P., Weiss, S., Adya, M., Blanck, P. (2015). The March Goes On: Community Access for People with Disabilities, Journal of Community Psychology, 43(3), 348-363.

206. Lord, J.E., Raja Samant, D., & Blanck, P. (2015). Law and People with Disabilities, in International Encyclopedia of Social & Behavioral Sciences, ed. J. Wright; Oxford: Elsevier, 2d ed., Vol. 13, 497–503.

207. Blanck, P. (2015). ADA at 25 and People with Cognitive Disabilities: From Voice to Action, Inclusion, 3(2), 46-54.

208. Blanck, P. (2015). eQuality: Web Accessibility and People with Cognitive Disabilities, Inclusion, 3(2), 75-91.

209. International Labour Organization (Murray, B., Blanck, P., Myhill, W., & O'Reilly, A.: Contributing Authors) (3d edition, 2015). Decent work for persons with disabilities: promoting rights in the global development agenda, International Labour Organization (ILO), Geneva, Switzerland.

## Forthcoming Publications and Working Papers

210. Blanck, P. (2016). Universal Architectural Design and People with Disabilities, Numbers Magazine by Kreab (in Spanish and English) (in press).

211.    Blanck, P., Campanella, T., & Martinis, J. (2016).  Advocacy and Legal Considerations to Ensure Civil Rights, in A Comprehensive Guide to Intellectual and Developmental Disabilities (eds. Michael Wehmeyer, Ivan Brown, Maire Percy, Karrie Shogren, & Alan Fung) (2nd ed., 2016, Paul H. Brookes Publishing Company) (in press).

212.    Blanck, P. & Flynn, E. (Eds.) (2016), Routledge Handbook of Disability Law and Human Rights, Taylor & Francis Group, London, UK (in press).

213.    Flynn, E. & Blanck, P. (2016), Introduction, in Routledge Handbook of Disability Law and Human Rights, Taylor & Francis Group, London, UK (in press).

214.    Blanck, P. (2016), eQuality: The Right to the Web, in Routledge Handbook of Disability Law and Human Rights, Taylor & Francis Group, London, UK (in press).

215.    Blanck, P. (2016). Web Accessibility for People with Cognitive Impairments: A Legal Right?, in Global Inclusion: Disability, Human Rights, and Information Technology (eds. Michael Stein & Jonathan Lazar), University of Pennsylvania Press (forthcoming).

216.    Lord, J., et al., Blanck, P. (2016). Disability, Health Disparity and Repressive Environments: Assessing Country Conditions in North Korea, Int. J. Environ. Res. Public Health, 12, 1-xx (2016) (forthcoming).

217.    Blanck, P. (2016). ADA at 25 and Persons with Cognitive Disabilities: From Action to Inclusion, Inclusion (forthcoming).

218.    Blanck, P. (2016). The First "A" in the ADA: And 25 More "A"s Towards Equality for Americans with Disabilities, Inclusion (forthcoming).

219.    Morris, M., Rodriguez, C., & Blanck, P. (2016). ABLE Accounts: A Down Payment on Freedom, Inclusion (forthcoming).

220.    Ekberg, K., Pransky, G., Besen, E., Fassier, J., Feuerstein, M., Munir, F., & Blanck, P. (2016). New business structures creating organizational opportunities and challenges for work disability prevention, Journal of Occupational Rehabilitation (in submission).

221.    Arstein-Kerslake, A., Browning, M., Watson, J., Martini, J., & Blanck, P. (2016). Future Directions in Supported Decision-Making Research, Disability Studies Quarterly (in submission).

222.    Logue, L. M. & Blanck, P. (2017). Fatal Decisions: Civil War Veterans, Psychological Illness, and Suicide, Cambridge University Press (in preparation).

223.    Shogren, K., Wehmeyer, M., Martinis, J., & Blanck, P. (2017). Supported Decision Making Over the Life Course: Community, Financial and Health Decisions by Persons with Disabilities and Older Adults (in preparation).

224.    Blanck, P., Waterstone, M., & Martinis, J. (2nd ed., 2017). Treatise on Disability Civil Rights Law and Policy, West Publishers (in preparation).

225.    Blanck, P. (2017). The Future of the American with Disabilities Act: Introduction to Special Section on the ADA, Journal of Occupational Rehabilitation (P. Blanck ed.) (in preparation).

226.   Shogren, K., Wehmeyer, M., Martinis, J., & Blanck, P. (2017). Supported Decision Making Over the Life Course, <u>Journal of Occupational Rehabilitation</u> (in preparation).

227.   Schur, L., Kruse, D., & Blanck, P. (2017). Employment and Disability, <u>Journal of Occupational Rehabilitation</u> (in preparation).

228.   Schur, L., Kim, A., Han, K., Kruse, D., Adya, M., & Blanck, P. (2017).  Disability at Work: Job Characteristics and Attitudes of Employees with Disabilities, <u>Journal of Occupational Rehabilitation</u> (in preparation).

229.   Giannoumis, A.G. & Blanck, P. (2017). *eQuality* 2.0: New Directions in Accessible Technologies and Independence in Living, <u>Journal of Occupational Rehabilitation</u> (in preparation).

230.   Blanck, P. (2017).  <u>*eQuality* 2.0: The Struggle for Web Accessibility by Persons with Cognitive Disabilities</u>, 2nd edition, Cambridge University Press (in preparation).

231.   Uyanik, H., Shogren, & Wehmeyer, M., Campanella, T., Martinis, J., & Blanck, P. (2017). Supported Decision Making, in <u>Handbook of Positive Psychology in Intellectual and Developmental Disabilities: Translating Research into Practice</u> (eds. M. Wehmeyer, K. Shogren, & N. Singh) (Springer: NY) (in preparation).

232.   de Paor, A., Quinn, G., & Blanck, P. (2017). Advancing Genetic Technologies: Disability and Human Rights Perspectives, <u>Laws: Special Issue on Precision Medicine, Law & Disability</u> (in preparation).

## Newspaper/Magazine/Newsletter Articles and Commentary

Blanck, P. (Mar., 8, 2010).  Commentary:  E-Books Must Be Accessible, and That Means Audio, The Chronicle of Higher Education, at http://chronicle.com/article/E-Books-Must-Be-Accessible/64518/.

Blanck, P. (Nov. 11, 1991). Persons with disabilities can be assets to business. O'Brien County Bell, Primghar, IA.

[Reprinted] (Nov. 14, 1991).  Disability act being phased in.  Tama News-Herald, Tama, Iowa.

[Reprinted] (Dec. 4, 1991). Disability act will soon begin to have an impact.  Bloomfield Democrat, Bloomfield, IA.

Blanck, P.D. (Oct. 7, 1992).  Disabilities act myths are often unfounded.  Journal-Gazette, Fort Wayne, IN.

[Reprinted] (Oct. 12, 1992).  Disabilities getting a bad rap. Middlesex News, Framingham, MA.

[Reprinted] (Oct. 22, 1992).  Look at reality, not myth, in disabilities act.  Valley Foothills News, Yuma, AZ.

[Reprinted] (Oct. 23, 1992).  Realities, myths of disabilities.  The Evening Bulletin, Providence, RI.

[Reprinted] (Oct. 23, 1992).  Realities, myths of disabilities.  The Providence Journal, Providence, RI.

Blanck, P.  (Jan. 1993).  Americans with disabilities: The hidden electorate. Region VIII, AAMR Newsletter, ND.

Blanck, P.D. (Sept. 24, 1993).  ADA – Separating fact from fiction.  31(3) FYI at 4, U. of Iowa.

[Reprinted] (Oct. 19, 1993).  Emphasize the facts about disabilities act.  Des Moines Register, Iowa (at 7a).

Blanck, P.D. (Dec. 1993).  Americans with Disabilities Act and health care reform.  Scripps-Howard News service.

Blanck, P.D. (Dec. 1993).  Judges and juries are getting a bad rap.  Scripps-Howard News service.

[Reprinted] (Nov. 26, 1993).  Judging juries.  Syracuse Herald-Journal, Syracuse, NY.

[Reprinted] (Nov. 29, 1993).  Judges and juries do better than the public might think. Daily Local News, West Chester, PA.

[Reprinted] (Nov. 30, 1993).  Jurors do a better job than most people think.  Winston-Salem Journal, Winston-Salem, NC.

Blanck, P. (Dec. 1994).  Transcending the ADA at Sears, Roebuck and Co. . . . . For the price of dinner and a movie.

Blanck, P.D. (Jan. 1995).  Buck v. "The Bell Curve."

Blanck, P.D. & Pope, M.H. (1995).  Editorial: Spine research, law and public policy. 20(5) Spine 511-12.

Blanck, P.D. (Sept. 1995).  Editorial: Disaster Mitigation for People with Disabilities.

Blanck, P.D. (May 6, 1998).  Letter to Editor: JAMA, 279(17), 1349.

Blanck, P.  (Sunday, Sept. 2, 2001). Op. Ed. Business: Make Use of Disabled Work Force.  IA City Press Cit., 9A.

Blanck, P.  (Aug. 2005). Guest Column, Corporate Culture & Disability, ADA Compliance Guide Newsletter, Washington, D.C., available at http://www.thompson.com.

## Harvard Business School Case Publications

9-483-031(1982).          Patrick J.J. Rich (with J. Dowd).

9-483-050 (1982).         A note on career planning in industry.

9-483-058 (1982).         The Wane Division of the American Instruments, Corporation (A).

9-483-094 (1982).         The Wane Division of the American Instruments, Corporation (B).

## PRESENTATIONS

See also http://bbi.syr.edu for listing of other web-based presentations and accessible formats where possible.

1.     Blanck, P., Reis, H.T., & Jackson, L. (1979).  The effects of the verbal reinforcement on intrinsic motivation for sex-linked tasks.  Presentation meeting of the American Psychological Association, NY.

2.     Blanck, P.D., Rosenthal, R., Snodgrass, S.E., DePaulo, B.M, & Zuckerman, M. (1980).  Longitudinal and cross-sectional age effects in nonverbal decoding skill and style.  Presentation at the meeting of the Eastern Psychological Association, Hartford.

3.     Blanck, P.D., Rosenthal, R., Snodgrass, S.E., DePaulo, B.M., & Zuckerman, M. (1980).  Developmental changes in females' superiority at decoding nonverbal cues.  Presentation at the meeting of the American Psychological Association, Montreal.

4.     McLeod, P.L., Rosenthal, R., Blanck, P., & Snodgrass, S.E. (1980). Micromomentary movement and the decoding of face and body cues.  Presentation meeting of American Psychological Association, Montreal.

5.     Blanck, P.D. & Rosenthal, R. (1980).  Nonverbal sensitivity and athletic team performance.  Presentation at the meeting of the New England Psychological Association, Boston.

6.     Blanck, P.D. & Rosenthal, R. (1981).  Measuring sensitivity to verbal and nonverbal discrepant and consistent multichannel messages: The MOVANS Test.

7.     Presentation at the meeting of the Eastern Psychological Association, New York.

8.     Snodgrass, S.E., Rosenthal, R., & Blanck, P. (1981).  Sex role association via teachers' behavior and sexually stereotyped materials.  Presentation at meeting of Association of Women in Psychology, Boston.

9.     Blanck, P.D. & Rosenthal, R. (1981).  Nonverbal styles and skills in best-friend relationships.  Presentation at the meeting of the New England Psychological Association, Brandeis University.

10.    Blanck, P.D., Rosenthal, R., & Cordell, L.H. (1985).  Nonverbal communication in the clinical and legal context.  Presentation at the meeting of the California Psychological Association, San Francisco.

11.    Blanck, P.D. & Rosenthal, R. (1986).  Judges' verbal and nonverbal in criminal jury trials.  Symposium of jury decision-making.  Presentation at the meeting of the American Psychological Association,

Washington, D.C. Colloquium. (1986). Trial judges' behavior in criminal jury trials.  U. Nebraska, Lincoln, Law School.

12.     Blanck, P.D. (1988).  The Archeology of Field Research in the Courtroom.  Presentation at the meeting of the Law and Society Association, Vail, Colorado.

13.     Blanck, P.D. (1989).  Trial judges' behavior in criminal jury trials.  University of Iowa, College of Law.

14.     Bernieri, F., Blanck, P.D., Rosenthal, R., Vannicelli, M., & Yerrell, P.H. (1990).  Therapists' speech: Channel congruency, affect, and variability. Presentation at the meeting of the American Psychological Association, Boston, MA.

15.     Blanck, P.D. (1990).  Legal policy and methodological issues in deinstitutionalizing the mentally retarded. Presentation at the meeting of American Psychology-Law Society Division 41 Conf., Williamsburg, VA.

16.     Blanck, P.D. (1990).  Panelist on "Selecting impartial juries."  Annenberg Washington Program Forum, Washington, D.C.

17.     Blanck, P. (1991).  Ethical, moral, and legal issues in the primary and secondary analysis of videotape data of family interactions.  Presentation at Henry Murray Research Center, Radcliffe College, Harvard Univer.

18.     Blanck, P.D. (1991).  Empirical study of the Americans with Disabilities Act: Model of Study and Preliminary Results.  Presentation at the American Association for Mental Retardation, Washington, D.C.

19.     Blanck, P.D. (1991).  The interface of law and psychology, Keynote at the Iowa Psychological Association meeting, Iowa City, IA.

20.     Blanck, P.D. (1991).  The Americans with Disabilities Act: A new Bill of Rights, Presentation at the University of Iowa, College of Law celebration of the Bicentennial of the Bill of Rights, Iowa City, IA.

21.     Saks, M.J. & Blanck, P.D. (1992).  Improving on Justice: The Unrecognized Benefits of Sampling and Aggregation in the Trial of Mass Torts.  Presentation at the meeting of the American Association of Law Schools, San Antonio, TX.

22.     Blanck, P.D. (1992).  The Americans with Disabilities Act, Colloquium, Department of Sociology, University of Iowa.

23.     Blanck, P.D. (1992).  Ethical and legal implications of the human genome initiative.  Presentation at the Iowa Humanities Symposium, "Genes and Human Self-Knowledge," University of Iowa, College of Medicine, Iowa City, IA.

24.     Blanck, P.D. (1992).  Americans with Disabilities Act: Advising employers and employees.  Presentation at the University of Iowa, College of Law Symposium (CLE) on Employee Rights and Benefits.

25.     Blanck, P.D. (1992).  Introduction to Program on "Communicating with Juries." Presentation at the Annenberg Washington Program, Washington, D.C.

26.     Blanck, P.D. (1992).  The Emerging Work Force of Persons with Disabilities: The ADA and ADR. Address to the Industry-Labor Council Meeting "Giving Us the Tools," National Center for Disability Services, St. Louis, MO.

27.     Blanck, P.D. (1992).  The Emerging Work Force of Persons with Disabilities.  Address to the Equal Employment Opportunity Commission, Washington, D.C.

28.     Blanck, P.D. (1992).  Americans with Disabilities Act: Advising employers and employees.  Presentation at the University of Iowa, College of Law (CLE).

29.     Blanck, P.D. (1992).  Fact Finding and Decision Making, Address at the meeting of the Ohio Judicial Conference, Columbus, OH.

30.     Blanck, P.D. ((1992).  Americans with Disabilities Act: Facts and Myths.  Presentation at the University Hospital School Rounds, University of Iowa.

31.     Blanck, P.D. (1992).  Americans with Disabilities Act: The Basics, Invited Lecture at Goodwill Industries, Inc. & Iowa City Chamber of Commerce, Iowa City, IA.

32.     Blanck, P.D. (1992).  Americans with Disabilities Act: Basics, Invited Lecture at Alliance for the Mentally Ill meeting, Iowa City, IA.

33.     Blanck, P.D. (1993).  The Emerging Work Force: Studying the ADA.  Invited Public Address at the Woodrow Wilson School of Public Policy, Princeton University.

34.     Blanck, P.D. (1993).  Americans with Disabilities Act: Issues for Rehabilitation Professionals, Invited Lecture at Rehabilitation Psychology Program, University of Iowa.

35.     Blanck, P.D. (1993).  Americans with Disabilities Act: Issues for Pulmonary Physicians, Invited Rounds at Univ. Iowa Hospitals.

36.     Blanck, P.D. (1993).  Social Change through Law:  Where is the Difference, Invited Presentations, Teaching Texts & Diversity, University of Iowa.

37.     Blanck, P.D. (1993).  The ADA and ADR, Invited Presentation, American Association on Mental Retardation Convention, Washington, D.C.

38.     Blanck, P.D. (1993).  Americans with Disabilities Act: Issues for Eye Researchers and Clinicians, Invited Rounds Univ. Iowa Hosp.

39.     Blanck, P.D. (1993).  The ADA and ADR, Invited Presentation, USPDI Conference on ADA and Technology, Washington, D.C.

40.     Blanck, P.D. (1993).  The ADA and ADR, Invited Presentation, Access Center Conference, Davenport, IA.

41.     Blanck, P.D. (1993).  Field of Dreams and the ADA, Keynote Address, Iowa ARC, Cedar Rapids, IA.

42.     Blanck, P. (1993). Rural employment and the ADA, Invited Address, Rural Employment Alt., Conroy, IA.

43.     Blanck, P.D. (1993).  Implementing the ADA, Keynote, Missouri Association County Developmental Disabilities Ser., St. Louis, MO.

44.     Blanck, P.D. (1993).  Implementing the ADA, Invited Address, Iowa City Public Library, IA.

45.     Blanck, P.D. (1994).  Health care reform: Access and partnerships. Presentation to the President's Committee on Mental Retardation Health Care Reform Conference, Washington, D.C.

46.     Blanck, P.D. (1994).  ADA and ADR, Address to the Iowa Risk Project, Iowa City, IA.

47.     Blanck, P.D. (1994).  Putting the employment provisions of the ADA to work, CLE, Univ. Iowa, College of Iowa, Iowa City, IA.

48.     Blanck, P.D. (1994).  Introduction/Moderator to Program "Communications technology for everyone," Conference at the Annenberg Washington Program, Washington, D.C.

49.     Blanck, P.D. (1994).  Emerging issues in ADA and ADR, Address to the American Association on Mental Retardation Annual Convention, Boston, MA.

50.     Blanck, P.D. (1994).  Moderator, Implementing Consent Decrees, American Association on Mental Retardation Annual Convention, Boston, MA

51.     Blanck, P. (1994). Inclusive Education and the ADA, Presentation at the Department of Special Education, Univ. Iowa, Iowa City, IA.

52.     Blanck, P.D. (1994). Community integration and the ADA, Invited Address, Barry-Lawrence Retreat, Branson, MO.

53.     Blanck, P.D. (1994).  Communications Technology for everyone.  Invited Address, Smithsonian Museum, Washington, D.C.

54.     Blanck, P.D. (1994).  Empirical Study of the ADA, Invited Address, Department of Psychology, & Woodrow Wilson School, Princeton University, NJ.

55.     Blanck, P.D. (1994).  The Appearance of Justice, Moderator for conference co-sponsored by Princeton University, Woodrow Wilson School, and the Annenberg Washington Program, Princeton, NJ.

56.     Blanck, P.D. (1995).  On diversity, disability, and employment, Invited address, American Association of Law Schools Conference, New Orleans, LA.

57.     Blanck, P.D. (1995).  Human rights and persons with intellectual disability: International and national perspectives, Symposium, Yale Law School, New Haven, CT.

58.     Blanck, P.D. (1995).  ADA and occupational medicine, Invited address, Iowa Conference on Occupational Medicine, Iowa City, IA.

59.     Blanck, P.D. (1995).  Implications of ADA for Psychologists, Invited address, American Psychology–Law Society Conv., NY, NY.

60.     Blanck, P.D. (1995).  ADA in the Workplace – Evolutionary or Revolutionary, Invited address, California Committee on Employment of Persons with Disabilities Conference, Sacramento, CA.

61.     Blanck, P.D. (1995).  ADA in the workplace: "Back" to work, Invited address, Southam Occupational Health & Safety Conference, Toronto, Canada.

62.     Blanck, P.D. (1995).  ADA's Impact on the Workplace: Empirical Findings, Invited address, National Employment Lawyer's Association, San Francisco, CA.

63.     Blanck, P.D. (1995).  U.S. Disability Policy and Law, Invited Address to Handikapp Ombudsmannen, Stockholm, Sweden.

64.     Blanck, P.D. (1995).  Voices of Freedom: America Speaks Out on ADA, National Council on Disability Forum, Washington, D.C.

65.     Blanck, P.D. (1995).  Work Force Diversity and the ADA, Invited Address, Northern States Power Company, Minneapolis, MN.

66.     Blanck, P.D. (1995).  ADA, Employment, Civil Rights. Invited Address, American Association on Mental Retardation Public Policy Forum, Washington, D.C.

67.     Blanck, P.D. (1996).  Persons with Mental Retardation in the Juvenile Justice System.  Invited Address, American Association on Mental Retardation Annual Conference, San Antonio, TX.

68.     Blanck, P.D. (1996).  Institutional reform litigation.  Panel Address, American Association on Mental Retardation Annual Conference, San Antonio, TX.

69.     Blanck, P.D. (1996).  How Does ADA Work for You? / Getting ADA to Work for You.  Invited Address, St. Francis Health Care Center, Green Springs, OH.

70.     Blanck, P.D. (1996).  The ADA and internal medicine, Medicine & Society Lecture Series, Department of Internal Medicine, University of Iowa.

71.     Blanck, P.D. (1996).  The ADA and rehabilitation medicine, Prince Lecture and Prince Visiting Professorship, Rehabilitation Institute of Chicago, Northwestern University, IL.

72.     Blanck, P.D. (1996).  Emerging ADA Law, Faculty Workshop, Northwestern University Law School.

73.     Blanck, P. (1996).  Emerging Issues under the ADA, Keynote Address, Assoc. ADA Coordinators Conference, Raleigh Durham, NC.

74.     Blanck, P.D. (1996).  ADA Title I, Ergonomics and Workers' Compensation Law, Invited Address, Worksafe Iowa Conference, Reducing Workplace Injuries & Illnesses Through Ergonomics, Iowa City, IA.

75.     Blanck, P.D. (1996).  Transcending the ADA, Invited Address, Villanova Law School Symposium on the ADA, Villanova, PA.

76.     Blanck, P. (1996).  Disability and Rural Health, Health in a Changing Rural Environment Conf., IA City.

77.     Blanck, P.D. (1997).  The Ergonomics of the ADA, Invited Address, DePaul Law School, Symposium on the ADA, Chicago, IL.

78.     Blanck, P. (1997). Socially Assisted Dying: Opening Remarks. Conf. Socially Assisted Dying, Northwestern University, Chicago, IL.

79.     Blanck, P.D. (1997).  ADA and Psychiatry, Grand Rounds, Department of Psychiatry, University of Iowa.

80.     Blanck, P. (1997).  Corporate Culture and the ADA, ADA Title I Conference Sponsored by the Industry-Labor Council, Chicago, IL.

81.     Blanck, P.D. (1997).  The emerging role of the staffing industry in employing people with disabilities. Working together, leading the way, Conference sponsored by Iowa CEO, Des Moines, IA.

82.     Blanck, P.D. (1997).  Students with Learning Disabilities, Reasonable Accommodations, and the rights of institutions of higher education to establish and enforce academic standards.  Invited Presentation at the Journal of Gender, Race and Justice, Annual Symposium, Iowa City, IA.

83.     Blanck, P.D. (1998).  Exploring the Future: Trends and Challenges. Keynote Address at Region VII, Four State, Issues Forum, Kansas City, MO. [also speaking Economic Cents of Hiring Persons with Disabilities.]

84.     Blanck, P. (1998). Human & Civil Rights: An Iowa Perspective. Keynote 1998 Iowa Civil Rights Commission, Des Moines, IA.

85.     Blanck, P. (1998).  ADA: Issues and Impact. Invited Presentation at Current Topics in Occupational Health Symp., Iowa City, IA.

86.     Blanck, P.D. (1998).  Treatment and Habilation and the ADA.  Invited Presentation, American Bar Assoc. Conference "In Pursuit" … A Blueprint for Disability Law and Policy: ABA National Conference.

87.     Blanck, P.D. (1998).  Closing Roundtable.  Invited Moderator at American Bar Association Conference "In Pursuit" … A Blueprint for Disability Law and policy: An ABA National Conference.

88.     Blanck, P.D. (1998).  The Emerging Role of the Staffing Industry in Employing People with Disabilities and Manpower, Inc., Keynote Address, Shriners Hospitals Choices Conference, Chicago, IL.

89.     Blanck, P.D. (1998).  The ADA and the Emerging Workforce. Invited Address, American Association on Mental Retardation Disability Summit, Washington, D.C.

90.     Blanck, P. (1998).  ADA, Disabilities, and Discrimination in Health Care, Presentation before the Bioethics Forum, Univ. Iowa.

91.     Blanck, P.D. (1998).  Statement of Professor Peter David Blanck, Before the U.S House of Representatives Committee on Education and the Workforce, Monday, October 5, 1998, Washington, D.C.

92.     Blanck, P.D. (1998).  Statement of Professor Peter David Blanck, Before the U.S. Commission on Civil Rights, Public Hearings on the Americans with Disabilities Act, Thursday, November 12, 1998, Washington, D.C.

93.     Blanck, P. (1999).  Work and Disability. Invited Address, Annual Meeting of the American Assoc. Law Schools, New Orleans, LA.

94.     Blanck, P.D. (1999).  Civil War Pensions, Civil Rights, and the Americans with Disabilities Act. Invited Address, Symposium on ADA Backlash, University of California at Berkeley.

95.     Blanck, P.D. (1999).  The ADA and the Emerging Workforce. Invited Address, Annual Colloquium, University of Iowa, Department of Rehabilitation Counseling.

96.     Blanck, P. (1999). Genetic Knowledge and Disability, Symposium Moderator, Rehab. Inst. Chicago, IL.

97.     Blanck, P.D. (1999).  The ADA and the Emerging Workforce. Invited Plenary Address, Joint Employment & Technical Training Conference, U.S. Department of Labor, Washington, D.C.

98.     Blanck, P.D. (1999).  The Unintended Consequence of the ADA. Invited Address, National Disability Management Conference, Rehearsing Your Future, Washington Business Group on Health & Unum-Provident Corp., Washington, D.C.

99.     Blanck, P. (1999).  Disability and Compliance. Invited Address, National Workers' Compensation and Disability Conf., Chicago, IL.

100.    Blanck, P.D. (1999).  The Year of the ADA at the U.S. Supreme Court, University of Iowa College of Law Continuing Legal Education, Iowa City, IA.

101.    Blanck, P.D. (2000).  The Disabilities of Civil War Veterans: Empirical Study. Invited Address, Disability Institute ADA Symposium, University of Alabama School of Law, Tuscaloosa, AL.

102.    Blanck, P.D. (2000).  Entrepreneurs with Disabilities. Invited Address, President's Committee on Employment of People with Disabilities Annual Meeting, Washington, D.C.

103.    Blanck, P.D. (2000).  Civil War Pensions and Disability in America. Invited Address, ADA Tenth Anniversary Symposium, Ohio State University, Columbus, OH.

104.    Blanck, P.D. (2000).  Employment, the ADA, and the Supreme Court. Invited Address, Issues Forum, Kansas City, MO.

105.    Blanck, P.D. (2000).  Graduating from High School/High Tech, Keynote Address, Grant Wood area Educational Agency Graduation, Cedar Rapids, IA.

106.    Blanck, P.D. (2000).  Disability, Employment Policy and the ADA. Invited Address, Central States Occupational Medicine Association Meeting, Davenport, IA.

107.    Blanck, P. (2000).  ADA and Health Care, Panel, Rehabilitation Institute Chicago and Northwestern Univ. Conf., Chicago, IL.

108.    Blanck, P.D. (2000).  Rethinking ADA Civil Rights Enforcement, Moderator for National Retreat for the National Council on Disability Meeting, Washington, D.C.

109.    Blanck, P. (2000).  Employment Policy and the ADA: Research Questions and Challenges. Invited Address, Mary Switzer Lec. Ser., NIDRR, Lansing, MI.

110.    Blanck, P.D. (2000).  Studying Employment Policy and the Workforce of Persons with Disabilities. Rehabilitation Services Administration Annual Conference, Plenary Address, Philadelphia, PA.

111.    Blanck, P.D. (2000).  The Disabilities of Civil War Veterans. Invited Address, University of Nebraska College of Law, Lincoln, NE.

112.    Blanck, P.D. (20000.  Conceptions of Disability after the Civil War, Invited Address, University of Chicago, Center for Population Economics, Graduate School of Business, Chicago, IL.

113.   Blanck, P.D. (2000).  Studying the Impact of the ADA: Past and Present Issues, University of Michigan Law School, Invited Address, ADA Symposium, Ann Arbor, MI.

114.   Blanck, P.D. (2001).  Employment, Disability Policy and the ADA, Featured Address, "The Future is Not What it Used to Be," Conference on Workforce of Iowans with Disabilities, Des Moines, IA.

115.   Blanck, P.D. (2001).  Before Civil Rights: Veterans' Pensions and the Politics of Disability in America, 1862-1907, Invited Faculty Colloquium, Stanford Law School, CA.

116.   Blanck, P.D. (2001).  Veterans' Pensions and the Politics of Disability in America, Invited Discussant, National Bureau of Economic Research Conference, Health and Labor Force Participation over the Life Cycle: Evidence from the Past, Cambridge, MA.

117.   Blanck, P.D. (2001).  Before Civil Rights: Veterans' Pensions and the Politics of Disability in America, 1862-1907, Invited Faculty Colloquium, William & Mary Law School, VA.

118.   Blanck, P.D. (2001).  Keynote Address: Emerging Issues for the New Millennium, Annual Conference on Vocational Rehabilitation, Rehabilitation Institute of Chicago, Chicago, IL.

119.   Blanck, P.D. (2001).  Civil War Pensions and the Politics of Disability, Invited Enrichment Speaker Series/Faculty Colloquium, University of Houston, School of Law, Houston, TX.

120.   Blanck, P.D. (2001).  The Emerging Workforce of Entrepreneurs with Disabilities, America's Workforce Network Research Conference, U.S. Department of Labor, Washington, D.C.

121.   Blanck, P.D. (2001).  Civil War Pension Attorneys and the Politics of Disability in America, Invited Address, Conceptions of Disability Symposium, Bills of Right Institute, William & Mary Law School, VA.

122.   Blanck, P. (2001).  Economics of Employing People with Disabilities, Invited Speaker, Cornell Univ., RRTC Employment Conference, Washington, D.C.

123.   Blanck, P.D. (2001).  Ticket to Work and Work Incentives, Expert Roundtable Participant, Social Security Administration Conference, Washington, D.C.

124.   Blanck, P.D. (2001).  Civil War Pensions and the Politics of Disability in America, Invited Address, American Historical Association Convention, Chicago, IL.

125.   Blanck, P.D. (2001).  National Workplace Forum: Setting a National Agenda for Increasing the Employment of Individuals with Disabilities, U.S. Chamber of Commerce & Virginia Commonwealth University, Invited Presented, Washington, D.C.

126.   Blanck, P. (2002). Exploring the Future of Disability Civil Rights. Keynote Region VII, Four State, Issues Forum, Kansas City, MO.

127.   Blanck, P.D. (2002).  Exploring the Future of Disability Rights.  Keynote Conversations with J. Young at the World Institute on Disability/Virginia Commonwealth University Policy Forum, Los Angeles, CA.

128.   Blanck, P.D. (2002).  Exploring the Future of American Disability Civil Rights, and Comparisons to the UK Disability Discrimination Act.  Keynote Address, Employers' Forum on Disability, London, England.

129.    Blanck, P.D. (2002).  Ticket to Work and Work Incentives, Expert Roundtable Participant, Applicability of the ADA to Employment Networks (ENs), Social Security Administration Conference, Washington, D.C.

130.    Blanck, P.D. (2002).  The Definition of Disability under the Social Security Act and its Relation to the Americans with Disabilities Act, Testimony before the U.S. House of Representatives Subcommittee on Social Security, Thursday, July 11, Washington, D.C.

131.    Blanck, P.D. (2002).  ADA Research & Policy Agenda, Advisory Panel, GAO Meetings, Washington, D.C.

132.    Blanck, P.D. (2002).  The Future of American Disability Civil Rights, Keynote Address at the Iowa Rehabilitation Professionals Annual Meeting, Des Moines, IA.

133.    Blanck, P.D. (2002).  National Summit on Technology and Disabilities, Invited participant and facilitator, RESNA Conference, Providence, RI.

134.    Blanck, P. (2002).  AT Outcome Measurement: Where are we now and where are we headed? Washington University Program in Occupational Therapy Conference, St. Louis, MO.

135.    Blanck, P. (2003).  Nonverbal Communication in Applied Research Involving Persons with Disabilities, Invited participant, Claremont Applied Social Psychology Conference, Applications of Nonverbal Communication, Claremont, CA.

136.    Blanck, P. (2003).  "It Works," Invited moderator, The Information Technology Association of America (ITAA) Annual Workforce Convocation, Arlington, VA.

137.    Blanck, P. (2003).  The De-Evolution of the ADA: Federalism, and the Rise of State Disability Law, Invited speaker, Annual Conference of State Court Chief Justices, San Juan, PR.

138.    Blanck, P. (2003).  Politics and Practice of Accommodation, Invited Speaker, Job Accommodation Network (JAN), Annual Conference, Arlington, VA.

139.    Blanck, P. (2003).  Poverty and Disability, Invited Speaker, Intersection of Disability with Gender, Race and Justice, Symposium sponsored by the Journal of Race, Gender and Justice, Iowa City, IA.

140.    Blanck, P. (2003).  Keynote Address, Journal of Gender, Race & Justice Annual Symposium, Justice for All?  Exploring Gender, Race and Sexual Orientation Within Disability Law, Iowa City, IA.

141.    Blanck, P. (2003).  American Disability Law and Policy, Invited Speaker, International Seminar: Anti-Discrimination Legislation: Disability Experience, Organized by the Norwegian "Commission against Discrimination of Disabled People", appointed by the Norwegian Government 2003-2004, Oslo, Norway.

142.    Blanck, P. (2003).  Law and Ethics of Data Sharing, Invited Speaker, Data Sharing Workshop, Sponsored by The National Institutes of Health, National Institute of Child Health and Development (NIH/NICHD), Bethesda, MD.

143.    Blanck, P. (2003).  ADA and the European Year of the Disabled, Invited Address, Merrill Lynch Conf. European Year Disabled, London, UK.

144. Blanck, P. (2003).  The Law and Politics of the ADA, Invited Speaker, Research Council of Norway, Conference on "Anti-Discrimination Legislation as an Instrument to Promote Equal Opportunities for People with Disabilities - International Experiences", Oslo, Norway.

145. Blanck, P. (2003).  The Law and Politics of the ADA, Invited Speaker, Conference on "Anti-discrimination Legislation: The Disability Experience," Norwegian Governmental Commission Against Discrimination of People with Disabilities, Oslo, Norway.

146. Blanck, P. (2003).  Is the ADA a Failed Law?, Speaker, Middlesex University, London, GB.

147. Blanck, P. (2004).  Disability Law and Policy in Rehabilitation Education.  Keynote Address, National Council on Rehabilitation Education (NCRE), Annual Meeting, Tucson, AZ.

148. Blanck, P.  (2004).  The Accessible Courtroom, Invited Speaker, The Legal and Policy Implications of Courtroom Technology, International Conference Sponsored by The Courtroom 21 Project and William and Mary Bill of Rights Journal, Williamsburg, VA.

149. Blanck, P.  (2004). Realities and Opportunities in the 21st Century Workplace–Disability Issues, Invited Panelist, U.S. Equal Employment Opportunity Commission, Forum with Chair Cari Dominguez, DC.

150. Blanck, P.  (2004). Future of Disability Law and Policy, Invited Talk, U.S. Equal Employment Opportunity Commission, Office of Legal Counsel, Washington, DC.

151. Blanck, P.  (2004).  Union Army Veterans' Pensions and the Politics of Disability in Nineteenth Century America, Distinguished Lecture on Human Rights, Syracuse University College of Law, Syracuse, NY.

152. Blanck, P.  (2004).  Employees with Disabilities: Employer Misconceptions Versus Data and Practice, Master Tutorial Presenter, Society for Industrial and Organizational Psychology, Ann. Conf., Chicago, IL.

153. Sewell, R., Song, C., Smith, R., Bauman, N., & Blanck, P.  (2004). Union Army Veterans with Hearing Loss and the Evolution of Disability in America During 1862-1920, Paper, Annual Meeting of the Triological Society, Phoenix, AZ.

154. Blanck, P.  (2004).  Disability Rights: Thematic Issues, Moderator at Equality and Disability: Exploring The Challenge and Potential of Framework Directive 2000/78/EC, Conference organized in Louvain-La-Neuve, Belgium (29-30 April).

155. Blanck, P. (2004). Definition of Disability, Social Security Advisory Board Forum, Invited Discussant, DC.

156. Blanck, P.  (2004).  Disability Law and Technology Policy, State of Technology Conference, Rehabilitation Engineering Research Center (RERC) on Mobile Wireless Technologies for Persons with Disabilities, Georgia Centers for Advanced Telecommunications Technology, Invited Address, Atlanta Georgia.

157. Blanck, P.  (2004).  The Past, Present and Future of Disability Rights, Keynote address, at the Job Accommodation Network (JAN), Annual Conference, Orlando, FL.

158. Blanck, P.  (2004). Past and Future of Disability Law and Policy, Inaugural Thornburgh Family Lecture on Disability Law and Policy, University of Pittsburgh, PA.

159.    Blanck, P.  (2004).  Celebrating Disability Rights, Keynote address for the Arkansas Rehabilitation Services Commission Meeting for Disability Awareness Month, Little Rock, Arkansas.

160.    Blanck, P. (2004).  Disability Law and Policy, Invited address, at the Miller Center of Public Affairs, University of Virginia, Charlottesville, VA.

161.    Blanck, P. (2004).  Demystifying Workplace Accommodations, Panel at National Business Group on Health Annual Conference, Orlando, FL.

162.    Blanck, P. (2004).  Disability Discrimination in North America, Panel at Workplace Discrimination and the Law in North America, NAFTA Labor Secretariat, Washington, DC.

163.    Blanck, P.  (2004). Disability Civil Rights Law and Policy.  Keynote Address, Israeli Association of Rehabilitation Professionals, Annual Meeting, Tel Aviv, Israel.

164.    Blanck, P.  (2004). Disability Civil Rights Law and Policy.  Invited Address, Israeli Knesset, A special meeting of the Committee on Labour, Social Welfare and Health Committee, chaired by MK Shaul Yahalom, Jerusalem, Israel.

165.    Blanck, P. (2005). Fifth Meeting of the Working Group on Data Collection to Measure the Extent and Impact of Discrimination in Europe, European Commission, Section on Employment, Social Affairs and Equal Opportunities, Invited Presentation on the U.S. Experience with the Measurement of the Americans with Disabilities Act, Brussels, Belgium.

166.    Blanck, P.  (2005). Disability Rights and Legal Education.  Invited Lecture Series on Diversity and Legal Education, University of Mississippi, School of Law, Oxford, Miss.

167.    Blanck, P.  (2005). Future of Disability Law and Policy, Keynote Address, Alabama Transition Conference, Auburn University.

168.    Blanck, P.  (2005).  Introduction to Disability Law, Invited Address, Library of Congress, Center for International Rehabilitation, & the American Society for International Law (ASIL) Conference on International Disability Rights, Washington, D.C.

169.    Blanck, P.  (2005).  Employment and Disability, Annual Symposium, Invited Panelist, Disability Research Institute (DRI), University of Illinois at Urbana-Champaign, Funded by a grant from the U.S. Social Security Administration, National Press Club, Washington, D.C.

170.    Blanck, P.  (2005). Americans with Disabilities and Civil Rights, Invited Address, Grinnell College, IA.

171.    Blanck, P.  (2005).  Disability Civil Rights Law and Policy, Keynote Address, YAI/National Institute for People with Disabilities Network, Annual Conference, New York, NY.

172.    Blanck, P.  (2005). ADA as Disability Law and Policy, 29th International Congress on Law and Mental Health, International Academy of Law and Mental Health Congress, Paris, France.

173.    Blanck, P.  (2005). Disability Law and Policy, Disability Law Summer Symposium, National University of Ireland, Galway.

174.    Blanck, P.  (2005). EEOC ADA Workshop, Moderator, Iowa City, Iowa.

175.  Blanck, P.  (2005).  Disability Law and Policy, Evidence-Based Outcomes, Plenary address for the RERC on Workplace Accommodations State of the Science Conference, Atlanta, Georgia.

176.  Blanck, P.  (2005).  Disability Law and Policy, Keynote address for the Arkansas Workers' Compensation Annual Conference, Little Rock, Arkansas.

177.  Blanck, P.  (2005). The Future of Disability Law and Policy, Loyola Law School, Los Angeles, CA.

178.  Blanck, P.  (2005).  The Future of the Americans with Disabilities Act, invited speaker, University of Mississippi Law School, Conference on the ADA at 15, Oxford, Miss.

179.  Blanck, P.  (2005). The Americans with Disabilities Act, invited lecturer, Harvard Law School, Cambridge, MA.

180.  Blanck, P.  (2005). The Burton Blatt Institute and the Future of Disability Law and Policy, faculty colloquium, Center for Policy Research. Maxwell School, Syracuse University, NY.

181.  Blanck, P.  (2006).  Empirical Study of the Americans with Disabilities Act, invited speaker, New York University School of Law Conference on Assessing the Employment Provisions of the Americans with Disabilities Act, NYC, NY.

182.  Blanck, P.  (2005).  The Burton Blatt Institute and the Future of Disability Law and Policy, Syracuse University College of Law Lecture Series, N.Y.C. Lubin House Lecture Series, NY.

183.  Blanck, P.  (2006). Disability Law and Policy, Disability Law Summer Symposium, National University of Ireland, Galway.

184.  Blanck, P.  (2006).  On the Legacy of Professor Stanley Herr, Beit Issie Shapiro's First Fellow, Keynote Address, Beit Issie Shapiro Annual Conference, Tel Aviv, Israel.

185.  Blanck, P.  (2006).  The Challenge of Monitoring Social Reform in the Area of Disability–The International Perspective, Keynote Address, Conference on Disability Studies as a Field of Human Rights, Inquiry and Teaching, US–Israel Binational Conference; sponsored by the Israeli Ministry of Justice, Commission for Equal Rights of People with Disabilities, Tel Aviv, Israel.

186.  Blanck, P.  (2006).  Employment Demand, Invited panelist, Interagency Committee on Disability Research (ICDR), Interagency Subcommittee on Employment, Research Summit on "Employer Perspectives on Workers with Disabilities: A National Summit to Develop a Research Agenda," Crystal City, VA.

187.  Blanck, P.  (2006).  New Paths in Disability Law and Policy, Keynote Address, The Indiana Governor's Council for People with Disabilities Annual Conference, Indianapolis, Indiana.

188.  Blanck, P.  (2006).  The US (ADA) approach and its impact on eAccessibility, speaker at the European Workshop on Achieving eAccessibility: The role of Equality Legislation and Other Measures, European Union Commission, Brussels, Belgium.

189.  Blanck, P.  (2006).  Social regulation of accessibility to ICT for people with disabilities: What can Norway learn from other countries?, invited speaker, NOVA Institute, Oslo, Norway.

190.    Blanck, P. (2006). Disability Politics Historically and Today, Faculty Colloquium, University of San Diego School of Law, San Diego, CA.

191.    Blanck, P. (2006). Future and Past of Disability, Colloquium, Social Psychology Department, University of California, Riverside, CA.

192.    Morris, M. & Blanck, P. (2007). Access to Ownership for Persons with Disabilities: A Post Katrina Analysis, Presentation at the American Association of Law Schools Annual Meeting, Washington, DC.

193.    Blanck, P. (2007). Politics of Disability Inequality after the Civil War and Today, Presentation at the Journal of Law and Inequality Symposium Commemorating the First 25 Years of Academic Legal Analysis of Issues in Inequality, University of Minnesota Law School, Minneapolis, Minn.

194.    Blanck, P. (2007). Litigating ICT Access, Presentation at Global Forum to United Nations Global Initiative for ICT and Development, Global Initiative for Inclusive Technologies (G3ict), W2i, Wireless Internet Institute with the Secretariat for Convention on the Protection and Promotion of the Rights and Dignity of Persons with Disabilities and UNITAR, UN Institute for Training and Research, NYC, NY.

195.    Logue, L. & Blanck, P. (2007). Aging and Disability, Presentation at "Aging and Disability Conference," Maxwell School, Syracuse University, NY.

196.    Blanck, P. & Reina, M. (2007). The Rights of People with Disabilities: Policy and Legal Aspects, U.S. Department of State Bureau of International Information Programs and the U.S. Embassy in Madrid, invited speaker for digital video conference, NY and DC.

197.    Blanck, P. (2007). People with Disabilities in Times of Crisis and War, Presentation at the Israeli OMRDD Conference, Haifa, Israel.

198.    Blanck, P. (2007). American Disability Law and Policy, Workshop Presentations at the Israeli National Social Security Office, Jerusalem, Israel.

199.    Blanck, P. (2007). The Digital Divide in the US and Abroad, Presentation at T4P'07, First International Conference on Technology for Participation and Accessible eGovernment Services, Agder University College, Kristiansand, Norway.

200.    Blanck, P. (2007). Corporate Culture, Litigation and the Global Access to the Internet, Presentation at Trondheim University, Trondheim, Norway.

201.    Blanck, P. (2007). Disability Law and Policy in the Theater, Presentation at the Kennedy Center's Leadership Exchange in Arts and Disability (LEAD) conference, Minneapolis, MN.

202.    Logue, L. & Blanck, P. (2007). African-American Veterans and Civil War Pensions, Presentation at "Military Service, Social (Dis) advantage, and the Life Course," Maxwell School Conference on Disability and the Military Experience, Syracuse University, NY.

203.    Blanck, P. (2007). Exploring New Markets: What You Need to Know to Tap into the Disability Community, Address at the Opportunity Conference, hosted by U.S. Secretary of Labor Elaine L. Chao, Washington, D.C.

204.    Blanck, P.  (2007). Disability Rights and E-Accessibility, European Commission Project, Brussels, Belgium.

205.    Blanck, P.  (2007).  Disability Pensions for Union Army Veterans: Historical and Contemporary Lessons, Faculty Colloquium, for The John J. Heldrich Center for Workforce Development, at the Edward J. Bloustein School of Planning and Public Policy, and the School of Management and Labor Relations, Rutgers University, NJ.

206.    Blanck, P.  (2007).  The Future of Disability Rights, Keynote Address to the Israeli Knesset on Disability Day, Jerusalem, Israel.

207.    Blanck, P.  (2007). Disability World Developments, Lecture to Bekol–Organization of Hard of Hearing and Deaf People in Israel, Jerusalem, Israel.

208.    Blanck, P.  (2008).  American Disability Law and Policy in Transition, Eastern Kentucky University College Education Dean's Lecture Series, Richmond, KY.

209.    Blanck, P.  (2008). International Developments in Accessible ICT, G3ict Forum, Hosted by the Ecuadorian Ministry of Social Development, Quito, Ecuador.

210.    Blanck, P.  (2008).  The Past and Future of Disability Law and Policy, closing presentation at the 2008 Jacobus tenBroek Disability Law Symposium, National Federation of the Blind, Baltimore, MD.

211.    Blanck, P.  (2008). Best Practices, Corporate Attitudes and Employment of Persons with Disabilities, Address at Office of Disability Employment Policy (ODEP) Annual Conference, Washington, D.C.

212.    Blanck, P.  (2008). Research on the Employment of Persons with Disabilities, Interagency Subcommittee on Employment, Interagency Committee on Disability Research (ICDR) Conference, Washington, D.C.

213.    Blanck, P.  (2008). Reframing the Disability Issue for Employers, Cornell/AAPD Policy Forum, Washington, DC.

214.    Blanck, P.  (2008).  Disability Rights, Options for Independence Annual Conference Keynote Address, Auburn, NY.

215.    Blanck, P.  (2008).  Reasonableness of Accommodations, Presentation at the Kennedy Center's Leadership Exchange in Arts and Disability (LEAD) conference, Ft. Lauderdale, FL.

216.    Blanck, P.  (2008).  Disability Rights for Health and Medical Professions, Colloquium address, 2nd Annual Conference of the Ono Research Institute for Health and Medical Professions, Ono Academic College, Kiryat Ono, Israel.

217.    Blanck, P.  (2008). Disability Law and Policy, Colloquium address, Ono Academic College Law School, Kiryat Ono, Israel.

218.    Blanck, P.  (2008). Age and Disability, Speaker at Law and Psychology of Age and Disability Discrimination Conference, University of Nebraska.

219.    Blanck, P. (2009).  Disability as an Element of Diversity in the Legal Profession, Diversity Summit: State of Diversity in the Legal Profession, American Bar Association Presidential Initiative, Mid-Year Meetings, Boston, MA.

220.    Myhill, W. & Blanck, P.  (2009). Disability and Aging, Speaker at Symposium on Aging and Disability, Marquette University Law School, Milwaukee, WI.

221.    Blanck, P. (2009).  The Future is Now in Disability Law and Policy, Closing presentation at the 2009 Jacobus tenBroek Disability Law Symposium, National Federation of the Blind, Baltimore, MD.

222.    Blanck, P. (2009).  Future of Disability Law and Policy, Remarks at the Opening Ceremonies for the Centre for Disability Law and Policy, National University of Ireland, Galway, Ireland.

223.    Blanck, P. (2009). Disability Law and Policy: Past, Present, Future, Disability Studies and Research Centre, University of New South Wales, Sidney, Australia.

224.    Blanck, P. (2009).  Disability and Social Justice, Centre for International Governance & Justice Regulatory Institutions Network, ANU College of Asia and the Pacific, The Australian National University, Canberra, Australia.

225.    Blanck, P. (2009).  Disability Civil Rights Law and Policy, Lectures as Distinguished Visiting Professor, Graduate School of Social Welfare at Hokusei Gakuen University, Sapporo, Japan.

226.    Blanck, P. (2009).  Future of the ADA, Japan Association of Employment of Elderly and Persons with Disabilities, An independent administrative agency in Ministry of Health, Labor & Welfare, Tokyo, Japan.

227.    Blanck, P. (2009).  The ADA, American Society and People, Japan Disability Forum, A national network of disability organizations to promote the implementation of the Convention on the Rights of Persons with Disabilities as well as an anti-discrimination law for persons with disabilities in Japan, Tokyo, Japan.

228.    Blanck, P. (2009). Law of the ADA, Graduate School & Faculty of Law, Kobe University, Japan.

229.    Blanck, P. (2010). U.S. and Japanese Disability Law, at Japan's Anticipated Disability Law and the Americans with Disabilities at Twenty: Workshop on Comparative Law, Policy and Research, in Los Angeles, CA; Co-sponsored by Burton Blatt Institute & Hokusei Gakuen University, Sapporo, Japan.

230.    Blanck, P. (2010). U.S. Disability Law and the CRPD, panelist at International Disability Law Conference on the Convention on the Rights of Persons with Disabilities, at Loyola Law School, Los Angeles, CA.

231.    Blanck, P. (2010).  U.S. Disability Law and Policy after Obama, International and Comparative Perspectives on Employment and Disability Law Conference, National University of Ireland, Galway.

232.    Blanck, P. (2010).  Universal Design: Inclusion, Innovation, Livability and Economics, Address at Access to the World, Implementation of Universal Design Legislation Seminar, Centre for Excellence in Universal Design (CEUD), Irish National Disability Authority (NDA), Dublin, Ireland.

233.    Blanck, P. (2010).  ADA at 20 and Mobility Access, Keynote address at ADA 20/20: Looking Back, Looking Forward on Mobility, Sponsored by BraunAbility, National Press Club, Washington, DC.

234.   Blanck, P. (2010).  Future of Disability Law, Policy and Research, Colloquium address at the University of Tokyo, Japan.

235.   Blanck, P. (2010).  Americans with Disabilities Act at Twenty, Colloquium address at University of Tsukuba, Graduate School of Comprehensive Science, Japan.

236.   Blanck, P. (2010). Developments in U.S. Disability Law, presentation at International Disability Law Conference, at Remning University, Beijing, China.

237.   Blanck, P. (2010). Cloud Computing for People with Cognitive Disabilities: Legal, Policy, and Universal Design Considerations, presentation at the Coleman Institute Workshop on Implications of Cloud Computing for People with Cognitive Disabilities, University of Colorado at Boulder, Law School, CO.

238.   Blanck, P. (2010). Developing an Accessible National Information Infrastructure for People with Cognitive Disabilities, panelist at the Tenth Annual Coleman Institute Conference, "All  Together Now: The Power of Partnerships in Cognitive Disability & Technology," University of Colorado at Boulder, Law School, CO.

239.   Blanck, P. (2011).  $r_{rosenthal}$ : Effect size indicator, and $R^2$: Robert Rosenthal's goodness of fit, Colloquium to the Social Psychology Department, University California, Riverside, CA.

240.   Blanck, P. & Lord, J. (2011). Disability as a Protected Class for the Purpose of Seeking Political Asylum, presentation at the 2011 Jacobus tenBroek Disability Law Symposium, National Federation of the Blind, Baltimore, MD.

241.   Blanck, P. (2011).  Disability History and Law, Colloquium, University of Wisconsin's Financial Literacy and Disability Project (FLAD) and the UW Disability Studies Cluster, Madison, WI.

242.   Blanck, P. (2011). Disability and Economics: Challenges and Opportunities, Symposium on Disability and Economics, Burton Blatt Institute and University of Tokyo Project on Research on Economy and Disability, Syracuse, NY.

243.   Blanck, P. (2011). Future of Deinstitutionalization and Community Living in Israel, Conference, and Expert Committee Member, sponsored by Israeli Ministry of Welfare and Social Services, Tel Aviv, Israel.

244.   Blanck, P. (2011). Understanding Disability, Discussant to Thomas Shakespeare, at the Center for International Rehabilitation Research Information and Exchange (CIRRIE), in cooperation with WHO/PAHO, World Bank, U.S. International Council on Disability and Inter-Agency Committee on Disability Research, U.S. Launch and Symposium on the World Report on Disability, Washington DC.

245.   Blanck, P. (2011). Right to Technology Access for People with Cognitive Disabilities, Closing Keynote Address, State of the States, State of the Nation, 2011: Coleman Institute National Conference on Cognitive Disability and Technology in Challenging Economic Environments, University of Colorado, Boulder, CO.

246.   Blanck, P. (2011). Equal Employment Opportunity Commission (EEOC) Regulations Implementing the American with Disabilities Amendments Act (ADAAA): Expanding Coverage under the "Disability" Definition, American Bar Association (ABA) Center for Continuing Legal Education, on behalf of the ABA Commission on Mental and Physical Disability Law, Webinar Panelist.

247.   Blanck, P. (2011). Universal Design in the World, Keynote address, at the III International Meeting on Technology and Innovation for Persons with Disabilities, The Universal Design in the Brazilian Industry, São Paulo, Brazil.

248.   Blanck, P. (2011). Universal Design in Electrical & Electronics Industry, Panelist, at the III International Meeting on Technology and Innovation for Persons with Disabilities, The Universal Design in the Brazilian Industry, São Paulo, Brazil.

249.   Blanck, P. (2011). World Bank, Legal Innovation and Empowerment through the CRPD, Panel speaker, Law, Justice & Development Week 2011, World Bank, Washington D.C.

250.   Blanck, P. (2011). Accessibility and Universal Design: The Global Universal Design Commission (GUDC), Conference sponsored by Israeli Ministry of Welfare and Social Services, Tel Aviv, Israel.

251.   Blanck, P. (2012).  U.S. Genetic Antidiscrimination Law, Invited speaker at the Symposium on Genetic Discrimination, European Union Parliament, Brussels, Belgium.

252.   Blanck, P. (2012).  Hot Issues in Disability Law, Invited speaker, National Council on Disability (NCD) Quarterly Meetings, NY, NY.

253.   Blanck, P. (2012).  Introduction and Moderator, Psychotropic Medication and the Law, The Saks Institute for Mental Health Law, Policy, and Ethics, Los Angeles, CA.

254.   Blanck, P. (2012). Implementing the American with Disabilities Amendments Act (ADAAA), Plenary speaker, American Bar Association (ABA), ABA Commission on Mental and Physical Disability Law, Annual Conference, Washington, D.C.

255.   Blanck, P. (2012). The Right to the Web and the Cloud, The Interagency Committee on Disability Research (ICDR) Assistive Technology/Technology (AT/T) Forum (June 26, 2012, Webinar).

256.   Blanck, P. (2012). Full and Equal Participation by Persons with Disabilities to the Courts and Civil Society, Speaker, Access to Justice for Persons with Disabilities, Side Event of the Fifth Session of the Conference of States Parties to the Convention on the Rights of Persons with Disabilities, United Nations, NY, NY.

257.   Blanck, P. (2012). ADA Legal Update: What's on the Docket?, Colloquium, University of Houston Law Center, ILRU (Independent Living Research Utilization) Southwest ADA Center, Houston, TX.

258.   Blanck, P. (2012). Right to the Web for People with Cognitive Disabilities, Keynote Address, Coleman Institute on Cognitive Disability, National Conference, Univ. Colorado, Boulder, CO.

259.   Blanck, P. (2012). Disability and the Experience of Social Isolation, Speaker at Symposium on Social Isolation and Disconnectedness as a Risk Factor for Family Members across the Lifespan, National Human Services Assembly, National Collaboration for Families, Washington, D.C.

260.   Blanck, P. (2013). Civil Rights of People with Disabilities, Upstate Medical University, SUNY, Diversity Lecture Series, Syracuse, NY.

261.   Blanck, P. (2013). eQuality: The Right to the Web for People with Cognitive Disabilities, Faculty Colloquium, Southwestern Law School, Los Angeles, CA.

262.    Blanck, P. (2013). Social Security Reform Proposals: Toward Fiscal and Structural Balance, Discussant at Social Security Disability: Time for Reform, Social Security Advisory Board Disability Forum, Washington, D.C.

263.    Blanck, P. (2013). "When Gawd make cripple, He mean him to be lonely;" Disability, the Web and an Inclusive World, Presentation at the Symposium on Including Disability: How Legal Discourse Can Shape Life's Transitions, UCLA Law Disability Symposium, Los Angeles, CA.

264.    Blanck, P. (2013). Disability Law and Policy: U.S. and Japan, Symposium on U.S. and Japanese Disability, Loyola Law School, Los Angeles, CA.

265.    Blanck, P. (2013). The Right to the Web for People with Cognitive Disabilities and Ownership of Web Content, Participant at Cherry Blossom Symposium on Intellectual Property and Federal Policy: Universal Access in the Digital Environment, American University Washington College of Law, Washington, D.C.

266.    Blanck. P. (2013). The Right to Web Equality for People with Cognitive Disabilities, Guest Speaker at NIDRR Presents, National Institute for Disability Rehabilitation Research, Washington, D.C.

267.    Blanck, P. (2013). Emergency Care for Homebound and Vulnerable Populations, Keynote Address at 2013 Rural and Ready Symposium, Sault Sainte Marie, Mich.

268.    Blanck, P. (2013). Web Quality for People with Cognitive Disabilities, Talk Co-hosted by the Irish National Disability Authority (NDA) Centre for Excellence in Universal Design, National University of Ireland (NUI) Galway Centre for Disability Law and Policy, Dublin, Ireland.

269.    Blanck, P. (2013). The Future of Accessible Technology—Legal Perspectives, NOVA—Norwegian Social Research Institute—Talk at the European Assistive Technology Ecosystem Symposium, 4th DREAM Network-Wide Event, Oslo, Norway.

270.    Blanck, P. (2013). Declaration of the Right to Web Equality for People with Cognitive Disabilities, Address, Coleman Institute on Cognitive Disability, National Conference, Univ. Colorado, Boulder, CO.

271.    Blanck, P. (2013). Symposium on Best Practices in Supported Decision-Making, Research Group Facilitator, American University, Washington College of Law, Washington, D.C.

272.    Blanck, P. (2014). Closing Remarks, Workshop on the UN Convention for the Rights of Persons with Disabilities, University of Haifa, Haifa, Israel.

273.    Blanck, P. (2014). eQuality, Speaker at the U.S. and Japan Accessibility Policy Symposium, Center on Japanese Studies, University of California, Berkeley, CA.

274.    Blanck, P. (2014). Emergency Planning for People with Disabilities, Address to Northern Virginia Emergency Response System (NVERS) and the Regional Hospital Coordination Center (RHCC), Virginia Department of Emergency Management, and Northern Virginia Hospital Alliance, Symposium on Emergency Operations Planning: An Inclusive Approach, Alexandria, VA.

275.    Blanck, P. (2014). Supported Decision Making as an Alternative to Guardianship, Plenary Session at the 2014 Jacobus tenBroek Disability Law Symposium, National Federation of the Blind, Baltimore, MD.

276.   Blanck, P. (2014). Web eQuality for People with Cognitive Disabilities, National University of Ireland (NUI) Galway Centre for Disability Law and Policy, DREAM Symposium, Galway, Ireland.

277.   Blanck, P. (2014). Web Equality and Persons with Disabilities, 2014 International Summit on Accessibility, Carleton University, Ottawa, Canada.

278.   Blanck, P. (2014). New Directions in Disability Policy, Presentation to the National Council on Disability, Washington, D.C.

279.   Blanck, P. (2014). Legal Aspects of Internet Access for People with Cognitive Disabilities, Coleman Institute on Cognitive Disability, National Conference, Univ. Colorado, Boulder, CO.

280.   Blanck, P. (2015). Co-Facilitator, Integrating the Internet Now and in 25 Years, Jacobus tenBroek Disability Law Symposium, National Federation of the Blind, Baltimore, MD.

281.   Blanck, P.  (2015).  The Future of Disability, Plenary Panelist, 2015 Jacobus tenBroek Disability Law Symposium, National Federation of the Blind, Baltimore, MD.

282.   Blanck, P. (2015). Launching for a Successful Career: Preparing Students for the Future, Moderator at Saks Institute Spring Symposium 2015, Mental Health on Campus: Keys to Success for University, Community College and Veteran Students, University of Southern California, CA.

283.   Blanck, P. (2015). *eQuality* and the Future of the Web for People with Disabilities, National ADA Symposium on the Americans with Disabilities Act, Atlanta, GA.

284.   Blanck, P. (2015). U.S. Strategic Litigation: Moving courts in the direction of supported decision-making and Lessons for Israel, at Symposium: Just Being Me: My Right to be in the World (Community Living) and my Right to make my own Decisions in the World (Legal Capacity). A Global Context for the Reform Process in Israel. Jerusalem, Israel.

285.   Blanck, P. (2015). *eQuality* and Web Access, Webinar for Institute on Disability and Public Policy for the ASEAN Region  Association of Southeast Asian Nations (ASEAN).

286.   Blanck, P.  (2015). Web *eQuality* and People with Disabilities, Symposium Speaker at Ritsumeikan University, Kyoto, Japan.

287.   Blanck, P.  (2015). The Future of the Web, Keynote Address, First Japanese Association on Higher Education And Disability (AHEAD) Symposium, University of Tokyo, Japan.

288.   Blanck, P.  (2015). Web *eQuality* and People with Disabilities, Symposium Speaker at University of Melbourne, Australia.

289.   Blanck, P.  (2015). Supported Decision Making and the U.S. Experience, Symposium Speaker at University of Melbourne, Australia.

290.   Blanck, P.  (2015). Web *eQuality* and People with Disabilities, Symposium Speaker at University of Sydney, Australia.

291.   Blanck, P.  (2015). Supported Decision Making and the U.S. Experience, Symposium Speaker at University of Sydney, Australia.

292.    Blanck, P.  (2015). The National Resource Center for Supported Decision Making, Address to the Australia Office of the Public Guardian and the University of New South Wales, Sydney, Australia.

293.    Blanck, P.  (2015). Corporate Culture and Disability, Address to the Australian Human Rights Commission, Sydney, Australia.

294.    Blanck, P. (2015). *eQuality* for Individuals with Cognitive Disabilities, Lecture, Sapienza University of Rome, Gruppo Asperger Lazio ONLUS, Rome, Italy.

295.    Blanck, P. (2015). The Future of Workplace Accommodations, Improving Research of Employer Practices to Prevent Disability, Liberty Mutual Research Institute for Safety, Hopkinton, MA.

296.    Blanck, P. (2015). Americans with Disabilities Act at 25, Talk at the Harvard Law School, Prison Legal Assistance Project, Cambridge, MA.

297.    Blanck, P. (2015). *eQuality*: Future of Web Accessibility for People with Disabilities, Federal Communications Commission (FCC), Colloquium Series, Washington, D.C.

298.    Blanck, P. (2015). Emerging Technology in Employment and Education, Presenter to the U.S. National Council on Disability, Quarterly Meeting, Concord, NH.

299.    Blanck, P. (2015). The Future of the Americans with Disabilities Act, Keynote Address, Maine Association for Community Service Providers Annual Meeting, Auburn, ME.

300.    Blanck, P. (2015). Research and Evidence Based Practice, Presentation & Facilitation, Supported Decision-Making Invitational Symposium 2015: Promoting the Right to Choose: Moving From Theory to Practice, Quality Trust for Individuals with Disabilities, American University, Washington College of Law, D.C.

301.    Blanck, P. (2015). Universal Design Certification, Mary Free Bed YMCA Dedication Celebration, Grand Rapids, MI.

302.    Blanck, P. (2016). *eQuality*: Future of Web Accessibility for People with Disabilities, Hall Center for the Humanities, Invited lecture, Disability Studies Seminar, University of Kansas, Lawrence, KS.

## Forthcoming Presentations

303.    Morris, M. & Blanck, P. (2016). Implementing the ABLE Act of 2014, Jacobus tenBroek Disability Law Symposium, Baltimore, MD.

304.    Blanck, P. (2016).  *eQuality* and the Future of Web Accessibility for People with Disabilities, Keynote Address, The American Network of Community Options and Resources (ANCOR) Annual Conference, Chicago, IL.

305.    Blanck, P. (2017). A World Without Disability Rights?, Centre for Law & Social Justice & Disability Law Hub, University of Leeds, Leeds, UK.

**Exhibit 2**

**Peter Blanck, Ph.D., J.D.**

**List of Materials Considered**

1. ADA related documents produced by Defendants on February 9, 2015.

2. Corizon Monthly Reports from January 2012 through October 2014.

3. Corizon related documents produced on February 23, 2015.

4. Defendants' responses to Plaintiffs' discovery requests produced on May 27, 2015.

5. Defendants' responses to Platiniffs' discovery requests produced on February 6, 2015.

6. Deposition Transcript of Dewayne Estes.

7. Deposition Transcript of Grantt Culliver.

8. Deposition Transcript of James Tucker.

9. Deposition Transcript of Ruth Naglich (30(b)(6)).

10. Deposition Transcript of Wendy Williams (30(b)(6)).

11. Deposition Transcript of Kenneth Jones.

12. Deposition Transcript of Aaron Billups.

13. Deposition Transcript of Ernest Claybon.

14. Deposition Transcript of Michelle Ellington.

15. Deposition Transcript of Joel Gilbert.

16. Deposition Transcript of Adrienne Givens.

17. Deposition Transcript of Gwendolyn Givens.

18. Deposition Transcript of Timothy Holcomb.

19. Deposition Transcript of Veronica Moore.

20. Deposition Transcript of Guy Noe.

21. Deposition Transcript of Kenneth Peters.

22. Deposition Transcript of Bobby Copeland.

23. Prison Jacket of Bobby Copeland.

24. Medical Records of Bobby Copeland.

25. Deposition Transcript of Cherry Baker.

26. Prison Jacket of Cherry Baker.

27. Medical Records of Cherry Baker.

28. Deposition Transcript of Tedrick Brooks.

29. Prison Jacket of Tedrick Brooks.

30. Medical Records of Tedrick Brooks.

31. Deposition Transcript of Edward Braggs.

32. Prison Jacket of Edward Braggs.

33. Medical Records of Edward Braggs.

34. Deposition Transcript of Quang Bui.

35. Medical Records of Quang Bui.

36. Deposition Transcript of Richard Businelle.

37. Prison Jacket of Richard Businelle.

38. Medical Records of Richard Businelle.

39. Deposition of Gary Broyles.

40. Prison Jacket of Gary Broyles.

41. Medical Records of Gary Broyles.

42. Deposition transcript of Howard Carter.

43. Prison Jacket of Howard Carter.

44. Medical Records Howard Carter.

45. Deposition Transcript of Robert Dillard.

46. Prison Jacket of Robert Dillard.

47. Medical Records of Robert Dillard.

48. Prison Jacket of Chandler Clements.

49. Medical Records of Chandler Clements.

50. Deposition Transcript of Joshua Dunn.

51. Prison Jacket of Joshua Dunn.

52. Medical Records of Joshua Dunn.

53. Deposition Transcript of Christopher Gilbert.

54. Medical Records of Christopher Gilbert.

55. Deposition transcript of Dwight Hagood.

56. Medical Records of Dwight Hagood.

57. Deposition Transcript of Daletrick Hardy.

58. Medical Records of Daletrick Hardy.

59. Deposition transcript of Sylvester Hartley.

60. Deposition transcript of Christopher Jackson.

61. Prison Jacket of Christopher Jackson.

62. Medical Records of Christopher Jackson.

63. Deposition Transcript of Brandon Johnson.

64. Prison Jacket of Brandon Johnson.

65. Medical Records of Brandon Johnson.

66. Deposition transcript of John Maner.

67. Prison Jacket of John Maner.

68. Medical Records of John Maner.

69. Deposition transcript of Roger McCoy.

70. Prison Jacket of Roger McCoy.

71. Medical Records of Roger McCoy.

72. Deposition transcript of Kenneth Moncrief.

73. Prison Jacket of Kenneth Moncrief.

74. Medical Records of Kenneth Moncrief.

75. Deposition transcript of Roger Moseley.

76. Medical Records of Roger Moseley.

77. Medical Records of Rick Martin.

78. Deposition transcript of Leviticus Pruitt.

79. Prison Jacket of Leviticus Pruitt.

80. Medical Records of Leviticus Pruitt.

81. Deposition Transcript of Turner Rogers.

82. Medical Records of Turner Rogers.

83. Deposition transcript of Jonathan Sanford.

84. Prison Jacket of Jonathan Sanford.

85. Medical Records of Jonathan Sanford.

86. Deposition transcript of Richard Terrell.

87. Prison Jacket of Richard Terrell.

88. Medical Records of Richard Terrell.

89. Medical Records of Sylvester Hartley.

90.  Deposition transcript of Joseph Torres.

91.  Prison Jacket of Joseph Torres.

92.  Medical Records of Joseph Torres.

93.  Deposition transcript of Robert Williams.

94.  Deposition Transcript of Charlie Henderson

95.  Prison Jacket of Charlie Henderson.

96.  Medical Records of Charlie Henderson.

97.  Deposition Transcript of Bradley Pearson.

98.  Prison Jacket of Bradley Pearson.

99.  Medical Records of Bradley Pearson.

100.  Deposition Transcript of Jamie Wallace.

101.  Prison Jacket of Jamie Wallace.

102.  Medical Records of Jamie Wallace.

103.  Prison Jacket of William Villar.

104.  Medical Records of William Villar.

105.  Deposition Transcript of Donald Turner.

106.  Prison Jacket of Donald Turner.

107.  Medical Records of Donald Turner.

108.  Deposition Transcript of Jermaine Mitchell.

109.  Prison Jacket of Jermaine Mitchell.

110.  Medical Records of Jermaine Mitchell.

111.  Robert Myniasha Williams Medical Records.

112.  Deposition Transcript of Daniel Tooley.

113. Prison Jacket of Daniel Tooley.

114. Medical Records of Daniel Tooley.

115. Medical Records of Hubert Tollar.

116. Prison Jacket of Augustus Smith.

117. Medical Records of Augustus Smith.

118. Medical Records of Brian Sellers.

119. Deposition Transcript of Timothy Sears.

120. Prison Jacket of Timothy Sears.

121. Medical Records of Timothy Sears.

122. Medical Records of Matthew Mork.

123. Deposition Transcript of Tommie Moore.

124. Prison Jacket of Tommie Moore.

125. Medical Records of Tommie Moore.

126. Donaldson Correctional Facility SOPs produced by Defendants.

127. Hamilton A&I SOPs produced by Defendants.

128. ADOC RFP for Healthcare dated July 17, 2012

129. ADOC RFP for Mental Health Services dated June 28, 2013

130. State's Response to Plaintiffs' First Requests for Production, November 17, 2014.

131. Email from Culliver to ADOC Officials, January 23, 2015 re: Shaving Policy.

132. ADOC Hospice Program Manual.

133. ADOC Health Service Manual.

134. ADOC Administrative Regulations 600 – 639.

135. ADOC Administrative Regulations 700 – 708.

136. Discovery Mediation Agreement dated September 9, 2015

137. MHM Monthly Reports from January 2012 through October 2014.

138. Documents produced by Defendant(s) on February 6, 2015.

139. ADOC's signed interrogatory responses dated April 3, 2015.

140. ADOC's current contract with Corizon.

141. ADOC's current contract with MHM.

142. Pleadings in *Dunn, et al., v. Dunn, et al.*

143. Numerous, publicly available documents cited in the endnotes of my Report.