**EN EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS DE AMÉRICA
PARA EL DISTRITO MEDIO DE ALABAMA**

| | | |
|---|---|---|
| JOSHUA DUNN, ET AL., | ) | |
| | ) | |
| Demandantes, | ) | |
| | ) | Acción Civil Número: |
| v. | ) | |
| | ) | 2:14-cv-00601-MHT-TFM |
| JEFFERSON DUNN, ET AL., | ) | |
| | ) | |
| Demandados. | ) | |

**ACUERDO DE CONCILIACIÓN MODIFICADO Y ACTUALIZADO CON RESPECTO
LOS RECLAMOS  QUE SURGEN DEL ACTA DE NORTEAMERICANOS CON
DISCAPACIDADES Y  §504 DE LA LEY DE REHABILITACIÓN DE 1973, Y QUE
RESUELVE LA
<u>FASE 1 DE JUICIO DE ESTOS PROCEDIMIENTOS</u>**

## TABLE OF CONTENTS

I.      INTRODUCCIÓN ................................................................................. 3

II.     DECLARACIÓN DE PARTES, PROPÓSITO E INTENCIÓN ....................................... 4

III.    APROBACIÓN PRELIMINAR Y FINAL DEL ACUERDO DE ACCIÓN COLECTIVA ... 8

IV.    DEFINICIONES .................................................................................... 8

V.     DISPOSICIONES SUSTANTIVAS .............................................................. 12

    1. Introducción.. .............................................................................. 12

    2. Disposiciones respecto a Evaluación, Auto-evaluación y Plan de Transición, y Medidas
       Correctivas. ................................................................................ 13

    3. Disposiciones respecto a Acceso al Programa y Ajustes Razonables. ......................... 26

    4. Disposiciones respecto a RTUs y SUs. ...................................................... 27

    5. Disposiciones respecto a Identificación, Documentación y Seguimiento de Reclusos
       con Discapacidades. ....................................................................... 29

    6. Disposiciones respecto a Niveles de Seguridad. ............................................. 39

    7. Disposiciones respecto a Ayudas Auxiliares. ................................................ 41

    8. Disposiciones respecto a Emergencias. ....................................................... 47

    9. Disposiciones respecto a Ajustes y Apelaciones. ............................................. 49

    10. Disposiciones respecto a Coordinadores de ADA. .......................................... 51

    11. Provisiones respecto a la Capacitación de Personal ADO. .................................. 59

    12. Provisiones respecto a un Plan de Aseguramiento de la Calidad (incluyendo
       Herramientas de Aseguramiento de la Calidad.) ................................................. 62

    13. Reclamos sin Resolver. ..................................................................... 74

VI.    MONITOREO ..................................................................................... 74

VII.   PROCESO DE RESOLUCIÓN DE DISPUTAS ............................................... 75

VIII.  RESERVA DE COMPETENCIA Y APLICACIÓN ........................................... 78

IX.    TERMINACIÓN ................................................................................. 78

X.     MODIFICACIONES .............................................................................. 79

XI.    FINANCIAMIENTO .............................................................................. 80

XII.   HONORARIOS Y GASTOS DE ABOGADOS ................................................ 81

XIII.  PROVISIONES ADICIONALES ................................................................ 83

## I.   INTRODUCCIÓN

1.      El 17 de junio de 2014, los Demandantes designados individualmente y el Programa de Defensa de las Personas con Discapacidades de Alabama ("ADAP") presentaron la demanda instantánea (la "Demanda") objetando, entre otras cosas, el cumplimiento por parte del Departamento Correccional de Alabama ("ADOC") con las disposiciones del Acta de norteamericanos con discapacidades, 42 USC Sección 12111, y sigs., incluyendo el Acta de Modificación de ADA de 2008, 42 USC 12001 y sigs., (colectivamente, el "ADA") y Sección 504 de la Ley de Rehabilitación de 1973, 29 USC Sección 701, y sigs. ("Ley de Rehabilitación") (ADA y Ley de Rehabilitación se denominan conjuntamente en este documento como las "Leyes").

2.      El Tribunal de Distrito de EE.UU. para el Distrito Medio de Alabama (el "Tribunal") ha bifurcado las cuestiones planteadas en la demanda en dos fases de juicio: Fase 1, que incluye el juicio de los reclamos y cuestiones planteadas en virtud de las Leyes, con excepción de las reclamos relacionados con el estado de salud mental; y la Fase 2, que incluye todos los demás reclamos de la demanda.

3.      El 15 de marzo de 2016, las partes presentaron sus "Propuesta Conjunta para la aprobación preliminar de un acuerdo de demanda colectiva a los reclamos relativos que se derivan del Acta de Norteamericanos con Discapacidades y la sección 504 de la Ley de Rehabilitación de 1973 (Doc. 376) ("Propuesta Conjunta").  Adjunto a la Propuesta Conjunta se encuentra el "Acuerdo de conciliación en cuanto a los reclamos basados en el Acta de Americanos con Discapacidades y Sección 504 de la Ley de Rehabilitación de 1973, y la Resolución del Juicio Fase I del presente procedimiento" de las partes (Doc. 376-1) ("Acuerdo").

4.      El Tribunal realizó una audiencia sobre la Propuesta Conjunta el 17 de marzo de 2016.

5.      Después de la audiencia, y por Orden de 18 de marzo de 2016, el Tribunal dispuso que el "Plan" al que se hace referencia en el Acuerdo sea presentado al Tribunal. (Doc. 394 en ¶ (2)) ( "Orden").

6.      Desde la entrada de la Orden, las partes han seguido trabajando, tanto de forma independiente y a través de la mediación extensa, para perfeccionar y definir los términos y disposiciones de un acuerdo que resuelva los problemas a ser juzgados en la Fase 1.   Las Partes consideran que han llegado a una resolución de ese tipo y que, con el fin de evitar un pleito prolongado, costoso e incierto adicional, les conviene resolver las cuestiones que se juzgaron en la Fase 1 del presente pleito.

7.      En consecuencia, las Partes, por y a través de sus respectivos abogados, estipulan de forma conjunta y de acuerdo con las siguientes disposiciones resolver la Fase 1 del pleito.

II.     DECLARACIÓN DE PARTES, PROPÓSITO E INTENCIÓN

1.      El ADOC del Demandado designado es el organismo del Estado de Alabama a cargo de los centros de prisiones y de libertad provisional para permitir el trabajo operadas y de propiedad del estado de Alabama que en la actualidad o en el futuro pueden tener la custodia física de los demandantes nombrados individualmente.

2.      Los demandantes designados individualmente en esta demanda están actualmente o pueden estar en el futuro, bajo la custodia física de ADOC.

3.      ADAP del demandante es la agencia de protección y defensa debidamente autorizada en el Estado de Alabama.

4.      Los demandantes designados individualmente y ADAP procuran la certificación colectiva de sus reclamos formulados en la demanda bajo las Leyes. Como parte de esta resolución acordada de los reclamos que se juzgó en la Fase 1 del presente pleito, ADOC consiente a la certificación, conforme a la Regla Federal de Procedimiento Civil 23, de una clase

cuyos miembros (la "Clase") se define como "cualquier recluso actual o futuro bajo custodia física de ADOC que tiene una discapacidad según se define en 42 USC Sección 12102 y 29 U.S.C. Sección 705 (9)(B), con exclusión de aquellos reclusos cuyas discapacidades se relacionan exclusivamente o se derivan exclusivamente de una enfermedad mental, enfermedad o defecto".

5.      Los demandantes designados individualmente, la Clase y ADAP se denominan colectivamente en este documento como "Demandantes".

6.      Los Demandantes y ADOC se conocen colectivamente como las "Partes".

7.      Las Partes establecen que no hay reclamos individuales o colectivos, incluyendo los reclamos de clase putativos, en virtud de las Leyes impuestas contra el Demandado designado Jefferson Dunn, designado en su carácter oficial como Comisionado del Departamento Correccional de Alabama, o la demandada designada Ruth Naglich, designado en su carácter oficial como Comisionada Asociada de Servicios de Salud del Departamento Correccional de Alabama.

8.      El propósito de este "Acuerdo de conciliación Modificado y Actualizado en cuanto a los reclamos basados en el Acta de Americanos con Discapacidades y Sección 504 de la Ley de Rehabilitación de 1973, y la Resolución del Juicio Fase I del presente procedimiento" ( "Acuerdo Modificado") es: (1) modificar, completar y sustituir el Acuerdo; (2) proporcionar el "plan" solicitado en la Orden; y (3) conciliar y resolver todas las cuestiones que debían ser presentadas en el juicio de la Fase 1 de este asunto. Las Partes acuerdan y estipulan que en el presente Acuerdo Modificado por la presente se resuelven todos los reclamos pendientes en la presente acción de presuntas violaciones de las Leyes, a excepción de los reclamos en virtud de las Leyes que se refieren exclusivamente o se derivan exclusivamente de la enfermedad mental,

enfermedad o defecto. Los reclamos presentados por los Demandantes en virtud de las Leyes que se relacionan exclusivamente o se derivan exclusivamente de la enfermedad mental, enfermedad o defecto no se renuncian y se reservan para la resolución durante el juicio de Fase 2.[1]

9.      Con excepción del consentimiento de ADOC a la certificación de clase según se describe en la Sección II, párrafo 4 anterior, las partes acuerdan que ADOC no ha dado su consentimiento para la certificación de clase de reclamos que surjan en virtud de las Leyes y que se refieran exclusivamente, o se deriven exclusivamente, de discapacidades de salud mental, o reclamos que se presentan bajo la Octava Enmienda.  La certificación de clase y los méritos de dichos reclamos se resolverán en la Fase 2 de este pleito.

10.     Las Partes no podrán utilizar este Acuerdo o Acuerdo Modificado para cualquier propósito en la Fase 2 del pleito excepto como prueba de lo que se ha resuelto, o no, por el presente Acuerdo Modificado.

11.     Nada en este Acuerdo o Acuerdo Modificado será interpretado como una admisión por ADOC de cualquier violación de la ley.  Por el contrario, ADOC niega toda acusación material de la Demanda, en su versión modificada, en este caso y niega cualquier responsabilidad a los Demandantes.  Este Acuerdo Modificado y Acuerdo no constituyen, y no deben interpretarse como, una admisión o pruebas de cualquier acto de indiferencia deliberada a los derechos constitucionales de cualquier Recluso, o de cualquier violación de las Leyes.

12.     Las Partes establecen que nada en este Acuerdo o Acuerdo Modificado será utilizado para ningún propósito fuera de la cuestión titulada anteriormente o en contra de

---

[1] Las Partes acuerdan que la cuestión de que si ADOC se debe exigir para agregar las siguientes categorías de reclusos a la cantidad de casos de salud mental está reservado expresamente para la resolución durante la Fase 2 de este pleito: (i) reclusos internados en observación suicida o celdas seguras; (ii) cualquier recluso que ha sido colocado en segregación más de dos veces en un período de 365 días (con excepción de la colocación en segregación por motivos de custodia de protección o razones similares); y (iii) cualquier recluso que pasa más del 50% de su tiempo alojado en segregación.

cualquier Demandado designado en cualquier otro pleito que se presente o se pueda presentar en contra de cualquier Demandado.   Nada en este Acuerdo o Acuerdo Modificado se interpretará como una obligación para ADOC de hacer más que lo que se requiere por las Leyes, las decisiones judiciales que aplican o interpretan las Leyes, o las Normas y Reglamentos que interpretan las Leyes.

13.     as Partes consideran que este acuerdo modificado es justo, razonable y adecuado para proteger los intereses de todas las Partes en cuanto a las cuestiones que contiene el presente documento.  Las partes presentan conjuntamente este Acuerdo Modificado en el Tribunal y piden al Tribunal que emita una orden que notifique a la Clase, el establecimiento de un período de objeciones, y el establecimiento de una audiencia de justicia para su aprobación preliminar, y que el Tribunal luego apruebe la Clase y la conciliación como final.

14.     Sin embargo, y si este Acuerdo Modificado no es aprobado por el Tribunal de manera tal que se concilie y resuelva, por clase, todos los asuntos que se juzgaron en la Fase 1, las Partes conservan todos sus derechos de pleito previo a la conciliación y defensas, incluyendo el derecho de ADOC a pedir la revisión interlocutoria de cualquier certificación de la clase de concesión de orden.   Además, las Partes deberán volver a la situación anterior en el Juicio como si las partes no hubieran celebrado este Acuerdo Modificado. Toda conversación, oferta o negociación correspondiente a este Convenio o Acuerdo Modificado no será visible u ofrecido como prueba o utilizado en la Demanda o cualquier otra acción o procedimiento para cualquier propósito modificado, sin perjuicio del derecho de los Demandantes de procurar la certificación colectiva y el derecho de ADOC de oponerse a la certificación colectiva.  En tal caso, todas las Partes se mantendrán en la misma posición como si no se hubieran negociado, celebrado o presentado el Acuerdo o Acuerdo Modificado ante el Tribunal.

III.     APROBACIÓN PRELIMINAR Y FINAL DEL ACUERDO DE ACCIÓN COLECTIVA

1.     Aprobación Preliminar - A no más de siete (7) días después de que todos los firmantes necesarios hayan ejecutado este Acuerdo Modificado, las partes presentan conjuntamente este Acuerdo Modificado al Tribunal para su aprobación preliminar, junto con una orden propuesta para su aprobación preliminar, un cronograma de notificación, notificaciones propuestas de aprobación preliminar, un cronograma para un período de objeciones, y una solicitud para una audiencia de justicia bajo la Norma 23(e) de las Normas federales de Procedimiento Civil.

2.     Aprobación Final - Dentro de los veinte (20) días a partir de que las Partes llegan a un acuerdo, las partes presentarán al Tribunal cualquier acuerdo o acuerdos adicionales, que incluirán disposiciones de notificación, una Orden de Aprobación Final propuesta, y cumplirán con todas las disposiciones de la Norma 23 (e) de las Normas Federales de Procedimiento Civil.

IV.     DEFINICIONES

1.     "Cumplimiento Sustancial" significa la adhesión en todos los aspectos materiales a los términos de este Acuerdo Modificado y a cualquier plan o método implementado por ADOC con el fin de cumplir con los términos de este Acuerdo Modificado, reconociendo que no se requiere el cien por ciento (100%) del cumplimiento.  Desviaciones aisladas, agudas, no sustantivas o inmateriales de los términos de este Acuerdo Modificado o de cualquier plan o método implementado por ADOC con el fin de cumplir con los términos de este Acuerdo Modificado no impedirá que una conclusión de Cumplimiento Sustancial, siempre que ADOC puede demostrar que cuenta con:

        a.      un sistema o sistemas implementados (I) para asegurar el cumplimiento, y (ii) para tomar las medidas correctivas en respuesta a los casos de incumplimiento; y

        b.      políticas, prácticas y recursos  instituidos que se puedan cumplir de manera duradera y sostenida.

    2.      "Discapacidad" y "discapacidades" tienen el mismo significado que tienen en virtud de las Leyes y reglamentos de ejecución aplicables.

    3.      "Recluso" se define como cualquier individuo detenido por o bajo la custodia de ADOC, incluyendo cualquier persona alojada o mantenida en cualquier centro operado o controlado por ADOC.   Este término no incluye cualquier individuo que ha sido puesto en libertad bajo palabra y/o libertad condicional o que no esté alojado físicamente en un centro de ADOC.

    4.      Recluso con una Discapacidad.   Un Recluso que es una persona calificada con una discapacidad que:

        a.      Tiene un impedimento físico o mental que sustancialmente limita una o más actividades importantes de la vida;

        b.      Tiene un registro o historial de dicho impedimento; o

        c.      se percibe o considera que tiene dicho impedimento.

    5.      "Programas" se definen como capacitación o instrucción educativa, vocacional, de rehabilitación, de libertad provisional para permitir el trabajo, y religiosa e incluye todo tratamiento o programas similares, procedimientos o procesos educativos, de rehabilitación, de tratamiento de abuso de sustancias, profesionales, de libertad provisional para permitir el trabajo, religiosos, disciplinarios, de clasificación, de salud física o mental proporcionados a los Reclusos

244554.6

en custodia de ADOC independientemente de que dichos programas sean administrados por ADOC, o por un contratista de ADOC.

6.      Un "Recluso calificado de otra manera":  Un recluso que es capaz de satisfacer todos los requisitos para un programa a pesar de su impedimento.

7.      Ayudas y Servicios Auxiliares:  Se refiere a los intérpretes calificados, tomadores de notas, servicios de transcripción, materiales escritos, amplificadores de terminales telefónicas, sistemas de ayuda auditiva, teléfonos compatibles con audífonos, decodificadores de subtítulos, dispositivos de telecomunicaciones de subtitulado para personas sordas ("TDD" o "TTY"), pantallas de videotexto u otros métodos efectivos para que los materiales auditivos estén disponibles para las personas con discapacidad auditiva; lectores calificados, textos grabados, documentos en Braille o en letra grande, u otros métodos efectivos para que los materiales entregados visualmente esté disponibles para las personas con discapacidad visual; adquisición o modificación de dispositivos; u otros servicios y acciones similares. Este término también incluye la provisión de profesores y ayudantes en su caso.

8.      Coordinador de ADA en todo el estado.  Un empleado de ADOC encargado de la obligación de garantizar el cumplimiento de las disposiciones de las Leyes en todos los centros de ADOC, entre otras funciones como se detalla en este Acuerdo Modificado.

9.      Coordinador de Centro de ADA.   Un empleado de ADOC encargado de la obligación de garantizar el cumplimiento de las disposiciones de las Leyes en los centros de ADOC para el cual él o ella se designa como Coordinador de ADA de Centro, entre otras funciones, como se detalla en este Acuerdo Modificado.

10.     Centro. Todos los centros penitenciarios, incluidos los centros de libertad provisional para permitir el trabajo, operados por ADOC ya sea en el momento de este Acuerdo o en el futuro.

11.     Actividades importantes de la vida.  Estas incluyen, pero no se limitan a: el cuidado de sí mismo, realizar tareas manuales, ver, oír, comer, dormir, caminar, pararse, levantarse, inclinarse, hablar, respirar, aprender, leer, concentrarse, pensar, comunicarse y trabajar.

12.     Funciones corporales principales.  Estas incluyen, pero no se limitan a las funciones del sistema inmunológico, el crecimiento celular normal, digestivo, intestinal, vejiga, neurológico, cerebral, respiratorio, circulatorio, endocrino y las funciones reproductivas.

13.     Dificultades indebidas.  Un ajuste que es excesivamente costoso, extenso, sustancial, perjudicial, o que alteraría fundamentalmente la naturaleza o el funcionamiento de ADOC o cualquiera de sus centros.

14.     Solicitud de un ajuste.  Un pedido a un Coordinador de ADA de Centro de un recluso para usar un dispositivo o servicio de asistencia, cambio de ubicación de alojamiento, modificación de acceso de arquitectura o programa, u otra modificación de la política o procedimiento para asegurar que un Recluso con una discapacidad pueda, con ajustes razonables, acceder a todos los programas y áreas de programas y áreas del Centro (incluyendo el alojamiento), de una manera consistente a la que un Recluso sin discapacidad de otra manera tendría acceso en una situación similar.

15.     Apelación. El proceso que permite a un Recluso procurar la revisión por el Coordinador de ADA en todo el estado de una decisión de un Coordinador de ADA del Centro.

244554.6

16.      Formulario de solicitud de ADA.  El formulario, un ejemplar que se adjunta al presente como Anexo "A", a través del cual un Recluso puede solicitar un ajuste o ejercer una apelación.

V.      DISPOSICIONES SUSTANTIVAS

1.      Introducción. Las Partes han desarrollado conjuntamente y acordado las disposiciones sustantivas descritas a continuación que están diseñadas para proporcionar cuidado, servicios, ajustes, programas y actividades para los Reclusos de conformidad con los términos de este Acuerdo Modificado y las Leyes.   Estas disposiciones tienen por objeto garantizar que los Reclusos no se expongan, por la discapacidad, a un daño sustancial y que los Reclusos no sean, por la discapacidad, objeto de discriminación.

244554.6

2.     Provisiones respecto a Evaluación, Auto-evaluación y Plan de Transición, y Medidas Correctivas.

I.     El siguiente resumen describe las actividades y los plazos en los que estas actividades se completaran (se analizan en más detalle en las disposiciones posteriores). Todos los marcos de tiempo se basan en la fecha de la aprobación final del Tribunal de este Acuerdo Modificado ("Aprobación Final").

A.     Dentro de los cuatro (4) meses de la Aprobación Final, ADOC habrá completado una lista de todos los programas educativos y de rehabilitación, y todos los programas vocacionales, ordenados por la institución, para todos los centros de ADOC. *Consulte* la Sección V.2.IV.

B.     Dentro de los seis (6) meses a partir de la Aprobación Final, ADOC designará centros que certifique que no se utilizará para albergar Reclusos con impedimentos de movilidad o vista. *Consulte* la Sección V.2.III.

C.     Dentro de doce (12) meses de la Aprobación Final, ADOC completará una Autoevaluación para incluir:

1.     Una encuesta arquitectónica de sus principales centros de prisión y de libertad provisional para permitir el trabajo. *Consulte* la Sección V.2.IV.

2.     Una revisión sistemática de las Políticas y Procedimientos de ADOC, y las Políticas y Procedimientos específicos de los centros, específicos para los reclusos para cualquier centro donde ADOC tenga la intención de albergar a Reclusos con discapacidades. *Consulte* la Sección V.2.IV.

3.     Todas las evaluaciones médicas anuales (o semestrales) del Recluso para asegurar que todas las desventajas y ajustes relacionados con la discapacidad se

introduzcan en el Módulo de Servicios de Salud, conforme a lo dispuesto en la Sección V.5.I. a continuación, con excepción de las evaluaciones analizadas en la Sección V.5.I.C.2.ii. de abajo, se habrán completado.

        D.      Dentro de los quince (15) meses a partir de la Aprobación Final, ADOC completará un plan de transición que describa cómo ADOC tiene la intención de efectuar el cumplimiento de las leyes relativas a la asignación de alojamiento y el acceso al programa. Esto designa si las barreras arquitectónicas se eliminarán, o recuperarán, o construirán nuevos centros, o si se implementarán cambios de política para superar cualquier barrera arquitectónica en cada caso para cada centro. *Consulte* la Sección V.2.V.

        E.      Dentro de los dieciocho (18) meses de la Aprobación Final, ADOC hará lo siguiente:

        1.      Modificar todas las políticas y procedimientos necesarios para superar las barreras arquitectónicas sin recuperación o eliminación. *Consulte* la Sección V.2.V.B.

        2.      Para todos los casos en los que se selecciona eliminación o recuperación arquitectónica, o la construcción de nuevos centros, ADOC proporcionará el Monitor de todos los materiales existentes que describen los procesos de eliminación o corrección o construcción, incluyendo las especificaciones de la licitación, las solicitudes de propuestas, los contratos (si los mismos existen como parte de ese momento) y registros similares. *Consulte* la Sección V.2.V.

        F.      Dentro de las veinticuatro (24) meses después de la Aprobación Final, y otros treinta (30) meses después de la Aprobación Final, ADOC suplementará y

actualizará el estado de los programas de eliminación o recuperación arquitectónica o los procesos de construcción. *Consulte* la Sección V.2.V.

G.      Dentro de los treinta y dos (32) meses después de la Aprobación Final, ADOC se habrá completado toda la eliminación de barreras arquitectónicas o la recuperación o la construcción de nuevos centros suficientes para alojar a los Reclusos con discapacidades. *Consulte* la Sección V.2.V.

II.      Identificación y listado de programas.  Dentro de los cuatro (4) meses de la Aprobación Final, ADOC proporcionará al experto arquitectónico designado y al abogado de los Demandantes una lista completa de todos los programas educativos, vocacionales y de rehabilitación identificados por nombre y centro o centros donde se imparten.   Esta lista incluirá los programas y servicios en los centros que no están destinados a ser objeto de reconocimiento arquitectónicamente.

III.      Designación de los Centros que no albergan Reclusos con Discapacidad. ADOC podrá designar a algunos de sus Centros que no será objeto de vigilancia desde el punto de vista arquitectónico, con sujeción a las limitaciones establecidas en la Sección V.2.IV.D.3. abajo.    ADOC certificará, por escrito, sus centros que no van a albergar los reclusos con discapacidad visual o motriz y esta certificación será proporcionada al experto arquitectónico designado y el abogado de los demandantes dentro de los seis (6) meses después de la fecha de su Aprobación Final.

IV.      Autoevaluación. ADOC realizará una autoevaluación de sus centros en consonancia con lo dispuesto en 28 C.F.R. 105-35.117 y 35.150 (c) y (d).

A.      A más tardar doce (12) meses siguientes a la Aprobación Final, ADOC completará una Autoevaluación por escrito que identifique y establezca, por Centro, lo

siguiente: todos programas, actividades y servicios que ADOC proporciona o pone a disposición de los Reclusos en cada centro, incluyendo centros que no será objeto de vigilancia desde el punto de vista arquitectónico; el acceso de los Reclusos hacia y dentro de cada uno de los centros de ADOC, a donde ADOC propone asignar los Reclusos con discapacidad visual o motriz; y todas las políticas y prácticas relativas a los Reclusos en cada centro a donde ADOC propone asignar los Reclusos con discapacidad, en particular las políticas y prácticas que rigen la administración de los Programas, las actividades y los servicios de ADOC en ese Centro en lo que se refiere a los Reclusos. Estas políticas y prácticas se reflejan normalmente en los reglamentos administrativos, procedimientos operativos estándar, directrices de política y memorandos de ADOC.

B.      La revisión de las políticas de ADOC garantizará lo siguiente:

1.      Que ADOC sea capaz de comunicarse con Reclusos discapacitados, de una manera que sea tan eficaz como la comunicación con los demás reclusos. Si ADOC se comunica con los Reclusos por teléfono, se debe asegurar que los sistemas de telecomunicaciones TDD o igualmente eficaces se utilicen para comunicarse con las personas con discapacidad auditiva o del habla.      Si ADOC proporciona servicios telefónicos de emergencia, se deben revisar sus políticas para garantizar el acceso directo a las personas que utilizan TDD y módems de computadora.

2.      Que ADOC tenga capacidad para Reclusos con impedimentos visuales y auditivos.  Esto puede incluir, pero no se limita a, los lectores para personas con problemas de vista; intérpretes u otras medidas alternativas de comunicación, según corresponda, a las personas con discapacidad auditiva; y la toma de notas para las personas con impedimentos manuales.   Un método para asegurar estos servicios debe desarrollarse,

incluyendo orientación sobre cuándo y dónde se prestarán estos servicios.  ADOC puede permitir que Reclusos debidamente capacitados y dispuestos presten servicios en estas capacidades.  Cuando el equipo se utiliza como parte del programa, actividad o servicio de ADOC, una evaluación debe hacerse para asegurarse de que el equipo sea utilizable por los Reclusos con discapacidad, en particular los reclusos con problemas de audición, visuales e impedimentos manuales. Además, ADOC debe tener políticas que aseguren que el equipo funcione.

3.      Que los Reclusos con Discapacidades se tengan en cuenta y sean evacuados a un lugar de seguridad durante una emergencia.  Esto puede requerir la instalación de señales de alarmas visuales y audibles y procedimientos especiales para ayudar a las personas con discapacidad de un centro durante una emergencia.

4.      Que los Reclusos con discapacidades no sean retratados de una manera ofensiva o degradante.

5.      Que las decisiones de ADOC relativas a una alteración fundamental en la naturaleza de un programa, actividad o servicio, o una decisión de que una carga financiera o administrativa indebida será impuesta por el Título II de la ADA, se tomen correctamente y con rapidez.

6.      Que la construcción de cualquier centro nuevo o parte de un centro, o la modificación de centros existentes después del 26 de enero de 1992, se ajuste a los estándares designados por las regulaciones que hacen cumplir el Título II de la ADA.

7.      Que se tomen medidas para asegurar que los empleados de ADOC estén familiarizados con las políticas y prácticas para la plena participación de los reclusos con discapacidad.  Una capacitación adecuada debe ser proporcionada a los empleados.

8.       Que, si ADOC limita o deniega la participación de un Recluso en sus programas, actividades o servicios basados en el uso de drogas de ese Recluso, se asegure de que este tipo de políticas no discriminen a los ex-consumidores de drogas, en contraposición a las personas que están actualmente involucradas en el consumo de drogas ilegales.   Nada en el presente se utilizará para permitir que ADOC limite la prestación de atención médica o de salud mental para los Reclusos en base al uso ilegal de drogas a menos que se determine por los proveedores de atención de la salud médica o mental de ADOC como contraindicada.

C.       Una vez que ADOC haya identificado sus políticas y prácticas, se revisará y analizará si esas políticas y prácticas permiten, o afectan de manera adversa, la plena participación de los Reclusos con discapacidad en sus programas, actividades y servicios. Al realizar esta revisión y análisis, ADOC será consciente de que a pesar de que sus políticas y prácticas puedan parecer inofensivas, estas políticas cuando se aplican pueden producir la negación de los Reclusos con discapacidad de la plena participación de sus programas, actividades o servicios.  Estas políticas o prácticas serán modificadas para asegurar que los Reclusos puedan, mediante un ajuste razonable, acceder a los Programas.  ADOC no tiene que alterar o cambiar las políticas necesarias para el funcionamiento o la prestación del programa, servicio o actividad.   La autoevaluación debe identificar las modificaciones a las políticas que se aplicarán e incluirán justificaciones completas para no modificar ninguna exclusión o limitación de las políticas o prácticas.

D.       ADOC inspeccionará sus centros, para identificar cualquier barrera física para el acceso de un Recluso al Centro (la "Encuesta"). La encuesta será por escrito (complementada según corresponda por medio de fotografías y/o diagramas) e identificará todas

244554.6

las barreras arquitectónicas para el alojamiento y el acceso al programa, tal como se define por las Leyes, para cualquier área a la que los Reclusos en dicho Centro se les permite el acceso.  La encuesta determinará si los Reclusos con impedimentos visuales o motrices tienen acceso a todas las áreas dentro del centro a las cuales el Recluso dado puede acceder, teniendo en cuenta las preocupaciones de seguridad apropiadas. La encuesta identificará los pasos que se deben tomar para hacer los programas, si se considera en su totalidad, accesibles a Reclusos discapacitados. Si son necesarios cambios estructurales o modificaciones a los centros, los cambios o modificaciones deben ser descritos en el Plan de Transición.  La Encuesta incluirá una revisión sistemática de cada centro que ADOC pueda elegir para albergar Reclusos con discapacidades definidas por las Leyes.

      1.      Como parte de la encuesta, ADOC evaluará al menos las siguientes áreas de su prisión existente y centros de libertad provisional para permitir el trabajo para, entre otras cosas, determinar la existencia de barreras arquitectónicas que inhiban el acceso funcional a los Reclusos con discapacidades físicas a aquellas partes de las prisiones y centros de libertad provisional para permitir el trabajo a las que se les permite acceso a los Reclusos: (a) Alojamiento; (b) Áreas recreativas; (c) Programas vocacionales; (d) programas educativos; (e) capilla; (f) Bibliotecas; (g) cantina; (h) Cafetería; (i) Visitación; (j) Artesanías como pasatiempo; (k) áreas de tratamiento de atención médica; y (l) áreas de tratamiento de atención de la salud mental.

      2.      La encuesta se llevará a cabo conjuntamente por ADOC, un experto arquitectónico ("Experto arquitectónico") acordado y un representante designado por el abogado de los demandantes.   ADOC compensará al experto en la proporción acordada con el experto, y compensará la persona designada por el abogado de los demandantes, a razón de $

244554.6

1,500.00 por cada día o parte de un día, de la encuesta, y a una proporción de $ 150.00 por cualquier hora de permanencia en la preparación y/o revisión de la Encuesta.[2] Las partes programarán conjuntamente las encuestas de los centros seleccionados.  Si las partes no logran ponerse de acuerdo si una condición específica constituye o crea una violación de las leyes, se identificarán tales condiciones pero aparecerán como cuestionadas.  Más de un centro podrán ser examinado en un día determinado, siempre que se asigne suficiente tiempo para cada centro, y este tipo de encuestas no podrá exceder nueve horas por cada día.   Un abogado conocedor de los Demandantes podrá servir como designado de los Demandantes.  Cualquier artículo identificado como cuestionado se resolverá a través del proceso de resolución de disputas que se describe en la Sección VII., más abajo.

        3.     ADOC no necesita incluir como parte de la encuesta los centros que ADOC certifica que no albergarán Reclusos con discapacidades visuales o motrices.   Para excluir un centro de la Encuesta, ADOC designará por escrito una lista de dichos centros, no más tarde que seis (6) meses después de la fecha de su Aprobación Final. Sin embargo, ADOC inspeccionará centros suficientes para garantizar la suficiente disponibilidad de camas para albergar a Reclusos con discapacidad que sean compatible con sus necesidades individuales, sino que también teniendo en cuenta el requisito de que alojamiento integrado sea proporcionado cuando corresponda. *Consulte Olmstead v. L.C.*, 527 U.S. 581 (1999). ADOC debe inspeccionar al menos el cincuenta por ciento (50%) de sus centros existentes y en uso a partir de la Aprobación Final de cada una de las siguientes categorías:   Centro Mayor: Régimen de Estricta Vigilancia, Centro Mayor: Régimen de Vigilancia Media y Centro de libertad provisional para

---

[2] La compensación del abogado de los Demandantes por su participación en este proceso se considera como parte de los costos del control que se establecen en la Sección VI. de este Acuerdo Modificado.

permitir el trabajo/en la Comunidad. El número mínimo de centros necesarios se calculará por separado en centros para hombres y para mujeres.  El centro correccional J.O. Davis se debe incluir en la encuesta.

            E.     ADOC mantendrá una copia de su auto-evaluación durante un período de tres (3) años.  Se hará una copia de esta autoevaluación que estará disponible para el público en general, y una copia de la misma se mantendrá en la biblioteca de derecho de todos los centros de ADOC. Se permite que ADOC corrija cualquier copia de la autoevaluación puestos a disposición del público o de los reclusos en cualquier parte de la autoevaluación que podría afectar negativamente a las preocupaciones de seguridad o de seguridad en los centros de ADOC.   Sin embargo, se proporcionarán copias puras de la autoevaluación, en sobre sellado, al Tribunal, el árbitro, el monitor, y el abogado de los Demandantes.

            V.     Plan de Transición.   ADOC creará un Plan de Transición para ADA compatible con las disposiciones de 28 C.F.R. 105 a 35.117 y 35.150 (c) y (d).  El Plan de Transición mostrará una lista de las mejoras y los cambios necesarios en los programas, actividades y servicios que ADOC proporciona o pone a disposición de los reclusos; todas las políticas y prácticas relativas a los Reclusos de ADOC; y el acceso de los reclusos hacia y dentro de los centros de ADOC necesario para garantizar que ADOC cumpla con las disposiciones de las leyes y el presente Acuerdo Modificado.

            A.     ADOC utilizará los resultados de la encuesta, el análisis de la remediación necesaria y la información obtenida durante la ejecución de los procedimientos existentes o nuevos relativos a la identificación de personas discapacitadas, con el fin de asignar los Reclusos con discapacidad a centros que sean apropiados para sus necesidades individuales, en base a la discapacidad, el nivel de seguridad y la clasificación.   No se requerirá que ADOC

244554.6

utilice los centros que se identifican como parte de la Encuesta que tienen barreras arquitectónicas significativas que hacen que la remediación o los ajustes razonables sean impracticables o que supongan un gasto excesivo para ADOC.   Sin embargo, ADOC se asegurará de que haya una cantidad suficiente de camas de clasificación de seguridad correspondiente y el propósito especializado para asegurarse de que todas las personas discapacitadas, estén debidamente alojadas en base a su estado de discapacidad individual, y que esos Reclusos reciban el mismo acceso a los programas que tienen en una situación similar los reclusos sin discapacidad en los mismos centros.   Todos los programas disponibles en cualquier lugar dentro del sistema ADOC para Reclusos en situación similar sin discapacidades serán puestos a disposición de este tipo de Reclusos con discapacidad.  Sin embargo, esto no significa que un Recluso con una discapacidad pueda obtener una transferencia a otro centro que ofrezca los mismos programas que se ofrecen en sus centros actuales.  Si un área se considera accesible para un recluso con una discapacidad en un centro existente, se regirá por las Normas de 1991 de la ADA para el Diseño Accesible, y las normas aplicables que se encuentran en 28 CFR sección 36, a menos que las modificaciones arquitectónicas importantes sean, o fueran, hechas para los centros existentes a partir del 26 de enero de 1992.   Si las modificaciones sustanciales se hacen, o se hicieron en el centro existente después del 26 de enero de 1992, y para cualquier prisión nueva construida por ADOC, la accesibilidad se regirá por las Normas de ADA 2010 de Diseño Accesible que se encuentran en 28 CFR sección 35.151 con respecto a nuevas construcciones y modificaciones, y las Directrices de Accesibilidad ADA 2004 ("ADAAG") que se encuentran en 36 C.F.R. sección 1191.

244554.6

B.      ADOC tomará las medidas correctivas apropiadas para eliminar los obstáculos a la participación plena y equivalente.  Las correcciones necesarias serán completadas según el siguiente cronograma:

1.      Arquitectónico:

a.      Todos los cambios arquitectónicos necesarios para cualquier entidad ADOC a la que se asignen Reclusos con discapacidades visuales o motrices serán completados dentro de los veinte (20) meses desde la finalización de la encuesta.

b.      Dentro de los tres (3) meses siguientes a la finalización de la encuesta, ADOC identificará por escrito cómo se propone para efectuar el cumplimiento de la ADA en relación con la asignación de alojamiento y el acceso programático afectados por las barreras arquitectónicas y otras. Cualquier cambio en el procedimiento necesario para superar las barreras arquitectónicas será por escrito, describiendo específicamente la metodología exacta por la cual ADOC pretende superar cada barrera identificada durante la Encuesta para cualquier centro en el que ADOC tenga la intención de albergar reclusos con discapacidad, sin la eliminación de barreras o remediación.  Cualquier área cuestionada, si no se elimina o recupera, será identificada por escrito con una explicación de por qué ADOC no cree que sea necesaria una modificación.

c.      Nada en este Acuerdo se interpretará como una exigencia de eliminación o recuperación de barreras arquitectónicas identificadas en la encuesta si ADOC es capaz de crear un cambio de política o procedimiento que tenga el efecto neto de dejar sin efecto el problema asociado con la barrera, y que tal eliminación o remediación no física no coloque más que una carga adicional nominales a los Reclusos con discapacidad que aseguren el acceso a la programación.  Si se elimina o recupera, ADOC proporcionará todos los

materiales documentales asociados al abogado de los Demandantes, incluyendo contratos, para asegurarse de que todas las recuperaciones adecuadas se hicieron dentro del plazo establecido.

d.      Al vencimiento del período de un (1) año durante el cual ADOC evaluará sus centros, a más tardar cada sexto (6º) mes de allí en adelante, ADOC proporcionará al monitor un informe de estado para incluir una línea de tiempo, una hoja de cálculo o un documento o registro similar que refleje el trabajo que se contemple, el trabajo que se ha iniciado, el trabajo que está en curso y el trabajo que ha sido completado. Este documento contendrá las fechas esperadas de finalización de los trabajos en curso o del trabajo que aún no ha comenzado.  El monitor tendrá acceso a cualquier contrato, orden de cambio o documento o registro necesario similar para asegurarse de que el trabajo apropiado se ha previsto, qué trabajo se hará y el período de tiempo previsto necesario para completar el trabajo.

2.      Procedimiento: Dentro de los seis (6) meses después de la finalización de la encuesta, ADOC deberá tener implementadas todas las políticas, procedimientos y/o Procedimientos Operativos Estándar para eliminar las barreras identificadas en la Encuesta para todos los casos en los que no se contempla la recuperación física.

C.      Nada en este documento impide que ADOC haga modificaciones o mejoras en sus centros de prisión o de libertad provisional para permitir el trabajo existente a fin de que dichos centros o cualquier parte de dichos centros alcancen el cumplimiento de los requisitos arquitectónicos de la ADA.  Del mismo modo, nada en este documento impide que ADOC construya totalmente nuevos centros de prisión o de libertad provisional para permitir el trabajo, siempre que dichos centros cumplan con las disposiciones de las Leyes.

D.      El Plan de Transición incluirá el nombre del funcionario responsable de la implementación del plan.

E.      ADOC mantendrá una copia del Plan de Transición.   Además, una copia del Plan de Transición mismo se mantendrá en la biblioteca de derecho de todos los centros de ADOC que tengan una biblioteca de derecho interna. Se permite que ADOC corrija cualquier copia de la autoevaluación puestos a disposición del público o de los reclusos en cualquier parte de la autoevaluación que podría afectar negativamente a las preocupaciones de seguridad o de seguridad en los centros de ADOC.   Sin embargo, se proporcionarán copias puras del Plan de Transición, en sobre sellado, al Tribunal, el árbitro, el monitor, y el abogado de los Demandantes.

VI.      Centros de Prisión. No obstante cualquier disposición de este Acuerdo Modificado que exprese lo contrario, las partes reconocen que las estructuras en cuestión son los centros de prisión o de libertad provisional para permitir el trabajo que, por su propia naturaleza, tienen barreras para impedir que los reclusos se escapen de la custodia. No es necesario eliminar o recuperar barreras tales como cerraduras y entradas bloqueadas, barras, vallas y otros dispositivos similares y las estructuras necesarias para encarcelar a reclusos o, debido a razones de custodia, restringir el movimiento del Recluso.

244554.6

      3.    <u>Disposiciones respecto a Acceso al Programa y Ajustes Razonables</u>. ADOC proporcionará ajustes razonables para personas discapacitadas, de manera que esos Reclusos puedan acceder y participen en los programas ofrecidos por ADOC.  Los ajustes razonables pueden incluir, pero no se limitan a, modificaciones arquitectónicas a un centro o parte de un centro, suministrar materiales en formatos alternativos, proporcionar dispositivos de comunicación aumentativa, proporcionar ayudantes, y prolongar el tiempo necesario para completar un programa. En la medida permitida por las disposiciones de la  Ley de Eliminación de Violaciones en Prisión, 42 USC § 15601, y sigs. ("PREA"), ADOC puede utilizar ayudantes, incluso de otros reclusos, para facilitar el acceso a los programas de ADOC para Reclusos con discapacidad.

244554.6

4.  <u>Disposiciones respecto a RTUs y SUs</u>.  Las Unidades de Tratamiento Residencial ("RTU") y Unidades de Estabilización ("SU") son confinamientos especializados dentro de una prisión donde los reclusos reciben en general el acceso a muchos servicios en los confines de las propias unidades.   Se proporciona a los Reclusos acceso a programas educativos y de rehabilitación en las unidades en sí mismas, en lugar de en el establecimiento de la clase regular que los Reclusos de la población general pueden utilizar.

I.   Para que ADOC restrinja el acceso a la programación de los Reclusos en estas unidades, ADOC debe llevar a cabo una evaluación individualizada de por qué dicha programación podría suponer un riesgo para el Recluso o los otros, o por qué el estado de salud mental actual del Recluso impide que sea capaz de participar de manera significativa en el programa.   Cada Recluso debe evaluarse por separado para cada programa.  La evaluación puede ser hecha solamente por un psiquiatra, un psicólogo o un enfermeras especializadas tituladas ("CRNP") que ha tratado activamente al Recluso.  La evaluación debe ser por escrito y debe identificar los motivos específicos por los cuales el acceso a un determinado programa está restringido.   Dentro de los tres (3) días, sin incluir fines de semana o feriados, de que a un Recluso en una RTU o SU se le niegue el acceso a un programa, la explicación por escrito del médico que explique por qué el acceso está restringido debe ser proporcionado al Recluso afectado.  El Recluso puede entonces tomar ventaja de las disposiciones del Ajuste de ADA y Procedimiento de Apelación que se establece como parte de este Acuerdo Modificado.

II.   ADOC volverá a evaluar el acceso de programa para cualquier Recluso alojado en una RTU o UB al que se le ha denegado el acceso a los programas después de solicitar dicho acceso cada vez que una nueva programación esté disponible, o una nueva inscripción a la programación existente esté disponible.

244554.6

III.    Aunque la programación educativa y de rehabilitación es fácilmente transferible a las unidades de alojamiento de la RTU y SU, la programación vocacional no lo es.[3] En la medida que la programación vocacional esté disponible sólo en edificios separados de las unidades de alojamiento en los centros de ADOC, sería poco práctico intentar llevar estos programas en unidades de vivienda RTU/SU dada la naturaleza de esas unidades.   El acceso a las herramientas necesarias para participar en este tipo de programación puede suponer un riesgo mayor seguridad en unidades de alojamiento en general.   Debido a que tanto la Ley de Reforma del Litigio Penitenciario y las disposiciones de ajuste razonables de las Leyes limitan el acceso sin restricciones a la programación en determinadas circunstancias, no se requerirá ADOC para proporcionar acceso a la programación vocacional para reclusos en RTU y SU.   Sin embargo, una vez que un Recluso se estabilice en una RTU o SU y luego sea reasignado al alojamiento en la población general, el Recluso no puede ser discriminado para inscribirse en los programas de vocacionales en base a su admisión anterior a una unidad de salud mental residencial.

---

[3] ADOC ofrece actualmente programación y formación vocacional en una variedad de campos. Incluyen oficios de la construcción, electricidad, taller de carrocería y mecánica de automóviles, soldadura y esteticista.

244554.6

5.      <u>Disposiciones respecto a Identificación, Documentación y Seguimiento de Reclusos con Discapacidades</u>.   ADOC identificará reclusos con discapacidad en la admisión inicial y durante su custodia.

I.      Evaluación. ADOC seguirá realizando chequeos, evaluaciones y pruebas a los Reclusos para determinar la discapacidad física, mental o intelectual en el momento de la admisión inicial, en consonancia con la Política del Departamento de Servicios de Salud ("SSO") de ADOC.  ADOC puede reconocer la discapacidad de un Recluso, ya sea como resultado de una evaluación, prueba o la auto-identificación.

A.      Chequeo: Después de ser tomado bajo custodia de ADOC, se continuará realizando el chequeo de los reclusos para determinar la discapacidad en el momento de la evaluación inicial de la salud.  Este chequeo se realizará dentro de los cinco (5) días, no incluyendo fines de semana y feriados, de que un Recluso ingresó a la custodia de ADOC.

1.      En el plazo de doce (12) horas de que un Recluso llegue a un centro de admisión de ADOC, el Recluso será cuestionado por vía oral consistente con el "Chequeo de Admisión de Recién Llegado - Formulario 2" de ADOC y la "Evaluación de Chequeo de Salud Mental de Recepción - Formulario de Admisión de 1" de ADOC con respecto a:

a.      iscapacidades percibidas o reconocidas;

b.      tratamientos y diagnósticos físicos, de salud, intelectual o mental previos; y

c.      discapacidades identificadas previamente.

2.      El chequeo será compatible con la política de OHS y las Normas de la Comisión Nacional sobre Asistencia Médica Penitenciaria ("NCCHC"). El

chequeo se llevará a cabo por los proveedores de salud médica y mental empleados o contratados por ADOC.

3.      ADOC ajustará razonablemente a los Reclusos con problemas de visuales, auditivos o motrices durante la admisión.

B.      Autoidentificación.   Los Reclusos pueden autoidentificarse como persona con discapacidad.

1.      ADOC puede aceptar la afirmación de la discapacidad del Recluso.

2.      ADOC no está obligado a aceptar la afirmación de la discapacidad de un Recluso.  Si ADOC no acepta esa afirmación, tomará las medidas apropiadas para obtener informes médicos relativos a la condición de salud médica o mental del Recluso autoidentificado o cualquier otro tratamiento de tal condición con el fin de confirmar o refutar la incapacidad reclamada por el Recluso. Alternativamente, ADOC realizará un chequeo de la salud médica o mental suficiente y apropiado según se analiza en la sección de "Examen y Prueba" - Sección C inmediatamente más abajo- para determinar si el Recluso tiene una discapacidad tal como se define por la ADA.

C.      Exámenes y pruebas.   Independientemente de si un Recluso se autoidentifica como que tiene una discapacidad, ADOC continuará evaluando los Reclusos por si tienen una discapacidad a través de exámenes y pruebas.

1.      ADOC identificará los Reclusos con discapacidades físicas, de conformidad con la Política de OHS.   Un examen físico de cada Recluso se llevará a cabo por un médico empleado o contratado por ADOC y apropiadamente licenciado por el estado de Alabama. Este examen se producirá dentro de los siete (7) días de la admisión, sin incluir fines

de semana y feriados.   Los Reclusos en custodia de ADOC en el momento de la aprobación final del Tribunal de este Acuerdo Modificado continuarán de realizando chequeos, evaluaciones y pruebas para determinar la discapacidad para asegurarse de que se identifique la situación de discapacidad física, se trate y ajuste.   Dentro de los seis (6) meses a partir de la aprobación final del Tribunal de este Acuerdo, realizarán chequeos, evaluaciones y pruebas a cada Recluso con un código de atención de la salud de 4 o superior para determinar si tienen discapacidades físicas. Cada Recluso con un código de atención de la salud de 3 o menos será evaluado dentro de los doce (12) meses de la aprobación final del Tribunal de este Acuerdo en el momento de su examen físico anual.

       2.     ADOC identificará a los Reclusos con discapacidad intelectual a través del uso de las pruebas administradas adecuadamente de acuerdo con el siguiente régimen.

       i.     A partir de ocho (8) meses después de la aprobación final del Tribunal de este Acuerdo Modificado, se hará un chequeo de los Reclusos que entran o regresan a la custodia de ADOC ("Reclusos Nuevos") para determinar la discapacidad intelectual inicialmente utilizando la prueba Beta III. Esta prueba se llevará a cabo en un entorno de grupo. Luego se le hará un chequeo a un Recluso nuevo con una puntuación de 80 o más baja en la prueba Beta III de forma individual para determinar si tiene discapacidad intelectual utilizando la versión más actual de la Escala Abreviada de Inteligencia  de Weschler (WASI). Si las puntuaciones del Recluso son de 75 o más bajas con WASI, no son necesarias más pruebas de coeficiente intelectual y el Recluso se considerará que tienen un CI igual a la puntuación de WASI del Recluso.   Si la puntuación del Recluso en Beta III es de 80 o menos, pero la puntuación con WASI del Recluso es mayor a 75 pero menos de 79, entonces se le administrará

244554.6

al recluso la versión más actualizada de la Escala de Inteligencia de Wechsler para adultos, (WAIS), actualmente la WAIS IV. Un Recluso con una puntuación de 79 o superior en la WASI, o 76 o superior en la WAIS, se considerará que tiene un coeficiente intelectual muy alto como para un nuevo examen de discapacidad intelectual.  Si la puntuación de un Recluso ya sea en el WASI o WAIS es de 75 o menos, entonces se harán pruebas adicionales para determinar si el Recluso tiene una discapacidad intelectual o del desarrollo utilizando la versión más actualizada de las Escalas de Conducta de Adaptación de Vineland, otros protocolos apropiados de manera similar, o la evaluación clínica adecuada.

      ii.     Todos los reclusos que ingresan a la custodia de ADOC durante los ocho meses siguientes a la aprobación final del Tribunal de este Acuerdo Modificado con una puntuación de 75 o menos en una prueba Beta III administrada o a pedido de ADOC se determinarán que tienen una discapacidad intelectual y no se requerirán más pruebas. Los reclusos bajo custodia de ADOC en el momento en que el Tribunal dé su aprobación final a este Acuerdo Modificado que tienen un registro de una puntuación con Beta III previamente administrado o a pedido de ADOC tendrán esas puntuaciones introducidas en el Módulo de SST en el momento de su próxima revisión de la clasificación anual o semestral, lo que ocurra primero, y será determinado que tienen capacidad intelectual y no se requerirán más pruebas. Los Reclusos actuales que no tienen registro de una puntuación de la prueba Beta III administrada o a pedido de ADOC se someterán a la prueba Beta III dentro de los tres (3) meses siguientes próxima revisión anual o semestral de clasificación del Recluso, lo que ocurra primero. Los resultados de esas pruebas serán colocados en el módulo de OHS después de la recepción de dichos resultados y  se determinará que los que tengan una puntuación de 75 o

menos tienen una discapacidad intelectual y no se requerirán más pruebas.  Las tres categorías de reclusos en la presente subsección serán referidos como "Reclusos actuales".

         iii.     ADOC se reserva el derecho, pero no está obligado, a administrar el WAIS a cualquier Recluso, independientemente de la puntuación Beta III o WASI del Recluso, para confirmar una puntuación de CI.

         iv.     Las Partes se reservan el derecho de volver a examinar el umbral de corte inicial en la prueba Beta III cuando se introduzca Beta IV y entre en uso por ADOC y decida si el punto de corte utilizado para desencadenar la administración de más pruebas de CI se mantendrá en 80.  Las partes evaluarán los datos que muestran la distribución de los individuos que fueron utilizados para normalizar la puntuación, así como la documentación revisada por pares y artículos que muestran que la prueba Beta IV tiene un rendimiento al menos tan bueno como la WASI, en comparación con la WAIS.

         v.     Los profesionales de la salud mental con licencia apropiada empleados o contratados por ADOC utilizarán las pautas que se describen en el Manual Diagnóstico y Estadístico de los Trastornos Mentales más reciente, según lo publicado por la Asociación Psiquiátrica Americana ("APA"), para determinar los criterios para identificar las personas con discapacidad intelectual.  El porcentaje de Reclusos identificados por tener una discapacidad intelectual debe ser el reflejo de los resultados de los artículos revisados por pares que estiman que aproximadamente el 4-10% de los Reclusos en las cárceles del estado cumple con la definición clínica de la discapacidad intelectual.  Además, el porcentaje de reclusos identificados a través de pruebas intelectuales como que se encuentran por debajo del umbral de CI del protocolo de pruebas incorporadas en el presente documento, pero que se encontró que no tienen una discapacidad intelectual, ya sea porque: i.) no tenían déficits significativos en las

conductas de adaptación identificadas en el DSM-V, o ii.), porque el inicio del funcionamiento intelectual del Recluso según se define por los resultados de las pruebas de CI no ocurren durante el periodo de desarrollo del Recluso, será un reflejo de las conclusiones de los artículos revisados por pares que encontró que aproximadamente el 80% de los Reclusos que tenían un CI por debajo del umbral fueron encontrados en última instancia que cumplían con la definición de tener una discapacidad intelectual.

3.     A los efectos de la determinación de discapacidades del desarrollo, y además de los procesos de determinación de discapacidad intelectual para los Reclusos Nuevos y Reclusos Actuales descritos en la disposición 5.I.C.2. inmediatamente anterior, ADOC puede administrar la versión más actual de la Prueba de Amplio Alcance para Determinar el Aprovechamiento Académico (WRAT), actualmente la WRAT IV, a Reclusos Nuevos.  Si un Recluso tiene puntuaciones inferiores al nivel de grado 7 en la WRAT, se llevarán a cabo las evaluaciones clínicas apropiadas para determinar la condición de discapacidad del desarrollo.

4.     La identificación de los Reclusos con discapacidad intelectual o del desarrollo se hará por un psiquiatra o psicólogo, aunque los profesionales de la salud mental y asociados psicológicos pueden participar en el proceso.

5.     ADOC continuará periódicamente con el chequeo, evaluación y prueba de los Reclusos para determinar la discapacidad, mientras que los Reclusos estén bajo la custodia de ADOC para asegurar que se identifique cualquier cambio en el estado de incapacidad de un Recluso, se trate y ajuste.

I.     Documentación.     ADOC     documentará     los     resultados     de     la autoidentificación o el examen de los Reclusos para determinar si tienen discapacidades físicas,

intelectuales o mentales realizadas en cualquier momento, incluso en la admisión y durante su detención.

A.      ADOC pasará a documentar la información descrita anteriormente en el módulo de la computadora de OHS en el momento que el Módulo de la computadora esté operativo.  Antes de la implementación del Módulo, el Departamento de Servicios de Salud proporcionará capacitación para cada categoría de personal que pueda acceder al módulo relativo a la información relacionada con la discapacidad de un Recluso que puede ser ingresada en el Módulo.

B.      El Módulo de captura y almacena electrónicamente la información recogida por la parte que hace el chequeo pertinente en cada paso de la admisión.  Solamente las partes y los proveedores apropiados tendrán acceso a cambiar y almacenar la información en el panel de control y el acceso al panel de control estará limitado por el personal de seguridad y clasificación de ADOC a fin de no revelar información personal de salud, tal como el término se define por la ley HIPAA.  Sin embargo, el módulo permitirá el acceso a la información general necesaria para clasificar correctamente, albergar y ajustar razonablemente a los Reclusos con discapacidades físicas o mentales, como códigos médicos, códigos de salud mental, limitaciones físicas, y las comunicaciones con necesidades especiales.

C.      La información del Recluso que se mantiene en el Módulo se actualizará a medida que se realiza la evaluación adicional, el chequeo, las pruebas y los exámenes sobre los Reclusos. El Módulo se actualizará con esta información a más tardar tres (3) días, excepto los fines de semana y feriados, siguientes a la finalización de la evaluación, chequeo, prueba o examen.

D.      Cualquier contratista que presta servicios de salud retenido por ADOC estará contractualmente obligado a mantener el módulo y actualizar la información contenida en el mismo en relación con las discapacidades o ajuste del Recluso.

E.      La información obtenida será proporcionada al personal de ADOC y los contratistas de ADOC coherentes con las disposiciones de la ley HIPAA.

II.      Seguimiento.   ADOC hará un seguimiento de los Reclusos que han sido identificados con una discapacidad y algún ajuste para dicha incapacidad para asegurar que los Reclusos reciban atención y el ajuste apropiado para discapacitados.

A.      ADOC utilizará el Módulo para realizar un seguimiento de la atención y cualquier ajuste para personas discapacitadas, que estén dirigidos o pedidos por los proveedores médico o de salud mental de ADOC.

B.      El Módulo mostrará a los usuarios apropiados, compatibles con las disposiciones de la ley HIPAA, (1) la naturaleza de la discapacidad o discapacidades de un Recluso; (2) los ajustes pedidos por los proveedores médicos o de salud mental-contratistas de ADOC por la discapacidad o discapacidades de un Recluso, incluyendo, pero no limitado a, los aparatos médicos y restricciones al alojamiento o la colocación de la cama; y (3) las restricciones de seguridad que son el resultado de la incapacidad.

C.      ADOC revisará periódicamente el Módulo de OHS y lo actualizará según corresponda.

D.      La información de seguimiento en el Módulo y por los Coordinadores de ADA del centro se pondrá a disposición de los empleados y contratistas de ADOC, en consonancia con las disposiciones de la ley HIPAA, para garantizar que los ajustes razonables se hagan y se harán para los Reclusos que necesitan un ajuste.

244554.6

III.     Colocación y cambio de estado.   Si durante el curso del encarcelamiento por ADOC se identifica mediante un adecuado chequeo, evaluación o prueba que un Recluso tiene (a) una discapacidad no diagnosticada o reconocida previamente o (b) una discapacidad existente que ha cambiado sustancialmente, ADOC tomará todas las medidas necesarias para determinar si, y en qué medida, la discapacidad puede recibir un ajuste razonable.

A.     El personal médico o de salud mental apropiado de ADOC, incluyendo el coordinador de ADA en el centro donde el Recluso es (o debe ser) alojado deberá, dentro de los cinco (5) días, no incluyendo fines de semana y feriados, revisar la identificación de la discapacidad o cambio, revisar la información que contiene el Módulo y la información mantenida por el Coordinador de ADA del Centro en el Módulo de OHS para determinar la necesidad de ajuste de la discapacidad identificada recientemente o el cambo de discapacidad. Los ajustes razonables apropiados, incluyendo pero no limitados a asignaciones de alojamiento - determinados códigos de seguridad, códigos de salud y códigos de salud mental- para dicha discapacidad identificada recientemente o cambio de la misma, se proporcionarán dentro de los cinco (5) días, no incluyendo fines de semana y feriados, de la revisión de la información por el personal que se describen anteriormente.

B.     ADOC se compromete a transferir reclusos con discapacidades visuales o motrices emergentes o agudas de cualquier enfermería o centro que no cumpla con ADA bajo  un cronograma que, por razones de seguridad, se presentará ante los tribunales bajo sello.

IV.     Chequeo de transferencia.  Los Reclusos transferidos de un centro ADOC a otro serán sometidos a un chequeo de transferencia en el centro receptor.

244554.6

A.    Si, como resultado del chequeo de transferencia, aparece que un Recluso con el código de la salud de Discapacidad se debe elevar, dentro de los 14 días, no incluyendo fines de semana y feriados, el proveedor en el centro receptor se comunicará con el proveedor del centro que lo envía para analizar el código de salud antes del Recluso y las razones para el aumento de código de salud del Recluso.

B.    Si, como resultado de esa comunicación, se determina que el Recluso con el código de la salud de una discapacidad no debe ser elevado, entonces ADOC no está obligado a actualizar el módulo para reflejar esa discusión.

C.    Si, como resultado de esa comunicación, se determina que el Recluso con el código de la salud de Discapacidad todavía debe ser elevado, se abre un recuadro de comentario dentro del módulo y se actualiza para reflejar que se ha producido la comunicación y las razones para aumentar el código de la salud de la Discapacidad del Recluso.

D.    Las disposiciones de esta sección no se aplican cuando un Recluso con una discapacidad se transfiere de un centro a otro debido a que el Recluso con una discapacidad se admite en la enfermería del centro receptor.

V.    Uso de la información. La información creada y recopilada durante los procesos de identificación, documentación y seguimiento descritos anteriormente se utilizará para proporcionar a los reclusos con discapacidades identificadas o reconocidas ajustes razonables en consonancia con las disposiciones de las Leyes según se aplican a los centros correccionales.  La información será utilizada más como parte de las disposiciones de garantía de calidad de este Acuerdo.

244554.6

6.    <u>Disposiciones respecto a Niveles de Seguridad</u>.   En la clasificación inicial, reclasificación o revisiones adicionales de clasificación, ADOC asignará niveles de seguridad a los Reclusos sin tener en cuenta la discapacidad.   ADOC no va a aumentar el nivel de seguridad o nivel de custodia para un Recluso únicamente en base a la discapacidad de un Recluso.   ADOC puede disminuir el nivel de seguridad para un Recluso con una discapacidad bajo dos circunstancias generales.

I.    ADOC puede, a discreción de ADOC, bajar el nivel de seguridad de un Recluso para permitir que un Recluso con una discapacidad acceda a un programa o institución (o parte de un centro) a la cual el Recluso no estaría autorizado a acceder debido al nivel de seguridad de ese Recluso.   Para que un Recluso sea considerado para una reducción en virtud de dicha circunstancia, debe aplicarse todo lo siguiente:

A.    El programa o centro determinado se considera importante para la rehabilitación, la educación, o el tratamiento del Recluso determinado, basándose en la discapacidad de ese Recluso.  Para ser considerado "importante", el programa o el centro (o parte de un centro) debe centrarse en beneficiar sustancialmente la salud, condición o habilidades para la vida de un Recluso de manera diferente, y además, que las de un Recluso sin discapacidad.[4]

B.    El Recluso no debe haber tenido ninguna determinación disciplinaria importante durante por lo menos un (1) año antes de la fecha que se ha solicitado la

---

[4]Por ejemplo, si ADOC tiene un programa de enseñanza de las habilidades para la vida, es probable que muchos, si no todos, los Reclusos puedan beneficiarse de un programa de este tipo. Sin embargo, para los reclusos con discapacidad intelectual, uno de los principales métodos de integración de dicho individuo en una existencia más normalizada es una extensa capacitación en habilidades para la vida para aumentar la atención a las deficiencias de su discapacidad.   En dicha circunstancia, la enseñanza de las habilidades para la vida se dirige y beneficia especialmente a un Recluso de una manera mucho mayor que el beneficio para un Recluso sin una discapacidad intelectua.

244554.6

reducción.  Si un arma estuvo involucrada en un caso disciplinario previo, entonces, el Recluso debe estar libre de esa determinación disciplinaria durante al menos dos (2) años antes de la fecha de la solicitud.

C.     El programa o centro debe estar disponible para un Recluso en una situación similar sin discapacidad.

II.     ADOC también puede reducir el nivel de seguridad de un Recluso en base a una discapacidad en la cual la discapacidad misma hace que el Recluso sea de menos riesgo para la seguridad.

III.     La reducción en el nivel de seguridad puede ser permanente (sujeta a una nueva evaluación por razones disciplinarias) o temporal.

7.      <u>Disposiciones respecto a Ayudas Auxiliares</u>.

I.      ADOC proporcionará ayuda y servicios auxiliares específicos y apropiados necesarios para reclusos con discapacidad para acceder a todos los programas y servicios prestados a los Reclusos bajo la custodia de ADOC.   Las ayudas y servicios auxiliares incluyen, pero no se limitan a, lo siguiente:

A.      Intérpretes de lenguaje de señas:

B.      Tomadores de notas o servicios de transcripción;

C.      Materiales escritos en formatos alternativos, como letra grande Braille;

D.      Amplificadores de terminales telefónicas;

E.      Dispositivos para escuchar de asistencia;

F.      Sistema de teléfono compatible con audífonos;

G.      Audífonos;

H.      Dispositivos de subtitulado de telecomunicaciones para Reclusos sordos (TDD o TTY);

I.      Pantallas de texto de vídeo;

J.      Otros métodos apropiados para entregar materiales auditivamente a los Reclusos con problemas de audición;

K.      Lectores o tutores;

L.      Textos grabados; y

M.      Otros métodos adecuados para poner los materiales entregados visualmente a disposición de los Reclusos con problemas visuales.

II.     Uno o más teléfonos TTY estarán disponibles en cualquier centro en el que se aloja cualquier Recluso con una discapacidad auditiva que necesita un dispositivo de este tipo con el fin de participar efectivamente en una conversación telefónica.    Si ADOC elige agregar Reclusos con problemas de audición en un único centro o una pequeña cantidad de centros, entonces ADOC se asegurará de que haya un número suficiente de teléfonos TTY disponibles en ese centro para que los Reclusos con problemas de audición puedan hacer uso del teléfono TTY de manera consistente como el acceso a los teléfonos por los Reclusos sin problemas de audición  Los teléfonos TTY deben estar disponibles durante los mismos períodos, y en las mismas circunstancias, que el acceso a los teléfonos que se les permite a los Reclusos en situación similar.   Sin embargo, y si en el ADOC o un centro se coloca un límite de tiempo o duración en cualquier llamada telefónica, un Recluso con una discapacidad auditiva que utiliza un teléfono TTY deben tener derecho al uso del teléfono TTY durante un período cuatro (4) veces el período que se le permite a un Recluso en una situación similar y sin problemas de audición para usar el teléfono para cualquier llamada de un teléfono. ADOC se asegurará de que todos esos teléfonos TTY se mantengan en buen estado y funcionen.

III.     ADOC o el proveedor de servicios médicos hará lo siguiente:

A.     Realizar un mínimo de una evaluación de rutina cada tres (3) meses (o antes, a pedido del Recluso) de cada Recluso sordo o con problemas de audición en relación con la prestación de ayudas y servicios auxiliares apropiados;

B.     Mantener los registros médicos apropiados en relación con las ayudas y servicios auxiliares;

C.     Comprar y mantener los tipos adecuados de baterías para audífonos en stock;

D.      Proporcionar reemplazo de baterías de audífonos a los Reclusos que las pidan no más tarde de 24 horas (excepto fines de semana y feriados) después de dicha solicitud, si están fácilmente disponibles dentro de la comunidad local.  En caso de que un audífono requiera un tipo específico de batería o especializada no disponible en el ámbito local, ADOC, o su proveedor médico tendrán 72 horas (excepto fines de semana y feriados) para garantizar este tipo de batería especializada;

E.      Enviar audífonos a un proveedor de reparación no más tarde de 48 horas (excepto fines de semana y feriados) a raíz de una solicitud validada por un Recluso para la reparación de su aparato auditivo; ye

F.      Informar al Recluso cuando el audífono fue enviado para su reparación y anticipar la fecha de regreso.

IV.      ADOC o su proveedor de servicios médicos mantendrá un registro anual, perpetuo de todas las reparaciones de audífonos existentes, que incluya:

A.      Fecha en la que el dispositivo se recibió para su reparación en el centro;

B.      Nombre del proveedor externo que realiza la reparación;

C.      Fecha en que el dispositivo fue enviado o llevado al proveedor para la realización de la reparación; y

D.      Fecha en la que el dispositivo fue recibido de nuevo en el centro.

V.      ADOC proporcionará intérpretes de lenguaje de señas para los Reclusos con problemas de audición, cuyo principal medio de comunicación es el lenguaje de señas americano ("ASL"). Las personas empleadas o contratadas por ADOC para este propósito serán calificadas y capaces de comunicarse de manera efectiva en ASL.  Estas personas estarán de

acuerdo en cumplir con el Código de Ética para los intérpretes de ASL certificados para las circunstancias en las que se pueden requerir intérpretes en las siguientes situaciones enumeradas. Esta lista no es exhaustiva ni obligatoria, y no implica que no haya otras situaciones en las que puede ser necesario o apropiado proporcionar intérpretes a los Reclusos:

        A.      Admisión Inicial.

        B.      Proceso de Clasificación.

        C.      Citas y programas de atención de la salud regularmente programados.

        D.      Tratamiento por Abuso de Sustancias y otra programación formal.

        E.      Clases y actividades educativas.

        F.      Audiencias del consejo de disciplina.

        G.      Investigaciones criminales.

        H.      Entrevistas de revisión de clasificación.

        I.      Investigaciones formales realizadas por el personal de ADOC.

        VI.      En los casos en que no se impliquen preocupaciones de privacidad o seguridad, otros Reclusos con las habilidades requeridas pueden ser utilizados como intérpretes de lengua de señas, siempre que tanto el Recluso con una discapacidad auditiva y el Recluso no discapacitado calificado acepten este tipo de arreglo.   El Recluso con una discapacidad auditiva y el recluso no discapacitado calificado debe ser capaz de comunicarse de manera efectiva con los demás y el Recluso no discapacitado calificado debe ser capaz de transmitir con eficacia y precisión la información que se proporciona por el Recluso con discapacidad auditiva.   El Recluso con una discapacidad auditiva debe ser informado que puede negarse a permitir que un Recluso preste servicios como intérprete.   También se le debe informar que en caso de que

rechace otro Recluso como intérprete, se le proporcionará un intérprete no Recluso sin costo alguno, y que no se tomará ninguna acción adversa contra él.    Cualquier Recluso que sirve como intérprete en tales circunstancias se requerirá que firme un documento que indique el acuerdo del Recluso a cumplir con todas las leyes de privacidad, incluyendo HIPAA.

VII.    ADOC no puede utilizar un Recluso que preste servicios como un intérprete de lenguaje de señas, en cualquier circunstancia relacionado con el tratamiento médico o de la salud mental, exámenes o consultas, o el inicio o la investigación de un incidente bajo la Ley de Eliminación de Violaciones en Prisión (PREA), excepto en circunstancias muy limitadas, donde una demora prolongada en la obtención de un intérprete efectiva podría poner en peligro la seguridad del Recluso con sordera, el desempeño de funciones de primera respuesta en la Sección 115.64 de la PREA, o la investigación de un siniestro cubierto por la PREA.

VIII.    ADOC no puede contratar a un Recluso para que preste servicios como intérprete de lenguaje de señas, en cualquier circunstancia relacionada con el debido proceso[5] o la investigación o la iniciación de cualquier incidente relacionado con agresiones, violencia, u otras actividades potencialmente criminales dentro de los centros.

IX.    ADOC proporcionará al Recluso Manuales, libros de texto y materiales, órdenes u oficios de los tribunales que se requieran para ser publicados, u otros materiales escritos similares en formatos alternativos como el Braille y letra grande.   ADOC no tiene por qué tener en el lugar de todos los libros de texto y materiales necesarios en todo momento, pero debe tener disponibles, todos esos materiales tales como que están disponibles para los Reclusos con problemas de visión, según sea necesario.   ADOC tendrá a su disposición un número

---

[5] Los eventos de "debido proceso" incluirían, pero no se limitan a, procedimientos disciplinarios, investigaciones de las actividades criminales potenciales o supuestas por el Recluso, y la administración de medicamento involuntaria.

suficiente de dichos materiales en formato alternativo de tal manera que todos los Reclusos que necesitan acceso a los mismos puedan hacerlo simultáneamente.

X.    Para los materiales escritos que son únicos a un Reclusos como información médica y de salud mental, información disciplinaria, información de clasificación, u otros documentos dirigidos solamente a ese Recluso, ADOC o bien proporcionará la misma en formato alternativo o creará un procedimiento bajo el cual dichos Reclusos puedan tener acceso a la información en función de cómo un Recluso sin discapacidad visual podría acceder a dichos materiales.   Proporcionar los materiales auditivos, ya sea por cinta de grabación, o proporcionar acceso a una persona que lea los materiales para el Reclusos es aceptable.   No puede haber límites en el número de veces que el Recluso pueda tener acceso a la información, pero ADOC puede crear limitaciones razonables sobre dónde y cuándo se puede acceder a la información.  Si ADOC tiene la intención de poner dichos materiales disponibles mediante la lectura de los materiales al recluso, ADOC anotará en el archivo del Recluso quién, qué, cuándo dichos materiales se pusieron a disposición.

244554.6

8.    <u>Disposiciones respecto a Emergencias</u>.

I.    ADOC revisará el Reglamento Administrativo actual para incluir disposiciones para garantizar que los reclusos con discapacidades sean evacuados a lugares seguros en situaciones de emergencia.    Para cada centro con Reclusos con impedimentos visuales, auditivos y motrices, el comandante de turno por cada turno designará por escrito más de un Oficial Correccional que tenga asignada la tarea de asegurar que todos esos Reclusos sean evacuados a un lugar seguro en situaciones de emergencia.  Un registro reflejará los Oficiales Correccionales asignados a cada turno. El comandante del turno notificará a los oficiales asignados quienes reconocerán esta asignación por escrito.  Cada centro puede poner en práctica un procedimiento operativo estándar específico para ese centro para asegurar el cumplimiento basándose en las características únicas de ese centro.

II.    En cada centro, ADOC designará una o más áreas de Ayuda de Rescate (tal como se define en la Sección 3.5 de las Normas de la ADA 1991 para Diseño Accesible), para el 1° de noviembre de 2016.  En o antes de esa fecha, los centros publicarán un memorando escrito explicando el área de Ayuda de Rescate, y el área debe ser mostrada en un mapa. Tanto la memoria escrita como el mapa se publicarán en la ubicación en la cual la información del recluso suele publicarse.  El memorando escrito también se proporciona en formato alternativo a pedido. La determinación del número y ubicación de estas zonas debe tener en cuenta el tamaño del centro, la compacidad del centro, y el número de personas discapacitadas, que probablemente estén presentes en el centro.

III.    Para cada turno en cada centro, el comandante de turno le asignará la responsabilidad de asegurar que los reclusos que se encuentren en el área de Ayuda de Rescate estén adecuadamente protegidos y se evacuen antes de que dicho personal pueda abandonar el

centro.   Esta asignación se hará por escrito, y dicho Oficial asignado reconocerá esta asignación

por escrito.  En otras áreas del centro, ADOC implementará un sistema en el que su personal se

asegure de que todos los Reclusos bajo el control de los funcionarios de prisiones en un lugar en

particular sean evacuados a un lugar seguro en base a la naturaleza de la emergencia.

IV.    ADOC implementará un sistema de simulacros periódicos de urgencia que

permitan a los centros, por lo menos trimestralmente, como parte de esa voluntad de práctica

asegurar que los oficiales asignados a las funciones anteriormente descritas ejecuten plenamente

estas responsabilidades.   Para las primeras dos sesiones en cada centro, ADOC proporcionará un

intérprete de lenguaje de señas para explicar el proceso a los Reclusos que utilizan el lenguaje de

señas como su principal medio de comunicación.   Todos los reclusos que tienen impedimentos

visuales, auditivos y motrices recibirán una explicación escrita del procedimiento.    Esta

explicación será proporcionada en un formato alternativo cuando sea apropiado.   A partir de

entonces, los Reclusos que son trasladados a un centro, o que tienen una condición que surgió

recientemente impedimentos visuales, auditivos y motrices, recibirá una copia del plan de

evacuación de emergencia, ya sea por escrito o, en su caso, en formatos alternativos dentro de los

tres (3) días hábiles de: (1) llegar al centro receptor o (2) un diagnóstico médico de

impedimentos visuales, auditivos y motrices.   ADOC proporcionará acceso a un intérprete de

lenguaje de señas a cualquier recluso con discapacidad auditiva que utilice el lenguaje de señas

como su medio principal de comunicación con el fin de responder y explicar el procedimiento.

V.    La modificaciones requeridas para la política analizadas en esta

Disposición están destinadas a complementar las políticas existentes y los Procedimientos

Operativos Estándar actualmente vigentes en cada centro, y no los sustituyen.

244554.6

9.       <u>Disposiciones respecto a Ajustes y Apelaciones.</u>

I.       A partir del 1° de febrero de 2017, cualquier Recluso que tenga, o cree que tenga, una discapacidad según la definición de las Leyes puede realizar Solicitudes de Ajuste y presentar Apelaciones relacionadas con las decisiones sobre las Solicitudes de Ajuste.

II.       La Solicitud de un Recluso de Ajuste o Apelación será por escrito y contendrá información sobre la supuesta discriminación, la solicitud de Ajuste, o la razón de la Apelación.  Se establece en el Formulario de Solicitud de ADA (Anexo A) o cualquier formulario posterior generado por ADOC para el mismo propósito.  Los formularios de solicitud de ADA estarán disponibles para los Reclusos con discapacidades a través de la oficina del Comandante de turno o el cubículo de seguridad centralizado, la oficina del Coordinador de ADA del centro, y la Biblioteca de Derecho, siempre que el centro tenga una biblioteca de derecho.  Los formularios de solicitud ADA se proporcionarán a los reclusos a través de la solicitud, ya sea por vía escrita u oral.

III.       La solicitud de ajuste o apelación debe ser presentada por el Recluso tan pronto como sea posible.  Las apelaciones al Coordinador de ADA de todo el estado deben hacerse dentro de los treinta (30) días calendario después de la denegación de la Solicitud de Ajuste.  La Solicitud de Ajuste o Apelación debe también, en general especificar el tipo de ajuste o servicio que el Recluso procura.  El formulario de solicitud de ADA debe estar fechado y firmado por el recluso. Cajas o depósitos similares serán colocados en el Centro para depositar tales formularios o los formularios se pueden administrar por el Recluso (incluyendo, pero no limitado a, los Reclusos cuyo movimiento está restringido debido a su nivel de custodia y que no puedan depositar el formulario por sí mismo) a cualquier oficial o empleado ADOC para su depósito en esas cajas.  La caja, o depósito para depositar el formulario de solicitud de ADA, se

ubicará en lugares en los que todos los reclusos cuya custodia les permita el movimiento en el centro puedan tener acceso. Si un Recluso es incapaz de completar el formulario, por cualquier motivo, el personal de ADOC ayudará al recluso a completar el formulario. Luego de la recepción de dicho formulario, el Coordinador del Centro de ADA revisará, documentará, responderá y conservará una copia del formulario y la respuesta en consonancia con las funciones y los parámetros especificados en la parte de este Acuerdo, relativo a las tareas de los coordinadores de ADA. Si el Coordinador de ADA del Centro no está seguro de lo que se requiere en el formulario, el Coordinador de ADA del Centro entrevistará personalmente al Recluso y hará preguntas adecuadas para informar al Coordinador de ADA del Centro y al Coordinador de ADA en todo el estado sobre la naturaleza de la solicitud de ajuste y cualquier ajuste adecuado o apelación.

IV.     La seguridad, la protección y la salud del Recluso al hacer una Solicitud de Ajuste o Apelación, y la de otros reclusos, y la seguridad del Centro siempre será una preocupación predominante al hacer ajustes razonables para los reclusos con discapacidad.

V.     En el caso de que el Centro determine que no puede hacer ajustes razonables para un Recluso con una discapacidad, se pueden considerar otros centros y programaciones disponibles en otros centros de un nivel de seguridad adecuado para dar albergar a un recluso con una discapacidad particular, para incluir las transferencias.

10. <u>Disposiciones respecto a Coordinadores de ADA</u>.   ADOC emplearán Coordinadores de ADA del Centro ADA y un Coordinador de ADA en todo el estado dentro de los plazos establecidos para la Autoevaluación de ADOC y el Plan de Transición.

      I.      Coordinadores de ADA del centro.

      A.      ADOC designará a un empleado responsable ("Coordinador de ADA del Centro") en cada centro ADOC para coordinar sus esfuerzos para cumplir y llevar a cabo sus responsabilidades en virtud de las leyes con respecto a cualquier recluso actual o futuro en custodia física de ADOC que tiene una discapacidad.  El personal de cada centro ADOC recibirá una notificación del Coordinador de ADA del Centro designado para el centro.

      B.      Los Coordinadores de ADA del Centro dirigirán los informes al alcaide de su centro asignado en relación con sus funciones como Coordinador de ADA del Centro y puede tener funciones adicionales a las de Coordinador de ADA.

      C.      En cada centro ADOC, el nombre, la dirección de la oficina, y el número de teléfono del Coordinador de ADA del Centro de dicho centro será fijado en cada dormitorio, sala de comedor, área de visitas, biblioteca, áreas de tratamiento de cuidados médicos, áreas de tratamiento de cuidado de la salud mental, capilla, cantina y áreas educativas. Cada oficina del Coordinador de ADA del Centro estará en un lugar de fácil acceso para los reclusos de la población general.  Esta publicación también contendrá el nombre, la dirección de la oficina, y el número de teléfono del Coordinador de ADA en todo el estado, descrito en este documento, así como la ubicación de los formularios de solicitud de ADA y las cajas para los formularios de solicitud de ADA dentro de cada centro.

      D.      Cada Coordinador de ADA del Centro recibirá y responderá a todos los formularios de solicitud de ADA para ese centro o transmitirá apelaciones a ADA al

244554.6

Coordinador de ADA en todo el estado.   El Coordinador de ADA del Centro mantendrá un archivo que contenga todos los formularios de solicitud de ADA recibidos y sus respuestas a las Solicitudes de Ajuste y Apelaciones.   En caso de que un Recluso requiera o solicite ayuda para completar un formulario de solicitud de ADA, el Coordinador de ADA del Centro ayudará al recluso a completar el formulario.  Cada Coordinador de ADA del Centro preparará un informe mensual con respecto a las Solicitudes de Ajuste recibidas y los ajustes otorgados.  El informe mensual se presentará al Coordinador de ADA en todo el estado para el séptimo (7º) día del mes siguiente.  El informe mensual incluirá, como mínimo, la siguiente información:

1.      Número de solicitudes de ADA

2.      Número de solicitudes de ADA otorgadas

3.      Número de solicitudes de ADA denegadas

4.      Número de solicitudes de ADA denegadas porque las solicitudes involucraban un problema de salud mental o física.

5.      Número de solicitudes de ADA parcialmente denegadas

6.      Número de solicitudes de ADA parcialmente denegadas debido a que las solicitudes involucraban un problema de salud mental o física.

7.      Detalle del estado de cualquier violación a ADA descubierta por el Coordinador de ADA del Centro.

E.      Cada Coordinador de ADA del Centro revisará las regulaciones administrativas de ADOC existentes, los procedimientos operativos estándar del centro existentes y las normas administrativas para evaluar el cumplimiento de las obligaciones del centro según ADA y proporcionará las recomendaciones resultantes con respecto al cumplimiento tanto al coordinador de ADA en todo el estado como al alcaide del centro.

F.      Cada Coordinador de ADA del Centro asistirá regularmente a las reuniones de personal que se producen en centro para analizar el cumplimiento de ADA del centro y para responder a cualquier pregunta del personal con respecto a la conformidad con ADA.

G.      Todos los Coordinadores de ADA del Centro asistirás a una reunión anual en persona con el Coordinador de ADA en todo el estado, y asistirán a las reuniones telefónicas trimestrales con el Coordinador de ADA en todo el estado.

H.      Los Coordinadores de ADA del Centro se asegurarán de que las copias de los formularios de solicitud de ADA, o la información contenida en el mismo, se mantengan en el archivo del recluso.

I.      Los Coordinadores de ADA del Centro garantizarán mensualmente que todos los dispositivos de apoyo asignados al centro estén disponibles y en buenas condiciones.   Los Coordinadores de ADA del Centro también se asegurarán mensualmente que todos los formularios de formatos alternativos estén disponibles.  Los Coordinadores de ADA del Centro confirmarán la disponibilidad de dispositivos de asistencia y formas alternativas de formato en el informe mensual descrito anteriormente.

J.      Por lo menos mensualmente, cada Coordinador de ADA del Centro recorrerá el centro, para incluir cualquier área que se permita acceso a un recluso, para determinar si algún recluso se encuentra en un lugar apropiado, cualquier accesorio ADA compatible está en mal estado o no funciona, cualquier parte de la estructura física que necesite reparación que pueda afectar el cumplimiento de ADA, o si cualquier política, procedimiento u operación no se realiza de una manera necesaria para garantizar el cumplimiento de la responsabilidad permanente de ADOC bajo ADA.   Si se observa alguna deficiencia, el

Coordinador de ADA del Centro, dentro de las 24 horas, notificará por escrito al personal apropiado encargado de modificar el programa o estructura no conforme, el alcaide y el Coordinador de ADA en todo el estado de la naturaleza del problema.   El Coordinador de ADA del Centro revisará periódicamente si el problema identificado se ha rectificado hasta el momento en que se modifica.

K.     Los Coordinadores de ADA del Centro revisarán de inmediato todas las solicitudes de ADA, apenas las reciban, para determinar si una solicitud se refiere a una situación de urgencia.   En el caso de una situación de urgencia, el coordinador de ADA del Centro responderá a la solicitud por escrito y, en caso necesario, el ajuste solicitado dentro de los tres (3) días siguientes a la recepción de la solicitud, sin incluir fines de semana y feriados.   En todas las demás situaciones, el Coordinador de ADA del Centro responderá a la solicitud por escrito dentro de los diez (10) días siguientes a la recepción de la solicitud, no incluyendo fines de semana y feriados.

II.     Coordinador de ADA en todo el estado.

A.     ADOC empleará un empleado responsable ("Coordinador de ADA en todo el estado") para coordinar sus esfuerzos de todo el estado para cumplir y llevar a cabo sus responsabilidades en virtud de las Leyes con respecto a cualquier recluso actual o futuro en custodia física de ADOC que tenga una discapacidad.    El personal en todos los centros de ADOC recibirá una notificación del Coordinador de ADA en todo el estado designado.

B.     El Coordinador de ADA en todo el estado será un puesto de tiempo completo.   El Coordinador de ADA en todo el estado responderá directamente al Inspector General de ADOC.

244554.6

C.      En cada centro ADOC, el nombre, la dirección de la oficina, y el número de teléfono del Coordinador de ADA en todo el estado será colocado en cada dormitorio, sala de Chow, área de visitas, biblioteca, áreas de tratamiento de cuidados médicos, áreas de tratamiento de salud mental, capilla, cantina y áreas educativas.

D.      El Coordinador de ADA en todo el estado recibirá, revisará y mantendrá informes mensuales de los Coordinadores de ADA del Centro en cada centro.  El Coordinador de ADA en todo el estado preparará informes trimestrales que resuman los datos recibidos de los Coordinadores de ADA del Centro a través de sus respectivos informes mensuales y presentarán los informes trimestrales el día quince (15) en los meses de abril, julio, octubre y enero al Inspector general de ADOC y el Comisionado adjunto del Departamento de Servicios de Salud.

E.      El Coordinador de ADA en todo el estado revisará las regulaciones administrativas de ADOC, los procedimientos operativos estándar del centro proporcionados por los coordinadores de ADA del centro, y las directrices administrativas existentes para evaluar el cumplimiento de las obligaciones de ADOC bajo ADA, para proporcionar las recomendaciones resultantes en cuanto al cumplimiento al Comisionado, alcaide del centro y coordinadores de ADA del Centro.

F.      El Coordinador de ADA en todo el estado inspeccionará todos los centros principales y de libertad provisional para permitir el trabajo de ADOC, para incluir visitas a la planta física, entrevistas con el personal y entrevistas con los reclusos con discapacidades, para el cumplimiento de las Leyes de la siguiente manera:

1.      Cada centro será inspeccionado anualmente.

244554.6

2.      Los centros donde se alojan los reclusos impedimentos visuales o motrices serán inspeccionados por el Coordinador de ADA en todo el estado para determinar el cumplimiento con las Leyes semestralmente.   Por lo menos una (1) de estas inspecciones se realizará sin previo aviso.

G.      El Coordinador de ADA en todo el estado llevará a cabo las auditorías del programa de aseguramiento de la calidad según se describe en la parte de Aseguramiento de la calidad de este Acuerdo.

H.      El Coordinador de ADA en todo el estado será auditado por lo menos anualmente por el Comité de ADA descrito en la Parte de Aseguramiento de la calidad de este Acuerdo.

I.      El Coordinador de ADA en todo el estado revisará y proporcionará información respecto a cualquier capacitación de ADA propuesta ofrecida por ADOC a su personal administrativo, personal de la institución, o el personal de cualquier proveedor tercero.

J.      Todas las apelaciones de las solicitudes de ADA serán revisadas por el Coordinador de ADA en todo el estado.   Dichas apelaciones serán recibidas por el Coordinador de ADA en todo el estado directamente o remitida al Coordinador de ADA en todo el estado por el Coordinador de ADA del Centro o el alcaide, donde el recluso perjudicada es alojado.  El Coordinador de ADA en todo el estado responderá por escrito a cualquier apelación de ADA dentro de los quince (15) días desde la recepción de la apelación, no incluyendo fines de semana y feriados.  El Coordinador de ADA en todo el estado mantendrá un archivo de todas las apelaciones y respuestas de ADA.  El archivo contendrá todas las características siguientes para cada apelación en la medida que se generaron dichos documentos: la solicitud de ADA original,

la denegación de la solicitud original, la apelación del recluso de la solicitud denegada, y la respuesta escrita a la apelación del recluso.

K.      Durante los primeros doce (12) meses siguientes a la Aprobación Final del Acuerdo Modificado, el Coordinador de ADA en todo el estado:

1.      Realizará reuniones anuales en persona para todos los coordinadores de ADA del Centro;

2.      Además de lo anterior, llevará a cabo una segunda reunión en persona con los coordinadores de ADA del Centro de las centros donde se alojan los reclusos con impedimentos visuales y motrices; y

3.      Tendrá reuniones telefónicas mensuales con todos los coordinadores de ADA del Centro.

L.      A los dos (2) años a partir de doce (12) meses después de la aprobación final, el Coordinador de ADA en todo el estado:

1.      Realizará reuniones anuales en persona con todos los coordinadores de ADA del Centro;

2.      Además de lo anterior, llevará a cabo una segunda reunión en persona con los coordinadores de ADA del Centro de las centros donde se alojan los reclusos con impedimentos visuales y motrices; y

3.      Tendrá reuniones telefónicas trimestrales con todos los coordinadores de ADA del Centro.

M.      Después de tres (3) años a partir de la aprobación final, las reuniones descritas en los párrafos K y L inmediatamente anteriores se puede reducir a una

244554.6

reunión anual en persona para todos los coordinadores de ADA del Centro y reuniones telefónicas trimestrales con todos los coordinadores de ADA del Centro.

N.    El Coordinador de ADA en todo el estado responderá a cualquier pregunta de los coordinadores de ADA del centro con respecto a las Solicitudes de Ajuste de los Reclusos o los problemas de accesibilidad de la ADA que afectan a centros específicos.

244554.6

11.    Provisiones respecto a la Capacitación de Personal ADO.  ADOC proporcionará capacitación inicial y periódica relativa a las disposiciones y los requisitos de ADA tanto al personal de seguridad (es decir, los que están obligados a asistir a la Academia de Capacitación de Oficiales Correccionales) y Coordinadores de ADA.

I.    Capacitación Inicial.

A.    Personal de Seguridad.  El Programa de Defensa de las Personas con Discapacidades de Alabama ("ADAP") proporcionará, en conjunto con ADOC, capacitación sobre las disposiciones y requisitos de ADA para la primera clase de estudiantes que ingresan a la Academia de Capacitación de Oficiales Correccionales después del 1° de enero de 2017.  Esta Capacitación constará de no menos de cuatro (4) horas de instrucción en el aula. A partir de entonces, ADOC proporcionará las cuatro (4) horas de Capacitación para cada clase que entra a la Academia de Capacitación de Oficiales Correccionales. ADAP permitirá que ADOC utilice todos los programas, materiales y similares generados por ADAP para esta instrucción.  Esto incluye, además, sin limitación, las grabaciones de video de la instrucción proporcionada por ADAP. ADOC no va a difundir este material fuera de ADOC ausentes una citación o solicitud de presentación ADOC acuerda compensar a ADAP por sus servicios en la prestación de esta Capacitación. ADOC y ADAP entrarán en un memorando de entendimiento que describa con más detalle las obligaciones y compromisos relativos a esta Capacitación de las partes.

B.    Coordinadores de ADA.    ADAP, en conjunción con ADOC, proporcionara Capacitación sobre las disposiciones y requisitos de ADA a todos los Coordinadores de ADA del centro y el Coordinador de ADA en todo el estado que comienzan en o antes del 31 de enero de 2017. Esta Capacitación durará no menos de seis (6) horas de instrucción en el aula.   ADAP proporcionará cuatro (4) horas de instrucción a los coordinadores

en relación con las disposiciones y requisitos de la ADA y sus responsabilidades como coordinadores de ADA.  ADOC proporcionará dos (2) horas adicionales de instrucción en relación con las políticas y procedimientos internos de ADOC ya que el mismo se relacionan con las funciones de un coordinador de ADA. A partir de entonces, ADOC proporcionará los seis (6) horas de capacitación a cualquier coordinador de ADA que designe.  ADAP permitirá que ADOC utilice todos los programas, materiales y similares generados por ADAP para esta instrucción.  Esto incluye, además, sin limitación, las grabaciones de video de la instrucción proporcionada por ADAP. ADOC no va a difundir este material fuera de ADOC ausentes una citación o solicitud de presentación ADOC acuerda compensar a ADAP por sus servicios en la prestación de esta Capacitación.

II.     Capacitación Anual.

A.     Personal de Seguridad.  ADOC requerirá que todos los miembros de su personal de seguridad participe en dos (2) horas de capacitación anual en relación con ADA. ADAP ofrecerá esta capacitación durante la primera sesión de capacitación de ADOC en una región ADOC seleccionada en cada uno de los años civiles 2018, 2019 y 2020. A partir de entonces, ADOC proporcionará esta capacitación.  ADAP permitirá que ADOC utilice todos los programas, materiales y similares generados por ADAP para esta instrucción.  Esto incluye, además, sin limitación, las grabaciones de video de la instrucción proporcionada por ADAP. ADOC no va a difundir este material fuera de ADOC ausentes una citación o solicitud de presentación ADOC acuerda compensar a ADAP por sus servicios en la prestación de esta Capacitación.

B.     Coordinadores de ADA.     ADOC requerirá que todos los Coordinadores de ADA del centro y el Coordinador de ADA en todo el estado participen en dos

244554.6

(2) horas de capacitación anual sobre ADA. ADAP ofrecerá esta capacitación durante los años civiles 2018, 2019 y 2020.  A partir de entonces, ADOC proporcionará esta capacitación.  ADAP permitirá que ADOC utilice todos los programas, materiales y similares generados por ADAP para esta instrucción.  Esto incluye, además, sin limitación, las grabaciones de video de la instrucción proporcionada por ADAP. ADOC no va a difundir este material fuera de ADOC ausentes una citación o solicitud de presentación ADOC acuerda compensar a ADAP por sus servicios en la prestación de esta Capacitación.

244554.6

12.     Provisiones respecto a un Plan de Aseguramiento de la Calidad (incluyendo Herramientas de Aseguramiento de la Calidad.)

I.     ADOC implementará un Programa de Aseguramiento de la Calidad ("QAP") para evaluar el cumplimiento de los términos del Acuerdo de conciliación, así como de sus obligaciones legales en curso bajo ADA.  El QAP será administrado por el Coordinador de ADA en todo el estado de ADOC.   El Coordinador de ADA en todo el estado llevará a cabo todas las auditorías QAP descritas en este documento, excepto la auditoría QAP del Coordinador de ADA en todo el estado.  La auditoría QAP del Coordinador de ADA en todo el estado se llevará a cabo por el Comité de ADA descrito en este documento.   El Programa de Aseguramiento de la Calidad incluirá auditorías mayores, auditorías periódicas correctivas y auditorías menores.[6]

A.     Al menos anualmente, el Coordinador de ADA en todo el estado llevará a cabo una auditoría mayor de cada Centro para el Coordinador de ADA del Centro para garantizar el cumplimiento de los términos del acuerdo de conciliación y sus obligaciones legales en curso bajo ADA.

1.     Una herramienta de auditoría, incluyendo las siguientes áreas de investigación se utilizarán en este proceso:

a.     Todos los ajustes de ADA, así como los procesos de quejas y apelaciones;

---

[6] Las auditorías mayores se definen como la utilización de todas las secciones de la herramienta de auditoría.  Las auditorías correctivas periódicas se definen como auditorías desencadenadas por deficiencias encontradas en cualquier auditoría mayor o menor de algún subconjunto de las secciones de la herramienta de auditoría para determinar si el plan de acción correctiva resultante ha sido implementado y es eficaz en la corrección de las deficiencias encontradas.   Las auditorías menores se definen como auditorías programadas regularmente que utilizan un conjunto de rotación de menos de todas las secciones de la herramienta de auditoría.

b.      Capacitación de ADA para el personal de ADOC con respecto a reclusos con discapacidad;

c.      Acceso a la programación para reclusos con discapacidad;

d.      Las asignaciones de los códigos de salud por proveedor de atención de la salud y niveles de seguridad de ADOC para reclusos con discapacidad;

e.      Identificación, seguimiento y transferencia de reclusos con discapacidad; y

f.      Provisión de alojamiento accesible y centros y mantenimiento de la misma.

2.      La herramienta de auditoría para medir el cumplimiento de ADA se revisará anualmente después del primer año de su implementación y modificado según sea necesario o conveniente para garantizar el cumplimiento.   Los datos iniciales para evaluar se adjuntan a la presente, bajo el título "Herramientas de auditoría de garantía de calidad". Cualquier centro auditado de conformidad con el Programa de Aseguramiento de Calidad mantendrá al menos un 85% de cumplimiento de cada materia.   Una falla en cualquiera o todas las materias someterá al centro a una auditoría correctiva, no más tarde de seis (6) meses después de la finalización de la auditoría anual, cubriendo al menos aquellas áreas en las que el centro no satisfaga el 85% de cumplimiento.

3.      Al término de cada auditoría de QAP (ya sea mayor, correctiva o menor) un informe por escrito de la auditoría, que muestre los porcentajes de cumplimiento en cada materia será proporcionado al alcaide del centro, la Oficina de ADOC de

Servicios de Salud ("OHS"), el Coordinador de ADA en todo el estado, el Coordinador de ADA del Centro en el centro auditado. El Coordinador de ADA en todo el estado mantendrá un registro completo de todas las auditorías llevadas a cabo (ya sean mayores, correctivas o menores), junto con todos los planes de acciones correctivas correspondientes.

4.      Si se identifican deficiencias, dentro de los quince (15) días (excluyendo fines de semana y feriados) después de que se presente el informe escrito, el alcaide del centro, un representante de SST, el Coordinador de ADA en todo el estado, y el Coordinador de ADA del Centro se reunirán y hablarán telefónicamente o en persona para desarrollar un plan de acciones correctivas para remediar las deficiencias observadas. Todos los planes de acción correctiva serán por escrito. Después de que un plan de acción correctiva haya sido aprobado y aplicado, una auditoría correctiva seguirá. Durante la auditoría correctiva, el auditor revisará si el centro ha implementado los términos del plan de acción correctiva y si las deficiencias de cumplimiento subyacentes han sido resueltas. Los resultados de la auditoría correctiva serán por escrito, y si se observan deficiencias continuas, se desarrollarán acciones correctivas adicionales y se llevará a cabo auditorías adicionales correctivas para lograr el cumplimiento.

B.      Además de la auditoría anual mayor, cada centro estará sujeto a auditorías periódicas menores que son auditorías de algunas partes de la auditoría completa. Las áreas temáticas de las auditorías menores se rotarán anualmente para asegurar que cada materia se revise en cada centro a través del proceso de auditoría menor por lo menos cada tres (3) años. Los centros no serán avisados de la sincronización o materia de las auditorías menores. La auditoría correctiva y los procesos plan de acciones correctivas descritos en este documento también se aplican a las deficiencias encontradas a través del proceso de auditoría menor periódica.

II.     Un Comité de ADA será designado por el Comisionado ADOC para incluir un mínimo de cinco (5) personas, al menos el cuarenta por ciento (40%) de las cuales serán externos a ADOC.  Los representantes externos incluirán un representante de Oficina del Gobernador de la Discapacidad y de un representante del Departamento de Salud Mental de Alabama.  Si no hay ningún representante de la Oficina del Gobernador de la Discapacidad o el Departamento de Salud Mental de Alabama dispuesto o disponible para prestar servicios en el Comité, el Comisionado de ADOC reclutará un número apropiado de representantes de organismos en situación similar o grupos de interés externos de ADOC.  El Comité ADA se reunirá cuando sea necesario, pero por lo menos una vez al año, para auditar al Coordinador de ADA en todo el estado.

A.     La auditoría del Coordinador de ADA en todo el estado incluirá las siguientes áreas de investigación:

1.     Mantener el cumplimiento de las políticas y procedimientos relativos a los reclusos con discapacidades de ADOC;

2.     Una revisión de los informes trimestrales del Coordinador de ADA en todo el estado;

3.     Una revisión de informes mensuales de los Coordinadores de ADA del Centro; y

4.     Una revisión de los archivos de apelaciones de quejas de ADA del recluso mantenidos por el Coordinador de ADA en todo el estado.

B.     La herramienta de auditoría para medir el cumplimiento del Coordinador de ADA en todo el estado con estas áreas será revisado periódicamente y modificado para garantizar el cumplimiento.   Los datos iniciales para evaluar se adjuntan al

244554.6

presente.  De conformidad con el Programa de Aseguramiento de la Calidad, el Coordinador de ADA en todo el estado mantendrá al menos un 85% de cumplimiento de cada área de materia. Una falla en cualquiera o todas las materias someterá al Coordinador de ADA en todo el estado a una auditoría correctiva, no más tarde de seis (6) meses después de la finalización de la auditoría anual, cubriendo al menos aquellas áreas en las que el centro no satisfaga el 85% de cumplimiento.

C.       Al término de cada auditoría de QAP del Coordinador de ADA en todo el estado, un informe por escrito de la auditoría, que muestre los porcentajes de cumplimiento en cada materia será proporcionado al Comisionado, la Oficina de ADOC de Servicios de Salud ("OHS"), el Coordinador de ADA en todo el estado.  El Coordinador de ADA en todo el estado mantendrá un registro completo de todas las auditorías llevadas a cabo junto con todos los planes de acciones correctivas correspondientes.

D.       Si se identifican deficiencias, dentro de los quince (15) días (excluyendo fines de semana y feriados) después de que se presentó el informe escrito, el Inspector General de ADOC, un representante de la OHS, un representante del[7] Comité de ADA, y el Coordinador de ADA en todo el estado se reunirán y hablarán telefónicamente o en persona para desarrollar un plan de acciones correctivas para remediar las deficiencias observadas. Todos los planes de acción correctiva serán por escrito.  Después de que un plan correctivo haya sido aprobado y aplicado, una auditoría correctiva seguirá.   Durante la auditoría correctiva, el Comité de ADA revisará si el Coordinador de ADA en todo el estado ha implementado los términos del plan de acción correctiva y si las deficiencias de cumplimiento subyacentes han sido

---

[7] El Comité ADA no puede nombrar como su representante al miembro del personal de OHS que presta servicios en el Comité.  Es permisible para OHS nombrar como su representante al miembro de su personal que preste servicios en el Comité de ADA.

resueltas.   Los resultados de la auditoría correctiva serán por escrito, y si se observan deficiencias continuas, se desarrollarán acciones correctivas adicionales y se llevará a cabo auditorías adicionales correctivas para lograr el cumplimiento.

III.    Herramientas de Auditoría de QA.

A.    Centros de Admisión.  La auditoría de los registros médicos en la admisión consistirá en una revisión de cien (100)  registros médicos seleccionados al azar de los reclusos en la admisión.  La revisión incluirá una revisión de los registros de al menos seis (6) meses separados e incluirá una revisión de los registros médicos de los reclusos que ya no pueden ser alojados en el centro de admisión.  Todos los reclusos que fueron seleccionados durante el período [8]anterior serán introducidos en una base de datos en la que se utilice un ordenador u otro método similar de selección aleatoria para asegurarse de que no haya sesgo de selección.   Este proceso de selección se producirá diez (10) días antes de la auditoría programada, y ADOC se asegurará de que, si el archivo original no es accesible de otro modo, una copia duplicada de las porciones de las secciones del expediente médico necesarios para la auditoría para un recluso no alojado actualmente en el centro de admisión se transporte al centro de admisión para fines de auditoría.  Se evaluarán los siguientes aspectos:

1.    ¿Se interrogó al Recluso, dentro de las doce (12) horas de su llegada al centro de admisión de ADOC con relación a: discapacidad percibida o reconocida; tratamientos y diagnósticos de salud física, intelectual o mental previos y discapacidades identificadas previamente?

2.    ¿Se sometió al Recluso a un control de las discapacidades físicas y mentales dentro de los siete (7) días, no incluyendo fines de semana y feriados, de la

---

[8] "Período anterior" se define como el período transcurrido desde la última auditoría de la misma clase que la que se lleva a cabo actualmente.

llegada al centro de admisión de ADOC por un proveedor de servicios médicos y mental debidamente calificado de la salud?[9]

        3.     Dentro de los siete (7) días, excepto los fines de semana y feriados, del chequeo de la salud física y mental del recluso por un proveedor de salud médica y mental calificado, ¿fueron todos los perfiles aprobados, los códigos médicos y de salud mental, los ajustes y la discapacidad ingresados en el Módulo de Servicios de Salud del sistema informático?

        4.     Dentro de los tres (3) días, no incluyendo fines de semana y feriados, de que un proveedor de salud médica o mental ingresó un perfil, recomendó un ajuste para discapacitado, encontró una condición de salud médica o mental calificada de ADA o creó un código de salud mental de dos (2) o mayor, ¿fue el Coordinador de ADA del Centro notificado por escrito de cada uno de dichos eventos?

        5.     Dentro de los siete (7) días, excepto los fines de semana y feriados, de la llegada de un recluso en la Planta de admisión de ADOC, ¿se le administró Beta y WRAT al Recluso?

        6.     Dentro de los tres (3) días, excepto los fines de semana y feriados, de la puntuación de un recluso de ochenta (80) o menos en beta o la puntuación de siete (7) o menos en WRAT, ¿se programó realizar al recluso más pruebas y revisión por un psicólogo por la posible existencia de una discapacidad mental o una discapacidad de aprendizaje?

        7.     Para todos los reclusos con una puntuación de ochenta (80) o menos en Beta y/o una puntuación de siete (7) o menos en WRAT, ¿se completaron todas las

---

[9] Un proveedor "debidamente calificado" se define como el proveedor de salud médica y/o mental autorizado para llevar a cabo el chequeo inicial de los Reclusos a su llegada en un centro de ADOC.

pruebas, entrevistas y exámenes por un psicólogo dentro de los treinta y tres (33) días a partir la fecha de notificación de la puntuación de Beta o WRAT?

8.      Para cualquier recluso con una puntuación de 75 o menos en Beta en el momento de la llegada a la custodia de ADOC, ¿se notificó al director de clasificación de ADOC y el psicólogo jefe en un plazo de tres (3) días, no incluyendo fines de semana y feriados?

9.      Para cualquier recluso que llegó con una receta para un medicamento de la salud física o mental, ¿fue el del recluso examinado por un proveedor de salud médica/mental adecuadamente calificado antes de que se agote el medicamento con el cual el recluso llegó al centro de admisión de ADOC?

10.     Para cualquier recluso que llegó con una receta para un medicamento de la salud física o mental, ¿fue que la receta validada y, una vez validada, el recluso recibió el medicamento hasta que él/ella fue atendido por un proveedor de salud médica/mental?

11.     ¿Los reclusos que llegan al centro de admisión de ADOC reciben información sobre sus derechos bajo ADA, y los procedimientos para el ajuste apropiado, quejas y apelación, dentro de los tres (3) días de su llegada, sin incluir fines de semana y feriados, y reconocen dicha información por escrito?

12.     Un centro de admisión de ADOC también estará sujeto y será evaluado bajo la auditoría de "Centros de no admisión" con respecto a los reclusos que han sido alojados de forma continua en un centro de este tipo durante los últimos seis (6) meses.

244554.6

B.      Centros de no admisión.  La auditoría de un centro de no admisión consistirá en una revisión de los registros médicos y de salud mental de cincuenta (50) reclusos seleccionados al azar. [10] Se evaluarán los siguientes aspectos:

1.      ¿Cada recluso recibe una nueva evaluación oportuna de su estado de salud médica y mental según se requiere por las políticas de ADOC?

2.      Si cualquiera de los reclusos ha recibido un ajuste de ADA que no se encuentra en el Módulo de Servicios de Salud, ¿el Coordinador de ADA tiene un registro de todos esos ajustes?

3.      La auditoría también consistirá en una revisión de cuarenta (40) solicitudes de ajuste/apelaciones de ADA otorgadas, rechazadas u otorgadas parcialmente.

4.      ¿Fueron  otorgados  todos  los  ajustes/apelaciones introducidos en el sistema informático del módulo de servicios de salud dentro de los tres (3) días, no incluyendo fines de semana y feriados, de las solicitudes otorgadas?

C.      Coordinadores de Centro de ADA.    La auditoría de un Coordinador de ADA del centro consistirá en una revisión de veinte (20) solicitudes de ajuste, veinte (20) transferencias de un recluso con ajuste de ADA a otro centro, diez (10) solicitudes de ajuste, y cinco (5) apelaciones, y también incluirá una entrevista en persona con diez (10) reclusos que han presentado Solicitudes de Ajuste de ADA, del período anterior. [11] Las siguientes áreas serán evaluadas durante la auditoría.

1.      ¿Fueron  todos  los  ajustes,  solicitudes  y  apelaciones contestadas/enviadas, dentro de los parámetros de tiempo aplicables?

---

[10] El proceso de selección al azar se describe en la sección "Centro de Admisión" en este documento o un procedimiento similar es aceptable.
[11] Si hay menos que el número asignado, entonces, toda una categoría particular será revisada.

2.     ¿La respuesta identifica adecuadamente la razón de cualquier denegación o denegación parcial de una solicitud de ajuste de ADA?

3.     Para cada solicitud de ajuste que se deniega o se deniega parcialmente, ¿hay confirmación por escrito de que el Coordinador de ADA del Centro se reunió con el recluso en persona dentro de los parámetros de tiempo aplicables?

4.     ¿Existe un informe mensual que contenga todos los elementos del "Informe Mensual del Coordinador de ADA del Centro"?

5.     ¿Existe un informe mensual por escrito que indique que el Coordinador de ADA del Centro realizó un recorrido de todas las áreas del centro a las que se les permite el acceso a los reclusos, junto con un registro por escrito de las deficiencias observadas?

6.     ¿El Coordinador de ADA del Centro asistió a todas las capacitaciones anuales obligatorias requeridas para los Coordinadores de ADA del centro?

7.     ¿El Coordinador de ADA del Centro asistió a todas las reuniones periódicas necesarias para el personal de ADA de ADOC?

8.     ¿El Coordinador de ADA del Centro transmitió toda la información que no se encuentra en el módulo informático de servicios de salud en relación con el ajuste y/o el perfil de un recluso al centro receptor dentro de los tres (3) días, no incluyendo fines de semana y feriados, de la transferencia del recluso?

D.     Coordinador de ADA en todo el estado.

1.     Una revisión del Coordinador de ADA en todo el estado consistirá en una revisión de los materiales en su posesión.   En él se incluirán:

a.     ¿El Coordinador de ADA en todo el estado tiene un archivo completo con todas las auditorías de los centros y los resultados?

b.      ¿El Coordinador de ADA en todo el estado tiene un archivo completo de todos los planes de acción correctiva para todos los centros?

c.      ¿El Coordinador de ADA en todo el estado tiene un archivo completo de todos los informes mensuales de los centros?

d.      ¿El Coordinador de ADA en todo el estado tiene una prueba por escrito de los recorridos obligatorios en el centro?

e.      ¿El Coordinador de ADA en todo el estado asiste a todas las capacitaciones anuales obligatorias?

f.      ¿El Coordinador de ADA en todo el estado asiste a todas las reuniones periódicas de su personal de ADA de ADOC?

g.      ¿El Coordinador de ADA en todo el estado tiene un informe anual en el que cualquier modificación de los centros, las políticas, los procedimientos y los reglamentos que se deben implementar para garantizar el continuo cumplimiento de la ADA?

2.      El Coordinador de ADA en todo el estado también se evaluará mediante la revisión del proceso de apelación.   Para efectuar esto, se revisarán las veinte (20) apelaciones del período anterior.  Se incluirán:

a.      ¿El Coordinador de ADA en todo el estado revisión y respondió dentro de los parámetros de tiempo contemplados en este documento?

b.      Para cada solicitud de ajuste o queja que se deniega o se deniega parcialmente, ¿hay confirmación por escrito de que el Coordinador de ADA del Centro se reunió con el recluso en persona dentro de los parámetros de tiempo aplicables?

E.      Evaluación de Resultados.  Para efectos de determinar el requisito de una "auditoría correctiva" según se contempla en el presente documento, el umbral del 85% se aplicará a cada subsección para cada persona/centro aplicables.[12]

F.      Aviso.  ADOC publicará las disposiciones de este acuerdo en la biblioteca de derecho, o si no hay una biblioteca de derecho, en la zona en la que otra información se pone a disposición de los reclusos en cada uno de sus centros principales y de libertad provisional para permitir el trabajo.  Se modificarán los manuales del recluso para incluir las disposiciones del presente acuerdo. La sustancia de lo que se ha escrito en las bibliotecas y en los manuales del Recluso será redactado por ADOC y los Demandantes de forma conjunta. Todos estos documentos estarán disponibles en formatos alternativos para incluir letra grande y Braille.

---

[12] Por ejemplo, si una revisión de los registros médicos se contempla sólo para aquellos casos en los que los datos muestran una falta de cumplimiento, o se utilizará un rendimiento aceptable.  Si se utilizan 50 registros, pero para un asunto en particular menos de 50 personas habrían sido objeto de un procedimiento de ese tipo, entonces se ignorarán esos casos no aplicables.

13.    <u>Reclamos sin Resolver</u>.  Los Demandantes presentan reclamos en este juicio que no se resuelven por el presente Acuerdo Modificado y que están sujetas a ser tratados en la Fase 2 de este pleito.  ADOC no contenderá en el Juicio Fase 2 que se requiere que los demandantes resuelvan estos reclamos en el presente Acuerdo Modificado.   Los Demandantes no renuncian y se reservan el derecho de perseguir cambios arquitectónicos adicionales que no están basados en ADA por razones de salud médica o mental como parte de la Fase 2 de este juicio.   Nada en este párrafo se interpretará como una admisión por parte de los Demandados de que  cambios en la arquitectura se necesiten, sean necesarios o se requieran, en la medida que dichos cambios en la arquitectura se necesiten, sean necesarios o se requieran, una causa de acción existe para exigir que se hagan.

VI.    MONITOREO

1.    Las Partes acuerdan que el monitoreo del cumplimiento de ADOC con los términos de este Acuerdo Modificado es necesario y que ADAP servirá como monitor.  ADOC permitirá ADAP un acceso razonable a los centros, documentos, personal, procedimientos, registros, anotaciones, Reclusos, y otras fuentes de información similares con el fin de garantizar ese cumplimiento.   ADAP tendrá derecho a llevar a cabo entrevistas con los reclusos y el personal para evaluar el cumplimiento de los términos con este Acuerdo Modificado.

2.    ADAP acepta quedar obligado a cualquiera de las órdenes de protección o judiciales introducidas en este caso para proteger la confidencialidad de los registros del recluso y la seguridad de la información sensible.

3.    ADAP preparará un informe escrito sobre los esfuerzos de ADOC para satisfacer los requisitos de este Acuerdo y cualquier plan para efectuar los términos de este Acuerdo Modificado por lo menos cada tres meses.  Cada informe indicará todos los entornos en los que

ADOC tenga, o no tenga, cumplimiento sustancial.  Dicho informe será proporcionado a ADOC y todos los abogados designados.   Si ADAP cree que ADOC no está en cumplimiento sustancial de los términos y disposiciones del presente Acuerdo Modificado y cualquier plan para efectuar sus términos, ADAP proporcionará recomendaciones de acciones por escrito que se consideran necesarias para lograr el cumplimiento sustancial de los términos de la disposición o disposiciones.   ADOC tendrá entonces veinte (20) días para presentar por escrito comentarios, objeciones o planes de acción correctiva en respuesta.   Las Partes se reunirán y deliberarán para intentar subsanar las deficiencias detectadas por ADAP.

4.       El monitoreo continuará por un período no superior a seis (6) años a partir de la firma de este Acuerdo Modificado, independientemente de que ADOC construya o no nuevas cárceles.   En el caso de que ADOC se haya comprometido a la construcción de nuevas cárceles, pero no se hayan completado al 1° de enero de 2020, el monitoreo continuará hasta dos (2) años después de la finalización de las cárceles.

5.       Si ADAP encuentra evidencia de cualquier violación de la ley que no implique la materia de este Acuerdo Modificado, está obligado a informar eso al Consejo General de ADOC, o a la persona designada.

VII.   PROCESO DE RESOLUCIÓN DE DISPUTAS

1.       Durante la evaluación, implementación o periodos de monitoreo de este Acuerdo Modificado (consulte las secciones V-VI, arriba), si el abogado de los Demandantes o el monitor creen que ADOC no está cumpliendo con algún aspecto del Acuerdo Modificado, notificarán al consejo para ADOC, por escrito, dicha creencia identificando los hechos que apoyan la creencia. ADOC investigará las acusaciones y responderá por escrito a través de su abogado dentro de los treinta (30) días siguientes a la recepción de la notificación.  Si el abogado de los Demandantes o el monitor no está satisfecho con la respuesta de ADOC, las partes negociarán de buena fe para

resolver el problema. Si las Partes no pueden resolver el problema oportunamente y de manera satisfactoria, las Partes convienen en presentar el asunto a arbitraje obligatorio ante Hon. John E. Ott, EE.UU., el juez del Distrito Norte de Alabama. [13] Esta disposición sobre arbitraje obligatorio se aplica independientemente de si el problema afecta a doce (12) o más Reclusos, según se analiza a continuación.

2. Si el asunto afecta a menos de doce (12) reclusos, la resolución a través del proceso de arbitraje será la resolución final en virtud del presente Acuerdo Modificado. Nada en este Acuerdo Modificado establece un requisito previo administrativo obligatorio con el que un Recluso deba cumplir antes del inicio de una demanda alegando violaciones de las Leyes ocurridas durante el tiempo de condena del recluso. Nada en este Acuerdo impedirá que un recluso ejerza sus derechos en virtud del Proceso de Quejas de ADA de ADOC.

3. Si el asunto afecta a doce (12) o más reclusos y las Partes no pueden resolver el asunto oportunamente y de manera satisfactoria a través de la negociación o el proceso de arbitraje, cualquiera de ellas podrá someter el asunto al Tribunal para su resolución. Cualquier asunto llevado ante el Tribunal se decidirá sobre un abuso de un estándar de discreción.

4. Los asuntos relativos a las políticas de todo el sistema o del centro específicas de ADOC, o las barreras físicas dentro de un centro específico, se presumirán que impactan a doce (12) o más Reclusos. El árbitro tendrá la autoridad para decidir si una cuestión afecta a doce (12) o más reclusos.

---

[13]Si, en cualquier momento durante la vigencia del presente Acuerdo Modificado esté vigente, el juez Ott o cualquier árbitro sucesor no esté disponible para arbitrar las disputas, las Partes se podrán de acuerdo sobre un árbitro sustituto. Si las partes no pueden ponerse de acuerdo sobre un árbitro sustituto, solicitarán al tribunal que designe un árbitro sustituto que será un juez federal de los EE.UU. actual o anterior de uno de los tribunales de distrito de Estados Unidos que ejerza en los distritos norte, medio o sur de Alabama.

5.      Si el árbitro o Tribunal, en su carácter de tomador de decisiones finales, encuentra que ADOC ha dejado de cumplir con este Acuerdo Modificado, ADOC presentará un plan para remediar las deficiencias identificadas dentro de los treinta (30) días de la decisión.  Si ese plan no remedia a tiempo las deficiencias, el Tribunal se reserva la autoridad de hacer cumplir este Acuerdo Modificado a través de todos los recursos previstos por la ley.   Los honorarios de los abogados otorgados están sujetos a las disposiciones de la Sección XII de este Acuerdo Modificado.

6.      El Tribunal será el foro exclusivo para la ejecución de este Acuerdo Modificado. Cualquier orden para lograr el cumplimiento sustancial de las disposiciones del presente Acuerdo Modificado estará sujeta a las disposiciones de la Ley de Reforma del Litigio Penitenciario, 18 USC sección 3626.

244554.6

VIII.   RESERVA DE COMPETENCIA Y APLICACIÓN

1.      Las partes aceptan la reserva y el ejercicio de la competencia jurisdiccional del Tribunal sobre las controversias entre las Partes y entre las Partes que se deriven de este Acuerdo Modificado.

2.      A los efectos de competencia jurisdiccional y aplicación de este Acuerdo Modificado solamente, las Partes pueden pedir conjuntamente al Tribunal que el presente Acuerdo Modificado responda a los requisitos de 18 USC sección 3626 (a) (1) (A) en que esté estrictamente definido, no vaya más allá de lo necesario para corregir la violación de un derecho federal, y sea el medio menos intrusivo necesario para corregir la violación de los derechos federales de los Demandantes.

3.      El Tribunal conservará competencia jurisdiccional para hacer cumplir los términos de este Acuerdo Modificado, una vez aprobado, hasta que se ponga fin al Acuerdo.

4.      El presente Acuerdo Modificado podrá ser aplicado únicamente por las Partes que aparecen en el presente.   Nada de en este Acuerdo Modificado está previsto, ni se interpretará que evidencie una intención de conferir derecho o remedio a cualquier persona que no sea las Partes del mismo.

IX.   TERMINACIÓN

1.      ADOC puede procurar una terminación de sus obligaciones bajo este Acuerdo Modificado con ocasión de la comprobación de que esté en cumplimiento sustancial con el presente Acuerdo Modificado y se haya mantenido el cumplimiento sustancial durante al menos doce (12) meses consecutivos.   ADOC no puede obtener una terminación de sus obligaciones bajo este Acuerdo Modificado, hasta cinco (5) años siguientes a la aprobación final de este Acuerdo Modificado.

2.       Si, tras la solicitud de terminación, el Tribunal concluye que el ADOC está en cumplimiento sustancial con todos los términos y condiciones de este Acuerdo Modificado, entonces el Tribunal podrá dar por terminada la competencia jurisdiccional de la Parte o Partes de este caso sujeto a este Acuerdo Modificado.

3.       Las Partes trabajarán de buena fe para lograr el cumplimiento sustancial de todos los términos y condiciones del presente Acuerdo Modificado dentro de los parámetros de tiempo de este Acuerdo Modificado.   Si los Demandantes consideran que ADOC no avanza hacia el cumplimiento sustancial de los términos y condiciones de este Acuerdo Modificado, los demandantes pueden proceder con una orden que extienda la competencia jurisdiccional sobre este asunto más allá del período de tiempo máximo contemplado en el presente documento.  Para ampliar la competencia jurisdiccional, se requerirá que los demandantes establezcan evidencia sustancial y el Tribunal entonces halle que ADOC no está en cumplimiento sustancial con este Acuerdo Modificado o cualquier Orden posterior introducida por el Tribunal.

X.       MODIFICACIONES

1.       Por mutuo acuerdo, las Partes podrán modificar los términos de este Acuerdo Modificado (a excepción de la disposición de monitoreo de seis años de la sección XII.2. más abajo), incluyendo pero no limitado a los calendarios para la adopción de medidas específicas, siempre que dichas modificaciones sean formalizadas por escrito, firmadas por las partes o por medio de sus abogados, y aprobadas por el Tribunal.

2.       ADOC no podrá hacer cambios sustanciales en ninguna política, procedimiento, norma o regla que entre en conflicto con los términos de este Acuerdo Modificado.  ADOC suministrará o pondrá a disposición del abogado de los Demandantes cualquier política, procedimiento, reglamento o norma que implemente las disposiciones del presente Acuerdo para su revisión y comentarios.

3.      Se espera que la Iniciativa de Transformación de la Prisión de Alabama ("APTI")
se considere durante o antes de la Sesión Ordinaria de 2017 de la Legislatura de Alabama.  En el
caso de que la Legislatura de Alabama apruebe la APTI en o antes de la conclusión del Sesión
Ordinaria de 2017 de la Legislatura de Alabama de manera tal que tenga autoridad vinculante
autorizada para la construcción de nuevos centros penitenciarios, las partes acuerdan reunirse y
volver a evaluar los plazos analizados en la sección V.2.   "Provisiones respecto a Evaluación,
Auto-evaluación y Plan de Transición, y Medidas Correctivas" y en cualquier lugar de este
Acuerdo Modificado. Si las partes no pueden ponerse de acuerdo sobre plazos modificados o
complementarios para estas disposiciones, en base a la construcción de nuevos centros
autorizados por la APTI, las partes se someten estas cuestiones al "Proceso de Resolución de
Disputas" analizado en la Sección VII del presente Acuerdo Modificado.

4.      ADOC no podrá aprobar ningún cambio en políticas, procedimientos, normas o
reglas por su proveedor de la salud médica y/o mental que entre en conflicto con los términos de
este Acuerdo Modificado.


XI.    FINANCIAMIENTO

1.      Las Partes reconocen que la implementación de los términos de este Acuerdo
Modificado y cualquier plan necesario para efectuar sus términos están sujetos a la
disponibilidad y la recepción de los fondos asignados.

2.      Las Partes reconocen además que la falta de fondos no impide que el Tribunal
ingrese una Orden para lograr el cumplimiento de este Acuerdo Modificado que concuerde con
las disposiciones aplicables de la Ley de Reforma del Litigio Penitenciario, 18 USC sección
3626, y con otra ley aplicable, siempre que ADOC se reserve el derecho de afirmar que la falta
de financiación debe tomarse en cuenta en cualquier orden correctiva.

3.      ADOC se compromete a hacer todos los esfuerzos posibles buena fe para procurar todo el financiamiento necesario para implementar los términos de este Acuerdo Modificado. En el caso de que las partes no consigan ponerse de acuerdo en cuanto a si hay financiamiento suficiente para implementar el presente Acuerdo Modificado, las partes se reunirán y analizarán, y si es necesario, consultarán con el Tribunal.   Si las partes siguen sin llegar a un acuerdo, cualquiera de las partes puede procurar la asistencia del Tribunal.

XII.    HONORARIOS Y GASTOS DE ABOGADOS

1.      ADOC se compromete a pagar los honorarios de abogados y costos asociados a los abogados de los Demandantes la cantidad total de $ 1,250,000.00.   Los demandantes coinciden en que ADOC puede pagar esta suma en cuotas de la siguiente manera: un primer pago de cuota de $ 500,000.00 en o antes de los treinta (30) días siguientes a la Aprobación Final; un segundo pago de cuota de $ 375,000.00 dentro de los seis (6) meses de allí en adelante; un pago de última cuota de $ 375,000.00 dentro de los seis (6) meses después del segundo pago de cuota. Dichos pagos serán remitidos a Southern Poverty Law Center.   Se renuncia a los intereses sobre las sumas.  ADOC reconoce que los abogados de los Demandantes han estado involucrados en el procesamiento de otros reclamos en este caso más allá de los resueltos por el presente Acuerdo. ADOC reconoce que el pago de la suma anterior es por el trabajo y los costos asociados a los reclamos resueltos en este documento y que los abogados de los Demandantes se reservan el derecho de procurar honorarios y costos adicionales de abogados por los reclamos que no se abordan en el presente Acuerdo.

2.      Los abogados de los Demandantes de acuerdo en que no procurarán ni solicitarán al Tribunal regulación de honorarios y gastos por los servicios de monitoreo superiores a las siguientes cantidades.   Para fines de descripción de los períodos de aquí en adelante, el tiempo comienza después de la firma y la aprobación final de esta conciliación por el Tribunal.   Los

montos de honorarios por el monitoreo de los servicios tendrán un tope, y no excederán, en total los siguientes montos:

      a.        Primer Año: $ 70,000.00

      b.        Segundo Año: $ 60,000.00

      c.        Tercer Año: $ 50,000.00

      d.        Cuarto Año: $ 40,000.00

      e.        Quinto Año: $ 60,000.00

      f.        Sexto Año: $ 50,000.00

El costo asociado con la participación del abogado de los Demandantes en la encuesta del Centro descrita en la Sección V.2. de este Acuerdo Modificado se aplica para cubrir el costo total del monitoreo, pero no se deducirá en su totalidad desde el primer año y puede ser repartidos en las evaluaciones de otros años si es necesario.

      3.      El abogado de los Demandantes proporcionará las horas detalladas sobre trimestralmente.  ADOC se compromete a pagar una tarifa por hora de $ 195.00 por los servicios prestados en el proceso de monitoreo.  Las Partes se reunirán y hablarán e intentarán llegar a un acuerdo sobre el pago del los servicios de monitoreo prestados.   En el caso de que las partes no consigan ponerse de acuerdo sobre el número razonable de horas, cualquiera de las partes puede procurar la asistencia del árbitro o el Tribunal si las partes siguen sin llegar a un acuerdo.

      4.      Los límites anuales y los honorarios por hora descritos en este documento no se aplican a: (a) las propuestas de los Demandantes para hacer cumplir los términos de este Acuerdo Modificado; y (b) la oposición de los Demandantes para cualquier Propuesta presentada por ADOC que surja de este Acuerdo Modificado.  No se regularán honorarios y gastos a los abogados de los Demandantes por dichas propuestas u oposiciones a menos que el Tribunal

244554.6

declare: (a) que la propuesta o la oposición sean necesarias para hacer cumplir los derechos sustanciales bajo las Leyes; y (b) que los Demandantes intentaron resolver el asunto y/o acotar los asuntos planteados tanto como sea posible mediante reuniones y conferencias con ADOC, teniendo plena oportunidad de recurrir al proceso de mediación antes de presentar los asuntos al Tribunal.  Los abogados de los Demandantes acuerdan que no pueden procurar costos y honorarios de abogado por más de $ 200,000 por año en propuestas para hacer cumplir los términos de este Acuerdo.

XIII.   PROVISIONES ADICIONALES

1.      El presente Acuerdo Modificado constituye el acuerdo completo entre las partes en cuanto a todos los reclamos que contiene el presente documento.  Este Acuerdo Modificado reemplaza todos los acuerdos, ya sean escritos, orales o implícitos.  Cada parte manifiesta que tiene la autoridad legal para celebrar y firmar el presente Acuerdo.

2.      El presente Acuerdo Modificado no puede ser alterado o modificado, excepto por escrito y firmado por todas las partes o sus representantes.

3.      El presente Acuerdo Modificado será vinculante para todos los sucesores, cesionarios, empleados, agentes y todos los demás que trabajen en nombre de los Demandantes y ADOC.

4.      El presente Acuerdo Modificado puede ser firmado en varios ejemplares y dichos ejemplares se proporcionarán a todas las Partes inmediatamente después de su firma.

_____     Fecha: _____

Rhonda Brownstein
Southern Poverty Law Center
400 Washington Avenue
Montgomery, Alabama  36104
(334) 956.8200
rhonda.brownstein@splcenter.org
*Uno de los Abogados para los Demandantes*

_____     Fecha: _____

Maria V. Morris
Southern Poverty Law Center
400 Washington Avenue
Montgomery, Alabama  36104
(334) 956-8200
maria.morris@splcenter.org
*Uno de los Abogados para los Demandantes*

244554.6

_____     Fecha: _____
James A. Tucker, Executive Director
Programa de Defensa de Discapacidades de Alabama
Box 870395
Tuscaloosa, Alabama  35487

_____     Fecha: _____
J. Patrick Hackney
Programa de Defensa de Discapacidades de Alabama
Box 870395
Tuscaloosa, Alabama  35487
(205) 348-4928
jphackney@adap.ua.edu
*One of the Attorneys for Plaintiffs*

_____     Fecha: _____
William Van Der Pol, Jr.
Programa de Defensa de Discapacidades de Alabama
Box 870395
Tuscaloosa, Alabama  35487
(205) 348-4928
wvanderpoljr@adap.ua.edu
*One of the Attorneys for Plaintiffs*

Fecha: _____

_____

Anil A. Mujumdar
Zarzaur Mujumdar & Debrosse – Abogados del Juicio
2332 2nd Avenue North
Birmingham, Alabama  35203
(205) 983-7985
anil@zarzaur.com
*Uno de los Abogados para los Demandantes del Programa de Defensa de Discapacidades de Alabama*

244554.6

_____                    Fecha: _____
William G. Somerville
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
420 North 20th Street, Suite 1600
Birmingham, Alabama  35203-5202
(205) 250-8375
wsomerville@bakerdonelson.com
*Uno de los Abogados para los Demandantes*

_____      Fecha: _____

David R. Boyd
Balch & Bingham LLP
P.O. Box 78
Montgomery, Alabama  36101
(334) 834-6500
dboyd@balch.com
*Uno de los Abogados para el Demandado del Departamento Correccional de Alabama*

_____      Fecha: _____

John G. Smith
Balch & Bingham LLP
P.O. Box 78
Montgomery, Alabama  36101
(334) 834-6500
jgsmith@balch.com
*Uno de los Abogados para el Demandado del Departamento Correccional de Alabama*

244554.6

_____    Fecha: _____

Anne Hill, General Counsel
Departamento Correccional de Alabama
301 South Ripley Street
Montgomery, Alabama  36130
(334) 353-3885
anne.hill@doc.alabama.gov
*Uno de los Abogados para el Demandado del Departamento Correccional de Alabama*

_____    Fecha: _____

Jefferson Dunn
En su carácter oficial de Comisionado
        de Departamento Correccional de Alabama
301 South Ripley Street
Montgomery, Alabama  36130





**Translation Cloud LLC**
121 Newark Ave., 3rd Floor
Jersey City, NJ 07302
1 (800) 790-3680

Project Manager: Kavita Ramgahan
Document Translation
Translation from English to Spanish
June 22, 2016