# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA

JOSHUA DUNN, ET AL.,)

       )

    Plaintiffs,   )

       )   Civil Action Number:

v.        )

       )   2:14-cv-00601-MHT-TFM

JEFFERSON DUNN,  )

ET AL.,      )

       )

    Defendants.  )

# AMENDED AND RESTATED SETTLEMENT AGREEMENT CONCERNING CLAIMS ARISING UNDER THE AMERICANS WITH DISABILITIES ACT AND §504 OF THE REHABILITATION ACT OF 1973, AND RESOLVING THE <u>PHASE 1 TRIAL OF THESE PROCEEDINGS</u>

# **TABLE OF CONTENTS**

I.   INTRODUCTION ......................................................4

II.  STATEMENT OF PARTIES, PURPOSE, AND INTENT.........................................................................7

III. PRELIMINARY AND FINAL APPROVAL OF CLASS ACTION SETTLEMENT................................16

IV.  DEFINITIONS..........................................................17

V.   SUBSTANTIVE PROVISIONS..............................25

1. Introduction.......................................................25

2. Provisions Regarding Assessment, Self Evaluation and Transition Plan, and Corrective Actions....26

3. Provisions Regarding Program Access and Reasonable Accommodation. ..........................56

4. Provisions Regarding RTUs and SUs.................58

5. Provisions Regarding Identifying, Documenting and Tracking Inmates with Disabilities. ..........63

6. Provisions Regarding Security Levels.................86

7. Provisions Regarding Auxiliary Aids.................90

8. Provisions Regarding Emergencies. ..................103

9. Provisions Regarding Accommodations and Appeals. ........................................................108

10. Provisions Regarding ADA Coordinators. ......113

11. Provisions Regarding Training of ADOC Staff. ........................................................................130

12. Provisions Regarding a Quality Assurance Plan (including Quality Assurance Tools.).............136

13. Unresolved Claims. ..........................................163

VI. MONITORING ......................................................164

VII. DISPUTE RESOLUTION PROCESS...................167

VIII. ............ RESERVATION OF JURISDICTION AND ENFORCEMENT ..................................................172

IX. TERMINATION ....................................................173

X. AMENDMENTS ...................................................175

XI. FUNDING............................................................178

XII. ATTORNEYS' FEES AND EXPENSES..............179

XIII. ADDITIONAL PROVISIONS ............................184

244554.6

# I.   INTRODUCTION

1.   On June 17, 2014, the individually named Plaintiffs and the Alabama Disabilities Advocacy Program ("ADAP") filed the instant lawsuit (the "Lawsuit") challenging, among other things, the compliance of the Alabama Department of Corrections ("ADOC") with the provisions of the Americans with Disabilities Act, 42 USC § 12111, *et seq*., including the ADA Amendment Acts of 2008, 42 USC 12001 *et seq*., ( collectively, the "ADA") and §504 the Rehabilitation Act of 1973, 29 USC § 701, *et seq*. ("Rehabilitation Act") (the ADA and Rehabilitation Act are jointly referred to herein as the "Acts.")

244554.6

2.     The U.S. District Court for the Middle District of Alabama (the "Court") has bifurcated the issues raised in the Lawsuit into two trial Phases: Phase 1, which includes the trial of claims and issues brought under the Acts, other than claims relating to mental health status; and Phase 2, which includes all other claims in the Lawsuit.

3.     On March 15, 2016, the parties submitted their "Joint Motion for Preliminary Approval of a Class Action Settlement of Concerning Claims Arising Under the Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973 (Doc. 376) ("Joint Motion"). Attached to the Joint Motion was the parties' "Settlement Agreement Concerning Claims Arising Under the Americans with Disabilities Act and § 504 of the

244554.6

Rehabilitation Act of 1973, and Resolving the Phase I Trial of These Proceedings" (Doc. 376-1) (" Agreement").

4.   The Court conducted a hearing on the Joint Motion on March 17, 2016.

5.   Following that hearing, and by Order of March 18, 2016, the Court directed that the "Plan" referenced in the Agreement be submitted to the Court. (Doc. 394 at ¶ (2)) ("Order").

6.   Since the entry of the Order, the parties have continued to work, both independently and through extensive mediation, to further refine and define the terms and provisions of an agreement that will settle the issues to be tried in Phase 1.  The Parties believe that they have

244554.6

reached such a resolution and that, in order to avoid additional protracted, costly and uncertain litigation, it is in their respective best interests to resolve the issues to be tried in Phase 1 of this litigation.

7.    Accordingly, the Parties, by and through their respective counsel, jointly stipulate and agree to the following provisions to resolve Phase 1 of the litigation.

## II.   STATEMENT OF PARTIES, PURPOSE, AND INTENT

1.    Named Defendant ADOC is the agency of the State of Alabama in charge of the state-owned and operated prisons and work release facilities in Alabama that currently or may in the future have physical custody of the individually named plaintiffs.

244554.6

2.   The individually named plaintiffs in this lawsuit are currently, or may in the future be, in the physical custody of ADOC.

3.   Plaintiff ADAP is the duly authorized protection and advocacy agency in the State of Alabama.

4.   The individually named plaintiffs and ADAP seek class certification of their claims asserted in this lawsuit under the Acts. As part of this agreed resolution of the claims to be tried in Phase 1 of this litigation, ADOC consents to the certification, under Federal Rule of Civil Procedure 23, of a class whose members (the "Class") are defined as "any current or future inmate in the physical custody of ADOC who has a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B),

excluding those inmates whose disabilities relate solely to or arise solely from mental disease, illness, or defect."

5.   The individually named plaintiffs, the Class, and ADAP are collectively referred to herein as "Plaintiffs."

6.   The Plaintiffs and ADOC are collectively referred to as the "Parties."

7.   The Parties stipulate that there are no individual or class claims, including putative class claims, under the Acts asserted against Named Defendant Jefferson Dunn, named in his official capacity as Commissioner of the Alabama Department of Corrections, or Named Defendant Ruth Naglich, named in her official capacity as Associate Commissioner of Health Services for the Alabama Department of Corrections.

244554.6

8.   The purpose of this "Amended and Restated Settlement Agreement Concerning Claims Arising Under the Americans with Disabilities Act and §504 of the Rehabilitation Act of 1973, and Resolving the Phase 1 Trial of these Proceedings" ("Amended Agreement") is to: (1) amend, supplement and supersede the Agreement; (2) provide the "plan" requested in the Order; and (3) settle and resolve all issues which were to be presented in the trial of Phase 1 of this matter. The Parties agree and stipulate that by this Amended Agreement they hereby resolve all pending claims in this action for alleged violations of the Acts, except for claims under the Acts that relate solely to or arise solely from mental disease, illness or defect. Claims brought by Plaintiffs under the

Acts that relate solely to or arise solely from mental disease, illness or defect are not waived and are reserved for resolution during the Phase 2 trial.[1]

9.    Except for ADOC's consent to class certification as described in Section II, paragraph 4 above, the Parties agree that ADOC has not consented to class certification of claims that arise under the Acts and that relate solely to or arise solely from mental health disabilities, or claims that arise under the Eighth Amendment. Class certification and the merits of such claims will be resolved in Phase 2 of this litigation.

---

[1] The Parties agree that the question of whether ADOC should be required to add the following categories of Inmates to the mental health caseload is expressly reserved for resolution during Phase 2 of this litigation: (i) Inmates placed in suicide watch or safe cells; (ii) any Inmate who has been placed in segregation more than two times in a 365-day period (except that placement into segregation for protective custody or similar reasons); and (iii) any Inmate who spends more than 50% of his or her time housed in segregation.

10. The Parties may not use this Amended Agreement or Agreement for any purpose in Phase 2 of the litigation except as evidence of what has or has not been resolved by this Amended Agreement.

11. Nothing in this Amended Agreement or Agreement will be construed as an admission by ADOC of any violation of law.  To the contrary, ADOC denies every material allegation of the Complaint, as amended, in this case and denies any liability to the Plaintiffs.  This Amended Agreement and Agreement do not constitute, and will not be construed as, an admission or evidence of any act of deliberate indifference to the constitutional rights of any Inmate, or of any violation of the Acts.

244554.6

12. The Parties stipulate that nothing in this Amended Agreement or in the Agreement will be used for any purpose outside of the above-captioned matter or against any named Defendant in any other litigation that has been or may be filed against any named Defendant. Nothing in this Amended Agreement or in the Agreement will be construed to require ADOC to do more than what is required by the Acts, court decisions applying or interpreting the Acts, or Rules and Regulations interpreting the Acts.

13. The Parties believe that this Amended Agreement is fair, reasonable, and adequate to protect the interests of all Parties concerning the issues contained herein. The Parties jointly file this Amended Agreement

244554.6

with the Court and ask that the Court issue an order directing notice to the Class, setting an objection period, and setting a fairness hearing for preliminary approval, and that the Court then approve the Class and the settlement as final.

14. However, and in the event that this Amended Agreement is not approved by the Court such that it settles and resolves, on a class basis, all issues to be tried in Phase 1, the Parties retain all of their pre-Settlement litigation rights and defenses, including ADOC's right to petition for interlocutory review of any order granting class certification. Additionally, the Parties shall return to the status quo ante in the Lawsuit as if the Parties had not entered into this Amended Agreement. Any discussions,

244554.6

offers, or negotiations associated with this Amended Agreement or Agreement will not be discoverable or offered into evidence or used in the Lawsuit or any other action or proceeding for any purpose, without prejudice to Plaintiffs' right to seek class certification, and ADOC's right to oppose class certification.  In such event, all Parties will stand in the same position as if the Amended Agreement or Agreement had not been negotiated, made or filed with the Court.

244554.6

## III. PRELIMINARY AND FINAL APPROVAL OF CLASS ACTION SETTLEMENT

1.     Preliminary Approval – No later than seven (7) days after all necessary signatories have executed this Amended Agreement, the Parties will jointly submit this Amended Agreement to the Court for preliminary approval, along with a proposed order for preliminary approval, a schedule for notice, proposed notices of preliminary approval, a schedule for an objection period, and a request for a fairness hearing under Rule 23 (e) of the Federal Rules of Civil Procedure.

2.     Final Approval – Within twenty (20) days of the Parties reaching agreement, the Parties will file with the Court any additional agreement or agreements, which will include notice provisions, a proposed Final Approval

244554.6

Order, and comply with all provisions of Rule 23(e) of the Federal Rules of Civil Procedure.

## IV.   DEFINITIONS

1.   "Substantial Compliance" means adherence in all material respects to the terms of this Amended Agreement and to any plans or methods implemented by ADOC so as to comply with the terms of this Amended Agreement, recognizing that one hundred percent (100%) compliance is not required.   Isolated, acute, non-substantive or immaterial deviations from the terms of this Amended Agreement or from any plans or methods implemented by ADOC so as to comply with the terms of this Amended Agreement will not prevent a finding of Substantial

244554.6

Compliance, provided that ADOC can demonstrate that it has:

  a. implemented a system or systems (i) for assuring compliance, and (ii) for taking corrective measures in response to instances of non-compliance; and

  b. instituted policies, practices, and resources that are capable of durable and sustained compliance.

 2. "Disability" and "Disabilities" have the same meaning they have under the Acts and applicable implementing regulations.

 3. "Inmate" is defined as any individual detained by or in the custody of ADOC, including any individual housed in or held at any facility operated or controlled by ADOC.  This term does not include any individual who

244554.6

has been released on parole and/or probation or who is not physically housed in an ADOC facility.

4.     Inmate with a Disability.   An Inmate who is a qualified individual with a disability who:

a.     Has a physical or mental impairment that substantially limits one or more major life activities;

b.     Has a record or history of such impairment; or

c.     Is perceived or regarded as having such impairment.

5.    "Programs" are defined as educational, vocational, rehabilitative, work release, treatment, and religious training or instruction and include all educational, rehabilitative, substance abuse treatment,

244554.6

vocational, work release, religious, disciplinary, classification, medical or mental health treatment or similar programs, procedures, or processes provided to Inmates in ADOC custody regardless of whether such programs are administered by ADOC, or by a contractor of ADOC.

6.    An "Otherwise Qualified Inmate:" An Inmate who is able to meet all of a Program's requirements in spite of his or her impairment.

7.    Auxiliary Aids and Services: Refers to qualified interpreters, note takers, transcription services, written materials, telephone handset amplifiers, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, captioning telecommunications devices

244554.6

for deaf persons ("TDD" or "TTY"), videotext displays or other effective methods of making aurally delivered materials available to individuals with hearing impairments; qualified readers, taped texts, documents in Braille or large print, or other effective methods of making visually delivered materials available to individuals with visual impairments; acquisition or modification of devices; or other similar services and actions. This term also includes the provision of tutors and aides where appropriate.

8. Statewide ADA Coordinator. An ADOC employee charged with the duty of ensuring compliance with the provisions of the Acts throughout ADOC's

244554.6

facilities, among other duties as detailed elsewhere in this Amended Agreement.

9.    Facility ADA Coordinator. An ADOC employee charged with the duty of ensuring compliance with the provisions of the Acts at the ADOC facility for which he or she is designated as Facility ADA Coordinator, among other duties as detailed elsewhere in this Amended Agreement.

10. Facility. All correctional facilities, including work release centers, operated by ADOC whether at the time of this Agreement or in the future.

11. Major Life Activities. These include, but are not limited to: caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing,

244554.6

lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

12. Major Bodily Functions. These include but are not limited to functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

13. Undue Hardships. An accommodation that is excessively costly, extensive, substantial, disruptive, or that would fundamentally alter the nature or operation of ADOC or any of its Facilities.

14. Request for an Accommodation. A request to a Facility ADA Coordinator by an Inmate for use of an assistive device or service, change in housing placement,

244554.6

modification of architectural or program access, or other modification of policy or procedure to ensure than an Inmate with a Disability may, with a reasonable accommodation, access all programs and program areas and Facility areas (to include housing), in a manner consistent with that of an Inmate without a disability who is otherwise similarly situated.

15. Appeal.  The process that permits an Inmate to seek review by the Statewide ADA Coordinator of a decision by a Facility ADA Coordinator.

16. ADA Request Form. The form, an exemplar of which is attached hereto as Exhibit "A," through which an Inmate may Request an Accommodation or pursue an Appeal.

244554.6

## V.   SUBSTANTIVE PROVISIONS

1.   Introduction.  The Parties have jointly developed and agreed upon the below-described substantive provisions that are designed to provide for care, services, accommodations, programs, and activities for Inmates consistent with the terms of this Amended Agreement and the Acts.  These provisions are intended to ensure that Inmates are not, on the basis of disability, exposed to substantial harm and that Inmates are not, on the basis of disability, subject to discrimination.

244554.6

2. <u>Provisions Regarding Assessment, Self-Evaluation and Transition Plan, and Corrective Actions</u>.

I. The following summary describes the activities and time frames in which these activities will be completed (discussed in more detail in later provisions).All time frames are based on the date of the Court's Final Approval of this Amended Agreement ("Final Approval").

A. Within four (4) months of Final Approval, ADOC will have completed a list of all educational and rehabilitative programs, and all vocational programs, sorted by institution, for all ADOC facilities. *See* Section V.2.IV.

244554.6

B.   Within   six   (6)   months   of   Final Approval,   ADOC   will   designate   facilities   which   it certifies will not be used to house Inmates with mobility or vision impairments. *See* Section V.2.III.

C.   Within   twelve   (12)   months   of   Final Approval,   ADOC   will   complete   a   Self-evaluation   to include:

1.   An architectural survey of its major prison and work release facilities. *See* Section V.2.IV.

2.   A   systematic   review   of   ADOC Policies and Procedures, and facility specific Policies and Procedures,   specific   to   inmates   for   any   facility   where ADOC   intends   to   house   inmates   with   disabilities.   *See* SectionV.2.IV.

244554.6

3.    All annual (or semi-annual) Inmate medical evaluations to ensure that all disability-related handicaps and accommodations are entered into the Health Services Module, as provided in Section V.5.I. below, except for those evaluations discussed in Section V.5.I.C.2.ii. below, will have been completed.

D.  Within fifteen (15) months of Final Approval, ADOC will complete a Transition Plan describing how ADOC intends to effectuate compliance with the Acts concerning housing assignments and program access.  This will designate whether architectural barriers are to be removed, or remediated, or new facilities built, or if policy changes will be implemented

244554.6

to overcome any architectural barrier in each instance for each Facility. *See* Section V.2.V.

E.   Within eighteen (18) months of Final Approval, ADOC will:

1.   Modify all procedures and policies necessary to overcome architectural barriers without remediation or removal.  *See* Section V.2.V.B.

2.   For all instances in which architectural removal or remediation is selected, or new Facilities built, ADOC will provide the Monitor all existing materials outlining the removal or remediation or building processes, including any bid specifications, requests for proposals, contracts (if the same exist as of that time) and similar records. *See* Section V.2.V.

F.   Within twenty-four (24) months after Final Approval, and again at thirty (30) months after Final Approval, ADOC will supplement and update the status of any architectural removal or remediation programs or building processes. *See* Section V.2.V.

G.   Within thirty-two (32) months after Final Approval, ADOC will have completed all architectural barrier removal or remediation or constructed sufficient new facilities to accommodate Inmates with Disabilities. *See* Section V.2.V.

II.   Identification and Listing of Programs.  Within four (4) months of Final Approval, ADOC will provide the designated Architectural Expert and Plaintiffs' counsel a complete list of all educational,

244554.6

vocational, and rehabilitative programs and services, identified by name and at the Facility or Facilities where offered. This list will include programs and services at Facilities that are not intended to be architecturally surveyed.

III. Designation of Facilities That Will Not House Inmates with Disabilities. ADOC may designate certain of its Facilities that will not be architecturally surveyed, subject to the limitations set forth in Section V.2.IV.D.3. below. ADOC will certify, in writing, its facilities that will not contain Inmates with vision or mobility disabilities and this certification will be provided to the designated Architectural Expert and Plaintiffs'

counsel within six (6) months after the date of Final Approval.

IV.   Self-Evaluation. ADOC will conduct a self-evaluation of its Facilities consistent with the provisions of 28 C.F.R. 105-35.117 and 35.150 (c) and (d).

A.   On or before twelve (12) months following Final Approval, ADOC will complete a written Self-evaluation identifying and listing, by Facility, the following: all programs, activities, and services ADOC provides or makes available to Inmates at each facility, including facilities that will not be architecturally surveyed; Inmates' access to and within each of ADOC's Facilities where ADOC intends to assign Inmates with vision or mobility impairments; and all of ADOC's

policies and practices regarding Inmates at each facility where ADOC intends to assign Inmates with Disabilities, including policies and practices that govern the administration of ADOC's Programs, activities, and services at that Facility as the same relate to Inmates. These policies and practices are typically reflected in ADOC's administrative regulations, standard operating procedures, policy directives, and memoranda.

   B.   ADOC's review of its policies will ensure the following:

   1.   That ADOC is able to communicate with Inmates with Disabilities in a manner that is as effective as its communications with other Inmates. If ADOC communicates with Inmates by

244554.6

telephone, it should ensure that TDDs or equally effective telecommunication systems are used to communicate with individuals with impaired hearing or speech.  If ADOC provides telephone emergency services, it should review its policies to ensure direct access to individuals who use TDD's and computer modems.

2. That ADOC accommodates Inmates with vision and hearing impairments. This may include, but is not limited to, readers for individuals with vision impairments; interpreters or other alternative communication measures, as appropriate, for individuals with hearing impairments; and note-takers for individuals with manual impairments. A method for securing these services should be developed, including guidance on

244554.6

when and where these services will be provided. ADOC may permit properly trained and willing Inmates to serve in these capacities. Where equipment is used as part of ADOC's program, activity, or service, an assessment should be made to ensure that the equipment is usable by Inmates with Disabilities, particularly Inmates with hearing, visual, and manual impairments. In addition, ADOC should have policies that ensure that the equipment is maintained in operable working order.

3.   That Inmates with Disabilities are accounted for and evacuated to a place of safety during an emergency. This may require the installation of visual and audible warning signals and special procedures for

244554.6

assisting individuals with disabilities from a facility during an emergency.

4.    That Inmates with Disabilities are not portrayed in an offensive or demeaning manner.

5.    That ADOC's decisions concerning a fundamental alteration in the nature of a Program, activity, or service, or a decision that an undue financial or administrative burden will be imposed by Title II of the ADA, are made properly and expeditiously.

6.    That the construction of any new Facility or part of a facility, or the alteration of existing Facilities after January 26, 1992, conforms to the standards designated under the regulations enforcing Title II of the ADA.

7.     That measures have been taken to ensure that employees of ADOC are familiar with the policies and practices for the full participation of Inmates with Disabilities. Appropriate training should be provided to employees.

8.     That, if ADOC limits or denies an Inmate's participation in its Programs, activities, or services based upon that Inmate's drug usage, it ensures that such policies do not discriminate against former drug users, as opposed to individuals who are currently engaged in illegal drug use. Nothing herein will be construed to permit ADOC to limit the provision of medical or mental health care to Inmates based upon the illegal use of drugs unless the same is determined by

244554.6

ADOC's medical or mental health care provider(s) to be contraindicated.

C.   Once ADOC has identified its policies and practices, it will review and analyze whether these policies and practices permit, or adversely affect, the full participation of Inmates with Disabilities in its Programs, activities, and services. In performing this review and analysis, ADOC will be mindful that although its policies and practices may appear harmless, those policies may in application result in denying Inmates with disabilities the full participation of its Programs, activities, or services.  These policies or practices will be modified to ensure that Inmates may, with reasonable accommodation, access Programs.  ADOC does not have

244554.6

to alter or change policies necessary for the operation or provision of the program, service, or activity. The self-evaluation should identify policy modifications to be implemented and include complete justifications for not modifying any exclusionary or limiting policies or practices.

D. ADOC will survey its Facilities,to identify any physical barriers to Inmate access at the Facility (the "Survey"). The Survey will be in writing (supplemented where appropriate by photographs and/or diagrams) and will identify all architectural barriers for housing and Program access, as defined by the Acts, for any areas in which Inmates in such Facility are allowed access. The Survey will determine whether Inmates with

244554.6

vision or mobility impairments are provided access to all areas within the facility in which the given Inmate may access, given appropriate security concerns. The survey will identify steps that should be taken to make Programs, when viewed in their entirety, accessible to Inmates with Disabilities. If structural changes or modifications to facilities are necessary, those changes or modifications should be described in the Transition Plan. The Survey will include a systematic review of each Facility in which ADOC may choose to house inmates with disabilities defined by the Acts.

1.   As part of the Survey, ADOC will assess at least the following areas of its existing Prison and Work Release Facilities to, among other things,

determine the existence of architectural barriers which functionally inhibit Inmates with physical disabilities from accessing those parts of the Prisons or Work Release Facilities that Inmates are permitted to access: (a) Housing; (b) Recreational Areas; (c) Vocational Programs; (d) Educational Programs; (e) Chapel; (f) Libraries; (g) Canteen; (h) Cafeteria; (i) Visitation; (j) Hobby Craft; (k) Medical care treatment areas; and (l) Mental health care treatment areas.

2. The Survey will be conducted jointly by ADOC, an agreed-upon Architectural Expert (the "Architectural Expert") and a representative designated by Plaintiffs' counsel. ADOC will compensate the expert at a rate agreed to with the expert,

244554.6

and will compensate the person designated by Plaintiffs'

counsel at a rate of $1,500.00 for each day, or part of a

day, of the survey, and at a rate of $150.00 for any hours

spent in preparing and/or reviewing the Survey.[2]   The

parties will jointly schedule surveys of the selected

facilities.  If the parties are unable to agree whether a

specific condition constitutes or creates a violation of the

Acts, such condition will be identified but listed as

questioned.  More than one facility may be surveyed on

any particular day provided that sufficient time is

allocated to each facility, and such surveys may not

exceed nine hours on each day.  One knowledgeable

counsel for Plaintiffs may serve as Plaintiffs' designee.

---

[2] The compensation of Plaintiffs' counsel for involvement with this process is considered as part of the monitoring costs as set out in Section VI. of this Amended Agreement.

244554.6

Any item identified as questioned will be resolved through the Dispute Resolution Process described in Section VII., below.

3.     ADOC need not include as part of the Survey facilities ADOC certifies will not house Inmates with vision or mobility Disabilities.  To exclude a facility from the Survey, ADOC will designate in writing a list of any such facilities not later than six (6) months after the date of Final Approval. However, ADOC will survey enough facilities to ensure sufficient available bed space to house Inmates with Disabilities in a manner consistent with their individual needs, but also considering the requirement that integrated housing be provided when appropriate. *See Olmstead v. L.C.*, 527

244554.6

U.S. 581 (1999). ADOC must survey at least fifty percent (50%) of its facilities existing and in use as of Final Approval of in each of the following categories:  Major Facility-Close Custody, Major Facility-Medium Custody, and Work Release/Community Based Facility.  The minimum number of facilities required shall be calculated separately for men's and women's facilities.  J.O. Davis Correctional Facility must be included in the Survey.

   E.   ADOC will maintain a copy of its self-evaluation for a period of three (3) years.  A copy of this self-evaluation will be made available to the general public, and a copy of the same will be maintained at the law library of all ADOC facilities. ADOC is permitted to redact from any copy of the self-evaluation made

available to the public or to Inmates any portion of the self-evaluation that could adversely impact safety or security concerns at ADOC facilities. However, unreacted copies of the self-evaluation will be provided, under seal, to the Court, the arbitrator, the monitor, and Plaintiffs' counsel.

v.   Transition Plan. ADOC will create an ADA Transition Plan consistent with the provisions of 28 C.F.R. 105-35.117 and 35.150 (c) and (d). The Transition Plan will list any improvements and changes necessary in the Programs, activities, and services ADOC provides or makes available to Inmates; all of ADOC's policies and practices regarding Inmates; and Inmates' access to and within ADOC's facilities necessary to ensure that ADOC

244554.6

complies with the provisions of the Acts and this Amended Agreement.

A.   ADOC will use the results of the Survey, the analysis of the necessary remediation, and the information gleaned during the implementation of any existing or new procedures concerning the identification of Inmates with Disabilities in order to assign Inmates with Disabilities to Facilities that are appropriate for their individualized needs, based on disability, security level, and classification.  ADOC will not be required to utilize facilities that are identified as part of the Survey as having significant architectural barriers making remediation or reasonable accommodation impracticable or that would impose Undue Hardship on ADOC.  However, ADOC

will ensure that there are a sufficient number of beds of appropriate security classification and specialized purpose to ensure that all Inmates with Disabilities are appropriately housed based upon their individual disability status, and that such Inmates are provided equal access to programs as similarly situated inmates without disabilities in the same facility.  All Programs available anywhere within the ADOC system for similarly situated Inmates without disabilities will be made available to such Inmates with Disabilities.  However, this does not mean an Inmate with a disability may obtain a transfer to a different facility that offers the same Programs offered at his current facility.  Whether an area is deemed accessible for an Inmate with a Disability in an existing

244554.6

facility shall be governed by the 1991 ADA Standards for Accessible Design, and the applicable standards found at 28 C.F.R § 36, unless substantial architectural modifications are, or were, made to the existing facility after January 26, 1992.  If substantial modifications are, or were made to the existing facility after January 26, 1992, and for any new prisons built by ADOC, accessibility will be governed by the 2010 ADA Standards of Accessible Design found at 28 C.F.R. § 35.151 regarding new construction and alterations, and the 2004 ADA Accessibility Guidelines ("ADAAG") found at 36 C.F.R. § 1191.

B.   ADOC will take appropriate remedial action to eliminate impediments to full and equivalent

participation. Any corrections necessary will be completed under the following schedule:

1.  Architectural:

a. Any necessary architectural changes to any ADOC Facility in which Inmates with vision or mobility impairments are assigned will be completed within twenty (20) months of completion of the survey.

b. Within three (3) months of the completion of the survey, ADOC will identify in writing how it intends to effectuate compliance with the ADA concerning housing assignments and programmatic access affected by architectural and other barriers. Any changes in procedure required to overcome architectural barriers

244554.6

will be in writing, specifically outlining the exact methodology by which ADOC intends to overcome each barrier identified during the Survey for any facility in which ADOC intends to house inmates with disabilities, without barrier removal or remediation. Any questioned areas, if not removed or remediated, shall be identified in writing with an explanation as to why ADOC does not believe that a modification is necessary.

c.   Nothing in this Agreement will be construed as requiring removal or remediation of architectural barriers identified in the Survey if ADOC is able to create a policy or procedure change which has the net effect of nullifying the problem associated with the barrier, and that such non-physical removal or

244554.6

remediation does not place anything more than nominal additional burdens on Inmates with Disabilities securing access to programming.  If removal or remediation is to occur, ADOC will provide all associated documentary materials to Plaintiffs' counsel, including contracts, to ensure that all appropriate remediation occurs within the prescribed period.

        d.   Following the expiration of the one (1) year period during which ADOC will assess its facilities, no later than every sixth (6th) month thereafter, ADOC will provide the monitor with a status report to include a timeline, spreadsheet or similar document or record reflecting work that is contemplated, work that has begun, work that is ongoing and work that has been

244554.6

completed. This document will contain expected dates of completion of ongoing work or work that has not yet commenced. The monitor will be provided access to any contract, change order or similar document or record necessary to ensure the appropriate work has been provided for, what work will be done and the anticipated time period necessary to complete the work.

2.     Procedural: Within six (6) months after completion of the Survey, ADOC will have implemented all policies, procedures, and/or Standard Operating Procedures to remove barriers identified in the Survey for all instances in which physical remediation is not contemplated.

244554.6

C.   Nothing herein prevents ADOC from making modifications or improvements to its existing prison or work release facilities in order to bring such facilities or any parts of such facilities into compliance with the architectural requirements of the ADA. Likewise, nothing herein prevents ADOC from constructing entirely new prison or work release facilities so long as those facilities are complaint with the provisions of the Acts.

D.   The Transition Plan will include the name of the official responsible for the plan's implementation.

E.   ADOC will maintain a copy of the Transition Plan.  Additionally, a copy of the Transition Plan same will be maintained at the law library of all

244554.6

ADOC facilities that maintain an inmate law library. ADOC is permitted to redact from any copy of the self-evaluation made available to the public or to Inmates any portion of the self-evaluation that could adversely impact safety or security concerns at ADOC facilities. However, unreacted copies of the Transition Plan will be provided, under seal, to the Court, the arbitrator, the monitor and Plaintiffs' counsel.

VI. Prison Facilities. Notwithstanding any provision of this Amended Agreement to the contrary, the parties acknowledge that the structures at issue are prisons or work release facilities that, due to their very nature, have barriers to prevent inmates from escaping custody. Barriers such as locks and locked entryways, bars, fences

244554.6

and similar devices and structures necessary to incarcerate Inmates or, due to custodial reasons, restrict Inmate movement, need not be removed or remedied.

244554.6

3. <u>Provisions regarding Program Access and Reasonable Accommodation</u>.   ADOC will provide reasonable accommodations to Inmates with Disabilities so that those Inmates may access and participate in Programs offered by ADOC. Reasonable accommodations can include, but are not limited to, architectural modifications to a facility or part of a facility, supplying materials in alternate formats, providing augmentative communication devices, providing aides, and extending time needed to complete a Program.  To the extent allowed by the provisions of the Prison Rape Elimination Act, 42 USC § 15601, *et seq.* ("PREA"), ADOC may use aides, including other

244554.6

Inmates, to facilitate access to ADOC Programs for

Inmates with disabilities.

4.   <u>Provisions   Regarding   RTUs   and   SUs</u>. Residential Treatment Units ("RTUs") and Stabilization Units ("SUs") are specialized confinements within a prison where Inmates generally receive access to many services within the confines of the units themselves. Inmates are provided access to educational and rehabilitative Programs in the units themselves, rather than in the regular classroom setting that Inmates in general population may utilize.

I.   For   ADOC   to   restrict   access   to programming for Inmates in these units, ADOC must conduct an individualized assessment as to why such programming would pose a risk to the Inmate or others, or why the Inmate's current mental health status precludes

244554.6

being able to meaningfully participate in the Program. Each Inmate must be assessed individually for each Program. The assessment may be made only by a psychiatrist, psychologist, or Certified Registered Nurse Practitioner ("CRNP") who has actively treated the Inmate. The assessment must be in writing and must identify the specific reason(s) why access to a given Program is restricted. Within three (3) days, not including weekends or holidays, of an Inmate in an RTU or SU being denied access to a Program, the written explanation of the clinician explaining why access is restricted must be provided to the affected Inmate. The Inmate may then take advantage of the provisions of the

244554.6

ADA Accommodation and Appeal Procedure that is established as part of this Amended Agreement.

II.   ADOC will reassess Program access for any Inmates housed in an RTU or SU who have been denied access to Programs after requesting such access each time new programming is made available or new enrollment into existing programming becomes available.

III.   While educational and rehabilitative programming is readily transferable to the RTU and SU housing units, vocational programming is not.[3]   To the extent vocational programming is available only in separate buildings from any housing units at ADOC facilities, it would be impractical to attempt to bring these

---

[3] ADOC currently provides vocational programming and training in a variety of fields.  They include building trades, electrical, body shop and auto mechanics, welding, and beautician.

244554.6

programs into RTU/SU housing units given the nature of those units.  Access to the necessary tools to participate in such programming may pose a heightened security risk in housing units generally.  Because both the Prison Litigation Reform Act and the reasonable accommodations provisions of the Acts place limitations upon unfettered access to programming in certain circumstance, ADOC will not be required to provide access to vocational programming for inmates in RTUs and SUs.  However, once an inmate is stabilized in an RTU or SU and then reassigned to general population housing, the Inmate may not be discriminated against in enrolling in vocational Programs based upon his or her prior admission to a residential mental health unit.

244554.6

5.   <u>Provisions Regarding Identifying, Documenting and Tracking Inmates with Disabilities</u>.   ADOC will identify Inmates with disabilities at initial intake and while in custody.

I.      Evaluation. ADOC will continue to screen, evaluate and test Inmates for physical, mental or intellectual disabilities at the time of initial intake, consistent with ADOC Office of Health Services ("OHS") Policy.   ADOC may recognize an Inmate's disability either as the result of appropriate evaluation, testing, or self-identification.

A. Screening. Upon being taken into ADOC's custody, Inmates will continue to be screened for disabilities at the time of the initial health assessment.

244554.6

This screening will be accomplished within five (5) days, not including weekends and holidays, of an Inmate entering ADOC's custody.

1.   Within twelve (12) hours of an Inmate arriving at an ADOC intake facility, the Inmate will be questioned orally consistent with ADOC's "New Arrival Intake Screening – Form 2" and ADOC's "Reception Mental Health Screening Evaluation – Intake Form 1" concerning:

a.   perceived or recognized disabilities;

b.   prior physical, intellectual or mental health treatment and diagnoses; and

244554.6

c.   previously                identified disabilities.

2.   The screening will be consistent with OHS Policy and National Commission on Correctional Health Care ("NCCHC") Standards. The screening will be performed by medical and mental health providers employed or contracted by ADOC.

3.   ADOC will reasonably accommodate inmates with vision, hearing or mobility disabilities during Intake.

B.   Self-Identification.   Inmates may self-identify as having a disability.

1.   ADOC may accept the Inmate's claim of disability.

244554.6

2.    ADOC is not required to accept an Inmate's claim of disability. If ADOC does not accept that claim, it will take appropriate steps to obtain medical records concerning the Inmate's self-identified medical or mental health condition and any treatment for such condition in order to confirm or rebut the disability the Inmate claims. Alternatively, ADOC will conduct sufficient and appropriate medical or mental health screening as discussed in the "Examination and Testing" section - Section C immediately below - to determine whether the Inmate has a disability as defined by the ADA.

C.   Examination and Testing. Regardless of whether an Inmate self-identifies as having a disability,

ADOC will continue to evaluate Inmates for disabilities through examination and testing.

1.   ADOC will identify Inmates with physical disabilities in accordance with OHS Policy.  A physical exam of each Inmate will be conducted by a medical provider employed or contracted by ADOC and appropriately licensed by the State of Alabama. This exam will occur within seven (7) days of intake, not including weekends and holidays.  Inmates in ADOC's custody at the time of the Court's final approval of this Amended Agreement will continue to be screened, evaluated and tested for disabilities to ensure that physical disability status is identified, treated and accommodated. Within six (6) months of the Court's final approval of this

244554.6

Agreement, each Inmate with a health care code of 4 or above will be screened, tested and evaluated for physical disabilities.  Each Inmate with a health care code of 3 or less will be evaluated within twelve (12) months of the Court's final approval of this Agreement at the time of their annual physical.

2.   ADOC will identify Inmates with intellectual disabilities through the use of appropriately administered tests under the following regimen.

i.   Beginning eight (8) months after the Court's final approval of this Amended Agreement, Inmates coming into or returning to ADOC's custody ("New Inmates") will be screened for intellectual disabilities initially using the Beta III test. This testing

244554.6

will be performed in a group setting. A New Inmate who scores 80 or lower on the Beta III test will then be individually screened for intellectual disabilities using the most current version of the Weschler Abbreviated Scale of Intelligence (WASI).  If the Inmate scores 75 or below on the WASI, no further IQ testing is necessary and the Inmate will be deemed to have an IQ equal to the Inmate's WASI score.  If the Inmate's score on the Beta III is 80 or less, but the Inmate's WASI score is greater than 75 but less than 79, then the Inmate will be given the most current version of the Weschler Adult Intelligence Scale, (WAIS), currently the WAIS IV. An Inmate who scores 79 or higher on the WASI, or 76 or higher on the WAIS, is deemed to have an IQ too high for further

consideration of an intellectual disability. If an Inmate's score on either the WASI or the WAIS is 75 or less, then additional testing to determine whether the Inmate has an intellectual or developmental disability will be performed using the most current version of the Vineland Adaptive Behavior Scales, other similarly appropriate protocols, or appropriate clinical assessment.

        ii. All Inmates who are admitted to ADOC's custody during the eight months following the Court's final approval of this Amended Agreement who score 75 or less on a Beta III test administered by or at the request of ADOC will be determined to have an intellectual disability and no further testing will be required. Inmates in the custody of the ADOC at the time

244554.6

the Court gives final approval to this Amended Agreement who have a record of a score from a Beta III previously administered by or at the request of ADOC will have those scores entered into the OHS Module at the time of their next annual or semi-annual classification review, whichever is earlier, and will be determined to have an intellectual ability and require no further testing. Current Inmates who have no record of a test score from a Beta III test administered by or at the request of ADOC will be tested using the Beta III within three (3) months following the Inmate's next annual or semi-annual classification review, whichever is earlier. The results of that testing will be placed in the OHS module after receipt of those results and those who score 75 or less will be

determined to have an intellectual disability and no further testing will be required.  All three categories of inmates in this sub-section will be referred to as "Current Inmates."

iii.  ADOC reserves the right, but is not required, to administer the WAIS to any Inmate, regardless of the Inmate's Beta III or WASI score, to confirm an IQ score.

iv.  The Parties reserve the right to re-examine the initial threshold cutoff on the Beta III test when the Beta IV test is introduced and enters use by ADOC and decide if the cutoff score utilized to trigger the administration of further IQ testing will remain at 80. The parties will evaluate the data showing the distribution of

244554.6

individuals who were utilized to normalize the score, as well as peer reviewed documentation and articles showing that the Beta IV test performs at least as well as the WASI, compared to the WAIS.

    v. Appropriately licensed mental health professionals employed by or contracted by ADOC will utilize the guidelines outlined in the most current Diagnostic and Statistical Manual of Mental Health Disorders, as published by the American Psychiatric Association ("APA"), to determine the criteria in identifying individuals with intellectual disabilities. The percentage of Inmates identified as having an intellectual disability should be reflective of findings of peer reviewed articles which estimate that approximately 4-

244554.6

10% of inmates in State Prisons meet the clinical definition of Intellectual Disability. Further, the percentage of Inmates identified through intellectual testing as falling below the IQ threshold of the testing protocol incorporated herein, but who are found not to have an Intellectual Disability because either, i.) they did not have significant deficits in adaptive behaviors as identified in the DSM-V, or ii.) because onset of the inmate's intellectual functioning as defined by the results of IQ testing did not occur during the inmate's developmental period, will be reflective of the findings of peer reviewed articles which found that approximately 80% of inmates who had an IQ below the threshold were

244554.6

ultimately found to meet the definition of having an Intellectual Disability.

3. For the purpose of determining developmental disabilities, and in addition to the processes for determining intellectual disabilities for New Inmates and Current Inmates described in provision 5.I.C.2. immediately above, ADOC may administer the most current version of the Wide Range Achievement Test (WRAT), currently the WRAT IV, to New Inmates. If an Inmate scores at less than the 7th grade level on the WRAT, appropriate clinical assessments will be performed to determine developmental disability status.

4. The identification of Inmates with intellectual or developmental disabilities will be made by a psychiatrist

or psychologist, although mental health professionals and psychological associates may participate in the process.

5. ADOC will continue to periodically screen, evaluate and test Inmates for disabilities while Inmates are in ADOC's custody to ensure that any change in an Inmate's disability status is identified, treated and accommodated.

I. Documentation. ADOC will document the results of self-identification or examination of Inmates for physical, intellectual or mental disabilities performed at any time, including at intake and while in custody.

A. ADOC will transition to documenting the-above described information into the OHS Computer Module at the time the Computer Module becomes

operative. Prior to the implementation of the Module, the Office of Health Services will provide training to each category of staff who may access the module concerning information related to an Inmate's disabilities that may be entered into the Module.

      B.  The Module will electronically capture and store the information collected by the appropriate screening party at each step of intake. Only appropriate parties and providers will have access to change and store information on the dashboard and access to the dashboard will be limited by ADOC security and classification personnel so as not to disclose personal health information, as that term is defined by HIPAA. The Module will, however, allow access to general

244554.6

information necessary to properly classify, house, and reasonably accommodate Inmates with physical or mental disabilities, such as medical codes, mental health codes, physical limitations, and special needs communications.

C.   Inmate information maintained on the Module will be updated as additional evaluation, screening, testing and examinations upon Inmates are performed. The Module will be update with this information no later than three (3) days, not including weekends and holidays, following the completion of the evaluation, screening, testing or examination.

D.   Any health services contractor retained by ADOC will be contractually obligated to maintain the

244554.6

Module and update information contained therein related to Inmate disabilities or accommodation.

        E.  The information obtained will be provided to ADOC personnel and contractors of ADOC consistent with the provisions of HIPAA.

        II.  Tracking.  ADOC will track Inmates who have been identified as having a disability and any accommodations for such disability to ensure that Inmates receive appropriate care and accommodations for disabilities.

        A.  ADOC will utilize the Module to track the care and any accommodations for Inmates with disabilities that are directed or ordered by ADOC's medical or mental health providers.

244554.6

B.   The Module will display to appropriate users, consistent with the provisions of HIPAA, the (1) nature of an Inmate's disability or disabilities; (2) accommodations ordered by ADOC's medical or mental health provider-contractors for an Inmate's disability or disabilities, including, but not limited to, medical appliances and restrictions on housing or bed placement; and (3) any security restrictions that are the result of the disability.

C.   ADOC will periodically review the OHS Module and update it as appropriate.

D.   The information tracked on the Module and by the Facility ADA Coordinators will be made available to ADOC employees and contractors, consistent

with the provisions of HIPAA, to ensure that reasonable accommodations are made and will be made for Inmates in need of an accommodation.

III.    Placement and change in status.  In the event an Inmate, during the course of incarceration by ADOC, is identified by appropriate screening, evaluation or testing as having (A) a previously undiagnosed or unrecognized disability or (B) an existing disability has materially changed, ADOC will take all necessary steps to determine whether, and to what extent, that disability may be reasonably accommodated.

A.   Appropriate medical or mental health staff and ADOC personnel, including the ADA coordinator at the facility where the Inmate is (or is to be)

244554.6

housed will, within five (5) days, not including weekends and holidays, of the disability identification or change, review the information contained on the Module and the information maintained by the Facility ADA Coordinator on the OHS Module to determine the necessity of accommodation of the newly identified disability or changed disability. Appropriate reasonable accommodations, including but not limited to housing assignments- given security codes, health codes and mental health codes- for such newly identified or changed disability, will be provided within five (5) days, not including weekends and holidays, of the review of the information by the above-described personnel.

244554.6

B.   ADOC agrees to transfer Inmates with emergent or acute mobility or vision impairments from any non-ADA compliant infirmary or Facility under a schedule that, for security reasons, will be submitted to the court under seal.

IV.   Transfer screening. Inmates transferred from one ADOC facility to another will undergo a Transfer Screening at the receiving facility.

A.   If, as a result of the Transfer Screening, it appears that an Inmate with a Disability's health code should be raised, within 14 days, not including weekends and holidays, the provider at the receiving facility will communicate with the provider at the sending facility to

244554.6

discuss the Inmate's prior health code and the reasons for increasing the Inmate's health code.

B.   If, as a result of that communication, it is determined that the Inmate with a Disability's health code should not be raised, then ADOC is not obligated to update the Module to reflect that discussion.

C.   If, as a result of that communication, it is determined that the Inmate with a Disability's health code should still be raised, a comment box within the Module will be opened and updated to reflect that the communication occurred and the reasons for the Inmate with a Disability's increased health code.

D.   The provisions of this section do not apply when an Inmate with a Disability is transferred

244554.6

from one facility to another due to the Inmate with a disability being admitted to the Infirmary at the receiving facility.

v.   Use of Information. Information developed and collected during the Identification, Documentation and Tracking processes outlined above will be used to provide Inmates with identified or recognized disabilities reasonable accommodations consistent with the provisions of the Acts as the same are applied to correctional facilities. The information will be further used as part of the Quality Assurance provisions of this Agreement.

244554.6

6.    <u>Provisions Regarding Security Levels</u>.  At initial classification, reclassification or additional classification reviews, ADOC will assign Inmates security levels without regard for disabilities. ADOC will not increase a security level or custody level for an Inmate based solely upon an Inmate's disability.[4]  ADOC may lower a security level for an Inmate with a disability under two general circumstances.

I.    ADOC may, within ADOC's discretion, lower an Inmate's security level to allow an Inmate with a disability to access a program or facility (or portion of a

---

[4] A "custody level" is "a level of supervision required for an Inmate at the institution, within the ADOC, where the Inmate is confined.  An Inmate can be assigned a custody level of maximum, close, medium, minimum-in, minimum-out, or community."  ADOC Admin. Reg. 400. A "security level" is "the rating assigned to various institutions and placement options within the ADOC and to Inmates through classification procedures for the purposes of placement within the ADOC".  <u>Id.</u>  An Inmate's security level is utilized, among other purposes, to determine which prisons, and portions of prisons, an Inmate may be housed.

facility) to which the Inmate would not otherwise be entitled to access due to that Inmate's security level. For an Inmate to be considered for a reduction under such a circumstance, all of the following must apply:

A. The given program or facility is considered important to the rehabilitation, education, or treatment of the given Inmate based upon that Inmate's disability. To be considered "important", the program or facility (or portion of a facility) must be focused on substantially benefiting an Inmate's health, condition, or life skills in a manner different from, and in addition to, that for an Inmate without a disability.[5]

---

[5] For instance, if ADOC has a program teaching life skills, it is likely that many, if not all, Inmates may benefit from such a program. However, for Inmates with intellectual disabilities, one of the primary methods of integrating such an individual into a more normalized existence is extensive training on life skills to augment deficiencies attendant to their disability. In such a

244554.6

B.   The Inmate must have had no major disciplinary findings for at least one (1) year prior to the date the reduction has been requested.  If a weapon was involved in a prior disciplinary event, then the Inmate must be free of such a disciplinary finding for at least two (2) years before the date of the request.

C.   The program or facility must be available to a similarly situated Inmate without a disability.

II.   ADOC may also reduce the security level of an Inmate based upon a disability where the disability itself makes the Inmate less of a security risk.[6]

---

circumstance, life skill training is particularly targeted and beneficial to such an Inmate in a manner far greater than the benefit to an Inmate without an intellectual disability.

[6] For instance, Inmates with significant medical issues, mobility issues, and vision issues may inherently pose a less significant security risk than a similarly situated Inmate without a disability.

244554.6

III.   The reduction in security level may be permanent (subject to re-evaluation for disciplinary reasons) or temporary.

244554.6

7.   <u>Provisions Regarding Auxiliary Aids</u>.

I.   ADOC will provide specific and appropriate auxiliary aids and services necessary for Inmates with disabilities to access all Programs and services provided to Inmates in the custody of ADOC.  Auxiliary aids and services include, but are not limited to, the following:

A.   Sign language interpreters;

B.   Note takers or transcription services;

C.   Written materials in alternate format such as Braille large print;

D.   Telephone handset amplifiers;

E.   Assistive listening devices;

F.   Telephone system compatible with hearing aids;

244554.6

G.  Hearing aids;

H.  Captioning telecommunication devices for deaf Inmates (TDD or TTY);

I.  Video text displays;

J.  Other appropriate methods to aurally deliver materials to Inmates with hearing impairments;

K.  Readers or tutors;

L.  Taped texts; and

M.  Other appropriate methods to make visually delivered materials available to Inmates with vision impairments.

II.  One or more TTY phones will be available at any facility at which any Inmate with a hearing impairment who needs such a device in order to

244554.6

effectively participate in a telephone conversation is housed. If ADOC chooses to aggregate Inmates with hearing impairments in a single, or small number, of facilities then ADOC will ensure that there are a sufficient number of TTY phones available at that facility so that Inmates with hearing impairments may make use of the TTY phone consistent with access to phones for a non-hearing impaired Inmates. TTY phones must be made available during the same periods, and under the same circumstances, that similarly situated Inmates are allowed access to telephones. However, and in the event ADOC or a facility places a time or length limit on any telephone call, an Inmate with a hearing impairment utilizing a TTY phone must be entitled to use of the TTY phone for a

244554.6

period of four (4) times the period that a similarly situated Inmate without a hearing impairment is permitted to use the telephone for any one telephone call. ADOC will ensure that all such TTY phones are kept in good repair and operational.

III.   ADOC or its medical services provider will:

A.   Conduct a minimum of one routine assessment every three (3) months (or sooner by Inmate request) of each deaf or hard of hearing Inmate regarding the provision of appropriate auxiliary aids and services;

B.   Keep appropriate medical records regarding auxiliary aids and services;

C.   Purchase and keep appropriate types of hearing aid batteries in stock;

244554.6

D.   Provide replacement hearing aids batteries to Inmates requesting them no later than 24 hours (excluding weekends and holidays) after such request, if readily available within the local community. Should a hearing aid require a specific or specialized battery type not available on the local level, ADOC or its medical vendor will have 72 hours (excluding weekends and holidays) to secure such specialty battery;

E.   Send hearing aids to a repair vendor no later than 48 hours (excluding weekends and holidays) following a validated request by an Inmate for repair of his or her hearing aid; and

F.   Inform the Inmate when the hearing aid was sent for repair and the anticipated return date.

244554.6

IV.   ADOC or its medical services provider will maintain an annual, perpetual log of all existing hearing aid repairs, to include:

A.   Date the device was received for repair at the facility;

B.   Name of outside vendor performing the repair;

C.   Date the device was shipped or taken to the vendor conducting the repair; and

D.   Date the device was received back at the facility.

V.   ADOC will provide sign language interpreters to Inmates with hearing impairments whose primary means of communication is American Sign

244554.6

Language ("ASL.") Individuals employed or contracted by ADOC for this purpose will be qualified and able to effectively communicate in ASL. These individuals will agree to abide with the Code of Ethics for certified ASL interpreters circumstances where interpreters may be required in the following listed situations.  This list is neither exhaustive nor mandatory, and does not imply that there are no other situations when it may be necessary or appropriate to provide interpreters to Inmates:

> A.   Initial Intake.
>
> B.   Classification processing.
>
> C.   Regularly    scheduled    health    care

appointments and programs.

244554.6

D.   Substance Abuse treatment and other formal programming.

E.   Educational classes and activities.

F.   Disciplinary board hearings.

G.   Criminal Investigations.

H.   Classification review interviews.

I.   Formal investigations conducted by ADOC staff.

VI.   In instances which do not implicate privacy or security concerns, other Inmates with the requisite skills may be utilized as sign language interpreters, provided that both the Inmate with a hearing impairment and the skilled non-disabled Inmate agree to such an arrangement.  The Inmate with a hearing impairment and

244554.6

the skilled non-disabled Inmate must be able to effectively communicate with each other and the skilled non-disabled Inmate must be able to effectively and accurately relay the information being provided by the Inmate with a hearing impairment. The Inmate with a hearing impairment must be informed that he may decline to allow an Inmate to serve as an interpreter.  He must also be informed that should he decline another Inmate as an interpreter, he will be provided a non-Inmate interpreter at no cost, and that no adverse action will be taken against him.   Any Inmate who serves as an interpreter under such circumstances will be required to sign a document indicating that Inmate's agreement to abide by all privacy laws, to include HIPAA.

244554.6

VII.   ADOC may not utilize an Inmate to serve as a sign language interpreter in any circumstance involving medical or mental health treatment, examinations, or consultations, or the initiation or investigation of an incident under the Prison Rape Elimination Act (PREA), except in the very limited circumstance where an extended delay in obtaining an effective interpreter could compromise the safety of the Inmate with deafness, the performance of first responder duties under Section 115.64 of PREA, or the investigation of an incident covered by PREA.

VIII.  ADOC may not employ an Inmate to serve as a sign language interpreter in any circumstance

244554.6

involving due process[7] or the investigation or initiation of any incident relating to assaults, violence, or other potentially criminal activities within the facilities.

IX.   ADOC will provide the Inmate Handbooks, text books and materials, Orders or Notices from Courts which are required to be posted, or other similar written materials in alternate formats such as Braille and large print.  ADOC need not have on-site all text books and materials necessary at all times, but must have available, all such materials such as they are available to sight impaired Inmates as needed.  ADOC will have available a sufficient number of such materials in alternate format

---

[7] "Due Process" events would include, but would not be limited to, disciplinary proceedings, investigations of potential or alleged criminal activities by the Inmate, and involuntary administration of medication.

244554.6

such that all Inmates who need access to them may do so simultaneously.

x.    For written materials that are unique to an Inmate such as medical and mental health information, disciplinary information, classification information, or other documents directed to only such Inmate, ADOC will either provide the same in alternate format, or will create a procedure under which such Inmates may have access to the information consistent with how an Inmate without a sight impairment would access such materials. Providing such materials aurally either by taped recording, or providing access to a person who would read the materials to the Inmate is acceptable. There cannot be limits on the number of times the Inmate can

access the information, but ADOC can create reasonable limitations on where and when the information can be accessed.   If ADOC intends to make such materials available by reading the materials to the Inmate, ADOC will note in the Inmate's file who, what, and when such materials are made available.

8.   <u>Provisions Regarding Emergencies</u>.

I.   ADOC will revise the current Administrative Regulation to include provisions to ensure that Inmates with Disabilities are evacuated to safe locations in times of emergencies.  For each Facility that contains Inmates with vision, hearing or mobility impairments, the Shift Commander for each shift will designate in writing more than one Correctional Officers who are assigned the duty of ensuring that all such Inmates are evacuated to a safe location in times of emergencies.  A log will reflect the assigned Correctional Officers for each shift. The Shift Commander will notify the assigned officers who will acknowledge this assignment in writing.  Each facility may implement a

244554.6

Standard Operating Procedure specific to that facility to ensure compliance based upon the unique features of that facility.

II.   In each Facility, ADOC will designate one or more areas of Rescue Assistance (as defined under Section 3.5 of the 1991 ADA Standards for Accessible Design), by November 1, 2016.  On or before that date, the facilities will post a written memorandum outlining the area(s) of Rescue Assistance, and the area(s) must be shown on a map. Both the written memorandum and map will be posted in the location in which Inmate information is normally posted. The written memorandum will also be provided in alternate format upon request.  The determination of the number and location of such areas

244554.6

must take into account the size of the facility, the compactness of the facility, and the number of Inmates with Disabilities likely to be present in the facility.

III. For each shift in each facility, the Shift Commander will assign responsibility to ensure that Inmates found at the area of Rescue Assistance are adequately protected and evacuated before such personnel may vacate the facility. This assignment will be done in writing, and the Officer so assigned will acknowledge this assignment in writing. In other areas of the facility, ADOC will implement a system under which its personnel ensure that all Inmates under the control of correctional officers in a particular location are evacuated to a safe location based upon the nature of the emergency.

244554.6

IV.   ADOC will implement a system of periodic emergency drills whereby facilities, on at least a quarterly basis, as part of that drill will to ensure that the officers assigned the above-described duties fully execute these responsibilities.  For the initial two such sessions in each facility, ADOC will provide a sign language interpreter to explain the process to Inmates who use sign language as their primary means of communication.  All Inmates who have a sight, hearing, or mobility impairment will be provided a written explanation of the procedure.  This explanation will be provided in an alternative format when appropriate.   Thereafter, Inmates who are transferred into a facility, or who have a newly emergent condition of a sight, hearing, or mobility impairment, will

244554.6

be provided a copy of the emergency evacuation plan, either written or, where appropriate, in alternate formats within three (3) business days of: (1) arriving at the receiving facility or (2) a medical diagnosis of a sight, hearing or mobility impairment.   ADOC will provide access to a sign language interpreter to any hearing impaired Inmate who uses sign language as his or her primary means of communication in order to answer and explain the procedure.

v.   The required policy modifications discussed in this Provision are intended to supplement any existing policies and Standard Operating Procedures currently in place at each facility, and not to supersede them.

244554.6

9.    <u>Provisions Regarding Accommodations and Appeals</u>.

I.    Effective February 1, 2017, any Inmate who has, or believes he or she has, a disability as defined by the Acts may make Requests for Accommodations and pursue Appeals of decisions concerning Requests for Accommodations.

II.    An Inmate's Request for Accommodation or Appeal will be in writing and contain information about the alleged discrimination, Request for Accommodation, or reason for the Appeal. It will be set out on the ADA Request Form (Exhibit A) or any later form generated by ADOC for the same purpose. ADA Request Forms will be made available to Inmates with Disabilities through the

244554.6

Shift Commander's office or centralized security cubicle, the Facility ADA Coordinator's office, and the Law Library, provided the Facility maintains a Law Library. ADA Request Forms will be provided to Inmates through either written or oral request.

III.   The Request for Accommodation or Appeal should be submitted by the Inmate as soon as possible. Appeals to the Statewide ADA Coordinator must be made within thirty (30) calendar days after a denial of a Request for Accommodation. The Request for Accommodation or Appeal must also generally specify the type of accommodation or service the Inmate seeks. The ADA Request Form must be dated and signed by the Inmate. Boxes or similar repositories will be placed in the Facility

244554.6

for depositing such forms or the forms may be given by the Inmate (including, but not limited to, Inmates whose movement is restricted due to their custody level and are unable to deposit the form on their own) to any ADOC officer or employee for deposit in such boxes. The box, or repository to deposit the ADA Request Form, will be located in places in which all Inmates whose custody permits them movement in a Facility may have access. In the event that an Inmate is unable to complete the form for any reason, ADOC personnel will assist the Inmate in completing the form. Upon receipt of such a form, the Facility ADA Coordinator will review, document, respond, and retain a copy of the form and response consistent with the duties and time parameters specified in

244554.6

the part of this Agreement concerning the duties of ADA Coordinators. If the Facility ADA Coordinator is unsure what is being requested in the Form, the Facility ADA Coordinator will personally interview the Inmate and make appropriate inquiries to inform the Facility ADA Coordinator and Statewide ADA Coordinator about the nature of the Request for Accommodation and any appropriate accommodation, or Appeal.

IV.   The safety, security, and health of the Inmate making a Request for Accommodation or Appeal, and that of other Inmates, and the security of the Facility will always be an overriding concern in making reasonable accommodations for Inmates with disabilities.

244554.6

v.    In the event that the Facility determines that it cannot reasonably accommodate a n Inmate with a Disability, consideration may be given to Facilities and programming available at various other Facilities of an appropriate security level to accommodate an Inmate's particular disability, to include transfers.

244554.6

10. <u>Provisions Regarding ADA Coordinators</u>. ADOC will employ Facility ADA Coordinators and a Statewide ADA Coordinator within the time frames established for ADOC's Self-evaluation and Transition Plan.

I. Facility ADA Coordinators.

A. ADOC will designate a responsible employee ("Facility ADA Coordinator") at each ADOC facility to coordinate its efforts to comply with and carry out its responsibilities under the Acts with respect to any current or future Inmate in the physical custody of ADOC who has a disability.  The staff at each ADOC facility will receive notice of the designated Facility ADA Coordinator for the facility.

244554.6

B.   The Facility ADA Coordinators will be direct reports to the warden of their assigned facility concerning their duties as a Facility ADA Coordinator and may have duties in addition to those as ADA Coordinator.

C.   In each ADOC facility, the name, office address, and telephone number for that facility's Facility ADA Coordinator will be posted in each dormitory, chow hall, visitation area, library, medical care treatment areas, mental health care treatment areas, chapel, canteen, and educational areas.   Each Facility ADA Coordinator's office will be in a location readily available to Inmates in general population.   This posting will also contain the name, office address, and telephone number of the

244554.6

Statewide ADA Coordinator, described herein, as well as the locations of ADA Request Forms and drop boxes for ADA Request Forms within each facility.

D.   Each Facility ADA Coordinator will receive and respond to all ADA Request Forms for that facility or transmit ADA appeals to the Statewide ADA Coordinator.  The Facility ADA Coordinator will keep a file containing all ADA Request Forms received and all responses given to requests for accommodations and appeals.  Should an Inmate require or request assistance completing an ADA Request Form, the Facility ADA Coordinator will assist the Inmate with completing the form.  Each Facility ADA Coordinator will prepare a monthly report regarding the requests for

244554.6

accommodations received and the accommodations granted. The monthly report will be submitted to the Statewide ADA Coordinator by the seventh (7th) day of the following month. The monthly report will, at a minimum, include the following information:

1.   Number of ADA requests

2.   Number of granted ADA requests

3.   Number of denied ADA requests

4.   Number of ADA requests denied because the requests involved a medical or mental health issue.

5.   Number of partially denied ADA requests

244554.6

6.    Number of ADA requests partially denied because the requests involved a medical or mental health issue.

7.    Narrative about the status of any ADA violations discovered by the Facility ADA Coordinator.

E.    Each Facility ADA Coordinator will review existing ADOC administrative regulations, existing facility standard operating procedures, and administrative directives to assess compliance with the facility's obligations under the ADA and will provide any resultant recommendations regarding compliance to both the Statewide ADA Coordinator and the facility's warden.

F.   Each Facility ADA Coordinator will attend regularly occurring facility staff meetings to discuss the facility's ADA compliance and to respond to any staff questions regarding ADA compliance.

G.   All Facility ADA Coordinators will attend an annual in-person meeting with the Statewide ADA Coordinator, and will attend quarterly telephonic meetings with the Statewide ADA Coordinator.

H.   The Facility ADA Coordinators will ensure that copies of ADA Request Forms, or the information contained therein, are maintained in the Inmate's file.

I.   The Facility ADA Coordinators will ensure on a monthly basis that all assistive devices

244554.6

assigned to the facility are available and in working order. The Facility ADA Coordinators will also ensure on a monthly basis that all alternative format forms are available.  The Facility ADA Coordinators will confirm the availability of assistive devices and alternative format forms in the monthly report described above.

J.   At least monthly, each Facility ADA Coordinator will tour the facility, to include any area an Inmate is permitted to access, to determine if any Inmates are housed in an inappropriate location, any ADA compliant fixtures are in disrepair or non-operational, any part of the physical structure is in need of repair which would affect ADA compliance, or if any policy, procedure, or operation in not being conducted in a

244554.6

manner necessary to ensure compliance with ADOC's ongoing responsibility under the ADA. If any deficiencies are noted, the Facility ADA Coordinator will, within 24 hours, notify in writing the appropriate personnel charged with remedying the non-compliant program or structure, the Warden, and the Statewide ADA Coordinator of the nature of the problem. The Facility ADA Coordinator will periodically review whether the problem identified has been rectified  until such time as it is remedied.

K.   Facility ADA Coordinators will, upon receipt, immediately review all ADA requests to determine whether a request concerns an urgent situation. In the event of an urgent situation, the Facility ADA

244554.6

Coordinator will respond to the request in writing and provide, if required, the requested accommodation within three (3) days of receipt of the request, not including weekends and holidays. In all other situations, the Facility ADA Coordinator will respond to the request in writing within ten (10) days of receipt of the request, not including weekends and holidays.

II.   Statewide ADA Coordinator.

A. ADOC will employ a responsible employee ("Statewide ADA Coordinator") to coordinate its efforts statewide to comply with and carry out its responsibilities under the Acts with respect to any current or future Inmate in the physical custody of ADOC who has a disability.  The staff at all ADOC facilities will

244554.6

receive notice of the designated Statewide ADA Coordinator.

B. The Statewide ADA Coordinator will be a full-time position. The Statewide ADA Coordinator will answer directly to Inspector General of the ADOC.

C. In each ADOC facility, the name, office address, and telephone number for the Statewide ADA Coordinator will be posted in each dormitory, chow hall, visitation area, library, medical care treatment areas, mental health care treatment areas, chapel, canteen, and educational areas.

D. The Statewide ADA Coordinator will receive, review, and maintain monthly reports from the Facility ADA Coordinators at each facility. The

244554.6

Statewide ADA Coordinator will prepare quarterly reports summarizing the data received from Facility ADA Coordinators via their respective monthly reports and submit the quarterly reports by the fifteenth (15th) day in the months of April, July, October, and January, to the ADOC Inspector General and the Associate Commissioner for the Office of Health Services.

E.   The Statewide ADA Coordinator will review existing ADOC administrative regulations, facility standard operating procedures provided by Facility ADA Coordinators, and administrative directives to assess compliance with the ADOC's obligations under the ADA and to provide any resultant recommendations regarding

244554.6

compliance to the Commissioner, the facility wardens, and the Facility ADA Coordinators.

F.   The Statewide ADA Coordinator will inspect every ADOC major and work release facility, to include tours of the physical plant, interviews with staff and interviews with Inmates with disabilities, for compliance with the Acts as follows:

1.   Each Facility will be inspected on an annual basis.

2.   Facilities where Inmates with vision or mobility impairments are housed will be inspected by the Statewide ADA Coordinator for compliance with the Acts on a bi-annual basis.  At least one (1) of these inspections will be unannounced.

244554.6

G.   The Statewide ADA Coordinator will conduct the Quality Assurance Program audits as described in the Quality Assurance part of this Agreement.

H.   The Statewide ADA Coordinator will be audited at least annually by the ADA Committee described in the Quality Assurance Part of this Agreement.

I.   The Statewide ADA Coordinator will review and provide input regarding any proposed ADA training offered by the ADOC to its administrative staff, facility staff, or the staff of any third-party providers.

J.   All appeals of ADA requests will be reviewed by the Statewide ADA Coordinator.   Such

244554.6

appeals will be received by the Statewide ADA Coordinator directly or forwarded to the Statewide ADA Coordinator from the Facility ADA Coordinator or the warden where the aggrieved Inmate is housed. The Statewide ADA Coordinator will respond in writing to any ADA appeal within fifteen (15) days from receipt of the appeal, not including weekends and holidays. The Statewide ADA Coordinator will maintain a file of all ADA appeals and responses. The file will contain all of the following for each appeal to the extent such documents were generated: the original ADA request, the denial of the original request, the Inmate's appeal of the denied request, and the written response to the Inmate's appeal.

K.  For the first twelve (12) months following Final Approval of the Amended Agreement, the Statewide ADA Coordinator will:

1.  Conduct annual in-person meetings for all Facility ADA Coordinators;

2.  In addition to the above, Conduct a second in-person meeting with the Facility ADA Coordinators for facilities where Inmates with vision or mobility impairments are housed; and

3.  Host monthly telephonic meetings with all facility ADA Coordinators.

L.  For the two (2) years following twelve (12) months after Final Approval, the Statewide ADA Coordinator will:

244554.6

1.   Conduct annual in-person meetings with all Facility ADA Coordinators;

2.   In addition to the above, conduct a second in-person meeting with Facility ADA Coordinators for facilities where inmates with vision or mobility impairments are housed; and

3.   Host quarterly telephonic meetings with all Facility ADA Coordinators.

M.   After three (3) years following Final Approval, the meetings described in paragraphs K and L immediately above may be reduced to an annual in-person meeting for all Facility ADA Coordinators and quarterly telephonic meetings with all Facility ADA Coordinators.

244554.6

N.   The Statewide ADA Coordinator will respond to any questions from Facility ADA Coordinators regarding Inmate requests for accommodations or ADA accessibility issues affecting specific facilities.

244554.6

11. <u>Provisions Regarding Training of ADOC Staff</u>.
ADOC will provide initial and periodic training
concerning the provisions and requirements of the ADA
to both security staff (i.e., those who are required to
attend the Correctional Officer Training Academy) and
ADA Coordinators.

       I.    Initial Training.

       A. Security Staff.   The Alabama
Disabilities Advocacy Program ("ADAP") will, in
conjunction with ADOC, provide training concerning the
provisions and requirements of the ADA to the first class
of students entering the Correctional Officer Training
Academy following January 1, 2017. This training will
consist of no less than four (4) hours of classroom

244554.6

instruction. Thereafter, ADOC will provide the four (4) hours of training to each class entering the Correctional Officer Training Academy. ADAP will allow ADOC to utilize all curricula, materials and the like generated by ADAP for this instruction. This further includes, without limitation, video recordings of the instruction provided by ADAP. ADOC will not disseminate these materials outside of ADOC absent a subpoena or request for production. ADOC agrees to compensate ADAP for its services in providing this training. ADOC and ADAP will enter into a memorandum of understanding that further described the parties' obligations and commitments concerning this training.

244554.6

B.   ADA Coordinators.   ADAP will, in conjunction with ADOC, provide training concerning the provisions and requirements of the ADA to all Facility ADA Coordinators and the Statewide ADA Coordinator beginning on or before January 31, 2017.This training will consist of no less than six (6) hours of classroom instruction.   ADAP will provide four (4) hours of instruction to the Coordinators concerning the provisions and requirements of the ADA and their responsibilities as ADA Coordinators.  ADOC will provide two (2) additional hours of instruction concerning ADOC's internal policies and procedures as the same relate to the duties of an ADA Coordinator. Thereafter, ADOC will provide the six (6) hours of training to any ADA

244554.6

Coordinators it designates. ADAP will allow ADOC to utilize all curricula, materials and the like generated by ADAP for this instruction. This further includes, without limitation, video recordings of the instruction provided by ADAP. ADOC will not disseminate these materials outside of ADOC absent a subpoena or request for production. ADOC agrees to compensate ADAP for its services in providing this training.

II.   Annual Training.

A.   Security Staff.  ADOC will require all members of its Security staff to participate in two (2) hours of annual training concerning the ADA. ADAP will provide this training during ADOC's first training session in a selected ADOC region in each of the calendar years

244554.6

of 2018, 2019 and 2020. Thereafter, ADOC will provide this training. ADAP will allow ADOC to utilize all curricula, materials and the like generated by ADAP for this instruction. This further includes, without limitation, video recordings of the instruction provided by ADAP. ADOC will not disseminate these materials outside of ADOC absent a subpoena or request for production. ADOC agrees to compensate ADAP for its services in providing this training.

B.   ADA Coordinators.  ADOC will require all Facility ADA Coordinators and the Statewide ADA Coordinator to participate in two (2) hours of annual training concerning the ADA. ADAP will provide this training during the calendar years of 2018, 2019 and

244554.6

2020. Thereafter, ADOC will provide this training. ADAP will allow ADOC to utilize all curricula, materials and the like generated by ADAP for this instruction. This further includes, without limitation, video recordings of the instruction provided by ADAP. ADOC will not disseminate these materials outside of ADOC absent a subpoena or request for production. ADOC agrees to compensate ADAP for its services in providing this training.

244554.6

## 12.   Provisions regarding a Quality Assurance Plan (including Quality Assurance Tools)

I.      ADOC will implement a Quality Assurance Program ("QAP")  to assess its compliance with the terms of the Settlement Agreement, as well as its ongoing legal obligations under the ADA. The QAP will be administered by ADOC's Statewide ADA Coordinator. The Statewide ADA Coordinator will conduct all QAP audits described herein except the QAP audit of the Statewide ADA Coordinator.   The QAP audit of the Statewide ADA coordinator will be conducted by the ADA Committee described herein.    The Quality

244554.6

Assurance Program will include major audits, periodic corrective audits, and minor audits.[8]

A.   At least annually, the Statewide ADA Coordinator will conduct a major audit of each facility's Facility ADA Coordinator to ensure compliance with the terms of the settlement agreement and its ongoing legal obligations under the ADA.

1.   An audit tool including the following areas of inquiry will be utilized in this process:

a.   All ADA accommodations as well as grievance and appeals processes;

---

[8] Major audits are defined as utilizing all sections of the auditing tool.  Periodic corrective audits are defined as audits triggered by deficiencies found in either a major audit or a minor audit of some subset of the sections of the auditing tool to determine if the resulting corrective action plan has been implemented and is effective in correcting deficiencies found.  Minor audits are defined as regularly scheduled audits utilizing a rotating set of less than all the sections of the auditing tool.

b.   ADA training for ADOC staff regarding Inmates with disabilities;

c.   Access to programming for Inmates with disabilities;

d.   Assignments of health codes by ADOC's healthcare provider and security levels for Inmates with disabilities;

e.   Identification, tracking, and transfer of Inmates with disabilities; and

f.   Provision of accessible housing and facilities and maintenance of the same.

2.   The audit tool to measure compliance with the ADA will be annually reviewed following the first year it is put into use and modified as

244554.6

necessary or appropriate to ensure compliance. The initial data to be evaluated is appended hereto under the title "Quality Assurance Audit Tools." Any facility audited pursuant to the Quality Assurance Program will maintain at least 85% compliance with each subject area. A failure on any or all subject areas will subject the facility to a corrective audit, no later than six (6) months after completion of the annual audit, covering at least those areas in which the facility failed to meet 85% compliance.

3. At the conclusion of each QAP audit (whether major, corrective, or minor) a written report of the audit, showing the percentages of compliance in each subject area will be provided to the

244554.6

facility Warden, ADOC's Office of Health Services ("OHS"), the Statewide ADA Coordinator, the Facility ADA Coordinator at the audited facility.  The Statewide ADA Coordinator will maintain a complete record of all audits performed (whether major, corrective, or minor) along with all corresponding corrective action plans.

4.    If any deficiencies are identified, within fifteen (15) days (excluding weekends and holidays) after the written report is submitted, the facility Warden, a representative from OHS, the Statewide ADA Coordinator, and the Facility ADA Coordinator will meet and confer telephonically or in person to develop a corrective action plan to remedy any deficiencies found. All corrective action plans will be in writing.  After a

244554.6

corrective action plan has been adopted and implemented, a corrective audit will follow.   During the corrective audit, the auditor will review whether the facility has implemented the terms of the corrective action plan and whether the underlying compliance deficiencies have been resolved.  The results of the corrective audit will be in writing, and if continuing deficiencies are noted, additional corrective actions will be developed and additional corrective audits will be conducted to achieve compliance.

B.   In addition to the annual major audit, each facility will be subject to periodic minor audits which are audits of some portions of the full audit.  The subject areas of the minor audits will be rotated annually

244554.6

to ensure that each subject area is reviewed at each facility through the minor audit process at least every three (3) years. The facilities will not be given notice of the timing or subject of minor audits. The corrective audit and corrective action plan processes described herein also apply to deficiencies found via the periodic minor audit process.

II.    An ADA Committee will be appointed by the ADOC Commissioner to include a minimum of five (5) persons, at least forty percent (40%) of whom are from outside the ADOC.  The outside representatives will include one representative from the Governor's Office on Disability and one representative from the Alabama Department of Mental Health.  If no representative from

244554.6

the Governor's Office on Disability or the Alabama Department of Mental Health is willing or available to serve on the Committee, the ADOC Commissioner will recruit an appropriate number of representatives from similarly situated agencies or interest groups outside of ADOC. The ADA Committee will meet as needed, but at least once annually, to audit the Statewide ADA Coordinator.

    A. The audit of the Statewide ADA Coordinator will include the following areas of inquiry:

        1. Maintaining compliance with the ADOC's policies and procedures relating to Inmates with disabilities;

2.    A review of the Statewide ADA Coordinator's quarterly reports;

3.    A review the Facility ADA Coordinators' monthly reports; and

4.    A review of the files of Inmate ADA grievance appeals maintained by the Statewide ADA Coordinator.

B.  The audit tool to measure the Statewide ADA Coordinator's compliance with these subject areas will be periodically reviewed and modified to ensure compliance. The initial data to be evaluated is appended hereto. Pursuant to the Quality Assurance Program, the Statewide ADA Coordinator will maintain at least 85% compliance with each subject area. A failure on any or all

244554.6

subject areas will subject the Statewide ADA Coordinator to a corrective audit, no later than six (6) months after completion of the annual audit, covering at least those areas in which the Statewide ADA Coordinator failed to meet 85% compliance.

C.   At the conclusion of each QAP audit of the Statewide ADA Coordinator, a written report of the audit, showing the percentages of compliance in each subject area, will be provided to the Commissioner, ADOC's Office of Health Services ("OHS"), and the Statewide ADA Coordinator.   The Statewide ADA Coordinator will maintain a complete record of all audits performed along with all corresponding corrective action plans.

244554.6

D.   If any deficiencies are identified, within fifteen (15) days (excluding weekends and holidays) after the written report is submitted, the ADOC Inspector General, a representative of OHS, a representative of the ADA Committee,[9] and the Statewide ADA Coordinator will meet and confer telephonically or in person to develop a corrective action plan to remedy any deficiencies found.  All corrective action plans will be in writing.  After a corrective plan has been adopted and implemented, a corrective audit will follow.  During the corrective audit, the ADA Committee will review whether the Statewide ADA Coordinator has implemented the terms of the corrective action plan and whether the

---

[9] The ADA Committee cannot name as its representative the OHS staff member who serves on the Committee.  It is permissible for OHS to name as its representative the member of its staff who serves on the ADA Committee.

244554.6

underlying compliance deficiencies have been resolved. The results of the corrective audit will be in writing, and if continuing deficiencies are noted, additional corrective actions will be developed and additional corrective audits will be conducted to achieve compliance.

       III.   <u>QA Audit Tools</u>.

       A.  Intake Facilities.  The audit of medical records at intake will consist of a review of one hundred (100) randomly selected medical records of Inmates at intake.  The review will include a review of records from a least six (6) separate months and will include a review of medical records of Inmates who may no longer be housed in the intake facility.   All Inmates who were

244554.6

screened during the previous period[10] will be entered into a database under which a computer or other similar method of random selection is utilized to ensure against selection bias.  This selection process will occur ten (10) days before the scheduled audit, and ADOC will ensure that, if the original file is not otherwise accessible, a duplicate copy of the portions of the sections of the medical record necessary for the audit for an Inmate not currently housed at the intake facility is transported to the intake facility for audit purposes.   The following areas will be assessed:

1.   Was the Inmate questioned, within twelve (12) hours of arrival at ADOC's intake facility

---

[10] "Previous period" is defined as the period since the most recent audit of the same kind as being currently undertaken.

244554.6

concerning: perceived or recognized disabilities; prior physical, intellectual, or mental health treatment and diagnoses; and previously identified disabilities?

      2.    Did the Inmate receive a screening for physical and mental health disabilities within seven (7) days, not including weekends and holidays, of arrival at ADOC's intake facility by a properly qualified medical and mental health provider?[11]

      3.    Within seven (7) days, not including weekend and holidays, of the Inmate's physical and mental health screening by a qualified medical and mental health provider were all approved profiles, medical and mental health codes, accommodations, and

---

[11] A "properly qualified" provider is defined as the medical and/or mental health provider authorized to conduct the initial screening for Inmates upon arrival at an ADOC facility.

244554.6

disabilities entered into the Health Services Module computer system?

4.    Within three (3) days, not including weekends and holidays, of a medical or mental health provider entering a profile, recommending an accommodation for disabilities, finding an ADA qualified medical or mental health condition,  or creating a mental health code of two (2) or greater, was the Facility ADA Coordinator notified in writing of each such an event?

5.    Within seven (7) days, not including weekends and holidays, of arrival of an Inmate at ADOC's Intake Facility, did the Inmate receive a Beta and a WRAT?

244554.6

6.  Within three (3) days, not including weekends and holidays, of an Inmate scoring eighty (80) or below on the Beta or a scoring seven (7) or below on the WRAT, was the Inmate scheduled for further testing and review by a psychologist for the possible existence of an intellectual disability or a learning disability?

7.  For all Inmates scoring eighty (80) or below on the Beta and/or scoring seven (7) or below on the WRAT, were all testing, interviews, and examinations conducted by a psychologist completed within thirty three (33) days from the date of notification of the Beta or WRAT score?

8.  For any Inmate scoring 75 or below on the Beta at the time of arrival in ADOC's custody, was

244554.6

ADOC's director of classification and chief psychologist notified within three (3) days, not including weekends and holidays?

9.    For any Inmate who arrived with a prescription for a physical or mental health medication, was the Inmate examined by a properly qualified medical/mental health provider before the medication which the Inmate entered ADOC's intake facility ran out?

10.    For any Inmate who arrived with a prescription for a physical or mental health medication, was that prescription validated and, once validated, did the Inmate receive that medication(s) until he/she was seen by a medical/mental health provider?

244554.6

11.   Did Inmates arriving at ADOC's intake facility receive information on their rights under the ADA, and the appropriate accommodation, grievance, and appeal procedures, within three (3) days of arrival, not including weekends and holidays, and acknowledge receipt of such information in writing?

12.   An ADOC intake facility also will be subject to, and assessed under the "Non-Intake Facilities" audit with respect to Inmates who have been continuously housed in such a facility for the previous six (6) months.

B.   Non-Intake Facilities.   The audit of a non-intake facility will consist of a review of the medical

244554.6

and mental health records of fifty (50) Inmates selected at random.[12]  The following areas will be assessed:

1.  Did each Inmate receive a timely reassessment of their medical and mental health condition as required by ADOC policies?

2.  If any Inmate has received an ADA accommodation which is not contained on the Health Services Module, does the ADA Coordinator have a log of all such accommodations?

3.  The audit will also consist of a review of forty (40) granted, denied, or partially granted requests for ADA accommodation/appeals.

---

[12] The random selection process described in "Intake Facility" section herein or a similar procedure is acceptable.

244554.6

4.   Were all granted accommodations/appeals entered into the health services module computer system within three (3) days, not including weekends and holidays, of the requests being granted?

C.   Facility ADA Coordinators.  The audit of a facility ADA Coordinator will consist of a review of twenty (20) requests for accommodations, twenty (20) transfers of an Inmate with an ADA accommodation to another facility, ten (10) requests for accommodation, and five (5) appeals, and will also include an in-person interview with ten (10) Inmates who have filed requests

244554.6

for ADA accommodations, from the previous period.[13] The following areas will be assessed during the audit.

1.   Were all accommodations, requests and appeals answered/forwarded, within the applicable time parameters?

2.   Does the response adequately identify the reason for any denial or partial denial of a request for an ADA accommodation?

3.   For each request for an accommodation that is denied or denied in part, is there written confirmation that the Facility ADA Coordinator met with the Inmate in person within the applicable time parameters?

---

[13] If fewer than the allotted number exist, then all of a particular category will be reviewed.

244554.6

4.      Is there a monthly report containing all the elements of the "Facility ADA Coordinator's Monthly Report"?

5.      Is there a monthly written report indicating that the Facility ADA Coordinator conducted a walkthrough of all areas of the facility where Inmates are allowed access, along with a written record of any deficiencies found?

6.      Did the Facility ADA Coordinator attend all mandatory annual training required of Facility ADA Coordinators?

7.      Did the Facility ADA Coordinator attend all required periodic meetings of ADOC ADA staff?

244554.6

8. Did the Facility ADA Coordinator transmit all information not contained on the health services computer module regarding an Inmate's accommodation and/or profile to the receiving facility within three (3) days, not including weekends and holidays, of the Inmate's transfer?

D.   Statewide ADA Coordinator.

1. A review of the Statewide ADA Coordinator will consist of a review of materials in his/her possession.  It will include:

a. Does the Statewide ADA Coordinator have a complete file containing all facility audits and results?

244554.6

b.   Does the Statewide ADA Coordinator have a complete file of all corrective action plans for all facilities?

c.   Does the Statewide ADA Coordinator have a complete file of all monthly facility reports?

d.   Does the Statewide ADA Coordinator have written proof of the mandatory facility walk-throughs?

e.   Did the Statewide ADA Coordinator attend all mandatory annual training?

f.   Did the Statewide ADA Coordinator attend all periodic meetings of ADOC ADA staff?

244554.6

g.   Does the Statewide ADA Coordinator have an annual report showing any modification of facilities, policies, procedures, or regulations which must be implemented to ensure continued compliance with the ADA?

2.   The Statewide ADA Coordinator will also be assessed by reviewing the appeals process. To effectuate this, twenty (20) appeals from the previous period will be reviewed.  It will include:

a.   Did the Statewide ADA Coordinator review and respond within the time parameters contemplated herein?

b.   For each request for an accommodation or grievance that is denied or denied in

244554.6

part, is there written confirmation that the Facility ADA Coordinator met with the Inmate in person within the applicable time parameters?

E.   Evaluation of Results.  For purposes of determining the requirement for a "corrective audit" as contemplated herein, the 85% threshold will apply to each subsection for each applicable person/facility.[14]

F.   Notice.  ADOC will post the provisions of this agreement in the law library, or if there is no law library, the area where other inmate information is made available of each of its prison and work release facilities. It will amend the Inmate handbooks to include the provisions of this agreement. The substance of what will

---

[14] For instance, if a review of medical records is contemplated only those instances in which data showing a failure to perform, or acceptable performance will be used.  If 50 records are used, but for a particular issue less than 50 individuals would have been subject to such a process, then such non-applicable instances will be ignored.

244554.6

be posted in the libraries and in the Inmate handbooks will be drafted by ADOC and Plaintiffs jointly.  All such documents will be available in alternative formats to include large print and braille.

244554.6

13.  <u>Unresolved Claims</u>.   Plaintiffs bring claims in this lawsuit that are not resolved by this Amended Agreement and that are subject to be tried in Phase 2 of this litigation.  ADOC will not contend in the Phase 2 Trial that Plaintiffs were required to resolve these claims in this Amended Agreement.  Plaintiffs are not waiving and reserve the right to pursue additional architectural changes that are not ADA-based for medical or mental health purposes as part of Phase 2 of this lawsuit.  Nothing in this paragraph will be construed as an admission on the part of the Defendants that there are architectural changes needed, necessary, or required or that, to the extent such architectural changes are needed,

244554.6

necessary, or required, a cause of action exists to mandate that such changes be made.

## VI.  MONITORING

1.   The Parties agree that monitoring of ADOC's compliance with the terms of this Amended Agreement is necessary and that ADAP will serve as the monitor.  ADOC will allow ADAP reasonable access to facilities, documents, staff, procedures, logs, records, Inmates, and other similar informational sources in order to ensure that compliance.  ADAP will be entitled to conduct interviews with Inmates and staff to assess compliance with the terms of this Amended Agreement.

2.   ADAP agrees to be bound by any Protective or Court Orders entered in this case to protect the

confidentiality of Inmate records and sensitive security information.

3.   ADAP will prepare a written report on ADOC's efforts to meet the requirements of this Agreement and any plan to effectuate the terms of this Amended Agreement at least quarterly.  Each report will indicate all areas in which the ADOC is, or is not, in Substantial Compliance.  Such report will be provided to ADOC and all counsel of record.  If ADAP believes that ADOC is not in Substantial Compliance with the terms and provisions of this Amended Agreement and any plan to effectuate its terms, ADAP will provide written recommendations of actions that it believes necessary to achieve Substantial Compliance with the terms of the provision or

244554.6

provisions.  ADOC will then have twenty (20) days to provide written comments, objections, or remedial action plans in response.  The Parties will meet and confer to attempt to address deficiencies identified by ADAP.

4.  Monitoring will continue for a period not exceeding six (6) years from the execution of this Amended Agreement, regardless of whether ADOC does or does not build new prisons.  In the event that ADOC has undertaken to build new prisons, but they have not been completed as of January 1, 2020, monitoring will continue until two (2) years after the completion of the prisons.

5.  If ADAP finds evidence of any violation of law which does not involve the subject matter of this

244554.6

Amended Agreement, it is obligated to report that to the ADOC General Counsel, or her designee.

## VII. DISPUTE RESOLUTION PROCESS

1. During the assessment, implementation, or monitoring periods of this Amended Agreement (*see* Sections V-VI, above), if Plaintiffs' counsel or the monitor believe that ADOC is not complying with some aspect of the Amended Agreement, they will notify counsel for the ADOC, in writing, of such a belief identifying any facts supporting the belief. ADOC will investigate the allegations and respond in writing through its counsel within thirty (30) days after receipt of the notification. If Plaintiffs' counsel or the monitor is not satisfied with ADOC's response, the Parties will negotiate

244554.6

in good faith to resolve the issue(s). If the Parties are unable to resolve the issue(s) timely and satisfactorily, the Parties agree to present the issue(s) for binding arbitration before Hon. John E. Ott, U.S. Magistrate Judge for the Northern District of Alabama.[15] This provision regarding binding arbitration applies regardless of whether the issue affects twelve (12) or more inmates, as discussed below.

2.     If the issue is one that impacts fewer than twelve (12) inmates, resolution through the arbitration process shall be the final resolution under this Amended Agreement. Nothing in this Amended Agreement establishes a compulsory administrative prerequisite with

---

[15] If, at any time during the term this Amended Agreement is in effect, Judge Ott or any successor arbitrator becomes unavailable to arbitrate disputes, the Parties will agree upon a replacement arbitrator. If the Parties are unable to agree upon a replacement arbitrator, they will petition the Court to appoint a replacement arbitrator who will be a current or former U.S. Magistrate Judge from one of the U.S. District Courts sitting in Northern, Middle or Southern Districts of Alabama.

244554.6

which an Inmate must comply prior to the initiation of a lawsuit alleging violations of the Acts suffered during the Inmate's term of incarceration. Nothing in this agreement shall prevent an Inmate from exercising his/her rights under ADOC's ADA Grievance Process.

3.   If the issue is one that impacts twelve (12) or more Inmates and the Parties are unable to resolve the issue(s) timely and satisfactorily through negotiation or the arbitration process, either party may bring the issue before the Court for resolution.  Any issue brought before The Court will be decided on an abuse of discretion standard.

4.   Issues relating to ADOC system-wide or facility specific policies, or physical barriers within a specific

244554.6

facility, shall be presumed to impact twelve (12) or more inmates.  The Arbitrator shall have the authority to decide whether an issue impacts twelve (12) or more inmates.

5.    In the event that the arbitrator or Court, acting as final decision-maker, finds that ADOC has failed to comply with this Amended Agreement, ADOC will submit a plan to remedy the deficiencies identified within thirty (30) days of the decision. In the event that such a plan does not timely remedy the deficiencies, the Court retains the authority to enforce this Amended Agreement through all remedies provided by law.  Any attorneys' fees awarded are subject to the provisions of Section XII of this Amended Agreement.

244554.6

6.    The Court will be the sole forum for enforcement of this Amended Agreement.  Any order to achieve Substantial Compliance with the provisions of this Amended Agreement will be subject to the provisions of the Prison Litigation Reform Act, 18 U.S.C. § 3626.

244554.6

# VIII. RESERVATION OF JURISDICTION AND ENFORCEMENT

1.   The Parties consent to the reservation and exercise of jurisdiction by the Court over disputes between the Parties and among the Parties arising out of this Amended Agreement.

2.   For purposes of jurisdiction and enforcement of this Amended Agreement only, the Parties jointly request the Court to find that this Amended Agreement satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A) in that it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation of the federal rights of the Plaintiffs.

244554.6

3.    The Court will retain jurisdiction to enforce the terms of this Amended Agreement, once approved, until the Agreement is terminated.

4.    This Amended Agreement may be enforced only by the Parties hereto.  Nothing contained in this Amended Agreement is intended, or will be construed, to evidence an intention to confer any right or remedy upon any person other than the Parties hereto.

## IX.  TERMINATION

1.    ADOC may seek a termination of its obligations under this Amended Agreement upon a finding that it is in Substantial Compliance with this Amended Agreement and has maintained Substantial Compliance for at least twelve (12) consecutive months.  ADOC may not obtain a

244554.6

termination of its obligations under this Amended Agreement until five (5) years following the Final Approval of this Amended Agreement.

2. If, upon request for termination, the Court concludes that the ADOC is in Substantial Compliance with all terms and conditions of this Amended Agreement, then the Court may terminate jurisdiction of the portion or portions of this case subject to this Amended Agreement.

3. The Parties will work in good faith to achieve Substantial Compliance with all terms and conditions of this Amended Agreement within the time parameters of this Amended Agreement. If Plaintiffs believe that ADOC is not in or progressing toward Substantial

244554.6

Compliance with the terms and conditions of this Amended Agreement, Plaintiffs may move for an order extending jurisdiction over this matter beyond maximum time period contemplated herein.  To extend jurisdiction, Plaintiffs will be required to establish by substantial evidence and the Court will so find that ADOC is not in Substantial Compliance with this Amended Agreement or any subsequent Order entered by the Court.

## X.   AMENDMENTS

1.   By mutual agreement, the Parties may change terms of this Amended Agreement (except for the six-year monitoring provision of Section XII.2. below), including but not limited to the timetables for taking specific actions, provided that such modifications are

244554.6

memorialized in writing, signed by the Parties or through their counsel, and approved by the Court.

2.    ADOC may not make any substantial changes to any policy, procedure, regulation, or rule that conflicts with the terms of this Amended Agreement.  ADOC will supply or make available to Plaintiffs' counsel any policies, procedures, regulations, or rules implementing the provisions of this Agreement for their review and comment.

3.    The Alabama Prison Transformation Initiative ("APTI") is expected to be considered during or before the 2017 Regular Session of the Alabama Legislature. In the event the Alabama Legislature passes the APTI on or before the conclusion of the 2017 Regular Session of

244554.6

Alabama Legislature such that it has authorized bonding authority for the construction of new prison facilities, the parties agree to meet and re-evaluate the deadlines discussed in Section V.2. "Provisions Regarding Assessment, Self-evaluation and Transition Plan, and Corrective Actions" and elsewhere in this Amended Agreement. If the Parties cannot agree upon amended or supplemental deadlines for these provisions, based on the construction of new Facilities authorized by the APTI, the Parties will submit those issues to the "Dispute Resolution Process" discussed in Section VII of this Amended Agreement.

4.     ADOC may not approve any changes in policy, procedure, regulation, or rule by its Medical and/or

Mental Health provider that conflicts with the terms of this Amended Agreement.

## XI.  FUNDING

1.   The Parties acknowledge that implementation of the terms of this Amended Agreement and any plan necessary to effectuate its terms are subject to the availability and receipt of appropriated funds.

2.   The Parties further acknowledge that the lack of funding does not preclude the Court from entering an Order to achieve compliance with this Amended Agreement that comports with the applicable provisions of the Prison Litigation Reform Act, 18 U.S.C. § 3626, and with other applicable law, provided that ADOC

244554.6

reserves the right to assert that the lack of funding should be taken into account in any remedial order.

3.    ADOC agrees to make all possible good faith efforts to seek all necessary funding to implement the terms of this Amended Agreement.  In the event that the Parties are unable to agree as to whether there is sufficient funding to implement this Amended Agreement, the Parties will meet and confer, and if necessary, consult with the Court.  In the event that the Parties remain unable to agree, either party may seek assistance of the Court.

## XII. ATTORNEYS' FEES AND EXPENSES

1.    ADOC agrees to pay attorneys' fees and associated costs to counsel for the Plaintiffs in the total amount of $1,250,000.00.   Plaintiffs agree that ADOC

244554.6

may pay this sum in installments as follows: a first installment payment of $500,000.00 on or before thirty (30) days following Final Approval; a second installment payment of $375,000.00 within six (6) months thereafter; a final installment payment of $375,000.00 within six (6) months following the second installment payment. Such payments will be remitted to the Southern Poverty Law Center. Interest on such sums is waived. ADOC acknowledges that counsel for Plaintiffs have been involved in the prosecution of other claims in this case beyond those resolved by this Agreement. ADOC acknowledges that payment of the above sum is for work and associated costs on the claims resolved herein and that Plaintiffs' counsel reserve the right to seek additional

244554.6

attorneys' fees and costs for claims not addressed by this Agreement.

2.    Plaintiffs' counsel agrees that they will not seek nor petition the Court for an award of fees and expenses for monitoring services greater than the following amounts. For purposes of describing the periods hereinafter, the time commences upon execution and final approval of this settlement by the Court. The fees amounts for monitoring services will be capped at, and not exceed, a total of the following amounts:

      a.    Year One: $70,000.00

      b.    Year Two: $60,000.00

      c.    Year Three: $50,000.00

      d.    Year Four: $40,000.00

e.   Year Five: $60,000.00

f.   Year Six: $50,000.00

The cost associated with Plaintiffs' counsel's participating in the facility survey described in Section V.2. of this Amended Agreement applies toward the total cost of monitoring but will not be deducted in whole from year one and can be spread over other year's assessments if necessary.

3.   Plaintiffs' counsel will provide itemized hours expended on a quarterly basis. ADOC agrees to pay an hourly rate of $195.00 for services rendered in the monitoring process.  The Parties will meet and confer and attempt to agree upon payment for monitoring services rendered.  In the event that the Parties are unable to agree

244554.6

upon the reasonable number of hours expended, either party may seek assistance of the arbitrator or the Court if the Parties remain unable to agree.

4.    The annual caps and hourly rates described herein do not apply to: (a) Plaintiffs' motions to enforce the terms of this Amended Agreement; and (b) Plaintiffs' opposition to any motions filed by ADOC arising out of this Amended Agreement.  No fees and expenses will be awarded to Plaintiffs' counsel for such motions or oppositions unless the Court finds: (a) that the motion or opposition was necessary to enforce substantial rights under the Acts; and (b) that Plaintiffs attempted to resolve the matter and or narrow the issues as much as possible by meeting and conferring with ADOC, taking full

244554.6

opportunity of recourse to the mediation process before presenting the issues to the Court. Plaintiffs' counsel agree that they may not seek attorneys' fees and costs of more than $200,000 per year on motions to enforce the terms of this Agreement.

## XIII. ADDITIONAL PROVISIONS

1.   This Amended Agreement constitutes the entire agreement among the Parties as to all claims contained herein. This Amended Agreement supersedes all prior agreements, whether written, oral, or implied. Each party represents that it has full legal authority to enter into and execute this Agreement.

244554.6

2.    This Amended Agreement may not be altered or amended, except in writing signed by all Parties or their representatives.

3.    This Amended Agreement will be binding on all successors, assigns, employees, agents, and all other working on behalf of Plaintiffs and ADOC.

4.    This Amended Agreement may be executed in counterparts and such counterparts will be provided to all Parties immediately upon execution.

244554.6

_____   Date: _____
Rhonda Brownstein
Southern Poverty Law Center
400 Washington Avenue
Montgomery, Alabama  36104
(334) 956.8200
rhonda.brownstein@splcenter.org
*One of the Attorneys for Plaintiffs*

_____   Date: _____
Maria V. Morris
Southern Poverty Law Center
400 Washington Avenue

244554.6

Montgomery, Alabama  36104
(334) 956-8200
maria.morris@splcenter.org
*One of the Attorneys for Plaintiffs*

_____   Date: _____
James A. Tucker, Executive Director
Alabama Disabilities Advocacy Program
Box 870395
Tuscaloosa, Alabama  35487




_____   Date: _____
J. Patrick Hackney
Alabama Disabilities Advocacy Program
Box 870395
Tuscaloosa, Alabama  35487
(205) 348-4928
jphackney@adap.ua.edu
*One of the Attorneys for Plaintiffs*

244554.6

_____     Date: _____
William Van Der Pol, Jr.
Alabama Disabilities Advocacy Program
Box 870395
Tuscaloosa, Alabama  35487
(205) 348-4928
wvanderpoljr@adap.ua.edu
*One of the Attorneys for Plaintiffs*

244554.6

_____      Date: _____

Anil A. Mujumdar

Zarzaur Mujumdar & Debrosse – Trial Lawyers

2332 2nd Avenue North

Birmingham, Alabama  35203

(205) 983-7985

anil@zarzaur.com

*One of the Attorneys for Plaintiff Alabama Disabilities*
*Advocacy Program*

_____      Date: _____

William G. Somerville

Baker, Donelson, Bearman, Caldwell & Berkowitz, PC

420 North 20th Street, Suite 1600

Birmingham, Alabama  35203-5202

(205) 250-8375

wsomerville@bakerdonelson.com

*One of the Attorneys for Plaintiffs*

Date: _____

_____
David R. Boyd
Balch & Bingham LLP
P.O. Box 78
Montgomery, Alabama  36101
(334) 834-6500
dboyd@balch.com
*One of the Attorneys for Defendant Alabama Department of Corrections*

244554.6

_____          Date: _____

John G. Smith
Balch & Bingham LLP
P.O. Box 78
Montgomery, Alabama  36101
(334) 834-6500
jgsmith@balch.com
*One of the Attorneys for Defendant Alabama Department of Corrections*

244554.6

_____     Date: _____
Anne Hill, General Counsel
Alabama Department of Corrections
301 South Ripley Street
Montgomery, Alabama  36130
(334) 353-3885
anne.hill@doc.alabama.gov
*One of the Attorneys for Defendant Alabama Department of Corrections*

_____     Date: _____
Jefferson Dunn
In His Official Capacity as Commissioner
    of the Alabama Department of Corrections
301 South Ripley Street
Montgomery, Alabama  36130

244554.6