IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| JOSHUA DUNN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| JEFFERSON S. DUNN, in his | ) | |
| official capacity as | ) | |
| Commissioner of | ) | |
| the Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

PHASE 1 FINAL SETTLEMENT APPROVAL OPINION AND ORDER

I.   INTRODUCTION

The individual plaintiffs in Phase 1 of this lawsuit are 17 prisoners with disabilities in the custody of the defendants, the Alabama Department of Corrections (ADOC or the Department) and Commissioner Jefferson Dunn. The Alabama Disabilities Advocacy Program (ADAP), Alabama's protection and advocacy organization for people with disabilities, is also a plaintiff.

Plaintiffs alleged that the Department has violated Title II of the Americans with Disabilities Act (ADA), codified at 42 U.S.C. § 12131 et seq., and § 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794.[1]   Briefly, plaintiffs contended that the Department lacks adequate systems for implementing its obligations under the ADA, and that this results in discrimination against and failure to accommodate prisoners with disabilities.[2]   Specifically, plaintiffs

---

1. This case has been bifurcated for the administrative convenience of the court and parties. Phase 1, at issue in this opinion, involves ADA claims alleging discrimination on the basis of and non-accommodation of physical disabilities.  Phase 2, to be tried later, involves Eighth Amendment claims alleging inadequate medical and mental healthcare. Phase 2 also involves ADA claims alleging discrimination on the basis of and non-accommodation of mental disabilities.  Although class certification will be considered separately for the two phases, there is significant overlap between the putative class representatives and members.

2. "State prisons fall squarely within the statutory definition of 'public entity,'" and Title II therefore "unmistakably includes State prisons and prisoners within its coverage." Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 209-10 (1998).  Moreover, the ADA applies to all of the "many recreational 'activities,' (continued...)

alleged that the Department failed to (1) implement a
system for identifying prisoners with disabilities;
(2) institute a system for receiving accommodation
requests and a grievance procedure for challenging
denied accommodations; (3) appoint ADA coordinators;
(4) adequately train personnel regarding the
requirements of the ADA; (5) develop an ADA transition
plan and corresponding policies and procedures;
(6) remove architectural barriers affecting prisoners
with disabilities; (7) provide reasonable
accommodations, such as auxiliary and visual aids and
services, to those with disabilities; and (8) enable
those with disabilities to access various types of
programming and services. Plaintiffs sought
declaratory and injunctive relief. Jurisdiction is

---

medical 'services,' and educational and vocation
'programs'" offered by prisons, id. at 210; see also
Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1081 (11th
Cir. 2007), and to such basic necessities of life as
use of toilets, showers, and sinks, see Schmidt v.
Odell, 64 F. Supp. 2d 1014, 1032-33 (D. Kan. 1999)
(Brown, J.).

proper under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

In March 2016, almost two years after this case was filed and after extensive discovery, the parties submitted to the court a joint motion for preliminary approval of a settlement of the Phase 1 claims in this case. Their agreement lacked specificity; akin to an outline, it contained placeholders in the form of references to a "plan" that the parties intended to develop later. Concerned that it could not approve a settlement without scrutinizing its details--the "beef," as the court bluntly put it--the court ordered the parties to submit this plan.

Initially, it appeared that it would be impossible for the parties to reach agreement as to specifics; both they and the court prepared to go to trial. Meanwhile, they continued to negotiate, and wisely requested the assistance of United States Magistrate Judge John Ott, who generously volunteered--despite being from another district--to devote a tremendous

4

amount of time to the task.  After numerous lengthy mediation sessions, they reached a much more detailed settlement agreement.

The parties submitted this agreement to the court and, after a hearing, it entered an order granting preliminary approval and requiring the parties to provide notice to class members.  <u>See</u> Phase 1 Preliminary Settlement Approval Order (doc. no. 532).

The preliminary approval order provisionally certified the putative Phase 1 class and established a procedure for providing notice of the proposed settlement agreement--and a reasonable opportunity to object or comment--to putative class members.  Both the court's certification analysis and the notice procedure are discussed in greater detail below.

In addition to receiving written comments on the settlement from putative class members, the court held three fairness hearings.  In the first two, it heard from a representative group of putative class members who had submitted comments on or objections to the

settlement agreement and who were selected by the court, with the input of the parties. Following these hearings, the court held a third fairness hearing at which counsel for the parties responded to the various comments and objections raised by these witnesses and other questions raised by the court.

For the reasons that follow, the court will grant final approval of the settlement and the parties' request to enter a consent decree.


## II.  DESCRIPTION OF PROPOSED SETTLEMENT

The settlement agreement runs some 78 pages.  As a preliminary matter, it is predicated on--and defendants consent to--the certification of a settlement class defined as "any current or future inmate in the physical custody of ADOC who has a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. §705(9)(B), excluding those inmates whose disabilities relate solely to or arise solely from mental disease, illness,

or defect." Am. and Restated Settl. Agmt. (doc. no. 518) at 4.

The settlement agreement addresses the following measures that the Alabama Department of Corrections will be required to take in order to ensure that it is in compliance with the ADA and the Rehabilitation Act:

Self-Assessment and Transition Plan: The Department will evaluate all facilities that house disabled prisoners, and identify necessary changes to facilities and policies concerning disabled prisoners' ability to communicate and access programs. The Department will create a transition plan, listing changes to be made and deadlines for those changes.

Programs: The Department will provide reasonable accommodations for disabled prisoners to access the programs offered by the Department.

Special Housing Units: The Department will make individualized assessments of disabled prisoners housed in residential treatment and stabilization units to

ensure that they have reasonable access to the Department's programs.

Identification and Tracking: An initial screening for disabilities will be performed within 12 hours of a prisoner's entering the Department's custody, and a physical examination will be administered within seven days of entry. The Department will test new prisoners for intellectual and developmental disabilities using certain tests and guidelines. Within about one year, all prisoners will receive testing for intellectual disabilities and physical examinations. The Department will track prisoners with disabilities through a new system-wide computer database. The Department will periodically re-evaluate prisoners for changes in disability status, and will do so anytime a prisoner is transferred among facilities.

Security Levels: In assigning security levels, the Department will not increase a prisoner's security level solely based upon a disability, but the

Department will have discretion to lower a prisoner's security level based upon a disability.

Auxiliary Aids and Services:  For prisoners with hearing and vision impairments, the Department will provide auxiliary aids and services including readers, materials in Braille, and teletype phones. Hearing-impaired prisoners will be assessed at least every three months to ensure their hearing aids are properly functioning, and any needed repairs or replacement batteries will be provided according to set deadlines.  Sign-language interpreters will be provided for certain specified proceedings, such as intake interviews, health-care appointments, and disciplinary hearings, and other prisoners may serve as interpreters only with a hearing-impaired prisoner's consent and only on occasions not involving either medical care or a criminal investigation, or otherwise implicating a due-process right.

**Emergencies**:  To evacuate disabled prisoners in the event of an emergency, the Department will designate responsible employees, create plans, and run drills.

**Requests, Grievances, and Coordinators**:  The Department will implement a procedure for receiving and processing prisoners' requests for accommodations and appeals of denials, including specified forms, repositories to submit forms, and assistance for prisoners in completing and submitting forms.  The Department will appoint an ADA coordinator for each of its facilities, as well as a state-wide coordinator, to handle ADA requests, process appeals, produce monthly reports, and assess compliance.

**Training**:  The Department will provide initial and annual ADA training to correctional officers and enhanced training to ADA coordinators.

**Quality Assurance**: The Department will create a quality-assurance program that includes audits of the identification of disabled prisoners and of accommodation requests and appeals.

10

The agreement also contains the following provisions related to implementation:

Monitoring: ADAP will monitor the Department's compliance with the consent decree, and will be entitled to access relevant documents and to conduct interviews with prisoners and staff. ADAP will prepare quarterly reports on the Department's compliance containing written recommendations for any necessary changes, and the parties will meet and confer to address any reported deficiencies.

Dispute Resolution Process: Both the named plaintiffs and unnamed class members (either with or without representation by class counsel) must arbitrate claims that the Department is not in compliance with the consent decree. If the Department's alleged non-compliance impacts fewer than 12 prisoners, the arbitrator's decision will be final. If 12 or more prisoners are affected, the arbitrator's decision may be appealed to the court for review under an abuse-of-discretion standard.

11

Termination:   After five years the Department may request termination of the consent decree, which will terminate after six years unless plaintiffs request and the court grants an extension.

Amendment:   The parties may mutually amend the agreement.   The parties agree to re-evaluate deadlines in the transition plan if Alabama passes legislation to construct new prison facilities.

Funding:   The Department will make good-faith efforts to obtain necessary funding to comply with the agreement.

Attorneys' Fees:   Finally, the agreement contains an agreement that the Department will pay plaintiffs' attorneys $ 1.25 million in fees and costs, as well as additional fees on an hourly basis (subject to caps) during the monitoring process, and fees for any litigation necessary to enforce the consent decree.

### III.   DISCUSSION

Judicial policy favors the settlement of class-action cases. Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984). This is particularly true "in an area [such as this] where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals," Ass'n for Disabled Ams., Inc. v. Amoco Oil Co., 211 F.R.D. 457, 466 (S.D. Fla. 2002) (Gold, J.) (quoting Patterson v. Newspaper & Mail Deliverers' Union, 514 F.2d 767, 771 (2d Cir. 1975)), and "in class actions with their notable uncertainty, difficulties of proof, and length," Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 538 (S.D. Fla. 1988) (King, J.) (citations omitted), aff'd, 899 F.2d 21 (11th Cir. 1990).

However, the court retains an important role in evaluating and approving such settlements, pursuant to multiple provisions of Federal Rule of Civil Procedure 23 and the Prison Litigation Reform Act (PLRA), 18

U.S.C. § 3626.    First, because the settlement contemplates the certification of a class, the court must determine whether the requirements of Rule 23(a) and (b) are met.    Second, Rule 23(e) imposes both procedural and substantive requirements that must be satisfied before the court may approve a settlement that binds absent class members.    Third, because the settlement includes an agreed-upon award of attorneys' fees and costs to plaintiffs' counsel, the court must determine their suitability for appointment as class counsel pursuant to Rule 23(g) and the reasonableness of the fee award reasonable pursuant to Rule 23(h). Fourth and finally, the court must confirm that the prospective relief to be afforded through entrance of a consent decree complies with various provisions of the PLRA.


A.  Class Certification: Rules 23(a) and (b)(2)

The    court    previously    granted    provisional certification of a settlement class defined to include

14

"any current or future inmate in the physical custody of the Alabama Department of Corrections who has a disability as defined in 42 U.S.C. § 12012 and 29 U.S.C. § 705(9)(B), excluding those inmates whose disabilities relate solely to or arise from mental disease, illness, or defect."  Phase 1 Preliminary Settlement Approval Order (doc. no. 532) at 2.[3]

Having considered the parties' post-settlement brief on this topic, the court now concludes that final certification of this settlement class is appropriate for the reasons that follow.

In order for any certification motion to succeed, the putative class representatives must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of

---

3.  The court and the parties intended the word 'solely' to modify both 'relate to' and 'arise from," as reflected in the settlement agreement itself. However, the court preliminarily certified the class based on the language included in the parties' motion for preliminary approval, which omitted the second 'solely.'  The class certified here is worded according to the language in the settlement agreement.

law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  In addition, a class must clear one of three additional hurdles; because the named plaintiffs in this case seek certification of a Rule 23(b)(2) class, they must also show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  These requirements apply with "equal force" to uncontested certification of a class for purposes only of settlement. Austin v. Hopper, 15 F. Supp. 2d 1210, 1224 (M.D. Ala. 1998) (Thompson, J.) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620-22 (1997)).

The court notes that, in conducting this analysis, it has had the benefit of briefing on a contested motion for class certification filed prior to settlement of Phase 1 of this case.   Although defendants no longer contest certification for purposes and in light of the settlement, the court has assured itself that, for the reasons discussed below, none of the arguments defendants previously offered warrants denial of certification.

### i.  Standing

"[A]ny analysis of class certification must begin with the issue of standing"; only once the court finds that the named plaintiffs have standing may it consider whether they have "representative capacity, as defined by Rule 23(a), to assert the rights of others." Griffin v. Dugger, 823 F.2d 1476, 1482 (11th Cir. 1987).   To show Article III standing, the named plaintiffs must show that they have been injured, that their injuries are fairly traceable to the defendants'

conduct, and that a judgment in their favor would likely redress their injuries.  See <u>Mulhall v. UNITE HERE Local 355</u>, 618 F.3d 1279, 1286 (11th Cir. 2010).

The individual named plaintiffs clearly have standing to assert the claims brought in Phase 1 and now resolved in the settlement agreement.[4]  Each is a prisoner in the custody of defendants, (allegedly) has

---

4. Not all of the plaintiffs named in the complaint prior to bifurcation raised Phase 1 claims. The following named plaintiffs did so, and are therefore named class representatives: Edward Braggs, Tedrick Brooks, Gary Lee Broyles, Sylvester Hartley, Charlie Henderson, Brandon Johnson, John Maner, Jermaine Mitchell, Roger Moseley, Timothy Sears, Daniel Tooley, Joseph Torres, and Donald Ray Turner.

Note that the court has excluded from this list four named plaintiffs who were released from custody prior to the filing of plaintiffs' motion for class certification, and whose ability to serve as class representative defendants then challenged. (These four individuals are: Christopher Gilbert, Dwight Hagood, Tommie Moore, and Bradley Pearson.) Because the parties' have reached a settlement, it is irrelevant whether these named plaintiffs' class claims are moot. <u>See</u> <u>Dunn v. Dunn</u>, 148 F. Supp. 3d 1329 (M.D. Ala. 2015) (Thompson, J.) (discussing the legal framework for assessing the mootness of putative class claims brought by prisoners who have been released from custody). For the purposes of this opinion alone, the court has assumed without deciding that they are.

18

a disability that qualifies for the protection of the ADA and the Rehabilitation Act, and (allegedly) has been denied reasonable accommodations as a result of the policies and procedures of defendants. A judgment in plaintiffs' favor would have remedied these alleged violations, just as will this consent decree.

### ii.  Rule 23(a)

### 1.  Numerosity

Rule 23(a)(1)'s requirement of numerosity is satisfied if joinder--the usual method of combining similar claims--would be impracticable. Although there is no strict threshold, classes containing more than 40 members are generally large enough to warrant certification. See, e.g., Cox v. Am. Cast Iron Pipe Co., 784 F.2d 1546, 1553 (11th Cir. 1986); see also William B. Rubenstein, Newberg on Class Actions § 3.12 (5th ed.). "[P]laintiff[s] need not show the precise number of members in the class," given that the numerosity requirement is "less significant" where

"class wide discrimination has been alleged." Evans v.
U.S. Pipe & Foundry Co., 696 F.2d 925, 930 (11th Cir.
1983).

In moving to certify a class prior to settlement,
plaintiffs acknowledged that, due to the Department's
"fail[ure] to adequately identify, track and
accommodate people in its custody with disabilities,
ADOC's data significantly underestimate[] and
under-identif[y] the number of people with disabilities
in its custody," and thus that they--and the
court--could not be sure with great specificity how
many current prisoners are members of the class. Mem.
of Law in Supp. of Pls.' Mot. for Class Cert. (doc. no.
433-2) at 30. However, they submitted evidence, in the
form of records obtained from the Department's medical
contractor, indicating that, as of March 2015 (the date
of the most recent records available to plaintiffs), at
least 100 prisoners used wheelchairs, 20 had hearing
impairments, a dozen were blind, and a dozen used
prostheses. All of these disabilities plainly fall

within the definition of disability in the ADA.[5]   This

evidence alone is sufficient to support a finding of

numerosity.[6]

---

5.   In relevant part, that definition states that
"the term 'disability' means ... a physical or mental
impairment that substantially limits one or more major
life activities of [an] individual," and "major life
activities include, but are not limited to, caring for
oneself, performing manual tasks, seeing, hearing,
eating, sleeping, walking, standing, lifting, bending,
speaking, breathing, learning, reading, concentrating,
thinking, communications, and working."   42 U.S.C.
§ 12102(1)(A) and (2)(A).

6.   Plaintiffs also suggested in their motion and
the parties now suggest in their post-settlement brief
that the court consider statewide data regarding the
rate of disability among the adult population in
Alabama (apparently, it leads the nation at slightly
less than a third).   Because the court need not
calculate exactly how many current prisoners are
members of the class in order to certify it, the court
need not determine whether a reliable inference can be
drawn on the basis of these data.   However, the court
notes that a recent study by the federal Bureau of
Justice Statistics found that approximately a third of
state and federal prisoners reported at least one
disability, and that almost a quarter of these
prisoners reported a serious vision, hearing, or
ambulatory impairment, rates more than twice that of
the general population.   See Jennifer Bronson, et al.,
Disabilities Among Prison and Jail Inmates, 2011-12
(Dec. 2015) (reporting findings based on a national
survey of almost 40,000 prisoners housed in over 200
state and federal prisons, including at least one
(continued...)

"Moreover, the fluid nature of a plaintiff class--as in the prison-litigation context--counsels in favor of certification of all present and future members." Henderson v. Thomas, 289 F.R.D. 506, 510 (M.D. Ala. 2012) (Thompson, J.) (citing Kilgo v. Bowman Transp., Inc., 789 F.2d 859, 878 (11th Cir. 1986) (affirming a certified class of 31 present members as well as future members who could not be identified); Green v. Johnson, 513 F. Supp. 965, 975 (D. Mass. 1981) (Freedman, J.) (finding numerosity after considering "the fact that the inmate population at these facilities is constantly revolving")); see also Reid v. Donelan, 297 F.R.D. 185, 189 (D. Mass. 2014) (Ponsor, J.) (explaining, in finding numerosity and certifying a class of detained plaintiffs, that "when a party seeks only declaratory or injunctive relief, ... the

_____

facility located in each state), available online at www.bjs.gov/content/pub/pdf/dpji1112.pdf. (This online document has been filed on the docket.) Given that defendants incarcerate approximately 25,000 prisoners, the size of the class is almost certainly in the thousands.

inclusion of future members increases the impracticability of joinder" (citing <u>McCuin v. Sec'y of Health & Human Servs.</u>, 817 F.2d 161, 167 (1st Cir. 1987)); Rubenstein, <u>Newberg on Class Actions</u> § 3.15 (5th ed.) (explaining that the inclusion of future class members "may make class certification more, not less, likely"; citing two decisions certifying classes of prisoners, <u>Hill v. Butterworth</u>, 170 F.R.D. 509, 514 (N.D. Fla. 1997) (Paul, J.) ("[T]he presence of an unknown number of future class members here actually bolsters a finding of the requisite numerosity. ... This Circuit has held [that when] the alleged class includes future [members], necessarily unidentifiable[,] ... the requirement of Rule 23(a)(1) is clearly met, for joinder of unknown individuals is clearly impracticable." (citation and internal quotation marks omitted)); <u>Clarkson v. Coughlin</u>, 145 F.R.D. 339, 346 (S.D.N.Y. 1993) (Sweet, J.) ("The class action device is particularly well-suited in actions brought by prisoners due to the fluid composition of

the prison population.  Prisoners frequently come and go from institutions for a variety of reasons.  Veteran prisoners are released or transferred, while new prisoners arrive every day.  Class actions therefore generally tend to be the norm in actions such as this." (citations and internal quotation marks omitted))).[7]

In light of plaintiffs' evidentiary showing that there are at least--and probably quite substantially more than--150 prisoners with disabilities (as defined in the ADA) in the custody of the Department, and in light of precedent making clear that it is appropriate in prison-conditions litigation to consider future and as-yet-unidentifiable class members in determining whether joinder is impracticable or indeed impossible, the court finds that the class meets the numerosity

---

7. Recognition of prisoners' relatively limited "access to the legal system ... has [also] led courts to certify classes in cases ... which involve issues of common concern to inmates even when the potential class size is small and somewhat undefined." Bradley v. Harrelson, 151 F.R.D. 422, 426 (M.D. Ala. 1993) (Albritton, J., adopting recommendation of Carroll, M.J.) (citation and internal quotation marks omitted).

requirement of Rule 23(a)(1).

## 2.  Commonality

Rule 23(a)(2) requires named plaintiffs seeking class certification to show that "there are questions of law or fact common to the class."  In <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338 (2011), the Supreme Court explained that "this does not mean merely that they have all suffered a violation of the same provision of law.  ...  [Rather,] [t]heir claims must depend upon a common contention ... [which] must be of such a nature that it is capable of classwide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.  What matters to class certification ... is not the raising of common 'questions'--even in droves--but, rather the capacity of a classwide proceeding to generate common <u>answers</u> apt to drive the resolution of the litigation." <u>Id</u>. at 350 (citation and internal quotation marks

omitted).    In  short,  commonality  requires  a  showing
that  there  is  "some  glue"  holding  the  claims  together.
Id. at 352.

However,  plaintiffs  seeking  to  demonstrate
commonality  under  Rule  23(a)(2)  need  not  show  that
common  questions  "predominate"  over  individual
questions  as  required  under  Rule  23(b)(3);  indeed,
"even  a  single  common  question  will  do."  Wal-Mart, 564
U.S. at 359 (citations and alterations omitted).


### a.  Analysis

In  their  pre-settlement  opposition  to  plaintiffs'
motion  for  class  certification,  defendants  focused
primarily  (almost  exclusively)  on  contesting
commonality.   Although  they  no  longer  raise  these
points  of  law,  the  court  must  give  a  reasoned  response
to  their  arguments  in  order  to  explain  adequately  why
certification  of  a  settlement  class  is  warranted.

Defendants  contended  that  commonality  was  lacking
because  the  putative  class  was  "expansive,"

encompassing prisoners with a wide range of disabilities, and sought to "challenge the entire panoply of possible ADA violations." Def.'s Opp'n to Pls.' Mot. for Class Cert. (doc. no. 476)) at 18. They argued that plaintiffs' claims were "not a single, homogenous claim," except at "the highest level of abstraction," but rather "many different ADA claims touching on many different ADA requirements that Plaintiffs[] ha[d] lumped together for purposes of this lawsuit." Id. at 18-19.

Defendants were quite correct that the individual named plaintiffs' disabilities, and the accommodations they alleged they had been denied, are rather different. But defendants misapprehended the basis of liability plaintiffs asserted: not the denial of the accommodations themselves, but the denial of a system that would have the effect of ensuring that they and their fellow prisoners were appropriately accommodated. (Or, to phrase it differently, they argue that defendants have failed to remedy an inadequate system

27

that has the effect of discriminating against them by failing to accommodate their disabilities.)

If indeed plaintiffs were an assorted group of prisoners alleging merely that defendants had failed to provide them particular accommodations (and seeking simply orders requiring that they be provided those same accommodations), class certification would not be appropriate.  But plaintiffs were endeavoring to prove not merely, or even primarily, that their individual rights to particular accommodations under the ADA have been violated.  They planned to present evidence to this effect to demonstrate that defendants' failure to implement certain policies and procedures has the effect of consistently violating their rights under the ADA, and that they--and the class members they represent--were therefore entitled to an order requiring defendants to implement those policies and procedures.[8]

---

8.  Of course, it may well be true that some class members have not actually been denied a reasonable (continued...)

Plaintiffs directed the court to a number of alleged systemic failures. They highlighted three in particular (which also constitute violations of Department of Justice regulations promulgated pursuant to Title II of the ADA, <u>see</u> 28 C.F.R. §§ 35.107(a), 35.107(b), 35.150(d)): the failure to (1) appoint and train ADA coordinators, (2) adopt ADA grievance procedures, and (3) develop an ADA transition plan. Defendants conceded for the sake of argument that whether they had failed to do these things could be common questions with common answers, but argued that these questions could not satisfy Rule 23(a)(2) because the regulations at issue are not privately enforceable, and the common answers were therefore not "apt to drive the resolution of the litigation." <u>Wal-Mart</u>, 564 U.S.

---

accommodation. But the inclusion of some class members who have not been injured does not defeat certification. <u>See</u> <u>In re Deepwater Horizon</u>, 785 F.3d 1003, 1015 (5th Cir. 2015); <u>Shelton v. Bledsoe</u>, 775 F.3d 554, 564 (3d Cir. 2015); <u>Messner v. Northshore Univ. HealthSystem</u>, 669 F.3d 802, 824 (7th Cir. 2012); <u>Holmes v. Godinez</u>, 311 F.R.D. 177, 216 (N.D. Ill. 2015) (Aspen, J.).

at 350.

The court will assume, also for the sake of argument, that defendants were correct that these regulations do not create a private right of action. This would not, however, have made them irrelevant. They are binding regulations promulgated by the Department of Justice (which would be empowered to bring an enforcement action).[9]  When courts have found them not to be privately enforceable, as in <u>Ability Ctr. of Greater Toledo v. City of Sandusky</u>, 385 F.3d 901, 913-14 (6th Cir. 2004) (relying on <u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001)), they have reasoned that the regulations are designed to facilitate, but do more

---

9. <u>See A.R. ex rel. Root v. Dudek</u>, 31 F. Supp. 3d 1363, 1368-70 (S.D. Fla. 2014) (Rosenbaum, J.) (explaining that 42 U.S.C. § 12132, Title II's enforcement provision, incorporates by reference the enforcement provision of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-1, which authorizes the Department of Justice to bring enforcement litigation); 42 U.S.C. § 2000d-1 (granting agencies enforcement authority to "effect[]" "[c]ompliance with ... requirement[s] adopted pursuant to this section," such as "regulations ... which shall be consistent with achievement of the objections of the statute").

than merely describe, compliance with the ADA, such
that "it is conceivable that a public entity could
fully satisfy its obligations to accommodate the
disabled while at the same time fail to put forth a
suitable transition plan."

All this means is that the Department's failure to
implement a transition plan would not have constituted
a per se violation; plaintiffs could not have shown
liability merely by proving that the Department had no
transition plan, without showing that the Department
had, as a result, failed to accommodate prisoners with
disabilities. That said, plaintiffs could have argued,
and proven at trial, that the Department's failure to
do the things required by these regulations had the
effect of discriminating.

b.  Methods-of-Administration Regulation

Indeed, there is another--privately
enforceable--ADA regulation which makes clear that
policies and practices (or their absence) which result

in discrimination against people with disabilities are actionable under the ADA, even if the policies and practices (such as the three regulations discussed above) are not themselves required by the statue. Under this regulation, plaintiffs in an ADA case can challenge a policy or practice--whether it is one described in another regulation or simply one articulated by the plaintiffs themselves--if it causes the public entity to discriminate against them, including by failing to accommodate them.

The so-called methods-of-administration regulation recognizes that the ADA forbids a public entity's utilization, "directly or through contractual or other arrangements, [of] criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect

to individuals with disabilities." 28 C.F.R.
§ 35.130(b)(3).[10]

This regulation "applies to written policies as
well as actual practices, and is intended to prohibit
both blatantly exclusionary policies or practices as
well as policies and practices that are neutral on
their face, but deny individuals with disabilities an
effective opportunity to participate." Cota v.
Maxwell-Jolly, 688 F. Supp. 2d 980, 995 (N.D. Cal.
2010) (Armstrong, J.) (citation and internal quotation

_____

10. Courts have consistently held that the
methods-of-administration regulation is privately
enforceable under Alexander, because it "does not
create rights that do not exist under the ADA."
Brantley v. Maxwell-Jolly, 656 F. Supp. 2d 1161,
1175-76 (N.D. Cal. 2009) (Armstrong, J.); see also Day
v. D.C., 894 F. Supp. 2d 1, 22-23 (D.D.C. 2012)
(Huvelle, J.); Conn. Off. of Prot. & Advocacy for
Persons with Disabilities v. Connecticut, 706 F. Supp.
2d 266, 277-78 (D. Conn. 2010) (Thompson, J.); Crabtree
v. Goetz, 2008 WL 5330506, at *24 (M.D. Tenn. Dec. 19,
2008) (Haynes, J.); Frederick L. v. Dep't of Pub.
Welfare, 157 F. Supp. 2d 509, 538 (E.D. Pa. 2001)
(Schiller, J.); Judice v. Hosp. Serv. Dist. No. 1, 919
F. Supp. 978, 982 (E.D. La. 1996) (Feldman, J.) ("28
C.F.R. § 35.130 ... do[es] not seem broader than the
statute.").

marks omitted). And there is nothing in the regulation or the case law interpreting it to suggest that the discriminatory effects of a particular method of administration must be uniform in order for the method to be properly subject to challenge.[11]

Moreover, an omission as well as a commission can be an actionable method of administration.[12]    In

---

11. Consider, for example, the hypothetical prison administrator who decides whether to accept any particular accommodation request by flipping a coin. This method of administration will have widely varied effects, and will just as plainly be actionably unlawful. Less farcically, consider the administrator who denies any accommodation that would cost more than $ 20. This method of administration may result in the denial of hearing aids, sign-language interpreters, and shower grab-bars, in lots of different facilities to lots of different prisoners with lots of different disabilities. Clearly, though, they could properly raise one common joint methods-of-administration claim and offer evidence of all these denials as proof of discriminatory effects.

12. The methods-of-administration regulation makes clear that a know-nothing, do-nothing policy of non-administration is a privately actionable violation of the ADA, at least when plaintiffs can show that it has the effect of discriminating. As Justice Marshall explained in Alexander v. Choate, Congress designed the Rehabilitation Act, the predecessor statute to the ADA, to address not only "invidious animus," but also, more (continued...)

Connecticut Office of Protection & Advocacy for Persons
with Disabilities v. Connecticut, 706 F. Supp. 2d 266
(D. Conn. 2010) (Thompson, J.), the court held that the
plaintiffs had adequately alleged a claim under the
regulation by contending that the defendants had, among
other things, "failed to adequately assess and identify
the long-term care needs of Plaintiffs and the Class
they represent and to determine whether those needs
could be appropriately met in integrated,
community-based settings." Id. at 277-78. The court
went on to find that the plaintiffs had identified

---

commonly, "thoughtlessness and indifference--[] benign
neglect." 469 U.S. 287, 295 (1985). Courts have
consistently explained that "Title II [of the ADA]
imposes affirmative obligations on public entities and
does not merely require them to refrain from
intentionally discriminating against the disabled."
Ability Ctr. of Greater Toledo v. City of Sandusky, 385
F.3d 901, 910 (6th Cir. 2004); see also Disabled in
Action v. Bd. of Elections in City of N.Y., 752 F.3d
189, 200-01 (2d Cir. 2014); Toledo v. Sanchez, 454 F.3d
24, 32 (1st Cir. 2006); Bennett-Nelson v. La. Bd. of
Regents, 431 F.3d 448, 454-55 (5th Cir. 2005);
Constantine v. Rectors & Visitors of George Mason
Univ., 411 F.3d 474, 488 (4th Cir. 2005). Under the
ADA, a public entity must be "proactive." Clemons v.
(continued...)

multiple common issues suitable for class certification "with respect to the alleged failure of the methods of administration used by the defendants," including their "failure to evaluate the proposed class for readiness for community placement."  Id. at 287; see also id. at 289 (explaining that the "gravamen" of the plaintiffs' claims was not a demand to be placed in community-based alternatives but rather a demand that the defendants "cease using methods of administration that subject individuals with disabilities to discrimination").  See also Kathleen S. v. Dep't of Pub. Welfare of Pa., 10 F. Supp. 2d 460, 471 (E.D. Pa. 1998) (Broderick, J.) (finding that the defendant had "utilized methods of administration at Haverford State Hospital which have resulted in discrimination against class members .... through its failure to initiate plans sufficiently in advance to ensure the necessary placements in the community within a reasonable time after it was

Dart, 2016 WL 890697, at *6 (N.D. Ill. Mar. 9, 2016) (Tharp, J.).

determined that a member of [the class] had become appropriate for community placement").


### c.  Common Questions

The methods-of-administration regulation neatly encapsulates the common questions plaintiffs presented, which were whether the Department has employed methods of administration that have the effect of discriminating against prisoners with disabilities--namely, (1) employing no system or an inadequate system for identifying and tracking prisoners with disabilities, (2) employing no system or an inadequate system for prisoners to request accommodations and submit grievances regarding non-accommodation, (3) failing to appoint or train ADA coordinators or other administrators responsible for oversight of compliance with the ADA, (4) failing to train staff regarding the requirements of the ADA, (5) failing to promulgate policies and procedures regarding the treatment of prisoners with disabilities,

and (6) failing to draft a plan for identifying and addressing areas of non-compliance with the requirements of the ADA.  These are questions common to the class, susceptible of common answers apt to drive the resolution of the case.

Plaintiffs not only alleged in their complaint that the lack of these policies and practices resulted in discrimination; they presented expert evidence to show as much in support of their motion for class certification.  While the court would of course have had to weigh this evidence against any contrary evidence presented by defendants had Phase 1 of this case proceeded to a merits adjudication, plaintiffs "affirmatively demonstrate[d] [their] compliance with [] Rule" 23(a)(2).  <u>Wal-Mart</u>, 564 U.S. at 350.

The commonality requirement is satisfied.


### 3. Typicality

Although the commonality and typicality inquiries "tend to merge," the typicality requirement--which is

"somewhat of a low hurdle"--focuses the court's attention on "whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982); Taylor v. Flagstar Bank, FSB, 181 F.R.D. 509, 517 (M.D. Ala. 1998) (Albritton, J.); Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1322 (11th Cir. 2008) (citation omitted). A class representative's claims are typical if they "arise from the same event or pattern or practice and are based on the same legal theory" as the class claims; they need not be identical. Williams v. Mohawk Indus., Inc., 568 F.3d 1350, 1357 (11th Cir. 2009) (citation omitted); see In re Healthsouth Corp. Sec. Litig., 257 F.R.D. 260, 275 (N.D. Ala. 2009) (Bowdre, J.).

This court has previously found the typicality requirement satisfied in another case brought by disabled prisoners, given that "the named plaintiffs' legal claim--that the defendants are engaged in disability discretion in violation of the ADA and

Rehabilitation Act--is identical to the class's claim."
Henderson, 289 F.R.D. at 511.  Here, too, the named
plaintiffs brought the same claims as the class: that
the Department employed methods of administration which
resulted in rampant discrimination against prisoners
with disabilities.

It is true that the named plaintiffs (and the class
members more generally) have diverse disabilities and
require various different accommodations for those
disabilities.  Their claims were not disability or
accommodation-specific, though; they challenged
systemic practices with which they all interact and
from which they all allegedly suffer.  Moreover, to the
extent that the named plaintiffs have sought and
obtained relief that pertains specifically to prisoners
with certain categories of disabilities, such as those
related to communication, mobility, or cognition, the
court is satisfied that the named plaintiffs, as a
group, adequately cover the spectrum of disabilities,

such that the particular interests of all class members are represented.

### 4.   Adequacy

Rule 23(a)(4) requires the court to find that the "representative parties will fairly and adequately protect the interests of the class."  This analysis "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class;[13] and (2) whether the representatives will adequately prosecute the action." Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1189 (11th Cir. 2003) (citation omitted).

"Adequate representation is usually presumed in the absence of contrary evidence," and generally exists for injunctive-relief classes, because there is no monetary

---

13. For a conflict to defeat class certification, it must be "fundamental," such that "some party members claim to have been harmed by the same conduct that benefitted other members of the class." Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1189 (11th Cir. 2003).

pie to be sliced up.  Access Now, Inc. v. Ambulatory Surgery Ctr. Grp., Ltd., 197 F.R.D. 522, 528 (S.D. Fla. 2000) (Seitz, J.).  No member of the class will be harmed when another prisoner's disability is accommodated pursuant to the relief they have all sought and together obtained.  To the contrary: many of the reforms the consent decree requires facially benefit all disabled prisoners equally; for example, establishing an ADA request and grievance process will allow all class members, regardless of their individual circumstances, to seek out and obtain accommodations. See Ass'n for Disabled Ams., Inc., 211 F.R.D. at 464 (certifying a settlement class of persons with diverse disabilities and finding that the consent decree to be issued would "provide substantially equal benefits and relief to all members of the class through increased accessibility and the coordinated removal of physical and communication barriers").

Moreover, many of the particular accommodations to be provided to individual class members will in fact

have significant benefits for other prisoners.  Once an inmate handbook is translated into Braille for one prisoner's use, for example, another blind prisoner who enters the system will more readily be provided with the same accommodation.  Once a grab bar is installed in a shower in a particular dormitory to accommodate a prisoner who has difficulty standing, another prisoner with a similar disability can use it.

Turning now to the second aspect of Rule 23(a)(4): "The vigor with which [] named representative[s] and [their] counsel will pursue the class claims is assessed by considering the competency of counsel and the rationale for not pursuing further litigation." Id. (citing Griffin v. Carlin, 755 F.2d 1516, 1533 (11th Cir. 1985)).  The competency of counsel for plaintiffs in this case is reflected plainly in their extensive involvement in a large number of successful class actions vindicating the constitutional or federal statutory rights of classes of prisoners and individuals with disabilities in Alabama, throughout

43

the South, and across the country.  <u>See</u> Mem. of Law in Supp. of Pls.' Mot. for Class Cert. (doc. no. 433-2) at 46-48 (listing cases).

Their rationale for not pursuing further litigation is equally plain--after extensive negotiation and while actively preparing to try Phase 1 of this case, they reached a settlement highly favorable to all members of the class.  "[C]ontinued litigation would only serve to delay class relief ...."  <u>Ass'n for Disabled Ams., Inc.</u>, 211 F.R.D. at 464.

Admittedly, the court is troubled by plaintiffs' counsel's earlier acquiescence to an initial settlement agreement that included a seriously inadequate level of specificity.  On balance, however, the court is impressed that once set to the task of negotiating a detailed 'plan,' they proceeded to engage in weeks of involved mediation, in which they apparently fought hard and obtained very good results for their clients. The fact that these efforts at first fell through, and only resulted in a settlement shortly before trial, is

44

one indication of the steadfastness of plaintiffs'
counsel. Additionally, the bifurcation of this case
into phases places the court at a uniquely privileged
vantage point in assessing whether plaintiffs' counsel
are overeager to settle. The parties have attempted to
negotiate a settlement to Phase 2 of this
case--concerning medical, dental, and mental
healthcare--in numerous mediation sessions with the
same magistrate judge who helped them to resolve Phase
1. Despite seeking a three-week extension of pretrial
deadlines in the hope that they would be able to reach
agreement, they have informed the court that Phase 2
will go to trial. Although the court cannot know the
reasons for this decision, it certainly suggests that
plaintiffs' counsel are not pushovers.

Rule 23(a)(4) is satisfied.


iii. Rule 23(b)(2)

A class satisfies Rule 23(b)(2) in cases in which
"the party opposing the class has acted or refused to

45

act on grounds generally applicable to the class,
thereby making appropriate final injunctive relief or
corresponding declaratory relief with respect to the
class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule
23(b)(2) has been liberally applied in the area of
civil rights, including suits challenging conditions
and practices at various detention facilities, as well
as claims for violations of the ADA and Rehabilitation
Act." Bumgarner v. NCDOC, 276 F.R.D. 452, 457-58
(E.D.N.C. 2011) (Boyle, J.); see also Wright & Miller,
7AA Fed. Prac. & Proc. Civ. § 1776 (3d ed.) (discussing
the range of civil-rights actions certified pursuant to
Rule 23(b)(2), and explaining that "the class suit is a
uniquely appropriate procedure in civil-rights cases,
which generally involve an allegation of discrimination
against a group as well as the violation of rights of
particular individuals"). Indeed, some courts have
gone so far as to say that the rule's requirements are
"almost automatically satisfied in actions primarily

seeking injunctive relief." <u>Baby Neal ex rel. Kanter</u> <u>v. Casey</u>, 43 F.3d 48, 59 (3d Cir. 1994).

As plaintiffs have repeatedly explained (and indeed offered some evidence to demonstrate) throughout the litigation of this case, the problems of which they complain and the remedies they seek are <u>systemic</u>. The existence or lack of a general, state-wide Department policy or procedure regarding the identification, tracking, or accommodation of disabilities necessarily affects all disabled prisoners.[14]

---

14. As discussed above in the commonality context, the fact that some class members may already have received reasonable accommodations and therefore might not have been injured by the challenged policies and procedures does not defeat certification. <u>See</u> <u>Anderson</u> <u>v. Garner</u>, 22 F. Supp. 2d 1379, 1386 (N.D. Ga. 1997) (Murphy, J.) ("'[A]ll the class members need not be aggrieved by or desire to challenge the defendant's conduct in order for one or more of them to seek relief under Rule 23(b)(2).' <u>Johnson v. American Credit Co.</u> <u>of Georgia</u>, 581 F.2d 526, 532 (5th Cir. 1978); <u>Georgia</u> <u>State Conference of Branches of NAACP v. State</u>, 99 F.R.D. 16, 35 (S.D. Ga. 1983). 'What is necessary is that the challenged conduct or lack of conduct be premised on a ground that is applicable to the entire class.' <u>Georgia NAACP</u>, 99 F.R.D. at 35-36.").

Class certification pursuant to Rule 23(b)(2) is appropriate.

### B.  Settlement Approval: Rule 23(e)

When parties to a non-class action--who have participated actively in litigating and then in resolving their case--reach a private settlement, the court need not and does not enquire into the appropriateness of it terms.  Before approving a settlement agreement in a class action, though, "a court has a heavy, independent duty to ensure that the settlement is 'fair, adequate, and reasonable.'"  Laube v. Campbell, 333 F. Supp. 2d 1234, 1238 (M.D. Ala. 2004) (Thompson, J.) (quoting Fed. R. Civ. P. 23(e)(2), additional citation omitted).  This careful inspection is "essential to ensure adequate representation of class members who have not participated in shaping the settlement."  Fed. R. Civ. P. 23(e) advisory committee note.  In the course of this review, the court must determine whether notice to the class was adequate, and

48

must consider the comments made and objections raised
by class members, as well as the opinions of class
counsel.  <u>Laube</u>, 333 F. Supp. 2d at 1238.

### i.  Notice to Class Members

"The court must ensure that all class members are
informed of the agreement[] and have the opportunity to
voice their objections."  <u>Laube</u>, 333 F. Supp. 2d at
1240; Fed. R. Civ. P. 23(e)(1).

The court's order preliminarily approving the
settlement agreement contained specific procedures for
the Department of Corrections to give notice of the
settlement to the members of the provisionally
certified class, as well as approved notice and comment
forms.  Substantively, the three-page notice form
included a description of the case, a definition of the
class, a list of the provisions of the settlement
agreement, an indication of its preclusive effects, and
notice of the agreement concerning attorney's fees.
Additionally, the notice included directions for

49

obtaining a copy of the settlement agreement, contact information for class counsel along with an invitation for prisoners to inquire about the settlement, an announcement of the fairness hearing, and instructions for prisoners to exercise their right to comment about or object to the settlement. The comment form allowed a respondent to select the general topic(s) at issue from a list, and to indicate whether the commenter wished to testify at a fairness hearing.

The notice form was posted in each dormitory and library within the prison system, and copies of the comment form were made available in the libraries and shift commanders' offices. Copies of the settlement agreement were made available for viewing in the law library or another location within each facility and were provided upon request to any prisoners lacking access to that location. Prisoners who were not housed in dormitories were hand-delivered a copy of the notice and comment forms and an envelope. Weekly oral

announcements also notified all prisoners of the settlement and the opportunity to comment or object.

The notice and comment forms and copies of the settlement agreement were also made available in Spanish, Braille, and large print. Upon request, prisoners were to receive assistance in reading the documents and in writing comments.

Secured and clearly labeled comment boxes were placed in each facility for prisoners to submit forms, and defendants' staff were designated to collect comment forms from prisoners lacking the freedom to move about their facilities. The comment boxes and forms were transmitted to the Department's general counsel, and a representative of the clerk of court met with the parties to open the comment boxes. Prisoners were also given the option to submit comments by mail directly to the clerk of court.

Notice of the settlement agreement was posted by June 24, 2016, and prisoners were given until July 25, 2016, to submit comments. (Comments received by mail

after this date were also docketed.)  More than 550 prisoners submitted comments.

One matter concerning the submission of comments warrants additional discussion.  The court received correspondence from two prisoners housed at Holman Correctional Facility, which it construed both as objections to the settlement agreement and as motions for extensions of the time for submission of comments.

Both submissions, which were phrased similarly to each other, stated that prisoners at Holman had been unable to review the settlement agreement at all because the facility--including the law library where the settlement documents were to be made available--had been in lockdown throughout the duration of the comment period.  These prisoners further stated that no comment box had been placed at Holman.[15]

_____

15. Notably, these submissions were postmarked well after the comment period had closed; at that time, there should no longer have been a comment box in the facility.

52

The court promptly brought these submissions to the attention of the parties, explaining that it took the allegations very seriously.  Because the putative class members in this case are incarcerated, and their freedom of movement is limited not only by their custodians but also in many cases by their disabilities, the court is acutely sensitive to ensuring that they received adequate notice and a meaningful opportunity to be heard.  Hence, the court instructed the parties to investigate these allegations and report back.

Having now looked into the matter, the parties contend that prisoners at Holman were in fact given adequate notice of the settlement agreement and opportunity to respond to it.  First, the parties point to the fact that nine prisoners at Holman did timely submit comments, three by direct mail to the court and six by way of a comment box placed at Holman, consistent with the established notice procedure.  Second, the parties present evidence in the form of a

sworn affidavit by the Warden of Holman, which indicates that he followed the notice procedures, that Holman was on lockdown on June 27-28, July 1-5, July 11-12, and July 16-17, but not otherwise on lockdown during the comment period, and that during these lockdown periods notice and comment forms were nonetheless available to prisoners throughout the facility.

Although it is unfortunate that prisoners at Holman were unable to review the settlement agreement in the law library for some portions of the comment period, the evidence submitted by the parties suggests--and the comments the court received from prisoners at Holman corroborates--that prisoners housed there were able to do so for more than half of the one-month period allotted. Therefore, the court finds that putative class members at Holman were afforded an adequate opportunity to review and respond to the settlement agreement, and that they need not be afforded additional time to do so.

## ii. Objections and Comments

Based on the suggestions of counsel and the court's own review of the comments submitted, 45 prisoners and two individuals who had been released from the Department's custody during the pendency of this lawsuit were selected to testify during fairness hearings conducted over the course of two days--partially in person at the federal courthouse, and partially by videoconference (due to the impracticality of visiting a large number of prisons). Of those selected, 37 elected to testify. Prisoners were selected based on various considerations, including the substance of their comments; those who submitted comments not germane to the case or the settlement were excluded from consideration. Efforts were made to ensure a fairly representative sample in terms of the range of disabilities class members have and the facilities in which they are housed. Both the parties and the court have reviewed the written

55

comments of those who were not selected to testify, as well as those who declined to do so.

Those prisoners who testified at the fairness hearings and those who submitted comments raised a range of issues, many of which were relevant but some of which were not. For example, some prisoners wrote about other legal claims they wished to bring or on prison conditions unrelated to discrimination against prisoners with disabilities.

Other comments were relevant to this litigation, but were more squarely related to claims at issue in Phase 2, rather than Phase 1. For example, several prisoners commented that their requests for medically necessary treatment, including mental-health treatment, had been denied by the Department.

Of the directly pertinent comments, the vast majority expressed discontentment with existing conditions or procedures, rather than any objection to the adequacy or fairness of the agreement or to any specific provision of it. Indeed, many expressed

support for the agreement. Generally, the comments submitted fell into five loosely defined categories: identification, accommodations, architecture, grievances, and money damages and attorney fees.

Identification: Thirty-one prisoners flagged their comments as related to disability-identification procedures. Some commented that they had not been formally identified as disabled despite the fact that their medical records indicated they were. Some suggested allowing disabled prisoners to self-identify. Others commented that identification of their disabilities did not follow them during transfers between facilities. Further, some alleged that the Department's failure to identify their disabilities had resulted in them being required to hold jobs they were not capable of performing. Finally, some prisoners suggested that those with disabilities be housed separately from others, in part due to security-related concerns.

The settlement agreement allows, but does not
require, the Department to accept an individual
prisoner's self-report of a disability.  Assuming the
Department does not accept such self-reports, the
agreement requires it to conduct screening procedures
within specified time periods, using specified tests,
and requires it to review disability determinations
periodically.  As to tracking, the agreement mandates a
new Department-wide computer system.  It also requires
the Department's personnel at receiving facilities to
review a prisoner's disability status and corresponding
health codes in the event of a transfer.  Furthermore,
the agreement's identification provisions are designed
to address the concerns of those prisoners required to
do work they are not able to perform; once identified,
a disabled prisoner would be given a work assignment
(if any) consistent with the prisoner's limitations.
Finally, as to requests that disabled prisoners be
housed separately from other prisoners, the court
agrees with the parties that imposing such a

requirement would be inconsistent with the ADA's integration mandate.   See 42 U.S.C. § 12101(a)(2); Olmstead v. L.C., 527 U.S. 581 (1999).

Accommodations: One hundred and four prisoners indicated that their comments pertained to disability accommodations.  Some prisoners with vision impairments stated that materials provided to them, such as official notices or books, should be made available in alternate formats such as large print or audio.  At the fairness hearing, for example, one woman with a vision impairment testified that her requests for books on tape had been denied repeatedly.  The settlement agreement addresses these concerns.  It provides that educational materials, notices, court orders, and other generally available documents must be provided in alternate formats; it also provides for taped texts.

Several prisoners with hearing impairments commented that they had been denied access to functional hearing aids; for example, prisoners commented that they had been provided with one hearing

aid instead of two, or that their hearing aid batteries, or hearing aids themselves, were not repaired or replaced in a timely manner. The court heard from multiple prisoners that they were unable to use their hearing aids because they were broken and had not been repaired for extended periods of time. Others commented that they had not been provided with sign language interpreters. The settlement agreement addresses these concerns by mandating that the Department assess each hearing-impaired prisoners with respect to auxiliary aids and services every three months, timely replacement or repair of damaged hearing aids, and timely replacement of hearing aid batteries.

Other prisoners commented that, due to their disabilities, they are denied access to certain facilities and programming. For example, at the fairness hearing, one witness stated that he had been denied access to trade school and the honors program due to his disability. To address these sorts of issues, the settlement agreement provides that any

60

individual who, independent of disability status, qualifies for a certain program, must be provided access to that program on a non-discriminatory basis, and requires the Department to undertake a transition planning process to determine (among other things) how to afford prisoners access to programs which are currently inaccessible.

Facilities: Forty-six prisoners indicated that their comments pertained to architectural barriers. The court received such comments pertaining to numerous (indeed, nearly all) Department facilities. Prisoners commented, for example, that the facilities where they were housed lacked accessible bathrooms with shower chairs and hand rails, that hallways and dorms lacked rails, and that--due to overcrowding--prisoners with devices such as canes and wheelchairs were unable to move around safely. At the fairness hearings, prisoners testified, for example, that they were unable to attend chapel and certain programs due to those programs being held in locations that are not

accessible to individuals with mobility impairments. Others noted that facilities lacked climate controls, making them extremely hot in the summer and extremely cold in the winter.

The settlement agreement addresses these concerns by requiring the Department to develop and implement a transition plan for identifying and addressing architectural barriers. The Department may address these issues either through architectural changes or potentially through the relocation of programs. The comments concerning climate control were mostly unrelated to any prisoner's disability and, therefore, unrelated to the claims brought and now settled in this case. To the extent that a prisoner's disability does require access to facilities of a certain temperature-- for example, one prisoner testified at the fairness hearing that, due to her burn injury, she cannot have prolonged heat exposure--those concerns should be addressed by way of the new accommodation request and

grievance procedure provided for in the settlement agreement.

Grievances: Fifteen prisoners noted that their comments pertained to the Department's grievance procedure. Most of these comments criticized the Department's existing (general) grievance procedure rather than the procedure outlined in the agreement. Prisoners complained, for example, that no grievance procedure currently exists, or that the existing grievance procedure is inadequate. Others expressed concern about the ADA grievance procedure outlined in the settlement agreement. One commenter suggested that the Department's personnel be required to sign a document indicating receipt of an individual grievance. Another prisoner who testified at the fairness hearing suggested that a third party, outside of the Department's system, be involved in the grievance process. Relatedly, a few prisoners objected to the Department's employees serving as ADA coordinators.

Because the settlement agreement does establish a
clear and well-elaborated procedure for receiving and
adjudicating requests for accommodations and appeals
from the denial of such requests, it adequately
addresses the objections to the lack of an adequate
process. The agreement does not require staff to issue
signed receipts, but it does require that ADA
Coordinators document all grievances, which will help
to ensure accountability. If an individual prisoner
within the settlement class is unable to secure a
requested accommodation, that individual can seek
assistance from plaintiffs' counsel, and may pursue
arbitration, even without plaintiffs' counsel's
consent. The settlement agreement thus adequately
addresses this concern. Finally, ADA regulations
require that the coordinators be the Department's
employees. See 28 C.F.R. § 35.107(a) ("A public entity
that employs 50 or more persons shall designate at
least one employee to coordinate its efforts to comply
with and carry out its responsibilities under this

part, including any investigation of any complaint communicated to it alleging its noncompliance with this part or alleging any actions that would be prohibited by this part.")

   <u>Attorney Fees and Money Damages</u>:   Some prisoners objected to the attorneys' fee provision of the settlement agreement, while others objected to the fact that the agreement only provided for injunctive relief rather than money damages.   The court will address the appropriateness of the attorneys' fees in a subsequent section of this opinion.

   As to money damages, the court understands that commenters alleging past harms may feel that they are entitled to damages.   But in determining whether the settlement in this case is a fair and reasonable one, the court must look to whether the settlement agreement is an adequate resolution of the claims presented in this lawsuit.   Since its inception, the plaintiffs in this case have only alleged claims for injunctive relief; no money damages were ever at issue.   Moreover,

Eleventh Circuit case law makes clear that an unnamed class member cannot be precluded from bringing a claim for damages stemming from the same conditions challenged in the class action, if the class representatives sought only injunctive or declaratory relief.  See Fortner v. Thomas, 983 F.2d 1024, 1031 (11th Cir. 1993) (collecting cases).  This additional remedial avenue has therefore not been foreclosed.

Conclusion:  The court has carefully considered the comments and objections filed by class members, which highlight the importance of the reforms to be effected pursuant to the consent decree.  However, none calls into serious question the fairness or adequacy of the settlement agreement.

### iii.   Objections by Federal Public Defender and Equal Justice Initiative

Four death-sentenced prisoners, represented by the Federal Public Defender, filed an objection to the section of the settlement agreement, V.5.I.C.2, that requires defendants to test prisoners for intellectual

66

disabilities and that reserves for defendants the right to administer additional tests.   Their objection is that there is a risk that this testing, especially if repeated, could artificially inflate a prisoner's results, which could in turn adversely impact a potential intellectual-disability defense to a death sentence under Atkins v. Virginia, 536 U.S. 304 (2002).

The objectors requested that the reservation of defendants' right to administer additional testing be struck from the settlement, that death-sentenced prisoners (and their lawyers) be given an opportunity to opt out of testing, and that such prisoners be allowed to provide defendants with alternate documentation to demonstrate their intellectual disabilities.

The court ordered the parties to solicit and present to the court the view of the Equal Justice Initiative, which represents many of the prisoners on Alabama's death row.   The Equal Justice Initiative agrees with the objection and believes that the only

way to protect the rights of the roughly 200 death-sentenced prisoners in defendants' custody is to exempt them from all testing "until and unless [their] lawyer[s] request[]" it.   Letter from Bryan Stevenson (doc. no. 652-1) at 1.   The Federal Defender has since expressed its agreement with the Equal Justice Initiative that death-sentenced prisoners should not be required to opt out of testing.   Both the Federal Defender and the Equal Justice Initiative take the position that the proposed exemption does not violate the ADA or the Rehabilitation Act.

In response to the objections of the Federal Defender and Equal Justice Initiative, the parties submitted a joint proposal that the relevant section be 'carved out' with respect to the few hundred prisoners on death row.   Under this approach, the Department will not be required to change its current practices regarding the testing of death-row prisoners for intellectual disabilities, and the question whether these practices are adequate with respect to those

prisoners will be reserved for adjudication or settlement during Phase 2 of this litigation.

The parties agree that this resolution is in the best interest of all class members, including the death-row prisoners affected by it. The court finds that the objections of the Federal Defender and Equal Justice Initiative present a serious question worthy of further consideration and, because the parties' proposed solution would allow more time to resolve this narrow issue without delaying the entry of the consent decree, it agrees that such a carve-out is appropriate.

Unlike most of the other stipulations the parties have filed, which offer clarifying interpretations of provisions of the settlement agreement, the parties' proposal with respect to this issue amounts to a modification of the settlement agreement. However, after careful consideration, the court finds that additional notice of this modification need not be given, for three reasons.

First, the parties propose a modification only to a small subsection of the settlement agreement. Second, the number of prisoners affected by the change will be very small--less than one percent of the current population. Third, and most important, carving out the provision will not constitute a final resolution of the issue. Instead, the matter will simply be reserved for future resolution. For these reasons, notice is not required. See Harris v. Graddick, 615 F. Supp. 239, 244 (M.D. Ala. 1985) (Thompson, J.) (holding, with respect to an amendment to a settlement of a Rule 23(b)(2) class action, that "where the amendment is narrow and it is clearly apparent that the interests of the classes are not substantially impaired, the court is of the opinion that the notice already given is adequate and that additional notice is not required pursuant to Rule 23(e)"); see also Keepseagle v. Vilsack, 102 F. Supp. 3d 306, 313-14 (D.D.C. 2015) (Sullivan, J.) (citing cases).

iv.  Views of Class Counsel

Class counsel contend that the settlement agreement is a fair, adequate, and reasonable resolution of plaintiffs' Phase 1 claims.  They argue that, if the agreement is approved, the Department will be required to address discrimination against disabled prisoners on several fronts, including by creating a transition plan and the oversight mechanisms described above, by instituting corrective actions to bring facilities into compliance with the ADA and the Rehabilitation Act, and by continually reassessing its policies and procedures to ensure that prisoners are not discriminated against on the basis of their disabilities.

They also contend that changes to existing policies and procedures will allow for improved identification and tracking of disabilities and ensure that prisoners with disabilities will be afforded, and continue to receive, appropriate accommodations throughout their incarceration.  These policy and procedural changes will allow disabled prisoners increased access to

71

rehabilitative programming available within the Department system; those prisoners in residential treatment and stabilization units will likewise benefit from individualized assessments as to the appropriateness of restricting their access to such programming.

Further, class counsel argue that, although the settlement agreement will not provide (and plaintiffs never sought) direction as to the particular accommodations to be provided to individual prisoners, the changes to the Department's existing grievance processes will create a meaningful avenue for prisoners to assert their rights to such accommodations. Finally, they argue that the Department's creation of a new quality assurance program, the monitoring process, and the continued jurisdiction of the court for a period of at least five years will help to ensure that the agreement is implemented appropriately.

The court considered appointing a guardian ad litem to advocate for the interests of the unnamed class

members who, due to cognitive and communication-related disabilities, are incapable of understanding the terms of the settlement agreement or submitting intelligible comments on them. The court heard the views of the parties as to this proposal. Instead of appointing a guardian ad litem, it found that ADAP, which has a federal mandate to advocate for and ensure the protection of disabled Alabamians, was best situated to voice the concerns of these class members.

The court explained that, although "this court did not appoint a [guardian ad litem] to represent incompetent class members in a previous class action challenge regarding the State's mental health and mental retardation system[,] [it] then explained ... that 'a court should be even more circumspect about accepting a settlement where ... members of the plaintiff class are not themselves capable of assessing the settlement and voicing their views on whether it is fair, reasonable and adequate, and the court must therefore rely on comments from such secondary sources

as public interest groups and organizations.'" <u>See</u>
<u>Dunn v. Dunn</u>, -- F. Supp. 3d --, 2016 WL 3869905, at *2
(M.D. Ala. July 7, 2016) (Thompson, J.) (quoting W<u>yatt</u>
<u>ex rel. Rawlins v. Wallis</u>, 1986 WL 69194, at *3 (M.D.
Ala. Sept. 22, 1986) (Thompson, J.), and citing William
B. Rubenstein, <u>The Fairness Hearing: Adversarial and</u>
<u>Regulatory Approaches</u>, 53 UCLA L. Rev. 1435, 1450-52
(2006) (discussing the related roles that public
interest groups and court-appointed guardians can play
in monitoring the fairness of class settlements)).
ADAP is the primary public interest organization
devoted to disability rights issues in Alabama.

The court also declined to appoint a guardian ad
litem because, practically speaking, such an individual
would be hard-pressed to even identify class members
with cognitive and communication-related disabilities,
given that the lack of a system to identify such
prisoners is one of the problems to be remedied under
the settlement. By contrast, ADAP is familiar with the
needs of these class members in light of its statutory

role as their advocate and its involvement in this litigation. The court therefore instructed ADAP to file a brief discussing whether the settlement agreement was a fair resolution of the claims of class members with severe cognitive and communication-related disabilities.

In its brief, ADAP explains that the settlement agreement is a fair resolution of these claims because it provides benefits to all disabled prisoners as well as particular benefits to the subset with cognitive and communication-related disabilities. The settlement agreement's provisions relating to identification and tracking of disabled prisoners, access to programs and services, and the ADA request and grievance process, inure to the benefit of all disabled prisoners.

Additionally, the settlement agreement includes detailed specifications for testing to assess prisoners for cognitive disabilities; these evaluations will allow defendants to provide accommodations to those prisoners who require them. Prisoners with severe

communication-related disabilities have much to gain from the provisions regarding auxiliary aids and program access, which require defendants to supply note-takers, readers, and tutors, other aides, and communication devices.

### v.  Court's Assessment

The court must also assess for itself, based on the evidence and argument presented by the parties and by class members who submitted comments and objections, whether the settlement is fair, adequate, and reasonable.  "Relevant factors include the stage in the proceedings; the plaintiffs' likelihood of success at trial; the complexity, expense, and likely duration of the lawsuit; and the range of possible recovery."  Laube, 333 F. Supp. 2d at 1246.

As to the substantive provisions of the agreement, the court finds that they represent a highly favorable result for the plaintiff class.  The plaintiffs in this case challenged the Department's treatment of disabled

prisoners at a systemic level.  They argued that the Department's policies and procedures were grossly inadequate to ensure compliance with the ADA and the Rehabilitation Act, and that because of these inadequate policies and procedures, disability discrimination was prevalent.

The settlement agreement essentially gives the class all of the remedies plaintiffs sought at the outset of this litigation.  Notably, even if plaintiffs had proceeded to and prevailed at trial on their Phase 1 claims, the parties would have still been confronted with the task of fashioning a remedial plan.  Any such plan would likely have closely resembled that contained in the settlement agreement currently before the court. Notably, because there are a variety of ways in which the Department may accommodate certain disabilities (for example, either by moving a prisoner or by renovating the facility where he is housed), the court would as an initial matter have permitted defendants to select the manner in which they would come into

compliance with federal law. Moreover, because such systemic changes are involved (for example, the creation and implementation of a new computer system, and assessment and training of tens of thousands of people), it would not have been feasible to order significantly more rapid compliance than is contemplated in the settlement agreement. If anything, settlement means that change will come more quickly.

During and shortly following the preliminary approval hearing, the court did express significant concerns regarding two particular provisions of the settlement agreement: a provision stating that the claims being settled had been raised only against the Department, and not against the official-capacity defendants, and a provision outlining a mechanism for arbitration of disputes arising during the implementation period. However, after considerable discussion, the parties have resolved these issues to the satisfaction of the court by entering into binding stipulations regarding these provisions.

### 1.  Official-Capacity Defendants

The settlement agreement states that the plaintiffs brought no ADA or Rehabilitation Act claims against the two official-capacity defendants (who are defendants to plaintiffs' Eighth Amendment claims in Phase 2 of this litigation), and that the Department is therefore the only defendant involved in the settlement of Phase 1.

The court expressed concern that the exclusion of the official-capacity defendants from the Phase 1 settlement could potentially create a problem were plaintiffs later to return to court in an effort to enforce the terms of or extend the consent decree. Alabama's Eleventh Amendment immunity has been abrogated by the express terms of the Rehabilitation Act.  See Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 344 F.3d 1288, 1290-93 (11th Cir. 2003).  The ADA, by contrast, abrogated sovereign immunity only to the extent that the claims brought under it allege actions that constitute violations of the Fourteenth

Amendment.  See United States v. Georgia, 546 U.S. 151, 159 (2006).

Absent the inclusion of an official-capacity defendant subject to suit under Ex parte Young, plaintiffs would be unable to challenge any ongoing violations of the ADA (but not the Rehabilitation Act) that did not constitute violations of the Fourteenth Amendment.  Although these are often described as largely overlapping statutes, see Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000), there are some disability-rights claims that can be brought only or are easier to bring under the ADA, because the ADA's causation requirement is more relaxed--that is, "because of," rather than "solely by reasons of."  See Soledad v. U.S. Dep't of Treasury, 304 F.3d 500, 504-05 (5th Cir. 2002).

The State was unable simply to waive its immunity for purposes of this suit, because a provision of the Alabama Constitution has been interpreted to bar waiver "by the Legislature or any other State authority."

Stroud v. McIntosh, 722 F.3d 1294, 1299 n.2 (11th Cir. 2013) (citation omitted); see also Alabama v. Pugh, 438 U.S. 781, 782 (1978) (same).   Therefore, the parties have stipulated that "without the necessity of a separate amendment to the Complaint, Commissioner Dunn, in his official capacity as Commissioner of the Alabama Department of Corrections, be added (a) as a defendant to the claims addressed in the proposed Phase 1 settlement agreement and (b) as a named party to that agreement."   Joint Br. Addressing Ct.'s Question Re. Addition of Official-Capacity Defs. to Phase 1 Claims and Settl. (doc. no. 576) at 1.   This stipulation resolves the court's concern; both the Alabama Department of Corrections and Commission Jefferson Dunn are defendants to the Phase 1 claims.

## 2. Arbitration

The settlement agreement provides for the arbitration of disputes arising during the pendency of the consent decree.   Because the court requested and

the parties provided a number of clarifications
regarding the scope and effect of this provision, it is
reproduced here in full for ease of discussion:

"VII.   DISPUTE RESOLUTION PROCESS

1.   During the assessment, implementation,
or monitoring periods of this Amended Agreement
(see Sections V-VI, above), if Plaintiffs'
counsel or the monitor believe that ADOC is not
complying with some aspect of the Amended
Agreement, they will notify counsel for the
ADOC, in writing, of such a belief identifying
any facts supporting the belief. ADOC will
investigate the allegations and respond in
writing through its counsel within thirty (30)
days after receipt of the notification.   If
Plaintiffs' counsel or the monitor is not
satisfied with ADOC's response, the Parties
will negotiate in good faith to resolve the
issue(s).   If the Parties are unable to resolve
the issue(s) timely and satisfactorily, the
Parties agree to present the issue(s) for
binding arbitration before Hon. John E. Ott,
U.S. Magistrate Judge for the Northern District
of Alabama.[15]   This provision regarding binding
arbitration applies regardless of whether the
issue affects twelve (12) or more inmates, as
discussed below.

15. If, at any time during the
term this Amended Agreement is in
effect, Judge Ott or any successor
arbitrator becomes unavailable to
arbitrate disputes, the Parties will
agree upon a replacement arbitrator.
If the Parties are unable to agree
upon a replacement arbitrator, they

will petition the Court to appoint a
replacement arbitrator who will be a
current or former U.S. Magistrate
Judge from one of the U.S. District
Courts sitting in Northern, Middle or
Southern Districts of Alabama.

2.   If the issue is one that impacts fewer
than twelve (12) inmates, resolution through
the arbitration process shall be the final
resolution under this Amended Agreement.
Nothing in this Amended Agreement establishes a
compulsory administrative prerequisite with
which an Inmate must comply prior to the
initiation of a lawsuit alleging violations of
the Acts suffered during the Inmate's term of
incarceration.  Nothing in this agreement shall
prevent an Inmate from exercising his/her
rights under ADOC's ADA Grievance Process.

3.   If the issue is one that impacts
twelve (12) or more Inmates and the Parties are
unable to resolve the issue(s) timely and
satisfactorily through negotiation or the
arbitration process, either party may bring the
issue before the Court for resolution.  Any
issue brought before [t]he Court will be
decided on an abuse of discretion standard.

4.   Issues relating to ADOC system-wide or
facility specific policies, or physical
barriers within a specific facility, shall be
presumed to impact twelve (12) or more inmates.
The Arbitrator shall have the authority to
decide whether an issue impacts twelve (12) or
more inmates.

5.   In the event that the arbitrator or
Court, acting as final decision-maker, finds
that ADOC has failed to comply with this

83

Amended Agreement, ADOC will submit a plan to
remedy the deficiencies identified within
thirty (30) days of the decision.  In the event
that such a plan does not timely remedy the
deficiencies, the Court retains the authority
to enforce this Amended Agreement through all
remedies provided by law.  Any attorneys' fees
awarded are subject to the provisions of
Section XII of this Amended Agreement.

6.  The Court will be the sole forum for
enforcement of this Amended Agreement.  Any
order to achieve Substantial Compliance with
the provisions of this Amended Agreement will
be subject to the provisions of the Prison
Litigation Reform Act, 18 U.S.C. § 3626."

Am. and Restated Settl. Agmt. (doc. no. 518) at 70-72.

In its order preliminarily approving the settlement
and in subsequent briefing orders, the court expressed
concerns and sought clarification regarding the extent
to which arbitration would be _binding_ (or, put
differently, not subject to judicial review), _mandatory_
(or, put differently, the exclusive avenue for relief),
and _enforceable_.

In a number of subsequent stipulations, the parties
have addressed the court's questions and significantly
assuaged its concerns.

a.   When Is Arbitration Binding?

As a preliminary matter, the parties have addressed the court's concern that the language in this provision is somewhat inconsistent, in describing the arbitration in subsection 1 as "binding" but then explaining that the arbitrator's decisions will be appealable if the issues decided affect 12 or more prisoners.  The parties have entered a binding stipulation confirming that the word "binding" should be omitted from this subsection and that "the decision of the arbitrator is binding (that is, not subject to appeal) only if the issue affects fewer than twelve (12) inmates." Parties' Joint Stip. (doc. no. 638) at 1.

Additionally, the court anticipated the possibility that a dispute could arise over whether the arbitrator had correctly decided that an issue affected fewer than 12 prisoners.  The court therefore sought clarification as to whether the parties intended their agreement--in stating that the arbitrator "shall have the authority

to decide whether an issue impacts twelve (12) or more inmates"--to vest him with the exclusive (unreviewable) authority to decide this issue.  In response to this concern, the parties have entered a binding stipulation in which they "agree that the arbitrator's decision as to whether a particular issue affects more than 12[16] inmates will be subject to review by the District Court for abuse of discretion."  Id.

Lastly, the court sought clarification regarding the relationship between the arbitration process and motions the parties might file to terminate or extend the consent decree.  The parties confirmed in a binding stipulation that such motions may be heard and decided only by the court.  Phase 1 Parties' Joint Stip. Concern. Provs. of PLRA as Relates to Phase 1 Settl. (doc. no. 560) at 3.

---

16. The court understands the parties to mean "12 or more," rather than "more than 12."  According to the arbitration provision, decisions affecting exactly 12 prisoners are appealable.

The parties further explained that although many of
the arbitrator's factual findings would be binding on
this court in considering such a motion, some factual
findings, and the arbitrator's conclusions of law,
would not be.[17]   Specifically, they stated that the
arbitrator's decisions would be binding on a motion to
terminate or extend only if defendants successfully
asserted the affirmative defense of collateral
estoppel.   See Joint Resp. to Ct.'s Second Suppl. Br.
Order (doc. no. 563) at 7 & n.5.   They
explained--correctly--that to the extent an issue
raised in a motion to terminate or extend was identical
to one actually litigated (with a full and fair
opportunity to do so) in front of, and necessarily
decided by, the arbitrator, his decision would preclude

---

17. This discussion pertains only to factual
findings made by the arbitrator which relate to fewer
than 12 prisoners.   Because the arbitration provision
sets no deadline by which decisions affecting 12 or
more prisoners must be appealed, any factual findings
pertaining to 12 or more prisoners could simply be
appealed in conjunction with a motion to terminate or
extend.

relitigation of that issue on a motion to terminate or extend.  See Christo v. Padgett, 223 F.3d 1324, 1339 (11th Cir. 2000) (setting forth requirements for collateral estoppel); Freecharm Ltd. v. Atlas Wealth Holdings Corp., 499 F. App'x 941, 943-45 (11th Cir. 2012) (holding that collateral estoppel barred relitigation of an issue decided in arbitration).

Moreover, the parties agreed that the arbitrator's conclusions of law would not be binding under the doctrine of collateral estoppel, because the legal question whether defendants had violated the consent decree with respect to any individual unnamed class member would not have been litigated by the named plaintiffs and, perhaps more important, would be very much distinct from the legal issues before the court on a motion to terminate or extend: whether defendants were in substantial compliance with the decree and

whether they were committing ongoing violations of the ADA.[18]

Helpfully, the parties offer an illustrative example of an unnamed class member, Mr. Jones, who asserts in an arbitration that he submitted an accommodation request for a cane but received no response, in violation of the consent decree. Suppose, they say, that the arbitrator decides that defendants have not violated the decree because Mr. Jones did not in fact submit the accommodation request. Suppose as well that plaintiffs later seek to avoid termination of the decree based (in part or in whole) on a showing

---

18. In the fifth year, the question (per the terms of the settlement agreement) would be whether defendants had been in substantial compliance with the terms of the decree for at least one year.

Were plaintiffs to seek to extend jurisdiction into a sixth year and beyond, the court would need to determine--pursuant to the PLRA--whether "prospective relief remain[ed] necessary to correct a current and ongoing violation of [a] Federal right, extend[ed] no further than necessary to correct the violation of the Federal right, and [was] narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 36526(b)(3).

that defendants are repeatedly failing to respond to accommodations requests.

In such a circumstance, the parties agree that the arbitrator's factual finding that Mr. Jones did not submit an accommodation request would be binding on the court.  However, plaintiffs would not be estopped from arguing that other class members had submitted requests but received no responses, or indeed that Mr. Jones had suffered some other violation of the consent decree or the ADA (including that the failure to provide him with a cane was, per se, a violation of either the decree or the statute).  Moreover, as discussed, the specific legal issue decided by the arbitrator--that defendants had not violated the decree by failing to respond to Mr. Jones's accommodation request--would not again be at issue on a motion to extend or terminate, so his determination would therefore not bind the court.

b.   When Is Arbitration Mandatory?

The court's most significant concern about the arbitration provision, based on representations made by defense counsel during the preliminary approval hearing, was that it could prevent class members from raising in federal court (this one or another one) claims that had not been raised or settled in this case.[19]   Had it swept so broadly, the court might well have been unwilling to approve it.

However, the parties have agreed to construe the arbitration provision to require an unnamed class member to submit to arbitration only if seeking to

---

19. See Pride v. Correa, 719 F.3d 1130, 1134-37 (9th Cir. 2013) (holding that a consent decree governing the provision of medical care to prisoners across the state did not preclude an individual prisoner's Eighth Amendment claims regarding specific medical treatment allegedly denied to him, because the consent decree governed "a broad category of conduct" and the "specific issues raised [by the plaintiff] ha[d] not already been addressed conclusively by the decree[]," and that "individual claims for injunctive relief related to medical treatment are discrete from the claims for systemic reform addressed in [the consent decree]" (citations and internal quotation marks omitted)).

enforce the terms of the settlement agreement.   See Joint Br. Re. Scope of Arbitration (doc. no. 575).   A prisoner who seeks to assert a new and independent claim alleging a violation of the ADA or the Rehabilitation Act is free to file such a lawsuit in federal court.   Of course, defendants would be at liberty to argue that the claims in that complaint were precluded by the settlement in this case, but they would have to do so based on the substantive provisions of the consent decree and not on the arbitration provision itself.

Based on this stipulation, and in light of circuit case law regarding enforcement of consent decrees by unnamed class members, the court concludes that on balance, the arbitration provision expands, rather than limits, the remedies available to an unnamed class member who contends that the consent decree has been violated to that individual's detriment.   In the Eleventh Circuit, consent decrees are enforceable only through contempt proceedings, see Reynolds v. McInnes,

338 F.3d 1201, 1208 (11th Cir. 2003), and "unnamed, non-intervening members of a class ... do not have standing to enforce [a] consent decree." Reynolds v. Butts, 312 F.3d 1247, 1250 (11th Cir. 2002). But see Clarkson v. Coughlin, 2006 WL 587345 (S.D.N.Y. Mar. 10, 2006) (Sweet, J.) (discussing the adjudication of contempt motions brought by unnamed class members to enforce a consent decree). Absent the arbitration provision, an unnamed class member unrepresented by class counsel could not obtain relief for a violation of the consent decree. The arbitration provision gives such a prisoner an avenue by which to appeal the denial of accommodation to an adjudicator unaffiliated with the Department.

Additionally, the court expressed the concern that the remainder of the consent decree not be undermined were a court later to invalidate the arbitration provision, for whatever reason. During an on-the-record conference call to address this issue, the parties stipulated that the arbitration provision

is to be "governed by the Federal Arbitration Act and case law interpreting it," and, pursuant to that case law, "is severable from the remainder of the settlement agreement, such that were a court to invalidate the arbitration provision at some point during the pendency of the consent decree, the remainder of the consent decree would remain in full force." Arbitration Severability Stip. (doc. no. 719) at 4. See Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445 (2006) ("[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." (interpreting § 2 of the Federal Arbitration Act, 9 U.S.C. §§ 1-16)).


c.  How Is Arbitration Enforceable?

The court sought confirmation that the arbitrator's decisions would meaningfully be enforceable. The parties confirmed their agreement that although the arbitrator will not himself exercise enforcement power, the consent decree requires compliance with decisions

of the arbitrator, such that failure to do so would be a "straightforward" basis for a finding of contempt. Joint Resp. to Ct.'s Second Suppl. Br. Order (doc. no. 563) at 3-6. (Of course, whether defendants had indeed failed to comply with a decision by the arbitrator would be a question for the court to decide.) To the extent that a dispute concerns a dozen or more prisoners and the arbitrator's decision is in fact appealed to the court, failure to comply with the resulting court order would obviously be a basis for a finding of contempt.[20]

### d. Conclusion

The court evaluated the arbitration provision in the parties' settlement agreement with extreme care, given the host of serious concerns that arise when adjudications of individual civil-rights claims are shunted from the federal courts to alternative

---

20. In such a case, the movant would need to show by clear and convincing evidence that the non-movant (continued...)

mechanisms of dispute resolution.  <u>See</u> Judith Resnik,
<u>Diffusing Disputes: The Public in the Private of
Arbitration, the Private in Courts, and the Erasure of
Rights</u>, 124 Yale L.J. 2680 (2015); Kathryn A. Sabbeth &
David C. Vladeck, <u>Contracting (Out) Rights</u>, 36 Fordham
Urb. L.J. 803 (2009).

However, the arbitration provision at issue here
offers some benefits to class members in facilitating
prompt resolution of disputes regarding noncompliance,
and avoids many of the most significant pitfalls that
often attend such clauses.  Although some arbitration
clauses expressly preclude aggregation of claims, <u>see</u>
Judith Resnik, <u>Fairness in Numbers: A Comment on AT&T
v. Concepcion, Wal-Mart v. Dukes, and Turner v. Rogers</u>,
125 Harv. L. Rev. 78 (2011); Jean R. Sternlight, <u>As
Mandatory Binding Arbitration Meets the Class Action,
Will the Class Action Survive?</u>, 42 Wm. & Mary L. Rev. 1
(2000), this provision both permits aggregation and
preserves judicial review of any dispute that affects

---

had failed to comply with the court's order.

numerous prisoners or implicates systemic or facility-wide policies. And while some arbitration clauses sweep very broadly (or are interpreted by courts to do so), requiring arbitration of a wide array of disputes might arise between the parties, see Dasher v. RBC Bank (USA), 745 F.3d 1111, 1115 (11th Cir. 2014) (discussing the presumption in favor of arbitrability), this provision applies only to disputes arising from the terms of the parties' settlement agreement and not to freestanding claims that defendants have violated the ADA or the Rehabilitation Act.

After close consideration, the court therefore concludes that the arbitration provision, as construed by the parties' binding stipulations, is fair and reasonable to the class members.

Finally, the court notes that, to the extent the parties' stipulations clarify the meaning of a portion of the provision by expressly adopting one of multiple possible interpretations of it, they all adopt the interpretation that is least restrictive of class

97

members' rights to raise disputes in federal court. The court therefore concludes that additional notice of the parties' stipulations need not be provided to the members of the class prior to final approval and entry of the consent decree.  See Keepseagle, 102 F. Supp. 3d at 313-14; Harris, 615 F. Supp. at 244.

However, the court will require the parties to prepare a notice, intelligible to the lay reader, describing the arbitration process as construed by these stipulations.  This notice should be posted or distributed to class members either in advance of or in conjunction with the notice defendants will provide regarding the availability of the new ADA request and grievance process.

### C.  Class Counsel and Fees: Rules 23(g) and (h)

#### i.  Rule 23(g)

Rule 23(g) requires the court to appoint (and also to assess the suitability of plaintiffs' counsel to serve as) class counsel.  The rule requires the court

to consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).   The court must conclude that class counsel will "fairly and adequately represent the interests of the class."   Fed. R. Civ. P. 23(g)(4).

Lawyers affiliated with the Southern Poverty Law Center, the Alabama Disabilities Advocacy Program, and the law firm of Baker, Donelson, Bearman, Caldwell & Berkowitz have represented named plaintiffs in litigating and negotiating the settlement of this case, and seek appointment as class counsel.[21]   As previously

---

21. The law firm of Zarzaur, Mujumdar, and Debrosse, has also participated extensively in the Phase 1 litigation, in representing ADAP.  Because its attorneys do not represent the individual named class (continued...)

discussed, the record reflects that these attorneys have substantial experience in litigating class actions and in the complex substantive areas of both prisoners'-rights and disability-rights law.

These lawyers have also devoted an extraordinary amount of time and energy to identifying and developing the claims and evidence in this case. They identified plaintiffs, investigated their allegations, drafted a lengthy complaint, engaged in very extensive discovery (and litigation over it), appeared at numerous court hearings and conferences, participated in days of mediation, briefed a motion for class certification, and responded to questions raised by the court and comments made by class members regarding the settlement agreement.

Finally, the court cannot identify--and neither defendants nor the prisoners who have commented on the

---

members, they have not been named class counsel. However, the court understands that they are due to receive a portion of the attorneys' fees discussed below.

settlement  agreement  have  suggested--any  reason  to
believe  that  these  attorneys  have  not  fairly  and
adequately  represented  the  interests  of  the  class,  or
will not do so in the future.

The  court  therefore  concludes  that  plaintiffs'
counsel should be appointed class counsel.


### ii.  Rule 23(h)

Federal  Rule  of  Civil  Procedure  23(h)  requires  that
when  class  counsel  seek  fees  and  costs  "that  are
authorized  by  law  or  by  the  parties'  agreement,"  they
move  for  those  fees  and  provide  notice  to  the  class.
Fed.  R.  Civ.  P.  23(h)(1).  Class  members  (and  also
defendants,  absent  a  settlement)  must  be  given  notice
and  an  opportunity  to  object,  and  the  court  must  find
that  the  award  sought  is  reasonable.  Fed.  R.  Civ.  P.
23(h)(2), (h)(3).

The  settlement  agreement  provides  that  defendants
will  pay  plaintiffs'  counsel  $ 1.25  million  for  their
litigation  of  the  Phase  1  claims  up  until  settlement,

as well as additional fees of $ 195.00 per hour (subject to caps) for monitoring services. For litigation arising out of the consent decree, plaintiffs' counsel will be entitled to fees (again, subject to caps) only if the court finds that their services were necessary and that they attempted to resolve the issue informally.

Because this provision was included in the settlement agreement, class members received notice of it. A few prisoners objected to the fee provision, arguing that the fees class counsel would receive were excessive. One prisoner argued that class counsel should receive a larger fee award. For the reasons that follow, the court concludes that the fees contemplated by the settlement agreement are appropriate.

Even when both parties agree to an award, the court has an independent responsibility to assess its reasonableness, in order to guard against the risk that class counsel might agree to enter into a settlement

less favorable to their clients in exchange for
inappropriately high fees.  See Piambino v. Bailey, 610
F.2d 1306, 1328 (5th Cir. 1980).[22]  The court uses the
lodestar method, multiplying the number of hours
reasonably expended by a reasonable hourly rate, see
Norman v. Hous. Auth. of Montgomery, 836 F.2d 1292,
1299 (11th Cir. 1988), and then considering whether an
upward or downward adjustment is warranted in light of
the factors set out in Johnson v. Georgia Highway
Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974).[23]

---

22. The Eleventh Circuit has adopted as precedent
all decisions of the former Fifth Circuit rendered
prior to October 1, 1981.  See Bonner v. Prichard, 661
F.2d 1206, 1207 (11th Cir. 1981) (en banc).

23. These factors are: (1) the time and labor
required; (2) the novelty and difficulty of the
questions; (3) the skill required to perform the legal
services properly; (4) the preclusion of other
employment by the attorney due to acceptance of the
case; (5) the customary fee in the community;
(6) whether the fee is fixed or contingent; (7) time
limitations imposed by the client or circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the
attorneys; (10) the "undesirability" of the case;
(11) the nature and length of the professional
(continued...)

In support of their motion, plaintiffs' counsel have submitted evidence that they incurred approximately $ 261,000 in expenses litigating Phase 1 of this case; a portion of the award would cover those expenses.

As to the remainder of the award, plaintiffs' counsel request compensation at a blended hourly rate of $ 196 per hour. Evidence submitted by plaintiffs shows that this rate is consistent with or below the blended hourly rates deemed reasonable in other civil rights cases in Alabama, and very substantially below the rates at which the lawyers employed by law firms ordinarily bill their clients. The court also finds class counsel's contention--supported by affidavits--that they have expended (at least) 5,050 hours in litigating Phase 1 of this case entirely convincing, given the court's own knowledge of the amount of time numerous attorneys have spent in court,

---

relationship with the client; and (12) awards in similar cases.

in mediation, in depositions, and in site inspections. Based on these findings, the lodestar figure amounts to the $ 989,000 provided for in the settlement agreement.

After considering the Johnson factors, the court finds that no downward adjustment of the lodestar figure is warranted. This litigation, which has been ongoing since 2014, is extraordinarily large in scope; it concerns both current and future disabled prisoners at all state prison facilities, and it sought and achieved a remedial order that mandates a dramatic transformation in the way that the Department treats such prisoners. The range of complex legal and factual questions presented by the plaintiffs' claims, and the amount of time plaintiffs' attorneys spent both in preparing this case for trial and, more recently, in negotiating and securing approval of the settlement agreement, warrant the sizeable fee award. Moreover, the court is convinced that the experienced attorneys who litigated this case, and who took it on without any guarantee of compensation, would have been entitled to

a higher hourly rate had they litigated a contested fee motion.

Finally, the court notes that class counsel seek these fees pursuant to the fee provisions contained in the ADA (42 U.S.C. § 12205) and the Rehabilitation Act (29 U.S.C. § 794a), so their award is not limited by the PLRA's restrictions on attorneys' fees in prison litigation, which apply only to cases in which the attorneys' fees are authorized under 42 U.S.C. § 1988. 42 U.S.C. § 1997e(d)(1).

### D.   Prison Litigation Reform Act

"The PLRA strictly limits the prospective relief a federal court may order in cases concerning prison conditions." Gaddis v. Campbell, 301 F. Supp. 2d 1310, 1313 (M.D. Ala. 2004) (Thompson, J.).  These strictures apply to consent decrees, and hence to this settlement. 18 U.S.C. § 3626(c)(1).

The PLRA provides that a "court shall not grant or approve any prospective relief unless the court finds

that such relief is narrowly drawn, extends no further
than necessary to correct the violation of a Federal
right, and is the least intrusive means necessary to
correct the violation of the Federal right." 18 U.S.C.
§ 3626(a)(1)(A).   Furthermore, in conducting this
"need-narrowness-intrusiveness" inquiry, the court is
required to "give substantial weight to any adverse
impact on public safety or the operation of a criminal
justice system caused by the relief." Id.

In some circumstances--such as when a court extends
prospective relief by making renewed findings that the
need-narrowness-intrusiveness requirements continue to
be met in light of a "current and ongoing
violation"--the PLRA requires it to "engage in a
specific, provision-by-provision examination of [a]
consent decree[], measuring each requirement against
the statutory criteria." Cason v. Steckinger, 231 F.3d
777, 785 (11th Cir. 2000).   However, in the case of
such an extension or, as here, in submitting to the
court an initial settlement agreement, "[t]he parties

are free to make any concessions or enter into any stipulations they deem appropriate," and the court does not need to "conduct an evidentiary hearing about or enter particularized findings concerning any facts or factors about which there is not dispute."  Id. at 785 n.8.

In this case, the parties agree that the consent decree satisfies the need-narrowness-intrusiveness requirements of 18 U.S.C. § 3626(a)(1)(A).  They so stipulate in the settlement agreement.  Based on the court's independent review of the settlement agreement, the court agrees.

The court further finds that the consent decree will not have an adverse effect on public safety or the operation of the criminal-justice system.  See 18 U.S.C. § 3626(a)(1)(A).  Quite the opposite is true.  A primary purpose of the State's prison system is to rehabilitate prisoners in its custody, many of whom will be released to rejoin society.  See ADOC Admin. Reg. 002 at 2 ("The mission of the Alabama Department

of Corrections is to confine, manage and provide
rehabilitative programs for convicted felons in a safe,
secure and humane environment ....").  When the Alabama
Department of Corrections provides accommodations for
prisoners with disabilities in a manner and to an
extent compliant with federal law, those prisoners will
be significantly better able to access and benefit from
the range of services and programming available during
their incarceration.

Two other portions of the PLRA warrant discussion.
First, 18 U.S.C. § 3626(b)(1)(A) provides that
prospective relief orders "shall be terminable upon the
motion of any party or intervener ... 2 years after the
date the court granted or approved the prospective
relief [or] ... 1 year after the date the court has
entered an order denying termination of prospective
relief under this paragraph ...."  However, because the
remedial steps set forth in the parties' consent decree
will require more than two years to implement, they
have agreed, both in the agreement and by filing

written stipulations, that defendants may waive and
have waived the right to seek termination of the
consent decree pursuant to § 3626(b) until at least
five years after the date of final approval.  <u>See</u>
<u>Depriest v. Walnut Grove Corr. Auth.</u>, 2015 WL 3795020,
at *6 (S.D. Miss. June 10, 2015) (Reeves, J.) ("Nothing
about the PLRA prohibits parties from agreeing to
termination conditions different from those contained
in the PLRA." (citing cases)). The parties also agree
that the consent decree will automatically terminate
six years after the date of final approval, unless
plaintiffs seek to extend it and the court finds
extension warranted pursuant to § 3626(b)(3).  The
court concludes that the termination provisions of the
consent decree comply with the PLRA, and that they are
appropriate in light of the significance of the
transformational reforms the agreement contemplates and
this court will require.

        Second, 18 U.S.C. § 3626(f) imposes requirements on
a district court appointing a special master in a

prison case.  In order for such an appointment to be permissible during the remedial phase of a case, the court must find that the remedial phase will be "sufficiently complex to warrant the appointment." § 3626(f)(1)(B).  Additionally, the statute prescribes a mechanism for selecting a special master from lists submitted by the parties; it appears that the consent of both parties would satisfy the spirit, though perhaps not the letter, of the provision.  See § 3626(f)(2).  Also, § 3626(f)(5) requires the court to review whether a special master remains necessary on a twice-yearly basis, and § 3626(f)(6) imposes certain limitations on the special master's power.

Furthermore, the PLRA defines the term "special master" to mean "any person appointed by a Federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master, regardless of the title or description given by the court." § 3626(g)(8).  Pursuant to Rule 53, a special master

111

ordinarily makes recommended factual findings which a district court reviews de novo upon objection; however, parties to a case may stipulate that a special master appointed upon their consent has the authority to make final, unreviewable factual findings. See Fed. R. Civ. P. 53(f)(3)(B).

The arbitrator to be appointed pursuant to the consent decree, however, is not a special master. Neither the court nor the parties have ever suggested as much, and the parties stipulated that 18 U.S.C. § 3626(f) is not applicable to the arbitrator, and expressly waived the right to challenge his decision or the consent decree on the basis of this provision.

In sum, the court is satisfied that its entry of the consent decree is in full compliance with the PLRA.


### IV. CONCLUSION

In Alexander v. Choate, Justice Marshall explained that Congress passed the Rehabilitation Act to ensure that people with disabilities were no longer "shunted

aside, hidden, and ignored." 469 U.S. 287, 296 (1985) (quoting 117 Cong. Rec. 45974 (1971) (statement of Rep. Vanik)). Prisoners, looked down upon by society and hidden from public view, are likewise at risk of such treatment. Absent the protections created and processes mandated by the ADA and accompanying regulations, and without effective oversight, prisoners with disabilities are doubly damned.

This settlement reflects the Alabama Department of Corrections' commitment to making manifest the rights of disabled prisoners in its custody; it represents the shouldering of significant responsibility, and presents an equally significant opportunity, by delineating a years-long process of ensuring compliance with the dictates of federal disability law. The court understands defendants' investment in this process to be genuine, and commends them for it.

The court also recognizes the important role played by prisoners with disabilities in bringing this litigation, and commends both the named plaintiffs and

the numerous prisoners who submitted comments for their advocacy on behalf both of themselves and of others.

Finally, the court expresses its appreciation to Magistrate Judge Ott, for his truly tireless efforts in helping the parties to reach this settlement agreement, and for his willingness to serve as the arbitrator.

\* \* \*

In accordance with the foregoing opinion, it is ORDERED as follows:

(1) An injunctive-relief settlement class, defined as "any current or future inmate in the physical custody of the Alabama Department of Correction who has a disability as defined in 42 U.S.C. § 12012 and 29 U.S.C. § 705(9)(B), excluding those inmates whose disabilities relate solely to or arise solely from mental disease, illness, or defect," is certified under Federal Rule of Civil Procedure 23(a) and (b)(2).

(2) The Southern Poverty Law Center, the Alabama Disabilities Advocacy Program, and the law firm of Baker, Donelson, Bearman, Caldwell & Berkowitz are appointed as class counsel to represent the settlement class under Federal Rule of Civil Procedure 23(g).

(3) The parties' settlement agreement (doc. no. 518), as amended, is approved.

(4) The objections to the settlement agreement (doc. nos. 578, 582, 593, 596, 606, 612, 623, 641, 652, 659, and 663) are overruled.

(5) The parties' stipulations (doc. nos. 560, 563, 575, 576, 638, 696, 709, and 719) are adopted.

(6) The settlement agreement, as amended, is entered as a separate consent decree. Defendants are to commence compliance with its terms as interpreted by the above-entered stipulations.

(7) United States Magistrate Judge John Ott is appointed arbitrator pursuant to Section VII of the consent decree.

(8) Plaintiffs' motion for attorneys' fees (doc. no. 703) is granted.

(9) The parties are to meet and confer and submit to the court by no later than September 23, 2016, a plan for providing notice to class members of the entry of this consent decree and for ensuring that they have access during the pendency of the consent decree to both it and this opinion.  In particular, this notice must describe in lay terms the accommodation request and grievance processes set out in the decree, and must note the availability of arbitration.

DONE, this the 9th day of September, 2016.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE