Expert Report of Kathryn A. Burns, M.D., M.P.H.
Mental Health Expert
*Dunn v Dunn*

Submitted
July 5, 2016

# CONTENTS

Assignment                                                          3

Summary of Opinions                                                 4

Qualifications                                                      5

Compensation                                                        7

Facts and Data Considered in Forming Opinions                       7

OPINIONS & BASIS & REASONS FOR OPINIONS                             8

OPINION 1:                                                          9

Staffing levels are inadequate to provide appropriate mental health care.  MHM staffing levels are deficient in both quantity and professional credentials.  Custody staffing numbers are inadequate to provide escort and supervision and effectively prevent prisoner access to treatment.

OPINION 2:                                                         21

The mental health screening process for identification and classification of prisoners with serious mental illness is inadequate.  Many prisoners with mental illness are not identified and consequently receive no treatment whatsoever. Others receive only psychotropic medication rather than more comprehensive care that addresses their clinical condition and needs.

OPINION 3:                                                         30

Mental health treatment is inadequate to meet the needs of the prisoner population with serious mental illness.  Residential and stabilization unit treatment beds are underutilized but also provide little treatment beyond psychotropic medication due to staffing level shortages of both treatment and custody staff.  Individual contacts with mental health staff are brief, infrequent and often not conducted in confidential settings.  There is little group treatment in mental health treatment units and even less in outpatient settings. As a consequence, prisoners with untreated and undertreated serious mental illness are over-represented in the segregation population – essentially punished for manifestations of serious mental illness.

OPINION 4:                                                         43

Quality assurance and contract oversight are seriously lacking.  Even when problems are identified, corrective actions are not implemented to ensure the problem is corrected and does not recur.

Conclusion                                                         46

Assignment

Plaintiffs asked me to evaluate the mental health care provided to inmates confined in the Alabama Department of Corrections (ADOC) prison system.  Mental health care to inmates with serious mental illness and other mental health diagnoses is provided through a contract between ADOC and MHM Services, Inc. (MHM).  (The ADOC also has a small number of staff psychological associates and psychologists to assist with the admission reception process and other brief interactions with prisoners, as opposed to on-going care provided by the contractor.  This is more fully described later in this report.)  As set forth in the ADOC Request for Proposal (RFP) No. 2013-02, the vendor is to provide a comprehensive program of mental health services to include reception evaluations, intensive stabilization unit (SU) care, residential treatment unit (RTU) level of care, outpatient services and in-patient psychiatric care.  According to the RFP, the elements of care are to include effective and appropriate psychotropic medication; psychiatric or psychological individual contact as clinically indicated; mental health professional individual contact/follow-up at a minimum of 60 days; mental health nursing staff monitoring of medication compliance and required laboratory testing; counseling/programming to increase coping skills and provide support; activities to promote socialization; and access to adequate out-of-cell time and outdoor recreation. The contract was awarded to MHM October 1, 2013 although MHM had a similar contract for the delivery of comprehensive mental health services from 2008-2013.

3

Summary of Opinions

I have formed the following opinions in this case:

Staffing is woefully inadequate to provide an appropriate/sufficient level of mental health care.  There are deficient numbers of mental health staff to adequately serve the inmate population and some of the staff are not appropriately licensed or credentialed to do the job duties assigned to them without adequate oversight or supervision – and they are not provided that oversight or supervision.  Additionally, the delivery of mental health care is impeded by security staffing shortages throughout the ADOC which impacts mental health staff access to inmates as security is responsible for inmate escort and supervision.

Inmates with serious mental health needs are not identified timely.  The reception screening and evaluation process under-identifies inmates with mental health needs including those with serious mental health needs.  Self-referrals for mental health care are not responded to in a timely manner or ignored altogether forcing inmates to engage in increasingly dangerous behaviors to get mental health staff attention and care. Referrals from other institutional staff are also deficient. The ADOC mental health classification system has less to do with classifying inmates with serious mental illness than it does with determining inmate housing.

Mental health treatment consists almost exclusively of psychotropic medication management – even in residential treatment settings.  Caseload sizes are too large to

4

permit more than brief, infrequent individual appointments as opposed to an actual

course of therapy or counseling.  Group treatment is non-existent in some prisons and

not accessible in others due to shortages of security staff to provide escort and

supervision.  Residential treatment beds are underutilized while inmates with serious

mental illness are suffering without treatment in segregation housing units.


Oversight of the mental health services contract by ADOC is seriously lacking.  The

internal system of quality assurance reported by MHM is inadequate and seriously

flawed.  There is no evidence of meaningful oversight of mental health treatment by the

ADOC Office of Health Services (OHS).  This is best exemplified by the continued

placement of segregation inmates into mental health treatment beds and the

disproportionate number of inmates with mental illness into segregation beds where

there is virtually no access to mental health treatment.


Qualifications

I am a Medical Doctor licensed in the state of Ohio.  I am Board Certified in the practice

of General Psychiatry and Forensic Psychiatry.  I also have a Master's Degree in Public

Health.  I am a Distinguished Fellow of the American Psychiatric Association.  I am

Board Certified by the American Board of Psychiatry and Neurology (ABPN) in General

Psychiatry and Forensic Psychiatry.  I have served both as a Board Examiner for the

ABPN general adult psychiatry oral examination and on the forensic psychiatry

committee writing examination questions and preparing the forensic psychiatry board

examinations.

Since July 2013, I have served as the Chief Psychiatrist for the Ohio Department of Rehabilitation and Correction, a position I also held from May 1995 to August 1999.  I have provided psychiatric care to inmates in jails and prisons in addition to holding administrative posts.  I have been a physician surveyor of health services for the National Commission on Correctional Health Care and am a Certified Correctional Health Professional.  I have written correctional mental health policies and procedures and developed staffing plans for correctional mental health services.  I have written and been published in journals and peer reviewed textbooks on topics pertaining to correctional mental health care.

I have served as both a consulting and testifying expert witness in legal cases involving correctional mental health care.  I have conducted assessments of the adequacy of mental health care in individual correctional facilities as well as state systems including Massachusetts, Pennsylvania, Indiana, Illinois, Ohio and Alabama.  I was one of the mental health experts in the *Bradley v Hightower/Haley* case that settled in 2000.  I have also been a monitoring expert in correctional litigation cases including *Coleman v Brown* (California), *Disability Rights Network of Pennsylvania v Wetzel* (Pennsylvania), *Disability Law Center v Massachusetts Department of Correction* (Massachusetts), *Graves v Arpaio* (Maricopa County, Arizona) and *Carty v Mapp* (US Virgin Islands).

A copy of my current curriculum vitae, which includes a list of all publications authored and a list of all cases in which I have testified at trial or deposition during the past four years is attached to this report as Appendix A.

Compensation

My rate of compensation for this case is $350 per hour for all work, including deposition and testimony at trial.  Travel time is compensated at $100 per hour.

Facts and Data Considered in Forming Opinions

In forming my opinions, I considered information gathered and observations made during site visits at the following prisons on the indicated dates:

- Tutwiler Prison for Women – May 13, 2015

- Bibb Correctional Facility – May 14, 2015

- St. Clair Correctional Facility – May 15, 2015

- Holman Correctional Facility – August 17, 2015

- Fountain Correctional Facility– August 18, 2015

- Donaldson Correctional Facility – September 8-9, 2015

- Kilby Correctional Facility – September 10-11, 2015

- Bullock Correctional Facility – March 14-15, 2016

- Easterling Correctional Facility – March 16, 2016

Site visits consisted of observations of inmate housing units, including segregation; observations of mental health program areas; crisis watch cells; mental health housing

7

units; brief non-confidential cell front conversations with some inmates; individual out-of-cell and interviews with inmates identified from the mental health caseload roster.  I conducted individual interviews with 77 prisoners and spoke with another 25 prisoners very briefly at cell front as permitted by the agreement between the parties.  I reviewed mental health records and logs when they were made available to me.  I observed the medication administration practice at one facility when permitted to do so.  This methodology (document review, site visits, interviews and observations) is the same as that used by other experts in the field to assess correctional mental health care and that I have used in assessing other correctional facilities and systems.

Appendix B contains a complete list of the documents I considered in preparation of this report.  Appendix C contains a name key in which prisoners are assigned a number for purposes of this report in which they will be referred to by number rather than name.

Discovery production was delayed in this case relative to the scheduling order for the submission of expert reports.  If additional documents and/or other data become available to me, I reserve the opportunity to review the new information and modify or supplement my opinions if necessary.

Opinions and Basis and Reasons for Opinions

In forming my opinions, I have relied on my training and experience in general psychiatry, forensic psychiatry and correctional psychiatry:  I have provided psychiatric

care to inmates in jails and prisons and supervised the care provided by other mental

health professionals; I have experience in administration and oversight of correctional

mental health care and I have visited dozens of correctional facilities and interviewed

staff, administrators and hundreds of prisoners and detainees.  I am familiar with the

standards for the delivery of mental health care promulgated by the National

Commission on Correctional Health Care (NCCHC) as well as position statements and

guidelines promulgated by other professional organizations including the American

Psychiatric Association.  I have extensive experience assessing the quality of care in

correctional facilities and systems.


**OPINION 1:  INADEQUATE STAFFING**
Staffing levels are inadequate to provide appropriate mental health care.  MHM staffing
levels are deficient in both quantity and professional credentials.  Custody staffing
numbers are inadequate to provide escort and supervision and effectively prevent
prisoner access to treatment.

In September 2000, the state entered into a Settlement Agreement (*Bradley v Haley*,

Civil Action No 92-A-70-N) for the provision of mental health services to male inmates in

the ADOC.  The Agreement addressed mental health treatment services, size and

location of treatment units, types and numbers of mental health staff assigned to each

level of care, policies and procedures, training and contract oversight and quality

assurance to ensure ongoing quality of care.  The ADOC agreed to provide the

following types and numbers of mental health staff for a male inmate population of

20,619:[1]

- 11 Psychiatrists (nurse practitioners could be substituted for up to 3 psychiatrists)
- 10 Psychologists
- 28 Mental Health Professionals (MHP)
- 3 Registered Nurses (RN)
- 25 Licensed Practical Nurses (LPN)
- 11 Activities Technicians (AT)
- 12.5 Clerical Support positions[2]

These numbers and types of mental health staff were developed to meet the mental

health needs of the male prisoner population.  They included staffing for 40 Stabilization

Unit (SU) beds and 300 Residential Treatment Unit (RTU) beds.[3]  Women's mental

health staffing was not included because *Bradley* addressed only the male prisoner

population.  Notably, it is well recognized in correctional mental health that women

prisoners tend to access and utilize mental health services at a higher rate than men.  In

spite of the passage of time and increases in both the male and female prison

population in Alabama, mental health staffing levels have not kept pace with the

increased size of the incarcerated population and their mental health needs.

In January 2012, ADOC had a contract with MHM for the following positions:[4]

---

[1] ADOC website indicates 22,053 inmates (male and female) in the September 2000 population report.  The reported population of females (867 at Tutwiler, 273 at Montgomery and 294 at Birmingham) have been subtracted from the total to arrive at the male population of 20,619.
[2] *Bradley v. Haley* (Civil Action No 92-A-70-N) Settlement Agreement, August 8, 2000 Agreement of the Experts; p. 12
[3] Id., pp. 7-9
[4] MHM Monthly Report January 2012 (ADOC 043544-043547)

- 6.75 Psychiatrists and 5.45 Clinical Registered Nurse Practitioners (CRNP) = 12.2
- 5 Psychologists
- 41.05 MHP
- 3 RN
- 44.5 LPN
- 9 AT
- 13.2 Clerical support

The overall inmate population had increased, female prisoners were included and residential beds increased to 440 combined SU and RTU beds.

Psychiatrists had decreased while use of mid-level CRNPs had increased since the *Bradley* Settlement.  The number of psychologists had been cut in half so that institutions were left with only part-time psychology coverage.  Registered nurse positions were not increased but the number of LPNs increased substantially.  Mental health professionals also increased substantially.  Mental health professionals, as defined in the *Bradley* Agreement, are  "masters degree psychology associates, masters degree social workers, professional counselors and mental health technicians with extensive training and experience in mental health care."[5]  Note that there is no requirement for licensure or certification for MHPs.  Activity tech positions had decreased, even though more than 100 residential treatment beds were opened.  Activity technicians are generally assigned to provide individual and group programming for inmates in residential units and staffed at a ratio of 1 AT to 30 inmates.    This is a standard ratio used in other correctional systems providing residential care to prisoners.

---

[5] *Bradley v. Haley* (Civil Action No 92-A-70-N) Settlement Agreement, August 8, 2000 Agreement of the Experts; p. 1.

By the following year, January 2013, psychiatrists had been further reduced while mid-level CRNPs had again increased; psychologists had been reduced again as had been LPNs, ATs and Clerical Support staff.[6]  The overall census was only 150 inmates fewer than the previous year.[7] The number of residential beds did not change.[8]  By February 2016, the most recent date that staffing was reported, psychiatrists had been again reduced and CRNPs increased for a total of 12 positions for the population of 24,000 male and female prisoners.[9] The following table depicts these changes in inmate census and MHM staff.  (MHM regional administrative staff have not been included in these numbers because they do not provide consistent direct care to prisoners.  The clerical support in the table refer to persons that work inside the prisons directly with the mental health staff providing care.)

|  | September 2000 | January 2012 | January 2013 | February 2016 |
|---|---|---|---|---|
| Inmate census | 20,619 *men only* | 25,451 | 25,301 | 24,191 |
| Psychiatric provider: | 11 | 12.2 | 11.75 | 11.75 |
| -   Psychiatrist | 8 | 6.75 | 5.5 | 4.95 |
| -   NP | 3 | 5.45 | 6.25 | 7.05 |
| Psychologist | 10 | 5 | 3.25 | 3.5 |
| MHProfessional | 28 | 41.05 | 41.8 | 44.25* |
| RN | 3 | 3 | 3 | 3 |
| LPN | 25 | 44.5 | 38.9 | 39.4 |
| AT | 11 | 9 | 7.5 | 8 |
| Clerical support | 12.5 | 13.2 | 10.4 | 10.95 |

* This number includes 14 "site administrators" who are unlikely to carry a full caseload due to their other administrative responsibilities.

---

[6] MHM Monthly report January 2013 (ADOC 044003-044006)
[7] Inmate census figures were obtained from the ADOC website doc.state.al.us, ADOC link to statistical reports (accessed June 20, 2016)
[8] MHM Monthly report January 2013 (ADOC 044005-044006)
[9] MHM Monthly Report February 2016 (ADOC 0319158-0319162)

The trends are clear.  In spite of an increased census since 2000, plus a system to provide mental health care to both male and female prisoners, and an increase in residential beds to 414 as reported in February 2016 , the staff to inmate-patient ratios have decreased in almost every instance and there are fewer licensed and credentialed mental health providers and an increased use of unlicensed and less educated staff.

In Alabama and elsewhere, CRNPs are considered mid-level practitioners and cannot work independent of a collaborative relationship with a psychiatrist. Dr. Hunter, the Chief Psychiatrist for MHM in Alabama, described the conditions set forth in Alabama law as follows: One physician can serve as the collaborating psychiatrist for up to four CRNPs.  The collaborating physician must spend 10% of the collaboration time for each CRNP on site with the CRNP and review 10% of each CRNP's records.[10]  The documents I reviewed showed no evidence of either of these requirements happening at many ADOC facilities, although it would be the standard of practice to document the collaboration  in some fashion.  This may take the form of a notation in the progress notes of a prisoner's chart or reports of medical record reviews conducted of the nurse practitioner's work.  In fact, some institutions have only CRNP coverage and no psychiatric time.  According to the February 2016 MHM Monthly Operations Report, facilities staffed only with CRNPs  include Easterling, Fountain, Holman, Limestone, St. Clair, Staton (which includes Draper and Elmore), and Ventress.[11]  In ADOC, CRNPs are essentially functioning independently as opposed to in a collaborative relationship.

---

[10] MHM Alabama 1st Quarterly CQI Meeting April 22, 2015 - MHM029592
[11] MHM Monthly Report February 2016 (ADOC 0319160-0319162)

Dr. Hunter, the Chief Psychiatrist for MHM in ADOC, acknowledges there is no difference in the role of the psychiatrist and CRNP except at Kilby and Tutwiler where psychiatrists, rather than CRNPs, do all of the reception mental health evaluations and formulate initial diagnoses.[12]  Later, in the course of incarceration, if a CRNP does a diagnostic assessment, it must be reviewed by their collaborating physician.[13]  If this is actually happening, it was not readily apparent in the records reviewed.  CRNPs now outnumber physicians in the system – no longer being utilized as physician extenders but replacements.   This is highly problematic inasmuch as nurse practitioners are not physicians.  They have less training, knowledge, skill and judgment, which is why they are considered mid-level clinicians and are required by law to have a collaborative relationship with a physician.  This is not to say that many nurse practitioners are not skilled and caring individuals but they do require review and oversight.  Without that review and oversight there is heightened risk that diagnoses are inaccurate or missed and medication management clinically unsound.  This leads to delays in care, worsening of symptoms and needless suffering by prisoners.  Dr. Hunter appears to have some recognition of this as he assigns physicians to the reception process to make diagnoses and initiate medication treatment and also tries to assign them to the residential treatment units for the treatment of serious mental illnesses.[14]

The number of psychologists, licensed independent mental health practitioners, has been reduced to the point where their ability to provide services to inmates in the system is so limited as to be virtually non-existent.  There are 15 major prisons.  A

---

[12] Deposition of Dr. Robert Hunter taken April 21, 2016 (274:15-16)
[13] Id. (275:3-8)
[14] Deposition of Dr. Robert Hunter taken April 21, 2016 (93:14 – 95:15)

single psychologist certainly cannot cover 5 institutions located far and wide across the state.  There is no capacity to provide regular, on-going and meaningful treatment to a caseload of inmates and/or provide consultation and assistance with diagnostic formulations with so few psychologist positions.

The number of ATs has also been reduced dramatically.  The *Bradley* staffing ratios included 1 AT for every 30 inmates in residential level of care; the same staffing ratio used in other correctional systems, including Ohio and Massachusetts.  However, in spite of operating up to 414 beds which would require at least 13.8 Activity Techs, MHM provides only 8.  The ratio has increased to 1 AT for every 52 inmates.  However, the deficit is even more striking when individual institutions are compared:  Tutwiler has 2 ATs for a 30 bed RTU, but Donaldson has only 2 ATs for 96 beds (ratio of 1 AT for 48 inmates) and Bullock has only 4 ATs for 250 beds, or 1:63.[15] These deficits impact both the number and types of group and individual programming that can be provided and the number of inmates that can participate.

The MHP classification consists of several different types of staff with varying degrees of education and training.  Licensure is not required.   This has implications for what the MHP is able to do and provide.  For example, in the community, a person with a master's degree in psychology cannot be licensed to work independently, a licensed psychologist must supervise their work.  MHM does not require this type of oversight or supervision.  Some of the MHM MHPs are licensed social workers, but neither MHM nor

_____

[15] MHM February 2016 monthly report (ADOC0319155)

ADOC requires licensure.  Unlicensed staff could not provide mental health care to people outside of prison independent of supervision by a licensed provider and are unqualified to do so in prison.   The use of unlicensed mental health staff to provide psychotherapy to inmates does not meet the standard of care.  Unlicensed staff do not have the requisite degree of training or recognized skill set to provide treatment without supervision.  This can lead to use of the incorrect or improper treatment techniques and/or failure to recognize signs and symptoms of serious mental illness increasing the risk of harm by delaying treatment and causing needless suffering.   Untreated or unrecognized mental illness can result in suicide or other serious self-harm.

The system continues to rely almost exclusively on licensed practical nurses rather than registered nurses.  LPNs must work under the supervision of a RN.  However, there are only 3 RNs in the system, one each at Tutwiler, Donaldson and Bullock.  The RNs work the day shift.  These three institutions have residential mental health units and LPNs working without oversight or supervision evenings, nights and weekends.  Further, all of the other sites do not have an RN for mental health on site – ever.  The overwhelming majority of the LPNs are assigned to prisons that do not have residential mental health units and have no RN direction/supervision or oversight. LPNs are being utilized to complete tasks that they are not qualified to perform – the most glaring example is their gatekeeper role in the reception process.

The Alabama Nurse Practice Act, Article I, 34-21.1 clearly makes a distinction between the types of activities LPNs are permitted to do and the types of activities a Registered Nurse is permitted to do.  Relevant portions of the code follow (emphasis added).

16

*Practice of Practical Nursing. (LPN)*

*The performance, for compensation, of acts designed to promote and maintain health, prevent illness and injury and provide care utilizing standardized procedures and the nursing process, including administering medications and treatments, under the direction of a licensed professional nurse or a licensed or otherwise legally authorized physician or dentist. Such practice requires basic knowledge of the biological, physical, and behavioral sciences and of nursing skills* ***but does not require the substantial specialized skill, independent judgment, and knowledge required in the practice of professional nursing.*** *Additional acts requiring appropriate education and training may be performed under emergency or other conditions which are recognized by the nursing and medical professions as proper to be performed by a licensed practical nurse.*

*Practice of Professional Nursing. (RN)*

*The performance, for compensation, of any act in the care and counselling of persons or in the promotion and maintenance of health and prevention of illness and injury based upon the nursing process which includes* ***systematic data gathering, assessment, appropriate nursing judgment and evaluation of human responses to actual or potential health problems through such services as case finding, health teaching, health counselling;*** *and provision of care supportive to or restorative of life and well-being, and executing medical regimens including administering medications and treatments prescribed by a licensed or otherwise legally authorized physician or dentist. A nursing regimen shall be consistent with and shall not vary any existing medical regimen. Additional acts requiring appropriate education and training designed to maintain access to a level of health care for the consumer may be performed under emergency or other conditions which are recognized by the nursing and medical professions as proper to be performed by a registered nurse.*

MHM is assigning LPNs to do tasks that should be done by RNs.  LPNs do not have the requisite degree of education or training to work independent of RN direction.  They cannot make diagnoses and should not be used for the critical reception screening process.  Failure to recognize signs and symptoms of mental illness results in delays or

failure to provide treatment.  This can increase the risk of psychological suffering.  Untreated serious mental illness can result in suicide, self-harm and other behaviors putting other prisoners and staff at risk of harm.

The trend is for use of less educated and lower credentialed staff:  CRNPs instead of psychiatrists, LPNs instead of RNs, unlicensed MHPs instead of master's prepared social workers and counselors recognized by virtue of licensure to provide mental health care.  MHM psychologists have been all but eliminated and AT caseloads are almost double the long-recommended staffing ratios and profoundly impact treatment.

ADOC has some psychological associates but they do not provide treatment services to inmates with serious mental illness.  They do a sort of reception screening, described in the identification section that follows, but are not providing on-going care.  They respond to prisoner crises and make referrals to MHM.  At various times in the past, there was some agreement that ADOC psychological associates would assume responsibility for care of some prisoners when their mental health classification was reduced to MH1 – although ADOC does not have psychiatrists (or CRNPs) to continue medication management, so inmates on medications cannot be turned over to ADOC completely.  Furthermore, the agreement was never fully implemented at all institutions and appears to have been essentially abandoned at the current time.  The psychological associates do not provide on-going care or follow-up to prisoners on the mental health caseload.  They are responsible for inmates assigned MH-0 but by definition, these are inmates who have no identified mental health condition or need for services.  So, essentially,

ADOC psychological associates play some role in the correctional reception process, but it appears more related to security or institutional assignment than the provision of treatment.  ADOC psychological associates do not assign the mental health classification code.

That mental health staffing levels are inadequate does not appear to be in dispute, even by MHM.  The Program Director for Alabama, Teresa Houser, acknowledged in deposition testimony that many institutions did not have enough mental health staff. Institutions included Bullock, Tutwiler, Easterling, Limestone and Kilby.[16] Ms. Houser further acknowledged that the Draper, Staton, Elmore complex and Bibb "could benefit from more time for a provider, either nurse practitioner or psychiatrist."[17] The MHM Psychiatric Director, Dr. Robert Hunter also testified in deposition that the caseload was increasing and inmates were more acutely ill which was "starting to tax our ability to adequately do what we do."[18]

At a time when there are increasing numbers of inmates with mental illness, and more acute illness, the anticipated direction would be to increase not only the numbers of staff but also the qualifications of staff to be able to deal with these challenges.  Instead, the trend over time has been the opposite: fewer psychiatrists with replacement by mid-level clinical registered nurse practitioners; fewer licensed psychologists; no increase in

---

[16] Deposition of Teresa Houser taken April 22, 2016 (34:11–37:15)
[17] Deposition of Teresa Houser taken April 22, 2016 (41:1-5; 37:22–39:22)
[18] Deposition of Dr. Robert Hunter (44:4-13; 49:13-23)

RNs to provide direction and oversight to increasing numbers of LPNs; fewer ATs and less clerical support.

Mental health staff shortages combined with reliance on less credentialed, unlicensed staff has a profound impact on the identification and treatment of prisoners with mental illness as will be discussed in the sections that follow.  Inmates are not identified timely, access to care is delayed by overwhelmingly large caseloads, individual psychotherapy is non-existent, group therapy and programming are minimal.  Staff remain in crisis response mode and cannot provide on-going, much less preventative, care.  Follow-up is minimal.

ADOC correctional officer shortages also impact mental health treatment.  COs are used to provide prisoner supervision and maintain order and safety.  COs are needed to release inmates from their cells and/or housing units for appointments, provide escort and supervision for clinics and group treatment and programming activities.  Given the security staffing shortages in the ADOC, COs are unable to perform these necessary functions for the provision of mental health care.  Consequently, prisoners do not have access to mental health care.

In the ADOC, inmates in segregation are not regularly monitored.  At Bibb, I saw evidence of fire setting and destruction in the segregation units — COs are located in the larger dormitories, but not available to adequately monitor prisoners in the small segregation housing units in each building.  At Bullock, mental health staff cannot

provide treatment because there are insufficient officers to get inmates out of their cells

in the Stabilization Unit and supervise them during group activities.  Consequently,

prisoners with mental illness at Bullock, housed in an "intensive" level of care, do not get

out of their cells.  Prisoners with serious mental illness in the RTU at Donaldson cannot

come out of their cells to access the very care they have been sent there to receive.

This has been a consistent audit finding and complaint from MHM for years – and yet,

the problem continues.[19]   Inmates are locked down and not receiving treatment due to

CO staffing shortages.

The consequences of mental health and correctional officer staffing shortages are that

inmates with serious mental illness do not receive adequate mental health care.

**OPINION 2:  INADEQUATE IDENTIFICATION & CLASSIFICATION PROCESS**

The mental health screening process for identification and classification of prisoners
with serious mental illness is inadequate.  Many prisoners with mental illness are not
identified and consequently receive no treatment whatsoever. Others receive only
psychotropic medication rather than more comprehensive care that addresses their
clinical condition and needs.

There are three basic ways in which prisoners are able to access mental health care in

correctional facilities:  they are identified at the time of reception into the prison system;

they may ask for mental health care (self-referral) or be referred to mental health by

other prison staff (staff referral) at any time during their incarceration.  In ADOC, there

are problems with each of these mechanisms to access mental health care.

---

[19] Clinical Contract Compliance Review Report March 2015 (MHM041821-041851);
Clinical Contract Compliance Review Report February 2016 (MHM040590-040606)

*Reception Screening Process*

The identification process begins at the time of entry into the prison system – at Tutwiler

for women and at Kilby for nearly all men.  There appears to be two parallel processes

at the time of reception – one operated by ADOC and the other by MHM.  ADOC

psychology staff conduct reception mental health evaluations that consist of an

interview and documentation of it on a 4-page "Psychological Evaluation" form followed

by the administration of three tests:  intelligence screening (BETA); educational

evaluation (WRAT) and a personality inventory (MMPI-II).  This information does not

appear to be utilized later in the psychiatric assessment of the inmate or treatment

planning.  ADOC psychology staff do not assign the inmate a mental health code.  They

may refer the inmate to MHM for a psychiatric assessment if they believe one is

necessary but MHM also has its own reception screening process occurring on a

parallel track.

An MHM LPN screens all inmates entering the ADOC for mental health history and

psychotropic medication prescription. The LPN then determines which inmates to refer

on to the psychiatrist for a comprehensive psychiatric examination.  This is an improper

function for an LPN, as it requires a higher level of specialized assessment skill,

diagnostic knowledge and the exercise of independent judgment for which LPNs are not

trained and generally do not possess.  The task of mental health screening and referral

is more often conducted by RNs or master's prepared mental health professionals in

other systems.  MHM's use of LPNs for this task accounts for some of the under-

identification problem, but other factors contribute as well.

MHM consistently reports lower prevalence rates of mental illness in ADOC prisons

than prevalence rates reported in other prisons and prison systems throughout the

United States.  The October 2014 monthly report produced by MHM reported that

13.1% of the ADOC inmate population was on the mental health caseload; 9.5% of the

ADOC inmate population was prescribed psychotropic medication.[20] Dr. Woodley,

MHM's Clinical Director, reported the same prevalence rates at the Statewide CQI

Quarterly Meeting held January 28, 2015.[21] The February 2016 monthly report indicated

14.2% of the inmate population was on the mental health caseload and 9.7% of the

population was prescribed psychotropic medication.  These numbers do not vary

significantly over the time of the MHM contracts.

Other states and research studies indicate the rates are actually much higher.  The

Bureau of Justice Statistics Special Report on Mental Health Problems of Prison and

Jail Inmates found 73% of female prison inmates and 55% of male prison inmates

reported mental health problems.[22]  (Mental health problems were defined as recent

history or symptoms in the previous 12 months – history included a clinical diagnosis or

treatment and symptoms were based on diagnostic criteria.)  Furthermore, 43% of state

prisoners reported symptoms that met the criteria for mania; 23% reported symptoms of

major depression and an estimated 15% reported symptoms that met the criteria for a

psychotic disorder.  A more recent report by the Treatment Advocacy Center published

---

[20] MHM Monthly Report October 2014 (ADOC 044517)
[21] MHM Statewide CQI Quarterly Meeting Minutes, January 28, 2015 (MHM029615)
[22] Available online through the US Department of Justice, Office of Justice Programs, report dated September 2006; NCJ 213600

in 2014, reported 15% of inmates in state prisons have serious mental illness.[23] Serious

mental illnesses include diagnoses such as schizophrenia, schizoaffective disorder,

bipolar disorder, major depression and other disorders with symptoms of psychosis.

MHM training materials appear to recognize that 14.5% of male admissions and 31% of

admissions to jails have serious mental illness.[24] However, for prison, MHM trains that

10-15% of inmates have mental illnesses but "not all . . . are considered serious mental

illnesses."[25]   No references are cited in the MHM training materials and there is simply

no reason to believe that prevalence rates of mental illness and serious mental illness in

ADOC would be any different than rates found in studies and reported in other states.

(In fact, there is reason to believe that ADOC prevalence rates are higher than that

found in other state correctional facilities due to the status of the community treatment

system in Alabama when compared with that in other states.)  My own observations in

states that include Ohio, Massachusetts, Pennsylvania, California and Indiana, among

others, suggest that the prevalence of mental illness in state prisons is approximately

25-30% of male inmates with 10-15% of the male population having a serious mental

illness.  Female prisoners have higher rates: as many as 80% of women are on the

mental health caseload in most systems I have observed and 30% of the female inmate

population are seriously mentally ill.

---

[23] Torry EF, Zdanowicz MT, Kennard AD et al.  The treatment of persons with mental illness in prisons and jails: a state survey.  Arlington VA, Treatment Advocacy Center, April 8, 2014.

[24] MHM Training Materials (MHM 041301-041311)

[25] MHM 041302

The identification and classification processes in Alabama are flawed and do not accurately or timely identify inmates with serious mental illness and in need of treatment. The prevalence numbers speak for themselves.  The screening and identification process is ineffective in identifying inmates with serious mental illness, treatment is withheld or delayed and prisoners suffer needlessly.

[Question from the court: Are there examples of prisoners who have not been timely or accurately screened?]

*Mental health classification system*

ADOC defines serious mental illness in Administrative Regulation 602 as follows:

A substantial disorder of thought, mood, perception, orientation or memory such as those that meet the DSM IV criteria for Axis I disorders:  schizophrenia, schizoaffective disorder, psychotic disorders due to substance abuse or general medical condition, major depression, bipolar disorder, and organic conditions resulting in significant and debilitating psychotic symptoms or cognitive impairment; persistent  and disabling Axis II personality disorders.  A serious mental illness significantly impairs judgment, behavior and the capacity to recognize reality or cope with the ordinary demands of life within the prison environment and is manifested by substantial pain or disability. Serious mental illness requires a mental health diagnosis, prognosis and treatment, as appropriate, by mental health staff.

This is consistent with definitions used in other states and systems.  However, in ADOC, inmates are not classified or tracked as to whether or not they have a serious mental illness.  Inmates are assigned a mental health code or classification on a scale of MH-0 to MH-6 as follows:

MH-0: No identified need for mental health assistance.

MH-1: Stabilized with mild impairment in mental functioning.  Placement in general population, segregation.
(Some subcategories have been added to this classification MH-1a, MH-1b and MH- 1c that are related to whether or not the prisoner is prescribed psychotropic medications and how long he or she has been taking them.)

MH-2: Not stabilized with mild impairment in mental functioning.  Placement in general population, segregation.

MH-3: Moderate impairment such as difficulty in social situations and/or poor behavioral control.  Placement in RTU – open dorm.

MH-4: Severe impairment and suicide ideation and/or poor reality testing.  Placement in RTU – closed dorm.  (Celled environment)

MH-5: Severe impairment such as hallucinations and delusions or inability to function in most areas of daily living.  Placement in Stabilization Unit (SU)

MH-6: Severe debilitating symptoms/persistent danger to self or others, recurrent violence, inability to maintain minimal personal hygiene, or gross impairment in communication. State Commitment or hospital services.


The ADOC mental health coding or classification system is flawed and does not correlate with the definition of serious mental illness.  The ADOC mental health codes classify prisoners by their presumed housing needs (outpatient or residential treatment – dormitory or cell) as opposed to whether or not they have serious mental illness.  This has direct bearing on the number of professional staff required to care for inmates with serious mental illness.  This coding system does not permit that calculation.


Furthermore, multiple instances of inappropriate classification were found during the tours and review of records.  Prisoner #24 (incarcerated 25 years, prescribed two antipsychotic medications for diagnosis of delusional disorder, rule-out schizophrenia) is

classified as MH-1. It is not clear what additional information might be required after 25 years to either rule-in or finally rule-out schizophrenia, but being on two antipsychotic medications implies some very refractory psychotic symptoms. Prisoner #26 has been in the Donaldson RTU twice, is prescribed three antipsychotics and two antidepressants, and frequently is on mental health watch. Prisoner #26 is classified as MH-1, though inpatient care should be considered if he requires this number of medications and is experiencing no symptomatic relief.  Prisoner #85 spent 8 years in the Kilby mental health unit but was released to the main camp at Bullock with continued auditory hallucinations and a MH-1 classification.  With continued symptoms and functional impairment, he needs a higher level of mental health care. These are just a few examples of the many instances of misclassification I saw.

*Inmate and staff referrals for mental health care*

Inmates may submit a written request to mental health for services or verbally request that custody staff call MHM in the event of an emergency.  I found many instances in which MHM was unresponsive to prisoner self-referrals.  Written referrals do not receive a timely response. Untimely and inadequate responses lead inmates to engage in increasingly desperate acts to get the attention of MHM staff and necessary services. Such acts include infliction of self-injury, property damage, fire setting and suicide attempts.  Ironically, these behaviors often result in disciplinary action and placement in segregation where mental health treatment is even more difficult to access.   Case examples include: Prisoner #20 (multiple instances of placement in segregation, serious self-injury, placement on watch and no mental health care following watch

discontinuation); Prisoner #29 (has received disciplinary tickets for creating a "security, safety or health hazard" when he injured himself seeking mental health attention); Prisoner #32 (documentation indicates he has bipolar disorder which is untreated and leading to behavioral problems; he was not listed in the MHM caseload list and housed in segregation in spite of the recognition that his untreated illness was the cause of his negative behaviors); Prisoner #35 (set his cell on fire and cut himself in segregation; steri-strips were placed on his cuts and he was returned to segregation); and Prisoner #74 (reported that in the RTU, it took about 3 weeks to be seen in response to putting in a written request; to be seen sooner, he said he would either ask a "nice" CO to call mental health for him or hurt himself for a more rapid response); Prisoner #99 (spent four months in segregation and reportedly set his cell on fire while on suicide watch; has never seen his MHP privately but sees the CRNP once a month; this is not an adequate level of mental health care).

MHM self-audits referral response times as recorded in a log.  They report problems with the logs not recording referral urgency and blanks that don't permit calculations of response times.  Audits conducted by the MHM Corporate Team in 2012 found problems at Fountain (no documentation regarding the date that each referral was received, person responsible for follow-up and disposition)[26]; Tutwiler (blanks on log and responses within 5 days of receipt only 71-72% of the time in April and May 2012)[27]; Donaldson (referral response timely 66%, 50%, 100% of the time for months of

---

[26] MHM 031528
[27] MHM 031549

October, November and December 2012)[28].  In 2014, the MHM corporate team audited

Kilby and noted similar findings.[29] The audit results reported do not indicate whether the

referrals were generated by staff or inmate self-referrals.


Inadequate and untimely responses to referrals also contribute to the under-recognition

of prisoners with serious mental illness and lead to worsening of conditions and

needless suffering.


*Removal from the mental health caseload*

Another factor that contributes to the very low prevalence rate of inmates with mental

illness reported by MHM is that MHM actively removes inmates from the mental health

caseload in an effort to "manage" the population.  This practice is referenced in

institutional multidisciplinary meetings as well as state-wide MHM meetings.  Ostensibly,

such inmates are then referred back to the ADOC psychology staff for continued follow-

up and care and can be referred back to MHM if necessary.  There are no statistics

reported for how often this might happen.  Ordinarily, changes in prisoner classification,

admissions and discharges from the mental health caseload would be tracked to

determine whether there were any trends and patterns from which conclusions could be

drawn about the size of the caseload, the number and types of services required and

adequacy of staffing levels, the effectiveness of treatment and whether any changes in

policies or procedures were necessary.   In my assessment of the ADOC and MHM, I

found no evidence of such a tracking mechanism.  The lack of such a mechanism

---

[28] MHM 031601
[29] MHM 031618

impairs the ability to identify and correct problems with practices or procedures and

identify staffing needs.

Inmates with serious mental illness are not identified at the front door; requests are not

responded to timely; and inmates are removed from the caseload without regard to

whether or not they have a serious mental illness.

**OPINION 3:  INADEQUATE TREATMENT**

Mental health treatment is inadequate to meet the needs of the prisoner population with
serious mental illness.  Residential and stabilization unit treatment beds are
underutilized but also provide little treatment beyond psychotropic medication due to
staffing level shortages of both treatment and custody staff.  Individual contacts with
mental health staff are brief, infrequent and often not conducted in confidential settings.
There is little group treatment in mental health treatment units and even less in
outpatient settings. As a consequence, prisoners with untreated and undertreated
serious mental illness are over-represented in the segregation population – essentially
punished for manifestations of serious mental illness.

Inmates with serious mental illness must be provided a level of mental health care that

meets their needs.  This requires a continuum of services ranging from outpatient care,

through residential care (RTU, SU) to inpatient care.  Inpatient care is a psychiatric

hospital level of care and is not provided by ADOC, but rather through transfer to a state

psychiatric hospital (Taylor Hardin).  According to MHM Chief Psychiatrist, Dr. Hunter,

inpatient psychiatric care is rarely sought except as an inmate nears prison release.[30]

The rationale for this infrequent access is not clear.  I found many inmates on the tours

that clearly required a higher level of care than could be provided in ADOC facilities

---

[30] Deposition of Dr. Robert Hunter (267:23 – 268:11)

where they could not participate in treatment activities due to having insufficient security staff available, and insufficient MHM staffing to provide intensive psychiatric treatment, psychiatric nurses or technicians.

There are two levels of intermediate care in ADOC – Intensive Psychiatric Stabilization Unit (SU) and Residential Treatment Unit (RTU) care.  The requirements for housing, treatment (group and individual counseling, psycho-education, activities), treatment planning, programming and the frequency of contacts and charting by psychiatrists, mental health nurses, treatment coordinators and activity technicians are articulated in Administrative Regulations 632: Intensive Psychiatric Stabilization Unit and 633: Residential Treatment Unit.[31] Placement in SU is for prisoners "experiencing severe impairment such as hallucinations and delusions or inability to function in most areas of daily living."  Treatment interventions are supposed to be provided daily with the intention of rapid stabilization and a short stay with prisoners typically discharged to an RTU for continuing treatment.  There are SU beds at Tutwiler for female inmates and SU beds at Donaldson and Bullock for male inmates.  SU beds are underutilized.  The Bullock SU beds are often used to house segregation inmates in addition to inmates needing an intensive level of care.  It is not acceptable to mix these populations.  The SU inmates with mental illness are the most vulnerable and subject to be preyed upon by segregation inmates.  There are serious management issues as well in terms of required security staffing levels to permit inmates out of cell time, escort them to treatment opportunities, supervision and monitoring, particularly inmates on watch

---

[31] ADOC 000185-000217 contains both Administrative Regulations

status as a result of their mental illness.  Treatment access is seriously compromised, inmates remain locked in their cells and suffer needlessly.  MHM meeting minutes and audits continue to identify the placement of non-mentally ill inmates in SU beds as problematic.[32]  Although the Administrative Regulation (AR) expressly prohibits housing of inmates that have not been admitted to the SU on the unit absent "emergency security concerns" the practice continues.  The AR also dictates correctional officer coverage sufficient to permit active treatment from 8 AM until 4 PM Monday through Friday and out-of-cell time from 8 AM until 8 PM daily.  This is simply not happening; there is insufficient correctional officer coverage and consequently treatment interventions are not provided daily as required.  This is reflected in the charts reviewed as well as the MHM meeting minutes and audits previously mentioned.  Psychotropic medication management is virtually the only treatment intervention provided.

The RTU level of care is intended to provide a safe housing environment for inmates requiring more intensive treatment than that which can be provided on an outpatient basis.  Treatment interventions are to progress from brief interactions with the psychiatrist, nurse and treatment coordinator at the cell front to multiple treatment groups per week, daily activity or education groups and a job assignment.  The eventual goal for the majority of inmates in RTU level of care is to transition back to general population housing and outpatient care. There are RTU beds for male inmates at Bullock and Donaldson and at Tutwiler for females.  Bullock RTU space is also used to house non-RTU inmates at times and at Donaldson, groups are not conducted as

---

[32] MHM Alabama 3rd Quarterly CQI Meeting November 6, 2013 (MHM029570); Deposition of Dr. Robert Hunter (159:16-21); MHM Clinical Contract Compliance Review Reports from 2015 (MHM041821-041851) and 2016 (MHM040590-040606)

scheduled due to correctional officer coverage shortages.[33] Psychotropic medication

management is the main treatment intervention provided. It is well established both

inside and outside of prison, that mental health treatment is more than psychotropic

medication.  Some mental health conditions do not require treatment with medication at

all; other conditions require medication but improve to a greater extent when treatment

with medication is combined with other treatment modalities including group and

individual psychotherapy.   At Donaldson, inmates report that they are locked in their

cells with minimal opportunity to participate in treatment interventions.  At Bullock,

inmates are in dormitory-style housing and so have some opportunity for social

interaction with one another but do not receive other forms of treatment.  As previously

noted, the lack of sufficient numbers of AT staff precludes their ability to provide

sufficient programming to prisoners in either group or individual interactions.  There are

too few mental health treatment groups offered to permit participation by the sheer

number of inmates in the Bullock RTU.  Further, during the tour, I learned of an incident

in which an officer physically struck a prisoner in a wheelchair on the day of the visit.

Such events are not rare, according to inmates in the Bullock RTU.  These

environments are not therapeutic. Again, for men, the only treatment intervention

consistently available is psychotropic medication.

[Question from the court: Are there examples of prisoners who have been denied treatment
other than psychotropic medication?]

The RTU at Tutwiler, in contrast, offers daily group treatment and activities to the

women housed there.  Staff at Tutwiler also met with inmates on the lower program

levels of the RTU as well as inmates on watch in confidential office space, rather than at

---

[33] MHM Clinical Contract Compliance Review Reports from 2015 (MHM041821-041851)
and 2016 (MHM040590-040606)

the cell front (which is not confidential).  Psychiatrist contacts were also conducted in private and at the frequency dictated by the Administrative Regulation.  The operation of the unit did not appear to be plagued by correctional officer shortages.  Multiple programming opportunities were provided, mostly by the AT staff rather than mental health treatment groups but the women observed participating in group treatment appeared attentive and engaged in the process during the site visit.  There are two ATs assigned to this 30-bed RTU, which explains why activities programming is able to occur daily.  Treatment plans and interventions require improvement to ensure care is individualized and based on inmate need rather than having all prisoners participate in the same groups daily, but by way of comparison to the RTU operations for the male inmates, Tutwiler represents a much better and more therapeutic environment.  The Tutwiler RTU should be utilized to its full bed capacity.

MHM monthly reports repeatedly demonstrate under-utilization of SU and RTU bed space.  The most recent MHM monthly report produced (February 2016) showed only 79% of the male RTU beds and 57% of the Tutwiler beds filled at the end of the month.  There were only 9 inmates in the 30-bed Bullock SU and no women in the 8-bed Tutwiler SU.  This is a consistent finding and related to a trend of understating the degree of mental illness and functional impairment suffered by prisoners in ADOC.  Inmates requiring an RTU level of care but improperly classified as outpatients include: Prisoner #15 (seriously mentally ill inmate with side effects from medication and still experiencing symptoms that negatively impact functioning leading to placement on watch in infirmary but not considered for transfer to higher level of care); Prisoner #19 (presented with garbled, mumbling speech and appeared to have an intellectual

34

disability in addition to serious mental illness but kept at St. Clair); Prisoner #11

(repeatedly housed in segregation; very low functioning transferred to the Bullock RTU

after our visit with him at Bibb where he was interviewed again as Prisoner #72. He

remained grandiose and paranoid at that time); and Prisoner #34 (had been previously

in the RTUs at Donaldson and Bullock; but housed at Fountain during the tour).

Prisoner #34 displayed prominent negative symptoms of schizophrenia and received no

treatment except medication.  He clearly needed a higher level of mental health care

than that provided at Fountain.


The requirements for Outpatient Services are located in Administrative Regulation

623.[34]  Individual counseling is to occur no less than once a month, psychiatrist

appointments no less than every 90 days and support and/or psycho-educational

groups regarding medication compliance and adjustment issues are also to be provided.

Review of charts and inmate interviews demonstrated that again, virtually the only

treatment being provided is psychotropic medication.  Encounters with assigned MHPs

are brief (10-20 minutes), infrequent, and often not confidential with other MHM staff in

the room.  A ten- or twenty-minute conversation that occurs monthly or less often is not

individual psychotherapy, counseling or actual treatment.  The infrequency and duration

of these contacts was reported by the inmates interviewed during the tours and

acknowledged by MHM staff in deposition testimony.[35]

---

[34] ADOC 000132-000137
[35] Deposition of Sharon Trimble taken February 4, 2016 (38:15-39:22); deposition of
LaSandra Buchanant taken February 19, 2016 (42:17-45:20); deposition of Lesleigh
Dodd taken February 18, 2016 (65:1-65:15)

Group treatment for outpatients is seriously lacking.  This is recognized and acknowledged by MHM in their own most recent Clinical Contract Compliance Review Report.  Only 1-4 groups were offered weekly at Bullock, Holman and Limestone for outpatient caseload sizes of 305, 80 and 290 prisoners respectively.  No outpatient groups were being conducted at Staton, St. Clair and Donaldson for 682 prisoners reported on the outpatient mental health caseload.[36]  Nominally, I would expect to see group treatment interventions for prisoners with depression, post traumatic stress disorder, anxiety and schizophrenia and prisoners would be offered these interventions based upon their individualized assessment of mental health needs.

Outpatient treatment for inmates housed in segregation units is even more deficient. Prisoners housed in segregation receive medications and brief cell front contacts by MHPs and LPNs.  There is no mental health therapy or group treatment for inmates in segregation as reflected in the medical records reviewed, prisoner interviews and various MHM reports.  Although there is increasing recognition of the harmfulness of segregation particularly for inmates with serious mental illness both in the larger corrections profession as well as ADOC, there have been no changes to the operation or use of segregation to house inmates with serious mental illness in Alabama.  In fact, inmates with mental illness are over-represented in ADOC segregation housing.  This factor, combined with underutilization of the SU and RTU beds, leads to the conclusion that inmates with mental illness are being diverted to segregation for behaviors related

---

[36] MHM Clinical Contract Compliance Review Report February 2016 (MHM040597); MHM Monthly Report February 2016 (ADOC 0319153)

to untreated or undertreated mental illness rather than being placed or maintained in more intensive mental health treatment settings.

Medical record reviews and inmate interviews do not reflect adequate treatment planning or interventions.  Therapeutic programs and counseling are inadequate. Caseload sizes do not permit more than the minimum required contacts --- and these are brief, often not conducted in confidential settings and so infrequent that they simply cannot be called psychotherapy.[37]

Group treatment interventions are lacking in both outpatient settings due to insufficient numbers of treatment staff and overwhelmingly large caseload sizes.  In male residential settings, group treatment interventions are lacking as a result of insufficient numbers of both mental health treatment staff and the shortage of security staff to provide escort and inmate supervision.

There is an over-reliance on psychotropic medication as being the only treatment intervention that is consistently available.  However, even that is compromised by inadequate staffing ratios, vacancies and insufficient oversight of mid-level practitioners. Chart reviews and audit findings demonstrate follow-up appointments are infrequent, brief and frequently not conducted in a confidential area as I observed during site visits and in records reviewed. The medication formulary itself contains rather limited choices of antipsychotic and antidepressant medications but access to non-formulary

---

[37] Deposition of Dr. Robert Hunter (44:12-19, 46:3 – 47:6)

medications appears to be a fairly simple and straightforward process and requests are overwhelmingly approved.[38]  In spite of this, there appears to be an over-reliance on long-acting haloperidol (Haldol) and fluphenazine (Prolixin) injections.  These particular medications, and others like them, impact normal movement and can cause severe restlessness (akathisia) and painful muscle spasms (acute dystonic reaction) and also lead to permanent, irreversible movement disorders that include tremor, involuntary movements of the tongue and mouth (tardive dyskinesia) and Parkinsonism.  Many of the inmates interviewed displayed these types of movement disorders, but their prescriptions were continued rather than changed to medications less likely to cause these problems.  Prisoners experiencing uncomfortable, physically incapacitating and perhaps permanent side effects from these medications include: Prisoner #10 (He is receiving two side effect medications to combat the negative effects of Prolixin injections, rather than being prescribed a different medication.  Further, even when a progress note dated 9/12/13 (MR003180) clearly documented that he did not want the injection, just the prescribed pill medication, the injection was administered anyway.); Prisoner #5 (She did well on Abilify in the county jail but this was changed without explanation to Haldol and then Prolixin.  She experienced extreme sedation and a shuffling gate.  The medication was stopped and she is reluctant to try any other medication.  She is on no medication in spite of on-going auditory hallucinations to which she responds verbally at times and may have been present during her multiple murder offense.); Prisoner #21 (involuntary mouth movements); Prisoner #22

---

[38] Deposition of psychiatrist, Dr. Glodys St-Phard taken February 11, 2016 (71:22–73:5, 76:12-18, 78:12–79:15); Deposition of Dr. Robert Hunter taken April 21, 2016 (285:13-21, 288:15-17)

(involuntary tongue movements); Prisoner #37 (remarkable bradykinesia – extremely slow movement); and Prisoner # 53 (experiencing marked akathesia manifested by nearly continuous fidgeting, shuffling feet and moving legs while seated).

There are some additional clinical concerns about the use of these injectable medications: it takes 6 weeks to 3 months after a dosage adjustment to see a response to the adjustment because they are so long-acting.  Using them to make dose adjustments is therefore impractical when the adjustment is made in response to worsening symptoms or when a dose reduction is necessary to reduce or eliminate side effects.  Dosage adjustments are most often made with oral medications for this reason in other systems, but this is not the case in ADOC.  Furthermore, inmates consistently reported being subjected to being threatened with forcible medication injections if they refused either oral medications or a scheduled injection; and some said they had actually been subjected to the use of force to be given an injection of a refused medication. Prisoners that reported having experienced this included: Prisoner #6 (RTU level dropped when she refused her injection); Prisoner #7 (reports being told if she refused the injection she would be locked up, and, when she complained of side effects, she was told the dosage would not be lowered); and Prisoner #33 (reports he was put into a safe cell and given a shot of medication).  Other inmates also reported these types of verbal threats and physical administration of medication they refused.

ADOC has both a provision for the administration of medication in an emergency situation as well as a procedure to over-ride inmate refusal of medication in non-emergency situations.  Long-acting antipsychotic medications would not be used in an

emergency situation for the reason described above – they are long-acting and it takes a relatively long time for them to begin to work after the injection.  The non-emergency involuntary medication procedure is supposedly modeled after the 1990 United States Supreme Court decision in *Washington v Harper* [39] in which the Court upheld the Washington state prison policy permitting involuntary medication that articulated a process conferring a number of rights to inmates before medication could be authorized: the right to a hearing on the issue; the right to notice of the hearing; the right to attend the hearing, present evidence and cross-examine witnesses; the right to representation by a lay advisor; the right to appeal the decision; and the right to periodic review of on-going administration of involuntary medication. Chart reviews and inmate interviews identified a number of problems with MHM's implementation of the ADOC policy that purports to be modeled after the Washington policy.  In ADOC, inmates do not always receive notice of the involuntary medication process, there are lapses of time between periodic reviews when medication is still administered but the order is no longer in effect, and the "hearing" itself does not appear to require the presence or testimony of the psychiatrist or CRNP actually requesting to over-ride the inmate's refusal. Consequently, the prisoner does not have the opportunity to cross-examine witnesses. Dr. Hunter chairs the three-person panel making the decision but the "hearing" is primarily a paper review of the request, and perhaps the medical record and some questions posed to the inmate.[40] In at least one case reviewed, the panel actually authorized involuntary treatment with medications that were different from the medications requested by the treating prescriber.

---

[39] *Washington v Harper* 494 US 210 (1990)
[40] Dr. Robert Hunter deposition testimony

The ADOC process as currently implemented by MHM also causes unnecessary delays in treatment.  Inmates being considered for initiation of involuntary medication are transferred from their "home" institution and the prescriber seeking the use of the medication to Bullock where a second prescriber and treatment team that does not know the inmate make a decision as to whether or not to formally file the petition for involuntary medication.  Dr. Hunter receives the petition and convenes the panel.  He testified that the process generally takes 3-4 weeks but can take as long as 6 weeks although some have been done in 7-10 days.  It is unclear why MHM believes this two-treatment team and prescriber procedure is necessary.  These additional steps and institutional transfers seem to delay initiation of treatment and are quite disruptive to continuity of care and relationships with the treating doctor or CRNP.

Problems identified during the tours with respect to the involuntary medication process included: Prisoner #16 (experiencing side effects to the medication but it isn't changed; no evidence of his having receiving notice for hearings in 2010 (MR002596); and medication orders renewed in spite of the rationale containing no information of current functioning but rather repeating historical information from 2008); Prisoner #21 (reported he wasn't notified or taken to attend his "hearing"; he has involuntary movements of his mouth which are not being addressed); Prisoner #45 (transferred to Bullock for his "hearing" and returned to Donaldson; he doesn't know why he was given involuntary medications but it is his only treatment); Prisoner #46 (received long-acting involuntary medication injections from April 2015 through June 2015 even though no involuntary order was in effect at the time.  When the lapse was discovered, he was subjected to a

41

continuation hearing and a 6-month involuntary medication order.  The notice for the hearing provided to him did not include the date or time of the hearing.  Nevertheless it was held.); and Prisoner #48 (treating prescriber requested permission for Prolixin decanoate, Haldol decanoate, Risperdal consta and Trilafon injectable but panel approved only Haldol decanoate and Remeron.  The inmate has remarkable degree of akathesia which is not documented in his record.  His treatment plan does not contain a diagnosis even though he is presumably so ill as to require involuntary medication.).

*Inadequate Suicide Prevention and Crisis Watch Procedures*

Based on inmate interviews, record reviews, site visit observations and deposition testimony, treatment for inmates on suicide watch or other forms of crisis watch is deficient.  Mental health treatment is generally limited to brief cell front contacts by MHP staff asking the prisoner whether or not he remains suicidal.  Rarely are prisoners on suicide watch or other crisis watch taken out of their cell for an actual private counseling session.[41]  Further, prisoners released from suicide or crisis watch are not routinely placed on the mental health caseload.  They do not receive adequate follow-up from MHPs or other mental health staff.[42]

Monitoring of prisoners in crisis is also inadequate.  I found no evidence that ADOC or MHM has a process to ensure constant watch when a prisoner is actively suicidal.  The form on which ADOC records officer observations of inmates on watch contains pre-

---

[41] Deposition of Lasandra Buchanant taken February 19, 2016 (99:2-103:12)
[42] Medical records of Prisoners #20 and #29.

printed 15-minute intervals.[43]  The exact time of observation must be recorded

contemporaneously with the observation and the intervals must be irregular rather than

at precise 15-minute intervals.  Observations made at predictable and regular intervals

increase the risk that the prisoner on watch has adequate time and opportunity to

attempt and complete suicide in between observations.  It undermines the purpose of

placing the inmate on watch status and the monitoring process.  Furthermore, prisoners

in crisis are sometimes placed in inappropriate locations such as offices or libraries

rather than in safe cells which increases the risk of self-harm and suicide.[44]


## OPINION 4: INADEQUATE QUALITY ASSURANCE & OVERSIGHT

Quality assurance and contract oversight are seriously lacking.  Even when problems
are identified, corrective actions are not implemented to ensure the problem is corrected
and does not recur.

Quality assurance processes are inadequate to identify and *correct* problems.  MHM

routinely reports on institutional audits of charting, treatment interventions, frequency of

contacts and just as routinely reports on problems as noted in preceding sections

(contacts not occurring in accordance with the minimum requirements of the

Administrative Regulation, problematic documentation and treatment plans, lack of

group treatment, untimely responses to referrals, etc.).  The same or similar findings are

reported time after time without improvement or recognition that the problems are

recurring.

---

[43] Deposition of Brenda Fields taken February 5, 2016 (100:19-103:2).
[44] Depositions of Teresa Houser taken April 22, 2016 (270:7-16) and Dr. Robert Hunter
(166:17-176:15).

MHM Clinical Operations does an annual report of contract performance auditing a sample of institutions.  The 2015 audit included six work release centers and Bullock, Donaldson, Kilby and Tutwiler.  A total of ten facilities were audited in this review but only 144 medical records were reviewed.  The sample size for an audit of this many facilities is inadequate.  Further, facility staff are asked to select the files for review as opposed to being randomly selected.  (Ordinarily, records to be reviewed are selected randomly to assure generalizability of findings and the number of records calculated to permit calculation of statistical significance.)  Nevertheless, problems that included improper placement of segregation inmates in the Bullock SU, underutilization of the Tutwiler and Bullock RTUs and "on-going issues regarding access" to inmates at Donaldson, "especially to seriously mentally ill inmates in the RTUs" were identified. The problems identified at Bullock and Donaldson as on-going and unresolved in 2015 were again identified the following year.

The 2016 audit was conducted at Bullock, Donaldson, Holman, Limestone, St. Clair and the Staton/Draper/Elmore complex.  Consequently, it did not include any female inmates or the mental health care provided to them, or the reception process which is the linchpin in identification of inmates with mental illness.  Key findings included the lack of group treatment interventions noted earlier; the inability to conduct groups at Donaldson and Bullock due to limited security staff in the so-called intensive treatment units and a back-log of outpatient MHP and psychiatric (or CRNP) visits at Donaldson. Deposition testimony of Brenda Fields, MHM Clinical Operations Associate, indicated that pursuant to a decision made in November 2015, the problems identified in these

reports will require the development of a corrective action plan (CAP) and follow-up.[45]  It had not yet been determined how or who would review the plans and assess whether the proposed actions once completed actually corrected the identified problem at the time of her deposition. (February 5, 2016)  No such CAP or follow-up from the February 2016 audit was produced at the time of this report.

The ADOC Office of Health Services is responsible to monitor MHM's performance under the contract.  However, the Associate Commissioner for Health Services, Ruth Naglich, was not aware of any schedule of proposed audits for mental health care or whether such a schedule had ever existed in the life of the contracts[46].  It is a task long assigned to the ADOC Chief Psychologist but there appeared to be little oversight or familiarity with whether or not it was being done.  (Dr. Tytell now holds the position of ADOC Chief Psychologist, having been appointed following the passing of Dr. Cavanaugh who held the position for a number of years previously.)  In her deposition in December 2015, Ms. Naglich deferred to Dr. Tytell's discretion in deciding how he wanted to schedule those audits, but didn't know how many audits were typically conducted.[47]  MHM was aware of only three ADOC audits of mental health care under the 2008 and 2013 contracts:  two conducted at Donaldson (2013, 2015) and one related to chronic care at Bullock.[48]

---

[45] Deposition of Brenda Fields taken February 5, 2016 (84:12-85:11)
[46] Deposition of Ruth Naglich taken December 7, 2015 (98:23-100:20)
[47] Id. at 99:13-100:20.
[48] Deposition of Teresa Houser 11/20/15 (293:2-12)

This system is ineffective and almost meaningless.  In one, the fox is guarding the hen house and identified problems persist.  In the other, ADOC OHS does next to nothing. Perhaps the most illustrative example of the very serious consequences of the identification of problems but failure to act is articulated in Dr. Hunter's deposition testimony.  Upon reviewing inmate suicides, he identified that placement in segregation or the prospect of segregation placement was a common denominator in many suicides. He reported this finding to ADOC.  There was a meeting in October 2015 at which segregation was discussed but no changes were made and there was no follow-up as of April 2016.  Even when major problems such as this are identified, they are not acted upon.[49]

There is no outside entity used to audit or assess the system or mental health care provided.  The *Bradley* Settlement Agreement called for accreditation by the National Commission of Correctional Health Care (NCCHC), but this requirement was subsequently eliminated.  The ADOC would be well served to resurrect it.

**CONCLUSION**

Staffing numbers of both mental health providers as well as custody staff are deficient and impede inmate access to and the delivery of care.  The screening and evaluation process fails to identify prisoners with mental health needs, including serious mental illness.  The classification system and contract incentives serve to understate severity of illness so that the more expensive residential treatment beds are underutilized while

---

[49] Deposition of Dr. Robert Hunter 4/21/2016 (191:15-19)

46

prisoners with serious mental illness are maintained in outpatient dormitory settings where they receive no treatment except medication, or they are placed into segregation for behaviors related to untreated or under-treated serious mental illness.  Individual contacts are infrequent, brief and do not constitute counseling or therapy.  Group treatment and programming is not offered to the overwhelming majority of ADOC prisoners on the mental health caseload who reside in the general population or segregation.  Even when prisoners are admitted to intermediate levels of care – stabilization and residential treatment units – staffing levels do not permit the provision of mental health care other than psychotropic medication.  (The lone exception to this appears to be the Tutwiler RTU which is both much smaller and better staffed than the male institutions.  However a small pocket of adequacy serving fewer than 30 inmates does not make a system charged with serving more than 24,000 individuals adequate.) Psychotropic medication is the only intervention consistently available and there are problems with over-reliance on long-acting injectable medications that are coerced rather than an informed choice even when the involuntary medication process has not been initiated or approved.

In sum, the deficiencies in ADOC - inadequate staffing levels, qualifications, identification and classification, treatment and oversight of the mental health care -deny prisoners care for their serious mental illness leading to needless pain, suffering, self-injury, suicide and punishment for symptoms of untreated mental illness.  These are systemic problems that can and should be addressed through changes to the mental health care delivery system.

Respectfully submitted,

/s/

Kathryn A. Burns, M.D., M.P.H.

July 5, 2016

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

**Curriculum Vitae**

## Kathryn A. Burns, M.D., M.P.H.

Chief Psychiatrist
Ohio Department of Rehabilitation and Correction
770 West Broad Street
Columbus, Ohio 43222
614.728.1974

Date of Birth:  November 12, 1957

| | |
|---|---|
| **Education:** | Cleveland State University
Cleveland, Ohio (1976-1980)
B.S. in Biology, Magna Cum Laude |
| | Case Western Reserve University School of Medicine
Cleveland, Ohio (1981-1985)
M.D. |
| | Ohio State University School of Medicine & Public Health
Columbus, Ohio (1997)
M.P.H. |
| **Training:** | Psychiatric Resident (1985-1989)
University Hospitals of Cleveland
CWRU School of Medicine |
| | Chief Resident, Department of Psychiatry (1988-1989)
University Hospitals of Cleveland |

**Specialized Education:**

Forensic Fellow, Department of Psychiatry (1989-1990)
University Hospitals of Cleveland
CWRU School of Medicine

CWRU School of Law:  *Criminal Law; Criminal Law & Psychiatry; Civil Law & Psychiatry* (1989-1990)

Cleveland-Marshall College of Law:  *Law & Psychiatry in the Criminal Justice System* (1989)

**Academic Appointments:**

Case Western Reserve University School of Medicine
Assistant Clinical Professor of Psychiatry

The Ohio State University College of Medicine
Auxiliary Faculty - Assistant Professor of Psychiatry

**Professional Licenses:**

State Medical Board of Ohio, License # 35-05-7006

**Certification:**   American Board of Psychiatry & Neurology
Psychiatry, Certificate No. 35117 (1992)

American Board of Psychiatry & Neurology
Forensic Psychiatry, Certificate No. 36 (1994)

National Commission on Correctional Health Care
Certified Correctional Health Professional (2000)

**Professional Memberships:**

**American Psychiatric Association** (1986-Present)
Appointed to Task Force to Revise APA Report on Jails & Prisons,
Council on Psychiatric Services (1997-2000)
Elected to Distinguished Fellow (12/01/99)

**Ohio Psychiatric Association** (1986-Present)

**American Academy of Psychiatry & the Law** (1988-Present)
Institutional & Correctional Psychiatry Committee (2000-2002)
Criminal Behavior Committee (1997-1999)
Public Information Committee (1991)

**Midwestern Chapter of the American Academy of Psychiatry &
the Law** (1988-Present)
Annual Meeting Program Committee Chair (1992)
Chapter President (1993-1994)

**International Academy of Law and Mental Health**
(1992-Present)

**American Correctional Association** (1995-Present)
Appointed to Mental Health Committee (1998-2000)

**American Correctional Health Services Association**
(1995-Present)

**Professional Experience**:

Mentally Disordered Offender Program:
Psychiatrist, Senior Psychiatrist (1988-1994)
*(Outpatient mental health treatment for adults with serious mental illnesses granted
probation for felony level offenses)*

2

Money & Mailboxes:  Psychiatric Consultant (1988, 1991-1993)
*(Outpatient mental health treatment for homeless persons with serious mental illnesses)*

Lorain Community Hospital:  Staff Psychiatrist (1989)

Cuyahoga County Court Psychiatric Clinic:  Staff Psychiatrist (1989-1993)
*(Pre-trial and post-conviction psychiatric evaluations of adults on issues of competency to stand trial, criminal responsibility, drug dependency, civil commitment)*

CWRU School of Medicine, University Hospitals of Cleveland Department of Psychiatry: Assistant Professor of Psychiatry (1990-1992)

SAMI/M-Power Program:  Staff Psychiatrist (1990-1994)
*(Outpatient community mental health day treatment program for adults with co-occurring substance abuse and mental illness.)*

Western Reserve Psychiatric Hospital:  Psychiatric Consultant (1990-1992)

Cleveland Psychiatric Institute:  Director, Court Evaluation Unit (1991-1994)

Neighborhood Counseling Services:  Medical Director (1992-1994)
In addition to Medical Director, served as treating psychiatrist for Conditional Release Unit *(community mental health treatment for persons found Not Guilty by Reason of Insanity)*

Cuyahoga County Community Mental Health Board:  Chief Clinical Officer (1994-1995, 2002-2007)

Ohio Department of Rehabilitation and Correction:  Chief Clinical Officer
Bureau of Mental Health Services (1995-1999)

Wright State University School of Medicine:  Assistant Clinical Professor of Psychiatry (1995-2000)

Twin Valley Behavioral Healthcare – Columbus Campus:
Director of Forensic Services (1999-2002)

The Ohio State University College of Medicine:  Assistant Clinical Professor of Psychiatry  (1999-2002)   O*utstanding Faculty Award (June 2002)*

Shawnee Forensic Center:  Psychiatric Consultant (1998-2010)

National Commission on Correctional Health Care:  Physician Surveyor (1998-present)

Forensic Center of District IX, Inc.:  Psychiatric Consultant (2000-present)

Editorial Board Member/Contributing Editor:  Correctional Mental Health Report
Civic Research Institute, Inc., Kingston, NJ (1999-Present)

Forensic Psychiatric Center of Northeast Ohio, Inc.: Psychiatric Consultant (2005-present)

Liaison for Mental Health Services in Jails; Ohio Criminal Justice Coordinating Center of Excellence, Northeastern Ohio Universities College of Medicine (2006 - )

Appointed to Forensic Psychiatry Committee of the American Board of Psychiatry & Neurology (2009 - )

Alcohol, Drug and Mental Health Board of Franklin County:  Chief Clinical Officer (2007-2013)


**Presentations:**

***Attempted Family Murder:  Dissociation vs. Dissimulation***
Phillip J. Resnick, MD, co-presenter
CWRU Department of Psychiatry Grand Rounds, Cleveland OH (January 1990)
Ohio Association of Forensic Directors, Columbus OH (March 1990)


***Working with the Forensic Client in Community Treatment***
Phillip J. Resnick, MD, co-presenter
National Case Management Conference, Cincinnati OH (September 1990)

***Corrections & Community Collaboration:  The Mentally Disordered Offender Program***
American Psychiatric Association 43rd Institute on Hospital & Community Psychiatry, Los Angeles CA (October 1991)

***Not Mad, Still Bad, What Now?:  The Disposition of Non-Mentally Ill Insanity Acquittees***
American Academy of Psychiatry & the Law – Midwestern Chapter Meeting
Cleveland OH  (April 1992)

***Forensic Psychiatry in the Community:  The Cuyahoga County Experience***
American Academy of Psychiatry & the Law – Midwestern Chapter Meeting
Detroit MI (April 1994)

***Treatment/Placement Implications & Strategies for the 18+ Offender***
Ohio Department of Youth Services Annual Program Conference
Columbus OH (December 1994)

***Assertive Community Treatment Teams:  Stopping the State Hospital Revolving Door***
MetroHealth Medical Center Department of Psychiatry Grand Rounds, Cleveland OH (January 1995)
All Ohio Institute on Community Psychiatry, Cleveland OH (March 1995)

***Can We Talk:  Emergency Psychiatry Meets Managed Care***
Kenneth Serta, MD, co-presenter
American Psychiatric Association Annual Meeting, Miami Beach FL (May 1995)

***Legal & Program Aspects of Staff Victimization***
Fred Cohen, moderator
American Correctional Association Annual Meeting, Indianapolis IN (January 1997)

***Hot Off the Press:  New Guidelines for Jails & Prisons***
H. Weinstein, C. Newkirk, J. Zil, co-presenters
American Psychiatric Association Annual Meeting, Toronto, Canada (May 1998)

***Legal vs. Moral Wrongfulness Schism***
S. Noffsinger, M. Carroll, D. Pinals, co-presenters
American Academy of Psychiatry & the Law Annual Meeting
New Orleans LA (October 1998)

***So You're Incompetent to Stand Trial – Now What?***
S. Noffsinger, J. Radio, A. Hernandez, co-presenters
American Academy of Psychiatry & the Law Annual Meeting
Baltimore MD (October 1999)

***APA Guidelines for Correctional Psychiatry***
American Academy of Psychiatry & the Law – Midwestern Chapter Annual Meeting
Cleveland OH (April 2000)

***Forensic Psychiatry Board Review Course***
Topics presented:  Competencies:  Civil & Criminal; Managed Care
Boston MA (October 2001)

***Firearms Risk Management in Inpatient Psychiatric Care***
XXVIIth International Congress on Law & Mental Health
Amsterdam, The Netherlands (July 2002)

***Course:  Correctional Psychiatry***
H. Weinstein, C. Newkirk, K. Gilbert, A. Hanson, J. Zil, co-presenters
53rd Institute on Psychiatric Services, APA Annual Fall Meeting, Orlando FL
(October 2001)
H. Weinstein, K. Gilbert, A. Hanson, J. Zil, co-presenters
54th Institute on Psychiatric Services, APA Annual Fall Meeting, Chicago IL
(October 2002)
H. Weinstein, K. Gilbert, A. Hanson, J. Zil, co-presenters
55th Institute on Psychiatric Services, APA Annual Fall Meeting, Boston MA
(October 2003)

***Practicing Rewarding Psychiatry in Jails and Prisons – A Practicum***
H. Weinstein, K. Gilbert, A. Hanson, co-presenters
American Psychiatric Association Annual Meeting, Atlanta GA
(May 2005)

***Providing Mental Health Care at the Prison's Back Door: Re-Linking Mentally Ill Offenders to Community Treatment***
XXIX International Congress on Law & Mental Health
Paris, France (July 2005)

***Preventing Suicide in Correctional Facilities***
H. Weinstein, K. Gilbert, A. Hanson, co-presenters
57th Institute on Psychiatric Services, APA Annual Fall Meeting, San Diego, CA (October 2005)

***Prescribing Controlled Substances in Prison***
K. Appelbaum, J. Metzner, R. Trestman, co-presenters
American Academy of Psychiatry & the Law Annual Meeting
Montreal Canada (October 2005)

***Jail Suicide Prevention***
Ohio Department of Mental Health 2006 Annual Forensic Conference
Sandusky OH (August 2006)

***Jail Mental Health Services***
Ohio Department of Mental Health 2007 Annual Forensic Conference
Wilmington OH   (August 2007)

***Psychiatric Services in Jails & Prisons:  It's Time to Revise the APA Guidelines***
H. Weinstein, co-presenter
American Psychiatric Association Annual Meeting, Washington DC
(May 2008)

***Psychopharmacology in Jails and Prisons: Principles, Practice and Special Issues***
H. Weinstein, E. Roskes, B. Bay, co-presenters
61st Institute of Psychiatric Services, APA Annual Fall Meeting, New York, NY (October 2009)

***Practicing in the Pokey – What It's All About***
30th Annual Spring Midwest American Academy of Psychiatry and the Law Meeting, Columbus, OH (March 2013)

**Publications:**

Sherman M, Burns K, et al.:  Firearms Risk Management in Psychiatric Care. *Psychiatric Services* 52: 1057-1061, 2001.

Burns K:  Creating a Mental Health Classification System. *Correctional Mental Health Report* 4(1):3, 2002.

Burns K:  Mental Health Screening.  *Correctional Mental Health Report* 4(2):19, 2002.

Burns K:  Mental Health Evaluation.  *Correctional Mental Health Report* 4(3):35, 2002.

Burns K:  "Jail Diversion and Correctional Psychotropic Medication Formularies"; Management and Administration of Correctional Health Care, J. Moore, ed.  Kingston NJ:  Civic Research Institute, 2003.

Burns K:  "Psychopharmacology in Correctional Settings"; Handbook of Correctional Mental Health Care. C.L. Scott and J.B. Gerbasi, eds. Arlington VA:  American Psychiatric Publishing, Inc., 2005.

Burns K:  The Red Zone: Boundaries of Clinical Versus Forensic Work in Correctional Settings.  *Correctional Health Care Report* 7(5):67, 2006; also appears as Chapter 19 Correctional Psychiatry Practice Guidelines and Strategies.  O.J. Thienhaus and M. Piasecki, eds.  Kingston NJ: Civic Research Institute, 2007.

Burns K: Commentary: The Top Ten Reasons to Limit Prescription of Controlled Substances in Prisons.  J Am Acad Psychiatry Law 37:50-2, 2009.

Burns K:  "Pharmacotherapy in Correctional Settings"; Handbook of Correctional Mental Health Care, Second Edition. C.L. Scott, ed. Arlington VA:  American Psychiatric Publishing, Inc., 2010.

Burns, K:  Psychiatry behind bars: Practicing in jails and prisons.  Current Psychiatry 10:2-15, 2011.

Cloyes KG and Burns KA: "Aging prisoners and the provision of correctional mental health"; Oxford Textbook of Correctional Psychiatry. RL Trestman, KL Appelbaum, JL Metzner, eds. New York NY: Oxford University Press, 2015.

**Correctional Mental Health Care Consultation and Monitoring:**

*Ralph Coleman, et al. v Edmund G. Brown, Jr., et al.*
No. 2:90-cv-0520 KJM DAD
US District Court, Eastern District of California
Serve as a mental health expert on Special Master's monitoring team to assess delivery of mental health care to inmates confined in California Department of Corrections and Rehabilitation

*Fred Graves, et al., v Joseph Arpaio, et al.*
No. CV-77-0479-PHX-NVW  United States District Court, District of Arizona
Appointed as expert by Court to evaluate delivery of mental health care at Maricopa County Jails, assist in development of a plan demonstrating compliance with Second Amended Judgment and report on implementation of the plan

*Disability Laws Center, Inc., v Massachusetts Department of Correction, et al.*
No. 07-10463 (MLW) US District Court, District of Massachusetts
Retained by Disability Law Center as designated expert to assess MDOC compliance with the terms of a Settlement Agreement

*Disability Rights Network of Pennsylvania v John Wetzel, Secretary Pennsylvania Department of Corrections* (US District Court, Middle District of PA  Civil Case No. 1:13-CV-00635)
Initially consulting expert to plaintiffs then jointly selected by parties to assess and report the DOC's implementation of the terms of Settlement Agreement

*Carty v Mapp*
Case 3:94-CV-78  District Court of the Virgin Islands, Division of St. Thomas & St. John
Parties' joint expert in Mental Health Care to assess compliance with terms of a Settlement Agreement at Criminal Justice Complex and the Alva Swan Annex, located in St. Thomas, Territory of the United States Virgin Islands.

*Disability Rights Florida, Inc. v Julie Jones, Secretary Florida Department of Corrections, et al* (US District Court, Southern District of Florida, Miami Division Civil Action No 14-23323-Civ-SCOLA, Consolidated Action Case No 14-24140-Civ-SCOLA)
Consulting expert to plaintiffs to conduct assessments of the inpatient unit at Dade Correctional Institution and develop recommendations on issues of mental health treatment, staffing, training and quality improvement.  Will continue as consultant to plaintiffs to conduct assessments of inpatient units' implementation of Plan of Compliance developed by the parties.


I have also served as a consulting expert on the provision of mental health care to inmates in state correctional facilities in Alabama, Florida, Georgia, Indiana, Illinois, Montana, New Jersey, Pennsylvania and St. Croix, US Virgin Islands.

**Expert Witness Disclosure:**

*Roger Canupp, et al., v. Robert Butterworth, Secretary of the Florida Department of Children and Families*
Case No. 2:04-cv-260-FtM-MMH-DNF  United States District Court, Middle District of Florida, Fort Myers Division (Retained by plaintiff class; report and deposition testimony 03/09/09)

*Fred Graves, et al., v. Joseph Arpaio, et al.*
No. CV-77-0479-PHX-NVW  United States District Court, District of Arizona
(Retained by defendants; deposition and trial testimony; appointed as expert by Court to evaluate delivery of mental health care at Maricopa County Jails, assist in development of a plan demonstrating compliance with Second Amended Judgment and report on implementation of the plan)

*Frank Mercado, Individually and as Administrator of the Estate of David Mercado, and Evelyn Mercado v. The City of New York, et al.*
Case No. 08 CV 2855  United States District Court, Southern District of New York
(Retained by plaintiff, deposition testimony 01/31/11)

*Indiana Protection & Advocacy Services Commission, et al., v. Commissioner, Indiana Department of Correction*
Case No. 1:08-cv-1317 TWP-MJD United States District Court, Southern District of Indiana, Indianapolis Division (Retained by plaintiff; report, deposition and trial testimony, July 2011)

*Monica Hall, Administratrix and Personal Representative of the Estate of Jon A. Hall, Deceased. and Candace Riley, Custodian and Legal Guardian of J.H., Minor Child of Jon A. Hall, Deceased v. McCracken County Kentucky, et al.*
Civil Action No. 5:09-CV-208-R United States District Court, Western District of Kentucky, Paducah Division (Retained by plaintiffs; report and deposition testimony 08/08/11)

*Mark Young, Sonyae Young v. Burlington County, et al.*
Case no. BUR-L-001840-09 Superior Court of New Jersey, Burlington County, Law Division Civil Action
(Retained by plaintiffs; report and deposition testimony, summer 2011)

*Tammy Rene Millmine as Personal Representative of the Estate of Billy Frank Cornett, Jr., v. Lexington County SC, Cassandra Means, et al.*
Case No. 3:10-CV=1595-CMC United States District Court, DIstrict of South Carolina, Columbia DIvision
(Retained by plaintiff; report and deposition testimony 09/29/11)

*Ronell Richard, as Administrator of the Estate of Edgar Richard, Jr., v. Board of County Commissioners of Sedgwick County; Sedgwick County, et al.*
Case No. 09-1278=WEB-KMH (Consolidated with Case No. 10-1042-WEB-KMH)
United States District Court, District of Kansas
(Retained by plaintiff, report and deposition testimony 12/06/12; hearing testimony 12/14)

*Diana Serrano as Personal Representative of the Estate of Freddie Gonzalez, Jr., Deceased, v. Indiana Department of Correction, et al.*
Cause No. 49D05-1001-CT-001755  In the Marion Superior Court 5 Indiana
(Retained by plaintiff, report and deposition testimony 03/11/13)

*Frank H. Kruse as Administrator for the Estate of James Michael Hall v. Corizon, Inc., f/k/a Correctional Medical Services, Inc., et al.*
Case No.  CV-2012-212  United States District Court, Southern District of Alabama, Southern Division
(Retained by plaintiff, report and deposition testimony 01/16/13)

*James Sardakowski v. Tom Clements, et al.*
Civil Action No. 12-CV-01326-RBJ-KLM  United States District Court, District of Colorado
(Retained by plaintiff, report and deposition testimony 10/18/13)

*MH et al v. County of Alameda, et al.*
Case no. C11-2868 JST (MEJ) United States District Court, Northern District of California
(Retained by plaintiff, report and deposition testimony 12/27/13)

*Carty v Mapp*
Case 3:94-CV-78  District Court of the Virgin Islands, Division of St. Thomas and St. John
(Parties' joint expert, testimony in status hearing 2/23/15)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JOSHUA DUNN, ET AL.,           )
                               )
        Plaintiffs,            )
                               )        Civil Action Number:
v.                             )
                               )        2:14-cv-00601-MHT-TFM
JEFFERSON DUNN, ET AL.,        )
                               )
        Defendants.            )

*I relied upon my interviews, site inspections, and the materials listed below, in addition to
everything cited in my report, to form my opinion in this matter,*

DEPOSITION TRANSCRIPTS
- Brenda Fields
- Glodys St-Phard, MD
- LaSandra Buchanant
- Lesleigh Dodd
- Lynn Brown
- Robert Hunter, MD
- Scott Holmes
- Sharon Trimble
- Teresa Houser 11.20.2015
- Teresa Houser 4.22.2016
- Jefferson Dunn
- Kim Thomas
- Ruth Naglich 12.7.2015
- Ruth Naglich  4.7.2016

DEPOSITION TRANSCRIPTS AND EXHIBITS
- Plaintiff Brandon Johnson
- Plaintiff Christopher Jackson
- Plaintiff Daletrick Hardy
- Plaintiff Edward Braggs
- Plaintiff Howard Carter
- Plaintiff Jonathan Sanford
- Plaintiff Joshua Dunn
- Plaintiff Kenneth Moncrief
- Plaintiff Leviticus Pruitt

- Plaintiff Quang Bui
- Plaintiff Richard Businelle
- Plainitiff Richard Terrell
- Plaintiff Robert "Myniasha" Williams
- Plaintiff Robert Dillard
- Plaintiff Roger McCoy
- Plaintiff Sylvester Hartley

SOPs
- ADOC044541-044549 – Bibb
- ADOC044550-044630 – Donaldson
- ADOC044631-044661 – Easterling
- ADOC044662-044730 – Fountain
- ADOC044731-044816 – Hamilton
- ADOC044822-044880 – Kilby
- ADOC044881-044959 – Limestone
- ADOC044960-044989 - St. Clair
- ADOC044990-044999 – Staton
- ADOC045000-045052 – Tutwiler
- ADOC045053-045085 – Ventress
- RFP 006 008 WE Donaldson Documents
- RFP 006 and 009 Draper Segregation Unit (E-Dorm) 05 18 12 to Current
- RFP 006 and 009 Draper Segregation Unit (E-Dorm) 05 30 13 to Current
- RFP 006 BibbSOPMentalHealthWatch
- RFP 006 Elmore Suicide Watch Precautionary Watch
- RFP 006 SOP B-22 Limestone Mental Health Referral Procedures
- RFP 006 SOP G-22 Limestone Suicide Watch
- RFP 006 SOP G-28 Limestone Inmate Refusal to Take Nourishment
- RFP 006 SOP G-44 Limestone Five Point Restraints
- RFP 006 Staton G Dormitory MOU Holding Unit Holding Tank
- RFP 006 Suicide Watch and Safe Cell
- RFP 006 Tutwiler Intense Psychiatric Stabilization
- RFP 006 Ventress Five Point Restraints Suicide Watch
- RFP 006 Ventress Suicide Preventions
- RFP 008 022 HAMsop 222-01 inmate orientation
- RFP 009 AR434 Disciplinary Segregation
- RFP 009 AR436-1 ISRB Change 1
- RFP 009 Bibb SOP Segregation2012toPresent
- RFP 009 Easterling Segregation
- RFP 009 Elmore Segregation
- RFP 009 HAMsop 60-111 Seg-Shift Office Post 10-3-13
- RFP 009 Kilby Segregation Cell Blocks C, D, E, and F

- RFP 009 Kilby Segregation Review
- RFP 009 Kilby Segregation Unit
- RFP 009 SOP 174 St. Clair The Segregation Unit
- RFP 009 SOP 202 St. Clair Dry Cells
- RFP 009 SOP C-1 Limestone Segregation Unit
- RFP 009 SOP E-5 Limestone Protective Custody
- RFP 009 Staton G Dormitory MOU Holding Unit Holding Tank
- RFP 024 A403-1 Procedures for Inmate Rule Violations Change 1
- RFP 024 AR403 Procedures for Inmate Rule Violations
- RFP 024 AR403-2 Procedures for Inmate Rule Violations Change 2
- RFP 024 Bibb SOP Disciplinary Hearing
- RFP 024 E-23 Limestone Due Process Hearing Requirements
- RFP 024 Tutwiler Disciplinary Hearing Procedures For Women
- RFP 031 ADOC Intake forms
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6 and #8: Donaldson Documents
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6 and #9: Documents related to Draper Segregation Unit (E-Dorm) from 5.8.2012 to Current
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6 and #9: Documents related to Draper Segregation Unit (E-Dorm) 5.30.2013 to Current
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:
- Bibb SOPs on Mental Health Watch
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Elmore SOPs on Mental Health Watch
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6: Limestone SOPs B-22 on Mental Health Referral Procedures
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Limestone SOPs G-22 on Suicide Watch
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Limestone SOPs G-28 on Inmate Refusal to Take Nourishment
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Limestone SOPs G-44 on Five Point Restraints
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6: Staton SOPs on G Dormitory/MOU/Holding Unit/Holding Tank
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Easterling SOPs on Mental Health/Suicide Watch and Safe Cell
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Tutwiler Intense Psychiatric Stabilization
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Ventress Five Point Restraints/Suicide Watch
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Ventress Suicide Preventions

- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8 and #22: Hamilton A&I SOPs 222-01 on Inmate Orientation
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8 and #24: Hamilton A&I SOPs 705-01 on Hearing Impaired
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8:  Easterling Disability
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8:  Hamilton A&I SOPs 222-01 on ADA Inmate Grievance Appeal Form
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8:  Hamilton A&I SOPs 222-01 on ADA Inmate Grievance Appeal Log
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8:  Hamilton A&I SOPs 222-01 on ADA Memo to Inmates
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8:  Hamilton A&I SOPs 222 on ADA Grievance
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8:  Limestone SOPs G-25 on Inmate Access to Telephones
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8:  Tutwiler American Disabilities Act Inmate Grievance Procedure
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Administrative Regulation 433 - Administrative Segregation
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Administrative Regulation 434 – Disciplinary Segregation
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Administrative Regulation 436 – Institutional Segregation Review Board
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Administrative Regulation 436-1 - Change ##1 to Institutional Segregation Review Board
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Administrative Regulation 436-2 - Change #2 to Institutional Segregation Review Board
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Bibb SOPs on Segregation 2012 to Present
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Bibb SOPs on Segregation 2012 to Present
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Easterling Segregation
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Elmore Segregation
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Hamilton A&I SOPs 434-01 on Disciplinary Segregation
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Hamilton A&I SOPs 436-01 on Institutional Segregation Review
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Hamilton A&I SOPs 60-111 on Segregation / Shift Office Post 10-3-13

- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Kilby Death Row Inmates
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Kilby L Block Security Officer
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Kilby O Dormitory
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Kilby Segregation Cell Blocks C, D, E and F
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Kilby Segregation Review
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Kilby Segregation Unit
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  SOP 174 - St. Clair The Segregation Unit
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  SOP 202 – St. Clair Dry Cells
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  SOP 433-1 Holding Unit Decatur CBF
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  SOP C-1 Limestone Segregation Unit
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  SOP C-48 Limestone House Arrest
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  SOP C-56 Limestone House Arrest Special Unit
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  SOP E-5 Limestone Protective Custody
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Staton G Dormitory MOU Holding Unit Holding Tank
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Tutwiler The Segregation Unit
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Ventress Administrative Segregation and Housing for Close Custody
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Ventress Disciplinary Segregation
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Ventress Segregation Temperature Checks
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #24:  A403-1 Procedures for Inmate Rule Violations Change 1
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #24:  A403-2 Procedures for Inmate Rule Violations Change 2
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #24:  Bibb SOP Disciplinary Hearing

- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #24:  E-23 Limestone Due Process Hearing Requirements
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #24:  Kilby Mental Health Referral Procedures
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #24:  Tutwiler Disciplinary Hearing Procedures for Women
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #24:  Ventress Behavior Citation Procedures
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #31:  ADOC Intake forms

MHM REPORTS
- ADOC043533-043610 - January 2012
- ADOC043611-043655 - February 2012
- ADOC043656-043691 - March 2012
- ADOC043692-043723 - April 2012
- ADOC043724-043753 - May 2012
- ADOC043754-043803 - June 2012
- ADOC043804-043833 - July 2012
- ADOC043834-043864 - August 2012
- ADOC043865-043901 - September 2012
- ADOC043902-043928 - October 2012
- ADOC043929-043969 - November 2012
- ADOC043970-043994 - December 2012
- ADOC043995-044029 - January 2013
- ADOC044030-044057 - February 2013
- ADOC044058-044084 - March 2013
- ADOC044085-044107 - April 2013
- ADOC044108-044137 - May 2013
- ADOC044138-044167 - June 2013
- ADOC044168-044189 - July 2013
- ADOC044190-044215 - August 2013
- ADOC044216-044237 - September 2013
- ADOC044238-044259 - October 2013
- ADOC044260-044281 - November 2013
- ADOC044282-044303 - December 2013
- ADOC044304-044326 - January 2014
- ADOC044327-044348 - February 2014
- ADOC044349-044364 - March 2014
- ADOC044365-044389 - April 2014
- ADOC044390-044413 - May 2014
- ADOC044414-044437 - June 2014
- ADOC044438-044462 - July 2014

- ADOC044463-044486 - August 2014
- ADOC044487-044514 - September 2014
- ADOC044515-044537 - October 2014
- ADOC0319013-0319017 - December 2014
- ADOC0319018-0319019 - December 2014 Pharmacy Summary
- ADOC0319020-0319024 - December 2014 Staffing by Facility
- ADOC0319025 - December 2014 Staff changes
- ADOC0319026 - December 2014 DON Report
- ADOC0319027-0319031 - December 2014 Training Report
- ADOC0319032-0319054 - June 2015
- ADOC0319055-0319073 - November 2014
- ADOC0319074-0319095 - April 2015
- ADOC0319096-0319113 - August 2015
- ADOC0319114-0319127 - December 2015
- ADOC0319128-0319149 - February 2015
- ADOC0319150-0319173 - February 2016
- ADOC0319174-0319193 - January 2015
- ADOC0319194-0319218 - January 2016
- ADOC0319219-0319238 - July 2015
- ADOC0319239-0319258 - March 2015
- ADOC0319259-0319278 - May 2015
- ADOC0319279-0319293 - November 2015
- ADOC0319294-0319312 - October 2015
- ADOC0319313-0319332 - September 2015
- MHM Staffing Report - Pages from ADOC0319150-0319173 - February 2016

MULTIDISCIPLINARY MEETING NOTES
- Bibb Correctional Facility
- Bullock Correctional Facility
- Donaldson Correctional Facility
- Easterling Correctional Facility
- Fountain Correctional Facility
- Hamilton A& I Correctional Facility
- Holman Correctional Facility
- St. Clair Correctional Facility
- Tutwiler Correctional Facility
- Ventress Correctional Facility

ADDITIONAL DOCUMENTS:
- Administrative Regulations-600-639-MH
- Administrative Regulations-700-708
- ADOC and Corizon Medical Services Agreement- 2012
- MHM Contract

- Corizon Contract
- ADOC Health Services Manual
- ADOC Hospice Program
- (ADOC – Dunn) Response to RFP (2)
- First Amended Complaint
- Audits by MHM Corp Team
- ADOC0226689
- ADOC0226690
- Chart Audits by Regional Office
- Additional CQI Minutes
- Clinical Contract Compliance Review Report
- Death Review Reports
- Medication Errors
- MHM Training Outlines and Powerpoints
- Additional Death Reports
- 2015 ADOC Clinical Contract Compliance Review Report
- DOC Facility Database
- Staton Database
- Kilby Database
- Holman Database
- Fountain JOD Atmore Loxley Camden Database
- Database-Caseload February 2016
- Copy of MH Caseload Week Ending February 26, 2016
- MHM029500-029619
- MHM'S First Supplemental Responses to P's SDT
- ALDOC Roster Discovery Chart
- MHM029500-029619
- MHM029620-029625
- MHM029626-029633
- MHM029634-029636
- MHM029637-029639
- MHM029640-029642
- MHM029361-029437 EASTERLING MH
- AL Attempt-Completed 08-15
- Occurrences
- Occurrences
- MHM027857-027946 BIBB
- MHM027947-028134 BULLOCK
- COMPLETED SUICIDES
- MHM028154-028275 DONALDSON
- MHM028276-028312 HAMILTON
- MHM028313-028346 LIMESTONE

- SA REPORTS
- MHM028665-028971 TUTWILER
- MHM028972-029043 VENTRESS
- MHM029044-029288 KILBY
- MHM029289-029304 STATON MH
- MHM029305-029320 STATON-DRAPER MH
- MHM029321-029334 STATON-ELMORE MH
- MHM029335-029336 STATON-FRANK LEE MH
- MHM029337-029360 STATON docs MH
- MHM Stats for 2010 – January 2010 through December 2010
- MHM Stats for 2014 – February 2014 through December 2014
- MHM Audit – Donaldson
- MH Subclass – Depo guide
- Non-Formulary Med Requests 2015
- Signed Interrogatory Responses of the Alabama Department of Corrections
- 3-3-15 Formulary
- 47624 – Houser E-mail
- Discovery Index – Master Copy
- Doc. 210 - Third Amended Complaint
- Doc. 99 - Second Amended Complaint
- The *Bradley v. Haley* (Civil Action No 92-A-70-N) Settlement Agreement

PHOTOS FROM MARCH SITE INSPECTIONS
- Bullock
- Easterling

RECORDS:
- Johnson, Brandon
- Jackson, Christopher
- Hardy, Daletrick
- Braggs, Edward
- ADOC response to our July 12,2012 request for records on Howard Carter – Conduct Records – 120822 (four parts)
- Carter, Howard
- Wallace, Jamie
- Wallace, Jamie
- Sanford, Jonathan
- Dunn, Joshua
- Moncrief, Kenneth
- Pruitt, Leviticus
- Bui, Quang
- Businelle, Richard
- Terrell, Richard

- Williams, Robert
- Dillard, Robert
- McCoy, Roger
- Hartley, Sylvester
- Emmonds, Robert
- Kim McLaughlin - Volumes 1 and 2
- Monk, Joseph - Parts 1 - 12
- Burch, Curtis - Parts 1 - 3
- Barlow, Michael - Part 1 - 3
- Daniel Weed
- Miller, Lester
- Riley, Torrian