Case 2:14-cv-00601-MHT-TFM   Document 671-1   Filed 09/22/16   Page 1 of 117

*Dunn, et al. v. Dunn, et al.*

**United States District Court for the Middle District of Alabama, Northern Division**
**Civil Action No.: 2:14-cv-00601-MHT-TFM**

**Rebuttal Expert Report by Robert D. Morgan, Ph.D.**

# TABLE OF CONTENTS

Page

REBUTTAL EXPERT REPORT OF ROBERT D. MORGAN, Ph.D. ........................................ 1

EXECUTIVE SUMMARY .................................................................................................... 1

EXPERT QUALIFICATIONS ............................................................................................... 5

TESTIMONY, PUBLICATIONS, AND COMPENSATION ....................................................... 9

OPINIONS ....................................................................................................................... 10

    A.    Specific Issues Referred for Evaluation ...................................................... 10

    B.    Overarching Opinions ................................................................................. 10

    C.    Basis and Reasons for Opinions .................................................................. 10

RESULTS, FINDINGS, AND CONCLUSIONS ...................................................................... 11

  Examination of ADOC Facilities ................................................................................. 11

    A.    Observed Conditions in Eight ADOC Facilities .......................................... 12

  Availability and Provision of Mental Health Treatment .............................................. 14

    A.    Availability of Mental Health Services ........................................................ 14

    B.    Access to Mental Health Staff ..................................................................... 17

  Study of the ADOC Use of Segregation ...................................................................... 19

    A.    Summary Review of the Literature Studying Segregated Housing ................ 20

    B.    Meta-Analytic Reviews on the Effects of Segregated Housing ..................... 23

    C.    Conditions of Segregation in the ADOC ..................................................... 26

CONCLUDING OPINIONS .............................................................................................. 27

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **JOSHUA DUNN**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:14-cv-00601-MHT-TFM** |
| | ) | |
| **JEFFERSON DUNN**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

### REBUTTAL EXPERT REPORT OF ROBERT D. MORGAN, Ph.D.

Testifying rebuttal expert Robert D. Morgan, Ph.D. submits his rebuttal expert report in this matter as follows:

### EXECUTIVE SUMMARY

Forty-two inmates filed a class action complaint alleging that the Alabama Department of Corrections (ADOC) failed to provide inmates in its custody (1) "constitutionally adequate medical care," (2) "constitutionally adequate mental health care," (3) "due process when medicating persons against their will," and (4) "prisoners with disabilities with the accommodations and services to which they are entitled under the Americans with Disabilities Act ("ADA") and section 504 of the Rehabilitation Act of 1973 ("§ 504)"" (see plaintiffs amended complaint, p. 2). Defendants retained me in this matter as an expert witness to investigate the conditions of confinement in the ADOC, including confinement in segregated housing and the ADOC's capacity and capability to meet the mental health needs of inmates confined in the ADOC. Furthermore, I was retained to examine if the ADOC has been deliberately indifferent to the mental health needs of inmates, and particularly inmates with serious and persistent mental illness.

To examine the conditions of confinement in the ADOC, I visited eight ADOC correctional facilities. Between the dates of July 11, 2016 and July 15, 2016, I toured and interviewed administrative, medical, and mental health staff at the following correctional facilities: St. Clair Correctional Facility (SCCF), Donaldson Correctional Facility (DCF), Bibb Correctional Facility, Kilby Correctional Facility (KCF), Tutwiler Correctional Facility (TCF), Bullock Correctional Facility (BCF), Easterling Correctional Facility (ECF), and Holman Correctional Facility (HCF). During my visits I was accompanied by administrative and correctional staff, and I was granted access to the entire prison with no areas being unavailable to me.

The eight ADOC correctional facilities I visited were generally aged with visible signs of wear and tear; however, renovations and improvements were in progress. Living quarters were generally crowded throughout the eight facilities I visited. Although plaintiffs' experts, Dr. Haney and Mr. Vail, indicated significant over-crowding, each of the eight facilities I visited had open beds (i.e., they were not at or above capacity). The ADOC is severely understaffed. In fact, understaffing is, in my opinion, at crisis levels and necessitates immediate action to reduce the staff shortage in particularly low staffed facilities.

Within the ADOC, mental health services are provided by ADOC employed mental health professionals (typically a master's level psychological associate) and MHM Correctional Services, Inc. (MHM). Inmates designated as having a mental health concern are classified as having a mental health code. The code ranges from 0 (no identified need for mental health assistance) to 6 (severe, debilitating symptoms necessitating inpatient hospitalization). ADOC mental health staff provide services to inmates classified with a mental health code of 0, whereas

MHM mental health staff provide services to inmates classified with a mental health code of 1 or greater.

With regard to mental health service provision, my visits indicated that both ADOC and MHM mental health staff provide a range of services, which can be described as basic or rehabilitative services. Basic mental health services aim to assess inmates' mental health needs and provide services to alleviate distress, reduce psychiatric symptomatology, and generally improve institutional functioning. Rehabilitative services, on the other hand, aim to alter antisocial behaviors, tendencies, and lifestyles for a reduction in criminal recidivism.

The ADOC has clearly defined policy and procedures for the provision of mental health services to their inmate population. For example, I found specific policies and procedures outlining the identification of inmates at-risk for psychological and/or behavioral decompensation so that mental health staff can intervene in a timely fashion if and when decompensation occurs. Furthermore, the ADOC maintains a record of inmates with mental health needs, and clearly defines who (i.e., ADOC or MHM mental providers) is responsible for providing services to each inmate based on his or her designated mental health code (i.e., ADOC mental health professionals provide services to inmates classified with no mental health needs [mental health code = 0], and MHM professionals provide services for inmates classified with a mental health code of 1 or greater).

The correctional staffing shortages that are prominent throughout ADOC facilities do not appear to significantly interfere with the provision of mental health services to the inmate population. That is, during my visits, mental health staff (including both ADOC and MHM mental health staff) denied difficulties accessing inmates for the provision of services. Furthermore, there generally appeared to be adequate mental health staff to meet inmate mental

health needs. Although vacancies existed during my visits, and access to adequate mental health professionals was lacking in some areas (e.g., rural areas), mental health staffing levels throughout the eight facilities I visited were generally sufficient to meet the basic mental health needs of ADOC inmates.

ADOC segregation units differed by facility ranging from limited segregation cells to large three-tiered cellblocks. The conditions within each segregation unit varied, with some seeming relatively comfortable, but at least one that was almost unbearable due to the temperature. Notably, the ADOC does not use indeterminate administrative segregation sentencing; rather, the duration of confinement to segregated housing is regulated by specific ADOC policies that are reportedly readily available to all inmates. The exception appears to be in the event that an inmate in segregation has an enemy in the general population. To ensure the safety of one or both inmates, the segregated inmate cannot be released to general population until that inmate or the enemy is transferred to another facility. Determinate sentencing of this nature provides inmates with an opportunity to structure their time and plan for release; thus, it is my opinion this is an advantageous policy. A determinate administrative segregation policy also likely diminishes the hopelessness that some inmates might otherwise experience under an indeterminate sentencing structure.

Although conditions within ADOC segregation units were variable, I do not believe the defendants have been deliberately indifferent to inmate mental health needs or concerns to the extent they arise in segregation. On the contrary, the ADOC has a clearly-developed mental health services delivery system that exists to identify and address any mental health issue presented by any ADOC segregated inmate. This specifically includes both ADOC and MHM mental health staff conducting mental health rounds twice per week, which is a level of

monitoring that exceeds nationally accepted best standards of practice. Thus, it is my opinion that the ADOC has developed a clearly defined mental health delivery services system outlined in policy that is consistent with national standards of practice, and to the extent any such concern may arise in segregation, that the ADOC is not acting with systemic deliberate indifference to the mental health concerns of segregated inmates.

## EXPERT QUALIFICATIONS

I received a Bachelor's of Science (B.S.) degree in psychology (minor in biology) from the University of Nebraska at Kearney in 1991, a Master's of Science (M.S.) degree in clinical psychology from Fort Hays State University (Kansas) in 1993, and a Doctor of Philosophy (Ph.D.) in counseling psychology from Oklahoma State University in 1999. I completed a pre-doctoral internship in correctional psychology at the Federal Correctional Institution – Petersburg (FCI-Petersburg; Virginia) in 1998-1999, and a postdoctoral fellowship in forensic psychology at the Department of Psychiatry, University of Missouri-Kansas City School of Medicine and Missouri Department of Mental Health in 1999-2000. I am a Licensed Psychologist (Texas; #31546) and annually meet the Texas Code of Criminal Procedures (Article 46B) Yearly Continuing Medical Education Requirements ("8 hours of education relating to forensic evaluations").

Currently, I am the Department Chairman and the John G. Skelton, Jr. Regents Endowed Professor in Psychological Sciences at Texas Tech University (TTU). I am also Director of the Institute for Forensic Sciences at TTU. I began my academic career at TTU in 2000 and was promoted to full professor in 2011. During my tenure at TTU, I also served as Associate Chair of the Department of Psychology (2003-2004) and Director of Training for the counseling psychology doctoral program (2005-2007). I was appointed Director of the Institute for Forensic Sciences in 2014 and Chair of the Department of Psychological Sciences in 2015.

5

At TTU, I have taught Abnormal Psychology and Forensic Psychology to undergraduate students; however, my primary teaching responsibilities are to graduate students enrolled in the American Psychological Association accredited doctoral programs in clinical and counseling psychology. These courses include Practicum in Intelligence Testing, Advanced Counseling Practicum, and Psychology and the Law. These courses are geared toward teaching doctoral students how to conduct cognitive assessments (i.e., I teach doctoral students how to administer, score, interpret and report findings from standardized intelligence and cognitive assessments), and provide psychological assessments and psychotherapy in diverse clinical settings, to include correctional and forensic contexts. The Psychology and Law course provides doctoral students a foundation in the interface between psychology and the legal system, including topics in forensic and correctional psychology, court and judicial testimony and psychologists' influence in policy legislation. My current clinical supervision (2007 – present) is of doctoral students providing psychological services at the Lubbock-Crosby County Community Supervision and Corrections Department, which provides services to offenders on probation, including offenders admitted to a residential treatment program.

The core purpose of my research and scholarly activities is to help offenders achieve a higher quality of life that is crime free and that ultimately results in increased public safety. Notably, I actively engage in research designed to contribute to a best practices model for the provision of mental health services in correctional environments. In this regard, my work has focused on the investigation of the effects of incarceration on inmates' mental health functioning and evaluations of effective correctional treatment programming. My research has been funded by the National Institute of Mental Health, the National Institute of Justice, the Center for

6

Behavioral Health Services & Criminal Justice Research, the Texas Department of Criminal Justice – Community Justice Assistance Division, and the Texas Tech University School of Law.

I have authored or co-authored over 75 articles, book chapters, and reports primarily dealing with identifying effective treatment approaches for working with inmates, including inmates with severe and persistent mental illnesses. I also remain interested in helping corrections departments provide an environment conducive to inmate growth and rehabilitation. For example, I recently published a comprehensive study of the magnitude of health and mental health effects experienced by inmates in administrative segregation (Morgan et al., 2016). I have also published three books, including the *Clinician's Guide to Violence Risk Assessment*. In addition, I am the lead or co-developer of two treatment programs, one for justice involved persons with mental illness (i.e., *Changing Lives and Changing Outcomes: A Treatment Program of Justice Involved Persons with Mental Illness*), and one for inmates placed in segregated housing units (i.e., *Escaping the Cage: A Mental Health Treatment Program for Inmates Detained in Restrictive Housing*).

My research extends from my 20 years of providing correctional and forensic services to inmates and criminal defendants. From 1993 to 1995, I served as a Mental Health Professional with Prison Health Services at the El Dorado Correctional Facility (EDCF), a "supermax" security correctional facility, and the Winfield Correctional Facility (WCF), a minimum security facility in the Kansas Department of Corrections (KDOC). My primary assignment at EDCF was to provide mental health services in the institution's administrative segregation housing unit. In this role, I conducted weekly mental health rounds to monitor inmates for decompensated mental health functioning, and I served as a member of the segregation review board. I also provided crisis management services on an as-needed basis. Lastly, I provided psychotherapy services to

inmates incarcerated in administrative segregation for various periods of time, including five-to-ten year time periods, in part, to prepare them for release back to the general population. At WCF, I was responsible for all mental health services at the facility including monitoring the mental health functioning of inmates in administrative segregation. As this was a minimum security facility, inmates placed in administrative segregation for disciplinary, mental health, or other reasons remained segregated from the general population for shorter periods of time (i.e., typically less than thirty days). I also completed correctional internships in the United States Penitentiary at Leavenworth (10 weeks in 1993) and the aforementioned internship at FCI-Petersburg.

From 2001 to present, I have operated an independent forensic psychology practice. From 2002 to 2012, I served as the Director of Forensic Services and Director of Postdoctoral Fellowship in Forensic Psychology at the Lubbock Regional Mental Health Mental Retardation Center (LRMHMR) in Lubbock, Texas. In this role I co-developed a community-based forensic mental health service to include a jail-based competency restoration program for criminal defendants adjudicated not competent to stand trial. I received full medical staff membership at Sunrise Hospital (an acute care psychiatric hospital) during my tenure at LRMHMR. I have completed approximately 900 criminal pretrial mental health evaluations and post-trial criminal risk assessments to include issues of competency to stand trial, criminal responsibility, and criminal risk. I testified in 23 of these cases in state courts in Kansas, Missouri, Oklahoma, and Texas. I am also a mental health consultant to Correct Care Solutions, a private provider of correctional health care services (including mental health care) to correctional agencies across the United States. Finally, I am working with the Windham School District (Huntsville, Texas) to revise their life skills programming aimed at helping inmates prepare for community re-entry.

Specifically, I revised their two life skills programs, one of which is required of all inmates in the Texas Department of Criminal Justice prior to release, and we are currently evaluating the effectiveness of these two programs.

My other professional responsibilities are varied, but still founded in correctional mental health and geared towards improving our response to offender populations. In 2011, Texas Governor Rick Perry appointed me to the Advisory Committee to the Texas Board of Criminal Justice on Offenders with Medical or Mental Impairments. I am a Fellow of two divisions of the American Psychological Association, and formerly served as President of Division 18 (Psychologists in Public Service) of the American Psychological Association (2009-2010). I co-developed the North American Correctional and Criminal Justice Psychology Conference, with conferences held in 2007, 2011, and 2015. From 2006 to 2011, I was a member of the Mental Health in Corrections Consortium Advisory Board, and in 2008, I served as a consultant to the Justice Center: The Council of State Government for the development of a monograph entitled "Improving outcomes for people with mental illness under community supervision: A research guide for policymakers." I served on the editorial boards of two scientific journals, Psychological Services (2002-2013) and Criminal Justice and Behavior (2005-present), as well as an ad hoc reviewer for a number of scientific journals.

My curriculum vitae is attached to this report as Attachment A.

## TESTIMONY, PUBLICATIONS, AND COMPENSATION

Attachment B sets forth a list of cases in which I have provided expert testimony in deposition or at trial over the past four years, publications I have authored in the past ten years, and the compensation for my work in this matter.

## <u>OPINIONS</u>

The opinions I offer in this report are to a reasonable degree of psychological certainty.

**A.  <u>Specific Issues Referred for Evaluation</u>**

I was retained to examine the conditions of confinement in the ADOC, including confinement in segregated housing and the ADOC's capacity and capability to meet the mental health needs of inmates confined in the ADOC. Furthermore, I was retained to examine if the ADOC has been deliberately indifferent to the mental health needs of inmates, particularly inmates with serious and persistent mental illness.

**B.  <u>Overarching Opinions</u>**

Given my investigation to date in this case, I offer the following opinions:

1.  The eight facilities I visited were aged with visible signs of wear and tear, and living quarters were generally crowded; however, the ADOC is actively involved in improvements and renovations designed to create a better living environment for inmates.

2.  The ADOC is significantly understaffed; however, this understaffing does not prohibit plaintiffs and other class members from receiving needed mental health services, including both basic and rehabilitative services.

3.  MHM staffing levels throughout the eight facilities I visited are sufficient to meet the basic mental health needs of inmates on the mental health caseload.

4.  The ADOC has developed a clearly defined mental health delivery services system, with policy and procedures consistent with national standards of practice, such that the ADOC is not acting with systemic deliberate indifference to inmates' mental health needs.

5.  The ADOC has also developed a clearly defined mental health delivery services system for segregated inmates, and this system is outlined in policy that is consistent with national standards of practice, such that the ADOC is not acting with systemic deliberate indifference to segregated inmates' mental health concerns, to the extent any such concern may arise in segregation.

**C.  <u>Basis and Reasons for Opinions</u>**

Attachment C sets forth a complete list of facts and data I considered to prepare this report.

The list below identifies the facts and data I found most pertinent to my opinions:

1. Information provided by Defendants' counsel, including: (a) Plaintiffs' Third Amended Complaint Class Action Complaint for Declaratory and Injunctive Relief; (b) Expert Report of Professor Craig Haney, Ph.D., J.D.; (c) Expert Report of Eldon Vail; and (d) ADOC policies and procedures that govern the delivery of mental health services and the use of segregation in ADOC facilities.

2. My experience and expertise in correctional mental health, including: (a) the provision of psychological services in state and federal correctional facilities, including in segregated housing units; (b) the development of a therapeutic program for inmates in segregated housing; (c) consultation with private and state correctional agencies regarding the provision of mental health services, including services provided in segregated housing; and (d) my research on the effects of incarceration, including segregation, on inmate health and mental health functioning and prison mental health service provision.

3. Review of psychological, psychiatric, and general mental health scientific journals, as well as legal journals, regarding segregated housing in prison and the effects on inmate physical and mental health functioning.

4. Site visits of eight ADOC correctional facilities. These site visits included a tour of the institution and interviews with correctional administration, custody, and medical and mental health staff.

## RESULTS, FINDINGS, AND CONCLUSIONS

### Examination of ADOC Facilities

**Conclusion**. The eight ADOC correctional facilities I visited were generally aged with visible signs of wear and tear; however, it was apparent, particularly at St. Clair Correctional Facility, that significant renovations and improvements were in progress. Living quarters are generally crowded throughout the eight facilities I visited. Segregation units differed by facility, ranging from limited segregation cell space to large three-tiered cellblocks. The conditions within segregation units also varied during my visits, but I noted a particular concern for the temperature in A Block at St. Clair Correctional Facility. Although administrative staff appear resourceful with regard to staffing and general institutional management, understaffing remains a major concern across the ADOC. It is my opinion that correctional officer understaffing should

11

be viewed as a correctional crisis within the ADOC, such that this crisis necessitates immediate action.

Administrative, correctional, and professional (e.g., mental health) staff were cordial and helpful throughout my visits. No areas were off limits during any of my visits, and I did not feel that my safety was ever threatened nor was I in any obvious danger. I observed productive communication between administrative and correctional staff and inmates that was consistent across my visits. I observed many inmates greet staff conducting my facility tours with genuine warmth. Overall, it was apparent that inmates felt comfortable and welcome to approach administrative staff with questions regarding their personal situation.

## A.  Observed Conditions in Eight ADOC Facilities

In preparing for this report I had the opportunity to tour eight ADOC correctional facilities. Between the dates of July 11, 2016 and July 15, 2016, I toured and interviewed administrative, medical and mental health staff at the following correctional facilities: St. Clair Correctional Facility (SCCF), Donaldson Correctional Facility (DCF), Bibb Correctional Facility (BCF), Kilby Correctional Facility (KCF), Tutwiler Correctional Facility (TCF), Bullock Correctional Facility (BCF), Easterling Correctional Facility (ECF), and Holman Correctional Facility (HCF). Contrary to Dr. Haney's experience, during my eight facility tours, I was granted access to the entire prison and there were no areas that were unavailable to me.

See Attachment D for a detailed summary of my observations from each of the facilities I visited, including summaries of my interviews with staff from each of the facilities.

The facilities I toured in the ADOC can generally be summarized as aged facilities with the effects of general wear and tear present throughout (e.g., cracked cement, faded/peeling paint, and antiquated correctional designs). Notably, given the time of year of my visits (i.e., July), air conditioning was generally absent throughout the facilities. Large industrial fans were

strategically placed throughout the institutions to enhance air circulation. This helped in many areas, but provided limited relief in others. The temperature was particularly problematic when the industrial fans were not functioning (e.g., segregation unit of SCCF). I routinely observed inmates moving throughout the premises, rather in transport to a specific location (e.g., appointments, cafeteria), recreation (e.g., on the recreation yard), or working (e.g., cleaning hallways, segregation cells). Inmates were typically double bunked or double celled, with the exception of many segregation units. Dormitory living quarters were generally crowded with limited correctional officer presence in some high count living areas.

Staff at all eight facilities that I visited noted understaffing. Understaffing is a significant concern for the ADOC, and one that appears to be widely recognized by staff of all levels. Plaintiffs allege significantly overcrowded prison conditions, and plaintiffs' experts Dr. Haney and Mr. Vail noted significant overcrowding in their respective reports. Notably, each of the eight facilities I visited had open beds, including segregation beds. It appears to me this discrepancy may be explained by differences in design versus rated capacity. The inmate census in all eight correctional facilities I visited exceeded the design capacity. Prisons, like other institutions (e.g., hospitals, schools), are designed to accommodate a specific number of people; however, when the designated number is exceeded, modifications (and possibly renovations) are made to accommodate more people. Correctional facilities therefore can be rated for a census that exceeds the design capacity. In the case of the eight ADOC facilities I visited, all eight maintained a census below the reported rated capacity. That said, it was noted that many of the living quarters, particularly the dormitory style units, afforded inmates little free space (e.g., limited recreational space or freedom of movement space within living quarters).

**Availability and Provision of Mental Health Treatment**

**Conclusion**. It is my opinion that the ADOC has developed a clearly defined mental health delivery services system and has policies and procedures that are consistent with national standards of practice, such that the ADOC is not acting with systemic deliberate indifference to inmates' existing mental health concerns. I interviewed ADOC and MHM mental health staff and reviewed ADOC policy and procedures for the provision of mental health services, including mental health services provided in segregated housing units. I found the ADOC has mental health policies and procedures in place to identify inmates at-risk for decompensated mental health functioning. Furthermore, the ADOC system dictates tracking of inmates with mental health needs (i.e., use of a mental health classification system), and has clearly defined roles for who is responsible for providing mental health services to the inmate population (i.e., ADOC mental health professionals to inmates classified with no mental health needs [mental health code = 0], and MHM mental health professionals for inmates classified with a mental health code of 1 or greater).

**A.  Availability of Mental Health Services**

Mental health services are available to inmates throughout the eight ADOC facilities I visited. Mental health services in correctional settings can be conceptualized as basic mental health services or rehabilitative mental health services (Dvoskin & Morgan, 2010; Fagan, 2003; Morgan, 2003). Basic mental health services are necessarily available to all offenders in criminal justice settings, as mandated by public policy initiatives and litigation at state and federal levels (e.g., *Estelle v. Gamble, 1977; Estelle v. Ruiz, 1982*).  Basic mental health services are analogous to a community mental health center model (see Dvoskin & Morgan, 2010) with the aim of assessing needs and providing services intended to alleviate distress, reduce psychiatric symptomatology, and improve institutional functioning and coping.  Rehabilitative services, on

14

the other hand, aim to alter criminal behaviors, tendencies, and lifestyles for a reduction in criminal recidivism.

Mental health services within the ADOC are provided by ADOC employed mental health professionals (typically a master's level psychological associate) and MHM Correctional Services, Inc. (MHM). Inmates designated as having a mental health concern are classified as having a mental health code. The code ranges from 0 (no identified need for mental health assistance) to 6 (severe, debilitating symptoms necessitating inpatient hospitalization). Administrative Regulation No. 613 (Mental Health Coding and Tracking of Inmates) summarizes the mental health code and associated services.

Inmates not classified with a mental health code (i.e., MH Code = 0) are provided basic (when the need arises) and rehabilitative services by ADOC mental health professionals, while those classified with a mental health code (MH Code 1-6) are provided basic and rehabilitative services by MHM mental health professionals.

Dr. Haney noted in his report (see p. 24, "Virtually without exception, every prisoner I spoke to on the mental health caseload…complained about receiving no more than, at best, superficial and sporadic contact with mental health staff…Very seriously mentally ill prisoners…are seen (let alone treated) infrequently by mental health staff, have little…access to meaningful treatment or therapy of any kind, and are barely being monitored…"). Despite these assertions, it is not clear in his report whether or not Dr. Haney considered evidence beyond inmate self-report to include a review of their medical files. Further, Dr. Haney is not a trained mental health professional and, to my knowledge, has never provided mental health services in a correctional facility. It is unclear what objective standard he is using to support his opinion that the ADOC is not providing adequate services. For example, in my experience providing basic

psychological services (i.e., services designed to help the client population maintain functioning) in community and correctional settings, contact is often limited to follow-up services (or in the case of psychiatric care, contact every three months). It is only in times of client decompensation that enhanced services are provided.

For example, when providing basic mental health services to segregated inmates in the KDOC, many of the inmates with mental illness with whom I worked required no additional mental health services beyond the regularly scheduled psychiatric consult (usually every three months); however, some inmates with mental illnesses would eventually evidence decompensated functioning. During these periods, I would have the inmate removed from the cell and see them in a private room for more thorough assessment and therapeutic services. If warranted, I would expedite a currently scheduled psychiatric consult. If this increase in service produced the desired effect (i.e., the inmate returned to his baseline level of functioning), I would resume my regular monitoring routine (e.g., rounds). Thus, there would be extended periods of time during which the inmate in this example might report (and an outside observer unfamiliar with the needs of individuals with mental illness) may observe what they believe to be limited mental health care. It would only be by file review that an expert in the maintenance and treatment of individuals with severe and persistent mental illness could determine if, in fact, adequate mental health care was provided. It has been my experience that mental health services provided to individuals with mental illness who are not criminal justice-involved and who are living in the community receive similar models of care (i.e., there is scheduled contact with a mental health professional to monitor or assist with functioning with infrequent and very brief contact with a psychiatrist sufficient to assess the effectiveness of the psychotropic treatment regimen). Thus, the ADOC policy, including the application of that policy for inmates in

administrative segregation, appears sufficient for maintaining the mental health functioning of incarcerated inmates.

## B.  Access to Mental Health Staff

As previously noted, the ADOC facilities I visited were somewhat crowded; however, there generally appeared to be adequate mental health staff to meet inmate mental health needs. This was particularly true for inmates classified with a mental health code. As one example, there were approximately 150 inmates on the mental health caseload (i.e., classified with a mental health code of 1 or greater) at the DCF. To serve these inmates, MHM provides two full-time activity therapists, three full-time counselors, one part-time (i.e., 30 hours per week) licensed psychologist, four full-time mental health nurses, and two rotating psychiatrists. This level of staffing is generally consistent with what I observed at the other seven facilities I visited. Thus, although staffing varies by facility (with some facilities working to fill positions), it is my opinion that MHM staffing levels throughout the eight facilities I visited are sufficient to meet the basic mental health needs of inmates on the mental health caseload.

Notably, in spite of staff shortages, mental health staff (including both ADOC and MHM mental health staff) denied difficulties accessing inmates for the provision of services. In other words, ADOC staffing shortages did not prohibit mental health staff from having access to inmates in a confidential setting. This was reportedly true for ADOC and MHM staff providing both basic and rehabilitative services.

In preparing for this report I requested and was provided with a variety of documentation, and in reviewing these materials I noted that the ADOC conducts audits of mental health service provision in its facilities. Although it is not clear to me how frequently these audits occur, the audits I reviewed (i.e., from 2011) thoroughly reviewed the provision of mental health services at various ADOC institutions. Specifically, these audits included a review of: (1) the mental health

caseload (e.g., inmate to staff ratios), (2) implementation and thoroughness of treatment plans, progress notes, problem lists, and diagnoses of inmates served, (3) suicide watch and use of mental health observation, (4) mental health staff meetings and trainings, (5) use of treatment logs, (6) completion of segregation rounds, and (7) review of monthly reports. Audits of this nature are an important procedure to ensure quality control and availability of services to inmates in need.

Contrary to Dr. Haney's conclusions, the ADOC provides policies and procedures for the provision of mental health services to ensure systematic and appropriate levels of service. In fact, policies and procedures governing the provision of mental health care are provided at the state (e.g., the previously noted Administrative Regulation 613 regarding the Mental Health Coding and Tracking of Inmates, Administrative Regulation 624: Mental Health Segregation Rounds) and individual facility (e.g., many of the facilities I visited, such as BCF, KCF, TCF, had facility-specific policy and regulations to govern mental health service provision beyond that provided by the ADOC) levels. These policies and procedures are designed to ensure inmate access to care. Furthermore, although Dr. Haney interviewed inmates to make his determination that the ADOC provides inadequate mental health treatment, there is no indication that he confirmed inmate reports by reviewing inmate medical files or audits (i.e., that he matched inmate report to contacted visits noted in medical or mental health records). It is commonly accepted that inmate reports may or may not be valid (see for example, Hare, 2003), such that the veracity of inmate self-reports are typically "treated as suspect" (Kroner, Mills, & Morgan, 2005), and should be confirmed by file review. Despite inmate reports to the contrary (as reported by Dr. Haney), based on my review of ADOC mental health policy, it is my opinion that the ADOC has a clearly defined mental health services delivery system applicable to all inmates,

including inmates on the mental health caseload, and these policies and procedures are consistent with national standards of practice.

Beyond basic mental health services, ADOC and MHM mental health staff provide rehabilitative services in the form of group therapies. Although Dr. Haney criticized the ADOC for a lack of group counseling or group activities, my review of services and consultation with mental health staff indicated the availability of group treatments at all eight facilities I visited. These treatment groups focused on a variety of topics including: coping with incarceration, anger management, self-esteem, parenting, dealing with feelings, and other personal development groups. For female offenders at TCF, trauma-oriented groups were also available. Based on staff report, these treatment groups were ongoing at each of the eight facilities I visited (though KCF offers limited therapeutic programming due to high inmate turnover). It was common at each facility for mental health professionals to reportedly provide four therapeutic groups per week. At some of the facilities there was a small waitlist (of note, Bibb Correctional Facility had a large waitlist estimated at approximately 150 inmates), whereas others had no waitlist thereby affording inmates with immediate access to group treatment.

## Study of the ADOC Use of Segregation

**Conclusion.** ADOC inmates placed in segregation are at some risk for the development of mental health problems or psychological decompensation; however, this risk is no greater in magnitude than the risk general population inmates encounter throughout their incarceration. I interviewed ADOC and MHM mental health staff and reviewed ADOC policy and procedures for the provision of mental health services in segregation. I found that the ADOC has mental health policies and procedures in place to identify at-risk inmates so that mental health staff can intervene in a timely fashion if and when an inmate decompensates with regard to their mental health functioning. Thus, it is my opinion that the ADOC has developed a clearly defined mental

health delivery services system outlined in policy that is consistent with national standards of practice, and to the extent any such concern may arise in segregation, the ADOC is not acting with systemic deliberate indifference to segregated inmates' mental health concerns,.

A.  **Summary Review of the Literature Studying Segregated Housing**

Dr. Haney provides a review of the scientific literature on isolation; however, his review is incomplete. Much has been written about the potential adverse and harmful effects of segregation. Specifically, it has been reported by some that inmates experience a myriad of mental health concerns and symptoms, including appetite and sleep disturbance, anxiety (including panic), depression and hopelessness, irritability, anger and rage, lethargy, psychosis, cognitive rumination, cognitive impairment, social withdrawal, and suicidal ideation, as well as self-injurious behaviors (see Grassian, 2006, n.d.; Haney, 2003, 2009; Kupers, 2008; Andersen, Sestoft, Lillebaek, Gabrielsen, Hemmingsen, & Kramp, 2000; Bonner, 2006; Brodsky, & Scogin, 1988; Cloyes, Lovell, Allen, & Rhodes, 2006; Cohen, 2006, 2008, 2012; Hayes, & Rowan, 1988; Haney, 1993; Hresko, 2006; Lovell, 2008; Miller, & Young, 1997; Smith, 2008). Offenders with mental illness are particularly vulnerable to placement in administrative segregation (Metzner & Fellner, 2010), where they generally appear to experience more mental health disturbance (i.e., greater symptomatology) than offenders with mental illness not placed in administrative segregation (O'Keefe, 2007). Lastly, inmates released directly from segregation to the community have shown poorer post-release outcomes than inmates not released from segregation (Lovell, Johnson, & Cain, 2007).

These studies, however, do not paint a complete picture of the effects resulting from placing inmates in segregation, nor do they provide information regarding the magnitude of potentially harmful effects. To these points, Dr. Haney's literature review was incomplete.

20

When examining very brief periods of segregation (as brief as a few days), almost no deleterious effects have been found (see Gendreau & Bonta, 1984; Bonta & Gendreau, 1995; and Suedfeld, Ramirez, Deaton, & Baker-Brown, 1982). Controlled studies looking at longer periods of segregation have also found no deleterious effects. For example, Zinger and colleagues (2001) conducted a longitudinal study of inmates segregated for 60 days. They found no mental health decompensation for segregated inmates compared to their peers in the general prison population.

Even more compelling are the results from O'Keefe and colleagues (2010) obtained from the most sophisticated segregation study to date. In this study, commonly referred to as the "Colorado Study," as it was completed in Colorado, participants consisted of 247 men from administrative segregation, the general prison population, and a psychiatric care facility. Researchers assessed inmates across multiple time periods on the following domains: psychosis; anxiety, depression, and hopelessness; somatization; social functioning; cognitive functioning; anger; and hypersensitivity. Contrary to the researchers' hypotheses, results indicated that administrative segregation confinement of one year was generally not associated with the onset of psychological symptoms or cognitive impairment for mentally ill and non-mentally ill inmates, nor did inmates with mental illness fair worse in administrative segregation than their non-mentally ill peers.

The Colorado Study is not without limitations. Dr. Haney, in his expert report, lists many of the criticisms associated with this study, but it should be recognized that all studies in the psychological literature (including those relied upon by Dr. Haney) are replete with limitations. In the scientific literature, using methodological limitations to minimize results from a comprehensive and well-designed study is commonly referred to as "knowledge destruction."

Knowledge destruction refers to the "specific pseudoscientific arguments used by theoreticists to discount research findings not to their liking" (p. 200, Gendreau, 1995, referencing Andrews and Bonta 1994). Dr. Haney's review of the Colorado Study is one such attempt at knowledge destruction by pointing out errors in an attempt to negate the implications of this study. Simply stated, there are no perfect studies. Given that this study represents the most sophisticated and methodologically sound longitudinal study to date on the effects of segregation on inmate mental health functioning, the findings are most informative.

In fact, the Colorado Study is, in my opinion, the landmark study examining the effects of segregation on inmate well-being. The researchers applied research methodology that provided several advantages over previous investigations that examined the effects of administrative segregation. First, this study was longitudinal in that it used a repeated measures design that assessed inmates up to five time periods at three-month intervals. This is a significant strength of the study (see also Berger, Chaplin, & Trestman, 2013). Additionally, the study included multiple groups to allow for comparisons between segregated and non-segregated populations. The duration of the study is also a significant strength over prior research, as "[t]he full year of assessments more realistically reflects the timeframe of greatest concern regarding potential psychological impact" (p. 1; Berger et al., 2013). Most impressive, the researchers incorporated a multi-method assessment strategy, another significant improvement over the typical research approach of relying solely on a review of records and clinical interviews (although not reviewed in this report, the scientific literature summarizing mental health professionals ability to accurately make clinical diagnoses and predict likely outcomes is notoriously weak). Finally, the Colorado Study presents a "reasonable real-world test of the hypotheses" outlined in the study (p. 1; Berger et al., 2013).

22

My review of the scientific literature (as well as that of Dr. Haney's) is a qualitative review subject to bias. Furthermore, such a review provides no information regarding the magnitude of effects when negative outcomes do occur. When the studies reviewed above are subjected to an empirical review, the result yields compelling data regarding the effects of placing inmates in segregation, and importantly, we know more about the magnitude of these effects. A recent meta-analysis conducted by my colleagues and me provides this information. Although Dr. Haney did not have access to the full results of this paper, I believe he was knowledgeable of our work and the general outcomes thereof, yet he did not include these findings in his expert report.

## B. **Meta-Analytic Reviews on the Effects of Segregated Housing**

Meta-analysis is the assimilation of completed research studies into one comprehensive quantitative database, which allows for an empirical (and theoretically a more thorough) examination of a phenomena of interest, such as the effect of segregation on inmate mental health functioning. Meta-analysis is a widely accepted method for "summarizing the results of empirical studies within the behavioral, social, and health sciences" (Lipsey & Wilson, 2001, p. 1). Meta-analytic reviews offer many advantages over a qualitative review (i.e., narrative summary) of the literature. Specifically, meta-analysis provides (Field & Gillett, 2010):

(1) the mean and variance of underlying population effects. For example, we can study the effects of segregated housing compared to general population housing;

(2) variability in effects across studies. Meta-analysis allows researchers to "estimate the variability between effect sizes across studies" (p. 666). For example, we can examine the magnitude of the effect of placement in segregated housing versus placement in non-segregated housing and we can examine how much variability exists in effects across studies; and

(3) moderator variables. Meta-analysis allows us to examine variables that contribute to the obtained effects. For example, if inmates respond unfavorably to segregated housing compared to their peers not placed in segregated housing in one study, but another study suggests that segregated inmates respond similarly to peers not placed in segregated

housing, we can examine variables that may explain the different relations across the two studies. In other words, we can attempt to identify aspects of segregation or inmate characteristics that modify the relation between segregation and negative outcomes.

To better understand the effects, including the magnitude of effects, resulting from the use of administrative segregation in corrections, two research groups completed independent meta-analytic reviews. As noted in the published manuscript (Morgan et al., 2016, p. 3), although these meta-analyses were conducted almost simultaneously, the respective researchers were unaware of the other group's work until the results were finalized. Importantly, the two research groups were blind to each other's methods, calculations, and statistical results until the analyses were completed (Group 1) or nearly completed (Group 2). The comparison of these two meta-analyses was fortuitous, since there is a growing recognition in psychology that a failure to replicate is of grave concern, not only for primary studies (Pasher & Wagenmakers, 2012), but also for meta-analyses themselves (Rosenthal, 1990). Moreover, where there is a great deal of sensitivity and controversy that affects legal issues about the humane care of inmates, replication becomes even more critical. Here, we present what is known in the literature as a systematic replication, such that general features and goals of research replications, in this case meta-analyses, remain similar; however, there were differences in some important aspects (e.g., inclusion criteria, number of studies coded, coding procedures, and analytical procedures). It has been proposed that systematic replications offer more information than literal or operational replications for cross-validation and generalization (Schmidt, 2014).

The following table provides the specific results for each outcome from the two reviews. For purposes of reading this table, *d* is the effect size (*ES*) calculation in which higher numbers represent more significant effects (small effect = ~0.20; moderate effect = ~0.50; large effect = ~0.80; Cohen, 1992).

24

*Effect size (d) comparison of two independent meta-analyses of effects of segregation*

| Meta-Analysis 1 | | | | Meta-Analysis 2 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Construct | $d$ | 95% CI | $k$ | Construct | $d$ | 95% CI | $k$[a] |
| Anger | -0.11 | [-0.34, 0.11] | 3 | Anger/aggression | 0.28 | [-0.16, 0.73] | 11 |
| Hostility | 0.28 | [-0.26, 0.82] | 5 | Anger/aggression | 0.28 | [-0.16, 0.73] | 11 |
| Anxiety | 0.34 | [0.09, 0.58] | 6 | Anxiety | 0.39 | [0.08, 0.70] | 11 |
| Depression | 0.15 | [-0.05, 0.35] | 6 | Mood/emotion | 0.55 | [-0.34, 1.43] | 5 |
| Psychosis | 0.07 | [-0.29, 0.44] | 4 | Psychosis | 0.38 | [0.10, 0.66] | 10 |
| Intelligence | 0.06 | [-0.20, 0.31] | 3 | Cognitive Functioning | 0.19 | [-0.17, 0.54] | 16 |
| Hypersensitivity | 0.31 | [-0.07, 0.69] | 4 | Hypersensitivity/hyper-activity | 0.10 | [-0.96, 1.17] | 8 |
| Physical health | 0.20 | [-0.03, 0.42] | 4 | Physical health | 0.37 | [-0.04, 0.77] | 13 |
| Recidivism | 0.12 | [0.03, 0.21] | 7 | Recidivism | 0.33 | [0.10, 0.57] | 14 |

*Note.* $d$ = Cohen's $d$; CI = confidence interval; $k$ = number of effect sizes.
[a] Includes dependent effect sizes.

Collectively, the findings from these two meta-analytic reviews indicated that the adverse effects on outcomes of interest resulting from segregation ranged from $d$ = 0.06 – 0.55 (i.e., small to moderate) for the time periods observed by the included studies. Moderator analyses from both investigations further reveal considerably smaller effect sizes among studies with stronger research designs compared to those with weaker designs. That is, the stronger the research design (which presumably provides a better evaluation of the phenomena of interest), the lower the effect size. Notably these results, which are in the small to moderate range with no analyses resulting in a large *ES*, is clearly contradictory to much that has been written about the demonstrable effects of administrative segregation (see Haney 2008, 2009 for example).

For the sake of comparison, it is relevant to compare the magnitude of the effects resulting from confinement in segregated housing to effects resulting from general incarceration (i.e., non-segregated imprisonment). Similar procedures in meta-analysis of the adverse effects of incarceration produced results (see Bonta & Gendreau, 1990; Gendreau & Labrecque, in press; Gendreau & Smith, 2012; Jonson, 2010; Smith, Goggin, & Gendreau, 2002) comparable

to or greater (i.e., more severe) than those obtained in the respective meta-analytic reviews of the segregation literature. In other words, as a general matter, and with various non-segregated prison conditions, the quantifiable effects resulting from segregation are comparable to the quantifiable effects resulting from incarceration.

## C.  Conditions of Segregation in the ADOC

According to Warden Bolling and Captain Baldwin (DCF), by way of practice, the ADOC, does not segregate inmates for indeterminate time periods. That is, both disciplinary and administrative segregation has specific sentences based on ADOC policy (e.g., 30 months in administrative segregation in the event of an inmate murder). Nevertheless, an inmate may remain in Administrative Segregation for security reasons (e.g., if an inmate has a known "enemy" in the facility the inmate will not be released from Administrative Segregation until either that inmate or the enemy is moved to another facility). The use of determinate administrative segregation sentencing procedures is not typical of other correctional systems of which I am familiar, whereby indeterminate administrative segregation sentencing is typically implemented, which can be stressful for an inmate. A specified release date allows an inmate to structure their time and plan for release; therefore, it is my opinion that determinant sentencing is an advantageous policy. As a note, I was unable to identify ADOC policy and procedure regarding the determinate sentencing structure for disciplinary or administrative segregation placement.

I further do not believe that defendants have placed inmates who are mentally ill in segregation without regard for their mental health. It is common practice in prison segregation units for inmates to receive frequent contact and/or observation by mental health professionals to identify those who may be experiencing mental health issues (or to identify signs of decompensation if they have a mental illness). The ADOC is no exception. Specifically,

Administrative Regulation 624: Mental Health Segregation Rounds specifies that ADOC psychologist or psychological associate "shall conduct mental health rounds in Segregation (Seg) Units and Death Row at least twice each week, and once during the Segregation Review Board Rounds…" (p. 2). Based on my interviews with ADOC and MHM mental health staff, mental health segregation rounds are completed twice per week by both entities. Thus, inmates could be observed or evaluated up to four times per week, depending on the unit. This does not include evaluations that occur during Segregation Review Board Rounds, which are optional or voluntary in some units, but mandatory in others (e.g., HCF). This level of observation exceeds that in many jurisdictions, and is consistent with national guidelines such as the American Psychiatric Association guidelines for delivering psychiatric services in prison segregation units (American Psychiatric Association, 2000). In addition, inmates may request mental health services verbally or in writing via standard ADOC operating procedures. Finally, mental health staff I interviewed indicated that if, during the course of their provision of mental health rounds, they have a concern about an inmate, they will request security staff to extract the inmate from the cell for a private session. Mental health staff indicated no barriers due to policy, procedures, or staffing deficits that have prohibited such sessions from occurring when needed. Based on my review of available documentation and interviews with staff, it is my opinion that the ADOC has procedures, outlined in policy, to minimize any potential harm resulting from the use of segregation, and these policies and procedures are consistent with nationally accepted best standards of practice.

## CONCLUDING OPINIONS

Forty-two inmates filed a class action complaint alleging that the ADOC failed to provide inmates in its custody (1) "constitutionally adequate medical care," (2) "constitutionally adequate mental health care," (3) "due process when medicating persons against their will," and (4)

27

"prisoners with disabilities with the accommodations and services to which they are entitled under the Americans with Disabilities Act ("ADA") and section 504 of the Rehabilitation Act of 1973 ("§ 504")" (see plaintiffs amended complaint, p. 2). I was asked to examine the conditions of confinement in the ADOC, including confinement in segregated housing, and ADOC's capacity and capability to meet the mental health needs of inmates confined in the ADOC. Furthermore, I was retained to examine, if the ADOC has been deliberately indifferent to the mental health needs of inmates, particularly those with serious and persistent mental illnesses.

My examination consisted of a review of (1) the Plaintiffs' Third Amended Compliant Class Action Complaint for Declaratory and Injunctive Relief; (2) Expert Report of Professor Craig Haney, Ph.D., J.D.; (3) Expert Report of Eldon Vail; and (d) ADOC policies and procedures that govern the delivery of mental health services and the use of segregation in ADOC facilities, (4) my experience and expertise in correctional mental health; (6) review of psychological, psychiatric, and general mental health scientific journals as well as legal journals regarding segregated housing in prison and the effects on inmate physical and mental health functioning, and (7) site visits of eight ADOC correctional facilities (SCCF, DCF, BCF, KCF, TCF, BCF, ECF, and HCF).

Results of my examination indicated that the eight ADOC correctional facilities I visited were generally aged with visible signs of wear and tear. Living quarters were generally crowded, and the ADOC was severely understaffed. In spite of these conditions, inmates have access to mental health services such that staffing or crowding do not limit the provision of these services by ADOC or MHM providers. Furthermore, I found the ADOC has clearly defined policies and procedures for the provision of mental health services to the inmate population, including

procedures for classifying inmate mental health needs to facilitate service provision and tracking of inmates with mental health concerns.

Based on my examination, I offer the following opinions:

1. The eight facilities I visited were aged with visible signs of wear and tear, and living quarters were generally crowded; however, the ADOC is actively involved in improvements and renovations designed to create a better living environment for inmates.

2. The ADOC is significantly understaffed; however, this understaffing does not prohibit plaintiffs and other class members from receiving needed mental health services including both basic and rehabilitative services.

3. MHM staffing levels throughout the eight facilities I visited are sufficient to meet the basic mental health needs of inmates on the mental health caseload.

4. The ADOC has developed a clearly defined mental health delivery services system, with policy and procedures consistent with national standards of practice, such that the ADOC is not acting with systemic deliberate indifference to inmates' mental health needs.

5. The ADOC has also developed a clearly defined mental health delivery services system for segregated inmates and this system is outlined in policy that is consistent with national standards of practice, such that the ADOC is not acting with systemic deliberate indifference to segregated inmates' mental health concerns, to the extent any such concern may arise in segregation.

It should be noted that I have not personally examined the Plaintiffs in this matter; consequently, this report is completed based on the limited sources of information previously listed.

Dated: August 22, 2016                    Respectfully Submitted,

_____
Robert D. Morgan, Ph.D.
Licensed Psychologist (Texas, 31546)

29

Attachment A

**ROBERT D. MORGAN**
August 21, 2016

John G. Skelton, Jr. Regents Endowed Professor in Psychology
Department of Psychological Sciences
Box 42051
Texas Tech University
Lubbock, TX 79409-2051
806-834-7117 (office) or 806-535-4861 (cell)
FAX: 806-742-0818
E-Mail: robert.morgan@ttu.edu

## EDUCATION

1999-2000    Postdoctoral Fellowship in Forensic Psychology, Department of Psychiatry, University of Missouri-Kansas City School of Medicine and Missouri Department of Mental Health

1998-1999    Predoctoral Internship, Federal Correctional Institution-Petersburg, VA (APA-Accredited)

Ph.D.   1999    Counseling Psychology, Oklahoma State University (APA-Accredited).
Dissertation: The efficacy of an interpersonal/cognitive-behavioral group psychotherapy program with male inmates

M.S.   1993    Clinical Psychology, Fort Hays State University.
Thesis: The utility of DSM-III-R decision trees in relation to diagnostic speed and accuracy

B.S.   1991    Psychology, University of Nebraska at Kearney

## ACADEMIC POSITIONS/APPOINTMENTS

2015 – present          Chair, Department of Psychological Sciences, Texas Tech University

2014 – present          Director, Institute of Forensic Science, Texas Tech University

2011 – present          John G. Skelton, Jr. Regents Endowed Professor in Psychology, Texas Tech University

2011 – present          Professor, Department of Psychology, Texas Tech University

| 2005 – 2011 | Associate Professor, Department of Psychology, Texas Tech University |
| May, 2005 – August, 2007 | Director of Training, Counseling Psychology Doctoral Program (APA-Accredited), Department of Psychology, Texas Tech University |
| August, 2004 – May, 2005 | Co-Director of Training, Counseling Psychology Doctoral Program (APA-Accredited), Department of Psychology, Texas Tech University |
| May, 2003 – August, 2004 | Associate Chair of Psychology, Texas Tech University |
| 2000 – 2005 | Assistant Professor, Department of Psychology, Texas Tech University |
| 1994 | Adjunct Instructor, Butler County Community College, Kansas |

## PUBLICATIONS AND PRESENTATIONS

### Refereed Journals

Batastini, A. B., King, C. M., Morgan, R. D. & McDaniel, B. (in press). Telepsychological services with criminal justice and substance abuse clients: A systematic review and meta-analysis. *Psychological Services*.

Batastini, A. B. & Morgan, R. D. (in press). Connecting the disconnected: Preliminary results and lessons learned from a telepsychology initiative with special management inmates. *Psychological Services*.

McDonald, B. R., Morgan, R. D., Metz, P. (in press). The attorney-client working relationship: A comparison of in-person versus videoconferencing modalities. *Psychology, Public Policy, and Law*.

Morgan, R. D., Gendreau, P., Smith, P.., Gray, A. L., Labrecque, R. M., MacLean, N., Van Horn, S. A., Bolanos, A. D., Batastini, A. B., & Mills, J. F. (2016). Quantitative Syntheses of the Effects of Administrative Segregation on Inmates' Well-Being. *Psychology, Public Policy, and Law*. http://dx.doi.org/10.1037/law0000089

Morgan, R. D., Mitchell, S. M., Thoen, M. A., Campion, K., Bolanos, A. D., Sustaita, M. A., & Henderson, S. (in press). Specialty courts: Who's in and are they working. *Psychological Services*.

Whited, W. H., Wagar, L. B., Mandracchia, J. T., & Morgan, R. D. (in press). Partners or partners in crime? The relationship between criminal associates and criminogenic thinking. *The International Journal of Offender Therapy and Comparative Criminology.*

Bartholomew, N. R. & Morgan, R. D. (2015). Co-morbid mental illness and criminalness: Implications for housing and treatment. *CNS Spectrums, 20,* 231-240.

Morgan, R. D., Batastini, A. B., Murray, D. D., Serna, C., & Porras, C. (2015). Criminal thinking: A fixed or fluid process? *Criminal Justice and Behavior, 42,* 1045-1065.

Batastini, A. B., Bolanos, A. D., & Morgan, R. D (2014). Attitudes toward hiring applicants with mental illness and criminal justice involvement: The impact of education and experience. *International Journal of Law and Psychiatry 37,* 524-533.

Morgan, R. D., Kroner, D. G., Mills, J. F., Bauer, R., & Serna, C. (2014). Treating justice involved persons with mental illness: Preliminary evaluation of a comprehensive treatment program. *Criminal Justice and Behavior, 41,* 902-916.

Wilson, A. B., Farkas, K., Ishler, K., Gearhart, M. Morgan, R. D., & Ashe, M. (2014). Criminal thinking styles among people with serious mental illness in jail. *Law and Human Behavior, 38,* 592-601.

Gaines, M. V., Giles, C. L., & Morgan, R. D. (2013). The detection of feigning using multiple PAI scale elevations: A new index. *Assessment, 20,* 437-447. doi: 10.1177/1073191112458146

Gross, N. G., & Morgan, R. D. (2013). Understanding persons with mental illness who are and are not criminal justice involved: A comparison of criminal thinking and psychiatric symptoms. *Law & Human Behavior, 37,* 175-186. doi: 10.1037/lhb0000013

Magaletta, P. R., Patry, M. W., Patterson, K. L., Gross, N. R., Morgan, R. D., & Norcross, J. C. (2013). Training Opportunities for Corrections Practice: A National Survey of Doctoral Psychology Programs. *Training and Education in Professional Psychology, 7,* 291-299.

Mandracchia, J. T., Shaw, L. B., & Morgan, R. D. (2013). What's with the attitude? Changing attitudes about criminal justice issues. *Criminal Justice & Behavior, 40,* 95-119. doi: 10.1177/0093854812459474

McDonald, B. R., & Morgan, R. D. (2013). Enhancing homework compliance in correctional psychotherapy. *Criminal justice and behavior, 7,* 814-828. Doi:0093854813480781.

Morgan, R. D. (2013). Vocational psychology in corrections: It is about time. *The Counseling Psychologist, 41,* 1062-1072. doi: 10.1177/0011000013482381

Morgan, R. D., Kroner, D. G., Mills, J. F., Serna, C., & McDonald, B. R. (2013). Dynamic risk assessment: A validation study. *Journal of Criminal Justice, 31,* 115-124.

Wolff, N., Frueh, B. C., Huening, J., Shi, J., Epperson, M. W., Morgan, R. D., Fisher, W. (2013). Looking to practice to inform the next generation of behavioral health and criminal justice interventions. *International Journal of Law & Psychiatry, 36,* 1-10. doi: 10.1016/j.ijlp.2012.11.001

Wolff, N., Morgan, R. D., & Shi, J. (2013). Comparative analysis of attitudes and emotions among inmates: Does mental illness matter? *Criminal Justice and Behavior, 40,* 1092-1108.

Mandracchia, J. T., & Morgan, R. D. (2012). Predicting offenders' criminogenic cognitions with status variables. *Criminal Justice & Behavior, 39,* 5-25. doi: 10.1177/0093854811425453

Morgan, R. D., Flora, D. B., Kroner, D. G., Mills, J. F., Varghese, F., & Steffan, J. S. (2012). Treating offenders with mental illness: A research synthesis. *Law and Human Behavior, 36,* 37-50. doi:10.1007/s10979-011-9271-7

Romani, C. J., Morgan, R. D., Gross, N. R., & McDonald, B. R. (2012). Treating criminal behavior: Is the bang worth the buck? *Psychology, Public Policy and Law, 18,* 144-165. doi: 10.1037/a0024714

Bewley, M. T., & Morgan, R. D. (2011). A national survey of mental health services available to offenders with mental illness: Who is doing what? *Law & Human Behavior, 35,* 351-363. doi:10.1007/s10979-010-9242-4

Mandracchia, J. T., & Morgan, R. D. (2011). Understanding criminals' thinking: Further examination of the Measure of Offender Thinking Styles – Revised. *Assessment, 18,* 442-452.

Morgan, R. D. (2011). If Not Us, Then Who? Presidential Address. *Psychological Services, 8,* 140-150. doi:10.1037/a0023727

Rozycki-Lozano, A. T., Morgan, R. D., Murray, D. D., & Varghese, F. (2011). Prison tattoos as a reflection of the criminal lifestyle. *International Journal of Offender Therapy and Comparative Criminology, 55,* 509-529. doi:10.1177/0306624X10370829

Shaw, L. B., & Morgan, R. D. (2011). Inmate attitudes toward treatment: Mental health service utilization and treatment effects. *Law and Human Behavior, 35,* 249-261. doi:10.1007/s10979-010-9233-5

Wolff, N., Morgan, R. D., Shi, J., Fisher, W., & Huening, J. (2011). Comparative analysis of thinking styles and emotional states of male and female inmates with and without mental disorders. *Psychiatric Services, 62,* 1485-1493.

Mandracchia, J. T., & Morgan, R. D. (2010). The relationship between status variables and criminal thinking in offenders. *Psychological Services, 7,* 27-33. doi:10.1037/a0016194

Morgan, R. D., Fisher, W. H., Duan, N., Mandracchia, J. T., & Murray, D. (2010). Prevalence of criminal thinking among state prison inmates with serious mental illness. *Law & Human Behavior, 34,* 324-336. doi:10.1007/s10979-009-9182-z

Senter, A. W., Morgan, R. D., Serna-McDonald, C., & Bewley, M. (2010). Correctional psychologist burnout, job satisfaction and life satisfaction. *Psychological Services, 7,* 190-201. doi:10.1037/a0020433

Steffan, J. S., Morgan, R. D., Lee, J., & Sellbom, M. (2010). A comparative analysis of MMPI-2 malingering detection models among inmates. *Assessment, 17,* 185-196. doi:10.1177/1073191109359382

Varghese, F. P. Hardin, E. E., Bauer, R., & Morgan, R. D. (2010). Attitudes toward hiring offenders: The roles of criminal history, job qualifications, and race. *International Journal of Offender Therapy and Comparative Criminology, 54,* 769-782. doi:10.1177/0306624X09344960

Miller, T. W., Morgan, R. D., & Wood, J. A. (2009). Tele-practice technology: A model for healthcare delivery to underserved populations. *International Journal of Healthcare Delivery Reform Initiatives, 1,* 55-69. doi:10.4018/jhdri.2009070104

Morgan, R. D. & Cohen, L. M. (2008). Clinical and counseling psychology: Can differences be gleaned from printed recruiting materials? *Training and Education in Professional Psychology, 2,* 156-164. doi:10.1037/1931-3918.2.3.156

Morgan, R. D., Patrick, A. R., & Magaletta, P. R. (2008). Does the use of telemental health alter the treatment experience?: Inmates' perceptions of telemental health vs. face-to-face treatment modalities. *Journal of Consulting and Clinical Psychology, 76,* 158-162. doi:10.1037/0022-006X.76.1.158

Steffan, J. S., & Morgan, R. D. (2008). Diagnostic accuracy of the MMPI-2 Malingering Discriminant Function Index in the detection of malingering among inmates. *Journal of Personality Assessment, 90,* 392-398. doi:10.1080/00223890802108204

Ax, R. K., Fagan, T. J., Magaletta, P. R., Morgan, R. D., Nussbaum, D., & White, T. W. (2007). Innovations in correctional assessment and treatment [Special issue]. *Criminal Justice and Behavior, 34,* 893-905. doi:10.1177/0093854807301555

Beer, A. M., Morgan, R. D., Garland, J. T., & Spanierman, L. B. (2007). The role of romantic/intimate relationships in the well-being of incarcerated females. *Psychological Services, 4,* 250-261. doi:10.1037/1541-1559.4.4.250

Kroner, D. G., Mills, J. F., & Morgan, R. D. (2007). Underreporting of Crime-Related Content and the prediction of criminal recidivism among violent offenders. *Psychological Services, 4,* 85-95. doi:10.1037/1541-1559.4.2.85

Magaletta, P. R., Morgan, R. D., Reitzel, L. R., & Innes, C. A. (2007). Toward the one: Strengthening behavioral sciences research in corrections [Special issue]. *Criminal Justice and Behavior, 34,* 933-944. doi:10.1177/0093854807301562

Mandracchia, J. T., Morgan, R. D., Garos, S., & Garland, J. T. (2007). Inmate thinking patterns: An empirical investigation. *Criminal Justice & Behavior, 34,* 1029-1043. doi:10.1177/0093854807301788

Morgan, R. D., Beer, A. M., Fitzgerald, K. L., & Mandracchia, J. T. (2007). Graduate students' experiences, interests, and attitudes towards correctional/forensic psychology. *Criminal Justice and Behavior, 34,* 96-107. doi:10.1177/0093854806289831

Morgan, R. D., Steffan, J. S., Shaw, L., & Wilson, S. (2007). Needs for and barriers to correctional mental health services: Inmate perceptions. *Psychiatric Services, 58,* 1181-1186. doi:10.1176/appi.ps.58.9.1181

Steffan, J. S., Kroner, D. G, & Morgan, R. D. (2007). Effect of symptom information and intelligence in dissimulation: An examination of faking response styles by inmates on the Basic Personality Inventory. *Assessment, 14,* 1-13. doi:10.1177/1073191106295404

Wormith, J. S., Althouse, R., Reitzel, L. R., Simpson, M., Fagan, T. J., & Morgan, R. D. (2007). The rehabilitation and reintegration of offenders: The current landscape and some future directions for correctional psychology [Special issue]. *Criminal Justice and Behavior, 34,* 879-892. doi:10.1177/0093854807301552

DiLillo, D., DeGue, S., Cohen, L. M., & Morgan, R. D. (2006). The Path to Licensure for Academic Psychologists: How Tough is the Road? *Professional Psychology: Research and Practice, 37,* 567-586. doi:10.1037/0735-7028.37.5.567

Kroner, D. G., Mills, J. F., & Morgan, R. D. (2006). Socially desirable responding and the measurement of violent and criminal risk: Self-report validity. *Journal of Forensic Psychology Practice, 6,* 27-42. doi:10.1300/J158v06n04_02

Miller, T. W., DeLeon, P. H., Morgan, R. D., Penk, W. E., & Magaletta, P. R. (2006). The public sector psychologist with 2020 Vision. *Professional Psychology: Research and Practice, 37,* 531-538. doi:10.1037/0735-7028.37.5.531

Garland, J. T., Morgan, R. D., & Beer, A. M. (2005). Impact of time in prison and security level on inmates' sexual attitude, behaivor, and identity. *Psychological Services, 2,* 151-162. doi:10.1037/1541-1559.2.2.151

Morgan, R. D., Garland, J. T., Rozycki, A. T., Reich, D. A., & Wilson, S (2005). Group Therapy Goals: A Comparison of Group Therapy Providers and Male Inmates. *The Journal for Specialists in Group Work, 30,* 159-172. doi:10.1080/01933920590926011

Morgan, R. D., Kroner, D. G., & Mills, J. F (2006). Group Psychotherapy in Prison: Facilitating Change Inside the Walls. *Journal of Contemporary Psychotherapy, 36,* 137-144. doi:10.1007/BF02729057

Steffan, J. S., & Morgan, R. D. (2005). Meeting the needs of mentally ill offenders: Inmate service utilization. *Corrections Today, 67,* 38 - 41, 53.

Steffan, J. S., Morgan, R. D., Cicerello, A. & Birmingham, D. (2005). Utility of the MCMI-3 to detect response bias among forensic patients. *Journal of Forensic Psychology, 23,* 43-58.

Morgan, R. D., Rozycki, A. T., & Wilson, S. (2004). Inmate perceptions of mental health services. *Professional Psychology: Research and Practice, 35,* 389-396. doi:10.1037/0735-7028.35.4.389

Steffan, J. S., Clopton, J. R., & Morgan, R. D. (2003). An MMPI-2 scale to detect malingered depression (Md Scale). *Assessment, 10,* 382-392. doi:10.1177/1073191103259548

Cohen, L. M., Morgan, R. D., DiLillo, D., & Flores, L. Y. (2003). Why was my major professor so busy? Establishing an academic career while pursuing applied work. *Professional Psychology: Research and Practice, 34,* 88-94. doi:10.1037//0735-7028.34.1.88

Morgan, R. D., & Flora, D. B. (2002). Group psychotherapy with incarcerated offenders: A research synthesis. *Group Dynamics: Theory, Research, and Practice, 6,* 203-218. doi:10.1037//1089-2699.6.3.203

Morgan, R. D., & Winterowd, C. L. (2002). Interpersonal process-oriented group psychotherapy with offender populations. *International Journal of Offender Therapy and Comparative Criminology, 46,* 466-482. doi:10.1177/0306624X02464008

Ax, R. K., & Morgan, R. D. (2002). Internship training opportunities in correctional psychology: A comparison of settings. *Criminal Justice and Behavior, 29,* 332-347. doi:10.1177/0093854802029003005

Morgan, R. D., Van Haveren, R. A., & Pearson, C. A. (2002). Correctional officer burnout: Further analyses. *Criminal Justice and Behavior, 29,* 144-160. doi:10.1177/0093854802029002002

Winterowd, C. L., Morgan, R. D., & Ferrell, S. W. (2001). Principal component analysis of important goals for group counseling and psychotherapy with male inmates. *Journal for Specialists in Group Work, 26,* 406-417. doi:10.1080/01933920108413788

Ferrell, S. W., Morgan, R. D., & Winterowd, C. L. (2000). Job satisfaction of mental health professionals providing group psychotherapy in state correctional facilities. *International Journal of Offender Therapy and Comparative Criminology, 44,* 232-241. doi:10.1177/0306624X00442008

Morgan, R. D., Olson, K., Krueger, M. R., Schellenberg, R. P., & Jackson, T. J. (2000). Do the DSM decision trees improve diagnostic ability? *Journal of Clinical Psychology, 56,* 73-88. doi:10.1002/(SICI)1097-4679(200001)56:1<73::AID-JCLP7>3.0.CO;2-I

Morgan, R. D., Ferrell, S. W., & Winterowd, C. L. (1999). Therapists' perceptions of important therapeutic factors in psychotherapy groups for male inmates in state correctional facilities. *Small Group Research, 30,* 712-729. doi:10.1177/104649649903000603

Morgan, R. D., Winterowd, C. L., & Ferrell, S. W. (1999). A national survey of group psychotherapy services in correctional facilities. *Professional Psychology: Research and Practice, 30,* 600-606. doi:10.1037//0735-7028.30.6.600

Morgan, R. D., Winterowd, C. L., & Fuqua, D. R. (1999). The efficacy of an integrated theoretical approach to group psychotherapy for male inmates. *Journal of Contemporary Psychotherapy, 29,* 203-222. doi: 10.1023/A:1021969118113

**Books**

Kuther, T. L., & Morgan, R. D. (2012). *Careers in Psychology: Opportunities in a Changing World* (4th ed.). Pacific Grove, CA: Wadsworth/Thomas Learning.

Mills, J. F., Kroner, D. G., & Morgan, R. D. (2011). *The clinician's guide to violence risk assessment.* New York: Guilford Publications.

Kuther, T. L., & Morgan, R. D. (2010). *Careers in Psychology: Opportunities in a Changing World* (3rd ed.). Pacific Grove, CA: Wadsworth/Thomas Learning.

Kuther, T. L., & Morgan, R. D. (2007). *Careers in Psychology: Opportunities in a Changing World* (2nd ed.). Pacific Grove, CA: Wadsworth/Thomas Learning.

Morgan, R. D., Kuther, T. L., & Habben, C. (Eds.). (2005). *Life After Graduate School in Psychology: Insider's Advice from New Psychologists.* New York: Psychology Press.

Kuther, T. L., & Morgan, R. D. (2004). *Careers in Psychology: Opportunities in a Changing World.* Pacific Grove, CA: Wadsworth/Thomas Learning.

**Books in Progress**

Morgan, R. D., Kroner, D. G., & Mills, J. F. (invited book under contract). *Treating the Mentally Disordered Offender: A Model and Guide for Empirically Supported Practice.* New York: Oxford University Press.

**Chapters in Books**

Kroner, D. G., & Morgan, R. D. (2014). An overview of strategies for the assessment and

treatment of criminal thinking. In R. C. Tafrate & D. Mitchell (Eds.), *Forensic CBT: A Handbook for Clinical Practice*. Hoboken, NJ: Wiley-Blackwell.

Morgan, R. D., Kroner, D. G., Mills, J. F., & Batastini, A. B. (2014). Treating criminal offenders. In I. B. Weiner & R. K. Otto (Eds.) *Handbook of Forensic Psychology* (pp. 795-837). Hoboken, NJ: John Wiley & Sons.

Morgan, R. D., Romani, C. J., & Gross, N. G. (2014). Group work with offenders and mandated clients. In J. L. DeLucia-Waack, C. Kalodner, & M. Riva (Eds.), *The Handbook of Group Counseling and Psychotherapy* (pp. 441-449). Thousand Oaks, CA: Sage Publications.

Batastini, A. B., McDonald, B., & Morgan, R. D. (2013). Videoteleconferencing in forensic and correctional practice. In K. Myers & C. Turvey (Eds.) *Telemental Health: Clinical, Technical and Administrative Foundations for Evidence-Based Practice* (pp, 251-271). Kidlington, United Kingdom: Elsevier.

Bauer, R. L., Morgan, R. D., & Mandracchia, J. T., (2010). Offenders with severe and persistent mental illness. In T. J. Fagan & R. K. Ax (Eds.), *Correctional Mental Health* (pp. 189-212). Thousand Oaks, CA: Sage Publications.

Miller, T. W., Morgan, R. D., & Wood, J. A. (2009). A telehealth technology model for information science in rural settings. In A. Dwivedi (Ed.), Handbook of Research on IT Management and Clinical Data Administration in Healthcare. Hershey, PA: IGI Global.

Senter, A., Morgan, R. D., & Mandracchia, J. T. (2007). Differing perspectives: Correctional systems in non-western countries. In R. K. Ax and J. T. Fagan (Eds.). *Corrections, Mental Health, and Social Policy: International Perspectives* (pp. 320-334). Springfield, IL: Charles C. Thomas.

Flores, L. Y., & Morgan, R. D. (2005). Doctoral institutions: On the other side of the fence. In R. D. Morgan, T. L. Kuther, & C. Habben (Eds.), *Life After Graduate School in Psychology: Insider's Advice from New Psychologists* (pp. 29-44). New York: Psychology Press.

Kuther, T. L., Habben, C. J., & Morgan, R. D. (2005). Today's new psychologist: Traditional and emerging career paths. In R. D. Morgan, T. L. Kuther, & C. Habben (Eds.), *Life After Graduate School in Psychology: Insider's Advice from New Psychologists* (pp. 1-11). New York: Psychology Press.

Morgan, R. D., Habben, C. J., & Kuther, T. L. (2005). Our future is up to us: The new psychologist's role in shaping the profession. In R. D. Morgan, T. L. Kuther, & C. Habben (Eds.), *Life After Graduate School in Psychology: Insider's Advice from New Psychologists* (pp. 329-332). New York: Psychology Press.

Morgan, R. D. (2004). Groups with offenders and mandated clients. In J. L. DeLucia-Waack, D. Gerrity, C. Kalodner, & M. Riva (Eds.), *Handbook of Group Counseling and Psychotherapy* (pp. 388-400). Thousand Oaks, CA: Sage Publications.

Morgan, R. D. (2003). Basic mental health services: Services and issues. In T. Fagan & R. K. Ax (Eds.), *Correctional mental health handbook* (pp. 59-71). Thousand Oaks, CA: Sage Publications.

## Non-Refereed Publications

Van Horn, S. A. & Morgan, R. D. (in press). Mental health care in the justice system. In A. Wenzel (Ed.), Encyclopedia of Abnormal and Clinical Psychology. Thousand Oaks: Sage.

Morgan, R. D., Kroner, D. G., & Mills, J. F. (2012). *Re-entry: Dynamic risk assessment* (Report No. 238075). Washington, DC: National Institute of Justice.

Epperson, M., Wolff, N., Morgan, R., Fisher, W., Frueh, B. C., & Huening, J. (2011). *The next generation of behavioral health and criminal justice interventions: Improving outcomes by improving interventions.* Center for Behavioral Health Services & Criminal Justice Research.

Dvoskin, J. A., & Morgan, R. D. (2010). Correctional psychology. In I. Weiner, & W. E. Craighead (Eds.), *Corsini Encyclopedia of Psychology* (Vol. 1, pp. 417-420). New York: Wiley.

Community Corrections Research Guide Advisory Group (2009). *Improving outcomes for people with mental illness under community supervision.* New York: Council of State Governments Justice Center.

Magaletta, P. R., McLearen, A. M., & Morgan, R. D. (2007). Framing evidence for mental health services research in corrections. *Corrections Today, 69,* 38-40.

Morgan, R. D. (2007). Foreword [Special issue]. *Criminal Justice and Behavior, 34,* 877-878.

## Conference Presentations

Van Horn, S. A., & Morgan, R. D. (2016, June). *Engagement and Treatment Completion in a Correctional Sample.* Paper presented at the annual International Association of Forensic Mental Health Conference, New York City, New York.

Van Horn, S. A., Morgan, R. D., & Wang, E. (2016, June). *Assessing Risk in Justice-Involved Women: Predictive Validity of the Criminal Sentiments Scale-Modified and the Effect of Treatment on Recidivism.* Paper presented at the annual International Association of Forensic Mental Health Conference, New York City, New York.

Bolanos, A. D., Morgan, R. D., & Mitchell, S. M. (2016, June). Psychiatric and criminogenic risk:

Comparing psychiatric inpatients to offenders who plead not guilty by reason of insanity. In R. Serin (Chair), *Refining assessment and intervention in justice involved persons with mental illness.* Symposium presented at the 2016 annual meeting of the Canadian Psychological Association, Victoria, Canada.

Morgan, R. D. (2016, June). Communicating risk information. In J. Mills (Chair), *Factors that influence the over-estimation of criminal risk.* Symposium presented at the 2016 annual meeting of the Canadian Psychological Association, Victoria, Canada.

Morgan, R. D., Hunter, J., Van Horn, S., & Ramler, T. (2016, June). Changing Lives and Changing Outcomes: A treatment program for offenders with mental illness. In R. Serin (Chair), *Refining assessment and intervention in justice involved persons with mental illness.* Symposium presented at the 2016 annual meeting of the Canadian Psychological Association, Victoria, Canada.

Morgan, R. D. (2016, April). *Changing Lives and Changing Outcomes: A treatment program for offenders with mental illness.* Paper presented at the Rethinking Mass Incarceration in the South conference, Oxford, Mississippi.

Batastini, A. B., Chadick, C. D., Morgan, R. D., & Levulis, S. J. (2016, March). *The psychological impact of solitary: A longitudinal comparison of general population and long-term administratively segregated inmates.* Paper presented at the annual meeting of the American Psychology-Law Society, Atlanta, Georgia.

Grabowski, K., Morgan, R. D., & Bauer, R. (2016, March). *The relationship of criminal risk factors and psychiatric symptomatology in predicting disciplinary infractions.* Poster presented at the annual meeting of the American Psychology-Law Society, Atlanta, Georgia.

Hoeffner, C., Batastini, A. B., & Morgan, R. D. (2016, March). *Does the method of risk communication effect mock jurors' perceptions of violence?* Poster presented at the annual meeting of the American Psychology-Law Society, Atlanta, Georgia.

Van Horn, S. A., Morgan, R. D., & Ramler, T. (2016, March). Engagement and treatment completion in a correctional sample. Poster presented at the annual meeting of the American Psychology-Law Society, Atlanta, Georgia.

Morgan, R. D., MacLean, N., Van Horn, S. A., Bolanos, A., & Batastini, A. B. (2015, August). *Administrative segregation: Is it really as harmful as some predict?* Poster presented at the 2015 meeting of the American Psychological Association, Toronto, Canada.

Bolanos, A. D., Morgan, R. D., Mitchell, S. M., & Grabowski, K. E., (2015, June). Shared risk factors among persons with metnal illness who are and are not criminal justice involved. In D. Kroner (Chair), *Treating offenders with mental illness: Current research perspectives.* Symposium presented at the 2015 meeting of the North American Correctional and Criminal Justice Psychology Conference, Ottawa, Canada.

Grabowski, K. E., Mitchell, S. M., Bolanos, A. D., Morgan, R. D., & Hunter, J., (2015, June). *The relation between perceived burdensomeness and suicidal ideation: A comparison of persons with mental illness who are and are not criminal justice involved*. Poster presented at the 2015 meeting of the North American Correctional and Criminal Justice Psychology Conference, Ottawa, Canada.

MacLean N. & Morgan, R. D. (2015, June). *Bias in forensic risk assessments*. Poster presented at the 2015 meeting of the North American Correctional and Criminal Justice Psychology Conference, Ottawa, Canada.

Morgan, R. D., Gray, A. L., MacLean, N., Van Horn, S. A., Bolanos, A. D., Batastini, A. B., & Mills, J. F. (2015, June). Administrative segregation: Is it really as harmful as some proclaim? In S. Wormith (Chair), *The effects of prison life and solitary confinement*. Symposium presented at the 2015 meeting of the North American Correctional and Criminal Justice Psychology Conference, Ottawa, Canada.

Morgan, R. D., Mitchell, S., Thoen, M., Sustaita, M., Bolanos, A. D., & Campion, K. (2015, June). *Specialty courts: Who's in and are they working*? Paper presented at the 2015 meeting of the North American Correctional and Criminal Justice Psychology Conference, Ottawa, Canada.

Nunez, M., Mitchell, S. M., Van Horn, S. A., Bolanos, A. D., & Morgan, R. D. (2015, June). *The relation between hopelessness and mental health recovery attitudes in individuals with and without criminal justice involvement*. Poster presented at the 2015 meeting of the North American Correctional and Criminal Justice Psychology Conference, Ottawa, Canada.

Van Horn, S. A. & Morgan, R. D. (June, 2015). What works in Changing Lives and Changing Outcomes: A new intervention for justice involved persons with mental illness. In D. Kroner (Chair), *Treating offenders with mental illness: Current research perspectives*. Symposium presented at the 2015 meeting of the North American Correctional and Criminal Justice Psychology Conference, Ottawa, Canada.

Batastini, A. B., Morgan, R. D., & McDaniel, B. (2015, March), *Comparing Group Psychotherapy via Telehealth and In-Person Service Modalities for Inmates in Long-Term Segregation*. Poster presented at the annual meeting of the American Psychology-Law Society, San Diego, California.

Morgan, R. D., Mitchell, S., Thoen, M., Sustaita, M., Bolanos, A., & Campion, K. (2015, March). Specialty courts: Who's in and are they working? In R. D. Morgan (Chair), *Working to improve correctional practice: Assessing risk, community intervention, and understanding desistance*. Symposium presented at the 2015 American Psychology and Law Society Convention, San Diego, CA.

Batastini, A. B., Bolanos, A., & Morgan, R. D. (2014, August). *Employer Attitudes toward Hiring*

*Applicants with Mental Illness and Criminal Justice Involvement: A Follow-Up Study.* Poster presented at the annual meeting of the American Psychological Association Convention, Washington, D.C.

McDonald, B. R., Morgan, R. D., Campion, K., & Bolanos, A. (August 2014). *The Attorney-Client Working Relationship: Videoconferencing versus In-Person Modalities.* Poster presented at the annual convention of the American Psychological Association, Washington, D.C.

White, K. B. & Morgan, R. D. (2014, August). *Trauma, Criminal Risk, and Treatment Outcomes in a Correctional Sample.* Poster session presented at the annual convention of the American Psychological Association, Washington, DC.

Batastini, A. B., King, C. M., McDaniel, B., MacLean, N., Van Horn, S., & Morgan, R. D. (2014, March). *Effectiveness of Telepsychology in Correctional and Forensic Practice: A Research Synthesis and Meta-Analysis.* Paper presented at the annual meeting of the American Psychology-Law Society, New Orleans, Louisiana.

Morgan, R. D., Van Horn, S. A., MacLean, N., Bolanos, A., Batastini, A. B., Gray, A., & Mills, J. F. (2014, March). *Administrative Segregation: Is It a Harmful Correctional Practice?* Poster presented at the annual meeting of the American Psychology-Law Society, New Orleans, Louisiana.

White, K. B. & Morgan, R. D. (2014, March). *Readiness for Change, Personal Growth Initiative, and Criminal Risk in a Correctional Sample.* Poster presented at the annual meeting of the American Psychology-Law Society, New Orleans, Louisiana.

Morgan, R. D., & Kroner, D. G., (2013, October). *An evidenced-based approach for Treating inmates with mental illness.* Paper presented at the annual meeting of the National Commission on Correctional Health Care, Nashville, TN.

Morgan, R. D., Kroner, D. G., & Mills, J. F. (2013, July). *An evidenced-based approach for Treatment of inmates with mental illness.* Paper presented at the annual meeting of the National Commission on Correctional Mental Health Care, Las Vegas, NV.

Gross, N. R., Morgan, R. D., & Piper, M. A. (2013, August). *Variables predictive of criminal justice involvement in community mental health consumers.* Poster presented at the 2013 American Psychological Association Convention, Honolulu, HI.

Batastini, A. B., Morgan, R. D., Mills, J. F., Kroner, D. G., & Moor, K. (2013, March). *Changing Problematic Associates: A Preliminary Evaluation of a Treatment Program for Offenders with Mental Illness.* Poster session presented at the annual American Psychology-Law Society Conference, Portland, Oregon.

Gross, N. R., & Morgan, R. D. (2013, March). Criminal thinking in a community mental health

sample: Effects on treatment engagement, psychiatric recovery, and criminality. In R. D. Morgan (Chair), *Mental illness in criminal justice settings: Identifying needs and custodial concerns.* Symposium presented at the 2013 American Psychology and Law Society Convention, Portland, OR.

Batastini, A. B., Bolanos, A., Dean, T., Moor, K., Bewley, M., & Morgan, R. D. (2012, August). *Employer Bias in Hiring Mentally Ill and Criminal Justice-Involved Applicants: The Impact of Education and Experience.* Poster session presented at the annual American Psychological Association Convention, Orlando, Florida.

Gross, N. R., Morgan, R. D., & Mitchell, S. M. (2012, August). *An Exploratory Analysis of the Relationship of Criminal Thinking and Psychiatric Symptomology with the Number of Lifetime Psychiatric Hospitalizations.* Poster presented at the Annual Convention of the American Psychological Association, Orlando, FL.

Bauer, R. L., Bolanos, A. D., Morgan, R. D. (2012, March). *Incarceration of Long-Term Incarceration for Persons with Mental Illness.* In Morgan, R. D. (Chair), *Mental illness in criminal justice settings: Identifying needs and custodial concerns.* Symposium presented at the 2013 Annual Conference of the American Psychology-Law Society, Portland, OR.

Gross N. R., Mitchell, S. M., Gutierrez, M. N., & Morgan, R. D. (2011, August). *Criminal thinking and psychiatric presentation: A comparison of offenders with mental illness and psychiatric patients.* Poster presented at the annual convention of the American Psychological Association, Washington DC.

Mandracchia, J. T., Gonzalez, R., & Morgan, R. D. (August, 2011). *Predicting offenders' criminogenic cognitions with status variables.* Poster presented at the annual convention of the American Psychological Association, Washington DC.

McDonald, B., & Morgan, R. D. (August 2011). *Enhancing homework compliance in correctional psychotherapy: An empirical investigation.* Poster presented at the annual convention of the American Psychological Association, Washington, D.C.

Mitchell, S.M., Romani, C.J., Morgan, R.D. (2011, August). *Criminal thinking: a link between self-injurious behavior and mood disorders in offenders with mental illness.* Poster presented at the annual convention of the American Psychological Association, Washington, D.C.

Morgan, R.D. (2011, August). Discussant. In R. D. Morgan (Chair), *Offender treatment programs: Past, present and future directions.* Symposium conducted at the annual convention of the American Psychological Association, Washington DC.

Romani, C. J., Mandraccia, J., T., & Morgan, R. D. (2011, August). *Does psychiatric diagnosis help us understand criminal thinking in offenders with severe mental illness: An exploratory cluster analysis.* Poster presented at the annual convention of the American Psychological Association, Washington D.C.

Romani, C. J., Morgan, R. D., Gross, N.R., & McDonald, B, R. (2011, August). The not-so-hidden value of appropriate treatments: What the literature hasn't told you about R-N-R. In R. D. Morgan (Chair) *Offender treatment programs: Past, present, and future directions*. Symposium conducted at the annual convention of the American Psychological Association, Washington, D.C.

Serna, C., Bolanos, A., Murray, D., Porras, C., Rodriguez, A., & Morgan, R. D. (August 2011). *Criminal thinking: A state or trait process*. Poster presented at the annual convention of the American Psychological Association, Washington D.C.

Morgan, R. D (June, 2011). Dynamic risk assessment: An overview. In D. G. Kroner (Chair), *Dynamic risk assessment: Examination of a 6-wave study with outcome data*. Symposium conducted at the Second North American Correctional and Criminal Justice Psychology Conference, Toronto, Canada.

Morgan, R. D., Kroner, D. G., Mills, J. F., & Bauer, R. (June, 2011). Changing lives and changing outcomes: A treatment outcome study for offenders with mental illness. In S. M. Manchak (Chair), *Moving beyond "What works?" to "How?" and "For whom?": A closer look at interventions for offenders with mental illness*. Symposium conducted at the Second North American Correctional and Criminal Justice Psychology Conference, Toronto, Canada.

Romani, C. J., Morgan, R. D., Gross, N.R., & McDonald, B, R. (2011, June). The not-so-hidden value of appropriate treatments: What the literature hasn't told you about R-N-R. In J. A. Dvoskin (Chair) *Offender treatment programs: Past, present, and future directions*. Symposium conducted at the North American Correctional and Criminal Justice Psychology Conference, Toronto, ON.

Morgan, R. D., Fisher, W., & Wolff, N. (March, 2011). Offenders with mental illness: Are they mad, bad or both? In V.A. Hiday (Chair), *Reducing recidivism among mentally ill offenders*. Symposium conducted at the annual meeting of the American Psychology-Law Society, Miami, Florida.

Bewley, M. T., Steffan J. S., Morgan, R. D., Sellbom, M., & Jane, A. (August 2010). *Detecting the sophistication among depressed malingerers using the Md Scale*. Poster presented at the annual convention of the American Psychological Association, San Diego, California.

Day, L. E., Mitchell, S. M., Davenport, K. L., Serna-McDonald, C. C., & Morgan, R. D. (August 2010). *Offenders' with mental illness refusal of mental health treatment*. Poster presented at the annual convention of the American Psychological Association, San Diego, California.

Gross, N. R., Mills, J. F., Kroner, D. G., Steffan, J. S., Rodriguez, A., & Morgan, R. D. (August 2010). *Depression, problem solving, and hopelessness: A model for suicide*. Poster presented at the annual convention of the American Psychological Association, San Diego, California.

Mandracchia, J. T., Shaw, L. B., To, Y. M., & Morgan, R. D. (August 2010). *Attitudes toward criminal justice issues by race, gender, and education.* Poster presented at the annual convention of the American Psychological Association, San Diego, California.

McDonald, B. R., Mills, J. F., Morgan, R. D., Kroner, D. G., Steffan, J. S., & Bewley, M. T. (August 2010). *Coping with negative affect: Are coping strategies specific to emotion?* Poster presented at the annual convention of the American Psychological Association, San Diego, California.

Romani, C. J., Morgan, R. D., Gutierrez, M. N., Gross, N. R., & McDonald, B. R. (August 2010). *Does treatment provide a financial incentive to correctional institutions?* Poster presented at the annual convention of the American Psychological Association, San Diego, California.

Serna-McDonald, C. C. & Morgan, R. D. (August 2010). *Effectiveness of treatment for offenders with mental illness.* Poster presented at the annual convention of the American Psychological Association, San Diego, California.

Kroner, D. G., Morgan, R. D., Mills, J. F., Serna, C., Bewley, M. T. (March 2010). *Dynamic risk Assessment: Can we get there?* Paper presented at the annual convention of the American Psychology-Law Society, Vancouver, Canada.

Morgan, R. D., Kroner, D. G., Mills, J. F., Bauer, R. L., & Serna, C. (March 2010). *Changing Lives and Changing Outcomes*: An examination of treatment fidelity and effectiveness. Paper presented at the annual convention of the American Psychology-Law Society, Vancouver, Canada.

Morgan, R. D., Kroner, D. G., Mills, J. F., Serna, C., & Bewley, M. T. (August 2009). Can We Use Dynamic Risk to Predict Future Criminal Behavior? In Garcia, M. (Moderator). *Answering Questions about Prisoner Reentry.* Workshop presented at the annual convention of the American Probation and Parole Association, Anaheim, CA.

Bewley, M. T, Nillson, K., Ezell, J., Day, L., Morgan, R. (August 2009). *National Survey of the Description of Services Provided to Mentally Ill Offenders in Prison.* Poster presented at the annual convention of the American Psychological Association, Toronto, Canada.

Morgan, R. D. (August 2009). Discussant. In Varghese, F.P. & Medlock, E. (Co-Chairs). *Post-release offender employment: Barriers, interventions, and implications for social justice.* Symposium presented at the annual convention of the American Psychological Association, Toronto, Canada.

Morgan, R. D., Duan, N., Fisher, W., Romani, C., Mandracchia, J., Murray, D. (August 2009) *Criminal Thinking of Offenders with Mental Illness.* Poster presented at the annual convention of the American Psychological Association, Toronto, Canada.

Morgan, R. D., Kroner, D. G., Mills, J. F., Bauer, R., & Serna, C. (August 2009). *Dynamic Risk Assessment in Criminal Justice: Can We Get There?* Poster presented at the annual convention of the American Psychological Association, Toronto, Canada.

Morgan, R. D., Duan, N., Fisher, W., Romani, C. J., Mandracchia, J. T., & Murray, D. (August 2009). *Criminal Thinking of Offenders with Mental Illness*. Poster presented at the annual convention of the American Psychological Association, Toronto, Canada.

Murray, D., Porras, C., Serna, C., Rodriguez, A., & Morgan, R. (August 2009). *Criminal Thinking: A Static or Dynamic Process.* Poster presented at the annual convention of the American Psychological Association, Toronto, Canada.

Varghese, F.P., Hardin, E.E., & Morgan, R.D. (August 2009). Factors Influencing Offender Employability. In Varghese, F.P. & Medlock, E. (Co-Chairs), *Post-release offender employment: Barriers, interventions, and implications for social justice*. Symposium presented at the annual convention of the American Psychological Association, Toronto, Canada.

Morgan, R. D. (March 2009). Changing Lives and Changing Outcomes: Treatment targets and specified mechanisms of change. In R. D. Morgan (Chair), *Treating the mentally disordered offender: A model and guide for empirically supported practice.* Symposium presented at the annual meeting of the American Psychology-Law Society, San Antonio, Texas.

Bewley, M. T. & Morgan, R. D. (March 2009). *National survey of mental health services for mentally ill offenders in prison*. Poster presented at the annual meeting of the American Psychology-Law Society, San Antonio, Texas.

Mandracchia, J. T. & Morgan, R. D. (August 2008). *Inmate Thinking Patterns: An Integrative Approach.* Poster presented at the annual convention of the American Psychological Association, Boston, MA.

Shaw, L., Morgan R. D., & Bewley, M. (August 2008). *Inmate Characteristics and Mental Health Services.* Poster presented at APA Conference. Boston, MA.

Mandracchia, J. T. & Morgan, R. D. (May 2007). *Criminal Thinking: Past Perspectives and Future Directions*. Concurrent Session presented at the annual meeting of the Mental Health in Corrections Consortium, Kansas City, Missouri.

Bewley, M., Shaw, L., & Morgan R. D. (April 2008). *Diagnosis, Behavior, and Risk for Recidivism.* Poster presented at the MHCC Symposium, Kansas City, MO.

Mandracchia, J. T., Bewley, M., Murray, D., & Morgan, R. D. (March 2008). *Towards Reducing Criminal Behavior: Using the MOTS-R to Evaluate the Dynamic Nature of Criminal Thinking.* Poster presented at the International Counseling Psychology Conference, Chicago, Illinois.

Varghese, F.P., Hardin, E.E., & Morgan, R.D. (2008, March). *The employability of inmates using social cognitive career theory.* Poster presented at the International Counseling Psychology Conference, Chicago, Illinois.

Morgan, R. D., Bauer, R. L., Fisher, W., Duan, N., Mandracchia, J. T., Murray, D., Gaines, M. V., & Varghese, F. P. (2008, March). *Predicting disciplinary infractions among mentally disordered offenders.* Poster presented at the annual meeting of the American Psychology-Law Society, Jacksonville, FL.

Mandracchia, J. T. & Morgan, R. D. (2008, March). *Towards Reducing Criminal Behavior: Using the MOTS-R to Evaluate the Dynamic Nature of Criminal Thinking.* Poster presented at the International Counseling Psychology Conference, Chicago, Illinois.

Gaines, M.V., Giles, C.L., Morgan, R.D., & Steffan, J. (2007, August). *The Combined Use of the M-FAST and PAI in the Detection of Malingering among Inmates.* Poster presented at the annual meeting of the American Psychology Association, San Francisco, California.

Magaletta, P., Morgan, R. D., Reitzel, L, & Innes, C. (2007, August). Toward the one: Strengthening behavioral sciences research in corrections. In R. D. Morgan (Chair), *Developing a research agenda in correctional psychology.* Symposium presented at the annual meeting of the American Psychological Association, San Francisco, CA.

Morgan, R. D., Duan, N., Fisher, W. H., Mandracchia, J. T., Murray, D., Rodriguez, A., (2007, August). *Criminal thinking and attitudes in mentally disordered offenders.* Poster presented at the annual meeting of the American Psychological Association, San Francisco, CA.

Morgan, R. D., Flora, D. B., Kroner, D. G., Mills, J., Varghese, F., & Steffan, J. S. (2007, August). Treatment of mentally disordered offenders: A research synthesis. In D.G. Kroner and R.D. Morgan (Co-Chairs), *Mentally disordered offenders: A special population requiring special attention.* Symposium presented at the annual meeting of the American Psychological Association, San Francisco, CA.

Nussbaum, D., Ax, R. K., Fagan, T., Magaletta, P., & Morgan, R. D. (2007, August). Innovations in correctional assessment and treatment. In R. D. Morgan (Chair), *Developing a research agenda in correctional psychology.* Symposium presented at the annual meeting of the American Psychological Association, San Francisco, CA.

Wormith, J., Althouse, R., Reitzel, L., Fagan, T., & Morgan, R. D. (2007, August). The rehabilitation and reintegration of offenders: The current landscape and some future directions for correctional psychology. In R. D. Morgan (Chair), *Developing a research agenda in correctional psychology.* Symposium presented at the annual meeting of the American Psychological Association, San Francisco, CA.

Mandracchia, J. T., Varghese, F. V., Morgan, R. D., & Jackson, C. T. (2007, June). Reliability and Validity of the Depression, Hopelessness, and Suicide Screening Form in a Clinical Population.

In J. Mills (Chair) *The Depression Hopelessness And Suicide Screening Form: Validity and generalizability to offender, student and clinical samples*. Symposium presented at the North American Correctional and Criminal Justice Psychology Conference, Ottawa, Canada.

Mandracchia, J. T., & Morgan, R. D. (2007, June). Graduate school training in correctional and forensic psychology. In R. D. Morgan (Chair), *Training in correctional and forensic psychology*. Symposium presented at the North American Correctional and Criminal Justice Psychology Conference, Ottawa, Ontario.

Morgan, R. D. (2007, July). Treatment of individuals with mental illness in a state prison. In J. Draine (Chair), *Mental illness and treatment during and after incarceration*. Linked session presented at the Nineteenth NIMH Conference on Mental Health Services Research, Washington, DC.

Morgan, R. D.., Flora, D., Kroner, D. G., Mills, J. F., Varghese, J. P., & Steffan, J. S. (2007, June). *Treatment of mentally disordered offenders: A research synthesis*. Paper presented at the North American Correctional and Criminal Justice Psychology Conference, Ottawa, Canada.

Morgan, R. D., Gaines, M. V., Fisher, W., Duan, N., Mandracchia, J. T., Murray, D., Rodriguez, A., Bauer, R. L., & Varghese, F. P., (2007, June). *Tailoring services for mentally ill offenders*. Poster presented at the North American Correctional and Criminal Justice Psychology Conference, Ottawa, Canada.

Mandracchia, J. T., Morgan, R. D., Garos, S., & Garland, J. T. (2007, April). *Status Variables and Criminal Thinking in Offenders*. Poster presented at the annual meeting of the Mental Health in Corrections Consortium, Kansas City, Missouri.

Mandracchia, J. T., Shaw, L., Morgan, R. D. (2007, February). *Effects of Education on Attitudes towards Criminal Justice Issues*. Paper presented at the annual meeting of the Southwest Educational Research Association, San Antonio, Texas.

Mandracchia, J. T., Morgan, R. D., Garos, S., Garland, J. T., & Rodriguez, A. (2006, August). *Inmate thinking patterns: An empirical investigation*. Poster presented at the annual meeting of the American Psychological Association, New Orleans, Louisiana.

Morgan, R. D., Steffan, J. S., Shaw, L. B., & Wilson, M. S. (2006, August). *Needs and barriers for correctional mental health services: Inmate perceptions*. Poster presented at the annual convention of the American Psychological Association, New Orleans, Louisiana.

Senter, A., & Morgan, R. D. (2006, August). *Public Service Psychologist Burnout, Job Satisfaction, and Life Satisfaction*. Poster presented at the annual meeting of the American Psychological Association, New Orleans, LA.

Senter, W. A., & Morgan, R. D. (2006, May). *Working in the Big House: Correctional Psychologist, Burnout, Job Satisfaction, and Life Satisfaction.* Poster presented at the annual meeting of the Mental Health in Corrections Consortium, Kansas City, MO.

Rodriguez, A., Steffan, J. S. Lopez, M. J., & Morgan, R. D. (2006, May). *Detecting malingering among offenders with the MCMI-3.* Poster presented at the annual meeting of the Mental Health in Corrections Consortium, Kansas City, MO.

Varghese, F. P., Hardin, E. E., & Morgan, R. D. (2006, May). Understanding the factors that affect employability of soon-to-be released prisoners. Poster Presented at the annual meeting of the Mental Health and Corrections Consortium, Kansas City, Missouri.

Morgan, R. D. (2005, August). Discussant. In R. Morgan (Chair), Associates and Adult Criminal Behavior: Theory, Research, Treatment, and Evaluation. Symposium conducted at the annual meeting of the American Psychological Association, Washington, D.C.

Morgan, R. D., & Patrick, A. R. (2005, August). Offender perceptions of telemedicine vs. face-to-face psychotherapy. Poster presented at the annual meeting of the American Psychological Association, Washington, D.C.

Steffan, J. S., & Morgan, R. D. (2005, August). *Examination of a new MMPI-2 scale to detect malingered depression.* Poster presented at the annual meeting of the American Psychological Association, Washington, D.C.

Steffan, J. S., Morgan, R. D., & Lopez, M. J. (2005, August). *Detecting inmates malingering: Comparison of the MMPI-2, PAI, and MCMI-3.* Poster presented at the annual meeting of the American Psychological Association, Washington, D.C.

Steffan, J. S., & Morgan, R. D. (2005, June). Detection of malingered depressive symptoms with multiscale inventories: An analysis of the MMPI-2, PAI, and MCMI-3 with correctional inmates. In F. Rudmin (Chair), *Psychometric detection of feigned (faked, malingered) depression.* Conversation session presented at the annual meeting of the Canadian Psychological Association, Montreal, Ontario, Canada.

Steffan, J. S., Denney, D., & Morgan, R. D. (2005, April). *Reducing institutional infractions: An analysis of the CODE treatment program.* Poster session presented at the Mental Health in Corrections Consortium, Kansas City, Missouri.

DeGue, S., Fortier, M. A., DiLillo, D., Cohen, L. M., & Morgan, R. D. (November 2004). *Issues and Obstacles in the Licensure Process for Early Career Academic Psychologists.* Poster presented at the 38th annual meeting of the Association for the Advancement of Behavioral Therapy, New Orleans, LA.

Beer, A. M., Morgan, R. D., & Garland, J. T. (2004, July/August). *The role of romantic/intimate relationships in the well-being of incarcerated females*. Poster presented at the annual meeting of the American Psychological Association, Honolulu, HI.

Morgan, R. D. (2004, July/August). Training psychologists for public service psychology in 2020. In R. D. Kerns and T. W. Miller (Chairs), *Future of Psychology in the Public Sector: Innovations and Challenges for 2020*. Symposium conducted at the annual meeting of the American Psychological Association, Honolulu, HI.

Morgan, R. D., Beer, A. M., Fitzgerald, K. L., & Mandracchia, J. T. (2004, July/August). *Graduate student's experiences, interests, and attitudes towards correctional/forensic psychology*. Poster presented at the annual meeting of the American Psychological Association, Honolulu, HI.

Patrick, A. R., Morgan, R. D., & Garland, J. T. (2004, July/August). Inmate perceptions of telepsychology and telepsychiatry. In R. D. Morgan (Chair), *Treatment Behind Bars: Innovative Strategies*. Symposium conducted at the annual meeting of the American Psychological Association, Honolulu, HI.

Kroner, D. G., Mills, J. F., Morgan, R. D. & Mandracchia, J. T. (2004, April). *Training correctional mental health professional's in suicide prevention*. Concurrent session (2 hours) presented at the annual meeting of the Mental Health in Corrections Consortium, Kansas City, MO.

Steffan, J. S., Cicerello, A. R., Birmingham, D. L., Morgan, R. D., & Mandracchia, J. T. (2004, April). *Sensitivity of the MCMI – 3 to response bias among forensic patients*. Poster presented at the annual meeting of the Mental Health in Corrections Consortium, Kansas City, Missouri.

Steffan, J. S., Kroner, D. G., & Morgan, R. D. (2004, April). *Detecting malingering or faking good by inmates on the Basic Personality Inventory*. Poster presented at the annual meeting of the Mental Health in Corrections Consortium, Kansas City, MO.

Garland J. T., Morgan, R. D., & Beer, A. M. (2003, November). *Correctional Variables as Predictors of Inmate Sexuality Shifts*. Poster presented at the annual meeting of the American Association of Behavioral Therapy, Boston, MA.

Beer, A. M., Garland, J. T., & Morgan, R. D. (2003, August). Romantic/Intimate Relationships and the Well-being of Incarcerated Females. In R. D. Morgan (Chair), *Inmate sexuality and relationships: Before, during, and after incarceration*. Symposium conducted at the annual meeting of the American Psychological Association, Toronto, Canada.

Garland, J. T., Beer, A. M., & Morgan, R. D. (2003, August). Length of Incarceration and Security Level: Effects on Inmate Sexuality. In R. D. Morgan (Chair), *Inmate sexuality and relationships: Before, during, and after incarceration*. Symposium conducted at the annual meeting of the American Psychological Association, Toronto, Canada.

Morgan, R. D., & Cohen, L. M. (2003, August). *Counseling and Clinical Psychology: Are We Training Students Differently?* Poster presented at the annual meeting of the American Psychological Association, Toronto, Canada.

Rozycki, A. T. & Morgan, R. D (2003, August). Transition into Adulthood: The Experiences of Mexican Americans and White Americans. Poster presented at the annual meeting of the American Psychological Association, Toronto, Canada.

Steffan, J. S., Clopton, J. R., & Morgan, R. D. (2002, November). *An MMPI-2 scale to detect malingering of depression.* Paper presented at the annual meeting of the Texas Psychological Association, San Antonio, TX.

Morgan, R. D. (2002, August). What works? Measuring and identifying correctional treatment programs that work. In R. K. Ax (Chair), *Psychology behind bars: Addressing mental health needs.* Symposium conducted at the annual meeting of the American Psychological Association, Chicago, IL.

Morgan, R. D., Rozycki, A. T., Garland, J. T., Reich, D., & Wilson, S. (2002, August). *Treatment goals in group work with inmates.* Poster session presented at the annual meeting of the American Psychological Association, Chicago, IL.

Morgan, R. D., Wilson, S., & Rozycki, A. T. (2001, August). *Inmate perceptions of mental health services.* Poster session presented at the annual meeting of the American Psychological Association, San Francisco, CA.

Birmingham, D., & Morgan, R. D. (2001, August). Helping police manage Type III stress. In S.Holton (Chair), *Law enforcement and stress: Crossing the blue line.* Symposium conducted at the annual meeting of the American Psychological Association, San Francisco, CA.

Morgan, R. D. (2000, August). Academic training opportunities for professional psychologists. In J. M. Cantor (Chair), *Training in psychology: Students' needs, current opportunities, and academic alternatives.* Symposium conducted at the annual meeting of the American Psychological Association, Washington, D.C.

Morgan, R. D. (2000, August). *The efficacy of an integrative group psychotherapy program for inmates.* Paper presented at the annual meeting of the American Psychological Association, Washington, D.C.

Flora, D. B., & Morgan, R. D. (2000, August). *Group psychotherapy with incarcerated offenders: A meta-analysis.* Poster session presented at the annual meeting of the American Psychological Association, Washington, D.C.

Birmingham, D., Cicerello, A., & Morgan, R. D. (1999). *Suicide assessment and prevention.* Workshop presented at the Kansas City Jail and Detention Center.

Birmingham, D., Morgan, R. D., & Cicerello, A. (1999). *Stress management for law enforcement officers*. Workshop presented to the Kansas City Police Academy.

Ax, R. K., & Morgan, R. D. (1999, August). *Predoctoral internships in correctional settings*. Paper presented at the annual meeting of the American Psychological Association, Boston, MA.

Morgan, R. D., Winterowd, C. L., & Fuqua, D. R. (1999, August). *The efficacy of a group psychotherapy program for male inmates*. Poster session presented at the annual meeting of the American Psychological Association, Boston, MA.

Van Haveren, R., Morgan, R. D., & Pearson, C. (1999, August). *Correctional officer burnout: Further analyses*. Poster session presented at the annual meeting of the American Psychological Association, Boston, MA.

Ferrell, S. W., Morgan, R. D., & Winterowd, C. L., (1997, October). *Job satisfaction of mental health professionals in state correctional facilities*. Poster session presented at the annual meeting of the Rocky Mountain Educational Research Association, Stillwater, OK.

Morgan, R. D., Winterowd, C. L., & Ferrell, S. W. (1997, August). *A national survey of group psychotherapy services in correctional facilities*. Poster session presented at the annual meeting of the American Psychological Association, Chicago, IL.

Morgan, R. D. (1997, May). *Group psychotherapy in corrections: Past, present, and future considerations*. Paper presented at the annual meeting of the Mental Health in Corrections Symposium, Kansas City, MO.

Morgan, R. D., Olson, K. R., Krueger, M. R., & Schellenberg, R. P. (1995, April). *Utility of DSM-III-R decision trees*. Poster session presented at the annual meeting of the Southwestern Psychological Association, San Antonio, TX.

Morgan, R. D. (1992, March). *Does the use of the DSM-III-R decision trees increase diagnostic accuracy?* Paper presented at the Great Plains Students Psychology Convention, Kearney, NE.

Morgan, R. D., & Rycek, R. F. (1991, April). *Differences in memory strategies of hospitalized and outpatient schizophrenics*. Paper presented at the annual meeting of the Rocky Mountain Psychological Association, Denver, CO.

Rycek, R. F., Ehrlich, R., & Morgan, R. D. (1991, April). *Differences between traditional and non-traditional students on Wason-type problems*. Paper presented at the annual meeting of the Rocky Mountain Psychological Association, Denver, CO.

## Workshops Presented

Title: *Evidenced based correctional practice for managing and treating offenders with mental illness.*

One Day Training Workshop
Trainer: Robert D. Morgan & Jeremy F. Mills
Sponsored by Canadian Psychological Association.
June 3, 2015

Title: *Changing Lives and Changing Outcomes: A Treatment Program for Offenders with Mental Illness*
One Day Training Workshop
Trainer: Robert D. Morgan
Sponsored by Correct Care Services, Inc.
March 29, 2015

Title: *Escaping the cage: A mental health treatment program for inmates detained in restricted housing*
One Day Training Workshop
Trainer: Robert D. Morgan
Sponsored by Maine Department of Corrections
November 17, 2014, Warren, Maine

Title: *Changing Lives and Changing Outcomes: A Treatment Program for Offenders with Mental Illness*
Two day Training Workshop
Trainers: Morgan, R. D. & Kroner, D. G.
Sponsored by Harris County Community Supervision & Corrections Department
April 2014, Houston, Texas

Title: *Changing Lives and Changing Outcomes: A Treatment Program for Offenders with Mental Illness*
One day Training Workshop
Trainer: Morgan, R. D.
Sponsored by Maine Department of Corrections
February 2014, Warren, Maine

Title: *Risk, needs, and responsivity principles with offenders with mental illness*
One day Continuing Education Workshop
Trainer: Morgan, R. D.
Sponsored by Institute of Law, Psychiatry & Public Policy (University of Virginia)
January 2014, Charlottesville, Virginia

Title: *Changing Lives and Changing Outcomes: A Treatment Program for Offenders with Mental Illness*
Two day Training Workshop
Trainers: Morgan, R. D. & Kroner, D. G.
Sponsored by Forensic and Mental Health Services, Inc
September 2013, Cincinnati, Ohio

Title: *Treating persons with mental illness who are justice involved: A guide to practice*
One-half day Training Workshop
Trainer: Morgan, R. D.
Sponsored by StarCare Specialty Health System
August 2012, Lubbock, Texas

Title: *Treating Offenders with Mental Illness: An Evidenced-Based Approach*
One and one-half hour Continuing Education Workshop
Trainers: Morgan, R. D. & Kroner, D. G.
Sponsored by the 5th Academic & Health Policy Conference on Correctional Health
March 2012, Atlanta Georgia

Title: *Treating the Mentally Disordered Offender: A Model and Guide for Practice*
One day Continuing Education Workshop
Trainer: Morgan, R. D.
Sponsored by the Texas Forensic Mental Health Conference
October 2011, Vernon, Texas

Title: *Treating Offenders with Mental Illness: Toward an Evidenced-Based Approach*
One- day Pre-conference Workshop
Trainers: Morgan, R. D., Kroner, D. G., & Mills, J. F.
Sponsored by American Psychology-Law Society (Division 41; APA)
March 2011, Miami, Florida

Title: *Treating Mentally Disordered Offenders*
One-half day Pre-conference Workshop
Trainers: Morgan, R. D., Kroner, D. G., & Mills, J. F.
Sponsored by Mental Health in Corrections Consortium
April 2008, Kansas City, Missouri

Title: Texas *Criminal Procedure & Offenders with Mental Impairments: A Refresher*
One-half day Continuing Education Workshop
Trainers: Shannon, B., Gerlach, M., & Morgan, R. D.
Sponsored by the Texas Tech University Law School
December 2007, Lubbock, Texas

Title: *Assessing Criminal and Violence Risk: Theory, Ethics, and Application*
One-day Pre-conference Workshop
Trainers: Kroner, D. G., Morgan, R. D., & Mills, J. F.,
Sponsored by the North American Correctional and Criminal Justice Psychology Conference
June 2007, Ottawa, Canada

Title: *Assessing Criminal and Violence Risk: Theory, Ethics, and Application*
One-day Pre-conference Workshop

Trainers: Mills, J. F., Kroner, D. G., & Morgan, R. D.
Sponsored by Mental Health in Corrections Consortium
April 2007, Kansas City, Missouri

Title: *Assessing Criminal and Violence Risk: Theory, Ethics, and Application*
One-day Continuing Education Workshop
Trainers: Mills, J. F., Kroner, D. G., & Morgan, R. D.
Sponsored by the American Psychological Association
August 2006, New Orleans, Louisiana

Title: *Assessing Criminal and Violence Risk: Theory, Ethics, and Application*
One-day Continuing Education Workshop
Trainers: Mills, J. F., Kroner, D. G., & Morgan, R. D.
Sponsored by the Canadian Psychological Association
June 2006, Calgary, Alberta

Title: *Assessing Criminal and Violence Risk: Theory, Ethics, and Application*
One-day Pre-conference Workshop
Trainers: Mills, J. F., Kroner, D. G., & Morgan, R. D.
Sponsored by Mental Health in Corrections Consortium
May 2006, Kansas City, Missouri

**Invited Addresses**

Morgan, R. D. (August, 2015). Counseling psychologists in corrections: A natural fit. Fellows address presented at the 2015 meeting of the American Psychological Association, Toronto, Canada.

Morgan, R. D. (June, 2015).  Psychological assessment in correctional and forensic contexts. Keynote address presented at the Annual MMPI Symposium, Minneapolis, Minnesota.

Morgan, R. D. (April, 2015). Criminal risk factors and offenders with mental illness. Keynote address presented at the Mental Health in Corrections Consortium, Springfield, MO.

Morgan, R. D. (April, 2015). An evidenced-based approach for treating inmates with mental illness. Workshop presented at the Mental Health in Corrections Consortium, Springfield, MO.

Morgan, R. D. (April, 2014). Evidenced based correctional practice for managing and treating offenders with mental illness. Southern Illinois University, Carbondale, IL.

Morgan, R. D. (November, 2012). Treating justice involved persons with mental illness: An evidenced-based approach. Keynote address presented at the Ohio Department of Mental Health and the Northeast Ohio Medical University Forensic Focus Conference, Columbus, Ohio.

Lim, E. & Morgan, R. D. (April 2012). Insanity & other mental issues. Invited presentation at the Capital Trial Persecution for Texas district attorney's, Austin, Texas.

Morgan, R. D. (August 2010). *If not us, then whom?* Presidential address (Division 18) presented at the annual convention of the American Psychological Association, San Diego, California.

Morgan, R. D. (2010, April). Representing offenders with mental illness. Lubbock Special Needs Defenders Office. Invited presentation at a meeting of the Lubbock County Defense Association, Lubbock, Texas (1 hour CLE approved by the State Bar of Texas).

Morgan, R. D. & Gerlach, M. V. (2007, May). *Lubbock Regional MHMR Community Forensic Psychology Program*. Invited presentation at a meeting of the Lubbock County Defense Association, Lubbock, Texas.

Morgan, R. D. & Gerlach, M. V. (2007, March). *Lubbock Regional MHMR Community Forensic Psychology Program*. Invited presentation at the Texas Criminal Procedure & Offenders with Mental Impairments: CLE Training for Judges and Attorney's, Lubbock, Texas.

Morgan, R. D. (2006, June). *Treating Mentally Disordered Offenders: An Integrated Treatment Model*. Invited address at the 11th Biennial Symposium on Violence and Aggression, Saskatoon (Saskatchewan), Canada.

Morgan, R. D. (2006, May). *Ethics and Risk Assessment*. Invited address at the Northeastern Oklahoma Psychology Internship Program's Annual Conference, Tulsa, Oklahoma.

Morgan, R. D. (2003, December). *Forensic Psychology: Much More Than CSI and Silence of the Lambs*. Invited address at the annual Psychology Department Career Day, University of Nebraska at Kearney.


**EXTRAMURAL FUNDING**

**Research Grants – Current/Pending**

Windham School District
Title: Assessment, Review and Revision of the Windham School District Life Skills Curriculum
Principal Investigator
Funding Dates: January 4, 2016 – December 31, 2019
Direct Costs: $216,004
Status: Funded

National Institute of Justice
Title: Toward a better understanding of restrictive housing: An examination of the long-term and environmental effects of segregation on physical and mental health outcomes
Principal Investigator

Funding Dates: January 1, 2017 – December 31, 2019
Direct Costs: $282,934
Status: Under Review

National Institute of Justice
Title: Reviewing the Use of Step-Down Programs in Restrictive Housing Environments within
United States Prisons and Jails: A National Survey
Co-Principal Investigator
Funding Dates: January 1, 2017 – December 31, 2018
Direct Costs: $116,511 (TTU subcontract)
Status: Under Review

National Institute of Justice
Title: Evaluating the acceptability and feasibility of a step-down treatment program for mentally ill
inmates detained in long-term administrative segregation
Co-Principal Investigator
Funding Dates: January 1, 2017 – December 31, 2018
Direct Costs: $27,173 (TTU subcontract)
Status: Under Review

**Research Grants - Completed**

Texas Tech University School of Law
Title: Criminal Defendants' Perceptions of Working Alliance, Trust, Procedural Fairness, and
Satisfaction in Attorney-Client Pretrial Consultations: A Comparison of Videoconferencing and
Face-to-Face Modalities
Co-Investigator
Funding Dates: June 1, 2012 – July 31, 2014
Direct Costs: $70,000 (estimated)

Texas Department of Criminal Justice – Community Justice Assistance Division
Lubbock Specialty Courts: Who's in and are they working?
Co-Principal Investigator
Funding Dates: September 1, 2012 – May 31, 2014
Direct Costs: $80,000

Center for Behavioral Health Services & Criminal Justice Research
Sub-recipient: 1P30MH079920 (National Institute of Mental Health Award)
Criminal Thinking in a Community Mental Health Sample: Effects on Treatment Engagement and
Psychiatric Recovery
Co-Principal Investigator
Funding Dates: August 1, 2011 – July 31, 2013
Direct Costs: $88,500

Center for Behavioral Health Services & Criminal Justice Research

Sub-recipient: 1P30MH079920 (National Institute of Mental Health Award)
Piloting Changing Lives and Changing Outcomes for Offenders with Mental Illness
Principal Investigator
Funding Dates: May 1, 2009 – July 31, 2011
Direct Costs: $56,162

National Institute of Justice
2007-IJ-CX-0027
Re-entry: Dynamic Risk Assessment
Principal Investigator
Funding Dates: October 1, 2007 – September 30, 2011
Direct Cost: $185,950

JEHT Foundation
Changing Lives and Changing Outcomes: A Bi-Adaptive Intervention for Offenders with
    Mental Illness
Principal Investigator
Funding Dates: July 1, 2009 – June 30, 2010
Direct Costs: $60,957
Status: Funding rescinded due to foundation collapse following 2009 financial crisis

National Institute of Mental Health
R34 MH070401-01A1
Tailoring Services for Mentally Ill Offenders
Principal Investigator
Funding Dates: September 23, 2005 – June 30, 2009
Direct Costs: $292,500

University of Minnesota Press
Elaborating on the construct validity of MMPI-2-RF scales in an acute forensic and nonforensic
    inpatient setting
Principal Investigator
Funding Dates: August 2007 – August 2008
Direct Cost: $19,396

Institute for Forensic Sciences; Texas Tech University Health Sciences Center
Sub-recipient: 2005-IJ-CX-K016(S-1) (National Institute of Justice Award)
Inmate Characteristics and Mental Health Services: A Model for Predicting Treatment Outcome
Principal Investigator
Direct Costs: $14,011

Texas Tech University Research Enhancement Fund (REF)
Inmate Perceptions of Mental Health Services
Principal Investigator
Funding Dates: September 2001 – August 2002

Direct Costs: $2,500

**Professional Service Grants – Current**

Forensic and Mental Health Services, Inc (Hamilton Ohio, Butler County)
Title: Evidence based practice integrated service interventions for the justice involved client
Co-Investigator (PI: Jenny O'Donnell, Psy.D.)
Funding Dates: July 1, 2013 – June 30, 2015
Direct Cost: $278,000.00

**Contracts – Current**

Texas Tech University/Dr. Morgan and Lubbock – Crosby County Community Supervision and
    Corrections Department
Contract for provision of substance abuse and mental health services to probationers
Director and Clinical Supervisor: Robert D. Morgan
Funding Dates: September 1, 2007 – May 31, 2014
Costs: $84,032/year ($588,223 total costs)

**TEACHING EXPERIENCE**

**Graduate**

    Practicum in Intelligence Testing
    Advanced Counseling Practicum
    Psychology and Law
    Thesis and Dissertation Supervision

**Undergraduate**

    Forensic Psychology
    Abnormal Psychology
    Introductory Psychology

**PROFESSIONAL EXPERIENCE & POSITIONS**

2013-Present   Consultant, CorrectCare Solutions, Nashville, Tennessee

2001-Present   *Independent Practice*, Specialty: Criminal Forensic Psychology, Lubbock, TX.

2013-2015      Consultant, State of California, Department of Justice

2011-2017      *Appointee* (Governor Perry), Advisory Committee to the Texas Board of Criminal
               Justice on Offenders with Medical or Mental Impairments

| 2002-2012 | *Director of Forensic Services* and *Director of Postdoctoral Fellowship Program in Forensic Psychology (2007-2012)*, Lubbock Regional Mental Health Mental Retardation Center. Center (Full Medical Staff Membership to Sunrise Canyon Hospital) |
|---|---|
| 2008 | *Consultant*, Justice Center: The Council of State Government. *Improving outcomes for people with mental illness under community supervision: A research guide for policymakers.* |
| 2005 | *Consultant*, BrianPower Inc. for the Dallas Cowboys at the National Football League Combine. |
| 2001-2003 | *Mentee*, Mentoring and Education for Health Services Research Program, Yale University and National Institute of Mental Health (NIMH). |
| 8/97-5/98 | *Intake Counselor*, University Counseling Center, Oklahoma State University. |
| 1997 | *Consultant*, Oklahoma Department of Corrections. |
| 1995-1997 | *Psychologist in Training*, Edwin Fair Community Mental Health Center, Perry, OK and Jim Thorpe Rehabilitation Hospital, Oklahoma City, OK. |
| 1993-1995 | *Mental Health Professional*, El Dorado Correctional Facility and Winfield Correctional Facility, KS. |
| 1992 | *Psychology Internship*, Psychology Department, United States Penitentiary at Leavenworth, KS. |
| 1991-1993 | *Graduate Teaching Assistant*, Department of Psychology, Fort Hays State University, KS. |
| 1991-1992 | *Psychologist in Training*, Kelly Center, Fort Hays State University, KS. |

## HONORS AND AWARDS

2014  Outstanding Researcher from College of Arts and Sciences, Texas Tech University
2007  Extramural Research Promotion Award, Texas Tech University
2007  Mary S. Cerney Student Award For Best Personality Assessment Research Paper (Jarrod S. Steffan, Robert D. Morgan, & Daryl G. Kroner)
2006  Outstanding Contribution to Science Award, Texas Psychological Association
2005  Extramural Research Promotion Award, Texas Tech University
2003  Early Career Achievement Award, Division 18, American Psychological Association

## ORGANIZATIONS AND ADDITIONAL PROFESSIONAL ACTIVITIES

### Memberships in Professional Associations and Licenses

American Psychological Association
    Fellow, Division 17, Society of Counseling Psychology
    Fellow, Division 18, Psychologists in Public Service
    Member, Division 41, American Psychology-Law Society

Canadian Psychological Association

Licensed Psychologist, State of Texas (#31546), 2001-present

### Editorial Responsibilities

*Editorial Board*

| | |
|---|---|
| 2005 – Present | *Criminal Justice and Behavior* |
| 2002 – 2013 | *Psychological Services* |

*Ad Hoc Reviewer*

Guilford Publishing House. *Assessment; Criminal Justice and Behavior; Journal of Clinical Psychology; Journal of Consulting and Clinical Psychology; Journal of Contemporary Psychotherapy; Journal of Counseling Psychology; Journal of Forensic Psychiatry and Psychology; Journal of Psychopathology and Behavioral Assessment; Professional Psychology: Research and Practice; Social Psychiatry and Psychiatric Epidemiology; The Counseling Psychologist.*

### Service Activities

*National Service*

| | |
|---|---|
| 2005-present | Member, American Psychology-Law Society Corrections Committee |
| 2014 | *External Reviewer*, Promotion and Tenure, University of Indiana |
| 2014 | *External Reviewer*, Promotion (Professor), University of Virginia |
| 2013 | *External Reviewer*, Promotion (Professor), Penn State Harrisburg |
| 2010 | *External Reviewer*, Promotion and Tenure, University of Saskatchewan (Canada) |

| | |
|---|---|
| 2008-2011 | *President-Elect, President, and Past-President*, Division 18, American Psychological Association |
| 2006-2015 | *Member*, Steering Committee, The North American Correctional and Criminal Justice Psychology Conference (NACCJPC) |
| 2006-2011 | *Member*, Mental Health in Corrections Consortium Advisory Board |
| 2005-2007 and 2008-2011 | *Member*, Executive Committee, Division 18, American Psychological Association |
| 2005-2007 | *Chair*, Criminal Justice Section, Division 18, American Psychological Association |
| 2004-2007 | *Member*, Division 17 Program Committee, American Psychological Association |
| 2004-2006 | *Administrator*, Criminal Justice Listserv, Division 18, American Psychological Association |
| 2004 | *Secretary-Treasurer*, Division 18, American Psychological Association (appointed by the division president to complete the term of the elected secretary-treasurer who was unable to complete the term due to illness) |
| 2004 | *Member*, Committee for Preparing Public Service Psychologists for Prescribing Psychotropic Medications, Division 18, American Psychological Association |
| 2004 | *Member*, Hospitality Suite Committee, Division 17, American Psychological Association |
| 2003-2005 | *Secretary*, Criminal Justice Section, Division 18, American Psychological Association |
| 2003 | *Member*, Program Committee (Student Proposals), Division 17, American Psychological Association |
| 2002–2004 | *Member-at-Large*, Section on Counseling and Psychotherapy Process and Outcome Research, Special Section of Division 17, American Psychological Association. |
| 2002-2003 | *Member*, Division 18 Program Committee, American Psychological Association |
| 1999–2000 | *Member*, New Professionals Task Force, American Psychological Association |

*University Service*

| | |
|---|---|
| 2013-2016 | *Senator*, Faculty Senate, Texas Tech University |
| 2015 | *Member*, 74.08 Committee (Allegations of Misconduct in Research, Scholarly, or Creative Activity), Texas Tech University |
| 2010-2015 | *Member*, College of Arts & Sciences Awards Committee, Texas Tech University |
| 2011-2012 | *Member*, College of Arts & Sciences STEM Committee, Texas Tech University |
| 2005-2006 | Academic Advisor, Forensic Sciences Minor, Texas Tech University |
| 2002 | *Ad Hoc Reviewer*, Research Enhancement Fund (REF) proposals, Texas Tech University |
| 2001–2004 | *Member,* Advisory Group, The International Forensic Sciences Institute of the Texas Tech University System |
| 2001–2003 & 2004-2006 | *Faculty Mentor*, McNair Scholars Program, Texas Tech University |
| 2001 | *Graduate School Representative*, Doctoral Dissertation Defense, Department of Education, Texas Tech University |

*Department Service*

| | |
|---|---|
| 2003-2007 & 2015 – present | *Member*, Executive Committee, Texas Tech University |
| 2015-2016 | *Chair*, Department Search Committee (5 hires), Texas Tech University |
| 2013 | *Chair*, Counseling Psychology Search Committee, Texas Tech University |
| 2011-2012 & 2013-present | *Chair*, Research & Faculty Development Committee, Texas Tech University |
| 2007-2011 | *Member*, Research Committee, Texas Tech University |
| 2007- 2012 & 2002-2004 | *Coordinator*, Counseling Psychology Internship Applications, Texas Tech University |
| 2009 | *Member*, Student Misconduct Committee, Texas Tech University |
| 2004 | *Member*, Merit Raise Committee, Texas Tech University |
| 2003-2004 | *Member*, Clinical Psychology Search Committee, Texas Tech University |

Robert D. Morgan
August 2016
Page 65 of 65

| | |
|---|---|
| 2002-2004 | *Chair*, Counseling Psychology Program Admissions Committee, Texas Tech University |
| 2002–2003 | *Member*, Human Factors Search Committee, Texas Tech University |
| 2002 | *Judge*, First Annual Research Methods Poster Competition, Texas Tech University |

This vita is accurate as of this date: July 9, 2016.

Attachment B

## ATTACHMENT B

## TESTIMONY, PUBLICATIONS, AND COMPENSATION

### List of cases Dr. Morgan has testified in over the past 4 years

*Christopher Holder v. Stacy M. Saunders et al.* (Case No.: 13-CV-038-ART), United States District Court, Eastern District of Kentucky Southern Division Pikeville
- Deposition testimony for the plaintiff in the civil matter of Holder v. Saunders, et al. (September 11, 2015)

*Ashker, et al. v. Governor, et al.* (Case No.: C 09-05796 CW (N.D. Cal.)), United States District Court, Northern District of California, Oakland Division
- Deposition testimony for the state in the class action matter of Ashker, et al., v. Governor, et al. (May 15, 2015)

*State of Texas v. Joseph Richards* (Cause No.: DCR 5040-13), 154th Judicial District Court of Lamb County, Texas
- Testified for the state during a competency to stand trial hearing before the Honorable Judge Felix Klein (May 22, 2014)

*State of Texas v. Jerry Fuentes* (Cause No.: DCR-5028-13), 154th Judicial District Court of Lamb County, Texas
- Testified for the state during a competency to stand trial hearing before the Honorable Judge Felix Klein (May 22, 2014)

*State of Texas v. James Chancellor Creech* (Cause No.: CR40161), 238th District Court of Midland County, Texas
- Testified for the state regarding the issue of criminal responsibility (insanity) before the Honorable Judge Elizabeth Leonard (February 12, 2013)

*State of Oklahoma v. Connor Mason* (Cause No.: CF-2009-6819), District Court of Oklahoma County, Oklahoma
- Testified for the defense during the punishment phase before the Honorable Judge Jerry D. Bass (December 20, 2012)

*State of Texas v. Leslie Bunt* (Cause No.: 2009-458,025), 137th District Court of Lubbock County, Texas
- Testified for the state during a competency to stand trial hearing before the Honorable Judge John "Trey" J. McClendon III (February 1, 2012)

### List of Dr. Morgan's publications during the past 10 years

Batastini, A. B., King, C. M., Morgan, R. D. & McDaniel, B. (in press). Telepsychological services with criminal justice and substance abuse clients: A systematic review and meta-analysis. *Psychological Services*.

Batastini, A. B. & Morgan, R. D. (in press). Connecting the disconnected: Preliminary results and lessons learned from a telepsychology initiative with special management inmates. *Psychological Services.*

McDonald, B. R., Morgan, R. D., Metz, P. (in press). The attorney-client working relationship: A comparison of in-person versus videoconferencing modalities. *Psychology, Public Policy, and Law.*

Morgan, R. D., Gendreau, P., Smith, P.., Gray, A. L., Labrecque, R. M., MacLean, N., Van Horn, S. A., Bolanos, A. D., Batastini, A. B., & Mills, J. F. (in press). Quantitative Syntheses of the Effects of Administrative Segregation on Inmates' Well-Being. *Psychology, Public Policy, and Law.*

Morgan, R. D., Mitchell, S. M., Thoen, M. A., Campion, K., Bolanos, A. D., Sustaita, M. A., & Henderson, S. (in press). Specialty courts: Who's in and are they working. *Psychological Services.*

Whited, W. H., Wagar, L. B., Mandracchia, J. T., & Morgan, R. D. (in press). Partners or partners in crime? The relationship between criminal associates and criminogenic thinking. *The International Journal of Offender Therapy and Comparative Criminology.*

Bartholomew, N. R. & Morgan, R. D. (2015). Co-morbid mental illness and criminalness: Implications for housing and treatment. *CNS Spectrums, 20,* 231-240.

Morgan, R. D., Batastini, A. B., Murray, D. D., Serna, C., & Porras, C. (2015). Criminal thinking: A fixed or fluid process? *Criminal Justice and Behavior, 42,* 1045-1065.

Batastini, A. B., Bolanos, A. D., & Morgan, R. D (2014). Attitudes toward hiring applicants with mental illness and criminal justice involvement: The impact of education and experience. *International Journal of Law and Psychiatry 37,* 524-533.

Kroner, D. G., & Morgan, R. D. (2014). An overview of strategies for the assessment and treatment of criminal thinking. In R. C. Tafrate & D. Mitchell (Eds.), *Forensic CBT: A Handbook for Clinical Practice.* Hoboken, NJ: Wiley-Blackwell.

Morgan, R. D., Kroner, D. G., Mills, J. F., & Batastini, A. B. (2014). Treating criminal offenders. In I. B.Weiner & R. K. Otto (Eds.) *Handbook of Forensic Psychology* (pp. 795-837). Hoboken, NJ: John Wiley & Sons.

Morgan, R. D., Kroner, D. G., Mills, J. F., Bauer, R., & Serna, C. (2014). Treating justice involved persons with mental illness: Preliminary evaluation of a comprehensive treatment program. *Criminal Justice and Behavior, 41,* 902-916.

Morgan, R. D., Romani, C. J., & Gross, N. G. (2014). Group work with offenders and mandated clients. In J. L. DeLucia-Waack, C. Kalodner, & M. Riva (Eds.), *The Handbook of Group Counseling and Psychotherapy* (pp. 441-449). Thousand Oaks, CA: Sage Publications.

Wilson, A. B., Farkas, K., Ishler, K., Gearhart, M. Morgan, R. D., & Ashe, M. (2014). Criminal thinking styles among people with serious mental illness in jail. *Law and Human Behavior, 38*, 592-601.

Batastini, A. B., McDonald, B., & Morgan, R. D. (2013). Videoteleconferencing in forensic and correctional practice. In K. Myers & C. Turvey (Eds.) *Telemental Health: Clinical, Technical and Administrative Foundations for Evidence-Based Practice* (pp, 251-271). Kidlington, United Kingdom: Elsevier.

Gaines, M. V., Giles, C. L., & Morgan, R. D. (2013). The detection of feigning using multiple PAI scale elevations: A new index. *Assessment, 20,* 437-447. doi: 10.1177/1073191112458146

Gross, N. G., & Morgan, R. D. (2013). Understanding persons with mental illness who are and are not criminal justice involved: A comparison of criminal thinking and psychiatric symptoms. *Law & Human Behavior, 37*, 175-186. doi: 10.1037/lhb0000013

Magaletta, P. R., Patry, M. W., Patterson, K. L., Gross, N. R., Morgan, R. D., & Norcross, J. C. (2013). Training Opportunities for Corrections Practice: A National Survey of Doctoral Psychology Programs. *Training and Education in Professional Psychology, 7*, 291-299.

Mandracchia, J. T., Shaw, L. B., & Morgan, R. D. (2013). What's with the attitude? Changing attitudes about criminal justice issues. *Criminal Justice & Behavior, 40,* 95-119. doi: 10.1177/0093854812459474

McDonald, B. R., & Morgan, R. D. (2013). Enhancing homework compliance in correctional psychotherapy. *Criminal justice and behavior, 7*, 814-828. Doi:0093854813480781.

Morgan, R. D. (2013). Vocational psychology in corrections: It is about time. *The Counseling Psychologist, 41*, 1062-1072. doi: 10.1177/0011000013482381

Morgan, R. D., Kroner, D. G., Mills, J. F., Serna, C., & McDonald, B. R. (2013). Dynamic risk assessment: A validation study. *Journal of Criminal Justice,* 31, 115-124.

Wolff, N., Frueh, B. C., Huening, J., Shi, J., Epperson, M. W., Morgan, R. D., Fisher, W. (2013). Looking to practice to inform the next generation of behavioral health and criminal justice interventions. *International Journal of Law & Psychiatry, 36,* 1-10. doi: 10.1016/j.ijlp.2012.11.001

Wolff, N., Morgan, R. D., & Shi, J. (2013). Comparative analysis of attitudes and emotions among inmates: Does mental illness matter? *Criminal Justice and Behavior, 40,* 1092-1108.

Kuther, T. L., & Morgan, R. D. (2012). *Careers in Psychology: Opportunities in a Changing World* (4th ed.). Pacific Grove, CA: Wadsworth/Thomas Learning.

Mandracchia, J. T., & Morgan, R. D. (2012). Predicting offenders' criminogenic cognitions with status variables. *Criminal Justice & Behavior, 39,* 5-25. doi: 10.1177/0093854811425453

Morgan, R. D., Flora, D. B., Kroner, D. G., Mills, J. F., Varghese, F., & Steffan, J. S. (2012). Treating offenders with mental illness: A research synthesis. *Law and Human Behavior, 36,* 37-50. doi:10.1007/s10979-011-9271-7

Romani, C. J., Morgan, R. D., Gross, N. R., & McDonald, B. R. (2012). Treating criminal behavior: Is the bang worth the buck? *Psychology, Public Policy and Law, 18,* 144-165. doi: 10.1037/a0024714

Bewley, M. T., & Morgan, R. D. (2011). A national survey of mental health services available to offenders with mental illness: Who is doing what? *Law & Human Behavior, 35,* 351-363. doi:10.1007/s10979-010-9242-4

Mandracchia, J. T., & Morgan, R. D. (2011). Understanding criminals' thinking: Further examination of the Measure of Offender Thinking Styles – Revised. *Assessment, 18,* 442-452.

Mills, J. F., Kroner, D. G., & Morgan, R. D. (2011). *The clinician's guide to violence risk assessment.* New York: Guilford Publications.

Morgan, R. D. (2011). If Not Us, Then Who? Presidential Address. *Psychological Services, 8,* 140-150. doi:10.1037/a0023727

Rozycki-Lozano, A. T., Morgan, R. D., Murray, D. D., & Varghese, F. (2011). Prison tattoos as a reflection of the criminal lifestyle. *International Journal of Offender Therapy and Comparative Criminology, 55,* 509-529. doi:10.1177/0306624X10370829

Shaw, L. B., & Morgan, R. D. (2011). Inmate attitudes toward treatment: Mental health service utilization and treatment effects. *Law and Human Behavior, 35,* 249-261. doi:10.1007/s10979-010-9233-5

Wolff, N., Morgan, R. D., Shi, J., Fisher, W., & Huening, J. (2011). Comparative analysis of thinking styles and emotional states of male and female inmates with and without mental disorders. *Psychiatric Services, 62,* 1485-1493.

Bauer, R. L., Morgan, R. D., & Mandracchia, J. T., (2010). Offenders with severe and persistent mental illness. In T. J. Fagan & R. K. Ax (Eds.), *Correctional Mental Health* (pp. 189-212). Thousand Oaks, CA: Sage Publications.

Mandracchia, J. T., & Morgan, R. D. (2010). The relationship between status variables and criminal thinking in offenders. *Psychological Services, 7,* 27-33. doi:10.1037/a0016194

Morgan, R. D., Fisher, W. H., Duan, N., Mandracchia, J. T., & Murray, D. (2010). Prevalence of criminal thinking among state prison inmates with serious mental illness. *Law & Human Behavior, 34,* 324-336. doi:10.1007/s10979-009-9182-z

Senter, A. W., Morgan, R. D., Serna-McDonald, C., & Bewley, M. (2010). Correctional psychologist burnout, job satisfaction and life satisfaction. *Psychological Services, 7,* 190-201. doi:10.1037/a0020433

Steffan, J. S., Morgan, R. D., Lee, J., & Sellbom, M. (2010). A comparative analysis of MMPI-2 malingering detection models among inmates. *Assessment, 17,* 185-196. doi:10.1177/1073191109359382

Varghese, F. P. Hardin, E. E., Bauer, R., & Morgan, R. D. (2010). Attitudes toward hiring offenders: The roles of criminal history, job qualifications, and race. *International Journal of Offender Therapy and Comparative Criminology, 54,* 769-782. doi:10.1177/0306624X09344960

Miller, T. W., Morgan, R. D., & Wood, J. A. (2009). Tele-practice technology: A model for healthcare delivery to underserved populations. *International Journal of Healthcare Delivery Reform Initiatives, 1,* 55-69. doi:10.4018/jhdri.2009070104

Morgan, R. D. & Cohen, L. M. (2008). Clinical and counseling psychology: Can differences be gleaned from printed recruiting materials? *Training and Education in Professional Psychology, 2,* 156-164. doi:10.1037/1931-3918.2.3.156

Morgan, R. D., Patrick, A. R., & Magaletta, P. R. (2008). Does the use of telemental health alter the treatment experience?: Inmates' perceptions of telemental health vs. face-to-face treatment modalities. *Journal of Consulting and Clinical Psychology, 76,* 158-162. doi:10.1037/0022-006X.76.1.158

Steffan, J. S., & Morgan, R. D. (2008). Diagnostic accuracy of the MMPI-2 Malingering Discriminant Function Index in the detection of malingering among inmates. *Journal of Personality Assessment, 90,* 392-398. doi:10.1080/00223890802108204

Ax, R. K., Fagan, T. J., Magaletta, P. R., Morgan, R. D., Nussbaum, D., & White, T. W. (2007). Innovations in correctional assessment and treatment [Special issue]. *Criminal Justice and Behavior, 34,* 893-905. doi:10.1177/0093854807301555

Beer, A. M., Morgan, R. D., Garland, J. T., & Spanierman, L. B. (2007). The role of romantic/intimate relationships in the well-being of incarcerated females. *Psychological Services, 4,* 250-261. doi:10.1037/1541-1559.4.4.250

Kroner, D. G., Mills, J. F., & Morgan, R. D. (2007). Underreporting of Crime-Related Content and the prediction of criminal recidivism among violent offenders. *Psychological Services, 4,* 85-95. doi:10.1037/1541-1559.4.2.85

Magaletta, P. R., Morgan, R. D., Reitzel, L. R., & Innes, C. A. (2007). Toward the one: Strengthening behavioral sciences research in corrections [Special issue]. *Criminal Justice and Behavior, 34,* 933-944. doi:10.1177/0093854807301562

Mandracchia, J. T., Morgan, R. D., Garos, S., & Garland, J. T. (2007). Inmate thinking patterns: An empirical investigation. *Criminal Justice & Behavior, 34,* 1029-1043. doi:10.1177/0093854807301788

Morgan, R. D., Beer, A. M., Fitzgerald, K. L., & Mandracchia, J. T. (2007). Graduate students' experiences, interests, and attitudes towards correctional/forensic psychology. *Criminal Justice and Behavior*, *34*, 96-107. doi:10.1177/0093854806289831

Morgan, R. D., Steffan, J. S., Shaw, L., & Wilson, S. (2007). Needs for and barriers to correctional mental health services: Inmate perceptions. *Psychiatric Services, 58,* 1181-1186. doi:10.1176/appi.ps.58.9.1181

Senter, A., Morgan, R. D., & Mandracchia, J. T. (2007). Differing perspectives: Correctional systems in non-western countries. In R. K. Ax and J. T. Fagan (Eds.). *Corrections, Mental Health, and Social Policy: International Perspectives* (pp. 320-334). Springfield, IL: Charles C. Thomas.

Steffan, J. S., Kroner, D. G., & Morgan, R. D. (2007). Effect of symptom information and intelligence in dissimulation: An examination of faking response styles by inmates on the Basic Personality Inventory. *Assessment*, *14*, 1-13. doi:10.1177/1073191106295404

Wormith, J. S., Althouse, R., Reitzel, L. R., Simpson, M., Fagan, T. J., & Morgan, R. D. (2007). The rehabilitation and reintegration of offenders: The current landscape and some future directions for correctional psychology [Special issue]. *Criminal Justice and Behavior, 34*, 879-892. doi:10.1177/0093854807301552

DiLillo, D., DeGue, S., Cohen, L. M., & Morgan, R. D. (2006). The Path to Licensure for Academic Psychologists: How Tough is the Road? *Professional Psychology: Research and Practice, 37,* 567-586. doi:10.1037/0735-7028.37.5.567

Kroner, D. G., Mills, J. F., & Morgan, R. D. (2006). Socially desirable responding and the measurement of violent and criminal risk: Self-report validity. *Journal of Forensic Psychology Practice, 6,* 27-42. doi:10.1300/J158v06n04_02

Miller, T. W., DeLeon, P. H., Morgan, R. D., Penk, W. E., & Magaletta, P. R. (2006). The public sector psychologist with 2020 Vision. *Professional Psychology: Research and Practice, 37,* 531-538. doi:10.1037/0735-7028.37.5.531

**Compensation**
Dr. Morgan's compensation for this work was $285.00/hourly.

Attachment C

## ATTACHMENT C

## BASIS AND REASONS FOR OPINIONS

1. Information provided by the Attorney General's Office:

    a. Plaintiffs' Third Amended Complaint, Class Action Complaint for Declaratory and Injunctive Relief filed with the United States District Court, Middle District of Alabama, Northern Division;

    b. Expert Report of Professor Craig Haney, Ph.D., J.D.;

    c. Expert Report of Eldon Vail;

    d. State of Alabama, Alabama Department of Corrections, Administrative Regulation Number 613: Mental Health Coding and Tracking of Inmate;

    e. State of Alabama, Alabama Department of Corrections, Administrative Regulation Number 624: Mental Health Segregation Round;

    f. Email from Grantt Culliver: Directive – Shaving Policy for inmates housed in Segregation, RTU, STU, and Safe Cells sent on January 15, 2016;

    g. Email from Grantt Culliver: Directive – Shaving Policy for inmates housed in Segregation, RTU, STU, and Safe Cells sent on January 23, 2016;

    h. State of Alabama Draper Correctional Center Standard Operating Procedure 5-70;

    i. State of Alabama Bibb Correctional Facility Standard Operating Procedure 015-18;

    j. State of Alabama Limestone Correctional Center Standard Operating Procedure B-22;

    k. State of Alabama, Alabama Department of Corrections, Administrative Regulation Number 433: Administrative Segregation;

    l. State of Alabama, Alabama Department of Corrections, Administrative Regulation Number 434: Disciplinary Segregation;

    m. State of Alabama, Alabama Department of Corrections, Administrative Regulation Number 436: Institutional Segregation Review;

    n. State of Alabama Bibb Correctional Facility Standard Operating Procedure 005-19;

    o. State of Alabama Easterling Correctional Facility Standard Operating Procedure 433;

    p. State of Alabama, Alabama Department of Corrections, Administrative Regulation Number 13-007: Segregation;

    q. State of Alabama, Alabama Department of Corrections, Administrative Regulation Number 60-111: Segregation / Shift Office Post;

    r. State of Alabama, Alabama Department of Corrections, Administrative Regulation Number 434-01: Disciplinary Segregation;

    s. State of Alabama, Alabama Department of Corrections, Administrative Regulation Number 436: Institutional Segregation Review;

    t. State of Alabama Kilby Correctional Facility Standard Operating Procedure VI-4;

    u. State of Alabama Kilby Correctional Facility Standard Operating Procedure VII-14;

    v. State of Alabama Kilby Correctional Facility Standard Operating Procedure VI-7;

w.  State of Alabama St. Clair Correctional Facility Standard Operating Procedure 174: The Segregation Unit;

x.  State of Alabama Limestone Correctional Facility Standard Operating Procedure C-1: The Segregation Unit;

y.  State of Alabama  Staton Correctional Facility Standard Operating Procedure C-08-G

z.  State of Alabama Julia Tutwiler Correctional Facility Standard Operating Procedure 5-9;

aa. State of Alabama Ventress Correctional Facility Standard Operating Procedure 5-21;

bb. State of Alabama Ventress Correctional Facility Standard Operating Procedure 5-22;

cc. State of Alabama Ventress Correctional Facility Standard Operating Procedure 5-25;

dd. State of Alabama Kilby Correctional Facility Standard Operating Procedure VII-12;

ee. State of Alabama Memo dated June 8, 2011 from Dr. Ron Cavanaugh re: Blending of Mental Health Service Audit;

ff.  State of Alabama Memo dated April 3, 2015 from Willie Thomas, Warden III (Bibb County Correctional Facility) re: Disposable razor for disciplinary segregation inmates;

gg. Corizon Health Services Policy and Procedures Manual and Forms

hh. State of Alabama Department of Corrections Crisis Cell Utilization, St. Clair, May 2015;

ii.  Alabama Department of Corrections Segregation Log Checklist, St. Clair, May 8, 2015;

jj.  State of Alabama Department of Corrections, Fountain Correctional Center Standard Operating Procedure Number 9-15: Dormitory Number 6 (Segregation Unit);

kk. State of Alabama Department of Corrections, Fountain Correctional Center Standard Operating Procedure Number 12-12: Administrative/Disciplinary Segregation;

ll.  State of Alabama Department of Corrections, Fountain Correctional Center Standard Operating Procedure Number 12-18: Administrative Segregation;

mm.      State of Alabama Department of Corrections, G.K. Fountain Correctional Center Standard Operating Procedure Number 12-12: Disciplinary Segregation;

nn. Alabama Department of Corrections, Fountain Correctional Center, Post Orders: Segregation Rover;

oo. Alabama Department of Corrections, Fountain Correctional Center, Post Orders: Segregation Security Officer;

pp. Alabama Department of Corrections, Fountain Correctional Center, Segregation (Special Management);

qq. State of Alabama Department of Corrections, Holman Correctional Facility Standard Operating Procedure Number 9-12: Administrative Segregation/Protective Custody;

rr.  State of Alabama Department of Corrections, Holman Correctional Facility Standard Operating Procedure Number 9-013: Disciplinary Segregation;

ss.  State of Alabama Department of Correction, Memo from Terry Raybon, Correctional Warden II (Holman Correctional Facility), dated September 12, 2014 re: Segregation Feeding;

tt.  State of Alabama Department of Correction, Memo from Terry Raybon, Correctional Warden II (Holman Correctional Facility), dated September 9, 2014 re: Segregation Releae Documentation;

uu.  State of Alabama Department of Corrections, Holman Correctional Facility Standard Operating Procedure Number 009-0018: Segregation Special Management;

vv.  State of Alabama Department of Corrections, Ventress Correctional Facility Standard Operating Procedure Number 5-25: Disciplinary Segregation;

ww.  State of Alabama Department of Corrections, Ventress Correctional Facility Standard Operating Procedure Number 5-22: Segregation Temperature Checks;

xx.  State of Alabama Department of Corrections, Fountain Correctional Center Standard Operating Procedure Number 15-62: Mental Health Consultation to the Disciplinary Process;

yy.  State of Alabama Department of Corrections, Kilby Correctional Facility Standard Operating Procedure Number VII-12: Mental Health Referral Procedures;

zz.  Alabama Department of Corrections Ventress and Holman Correction Facility 2014 & 2015 Duty Post Logs;

aaa.  Plaintiffs Alabama Department of Corrections Institutional Record

bbb.  Alabama Department of Correction Duty Post Logs, 2014 & 2015.

Attachment D

## ATTACHMENT D

## FACILITY TOURS

## ST. CLAIR CORRECTIONAL FACILITY

I toured the St. Clair Correctional Facility (SCCF) and met with administrative staff on July 11, 2016 (2:00 – 4:30 PM, approximate). Prior to my tour I interviewed Warden II Specs and ADOC Attorney Bart Harmon. Warden II Specs and Mr. Harmon, along with various correctional officers conducted my tour. During my tour I briefly interviewed Mr. Ronald Douglas, ADOC Psychological Associate, Ms. Doris Heney, Therapeutic Community provider, and various correctional officers.

SCCF is a maximum security facility with a housing capacity of 1,514 inmates (per the ADOC website). Of the 1,514 beds, 216 are in segregation blocks (72 Disciplinary Segregation beds and 144 Administrative Segregation beds). At the time of my tour, 48 of the Administrative Segregation beds (B block) were closed due to structural damage to the unit caused by a recent storm. This storm occurred in the middle of the night and officers had to evacuate inmates for their safety. SCCF also maintains a Therapeutic Community with 200 beds in an open dorm setting. On July 11, 2016 (the date of my visit), 142 of these beds were occupied. Although not a point of discussion during my tour of SCCF, this facility is generally recognized as the most challenging (e.g., presents the most security concerns, is a volatile population) by ADOC staff (including staff at other facilities) and likely inmates as well (per staff report).

Warden II Specs described the difference between Administrative Segregation and Disciplinary Segregation in the ADOC. Of particular relevance with regard to the use of

Administrative Segregation, the ADOC does not use indeterminate sentences for segregation placement, unless necessary to protect an inmate. For example, if an inmate has an "enemy" on the same prison compound, that inmate may remain in Administrative Segregation until they or the enemy can be moved to an alternate facility. In other situations, the ADOC Classification Manual details when an inmate will be removed from Administrative Segregation (i.e., Closed Custody classification). Unlike many other jurisdictions (state or federal), the ADOC does not use indeterminate segregation sentencing.

Warden II Specs conducted the facility tour for defense attorney Eric Getty and me. Mr. Harmon accompanied us on this tour, as did a variety of correctional officers. I was granted access to the entire facility and no area was deemed off limits. I walked the general prison grounds and entered the segregation blocks, as well as the medical and mental health departments. The facility is aged (built in 1983 per the ADOC website) with signs of wear and tear (e.g., cracked cement, peeling paint); however, it was clear the ADOC was working to upgrade the quality of living conditions. For example, in the medical department, a relatively small and clearly aged department, there were multiple murals of scenic pictures on the wall which serve as an upgrade to the sterile color scheme and peeling paint in the unit. As a further example, general population units were being significantly remodeled to provide a safer and more comfortable living situation for inmates. For example, Block Q was nearing completion of a 3.5-million-dollar remodel and the cell house had a much more modern correctional layout, was aesthetically pleasing, and most importantly, had cool circulating air. As the majority of ADOC facilities were not air conditioned, this was a significant improvement.

I visited A Block, a segregation unit housing 24 inmates. The unit was laid out in an octagon design with two tiers of cells on each side of the unit. Although there were large

industrial fans on the unit, they were non-functional on the day of my tour. The unit was hot and the air was humid. An officer was providing ice to each inmate through the meal port in their door. Although ice is provided on a daily basis to inmates, correctional officers explained that on this day they were providing extra ice to offset the hot and humid temperature within the unit. Although ice would likely provide some relief, the temperature was uncomfortable and the air was stale.

Aside from the uncomfortable temperature, the unit was generally clean. The shower was small. Although the shower floor appeared clean, the piping and built-in soap tray were noted for crust and corrosion. Cleaning supplies, such as a mop and bucket, were in the shower during my observation. In A Block, there were four officers working on the unit and they were observed to be responsive to inmate requests (responding to yells across the unit or approaching inmate cells to communicate cell-side.

As previously noted, B Block received significant damage from a storm shortly before my visit. The roof was visibly damaged. Although not immediately visible, upon further touring of the facility, an interior security fence (interior in that it separates one prison area from another, but is not a barrier to the external world) was visibly damaged, which reportedly resulted from a portion of the B Block building landing on the fence. Officers reported a plan to repair both B Block and the damaged fence.

I visited the property department and was provided a summary of how inmate property is processed. We then visited the Therapeutic Community (TC). The TC is separated from the rest of the facility with its own living quarters and recreational yard (i.e., basketball court, weight set). The TC provides dorm style living quarters. Although the temperature was warm, multiple large industrial fans were circulating the air. Inmates were actively engaged in conversation and

what appeared to be therapeutic activities. Some inmates were lying on their bunks. According to Ms. Heney, the TC is a 14-month program that includes two months of orientation and 12 months of treatment. It is a voluntary program with a wait list of approximately 30 inmates. The SCCF TC program is the only such program in the state. Ms. Heney reported that inmates participate in 1 to 4 hours of programming per day, and additional counseling is available upon need/request.

As previously noted, during my tour I also had an opportunity to briefly (less than 5 minutes) interview Mr. Ronald, ADOC Psychological Associate. Mr. Ronald provides mental health services to inmates who are classified by a mental health code of 0 (i.e., no apparent need for assistance). He conducts segregation rounds twice per week (as do MHM mental health providers). Mr. Ronald noted that, although he typically sees segregated inmates cell-side, he will request officers to release inmates from their cell for crisis sessions. Although this occurs infrequently, he denied logistical complications when this request is made (i.e., staff shortages do not prevent him from having confidential access to inmates in need). In addition to mental health rounds to identify inmates at-risk for mental health decompensation and inmate requests for services, Mr. Ronald noted that he also receives referrals from staff (including non-mental health correctional staff) when inmates exhibit signs or symptoms of mental illness or decompensation.

## DONALDSON CORRECTIONAL FACILITY

I toured the Donaldson Correctional Facility (DCF) and met with administrative staff on July 12, 2016 (9:00 – 11:00 AM, approximate). Prior to my tour, I interviewed Warden Leon Bolling, Captain Baldwin, Psychologist Katrina King Evans, Ph.D., and Classification Administrator Bonner (first name unknown). During my tour, I was also able to briefly interview Mr. Mike Miller, MHM Site Administrator.

DCF is a maximum security facility. During my meeting with the administration, I was informed that DCF can house 1,606 inmates (the ADOC website lists capacity at 1,706), but on the date of my tour (July 12, 2016) only 1,487 inmates were incarcerated within the facility. DCF is a general population prison that includes Disciplinary and Administrative Segregation units as well as a Residential Treatment Unit (RTU) for inmates with significant mental health needs. There are 96 RTU beds, 32 Disciplinary Segregation beds, and 216 Administrative Segregation beds. The DCF also houses 20 death row inmates. Ms. Bonner, Classification Administrator, provided information regarding inmate classification and, along with Captain Baldwin, explained classification decisions as they apply to inmates in segregation (including Disciplinary and Administrative Segregation). DCF administrative staff reported that ADOC does not have indeterminate Administrative Segregation sentences.    That is, both Disciplinary and Administrative Segregation have specific sentences based on ADOC policy (e.g., 30 months in Administrative Segregation in the event of an inmate murder). Nevertheless, an inmate may remain in Administrative Segregation for security reasons (e.g., if an inmate has a known "enemy" in the facility the inmate will not be released from Administrative Segregation until either that inmate or the enemy is moved to another facility).

Inmates in segregation are offered daily exercise (45 minutes) and showers three times per week. Visits for inmates in segregation are allowed every 6 months. All disciplinary and Administrative Segregation inmates are offered an opportunity to attend weekly Segregation Review Board meetings that occur every Wednesday. The Segregation Review Board consists of four members: (1) an ADOC mental health representative (typically Dr. Evans), (2) a Warden II, (3) a Classification Administrator or representative (typically Ms. Bonner), and a Chaplain. Inmates are verbally invited to meet with the review board.

In addition to segregation units, DCF has a "restricted dorm" for inmates with restricted privileges, but who are not placed in segregation. Per Warden Bolling and Captain Baldwin, this is a new program at DCF.

During this meeting Dr. Evans provided me information regarding the distinction between ADOC mental health staff and MHM mental health staff. The essential distinction is that ADOC mental health staff (such as Dr. Evans and the Psychological Associate) provide basic and rehabilitative mental health services to the general inmate population, whereas MHM mental health staff are responsible for providing basic and rehabilitative mental health services to inmates on the Mental Health Caseload. Dr. Evans also instructed me on the mental health levels (i.e., MH1 – MH6) used by ADOC. With regard to rehabilitative services, Dr. Evans reported that both she and the Psychological Associate provide two rehabilitation oriented treatment groups per week (four groups total). These groups typically consist of anger management, values clarification, or other topics of relevance to inmate functioning or preparation for community re-entry. Approximately 20 inmates attend each treatment group such that approximately 80 inmates are receiving rehabilitative services per week. Each treatment group is approximately 1 hour in duration.

Warden Bolling and Captain Baldwin conducted the facility tour. They granted me access to the entire prison complex. In addition to walking the general prison grounds, I was provided access to the Crime Bill Unit (i.e., substance abuse treatment program unit), a general population unit (i.e., pod housing), the RTU program units, segregation, and death row units. I was escorted through the medical, dental, and mental health departments, and allowed access to the law library, education facilities, gymnasium, cafeteria, and other areas of the prison. Although accessible, I determined that some areas were unnecessary to my tour (e.g., trade school,

additional housing units that mirror units already observed). I observed the Warden and Captain interact with several inmates and correctional staff. Inmates actively and respectfully sought out these staff for brief discussions. Correctional staff went out of their way to greet both, sometimes purely as a social gesture and other times to briefly discuss an issue of business. I observed the Warden constructively correct inmate behavior on several occasions (e.g., shirt not tucked into pants, clothes drying over handrails in the unit); all directives were met with immediate inmate compliance with no resistance or negative emotional reaction. In my opinion, the Warden appeared skilled at correcting inmate behavior.

The facility is somewhat aged (opened in 1982) with wear and tear consistent with its age. Despite this, the facility was clean and its main walkways consisted of polished floors and well painted walls. Living units were aged with some obvious maintenance/reconstruction needed (e.g., to remove school desks from segregation unit, remove old shower towers from Crime Bill unit), but generally clean and organized, and free of unnecessary obstacles that would limit inmate activity. The Crime Bill unit had wooden benches in the dayroom area for therapeutic and educational groups. The RTU had a leather recliner that was used for inmate pedicures to allow for safer and gentler (i.e. less stressful) removal of toenails. The RTU was well air conditioned. Although ADOC is recognized for being understaffed, every unit I entered had an officer present; however, I did observe some units through glass windows that did not an officer on the unit.

The open pod (i.e., dormitory type living arrangement) consisted of single bunk beds, a notable improvement from approximately 2011 and 2008 when the open pods were double and triple bunked, respectively. During my tour, the unit I observed was about one-half full with inmates (with one officer walking the living area). Many others were in the recreation area

outside of the unit. Warden Bolling noted that, although some inmates have jobs within the institution, most do not (and the only paying jobs are in the commissary).

As previously noted, during my tour of the MHM mental health department, I had an opportunity to meet briefly with Mr. Miller (approximately 3 minutes). During this meeting Mr. Miller reported that MHM mental health staff provide both basic and rehabilitative services and showed a schedule of rehabilitative treatment programming for July 2016. Per my count, MHM provided six groups on Monday's and Wednesday's across five 1-hour slots, such that one hour had two different groups being offered. Additionally, two groups were held on Tuesday's, three on Thursday's, and five on Friday's.

## BIBB CORRECTIONAL FACILITY

I toured the Bibb Correctional Facility (Bibb) on July 12, 2016 (1:30 – 3:00 PM, approximate). Prior to my tour, I interviewed Warden Willie Thomas, Captain Hutton (first name unknown), and Psychological Associate, Glenda Black.

Bibb is a medium security correctional facility with well-manicured landscaping. During my meeting with administration, I was informed that Bibb has the capacity to house 1,896 inmates (the ADOC website lists capacity at 1,914), but on the date of my tour (July 12, 2016) only 1,862 inmates were incarcerated within the facility. Bibb is a general population facility with 36 segregation beds (in 18 cells). There were 30 inmates in segregation on the day of my tour (five inmates were classified as closed custody inmates such that they were prohibited from having a cellmate). Ms. Black estimated that 250 inmates at Bibb were on the mental health caseload. Ms. Bibb was the mental health professional for the general population inmates, and MHM has five mental health positions for managing the mental health caseload (one of these positions was vacant at the time of my tour). A psychiatrist is at the facility once per week, and

telepsychiatry is available via equipment in the mental health department. Both Ms. Black and MHM mental health staff are responsible for providing basic and rehabilitative mental health services. Ms. Black, for example, provides four groups per week (two anger management groups and two values clarification groups) for approximately 40 to 50 inmates per group. Although she provides four groups per week, she is unable to meet inmate demand such that she has a treatment group wait list of 150 inmates (estimated).

The Warden estimated that 2-3% of inmates in Bibb have job assignments. Thus, he works to supplement inmate time with a variety of volunteer chaplain services such that two to four chapel services are available per day (services are more limited on Saturday). Warden Thomas is an experienced prison administrator, but was admittedly limited by resources. As an example, although Bibb is sanctioned for 278 officers, the facility only had 84 correctional officers on staff at the time of my tour. Per Warden Thomas, Bibb is the most understaff facility in the state.

Warden Thomas conducted the facility tour. He granted me access to the entire prison complex. In addition to walking the general prison grounds, I was provided access to a general population unit (pod housing design), the dental and medical department (including the infirmary), the mental health department, the cafeteria area, and other areas that I elected not to visit due to their irrelevance to the class action (e.g., education) or redundancy (e.g., similar living quarters). Warden Thomas was friendly towards those of us on the tour, as well as inmates and correctional staff we encountered throughout the tour. The Warden was warmly greeted by many inmates including one inmate scheduled for release with whom the Warden commended his job skills (lawn care) and noted optimism for him not returning to prison. During the tour the Warden shared his correctional philosophy, which emphasized effective communication skills

for correcting inmate behavior, treating inmates fairly and consistently, and treating inmates with respect (even when correcting behavior, and especially when withholding privileges or denying requests). The Warden knew correctional and contract staff by name. He also addressed many inmates by name.

Bibb was opened in 1997 and shows wear and tear consistent with 20 years of use. The facility is in need of some repair. For example, it rained prior to the initiation of my tour at Bibb, and two entry ways (a living area and a medical area) were noted to have leaks in the immediate entry way (towels were on the floor to absorb the water). The housing unit I observed was crowded with limited correctional officer presence (a fact noted by Warden Thomas). The segregation cells were in an area isolated from the three pods within the unit. Although the floor area outside of the segregation cells had recently been repainted (per Officer Thomas' report), there was a burnt area in front of one cell from a recent fire. The infirmary has 28 beds, 14 each in small caged rooms adjacent to each other. The infirmary living quarters were within the medical department. Although the physical space was in need of some general repair, the prison grounds both internal and external to the facility were extremely well kept. Hedges and bushes were well trimmed, grass was nicely mowed, and landscaped edging was well manicured.

## KILBY CORRECTIONAL FACILITY

I toured the Kilby Correctional Facility (KCF) and met with administrative staff on July 13, 2016 (9:00 – 10:30 AM, approximate). Prior to my tour, I interviewed Wardens Carleton and Thomas, Captains Logan and McClain, Ms. Jacklyn Jones (Corizon Health Care), and Ms. Elizabeth Harris (MHM Site Administrator). During my tour, I was also able to briefly interview Ms. Pamela Vaughn from inmate classification, and Ms. Amy Boyd, ADOC Psychological Associate.

KCF is the receiving facility for all male inmates in the ADOC. Although it is a receiving facility, KCF maintains 528 permanent assignment beds (i.e., 528 inmates remain at KCF rather than being assigned to other correctional facilities across the state). The administration reported that the KCF can house 1,448 inmates (the ADOC website lists capacity at 1,421), but on the date of my tour (July 13, 2016) only 1,246 inmates were incarcerated within the facility. KCF maintains three primary living units within the institution: (1) general population (i.e., the 528 beds as noted above), (2) segregation (136 beds), and (3) quarantine housing where inmates completing the intake process are housed.

As a receiving facility, KCF processes and evaluates all male inmates received by the ADOC. Administration described in detail the processing and evaluation process. As inmates are received at the institution, they are taken from the transport vehicle to a designated receiving area where they are processed (finger printed, given a haircut, shave, and shower, property and prison clothing distributed, and photographed for their files and ADOC identification). They are then placed in a quarantine unit to complete the classification, medical, and mental health evaluations. Per ADOC administrative staff report, this evaluation process is typically completed within 10 business days.

The following mental health staffing is provided at KCF: four mental health professionals for the ADOC, and eight counselors, two LPN's, one psychiatrist, three mental health professionals, and one on-site administrator who are employed by MHM.

With regard to mental health evaluations, all newly received inmates complete a mental health screening by MHM staff. The comprehensive psychological assessment (that includes intelligence and psychopathology/personality testing, and a clinical interview) are completed by

ADOC mental health staff. A report summarizing any mental health concerns and treatment/programming recommendations is then developed.

In addition to completing the mental health screening (by MHM mental health staff) and the psychological report (by ADOC mental health staff), both groups of mental health professionals also provide therapeutic services and segregation rounds. MHM mental health staff are responsible for therapeutic services to inmates on the mental health caseload (estimated 180-205 inmates on average) as well as segregation rounds (segregation rounds are conducted by MHM mental health staff two times per week. ADOC mental health staff provide therapeutic services to KCF inmates who are not on the mental health caseload. They also provide segregation rounds twice per week. Between ADOC and MHM providers, inmates in segregation receive rounds, on average, four times per week, which far exceeds policy and commonly accepted national expectations. In addition to these mental health rounds, all segregated inmates are afforded an opportunity to see the Segregation Review Board on a weekly basis (Wednesday's). Therapeutic programming is available to inmates in segregation (e.g., Taking a Chance on Change, TCC; anger management). The mental health site administrator denied difficulties pulling inmates out of segregation cells for individual therapeutic services (i.e., staffing shortages have not resulted in limited access to inmates). Consistent with state policy, inmates in segregation at KCF are offered daily exercise (i.e., 45 minutes) and showers three times per week. Visits for inmates in segregation are allowed every 6 months.

Correctional rehabilitation programming is limited at KCF due to the vacillation in the inmate population (i.e., most inmates are not at KCF long enough to complete a therapeutic program). KCF maintains one small mental health unit consisting of 13 cells. Of these cells, 12

are for crisis/suicide observation, and one is designated for youthful offenders (this cell can house up to five youthful offenders; youthful offenders are defined as under the age of 17).

Wardens Carleton and Thomas and Captains Logan and McClain conducted the facility tour. They granted me access to the entire prison complex. In addition to walking the general prison grounds, I was provided access to the receiving area, a quarantine unit, a general population unit, the mental health unit, and a segregation unit. I was also escorted through the medical, dental, and mental health departments, and allowed access to the law library, gymnasium, cafeteria, and other areas of the prison. Despite having access, I determined some areas as unnecessary to tour (e.g., education, chaplain, additional housing units that mirror units already observed).

The facility was opened in 1969 (per the ADOC website) with wear and tear consistent with its age. The facility was clean, but cracks were evident in concrete and paint was eroding in some areas. Living units were organized in a dormitory fashion and were generally crowded with little to no open floor space. Although fans were strategically placed throughout the facility to create airflow (a necessity given average summertime temperatures and the humidity index in Alabama), some units remained uncomfortably warm.

## TUTWILER CORRECTIONAL FACILITY

I toured the Tutwiler Correctional Facility (TCF) and met with administrative staff on July 13, 2016 (1:00 – 2:30 PM, approximate). TCF is a women's facility with a reported inmate capacity of 950 female inmates (ADOC website indicates the capacity at 975 inmates). There were 888 inmates at TCF on the day of my tour.

TCF also serves as the ADOC receiving facility and death row for female inmates. Unlike the other facility visits, I toured TCF prior to meeting with administrative, medical, and mental health staff. Captain McClain conducted my tour. TCF is an older facility (opened in 1942 per the ADOC website), but is generally well maintained. Space is limited throughout the facility, although staff appear efficient at maximizing space resources. For example, medical facilities (including an infirmary) offer limited examination rooms, but staff appear capable of meeting inmate needs (per staff report) in spite of limited space. Mental health facilities were similarly of limited space, but did provide opportunities for one-on-one and group services.

The Residential Treatment Unit (RTU) offered sufficient living and recreational / program space. The RTU houses 31 inmates and the stabilization unit houses eight inmates. The stabilization unit was designed and operated like a segregation unit (eight cells in tier fashion), with inmates being released for 45 minutes of exercise per day, and showers 3 times per week. Mental health programming is available, but the design of this unit does not allow for a therapeutic milieu for this emotionally disturbed population.

Death row consists of two cells that are situated off a main corridor, but separated by a steel door such that inmates are isolated from interaction with the general population. Both cells were occupied. There was no officer stationed in this area; rather, an officer conducts 30 minute checks of the inmates on death row. In my experience, this is an unusual situation. The two inmates can request assistance by pressing a buzzer. TCF also maintains 22 segregation cells, and two of these cells are double bunked (totaling 24 segregation beds).

After completing my tour, I interviewed Warden II Wright, Captain McClain, Captain Rogers, Ms. Greer (Site Administrator for MHM), Ms. Love (Health Services Administrator, Corizon), Dr. Holmes, ADOC psychologist, and Segregation Lieutenant Coleman.

As a receiving facility, TCF processes and evaluates all female inmates received by the ADOC. The TCF process is similar to that of KCF such that inmates who are received at the institution are moved from the transport vehicle to a receiving area where they are processed (finger printed, showered, property and prison clothing distributed, watch PREA and TCF orientation films, and photographed for their file and ADOC identification). Classification, medical, and mental health evaluations are completed on each inmate. The mental health evaluation is more detailed than that provided for male inmates and includes the following: screening of intellectual functioning (i.e., BETA)—a more comprehensive measure (i.e., Wechsler Adult Intelligence Scale) is administered if the screener indicates an intelligence quotient below 75—, a psychopathology and personality inventory (i.e., Minnesota Multiphasic Personality Inventory; MMPI), an achievement test (i.e., Wide Range Achievement Test; WRAT), and a structured clinical interview.

The following MHM mental health staffing is provided at TCF: four counselors, one licensed clinical psychologist, seven nurses, two psychiatrists (both full-time), two activity technicians, one psychiatric nurse practitioner, one nurse medical practitioner, and one administrative assistant. This mental health team provides services to inmates on mental health levels I - VI (inmates at level VI are transferred to a state psychiatric unit). In addition to general population inmates needing services, the MHM mental health staff also provide services for the RTU and stabilization units. The mental health caseload at TCF is approximately 480 inmates, so this staffing level certainly seems adequate to meet the mental health needs at the facility. In addition to basic mental health services (i.e., services designed to reduce crisis and maintain inmate mental health functioning), MHM staff provide four therapeutic groups per week on the

RTU and four per week on the general population units. Activity technicians (sometimes referred to as Activity Therapists in other facilities/jurisdictions) each provide seven activity groups per day (i.e., for a cumulative of 14 sessions per day). MHM staff indicated there was no wait list for the outpatient (i.e., non-RTU) treatment groups, stating that "if an inmate wants in a group, there is room."

The ADOC mental health staff consists of three psychological associates, three drug treatment counselors (two with bachelor's degrees, and one with a master's degree), and one licensed psychologist. There is an additional psychological associate position currently vacant. Per Dr. Holmes, the ADOC mental health staff provide approximately 14 to 15 different psycho-educational groups to inmates at TCF (e.g., personal development, trauma, parenting, self-esteem, stress management, alternatives to criminal thinking). Specifically, this staff provide 12 groups per week with approximately 20 members per group. Each group last approximately 50 minutes (with the exception of trauma groups that last for 2 hours to allow more time to process sensitive topics), and is 4 weeks in duration. The ADOC has a waitlist of approximately 20 inmates.

As previously noted, the TFC has 24 segregation beds. Mental health rounds are conducted four times per week with the MHM staff conducting rounds two times per week, and ADOC mental health staff conducting rounds two times per week. These rounds are documented in every inmates' segregation file, and staff are recorded on the Segregation Log Form. Inmates also have an opportunity to see the Segregation Review Board once per week. If, during rounds or when meeting with the Segregation Review Board an inmate is observed or opined to be decompensating as a result of her placement in segregation, mental health staff will have the

inmate removed from segregation for a more thorough assessment. A determination of service need is then made.

## BULLOCK CORRECTIONAL FACILITY

Bullock Correctional Facility (BCF) is a 1,609 bed (per the Warden, 1,658 per the website) medium security correctional facility. I toured BCF on July 14, 2016 (9:00 AM – 10:30 AM, approximate) and the census on this date was 1,544 with 310 on the mental health caseload (Levels I and II; the Warden called classification to confirm these numbers). Prior to my tour, I met with Warden II Strickland, who had been at the facility for approximately 4 months. Warden Strickland and Captain Jenkins conducted the tour.

In addition to general population inmates, BCF also has 20 segregation cells (10 of which are single bunk cells and 10 of which are double bunk cells). On this date, 5 of the 20 segregation cells were empty. The facility also includes 9 infirmary beds, 250 RTU beds, and 30 mental health stabilization beds. General living units are dormitory style with double bunks. BCF also has a Crime Bill unit (number of beds unknown).

The RTU consists of 250 beds with recreational and treatment space. The unit is double bunked and includes two observational cells in the therapeutic area. The unit is well air conditioned, which is necessary given the necessity of psychotropic medications for inmates on the RTU. Inmates on the RTU are segregated from general population inmates in that they eat in the cafeteria and sue the recreation hard separate from other inmates. The stabilization unit is separate from the RTU and has a tiered structure with large common areas. Both units were tidy (e.g., free of debris), clean, and organized. To serve the RTU and stabilization unit, MHM employs the following mental health professionals at BCF: one full-time and one part-time masters level psychologist, one full-time psychiatric nurse practitioner, one part-time chronic

care nurse, four mental health professionals (a fifth position is currently open), four full-time activity therapists, one nurse manager, approximately 25 licensed practical nurses (LPN's), two administrative assistants, one licensed psychologist (30 hours), one site administrator (Ms. Laura Whitfield, who I briefly interviewed for this information), and a psychiatrist on an as needed basis. These staff provide a variety of services to RTU and the stabilization unit that includes individual and group therapeutic programming (i.e., approximately 20 mental health therapy groups and 20 activities therapy groups per week), crisis services, medication education, medication monitoring, services as requested (e.g., sick calls), and other as needed mental health services.

MHM also provides mental health services for the general population mental health caseload for which they have one site administrator, one mental health nurse, three mental health professionals, and one administrative assistant. Mental health services provided to the main compound are considered "outpatient," and services to the RTU and stabilization unit are considered "inpatient." Although services are distinguished by inpatient and outpatient, BCF has "blended" services in that inpatient and outpatient programs overlap to ensure quality of care.

With regard to segregation, ADOC mental health rounds are conducted as part of the Segregation Review Board, as well as twice weekly outside of the review board. MHM mental health staff, conduct mental health rounds on a weekly basis. In addition to segregation rounds and basic mental health services, the ADOC psychological associate provides approximately 5 to 6 groups per week (including domestic violence, anger management, life skills, etc.). There is currently a waitlist of approximately 23 inmates for anger management.

The general population units have one officer for four units, which the Warden acknowledged was not sufficient.

## EASTERLING CORRECTIONAL FACILITY

I toured the Easterling Correctional Facility (ECF) and met with administrative staff on July 14, 2016 (12:30 – 2:00 PM, approximate). Prior to my tour, I interviewed Wardens Myers and Richie, Captain Lawson, and Lieutenant Danzey.

ECF is a medium security facility with a capacity for housing 1,550 inmates (per Warden Meyers). The ADOC website lists the capacity at 1,267 inmates, and the census on the day of my visit was 1,535. ECF is a general population prison that includes disciplinary and Administrative Segregation units (102 total segregation beds; 64 administrative and 38 disciplinary). Rounds are conducted by both MHM (twice weekly) and ADOC (twice weekly when staffed, see next paragraph regarding this vacancy) mental health staff. Inmates also have the opportunity to meet with the Segregation Review Board once per week. The Segregation Review Board consists of the Warden (usually I or II), a classification supervisor, chaplain, segregation lieutenant, and a captain. Although there is usually an ADOC mental health representative on the board, due to a staffing vacancy at the facility there was no such a representative at this time.

MHM staff consist of one site administrator (full-time), three mental health professionals (one full-time and two part-time), one mental health nurse (full-time), one administrative assistant, and one additional nurse as needed. ECF is designated to have one ADOC psychological associate; however, this position is currently vacant. As there is no ADOC mental health professional on ECF staff at this time, MHM mental health staff provide services to all inmates in the facility (i.e., MHM do not limit services only to those inmates on the mental health caseload). There were 220 inmates on the mental health caseload on the day of my visit. The mental health caseload at ECF includes inmates at mental health Level I or II. Inmates with mental health needs beyond Level II are transferred to another facility for treatment and

management. In addition to mental health rounds and providing therapeutic services to inmates on the mental health caseload, MHM mental health staff conduct two treatment groups per week (e.g., self-esteem, coping with incarceration, anger management).

Wardens Meyers and Richie, Captain Lawson, and Lieutenant Danzey conducted my tour. The segregation unit consisted of cells in a tier fashion. The unit was very clean, debris free, and appeared to have been recently mopped. The unit was relatively quiet throughout my visit. Large industrial fans were circulating air. Although not nearly as warm as the general population unit I visited, I did ask Lieutenant Danzey about the temperature on the unit, and he noted that they have to remain diligent of the temperature in segregation due to inmates on the mental health caseload receiving psychotropic medications. He stated that if it gets too warm they open vents to circulate more air and provide additional ice (inmates receive ice during the day) to inmates.

Inmates in segregation are offered daily exercise (45 minutes) and showers three times per week. Visits for inmates in segregation are allowed every 6 months per ADOC regulations. As previously noted, all segregated inmates (i.e., Disciplinary and Administrative Segregation inmates) are offered an opportunity to attend weekly Segregation Review Board meetings.

The living unit I visited was again very warm. It was a dormitory style housing unit and inmates were double bunked. The unit was hot, and although large industrial fans were strategically placed to circulate air, the air was stagnant. The inmates in the unit I visited had significant recreational space. A television viewing area occupied much of this space. A telephone was accessible near the entrance of the unit. One officer was assigned to both this unit and the adjoining unit (the Lieutenant noted that, but for the staff shortage, there would typically be an officer assigned to each of the units).

In addition to the segregation and general population living units, I toured the medical unit, the gymnasium, and the recreational yard. Although other areas of the institution were available for touring (e.g. additional living units, the cafeteria), I declined.

The recreational yard was large. In fact, it was one of the largest I have seen in my approximate 20 years of correctional experience. The yard included one full sized softball field (with fence), one soccer field (though it did not appear to be regulation length), a basketball court, weight area, and significant open space beyond these amenities. I commented to the Lieutenant that this is the first time I have seen a soccer field within a prison recreational area, and he noted that Hispanic inmates communicated to administrative staff that other inmates had sports fitting their national demographic and requested access to the sport of their nationality (i.e., soccer). The Lieutenant stated they (i.e., administrative staff) readily agreed and that the soccer field is in nearly constant use regardless of weather conditions.

## HOLMAN CORRECTIONAL FACILITY

I toured the Holman Correctional Facility (HCF) on July 15, 2016 (9:00 – 10:30 AM, approximate). Prior to my tour, I interviewed Warden I Mitchell, Captains Fails and Rouse, Mr. Odom, from the Classification Department, Ms. Brown, Psychological Associate II (ADOC), Ms. O'Barr, Nurse (LPN, MHM), and Ms. Lesliegh (Site Administrator, MHM).

HCF is a maximum security correctional facility that maintains the primary death row for male inmates in the ADOC (a secondary death row is maintained at Donaldson Correctional Facility). During my pre-tour meeting with the above listed staff, I was informed that HCF has the capacity to house 1,029 inmates (the ADOC website lists capacity at 1,002), but on the date of my tour (July 15, 2016) only 959 inmates were incarcerated within the facility. HCF is a

general population facility with 198 segregation cells (single bunk occupancy) and 160 death row inmates.

According to Ms. Lesliegh, the mental health caseload consisted of 86 inmates on the day of my tour, with a caseload average of 90 inmates (estimated). The caseload reached as high as 130 inmates approximately 3 years ago. ADOC has one Psychological Associate at HCF (i.e., Ms. Brown) with one position vacant (the position is not currently open due to budgetary constraints). MHM consists of two full-time staff, one part-time (i.e., 20 hours) licensed psychologist, one part-time (20 hours) certified nurse practitioner, one part-time (16 hours) mental health professional, and one part-time (24 hours) administrative assistant.

HCF is not a "blended facility" with regard to mental health, so the ADOC Psychological Associate (Ms. Brown) provides mental health services to general population inmates, and MHM staff provide services to mental health caseload inmates. Both Ms. Brown and MHM staff provide a variety of therapeutic groups (i.e., Ms. Brown provides one group per week, and MHM staff, Dr. Crum, provides three groups per week). Ms. Brown has a waitlist of approximately 15 inmates, whereas MHM staff have no wait list. Both mental health groups would like to provide additional treatment programming, but they are limited by time. Although security staffing shortages exist at HCF, consistent with the other facilities I visited, both Ms. Brown and MHM staff denied access to inmates (i.e., staffing shortages did not impede their access to inmates or the provision of mental health services).

Warden Mitchell and Captains Fails and Rouse conducted the facility tour. I was granted access to all areas of the facility with no restrictions. In addition to walking the general prison grounds, I was provided access to a general population unit (with dormitory style housing), the faith based unit, a segregation unit, and death row. Although additional general population and

segregation units were made available, I declined as they were reportedly similar to what I already observed. I also visited the medical, including the infirmary, and mental health departments. I was able to visualize the cafeteria, hobby area, and recreational yard (both for general population and death row inmates).

Prior to entering the segregation unit, Captain Fails informed me that the unit would likely get loud upon our entrance and that inmates would likely address me in a possibly derogatory manner. Upon arrival, however, the noise level elevated minimally. Although a few inmates tried to address our group, I was unable to make out what was said. There were two inmates (segregated inmates who earned an opportunity to work in the unit) mopping the main floors. The floors were clean, and the unit was free of debris. A few cells had string extended from the cell (this is referred to as phishing in segregation parlance), and the Warden noted these would be removed by an officer. The segregation cells were in tier format with three levels. It appeared nearly all of the cells were occupied. One cell was empty and I observed that the cell contained one rusted metal bed, one stainless steel sink, and commode. Paint was significantly chipped and peeled off. The window allowed for significant natural light. The cell smelled of Sulphur, left over from a somewhat recent fire, and there was black smoldering on the wall and around the wiring in the ceiling. A light fixture was missing and wires were exposed. The next-door cell also smelled of Sulphur and also had (although to a lesser degree) black smoldering on the wall. The paint in this cell was equally poor.

Per their report, both ADOC and MHM mental health staff conduct rounds two times per week and serve on the Segregation Review Board. Notably, unlike other institutions I visited, the Segregation Review Board meets with each inmate cell-side once per week (as opposed to the more standard procedure of verbally offering inmates an opportunity to meet with the board).

This procedure ensures that the Segregation Review Board meets with every segregated inmate on a weekly basis. Thus, considered collectively, the Segregation Review Board and mental health rounds results in inmates being monitored for mental health functioning up to five times per week which far exceeds the national standard of segregation mental health rounds occurring once or twice per week. However, both ADOC and MHM mental health staff noted that rounds twice per week is aspirational as they do not always have the time due to other demands, but rounds are conducted at a minimum of one time per week (the ADOC Psychological Associate further noted that the Segregation Review Board may consist of her "rounds" for some weeks). MHM staff provide therapeutic programming to segregated inmates. Specifically, they provide the Taking a Chance on Change program to inmates via institutional mail. For this program, mental health staff will mail a module from the program to an inmate, who completes the module and returns it, also via mail, to the mental health staff.  Staff reviews the material, provides written or verbal feedback as warranted, and mails the next therapeutic module. Inmates receive a certificate after completing this program.

Death row consisted of one level of cells with a window adjacent to the cell allowing in natural light and view of the outdoors. Inmates on death row are allowed to possess more property and the cells I observed contained televisions, radios, small desk fans, hot plates, and an assortment of other items. The inmates appeared skilled at maximizing their limited space (e.g., string hung across the top of the cell to hang clothes or other items). Death row inmates have a large recreational area that includes a basketball court, weights, and ample walking area. According to Captain Fails, HCF is the only prison in the country that has an outdoor group recreational area for death row inmates.

The general living area and the faith based housing unit were both single bunk dormitory-style living. Both were staffed by one officer and the single bunk system allowed for viewing access across the unit. Privacy and space in the general living unit was limited, but there was significant recreational space in the faith based living unit. Both units relied on large industrial fans to circulate air flow.

HCF was opened in 1969 and shows wear and tear consistent with almost 50 years of use. The facility is in need of painting (medical staff jokingly requested that I include the need for a paint job in my report, to which the Warden stated he was actually working on it for their area – this update was happily received by staff). Although HCF is an older facility that would benefit from cosmetic repair, it is a clean facility (e.g., walls were generally clean, floors were clean and polished). Living units provided limited access to recreational areas, but inmates do have access to an outdoor recreational area and a large well-equipped hobby department.

HCF was on "controlled movement" on the day of my tour. This is distinguished from a "lock down" in that during controlled movement inmate movement is limited to one unit at a time. For example, only one unit was allowed to go to the cafeteria or recreational yard at a time while others remained on their respective units. During a lock down, there is no inmate movement with the exception of necessary movement (e.g., doctor's visits, mental health appointment). Thus, during my tour the majority of inmates were restricted to their living quarters. The Warden informed me, per my inquiries, that the controlled movement was in response to inmate-on-inmate assaults (i.e., two stabbings approximately two weeks prior to my visit), and that he has informed inmates that when they demonstrate the ability to be responsible with increased freedoms, he will reduce the restrictions. When queried as to the time of the last lock-down, the Warden reported that it was during the same inmate-on-inmate assaults from

approximately two weeks prior. The facility also experienced a group disturbance in March. The Warden and Captains also noted some problems containing contraband. Such issues are to be expected in maximum security correctional institutions; however, I do not have data on the frequency of these disturbances to determine if HCF experiences more than the average maximum security facility.

With regard to medical and mental health (including ADOC and MHM), the departments are small with limited work space. Confidentiality is of concern when multiple inmates are being served at one time (though this did not occur during my visit), but it is worth noting that MHM offices are in the administrative area of HCF so inmates are not seen within the department.

Attachment E

**ATTACHMENT E**

**REFERENCES**

American Psychiatric Association, & Weinstein, H. C. (2000). *Psychiatric services in jails and prisons: a task force report of the American Psychiatric Association.* Washington, DC: American Psychiatric Association.

Andersen, H. S., Sestoft, D., Lillebæk, T., Gabrielsen, G., Hemmingsen, R., & Kramp, P. (2000). A longitudinal study of prisoners on remand: psychiatric prevalence, incidence and psychopathology in solitary vs. non-solitary confinement. *Acta Psychiatrica Scandinavica, 102*(1), 19-25.

Berger, R. H., Chaplin, M. P., Trestman, R. L. (2013). Commentary: Toward an improved understanding of administrative segregation. *The Journal of the American Academy of Psychiatry and the Law, 41*(1), 61-64.

Bonner, R. L. (2006). Stressful segregation housing and psychosocial vulnerability in prison suicide ideators. *Suicide & Life-Threatening Behavior, 36*(2), 250-254.

Bonta, J., & Gendreau, P. (1990). Reexamining the cruel and unusual punishment of prison life. *Law and Human Behavior,* 14(4), 347-366.

Bonta, J. & Gendreau, P. (1995). Reexamining the cruel and unusual punishment of prison life. In T. J. Flanagan (Ed), *Long-term imprisonment: Policy, science, and correctional practice* (75-94). Thousand Oaks, CA: Sage Publications.

Brodsky, S. L., & Scogin, F. R. (1988). Inmates in protective custody: First data on emotional effects. *Forensic Reports, 1*(4), 267-280.

Cloyes, K. G., Lovell, D., Allen, D. G., & Rhodes, L. A. (2006). Assessment of psychosocial impairment in a supermaximum security unit. *Criminal Justice and Behavior, 33,* 760-781.

Cohen, F. (2006). Isolation in penal settings: The isolation-restraint paradigm. *Washington University Journal of Law and Policy.*

Cohen, F. (2008). Penal isolation: Beyond the seriously mentally ill. *Part of special issue: The Disturbed Offender in Confinement, 35*(8), 1017-1047.

Cohen, F. (2012). Massachusetts DOC Settles: Seeks Reform of Segregation for SMI Inmates. *Correctional Mental Health Report, 14*(3), 33-45.

Cohen, J. (1992). A power primer. *Psychological Bulletin, 112,* 155-159. doi:10.1037/0033-2909.112.1.155

Dvoskin, J. A., & Morgan, R. D. (2010). Correctional psychology. In I. Weiner, & W. E.

Craighead (Eds.), *Corsini Encyclopedia of Psychology* (Vol. 1, pp. 417-420). New York: Wiley.

*Estelle v. Gamble* [429 U.S. 1066, (1977)]

*Estelle v. Ruiz* [679 F.2d 1115, (1982)]

Fagan, T. J. (2003). Mental health in corrections:  A model for service delivery. In T. Fagan & R. K. Ax (Eds.), *Correctional mental health handbook* (pp. 59-71).  Thousand Oaks, CA: Sage

Field, A. P., & Gillett, R. (2010). How to do a meta-analysis. *British Journal of Mathematical and Statistical Psychology*, *63*(3), 665-694.

Gendreau, P., & Bonta, J. (1984). Solitary confinement is not cruel and unusual punishment: People sometimes are. *Canadian Journal of Criminology, 26,* 467-478.

Gendreau, P., & Labrecque, R. M. (in press). The effects of administrative segregation: A lesson in knowledge cumulation. In J. Wooldredge & P. Smith (Eds.), *Oxford handbook on prisons and imprisonment.* Oxford, UK: Oxford University Press.

Gendreau, P., & Smith, P. (2012). Assessment and treatment strategies for correctional institutions. In J. A. Dvoskin, J. L. Skeem, R. W. Novaco, & K. S. Douglas (Eds.), *Using social science to reduce violent offending.* New York: Oxford University Press.

Grassian, S. (2006). Psychiatric effects of solitary confinement. *Journal of Law and Policy, 22,* 325-383.

Grassian, S. (n.d.). *Solitary confinement can cause severe psychiatric harm.* Publication source unknown.

Haney, C. (2003). Mental Health Issue in Long-Term Solitary and 'Supermax' Confinement. *Crime & Delinquency, 49*(1), 124.

Haney, C. (2008). A culture of harm: Taming the dynamics of cruelty in supermax prisons. *Criminal Justice and Behavior, 35*(8), 956-984.

Haney, C. (2009). The social psychology of isolation: Why solitary confinement is psychologically harmful. *Prison Service Journal, 181,* 12-20.

Haney, C. (1993). Infamous Punishment: The Psychological Effects of Isolation. *National Prison Project Journal, 8,* 3-21.

Hare, R. D. (2003). The Hare Psychopathy Checklist - Revised (2nd       ed.). Toronto, Ontario: Multi-Health Systems.

Hayes, L. M., & Rowan, J. R. (1988). *National study of jail suicides: Seven years later.* National Center on Institutions and Alternatives: Alexandria, VA.

Hresko, T. (2006). In the Cellars of the Hollow Men: Use of Solitary Confinement in U.S. Prisons and Its Implications under International Laws against Torture. *Pace International Law Review, 18*(1), 1-27.

Jonson, C. L. (2010). The impact of imprisonment on reoffending: A meta-analysis. (Doctoral dissertation). Retrieved from PsycINFO. (AAI3438930).

Kroner, D. G., Mills, J. F., & Morgan, R. D. (2006). Socially desirable responding and the measurement of violent and criminal risk: Self-report validity. *Journal of Forensic Psychology Practice, 6*(4), 27-42.

Kupers, T. (2008). What to do with the survivors? Coping with the long-term effects of isolated confinement. *Criminal Justice and Behavior, 35,* 1005-1016.

Lipsey, M. W. & Wilson, D. B. (2001). Practical meta-analysis. Sage: Thousand Oaks; California.

Lovell, D. (2008). Patterns of disturbed behavior in supermax population. *Criminal Justice and Behavior, 35,* 985-1004.

Lovell, D., Johnson, L. C., & Cain, K. C. (2007). Recidivism of supermax prisoners in Washington state. *Crime and Delinquency, 53,* 633-656.

Metzner, J. L., & Fellner, J. (2010). Solitary confinement and mental illness in U.S. prisons: A challenge for medical ethics. *The Journal of the American Academy of Psychiatry and the Law, 38,* 104-108.

Miller, H. A., & Young, G. R. (1997). Prison segregation: Administrative detention remedy or mental health problem? *Criminal Behaviour and Mental Health, 7*(1), 85-94.

Morgan, R. D. (2003). Basic mental health services: Services and issues. In T. Fagan & R. K. Ax (Eds.), *Correctional mental health handbook* (pp. 59-71). Thousand Oaks, CA: Sage Publications.

Morgan, R. D., Gendreau, P., Smith, P.., Gray, A. L., Labrecque, R. M., MacLean, N., Van Horn, S. A., Bolanos, A. D., Batastini, A. B., & Mills, J. F. (2016). Quantitative Syntheses of the Effects of Administrative Segregation on Inmates' Well-Being. *Psychology, Public Policy, and Law.* http://dx.doi.org/10.1037/law0000089

O'Keefe, M. L. (2007). Administrative segregation for mentally ill Inmates. *Journal of Offender Rehabilitation, 45*(1/2), 149-165.

O'Keefe, M. L., Klebe, K. J., Stucker, A., Sturm, K., & Leggett, W., (2010). *One year longitudinal study of the psychological effects of administrative segregation.* Report submitted to the National Institute of Justice, Washington DC.

Pashler, H., & Wagenmakers, E.J. (2012). Editors' introduction to the special section on replicability in psychological science: A crisis of confidence? *Perspectives on Psychological Science, 7*, 528–530. doi:10.1177/1745691612465253

Rosenthal, R. (1995). Writing meta-analytic reviews. *Psychological Bulletin,* 118(2), 183-192.

Schmidt, F. L. (2014). *The crisis of confidence in research: Is lack of replication the real problem? Or is it something else?* Presented at the annual meeting of the Association for Psychological Science in San Francisco, CA.

Smith, P. S. (2008). "Degenerate criminals": Mental health and psychiatric studies of Danish prisoners in solitary confinement, 1870-1920. *Criminal Justice and Behavior, 35,* 1048-1064.

Smith, P., Goggin, C., & Gendreau, P. (2002). The effects of prison sentences and intermediate sanctions on recidivism: General effects and individual differences. Ottawa, ON: Solicitor General Canada.

Suedfeld, P., Ramirez, C., Deaton, J., & Baker-Brown, G. (1982). Reactions and attributes of prisoners in solitary confinement. *Criminal Justice and Behavior, 9,* 303-340.

Zinger, I., Wichmann, C., & Andrews, D. A. (2001). The psychological effects of 60 days in administrative segregation. *Canadian Journal of Criminology, 43*(1), 47-83.

Attachment F

**Dunn, et al. v. Alabama Department of Corrections, et al.**

**Documents Sent to Expert Robert Morgan Ph.D.**

| BATES NO. | DESCRIPTION | PRODUCTION DATE | PRODUCED BY |
|---|---|---|---|
| ADOC039820-039822 | 011615 Segregation, RTU, SU, Safe Cell Directive | January 20, 2015 | Balch |
| ADOC044538-044540 | Email Notification and Directive Shaving Policy for Inmates Housed in Segregation, | January 26, 2015 | Balch |
| ADOC033094-033149 | RFP 006 and 009 Draper Segregation Unit (E-Dorm) 05/18/12 to Current | February 3, 2015 | Balch |
| ADOC033150-033203 | RFP 006 and 009 Draper Segregation Unit (E-Dorm) 05/30/13 to Current | February 3, 2015 | Balch |
| ADOC033204-033217 | RFP 006 Bibb SOP Mental Health Watch | February 3, 2015 | Balch |
| ADOC033224-033226 | RFP 006 SOP B-22 Limestone Mental Health Referral Procedures | February 3, 2015 | Balch |
| ADOC033381-033397 | RFP 009 AR433 Administrative Segregation | February 3, 2015 | Balch |
| ADOC033398-033409 | RFP 009 AR434 Disciplinary Segregation | February 3, 2015 | Balch |
| ADOC033410-033412 | RFP 009 AR436 Institutional Seg Review Board | February 3, 2015 | Balch |
| ADOC033416-033444 | RFP 009 Bibb SOP Segregation 2012 to Present | February 3, 2015 | Balch |
| ADOC033476-033543 | RFP 009 Easterling Segregation | February 3, 2015 | Balch |
| ADOC033544-033554 | RFP 009 Elmore Segregation | February 3, 2015 | Balch |
| ADOC033555-033562 | RFP 009 HAM SOP 60-111 Seg Shift Office Post 10 03 13 | February 3, 2015 | Balch |
| ADOC033563-033573 | RFP 009 HAM SOP 434-01 Disciplinary Seg | February 3, 2015 | Balch |
| ADOC033574-033576 | RFP 009 HAM SOP 436-01 Institutional Segregation Review | February 3, 2015 | Balch |
| ADOC033598-033602 | RFP 009 Kilby Segregation Cell Blocks C, D, E, and F | February 3, 2015 | Balch |
| ADOC033603-033607 | RFP 009 Segregation Review | February 3, 2015 | Balch |
| ADOC033608-033630 | RFP 009 Segregation Unit | February 3, 2015 | Balch |
| ADOC033631-33649 | RFP 009 174 St. Clair The Segregation Unit | February 3, 2015 | Balch |
| ADOC033670-033691 | RFP 009 SOP C-1 Limestone Segregation Unit | February 3, 2015 | Balch |
| ADOC033712-033730 | RFP 009 Stanton G Dormitory Unit Holding Tank | February 3, 2015 | Balch |

| BATES NO. | DESCRIPTION | PRODUCTION DATE | PRODUCED BY |
|---|---|---|---|
| ADOC033749-033773 | RFP 009  Tutwiler The Segregation Unit | February 3, 2015 | Balch |
| ADOC033774-033786 | RFP 009 Ventress Administrative Segregation and Housing for Close Custody | February 3, 2015 | Balch |
| ADOC033787-033799 | RFP 009 Ventress Disciplinary Segregation | February 3, 2015 | Balch |
| ADOC033800-033802 | RFP 009 Ventress Segregation Temperature Checks | February 3, 2015 | Balch |
| ADOC034251-034253 | RFP 024 Kilby Mental Health Referral Procedures | February 3, 2015 | Balch |
| ADOC046186-046229 | MHM 2011 Audit of Mental Health Caseload | March 11, 2015 | MCG – HSV |
| ADOC067037 | 2015.04.03 Memo to Segregation Inmates (Redacted) | May 13, 2015 | Balch |
| Dunn(Corizon)_08280-08783 | Bibb Policies & Procedures - CMS | June 5, 2015 | Maynard |
| Dunn(Corizon)_08784-08978 | Bibb Policies & Procedures - Corizon | June 5, 2015 | Maynard |
| Dunn(Corizon)_08979-09628 | Bullock Policies & Procedures - CMS | June 5, 2015 | Maynard |
| Dunn(Corizon)_09629-09978 | Bullock Policies & Procedures - Corizon | June 5, 2015 | Maynard |
| Dunn(Corizon)_09979-10170 | BWR Policies & Procedures | June 5, 2015 | Maynard |
| Dunn(Corizon)_10171-10653 | Corr. Dental Assoc. Policies & Procedures | June 5, 2015 | Maynard |
| Dunn(Corizon)_10654-10888 | Donaldson Policies & Procedures | June 5, 2015 | Maynard |
| Dunn(Corizon)_10889-11553 | Easterling Policies & Procedures - CMS | June 5, 2015 | Maynard |
| Dunn(Corizon)_11554-11677 | Easterling Policies & Procedures - Corizon | June 5, 2015 | Maynard |
| Dunn(Corizon)_11678-11882 | Fountain Policies & Procedures - Corizon | June 5, 2015 | Maynard |

245342.1

| BATES NO. | DESCRIPTION | PRODUCTION DATE | PRODUCED BY |
|---|---|---|---|
| Dunn(Corizon)_11883-12198 | Hamilton Policies & Procedures - CMS | June 5, 2015 | Maynard |
| Dunn(Corizon)_12199-12431 | Hamilton Policies & Procedures - Corizon | June 5, 2015 | Maynard |
| Dunn(Corizon)_12432-12682 | Holman Policies & Procedures - Corizon | June 5, 2015 | Maynard |
| Dunn(Corizon)_12683-13442 | Kilby Policies & Procedures | June 5, 2015 | Maynard |
| Dunn(Corizon)_13443-14241 | Limestone Policies & Procedures - CMS | June 5, 2015 | Maynard |
| Dunn(Corizon)_14242-14744 | Limestone Policies & Procedures - Corizon | June 5, 2015 | Maynard |
| Dunn(Corizon)_14745-15571 | St. Clair Policies & Procedures - CMS | June 5, 2015 | Maynard |
| Dunn(Corizon)_15572-16194 | St. Clair Policies & Procedures - Corizon | June 5, 2015 | Maynard |
| Dunn(Corizon)_16195-16864 | Staton Policies & Procedures - CMS | June 5, 2015 | Maynard |
| Dunn(Corizon)_16865-17144 | Staton Policies & Procedures - Corizon | June 5, 2015 | Maynard |
| Dunn(Corizon)_17145-17743 | Tutwiler Policies & Procedures - CMS | June 5, 2015 | Maynard |
| Dunn(Corizon)_17744-17953 | Tutwiler Policies & Procedures - Corizon | June 5, 2015 | Maynard |
| Dunn(Corizon)_17954-18769 | Ventress Policies & Procedures - CMS | June 5, 2015 | Maynard |
| Dunn(Corizon)_18870-18991 | Ventress Policies & Procedures - Corizon | June 5, 2015 | Maynard |
| Dunn(Corizon)_31546-31572 | Segregation & Special Housing | July 10, 2015 | Maynard |

3

| BATES NO. | DESCRIPTION | PRODUCTION DATE | PRODUCED BY |
|---|---|---|---|
| ADOC033445-033475 | RFP 009 Bibb SOP Segregation | July 20, 2015 | Balch |
| ADOC033731-033748 | RFP 009 Tutwiler Segregation Unit 05 20 08 | July 20, 2015 | Balch |
| ADOC10341-103158 | SOP#174 The Segregation Unit 08-08-15 | August 25, 2015 | Balch |
| ADOC103956-103968 | St. Clair Crisis Cell Utilization and Mental Health Watch Restraint Procedure May 2015 | September 16, 2015 | Balch Bham |
| ADOC104033-104280 | AEO, St. Clair Segregation Logs 05-08-15 Thru 05/14/15 | September 16, 2015 | Balch Bham |
| ADOC106631-106633 | RFP 003 Fountain Dormitory Number 6 Segregation Unit | October 9, 2015 | Balch |
| ADOC106721-106731 | RFP 009 Fountain Administrative Disciplinary Segregation | October 9, 2015 | Balch |
| ADOC106732-106745 | RFP 009 Fountain Administrative Segregation | October 9, 2015 | Balch |
| ADOC106746-106756 | RFP 009 Fountain Disciplinary Segregation 02 06 12 | October 9, 2015 | Balch |
| ADOC106757-106768 | RFP 009 Fountain Disciplinary Segregation | October 9, 2015 | Balch |
| ADOC106769-106770 | RFP 009 Fountain Post Orders Segregation Rover - AEO | October 9, 2015 | Balch |
| ADOC106771-106774 | RFP 009 Fountain Post Orders Segregation Security Officer- AEO | October 9, 2015 | Balch |
| ADOC106775-106779 | RFP 009 Fountain Segregation Special Management - AEO | October 9, 2015 | Balch |
| ADOC106780-106798 | RFP 009 Holman Administrative Segregation Protective Custody | October 9, 2015 | Balch |
| ADOC106799-106811 | RFP 009 Holman Disciplinary Segregation | October 9, 2015 | Balch |
| ADOC106812-106815 | RFP 009 Holman Segregation Feeding | October 9, 2015 | Balch |
| ADOC106816-106817 | RFP 009 Holman Segregation Release Documentation | October 9, 2015 | Balch |
| ADOC106818-106823 | RFP 009 Holman Segregation Special Management | October 9, 2015 | Balch |
| ADOC106824-106836 | RFP 009 Ventress Disciplinary Segregation | October 9, 2015 | Balch |
| ADOC106837-106839 | RFP 009 Ventress Segregation Temperature Checks | October 9, 2015 | Balch |
| ADOC107340-107346 | RFP024 Fountain Mental Health Consultation to Disciplinary Process | October 9, 2015 | Balch |
| ADOC107347-107349 | RFP024 Kilby Mental Health Referral Procedures | October 9, 2015 | Balch |

4

245342.1

| BATES NO. | DESCRIPTION | PRODUCTION DATE | PRODUCED BY |
|-----------|-------------|-----------------|-------------|
| ADOC0269205-0274037 | Ventress Seg Crisis Logs | April 14, 2016 | Balch |
| ADOC0278860-0278975 | Bobby Copeland Inmate File | May 18, 2016 | Balch |
| ADOC0278976-0280062 | Brandon Johnson Inmate File | May 18, 2016 | Balch |
| ADOC0280341-0280840 | Cherry Baker Inmate File | May 18, 2016 | Balch |
| ADOC0281003-0285340 | Christopher Jackson Inmate File | May 18, 2016 | Balch |
| ADOC0282246-0285340 | Daletrick Hardy Inmate File | May 18, 2016 | Balch |
| ADOC0290061-0292378 | Howard Carter Inmate File | May 18, 2016 | Balch |
| ADOC0293598-0295245 | Joshua Dunn Inmate File | May 18, 2016 | Balch |
| ADOC0295246-0295641 | Paul Folsom Inmate File | May 18, 2016 | Balch |
| ADOC0295642-0296085 | Quang Bui Inmate File | May 18, 2016 | Balch |
| ADOC296086-0297086 | Richard Businelle Inmate File | May 18, 2016 | Balch |
| ADOC0297087-0297593 | Rick Martin Inmate File | May 18, 2016 | Balch |
| ADOC297594-0298401 | Robert Dillard Inmate File | May 18, 2016 | Balch |
| ADOC0298402-0298809 | Sheila Allen Inmate File | May 18, 2016 | Balch |
| ADOC0301063-0301255 | Willie McClendon Inmate File | May 18, 2016 | Balch |
| ADOC0301256-0302125 | Roger McCoy Inmate File | May 18, 2016 | Balch |
| ADOC0302126-0302519 | Augustus Smith Inmate File | May 18, 2016 | Balch |
| ADOC0302713-0303962 | Brian Sellers Inmate File | May 18, 2016 | Balch |
| ADOC0303963-0304570 | Jermaine Mitchell Inmate File | May 18, 2016 | Balch |
| ADOC0304571-0305493 | Jonathan Sanford Inmate File | May 18, 2016 | Balch |
| ADOC0305494-0305943 | Kenneth Moncrief Inmate File | May 18, 2016 | Balch |
| ADOC0305944-0307391 | Leviticus Pruitt Inmate File | May 18, 2016 | Balch |
| ADOC0307392-0307822 | Matthew Mork Inmate File | May 18, 2016 | Balch |

245342.1

| BATES NO. | DESCRIPTION | PRODUCTION DATE | PRODUCED BY |
|---|---|---|---|
| ADOC0309744-0309965 | Turner Rogers Inmate File | May 18, 2016 | Balch |
| ADOC0309966-0310113 | Zerrick Naylor Inmate File | May 18, 2016 | Balch |
| ADOC0310908-0311324 | Hubert Tollar Inmate File | May 18, 2016 | Balch |
| ADOC0311325-0311866 | Jamie Wallace Inmate File | May 18, 2016 | Balch |
| ADOC0312110-0312893 | Richard Terrell Inmate File | May 18, 2016 | Balch |
| ADOC0312894-0313780 | Robert Williams Inmate File | May 18, 2016 | Balch |
| ADOC0313781-0314329 | William Sullivan Inmate File | May 18, 2016 | Balch |
| ADOC0314330-0314939 | William Villar Inmate File | May 18, 2016 | Balch |
| ADOC0320844-0330324 | 2014-2015 Seg Infirmary and Mental Health Encounters | June 23, 2016 | Balch |
|  |  |  |  |

245342.1