**Expert Report of Eldon Vail**

Dunn, et. al. v. Dunn, et. al.
The District Court of the United States
Middle District of Alabama
2:14-cv-601-MHT-TFM

Submitted: July 5, 2016
Submitted with Supplemental Citations: October 17, 2016

# TABLE of CONTENTS

Assignment .............................................................................................. 3

Summary of Opinions ........................................................................... 4

Qualifications ......................................................................................... 5

Facts and Data Considered in Forming Opinions ........................... 12

Opinions ................................................................................................ 13

  A. OVERCROWDING: Alabama prisons are severely overcrowded,
     resulting in living conditions that lead to increased levels
     of violence and increased demands for healthcare .............................. 14

    1. Alabama Prisons are Severely Overcrowded ................................. 14

    2. Alabama Prisons were not Built to Support Current Populations .. 16

          Inadequate Bathrooms .......................................................... 17

          Inadequate Space to Safely House Close-
          Custody and Other High-Risk Inmates ..................................... 22

    3. Alabama's Prison Overcrowding Leads to Increased
       Violence And Increased Needs for Medical Care ......................... 25

          ADOC Incident Reports ............................................................ 29

    4. Higher Levels of Violence Give Rise to
       Increased Needs for Healthcare ...................................................... 31

  B. INADEQUATE STAFFING: Alabama prisons are severely
     understaffed, resulting in a dangerous environment for inmates as
     well as an inability of custody staff to successfully interact with
     and support the healthcare objectives of the ADOC............................ 33

    1. ADOC is Severely Understaffed .................................................... 33

          ADOC's History of Inadequate Staffing Levels ........................ 35

    2. ADOC does not Have Enough Staff to
       Properly Supervise Prisoners ......................................................... 39

          Inadequate Staffing Leads to Unsafe Conditions ...................... 43

          Inmate Interviews ...................................................................... 44

          ADOC Records .......................................................................... 50

          Inadequate Staffing Results in Inadequate Monitoring
          of Segregation .......................................................................... 51

    3. Staffing Levels Prevent Custody Staff from Supporting the
       Healthcare Needs of Prisoners in the ADOC ................................. 57

          Missed Appointments ............................................................... 57

          Segregation Impacts................................................................. 63

          Custody Practices and Facility Violence
          Create Interference with Healthcare .......................................... 66

Conclusion ............................................................................................ 73

## ASSIGNMENT[1]

I have been retained by Plaintiffs to evaluate and offer my opinion regarding the effect of the Alabama Department of Corrections' (ADOC or "the Department") policies and operational practices on the administration of healthcare[2] to prisoners within ADOC's custody. The particular focus of my review has been on the relationship between correctional staff, access to healthcare, the impacts of crowding and the adequate provision of care within ADOC prisons. I further examine the design of ADOC facilities to determine whether or not the configuration of ADOC facilities has an impact on how care is dispensed. The methodology I have followed in conducting my analyses, as described in this report, is consistent with my normal practice in assessing prison operations and, based on my experience, is

---

[1] I was first contacted regarding this case in July of 2014. I was initially asked to evaluate and offer my opinion as to the practices regarding razor blades in the ADOC prisons and the response by officials to the concerns raised by Plaintiffs about those practices. In response I authored a short declaration, concluding that "ADOC does not currently have an effective system to account for razor blades in their prisons resulting in a risk of serious harm for both prisoners and staff…This is not a complex problem and given the documented incidents of self-harm in the Plaintiffs' complaint, should be treated as an emergency and be corrected in a matter of weeks, not months." My charge by Plaintiffs' counsel was then extended to cover the issues in the current case.

[2] The term "healthcare" encompasses both medical and mental healthcare.

consistent with the methodology employed by other experts in the field of corrections.

My work on this matter is ongoing. This report summarizes my current opinions given the available information I have reviewed to date. It is my understanding that a number of relevant documents requested by Plaintiffs' counsel have yet to be produced or were produced after the discovery cut-off date. If additional information is produced, I reserve the right to modify or supplement my analyses and opinions accordingly.

## SUMMARY OF OPINIONS

It is my opinion that conditions within ADOC, as well as its operational practices, interplay to cause a direct harmful impact and risk of harm on the provision of medical and mental healthcare for prisoners currently housed in the ADOC.

First, the severe overcrowding in Alabama prisons results in living conditions that increase both the potential for violence and the need for prisoners to access healthcare. Every ADOC prison I inspected was dramatically underbuilt in physical plant capacity to safely house the number of prisoners in the living unit areas, including the toilet facilities. This is amplified by ADOC's routine practice of housing close-custody inmates in

open dormitories that are unsuitable for the safe housing of high-risk inmates.[3]

Second, the systemic and pervasive lack of authorized custody staffing prevents ADOC from ensuring prisoners are able to access necessary care. This problem is made worse by an astonishing vacancy rate of correctional officers to fill the ADOC's authorized correctional officer positions. The result is a very dangerous prison environment for the inmates, as well as an inability of custody staff to successfully interact with and support the healthcare objectives of the department.

The increased need for care caused by violence and other health-related issues stemming from overcrowding, combined with the inability of ADOC, because of a dramatic lack of custody staff, to ensure prisoners are able to access care, results in a current, ongoing and significant risk of serious harm to ADOC inmates living in Alabama prisons. It is quite simply a system in a state of perpetual crisis—a fact known and yet unaddressed by Alabama officials for a considerable period of time. For example, in 2006 a Governor's Task Force on Prison Crowding was created, but the results of

---

[3] The ADOC Classification policy does not give a definition for "close-custody". Typically, close-custody refers to the highest risk inmates eligible to be placed in a general population setting. Although these inmates should be housed in cells, they should have access to robust programming and spend considerable times out of their cells—in the dayroom, in the yard, or in programming—each day.

that work group were limited due to "lack of funding".[4] In fact, the crowding problem is much the same as it was a decade ago when the Task Force was created.

## QUALIFICATIONS

I am a former correctional administrator with nearly 35 years of experience working in and administering adult institutions. Before becoming a corrections administrator, I held various line and supervisory level positions in a number of prisons and juvenile facilities in Washington, in addition to serving as a Juvenile Parole Officer and pre-release supervisor. I have served as the Superintendent (Warden) of three adult institutions, including facilities that housed maximum, medium and minimum-security inmates. As a Superintendent I directly supervised the healthcare administrator in my institutions.

I served for seven years as the Deputy Secretary for the Washington State Department of Corrections (WDOC), where I was responsible for the operation of prisons and community corrections. I briefly retired, but was asked by the former Governor of Washington, Chris Gregoire, to come out of retirement to serve as the Secretary of the Department of Corrections in the fall of 2007. I served as the Secretary for four years, until I retired in

---

[4] ADOC Fiscal Year 2009 Annual Report, page 20.

2011.

As a Superintendent, Assistant Director of Prisons, Assistant Deputy Secretary, Deputy Secretary and Secretary, I was responsible for the safe and secure operations of adult prisons in the State of Washington, a jurisdiction that saw and continues to see a significant downward trend in prison violence with very little class-action litigation.

As the Superintendent of McNeil Island Corrections Center, and as a result of legislation, then-Secretary Chase Riveland charged me with designing and opening a new program for mentally ill inmates within the WDOC. I did so in collaboration with leaders from a number of departments from the University of Washington (UW) who informed the design and operation of the two units, one medium security and one maximum security, devoted to this population.[5] That collaboration continued for nearly 20 years as UW staff came to assist the Department in improving our treatment of mentally ill inmates throughout the system. Our focus was on moving inmates out of high security bed placement whenever possible. For this program, we created a new job series, "Correctional Mental Health" workers. About two-thirds of the line staff were former correctional officers,

---

[5] McNeil Island was a 1,700-bed facility with five medium-security living units a maximum-security segregation unit, and a stand-alone minimum-security unit outside the secure perimeter of the main institution.

and the other third had little or no correctional experience but did have undergraduate or Master's degrees in psychology or other social services majors. The leadership of the program was also a hybrid of correctional and mental health staff, as well as psychiatrists and psychologists. This allowed the program to blend the two disciplines to make the program safe as well as effective in providing treatment to the mentally ill who were housed there. We provided psycho-educational treatment. Along with treatment from the primary clinicians, inmates were offered classes in areas such as anger management, symptom recognition, and medication management. The living unit itself was used as an environment to practice the skills being learned by the mentally ill inmates away from the pressures they can experience in a general population prison. We expected staff and inmates alike to model pro-social behavior. The design proved effective. According to researchers from the UW, "[p]articipants were substantially less symptomatic when they left the program than when they entered . . . . there was a significant improvement in major infractions and use of expensive resources following program stays . . . and, the pattern of work and school assignments is one of improvement."[6]

---

[6] D. Lovell, D. Allen, C. Johnson and R. Jemelka, *Evaluating the Effectiveness of Residential Treatment for Prisoners with Mental Illness*, Criminal Justice and Behavior, Vol. 28, February 2001, 83-104.

As Assistant Director for Prisons in Washington, my responsibilities included oversight of mental health programs for all prisons in the State of Washington. Part of this assignment was to oversee the design of a capital project that more than doubled the size of Washington's largest program for the mentally ill. Taking what I had learned from my experience on McNeil Island, my primary focus was to design a housing continuum for the mentally ill that did not rely on over-classifying individuals as maximum security, and instead moved them through less restrictive levels of prison housing. We developed a design that allowed inmates to move through progressive custody levels from maximum to minimum and to avoid segregation whenever possible.

During my tenure as the Deputy Secretary, we created a specialized high-security treatment unit for the mentally ill inmates, where the inmates could be safely housed without significant levels of isolation and also receive robust treatment from mental health professionals. This unit was separate and apart from regular segregation units.

As Deputy Secretary and later as Secretary, I focused on providing proper treatment for the mentally ill in prison on a system-wide basis. The pioneering work of the McNeil program and Washington's correctional

programs for inmates placed in isolation have been extensively studied and guided by researchers from the UW.[7]

Shortly after becoming the Secretary of the Washington State Department of Corrections, I chose an administrator from outside the field of corrections with a background solely in healthcare as my Deputy Secretary.[8] I consciously made this choice to make certain we were providing constitutional care to our incarcerated population. During our tenure together, we avoided class-action litigation related to our delivery of healthcare and simultaneously improved outcomes for prisoners.

My opinions are based upon my substantial experience running correctional institutions and presiding over a statewide prison system for more than a decade, including direct supervision of my subordinates who were responsible for the provision of both medical and mental health care to inmates. During my time in with the WDOC, that system successfully provided care and addressed the challenge created by the rapid influx of the mentally ill into the prison environment. In my 35 years of work in

---

[7] For examples see, Lovell, *A Profile of Washington Inmates on Intensive Management Status*, University of Washington-Department of Corrections Behavioral Health Collaboration, October 2010; Lovell, *Patterns of Disturbed Behavior in a Supermax Population*, Criminal Justice and Behavior, 2008, 985; D. Lovell and R. Jemelka, *Coping With Mental Illness in Prison*, Family and Community Health, 1998.

[8] My deputy was Cheryl Strange, currently the CEO of Western State Hospital, the largest mental health hospital in Washington.

corrections, I have spent considerable time working to provide for the proper custody and care of the physically and mentally ill sentenced to prison.

I am experienced in sound correctional practice.

Since my retirement I have served as an expert witness and correctional consultant for cases and disputes 40 times in multiple jurisdictions—state, local and federal. As an expert witness and consultant I have been called upon to address security issues and conditions of confinement in adult prisons and jails across the country. Many of those cases involved the care, custody and conditions of confinement for mentally ill inmate patients and the quality of healthcare for all inmates, including in the states of California, Arizona, Mississippi, Delaware, New Jersey and Illinois.

I am currently working for the United States Department of Justice, investigating the treatment of gay, lesbian and transgender inmates in the Georgia Department of Corrections; for the Sacramento County Sheriff, developing recommendations for the improved treatment of mentally ill prisoners and the overuse of segregation in their jails; for the Southern Poverty Law Center and the American Civil Liberties Union in a class-action lawsuit about conditions in the Eastern Mississippi Correctional Facility; and, for Morrison and Foerster, tracking compliance with a

settlement agreement with the New York Department of Corrections and Community Service regarding the conditions of confinement and overuse of segregation in that state's prison system.

A true and correct copy of my current resume is attached as Exhibit 1 to this report, which lists my work experience, publications, and service as an expert witness and correctional consultant, including prior trial and deposition testimony.

My billing rate for work on this case is $150 per hour.

## FACTS AND DATA CONSIDERED IN FORMING OPINION

I considered information from a variety of sources in the course of my work on this case. Sources include court filings submitted by the parties, certain deposition testimony, and an enormous volume of information about the operation of the Alabama Department of Corrections made available through discovery.

I also traveled to Alabama on three separate occasions to inspect seven ADOC prisons in order to better understand their operation.[9] On May 13-15 of 2015, I inspected Tutwiler, Bibb and St. Clair, spending one day at each facility. On August 17-18 of 2015, I inspected Holman and Fountain, again

---

[9] According to the ADOC, four of the facilities I visited, Kilby, Tutwiler, St. Clair and Holman, are close-custody institutions. The other three, Fountain, Easterling and Bibb, are medium-custody institutions.

spending one day at each facility. In March of this year, I returned to Alabama and spent one day at Easterling on the 16th and one day at Kilby on the 18th. During these inspections I had the opportunity to view the physical plant and ask limited questions of the staff regarding the basic operation of the prison. My ability to speak with inmates was severely restricted and for the most part limited to confidential interviews. It was not until my third inspection that I could speak to inmates at the cell front or in common areas. However, even during that third inspection, there were some areas at Kilby where this was not allowed. This severe restriction on conversations with inmates is completely unique in my experience, and I have been inside some very dangerous prisons, including the segregation units in the Corcoran State Prison in California, the Eyman facility in Arizona, the Stateville Correctional Center in Illinois and the Upstate Correctional Facility in New York—all maximum-security prisons housing those considered to be the "worst of the worst" in each respective state. While I have been limited from speaking to the occasional inmate because of an immediate behavior problem, I have never encountered the restrictions imposed in this case. Nevertheless, I did have the opportunity to conduct 42 confidential interviews with prisoners in seven prisons and review an enormous amount of written material, both sufficient to offer my opinions in this case. A

complete list of the material I have reviewed is offered as Exhibit 2 to this report.

## OPINIONS

The conditions and operational practices of ADOC have a direct harmful impact and risk of harm on the provision of medical and mental healthcare for prisoners within the custody of ADOC. Both overcrowding and inadequate staffing of correctional officers result in a violent, dangerous, and dangerously unhealthy prison environment in which ADOC custody staff are unable to successfully interact with and support the healthcare objectives of the Department. The combination and interaction of these factors creates a current, ongoing and significant risk of serious harm to inmates living in Alabama prisons.

**A. OVERCROWDING: Alabama prisons are severely overcrowded, resulting in living conditions that lead to increased levels of violence and increased demands for healthcare.**

1. <u>Alabama Prisons are Severely Overcrowded</u>

There is no question that prisons in Alabama are overcrowded. The Alabama Department of Corrections (ADOC) currently has approximately 24,189 prisoners in its custody. ADOC facilities are only designed to hold 13,318 prisoners.[10]

---

[10] ADOC March 2016 Monthly Statistical Report, Facility Operations.

14

## Population Figures – March 2016



SOURCE: ADOC MARCH 2016 MONTHLY STATISTICAL REPORT, FACILITY OPERATIONS

The numbers in the above chart are typical of the other prisons in the

ADOC.  The additional inmates beyond the rated capacity are stuffed into

---

ADOC records show that in March of 2016, Kilby housed 1,288 inmates in a facility with a design capacity of 440. Holman housed 802 with a design capacity of 581. Bibb housed 1,901 in a facility with a design capacity for 918. Tutwiler housed 692 in a facility designed for 417. Easterling housed 1,515 with a design capacity of 652 and Fountain housed 1,255 with a design capacity of 719. Ibid.

open-bay dorms designed for far fewer inmates.  As a result, basic living space for each human being in their bunk areas is very restricted.

The following photo was taken at in the Kilby G/H dorm on the day of my inspection at that facility, March 18, 2016.



The issue of overcrowding is a known fact.  State officials readily admit that Alabama's prison population far exceeds capacity.  This year, Alabama's Governor Robert Bentley put forth the Alabama Prison Transformation Initiative, a plan to build four mega prisons.  The documents supporting this Initiative state, "The ADOC currently houses over 24,000

inmates, resulting in an occupancy rate of over 180%".[11]  Similarly, in a
PBS interview this year, Governor Bentley stated:

> The facilities we have right now with 190 percent
> occupancy rate, almost 200 percent, I mean, this is
> just unacceptable. And it's dangerous, not only to
> the prisoners, to our corrections officers, and really
> to the public, and it's costing us hundreds of
> millions of dollars.[12]

Whichever figure is the most accurate regarding the extent of
overcrowding, it is clear that ADOC prisons are housing too many inmates
in too small of space, and the result is dangerous for both the inmates and
the staff.

## 2.  Alabama Prisons were not Built to Support Current Populations

Because Alabama's prison population far exceeds its design capacity,
it is not surprising that ADOC facilities are unable to support current inmate
populations.  From the facilities I inspected there are clear examples of the
restrictions on space that result from placing prisoners in spaces designed for
much fewer persons.  These space limits increase inmate violence and result
in additional medical treatment needs.  First, the bathrooms in ADOC

---

[11] Alabama Prison Transformation Initiative Information Paper, page
3, http://www.doc.state.al.us/docs/Alabama%20Prison%20Transformation
%20Initiative%20061616-01.pdf.
[12] *Violent, overcrowded Alabama prisons hit a breaking point*, PBS
Newshour,  http://www.pbs.org/newshour/bb/violent-overcrowded-alabama-
prisons-hit-a-breaking-point%E2%80%8B%E2%80%8B%E2%80%8B/
(Apr. 8, 2016).

prisons are inadequate to support the population required to use them. Second, there is not enough space to safely house close-custody inmates.

*Inadequate Bathrooms*

The bathrooms in ADOC prisons are inadequate to support the population required to use them.  This likely produces competition for toilets, sinks and shower facilities, resulting in unnecessary tension in the ADOC population.

The American Correctional Association (ACA) established standards for the construction and operation of prisons and jails.  Even if prison systems choose not to be accredited by ACA auditors, it is very common to look to the ACA for guidance about what is tolerable in the physical plant of prison facilities.  The ACA standard for toilets states:

> Toilets are provided at a minimum ratio of 1 for every 12 inmates in male facilities and 1 for every 8 inmates in female facilities. Urinals may be substituted for up to one-half of the toilets in male facilities.[13]

ADOC prisons regularly violate these standards. There are multiple examples:

---

[13]  ACA Standard 4-4137, Standards for Adult Correctional Institutions, 4th edition.

## Toilet Ratio



American Correctional Association (ACA) Minimum Standards
*Urinals may be substitued for up to one-half of the toilets*

Bibb

Holman
(J dorm)

Easterling
(F-1 dorm)

Kilby
(G dorm)

Bibb:  The Bibb dormitories house about 106 inmates.  There are 4 toilets and 1 large urinal in each dormitory, for a ratio per inmate of about 1 to 21, even if all are functioning properly.  The stress on this plumbing was

evident during my inspection.  I noted 7 toilets that were broken or plugged, as well as 5 urinals that were leaking or otherwise not functional.



It is typical that facilities are cleaned before outside inspections occur. Inmates informed me that was the case at Bibb, which is where the photograph above was taken.

Holman:  There were about 160 inmates in J Dorm the day I visited. There were 7 toilets and 6 urinals for a ratio of about 1 for each 16 inmates. In F dorm, which houses about 240 inmates, there were 16 toilets and 2 urinals, for a ratio of about 1 toilet for each 14 inmates.

Easterling: In the F-1 dorm at Easterling, which houses about 120 inmates, there were 5 toilets and 1 urinal, for a ratio of about 1 toilet for every 20 inmates. The situation was only slightly better in F-2 dorm.  It has

the same bathroom set up as F-1 but only houses 110 inmates.  C dorm also has the same bathroom set up but houses only about 90 inmates for a ratio of 1 toilet for every 15 inmates.

Kilby: In G dorm, there were 8 toilets and 1 urinal.  I was told the dorm houses up to 199 inmates.  That would be a ratio of 1 to 22. On the day of my inspections, I was told the dorm was holding 154 inmates, for a ratio of about 1 to 17.  H dorm had the same toilet/urinal design and housed 145 inmates on the day of my inspection, for a ratio of 1 to 16.

Recalling that the ACA ratio is 1 toilet for every 12 male inmates, it is clear that these male facilities do not meet the ACA standard. These standards have taken decades to develop. They are based on the experience of corrections professionals in countless prisons. They are the minimum necessary to prevent inmates from being denied one of their basic human needs while they are incarcerated. American Correctional Association, Standards and Accreditation, http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards___Accreditation/Standards/ACA_Member/Standards_and_Accreditation/StandardsInfo_Home.aspx?hkey=7c1b31e5-95cf-4bde-b400-8b5bb32a2bad.

Similarly, the ACA standard for sinks is 1 for every 12 inmates[14] and the standard for showers is 1 for every 8 inmates.[15]   Again, facilities in the ADOC fall far short.

Bibb: In A-1 dorm there were 9 showers for 106 inmates, for a ratio of 1 for 11 inmates.  There were 5 sinks, for a ratio of 1 for every 21 inmates. Other dorms were basically the same.

Easterling:  In dorms F-1 and F-2, which house 120 and 110 inmates respectively, there were 8 showers and 7 sinks, for ratios of 1 shower for every 15 inmates and 1 sink for every 17 inmates.  Dorms C-1 and C-2 have the same shower and sink set up and house, respectively about 90 and 133 inmates.  The shower ratio runs from about 1 for every 11 inmates in Dorm C-1 to 1 for every 16 inmates in Dorm C-2.  The sink ratios were 1 to 17 in C-1 and 1 to 19 in C-2.

Kilby:  In G dorm, which housed 154 inmates on the day of my inspection, there were 8 showers, for a ratio of 1 shower for every 19 inmates.  H dorm housed 145 inmates and had the same shower set up for a ratio of 1 shower for every 8 inmates.

Like the toilets and the urinals, some of the showers and sinks were also broken and in disrepair, likely from overuse.  Such extreme lack of

---

[14] ACA Standard 4-4138.
[15] ACA Standard 4-4139.

functioning plumbing fixtures available to relieve oneself or clean oneself creates competition for some of the basic functions of life.  In my opinion, based on my experience as a prison Superintendent and agency administrator, such competition will inevitably lead to tension and conflicts within the inmate population.  Given that there are times of day, for example early in the morning or after inmates have been required to remain on their bunk during counts or unit inspections, when there is great competition for such facilities, it is predictable that weaker inmates will be last to access them and that the potential for violence is elevated as a result.  These types of conflicts frequently result in prisoner-on-prisoner violence that leads to injuries and, again, increased need for medical care.

*Inadequate Space to Safely House Close-custody and*
*Other High-Risk Inmates*

Another significant problem for the ADOC is that they regularly house close-custody prisoners in open dormitories.[16]  This is true at Holman, Tutwiler, St. Clair and Bibb. With the exception of inmates housed in segregation, these are the inmates most likely to act out and cause problems for correctional authorities.  While there may be exceptions of which I am

---

[16] The ADOC assigns inmates to close, medium or minimum-custody based on a validated classification tool that "scores" inmates for their level of risk to prison security.  From this information, the ADOC staff make assignments to their various prisons and housing units within those prisons.

unaware, I have not been in, nor do I know of, another prison system that regularly and routinely puts close-custody inmates in open dorms. These inmates require cells.[17] The risk to other inmates and to the staff is simply too great. It is my opinion that the ADOC prison system is dramatically underbuilt to house close-custody inmates which contributes to the level of violence in their prisons and, in turn, an increased need for medical care. It is tough to control an angry inmate when there is no cell to put them in.

The absence of cells for close-custody or other high-risk inmates has other impacts on the ADOC prison system. Several ADOC prisons have "behavior" or "hot" dorms where they house prisoners with segregation-type restrictions on movement and privileges. Yet the inmates are confined, together, in the open dormitory environment. These inmates have allegedly misbehaved in some manner and are assigned to these units as a result. They typically have no programming and very little movement outside of the unit, creating a pressure cooker type environment for the inmates housed there. These dorms don't have televisions like the other dorms have, creating an even more stark setting and dangerous idle time.

During my inspection of Fountain, a medium-custody prison, I encountered such units. There were two of them, adjacent to one another. A

---

[17] Again, placement of close custody inmates in cells cannot be the equivalent of segregation or isolation, as described in footnote 3.

single officer was sitting in a chair at the front of both of these units, assigned to supervise them both.[18]  He could see into the units, but it would be impossible to view anything going on unless it was happening near the front of each dorm.  As a matter of inspection routine I usually enter every unit and make my way through it. Going into one of these "hot" dorms at Fountain, I noticed most of my escorts hanging back.  I believe I was the only one to make it to the back of the dorm.  When I got there I found inmates lounging and openly smoking cigarettes, a practice against the rules in the dormitories of the ADOC.   There was also evidence of inmates smoking in the bathroom of the unit. In my opinion this is a simple example that I happened upon of how much inmates are able to control the dormitories due to lack of frequent and regular officer supervision.  Given that this was a "behavior" dorm where inmates had been placed for punishment after committing acts of misbehavior, and given the lack of direct supervision by correctional officers, I am sure this is not the only rule the inmates were ignoring.

---

[18]   Given the staff shortages endemic to the ADOC (which I discuss in more detail later), too frequently there is no officer coverage whatsoever for long periods of time in those dormitories, creating an environment where stronger high-risk close-custody prisoners can prey on weaker close-custody prisoners.  This can and does give rise to the power of prison gangs, as inmates seek protection from other inmates by affiliating with a gang. Gangs are no small problem in ADOC prisons, a fact universally acknowledged by both staff and inmates.

In my experience the lack of true cells for close-custody inmates or inmates who regularly violate prison rules has an impact on the operation of medium-security facilities as well.  Some inmates in medium-custody need to know that there are privileges associated with that custody classification that will be lost should they misbehave.  Given that the dormitories in medium are the same as those in close, such deterrent effect is lost on Alabama prisoners.

Bibb, another medium-security prison, also has one of these "behavior dorms."  I believe at Bibb they call it a Behavior Modification dorm. I am hard pressed to understand what behavior is being modified in conditions of unnecessary enforced idleness.  Problems in that dorm have erupted in the past.

In 2015, inmates in that dormitory refused to follow the orders of correctional officers, barricaded the entrance to the dorm and started a fire, which damaged the electrical system.  Four hours later ADOC official negotiated a resolution to this crisis.[19]

3. <u>Alabama's Prison Overcrowding Leads to Increased Violence And Increased Needs for Medical Care</u>

---

[19] Dethrage, Stephen, *Bibb County prison on lockdown after inmates barricade dormitory, start fire*, AL.com http://www.al.com/news/tuscaloosa/index.ssf/2015/07/bibb_county_prison_on_lockdown.html (July 31, 2015).

As referenced above, the overcrowded conditions in Alabama prisons are likely to produce unnecessary tension in the ADOC prison population, which does ultimately lead to violence. This reality is clearly recognized by state officials.  Such violence predictably results in increased demand for medical care.  As discussed further in Section B below, ADOC's severe understaffing creates barriers to inmates accessing that necessary care.

In March of this year, there were violent incidents at two ADOC prisons.  Following these incidents, U.S News & World Report reported, "Alabama Governor Robert Bentley says prison uprisings will occur in other facilities in the state if the problems of overcrowding and understaffing aren't addressed".[20] I agree with the Governor.  Overcrowding makes prisons more violent and more dangerous for both the staff and for the inmates.  In my own experience, the overall violence and risk of disturbance is elevated when facilities are overcrowded.

In 1992, shortly after I was appointed the Superintendent of the McNeil Island Corrections Center, one of the living units at the facility—a stand-alone minimum unit—was at 200% of capacity and was housing in

---

[20]AP, *Alabama Gov. Robert Bentley says prison uprisings will occur in other facilities in the state if the problems of overcrowding and understaffing aren't addressed*, U.S. News & World Report, http://www.usnews.com/news/us/articles/2016-03-15/the-latest-alabama-governor-visits-troubled-prison (March 15, 2016).

excess of 400 inmates in a unit designed for fewer than 200.  On a Friday night before Labor Day, violence broke out and gang fights between black and Hispanic inmates spiraled out of control into a full-scale riot, resulting in the death by stabbing of one prisoner and several others being injured.  Staff abandoned their posts for their own safety, and it wasn't until dawn of the following morning that, with the help of the Washington State Patrol and tactical teams responding from other institutions, we regained control of the facility.  Shortly thereafter, the population of the stand-alone unit was reduced to its design capacity. We had no similar events until the day the unit closed two decades later.  We determined in our review of the riot that the "flash-point" for the riot was competition for access to recreation facilities (the weight pile), a conflict typical of an overcrowded prison. Overcrowded prisons, even at the minimum-security level, are more likely to explode than prisons that do not exceed the number of prisoners they were designed to hold.

The link between overcrowding and rising levels of prison violence is widely recognized by researchers throughout the field.

Dr. Craig Haney[21], a psychologist and professor at the University of California at Santa Cruz, has written extensively on the impacts of

---

[21] Dr. Haney is an expert in this case. I have worked with him in

overcrowding in prisons.  In 2006, he published an article entitled *The Wages of Overcrowding* that summarizes much of the then-current research on overcrowded prisons.[22] Several examples from his paper inform the discussion about the severe overcrowding and the resultant danger to prisoners in Alabama's prisons.  First, he notes:

> …[w]here crowded conditions are chronic rather than temporary…there is a clear association between restrictions on personal space and the occurrence of disciplinary violations.[23]

Second, he states:

> …overcrowding means that there is less for prisoners to do, fewer outlets to release the resulting tension, a decreased staff capacity to identify prisoner problems, and fewer ways to solve them when they do occur… [Therefore,] overcrowded conditions in which prisoners have a significant amount of idle time can contribute to a higher level of prison rapes.[24]

Similarly, a senior researcher for the Federal Bureau of Prisons reports that,

> The major findings on which most prison researchers agree are (1) that prisoners housed in large, open bay dormitories are more likely to visit

---

California, New York, Illinois and Arizona. He is widely recognized as an expert on the impacts on behavior caused by overcrowding prison conditions, as well as the harmful effects of segregated confinement.

[22] Haney, Craig, *The Wages of Overcrowding*, Washington University Journal of Law & Policy, Volume 22, January, 2006.

[23] Ibid, page 272

[24] Ibid, page 276

clinics than are prisoners in other housing arrangements (single-bunked cells, double-bunked cells, small dormitories, large partitioned dormitories); (2) that prisons that contain dormitories have somewhat higher assault rates than do other prisons; and (3) that prisons housing significantly more inmates than a design capacity based on sixty square feet per inmate have high assault rates.[25]

Unfortunately, these are precisely the conditions that exist in the Alabama Department of Corrections.  I note that the conditions described by the Bureau of Prisons researcher parallel the dominant living unit design in the Alabama prisons I inspected—they are large, open bay dormitories housing significantly more inmates than they were designed to hold.  The result is significant levels of violence within the ADOC.

*ADOC Incident Reports*[26]

---

[25] Gees, Gerald G., *The Effects of Overcrowding in Prison*, University of Chicago, 1985

[26] It is my understanding that Defendants were to produce "Incident Reports. With respect to Request No. 135 to ADOC, relating to incident reports of violent behavior including both self-harm and violence toward others, the State will produce all incident reports from all major institutions from January 1, 2014 through August 31, 2015. The search for responsive documents will be conducted by searching incident codes, including but not limited to fighting with a weapon, fighting without a weapon, assault on another inmate, self-harm, attempted suicide, suicide, and homicide." Initially I understand that the only documents that were produced related to that request (and therefore the only documents that I received) concerned inmate deaths from 2007-2012 and a limited number of Incident Report Logs from a small number of facilities. I understand that the Defendants produced thousands of documents, including a large number of Incident

As part of my assessment, I reviewed six months of Incident Report Logs for St. Clair (from Nov. 15, 2014 to May 15, 2015).[27] These logs confirm the danger that inmates face in that facility. During that period of time, the reports indicate that inmates were involved in 46 fights and 74 assaults, and 24 weapons were discovered. In my experience as a corrections practitioner and studying prison systems for the last several years, staff in any correctional facility never discover all weapons or every fight or assault. This is especially true in a facility that cannot fill half of its authorized correctional officer positions. I am completely confident in saying that the level of violence at St. Clair, a close-custody facility, is much worse than these numbers clearly illustrate.

The Incident Report Logs for Fountain (January 1, 2015 to July 16, 2015), a medium-custody facility, are very similar.[28] This is itself a surprise, as medium-custody facilities are typically less dangerous than a close-custody facility such as St. Clair. However, Fountain reports 72 inmates

---

Reports, responsive to the initial request, within the last two weeks. Counsel for the Plaintiffs has provided those responsive documents, but I have only had the opportunity to review a small sample of these reports thus far. Based on my review at this point, there is nothing in the recently produced reports that contradicts my concern about the level of violence in ADOC prisons. I reserve the right to comment on these reports in more detail after I have a chance to thoroughly review what has just recently been produced.

[27] ADOC 103969-104032.

[28] ADOC 103329-103353.

involved in fights and 56 assaults during this time period, again likely underestimating the number of actual fights and assaults as, based on my experience, many are likely undiscovered.

The Incident Report Logs from Holman (February 1, 2015 to July 31, 2015)[29] reflect that it too is a dangerous place. For this time period, Holman reports 66 fights and 74 assaults, again numbers that likely underestimate the amount of physical conflict experienced by inmates at that facility.

While Tutwiler, being a prison for women, had lower reports of violence in their Incident Report Logs (November 13, 2014 to May 13, 2015)[30] than the male facilities, there were more incidents of violence than I would have expected based on my experience.  Tutwiler recorded 28 inmates involved in fights and 17 assaults.  As a former Superintendent (Warden) of a women's prison in Washington, what I found most startling was 25 Use of Force (UOF) events recorded at Tutwiler during that period. Given that there were 29 reported at Fountain, 12 at Holman and only four at St. Clair, the number at Tutwiler was surprisingly high.  While I suspect that Holman and St. Clair may well be underreporting, 24 UOF events at a women's prison in six months makes me concerned about the officer's training and commitment to de-escalate situations and avoid the use of force

---

[29] ADOC 103841-103890.
[30] ADOC 103191-103273.

whenever possible.  I am confident that I did not have 24 UOF events during the two and a half years I was Superintendent of the Washington Corrections Center for Women, a maximum, medium and minimum-custody facility.

4. <u>Higher Levels of Violence Give Rise to Increased Needs for Healthcare</u>

As reported by the Federal Bureau of Prisons, "prisoners housed in large, open bay dormitories [like those in the ADOC] are more likely to visit clinics than are prisoners in other housing arrangements."[31]

The need for greater medical care is not surprising where there is severe overcrowding and an increased potential for violence.  The link between higher levels of violence and the rising need for healthcare in the Alabama prisons concern me.  The level of violence in ADOC prisons was also of concern to ADOC's contract medical provider Corizon. In an email from the company Vice President Larry Linton, he asks one of his staff for an analysis of "trauma related costs" in 2012 and 2013.[32] After some discussion about whether or not all trauma can be attributed to inmate violence (it cannot be) he writes, "But I was reminded by Ruth Naglich today that there is a lot of trauma that is actually based on inmate violence but not reflected in our reporting mechanisms." I was pleased to see in the

---

[31] Gees, Gerald G., *The Effects of Overcrowding in Prison*, University of Chicago, 1985.

[32] ADOC0249154.

email conversation that Ruth Naglich,[33] Associate Commissioner of Health Services for the ADOC, supports my view that all inmate violence is not detected or reported. The analysis that was completed for Mr. Linton confirms my concerns.  His analyst says, "I think this [referring to a spreadsheet attached to the email] should help support your strong suspicion that trauma related costs are rising."[34] I would note that the analyst specifically mentions open wounds, fractures and dislocations. The spreadsheet attached to the email recounts 48 wounds and 53 fractures, further evidence of the dangers inmates confined in ADOC prisons experience.

The spreadsheet attached to the email shows that overall emergency costs between 2012 and 2013 increased by 79%.  Individual trips to the emergency room increased by 56% in that time frame, and the average cost of a trip to the emergency room increased by 14%, further evidence of the Corizon vice president's suspicion that trauma events were increasing the costs to his company.  Certainly, avoidable increases in demand for medical attention that are occasioned by violence related to overcrowding divert resources from other types of care necessary within ADOC.

---

[33] Ms. Naglich has been named, in her official capacity, as a defendant in this lawsuit

[34] ADOC0249154.

**B. INADEQUATE STAFFING: Alabama prisons are severely understaffed, resulting in a dangerous environment for inmates as well as an inability of custody staff to successfully interact with and support the healthcare objectives of the ADOC.**

The overcrowding in ADOC prisons and the challenges it presents to the provision of medical care is further complicated by the lack of sufficient numbers of staff to properly supervise the inmates. In my experience, having correctional officers constantly in the living units where inmates reside is the single best element to detect, deter and respond to situations that may become violent. The evidence is both startling and remarkable that the ADOC is insufficiently staffed to perform the basic functions of keeping the inmates safe and secure.  In particular, the lack of adequate staffing means that in many cases officers are not regularly in the dorms with inmates. This also means that, without more custody staff, ADOC is incapable of supporting the rising needs for inmate healthcare within its system.

1.  <u>ADOC is Severely Understaffed.</u>

ADOC is insufficiently staffed to perform the basic functions of keeping the inmates safe, secure, and healthy. According to the Department's own figures, they have 5,832 authorized positions (including both custody and support staff positions) but actually only 3,818 employees

for an overall staffing level of 65%.[35]  In the same report, ADOC says it currently houses over 24,000 inmates.[36]  By contrast, when I was the Secretary of the Washington Department of Corrections I had over 9,000 employees[37] for 18,000 inmates and most of those positions were constantly full.

The level of custody staffing in the system is even more alarming than ADOC's overall staffing figures:



Correctional Officer Staffing

SOURCE: ADOC MONTHLY STATISTICAL REPORT FOR MARCH 2016

---

[35] ADOC Monthly Statistical Report for March 2016.

[36] Ibid.

[37] As a result of the global financial crisis of 2008, I had to reduce staffing from 9,000 by 1,200 positions, closing three institutions between 2009 and 2011.  Nonetheless, my staffing ratios were higher ratio than those of ADOC.

(Holman: 45.8%, Kilby: 65.5%, St. Clair: 50.6%, Tutwiler: 46.9%, Bibb: 33.8%, Easterling: 39.8%, Fountain: 31.5%).[38]

These numbers are astonishing to me.  With the exception of Kilby and barely at St. Clair (where the vacancy rates are astounding, but slightly less so in comparison to other ADOC prisons), over half of the authorized correctional officer positions at the other four facilities are unfilled.  At Fountain and Bibb, only about a third are filled.  Such dramatic correctional officer vacancy rates have important consequences for the safe and secure operations of prisons, including the safety of both staff and prisoners. The ADOC has known about this problem for many years.

The warden at Tutwiler explained the problem succinctly: When asked during his deposition how many staff he had, Warden Barrett directly responded by saying, "not enough", simply acknowledging what everyone knows and what he has to try to manage on a daily basis.[39]

*ADOC's History of Inadequate Staffing Levels*

The chronic shortage of correctional staff has been a focus for the ADOC in its Annual Reports going back a decade.

---

[38] ADOC Monthly Statistical Report for March 2016.
[39] Deposition of Bobby Barrett, Feb. 29, 2016, page 10, lines 17-20.

## ADOC's History of Inadequate Staff



SOURCE: ADOC ANNUAL REPORT FY 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014

In 2006, ADOC said:

> The numbers for Correctional Officers are 2,927 authorized and 2,483 on hand, or a shortage of 444 (about 18%). Moreover, it is likely that the authorized strength of Correctional Officers is substantially lower than the optimum level required for efficient operation. In Alabama, our Officer to prisoner ratio is 1:10; for our surrounding states it averages 1:6. While 1:10 may seem adequate on its face, it must be remembered that prisoners must be guarded 24 hours per day, 7 days per week, requiring a 3 shift operation. On any given day, hundreds of Correctional Officers are either on military duty, sick leave, annual leave, in a training mode, guarding prisoners in hospitals where two COs must be on duty for each hospitalized prisoner

> 24-hours a day, providing security for prisoners in transit, or fulfilling other important but distracting functions. Accordingly, it is not uncommon for a single Correctional Officer to be supervising up to 250 - 300 medium or higher level prisoners for an extended period of time. At the time of this writing, the problem is getting worse.[40]

The situation has been in a near-constant decline ever since. In 2007 and 2008, ADOC had around an 18% staffing shortage, and the shortage was a little worse (23%) in 2009. Each year, ADOC recognized the danger the staffing shortage presented and repeated the 2006 verbiage in its Annual Report.[41] In the 2010 Annual Report, the problem is summarized as "Correctional staffing continues to fall short of required levels—impacting the inmate to officer ratio and overtime necessary to cover essential posts" and accompanied by the shortage rate: 12.2% at close facilities and 21.2% at medium security facilities.[42] By 2011, the shortage of correctional officers jumped to 36.1% at major facilities, but the ADOC reduced its own analysis, saying only "This past year we not only had to deal with budget crisis, crowded prison facilities and staff shortages…"[43] The trend has continued ever since. As correctional officer shortages rise, ADOC's analysis becomes

---

[40] ADOC Annual Report FY 2006.
[41] ADOC Annual Report FY 2007; ADOC Annual Report FY 2008; ADOC Annual Report FY 2009.
[42] ADOC Annual Report FY 2010.
[43] ADOC Annual Report FY 2011.

more sparse and more buried: "…[W]hile handing the challenges of prison crowding, security and administrative staff shortages and strict budgetary demands…," 40.8% custodial officer shortage (2012) [44]; "Staffing shortages continue to challenge the ADOC…," 43.3% custodial officer shortage (2013). No analysis of or statistics about correctional staffing shortage (2014)[45]; No analysis of shortage but graph showing correctional officer shortages by facility ranging from 68% at Bibb to 2.1% at the Hamilton facility (2015)."[46]

The ADOC has a long history of a shortage of the fundamental first line staff in a prison—the correctional officer. The problem continued to get progressively worse over the last decade. In 2006 the shortage was 18%. ==ADOC Annual Report FY 2006.== In 2013 the problem ballooned to a 43.3% shortage. ==ADOC Annual Report FY 2013.== I do not know why the ADOC failed to report their officer shortage in the same way in 2014 and 2015, but I have seen nothing that would show there has been any significant improvement. It is very clear that Alabama corrections officials and the state's legislative and executive branches have known of this problem and failed to take meaningful steps to solve it for at least a decade. In the

---

[44] ADOC Annual Report FY 2012.
[45] ADOC Annual Report FY 2013.
[46] ADOC Annual Report FY 2015.

meantime, the impacts and the significant risk of serious harm are experienced on a daily basis in the state's prisons.

### 2. ADOC does not Have Enough Staff to Properly Supervise Prisoners

The ADOC is insufficiently staffed to properly supervise inmates, which is critical both to preventing inmate violence and also to ensuring inmates have adequate access to healthcare.  Staff simply cannot be multiple places at once. Officers may be faced with the need to transport someone to a medical unit while they also have the responsibility to supervise inmates in an open bay dormitory with 250 inmates or more.  It is very likely that the nature of the medical problem may well seem of secondary importance to the correctional officer when faced with the prospect of not maintaining supervision of a dormitory.

But the problem in the ADOC facilities is even worse. In many cases correctional officers are not regularly in the dorm where the inmates reside. In some cases there are simply not enough officers on duty to assign one to each dorm. When that is the practice at the facility, it establishes a norm that the officer's presence in the dorm is not necessary since unsupervised dorms are sanctioned by the prison administration when they do not have enough staff to place at least one officer in the dorm. As noted in more detail below, inmates consistently report that there are not enough officers to supervise the

dorms. These inmates' accounts are consistent with the shift rosters I have seen for the facilities I inspected.

For example, I reviewed 23 shift rosters for Fountain from August 2015.[47] Only twice out of those 23 rosters did I find that there were sufficient numbers of correctional officers so that one could be assigned to each dorm. That is not at all surprising in a facility that cannot fill nearly 70% of their authorized positions. Ibid. *See also* ADOC Annual Report FY 2015, at 43.

The record at Holman, another close-custody facility, tells the same story. In the 18 shift rosters I reviewed for Holman[48], every one of them showed too few staff on duty to actually have one correctional officer assigned to work in each unit. Inmate #17 at Holman told me, "There are not enough police".

The struggle to fill all posts has understandably been going on for a long time given the ADOC's longstanding problem to fill their authorized positions. There is documentation that this problem goes back to at least 2012 at Kilby. In six memos from the Team Supervisor to the Captain from November 2012, the Team Supervisor noted that each day there were

---

[47] ADOC 103821-103844.
[48] ADOC 103938-103955.

between five and eight positions that went "unmanned."[49] Without sufficient staff to supervise the inmates, even without the level of overcrowding known to exist in ADOC prisons, the risk of violence goes up exponentially.

While onsite at Kilby, I had the opportunity to view staff rosters from March 2016.[50] My review indicates that very similar problems exist for this current year.

| Date/Shift | Officers Short | # of Officers on Overtime |
|---|---|---|
| 3/1 Day shift | 5 short | 14 on O.T. |
| 3/2 Day shift | 6 short | 16 on O.T. |
| 3/3 Day shift | 3 short | 17 on O.T. |
| 3/4 Day shift | 3 short | 12 on O.T. |
| 3/5 Day shift | 9 short | 5 on O.T. |
| 3/6 Day shift | 14 short | 12 on O.T. |
| 3/7 Day shift | 10 short | 14 on O.T. |

I also reviewed the rosters for the night shift. The number of vacancies and the number of staff on overtime was less than on the day shift but did include up to seven positions that went unfilled on the night shift and as many as seven staff working overtime. The number of staff on overtime is particularly alarming. Given that the critical number of staff on any given

---

[49] PLF 007319-PLF007638.

[50] I believe these documents were requested in discovery but to my knowledge have not been produced.

shift as defined by Kilby is 24-38, depending on the shift and the day of the week, having this large of a percentage on overtime is bound to impact the individual officer's performance and overall institution safety. If medical emergencies arise at night, there is not adequate staff to ensure that those prisoners have immediate access to medical care. As described below, officers are likely to struggle to be alert and may find that the additional work hours lower their ability to exercise the patience and restraint necessary to supervise prisoners. In my experience, the ability to respond to incidents, crisis and emergencies can be impacted when officers are working too much overtime.

Included with these rosters was some detail on which posts to close when there are not enough officers to fill them. These instructions included, "A Dorm—Combine A & B into 1", "O Unit—Combine O & N into 1" and so on. Expecting a single officer to supervise two dorms or units, perhaps on an overtime shift, creates a danger that I have never witnessed either running or inspecting correctional institutions.

During my inspection of Easterling, I also had a brief opportunity to view the shift rosters for the facility. The staffing shortage, though not as dramatic as at Kilby, did reveal similar concerns, especially with the amount of overtime required each shift.

| Date/Shift | Officers Short | # of Officers on Overtime |
|---|---|---|
| 2/29 Day shift | 1 short | 8 on O.T. |
| 3/1 Day shift | 3 short | 8 on O.T. |
| 3/2 Day shift | 0 short | 6 on O.T. |
| 3/3 Day shift | 4 short | 5 on O.T. |
| 3/4 Day shift | 1 short | 8 on O.T. |
| 3/5 Day shift | 1 short | 8 on O.T. |
| 3/6 Day shift | 1 short | 8 on O.T. |
| 3/7 Day shift | 3 short | 5 on O.T. |

The night shift at Easterling was similar to the day shift, showing one to three officers short each shift and overtime required for between four and eight officers.

The workload and stress caused by working too many hours with too few fellow staff can also cause officers to cut corners. In the deposition of Brenda Fields, Clinical Operations Associate for MHM,[51] she talked about reviewing the records of someone on suicide watch at Limestone, a facility I did not inspect. Ms. Fields is critical of the practice at that facility of filling

---

[51] The contract provider of mental healthcare.

out the times on the required log sheet at 15-minute intervals for suicide

watch in advance. She says:

> NCCHC [52] recommends staggering fifteen-minute
> checks because you don't want the patient to know
> or the client to know you're doing checks on the
> hour, because then they can plan their suicide in
> between those fifteen minutes. And then it's not
> usually that a person is going to go every fifteen
> minutes on the clock, so you want accurate times
> for those fifteen-minute checks. [53]

The danger of such corner cutting is obvious and clearly articulated by Ms.

Fields.

*Inadequate Staffing Leads to Unsafe Conditions*

As stated above, ADOC staffing levels create dangerous conditions

that I have never witnessed either running or inspecting correctional

institutions. ADOC's current staffing levels and practices, combined with its

overcrowding, creates unsafe conditions and an inability to ensure that

prisoners are able to access medical care in Alabama prisons. The impact of

such conditions was evident in the ADOC's own records, the testimony of

ADOC employees, and the experiences recounted to me in the confidential

interviews I had with individual inmates.

---

[52] The National Commission on Correctional Health Care (NCHHC)
is a similar organization as the American Correctional Association. Both
organizations promulgate standards for the operation of correctional
facilities.

[53] Deposition of Brenda Fields, Feb. 5, 2016, page 101, lines 4-12.

*Inmate Interviews*

What is startling to me about the interviews I did in Alabama prisons is the consistency of the reports from different inmates in different prisons. And those accounts are entirely believable, as I have come to understand the dramatic inability of the ADOC to fill their authorized correctional officer positions. When you are working with only a third to half to sometimes two-thirds of your authorized officer staffing levels, those who are working cut corners to keep themselves safe. If there are not enough officers to put at least one in a dorm when occupied and there are not enough officers in the facility to provide quick and adequate back-up when problems do break out, it is entirely predictable that dorms go unsupervised, inmate misbehavior is not addressed and that inmates run the prison or at least the dormitories where the inmates spend their time.

Inmate #7 at Bibb told me that "It gets rough in the dorm, especially in the back" and that the officers never respond to problems in that area. He also said officers actually enter the dorms only once every couple of hours, sometimes even less. Similarly, Inmate #6 told me that, "Officers come into the dorm about once every three hours." He then added that there are, "Lots of weapons in this prison." Inmate #9 told me that when fights break out in the unit officers come into the dorm when the inmates let them in. Inmate #6

told me that, "Officers come into the dorm about once every three hours." Inmate #10 told me that, "lots of PREA[54] events happen in the dorm and the officers don't know about it." He said he had recently witnessed a fight that went on for about 30 minutes, but the officer didn't respond because he was asleep in the cube[55]. An inmate held in segregation (which is located down the hall from the regular dorm with no direct staff supervision) told me that sometimes officers check on him only every three or four hours.

At St. Clair multiple inmates told me that sometimes when there is a problem with a cell partner, one prisoner is "put on the door," meaning he must exit the cell or be beaten, and will sleep on a bench in the dayroom for the night and that officers do nothing about it. There are consistent reports from the segregation units at St. Clair that staff rarely, if ever, come into the units to check on the inmates. Inmate #12 gave an example of it taking two hours for medical staff to respond following a fight that had recently occurred in the unit. Inmate #14 told me there are lots of weapons at St. Clair and that there are not enough officers to do good security.

The same themes were repeated at Holman. Inmate #17 simply said there are "not enough police." He further explained that sometimes on the

---

[54] Prison Rape Elimination Act. By saying, "PREA events," the prisoner was referring to incidents of sexual assault and rape.

[55] The ADOC use the word "cube" to describe control booths.

day shift there is only one officer to supervise two dorms and at night there are sometimes no officers except for the one in the cube. He also said that officers are afraid and that they are slow to respond, even when a stabbing occurs. Inmate #18 told me he had a seizure in his cell and it took staff 45 minutes to respond. He (and others) also confirmed that oftentimes there are not enough officers to work in the dorm and that there is only one in the cube. Inmate #19 told me officers sometimes leave the dorms unsupervised for long periods of time and that the prison is "way understaffed." Even more dramatically, more than one inmate offered that Holman "is a dangerous place." Inmate #21 went on to say that the inmates run the prison, as officers are sometimes so overworked that they sleep during the night shift and are absent from the dorm.

Similar stories came from my interviews at Fountain. Inmate #23 told me that often there is only one officer to supervise two dorms and that officers look the other way when inmates have cell phones (confirmed by accounts from multiple inmates) and that, as was stated during an interview at Bibb described above, "Bad stuff happens in the back of the dorms." He went on to say that officers ignore misbehavior for their own safety and to avoid the paperwork, telling me about a time when an officer attempted to confiscate a cell phone and wound up getting stabbed. Inmate #24 told me

that the only time an officer comes into his dorm is when they are taking a count (reported by others as well). He said he too had witnessed a staff member being stabbed when attempting to confiscate a cell phone.[56] He had been keeping track of events in his dorm and said there had been four stabbings and three sexual assaults in a recent 47-day period. Inmate #25 told me that on the day shift officers will step out of the dorm for 30 minutes at a time and that sometimes on the night shift there is only one officer to supervise two dorms and that, "Then things happen." He went on to explain that, "Inmates are in control." Inmate #29 reported that he sees officers come through at shift change and then he doesn't see them again, that cell phones and drugs are rampant and that there have been multiple stabbings at the facility.

Inmate #36 at Easterling related a frightening story where he was forced to perform oral sex with a knife to his throat while there were no officers in the dorm. He reported he put in written accounts of this event to the Warden, the Captain and put an account in the PREA box but never received a response. He reported that frequently there are no officers in the dorm.

---

[56] While it's not clear whether they witnessed two different incidents, the conditions in the facilities I inspected certainly create an environment where stabbings, including stabbings of officers and staff, are neither unexpected nor impossible.

At Tutwiler, Inmate #4 told me that frequently there are not enough officers for one to be assigned to each dorm and that sometimes officers must supervise two dorms. She further stated that she did not trust any of the officers but was afraid to rock the boat and feared retaliation for agreeing to speak with me. Others complained that dormitories are frequently short staffed, which impacts access to the yard for exercise and recreation and to the medical clinic for medical treatment.

Two other themes also emerged as consistent reports in many of the confidential interviews. One, there is a level of profound idleness in ADOC facilities. Many of the inmates I spoke with had little or no productive programming or job opportunity to keep them occupied throughout the day. This was supported by my inspection of the various dorms where I found too many inmates languishing in the middle of a weekday when I would expect them to be working or participating in some kind of structured activity. Too much idleness also contributes to higher levels of facility violence. There is strong consensus among corrections professionals that inmates who are productively occupied are good for prison security.

Two, very often inmates reported that correctional officers remain in the room during encounters with healthcare providers. This should be avoided whenever possible. While it might be necessary for a few inmates, it

should not be the common practice. Inmates are likely to withhold important information about their health with the officer present. The provider needs to hear the full and complete story if they are to provide effective treatment interventions.

Some corrections officials believe and teach that one should not believe anything an inmate says. I am not one of them. It is true that sometimes inmates do not tell the truth but it is equally true that sometimes they do. I have conducted several hundred confidential interviews with inmates in the states of California, Arizona, New York, Mississippi, North Carolina, Illinois, New Jersey and Georgia in the last four years. I also spent 35 years working in corrections, about half that time working the floor or as a Superintendent (Warden). I know my way around inmates and assess credibility based on the entire story relayed or not relayed to me by the individual prisoner. I look for consistency within the reports of individual inmates, whether or not the inmate will take the bait from a question I ask to embellish something they had already told me, as well as consistency between the reports I receive from multiple inmates. If I had any question about the credibility of a particular inmate, I did not recount his version of events here.

*ADOC Records*

The ADOC has a process whereby sometimes some prisons have a "Vulnerability Analysis" conducted by staff from other facilities. These reports reveal that the auditors express concerns and evidence of the dangerous nature of the ADOC prisons that I have been documenting in this section of the report. I share critical samples from those reports as follows[57]:

## Vulnerability Analysis

| Facility | Kilby | St. Clair | Bibb |
|---|---|---|---|
| Use of Force Events | 66 | 62 | 112 |
| Assaults | 32 | 36 | 41 |
| Fights Reported | 46 | 0 | 0 |
| Weapons Discovered | 1 | 95 | 51 |
| Cell Phones | 259 | 361 | 207 |
| CRITICAL THREATS | ▸Shortage of officers ▸Unauthorized activities and possession of illegal cell phones ▸Illegal drugs in the institution | ▸Staffing shortage ▸Tuberculosis: The recent discovery of active TB cases has shown a vulnerability to be able to control infectious diseases | ▸Shortage of officers ▸PREA compliance: need a number of video cameras and DVRs ▸No Segregation Unit for facility with over 1938 inmates |

SOURCE: 041714 VULNERABILITY ANALYSIS – KILBY CF; 041814 VULNERABILITY ANALYSIS – ST. CLAIR CF; 041714 VULNERABILITY ANALYSIS – BIBB APRIL 2014

---

[57] 041714 Vulnerability Analysis – Kilby CF. 041814 Vulnerability Analysis – St. Clair CF. 041714 Vulnerability Analysis – Bibb April 2014. Both St. Clair and Bibb reported zero fights on their vulnerability analysis. Those figures are simply not believable, particularly based on my observations about the out-of-control nature of both facilities. This deficiency points to potentially severe under-reporting and undermines the quality of the data.

*Inadequate Staffing Results in Inadequate Monitoring of Segregation*

Insufficient staff results in critical areas of the prisons not being properly monitored. In most prisons, there are segregation or isolations units for certain prisoners. Segregation, by definition, houses the highest risk prisoners in the facility. The conditions for prisoners in segregation increase the risk for self-harm and result in an increased likelihood of requiring both medical and mental health care. Their safety is dependent on frequent checks by correctional officers.[58] For that reason alone an absolute minimum number of officers is always required beyond just the one that works in the cube so that officers are available to actually look into the cells, see if the inmate is safe or has any needs or requests on a regular and frequent basis. Typically, during waking hours, officers should verbally acknowledge the inmate. On the night shift they are to look for living breathing flesh and try not to disrupt the inmate's sleep.

According to ADOC policy,

> Observation of an inmate in disciplinary segregation shall be conducted at least every thirty (30) minutes and shall be annotated on the duty post log.[59] [60]

---

[58] During a check of an inmate in a segregation cell the officer needs to stop at each cell, look inside and make sure the inmate is safe.

[59] ADOC Administrative Regulation 434, Disciplinary Segregation, V-J-4-b.

[60] The ACA standard for segregation cell checks reads as follows:

54

Unfortunately, this type of monitoring rarely happens in Alabama prisons.

Captain Peters, the segregation Captain for St. Clair, said in his deposition that there is no minimum staffing required in his segregation units.[61] He went on to explain that it is required that the officer be assigned to the cube, but there are no requirements for a specific number of officers for any area of the segregation unit beyond the cube.[62]   This is the first and only time in my experience that I have ever heard a corrections person make this statement.

Captain Peters described officer staffing in the St. Clair segregation unit, reporting two rovers assigned to each of the three segregation cellblocks. In my opinion, these positions should be required, just as the cube officer is.[63] Even though Captain Peters reported that rovers are assigned to the segregation cellblocks and are assigned to check on the inmates every 30 minutes, he acknowledged that these checks sometimes do not happen.[64] He reported that he recalls occasions when there were only

---

"Written policy, procedure and practice require that all special management inmates are personally observed by a correctional officer at least once every 30 minutes on an irregular schedule. ACA Standard 4-4257."

[61] Deposition of Kenneth Peters, Oct. 21, 2015, page 11, line 23.
[62] Ibid, page 121, line 8.
[63] Ibid, page 72, lines 2-6.
[64] Ibid, page 122, lines 18-23 – page 123, line 1.

two rovers instead of six for his three segregation units.[65] The Captain's testimony is consistent with what inmates at St. Clair told me about infrequent checks of inmates in segregation cells.

The accounts of the inmates I interviewed are also consistent with the records I have reviewed from the St. Clair segregation units—the required checks are not regularly occurring. In my review of 13 of those segregation logs made available to me for St. Clair, I did not find a single shift where segregation checks were made according to ADOC policy and as defined by Captain Peters in his deposition, "They are supposed to be doing a round through the block every 30 minutes".[66] Segregation checks are rarely identified in the logs at all, a practice that diverges from what I have seen in every other jurisdiction where I have reviewed segregation logs. Instead I found in every log I reviewed, gaps where officers did not even enter the unit for 90 minutes[67], 80 and 97 minutes[68], 106 and 122 minutes[69].   I did not see a single shift in any facility when the officers consistently make the 30 minutes checks.

---

[65] Ibid, page 125, lines 11-20.
[66] Ibid, page 122, line 19-20.
[67] ADOC 104039-104040; ADOC 104250-104251.
[68] ADOC 104053-104054.
[69] ADOC 104186-104187.

My observations regarding security checks in segregation was confirmed in 2014 when an outside team conducted a Security Audit at St. Clair. The auditors report states:

> There is specific language in the Standard Operational Procedure concerning security checks being conducted every thirty (30) minutes; however, these checks are not being conducted.[70]

A Security Audit was also conducted at Holman, and the auditors identified a similar problem with segregation security checks at that facility.

> Non-Compliant – the current SOP for Segregation does not give a time frame for observation checks, it was also noted that staff were not doing routine checks in the segregation unit. Logs in the Death Row unit indicated that this was not being done consistently as well. A lack of the proper amount of staff could be a contributing factor.[71]

Although ADOC's policy requires 30-minute checks for inmates in disciplinary segregation, there is no matching requirement for 30-minute checks in the ADOC Administrative Segregation Policy.[72] Such a distinction is nonsensical. This may be a simple policy omission, but if it is intentional and ADOC does not require 30-minute checks for inmates in Administrative Segregation, it would put inmates housed in those cells at very significant risk of harm. Placement of inmates in segregation is a well-known risk factor

---

[70] ADOC066032.
[71] ADOC066119.
[72] ADOC Administrative Regulation 433, Administrative Segregation.

for suicide and self-harm, thus the need for frequent checks as required by the ACA standard. I believe Dr. Haney is addressing this issue in his report in this case.

In some facilities, the failure of staff to check segregation units is likely exacerbated by the location of each segregation unit within the facilities. For example, during my inspection of Bibb in the fall of 2015, I discovered that Bibb does not have segregation units but they do have segregation cells. There are a few such cells located down a hallway and through a little anteroom with a door from the general population dormitories. This location is very dangerous for the inmates housed in those cells, other prisoners in the dorm, and the staff. The most significant risk factor is that there is no direct supervision of these cells. They have a complete absence of natural light and feel quite like a dungeon. Their location makes prisoners housed in them easy to forget with the challenges that the correctional officers face simply trying to supervise the 100 plus inmates living in the adjacent dorm.

During my inspection, I viewed this segregation area in the back of several of the general population dormitories. There had recently been a fire in one of those segregation areas and the debris from the fire was still evident as was the powerful smell of smoke. Officers confirmed that an

inmate had set the fire while in the segregation cell. Inmate interviews elaborated that there had been several such fires in that area during the same week. In my experience, an inmate who sets a fire in segregation is expressing profound distress about some issue and resorts to this tactic out of desperation because he finds no other way to have his concerns addressed.

Inspecting a vacant segregation cell I noted an exposed electrical box and multiple tie off points should a prisoner want to attempt suicide. There are no cameras in these cells and the only way the officer would know if there was a problem would be to walk down the hall, move the flap over the interior window and look in to see the inmate. Even if the required half-hour checks were being performed, this set-up makes for very dangerous conditions of confinement for any prisoner housed in such cells.

I had the opportunity for an interview with one prisoner from a Bibb segregation cell. He reported that the only outdoor recreation he was receiving occurred in the middle of the night and only happened from one to four times a week, depending on availability of officers. Never did he receive the five hours of recreation a week required by the ADOC policies.[73]

---

[73] ADOC Administrative Regulation 433, Administrative Segregation, V-H-8-a and, ADOC Administrative Regulation 434, Disciplinary Segregation, V-C-5-c.

He said that checks of his cell by correctional officer generally occurred every three or four hours, depending on who was on duty.

As a long-time correctional administrator who spent considerable time focusing on the conditions of confinement and appropriate use of segregation, these segregation units at Bibb are terrifying and should not be used unless officers are assigned to be directly adjacent to those cells when occupied by inmates.

### 3. Staffing Levels Prevent Custody Staff from Supporting the Healthcare Needs of Prisoners in the ADOC

The lack of sufficient numbers of correctional officers is an ongoing barrier to the delivery of healthcare in the ADOC. There are simply not enough officers to support the healthcare demands of the department.

Concerns about the impact of inadequate custody staff on the delivery of healthcare is a problem that has been repeatedly expressed by the healthcare staff attempting to deliver such services. In this section I list examples from meeting minutes and other reports from healthcare staff of problems with access to care and specific security issues that they identify related to the shortage of correctional officers.

*Missed Appointments*

Staffing shortages throughout the ADOC regularly cause medical appointments to be missed.

This is documented at Holman numerous times. An MHM Monthly Report described this concern, "Difficulty with ADOC staffing. Unable to get some inmates down for BMI monitoring. Logs being utilized, however, timing is an issue due to staffing."[74]

In the deposition of Lesleigh Dodd, MHM's site administrator at Holman (who has also done work at Fountain), she acknowledges difficulties with correctional officer shortages and the impact on inmates who need injections.[75] She also described the effects of insufficient ADOC custody staff to meet both the requirements of medical and mental health.[76]

Cheryl Harvey is a nurse practitioner who works for the mental health contract provider at Holman and Fountain. In her deposition, she too described the impact of too few correctional officers on providing timely appointments with inmates.[77] Ms. Harvey also confirmed the accuracy of the contractors' monthly reports that describe struggles accessing prisoners due to officer shortages at Fountain.[78]

---

[74] ADOC044537.

[75] Deposition of Lesleigh Dodd, Feb. 18, 2016, page 150, line 16 – page 151, line 21.

[76] Ibid, page 197, lines 6-12.

[77] Deposition of Cheryl Harvey, Mar. 7, 2016, page 76, line 21 – page 22, line 13.

[78] Ibid, page 187, line 19 – page 20, line 188, line 19; page 223, lines 11-19; and page 228, line 17 – page 231, line 6.

The Medical Advisory Committee (MAC) minutes for Fountain further detail their difficulties:

- "3 appointments rescheduled due to ADOC not being able to arrange staffing for transportation."[79]

- Several off-site appointments were rescheduled to accommodate ADOC.[80]

- "ADOC attempting to facilitate number of transports required, but reschedules increasing."[81]

- Communication problems with custody staff result in "huge increase in missed appointments".[82]

- "Continue to have delays in sick calls for hot dorm as these inmates are not being escorted to HCU for scheduled sick calls, this puts us out of compliance with screening within 48 hours."[83]

The MAC minutes describe missed appointments as a problem at Kilby as well. They report having troubles getting inmates down to the lab.[84] There is a report from a doctor that inmates are coming too late for their appointments.[85] Communication problems are documented, as "Inmates are

---

[79] Dunn (Corizon)_0252973.
[80] Dunn (Corizon)_0252995.
[81] Dunn (Corizon)_0252696.
[82] Dunn (Corizon)_0252985.
[83] Dunn (Corizon)_0252979.
[84] Dunn (Corizon)_0253105.
[85] Dunn (Corizon)_0253807.

not being told when it is time for KOP to be issued."[86] And, "When meds (chronic meds) are order (sic) for new intake inmates someone is turning them away from pickup (sic) their meds."[87]

At Tutwiler, among other problems, the problems with pill call were the focus of MAC meetings over a period of several months with healthcare staff continuously and repeatedly reporting their concerns in several different meetings.

- Staff not calling the inmates to health care at the appropriate time or they were letting them come down at the wrong times.[88]

- Officers will not call for pill call.[89]

- Still issues with pill call and officer behavior.[90]

- Still problems with pill call.[91]

- "Officers are doing a horrible job with watching pill line."[92]

- Offsite appointments are being missed.[93]

- Issues with not getting inmates to their

---

[86] Dunn (Corizon)_0253441.
[87] Dunn (Corizon)_0253727.
[88] Dunn (Corizon)_0254372.
[89] Dunn (Corizon)_0254344.
[90] Dunn (Corizon)_0254381.
[91] Dunn (Corizon)_0254377.
[92] Dunn (Corizon)_0254347.
[93] Dunn (Corizon)_0254348.

appointments on time.[94]

From the multidisciplinary mental health meeting minutes at St. Clair:

- Delays of inmates being seen by mental health are due to officer shortage.[95]

- "Mr. Wheat indicated that a shot may be ordered for a specific inmate but if security staff is short, the probability of the inmate getting the shot is extremely low".[96]

- References to the shortage of officers, ongoing stabbings and multiple institution lockdowns.[97]

Also a similar story from the MAC meeting minutes at Bibb:

- 3 inmates missed appointments due to security not picking the inmates up.[98]

- 3 inmates missed appointments. They were missed by security.[99]

- 4 inmates missed appointments due to transportation issues.[100] Having problems getting inmates from B-Dorm to their appointments.[101]

- 1 inmate missed an appointment due to

---

[94] Dunn (Corizon)_0254357.
[95] MHM029962.
[96] MHM029970.
[97] MHM029972.
[98] Dunn (Corizon)_0252661.
[99] Dunn (Corizon)_0252665.
[100] Dunn (Corizon)_0252679 .
[101] Dunn (Corizon)_0252680.

transportation issues.[102]

- Discussion of a problem with inmates getting their insulin on time. The Captain said he would educate the supervisor on the importance of inmates getting their insulin.[103]

- 1 inmate missed an outside appointment due to transportation issues.[104]

At Easterling the MAC minutes document the request for a solution to inmates being late for off-site appointments.[105]

In her deposition, Ms. Fields reports problems with groups and programs for inmates on the mental health caseload being canceled at Limestone due to "not having enough officers".[106]

The transportation problems have a very real effect on the medical care provided to inmates. Care is often delayed or not fully provided. Beyond the impact on care, though, it is not unreasonable to assume that the systemic problems getting inmates to appointments on time creates frustration for everyone involved. That is the only way I could explain why Easterling adopted the following language in their institution policy:

> When an inmate is not at the infirmary by their scheduled time, the Health Care Unit Officer will

---

[102] Dunn (Corizon)_0252681 .
[103] Dunn (Corizon)_0252685.
[104] Dunn (Corizon)_0252694.
[105] Dunn (Corizon)_0252939.
[106] Deposition of Brenda Fields, Feb. 5, 2016, page 128, lines 5-8.

> take immediate action to notify the cubicle officer
> or rover where the inmate would normally be at that
> time so the inmate can be quickly found and sent or
> escorted to the Health Care Unit.
>
> The rover will locate the inmate and give him a
> direct order to report to the infirmary. The dorm
> rover will advise the HCU Officer of the name(s) of
> the inmate(s), which were located.
>
> If the inmate has not arrived within thirty (30)
> minutes of his scheduled appointment, then the
> Shift Supervisor will be notified by the Health Care
> Unit Officer or medical personnel.
>
> The Shift Commander will locate the inmate and
> use whatever force necessary to escort the inmate to
> the infirmary. The Warden or his designee will be
> notified of the inmate's refusal, if force is used to
> get an inmate to a medical appointment.[107]

This authorization of unnecessary use of force in the policy language of an institution is outrageous. If it is indeed the practice it should be stopped immediately, no matter how much frustration has been built up. While inmate "no-shows" for medical appointments can be a problem, at best it should be handled as a disciplinary issue, not as a situation requiring the application of "whatever force (is) necessary". This is a very dangerous, wrong-headed policy and it should be rescinded immediately.

---

[107] Easterling Correctional Facility, REG/SOP Misc-12, "No-Shows" For Medical Appointments, page 2.

*Impact of Segregation on Prisoners' Mental Health*

The importance of mental health staff regularly checking on and interacting with inmates in segregation is critical to keeping them safe. This policy and practice is widely accepted within the corrections industry. The Association of State Correctional Administrators (ASCA) has adopted policy guidelines for inmates in restricted housing (segregation). The applicable guidelines say,

> Provide in-person mental health assessments, by trained personnel within 72 hours of an offender being placed in restrictive status housing and periodic mental health assessments thereafter including an appropriate mental health treatment plan.
>
> Provide appropriate access to medical and mental health staff and services[108]

Due to the risk of harm associated with segregated confinement, the mental health status of inmates in segregation needs to be regularly monitored and assessed in order to keep them safe. It is clear from the records that I reviewed that staffing shortages are creating an impediment for regular access by mental health staff to inmates in segregation, to include participation in groups. This is an issue across the facilities in the ADOC that I inspected.

---

[108] ASCA Resolution #24.

Widely recognized in many jurisdictions today is the need to get segregated inmates out of their cells for individual and group counseling. While there is some effort to do this for some of the inmates in segregation in Alabama, too often the efforts of mental health staff are hampered by too few custody staff.

Ms. Dodd, site administrator for the mental health provider at Holman, described the lack of access to groups for inmates in segregation and suggests that the barrier to those groups is officer shortage.[109]

The records show this is a problem at Fountain as well. The multidisciplinary meeting minutes[110] describe "complications" having an officer available to go on the visitation yard for group.[111] The minutes also report some safety concerns for mental health staff as the provider must conduct groups with only a "walkie-talkie," as there is no officer available to provide security during the group. As staff at Fountain recognized, this is outside of policy.[112] Also mental health staff reports difficulties getting inmates from segregation to their scheduled appointments.[113]

---

[109] Deposition of Lesleigh Dodd, Feb. 18, 2016, page 72, line 10 – page 72, line 21.

[110] Facility-specific meetings where issues about the provision of mental health care are discussed.

[111] MHM030173.

[112] MHM030187.

[113] MHM030193.

The records show the same problem at St. Clair. The Quality Improvement Reports at St. Clair note that, "Due to limited ADOC officer coverage, we are unable to provide segregation rounds"[114] and, "Mental Health has not been able to provide segregation rounds and groups because of officer shortage issues."[115]

The difficulty doing regular segregation rounds is documented at Holman in the multidisciplinary mental health meeting minutes in 2014,[116] and in the MAC minutes a year later.[117] The MHM Monthly Report comments for Holman say, "Staff states it is difficult to do Seg rounds due to lack of officers as well."[118] In her deposition, Nurse Harvey, nurse practitioner at Holman, confirms this report.[119]

The same concern is reflected in the records from Tutwiler. The multidisciplinary mental health meeting minutes show that officers working in the segregation unit are having problems coordinating the times that mental health can see the segregation inmates.[120] Those minutes also report

---

[114] MHM032027.
[115] MHM032030.
[116] MHM030276 and MHM030274.
[117] Dunn (Corizon)_0253090.
[118] ADOC044507.
[119] Deposition of Cheryl Harvey, Mar. 7, 2016, page 187, line 19 – page 188, line 6.
[120] MHM030109.

challenges moving inmates to mental health appointments[121] and the

difficulties coordinating with officers not assigned to mental health.[122]

Finally, Tutwiler reports issues having sessions with inmates in segregation

and with the consistency of officers in segregation and in mental health

units.[123]

*Custody Practices and Facility Violence Create
Interference with Healthcare*

  The level of violence and the custody practices of the overcrowded

ADOC prison system interfere with inmates receiving timely healthcare.

Because too few staff are available to attend to mental health crisis or injury

as a result of the violent climate within the ADOC facility, it takes away

from providing access to treatment to other inmates for routine sick call

complaints or chronic care needs. Unfortunately, those crises occur with too

much frequency making attending to routine prison operations and health

care needs difficult and sometimes impossible to achieve. In short, basic

custody and security practices in the ADOC have "devolved".

  Nurse Harvey confirmed in her deposition that accessing patients—

either going to them or having them brought to her—is difficult because of

---

[121] MHM030106.
[122] MHM030125.
[123] MHM030120 – 030121.

ADOC practice.[124] She references "stabbings" and "fights" and the resultant lockdowns creating interruptions and impediments to providing mental health treatment to inmates at that facility. Ibid.

The level of violence at Kilby has caused inmates to check into a crisis cell, not because they were suicidal but because they feared for their safety from other inmates. This requires mental health and medical staff to respond to the crisis, taking them away from providing treatment to the other inmates. The Kilby multidisciplinary mental health meeting minutes relay an account of an inmate being admitted to the crisis unit not because he was suicidal but because of difficulties with other inmates in segregation.[125] There is another suicide reference for an inmate who was seeking protection due to debt to other inmates.[126] In yet another report, an inmate cut his wrist to get moved due to debts to other prisoners in population.[127] Finally, another report described an inmate in segregation due to debts he had incurred to other inmates in the general population.[128]

In my opinion these multidisciplinary mental health meeting minutes from Kilby indicate an unsafe prison environment. If inmates are using the

---

[124] Deposition of Cheryl Harvey, Mar. 7, 2016, page 49, line 20 – page 54, line 3.
[125] MHM029941.
[126] MHM029939.
[127] MHM029935.
[128] MHM029933.

crisis cells to find safety from other inmates, the climate is requiring inmates to fend for themselves to find some level of personal safety.

In the notes, the crisis counselor at Kilby reported that the noise level in O-dorm (a segregation unit) makes it difficult to concentrate. The lieutenant added that these high custody inmates have no incentives or privileges to control their behavior. The lieutenant also mentioned some of the staff working in the unit need additional training but the training is only offered at certain times of the year.[129] I presume the lieutenant's comments concern the necessity of training officers to work in segregation before they are actually assigned there. Absent such training, officers may have a difficult time knowing how to maintain order and control.

From the MAC minutes at Kilby it was wisely expressed that, "Medical needs to integrate better w/ ADOC. It need (sic) to be a medical or mental health employee to try to talk to the inmate the last time prior to ADOC CERT team going in to extract the inmate from his cell."[130]

---

[129] MHM029928.

[130] Dunn (Corizon)_0253580 -253581. Further, In my experience testifying as an expert in another case, I recommended to the judge that a mental health staff speak with an inmate in a planned use of force situation, such as a cell extraction, before force is used. Two years later I returned to the jail to examine the record after the Court imposed this requirement. I found that 60% of the time a mental health staff person has such a conversation force was avoided altogether. The ADOC would be wise to adopt such a requirement in policy and in practice.

At Bibb, the MAC minutes reflect concern by the medical staff for their own safety. A staff member talked about two medical staff being locked in the healthcare unit (HCU) with two inmates and no officer. She requested this not happen again.[131] Then, two months later there is a lengthy report of 17 medical staff being locked in medical with 15 inmates with no officer in the area. This was apparently the second time this occurred. The tone of the report is extremely frustrating.

> Dr. P stated that we are locked in here, I said what is going on (sic) he stated that there is no officer in here and we are locked in. So I walked out looking for the officer (sic) he was not in the bathroom (sic) I looked and asked some more where is the officer…I then go back to the wards G3 and G4 and grab the cage door they were not locked. I could open them up. I had 177 employees myself included and 15 inmates with no officer in the building… I have a real problem with this because this is the second time that I have been locked in health care with no officer.[132]

Those same minutes also say, "We have inmates that are not showing up for pill call because we have so many people on medications they do not want to stand in line and wait."[133]

In Captain Peters' deposition he described the sick call process for inmates in segregation. It is entirely dependent on officers making rounds so

---

[131] Dunn (Corizon)_0252689.
[132] Dunn (Corizon)_0252734 – 0252735.
[133] Ibid.

that the inmate can ask for, complete and then hand back a sick call form to the officer so it can be forwarded to medical staff.[134] Given what my observations and what I have established in this report, that sometimes there are not enough officers to properly staff the segregation units at Holman and that regular checks of segregation units are sometimes missed, inmates are almost definitely hindered when they try to access care. At best, care is not accessible in a timely fashion.

Captain Peters also said that when medical contact in segregation does occur, officers routinely and regularly stay in the room with the health care provider.[135] As mentioned above, in my experience this violates the prisoner's ability for a confidential conversation with the provider and should only happen in rare, exigent circumstances. To do so regularly and routinely will result in the inmate holding information back, not wanting to share with the officer in the room. The result is the providers does not get the necessary information and cannot provide proper treatment.

There are also reports of officers actively hindering care. At Tutwiler it was reported that officers were inappropriately taking inhalers from inmates.[136]

---

[134] Deposition of Kenneth Peters, Oct. 21, 2015, page 132, lines 7-15.
[135] Ibid, page 134, lines 2-13.
[136] Dunn (Corizon)_0254362.

The failure to adequately supervise and screen prisoners also creates a risk for infectious diseases to spread rapidly in a facility. From the Easterling MAC meeting minutes multiple cases of scabies were reported. [137] Easterling appears to have suffered an outbreak of scabies over several months last year. There is also an inquiry by the Alabama Department of Health regarding scabies outbreak at Easterling dated December of 2014.[138]

Similarly, multiple cases of scabies were reported at Fountain,[139] and Tutwiler reported an increase in scabies[140]

St. Clair also suffered an infectious disease outbreak. In a series of emails[141] from the Alabama Department of Public Health, Division of TB Control, the Department of Public Health express frustration at their inability to gain the cooperation of the Warden regarding testing staff for tuberculosis. There is a reference to the Warden being "rude," including that he "growled" when questioned about staff not being tested for TB.

Medical staff shortages, combined with officer shortages, exacerbate the problems in ADOC facilities. From the MAC minutes at Holman:

> For the month of June, we did not have a doctor, so Dr. Iliff was coming over from Fountain and

---

[137] Dunn (Corizon)_0252933 and Dunn (Corizon)_0252939.
[138] ADOC0249144.
[139] Dunn (Corizon)_0252971.
[140] Dunn (Corizon)_0254376.
[141] ADPH Bates Production Number: 3724-3729, 3730-3731.

> spending just a half day here. Most of those days were after lunch and DOC was conducting count and feeding during that time, so the hospital was shut down.[142]

It is clear from these examples that the lack of correctional officer staffing, as well as the overcrowded conditions and the resultant conditions of confinement, contributes to the problems of access to healthcare for the inmates in the ADOC.

## CONCLUSION

When I was first retained in this case to opine about razor blades, I did not understand how a "modern" prison system could have such difficulty with what is a relatively simple issue. While managing razor blades in prison is always a concern and no system is foolproof, the ADOC appeared to be completely inept at making progress on the issue. But after spending seven days in ADOC facilities and reading thousands of documents related to this case, I now have a better understanding: The ADOC is profoundly overcrowded, dangerously understaffed and simply incapable of running safe and secure prisons that protect the physical and mental health of the people in custody. It is a system in a state of perpetual collapse. For years the ADOC had been painfully aware of their shortage of correctional officers, and I am certain must have made efforts to solve that problem.

---

[142] Dunn (Corizon)_0253081.

Those efforts, though, have been unsuccessful and today the understaffing problem is still not solved. There has been past litigation about mental health treatment in male facilities in ADOC, but as other experts will report, deep and systemic problems remain. The most fundamental problem is that the ADOC has about twice as many inmates than they are able to safely and humanely manage. They have less than half the custody staff needed to supervise these inmates. Their facilities are underbuilt and decaying. Inmates exist in conditions that I would expect to find in a developing country, not in a prison in the USA.

The combination of staffing shortages and overcrowding has made the ADOC incapable of performing the basics of correctional supervision. Ignoring these two particular challenges for the moment, ADOC needs to return focus to the basics in order to keep both their staff and inmates safe. To that end I recommend the following:

> Officers must be in the dorms when the inmates are present. One officer in a close-custody dorm is unsafe for both the officers and the inmates. Two officers must be assigned to each close-custody dorm in addition to the officer in the cube. Officers need to work as a team to manage this high-risk population so that they have appropriate backup. Given the lack of individual cells available to manage their close-custody population, this is a critical recommendation if progress is to be made.

Three officers should be assigned for every two medium-custody dorms. At least one of those officers must stay in the dorm when inmates are present to supervise the inmates. At least one officer needs to move in and out of the two assigned dorms to provide backup and support to the primary dorm officer.

These officers must be trained in the principles of Direct Supervision. This will help the officers better understand their roles and help them develop the skills to properly supervise the inmates. When officers are in the dorms and are properly trained, conflicts can be detected before they erupt into violence and can often be prevented.

The ADOC should seek outside review of their current segregation population to see if that population can be reduced. The National Institute of Corrections (NIC) provides technical assistance grants that may be available to fund this work. I am sure the ADOC is familiar with the resources available from the NIC. The VERA Institute of Justice[143] and Segregation Solutions[144] are other low or no cost options. It is highly likely that a close examination of segregation practices in the ADOC will show that segregation is being over-used, particularly for vulnerable populations, and that some inmates could be released to general population. Such a change could give the department the opportunity to convert segregation unit(s) to general population close-custody cellblocks. Transferring some close-custody inmates into cells that are operated as general population units will make their prison system safer, reduce violence, and in turn reduce the strain on the already strapped medical care.

---

[143] http://www.vera.org/search/node/segregation.
[144] http://segregationsolutions.org/index.html.

The mentally ill should be prohibited from placement in segregation absent exigent circumstances. The mentally ill need to be in secure treatment units and not in regular segregation cells.

The ADOC needs to solve the problem of missed medical and mental health appointments. I recommend that facility-by-facility, line officers and sergeants meet directly with medical and mental health staff to develop site-specific solutions.

Custody staff should not be expected or allowed to remain in the room with medical or mental health staff except in exigent circumstances. Officers should remain immediately available, but confidentiality between the inmate and the provider cannot be assured with the officer in the room. This is the safe practice in many jurisdictions because it allows officers to be available if needed to address an immediate concern but also allows the medical staff to address medical needs that will alleviate the need for medical and mental health treatment in the future. If confidentiality can be assured, it is much more likely the provider will hear the entire story and be much better able to provide proper treatment.

The problem of chronic inmate idleness that pervades the ADOC prisons must be addressed. In addition the facilities are in need of regular, daily maintenance and of dramatic improvement in overall sanitation. Inmates should be put to work cleaning and maintaining existing facilities, which would help prevent the spread of infectious disease and also provide meaningful activity for inmates. In my interviews with inmates there were very few that were productively occupied during the day. The ADOC does not pay inmates to work. That is

true in some other southern states but is not the practice across the country. Inmates usually receive some nominal pay for working and it serves as an incentive. If it is not possible to pay inmates, the ADOC should seek other rewards to serve as incentives for successful work performance. If sentence reductions credits or additional privileges can be awarded, such as opportunities for increased contact with family members, behavior will improve, which will have a direct effect on safety and health of inmates. The Washington state prisons were in a similar state of disarray as a result of overcrowding and spiraling violence in the late 70's and early 80's. The department responded with both a carrot and a stick. They built their first super-max unit—the stick—and established a family visiting program—the carrot—where families could spend up to 48 hours with their incarcerated loved ones. It worked and today still stands as a powerful incentive to improve inmate behavior. It has strong support in the Washington Legislature, as it is consistent with what is known about reducing recidivism—inmates who maintain family support through incarceration have lower recidivism rates than those who do not.[145] While I recognize a family visiting program may be a leap for Alabama officials, it is the principle of finding incentives that will work in this system that should be their important focus.

The ADOC should explore sustainability initiatives.[146] In the global financial crisis of 2008-09, Washington State created jobs for inmates recycling almost all the imaginable waste from our institutions. This had the dual effect of providing employment for inmates, which has a direct effect

---

[145] Minnesota Department of Corrections, *The Effects of Prison Visitation on Offender Recidivism*, November 2011.

[146] http://sustainabilityinprisons.org.

on inmate health and safety as described above, and reducing operating costs. Washington saved hundreds of thousands of dollars in garbage fees.

The ADOC must establish a grievance system for non-medical grievances. Alabama is the only state that I am aware of that does not have one. A grievance system that actually works and is perceived by the inmates as a legitimate vehicle to solve problems will make their institutions safer, reduce inmate violence, and in turn improve inmate health. I do not know of another state in this country that operates without a grievance system for inmates.

As difficult as some of these recommendations might sound to implement, the ADOC faces even greater problems with staffing shortages and overcrowding.

It is highly likely that salaries are a problem in recruiting and retaining qualified staff. The ADOC should work with the Legislature to ensure widespread understanding of how critical this issue is for the safe operations of the State's prisons. Corrections is tough and demanding work and officers must be paid a living wage if they are to be motivated to continue their employment. Other alternatives to consider could include incentives for staying on the job (for five or 10 years or some other interval). If a small addition to vacation time or an additional seniority raise could be tied to longevity, it may motivate some staff to stay on in order to achieve those bonuses. Tuition reimbursement may be another option. I have witnessed

some top quality leaders emerge from the line staff who had part of their college tuition paid while they were working as correctional staff. Many advanced in their careers and are now running prisons effectively and efficiently, and are loyal to the system that they helped develop.

But the problem of overcrowding is paramount and is a major obstacle for the ADOC to move forward and make progress on any issues, but especially on providing safe facilities that ensure the health and mental well-being of the prisoners in its custody. To quote from the 2009 Annual Report:

> Most, if not all, of these problems are the result of the unprecedented growth in the inmate population over the last 15 years. The solutions all hinge on achieving a reversal in inmate growth. The reversal of this growth trend is critical but, by and large, beyond the control of the Department of Corrections.[147]

Yet some seven years after ADOC conceded this point, no real progress has been made on the issue of overcrowding. I am aware of some of the current discussion surrounding this issue in the State of Alabama but I have not yet heard realistic solutions. States should only incarcerate the number of people that they have room to safely and humanely house. Absent some alignment between the number of inmates and the space available, I am not confident that the ADOC will be able to move forward. If they don't find a solution to

---

[147] ADOC FY 2009 Annual Report.

the problem of overcrowding I have great fear that they will leave their staff in unsafe working conditions and leave their inmates in the current situation of significant risk of serious harm.


_____

Eldon Vail

# Exhibit 1

**ELDON VAIL**
1516 8th Ave SE
Olympia, WA. 98501
360-349-3033
Nodleliav@comcast.net

## WORK HISTORY

Nearly 35 years working in and administering adult and juvenile institutions, and probation and parole programs, starting at the entry level and rising to Department Secretary. Served as Superintendent of 3 adult institutions, maximum to minimum security, male and female. Served as Secretary for the Washington State Department of Corrections (WADOC) from 2007 until 201l.

- Secretary                        WADOC                              2007-2011
- Deputy Secretary                 WADOC                              1999-2006
- Assistant Deputy Secretary       WADOC                              1997-1999
- Assistant Director for Prisons   WADOC                              1994-1997
- Superintendent                   McNeil Island Corrections Center   1992-1994
- Superintendent                   WA. Corrections Center for Women   1989-1992
- Correctional Program Manager     WA. Corrections Center             1988
- Superintendent                   Cedar Creek Corrections Center     1987
- Correctional Program Manager     Cedar Creek Corrections Center     1984-1987
- Juvenile Parole Officer          Division of Juvenile Rehabilitation  1984
- Correctional Unit Supervisor     Cedar Creek Corrections Center     1979-1983
- Juvenile Institution Counselor   Division of Juvenile Rehabilitation  1974-1979

## SKILLS AND ABILITIES

- Ability to analyze complex situations, synthesize the information and find practical solutions that are acceptable to all parties.

- A history of work experience that demonstrates how a balance of strong security and robust inmate programs best improves institution and community safety.

- Leadership of a prison system with very little class action litigation based on practical knowledge that constitutional conditions are best achieved through negotiation with all parties and not through litigation.

- Extensive experience as a witness, both in deposition and at trial.

- Experience working with multiple Governors, legislators of both parties, criminal justice partners and constituent groups in the legislative and policymaking process.

- Skilled labor negotiator for over a decade. Served as chief negotiator with the Teamsters and the Washington Public Employees Association for Collective Bargaining Agreements. Chaired Labor Management meetings with Washington Federation of State Employees.

## HIGHLIGHTS OF CAREER ACCOMPLISHMENTS

- Reduced violence in adult prisons in Washington by over 30% during my tenure as Secretary and Deputy Secretary even though the prison population became much more violent and high risk during this same time period.

- Long term collaboration with the University of Washington focusing on improving treatment for the mentally ill in prison and the management of prisoners in and through solitary confinement.

- Implemented and administered an extensive array of evidence based and promising programs:

  o Education, drug and alcohol, sex offender and cognitive treatment programs.
  o Implemented sentencing alternatives via legislation and policy, reducing the prison populations of non-violent, low risk offenders, including the Drug Offender Sentencing Alternative and, as the Secretary, the Family and Offender Sentencing Alternative. http://www.doc.wa.gov/community/fosa/default.asp
  o Pioneered extensive family based programs resulting in reductions in use of force incidents and infractions, as well as improved reentry outcomes for program participants.
  o Established Intensive Treatment Program for mentally ill inmates with behavioral problems.
  o Established step down programs for long-term segregation inmates resulting in significant reduction in program graduate returns to segregation. http://www.thenewstribune.com/2012/07/10/2210762/isolating-prisoners-less-common.html

- Initiated the Sustainable Prisons Project http://blogs.evergreen.edu/sustainableprisons/

- Improved efficiency in the agency by administrative consolidation, closing 3 high cost institutions and eliminating over 1,200 positions. Housed inmates safely at lowest possible custody levels, also resulting in reduced operating costs.

- Increased partnerships with non-profits, law enforcement and community members in support of agency goals and improved community safety.

- Resolved potential class action lawsuit regarding religious rights of Native Americans. http://seattletimes.nwsource.com/html/opinion/2015464624_guest30galanda.html

2

- Successful settlement of the Jane Doe class action law suit, a PREA case regarding female offenders in the state's prisons for women.

- Led the nation's corrections directors to support fundamental change in the Interstate Compact as a result of the shooting of 4 police officers in Lakewood, WA.

- Dramatically improved media relations for the department by being aggressively open with journalists, challenging them to learn the difficult work performed by corrections professionals on a daily basis.

## EDUCATION AND OTHER BACKGROUND INFORMATION

- Bachelor of Arts - The Evergreen State College, Washington – 1973

- Post graduate work in Public Administration - The Evergreen State College, Washington - 1980 and 1981

- National Institute of Corrections and Washington State Criminal Justice Training Commission - various corrections and leadership training courses

- Member of the American Correctional Association

- Associate member, Association of State Correctional Administrators (ASCA)

- Guest Speaker, Trainer and Author for the National Institute of Corrections (NIC)

- Commissioner, Washington State Criminal Justice Training Commission 2002-2006, 2008-2011

- Member, Washington State Sentencing Guidelines Commission 2007-2011

- Instructor for Correctional Leadership Development for the National Institute of Corrections

- Author of *Going Beyond Administrative Efficiency—The Budget Crisis in the State of Washington*, published in Topics of Community Corrections by NIC, 2003

- Advisory Panel Member, *Correctional Technology—A User's Guide*

- Consultant for *Correctional Leadership Competencies for the 21st Century*, an NIC publication

- Co-chair with King County Prosecutor Dan Satterberg, *Examining the Tool Box: A Review of Supervision of Dangerous Mentally Ill Offenders* http://your.kingcounty.gov/prosecutor/DMIO%20-WorkgroupFinalReport.pdf

- Consultant for Correctional Health Care Executive Curriculum Development, an NIC training program, 2012

- Guest lecturer on solitary confinement, University of Montana Law School in 2012

- On retainer for Pioneer Human Services from July 2012 - July 2013

- On retainer for BRK Management Services from September 2012 – April 2013

- Guest Editorial, Seattle Times, February 22, 2014
  http://www.seattletimes.com/opinion/guest-opinions-should-washington-state-abolish-the-death-penalty/

**CURRENT ACTIVITIES**

- Serve on the Board of Advisors for Huy, a non-profit supporting Native American Prisoners

- Registered Agent for the Association of State Correctional Administrators (ASCA) in Washington

- Retained as an expert witness or correctional consultant in the following cases:

  - *Mitchell v. Cate*,
    No. 08-CV-1196 JAM EFB
    United States District Court, Eastern District of California,
    Declarations, March 4, 2013, May 15, 2013 and June 7, 2013
    Deposed, July 9, 2013
    Case settled, October 2014

  - *Parsons, et al v. Ryan*,
    No. CV 12-06010 PHX-NVW
    United States District Court of Arizona
    Declarations and reports, November 8, 2013, January 31, 2014,
    February 24, 2014, September 4, 2014
    Deposed, February 28, 2014 and September 17, 2014
    Case settled, October 2014

  - *Gifford v. State of Oregon*,
    No. 6:11-CV-06417-TC
    United States District Court, For the District of Oregon,
    Eugene Division,
    Expert report, March 29, 2013
    Case settled, May 2013

o   *Ananachescu v. County of Clark*,
    No. 3:13-cv-05222-BHS
    United States District Court, Western District of Tacoma
    Case settled, February 2014

o   *Coleman et al v. Brown, et al*,
    No. 2:90-cv-0520 LKK JMP P
    United State District Court, Eastern District of California,
    Declarations, March 14, 2013, May 29, 2013, August 23, 2013 and
    February 11, 2014
    Deposed, March 19, 2013 and June 27, 2013
    Testified, October 1, 2, 17 and 18, 2013

o   *Peoples v. Fischer*,
    No. 1:11-cv-02694-SAS
    United States District Court, Southern District of New York
    Interim settlement agreement reached February 19, 2014,
    Case settled, March 2016

o   *Dockery v. McCarty*,
    No. 3:13-cv-326 TSL JMR
    United States District Court for the Southern District of
    Mississippi, Jackson Division
    Report, June 16, 2014

o   *C.B., et al v. Walnut Grove Correctional Authority et al*,
    No. 3:10-cv-663 DPS-FKB,
    United States District Court for the Southern District of
    Mississippi, Jackson Division
    Memo to ACLU and Southern Poverty Law Center,
    March 14, 2014, filed with the court
    Reports to the court August 4, 2014 and February 10, 2015
    Testified, April 1, 2 and 27, 2015

o   *Graves v. Arpaio*,
    No. CV-77-00479-PHX-NVW,
    United States District Court of Arizona
    Declaration, November 15, 2013
    Testified, March 5, 2014
    Declaration, April 1, 2016

o   *Wright v. Annucci, et al*,
    No. 13-CV-0564 (MAD)(ATB)
    United States District Court, Northern District of New York
    Reports, April 19, 2014 and December 12, 2014

o *Corbett v. Branker,*
  No. 5:13 CT-3201-BO
  United States District Court, Eastern District of North Carolina,
  Western District
  Special Master appointment November 18, 2013
  Expert Report, January 14, 2014
  Testified, March 21, 2014

o *Fontano v. Godinez,*
  No. 3:12-cv-3042
  United States District Court, Central District of Illinois,
  Springfield Division
  Report, August 16, 2014
  Testified June 29, 2016

o *Atencio v. Arpaio*,
  No. CV12-02376-PHX-PGR
  United States District Court of Arizona
  Reports, February 14, 2014 and May 12, 2014
  Deposed, July 30, 2014

o *State of Oregon v. James DeFrank,*
  Case # 11094090C
  Malheur County, Oregon

o *Disability Rights, Montana, Inc. v. Richard Opper,*
  No. CV-14-25-BU-SHE
  United State District Court for the District of Montana,
  Butte Division

o *Larry Heggem v. Snohomish County,*
  No. CV-01333-RSM
  United States District Court,
  Western District of Washington at Seattle
  Report, May 29, 2014
  Deposed, June 27, 2014

o *Padilla v. Beard, et al,*
  Case 2:14-at-00575
  United States District Court, Eastern District of California,
  Sacramento Division
  Declaration, February 26, 2016
  Deposed June 3, 2016

- *Dunn et al v. Dunn et al,*
  No. 2:14-cv-00601-WKW-TFM
  United States District Court, Middle District of Alabama
  Declarations, September 3, 2014, April 29, 2015 and
  June 3, 2015

- *Sassman v. Brown,*
  No. 2:14-cv-01679-MCE-KJN,
  United States District Court, Eastern District of California,
  Sacramento Division
  Declaration, August 27, 2014, Report, December 5, 2014
  Deposed, December 15, 2014

- *Doe v. Michigan Department of Corrections*
  No. 5:13-cv-14356-RHC-RSW
  United States District Court, Eastern District of Michigan,
  Southern Division

- *Robertson v. Struffert, et al*
  Case 4:12-cv-04698-JSW
  United States District Court, Northern District of California
  Declaration, March 16, 2015
  Deposed May 4, 2015
  Case settled, October 2015

- *Commonwealth of Virginia v. Reginald Cornelius Latson*
  Case No: GC14008381—00
  General District Court of the County of Stafford
  Report, January 12, 2015
  Pardon granted

- *Star v. Livingston*
  Case No: 4:14-cv-03037
  United States District Court, Southern District of Texas,
  Houston Division
  Report, March 3, 2015

- *Doe v. Johnson*
  Case 4:15-cv-00250-DCB
  United States District Court for the District of Arizona
  Reports, December 4, 2015 and March 10, 2016

- *Redmond v. Crowther*
  Civil No. 2:13-cv-00393-PMW
  United States District Court, Central Division,
  State of Utah
  Report, April 28, 2015
  Deposed, July 28, 2015

- *Flores v. United States of America*
  Civil Action No 14-3166
  United States District Court, Eastern District of New York
  Report, August 14, 2015

- *Bailey v. Livingston*
  Civil Action No. 4:14-cv-1698
  United States District Court, Southern District of Texas,
  Houston Division
  Report, August 5, 2015
  Deposed, December 2, 2015

- *Rasho v. Godinez*
  Civil Action No. 07-CV-1298
  United States District Court, Central Division of Illinois,
  Peoria Division
  Case settled, December 2015

- *State of Arizona, Appellee, v. Pete J. Van Winkle, Appellant*
  No. CR–09–0322–AP
  Testified, March 28, 2016

- *Morgal v. Williams*
  No. CV 12-280-TUC-CKJ
  United States District Court for the District of Arizona
  Report, February 1, 2016
  Deposed, February 25, 2016

- *Williams v. Snohomish County*
  Case No. 15-2-22078-1 SEA
  Superior Court for the State of Washington, King County

- *Sacramento County Sheriff*
  Retained by Sacramento County Sheriff to evaluate housing units
  in the Sacramento County jails, including maximum custody,
  segregation and protective custody
  Report, June 27, 2016

o   *Fant v. The City of Ferguson*
Case No. 415-cv-00253 E.D. MO
United States District Court, Eastern District of Missouri
Report, January 8, 2016

o   *Community Legal Aid Society, Inc. v. Robert M. Coupe*
Case No. 1:15-cv-00688
United States District Court for the District of Delaware

o   *P.D. v. Middlesex County*
Superior Court of New Jersey

o   *C-Pod Inmates of Middlesex County v. Middlesex County*
3:15-cv-07920-PGS-TJB
United States District Court for the District of New Jersey

o   *Johnson v. Mason County*
NO. 3:14-cv-05832-RBL
United States District Court, Western District of Washington at Tacoma
Declaration, April 5, 2016

o   *Gould v. State of Oregon, et al*
Case No. 2:15-cv-01152-SU
United States District Court for the District of Oregon

o   *U.S. Department of Justice*
Retained by DOJ to join team investigating sexual harassment, sexual abuse and sexual assaults by inmates and staff in the Georgia Department of Corrections

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JOSHUA DUNN, ET AL.,                    )
                                        )
          Plaintiffs,                   )
                                        )     Civil Action Number:
v.                                      )
                                        )     2:14-cv-00601-MHT-TFM
JEFFERSON DUNN, ET AL.,                 )
                                        )
          Defendants.                   )


<u>Materials Relied Upon to Form Opinions in *Dunn v. Dunn*</u>

*In forming my opinions, I relied upon the following: 1) materials produced in discovery (listed below); 2) scholarly articles and professional standards (as cited in my report); and 3) observations, impressions, and analyses formed during my inspections of ADOC facilities.*

<u>DEPOSITION TRANSCRIPTS</u>

- BRENDA FIELDS
- CHARLES WOODLEY
- CHERYL HARVEY
- COMMISSIONER JEFFERSON DUNN
- DEWAYNE ESTES
- FELECIA GREER
- KENNETH PETERS
- KIM THOMAS
- LASANDRA BUCHANANT
- LESLEIGH DODD
- MICHELLE ELLINGTON
- SHARON TRIMBLE
- WARDEN BOBBY BARRETT


<u>ADDITIONAL DOCUMENTS</u>

- ADA Grievances and Appeals
- Administrative Regulations 600-639-MH
- Administrative Regulations-700-708
- ADOC's Responses to Written Inspection Questions at Holman and Fountain Inspections

- ADOC's Responses to Written Inspection Questions at St. Clair, Holman and Fountain Correctional Facilities – 9.15.2015 production
- ADOC Administrative Regulation 433, Administrative Segregation
- ADOC Administrative Regulation 433, Administrative Segregation, V-H-8-a
- ADOC Administrative Regulation 434, Disciplinary Segregation, V-C-5-c
- Bibb – MMM
- Staffing Analysis RFP#129
- Selma OJT Training File
- Tutwiler Prison for Women Duty Rosters 2014, 2015
- Tutwiler Prison for Women Incident Report Logs 2014, 2015
- Duty Post Logs 2015
- St. Clair Correctional Facility Segregation Count / Tabulation Form
- Handcuff/Leg Iron Accountability Log
- St. Clair Correctional Facility Inmate Bed Movement
- St. Clair Correctional Facility Inmate Bed Count Roster 2015
- Segregation Log Checklist 2015
- Holman Prison Incident Report Logs 2015
- Fountain Correctional Center Incident Reports/Duty Officer Reports  2015
- Fountain Incident Report Logs 2015
- Donaldson-Multidisciplinary Minutes 10-14-14
- Donaldson-Multidisciplinary Minutes 11-10-15
- Donaldson-Multidisciplinary Minutes 4-8-14
- Donaldson-Multidisciplinary Minutes 6-9-15
- Donaldson-Multidisciplinary Minutes 8-11-15
- Donaldson-Multidisciplinary Minutes 9-23-15
- Email re enemy situation 9-11-14
- MHM Contract Compliance Reports 2010-2012
- St. Clair Quality Improvement Report 8-27-14
- St. Clair-Multidisciplinary Minutes 12-18-14
- St. Clair-Multidisciplinary Minutes 4-24-14
- St. Clair-Multidisciplinary Minutes 9-25-14
- Staff Training Report 6-2014
- Staff Training Report 8-2014
- Tutwiler-Multidisciplinary Minutes 11-10-15
- Tutwiler-Multidisciplinary Minutes 4-14-15
- Tutwiler-Multidisciplinary Minutes 6-9-15
- Tutwiler-Multidisciplinary Minutes 7-14-15
- ADMIN SEG – NATIONAL OVERVIEW
- ADOC 2013 BUDGET
- ADOC 2014 BUDGET
- EASTERLING – MMM
- FOUNTAIN – MMM

- FW TRAUMA RELATED COSTS
- HOLMAN – MMM
- KILBY – MMM
- ST. CLAIR – MMM
- TUTWILER – MMM
- ADOC044631-044661 – Easterling
- ADOC045516-045599
- ADOC065321-065403  Easterling Jobs_Redacted
- Dunn(Corizon)_11077
- Dunn(Corizon)_20314
- Dunn(Corizon)_20326
- RFP 009 Easterling Segregation
- SOP 006-01 - Easterling1
- SOP 006-04 - Easterling1
- 041714 Vulnerability Analysis - Kilby CF
- RFP2 AEO
- RFP2 conf
- ADOC044822-044880 – Kilby
- ADOC045906-046010
- ADOC046184
- ADOC065512-065548  Kilby Jobs_Redacted
- Dunn(Corizon)_13060
- Dunn(Corizon)_13062
- KilbyFire and Emergency Evacuation2011 1
- KilbySOP V-14 1998 1
- KilbySOP V-14 Emergency Drill 1
- KilbySOP V-14 Emergency Plan 1
- KilbySOP V-2 Emergency Inmate Housing 2010 1
- KilbySOP V-2 Emergency Inmate Housing 2015 1
- StatonSOP D-03-Emergency Procedures - Hazardous Chemicals-Man Made Disasters1
- 2008ADOC Emergency Operations Manual-Hurricane Appendix- May 08-(2)
- 2012ADOC Emergency Operations Manual-Hurricane Appendix- May 2012
- BIBB JOBS
- BULLOCK JOBS
- DONALDSON JOBS
- EASTERLING JOBS
- FOUNTAIN JOBS
- HOLMAN JOBS
- KILBY JOBS
- LIMESTONE JOBS
- MOBILE WORK RELEASE JOBS
- ST. CLAIR JOBS

3

- STATON JOBS
- TUTWILER JOBS
- VENTRESS JOBS
- TRADE SCHOOL CHART
- PROGRAM INFORMATION
- Vulnerability Analysis – Fountain CF
- Vulnerability Analysis – Holman CF
- Fountain Jobs
- Holman Jobs
- Memorandum to Security Staff
- Corizon Policy:  Access to care
- Corizon Policy:  Infection Control Program
- Corizon Policy:  Information on Health Services
- Corizon Policy:  Healthy Lifestyle Promotion
- Corizon Policy:  Chronic Disease Services
- Corizon Policy:  Restraint and Seclusion
- Holman Sick Call Summary – March 2015
- Skin Infection Tracking Log – April 2013
- Fountain Emergency Procedures
- Fountain Fire Safety and Evacuation Plans
- Fountain Weather Related Disasters
- Holman Security Audit
- Holman Fire and Emergency Evacuation Procedures
- Post Orders / Health Care Unit Security Officer
- Fountain Health Services Audit – May 10, 2011
- Audit and Re-Audit Results – 2011 and 2012
- Fountain Job List
- Holman Job List
- ADOC facilities duty post logs
- Bibb-MAC
- Dept of Health – Easterling
- Dept of Health
- Easterling-MAC
- Fountain Security Audit
- Fountain-MAC
- Holman-MAC
- Kilby-MAC
- Security Audit – Emails
- St. Clair Security Audit
- Tutwiler-MAC
- Vulnerability Analysis – Fountain CF
- Vulnerability Analysis – Ventress CF

- Vulnerability Analysis – Bibb April 2014
- Vulnerability Analysis – Hamilton A & I
- Vulnerability Analysis – Hamilton CBF
- Vulnerability Analysis – Holman CF
- Vulnerability Analysis – Kilby CF
- Vulnerability Analysis – Limestone CF
- Vulnerability Analysis – Staton CF
- Vulnerability Analysis – Elmore CF
- Vulnerability Analysis – St. Clair CF
- Vulnerability Analysis – Camden CBF
- Vulnerability Analysis – Donaldson CF
- Vulnerability Analysis – Loxley CF
- Vulnerability Analysis – Red Eagle CF
- Vulnerability Analysis – Bullock CF
- Vulnerability Analysis – Mobile CBF
- 2011 Vulnerability Analysis – Hamilton A&I
- 2012 Vulnerability Analysis – Hamilton A & I
- Security Audit Cover letter (Donaldson)
- Donaldson Security Audit
- St. Clair Security Audit
- St. Clair Security Audit Findings
- Holman - Security Audit 09-2011 – Printed
- BIBB STANDARD OPERATING PROCEDURES
- DONALDSON STANDARD OPERATING PROCEDURES
- EASTERLING STANDARD OPERATING PROCEDURES
- FOUNTAIN STANDARD OPERATING PROCEDURES
- HAMILTON A&I STANDARD OPERATING PROCEDURES
- HOLMAN STANDARD OPERATING PROCEDURES
- KILBY STANDARD OPERATING PROCEDURES
- LIMESTONE STANDARD OPERATING PROCEDURES
- ST. CLAIR STANDARD OPERATING PROCEDURES
- STATON STANDARD OPERATING PROCEDURES
- TUTWILER STANDARD OPERATING PROCEDURES
- VENTRESS STANDARD OPERATING PROCEDURES
- BIBB - SEGREGATION
- BIBB  STANDARD OPERATING PROCEDURES
- BIBB – EMERGENCY TRANSPORTATION
- BULLOCK EMERGENCY EVACUATION PROCEDURES
- BULLOCK EMERGENCY FEEDING PROCEDURES – OLD
- BULLOCK EMERGENCY FEEDING PROCEDURES
- BULLOCK EMERGENCY LOCK DOWNS
- BULLOCK EMERGENCY PROCEDURES IN CASE OF FIRE

- BULLOCK MONITORING FIRE EMERGENCY PROCEDURES
- BULLOCK SOP EMERGENCY PROCEDURES OUTLINING EMPLOYEE DUTIES AND RESPONSIBLITIES
- DONALDSON 2-4 EMERGENCY PROCEDURES IN CASE OF RIOT OR DISTURBANCE
- DONADLSON 2-6 EMEREGENCY PROCEDURES FOR SEVERE WEATHER
- DONALDSON 2-07
- DONALDSON 2-08
- DONALDSON 2-11
- DONALDSON 2-15
- DONALDSON 2-16
- DONALDSON 4-026 TRANSPORTATION OF INMATES
- DONALDSON 7-001 EMERGENCY PROCEDURES IN CASE OF RIOT OR DISTURBANCE
- DONADLSON 7-002 EMERGENCY PROCEDURES FOR SEVERE WEATHER
- DRAPER EMERGENCY FIRE PROCEDURES
- DRAPER EMERGENCY HOUSING
- DRAPER EMERGENCY WEATHER PROCEDURES
- ELMORE 901 – EMERGENCY PROCEDURES POWER FAILURE 1
- ELMORE 902 – RIOT MAJOR DISTURBANCE PLAN 1
- ELMORE 904 - EMERGENCY LOCKDOWNS 1
- ELMORE 905 – MONITORING FIRE AND EMERGENCY PROCEDURES1
- ELMORE 906 – FIRE AND EMERGENCY EVACUATION PROCEDURES1
- ELMORE 907 – SEVERE WEATHER PLAN1
- ELMORE 908 – SHELTER-IN-PLACE PROCEDURES FOR CHECMICAL-BIOLOGICAL CONTAMINATION1
- FOUNTAIN09-02 EMERGENCY PROCEDURES – FOUNTAIN JOD1
- FOUNTAIN09-06 FIRE SAFETY AND EVACUATION PLANS (2) – FOUNTAIN – JOD1
- FOUNTAIN09-17 WEATHER RELATED DISASTERS-NEW-FOUNTAIN1
- HAIC PANDEMIC FLU PLAN final1
- HAMILTON A&I FACILITY PANDEMIC FLU CHECKLIST1
- HAMILTONSOP 329-01 ADA FIRE AND EMERGENCY EVACUATION1
- HAMILTONSOP 329-01 AGREEMENT LETTER 2 1
- HAMILTONSOP 329-01 AGREEMENT LETTER 3 1
- HAMILTONSOP 329-02 FIRE, SEVERE WEATHER, AND EVACUATION DRILLS1
- HAMILTONSOP 329-03 EMERG PROCED PWR FAILURE1
- HAMILTONSOP 329-03 EMERG PROCEDURE PWR FAILURE1
- HAMILTONSOP 329-04 SEVERE WEATHER WORKING CONDITIONS1
- HAMILTONSOP 329-05 EMERG FOOD STORAGE AND FEEDING PROCED1
- HAMILTONSOP 329-07 RIOT DISTURBANCE1
- HAMILTONSOP 405-01 INMATE EMERGENCY VISIT2 1
- HAMILTONSOP HAIC# PANDEMIC FLU1
- HAMILTONSOP1
- HOLMANFIRE & EMERGENCY EVACUATION PROCEDURES – HOLMAN1

- HOLMANFIRE & EMERGENCY EVACUATION PROCEDURES – HOLMAN1
- HOLMANFIRE AND EMERGENCY EVACUATION PROCEDURES (2) 1
- KILBYFIRE AND EMERGENCY EVACUATION2011 1
- KILBYSOP V-14 1998
- KILBYSOP V-14 EMERGENCY DRILL 1
- KILBYSOP V-14 EMERGENCY PLAN 1
- KILBBYSOP V-15 EMERGENCY SITUATIONS 1
- KILBYSOP V-2 EMERGENCY INMATE HOUSING 2010 1
- KILBYSOP V-2 EMERGENCY INMATE HOUSING 2015 1
- LIMESTONESOP D-10 – EMERGENCY PROCEDURE NATIONAL GUARD-RESERVE ACTIVATION 1
- LIMESTONESOP D-13 – EMERGENCY EVACUATION1
- LIMESTONESOP D-4 SEVERE WEATHER 1
- LIMESTONESOP D-5 – EMERGENCY PROCEDURES FOR POWER FAILURE 1
- LIMESTONESOP D-12 – WINTER STORM OPERATIONS1
- SECOND AMENDED COMPLAINT
- SOP 006-01 – EASTERLING1
- SOP 006-03 – EASTERLING1
- SOP 006-04 – EASTERLING1
- STATONSOP D-02 – EMERGENCY PROCEDURES RIOT OR DISTURBANCES1
- STATONSOP D-03 – EMERGENCY PROCEDURES – HAZARDOUS CHEMICALS – MAN MADE DISASTERS1
- STATONSOP D-13 – EMERGENCY SITUATION WEATHER1
- STATONSOP D-21 – FIRE DRILLS1
- STATONSOP D-28 – HURRICANEPREPARATION – INCOMING EVACUATED INMATES1
- STCLAIRSOP #115 EMERGENCY PROCEDURES FOR INCLEMENT WEATHER1
- STCLAIRSOP #116 – EMERGENCY PROCEDURES – RIOT – DISTURBANCE1
- STCLAIRSOP #118 – FIRE PREV. & EVACUATION1
- STCLAIRSOP #122 – EMER. INST. EVACUATION1
- TUTWILERSOP 9-12 EMERGENCY PROCEDURE FOR SEVERE WEATHER (SIGNED)1
- VENTRESS9-10 CONTINGENCY PLAN FOR POWER FAILURE new letterhead 1
- VENTRESS9-13 CONTINGENCY PLAN FOR REDUCTION OF POSTS – NEW LETTERHEAD 1
- VENTRESS9-18 CONTINGENCY PLAN FOR PANDEMIC INFLUENZA EMERGENCY OPERATION 1
- VENTRESS9-2 EMERGENCY LOCKDOWN 3 2013 1
- VENTRESS9-2A RIOT DISTURBANCE HOSTAGE SITUATIONS 10 2007 1
- VENTRESS9-7 FIRE SAFETY AND EVACUATION PLAN 4 2013
- VENTRESS9-7A EMERGENCY PROCEDURE FOR INSTITUTION EVACUATION 4 2013 1
- RFP 2 AEO
- RFP 2 AEO

- ADOC Health Services Manual
- MHM February 2016 monthly report
- ADOC039224-ADOC039232-RFP 9
- ADOC039316-ADOC039337 RFP3
- ADOC039373-ADOC039374-RFP 9
- ADOC039375-ADOC039417-RFP 2-ATTORNEYS' EYES ONLY
- ADOC039387-ADOC039394 RFP9 AEO
- ADOC039403-ADOC039409 RFP12 AEO
- ADOC039418-ADOC039426 RFP3 conf
- ADOC039427-ADOC039437-RFP 9
- ADOC039438-ADOC039448-RFP 9
- ADOC039449-ADOC039453 RFP2 AEO
- ADOC039454-ADOC039458 RFP2 AEO
- ADOC039459-ADOC039462 RFP2 AEO
- ADOC039463-ADOC039475 RFP12 AEO
- ADOC039476-ADOC039492 RFP2 conf
- ADOC039493-ADOC039495-RFP 58
- ADOC039496-ADOC039502-RFP 24
- ADOC039503-ADOC039512-RFP 26
- ADOC039513-ADOC039518 RFP AEO
- ADOC039519-ADOC039526 RFP2 conf
- ADOC039527-ADOC039531 RFP2 AEO
- ADOC039532-ADOC039535 RFP2 AEO
- ADOC039536-ADOC039542 RFP2 AEO
- ADOC039543-ADOC039550 RFP2 AEO
- ADOC039551-ADOC039556 RFP2 AEO
- ADOC039557-ADOC039559 RFP2 AEO
- ADOC039560-ADOC039568 RFP2 AEO
- ADOC039569-ADOC039578 RFP2 AEO
- ADOC039579-ADOC039582 RFP2 AEO
- ADOC039583-ADOC039585 RFP2 conf
- ADOC039586-ADOC039590 RFP2 conf
- ADOC039591-ADOC039593 RFP2 conf
- ADOC039594-ADOC039596 RFP2 conf
- ADOC039597-ADOC039599 RFP2 AEO
- ADOC039700-ADOC039702 RFP2 AEO
- ADOC039703-ADOC039706 RFP2 AEO
- ADOC039707-ADOC039708 RFP2 AEO
- ADOC039709-ADOC039711-RFP 2
- ADOC039712-ADOC039714-RFP 2
- ADOC039715-ADOC039717-RFP 2
- ADOC039718-ADOC039720-RFP 2

8

- ADOC039721-ADOC039723 RFP2 conf
- ADOC039724-ADOC039733-RFP 3-ATTORNEYS' EYES ONLY
- ADOC039734-ADOC039740-RFP 3-ATTORNEYS' EYES ONLY
- ADOC039741-ADOC039761-RFP 2-ATTORNEYS' EYES ONLY
- ADOC039762-ADOC039768-RFP 2- ATTORNEYS' EYES ONLY
- ADOC039769-ADOC039774-RFP 2-ATTORNEYS' EYES ONLY
- ADOC039775-ADOC039784-RFP 2-ATTORNEYS' EYES ONY
- ADOC039784-RFP 2-ATTORNEYS' EYES ONLY
- ADOC039785-ADOC039786-RFP 2
- ADOC039787-ADOC039789-RFP 2-ATTORNEYS' EYES ONLY
- ADOC039790-ADOC039793-RFP 2
- ADOC039794-ADOC039795-RPF 2
- ADOC039796-ADOC039798-RFP 58
- ADOC039799-ADOC039800-RFP 2
- ADOC039801-ADOC039804-RFP 2-ATTORNEYS' EYES ONLY
- ADOC039805-ADOC039806-RFP 2
- ADOC039807-ADOC039808-RFP 2
- ADOC039809-ADOC039810-RFP 2-ATTORNEYS' EYES ONLY
- ADOC039811-ADOC039813-RFP 58
- ADOC039814-ADOC039819-RFP 2-ATTORNEYS' EYES ONLY
- ADOC044541-044549 – Bibb
- ADOC044550-044630
- ADOC044631-044661 – Easterling
- ADOC044662-044730 - Health Care Unit Security Officer Post Orders
- ADOC044731-044816 – Hamilton
- ADOC044817-044821
- ADOC044822-044880 – Kilby
- ADOC044881-044959 – Limestone
- ADOC044960-044989
- ADOC044990-044999 – Staton
- ADOC045000-045052 – Tutwiler
- ADOC045053-045085
- ADOC045813-045905
- ADOC046072-046124
- ADOC046136-046137
- ADOC046138-046183
- ADOC046184
- ADOC061816-ADOC061869-RFP 10
- ADOC061870-ADOC061872-RFP 10
- ADOC061873-ADOC061880-RFP 10
- ADOC061881-ADOC061900-RFP 10
- ADOC061901-ADOC061907-RFP 10

- ADOC062010-ADOC062016-RFP 5
- ADOC062017-ADOC062050
- ADOC062051-ADOC062059-RFP 3
- ADOC062060-ADOC062061-RFP 10
- ADOC062062-RFP 5 - Razor email
- ADOC062063-ADOC062067-RFP 5 – razors
- ADOC062068-RFP 5 – razors
- ADOC062069-RFP 5 – razors
- ADOC062180-ADOC062362-RFP 10
- ADOC062363-ADOC062458-RFP 6-7
- ADOC062459-ADOC062461-RFP 10
- ADOC39395-ADOC039402 RFP AEO
- ADOC39600-39605 RFP 2 AEO
- ADOC39606-39608 RFP 2 AEO
- ADOC39618-39621 RFP 2 AEO
- ADOC39622-39626 RFP 6
- ADOC39627-39628 RFP 2
- ADOC39629-39636 RFP 2 AEO
- ADOC39637-39644 RFP 2 AEO
- ADOC39645-39650 RFP 2 AEO
- ADOC March 2016 Statistical Report, Facility Operations
- ADOC Annual Report FY 2006.
- ADOC Annual Report FY 2007
- ADOC Annual Report FY 2008
- ADOC Annual Report FY 2009
- ADOC Annual Report FY 2010
- ADOC Annual Report FY 2011
- ADOC Annual Report FY 2012
- ADOC Annual Report FY 2013
- ADOC Annual Report FY 2015
- Bibb Emergency Transportation
- Bullock Emergency Evacuation Procedures
- Bullock Emergency Feeding Procedures OLD
- Bullock Emergency Feeding Procedures
- Bullock Emergency Lock Downs
- Bullock Emergency Procedures in case of Fire
- Bullock Monitoring Fire Emergency Procedures
- Bullock SOP Emergency procedures outlining employee duties responsibilities
- Donaldson 2-4 Emergency Procedures in case of riot or disturbance
- Donaldson 2-6 Emergency Procedures for Severe Weather
- Donaldson2-07
- Donaldson2-08

- Donaldson2-11
- Donaldson2-15
- Donaldson2-16.sop
- Donaldson4-026 Transportation of Inmates
- Donaldson7-001 Emergency Procedures in case of Riot or Disturbance
- Donaldson7-002 Emergency Procedures for Severe Weather
- DraperEmergency Fire Procedures
- DraperEmergency Housing
- DraperEmergency Weather Procedures
- Elmore901 - Emergency Procedures Power Failure1
- Elmore902-Roit-Major Disturbance Plan1
- Elmore904-Emergency Lockdowns1
- Elmore905-Monitoring Fire and Emergency Procedures1
- Elmore906-Fire and Emergency Evacuation Procedures1
- Elmore907-Severe Weather Plan1
- Elmore908-Shelter-In-Place Procedures for Chemical -Biological Contamination1
- Easterling Correctional Facility, REG/SOP Misc-12
- Fountain09-02 Emergency Procedures  - Fountain JOD1
- Fountain09-06 FIRE SAFETY AND EVAUCATION PLANS (2) - Fountain - JOD1
- Fountain09-17Weather Related Disasters-New - Fountain1
- HAIC PANDEMIC FLU PLAN final1
- Hamilton A & I Facility Pandemic flu checklist1
- Hamiltonsop 329-01 ADA fire and emergency evacuation1
- Hamiltonsop 329-01 agreement letter 2 1
- Hamiltonsop 329-01 agreement letter 3 1
- Hamiltonsop 329-02 fire, severe weather, and evacuation drills1
- Hamiltonsop 329-03 emerg proced pwr failure1
- Hamiltonsop 329-03 emerg procedure pwr failure1
- Hamiltonsop 329-04 severe weather working conditions1
- Hamiltonsop 329-05 emerg food storage and feeding proced1
- Hamiltonsop 329-07 riot disturbance1
- Hamiltonsop 405-01 inmate emergency visit2 1
- HamiltonSOP HAIC# PANDEMIC FLU1
- HamiltonSOP1
- HolmanFIRE & EMERGENCY EVACUATION PROCEDURES - Holman1
- HolmanFIRE & EMERGENCY EVACUATION PROCEDURES - Holman1
- HolmanFIRE AND EMERGENCY EVACUATION PROCEDURES (2)1
- KilbyFire and Emergency Evacuation2011 1
- KilbySOP V-14 1998 1
- KilbySOP V-14 Emergency Drill 1
- KilbySOP V-14 Emergency Plan 1
- KilbySOP V-15 Emergency Situations 1

- KilbySOP V-2 Emergency Inmate Housing 2010 1
- KilbySOP V-2 Emergency Inmate Housing 2015 1
- LimestoneSOP D-10 -- Emergency Procedure National Guard-Reserve Activation 1
- LimestoneSOP D-13 -- Emergency Evacuation1
- LimestoneSOP D-4 --Severe Weather 1
- LimestoneSOP D-5 -- Emergency Procedures for Power Failure 1
- LimetsoneSOP D-12 -- Winter Storm Operations1
- MMM – Chart
- Second Amended Complaint
- SOP 006-01 - Easterling1
- SOP 006-03 - Easterling1
- SOP 006-04 - Easterling1
- State of Alabama Department of Corrections Incident Reports
- StatonSOP D-02 - Emergency Procedures Riot or Disturbances1
- StatonSOP D-03-Emergency Procedures - Hazardous Chemicals-Man Made Disasters1
- StatonSOP D-13 - Emergency Situation Weather1
- StatonSOP D-21 - Fire Drills1
- StatonSOP D-28 - HURRICANE PREPARATION - Incoming Evacuated Inmates1
- StClairSOP #115 emergency procedures for inclement weather1
- StClairSOP #116 - EMERGENCY PROCEDURES-RIOT-DISTRUBANCE1
- StClairSOP #118 - FIRE PREV. & EVACUATION1
- StClairSOP #122 - EMER. INST. EVACUATION1
- TutwilerSOP 9-12 Emergency Procedure for Severe Weather (Signed)1
- Ventress9-10  CONTINGENCY PLAN FOR POWER FAILURE new letterhead 1
- Ventress9-18   CONTINGENCY PLAN FOR PANDEMIC INFLUENZA EMERGENCY OPERATION 1
- Ventress9-2  EMERGENCY LOCKDOWN  3  2013 1
- Ventress9-2A  RIOT   DISTURBANCE  HOSTAGE  SITUATIONS  10  2007 1
- Ventress9-7  FIRE  SAFETY AND EVACUATION PLAN    4  2013 1
- Ventress9-7A  EMERGENCY PROCEDURE FOR INSTITUTIONAL EVACUATION  4  2013 1
- Photos from Site Inspection at Kilby