IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| JOSHUA DUNN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| JEFFERSON S. DUNN, in his | ) | |
| official capacity as | ) | |
| Commissioner of | ) | |
| the Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

PHASE 2A ADAP SUMMARY JUDGMENT OPINION

The plaintiffs in this putative class-action
lawsuit are dozens of state prisoners and the Alabama
Disabilities Advocacy Program (ADAP). The defendants
are officials of the Alabama Department of Corrections
(ADOC): the Commissioner and the Associate Commissioner
of Health Services.[1] They are sued in their official
capacities only.

---

1. ADOC itself is also a party, but with respect
to only claims under the Americans with Disabilities
Act (ADA), codified at 42 U.S.C. § 12131 et seq., and
(continued...)

In Phase 2A of this case, with which this opinion is concerned, ADAP and a subset of individual plaintiffs assert the following mental-health claims: constitutionally inadequate mental-health treatment in Alabama prison facilities and involuntary medication without due process. They rely on the Eighth and Fourteenth Amendments, as enforced through 42 U.S.C. § 1983. Plaintiffs seek declaratory and injunctive relief. Jurisdiction is proper under 28 U.S.C. § 1331 (federal question) and § 1343 (civil rights).[2]

_____

§ 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794, which are nearly settled and therefore not discussed in this opinion. See Joint Status Report (doc. no. 968) at 968 ("Plaintiffs and Defendants ADOC have agreed in substance to a settlement that resolves the Phase 2A ADA issues. These parties continue to work to resolve the Plaintiffs' claims for attorneys and monitoring fees for these issues."). To the extent that the parties are not successful in reaching a final resolution of these claims, they have reserved them for later adjudication. See Phase 2 Order on Remaining ADA Claims (doc. no. 981).

2. This case has twice been bifurcated for the administrative convenience of the court and the parties. The claims in Phase 1, which the parties settled with a consent decree approved by the court, involved ADA claims alleging discrimination on the (continued...)

The issue before the court is whether ADAP has associational standing to bring the mental-health care claims at issue in Phase 2A of this case.[3] The court concludes that it does.

---

basis of and non-accommodation of physical disabilities. See Dunn v. Dunn, -- F.R.D. --, 2016 WL 4718216 (M.D. Ala. Sept. 9, 2016) (Thompson, J.). The claims in Phase 2B, which are set to go to trial after the Phase 2A claims (should they survive summary judgment), involve Eighth Amendment claims related to medical and dental care.

3. ADAP itself has been a plaintiff in this case since its outset. During the course of litigation of Phase 1 (concerning discrimination against and failure to accommodate prisoners with physical disabilities), the court sought clarification as to the precise basis for ADAP's standing--that is, whether it was claiming organizational standing, associational standing, or both. In response, ADAP represented that it was asserting both. It was unnecessary to resolve whether ADAP had adequately pled associational standing at the time, because the parties settled Phase 1. In order to ensure that the basis of ADAP's asserted standing was squarely presented, for purposes of defendants' response and for adjudication, the court instructed ADAP to seek leave to amend the complaint to clarify the bases for its standing (in advance both of the deadline for amendments and the Phase 2 briefing), and leave was granted. Dunn v. Dunn, 2016 WL 4169157 (M.D. Ala. Aug. 5, 2016) (Thompson, J.). Although defendants were offered the opportunity to conduct additional discovery regarding standing, id. at *3, they declined to do so.

## I.  Background

ADAP's claims are systemic and prospective in nature: It contends not that any particular prisoner's rights were violated in the past, but instead that defendants' policies and practices violate and will continue to violate the constitutional rights of prisoners who have serious mental illness, both by creating a substantial risk of serious harm to them and by denying them due process.

While defendants have sought summary judgment, their summary-judgment motion does not mention ADAP, but focuses exclusively on ADAP's co-plaintiffs, individual prisoners.[4]  The court issued an order informing the parties that it would, sua sponte, "raise for disposition on summary judgment the issue of

---

4.  In defendants' motion for summary judgment, they specify that they are requesting "judgment as a matter of law as to the claims of Named Plaintiffs." Motion for Summary Judgment (doc. no. 768) at 2.  In a footnote, defendants expressly define the phrase "Named (continued...)

whether plaintiff Alabama Disabilities Advocacy Program
... has associational standing with respect to any,
some, or all of the claims to be litigated during Phase
2 of this case.  See Celotex Corp. v. Catrett, 477 U.S.
317, 326 (1986) (recognizing that district courts have
the authority to raise issues for disposition on
summary judgment sua sponte, so long as the parties are
on notice that they must come forward with any and all
pertinent evidence)."  Phase 2 Briefing Order on
Associational Standing (doc. no. 724) at 1-2.

The court further ordered ADAP to "file a brief
affirmatively setting forth the basis for its asserted
associational standing and explaining the scope of this
standing"; the brief was "to discuss any relevant case
law and any evidence [ADAP] believes is pertinent to
its assertion of standing," and required defendants,
"[i]f [they] wish to contest" ADAP's associational
standing, to "do so in the context of their summary

---

Plaintiffs" by listing every individual prisoner
plaintiff, but not ADAP.  Id. at 2 n.2.

judgment motion." <u>Id</u>. at 2.  <u>See</u> Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2720.1 (4th ed.) ("[I]f the court determines to enter summary judgment on a ground not presented or argued by the parties, the failure to give the losing party an opportunity to defend against that ground provides a ground for reversal. Conversely, as now expressly recognized by Rule 56(f), if the parties are provided with an opportunity to address the court's alternative ground, then summary judgment may properly be entered.").

Having been placed on notice that the court would consider resolving the issue of associational standing on summary judgment, the parties filed briefs as directed, and the court has considered the arguments and evidence put forward.  For the reasons explained below, pursuant to Federal Rule of Civil Procedure 56(f), the court will grant summary judgment to ADAP on the issue of associational standing, and, as ADAP requested, "uphold its associational standing to bring

its claims" in Phase 2A of this case.   Pl. ADAP's Br.
on Associational Standing (doc. no. 754) at 25.


## II.   Summary Judgment Standard

Summary judgment, which can be granted not only as
to a claim or defense but also as to any "part" of a
claim or defense, is appropriate under Federal Rule of
Civil Procedure 56(a) if "there is no genuine dispute
as to any material fact" and one party "is entitled to
judgment as a matter of law."   Only record
evidence--not assertions in pleadings--can create a
dispute of material fact.   Fed. R. Civ. P. 56(c)(1).
The evidence is to be viewed in the light most
favorable to the party against which summary judgment
is being sought or considered.   <u>Coleman v. Smith</u>, 828
F.2d 714, 717 (11th Cir. 1987).


## III.   Associational Standing

ADAP, the State's protection and advocacy
organization (P&A), contends that it has associational

**7**

standing to litigate claims that are, in essence, identical to those the individual plaintiffs endeavor to bring on behalf of the plaintiff classes.[5] The court agrees for the following reasons.

---

5. ADAP is not only representing itself as an association but also serving as counsel to the individual named plaintiffs who represent the putative plaintiff class or classes. Notably, "class certification under Rule 23 and associational standing are evaluated on two different rubrics," and an organization may well have associational standing even if the requirements of Rule 23 could not be met. See Bhd. of Maint. of Way Emps. Div. of Int'l Bhd. of Teamsters v. Ind. Harbor Belt R.R. Co., 20 F. Supp. 3d 686, 691 (N.D. Ind. 2014) (Simon, J.). Defendants also argue, relying on Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo., 458 F. Supp. 2d 160, 172-73 (S.D.N.Y. 2006) (Karas, J.), that, even if ADAP does have standing to bring claims that are coextensive with those brought by the putative plaintiff class or classes, it should be denied prudential standing because its claims would be duplicative. This argument holds no water. Since ADAP's claims mirror those of the class or classes, and ADAP also represents the individual named plaintiffs, defendants will hardly be put to any extra trouble defending against both. If defendants did not contest that the individual named plaintiffs can proceed on their claims (both individually and as a class or classes), ADAP would presumably feel no need to continue to assert its own standing, essentially in the alternative.

ADAP also asserts organizational standing pursuant to Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982), (continued...)

The Protection and Advocacy for Individuals with Mental Illness Act (PAIMI) authorizes P&As to bring litigation to address systemic problems in the treatment of people with mental illness.[6]  Specifically, 42 U.S.C. § 10805(a)(1)(B) authorizes P&As to "pursue administrative, legal, or other appropriate remedies to ensure the protection of the rights of individuals with mental illness who are receiving care or treatment in the State"; meanwhile, § 10805(a)(1)(B) authorizes P&As to "pursue administrative, legal, and other remedies on

---

and Georgia Latino Alliance for Human Rights v. Governor of Ga., 691 F.3d 1250, 1257 (11th Cir. 2012). See Fifth Am. Compl. (doc. no. 805) at 24 ("Prior to commencement of this lawsuit, ADAP spent significant time and resources advocating on behalf of prisoners with disabilities [including mental illness] in ADOC custody, monitoring and investigating the treatment and accommodation of prisoners with disabilities in ADOC custody.  ADAP's prelitigation efforts and expenditures of recourse were necessitated by the ADOC policies and practices challenged, which policies and practices serve to frustrate and perceptibly impair ADAP's advocacy efforts and its ability to accomplish the statutory purposes for which it was created.").  The court need not address this alternative basis for standing at this time.

behalf of an individual ... with mental illness" under certain circumstances. As many courts have explained, and as many others have recognized in the course of finding that P&As have standing to bring claims on behalf of identifiable groups of similarly situated constituents, "PAIMI authorizes [P&As] to pursue claims for system-wide change" under subsection (a)(1)(B), in addition to claims on behalf of individuals pursuant to subsection (a)(1)(C). <u>Univ. Legal Servs., Inc. v. St. Elizabeth's Hosp.</u>, 2005 WL 3275915, at *5 (D.D.C. July 22, 2005) (Hogan, J.); <u>see</u> <u>also</u> <u>Brown v. Stone</u>, 66 F. Supp. 2d 412, 425 (E.D.N.Y. 1999) (Block, J.) ("Essentially, subdivision B is apparently designed to address systemic issues affecting the rights of multiple individuals. ... By contrast, subdivision C addresses the rights of particular individuals, and is significantly more restrictive...." (citations omitted)). As the court explained in <u>Brown</u>, "if

---

6. Oddly, the case law sometimes refers to this statute with the acronym PAMII.

Congress merely intended for state [P&A] systems to act as advocates on behalf of [specific] mentally [ill] individuals, it would not have included (a)(1)(B) in the statute in addition to (a)(1)(C)." Id. at 425 (E.D.N.Y. 1999) (Block, J.) (citation omitted). "Given 'the broad remedial purposes of the Act,'" the court in Brown concluded, the plaintiff P&A had standing to bring claims on behalf of "a particular group of individuals" it had "identified," not by name but by what amounted to a description of a class: "all those" indigent patients in state psychiatric hospitals being assessed full charges for their care based on the defendants' policy of charging for care any patients who sued for injuries arising out of their psychiatric treatment. Id. (quoting Rubenstein v. Benedictine Hosp., 790 F. Supp. 396, 409 (N.D.N.Y. 1992) (Cholakis, J.)).

Of course, in addition to this statutory authorization to bring actions on behalf of mentally ill individuals, ADAP must also have standing to sue

under Article III.  The Supreme Court has articulated a
three-part test for determining whether an organization
has associational standing to sue on behalf of its
members: "an association has standing to bring suit on
behalf of its members when: (a) its members would
otherwise have standing to sue in their own right;
(b) the interests it seeks to protect are germane to
the organization's purpose; and (c) neither the claim
asserted nor the relief requested requires the
participation of individual members in the lawsuit."
Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333,
343 (1977).  Although the first two prongs of the Hunt
test are constitutional requirements, the third is
merely prudential and may be eliminated by Congress.
United Food & Commercial Workers Union v. Brown Grp.,
Inc., 517 U.S. 544, 555-58 (1996).

The Eleventh Circuit has squarely held that P&As
may sue on behalf of the constituents they serve just
"like a more traditional association may sue on behalf
of its members."  Doe v. Stincer, 175 F.3d 879, 885-86

12

(11th Cir. 1999).  In so doing, it explained that a P&A that meets PAIMI's requirements, despite not having members in a formal sense, functions as a membership organization, and can have associational standing to represent its constituents.

P&As are required under PAIMI to have a governing board and advisory council that include specified percentages of individuals or family members of individuals who receive or have received mental-health care; to provide the public with an opportunity to comment on its activities and priorities; and to have a grievance system for clients and potential clients. See id. at 886.  ADAP has shown, and defendants have not disputed, that ADAP meets these requirements of PAIMI and functions as a membership organization for purposes of asserting associational standing on behalf of its constituents, Alabamians with mental illness.

Defendants do claim,[7] however, that ADAP has not demonstrated that it was appropriately designated as the P&A that the "State shall have in effect," per 42 U.S.C. § 15043(a).[8]   This is a remarkable argument, in

---

7.   Notably, defendants, in their brief, do not go so far as to say that ADAP is _not_ the State's P&A; they merely challenge the adequacy of the evidence it has put forward to demonstrate that it was designated as such.   Accordingly, defendants do not suggest that any _other_ organization is instead the P&A, or, for that matter, that Alabama does not have a P&A.   They also do not dispute that ADAP has proven that it receives, through the State, the federal funds that the State is authorized to collect only if it has a P&A.   In fact, defendants have not presented any evidence creating a factual dispute regarding ADAP's P&A status; instead, they assert that a P&A must be created by a state executive or legislative action.

8.   P&As have obtained their statutory mandates through a series of statutes expanding their purview to cover additional forms of disabilities.   Therefore, considerable cross-referencing is required.   42 U.S.C. § 10805(a)(1)(B) authorizes "a system established in a State under section 10803 of this title" to litigate on behalf of individuals with mental illness; § 10803 explains that an "eligible system[]" that receives a federal allotment is to "establish and administer [a] system ... to protect and advocate the rights of individuals with mental illness"; § 10802(2) defines the term "eligible system" to mean "the system established in a State to protect and advocate the rights of persons with developmental disabilities under subtitle C of the Developmental Disabilities Assistance (continued...)

light of the fact that both this court and the Eleventh Circuit have expressly recognized ADAP as Alabama's P&A for over two decades.  Indeed, in <u>Stincer</u> itself, 175 F.3d at 883, the court of appeals cited its affirmation of this court's decision in <u>Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Center,</u> 97 F.3d 492, 495 (11th Cir. 1996) ("The Advocacy Program is the federally mandated and funded P&A system Alabama has established pursuant to 42 U.S.C. § 6042(a)(1)."), <u>aff'g</u> 894 F. Supp. 424, 426-27 (M.D. Ala. 1995) (Thompson, J.).  <u>See also</u> <u>Ala. Disabilities Advocacy Program v. SafetyNet Youthcare, Inc.,</u> 65 F. Supp. 3d 1312, 1321-22 (S.D. Ala. 2014) (Granade, J.), <u>on reconsideration in other part,</u> 2015 WL 566946 (S.D. Ala. Feb. 11, 2015); <u>Ala. Disabilities Advocacy Program v. Wood,</u> 584 F. Supp. 2d 1314, 1315 (M.D. Ala. 2008)

---

and Bill of Rights Act of 2000"; § 15043, in turn, says that in order to receive a federal allotment, a "State shall have in effect a system to protect and advocate the rights of individuals with developmental disabilities."

(Thompson, J.).  These repeated judicial findings alone probably suffice to make this argument a nonstarter.

In addition, defendants' argument is based on a faulty premise.  They contend that Governor George Wallace's 1976 designation of the University of Alabama's Legal Aid Clinic as the organization to implement a P&A was inadequate, because his communication was not labeled as an executive order and, in any event, he was not empowered to create a state agency by executive order.  The rub is this: There is no need for a P&A to be a state agency or indeed a creation of the State.  A State need only "have in effect" a P&A, not create one.  Moreover, defendants have pointed to no state law requiring any particular executive or legislative action in order to designate a preexisting organization as the one authorized to serve functions outlined and receive monies appropriated by Congress.  Although some P&As in other States were created by statute or executive

order, the manner of designation employed in Alabama was also entirely permissible.

Finally, at multiple prior points in the course of this very case, defendants have recognized ADAP as the State's P&A.   In advance of filing this litigation, ADAP investigated the treatment of prisoners with disabilities and mental illness in ADOC prisons across the State; during and in order to facilitate this investigation, ADAP, along with plaintiffs' counsel, the Southern Poverty Law Center (SPLC), entered into a "Memorandum of Understanding" with ADOC.   This document clearly reflects the State's understanding that ADAP is the State's P&A.   It states that ADOC "recognizes and appreciates the mission of the Alabama Disabilities Advocacy Program and its desire to assist and advocate for individuals in institutions who are identified as mentally ill and/or developmentally disabled."   Memo. of Understanding (doc. no. 754-10) at 2.   Furthermore, the memorandum recognizes that SPLC--which was assisting ADAP in carrying out its functions--"may

request copies of inmate records," and that "[t]hese will be supplied in accordance with the applicable authorization required by or granted under 42 U.S.C. § 10805 or 42 U.S.C. § 15043." Id. These statutory provisions authorize P&As--and only them--to access the records of their constituents. By entering into this agreement, ADOC necessarily recognized that ADAP was the State's P&A.

Additionally, when the court asked defendants for their position as to whether a guardian ad litem should be appointed to represent the interests of a subset of the Phase 1 settlement class at the fairness hearing, the State expressed in writing its belief that this was unnecessary, explaining as follows: "[O]ne of the Phase 1 Plaintiffs is [ADAP]. As stated in the complaint, the Amended Agreement and elsewhere in the record, ADAP is the duly authorized protection and advocacy agency in the state of Alabama for disabled persons. Given its unique position in this regard, ADOC believes that ADAP will adequately represent and protect the

18

interests of all putative class members...." Notice of
Resp. (doc. no. 531) at 1-2.  In light of the
foregoing, defendants' argument that ADAP is not the
State's P&A is meritless.

That sideshow behind it, the court turns to
application of the first prong of <u>Hunt</u>--whether the
association's members would otherwise have standing to
sue in their own right.  In <u>Stincer</u>, the Eleventh
Circuit explained that all a representative entity must
do under <u>Hunt</u>'s first prong is to show "that one of its
members or constituents has suffered an injury that
would allow it to bring suit in its own right"; one
constituent is enough, and he or she (and any
additional constituents) need not be named.  175 F.3d
at 884-85; <u>see</u> <u>also</u> <u>id</u>. at 882 (explaining that this is
a requirement that the member or constituent have
"standing").  Hence, ADAP has plainly satisfied the
first <u>Hunt</u> prong with respect to the Eighth Amendment
and due-process claims the individual named plaintiffs
have standing--as recognized in the court's separate

summary-judgment opinion--to bring, because the individual named plaintiffs are constituents of ADAP on whose behalf it has brought precisely the same claims they have brought on their own behalves.[9]

Furthermore, even were there no individual named plaintiffs in the case (either as class representatives or as individual plaintiffs), ADAP would have standing to bring these claims.  Stincer requires only that a P&A show that it has one constituent with standing to

_____

9.  Defendants argue that ADAP has not satisfied Hunt's first prong because the named plaintiffs have not exhausted available administrative remedies.  A failure to exhaust does not impact standing because standing is jurisdictional, while the PLRA's exhaustion requirement, the Supreme Court and Eleventh Circuit have explained, is not.  See Woodford v. Ngo, 548 U.S. 81, 101 (2006) ("[It is] clear that the PLRA exhaustion requirement is not jurisdictional.");  Bryant v. Rich, 530 F.3d 1368, 1374 & n.10 (11th Cir. 2008) (same). Thus, even if defendants were correct (as discussed in the separate opinion on summary judgment with respect to the individual named plaintiffs, they are not) that the individual named plaintiffs had failed to exhaust available administrative remedies, and were therefore barred from bringing their claims by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), this failure to exhaust would have no effect on these plaintiffs' standing, and would therefore be irrelevant (continued...)

bring the claim--not that an individual named plaintiff in the case has standing to bring the claim. (Indeed, there need not be any plaintiff other than the P&A; this is the very crux of associational standing.) Although not required to do so, plaintiffs have in fact identified, through their experts' reports, a significant number of particular prisoners other than the individual named plaintiffs who are mentally ill--and are therefore constituents of ADAP and who together have been subjected to each of the policies and practices being challenged here. Because this expert evidence demonstrates that at least one mentally ill prisoner has been directly exposed to and affected by each of these policies and practices, it further undergirds the court's conclusion that ADAP has constituents with standing to bring its claims, and thus that ADAP has satisfied the first prong of Hunt.

---

to their ability to support ADAP's associational standing.

Further, plaintiffs' experts' systemic evidence of the risk of harm to mentally ill prisoners would <u>alone</u>, even absent their identification of individual prisoners, be sufficient to meet <u>Hunt</u>'s first prong; the Eleventh Circuit has explained that, at least when seeking relief from a prospective harm, associations need only show the <u>high likelihood</u> of the existence of a member who will be harmed by the challenged policy or practice, but need not identify any particular member with such standing. <u>See</u> <u>Stincer</u>, 175 F.3d at 884 ("[U]nder Article III's established doctrines of representational standing, we have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought and we decline to create such a requirement in PAMII.").

Thus, for example, in <u>Fla. State Conference of N.A.A.C.P. v. Browning</u>, 522 F.3d 1153, 1160 (11th Cir. 2008), the court held that two organizations had associational standing to challenge a voter-registration law because, although they could not

identify a specific member who would be injured, it was highly likely that one of their members would be.  See also id. at 1160 ("When the alleged harm is prospective, we have not required that the organizational plaintiffs name names because every member faces a probability of harm in the near and definite future."); id. at 1163 ("[P]robabilistic harm is enough injury in fact to confer ... standing in the undemanding Article III sense.  ...  To satisfy the requirements of associational standing, all that plaintiffs need to establish is that at least one member faces a realistic danger [of being harmed by the challenged policy]."  (citation and internal quotation marks omitted)); see also Arcia v. Fla. Sec'y of State, 772 F.3d 1335, 1342 (11th Cir. 2014) (describing Browning as recognizing that associations with a large number of constituents can show associational standing based on the high probability that at least one of them will suffer an injury).

23

Defendants do not dispute that ADAP satisfies the second Hunt prong--that the interests ADAP seeks to protect in the lawsuit are germane to its purpose--with good reason. ADAP has been entrusted by Congress with the protection of and advocacy for the interests at issue in this litigation. See Stincer, 175 F.3d at 884 ("The very purpose of [the enabling statutes) was to confer standing on protection and advocacy systems ... as representative bodies charged with the authority to protect and litigate the rights of individuals with [disabilities]."). One of ADAP's priorities is protecting people with mental illness housed in institutional settings (including prisons) from abuse and neglect. In serving this advocacy function, ADAP can bring claims not only pursuant to its enabling statutes, but also pursuant to other statutes and constitutional provisions. See Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr., 642 F. Supp. 2d 872, 874 (S.D. Ind. 2009) (Hamilton, J.) (Eighth Amendment, ADA, and Rehabilitation Act claims);

<u>Stincer</u>, 175 F.3d at 880 (ADA); <u>N.J. Prot. & Advocacy,</u>
<u>Inc. v. Davy</u>, 2005 WL 2416962, at *4 (D.N.J. Sept. 30,
2005) (Chesler, J.) (due process); <u>Or. Advocacy Ctr. v.</u>
<u>Mink</u>, 322 F.3d 1101, 1105 (9th Cir. 2003) (due
process); <u>Aiken v. Nixon</u>, 236 F. Supp. 2d 211, 220-21
(N.D.N.Y. 2002) (McAvoy, J.) (Fourth Amendment, ADA,
and Rehabilitation Act); <u>Unzueta v. Schalansky</u>, 2002 WL
1334854, at *3 (D. Kan. May 23, 2002) (Rogers, J.) (due
process); <u>Risinger v. Concannon</u>, 117 F. Supp. 2d 61, 64
(D. Me. 2000) (Carter, J.) (unspecified civil rights
claims brought pursuant to § 1983); <u>Brown</u>, 66 F. Supp.
2d at 416 (First Amendment and equal protection);
<u>Rubenstein</u>, 790 F. Supp. at 398 (due process and equal
protection); <u>Goldstein v. Coughlin</u>, 83 F.R.D. 613, 614
(W.D.N.Y. 1979) (Curtin, J.) (Rehabilitation Act and
unspecified constitutional claims).

As for <u>Hunt</u>'s prudential third prong--that neither
the claim asserted nor the relief requested requires
the participation of individual members in the
lawsuit--the Eleventh Circuit appears to have

recognized in <u>Stincer</u>, and other courts have since squarely held, that Congress, by granting P&As the authority to pursue legal remedies to ensure the protection of those with disabilities, abrogated this requirement.[10]   In <u>Oregon Advocacy Center</u>, 322 F.3d at 1110-12, the court discussed at some length, and endorsed, the reasoning of <u>Stincer</u>.   Then, it concluded that Congress had, by passing statutes that "explicitly authorize[] [P&As] to bring suit on behalf of their constituents," abrogated <u>Hunt</u>'s third, prudential prong.   <u>Id</u>. at 1113 (reasoning based on <u>United Food</u>, 517 U.S. at 548-49, in which the Supreme Court held that Congress, "by specifically authorizing the union to sue for its members' damages," had "without doubt" abrogated the third prong of <u>Hunt</u>).   Numerous other

---

10. In <u>Stincer</u>, the court explained that the third prong could be abrogated by Congress, and, in not addressing it further, suggested that the plaintiff P&A would not need to meet it.   175 F.3d at 882-83. However, because the court remanded the case after finding that the record did not yet establish that the P&A had met <u>Hunt</u>'s first prong, <u>Stincer</u> did not (continued...)

district courts have reached the same conclusion.  <u>See</u>
<u>Ind. Prot. & Advocacy Servs. Comm'n</u>, 642 F. Supp. 2d at
878; <u>Joseph S. v. Hogan</u>, 561 F. Supp. 2d 280, 307
(E.D.N.Y. 2008) (Cogan, J.); <u>N.J. Prot. & Advocacy,</u>
<u>Inc.</u>, 2005 WL 2416962, at *2; <u>Univ. Legal Servs., Inc.</u>,
2005 WL 3275915, at *4; <u>Unzueta</u>, 2002 WL 1334854, at
*3; <u>Pa. Prot. & Advocacy, Inc. v. Houston</u>, 136 F. Supp.
2d 353, 364-65 (E.D. Pa. 2001) (Antwerpen, J.);
<u>Risinger</u>, 117 F. Supp. 2d at 68-70.

This is not to say that the claims ADAP has brought
could not satisfy <u>Hunt</u>'s third prong--that they do not
required the participation of individual constituents
in the litigation.  Indeed, ADAP's claims would
generally pass that test, for much the same reason that
they present common questions suitable for class-wide
resolution.  Because ADAP seeks uniform injunctive
relief throughout the prison system rather than
individualized relief, and because its most critical

explicitly and conclusively hold that the third prong
does not apply to P&As.

27

evidence consists of expert testimony, deposition testimony of mental-health providers and ADOC employees, and documentary evidence such as medical records and audits, the participation of any particular prisoner in the litigation is unnecessary. See Univ. Legal Servs., 2005 WL 3275915, at *5 ("[R]ather than seeking individualized relief, ULS seeks injunctive remedies that would bring institution-wide relief for its constituents. ULS could meet its burden by presenting evidence of its claims of institutional neglect and other problems through the use of medical records, audits, depositions of Defendants, expert and fact witness testimony, and other relevant documents and written discovery. The mere need to show individualized harm to the patients is not enough to offend Hunt's third prong without a clear need for their direct participation in the litigation itself.").

The fact that the assessments and treatments ADAP contends will be improved by the systemic reforms they seek will necessarily be individualized does not mean

that the participation of individual constituents would be required.   In Joseph S., a case litigated in the Eastern District of New York, an advocacy organization and two individual named plaintiffs brought ADA claims on behalf of mentally ill persons in highly restrictive nursing homes.   "Although the injunctive relief that plaintiffs [sought] would, if granted, require individualized evaluations of whether persons with mental illness could appropriately receive care and treatment in a setting more integrated than a nursing home," the court found that Hunt's third requirement would be met because "these individualized assessments would be completed by defendants, not the court," such that the participation of individual members in the litigation would not be required.   561 F. Supp. 2d at 308-09 (relying on Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock, 477 U.S. 274 (1986)); see also id. at 308 (explaining that "the fact that participation by some individuals may be required--for example, to demonstrate the general

manner in which defendants fail to ensure that individuals discharged from psychiatric wards or hospitals are properly screened before they are placed in nursing homes--is not fatal to associational standing").

## IV.  Exhaustion

Defendants raised for the first time at oral argument the contention that ADAP itself failed to exhaust administrative remedies before filing suit. Because exhaustion does not go to standing, the court will not resolve this issue on summary judgment. Instead, the court will briefly explain why the current record strongly suggests that ADAP has adequately exhausted.[11]

---

11. Defendants' argument that ADAP would lack associational standing if the individual named plaintiffs had failed to exhaust has been dispatched with above.  See supra n.9.

PAIMI explicitly addresses the issue of exhaustion by P&As prior to the initiation of legal action in 42 U.S.C. § 10807, which provides:

> "(a) Prior to instituting any legal action in a Federal or State court on behalf of an individual with mental illness, an eligible system ... shall exhaust in a timely manner all administrative remedies where appropriate.  If, in pursuing administrative remedies, the system ... determines that any matter with respect to such individual will not be resolved within a reasonable time, the system ... may pursue alternative remedies, including the initiation of a legal action.

> "(b) Subsection (a) of this section does not apply to any legal action instituted to prevent or eliminate imminent serious harm to an individual with mental illness."

There is very little case law interpreting this provision, but what does exist makes clear that § 10807's requirement is not a strict one.  In <u>Gonzalez v. Martinez</u>, 756 F. Supp. 1533 (S.D. Fla. 1991) (Nesbitt, J.), a court in this circuit discussed at some length the meaning of the phrase "where appropriate."  Recognizing that the plain language was not illuminating, the court turned to the legislative history of the provision:

"It is the belief of the Committee that conciliation, negotiation, mediation and other administrative procedures can work effectively in providing protection and advocacy of the mentally ill, especially because litigation in most instances is costly and time consuming. The Committee recognizes the experience of the [P&A] System in implementing such negotiation and mediation on behalf of persons with disabilities, as well as the system's use of other administrative remedies in lieu of litigation. The Committee further notes that only 5 percent of [P&A] cases in 1984 have resulted in court action. The Committee intends that the [P&A] System in its new role as the eligible protection and advocacy system for mentally ill persons under this Act should continue the non-litigative approach to advocacy and dispute resolution and urges the continued use of administrative and alternative remedies prior to the initiation of a legal action.

"It is not the intention of the Committee that the administrative remedies must be pursued for an unreasonable duration, but rather that whenever possible there should be timely and reasonable attempts made to mediate and negotiate appropriate administrative remedies. If the pursuit of administrative remedies has not solved any matter within a reasonable time, the eligible system may pursue alternative remedies, including the initiation of a legal action."

Id. at 1537-38 (quoting S. Rep. No. 109, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. 1361, 1371); see also id. at 1538 (quoting H.R. Conf. Rep. No. 576, 99th

Cong., 2d Sess., <u>reprinted</u> <u>in</u> 1986 U.S.C.C.A.N. 1377, 1382-83 ("The conferees recognize ... that exhaustion of administrative remedies may delay action on behalf of mentally ill individuals and have authorized the system to proceed with legal action when unreasonable delays exist. If legal action is initiated, courts retain their prerogative to determine that the issues are not ripe and to remand the matter for further administrative consideration.")).

The <u>Gonzalez</u> court then went on to reject the argument by defendants that § 10807 requires exhaustion of all administrative remedies, not only those that would "prove adequate under the traditional judicially-created exhaustion doctrine," and the court noted that the discussion of the court's "prerogative" in the House Report supports the conclusion that courts retain "substantial discretion" in determining whether a P&A has adequately exhausted. <u>Id</u>. at 1539; <u>see</u> <u>also</u> <u>Mich. Prot. & Advocacy Serv., Inc. v. Evans</u>, 2010 WL 3906259, at *3 (E.D. Mich. Sept. 30, 2010) (Hood, J.)

(agreeing).  The court concluded, moreover, that the state statutory remedies defendants argued the P&A should have exhausted--such as filing individual grievances--were not "adequate to provide relief for the type of egregious, systemic abuse that [the P&A] alleges." Gonzalez, 756 F. Supp. at 1538 (applying the exhaustion doctrine set out in Patsy v. Fla. Int'l Univ., 634 F.2d 900 (5th Cir. 1981)).

Another court has characterized § 10807 as "impos[ing] a limited obligation on a [P&A] to make some efforts to pursue administrative remedies before filing suit." Mich. Prot. & Advocacy Serv., Inc. v. Flint Cmty. Sch., 146 F. Supp. 3d 897, 905 (E.D. Mich. 2015) (Lawson, J.); see also id. at 906 ("The defendants were unable or unwilling, on repeated occasions, to complete any satisfactory response to the plaintiff's ... requests in a timely manner, and they therefore forfeited any right they had to handle the resulting ... disputes with the plaintiff exclusively through administrative channels."); Prot. & Advocacy

for Persons with Disabilities v. Armstrong, 266 F. Supp. 2d 303, 313 (D. Conn. 2003) (Squatrito, J.) (concluding that the P&A had satisfied the exhaustion requirement by "attempt[ing] to request" the relief sought in the litigation, which the defendant "declined to provide"); Advocacy Ctr. v. Stalder, 128 F. Supp. 2d 358, 365 (M.D. La. 1999) (Parker, J.) (same).

Therefore, it appears that the pretrial efforts of ADAP to bring its claims to the attention of defendants and seek to resolve them without litigation were sufficient to satisfy § 10807.

On April 9, 2014, a couple of months before this lawsuit was filed, ADAP and the SPLC sent the ADOC Commissioner a letter reporting the results of a lengthy investigation they had conducted.[12] As noted in the letter, this investigation included interviews with dozens of prisoners, facility inspections throughout

---

12. The Commissioner at the time was Kim Thomas, not Jefferson Dunn. Because this is an official-capacity suit, they are treated as one and the same.

ADOC's major institutions, and reviews of thousands of pages of medical records, policies, contracts, reports, and other documents. The authors of the letter asserted that Alabama's prisoners were not being provided constitutionally adequate mental-health care because of a shortage of mental-health professionals and a regular failure to adequately diagnose and treat mentally ill prisoners.

The letter pointed to evidence regarding understaffing, including the following: There were just 6.2 psychiatrists for the entire prison system, which left 11,000 prisoners--including 1,166 on the mental-health caseload--in a facility with no psychiatric staffing at all. It also noted that only 3.5 psychologists were employed in the prison system--roughly half the ratio that existed in the 1970s, when the level of mental-health staffing was found to be unconstitutionally inadequate. The letter also cited to the fact that the overall level of mental-health staffing present in ADOC facilities was

significantly lower than the minimum level set by ADOC in its request for proposals.

The letter also asserted that ADOC was under-identifying prisoners with mental illness, especially those with severe mental illnesses. This conclusion, the letter made clear, was based on a comparison of ADOC statistics to those found in a 2006 Department of Justice study; ADAP and SPLC also identified 853 prisoners who, in light of ADOC's own documentation of their mental illness, should have been classified as in need of more intensive mental-health treatment. They further reported their findings that only 9 % of prisoners received psychotropic medication, that many of those prisoners had almost no interaction with the prescribing professionals, that prisoners were taken off their medications and the mental-health caseload despite still needing treatment and despite continued self-injury and suicide attempts, that prisoners entering custody faced long delays in receiving medication, that less effective medications

were prescribed to save money, and that a shortage of custodial staff caused medication delivery to be delayed, skipped, and performed incorrectly.

The letter also explained that, according to an ADOC report, more than 30 prisoners whom mental-health staff had diagnosed as having a serious mental illness were housed in the general population in facilities with few mental-health staff (including 7 in a facility with no psychiatric staffing at all); that 270 prisoners, who were housed in residential treatment units due to their serious mental illnesses, received only cursory psychotherapy; and that prisoners who were acutely psychotic and a danger to themselves received little treatment besides being placed in a suicide cell where, once a day, a mental-health provider would stop by for less than five minutes. The letter also addressed ADOC's practice of providing razor blades to suicidal prisoners, including those housed in the residential treatment units and those with a documented history of suicide attempts.

Finally, the letter described ADOC's failure to provide due process when involuntarily medicating prisoners with mental illness. The authors discussed 30 prisoners suffering from mild impairment in mental functioning who they contended were unjustifiably subject to involuntary-medication orders.

As James Tucker, ADAP's Executive Director, testified, "The demand letter conveyed an identification of the issues that needed to be remedied." Tucker Depo. (doc. no. 754-1) at 175. The letter explained that while its authors were "ready to fully litigate this matter in federal court," they "believe[d] that it would in the best interests of all parties at this time to resolve these violations through a stipulated injunction," and requested that defendant "let [them] know whether [they were] willing to enter into discussion regarding how to resolve the issues presented below." Letter (doc. no. 754-11) at 2. Because, as Tucker put it, there was not "a meeting of the minds about how both sides might work together

to achieve a resolution," plaintiffs filed this lawsuit. Tucker Depo. (doc. no. 754-1) at 175.[13]

The current record reflects that ADAP attempted to resolve the issues identified in the letter informally, but that it "determine[d]"[14] that they would "not be resolved within a reasonable time." 42 U.S.C. § 10807(a).

Moreover, in light of the fact that this lawsuit was initiated to challenge a system of inadequate mental-health care that plaintiffs contend, and have

_____

13. Although ADAP and plaintiffs' counsel did have a meeting with the Commissioner in late May 2014, before the suit was filed, and defendants assert in their answer that plaintiffs' counsel did not "express[] any concerns over the 'urgency' of the issues discussed, and, in fact, refused to provide any meaningful information in order to address concerns raised because of their commitment to instituting this action," there is no evidence in the current record in support of this contention. Defs' Answer (doc. no. 834) at 34-35. Indeed, their position appears to be belied by the detailed nature of the 26-page letter, which concludes by expressing the view that "the concerns in this letter are serious issues and should be resolved in the most expeditious and effective way." Letter (doc. no. 754-11) at 27.

offered evidence to show, causes serious harm to
mentally ill prisoners on a daily basis--as one
example, they challenge inadequacies in crisis care
including access by suicidal prisoners to razor
blades--the court further note that the record strongly
suggests that ADAP was exempt from the exhaustion
requirement pursuant to 42 U.S.C. § 10807(b), which
allows the immediate filing, without any attempt at
exhaustion, of "any legal action instituted to prevent
or eliminate imminent serious harm to a mentally ill
individual."

The PLRA's exhaustion requirement, on the other
hand, does not apply to P&As.  As the Eleventh Circuit
as explained, the plain language of 42 U.S.C. § 1997e
reveals the scope of its applicability: it requires
exhaustion by "a prisoner."  "Prisoner" is defined in
42 U.S.C. 1997e(h) to mean "any person incarcerated or
detained in any facility who is accused of, convicted

---

14. The plain text of the provision merely requires
that the P&A make such a "determin[ation]," not that it
(continued...)

of, sentenced for, or adjudicated delinquent for, violations of criminal law." <u>Jackson v. State Bd. of Pardons & Paroles</u>, 331 F.3d 790, 795 (11th Cir. 2003). As this court has previously explained in another case brought by ADAP, "[t]he provisions respecting prisoner suits ... do not apply because ADAP is clearly not a 'prisoner' under the statute. ... ADAP is not a 'person' and has neither been incarcerated nor detained." <u>Ala. Disabilities Advocacy Program</u>, 584 F. Supp. 2d at 1316.

This accords with the sensible conclusions reached by a number of other courts that the estates and guardians of prisoners are not "prisoners" and are therefore not subject to the PLRA's exhaustion requirement. <u>See</u> <u>Tretter v. Pa. Dep't of Corr.</u>, 558 F. App'x 155, 157–58 (3d Cir. 2014) (administrator of prisoner's estate); <u>Anderson v. Cty. of Salem</u>, 2010 WL 3081070, at *2 (D.N.J. Aug. 5, 2010) (Bumb, J.) (administrator of prisoner's estate); <u>Torres-Rios v.</u>

_____

be an objectively reasonable one.

<u>Pereira-Castillo</u>, 545 F. Supp. 2d 204, 206 (D.P.R. 2007) (Besosa, J.) (administrator of prisoner's estate); <u>Netters v. Tenn. Dep't of Corr.</u>, 2005 WL 2113587, at *3 n.3 (W.D. Tenn. Aug. 30, 2005) (Mays, J.) (guardians of prisoner's minor next-of-kin); <u>Rivera-Rodriguez v. Pereira-Castillo</u>, 2005 WL 290160, at *6 (D.P.R. Jan. 31, 2005) (Delgado-Colon, M.J.) (guardians of minor prisoner).[15]

A couple of additional points bear mention. First, as a practical matter, there is no evidence in the current record to suggest that ADAP would be able to submit a grievance to MHM on behalf of a prisoner; in

---

15. The Supreme Court held in <u>Jones v. Bock</u> that the PLRA's requirement of exhaustion does not create a total exhaustion rule, wherein the failure of a prisoner to exhaust one claim would bar him from bringing other, exhausted claims. 549 U.S. 199, 220-21 (2007). Courts have concluded, by analogy to <u>Jones</u>, that the PLRA's exhaustion requirement is not applicable to the claims of non-prisoners brought alongside those of prisoners. <u>See</u> <u>Apanovich v. Taft</u>, 2006 WL 2077040, at *4 (S.D. Ohio July 21, 2006) (King, M.J.); <u>Arsberry v. Illinois</u>, 244 F.3d 558, 561-62 (7th Cir. 2001) (concluding that the failure of prisoner plaintiffs to exhaust their administrative remedies did (continued...)

that very concrete sense, it is not "available" to ADAP. Second, it would conflict with ADAP's statutory purpose and the associational standing doctrine just discussed to allow ADAP to bring claims only on behalf of prisoners who had themselves exhausted an administrative grievance process (assuming one were available to exhaust). This is because P&As have an essential role in advocating on behalf of prisoners with disabilities, whether mental or physical, that render it difficult or impossible for them to advocate for themselves. Although the court has not found and need not find that the individual named plaintiffs in this case would necessarily be incapable of filing grievances, common sense dictates that some severely mentally ill prisoners will be unable to do so. Moreover, the Eleventh Circuit's associational standing case law recognizes that an association seeking prospective injunctive relief need not necessarily

---

not "dispose of" the claims of the non-prisoner plaintiffs).

**44**

identify any particular constituent to show that one has standing. If the P&A need not identify any particular prisoner by name, it certainly cannot be expected to exhaust a particular prisoner's administrative remedies prior to filing suit.


## V. Conclusion

Finally, the court pauses to note that litigation of the claims in this case by ADAP is not merely an alternative, but in significant ways preferable, to litigation solely by the individual named plaintiffs. Review of the individual named plaintiffs' depositions and other record evidence reveals that, although many of them are quite lucid, some clearly experience difficulties with communication, whether due to intellectual disabilities, symptoms of mental illness, or a combination. In passing PAIMI, and in authorizing P&As to engage in legal advocacy on behalf of mentally ill constituents, Congress recognized that these constituents' impairments will often make it difficult

for them to recognize, understand, articulate, and advocate for their own rights. See Stincer, 175 F.3d at 884 ("The very purpose of PAMII was to confer standing on protection and advocacy systems ... as representative bodies charged with the authority to protect and litigate the rights of individuals with mental illness."); see also S. Rep. No. 100-454, 100th Cong., 2d Sess., reprinted in 1988 U.S.C.C.A.N. 3217, 3227 (discussing the PAIMI Amendments Act of 1988) ("Informing a mentally ill individual of his or her rights is a critical function of a protection and advocacy system.   It is also the Committee's expectation that the system will communicate this information to and respond to questions by mentally ill individuals in an appropriate, meaningful, and effective manner, taking into consideration the nature and severity of the particular individual's disability.").

\*\*\*

An appropriate summary judgment in favor of ADAP with respect to its associational standing to bring the Phase 2A claims in this case will be entered, and ADAP's Phase 2A claims will proceed to trial

DONE, this the 25th day of November, 2016.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE