IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| JOSHUA DUNN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| JEFFERSON S. DUNN, in his | ) | |
| official capacity as | ) | |
| Commissioner of | ) | |
| the Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

PHASE 2A INDIVIDUAL PLAINTIFFS
SUMMARY JUDGMENT OPINION

The plaintiffs in this putative class-action lawsuit are dozens of state prisoners and the Alabama Disabilities Advocacy Program (ADAP). The defendants are officials of the Alabama Department of Corrections (ADOC): the Commissioner and the Associate Commissioner

of Health Services.[1]   They are sued in their official capacities only.

In Phase 2A of this case, with which this opinion is concerned, ADAP and a subset of individual plaintiffs assert the following mental-health claims: constitutionally inadequate mental-health treatment in Alabama prison facilities and involuntary medication without due process.   They rely on the Eighth and Fourteenth Amendments, as enforced through 42 U.S.C. § 1983.   Plaintiffs seek declaratory and injunctive relief.   Jurisdiction is proper under 28 U.S.C. § 1331

---

1.   ADOC itself is also a party, but with respect to only claims under the Americans with Disabilities Act (ADA), codified at 42 U.S.C. § 12131 et seq., and § 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794, which are nearly settled and therefore not discussed in this opinion.   See Joint Status Report (doc. no. 968) at 968 ("Plaintiffs and Defendants ADOC have agreed in substance to a settlement that resolves the Phase 2A ADA issues.   These parties continue to work to resolve the Plaintiffs' claims for attorneys and monitoring fees for these issues.").   To the extent that the parties are not successful in reaching a final resolution of these claims, they have reserved them for later adjudication.   See Phase 2 Order on Remaining ADA Claims (doc. no. 981).

(federal question) and § 1343 (civil rights).[2]  The case is proceeding on two parallel tracks consisting of ADAP's claims and the individual plaintiffs' claims.

In September 2016, more than two years after this case was filed and after extensive discovery, defendants moved for summary judgment on the individual plaintiffs' Phase 2 claims.[3]  This motion is now before

---

2.  This case has twice been bifurcated for the administrative convenience of the court and the parties.  The claims in Phase 1, which the parties settled with a consent decree approved by the court, involved ADA claims alleging discrimination on the basis of and non-accommodation of physical disabilities.  See Dunn v. Dunn, -- F.R.D. --, 2016 WL 4718216 (M.D. Ala. Sept. 9, 2016) (Thompson, J.).  The claims in Phase 2B, which are set to go to trial after the Phase 2A claims (should they survive summary judgment), involve Eighth Amendment claims related to medical and dental care.

3.  In defendants' motion for summary judgment, they specify that they are requesting "judgment as a matter of law as to the claims of Named Plaintiffs." Motion for Summary Judgment (doc. no. 768) at 2.  In a footnote, defendants expressly define the phrase "Named Plaintiffs" by listing every individual prisoner plaintiff, but not ADAP.  Id. at 2 n.2.

3

the court.  The court will, at this time, decide the motion only as to the Phase 2A claims.[4]

As defendants requested summary judgment with regard to only individual plaintiffs, this opinion addresses only the claims by those individual prisoners, and hereinafter 'plaintiffs' refers to only individual plaintiffs, excluding ADAP.  The defendants' summary-judgment motion will be granted in part and denied in part.

---

4.  Both parties consented to the schedule of motions deadlines in this case, and to the simultaneous disposition of the motions for summary judgment and class certification.  In light of the need for extensive evidentiary development prior to considering class certification, this approach was both appropriate and necessary.  See Rubenstein, Newberg on Class Actions § 7:10 (5th ed.) (explaining that "Wal-Mart [Stores, Inc. v. Dukes, 564 U.S. 338 (2011),] authorized courts to look at the merits of a case in deciding the certification motion; that look at the merits may be aided by discovery, hence forestalling the certification decision to a point not dissimilar from the summary judgment point of a lawsuit"; and that "the Advisory Committee of Civil Rules, in 2003, changed the language of the timing rule [for decisions on class certification] from "as soon as practicable" to "at an early practicable time"; and that the (continued...)

# I.  Background

ADOC confines about 23,500 prisoners in 28 prison facilities, including 15 major facilities, which are close custody or medium custody, and 13 work release centers, which are minimum custody.  Of the major correctional facilities, Tutwiler is the only one that houses female prisoners.  At three of the major correctional facilities--Bullock, Donaldson, and Tutwiler--there are Residential Treatment Units ("RTUs"), which house mentally ill prisoners who need more direct monitoring and intensive treatment than is available in general population.  Bullock and Tutwiler also have Intensive Stabilization Units ("SUs"), which house mentally ill prisoners in need of direct monitoring and stabilization after crises.

Based on an intake screening, which takes place at Kilby for men and Tutwiler for women, prisoners receive

---

"Committee supported this change, in part, on the need (continued...)

a mental-health code ranging from MH-0, which indicates that a prisoner does not need any mental-health care, to MH-6, which indicates that a prisoner cannot be treated in ADOC custody and requires referral for inpatient treatment in a state hospital.  Codes of MH-1 to MH-2 are for prisoners who ADOC believes can be housed in general population, while the higher codes (MH-3 to MH-5) indicate that a prisoner should be housed in an RTU or SU.  Prisoners can also be added to the mental-health caseload during a post-intake classification review, based on a referral by staff, or by self-referral.  At different points in early 2016, the mental-health caseload included between 2,700 and 3,400 prisoners.

ADOC has contracted with MHM Correctional Services, Inc. (MHM) to provide mental-health services--including medication, individual counseling, and group therapy-- to mentally ill prisoners.  MHM's current contract with

_____

for discovery prior to certification").

ADOC went into effect on October 1, 2013. MHM's program in Alabama is led by Dr. Robert Hunter, who has been the Medical Director and Chief Psychiatrist since 2003, and Teresa Houser, who is the Program Manager (an administrative position) and has been working for MHM since 2008. MHM employs a range of mental-health providers, including psychiatrists, certified registered nurse practitioners (CRNPs), psychologists, 'mental health professionals' (MHPs), registered nurses (RNs), licensed practical nurses (LPNs), activity technicians (ATs), and clerical support staff.[5]

Although MHM provides virtually all of the mental-health treatment for prisoners, ADOC also employs two psychologists who assist with the intake process, 'psychological associates' who do some screening and may provide some therapeutic care to

---

5. The numbers and qualifications of, and the relationships among, these various categories of practitioners will be discussed at some length later in this opinion.

7

prisoners with very low-level mental illness,[6] and a chief psychologist who is responsible for oversight of mental-health staff.

Commissioner Jefferson Dunn, who took office in April 2015, leads the ADOC. Associate Commissioner for Health Services Ruth Naglich, who has served in this role since 2004, has a nursing license and 20 years of experience in correctional medicine. She is responsible for managing and overseeing ADOC's medical and mental-health services, including those services delivered by MHM.

## II.  Summary Judgment Standard

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(a) "if the movant shows that there is no genuine dispute as to any material fact and

---

6. These psychological associates are not psychiatrists or psychologists. There is conflicting record evidence regarding the role that they play-- specifically, as to whether they provide treatment to (continued...)

8

the movant is entitled to judgment as a matter of law."
With respect to issues where "the non-moving party
bears the burden of proof ... at trial [such as, here,
the merits of plaintiffs' claims], the moving party, in
order to prevail, must do one of two things: show that
the nonmoving party has no evidence to support its
case, or present affirmative evidence demonstrating
that the nonmoving party will be unable to prove its
case at trial." Hammer v. Slater, 20 F. 3d 1137, 1141
(11th Cir. 1994) (citation and internal quotation marks
omitted).

On issues as to which the movant has the burden of
proof at trial (such as, here, exhaustion of
administrative remedies), the movant "must show
affirmatively the absence of a genuine issue of
material fact: it must support its motion with credible
evidence that would entitle it to a directed verdict if
not controverted at trial." Rich v. Sec'y, Fla. Dep't

---

any prisoners who are actually on the mental-health
(continued...)

of Corr., 716 F.3d 525, 530 (11th Cir. 2013) (citation and internal quotation marks omitted).

Once the party seeking summary judgment has met its initial burden, the burden shifts to the nonmoving party to demonstrate why summary judgment would be inappropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986). The nonmoving party must affirmatively set forth specific facts showing a genuine issue for trial, and may not rest upon mere allegations or denials in pleadings. See Fed. R. Civ. P. 56(c)(1).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In making this determination, the court must view the evidence in the light most favorable to the nonmoving

_____

caseload, or only to prisoners who are not.

10

party, drawing all reasonable inferences in that party's favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); see also Am. Tel. & Tel. Co. v. Delta Commc'ns Corp., 590 F.2d 100, 101-02 (5th Cir. 1979) ("If a frog be found in the party punch bowl, the presence of a mischievous guest but not the occurrence of spontaneous generation may reasonably be inferred."). The court is not to weigh conflicting evidence or make credibility determinations at summary judgment. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996).

## III.  Procedural Arguments

### A.  Mootness

Defendants contend that the mental-health care claims of six of the named plaintiffs--Businelle, Carter, Dillard, Dunn, Moncrief, and Terrell--are due to be dismissed as moot, based on "'[t]he general rule ... that a prisoner's transfer or release from a jail moots his individual [and pre-certification class]

11

claim for declaratory and injunctive relief'" regarding conditions of confinement.[7]   <u>Dunn v. Dunn</u>, 148 F. Supp. 3d 1329, 1337 (M.D. Ala. 2015) (Thompson, J.) (quoting <u>McKinnon v. Talladega Cty.</u>, 745 F.2d 1360, 1363 (11th Cir. 1984)).   Plaintiffs argue that none of these plaintiffs' pre-certification class claims are moot because: (1) all of them but Terrell have been conditionally released and are subject to the terms of probation or parole, (2) Dunn has been arrested and charged with another crime, making it likely that he will be incarcerated again either if he is convicted of that crime or if his parole is revoked, (3) Businelle is subject to the "picking-off" exception to mootness for pre-certification class claims; and (4) Dillard's, Moncrief's, and Terrell's claims fall within the

---

7.   Although defendants also contend that some of the named plaintiffs' claims regarding medical care have been mooted by the provision--subsequent to the filing of the lawsuit--of care they requested, defendants have not raised such an argument with respect to any mental-health claims.   As a result, the court need not address this contention here. (continued...)

"inherently transitory" exception to mootness for pre-certification class claims. All of these arguments fail; therefore, the court will dismiss these named plaintiffs.[8]

The court easily rejects the first of these arguments. Plaintiffs cite no case law for the proposition that a prisoner released on probation or parole remains, as they contend, in the custody of the Department of Corrections; he certainly does not remain in its custody for purposes relevant here, since he is free to receive free-world mental-health care and cannot receive mental-health care provided by the Department. Although plaintiffs note generally that there are high rates of recidivism among state prisoners and that three individuals have previously been re-incarcerated, they have not attempted to

_____

8. Plaintiffs remain free, of course, to call these individuals as witnesses and to offer evidence about their care in proving their case at trial. They will not, however, remain parties to the case.

13

explain the relevance of this information to any
exception to mootness, instead suggesting that they
remain free to proceed on claims to the same extent as
if they were still imprisoned.

Plaintiffs also contend that Dunn's claims are not
moot because they fall within the "capable of
repetition, yet evading review" exception to mootness
for individual claims. Weinstein v. Bradford, 423 U.S.
147, 149 (1975). Based on Honig v. Doe, 484 U.S. 305,
317-23 (1988), they argue that there is a "reasonable
expectation" that Dunn will again be subject to the
challenged conduct. He has been arrested and charged
with a felony, and they contend that he is likely
either to be convicted of this offense or to have his
parole revoked. In either event, plaintiffs argue, he
will be returned to the custody of defendants and again
subject to their mental-health care system. Plaintiffs
have not submitted any record evidence to support these
claims. But even if they had submitted evidence to
this effect, plaintiffs' reliance on the "reasonable

14

expectation" standard elaborated upon in <u>Honig</u> would be misplaced.  A party seeking to employ the exception for claims that are "capable of repetition, yet evading review" must show "two elements combined: (1) the challenged action was, in its duration, too short to be fully litigated prior to its cessation or expiration, <u>and</u> (2) there was a reasonable expectation that the same complaining party would be subject to the same action again."  <u>Murphy v. Hunt</u>, 455 U.S. 478, 482 (1982) (emphasis added).  <u>Honig</u> addresses, and plaintiffs have addressed, only the latter of these two elements; Dunn has not shown that the duration of a future term in prison would be "so short as to evade review." <u>Spencer v. Kemna</u>, 523 U.S. 1, 18 (1998).

Plaintiffs next argue that Businelle's claims are subject to the "picking-off" exception because he was denied parole in May but granted it in September, just as class-certification briefing was in progress.  <u>See</u> <u>Zeidman v. J. Ray McDermott & Co.</u>, 651 F.2d 1030, 1050 (5th Cir. 1981) (finding that the relation-back

15

doctrine applies to defeat mootness with respect to class claims "when the defendants have the ability by tender to each named plaintiff effectively to prevent any plaintiff in the class from procuring a decision on class certification"); see also Stein v. Buccaneers Ltd. P'ship, 772 F.3d 698, 706-07 (11th Cir. 2014) (recognizing this as the law of the Eleventh Circuit). Although this quick reconsideration is perhaps somewhat suspicious, plaintiffs have not offered any evidence to show that defendants or their employees were in any way responsible for or involved in the decision by the independent parole board to grant him release.   Without any such evidence, the court cannot conclude that the exception applies.[9]

_____

9.  Although there is some support in the case law for application of this exception even when there is no evidence that the defendant actually did act with the intent of picking-off the plaintiffs at issue, see White v. Matthews, 559 F.2d 852, 857 (2d Cir. 1977), when the defendant could easily have acted in this fashion to prevent certification, plaintiffs have cited no case law suggesting either that the exception applies to acts other than those "specific[ally] ... (continued...)

Finally, plaintiffs' fourth argument--that the claims of Dillard, Moncrief, and Terrell fall within the exception to mootness for inherently transitory class claims--fares no better.  As the court explained in detail in a prior opinion: "A claim is inherently transitory not only if there <u>exists</u> no plaintiff who could both establish standing at the outset of litigation and retain an active stake by the time class certification is decided, but also if it would be difficult to identify <u>which</u> prospective plaintiff that would be at the time of filing.  As the Supreme Court explained in <u>Gerstein v. Pugh</u>, a claim should be considered inherently transitory when '[i]t <u>is by no means certain</u> that any given individual, named as plaintiff, would be in ... custody long enough for a

---

demanded in the lawsuit."  <u>Zeidman</u>, 651 F.3d at 1050-51.   In other words, while the picking-off exception would squarely apply to decisions by defendants to provide health care the named plaintiffs alleged they had long been denied, it is not clear that it applies to parole decisions not challenged in the lawsuit.

district judge to certify the class.'  420 U.S. 103, 110 n.11 (1975) (emphasis added).  Both the Second and Seventh Circuits have held that, although 'the ultimate length of confinement does affect the applicability of the 'inherently transitory' exception, the essence of the exception is <u>uncertainty</u> about whether a claim will remain alive for any given plaintiff long enough for a district court to certify the class.'"  <u>Dunn</u>, 148 F. Supp. 3d at 1340 (quoting <u>Olson v. Brown</u>, 594 F.3d 577, 582 (7th Cir. 2010) (emphasis added), and citing <u>Zurak v. Regan</u>, 550 F.2d 86, 90-92 (2d Cir. 1977); and <u>Thorpe v. District of Columbia</u>, 916 F. Supp. 2d 65, 67 (D.D.C. 2013) (Huvelle, J.)).

Although claims that "derive from potentially imminent release from custody are 'a classic example of a transitory claim,'" <u>id</u>. (quoting <u>Wade v. Kirkland</u>, 118 F.3d 667, 670 (9th Cir. 1997)), plaintiffs have endeavored to identify another category of issues that they contend are inherently transitory: those related to the mental-health care provided in ADOC's RTUs.

18

They note that there were only about 200 male prisoners housed in the RTUs at the time the complaint was filed, and have suggested that the prisoners frequently move into and out of the RTUs.

But the question here is not whether incarcerated plaintiffs who are not currently housed in the RTUs but have been in the past and may be again in the future can challenge the level of treatment provided in those units.  Instead, the question is whether plaintiffs who have been released from custody altogether can challenge certain conditions they experience in prison. Defendants point out that there are a number of easily identifiable prisoners who are virtually certain to remain in custody for years (because they are serving extremely long sentences, including in some instances life without the possibility of parole) and who have experienced or are likely to experience, and can therefore properly challenge, the conditions in the RTUs going forward.  Indeed, some of these prisoners remain as named plaintiffs in this case.

19

Plaintiffs also contend that Dillard and Terrell also represent a small number of prisoners who are both mentally ill and intellectually disabled. But plaintiffs fail to explain why the claims of such prisoners are inherently transitory; the fact that there are relatively few of them (how many, plaintiffs do not say) is not enough. Although the court can imagine ways in which the provision of mental-health care to prisoners with intellectual disabilities is shaped by those disabilities, it is not aware that plaintiffs have made any allegations in their complaint of systemic problems specific to this circumstance.[10] Dillard's, Moncrief's, and Terrell's claims are therefore not inherently transitory.

_____

10. The due-process claims raised by Dillard and Terrell do appear potentially to relate to their intellectual disabilities, to the extent that these disabilities may impact their ability to give informed consent to medication. Because the court will not be certifying this portion of plaintiffs' due-process claim for class-wide adjudication, it does not matter whether or not the due-process class claims these two named plaintiffs brought are moot.

## B.  Exhaustion

Defendants contend that many of the named plaintiffs have failed to exhaust administrative remedies and that their claims are therefore barred. They rely for evidence on the admissions of seven named plaintiffs (Businelle, Carter, Jackson, McCoy, Moncrief, Wallace, and Williams) in their depositions that they did not file a mental-health grievance within the last five years; the declaration of an MHM employee that a review of MHM files revealed another five named plaintiffs (Bui, Dillard, Hardy, Johnson, and Pruitt) who did not file a mental-health grievance between January 1, 2012, and July 1, 2014; and plaintiffs' admission that another (Hartley) never filed a grievance with respect to his claims in this case.[11]

---

11. These plaintiffs did not concede that there was a grievance process available to them with respect to these claims. Moreover, "[w]hether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's (continued...)

21

Defendants do not contend that one of the remaining
Phase 2A plaintiffs (Braggs) failed to exhaust.

The Prison Litigation Reform Act (PLRA) imposes the
following exhaustion requirement: "No action shall be
brought with respect to prison conditions under section
1983 of this title, or any other Federal law, by a
prisoner confined in any jail, prison, or other
correctional facility until such administrative
remedies as are available are exhausted."  42 U.S.C.
§ 1997e(a).   The Supreme Court has squarely held that
exhaustion is an affirmative defense, on which
defendants bear the burden of proof.  Jones v. Bock,
549 U.S. 199, 216-17 (2007).  And, as the Supreme Court
recently reiterated, proper exhaustion is a mandatory
predicate to suit, with one exception: administrative
remedies must be "available," meaning that "an inmate

---

suit, are not questions of fact.  They either are, or
inevitably contain, questions of law ... [which] [t]he
court cannot properly determine ... on the basis of a
party's concession...."  Snider v. Melindez, 199 F.3d
108, 113-14 (2d Cir. 1999).

is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" <u>Ross v. Blake</u>, 136 S. Ct. 1850, 1858-59 (2016) (quoting <u>Booth v. Churner</u>, 532 U.S. 731, 738 (2001)).

Defendants have not borne their burden of proof with respect to any of the named plaintiffs at issue in Phase 2A for a number of reasons. As a preliminary matter, it is critical to note that ADOC is a highly unusual state prison system, in that it does not operate its own general grievance process for prisoners; therefore, the question is whether a grievance process operated entirely by MHM, which is not a general grievance process and functions without any involvement by correctional officials, was available for exhaustion of the specific claims in this case, which are brought only against correctional officials. <u>See</u> <u>Henderson v. Thomas</u>, 1311 (M.D. Ala. 2012) (Thompson, J.) ("[W]ith no generalized grievance system, ADOC inmates have lost 'a way of attempting to

23

improve prison conditions without having to file a lawsuit.'   In turn, corrections officials 'lose the substantial benefits that administrative remedies were intended to provide them.'" (quoting <u>Turner v. Burnside</u>, 541 F.3d 1077, 1084-85 (11th Cir. 2008))).

Of course, the court recognizes that the PLRA's exhaustion requirement, unlike the pre-PLRA requirement, does not require that administrative remedies be "effective," and contains no futility exception.  <u>Alexander v. Hawk</u>, 159 F.3d 1321, 1326 (11th Cir. 1998).  Again, Alabama is an outlier; it is one of the few "state penal institutions [that do] not have an administrative remedy program to address prison conditions, and thus there are no 'available' administrative remedies to exhaust" with respect to many conditions-related claims.  <u>Id</u>. at 1327.  Instead, ADOC's contractors have provided (or not, in light of the discussion below) grievance processes for discrete issues.  Obviously, the provision of a grievance procedure with respect to one issue does not result in

24

a requirement that prisoners exhaust it as to all issues; the court is forced to determine which issues are covered and which are not.[12]

With respect to plaintiffs' claims that defendants' policies of custodial understaffing, and placement of prisoners in prolonged segregation without regard to their mental illness, create a substantial risk of serious harm by impeding access to, and increasing demand for, mental-health care, the grievance process was obviously not available; MHM has nothing to do with custodial staffing and the placement of prisoner in segregation. As this court explained in Henderson, in

_____

12. Defendants cite to this court's decision in Edwards v. Ala. Dep't of Corr., 81 F. Supp. 2d 1242, 1256-57 (M.D. Ala. 2000), for the proposition that "[r]egardless of their chances of success using the defendants' grievance procedures, the PLRA requires the plaintiffs to exhaust them." This statement is accurate, with one caveat: prisoners need not exhaust when the chance of success is zero, because the grievance process at issue does not encompass the subject of the prisoner's complaint. (At the time Edwards was decided, ADOC did offer its own, all-encompassing grievance process. This no longer exists.)

concluding that the medical-grievance process operated
by ADOC's medical care contractor was not available
with respect to "broader disputes about ADOC housing
and transfer policy" and could not "be used to complain
to prison officials--as opposed to the Correctional
Medical Services personnel--about accommodations
policy," "defendants have submitted no evidence that
the medical professionals reviewing the medical
grievance forms had any authority over nonmedical
issues or ADOC policy more generally. Allowing ADOC to
characterize the medical grievance process as a
generalized system would bait-and-switch the
plaintiffs." 891 F. Supp. 2d at 1310-11 (citation
omitted).

The same argument can fairly be made with respect
to plaintiffs' contentions that defendants are
prospectively violating the Eighth Amendment by
providing in their contract with MHM for too little
funding and too few qualified practitioners. Even were
it true (this issue is taken up later) that MHM made

available a grievance process for plaintiffs to challenge discrete instances of inadequate care at the hands of practitioners employed by MHM, there is no evidence to suggest that MHM administrators had any authority unilaterally to increase their own contractual funding or staffing levels (indeed, it is plain that they did not). Booth explains that although the precise form of relief requested by a prisoner need not be available in order for him to be required to exhaust a grievance procedure (for example, when a prisoner demands monetary compensation but this form of redress cannot be provided), a grievance process is not available when "the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." 532 U.S. at 736. Booth goes on to elaborate that the administrative officers hearing the grievance must have some "authority to act on the subject of the complaint," and take some responsive action "with respect to the type of allegations ... raise[d]." Id.

27

at 736 n.4 (emphasis added).  The officers' ability to
do something is not enough; they must have the ability
to do something <u>responsive</u>.  Here, MHM plainly has no
authority to give any relief at all with respect to the
funding and staffing levels set by defendants; if a
grievance were filed requesting such action, MHM would
surely "disclaim[] the capacity to consider those
petitions." <u>Ross</u>, 136 S. Ct. at 1859.[13]

---

13. Compare, for example, the process defendants
have put forward to the process at issue in <u>Lopes v.</u>
<u>Beland</u>, 2014 WL 1289455 (D. Mass. Mar. 29, 2014)
(Casper, J.).  In that case, the plaintiff was granted
a single-cell restriction based on a medical condition
that rendered it unsafe for him to be housed with a
cellmate, but then filed suit against both correctional
and medical contractor defendants, contending that this
restriction was sometimes violated.  The state
Department of Corrections maintained a general
grievance process, but carved out claims regarding
"medical ... decisions," and required grievances
regarding such issues to be filed with the medical
contractor, which maintained its own grievance process.
<u>Id</u>. at *2 (citation and quotation mark omitted).  The
court suggested that the failure to exhaust this
process might not have barred suit (even against the
medical contractor itself) if the contractor's
grievance process had not allowed prisoners a final
appeal to correctional officials, because then the
"prison grievance tribunal would [not] have had any
(continued...)

This is vividly illustrated by the fact that, although MHM initially submitted a proposal in 2013 for staffing of 144.95 full-time equivalent positions, based on its own assessment of the level needed to provided appropriate care to prisoners across the system, it eventually had to reduce that figure substantially, to 126.5, because MHM was informed by defendants that "the department ... wouldn't be able to fund that many employees."[14]   Houser Depo., P Ex. 14

_____

authority to take some responsive action to [the inmate's] complaints." Id. at *7 (citation omitted).

14. The court raised for consideration by the parties the question whether a grievance process is available with respect to claims against correctional defendants when it is operated entirely by a contractor. See Lopes, 2014 WL 1289455, at *6 (denying summary judgment to correctional defendants based on a finding that they had failed to meet their burden to show that the plaintiff had not exhausted correctional administrative remedies, while granting summary judgment to medical-contractor defendants based on a finding that they had met their burden to show that the plaintiff had failed to exhaust the contractor's grievance process). However, the court need not reach this issue, because it finds that defendants have not satisfied their burden to show the existence of an available grievance process.

(doc. no. 675-14) at 298.[15]   Houser, MHM's Program
Manager, testified that she has repeatedly requested
additional funding for staffing, but that her requests
have been denied due to budgetary constraints.

With regard to both the policies and practices
discussed above and the policies and practices over
which MHM does have control, the court further
concludes that even the grievance process that MHM
purports to operate is not available for purposes of
the PLRA because it is "so opaque that it becomes,
practically speaking, incapable of use," because,
although "some mechanism exists to provide relief," it
is "so confusing" that "no ordinary prisoner can
discern or navigate it."   Ross, 136 S. Ct. at 1859
(citation and quotation marks omitted) (explaining that
the "procedures need not," however, "be sufficiently

_____

15. 'P Ex.' hereinafter refers to exhibits attached
to plaintiffs' opposition to defendants' motion for
summary judgment or plaintiffs' motion for class
certification.   'D Ex.' refers to exhibits attached to
defendants' motion for summary judgment.

'plain' as to preclude any reasonable mistake or debate with respect to their meaning").

As an initial matter, plaintiffs point out that the only evidence defendants offered as to the existence of a grievance process for mental health-related claims at the relevant juncture (when the case was filed in 2014) was the declaration of MHM's Program Manager, Teresa Houser, attaching and referencing a grievance policy approved in July 2016.  This policy said nothing about what grievance process did or did not exist two years earlier.  See Smith v. Terry, 491 F. App'x 81, 83 (11th Cir. 2012) (per curiam) ("The only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed his original complaint.").  In reply, defendants have submitted a similar document they say--notably, without offering a supplemental declaration from Houser--was in effect since 2009.

Even if this policy were in effect, defendants have still failed to meet their burden to show that an

ordinary prisoner could figure out how to use it. As a
preliminary matter, Houser testified that prisoners are
informed of the mental-health grievance process when
they receive "a form entitled Orientation to Mental
Health Services," which, she says, "describe[es] the
grievance processes and procedures." Houser Decl., D
Ex. 143 (doc. no. 782-37) at 3. This statement
contorts the meaning of the word 'describe' well past
its breaking point. All the form tells prisoners is
this: "If you believe the mental health services
provided to you are inadequate, you may file an inmate
grievance." Inmate Orientation to Mental Health
Services, P Ex. 170 (doc. no. 850-70) at 2. It does
not tell prisoners anything about how to file such a
grievance (or how to distinguish it from any other form
of inmate grievance): this 'description' does not
reveal what form the grievance should be composed on,
to whom it should be given and by what means, what
information should be included, who will review it and

how quickly, and whether there is any process of appeal.

There is no evidence to suggest that MHM's written grievance policy was made available to prisoners; even if it was, the policy is not substantially more informative. It states that a prisoner "may file a formal grievance by completing the relevant form."[16] MHM Grievance Mechanisms for Health Complaints, D Ex. 182 (doc. no. 877-3), at 2, Dunn(MHM) 00071. Aside from the fact that this opaque boilerplate does not reveal which form is the "relevant" one, there is a further problem in practice: Houser stated in her deposition that the form prisoners are to use is actually the <u>medical</u> grievance form provided by Corizon, which is actually a grievance form produced by (and displaying the name of) Corizon's predecessor,

---

16. The court notes that this was changed, in the 2016 policy, to refer instead--but not much more informatively--to "the client-authorized form." 2016 Grievance Mechanism for Health Complaints, D Ex. 143 (doc. no. 782-37) at 9.

Correctional Medical Services.  If the requirement that a prisoner submit a form issued by one contractor, and used to file grievances with another, to yet a third contractor, not named on the form, were not enough to confound even the most intelligent and diligent of prisoners, there is still more.  The form Houser says should be used includes checkboxes to identify "the type of grievance you are filing," but the only two options are "Medical Grievance" and "Medical Grievance Appeal."  Grievances of William Sullivan, P Ex. 165 (doc. no. 683-5) at 1, PLF002101.  Apparently, defendants believe that prisoners should have surmised that they needed to cross out "Medical" and write "Mental Health," or that they should simply have created a new, third checkbox to indicate the topic of their grievances.

Moreover, MHM's current policy states that "[f]ormal grievances related to mental health services may not be received directly by mental health staff but may be sent to the designated institutional

department."    MHM  Grievance  Mechanism  for  Health
Complaints, D. Ex 182 (doc. no. 877-3) at 2, Dunn(MHM)
00071.  Unfortunately, the policy does not reveal what
the  designated  institutional  department  is,  or  how  a
prisoner  should  "send"  his  grievance  to  it.    Houser
stated  in  her  deposition--directly  contrary  to  the
written  policy  she  cited--that  a  prisoner  who  has
completed a grievance form should "either put it in the
in-house  mail  or  hand  it  to  us  when  they  see  us."
Houser Depo. (doc. no. 996-17) at 22.  Defendants have
not  offered  evidence  to  show  that  either  of  these
avenues  for  submission  is  disclosed  to  prisoners  in  any
way;  indeed,  one  is  forbidden  by  the  very  policy
defendants  say  reveals  how  the  process  works.    While
the  PLRA  might  not  require  a  grievance  process  that  is
completely  clear  and  easy  to  follow,  it  does  not
countenance  one  that  is  so  full  of  blind  alleys  and

dead ends that even those who run it cannot manage to accurately and consistently describe how it works.[17]

If a prisoner were able to determine how to file a grievance properly, it would be by sheer lucky guesswork. The fact that the court remains uncertain as to how a prisoner attempting to file a mental-health grievance should indicate as much on the form and how he should submit the form makes clear that this process

_____

17. The court notes that there are even more ways in which MHM's policy and the statements of Houser leave this court (and certainly an ordinary inmate) largely in the dark as to how its grievance process operates once a grievance is filed. For example, although the policy states that "[u]pon receipt of a grievance related to mental health services, staff forward it to the Program [Manager] or designee," it is logged, and the Program [Manager] or designee responds in writing, MHM Grievance Mechanism for Health Complaints, D. Ex 182 (doc. no. 877-3) at 2, Dunn(MHM) 00071, Houser--who is the Program Manager--testified that all grievances are actually taken initially to the site administrator, who "determine[s] what--what needs to happen next," and "make[s] a decision on how to go about handling it at that point." Houser Depo. P Ex. 181 (doc. no. 850-81) at 45-46. This statement strongly suggests that the procedures outlined in the policy are not consistently followed.

is not "available."[18]   Indeed, it appears that prisoners

do not understand that a mental-health grievance

process exists; two named plaintiffs, Businelle and

Jackson, testified to this effect.[19]   Although Houser

contends that the process must be understood because

"inmates ... submit grievances on a regular basis,"

_____

18. Plaintiffs also argue that the court should consider the fact that the prisoners at issue have serious mental illnesses in determining whether the grievance process was so confusing as to be unavailable to them.   However, even setting aside the potentially impaired cognitive abilities of the prisoners at issue, the court concludes on the current record that this grievance process is so poorly, confusingly, and inconsistently described that it is not available to any prisoner.   Hence, the court need not address this argument at this time.

19. Defendants are correct that a prisoner's mere assertion that he was unaware of the existence of a grievance procedure does not support a finding of unavailability in the face of system-wide evidence of its availability.   Edwards, 81 F. Supp. 2d at 1256. Here, the statements to this effect by two named plaintiffs are powerfully corroborated, rather than rebutted, by system-wide evidence of un-availability. The court also notes the striking disparity between the testimony of the numerous named plaintiffs regarding their awareness of a medical grievance process, and the testimony that they were not aware of a mental-health grievance process.

37

Houser Decl., D Ex. 143 (doc. no. 782-37) at 3,
plaintiffs have presented considerable evidence to the
contrary.   Although MHM's current policy states that
MHM's quality improvement program reviews grievances,
plaintiffs note that not a single filed grievance was
referenced in the minutes of MHM's quality improvement
meetings until October 2014 (after this case was
filed).   More damning still, MHM's own annual audit in
2014 documented that three major facilities had logged
no grievances at all that year, and that "MHM Site
Administrators indicated that they rarely receive
grievances."[20]   MHM 2014 Audit, P Ex. 177 (doc. no.
850-77) at 10, ADOC0140892-9.   In 2013, the audit

---

20. One of these facilities, Bullock, houses many
of the most severely mentally ill prisoners in the
system.  As the court is well aware from its own pro se
docket, prisoners are not reluctant to complain about
the care they are receiving.  Whether or not
constitutionally adequate mental-health care is being
provided at Bullock, it frankly beggars belief to
imagine that mentally ill prisoners housed there were
aware of a grievance process but not a single one opted
to use it over the course of the year in which this
case was filed.

revealed that "[g]rievance logs were found at most facilities, many of which included no grievances." MHM 2013 Audit, P Ex. 178 (doc. no. 850-78) at 14, ADOC0141610-13. Apart from raising concern as to why grievance logs were not found at <u>all</u> facilities, these audit findings further corroborate plaintiffs' contention that it is the very rare prisoner who is aware that he is permitted to file a grievance with MHM and can manage to figure out how to do so.[21]

Three additional points warrant mentioning with respect to exhaustion of plaintiffs' Eighth Amendment claims. First, the court notes that even if MHM's grievance process were available with respect to some

---

21. Defendants do cite to an unreported <u>pro</u> <u>se</u> case in which a magistrate judge of this court recommended dismissal of a mental-health claim as unexhausted on the basis of MHM's grievance process. <u>See</u> <u>Hayes v. Giles</u>, 2010 WL 4975619, at *7-8 (M.D. Ala. Oct. 28, 2010) (Capel, M.J.), <u>as adopted</u>, 2011 WL 22634 (M.D. Ala. Jan. 4, 2011) (Fuller, J.). But the <u>pro</u> <u>se</u> plaintiff in this case did not dispute the availability of a grievance process or his failure to exhaust it. As explained above, defendants bear an affirmative burden to show availability, and they have not met it.

or all of the claims at issue (again, it is not),
defendants evidence would be inadequate to establish
that plaintiffs have not exhausted it.  This is because
their evidence shows only that they did not file
grievances regarding their mental-health care over
spans of a few years.  As discussed below, with respect
to the statute of limitations arguments raised by
defendants, plaintiffs claim continuing violations
arising from policies or practices they say (and have
offered evidence to show) have existed for some years.
"In order to exhaust their remedies, prisoners need not
file multiple, successive grievances raising the same
issue (such as prison conditions or policies) if the
objectionable condition is continuing."  Turley v.
Rednour, 729 F.3d 645, 650 (7th Cir. 2013) (citing,
among other cases, Parzyck v. Prison Health Servs.
Inc., 627 F.3d 1215, 1219 (11th Cir. 2010) (a prisoner
is "not required to initiate another round of the
administrative grievance process on the exact same
issue each time" a deprivation occurs), and Johnson v.

<u>Johnson</u>, 385 F.3d 503, 521 (5th Cir. 2004)
("[P]risoners need not continue to file grievances
about the same issue.")).   In order to bear their
burden to show that plaintiffs had not exhausted, they
would need to show that they had never filed grievances
about the issues in this lawsuit.   This they have not
done.

Second, the Eleventh Circuit has recognized that "a
class of prisoner-plaintiffs certified under Rule
23(b)(2) satisfies the PLRA's administrative exhaustion
requirement through 'vicarious exhaustion,' i.e., when
one or more class members ha[s] exhausted his
administrative remedies with respect to each claim
raised by the class." <u>Chandler v. Crosby</u>, 379 F.3d
1278, 1287 (11th Cir. 2004) (alteration in original,
citation and internal quotation marks omitted).   Here,
because the court has, in conjunction with its denial
of summary judgment, certified a Rule 23(b)(2) class,
and because defendants do not raise the affirmative
defense of exhaustion with respect to the mental-health

claims brought one of the remaining named plaintiffs (Braggs), vicarious exhaustion might well apply to some or all of plaintiffs' claims.

Third and finally, the court notes that, while ADOC has no general grievance process, there does exist a formal process for appealing an involuntary-medication order. Defendants did not argue in their motion for summary judgment that the plaintiffs who raise due-process claims regarding involuntary medication have failed to exhaust this process. In any event, the one plaintiff who is actually subject to an involuntary-medication order, Bui, has filed an appeal of this order, so he appears to have exhausted this administrative remedy, assuming it is available. This appeals process is plainly not applicable to the remaining plaintiffs bringing due-process claims, who contend that the consent they gave was not voluntary, because they have not been afforded hearings or received orders and therefore have nothing to appeal.

**42**

## C.  Statute of Limitations

Defendants contend that summary judgment is due to be granted with respect to plaintiffs Hardy and McCoy, because their claims are barred by the statute of limitations.[22]  The statute of limitations for a § 1983 claim is determined by reference to state law; the court looks to the limitations period for personal injury torts.  Wallace v. Kato, 5498 U.S. 384, 387 (2007).  In Alabama, it is two years.  However, it is federal law that determines when the cause of action accrues--that is, when the clock begins to run.  Id. at 388.

"Generally, accrual occurs when the prisoner knows or should know that he has suffered the injury that forms the basis of his complaint and can identify the person who inflicted the injury.  Chappell v. Rich, 340 F.3d 1279, 1283 (11th Cir. 2003).  However, an

---

22. Defendants also raise this argument with respect to Dillard.  Because his claims are moot, the court need not address him further here.

43

'allegation of a failure to provide needed and requested medical attention constitutes a continuing tort, which does not accrue until the date medical attention is provided.' <u>Lavellee v. Listi</u>, 611 F.2d 1129, 1132 (5th Cir. 1980). The critical distinction in the continuing violation analysis is whether the prisoner complains 'of the present consequence of a one[-]time violation, which does not extend the limitations period, or the continuation of that violation into the present, which does.' <u>Lovett v. Ray</u>, 327 F.3d 1181, 1183 (11th Cir. 2003) (internal quotation marks omitted)." <u>Baker v. Sanford</u>, 484 F. App'x 291, 293 (11th Cir. 2012).

Plaintiffs have alleged just such a continuing violation; they seek prospective injunctive relief to remedy a substantial risk of serious harm that they contend has existed for some time and continues to exist. Given that the risk itself is the injury plaintiffs allege, the two challenged by defendants on this point need not actually demonstrate that this risk

**44**

has resulted in harm to them within the past two years. See Robinson v. United States, 327 F. App'x 816, 818 (11th Cir. 2007) (holding that "continuing to expose [the plaintiff] to the source of his [infection] ... was a continuing violation," presumably because it created a risk of reinfection). A prisoner can bring a claim that correctional administrators have acted in a way that creates a substantial risk of future harm even though that harm has never yet occurred; it would be nonsensical, then, to conclude that once some harm has occurred, a prisoner must bring a claim within a certain period of time, even though the conduct of the defendants that is creating the risk continues unabated. Plaintiffs in this case must, of course, show more than that the conduct of defendants creating the risk of harm occurred at the time of filing or at some point within the two years before the case was filed; they must, because they seek prospective relief against official-capacity defendants, show that this conduct is still ongoing.

45

As another court recently put it, "[d]efendants'
statute of limitations argument wholly ignores the
fundamental nature and substance of the Plaintiffs'
Eighth Amendment claim.  ...  Plaintiffs brought suit
to terminate an ongoing systemic pattern and practice
of failure to provide constitutionally adequate
[mental-health] care on the part of [the Department of
Corrections] and its contractual providers.  Plaintiffs
allege that the unlawful conduct was continuing as of
the date the lawsuit was filed, and that it continues
as of today.  The particular episodes of deficient
[mental-health] care alleged in the complaint are not
invoked as separate claims for relief, seeking recovery
on the basis of separate instances of compensable harm.
On the contrary, the examples of alleged sub-standard
care set forth in Plaintiffs' pleadings--which are now
supported by sworn declarations, deposition testimony,
and other competent record evidence--are offered as
corroboration for Plaintiffs' assertion that [ADOC] has
engaged in an ongoing pattern and practice of wrongful,

46

unconstitutional acts and omissions reflecting deliberate indifference to the serious medical needs of the prisoners residing [in their facilities]." Scott v. Clarke, 64 F. Supp. 3d 813, 826 (W.D. Va. 2014) (Moon, J.).

The court need not address Hardy, as it finds that he has not demonstrated the existence of a current, serious mental-health care need. (This issue is discussed below.) However, the court concludes that the statute of limitations does not bar McCoy's claims.

Defendants misperceive (or ignore) much of the substance of the claims brought by McCoy. They address only his involuntary-medication claim, and assert that he is disputing the procedures used to issue an involuntary-medication order in 2005. However, McCoy's claim actually revolves around his contention that he did not give voluntary and informed consent to medication injected into him in 2013 and 2014, well within the statute of limitations period. Moreover, with respect to McCoy's Eighth Amendment claim, he has

47

clearly alleged, and offered evidence to show, an ongoing denial of adequate treatment; Dr. Burns specifically cited him as someone whose acute and disabling mental illness was not, at the time of her inspection, receiving an appropriate level of treatment.[23]

### D.  Preclusion

The one named plaintiff involved in Phase 2A of this case with respect to whom defendants raise a preclusion argument is Pruitt.   However, his mental-health claims are not barred by this prior litigation.   Indeed, defendants' motion for summary judgment is ambiguous as to whether they even contend that Pruitt's mental-health claims, as opposed to his

---

23. Additionally, McCoy is free to offer evidence regarding events that occurred more than two years before this case was filed, as "[s]tatutes of limitations do not operate as an evidentiary bar controlling the evidence admissible at the trial of a timely-filed cause of action."  Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 346 (4th Cir. 1994).

medical care claims, are precluded.  Assuming, out of

an abundance of caution, that defendants do make such

an argument, the court explains below why it fails.

As defendants correctly explain, res judicata

(claim preclusion) prohibits "successive litigation of

the very same claim," New Hampshire v. Maine, 532 U.S.

742, 748 (2001), and applies "not only to the precise

legal theory presented in the prior case, but to all

legal theories and claims arising out of the same

nucleus of operative fact.'"  NAACP v. Hunt, 891 F. 2d

1555, 1561 (11th Cir. 1990).[24]  Collateral estoppel

(issue preclusion) bars relitigation of an issue when

the same issue was raised and actually litigated in a

prior suit, and the court's decision as to that issue

was necessary to the final resolution of the suit.  See

---

24. Res judicata also requires an identity of
parties; defendants argue that this requirement is
satisfied because some the defendants in the suit
previously filed by Pruitt were employees of, and
therefore in privity with, the defendants in this case.
The court need not reach this issue.

49

*Mike Smith Pontiac, GMC, Inc. v. Mercedez Benz of N. Am., Inc.*, 32 F.3d 528, 532 (11th Cir. 1994).

Here, Pruitt's prior suit was, quite obviously, totally unrelated to his claims in the present case. In 2009, he filed a pro se complaint against the warden of the facility where he was housed and a number of correctional officers.  This complaint makes no mention of mental-health care; instead, he complains about a particular, discrete incident, during which correctional officers allegedly kicked him out of a medical ward while he was in pain and awaiting testing for kidney stones, physically assaulted him, and then denied him access to care for his resulting injuries. The issues raised in that suit--whether the alleged actions occurred and whether they constituted violations of his constitutional rights--are entirely irrelevant to Pruitt's claim that he is currently being subjected to a substantial risk of serious harm due to the deliberate indifference of the Commissioner and Associate Commissioner to the serious mental-health

needs of prisoners in their custody.  The only thing connecting these two cases is that they have something to do with Pruitt's health during his incarceration. His current claims are not precluded.

### IV.  Substantive Arguments

#### A.  Eighth Amendment

##### 1.  Standard

Defendants adamantly insist that plaintiffs have not pursued a proper theory of Eighth Amendment liability because they seek to prove that defendants, by providing a deficient system of mental-health care, have created a substantial risk of serious future harm to mentally ill prisoners in their custody.  In light of their erroneous belief that such a showing would not support liability, defendants have proceeded in their summary judgment briefing as if plaintiffs have brought a case focused on obtaining specific treatment for their individual mental-health problems.  Before addressing defendants' arguments regarding the

sufficiency of plaintiffs' evidence, the court will detour to explain why plaintiffs' actual theory of the case is well-supported by the case law.  The court will discuss this precedent at some length because a clear understanding of its framework will facilitate the orderly and efficient presentation of the parties' evidence at trial.

One of the well-recognized ways that prison officials can violate the Eighth Amendment is by failing to provide prisoners with minimally adequate health care.  This is because prisoners "must rely on prison authorities to treat [their] medical needs; if the authorities fail to do so, those needs will not be met."  Estelle v. Gamble, 429 U.S. 97, 103 (1976). "Federal and state governments therefore have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration."  Harris v. Thigpen, 941 F.2d 1495, 1504 (11th Cir. 1991).  However, "an inadvertent failure to provide adequate medical care cannot be said to

constitute an unnecessary and wanton infliction of pain
or to be repugnant to the conscience of mankind.  ...
Medical malpractice does not become a constitutional
violation merely because the victim is a prisoner.  In
order to state a cognizable claim, a prisoner must
allege acts or omissions sufficiently harmful to
evidence deliberate indifference to serious medical
needs.  It is only such indifference that can offend
evolving standards of decency in violation of the
Eighth Amendment."   Estelle, 429 U.S. at 105-06
(citations and internal quotation marks omitted).

Moreover, it is clear that "[f]ailure to provide
basic psychiatric and mental health care states a claim
of deliberate indifference to the serious medical needs
of prisoners."  Rogers v. Evans, 792 F.2d 1052, 1058
(11th Cir. 1986).[25]   "The case law establishes that

---

25. Eleventh Circuit case law makes clear that the
"basic" mental-health care to which prisoners are
entitled includes not only pharmacological but also
psychotherapeutic treatment.  See Greason, 891 F.2d at
834 ("Even if this case involved failure to provide
(continued...)

'mental health needs are no less serious than physical needs' for purposes of the Eighth Amendment." <u>Thomas v. Bryant</u>, 614 F.3d 1288, 1312 (11th Cir. 2010) (quoting <u>Gates v. Cook</u>, 376 F.3d 323, 332 (5th Cir. 2004)). This is because the denial of adequate mental-health care can be just as painful as the denial of adequate physical health care. <u>See</u> <u>Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.</u>, 2012 WL 6738517, at *21 (S.D. Ind. Dec. 31, 2012) (Pratt, J.) ("Psychological pain exists. It is real and it results from many of the symptoms which are associated with the mentally ill.").

Deliberate indifference claims have both an objective and a subjective component. There are multiple modes of demonstrating the objective component of an Eighth Amendment violation. Although a prisoner may seek an injunction requiring prison officials to

psychotherapy or psychological counselling alone, the court would still conclude that the psychiatric care (continued...)

54

remedy a condition which is already inflicting harm on him at the time he files his complaint (for example, a prisoner is not receiving any insulin, which is necessary to treat his diabetes, and seeks an order requiring prison officials to provide it to him), he may also seek an injunction to prevent serious harm which is substantially likely to occur in the future-- in the phrasing of Farmer v. Brennan, "a substantial risk of serious harm."  511 U.S. 825, 834 (1994).[26]

---

was sufficiently similar to medical treatment to bring it within the embrace of Estelle.").

    26. It is clear that prisoners can make out Eighth Amendment violations based on the totality of multiple conditions of confinement, rather than needing to demonstrate that each individually is unconstitutional. See Hamm v. DeKalb Cty., 774 F.2d 1567, 1575-76 (11th Cir. 1985) (citing Ruiz v. Estelle, 679 F.2d 1115, 1139-40 (5th Cir. 1982).  Such claims are cognizable so long as the multiple conditions combine to deprive the prisoner of a specific human need, such as health care. See Gates, 376 F.3d at 333 ("Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise--for example, a low cell temperature at night combined with (continued...)

As the Supreme Court explained in <u>Helling v.</u> <u>McKinney</u>, 509 U.S. 25 (1993), a case in which a prisoner challenged his prolonged exposure to second-hand smoke, "a remedy for unsafe conditions need not await a tragic event," because "the Eighth Amendment protects against future harms to inmates," even when the harm "might not affect all of those exposed" to the risk and even when the harm would not manifest itself immediately. <u>Id</u>. at 33-34. As the court explained, prisoners complaining of unclean drinking water need not "wait[] for an attack of dysentery" before filing suit. <u>Id</u>. at 33. The Court made clear that, although "scientific" or other expert evidence is relevant is assessing the gravity of the risk--that is, "the seriousness of the potential harm

---

a failure to issue blankets." (citing <u>Wilson v.</u> <u>Seiter</u>, 501 U.S. 294, 304 (1991)). By the same token, when multiple policies or practices combine to create a substantial risk of serious harm to prisoners' mental health, they violate the Constitution.

and the likelihood that such injury to health will actually be caused by exposure to" the risk at issue-- the inquiry does not end there.  Id. at 36.  "It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate."  Id.[27]

---

27. Defendants repeatedly quote language from Helling describing the sort of risk that is actionable as one that is "sure or very likely to cause serious illness and needless suffering," and that gives rise to "sufficiently imminent dangers." 509 U.S. at 33-34. But Helling itself makes clear that it must be "sure or very likely" that some--not necessarily all--of the prisoners exposed will suffer harm, and that the dangers--like those of second-hand smoke--need not manifest themselves immediately.  The Eleventh Circuit has read Helling to require a plaintiff to show an "unreasonable" risk of serious harm, drawing on the language in Helling's holding.  Kelley v. Hicks, 400 F.3d 1282, 1284 (11th Cir. 2005) (quoting Helling, 509 U.S. at 35).

(continued...)

57

It is true that the Supreme Court once suggested, in dicta in a case about access to law libraries, that "a healthy inmate who ha[s] suffered no deprivation of needed medical treatment [lacks standing to] claim violation of his constitutional right to medical care ... simply on the ground that the prison medical facilities were inadequate." Lewis v. Casey, 518 U.S. 343, 350 (1996). But this pronouncement has no bearing

---

Furthermore, Helling requires that the risk involved must be "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." 509 U.S. at 36. While the first couple of words --"so grave"--might appear at first glance to set a very high bar, there are important modifiers in that sentence: "contemporary" and "unwillingly." Helling was decided in 1993; contemporary standards of decency had clearly evolved rapidly since 1964, when the Surgeon General of the United States issued the first federal report linking smoking to ill health. Moreover, the modifier "unwillingly" reflects once again the Court's recognition that prisoners "must rely on prison authorities to treat [their] medical needs," Estelle, 429 U.S. at 103; the question is not whether society believes a particular level of health care is one everyone must receive by right (indeed, at present, society does not require the provision of anything but emergency care), but rather whether society believes it (continued...)

58

on this case.  The plaintiffs here are prisoners with serious mental illnesses, not healthy prisoners; while a healthy prisoner might not be able to show a sufficiently specific and substantial risk of serious harm in alleging that he might become sick in some way at some time and need some form of medical care that might then not be adequately provided, plaintiffs in this case need mental-health care and argue that the severe inadequacies of the care being provided are subjecting them to a high likelihood of fairly imminent harm.  Indeed, they have offered evidence to show that the risk has already been manifested in deficient care they and others have received.  For prisoners who are not healthy, it is clear that they "need not wait until [they] suffer[] an actual injury because the constitutional injury <u>is</u> the exposure to the risk of harm."  <u>Parsons v. Ryan</u>, 289 F.R.D. 513, 521 (D. Ariz.

---

unacceptable to <u>force</u> someone to receive that level of health care.

2013) (Wake, J.) (citing Brown v. Plata, 563 U.S. 493, 506 n.3 (2011)), aff'd, 754 F.3d 657 (9th Cir. 2014).[28]

In the end, whether plaintiffs have already been harmed by the practices they challenge is, although relevant, not dispositive of their claims. This is because, as in Parsons, evidence related to the named plaintiffs was "not submitted to support individual Eighth Amendment claims; rather, the plaintiffs submitted [it] as evidence of the defendants' unlawful policies and practices, and as examples of the serious harm to which all inmates in [defendants'] custody are allegedly exposed." Parsons v. Ryan, 754 F.3d 657, 672 (9th Cir. 2014). What these plaintiffs must show is

---

28. In similar fashion, this case is distinguishable from another one on which defendants rely in their brief, Bumpus v. Watts, 448 F. App'x 3 (11th Cir. 2011). In that case, the court held that "[b]ecause [the plaintiff] only asserted that routine dental care would prevent future dental problems, he has failed to show an objectively serious medical need." Id. at 5. Whether or not the denial of preventative care is actionable under the Eighth Amendment is irrelevant, because plaintiffs are not healthy prisoners seeking preventative care.

that they have been subjected to the harmful policies and practices at issue, not (necessarily) that they have already been harmed by these policies and practices. Admittedly, to the extent that they allege a condition has existed for a length of time, they generally must show that some prisoners--themselves or others--have been harmed, in order to demonstrate an objectively substantial risk of serious harm.[29]

_____

29. Of course, expert testimony is also relevant to making this showing, especially because the uncertain course of mental illness, affected as it is by a number of factors, may make it difficult to show conclusively that the pain caused by, or the worsening of, any particular prisoner's illness is due to a particular denial of or delay in treatment; instead, it may be necessary for an expert to rely in significant part on her expertise in treating patients and experience observing outcomes to demonstrate how substantial the risks and how serious the harms are.

As an aside, the court notes that, in theory, a mechanism of injury could be such that, although no one in a prison system had yet been harmed, it was likely that many would be in the future.  For example, consider the introduction of a toxic substance, the symptoms of exposure to which only manifest after a period of time; plaintiffs would not need to wait until someone got sick to bring a claim.  In this case, however, there is no reason to believe that if the (continued...)

Although the Eighth Amendment's objective requirement of showing serious harm is not met by a showing of mere discomfort, see Chandler, 379 F.3d at 1295, "unnecessary pain or suffering" is serious harm. LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993). The serious-harm requirement "is concerned with both the 'severity' and the 'duration' of the prisoner's exposure" to the harm, such that an exposure to harm "which might not ordinarily violate the Eighth Amendment may nonetheless do so if it persists over an extended period of time." Chandler, 379 F.3d at 1295 (citation omitted); see also id. ("Severity and duration do not necessarily form a perfect sliding scale, but our analysis should be informed by a consideration of both factors."). As a result, a persistent and ongoing harm may be actionable even when

---

policies and practices of which plaintiffs complain indeed create a substantial risk of serious harm, that harm would not yet have occurred to at least some mentally ill prisoners.

that same harm, occurring in a discrete past instance, might not be.

One additional point bears mention. Defendants' repeatedly insist that what plaintiffs are presenting to the court in this case is a mere disagreement with their health care providers about the care appropriate in their cases. See Hamm v. DeKalb Cty., 774 F.2d 1567, 1575 (11th Cir. 1985) ("Th[e] evidence shows that [the plaintiffs] received significant medical care while at the jail. Although [he] may have desired different modes of treatment, the care the jail provided did not amount to deliberate indifference."). Defendants are quite right that a prisoner's mere preference for a different treatment over the one that was provided is insufficient to establish an Eighth Amendment violation.[30]   But the Eleventh Circuit has

_____

30. Many of the cases defendants cite for this proposition involve pro se prisoners who raise unsubstantiated disagreements with the care their providers have deemed appropriate.  This case is different both because the disagreements are (continued...)

made clear that the mere fact that a health care
provider provided some treatment is not sufficient to
establish that it was constitutionally adequate
treatment. Even in Eighth Amendment cases, "the
quality of a doctor's treatment is evaluated according
to professional standards." <u>Waldrop v. Evans</u>, 871 F.2d
1030, 1035 (11th Cir. 1989). In <u>Waldrop</u>, the Eleventh
Circuit agreed with the district court that there
existed a dispute of material fact as to whether a
psychiatrist's treatment of the plaintiff's serious
psychiatric needs was constitutionally adequate despite
the fact that "all actions taken by [the treating
psychiatrist] are undisputed," because the plaintiff's
"treatment must be evaluated according to professional
standards." <u>Id</u>. The circuit has clearly held that
"conflicting expert opinion concerning the extent to

_____

substantiated by expert evidence and because they do
not reflect one-off treatment decisions, but rather
policies or practices that repeatedly affect the care
provided to mentally ill prisoners.

64

which [psychiatric care] may have departed from professional standards" can warrant denial of summary judgment on an Eighth Amendment claim. _Greason v. Kemp_, 891 F.2d 829, 835 (11th Cir. 1990).[31]

The court now turns its attention to the subjective prong of the deliberate indifference standard.[32] In order to prove that a condition of confinement violates

----

31. Although it is unclear whether in _Greason_ and _Waldrop_, which were decided before _Farmer_, the court appropriately evaluated evidence regarding subjective deliberate indifference, _see_ _Campbell v. Sikes_, 169 F.3d 1353, 1365 n.9 & n.10 (11th Cir. 1999), it is clear that, as relevant here, these cases properly endorsed the relevance of expert testimony applying professional standard to the objective prong of an Eighth Amendment claim, _see_, _e.g._, _Campbell_, 169 F.3d at 1369 ("[I]n _Greason_ this Court relied on expert testimony only in addressing the objective prong of deliberate indifference.").

32. This prong actually contains both a subjective knowledge element and an objective response element-- that is, a prison official who is subjectively aware of a substantial risk of serious harm is liable if he "disregards the risk by failing to take [objectively] reasonable measures to abate it." _Farmer_, 511 U.S. at 847. Here, although defendants argue that they did not know of and did not create the risk of harm plaintiffs challenge, they have not argued that they have taken objectively reasonable (indeed, any) measures to address it.

the Eighth Amendment's prohibition on cruel and unusual punishment by creating an objectively "substantial risk of serious harm," a prisoner must show subjective "deliberate indifference" on the part of the defendant: that is, "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." Thomas, 614 F.3d at 1312; see also Kelley, 400 F.3d at 1284 (explaining the distinction between the objective and subjective prongs).

In general, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk ... was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and

the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."  Farmer, 511 U.S. at 842-43 (citations and internal quotation marks omitted).

Subjective deliberate indifference by prison officials to prisoners' medical and mental health can be manifested--and proven--in different ways.  As explained in Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999), courts have found deliberate indifference when a prison official "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason;[33] or (3) prevents a

_____

33. "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed."  Hill v. Dekalb Reg'l Youth Det. Ctr., 40 (continued...)

prisoner from receiving needed or recommended medical treatment." Courts have also found deliberate indifference when a prison official "persists in a particular course of treatment in the face of resultant pain and risk of permanent injury." Id. (citation and internal quotation marks omitted).

Although the Eighth Amendment is not violated merely because a prisoner receives less than ideal health care, the Eleventh Circuit has repeatedly recognized that even when some care is provided,

---

F.3d 1176, 1188 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2002). Notably, however, the detrimental effect need not be anything other than the "unnecessary and wanton infliction of pain," even for a period of a few hours. Brown v. Hughes, 894 F.3d 1533, 1537-38 (11th Cir. 1990) (quoting Estelle, 429 U.S. at 104); see also Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) (explaining that Hill's statement that a delay in treatment is actionable only when it "involve[s] life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem," or "the delay results in an inmate's suffering a life-long handicap or permanent loss," applies only to cases in which plaintiffs assert that their medical needs "required immediate or emergency attention").

"deliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (citing Steele v. Shah, 87 F.3d 1266, 1269-70 (11th Cir. 1996), and Waldrop, 871 F.2d at 1035); see also Rogers, 792 F.2d at 1058 (citing Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974), and Gittlemacker v. Prasse, 428 F.2d 1, 6 (3d Cir. 1970)).

What ties these forms of deliberate indifference together is, of course, deliberateness. On the one hand, the deprivation of care that in retrospect was necessary to avert harm--either pain, the worsening of a condition, or death--is not actionable merely because the defendant was negligent (even seriously so) in failing to recognize its necessity. (This is because we cannot infer knowledge on the part of the defendant when the care is merely subpar but not "grossly inadequate," not because any care better than the

69

grossly inadequate always passes constitutional
muster.)   On the other hand, the Eighth Amendment does
forbid the very same denial of or delay of care once
the defendant--a physician, officer, or official--
becomes aware that that care should be provided.
Delaying or denying provision of health care that a
defendant knows to be necessary for a "non-medical
reason," or rendering health care that is less
effective because it is "easier," is unconstitutional
because it reflects not a medical mistake but an
intentional deprivation.[34]

This discussion reveals a critical point,
overlooked by defendants in their protestations that
plaintiffs cannot show Eighth Amendment violations

_____

34. The specific reason for denying necessary care
is not particularly important, as long as it does not
reflect an exercise of medical judgment.   "[T]he policy
of deferring to the judgment of prison officials in
matters of prison discipline and security does not
usually apply in the context of medical care to the
same degree as in other contexts."   Harris, 941 F.2d at
1505 n.19 (quoting Wellman v. Faulkner, 715 F.2d 269,
272 (7th Cir. 1983).

because they all received some mental-health care:
Although health care that is just slightly better than
"grossly inadequate" does not violate the Constitution
when the defendant does not realize it is so subpar,
substantially smaller shortcomings in health care are
actionably unlawful when the decision-maker understands
that a particular standard of care will cause serious
harm to prisoners but decides to go ahead with it
nonetheless, because it is easier or cheaper. <u>See
Ancata v. Prison Health Servs., Inc.</u>, 769 F.2d 700,
703-04 (11th Cir. 1985) (holding that a plaintiff's
"allegation that the defendants failed to provide even
that level of diagnostic care that they themselves
believed necessary" clearly stated a claim for
deliberate indifference, without making a finding that
the denial of this level of care would, in and of
itself, reflect deliberate indifference, and stating
that "[i]ntentional failure to provide service

acknowledged to be necessary is the deliberate
indifference proscribed by the Constitution").[35]

   What is striking in this case is the extent to
which the mental-health practitioners involved appear
to recognize what plaintiffs' experts have opined: the
care being provided mentally ill prisoners in Alabama
is lacking in certain ways. Defendants argue at some
length that plaintiffs' experts have not convincingly
demonstrated that this care is so grossly inadequate
that its sheer inadequacy demonstrates deliberate
indifference, but this is beside the point. When
prison mental-health administrators know and
communicate that they need more staff to provide

---

   35. As a purely hypothetical illustrative example:
a court might find that a doctor's wholesale failure to
diagnose a rare, fatal disease--resulting in death--did
not reflect deliberate indifference, but in another
case, that once the doctor had diagnosed the disease,
the decision to prescribe one medication which she knew
would treat the disease but cause the prisoner to
become deaf, rather than another more expensive
medication that she knew did not have that serious side
effect, did evince deliberate indifference.

appropriate care for prisoners, and the Commissioner refuses to provide funding for this staff, not in any exercise of medical judgment but because he does not have the money, this suffices to establish deliberate indifference and--in conjunction with a showing that this creates a substantial risk of serious harm--to establish an Eighth Amendment violation.

Defendants have honed in on, and cited numerous times in their briefs, the line in Waldrop, repeated in other cases, that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation."  871 F.2d at 1035.[36]  First of

———————————

36. Defendants cite a number of cases reciting different versions of this point.  See Bauer v. Kramer, 424 F. App'x 917, 919 (11th Cir. 2011) ("A doctor's decision about the type of medicine that should be prescribed is generally 'a medical judgment' that is 'an inappropriate basis for imposing liability under section 1983.'  Adams v. Poag, 61 F.3d 1537, 1547 (11th Cir. 1995).");  Freeman v. Lebedovych, 186 F. App'x 943, 944 (11th Cir. 2006) ("When a mentally ill prisoner receives medical treatment that is arguably aimed at stabilizing his condition, we will generally refuse to engage in subsequent review of medical decisions.").

all, some of the policies and practices challenged here were not decided upon by medical staff (as defendants remind the court, the Commissioner and Associate Commissioner are not doctors), and do not concern treatment decisions; these include staffing decisions, and policies regarding placement in segregation.  In addition, even with respect to the policies and practices that do concern mental-health treatment, defendants have ignored the admonition that immediately follows in Waldrop: "Hesitation does not mean, however, that the course of a physician's treatment of a prison inmate's medical or psychiatric problems can never manifest the physician's deliberate indifference to the inmate's medical needs."  Id.  As the court explained in "reaffirm[ing]" its previous case law, deliberateness can either be inferred, from the fact that the medical care rendered is "grossly incompetent," or else demonstrated in the form of a "choice" to provide care known to be less effective-- and therefore to subject the prisoner to a substantial

74

risk of serious harm--because it is easier or cheaper. Id.; see also Freeman v. Lebedovych, 186 F. App'x 943, 944 (11th Cir. 2006) ("Inadequate psychiatric care constitutes deliberate indifference if the quality of psychiatric care received is a substantial deviation from accepted professional standards.").

Another point warrants some focused attention. Defendants have made a great fuss over plaintiffs' assertions that they are bringing a "systemic," rather than individual, Eighth Amendment challenge, as if this form of claim was not well-established in the jurisprudence of this circuit--indeed, so well-established that it is generally denoted with the term defendants so scorn.[37]

---

37. This ground is so well-trod that a number of district courts have set out a six-part framework for assessing the baseline constitutional adequacy of a prison mental-health care system. See Coleman v. Wilson, 912 F. Supp. 1282, 1298 (E.D. Cal. 1995) (Karlton, J.) ("[T]he courts have focused on the presence or absence of six basic, essentially common sense, components of a minimally adequate prison mental health care delivery system."). This framework, first (continued...)

formulated by Judge Justice, requires that (1) "there must be a systematic program from screening and evaluating inmates in order to identify those who require mental health treatment"; (2) "treatment must entail more than segregation and close supervision of the inmate patients"; (3) "treatment requires the participation of trained mental health professionals, who must be employed in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders"; (4) "accurate, complete, and confidential records of the mental health treatment process must be maintained"; (5) "prescription and administration of behavior-altering medications in dangerous amounts, by dangerous methods, or without appropriate supervision and periodic evaluation, is an unacceptable method of treatment"; and (6) "a basic program for the identification, treatment and supervision of inmates with suicidal tendencies is a necessary component of any mental health treatment program." Balla v. Idaho State Bd. of Corr., 595 F. Supp. 1558, 1577 (D. Idaho 1984) (Ryan, J.) (quoting Ruiz v. Estelle, 503 F. Supp. 1265, 1339 (S.D. Tex. 1980) (Justice, J.); other citations omitted). Because this framework was first articulated over 35 years ago, and because mental-health care has evolved dramatically since that time, the court considers it to be instructive but not determinative as to the floor below which mental-health care would be grossly inadequate and therefore unconstitutional. See Plata, 563 U.S. at 506 n.3 (discussing plaintiffs' entitlement to relief based on the showing that "the delivery of care in the prisons [had] fall[en] below the evolving standards of decency that mark the progress of a maturing society" (citing Farmer, 511 U.S. at 834)). The proposition that the constitutional minimum with respect to health care has increased over time should be an entirely (continued...)

"In institutional level challenges to prison health care such as this one, systemic deficiencies can provide the basis for a finding of deliberate indifference. <u>Rogers</u>, 792 F.2d at 1058. Deliberate indifference to inmates' health needs may be shown, for example, by proving that there are 'such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.' <u>Ramos v. Lamm</u>, 639 F.2d 559, 575 (10th Cir. 1980). ... [A]lthough incidents of malpractice standing alone will not support a claim of eighth amendment violation, '[a] series of incidents closely related in time may

---

uncontroversial one; courts find Eighth Amendment violations based on the denial of sorts of care that did not exist decades earlier. <u>See</u>, <u>e.g.</u>, <u>Petties v. Carter</u>, 836 F.3d 722, (7th Cir. 2016) (en banc) (reversing a grant of summary judgment on and remanding for trial an Eighth Amendment medical care claim, based in part on the court's finding that harm to the plaintiff, who had torn a tendon, would have been avoided by "sending [him] to the emergency room so he could get an MRI," a diagnostic procedure that did not (continued...)

disclose a pattern of conduct amounting to deliberate indifference.' <u>Rogers</u>, 792 F.2d at 1058–59 (citing <u>Bishop v. Stoneman</u>, 508 F.2d 1224 (2d Cir.1974)). 'Repeated examples of delayed or denied medical care may indicate a deliberate indifference by prison authorities to the suffering that results.' <u>Id</u>. at 1059 (citing <u>Todaro v. Ward</u>, 565 F.2d 48, 52 (2d Cir. 1977)); <u>see also</u> <u>Ramos</u>, 639 F.2d at 575 ('In class actions challenging the entire system of health care, deliberate indifference to inmates' health needs may be shown by proving repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff.')." <u>Harris</u>, 941 F.2d at 1505; <u>see also</u> <u>Inmates of Occoquan v. Barry</u>, 717 F. Supp. 854, 867 (D.D.C. 1989) (Green, J.) ("The evidence points to systemic failure throughout the entire medical services

---

exist until the late 1970s and did not come into regular use until much more recently).

that show deliberate indifference to the medical needs
of the inmates of Occoquan.").[38]

Notably, this means that, although one-off
negligent treatment is not actionable, its repetition
can render it so; put differently, care that causes
serious harm but is not grossly inadequate can be
challenged when it recurs, because frequent negligence,
just like a single instance of truly egregious
recklessness, may allow the court to infer subjective
deliberate indifference.

Moreover, deliberate indifference can, of course,
be demonstrated straightforwardly, through direct
evidence that an administrator was aware of serious

_____

38. In Wilson v. Seiter, 501 U.S. 294, 299-302
(1991), the Supreme Court considered and rejected the
petitioner's argument that the requirement of
subjective deliberate indifference should not apply to
systemic, as opposed to one-time, conditions. In so
doing, it explained that "[t]he long duration of a
cruel prison condition may make it easier to establish
knowledge and hence some form of intent, cf. Canton v.
Harris, 489 U.S. 378, 390, n.10 (1989); but there is no
logical reason why it should cause the requirement of
intent to evaporate." Wilson, 501 U.S. at 300-01.

systemic deficiencies and failed to correct them. In Greason, 891 F.2d at 839-40, the Eleventh Circuit affirmed a denial of a motion for summary judgment filed by the Georgia Department of Corrections' director of mental-health, because he was "aware of many conditions at the GDCC that could lead to grossly inadequate mental health care," such as that prisoners did not receive enough recreation time, that mental-health treatment plans were not employed, that there were no policies or procedures to enable officers to prevent suicides, and that there was a "severe lack of staff members and [a] need for a mental health care unit." "In light of all the major problems ... of which [the director] was aware but which he apparently did not attempt to remedy," the court had "no difficulty" in holding that a reasonable factfinder could find that he acted with deliberate indifference.[39] Id. at 839.

---

39. Unlike in the present case, the court in (continued...)

This is an official-capacity suit--"only another way of pleading an action against an entity of which an officer is an agent" or against the "official's office." <u>LaMarca</u>, 995 F.2d at 1542 (citations and internal quotation marks omitted). Therefore, the question is not whether the particular official-capacity defendants are "dedicated public servant[s] who [are] trying very hard to make [the prisons they run] efficient and effective correctional institution[s]"--often, administrators do struggle valiantly to reform the prisons they run--but rather "the institution's historical indifference." <u>LaMarca</u>, 995 F.2d at 1542 (internal quotation marks omitted) (explaining that substitution of a newly appointed superintendent as the official named in the suit had no

---

<u>Greason</u> was considering the director's deliberate indifference in the context of supervisory liability, as opposed to the underlying constitutional violation. <u>See</u> 891 F.2d at 836-37, 839 (finding a disputed issue as to whether the director, "in failing adequately to train and supervise subordinates ... was deliberately indifferent to an inmate's mental health care needs").

effect on the deliberate indifference analysis); <u>see</u> <u>also</u> <u>Laube v. Haley</u>, 234 F. Supp. 2d 1227, 1249 (M.D. Ala. 2002) (Thompson, J.) (explaining that "the real parties in interest are the responsible entities: the Department of Corrections and, ultimately, the State of Alabama.  Hence, the court's analysis of deliberate indifference is properly focused on the reasonableness of the State of Alabama's responses as limited by the State's powers").

One final point, which often arises in systemic cases and is squarely presented here, bears mention. It is clear that at least in official-capacity suits like this one, lack of funds is not a justification for substandard treatment.  <u>See</u> <u>Laube</u>, 234 F. Supp. 2d at 1248 ("When prison officials are sued solely in their official capacities, the lack of funds available to them is not an adequate defense to a finding of a constitutional violation on their part."); <u>see</u> <u>also</u> <u>Harris</u>, 941 F.2d at 1509 ("[W]e are troubled by and reject any suggestion ... that a state's comparative

wealth might affect a[] ... prisoner's right to constitutionally adequate medical care. We do not agree that financial considerations must be considered in determining the reasonableness of inmates' medical care.... We are aware that systemic deficiencies in medical care may be related to a lack of funds allocated to prisons by the state legislature. Such a lack, however, will not excuse the failure of correctional systems to maintain a certain minimum level of medical service necessary to avoid the imposition of cruel and unusual punishment.") (citation and internal quotation marks omitted)).

Indeed, inadequate funding can be a basis for a finding of deliberate indifference, to the extent that it is the non-medical reason for a correctional administrator's interference with the care medical providers have deemed necessary. As the Seventh Circuit put it in reversing a finding that no Eighth Amendment violation had occurred when "a psychiatric position was authorized for the prison and prison

officials had been trying for two years to fill it[,] ... this circumstance may weigh more heavily against the state than for it, since the position has remained vacant for two years and the authorized salary is, in the district court's words, 'woefully inadequate.'" Wellman v. Faulkner, 715 F.2d 269, 272-73 (7th Cir. 1983). The Eleventh Circuit likewise endorsed this point when it quoted with approval a line from a complaint alleging that "limited funds ... may have contributed to deliberate indifference shown for the serious medical needs" of the plaintiff. Ancata, 769 F.2d at 705.

Having addressed defendants' arguments regarding the relevant case law, the court will now turn to assessing whether plaintiffs have created a dispute of material fact as to the multiple necessary elements of their claims.

**84**

## 2. Serious Need

As a predicate to raising an Eighth Amendment mental-health claim, a plaintiff must have a serious mental-health care need. A serious need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Jacoby v. Baldwin Cty., 596 F. App'x 757, 763 (11th Cir. 2014) (citation omitted). Defendants contend that three of the Phase 2A plaintiffs, Hardy, Johnson, and Pruitt, have no current serious mental-health care need, as required to state an Eighth Amendment mental-health claim.[40]

---

40. In defendants' motion for summary judgment, they contended that "[t]hree (3) of the Named Plaintiffs suffer from no 'serious mental health need.'" Defs.' Summ. J. Br. (doc. no. 769) at 74. They then went on to make other arguments about "[t]he remaining Named Plaintiffs." Plaintiffs then proceeded, most reasonably, to discuss in their opposition brief the evidence in the record that they contend demonstrates that these three particular plaintiffs have serious mental-health needs, while also reasserting their (unchallenged) position that the (continued...)

As to Hardy, the court agrees with defendants. Although defendants' expert, Dr. Patterson, recognized that Hardy has dysthymic disorder, post-traumatic stress disorder, and antisocial and borderline personality disorders, he also concluded that these conditions "do not appear to affect him in such manner that he requires mental health care currently." Patterson Report (doc. no. 679-9) at 33. Hardy was removed from the mental-health caseload in 2010,

_____

remainder of the Phase 2A named plaintiffs also have such needs.

Inexplicably, defendants, in their reply, pretend as if they disputed whether plaintiffs other than these three have serious mental-health needs, stating as follows: "With the exception of three (3) individuals, Named Plaintiffs do not attempt to prove they suffered from the serious mental health need required to state an Eighth Amendment claim. They merely allege in conclusory fashion that they do indeed have a serious mental health need." Defs.' Summ. J. Reply (doc. no. 876) at 96. This misrepresentation is troubling. In any event, the court concludes, based on its review of the record, that plaintiffs have offered more than sufficient evidence to create a genuine dispute as to whether the remaining plaintiffs have serious mental-health needs.

apparently reflecting the conclusion of mental-health staff that he did not need treatment.   There is no record evidence to the contrary.[41]

As for Johnson: although defendants contend that he has never been diagnosed with a serious mental illness, there is no dispute that he suffered a traumatic brain injury as a child, that he was identified by staff at ADOC's mental hospital (prior to his conviction) as suffering from depression with possible psychosis and potentially incompetent to stand trial, and that in 2015, MHM's Medical Director and Chief Psychiatrist, Dr. Hunter, diagnosed him with adjustment disorder with anxiety and possible psychosis, after recognizing that he had "been in crisis for over a week" and had "paranoia and possible delusions."   Johnson Medical Records, P Ex. 62 (doc. no. 844-12) at 15, MR047700. He also testified in his deposition and has told other

_____

41. Although plaintiffs point out that Hardy has in the past engaged in or threatened self-harm, there is (continued...)

prisoners that he suffers from auditory hallucinations.
Defendants contend that Johnson's ability to express
his need for care orally and in writing demonstrates
that he is not seriously cognitively impaired.  Whether
or not their evidence shows this (plaintiffs point to
evidence that Johnson relies on his uncle or other
prisoners to fill out forms), his ability to articulate
his requests would not demonstrate that he was not
mentally ill.   This evidence is, at a minimum,
sufficient to create a dispute of material fact both as
to whether Johnson has been diagnosed (by Dr. Hunter)
as in need of mental-health treatment, and as to
whether it is obvious that he has a current, serious
mental-health need.

Pruitt was previously diagnosed with schizophrenia,
depression, and antisocial personality disorder.
However, mental-health staff have concluded that these
conditions are in remission since 2010, and removed him

_____

no evidence that he has done so at any time in the past
(continued...)

from the mental-health caseload. Defendants offer evidence to show that he has been evaluated numerous times since then--based on his repeated requests for treatment--and that mental-health staff have consistently concluded that he does not require treatment. However, there is evidence in the record sufficient to create a dispute of material fact as to whether it would be obvious to a lay person that Pruitt does require treatment, given his recent and serious attempts to harm himself: he was admitted to a crisis or suicide cell five times in the first half of 2014. In one case, he was readmitted within a few days after cutting himself again; in another case, it took over a week to stabilize him.

### 3. Substantial Risk of Serious Harm

Because defendants have taken the tack of responding to plaintiffs' claims as if they were about past violations, their response to the evidence that

---

four years.

plaintiffs have presented of a risk of harm has been conclusory (and largely constituted an attack on the methodology employed, rather than the findings offered, by plaintiffs' expert, Dr. Burns).  However, the court will discuss plaintiffs' evidence here in order to explain why it does create a dispute of material fact as to whether the policies and practices at issue create an actionable risk of harm.[42]   Because only

---

42. Almost all of the policies and practices at issue in this case directly impact the provision of mental-health care.  One does not, however: Although the court certainly appreciates plaintiffs' contention that an inadequate quality assurance system has contributed to the inadequate care they describe, the court is concerned that this issue might be too attenuated to constitute, in itself, an Eighth Amendment violation.  While adequate funding and staffing are categorically necessary to provide adequate health care, the court would like to hear further argument (and evidence from experts in the field) as to whether an adequate quality assurance program falls into the same category.  Because evidence regarding MHM and ADOC's quality assurance programs will clearly be relevant to establishing deliberate indifference with respect to other portions of plaintiffs' claim--plaintiffs offer this evidence to show both awareness of and disregard for deficiencies-- the court will hear it and resolve at or after trial whether an inadequate quality assurance program can (continued...)

defendants have moved for summary judgment, the court will focus its attention on plaintiffs' evidence. However, the court has carefully considered defendants' expert evidence as well; as noted below, defendants' primary mental-health expert, Dr. Patterson, agrees in many important respects with plaintiffs' experts.

Dr. Kathryn Burns, a licensed medical doctor with a certification in general psychiatry, has for several years served as the Chief Psychiatrist for the Ohio Department of Rehabilitation and Correction. She is also a Distinguished Fellow of the American Psychiatric Association, and has conducted assessments of the mental-health care provided by prison systems in six different States. Dr. Burns's expert report offers her opinions as to the adequacy of mental-health and custodial staffing, assessment and classification of mental illness, mental-health treatment, and oversight of mental-health care.

itself be an actionable violation of the Eighth
(continued...)

91

Dr. Craig Haney, who has a Ph. D. in psychology, is the Distinguished Professor of Psychology at the University of California, Santa Cruz, and has published scholarly articles and presented lectures on the psychological effects of incarceration. He has inspected and testified about numerous state prisons and similar institutions. Dr. Haney's expert report addresses the effects of overcrowding and understaffing on prisoners with mental-health needs, the effects of segregation on mentally ill prisoners, and the adequacy of mental-health treatment.

Eldon Vail has worked in prisons for nearly 35 years; he has served as warden of three different prisons, the Deputy Secretary of the Washington State Department of Corrections for seven years; and its Secretary for four years. Vail has been an expert witness and consultant in numerous cases involving correctional facilities. Vail's expert report covers

---

Amendment.

the impact of overcrowding and custodial understaffing on prisoners' need for health care and on defendants' ability to provide it, as well as the impact of segregation on prisoners' mental health.

Because these reports are lengthy and because defendants do not seriously engage with the substance of them in their motion for summary judgment, the court will not discuss comprehensively all of the deficiencies they identify; instead, it will simply offer an illustrative summary. Because Dr. Burns is plaintiffs' primary mental-health expert, the court will focus more significantly on her opinions, although, as discussed below, many of them were corroborated by Dr. Haney's independent assessment.

### a.  Inadequate Staff

Dr. Burns explains in her report that ADOC entered into a settlement agreement in Bradley v. Harrelson, in 2001, in which it agreed to provide certain specified levels of mental-health staff for the male prisoner

93

population.  <u>See</u>  Order  Approving  Settlement  Agreement,
<u>Bradley  v.  Harrelson</u>,  No.  2:92-cv-70  (M.D.  Ala.  June
27,  2001)  (Albritton,  J.),  ECF  No.  412.[43]  She  further
explains  that  despite  a  significant  increase  in  the
prisoner  population,  it  has  subsequently  entered  into
contracts  to  provide  significantly  fewer  highly
qualified  staff  (psychiatrists  and  psychologists),  and
more  practitioners  with  lower  levels  of  qualification
(clinical  registered  nurse  practitioners  (CRNPs),
licensed  practical  nurses  (LPNs),  and  "mental  health
professionals,"  such  as  social  workers  with  master's
degrees  and  counselors,  some  of  whom  are  unlicensed  and
uncertified  (MHPs)).   This  trend  has  continued  over
time:  in  2000,  there  were  eight  psychiatrists  for  about

---

43. The  provision  of  mental-health  care  to
Alabama's  prisoners  has  been  litigated  at  least  twice
before.  <u>See</u>  <u>Pugh v. Locke</u>,  406  F.  Supp.  318  (M.D.  Ala.
1976)  (Johnson,  J.),  <u>aff'd and remanded sub nom.</u> <u>Newman</u>
<u>v. Alabama</u>,  559  F.2d  283  (5th  Cir.  1977),  <u>cert. granted</u>
<u>in part, judgment rev'd in part, and remanded sub nom.</u>
<u>Alabama  v.  Pugh</u>,  438  U.S.  781  (1978);  <u>Bradley  v.</u>
<u>Harrelson</u>,  151  F.R.D.  422  (M.D.  Ala.  1993)  (Albritton,
J.)  (certifying  a  class).

20,600 prisoners (men only), but by earlier this year, there were about five full-time equivalents; over the same period, the number of MHPs increased by about 50%, and the number of CRNPs more than doubled, from three to just over seven full-time equivalents.    MHM's Program Manager, Houser, agreed in her deposition that, even were all vacancies filled, many of defendants' facilities would not have "enough" mental-health staff.

Dr. Burns relies on MHM's internal documents to demonstrate that, although Alabama law requires clinical registered nurse practitioners to be supervised by psychiatrists, they are practicing partially or in many cases entirely without supervision at many facilities.  Dr. Burns draws on her experience supervising CRNPs in her own practice and her experience evaluating prison mental-health care around the country to explain that allowing CRNPs to practice without supervision increases the likelihood that prisoners will be misdiagnosed and receive inappropriate pharmaceutical and therapeutic treatment.

She offers examples she recognized during her inspections of CRNPs' failure to diagnose or treat mental illness in prisoners, including instances of them dismissing serious symptoms (including auditory hallucinations and self-harm) and requests for treatment. Dr. Burns reaches similar conclusions regarding the reliance on unlicensed MHPs.

b. Inadequate Assessment

Dr. Burns explains that prisoners can access mental-health care in one of three ways--identification at reception, self-referral, and staff referral--and opines that each of these mechanisms is deficient in ways that subject prisoners to harm. Reception screening is conducted by licensed practical nurses, who take histories and determine whom to refer to psychiatrists for comprehensive evaluations. But Dr. Burns explains that LPNs are not qualified to make this preliminary assessment, and that reliance on these practitioners--who are unsupervised by registered

nurses (again, contrary to Alabama law)--to conduct reception screening results in the failure to recognize and diagnose mental illness. She opines (and it seems fairly self-evident) that this failure to diagnose in turn results in denial of treatment to prisoners who then go on to suffer, including through self-harm. Dr. Burns cites examples of prisoners whose mental illness was not recognized at reception, leading to denial of treatment except for placement in a crisis cell after cutting or attempting to hang themselves.

Dr. Burns also opines that under-identification is reflected in the fact that "MHM consistently reports lower prevalence rates of mental illness in ADOC prisons than prevalence rates reported in other prisoners and prison systems throughout the United States."[44] Burns Report (doc. no. 868-2) at 24-26. Dr.

_____

44. She also opines that another problem contributes to this low figure: MHM's active efforts, documented in institutional and state-wide meeting notes, to remove prisoners from the caseload, to ensure that it remains at a "working number." Burns Report (continued...)

Haney relies on different but similar comparator statistics in his report to conclude that ADOC's identification of prisoners who belong on the mental-health caseload "almost certainly" represents a "gross underestimate" of the number of mentally ill prisoners in their custody.  Haney Report (doc. no. 868-4) at 161.  Dr. Burns identifies prisoners who had not been placed on the mental-health caseload, initially or at all, despite their histories of mental-health problems, and received mental-health care only when in crisis. Dr. Burns also reviewed the mental-health classification system, and finds that it actually categorizes prisoners by their housing needs, rather than based on whether or not they suffer from serious mental illness, and she identified prisoners who had

---

(doc. no. 868-2) at 31 (citation omitted).  She again points to a prisoner who typified this problem, who, "despite being on a heavy load of psychotropic medication and being transferred to the highest level of mental health care offered in ADOC on two separate occasions, ... was removed from the mental health caseload at one point."  Id.

been denied of more intensive treatment despite
suffering from symptoms that would necessitate such
treatment, because they had received the lowest level
of mental-health classification (MH-1).

As for self-referrals, Dr. Burns reports finding
many instances in which MHM was unresponsive to written
requests for care, and documented a number of instances
in which prisoners engaged in self-harm and destructive
behavior in order to get attention from mental-health
providers. (She notes that "[i]ronically, these
behaviors often result in disciplinary action and
placement in segregation where mental health treatment
is even more difficult to access." Burns Report (doc.
no. 868-2) at 29.) She also notes that MHM audits of
responses to self-referrals reveal that they are often
untimely (or the timeliness of responses is not
documented).

## c.  Inadequate Treatment

Dr. Burns explains that prisoners with serious mental illness require a continuum of services from outpatient treatment to residential treatment to inpatient treatment, and a range of forms of treatment, including medication management and individual and group therapy.  She notes that inpatient care is provided by transferring a prisoner to a state psychiatric hospital, but notes that MHM's Medical Director and Chief Psychiatrist, Dr. Hunter, testified in his deposition that inpatient care is rarely sought except as a prisoner approaches release.  Dr. Burns opines that she "found many inmates on [her] tours that clearly required a higher level of care than could be provided in ADOC facilities."  Id. at 32.  She points to specific examples of prisoners who required inpatient treatment, including at least one prisoner who MHM providers recognized to require it.

100

As for intermediate, residential care for men,[45] Dr. Burns notes that prisoners who are not mentally ill are placed in residential treatment beds rather than in segregation,[46] and that the danger these prisoners pose, in conjunction with inadequate custodial staffing on these units (as reflected both in MHM documents and the reports of prisoners), results in the mentally ill prisoners on these units receiving little time out of their cells, missing appointments or having group sessions cancelled, and prisoners, including those being watched for self-harm, being inadequately monitored. Dr. Burns also observes, based on MHM reports, that residential treatment beds are consistently underutilized, and she points to a number of prisoners who have been classified as outpatients but require residential treatment. Dr. Haney also

---

45. r. Burns found residential care at the women's facility to be substantially better.

46. MHM documents also reflect providers' concern about this issue.

discusses this problem at some length in his report,
opining that insufficient treatment space for
critically mentally ill prisoners delays access to
necessary care. He further notes that Dr. Hunter,
MHM's Medical Director and Chief Psychiatrist,
acknowledged that even having additional mental-health
personnel would not necessarily "translate into less
crises, less crisis placement as long as the system
continues to lack appropriate spaces" to place
critically ill patients. Haney Report (doc. no. 868-4)
at 171-72 (quoting Hunter Depo. (doc. no. 675-16) at
162).

Furthermore, Dr. Burns opines that many seriously
mentally ill prisoners are receiving primarily
psychopharmacological treatment, and either no or
minimal psychotherapy. See Burns Report (doc. no.
868-2) at 35-36 ("It is well established both inside
and outside of prison, that mental health treatment is
more than psychotropic medication. Some mental health
conditions do not require treatment with medication at

all; other conditions require medication but improve to a greater extent when treatment with medication is combined with other treatment modalities including group and individual psychotherapy."). During her inspections, she "interviewed and reviewed the charts of dozens of prisoners who were offered no treatment other than psychotropic medication." Id. at 36 n.45. Her conclusions on this point are based not only on chart reviews and interviews with prisoners, but also on depositions of MHM staff, who acknowledged the infrequency and brief duration of psychotherapeutic contacts with prisoners.[47]

---

47. With respect to the treatment provided to the named plaintiffs, defendants repeatedly assert that their allegations regarding infrequent or nonexistent psychotherapy or counseling are false, based on medical records showing repeated "contacts" with mental-health staff.  The court has reviewed many of the records at issue and concludes that there is a genuine dispute as to whether these notations represent psychotherapy or brief check-in encounters, which Dr. Burns agrees occur but deems entirely distinct from "actual treatment." Id. at 38-39.

(continued...)

Dr. Burns also opines that group treatment is seriously lacking, both for prisoners in residential placements and, to a greater degree, for outpatients, noting that MHM's most recent contract compliance review revealed that a number of facilities with hundreds of prisoners each on their mental health caseloads offered few or no groups. She explains that group treatment interventions should be offered for prisoners with depression, post-traumatic stress disorder, anxiety, and schizophrenia, "based upon their individualized assessment of mental health needs." Burns Report (doc. no. 868-2) at 39.

---

Dr. Burns and Dr. Haney also opine that to the extent that counseling does occur, it is compromised by the fact that it generally occurs in non-confidential settings. Defendants' response to this contention (when raised by the named plaintiffs) appears to be that ADOC policy requires the presence of custody staff for security purposes. But this does not address whether the policy creates a substantial risk of serious harm. The court recognizes that bona fide security needs might justify such a requirement, at least in some instances; whether or not it is justified here will be assessed at trial.

**104**

Dr. Burns opines that prisoners who are prescribed psychotropic medication are also harmed by inadequate medication management practices. As a general matter, she concludes based on chart reviews and audit findings that follow-up appointments to assess the impact of medication are infrequent and brief. More specifically, she opines that prescribers rely too heavily on long-acting Haldol and Prolixin injections. Dr. Burns explains that these and similar medications "impact normal movement and can cause severe restlessness (akathisia) and painful muscle spasms (acute dystonic reaction) and also lead to permanent, irreversible movement disorders that include tremor, involuntary movements of the tongue and mouth (tardive dyskinesia) and Parkinsonism." Id. at 42. She reports that "[m]any of the inmates interviewed displayed these types of movement disorders, but their prescriptions were continued rather than changed to medications less likely to cause these problems," and identifies a number of prisoners who continue to be prescribed this

type of medication, and one who was previously took an alternative medication that worked well for her, was switched to these medications, suffered from serious side effects, was taken off it, and now receives no medication despite suffering from ongoing auditory hallucinations. Id. Dr. Burns also explains that this sort of injectable medication is so long-acting that it is impossible to adjust the dosage quickly (either upwards, to treat worsening symptoms, or downwards, to address side effects), and that other mental-health care systems therefore generally use oral medications to make dose adjustments.

Although Dr. Burns touches on the issue, Dr. Haney devotes much of his expert report to the harmful effects of ADOC's policy of housing prisoners with serious mental illness in segregation. Dr. Burns explains, based on her own observations during tours and MHM reports she reviewed, that prisoners with mental illness are overrepresented in segregation, and that prisoners in segregation "receive medications and

**106**

brief cell front contacts by MHPs and LPNs," but little or "no mental health therapy or group treatment."  Id. at 39.  In conjunction with the fact that residential beds are underused, this leads Dr. Burns to conclude that "inmates with mental illness are being diverted to segregation for behaviors related to untreated or undertreated mental illness rather than being placed or maintained in more intensive mental health treatment settings."  Id. at 40.

Dr. Haney describes his tours of segregation units at length.  In one facility, he describes the segregation units as "difficult to describe and unlike any I have ever seen in decades of doing this work"; they "typically remain dark," and the floors outside were "filthy" and appeared to be "charr[ed]."  Haney Report (doc. no. 868-4) at 50.  In another facility, he describes the segregation unit as filled with the smell of something burning and the sound of prisoners banging on their cell doors and screaming "help me"; some cell-door windows were covered, others were shattered,

107

a number of doors were blackened from fires, and there was urine puddled on the floor outside several cells. Haney Report (doc. no. 868-4) at 34.   At a third facility, in addition to conditions similar to the above, Dr. Haney describes hearing from multiple prisoners in segregation that they had been kept outside, in exercise pens, for multiple days on end. He described this finding as "bizarre and alarming." Id. at 67.

In each of these facilities, he observed and spoke with prisoners in segregation whose mental health he believes has seriously deteriorated as a result of their confinement in these conditions.   He also discusses at some length a bevy of scientific research he and others have conducted regarding the harmful psychological effects of segregation, particularly on prisoners who are mentally ill.[48]   This literature, he

_____

48. Defendants' expert, Dr. Morgan, offers some contrary evidence from a study he conducted.   However, even Dr. Hunter, MHM's Medical Director and Chief (continued...)

108

says, finds with remarkable consistency that prolonged
isolation of the sort he observed in defendants'
facilities results in some prisoners experiencing
profound emotional disturbances and serious
psychological injuries, including increased "anxiety,
withdrawal, hypersensitivity, ruminations, cognitive
dysfunction, hallucinations, loss of control,
irritability, aggression, rage, paranoia, hopelessness,
a sense of impending emotional breakdown,
self-mutilation, and suicidal ideation and behavior."
<u>Id</u>. at 113.  He cites additional studies for the
proposition that placement in segregation dramatically
increases the risk of self-harm.  He also describes a
growing "scientific, professional, human rights--and,
in fact, <u>correctional</u>--consensus" that the use of

---

Psychiatrist, testifies in his deposition that
"segregation is potentially detrimental to one's health
and well-being."  Hunter Depo., P Ex. 56 (doc. no.
844-6) at 180.  He observes that lengthy terms in
segregation can "lead to a lot of helplessness,
hopelessness, and despair."  <u>Id</u>. at 182.  There is
certainly a genuine dispute as to this point.

segregation is harmful and should be minimized, and
that the segregation of mentally ill prisoners should
be prohibited outright or very strictly limited.  Id.
at 103, 153-54.

Dr. Haney also opines that inadequate monitoring
and treatment practices further exacerbate the harms
caused by placement of mentally ill prisoners in
segregation.  For one thing, he agrees with and expands
upon the statement by Dr. Hunter, MHM's Medical
Director and Chief Psychiatrist, that "[t]here's a need
for closer monitoring or at least a mental health
intervention once an inmate is notified officially of a
classification change, especially if he's already in
segregation."  Id. at 184 (quoting Hunter Depo. (doc.
no. 996-2) at 221).  Dr. Haney also emphasizes the need
for monitoring of prisoners in segregation, noting that
Houser admitted in her deposition that "she does not
know how long mental health staff spend in the
Segregation Units, [and] does not know if they have set
schedules for going into the units."  Id. at 186

110

(citing Houser Depo. (doc. no. 996-17) at 177-78).  Dr. Haney notes that Dr. Hunter admits--in words remarkably similar to those plaintiffs' experts used to describe other interactions with mental-health staff--that segregation rounds are "somewhat of a drive-by type of process.  It's usually done at cell side: How are you doing, how are you getting along; look around inmate's cell, seeing what kind of condition he's in, look at the inmate, see what kind of condition he's in, how he's looking, how he's [] acting, how he's responding to you.  And, again, it's pretty cursory, just cell-side visit."  Haney Report (doc. no. 868-4) at 187 (quoting Hunter Depo. (doc. no. 996-2) at 192).

Additionally, Dr. Burns opines that treatment for prisoners on suicide or crisis watch is inadequate. Among other problems, Dr. Burns observes that treatment of prisoners on watch "is generally limited to brief cell front contacts by MHP staff asking the prisoner whether or not he remains suicidal," and that one prisoner was not seen by mental-health staff for an

entire weekend.  Burns Report (doc. no. 868-2) at 46.
She also notes that prisoners released from suicide or
crisis watch are not routinely placed on the mental-
health caseload, and cites examples of prisoners who
were thereby denied adequate follow-up treatment.  As
for monitoring, Dr. Burns "found no evidence that ADOC
or MHM has a process to ensure constant watch when a
prisoner is actively suicidal."  Id. at 47.  She notes
that the observation forms feature pre-printed
15-minute intervals, and that making observations at
"predictable and regular intervals increase[s] the risk
that the prisoner on watch has adequate time and
opportunity to attempt and complete suicide in between
observations."  Id.  She also notes that MHM officials
acknowledged in depositions that prisoners in crisis
are "sometimes placed in inappropriate locations such
as offices or libraries rather than in safe cells which
increases the risk of self-harm and suicide."  Id.  Dr.
Haney observed as much during some of this tours, see
Haney Report (doc. no. 868-4) at 62 (discussing a

prisoner who he found lying on the floor of an unlit office), and he notes that some of the suicide watch cells he saw "did not appear suicide proof"--in one, "there was a rusted metal bed on the floor and protrusions in the cell that could be used to fasten a sheet or other ligature." Haney Report (doc. no. 868-4) at 40-41.[49]

Dr. Haney adds his concern regarding statements made by Dr. Hunter, MHM's Medical Director and Chief Psychiatrist, that reflected his and others' disregard of prisoners' threats of self-harm: Dr. Hunter acknowledged hearing reports that custodial staff made jokes to prisoners about suicide, and that he knew of between five and ten instances in the preceding year in which, in the words of Dr. Haney quoting Dr. Hunter, "custody staff have challenged prisoners to make good

_____

49. He also reports that at one facility, the body of a prisoner who had committed suicide just a few days before his tour had not been discovered until the day after his death, because staff had not conducted security checks that night.

on their threats of self-harm--either 'called their bluffs' or explicitly ignored their stated intentions to engage in self-harm and sent them back to their housing unit--and the prisoners in fact engaged in self-harm including instances where the prisoner 'was sent back to their housing unit only for them to perhaps act out in a more severe manner, such as cut deeper.'" Haney Report (doc. no. 868-4) at 164 (quoting Hunter Depo. (doc. no. 996-2) at 165).  (Dr. Haney also notes that Houser testified to her awareness of custodial staff failing to inform mental-health staff of prisoners engaging in self-harm, and of one instance in which this may have contributed to a prisoner's death.)

Dr. Burns, Dr. Haney, and Eldon Vail, plaintiffs' correctional expert, further opine regarding the effects of inadequate custodial staff on various

aspects of the mental-health care provided to prisoners

in defendants' custody.[50]

_____

50. Dr. Haney reports on a number of effects of
custodial understaffing, some of which relate directly
to the provision of mental-health care at issue in this
case and some of which do not. To the extent that Dr.
Haney's report discusses other ramifications of the
"out-of-control" nature of defendants' facilities, the
court has considered them, for purposes of this case,
only as further confirmation of the extent of the
staffing deficit, and not as potential sources of
liability. That said, the court would be remiss if it
did not state on the record that Dr. Haney's
descriptions of the overall level of violence in
certain facilities he visited are extraordinarily
troubling. During a single day at Bibb, for example,
Dr. Haney personally "witnessed evidence of an uprising
by prisoners, an attempted escape, a suicide attempt,
evidence of recent fires in the Segregation Units,
presumably started by prisoners, and the representation
by the Warden that one half of the prison was so unsafe
that [Dr. Haney] could not enter it." Haney Report
(doc. no. 868-4) at 51. (The prisoner attempting to
commit suicide, by pulling a ligature around his neck,
had partially covered the window to his watch cell; a
lawyer participating in the tour was the one to notice
and summon correctional officers. Id. at 49-50.)) Dr.
Haney opined that "[a]ny of these incidents would be
noteworthy and indicative of a lack of institutional
control," and that "[t]ogether they reflect the kind of
chaos and disorder that appears to pervade the ADOC."
Id. at 51. He observed that over 40 years of studying
prisons, he has never "been denied entry to a prison or
been unable to complete an inspection because the
prison could not ensure [his] safety"; during his
(continued...)

Dr. Burns concludes, in part based on MHM employees' recognition of and complaints about the problem, that a shortage of correctional officers undermines prisoners' access to mental-health care, because the officers are needed to escort prisoners to, and supervise them at, individual and group appointments and activities. She points, in particular, to evidence that prisoners who are housed in a number of segregation and residential treatment units are not adequately monitored or treated because inadequate custodial staffing makes it difficult for mental-health staff to have out-of-cell contact with them. Vail agrees; in his report, he discusses records demonstrating that "staffing shortages are creating an impediment for regular access by mental health staff to inmates in segregation" at five major facilities. See Vail Report (doc. no. 868-6) at 67-70. He describes

---

inspections of facilities in Alabama, this occurred at three out of the six facilities he was scheduled to visit over the course of a week. Id. at 18.

116

notes from a multidisciplinary team meeting at one facility which indicate that a mental health provider "must conduct groups with only a 'walkie-talkie,' as there is no officer available to provide security during the group."  Id. at 68.

Dr. Haney, too, gives a number of examples, all of which draw on admissions by staff employed by MHM.  For example, he notes that Houser admitted that groups were "frequently" cancelled at six of ADOC's major facilities, that these shortages also affect "activity tech groups, individual counseling, seeing the providers, psychiatrist or nurse practitioner," and result in segregation rounds being "often delayed." Haney Report (doc. no. 868-4) at 176-77 (quoting Houser Depo. (doc. no. 996-32) at 190, 192-93); see also Haney Report (doc. no. 868-4) at 175-76 (quoting Fields Depo. (doc. no. 996-83) at 127-28 (stating that "a lot of the groups and programming were cancelled" due to custodial understaffing at four major facilities).  He further notes that Houser stated that the inadequate levels of

(and training of) custodial staff at Donaldson--one of ADOC's facilities designated to provide residential treatment--result in it being a "difficult facility to provide mental health services in at this time," and create "just a lack of a therapeutic milieu, and that, in and of itself, will cause problems."  Haney Report (doc. no. 868-4) at 177 (quoting Houser Depo (doc. no. 996-32) 206-07).  He opines, based on his observations and interviews, that another MHM employee's description of these problems as "compromise[s]" was "far too generous a euphemism."  Id. at 175.

### d.  Conclusion

This evidence is plainly sufficient to create a genuine dispute of material fact as to whether the policies and practices plaintiffs challenge create a substantial risk of serious harm to ADOC prisoners who have serious mental illnesses.

To conclude, it is worth noting that even defendants' own mental-health expert, Dr. Patterson,

agreed with many of the findings by Drs. Burns and
Haney, including: that "staffing of the facilities is
insufficient and a significant number of the mental
health staff are unlicensed practitioners," and that
there was "not documented supervision of the unlicensed
practitioners, all of whom were providing direct
services, and some [of whom] were also supervisors,"
Patterson Report (doc. no. 679-9) at 46; that the
"physical structures are outdated with regard to the
provision of mental health services in that many do not
have adequate space for the provision of group and
individual counseling and treatment, nor are there
adequate beds for the provision of residential
treatment (RTU) and stabilization (SU) services," which
"inherently limit[s] the number and capabilities of the
mental health staff," id. at 46-47; that there are
"delays in the provision of assessment and treatment
services including the provision of medications for
inmates, again largely related to the insufficient
staffing and inadequate identification of inmates in

119

need of services," id. at 47; that there are "deficiencies including delays in responses to sick calls, referrals, and scheduled appointments" that "contribute to a failure to provide necessary mental health services" and cause "potential harm," including "continued pain and suffering of mental health symptoms including suicide and disciplinary actions due to inadequate treatment," id.; and that there are "deficiencies in adequately identifying inmates during the reception and intake process that are in need of mental health services," resulting in an "underestimate[]" of "the numbers of inmates in need of mental health services," id. Dr. Patterson recognized "the need for increased numbers and properly trained and credentialed mental health staff" and supervision by registered nurses of those conducting intake assessments. Id.

He also found that the treatment plans he reviewed "are not appropriate for individual patients," as they are "neither individualized nor multidisciplinary," and

"were signed on different dates by different people, which indicates that they are not being reviewed by a treatment team simultaneously and with the inclusion of the inmate. This is a deficiency that must be corrected and quite simply is not appropriate." Id. at 50. He observed "treatment plans that are 'cookie cutter' and have the same problems listed over and over again as well as the same interventions and same objectives despite whatever improvements or lack thereof the individual inmate has experienced," and even found that treatment plans for prisoners in crisis cells failed to "reflect decompensation or deterioration in the inmate's functioning." Id. at 50-51.

Based on an audit he conducted, Dr. Patterson concluded that there were three areas of "substantial concern": "Suicide Risk Evaluation and Management," "Mental Health Treatment Planning," and referrals. He identified the first two as "seriously deficient." Id. at 52.

121

As Dr. Haney put it in his rebuttal report, defendants' own expert's "criticisms map almost perfectly onto, and significantly reinforce," those of plaintiffs' experts.  Haney Rebuttal Report (doc. no. 840-15) at 18.

### 4.  Individual Harm

As plaintiffs point out, evidence that the named plaintiffs have suffered harm is relevant to substantiate the assertion that defendants' policies place them and other at a substantial risk of serious harm.  (By this token, corroborating evidence related to the care of named plaintiffs whose claims are not justiciable is just as relevant as that of the named plaintiffs whose claims are justiciable.)  However, they need not, as a technical matter, show that harm has already occurred to them in order successfully to demonstrate the existence of a substantial risk of serious harm.  What they certainly need not show, despite defendants' vociferous insistence to the

contrary, is that they have each been harmed in ways that, on their own, would suffice to prove a claim for deliberate indifference with respect to the past provision of mental-health care.  See Parsons, 754 F.3d at 677 ("Because plaintiffs do not base their case on deficiencies in care provided on any one occasion, this Court has no occasion to consider whether these instances of delay--or any other particular deficiency in medical care complained of by the plaintiffs--would violate the Constitution ... if considered in isolation." (quoting Brown, 563 U.S. at 506 n.3)).

Nevertheless, all of the named plaintiffs have created a material dispute as to whether they have suffered serious harm; indeed, in a few cases defendants' own expert agrees that the care they have received was inadequate in ways that the court finds clearly amount to serious harm.[51]  As a preface, the

_____

51. Plaintiffs, and Drs. Burns and Haney in their rebuttal reports, raise significant concerns regarding Dr. Patterson's assessment of the appropriateness of (continued...)

the named plaintiffs' treatment when he admittedly never spoke with any of them, and relied heavily on records they contend (and, in fact, he agreed) are poorly kept.  In noting his agreement that the care of these named plaintiffs' care is inadequate, the court is not passing on the admissibility or reliability of his evidence.  Because plaintiffs have not moved for summary judgment, those are questions for trial.

The court notes that one of the named plaintiffs whose care Dr. Patterson found to be deficient, Carter, has been released.  Although his claims are therefore moot, the court will briefly discuss the evidence regarding his mental-health care, because it goes to the substantial risk of serious harm faced by the named plaintiffs who remain incarcerated.

Carter has been diagnosed with psychosis, schizoaffective disorder, adjustment disorder with mood and conduct disturbance, major depressive disorder, borderline personality disorder, and impulse control disorder.

Defendants contended in their motion for summary judgment that Carter merely "desire[d] a different type of mental-health treatment, despite his total lack of any qualification to direct his own treatment." Defs.' Mot. for Summ. J. (doc. no. 769) at 100.  This was a remarkable position, in light of the fact that someone who does have such qualifications--defendants' own expert, Dr. Patterson--agreed with Carter that he "ha[d] not received adequate mental health care while incarcerated in the Alabama Department of Corrections." Patterson Report (doc. no. 679-9) at 22.  Specifically, Dr. Patterson opined that Carter's care had been inadequate because his psychotropic medications were discontinued in 2014--despite the fact that, as Dr. (continued...)

124

court notes that there are many other disputes of fact

which are, for purposes of concision, not discussed

---

Patterson recognized, Carter continued to suffer
symptoms that including hearing voices that tell him to
cut himself. Id.

In addition to this denial of medication,
plaintiffs also noted that Carter was on "seg rotation"
(being rotated amongst segregation units at different
facilities). His medical records reflected statements
to mental-health staff, in line with the evidence
offered by Dr. Haney, that "he believe[d] he ha[d] some
paranoia because of being in segregation." Haney
Report (doc. no. 868-4) at 102-03; Carter Medical
Records, P Ex. 73 (doc. no. 844-23) at 23, MR029623.

Plaintiffs also offered evidence that Carter was
denied adequate care when he expressed his intent to
harm himself, including testimony indicating that the
last time prior to his deposition on which he cut
himself with a razor blade, he had written to the
mental-health staff, explaining that he "was having
suicidal though[s]," but did not "get nothing in
respond back." Carter Depo., P Ex. 30 (doc. no.
840-30) at 340. They also pointed to medical records
in which mental-health staff documented that Carter
reported hearing voices telling him to kill himself and
injure others, and that he was assessed to have a
"potential for injury," but described the plan for his
treatment, in its entirety, as "Release to DOC."
Carter Medical Records, P Ex. 73 (doc. no. 844-23) at
14-15, MR003288-89.

below; exclusion of a fact from this discussion is not

an indication that it is not in dispute.[52]

_____

52. Three preliminary unrelated notes bear
mentioning:

First, the court notes that its review of the
evidence in the voluminous record (filling over 25
boxes) in this case was thorough, despite it being
hampered by the need for painstaking deciphering of
many of the photocopied, handwritten mental-health
records defendants produced to plaintiffs, some of
which were barely legible.

Second, the court notes that a number of the named
plaintiffs have presented evidence to show that they
cut themselves repeatedly with razor blades they were
given by custodial staff (and which custodial staff
failed to remove from their persons and safe cells).
Frequently, these prisoners eventually swallowed the
razor blades.  The status of this issue is somewhat
unclear.  Initially, plaintiffs sought a preliminary
injunction on this issue; then, the parties reached an
agreement sufficient for plaintiffs to withdraw their
motion.  However, plaintiffs have represented to the
court that razor blades are still available to
prisoners in crisis, and their expert evidence is
sufficient to create a dispute of material fact as to
this point; the court will hear more at trial.

Third, the court agrees with defendants that
plaintiffs' complaint does, in a small number of
places, use overly broad language to characterize the
allegations of the named plaintiffs.  At points,
plaintiffs' complaint could be read to allege an
outright denial of treatment, when in fact they present
(continued...)

126

### a. Braggs

Braggs has been diagnosed with anxiety, major depressive disorder, and post-traumatic stress disorder.[53]

He takes psychotropic medications for these conditions. Braggs testified in his deposition that he has repeatedly contacted mental-health staff to complain of unpleasant side effects of these

_____

evidence to show, and now contend in their briefing, that a given plaintiff suffered only from extremely inadequate treatment. To a significant degree, however, this disparity appears to arise as a result of a genuine dispute as to what constitutes 'treatment': defendants' briefing considers every contact between a prisoner and mental-health staff to be treatment, whereas plaintiffs and their experts have a substantially narrower conception that excludes what they describe as cursory contacts.

53. Defendants do not address evidence of individual harm with respect to the mental-health care received by Braggs, Hartley, Jackson, Johnson, and McCoy in their motion for summary judgment, although they do discuss these plaintiffs' treatment in their statement of undisputed facts. Merely mentioning facts in the statement of facts is not sufficient to meet defendants' summary-judgment burden on this issue; the court addresses the issue to provide the parties guidance.

127

medications--that they make him feel sick--but has been told that his only other option was to discontinue the medication he had been prescribed. Defendants do not appear to have offered evidence to rebut this point.

Defendants' expert, Dr. Patterson, notes that Braggs' treatment plans contemplate regular therapy, but plaintiffs note that no such meetings are documented in his records (including during periods Braggs spent in segregation); instead, the only mental-health contacts documented in his records involve discussions about medication compliance. Defendants respond that plaintiffs admitted that Braggs had received both individual and group counseling while incarcerated. Pls.' Resp. to State's Reqs. for Admis. (doc. no. 382-1) at 77. What they actually admitted was that, subject to an objection that the request for admission was "ambiguous as to the time frame or frequency being referenced ... [and] vague as to the meaning of 'mental health treatment' and 'counseling,'"

Braggs did receive some mental-health treatment other than medication at some point.

Plaintiffs also point out that Braggs' treatment plans were signed by unsupervised LPNs and by ADOC's unlicensed site administrator, and that Braggs has been classified as MH-1 ("stabilized with mild impairment in mental functioning"), despite having multiple diagnoses and being prescribed multiple psychotropic medications. Dr. Burns found that allowing unsupervised LPNs to make treatment decisions resulted in such misclassification.[54]

---

54. Defendants' contention that Braggs received adequate mental-health treatment is based in part on a letter he sent in 2014 to the former ADOC Commissioner, Kim Thomas--who he believed to be the director of mental health at Hamilton A&I--in which he described mental-health staff as committed and qualified. Braggs Depo., D Ex. 7 (doc. no. 771-19) at 116-18. Braggs also agreed at his deposition that he did not believe that he should be "receiving any different mental health treatment at this time." Id. at 140.

However, in that same deposition, Braggs testified that he had repeatedly informed the mental-health staff that he was suffering side effects, but was informed that the only options were to endure these effects or (continued...)

Plaintiffs have created a dispute of material fact as to whether Braggs has been harmed by policies and practices regarding medication management, psychotherapeutic care, and assessment and classification.

### b.  Hartley

Hartley has been diagnosed with schizoaffective disorder.[55]

Defendants' expert, Dr. Patterson, reviewed Hartley's deposition testimony and his medical records, and agrees with plaintiffs that he "is not receiving adequate mental health care.  Interventions to adequately address his chronic marijuana abuse and the

---

the symptoms that would return if he stopped taking the medication.  Given that context, neither Braggs's failure to articulate a specific alternative treatment at his deposition nor his letter to the Commissioner demonstrates that he has not suffered harm.

55. In addition to Hartley's Eighth Amendment claim, he also brings a due-process claim.  Evidence as to this latter claim is not addressed here. (continued...)

resultant mental dysfunction including his aggression
and agitation, and self-injurious behaviors have not
been included in his treatment, and he continues to
abuse marijuana infrequently.  To properly remedy these
deficiencies, the treatment team needs to develop an
individualized, comprehensive treatment plan and
interventions to address his comorbid marijuana use and
impact on his mental health functioning."  Patterson
Report (doc. no. 679-9) at 41.  Dr. Patterson relatedly
notes in his report that Hartley's treatment plans are
"not individualized and are repetitive with the same
problem statement, interventions and goals repeated
treatment plan after treatment plan without reflection
of changes in Hartley's mental status and behaviors."
Id.[56]

_____

56. Defendants assert that the treatment Hartley
was provided with respect to his use of marijuana
was adequate, based on records reflecting that mental-
health staff encouraged him to maintain sobriety after
placing him on suicide watch in 2014, when he was
experiencing hallucinations caused by use of marijuana.
(continued...)

Dr. Burns likewise recognized Hartley's care as seriously deficient. She identified Hartley in her report as a prisoner who "require[es] an RTU level of care but [has been] improperly classified as [an] outpatient[]," and described him as a "seriously mentally ill inmate with side effects from medication and still experiencing symptoms that negatively impact [his] functioning leading to placement on watch in [the] infirmary but not considered for transfer to [a] higher level of care." Burns Report (doc. no. 868-2) at 37-38.

Plaintiffs have also presented evidence to demonstrate that, although Hartley does have frequent contacts with mental-health staff, they largely involve little or no counseling--which, according to Dr. Patterson, he requires. As one example, they point to his records from the first four months of 2016, noting

_____

Given that defendants' expert disagrees that this treatment was adequate, there is at least a genuine dispute as to this issue.

that he was seen by mental-health staff ten times, but
that six of them involved solely medication
administration, one was a medication check, and one was
a check-in while he was in a crisis cell; only two were
counselling sessions, but they were supposed to occur
monthly--that is to say, twice as often.  As a more
recent example, Dr. Burns notes in her report that
"[w]hen he was placed in suicide watch at St. Clair
shortly before our interview, his only contact with
mental health staff was through the door."  Burns
Report (doc. no. 868-2) at 46.

In addition, Hartley has offered evidence to show
inadequate medication management: his medical records
show that he has complained of shaking caused by the
Prolixin shots he receives, that he could not be
prescribed a sufficiently high dose of a medication to
treat these side effects because it adversely affected
his kidneys, and that he has requested--but not been
prescribed--alternative antipsychotic medication (from
a class of medications that, according to MHM records,

133

providers were discouraged from prescribing due to cost).

Plaintiffs have created a dispute of material fact as to whether Hartley has been harmed by policies and practices regarding assessment and classification, psychotherapeutic care, and medication management.[57]


### c.  Jackson

Jackson has been diagnosed with a mood disorder, antisocial personality disorder, and depression.

Plaintiffs have presented evidence to show that his extended, continuous placement in segregation, from 2007 to 2014, has resulted in psychological harm. Dr. Haney identified Jackson as an example of a prisoner who has suffered from placement in segregation, noting that Jackson stated that segregation "breaks you down mentally, you have anxiety and all this stuff but you

---

57. Hartley's medical records also indicate that at least one mental-health appointment of his has been cancelled due to inadequate custodial staffing.

don't realize it's happening to you."   Haney Report
Appendix (doc. no. 868-4) at 39-40.

Moreover, plaintiffs have offered evidence
sufficient to create a material dispute as to whether
he received adequate mental-health treatment while in
segregation.  Dr. Haney cited Jackson as an example of
the cursory nature of mental-health contacts in
segregation, noting that he stated that the counselor
"comes around to your cell, runs by, 'you want to talk
to mental health?' but half the time you don't even see
them, they rush through," and tell the prisoners that
the "only thing we want to know is, are you suicidal?"
Id.  Jackson also reported that when he was taken out
of his cell for a counseling appointment once a month,
it would last only "10-15 minutes, at most," and that
the counselors "change so often, you don't see the same
person twice, so you don't form any real connection to
them."  Id.

Plaintiffs also offer evidence to show that
Jackson's mental-health classification failed to

account for the severity of his symptoms; he was, until recently, classified at the lowest level, MH-1, despite his diagnoses--which providers have recognized are accompanied by "severe behavioral disturbances"--his receipt of multiple psychotropic medications including an antipsychotic, and his multiple recent placements on suicide watch.

Finally, Dr. Patterson noted his concern about lapses in medication administration for Jackson, and Jackson's medical records indicate that a number of his mental-health appointments were canceled due to security issues arising from insufficient number of custodial officers.[58]

_____

58. Defendants contend that Jackson has received adequate mental-health treatment because he agreed during his deposition that he does not "have any concerns" about the mental-health treatment decisions his providers have made. Although he testified that he wants "better" treatment, he was unable at his deposition to identify any specific inadequacies in his care. Jackson Depo., D Ex. 45-1 (doc. no. 777-1) at 149-50. As was the case with Braggs, Jackson's failure to articulate a specific, alternative course of treatment at his deposition does not necessarily mean (continued...)

Plaintiffs have created a dispute of material fact as to whether Jackson has been harmed by policies and practices regarding segregation, psychotherapeutic care, assessment and classification, medication management, and custodial staffing.

### d.   Johnson

Johnson has a significant intellectual disability, as reflected in his difficulty answering straightforward questions at his deposition. Prior to his conviction, he was evaluated at the state mental hospital and diagnosed as depressed and possibly psychotic; the evaluators believed that he might be incompetent to stand trial.

After his admission to prison, he had no contact with mental-health staff for about 20 years, until he

---

that he has not suffered harm from inadequate treatment, especially given the testimony by Jackson and expert opinion regarding his continuous stay in segregation and consequent deterioration.

137

was placed on suicide watch in late 2015. At that
time, his psychiatrist observed that he was
experiencing "paranoia [and] possible delusions," and
noted that despite his assessment at the state mental
hospital, he was not on the mental-health caseload.
Johnson Medical Records, P Ex. 62 (doc. no. 844-12) at
15, MR047700. Remarkably, in the section of the chart
for symptoms, Dr. Hunter noted as follows: "He is now
involved with SPLC to perhaps go to court given the
beforementioned." Id.

Plaintiffs have also offered evidence to show that
when Johnson was released from suicide watch, he was
placed in segregation, and, though referred for mental-
health treatment, did not receive it. See Haney Report
Appendix (doc. no. 868-4) at 37. Although he has some
contact with mental-health staff every week or two,
these interactions are very brief.

Plaintiffs have created a dispute of material fact
as to whether Johnson has been harmed by policies and

practices regarding assessment and classification, crisis case, and psychotherapeutic care.


### e.  McCoy

McCoy has been diagnosed with schizophrenia, and is delusional.[59]

Plaintiffs have presented evidence sufficient to create a dispute of material fact as to whether McCoy has received an appropriate level of care. Over 20 years in prison, he has spent only two years receiving residential, as opposed to outpatient, care. Dr. Burns concluded that he required an RTU level of care and had been improperly classified. Burns Report (doc. no. 868-2) at 37-38.  McCoy testified, and Dr. Burns recognized, that he is seen infrequently and inconsistently by mental-health staff, sometimes going months at a time without seeing a psychiatrist or nurse

---

59. In addition to his Eighth Amendment claim, McCoy also claims that he has been involuntarily (continued...)

practitioner. His medical records and his testimony reflect that his treatment plans are frequently altered outside of his presence; he does not believe that he has ever attended a meeting of his treatment team. McCoy's medical records reflect that he suffers from side effects from his psychotropic medication, including pain at the injection site, stiffness, and nausea, and he testifies that he has been refused treatment for these side effects.

Additionally, McCoy has been repeatedly placed in prolonged segregation, despite statements by his mental-health care providers that "[p]rolonged isolation will adversely affect [his] mental stability," and that "prolonged placement in segregation may cause [him] to decompensate or deteriorate psychologically," and that his "mental health has deteriorated since he was put in segregation." McCoy Institutional File, P Ex. 101

---

medicated. The evidence in support of the latter claim (continued...)

(doc. no. 850-1) at 15, ADOC021879; 3, ADOC021336; 8, ADOC021491.

Dr. Burns explains in her rebuttal report that when she interviewed McCoy, "he was psychotic with poorly organized thought processes and nearly incomprehensible speech." Burns Rebuttal Report (doc. no. 840-14) at 1. In her review of McCoy's records, she "found that the medical record did not accurately portray or document his condition." Id. She added that "there is evidence in the record that in spite of his psychotic state, he has been housed in segregation, seen infrequently and [] not received adequate medication management." Id. at 2.

Plaintiffs have created a dispute of material fact as to whether McCoy has been harmed by policies and practices regarding assessment and classification, psychotherapeutic care, medication management, and segregation.

---

is not addressed here.

### f. Pruitt

Pruitt has been diagnosed with schizophrenia.

He has repeatedly attempted to harm himself, and offered evidence sufficient to create a dispute of material fact as to the adequacy of the care he received during and after these crises. His medical records reflect that during a six-month period beginning at the end of 2013, he was admitted to a crisis cell at least five times (including, in one instance, for as long as eleven days); as defendants' expert, Dr. Patterson, recognizes in his report with respect to two of the admissions, there is no indication that he was seen by a psychiatrist or nurse practitioner (or, in most cases, a psychologist) during any of these stints. Patterson Report (doc. no. 679-9) at 42-43. His medical records reflect the effects of inadequate monitoring. During one admission to a suicide cell, another prisoner threw disinfectant in Pruitt's face. During another, he was housed in a

**142**

suicide cell located on death row (a practice Dr. Haney roundly condemns), and other prisoners threw burning fabric onto him, burning his leg; he was not removed from his cell until about 45 minutes had elapsed.

Plaintiffs have also presented evidence to show that the follow-up care Pruitt has received after leaving the suicide and crisis cells has been inadequate. Dr. Burns cites him as an example of her general conclusion that prisoners released from crisis cells are "not routinely placed on the mental health caseload" and are thus denied "adequate follow-up." Burns Report (doc. no. 868-2) at 46-47 & n.58. He stated in his deposition that he had requested mental-health treatment on a number of occasions, but was told that he would be seen by mental-health staff when they had time, and then not seen. Pruitt testified that the mental-health counselor had refused to see him the week preceding his deposition. He explained that the only contact with mental-health staff he had during the two years preceding his

deposition had occurred during segregation rounds;
unlike some other prisoners, he was never taken out of
his cell for counseling.  Dr. Burns corroborates this
statement, noting that his charts reflect that he has
been offered "no treatment other than psychotropic
medications," and that he has "repeatedly asked to see
a mental health counselor, including submitting a
request slip, but no one has spoken with him
individually."  Burns Report (doc. no. 868-2) at 36
n.45.  Dr. Burns also cites him as an example of
inadequate treatment leading to repeated self-harm.
Burns Report (doc. no. 868-2) at 18-19 & n.18.

Dr. Burns also recognizes in her report that Pruitt
has repeatedly received disciplinary sanctions for
symptoms of his mental illness--he has been cited for
creating a "security, safety or health hazard" when he
has injured himself.  Burns Report (doc. no. 568-2) at
29.

Plaintiffs have created a dispute of material fact
as to whether Pruitt has been harmed by policies and

**144**

practices regarding crisis care, assessment and classification, psychotherapeutic care, and disciplinary sanctions.

### g.  Wallace

Wallace has been diagnosed with bipolar disorder, paranoid schizophrenia, attention deficit hyperactivity disorder, and intermittent explosive disorder.  He also has an intellectual disability.  He has very recently engaged in self-harm, attempting to commit suicide by biting himself.

Defendants' expert, Dr. Patterson, agrees with plaintiffs that "[h]is mental health treatment has been inadequate in the ADOC."  Patterson Report (doc. no. 679-9) at 28.  In particular, he explains that Wallace's "treatment plans are inadequate and do not effectively address the symptoms of his Bipolar Disorder," and "his intellectual disability also contributes to his variable participation in treatment and is not adequately addressed in the treatment plans.

**145**

The medical records do not indicate he has been
consistently offered group therapies to address his
intellectual deficits and [] the focus of the plans
appears to be on his hygiene and participation, but the
interventions do not realistically provide for services
to address his dual diagnosis of Bipolar Disorder and
Intellectual Disability." Id. This alone is
sufficient to create a dispute of material fact as to
whether Wallace has been harmed defendants' provision
of inadequate mental-health care.

The record also contains evidence from Wallace's
deposition and his institutional file showing that he
has received numerous sanctions due to symptoms of his
mental illness, including nine disciplinary citations
for cutting his wrists.

Plaintiffs have also offered evidence to show that
Wallace has received inadequate psychotherapeutic
treatment. Although defendants respond that he had 550
interactions with mental-health staff between January
2012 and the end of September 2015, plaintiffs respond

that many of these interactions were cursory, citing
examples of extremely brief interactions. Moreover,
Dr. Haney cited Wallace as an example of a prisoner
receiving who had primarily brief, cell-front
interactions with mental-health staff; Dr. Haney's
report also noted that Wallace explained that, although
he is removed from his cell for a counseling session
once every other month, "officers hurry [the counselor]
up if she spends too long with inmates." Haney Report
Appendix (doc. no. 868-4) at 40.

Plaintiffs have created a dispute of material fact
as to whether Wallace has been harmed by policies and
practices regarding crisis care, disciplinary
sanctions, and psychotherapeutic care.

h.  Williams

Williams has been diagnosed with a mood disorder
and attention deficit hyperactivity disorder; she has
previously been prescribed antipsychotic medication and

received inpatient psychiatric treatment.[60]   She has a history of sexual abuse.

   Plaintiffs have offered evidence sufficient to create a dispute of material fact as to whether she has been denied adequate mental-health treatment as a result of the decision not to place her on the mental-health caseload for several years after her admission.   Despite being referred for an evaluation, Williams was not placed on the mental-health caseload upon reentering custody in late 2012.   In March 2014, she cut herself a number of times after a traumatic incident,[61] but was released from the safe cell without

_____

   60. Williams is a transgender woman.   Defendants have housed her in male facilities.

   61. The record reflects that Williams told mental-health providers that she was cutting herself because she wanted to speak with her attorney or her husband about this incident, but that she was not in fact suicidal.   In addition, she refused to speak with mental-health staff on certain occasions.   Although it is a somewhat close call, the court concludes that the evidence about these repeated instances of self-harm, combined with the opinion of plaintiffs' experts that the monitoring of and care provided to prisoners who (continued...)

any plan for follow-up treatment, and, despite her requests, without being put on the mental-health caseload.  Williams's experience dovetails with Dr. Burns's opinion that prisoners released from crisis cells are not being provided adequate follow-up treatment.

Moreover, plaintiffs have offered evidence to show that the care Williams received immediately surrounding the cutting incidents was deficient, including medical records showing that the providers who monitored her while she was in the crisis cell were not mental-health staff, and her deposition testimony that when she did speak with a mental-health provider, the interactions were brief--about five minutes.  On one instance, her medical records reflect that she was twice returned to segregation--over the course of less than an hour and a half--after cutting herself and indicating her intent

---

are harming themselves is inadequate, suffices to create a genuine dispute of material fact as to whether Williams has been harmed.

**149**

to continue doing so. Each time, she followed through, and was brought back to the medical unit. Again, this evidence appears to illustrate Dr. Burns's findings regarding the inadequacy of monitoring of prisoners engaging in self-harm.

Finally, plaintiffs note that Williams's self-harm began within a few days after her placement in segregation. In her declaration, Williams echoed what Dr. Haney explained in his report: "Being in segregation messes with my mental capacity. It triggers me to harm myself." Williams Decl., P Ex. 83 (doc. no. 679-3) at 2. Plaintiffs have therefore created a dispute of material fact as to whether Williams's placement in segregation subjected her to psychological (as well as physical) harm.

Plaintiffs have created a dispute of material fact as to whether Williams has been harmed by policies and practices regarding assessment and classification, crisis care, and segregation.

## 5.  Deliberate Indifference

Plaintiffs have presented evidence sufficient to establish subjective deliberate indifference in multiple different ways.  First, plaintiffs apprised defendants--in writing, prior to commencing litigation--that the policies and practices at issue in this case created a substantial risk of serious harm to prisoners with serious mental illness.  Second, MHM officials recognized the necessity of reforms (and the ways that prisoners were being harmed), and related these concerns to defendants, who failed to take responsive action, whether because they lacked sufficient funds or for some other reason.  Third, plaintiffs offer evidence regarding defendants' decision to renew MHM's contract despite serious, recognized problems, and failure to monitor the care being provided by MHM, and argue compellingly that this

evidence, too, could support a finding of subjective deliberate indifference.[62]

As discussed at length in the opinion as to ADAP, ADAP and plaintiffs' counsel from the Southern Poverty Law Center discussed in detail the allegations in this case in a letter they sent to defendants prior to beginning this litigation. Courts have repeatedly found subjective deliberate indifference in systemic cases based on the defendants' receipt of communications and reports setting forth the ways in which the medical or mental-health care provided in their prisoners was inadequate and failure to respond.

In <u>Scott v. Clarke</u>, 64 F. Supp. 3d 813, 835-37 (W.D. Va. 2014) (Moon, J.), the court found that

_____

62. Finally, plaintiffs have offered evidence of egregious and widespread shortcomings which appear to be manifested in such obvious ways that the court could infer subjective deliberate indifference based on their mere existence. The court has discussed this evidence at some length and will not tarry further, except to conclude that these facts, if proven at trial, could well support an inferential finding of subjective deliberate indifference.

plaintiffs had demonstrated a genuine dispute of material fact as to the defendants' subjective deliberate indifference to constitutionally inadequate medical care based in significant part on plaintiffs' counsel's pre-litigation letter to the defendants. This letter "notif[ied] [them] that Plaintiffs and other women residing at FCCW 'have suffered and continue to suffer the adverse physical and mental effects of FCCW's failure to provide care or provision of deficient care in deliberate indifference to their serious medical conditions'"; explained that despite delegating the provision of health care to a contractor, defendants retained "an affirmative duty" to ensure that the contractor was not subjecting prisoners to harm or a risk thereof by providing inadequate care; noted that defendants had been unresponsive to grievances regarding deficient care; "provided its recipients with an itemized listing of specific areas of concern in regard to the quality of medical care provided at FCCW"; "advised the addressees

of the potential legal implications of the sub-standard care described under the Eighth Amendment"; and "invited [them] to commence negotiations."  Id. at 836-37.  The defendants failed to take action in response to the letter from plaintiffs' counsel; plaintiffs then filed suit.  The court found that this and other evidence of defendants' "failure to require or undertake corrective action and [their] 'hands-off' attitude towards [their] medical care contractors ... constitute[d] ample grounds for a finding of deliberate indifference."  Id. at 839.  The initiation of this litigation occurred in very similar fashion.

Other courts have similarly found subjective awareness based on external reports.  See LaMarca, 995 F.2d at 1536-37 (subjective awareness shown based in part on "an external management review of [the prison] conducted from August 26 to 29, 1980," which "concluded that '[t]he assault trend, both inmate on inmate and inmate on staff, from July 1979, through June 1980, has increased'"); Austin v. Hopper, 15 F. Supp. 2d 1210,

1261 (M.D. Ala. 1998) (Thompson, J.) (subjective awareness shown based in part on "correspondence between the DOC and the Department of Justice" that "demonstrates that the DOC had knowledge of the allegations of serious harm being inflicted by prison officers upon inmates by means of the hitching post"); Coleman v. Wilson, 912 F. Supp. 1282, 1300, 1317 (E.D. Cal. 1995) (Karlton, J.) (subjective awareness shown based in part on "the Stirling Report produced pursuant to a legislative mandate and the CDC commissioned Scarlett Carp Report," "regarding the prevalence of, and the provision of mental health care services to, inmates who suffer from [serious mental] disorders"); Harris v. Angelina Cty., Tex., 31 F.3d 331, 335–36 (5th Cir. 1994) (subjective awareness shown based in part on "Reports from the Texas Commission on Jail Standards to the County").

Moreover, plaintiffs have presented a wealth of direct evidence demonstrating that defendants were apprised of at least some of the serious inadequacies

155

in mental-health care now challenged even before
counsel brought them to their attention. The
depositions of MHM administrators are replete with
acknowledgements of their awareness of--and
communication with defendants and their staff
about--the problems documented by plaintiffs' experts.

For example, with respect to the staff's ability to
handle the mental-health caseload: MHM Medical Director
and Chief Psychiatrist Dr. Hunter admits that the
combination of the increased size and severity of the
mental-health caseload with the staffing decision by
ADOC discussed above have "start[ed] to tax our ability
to adequately do what we do." Hunter Depo., P Ex. 16
(doc. no. 675-16) at 44. A recent audit by MHM of
Donaldson, one of ADOC's treatment-oriented facilities,
recognizes "a shortage of mental health staff" and
attendant problems, including that "admission nursing
assessments to the RTU were not being completed" and
"treatment plans were not being completed, not
individualized." Fields Depo. (doc. no. 996-83) at

127.    Houser    testified    that    MHM    had    repeatedly
requested  that  ADOC  provide  funds  to  hire  additional
mental-health  staff,  "in  order  for  us  to  be  able  to
provide  services  in  a  more  timely  way,"  and  because  the
"number  of  crises  that  go  on  on  a  daily  basis  ...  takes
away  from  doing  the  daily  therapeutic  things  for  the
people  on  the  caseload."   Houser  Depo.,  P  Ex.  15  (doc.
no.  675-15)  at  22.    The  funds  MHM  requested  were  not
provided,  due  to  "state  budget  issues."   Id. at  79-82.

As  another  example,  Dr.  Hunter  also  agrees  with
plaintiffs'    experts    concern    about    the    use    of
residential  treatment  units  to  house  prisoners  in
segregation  without  mental  illnesses.    Houser,  too,
acknowledges  that  residential  treatment  units  have  been
used  as  "overflow  seg,"  that  this  results  in  problems
with  "security"  and  "programming"  in  the  units,  and
that  it  causes  delays  in  mentally  ill  prisoners
receiving  treatment.   Houser  Depo. (doc. no. 996-17) at
191-92;  Houser  Depo. (doc. no. 996-32) at 59-60.   Dr.
Hunter  was  blunter:  "We've  always  had  a  problem  with

157

our treatment units, our stabilization units, doubling
as a segregation unit.  And we've been clear and vocal
that that's not the best use of our crisis space, and
it does compromise treatment."  Hunter Depo. (doc. no.
996-2) at 159.  A correctional administrator's failure
to respond when mental-health providers in his
facilities are "clear and vocal" that their ability to
provide care is being undermined reflects deliberate
indifference.

As for the placement of prisoners with mental
illness in segregation, Dr. Hunter explains that he met
with correctional administrators in early 2015 to share
concerns about "the deleterious effects of long-term
seg placement" and "what other systems are doing in
that regard to address their problem"; he reports that
the Commissioner's chief of staff was present at the
meeting and stated that the Commissioner "very much
would like some reform on how seg is handled here in
Alabama."  Hunter Depo. (doc. no. 996-2) at 184-86.
Houser describes MHM's effort to communicate at this

158

meeting "how when inmates are detained in a single cell
for long periods of time, it will cause--often cause
further decompensation in their mental health." Houser
Depo. (doc. no. 996-32) at 66.[63]  In particular, this
meeting with ADOC administrators about the use of
segregation was apparently prompted by an increasing
rate of suicide over the past few years.  Dr. Hunter
explained at the meeting that in "looking at the
suicides on record for that period of time, again a
common denominator in most of them was segregation
placement or the prospect of segregation placement,"
but testified that no follow-up steps had been taken by
defendants "to address mental health implications of
segregation," and that no follow-up meeting had
occurred, despite an agreement to have one.  Hunter
Depo., P Ex. 16 (doc. no. 675-16) at 191, 200-01.  At

_____

        63. This concern was put in stronger terms still in
the minutes of a meeting of MHM administrators in July
of 2013: "DOC is over using segregation on MH inmates.
They want to punish them."  CQI Meeting Minutes, P Ex.
182 (doc. no. 850-82) at 61.

159

the risk of stating the obvious, a correctional administrator's failure to take any corrective (or even responsive) action when the chief physician responsible for providing mental-health care to prisoners in his custody tells him that his practice of placing mentally ill prisoners in segregation is resulting in their deaths is a textbook case of deliberate indifference, and truly shocks the conscience.

Plaintiffs also point to defendants' failure to conduct more than minimal auditing of the mental-health care being provided, and their failure to respond to serious concerns raised by the auditing that was actually done, as further evidence of deliberate indifference. Although the Associate Commissioner and the Office of Health Services (OHS) she runs are responsible, under the contract, from monitoring the performance of MHM in delivering mental-health care, the evidence suggests that they have abdicated this obligation to engage in "continuous quality improvement." Mental Health Services Contract, P Ex.

153 (doc. no. 682-13) at 9, ADOC00330.  In 2013 and 2014, OHS conducted only two formal audits, both of the same residential treatment unit at one facility, Donaldson, in April and May 2013.  This audit revealed problems in a variety of areas including, among others, access to mental-health care, treatment planning, medication administration, and the placement of prisoners who did not require residential care in treatment beds.  Depositions revealed that OHS did not work with MHM to develop a plan to address these problems, re-audit the unit, or meet more than once do discuss the results; no one from MHM or the facility was present at the only meeting.  An MHM employee testified at her deposition that many of the problems identified in that audit remained three years later.  Although MHM does conduct more extensive quality improvement activities (and setting aside the inadequacies in this oversight as described by plaintiffs' experts), which document problems at different facilities with, among other things,

161

delinquent appointments, outdated treatment plans, and medication errors, OHS does not request or receive copies of the corrective action plans MHM creates in response to its audit findings, and the Associate Commissioner does not request or receive MHM's annual contract compliance report.[64]   She does not request or receive reports from the member of her staff who attends MHM's quality improvement meetings, or review minutes of those meetings.   The OHS audits that were conducted provide further support for the conclusion that the Commissioner and Associate Commissioner were aware of serious problems in the delivery of mental-health care to prisoners; their failure to conduct further audits or review the audits that are

_____

64. In fact, the Associate Commissioner testified that she "can't say for certain" whether the contract compliance report is even being produced, as required, on a yearly basis.  She explained that "[a] lot of that was handled directly with Dr. Cavanaugh," an individual who she then acknowledged has "been dead maybe a year and a half."  Naglich Depo., P Ex. 22 (doc. no. 676-2) at 182.

conducted by MHM is further evidence of their failure to take reasonable responsive action. Together, they are yet another basis on which the court could conclude that defendants have been deliberately indifferent.[65]


B.  Due Process

Defendants move for summary judgment with respect to involuntary-medication claims of Bui, Hartley, and McCoy, on the grounds that Bui has received adequate due process and that the other two prisoners have

---

65. Plaintiffs also suggest that defendants' decision to enter, in 2013, into a "capitated" contract that provides a certain, fixed amount of funding per prisoner reflects deliberate indifference because it creates a profit incentive for MHM to spend as little as possible in providing mental-health care. As another court has recently recognized, entering into such a contract can reflect a privileging of cost considerations over medical needs that constitutes deliberate indifference. See Scott, 64 F. Supp. 3d at 839-41; see also Manis v. Corr. Corp. of Am., 859 F. Supp. 302, 305 (M.D. Tenn. 1994) (Higgins, J.) ("Especially when a private corporation is hired to operate a prison, there is an obvious temptation to skimp on civil rights whenever it would help to maximize shareholders' profits."). The court will consider evidence going to this issue at trial.

163

consented to receiving the medication (such that it was not involuntary at all).[66]  The court finds that summary judgment is due to be denied in part and granted in part with respect to these claims.

In **Washington v. Harper**, the Supreme Court recognized that a prisoner possesses "a significant liberty interest in avoiding the unwanted administration of anti-psychotic drugs under the Due Process Clause of the Fourteenth Amendment."  494 U.S. 210, 221–22 (1990).  Given that the purpose of psychotropics is "to alter the will and the mind of the subject," forced medication "constitutes a deprivation of liberty in the most literal and fundamental sense." Id. at 238 (Stevens, J., concurring in part and dissenting in part).  Nonetheless, the right to refuse treatment of psychotropic drugs is not absolute. Although a prisoner's constitutional right to be free

---

66. Dillard and Terrell also brought due-process claims falling within this category.  These claims are moot.

from unwanted medication is evaluated in light of the fact that he is incarcerated, id. at 222, involuntary-medication orders must meet minimum standards of substantive and procedural due process, id. at 220.

In Harper, the Supreme Court concluded that "given the requirements of the prison environment, the Due Process Clause permits the state to treat a prisoner who has a serious mental illness with antipsychotic drugs against his will," if (1) "the inmate is dangerous to himself or others" and (2) "the treatment is in the inmate's medical interest." Id. at 227. Because Washington's policy met these substantive guarantees and provided adequate administrative procedures--including notice, a right to be present at an adversary hearing, and to present and cross examine witnesses--prior to a determination that prisoners would be medicated over his objections, the court found Washington's policy to comport with due process. Id. at 235.

165

Moreover, since Harper, courts have recognized that the viability of involuntary-medication claims do not depend upon the means used to compel the administration of unwanted medication: violence, the threat of violence, or the threat of other "adverse consequences." United States v. Williams, 356 F.3d 1045, 1054 n.10 (9th Cir. 2004); see also Roland v. McMonagle, 2015 WL 5918179, at *4 (S.D.N.Y. Oct. 9, 2015) (Oetken, J.) ("The Fourteenth Amendment prohibits prison officers from using the threat of violence to compel an inmate to ingest a drug, particularly where no medical professional has authorized forced medication."); Blackburn v. Alabama, 361 U.S. 199, 206 (1960) ("Since Chambers v. State of Florida, this Court has recognized that coercion can be mental as well as physical.... A number of cases have demonstrated, if demonstration were needed, that the efficiency of the rack and the thumbscrew can be matched ... by more sophisticated modes of 'persuasion.'"). However, mere encouragement to take a prescribed medication does not

166

give rise to a constitutional claim.  See Abbott v.
Soong, 2016 WL 1170944, at *3 (M.D. La. Mar. 2, 2016)
(Wilder-Doomes, M.J.), report and recommendation
adopted, 2016 WL 1215369 (M.D. La. Mar. 23, 2016)
(Dick, J.).


### 1.  Substantive Due Process

Bui, the one plaintiff who is currently subject to
an involuntary-medication order, has created disputes
of material fact with respect to whether the initial
order and its repeated renewals violated his
substantive and procedural due-process rights.

Bui has been diagnosed with schizoaffective
disorder, depressed type.  Since 2007, he has been
subject to a continuously renewed order for involuntary
antipsychotic medication, which he receives by monthly
injection.  It is clear that Bui does not take his
medication voluntarily: his medical record reflects
repeated verbal requests to staff to terminate the
involuntary-medication order, and indicates that on at

167

least one occasion he agreed to the injection only when "confronted with possible interventions (DOC assistance)." Bui Medical Records, P Ex. 68 (doc. no. 844-18) at 11, MR002531. It also indicates that he formally appealed the order in 2009, but that the committee concluded that his denial of any mental illness was evidence that the order should be continued. Id. at 40, MR002726.

Notes from the review of this involuntary-medication order include suggestions in February 2008 and January 2010 that, as put in the latter instance, he would be a "good candidate for discontinuing the involuntary medication order at next review." Id. at 47, MR002833; 32, MR002674. However, in July 2010, the order was renewed based on his "lack of insight regarding his mental illness," the likelihood that he would stop taking his medication if it was not involuntarily administered, and his recent gains from treatment. Id. at 30-31, MR002660-61. The

order has subsequently been renewed, about every six
months.

Plaintiffs have offered evidence to show that the
decision to continue involuntary medication has not
been based on current symptoms demonstrating a grave
disability or danger to himself or others, but rather
on the fact that he denies the existence of his mental
illness. Plaintiffs note that the fact that Bui
receives a long-acting injection on a monthly basis
means that he has never been able to appear (and be
observed) un-medicated at any of his hearings, as he is
entitled by ADOC regulations to do. The evidence in
the record shows that prior to the initiation of his
involuntary medication, Bui's symptoms involved
inappropriate behavior such as touching of female staff
and proselytizing--but no "outward aggression or
violence either to himself or others," Hunter Depo.
(doc. no. 996-2) at 256-59--and that his symptoms have
improved over time, allowing him to move into general
population. But defendants have not shown the absence

169

of a dispute of material fact as to whether his current

symptoms warrant ongoing involuntary medication.[67]

Summary judgment will therefore be denied as to whether

Bui's involuntary medication violates his substantive

due-process rights.

_____

67. Defendants contend that there is no dispute as
to whether it "[w]ould ... be appropriate to continue
[a prisoner; specifically, Bui] on involuntary
medications solely because he's doing well," noting
that their expert, Dr. Patterson, stated in his
deposition that this would "absolutely" be appropriate,
and contending that this evidence is unrebutted.
Patterson Depo., P Ex. 12 (doc. no. 840-12) at 240.
Even if this is so, this testimony goes only whether
continuation would be in the patient's medical
interest, not to whether it would be necessary because
he is a danger to himself or others.  (To the extent
that Dr. Patterson opined that a patient "doing well"
is a sufficient basis, on its own, to continue
involuntary medication indefinitely, his opinion is
contrary to Supreme Court law.  Harper, 494 U.S. at
227.  Plaintiffs point to the deposition testimony of
Dr. Charles Woodley that a determination as to a
patient's dangerousness should be based on observations
within the past year.  Woodley Depo., P Ex. 58 (doc.
no. 844-8) at 110-11.  In light of the undisputed
evidence that Bui is not currently a danger, and the
evidence in the record suggesting that involuntary
medication may no longer be in his medical interest,
there is a dispute of material fact as to whether
continuation of his involuntary-medication order
violates his substantive due-process rights.

## 2. Procedural Due Process

Plaintiffs also contend that defendants have violated Bui's right to procedural due process. They identify evidence of a number of inadequacies in the hearing process that has been afforded Bui: most of the hearing notices Bui received did not indicate the recommended medication and/or the reasons for the hearing, and some of the hearing notices include dates that appear to have been changed or were dated for the same day as the hearing or, in one case, the day after the hearing. Plaintiffs also presented some records that do not indicate--as they should--that Bui was provided with a staff advisor.

Defendants first contend that Bui's procedural due-process claim fails as a matter of law because ADOC's regulation setting forth procedures for involuntary medication is modeled after the Washington regulation that was upheld by the Supreme Court in Harper. However, simply showing that the regulation

171

itself is constitutional is not sufficient to defeat plaintiffs' claim that the procedure actually afforded to Bui--which they say fails to comply with that regulation--is unconstitutional. As the court understands it, plaintiffs' claim is not that <u>Harper</u> establishes the constitutional procedural floor, or that a prisoner has a constitutional due-process right to the procedures outlined in state regulations, but rather that the procedures in fact being provided do not suffice; deviations from the regulations approved in <u>Harper</u> and from state regulations are certainly pertinent to this inquiry, though not dispositive. His claim is therefore a potentially viable one.

Defendants also note that Bui answered in the affirmative during his deposition when asked (generally, rather than with respect to any one of his numerous hearings) whether he had received notice of and an opportunity to attend his involuntary-medication hearings, that he had refused to attend some hearings, and that he had received the various procedural

protections to which he was entitled at each one, such as the presence of a staff advisor, a right to appeal, and the ability to be unmedicated.  However, Bui is not a native or fluent speaker of English, and he appears to have misunderstood the one question in this series to which he gave more than a monosyllabic response. Bui Depo., D Ex. 14-1 (doc. no. 772-2) at 72-73 ("Q: You had the ability to be unmedicated on that day, correct?  A: Yeah.   I told him [the doctor] I was-- every time I see him, I told him I don't want to get a shot no more.").   Moreover, this admission appears clearly to be untrue; as plaintiffs point out, Bui is required to receive a monthly injection of a long-lasting medication that makes his appearance at a hearing in an unmedicated state impossible.  In light of this, and the apparent deficiencies revealed by his records, the court concludes that Bui's affirmative answers are insufficient to support summary judgment, and that a genuine dispute of material fact exists as to his procedural due-process claim.

### 3.   Voluntary and Knowing Consent

As for Hartley and McCoy, plaintiffs agree that they have signed forms consenting to administration of psychiatric medication,[68] but offer evidence to create a dispute of material fact as to whether there is a practice of coercing prisoners to take psychotropic medication and failing to inform them adequately about their medication, and as to whether this practice has resulted in the consent ostensibly given by Hartley and McCoy not being knowing or voluntary.  See Hightower ex rel. Dahler v. Olmstead, 959 F. Supp. 1549, 1569 (N.D. Ga. 1996) (citing Dunkins v. Thigpen, 854 F.2d 394, 398 (11th Cir. 1988)) ("In order to consent, Plaintiffs

---

68. With respect to McCoy, plaintiffs agree only that his signed name appears on the forms; McCoy testified that the signatures were not his own. Although the court might ordinarily hesitate to credit testimony to this effect and place a heavy burden on an individual claiming a signature to be inauthentic to demonstrate as much, the evidence corroborating his other allegations cautions in favor of hearing him out.

must waive their liberty interest in refusing antipsychotic medication. Any waiver of a constitutional right must be knowing and voluntary.").

Other than during a one-month period in 2005, McCoy has not been under an involuntary-medication order. However, he testified at his deposition that he verbally refused to take his shot on multiple occasions (constituting a withdrawal of prior consent), and that he has at times been subjected to force at the hands of correctional officers, threatened with placement in segregation, and actually placed in an isolation cell as a result of his refusal. (Defendants suggest that his testimony relates only to an incident in 2009. But he testified in his deposition that he continued to refuse medication and that officers threaten to "lock him up" if he doesn't accept the shot he receives "right now." McCoy Depo., D Ex. 61-1 (doc. no. 778-17) at 34. Another plaintiff corroborated portions of this

**175**

account in his deposition.[69]   Moreover, plaintiffs'
expert, Dr. Burns, observed during her interviews with
prisoners that they "consistently reported being
subjected to being threatened with forcible medication
injections if they refused either oral medications or a
scheduled injection; and some said they had actually
been subjected to the use of force to be given an
injection of a refused medication."  Burns Report (doc.
no. 868-2) at 43.

Defendants do not substantively dispute this
account of coercion, merely responding that McCoy
signed a number of consent forms, that his medical
records at points document McCoy's statements agreeing
to be medicated, and that his assertion of a forged
signature and his testimony describing coercion do not

---

69. The court recognizes that certain evidentiary
objections have been raised regarding this testimony;
these will be resolved at trial, as a genuine dispute
of material fact exists even without it.

suffice to create a genuine dispute of fact.[70]   But whether or not he signed the forms, he has offered evidence sufficient to create a material dispute as to whether his consent on many past occasions has been voluntary, and as to whether defendants' have an

---

70. Defendants rely on Whitehead v. Burnside, 403 F. App'x 401, 403-04 (11th Cir. 2010), for the proposition that McCoy's own "[s]elf-serving statements" alleging coercion "[can]not create a question of fact in the face of contradictory, contemporaneously created medical records."   This argument fails because McCoy offers not only his own statement but also the report of Dr. Burns that other prisoners described similar treatment (as well as the testimony of another prisoner who observed one of the incidents).   Were this evidence inadequate to proceed to trial on a claim like McCoy's, medical providers who failed to document their own malfeasance would be entirely protected from liability.   Illegal behavior like threatening a patient in order to coerce him to consent to medication is obviously not the sort of thing likely to be documented, even when it does occur. (Whitehead, by contrast, tried to create a dispute about something very likely to be documented if it had occurred: a recommendation that a fractured kneecap required immediate surgery.   Not only did his medical records not reflect that recommendation, prison records revealed that the administrator who Whitehead claimed had overruled the physician's recommendation was not present at the prison at the time.)

unconstitutional practice of allowing staff to coerce prisoners into taking psychotropic medication.

The due-process claim brought by Hartley, however, does not raise a genuine dispute of material fact. Hartley is developmentally disabled and reads at a third-grade level, and testified that he sometimes requires assistance in reading and understanding documents he signs. He also testified that he does not know what psychotropic medications he takes or what they are for. However, Hartley agreed that mental-health staff would answer his questions and explain the documents he was asked to sign. Furthermore, plaintiffs do not present evidence of a policy or practice of mental-health staff failing to educate prisoners about their medications. While Dr. Burns spoke to some prisoners who do not know what medications they are taking, this alone--absent some evidence that this information was not discussed by providers, or that these prisoners were not competent to consent--would not be sufficient evidence from which

178

to conclude that providers consistently fail to get informed consent from prisoners.[71] Accordingly, summary judgment will be granted with respect to Hartley's due-process claim.


## C. Liability

Defendants contend that plaintiffs have not offered evidence to demonstrate that any policies and procedures of the Commissioner and Associate Commissioner are causally related to any constitutional violations; in other words, they contend that they are simply not responsible. They note the unremarkable and undisputed facts that neither of these officials is actually involved in the direct provision of care to prisoners, and also that ADOC contracts with a

---

71. Even those who are not mentally ill or cognitively impaired do not necessarily remember the medications they are taking and cannot necessarily explain their effects.

corporation, MHM, to provide mental-health care.[72]   They also cite the principle that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability," <u>Cottone v. Jenne</u>, 326 F.3d 1352, 1360 (11th Cir. 2003) (citation and internal quotation marks omitted), but rather only for a "custom or policy," <u>Goebert v. Lee Cty.</u>, 510 F.3d 1312, 1331 (11th Cir. 2007) (citation omitted), which "must be the moving force of the constitutional violation," not merely "tangentially related to a constitutional violation," <u>Cuesta v. Sch. Bd. of Miami-Dade Cty.</u>, 285 F.3d 962, 967 (11th Cir. 2002) (citation and internal quotation marks omitted).[73]

_____

72. Actually, the record reflects that there are some low-level employees of ADOC--called psychological associates--who are involved to some extent in the direct provision of mental-health care to those with low-level problems, and that a couple of psychologists employed by ADOC play a role in the intake process.

73. In fact, it does not appear that this causation case law even applies to official-capacity, (continued...)

180

But this standard applies in cases where the inferior, not the superior, is the one who has been deliberately indifferent. Here, plaintiffs are not seeking to hold defendants responsible for the deliberately indifferent acts or omissions of their underlings; they are seeking to hold defendants responsible for their own deliberately indifferent acts

---

injunctive-relief claims brought under Ex parte Young. The cases defendants cite all involve retrospective claims for money damages against either personal-capacity defendants or municipal defendants. (Defendants do cite one case, Miller v. King, 384 F.3d 1248 (11th Cir. 2004), which applied this standard to an official-capacity, injunctive-relief claim without discussion. This decision was vacated, however, and is therefore no longer binding precedent. See Miller v. King, 449 F.3d 1149 (11th Cir. 2006).).

A number of other courts have held that official-capacity, injunctive-relief claims can proceed despite an absence of any retrospective causal connection to the defendants. See Parkell v. Danberg, 833 F.3d 313, 332 (3d Cir. 2016); Colwell v. Bannister, 763 F.3d 1060, 1070-71 (9th Cir. 2014); Hartmann v. California Dep't of Corr. & Rehab., 707 F.3d 1114, 1127 (9th Cir. 2013); Gonzalez v. Feinerman, 663 F.3d 311, 315 (7th Cir. 2011); Koehl v. Dalsheim, 85 F.3d 86, 89 (2d Cir. 1996); see also Planned Parenthood Ariz., Inc. v. Brnovich, 172 F. Supp. 3d 1075, 1084 (D. Ariz. 2016) (continued...)

and omissions, and those of the contractor to which they have delegated authority over a non-delegable constitutional obligation. The acts and omissions plaintiffs have challenged are specific policies and practices of defendants. They have offered evidence to show that these policies and practices have caused constitutional injury by creating a substantial risk of serious harm. Again, these policies and practices are not being identified to show defendants' liability for the deliberate indifference of officers or providers acting pursuant to them; they are being identified to show defendants' own deliberate indifference. They fall into two general categories: policies and practices with respect to which defendants actually exercised final decision-making authority, and those which can be ascribed to defendants because they delegated final decision-making authority with respect

---

(Logan, J.); Malik v. Tanner, 697 F. Supp. 1294, 1304 (S.D.N.Y. 1988) (Kram, J.).

to the non-delegable duty to provide adequate mental-health care to prisoners in their custody.[74]

---

74. Although plaintiffs have offered substantial evidence of policies and practices, the court notes that even acts or omissions that do not constitute a policy or practice would be sufficient to establish liability for a violation. (Of course, plaintiffs have endeavored to show the existence of policies and practices because they must do so for purposes of commonality in class certification.) See Williams v. Bennett, 689 F.2d 1370, 1383 (11th Cir. 1982) (explaining that in a case seeking prospective injunctive relief from an Eighth Amendment violation, the question is "whether the combined acts or omissions of all state officials with some responsibility for operation of the Alabama penal system created living conditions in the prisons which violated the eighth amendment"); LaMarca, 995 F.2d at 1538-42 (remanding a personal-capacity damages claim against a former prison warden in light of the plaintiffs' failure to show a causal connection to the former warden, but upholding a grant of injunctive relief against his successor based on a finding that the successor had not "taken sufficient steps to ensure that [the] past wrongs would not be repeated"); cf. Luckey v. Harris, 860 F.2d 1012, 1015-16 (11th Cir. 1988) ("Personal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity. ... All that is required is that the official be responsible for the challenged action. As the Young court held, it is sufficient that the state officer sued must, 'by virtue of his office, ha[ve] some connection' with the unconstitutional act or conduct complained of.").

In the first category fall policies and practices expressly set forth by defendants in the contract between ADOC and MHM: underfunding and understaffing, both in terms of the total number of mental-health staff and the number of staff with different qualifications. As has been discussed elsewhere, plaintiffs have presented evidence that the decisions of ADOC to provide less money and fewer and less qualified staff than their request for bids initially called for, and than MHM administrators requested, have resulted in a range of serious problems in the delivery of mental-health care across the system. Moreover, there is evidence in the record (in addition to the letter plaintiffs' counsel sent to defendants in advance of filing this case) that defendants were aware that the contractor they had selected was struggling to provide what it considered to be adequate care with the resources allotted, but failed to provide more resources.

Also in this first category are the policies or practices of operating prisons which are severely understaffed by correctional officers and overcrowded with prisoners.[75] Obviously, the Commissioner, not MHM, is responsible for providing adequate custodial staff and space in the facilities he runs.  Moreover, there is evidence that he and the Associate Commissioner are aware of the gravity of the harms that can result from understaffing, including to the health and safety of prisoners.  This category also includes correctional policies and practices like the placement of mentally

---

75. This category also includes policies and practices which are clearly determined by defendants and also appear to stem from custodial understaffing and overcrowding, such as the practice of housing segregation prisoners in residential treatment beds, and the practice of housing prisoners with serious mental illness in segregation cells.  The record makes clear that housing assignments are not within the control of MHM.

ill prisoners in segregation, and coercion of prisoners

to take psychotropic medications.[76]

The second category of policies and practices are

those that defendants have not themselves enacted, but

which are attributable to them because they have fully

delegated decision-making authority to MHM with respect

to their constitutional obligation to provide mental-

health care to prisoners.  As the Eleventh Circuit

explained in Ancata v. Prison Health Services, Inc.,

769 F.2d 700 (11th Cir. 1985), in rejecting an argument

very similar to defendants' contention that the health

care claims being brought against them based liability

only on respondeat superior: "The federal courts have

consistently ruled that governments, state and local,

---

76. It is clear that correctional administrators
can be liable for deficient health care based on their
adoption of custodial policies and practices that
hinder prisoners' access to care.  See H.C. by Hewett
v. Jarrard, 786 F.2d 1080, 1087 (11th Cir. 1986)
(finding liability when the defendant authorized
lengthy isolation of a prisoner and thereby "placed
medical attention beyond [his] reach").

have an obligation to provide medical care to
incarcerated individuals.  This duty is not absolved by
contracting with an entity [to provide these services.]
Although [a contractor] has contracted to perform an
obligation owed by the [State], the [State] itself
remains liable for any constitutional deprivations
caused by the policies or customs of the [contractor].
In that sense, the [government's] duty is
non-delegable."[77]  Id. at 705; see also id. at 706 n.11
(explaining that "if, either expressly or by default,
[a government entity] permit[s] others to decide or
determine policy, it is liable for their actions if
these policies prove unconstitutional").  The court
went on to elaborate that "where a governmental entity
delegates the final authority to make decisions then

_____

77. This proposition is well enshrined in Supreme
Court precedent.  See West v. Atkins, 487 U.S. 42, 56
(1988) ("Contracting out prison medical care does not
relieve the State of its constitutional duty to provide
adequate medical treatment to those in its custody, and
it does not deprive the State's prisoners of the means
to vindicate their Eighth Amendment rights.").

187

those decisions necessarily represent official policy,"
and concluded that when a defendant has a
constitutional obligation to provide health care but
gives a contractor the "responsibility to make final
decisions regarding a [policy or practice as to when or
what care is provided], then their acts, policies and
customs become official policy."[78]   Id. at 705 n.9
(citing Hearn v. City of Gainesville, 688 F.2d 1328,
1334 (11th Cir. 1982)); see also King v. Kramer, 680
F.3d 1013, 1020 (7th Cir. 2012) (holding that a county
could not "shield itself from § 1983 liability by

---

78. Defendants' response to plaintiffs' reliance on
Ancata is puzzling; they argue that it is
distinguishable because Ancata was decided on the
motion to dismiss stage, whereas this case is at the
summary judgment stage, and, they contend, plaintiffs
have not offered evidence to show that defendants had
"actual knowledge of a constitutional violation" by the
mental-health providers. Defs.' Reply Br. (doc. no.
876) at 120. But this goes to whether or not
plaintiffs can establish subjective deliberate
indifference, not to whether defendants can be held
liable for a policy or practice of MHM. And, as
discussed previously, plaintiffs have indeed offered
evidence sufficient to create a dispute of material
fact as to subject deliberate indifference.

contracting out its duty to provide medical services ... [because] the private company's policy becomes that of the County if the County delegates final decision-making authority to it").[79]

Therefore, to the extent that defendants ceded to MHM administrators decision-making authority over various policies or practices regarding treatment--for example, regarding aspects of medication management--

---

79. Although <u>Ancata</u> itself involved a county jail, rather than a state prison, its plain language makes clear that it is applicable to the latter as well. <u>See</u> <u>Reaves v. Dep't of Corr.</u>, -- F. Supp. 3d --, 2016 <u>WL</u> 4124301, at *17 (D. Mass. July 15, 2016) (Hillman, J.) (applying <u>Ancata</u>'s reasoning regarding delegation of policymaking authority to find that official-capacity defendants, including the Commissioner of the Department of Corrections, could be held liable for the policies or practices of a correctional health contractor); <u>Scott</u>, 64 F. Supp. 3d at 819-21 (applying <u>Ancata</u> to conclude that "where a State effectively cedes final decision-making authority with respect to the provision of or failure to provide medical care to a third-party contractor, the contractor's policies and decisions effectively become and constitute the policies and decisions of the State").

MHM's policies or practices are attributable to them.[80]

Defendants have not offered evidence that they retain

_____

80. As reviewed and discussed by the parties'
experts, ADOC does have a number of written policies
governing some aspects of the provision of mental-
health care.  To the extent that these policies result
in inadequate care, defendants are clearly, directly
liable.  To the extent that a certain aspect of mental-
health care is not governed by a departmental policy,
such that MHM sets the policy--or, to the extent that
MHM has a practice of failing to comply with the ADOC
policy (that is to say, MHM has final decision-making
authority "by default," Ancata, 769 F.2d at 706 n.11,
because its decisions are not actually subject to
oversight)--defendants are also liable.  See Mandel v.
Doe, 888 F.2d 783, 793-94 (11th Cir. 1989) (finding
that, after consideration of the "relevant operational
practices," a physician's assistant was the final
policymaker with respect to medical affairs at a prison
facility, because, "[a]lthough it was initially
contemplated that the physician's assistant would be
supervised by a medical doctor, the evidence revealed
that a custom and practice developed so that the policy
was that [the physician's assistant] was authorized to
function without any supervision or review at all").

Additionally, the court notes that, although MHM
appears to have decision-making authority with respect
to the types of medications prescribed, there is
evidence that these decisions are also causally
connected to defendants' denial of adequate funding.
Plaintiffs note that MHM's meeting notes reveal that
Dr. Hunter, its Medical Director and Chief
Psychiatrist, has repeatedly expressed concern about
the cost of certain classes of antipsychotics, and
(continued...)

as a formal matter or actually exercise as a practical matter decision-making authority with respect to these policies or practices. Moreover, plaintiffs have offered considerable evidence to show that the audits ADOC's Office of Health Services conducts of mental-health care or of MHM's compliance with its contractual obligations are either extremely sparse or non-existent; it appears that only two audits of any mental-health unit or program have been conducted in the past few years, and it appears that correctional

---

encouraged providers to "soften the impact" of these medications' increasing cost by "transitioning inmates off these medications." CQI Meeting Minutes, P Ex. 238 (doc. no. 686-18) at 3, MHM031155. Plaintiffs also point to the deposition testimony of named plaintiffs who were told by providers that they were being taken off medication that effectively treated their conditions (hallucinations and bipolar disorder) because ADOC "couldn't afford it." Wallace Depo., P Ex. 32 (doc. no. 840-32) at 29, 95; see also Businelle Depo., P Ex. 40 (doc. no. 840-40) at 83-84. As discussed above, although a prisoner does not have a constitutional right to a treatment of choice, it is clearly established that the knowing decision to provide less effective treatment in order to save money violates the Eighth Amendment.

officials do not request, receive, or review copies of MHM's internal quality assurance reports.  In light of this absence of oversight, the court has no difficulty in concluding that plaintiffs have at least created a dispute of material fact as to whether defendants can be held liable for the various policies and practices at issue in this case implemented by MHM.[81]

### D.  Ex Parte Young

Defendants also argue that the relief sought by plaintiffs in this case is not available under the Ex parte Young exception to Eleventh Amendment immunity. 209 U.S. 123 (1908).  To articulate the law correctly: Ex parte Young allows plaintiffs to sue officials of a State in their official capacities only to obtain prospective relief, and only to remedy a "continuing violation of federal law."  Seminole Tribe of Fla. v.

---

81. Bui's substantive and procedural due-process claims fall within this category; although there is an (continued...)

**Fla.**, 517 U.S. 44, 73 (1996) (citation and internal quotation marks omitted).  "**Ex parte Young** does not permit a plaintiff 'to adjudicate the legality of past conduct.'"  **Poindexter v. Dep't of Human Res.**, 946 F. Supp. 2d 1278, 1290 (M.D. Ala. 2013) (Watkins, J.) (quoting **Summit Med. Assocs., P.C. v. Pryor**, 180 F.3d 1326, 1337 (11th Cir. 1999)).  Defendants also point to language in **Ex parte Young** itself indicating that the exception cannot be employed to require an official to perform a task he has the discretion not to perform. 209 U.S. at 158.

Defendants contend that plaintiffs cannot obtain a declaration that past acts or omissions of defendants violated the Constitution, that plaintiffs have not presented evidence of an ongoing violation, and that plaintiffs improperly seek an order requiring defendants to perform discretionary tasks, which would

---

ADOC regulation governing the involuntary-medication process, it is implemented by MHM, per its contract.

constitute improper judicial interference with the management of state prisons.

This case, and the relief plaintiffs have requested, falls squarely within the Ex parte Young exception. Plaintiffs seek a declaration that defendants are committing an ongoing violation of the Eighth and Fourteenth Amendments.[82] And they seek a prospective injunction prohibiting them from subjecting prisoners to a substantial risk of serious harm and requiring them to implement a plan to change the policies and practices plaintiffs contend have created this risk.

_____

82. This is clearly the primary thrust of the declaratory relief plaintiffs request. The court recognizes, however, that plaintiffs' complaint could reasonably be read to also request a declaration that past discrete acts of defendants and various other officials and correctional and mental-health staff--as distinct from the past pendency of the current policies and practices of defendants--violated the Constitution. The court sees no conceivable need to consider whether it is empowered to enter such a declaration.

As discussed above, plaintiffs have indeed presented enough evidence to create a dispute of material fact as to whether such a continuing violation exists. To the extent that defendants object to plaintiffs' reliance on evidence about past events to demonstrate this risk, they confuse an evidentiary approach to proving claims and the claims themselves. Plaintiffs in official-capacity cases regularly rely on evidence of a pattern of past violations in order demonstrate that a policy or practice that caused those violations is presently and continues to be unconstitutional.[83]

_____

83. Consider a hypothetical claim that double-celling in a particular unit creates a substantial risk that prisoners housed on that unit will be sexually assaulted. One way to prove a current risk of harm is to offer expert evidence that the current practice of double-celling the prisoners on this unit makes it likely that sexual assault will occur. Another way (instead or in conjunction with the first) to prove plaintiffs' case is to show that double-celling has in past resulted in frequent assaults in this unit, thereby supporting the inference that double-celling will continue to have this effect in the future.

195

Finally, defendants also make an argument regarding the appropriate deference to be shown correctional administrators. This point really has little to do with Ex parte Young. Although defendants argue that this exception precludes the court from ordering official-capacity defendants to perform discretionary functions, they miss the mark entirely: While correctional administrators do have discretion with respect to how they provide constitutionally adequate mental-health care, Supreme Court case law makes clear and defendants surely agree that they very much lack discretion as to whether they provide it. See Procunier v. Martinez, 416 U.S. 396, 405-06 (1974) ("[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights."). It is well-established that

196

courts do not violate the Eleventh Amendment when they order official-capacity defendants to redress unconstitutional conditions. To the extent that the mental-health care being provided does not violate the Eighth Amendment, and to the extent that defendants' medication of prisoners without their consent does not violate due process, no injunction will be forthcoming.

The court notes that the relief plaintiffs have requested is precisely that contemplated by the requirement that courts afford "States the first opportunity to correct the errors made in the internal administration of their prisons." <u>Preiser v. Rodriguez</u>, 411 U.S. 475, 492 (1973). Plaintiffs do not seek--and this court will certainly not agree--to "dictat[e] in excruciatingly minute detail" the way that mental-health care should be provided to prisoners, or engage in a "wholesale takeover[] of state correctional facilities." <u>Lewis v. Casey</u>, 518 U.S. 343, 364 (1996) (Thomas, J., concurring). Plaintiffs ask only that the court identify any

197

policies and practices of defendants that violate the Constitution, and then order them to formulate a plan to address those policies and practices so that they no longer deprive prisoners of constitutionally adequate mental-health care.

Considerable deference to prison administrators' decisions regarding the management of their facilities is appropriate. But abdication of the court's role as warden of the Constitution is not.

* * *

In conclusion, defendants' motion for summary judgment on the individual plaintiffs' claims will be granted in part and denied in part. Businelle, Carter, Dillard, Dunn, Moncrief, and Terrell, along with their claims, will be dismissed without prejudice; and summary judgment will be entered on the merits against Hardy. The mental-health Eighth Amendment claims of Hartley, Braggs, Jackson, Johnson, McCoy, Pruitt, Wallace, and Williams will go to trial. The

**198**

involuntary-medication due-process claims of Bui and McCoy will also proceed to trial.

An appropriate judgment will be entered.

DONE, this the 25th day of November, 2016.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE