IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
EDWARD BRAGGS, et al.,        )
                              )
      Plaintiffs,             )
                              )         CIVIL ACTION NO.
      v.                      )         2:14cv601-MHT
                              )            (WO)
JEFFERSON S. DUNN, in his     )
official capacity as          )
Commissioner of               )
the Alabama Department of     )
Corrections, et al.,          )
                              )
      Defendants.             )
```

PHASE 2A CLASS CERTIFICATION OPINION

The plaintiffs in this putative class-action
lawsuit are dozens of state prisoners and the Alabama
Disabilities Advocacy Program (ADAP).  The defendants
are officials of the Alabama Department of Corrections
(ADOC): the Commissioner and the Associate Commissioner
of Health Services.[1]  They are sued in their official
capacities only.

_____

1. ADOC itself is also a party, but with respect
to only claims under the Americans with Disabilities
Act (ADA), 42 U.S.C. § 12131 et seq., and § 504 of the
(continued...)

In Phase 2A of this case, with which this opinion
is concerned, ADAP and a subset of individual named
plaintiffs assert the following claims:
constitutionally inadequate mental-health treatment in
Alabama prison facilities and involuntary medication
without due process.  They rely on the Eighth and
Fourteenth Amendments, as enforced through 42 U.S.C.
§ 1983.  Plaintiffs seek declaratory and injunctive
relief.  Jurisdiction is proper under 28 U.S.C. § 1331
(federal question) and § 1343 (civil rights).[2]  The case

---

Rehabilitation Act of 1973, codified at 29 U.S.C.
§ 794, which are nearly settled and therefore not
discussed in this opinion.  See Joint Status Report
(doc. no. 968) at 5 ("Plaintiffs and Defendants ADOC
have agreed in substance to a settlement that resolves
the Phase 2A ADA issues.  These parties continue to
work to resolve the Plaintiffs' claims for attorneys
and monitoring fees for these issues.").  To the extent
that the parties are not successful in reaching a final
resolution of these claims, they have reserved them for
later adjudication.  See Phase 2 Order on Remaining ADA
Claims (doc. no. 981).

2.  This case has twice been bifurcated for the
administrative convenience of the court and the
parties.  The claims in Phase 1, which the parties
settled with a consent decree approved by the court,
involve ADA claims alleging discrimination on the basis
(continued...)

is proceeding on two parallel tracks consisting of ADAP's claims and the individual named plaintiffs' claims.

In August 2016, more than two years after this case was filed and after extensive discovery, the individual plaintiffs formally moved for certification of a Phase 2 class, while ADAP pursued its claims separately as an association whose constituents include the mentally ill prisoners in ADOC's custody.[3]

---

of and non-accommodation of physical disabilities. See Dunn v. Dunn, -- F.R.D. --, 2016 WL 4718216 (M.D. Ala. Sept. 9, 2016) (Thompson, J.). The claims in Phase 2B, which are set to go to trial after the Phase 2A claims (should they survive summary judgment), involve Eighth Amendment claims related to medical and dental care.

3. As the court explained to the parties during the briefing process, it will, at this time, decide the motion only as to the Phase 2A claims, although the motion was filed for both Phase 2A and Phase 2B. Plaintiffs describe the class they seek to certify for purposes of Phase 2A as a mental-health subclass of a larger health care class they seek to have certified. As this case has been bifurcated into mental-health care and medical/dental care phases, the court will consider whether the mental-health class certified here should be considered a subclass of any future health care class when considering whether to certify such a class.

3

For reasons that follow, the motion for class certification filed by the individual plaintiffs (hereinafter referred to simply as plaintiffs) will be granted in part and denied in part, and two classes certified. The court has narrowed the scope of the mental-health care Eighth Amendment class, and winnowed down the involuntary-medication due-process claim to the portion suitable for class certification.

## I.   Rule 23(c)(1)(B)

Federal Rule of Civil Procedure 23(c)(1)(B) requires a certification order to "define the class and the class claims, issues, or defenses"; therefore, a court must consider the propriety of certification in relation to a specific putative class definition and specific putative class claims.

Plaintiffs seek certification of a Rule 23(b)(2) class consisting of "all persons with a serious mental health disorder or illness who are now, or will in the future be, subject to Defendants' mental health care

**4**

policies and practices in ADOC facilities." Pls.'
Reply Br. (doc. no. 890) at 57.[4]

The first claim plaintiffs seek to bring on behalf
of this class is that defendants are violating the

_____

4. Defendants note that plaintiffs initially
sought certification of a class of all prisoners
subject to defendants' mental-health care policies and
practices. Plaintiffs have clarified that they seek
certification of a narrower class, limited to prisoners
with serious mental illnesses. Because there is some
case law to suggest that healthy prisoners cannot raise
Eighth Amendment health care claims, the court will
employ the class definition limited to prisoners
(current or future) with serious mental illness, in an
exercise of its discretionary authority to "reshape the
boundaries and composition of the class" based on a
"determination that reformulating the class will better
serve the purposes of Rule 23 and the underlying
policies of the substantive law than would denying
certification altogether." Shelton v. Bledsoe, 775
F.3d 554, 564 (3d Cir. 2015) (quoting Tobias Wolff,
Discretion in Class Certification, 162 U. Pa. L. Rev.
1897, 1925 (2014)). In doing so, the court notes that
the effect of this choice of a narrower class
definition on the progress of the case and on any
eventual relief will be virtually nil. Plaintiffs'
Eighth Amendment claim does not concern the adequacy of
mental-health care being provided to prisoners who are
not seriously mentally ill. (Plaintiffs do contend
that defendants fail to recognize many prisoners'
serious mental illnesses. The interests of class
members in this category will be addressed at trial,
because one of the practices plaintiffs challenge is
(continued...)

Eighth Amendment by failing to provide constitutionally adequate mental-health care to prisoners with serious mental illnesses. Specifically, they allege that defendants have been deliberately indifferent to a substantial risk of serious harm posed to the putative class members by a number of policies and practices (both separately and in combination). Although these policies and practices, according to both parties' experts, sometimes contribute to each other, it is helpful to parse them in order to ensure that the putative class can properly challenge them.

Plaintiffs take the position that they need not demonstrate the suitability for class-wide adjudication of any particular policy or practice, and that they need only demonstrate that the overarching claim of inadequate mental-health care is appropriate for certification. But, as in Parsons v. Ryan, a similar recent case, the court must dive somewhat deeper. 289

---

defendants' failure to adequately screen prisoners for mental illness.)

6

F.R.D. 513, 522-23 (D. Ariz. 2013) (Wake, J.) (certifying a state-wide class of prisoners challenging systemic deficiencies in both medical and mental-health care). Although the court agrees that plaintiffs have brought only one Eighth Amendment "claim," this claim--as it has been formulated by plaintiffs--turns on evaluating the risk of harm posed by particular policies and practices. The court will need to ensure, therefore, that these policies and practices are common to the class, and that representatives have been put at risk by them. Defendants, for their part, seek to atomize the claims of plaintiffs by focusing on the minutiae of unimportant distinctions, failing to see the forest for the trees (and leaves).

The court is thus left with the task of reaching an appropriate middle ground, and defining the policies and practices at issue in a way that recognizes themes articulated in the allegations and the voluminous quantity of record evidence the court has reviewed, while ensuring that defendants are not left to face a

singular amorphous contention that the mental-health care they are providing is not good enough. Despite plaintiffs' protestations, the headings in their complaint do an admirable job in this respect, and the court has drawn heavily upon them in formulating the following list.

The eight policies and practices at issue in plaintiffs' Eighth Amendment claim are:

(1) Failing to provide adequate numbers of and sufficiently qualified mental-health staff.
(2) Failing to provide adequate levels of custodial staffing to avoid regular security-related interruptions to or interference with the provision of mental-health care.
(3) Failing to identify mental illness or recognize the severity of mental illness, at initial screenings, in future classification and placement decisions, and in response to referrals.
(4) Failing to prescribe and manage psychotropic medication and its side effects appropriately.
(5) Failing to provide more than cursory psychotherapeutic care and counseling.
(6) Failing to protect prisoners who are suicidal or engage in self-harm by inadequately monitoring and treating them and providing inadequate follow-up care.
(7) Placing prisoners in segregation without regard to its harmful effects on their mental health.
(8) Disciplining prisoners based on behavior that results from mental illness.

In addition, plaintiffs seek to raise on behalf of the class due-process claims related to involuntary medication. These, too, require some disaggregation. Plaintiffs seek to challenge three discrete policies or practices:

(1) Denying substantive due process to prisoners subject to involuntary-medication orders by beginning or continuing to require them to be medicated absent a recent finding that they pose a danger to themselves to others.

(2) Denying procedural due process to prisoners subject to involuntary-medication orders by failing to provide them adequate notice of hearings and other protections provided for in the applicable regulation.

(3) Denying substantive and procedural due process to prisoners who are not subject to involuntary-medication orders by coercing consent.

For the reasons set forth below, the court will certify two classes, as follows.

With respect to plaintiffs' Eighth Amendment challenge to the eight policies and practices enumerated above, the court will certify a class of "all persons with a serious mental-health disorder or illness who are now, or will in the future be, subject to defendants' mental-health care policies and

practices in ADOC facilities, excluding the work release centers and Tutwiler Prison for Women." Plaintiffs (and defendants) have agreed that prisoners at the work release centers should be excluded from the class definition; the court will explain below, in the context of its discussion of commonality, why it has also decided to exclude the female prisoners at Tutwiler.

With respect to plaintiffs' challenge to the policy or practice of denying procedural due process to prisoners subject to involuntary medication orders by failing to provide them adequate notice of hearings and other protections provided for in the applicable regulation, the court will also certify a class of "all persons with a serious mental-health disorder or illness who are now, or will in the future be, subject to defendants' formal involuntary medication policies and practices." The court has decided, in an exercise of its discretion to manage this litigation, not to certify for class-wide litigation plaintiffs'

substantive due-process challenge to the policy or practice of requiring involuntary medication without a recent finding of dangerousness--which turns at least in significant part on an inherently individualized determination--or their challenge to the policy or practice of obtaining consent through coercion. However, the individual plaintiffs who have brought these claims will proceed to trial; ADAP, through its associational standing, may represent the interests of unnamed prisoners who are subject to these policies and practices.

## II.  Evidentiary Burden

In Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011), the Supreme Court explained that "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule--that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law

or fact, etc." 564 U.S. at 350. A court should only certify a class if it "is satisfied, after a rigorous analysis that the prerequisites of Rule 23(a) have been satisfied." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013).[5]

The Supreme Court has been clear that what the party seeking certification must "affirmatively demonstrate," and what the court must find, is that the requirements for class certification are met--not that the class will prevail on its claims. As the Court put it in Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1196 (2013), it "totally misapprehend[s] the essential point" of this case law to suggest that certification is improper unless plaintiffs are able to prove that the common question "will be answered in their favor." All they need to

_____

5. While a few circuits have held that parties seeking certification must demonstrate their compliance with Rule 23 by a preponderance of the evidence, this is not the law in this circuit; the court further notes that its conclusions as to the appropriateness of class certification would not differ under this standard.

offer evidence to show--for purposes of certification--
is that there exists a common question, the answer to
which will be "apt to drive the resolution of the
litigation." <u>Wal-Mart</u>, 564 U.S. at 350.


### III.  <u>Daubert</u>

The parties have raised <u>Daubert</u> objections to each
other's experts.  For purposes of the Phase 2A pretrial
motions, however, the only objections that must be
resolved are those to plaintiffs' mental-health expert,
Dr. Kathryn Burns.[6]  Although the court has carefully

---

6.  Defendants have also raised Rule 26 objections
to the report offered by Dr. Burns.  The court
addressed these objections (like those plaintiffs made
regarding defendants' expert reports) by requiring both
parties' experts to supplement their reports with
additional citations in order to facilitate the court's
review.  The outstanding objections to the 50-page
report offered by Dr. Burns do not hold water.

In some cases, defendants' objections are to
opinions which Dr. Burns, as a highly-experienced
mental-health practitioner and administrator of a state
prison system's mental-health services, has plainly
based on her own experience, such as her opinion that
certified registered nurse practitioners "have less
training, knowledge, skill and judgment, which is why
(continued...)

considered all of the evidence in the record, it need not resolve plaintiffs' objections to defendants' experts until trial, because class certification is appropriate even assuming that defendants' expert evidence is admissible.  The court therefore assumes--for purposes only of this opinion--that it is. Defendants do not raise <u>Daubert</u> objections to the

---

they are considered mid-level clinicians and are required by law to have a collaborative relationship with a physician."  Burns Report (doc. no. 868-2) at 14.  Defendants also object to instances in which Dr. Burns gives a few examples of a particular phenomenon she observes, but notes that she saw many more. However, she identifies in her report all of the prisoners she interviewed and those whose records she reviewed, and she produced to defendants her notes; notably, defendants' experts relied on their notes to inform plaintiffs which specific records they relied upon in reaching their conclusions.  Moreover, defendants were free to ask her for additional examples during her day-long deposition.

   In her lengthy report, Dr. Burns satisfied her obligation to explain "the basis and reasons" for her opinions, and to disclose to defendants "the facts or data" she considered in reaching her opinions.  Fed. R. Civ. P. 26(a)(2)(B).

reports of plaintiffs' other Phase 2A experts, Dr.

Craig Haney[7] and Eldon Vail.[8]

---

7.   Although defendants have not raised any Daubert
objections to Dr. Haney, their expert does criticize
his reliance on statements by prisoners he interviewed
in reaching his conclusion.  However, Dr. Haney's
reliance on these statements was reasonable in light of
the fact that he considered them among other sources of
information, including observations, documents produced
by defendants and MHM, testimony of ADOC and MHM
employees, and medical records.  The court notes that
other courts have recognized that experts'
"consideration of [] inmates' declarations and
grievances as one of several sources informing his
opinion is a valid methodology and does not render his
opinion inadmissible." Gray v. Cty. of Riverside, 2014
WL 5304915, at *20 (C.D. Cal. Sept. 2, 2014) (Phillips,
J.) (discussing evidence regarding prison medical care,
as part of a class-certification evaluation).

Also, Dr. Haney explained in his deposition that
the medical records he reviewed were in "disarray" and
"weren't helpful in conveying information" because they
were "very difficult to read" and "had a lot that was
missing from them," that reviewing more of them would
therefore have been only "marginally useful," and that,
although his "expectation was that the records would
actually have been a very useful source of
information," he "was disabused of that notion when
[he] began to look at them."  Haney Depo. (doc. no.
840-2) at 81-82, 187-88.

Moreover, as Dr. Haney points out, his opinions
concern systemic and widespread deficiencies; although
heavy reliance on any one prisoner's self-report about
his own mental-health care could potentially be
(continued...)

suspect, Dr. Haney found that the self-reports of numerous prisoners corroborated each other and were supported by other evidence; he appropriately relied on this evidence to reach the broader conclusions on which this case will turn. See Haney Report (doc. no. 868-4) at 28-29 ("[T]here was a remarkable amount of consistency in the data on which I relied--consistency in the observations that I made from facility to facility and consistency in what prisoners after prisoner told me, both about the damaging conditions of confinement to which they are exposed and the egregious treatment, or lack thereof, that they receive.  ... Moreover, the prisoners' observations were corroborated by the aggregate system-wide data that I have examined, as well [as] the deposition testimony of ADOC and MHM officials with oversight responsibilities...."); see also Haney Depo. (doc. no. 840-2) at 58-59 ("[N]o one particular prisoners giving me one particular opinion about something led me to conclude anything.  ... [T]his particular gentleman's expression to me, the expressions from other people to me about the mistreatment, was corroborated not only by other prisoners at other institutions, many of them, but also by the chief psychiatrist of the entire system.  If this is the only person who told me this, then it would not have been something I would have put in my report or relied on.  But it was ... apparently such a consistent theme that it bubbled up to the top of the system and became a concern by people in the system, running the system.  So I felt confident in the fact it was a problem in the system.").

     8.  Defendants did insert a very brief Daubert argument regarding Vail into a footnote.  Because it is so peripherally raised, this objection is addressed (continued...)

### 1.  Standard

After the Supreme Court outlined a gatekeeping analysis for scientific expert testimony in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and made that analysis applicable (with necessary modifications in the precise questions asked) to other technical expert testimony in <u>Kumho Tire Co., Ltd. V. Carmichael</u>, 526 U.S. 137 (1999), the Eleventh Circuit explained that the purpose of this analysis is "to ensure the reliability and relevancy of expert testimony ... [and] to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting <u>Kumho Tire</u>, 526 U.S. at 152).  The appeals court went on to explain that under Federal

below in the context of a related objection to Dr. Burns.

Rule of Evidence 702, courts are to "engage in a rigorous three-part inquiry," considering "whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." <u>Id</u>. (citation and internal quotation marks omitted). The proponents of the expert testimony (here, plaintiffs) bear the burden of establishing that these three requirements are met. See <u>id</u>.

Ordinarily, "[t]he safeguards outlined in <u>Daubert</u> are less essential in a bench trial"; a judge need not gatekeep for herself. <u>M.D. v. Abbott</u>, 152 F. Supp. 3d 684, 709 (S.D. Tex. 2015) (Jack, J.) (citing <u>Gibbs v. Gibbs</u>, 210 F. 3d 491, 500 (5th Cir. 2000)), <u>appeal dismissed</u> (Apr. 5, 2016). However, the Eleventh

Circuit and others have held that when a court relies on expert testimony to find that a Rule 23 requirement has been met, the court must conduct a Daubert analysis and conclude that the expert's opinions satisfy its standard. Sher v. Raytheon Co., 419 F. App'x 887, 890-91 (11th Cir. 2011); see also In re Blood Reagents Antitrust Litig., 783 F.3d 183, 187 (3d Cir. 2015); Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011). Some courts have noted, however, that the Daubert analysis conducted for purposes of class certification may be narrower than that conducted for purposes of a trial on the merits, because "the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co., 301 F.R.D. 116, 126 (S.D.N.Y. 2014) (Oetken, J.).

Assessing an expert's qualifications is generally the most straightforward of these tasks. Defendants do not challenge Dr. Burns's qualifications, and as discussed below, the court finds that she is

exceedingly well-qualified to opine on the matters she addresses in her report.

As for the court's assessment of an expert's methodology, the court is to determine "whether the reasoning or methodology underlying the testimony is ... valid and ... whether that reasoning or methodology properly can be applied to the facts in issue."[9] <u>Daubert</u>, 609 U.S. at 592-93.  The traditional factors a court may consider, where appropriate, are "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular [expert] technique; and (4) whether the technique is generally accepted in the [expert] community."  <u>Frazier</u>, 387 F.3d at 1262. However, the court of appeals has emphasized that,

_____

9.  Notably, this is not an all-or-nothing inquiry. "Even if a part of an expert's testimony is based on unreliable methodology, the court should allow those parts that are reliable and admissible." <u>Lohr v. Zehner</u>, 2014 WL 3175445, at *1 (M.D. Ala. July 8, 2014) (continued...)

particularly in cases like this one, involving
non-scientific expert evidence, "[t]hese factors are
illustrative, not exhaustive; not all of them will
apply in every case, and in some cases other factors
will be equally important.... Sometimes the specific
Daubert factors will aid in determining reliability;
sometimes other questions may be more useful.  As a
result, 'the trial judge must have considerable leeway
in deciding in a particular case how to go about
determining whether particular expert testimony is
reliable.' Kumho Tire, 526 U.S. at 152.  Exactly how
reliability is evaluated may vary from case to
case...." Frazier, 387 F.3d at 1262; see also United
States v. Brown, 415 F.3d 1257, 1267-68 (11th Cir.
2005) (explaining that "the question of whether
Daubert's specific factors are, or are not, reasonable
measures of reliability in a particular case is a
matter that the law grants the trial judge broad

_____

(Thompson, J.) (citing United Fire and Cas. Co. v.
Whirlpool Corp., 704 F.3d 1338, 1342 (11th Cir. 2013)).

21

latitude to determine" (internal citations omitted));
<u>Ruiz v. Johnson</u>, 37 F. Supp. 2d 855, 889-92 (S.D. Tex.
1999) (Justice, J.), <u>rev'd on other grounds and
remanded sub nom</u>. <u>Ruiz v. United States</u>, 243 F.3d 941
(5th Cir. 2001) (explaining that an expert's evaluation
of the quality of the medical care provided by a prison
system is "not the type of testimony that necessarily
implicates <u>Daubert</u>'s requirement of scientific
methodology").   To the extent that an expert witness
relies "solely or primarily on experience, ... the
witness must explain how that experience leads to the
conclusion reached, why that experience is a sufficient
basis for the opinion, and how that experience is
reliably applied to the facts."   <u>Morris v. Fla.
Transformer, Inc.</u>, 455 F. Supp. 2d 1328, 1331 (M.D.
Ala. 2006) (Thompson, J.) (citing Fed. R. Evid. 702
advisory committee's note).[10]

_____

        10. Although Dr. Burns does rely on her experience
to a significant extent in reaching some of the
opinions she offers (specifically, with respect to the
competencies of providers with different levels of
(continued...)

As for helpfulness, "the court must ensure that the proposed expert testimony is relevant to the task at hand, ... i.e., that it logically advances a material aspect of the proposing party's case." <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1312 (11th Cir. 1999) (citations and internal quotation marks omitted). Additionally, for expert evidence to be helpful to the finder of fact, it must offer insight "beyond the understanding and experience of the average citizen." <u>United States v. Rouco</u>, 765 F.2d 983, 995 (11th Cir. 1985). Although the relevance standard for expert evidence is higher than the liberal admissibility policy set forth in Rules 401 and 402, <u>see</u> <u>Allison</u>, 184

---

qualifications, and the risks posed by relying on them to serve assessment and treatment functions), she does not rely solely or even primarily on her experience; she also explains at some length the ways her preexisting views regarding the effects of reliance on underqualified and unsupervised providers were borne out by the evidence she gathered during her inspections and in reviewing documents. Moreover, the court concludes that, to the extent that Dr. Burns relies on her own experience in reaching these conclusions, she has adequately explained why her experience supports her opinions in this case.

F.3d at 1309-10, <u>Daubert</u> itself makes clear that a court can deem expert evidence sufficiently helpful to be admissible but nonetheless conclude that it is insufficient to create a genuine dispute of material fact for purposes of summary judgment.  509 U.S. at 595-96; <u>see also</u> <u>Hirsch v. CSX Transp., Inc.</u>, 656 F.3d 359, 362 (6th Cir. 2011) (same).

One final note bears mention.  Here, because plaintiffs rely on the expert evidence of Dr. Burns with respect to their opposition to summary judgment and in support of their motion for class certification, the court is required first, to consider the admissibility of her opinions under Rule 702, and then to determine whether they, in conjunction with plaintiffs' other evidence, are sufficient both to create disputes of material fact regarding the merits of plaintiffs' claims for purposes of Rule 56, and to demonstrate the requirements of certification under Rule 23.  As the court has explained previously, these analyses are "quite distinct" and "must be kept

separate." <u>Morris</u>, 455 F. Supp. 2d at 1332 (quoting <u>Rudd v. General Motors Corp.</u>, 127 F. Supp. 2d 1330, 1336 (M.D. Ala. 2001) (Thompson, J.)).  In this section of the opinion, the court will address only Rule 702 admissibility.  Later in this opinion, it will address the role that this evidence plays in establishing compliance with Rule 23.  Finally, in the court's simultaneously issued opinion on summary judgment, it has addressed at some length why this evidence creates material disputes of fact as to the merits of plaintiffs' claims.

## 2.  Dr. Burns

As a preliminary matter, although defendants do not question Dr. Burns's qualifications, the court notes that they are quite impressive.[11]  Defendants' mental-

---

11. Of course, sterling qualifications are, on their own, insufficient to defeat a <u>Daubert</u> challenge. <u>See</u> <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1351-42 (11th Cir. 2003) ("[W]hile an expert's overwhelming qualifications may bear on the (continued...)

health expert, Dr. Patterson, has himself recently recognized her to be a "top nationally recognized expert[] in the field of correctional mental health." Rep. on Suicides Completed in the California Dep't of Corr. and Rehab. at 1, <u>Coleman v. Brown</u>, No. 2:90-cv-520 (E.D. Cal. March 13, 2013), ECF No. 4376. She currently serves as the Chief Psychiatrist of the Ohio Department of Rehabilitation and Correction (as she did for a period of four years in the late 1990s). She has also long been familiar with the provision of mental-health care in Alabama's prisons, as she served as an expert in previous litigation that successfully obtained a remedial settlement, <u>Bradley v. Harrelson</u>. <u>See</u> Order Approving Settlement Agreement, <u>Bradley v. Harrelson</u>, No. 2:92-cv-70 (M.D. Ala. June 27, 2001) (Albritton, J.), ECF No. 412.

As to Dr. Burns's methodology, defendants essentially present two different arguments: that she

---

reliability of [her] testimony, they are by no means a guarantor of reliability.")).

did not see enough firsthand ( of 15 major facilities,
102 prisoners), and that she (admittedly) did not
randomly select prisoners to interview.[12]   In other
prison cases, a number of courts have rejected <u>Daubert</u>
attacks on experts (offered by both plaintiffs and
defendants) on the grounds that their samples were
non-random, and that they did not consider enough
prisoners at enough facilities in order to extrapolate
conclusions about the system as a whole.   In <u>Ruiz</u>, 37
F. Supp. 2d at 890-92, the court rejected the

_____

12. Defendants also note that Dr. Burns criticized
an audit conducted by MHM on the grounds that it
involved only 10 facilities, and the non-random review
of the records of 144 prisoners.   This, they say,
undermines her own findings as well.   But the court is
not convinced that this criticism substantially
undercuts her conclusions; plaintiffs have taken the
entirely reasonable position that, because the purpose
of an audit (to track changes in the quality of care
being delivered over time) fundamentally differs from
that of an expert inspection (to aid the court in
determining whether deficiencies in the mental-health
care system create a substantial risk of serious harm
to mentally ill prisoners), different methodologies are
appropriate.   In any event, even if Dr. Burns's
criticism of MHM's methodology were applicable to her
own work as an expert, it would hardly establish that
(continued...)

defendants' arguments that "in the absence of statistical proof of violations ..., the plaintiffs have not and cannot show system-wide violations," explaining that although "[s]tatistical procedures can increase the court's confidence in making inferences from a given set of data, ... this is an issue of weight, rather than admissibility of a given methodology. Statistical models are simply not the only method for making general inferences from specific data."

As for non-random sampling, as the court put it in the context of the claims in Ruiz, "[t]he fact that 30 records show excessive use of force does not change because the records were selected non-randomly." Id. at 891. See also Coleman v. Wilson, 912 F. Supp. 1282, 1303 (E.D. Cal. 1995) (Karlton, J.) (rejecting a similar objection to expert declaration that the defendants contended were "unreliable insofar as they

the methodology she did employ was not sufficiently reliable to survive a Daubert challenge.

are based on medical files 'pre-selected' by plaintiffs' counsel"). Another court recently discussed at some length the use of non-random sampling by prison experts. In <u>Dockery v. Fisher</u>, 2015 WL 5737608, at *5 (S.D. Miss. Sept. 29, 2015) (Barbour, J.), the court recognized that non-randomized qualitative research methods are both "accepted and mainstream in the scientific community," and, in the view of some experts, "more applicable to a proper evaluation of the delivery of health care at a prison." The court quoted plaintiffs' expert as explaining that "[w]hen sampling from people (patients, staff) and documents in qualitative research, random samples are to be avoided. Instead, the gold standard for sampling is 'judgment sampling' or 'purposeful sampling.' Instead of using random number generators to select samples, a judgment sample is chosen based on the expertise and judgment of a subject matter expert with knowledge of the system or process being assessed. The goal is to obtain a sample which is as broad, rich, and

representative of the diversity of operational conditions as possible.  ...  Judgment samples are appropriate because ensuring that all potential observational units in a population and sampling time frame have equal probability of selection is often not the most desired or beneficial strategy. Rather, we look to the subject matter experts to guide which areas, times of day, or segments of the population are most important to study and understand." Id. at *6 (citation and internal quotation marks omitted).  The court also recognized the potential merit of defendants' arguments against this methodological approach, but concluded that this went to the weight to be given the expert evidence, rather than its admissibility.  Id.; see United States v. Monteiro, 407 F. Supp. 2d 351, 366 (D. Mass. 2006) (Saris, J.) ("It may well be that other methods ... may prove to be the best method of analysis.  However, Daubert and Kumho Tire do not make the perfect the enemy of the reliable;

an expert need not use the best method of evaluation, only a reliable one.").

In another recent case about the adequacy of prison health care, Jama v. Esmor Correctional Services., Inc., 2007 WL 1847385, at *26-27 (D.N.J. June 25, 2007) (Debevoise, J.), the court rejected a Daubert challenge to an expert on the grounds that he had reviewed only the 78 medical request forms submitted by the nine plaintiffs, who were among 1600 detainees housed at the facility at issue. Plaintiffs argued that his use of "convenience" rather than random sampling was unreliable and that "his sample size [was] too small to generate reliable statistics," but the court agreed with defendants that these challenges went to the weight of his evidence rather than to its admissibility. The court and others recognized that this sort of sampling is particularly reasonable when it is part of a multifaceted review that considers not only the records and statements of individuals but also other sources such as deposition transcripts and other

documents that allows an expert to "draw general conclusions." Id.; see also Parsons, 2014 WL 3721030, at *4.

Defendants cite a number of cases for the proposition that because Dr. Burns cited in her report only 29 examples of different individual prisoners receiving inadequate care or classification, the size of her sample was insufficient to allow her to draw conclusions about systemic inadequacies.[13] These cases are, however, distinguishable from the case at bar. In Wal-Mart, the court concluded that 120 anecdotal affidavits describing instances of discrimination at 235 out of 3,400 stores were insufficient to "demonstrate that the entire company operates under a general policy of discrimination." 564 U.S. at 358 (citation and internal quotation marks omitted.) The individual prisoners whose care Dr. Burns discusses

_____

13. Dr. Burns has since supplemented the report to include citations explicitly referencing another 29 examples with respect to 14 additional prisoners, for a total of 58 instances and 43 prisoners.

make up a significantly larger and more representative portion of the class than did the affiants in Wal-Mart, and, more important, the evidence about them is being used for an entirely different purpose.  In Wal-Mart, the affidavits represented only one in approximately 12,500 class members; here, ADOC recognizes as mentally ill by placement on the caseload about 3,500 prisoners, meaning that the 43 prisoners Dr. Burns cites (even setting aside her representation that these are but illustrative examples drawn from notes that include others) represent in the vicinity of one in 80 class members.  Moreover, while the Wal-Mart affiants related only to one in every 15 or so stores, Dr. Burns drew from about two-thirds of a much smaller number (15) of major correctional facilities.

Moreover, and critically, the Court in Wal-Mart had already rejected the plaintiffs' expert evidence, concluding that it did not establish that the company operated under a policy of discrimination; in the Court's discussion of the affidavits, it was simply

explaining that they did not, on their own, suffice to support the inference that such a policy existed.  With respect to all of Dr. Burns's opinions, by contrast, she cites other evidence to establish the existence of a policy or practice (such as statements by prison mental-health practitioners or internal documents).  In some cases, the existence of the policy or practice is effectively undisputed; for example, defendants do not disagree that a certain number of practitioners with certain qualifications provide mental-health care to prisoners.  What they dispute, and what Dr. Burns cites these prisoners to show, is that these policies and practices place prisoners at a substantial risk of serious harm.[14]

---

14. Another one of defendants' citations, <u>Henderson v. City and County of San Francisco</u>, 2006 WL 3507944, at *10 (N.D. Cal. 2006) (Walker, J.), is distinguishable for the same reasons.  In that case, plaintiffs were attempting to show that a sheriff had a practice of "routinely exonerat[ing] deputies of wrongdoing."  Plaintiffs had presented "almost no evidence" of this fact, but were given an opportunity to file a supplemental brief based on new discovery. They submitted 18 grievances selected by the plaintiffs (continued...)

The court will address the remainder of defendants' case law--offered in support of their contention that Dr. Burns lacks a sufficient basis for her conclusions--more briefly. Although Lloyd Noland Hosp. & Clinic v. Heckler, 762 F.2d 1561, 1568 (11th Cir. 1985), recognized the obvious point that a "sample size

from more than 200 filed by prisoners over a one-year period in which over 6,000 prisoners were housed in the facility; the grievances described only 14 alleged incidents, and in five of those cases, the prisoners were satisfied with the responses they had received. This left nine complaints about "any kind of force," much less unjustified force. The court quite reasonably concluded that this was insufficient, on its own, to create a dispute of material fact as to the "existence of a pervasive custom of excessive force."

The first key difference between Henderson and this case is that in Henderson, the court was presented with (a few) examples of documents plaintiffs simply asserted reflected excessive force, whereas here, far, far more voluminous evidence has been filtered through the expert judgment of Dr. Burns and resulted in her opinions. Moreover, even the facts on which Dr. Burns relied are easily distinguishable from the evidence deemed insufficient in Henderson: for one thing, Dr. Burns considered numerous different forms of evidence, including interviews, record reviews, inspections of facilities, internal documents, and testimony by mental-health care providers and administrators; for another, she considered facts regarding far more individuals--over a hundred, in fact.

[may be] too small" to draw certain conclusions from it, the issue in that case was worlds away: whether the Secretary of Health and Human Services had improperly relied on a study--which stated that "no broad conclusions can be drawn about the nature and extent of medical malpractice in this country" on the basis of the study--to reach a conclusion as to that very issue. Moreover, defendants suggest no basis for comparing the suitability of the sample size in the study at issue (or, indeed, what that sample size was) to that employed by Dr. Burns.

Dukes v. Georgia, 428 F. Supp. 2d 1298, 1317 (N.D. Ga. 2006) (Forrester, J.), stands for the similarly unremarkable proposition that an expert may lack "sufficient data and information" to reach a conclusion. But the expert at issue in that case does not appear to have sampled anything; he simply speculated, without much basis, about whether a lab technician should have identified a strain of yeast. The case is hardly on point. Gilliam v. City of

36

Prattville, 667 F. Supp. 2d 1276, 1298 (M.D. Ala. 2009) (Fuller, J.), concluded that, even if an unqualified expert had been qualified, his testimony would not have been reliable for numerous reasons, including that he had not examined the autopsies of the individual about whose death he was testifying and had offered no data or explanation to support his theory as to the cause of death or to refute other theories.  Again, not on point.  Finally, in United States ex rel. Wall v. Vista Hospice Care, Inc., 2016 WL 3449833, at *12 (N.D. Tex. June 20, 2016) (Lynn, J.), the court was required to determine how many false claims had been submitted by physicians, which in turn required assessments of "individual physicians' judgment regarding individual patients."  The court concluded (contrary to the view of at least one court in this circuit) that statistical sampling and extrapolation could not be used by experts to establish liability in such a case.  Defendants apparently believe this case is relevant because mental-health care providers (obviously) exercise some

judgment in caring for individual prisoners.  This case
is readily distinguishable, for two reasons: First, Dr.
Burns has not engaged in statistical sampling or
attempted to offer a precise quantitative assessment of
whether specific instances of mental-health care were
or were not adequate.  Second, because it is the
Commissioner and Associate Commissioner, not the
mental-health practitioners who provide care, who are
the defendants, this case does not turn on assessments
of the case-specific "subjective clinical judgment" of
mental-health staff, but rather on whether, in
staffing, funding, and overseeing the operation of the
mental-health care system, defendants have been
deliberately indifferent to an objective risk of
serious harm to mentally ill prisoners.

Defendants also cite a concurring opinion in EEOC
v. Freeman, 778 F.3d 463, 469-70 (4th Cir. 2015) (Agee,
J.), which expresses the judge's serious concern that
the EEOC "continues to proffer expert testimony from a
witness whose work has been roundly rejected in our

sister circuits." This expert had attempted to offer statistical evidence in support of a disparate impact theory. His work "contained a plethora of analytical fallacies": although he had a complete data set, he opted to "ignor[e]" years of relevant data from more than half of the years and locations at issue, resulting in "an egregious example of scientific dishonesty." Even within the subset of available data he did consider, he had "cherry-picked" the data that supported his conclusions. Dr. Burns, by contrast, is not endeavoring to offer statistical evidence, and opted for a sampling method that other courts have recognized as appropriate for an expert in her field, and that was especially reasonable in light of the restrictions on her ability to gather data.[15] She has

_____

    15. Plaintiffs' experts explained that, in contrast to their experience working on other similar cases, they had been provided an unusually limited level of access to information, and especially to medical records. <u>See</u> Haney Report (doc. no. 868-4) at 12 ("[A]lthough I had a wealth of information on which to rely and base my opinion--certainly enough information to reach and support the conclusions that are stated in (continued...)

considered all of the data she obtained in reaching her
conclusions.  Had Dr. Burns been provided access to,
and had it been feasible to review, a dramatically
larger sample, and had she then opted to base her
assessments only on a small subset of those records and
interviews, the concerns of defendants might be better
founded.

With respect to defendants' contention that Dr.
Burns did not tour all of defendants' facilities, the
court agrees with another court recently to consider
this very issue that "otherwise admissible testimony
based on investigation of some facilities but not all
is still probative to some extent and any limitation
goes to the weight of the opinions." Parsons, 2014 WL
3721030, at *4.  Moreover, as Judge Wake noted in that
case, the number of tours plaintiffs' experts were

_____

the remainder of this Report--my fact-finding was
limited in some unprecedented respects," including
"having access to prisoner files only during the
relatively brief time that they could be reviewed
on-site.").

allowed to complete, as well as the length of time they were allowed to spend in each facility and the number of prisoners whose records they were allowed to review and whose interviews they were permitted to conduct was circumscribed by defendants during the course of an extremely lengthy and contentious discovery mediation. See id. ("Defendants' strenuous objections to the burdensome nature of the multiple prison tours, [and] the Court's reduction of that burden by limiting the number of tours ... weigh[s] against complete exclusion of the opinions.")   The fact that Dr. Burns also reviewed policies and quality assurance documents relevant to other facilities, and that she reviewed the depositions of those responsible for providing or overseeing care at other facilities, further weighs in favor of considering her opinions even as to facilities she did not personally visit.[16]

_____

16. Defendants also raise, in a brief footnote, a Daubert challenge to plaintiffs' correctional expert, Eldon Vail.  The scope of this challenge is limited to the contention that "[b]ecause Mr. Vail did not visit (continued...)

As a last methodological point, defendants take issue with Dr. Burns's failure to review the entirety of the medical records of all of the prisoners she

and has no knowledge regarding ADOC's staffing policies at [a number of] facilities, he is not qualified under Daubert or Federal Rule of Evidence 702 to offer an opinion as to them." ADOC's Opp. to Class Cert. (doc. no. 810) at 8 n.3.

Defendants point to Vail's negative answer to the question "Are you aware of anything the Alabama Department of Corrections does at Bullock Correctional Facility to make sure that there are an adequate number of correctional staff present, given the number of inmates incarcerated at that facility?" as evidence that has no knowledge of staffing policies at that facility. But his "no" answer does not indicate that he had no basis for an opinion about staffing at that facility; it indicates only that he did not know of the existence of measures defendants take to ensure adequate staffing levels; in light of his other evidence that many ADOC facilities are severely understaffed, he appears to believe that no such measures are taken or that they are unsuccessful.

In fact, Vail testified in his deposition that he did review, for purposes of extrapolating his findings, records stating the "number of inmates," "number of staff," and "design capacity" at each of the facilities in the system. Vail Depo. (doc. no. 810-1) at 96. Although defendants are certainly free to cross-examine Vail at trial if they believe that his reliance on these data resulted in inaccurate conclusions, they are an adequate basis for his expert opinion for purposes of Daubert.

42

interviewed, and contend that this reflects a failure to confirm prisoners' self-reports. First of all, defendants concede that she did review the records of many of those she discusses specifically in her report. Furthermore, she may well have been able to reach reliable conclusions with respect to some issues without reviewing medical records. For example, to the extent that she disagreed with the classification of a severely mentally ill prisoner as an outpatient, she could well have both assessed the apparent severity of that prisoner's illness and determined that he was currently classified (and housed) as an outpatient without reviewing any documents. As another example, Dr. Burns described in her report observing prisoners who had been prescribed certain antipsychotics who exhibited movement disorders that are characteristic side effects of these medications. She is a psychiatrist who is capable of recognizing such a visible disorder without reference to records. Finally, although bald reliance on the totally

43

uncorroborated statement of a single mentally ill individual might in some instances be questionable, Dr. Burns often describes statements by prisoners from her interviews as confirmatory of information she obtained from other sources, including directly from MHM. This is, therefore, not a basis to exclude her opinion, although defendants are free to cross-examine her on this point in order to undermine her conclusions at trial. See Allison, 184 F.3d at 1311 (explaining that Daubert analysis is "not intended to supplant the adversary system").

In sum, the court concludes that Dr. Burns's methodology is sufficiently reliable, and that her opinions are based on a sufficient quantity, and range of sources of, data, to be admissible as expert evidence under Daubert and Federal Rule of Evidence 702.

As for helpfulness, defendants insist that there is a "fit" problem between Dr. Burns's report and the claims in this case, because her reports states that

**44**

various policies and practices subject prisoners to a "risk of harm"; they object to her failure to use the catchphrase from the case law, "substantial risk of serious harm."  But as Dr. Burns herself pointed out in her deposition, she has offered evidence helpful to the court in making this ultimate legal determination.  She has described in some detail the harms that she believes will, and in some instances did, result from defendants' policies and practices; it is the court's task to determine whether these harms are "serious," based on case law.  Indeed, as Dr. Burns is not a legal expert and would not be applying this case law, any assessment she made as to the seriousness of these harms would not be very helpful.[17]  See <u>Burkart v.</u>

_____

    17. Defendants cite four cases that they contend support their position that there is not a sufficient "fit" between Dr. Burns's opinions and the issues in this case.   In these cases, however, the expert evidence at issue was totally unhelpful, whereas here the expert evidence is quite helpful but not sufficient on its own, absent some additional legal analysis by the court, to support liability.   These cases all involve experts who, in one way or another, "fail[] to recognize ... the range of behavior between clearly (continued...)

unlawful and perfectly lawful." Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp., 582 F.3d 1227, 1233 (11th Cir. 2009); see also Corwin v. Walt Disney Co., 475 F.3d 1239 (11th Cir. 2007) (concluding that the district court had not abused its discretion in excluding portions of expert reports in a copyright case, when the experts had opined that there was a "striking similarity"--an element of the cause of action--between the ideas in a painting and a theme park, but this opinion was unhelpful because only the expression of an idea, and not the idea itself, could be copyrighted, and the experts had offered no opinions as to the expressions of ideas in the painting and theme park); Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1323 (11th Cir. 2003) (concluding that the district court had not abused its discretion in excluding portions of an expert report in which the expert asserted that there had been "an illegal price fixing conspiracy," but "did not differentiate between legal and illegal pricing behavior, and instead simply grouped both of these phenomena under the umbrella of illegal, collusive price fixing," explaining that "[t]his testimony could not have aided a finder of fact to determine whether appellees' behavior was or was not legal"); United States v. Aegis Therapies, Inc., 2015 WL 1541491, at *6-9 (S.D. Ga. Mar. 31, 2015) (Wood, J.) (excluding an expert report in a case about improper Medicare billing because the expert report offered opinions in binary fashion (yes or no) as to whether each of 102 incidents of care were provided with the expectation that they would result in "significant improvement," when the legally relevant question was whether they would result in "material improvement," a different and lower standard). In these cases, the expert reports were unhelpful to the triers of fact because they merely identified an undifferentiated category of acts (of various kinds), some of which were lawful and some of which were unlawful; a given act's (continued...)

<u>Washington Metro. Area Transit Auth.</u>, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge....").

Similarly, it is up to the court to determine whether the risk is sufficiently "substantial" to constitute an Eighth Amendment violation.[18]  Dr. Burns has offered evidence going to the incidence of the harms she has described; although her statements to this effect are not statistically precise, they are

inclusion in that category gave the factfinder no information about its status as lawful or unlawful. The equivalent report in this case would be one merely identifying policies the expert believes should be changed, without offering information that would help the court determine which of the policies created a substantial risk of serious harm and which did not.

18. Defendants also forget that an Eighth Amendment violation can be established on the basis of a combination of conditions resulting jointly in a deprivation of adequate mental-health care.  Whether or not the risk of harm from any particular challenged policy or practice is sufficiently substantial on its own to establish the objective component of an Eighth Amendment violation, plaintiffs may establish that some or all of them, together, do violate the Constitution. <u>See</u> <u>Laube v. Haley</u>, 234 F. Supp. 2d 1227, 1245 (M.D. Ala. 2002) (Thompson, J.) (citing <u>Wilson v. Seiter</u>, 501 U.S. 294, 304 (1994)). (continued...)

nonetheless very helpful. For example, she relies on chart reviews, interviews with prisoners, depositions of providers, and MHM quality assurance documents to conclude that for prisoners at a number of the facilities she toured, "virtually the only treatment being provided is psychotropic medication," that any individual psychotherapy being provided was infrequent and brief,[19] and that very few or no outpatient therapy groups were being offered. Burns Report (doc. no. 868-2) at 38-39. In this instance, the incidence of

_____

19. Defendants respond to individual prisoners' allegations that virtually no therapy is provided by citing medical records which sometimes show frequent contacts with mental-health professionals. But what plaintiffs complain of, and what Dr. Burns found in her inspections, was that prisoners were not receiving psychotherapy, not that they were having no contact whatsoever with mental-health professionals. Although this distinction may be harder to conceptualize with respect to mental-health care than to medical care, Dr. Burns explains that it is an important one. To offer an illustrative (if certainly imperfect) analogy, no one would dispute that to a prisoner with kidney failure, there is a world of difference between being "seen" by a nurse at the cell door who asks whether he is suffering from some of the symptoms of kidney (continued...)

harm is in her opinion extremely high.  As another example, Burns opines that mental-health staff continue to prescribe certain long-acting antipsychotic injections even when they cause serious side effects such as severe restlessness, painful muscle spasms, and irreversible movement disorders; she reached this conclusion based on chart reviews and interviews with and observations of prisoners.  Although her report does not reveal exactly what percentage of mentally ill prisoners are prescribed these medications, she does helpfully inform the court that "[m]any of the inmates interviewed displayed these types of movement disorders, but their prescriptions were continued rather than changed to medications less likely to cause these problems."  Id. at 42.  In addition, she provides six examples of prisoners who suffered in this particular manner.  Id. at 42-43.  As a third example, Dr. Burns opines that prisoners with mental illness are

---

failure and gives him some dietary suggestions, and receiving dialysis treatment.

significantly underidentified; she believes that this underidentification stems from a deficient screening process that relies on unqualified and unsupervised staff to conduct evaluations. Although she does not state exactly what proportion of the prisoners with mental illness in ADOC custody she believes have not been identified, she does offer a number of statistics from other state prison systems; there is a range, but even the most conservative comparator statistics suggest substantial underidentification. Id. at 24-26.

As a final iteration of this argument, defendants contend that Dr. Burns is merely opining as to what care she thinks is good care or what care should be provided, and that this is not what the Constitution requires defendants to provide. Although defendants are quite correct that expert opinions as to desirable prison conditions are insufficient to establish constitutional minima, see Rhodes v. Chapman, 452 U.S. 337, 348 n.13 (1981), their argument badly misconstrues the evidence Dr. Burns is offering. Although she does

express some opinions about how care should be provided
(based, for example, on the fact that certain types of
practitioners are "unqualified" to provide care without
supervision, see Burns Report (doc. no. 868-2) at 16),
she then goes on to explain how the failure to provide
care in this way causes harm to prisoners. For
example, she presents evidence, discussed above, to
support her conclusion that these unqualified and
unsupervised staff frequently fail to diagnose mental
illness.

The court concludes that Dr. Burns's expert
evidence will be helpful to the court in assessing
whether the mental-health care provided to prisoners in
Alabama falls below the constitutional floor, because
she will bring to bear her experience, and the results
of her investigation in this case, to help the court to
understand the seriousness of the risk of harm posed by
the challenged policies and practices. See Coleman,
912 F. Supp. at 1304 (rejecting a challenge that the

magistrate judge had "improperly relied on expert testimony to establish constitutional minima").

Lastly, defendants attack Dr. Burns's qualifications as well as her methodology with respect to one fairly narrow issue: her ability to offer an opinion regarding the adequacy of correctional staffing. As for her qualifications, they note that she admitted that she has never been responsible for staffing a correctional facility with custody staff or received any training in doing so. As for her methodology, they note that she testified in her deposition that she did not perform (as part of her assignment in this case) any sort of staffing analysis or review for adequacy the numbers of correctional officers in any facility for any shift. The court is not convinced by the argument regarding methodology; it seems clear that an expert might reliably assess a staffing level to be too low and therefore likely to cause harm without determining what staffing level would be appropriate. However, the court is more

troubled by the fact that although Dr. Burns is an esteemed expert in correctional mental health, plaintiffs have not demonstrated that her experience entitles her to opine on this separate, albeit related, issue. (Plaintiffs' response, that she has been involved in "evaluating and informing internal operations of correctional systems" through her role as a correctional mental-health administrator, is not convincing.) The court will therefore not rely on her opinion on this specific issue for purposes of the pretrial motions.[20] That all said, plaintiffs have in fact offered another expert, Eldon Vail, who is an experienced correctional administrator; defendants have not raised a Daubert challenge to his qualifications to address this issue, and the court has already rejected their contention that he lacks an adequate basis for his conclusions. His opinion on the inadequacies of correctional staffing and their effects on delivery of

---

20. If, at trial, plaintiffs can convince the court that Dr. Burns is qualified to testify on this topic, (continued...)

mental-health care is more detailed and better
supported than Dr. Burns's opinion on this point,
though essentially in accord; the court will therefore
consider his evidence instead of hers.


## IV.  Analysis

Federal Rule of Civil Procedure 23 "establishes the
legal roadmap courts must follow when determining
whether class certification is appropriate." <u>Valley
Drug Co. v. Geneva Pharm., Inc.</u>, 350 F.3d 1181, 1187
(11th Cir. 2003).  The party seeking certification
bears the burden of demonstrating that all of the
requirements of Rule 23 have been met.  <u>Id</u>.

In order for any certification motion to succeed,
the putative class representatives must show that
"(1) the class is so numerous that joinder of all
members is impracticable; (2) there are questions of
law or fact common to the class; (3) the claims or
defenses of the representative parties are typical of

---

it will consider her opinion.

the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In addition, a class must clear one of three additional hurdles: because the named plaintiffs in this case seek certification of a Rule 23(b)(2) class, they must also show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

The court's role at the class-certification stage is not to decide the underlying claims, but rather to determine whether the requirements for certification are met. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974). "Merits questions may be considered to the extent--but only to the extent--that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."

Amgen, 133 S. Ct. at 1194-95 (citation omitted).   A party seeking class certification must "affirmatively demonstrate his compliance with the Rule"; that is, plaintiffs must offer evidence sufficient to satisfy the court that the various requirements of Rule 23 have been met.   Wal-Mart, 564 U.S. at 350.

Commonality, in particular, "cannot be determined without a precise understanding of the nature of the underlying claims," and a careful consideration of the evidence offered in support of the common thread, but "[o]f course, this does not mean that the plaintiffs must show at the class certification stage that they will prevail on the merits" of those claims.   Parsons v. Ryan, 754 F.3d 657, 676 & n.19 (9th Cir. 2014) (citing, inter alia, Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 811 (7th Cir. 2012) ("[T]he court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits.")).

Having articulated the framework for its analysis,

the court will proceed to consider each requirement for certification in turn.

### 1. Standing

"[A]ny analysis of class certification must begin with the issue of standing"; only once the court finds that the named plaintiffs have standing may it consider whether they have "representative capacity, as defined by Rule 23(a), to assert the rights of others." Griffin v. Dugger, 823 F.2d 1476, 1482 (11th Cir. 1987). To show Article III standing, the named plaintiffs must show that they have been injured, that their injuries are fairly traceable to the defendants' conduct, and that a judgment in their favor would likely redress their injuries. See Mulhall v. UNITE HERE Local 355, 618 F.3d 1279, 1286 (11th Cir. 2010).

As defendants acknowledge, their arguments that the named plaintiffs lack standing to pursue the claims for which they seek certification "directly intersect[] and coincide[] with [their] argument in their] pending

Motion for Summary Judgment"--that is, defendants argue that they lack standing because their claims are moot, unexhausted, precluded or barred by the statute of limitations.[21]   Defs.' Opp. to Class Cert. (doc. no. 807) at 104.   The court has engaged in an extensive discussion of all of these arguments in the course of its opinion denying defendants' motion for summary judgment.   It rejected all of them except to the extent that it agreed that a few of the named plaintiffs' claims have become moot as a result of their releases from prison.   As these plaintiffs have been dismissed from the case, they will not be certified as class representatives.   Otherwise, defendants' arguments that the named plaintiffs lack standing to bring the claims they seek to have certified are rejected for the reasons set forth in the summary-judgment opinion.

---

        21. Oddly, they also argue that the named plaintiffs lack standing because their claims fail on the merits.   But that is simply not how standing--a preliminary inquiry into whether a litigant is in an appropriate position to raise a claim--works.

## 2.  Rule 23(a)

### A.  Numerosity

Rule 23(a)(1)'s requirement of numerosity is satisfied if joinder--the usual method of combining similar claims--would be impracticable.  Although there is no strict threshold, classes containing more than 40 members are generally large enough to warrant certification.  <u>See</u>, <u>e.g.</u>, <u>Cox v. Am. Cast Iron Pipe Co.</u>, 784 F.2d 1546, 1553 (11th Cir. 1986); <u>see also</u> Rubenstein, <u>Newberg on Class Actions</u> § 3.12 (5th ed.).

"Moreover, the fluid nature of a plaintiff class--as in the prison-litigation context--counsels in favor of certification of all present and future members."  <u>Henderson v. Thomas</u>, 289 F.R.D. 506, 510 (M.D. Ala. 2012) (Thompson, J.) (citing <u>Kilgo v. Bowman Transp., Inc.</u>, 789 F.2d 859, 878 (11th Cir. 1986) (affirming a certified class of 31 present members as well as future members who could not be identified); <u>Green v. Johnson</u>, 513 F. Supp. 965, 975 (D. Mass. 1981) (Freedman, J.) (finding numerosity after considering

59

"the fact that the inmate population at these facilities is constantly revolving")); see also Pederson v. Louisiana State Univ., 213 F.3d 858, 868 n.11 (5th Cir. 2000) ("[D]istrict courts must not focus on sheer numbers alone.... [T]he fact that the class includes unknown, unnamed future members also weighs in favor of certification."); Reid v. Donelan, 297 F.R.D. 185, 189 (D. Mass. 2014) (Ponsor, J.) (certifying a class of detained plaintiffs and explaining that the numerosity threshold may be relaxed "when a party seeks only declaratory or injunctive relief, since the inclusion of future members increases the impracticability of joinder" (citing McCuin v. Sec'y of Health & Human Servs., 817 F.2d 161, 167 (1st Cir. 1987)); Rubenstein, Newberg on Class Actions § 3.15 (5th ed.) (explaining that the inclusion of future class members "may make class certification more, not less, likely" and citing two decisions certifying classes of prisoners, Hill v. Butterworth, 170 F.R.D. 509, 514 (N.D. Fla. 1997) (Paul, J.) ("This Circuit has

60

held [that when] the alleged class includes future [members], necessarily unidentifiable[,] ... the requirement of Rule 23(a)(1) is clearly met, for joinder of unknown individuals is clearly impracticable." (citation and internal quotation marks omitted)); Clarkson v. Coughlin, 145 F.R.D. 339, 346 (S.D.N.Y. 1993) (Sweet, J.) ("The class action device is particularly well-suited in actions brought by prisoners due to the fluid composition of the prison population. ... Class actions therefore generally tend to be the norm in actions such as this." (citations and internal quotation marks omitted))).[22]

Plaintiffs have submitted evidence to show that in February 2016, there were 3,416 prisoners on the mental-health caseload (and argue that this figure

---

22. Recognition of prisoners' relatively limited "access to the legal system ... has [also] led courts to certify classes in cases ... involv[ing] issues of common concern to inmates even when the potential class size is small and somewhat undefined." Bradley v. Harrelson, 151 F.R.D. 422, 426 (M.D. Ala. 1993) (Albritton, J., adopting recommendation of Carroll, M.J.) (citation and internal quotation marks omitted).

significantly understates the number of seriously mentally ill prisoners in the State).  This exceeds the customary numerosity threshold by a factor of 85. Defendants nonetheless have a bone to pick.  They contend that "this number ... says nothing about how many individuals can claim an actual injury traceable to the State's policies and procedures."  Defs.' Opp. to Class Cert. (doc. no. 807) at 141.  There are a number of problems with this argument.

First, courts look at numerosity in a fairly straightforward fashion:  by assessing the practicability of joinder, in light of the number of people who fall within the definition of the class. Movants for class certification do not need to present evidence showing--one by one, many times over--that individual putative class members can proceed on the class claims; requiring as much would largely defeat the efficiency benefits of class-wide adjudication, and is unnecessary in light of the commonality requirement. See Rubenstein, Newberg on Class Actions § 3:11

("[W]here joinder is impracticable, judicial economy weighs in favor of representative litigation of common issues for similarly situated plaintiffs.").  Instead, they need to show that the class representatives can proceed on claims which are common to the class.

Plaintiffs' evidence regarding the size of the mental-health caseload goes directly to--indeed, conclusively resolves--the question whether more than 40 or so prisoners in ADOC custody have serious mental illnesses.  And, again, the fact that the class contains as-yet-unknown future members also counsels strongly in favor of finding that Rule 23(a)(1) has been satisfied.

Second, even if the court were required to consider how many prisoners "can claim an actual injury traceable to the State's policies and procedures," rather than how many prisoners in ADOC custody have a serious mental illness, the court would reiterate that the actual injury being claimed in this case is exposure to the substantial risk of serious harm

stemming from those policies and procedures.   If, as
plaintiffs claim, defendants provide inadequate numbers
of mental-health care providers and thereby subject all
prisoners   with   serious   mental   illnesses   to   a
substantial   risk   of   serious   harm,   then   all   class
members can claim an actual injury--even those who have
not yet suffered serious harm.

Finally, and for the sake of thoroughly responding
to a thoroughly unconvincing argument, the court notes
that plaintiffs have indeed presented evidence (some of
it not subject to any direct rebuttal) to show that
numerous individuals have in fact already suffered a
range of serious harms.   The reports of their experts
are filled with examples of prisoners who the experts
opine have suffered serious harm after receiving care
that was inadequate due to the failure of defendants to
provide enough funding, staffing, and oversight.[23]   A

---

23. Indeed, in light of the impracticability of
joinder in a prospective-relief case involving current
and future prisoners, the number of named plaintiffs
(continued...)

selection of these concrete harms includes: being denied necessary treatment other than psychotropic medication, being maintained on certain psychotropic medications despite suffering serious side effects and the availability of alternative medications, frequently missing doses of psychotropic medications or having them inappropriately or abruptly discontinued, being denied follow-up care after attempting to commit suicide, and being held in segregation without regard to the psychological deterioration it is causing.

Having addressed all of defendants' objections, the court finds that plaintiffs have met the numerosity requirement for the Eighth Amendment class.

The court also finds that the plaintiffs have met the numerosity requirement for the procedural dueprocess class. Plaintiffs have submitted undisputed evidence showing that about 70 to 80 individuals were subject to involuntary-medication orders as of March

who have survived summary judgment would arguably be sufficient, on its own, to establish numerosity.

2016; therefore, this class--of prisoners subject to involuntary-medications orders--meets the presumptive numerosity threshold discussed above.

### B.  Commonality

#### i.  Eighth Amendment Claim

Rule 23(a)(2) requires named plaintiffs seeking class certification to show that "there are questions of law or fact common to the class."  In Wal-Mart, the Supreme Court explained that "this does not mean merely that they have all suffered a violation of the same provision of law.  ...  [Rather,] [t]heir claims must depend upon a common contention ... [which] must be of such a nature that it is capable of classwide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.  What matters to class certification ... is not the raising of common 'questions'--even in droves--but, rather the capacity of a classwide proceeding to generate common

**66**

answers apt to drive the resolution of the litigation."
564 U.S. at 350 (citation and internal quotation marks
omitted).   In short, commonality requires a showing
that there is "some glue" holding the claims together.
Id. at 352.   However, plaintiffs seeking to demonstrate
commonality under Rule 23(a)(2) need not show that
common questions "predominate" over individual
questions as required under Rule 23(b)(3); indeed,
"even a single common question will do."   Wal-Mart, 564
U.S. at 359 (citations and alterations omitted).

In Wal-Mart, the plaintiffs failed to satisfy the
commonality requirement because they had not offered
"significant proof" of a policy of discrimination that
applied across the corporation's numerous stores.[24]   Id.

_____

24. It is worth emphasizing the critical difference
between the common policy the plaintiffs did have
enough evidence to demonstrate in Wal-Mart--a policy of
delegating discretion to supervisors--and the policies
and practices at issue here.   The court explained in
Wal-Mart that this was a "very common and presumptively
reasonable way of doing business--one that [it had]
said should itself raise no inference of discriminatory
conduct."   564 U.S. at 355 (citation and internal
quotation marks omitted).   In contrast, the policies
(continued...)

at 353. Here, plaintiffs have identified eight
different specific policies or practices, and offered
significant proof that they are common to the class of
prisoners in Alabama with serious mental illnesses.[25]

_____

and practices at issue here are very far from "a policy
against having uniform [] practices." Id.; see also
Parsons, 754 F.3d at 681 ("[This case] involves uniform
statewide practices created and overseen by two
individuals who are charged by law with ultimate
responsibility for health care and other conditions of
confinement in all [state] facilities, not a grant of
discretion to thousands of managers."); Logory v. Cty.
of Susquehanna, 277 F.R.D. 135, 143 (M.D. Pa. 2011)
("Unlike Dukes, where commonality was destroyed where
there was no common mode of exercising discretion that
pervade[d] the entire company, here there is a solid
[prison] policy that applied directly to all potential
class members" (internal citation and quotation marks
omitted)).   Moreover, it goes without saying that (as
one example) the practice of providing prisoners with
mental-health staff who are stretched far too thin and
unqualified to provide the care for which they are
responsible is certainly not a "presumptively
reasonable" way of operating a prison system and should
not be very common.

     25. As another court recently explained, drawing on
the imperfect but helpful analogy of what constitutes a
policy or custom for purposes of municipal liability
under Monell v. Department of Social Services, 436 U.S.
658 (1978), the common policy or practice "need not be
formal or officially adopted." Dockery v. Fischer, --
F. Supp. 3d --, 2015 WL 5737608, at *8 (S.D. Miss.
Sept. 29, 2015) (Barbour, J). A common policy can be
(continued...)

This is all plaintiffs need to do for purposes of class certification; they need to show that the policies and practices they challenge are common, not (yet) that the common policies and practices are unconstitutional. Put differently, they need to demonstrate the existence of common questions with common answers, not what those common answers are. See Amgen, 133 S. Ct. at 1194-95 (holding that merits questions are only to be considered to the extent they are relevant to Rule 23 determination).

"express[ly] adopt[ed]" by legislative, executive, or administrative act, but it can also be "based on the defendant's deliberate indifference"--that is, based on a showing that the defendants have "failed to respond to a need ... in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." Id. at *8-10 (quoting Lightfoot v. District of Columbia, 273 F.R.D. 314, 320-21 (D.D.C. 2011) (Kollar-Kotelly, J.), and citing Young v. Nationwide Mut. Ins. Co., 693 F.3d, 532, 542-43 (6th Cir. 2012)).  In this case, plaintiffs have offered evidence of common policies and practices that run the gamut from those that have been expressly adopted (such as the mental-health staffing levels defendants set by contract) to others which constitute a failure to act that evinces deliberate indifference (such as the practice of failing appropriately to (continued...)

The court will proceed as follows: First, it will discuss what must be shown to demonstrate that the policy or practice is common, generally and in the context of an Eighth Amendment substantial-risk-of-harm claim such as the one brought here.  Second, it will discuss the evidence plaintiffs have offered to show that policies and practices they have challenged are indeed common to the class.  Third and last, the court will address defendants' arguments that dissimilarities among class members defeat commonality.

As a general matter, a policy or practice need not affect every member of a class in order to be "common." See Rubenstein, Newberg on Class Actions § 3.23 (5th ed.) ("[T]he Fifth Circuit has held that questions affecting 'most,' 'a substantial number,' or 'a significant number' of the class members will qualify as 'common' questions.  This question has rarely been addressed outside the Fifth Circuit though courts that

---

monitor or provide follow-up care for prisoners in crisis).

have addressed it have adopted the Fifth Circuit's approach.").

Moreover, "class members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are subject to the same harm will suffice." Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994) (emphasis in original) (citing Hassine v. Jeffes, 846 F.2d 169, 177-78 (reversing the denial of certification of a class of prisoners challenging the risks posed by unsafe prison conditions)). As another district court recently explained in a jail-conditions case, "the Fifth Circuit, like the Third, [has] expressly disagreed with the proposition that a policy must injure each class member to provide the foundation for class wide relief." Jones v. Gusman, 296 F.R.D. 416, 465-66 (E.D. La. 2013) (Africk, J.) (citing M.D. ex rel. Stukenberg v. Perry, 675 F.3d 832, 847-48 (5th Cir. 2012)). Instead, in M.D., the court of appeals explained that a valid claim for class-wide relief

could be "based on an allegation that the [defendant] engages in a pattern or practice of agency action or inaction--including a failure to correct a structural deficiency within the agency, such as insufficient staffing--with respect to the class," even if plaintiffs do not contend that every member of the class has suffered an actual injury. 675 F.3d at 847-48 (internal citation and quotation marks omitted).

This case law supports a finding of commonality here, because being subjected to a substantial risk of serious harm is an actionable constitutional injury, even when a prisoner's physical or mental condition has not yet been detrimentally impacted. See Parsons, 754 F.3d at 681-83 (citing numerous cases, both within and outside the Eighth Amendment context, in which courts have found the commonality requirement satisfied, post-Wal-Mart, based on a systemic policy or practice that allegedly exposed the members of the class to an unconstitutional risk of harm); see also Dockery, 2015 WL 5737608, at *16-17 (recognizing as common questions

"whether [the challenged] conditions and health care have either subjected prisoners to an unconstitutionally unreasonable risk of harm or, conversely, were sufficient to provide humane conditions of confinement"); Scott v. Clarke, 61 F. Supp. 3d 569, 587 (W.D. Va. 2014) (Moon, J.) ("Plaintiffs allege that the policies and practices at FCCW--e.g., the defective sick call process; FCCW's refusal to refer or undue delay in referring prisoners for specialized care; the failure to maintain continuity in the provision of prescribed, potentially life-sustaining medications; etc.--reflect substandard medical care on the part of the Defendants. Whether these policies and practices place the Plaintiffs and other current and future FCCW prisoners at a substantial risk of serious harm to which the Defendants are deliberately indifferent implicates questions of fact and law common to the entire putative class."); Jones, 296 F.R.D. at 465-67 ("Whether certain conditions at OPP either by themselves, or through a

mutually enforcing effect, put inmates at a substantial
risk of harm is amenable to a common answer.   ...
Similarly, whether OPP officials have been deliberately
indifferent to any such risk can be demonstrated in a
manner that is applicable to all class members.   ...
Class  Plaintiffs'  Eighth  and  Fourteenth  Amendment
medical  and  mental-health  care  claims  [likewise]
warrant  certification.   ...   Class  Plaintiffs  have
identified  discrete  and  particularized  practices
including,  for  example,  medication  and  suicide
prevention practices, as well as staffing inadequacies,
that are mutually enforcing causes of OPP's deficient
conditions.   ...   Accordingly, a class action is an
appropriate vehicle for these claims."  (citations and
internal  quotation  marks  omitted));  <u>Hughes  v.  Judd</u>,
2013 WL 1821077, at *9, *23-24 (M.D. Fla. Mar. 27,
2013) (Pizzo, M.J.) (finding commonality and certifying
a  class  with  respect  to  a  Fourteenth  Amendment
risk-of-harm claim challenging a sheriff's failure to
address  a  high  level  of  violence  among  juvenile

detainees and practice of using pepper spray in
response to this violence), report and recommendation
adopted as modified on other grounds, 2013 WL 1810806
(M.D. Fla. April 30, 2013) (Merryday, J.); M.D. v.
Perry, 294 F.R.D. 7, 45 (S.D. Tex. 2013) (Jack, J.)
(finding commonality and certifying a class with
respect to a Fourteenth Amendment risk-of-harm claim
challenging a policy or practice of allowing
caseworkers in a foster care system to carry excessive
caseloads that posed a risk of harm to children).

The fact that not every mentally ill prisoner is
subjected to precisely the same level of risk also does
not defeat commonality. Indeed, the last time a judge
in this court heard a "systemic attack on the way that
mental health care is provided to acutely and seriously
mentally ill inmates in the Alabama prison system," it
explained that "[t]hough there certainly may be some
factual differences between the individual class
members and the nature and severity of their illness,
such individual differences do not defeat certification

because there is no requirement that every class member be affected by the institutional practice or condition in the same way." Bradley v. Harrelson, 151 F.R.D. 422, 426 (M.D. Ala. 1993) (Albritton, J.); see also Parsons, 754 F.3d at 678-80 ("[A]lthough a presently existing risk may ultimately result in different future harm for different inmates--ranging from no harm at all to death--every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide ADC policy or practice that creates a substantial risk of serious harm.  ...  Even if some inmates are exposed to a greater or idiosyncratic risk of harm by the policy and practice of not hiring enough staff to provide adequate medical care to all inmates, that single policy and practice allegedly exposes every single inmate to a serious risk of the same basic kind of harm." (internal citations omitted)).

Plaintiffs have offered more than adequate evidence to establish the existence of the common policies and

practices they challenge.[26]   This evidence, discussed in
the court's opinion on summary judgment, could not be
more different from the indefinite and speculative
evidence offered by the expert in Wal-Mart, of a
"culture" of discrimination manifested in millions of
discretionary decisions.  564 U.S. at 353-54.  Here,
the experts point to very concrete policies and
practices--such as using unsupervised and unqualified
nurses to conduct intake screenings, or placing
prisoners with serious mental illness in prolonged
segregation--that undisputedly occur or that plaintiffs
have offered considerable evidence (often in the form
of admissions by MHM administrators) to show are

---

26. The court notes that, in addition to the expert
evidence discussed here, plaintiffs have offered
evidence regarding care they and a couple of dozen
putative class members have received, in order to
further illustrate the commonality of the policies and
practices they challenge.  The evidence regarding the
named plaintiffs will be discussed below, in the
context of the typicality analysis.  Although
illustrative, the court need not and does not base its
decision regarding commonality on the declarations of
the unnamed class members; plaintiffs' expert evidence
is more than sufficient.

widespread.   See Parsons, 754 F.3d at 678 ("The putative class and subclass members thus all set forth numerous common contentions whose truth or falsity can be determined in one stroke: whether the specified statewide policies and practices to which they are all subjected by ADC expose them to a substantial risk of harm.  ...  These policies and practices are the 'glue' that holds together the putative class and the putative subclass; either each of the policies and practices is unlawful as to every inmate or it is not."). The only genuine debate in this case is as to the effects of these policies and practices--that is, whether or not they pose a substantial risk of serious harm. But this is not a question for the class-certification stage.

Instead of rehashing plaintiffs evidence in a second opinion, the court will simply note that plaintiffs' expert, Dr. Haney, reiterates at the conclusion of his report that the problems that he discussed in his reports were widespread and systemic. Unlike the expert in Wal-Mart, his conclusions are

based not on untethered theorizing, but on a large
quantity of concrete evidence.  He explains as follows:

> "[T]he observations that I made about
> various ADOC facilities were remarkably
> consistent throughout my tours--that is, with
> only minor variations, virtually the same kinds
> of problems surfaced in each of the facilities
> that I inspected.  Moreover, there was
> remarkable consistency in what prisoner after
> prisoner in these separate facilities told me
> (as documented in [the lengthy appendix to his
> report]).  It did not seem to matter whether
> the prisoners I interviewed were selected
> randomly for brief cell-front interviews,
> selected for individual, confidential
> interviews after having been seen cell-front,
> picked randomly from the facility's prisoner
> roster for individual confidential interviews,
> or suggested by counsel for Plaintiffs--they
> all told essentially the same kind of grim and
> often tragic stories.  In addition, because
> many of them had been housed in other ADOC
> facilities, they were in a position to confirm
> that the problems--the mistreatment and
> neglect--that they were encountering at their
> present facility were not unique to that place
> but rather existed in facilities throughout the
> ADOC.

> "In addition, these consistent accounts,
> and my own broad conclusion about systemic
> deficiencies throughout the Alabama prison
> system, are corroborated in many important
> respects by the candid observations and
> conclusions reached by an entirely different
> group of people--namely, mental health
> officials (employed by ... MHM [ADOC's mental
> health contractor]) charged with system-wide

> oversight responsibilities and the provision of
> mental health services in Alabama's 15 major
> prisons. Their stated opinions provide strong
> support for my own observations about the
> system-wide magnitude of the very serious
> problems that I encountered."

Haney Report (doc. no. 868-4) at 158-59.

As discussed at much greater length in the court's opinion denying summary judgment, Dr. Burns, plaintiffs' other mental-health expert, concurs, concluding that the "deficiencies in ADOC--inadequate staffing levels, qualifications, identification and classification, treatment and oversight of the mental health care--deny prisoners care for their serious mental illness leading to needless pain, suffering, self-injury, suicide and punishment for symptoms of untreated mental illness. These are systemic problems that can and should be addressed through changes to the mental health care delivery system." Burns Report (doc. no. 868-2) at 52.

Even Dr. Patterson, defendants' own expert, recognizes that a number of the policies and practices being challenged are pervasive, including that the

"staffing of the facilities is insufficient and a significant number of the mental health staff are unlicensed practitioners" who had not received any documented supervision.   Patterson Report (doc. no. 679-9) at 47.   Moreover, he recognizes that other policies and practices, and concrete harms, stem from this source.   For example, he observes "certain deficiencies in adequately identifying inmates during the reception and intake processes that are in need of mental health services, and therefore the numbers of inmates in need of mental health services are ... underestimated and reflect the need for increased numbers of and properly trained and credentialed mental health staff, as well as the need for supervision by registered nurses during the intake process to identify those inmates in need of further evaluation for mental health services."   Id. at 47.

Dr. Patterson is not merely suggesting that he found a few--or even a lot--of prisoners who were not identified; he is explaining that there is a consistent

pattern of failure attributable to a very specific set of decisions about system-wide staffing.   He agrees, then, that insufficiency of mental-health staffing is a pervasive problem, and that this causes prisoners not to be identified as in need of treatment, across the board.   (Of course, not every mentally ill prisoner is missed; rather, every mentally ill prisoner is at <u>risk</u> of being missed.)   It is thus <u>undisputed</u>--by the parties' experts if not by the parties--that at least one of the policies or practices challenged by plaintiffs is common to the class.[27]

_____

27. Indeed, a decision about system-wide staffing seems quite obviously to be a common policy or practice.   It is an express policy, which applies to all prisoners in the system.   The adequacy of staffing levels cannot be evaluated meaningfully with respect to any particular prisoner.   <u>See</u> <u>M.D.</u>, 675 F.3d at 848 n.7 (suggesting that staffing levels are the type of condition that is generally applicable to a class of plaintiffs, in noting that "it is not clear how several of the State's alleged failures, such as its failure to ... employ a sufficient number of caseworkers, can be considered [a] 'day-to-day, case-by-case operational failure[]'"); <u>Parsons</u>, 754 F.3d at 679 ("[T]he plaintiffs allege that they are placed at risk of serious harm by a policy and practice of severe under-staffing across all ADC medical care facilities. (continued...)

Whether this policy or practice of understaffing subjects mentally ill prisoners to a substantial risk of serious harm is one question (of a number of them) apt to drive the resolution of this litigation.  Unlike in <u>Wal-Mart</u>, the plaintiffs here have offered considerable evidence to show that this policy or practice is one of the <u>reasons</u> (indeed, the primary reason) that they are at serious risk of receiving inadequate care.  This evidence is not merely of a "common pattern or practice," as in an oft-repeated violation, but rather of a "common answer to the crucial question <u>why</u>" prisoners have been put at a

---

As a result of this statewide policy and practice, they allege, the quality and availability of care across all ADC facilities is constitutionally deficient.  This allegation presents questions of law and fact common to all members of the putative class.  ...  The question whether ADC's staffing policies pose a risk of serious harm to all ADC prisoners can thus be answered as to the entire class 'in one stroke.'  <u>Wal-Mart</u>, 131 S. Ct. at 2551.  Either ADC employs enough nurses and doctors to provide adequate care to all of its inmates or it does not do so; there is no need for an inmate-by-inmate inquiry to determine whether all inmates in ADC custody are exposed to a substantial risk of serious harm by ADC staffing policies.").

substantial risk of serious harm, <u>Wal-Mart</u>, 564 U.S. at 352: because ADOC provides inadequate numbers of and insufficiently qualified mental-health staff, resulting in, among other things, a failure to identify or recognize the acuity of mental illness in many prisoners.   Plaintiffs here have done exactly what defendants accuse them of failing to do.   Instead of attempting to distill "constellation of disparate but equally suspect practices" from varying experiences of class members, they have "identif[ied] the policy or custom they contend violated the [law] and then establish[ed] that the policy or custom is common to the class."   <u>Lightfoot</u>, 273 F.R.D. at 326; <u>see also</u> <u>Parsons</u>, 754 F.3d at 673 (agreeing with the district court that "the problems identified in the provision of health care are not merely isolated instances but, rather, examples of systemic deficiencies that expose all inmates to a substantial risk of serious harm," because the evidence of the existence of a number of specific common policies and practices "suggests that

the root cause of the injuries and threats of injuries suffered by Plaintiffs is the systemic failures in the provision of health care generally"); Jones, 296 F.R.D. at 466 ("The facts and law also demonstrate that Class Plaintiffs' Eighth and Fourteenth Amendment medical and mental health care claims warrant certification.  These claims do not allege amorphous systemic deficiencies. Class Plaintiffs have identified discrete and particularized practices including, for example, medication and suicide prevention practices, as well as staffing inadequacies, that are mutually enforcing causes of OPP's deficient conditions.  Accordingly, a class action is an appropriate vehicle for these claims." (citations and internal quotations marks omitted)).

Rather than discussing each of the remaining policies and practices at length, the court will merely discuss another example.  With respect to the policy or practice of "placing prisoners in segregation without regard to its harmful effects on their mental health,"

the pertinent question is whether defendants treat mentally ill prisoners alike in segregating them, <u>not</u> whether this creates a substantial risk of serious harm to such prisoners. Although Dr. Morgan disagrees with Dr. Haney regarding the <u>effects</u> of this practice, and opines that the mental-health monitoring and treatment provided to prisoners in segregation is adequate, he at no point offers any evidence to suggest that the question--whether or not these policies and practices create a substantial risk of serious harm--cannot be adjudicated on a class-wide basis.[28]

---

28. Likewise, Dr. Morgan's opinions as to the effects of understaffing or the efficacy of the assessment and classification system go to plaintiffs' claims on the merits--that is, whether defendants' policies place plaintiffs and putative class members at a substantial risk of serious harm. His opinions do not, however, undermine plaintiffs' evidence that defendants' policies and practices pose a common question capable of class-wide resolution; nothing Dr. Morgan says runs counter to the conclusion that these policies either do or do not create a substantial risk of serious harm to seriously mentally ill prisoners throughout the system.

Indeed, Dr. Morgan often relies heavily--sometimes entirely, to the exclusion of any consideration of the (continued...)

This distinguishes the case at bar from <u>Sher v.</u> <u>Raytheon Co.</u>, wherein the Eleventh Circuit reversed a grant of class certification and remanded for reconsideration because the district court had not "evaluat[ed] and weigh[ed] conflicting expert testimony," and "decline[d] to declare a proverbial, yet tentative winner" between these experts, at the class-certification stage. 419 F. App'x 887, 890 (11th Cir. 2011). In <u>Sher</u>, a case about release of toxins into groundwater, the plaintiffs attempted to show that they met the requirements for certification under Rule

---

actual treatment provided to any particular prisoners-- on the existence of a formal system-wide policy to conclude that the mental-health care being provided throughout the system is adequate. <u>See</u> Morgan Report (doc. no. 865-1) at 19 ("[B]ased on my review of ADOC mental health policy, it is my opinion that the ADOC has a clearly defined mental health services system applicable to all inmates, including inmates on the mental health caseload, and these policies and procedures are consistent with national standards of practice."). Whether or not Dr. Morgan's bald reliance on these policies supports his conclusions is a matter for trial, but it certainly reflects his view that the Eighth Amendment claim in this case can be resolved with respect to all class members in one fell swoop.

23(b)(3) by presenting an expert who said that he could map the underground area affected and create a mathematical model to show how much the value of each surrounding property had diminished without requiring any individualized consideration; defendants' experts, by contrast, concluded that the identified area included properties with no contamination and that the mathematical model would not obviate the need for individualized determinations of value diminution. Id. at 889. Because the experts disagreed about whether the plaintiffs met the requirements of Rule 23, such that class-wide resolution was appropriate, it was necessary to "declare a ... winner." Id. at 890; see also Ellis, 657 F.3d at 983-84 (holding that the district court should have resolved a dispute between the parties' experts as to whether gender disparities in promotion existed across the country or only in certain areas, because plaintiffs would be unable to show a common policy or practice unless they could show consistent nationwide discrimination). Here, Dr.

Morgan does not suggest that some identifiable subset of mentally ill prisoners is not at risk of placement in segregation (if he did, the court would need to weigh his evidence to determine whether plaintiffs had shown commonality); instead, Dr. Morgan simply disagrees that the practice of placing mentally ill prisoners in segregation places them at a substantial risk of serious harm.

Before concluding this discussion of commonality, the court will address defendants' contention that commonality is defeated by variations between the conditions in different facilities and the differing mental-health needs of members of the class. Although it is true that there are some differences between the various men's facilities,[29] in terms of the populations incarcerated there and the ways that certain forms of

_____

    29. Plaintiffs' experts did conclude that adequate mental-health care was being provided in the open residential treatment unit at Tutwiler, the only women's prison in the State.  However, as explained below, prisoners housed at Tutwiler will not be included in the class.

mental-health care are delivered (as an example, not all major facilities have residential treatment units), and in terms of the levels of staffing (some facilities have some psychiatrist coverage while others have none at all, and some facilities have especially severe shortages of custodial staff while others have somewhat more moderate shortages),[30] this does not defeat

---

30. Defendants particularly press this point with respect to plaintiffs' contention that the failure to provide adequate custodial staff interferes with the provision of mental-health care, noting that some facilities are more understaffed and some less. However, defendants' own expert, Dr. Morgan, despite recognizing the existence of some variation in the level of understaffing by facility, states that "[custodial] understaffing remains a major concern across the ADOC. It is my opinion that correctional officer understaffing should be viewed as a correctional crisis within the ADOC," such that this crisis necessitates immediate action." Morgan Report (doc. no. 671-1) at 11-12. He further notes that "[s]taff at all eight facilities that I visited noted understaffing." Id. at 13. This amounts to a recognition that the practice of custodial understaffing is common across facilities. Dr. Morgan disagrees with plaintiffs' experts as to the effect of this understaffing on the delivery of mental-health care. See id. at 31 ("The ADOC is significantly understaffed; however, this understaffing does not prohibit plaintiffs and other class members from receiving needed mental health services...."). But (continued...)

commonality for two principal reasons.

First, plaintiffs' experts have cited evidence showing, and concluded, that the practices at issue are fairly consistent across the major facilities they inspected, including all of the major hubs for treatment of prisoners with mental illness; although there were slight variations, they did not identify any men's facilities as positive outliers where the system for providing mental-health care was appreciably different (or where adequate mental-health care was

_____

this question--whether the common policy or practice subjects mentally ill prisoners to a substantial risk of serious harm by interfering with the delivery of their mental-health care--is a merits question for trial. Moreover, plaintiffs have pointed to admissions by mental-health staff that the lack of security staff has resulted in recurrent delays in or cancellations of mental-health treatment in different units at at least six of the major facilities. Minutes from a meeting of MHM administrators in January 2015 noted "widespread reports among several facilities of delays in seeing inmates for appointments due to security unavailability," and reflected a need to "[k]eep going up the chain of ADOC command" to address this problem. CQI Meeting Minutes, Pls.' Ex. 182 (doc. no. 850-82) at 121, MHM029619. A practice which is "widespread" and which requires high-level correctional intervention to address is common to the class.

being provided).

Second, and perhaps more important, the named plaintiffs' records clearly reflect that they are transferred very frequently between a large number of different facilities; it is fair to presume that the other class members are too.[31]  In that sense, defining a subclass to include only those who are or will be housed at a subset of facilities would be a semantic distinction without much if any practical difference. The claim in this case revolves around a prospective risk of harm; even if some aspect of the mental-health care at a particular facility is idiosyncratically better or worse, it is clear that numerous class members not currently housed at that facility are likely to be exposed to it in the future.

Another comparison to Wal-Mart is instructive.  In

_____

31. Specifically, seriously mentally ill prisoners are often transferred due to their need to be housed in a residential treatment unit or a stabilization unit, which are available at only a few facilities.  As a result, many of the putative class members are (continued...)

*Wal-Mart*, the fact that the class members worked at thousands of stores across the country made it impossible to show the existence of a common policy of discrimination based on discrimination at a subset of the stores.  564 U.S. at 356-58.  But the female employees of *Wal-Mart* were not frequently moved to numerous different stores in different regions of the country at the whim of the defendant corporation.  As the court pointed out, a woman working in Missoula, Montana, would be totally unaffected by discriminatory promotion practices at the stores in say, New Mexico. When a prisoner is in ADOC custody, however, he is subject to involuntary transfer at any time to another facility in the system, and therefore subject to the risks of harm that attend placement at those other facilities.  *Cf*. *Henderson*, 913 F. Supp. 2d at 1285-86 (holding that the claims of a prisoner who was transferred to a different facility were not moot

---

frequently transferred back and forth between other facilities and those with these specialized units.

because there was "more than a reasonable basis to believe that she will be subjected to segregation in [the same facility] again").

Moreover, litigation of these system-wide issues would not preclude sensitivity to any salient differences between facilities in crafting a remedial order in the event that the court does find liability.[32] The remedial order the Supreme Court affirmed in Brown v. Plata, 563 U.S. 493 (2011), for instance, ordered the California prison system to reduce overcrowding (which was resulting in unconstitutional medical care) to a certain percentage of design capacity across the State, while allowing it flexibility to adjust for the distinctive features and needs of different institutions by having some facilities be more crowded and some less. Coleman v. Schwarzenegger, 922 F. Supp. 2d 882, 970 n.64 (E.D. Cal. 2009), aff'd sub nom. Brown

---

32. Defendants would, subject to the court's consideration of objections raised by plaintiffs and independent approval, have the opportunity to propose the terms of any eventual remedial order.

<u>v. Plata</u>, 563 U.S. 493 (2011).

However, as noted above, the court has decided to define the class to exclude prisoners at Tutwiler Prison for Women. Although there is expert evidence regarding the mental-health care being provided at Tutwiler, and although many of the same policies and practices apply at that facility, there is no female class representative; unlike male prisoners who are frequently transferred between facilities, there are no transfers between Tutwiler and the rest of the men's facilities, and no named plaintiff will ever be incarcerated at Tutwiler. The court therefore concludes that it would be more appropriate for the adequacy of mental-health care at Tutwiler to be litigated by way of ADAP's associational standing.[33]

---

33. There was initially a female Phase 2A class representative, but she passed away during the pendency of this litigation. If ADAP did not have associational standing to bring this claim on behalf of the women at Tutwiler, the court would consider giving plaintiffs the opportunity to amend their complaint to add another female Phase 2A class representative. <u>See</u>, <u>e.g.</u>, <u>Diduck v. Kaszycki & Sons Contractors, Inc.</u>, 147 F.R.D. (continued...)

Defendants also argue that differences in the
health care needs of class members preclude a finding
of commonality.   For this proposition, they rely on
language from a Third Circuit decision, Rouse v.
Plantier, 182 F.3d 192, 199 (3d Cir. 1999):

> "In light of the diverse medical needs of,
> and the different level of care owed to, each
> group of plaintiffs [specifically, 'stable'
> versus 'unstable' diabetics], the District
> Court erred in holding that all members of the
> plaintiff class alleged a violation of their
> Eighth Amendment rights.   Based on the evidence
> in the summary judgment record, there may be
> one or more subgroups of plaintiffs as to whom
> particular aspects of the care allegedly
> provided was not consistent with Eighth
> Amendment requirements and other subgroups as
> to whom particular aspects of the care was
> constitutionally adequate."

But Rouse was an appeal from a denial of qualified
immunity (rather than an appeal from a
class-certification decision)[34] with respect to class

_____

60, 62 (S.D.N.Y. 1993) (Stewart, J.) (granting a stay
of proceedings until the plaintiffs could find a new
class representative following the death of a
representative).

34. Although Rouse involved injunctive-relief
claims as well, the court was very clear that "[t]he
(continued...)

96

claims for damages stemming from inadequate treatment
in the past (rather than, as here, a purely prospective
injunctive-relief class action alleging a current
substantial risk of serious harm).  In light of the
posture of the case, the court's instruction to the
district court, to focus on differences in the medical
needs of different subsets of the plaintiff claims, is
totally unremarkable: if the care provided in the past
was adequate for, say, 'stable' diabetics, they would
not have suffered any retrospective constitutional
violation, and would not be entitled to any damages.
But here, such parsing is neither necessary nor
appropriate: there are no damages to be apportioned,
and, more important, even if a given class member
admits that he has not in the past received care that

---

only issue in this appeal is whether the defendants are
entitled to summary judgment based on qualified
immunity," a defense that applies only to
individual-capacity damages claims and not to
official-capacity claims for prospective injunctive
relief.  182 F.3d at 196.  Moreover, the court
expressly stated that "[t]he question of class
(continued...)

violated the Constitution, he is not precluded from raising a prospective Eighth Amendment claim that defendants are currently subjecting him to a substantial risk of serious harm. Also, as a factual matter, the allegations in Rouse involved much more fine-grained aspects of care for a particular disease (for example, whether monitoring of blood sugar a certain number of times per day was sufficient), whereas the allegations in this case involve overarching inadequacies of staffing which, plaintiffs' experts have opined, contribute to a range of other systemic inadequacies that affect mentally ill prisoners irrespective of their particular diagnoses.

Finally, the court notes that it contemplated certifying subclasses, such as a subclass of those mentally ill prisoners receiving psychotropic medications, or a subclass of those held in segregation. However, the evidence in the record

certification ... is not before us, and we express no opinion on this issue." Id. at 199 n.3.

reflects that about two-thirds of mentally ill prisoners receive such medication, and that mentally ill prisoners who are not taking medication are frequently urged to do so (indeed, plaintiffs have offered evidence to suggest that prisoners who refused medication have sometimes been threatened with removal from the mental-health caseload). The record also reflects that prisoners with mental illness regularly move into and out of these restrictive housing units. As a result, certifying such subclasses would be an exercise in legal formalism; the court is satisfied that, to the extent that these medication and segregation practices create a substantial risk of serious harm to prisoners when they are taking medication or housed in segregation, this risk extends to all seriously mentally ill prisoners, who are all fairly likely to take medication and be placed in segregation at some point.

### ii. Due Process Claim

The court also finds that the procedural due-process class satisfies the commonality requirement. As with the Eighth Amendment claims, plaintiffs presented evidence through their expert, Dr. Burns, showing that prisoners across the ADOC system have not received adequate process before being subjected to involuntary medication. While the parties agree that the ADOC's written policy is constitutionally adequate under Washington v. Harper, 494 U.S. 2010 (1990), Bui challenges whether the procedures are adequate in practice.[35] This question applies to all class members, as they are all on involuntary-medication orders. The question can be answered in one stroke--namely, by determining whether ADOC's involuntary-medication practices adequately

---

35. This question largely, although imperfectly, overlaps with a very concrete one: Is there, or is there not, a practice of failing to comply with ADOC's written policy on involuntary medication? The answer to this question is the same for every member of the class.

protect due-process rights. <u>See</u> <u>Hightower ex rel.</u>
<u>Dehler v. Olmstead</u>, 959 F. Supp. 1549, 1557 (N.D. Ga.
1996) (considering procedural due-process claims, among
others, brought by a certified class of patients in a
state hospital), <u>aff'd sub nom.</u> <u>Hightower v. Olmstead</u>,
166 F.3d 351 (11th Cir. 1998).


## C. Typicality

    Although the commonality and typicality inquiries
"tend to merge," the typicality requirement--which is
"somewhat of a low hurdle"--focuses the court's
attention on "whether a sufficient nexus exists between
the claims of the named representatives and those of
the class at large." <u>Gen. Tel. Co. of Sw. v. Falcon</u>,
457 U.S. 147, 158 n.13 (1982); <u>Taylor v. Flagstar Bank,</u>
<u>FSB</u>, 181 F.R.D. 509, 517 (M.D. Ala. 1998) (Albritton,
J.); <u>Busby v. JRHBW Realty, Inc.</u>, 513 F.3d 1314, 1322
(11th Cir. 2008) (citation and internal quotations
omitted). A class representative's claims are typical
if they "arise from the same event or pattern or

practice and are based on the same legal theory" as the class claims; they need not be identical.  Williams v. Mohawk Indus., Inc., 568 F.3d 1350, 1357 (11th Cir. 2009) (citation and internal quotations omitted); see In re Healthsouth Corp. Sec. Litig., 257 F.R.D. 260, 275 (N.D. Ala. 2009) (Bowdre, J.).  Defendants argue that plaintiffs have failed to identify class representatives able to challenge each of the policies and practices at issue in this case; although they frame this argument as going to adequacy, it actually sounds in typicality.

For purposes of typicality, plaintiffs need to show that there are named plaintiffs who have been exposed to the policies or practices that create the substantial risk of serious harm they challenge, not that they have actually suffered the harm in the past.[36] So, for example, if lack of adequate medication

---

36. The remaining plaintiffs must also show--and have shown, as discussed in the court's opinion on summary judgment--that they have serious mental-health needs.

management creates a substantial risk of a prisoner taking psychotropic medications suffering unnecessarily from serious side effects, there must be a named plaintiff who is taking psychotropic medication; he need not necessarily prove, at the class-certification stage (or, for that matter, at trial), that he has already suffered from side effects.

Hence, plaintiffs need to prove that there are named plaintiffs who (1) receive mental-health care from the mental-health care staff,[37] (2) rely upon custodial staff to facilitate their receipt of mentalhealth treatment, (3) are assessed at intake, during classification reviews, and in response to referrals, (4) need or take psychotropic medications, (5) require psychotherapy, (6) engage or desire to engage in self-harm or to commit suicide, (7) are placed in segregation, and (8) receive disciplinary

---

37. More precisely, the question is not whether the named plaintiff does receive mental-health care, but whether he relies on the mental-health care staff for any care he does receive.

citations based on symptomatic behavior.  There is no
serious dispute,[38] though, that all of the named
plaintiffs fall within categories (1) and (3); that
many of the named plaintiffs--including at least six
who have been housed in segregation (Hartley, Jackson,
Johnson, McCoy, Pruitt, and Williams)--fall within
category (2); that at least eight (Braggs, Hartley,
Johnson, McCoy, Pruitt, Wallace, and Williams) fall
within category (4); and that at least two (in many

---

38. Again, defendants do argue, vehemently, that
the named plaintiffs have not offered evidence to show
that they, individually, have suffered past violations
of the Eighth Amendment as a result of these policies
and practices.  (As discussed in the court's opinion on
summary judgment, this is both incorrect and
irrelevant, because their claim concerns not past harm
but a future risk of harm that they contend exists
because they need mental-health care but can obtain it
only from a seriously deficient system.)  For the
purpose of typicality, the named plaintiffs need only
show that they are exposed to a particular policy or
practice--for example, that they need mental-health
care, and that they can only obtain that care from the
limited number of mental-health staff defendants have
provided.  Whether or not that limit is
unconstitutionally harmful is a question for trial and
not for class certification.

cases, more) fall within each of the remaining categories.[39]

Although they need not do so, plaintiffs have in fact presented evidence that at least one of them has not only been exposed to but harmed by the risk created by each of the policies or practices at issue. Rather than engage in an exhaustive discussion that would largely rehash the extended section on individual harm in the court's opinion on summary judgment, the court will instead mention illustrative examples.[40]

_____

39. Defendants' own expert, Dr. Patterson, recognized that at least Braggs, Hartley, Jackson, McCoy, and Wallace have required psychotherapeutic treatment; that at least Pruitt, Wallace, and Williams have engaged in self-harm (and that others have reported a desire to do so); and that at least Jackson, McCoy, Pruitt, Wallace, and Williams, have been housed in segregation. Although Dr. Patterson did mention a few disciplinary citations the named plaintiffs received, he did not discuss those citations that stemmed from symptomatic behavior (specifically, self-harm). He did opine, however, in general terms, that the "potential harm" of delays in providing mental-health treatment includes "disciplinary actions due to inadequate treatment." Patterson Report (doc. no. 679-9) at 47.

40. The court refers the reader to this section of its summary-judgment opinion.

As for defendants' policy or practice of failing to
provide adequate numbers of and sufficiently qualified
mental-health staff, plaintiffs have offered evidence
to show that the inadequate staffing has adversely
affected Hartley's treatment: his treatment plans
repeat problem statements and goals without documenting
changes in his mental state, and that his treatment
team meetings are not attended by required staff
members.    In fact, defendants' own mental-health
expert, Dr. Patterson, agrees with plaintiffs that
Hartley's treatment plans, and his resulting
mental-health care, are inadequate.   He further opines
that "Mental Health Treatment Planning" is "seriously
deficient, at least in part because of the lack of
adequate staffing."   Patterson Report (doc. no. 679-9)
at 52.

Plaintiffs have also offered evidence to show that
named plaintiffs have been exposed to and harmed by
defendants' failure to provide sufficient custodial
staffing to avoid regular security-related interference

with the provision of mental-health care.  For example, Jackson's medical records indicate that a number of his mental-health appointments were canceled due to security issues arising from an insufficient number of ADOC officers.

With respect to the failure to identify or recognize the severity of mental illnesses, plaintiffs have offered evidence to show that although staff at a state mental hospital recognized, prior to Johnson's incarceration in 1996, that he suffered from depression and was possibly psychotic (and potentially incompetent to stand trial), he was not placed on the mental-health caseload for almost two decades, until he was placed on suicide watch; at that point, he was recognized to be suffering from paraonia and possible delusions. Furthermore, although he was at this point referred for mental-health treatment, there appears to be no evidence that the mental-health staff ever received or acted upon the referral.  Moreover, Dr. Burns pointed to McCoy as an example of a prisoner who was severely

ill and required residential care but was not being
provided it due to his classification at an
inappropriately low level.

Plaintiffs have offered evidence to show that named
plaintiffs have been exposed to and harmed by
defendants' practice of failing to appropriately
prescribe and manage psychotropic medication and its
side effects. For example, Hartley's medical records
reflect that he has complained of a movement disorder
caused by his antipsychotic medication, that treating
this side effect has adversely affected his kidneys,
and that he has requested and been denied an
alternative antipsychotic medication which Dr. Burns
explained would be less likely to cause a movement
disorder.

With respect to defendants' failure to provide more
than cursory psychotherapeutic care and counseling,
plaintiffs have offered evidence to show that Braggs
has not received the regular therapy--for anxiety,
major depressive disorder, and post-traumatic stress

disorder--contemplated in his treatment plans; that Pruitt's repeated requests to speak to counselors have been rejected; and that Wallace, despite his repeated suicide attempts and self-harm, and diagnoses of bi-polar disorder and intellectual disability, has not consistently received group therapy. Defendants' expert, Dr. Patterson, agrees with plaintiffs that Wallace's care has been inadequate, due in part to the lack of group therapy.

Plaintiffs have offered evidence to show that named plaintiffs have been exposed to and harmed by defendants' practice of inadequately monitoring and providing inadequate follow-up care to prisoners who are suicidal or engage in self-harm. Over the course of a six-month period, Pruitt was admitted to a crisis cell as a result of self-injurious behavior at least five times, for stretches sometimes lasting more than a week. As to inadequate monitoring of the crisis cells, Dr. Patterson recognized that there was no indication in Pruitt's records that he was seen by a psychiatrist

or nurse practitioner during any of these admissions. He was attacked by other prisoners during two different admissions (disinfectant was thrown in his face and burning fabric was thrown onto his leg). Dr. Burns notes that he was not placed on the mental-health caseload after these admissions and opines that he was therefore denied adequate follow-up care.

As to defendants' placement of mentally ill prisoners in segregation without regard to its harmful effects on their mental health: McCoy has repeatedly been placed in segregation for extended periods of time, including one thirteen-month stretch, even though he was in a psychotic state and the mental-health staff had advised against prolonged isolation due to segregation's effect on his stability. Deterioration of McCoy's mental health during segregation was also documented in his records. Jackson was in segregation between 2007 and 2014; he was frequently transferred from one facility's segregation unit to another's. This extended stay in segregation has broken him down

mentally, according to his own testimony and the opinion of one of plaintiffs' experts.

Plaintiffs have likewise presented evidence to show that Wallace and Pruitt have been harmed by defendants' policy or practice of disciplining prisoners for behavior that stems from mental illness. Wallace received nine disciplinary citations for instances of cutting his wrists, and Pruitt has also received disciplinary tickets for creating a hazard when he engaged in self-harm.

Finally, with respect to the procedural due-process class, plaintiffs have presented evidence showing that the class representative, Bui, was exposed to and harmed by defendants' involuntary-medication practices. He has been under an involuntary-medication order since November 2007, and the order has been renewed approximately every six months. Plaintiffs have shown that on some occasions, Bui was not present at his own involuntary-medication hearings; that many notices were given to him on the day of the hearing, or back-dated;

and that on several occasions, he did not have a lay advisor during the hearing to explain the purpose of the hearing or to help him present objections to the hearing panel's findings.[41]

Rule 23(a)(3)'s typicality requirement has been satisfied with respect to both classes.


D.   Adequacy

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class."  This analysis "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class;[42] and (2) whether the representatives

_____

41. Plaintiffs' evidence shows at least that Bui's own presence and that of a lay advisor should have been--and was not--documented.

42. For a conflict to defeat class certification, it must be "fundamental," such as when "some party members claim to have been harmed by the same conduct that benefitted other members of the class."  Valley Drug Co., 350 F.3d at 1189.

112

will adequately prosecute the action." <u>Valley Drug Co.</u>
<u>v. Geneva Pharm., Inc.</u>, 350 F.3d 1181, 1189 (11th Cir.
2003) (citation omitted).[43]

"Adequate representation is usually presumed in the
absence of contrary evidence," and generally exists for
injunctive-relief classes, because there is no monetary
pie to be sliced up. <u>Access Now, Inc. v. Ambulatory</u>
<u>Surgery Ctr. Grp., Ltd.</u>, 197 F.R.D. 522, 528 (S.D. Fla.
2000) (Seitz, J.).

As noted above, defendants' argument against the
adequacy of the named plaintiffs as class
representatives is that the named plaintiffs have not

---

43. Prior to the promulgation of Rule 23(g)
regarding the adequacy of class counsel, courts
considered that topic in the context of Rule 23(a)(4).
Since Rule 23(g) was added in 2003, courts have been
"slow in shifting the analysis of counsel's adequacy
from Rule 23(a)(4) to Rule 23(g)," but the leading
treatise on the topic takes the position that the
drafters of the rule intended courts to "locate their
entire discussion of class counsel within the 23(g)
analysis and restrict their analysis under Rule
23(a)(4) to the topic of adequacy of the proposed class
representative." Rubenstein, <u>Newberg on Class Actions</u>
§ 3:80 (5th ed.). As defendants have also taken this
approach, the court will adopt it here.

themselves raised the claims they now seek to bring on behalf of the class; this argument goes to typicality rather than adequacy.  In any event, as the court has already explained, this argument fails.  Defendants have also reiterated in the section of their brief on adequacy their contentions that the named plaintiffs do not have justiciable claims.  This argument, too, has already been addressed in the section on standing.

Defendants have not suggested that the named plaintiffs have conflicts of interest with the class, and the court concludes that no such conflict exists. As for whether they will adequately prosecute this action, defendants challenged two of the named plaintiffs based on statements in their depositions arguably reflecting that they do not intend to represent other prisoners in this case or do not understand their roles as class representatives. However, these plaintiffs have been released from custody; because their claims are now moot, they cannot serve as class representatives.  The remaining named

plaintiffs are adequate representatives of the Eighth Amendment class, and Bui is an adequate representative of the procedural due-process class.


### 3. Rule 23(b)(2)

A class satisfies Rule 23(b)(2) in cases in which "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting to the class as a whole." Fed. R. Civ. P. 23(b)(2).

"Rule 23(b)(2) has been liberally applied in the area of civil rights, including suits challenging conditions and practices at various detention facilities." Bumgarner v. NCDOC, 276 F.R.D. 452, 457 (E.D.N.C. 2011) (Boyle, J.); see also Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1776 (3d ed.) (discussing the range of civil-rights actions certified pursuant to Rule 23(b)(2), and explaining that "the class suit is a uniquely appropriate procedure in civil-rights cases").

Indeed, some courts have gone so far as to say that the rule's requirements are "almost automatically satisfied in actions primarily seeking injunctive relief."  <u>Baby Neal ex rel. Kanter</u>, 43 F.3d at 59.

As plaintiffs have repeatedly explained and offered evidence to demonstrate throughout the litigation of this case, and as this court has found in addressing the commonality requirement, the problems of which they complain and the remedies they seek are <u>systemic</u>.[44]  The

---

44. As discussed above in the commonality context, the fact that some class members may have thus far received appropriate mental-health care and therefore might not yet have been harmed by the challenged policies and procedures does not defeat certification. Additionally, even if not all of the class members were subjected to a substantial risk of serious harm--that is, even if it were sure that the risk would not materialize with respect to some mentally ill prisoners--certification would still be appropriate. <u>See</u> <u>Anderson v. Garner</u>, 22 F. Supp. 2d 1379, 1386 (N.D. Ga. 1997) (Murphy, J.) ("'[A]ll the class members need not be aggrieved by or desire to challenge the defendant's conduct in order for one or more of them to seek relief under Rule 23(b)(2).' <u>Johnson v. American Credit Co. of Georgia</u>, 581 F.2d 526, 532 (5th Cir. 1978); <u>Georgia State Conference of Branches of NAACP v. State</u>, 99 F.R.D. 16, 35-36 (S.D. Ga. 1983) ("What is necessary is that the challenged conduct or lack of (continued...)

Supreme Court has approved of system-wide relief in
prison cases involving "systemwide violation[s]"
resulting from "systemwide deficiencies." <u>Plata</u>, 563
U.S. at 532.

Defendants are quite right that a single injunction
would not be appropriate if plaintiffs sought an order
requiring that each named plaintiff be provided the
specific forms of treatment he has been denied. They
cite <u>Wal-Mart</u> for the proposition that Rule 23(b)(2)
"does not authorize class certification when each
individual class member would be entitled to a
<u>different</u> injunction or declaratory judgment against
the defendant." 564 U.S. at 360. But Rule 23(b)(2)
certainly does not preclude certification merely
because the class members <u>could</u> bring separate claims
regarding the adequacy of the particular treatment they
have individually received--claims which, everyone
agrees, could not be resolved with a single injunction

conduct be premised on a ground that is applicable to
the entire class.")).

or declaratory judgment--when those are not the claims they actually <u>have</u> brought in this lawsuit.

For some reason, defendants repeatedly misconstrue the claims in the case as demands for individual treatment of various kinds, and then proceed to argue that the individualized claims plaintiffs are not raising cannot be brought in the form of a class action.[45] As the court explained at some length in its analysis of the applicable Eighth Amendment case law in its summary-judgment opinion, defendants' position is unwarranted; plaintiffs are not seeking adjudication of demands for particular individualized treatment, and the challenge they are actually bringing--to systemic

---

[45]. In support of this reading of plaintiffs' claims, defendants cite to deposition testimony wherein the named plaintiffs, when asked by defense counsel what concrete changes they would like to see in the individual care they are currently being provided, answer that question.  These statements, however, are not their <u>claims</u>.  Adequate staffing levels and adequate amounts of residential treatment space are not individual forms of treatment one can request; they are conditions that make it possible for appropriate treatment to be provided when and to the extent necessary.

deficiencies that create a substantial risk of serious harm--are well recognized.

Defendants declare that "an alleged delay in care at St. Clair bears no relationship of any kind to allegedly insufficient staffing at Hamilton, or allegedly insufficient intake procedures at Kilby." Defs.' Opp. to Class Cert. (doc. no. 807) at 167. This position is controverted by the evidence in this case. Plaintiffs' experts opine that all of these problems-- and others--stem directly and ineluctably from a contractual arrangement that provides for inadequate numbers of and insufficiently qualified mental-health staff. Fundamentally, defendants err in forgetting that the language of Rule 23(b)(2) focuses on the nature of defendants' acts and omissions and the suitability of class-wide relief, and does not require that the class-wide relief benefit each class member in precisely the same way. Here, plaintiffs seek a remedy for defendants' decision to starve the mental-health care system in Alabama prisons of human and financial

resources, and relief would be appropriate for everyone subjected to the substantial risk of serious harm plaintiffs claim this creates--that is, prisoners with serious mental illness.

It would, in fact, be impossible to grant any meaningful relief on this claim without granting it on a class-wide basis. See Wal-Mart, 564 U.S. at 360 ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted." (citation and internal quotation marks omitted)). Although the court could order, for example, that a particular prisoner who currently requires psychiatric care be seen by a psychiatrist, it cannot order that adequate staffing be provided to the extent necessary to address any one particular prisoner's mental-health care needs as they develop in the future. Although deficiencies in the individual treatment now being provided could potentially (though much less efficiently) be addressed one by one, the risks defendants' policies and practices pose to mentally ill

prisoners, whose needs change over time, could not. Moreover, any order remedying a systemic deficiency with respect to only one prisoner would rob Peter to pay Paul; the court would be playing a zero-sum game, shifting mental-health care resources from one prisoner to another.[46] By the same token, there exists no individual remedy for the practice of filling residential treatment beds with segregation prisoners, thereby reducing the bed space available in those units and undermining the treatment provided there; the court obviously cannot order that a bed be reserved for each prisoner likely to require one, or order that a particular prisoner's therapy in the residential treatment unit--but only his--not be disturbed.

Nor could the court address inadequate intake screenings without also addressing inadequate staffing levels, when the deficiencies in screening are caused

_____

46. Additionally, no relief other than class-wide relief could address the needs of future prisoner with mental illness.

by the fact that there are not enough staff members qualified to conduct the screenings or supervise others in doing so.   Moreover, as discussed above in the context of commonality, even ordering adequate staffing at a particular facility would not meaningfully redress the claims of prisoners currently housed at that facility, since the chance of a prisoner being moved to another one is very high.

The Rule 23(b)(2) cases to which defendants cite are all unavailing.   In Lakeland Regional Medical Center, Inc. v. Astellas U.S., LLC, 763 F.3d 1280 (11th Cir. 2014), the court affirmed the denial of certification in a case where the plaintiff failed to identify the relief it sought other than "such declaratory and injunctive relief as appropriate in order to compel and ensure defendant['s] future compliance with law."   Id. at 1291 (citation omitted).[47]

_____

47. The Lakeland court also found that the undisputed evidence demonstrated both that no other member of the putative class had ever asked for the sort of license the plaintiff wanted the defendant to (continued...)

Here, by contrast, plaintiffs have described in detail the specific policies and practices in which they ask the court to order defendants to stop engaging; to the extent that they seek an order requiring defendants to formulate a plan for remedying unconstitutional conditions, rather than setting out the details of that plan themselves, they do so only out of appropriate deference to the discretion of prison administrators. See Parsons, 754 F.3d at 689 n. 35 (explaining that requiring plaintiffs to articulate with great precision the terms of the injunction they seek is particularly inappropriate in "prison cases, given that an injunction in any such case must closely

_____

issue, and that it was very unlikely that any other member of the putative class would want to purchase that sort of license even if it were made available. In other words, the relief that the plaintiff asked for would not address the injury (if any) to the other members of the putative class.  Here, plaintiffs have offered expert evidence (with which, in many instances, defendants' mental-health expert actually agrees) to show that the policies and practices they challenge are generally applicable to prisoners with mental illness in the ADOC, and that the relief they seek would serve (continued...)

track the violations established by the evidence at trial, that any such relief must comply with the [Prison Litigation Reform Act]'s extensive requirements, that prison officials must play a role in shaping injunctions, that ultimate proof of some violations but not others might easily change the structure of a remedial plan, that conditions in prisons might change over the course of litigation, and that the class certification hearing is not a dress rehearsal of the trial on the merits (let alone a dress rehearsal of the remedy proceedings)"); <u>Morrow v. Washington</u>, 277 F.R.D. 172, 198 (E.D. Tex. 2011) (Ward, J.) ("Plaintiffs have set forth facts suggesting that Defendants' behavior was generally applicable to the class as a whole, making injunctive relief appropriate. The precise terms of the injunction need not be decided at this stage, only that the allegations are such that injunctive and declaratory relief are appropriate and

---

to redress the risk these policies and practices pose to all such prisoners.

that the class is sufficiently cohesive that an injunction can be crafted that meets the specificity requirements of Rule 65(d).").

Defendants' other cases fare no better. In Heffner v. Blue Cross and Blue Shield of Ala., Inc., 443 F.3d 1330, 1345 (11th Cir. 2005), certification of a Rule 23(b)(2) damages class was reversed because the court concluded that the class members were not entitled to relief (in the form of a refund of a deductible) absent an individualized showing that they had in fact relied on a summary plan description indicating that no deductible would be charged. Similarly, in Jamie S. v. Milwaukee Pub. Sch., 668 F.3d 481, 499 (7th Cir. 2012), the court reversed certification of a class in a case where "the intricate remedial scheme ... require[d] thousands of individual determinations of class membership, liability, and appropriate remedies," explaining that certification under Rule 23(b)(2) is not appropriate when "the relief sought would merely initiate a process through which highly individualized

determinations of liability and remedy are made."
Here, by contrast, no individualized determinations are
necessary or relevant.  If the court grants relief, it
will do so across the board, in one fell swoop.  This
relief will ensure that the statewide prison
mental-health care system, with which all class members
interact, is not operated pursuant to policies and
practices that subject all prisoners to a substantial
risk of serious harm.

     This is exactly the kind of case for which Rule
23(b)(2) was intended.[48]

_____

     48. It is just as clear that the procedural
due-process claim certified for class-wide resolution
satisfies Rule 23(b)(2), as the relief requested here
(an injunction requiring the provision of certain
procedural protections, not only in policy but also in
practice) would clearly apply to the class as a whole.
By contrast, the failure to make constitutionally
appropriate substantive determinations as to whether
prisoners should be involuntarily medicated is less
clearly susceptible to "final injunctive relief or
corresponding declaratory relief ... respecting the
class as a whole" under Rule 23(b)(2).  Although a
consistent refusal by those who authorize involuntary
medication to consider some specific, discrete factor
could arguably be susceptible to class-wide relief,
even if further individual determinations would need to
(continued...)

### 4. Rule 23(g)

In order to certify a class, the court must also appoint class counsel. In so doing, the court "must consider ... (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experiences in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(a). The court also "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class," Fed. R. Civ. P. 23(g)(1)(B).

Lawyers affiliated with the Southern Poverty Law Center, the Alabama Disabilities Advocacy Program, and the law firm of Baker, Donelson, Bearman, Caldwell &

---

be made, the court concludes that this issue will more appropriately be litigated by Bui and ADAP than by a class.

Berkowitz have represented named plaintiffs in litigating and negotiating the settlement of this case, and they now seek appointment as class counsel.[49]  As previously discussed for purposes of certification of the Phase 1 class in this case, the record reflects that these attorneys have substantial experience in litigating class actions and in the complex substantive areas of both prisoners'-rights and disability-rights law.

Notably, defendants take issue with the adequacy of only a subset of named plaintiffs' counsel.  They argue that the Southern Poverty Law Center (SPLC) should not be appointed as class counsel, but they do not make the same argument with respect to Baker, Donelson or ADAP, both of which represent the individual named plaintiffs.

---

49. Anil Mujumdar of the law firm of Zarzaur, Mujumdar & Debrosse has also participated extensively in the Phase 2A litigation, in representing only ADAP, not the named plaintiffs.  Neither he nor the firm has requested to be appointed as class counsel.

In any event, defendants' arguments with respect to SPLC are not convincing.  Although they focus on one possible deficiency in SPLC's pre-filing investigation--namely, its failure to review the medical and mental-health records of all named plaintiffs prior to filing their complaint--they ignore the detailed and involved investigation that SPLC and plaintiffs' other counsel conducted prior to (and since) the filing of this case.  Before filing suit, plaintiffs' counsel conducted a two-year investigation into health care in ADOC facilities, interviewed numerous prisoners, obtained some medical records, and obtained some records from defendants and their medical contractors through open records requests.  They issued a lengthy report on their findings, which discussed the named plaintiffs in some detail.  Especially in light of the difficulty of investigating secure institutions, this was plainly adequate.[50]

_____

50. The cases defendants cite as examples of inadequate pre-filing investigation bear little (continued...)

In addition, defendants argue that SPLC has taken positions in conflict with its fiduciary obligations to the putative class. Essentially, defendants complain that when, earlier this year, the Alabama legislature considered a proposal to invest hundreds of millions of dollars in building four large new prison facilities in the State, the president of SPLC sent a letter to a number of legislators opposing its passage. Whether or not this letter had any effect on legislative support for, or the eventual defeat of, the bill, nothing in it was in conflict with the interests of the putative class his organization seeks to represent.

---

resemblance to the case at bar. In these cases, counsel's deficiencies were glaring; they had failed to conduct even the most cursory inquiry into whether the proposed class representatives even existed--in Ballan v. Upjohn Co., 159 F.R.D. 473, 488 (W.D. Mich. 1994) (Hillman, J.), one was a "phantom," who "counsel had named ... without knowing who, let alone where, [she] was"--or had failed to speak at all to at least one of the proposed class representatives prior to the morning of his deposition, see Williams v. Balcor Pension Investors, 150 F.R.D. 109, 120 (N.D. Ill. 1993) (Zagel, J.).

As defendants themselves acknowledge, it was "the
<u>opinion</u> of the Commissioner [that] inmates in the ADOC
system would benefit from the [bill], because it would
alleviate problems caused by overcrowding and
understaffing." Defs.' Opp. to Class Cert. (doc. no.
807) at 171 (emphasis added). SPLC's president
expressed a different opinion, favoring a legislative
approach that prioritized "sentencing reform," and
"demand[ed] that the prison system reform its
management practices." <u>Id</u>.

Defendants' argument incorrectly presupposes either
that the Commissioner's view was indisputably correct,
or else that the only legislative alternatives were the
passage of the bill as proposed, on the one hand, and
no action at all on the other. This, too, is not the
case; there is a panoply of possible legislative
approaches to any issue as complex as prison reform.
The fact that an SPLC official expressed a preference
for options other than the one that happened to be on
the table at a particular moment hardly reflects an

abandonment of his fiduciary duty to his current or prospective clients.

Setting aside the fact that plaintiffs' counsel are free to take a different position than the Commissioner, it is not entirely clear how and why-- even accepting his position--the prison construction project would benefit the plaintiff class. According to the statement of the Commissioner quoted by defendants, the salient impact of the bill would be on overcrowding and understaffing.[51] Moreover, as with any "transformation" of the size contemplated here, the prison construction project would presumably impact the delivery of health care in numerous ways--some positive and some negative, many hard to predict. Plaintiffs

---

51. Confusingly, however, it also appears to be defendants' contention in this litigation that overcrowding and custodial understaffing do not result in constitutionally inadequate health care. If this is indeed their position, the court is uncertain why they believe that impeding the passage of a bill designed to address these issues would be adverse to the interests of a class whose sole purpose in bringing this litigation--obtaining adequate mental-health care--would be unaided by this reform.

note in replying to this argument that the record
reflects that the Commissioner has also suggested that
his proposal would allow ADOC to dramatically cut the
cost of providing health care.  The court certainly
passes no judgment on the merits of SPLC's perspective,
but it does seem perfectly reasonable for lawyers
representing clients who seek more funding for health
care to oppose a bill the proponent of which says would
result in less funding for health care.

### 5.  Ascertainability

Defendants argue that the Eighth Amendment class
certified here is not ascertainable.  However, there is
serious reason to doubt that the judicially created
ascertainability requirement applies to Rule 23(b)(2)
classes.  Even if it does, this class meets the
requirement.

Although the Eleventh Circuit did hold in
defendants' primary case, Little v. T-Mobile USA, Inc.,
691 F.3d 1302, 1304 (11th Cir. 2012), that a class must

be "clearly ascertainable"--that is, "its members can be ascertained by reference to objective criteria," Bussey v. Macon County Greyhound Park, Inc., 563 F. App'x 782, 787 (11th Cir. 2014) (citation and internal quotation marks omitted)--it did so in the context of a Rule 23(b)(3) damages class, not, as here, a Rule 23(b)(2) injunctive-relief class.   Defendants have not cited, and the court is not aware, of any cases within this circuit applying the ascertainability requirement to a Rule 23(b)(2) class, much less any binding precedent doing so.

Moreover, the circuits that have squarely addressed the issue have generally concluded that the ascertainability requirement does not apply to Rule 23(b)(2) injunctive-relief classes.   The recent discussion of this issue by the Third Circuit is detailed and persuasive.[52]

_____

52. Notably, the Third Circuit, like the Eleventh, has split from some other circuits in applying a "heightened" ascertainability requirement to Rule 23(b)(3) class actions.   See Mullins v. Direct Digital, (continued...)

**134**

In <u>Shelton v. Bledsoe</u>, 775 F.3d 554 (3d Cir. 2015),
the court distinguished Rule 23(b)(2) and (b)(3)
classes by noting that the latter "'allows
certification in a much wider set of circumstances,'
including those 'in which class-action treatment is not
as clearly called for,'" and explaining that because
Rule 23(b)(3) classes are an "'adventuresome
innovation,' Congress included additional 'procedural
safeguards,'" such as individual notice and an
opportunity to opt-out. <u>Id.</u> at 560 (quoting <u>Wal-Mart</u>,
131 S. Ct. at 2558, <u>Comcast</u>, 133 S. Ct. at 1432). In
Rule 23(b)(2) classes, on the other hand, "'[t]he key
... is the indivisible nature of the injunctive or
declaratory remedy warranted--the notion that the

---

<u>LLC</u>, 795 F.3d 654, 659-72 (7th Cir. 2015) (disagreeing
with <u>Marcus v. BMW of N. Am., LLC</u>, 687 F.3d 583 (3d
Cir. 2012), and <u>Karhu v. Vital Pharms., Inc.</u>, 621 F.
App'x 945, 946 (11th Cir. 2015) (requiring that the
"class definition contain[] objective criteria that
allow for class members to be identified in an
administratively feasible way ... [through a]
manageable process that does not require much, in any,
individual inquiry" (citations and internal quotation
marks omitted))).

conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" Id. at 561 (quoting Wal-Mart, 131 S. Ct. at 2557 (citation and internal quotation marks omitted). In sum, the court explained, "the identities of individual class members are less critical in a (b)(2) action than in a (b)(3) action." Id.

As the court noted in Shelton, an advisory committee note to Rule 23 describes cases which are specifically defined in terms of their unascertainability as "illustrative" examples of Rule 23(b)(2) classes: "various actions in the civil rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration." Fed. R. Civ. P. 23 advisory committee's note (1966) (emphasis added). This court therefore agrees with the Third Circuit that a requirement--directly contrary to the express language of the advisory committee--"that the members of the class be capable of specific

enumeration[] is inappropriate for (b)(2) classes."[53]

<u>Shelton</u>, 775 F.3d at 561.

---

53. The court also adds the following observations. Requiring plaintiffs seeking certification of a Rule 23(b)(2) class to demonstrate that they could determine <u>conclusively</u> and <u>a priori</u> who would and would not be a member of it would seriously undermine some of the most important functions of this type of litigation.

This is because (1) many civil rights cases involve challenges to discrimination on the basis of categories that are statutorily delineated by Congress in a legislative effort to protect the civil rights of people within them, and as discussed below, many of those categories are hard to assess in a perfectly objective fashion, and (2) other cases involve challenges to public entities' failures to adequately assess individuals to whom they have an obligation to provide services.

Concluding that the requirement that a class member have a "serious mental illness" was not a sufficiently objective one would set the court atop a dangerously slippery slope. It would undercut Congress's efforts to protect other groups, the bounds of which it defines in statute, such as people with disabilities. Other categories that have long formed the basis of civil rights violations (and the basis of class definitions in collective actions challenging those violations), like race, are hardly "objective." Store records can reveal who bought defective products; determining who is or is not "Hispanic" is not so simple. Although a court can engage in this inquiry, it is certainly an individualized one.

(continued...)

137

As the Third Circuit recounted, two other circuits
have reached the same conclusion.[54]  In Shook v. El Paso

---

In addition, strict application of this standard to
cases where the violation at issue is a failure to
identify would create a Catch-22; it would be the
height of irony for a prison system to be able to
defeat certification of a class seeking to challenge
its failure to identify prisoners with mental illness
by arguing that that very failure made the class
unascertainable.

54. As explained in the leading treatise on class
action law, "early circuit cases" in the Fifth, Sixth,
and Seventh Circuits applied the ascertainability
requirement "without considering the unique nature of
23(b)(2) actions," but "later district court cases in
these circuits have adopted an intermediate position
... under which the requirement of ascertainability is
applied less stringently in 23(b)(2) actions."
Rubenstein, Newberg on Class Actions § 3:7 (5th ed.).
It also observes that "recent decisions either ...
eschew the implied requirement of definiteness in Rule
23(b)(2) class actions, or follow the intermediate
approach, and treat definiteness as flexible ...[,]
even in circuits that have traditionally applied the
definiteness requirement to such class actions."  Id.
(citing, among other cases, In re Monumental Life Ins.
Co., 365 F.3d 408, 413 (5th Cir. 2004) (recognizing
that "a precise class definition is not as critical
where certification of a class for injunctive or
declaratory relief is sought under [R]ule 23(b)(2)," at
least so long as notice and opt-out rights are not
requested), and Kenneth R. ex. rel. Tri-City CAP,
Inc./GS v. Hassan, 293 F.R.D. 254, 264 (D.N.H. 2013)
(McAuliffe, J.) (holding that a Rule 23(b)(2) class
defined as containing persons with "serious mental
(continued...)

Cty., 386 F.3d 963, 972 (10th Cir. 2004), the court explained that "many courts have found Rule 23(b)(2) well suited for cases where the composition of the class is not readily ascertainable; for instance, in a case where the plaintiffs attempt to bring suit on behalf of a shifting prison population." The First Circuit has agreed. See Yaffe v. Powers, 454 F.2d 1362, 1366 (1st Cir. 1972) (holding that "the actual membership of [a Rule 23(b)(2)] class need not ... be precisely delimited," because individual notice to class members is not required); see also Floyd v. City of New York, 283 F.R.D. 153, 171-72 & n.115 (S.D.N.Y. 2012) (Scheindlin, J.) (citing cases). Shelton also pointed out the "significant" fact that the Supreme Court's recent foray into Rule 23(b)(2), Wal-Mart, "lacks any inquiry into 'ascertainability.'" 775 F.3d at 563.

---

illness" was sufficiently ascertainable (citation omitted))).

For these reasons, the court concludes that the class proposed in this litigation need not be ascertainable. That said, the court concludes in the alternative that even if the requirement did apply, plaintiffs' proposed class definition would satisfy it.

Although defendants complain that the term "serious" mental illness is undefined, defendants themselves note in their motion for summary judgment that there is case law in this circuit articulating what counts as "serious" in the arena of Eighth Amendment mental-health claims: an illness "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the need for a doctor's attention." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994) (explaining that "[t]his standard has been acknowledged and used by other federal circuit and district courts," and concluding that it was the "appropriate and guiding principle"). This is a rather straightforward, objective standard: a prisoner would

be a member of this class if he has been diagnosed as
needing mental-health treatment or if he is very
obviously mentally ill.[55]  Of course, because this is
not a Rule 23(b)(2) damages class action, and class
members will not be entitled to individual notice or
have the right to opt out, the court need not actually
conduct this inquiry to determine whether each prisoner
is or is not a member of the class.

     To conclude, the court will briefly address the
other two cases defendants cite, both of which are
unreported decisions by out-of-circuit district courts:
Johannes v. Washington, 2015 WL 5634446 (E.D. Mich.
Sept. 25, 2015) (Michelson, J.), and Schilling v.
Kenton Cty., 2011 WL 293759 (E.D. Ky. Jan. 27, 2011)
(Bunning, J.).  They are wholly consistent with the
result reached here; indeed, Johannes actually

_____

     55. Indeed, the existence of prisoners who are very
obviously mentally ill but who have not been diagnosed
by prison mental-health staff as needing treatment
would itself be compelling evidence of an Eighth
Amendment violation.

recognizes that the ascertainability requirement applies "less stringently" in Rule 23(b)(2) cases. 2015 WL 5634446, at *10. These cases declined to certify or expressed concern about certifying what are known as "fail-safe" classes--classes that are defined in terms of the eventual merits adjudication. See Schilling, 2011 WL 293579, at *5 ("A class definition is ... too general where it requires the Court to determine whether an individual's constitutional rights have been violated in order to ascertain membership in the class itself."). In this case, a fail-safe class would be one defined to consist of all prisoners who have received constitutionally inadequate mental-health care. Because plaintiffs have not proposed a fail-safe class, these cases suggest no reason not to certify.[56]

---

56. The court notes that some courts have in fact expressed a preference for fail-safe classes, in order to avoid the possibility that the class will include some members who have not been harmed by the challenged conduct. See Kenneth R., 293 F.R.D. at 264 (certifying a fail-safe class); Strouchler v. Shah, 286 F.R.D. 244, 247 (S.D.N.Y. 2012) (refining a class definition to address an overbreadth objection, and in so doing, (continued...)

* * *

The motion for class certification filed by the remaining named plaintiffs is granted in part and denied in part. The court will certify a class of all persons with a serious mental-health disorder or illness who are now, or will in the future be, subject to defendants' mental-health care policies and practices in ADOC facilities, excluding the work release centers and Tutwiler Prison for Women. The court will also certify a class of all persons with a serious mental-health disorder or illness who are now, or will in the future be, subject to defendants' formal involuntary-medication policies and practices.

---

creating a fail-safe class). The Fifth Circuit has both "rejected a rule against fail-safe classes," <u>In re Rodriguez</u>, 695 F.3d 360, 370 (5th Cir. 2012), and <u>also explained</u> that Rule 23(b)(2) classes can be certified even when not all members of them have been harmed, <u>see Johnson v. Am. Credit Co. of Ga.</u>, 581 F.2d 526, 532 (5th Cir. 1978). Bluntly put, this area of class-action law is a mess. <u>See</u> Rubenstein, <u>Newberg on Class Actions</u> § 3:6 (5th ed.).

The court will decline to certify a class for the individual plaintiffs' due-process challenge regarding involuntary medication without a recent finding of dangerousness, or for their due-process challenge regarding coerced consent. However, the individual plaintiffs with these claims will proceed to trial, and ADAP, through its associational standing, may represent the interests of unnamed prisoners who are subject to these policies and practices.

An appropriate order will be entered.

DONE, this the 25th day of November, 2016.

   /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE