Expert Report of Kathryn A. Burns, M.D., M.P.H.
Mental Health Expert
*Dunn v Dunn*

Submitted
July 5, 2016

Submitted with Supplemental Citations
October 17, 2016

# CONTENTS

Assignment                                                          3

Summary of Opinions                                                 4

Qualifications                                                      5

Compensation                                                        7

Facts and Data Considered in Forming Opinions                       7

OPINIONS & BASIS & REASONS FOR OPINIONS                             8

OPINION 1:                                                          9

Staffing levels are inadequate to provide appropriate mental health care. MHM staffing levels
are deficient in both quantity and professional credentials. Custody staffing numbers are
inadequate to provide escort and supervision and effectively prevent prisoner access to
treatment.

OPINION 2:                                                          23

The mental health screening process for identification and classification of prisoners with
serious mental illness is inadequate. Many prisoners with mental illness are not identified and
consequently receive no treatment whatsoever. Others receive only psychotropic medication
rather than more comprehensive care that addresses their clinical condition and needs.

OPINION 3:                                                          32

Mental health treatment is inadequate to meet the needs of the prisoner population with serious
mental illness. Residential and stabilization unit treatment beds are underutilized but also
provide little treatment beyond psychotropic medication due to staffing level shortages of both
treatment and custody staff. Individual contacts with mental health staff are brief, infrequent and
often not conducted in confidential settings. There is little group treatment in mental health
treatment units and even less in outpatient settings. As a consequence, prisoners with untreated
and undertreated serious mental illness are over-represented in the segregation population –
essentially punished for manifestations of serious mental illness.

OPINION 4:                                                          47

Quality assurance and contract oversight are seriously lacking. Even when problems are
identified, corrective actions are not implemented to ensure the problem is corrected and does
not recur.

Conclusion                                                          51

Assignment

Plaintiffs asked me to evaluate the mental health care provided to inmates confined in

the Alabama Department of Corrections (ADOC) prison system.  Mental health care to

inmates with serious mental illness and other mental health diagnoses is provided

through a contract between ADOC and MHM Services, Inc. (MHM).  (The ADOC also

has a small number of staff psychological associates and psychologists to assist with

the admission reception process and other brief interactions with prisoners, as opposed

to on-going care provided by the contractor.  This is more fully described later in this

report.)  As set forth in the ADOC Request for Proposal (RFP) No. 2013-02, the vendor

is to provide a comprehensive program of mental health services to include reception

evaluations, intensive stabilization unit (SU) care, residential treatment unit (RTU) level

of care, outpatient services and in-patient psychiatric care.  According to the RFP, the

elements of care are to include effective and appropriate psychotropic medication;

psychiatric or psychological individual contact as clinically indicated; mental health

professional individual contact/follow-up at a minimum of 60 days; mental health nursing

staff monitoring of medication compliance and required laboratory testing;

counseling/programming to increase coping skills and provide support; activities to

promote socialization; and access to adequate out-of-cell time and outdoor recreation.

The contract was awarded to MHM October 1, 2013 although MHM had a similar

contract for the delivery of comprehensive mental health services from 2008-2013.

Summary of Opinions

I have formed the following opinions in this case:

Staffing is woefully inadequate to provide an appropriate/sufficient level of mental health care.  There are deficient numbers of mental health staff to adequately serve the inmate population and some of the staff are not appropriately licensed or credentialed to do the job duties assigned to them without adequate oversight or supervision – and they are not provided that oversight or supervision.  Additionally, the delivery of mental health care is impeded by security staffing shortages throughout the ADOC which impacts mental health staff access to inmates as security is responsible for inmate escort and supervision.

Inmates with serious mental health needs are not identified timely.  The reception screening and evaluation process under-identifies inmates with mental health needs including those with serious mental health needs.  Self-referrals for mental health care are not responded to in a timely manner or ignored altogether forcing inmates to engage in increasingly dangerous behaviors to get mental health staff attention and care. Referrals from other institutional staff are also deficient. The ADOC mental health classification system has less to do with classifying inmates with serious mental illness than it does with determining inmate housing.

Mental health treatment consists almost exclusively of psychotropic medication management – even in residential treatment settings.  Caseload sizes are too large to

4

permit more than brief, infrequent individual appointments as opposed to an actual

course of therapy or counseling.  Group treatment is non-existent in some prisons and

not accessible in others due to shortages of security staff to provide escort and

supervision.  Residential treatment beds are underutilized while inmates with serious

mental illness are suffering without treatment in segregation housing units.


Oversight of the mental health services contract by ADOC is seriously lacking.  The

internal system of quality assurance reported by MHM is inadequate and seriously

flawed.  There is no evidence of meaningful oversight of mental health treatment by the

ADOC Office of Health Services (OHS).  This is best exemplified by the continued

placement of segregation inmates into mental health treatment beds and the

disproportionate number of inmates with mental illness into segregation beds where

there is virtually no access to mental health treatment.


Qualifications

I am a Medical Doctor licensed in the state of Ohio.  I am Board Certified in the practice

of General Psychiatry and Forensic Psychiatry.  I also have a Master's Degree in Public

Health.  I am a Distinguished Fellow of the American Psychiatric Association.  I am

Board Certified by the American Board of Psychiatry and Neurology (ABPN) in General

Psychiatry and Forensic Psychiatry.  I have served both as a Board Examiner for the

ABPN general adult psychiatry oral examination and on the forensic psychiatry

committee writing examination questions and preparing the forensic psychiatry board

examinations.

Since July 2013, I have served as the Chief Psychiatrist for the Ohio Department of
Rehabilitation and Correction, a position I also held from May 1995 to August 1999.  I
have provided psychiatric care to inmates in jails and prisons in addition to holding
administrative posts.  I have been a physician surveyor of health services for the
National Commission on Correctional Health Care and am a Certified Correctional
Health Professional.  I have written correctional mental health policies and procedures
and developed staffing plans for correctional mental health services.  I have written and
been published in journals and peer reviewed textbooks on topics pertaining to
correctional mental health care.

I have served as both a consulting and testifying expert witness in legal cases involving
correctional mental health care.  I have conducted assessments of the adequacy of
mental health care in individual correctional facilities as well as state systems including
Massachusetts, Pennsylvania, Indiana, Illinois, Ohio and Alabama.  I was one of the
mental health experts in the *Bradley v Hightower/Haley* case that settled in 2000.  I
have also been a monitoring expert in correctional litigation cases including *Coleman v
Brown* (California), *Disability Rights Network of Pennsylvania v Wetzel* (Pennsylvania),
*Disability Law Center v Massachusetts Department of Correction* (Massachusetts),
*Graves v Arpaio* (Maricopa County, Arizona) and *Carty v Mapp* (US Virgin Islands).

A copy of my current curriculum vitae, which includes a list of all publications authored and a list of all cases in which I have testified at trial or deposition during the past four years is attached to this report as Appendix A.

<u>Compensation</u>

My rate of compensation for this case is $350 per hour for all work, including deposition and testimony at trial.  Travel time is compensated at $100 per hour.

<u>Facts and Data Considered in Forming Opinions</u>

In forming my opinions, I considered information gathered and observations made during site visits at the following prisons on the indicated dates:

- Tutwiler Prison for Women – May 13, 2015
- Bibb Correctional Facility – May 14, 2015
- St. Clair Correctional Facility – May 15, 2015
- Holman Correctional Facility – August 17, 2015
- Fountain Correctional Facility– August 18, 2015
- Donaldson Correctional Facility – September 8-9, 2015
- Kilby Correctional Facility – September 10-11, 2015
- Bullock Correctional Facility – March 14-15, 2016
- Easterling Correctional Facility – March 16, 2016

Site visits consisted of observations of inmate housing units, including segregation; observations of mental health program areas; crisis watch cells; mental health housing

units; brief non-confidential cell front conversations with some inmates; individual out-of-cell and interviews with inmates identified from the mental health caseload roster.  I conducted individual interviews with 77 prisoners and spoke with another 25 prisoners very briefly at cell front as permitted by the agreement between the parties.  I reviewed mental health records and logs when they were made available to me.  I observed the medication administration practice at one facility when permitted to do so.  This methodology (document review, site visits, interviews and observations) is the same as that used by other experts in the field to assess correctional mental health care and that I have used in assessing other correctional facilities and systems.

Appendix B contains a complete list of the documents I considered in preparation of this report.  Appendix C contains a name key in which prisoners are assigned a number for purposes of this report in which they will be referred to by number rather than name.

Discovery production was delayed in this case relative to the scheduling order for the submission of expert reports.  If additional documents and/or other data become available to me, I reserve the opportunity to review the new information and modify or supplement my opinions if necessary.

Opinions and Basis and Reasons for Opinions

In forming my opinions, I have relied on my training and experience in general psychiatry, forensic psychiatry and correctional psychiatry:  I have provided psychiatric

care to inmates in jails and prisons and supervised the care provided by other mental

health professionals; I have experience in administration and oversight of correctional

mental health care and I have visited dozens of correctional facilities and interviewed

staff, administrators and hundreds of prisoners and detainees.  I am familiar with the

standards for the delivery of mental health care promulgated by the National

Commission on Correctional Health Care (NCCHC) as well as position statements and

guidelines promulgated by other professional organizations including the American

Psychiatric Association.  I have extensive experience assessing the quality of care in

correctional facilities and systems.

**OPINION 1:  INADEQUATE STAFFING**

Staffing levels are inadequate to provide appropriate mental health care.  MHM staffing
levels are deficient in both quantity and professional credentials.  Custody staffing
numbers are inadequate to provide escort and supervision and effectively prevent
prisoner access to treatment.

In September 2000, the state entered into a Settlement Agreement (*Bradley v Haley*,

Civil Action No 92-A-70-N) for the provision of mental health services to male inmates in

the ADOC.  The Agreement addressed mental health treatment services, size and

location of treatment units, types and numbers of mental health staff assigned to each

level of care, policies and procedures, training and contract oversight and quality

assurance to ensure ongoing quality of care.  The ADOC agreed to provide the

following types and numbers of mental health staff for a male inmate population of

20,619:[1]

- 11 Psychiatrists (nurse practitioners could be substituted for up to 3 psychiatrists)
- 10 Psychologists
- 28 Mental Health Professionals (MHP)
- 3 Registered Nurses (RN)
- 25 Licensed Practical Nurses (LPN)
- 11 Activities Technicians (AT)
- 12.5 Clerical Support positions[2]

These numbers and types of mental health staff were developed to meet the mental

health needs of the male prisoner population.  They included staffing for 40 Stabilization

Unit (SU) beds and 300 Residential Treatment Unit (RTU) beds.[3]  Women's mental

health staffing was not included because *Bradley* addressed only the male prisoner

population.  Notably, it is well recognized in correctional mental health that women

prisoners tend to access and utilize mental health services at a higher rate than men.  In

spite of the passage of time and increases in both the male and female prison

population in Alabama, mental health staffing levels have not kept pace with the

increased size of the incarcerated population and their mental health needs.

In January 2012, ADOC had a contract with MHM for the following positions:[4]

---

[1] ADOC website indicates 22,053 inmates (male and female) in the September 2000
population report.  The reported population of females (867 at Tutwiler, 273 at
Montgomery and 294 at Birmingham) have been subtracted from the total to arrive at
the male population of 20,619.
[2] *Bradley v. Haley* (Civil Action No 92-A-70-N) Settlement Agreement, August 8, 2000
Agreement of the Experts; p. 12
[3] Id., pp. 7-9
[4] MHM Monthly Report January 2012 (ADOC 043544-043547)

- 6.75 Psychiatrists and 5.45 Clinical Registered Nurse Practitioners (CRNP) = 12.2
- 5 Psychologists
- 41.05 MHP
- 3 RN
- 44.5 LPN
- 9 AT
- 13.2 Clerical support

The overall inmate population had increased, female prisoners were included and residential beds increased to 440 combined SU and RTU beds.

Psychiatrists had decreased while use of mid-level CRNPs had increased since the *Bradley* Settlement. The number of psychologists had been cut in half so that institutions were left with only part-time psychology coverage. Registered nurse positions were not increased but the number of LPNs increased substantially. Mental health professionals also increased substantially. Mental health professionals, as defined in the *Bradley* Agreement, are "masters degree psychology associates, masters degree social workers, professional counselors and mental health technicians with extensive training and experience in mental health care."[5] Note that there is no requirement for licensure or certification for MHPs. Activity tech positions had decreased, even though more than 100 residential treatment beds were opened. Activity technicians are generally assigned to provide individual and group programming for inmates in residential units and staffed at a ratio of 1 AT to 30 inmates. This is a standard ratio used in other correctional systems providing residential care to prisoners.

---

[5] *Bradley v. Haley* (Civil Action No 92-A-70-N) Settlement Agreement, August 8, 2000 Agreement of the Experts; p. 1.

By the following year, January 2013, psychiatrists had been further reduced while mid-level CRNPs had again increased; psychologists had been reduced again as had been LPNs, ATs and Clerical Support staff.[6]  The overall census was only 150 inmates fewer than the previous year.[7] The number of residential beds did not change.[8]  By February 2016, the most recent date that staffing was reported, psychiatrists had been again reduced and CRNPs increased for a total of 12 positions for the population of 24,000 male and female prisoners.[9] The following table depicts these changes in inmate census and MHM staff.  (MHM regional administrative staff have not been included in these numbers because they do not provide consistent direct care to prisoners.  The clerical support in the table refer to persons that work inside the prisons directly with the mental health staff providing care.)

|  | September 2000 | January 2012 | January 2013 | February 2016 |
|---|---|---|---|---|
| Inmate census | 20,619 *men only* | 25,451 | 25,301 | 24,191 |
| Psychiatric provider: | 11 | 12.2 | 11.75 | 11.75 |
| - Psychiatrist | 8 | 6.75 | 5.5 | 4.95 |
| - NP | 3 | 5.45 | 6.25 | 7.05 |
| Psychologist | 10 | 5 | 3.25 | 3.5 |
| MHProfessional | 28 | 41.05 | 41.8 | 44.25* |
| RN | 3 | 3 | 3 | 3 |
| LPN | 25 | 44.5 | 38.9 | 39.4 |
| AT | 11 | 9 | 7.5 | 8 |
| Clerical support | 12.5 | 13.2 | 10.4 | 10.95 |

* This number includes 14 "site administrators" who are unlikely to carry a full caseload due to their other administrative responsibilities.

---

[6] MHM Monthly report January 2013 (ADOC 044003-044006)
[7] Inmate census figures were obtained from the ADOC website doc.state.al.us, ADOC link to statistical reports (accessed June 20, 2016)
[8] MHM Monthly report January 2013 (ADOC 044005-044006)
[9] MHM Monthly Report February 2016 (ADOC 0319158-0319162)

The trends are clear.  In spite of an increased census since 2000, plus a system to provide mental health care to both male and female prisoners, and an increase in residential beds to 414 as reported in February 2016 , the staff to inmate-patient ratios have decreased in almost every instance and there are fewer licensed and credentialed mental health providers and an increased use of unlicensed and less educated staff.

In Alabama and elsewhere, CRNPs are considered mid-level practitioners and cannot work independent of a collaborative relationship with a psychiatrist. Dr. Hunter, the Chief Psychiatrist for MHM in Alabama, described the conditions set forth in Alabama law as follows: One physician can serve as the collaborating psychiatrist for up to four CRNPs.  The collaborating physician must spend 10% of the collaboration time for each CRNP on site with the CRNP and review 10% of each CRNP's records.[10]  The documents I reviewed showed no evidence of either of these requirements happening at many ADOC facilities, although it would be the standard of practice to document the collaboration  in some fashion.  This may take the form of a notation in the progress notes of a prisoner's chart or reports of medical record reviews conducted of the nurse practitioner's work.  In fact, some institutions have only CRNP coverage and no psychiatric time.  According to the February 2016 MHM Monthly Operations Report, facilities staffed only with CRNPs  include Easterling, Fountain, Holman, Limestone, St. Clair, Staton (which includes Draper and Elmore), and Ventress.[11]  In ADOC, CRNPs are essentially functioning independently as opposed to in a collaborative relationship.

---

[10] MHM Alabama 1st Quarterly CQI Meeting April 22, 2015 - MHM029592
[11] MHM Monthly Report February 2016 (ADOC 0319160-0319162)

Dr. Hunter, the Chief Psychiatrist for MHM in ADOC, acknowledges there is no difference in the role of the psychiatrist and CRNP except at Kilby and Tutwiler where psychiatrists, rather than CRNPs, do all of the reception mental health evaluations and formulate initial diagnoses.[12]  Later, in the course of incarceration, if a CRNP does a diagnostic assessment, it must be reviewed by their collaborating physician.[13]  If this is actually happening, it was not readily apparent in the records reviewed.  CRNPs now outnumber physicians in the system – no longer being utilized as physician extenders but replacements.   This is highly problematic inasmuch as nurse practitioners are not physicians.  They have less training, knowledge, skill and judgment, which is why they are considered mid-level clinicians and are required by law to have a collaborative relationship with a physician.  This is not to say that many nurse practitioners are not skilled and caring individuals but they do require review and oversight.  Without that review and oversight there is heightened risk that diagnoses are inaccurate or missed and medication management clinically unsound.  This leads to delays in care, worsening of symptoms and needless suffering by prisoners.[14]  Dr. Hunter appears to

---

[12] Deposition of Dr. Robert Hunter taken April 21, 2016 (274:15-16)

[13] Id. (275:3-8)

[14] I have observed this risk in my own practice and while evaluating prison systems around the country. While I rely on CRNPs, they do not have as much training as psychiatrists so some are more likely to inaccurately diagnose someone or apply improper medication management techniques if they are not supervised. I saw the impact of this inadequate supervision during my tours. For example, Prisoner #35 has a history of self harm and reported auditory hallucinations. Upon being released from a crisis cell less than a month before our interview, he was returned directly to his segregation cell. Prisoner #35 is seen by a CRNP, and mental health staff told him that he has "behavior problems, not mental health problems." Prisoner #91 has been receiving mental health treatment since he was eight years old, including placement in a mental health youth center three times. Both he and his mother asked that he receive mental health treatment multiple times since he entered ADOC custody in 2009. Despite the repeated requests, the CRNP told Prisoner #91 that he just wanted medication so

have some recognition of this as he assigns physicians to the reception process to make diagnoses and initiate medication treatment and also tries to assign them to the residential treatment units for the treatment of serious mental illnesses.[15]

The number of psychologists, licensed independent mental health practitioners, has been reduced to the point where their ability to provide services to inmates in the system is so limited as to be virtually non-existent.  There are 15 major prisons.  A single psychologist certainly cannot cover 5 institutions located far and wide across the state.  There is no capacity to provide regular, on-going and meaningful treatment to a caseload of inmates and/or provide consultation and assistance with diagnostic formulations with so few psychologist positions.

The number of ATs has also been reduced dramatically.  The *Bradley* staffing ratios included 1 AT for every 30 inmates in residential level of care; the same staffing ratio used in other correctional systems, including Ohio and Massachusetts.  However, in spite of operating up to 414 beds which would require at least 13.8 Activity Techs, MHM provides only 8.  The ratio has increased to 1 AT for every 52 inmates.  However, the deficit is even more striking when individual institutions are compared:  Tutwiler has 2 ATs for a 30 bed RTU, but Donaldson has only 2 ATs for 96 beds (ratio of 1 AT for 48 inmates) and Bullock has only 4 ATs for 250 beds, or 1:63.[16] These deficits impact both

---

==that he could "get high." Prisoner #91 finally started receiving mental health treatment only after being placed in a crisis cell three times – including once when he attempted to hang himself in his segregation cell and another when he cut his arms. Other examples are described more thoroughly in my notes, attached as Appendix 1.==

[15] Deposition of Dr. Robert Hunter taken April 21, 2016 (93:14 – 95:15)

[16] MHM February 2016 monthly report (ADOC0319155)

the number and types of group and individual programming that can be provided and the number of inmates that can participate.

The MHP classification consists of several different types of staff with varying degrees of education and training. Licensure is not required. This has implications for what the MHP is able to do and provide. For example, in the community, a person with a master's degree in psychology cannot be licensed to work independently, a licensed psychologist must supervise their work. MHM does not require this type of oversight or supervision.[17] Some of the MHM MHPs are licensed social workers, but neither MHM nor ADOC requires licensure. Unlicensed staff could not provide mental health care to people outside of prison independent of supervision by a licensed provider and are unqualified to do so in prison. The use of unlicensed mental health staff to provide psychotherapy to inmates does not meet the standard of care. Unlicensed staff do not have the requisite degree of training or recognized skill set to provide treatment without supervision. This can lead to use of the incorrect or improper treatment techniques and/or failure to recognize signs and symptoms of serious mental illness increasing the risk of harm by delaying treatment and causing needless suffering. I have observed this

---

[17] For example, Program Director Houser acknowledged that neither site administrators nor MHPs do not have to be licensed but can have a masters degree in psychology or a behavioral health field. Deposition of Teresa Houser taken November 20, 2015 (308:3-23). MHM's Chief Psychologist Charles Woodley acknowledged at his deposition that site administrators are responsible for supervising MHPs, and his "indirect supervision" is limited to training opportunities, periodic meetings, and case consultations initiated by the MHPs. Deposition of Charles Woodley take March 8, 2016 (47:9-48:22). Lesleigh Dodd explained that she is the site administrator and an MHP at Holman. Deposition of Lesleigh Dodd taken February 18, 2016 (20:2-7). Although she is not licensed, she supervises a Ph.D., CRNP, MHP, LPN, and a clerk, which involves making "sure they do their jobs, do what they're supposed to do." (15:16-18, 27:18-30:3). Those staff do not receive clinical supervision.

==increased risk in my own practice and through my decades of inspecting jail and prison facilities around the country.==   Untreated or unrecognized mental illness can result in suicide or other serious self-harm.

The system continues to rely almost exclusively on licensed practical nurses rather than registered nurses.  LPNs must work under the supervision of a RN.  However, there are only 3 RNs in the system, one each at Tutwiler, Donaldson and Bullock.  The RNs work the day shift.  These three institutions have residential mental health units and LPNs working without oversight or supervision evenings, nights and weekends.  Further, all of the other sites do not have an RN for mental health on site – ever.  The overwhelming majority of the LPNs are assigned to prisons that do not have residential mental health units and have no RN direction/supervision or oversight. LPNs are being utilized to complete tasks that they are not qualified to perform – the most glaring example is their gatekeeper role in the reception process.

The Alabama Nurse Practice Act, Article I, 34-21.1 clearly makes a distinction between the types of activities LPNs are permitted to do and the types of activities a Registered Nurse is permitted to do.  Relevant portions of the code follow (emphasis added).

*Practice of Practical Nursing. (LPN)*

*The performance, for compensation, of acts designed to promote and maintain health, prevent illness and injury and provide care utilizing standardized procedures and the nursing process, including administering medications and treatments, under the direction of a licensed professional nurse or a licensed or otherwise legally authorized physician or dentist. Such practice requires basic knowledge of the biological, physical, and behavioral sciences and of*

17

*nursing skills **but does not require the substantial specialized skill, independent judgment, and knowledge required in the practice of professional nursing.** Additional acts requiring appropriate education and training may be performed under emergency or other conditions which are recognized by the nursing and medical professions as proper to be performed by a licensed practical nurse.*

*Practice of Professional Nursing. (RN)*

*The performance, for compensation, of any act in the care and counselling of persons or in the promotion and maintenance of health and prevention of illness and injury based upon the nursing process which includes **systematic data gathering, assessment, appropriate nursing judgment and evaluation of human responses to actual or potential health problems through such services as case finding, health teaching, health counselling;** and provision of care supportive to or restorative of life and well-being, and executing medical regimens including administering medications and treatments prescribed by a licensed or otherwise legally authorized physician or dentist. A nursing regimen shall be consistent with and shall not vary any existing medical regimen. Additional acts requiring appropriate education and training designed to maintain access to a level of health care for the consumer may be performed under emergency or other conditions which are recognized by the nursing and medical professions as proper to be performed by a registered nurse.*

MHM is assigning LPNs to do tasks that should be done by RNs.  LPNs do not have the requisite degree of education or training to work independent of RN direction.  They cannot make diagnoses and should not be used for the critical reception screening process.  Failure to recognize signs and symptoms of mental illness results in delays or failure to provide treatment.  This can increase the risk of psychological suffering.  Untreated serious mental illness can result in suicide, self-harm and other behaviors putting other prisoners and staff at risk of harm.[18]

---

[18] For example, despite receiving mental health treatment since childhood, Prisoner #91 was denied mental health treatment when he entered ADOC custody in 2009.  Despite requesting treatment for years, Prisoner #91 was consistently denied treatment until he

The trend is for use of less educated and lower credentialed staff: CRNPs instead of psychiatrists, LPNs instead of RNs, unlicensed MHPs instead of master's prepared social workers and counselors recognized by virtue of licensure to provide mental health care. MHM psychologists have been all but eliminated and AT caseloads are almost double the long-recommended staffing ratios and profoundly impact treatment.[19]

ADOC has some psychological associates but they do not provide treatment services to inmates with serious mental illness. They do a sort of reception screening, described in the identification section that follows, but are not providing on-going care. They respond to prisoner crises and make referrals to MHM. At various times in the past, there was some agreement that ADOC psychological associates would assume responsibility for care of some prisoners when their mental health classification was reduced to MH1 –

had to be placed in a crisis cell three times – the first for suicidal thoughts, the second for attempting to hang himself, and the third after he cut his arms. Similarly, Prisoner #29 has an extensive history of self-harm and reported that he suffers with auditory and visual hallucinations of his deceased mother. Although he has repeatedly asked to see a CRNP to assess his medication, his counselor told him that he "didn't need anything" but that if he goes into a crisis cell, he would be forcibly medicated. Prisoner #20 has similarly attempted self-harm multiple times. Although he has been placed on suicide watch at times, he does not receive any follow-up—no counseling or medication assessment—after being removed from the crisis cell. Other examples are described in my notes, attached as Appendix 1.

[19] Dr. Woodley testified that there are four psychologist positions but, at the time of his deposition, only three were filled. Deposition of Charles Woodley taken March 8. 2016 (38:17-39:7). The psychologist position at Donaldson, the one that was open at the time of Dr. Woodley's deposition, has had constant turnover. (39:8-41:2, 42:22-43:22). In my review of progress notes and case files, I saw a total absence of evidence that psychologists are involved in mental health treatment. I did not see progress notes completed by psychologists or other notes in the charts. The absence of activity technicians is equally evident. As discussed below, there are two ATs assigned to a 30-bed RTU at Tutwiler. Not surprisingly, that unit was the one unit where I observed, and inmates reported, an active mental health group program. That is no coincidence.

although ADOC does not have psychiatrists (or CRNPs) to continue medication

management, so inmates on medications cannot be turned over to ADOC completely.

Furthermore, the agreement was never fully implemented at all institutions and appears

to have been essentially abandoned at the current time.  The psychological associates

do not provide on-going care or follow-up to prisoners on the mental health caseload.

They are responsible for inmates assigned MH-0 but by definition, these are inmates

who have no identified mental health condition or need for services.  So, essentially,

ADOC psychological associates play some role in the correctional reception process,

but it appears more related to security or institutional assignment than the provision of

treatment.  ADOC psychological associates do not assign the mental health

classification code.


That mental health staffing levels are inadequate does not appear to be in dispute, even

by MHM.  The Program Director for Alabama, Teresa Houser, acknowledged in

deposition testimony that many institutions did not have enough mental health staff.

Institutions included Bullock, Tutwiler, Easterling, Limestone and Kilby.[20] Ms. Houser

further acknowledged that the Draper, Staton, Elmore complex and Bibb "could benefit

from more time for a provider, either nurse practitioner or psychiatrist."[21] The MHM

Psychiatric Director, Dr. Robert Hunter also testified in deposition that the caseload was

increasing and inmates were more acutely ill which was "starting to tax our ability to

adequately do what we do."[22]

---

[20] Deposition of Teresa Houser taken April 22, 2016 (34:11–37:15)
[21] Deposition of Teresa Houser taken April 22, 2016 (41:1-5; 37:22–39:22)
[22] Deposition of Dr. Robert Hunter (44:4-13; 49:13-23)

At a time when there are increasing numbers of inmates with mental illness, and more acute illness, the anticipated direction would be to increase not only the numbers of staff but also the qualifications of staff to be able to deal with these challenges.  Instead, the trend over time has been the opposite: fewer psychiatrists with replacement by mid-level clinical registered nurse practitioners; fewer licensed psychologists; no increase in RNs to provide direction and oversight to increasing numbers of LPNs; fewer ATs and less clerical support.

Mental health staff shortages combined with reliance on less credentialed, unlicensed staff has a profound impact on the identification and treatment of prisoners with mental illness as will be discussed in the sections that follow.  Inmates are not identified timely, access to care is delayed by overwhelmingly large caseloads, individual psychotherapy is non-existent, group therapy and programming are minimal.  Staff remain in crisis response mode and cannot provide on-going, much less preventative, care.  Follow-up is minimal.

ADOC correctional officer shortages also impact mental health treatment.  COs are used to provide prisoner supervision and maintain order and safety.  COs are needed to release inmates from their cells and/or housing units for appointments, provide escort and supervision for clinics and group treatment and programming activities.  Given the security staffing shortages in the ADOC, COs are unable to perform these necessary

functions for the provision of mental health care. Consequently, prisoners do not have access to mental health care.[23]

In the ADOC, inmates in segregation are not regularly monitored. At Bibb, I saw evidence of fire setting and destruction in the segregation units — COs are located in the larger dormitories, but not available to adequately monitor prisoners in the small segregation housing units in each building. At Bullock, mental health staff cannot provide treatment because there are insufficient officers to get inmates out of their cells in the Stabilization Unit and supervise them during group activities. Consequently, prisoners with mental illness at Bullock, housed in an "intensive" level of care, do not get out of their cells. Prisoners with serious mental illness in the RTU at Donaldson cannot come out of their cells to access the very care they have been sent there to receive. This has been a consistent audit finding and complaint from MHM for years – and yet, the problem continues.[24]  Inmates are locked down and not receiving treatment due to CO staffing shortages.

The consequences of mental health and correctional officer staffing shortages are that inmates with serious mental illness do not receive adequate mental health care.

---

[23] For example, Fountain Multidisciplinary Minutes, October 21, 2015 (MHM030193): "Mental Health has difficulties getting inmates from segregation to their scheduled appointments."; St. Clair Multidisciplinary Meeting Minutes, January 29, 2015 (MHM029970): Injectable psychotropic medication "may be ordered for an inmate but if security staff is short, the probability of the inmate getting the shot is extremely low."

[24] Clinical Contract Compliance Review Report March 2015 (MHM041821-041851); Clinical Contract Compliance Review Report February 2016 (MHM040590-040606)

## OPINION 2:  INADEQUATE IDENTIFICATION & CLASSIFICATION PROCESS

The mental health screening process for identification and classification of prisoners with serious mental illness is inadequate.  Many prisoners with mental illness are not identified and consequently receive no treatment whatsoever. Others receive only psychotropic medication rather than more comprehensive care that addresses their clinical condition and needs.

There are three basic ways in which prisoners are able to access mental health care in correctional facilities:  they are identified at the time of reception into the prison system; they may ask for mental health care (self-referral) or be referred to mental health by other prison staff (staff referral) at any time during their incarceration.  In ADOC, there are problems with each of these mechanisms to access mental health care.


*Reception Screening Process*

The identification process begins at the time of entry into the prison system – at Tutwiler for women and at Kilby for nearly all men.  There appears to be two parallel processes at the time of reception – one operated by ADOC and the other by MHM.  ADOC psychology staff conduct reception mental health evaluations that consist of an interview and documentation of it on a 4-page "Psychological Evaluation" form followed by the administration of three tests:  intelligence screening (BETA); educational evaluation (WRAT) and a personality inventory (MMPI-II).  This information does not appear to be utilized later in the psychiatric assessment of the inmate or treatment planning.  ADOC psychology staff do not assign the inmate a mental health code.  They may refer the inmate to MHM for a psychiatric assessment if they believe one is necessary but MHM also has its own reception screening process occurring on a parallel track.

An MHM LPN screens all inmates entering the ADOC for mental health history and psychotropic medication prescription. The LPN then determines which inmates to refer on to the psychiatrist for a comprehensive psychiatric examination.  This is an improper function for an LPN, as it requires a higher level of specialized assessment skill, diagnostic knowledge and the exercise of independent judgment for which LPNs are not trained and generally do not possess.  The task of mental health screening and referral is more often conducted by RNs or master's prepared mental health professionals in other systems.  MHM's use of LPNs for this task accounts for some of the under-identification problem, but other factors contribute as well.

MHM consistently reports lower prevalence rates of mental illness in ADOC prisons than prevalence rates reported in other prisons and prison systems throughout the United States.  The October 2014 monthly report produced by MHM reported that 13.1% of the ADOC inmate population was on the mental health caseload; 9.5% of the ADOC inmate population was prescribed psychotropic medication.[25] Dr. Woodley, MHM's Clinical Director, reported the same prevalence rates at the Statewide CQI Quarterly Meeting held January 28, 2015.[26] The February 2016 monthly report indicated 14.2% of the inmate population was on the mental health caseload and 9.7% of the population was prescribed psychotropic medication.  These numbers do not vary significantly over the time of the MHM contracts.

---

[25] MHM Monthly Report October 2014 (ADOC 044517)
[26] MHM Statewide CQI Quarterly Meeting Minutes, January 28, 2015 (MHM029615)

Other states and research studies indicate the rates are actually much higher.  The
Bureau of Justice Statistics Special Report on Mental Health Problems of Prison and
Jail Inmates found 73% of female prison inmates and 55% of male prison inmates
reported mental health problems.[27]  (Mental health problems were defined as recent
history or symptoms in the previous 12 months – history included a clinical diagnosis or
treatment and symptoms were based on diagnostic criteria.)  Furthermore, 43% of state
prisoners reported symptoms that met the criteria for mania; 23% reported symptoms of
major depression and an estimated 15% reported symptoms that met the criteria for a
psychotic disorder.  A more recent report by the Treatment Advocacy Center published
in 2014, reported 15% of inmates in state prisons have serious mental illness.[28] Serious
mental illnesses include diagnoses such as schizophrenia, schizoaffective disorder,
bipolar disorder, major depression and other disorders with symptoms of psychosis.


MHM training materials appear to recognize that 14.5% of male admissions and 31% of
admissions to jails have serious mental illness.[29] However, for prison, MHM trains that
10-15% of inmates have mental illnesses but "not all . . . are considered serious mental
illnesses." [30]  No references are cited in the MHM training materials and there is simply
no reason to believe that prevalence rates of mental illness and serious mental illness in
ADOC would be any different than rates found in studies and reported in other states.

---

[27] Available online through the US Department of Justice, Office of Justice Programs,
report dated September 2006; NCJ 213600
[28] Torry EF, Zdanowicz MT, Kennard AD et al.  The treatment of persons with mental
illness in prisons and jails: a state survey.  Arlington VA, Treatment Advocacy Center,
April 8, 2014.
[29] MHM Training Materials (MHM 041301-041311)
[30] MHM 041302

(In fact, there is reason to believe that ADOC prevalence rates are higher than that found in other state correctional facilities due to the status of the community treatment system in Alabama when compared with that in other states.)  My own observations in states that include Ohio, Massachusetts, Pennsylvania, California and Indiana, among others, suggest that the prevalence of mental illness in state prisons is approximately 25-30% of male inmates with 10-15% of the male population having a serious mental illness.  Female prisoners have higher rates: as many as 80% of women are on the mental health caseload in most systems I have observed and 30% of the female inmate population are seriously mentally ill.

The identification and classification processes in Alabama are flawed and do not accurately or timely identify inmates with serious mental illness and in need of treatment. The prevalence numbers speak for themselves.  The screening and identification process is ineffective in identifying inmates with serious mental illness, treatment is withheld or delayed and prisoners suffer needlessly.[31]

*Mental health classification system*

---

[31] My review focused on people who were on the caseload, but even among that sample I found people who had been inadequately assessed and screened. For example, Prisoner #4 was a victim of childhood trauma, including physical, sexual, and emotional abuse, and had multiple foster home placements and a history of alcohol and marijuana use. Nonetheless, she was not placed on the mental health caseload when she came into ADOC custody. A few months later, she attempted to commit suicide and, after a week in a crisis cell, was placed on medication.  Prisoner #38 had a history of drug addiction, ADHD, and prescription stimulants. At the time of my interview with him, he had been in a crisis cell for weeks. Nonetheless, he had never been on the mental health caseload and had no mental health classification.  Other examples are described more thoroughly in my notes, attached as Appendix 1.

ADOC defines serious mental illness in Administrative Regulation 602 as follows:

A substantial disorder of thought, mood, perception, orientation or memory such as those that meet the DSM IV criteria for Axis I disorders: schizophrenia, schizoaffective disorder, psychotic disorders due to substance abuse or general medical condition, major depression, bipolar disorder, and organic conditions resulting in significant and debilitating psychotic symptoms or cognitive impairment; persistent and disabling Axis II personality disorders. A serious mental illness significantly impairs judgment, behavior and the capacity to recognize reality or cope with the ordinary demands of life within the prison environment and is manifested by substantial pain or disability. Serious mental illness requires a mental health diagnosis, prognosis and treatment, as appropriate, by mental health staff.

This is consistent with definitions used in other states and systems. However, in ADOC, inmates are not classified or tracked as to whether or not they have a serious mental illness. Inmates are assigned a mental health code or classification on a scale of MH-0 to MH-6 as follows:

MH-0: No identified need for mental health assistance.

MH-1: Stabilized with mild impairment in mental functioning. Placement in general population, segregation.
(Some subcategories have been added to this classification MH-1a, MH-1b and MH- 1c that are related to whether or not the prisoner is prescribed psychotropic medications and how long he or she has been taking them.)

MH-2: Not stabilized with mild impairment in mental functioning. Placement in general population, segregation.

MH-3: Moderate impairment such as difficulty in social situations and/or poor behavioral control. Placement in RTU – open dorm.

MH-4: Severe impairment and suicide ideation and/or poor reality testing.  Placement in RTU – closed dorm.  (Celled environment)

MH-5: Severe impairment such as hallucinations and delusions or inability to function in most areas of daily living.  Placement in Stabilization Unit (SU)

MH-6: Severe debilitating symptoms/persistent danger to self or others, recurrent violence, inability to maintain minimal personal hygiene, or gross impairment in communication. State Commitment or hospital services.

The ADOC mental health coding or classification system is flawed and does not correlate with the definition of serious mental illness.  The ADOC mental health codes classify prisoners by their presumed housing needs (outpatient or residential treatment – dormitory or cell) as opposed to whether or not they have serious mental illness.  This has direct bearing on the number of professional staff required to care for inmates with serious mental illness.  This coding system does not permit that calculation.

Furthermore, multiple instances of inappropriate classification were found during the tours and review of records.  Prisoner #24 (incarcerated 25 years, prescribed two antipsychotic medications for diagnosis of delusional disorder, rule-out schizophrenia) is classified as MH-1. It is not clear what additional information might be required after 25 years to either rule-in or finally rule-out schizophrenia, but being on two antipsychotic medications implies some very refractory psychotic symptoms. Prisoner #26 has been in the Donaldson RTU twice, is prescribed three antipsychotics and two antidepressants, and frequently is on mental health watch. Prisoner #26 is classified as MH-1, though inpatient care should be considered if he requires this number of medications and is experiencing no symptomatic relief.  Prisoner #85 spent 8 years in the Kilby mental

health unit but was released to the main camp at Bullock with continued auditory hallucinations and a MH-1 classification.  With continued symptoms and functional impairment, he needs a higher level of mental health care. These are just a few examples of the many instances of misclassification I saw.

*Inmate and staff referrals for mental health care*

Inmates may submit a written request to mental health for services or verbally request that custody staff call MHM in the event of an emergency.  I found many instances in which MHM was unresponsive to prisoner self-referrals.  Written referrals do not receive a timely response. Untimely and inadequate responses lead inmates to engage in increasingly desperate acts to get the attention of MHM staff and necessary services. Such acts include infliction of self-injury, property damage, fire setting and suicide attempts.  Ironically, these behaviors often result in disciplinary action and placement in segregation where mental health treatment is even more difficult to access.   Case examples include: Prisoner #20 (multiple instances of placement in segregation, serious self-injury, placement on watch and no mental health care following watch discontinuation); Prisoner #29 (has received disciplinary tickets for creating a "security, safety or health hazard" when he injured himself seeking mental health attention); Prisoner #32 (documentation indicates he has bipolar disorder which is untreated and leading to behavioral problems; he was not listed in the MHM caseload list and housed in segregation in spite of the recognition that his untreated illness was the cause of his negative behaviors); Prisoner #35 (set his cell on fire and cut himself in segregation; steri-strips were placed on his cuts and he was returned to segregation); and Prisoner

#74 (reported that in the RTU, it took about 3 weeks to be seen in response to putting in a written request; to be seen sooner, he said he would either ask a "nice" CO to call mental health for him or hurt himself for a more rapid response); Prisoner #99 (spent four months in segregation and reportedly set his cell on fire while on suicide watch; has never seen his MHP privately but sees the CRNP once a month; this is not an adequate level of mental health care).

MHM self-audits referral response times as recorded in a log. They report problems with the logs not recording referral urgency and blanks that don't permit calculations of response times. Audits conducted by the MHM Corporate Team in 2012 found problems at Fountain (no documentation regarding the date that each referral was received, person responsible for follow-up and disposition)[32]; Tutwiler (blanks on log and responses within 5 days of receipt only 71-72% of the time in April and May 2012)[33]; Donaldson (referral response timely 66%, 50%, 100% of the time for months of October, November and December 2012)[34]. In 2014, the MHM corporate team audited Kilby and noted similar findings.[35] The audit results reported do not indicate whether the referrals were generated by staff or inmate self-referrals.

Inadequate and untimely responses to referrals also contribute to the under-recognition of prisoners with serious mental illness and lead to worsening of conditions and needless suffering.

---

[32] MHM 031528
[33] MHM 031549
[34] MHM 031601
[35] MHM 031618

*Removal from the mental health caseload*

Another factor that contributes to the very low prevalence rate of inmates with mental

illness reported by MHM is that MHM actively removes inmates from the mental health

caseload in an effort to "manage" the population.  This practice is referenced in

institutional multidisciplinary meetings as well as state-wide MHM meetings.[36]

Ostensibly, such inmates are then referred back to the ADOC psychology staff for

continued follow-up and care and can be referred back to MHM if necessary.  There are

no statistics reported for how often this might happen.  Ordinarily, changes in prisoner

classification, admissions and discharges from the mental health caseload would be

tracked to determine whether there were any trends and patterns from which

conclusions could be drawn about the size of the caseload, the number and types of

services required and adequacy of staffing levels, the effectiveness of treatment and

whether any changes in policies or procedures were necessary.   In my assessment of

the ADOC and MHM, I found no evidence of such a tracking mechanism.  The lack of

such a mechanism impairs the ability to identify and correct problems with practices or

procedures and identify staffing needs.

---

[36] For example, Bullock Multi Disciplinary Meeting Minutes, June 26, 2014 (MHM029857): "Ms. Babers reported that with the caseload growing, the staff should be looking to move those off, who have received maximum benefit from their treatment, and are functioning well, in an outpatient status." Bullock Multi-Disciplinary Meeting Minutes, July 17 2014 (MHM029863): "The first topic of discussion was to get some inmates coded down to the code of MH-0." Bullock Multidisciplinary Meeting Minutes, October 8, 2015 (MHM029817): "Mr. Moore stated there are 283 inmates on the caseload and said thanks to Ms. Zimmerman for keeping the caseload at a working number." Prisoner #25 exemplifies the problem – despite being on a heavy load of psychotropic medication and being transferred to the highest level of mental health care offered in ADOC on two separate occasions, Prisoner #25 was removed from the mental health caseload at one point.

Inmates with serious mental illness are not identified at the front door; requests are not

responded to timely; and inmates are removed from the caseload without regard to

whether or not they have a serious mental illness.


## OPINION 3:  INADEQUATE TREATMENT

Mental health treatment is inadequate to meet the needs of the prisoner population with
serious mental illness.  Residential and stabilization unit treatment beds are
underutilized but also provide little treatment beyond psychotropic medication due to
staffing level shortages of both treatment and custody staff.  Individual contacts with
mental health staff are brief, infrequent and often not conducted in confidential settings.
There is little group treatment in mental health treatment units and even less in
outpatient settings. As a consequence, prisoners with untreated and undertreated
serious mental illness are over-represented in the segregation population – essentially
punished for manifestations of serious mental illness.


Inmates with serious mental illness must be provided a level of mental health care that

meets their needs.  This requires a continuum of services ranging from outpatient care,

through residential care (RTU, SU) to inpatient care.  Inpatient care is a psychiatric

hospital level of care and is not provided by ADOC, but rather through transfer to a state

psychiatric hospital (Taylor Hardin).  According to MHM Chief Psychiatrist, Dr. Hunter,

inpatient psychiatric care is rarely sought except as an inmate nears prison release.[37]

The rationale for this infrequent access is not clear.  I found many inmates on the tours

that clearly required a higher level of care than could be provided in ADOC facilities

where they could not participate in treatment activities due to having insufficient security

---

[37] Deposition of Dr. Robert Hunter (267:23 – 268:11)

staff available, and insufficient MHM staffing to provide intensive psychiatric treatment, psychiatric nurses or technicians.[38]

There are two levels of intermediate care in ADOC – Intensive Psychiatric Stabilization Unit (SU) and Residential Treatment Unit (RTU) care.  The requirements for housing, treatment (group and individual counseling, psycho-education, activities), treatment planning, programming and the frequency of contacts and charting by psychiatrists, mental health nurses, treatment coordinators and activity technicians are articulated in Administrative Regulations 632: Intensive Psychiatric Stabilization Unit and 633: Residential Treatment Unit.[39] Placement in SU is for prisoners "experiencing severe impairment such as hallucinations and delusions or inability to function in most areas of daily living."  Treatment interventions are supposed to be provided daily with the intention of rapid stabilization and a short stay with prisoners typically discharged to an RTU for continuing treatment.  There are SU beds at Tutwiler for female inmates and

---

[38] For example, Prisoner #12, who is diagnosed with paranoid schizophrenia, received mental health treatment in the free world and spent three years in the Bullock RTU. He was then transferred to outpatient care at Bibb. Prisoner #12 was involuntarily medicated, but only saw his psychiatrist by video (through telepsychiatry) and his counselor periodically when he puts in a request. At the time of our interview, Prisoner #12 had not received group therapy at Bibb and had been placed on suicide watch a few times, only to be removed when mental health staff told him that he was stable. Prisoner #12 struggles with ongoing hallucinations and believes that television and radio talk to him. He should be placed in a long-term treatment facility. Similarly, Prisoner #9 is housed in a cell on the RTU. She received mental health treatment on the street and did not know why she was in the RTU. Prisoner #9 suffers from involuntary mouth movements and a tremor, likely as a result of her medication, and was unable to provide much information about her care or mental health status. Other prisoners who required a higher level of care are described in my notes, attached as Appendix 1. Other examples were described in MHM documents. For instance, when mental health staff exhausted treatment options at Bullock, the doctors were "trying to get him to UAB" for additional treatment. MHM040314, Bullock Multidisciplinary Minutes, October 22, 2015.

[39] ADOC 000185-000217 contains both Administrative Regulations

33

Braggs v. Dunn                           2:14-cv-601-MHT                              J-460

SU beds at Donaldson and Bullock for male inmates.  SU beds are underutilized.  The

Bullock SU beds are often used to house segregation inmates in addition to inmates

needing an intensive level of care.  It is not acceptable to mix these populations.  The

SU inmates with mental illness are the most vulnerable and subject to be preyed upon

by segregation inmates.  There are serious management issues as well in terms of

required security staffing levels to permit inmates out of cell time, escort them to

treatment opportunities, supervision and monitoring, particularly inmates on watch

status as a result of their mental illness.  Treatment access is seriously compromised,

inmates remain locked in their cells and suffer needlessly.[40]  MHM meeting minutes and

audits continue to identify the placement of non-mentally ill inmates in SU beds as

problematic.[41] Although the Administrative Regulation (AR) expressly prohibits housing

of inmates that have not been admitted to the SU on the unit absent "emergency

security concerns" the practice continues.  The AR also dictates correctional officer

coverage sufficient to permit active treatment from 8 AM until 4 PM Monday through

Friday and out-of-cell time from 8 AM until 8 PM daily.  This is simply not happening;

there is insufficient correctional officer coverage and consequently treatment

interventions are not provided daily as required.  This is reflected in the charts reviewed

---

[40] For example, at a Fountain Multidisciplinary Meeting in October 2015, staff recognized that "Mental Health has difficulties getting inmates from segregation to their scheduled appointments." (MHM030193). Examples of prisoners who made similar reports are described in my notes, attached as Appendix 1.
[41] MHM Alabama 3rd Quarterly CQI Meeting November 6, 2013 (MHM029570); Deposition of Dr. Robert Hunter (159:16-21); MHM Clinical Contract Compliance Review Reports from 2015 (MHM041821-041851) and 2016 (MHM040590-040606)

as well as the MHM meeting minutes and audits previously mentioned.  Psychotropic

medication management is virtually the only treatment intervention provided.[42]

The RTU level of care is intended to provide a safe housing environment for inmates

requiring more intensive treatment than that which can be provided on an outpatient

basis.  Treatment interventions are to progress from brief interactions with the

psychiatrist, nurse and treatment coordinator at the cell front to multiple treatment

groups per week, daily activity or education groups and a job assignment.  The eventual

goal for the majority of inmates in RTU level of care is to transition back to general

population housing and outpatient care. There are RTU beds for male inmates at

Bullock and Donaldson and at Tutwiler for females.  Bullock RTU space is also used to

house non-RTU inmates at times and at Donaldson, groups are not conducted as

scheduled due to correctional officer coverage shortages.[43] Psychotropic medication

management is the main treatment intervention provided. It is well established both

inside and outside of prison, that mental health treatment is more than psychotropic

medication.  Some mental health conditions do not require treatment with medication at

---

[42] For example, during the 2016 audit, MHM recognized that concerns in the Bullock SU "included that correctional officers are not always available to the extent necessary to ensure safety when patients are out of their cells. . . Psychiatric and nursing staff noted that clinical contact with SU patients have been limited to occurring cell-front with the inception [sic] of out-of-cell programming. This is due in large part to limited space and limited security coverage on the unit." (MHM040604). Brenda Fields, a Clinical Operations Associate for MHM and the former Manager for Quality Assurance for MHM in Alabama, testified that "[t]here were problems with not having enough officers, so a lot of the groups and programming were cancelled because of that." Deposition of Brenda Fields taken February 5, 2016 (128:5-8). Prisoner #96 also reported that although he is assigned to groups, the officers never come get him so he does not have the opportunity to attend.

[43] MHM Clinical Contract Compliance Review Reports from 2015 (MHM041821-041851) and 2016 (MHM040590-040606)

all; other conditions require medication but improve to a greater extent when treatment

with medication is combined with other treatment modalities including group and

individual psychotherapy.   At Donaldson, inmates report that they are locked in their

cells with minimal opportunity to participate in treatment interventions.  At Bullock,

inmates are in dormitory-style housing and so have some opportunity for social

interaction with one another but do not receive other forms of treatment.[44]  As previously

noted, the lack of sufficient numbers of AT staff precludes their ability to provide

sufficient programming to prisoners in either group or individual interactions.  There are

too few mental health treatment groups offered to permit participation by the sheer

number of inmates in the Bullock RTU.  Further, during the tour, I learned of an incident

in which an officer physically struck a prisoner in a wheelchair on the day of the visit.

Such events are not rare, according to inmates in the Bullock RTU.  These

environments are not therapeutic. Again, for men, the only treatment intervention

consistently available is psychotropic medication.[45]

---

[44] For example, Prisoner #72 reported that even in the RTU, he was on "lock down" most of the day and that there was no real program. Prisoner #73 reported that although he has tried to enroll in educational courses such as GED courses, they are not provided on the RTU. Prisoner #76 reported that the main group he is offered is "movie therapy," which is just playing video games. Other examples are described in my notes, attached as Appendix 1.

[45] In my inspections, I interviewed and reviewed the charts of dozens of prisoners who were offered no treatment other than psychotropic medications. Regardless of whether they requested counseling or not, ADOC's decision to provide nothing more than psychotropic medications is effectively denying them any other options. While examples are discussed more thoroughly in my notes, attached as Appendix 1, Prisoner #12 has made unanswered requests for various forms of group therapy or educational courses. Prisoner #29 has repeatedly asked to see a mental health counselor, including submitting a request slip, but no one has spoken with him individually. Other examples are provided in my notes, attached as Appendix 1.

The RTU at Tutwiler, in contrast, offers daily group treatment and activities to the women housed there.  Staff at Tutwiler also met with inmates on the lower program levels of the RTU as well as inmates on watch in confidential office space, rather than at the cell front (which is not confidential).  Psychiatrist contacts were also conducted in private and at the frequency dictated by the Administrative Regulation.  The operation of the unit did not appear to be plagued by correctional officer shortages.  Multiple programming opportunities were provided, mostly by the AT staff rather than mental health treatment groups but the women observed participating in group treatment appeared attentive and engaged in the process during the site visit.  There are two ATs assigned to this 30-bed RTU, which explains why activities programming is able to occur daily.  Treatment plans and interventions require improvement to ensure care is individualized and based on inmate need rather than having all prisoners participate in the same groups daily, but by way of comparison to the RTU operations for the male inmates, Tutwiler represents a much better and more therapeutic environment.  The Tutwiler RTU should be utilized to its full bed capacity.

MHM monthly reports repeatedly demonstrate under-utilization of SU and RTU bed space.  The most recent MHM monthly report produced (February 2016) showed only 79% of the male RTU beds and 57% of the Tutwiler beds filled at the end of the month. There were only 9 inmates in the 30-bed Bullock SU and no women in the 8-bed Tutwiler SU.  This is a consistent finding and related to a trend of understating the degree of mental illness and functional impairment suffered by prisoners in ADOC. Inmates requiring an RTU level of care but improperly classified as outpatients include: Prisoner #15 (seriously mentally ill inmate with side effects from medication and still

experiencing symptoms that negatively impact functioning leading to placement on

watch in infirmary but not considered for transfer to higher level of care); Prisoner #19

(presented with garbled, mumbling speech and appeared to have an intellectual

disability in addition to serious mental illness but kept at St. Clair); Prisoner #11

(repeatedly housed in segregation; very low functioning transferred to the Bullock RTU

after our visit with him at Bibb where he was interviewed again as Prisoner #72. He

remained grandiose and paranoid at that time); and Prisoner #34 (had been previously

in the RTUs at Donaldson and Bullock; but housed at Fountain during the tour).

Prisoner #34 displayed prominent negative symptoms of schizophrenia and received no

treatment except medication.  He clearly needed a higher level of mental health care

than that provided at Fountain.


The requirements for Outpatient Services are located in Administrative Regulation

623.[46]  Individual counseling is to occur no less than once a month, psychiatrist

appointments no less than every 90 days and support and/or psycho-educational

groups regarding medication compliance and adjustment issues are also to be provided.

Review of charts and inmate interviews demonstrated that again, virtually the only

treatment being provided is psychotropic medication.[47]  Encounters with assigned

MHPs are brief (10-20 minutes), infrequent, and often not confidential with other MHM

---

[46] ADOC 000132-000137

[47] For example, Prisoner #12 (no groups at Bibb, only brief interactions with MHP), Prisoner #17 (no groups at St. Clair since 2011, only way to be seen by mental health is to submit request), and Prisoner #25 (no groups at Holman) all reported a lack of group therapy or mental health program.  Other prisoner reports are documented in my notes, attached as Appendix 1. MHM recognizes this trend – in a continuing quality improvement meeting, Dr. Hunter reported that "prescribing is more prevalent" than "non-pharmacological intervention (MHM029552).

staff in the room.  A ten- or twenty-minute conversation that occurs monthly or less often

is not individual psychotherapy, counseling or actual treatment.  The infrequency and

duration of these contacts was reported by the inmates interviewed during the tours and

acknowledged by MHM staff in deposition testimony.[48]

Group treatment for outpatients is seriously lacking.  This is recognized and

acknowledged by MHM in their own most recent Clinical Contract Compliance Review

Report.  Only 1-4 groups were offered weekly at Bullock, Holman and Limestone for

outpatient caseload sizes of 305, 80 and 290 prisoners respectively.  No outpatient

groups were being conducted at Staton, St. Clair and Donaldson for 682 prisoners

reported on the outpatient mental health caseload.[49]  Nominally, I would expect to see

group treatment interventions for prisoners with depression, post traumatic stress

disorder, anxiety and schizophrenia and prisoners would be offered these interventions

based upon their individualized assessment of mental health needs.

Outpatient treatment for inmates housed in segregation units is even more deficient.

Prisoners housed in segregation receive medications and brief cell front contacts by

MHPs and LPNs.  There is no mental health therapy or group treatment for inmates in

segregation as reflected in the medical records reviewed, prisoner interviews and

---

[48] Deposition of Sharon Trimble taken February 4, 2016 (38:15-39:22); deposition of
LaSandra Buchanant taken February 19, 2016 (42:17-45:20); deposition of Lesleigh
Dodd taken February 18, 2016 (65:1-65:15)
[49] MHM Clinical Contract Compliance Review Report February 2016 (MHM040597);
MHM Monthly Report February 2016 (ADOC 0319153)

various MHM reports.[50]  Although there is increasing recognition of the harmfulness of segregation particularly for inmates with serious mental illness both in the larger corrections profession as well as ADOC, there have been no changes to the operation or use of segregation to house inmates with serious mental illness in Alabama.  In fact, inmates with mental illness are over-represented in ADOC segregation housing.[51]  This factor, combined with underutilization of the SU and RTU beds, leads to the conclusion that inmates with mental illness are being diverted to segregation for behaviors related to untreated or undertreated mental illness rather than being placed or maintained in more intensive mental health treatment settings.

Medical record reviews and inmate interviews do not reflect adequate treatment planning or interventions.  Therapeutic programs and counseling are inadequate.  Caseload sizes do not permit more than the minimum required contacts --- and these are brief, often not conducted in confidential settings and so infrequent that they simply cannot be called psychotherapy.[52]

_____

[50] Prisoner #25 reported that he did not receive individual or group counseling at Holman.  Prisoner #46 reported that he had only seen a counselor for an individual, out-of-cell session one time in five years.  Other examples are discussed in my notes at Appendix 1.

[51] This is regularly reported by MHM. In Tutwiler's Multidisciplinary Meeting Minutes from June 3, 2014, MHM reported that 80-90% of the people in segregation were on the mental health caseload. (MHM030082); (MHM040286) (17 out of 25 inmates in segregation were on mental health caseload); (MHM040290) ("Ms. Greer reports that the percentages in segregation are high for the amount of inmates on the mental health caseload). I also observed the high representation of mentally ill prisoners in segregation during my tours. Prisoners themselves are aware of the high number of mentally ill prisoners in segregation – Prisoner #27 reported to me that several of them had been in segregation for years. Other examples are discussed in my notes attached as Appendix 1.

[52] Deposition of Dr. Robert Hunter (44:12-19, 46:3 – 47:6)

Group treatment interventions are lacking in both outpatient settings due to insufficient numbers of treatment staff and overwhelmingly large caseload sizes. In male residential settings, group treatment interventions are lacking as a result of insufficient numbers of both mental health treatment staff and the shortage of security staff to provide escort and inmate supervision.

There is an over-reliance on psychotropic medication as being the only treatment intervention that is consistently available. However, even that is compromised by inadequate staffing ratios, vacancies and insufficient oversight of mid-level practitioners. Chart reviews and audit findings demonstrate follow-up appointments are infrequent, brief and frequently not conducted in a confidential area as I observed during site visits and in records reviewed.[53] The medication formulary itself contains rather limited choices of antipsychotic and antidepressant medications but access to non-formulary medications appears to be a fairly simple and straightforward process and requests are

---

[53] For example, Prisoner #33 reported that he is sometimes called to see the CRNP, but his counselor is always in the room during those sessions. Prisoner #34 reported that other people are always in the room for his sessions with his counselor unless he specifically says he wants to discuss something privately. Prisoner #65 reported that while in segregation, he always saw the psychiatrist in an office with custody staff present. Prisoner #99 reported that he has never seen his counselor privately. Other examples are described in my notes, attached as Appendix 1. I witnessed this phenomenon during my tours, when I saw prisoners receiving counseling while people other than the counselor were in the room. In MHM's 2016 audit findings, MHM raised "[c]oncerns related to safety and confidentiality continue with the presence of segregation inmates on the SU. Psychiatric and nursing staff noted that clinical contacts with SU patients have been limited to occurring cell-front." (MHM040604)

overwhelmingly approved.[54]  In spite of this, there appears to be an over-reliance on

long-acting haloperidol (Haldol) and fluphenazine (Prolixin) injections.  These particular

medications, and others like them, impact normal movement and can cause severe

restlessness (akathisia) and painful muscle spasms (acute dystonic reaction) and also

lead to permanent, irreversible movement disorders that include tremor, involuntary

movements of the tongue and mouth (tardive dyskinesia) and Parkinsonism.  Many of

the inmates interviewed displayed these types of movement disorders, but their

prescriptions were continued rather than changed to medications less likely to cause

these problems.  Prisoners experiencing uncomfortable, physically incapacitating and

perhaps permanent side effects from these medications include: Prisoner #10 (He is

receiving two side effect medications to combat the negative effects of Prolixin

injections, rather than being prescribed a different medication.  Further, even when a

progress note dated 9/12/13 (MR003180) clearly documented that he did not want the

injection, just the prescribed pill medication, the injection was administered anyway.);

Prisoner #5 (She did well on Abilify in the county jail but this was changed without

explanation to Haldol and then Prolixin.  She experienced extreme sedation and a

shuffling gate.  The medication was stopped and she is reluctant to try any other

medication.  She is on no medication in spite of on-going auditory hallucinations to

which she responds verbally at times and may have been present during her multiple

murder offense.); Prisoner #21 (involuntary mouth movements); Prisoner #22

(involuntary tongue movements); Prisoner #37 (remarkable bradykinesia – extremely

---

[54] Deposition of psychiatrist, Dr. Glodys St-Phard taken February 11, 2016 (71:22–73:5, 76:12-18, 78:12–79:15); Deposition of Dr. Robert Hunter taken April 21, 2016 (285:13-21, 288:15-17)

slow movement); and Prisoner # 53 (experiencing marked akathesia manifested by nearly continuous fidgeting, shuffling feet and moving legs while seated).

There are some additional clinical concerns about the use of these injectable medications: it takes 6 weeks to 3 months after a dosage adjustment to see a response to the adjustment because they are so long-acting.  Using them to make dose adjustments is therefore impractical when the adjustment is made in response to worsening symptoms or when a dose reduction is necessary to reduce or eliminate side effects.  Dosage adjustments are most often made with oral medications for this reason in other systems, but this is not the case in ADOC.  Furthermore, inmates consistently reported being subjected to being threatened with forcible medication injections if they refused either oral medications or a scheduled injection; and some said they had actually been subjected to the use of force to be given an injection of a refused medication. Prisoners that reported having experienced this included: Prisoner #6 (RTU level dropped when she refused her injection); Prisoner #7 (reports being told if she refused the injection she would be locked up, and, when she complained of side effects, she was told the dosage would not be lowered); and Prisoner #33 (reports he was put into a safe cell and given a shot of medication).  Other inmates also reported these types of verbal threats and physical administration of medication they refused.

ADOC has both a provision for the administration of medication in an emergency situation as well as a procedure to over-ride inmate refusal of medication in non-emergency situations.  Long-acting antipsychotic medications would not be used in an emergency situation for the reason described above – they are long-acting and it takes

43

a relatively long time for them to begin to work after the injection.  The non-emergency involuntary medication procedure is supposedly modeled after the 1990 United States Supreme Court decision in *Washington v Harper* [55] in which the Court upheld the Washington state prison policy permitting involuntary medication that articulated a process conferring a number of rights to inmates before medication could be authorized: the right to a hearing on the issue; the right to notice of the hearing; the right to attend the hearing, present evidence and cross-examine witnesses; the right to representation by a lay advisor; the right to appeal the decision; and the right to periodic review of on-going administration of involuntary medication. Chart reviews and inmate interviews identified a number of problems with MHM's implementation of the ADOC policy that purports to be modeled after the Washington policy.  In ADOC, inmates do not always receive notice of the involuntary medication process, there are lapses of time between periodic reviews when medication is still administered but the order is no longer in effect, and the "hearing" itself does not appear to require the presence or testimony of the psychiatrist or CRNP actually requesting to over-ride the inmate's refusal. Consequently, the prisoner does not have the opportunity to cross-examine witnesses. Dr. Hunter chairs the three-person panel making the decision but the "hearing" is primarily a paper review of the request, and perhaps the medical record and some questions posed to the inmate.[56] In at least one case reviewed, the panel actually authorized involuntary treatment with medications that were different from the medications requested by the treating prescriber.

---

[55] *Washington v Harper* 494 US 210 (1990)
[56] Dr. Robert Hunter deposition testimony

The ADOC process as currently implemented by MHM also causes unnecessary delays
in treatment.  Inmates being considered for initiation of involuntary medication are
transferred from their "home" institution and the prescriber seeking the use of the
medication to Bullock where a second prescriber and treatment team that does not
know the inmate make a decision as to whether or not to formally file the petition for
involuntary medication.  Dr. Hunter receives the petition and convenes the panel.  He
testified that the process generally takes 3-4 weeks but can take as long as 6 weeks
although some have been done in 7-10 days.  It is unclear why MHM believes this two-
treatment team and prescriber procedure is necessary.  These additional steps and
institutional transfers seem to delay initiation of treatment and are quite disruptive to
continuity of care and relationships with the treating doctor or CRNP.


Problems identified during the tours with respect to the involuntary medication process
included: Prisoner #16 (experiencing side effects to the medication but it isn't changed;
no evidence of his having receiving notice for hearings in 2010 (MR002596); and
medication orders renewed in spite of the rationale containing no information of current
functioning but rather repeating historical information from 2008); Prisoner #21 (reported
he wasn't notified or taken to attend his "hearing"; he has involuntary movements of his
mouth which are not being addressed); Prisoner #45 (transferred to Bullock for his
"hearing" and returned to Donaldson; he doesn't know why he was given involuntary
medications but it is his only treatment); Prisoner #46 (received long-acting involuntary
medication injections from April 2015 through June 2015 even though no involuntary
order was in effect at the time.  When the lapse was discovered, he was subjected to a

continuation hearing and a 6-month involuntary medication order.  The notice for the

hearing provided to him did not include the date or time of the hearing.  Nevertheless it

was held.); and Prisoner #48 (treating prescriber requested permission for Prolixin

decanoate, Haldol decanoate, Risperdal consta and Trilafon injectable but panel

approved only Haldol decanoate and Remeron.  The inmate has remarkable degree of

akathesia which is not documented in his record.  His treatment plan does not contain a

diagnosis even though he is presumably so ill as to require involuntary medication.).

*Inadequate Suicide Prevention and Crisis Watch Procedures*

Based on inmate interviews, record reviews, site visit observations and deposition

testimony, treatment for inmates on suicide watch or other forms of crisis watch is

deficient.  Mental health treatment is generally limited to brief cell front contacts by MHP

staff asking the prisoner whether or not he remains suicidal.  For example, Prisoner #25

was placed in a crisis cell a few months before our interview. He was seen be a doctor

on Friday but was not seen by mental health staff all weekend. Prisoner #15 has

struggled with mental health problems all his life. When he was placed in suicide watch

at St. Clair shortly before our interview, his only contact with mental health staff was

through the door. Similarly, Prisoner #18, who suffers from paranoia and auditory

hallucinations, was seen at the door the entire two weeks he was on watch in January

2015. Other examples are described in my notes, attached as Appendix 1. Rarely are

prisoners on suicide watch or other crisis watch taken out of their cell for an actual

private counseling session.[57]  Further, prisoners released from suicide or crisis watch

---

[57] Deposition of Lasandra Buchanant taken February 19, 2016 (99:2-103:12)

are not routinely placed on the mental health caseload.  They do not receive adequate

follow-up from MHPs or other mental health staff.[58]

Monitoring of prisoners in crisis is also inadequate.  I found no evidence that ADOC or

MHM has a process to ensure constant watch when a prisoner is actively suicidal.  The

form on which ADOC records officer observations of inmates on watch contains pre-

printed 15-minute intervals.[59]  The exact time of observation must be recorded

contemporaneously with the observation and the intervals must be irregular rather than

at precise 15-minute intervals.  Observations made at predictable and regular intervals

increase the risk that the prisoner on watch has adequate time and opportunity to

attempt and complete suicide in between observations.  It undermines the purpose of

placing the inmate on watch status and the monitoring process.  Furthermore, prisoners

in crisis are sometimes placed in inappropriate locations such as offices or libraries

rather than in safe cells which increases the risk of self-harm and suicide.[60]

**OPINION 4: INADEQUATE QUALITY ASSURANCE & OVERSIGHT**

Quality assurance and contract oversight are seriously lacking.  Even when problems
are identified, corrective actions are not implemented to ensure the problem is corrected
and does not recur.

Quality assurance processes are inadequate to identify and *correct* problems.  MHM

routinely reports on institutional audits of charting, treatment interventions, frequency of

---

[58] Medical records of Prisoners #20 and #29.
[59] Deposition of Brenda Fields taken February 5, 2016 (100:19-103:2).
[60] Depositions of Teresa Houser taken April 22, 2016 (270:7-16) and Dr. Robert Hunter
(166:17-176:15).

47

contacts and just as routinely reports on problems as noted in preceding sections

(contacts not occurring in accordance with the minimum requirements of the

Administrative Regulation, problematic documentation and treatment plans, lack of

group treatment, untimely responses to referrals, etc.).  The same or similar findings are

reported time after time without improvement or recognition that the problems are

recurring.


MHM Clinical Operations does an annual report of contract performance auditing a

sample of institutions.  The 2015 audit included six work release centers and Bullock,

Donaldson, Kilby and Tutwiler.  A total of ten facilities were audited in this review but

only 144 medical records were reviewed.  The sample size for an audit of this many

facilities is inadequate.  Further, facility staff are asked to select the files for review as

opposed to being randomly selected.  (Ordinarily, records to be reviewed are selected

randomly to assure generalizability of findings and the number of records calculated to

permit calculation of statistical significance.)  Nevertheless, problems that included

improper placement of segregation inmates in the Bullock SU, underutilization of the

Tutwiler and Bullock RTUs and "on-going issues regarding access" to inmates at

Donaldson, "especially to seriously mentally ill inmates in the RTUs" were identified.

The problems identified at Bullock and Donaldson as on-going and unresolved in 2015

were again identified the following year.


The 2016 audit was conducted at Bullock, Donaldson, Holman, Limestone, St. Clair and

the Staton/Draper/Elmore complex.  Consequently, it did not include any female

inmates or the mental health care provided to them, or the reception process which is

the linchpin in identification of inmates with mental illness.  Key findings included the

lack of group treatment interventions noted earlier; the inability to conduct groups at

Donaldson and Bullock due to limited security staff in the so-called intensive treatment

units and a back-log of outpatient MHP and psychiatric (or CRNP) visits at Donaldson.

Deposition testimony of Brenda Fields, MHM Clinical Operations Associate, indicated

that pursuant to a decision made in November 2015, the problems identified in these

reports will require the development of a corrective action plan (CAP) and follow-up.[61]  It

had not yet been determined how or who would review the plans and assess whether

the proposed actions once completed actually corrected the identified problem at the

time of her deposition. (February 5, 2016)  No such CAP or follow-up from the February

2016 audit was produced at the time of this report.


The ADOC Office of Health Services is responsible to monitor MHM's performance

under the contract.  However, the Associate Commissioner for Health Services, Ruth

Naglich, was not aware of any schedule of proposed audits for mental health care or

whether such a schedule had ever existed in the life of the contracts[62].  It is a task long

assigned to the ADOC Chief Psychologist but there appeared to be little oversight or

familiarity with whether or not it was being done.  (Dr. Tytell now holds the position of

ADOC Chief Psychologist, having been appointed following the passing of Dr.

Cavanaugh who held the position for a number of years previously.)  In her deposition in

December 2015, Ms. Naglich deferred to Dr. Tytell's discretion in deciding how he

---

[61] Deposition of Brenda Fields taken February 5, 2016 (84:12-85:11)
[62] Deposition of Ruth Naglich taken December 7, 2015 (98:23-100:20)

wanted to schedule those audits, but didn't know how many audits were typically

conducted.[63]  MHM was aware of only three ADOC audits of mental health care under

the 2008 and 2013 contracts:  two conducted at Donaldson (2013, 2015) and one

related to chronic care at Bullock.[64]


This system is ineffective and almost meaningless.  In one, the fox is guarding the hen

house and identified problems persist.  In the other, ADOC OHS does next to nothing.

Perhaps the most illustrative example of the very serious consequences of the

identification of problems but failure to act is articulated in Dr. Hunter's deposition

testimony.  Upon reviewing inmate suicides, he identified that placement in segregation

or the prospect of segregation placement was a common denominator in many suicides.

He reported this finding to ADOC.  There was a meeting in October 2015 at which

segregation was discussed but no changes were made and there was no follow-up as

of April 2016.  Even when major problems such as this are identified, they are not acted

upon.[65]


There is no outside entity used to audit or assess the system or mental health care

provided.  The *Bradley* Settlement Agreement called for accreditation by the National

Commission of Correctional Health Care (NCCHC), but this requirement was

subsequently eliminated.  The ADOC would be well served to resurrect it.

---

[63] Id. at 99:13-100:20.
[64] Deposition of Teresa Houser 11/20/15 (293:2-12)
[65] Deposition of Dr. Robert Hunter 4/21/2016 (191:15-19)

**CONCLUSION**

Staffing numbers of both mental health providers as well as custody staff are deficient and impede inmate access to and the delivery of care.  The screening and evaluation process fails to identify prisoners with mental health needs, including serious mental illness.  The classification system and contract incentives serve to understate severity of illness so that the more expensive residential treatment beds are underutilized while prisoners with serious mental illness are maintained in outpatient dormitory settings where they receive no treatment except medication, or they are placed into segregation for behaviors related to untreated or under-treated serious mental illness.  Individual contacts are infrequent, brief and do not constitute counseling or therapy.  Group treatment and programming is not offered to the overwhelming majority of ADOC prisoners on the mental health caseload who reside in the general population or segregation.  Even when prisoners are admitted to intermediate levels of care – stabilization and residential treatment units – staffing levels do not permit the provision of mental health care other than psychotropic medication.  (The lone exception to this appears to be the Tutwiler RTU which is both much smaller and better staffed than the male institutions.  However a small pocket of adequacy serving fewer than 30 inmates does not make a system charged with serving more than 24,000 individuals adequate.)  Psychotropic medication is the only intervention consistently available and there are problems with over-reliance on long-acting injectable medications that are coerced rather than an informed choice even when the involuntary medication process has not been initiated or approved.

In sum, the deficiencies in ADOC - inadequate staffing levels, qualifications, identification and classification, treatment and oversight of the mental health care -deny prisoners care for their serious mental illness leading to needless pain, suffering, self-injury, suicide and punishment for symptoms of untreated mental illness.  These are systemic problems that can and should be addressed through changes to the mental health care delivery system.

Respectfully submitted,

/s/

Kathryn A. Burns, M.D., M.P.H.

July 5, 2016

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

**Curriculum Vitae**

## Kathryn A. Burns, M.D., M.P.H.

Chief Psychiatrist
Ohio Department of Rehabilitation and Correction
770 West Broad Street
Columbus, Ohio 43222
614.728.1974

Date of Birth:  November 12, 1957


**Education:**          Cleveland State University
                        Cleveland, Ohio (1976-1980)
                        B.S. in Biology, Magna Cum Laude

                        Case Western Reserve University School of Medicine
                        Cleveland, Ohio (1981-1985)
                        M.D.

                        Ohio State University School of Medicine & Public Health
                        Columbus, Ohio (1997)
                        M.P.H.

**Training:**           Psychiatric Resident (1985-1989)
                        University Hospitals of Cleveland
                        CWRU School of Medicine

                        Chief Resident, Department of Psychiatry (1988-1989)
                        University Hospitals of Cleveland

**Specialized Education:**

                        Forensic Fellow, Department of Psychiatry (1989-1990)
                        University Hospitals of Cleveland
                        CWRU School of Medicine

                        CWRU School of Law:  *Criminal Law; Criminal Law & Psychiatry;
                        Civil Law & Psychiatry* (1989-1990)

                        Cleveland-Marshall College of Law:  *Law & Psychiatry in the
                        Criminal Justice System* (1989)

**Academic Appointments:**

                        Case Western Reserve University School of Medicine
                        Assistant Clinical Professor of Psychiatry

                        The Ohio State University College of Medicine
                        Auxiliary Faculty - Assistant Professor of Psychiatry

**Professional Licenses:**
>           State Medical Board of Ohio, License # 35-05-7006


**Certification:**      American Board of Psychiatry & Neurology
Psychiatry, Certificate No. 35117 (1992)

American Board of Psychiatry & Neurology
Forensic Psychiatry, Certificate No. 36 (1994)

National Commission on Correctional Health Care
Certified Correctional Health Professional (2000)


**Professional Memberships:**

**American Psychiatric Association** (1986-Present)
Appointed to Task Force to Revise APA Report on Jails & Prisons,
Council on Psychiatric Services (1997-2000)
Elected to Distinguished Fellow (12/01/99)

**Ohio Psychiatric Association** (1986-Present)

**American Academy of Psychiatry & the Law** (1988-Present)
Institutional & Correctional Psychiatry Committee (2000-2002)
Criminal Behavior Committee (1997-1999)
Public Information Committee (1991)

**Midwestern Chapter of the American Academy of Psychiatry & the Law** (1988-Present)
Annual Meeting Program Committee Chair (1992)
Chapter President (1993-1994)

**International Academy of Law and Mental Health**
(1992-Present)

**American Correctional Association** (1995-Present)
Appointed to Mental Health Committee (1998-2000)

**American Correctional Health Services Association**
(1995-Present)


**Professional Experience**:

Mentally Disordered Offender Program:
Psychiatrist, Senior Psychiatrist (1988-1994)
*(Outpatient mental health treatment for adults with serious mental illnesses granted probation for felony level offenses)*

2

Money & Mailboxes:  Psychiatric Consultant (1988, 1991-1993)
*(Outpatient mental health treatment for homeless persons with serious mental illnesses)*

Lorain Community Hospital:  Staff Psychiatrist (1989)

Cuyahoga County Court Psychiatric Clinic:  Staff Psychiatrist (1989-1993)
*(Pre-trial and post-conviction psychiatric evaluations of adults on issues of competency to stand trial, criminal responsibility, drug dependency, civil commitment)*

CWRU School of Medicine, University Hospitals of Cleveland Department of Psychiatry:  Assistant Professor of Psychiatry (1990-1992)

SAMI/M-Power Program:  Staff Psychiatrist (1990-1994)
*(Outpatient community mental health day treatment program for adults with co-occurring substance abuse and mental illness.)*

Western Reserve Psychiatric Hospital:  Psychiatric Consultant (1990-1992)

Cleveland Psychiatric Institute:  Director, Court Evaluation Unit (1991-1994)

Neighborhood Counseling Services:  Medical Director (1992-1994)
In addition to Medical Director, served as treating psychiatrist for Conditional Release Unit *(community mental health treatment for persons found Not Guilty by Reason of Insanity)*

Cuyahoga County Community Mental Health Board:  Chief Clinical Officer (1994-1995, 2002-2007)

Ohio Department of Rehabilitation and Correction:  Chief Clinical Officer
Bureau of Mental Health Services (1995-1999)

Wright State University School of Medicine:  Assistant Clinical Professor of Psychiatry (1995-2000)

Twin Valley Behavioral Healthcare – Columbus Campus:
Director of Forensic Services (1999-2002)

The Ohio State University College of Medicine:  Assistant Clinical Professor of Psychiatry  (1999-2002)   O*utstanding Faculty Award (June 2002)*

Shawnee Forensic Center:  Psychiatric Consultant (1998-2010)

National Commission on Correctional Health Care:  Physician Surveyor (1998-present)

Forensic Center of District IX, Inc.:  Psychiatric Consultant (2000-present)

Editorial Board Member/Contributing Editor:  Correctional Mental Health Report
Civic Research Institute, Inc., Kingston, NJ (1999-Present)

3

Forensic Psychiatric Center of Northeast Ohio, Inc.: Psychiatric Consultant (2005-present)

Liaison for Mental Health Services in Jails; Ohio Criminal Justice Coordinating Center of Excellence, Northeastern Ohio Universities College of Medicine (2006 - )

Appointed to Forensic Psychiatry Committee of the American Board of Psychiatry & Neurology (2009 - )

Alcohol, Drug and Mental Health Board of Franklin County:  Chief Clinical Officer (2007-2013)


**Presentations:**

***Attempted Family Murder:  Dissociation vs. Dissimulation***
Phillip J. Resnick, MD, co-presenter
CWRU Department of Psychiatry Grand Rounds, Cleveland OH (January 1990)
Ohio Association of Forensic Directors, Columbus OH (March 1990)

***Working with the Forensic Client in Community Treatment***
Phillip J. Resnick, MD, co-presenter
National Case Management Conference, Cincinnati OH (September 1990)

***Corrections & Community Collaboration:  The Mentally Disordered Offender Program***
American Psychiatric Association 43rd Institute on Hospital & Community Psychiatry, Los Angeles CA (October 1991)

***Not Mad, Still Bad, What Now?:  The Disposition of Non-Mentally Ill Insanity Acquittees***
American Academy of Psychiatry & the Law – Midwestern Chapter Meeting
Cleveland OH  (April 1992)

***Forensic Psychiatry in the Community:  The Cuyahoga County Experience***
American Academy of Psychiatry & the Law – Midwestern Chapter Meeting
Detroit MI (April 1994)

***Treatment/Placement Implications & Strategies for the 18+ Offender***
Ohio Department of Youth Services Annual Program Conference
Columbus OH (December 1994)

***Assertive Community Treatment Teams:  Stopping the State Hospital Revolving Door***
MetroHealth Medical Center Department of Psychiatry Grand Rounds, Cleveland OH (January 1995)
All Ohio Institute on Community Psychiatry, Cleveland OH (March 1995)

***Can We Talk:  Emergency Psychiatry Meets Managed Care***
Kenneth Serta, MD, co-presenter
American Psychiatric Association Annual Meeting, Miami Beach FL (May 1995)

***Legal & Program Aspects of Staff Victimization***
Fred Cohen, moderator
American Correctional Association Annual Meeting, Indianapolis IN (January 1997)

***Hot Off the Press:  New Guidelines for Jails & Prisons***
H. Weinstein, C. Newkirk, J. Zil, co-presenters
American Psychiatric Association Annual Meeting, Toronto, Canada (May 1998)

***Legal vs. Moral Wrongfulness Schism***
S. Noffsinger, M. Carroll, D. Pinals, co-presenters
American Academy of Psychiatry & the Law Annual Meeting
New Orleans LA (October 1998)

***So You're Incompetent to Stand Trial – Now What?***
S. Noffsinger, J. Radio, A. Hernandez, co-presenters
American Academy of Psychiatry & the Law Annual Meeting
Baltimore MD (October 1999)

***APA Guidelines for Correctional Psychiatry***
American Academy of Psychiatry & the Law – Midwestern Chapter Annual Meeting
Cleveland OH (April 2000)

***Forensic Psychiatry Board Review Course***
Topics presented:  Competencies:  Civil & Criminal; Managed Care
Boston MA (October 2001)

***Firearms Risk Management in Inpatient Psychiatric Care***
XXVIIth International Congress on Law & Mental Health
Amsterdam, The Netherlands (July 2002)

***Course:  Correctional Psychiatry***
H. Weinstein, C. Newkirk, K. Gilbert, A. Hanson, J. Zil, co-presenters
53rd Institute on Psychiatric Services, APA Annual Fall Meeting, Orlando FL
(October 2001)
H. Weinstein, K. Gilbert, A. Hanson, J. Zil, co-presenters
54th Institute on Psychiatric Services, APA Annual Fall Meeting, Chicago IL
(October 2002)
H. Weinstein, K. Gilbert, A. Hanson, J. Zil, co-presenters
55th Institute on Psychiatric Services, APA Annual Fall Meeting, Boston MA
(October 2003)

***Practicing Rewarding Psychiatry in Jails and Prisons – A Practicum***
H. Weinstein, K. Gilbert, A. Hanson, co-presenters
American Psychiatric Association Annual Meeting, Atlanta GA
(May 2005)

***Providing Mental Health Care at the Prison's Back Door: Re-Linking Mentally Ill Offenders to Community Treatment***
XXIX International Congress on Law & Mental Health
Paris, France (July 2005)

***Preventing Suicide in Correctional Facilities***
H. Weinstein, K. Gilbert, A. Hanson, co-presenters
57th Institute on Psychiatric Services, APA Annual Fall Meeting, San Diego, CA (October 2005)

***Prescribing Controlled Substances in Prison***
K. Appelbaum, J. Metzner, R. Trestman, co-presenters
American Academy of Psychiatry & the Law Annual Meeting
Montreal Canada (October 2005)

***Jail Suicide Prevention***
Ohio Department of Mental Health 2006 Annual Forensic Conference
Sandusky OH (August 2006)

***Jail Mental Health Services***
Ohio Department of Mental Health 2007 Annual Forensic Conference
Wilmington OH   (August 2007)

***Psychiatric Services in Jails & Prisons:  It's Time to Revise the APA Guidelines***
H. Weinstein, co-presenter
American Psychiatric Association Annual Meeting, Washington DC
(May 2008)

***Psychopharmacology in Jails and Prisons: Principles, Practice and Special Issues***
H. Weinstein, E. Roskes, B. Bay, co-presenters
61st Institute of Psychiatric Services, APA Annual Fall Meeting, New York, NY (October 2009)

***Practicing in the Pokey – What It's All About***
30th Annual Spring Midwest American Academy of Psychiatry and the Law Meeting, Columbus, OH (March 2013)

**Publications:**

Sherman M, Burns K, et al.:  Firearms Risk Management in Psychiatric Care. *Psychiatric Services* 52: 1057-1061, 2001.

Burns K:  Creating a Mental Health Classification System. *Correctional Mental Health Report* 4(1):3, 2002.

Burns K:  Mental Health Screening.  *Correctional Mental Health Report* 4(2):19, 2002.

Burns K:  Mental Health Evaluation.  *Correctional Mental Health Report* 4(3):35, 2002.

Burns K:  "Jail Diversion and Correctional Psychotropic Medication Formularies"; Management and Administration of Correctional Health Care, J. Moore, ed.  Kingston NJ:  Civic Research Institute, 2003.

Burns K:  "Psychopharmacology in Correctional Settings"; Handbook of Correctional Mental Health Care. C.L. Scott and J.B. Gerbasi, eds. Arlington VA:  American Psychiatric Publishing, Inc., 2005.

Burns K:  The Red Zone: Boundaries of Clinical Versus Forensic Work in Correctional Settings.  *Correctional Health Care Report* 7(5):67, 2006; also appears as Chapter 19 Correctional Psychiatry Practice Guidelines and Strategies.  O.J. Thienhaus and M. Piasecki, eds.  Kingston NJ: Civic Research Institute, 2007.

Burns K: Commentary: The Top Ten Reasons to Limit Prescription of Controlled Substances in Prisons.  J Am Acad Psychiatry Law 37:50-2, 2009.

Burns K:  "Pharmacotherapy in Correctional Settings"; Handbook of Correctional Mental Health Care, Second Edition. C.L. Scott, ed. Arlington VA:  American Psychiatric Publishing, Inc., 2010.

Burns, K:  Psychiatry behind bars: Practicing in jails and prisons.  Current Psychiatry 10:2-15, 2011.

Cloyes KG and Burns KA: "Aging prisoners and the provision of correctional mental health"; Oxford Textbook of Correctional Psychiatry. RL Trestman, KL Appelbaum, JL Metzner, eds. New York NY: Oxford University Press, 2015.

**Correctional Mental Health Care Consultation and Monitoring:**

*Ralph Coleman, et al. v Edmund G. Brown, Jr., et al.*
No. 2:90-cv-0520 KJM DAD
US District Court, Eastern District of California
Serve as a mental health expert on Special Master's monitoring team to assess delivery of mental health care to inmates confined in California Department of Corrections and Rehabilitation

*Fred Graves, et al., v Joseph Arpaio, et al.*
No. CV-77-0479-PHX-NVW  United States District Court, District of Arizona
Appointed as expert by Court to evaluate delivery of mental health care at Maricopa County Jails, assist in development of a plan demonstrating compliance with Second Amended Judgment and report on implementation of the plan

*Disability Laws Center, Inc., v Massachusetts Department of Correction, et al.*
No. 07-10463 (MLW) US District Court, District of Massachusetts
Retained by Disability Law Center as designated expert to assess MDOC compliance with the terms of a Settlement Agreement

*Disability Rights Network of Pennsylvania v John Wetzel, Secretary Pennsylvania Department of Corrections* (US District Court, Middle District of PA  Civil Case No. 1:13-CV-00635)
Initially consulting expert to plaintiffs then jointly selected by parties to assess and report the DOC's implementation of the terms of Settlement Agreement

*Carty v Mapp*
Case 3:94-CV-78  District Court of the Virgin Islands, Division of St. Thomas & St. John
Parties' joint expert in Mental Health Care to assess compliance with terms of a Settlement Agreement at Criminal Justice Complex and the Alva Swan Annex, located in St. Thomas, Territory of the United States Virgin Islands.

*Disability Rights Florida, Inc. v Julie Jones, Secretary Florida Department of Corrections, et al* (US District Court, Southern District of Florida, Miami Division Civil Action No 14-23323-Civ-SCOLA, Consolidated Action Case No 14-24140-Civ-SCOLA)
Consulting expert to plaintiffs to conduct assessments of the inpatient unit at Dade Correctional Institution and develop recommendations on issues of mental health treatment, staffing, training and quality improvement.  Will continue as consultant to plaintiffs to conduct assessments of inpatient units' implementation of Plan of Compliance developed by the parties.


I have also served as a consulting expert on the provision of mental health care to inmates in state correctional facilities in Alabama, Florida, Georgia, Indiana, Illinois, Montana, New Jersey, Pennsylvania and St. Croix, US Virgin Islands.

**Expert Witness Disclosure:**

*Roger Canupp, et al., v. Robert Butterworth, Secretary of the Florida Department of Children and Families*
Case No. 2:04-cv-260-FtM-MMH-DNF  United States District Court, Middle District of Florida, Fort Myers Division (Retained by plaintiff class; report and deposition testimony 03/09/09)

*Fred Graves, et al., v. Joseph Arpaio, et al.*
No. CV-77-0479-PHX-NVW  United States District Court, District of Arizona
(Retained by defendants; deposition and trial testimony; appointed as expert by Court to evaluate delivery of mental health care at Maricopa County Jails, assist in development of a plan demonstrating compliance with Second Amended Judgment and report on implementation of the plan)

*Frank Mercado, Individually and as Administrator of the Estate of David Mercado, and Evelyn Mercado v. The City of New York, et al.*
Case No. 08 CV 2855  United States District Court, Southern District of New York
(Retained by plaintiff, deposition testimony 01/31/11)

*Indiana Protection & Advocacy Services Commission, et al., v. Commissioner, Indiana Department of Correction*
Case No. 1:08-cv-1317 TWP-MJD United States District Court, Southern District of Indiana, Indianapolis Division (Retained by plaintiff; report, deposition and trial testimony, July 2011)

*Monica Hall, Administratrix and Personal Representative of the Estate of Jon A. Hall, Deceased. and Candace Riley, Custodian and Legal Guardian of J.H., Minor Child of Jon A. Hall, Deceased v. McCracken County Kentucky, et al.*
Civil Action No. 5:09-CV-208-R United States District Court, Western District of Kentucky, Paducah Division (Retained by plaintiffs; report and deposition testimony 08/08/11)

*Mark Young, Sonyae Young v. Burlington County, et al.*
Case no. BUR-L-001840-09 Superior Court of New Jersey, Burlington County, Law Division Civil Action
(Retained by plaintiffs; report and deposition testimony, summer 2011)

*Tammy Rene Millmine as Personal Representative of the Estate of Billy Frank Cornett, Jr., v. Lexington County SC, Cassandra Means, et al.*
Case No. 3:10-CV=1595-CMC United States District Court, DIstrict of South Carolina, Columbia DIvision
(Retained by plaintiff; report and deposition testimony 09/29/11)

*Ronell Richard, as Administrator of the Estate of Edgar Richard, Jr., v. Board of County Commissioners of Sedgwick County; Sedgwick County, et al.*
Case No. 09-1278=WEB-KMH (Consolidated with Case No. 10-1042-WEB-KMH)
United States District Court, District of Kansas
(Retained by plaintiff, report and deposition testimony 12/06/12; hearing testimony 12/14)

*Diana Serrano as Personal Representative of the Estate of Freddie Gonzalez, Jr., Deceased, v. Indiana Department of Correction, et al.*
Cause No. 49D05-1001-CT-001755  In the Marion Superior Court 5 Indiana
(Retained by plaintiff, report and deposition testimony 03/11/13)

*Frank H. Kruse as Administrator for the Estate of James Michael Hall v. Corizon, Inc., f/k/a Correctional Medical Services, Inc., et al.*
Case No.  CV-2012-212  United States District Court, Southern District of Alabama, Southern Division
(Retained by plaintiff, report and deposition testimony 01/16/13)

*James Sardakowski v. Tom Clements, et al*.
Civil Action No. 12-CV-01326-RBJ-KLM  United States District Court, District of Colorado
(Retained by plaintiff, report and deposition testimony 10/18/13)

*MH et al v. County of Alameda, et al.*
Case no. C11-2868 JST (MEJ) United States District Court, Northern District of California
(Retained by plaintiff, report and deposition testimony 12/27/13)

*Carty v Mapp*
Case 3:94-CV-78  District Court of the Virgin Islands, Division of St. Thomas and St. John
(Parties' joint expert, testimony in status hearing 2/23/15)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JOSHUA DUNN, ET AL.,                    )
                                        )
            Plaintiffs,                 )
                                        )     Civil Action Number:
v.                                      )
                                        )     2:14-cv-00601-MHT-TFM
JEFFERSON DUNN, ET AL.,                 )
                                        )
            Defendants.                 )


***I relied upon my interviews, site inspections, and the materials listed below, in addition to
everything cited in my report, to form my opinion in this matter,***

DEPOSITION TRANSCRIPTS
- Brenda Fields
- Glodys St-Phard, MD
- LaSandra Buchanant
- Lesleigh Dodd
- Lynn Brown
- Robert Hunter, MD
- Scott Holmes
- Sharon Trimble
- Teresa Houser 11.20.2015
- Teresa Houser 4.22.2016
- Jefferson Dunn
- Kim Thomas
- Ruth Naglich 12.7.2015
- Ruth Naglich  4.7.2016

DEPOSITION TRANSCRIPTS AND EXHIBITS
- Plaintiff Brandon Johnson
- Plaintiff Christopher Jackson
- Plaintiff Daletrick Hardy
- Plaintiff Edward Braggs
- Plaintiff Howard Carter
- Plaintiff Jonathan Sanford
- Plaintiff Joshua Dunn
- Plaintiff Kenneth Moncrief
- Plaintiff Leviticus Pruitt

- Plaintiff Quang Bui
- Plaintiff Richard Businelle
- Plainitiff Richard Terrell
- Plaintiff Robert "Myniasha" Williams
- Plaintiff Robert Dillard
- Plaintiff Roger McCoy
- Plaintiff Sylvester Hartley

SOPs

- ADOC044541-044549 – Bibb
- ADOC044550-044630 – Donaldson
- ADOC044631-044661 – Easterling
- ADOC044662-044730 – Fountain
- ADOC044731-044816 – Hamilton
- ADOC044822-044880 – Kilby
- ADOC044881-044959 – Limestone
- ADOC044960-044989 - St. Clair
- ADOC044990-044999 – Staton
- ADOC045000-045052 – Tutwiler
- ADOC045053-045085 – Ventress
- RFP 006 008 WE Donaldson Documents
- RFP 006 and 009 Draper Segregation Unit (E-Dorm) 05 18 12 to Current
- RFP 006 and 009 Draper Segregation Unit (E-Dorm) 05 30 13 to Current
- RFP 006 BibbSOPMentalHealthWatch
- RFP 006 Elmore Suicide Watch Precautionary Watch
- RFP 006 SOP B-22 Limestone Mental Health Referral Procedures
- RFP 006 SOP G-22 Limestone Suicide Watch
- RFP 006 SOP G-28 Limestone Inmate Refusal to Take Nourishment
- RFP 006 SOP G-44 Limestone Five Point Restraints
- RFP 006 Staton G Dormitory MOU Holding Unit Holding Tank
- RFP 006 Suicide Watch and Safe Cell
- RFP 006 Tutwiler Intense Psychiatric Stabilization
- RFP 006 Ventress Five Point Restraints Suicide Watch
- RFP 006 Ventress Suicide Preventions
- RFP 008 022 HAMsop 222-01 inmate orientation
- RFP 009 AR434 Disciplinary Segregation
- RFP 009 AR436-1 ISRB Change 1
- RFP 009 Bibb SOP Segregation2012toPresent
- RFP 009 Easterling Segregation
- RFP 009 Elmore Segregation
- RFP 009 HAMsop 60-111 Seg-Shift Office Post 10-3-13
- RFP 009 Kilby Segregation Cell Blocks C, D, E, and F

- RFP 009 Kilby Segregation Review
- RFP 009 Kilby Segregation Unit
- RFP 009 SOP 174 St. Clair The Segregation Unit
- RFP 009 SOP 202 St. Clair Dry Cells
- RFP 009 SOP C-1 Limestone Segregation Unit
- RFP 009 SOP E-5 Limestone Protective Custody
- RFP 009 Staton G Dormitory MOU Holding Unit Holding Tank
- RFP 024 A403-1 Procedures for Inmate Rule Violations Change 1
- RFP 024 AR403 Procedures for Inmate Rule Violations
- RFP 024 AR403-2 Procedures for Inmate Rule Violations Change 2
- RFP 024 Bibb SOP Disciplinary Hearing
- RFP 024 E-23 Limestone Due Process Hearing Requirements
- RFP 024 Tutwiler Disciplinary Hearing Procedures For Women
- RFP 031 ADOC Intake forms
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6 and #8: Donaldson Documents
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6 and #9: Documents related to Draper Segregation Unit (E-Dorm) from 5.8.2012 to Current
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6 and #9: Documents related to Draper Segregation Unit (E-Dorm) 5.30.2013 to Current
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:
- Bibb SOPs on Mental Health Watch
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Elmore SOPs on Mental Health Watch
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6: Limestone SOPs B-22 on Mental Health Referral Procedures
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Limestone SOPs G-22 on Suicide Watch
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Limestone SOPs G-28 on Inmate Refusal to Take Nourishment
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Limestone SOPs G-44 on Five Point Restraints
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6: Staton SOPs on G Dormitory/MOU/Holding Unit/Holding Tank
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Easterling SOPs on Mental Health/Suicide Watch and Safe Cell
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Tutwiler Intense Psychiatric Stabilization
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Ventress Five Point Restraints/Suicide Watch
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #6:  Ventress Suicide Preventions

- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8 and #22: Hamilton A&I SOPs 222-01 on Inmate Orientation
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8 and #24: Hamilton A&I SOPs 705-01 on Hearing Impaired
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8: Easterling Disability
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8: Hamilton A&I SOPs 222-01 on ADA Inmate Grievance Appeal Form
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8: Hamilton A&I SOPs 222-01 on ADA Inmate Grievance Appeal Log
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8: Hamilton A&I SOPs 222-01 on ADA Memo to Inmates
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8: Hamilton A&I SOPs 222 on ADA Grievance
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8: Limestone SOPs G-25 on Inmate Access to Telephones
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #8: Tutwiler American Disabilities Act Inmate Grievance Procedure
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Administrative Regulation 433 - Administrative Segregation
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Administrative Regulation 434 – Disciplinary Segregation
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Administrative Regulation 436 – Institutional Segregation Review Board
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Administrative Regulation 436-1 - Change ##1 to Institutional Segregation Review Board
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Administrative Regulation 436-2 - Change #2 to Institutional Segregation Review Board
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Bibb SOPs on Segregation 2012 to Present
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Bibb SOPs on Segregation 2012 to Present
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Easterling Segregation
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Elmore Segregation
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Hamilton A&I SOPs 434-01 on Disciplinary Segregation
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Hamilton A&I SOPs 436-01 on Institutional Segregation Review
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9: Hamilton A&I SOPs 60-111 on Segregation / Shift Office Post 10-3-13

- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Kilby Death Row Inmates
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Kilby L Block Security Officer
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Kilby O Dormitory
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Kilby Segregation Cell Blocks C, D, E and F
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Kilby Segregation Review
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Kilby Segregation Unit
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  SOP 174 - St. Clair The Segregation Unit
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  SOP 202 – St. Clair Dry Cells
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  SOP 433-1 Holding Unit Decatur CBF
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  SOP C-1 Limestone Segregation Unit
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  SOP C-48 Limestone House Arrest
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  SOP C-56 Limestone House Arrest Special Unit
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  SOP E-5 Limestone Protective Custody
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Staton G Dormitory MOU Holding Unit Holding Tank
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Tutwiler The Segregation Unit
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Ventress Administrative Segregation and Housing for Close Custody
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Ventress Disciplinary Segregation
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #9:  Ventress Segregation Temperature Checks
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #24:  A403-1 Procedures for Inmate Rule Violations Change 1
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #24:  A403-2 Procedures for Inmate Rule Violations Change 2
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #24:  Bibb SOP Disciplinary Hearing

- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #24:  E-23 Limestone Due Process Hearing Requirements
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #24:  Kilby Mental Health Referral Procedures
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #24:  Tutwiler Disciplinary Hearing Procedures for Women
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #24:  Ventress Behavior Citation Procedures
- Defendants' Response to Plaintiffs' RFP (Request for Production of Documents) #31:  ADOC Intake forms

<u>MHM REPORTS</u>
- ADOC043533-043610 - January 2012
- ADOC043611-043655 - February 2012
- ADOC043656-043691 - March 2012
- ADOC043692-043723 - April 2012
- ADOC043724-043753 - May 2012
- ADOC043754-043803 - June 2012
- ADOC043804-043833 - July 2012
- ADOC043834-043864 - August 2012
- ADOC043865-043901 - September 2012
- ADOC043902-043928 - October 2012
- ADOC043929-043969 - November 2012
- ADOC043970-043994 - December 2012
- ADOC043995-044029 - January 2013
- ADOC044030-044057 - February 2013
- ADOC044058-044084 - March 2013
- ADOC044085-044107 - April 2013
- ADOC044108-044137 - May 2013
- ADOC044138-044167 - June 2013
- ADOC044168-044189 - July 2013
- ADOC044190-044215 - August 2013
- ADOC044216-044237 - September 2013
- ADOC044238-044259 - October 2013
- ADOC044260-044281 - November 2013
- ADOC044282-044303 - December 2013
- ADOC044304-044326 - January 2014
- ADOC044327-044348 - February 2014
- ADOC044349-044364 - March 2014
- ADOC044365-044389 - April 2014
- ADOC044390-044413 - May 2014
- ADOC044414-044437 - June 2014
- ADOC044438-044462 - July 2014

- ADOC044463-044486 - August 2014
- ADOC044487-044514 - September 2014
- ADOC044515-044537 - October 2014
- ADOC0319013-0319017 - December 2014
- ADOC0319018-0319019 - December 2014 Pharmacy Summary
- ADOC0319020-0319024 - December 2014 Staffing by Facility
- ADOC0319025 - December 2014 Staff changes
- ADOC0319026 - December 2014 DON Report
- ADOC0319027-0319031 - December 2014 Training Report
- ADOC0319032-0319054 - June 2015
- ADOC0319055-0319073 - November 2014
- ADOC0319074-0319095 - April 2015
- ADOC0319096-0319113 - August 2015
- ADOC0319114-0319127 - December 2015
- ADOC0319128-0319149 - February 2015
- ADOC0319150-0319173 - February 2016
- ADOC0319174-0319193 - January 2015
- ADOC0319194-0319218 - January 2016
- ADOC0319219-0319238 - July 2015
- ADOC0319239-0319258 - March 2015
- ADOC0319259-0319278 - May 2015
- ADOC0319279-0319293 - November 2015
- ADOC0319294-0319312 - October 2015
- ADOC0319313-0319332 - September 2015
- MHM Staffing Report - Pages from ADOC0319150-0319173 - February 2016

MULTIDISCIPLINARY MEETING NOTES
- Bibb Correctional Facility
- Bullock Correctional Facility
- Donaldson Correctional Facility
- Easterling Correctional Facility
- Fountain Correctional Facility
- Hamilton A& I Correctional Facility
- Holman Correctional Facility
- St. Clair Correctional Facility
- Tutwiler Correctional Facility
- Ventress Correctional Facility

ADDITIONAL DOCUMENTS:
- Administrative Regulations-600-639-MH
- Administrative Regulations-700-708
- ADOC and Corizon Medical Services Agreement- 2012
- MHM Contract

- Corizon Contract
- ADOC Health Services Manual
- ADOC Hospice Program
- (ADOC – Dunn) Response to RFP (2)
- First Amended Complaint
- Audits by MHM Corp Team
- ADOC0226689
- ADOC0226690
- Chart Audits by Regional Office
- Additional CQI Minutes
- Clinical Contract Compliance Review Report
- Death Review Reports
- Medication Errors
- MHM Training Outlines and Powerpoints
- Additional Death Reports
- 2015 ADOC Clinical Contract Compliance Review Report
- DOC Facility Database
- Staton Database
- Kilby Database
- Holman Database
- Fountain JOD Atmore Loxley Camden Database
- Database-Caseload February 2016
- Copy of MH Caseload Week Ending February 26, 2016
- MHM029500-029619
- MHM'S First Supplemental Responses to P's SDT
- ALDOC Roster Discovery Chart
- MHM029500-029619
- MHM029620-029625
- MHM029626-029633
- MHM029634-029636
- MHM029637-029639
- MHM029640-029642
- MHM029361-029437 EASTERLING MH
- AL Attempt-Completed 08-15
- Occurrences
- Occurrences
- MHM027857-027946 BIBB
- MHM027947-028134 BULLOCK
- COMPLETED SUICIDES
- MHM028154-028275 DONALDSON
- MHM028276-028312 HAMILTON
- MHM028313-028346 LIMESTONE

- SA REPORTS
- MHM028665-028971 TUTWILER
- MHM028972-029043 VENTRESS
- MHM029044-029288 KILBY
- MHM029289-029304 STATON MH
- MHM029305-029320 STATON-DRAPER MH
- MHM029321-029334 STATON-ELMORE MH
- MHM029335-029336 STATON-FRANK LEE MH
- MHM029337-029360 STATON docs MH
- MHM Stats for 2010 – January 2010 through December 2010
- MHM Stats for 2014 – February 2014 through December 2014
- MHM Audit – Donaldson
- MH Subclass – Depo guide
- Non-Formulary Med Requests 2015
- Signed Interrogatory Responses of the Alabama Department of Corrections
- 3-3-15 Formulary
- 47624 – Houser E-mail
- Discovery Index – Master Copy
- Doc. 210 - Third Amended Complaint
- Doc. 99 - Second Amended Complaint
- The *Bradley v. Haley* (Civil Action No 92-A-70-N) Settlement Agreement

PHOTOS FROM MARCH SITE INSPECTIONS
- Bullock
- Easterling

RECORDS:
- Johnson, Brandon
- Jackson, Christopher
- Hardy, Daletrick
- Braggs, Edward
- ADOC response to our July 12,2012 request for records on Howard Carter – Conduct Records – 120822 (four parts)
- Carter, Howard
- Wallace, Jamie
- Wallace, Jamie
- Sanford, Jonathan
- Dunn, Joshua
- Moncrief, Kenneth
- Pruitt, Leviticus
- Bui, Quang
- Businelle, Richard
- Terrell, Richard

- Williams, Robert
- Dillard, Robert
- McCoy, Roger
- Hartley, Sylvester
- Emmonds, Robert
- Kim McLaughlin - Volumes 1 and 2
- Monk, Joseph - Parts 1 - 12
- Burch, Curtis - Parts 1 - 3
- Barlow, Michael - Part 1 - 3
- Daniel Weed
- Miller, Lester
- Riley, Torrian

# Plaintiffs' Supplemental Citations to Expert Report

# Exhibit 2, Appendix 1 (filed under seal)

**Burns Report - Appendix 1**
**Supplemental Citations (in bold)**
**Pages correspond to the pages in the PDF filed as Doc. 555-5**

- Pg. 14
  Without that review and oversight [by psychiatrists of CRNPs] there is heightened risk that diagnoses are inaccurate or missed and medication management clinically unsound. This leads to delays in care, worsening of symptoms and needless suffering by prisoners. **I have observed this risk in my own practice and while evaluating prison systems around the country. While I rely on CRNPs, they do not have as much training as psychiatrists so some are more likely to inaccurately diagnose someone or apply improper medication management techniques if they are not supervised. I saw the impact of this inadequate supervision during my tours. For example, Prisoner #35 has a history of self harm and reported auditory hallucinations. Upon being released from a crisis cell less than a month before our interview, he was returned directly to his segregation cell. Prisoner #35 is seen by a CRNP, and mental health staff told him that he has "behavior problems, not mental health problems." Prisoner #91 has been receiving mental health treatment since he was eight years old, including placement in a mental health youth center three times. Both he and his mother asked that he receive mental health treatment multiple times since he entered ADOC custody in 2009. Despite the repeated requests, the CRNP told Prisoner #91 that he just wanted medication so that he could "get high." Prisoner #91 finally started receiving mental health treatment only after being placed in a crisis cell three times – including once when he attempted to hang himself in his segregation cell and another when he cut his arms. Other examples are described more thoroughly in my notes, attached as Appendix 1.**

- Pg. 15
  For example, in the community, a person with a master's degree in psychology cannot be licensed to work independently, a licensed psychologist must supervise their work. MHM does not require this type of oversight or supervision. **For example, Program Director Houser acknowledged that neither site administrators nor MHPs do not have to be licensed but can have a masters degree in psychology or a behavioral health field. Deposition of Teresa Houser taken November 20, 2015 (308:3-23). MHM's Chief Psychologist Charles Woodley acknowledged at his deposition that site administrators are responsible for supervising MHPs, and his "indirect supervision" is limited to training opportunities, periodic meetings, and case consultations initiated by the MHPs. Deposition of Charles Woodley take March 8, 2016 (47:9-48:22). Lesleigh Dodd**

1

**explained that she is the site administrator and an MHP at Holman. Deposition of
Lesleigh Dodd taken February 18, 2016 (20:2-7). Although she is not licensed, she
supervises a Ph.D., CRNP, MHP, LPN, and a clerk, which involves "mak[ing] sure they
do their jobs, do what they're supposed to do." (15:16-18, 27:18-30:3). Those staff do
not receive clinical supervision.**

- Pg. 16

  Unlicensed staff do not have the requisite degree of training or recognized skill set to
  provide treatment without supervision. This can lead to use of the incorrect or improper
  treatment techniques and/or failure to recognize signs and symptoms of serious mental
  illness increasing the risk of harm by delaying treatment and causing needless suffering.
  **I have observed this increased risk in my own practice and through my decades of
  inspecting jail and prison facilities around the country.**

- Pg. 17-18

  Failure to recognize signs and symptoms of mental illness results in delays or failure to
  provide treatment. This can increase the risk of psychological suffering. Untreated
  serious mental illness can result in suicide, self-harm and other behaviors putting other
  prisoners and staff at risk of harm. **For example, despite receiving mental health
  treatment since childhood, Prisoner #91 was denied mental health treatment when he
  entered ADOC custody in 2009. Despite requesting treatment for years, Prisoner #91
  was consistently denied treatment until he had to be placed in a crisis cell three times
  – the first for suicidal thoughts, the second for attempting to hang himself, and the
  third after he cut his arms. Similarly, Prisoner #29 has an extensive history of self-
  harm and reported that he suffers with auditory and visual hallucinations of his
  deceased mother. Although he has repeatedly asked to see a CRNP to assess his
  medication, his counselor told him that he "didn't need anything" but that if he goes
  into a crisis cell, he would be forcibly medicated. Prisoner #20 has similarly attempted
  self-harm multiple times. Although he has been placed on suicide watch at times, he
  does not receive any follow-up—no counseling or medication assessment—after being
  removed from the crisis cell. Other examples are described in my notes, attached as
  Appendix 1.**

- Pg. 18

  MHM psychologists have been all but eliminated and AT caseloads are almost double
  the long-recommended staffing ratios and profoundly impact treatment. **Dr. Woodley
  testified that there are four psychologist positions but, at the time of his deposition,
  only three were filled. Deposition of Charles Woodley taken March 8. 2016 (38:17-**

39:7). **The psychologist position at Donaldson, the one that was open at the time of Dr. Woodley's deposition, has had constant turnover. (39:8-41:2, 42:22-43:22). In my review of progress notes and case files, I saw a total absence of evidence that psychologists are involved in mental health treatment. I did not see progress notes completed by psychologists or other notes in the charts. The absence of activity technicians is equally evident. As discussed below, there are two ATs assigned to a 30-bed RTU at Tutwiler. Not surprisingly, that unit was the one unit where I observed, and inmates reported, an active mental health group program. That is no coincidence.**

- Pg. 20
  Given the security staffing shortages in the ADOC, COs are unable to perform these necessary functions for the provision of mental health care. Consequently, prisoners do not have access to mental health care. **For example, Fountain Multidisciplinary Minutes, October 21, 2015 (MHM030193): "Mental Health has difficulties getting inmates from segregation to their scheduled appointments."; St. Clair Multidisciplinary Meeting Minutes, January 29, 2015 (MHM029970): Injectable psychotropic medication "may be ordered for an inmate but if security staff is short, the probability of the inmate getting the shot is extremely low."**

- Pg. 25
  Question from the court: Are there examples of prisoners who have not been timely or adequately screened? **My review focused on people who were on the caseload, but even among that sample I found people who had been inadequately assessed and screened. For example, Prisoner #4 was a victim of childhood trauma, including physical, sexual, and emotional abuse, and had multiple foster home placements and a history of alcohol and marijuana use. Nonetheless, she was not placed on the mental health caseload when she came into ADOC custody. A few months later, she attempted to commit suicide and, after a week in a crisis cell, was placed on medication. Prisoner #38 had a history of drug addiction, ADHD, and prescription stimulants. At the time of my interview with him, he had been in a crisis cell for weeks. Nonetheless, he had never been on the mental health caseload and had no mental health classification. Other examples are described more thoroughly in my notes, attached as Appendix 1.**

- Pg. 29
  Another factor that contributes to the very low prevalence rate of inmates with mental illness reported by MHM is that MHM actively removes inmates from the mental health caseload in an effort to "manage" the population. This practice is referenced in

institutional multidisciplinary meetings as well as state-wide MHM meetings. **For example, Bullock Multi Disciplinary Meeting Minutes, June 26, 2014 (MHM029857): "Ms. Babers reported that with the caseload growing, the staff should be looking to move those off, who have received maximum benefit from their treatment, and are functioning well, in an outpatient status." Bullock Multi-Disciplinary Meeting Minutes, July 17 2014 (MHM029863): "The first topic of discussion was to get some inmates coded down to the code of MH-0." Bullock Multidisciplinary Meeting Minutes, October 8, 2015 (MHM029817): "Mr. Moore stated there are 283 inmates on the caseload and said thanks to Ms. Zimmerman for keeping the caseload at a working number." Prisoner #25 exemplifies the problem – despite being on a heavy load of psychotropic medication and being transferred to the highest level of mental health care offered in ADOC on two separate occasions, Prisoner #25 was removed from the mental health caseload at one point.**

- Pg 30-31

  I found many inmates on the tours that clearly required a higher level of care than could be provided in ADOC facilities where they could not participate in treatment activities due to having insufficient security staff available, and insufficient MHM staffing to provide intensive psychiatric treatment, psychiatric nurses or technicians. **For example, Prisoner #12, who is diagnosed with paranoid schizophrenia, received mental health treatment in the free world and spent three years in the Bullock RTU. He was then transferred to outpatient care at Bibb. Prisoner #12 was involuntarily medicated, but only saw his psychiatrist by video (through telepsychiatry) and his counselor periodically when he puts in a request. At the time of our interview, Prisoner #12 had not received group therapy at Bibb and had been placed on suicide watch a few times, only to be removed when mental health staff told him that he was stable. Prisoner #12 struggles with ongoing hallucinations and believes that television and radio talk to him. He should be placed in a long-term treatment facility. Similarly, Prisoner #9 is housed in a cell on the RTU. She received mental health treatment on the street and did not know why she was in the RTU. Prisoner #9 suffers from involuntary mouth movements and a tremor, likely as a result of her medication, and was unable to provide much information about her care or mental health status. Other prisoners who required a higher level of care are described in my notes, attached as Appendix 1. Other examples were described in MHM documents. For instance, when mental health staff exhausted treatment options at Bullock, the doctors were "trying to get him to UAB" for additional treatment. MHM040314, Bullock Multidisciplinary Minutes, October 22, 2015.**

- Pg. 32

  Treatment access is seriously compromised, inmates remain locked in their cells and suffer needlessly. **For example, at a Fountain Multidisciplinary Meeting in October 2015, staff recognized that "Mental Health has difficulties getting inmates from segregation to their scheduled appointments." (MHM030193). Examples of prisoners who made similar reports are described in my notes, attached as Appendix 1.**

- Pg 32

  This is simply not happening; there is insufficient correctional officer coverage and consequently treatment interventions are not provided daily as required. This is reflected in the charts reviewed as well as the MHM meeting minutes and audits previously mentioned. Psychotropic medication management is virtually the only treatment intervention provided. **For example, during the 2016 audit, MHM recognized that "[c]oncerns [in the Bullock SU] included that correctional officers are not always available to the extent necessary to ensure safety when patients are out of their cells. . . Psychiatric and nursing staff noted that clinical contact with SU patients have been limited to occurring cell-front with the inception [*sic*] of out-of-cell programming. This is due in large part to limited space and limited security coverage on the unit." (MHM040604). Brenda Fields, a Clinical Operations Associate for MHM and the former Manager for Quality Assurance for MHM in Alabama, testified that "[t]here were problems with not having enough officers, so a lot of the groups and programming were cancelled because of that." Deposition of Brenda Fields taken February 5, 2016 (128:5-8). Prisoner #96 also reported that although he is assigned to groups, the officers never come get him so he does not have the opportunity to attend.**

- Pg. 33

  At Bullock, inmates are in dormitory-style housing and so have some opportunity for social interaction with one another but do not receive other forms of treatment. **For example, Prisoner #72 reported that even in the RTU, he was on "lock down" most of the day and that there was no real program. Prisoner #73 reported that although he has tried to enroll in educational courses such as GED courses, they are not provided on the RTU. Prisoner #76 reported that the main group he is offered is "movie therapy," which is just playing video games. Other examples are described in my notes, attached as Appendix 1.**

- Pg. 33

  Question from the Court: Are there examples of prisoners who have been denied treatment other than psychotropic medications? **In my inspections, I interviewed and**

reviewed the charts of dozens of prisoners who were offered no treatment other than
**psychotropic medications. Regardless of whether they requested counseling or not,
ADOC's decision to provide nothing more than psychotropic medications is effectively
denying them any other options. While examples are discussed more thoroughly in my
notes, attached as Appendix 1, Prisoner #12 has made unanswered requests for
various forms of group therapy or educational courses. Prisoner #29 has repeatedly
asked to see a mental health counselor, including submitting a request slip, but no one
has spoken with him individually. Other examples are provided in my notes, attached
as Appendix 1.**

- Pg. 35

  Review of charts and inmate interviews demonstrated that again, virtually the only
  treatment being provided is psychotropic medication. **For example, Prisoner #12 (no
  groups at Bibb, only brief interactions with MHP), Prisoner #17 (no groups at St. Clair
  since 2011, only way to be seen by mental health is to submit request), and Prisoner
  #25 (no groups at Holman) all reported a lack of group therapy or mental health
  program. Other prisoner reports are documented in my notes, attached as Appendix
  1. MHM recognizes this trend – in a continuing quality improvement meeting, Dr.
  Hunter reported that "prescribing is more prevalent" than "non-pharmacological
  intervention (MHM029552).**

- Pg. 36

  There is no mental health therapy or group treatment for inmates in segregation as
  reflected in the medical records reviewed, prisoner interviews and various MHM
  reports. **For example, Prisoner #25 reported that he did not receive individual or group
  counseling at Holman. Prisoner #46 reported that he had only seen a counselor for an
  individual, out-of-cell session one time in five years. Other examples are discussed in
  my notes at Appendix 1.**

- Pg. 36

  In fact, inmates with mental illness are over-represented in ADOC segregation housing.
  **This is regularly reported by MHM. In Tutwiler's Multidisciplinary Meeting Minutes
  from June 3, 2014, MHM reported that 80-90% of the people in segregation were on
  the mental health caseload. (MHM030082); (MHM040286) (17 out of 25 inmates in
  segregation were on mental health caseload); (MHM040290) ("Ms. Greer reports that
  the percentages in segregation are high for the amount of inmates on the mental
  health caseload). I also observed the high representation of mentally ill prisoners in
  segregation during my tours. Prisoners themselves are aware of the high number of**

mentally ill prisoners in segregation – Prisoner #27 reported to me that several of
them had been in segregation for years. Other examples are discussed in my notes
attached as Appendix 1.

- Pg. 37
  Chart reviews and audit findings demonstrate follow-up appointments are infrequent,
  brief and frequently not conducted in a confidential area as I observed during site visits
  and in records reviewed. **For example, Prisoner #33 reported that he is sometimes
  called to see the CRNP, but his counselor is always in the room during those sessions.
  Prisoner #34 reported that other people are always in the room for his sessions with
  his counselor unless he specifically says he wants to discuss something privately.
  Prisoner #65 reported that while in segregation, he always saw the psychiatrist in an
  office with custody staff present. Prisoner #99 reported that he has never seen his
  counselor privately. Other examples are described in my notes, attached as Appendix
  1. I witnessed this phenomenon during my tours, when I saw prisoners receiving
  counseling while people other than the counselor were in the room. In MHM's 2016
  audit findings, MHM raised "[c]oncerns related to safety and confidentiality continue
  with the presence of segregation inmates on the SU. Psychiatric and nursing staff
  noted that clinical contacts with SU patients have been limited to occurring cell-front."
  (MHM040604)**

- Pg. 42
  Based on inmate interviews, record reviews, site visit observations and deposition
  testimony, treatment for inmates on suicide watch or other forms of crisis watch is
  deficient. Mental health treatment is generally limited to brief cell front contacts by
  MHP staff asking the prisoner whether or not he remains suicidal. **For example, Prisoner
  #25 was placed in a crisis cell a few months before our interview. He was seen be a
  doctor on Friday but was not seen by mental health staff all weekend. Prisoner #15
  has struggled with mental health problems all his life. When he was placed in suicide
  watch at St. Clair shortly before our interview, his only contact with mental health
  staff was through the door. Similarly, Prisoner #18, who suffers from paranoia and
  auditory hallucinations, was seen at the door the entire two weeks he was on watch in
  January 2015. Other examples are described in my notes, attached as Appendix 1.**
  Rarely are prisoners on suicide watch or other crisis watch taken out of their cell for an
  actual private counseling session.[41](Deposition of Lasandra Buchanant taken February 19, 2016 (99:2-103:12))
  Further, prisoners released from suicide or crisis watch are not routinely placed on the
  mental health caseload. They do not receive adequate follow-up from MHPs or other
  mental health staff.[42](Medical records of Prisoners #20 and #29)

# Plaintiffs' Supplemental Citations to Expert Report

# Exhibit 2, Attachment 1 (filed under seal)

# Part 1

TOPIC: Braggs v. Dunn

2:14-cv-601-MHT

DATE: J-460

FILE UNDER:

PAGE:

# DUNN v DUNN

# #1

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013860

TOPIC: ~~DEPARTMENT~~ TDUR
2:14-cv-601-MHT
DATE: 05·13·~~16~~

FILE UNDER: 

PAGE:

9:19am

Wendy Williams - Deputy Commissioner?
  19Hz     950
          700 + 250 annex
       today (941)

RECEPTION, DR, LWOP
13 DORMS
  SEG -
  MH UNIT -
  Health Care Unit/Inf.
  AGED, INFIRM, PG

MAX

TOUR
Central corridor
dorms off either side
bunk beds

DORM B    DORM D - healthcare
DORM A    DORM E
entry     VISITING
          LAUNDRY
L SEG
M - DR
k
J         H - mental Health

DORM D - Health Care Unit
  DORM E - Aged + infirm unit -
     Single beds ~12 - TV in main area
     couple wheelchairs, crutches
  pharmacy; pill call window to hallway

pill call
  ramp to bath/shower area
  3 toilets - 1 stainless, 2 porcelain
  2 working sinks
  4 showers   3 in a row step, 1 y/chair entry
  13-14 beds

log adm   "Green room"  4 cells. 2 people

  Medical records room
  Isolation room x2

  Infirmary - 6 beds, dormitory
  Dental Unit
  X-Ray
  benches in alcove. also hallway for waiting
  5 exam rooms    sick call
                  exam 1 + trauma
      sick call   exam 2
~~Trauma room~~ - Room 1   exam 3
                  Chronic Care

two psychotropic meds

CONFIDENTIAL - ATTORNEYS EYES ONLY

TOPIC: Braggs v. Dunn   2:14-cv-601-MHT   DATE: J-460

FILE UNDER:   PAGE:

L dorm - Segregation
   2 open cells
   1 closed dorm - bunks
   expanded metal grate cells 2 - fans set up outside cells
         4-15-
                  corridor
   15 inmates
                   urinals    cells
                        single cells, stainless commode/sink
                           12   L6 → L17
                           cells
   segregation clean · quiet, grooming, hygiene ·
   cell organization looked good throughout

Reception - through visiting, outside to adjacent building
      central area photos
          property vaults?
          classification offices
          waiting area
   receiving screening actually done in medical

? when & where
intake/receiving
screening

DR   (DORM H)                    Gobble
   2 cells, bar front           Scott
   MH records
         H     J        +1 person
         G
              K
         F    E
         A

H - MH dorm
   writing    office space -
   area           2 psychiatrist offices
                  1 telepsych
      2 ADOC psych associate offices

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013862

TOPIC: Braggs v. Dunn    2:14-cv-601-MHT    DATE: J-460

FILE UNDER:    PAGE:

RTU

control bubble

2 group sessions (1 in day room) 1 in room outside

Single beds along both walls

15

15
30

30 total beds — many empty

Rec area out back — grassy area
garden
rec cages
patio c pavers, white chairs

SU   8 cells
UH   11½

Cynthia Pauley         Window
? glass above sink / commode    bed

bed                             toilet

Call button c Speaker           Door

cells along 1 side              Brittany Hill
— no windows on the            Q Mims
c        opposite side          Andrea Smith
MH nursing office               Lakeisha Walker

restraint bed located in office, against the wall
pill call room              — not used 6 yrs
nursing station

LPN

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013863

| TOPIC: | | DATE: |
|---|---|---|
| Braggs v. Dunn | 2:14-cv-601-MHT | J-460 |

| FILE UNDER: | PAGE: |
|---|---|

Officer's cube    9 camera views –
                      yard
                      dorm
                      outside of

Bathroom    8 commodes
            7 showers – 1 could accomodate wheel-
                       chair
                    Others have small step up

            meals on unit

            W/ SU
            Census RTU
            meds used ?
            reception – medical/MH screening
            Staffing levels

            SU  – MH5 + above    (there are none)
                – Suicide watch or crisis (incl. MHO)
                – RTU level 1

            MHM                          ADOC
            1 Site Administrator         1 psychological associate
            [ 1 PhD clinical psychologist
              2 psychiatrists
              1 NP (psych)
              1 medical NP
              1 nurse manager
              1 LPN
              4 MHPs
              2 ATs

CONFIDENTIAL - ATTORNEYS EYES ONLY

| TOPIC: Braggs v. Dunn | 2:14-cv-601-MHT | DATE: J-460 |

| FILE UNDER: | PAGE: |

INTERVIEWS

* MINDY ALLEN ✓
  EVELYN NELSON ✓
  AMY LUCIO ✓
  MONIQUE CASEY ✓
  (CHERRITHA HARRIS) - transferred out
  QUIAUNDRA MIMS ✓
  AMY ANDERSON
  KAREN NORRIS ✓
* KIMBERLY McLAUGHLIN ✓
  CYNTHIA PAULEY ✓
  AMY BISHOP ✓

  * MDRs

RECORDS
MARSH COLBY
TIERRA GOBBLE

CONFIDENTIAL - ATTORNEYS EYES ONLY

| TOPIC: | DATE: |
|---|---|
| Braggs v. Dunn    2:14-cv-601-MHT | J-460 |

| FILE UNDER: | PAGE: |
|---|---|

CRISIS CELL UTILIZATION

| Inmate Name | AIS # | Date/Time placed on watch | Type of Watch | Reason for watch | Date/Time Released from watch | Hrs on watch status |
|---|---|---|---|---|---|---|
| | | | ☐ Observation ☐ Suicide ☐ Precautionary | | | |

LOG LOG

CONFIDENTIAL - ATTORNEYS EYES ONLY

| TOPIC: Braggs v. Dunn | 2:14-cv-601-MHT | DATE: J-460 |
|---|---|---|

FILE UNDER:                                      PAGE:

---

**ALLEN, MINDY**

June 2014 — 4.5 yrs
On MH Caseload - intake, a×in past, Dr Ozula (psychiatrist)
never asked for outside records        Bipolar + depression in
        the world

coherent, relevant
organized,        Tegretol instead of Seroquel
rarg. appropriate        frustrated by doc asking what she wants to take rather than
very rate + tone        deciding dx. what she needs
not preoccupied        Dr Ozula - monthly        Dr Bannerjee
organized, logical        MH therapist. Ms Biggers 2×/mo    face-to-face 15-20'   helpful
        in separation now - got an assault ticket. closed custody        been great
        50 more days in seg
        no property in seg. It's in receiving, no pens/paper

        Meds. Prozac 40 mg    Remeron 15    Seroquel 200 HS + 50 AM
        nightmares, wake up in sweats; doesn't want to get out of
        bed - no energy, chore to take shower, can't focus
        attention. tired
        5 days SW; 2 days precautionary
        M→F  individual while on watch, privately in MH office

**NELSON, EVELYN**

        gt you on medicine - steady increase)
pleasant. coop,        80 prozac   150 Vistaril   100 mg Lithium (capsule)
        next
nor guarda or        depression, trouble sleeping, anxiety
suspicious        seemed like a few whs
grooming + hygiene        separation since April 14 - until May 30   45 days
good        can't call home to ✓ on partner's condition, life support
        J Dow -
not preoccupied        May 1-2 yrs ; 2017 release EOS        Supervised Release Program
organized, logical                eligibility
RR
        on street. Amitriptyline. quit taking it, hurt self
        took OD on pills outside ; not sure if they asked on records
        Dr Ozula  1×/mo    〉
        Ms Roberson 2×/mo  〉
        in seg. stand cell front; has been on watch here, last night
        check on daily at cell front.
        Treatment Team

CONFIDENTIAL - ATTORNEYS EYES ONLY
PLF013867

TOPIC: Braggs v. Dunn                2:14-cv-601-MHT        DATE: J-460

FILE UNDER:                                                 PAGE:

---

- groups
- cross word puzzles
- was in welding class - can get back in Nut

**LUCIO, Amy**

was receiving MH care -      on FL. Prozac + anxiety medicine
                                        self medicating
tried 6 diff meds. Vistaril + Tegretol - couldn't refill ax
wanted to put her on something else.     100mg   300mg    Dr Bland
Risperdal                                              couple months

anxious, mind      EOS . May 22
racing, can't sleep    unauthorized areas, sex offense
~30 in 24°       panic attacks in seg.  Under alot of pressure,
neat, clean      not sleeping at all
organized, logical   to be released from seg on 19th ; suicide watch May last yr
                 - feeling threatened + unsure
Can't transfer probation because she can't make calls
⊕ family support
G dorm - general population
disciplinary for not cleaning up vomit when sick
30-45 minutes  (night time)  sometimes in hr

**CASEY, MONIQUE**

4 mos seg - until June    1st disciplinary. typing
Dorm 4 - receiving          90 days
took test u: MH ; people deny MH because costa release
Had check when younger
Prozac + Seroquel.  depression, racing thoughts
       trauma - physical, sexual + emotional abuse
       foster homes, state raised, 2nd term
10 yr sentence - will get out in 2
used EtOH, cannabis on the street ; worked - electrical
engineering. 2 yrs community college
psychiatrist - seen twice because doing started
counselor. every 45 days, helps a lot
Biggie

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013868

s suemeteeth w/ inerses
coherent, unraw.
masculine appearance
eet tone

suicide watch in March - that's when meds started
7-8 days; daily - no handcuffs, shackles
clothes on precautionary; turtle suit + blanket
⊖ pillow
not on MH caseload previously
no credit for time served seg - close in first 30 days

BISHOP, ~~Antonio~~
~~Amy~~
285694

Dorm F - general population
MH caseload - given arrival 2012
MH services in county, Madison Co. - Abilify + Valium
    professor phd genetics              Vistaril
Seg because LWOP - took off Valium, Haldol, Cogentin +
                                            Vistaril
    B to Prozium - too sedating, sleeping, Parkinsonism
no medication - voices don't command, see once in
    a while; helped ~~Abilify~~ hallucinations

pill call takes a long time, talks to self - gets in house
rats, peeking out
plays chess
works in laundry, would like to tutor
safety net - got a shot
counselor Beday Q 30 days
psychiatrist Q 2 mos

has been up plan

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013869

**MIMS, QUIANDER**

Crisis watch - came back from court, good news
  Going home
RTU - dropped level 'cause refused shot. Haldol & Zwas
  - too much
flat affect
4 levels - level 1 + 2 in cell
    3 + 4 dormitory

more freedom → population
Not on involuntary meds but
Paxil, Trazodone - bipolar D/o.   PTSD on Street
too much - overly sedated       Seroquel on Street
dropped from level 4 to 1  b/c refused shot
Groups - self-esteem, book, arts + craft
M → F groups every day
  morning group durdea, rest of time in same
Ms Biggis - Wiley - dayroom 30' - 60'
monthly - not one assigned, whoever is there


**NORRIS, KAREN**

9 yrs - on MH caseload since prison, On Seroquel Seri 9
bipolar psychotic features. borderline PD
Haldol shot - gonna lock up if don't take it
  works in kitchen
pill line can take an hr + a half, inconsistent times
won't reduce dose; Q 2 wks 50 mg
Remeron - makes head feel stuffy
Haldol walk slow
  audio hallucinations Sometimes - spirits
    mean or negative, not always negative
    ♂ + ♀ - reminds me of mother
    Fna - related somehow to biological
  music helps alot, listen, sing; harmonica
  "control" physical pain - cutting; no so much in last
  couple mos.  During daytime changed
2 yrs hay - in seg p CD
parole ix ↄ_____ fra mee going up
upholstery program - auto

| TOPIC: Braggs v. Dunn | 2:14-cv-601-MHT | DATE: J-460 |
|---|---|---|

FILE UNDER:                                                    PAGE:

---

**McLAUGHLIN, KIMBERLY**

283924

army. air force                    life c parole but will be out in 4 yrs
no phone call 8 yrs
MH - MI starts in puberty. Dopamine + Serotonin, Risperdal causes
men to grow breasts. Estrogen - hormones, diabetes, heart disease

Dr    Bland - panic & anxiety,    seen 2x in 5 mos
            from Risperdal

loose, rambling      Gordon - at Dr Hunter's request but Bland changed to
paranoia                      Prolixin shots
grandiose            doped up on psych meds
                     chemical imbalance, rough life, refused Paxil
the best care ever   Dr Toland 12 yrs in ca - sell meds on hall
received             H Dorm - but wants to get out
                              4 mos in lockdown. 1mo in H Dorm -
                     goes to all groups
                     previously here for 2 yrs
                   - MH technicians - more drugs. panic + anxiety


**PAULEY, CYNTHIA**

                                            doesn't
          H dorm. RTU -    RTU level 2, show what to do level 3
          in cell, sleep medicine - Ambien
          groups - put me in cell + get her for groups
          December to Tutwiler → dorm → H dorm
1000'     bring pills to her, don't know why here, drug - cocaine
mouth movements
tremor    doesn't know what to do to get to level 3 or 4
old er woman  was in MH on streets
more under © eye

---

CONFIDENTIAL - ATTORNEYS EYES ONLY

TOPIC: Braggs v. Dunn       2:14-cv-601-MHT       DATE: J-460

FILE UNDER:       PAGE:

INVOLUNTARY MEDS.

BORDERS, AQUEELA

initialed 8/28/14    order expires 11/28/14
12/23/14                      6/23/14

McLAUGHLIN, KIMBERLY
prolixin

initialed 4/14/15    expires 7/14/15

LANGFORD. CELEST  202503  Su

EMERGENCY FORCED MEDS

Haldol D

GOBBLE, TIERRA    2719    4.18.83
Maj depressive D10. OAD

Pill Call
4 AM
11 AM
6 PM

Infirmary log

CONFIDENTIAL - ATTORNEYS EYES ONLY

TOPIC: Braggs v Dunn   2:14-cv-601-MHT   DATE: 5·14·15

FILE UNDER:   PAGE:

SECURITY LEVEL 4 ——————————— MED CUSTODY

(POP 1926)

CASELOAD:
MH 1 - 161
MH 2 - 30
———
191

10% (circled)

31 (I) on
psychotropic meds

| EDST. | WEST |
|-------|------|
| A | D |
| B | E |
| C | F |

each dorm has a few seg cells
⊖ RTU
⊖ SU
Outp. facility

2 SAFE CELLS
INFIRMARY
⊖ RECEPTION

— MH CASELOAD —
TOUR · ADMIN AREA

LEVELS
ST CLAIR
DONALDSON
HOLMAN

visit room · 16 (I) in group. anger management
Chapel - movie, band set up

Kitchen
Pill call

Campus style
Pill call - Out door windows x2   alpha
covered. Stoop down. Scan ID
hand pills in cup — no mouth check
no water
blister packs

INFIRMARY CENSUS
8 —

Zon MH caseload MH2

nursing station
exam rooms

2 Crisis cells —
large.   large windows   cuff port.
in door & obs from outside

⊖ cameras;
Cell 1 —  stainless commode + sink
Cell 2    occupied, missing obs 9:00 — 1
HRMS  9-641

CONFIDENTIAL ATTORNEYS EYES ONLY

fill or pour

PLF013873

Crisis cells 1 + 2

Ward 3 + Ward 4                    up to
→ each contain multiple beds ~8   (7 you sure)

— MH office - 2 desks, computer, printer
— Then medical behind
        telemed in back room

unclear whether this space is    - emergency
                                  referrals +
                                  some outpt.
There is also another office space to see ① for
MH reasons

Records room
2 chair dental suite

vestibule has benches for waiting area

EAST  ___

A - 4 dorms each building
       A1 - bunks - 53 bunks (100 beds)
crine  Classroom - grd space but lots of broken chairs
Brie                    ceiling fans (on low) \ Y
           3by           plus large industrial fans
       A2 - 3 cells - bunk   suspended from ceiling
              1 empty beds   tears + exposed insulation
       A3 dorms 1 2 guy | ___ from ceiling
53 bunks (106).     empty cell - bunk bed
   2 classrooms in back         mattress on bottom
Carge tears in              filled container on floor
   ceiling fabric   strong smell of burning
   c exposed insulation
   TV's mounted in middle of support beams
   microwave

A4

AMBIENT
TEMPERATURE
MONITORING

Crine Bill + follow-up care

CONFIDENTIAL - ATTORNEYS EYES ONLY

TOPIC: Dorms
Braggs v. Dunn
2:14-cv-601-MHT
DATE: J-460

FILE UNDER: 1 / 3 / 4

PAGE:

B DORM    B ① ⊖ TV.
⊖ microwave

also peeling + exposed
insulation

Behavorial
Modification    B ②    2 men - 1 door card
1 man
2 cards - 1 man

again smell of
burning

Seg cells - 3 ē bunks in each "2" dorm each
unit; leave center light our
cell lights also outside

programming +
bureaus this
"B" unit

B ③  no change, bunks, torn ceiling

B ④  2 TVs + microware  -  torn., exposed ceiling

fall off of front drinking fountains

C DORM
workers

C4  dorm (fewer bunks), torn exposed ceiling
TVs, microwa, 3 phones

20A

C3  particularly bad peeling, exposed ceiling
fans torn, can't hear TV
2 program rooms completely empty
fly strip in bathroom

C2
windows covered ē meal tra holes
Parker  216438  Gram 3·31.15

C1  also smells / fewer beds
6 phones
microware + 2 TVs
empty program rooms = totally empty
no chairs, benches

1 locked
1 open

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013875

TOPIC: Braggs v. Dunn    2:14-cv-601-MHT    DATE: J-460

FILE UNDER:    PAGE:

D - gp
E - gp
F - Honor Dorm
      Faith based

outside weights

D DORM

① TVs, microwaves,                    turn ceiling - some attempt
    2 program rooms -                  repairs, tape, plastic
    6 phones                           sheeting

each dorm also had large white ice chest
    4' long - 2' deep, 18" wide

② 1 E door card
    2 E door cards
    1 empty

    ceiling gone, poor visibility, grate above toilet
    covered window E metal, tiny holes
    bunk beds

③ empty program rooms - both unlocked
    completely empty, torn ceiling, exposed
    - some repairs tape, lg plastic sheets

④ fewer bed but same general design
    1 empty, locked + 1 empty unlocked

E DORM    E4
          open program room, bench, checker boards
          locked program room - empty

          E3 empty program rooms - 1 open, 1 locked
              TVs but nothing on · just snow on both
              torn, exposed ceiling ;    fresh ice in chest
          E2   BROWN 224946  3.31.15
               NASH  286284   4.14.15
          lights controlled outside, all off

          E1   no TV signals ; 2 empty program rooms

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013876

| TOPIC: | | DATE: |
|---|---|---|
| Braggs v. Dunn | 2:14-cv-601-MHT | J-460 |

| FILE UNDER: | | PAGE: |
|---|---|---|
| | | |

1 air conditioned

F DORM

F1 - program rooms contain chairs + some bertod
materials. This is faith based dorm
ceilings similar need of repair
maintenance piping exhaust fan at peak of roof/ceiling
air

bunks have 2
drawers + locker
under bottom
bunk -
1 belong to each
bunkie

F2    1-1 people + floor cards  Whole area blackened soot.
       2-1                      ↳ new, all same handwriting
       3-2

F3 - TVs not working - just snow

F4 - TVs turned off

Classification building
   1 telepsych room  Ⓕ   (doc is remote)

IDLE - IDLE · IDLE · IDLE · IDLE · IDLE · IDLE · IDLE · IDLE · IDLE

161 MH1
30 MH2

MONITORING TEMPS    all dorms monitored
Temperature outside > 80°,  Check 3x/day

330 Ⓘ ɛ jobs
781 ɛ jobs

Bad Dorm. disciplinary complaint - any
C is not the only Dorm for Ⓘ c̄ job
Ice coolers filled 3x/day
730-530 day rooms open; 7 days/wk
30' rounds to seg           9am - "clement time
pill call  3am   3pm        9pm specialty cases

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013877

| TOPIC: Braggs v. Dunn | 2:14-cv-601-MHT | DATE: J-460 |
| --- | --- | --- |
| FILE UNDER: | | PAGE: |

SEG CENSUS

24        Capacity 36
7 disc   17 admin seg
7 on MH caseload, MHI all admin seg

— 1 vacancy — MHP

No forcible meds

— INVOLUNTARY MEDS. LOG
      BROWN, BOBBY 200684
      GLENN, KENNY 189724
      PORTER, JERUSALEM 274102

— PHYSICAL RESTRAINT LOG   - not used

1 SITE administrator 1
1 LPN
2 MHPs   (1 vacant)
AA
psychiatrist - telepsych
1 ADOC psych associate II

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013878

TOPIC: Braggs v. Dunn

2:14-cv-601-MHT

DATE: J-460

FILE UNDER:

PAGE:

BUSWELLE.

3-4 mos ago, MH prior
When they decide to give it - computer, sometimes
Wellbutrin -            ] not involuntary
Symmetrel -
Prolixin shots Q 2wks  ⌋

psychiatrist 1 x in 3 mos
      Q 6 mos.    DRC calls
Stop taking
Ms Lee - X2 since being here; doesn't know how often to see
MH on street. hospital x 3, mom custody, had meds
So·So· depression 7 of 10 today, cut self ~ 6 mos ago
      BA - Quieter, large dorm
Paranoia - people talking about me, plotting against her
Symmetrel
Cogentin
smoke cigarettes; no job, put name on waitlist, - kitchen work
⊖ industry.
⊖ groups   Anger management class is part of MH, took in past but
      not here;   would attend groups if offered
no time in segregation
charges Arm band to go into different dorm
can't see people when you need to. meds
chronic care  2 mos  ⊖ chronic care clinics
sick call $3 - can sign up nurses' sick call
MH lock up  MH Classification system.
smells, sight, sound (people - conversations -
      always people he knows)

7-9 AM
Count + lunch
930 - 12³⁰ or 1
3 pm dinner
keep ice, never seen them take temperature, heat class
chapel - 4 people, weekly - nurse (does her shots)

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Braggs v. Dunn

2:14-cv-601-MHT

couple yrs
2006 - 2014        monthly, sees ~5'
                stop taking meds. Call you over
            — No TV, no smoking, no driving   — can go to store
step down. TVs, smoke drink, canteen:   job - porter
      ≠                        Ogden

couple months — witnessed a rape so he got sent from
                Bullock to Bibb

no difference between Bullock main camp &
      Bibb in terms of MH treatment

— different staff
— right medication
— wouldn't beat MH up all the time

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013880

TOPIC: Braggs v. Dunn                    2:14-cv-601-MHT                    DATE: J-460

FILE UNDER:                                                           PAGE:

McCoy
176745

Bullock   Staton   East   Holman
Limestone 10 yrs -
2 yrs - D dorm - the whole time, MH caseload
Dec shot 10 days, no side effect medicine
    goes to health care to get the shot
Dr - hasn't seen in a long time - not since last year
    last seen December; TV
Ms Lee - everyday, comes up to see
    whenever she calls him 2-3 minutes
No groups; no job assignment; ⊖ money on books
⊖ commissary
lay around - they locked the doors, phones + TVs
                                    not usually
                                    on until 5pm
                    |              |
            day room        9am - evening
        every now + then
B dorm - when you get locked down, keep as long as they want
no hobbies
last December 2014 - RIB hearing, 1 day - Ms Lee got him
                                    out

restricted range after, missing teeth. appears vernicularin
    to understand, appears sad but denies being afraid
    or worried


Want to go back to protective custody
    everyday, all day they are mean to him, feels crazy
    to him - inmates + staff

CONFIDENTIAL - ATTORNEYS EYES ONLY

TOPIC: Braggs v. Dunn    2:14-cv-601-MHT    DATE: J-460

FILE UNDER:    PAGE:

GLENN
189742

Bullock  RTU 3 years
MH casual - 3 mos    B dorm, B4
    because on meds
Zyprexa + Prolixin Shots 2 Wks
afternoon    paranoid schizophrenia
free world tx - hallucinations, doesn't remember what
figuring to come off shot - too drowsy
Shots started because
Humar
couple more
behavior certain; 6 more wks    Dr Bland
talking to doctor on TV
counselor  Ms Lee - put in request to see - not too
    much counseling
Groups ; heat precautions. 3 wks, visitation 20 people
    MH nurse -
watch.
    2-3x - feeling awkward, family problems
        3-4 days, when told I was stable
            vital signs
    - 3 wks ago , feel better
    shift office to tell them when he needs watch
    somebody checking makes him feel better
    5 v6 yrs
    TV + radio talk to him, money involved
    foul smells

MH 2  but should be a 4 because on forced meds

TOPIC: Braggs v. Dunn    2:14-cv-601-MHT    DATE: J-460

FILE UNDER:    PAGE:

**BROWN, BOBBY** — Haldol dec 25 ng involuntary meds
refused to participate interview

**COLE**
**213565**

environment fit for them
MH
put me on my better medication, Prolixin injection
not going to pill call regular
bad dreams, ⊖ voices × 1 time
depression -
Bullock MH 2001 - 2005 parole
2007 - 2013 →

*mapp smiling
closes eyes*

St Clair   10 - 11 mos
Bibb - 5 mos      D4
tortured for being innocent
health care / infirmary
treatment more active - at Bullock
injection
psychotropic med; once - twice / month - Dr Chancy
no counselors.   no groups
law library + sit rep for a while, missed the
mtg

counselor, classes, depression group, understanding mental illness
program rooms unlocked most every day

fit in more, not too many MI
no job, requested work release

2026 EOS - comes up for parole 2017

CONFIDENTIAL - ATTORNEYS EYES ONLY

TOPIC: St Clair    Bragg v. Dunn    DATE: 5.15.19 4:00

FILE UNDER: MAX    PAGE:

---

6·3·83 opened
216 seg beds
1082 · gp beds
25 HCU - 4 wards of 5 beds
5 iso cells

1294 census
1323 cap

ADC Industry - Jr college
furniture
chemical

---

dialysis center for ♂ ①
TC 250 bed
Faith based dorm

A· TC dorm 256
as J + K  Faith based (same bldg)

24 cells double occupancy 48

L, M, N, O, P, Q — 96 each

---

A  24 cells  DC
B + C  48 each  AC
D  48  DC
E  48  AC

F  Inf  25
G  used ①  58          MED/MH

---

A.  2 stories - cells on 2 sides  12 total
eg industrial fan
clapping, peeling paint 1st
broken phone — no receiver
all cells occupied, not all have door cards  one other phone 2nd floor
concrete slab bed, stainless commode + sink unit, window to
outside

4 individual yards - concrete ground, chainlink ceiling
cinder block walls

MH offices
V

3 offices — cinder block walls do not go up to ceiling
"group" room - multipurpose room
sick call, visits — 4 tables (word)

D + C
admin seg

B  24 cells (B1 + B2) so 48 cells
concrete bar — expanded metal grass x 4
window, stainless sink, commode
2 story; wedg. shaped



C  C1 + C2  — same construction

yard rectangular, cement floor, razor wire — no ceiling

---

CONFIDENTIAL - ATTORNEYS EYES ONLY

TOPIC:    Braggs v. Dunn                          2:14-cv-601-MHT                  DATE:   J-460

FILE UNDER:                                                                       PAGE:

D+E

These seg cells
have windows to
outside - the ones
visited did not have
windows covered
So natural light
could enter, also
glare at bottom

D cells - expanded mural 3 + 1 covering lights
   D2 - loud, slurring, 2 per neices in new cell

E 1 + 2  (24 cells each)

"day room area" of each seg unit empty  (no tables or TVs)

E   Infirmary
   [ hospital bed
   [ stainless commode/sink            ] isobell F2
   [ missing plate
   hosp tray     wet
   broken bed, floor plastic to prop up head of bed
      mattress

F1 also iso cell

MH office - desk, chair   telescreen equipment

G - aged + infirm - air conditioned   5B
   bunk beds, wheel chair, canes

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013885

TOPIC: Braggs v. Dunn          2:14-cv-601-MHT          DATE: J-460

FILE UNDER: INMATE INTERVIEWS          PAGE:

[HARTLEY] SYLVESTER   MH All my life; medication   Cognom, Prolixin 2 x months
MH3                                                                1 arm
                                                          1 BID
                                                          730pm
                        can't sleep, shakin in the bed   check mouth
                        dry mouth
                        MH 2x/month - office - infirmary
                              Panata - hours + hours, be seen
                              doctor 1x/mo - in person   Ms Cool
blunt affect          medical - broken leg + femur; dialysis 3x/wk
↓ spontaniety         65 dormitory
but answers questions  medicine to slow down, take car
                        hear voices - man voices no name, unfamiliar
smells of cigarettes          kill myself.
                        cut on self; last heard ~ month ago
                        sad feeling. Locked up 35 yrs
                        MH Mobile 2x/wk - programs
                        padded cell in infirmary - mattress on flor, gown, blanket,
                                      Stanless    -    4.5 days
                              talk at the door
                        no programs- used to have programs in seg; 1 man cell 7 yrs
                        no job assignment here - clean cage, pick butts up   2002-2007
                        no thoughts suicide ~ a month ago
                   -    real food
                        programs
                        sleep all day + all night


[BUI]
                        65 - 6 years top bunk
                        counselor Ms Panata - monthly, office in infirmary
                        5-6 years SHU   Haldol D S
                              still has shakes- not so much today
cheerful, polite       paranoid      Dr Hunter
some spontaniety                     Dr Wardley
short responses                      2 other people
but relevant. coherent  no groups, programs, job
                        full officer - life emergency

CONFIDENTIAL - ATTORNEYS EYES ONLY

TOPIC: Braggs v. Dunn    2:14-cv-601-MHT    DATE: J-460

FILE UNDER:    PAGE:

**LITTLE, TERRY**

MH 1

Spontaneous,
full range affect
euthymic,
coherent, relevant
appropriate, logical

**MARSH, CHARLEY**

2012

pleasant, polite
flat affect
not guarded or
suspicious
alert O×3

reports memory probs
cx - can't recall why he was on watch

---

MH          Dome
            O-1
Ms Moore - counselor  Q 90 days
purge + 2 others - (need List Stop Risperdal)
    ⤷ supposed to calm nerves, takes in evening 8³⁰ or 9PM
25 yrs locked up
~ 2004 - had filed lawsuit re: overcrowding, saw doctor then
    worse crowding, stabbing + killing
Warden Estes has been here ~ month
MH prescribes MB Cargon - face to face 1:1
2x/wk laundry -
food - meat packaging says not for human consumption
buy from store, soups, cheese, olives, summer sausage
brother sends money + daughter  12 children ; (4)dead
                                52 grandchildren
visits ~ 1 × /year                30 g grand
St Clair - since '91
LWOP stay St. Clair
MH is great ē us all — just no groups no more, ~~here~~ ~ 4 yrs
                            ago, used to have them but ① jumped
                            on group leader
Send request if need to be seen

---

MH caseload, medication Risperdal ; some weak
also on street - - N down
215 → 170 lbs   Risperdal caused him to lose weight
Adoc reception 2012 .   lost weight , high blood pressure
Used to at Kilby - 1 wk → St Clair   15 years - asset, cream
outside . psychiatrist, counselor              cornfriend
St Clair - MH counselor Mr ~~atone~~  3 MH counselors
                            nurse
Ms Cargon Q 4-5 months , put form in to see screen
MH Watch 2 wks  Jan 2015, padded cell ; seen at door
Ms Cargon took him off Watch
paranoia, and hallucinations . call name  - better ē meds
Ms Moore Q 30 days - office in inf
H/o suicide attempt - drove truck into pole by speed
ā County House

TOPIC: Braggs v. Dunn    2:14-cv-601-MHT    DATE: J-460

FILE UNDER:    PAGE:

MH    G bed 19

**YOUNG**

MH 2

"not until I showed", some days don't get to us
Supposed to be on Prozac; Haldol in arm, Q 2 wks
1 Cogentin, selling cogentin $75,000
15 years - kidnap + rape. DNA neg   Lituno
MH on street
Signed up for doctor but
Ms Moore ¬
Ms Shah - ¬
    Nurse
Ms Cougin ~ yesterday, Cogentin in arm, side effect of shot
    keep from locking up
Want to go home; no groups, want to work in laundry
not enough food, no money on books

gurbeed, mumbled
Speech; some inapp
(out of context) laugh
- but not excessive, may
be more social
difficulty signing
name

**DUNN**

don't care, need MH care    Q
wrote request - no response; days or hours
Ebau  showed nurse  couple hrs til shift change. March 2014
    took him out, beat him up
    took to health care — back in cell in seg, cut self again
    next morning to health care
outside hospital
2 days on watch, check things on door
no follow-up. no counseling, no NP, no meds

MH Q 90 days   Ms Cougin + Ms Palamore
    ↳ blood work   ↳ about a nurse

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013888

TOPIC: Braggs v. Dunn   2:14-cv-601-MHT   DATE: J-460

FILE UNDER:   PAGE:

5 mg Haldol  2 mg Cogentin        G5

**NELSON | CURTIS**   50 Haldol decanoate

pressured speech
agitated, able to
be · direct

mouth movements
suspicious

Robert Munro, Charles Woolley — approved    Ms Corigan — said he needs
prove meds d/c'd 3 times in pass        meds

denying medical - for back brace
schizophrenia, pan tried : bipolar ; manic · depressive
no hallucinations : fabricated
2025 out date
May 1 — mailed equal justice initiative
They would not take him to hearing re : meds
Mrs Pamelor retiring in 2 wks
    Ms Moore.
not suicidal , documents thru childhood — not true
fabricated case to support meds

**PRINCE**

tongue
movement

① #10 cell
② wk ago Tuesday
seen not on street, hears voices, impulse disorder
    walls closing in on him, state says 10 days —
attempted suicide #1/2 — 25 days —    give them to
                                        share don't
                                        pick em up

couple years ago
Ms Corigan Th F — keep you here
Haldol shot 50 mg Q 3 wks
   2 yrs —
6 yrs.  August 25, 2009        neg asked protection
transfer to Live 4
young group :    radio, dog house
sprinklers

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013889

| TOPIC: | | DATE: |
|---|---|---|
| Braggs v. Dunn | 2:14-cv-601-MHT | J-460 |

| FILE UNDER: | PAGE: |
|---|---|

CARTER

Spontaneous, eye contact
tone, thought
appropriate. logical

DORM C 19
MH Caseload — Wersion prison 21
Holman - Was on meds
no meds now
hearing voices, depression      -
had suicidal thoughts
feel like needs medication- always hear voices,
Ms Coveyn Accused him of trying to
Dr Hunter        └─ can't be in pop
↓ Q 3 nos - The Pakman leaving
paperwork course for MH
last group last year
has been in Seg 5-6 years;  Holman better  | groups
                            Donaldson better |

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013890

| TOPIC: Braggs v. Dunn | 2:14-cv-601-MHT | DATE: J-460 |
|---|---|---|

| FILE UNDER: 6·18·15 | PAGE: |
|---|---|

8.18.15

| HOLMAN |
|---|

MALE MAX  750 census 3/16/00
160 PR Cells, 89 Seg Cells  21 on psych meds      26 GP/DON meds
Psychiatrist 4°    Psychologist 8    Agent teen 40   Psych Assoc 40

MHO → MH6

- STEPHEN RODGERS
  MIKE EDWARDS
- MITESH SHAW
  BILL
  MARHA
  VAROSKA
  ELDON VAIL
  ME
  JODY

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013891

TOPIC: Braggs v. Dunn
2:14-cv-601-MHT
DATE: 08.17.16
0830 → 6:00 pm
FILE UNDER:
PAGE:

LEVEL 5

985   capacity 1029
  163 deathrow (single cell)        3 CRISIS BEDS on          MH area. Located just inside
  189 segregation (single cell)     "P SIDE"                  3 desks around wall main office
                                     small infirmary           table in center.
CENTRAL CORRIDOR E HOUSING UNITS OFF EACH SIDE (4 each side    enter office       all c computers
                                               8 total)                            monitors

Honors "E dorm" 174 beds                          SAFE CELLS
SEGREGATION SEPARATE BLDG 3 STORIES. Single cell   REFERRAL
     Seg                        ENTRY              MD MEETINGS
   Exercise  |                                     CRNP CONTACTS

            KLM                                    - HCU -
                                                  Health care / infirmary -
☐ ✓ MHM REPORT FOR STAFFING → DODD MHP → CORBITT MHP   exam rooms - 2 exam
SHOULD BE NO MH3,4,5 π PI   (PRUITT, LEVITICUS) 217910    chairs          table bed / scott
              ✓ SW BURDEN, JEFFREY  2593               lab
MH1 - 89      ✓ SIB ROLLINS, ROGER 171414            ARNP sees ⊕ health care
MH2 - 4       ✗ SW (HARREL, REGINALD) 261808         medical ward  5 beds
              OTD ✗  VICKERS, CHRIS - Donaldson        2 dental chairs
              NO✗ SIB ROLLINS, ROGER 171414
              NO✗   REEVES, MATTHEW  2636            new library      lobby] still
                    DOZIER, ALTAIR 264519            chapel          craft] items
              ✗     POOLE, KEATH  294806             D dorm
              ✗   (BURNS, JOSEPH)  225070                   4 rows
              ✗   (DOZIER, ALTAIR)  264519           114 beds, no bunks,
              NO✗   MCCASTER COLLIS 168009           single story.
              NO ✗ MH2 (SAINI, AMRIT) 182247        toilets, showers up front
              ✗   (WILSON, CHRISTOPHER) 160809
ROSTER   33   ✗   (BURTON  2537)
         41
         19
        ───                                          12 large yards monitored area
         93  (<10%)                                  exercise
              MH SEG ROUNDS -                        control booth used between
not on meds  5                                        B dorm + D dorm
            22                                        architecture repeats
            27                                         B dorm + C dorm
93
-27      no rounds staff shortage
───       •8/14  7/17    vacation 6/24/15-7/6/15
66 on meds •8/10  7/13       6/12  5/24  5/8
           •7/27  7/10       6/8   5/22  5/4
                             6/5   5/15  4/12
           •8/27 -1/19                    4/10
           •2/6  -1/9
           •1/27        22 × no rounds
                            in seg
                                at least
        some groups 1×/ month (log went
              back to 2009)

CONFIDENTIAL - ATTORNEYS EYES ONLY
PLF013892

P tier -
- 3 crisis cells
  bar doors
- (3) metal bed on wall
  cotton batting in plastic
  "mattress"
  can't [Stainless toilet +
  sit [ wall mounted sink
- (c) metal bed mounted
  on concrete
  - this one away from
    wall, ramp under
    metal bed
    ~2 ft off floor
- (d) bed mounted on
  slab E, ramp under
  ~2' off floor
  Camera in hallway
  Can see cells but
  not the there

IR   P 1-14
- single cells
  barred fronts
  stainless commode
  + wall
- large cooler ice on
  unit
  microwave
  cells on interior wall
  windows exterior
  cligue - lit in
  light but can't
  see out
- P2 - cells are
  covered E [crosshatch]   15-28A
- bed   wall mounted sink
  commode
  ledge (desk?)

- Rounds Q 90 minutes
- Q - step down program
  Sg

H1
NO

temp log on
computer, not on
paper trackbook.
all filled in advance

Segregation
3 stories
Solid door cell front
loud, smells like paper
burning
2 on first floor E
pass through box on
port which is located
~ 3' up from ground
Stainless sink +
commode on wall but
not on top one another
metal shelf
metal bed on far wall
narrow window to outside

K first floor
L 2nd floor
M 3rd floor
hot + loud

rec yard off central
area of Seg   [down arrow]

mop bucket dumped on
ground

MICKEA MILLER 272920

wall mounted fans are not working
lots of burn marks
showering, banging

HOLMAN CF MULTIDISCIPLINARY MINUTES

CRNP
Path MHP
Dr Crum · Psychologist
Corbitt MHP
Lt Mathews

Documents fm MH office -
multi · meeting notes

1/M on heat precaution meds (30)

Crisis cell utilization
13 hrs → 111.80 → 188.27 → 243.90
                                    Rollins

Crisis cells do not need safe cell
criteria; multiple tie off
points; no safety beds

CONTACT LOGS - individual
GROUP LOGS
SEG ROUNDS SHEETS

Records

BURTON 2537
older appearing PCM
glasses, edentulous
DOB 11.20.45

MH1 —
Delusional D/O
R/O schizophrenia,
paranoid type,

Navane, Effexor, Haldol bedtime
relaxation, 1 to help sleep, Slott 1x/month
working good  I 2  25 years on DR
just came off of crisis cell - 1 day
sees doctor/ARNP when he asks; says he got a hour of seg, then taken
to his own cell
19th August 2013  Obama  TV in cell, far
Speech - not always relevant but coherent; thought form okay
rambling.

weight loss     8.13.15    Medical PN - referred from MH - GI bleed black stools reported being drugged + raped
anemia                     (but also difficult to know how oriented/accurate it is) —
GI bleed                   medicine had some labs drawn + "likely psych issue"
                           confused, poor memory per MH note
8/13/15 MH2 but entry prior says MH1-C

BURNS, JOSEPH WM
4.18.84   225070

MH 1

APPEARANCE + BEH
MOOD/AFFECT
SPEECH
THOUGHT FORM/CONTENT
COGNITIVE

really aroused, groomed
coop, spontaneous
coherent, logical
rational, organized
alert, intact

MOOD DISORDER
POLYSUB
ASPD

HALDOL 20 HS
BENADRYL 100 HS
SEROQUEL 100 BID
COGENTIN 2 mg HS
WELLBUTRIN 150 HS

multiple crisis cell placements
self injurious behaviors

segregation - MH keeping him
in seg; Ms Dodd
June cut self → Dr Corbitt came
to see him on Friday.
didn't see anyone all week
sick call seen that now
ARNP Q 90 days

impulsive, act out a lot
lock up almost 10 yrs
step down — Donaldson, Hamilton or
cell
3-6 mos

Dr Crum - does a group for seg but
not regular
on rotation since 2013

Bullock — Limestone — W.Jeff —
Limestone

2006-2008 - taken off MH caseload
RTU twice   2000 2011 Donaldson
RTU

2-3 minutes c̄ ARNP
no counseling sessions

no programs

no razor blades passed out in
seg 2-3 mos

CO comes c̄ on Thursdays —
but not lately.

Crisis cell
shower, no other property
Ms Dodd has released him
ARNP has released him
Donaldson let him out seg
St Clair did okay

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013894

TOPIC: Braggs v. Dunn    2:14-cv-601-MHT    DATE: J-460

FILE UNDER:    PAGE:

---

| SAINI, AMRIT | 182247 |
MH 2

Refused to sign release for medical records

---

Nurse practitioner — Q 2 wks y needs DA

Recently at Bullock. just broke down threats, scary stuff, 1-2 mos SU been on old medicine Zyprexa concerned re: new meds — stopped meds → Bullock

depression - not under control
worried, upset — freq. upset by
alert oriented
suspicious - some understandable
but some unrealistic paranoia
tells officer needs to be seen -
Dodd there in 15-20'
no groups since 5/2014 -
his choice
self awareness group, anger management
still hears voices sometimes

medicine issue better
not as much counseling
classes - fewer

coherent, logical but
suspicious, guarded
form better organized
grooming, hygiene good
fairly cooperative but mildly
challenging at times
little affective range; speech
spontaneous; rate speech
members, rambling at times

---

WILSON, CHRIS B/M 160809
SCHIZOPHRENIA    DOB 1.23.69
⊕ SH: swallowed razor blade
Haldol D 100 Q 2 wks
Benadryl 25 HS

POOLE HEATH    294806    W/M
DOB 11.4.75
DOA 6.19.14
problem list NEURO DISORDER
6/22/15 · alert that MH to
assess this wk
7/30/15 - medical PN
smoked mojo +
became confused —
hold in crisis cell 3 v
return to reg cell
6/23 - superficial lacerations
wrist, continuous
agitation peers on segregation
Valproic acid syrup IC
6/12/15
6/13 - Cheryl Harvey ARNP
Refusing Depakote + Zoloft
H/o Bipolar Manic —
"guarded, anxious, hostile"
but these are not attributed to
BAD; said maintain on
caseload

Not on current caseload list -
no documentation in chart
that he's been removed.
Last tx plan update (6/15)
indicates unrated Bipolar
getting in trouble

CONFIDENTIAL - ATTORNEYS EYES ONLY

Case 2:14-cv-00601-MHT-JTA   Document 1038-1044   Filed 12/05/16   Page 118 of 134
TOPIC:   Braggs v. Dunn          2:14-cv-601-MHT          DATE:   J-460
FILE UNDER:                                              PAGE:

**HARRELL, REGINALD**
261808   DOB 2-17-87

MH2

---

Stopped meds - pill call not
Renewn
Cognron
Haldol

hearing voices, depression
5 mos ɛ meds
Ms Boreun, Dodd.
didn't talk to ARNP
At. voices - "cut self", off + on all
   day
Seg - 9 yrs in prison; seg 1 month
jumped on at Jefferson 24 stitches
Taylor Hardin - juvenile ct
   sent mental evaluation
Taylor Hardin again 5 adult charge
   2 mos; meds there + in
   county jail
In population. Can focus on some
other things - nothing to do in
seg              March 2015
Crisis all - about a month
   ag. cut wrist ɛ razor
certain officers give you a
razor;

no MH counselor
not on meds

depression - worse
accusing him of wanting
   meds to get high

no rounds in seg -
   no MH rounds

L 32· older WM

---

**DOZIER, ALTAIR BIM**
11-18-82   264519

August 2014 - population. just
   released seg; 5 mos seg -
   out wk - been a wk
~10 days out & down
MS Dodd - sees when
MS Harvey ARNP - Q 90 days
   shot every month -
   they missed in 2 mos in
   a row when he was in
   seg
meds↑ 50 Haldol im
W Jefferson - staff 24° x 7 days
   give you pad + pen

St Clair - heard better MH
police go to sleep. go out of dorm
fear for life. get paranoid -
God tells him go to lock up
① mean prison here

has done time in TX + FL but 2 x 98's
   in AL.
He hasn't been hurt - but
   will protect himself.
guards are scared

New Beginning - Dorm - seg dorm
[no smoking, no loud talking
   groups]
other
doesn't
program

---

eyes in cell
M 28
M 21  2-3 yrs
   doesn't come
   out
M 17 2 yrs. don't
   come out
L 17 - doesn't know
   who he is

M 61  5 yrs; beats on door all day

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013896

PRUITT, LEVITICUS

named π

---

not on MH caseload ~ & yr
c/o medication side effect
Haldol - locked up
D/C'd med -
meds lupea SH/UH no
who passed away
no MH counselor
request slip -
no one has spoken him
1:1; Seg board -
MH said he didn't need
anything
cut self
crisis cell lots of times
mood ~ 7/10 -
up parole 2020
appears depressed, soft-
spoken,
D dorm - general pop
older guys;
couple wheelchairs &
walkers
about
~ 6 mos in D dorm
in Seg. prior
18 mos in seg -
food cold
not on time
COs don't walk around
in seg
Kilby reception

multiple times in crisis cell
2014

---

Williams

→ MHB. stopping/blocking referrals
to ARNP
threaten to give shot if go to
crisis

REEVES, MATTHEW  BM    DR
DOB 12.13.77    2636

All psychotropics D/C'd 6.11.15
was on Haldol Dec; Benadryl IM
Paxil

CONFIDENTIAL - ATTORNEYS EYES ONLY

TOPIC: Braggs v. Dunn  FOUNTAIN    2:14-cv-601-MHT    DATE: 08·18·15  460    900 AM →

FILE UNDER:    PAGE:

~ MEDIUM ~

48
single + 16 double celled seg

| INCIDENT REPORT LOG | .... |

4·28·15 FORCED MEDS/NOURISHMENT  293267 (SMITH, RAVEN) ✓

4·21·15  SELF·INJURY     190108 X CUNNINGHAM, DEWAYNE —
+5·13·15 +7·18·15
5·4·15  SELF·INJURY     194674  WEED, DANIEL ✓
6·13·15

6·20·15  SUICIDE WATCH    230027 (MORTON, MARK) ✓

7·17·15  FORCED MEDS/NOURISHMENT 293120 X SMITH, CAMERON —

7·28·15  SELF·INJURY     254859 X MONK JOSEPH —
+7·23·15
7·26·15  SELF·INJURY     144257 (HARRIS, MICHAEL) —

7·28·16   "       235137 (ANDERSON, JOEL) —

COUNT = 1242   (1256 total assigned)
F DORM — FAITH DORM/ DRUG TX
I DORM — TRADESMEN/KITCHEN
SEG C + L
D + E RESTRICTED DORMS — LIMITED MOVEMENT
K — OLD + INFIRM

TOUR

F DORM – separate building (out S yard)
    faith + aftercare
dormitory, bunk beds
– entry area ē pews, tables + chairs
    microwave, 2 TV areas, book shelves have
        nothing on them
showers, sinks + commodes, urinal trough
overhead fans in living area
CO station open, elevated above floor level
All (I) placed or lying on beds
    eerily quiet
    hot + stuffy

→ CENTRAL CORRIDOR
↑   ↓
OP dorm — J
bunks
                    95 bunks
                    190 capacity
windows      windows
                fans on ceiling
restroom        most not turning
                all appear to be
                    working
smaller dorm BE (D) back to back
                    small dorms
bunk beds – 2 rows
1 along outer wall – windows
1 along inner wall (solid) —
back to back ē similar small
    dorm next door
broken fluorescent lights
3/4 ceiling fans working
2 large electrical fans
    both working

(K) area + infirm dorm
1 TV + 3 rows pews
4 rows bunks
1 along wall AISLE
2 head to head in center
1 along wall AISLE
ceiling fans working
large construction fans mounted
    to outside hallway
corrugated tin fin ceiling
36 bunks (72)
couple fly strips

CONFIDENTIAL - ATTORNEYS EYES ONLY    PLF013898

| TOPIC: Braggs v. Dunn | 2:14-cv-601-MHT | DATE: J-460 |
| FILE UNDER: | | PAGE: |

↓TV areas (home + rear of dorm)

mailboxes outside @ dorm but ∅ medical/MH

→ Sick call slips on floor outside Lt office

SEGREGATION
  C SIDE. disciplinary
  → L SIDE administrative

    2 ranges
    single cell, metal bunk on wall, thin matres
    stainless commode + sink
  L181A  flooded        DANIELS
    barred cell front + door   shower
  1 cell near front c expanded metal, 2 also   cells
    at end of block

Temperature log - up to 92° but appear to be
  real temps
no windows in cell but 2 small ventilation opening
  above toilet + sink    6" x 12"   ✠← metal bars

[boxes drawn]

shower at front
  /

Covered walkway
  crash gate pill call - care c computer
                        located of anteroom
CRISIS cells (2);  1 shower room
  Sink/commode - 1 piece
  2 cameras
  Mattress, raised platform bed on wall
  ventilation hule
Cameras viewed at CO station near entry
  impossible to see while seated
  - and it's behind the crash gate
  - and the cameras don't work

WARD
  10 beds -
  1 TV.
restroom c toilets, sink
  showers

2 MH offices

AUDIT TOOL
MHM MEDS + TEAM MTGS
DISC LOG
SEG LOG
CODE BOOK
NON COMPLIANCE log

AUDIT TOOL + SUICIDE INTERVENTION
DISCHARGE PLANNING

CONFIDENTIAL - ATTORNEYS EYES ONLY

TOPIC: Braggs v. Dunn    2:14-cv-601-MHT    DATE: J-460

FILE UNDER:    PAGE:

SMITH, RAVEN
1-a
293267
Risperdal 2mg pm
Depakote 750 pm

DOB  12/22/90
DOA  3/27/14

used to take lit +
Risperdal on street

no VPA level
ordered

Bipolar 1
doesn't take meds anymore
put in safe cell + give him shot
denies feeling suicidal, cussed
police out because he hit him
- no one talked to him
Richardson -
3yr
every tuesday Bipolar group but
he has GED @ same time
saw doctor 1x on computer
Mr Harvey in person -
Richardson in room ā ARNP
5am, 5pm but may be at 10pm
works in chicken      H dorm
GED classes
never felt suicidal; got hit
then in the hole 4 wks
He was supposed to see CRNP
yesterday but didn't go
Keene
Hope
Harvey CRNP
Richardson
Not seen 1:1
MH was doing large management

wrinkled white shirt but neatly dressed
+ groomed; pleasant, coop
thinking organized, rational
linear, euthymic, s↓
rate speech, won't go to MH
because they are disrespectful
+ won't listen to him

10·31·81
MORTON, MARK    MH2
230027    Holdor DEL 5Q2
Ⓣ-BENADRYL IM
J Bloom

crisis cell 2-3 days
everyday 2-3×/day
MHP· Mr Richardson
~20 minutes
Richardson
he will ask them to leave
meds clean + change
Mr Harvey · 3 wks
sees when gets shot
keep down side effects

No MH on street
~13 years - 25 yr sentence
2008 - told people he was
Jesus Christ. read
Bible + misinterpreted
at Holman - starved
Bipolar shots
Richardson - MH diden
Bullock 2013 MH pat
put in for transfer
Ventress
Fountain - January 22 2015
about the same
sees ARNP Q 2-3 mos
not in any group
stay in dorm
2 cousins suicide

restricted officer, neg sx
prominent (stay in dorm,
doesn't attend school, groups
or job assignment)
no
HO level meds -

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013900

Case 2:14-cv-00601-MHT-JTA    Document 1038-1044    Filed 12/05/16    Page 123 of 134

TOPIC: Braggs v. Dunn
2:14-cv-601-MHT
DATE: J-460

FILE UNDER:
PAGE:

ANDERSON, JERA
6.14.85
235137

Dysthymia
Schizp? D/o

Injured self this mo
Cut cut on side -
at Fountain; Ad Seg ~
1 month
wouldn't give mattress
still didn't get mattress
crisis cell - cut self x 2 in
last month. couldn't sleep
hearing voices
still not sleeping + hearing
voices
"behavior probs not MH probs"
MH probs on street + in prison
before release - stopped meds
used steri-strips to close
wound, back to seg

Sleepy, hungry
destroy state property
not cutting up

Ms Harvey - told him she's a doctor
"oppositional defiant D/o"

no suicide attempts, not eating
AN - people you know or don't know
to me; maybe my own thing
unfair OCC (maybe 1x in 2 wks)
arguing & self: another (I) told me to
or him
MH comes through 1x/wk, doesn't
stop to talk unless you ask me to
stop

pleasant, coop, not guarded or
suspicious; restricted range
affect but reactive, mildly
depressed, distractible (mild)

HATLEY, DANNY    134563
DOB 10.19.64
DOA 11.7.13

- Trazodone 100mg HS - this med
for
depression 2013
- Elavil, Remeron,
Wellbutrin
5pm - sometimes
⊖ suicidal; sin,
coward's way out
⊖ suicide watch
in prison
2002 - 2010 - also treated
for depression +
3 more years -
fights, stabbing
1 dorm

Q 30-90 days for CRNP
no 1:1; used to have
classes - no more
job - work in bathroom

Thin wm, spontaneous,
mildly depressed but
reactive, clean shaven
spontaneous pleasant
cooperative

maj depression recurrent
changed stopped
Remeron to Trazodone
c̄ NO explanation/
rationale provided

REMERON 45 mg prn d/c
to Trazodone 100

CONFIDENTIAL - ATTORNEYS EYES ONLY
PLF013901

TOPIC: Braggs v. Dunn     2:14-cv-601-MHT     DATE: J-460

FILE UNDER:     PAGE:

**CURTIS, ANDREW 298446**

22yo    DOA 9·19·15
Fountain 4·10·15

2 yrs sentence

G Doern - couple months, from Mobile

RISPERDAL 2
PROZAC 20
HALDOL D 50 Q 4 x2
BENADRYL

Stopped taking on the street
Would hold him down

hate people, kill people; go to
sleep to get it out of head
Remeron

2011 - put gun in mouth
pull it but wouldn't shoot

Shot is new meds?
people is new  }
bradykinesia remarkable
GED - daily; don't like
going outside - doesn't
like being around a
lot of people
6th grade education.

flat affect, would be
vulnerable in population
schizophrenia

---

REMERON 45

**HARRIS, MICHAEL**

drug addict - you're not getting
anything; go kill yourself
4 yrs ago · spice →
extreme anxiety;
couldn't read or watch
TV or concentrate

Suboxone     $5/ per
8 mg cut to 16

protective custody (owed dues
couldn't pay)
medications
prior to CRNP - had telepsych

Mr Richardson said he was
going to put him on caseload
but hasn't heard back

Old WM, unshaven
primarily SA but also
ADD

TORRES, KEVIN
295891
Rispidae +
Prozpe 20
12·17·79

neas started 2007
stress @ trial at county
jail, CPZ + cogentin
tried Rispidae, Prozpe
depressor, hearing voices

stopped neds 2008 —
released, wasn't on neds
offered neds county
jail - he refused.
Ventress — asked MH,
new program, no neds
+ did fine
Atmore Work Center -
she antagonized him;
saw CRNP - said he should
take neds
NO AH/VH; not depressed

took them 3 days but stopped,
doesn't need them
felt bullied to accept
medication —
she made him MH2
anyway + brought him
into Fountain

Chart -  " Schizoaffective DIO" —
but prob list "schizophrenia"

MSE: attention; concentration
good: not guarded or
preoccupied, spontaneous, full
range affect; thought form
is organized + logical
speech coherent + relevant

MOORE, LARRY    155768
DOB 1·23·63

Bipolar DIO in remission
per spread sheet
Depakote 1500 Q PM
Benadryl 100 Q pm

VPA level ordered  3·6·15
level 158.4
dose was lowered but there's
no note to describe this
entire thing

CONFIDENTIAL - ATTORNEYS EYES ONLY

TOPIC: Braggs v. Dunn
DONALDSON
2:14-cv-601-MHT

DATE: 09.08.15

FILE UNDER:

PAGE:
7:30 AM PICK UP
8:30 AM ARRIVAL @ PRISON

STEVE ROGERS
ERIC
JODY
MITESH

10 AM    MEETING CONF ROOM   WARDEN
COUNT 1507
EAST / WEST HALLWAYS
A > Crimebill
B    Program
ABE · education
✓ INFIRMARY
C } population
D

✓ V / W | more seg

R / open bay
closed S / MH INMATE
T
U
intersection

S has crisis cells
R+U are open
ST are closed

CLASSIFICATION
BARBER SHOPS

✓ MH STAFF LOCATION
– MHM
– ADOC psych associates
✓ psychologist

✓ E }
✓ F } SEG + DR
G
✓ H }

✓ I/J seg        ✓ P/Q seg      I J } disciplinary
KITCHEN                          P Q    seg

BLACKTOP DORMS                  AD SEG MED } all the
✓ H 45 yo · OLD FOLKS DORM      AD SEG CLOSED } rest
N FAITH DORM
K
L
O

[After entry gate,] the entrance to main prison is a short site walk from the entry
gate. Upon entry, warden's complex/administration area to left + large visitation/
vending room on right. (also contains some individual attorney visit rooms –
contact)

Two main hallways (east + west) radiate off the central/main entry to the
building. The east wing contains Dorms A + B (crime bill program)

                        disciplinary seg | C + D – population
4 P/Q – each 8 cells (4 up town)   E, F, G H – segregation
West wing   V + W – more seg       I / J – seg DR
            R, S, T, U – RTU
            ST are "closed" + R+U "open"

CONFIDENTIAL - ATTORNEYS EYES ONLY

Infirmary, barbershop, dining halls, classification, gym, library,
are located in area between the 2 wings

PLF013904

TOPIC: Braggs v. Dunn
2:14-cv-601-MHT
DATE: J-460

FILE UNDER:

PAGE:

EAST hallway
crash gate

L side

A/B
2 infirmary

K side

2 infirmary

C/D
barber shop
Capt office
E gym
law library

Crash gate

F - G
E - H

(E)  2 ties
12 cells

12 chairs 2 pot

E 7   18 mo   HUDSON, TERRANCE   233260
not getting meds

H-DR
H ⓔ come to eaendor
— Anthony Brown

queér, report MH
rounds 2-3 x / wk
stop at every cell

electricity
Cafeteria

F

J
LARRY Yarbo
Both have
11 D
shot last month
We shot last month

RN
JENKINS
O dorm. "old men" —
dormitory, single beds (⊙ bunks)

no 🏠🏠 🏠🏠
TIMOTHY PROWELL
Haldol 75 mg x 13 dys
cogmen  Q 3 mo
forced meds

CONFIDENTIAL - ATTORNEYS EYES ONLY
PLF013905

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013906

TOPIC: Brooks - Dunn

FILE UNDER:

O Dorm

REEVES, ALAN
January
was on inhaler - they took him off
MH - yes, no meds; 2x in 28 years

WEST
back to far

L                                          R

RP    8 cells + up
 ∅     + down                    West dining hall

P1 + P3 — Not cames/crown

∅  1. - not
    3 counseling

(R) - 2 tiers / 12 cells (24 total)
     ping pong table
     microwave
     day room TV

ST
RU

The RTU is 4 dorms:
R S T + U
R + U are "open" -
2 tiers, 12 cells per
tier, 24 total singles
Bells are concrete slab
bed located a couple
feet off floor;
stainless steel
sink / commode;
No electrical outlets
Max security light →
Day room has ping pong
table, microwave -
TV.
There are not enough
seats in dayroom to
accommodate all 24
⊕ a seat.
Individual appts are in
MH area.
Group is held on
the unit.

concrete slab bed
stainless, sink, commode
large gave air vent above sink
max security light
⊖ electricity

charles Willey 112974

(S) closed RTU

12 - Broadhead -
    come out handcuffs

11 - Davis — 2 yrs in RTU  181875

8 - TIAU

7 -

S is "closed" -
inmates can only come out
in handcuffs, behind back
- even for rec.
S1 + S2 are "crisis cells"
S1 - no bed or slab, stainless
     commode, large opening
     gate above sink
     Camera *
S2 - same as all other cells x
     Camera*

* - not clear cameras were
    operational : co in the bubble
    who is not by opening
    see don't know
    how to v cameras

* 6 JONES  4 mos in there.

5

3 JACKSON
  out free, still on watch

* MCKINNEY  4
* VIGOR

TOPIC: Braggs v. Dunn    2:14-cv-601-MHT    DATE: J-460

FILE UNDER:    PAGE:

Sec 1 + 2

T- semi-open
  out for group — no handcuffs
  groups on unit
  no group schedule on wall

5 Bradley

\* 7. Fowles 127508

empty book case ⎤
hygiene hangman ⎦
TV on dayroom

9 chairs
table top 4 stools

U
— TV, microwave

#13  current wears w   Carl Harrison
     AT  2-3 x / wk
     outside · couple times / wk

#10 — 279830

S1 — no bed, large opening vent above sink
     Stainless commode
     Camera

S2  Same ☓ concrete bed
    Camera

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013907

was continued                              gyn
                                           biology

(MH staffing)

Ms Warren - new MH administrator
    3 MH counsellors   HMP professionals, Master's prepared
24 nursing → 8 nurses    ⓇLicensure
LPNS
x nurse    1 psychiatrist 30 hrs  TWR  inpt
manage
           1 psychologist - T→F Suicide watch
           2 ATs
           1 NP - 30 hrs       MTW      outpt
no telepsych

Infirmary - 20 beds      6 ⎫           These are not
                         6 ⎬           used for MH
                         6 ⎭           purposes
                         2  1 is neg pressure
                        20

RTU meds passed by MH

                                        outpt.

96 BED RTU
    1.25 MD
    3 AT
        Psychologist/licensed MHP
    RNs
    LPNs

CONFIDENTIAL - ATTORNEYS EYES ONLY

PLF013908

| TOPIC: | Braggs v. Dunn | 2:14-cv-601-MHT | DATE: | J-460 |
| FILE UNDER: | | | PAGE: | |

MH3

ABERNATHY, SHERITA
ALLEN, PAMELA
BAILEY, PATRICIA
BAKER, ~~BEBOTA~~ LEGINA
BROWN, CHRISTOLYN
CARROLL, BOBBIE
EVANS, ALICE
GRACE, LATOYA
Mc LAUGHLIN, KIMBERLY
MILLER, HEATHER
MITCHELL, TERESA
PAULEY, CYNTHIA
PROCTOR, TIFFNEY
ROGERS, GLORIA
SCHATZ, AMIE
SCOGGINS, LESLIE
TEPPENPAW, TERRI
WESTBROOK, PATTY

INTO BIRMINGHAM    Donaldson   T W   30 miles
OUT OF MONTGOMERY    Kilby    Th F    15 E of mont
25' drive

TUTWILER
BIBB
ST CLAIR
HOLMAN
FOUNTAIN
DONALDSON
KILBY

CONFIDENTIAL - ATTORNEYS EYES ONLY

# Plaintiffs' Supplemental Citations to Expert Report

# Exhibit 2, Attachment 1 (filed under seal)

# Part 2

| TOPIC: | | DATE: |
|---|---|---|
| Braggs v. Dunn | 2:14-cv-601-MHT | J-460 |

| FILE UNDER: | PAGE: |
|---|---|

# DUNN v DUNN

# #2

CONFIDENTIAL - ATTORNEYS EYES ONLY

Case 2:14-cv-00601-MHT-JTA    Document 1038-1044    Filed 12/05/16    Page 184 of 184
Braggs v. Dunn                    2:14-cv-601-MHT

TOPIC:
FILE UNDER:
PAGE: — JULY 2016
J-460
400

EVANS, Harold   9.10.5 51   143082   LEVEL 3   BIPOLAR   U6   Sept 12.
Oct 17

TOFRANIL, LITHIUM
100 HS      900 HS

UAPS TFTs  7/22/15  ✓  "Li TO FOLLOW"   0.5 "LO"
group note attendance - "refuses to participate in programming"
Current events 1x/wk ⎤  1/2/15 - 4/2/15
Recreational skills 1x/wk ⎦
Educational

Bipolar Dro depressed; Axis II deferred. s/p skin cancer s/p brain tumor,
HTN; s/p CVA, ↓ thyroid, hyperlipidemia
Treatmentplan  9.3.15  #1 poor hygiene/cue dirty
#2 noncompliant c̄ meds
HMS 1.27.15  but on no antipsychotic meds
2015.  1.27.15 no, refused 4/3/15, refused 4/24/15

H/o brain tumor  10/2011 - right side, no balance. muscle control

16 mos in U - stopped taking med in population)
So they put him in RTU
thyroid pills ⎤         been taking everyday —
BP pills         ⎥         last 4-5 days
diabetic med ⎦
group.  Johnson + Southern

no hearing test - was supposed to have hearing aid
in Birmingham p̄ brain surgery

Been in '88 - diagnosed depression
✓ nurse Q 90 days
never forced to take meds                  — very hard to communicate
counselors are here everyday                c̄ due to hearing
doctor Q 30 days                             loss
                                             elderly appearing wm
                                             mobility impaired -
                                                          walker; hemiparesis
stay locked down all the time -   breakfast - ® side
                                   lock down 4am → lunch
                                   lunch - pill call -
                                   lock down 6 pm
all locked down 10 pm,  CONFIDENTIAL - ATTORNEYS'EYES ONLY  out 8 or 8:30;

PLF013911