```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE MIDDLE DISTRICT OF ALABAMA

 3                        NORTHERN DIVISION

 4   EDWARD BRAGGS, et al.,

 5         Plaintiffs,

 6     vs.                        CASE NO.:  2:14cv601-MHT

 7   JEFFERSON S. DUNN, in his
     official capacity as
 8   Commissioner of the
     Alabama Department of
 9   Corrections, et al.,

10         Defendants.

11                   * * * * * * * * * *

12            EXCERPT OF BENCH TRIAL PROCEEDINGS

13               TESTIMONY OF CRAIG HANEY

14                        VOLUME 1

15                   * * * * * * * * * *

16         BEFORE THE HONORABLE MYRON H. THOMPSON, SENIOR UNITED

17   STATES DISTRICT JUDGE, at Montgomery, Alabama, on Thursday,

18   January 19, 2017, commencing at 8:03 a.m.

19                         APPEARANCES:

20   FOR THE PLAINTIFFS:     Ms. Maria V. Morris
                             Ms. Latasha L. McCrary
21                           Ms. Brooke Menschel
                             Ms. Rhonda C. Brownstein
22                           Ms. Kristi L. Graunke
                             Ms. Natalie Lyons
23                           Ms. Jaqueline Aranda Osorno
                             Attorneys at Law
24                           SOUTHERN POVERTY LAW CENTER
                             400 Washington Avenue
25                           Montgomery, Alabama  36104
```

```
 1                    APPEARANCES, Continued:

 2  FOR THE PLAINTIFFS:      Ms. Lisa W. Borden
                             Ms. Patricia Clotfelter
 3                           Mr. William Glassell Somerville III
                             Attorneys at Law
 4                           BAKER DONELSON
                             1400 Wells Fargo Tower
 5                           420 20th Street North
                             Birmingham, Alabama  35023
 6
                             Mr. William Van Der Pol Jr.
 7                           Staff Attorney
                             ALABAMA DISABILITIES ADVOCACY PROGRAM
 8                           P.O. Box 870395
                             Tuscaloosa, Alabama  35487
 9
                             Mr. Gregory Martin Zarzaur
10                           Mr. Anil A. Mujumdar
                             Attorneys at Law
11                           ZARZAUR MUJUMDAR & DEBROSSE
                             2332 Second Avenue North
12                           Birmingham, Alabama  35205

13  FOR THE DEFENDANTS:      Mr. William Richard Lunsford
                             Mr. Stephen C. Rogers
14                           Attorneys at Law
                             MAYNARD COOPER & GALE, P.C.
15                           655 Gallatin Street
                             Huntsville, Alabama  35801
16
                             Mr. Mitesh Bansilal Shah
17                           Mr. Luther M. Dorr
                             Mr. Evan Patrick Moltz
18                           Attorneys at Law
                             MAYNARD COOPER & GALE, P.C.
19                           1901 Sixth Avenue North, Suite 2400
                             Birmingham, Alabama  35203
20
                             Mr. Steven C. Corhern
21                           Attorney at Law
                             BALCH & BINGHAM
22                           1901 Sixth Avenue North, Suite 1500
                             Birmingham, Alabama  35203
23
                             Mr. John Garland Smith
24                           Attorney at Law
                             BALCH & BINGHAM
25                           105 Tallapoosa Street, Suite 200
                             Montgomery, Alabama  36104
```

```
 1                      APPEARANCES, Continued:

 2   FOR THE DEFENDANTS:       Ms. Elizabeth Anne Sees
                               Ms. Anne A. Hill
 3                             Assistant Attorneys General
                               STATE OF ALABAMA
 4                             DEPARTMENT OF CORRECTIONS
                               301 South Ripley Street
 5                             Montgomery, Alabama  36130

 6            Proceedings reported stenographically;
                  transcript produced by computer.
 7
                      * * * * * * * * * *
 8
                         EXAMINATION INDEX
 9
     CRAIG WILLIAM HANEY
10
         DIRECT BY MS. MENSCHEL                              4
11
                  * * * * * * * * * * * *
12

13      (The following excerpt of proceedings was heard before the

14      Honorable Myron H. Thompson, Senior United States District

15      Judge, at Montgomery, Alabama, on Thursday, January 19,

16      2017, commencing at 8:03 a.m.:)

17      (Call to Order of the Court)

18

19

20

21

22

23

24

25
```

```
 1                    CRAIG WILLIAM HANEY
 2      The witness, having first been duly sworn to speak the
 3 truth, the whole truth and nothing but the truth, testified as
 4 follows:
 5                    DIRECT EXAMINATION
 6 BY MS. MENSCHEL:
 7 Q.  Good morning.
 8 A.  Good morning.
 9 Q.  Would you please state your name for the record.
10 A.  My name is Craig William Haney.
11 Q.  Were you retained by the plaintiffs to form an opinion in
12 this case?
13 A.  I was.
14 Q.  Did you, in fact, form an opinion in this case?
15 A.  I did.
16 Q.  Did you submit an expert report in this case?
17 A.  Yes.
18          MS. MENSCHEL:  Your Honor, Dr. Haney's expert report
19 and key are admitted as Joint Exhibit 459.
20 Q.  Did you submit a rebuttal report in this case?
21 A.  I did.
22          MS. MENSCHEL:  Dr. Haney's rebuttal report has been
23 admitted as Joint Exhibit 465.
24 Q.  Dr. Haney, during your testimony, would it be helpful to
25 have copies of your expert report?
```

```
 1  A.  Yes, it would.

 2  Q.  Would it be helpful to have a copy of your rebuttal report?

 3  A.  Yes.

 4  Q.  Would it be helpful to have a copy of your handwritten notes

 5  in this case?

 6  A.  It would.

 7  Q.  Would it be helpful to have a list of initials and full

 8  names of people that you'll be referring to during your

 9  testimony?

10  A.  It would be very helpful.

11          MS. MENSCHEL:  Your Honor, may I approach Dr. Haney

12  with a binder containing those documents?

13          THE COURT:  Yes.

14  Q.  Dr. Haney, as you testify, we are going to try to not use

15  any full names of the prisoners who you're talking about.

16  Instead, we're going to try to use initials.  Okay?

17  A.  Yes.

18  Q.  Thank you.  Please tell us about your educational

19  background.

20  A.  I have a bachelor's degree in psychology from the University

21  of Pennsylvania.  Went to graduate school in psychology at

22  Stanford University where I received a master's degree and Ph.D.

23  Early in my graduate training I got interested in the

24  application of psychology to legal issues, and so I went to and

25  graduated from the Stanford Law School as well.
```

1  Q.  Other than your work as an expert or consultant, where do

2  you work right now?

3  A.  I am a professor at the University of California at Santa

4  Cruz.

5  Q.  What is your role at University of California at Santa Cruz?

6  A.  I'm a full-time professor, distinguished professor of

7  psychology is the title.  Until very, very recently, I was also

8  the director of the legal studies program.  And I'm the U.C.

9  presidential chair for 2015 to 2018.

10  Q.  Can I ask you to speak a little bit closer to the

11  microphone?

12  A.  Yes.  Of course.

13  Q.  Thank you.  What do you teach?  What are you a professor in?

14  A.  I teach courses -- undergraduate courses in psychology and

15  law and social psychological theory, but I also teach in the

16  graduate program.  We have a fairly large graduate program, a

17  Ph.D. granting program, and I teach courses in methodology and

18  social psychological theory.

19  Q.  You also mentioned that you were the presidential chair.

20  What is that?

21  A.  Actually, I still am for another year.

22     It's an honor which is given to one faculty member for a

23  three-year period on the campus.  That faculty member is given

24  funds to basically distribute to other people -- they're not

25  funds that come to me -- in order to stimulate activity,

1  intellectual activity, social policy-related activity on a

2  particular topic or issue that that particular professor has

3  expertise in.

4  Q.  And what is the legal studies program that you are the chair

5  of, director of?

6  A.  It's an undergraduate program in legal studies.  It's

7  actually a major on campus.  We have about 250 students who

8  actually major in legal studies and then another group of

9  students who minor in legal studies so they can major in another

10  discipline and take legal studies as a minor when they graduate.

11  Many of them go to law school but not all of them do.

12  Q.  Are you involved in research at UCSC?

13  A.  Yes.  It's a Research 1 institution, and we are expected --

14  all of us are expected to do research, to publish, to write.  Of

15  course, I participate in all those activities.

16  Q.  Is there any particular focus of your research?

17  A.  All of my research, really, since graduate school has been

18  focused on, as I mentioned a little while ago, the broad area of

19  psychology and law.  Within that area or large broad topic, much

20  of my research focuses on the things you will ask me about.

21  I've studied prisons, prison conditions, how people react to

22  prison environments, mental health care in prison, the treatment

23  of the mentally ill in prison.  In recent years, a special focus

24  on isolation and solitary confinement.

25      In addition to those topics, I've studied and written about

 1    some other issues, capital punishment, jury decision making

 2    processes and so on.  But probably most of the work I've done

 3    has been focused on prison-related issues.

 4    Q.  How did you become initially interested in prison-related

 5    issues or prison conditions, as you said?

 6    A.  I was a graduate student in 1971, and Philip Zimbardo and

 7    Curtis Banks and I did an experiment which became a very

 8    well-known experiment in psychology in which we placed

 9    undergraduate college student volunteers in a simulated prison

10    environment.  It's a study that came to be known as the Stanford

11    Prison Experiment.

12        And the results of the study were very dramatic.  The

13    students who participated were randomly assigned to either be

14    guards or prisoners.  And even though it was a simulated prison

15    environment, it became in many respects a very real environment

16    for the people who were in it and for those of us who were

17    observing it.  Those of us who had set it up were very

18    surprised, shocked, really, by how quickly the simulated prison

19    environment became a real psychological environment for the

20    students inside it.

21        We had anticipated that the study would last for two weeks.

22    The reactions of the student prisoners were so extreme that we

23    had to terminate the study after only six days.  And that

24    experience -- I was a graduate student at the time and was

25    present for most of the time that the study was taking place.

 1  It really did deepen my interest in the way in which people were

 2  changed and affected by institutional environments in general

 3  and prison environments in particular.  And from that point on,

 4  I really concentrated much of the work I did, the research and

 5  the writing that I did, on prison-related issues.  Obviously,

 6  real prisons rather than simulated ones.

 7  Q.  Have you in the course of your career had any involvement

 8  with the National Academy of Sciences?

 9  A.  Yes.

10  Q.  What has that involvement entailed?

11  A.  In 2012 I was appointed to a National Academy of Sciences

12  committee to study the high rate of incarceration in the United

13  States.  The committee was tasked with the responsibility of

14  trying to understand why the United States had come to have such

15  a high rate of incarceration over the last 20 or 30 years.  And

16  in addition to analyzing causes, to analyze the consequences of

17  that high rate of incarceration, both the economic and the

18  psychological and political and legal consequences of it, and

19  then also to make recommendations about whether and what ought

20  to be done to reduce the high rate of incarceration and bring

21  the United States into line with other countries around the

22  world.

23       So we worked for about two years.  It was a committee -- as

24  I recall, about 15 or so people.  It included -- they were

25  mostly scholars, but there was actually a federal judge on the

 1  committee, there was a head of a department of corrections, and

 2  we worked for about two years and wrote a book, actually, that

 3  was published by the National Academy of Science in which our

 4  findings were summarized and disseminated.

 5  Q.  Those recommendations that you developed that were involved

 6  in the book, were they presented to any agencies or governmental

 7  organizations?

 8  A.  Yes.  It was actually a remarkable experience for me because

 9  when we finished the book in the spring of 2014, a group of us,

10  a subgroup of the larger committee was asked to come to

11  Washington, D.C.  We came repeatedly, and we briefed a number of

12  political leaders.  So we briefed members of the U.S. Congress

13  and their staffs.  We briefed representatives from the

14  Department of Justice and Homeland Security.  We also had two

15  meetings at the White House with the domestic policy council.

16      So there were four or five of us who became essentially a de

17  facto briefing committee.  And we spent, as I said, a lot of

18  time in Washington talking with political and -- political

19  leaders and policymakers about the implications of the

20  committee's report.  And that led to some legislation, and it

21  led to some changes in policy in the federal government.  The

22  Department of Justice changed policy on things like segregation

23  and so on.

24  Q.  Other than the book that you mentioned with the National

25  Academy of Sciences, have you published any other books?

1    A.   Yes.

2    Q.   How many?

3    A.   Two other books.

4    Q.   And would you tell us briefly the titles and the topics.  If

5    you need to refer to your resume, I believe it's the green --

6    the first green tab in your binder.

7    A.   I can remember the titles of the books.  A book about the

8    system of capital punishment in the United States which is

9    called Death by Design.  And then a second book about prisons,

10   adjustment to prison, what happens to people in prison,

11   including the mentally ill, a book called Reforming Punishment

12   that the American Psychological Association published.

13   Q.   Are you currently working on any books?

14   A.   I'm finishing a book about the causes of crime, and I just

15   started a book about solitary confinement, the psychological

16   effects of solitary confinement.

17   Q.   Other than the books that we've discussed, have you

18   published any articles or journals or sections of books?

19   A.   Yes.

20   Q.   Do you have any approximation of how many of those documents

21   you've published related to prison conditions, prison

22   solitary -- or solitary confinement?

23   A.   I don't know exactly.  There's over -- probably over 100

24   journal articles, book chapters, and so on.  Many of them,

25   probably most of them, address in one way or another some aspect

1    of the psychology of prison confinement.

2    Q.   Are you involved in any journals as a consultant or

3    reviewer?

4    A.   Yes.

5    Q.   What does it mean to be a reviewer for a journal?

6    A.   Most academic journals are what are called peer reviewed,

7    which means that authors submit an article to a journal and that

8    article is then sent out to other experts in the area to review

9    and to make a decision or recommendation about whether or not

10   the publication -- whether or not the article should result in a

11   publication.  So a reviewer is a peer reviewer, a person who is

12   an expert in an area or on a topic who gets asked to review

13   other people's submitted research.

14   Q.   Are you involved in the editorial board of any journals?

15   A.   Some editorial boards, yes.  Not anywhere near as many as

16   journals that I actually review for.

17   Q.   What is the difference between being involved in an

18   editorial board and being a reviewer?

19   A.   It's mostly workload.  When you're on the editorial board,

20   you tend to get more requests to review articles or submissions

21   for that particular journal.  In some instances you also have

22   some influence over the editorial policy of the journal; the

23   kinds of things that are likely to be published by the journal.

24   You have a little closer contact with the actual editor of the

25   journal.

1  Q.  How many journals approximately have you reviewed for in the

2  last five years?

3  A.  I would -- it's hard -- I don't have an exact count.

4  Several dozen, I'm sure.  These requests come all the time.

5  It's probably a couple dozen in the last five years.

6  Q.  Are you a member of any professional organizations?

7  A.  The American Psychological Association, the Law and Society

8  Association, the Society of Criminal Technology.

9  Q.  Have you ever been invited to lecture on issues related to

10  mental health and incarceration?

11  A.  Yes.

12  Q.  How often?

13  A.  Reasonably often.  Usually several times a year.

14  Q.  Have you given any speeches on those topics in the last

15  year?

16  A.  Yes.

17  Q.  Are there any that you can tell us about sitting here today?

18  A.  At the University of Pittsburgh law school.  At the

19  University of North Carolina law school.  At the University of

20  California at San Francisco we have what's called a consortium

21  of University of California professors who are interested in

22  criminal justice issues that I and a colleague of mine run, and

23  so at the last consortium meeting last year I was asked to talk

24  about mental health care in the California prison system.

25  Q.  Have you ever addressed any international organizations or

1 governmental agencies?

2 A.  Yes.

3 Q.  Which ones?

4 A.  The International Committee of the Red Cross.  I spent a

5 week with them in Geneva some years ago with the people who are

6 called detention monitors.  These are Red Cross physicians

7 mostly who monitor detention conditions around the world.  So I

8 was there for a week training them and addressing them about the

9 psychological effects of prison confinement.

10     I participated in a panel at the United Nations -- not the

11 entire body of the United Nations but a smaller group of U.N.

12 representatives in which the U.N. Special Rapporteur on torture,

13 Juan Mendez, spoke, and then we had a panel discussion of his

14 comments.

15     Lots of times in front of governmental agencies, domestic

16 agencies.  The United States Senate in 2012.  Members of

17 Congress a few years before that.  A number of times in front of

18 the California legislature, several times even last year in

19 front of the California legislature.

20 Q.  Have you ever been involved in training of corrections

21 officers?

22 A.  Yes.

23 Q.  When have you done that?

24 A.  I did it a long time ago when I first began to do work in

25 psychology and law.  I spent a lot of time actually training

1  police officers and training deputy sheriffs who worked in

2  county jails.  In California jails are run or overseen by the

3  sheriff's department, a county-level agency, and so I spent time

4  doing training with them.

5      I spent time in a National Institute of Justice program

6  training middle and upper-level correctional managers.  So these

7  were people who were either associate wardens or associate

8  directors of corrections.  It was a program called Correctional

9  Excellence that was held at the National Institute of

10  Corrections Training facility in Colorado.  And I did that for

11  several years.

12      Most recently I've been working with a correctional officers

13  association in California -- it's called the CCPOA -- on

14  exploring possibilities of creating a training program that's

15  directed at correctional officer well-being on the theory that

16  in addition to prisoners being affected by the environments in

17  which they live, correctional officers are also.  And it's an

18  understudied and underaddressed problem.  So they approached me

19  and asked me if we would -- if we could brainstorm a way to

20  address issues of correctional officer well-being in California.

21  Q.  Have you ever been -- have you ever served as an expert in a

22  case involving the adequacy of mental health care in a prison

23  system?

24  A.  Yes.

25  Q.  How many times have you done that approximately?

1  A.  That's been an issue in cases that I have been involved in

2  and in some instances testified in probably two dozen times.

3  Q.  Are any of those cases systemic cases, or are they regarding

4  individuals?

5  A.  I think all of them are systemic cases in one form or

6  another.  I may be wrong about this, but I don't think I've

7  addressed a case in which only an individual's mental health or

8  treatment was at stake.  They're virtually all systemic.  Some

9  of them involve a single prison rather than an entire prison

10 system, but it's still a systemic analysis of how the prison

11 system is functioning and mental health care delivery is

12 functioning in that prison versus the entire prison system.

13 Q.  Are there cases in which you've served as an expert

14 regarding the adequacy of mental health care for an entire

15 prison system?

16 A.  Yes.

17 Q.  And what are those cases?  What systems do those involve if

18 you can remember?

19 A.  Sure.  They certainly involve the state of Texas.  The state

20 of New Mexico.  To a certain extent the state of Florida,

21 although concentrated mostly on mental health care delivery in

22 the isolation units in the prison system in Florida.  The state

23 of Arizona.  For a very long time the state of California.

24 Q.  Who brought you in to those cases that you just mentioned?

25 Which party?

1  A.  Well, I've been brought into cases by the United States

2  Department of Justice, but primarily by attorneys for

3  plaintiffs.

4  Q.  Have you worked with correctional departments, even if you

5  have not been brought into a case by them?

6  A.  Yes.  I actually work with representatives from correctional

7  departments currently.  I'm part of a group of people that the

8  Vera Institute of Justice has brought together where we work

9  with correctional systems in the United States on projects that

10  are designed to reduce their use of segregation.  It's called

11  Safe Alternatives to Segregation.  And in the group that the

12  Vera Institute has put together are directors of corrections

13  from New Mexico, from Washington, from Colorado in my group, my

14  group of advisors.  And in addition to that, we then bring in

15  leaders from correctional systems around the country who apply

16  to the Vera Institute to have us work with them on ways of

17  reducing the use of isolation in their prison systems.  So I'm

18  working with those folks all the time.

19  Q.  In those cases that you just mentioned where you've been --

20  where you've been brought in to serve as an expert regarding the

21  adequacy of mental health care in a prison system, broadly what

22  did you do to form your opinions?

23  A.  I do several things typically.  I review documents.

24  Oftentimes there are documents that have been produced even

25  before I get involved in the case.  So there would be complaints

1    or allegations about what the issues are in the case.  That

2    almost always predates my involvement in the case.  There may be

3    other materials or documents which have been brought together.

4        I usually have to familiarize myself with the system, so

5    whatever has been published or printed about the dimensions of

6    the system, the number of institutions and what they're like and

7    so on, I usually look at those documents.  Then I usually

8    formulate a plan to inspect institutions and also conduct

9    interviews with -- primarily with prisoners, but also typically,

10   in passing, depending upon the ground rules, with staff members

11   as well.

12       And then I oftentimes review additional records; records

13   that have been produced in the course of the litigation.  Those

14   records could involve the various pieces of discovery-related

15   documents, monthly reports, data generated by the correctional

16   system itself.  It might very well involve quality assurance

17   reports where the systems attempt to take stock of itself.  Some

18   individual prisoner medical records or files to the extent to

19   which those are available.  Basically, that kind of information

20   is the sum and substance of what I typically review.  As

21   litigation proceeds, there may also be additional information in

22   the form of deposition or trial testimony, which I also

23   oftentimes review.

24   Q.  Is that process that you just described generally the same

25   process you went through in this case?

1   A.  It's pretty much exactly the process I went through in this

2   case, yes.

3   Q.  Have you ever been offered as an expert -- as a mental

4   health expert to testify in Court at a trial or a hearing?

5   A.  Yes.

6   Q.  Have you been accepted as qualified?

7   A.  Yes.

8   Q.  How many times approximately?

9   A.  More than a dozen.  I'm not sure exactly how many times.

10  Certainly more than a dozen.

11  Q.  Have you ever been deemed not to be qualified to testify at

12  a hearing or in court?

13  A.  No.  Not not to be qualified, no.

14  Q.  Dr. Haney, the resume' that's in your report, does it

15  accurately reflect the jobs that you've held?

16  A.  Yes.

17  Q.  Does it accurately reflect the organizations that you're

18  involved in?

19  A.  Yes.

20  Q.  Does it accurately reflect the books you've published?

21  A.  Yes.

22  Q.  Does it accurately reflect your involvement in journals?

23  A.  Yes, although as we discussed yesterday, that part is always

24  in flux.  The journal reviewing and so on is a kind of

25  constantly evolving and changing process.  So I think it's up to

1  date, but that may be the one area where it may be -- there may

2  be some additions and some subtractions.

3  Q.  When was the most recent time you were asked to review for a

4  new journal?

5  A.  The day before yesterday.  I was on the plane coming here.

6  Got an e-mail.

7  Q.  So that reflected in the copy of your resume in your report?

8  A.  No, that certainly isn't, and there are probably a few other

9  changes in that section of my resume' that are not entirely

10  current.

11  Q.  Other than the changes regarding journals, is your resume'

12  up to date as far as you know?

13  A.  Yes.

14  Q.  I would like to ask you a few questions about your process

15  in reaching your opinions in this case.  Did you conduct site

16  visits?

17  A.  I did.

18  Q.  Did you visit every facility in the Alabama Department of

19  Corrections?

20  A.  I did not.

21  Q.  Why not?

22  A.  Several reasons.  One, to be perfectly frank, it was just

23  practicality.  A constraint in terms of time.  I tried to, and I

24  believe I did, visit a representative sample of the institutions

25  in the system.

1    I certainly made a point of inspecting and interviewing

2  people at the facilities where there was the highest

3  concentration of mentally ill prisoners, the women's facility

4  and then the two men's facilities, Donaldson and Bullock, where

5  they have residential treatment units.  So I felt I got a good

6  sample of the prisoners in the system on which to premise an

7  opinion.

8    It's also the case that in the past work that I've done,

9  I've rarely been in a position to visit and interview at every

10  facility in the system.  California is perhaps an extreme

11  example, but we have 33 prisons.  And even though I've been

12  working on the California mental health care case for nearly 20

13  years, I have not been to all 33 of those prisons and done

14  inspections and interviews there.  Obviously, Alabama does not

15  have that many prisons, but even in smaller systems it's not

16  necessary to go literally everywhere.

17    Part of the reason is not only that you can get a good

18  sample of the prisons and a good idea of the entire system, but

19  also prisoners move through the system.  So when you interview

20  prisoners, they can tell you about other prisons that they've

21  been in, including prisons that you may not have visited.

22    It's also the case that problems that exist at one prison

23  tend to affect others.  That is to say, for example, untreated

24  mental illness or inadequately treated mental illness of a

25  prisoner in one facility may have a consequence at another

1    facility because that prisoner will go to that facility.  So

2    these problems are not cabined or confined to one particular

3    institution, and you can, therefore, get a good idea about how a

4    system works by looking at a sample.  It should be a significant

5    sample and a meaningful sample, but a sample of the prisons in

6    the system.

7    Q.  You also mentioned interviews.

8    A.  Yes.

9    Q.  Can you briefly describe the format of the interviews you

10   conducted in this case.

11   A.  The format involved two different approaches.  One approach

12   was what are typically called cell-front interviews.  So this

13   involves touring through the prison and talking to individual

14   prisoners at their -- at the front of their cell, either through

15   the bars or at the doors of the cells or in dormitories near

16   their bunks typically.  And then in addition to that, conducting

17   what I called in my report confidential interviews.  These are

18   individual interviews conducted separately, under confidential

19   conditions, out of the presence of others, typically no one else

20   there except for myself and typically plaintiffs' counsel.  And

21   those interviews typically are longer, more substantive or in

22   depth.

23   Q.  Did you interview every named plaintiff in this case?

24   A.  No.

25   Q.  Why not?

1  A.  Well, again, I got a sample of the plaintiffs in the case.

2  I was interested not only in what they had to say, but

3  interested in what other inmates had to say as well, even those

4  who were not directly involved in the lawsuit and who were not

5  named as plaintiffs in the case.

6  Q.  How did you decide who to interview in this case?

7  A.  In several different ways.  In some instances I had a roster

8  of people at the institution that identified who was in the

9  institution who was on the mental health caseload, and in some

10  instances I randomly selected just names from that roster.  I

11  also selected people in the course of the cell-front interviews

12  I was doing.  The cell-front interviews were more or less

13  random.  I would typically go through a unit and just pick

14  people to interview.  Sometimes I then asked to interview those

15  people I interviewed cell front later for a confidential

16  interview.  And some of the interviews I did, some of the

17  confidential interviews I did, were people who were suggested by

18  plaintiffs' counsel.

19  Q.  You said earlier that you followed the same process

20  generally, so I assume that means generally you interview

21  prisoners in these cases; is that correct?

22  A.  I do.  I make a point of doing that, and I spend a

23  considerable amount of time doing that.

24  Q.  Why do you rely on what prisoners tell you?

25  A.  Because they are an invaluable source of information about

1  what is happening to them.  They are the best judges of what is

2  happening to them and of their experience of it.  It is an

3  excellent way to get a sense of what, for lack of a better word,

4  I'll call the penetration of mental health care delivery in the

5  system.  Different from what the rules and regulations or

6  program statements may be, even different from what the

7  perspective of the mental health care providers may be, but

8  inmates are at the other end of that and they get -- they get a

9  very clear impression from their perspective of what it's like

10  to live in the facility, of what it's like to try to access

11  mental health care in the facility, of how they're being

12  affected by the conditions of their confinement, and the nature

13  and the quality of the mental health care they're getting.  And

14  there really isn't anybody else who can provide you with that

15  kind of information.

16  Q.  How do you assess whether a prisoner who is telling you

17  about their experience is being truthful or accurate?

18  A.  Well, I assess it in a couple of different ways.  One is

19  I've been doing this for quite a while, and I've been

20  interviewing prisoners for a very long period of time.  And I

21  find generally on most of the questions that I ask, prisoners

22  are candid.  They're talking about what's happening to them.

23  They're talking about their perceptions of things; what they're

24  feeling about things.  And so usually I'm in a position to gauge

25  whether or not what somebody is telling me looks and feels

 1  authentic and accurate.  But I don't rely just on that.

 2      So you really do amass a lot of information when you do

 3  these kind of analyses, and you match it up with what other

 4  people tell you.  Obviously, if a prisoner is telling you

 5  something that's very much at odds with what other people are

 6  saying or what it is you're seeing, you might be skeptical about

 7  what that particular person is telling you.

 8      When there's a consistency of what prisoners are telling you

 9  and when you're talking to people at different institutions,

10  when you're talking to people, prisoners, about other

11  institutions, and they're telling you things which are

12  consistent with what other people have told you, then you have

13  every reason to attach a higher degree of reliability to it.

14  You also match it up against documents when you can.  What

15  information that you have, either from a system itself or

16  individual prisoner files, oftentimes are useful.

17      So you don't take what any particular person says in the

18  abstract and rely exclusively on that.  You take all of the

19  information and put it in the context of the different sources

20  of information that you have.

21  Q.  Did you do that in this case?

22  A.  I did.  Yes, I did.  And in this case I had the benefit of,

23  in addition, some deposition testimony.  Some deposition

24  testimony not just from prisoners but also from Department of

25  Corrections and MHM employees, which in many instances

 1  corroborated exactly what it was the prisoners were telling me

 2  about some of the issues in the case.

 3  Q.  Did you review in this case the medical records of every

 4  person you spoke to?

 5  A.  No, I didn't.

 6  Q.  Why not?

 7  A.  There were a couple of reasons.  One is that I had a limited

 8  amount of time when I was doing the tours to review those

 9  records, and so I actually used whatever time was allocated for

10  me in the course of the tours.

11      But I found, unfortunately, that the records were not

12  particularly useful.  They were disorganized.  Oftentimes they

13  appeared to me to be incomplete.  They did not have a lot of

14  information in them.  And I made the judgment that it, in fact,

15  wasn't a particularly good use of my time.  I used the time that

16  was allocated to me, but I didn't -- I didn't get a lot of

17  information from those document reviews.

18      I learned later when I read Dr. Patterson's report that he

19  had reached the same conclusion that I did about the

20  unreliability of the recordkeeping and the poor quality of the

21  recordkeeping in the inmate files, and that was a judgment that

22  I had reached early on in the process.

23  Q.  What, if any, conclusions do you reach if something is

24  brought do your attention that contradicts what a prisoner told

25  you?

```
 1  A.  Well, I take it into account.  I think about it.  I look at

 2  it.  I check against other information that I have.

 3  Contradictions sometimes are purposeful fabrications.  Sometimes

 4  they're innocent misstatements or misremembering.  So if it's an

 5  incidental issue about when a particular prisoner was at a

 6  particular institution, that could be inadvertent and not

 7  particularly significant.  So I don't -- you know, I try to put

 8  it in context and understand why or how the contradiction might

 9  have been made.

10       MS. MENSCHEL:  Your Honor, I would like to offer

11  Dr. Craig Haney as an expert witness and an expert psychological

12  witness on the subject of adequacy of mental health care in

13  correction systems at this time.

14       MR. SMITH:  Your Honor, we would reassert our

15  objections made in our Daubert motion.

16       MS. MENSCHEL:  Your Honor, actually, I don't believe

17  that Daubert objections have been made to Dr. Haney at any

18  point.  And our understanding of the Court's scheduling orders

19  is that Daubert motions that were not included in the trial

20  briefs were waived.

21       MR. SMITH:  Your Honor, your orders are what they are.

22  I do not have the ability off the top of my head to recall.

23       THE COURT:  Why don't you look into it and let me know

24  what you find.

25       MR. SMITH:  Yes, sir.
```

```
 1              MS. MENSCHEL:  May I proceed, Your Honor?

 2              THE COURT:  Yes.

 3   BY MS. MENSCHEL:

 4   Q.  Dr. Haney, can you please briefly state your opinions in

 5   this case.

 6   A.  Yes.  I rendered several general or overarching opinions in

 7   the case.  I believe, as I recall, I said in my report, and I

 8   still believe, that the system that I saw is a system that is in

 9   crisis in very significant ways.  It felt to me, and my

10   observations were certainly corroborated by a number of the

11   people I interviewed, that it was a system that was bordering on

12   the verge of being out of control.  And that had several

13   dimensions to it.

14       The first was that, again, it felt, it looked, and it seemed

15   to me felt and looked to prisoners and even to a certain extent

16   to the staff, as a dangerous system; an unsafe system.  And I

17   can elaborate on that in a bit, as I'm sure you'll ask me to do.

18   But that was part of the crisis.

19       The other part of the crisis was that it is a very

20   overcrowded, a chronically overcrowded system.  And that

21   overcrowding means not only that there are too many prisoners in

22   the system, but there are not enough staff members.  And those

23   two things are both dramatic.  Significant.  They're not mild or

24   modest issues.

25       And those things have an impact on mentally ill inmates.
```

1    They have an impact on everybody, but they especially impact

2    mentally ill inmates for reasons, again, that I suspect we'll

3    talk about.

4        In addition to that, in part -- and in part because of

5    these things, there is inadequate mental health care being

6    delivered to the mentally ill prisoners in the system.

7        And finally, I believe that has resulted in the overuse of

8    segregation or isolation in the system for mentally ill

9    prisoners, which has the effect of feeding back on the

10    inadequacy of mental health care.  It's very difficult to

11    deliver adequate mental health care in isolation units, and

12    mentally ill prisoners deteriorate in isolated units.  So the

13    inadequacies in the mental health system actually are

14    exacerbated by the use of isolation for mentally ill prisoners.

15    Q.  I think you accurately referenced that we will probably talk

16    a lot about all of those things.  But before we do, can I ask

17    you a few more questions about your process in this case and

18    generally.  How do you assess adequacy related to mental health

19    services?

20    A.  Well, I wish there was a simple answer to that question.

21    There isn't really a yardstick.  There isn't a measure.  You

22    can't give a score that I know of to a system.  So I try to look

23    at several different components of an adequate or functioning

24    mental health care system and try to understand whether those

25    things are being done in the system and whether they're being

1  done adequately and effectively.

2      And I can articulate what those four things are --

3  Q.  Please do.

4  A.  -- if you want.

5      So the first thing is that an adequate mental health care

6  system has to have a good system of detection or identification

7  of mental health problems.  You can't address a problem unless

8  you actually -- unless you have actually identified it or

9  detected it.

10      But detection and identification doesn't just involve an

11  intake where, of course, it is importantly done.  It also

12  involves creating a culture in the rest of the system where

13  inmates feel that they can easily access the mental health care

14  delivery system.

15      The reason for that is that sometimes people are missed

16  when they come into the system, and sometimes people come into

17  the system who don't necessarily have mental health problems at

18  the time they come in but develop them later on.  Accurate

19  identification and detection involves having a system in place

20  to pick those people up too.  And that means having the presence

21  of mental health care people in the system.  It means having a

22  functioning system so prisoners can see, if they do identify as

23  having a mental health problem, they're likely to get treatment.

24  They're likely to be treated well by the mental health care

25  system.  It means having correctional officers trained to

1    identify, not just in intake but throughout the system, to

2    identify these problems and to know how to refer people to

3    mental health care.  To create basically a culture in which

4    mental health care is part of the system in which the prisoners

5    are confined.

6        So that's the detection and identification part.

7    Q.  You said there were three others, I think?

8    A.  Yes.

9        Obviously, once identified, whether at the outset or in the

10   course of somebody's confinement, the system itself has to

11   develop a plan or a response, and that plan or response has to

12   be in the form of treatment.  Treatment that is adequate or

13   appropriate in terms of the amount of treatment, in terms of the

14   modality of treatment.  So not just medication, but other forms

15   of treatment, individual counseling, group therapy when

16   appropriate.  The treatment has to be delivered under the

17   appropriate settings and by people who have appropriate

18   credentials or qualifications or skills.

19       Once the treatment is implemented, then the next component

20   comes into play, which is there has to be a system in place to

21   monitor the well-being of the people who are on the mental

22   health caseload.  So that means not only doing follow-ups to

23   whatever treatment plan has been implemented and changing or

24   modifying the treatment plan depending on how the person is

25   responding or not responding, but it also means safeguarding the

1    well-being of the mental patient prisoners in other ways.  By

2    not putting them in unsafe environments which are likely to

3    exacerbate their mental illness.  Not putting them, for example,

4    in isolated confinement, which is likely to lead to

5    deterioration or decompensation.  That's part of safeguarding

6    the well-being of people who are on the mental health caseload.

7        Suicide prevention is another component of this.  So

8    somebody's already on the mental health caseload or they're

9    identified as having a psychiatric problem, and that problem has

10   gotten to an extreme degree.  So responding to the suicidality

11   of people who are on or about to be on the mental health

12   caseload is part of that as well.  Following up on them if

13   they're placed in suicide watch when they get out and so on.

14       And then the final component is the system has to operate

15   as a system.  That is to say, the components of it have to be

16   integrated and the system itself has to have mechanisms in place

17   for understanding where and when problems have arisen and

18   correcting them.  So this is typically called quality assurance,

19   or I think in this system it's called continuing quality

20   improvement.  It's called different things in different systems.

21   But it involves a self-assessment.  And those self-assessments

22   have to be careful.  And not only do they have to be done, but

23   then there needs to be a corrective action plan which is

24   implemented so that the identified problems in mental health

25   care delivery are not just identified, but they're corrected.

1  Q.  What kind of evidence do you look for or rely on to

2  determine whether mental health care is adequate in a particular

3  system?

4  A.  Well, you look at all of the things that I've already talked

5  about.  I mean, you look at each one of those components, each

6  part of the system, and you do it by relying on all the

7  information that we talked about earlier.

8  Q.  So is assessing a system and determining whether it's

9  adequate, is that the same as best practices?

10 A.  No.  No.  Not at all.  Best practices are that, best.  The

11 best that the consensus in the field suggests ought to be

12 followed.  So those are typically the -- not necessarily ideals.

13 I mean, one would like to think that most systems operate with

14 best practice.

15     I try to assess something, a lower standard, frankly, which

16 is just adequacy.  Is it an adequately functioning system?  I

17 don't believe that best practice necessarily is the legal

18 threshold for a system, even though all systems might and,

19 indeed, should aspire to best practices.

20 Q.  So when you were looking at this system in Alabama, were you

21 looking for adequacy or were you looking for best practices?

22 A.  Adequacy.

23 Q.  Dr. Haney, in your experience, if you're looking at a

24 prison, what constitutes a risk of harm in a prison context --

25 in the mental health prison context?

```
 1  A.  So I know this is a legal term, and I'm going to try not to
 2  define it from a legal perspective because I'm not -- certainly
 3  not a legal scholar, nor am I testifying as one.  But it's a
 4  concept that actually has a parallel in psychology and in social
 5  science.
 6       So I understand when I wrote about a substantial or a
 7  significant risk of serious harm, what I had in mind was a harm
 8  that was considerable.  Substantial means considerable.  It
 9  doesn't mean incidental or possible but unlikely.  It means
10  considerable and probable.  And harm means something more
11  than -- it means something consequential; that is to say,
12  something more than mere discomfort, more even than pain, even
13  though I'm not suggesting pain is insignificant.  But it means
14  something harmful.  Damage could be done.  And so therefore,
15  there is a considerable chance or likelihood that actual damage
16  will be done to people as a result of the conditions to which
17  they are exposed or the treatment which they are not receiving.
18  Q.  When you were looking at the mental health care provided in
19  the Alabama Department of Corrections, did you see a substantial
20  risk of serious harm to mental health prisoners in ADOC?
21  A.  Yes, I did.
22  Q.  Is that discussed in your report at all?
23  A.  It's discussed throughout my report.
24  Q.  If we wanted to find evidence of it in your report, what
25  would we look for?
```

1  A.  Well, my initial report had two sections to it:  One long

2  section of descriptions and conclusions on my part, and then

3  there was an appendix, an Exhibit 4, which summarized the

4  material that I had gathered from the prisoners whom I

5  interviewed.  You could look on any page of Exhibit 4, virtually

6  any page of Exhibit 4, and find evidence of prisoners at

7  substantial risk of serious harm.  That's how extensive it was.

8  And that exhibit includes virtually everybody I talked to in the

9  order I talked to them.  So I didn't cherry pick people and put

10  them in there and leave other people out.  People who had

11  information that they provided to me about what they were

12  experiencing and what their mental health care consisted of are

13  all contained in order in that exhibit.  And as I said, in

14  virtually -- open it anywhere, and there are accounts from

15  prisoners of inadequate treatment, being placed at substantial

16  risk of serious harm.

17  Q.  Dr. Haney, I'd like to talk about the first opinion that you

18  mentioned, that this is a system in crisis.  What do you mean

19  when you say that?

20  A.  I mean if you take into account the various components of

21  the information that I acquired from the observations that I

22  made, from the descriptions from the prisoners themselves, from

23  the accounts that I've seen of the overcrowding in the system,

24  of the understaffing, it's a system that is, as I said a few

25  minutes ago, unstable.  It's unstable in the sense that there

 1    are crises of security.  There are crises of mental health care.

 2    There's inadequacy in the systems that are supposed to hold this

 3    prison system together.

 4        And they manifested themselves in a variety of different

 5    ways.  You know, they're based in part on observations that

 6    other people have had as well about the inadequate number of

 7    staff, both correctional or custody staff, mental health staff

 8    as well.

 9        I saw testimony about a mental health caseloads that had

10    increased in some instances almost 100 percent.  Caseloads of

11    psychiatrists increasing not quite that much, but at a

12    significant level.  Testimony from Dr. Hunter that there are

13    increasing numbers of mentally ill prisoners coming into the

14    system with more complicated problems, substance abuse problems,

15    higher levels of acuity or more serious mental illness at the

16    same time that the caseloads are increasing.  The staffing

17    vacancies are shocking in these institutions, and the

18    institutions remain seriously overcrowded.

19        That really leads into the other observation that I made

20    about the danger and the unsafe nature of the conditions.  I

21    encountered things that in terms of safety of the institutions

22    and the systems as a whole that really were at such a level that

23    it suggested to me, again, that this was a system that didn't

24    have a problem here or there, but really was one in crisis where

25    the system itself had a level of instability to it that is

1  unprecedented in my experience.

2  Q.  So I would like to follow up on the very last thing you

3  said, that it didn't have a problem here or there, but it was

4  really in the system.  How do you know that it's a systemwide

5  problem?

6  A.  Well, again, a lot of the testimony that I saw from

7  officials dealt with the system as a whole.  So, for example,

8  when Dr. Hunter talks about caseloads and so on, he's talking

9  about the system.  I reviewed data about the lack of staffing

10 that was systemwide data.  It wasn't one or two prisons.  It was

11 basically across the board.  Some were worse than others, to be

12 sure, but the entire system is woefully understaffed and

13 overcrowded.

14     The overcrowding data is systemwide data.  The Alabama

15 system has been -- it's the perennial leader in the nation in

16 terms of the percent of overcrowding in the system.  And this is

17 a chronic problem.  This is not just something that is recent.

18 So these are systemic issues that this system has been dealing

19 with for a very long time.

20     The danger and lack of safety in the system was apparent

21 throughout the system, the parts of the system that I saw.  As I

22 recounted in my report, there was a week or ten-day period in

23 March of 2016 when I was scheduled to come here and tour,

24 inspect, and interview prisoners at six different prisons.  At

25 three of those prisons, half of the ones that I was scheduled to

 1   come to, either I was unable to do that because the prison

 2   itself was in chaos and violence had broken out and the

 3   officials, as they said, could not ensure our safety, or I had

 4   to conduct those tours under extremely modified and limited

 5   circumstances, again, because, as we were told, as I was told,

 6   the particular facility could not ensure my safety.

 7        There were actually also groun drules that I encountered in

 8   some other places, including the first time I toured Holman.

 9   The second time I attempted to tour Holman, the visit was

10   canceled in progress because violence broke out at the

11   institution, and we were quickly moved back outside the

12   institution.

13        The first time I went to Holman, I was told that when I went

14   into the segregation unit, I was not allowed to address any of

15   the prisoners cell front and I was not allowed to go to the

16   third tier of the three-tier or level segregation unit, because

17   it was too dangerous for me to go up to the third tier and the

18   captain told me that it would be unsafe if I went up there.

19   These are just not the kinds of things that happen in systems

20   that are stable.

21        MR. SMITH:  Your Honor, let me make this statement.

22   And it's in the nature of an objection.  But what the witness is

23   testifying to is part of an agreement that was reached with

24   plaintiffs' counsel, particularly as it relates to views of

25   witnesses in segregation at Holman.

```
 1              THE COURT:  You've lost me there.  What do you mean?
 2              MR. SMITH:  What I'm saying is the witness has
 3    testified about limits that he says were placed upon him.  These
 4    limits, using his term, were part of an agreement that was
 5    entered into with plaintiffs' counsel prior to the inspections
 6    or tours or whatever you want to call them occurring.  And what
 7    I'm saying is he appears to be critical of the fact that he was
 8    not allowed to do these things, yet it was part of an agreement
 9    that plaintiffs' counsel voluntarily entered into.  So we would
10    object that the testimony he's just given is irrelevant to the
11    issues to be tried in this matter, and we would ask that that
12    testimony be stricken.
13              MS. MENSCHEL:  Your Honor, if I may.  I believe,
14    actually -- and I'm happy to explore this further -- that
15    Dr. Haney would testify about some pieces of an agreement that
16    may have been reflected by an agreement between the parties, but
17    additional restrictions that were placed on him based upon his
18    arrival at facilities.
19              THE COURT:  Just a minute.  Just a minute.
20              MS. MENSCHEL:  Certainly.
21              THE COURT:  Are you aware of an agreement between
22    counsel in this case?
23              THE WITNESS:  Yes, Your Honor.
24              THE COURT:  Was that agreement in writing, counsel?
25              MS. MENSCHEL:  Yes.  I believe it's the mediation
```

1  agreement.  I can find the docket number in a moment if you

2  would like.

3          THE COURT:  A mediation --

4          MS. MENSCHEL:  It was an agreement that was part of the

5  mediation -- a mediation agreement that was filed.  I don't have

6  the docket number.

7          MR. SMITH:  Your Honor, it was the result of a

8  mediation, along with other discussions.  I don't know that the

9  agreement itself is in any way privileged or protected as a

10 result of the mediation privilege.

11         THE COURT:  I see.  That's what I was getting at.  Is

12 it the document that was that omnibus agreement or what?

13         MR. SMITH:  I cannot recall off the top of my head if

14 it was omnibus as to all facility visits or inspections.  It

15 certainly applied to the visits or inspections or tours that

16 this witness made.

17         THE COURT:  Well, what we'll do is this.

18         MR. LUNSFORD:  Your Honor, it's --

19         THE COURT:  Why don't you produce the agreement and

20 show me where it is.  And then you-all can explore all this with

21 the witness, and I'll take that into consideration.

22         MS. MENSCHEL:  Would you like me to hold off exploring

23 that issue further?

24         THE COURT:  No, you can explore it, and then on cross

25 you can show what was the actual part of the agreement.  In

1    other words, it's part of the battle.

2           MS. MENSCHEL:  Sure.

3           MR. LUNSFORD:  Your Honor, it's document number 249.

4           THE COURT:  Very good.

5           MR. SMITH:  Court's document 249.

6           MR. LUNSFORD:  Yes.

7           THE COURT:  Is that that omnibus agreement?

8           MR. LUNSFORD:  Yes, sir.  You're exactly right.

9           MS. MORRIS:  Actually, just for clarity, I believe it's

10   250-1.  Not to be in dispute, just in case you're actually

11   looking for it, I'm pretty sure it's 250-1.  249 was a tentative

12   because we had not reached an agreement at the time that we were

13   supposed to file something, and the final version was filed as

14   250, so that's the one you should look at.

15           THE COURT:  Very good.  Thank you.

16           MS. MENSCHEL:  Thank you, Your Honor.

17   BY MS. MENSCHEL:

18   Q.  Dr. Haney, in your experience as an expert, how did

19   restrictions that were placed on you that you understand may

20   have been as an agreement between the parties, how did those

21   compare to other restrictions that have been placed on you in

22   your career as an expert?

23   A.  They were much more restrictive and severe.  I don't recall

24   ever having had remotely those kinds of limitations placed on

25   me, even from the outset, not to mention the other things that

1  happened in the course of the tours that had nothing to do with

2  the agreement.

3  Q.  Can you talk a little bit about those other things that

4  happened in the course of the tours.

5  A.  Sure.  I may be mistaken, but it was my understanding that

6  the prohibition of going to the third tier in Holman was not

7  part of the agreement.  I haven't read the agreement for a

8  while.  I did understand the limitations of being able to

9  approach -- or not being able to approach prisoners in

10  segregation was part of the agreement in Holman.

11      However, in addition to that, when I returned to Holman, it

12  was my understanding that I was returning to Holman to, in fact,

13  be able to tour the unit again and actually to go to the third

14  floor of that unit, but we terminated that visit as it began.

15  We were walking into the institution with the warden, and as we

16  entered the institution a correctional officer approached him in

17  a panic and explained to him that there was a disturbance that

18  was taking place in a housing unit.

19      This was a facility where a disturbance had taken place

20  earlier.  A few days earlier, the warden had actually been

21  attacked in that facility.  And the warden very quickly hustled

22  us all out of the institution, and we made other plans to go to

23  another institution.

24      That, obviously, had nothing to do with an agreement.  And

25  that was an example of one of the facilities that week where

1    there were -- there was unexpected conflict and danger.

2        We went then to another facility, Bibb, another one of the

3    six that I was supposed to go to that week.  I was informed when

4    we got to Bibb by the warden at Bibb that because of violence in

5    the institution that he could not ensure my safety if I entered

6    one half of the institution.  So we confined our touring and my

7    interviewing to the other half of the institution.

8        And I actually was able to witness when I was there the

9    aftermath of a conflict; what appeared to be a kind of riot or

10   disruption that had taken place in one half of the institution

11   as correctional officers were clearing inmates out in a forceful

12   way of that institution.  I visually witnessed that.  But that

13   was a whole half of an institution which I never saw.  It

14   included a behavior modification unit, which I had been

15   interested in seeing but was not allowed to go in because the

16   institution was -- that half of it was too dangerous to enter.

17       The next -- as I recall, it was the next day or perhaps a

18   few days later, I was scheduled to go to St. Clair.  While I was

19   at another institution, Donaldson, there was some question about

20   whether or not my visit to St. Clair would be canceled, entirely

21   canceled, because there was violence in the system and at

22   St. Clair.

23       The resolution of that was that I would be permitted to go

24   to St. Clair, but I would not be allowed to actually go into any

25   of the mainline housing units except to view them from a

1    platform at the entry of the housing unit.  Not to approach a

2    cell at all or certainly not do any cell-front interviews, but

3    simply to observe them from a housing unit.  So we weren't even

4    able to take photographs of the mainline housing units at

5    St. Clair because of the threat of violence in the institution

6    and the institution being -- operating under lockdown.

7        And then when I went to the segregation unit in St. Clair

8    where I was allowed to enter the unit, I was allowed only to

9    walk around in the unit but not talk to anybody cell front and

10   not to go to the second -- the segregation units in St. Clair

11   are two stories or tiers high.  I was not allowed in the second

12   tier.

13       It's my understanding that none of the description of the

14   things I've just described to you had anything to do with the

15   agreement, but, rather, were in direct response to the violence

16   and disruption that existed in the system and in those

17   facilities on the days I was there.

18   Q.  Do you have an understanding of why you were, for example,

19   not allowed to approach cells or go into the mainline housing

20   units at St. Clair or any of the other circumstances you just

21   mentioned?

22   A.  Again, the explanation was that there were problems, there

23   was chaos and disruption in the system, in the facility, and

24   that it was too dangerous.

25   Q.  In your career as an expert --

1    You mentioned earlier that a warden told you that they could

2  not protect your safety; is that right?

3  A.  Yes.

4  Q.  How many times did that happen approximately during your

5  tours in Alabama?

6  A.  Well, several -- I mean, several times, in one form or

7  another, that was the message that came either from the warden

8  or from someone else.

9  Q.  In your experience as an expert in prison conditions as they

10  relate to mental health care, how frequently has that happened

11  where you've been told you can't inspect a particular part of a

12  prison because they can't protect your safety?

13  A.  It's unheard of in my experience.  I mean, I've certainly

14  been to prisons where there's an incident and a particular part

15  of the prison is locked down while an incident is being

16  investigated, but not a half of a prison or an entire facility

17  or being told that there's some doubt about whether or not you

18  can even go to this facility because we don't know what's going

19  on there, or being hustled out of the facility because there's

20  violence taking place as we're preparing to conduct the tour.  I

21  don't recall that having happened under those circumstances

22  anywhere else.

23        MS. MENSCHEL:  Your Honor, may I have a moment?

24        THE COURT:  Yes.

25    (Brief pause in the proceedings)

1   BY MS. MENSCHEL:

2   Q.   Dr. Haney, how many facilities did you visit during your

3   inspections in Alabama?

4   A.   Eight.

5   Q.   I would like to go through your inspections a little bit.

6       What was the first -- actually, and if it's helpful to you,

7   feel free to refer to your report at any time.  What was the

8   first facility you visited?

9   A.   The Tutwiler facility for women.

10  Q.   When was that?

11  A.   The first -- I was there two days, and it was in September.

12  September 14th and 15th of 2015.

13  Q.   Briefly, what did you do during your inspection at Tutwiler?

14  A.   I first toured the facility.  In the course of touring the

15  facility, I typically talked to some of the women in the various

16  units that I saw and made observations about the living

17  conditions.  I asked questions in the course of the cell-front

18  interviews about whether or not they were on the mental health

19  caseload; what kind of mental health treatment or attention they

20  were getting in the institution.  Then also made notes about

21  people who I might like to interview in more in depth the next

22  day.

23      When I went back the second day, that day consisted almost

24  entirely, as I recall, not of any inspections, but of individual

25  confidential interviews with prisoners, either prisoners who I

1  had seen the day before or prisoners who I had picked from a

2  list.  I think there may have been one or two prisoners who

3  plaintiffs' counsel suggested that I interview.

4  Q.  Dr. Haney, I'd like to show you Plaintiffs' Demonstrative

5  Exhibit 44.

6           MR. MUJUMDAR:  Your Honor, may I approach?

7           THE COURT:  Yes.

8           MR. MUJUMDAR:  Where would Your Honor like the exhibit

9  set up?

10          THE COURT:  Let's see.  Yes, that's fine.  If the

11  witness can see it, I know I can see it.

12          MS. MENSCHEL:  Your Honor, just for clarity --

13          THE COURT:  Oh, you're going to have it up here.

14          MS. MENSCHEL:  As we're going through facilities, I

15  will be asking Dr. Haney to describe certain photos that come up

16  on the screen, but I would like to have the facility diagram

17  also in poster board in case you have questions or we need to

18  refer to the map itself.  But most of his testimony will be

19  related to the photos that will be on TrialPad.

20          THE COURT:  Very good.

21  Q.  Dr. Haney, do you recognize what's on the screen before you

22  or to your left?

23  A.  I do.  It's a diagram of Tutwiler Correctional Facility for

24  Women.

25  Q.  I'd like to talk a little bit about Tutwiler.  As I think

 1  you mentioned a moment earlier, Tutwiler is the main facility

 2  for women; is that right?

 3  A.  Correct.

 4  Q.  During your inspection, did you look at the intake system at

 5  Tutwiler at all?

 6  A.  Yes, some of it.  I was walked through it.  I was touring

 7  with another expert, and we -- I believe the first area that we

 8  went or one of the first areas we went was the intake area.

 9  Q.  Did you have any impression of the intake area?

10  A.  Only that it was a congested area, and there was a lot of

11  activity taking place in that area.  Otherwise, I didn't have

12  any particular observations about it.

13  Q.  Did you see any general population dorms at Tutwiler?

14  A.  I did.  I did.  I saw a number of them.

15  Q.  Can you tell us a little bit about your impression of the

16  general population dorms.

17  A.  They were unremarkable.  They're dormitory housing units.

18  You know, they varied in quality and the level of upkeep, but

19  there wasn't anything --

20          THE COURT:  Would someone mind just pointing out these

21  areas?

22          MS. MENSCHEL:  Certainly.

23          THE COURT:  Just where you're talking on the chart.

24          THE WITNESS:  Do you want me to try to do that?

25          THE COURT:  I think I know where the entrance is, and

 1  I'm not sure where the intake area is.

 2          MS. MENSCHEL:  Your Honor, I believe that the area

 3  that's currently highlighted is the intake area.  And general

 4  population dorms are in a variety of places around the facility.

 5  Q.  Did you visit the mental health unit at Tutwiler?

 6  A.  I did.  Yes.

 7  Q.  If you look to the right of the map --

 8  A.  Yes.

 9  Q.  -- the part that's highlighted right now, do you know if

10  that's the mental health area at Tutwiler?

11  A.  It is.  The large area in the center is a dorm room.  I'll

12  try to do this more effectively.  There's sort of a large

13  rectangle in the center there of that area.

14  Q.  You can actually touch the screen.  I think it will mark it.

15  A.  Higher tech than I'm used to.

16      So that's a large RTU, residential treatment unit.  These

17  individual cells over here are stabilization unit cells

18  adjoining that area, and this whole larger area is the mental

19  health area at the institution.

20  Q.  Did you visit all of those areas?

21  A.  I did, yes.

22  Q.  I'm going to show you Plaintiffs' Demonstrative Exhibit 51.

23  A.  Yes.

24  Q.  Dr. Haney, do you recognize this photo?

25  A.  I do.

1   Q.  What do you understand this to be?

2   A.  It's a photograph of the stabilization unit which also is

3   sometimes used as a segregation overflow unit.  That's the unit

4   that I showed you in the previous diagram that adjoins the RTU

5   in Tutwiler.

6   Q.  What was your impression of the stabilization unit at

7   Tutwiler?

8   A.  It was surprisingly stark and severe.  I understood it to be

9   a kind of transitional housing unit for prisoners who were

10  transitioning out of crisis and perhaps into residential

11  treatment, and it was in stark contrast to the RTU, which was

12  just next door.  It really looked and felt like a -- it felt

13  unusually like a segregation unit.  I subsequently learned that,

14  in fact, it did double as a segregation unit at the facility;

15  that oftentimes if there were too many women who were placed in

16  segregation, they brought them to the stabilization unit and

17  housed them as segregation prisoners.

18      This was my first experience with this, both with the

19  stabilization unit and in the doubling of function of a

20  stabilization unit as a segregation overflow unit.  But as I was

21  about to learn, this was not an uncommon practice in the system.

22  Q.  You said that the stabilization unit was stark and severe, I

23  believe.  Can you explain what you mean by that a little bit.

24  A.  Well, it's not a particularly therapeutic environment.  It

25  really looks like a segregation cell.  The cells are sparse.

1  There's virtually nothing in them.  The unit itself is, as you

2  can see, very severe.  You know, it's clean, this one is

3  clean -- many of them are not -- but it's -- nonetheless, the

4  prisoners are locked in their cells.  You know, there's not an

5  area for them to easily venture out of their cell.  It's not a

6  very accommodating place even if they were to.

7      And, again, not surprisingly, it does function as a

8  segregation unit.  That's more or less the way it's

9  architecturally constructed.  That's what it looks like.  That's

10  what it feels like.

11  Q.  You mentioned that it was sometimes used for segregation

12  overflow.  Do you have any sense of whether it was being used

13  for segregation overflow during your tour?

14  A.  I believe it was.  There were, I think, a couple of inmates

15  in there who were there not because they were stabilization unit

16  inmates, but rather because they were in segregation.  It was

17  certainly a very common practice elsewhere in the system.

18  Q.  Did you also inspect the segregation unit at Tutwiler?

19  A.  I did.

20  Q.  I'm going to show you Plaintiffs' Demonstrative Exhibit 48.

21  Do you recognize this photo?

22  A.  I do.

23  Q.  What does this represent?

24  A.  It's one of the cell doors that is to the cells in the

25  segregation unit.  There is a row, long row of segregation -- I

1    don't think we pointed it out to the Court on the diagram, but

2    the segregation unit is separate and apart from where the mental

3    health unit is.  It's in a sense almost at the other end of the

4    facility.  And there is a row of cells in which prisoners are

5    confined for segregation.  Some of them are double celled,

6    actually, which is an unusual practice.  I spent a fair amount

7    of time interviewing the women who were in these cells and also

8    subsequently interviewed a number of them the next day on a

9    confidential basis.

10   Q.  What do you mean when you say double celled?

11   A.  I mean there was more than one woman in the cell.

12   Q.  Why is that unusual, if you know?

13   A.  Well, it's not unheard of, but it's generally a questionable

14   or frowned-upon practice.  And perhaps the reasons are obvious,

15   but prisoners who are in segregation or isolation are under the

16   stress of being confined in their cell 23 or so hours a day.

17   That is, in and of itself, difficult to do.  It's difficult to

18   exist that way for any long period of time.  To have another

19   person in an environment like that then adds the additional

20   stress of being in the presence of somebody else who is isolated

21   and in the cell 23 hours a day.  That's a very delicate balance

22   that few people can actually manage.  Even if you were to be

23   able to pick the person with whom you were double celled, you

24   might imagine what it would be like to be locked in the bathroom

25   with your closest friend for any period of time.  It would be

1  difficult, even if it was your closest friend.  Prisoners are

2  not typically locked up together with their closest friends, so

3  being in these cells is oftentimes difficult or stressful.  I've

4  sometimes said that prisoners who are in isolation and double

5  celled are both overcrowded and isolated at the same time

6  because they have sort of the worst of both worlds impacting

7  them.

8  Q.  Looking at the plaintiffs' demonstrative exhibit that's in

9  front of you, number 48, can you describe what's in front of the

10 door there and why, if you know?

11 A.  There's a fan there, and it's because the cells get hot and

12 the ventilation system doesn't work very well.  So the women

13 request, and this is an example of the fan being put in front of

14 the cell to ventilate the cell.  I was there in September, and

15 it was quite hot the day I was there.

16 Q.  In your experience, would heat or the temperature of a cell

17 have any impact on mental health?

18 A.  Well, it certainly can.  I mean, obviously, it adds to the

19 stress of the environment and adds to the stress of the

20 confinement.  One of the problems with temperature, which seems

21 like -- may seem like an incidental issue, with prisoners who

22 are in isolation is that that cell environment and that cell

23 temperature is all they have.  That's what they're going to

24 experience today.  And even if cells in general are not well

25 ventilated, and that's a bad thing wherever it happens,

 1  prisoners are typically not in their cells all day.  So, you

 2  know, they really only have to worry about what the temperature

 3  is in their cell for the portion of the day that they're there.

 4  So if it's too hot or it's too cold, you tolerate it for the

 5  number of hours you're in your cell.

 6       But when you're in your cell literally around the clock,

 7  that becomes a very -- that can be a very oppressive part of

 8  your environment, either you're freezing or you're boiling hot,

 9  and that is a pressure or a stress on you that mentally ill

10  prisoners, of course, react to.

11  Q.  I'm going to pull up Plaintiffs' Demonstrative Exhibit 44,

12  which is the facility map.

13       Dr. Haney, in your tour, do you believe that the area that's

14  highlighted there is the segregation unit?

15  A.  Yes.  That's the unit I was talking about.  You can see a

16  row of cells in kind of an L shape, upside down L.

17  Q.  Did you inspect the medical unit during your visit to

18  Tutwiler?

19  A.  I did.

20  Q.  I'm going to pull up Plaintiffs' Demonstrative Exhibit 46.

21  Do you know what this is?

22  A.  It's the entrance to the infirmary.  Yes.

23  Q.  What role does the infirmary play at Tutwiler?  That may

24  be --

25            THE COURT:  Where is the infirmary on the map?

```
 1              THE WITNESS:  It's at the end of a hallway, Your Honor.
 2   So you walk down that hallway, and the infirmary is down at the
 3   end of that.
 4              THE COURT:  I realize that, but on the map -- where are
 5   we looking on the map?
 6              THE WITNESS:  Oh, I'm sorry.  On the map.
 7              MS. MENSCHEL:  I believe that's the infirmary, Your
 8   Honor.
 9              THE COURT:  What hallway is that that we were looking
10   at a moment ago?  I was just wondering where that long hallway
11   was.  I don't see it there.
12              THE WITNESS:  I think it's a larger area.  Yes.
13              THE COURT:  Oh, that's the long hallway there?  Okay.
14   Thank you.
15              THE WITNESS:  I actually think it's -- I'm actually not
16   sure that's quite it.  I actually think the hallway is this --
17              THE COURT:  You can touch the screen.
18              THE WITNESS:  Okay.  I think we were looking at this
19   area, I think.  Not that.  Yes, because there were -- the cells
20   that adjoin that hallway are segregation cells, and I think
21   that's -- the hallway that you were showing me is right there.
22   So I think we were looking down that --
23              THE COURT:  Where is the infirmary that you said was at
24   the end of the hallway?
25              THE WITNESS:  If you kept walking straight, it would be
```

1   at the very end, like right up here.

2          THE COURT:  Right.  There.  Okay.  I thought they were

3   showing the other section for a second.

4          MS. MENSCHEL:  I apologize for that, Your Honor.  The

5   hallway that that photo, which I'll pull up again in a moment,

6   is taken from is where the very bottom arrow is, I believe, kind

7   of looking down that hallway.

8          THE COURT:  I think I understand now.  You were just

9   showing the other -- I think you were showing a totally

10  different area, and that's what was confusing me.

11         MS. MENSCHEL:  I apologize for that, Your Honor.

12  Q.  Going back to Plaintiffs' Demonstrative Exhibit 46, I

13  believe you just said something about segregation cells.

14  A.  Yes.

15  Q.  Were there segregation cells in the infirmary?

16  A.  Yes.  Well, yes.  Technically, they were in the infirmary.

17  They were in the hallway that led to the infirmary.  So as

18  you -- sick call was in that hallway.  So there were -- the day

19  we were there, there were prisoners in the hallway on sick call.

20  Some of them sitting on the benches and so on leading up to the

21  infirmary, waiting to be seen by the nurse or the doctor.

22       But on the right-hand side, there are -- there's a smaller

23  hallway behind a door.  Behind that door are a series of

24  individual cells that are used as segregation cells.

25  Q.  Going back to the facility map, can you identify the cells

1    you're talking about on that map?

2    A.   Behind that -- behind that partition that says corridor.  So

3    there is a main corridor.  That's the view you just saw.  Then

4    there is a door and there is a smaller, narrower corridor that's

5    listed on the map right before the cells, and you can see there

6    is a row of five cells.  Those are the cells I'm talking about.

7    Q.   Could you see, as far as you remember, from the hallway we

8    were just looking at into where the cells were?

9    A.   Yes.  That's actually how I knew the cells were there.

10   That's how I saw the cells.  We went down to the infirmary.  We

11   went down to the infirmary, and as we walked down the hallway,

12   we passed large windows.  Behind those windows was this small

13   narrow corridor, and I could see cells and some women at the

14   doors of the cells that we passed by.  I first thought that

15   perhaps they were also part of sick call, but I subsequently

16   learned when we came back that these were also segregation

17   overflow cells.  And I actually went back and interviewed some

18   of the women who were there.

19           MS. MENSCHEL:  I'd like to pull up Plaintiffs'

20   Demonstrative Exhibit 47.

21   Q.   Do you recognize this picture?

22   A.   Yes.  That's exactly what I meant.  That's the view from the

23   infirmary sick call hallway through those windows back to those

24   cells.

25   Q.   How did you find out what those cells were used for?

1   A.  I believe I asked to go back and interview the women who

2   were back there.  I think -- as I remember it, thinking that

3   they were sick call, waiting for sick call, and I was curious

4   why they were in cells rather than sitting out on the benches.

5   And then I learned that, in fact, they weren't waiting for sick

6   call.  They were in segregation.

7           MS. MENSCHEL:  I'd like to pull up Plaintiffs'

8   Demonstrative Exhibit 52.

9   Q.  Do you recognize this photo?

10  A.  I do.

11  Q.  What is that?

12  A.  That's the hallway where the segregation cells are.  So as

13  you look at that photograph, to the right is the infirmary sick

14  call hallway leading to the infirmary.  Then to the left are the

15  segregation cells themselves.

16  Q.  What was your impression of this unit being used for

17  segregation?

18  A.  I thought it was bizarre and problematic, frankly, in

19  several different ways.  I mean, it -- anybody going to sick

20  call, obviously, observes different women in segregation, locked

21  behind the segregation bars.  The women in segregation who are

22  housed in those cells, essentially around the clock, look out

23  the windows at people who are going to sick call.  It was just a

24  strange combination of people.  It's the kind of thing that you

25  wouldn't -- I don't think anybody would thoughtfully design a

 1  unit like that.  It appeared to be kind of an expedient.  There

 2  were these cells and there was a place, and there was too many

 3  people in segregation, so they ended up getting stuck in this

 4  unit.  But this is certainly not the kind of place that you

 5  would pick or design for such a purpose.

 6          MS. MENSCHEL:  I'd like to pull up -- we looked at it

 7  earlier -- the Demonstrative Exhibit 48.

 8  Q.  What was your impression of the segregation unit

 9  specifically at Tutwiler?

10  A.  They were severe segregation units.  There's no evidence in

11  these units of the possibility of there being any activity

12  taking place on the units themselves.  They're not designed in

13  such a way that there could be any kind of day room activity for

14  the women to engage in.  And of course, it turns out that they

15  don't.  They don't have the opportunity to do that.  So they

16  really do spend their lives living in these cells, with the

17  exception of the time when they're allowed out into the small

18  yard that adjoins the cell -- that adjoins the area.  Not the

19  cells.  But even that tends -- it turns out is not often

20  utilized.  The women described to me when I interviewed them

21  that many of them said that even though it was difficult for

22  them and oppressive -- and I should add many of them were

23  mentally ill prisoners -- that it was difficult and oppressive

24  for them to stay in their cell around the clock, that they

25  nonetheless did that because when they were given the

1    opportunity to go out to the yard, they were placed in

2    restraints and they were left in restraints when they were out

3    on the yard.  And the women said that that was just -- it was

4    difficult and degrading.  And so even though it was difficult to

5    be in their cell around the clock, they would forego the

6    opportunity to go out to yard where, as I said, they would be

7    out there by themselves and they would be in restraints.

8    Q.  What is your opinion about people going out to the yard in

9    restraints?

10   A.  Well, my opinion is that people in segregation should go out

11   to the yard as much as they can, but they should not be placed

12   in restraints because being placed in restraints defeats the

13   purpose of having them go out into the yard.

14   Q.  How so?

15   A.  Well, it gives them an opportunity to breathe some fresh

16   air, perhaps, but little else.  And many people, not just women

17   but men as well, find it degrading to be out in the yard in

18   restraints.  You can't freely move around.  You certainly can't

19   exercise.  And so not surprisingly, people who are given that

20   opportunity oftentimes basically relinquish it and don't leave

21   their cells at all, which is problematic.

22   Q.  Why is it valuable -- this may be an obvious question -- to

23   have the opportunity to go out on the yard or to have yard time?

24   A.  Cell confinement is oppressive for people.  It's especially

25   oppressive for people who are mentally ill.  Anything that can

1  be done to alleviate that is positive, especially if prisoners

2  will avail themselves of it.

3      So going out to the yard is an example of that.  Yard time

4  is invaluable -- is an invaluable release for people who are

5  confined in isolation or, as it's called in Alabama,

6  segregation.  It alleviates some of the stress of being confined

7  in your cell.

8      These cells, you can imagine perhaps what it would be

9  like -- what a small space like that would feel like and smell

10  like if a human being was confined in an area the size of, say,

11  a king sized bed or a parking space around the clock.  So the

12  cells tend to get dirty.  They tend to get dank.  The air is

13  dank.  So getting outside is an opportunity to breathe fresh

14  air; to see the sunlight.  So it's a positive experience

15  unless -- unless somehow the prison turns it into a negative

16  experience, which is, frankly, what the women described to me.

17  Q.  Did you believe, based on your inspection and interviews at

18  Tutwiler, that women at Tutwiler were at a substantial risk of

19  serious mental health harm?

20  A.  Yes.

21  Q.  How so?

22  A.  There are women who are on the mental health caseload at

23  Tutwiler.  Many of them are in the segregation units.

24  Disproportionate number of them, in my opinion.  I

25  interviewed -- I think the day I was there, I interviewed

1    eight -- the two days I was there, I think I interviewed eight

2    women from the segregation unit, most if not all of whom were on

3    the mental health caseload.  Placing mentally ill prisoners in

4    those units under those circumstances places them at substantial

5    risk of harm.

6        The stabilization unit I've already described.  It is really

7    not much different in terms of the way it's structured and the

8    way it's run from a segregation unit.  And, indeed, as I said at

9    the very outset, it is actually used as a segregation unit when

10    there are too many women in segregation and there's space in the

11    stabilization unit.  So those women also are at risk of harm.

12            MS. MENSCHEL:  Your Honor, at this time I would ask to

13    move Plaintiffs' Demonstrative Exhibits 46, 47, 48, 51, and 52

14    into evidence.  Those are the photos that we just went through

15    from Tutwiler.

16            THE COURT:  Admitted.

17            MS. MENSCHEL:  46, 47, 48, 51, and 52 were also

18    discussed with witness K.N. last week.  I would also ask to move

19    Plaintiffs' Demonstrative Exhibit 44, which is the facility map,

20    into evidence under seal.

21            THE COURT:  Admitted.

22    Q.  Dr. Haney, during your site inspections, did you visit

23    Holman?

24    A.  I did.  Three times.

25    Q.  Why three times?

1  A.  The first time I visited, I was able only to tour part of

2  the segregation unit and to conduct some interviews.  I was not

3  able to conduct the number of interviews that I expected to be

4  able to conduct, partly because I was told that some of the

5  people I wanted to see were not willing to talk.  So I

6  believe -- and this is my belief, so I may be inaccurate -- that

7  the lawyers for both sides renegotiated a second visit for me to

8  return to Holman to be able to see the part of the segregation

9  unit that I hadn't seen, the third floor of the unit, and I

10 believe also to engage in some additional observations in the

11 segregation unit and then to interview additional people who I

12 hadn't been able to interview when I was there originally.

13     That was the visit that was terminated just literally as it

14 began.  So we got inside the prison, but we never even got to

15 the segregation unit, and that visit was terminated.  I went

16 elsewhere.

17     I returned to Holman a third time to do some follow-up

18 interviews with some of the prisoners who I had tried to

19 interview even from the very first time I was there and then the

20 second time, and I finally did get to interview some of them the

21 third time I was there.

22 Q.  Were you ever able to conduct an inspection of the part of

23 the facility that you were not able to conduct the first time?

24 A.  Never.

25 Q.  Based on your inspections and interviews at Holman, do you

1   believe that mentally ill prisoners at Holman are at a

2   substantial risk of serious harm?

3   A.   Yes.  Absolutely.

4   Q.   Why?

5   A.   The conditions of the Holman segregation unit are really

6   difficult to capture in words.  The first day I went there that

7   I was able to at least inspect the unit was for me a very

8   memorable experience because I'm not sure I had ever seen a unit

9   quite like that or had quite that kind of an experience.

10          When I toured the unit, when I entered the segregation

11   area -- and I know you have a photograph and a diagram, but it's

12   a very large area.  It's kind of a V-shaped area.  There was a

13   smell of burning paper or something burning or there had been

14   fires in the unit that had been set.  And that smell was in the

15   air, and there was the faint smoke still lingering in parts of

16   the first floor of the institution.

17          As I entered the institution, I could hear a din of noise

18   and yelling.  And I was allowed to walk down the middle of

19   the -- of each of these -- of the V-shaped units in the middle

20   of the unit but not approaching any of the cells.

21          There was a kind of bedlam environment.  There was

22   screaming, shouting, people yelling, "please help me."

23   Prisoners holding up cards on the windows of their doors saying

24   "help me."  "Look at my medical file" was another big note on

25   the door.  And I walked down the other hallway, and the same

```
 1   thing happened or the same -- there was the same atmosphere.

 2        When I went to the second floor, it wasn't quite as loud on

 3   the second floor, there wasn't quite as much noise at all, but

 4   it -- there were prisoners -- that hallway on the second floor

 5   is narrower, so I was -- of necessity, I was a little closer to

 6   the cells than I was on the first floor, which was a wider

 7   hallway.  You know, I could see inside the cells and see how

 8   disheveled the cells were.

 9        I saw one prisoner who appeared to be in significant

10   distress.  He came to the door.  Appeared to want to talk to me.

11   As I passed his cell, a correctional officer took my arm and

12   moved me around the puddle of urine that was out in front of his

13   cell.  That's when he told me I couldn't go up to the -- when I

14   asked about why I couldn't go to the third floor, he said, "It's

15   too dangerous up there."  It was a -- even for somebody like

16   myself who sees many, many of these places and has been doing

17   this for decades, it was a shocking experience.

18        Another part of it -- there was an empty cell on the first

19   floor, and I thought -- there was some yellow tape over it, and

20   I thought perhaps it was being repaired.  So I asked if I could

21   go inside to inspect it, and I was very quickly told no.

22   Eventually they found another cell that was not occupied, and I

23   was able to go in it.  I know you have some photographs of the

24   empty cells.  But it turned out that that cell with the yellow

25   tape across it was a cell in which a prisoner had committed
```

1    suicide a few days before, and it was a crime scene on the first

2    floor of the -- a potential crime scene on the first floor of

3    the facility.

4    Q.  I'd like to ask you a lot of questions about all of the

5    things you just said and certainly come back to the prisoners

6    who committed suicide either later today or tomorrow.

7         So I'd like to start with segregation.  Plaintiffs'

8    Demonstrative Exhibit 118.  What does this photo depict?

9    A.  That's the entrance, the first floor entrance to the

10   segregation unit as you walk into the unit.

11   Q.  When you walk in, I think you described a V shape.  Pulling

12   up Plaintiffs' Demonstrative Exhibit 119, what does this show?

13   Can you explain this photo to us?

14   A.  Yes.  That's the point of the V.  As you walk into the unit,

15   you go to either side.  It's both sides, the first floor of the

16   segregation unit, and that's the correctional officer station in

17   the middle.  There are floors above it, three more tiers, that

18   are open.  You'll see this in a moment.

19          MS. MENSCHEL:  Plaintiffs' Demonstrative Exhibit 120.

20   Q.  Can you explain what this -- the three tiers in this photo?

21   A.  Yes.  So this is what I was describing as the first floor of

22   the segregation unit.  There are three tiers, so two tiers above

23   it.  And when I toured both sides of the first floor, I was told

24   to stay in the middle of the floor.  But you can see on the

25   second tier that obviously, you can't -- the middle is just --

 1  really sort of adjoins the cell.  So you have a better vantage

 2  point looking into the cell and seeing the prisoners as you walk

 3  on the second floor and I would assume on the third floor as

 4  well.  And this is -- you know, you can see from the photograph,

 5  this is a large unit.  There's -- if I recall correctly, there

 6  are about 250 or so prisoners in all three of these tiers, both

 7  sides.

 8      You can't see it here.  We have other photographs of the

 9  disrepair of the cells themselves.  This red device on the cell

10  in the bottom left is a -- it's called different things in

11  different systems.  Some systems call them food tray extenders.

12  I'll describe the function, and you can see why it might be

13  labeled that.

14      In instances where prisoners -- so prisoners who are in

15  segregation live in their cells, which means that they sleep in

16  their cells, they use the bathroom in their cells, and they eat

17  in their cells.  That means that they have to be brought food,

18  so food trays are delivered to them.  Different systems in

19  different places.  Sometimes it's a sack lunch or a tray.  But

20  if it's a tray, it's usually one tray and oftentimes two a day,

21  it has to be brought and then the tray has to be taken back.

22      Sometimes prisoners are disruptive in the course of that

23  exchange.  They may want to hold their tray.  They may jostle

24  the tray with the officer when they're getting it or when

25  they're giving it back.  They may use it as a opportunity to

 1  push the tray out and spill the food on the officer or whatever.

 2  So they're disruptive in the course of those interactions.

 3      Sometimes what prison systems do in order to address that

 4  problem is they install these food tray extenders.  And the way

 5  this works is that the -- this -- the part of this device which

 6  is -- adjoins -- this part right here has a slot that covers the

 7  prisoners' -- the tray opening to the cell.  So an officer would

 8  come, put the tray on the outside, close that slot here, and

 9  then open the slot that allows the tray to be taken by the

10  prisoner into the cell.  After the prisoner has eaten the meal,

11  then he puts the tray back on the slot.  When it's time to

12  collect the trays, he puts the tray back on the slot.  The

13  officer closes the part to the prisoner's cell door and then

14  opens the part out here and takes the tray.  So it sort of puts

15  the prisoner three feet farther back back into the cell in order

16  to deal with this issue of the conflicts that can occur in the

17  exchange of the trays.

18  Q.  Does that have any impact on people's mental health, any

19  additional impact on people's mental health?

20  A.  Well, it's further isolating.  I mean, it's -- I mean, this

21  sort of -- think about it as extending the wall between this

22  person and the rest of the environment and other human beings in

23  that environment.  You know, it's not unheard of.  It's not the

24  only place where I've seen these.  It's certainly not an ideal

25  way to deal with a problem.  But in instances -- I mean,

1  correctional officers sometimes decide that's the only way they

2  can deal with it.

3  Q.  Was this the only one you saw during your tour of Holman,

4  your inspection of Holman?

5  A.  I think there were others.  I don't think that was the only

6  one.  I think there were a couple.  You can see from looking

7  down here -- there might be one at the end of the hallway there.

8  I'm not sure.  I think I saw a few of them.  But certainly this

9  one was obvious.

10  Q.  Dr. Haney, on the right-hand side of this photo, about -- I

11  think on the first floor, the second door down, which I think

12  we're going to blow up there, do you see that kind of yellow

13  thing?

14  A.  I do.

15  Q.  Do you know what that is?

16  A.  That may be the cell that I was talking about earlier that

17  had the tape over it that I mistakenly thought was a cell that

18  was being repaired, but, in fact, was a cell in which someone

19  had recently committed suicide.

20  Q.  You touched on this earlier, but what was your opinion of

21  this unit, of the segregation unit?

22  A.  That it's horrible.  That's, I guess, not a technical enough

23  term.  But it is -- it is a chaotic, tumultuous environment

24  where I believe it would be difficult for even a mentally

25  healthy person to survive for very long without suffering the

 1   negative effects of being confined there.  But certainly for a

 2   mentally ill person, it would be an intolerable environment to

 3   be housed.

 4          THE COURT:  Are we talking about mentally ill or

 5   seriously mentally ill?

 6          THE WITNESS:  I'm talking about just mentally ill, Your

 7   Honor.  I think a person seriously mentally ill, to be sure, but

 8   a person on the mental health caseload would find this

 9   environment an intolerable environment to be in for a very long

10   period of time.

11   Q.  Dr. Haney, you talked about the condition of the cells.  I

12   would like to show you Plaintiffs' Demonstrative Exhibit 121.

13   Can you describe what's in this photo.

14   A.  These are photographs of various cells in the Holman

15   segregation unit that we were just looking at.  You can see a

16   number of things here.  On the outside of the cells you can see,

17   first of all, the disrepair of the cell doors.  You can see

18   evidence of fires having been started.  I was told -- I learned

19   from a number of prisoners who I interviewed that it was common

20   for fires to be started in this unit.  And certainly the

21   aftereffects of those fires were evident on a number of cell

22   doors.

23       This is a sample of them.  We took a lot of photographs.  I

24   selected just some as illustrations.  These are not the only

25   ones that looked like this.

1    The other thing about these cells, and I think there may be

2 some other photographs of this, these are difficult cells to

3 look into.  So this is another part of the problem with

4 putting -- really, frankly, putting anybody in these cells, but

5 putting a mentally ill, seriously mentally ill or not prisoner

6 in these cells, because it's very difficult to monitor prisoners

7 in there.  These are small windows.  You can see that the

8 windows themselves are oftentimes discolored.  In some

9 instances -- I think there's a photograph later of the glass

10 having been shattered or cracked.  But even when it's not

11 shattered or cracked, it's a very small opening.  And because of

12 the lighting in the cell, it's difficult to see inside.

13    So these are really dangerous cells to put people in because

14 of how -- first of all the general atmosphere in this unit, but

15 then, secondly, in combination, the difficulty of monitoring

16 people once they're confined inside.

17         THE COURT:  What do you mean?  Because you can't see

18 through the window?

19         THE WITNESS:  Yes, Your Honor.  Exactly.  So you

20 can't -- it's hard to be -- you would really have to go up to

21 the window and look in and purposely look in and look hard to

22 see what's going on inside some of these cells.  And you'll see

23 some of them actually have coverings over them, so it's

24 impossible, even, to see in them.

25         THE COURT:  Covering over the window?

1            THE WITNESS:  Yes.

2    BY MS. MENSCHEL:

3    Q.  If there was no covering over the window, from your

4    recollection, how far would you have to be in order to see into

5    the cell windows at Holman in this unit?

6    A.  Well, in some of them you would have to peer directly into

7    it.  Some of the cells above had a little bit better lighting,

8    my recollection was, but you would have to peer directly into

9    them in many instances.  Many of the cells were very dark.  Many

10   of the prisoners told me that the light switches didn't work in

11   their cells.  I interviewed a prisoner who said he lived in the

12   dark because the light switch was broken and he -- when the sun

13   went down, he was in a dark cell.

14   Q.  You also talked about fires in the unit and on these doors,

15   the evidence of the fires.  What does -- if there is a fire in

16   the unit, what, if anything, does that indicate to you about

17   prisoners' mental health?

18   A.  It reflects a level of desperation.  It is a last-ditch

19   effort to get attention; to make a statement.  And it is done --

20   it's an act of desperation.  There is no other -- there's no

21   benefit anybody really gets from lighting a fire except to

22   somehow express their anger; express their level of desperation.

23   Q.  You said to get attention.  Who would they be trying to get

24   attention from?

25   A.  Get attention from the staff.  To get attention from either

 1    the mental health or the correctional staff.  Basically, it is

 2    basically a desperate way to say, I have some significant need.

 3    It may or may not be a mental health need, but it may be

 4    something that they feel that is important to them that's been

 5    ignored.  And they -- you know, it might be a prisoner who's

 6    asked on multiple occasions and finally, in an act of

 7    desperation, does something like that to force the correctional

 8    staff to attend to them and to engage in some sort of

 9    interaction.

10    Q.  I think you said earlier that you went into some of the

11    cells.

12    A.  I did.  I went into -- I was able to go into one or two

13    cells that were occupied and one or two cells that were empty.

14    Q.  I'm going to pull up Plaintiffs' Demonstrative Exhibit 122.

15    Do you recognize this photo?

16    A.  I do.

17    Q.  Can you describe what is included in this exhibit.

18    A.  These are photographs of the interior of the Holman

19    segregation unit cells, some of them.  These are, obviously,

20    occupied cells.  I believe these were photographs that were

21    taken from the window, which is why there's a little bit of

22    discoloration on the photograph itself.  So I think we took

23    these photographs from the outside window looking in.  I don't

24    think the cell door was open.  We have some other photographs

25    where we were inside the cells.

1       And, you know, again, just to emphasize what I said earlier,

2    I mentioned before these photographs were up there to imagine

3    what it would be like to live around the clock in a small space

4    and basically to be -- to be confined in that space for all of

5    your daily and bodily functions and what that would -- what a

6    cell would look like if someone was confined in that way and

7    what -- you can imagine by looking at it perhaps what it would

8    feel like and what it would smell like.  And that certainly --

9    these photographs underscore what existence is like in cells

10   like that in a unit like that one.

11   Q.  What concerns you about these particular cells that you're

12   looking at right now?

13   A.  Well, they are very dark.  They are very cramped.  They

14   begin -- you know, particularly on the ones where you can

15   actually see enough of the walls and so on, you can see that

16   they are in disrepair.  The plaster is worn off.  You'll see

17   some other ones in which there's a strange material on the

18   walls.  They are difficult cells to keep clean.  These are old,

19   deteriorated cells, which, again, makes it difficult for

20   prisoners to keep them clean.  It makes it difficult to keep

21   insects and rodents out of these cells.

22       And then you can see the cell on the left, I mean, you

23   really can see what starts to look like a level of

24   disorientation and desperation on the part of the person who's

25   living there.

```
 1      One of the hardest things for people who are living in
 2  isolation is to maintain an orderly routine.  Because days --
 3  hours run into days, days run into weeks, weeks into months.
 4  And it requires a level of discipline, internal discipline, to
 5  impose a routine on yourself, and not everybody has that level
 6  of discipline.  And the longer you're there, the fewer people
 7  have it.  And so prisoners start to lose that orientation.  They
 8  start to lose that discipline and then can really fall prey to
 9  depression that overcomes people when they're in an environment,
10  living like that day after day, getting up, and that's basically
11  all they have; all they're surrounded with.
12          THE COURT:  We're going to have to stop here.  The
13  recess will be for an hour.
14          Counsel, would you mind just putting your papers,
15  especially counsel here and counsel here, just move them to the
16  side.  You don't have to remove them.  Just leave them because
17  we'll have other lawyers coming in.
18      (Recess was taken from 10:01 a.m. until 11:13 a.m., after
19       which proceedings continued, as follows:)
20          THE COURT:  Proceed.
21          MS. MENSCHEL:  Thank you, Your Honor.
22  Q.  Dr. Haney, before the break, we were talking about Holman
23  and the segregation unit.
24  A.  Yes.
25          MS. MENSCHEL:  I'd like to pull up Plaintiffs'
```

1  Demonstrative Exhibit 130.

2  Q.  Do you recognize this photo?

3  A.  I do.

4  Q.  Can you tell us about what's happening in this photo.

5  A.  It's one of the doors that I referred to earlier that had a

6  broken and covered window on the exterior or the outside of the

7  door, making it virtually impossible for anyone to see inside

8  the cell.  We were talking earlier about the cells generally

9  being difficult, but this makes it impossible.

10  Q.  Can I ask you to just speak into the microphone a little

11  bit.

12  A.  Yes.  I'm sorry.  I'll move my chair up.

13  Q.  When you say covered, covered with what?

14  A.  Well, as I recall, that's a piece of paper on the other side

15  of that break in the window.  So it's covered from the inside

16  with what appears to be just a regular piece of brown paper.

17  And then, obviously, the glass is broken on the outside.

18  Q.  Was this the only such window you saw in the Holman

19  segregation unit?

20  A.  Well, it was the only one that looked exactly like that, but

21  there were some other ones that were covered as well.

22  Q.  Dr. Haney, I'd like to talk about Plaintiffs' Demonstrative

23  Exhibit 123.  Can you describe what's depicted in these photos.

24  A.  This is the interior of a cell.  This is one of the

25  unoccupied cells that I entered, and we were allowed to take the

1  photograph from the inside.  It shows I think the layout of the

2  inside of the cell without all of the property and possessions

3  inside so you can get a feel for the size of the cell.  You can

4  get a feel for the amount of space or the lack of space that a

5  prisoner has even before they bring their property into the

6  cell.  You can also see the level of disrepair of just the cells

7  in general, you know, as well as this material on the bunk, on

8  the wall.  This looks like either kind of a mold or perhaps a

9  burn or charring from a previous fire in the cell.  And it

10 underscores the level of disrepair generally in that unit.

11 Q.  So zooming on the picture that was on the left, the black

12 material, the black material that you were just talking about,

13 what did you understand that to be?

14 A.  Well, to be honest with you, I couldn't tell what it was.  I

15 didn't touch it.  It appeared either to be some kind of a black

16 substance, obviously, that either might have been a mold or a

17 charring from a fire that might have been started inside the

18 cell, and the charring would have gone up the side of the cell.

19 Q.  So earlier you talked a little bit about charring on the

20 outside of doors.  If it was charring -- and as you said, you

21 don't know exactly what it was.  If it was charring, what would

22 that indicate to you?

23 A.  Well, it would indicate a cell fire, a fire started inside

24 the cell, extremely dangerous for perhaps obvious reasons.  An

25 occupied cell would have property in it that would be flammable,

```
 1   so starting a fire inside of a cell is a very dangerous,
 2   potentially lethal or fatal thing to do.
 3   Q.  I would like to focus on the middle photo of this exhibit
 4   for a moment.  On the left you kind of see what appears to be a
 5   toilet.  Looking up at the very top above the toilet, can you
 6   tell what that is?
 7   A.  Yes.  It's a sprinkler head.
 8   Q.  Does anything about the layout in this cell concern you?
 9   A.  Yes.  It's extremely dangerous.  The sprinkler head is
10   positioned directly above the commode and the sink.
11           THE COURT:  Where is the sprinkler head?
12           THE WITNESS:  Right there.
13   A.  Which would allow a prisoner so inclined to climb on top of
14   the toilet, on top of the sink, and to fasten a ligature on the
15   sprinkler head and, obviously, to hang themselves if that was
16   what they were intending to do.
17   Q.  Did you see this general layout in any other cells you
18   visited throughout the ADOC system?
19   A.  Yes.  I saw it many times.  I didn't do an exact count, but
20   I saw it in many of the units, including in some of the
21   stabilization units that I saw in the system.
22   Q.  I would like to talk about how people occupy their time in
23   segregation.
24           THE COURT:  Let me just ask a question here.  We spent
25   a lot of time, well, before the break and now, talking about the
```

1    conditions of the cell.  Why is that relevant?

2            THE WITNESS:  Well, it's relevant, Your Honor, because

3    the conditions under which people are kept affect how they feel.

4    Mentally ill prisoners who are kept in desolate or degraded

5    conditions oftentimes are affected.  Their emotional states are

6    affected.  It exacerbates their deterioration.  It can

7    exacerbate depression.

8            It's particularly true in segregation units in which

9    this is, essentially, their environment.  They don't get out of

10   that environment.  They don't have any other therapeutic

11   activities outside of whatever exists inside their cell.

12           THE COURT:  Go ahead.

13           MS. MENSCHEL:  Thank you.

14   Q.  I would like to ask you a little bit about how people occupy

15   their time, as you just --

16           THE COURT:  Let me go back.  So how would you -- this

17   is Holman prison?

18           THE WITNESS:  Yes, sir.

19           THE COURT:  How would you overall describe the

20   conditions -- these are segregation cells.

21           THE WITNESS:  They are.

22           THE COURT:  How would you overall describe the

23   conditions of the segregation cells?

24           THE WITNESS:  They are degraded, dilapidated,

25   deplorable.

```
 1          THE COURT:  Go ahead.
 2   BY MS. MENSCHEL:
 3   Q.  Dr. Haney, I know we're going to talk about a number of
 4   other segregation units.  But specifically related to Holman, do
 5   you -- what do you think the impact is on the mentally ill or
 6   the seriously mentally ill who are housed in these segregation
 7   units?
 8   A.  Well, as I explained to His Honor a moment ago, the units
 9   themselves and the conditions inside these units have an impact
10   on anybody who's confined in them.  And when I see cells like
11   that, I'm obviously concerned about the mental health of anybody
12   who's in there, but especially because they're in there around
13   the clock, essentially.
14       A mentally ill prisoner has no other outlet.  They have no
15   other activities.  They have no other therapeutic activities.
16   They're in that cell.  That becomes their environment.  And it's
17   very easy for preexisting depression or preexisting other mental
18   conditions to worsen and exacerbate in an environment like that
19   absent any other outlets.  So they're basically absorbing that
20   environment, and they do it around the clock.
21   Q.  How do people occupy their time in segregation?
22   A.  Well, prisoner after prisoner described segregation as empty
23   time; as time when they have nothing else to do in their cell
24   but sit and exist in their cells.  They have very little
25   property which they are allowed.  They rarely get out, even for
```

1  yard.  In many of the units they talked about not getting yard

2  time for days or weeks at a time.  And that really is the only

3  structured, organized time, other than showers for a brief

4  period of time where they're taken out for showers, that they

5  get out of the cell at all.  So it wouldn't be uncommon for a

6  prisoner to be spending days at a time doing nothing other than

7  sitting in the cell, other than those few days a week when they

8  would get a few minutes out for a shower.

9  Q.  You talked about exacerbating mental illness.  If a person

10  is placed in segregation and does not have an existing mental

11  illness, is it possible that they will develop one?

12  A.  Yes.  It's not only possible.  I've seen it happen, and it's

13  one of the concerns that people like myself who study isolation

14  and segregation and solitary confinement have.  It's worse,

15  obviously, for the mentally ill, but it creates a risk of harm,

16  even for the otherwise mentally healthy, depending on the amount

17  of time and the conditions under which somebody's confined.

18          THE COURT:  What type mental illness could they

19  develop?

20          THE WITNESS:  Many times depression, Your Honor.

21  That's the most common.  That's the most common form of mental

22  illness.  But I've also encountered inmates who have developed

23  full-blown psychoses.  They lose contact with reality.

24          The other kind of common mental illness that gets

25  developed is an anxiety disorder.  If a person is in an

1    environment like this for a long period of time, denied an

2    opportunity to interact where they connect with other people,

3    they find themselves becoming overcome with anxiety when they're

4    around other people.  Other people become threatening to them

5    because they've lived for so long in the absence of people.

6         THE COURT:  So could someone develop a serious mental

7    illness as a result of being in segregation?

8         THE WITNESS:  Yes, they could.  I've seen it happen.

9    It certainly doesn't happen to everyone, and I'm not suggesting

10   that it does, but I have seen it happen.

11        THE COURT:  How would you know whether someone had

12   developed a serious mental illness while in segregation?

13        THE WITNESS:  So these are instances in which somebody

14   has no preexisting history of mental illness.  There's never

15   been an instance in which they've had a psychiatric appointment.

16   They never reported symptoms of any kind of psychopathology at

17   all, let alone serious psychopathology.  And I've encountered

18   cases in which those people have become floridly psychotic.

19        THE COURT:  How would you know that?  How would a

20   prison know that?

21        THE WITNESS:  Well, it would be very difficult to know

22   that absent a proactive monitoring, which is one of the things

23   that's so important about the risk of putting somebody in an

24   environment like this.  These are hard places for monitoring to

25   take place.  That's why I spent so much time talking about those

1  windows and how difficult it is to see in them.

2           Also, and perhaps this is what the Court is getting at,

3  prisoners who are in a cell don't do very much.  So it's hard to

4  tell when they're beginning to deteriorate.  All they really do

5  on a daily basis is sit in their cell, they eat, they use the

6  toilet.  That's basically their routine.  And when somebody

7  begins to deteriorate, it can take a long period of time before

8  anybody notices that they are deteriorating since there is so

9  little that they do on a daily basis.

10           THE COURT:  I know you have the view that you don't put

11  someone in segregation who has a serious mental illness; right?

12           THE WITNESS:  Yes.

13           THE COURT:  When would you know whether someone who

14  otherwise did not have a serious mental illness now does?  How

15  would anyone even be aware of that?  I know you said to be

16  proactive, but what does that mean?

17           THE WITNESS:  It means that mental health staff have to

18  reach out to people who are in segregation.

19           THE COURT:  What would they do?

20           THE WITNESS:  They would take them out of their cell

21  and evaluate them.  They would do the kind of intake evaluation

22  that otherwise might be done at the very outset of a prison

23  sentence, and they would do it periodically.

24           THE COURT:  What does periodic mean?

25           THE WITNESS:  Periodic means every month, every two

1  months, checking on people.  They also -- it also means that the

2  correctional staff have to be trained in identifying the signs

3  and symptoms of mental illness because custody staff is there

4  every day.  And so if they -- they have to be trained to monitor

5  the mental health of the people who are kept in segregation for

6  exactly this reason.  Because it is easy for people to begin to

7  deteriorate and nobody to notice it.

8         THE COURT:  Did you see any instances in any of your

9  investigation of, for lack of a better word, of the prisons in

10  Alabama, of someone actually deteriorating and developing a

11  serious mental illness as a result of being in segregation?

12  A.  I saw instances of people's mental illness being exacerbated

13  by those conditions.  I actually didn't spend a lot of time with

14  people who weren't already on the mental health caseload.  I

15  would have to look back in my notes and see if I could find

16  instances of people who weren't identified as being on the

17  mental health caseload but had begun to manifest what looked

18  like symptoms of psychiatric disorder while they were in

19  segregation, even though they hadn't had them beforehand.

20         THE COURT:  You didn't see that in any of your research

21  of the system?

22         THE WITNESS:  No, because -- in part because I wasn't

23  looking for it.  I was mostly concentrating on the people who

24  were already on the mental health caseload.

25         THE COURT:  Go ahead.

```
 1   BY MS. MENSCHEL:

 2   Q.  Dr. Haney, you just said that one of the ways to identify

 3   those cases would be to take people out of their cells

 4   periodically.

 5   A.  Yes.

 6   Q.  Would that be all people or only people who had been

 7   identified as mentally ill?

 8   A.  All people.

 9   Q.  Who should be taking them out of their cells to do those

10   evaluations, in your opinion?

11   A.  They should be taken out by a mental health professional,

12   trained to observe and identify symptoms of mental illness.

13   Q.  You talked a bit about the risk that somebody could

14   deteriorate.  How serious is the risk for some mental health

15   deterioration for somebody who is housed in segregation cells at

16   Holman, in your opinion?

17   A.  In my opinion, it's very serious in Holman and in cells like

18   them.  I saw signs of people deteriorating, moving back and

19   forth between a segregation cell, a stabilization unit cell, a

20   crisis cell, and cycling with no apparent improvement and

21   oftentimes deterioration of their mental illness.

22   Q.  You also talked about the monitoring.  Why isn't it good

23   enough -- why do you have to take people out of their cells as

24   opposed to doing segregation rounds, for example, in order to

25   identify people who have started to deteriorate?
```

1    A.   Because there is very little that you can tell.  Not

2    nothing.  I don't want to suggest you can't gather any

3    information from a cell-front interview, but especially when you

4    have -- if you have no preexisting relationship with someone.

5         So for example, to take His Honor's question, this is a

6    person who isn't on the mental health caseload, so there's no

7    history that you can relate to; that you can talk to them about.

8    You don't really know them other than what you can learn by

9    looking at them briefly at the cell front.  That's a very

10   limited amount of information.  It's better than nothing, and

11   those kinds of cell-front checks are important to do, but it's

12   also the case that you -- that it is hard to get a lot of

13   information.

14        You've probably already heard testimony about the reluctance

15   of prisoners to talk openly about problems that they may be

16   having.  That's true for mentally ill, but it's also true for

17   nonmentally ill people.  People not on the caseload.

18        So periodically, if you have reason to believe that people

19   are at risk of harm, and people in segregation units like this

20   are, you need to take them out in a more clinical, confidential

21   setting, and talk at greater length with them where their

22   reluctance to talk openly about what they're feeling is reduced

23   and also where you can make more observations about how they're

24   behaving.  Realize that when you're talking to somebody through

25   a cell window or crack of a door, there really isn't any

1  behavior taking place to speak of.  It's limited information.

2  If you take somebody out and sit them down in a clinical setting

3  and have a conversation with them, you can see how they act, how

4  they interact with other people, how they're walking.  All sorts

5  of observations that would be difficult if not impossible to

6  make through the window of a segregation cell door.

7  Q.  Going back to Plaintiffs' Demonstrative Exhibit 130, was

8  there anything that you saw at Holman or in the system in

9  general that made the effectiveness -- made segregation rounds

10  less effective?

11  A.  Well, sure.  I mean, pointing to this as an extreme example

12  but by no means the only example of it, there's absolutely

13  nothing that you could gain from a cell-front observation in the

14  case of this particular inmate.  If you didn't open that door --

15  and if you were interested in a mental health contact, if you

16  didn't somehow bring that person out to converse with them, you

17  would be able to learn little or nothing, virtually nothing,

18  about their mental health state.  You couldn't see them, and it

19  would be very difficult even to converse with them verbally,

20  although you could do a bit of that.

21  Q.  You said something about talking through the crack in the

22  door.  Can you explain what you mean by that.

23  A.  Well, yes.  You can't -- these are solid windows, and it's

24  difficult -- this is true not only of this unit but of many of

25  the segregation units.  You actually can't easily stand in front

1  of the door and talk to somebody, because you can't hear them

2  and they can't hear you.  Oftentimes there's noise in the unit.

3  But even when there's not, it's difficult to hear one another.

4  So oftentimes what you do -- and I did this certainly in my cell

5  front, I was doing a lot of these interviews -- is you make eye

6  contact with the prisoners through the door, through the

7  glass -- not this one, but through the door where there is a

8  clear window -- and you maybe have a brief interaction with them

9  to let them know who you are and what you're there to talk to

10  them about.  But then if you really want to talk to them, you

11  move to the side, to the crack in the door, so that you can hear

12  them when they're talking and they can hear you.  So it's a very

13  limited and kind of contorted interaction that takes place cell

14  front in many of these units.

15  Q.  And when you say "the crack in the door," on this picture,

16  is there -- can you show us what you're talking about when you

17  say that?

18  A.  Well, it would be, essentially, over here.

19          THE COURT:  Oh, so you're saying the actual door

20  itself, a crack in the door?

21          THE WITNESS:  Yes.  On the sides, one or the other side

22  of the door, there's usually a little space, very small little

23  space, where the hearing is a little better.  It's not so

24  obvious here, but on some of the other ones we'll look at, you

25  can see there is --

```
 1              THE COURT:  You say you should talk through that?
 2              THE WITNESS:  You can actually talk better through
 3   that.  I mean, the alternative is you can kneel down on the
 4   floor and talk through the -- talk through the tray slot.  A lot
 5   of times prisoners -- they will do that.  They're not terribly
 6   comfortable doing it.  They have to get down -- they have to
 7   kneel down.  And the other thing is those tray slots are
 8   oftentimes not especially clean, and so it's not a pleasant way
 9   for an interaction to take place.
10              THE COURT:  Is that because the food goes through
11   there?
12              THE WITNESS:  Yes.  Yes.
13              THE COURT:  Now, you said that you have this picture of
14   this cell with something over the little window and the glass is
15   cracked, but not all cells were like that.
16              THE WITNESS:  No, they weren't.  They certainly
17   weren't.
18              THE COURT:  How often were they like the one on the
19   picture, that is, with the cracked glass and something over the
20   window?
21              THE WITNESS:  My recollection is that there were more
22   than a few of them.  They didn't all have -- they didn't all
23   have the paper on the other side, but there was cracked glass on
24   a number.  I didn't count them, but there were -- and they were
25   occupied cells.  Obviously, this is an occupied cell.
```

```
 1              THE COURT:  I'm talking about how often did you have
 2  both, the cracked glass and the something covering the window?
 3              THE WITNESS:  That was infrequent, Your Honor.
 4              THE COURT:  That was infrequent.  Okay.
 5  BY MS. MENSCHEL:
 6  Q.  Was Holman the only facility where you saw cracked glass
 7  windows?
 8  A.  No, not at all.
 9  Q.  Do you have any sense, sitting here, how many -- of the
10  tours you did, how many facilities had cracked glass in the
11  windows?
12  A.  I didn't do a systematic count, but it wasn't -- it wasn't
13  infrequent.  I saw them in a number of different places.
14  Q.  And how about the covering on the windows?  Was Holman the
15  only place where you saw that?
16  A.  No.  There were some other institutions where there was a
17  covering over the window.
18  Q.  We were talking about what people do to occupy their time in
19  segregation.  I'd like to pull up Plaintiffs' Demonstrative
20  Exhibit 129.  Do you know what this is, Dr. Haney?
21  A.  Yes.  It's a -- this is written on the wall of the
22  segregation unit at Holman, and it is a list of the property
23  that prisoners who are in either administrative segregation or
24  disciplinary segregation are permitted to have.
25  Q.  Does anything about this list surprise you?
```

1  A.  Well, it's a limited list of property, first of all.

2  Secondly, notice that there are no books allowed in these units.

3          THE COURT:  I see Bible.

4          THE WITNESS:  Just a Bible, Your Honor.  No other book.

5  Q.  And right above the Bible, what does that say on the left?

6  A.  On which side?  Current legal work.  So presumably, legal

7  papers, but otherwise, no books.

8  Q.  Why is that surprising, that there are no other books?

9  A.  It's not a common practice in segregation units with which I

10  have experience.  There's usually a limitation on the number of

11  books that somebody can have, but especially in units where for

12  the -- I mean, notice for the people on disciplinary

13  segregation, they don't have a radio and headphone.  So that

14  means they -- in their cell, other than the Bible, there's very

15  little actual in-cell activity that they can engage in, again,

16  other than their current legal work.

17  Q.  Does it concern you?

18  A.  Of course it concerns me.  One of the things that is so

19  problematic about these units is the lack of activity.  The lack

20  of activity outside of the cell is the most important and

21  obvious problem.  But if a person is going to be confined in

22  their cell 23 or so hours a day, not to have access to things

23  with which to occupy your time makes that time much more

24  difficult to tolerate.

25  Q.  Do people in segregation at Holman or elsewhere in the

1    system get recreation time?

2    A.   They do.

3    Q.   Why is that important?

4    A.   Well, again, we talked about it a little earlier today.   In

5    segregation you're living in your cell, and you have no other --

6    typically no other access to any other part of the institution

7    except for the amount of time that you're permitted to go to

8    shower, which is typically limited and a limited number of days,

9    and then your outdoor exercise or recreation.   So that's

10   critically important.

11   Q.   I know you talked at Tutwiler a little bit about restraints

12   while people were on the yard.   Do you have any other concerns

13   related to recreation time that you saw in the system?

14   A.   Yes.   Prisoners in segregation throughout the system talked

15   about the absence or lack of recreation time.   That they were

16   getting very little of it.   That they were supposed to have a

17   certain amount a week, and a number of prisoners -- and it's

18   throughout my interviews -- talked about not having been out to

19   yard for a couple of weeks.   Some prisoners talking about not

20   having been out for a month or more.   So, really, long periods

21   of time in between their recreation periods outside.

22        Many of them said that it was understaffing; that they

23   understood the reason would be understaffing.   Prisoners in

24   segregation need to be escorted out to the yard and escorted

25   back, and if there's a staff shortage, then certain things have

1   to be canceled, and yard time was typically one of the things

2   that got canceled.

3            THE COURT:  Wait a minute, now.  You learned this from

4   the prisoners?

5            THE WITNESS:  I did, Your Honor.

6            THE COURT:  Did you see anything other than what you

7   learned from the prisoners that supported your observation just

8   then that yard time was canceled because of understaffing?

9            THE WITNESS:  Only that I didn't ever see very many

10  prisoners in yard at any particular prison where we were.

11           THE COURT:  Was there anything else that you found that

12  supported that conclusion?

13           THE WITNESS:  No.  I didn't see any documentation of

14  that.

15           THE COURT:  Would that be documented?

16           THE WITNESS:  It's unclear.  I don't know, Your Honor.

17           THE COURT:  Go ahead.

18  BY MS. MENSCHEL:

19  Q.  Why did you think it was reliable, if you thought it was

20  reliable, that the prisoners told you that they didn't get very

21  much yard time?

22  A.  Because it was such a widespread complaint.  It came from

23  prisoners in virtually every institution, you know, describing

24  varying degrees of a lack of yard, but it was a consistent

25  complaint and a consistent explanation.

```
 1            THE COURT:  Was it that they got no yard time or they
 2   got too little yard time or both?
 3            THE WITNESS:  It was typically that they got very
 4   little over a period of time; that they hadn't been out for a
 5   week or two weeks or longer.  Not that there was absolutely
 6   none.
 7            THE COURT:  So the only basis for concluding -- for
 8   your concluding that this may be true is because it was a
 9   frequent complaint?
10            THE WITNESS:  Because it was a frequent complaint, and
11   it was consistent with my own observations that prisoners were
12   either not out in the yard or being taken to yard.  Ordinarily
13   when you're in a unit, you see --
14            THE COURT:  Why would the prisoners be out in the yard
15   necessarily when you were there?
16            THE WITNESS:  Well, I was there at various different
17   times during the day in different units.  You would expect to
18   see -- if prisoners were regularly being taken to yard, you
19   would expect to see either prisoners in the yard, or what you
20   typically see is movement in the unit.  So you see prisoners
21   being escorted in or escorted out.  And that I think I saw only
22   once during the entire period of time that I was there.
23            THE COURT:  Why would you expect to see that?  I still
24   don't understand why you would expect to see that.  Maybe they
25   were just being escorted out at times different from when you
```

1   were there.

2         THE WITNESS:  They could have been, Your Honor.  That's

3   possible.  But, again, I was there at different times.  And

4   ordinarily -- this is an activity that requires an individual

5   prisoner to be moved out of the unit to outdoor exercise.  So if

6   yard is being run in a unit, that takes up typically a

7   significant amount of time.  There's typically a significant

8   amount of movement associated with that in a unit.  And when

9   you're in a unit for a period of time, I was oftentimes in these

10   units for a considerable period of time in and around the

11   segregation unit.  You would see that happening.  And I saw that

12   happening very infrequently.  Unusually infrequently.

13         THE COURT:  How long are you there typically, say, at

14   Holman Prison?

15         THE WITNESS:  I was probably at Holman maybe two hours.

16   I was at other prisons much longer.

17         THE COURT:  Go ahead.

18   BY MS. MENSCHEL:

19   Q.  In the inspections you've done of other systems and when

20   you've been an expert in other systems, have you seen people

21   being taken out, transported to or from the yard?

22   A.  Yes.

23         MR. SMITH:  Your Honor, we object as to relevance.

24   We're talking about facilities in the Alabama Department of

25   Corrections systems and not what he may have seen, may have

```
 1   observed at other facilities.

 2           THE COURT:  You mean in other states?

 3           MR. SMITH:  Yes, sir.  In other states.

 4           THE COURT:  How is this relevant?

 5           MS. MORRIS:  Your Honor, we were just asking about his

 6   basis for his observations that it was frequent.

 7           THE COURT:  I'll allow it if it explains his basis.  Go

 8   ahead.

 9           MR. SMITH:  And I don't know what his answer is yet.

10           THE COURT:  I don't know what his answer is going to be

11   either.  So why don't we hear it first --

12           MR. SMITH:  Yes, sir.

13           THE COURT:  -- and then I can hear the argument.

14           MR. SMITH:  Yes, sir.

15           MS. MENSCHEL:  Thank you.

16   Q.  Dr. Haney, in other systems when you've seen --

17           THE COURT:  First of all, do you rely on what you

18   observed in other systems in reaching your conclusions?

19           THE WITNESS:  Yes.

20           THE COURT:  Go ahead.

21   BY MS. MENSCHEL:

22   Q.  When you've done inspections of other systems, and you just

23   testified that you've seen people being taken to or from the

24   yard, how does that relate to what prisoners are telling you in

25   those systems?
```

1          MR. SMITH:  Again, your Honor, we would object on

2   relevance.

3          THE COURT:  For now, overruled.  Go ahead.

4   A.  Well, when you do yard in a segregation unit, as I was

5   explaining to His Honor a moment ago, there have to be

6   correctional escorts who take prisoners out of the unit.  That's

7   a process that oftentimes goes on for the whole day.  I mean, so

8   when yard is being run and you're in those units, you're able to

9   see that taking on place.  You're able to see people either in

10  the unit you're in or some -- or in some other unit being

11  escorted back and forth to the yard.  It's a common -- it's a

12  common observation because it's labor intensive.  And so a unit

13  having yard time, every prisoner has to be walked out to the

14  yard and then at the end of the yard walked back.  You also

15  see -- when yard is being run in these units, you see people out

16  in the yard, around in the yard.  You see a number of prisoners

17  out at any given period of time.  And so you clearly can see

18  that yard is taking place.  I saw, again, very little of that in

19  this system.  Almost none of it in several of the institutions

20  that I was in.  And none of it in any of the units that I was in

21  where -- I was never in a unit where somebody was being placed

22  in restraints and taken out of their cell and walked out to the

23  yard.  I never saw that.  I can't say it never happened, but I

24  didn't see it in the units that I was in during the time I was

25  there.

1            THE COURT:  Ms. Menschel, is there any other evidence

2    in the record to support the conclusion that inmates missed yard

3    time, that is, inmates in segregation missed yard time due to

4    understaffing?

5            MS. MENSCHEL:  Your Honor, I believe that there has

6    been some testimony about that.  Specifically I think, although

7    I would like to confirm, that Ms. K.N. testified about it a

8    little bit.  And if I can after the next break get back to you

9    with an answer, I would appreciate that.

10            THE COURT:  Very good.  Go ahead.

11    BY MS. MENSCHEL:

12    Q.  Dr. Haney, so based on your experience as an expert looking

13    at these kinds of things, would you have expected during your

14    inspections to see people being taken out to yard?

15    A.  Yes.

16    Q.  Talking about your experience as an expert looking at prison

17    conditions and the impact on mental health, how many systems

18    approximately have you in your career evaluated for mental

19    health care in the prison system?

20    A.  I think I said earlier probably a couple dozen.  And in some

21    instances they were individual prisons, but roughly that number.

22    Q.  How many prisons, if possible, have you been into in your

23    career in the United States?

24    A.  Many dozens.  I'm not sure how many.

25    Q.  Do you know how many states you've been into prisons in?

```
 1    A.  More than half of the states in the country.

 2    Q.  More than 25?

 3    A.  Yes.

 4    Q.  How regularly or how frequently are you in prisons in the

 5    course of your work?

 6    A.  It varies, but in a given year, quite often.

 7    Q.  Would you say monthly or once or twice a year?

 8    A.  I don't know.  An average, probably monthly.  That would be

 9    an average because sometimes it's concentrated in a certain

10    couple of months.

11    Q.  So when we are talking about how what you saw in Alabama

12    compares to what you've seen in other prisons, are you relying

13    on those prisons that you just talked about?

14    A.  Yes.

15          MS. MENSCHEL:  I'd like to look at Plaintiffs'

16    Demonstrative Exhibit 124.

17    Q.  We were just talking about yard time.  Can you explain what

18    is on this photo as it relates to yard time.

19    A.  Yes.  Those are the exercise yards or cages at Holman, the

20    Holman segregation unit.

21    Q.  How many -- from your understanding, how does the entire

22    segregation -- or does the entire prison go out at the same

23    time, or is it smaller groups?

24    A.  No.  It's smaller groups, and they're in individual exercise

25    cages or units.
```

1  Q.  So how many people would be in any one of those cages that

2  are depicted on the screen?

3  A.  It's my understanding that one.  One at a time.

4  Q.  Did you visit the death row unit at Holman?

5  A.  Yes.

6  Q.  Did you have much of an impression of it?  Did you spend a

7  lot of time there?

8  A.  I did not spend a lot of time there.  I toured it.  I

9  don't -- I don't recall having interviewed anybody.  I don't

10 believe that they were -- the prisoners there were -- at the

11 time I was there I didn't understand to be part of the class in

12 this case, so I didn't do any interviews, cell front or

13 confidential.

14 Q.  Did you visit the suicide watch cells at Holman?

15 A.  I did.

16 Q.  How many suicide watch cells were there?

17 A.  There were several.  I don't remember the exact count.

18 There were a couple of them there.

19 Q.  Where were they located at Holman?

20 A.  They were located right on the corner or the end of the

21 death row unit at Holman.

22      MS. MENSCHEL:  I would like to look at Plaintiffs'

23 Demonstrative Exhibit 125.

24 Q.  Can you describe what you see in this picture.

25 A.  Those are the suicide watch cells at Holman.  And death row

1    is just beyond that far gate, as I recall it.

2          THE COURT:  Now, this is a suicide watch cell?

3          THE WITNESS:  Crisis cell, Your Honor.  Yes.

4          THE COURT:  Would it be a suicide watch cell as well?

5          THE WITNESS:  I believe so, yes.  I believe that's

6    where they are.

7          THE COURT:  So this cell is open so that everyone can

8    see in?

9          THE WITNESS:  Yes.

10          THE COURT:  So if you were watching someone on suicide

11    watch, you could actually see them all the way around virtually?

12          THE WITNESS:  You could.

13          THE COURT:  Okay.

14    BY MS. MENSCHEL:

15    Q.  You just mentioned that it was beyond the gate, was where

16    death row was located.  Can you show us on the picture what you

17    mean by that.

18    A.  Yes.  That gate.

19    Q.  The back gate in this picture?

20    A.  Yes.

21    Q.  Do you have an opinion about the location of these cells?

22    A.  It's an unusual place to put crisis cells in the sense that

23    the juxtaposition of prisoners who are potentially in crisis and

24    possibly suicidal with prisoners who are under sentence of death

25    and who spend their day dealing with the possibility of death is

1  an unusual juxtaposition or placement.  I can't imagine, again,

2  that it would be done by design and probably, instead, reflects

3  a kind of accommodation to the lack of more appropriate

4  available space.

5  Q.  I would like to ask you a few other questions about your

6  tour and inspection at Holman.  Did you tour general population

7  dorms at Holman?

8  A.  Yes.

9  Q.  Was there anything unusual about Holman's housing for

10 general population, the setup of Holman's housing for general

11 population?

12         MR. SMITH:  Judge, we object to the word "unusual."

13         THE COURT:  Well, I think she's trying not to lead him.

14         MR. SMITH:  I understand.

15         THE COURT:  So I'll allow that, as long as you bring it

16 home.

17         MS. MENSCHEL:  Certainly, Your Honor.  I'm also happy

18 to rephrase the question.

19 Q.  Dr. Haney, in your experience, how did the setup of Holman's

20 general population housing compare to other systems you've seen?

21 A.  The Holman general population units are open dormitory

22 units.  And dormitory units are relatively unusual in prisons in

23 general now days, but what was especially unusual and

24 problematic about Holman is that it is a maximum security prison

25 in which in the dormitories are housed maximum security

1  prisoners.  This is a very unusual and, in my experience,

2  unprecedented configuration.

3      For the most part, when dormitories are used, they're used

4  in a medium or low -- minimum or low medium facility.  The

5  reasoning is that they're very difficult to keep safe.  There's

6  no -- not only no privacy, but there's no individual physical

7  protection for individual inmates in these environments.  Unless

8  they're very heavily monitored with a very heavy correctional

9  presence, they're potentially very dangerous environments,

10 especially at night.  And I've just never seen a unit where

11 maximum security prisoners were housed in an environment like

12 that.

13 Q.  Do you think there is a risk of harm to mentally ill

14 prisoners who are housed in those units?

15 A.  Yes.  Absolutely.

16 Q.  Why is that?

17 A.  They're dangerous environments.  Mentally ill prisoners are

18 vulnerable prisoners in a prison system, wherever they're

19 housed.  They have a disability.  It renders them vulnerable.

20 They are sensitive to danger and risk because they feel their

21 vulnerability in the environment.

22     When they're placed in a dangerous environment, that

23 vulnerability is heightened and it makes them anxious.  It makes

24 them frightened.  It undermines their mental health.

25          THE COURT:  What are you saying is dangerous?  You're

1    saying this cell is dangerous?

2           THE WITNESS:  No, Your Honor.  We need to switch to the

3    other configuration of the cells.  This is --

4           MS. MENSCHEL:  Your Honor, I believe that Dr. Haney was

5    testifying about general population dorms at Holman.  And we

6    have an image, but it will take me -- if I can get it after the

7    break, I'd appreciate that.

8           THE COURT:  Very good.  Go ahead.

9           MS. MENSCHEL:  Actually, Your Honor, if I can --

10   Q.   Dr. Haney, I'm going to show you Plaintiffs' Demonstrative

11   Exhibit 126.  What is this?

12   A.   This is one of the general population open dormitories at

13   Holman.  Other than the segregation unit, this is what the cells

14   or housing units at Holman look like.  And this is the kind of

15   unit that -- this is one of the units we went in where the

16   photograph was taken, but this is what I was referring to as an

17   open dormitory.  It's not unheard of in prison systems in the

18   United States, but in my experience unheard of to have maximum

19   security prisoners housed that way.

20          MS. MENSCHEL:  Your Honor, a few of the individuals who

21   testified about yard time were Plaintiff C.J., Ms. K.N., Class

22   Member M.P., Class Member J.A., and Mr. Culliver.

23          We also have submitted Plaintiffs' Exhibit 1225, which

24   includes duty post logs, and we'll be happy to write

25   something -- compile a summary and submit it to the Court.

```
 1            THE COURT:  Very good.  Thank you.
 2            MS. MENSCHEL:  And Mr. Vail also testified on this
 3   issue.
 4            In addition, Your Honor, you would just like to call
 5   the Court's attention to Plaintiff L.P., who has been in the
 6   courtroom over the course of this week, has spent a considerable
 7   time in Holman and has been housed in the crisis cells we just
 8   looked at as well as the segregation unit.  We will identify for
 9   the Court the exhibit number for his updated movement history
10   this afternoon.
11            THE COURT:  Go ahead.
12   BY MS. MENSCHEL:
13   Q.  Dr. Haney, did you visit Easterling Correctional Facility?
14   A.  I did, yes.
15   Q.  When did you visit Easterling?
16   A.  I visited Easterling later in the year.  We were just
17   talking about two initial visits, first to Tutwiler and to
18   Holman, in September of 2015.  I returned in -- the next year,
19   on March 14th.  And that was the -- I described for the Court
20   the ill-fated visit, attempted visit to Holman, which was
21   terminated, and then we worked out an arrangement where I went
22   from Holman to Easterling and got to tour and conduct some
23   interviews in the segregation unit at Easterling in the
24   afternoon of the 14th of March, 2016.
25            THE COURT:  Why don't we recess, and we'll reconvene
```

1   about Easterling at one o'clock.

2       (Recess was taken from 11:59 a.m. until 1:02 p.m., after

3        which proceedings continued, as follows:)

4           THE COURT:  Proceed.

5           MS. MENSCHEL:  Thank you, Your Honor.

6           Before the break we were talking about Holman, and I

7   neglected to move into evidence the photos.  So I would like to

8   move into evidence Plaintiffs' Demonstrative Exhibit 118,

9   Plaintiffs' Demonstrative Exhibits 119, 120, 121, 122, 123, 124,

10  125, 126, 129, and 130.

11          THE COURT:  All admitted.

12          MR. SMITH:  Your Honor, the only thing that we would

13  say about that is that if plaintiffs' counsel is going to use

14  documents like that to question the witness, that those be

15  admitted into evidence before the witness is questioned about

16  them.

17          THE COURT:  Okay.  Very good.

18          MS. MENSCHEL:  Your Honor, unless there is some

19  misunderstanding, we shared them with defense counsel this

20  morning.  I think one may have inadvertently been missed, and

21  for that we apologize.

22          MR. SMITH:  And I'm not suggesting that we haven't been

23  provided that information.  I'm just simply saying that it's

24  improper under the rules.

25          THE COURT:  Well, sometimes you do have to have the

1  witness identify the picture and sort of tell what it is before

2  you --

3          MR. SMITH:  Understood.  Yes, sir.  Understood.

4          THE COURT:  Go ahead.

5  BY MS. MENSCHEL:

6  Q.  Thank you, Dr. Haney.  Before the break, we had just started

7  talking about Easterling, I believe.

8  A.  Yes.

9  Q.  And if I remember correctly, I think you said you visited

10  Easterling in March of 2016?

11  A.  On the 14th of March.

12  Q.  I would like to show you Plaintiffs' Demonstrative

13  Exhibit 55.  Do you know what this is, Dr. Haney?

14  A.  Yes.  It's the architectural plan for Easterling

15  Correctional Facility.

16          MS. MENSCHEL:  And, Your Honor, we have a poster board

17  version as well as we go through the photos.

18  Q.  Dr. Haney, do you know what security levels are housed at

19  Easterling?

20  A.  Easterling is a medium-security facility.

21  Q.  Can you briefly tell us what your impression of Easterling

22  was during your inspection.

23  A.  Yes.  I saw primarily, very briefly, a mainline housing unit

24  that was walked through very quickly, and I spent virtually all

25  of my time in the segregation unit at Easterling.

1    It's a relatively small segregation unit.  A straight line

2  of cells, two sort of sides to the long hallway, a doorway in

3  the middle, and then another set of, again, two rows of

4  segregation cells, which I both -- inspected by looking in.  I

5  was permitted to have a cell opened.  There were also two crisis

6  cells -- I think there were only two crisis cells, one of which

7  was occupied, one of which was not -- also on the unit.  And

8  then I was able to speak cell front with the prisoners and

9  confidentially interview several of them as well.

10    The unit itself, again, I focused on the segregation unit.

11  The exterior of the unit was very clean and well lit.  The

12  cells, however, were much less so.  They were cramped, small

13  cells, cramped cells.

14    My observation was -- I didn't do a systematic count, but

15  many if not most of them were double celled.  So there were two

16  male prisoners inside the segregation cells, and they were -- as

17  a result, those cells were especially cramped.

18    The segregation cells were not as deteriorated as Holman,

19  but they were nonetheless -- I would describe them as harsh,

20  harsh confinements, isolation cells.

21    That was certainly true of the crisis cells that I saw.

22  And my impressions were largely corroborated by the prisoners

23  whom I interviewed, both cell side and especially

24  confidentially.

25  Q.  So going back to the beginning, you said that you briefly

1  toured a mainline housing unit; is that right?

2  A.  Yes.  I honestly don't -- we went quickly through it because

3  we were relatively pressed for time.  And I don't even remember

4  which -- I don't think I reflected in my notes which one it was.

5  I didn't talk to anybody, I didn't have any cell-front

6  interviews with anybody, nor did I talk to anybody

7  confidentially.  And then I proceeded directly to the

8  segregation unit where I spent the bulk of my time.

9  Q.  So I would like to show you Plaintiffs' Demonstrative

10  Exhibit 57.  Do you recognize this photo?

11  A.  Yes.  That's the segregation hallway, one half of the

12  hallway.  I remember this unit as unit B.  That's what I wrote

13  down in my notes.  I'm not entirely sure that's what it is on

14  the architectural plan you showed me on the last slide, but it

15  was one dedicated unit in which all of the cells in the unit

16  were segregation cells.

17  Q.  Starting first with the doors, do you have any opinions

18  about the doors in the segregation unit at Easterling?

19  A.  Yes, I do.  We've talked about this a little bit before, and

20  this is a similar design.  It's problematic for the same reasons

21  it was problematic in Holman.  These are solid steel doors with

22  very small windows.  Very difficult to see inside of.  Again,

23  dangerous for all the reasons that I discussed in Holman.  There

24  are mentally ill prisoners in this unit.  I interviewed several

25  of them confidentially.  That means that it would be very

1  difficult for anybody who was not directly peering into the

2  window to make any kind of observation at all about what was

3  going on inside the cells.

4      It also adds to the -- it adds to the closed-in nature of

5  the solitary or isolated confinement.  Needless to say, you

6  don't have any even visual access to whatever may be -- whatever

7  minimal activity or movement may be taking place on the unit

8  floor is not something which you can even visually participate

9  in while you're isolated in your cell.

10  Q.  Do you have any understanding at all of what the double

11  yellow line in the middle of the hallway is?

12  A.  I was told that this is -- this is the line where -- when

13  people are being escorted through the unit, this is where they

14  stay.  But an inmate also told me that there were times when the

15  mental health staff walked down that line and announced their

16  presence as they were walking down the line, asking if there was

17  anybody in the cell who needed attention or if everybody was

18  okay.  I didn't see that happen, myself, so I can't corroborate

19  the fact that it happened.  But one inmate told me that that was

20  something that was sometimes done.

21  Q.  If that were true, would you have any concerns about that

22  practice?

23  A.  Well, if it were true, it would be terrible, for obvious

24  reasons.  You couldn't -- I mean, I couldn't see -- I stood on

25  that yellow line and really couldn't see anything.  I mean, you

1   could barely see the presence or absence of an inmate, even an

2   inmate standing in their cell, from that line.  So unless an

3   inmate had their face pressed to the window, it would be hard

4   for you to even have visual contact with an inmate and not

5   really any -- make any meaningful observation.  You would have

6   to go right up directly to the door.

7       And this was one of the units where we were talking with the

8   Court earlier about talking to the side of the door.  This is

9   where I -- where it was necessary to do that to have audio

10  contact, so to speak, with the person inside.  Because the doors

11  are solid and hard to hear through.

12  Q.  Can you show us on the picture, maybe one of the first cells

13  on the left, perhaps, what you mean about talking through the

14  doors, where you were talking at these cells?

15  A.  Well, I would talk here and/or here.  They're little -- you

16  know, little crack between the door that allows for a little bit

17  better communication.  So I typically stood by the door and

18  would ask a question and then would listen for the prisoner to

19  respond.

20  Q.  I believe you said you also looked inside some of these

21  cells?

22  A.  Yes.  I looked inside quite a few of them as I went through

23  the unit.

24          MS. MENSCHEL:  I'd like to turn to Plaintiffs'

25  Demonstrative Exhibit 58.

1  Q.  Can you describe what's going on in this photo.

2  A.  That was an empty Easterling segregation cell.  I asked for

3  the correctional officer to open the door, and we had an

4  opportunity to walk inside the cell and also take a photograph.

5  Obviously, that's a photograph taken from the hallway into the

6  cell.  There's a small window you can see just a little bit of

7  it in the back there; but otherwise, the cell is virtually

8  completely closed off with the solid door on the front, which is

9  typically closed.

10  Q.  I'm going to also pull up Plaintiffs' Demonstrative

11  Exhibit 59.

12  A.  Yes.  I mean, again, just to emphasize what I've said

13  already, these are small cells.  These are the cells -- this is

14  a single cell.  But this is a cell where a prisoner would live

15  their life inside the cell, except for those times when they

16  were taken to the shower or given an opportunity to go to yard.

17  You can see a prisoner has placed an eating utensil on the top

18  of the sink by the commode.  This is, of course, where prisoners

19  would eat as well as live the rest of their life.  So typically

20  a prisoner sits on the bunk and eats their meals until the tray

21  is collected.

22  Q.  Did you have any concerns about the cells in the segregation

23  unit that we've not already discussed?

24  A.  Largely the ones that -- largely the ones that we've

25  discussed about the difficult visibility and the nature of the

1    cells themselves.  I mean, these are -- these are grim, sparse,

2    harsh cells.

3    Q.  Does being in one of these cells and living in one of these

4    cells present a risk to prisoners' mental health?

5    A.  Yes, I believe it does.  I believe for mentally ill

6    prisoners, it certainly does.  There is no other activity in

7    this unit aside from the ones I've mentioned.  So you saw that

8    big hallway earlier.  There are no activities that take place in

9    that hallway.  Prisoners live in those cells and they live in

10   those cells around the clock with the exceptions that I

11   mentioned.  This is, in my opinion, detrimental to the mental

12   health, particularly of mentally ill prisoners, and especially

13   if it's experienced for any considerable period of time.

14          MS. MENSCHEL:  Your Honor, I would ask to move

15   Plaintiffs' Demonstrative Exhibit 57, Plaintiffs' Demonstrative

16   Exhibit 58, and Plaintiffs' Demonstrative Exhibit 59, which are

17   the photos from Easterling, into evidence.

18          THE COURT:  All admitted.

19          MS. MENSCHEL:  And I would also ask to move Plaintiffs'

20   Demonstrative Exhibit 55, which is the diagram, into evidence

21   under seal.

22          THE COURT:  Admitted.

23   Q.  Dr. Haney, did you visit Bullock Correctional Facility?

24   A.  Yes.

25   Q.  When did you visit Bullock?

1  A.  I spent two days at Bullock on March 15th and March 16th.

2  Q.  Why did you spend two days there?

3  A.  Bullock is one of the two male institutions with a high

4  concentration of mentally ill prisoners.  As you know, it

5  contains the residential treatment unit, sometimes referred to

6  by the prisoners as the blue building.  It's the large

7  residential treatment unit at the facility.  It also has a

8  stabilization unit and it has --

9      It's a complicated facility.  It has a number of other

10  things going on there as well.  There's a step-down unit.

11  People who are coming out of the RTU have a separate unit in the

12  main building.  There are a couple of large dormitories,

13  specially purposed dormitories with special things going on in

14  the open dormitory.

15      So it was a complicated facility and especially important

16  because of the large number of mentally ill prisoners who were

17  there.

18  Q.  So I'd like to first talk about the main camp, not the

19  mental health unit.  I would like to show you Plaintiffs'

20  Demonstrative Exhibit 133.  Dr. Haney, do you recognize what

21  this is?

22  A.  Yes.  That's an overview, a schematic of the Bullock

23  facility.

24  Q.  Does it include -- this is just the main building or the

25  mental health building?

1  A.  It's the main building, as far as I can tell.

2  Q.  So can you tell us a little bit about your inspection of the

3  main building specifically and what you did.

4  A.  With your permission, let me look at my report to get the

5  exact sequence of events, because we did quite a few things

6  there.

7      My recollection, refreshed from the report, is that we went

8  through -- at first we went through a couple of the specialized

9  units, the mainline housing units in the facility.  There were

10  also some crisis cells and some segregation cells that I also

11  inspected.

12      I spent the first period of time there going through that --

13  the main building.  I talked as well to some -- to several

14  prisoners who were in the RTU, essentially the step-down unit.

15  These were people who had formerly been in the RTU but now were,

16  in theory, at least, gradually moving out of that level of

17  mental health care and then went into the RTU and segregation

18  unit.

19  Q.  So the step-down unit that you just referred to, was that in

20  the main building?

21  A.  It was.

22  Q.  Okay.

23          MS. MENSCHEL:  I'd like to turn to Plaintiffs'

24  Demonstrative Exhibit 60.

25  Q.  Dr. Haney, do you recognize this photograph?

1    A.  Yes, I do.  Yes.

2    Q.  What is it?

3    A.  So this is in the main -- in the main building in Bullock.

4    It's one of the first -- one of the first units that I saw at

5    Bullock.  So this is not in the mental health area of the

6    facility.  It's a small segregation unit that I toured near the

7    outset of the tour and had an opportunity to speak cell front

8    with some of the prisoners who were in the cells, as well as I

9    believe I interviewed some of them the second day when I did

10   confidential interviews.

11   Q.  What was your impression of this unit?

12   A.  Well, again, it's -- you know, it looks a little bit like

13   the unit we just looked at in Easterling.  Again, same sort of

14   solid door exterior.  Problematic for the reasons that I

15   described.  Small windows on the doors.  Difficult to see in

16   easily.  These windows, I think, are a little bit larger, but

17   not much.

18       And the prisoners that I spoke to in this unit were having a

19   difficult time with the isolation.  They complained about being

20   closed in and having nothing to do.

21       They also -- you're probably wondering what the mattresses

22   are.  There are two categories of prisoners who are held in a

23   number of these segregation units.  They're administrative

24   segregation and disciplinary segregation.  Prisoners who are on

25   disciplinary segregation have a somewhat more severe set of

1    restrictions placed on them.  You may remember from when we

2    looked at that chart that was on the wall at Holman, the

3    administrative segregation prisoners had an opportunity to have

4    a radio and headphones.  The disciplinary segregation prisoners

5    didn't.

6         The other difference at most if not all of the units that I

7    saw and was explained to me, is that disciplinary segregation

8    prisoners have their mattresses removed from their cell during

9    the day.  So they're in their cell, they're locked in their

10   cells all day, but they're not allowed -- well, they are unable

11   to lie on their bunks because the -- at least on their

12   mattresses because the mattresses are removed as punishment.

13   Q.  This may be an obvious question, but did you have any

14   concerns about that practice?

15   A.  I just think that's extraordinarily Draconian.  Added to the

16   harshness of the isolation, the lack of meaningful activity in

17   which one can engage in the cell anyway, to add to that an

18   inability for a prisoner to lie down just seemed to me to be

19   unduly punitive and not serving any other purpose but that, but

20   punishment.  And especially when -- if -- when a prisoner is

21   mentally ill, this would just add another layer or level of

22   harshness to the nature of their day-to-day life.

23   Q.  You also mentioned the doors.

24        MS. MENSCHEL:  I'd like to pull up Plaintiffs'

25   Demonstrative Exhibit 61.

1  Q.  Do you recognize this photo?

2  A.  Yes.  That's a photo of one of the doors that's looking

3  through the door -- the window of the door into the cell.

4  That's a window on the back -- there's louvered windows on the

5  back of the cell.

6      You can see one obvious problem, which is that the door --

7  the window in the door is scratched, making it somewhat

8  difficult to see in.  It's a little better than some of the

9  windows we've seen so far, but still not really ideal visual

10  accessibility.

11  Q.  Did you look inside any of these cells?

12  A.  Yes, I did.  I looked inside most of them.

13          MS. MENSCHEL:  I'd like to pull up Plaintiffs'

14  Demonstrative Exhibit 62 and also Plaintiffs' Demonstrative

15  Exhibit 63.

16  Q.  Do you recognize these photos?

17  A.  I do.

18  Q.  What are they?

19  A.  This is the same unit, B dorm, in Bullock.  It's a

20  segregation unit, as I've described.  The first one -- the

21  photograph on the left is a good interior shot of the cell.

22      These are sparse, very sparse cells.  You can see from the

23  design, there's very little in them.  You can't see the commode

24  and the solid metal sink, but it's in the corner.

25      You know, there is very little in these cells.  There's no

1  place, really, to sit except on that ledge.  There's not a

2  little -- any table or desk or something which sometimes there

3  are in cells; even segregation cells in other systems.

4       That window on the back, it's really not a panoramic view of

5  the outside.  It's hard to see through.  But it does allow some

6  natural light into the cell.

7       On the right, however, is an area or an issue of some

8  concern.  We talked already about the presence of a shower head

9  inside a cell that we looked at earlier.  Here is the same kind

10  of problem.  That appears to me to be a shower head also above

11  the light.  But whatever it is, there is another problem, which

12  is that metal grate and the openings in that metal grate, which,

13  again, are suicide risks.  It would be possible for somebody to

14  loop a ligature over that and possibly for them to take their

15  life.  So it's not a suicide-proof cell, I guess, is a short way

16  of putting it.

17  Q.  You referred to the picture on the left, which is

18  Plaintiffs' Demonstrative Exhibit 62, and the one on the right,

19  which is Plaintiffs' Demonstrative Exhibit 63.  On 63, I believe

20  you said something about a shower head?

21  A.  A sprinkler head.  I'm sorry.

22          MS. MENSCHEL:  Your Honor, I would like to offer

23  Plaintiffs' Demonstrative Exhibits 60, 61, Plaintiffs'

24  Demonstrative Exhibit 62, and 63 into evidence.

25          THE COURT:  They're all admitted.

```
 1          MS. MENSCHEL:  And I would also like to offer

 2   Plaintiffs' Demonstrative Exhibit 133, which is the map of the

 3   Bullock main facility, into evidence under seal.

 4          THE COURT:  Admitted.

 5   Q.  You also toured the mental health building; is that right?

 6   A.  Yes.  I spent a fair amount of time in there, for obvious

 7   reasons.

 8   Q.  We're going to take a look at Plaintiffs' Demonstrative

 9   Exhibit 13.  Do you recognize this diagram?

10   A.  Yes.

11   Q.  What is that?

12   A.  Yes, I do.

13       This is -- so this is the mental health building.  You may

14   have heard "the blue building" referred to.  This is how it was

15   referred to by the prisoners when I talked to them about being

16   at Bullock or -- and being in the RTU at Bullock.

17       The large H, the diagram of the large spaces in H, are open

18   dorms.  They're RTU, but they're open dormitory housing.  You

19   can see that some of them are large.  Some of them are small.

20   They are areas where prisoners who are in the RTU -- who are in

21   the open RTU -- this is different from Donaldson, which we'll

22   talk about in a bit -- are housed in dormitories not unlike the

23   dormitories that we saw in Holman.  We've already seen those

24   photographs.  Somewhat differently configured, but basically an

25   open dormitory area.
```

1    The space in the middle, as you move -- on the diagram as
2    you move to the right from the housing unit we just looked at,
3    contains offices and classrooms and treatment space.  So that
4    would be these rooms in the middle.  Exactly.  And some of the
5    rooms even farther -- that are room-like to the farther right.
6    Yes.
7         Then you see a label that says cube, seg cube.  And that
8    seg cube looks out on two rows that are in a V shape, actually
9    an angle, a right angle, and those are combined segregation and
10   stabilization unit cells.  So they're on the other side of the
11   RTU.  You walk through -- there's a hallway you go through, you
12   pass through the treatment rooms, and then you're into the
13   Bullock segregation and stabilization unit area.  And that's on
14   the far right of the diagram.
15   Q.  Upper right of the diagram?
16   A.  Yes.
17        MS. MENSCHEL:  I'd like to pull up Plaintiffs'
18   Demonstrative Exhibit 66.
19   Q.  Dr. Haney, do you know what this image is?
20   A.  I do.
21   Q.  Can you explain what it is.
22   A.  That's a photograph of the area we were just talking about,
23   the stabilization and segregation unit.  In theory, the area
24   where we're standing is dedicated primarily to the segregation
25   cells in the unit.  And you're looking across, past the guard

1   station, which is on the right, to the stabilization unit cells.

2   That's in theory.  It turns out that, as I learned that day and

3   from other documents, that those stabilization unit cells are

4   often used as segregation cells as well.  There's a guard -- the

5   guard station or the correctional officer station is in the

6   middle.  There is a table or two.  There's one depicted here.

7   There may be one on the other side.  I don't recall.  But that's

8   pretty much it.  And there's not furniture or dedicated

9   treatment space or activity space or anything else out on the

10  floor of that unit.

11  Q.  You said that you learned that day that much of that space

12  was used for segregation.  How did you learn that?

13  A.  Well, I interviewed prisoners cell front, and there were a

14  number of them who told me they were there on segregation

15  status.  Others were there on stabilization unit status, but it

16  was a mixed group of people.

17  Q.  And I believe you said you saw in other documents; is that

18  right?

19  A.  Yes.

20  Q.  What documents are you referring to?

21  A.  I've seen a number of documents.  I saw Dr. Hunter referred

22  to it.  I believe Ms. Fields or Ms. Houser referred to it.

23      It's an area of concern for MHM that these -- these are

24  supposed to be treatment spaces.  A stabilization unit cell is

25  supposed to be the equivalent of a hospital bed.  They are far

1  from it, even the ones that are used as stabilization unit

2  cells.  But when they double as segregation cells, that gives

3  you a feel for how they're configured and how they're routinely

4  being used.  So I've seen a number of documents which refer to

5  this as being a problem or an issue, and I would agree fully

6  with that that it is a problem and an issue.

7  Q.  Why do you think it's a problem or issue to use the

8  stabilization unit cells for segregation?

9  A.  Because segregation cells are supposed to be therapeutic

10  environments.  They're supposed to be hospital beds for people

11  who are in some degree of crisis.  Their conditions -- their

12  mental health condition is severe and they are being, in theory,

13  stabilized.  They cannot and should not be housed in a cell

14  which doubles as a segregation cell where prisoners are to be

15  kept under control for punishment.

16      If you can easily move back and forth between one or the

17  other, one purpose is not working.  And in this particular

18  instance the purpose, in my opinion, that is not working is the

19  stabilization purpose.  These are -- this looks like a

20  relatively pleasant unit from afar, but the cells themselves are

21  anything but.  And the level of despair of the people inside

22  those cells was severe.  There is very little activity taking

23  place on that unit that could be described as therapeutic in any

24  way.

25          MS. MENSCHEL:  I would like to look at Plaintiffs'

1  Demonstrative Exhibit 68.

2  Q.  Do you know what this is, Dr. Haney?

3  A.  I believe that's one of the cells that I was referring to.

4  That's one of the -- I don't know which one it is, but it's one

5  of the stabilization unit cells.

6  Q.  What about this cell concerns you?

7  A.  Well, we can start with the windows.  It's relatively

8  difficult to see in.  Nowhere near as difficult as some of the

9  other ones that we looked at, but it's not easy to see exactly

10  what's going on inside.  You really have to --

11      If you think back to the image we saw earlier of the officer

12  station, it would be impossible for an officer from that cube to

13  see into these cells, given the configuration of the cells.  So

14  you would have to -- you would actually have to walk to the

15  cells and look in, monitor, do checks.  So you really don't even

16  have a visual at the same level from one side to the other.

17      You don't have any better visual from the officer's station.

18  You can't see into the officer's station, really, and the

19  officers certainly can't see into those relatively small cell

20  windows.  So it requires a direct visual inspection all the time

21  to be -- the monitoring needs to be more or less constant in

22  these units, by which I mean not literally constant, but being

23  done frequently, or you're not going to be able to tell what's

24  going on inside the cells.

25      And, then, again, you can see -- if you look at the

1   photograph on the right, this is why I described this as not a

2   hospital bed.  This is a harsh, really stark segregation unit

3   cell.

4       If somebody showed you that picture and asked a corrections

5   person, what is that, the first answer would probably be, that's

6   a seg cell.  And as I said, oftentimes it is in that unit.

7   That's exactly what it's being used for.  But sometimes it's

8   also being used as a stabilization unit cell.

9       It's not configured differently.  They don't change the cell

10  when they put somebody in there for stabilization versus

11  segregation.  And that's what it looks like inside the cell.

12  Q.  Do you have any concern  -- you testified it would be hard

13  to see into the cells from the guard station, I believe.

14  A.  Yes.

15  Q.  Does that concern you in a stabilization unit particularly?

16  A.  Of course.  I mean, these are people who are by definition

17  in some state of crisis, and they're there to be stabilized; to

18  have their crisis stabilized and, hopefully, for their mental

19  health to improve.  But they're at risk.  By definition, this is

20  a population that is at great risk.  And so not being able to

21  easily monitor them, especially when they're living in

22  conditions like this, is of great concern.

23  Q.  Dr. Haney, I'm showing you Plaintiffs' Demonstrative

24  Exhibit 67.  Do you recognize these images?

25  A.  Yes.

1  Q.  Can you please describe them for us.

2  A.  This is another one of these cells, exactly the same unit we

3  were just looking at, a stabilization unit cell.  This is a cell

4  in which an inmate, obviously, is occupying the cell.  I don't

5  remember -- I don't think that was -- I don't think that's the

6  inmate who you just saw from the previous photograph who was

7  lying down.  I think this is a different inmate who I asked if

8  it would be okay for us to photograph his cell, and we did.  He

9  agreed and we photographed it.

10      So you can just see, again, this is another cell, another

11  example of what these cells look like.  This is -- it is a very

12  harsh, painful environment for people to live in around the

13  clock.  It would be a difficult environment, even in the

14  short-term, for somebody who was in crisis, but for somebody to

15  spend any considerable period of time there would be even

16  harder.  This particular man was there as part of the

17  stabilization unit program, so in theory, his cell was being

18  used at that point in time as a stabilization cell.

19  Q.  You mentioned that the person in the cell that's depicted on

20  the right was laying down.  Does that raise any concerns for

21  you?

22  A.  Well it would -- yes, it does, because it's hard to know

23  what they're doing or what condition they're in.  If you --

24  let's assume you were monitoring that unit and that particular

25  person, and you went to that window.  It would be hard for you

1  to know what to make of what you saw.  You know, he's covered,

2  and you don't know what -- what condition he is in, obviously.

3  So the monitoring has to be careful in this unit.

4      You can see also that maybe by the configuration of the

5  other cell, the cell on the left, that there are areas of the

6  cell that you can't see easily from the hallway.  Even the view

7  we have here doesn't show you the whole cell.  So if you notice

8  in the corner to the left, there is a commode and a sink, and

9  that's in the corner.  That's out of the sight of an officer who

10 would be going by the window.

11 Q.  Was the person in the cell on the right, which is

12 Plaintiffs' Demonstrative Exhibit 68, was he the only one that

13 you saw laying down during your tours of facilities?

14 A.  No.  And I think I mentioned this in my report.  This was a

15 common scene.  It was not as common at Holman, where I mentioned

16 earlier the kind of chaos and loud noise and people screaming

17 and banging and so on.  There were very few people sleeping

18 through that.  But in the other segregation units and in the

19 other stabilization units -- and this was particularly a problem

20 here.  And when we talk about Donovan (as spoken) in a minute,

21 the closed RTUs in Donovan, there were just massive numbers of

22 prisoners asleep at various points in time during the day.

23     Now, the reason this is of concern, I talked a little bit

24 earlier about how hard it is for prisoners to maintain a kind of

25 coherence to their routine in a segregation unit.  Prisoners

```
 1  will -- they will describe for you the fact that there's no
 2  order really imposed on them by the outside, by the prison.
 3  They're in their cell all the time, and there are no activities
 4  for them to engage in.  So in order to survive that, you have to
 5  be able to do that yourself.  And when you see lots of prisoners
 6  sleeping at various points in time during the day, it indicates
 7  not only that they have nothing to do, but that they are going
 8  to lose that personal coherence, that -- the maintenance of a
 9  routine:  Getting up at a certain time, keeping your cell clean,
10  taking care of your personal hygiene, basically forcing yourself
11  to live a quasi normal existence.  So it's always of some
12  concern to me when I go through a segregation unit and I see a
13  lot of people in the bunk with the covers over their heads,
14  because it suggests that they are at risk of deteriorating in
15  this environment.
16  Q.  And you mentioned that you saw a number of people at both
17  Bullock and at Donaldson; is that right?
18  A.  Yes.
19  Q.  Going back to the diagram, which is Plaintiffs'
20  Demonstrative Exhibit 13.  In the middle area here, I believe
21  you testified that those were classrooms and offices; is that
22  right?
23  A.  Yes.
24  Q.  Were there any cells in that area?
25  A.  It depends on what you mean by cells.  There were two -- so
```

 1  we were given a tour of this area by, I believe, a correctional

 2  captain, who was very helpful in pointing out where various

 3  things were in a unit.

 4      We came upon a large -- a relatively large room with a large

 5  window on it that you could look into, and it seemed somewhat

 6  out of place.  There was a man sleeping on the floor with the

 7  covers pulled over his head.  And I asked what the room was used

 8  for, and the correctional escort described that it was a

 9  time-out room which she explained was a room where people, if

10  they needed a break, they needed a time out, they could go.  I

11  understood it to mean a quite brief period of time, maybe

12  measured in minutes or hours.  But in any event, there was a man

13  who was sleeping on the floor.

14      As we were going through the area, I walked around to the

15  other side, to the parallel area, in this area of offices and

16  classrooms, and there was another one of these large windowed,

17  cell-like arrangements.  And in this one there was a man who was

18  standing up and was alert and who came to the door and spoke to

19  me and described something very different.

20          MS. MENSCHEL:  I would like to put up Plaintiffs'

21  Demonstrative Exhibit 64 and Plaintiffs' Demonstrative

22  Exhibit 65.

23  Q.  Dr. Haney, can you explain what these photos show.

24  A.  Yes.  The photo on the left is the first one of these that I

25  saw that I was referring to.  So you can see the large window.

 1   It may be a little more obvious how that's arranged if you look

 2   at the photograph on the right.  That's the same kind of cell

 3   but on the opposite side of the office area we were in.

 4       So the first one is where we saw a man who was lying on the

 5   floor.  Again, the correctional officer said this was a time-out

 6   room.

 7       When I went around the corner, I encountered a prisoner in

 8   the cell on the right, same kind of cell.  He described a very

 9   long time-out, which had lasted, apparently, five weeks.  He was

10   in that cell, he said, for five weeks.  He was unclear about why

11   he was being kept in the cell.  He told me that he had -- he was

12   not technically on the mental health caseload, but that he had

13   had mental health problems in the past.  He actually described

14   fairly elaborate mental health problems, but he still was not on

15   the mental health caseload, but nonetheless was being kept in

16   that room.  He said he had been there for five weeks.  He had no

17   routine.  Was not being given counseling.  Was not being given

18   access to groups.  Had limited or no access to yard.  And the

19   only time he got out of his cell, he told me, was when he was

20   taken to showers.

21   Q.  Did that concern you specifically, him living in that room?

22   A.  Exceedingly.  It was unclear why he was there.  The irony

23   that he was in a treatment unit, was living in a treatment unit

24   but was not getting any treatment at all, was impossible to

25   ignore.  And it also appeared to be a very severe form of

1  confinement.

2      I actually asked him a whole series of questions that I

3  oftentimes ask people who are in the throes of being adversely

4  affected, severely adversely affected by isolation, and he

5  scored very high on literally every dimension of the adverse

6  effects of isolated confinement.  He described having really no

7  interaction with anybody except when he was fed by correctional

8  officers or, again, as I said, when he was taken to showers.

9  Q.  What are the types of adverse effects that he presented?

10 A.  So the Court was asking me this earlier.  He was very

11 depressed.  He was very anxious.  He was agitated, upset.  He

12 said that he was suffering from confused thinking.  He was

13 having a hard time remembering things, being clear about events

14 that had taken place and so on.  He was suffering from

15 headaches, sleeplessness.  Just having a difficult time overall

16 adjusting to this environment.

17 Q.  If individual prisoners are being kept like the gentleman on

18 the right in these cells, does that present a risk of mental

19 health harm to them?

20 A.  Yes, it obviously does, for all the reasons that I've

21 described.

22      MS. MENSCHEL:  I would like to go back to Plaintiffs'

23 Demonstrative --

24 Q.  Actually, before we go back to a different picture.  The

25 windows are shown in this cell in the image on the right.  Is

1  the visibility into this cell what you should have for a crisis

2  cell?

3  A.  Well, yes, the visibility is helpful.  These are not

4  necessarily people in crisis, obviously, so it's not serving

5  that purpose for them.  For them I think it's -- it was sort of

6  serving the opposite purpose, which is the man who I actually

7  spoke to at some length talked about feeling like he was naked;

8  that he was sort of out in the open.  But for a crisis cell,

9  that would be actually an advantage because it would facilitate

10 the ease with which you could keep constant visual observation

11 over someone.

12 Q.  And these were not crisis cells.  But had they been --

13 A.  No.  As far as I know, they had never been used for that

14 purpose.

15        MS. MENSCHEL:  I would like to turn back to Plaintiffs'

16 Demonstrative Exhibit 66.

17 Q.  Dr. Haney, did you have any opinion about the space outside

18 of the cells in the stabilization unit and segregation unit in

19 the Bullock blue building?

20 A.  Yes.  Yes, I do.

21 Q.  What was your opinion?

22 A.  Well, it's the kind of space -- it's an empty, open space

23 that could be, if one wanted to, used for programming.  It's not

24 now used for programming.  You can see there's a small little

25 table there with a couple of little uncomfortable looking stools

1   on it.  But you can imagine there being tables there and chairs.

2   There's correctional furniture that you can use, even if you

3   have prisoners who aren't able to be mobile all the time, but

4   can nonetheless be out of their cell and sitting at a table and

5   engaged in productive, meaningful activities.  There's plenty of

6   space in that unit to do that.  In a stabilization unit where

7   you're trying to get people out of the throes of whatever kind

8   of psychiatric disorder they've sunk into, you can imagine that

9   being used for that kind of purpose on a limited, graduated

10  basis.  But right now, or at least at the time I saw it, it was

11  empty space that wasn't used for any of those purposes at all

12  and couldn't have been, given the way it was configured, the

13  absence of furniture and so on.

14  Q.  Do you know whether it was used for programming on days

15  other than the day you were there?

16  A.  I don't -- first of all, I don't see how it could be,

17  because I don't see where the programming could take place.  But

18  secondly, none of the prisoners described any programming was

19  taking place in that unit.  I interviewed quite a few people,

20  both cell front and confidentially from that unit.  Because it

21  was so severe and stark, I spoke to a number of people there,

22  and nobody described any programming taking place there.

23  Q.  Did you ask?

24  A.  Yes.

25  Q.  Going back to the diagram, Plaintiffs' Demonstrative

1  Exhibit 13.  The space in the middle that you mentioned, the

2  classrooms, did you have any sense of how frequently that space

3  was used for programming?

4  A.  I had developed a sense of it from several different

5  sources.  One was the source that I referred to a number of

6  times.  I talked to prisoners about how much actual programming

7  was taking place in those areas.  Were they getting classes?

8  Were they having groups?  This was space that would have been

9  appropriate for both or either of those things, classes or group

10 settings.

11      You know, you would, obviously, require a room for that.

12 You can't do that in a small office, which would be appropriate

13 for individual counseling but not for groups or classes.  So

14 these offices were relatively large, a number of them were.

15      They weren't in use the day I was there.  Again, you know,

16 as the Court said about recreation, I might have been there on a

17 day when they just weren't being used.  But they weren't being

18 used when I was there.  I didn't see any evidence of them being

19 used.  Prisoners reported they weren't being used very often.

20 They didn't say they never had them, but they said they very

21 infrequently had them.  And then there was some sort of

22 scheduling information around that suggested that they weren't

23 used very often.

24 Q.  What kind of scheduling information?

25 A.  Well, there was -- for example, there was -- in the hallway

1  there was one schedule of classes or groups up in the hallway,

2  the main hallway where these officers were.  There was only one

3  that I saw in the actual main hallway, and it had a whole list

4  of various activities that appeared to be going on in the entire

5  treatment area.  But when I looked at the date of it, it was

6  dated fully one year earlier.  So I was there in 2016.  This was

7  an activity schedule for, if I remember correctly, February and

8  March of 2015.

9  Q.  What did that indicate to you, if anything?

10  A.  Well, you know, it indicated that there wasn't -- that the

11  scheduling -- the scheduling memos were not being very

12  conscientiously maintained.  Maybe somebody forgot to take it

13  down.  But if it was serving any function, it seems it would

14  only serve a function if it was current, as a way to let them

15  know what groups were taking place and when they were taking

16  place and where and so on.  Having one that was a year old

17  wouldn't serve any function at all.

18  Q.  How did you feel about the noncell space, the classroom

19  space, therapeutic space in the Bullock blue building overall?

20  A.  I thought it was fine.  This area that you've circled now?

21  I thought it was fine.  It looked -- it was open.  It was well

22  lit.  It looked like it was a place where there could be groups.

23  There could be classes.  There were -- you know, I -- it was

24  hard for me to figure whether there were enough spaces to

25  accommodate all of the people in the RTU.  If you look at the

1  area, the housing units to the left of that, those are pretty

2  big units.  But it nonetheless -- it was what I would regard as

3  a good treatment space.  It just didn't appear to be -- it

4  didn't appear to me to be in much use.

5  Q.  If it's not in much use, if the space is not in much use,

6  does that present a risk of harm, of mental health harm to

7  prisoners?

8  A.  Yes.  Prisoners that are in that unit for therapy, treatment

9  and therapy in a residential treatment unit, virtually always

10 includes some form of group therapy, group contact.  As I said,

11 prisoners reported getting very little of that, very little, and

12 even less that was meaningful.  And if, indeed, their reports

13 were accurate, my impressions that the space was underused means

14 that the large number of prisoners in that unit would not be

15 getting treatment that they otherwise needed.

16        MS. MENSCHEL:  Your Honor, I would like to offer

17 Plaintiffs' Demonstrative Exhibits 64, 65, 66, 67, and 68 into

18 evidence.

19        THE COURT:  Admitted.

20        MS. MENSCHEL:  And I would also like to offer

21 Plaintiffs' Demonstrative Exhibit 13, which is this map in front

22 of you, into evidence under seal.

23        THE COURT:  Admitted.

24 Q.  Dr. Haney, did you visit Bibb Correctional Facility?

25 A.  I did.

1  Q.  We've been talking throughout the day about your first

2  opinion that ADOC is -- the mental health system in ADOC is a

3  system in crisis.  Did you see evidence to support that opinion

4  at Bibb?

5  A.  Yes.  Quite a bit.

6  Q.  How so?

7  A.  Bibb -- I was at Bibb on the 17th of March 2016.  This was

8  during that week when I described earlier for the Court these

9  various events were taking place in the system.

10      When we arrived at Bibb, the warden at Bibb was very

11  concerned and very forthcoming and said directly to me, you

12  can't see half of the institution because I can't guarantee your

13  safety.  We have a situation, and it's too dangerous, and we

14  can't go in.

15      I persisted a little bit because it turned out that the area

16  where we couldn't -- that we couldn't go into was something

17  called the behavior modification unit, which I had read about in

18  documents about the system, and was interested in seeing.

19  Because the name implied that it was kind of a quasi treatment

20  unit, and I thought it was a place that I should look at and

21  assess.  But he was adamant that I couldn't.  And I learned sort

22  of in the course of the day that the reason he was so adamant

23  about not going to that unit was because that unit was where the

24  problem or the disturbance or the situation had occurred.  So

25  that was the beginning of the visit to Bibb.  A whole half of

1    the institution was inaccessible to us.

2        As we began the tour at Bibb, we walked to the infirmary

3    area of the institution.  And as we walked there, I could see

4    off to the left prisoners being pulled out of what I learned

5    later was the behavior modification unit and being relatively

6    forcibly treated by correctional officers who were pushing them

7    down the stairs, yelling at them, and so on.  And that was --

8    apparently, they were quelling the disturbance that had taken

9    place in that half of the institution.  So we got to see

10   firsthand some of what was going on in that unit -- in that

11   facility.

12       Then we entered the -- we entered the infirmary, and I went

13   to speak -- there were two men who were in crisis cells in the

14   infirmary.  I went to speak to one of them who explained to me

15   that he had been -- he had been in the behavior modification

16   unit where the disturbance had been taking place.

17       And as I was talking to him, there was a commotion next to

18   me, around the cell alongside of me.  And I backed away and

19   realized that the man in the next cell had placed a blanket up

20   on the window of the crisis cell and was -- we learned later had

21   placed a ligature around his neck and was attempting to hang

22   himself.  One of the lawyers with us -- I forget which one --

23   saw this when it happened.  I was talking to the prisoner in the

24   other cell.

25       We stepped back.  The warden, who was touring with us,

1  immediately called some other correctional officers.  They

2  entered the cell and resolved the situation, I thought, very

3  well, peacefully and very effectively.  But it was -- you know,

4  we had been at the institution at that point I think an hour,

5  and that's what we saw.

6      But we went on.  After we left the infirmary area, I was

7  going to tour the other part of the facility that I -- that we

8  were allowed to see.  And as we walked out the walkway into the

9  yard, I saw there were a group of men in a holding pen.  Perhaps

10  men who had been taken out of the behavior modification unit and

11  placed in that pen, I don't know, but they were standing in a

12  holding pen in the yard.  And one of them proceeded to climb

13  over a fence and try to escape from the holding pen and ran

14  across the yard and was chased down by a group of correctional

15  officers who, you know, cornered him and took him back to the

16  holding pen and put him in the pen.

17      You know, it was an eventful morning at Bibb, and we had

18  just begun.

19  Q.  What, if anything, does the set of events that you just

20  described imply to you about the risk to the mental health of

21  prisoners at Bibb?

22  A.  Well, these are indices of a very dangerous environment.

23  And that's, you know, obviously, not just my opinion.  That

24  was -- that's the characterization voiced by the warden of the

25  institution.  Obviously, if half of the prison was too dangerous

 1    for us to enter, then it was very likely dangerous for the

 2    prisoners who were living there.  And certainly, in the course

 3    of the interviews that I did with prisoners later in that day, a

 4    number of whom had been in -- were from the behavior

 5    modification unit, they described just a chaotic situation.  In

 6    fact, far from being a therapeutic treatment environment, the

 7    prisoners' term for that unit is hot bay, meaning that it is a

 8    hot, active, conflict-ridden environment; far from being a

 9    therapeutic environment.

10         And so, you know, these kinds of circumstances, this kind of

11    atmosphere, has an impact on all of the prisoners who are

12    confined in a prison.  But certainly prisoners who are mentally

13    ill, who for the reasons I described earlier today are otherwise

14    vulnerable even in the best of circumstances, to being in an

15    environment like that would place them at special risk of harm.

16    Q.  You talked a little bit about the structure.

17         MS. MENSCHEL:  I would like to look at Plaintiffs'

18    Demonstrative Exhibit 69.

19    Q.  Can you explain what this is, Dr. Haney.

20    A.  Yes.  So this is the -- if I remember this correctly, this

21    is -- well, I just talked about the behavior modification unit

22    or the hot bay.  That's here.  That's B unit.  This is the area

23    right here, the stairs in front of B, where we saw the

24    correctional officers removing the prisoners and putting them on

25    the ground.

```
 1        This is the -- this side of the prison is where we were

 2   allowed to tour.  This other whole half was off limits.  Where B

 3   is was off limits.  We were in the infirmary -- and I'm not sure

 4   I know where that is.  Maybe you can help me with -- mine is

 5   blurry, and I can't quite see where the infirmary is.  But in

 6   any event, the infirmary was --

 7             THE WITNESS:  This is going to be imprecise, Your

 8   Honor.

 9   A.  -- somewhere over here, if I remember correctly.

10        In any event, we walked out here and over here.  Right

11   around here is where the escape -- so called escape was

12   attempted.  And then we -- I did do some touring in one or the

13   other of D, E, and F, which are mainline housing -- housing

14   dorms which -- each of which have a segregation unit attached to

15   them.

16   Q.  How do the different housing dorms -- A, B, C, D, E, F --

17   compare to each other, as far as you understand?

18   A.  My understanding is that they are all exactly the same.

19   They're structured the same.  The only one which is different,

20   and not different in terms of how it's built but different in

21   terms of how it's run, is B.  That's the behavior modification

22   dorm.

23   Q.  You mentioned that each of the units have a segregation unit

24   in them.  Do you have any understanding, looking at this unit,

25   of where the segregation unit would be?
```

1  A.  So I believe that the segregation units are where the circle

2  has been placed.  It's a little hard to describe from the

3  architectural schematic.  But there are main housing units, and

4  then there's a walkway that you go through.  And around that

5  walkway you go to the back of the walkway, and there's a locked

6  door.  And inside, on the other side of that locked door, are

7  several segregation cells, also, obviously, with locked doors on

8  them.

9  Q.  Is that a standard design in your experience touring

10  facilities?

11  A.  I've never seen anything like it.

12  Q.  Does it concern you?

13  A.  Greatly.

14  Q.  Why?

15  A.  They were the most inaccessible cells I think I've seen in a

16  mainline housing unit maybe ever.  I can't -- I haven't been

17  able to adequately explain, I know, by describing how you have

18  to get to them.  It's sort of a circuitous route.  It's down a

19  long hallway and then a door, and the cells are behind the door.

20  There's no other visual access to the cells.

21       THE COURT:  I can't see what he's talking about from

22  this.  Is there no diagram --

23       MS. MENSCHEL:  This is the diagram that we were given.

24  And I'm happy to ask Dr. Haney -- I don't know the answer to

25  this -- if he would be able to draw an image of what he's trying

1    to explain.

2          THE COURT:  From his description, that sounds like that

3    would be a bit difficult.  You know, to say "go here" and "then

4    you go around there" and "you go around here" and "go around

5    there" doesn't really help me very much.  But if he can, you

6    know, he can make an attempt.  I guess I'm just speaking from my

7    own drawing limitations.  Maybe he has better --

8          MS. MENSCHEL:  Certainly.

9          THE WITNESS:  I'm not sure --

10          MS. MENSCHEL:  Your Honor, may I have one second?

11          THE COURT:  Right.

12       (Brief pause in the proceedings)

13          MS. MENSCHEL:  Your Honor, if Dr. Haney is comfortable,

14    I would like to ask him to try to draw it out.  I would also --

15    we would welcome it if the defendants would be able to give us a

16    diagram of the inside of one of the facilities or give the Court

17    a diagram of the inside of one of the facilities that might show

18    it better.

19          THE COURT:  Do you know whether such exists, that kind

20    of detail?

21          MR. LUNSFORD:  I'm going to have to defer to Mr. Smith

22    on that one.

23          THE COURT:  Mr. Smith, do you know whether such exists?

24          MR. SMITH:  No, sir.  I don't know that we have one.

25          MS. MENSCHEL:  And, Your Honor, we also would indicate

```
1   that we have asked the Court if the Court would be willing to
2   visit some of the facilities, and certainly we think that would
3   help with understanding this particular facility.
4            THE COURT:  I still would like to have a diagram, even
5   if I were to visit the facilities.
6            MS. MENSCHEL:  Certainly.
7            THE COURT:  Also, I think the record should reflect
8   what he's talking about anyway.
9            MS. MENSCHEL:  I'm sorry, Your Honor.  I didn't hear
10  you.
11           THE COURT:  The record should reflect what he's talking
12  about anyway.
13  Q.  Dr. Haney, would you be able to try to put our art skills to
14  work?
15           THE WITNESS:  Your Honor, I'm going to apologize for
16  this in advance, because this is not going to do this justice.
17  But --
18           MS. MENSCHEL:  Your Honor, may I approach with the
19  microphone?
20           THE COURT:  Yes.
21           THE WITNESS:  So what I remember about this, Your
22  Honor -- and this is just from memory -- is that there is a
23  walkway that adjoins the larger housing unit, which is over
24  here.  And then I don't remember whether you actually go through
25  the housing unit or whether you actually turn to the side.  But
```

1  you walk down a fairly long, empty hallway.  There is no visual

2  access even in the hallway, and you're really walking down this

3  empty hallway.  And then you come upon a door, a locked door.

4  And you open it -- or a correctional officer opens it --

5          THE COURT:  Would you stop for just a minute.

6      (Brief pause in the proceedings)

7          THE COURT:  Go ahead.

8          THE WITNESS:  And what's critical about this is that

9  even this is outside of the visual access by anybody unless you

10  are a correctional officer purposely walking down this hallway,

11  opening this door, and going into this unit.  And inside the

12  unit then, there is an open area -- and we have some photographs

13  of this.  We'll be able to pick it up visually in a minute.

14  There is an open area, and then off of that there are

15  segregation cells.  So they are -- this is a unit that is

16  completely isolated and self-contained from anybody and anything

17  except for the people who are behind this door and anybody who

18  might go down that hallway and open the door and go in --

19          THE COURT:  You say "behind this door."  What do you

20  mean, behind this door?

21          THE WITNESS:  This door here is a solid door.  We

22  have -- I think we have a photograph of it.  Maybe we do.  But

23  it's a locked door that allows you access into this segregation

24  unit.  And it's closed.  So you have to be -- you wouldn't know

25  what was going on inside there unless you opened it and went in.

```
 1              THE COURT:  Where are the COs?

 2              THE WITNESS:  Well, the COs are around here.  And

 3    then -- you know, when they go back there to check, they would

 4    go back there to check.  But they're not -- you know, ordinarily

 5    a CO is within visual contact of prisoners.  Even if he or she

 6    is overseeing a dormitory, you're present in that environment.

 7    You have visual -- if something happens, somebody yells, you're

 8    present.  I would venture not only can you not see back there,

 9    you can't hear what's going on back there.

10              THE COURT:  So your problem here is that the COs are a

11    distance away from the entire unit, and that distance is -- I

12    guess you would consider aggravated by the fact that it's just a

13    long hallway.  So anything could be going on back there, and

14    they could neither hear nor see it.

15              THE WITNESS:  That's correct.  And it also adds to the

16    isolation of the people in the unit.

17              THE COURT:  How does it add to the isolation?

18              THE WITNESS:  Because they see no one except for people

19    who are purposely going back there for the reason of opening

20    that door and coming in and checking on them.

21    Q.  Before you sit down, Dr. Haney, can I ask you to -- where

22    are the showers for the segregation unit?

23    A.  They're out here off the hallway.

24              THE COURT:  So you would have to come out to take a

25    shower?
```

```
1         THE WITNESS:  Exactly.
2  Q.  And on this diagram you drew, can you indicate where the
3  general -- the dorms are for the unit?
4  A.  The dorms are over here, but at a distance from this.  This
5  is -- not only is this not very pretty, but it's not to scale
6  certainly.
7         MS. MENSCHEL:  Your Honor, we will try to see if we can
8  come up with something before tomorrow.
9         THE COURT:  Great.
10 Q.  So, Dr. Haney, you talked a little bit about your concern
11 about these units.  How do they compare to other segregation
12 units you've seen around the country?
13 A.  Well, as I said when I started the discussion of this, I've
14 never seen a unit like this anywhere --
15        MR. SMITH:  Your Honor, again, we would object to the
16 relevance of this.
17        THE COURT:  Overruled.
18 A.  Anything remotely like it.  For the reasons that we've --
19        THE COURT:  By the way, when I say something is
20 overruled, you can still argue to me later that it doesn't
21 deserve to be credited by the Court.
22        MR. SMITH:  Thank you, Your Honor.
23 Q.  Go ahead.
24 A.  These units are, in my opinion, extremely dangerous for
25 anybody who's housed in them.  Anybody who might suffer a
```

1    medical emergency, anybody who might be suffering a

2    psychological or psychiatric emergency, would be at the mercy of

3    the correctional officers' routine.  Not suggesting that people

4    would be irresponsible or not be doing their rounds or whatever,

5    but these are -- correctional officers have responsibilities in

6    the main housing units to begin with.  They're large housing

7    units in these facilities.  They're bunk units.  They're not

8    easy to oversee either.  And then there is this additional duty

9    of going back to the seg cells.  And the condition of the cells

10   themselves, the condition of the unit, suggested that there was

11   relatively little contact between anybody else in the prison

12   system and the people who were back in that unit.

13              MS. MENSCHEL:  I'd like to talk about the conditions of

14   the unit that he just referenced, and I'm going to pull up

15   Plaintiffs' Demonstrative Exhibit 72.

16   Q.  Do you recognize this photograph?

17   A.  Yes.

18   Q.  What is it?

19   A.  It's back in that unit.  It's one of the cell doors to the

20   unit.

21   Q.  You said that the conditions of the unit itself were

22   concerning.  Does anything about the conditions depicted in this

23   image concern you?

24   A.  Well, again, I mean, the dirt, the soiling.  I mean,

25   obviously, no one has been back there recently to clear the

 1  smearing off of the doors or off of the floor.  These are -- The

 2  deteriorated nature of the conditions suggests that this is an

 3  area that's not of high priority particularly to anybody, and

 4  certainly not to anybody who would go back there and clean.

 5         MS. MENSCHEL:  I'm going to pull up Plaintiffs'

 6  Demonstrative Exhibit 73.  I'm actually going to pull up

 7  Plaintiffs' Demonstrative Exhibit 71 instead.

 8  Q.  What does this image show?

 9  A.  That's the hallway that -- that's inside that unit, behind

10  the first door that opens into the segregation unit itself.  And

11  that shows the floor -- it's another shot of the floor.  It

12  shows another one of the cell doors, the general dirt and

13  disrepair in the unit.

14     The day we went in there, there was a vague smell of a fire.

15  I think the correctional officer maybe even said there had been

16  a fire set in there earlier in the day out on the floor.  I

17  think there were some ashes that were still present on the floor

18  when we went back there.  You know, this is -- these are tucked

19  away both physically and, it would appear, psychologically from

20  the rest of the institution.

21  Q.  We talked a little earlier about fires in segregation units.

22  What would a fire in these units imply to you?

23  A.  Desperation.

24         MS. MENSCHEL:  I'm going to go to Plaintiffs'

25  Demonstrative Exhibit 73.

1  Q.  What do these images show?

2  A.  This is inside one of those cells.  The men in these units

3  were double celled.  I believe -- I looked at two separate ones

4  of these units, the one we're in now and another one.  These

5  units, incidentally, exist in all of the housing units

6  throughout the prison.  So when we were on one side of the

7  prison, there were three of them.  It's my understanding there

8  were at least three of them on the other side as well, with the

9  same number of cells and the same configuration.  In any event,

10  I saw two of them.

11      This is an example of cells in one of them.  You know,

12  these -- the cells are dirty.  They're deteriorated.  These men

13  are barely hanging on.  You know, they've got food on the floor.

14  They're trying to -- you know, they've got a blanket hanging

15  down.  Many of the people back there were asleep when we went

16  in.  By now, it was probably noon in the day.  A lot of the men

17  back in these units were asleep.  You can see hanging on the

18  wall -- one of the things that several of them complained about,

19  and certainly the guys in this cell complained about, was that

20  they had no cleaning utensils, so they had torn up some dirty

21  rags, and those rags are hanging on the cell wall.  That's the

22  bottom photograph.  And they told me that's what they had to use

23  in order to try to keep their cell just barely clean, but,

24  obviously, they weren't able to do a very good job.  You can see

25  the rust and the dirt on the floor.  Over on the right you see

1    there is a grocery bag that was for waste that was building up

2    in their cell.

3        And some of the men had been back there for a considerable

4    period of time.  Weeks or months.  A couple of guys had just

5    gotten there, but other guys had been there for quite some time.

6    And they described, as I've been discussing, rarely getting

7    checked on by anybody.  That's how they described it.  And even

8    though several of them were on the mental health caseload, they

9    described not being seen by anybody or not being seen for weeks

10   by anybody while they were back there.

11   Q.  Did the people who told you they had not been seen for

12   weeks, was that one or two people or was there any consistency

13   to it?

14   A.  There was consistency to it.  Several.  I didn't talk to

15   literally everybody back there, but the ones that I talked to

16   basically told the same story.  And they were from different

17   units.  Obviously, they were not overhearing each other.  People

18   from different units said basically the same thing.

19   Q.  We talked a little bit about the showers in these units.

20           MS. MENSCHEL:  I'm going to pull up Plaintiffs'

21   Demonstrative Exhibit 74.

22   Q.  Do you recognize this photo, Dr. Haney?

23   A.  I do.

24   Q.  What's this?

25   A.  That's the door to the shower in the hallway.  Remember, I

 1  said that the shower was outside the main door that got you into

 2  the unit.  So in order to get a shower, you would be escorted by

 3  an officer out of the unit, and right around the corner is this

 4  door which opens into the shower.

 5  Q.  What was the condition of the shower units?

 6  A.  The shower units were terrible.  They were as deteriorated

 7  as the cells themselves, if not more so.

 8          MS. MENSCHEL:  I'm going to pull up Plaintiffs'

 9  Demonstrative Exhibit 75.

10  Q.  Can you describe what's in this picture.

11  A.  That's the shower.  That's the floor of the shower in the

12  unit that we were just looking at.  So the men would go from the

13  cells that we were -- that were in the preceding pictures, out

14  to shower, and they would go through the shower door and into

15  the shower.

16  Q.  These images look pretty bright.  Was that your experience?

17  A.  They look red?

18  Q.  Bright.

19  A.  Bright?  No, it wasn't my experience.  That's -- and, in

20  fact, I should have pointed this out when we -- when you had the

21  photographs of the cell up on the screen.  This is a byproduct

22  of us using a flash.  I tried to have photographs taken through

23  the window of the cell.  In a couple of instances I wanted to do

24  that because the prisoners weren't awake and I just wanted to

25  see if we could get a image of the cell without having to wake

1   anyone, but you couldn't.  It was too dark inside the cells.

2   You couldn't actually do it.  So we had to open -- when we got

3   the door open, we used a flash on the camera, and it lit up the

4   cell.  The cells were not that well lit at all, nor was the

5   shower.  The shower was very dark, and it appears well lit only

6   because there was a flash used on the camera.

7   Q.  You said a moment ago that this is what you saw in different

8   units, I think was the term you used.  What do you mean by

9   different units?

10  A.  Well, there was -- at Bibb, these segregation units exist

11  attached to all of the larger housing units.  So this is --

12  these are photographs from one of the segregation units.  We

13  went to another one.  It was essentially exactly the same.  I

14  just selected photographs from one of them, not all of them.

15  But it is the same -- basically, the same configuration.  And I

16  didn't go into all of them, but it was my understanding that

17  they were configured exactly the same.

18  Q.  Do you believe that being housed in these units presents a

19  risk of harm to mentally ill or seriously mentally ill

20  prisoners?

21  A.  Yes.  Profoundly so.  These men were really at a kind of

22  subsistence level, existence.  They were barely holding on when

23  I talked to them.  Several of them had significant mental health

24  histories.

25      Ironically, one of the men that I interviewed in this unit,

1    I saw when I reviewed his mental health file that earlier he had

2    been having very serious problems.  And a recommendation --

3    treatment recommendation for him was that he needed more social

4    contact.  He needed to be placed in environments where he would

5    get a more full contact with other people.  He needed

6    socialization experiences.  And some months later, this is where

7    I found him, back in this unit.  He could hardly have been more

8    isolated from the rest of the prison population than he was in

9    this unit.

10   Q.  I believe you also said you visited some of the dorms; is

11   that right?

12   A.  I did.

13         MS. MENSCHEL:  I would like to look at Plaintiffs'

14   Demonstrative Exhibit 70.

15   Q.  Could you describe what's going on here.

16   A.  Yes.  So this is a Bibb dormitory.  There are a number of

17   them.  I assumed that all of them are configured in more or less

18   the same way, although, again, I only saw half of the facility.

19        The men are turned away for purposes of taking the

20   photograph.  That was to preserve their anonymity.  But, you

21   know, you can see what a dormitory looks like.  This is a little

22   bit different configuration from the Holman dormitory.  Bibb is

23   a medium security prison and so, you know, the concerns I have

24   about dormitory housing are just generic or general concerns

25   about it.  It's typically used only in minimum security.  The

1  real problem with Holman was it's a maximum security prison.

2  But here, you can see these are crowded units.  These are not --

3  there are people packed together pretty tightly, and it puts

4  stress on mentally ill inmates if they're around other prisoners

5  and don't feel safe and feel as though they might be vulnerable

6  to being preyed on.

7      There's also -- this is also an example of something we saw

8  throughout the system, which was relatively widespread idleness.

9  The dormitory housing units that I went into were full and

10  people were there during the day, in the middle of the day,

11  not -- ordinarily in prison contexts when systems are working

12  the way you expect them to, there are prisoners out working.

13  It's not common to be in a cell or in a dormitory during working

14  hours.  You're either in a classroom or you're at a job or

15  you're getting vocational training or something.  There was

16  relatively little movement in these facilities, and this was

17  certainly true at Bibb as well.

18      Now, you know, one day, one place, but this was not an

19  uncommon scene.  A little later we'll get to Kilby and some

20  other facilities, and the same thing.  Not a lot of activity

21  taking place in the dormitories.  So they're not only crowded,

22  but they're crowded and it would appear that the prisoners have

23  relatively little to do.

24  Q.  Do you know whether there were activities that were

25  happening on other days when you were not at the facility?

1  A.  I didn't have any -- didn't see any evidence that there was

2  or were.  They didn't no one described to me.  Prisoners didn't

3  describe them.  They didn't describe having jobs, for example,

4  or taking classes, for example.

5  Q.  Did you ask prisoners you spoke with about the types of

6  activities that they engaged in on most days?

7  A.  I often said, how do you spend your time?  What do you do?

8  And most of them described widespread idleness; that they did

9  not have very much to do.  Some of them tried to describe it for

10  their unit and talked about being in a unit of 40 or 50 men when

11  only one or two of them had a job and one or two of them was

12  taking a class.

13  Q.  Was it your impression that the idleness you saw was

14  specific to the day you were there or a more general state of

15  being?

16  A.  Well, I mean, my impression certainly from talking to the

17  inmates and from the observations I made at other institutions

18  was that it was widespread.  Obviously, at the same time, I was

19  at Bibb one day, so I can only describe what I saw on that day

20  at that facility.

21         MS. MENSCHEL:  Your Honor, I'd like to offer

22  Plaintiffs' Demonstrative Exhibits 70, 71, 72, 73, 74, and 75,

23  which are the Bibb photos, into evidence.

24         THE COURT:  All admitted.

25         MS. MENSCHEL:  I would also like to offer the facility

```
 1    map under seal, which is Plaintiffs' Demonstrative Exhibit 69.

 2            THE COURT:  Admitted.

 3            MS. MENSCHEL:  May I have a moment, Your Honor?

 4            THE COURT:  Yes.

 5        (Brief pause in the proceedings)

 6    BY MS. MENSCHEL:

 7    Q.  Dr. Haney, did you also conduct an inspection at Kilby?

 8    A.  I did, yes.

 9    Q.  When did you visit Kilby?

10    A.  Let me get the date exactly right.  Kilby was on the 18th.

11    It was the next day after Bibb.

12    Q.  Can you tell us a little bit about Kilby's role in the

13    Alabama Department of Corrections.

14    A.  Yes.  As I'm sure people know, it's the intake facility for

15    men in the Alabama Department of Corrections.  With very few

16    exceptions, everybody coming into the system, males coming into

17    the system, go through Kilby.  They go through the intake

18    process at Kilby, and then they are assigned out to one or

19    another other prison.  Kilby also has a group of inmates who are

20    housed at Kilby as permanent duty, but for the most part people

21    go through Kilby and then go elsewhere.

22            MS. MENSCHEL:  I'm going to pull up Plaintiffs'

23    Demonstrative Exhibit 134.

24    Q.  Do you recognize this diagram?

25    A.  Yes, more or less.  It's Kilby.  It will take me a minute to
```

1   orient myself to where we are.

2   Q.  We can zoom in a little bit.  I'm going to pull up next to

3   this Plaintiffs' Demonstrative Exhibit 77.  Do you recognize

4   that image?

5   A.  Yes, I do.  It's the so-called receiving bay.  This is where

6   prisoners come into the system on either a bus or whatever

7   transport they're coming in on.

8   Q.  Looking at the image on the left, do you know whether that

9   is, in fact, the receiving bay that's pictured there?

10  A.  Yes.  It's labeled as such, and I recall it being near the

11  laundry when we toured the institution.  The laundry was

12  adjoining the entry -- the entry area for the institution.

13          MS. MENSCHEL:  I would like to pull up on the right

14  Plaintiffs' Demonstrative Exhibit 78.

15  Q.  Could you describe this image.

16  A.  Yes.  This is the next step.  Prisoners come through the

17  receiving bay and come into the in-processing cages where, you

18  know, various things happen to them.  Property is exchanged and

19  various identifications get made and so on.  It begins the

20  process by which they're moved into the prison system

21  officially.

22  Q.  You mentioned that there is a more permanent population at

23  Kilby.  Did you visit any of those dorms?

24  A.  Yes.  There were several working dorms.  I went into at

25  least one of them at the institution.

1              MS. MENSCHEL:  I would like to pull up Plaintiffs'

2    Demonstrative Exhibit 79.

3    Q.  Do you recognize that image?

4    A.  Yes.  That's one of the dorms that is, as I recall, G dorm

5    where prisoners who were assigned to Kilby were housed.  Again,

6    another configuration of an open dormitory area.

7    Q.  On the image that I've identified on the map in front of

8    you, is that this dorm?

9    A.  It is.

10   Q.  What was your impression of the population in the dorm you

11   visited?

12   A.  Again, pretty crowded -- pretty crowded dormitory.  Pretty

13   full the day we were there.

14       You know, this is the kind of image that you don't see in

15   many prison systems, but it's not uncommon in Alabama.  It's

16   part of the overcrowding issue.

17   Q.  Did you visit any segregation units at Kilby?

18   A.  I visited a number of segregation units at Kilby.  Yes.

19   Q.  Okay.  I would first like to talk about the main segregation

20   unit at Kilby, and I'm going to put up Plaintiffs' Demonstrative

21   Exhibit 80.  Do you recognize this image?

22   A.  Yes, I do.  This is one of the hallways in what is referred

23   to -- I think by everybody, but certainly by the prisoners -- as

24   Big Seg.  It's a very large, two story -- I think it's just two

25   stories, but it's a big, imposing segregation structure.  Very

1    hot the day I was there.  The ventilation was terrible.

2    Prisoners complained about it a great deal.

3        It's very closed in.  I don't know if you can get a sense

4    from the photograph, but the cells are on both sides, so the

5    other side of this building is another set of the same --

6    basically, the same -- a mirror image of this.  And the unit

7    itself feels very claustrophobic even as you walk through it.

8    It's very noisy, or can be, and the ventilation in the entire

9    unit and certainly in the cells is problematic.  The air is kind

10   of heavy and dank, and prisoners complained a great deal about

11   insects; about rats.  I heard these stories, not just from

12   people who were housed here, but from other prisoners in other

13   units who talked about Big Seg, having been in there, and having

14   been -- having been overridden by insects and rats coming into

15   their cells at night.

16       It's an old facility.  This is an old unit.  It gets a lot

17   of use.  It's pretty full.  Might have been completely full the

18   day I was there.  And so there are a lot of people in

19   segregation, confined in their cells for long periods of time in

20   this very closed-in space.

21   Q.  Did you have concerns about the mental health impact of

22   being in Big Seg for individuals who were housed there?

23       I can restate that --

24   A.  Yes, I did.  I do.

25       I mean, this is a very -- this is a very -- a different

1  configuration of a very problematic segregation environment.

2  These are prisoners who, again, are in their cells pretty much

3  around the clock.  They get out for some recreation, they get

4  out for showers, but they don't get out for anything else.  And

5  they are living in a kind of pressure cooker environment.

6      Little bit -- a big unit, different from -- most of the

7  segregation units we've been looking at are relatively small.

8  This one at Holman was large.  The configuration of Holman was

9  different.

10     But this is also a large segregation unit and susceptible to

11 becoming very chaotic and loud.  So you think of -- sometimes

12 think of segregation as being sensory deprivation, and you are

13 deprived of the opportunity to have a lot of sensory experiences

14 that you would have in your day-to-day life:  social contact,

15 touching another person, even shaking somebody's hand.  Not

16 something you do when you're in segregation.  We've talked about

17 not having much property and not having any activities and

18 limited exercise and so on.

19     But sometimes segregation, in a big unit like this, can

20 subject you to something else which is also very stressful and

21 can be painful, which is sensory overload.  You are locked in

22 your cell, but you are around and in a chaotic environment where

23 people are loud.  They're noisy.  The unit is noisy.  If there

24 are mentally ill prisoners in the environment or just prisoners

25 who talk out a lot or act out a lot verbally, you can't --

1  there's no way to escape from that.  So there's the kind of

2  opposite toxic stimulation that you get from having too much

3  noise that you can't control or dampen.

4  Q.  How significant, in your opinion, is the risk of mental

5  health harm to prisoners housed in this unit?

6  A.  It's very significant.  And it would be all the more

7  significant for prisoners who are mentally ill, for all the

8  reasons we've described.

9        MS. MENSCHEL:  I would like to look at Plaintiffs'

10  Demonstrative Exhibit 81, which I'll pull up on the right.

11  Q.  Can you describe what's on this image.

12  A.  Yes.  This is an empty cell in Big Seg.  So you can get a

13  feel for what it looks like, the size of the cells.  These are

14  small cells.  When I said this was a packed unit, it's not --

15  there's a lot of cells in it, but the cells themselves are very

16  small.  And you can see what they look like, both with the

17  barred doors, and then also with the -- what it looks like with

18  an empty cell, inside.  You can see there is very little -- what

19  to say -- moving-around space inside these cells.

20  Q.  Does anything about the proximity of the sink unit and the

21  bed concern you?

22  A.  Well, it's not a very habitable or pleasant accommodation.

23  You're -- as I've said earlier -- and this is particularly vivid

24  because these cells are quite small -- you are basically eating

25  and sleeping within a few feet of the toilet and sink.  And

```
 1   there's no escape from that.  That's the reality of what life in
 2   one of these units is.
 3   Q.  What was your experience -- what did you learn of the units
 4   and the environment in the unit from conducting interviews at
 5   Kilby?
 6   A.  Well, I learned -- you know, the prisoners complained
 7   vociferously about this unit.  I said this already.  There are a
 8   lot of people in this unit, and this is a kind of notorious
 9   unit.  This and Holman are very notorious seg units in the
10   system, maybe because there are so many prisoners housed there.
11   Maybe because it's also a place where there is a lot of noise
12   and chaos and people don't forget having been there.  But there
13   were certainly prisoners who were mentally ill who were there,
14   and some of them I interviewed were suffering as a result of
15   being confined in this environment and felt they were
16   deteriorating there.
17   Q.  I think you mentioned that you visited other segregation
18   units as well; correct?
19   A.  At Kilby, yes, I did.  Yes.
20   Q.  The unit that's highlighted on the map in front of you, did
21   you visit that unit?
22   A.  Yes, I did.
23   Q.  What unit is that?
24   A.  It's O dorm or O unit.
25   Q.  What did you understand that unit to be?
```

1    A.  Well, I understood it to be a segregation unit.  From my

2    observation of it, it's built and run just like a segregation

3    unit.  That's what the prisoners described it as.  The routine

4    that they described experiencing there was a standard

5    segregation routine.

6        They were in -- they were in great despair, frankly.  It was

7    a very severe unit.  And a number of the prisoners there were

8    really, I think, having a very difficult time, given how they

9    were being treated and what they were experiencing.

10       They described all sorts of problems in that unit.  They

11   described -- actually described correctional officer brutality

12   in that unit.  They described being -- languishing there without

13   any mental health care; without any opportunity to go to yard.

14   Some of them were very young.  Couple of them were housed there

15   because they were juveniles.  And it was a very severe,

16   memorable unit.

17            MS. MENSCHEL:  I would like to pull up on the right

18   Plaintiffs' Demonstrative Exhibit 82.

19   Q.  Can you describe what is shown in this picture.

20   A.  That's the unit we've been talking about.  That's O dorm.

21   Again, relatively pleasant looking in the hallway, but, in fact,

22   inside the cells was a very different story.

23       When you actually talked to people -- some of them I talked

24   to cell front and others -- in addition to that, a few others I

25   talked to in individual interviews, confidential interviews.

1  They described what it's like to live in that unit.

2  Q.  I believe you testified that you recognized it as a

3  segregation unit.

4  A.  Yes.

5  Q.  How so?  What about it indicated that it was a segregation

6  unit?

7  A.  Well, the term "segregation" or "solitary confinement" or

8  "isolated confinement" is sort of a term of art in corrections.

9  It generally is used to refer to prisoners who are housed

10 separately 22 or 23 hours or so a day, separately from the rest

11 of the institution.  So this is what I've been referring to as

12 segregation.  This is what it typically means.  You're in your

13 cell most of the time.

14     That's exactly what the routine was in this cell.  These men

15 were not in classes.  They didn't have jobs.  They weren't

16 taking vocational training.  They were housed in their cell at

17 least 22 or 23 hours a day, and they had no other activities.

18 They had the basic segregation-issued property.  Their access

19 outside was largely to yard when they got an opportunity to go

20 to yard, but otherwise they were housed inside their cell.  And

21 that was segregation.

22          THE COURT:  How would that differ from just being in a

23 safe cell?

24          THE WITNESS:  No different, Your Honor.  I mean,

25 basically, you're involuntarily confined to your cell pretty

```
 1   much around the clock either way.

 2            THE COURT:  So safe cell could be segregation, too, be

 3   viewed as segregation?

 4            THE WITNESS:  It could be, although you would be in --

 5   you would -- you can be in a safe cell or in a cell for your own

 6   safety or protection but not necessarily housed there around the

 7   clock.  In other words, you could be -- you could be given

 8   access to activities.  You could be given access to -- you could

 9   be given access to extra property.  Because you're not being

10   there being punished, you're being there because you're there

11   for your own safety.

12            THE COURT:  So being in a safe cell, you could still

13   have access to programs and stuff?

14            THE WITNESS:  You could, with care.  Carefully done,

15   yes.

16            THE COURT:  Or just access to being around other

17   inmates?

18            THE WITNESS:  Other inmates who were simply confined

19   for their own safety.  So, for example, if you were concerned

20   that you had 17-year-olds in a prison system, you could house

21   them in a small unit where they were safely kept away from

22   adults but where they had an opportunity to engage in other

23   kinds of activities, you know, access to a day room, access to

24   some additional property, access to books, et cetera, et cetera.

25            THE COURT:  Go ahead.
```

1    BY MS. MENSCHEL:

2    Q.   In your experience conducting interviews in this unit, was

3    that happening in this unit?

4    A.   No.   None of that was happening in this unit.   It was -- as

5    I said, it was being run -- it was indistinguishable, as far as

6    I could tell, from a segregation unit.

7    Q.   Is there a difference in the amount of time someone would

8    spend in a safe cell versus a segregation cell?

9    A.   Typically, yes.

10   Q.   What's the difference?

11   A.   Well, a safe cell is ordinarily a temporary accommodation.

12   So you would be -- you're ordinarily being moved from a

13   dangerous environment to a less dangerous environment or kept in

14   protection for the period of time that you're there.   There were

15   prisoners who were here in this unit for a considerable period

16   of time.   I think one person told me he had been there a year.

17   There might have been others that were there approximately that

18   long.

19       There were a few others who had not been there that long,

20   but there were people who had been there a considerable amount

21   of time.   They are clearly not being kept there on their way

22   somewhere else.   They were being kept there because that was

23   where they were going to be housed and they had been housed

24   there for quite a while.

25           MS. MENSCHEL:   I'm going to pull up Plaintiffs'

1  Demonstrative Exhibit 83.

2  Q.  Can you describe this image.

3  A.  It's one of the O dorm cells.  You can see there's a two --

4  little different configuration than some of the others we've

5  been looking at, but, again, a solid steel door.  In this case

6  there's two windows in it that you can look into.

7  Q.  I'm going to --

8       MS. MENSCHEL:  Let's look at Plaintiffs' Demonstrative

9  Exhibit 84.

10  Q.  Can you talk about what's depicted in this image?

11  A.  That's an O dorm cell.  So when we're talking about this

12  being pretty much indistinguishable from a segregation cell,

13  that's more or less what I meant.  If you think back a few

14  photographs ago to an image of the Big Seg cell, it doesn't look

15  too much different from that.  The doors are different, but the

16  cell is pretty much configured the same way.  And the people --

17     The limitations on property and so on were very severe.

18  People had basically what you have when you have -- basically,

19  the same thing.  You're talking about a confinement in a very

20  small space and people not leaving that space for almost around

21  the clock on any given day and being kept there for, as I said

22  earlier, a long period of time.  Months if not years.

23  Q.  In O dorm --

24       MS. MENSCHEL:  I want to pull back up Plaintiffs'

25  Demonstrative 82.

1  Q.  Where were the showers located in O dorm?

2  A.  At the end -- my recollection is at the end of the hallway.

3  So if you kept walking down this hallway, at the end of that

4  hallway were showers.

5        MS. MENSCHEL:  I'm going to pull up also Plaintiffs'

6  Demonstrative 85.

7  Q.  Can you describe that picture.

8  A.  Those are the showers.  There was -- there's a little room

9  off to the side, and I remember it as being to the right of that

10  hallway.  I think that's accurate.  But in any event, at the end

11  of the hallway, at the end of the unit, there are these two

12  shower stalls, and those are they.

13  Q.  On the right-hand side of this picture that's in Plaintiffs'

14  Demonstrative 85, do you know what that is that I just circled?

15  A.  Yes.  It's a board on the -- obviously, on the wall of that

16  office building or that office room, and it lists -- as I

17  remember it, it lists some activities for that O dorm

18  segregation unit.

19        MR. SMITH:  I'm going to pull up, in addition to 85,

20  Plaintiffs' Demonstrative Exhibit 86.

21  Q.  Is that the board you were just talking about?

22  A.  Yes.  That's exactly the board.

23  Q.  When you say "segregation activities," what do you mean?

24  A.  Well, I mean, basically, there are only a few activities

25  that prisoners engage in in these units.  So they get to go to

1  the walk, they get to shower, they get to shave.  And that's

2  their routine.  And you can see that depicted on the activity

3  list.

4      As I understand it, this is -- you can see from the label,

5  this is March daily activity.  The column on the left are days

6  in March, so those are the days of the month, and that's what

7  the activities are for that day.

8  Q.  The document that's sort of in the middle of that image, can

9  you see what that says?

10  A.  In the middle of the image?  Yes.  So that's -- yes.  It's

11  labeled very distinctly "segregation laundry."  So, again, this

12  is the schedule for laundry for that unit.  Clearly, it's a

13  segregation unit.  It's described as the segregation laundry.

14          MS. MENSCHEL:  Your honor, may I have a second?

15          THE COURT:  Yes.

16      (Brief pause in the proceedings)

17  Q.  Dr. Haney, on the list that's on the left, can you read what

18  the green writing generally discusses?

19  A.  Yes.  It says, "MH shower."  It appears -- MH, I'm assuming,

20  refers to mental health.

21  Q.  And in the black writing, looking down that list in the

22  black writing, how many of the activities are related to

23  segregation --

24  A.  Well --

25  Q.  -- or how frequently are activities related to segregation?

1  A.  So there appears to be the term "seg walk" used every other

2  day.  So you have -- it says there's mental health shower and

3  walk and then seg shower and walk.  It's not exactly every other

4  day, but it's not every day either.  So there are days when

5  there isn't a seg walk.  But, you know, usually there is a seg

6  walk.  Not on weekends.  This is often the case in units like

7  this, that because officers -- because facilities are typically

8  short staffed on weekends, those days don't count.

9     So a prisoner who is in segregation might be housed -- might

10 get out of their cell on a Friday -- assuming that things are

11 going as planned, they might get out of their cell on Friday,

12 but they wouldn't get out again until Monday because of the

13 short staffing on the weekends.

14 Q.  From this list, does it appear that the green writing is

15 related to mental health activities and the black writing is

16 related to segregation activities?

17 A.  Well, that's how I would interpret it, yes.

18 Q.  Do you have any understanding -- was your understanding that

19 this list related to this particular unit, O dorm?

20 A.  Yes.  It was in O dorm, and it looks like it was

21 handwritten, obviously, so it doesn't appear to be something

22 that wasn't institution wide.  It wasn't, you know, mimeographed

23 and xeroxed and passed out to everybody for units throughout the

24 prison.  It looks like it was written specifically for this

25 unit.

```
 1            MS. MENSCHEL:  Your Honor, I would like to pull up
 2    Plaintiffs' Exhibit 1258.  The Court had inquired earlier about
 3    Plaintiff C.J.'s movement history.  The first page -- and I
 4    believe it continues on to the next page -- describes his
 5    housing while he was at Kilby.  And it shows that he was housed
 6    in O dorm, which is the unit we've just been discussing with
 7    Dr. Haney.
 8            THE COURT:  Go ahead.
 9        I don't understand why you think that the green writing
10    is mental health and the black writing is segregation on the
11    chart we just saw.  Is it because of the MH?
12            THE WITNESS:  Yes.
13            THE COURT:  It says "MH shower."  What does --
14            THE WITNESS:  That mental health inmates would shower
15    on that day.  That's how I interpreted it.  I don't know any
16    other designation that MH might refer to.
17            THE COURT:  Shower on what day?
18            THE WITNESS:  That they would shower on that day; that
19    the mental health inmates would shower on that day.
20            THE COURT:  Oh, I mean the first -- but it's every day.
21            THE WITNESS:  Well, I don't know if it refers to every
22    one of the mental health inmates.  That's the part that's
23    difficult to interpret.  It's also hard to know whether or
24    not -- to what extent the segregation walks and showers refer to
25    everybody in segregation.  It's a little bit difficult to
```

1  deconstruct.  But I just assumed that MH referred to mental

2  health.

3           MR. SMITH:  Your Honor, we would now object and move to

4  strike his testimony about what this means, since he's just

5  admitted he's making assumptions about what it means.  He

6  doesn't have any basis to opine upon what this means.  He didn't

7  inquire of anybody.  He doesn't know.  He's simply speculated.

8  And that's not admissible, nor is it relevant.

9           MS. MENSCHEL:  Your Honor, if I may.  Dr. Haney is an

10  expert in segregation units.  He talked about his impressions of

11  this unit, having walked around the unit, and things that he

12  identified and looked for in the unit.  And he has just shared

13  with the Court his understanding of this, which is based on his

14  expertise in this area and what he thought it implied and

15  related to based on his inspection of the unit.

16           MR. SMITH:  Well, respect --

17           THE COURT:  I think the evidence is relevant.  But

18  whether his testimony is credible, I'll just consider your

19  arguments you've just given.

20           MS. MENSCHEL:  Thank you, Your Honor.

21           THE COURT:  Proceed.

22  Q.  Dr. Haney, I think you -- we're talking about segregation

23  units that you toured.  I'm going to pull back up the facility

24  diagram, which is Plaintiffs' Demonstrative Exhibit 134.

25  A.  Yes.

1  Q.  Did you tour or inspect the units that are zoomed out there?

2  A.  Yes.  In the infirmary area of the facility.  I did.

3  Q.  What was your impression of those units?

4  A.  Well, again, these were segregationlike units.  Very

5  unusual.  There were only a few of them.  They were severe

6  units, hard units for people to adapt to or adjust to for any

7  period of time.  The people in them described the difficulties

8  that they confronted while they were housed there.

9       MS. MENSCHEL:  I'd like to pull up Plaintiffs'

10  Demonstrative Exhibit 87.

11  Q.  Do you recognize this image?

12  A.  That's one of the cells that I was referring to.  I don't

13  remember exactly how many of them there were.  There were only a

14  few of them, but they very distinctive.

15  Q.  What was distinctive about them?

16  A.  Well, they had -- they're cells that are, in correctional

17  parlance, described as boxcar cells.  They have an outer door

18  and then an inner door or set of bars.

19      You see, this is a picture of the cell with the outer door

20  open.  The day I was there, the outer doors were open on the

21  cells so you could look in the cell.  Inside, behind these bars,

22  is the cell itself.  And I interviewed some of the prisoners who

23  were housed there.

24       MS. MENSCHEL:  I'm going to pull up next to this

25  Plaintiffs' Demonstrative Exhibit 88.

1  Q.  Could you describe this image.

2  A.  Yes.  I mean, that's the -- that's the tray slot.  That's

3  the -- that's where the food is passed through the gate on the

4  outside of the inner door.

5  Q.  Do you know what these -- this unit was used for?

6  A.  You know, I want to say it was a segregation cell for people

7  who, for whatever reason, needed to be kept near the infirmary.

8  Q.  Did you have an impression of these particular units?

9  A.  Again, they were in disrepair.  They were severe, isolated

10  from the rest of the prison population.  The prisoners inside

11  voiced a number of complaints about not having access to any

12  programs, not having access to mental health care, not having

13  access to much exercise, et cetera.

14        MS. MENSCHEL:  I'm going to pull up Plaintiffs'

15  Demonstrative Exhibit 89.

16  Q.  Do you recognize this image?

17  A.  Yes.  That's the inside of the -- two photographs of the

18  inside of exactly what those cells looked like from the inside.

19  Q.  What was your impression about the condition of the cells?

20  A.  Well, again, like some of the other cells we've seen,

21  they're in disrepair.  They're deteriorated.  They're small.

22  And I think it would be a very difficult environment for people

23  to live for any considerable period of time.

24  Q.  Why?

25  A.  Well, these are -- you know, these are, among other things,

 1  windowless cells, so they have an even more closed feel to them.

 2  And obviously, the deteriorated condition of the cell, the small

 3  size of the cell, the lack of activity, the lack of social and

 4  human contact, all these things build on one another and begin

 5  to wear on someone's mental state, whether or not they're

 6  mentally ill.

 7  Q.  On the bottom image, what is that at the top -- do you have

 8  an understanding of what that is on the top right of that

 9  picture?

10  A.  If I remember correctly, it's a sink.

11  Q.  Do you have any concerns about that?

12  A.  Well, to the extent to which it could be used possibly as a

13  way to fasten something, it would concern me, yes.

14  Q.  What is that concern?

15  A.  Well, potentially it's an opportunity for someone to attempt

16  suicide.

17  Q.  A moment ago you mentioned that these cells did not have

18  windows.  Why is that noteworthy?

19  A.  Well, again, I mean, anything which lessens the feeling

20  of -- being closed in or being claustrophobic or being separated

21  from the rest of the world or being isolated only by yourself,

22  with no other inmate, from anyone else is psychologically

23  problematic for people.  Not everybody can handle that.  Not

24  even healthy people can always handle that.  So anything which

25  alleviates that some, whether it's getting people out of their

 1  cell -- we talked about exercise, we talked about the

 2  possibilities of activities in a unit and on a day room floor,

 3  people being able to associate with each other, and even

 4  something as being able to look out a window and see grass, see

 5  the sunlight, see the changing of the days or the colors -- is a

 6  way of retaining one's connection to the world outside and

 7  reminding yourself that you're still connected in some way to a

 8  human community.

 9       MS. MENSCHEL:  Your Honor, I would like to offer into

10  evidence Plaintiffs' Demonstrative Exhibits 77, 78, 79, 80, 81,

11  82, 83, 84, 85, 86, 87, 88, and 89.

12       THE COURT:  Admitted.

13       MS. MENSCHEL:  And I would also like to offer

14  Plaintiffs' Demonstrative Exhibit 134, which is the facility

15  map, under seal.

16       THE COURT:  Admitted.

17  Q.  Dr. Haney, I'd like to go back to Plaintiffs'

18  Demonstrative --

19       THE COURT:  It's now three o'clock.  We'll take a

20  15-minute recess.

21       MS. MENSCHEL:  Your Honor, can I ask a question?  You

22  had inquired about the layout of the Bibb inside facilities, the

23  inside of a dorm.  Would it be okay for us to speak with

24  Dr. Haney during the recess, or if not fully during the recess,

25  later today to try to sketch something out for you?

```
 1            THE COURT:  Counsel, defense counsel, any problem with

 2  that?

 3            MR. SMITH:  I mean, are they going to be discussing any

 4  testimony that he's given?

 5            THE COURT:  Limited to just the sketching.

 6            MR. SMITH:  If it's limited to just the sketching, I

 7  mean, I would think someone with -- well, no, Your Honor.  Just

 8  if it's limited to the sketching.

 9            THE COURT:  Okay.  Very good.  That's it.  Just limit

10  it to the sketching.

11            MS. MENSCHEL:  Thank you, Your Honor.

12        (Recess was taken from 3:08 p.m. until 3:38 p.m., after

13         which proceedings continued, as follows:)

14            THE COURT:  Counsel, I have your proposed temporary

15  restraining order.  Technically, a TRO I think only lasts 14

16  days or whatever.  I can't -- maybe 21.  Maybe seven.  Does

17  everyone agree with my adding language that the TRO is to last

18  until -- what?

19            MR. SMITH:  Until there is a final approval or

20  rejection of the proposed Phase 2A mental health settlement

21  agreement I think is appropriate, Your Honor.

22            MR. MUJUMDAR:  May I make a slight edit, Judge?  I

23  think what we were concerned about is we wouldn't be able to get

24  to a preliminary approval.

25            THE COURT:  That's what I'm saying.
```

```
 1              MR. MUJUMDAR:  So I don't think necessarily we need to
 2    wait for final approval.  But I think until such time as Your
 3    Honor --
 4              THE COURT:  Well, when I preliminarily approve it, that
 5    doesn't mean that your settlement goes into effect.  That just
 6    means you give notice to the class.  I'm not sure Mr. Smith
 7    isn't correct.  Preliminary approval just means I can set it for
 8    a fairness hearing.  Settlement doesn't go into effect.
 9              MR. MUJUMDAR:  Judge, we do want it to go into effect.
10              THE COURT:  Right.  I'm ready to put it into effect
11    this afternoon, but I just need -- I just didn't want someone
12    thinking, according to the rules -- I think -- I think a TRO
13    automatically terminates unless the Court indicates otherwise.
14    I think the rules say that.  I can't remember the number of
15    days.  It may be 14 days or something like that.
16              So what's wrong with just saying it stays in effect
17    under Mr. Smith's language?
18              MR. MUJUMDAR:  That's fine, Your Honor.
19              THE COURT:  Very good.  That's what I'll add, then.
20              MS. MENSCHEL:  May I proceed, Your Honor?
21              THE COURT:  Yes.
22    BY MS. MENSCHEL:
23    Q.  Dr. Haney, before the break we were talking about
24    segregation units at Kilby.
25    A.  Yes.
```

1  Q.  I'm going to pull back up Plaintiffs' Demonstrative

2  Exhibit 82.  This was O dorm that we talked about; is that

3  correct?

4  A.  That's correct.

5  Q.  I believe you testified earlier that you recognized this as

6  a segregation unit?

7  A.  I did.

8  Q.  How long did it take you to recognize this as a segregation

9  unit?

10  A.  Almost immediately.

11  Q.  What was the basis of you making that determination?

12  A.  Well, it has the outward appearance of a segregation unit.

13  The locked steel doors.  In addition to that, the cards on the

14  door typically have been in the past representing a kind of --

15  as I recall, administrative segregation.  So that, again, clued

16  me in.  And then as soon as I looked in the cells, it was

17  immediately obvious to me that this was a segregation unit:  The

18  sparseness of the unit, all the things I described earlier that

19  were depicted in the cell photographs that we showed.

20  Q.  Thank you.  You also visited Donaldson; is that correct?

21  A.  Yes, I did.

22  Q.  When did you visit Donaldson?

23  A.  So Donaldson was at the beginning of the next week, as I

24  recall.  It would have been on the 21st of March, again, also in

25  2016.

1  Q.  How much time did you spend at Donaldson?

2  A.  Two days at Donaldson, both touring and doing cell-front

3  interviews and confidential interviews.  I also returned to

4  Donaldson later, but I suspect that's not what you want to talk

5  to me about.

6  Q.  Why did you spend two days initially at Donaldson?

7  A.  Again, like Bullock, a large concentration of mentally ill

8  prisoners there.  There is a large residential treatment unit

9  there, closed, and then some more open RSU units there.  So a

10 big unit.  It's also a big prison with kind of complicated

11 layout, so it made sense to spend two days there.

12        MS. MENSCHEL:  I'm going to pull up Plaintiffs'

13 Demonstrative Exhibit 135.

14 Q.  What do you recognize -- do you recognize this?

15 A.  I do.  It's an aerial view of the Donaldson Correctional

16 Facility.

17 Q.  You talked a little bit about the facilities.  What did you

18 understand about the security level of Donaldson?

19 A.  Donaldson, I believe, is a maximum security prison, or at

20 least the RTU is a higher security level, and I think that

21 applies to the rest of the institution as well.

22 Q.  What was your general impression of the Donaldson facility?

23 A.  It was -- I said a moment ago it was a large, complicated

24 facility.  I was especially focused on the RTU units, which were

25 very troubling to me.  It also has a couple of segregation units

1  that also were equally of concern.

2    There were a number of prisoners in those segregation units

3  that -- who described severe conditions of confinement.  I saw

4  the segregation units.  But I spent most of my time inside the

5  RTU.  I also did individual interviews with prisoners, some of

6  whom were from segregation units, most of whom, however, were

7  from the RTU.

8  Q.  I would like to start with the RTU.  On this map that's

9  before you -- well, do you know the unit letters of the RTU?

10 A.  Yes.  It's depicted right here.  So it's S, R, T, U, this

11 unit right here.  Right there.  That's all -- that

12 configuration, those are in different levels of closed versus

13 open, but they are all part of the residential treatment unit.

14 Q.  Do you know the difference between the letters and the

15 different units and what the difference is between them?  And

16 you can refer to your report if that's helpful.

17 A.  Yeah, I may have to.  I keep mixing up the R's and the T's

18 and the U's.  It's my understanding that S is the most

19 restrictive, and then T, and then R and U are the open --

20 relatively open -- openish units.

21 Q.  What did restrictive or openish mean in your understanding?

22 A.  It has to do, as the names imply, with the extent to which

23 people are confined to their cell primarily while they're in the

24 residential treatment unit versus being given access to the open

25 area out in front of the cell, what is in some prison systems or

1  facilities called a dayroom area in the open space in front of

2  the cells.

3  Q.  In the most closed of these units, which I believe you said

4  was S, the most restrictive of these units, how much time did

5  you understand people to get out of their cells?

6  A.  Virtually none.  They were really confined in their cells

7  pretty much around the clock.  There weren't dayroom activities.

8  There weren't activities on the unit.  If they got out, they

9  were getting out for yard like a segregation unit prisoner would

10  get out for yard, but they did not have access to groups or

11  dayroom activities.

12  Q.  How did that compare to the other three units in the RTU?

13  A.  So there were -- as you move through that progression, there

14  was an increased amount of activity.  At least access to the

15  open areas in the units, so the next step up would allow you

16  some outside -- outside your cell activity.  And then in the

17  other two, the open RTUs, even more in theory.  So in those

18  units there were actually prisoners oftentimes milling around in

19  the open area during the daytime hours when I was there touring

20  the unit.  They described also having -- I didn't see groups in

21  action when I was there, but they described from time to time

22  there were some group activities that took place on the unit in

23  the open RTU.

24  Q.  In the open RTU.  Which letters were those?

25  A.  That would have been R and U.

1  Q.  What was your impression of the RTU generally?  You touched

2  on it earlier, but can you elaborate.

3  A.  It was a sobering experience.  It was not at all like -- it

4  was not at all what I expected to see.  It was atmospherically

5  almost indistinguishable from the segregation units I had been

6  looking at.  Certainly the closed RTUs were literally

7  indistinguishable in terms of how they felt, how they looked,

8  the level of dishevelment and disrepair in the cells themselves,

9  the level of desperation of the prisoners who were housed there,

10 the lack of activity, the complaints about lack of mental health

11 care, and on and on.  The physical conditions, especially in the

12 closed RTUs, were striking and surprising.

13 Q.  You said it wasn't what you expected to see.  Why did you

14 not expect to see that?

15 A.  Well, it's called a residential treatment unit, and I

16 expected to see something that resembled a residential treatment

17 unit.  The more open RTUs, at least as they were configured and

18 at least in terms of people being out of their cells a bit,

19 began to approximate something that I could imagine being a

20 treatment unit.  The closed RTUs, on the other hand, were, as I

21 said a moment ago, impossible to distinguish from a segregation

22 unit.  If someone had put you down in the middle of it and asked

23 you what it was, it would be -- I don't know how you would have

24 determined whether it was a segregation unit or a so-called

25 treatment unit.  And certainly the level of desperation among

1  the prisoners did not suggest that they were being -- that they

2  were in a therapeutic environment.  It suggested something quite

3  the opposite.

4         MS. MENSCHEL:  I want to pull up next to this

5  Plaintiffs' Demonstrative Exhibit 92.

6  Q.  Do you recognize this photograph?

7  A.  Yes.  It's a closed RTU cell.  Solid external door, small

8  window, some open windows in the back, cells relatively dark.

9  Q.  Do you have any concerns about the image that's shown here,

10  the door or the window in the RTU?

11  A.  Yes.  Same concern as I expressed earlier.  These are small

12  windowed cells, hard to see into.  Given the fact that these are

13  mental patients, this is of no small concern.  Especially

14  because these -- in the closed RTUs, these are people who are

15  not only mentally ill, significantly enough mentally ill to be

16  in a residential treatment unit, but mentally ill and in

17  isolation for all intents and purposes, therefore, at extremely

18  high risk of serious harm.  And so the difficulties in

19  monitoring them, given the configuration of these cell doors,

20  was of great concern.

21         MS. MENSCHEL:  I would like to look at Plaintiffs'

22  Demonstrative Exhibit 93.

23  Q.  Can you tell us what is depicted in these images.

24  A.  Again, an RTU cell.  This one with a covering over the

25  window, making it impossible, essentially, to see inside the

1   cell.

2   Q.  You talked about this a little bit earlier, but does the

3   covering concern you?

4   A.  Yes.  It concerned me greatly.  I think -- I raised it the

5   last time we were discussing -- if I recall correctly, we were

6   discussing the Holman segregation unit with the Court.  Needless

7   to say, this is of even greater concern.  These are explicitly

8   all mental patients in this facility, and they're in a unit

9   where they're confined in their cell.  And it is impossible to

10  see inside a cell with a newspaper on the outside of the -- or

11  on the inside of the window, making it impossible to see through

12  to the outside.

13  Q.  And why is it more concerning here?

14  A.  Well, these are prisoners who are at risk of, among other

15  things, deterioration, serious decompensation, and self-harm.

16  So the inability of correctional staff and/or mental health

17  staff to see inside these units is of grave concern.

18  Q.  Were these the only windows you saw at Donaldson that looked

19  like this?

20  A.  Absolutely not.  There were a number of them.  I don't know

21  exactly how many, I didn't count them, but there were more than

22  a few.

23  Q.  During your inspection of the Donaldson RTU, what was going

24  on?

25  A.  In the closed RTUs, I don't think anything was going on.

1    Most of the prisoners were in their cells.  Most of them were in

2    bed.  Most of them had the covers pulled up over their heads.

3        By the time we got to the open RTU and later in the morning,

4    there was a little bit more activity taking place.  I think it

5    was getting close to noontime, if I remember, and there were

6    some prisoners out milling about in the two open RTUs, but not

7    everyone was up and out -- out of their cells.

8        I actually talked to some people who were on the -- on

9    the -- in the -- I'll call it a dayroom, by which I mean the

10   space outside the cells themselves.  But there were no -- there

11   were no organized activities taking place.  I believe there was

12   a television on in one of the RTUs, the open ones, but otherwise

13   that was all that was taking place, as I recall.

14   Q.  You mentioned a moment ago that there were people with

15   covers pulled over their heads?

16   A.  Yes.

17        MS. MENSCHEL:  I would like to look at Plaintiffs'

18   Demonstrative Exhibit 94.

19   Q.  Can you describe the images that are in this exhibit.

20   A.  Yes.  These are images of people in their cells in one or

21   another of the RTUs units.  I asked for the photographs to be

22   taken to get a feel for the -- to get a feel for the cells.  And

23   these are different people in different cells at -- you know, I

24   want to say around 10:30 or so in the morning.  So it was the

25   morning, but it wasn't early in the morning, and there were a

1  great many people who were in various stages of lying in bed

2  with covers over their heads.

3  Q.  Do you have any concern about people lying in bed with

4  covers over their head?

5  A.  Always, for the reasons that I described earlier.  You

6  don't -- certainly not in a treatment unit, but even in any

7  other kind of segregation unit, you really don't want people

8  just falling into inactivity and possibly despondency and

9  despair.  And certainly this is a sign or symptom of the

10  possibility that that's exactly what's happening; that these are

11  people who have not -- who have lost the ability or the will to

12  organize their own existence and are simply existing in these

13  environments without any activity that they can engage in or

14  activity that they're trying to organize for themselves.

15  Q.  Did you have a chance to enter into any of the cells or look

16  into the cells themselves?

17  A.  Yes.

18          MS. MENSCHEL:  I'd like to pull up Plaintiffs'

19  Demonstrative Exhibit 1 and Plaintiffs' Demonstrative Exhibit

20  95.

21  Q.  Dr. Haney, do you recognize these images?

22  A.  I do.

23  Q.  What are they?

24  A.  They are images of a cell that we were able to open the door

25  of.  We obtained the inmate's permission to open the door to his

```
1   cell, and he allowed us to take a photograph of his cell.  He
2   took -- he stepped to the side, as you can see.  And I thought
3   that his cell was a dramatic example of exactly what I was
4   talking about a minute ago.  That's why I asked -- first of all,
5   I asked his permission to open the door and take a photograph of
6   how he was living.  Again, it's supposedly in a treatment unit.
7   Q.  Do you know who the inmate was who was housed in this cell?
8   A.  I do.
9   Q.  And who was that?  By initials only, if you can.
10  A.  I'll have to -- give me one second.
11  Q.  We can come back to it if you would like --
12  A.  Sorry.  I thought I had this at my fingertips, but I don't.
13  Q.  You're fine.
14      If you look at the image on the left --
15          MS. MENSCHEL:  Can you zoom in on that image?
16  Q.  -- what about the condition of this cell -- what about the
17  condition of this cell concerned you?
18  A.  Well, maybe it goes without saying, but, obviously, the cell
19  is very dirty.  The inmate has debris on the area where his bed
20  otherwise would be.
21      I believe, if I remember correctly, when I first approached
22  the cell, he was lying on the floor, and he had moved his
23  mattress to the floor.  He may have been asleep.  I think when I
24  came to the door, he was on the floor, and then he heard -- he
25  heard us at the door and then stood up, and that's when I began
```

1   to converse with him and look into his cell.  And so he's

2   moved -- he's moved down to the floor of his cell rather than

3   sleeping on the concrete area where the mattress was intended to

4   be.  And, you know, he's got debris and other things in his cell

5   that look like that.  And this is --

6       You know, this is the sign of somebody who is in great

7   despair and in personal or psychological disorganization.  And

8   that was evident to me also from my conversation with him.

9   Q.  How did this compare to other cells you saw in the RTU?

10  A.  Not every cell looked like that, but it wasn't unusual

11  either.  There were a number of cells that looked like that or

12  almost like that.  It manifested the same kind of problems and

13  the same signs of internal disorganization and despair as his

14  did, although sometimes in somewhat a different way.

15          MS. MENSCHEL:  Your Honor, Plaintiffs' Demonstrative

16  Exhibit 1, which is the image on the left, was also used and

17  discussed at length on the first day of trial with Plaintiff

18  J.W.

19  Q.  Dr. Haney, I would like to look at Plaintiffs' Demonstrative

20  Exhibit 96.  Can you describe what's depicted in this image.

21  A.  Yes.  This is another RTU cell, a Donaldson RTU cell.

22      This is a different kind of accommodation to living in a

23  unit like that.  This is -- you know, this is an example of

24  somebody who is trying, I think, very hard to maintain some

25  semblance of a routine.  He has his property organized and so

1  on.

2      He, too, has moved down from the concrete bunk area and has

3  his mattress on the floor of the cell, so he's living on the

4  floor.  But he's -- you know, he is, within the limitations of

5  being in a cell around the clock and living an existence like

6  that, grappling very hard to bring some order to it.  So he's

7  got his clothes washed and hanging and he's got his property

8  arrayed in front of him as an accommodation to the life that

9  he's being forced to live.

10 Q.  Is he shown in this picture?  It's a little hard to see.

11 A.  He is.

12 Q.  Where is he?

13 A.  His head is sticking up there at the bottom.

14 Q.  What does he appear to be doing?

15 A.  He appears to be sleeping.

16 Q.  What was the condition of the RTU itself outside of the

17 cells?

18 A.  It was grim.  I mean, the closed RTUs particularly, again,

19 not just segregation cells, but a segregation feeling to the

20 unit.  Just a kind of level of disrepair -- and some of it

21 really shocking disrepair -- that I was, again, taken aback to

22 see in a treatment unit.

23 Q.  What do you mean when you say "shocking disrepair"?

24 A.  Well, there were two showers that I, frankly, unfortunately,

25 will never forget, that were the showers for the two -- upstairs

 1  and downstairs showers of one of the closed RTUs that took me

 2  aback.  I actually had to -- I actually had to approach to see

 3  what it was, because I couldn't -- I honestly couldn't figure

 4  out what it was.

 5     And I asked not only inmates, but asked some correctional

 6  officers what was I seeing, and was it in the process of being

 7  repaired or what?  And, in fact, I was told, no, that's the

 8  shower, and that's the way it looks.

 9        MS. MENSCHEL:  I'm going to pull up Plaintiffs'

10  Demonstrative Exhibit 99.

11  Q.  Can you tell us what's shown in this demonstrative exhibit.

12  A.  That's one of the two showers that I was talking about.

13  Those are -- that's a -- I'm kind of at a loss for words to

14  describe what it is supposed to be.  It's supposed to be, I

15  guess, a place -- a soap holder where prisoners would go in to

16  shower -- and that's the shower, the larger shower -- and are

17  supposed to place their soap while they're showering and rinsing

18  off.  But you can see that there is an opening there, a cavity

19  of some sort, and there appears to be a fair amount of other

20  substances in there; a kind of deterioration into the wall.  It

21  looks like some kind of mold or something.

22     And that's a shower that's in use.  I made a point of asking

23  whether or not this was a condemned shower or still a shower

24  which was still being used, and I was told very clearly, no,

25  it's in use.

```
 1      This is either the first or second floor.  There's another
 2  one on the other floor that looks pretty much the same.  And
 3  this is in a treatment unit for prisoners suffering from some
 4  significant forms of mental illness.
 5  Q.  Is your concern about the showers that you saw related to a
 6  concern about mental health at all?
 7  A.  Yes.  Certainly it is a concern about hygiene, but it's also
 8  a concern about mental health.  This is degrading to put human
 9  beings in an environment where that's where they're showering.
10  And it conveys a message, a not very subtle message, about their
11  value as human beings, what they're worth, essentially, whether
12  it's intended or not.
13      And it does have an effect.  It has an effect on all of us
14  when we're exposed to things which convey this sense of
15  insignificance and the fact that you can be exposed to hazardous
16  or at least unhygienic environments repeatedly.
17      But certainly mentally ill people, many of whom are
18  struggling with their sense of themselves and where they fit in
19  the world and so on, you know, this is just not the kind of
20  thing that you would -- the kind of thing you would do to
21  someone that you cared about.  And people understand that and
22  prisoners understand that.
23  Q.  When people are -- I think the word you used was degrading.
24  What is the risk -- what are they at risk of happening as it
25  relates to their mental health?
```

1  A.  Well, there are lots of things that they're at risk of

2  experiencing.

3      For example, a scenario.  Somebody who is depressed, and

4  they're depressed about their situation in life and where they

5  are -- the fact that they're in prison, things have not turned

6  out the way they wanted to in life -- and they're struggling to

7  hold onto some hope and to hold onto some sense of themselves as

8  perhaps being able to get out of this situation.  And then

9  they're treated on a daily basis as if they really don't matter;

10 as if they really aren't worth anything; as if nobody really

11 does care about them.

12     Those kind of messages are conveyed, not just by

13 individuals, but they can be conveyed by the environment in

14 which you're living or the environment in which you're kept.

15 And that can sink you further and further into despair.

16     I'm not suggesting that's the only thing, but that's

17 certainly a contributory factor that can make somebody who is

18 already feeling very, very bad, despairing, maybe thinking it's

19 not worth going on, that could and very likely would make them

20 feel even worse.

21         MS. MENSCHEL:  I would like to talk a little bit more

22 about other conditions and pull up Plaintiffs' Demonstrative

23 Exhibit 97.

24 Q.  Do you recognize this image?

25 A.  Yes.  The floor in, I believe, one of the classrooms in

1  the -- near the open RTU area, if I am identifying that

2  correctly.  It's in the RTU.  And I remember seeing -- there

3  was -- there's a classroom area near the open RTU cells, and I

4  believe that this was a photograph I had taken of the floor.

5  There was debris on the floor, and it looked like a fire had

6  been set and there was some liquid that had been thrown on the

7  floor and hadn't been cleaned up.  It looked like it had been

8  there for a while.

9          MS. MENSCHEL:  I'm also going to pull you have

10  Plaintiffs' Demonstrative Exhibit 98 at the same time.

11  Q.  So focusing on the image that's in 97, does this concern

12  you?

13  A.  Well, again, yes.  I mean, not just this one image, but this

14  was not -- this was not an isolated example.

15      I think earlier, before we even talked about the showers and

16  we showed the shower photographs, I was talking to you about the

17  disrepair in the unit.  This is another example of what I saw

18  throughout.  Not literally everywhere you looked, but there were

19  lots of places in which there was an absence -- there was

20  debris.  Nobody had cleaned for a while.  It was clear that

21  these were not very well maintained units.

22  Q.  So now turning to Plaintiffs' Demonstrative 98, can you

23  describe what this picture shows?

24  A.  This is, in a sense -- I mean, I have to tell you, this is

25  mind boggling to me.  This is an RTU cell, and it depicts a --

1    so that's the sink, and underneath that is the commode, and

2    above it is a metal open grate that is an open and obvious

3    opportunity for somebody to tie a ligature around the grate.

4    And there's almost a step.  You could step on the commode, step

5    on the sink, and then place a ligature around your neck if you

6    were intent on committing suicide.

7        It's hard to imagine how such a design could exist inside a

8    unit where prisoners are, by definition, in varying stages of

9    serious or significant mental illness.

10   Q.  In your experience inspecting residential units around the

11   country, how regularly do you have this concern in residential

12   units?

13   A.  Well, relatively rarely.  I don't -- this is not something I

14   look for.  There are people who specialize in these issues, and

15   they can -- they can see things I can't see.  So when I'm

16   pointing out things that are obvious, I'm sure there were other

17   things that I missed.

18       But this is something that is just, as I said earlier, mind

19   boggling to me because it is so obvious and so problematic.

20   Q.  On the top left of this image, can you tell what that is

21   right under where it's labeled RTU?

22   A.  You know, it's another potential opportunity for somebody to

23   hook something in there.  I mean, needless to say, the more

24   obvious place would be the metal grate, but even something like

25   that -- I mean, again, this is somebody -- there are people who

1  suicide proof cells for a living, so they can see things I can't

2  see.  But that, too, is a possible opportunity for somebody to

3  hook something there and then move from standing on top of the

4  sink and hanging oneself on it.

5  Q.  I believe you also mentioned that you visited segregation

6  units at Donaldson.

7  A.  Yes.

8  Q.  Okay.  I would like to turn away from the RTU and talk about

9  the segregation units.  Did you visit multiple units,

10  segregation units at Donaldson?

11  A.  Yes.  My recollection is that I visited three different

12  ones.  Two of them were relatively small and one much larger

13  segregation unit.

14  Q.  So I would like to first talk about the larger segregation

15  unit.  Can you describe it?

16  A.  Big, you know, just kind of an oppressive, large structure,

17  lots of segregation cells, a different -- somewhat different

18  design.  You know, we've talked already about two very large

19  segregation cells, Holman's and the Big Seg at Kilby.  This was

20  a different kind of design of a large segregation unit, but the

21  cells were pretty much standard fare: Small cells, lots of

22  prisoners housed in them, very severe conditions.  Many

23  complaints from prisoners about the nature of the environment.

24      Some of them -- as I recall, some of them were on the mental

25  health caseload or with mental health histories, anyway, and

1    talking about an absence of mental health presence in the unit;

2    that mental health personnel never came -- or almost never came

3    back there or came back very rarely.  So it was a very serious

4    looking segregation unit.

5    Q.  On the left on the map that is Plaintiffs' Demonstrative

6    Exhibit 135, do you know whether the unit marked W, was that the

7    unit that you just described?

8    A.  I believe that was the large segregation unit I just

9    described.  There were other -- I saw -- I believe there are two

10   other segregation units that I also saw.  I see them there.  It

11   looks like Q and P, if that's a Q and a P, right below the T --

12   right below -- yeah.  Exactly.  Those were segregation units.

13   And I believe I went into both of those.  I certainly went into

14   the first two.  I may have gone into the second two as well.

15   They were essentially identical, those four units.

16            MS. MENSCHEL:  I would like to pull up Plaintiffs'

17   Demonstrative Exhibit 100.

18   Q.  Do you recognize this image?

19   A.  Yes.  That's the large segregation unit I was talking about.

20   That's the very sizable, substantial -- you know, along the

21   same -- different design, but along the scale of the Kilby Big

22   Seg.  And in a different way, but, again, very large in the way

23   that the Holman segregation unit was in terms of numbers of

24   people.

25   Q.  What is the vantage point that this image is taken from?

1  A.  It's from -- we were actually allowed to go into the guard

2  station or cube.  I was interested in what you could see from

3  inside, and the correctional officer was kind enough to let me

4  in it to look.

5      You know, it confirmed what I was concerned about, which was

6  you could see from inside the guard station almost nothing.  I

7  mean, there was no -- the unit was big, but that means the

8  distance from the correctional officer in the central

9  observation unit was significant enough so that there was really

10  no visual contact to speak of at all with the prisoners who were

11  in those cells.

12  Q.  Could you see -- when you say no visual contact with the

13  prisoners at all, could you see into the cells themselves from

14  where you were located?

15  A.  No.  That's a pretty good, accurate photograph of what you

16  saw from that vantage point.  And as you can see from the

17  photograph, you can't see anything.

18      It's also the case that, you know, the windows are small.

19  So not only is this the distance, but these particular units

20  have relatively small windows.  So the combination of the

21  distance from the officer station to the cell and then the size

22  of the window basically makes it impossible to see in.

23      And it doesn't matter which -- it's not the angle.  If

24  you -- even if you look straight across, you can't see, even on

25  the first tier of the unit, into a cell.

1    Q.  And I believe you said you also visited the smaller

2    segregation units?

3    A.  Yes.

4    Q.  What was your impression of those units?

5    A.  They were claustrophobic, small.  Air -- the air was dank,

6    and even inside the unit, not only in the cells.  Very, very

7    severe, harsh conditions of confinement inside the cells

8    themselves.

9       I talked to several prisoners inside the unit about how

10   difficult it was for them in that unit.  What a hard time they

11   were having surviving in the unit.  How little out-of-cell time

12   they had and so on.

13   Q.  Were you allowed full access to inspect those smaller units

14   that you just talked about?

15   A.  No.  As I recall, this was another instance in which I was

16   not allowed to go up to the second -- the smaller units had two

17   tiers.  They were small units, but they were two tiers high.  My

18   recollection is I was only allowed on the first tier, not the

19   second.

20   Q.  Do you have any understanding of why?

21   A.  Again, it was my understanding that there were safety

22   concerns.  I don't know any more than that.

23   Q.  Safety concerns for you or for the prisoners?

24   A.  I'm assuming for me.

25           MS. MENSCHEL:  I would like to talk about Plaintiffs'

1    Demonstrative Exhibit --

2            I'm sorry, Your Honor.  Can I have one second?

3            THE COURT:  Yes.

4        (Brief pause in the proceedings)

5    Q.  Dr. Haney, I would like to pull up Plaintiffs' Demonstrative

6    Exhibit 101.  Do you recognize this image?

7    A.  Yes.  It's the -- near the ceiling of the -- of one of the

8    watch cells in Donaldson, a suicide watch cell.

9    Q.  What does it show?

10   A.  It's a camera.  They have a procedure where the watch cells

11   provide for observation over a camera, and that's -- that shows

12   the camera.

13   Q.  What is your opinion about cameras -- the use of cameras as

14   a method of suicide prevention?

15   A.  It's generally a disfavored practice, partly because it's

16   not as proactive, and also when you -- if and when you see

17   something of concern, there's some distance that has to be

18   traveled before you get to the cell.  Whereas if you're doing

19   regular -- if you're doing constant watch, obviously, you're

20   right there.  If you're doing 15-minute watches, you know,

21   you're visually inspecting on site, so you can intervene

22   immediately if there's reason to do so.

23   Q.  Did you visit -- well, were there any suicide watch cells

24   contained in the infirmary area at Donaldson?

25   A.  Yes.  Yes.

```
1   Q.  Did you visit those cells?

2   A.  I did.

3   Q.  Turning back to the map, which is Plaintiffs' Demonstrative

4   Exhibit 135, can you identify the infirmary on the map?

5   A.  (Witness indicates)

6   Q.  So when you said you visited suicide watch cells in that

7   area, do you know what the cells were, what the unit was?

8   A.  It's unit Z.  The cells were called Z cells, if I remember

9   correctly.

10          MS. MENSCHEL:  I would like to pull up Plaintiffs'

11  Demonstrative Exhibit 102.

12  Q.  Dr. Haney, do you recognize this picture?

13  A.  Yes.

14  Q.  What does it show?

15  A.  It's a Z cell in the infirmary in Donaldson that was being

16  used and has been used in the past that was described to me as a

17  suicide watch cell.

18  Q.  Who described it to you that way?

19  A.  The correctional officer who was giving us the tour, and I

20  believe the inmate who was confined inside.

21  Q.  Do you have any opinion about the use of these cells as

22  suicide watch cells?

23  A.  Well, you can see how difficult they would be to observe,

24  look into.  I mean, they're -- there's --

25          THE COURT:  Is there a picture of the window?
```

```
 1              MS. MENSCHEL:  We can zoom in, Your Honor.

 2              THE COURT:  I'm not sure zooming in is going to be

 3    enough.

 4    Q.   Dr. Haney, can you describe what you remember of seeing of

 5    the window?

 6    A.   There is a kind of a grate on the window.  I believe these

 7    cells have another purpose to them as well, so they have -- they

 8    have an unusual covering on the window.  But there is a tight

 9    grate on the window that makes it difficult -- not impossible to

10    see in, but very difficult to see into the cell.

11              THE COURT:  Say that again?  A what?

12              THE WITNESS:  A grate --

13              THE COURT:  Yes.  You said impossible to what?

14              THE WITNESS:  To see into the cell.  So if you peer

15    through that grate, you can see in there, but you have to look

16    really hard.  You know, I should say --

17              THE COURT:  Would it obstruct your ability to discern

18    anything in there?

19              THE WITNESS:  It's very difficult, Your Honor.  My

20    experience was I had to really go up to it and squint into it

21    and look through it, and you can make out that there's someone

22    in there and you can see some parts of the cell.  But it's very

23    difficult to look into.  You can almost make out some shapes,

24    very vague shapes, from -- even from the photograph, but you can

25    also see that you really have to look through the openings, the
```

1  very small openings in the grating on the window itself.

2          There were lots of coverings, incidentally, also in the

3  segregation unit cells.  That large cell block we were talking

4  about, the guard station, and not being able to see into it, I

5  think I may have neglected to say also one of the reasons you

6  couldn't see into it was because there weren't grates like this,

7  but there were coverings on the windows in many of the cells in

8  that segregation unit.

9          Even if there had been from the guard vantage point an

10  opportunity to look into the cell -- that's the unit -- there

11  were coverings on the windows of the cell doors, making it

12  impossible for somebody to see in there even if they were

13  walking by.

14          MS. MENSCHEL:  Your Honor, I would like to offer

15  Plaintiffs' Demonstrative Exhibits 92, 93, 94, 95, 96, 97, 98,

16  99, 100, 101, and 102 into evidence.

17          THE COURT:  Admitted.

18          MS. MENSCHEL:  And I would also offer the Plaintiffs'

19  Demonstrative Exhibit 135, which is the map, into evidence under

20  seal.

21          THE COURT:  Admitted.

22  Q.  Dr. Haney, did you visit any other facilities during your

23  inspections?

24  A.  I did.  I toured one final facility, St. Clair correctional

25  institution.

1  Q.  When was that?

2  A.  It was on March 23rd, 2016.  And then I returned to

3  St. Clair at a later time, but just to do interviews.

4        MS. MENSCHEL:  I would like to pull up side by side

5  Plaintiffs' Demonstrative Exhibits 90 and 91.

6  Q.  Did you recognize these images?

7  A.  I do.

8  Q.  Can you explain what they are.

9  A.  Yes.  The -- this -- these are the -- let me see here --

10 this here is -- this long, sort of L shaped building is an

11 office building, and I believe it also contains the infirmary.

12 Down here are segregation units where I spent a fair amount of

13 time.

14 Q.  What do you understand to be the relationship between the

15 two exhibits?

16 A.  One is -- well, one is a schematic, and the other one is an

17 overhead, an actual overhead photograph of the facility.

18 Q.  Do they show the same facility?

19 A.  They show exactly the same facility.

20 Q.  And what facility is that?

21 A.  It's St. Clair.  I went to the overhead because it looked to

22 me to be a little easier to orient me to, but they both depict

23 the same thing.

24 Q.  So going to the overhead, which is Plaintiffs' Demonstrative

25 Exhibit 91, do you know where this is from?

1  A.  Where the photograph is from?

2  Q.  Yes.

3  A.  I don't.

4  Q.  Do you remember seeing a photograph during your inspection

5  of St. Clair?

6  A.  You know, it's possible it was in the institution itself.

7  I'm not sure.

8  Q.  Did your experience at St. Clair support your perspective

9  that ADOC's mental health system is a system in crisis?

10  A.  Yes, indeed.

11  Q.  How so?

12  A.  In a variety of different ways.

13     First of all, St. Clair is the institution that I was able

14  to tour under especially restrictive circumstances.  So this is

15  another example of the system in crisis and a system with

16  dangerous and unsafe conditions.

17     The ground rules under which I was allowed to visit

18  St. Clair were sort of exigent circumstances.  It was a

19  compromise because of what was happening in the prison at the

20  time.  I was told I couldn't tour the interior of the other --

21  the mainline housing units, which would have been these units

22  over here.  I was allowed to enter some of them, but only to

23  enter them from a platform that you stand on as you enter the

24  unit.

25     So as I think I described earlier today, we never -- I never

1   actually got on the floor of the housing units or certainly

2   never got to any cell-front interviews with any of the mainline

3   prisoners.  And we weren't even able to take any photographs of

4   the housing unit because -- even the lawyer who was taking the

5   photographs wasn't allowed to approach the cells in the mainline

6   part of the institution.

7   Q.  Could you describe what your impression of the mainline

8   part of the institution was, even from the limited access you

9   had?

10  A.  It looked -- I didn't have much of an impression, again,

11  because I had very, very limited access.  It looked to me like

12  there were a number of different mainline housing units that

13  were devoted to different kinds of -- or different groups of

14  prisoners.  So it looked to me like there was a faith dorm and

15  another dorm, maybe a clean and sober dorm or something.  There

16  was a dorm -- there were dorms that were -- that appeared to be

17  purposed for special things, but I couldn't -- beyond that, I

18  couldn't tell.

19      The dayroom areas in the dorms were -- that I could see from

20  the platform where I stood when I looked out into the units

21  seemed to be fine.  Open areas.  But I couldn't -- I mean, I

22  would be hard pressed to make any real judgments, not having

23  talked to any prisoners from those units at any great length and

24  certainly not having had an opportunity to go into the housing

25  units themselves.

1  Q.  So I think you said earlier, but where is segregation at

2  St. Clair on this image?

3  A.  These units here.  That little constellation of units right

4  there, those are all segregation units, with the exception of I

5  believe right -- in this area, I don't know that that's a

6  housing unit.  I believe it might be -- this is an office

7  building.  There is a -- there are officer stations here.  Right

8  there.  There is a mental health office there.  I did some of my

9  interviews in that area when I interviewed on the unit.  But

10  otherwise, these are all segregation units configured in the way

11  that's depicted in the photograph.

12  Q.  And I believe you also said that there was an office or an

13  infirmary in that area?

14  A.  Yes.

15  Q.  Did you visit that area?

16  A.  I did.

17  Q.  Where are prisoners kept in suicide watch at St. Clair?

18  A.  They're kept in the infirmary.  I spent a considerable

19  amount of time in there.

20     There were a number of prisoners who were in the suicide

21  watch or crisis cells in the unit.  And there was an

22  extraordinary circumstance in which I came upon a prisoner who

23  was being housed on the floor of the mental health office, which

24  is also contained in this area.

25        MS. MENSCHEL:  I would like to pull up Plaintiffs'

1    Demonstrative Exhibit 105.

2    Q.  Dr. Haney, can you describe this picture.

3    A.  Yes.  This is a photograph of the gentleman who was in the

4    mental health cell.  This is a photograph through the window

5    of -- that -- again, somewhat misleading because of the flash

6    that was used.  It was a dark cell from the outside when I first

7    looked in.  I don't even -- I'm not even sure how I noticed it.

8         But I saw the sign, mental health office, and I thought I

9    would look in to see what the mental health office looked like,

10   and I was going to ask for the light to be turned on.  And as I

11   peered into the window, it appeared that there was actually a

12   person in there.  And when I inquired, I was told, yes, indeed,

13   it was inmate so-and-so, and he was being housed there

14   temporarily.  And he was asleep, so we didn't -- I didn't wake

15   him.

16        We continued through the unit.  We interviewed some more

17   people.  We may have gone somewhere else in the facility.  I'm

18   not sure.  But a little bit later in the day, I came back to

19   that unit to do some further interviews.  There were some other

20   people I wanted to talk to back there, and I wanted to make a

21   point of talking to him if he was awake by now, and he was.  And

22   he explained to me that he had been there for a day or so and

23   that he was waiting to see mental health.  And he was living in

24   that cell -- in that office, rather.

25   Q.  Did the fact that he was living in that office present any

1  concerns for you?

2  A.  Of course.  This is no place to house a human being.  He was

3  in no small amount of distress.  I think he had been in distress

4  even before he came to the cell, and that's why he was supposed

5  to go and see mental health.  But he hadn't been seen, and he

6  was waiting there.  He wasn't sure when mental health was going

7  to come to see him.  He thought he had been there for at least a

8  day.

9      I was first told he had only been there a little while, and

10  then he told me he had been there for at least a day.  He had

11  spent the night there.  And it looked like he may have spent

12  more than a single night there.

13      I was flabbergasted.  And we talked for a while, and I asked

14  him some things about how he was surviving in there and how he

15  was getting by.  I asked him, you know, some basic, mundane

16  questions about how he went to the bathroom.  Because it was an

17  office.  It wasn't a cell.

18  Q.  So how did he go to the bathroom?

19  A.  He told me that there was a little plastic jug that they

20  gave him.  That if he knocked on the window, he could get a

21  correctional officer to bring him a plastic jug, and he went --

22  he urinated in the plastic jug.

23  Q.  Did you, during your inspection, see the plastic jug?

24  A.  Yes.  I asked to see it and I did see it.

25          MS. MENSCHEL:  Your Honor, we have an image of the

1  plastic jug if the Court would like, but only with the Court's

2  permission or if the Court would like us to pull it up.

3        THE COURT:  Pull it up.

4        MS. MENSCHEL:  I'm going to pull up Plaintiffs'

5  Demonstrative 106.

6  Q.  Dr. Haney, is that what you were just describing?

7  A.  Yes.

8  Q.  Did you see, Dr. Haney, other dedicated crisis cells in your

9  inspection at St. Clair?

10  A.  Yes, I did.  Yes.

11        MS. MENSCHEL:  I'm going to pull up Plaintiffs'

12  Demonstrative Exhibit 107.

13  Q.  What do you understand this to be?

14  A.  It's one of the crisis cells in that unit, in the hallway of

15  the infirmary where the crisis cells were located.

16  Q.  Did you look inside any of these cells?

17  A.  Yes, I did.

18        MS. MENSCHEL:  I'm going to pull up Plaintiffs'

19  Demonstrative Exhibit 108.

20  Q.  Can you describe that -- what's depicted here, Dr. Haney?

21  A.  This is looking into one of the crisis cells through the

22  exterior door in that hallway.  It's a suicide watch cell, and

23  it's -- I believe this cell was occupied at the time I was

24  there, but it's -- you can see there is a grate on the window.

25  And in order to look into the cell, obviously, you've got to

1  look through it.

2  Q.  How easy or hard was it to look through the window?

3  A.  It required some effort.  You can see -- if you look down at

4  the corner, you can see the image of somebody on the floor, in

5  the right-hand corner at the bottom.  But, you know, you have to

6  look.  It's not obvious.  It's not an ideal -- needless to say,

7  it's not an ideal or an easy way to do crisis cell or suicide

8  watch observations.

9  Q.  You said it's not ideal.  What are your concerns about this

10  particular crisis cell?

11  A.  Well, you can't -- you can't -- we haven't shown the cells.

12  I don't know if we have a photograph of them or not, but they're

13  very sparse and harsh cells for prisoners to be in.

14      I interviewed somebody in one of these cells who had been

15  there for five months, basically in an empty cell in the hallway

16  of the infirmary.  A crisis cell is not intended for a

17  five-month stay.  I confirmed with the correctional officer that

18  the date on the door was, in fact, the date of arrival, and it

19  was five months before we were there.

20      So you're -- not only are these risky cells in which to put

21  people who are in crisis, because they've difficult to do

22  regular observations, but also the cells themselves are not --

23  were never intended for long-term confinement.  And five months

24  is long-term confinement.

25      So it was a combination of things in that unit.  It's also

1  kind of a busy hallway, so I think it's easy for people to get

2  distracted.  There was -- there's a lot -- there was a lot going

3  on in the infirmary at St. Clair.  And it -- you know, the

4  people -- the people were coming and going, doing other things,

5  infirmary related things, and I had some concern that it would

6  be very easy just to ignore.  Those cells are on the side and

7  they're kind of -- not necessarily obvious things to attend to,

8  especially if you had other duties that you were taking care of.

9      So just the combination of the cells on the one side and

10  this young man that we just looked at who was lying on the floor

11  of the mental health office, urinating in a plastic bucket, you

12  know, it just underscored for me, again, the inadequacies of

13  this system.  These are people in varying degrees of crisis who

14  were in places that put them at greater rather than lesser risk.

15  Q.  You said that their cells are not intended for long-term

16  confinement.  Why not?

17  A.  Well, they're not designed for that.  I mean, they're not

18  configured for that.  They're bare cells.  And they're

19  structured that way or arranged that way to minimize the risk of

20  harm to the people who are housed inside, and that's

21  appropriate.  But they're not set up for people to live for any

22  considerable period of time.

23      The notion of a crisis cell is somebody's in crisis, they

24  get stabilized, they're moved somewhere else.  You wouldn't -- I

25  don't know the circumstance under which somebody would just be

1  left there.

2      These are places where people are supposed to stay for days.

3  Just days.  Many, many systems have time limits on -- 72 hours

4  or something, you know.  You get moved out of a crisis cell

5  quickly because you're supposed to be stabilized.  You're

6  supposed to get treatment.  The crisis cell is just to make sure

7  you don't harm yourself while you're being moved to somewhere

8  where you can receive more appropriate therapy, and so they're

9  not set up for people to live in them.

10     And you can imagine how living in one for any length of

11  time, the sparseness of the cell -- whatever advantage there is

12  to having the cell be very sparse and, therefore, difficult for

13  you to harm yourself, would be quickly compensated for by the

14  despair you would feel as a result of living in a cell where you

15  didn't have anything day in and day out for weeks and months at

16  a time.

17  Q.  Did you have any understanding of whether -- you just talked

18  about people being moved out of the cells, out of crisis cells.

19  Did you have any opinion about whether or not the treatment

20  after a person is moved out of a crisis cell is happening in

21  ADOC?

22  A.  Yes.  I mean, I heard many, many stories of people -- from

23  prisoners who were in crisis cells.  I mean, many of the

24  prisoners that I interviewed had been in crisis cells or suicide

25  watch, some of them many times.  And in some instances -- and

1    this was confirmed by their records.  Even though I didn't look

2    at a lot of records, there were some records, and it was clear

3    to me that some people, either whose records I reviewed on site

4    and in some instances records that you sent to me, involved

5    people who had been in and out of crisis cells many times.  And

6    repeatedly I heard stories of no follow-up.  That they came

7    out -- got out of the crisis cell, and nobody came to see them.

8        There was one man at Donaldson in the segregation unit at

9    Donaldson who was placed in a crisis cell.  There was a document

10   from Dr. Hunter expressing concerns about his mental health,

11   even though he wasn't on the mental health caseload.  He was

12   returned to the segregation unit from a crisis cell without

13   being placed on the mental health caseload and no further mental

14   health follow-up with him after he had been in a crisis cell.

15   And that was confirmed by the records I reviewed.

16       So it was -- the stories were very consistent.  And to the

17   extent to which there were documents that I was able to review

18   that corroborated that, those documents did, in fact,

19   corroborate that.

20   Q.  Turning back to the photos that is Plaintiffs' Demonstrative

21   Exhibit 106, do you have -- no.  Sorry.  I think it's actually

22   Plaintiffs' Demonstrative Exhibit 108.  Do you have any

23   understanding of what it is, if you kind of look just about in

24   the middle on the right of that image?

25   A.  I am not sure I do.  I mean, it just looks like something

```
 1   that's stuck on the wall, but I don't know exactly what -- you
 2   know, it looks like some kind of substance on the wall.  And I'm
 3   just not sure -- I don't -- I remember taking the picture, we
 4   took the picture of it, but I didn't examine it and I don't
 5   remember exactly whether I reached any conclusion about what
 6   exactly it was except some sort of substance that was up on the
 7   wall that had not been cleaned off.
 8              MS. MENSCHEL:  Your Honor, may I have a moment?
 9              THE COURT:  Yes.
10              (Brief pause in the proceedings.)
11              MS. MENSCHEL:  I would like to look at Plaintiffs'
12   Demonstrative Exhibit 104.
13   Q.  Dr. Haney, can you tell us what's depicted in this exhibit.
14   A.  Yes.  So we've been talking about these suicide watch cells
15   in the hallway of the infirmary at St. Clair, and I mentioned
16   that the cells themselves were very sparse, sparsely furnished
17   and empty, and the reasons why.  And these are photographs of
18   exactly what that looks like.
19   Q.  Do you remember this cell?
20   A.  Yes, I do.  Vividly.
21   Q.  Turning to the left-hand image here --
22   A.  Yes.
23   Q.  -- does anything about this cell concern you?
24   A.  Yes.  Yes, it does.  Again, the possibility, the very real
25   possibility that this provides an opportunity for somebody to
```

1  string a ligature around that light and potentially use it as a

2  point of hanging.

3  Q.  And this cell was a suicide watch cell; is that correct?  Or

4  was being used as one?

5  A.  Yes, it absolutely was.

6  Q.  I'd also like to talk a bit about the segregation units you

7  visited at St. Clair.  I'm going to pull back up Plaintiffs'

8  Demonstrative Exhibit 91.  You mentioned earlier, I believe, you

9  pointed out where the segregation units were.  Can you do that

10  again, please.

11  A.  Yes.  All these in here with the -- again, with the

12  exception of these.  I don't believe this was housing units, but

13  this was.  A, B, C, D, E.

14  Q.  What was the relationship between A and the other four units

15  there?

16  A.  A is the unit that the prisoners refer to as the doghouse.

17  Apparently, this is the unit where prisoners who are disfavored

18  or prisoners who have acted up in the other segregation units

19  are sent, and even more severe restrictions are placed on them

20  in comparison to the other units.

21         MS. MENSCHEL:  Your Honor, I believe that we have to --

22  the officers have to take Plaintiff L.P. back.  Can we break for

23  a moment to do that?

24         THE COURT:  Yes.

25     (Brief pause in the proceedings)

 1           THE COURT:  Why don't we take a five-minute recess

 2    right now.

 3        (Recess was taken from 4:51 p.m. until 5:03 p.m., after

 4         which proceedings continued, as follows:)

 5           THE COURT:  Proceed.

 6    BY MS. MENSCHEL:

 7    Q.  Dr. Haney, just before the break, we were talking about the

 8    segregation units, and I believe you had started to talk about

 9    the A dorm.  What is your understanding of what A dorm is?

10    A.  It's referred to as the doghouse.  I was told by several

11    inmates who had been in the doghouse that it was a punishment

12    unit within the segregation unit.

13    Q.  Did you meet anyone there who was housed there?

14    A.  Yes, I believe I did.  I believe I did interview somebody

15    who was in that unit.

16    Q.  Can you tell us about that interview.

17    A.  I'll have to refer -- if you can refer me to the paragraph

18    in my notes --

19           MS. MENSCHEL:  Your Honor, with the Court's permission,

20    may I refer Dr. Haney to part of his report?

21           THE COURT:  Yes.

22    Q.  Dr. Haney, I would refer you to page 61 of your appendix

23    that is attached to your report.

24    A.  Yes.  Sixty-one in the appendix?

25    Q.  Yes.

```
 1  A.  Okay.  Yes.  Yes.
 2      Actually, this was the last prisoner that I interviewed, the
 3  very last prisoner I interviewed in the system.  This was --
 4          THE WITNESS:  I returned, Your Honor, to St. Clair to
 5  do some interviews after the day that I had -- that I had toured
 6  and interviewed prisoners on site.  I went back and did some
 7  follow-up interviews.  And Mr. E.H. was --
 8          And I'm not sure I have accurately converted his
 9  initials --
10  Q.  I think there's another discussion on page 59 of the
11  appendix.
12  A.  Mr. E.L.Q. is, you know, a prisoner, again, who I
13  interviewed on my second visit.  This is a prisoner who had lots
14  of things to say about what was going on at St. Clair, including
15  the fact that, as I had an opportunity to observe myself, that
16  there were some prisoners who were being left out overnight in
17  the yard at the institution.
18  Q.  What do you mean, left out overnight?
19  A.  I mean literally left out overnight.  And I heard this -- I
20  witnessed -- I witnessed the aftermath of this when I was
21  touring the institution.
22      I had an opportunity then to talk to a number of prisoners
23  who were housed in the unit, both the day I was there, the first
24  day I was there, and then the second day later in June of 2016
25  when I returned to St. Clair, about the practice.  The day I was
```

1    there, when I was touring the segregation unit, I passed a group

2    of men.  We were walking down a hallway.  I believe it was on

3    our way to the A unit, what we referred to as the doghouse.

4        And in an exercise pen adjoining that walkway —— there was a

5    covered walkway where men were outside.  And they began to yell

6    to us and telling me that they had been out overnight.  And I

7    approached them to try to speak to them, and the warden —— the

8    associate warden who was escorting us would not allow me to

9    speak to them.

10       Later in the day, in fact, I corroborated with another

11   inmate who I interviewed who had a whole other story, that he,

12   in fact, had been out overnight the night before and had just

13   been returned to his cell that morning.  I then began to ask

14   other prisoners about it, whether or not this was, in fact, a

15   practice.  I had never heard of this.  I had never seen it

16   before at any other prison.  And I was told that, yes, in fact,

17   for punishment prisoners could be and were left outside

18   overnight and sometimes, I was told, for several days at a time.

19       One prisoner told me, in fact, that because of this practice

20   and because prisoners who were left out overnight or for several

21   nights had nowhere to use the bathroom, that the fact that they

22   had been left out overnight and had to relieve themselves in the

23   yard deterred other prisoners from going out to the yard even

24   when they were given an opportunity to do so.

25   Q.  Do you have concerns that that practice impacts people's

1  mental health?

2  A.  Well, yes.  I mean, obviously, it's an unheard of

3  correctional practice.  It's unsafe, physically unsafe for

4  people to be left out overnight.  It's degrading and humiliating

5  for people to be kept out of even the segregation cells to which

6  they have been confined and to be forced to go to the toilet in

7  an open, outdoor exercise area.

8      These are degrading and humiliating things for people to

9  experience.  And if somebody is mentally ill -- and there were

10 many prisoners in the segregation units at St. Clair who were

11 mentally ill, seriously mentally ill -- then, in fact, this

12 would exacerbate their mental illness and place them at risk.

13 Q.  What is the risk?  What will happen?  What is the potential

14 risk of -- what the results would be?

15 A.  Well, again, I mean, imagine a scenario in which somebody --

16 and many of the prisoners that I interviewed in the segregation

17 unit in St. Clair were depressed.  Were severely depressed.

18 They were on heavy psychotropic medications.  Some of them were

19 hearing voices.  They were very unstable.

20     You can imagine somebody decompensating outside, simply not

21 being able to manage the fact that they were outside overnight.

22 Maybe outside with other prisoners overnight and, therefore,

23 feeling unprotected by the fact that they didn't -- that they

24 weren't even housed in a cell.  You can imagine other prisoners

25 becoming increasingly depressed, in the same way that when we

1   were talking about the degraded cells in which people were

2   living, I said people could infer from the degraded cells and

3   from the grotesque showers that they were subjected to that they

4   were, in fact, worthless and becoming even further depressed.

5      I mean, you're taking risks with people who are fragile

6   human beings by definition.  And subjecting them to this kind of

7   maltreatment just increases the likelihood that they will have

8   some kind of extreme adverse reaction that is related to their

9   mental illness but that is also precipitated by the mistreatment

10  to which they're being subjected.

11          MS. MENSCHEL:  Can I pull up Plaintiffs' Demonstrative

12  Exhibit 116.

13  Q.  Dr. Haney, can you describe this image.

14  A.  Yes.  This is the outdoor exercise area that I was talking

15  about.  So this is the yard for the seg unit at St. Clair.  It

16  goes around -- it goes around that building that's labeled --

17  the sort of shed-like building that's labeled seg unit.  So

18  there are two sides to it.  It's sort of a square.  But that's

19  the outdoor yard area.

20  Q.  So was it your understanding that people were sleeping in

21  the outdoor area here?

22  A.  Yes.  That's exactly my understanding.

23  Q.  Going back to A dorm and the doghouse as I believe you

24  referred to it, did you tour inside that dorm?

25  A.  Yes, I did.

1          MS. MENSCHEL:  If you would turn to Plaintiffs'

2   Demonstrative Exhibit 109.

3   Q.  Can you describe what's shown in this exhibit.

4   A.  That's inside -- that particular -- I believe that's that

5   dorm, A block.  That's the doghouse dorm.

6      It's a segregation unit.  All of those little segregation

7   units that were depicted in the overhead are configured in this

8   way.  There's a first floor and a second floor.  There's a

9   correctional officer station or guard station.  You walk out on

10  a little platform, and it looks out onto the unit as you enter

11  it.  And that's where the photograph is taken from, from that

12  platform.  These are small units but very severe, deteriorated

13  conditions inside the cells.

14         MS. MENSCHEL:  I'm going to pull up Plaintiffs'

15  Demonstrative Exhibit 110.

16  Q.  Could you describe what's shown in this picture.

17  A.  This is a photograph that was taken from the door on the

18  unit floor, looking into a cell in A block.  And it's -- it

19  depicts -- I believe this was the cell that I ended up being

20  able to enter because it was not occupied at the time.  So I was

21  able to walk up to it and actually look into it and get a sense

22  of what was going on inside.

23     I was not, incidentally -- I may or may not have explained

24  this.  When I toured the unit, I was not allowed to talk cell

25  front to any of the prisoners who were in the segregation unit,

1  even on the first floor.

2  Q.  Why not?

3  A.  Again, I was told there were security concerns.  So I wasn't

4  able to actually approach the cells and look into them except

5  for the one cell that was unoccupied.  So I was able to take a

6  photograph and then enter that cell.

7      I ended up being able to talk to several other prisoners who

8  I arranged to get -- to have come out of their cell for a

9  confidential interview, but I didn't talk to them cell front.

10 This particular cell was empty, so I got a photograph of it from

11 the outside, and then we had some photographs taken inside the

12 cell as well.

13          MS. MENSCHEL:  I'm going to pull up next to this

14 Plaintiffs' Demonstrative Exhibit 112.

15 Q.  Dr. Haney, do you recognize the photos in that exhibit?

16 A.  Yes.  That's the cell that I was describing that I had had

17 an opportunity to go into.  It may or may not have been the cell

18 on the left, but it was a cell that was unoccupied at the time.

19 We were allowed to open the door, and I was allowed to go inside

20 the cell and take some photographs of what the cell looked like

21 inside.

22 Q.  Focusing on the pictures on the right, was there anything

23 particular about this cell that concerned you?

24 A.  Well, there are many things about this cell that concerned

25 me.  One is the evidence of psychic disorganization and abject

1  despondency of a person living like that, barely sustaining

2  themselves. This is almost a kind of -- I don't know how to

3  describe it -- state-of-nature existence. Here's a person who's

4  living a bare kind of psychic subsistence level and holding on.

5  So that's the first thing that struck me.

6      I talked to you earlier about the signs of deterioration and

7  concerns about somebody having a difficult time holding on and

8  managing themselves in an environment like that. You would look

9  at a cell like this and immediately be concerned about not only

10 the mental health, but the survival of somebody who's living in

11 a set of conditions like this.

12     I actually later was able to interview this man. He had

13 very serious mental illness. He was hearing voices. He had

14 been hearing voices. He was on psychotropic medications. Not

15 too much earlier, he had been on suicide watch, he told me, for

16 several weeks. He was put back in this cell and living in this

17 cell. He told me he rarely saw mental health. They rarely came

18 back to his unit.

19     He rarely went out. He was -- it was really pretty clear to

20 me that he didn't -- that he was afraid to go outside, he wasn't

21 comfortable going out, so he rarely went out of his cell. And

22 he was living like that. Very, very depressed when I saw him.

23     The other thing that concerns me, I mean, again, we've

24 talked about this before, but you can see there's a metal grate

25 in the cell that, with some degree of ingenuity, somebody might

1  be able to hook a ligature through that metal grate up on the

2  side of the wall.  And certainly for somebody who had been on

3  suicide watch, this would be of grave concern.

4      I mean, this is a person who had come directly -- according

5  to him, he had come directly back from suicide watch and placed

6  back in that cell -- that as well as this -- and was in despair

7  when I interviewed him not long after we entered his cell.

8  Q.  I think you used the term psychic disorganization?  I think

9  that was your term.

10 A.  Yes.

11 Q.  Can you explain what that means.

12 A.  Just that this is someone who has not been able to manage

13 his daily environment and keep any kind of structure or

14 organization in the life around him.  So you just see signs that

15 he's disorganized.  He's sort of coming apart.  And, indeed,

16 when you talk to him, that's really how he describes himself, as

17 barely holding on.  And it seems to me to be reflected in the

18 way in which he was living as well.

19 Q.  What are the signs that you see -- that you saw in the cell

20 or in this exhibit that he's coming apart?

21 A.  The degree to which the cell is disheveled.  The lack of any

22 real attempts to keep things organized.  You know, his sheet is

23 balled up in the corner.  His blanket is hanging half off the

24 bunk.  There's trash in different corners of the cell.

25     I mean, this is somebody who is struggling.  And, indeed,

1  when I interviewed him, he not only was struggling in the

2  moment, at that time, but he had been struggling for a long

3  time.  This was a person who's known to mental health but

4  returned from a crisis cell to a very severe segregation

5  environment to live in a cell like this.

6  Q.  I would like to go back to the demonstrative that's on the

7  left on the screen.  When you were doing your inspection of the

8  segregation unit at St. Clair, did you have any opinion about

9  the doors or the windows in the segregation units?

10  A.  Yes.  Again, these are -- I mean, we've -- I've said this

11  many times about many different units, but it certainly applies

12  here.  They're small windows.  They're hard to see in.

13      If you have people on the mental health caseload like this

14  gentleman whose cell is depicted on the right, who are in

15  severe -- severely depressed state, who are hearing voices, who

16  are at risk of self-harm, then this is a danger because it's

17  very hard to monitor them.  Even if you're well intentioned and

18  you try to, the task is a complicated one.

19  Q.  In your --

20  A.  A challenging one, rather.

21  Q.  Sorry.

22      In your inspections at St. Clair, did you believe that there

23  was monitoring going on or adequate monitoring?

24  A.  Certainly not by mental health.  I mean, prisoner after

25  prisoner described barely ever seeing mental health back in

1   those segregation units.  When they did come back, it was a very

2   brief, kind of pro forma.  Prisoners tend to refer to them as

3   drive-bys, quickly moving past.  These were prisoners who were

4   not being regularly taken out of their cells.

5       When Your Honor was asking me earlier today how would you

6   monitor somebody in segregation, this is an example of a unit

7   where it would be important to take people out of the cell, to

8   see them individually, regularly, individually, to be able to

9   monitor their mental health status.  Not only it gives them

10  counseling, if that were possible, but just to check in with

11  them in a meaningful way to make sure that they had not turned a

12  corner and were moving in the wrong direction.

13          MS. MENSCHEL:  I would like to look at Plaintiffs'

14  Demonstrative Exhibit 111.

15  Q.  Dr. Haney, can you explain what is shown in this image.

16  A.  Yes.  These are the -- these are the -- this is a

17  different -- now, it's a different segregation unit, this is C

18  block or C dorm, but still St. Clair segregation units.

19      These are two cells out -- obviously, closed-door cells

20  showing the relatively small windows, the difficulty of looking

21  in, and one of the cell windows essentially covered up.

22  Q.  And you've discussed a bit about your concerns about windows

23  being covered?

24  A.  Just to emphasize what I have already said about it.  Notice

25  that a number of the windows -- the one on the right appears to

1  be completely covered up.  The window on the left is just

2  partially covered up.  But it takes an already small window, and

3  it makes it even smaller.

4      This, obviously, was done by correctional officers.  So the

5  placement of the administrative segregation card on the door was

6  not done by the prisoners.  It was, obviously, done by a

7  correctional officer.  And that was commonplace in this

8  segregation unit.  There were a number of those windows that

9  were partially covered by the card identifying them as admin seg

10 prisoners, covering, you know, half or so of the already limited

11 view inside the cell.  Again, making it much more dangerous.

12 Q.  What was the environment like in the segregation units at

13 St. Clair during your inspection?

14 A.  It was terrible.  Chaotic.  In a couple of the units,

15 completely out of control.  There was in some of the units --

16 not literally all of them but some of them -- there was

17 screaming, banging, yelling.

18     In one of them I began to enter the unit, and the

19 correctional officer attempted to essentially prevent me from

20 coming into the unit.  And I could hear, there was a great

21 commotion taking place behind him.  I wasn't sure what was

22 happening or why.  But eventually he relented and moved aside,

23 and I entered and stood on the platform and realized that as I

24 was coming into the unit, a prisoner had somehow managed to put

25 his fist through the window on the cell and break the window.

1  And there was glass that -- freshly broken glass on the floor

2  right in front of the window.  And this prisoner was very

3  agitated, very upset, yelling.  And this had, obviously, just

4  happened as I was entering the unit.

5        MS. MENSCHEL:  I'm going to pull up Plaintiffs'

6  Demonstrative Exhibit 113.

7  Q.  Looking on the bottom left of this exhibit, can you explain

8  what's happening there or do you recognize the photo?

9  A.  That's the prisoner I was talking about, and that's the

10  cell.  So this is -- there's two floors to this.  He was on the

11  bottom floor.  That's the window that had just been broken.  You

12  can see the glass on the bottom of the window.  And he was, you

13  can perhaps see from the photograph, very agitated, very upset,

14  yelling.  And other prisoners in the unit were yelling and so

15  on.  That happened in a couple of other units as well, but,

16  obviously, not with somebody breaking the glass on the door.

17     You can see also the covered windows.  If you look up, the

18  two cells above, it's very hard to see in.  And the one cell has

19  the administrative segregation card over the window of the door.

20        MS. MENSCHEL:  I'm going to pull of Plaintiff's

21  Demonstratives 114 and 115.

22  Q.  So 114, can you explain what these images are.

23  A.  Yes.  This is an image of the cell window that had been

24  broken where the inmate had shoved his fist through the window.

25  He backed away from the window so I could take a photograph of

 1    the cell.  This was his cell that he was living in.  He was -- I
 2    wasn't allowed to interview him, but as I was standing there
 3    looking in his cell, he was yelling, and he was yelling that he
 4    was -- he couldn't breathe in his cell.  And he was -- he seemed
 5    like he may have been having a panic attack.  He was very, very
 6    upset.
 7        As you may know, I actually was able to interview him a
 8    little bit later in the day, and I learned that he was a
 9    prisoner who had been kept out overnight the night before.  He
10    had come back into his cell.  He was convinced that people were
11    trying to kill him at the institution and that he was -- that
12    people were going to come into his cell.
13        He tried to describe to me a way in which people could get
14    into his cell from the back of the cell.  It was unclear to me
15    how that could happen, but I wasn't sure whether or not it could
16    happen.
17        By the time I interviewed him in the afternoon, he had
18    calmed down.  And he went through a description of how difficult
19    it was to live in this unit, how hard his life had been, and
20    then he began to cry and talk about what -- how despondent and
21    despairing he was and why he did this.
22    Q.  What was your understanding of why he did this?
23    A.  He was upset.  He was frightened.  And he actually told me
24    he couldn't breathe, and he was trying to get the correctional
25    officer's attention and then finally punched the hole through

1   the window.

2   Q.  Do you have any concern about risk to his mental health?

3   A.  Of course.

4   Q.  Can you explain to us a little bit about your concern.

5   A.  He was a very unstable inmate in an extraordinary amount of

6   distress.  He told me he had been in distress for a long period

7   of time and that he couldn't get any help or attention and that

8   he had -- as punishment he had been forced to stay out overnight

9   the night before, and this appeared to have pushed him over the

10  edge.

11          THE COURT:  Now, these inmates, according to you, were

12  outside?

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  Were they shackled?

15          THE WITNESS:  I believe they were.  My recollection is

16  of the people I saw, they were shackled.  Not necessarily with

17  their hands, but I believe they were shackled at their ankles.

18  That's my recollection.

19          MS. MENSCHEL:  Pull up Plaintiffs' Demonstrative

20  Exhibit 115.

21  Q.  Do you recognize this photo, Dr. Haney?

22  A.  Yes.  Two more St. Clair segregation cells.

23  Q.  Can you tell us what is happening in the area that I've just

24  circled?

25  A.  Well, there appears to be some amount of debris outside of

1  the cell.

2      I was also told that the prisoners in these units are

3  concerned about rats coming into the cell and try to prevent

4  them by stuffing things under the door.  I'm not sure how

5  effective it is, but that was what I was told is what they

6  attempted to do at some point.

7  Q.  If there were rats coming into cells, would that have any

8  impact on people's mental health?

9  A.  Of course.

10  Q.  How so?

11  A.  Well, again, people living in degradation and exposed to

12  dehumanized conditions, you're hard pressed to do anything about

13  that.  It's humiliating.  It can be frightening for prisoners.

14      Imagine a prisoner who's having a difficult time, who's

15  fearful, who's anxious, who may be hallucinating, is not sure

16  whether there's something in his cell or not, whether he's being

17  attacked by animals or not.  It's not difficult to imagine how

18  it would be -- it would be humiliating and degrading for anyone,

19  but it's not difficult to imagine how it would be especially

20  problematic for someone who is mentally ill.

21  Q.  Did you visit any general population units at St. Clair?

22  A.  No.  As I recall, St. Clair -- I visited them, but I never

23  went inside of them.

24      I'm not sure that made sense.  I looked in them, but I

25  didn't actually inspect the actual units.

1   Q.   Okay.

2          MS. MENSCHEL:   Your Honor, I would like to offer

3   Plaintiffs' Demonstrative Exhibits 104, 105, 106, 107, 108, 109,

4   110, 111, 112, 113, 114, 115, and 116 into evidence.

5          THE COURT:   All admitted.

6          MS. MENSCHEL:   I'll also offer Plaintiffs'

7   Demonstrative Exhibits 90 and 91 into evidence under seal.

8          THE COURT:   Admitted.

9   Q.   Dr. Haney, have we discussed all of the facilities that you

10  visited during your inspections of the ADOC?

11  A.   Yes.

12  Q.   I would like to move on to the opinion you expressed earlier

13  today that there are dangerous conditions and a lack of control.

14  I know you've talked about this a little bit over the course of

15  the day.   What do you mean by dangerous conditions and a lack of

16  control?

17  A.   Conditions which put inmates as well as correctional staff

18  at risk of physical harm.   Those conditions were manifested

19  throughout the facilities that I was in as described in many of

20  the scenarios and incidents that I saw.   The various

21  restrictions that were placed.   The events that took place, some

22  of them that took place in front of me.   The representations by

23  correctional administrators, wardens, and associate wardens that

24  facilities were too dangerous or parts of facilities were too

25  dangerous to enter.   The dangerousness was repeatedly emphasized

1  by prisoners.

2      So I've just described what I saw.  I've described what was

3  represented to me by correctional staff; what happened while I

4  was in these places.

5      And this was echoed time and time again in the interviews

6  that I did, the interviews that I did cell front with prisoners,

7  but especially in the confidential interviews.  Prisoners sat

8  down and talked about being frightened.  Many of them terrified.

9  Terrified of other prisoners.  Terrified of the staff.

10      Some of them terrified of themselves in the sense that they

11  felt helpless.  They felt that they were not only at risk

12  because things were happening to them, but they were at risk --

13  or that they might be victimized, but that they were at risk

14  because they weren't being well taken care of.  They weren't

15  being kept safe.

16  Q.  What is the impact of the fear you described on a person's

17  mental health?

18  A.  Well, it is, in and of itself, a source of anxiety, and

19  unchecked anxiety can become a clinical syndrome of its own.  If

20  a person already suffers from a form of clinical -- an anxiety

21  disorder, then, obviously, being frightened, repeatedly

22  frightened by the conditions under which you're living or the

23  treatment to which you're subjected would exacerbate that.

24      But you can also imagine just the sheer fear, the

25  vulnerability that mental patients in particular have.  I've

1 alluded to this before, but I think it bears underscoring.

2 Mental patients are vulnerable per se in prison. It's a

3 difficult environment for somebody who is recognized as mentally

4 ill to survive in because they are at risk of being exploited.

5 Oftentimes this is a barrier to self-identification.

6     It's well known in correctional circles. I saw Dr. Hunter

7 talked about it in deposition testimony. It's one of the things

8 that makes it difficult to identify people at intake, because

9 they don't necessarily want to identify themselves as potential

10 mental patients.

11     And it's beyond the stigma that attaches to being mentally

12 ill in society at large. In prison, the stigma comes with the

13 possibility of victimization attached to it. So there's a sense

14 in which people don't want to identify because they're

15 vulnerable.

16     And this is true even in the best of systems. But in a

17 system where there is actual, real danger, where people don't

18 feel that the correctional system itself is capable of keeping

19 control, where there are things like riots taking place and, you

20 know, parts of the institution being closed down and wardens

21 saying, I can't keep you safe here or you can't go to this unit

22 because I can't guarantee your safety, if those things -- and I

23 scratched the surface, looking at that part of it. But it was

24 abundantly clear.

25     For people who are living in a system like that, the

1  system's inability to keep them safe is something they're

2  reminded of every day.  And so the fear of victimization for a

3  person who's mentally ill, who may not -- who may not be able to

4  manage themselves, who may not be able to defend themselves in

5  quite the same way someone else might be, is all the worse and

6  has all the worse, corrosive effect on their mental health.

7  Q.  What evidence did you see or hear that the prisoners

8  themselves, the mentally ill prisoners themselves, thought that

9  the system was not capable of keeping them safe?

10  A.  Again and again and again, prisoners told me that they were

11  afraid.  They talked about -- they mentioned different

12  facilities where they were terrified.  They mentioned not

13  wanting to go out of their cell because they were afraid.

14      I talked to a prisoner -- I mentioned when I was talking

15  earlier about Holman, that there was a prisoner on the second

16  floor of Holman who appeared to be very agitated when I walked

17  by his cell.  I mentioned that there was urine out in front of

18  his cell.  He was a prisoner I tried to interview later in the

19  day, and I was told he was not available to be interviewed.

20      Quite by accident, I encountered that prisoner in a

21  stabilization unit at Bullock.  I was able to match his name

22  with the prisoner who I had tried to interview at Holman.

23      He was in horrible shape in the stabilization unit at

24  Bullock.  And he told me that --

25      I asked him whether or not he was getting out of his cell,

1    because he looked like -- he was in awful shape when I saw him

2    at Holman, but he looked in even much worse shape when I saw him

3    in the stabilization unit at Bullock.

4        He said he was rarely getting out of his cell.  He had

5    basically been in his cell around the clock.

6        And I asked him whether or not he was being taken out of his

7    cell, given an opportunity to go out of his cell -- and, again,

8    he's in a stabilization unit, so he's supposed to be brought out

9    of his cell and he's supposed to have opportunities to relieve

10   the pressure of being in his cell all the time.

11       He told me he was frightened to come out of his cell

12   because, he said -- he had been at Holman, and Holman was

13   terrifying, and he had seen the things that had happened to

14   people at Holman.  When he was being -- if he came out of his

15   cell in the stabilization unit, he would have to come out of his

16   cell in restraints and stay in restraints.  If he was on the

17   dayroom floor or if he was outside, he said, he would be kept in

18   restraints, and he was terrified that he would not be able to

19   defend himself.  So he stayed in his cell.

20       So here's a case of somebody who certainly there's -- hard

21   to imagine anything more counterindicated for somebody like him

22   than to stay in your cell all the time.  But even the few

23   opportunities that he had to go out of his cell were ones that

24   he didn't take advantage of because he was so afraid, based on

25   what he had seen at Holman, largely; that if he came out of his

1    cell, even though now he was no longer at Holman, he was at risk

2    and he wasn't going to take that chance, so he stayed in his

3    cell.  And he appeared to me to be deteriorating much further

4    while he was in his cell, in part because of that.

5        That's an example.  I mean, there were multiple examples of

6    people -- people who described being threatened by correctional

7    officers, being made fun of by correctional officers as mental

8    patients, being derided for their mental illness.  Prisoners

9    talking about beatings that took place, either actual beatings

10   or beatings that they had heard of that they believed had

11   occurred, but which were -- which frightened them.

12       I interviewed -- you know, I interviewed a prisoner at Bibb

13   who had, in fact, been beaten.  He was in a confrontation with a

14   correctional officer and had actually been badly beaten and had

15   facial surgery as a result of it.  He was terrified of whether

16   or not something like that would happen again.

17       So the fear was widespread throughout the system as

18   expressed by the prisoners who I interviewed.  Some of the fear

19   was prisoners of other prisoners.  Absolutely.  Some of the fear

20   was prisoners of correctional officers.  Whether justified or

21   not, the fear was real.  They expressed it.

22       And much of it, I think, had to do with this systemic

23   dysfunction that I've described; a system that, at least as I

24   saw it, really was out of control.  This was not -- this was not

25   an unsubstantiated belief on the part of many of the prisoners.

1    Whether the harm was directly going to befall them or not, they

2    certainly had plenty of examples of it around them and of a

3    system that was unable to keep them safe and, frankly, also the

4    correctional staff as well.

5    Q.  What made you think that the prisoners who told you that

6    they had this fear, they had a fear of officers threatening them

7    or beating them, what made you believe that those fears or what

8    they expressed to you was reliable?

9    A.  Well, I believed their fear was authentic, so -- because

10   it's not the kind of thing you ordinarily hear from prisoners.

11   It's an unusual thing for prisoners to say.

12       And I'm not saying -- I'm not saying they were at risk of

13   being beaten.  I don't know the answer to that question.  But I

14   believe that they believed, which was -- which to me was the

15   most important thing.

16       You know, I also have to say that there are stories in the

17   system, not reported by prisoners and were not observed by me,

18   but --

19           MR. SMITH:  Your Honor, now we object to hearsay and

20   because it's outside the scope of the question that he was

21   asked.

22           THE COURT:  It is outside the scope of the question.

23           MS. MENSCHEL:  Okay.  On the hearsay issue, Your Honor,

24   he's an expert witness.  I think he would be able to rely on

25   hearsay.

```
 1            THE COURT:  I realize that, but what's your question?
 2            MS. MENSCHEL:  So I was asking about why Dr. Haney
 3   found that his opinion -- to the extent his opinion was based on
 4   what prisoners asked him -- I'm sorry -- what prisoners told him
 5   about their fears, why did he believe that that was a reliable
 6   opinion.
 7            THE COURT:  Go ahead and answer that.
 8   A.  So I was -- I was saying that there is -- there are accounts
 9   given by officials in the system of concerns about attitudes of
10   correctional officers towards mental patients in the system.
11   Stories of correctional officers daring people to take their own
12   life.  Correctional officers working in the treatment
13   facilities, Bullock, Donaldson, and concerns about the lack of
14   sympathy or empathy on the part of the correctional staff.
15        That, too, would bear on whether or not prisoners felt that
16   they were at risk of harm.  Risk of harm either at the hands of
17   another or risk of harm by somebody encouraging them to harm
18   themselves.  So these --
19        Again, whether there is -- there's a difference to be made
20   between whether there is an actual threat and whether somebody
21   believes there to be a threat.  And I had no reason to doubt
22   that the accounts I was given by prisoners of their fears,
23   whether those fears were always justified or not, were genuine
24   accounts.  They appeared to me to be genuine accounts.  And
25   there was plenty of basis in all of the things that I have
```

1   described for those accounts, whether in any individual case to

2   be accurate, to nonetheless be founded on some information or

3   evidence which could make that belief reasonable.

4   Q.  What is the impact of the fears that you've described on a

5   prisoner's mental health?

6   A.  Increasing anxiety, increasing sense of vulnerability,

7   increasing sense of their own fragility, and adding to their

8   overall instability.

9   Q.  How significant of a risk was that in your experience in

10  ADOC?

11  A.  It's a very significant risk, you know, as evidenced by all

12  the things you've said -- or I've said to you in answer to your

13  questions.  You know, again, in Exhibit 4, the multiple numbers

14  of people who talked about being frightened.  Being frightened

15  of their own vulnerability, being frightened of victimization at

16  the hands of other prisoners, being frightened of victimization

17  at the hands of staff, being frightened of victimization at

18  their own hands.

19  Q.  How did the level of dangerousness and lack of control that

20  you opined on in ADOC compare to your experience in other

21  facilities?  I'm sorry.  In other facilities outside of Alabama.

22  A.  There really is no comparison.  The crisis level of danger

23  and the lack of control in the system is -- I don't know that I

24  can say it's unique, but it's -- it's certainly exceptional.

25  These are not the kinds of things that prisoners are ordinarily

```
 1   afraid of.  These are not the kinds of things they ordinarily
 2   talk to you about at the level that they talk to you about it.
 3       But setting aside what they said to me, setting it aside
 4   completely, what I saw, what I personally saw was extraordinary.
 5   What I was told by correctional officers in various points in
 6   time moving through the system was extraordinary.  This is not
 7   the kind of thing that ordinarily happens in prison systems that
 8   are tasked with the responsibility of keeping -- whatever else
 9   they do, keeping order and keeping things safe and under
10   control.  This appeared to me to be a system that was bordering
11   on being completely out of control.
12   Q.  How does that dangerousness and lack of control impact the
13   culture in the facility?  Or in the system.  I'm sorry.
14           MR. SMITH:  Object to the form or object to the
15   question, Your Honor.  The culture, I think it's a vague and
16   undefined term.
17           THE COURT:  Well, let's see what he says first, and
18   then we'll see just how vague it is.
19   A.  I think it -- there becomes a kind of culture of -- an
20   atmosphere, if you will, another word for culture, an atmosphere
21   and a set of operating procedures that take into account that
22   level of danger and that level of risk.  So there is, you know,
23   a tendency to use segregation at a high level, particularly for
24   mentally ill, because it's a quick way to control a problem.
25       Systems that are as overcrowded and as understaffed as this
```

1 one oftentimes become dangerous and therefore resort to punitive

2 mechanisms or patterns or cultures of control where there isn't

3 the person power to take care of problems in any other way.  And

4 so you begin to respond to it by locking units down and locking

5 people up rather than trying to deal with a problem in a less

6 Draconian or punitive way, because you simply don't have the

7 person power with which to do it.

8          MS. MENSCHEL:  Your Honor, may I have a moment?

9          THE COURT:  Yes.

10          (Brief pause in the proceedings)

11          MS. MENSCHEL:  Your Honor, I'm about to move to

12 Dr. Haney's next opinion.  Would you like me to keep going for a

13 little while?

14          THE COURT:  What do you mean, next opinion?

15          MS. MENSCHEL:  He testified earlier today that he had a

16 number of opinions.  The first one was a system in crisis that

17 we've discussed for the bulk of the day.  I just talked through

18 dangerousness and lack of control, and his next opinion that he

19 mentioned was overcrowding and the effect on prisoners with

20 mental health.

21          THE COURT:  Why don't you list for me right now all of

22 the opinions.

23          MS. MENSCHEL:  Certainly.  The opinions that we're

24 going to discuss are the system in crisis, dangerous conditions

25 and lack of control, overcrowding and the effect on prisoners

 1  with mental health needs, the overuse of segregation, especially

 2  for mentally ill, and inadequate mental health treatment.

 3          THE COURT:  And how many opinions -- I didn't count

 4  them.

 5          MS. MENSCHEL:  I think there was five.

 6          THE COURT:  Five opinions?  And we've covered two?

 7          MS. MENSCHEL:  Yes, sir.

 8          THE COURT:  And how long is it going to take you to

 9  cover the remaining three?

10          MS. MENSCHEL:  I would expect significantly shorter.  I

11  would expect around lunch tomorrow.

12          THE COURT:  Okay.  Let's go about another 20 minutes,

13  and then we'll recess.

14          MS. MENSCHEL:  Okay.

15  Q.  Dr. Haney, you also offered an opinion related to

16  overcrowding and the effect that it has on mental health needs

17  of prisoners.

18  A.  Yes.

19          THE COURT:  By the way, Ms. Morris yawned just a few

20  minutes ago.  I've ribbed the defendants.  Now I'm going to rib

21  the plaintiffs.

22          MR. SMITH:  But, Your Honor, her e-mail was sent in

23  error.

24          THE COURT:  I was just making sure that everybody

25  understood it was an equal opportunity yawning.  Go ahead.

1  Q.  Dr. Haney, can you tell us what your opinion is related to

2  overcrowding.

3  A.  That the Alabama Department of Corrections is significantly

4  overcrowded and chronically overcrowded.  It's been overcrowded

5  for a long time.  The chronic overcrowding, I think, has also

6  impacted the culture or the atmosphere in the system.  It's a

7  system that has been operating at excessive levels of crowding

8  for a long time and has tried to accommodate to that in a number

9  of problematic ways, including the use of segregation.

10  Q.  Have you also offered an opinion related to understaffing or

11  staffing levels?

12  A.  Well, the two things are interconnected.  Overcrowding

13  doesn't just mean too many people in a system.  In fact, it

14  doesn't always mean that at all.  It means more people than you

15  have the resources to humanely confine.  That's what it means in

16  a prison system.

17       And so that -- in Alabama what that means is there are lots

18  and lots of people.  The Justice Department's estimate or

19  calculation of the number of prisoners in the system beyond the

20  design capacity in the system is that it's about 186 percent of

21  capacity, which I believe marks it as the most overcrowded

22  system in the country.  And it's been that for a long time.

23       There was a period of time in which Alabama competed with

24  California for the most overcrowded system.  But California, as

25  you know, was ordered by the U.S. Supreme Court to reduce its

1    population and is now no longer in the running for that

2    unfortunate title, but Alabama still is.

3        It's also, however -- not only does it have many, many more

4    prisoners, almost twice as many prisoners as the system was

5    designed for, but, as you know, it's woefully understaffed.  So

6    I've seen lots of data, read testimony, seen deposition

7    transcripts of how significant and widespread the understaffing

8    is, which adds to the level of overall overcrowding.

9        The understaffing is a correctional understaffing problem,

10   but it's also an understaffing problem with respect to the

11   delivery of mental health care.  I've, again, read deposition

12   testimony and trial testimony about the increased caseloads for

13   the mental health providers; in some instances estimated an

14   increase in caseloads of almost 100 percent, from 60 to -- per

15   mental health provider to over 100.  Increases in the

16   psychiatrist caseload not as much as that, but still significant

17   increases.

18       So you're talking about understaffing at multiple levels.

19   And that -- that leading -- again, as a component of

20   overcrowding.  And a system that is that overcrowded and that

21   understaffed cannot run -- cannot function the way a prison

22   system is supposed to function.

23   Q.  What is the impact of overcrowding and understaffing, sort

24   of broadly, on the mental health of prisoners?

25   A.  Broadly, it leads to widespread increase in stress and

 1    conflict.  And that comes about as a result of the crowding

 2    per se.

 3        So crowding has a direct effect on people.  People who are

 4    crowded together -- this is sort of common sense, but there's

 5    actually a lot of research on it to back it up, a lot of which

 6    is in my initial report.  People who are crowded together are

 7    irritable and more likely to engage in conflict.  And in a

 8    prison system it's particularly problematic, because they can't

 9    escape from that crowding.

10        If you're living in a crowded city, you may be able to leave

11    for a weekend or something or get away from it.  If you're

12    living in a crowded prison, you can't.  So there's a heightened

13    level of irritability and conflict, and that's across the board.

14    Not just the mentally ill, but prisoners in general.

15        In addition, there is a higher level of idleness in prisons

16    where there is overcrowding, understaffing.  There are fewer

17    things for prisoners to do.

18        If the understaffing is severe as it is in Alabama, that

19    means also that there are fewer correctional officers to monitor

20    the behavior of inmates.  So if there are -- if the idleness and

21    the increased crowding leads to irritability, leads to conflict,

22    there are fewer opportunities for correctional officers to

23    intervene and stop that conflict before something significant

24    happens.  So the tensions increase in systems like this.

25        The other problem is, especially when there's understaffing

1  in the mental health system, it becomes difficult for

2  correctional officers who are overworked to identify mental

3  health problems among prisoners, assuming they see that as part

4  of their job.

5      If the mental health staffing is also problematic, as it is

6  in this system, there are fewer mental health personnel to

7  provide mental health treatment, to both identify mental health

8  problems in the inmate population and then respond appropriately

9  to it when they do.  So those problems get worse rather than

10  better in an overcrowded system.

11      And this dynamic begins to feed on itself.  The system

12  becomes more conflict ridden.  And because of the understaffing,

13  it's more difficult for the system to respond effectively to

14  whatever conflicts occur.

15  Q.  What impact does the overcrowding and understaffing have --

16  just to follow up on what you just talked about, what impact

17  does the overcrowding and understaffing have on a mental health

18  patient's ability to access care?

19  A.  It makes it more difficult.  It makes it more difficult at

20  several different levels.  One is that if there is -- if there's

21  understaffing in the mental health system, the caseloads are

22  much larger and it's more difficult for mental health staff who

23  have identified the prisoner as a person on the mental health

24  caseload to respond to them.  If it's a person who's trying to

25  get on the mental health caseload, then it's more difficult for

1   the mental health staff to be responsive because they already

2   have too many patients.

3        You know, I encountered this in the very first place I

4   interviewed people at Tutwiler.  I remember interviewing a woman

5   who was trying to get on the mental health caseload, and she was

6   told by her mental health provider that, I have 120 patients and

7   I can't -- you know, I just can't see you very often.  And when

8   I do see you, you're going to have to wait for several hours to

9   get to see me because other people want to see me also.

10       And that's, obviously, a deterrent to attempting to obtain

11  mental health care, which is related to the level of

12  overcrowding in the system.  Overcrowding in the sense that

13  there's not enough staff to meet the needs of the people who are

14  in the system.

15       But it also makes it difficult for prisoners who need

16  escorts.  So some prisoners who might be mentally ill, and there

17  are many, many of them in this system who are in segregated

18  confinement who can't just leave their cell and go to see a

19  mental health provider or even put in a request to see a mental

20  health provider and then go on their own.  They have to be

21  escorted.  And if there aren't enough correctional officers to

22  do that, if correctional officers can barely manage the control

23  of the unit to which they've been assigned, then the wait times

24  in between a person being able to see a mental health provider,

25  even if they've requested it, gets greater and greater.

1    And I think that's part of what is accounting for prisoners

2  telling me over and over again in the system, I never -- you

3  know, I never see my mental health provider.  When I do see

4  them -- and this is the other part of the problem -- I can only

5  see them for a few minutes because they don't have enough time

6  to see me for the amount of time that I would like to see them

7  that I think I need to talk to them about my problems.  There

8  are too few of them, there are too many of us.  Too many

9  prisoners, too few mental health providers.

10  Q.  How do vacancy rates amongst correctional officers relate to

11  the ability to access care?

12  A.  Well, it relates to all of this.  Again, vacancy rates among

13  correctional officers means that each correctional officer is

14  doing more work and overseeing more prisoners than he or she

15  otherwise would.  Whatever else it means, high vacancy rate

16  means that.  That means that correctional officers are going to

17  have less time to identify people in need of mental health care

18  on their own and either -- and either notify mental health or

19  notify -- or advise the prisoners that perhaps they should see

20  mental health.

21    It also means, in those instances where people need escorts

22  to see their mental health providers or to go even to be

23  initially evaluated by mental health, that it will be difficult

24  to do that because absence of appropriate numbers of staff

25  members means there aren't people to do the -- there aren't

1    people to do the escorting.

2       So this is an interconnected system.  And when you have a

3    significant deficit in one area of the system, as you do in

4    Alabama, it impacts the other areas in indirect but nonetheless

5    very important ways.

6    Q.  We've talked a bit about dangerousness and lack of control.

7    Do vacancy rates of correctional officers impact how dangerous

8    or out of control or how little control there is in a particular

9    facility?

10   A.  Yes.  Absolutely and, perhaps, obviously.  Correctional

11   officers are charged with the responsibility of keeping these

12   environments safe.  If there are too few of them -- and there

13   are in this system by a significant degree -- then it's very

14   difficult for the ones who are in the system to adequately

15   monitor, adequately oversee the number of prisoners who are

16   under their care or responsibility.

17   Q.  How do vacancy rates amongst correctional officers relate to

18   the level of dangerousness of particular segregation units?

19   A.  Well, again, there's so -- correctional officers in

20   segregation units have a variety of responsibilities for not

21   just monitoring the mental health of their prisoners, but also

22   for making sure that the prisoners in those units have access to

23   the very few activities that are available to them.  So if you

24   have too few correctional officers, you have too few officers

25   who are in a position to carefully monitor the mental health of

 1  the prisoners who are in the units.  You have too few

 2  correctional officers to keep up the routine of taking people to

 3  showers, taking them to yard, taking them to their mental health

 4  appointments.  So you increase the idleness or the down time in

 5  segregation units where idleness and down time is already a

 6  significant problem.

 7  Q.  Throughout your inspection of the Alabama Department of

 8  Corrections, what was the evidence that you saw, in broad

 9  categories, of overcrowding and understaffing?

10  A.  Well, the overcrowding I've already talked about.  I mean,

11  there are -- there are lots and lots of prisoners who were

12  living in crowded dormitory units.  There are prisoners living

13  in units -- in segregation units that are barely habitable.  And

14  I can only infer that they're living in those units because

15  there's no other place to put them.

16      But you saw the photographs of them.  They're in utter, in

17  some instances, disrepair and serious states of deterioration.

18  And, again, you wouldn't -- you wouldn't expect those kind of

19  units even to be in operation, except that there are many, many

20  prisoners and not enough other places to put them.

21      You also see, I believe, overcrowding driving the misuse of

22  what otherwise would be treatment space.  So we talked earlier

23  today about stabilization units, which are supposed to be the

24  equivalent of hospital beds, basically being -- looking like,

25  being run like, and being used as segregation units.  That is,

 1    in my opinion, an overcrowding related issue.  Too many people

 2    in segregation.  And so they're crowding out people who

 3    otherwise would be in a stabilization unit that would be able to

 4    be run like one.  And then the understaffing, again, addresses

 5    these issues of safety.

 6        So you have -- when you have units that are out of control,

 7    where you have violence breaking out, some of that is very

 8    likely the consequence of there being too few staff members.

 9        You know, in many of these dormitories, there's one officer

10    who has oversight responsibility for the entire dormitory.  In

11    some instances at Holman, it was described to me sometimes more

12    than one.  So this is an understaffing issue.  You ordinarily

13    would have correctional officers present, oftentimes more than

14    one, in an environment like that where you have 60 or 70

15    inmates.

16        The escort issue I've already talked about.  That's a

17    dangerousness level issue in the sense that prisoners who are

18    deteriorating and not getting access to mental health care

19    because there are an insufficient number of escorts -- not just

20    my opinion but, again, MHM testimony, depositions, people

21    recognize it -- it's a problem in the system.  That means people

22    are not getting taken to mental health care, which increases the

23    likelihood that they will deteriorate, either harm themselves,

24    or perhaps harm somebody else.

25            MS. MENSCHEL:  Your Honor, may I have a moment?

```
 1              THE COURT:  Yes.
 2              (Brief pause in the proceedings)
 3    Q.  Dr. Haney, I'd like to pull up Plaintiffs' Demonstrative
 4    Exhibit 34.  This is a chart that discusses the population or
 5    describes the population in prisons in Alabama over time as well
 6    as the staffing rates and staffing numbers of COs over time.
 7        I'd like to focus particularly on the right-hand column,
 8    which is the 2016 numbers.  If you look at the far right column,
 9    it talks about the CO staffing percentage of those that are
10    allocated; in other words, the number of positions that are
11    filled at particular facilities of CO staffing positions, the
12    rate that they're filled.
13        I'd like to ask you about a few specific facilities.
14    Earlier today you testified about the Bibb segregation units.
15    And based on the staffing rate, COs are 28.30 percent filled at
16    Bibb.  Does that have an impact on how dangerous the Bibb
17    segregation cells are?
18              MR. SMITH:  We object to that, Judge, because that's
19    outside of the scope of his designation as an expert.  There's
20    no predicate laid for this witness to be able to testify to
21    these things.
22              MS. MENSCHEL:  I was just asking him -- he testified
23    about the dangerousness of the Bibb segregation cells, and he
24    also has just --
25              THE COURT:  I'll allow him to answer that, and then
```

 1  I'll consider it after you have asked the question.  Then

 2  Mr. Smith can, on cross, show whether or not there's any basis

 3  for it, or you can either lay a basis.  So go ahead.

 4          MR. SMITH:  And I have one final objection as well,

 5  Your Honor.  What counsel has highlighted there in the far

 6  right, correctional staffing percent of allocated, as the Court

 7  already indicated, that's not clear.  There's been no testimony

 8  on what allocated means.

 9          THE COURT:  Well, when you-all get that to me, then

10  I'll have to take that into consideration as well.  Okay.  Very

11  good.

12          Before we start on this, let's recess for the evening.

13          Mr. Smith, where are we on your Daubert challenge?

14  What did my order say?

15          MR. SMITH:  We looked, Your Honor, and I was mistaken.

16  We did not file a Daubert challenge to this witness.

17          THE COURT:  Thank you.  We'll start back, then, at

18  eight tomorrow.

19      (Proceedings recessed at 6:13 p.m.)

20              *  *  *  *  *  *  *  *  *  *  *  *

21

22

23

24

25

```
1                    COURT REPORTER'S CERTIFICATE

2            I certify that the foregoing is a correct transcript

3     from the record of the proceedings in the above-entitled matter.

4                              This 26th day of May, 2017.

5

6                              /s/ Patricia G. Starkie
                               Registered Diplomate Reporter
7                              Certified Realtime Reporter
                               Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```