IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


EDWARD BRAGGS, et al.,        )
                              )
     Plaintiffs,              )
                              )        CIVIL ACTION NO.
     v.                       )         2:14cv601-MHT
                              )             (WO)
JEFFERSON S. DUNN, in his     )
official capacity as          )
Commissioner of               )
the Alabama Department of     )
Corrections, et al.,          )
                              )
     Defendants.              )


PHASE 2A ADA FINAL SETTLEMENT APPROVAL OPINION

I.   INTRODUCTION

The individual plaintiffs in Phase 2A of this
lawsuit are prisoners with serious mental illnesses in
the custody of the defendants, the Alabama Department
of Corrections (ADOC or the Department) and its
Commissioner, Jefferson Dunn.  The Alabama Disabilities
Advocacy Program (ADAP), Alabama's protection and
advocacy organization for people with disabilities, is
also a plaintiff.

In this phase, the plaintiffs assert the claim that the Department is in violation of two statutes: Title II of the Americans with Disabilities Act, codified at 42 U.S.C. § 12131 et seq., and § 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794.  See Fifth Amended Complaint (doc. no. 805). For ease of reference, the court will refer to both statutes as the ADA.  The plaintiffs claim that systemic deficiencies within the Department result in discrimination against, and the Department's failure to accommodate, prisoners with mental disabilities.  These deficiencies include the failure to (1) implement a system for identifying prisoners with disabilities; (2) institute a system for receiving accommodation requests and a grievance procedure for challenging denied accommodations; (3) appoint ADA coordinators; (4) adequately train personnel regarding the requirements of the ADA; (5) develop an ADA transition plan and corresponding policies and procedures; (6) remove architectural barriers affecting prisoners with

disabilities; (7) provide reasonable accommodations, such as auxiliary and visual aids and services, to those with disabilities; and (8) enable those with disabilities to access various types of programming and services. The plaintiffs seek injunctive and declaratory relief. Jurisdiction is proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1343. Following months of negotiations, the parties have settled these contentions.

This case has twice been bifurcated for administrative convenience of the court and the parties. In September 2015, this case was divided into two distinct phases, with the first phase, Phase 1, involving ADA claims unrelated to mental health and the second phase involving all other claims. Then, in September 2016, Phase 2 of this case was further bifurcated into Phase 2A, encompassing an Eighth Amendment claim related to the treatment of prisoners with mental illness, involuntary-medication claims, and an ADA claim of prisoners with only mental

3

disabilities; and Phase 2B, involving Eighth Amendment claims related to medical and dental care.

The parties reached a settlement of the plaintiffs' Phase 1 ADA claims for prisoners with physical disabilities. After an exhaustive approval process, the court approved the Phase 1 settlement agreement, see Dunn v. Dunn, 318 F.R.D. 652 (M.D. Ala. 2016), which resulted in a consent decree.

During the Phase 2A trial, the parties, with the able assistance of United States Magistrate Judge John E. Ott of the United States District Court for Northern District of Alabama, reached a settlement of the remainder of the plaintiffs' ADA claims: the Phase 2A ADA claim now before the court concerning prisoners with only mental disabilities. After a hearing, the court preliminarily approved the proposed Phase 2A ADA settlement agreement. In its preliminary approval order, the court provisionally certified a settlement class and established a procedure for providing putative class members with notice of the agreement and

an opportunity to object and submit comments on the agreement's fairness.

After receiving written comments from putative class members, the court held three days of fairness hearings. During the first two days, the court heard from a representative group of putative class members--selected by the court with the input of the parties--who had submitted comments on the proposed agreement. During the third day, counsel for the parties responded to various comments made by various witnesses and other questions raised by the court. Additionally, the court considered affidavits, submitted by ADAP, from experts in the mental-health field opining on the adequacy, fairness, and reasonableness of the agreement.

After the hearing, the court entered an order granting final approval of the proposed phase 2A ADA settlement agreement and granted the parties' request that their settlement agreement be entered as a consent decree. See Phase 2A ADA Final Settlement Approval

Order (doc. no. 1290).   This opinion explains the court's reasons for doing so.

## II.  DESCRIPTION OF PROPOSED SETTLEMENT

Broadly speaking, the agreement does two things: (1) it applies the provisions of the Phase 1 ADA settlement agreement to prisoners with only mental disabilities; and (2) it requires the Department to administer an adaptive-behavior and life-skills course for mentally disabled inmates.

The settlement agreement applies the substantive provisions of the Phase 1 ADA settlement to prisoners with only mental disabilities.   These include, most relevantly, requirements that the Department: conduct a self-assessment to identify necessary changes to policies concerning disabled prisoners' ability to communicate and access programs, and create a transition plan, listing changes to be made and deadlines for those changes; provide reasonable accommodations for disabled prisoners to access the

programs offered by the Department; make individualized assessments of disabled prisoners housed in residential treatment and stabilization units to ensure that they have reasonable access to the Department's programs; screen, test, track, and periodically re-evaluate prisoners for disabilities or changes in disability status; avoid increasing a prisoner's security level solely based upon a disability; implement a procedure for receiving and processing prisoners' requests for accommodations and appeals of denials, including specified forms, repositories to submit forms, and assistance for prisoners in completing and submitting forms; appoint an ADA coordinator for each of its facilities, as well as a state-wide coordinator, to handle ADA requests, process appeals, produce monthly reports, and assess compliance; provide initial and annual ADA training to correctional officers and enhanced training to ADA coordinators; create a quality-assurance program that includes audits of the identification of disabled prisoners and of

accommodation requests and appeals. <u>See</u> <u>Dunn</u>, 318 F.R.D. at 658−59.  As these provisions are already being put in place for prisoners with physical disabilities, the practical effect of the settlement is primarily to make these provisions enforceable by prisoners with solely mental disabilities.

In addition to the incorporation of these Phase 1 provisions, the parties agree to four closely related "Substantive Provisions," which provide for the creation and administration of an adaptive-behavior and life-skills course for the settlement class.  More specifically, these provisions include:

<u>Adaptive-Behavior and Life-Skills Training</u>: The Department will provide adaptive-behavior and life-skills training for a period lasting no less than 181 consecutive calendar days to certain individuals.

<u>Frequency of Provision of Programming</u>: The Department will enroll appropriately identified prisoners into an adaptive-behavior and life-skills training program within six months of identification.

Prisoners should complete the program within six months, except for individuals with profound limitations.  An appropriately trained individual will lead the program.  Finally, any prisoner who remains in the Department's custody shall undergo a refresher course on the same topics every other year, so long as and until the prisoner returns to the level of functioning attained at the completion of the initial program.

**Transfer of Prisoners While They Are Enrolled in the Program**: The Department will attempt to minimize the transfer of prisoners while they are enrolled in the adaptive-behavior and life-skills training program. If a prisoner is transferred during the course of a program, the sending and receiving institutions will work with the prisoner to mitigate any harm that may result from the transfer, including, assigning a case manager to the prisoner, enrolling the prisoner into courses the prisoner has not completed, and meeting with the prisoner to discuss any remedial needs.

9

**Adaptive-Behavior and Life-Skills Program Components**: The Department will provide an initial adaptive-behavior and life-skills training program that includes 22 hours of instruction, not to exceed 90 minutes per class, addressing the following general topics: (1) decision making; (2) stress management; (3) communication skill building; (4) risk-taking consequences; (5) self-help; (6) accessing prison services; (7) hygiene; (8) self-direction; and (9) prison rules.

In addition to these substantive provisions, the settlement agreement contains the following implementation provisions, which were also included in the Phase 1 consent decree:

**Monitoring**: ADAP will monitor the Department's compliance with the consent decree, and will be entitled to access relevant documents and to conduct interviews with prisoners and staff. ADAP will prepare quarterly reports on the Department's compliance containing written recommendations for any necessary

changes, and the parties will meet and confer to address any reported deficiencies.

Dispute-Resolution Process: Both the named plaintiffs and unnamed class members (either with or without representation by class counsel) must arbitrate claims that the Department is not in compliance with the consent decree.  If the Department's alleged non-compliance impacts fewer than 12 prisoners, the arbitrator's decision will be final.  If 12 or more prisoners are affected, the arbitrator's decision may be appealed to the court for review under an abuse-of-discretion standard.

Termination: After five years, the Department may request termination of the consent decree, which will terminate after six years unless plaintiffs request, and the court grants, an extension.

Amendment: The parties may mutually amend the agreement.  The parties agree to re-evaluate deadlines in the transition plan if Alabama passes legislation to construct new prison facilities.

**Funding**: The Department will make good-faith efforts to obtain necessary funding to comply with the agreement.

**Attorneys' Fees**: Finally, the agreement states that the Department will pay plaintiffs' attorneys $ 250,000.00 in fees and costs, as well as additional fees of $ 195.00 per hour (subject to caps) for monitoring services, and fees for any litigation necessary to enforce the resulting consent decree.

Additionally, as in Phase 1, the parties agreed that no part of the agreement applies to death-row prisoners. The court previously dismissed "any claim initially brought in this action or remaining in Phase 2A or 2B of this action that ADOC fails to identify, track, and accommodate the intellectual disabilities of death row inmates." Judgment Dismissing Claims Related to Prisoners on Death Row (doc. no. 925). Accordingly, the parties simply reiterate their intent to "remove from the resolution of the claims Plaintiffs have asserted under the Acts any claim concerning the

identification, tracking and accommodation of any intellectual disability of any current or future Inmate in the custody of ADOC under a death sentence ....” Proposed Phase 2A ADA Settlement Agreement (doc. no. 1100) at 12.

Finally, the agreement is predicated on--and defendants consent to--the certification of a settlement class consisting of “any current or future inmate in the physical custody of ADOC who has a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B) relating to or arising from mental disease, illness, or defect.” Id. at 4. For the reasons that follow, the court found class certification and final approval of the agreement appropriate.


## III.  DISCUSSION

Judicial policy favors the settlement of class actions. Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984). However, “the settlement process is

more susceptible than the adversarial process to
certain types of abuse and, as a result, a court has a
heavy, independent duty to ensure that the settlement
is 'fair, adequate, and reasonable.'" Paradise v.
Wells, 686 F. Supp. 1442, 1444 (M.D. Ala. 1988)
(Thompson, J.) (citation omitted).   In addition to
analyzing the fairness of the proposed agreement, the
court must ensure that it is not illegal, or against
public policy.  See id.

In approving this agreement, the court had to make
four determinations.   First, because the agreement was
predicated upon class certification, the court had to
determine whether the requirements of Federal Rules of
Civil Procedure 23(a) and (b) were met.   Second, the
court assessed whether Rule 23(e)'s procedural and
substantive protections, ensuring that the settlement
class was given notice and an opportunity to comment on
or object to the agreement, were satisfied.   Third,
because the proposed settlement included an award of
attorneys' fees to plaintiffs' counsel, Rule 23(h)

14

required the court to find that such a fee award is
"reasonable." Finally, the court evaluated the
proposed settlement's compliance with the Prison
Litigation Reform Act (PLRA), 18 U.S.C. § 3626, which
establishes certain requirements for affording
prospective relief in cases involving prisons,
including when that prospective relief takes the form
of a court-enforceable settlement. See 18 U.S.C.
§ 3626(a)(1) & (c)(1).


A. Class Certification: Rules 23(a) and (b)

In its final approval order, the court certified a
class of prisoners to which the agreement applies.
Class certification is appropriate under Rule 23(a) if
the putative class representatives can show that "(1)
the class is so numerous that joinder of all members is
impracticable; (2) there are questions of law or fact
common to the class; (3) the claims or defenses of the
representative parties are typical of the claims or
defenses of the class; and (4) the representative

15

parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

In addition to the Rule 23(a) requirements, a class action is maintainable only if it falls within one of three categories of cases set forth in Rule 23(b). Here, the plaintiffs sought certification under Rule 23(b)(2). To qualify under 23(b)(2), a plaintiff must show that "the party opposing the class has acted or refused to act on grounds that generally apply to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). This requirement applies whether or not the parties contest settlement approval. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620–22 (1997).

Previously, the court provisionally certified a settlement class defined to include "any current or future inmate in the physical custody of the Alabama Department of Corrections who has a disability as defined in 42 U.S.C. § 12012 and 29 U.S.C. § 705(9)(B)

relating to or arising from mental disease, illness, or defect." Phase 2A Preliminary Settlement Approval Order (doc. no. 1205) at 2. Having considered the parties' joint statement in support of the proposed settlement, the court concluded that final class certification was appropriate for purposes of this settlement.

The court notes that, in conducting this analysis, it had the benefit of briefing on a contested motion for class certification filed prior to settlement of the Phase 2A ADA claim.[1]  Although defendants no longer

---

1. After consideration of plaintiffs' contested motion for class certification of the Phase 2 claims, the court granted class certification as to plaintiffs' Phase 2A Eighth Amendment and involuntary-medication claims. See Braggs v. Dunn, 317 F.R.D. 634, 639 n.1 (M.D. Ala. 2016). However, the court specifically reserved ruling on class certification as to the plaintiffs' remaining Phase 2A ADA and Phase 2B claims. See id. Accordingly, for purposes of approving this settlement, the court could not rely on its previous Phase 2A class-certification order. Instead, the court had to decide whether class certification is appropriate as to--and in light of the settlement of--these claims. Moreover, in a separate order and in light of this opinion, the court will deny the plaintiffs' motion for class certification as to their Phase 2A ADA claim as moot.

contest certification for purposes of and in light of this settlement, <u>see</u> Joint Motion for Preliminary Approval of Settlement (doc. no. 1175), the court has assured itself that, for the reasons discussed below, none of the arguments defendants previously offered against class certification warranted denial of certification for purposes of approving the settlement.

### 1. Standing

"[A]ny analysis of class certification must begin with the issue of standing"; only if the court finds that the named plaintiffs have standing may it consider whether they have "representative capacity, as defined by Rule 23(a), to assert the rights of others." <u>Griffin v. Dugger</u>, 823 F.2d 1476, 1482 (11th Cir. 1987). "The Supreme Court has explained that the 'irreducible constitutional minimum' of standing under Article III consists of three elements: an actual or imminent injury, causation, and redressability." <u>Hollywood Mobile Estates Ltd. v. Seminole Tribe of</u>

Florida, 641 F.3d 1259, 1265 (11th Cir. 2011) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)).

The individual named plaintiffs clearly have standing to assert the ADA claim brought in Phase 2A and now resolved in the instant agreement.[2]   These prisoners are in the custody of defendants, have a mental disability that qualifies for the protection of the ADA, and claim they have been denied reasonable accommodations as a result of the policies and procedures of defendants.   A judgment in plaintiffs' favor would remedy these alleged violations, just as will the consent decree.   Therefore, these plaintiffs have standing to proceed.

---

[2]. Not all of the plaintiffs named in the complaint raised a Phase 2A ADA claim.   The following named plaintiffs did so, and are therefore named class representatives: Christopher Jackson, Brandon Johnson, Roger McCoy, Robert "Myniasha" Williams, and Quang Bui. The court has excluded from this list former plaintiff Jamie Wallace, who died before certification of the settlement class, but otherwise would have qualified.

## 2.   Mootness

In addition, the plaintiffs' Phase 2A ADA claim is not moot.   Mootness, like standing, is a threshold question of justiciability.   See Harrell v. The Florida Bar, 608 F.3d 1241, 1247 (11th Cir. 2010) (noting that the three strands of justiciability are standing, ripeness, and mootness (citing Socialist Workers Party v. Leahy, 145 F.3d 1240, 1244 (11th Cir. 1998)). "Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies,' and an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." Kingdomware Techs., Inc. v. United States, 136 S. Ct. 1969, 1975 (2016) (internal quotations and citations omitted).   "A case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." Ethredge v. Hail, 996 F.2d 1173, 1175 (11th Cir. 1993).

Before agreeing to settle, the Department had argued that certification of a Phase 2A ADA settlement

should not be granted because the Phase 2A ADA claim
was moot; they contended that the Phase 1 ADA
settlement covered all potential ADA claims for all
prisoners, including those with solely mental
disabilities--who are the focus of the Phase 2A
agreement.    However, the Phase 1 consent decree
expressly excludes inmates whose disabilities "relate
solely to or aris[ing] solely from mental disease,
illness, or defect."   Phase 1 ADA Consent Decree (doc.
no. 728) at 5.   Because prisoners with solely mental
disabilities were expressly excluded from the Phase 1
consent decree--and nothing has changed with respect to
the allegations of these prisoners--the claim of the
proposed settlement class presented a live case or
controversy against the Department, and their claim was
not moot.

### 3.  Rule 23(a) and (b)(2)

In approving the Phase 2A settlement agreement, the
court also found that the requirements of Rule 23(a)

and Rule 23(b)(2) have been satisfied and that class
certification was appropriate.


### a. Numerosity

Rule 23(a)(1)'s numerosity requirement is satisfied
if joinder--the usual method of combining similar
claims--would be impractical.  <u>See</u> Fed. R. Civ. P.
23(a)(1).  Although there is no strict numerical
threshold, classes containing more than 40 members are
generally found adequate to warrant class
certification.  <u>See, e.g.</u>, <u>Vega v. T-Mobile USA, Inc.</u>,
564 F.3d 1256, 1267 (11th Cir. 2009) (citing <u>Cox v. Am.
Cast Iron Pipe Co.</u>, 784 F.2d 1546, 1553 (11th Cir.
1986)).  Moreover, where "class wide discrimination has
been alleged," as is the case here, "plaintiff[s] need
not show the precise number of members in the class,"
as the numerosity requirement is "less significant."
<u>Evans v. U.S. Pipe & Foundry Co.</u>, 696 F.2d 925, 930
(11th Cir. 1983).  Nevertheless, plaintiffs still must
make "some showing, affording the district court the

means to make a supported factual finding that the class actually meets the numerosity requirement." Vega, 564 F.3d at 1267 (emphasis original).

In this case, the plaintiffs submitted evidence that, as of February 2016, there were 3,416 prisoners on the mental-health caseload. See Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (doc. no. 669) at 113 (citing (MHM Monthly Report, February 2016)). As discussed in the Phase 2A Eighth Amendment opinion, only prisoners with mental illnesses serious enough to require treatment are placed on the caseload. See Braggs v. Dunn, __ F. Supp. 3d __, 2017 WL 2773833 at *9 (M.D. Ala. June 27, 2017). Furthermore, as the court found during the Phase 2A Eighth Amendment trial, many prisoners with mental illness are not identified due to deficiencies in ADOC's intake and referral systems; therefore, the number of prisoners with serious mental illness is likely higher. See id. at *18–21. While the mental illness of some of these individuals may not meet the

definition of disability under the ADA, it is safe to assume that well over 40 prisoners would so qualify. In sum, the settlement class is sufficiently numerous. Moreover, even if the class were small, "the fluid nature of a plaintiff class--as in the prison-litigation context--counsels in favor of certification of all present and future members." Henderson v. Thomas, 289 F.R.D. 506, 510 (M.D. Ala. 2012) (Thompson, J.) (citing Kilgo v. Bowman Transp., Inc., 789 F.2d 859, 878 (11th Cir. 1986), and Green v. Johnson, 513 F. Supp. 965, 975 (D. Mass. 1981) (Freedman, J.)); see also Bradley v. Harrelson, 151 F.R.D. 422, 426 (M.D. Ala. 1993) (Albritton, J.) (noting that class certification in cases involving issues of common concern to prisoners is often "a common-sense approach," "even when the potential class is small and somewhat undefined").

Based on the likely number of class members and the fluidity of the class, the court finds that joinder

would be impractical and that the plaintiff class is sufficiently numerous to warrant class certification.


### b.  Commonality

Rule 23(a)(2) requires plaintiffs seeking class certification to show that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  There is no requirement "that all ... question[s] of law or fact raised by the dispute be common."  Vega, 564 F.3d at 1268 (citation omitted). Instead, "[c]ommonality requires [only] that there be at least one issue whose resolution will affect all or a significant number of the putative class members." Williams v. Mohawk Industries, Inc., 568 F.3d 1350, 1355 (11th Cir. 2009) (citing Stewart v. Winter, 669 F.2d 328, 335 (5th Cir. 1982) (footnote omitted)). Indeed, "even a single common question will do ...." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 359 (2011) (alterations included; citations and quotations omitted).

25

In their pre-settlement opposition to plaintiffs'
motion for class certification, defendants had argued
that commonality was lacking because the putative class
was "expansive," encompassing prisoners with a wide
range of disabilities, and that plaintiffs sought to
"challenge the entire panoply of possible ADA
violations."  Defendants Opposition to Plaintiffs'
Motion for Class Certification (doc. no. 476) at 23.
They argued that the plaintiffs' claim was "not a
single, homogenous claim," except at "the highest level
of abstraction," but rather "many different ADA claims
touching on many different ADA requirements that
Plaintiffs[] ha[d] lumped together for purposes of this
lawsuit." Id. at—23.

However, as discussed at length in the Phase 1
settlement approval opinion, defendants' former
objections on this basis were misguided. See Dunn, 318
F.R.D. at 662—666.  It is not the denial of individual
accommodations for those with mental disabilities--but
rather the denial of a system that would have the

effect of ensuring that the prisoner plaintiffs and
others are appropriately accommodated--that was the
basis of plaintiffs' claim of liability under the ADA.
In other words, plaintiffs claimed that the Department
has employed methods of administration that have the
effect of discriminating against prisoners with
disabilities, namely by: (1) employing no system or an
inadequate system for identifying and tracking
prisoners with disabilities; (2) employing no system or
an inadequate system for prisoners to request
accommodations and submit grievances regarding failure
to accommodate; (3) failing to appoint or train ADA
coordinators or other administrators responsible for
oversight of compliance with the ADA; (4) failing to
train staff regarding the requirements of the ADA; (5)
failing to promulgate policies and procedures regarding
the treatment of prisoners with disabilities; and (6)
failing to draft a plan for identifying and addressing
areas of non-compliance with the requirements of the
ADA.  These questions are common to the class, and

susceptible to common answers "apt to drive the resolution of the litigation." <u>Wal-Mart</u>, 564 U.S. at 350. Accordingly, the commonality element of Rule 23(a) was met.


c. Typicality

Rule 23(a)(3) requires the named plaintiffs' claim to be "typical of the claims or defenses of the class" as a whole. Fed. R. Civ. P. 23(a). While the commonality and typicality inquiries both "focus on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members[,] ... typicality refers to the individual characteristics of the named plaintiff in relation to the class." <u>Prado-Steiman ex rel. Prado v. Bush</u>, 221 F.3d 1266, 1278-79 (11th Cir. 2000). A class representative's claims are typical if they "arise from the same event or pattern or practice and are based on the same legal theory" as the class claims taken as a whole. <u>Williams</u>, 568 F.3d at 1357 (citation

omitted); see In re Healthsouth Corp. Sec. Litig., 257 F.R.D. 260, 275 (N.D. Ala. 2009) (Bowdre, J.).

In this case, the named plaintiffs' claim satisfied the typicality requirement because it was identical to those of the settlement class as a whole: namely, that the Department employed methods of administration which resulted in discrimination against prisoners with mental disabilities. Accordingly, the typicality requirement was met.


d. Adequacy of Representation

Rule 23(a)(4) requires the court to find that the "representative parties will fairly and adequately protect the interests of the class." This analysis "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." Valley Drug Co. v. Geneva Pharm., 350 F.3d 1181, 1189 (11th Cir. 2003) (citation omitted). For a conflict to

29

defeat class certification, it must be "fundamental," such that "some party members claim to have been harmed by the same conduct that benefitted other members of the class." Id.

In this case, there was no conflict of interest between the named representatives and the class as a whole. Most of the reforms the settlement requires facially benefit all mentally disabled prisoners. For example, requiring ADOC to establish an ADA grievance procedure should benefit all prisoners with mental disabilities in seeking and receiving accommodations.[3] Moreover, the development of a system that correctly

3. Indeed, evidence from the implementation of the Phase 1 consent decree, and to the extent applicable, the agreement at issue here--which went into effect through a temporary restraining order--shows that the reforms have already produced positive results. See Supplemental Brief Regarding the ADA Accommodation and Appeals Process (doc. no. 1268). According to the parties, 123 ADA requests for accommodations have been made across all facilities, 43 of which have been granted; 12 requests are still pending. In addition, 12 appeals have been made from denials of said requests; three of those resulted in an accommodation. In addition, ADAP conducted a qualitative review of these figures and found that only one denied request clearly should have been granted.

identifies inmates with mental disabilities will serve
to benefit all inmates with mental disabilities. See
Ass'n for Disabled Ams., Inc. v. Amoco Oil Co., 211
F.R.D. 457, 464 (S.D. Fla. 2002) (Gold, J.) ("The
requested injunctive relief will provide substantially
equal benefits and relief to all members of the class
through increased accessibility and the coordinated
removal of physical and communication barriers.").
While some class members may not qualify for the
adaptive-behavior and life-skills course,[4] this is not a
fundamental conflict serious enough to undermine the
settlement.

In addition, the court was convinced that the named
representatives and their counsel would adequately

_____

4. The settlement provides that the
adaptive-behavior and life-skills training program will
be available to prisoners diagnosed with an
intellectual disability; prisoners who meet the IQ and
adaptive-behavior requirements defined under the Phase
1 consent decree, but who do not meet the "age of
onset" requirement of the DSM-V; and prisoners who ADOC
determines would "substantially benefit" from the
program. See Proposed Phase 2A ADA Settlement
Agreement (doc. no. 1100) at 13.

represent the settlement class. "The vigor with which [] named representative[s] and [their] counsel will pursue the class claim[] is assessed by considering the competency of counsel and the rationale for not pursuing further litigation." Id. (citing Griffin v. Carlin, 755 F.2d 1516, 1533 (11th Cir. 1985)). "The adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and of whether plaintiffs have interests antagonistic to those of the rest of the class." Griffin, 755 F.2d at 1533. Plaintiffs' counsel have significant experience in the prosecution of cases such as this one and have vigorously prosecuted this case. Additionally, plaintiffs' rationale for not pursuing further litigation is solid: they have obtained substantial reforms through the settlement, and the court sees no reason to believe that they would have obtained more relief by prolonging the litigation.

Accordingly, the court found that the adequacy-of-representation prong is satisfied.

### 4. Rule 23(b)(2)

A class action is maintainable under Rule 23(b)(2) if (1) the party opposing the class has acted or refused to act on grounds that apply generally to the class and (2) final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. See Fed. R. Civ. P. 23(b)(2); see also Holmes v. Continental Can Co., 705 F.2d 1144, 1155 (11th Cir. 1983) ("Subsection (b)(2) was 'intended primarily to facilitate civil rights class actions, where the class representatives typically sought broad injunctive relief against discriminatory practices." (citation omitted)). "Rule 23(b)(2) has been liberally applied in the area of civil rights, including suits challenging conditions and practices at various detention facilities, as well as claims for violations of the ADA and Rehabilitation Act." Bumgarner v.

NCDOC, 276 F.R.D. 452, 457–58 (E.D.N.C. 2011) (Boyle, J.); see also Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1776 (3d ed.) (explaining that "the class suit is uniquely appropriate procedure in civil-rights cases, which generally involve an allegation of discrimination against a group as well as the violation of rights of particular individuals").

As previously explained in the commonality discussion, liability in this case is premised on the notion that ADOC's policies and procedures result in systematic discrimination against the members of the settlement class because of their mental disabilities. ADOC's actions--or refusals to act--thus apply generally to the class.  In addition, injunctive relief in the form of a consent decree is appropriate respecting the class as a whole.  Therefore, class certification pursuant to Rule 23(b)(2) is appropriate.

## B.   Settlement Approval: Rule 23(e)

Under Rule 23(e), the settlement of a class action requires court approval.  Fed. R. Civ. P. 23(e)(1)(A). The court may approve a settlement that is binding on a class only if it determines that the settlement is "fair, adequate, and reasonable and is not the product of collusion between the parties."   Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977).[5]  This review is "essential to ensure adequate representation of class members who have not participated in shaping the settlement."   Fed. R. Civ. P. 23(e) advisory committee's note.   In reviewing a settlement, courts must determine whether notice to the class was adequate, Fed. R. Civ. P. 23(e)(1), and must examine comments and objections from class members as well as the opinion of class counsel.   See Laube v. Campbell,

---

5.   In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

333 F. Supp. 2d 1234, 1238 (M.D. Ala. 2004) (Thompson, J.).

### 1. Notice to Class Members

Rule 23(e) requires that notice to the class be provided "in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e). "The court must ensure that all class members are informed of the agreement[] and have the opportunity to voice their objections." Laube, 333 F. Supp. 2d at 1240; Fed. R. Civ. P. 23(e)(1). In this case, class members were provided adequate opportunities to learn about the proposed settlement and offer objections or make comments about it.

The court's order preliminarily approving the agreement contained specific procedures for the Department to give notice of the proposed agreement to members of the provisionally certified class and to distribute an approved notice and comment form. The notice form included a description of the case, a

definition of the class, a list of the provisions of the settlement agreement, an indication of its preclusive effects, and notice of the agreement concerning attorneys' fees. Additionally, the notice included directions for obtaining a copy of the agreement, contact information for class counsel, along with an invitation for prisoners to inquire about the settlement, an announcement of the fairness hearing, and instructions for prisoners to exercise their right to comment about or object to the settlement. The comment form allowed respondents to select from a list of general topics at issue, and to indicate whether they wished to testify at a fairness hearing.

The notice form was posted in each dormitory and library within the prison system, and copies of the comment form were made available in the libraries and shift commanders' offices. Copies of the agreement were made available for viewing in the law library or another location within each facility and were provided upon request to any prisoner lacking access to that

location.   Prisoners who were not housed in dormitories
were hand-delivered a copy of the notice and comment
forms and a pre-stamped envelope.   Weekly oral
announcements also notified all prisoners of the
settlement and opportunity to comment or object.

The notice and comment forms and copies of the
proposed agreement were made available in English,
Spanish, Braille, and in large print.   Upon request,
prisoners were to receive assistance in reading the
documents and in writing comments.

During the comment period, a weekly announcement
was made in every housing unit in each ADOC facility,
informing inmates about the proposed settlement and
reminding inmates of the date by which any comments
were required to be filed.[6]

_____

6.   The Department was required to read the
following announcement every Monday morning for the
duration of the comment period: "Attention.  There is a
proposed settlement of the Braggs v. Dunn Americans
with Disabilities Act lawsuit that affects all inmates.
You have until April 5, 2017, to provide written
comments about that settlement.   You can review the
proposed settlement agreement in the law library [for
facilities that have no law library, specify alternate

Secure and clearly labeled comment boxes were placed in each facility for prisoners to submit comment forms, and the Department's staff was required to collect comment forms from prisoners lacking the freedom of movement within their facilities. The comment boxes and forms were transmitted to the Department's general counsel, and a representative of the clerk of court met with the parties to open the comment boxes. Prisoners were also given the option to submit comments by mail directly to the clerk of court.

Notice of the proposed agreement was posted by March 6, 2017, and prisoners were given until April 5,

---

location]. If you are not able to access the law library [for facilities that have no law library, specify alternate location], a copy of the agreement will be provided to you if you request one from a correctional officer. By April 5, 2017, you should place all written comments in the ADA Settlement Comment Box, located next to the inmate request slip box. If you need a copy of the comment form, you can get one from the correctional officer supervising your living area or from the law library. If you cannot access the ADA Settlement Comment Box, you should ask a correctional officer to have your comment form collected and placed in the comment box." Phase 2A ADA Settlement Agreement Preliminary Approval Order (doc. no. 1205) at 9–10.

2017, to submit comments.   Comments received by mail after this date were also docketed.   More than one hundred prisoners submitted comments or objections to the proposed agreement.   While far fewer prisoners submitted comments during the Phase 2A ADA settlement comment period than during the Phase 1 ADA settlement comment period,[7] the court is satisfied with the number of comments submitted during this phase, because much of the agreement is merely an incorporation of the substantive provisions from the Phase 1 ADA consent decree, which many members of the Phase 2A settlement class previously had an opportunity to comment on.

One matter concerning the submission of comments warrants additional discussion.   On May 12, 2017, the court received a letter apparently signed by eight prisoners housed at Donaldson Correctional Facility's segregation unit.   The signatory prisoners requested an update on the status of Phase 2 of this lawsuit.   Of

_____

7. Over 550 prisoners commented during the Phase 1 settlement approval process.   See Dunn, 318 F.R.D. at 669.

**40**

particular concern were a couple of statements suggesting that prisoners in segregation at Donaldson Correctional Facility had not received any notice, whatsoever, of the status of this lawsuit.

The court subsequently ordered the parties to investigate the allegations stated in the letter, and to file a joint report of their findings. The parties filed a joint report of their findings and reported that the prisoners had received sufficient notice. In the report, counsel for the parties contended that many of the prisoners who signed the letter either refused to view the settlement or provide comments on it when give an opportunity to do so. The Department was required to maintain records of its distribution of the notice of settlement to prisoners in segregation units. The parties attached records to their joint report showing the prisoners' names, identification and bed numbers, the date, a signature of a witness correctional officer, and a box marked "Received paperwork, refused to sign" for each of the signatory

prisoners of the letter. Additionally, because the court received four comments from prisoners at Donaldson, that facility must have complied to some extent with the notice and comment procedure provided for in the court's preliminary settlement approval order.

Finally, during their investigation into allegations contained in the letter, ADAP was given the opportunity to interview each of the signatory prisoners to the letter. During the fairness hearing, ADAP's counsel reported that they were satisfied that these prisoners had in fact been given an opportunity to view and provide comments on the settlement agreement. And, moreover, any complaints they had were irrelevant to the agreement. For each of these reasons, the court is satisfied that the prisoners within ADOC were given adequate notice and an opportunity to comment on the proposed agreement.

### 2. Objections and Comments

### a.  Prisoner Comments

Prisoners who submitted comments to the court raised a range of issues, many of which were relevant; some of which were not.[8]  Out of the relevant comments received, the court heard testimony from 13 prisoners during fairness hearings conducted over the course of two days--partially in person at the federal courthouse, and partially by videoconference (due to the impracticality of visiting a large number of prisons).  Prisoners were selected primarily based on the substance of their comments.

_____

8.  While a few comments were completely unrelated to this lawsuit, many prisoners wrote about legal claims brought in this lawsuit but which were not the subject of the current agreement.  Specifically, many prisoners wrote about receiving inadequate health care.  Counsel estimate that "[a]pproximately forty-seven (47) inmates submitted comments ... relating to an individualized medical or mental health issue--e.g., a request for specific medical treatment."  Joint Statement in Support of Proposed Settlement (doc. no. 1243) at 19.

Of the directly pertinent comments and testimony, the vast majority expressed discontent with existing prison conditions, rather than with the adequacy or fairness of the agreement or of any specific provision of it.   Indeed, many expressed support for the agreement.[9]   Generally, the relevant comments fell into four loosely defined categories, including: (1) access to programs, (2) identification, (3) the grievance process, and (4) housing and related security-level determinations.   Each of these categories will be discussed further below.

Access to Programs:   Eight prisoners commented on the need for access to programs consistent with the adaptive-behavior and life-skills training program provided for in the agreement.   Some prisoners stated

_____

9.   To the extent possible, the court construed each comment as referring to the agreement.   After a careful review of each comment, the court assigned it to one or more categories based upon the substance of the comment itself.   Nevertheless, the court had to disregard 27 comment forms because they were either incomplete or blank, provided no reason for circling a particular (pre-identified) comment topic, or were indecipherable or otherwise irrelevant to the agreement.

directly that they would benefit from access to the program provided for in the agreement.  Others noted that access to the program would be beneficial to them for coping with their disabilities while imprisoned within ADOC and for their overall rehabilitation. Finally, some prisoners complained that they have never had access to any programs because of their disabilities and submitted that such access would be beneficial.

As mentioned earlier, the agreement provides that the adaptive-behavior and life-skills training program for prisoners with mental disabilities must include a variety of courses; be completed within a six-month period, unless an extension is otherwise necessary; be taught by trained individuals; be small enough to ensure "meaningful participation by affected inmates"; and be repeated periodically to ensure competence in program courses.  See Proposed Phase 2A ADA Settlement Agreement (doc. no. 1100) at 14.  These conditions should ensure that the program will be beneficial to

prisoners who are enrolled in it. Furthermore, as mentioned previously, the courses will cover such topics as decision making, stress management, communication skill building, risk-taking consequences, self-help, accessing prison services, hygiene, self-direction, and prison rules; these topics should assist prisoners in coping with the conditions of their confinement, and help rehabilitate them for life outside of prison.  See id. at 16–17.

Finally, those prisoners who would most benefit from the adaptive-behavior and life-skills training program should have access to it under the terms of the agreement.  The agreement provides that the following categories of prisoners will be enrolled in the program: prisoners diagnosed with an intellectual disability; prisoners who meet the IQ and adaptive-behavior requirements defined under the Phase 1 consent decree, but who do not meet the "age of onset" requirement of the DSM-V; and prisoners who ADOC

determines would "substantially benefit" from the program.  See id. at 13.

Identification: Identification was the most frequent topic of relevant comments on the agreement: 11 prisoners commented on the procedures for identifying inmates with disabilities.  Some commented favorably about the added requirements for identifying prisoners with disabilities, saying it would be beneficial because it would assist the Department in providing disabled prisoners with appropriate treatment, care, and accommodations and, more broadly, that it would protect prisoners from harm.

Other prisoners commented that the identification process should include training for Department staff to recognize and respond to prisoners with disabilities. These prisoners complained that their disabilities are frequently ignored by Department staff.  They further complained that many disabled prisoners had received disciplinaries for their reactions to certain stimuli--reactions which resulted from their mental

disabilities.   The agreement addresses these complaints
to the extent that it requires ADOC officials and staff
to be trained to recognize prisoners with disabilities
and to provide accommodations where appropriate.
Specifically, the agreement provides--by incorporation
of the Phase 1 consent decree--that "ADOC will provide
initial and periodic training concerning the provisions
and requirements of the ADA to both security staff ...
and ADA Coordinators."   Phase 1 ADA Consent Decree
(doc. no. 728) at 55–57.

Some prisoners commented that the Department should
consider a prisoner's mental-health history, including
any mental-health records, in making a determination
about whether a prisoner has a mental-health
disability.   The agreement covers this concern, because
it requires the Department to consider any previously
identified disabilities when the Department screens
prisoners for disabilities.   Id. at 27.

Some commenters suggested that prisoners should be
identified not only as they enter the prison system,

but also after exposure to the prison system, to
determine whether such exposure has had any effect on
their mental health or disability status. The
agreement addresses these concerns as well. It states
that "ADOC will continue to periodically screen,
evaluate and test Inmates for disabilities while
Inmates are in ADOC's custody to ensure that any change
in an Inmate's disability status is identified, treated
and accommodated." Id. at 32. Additionally, if a
prisoner is found to have a disability that was
previously undiagnosed, or if a disability, previously
known, is discovered to have materially changed, "ADOC
will take all necessary steps to determine whether, and
to what extent, that disability may be reasonably
accommodated." Id. at 34.

Grievance Process: Seven prisoners commented about
the grievance process. Some complained that there is
no procedure for seeking an ADA accommodation. Others
commented that, under the agreement, were they to make
a formal request for an accommodation, they would not

**49**

be guaranteed to receive a response from any Department employee--much less an accommodation.   Prisoners also complained that the grievance process takes too long. Each of these concerns is addressed in the agreement.

The agreement establishes a grievance procedure for each ADOC facility.   "Effective February 1, 2017, any Inmate who has, or believes he or she has, a disability as defined by the Acts may make Requests for Accommodations and pursue Appeals of decisions concerning Requests for Accommodations."   Proposed Phase 2A ADA Settlement Agreement (doc. no. 1100) at 46.

The agreement further provides for the appointment of an ADA coordinator who is required to "receive and respond to all ADA Request Forms for that facility or transmit ADA appeals to the Statewide ADA Coordinator." Phase 1 ADA Consent Decree (doc. no. 728) at 48–54.

Finally, the agreement contains strict deadlines for responding to prisoner requests for accommodations. The agreement states: "Facility ADA Coordinators will,

upon receipt [of a request for accommodation or other ADA form], immediately review all ADA requests to determine whether a request concerns an urgent situation. In the event of an urgent situation, the Facility ADA Coordinator will respond to the request in writing and provide, if required, the requested accommodation within three (3) days of receipt of the request, not including weekends and holidays. In all other situations, the Facility ADA Coordinator will respond to the request in writing within ten (10) days of receipt of the request, not including weekends or holidays." Id. at 51.

Housing and Related Security-Level Determinations: Ten prisoners commented on the procedures for housing and security-level determinations. Many of these complaints centered on the concern that prisoners with disabilities are at a higher risk of abuse, mistreatment, or violence from other prisoners because of their disabilities. They claimed that this increased risk--and any resulting injuries--is

discrimination against these prisoners on the basis of disability. Other prisoners complained that they have been denied transfers to facilities or to areas within their current facilities because of their disabilities. They suggested the agreement should weigh factors other than their disability in making housing or security-level determinations.

In some ways, these concerns are addressed by added procedures that identify prisoners with disabilities, as previously discussed, and by those provisions that require the Department to accommodate prisoners with disabilities. Indeed, the agreement contains "new procedures concerning the identification of inmates with disabilities in order to assign inmates with disabilities to facilities that are appropriate for their individualized needs." Phase 1 ADA Consent Decree (doc. no. 728) at 19. The agreement also has provisions that prevent the denial of access to facilities or programs because of a person's disability. If the Department restricts access to

programming for prisoners housed in the residential
treatment units or stabilization units of a particular
prison, "ADOC must conduct an individualized assessment
as to why such programming would pose a risk to the
Inmate or others, or why the Inmate's current mental
health status precludes being able to meaningfully
participate in the [adaptive-behavior and life-skills
training] Program." Id. at 25. Furthermore, the
agreement provides that the Department will assign
security levels without regard to disability. See id.
at 36.

Other Objections: Finally, prisoners made several
other objections, including objections to the
quality-assurance plan, the monitoring provisions, and
the provision for attorneys' fees. One prisoner
complained that, although he had been receiving
treatment as an accommodation for his mental-health
disabilities, he is not improving. Construed as a
comment on the quality of accommodations he is
receiving for his mental-health disabilities, the court

finds that this concern is addressed in the agreement. The agreement provides for a quality-assurance program to ensure that the Department is meeting its legal obligations under the ADA on a continuing basis.

Next, four prisoners commented on the inability of prisoners to ensure that the Department will comply with all of the provisions in the agreement. The agreement, however, provides a monitoring mechanism to ensure that the Department is in compliance. The parties have agreed to allow ADAP to serve as an independent monitor to ensure that the Department complies with the settlement terms.

Finally, one prisoner objected specifically to the attorneys' fee provision of the agreement. The prisoner complained that it is not fair for the attorneys to receive significant compensation for their services but for the prisoners, who have suffered disability discrimination, to receive nothing by way of monetary compensation. Prisoners voiced this concern during the Phase 1 settlement approval process as well.

There, the court explained that, although the court understands that commenters alleging past harms may feel that they are entitled to damages, the plaintiffs here have sought only injunctive relief for their claims. Moreover, an unnamed class member cannot be precluded from bringing a claim for damages stemming from the same conditions challenged in the class action if the class representatives sought only injunctive or declaratory relief. See Fortner v. Thomas, 983 F.2d 1024, 1031 (11th Cir. 1993) (collecting cases). Therefore, prisoners who wish to seek monetary compensation for violations of the ADA are not foreclosed from doing so by the settlement.

Conclusion: After a careful review of all the comments and objections filed by class members, the court was satisfied that none of the prisoners' comments called into serious question the fairness of the agreement, in whole or in part.

### b.  Comments from ADAP

The court considered appointing a guardian ad litem to advocate for the interests of the unnamed class members who, due to cognitive and communication-related disabilities, are incapable of understanding the terms of the settlement agreement or of submitting intelligible comments on them.  However, as it did during the Phase 1 settlement approval process, the court found that ADAP, which has a federal mandate to advocate for and ensure the protection of disabled Alabamians, was best situated to voice the concerns of these class members.  The court therefore instructed ADAP to file a brief discussing whether the settlement agreement was a fair, adequate, and reasonable resolution of the clams of class members with mental disabilities.  The court further requested ADAP to supplement its brief with one or more expert opinions addressing the fairness of the agreement to ensure that the basis of ADAP's opinions were sufficiently reliable.

ADAP filed a brief in support of the agreement. In it, ADAP submitted the opinions of two experts in the mental-health field: Dr. Robert Babcock, a licensed psychologist and Board Certified Behavioral Analysis; and Dr. Timothy Stone, a licensed psychiatrist and Medical Director of the Chilton-Shelby Mental Health Center. See ADAP's Submission of Independent Expert Opinions in Support of Proposed Settlement (doc. no. 1244). Both experts were given access to the Phase 1 and Phase 2A ADA settlement agreements. Additionally, both Dr. Babcock and Dr. Stone consulted outside scholarly sources in reaching their opinions on the overall fairness of the agreement. After a thorough review, ADAP, along with Dr. Babcock and Dr. Stone, found the agreement to be fair, adequate, and reasonable. See Affidavit of Robert A. Babcock, Ph.D., BCBA-D (doc. no. 1244-3) at 15; Affidavit of Timothy Stone, M.D. (doc. no. 1244-4) at 3.

## c. View of Class Counsel

In addition to considering the views of class members, the court considered the opinion of class counsel. <u>Pettway v. American Cast Iron Pipe Co.</u>, 576 F.2d 1157, 1215 (5th Cir. 1978); <u>Gaddis v. Campbell</u>, 301 F. Supp. 2d 1310, 1315 (M.D. Ala. 2004) (Thompson, J.).

Class counsel contended that the proposed agreement was a fair, adequate, and reasonable resolution of plaintiffs' Phase 2A ADA claim. Counsel submitted that the "Settlement Agreement is the product of arm's-length, serious, informed and non-collusive negotiations between knowledgeable counsel who have vigorously prosecuted and defended this litigation." Joint Motion for Preliminary Approval (doc. no. 1175) at 2. Moreover, counsel pointed out that the terms of this agreement are similar (indeed, they are to a large extent identical) to the terms of the Phase 1 consent decree that this court earlier approved and that the relief contemplated by the agreement is extensive.

Before the fairness hearing, however, the court
requested supplemental briefing on whether the
processes established in the agreement for seeking
accommodations or appealing denials of requests for
accommodations are meaningfully available to prisoners
with mental disabilities.  The parties filed a joint
supplemental brief with regard to this question.

In their brief, the parties state that the joint
duties of ADOC (with its identification, referral, and
reporting duties) and ADAP (with its accounting and
oversight duties) create a system of shared
responsibility over prisoners with mental disabilities
to ensure that they have meaningful access to the
benefits of the agreement.  The agreement provides
mechanisms for ADOC to identify prisoners with mental
disabilities, including by providing additional
training to ADOC employees.  The agreement further
provides that ADAP will have reasonable access to
"facilities, documents, staff, procedures, logs,
records, inmates, and other similar informational

sources in order to ensure [] compliance." Phase 1 ADA Consent Decree (doc. no. 728) at 69. If ADAP finds ADOC is not in substantial compliance with the agreement, then ADAP may provide recommendations for bringing ADOC into compliance with the terms of the Phase 1 consent decree or the agreement. Id. Additionally, ADAP can review ADA accommodation requests submitted to ADOC and decisions made on those requests. If ADAP finds that prisoners with mental-health disabilities are not taking advantage of these procedures at either level, ADAP may notify ADOC of its findings and suggest ways to improve the accommodation and grievance procedures. Or, if none of that works, ADAP can initiate the arbitration proceedings on behalf of particular prisoners or bring an action before the court to modify the agreement as a whole.

Upon consideration of the comments and objections from class members, as well as the views of ADAP, independent experts, and class counsel, the court found

that none of the comments seriously called into
question the fairness, adequacy, or reasonableness of
the agreement.

### 3. Court's Assessment

Based on the evidence and argument presented by the
parties and class members, the court determined that
the Phase 2A ADA settlement is fair, adequate, and
reasonable. <u>See</u> Fed. R. Civ. P. 23(e). "Relevant
factors include the stage in the proceedings; the
plaintiffs' likelihood of success at trial [on
remaining issues]; the complexity, expense, and likely
duration of the lawsuit; and the range of possible
recovery." <u>Laube</u>, 333 F. Supp. 2d at 1246.

The substantive provisions of the agreement
represent a highly favorable result for the plaintiff
class. Plaintiffs challenged the Department's
treatment of disabled prisoners at a systemic level.
They argued that the Department's policies and
procedures were grossly inadequate to ensure compliance

with the ADA and that, because of these inadequate policies and procedures, prisoners were being discriminated against on the basis of disability.

The Phase 2A ADA agreement, in conjunction with the Phase 1 agreement, essentially gives the class all of the ADA remedies plaintiffs sought at the outset of this litigation. Notably, even if plaintiffs had proceeded to and prevailed at trial on their Phase 2A ADA claim, the parties would have still been confronted with the task of fashioning a remedial plan. Any such plan would likely have closely resembled that contained in the Phase 2A ADA settlement agreement with which the court was presented. Moreover, because systemic changes are involved (for example, the creation and implementation of a new computer system, and assessment and training of tens of thousands of people), it would not have been feasible to order significantly more rapid compliance than is contemplated in the agreement. If anything, settlement means that change will come more quickly.

During and shortly following the preliminary approval hearing, the court expressed significant concerns regarding two particular aspects of the settlement agreement: first, whether the parties intended to incorporate any of the stipulations the parties entered into during the Phase 1 settlement approval process into the Phase 2A ADA settlement agreement; and, second, whether the agreement represented a settlement of all potential current and future claims that prisoners could bring under the ADA.

### a.  Phase 1 Stipulations

The first question the court had was whether, and if so which, stipulations entered into during the Phase 1 ADA settlement approval process were meant to be incorporated into the Phase 2A ADA settlement agreement.  The parties entered into a number of stipulations during the Phase 1 settlement approval process, including those found in documents numbers 560, 563, 575, 576, 638, 696, 709, and 719.

Accordingly, during the preliminary approval hearing, the court asked the parties whether they intended to incorporate all or some of these stipulations into the agreement.

The parties filed a joint notice with the court, stating that all but one stipulation, document number 709, from the Phase 1 consent decree were intended to be incorporated into the Phase 2A ADA settlement agreement. The parties stipulate that the "'Phase 1 Joint Stipulation Concerning Revised Intellectual Testing of Death Row Inmates' ('Joint Stipulation') does not apply to the Settlement Agreement before the Court. (Doc. 709)." Joint Notice (doc. no. 1197) at 2. The parties further confirmed that, "Nothing in the Phase 2 ADA Settlement Agreement presently before the Court ... relates to testing of inmates on death row for intellectual disabilities," as the court has dismissed all claims relating to prisoners sentenced to death. Joint Statement in Support of the Proposed Settlement (doc. no. 1243) at 2 n.1. The parties

affirmed that all other stipulations from Phase 1 of this case, between the Phase 1 preliminary approval hearing and the entry of the Phase 1 consent decree, apply to the Phase 2A ADA agreement.  Id.

As a result, the following stipulations from Phase 1 were incorporated into the agreement and consent decree: document numbers 560, 563, 575, 576, 638, 696, and 719. The Department will not be required to change its practices regarding the testing of death-row prisoners for intellectual disabilities.

### b.  Individual Claims

The court requested an additional stipulation that the agreement does not represent a settlement of all potential current and future claims that prisoners may bring under the ADA.  The court wanted to make clear that individual prisoners may still bring claims for discrimination under the ADA if they are seeking a remedy outside of the protections provided in the agreement.

As mentioned previously, there had been some confusion about what claim plaintiffs were actually asserting under the ADA. The Department argued that the plaintiffs' claim was "not a single, homogenous claim," except at "the highest level of abstraction," but rather "many different ADA claims touching on many different ADA requirements that Plaintiffs[] ha[d] lumped together for purposes of this lawsuit." Defendants Opposition to Plaintiffs' Motion for Class Certification (doc. no. 476) at 23-24. Plaintiffs responded that they are not seeking individual accommodations under the ADA; instead, the basis of liability in this case is the notion that ADOC's policies and procedures result in systematic disability discrimination against the plaintiff class. Accordingly, the court requested a specific stipulation from the parties as to whether prisoners could still maintain a cause of action under the ADA for any individualized disability discrimination.

The parties filed a stipulation that provides that there in fact "could be claims arising under the [ADA] or [the Rehabilitation Act] ... which may not be covered by the terms of the Phase 2A ... Settlement Agreement." Stipulation Concerning ADA Mental Health Settlement Agreement (doc. no. 1239) at 2 (emphasis original). The parties further stipulated that prisoners are not required to submit individual claims to the dispute-resolution process outlined in the settlement agreement, unless they are seeking to enforce the terms of the agreement itself. However, if a prisoner seeks to file an individual claim, he or she cannot use the agreement in the new lawsuit and, moreover, must separately comply with all of the procedural prerequisites provided under the PLRA and under any other applicable law. See id. Finally, the stipulation provides that ADOC shall not be limited by the agreement in asserting any defenses it may wish to assert in any future litigation concerning claims falling outside the scope of this agreement.

C.  **Class Counsel and Fees: Rules 23(g) and (h)**

1.  **Rule 23(g)**

Rule 23(g) requires the court to appoint (and also to assess the suitability of plaintiffs' counsel to serve as) class counsel. The rule requires the court to consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Before appointing them as class counsel, the court must conclude that plaintiffs' counsel will "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

In this case, lawyers for the plaintiff class include lawyers affiliated with the Southern Poverty Law Center, ADAP, and the law firm of Baker, Donelson,

Bearman, Caldwell & Berkowitz.   In addition, lawyers from the firm Zarzaur, Mujumdar, and Debrosse have represented the interests of ADAP in this litigation.[10]

As during the Phase 1 settlement approval proceedings, the court found that plaintiffs' counsel have fairly and adequately represented the interests of the Phase 2A ADA plaintiff class.   The court echoes the observations it expressed during Phase 1, see Dunn, 318 F.R.D. at 680, and finds that the lawyers for the plaintiff class have devoted an enormous amount of time identifying, developing, and pursuing the claim for the plaintiff class; that they have substantial experience and knowledge in litigating class actions of this sort; and, finally, that they have shown great dedication to representing the interests of the plaintiff class.   The court, therefore, appointed plaintiffs' counsel as counsel for the Phase 2A ADA settlement class.

_____

10. As was the case during Phase 1, counsel from the firm Zarzaur, Mujumdar, and Debrosse have not been named as class counsel because they represent only ADAP.   However, the court understands that they are due to receive a portion of the attorneys' fees discussed below.

## 2.   Rule 23(h)

Rule 23(h) provides that, "In a class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). To award attorneys' fees, however, a court must ensure that the parties have complied with the following procedures: (1) a claim for an award of attorneys' fees must be made by motion; (2) the class members must be given notice and an opportunity to object to the motion; and (3) the court must find that the award sought is reasonable. See id.

The agreement provides that the Department will pay plaintiffs' counsel $ 250,000.00 in fees and costs, as well as additional fees of $ 195.00 per hour (subject to caps) for monitoring services and fees for any litigation necessary to enforce the resulting consent decree, but only if the court finds the litigation

necessary and that plaintiffs' counsel attempted to resolve the issue informally, without litigation.

Because this provision was included in the agreement, class members received notice of the plaintiff class attorneys' request for attorneys' fees during the comment period. One prisoner objected to the fee provision; however, as mentioned previously, the prisoner merely argued that the provision of fees to class counsel was unfair, given the fact that prisoners were not also being awarded monetary damages. But again, because the agreement does not foreclose the opportunity for class members to seek monetary damages for individual claims, and because the plaintiffs have sought only injunctive relief and not damages in this case, this concern is unfounded.

Nevertheless, even when both sides agree to an award of attorneys' fees, the court has an independent responsibility to assess its reasonableness, in order to guard against the risk that class counsel might agree to enter into a settlement less favorable to

their clients in exchange for inappropriately high fees.  See Piambino v. Bailey, 757 F.2d 1112, 1144 (11th Cir. 1985) ("When the class attorneys succeed in reaping a golden harvest of fees in a case involving a relatively small recovery, the judicial system and the legal profession are disparaged. ... The practice of awarding attorneys' fees is one that has been delicate, embarrassing and disturbing for the courts ....  This embarrassment is rooted in the fact that the bitterest complaints [about the legal profession] from laymen [are directed at] the windfall fees and featherbedding that lawyers have managed to perpetuate through ... their influence with the judiciary. For the sake of their own integrity, the integrity of the legal profession, and the integrity of Rule 23, it is important that the courts should avoid awarding windfall fees and that they should likewise avoid every appearance of having done so.") (citations and internal quotations omitted).

To determine whether an attorneys' fee arrangement is reasonable, the court uses the lodestar method. It does so by multiplying the number of hours reasonably expended by a reasonable hourly rate, see Norman v. Hous. Auth. of Montgomery, 836 F.2d 1292, 1299 (11th Cir. 1988), and then considering whether an upward or downward adjustment is warranted in light of the factors set out in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974). Those factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the

professional relationship with the client; and (12) awards in similar cases.

In support of the attorneys' fee agreement, plaintiffs' counsel submitted evidence that they incurred approximately $ 243,000 in litigation expenses on the Phase 2A ADA claim. Plaintiffs' counsel expended over 900 hours of billable time on this portion of the case. The $ 243,000 request represents a blended rate of $ 264.00 per hour, which the parties jointly agree represents a reasonable hourly rate for litigation of this kind. Moreover, the parties agreed on the record during the fairness hearings that the request for attorneys' fees was reasonable.

After considering the <u>Johnson</u> factors, the court finds that the fee is reasonable and no downward adjustment of the lodestar figure is warranted. This settled claim, which has been ongoing since 2014, is extraordinarily large in scope; it concerns both current and future prisoners with mental disabilities at all state prison facilities, and it sought and

achieved a remedial order that mandates a dramatic transformation in the way that the Department treats such prisoners.  The range of complex legal and factual questions presented by the plaintiffs' claim, and the amount of time plaintiffs' attorneys spent both in preparing this claim for trial and in negotiating and securing approval of the settlement agreement, warrant the sizeable fee award.

Finally, the court notes that class counsel sought these fees pursuant to the fee provisions contained in the ADA (42 U.S.C. § 12205) and the Rehabilitation Act (29 U.S.C. § 794a), so their award is not limited by the PLRA's restrictions on attorneys' fees in prison litigation, which apply only to cases in which the attorneys' fees are authorized under 42 U.S.C. § 1988.

### D.  Prison Litigation Reform Act

The PLRA provides that a "court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further

than necessary to correct the violation of a Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3623(a)(1)(A). In conducting this 'need-narrowness-intrusiveness' inquiry, a court is required to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." Id.

While the requirement to engage in a need-narrowness-intrusiveness analysis must be met in some circumstances, "[t]he parties are free to make any concessions or enter into any stipulations they deem appropriate" when submitting an initial settlement to the court, and the court does not need to "conduct an evidentiary hearing about or enter particularized findings concerning any facts or factors about which there is not dispute." Cason v. Seckinger, 231 F.3d 777, 785 n.8 (11th Cir. 2000).

Here, the parties agreed that the consent decree satisfies the need-narrowness-intrusiveness

requirements of 18 U.S.C. § 3626(a)(1)(A). Based on the court's independent review of the agreement, the court agrees.

The court further finds--and the parties again stipulate--that the consent decree will not have an adverse effect on public safety or the operation of the criminal justice system. <u>See</u> 18 U.S.C. § 3626(a)(1)(A). Once the Department fulfills its obligations under the agreement and prisoners are able to access accommodations for their mental disabilities, those prisoners will be significantly better able to access and benefit from the range of services and programming during their incarceration. Furthermore, with increased training of staff, identification of prisoners with mental disabilities, and a quality-assurance process in place, the Department will better be able to ensure the safe operation of the prison system and the safety of those prisoners.

In addition, the PLRA's requirement that any prospective relief order must terminate within two

years after court approval (or one year after the court's denial of termination of a prospective relief order), see 18 U.S.C. § 3626(b)(1)(A), and the requirements for appointing a special master in a prison case, see 18 U.S.C. § 3626(f), are inapplicable here. First, the termination deadlines are inapplicable--as they are inapplicable for the Phase 1 consent decree--because the defendants have waived their right to seek termination of the consent decree until five years after the date of final approval. Second, the court has not appointed a special master, but rather an arbitrator--United States Magistrate Judge John E. Ott--pursuant to the consent decree. The parties stipulate that 18 U.S.C. § 3626(f) is not applicable to the appointment of an arbitrator, and have in any case expressly waived the right to challenge his decision or the consent decree on this basis.

In sum, the court is satisfied that its entry of the consent decree is in full compliance with the PLRA.

## IV.   CONCLUSION

"Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals." Brown v. Plata, 563 U.S. 493, 511 (2011). However, when as here the policies and procedures of a prison system result in systemic discrimination against those with disabilities--especially those with mental disabilities, who are less likely than ordinary persons (not to mention prisoners) to be able protect their own interests--courts may not allow that discrimination to continue simply to avoid any intrusion into the realm of prison administration. See also id. (referring to the court's obligations to remedy constitutional violations under the Eighth Amendment).

As was the case during Phase 1, the parties'
settlement of the Phase 2A ADA claim reflects the
Alabama Department of Corrections' commitment to making
manifest the rights of disabled prisoners in its
custody; it represents the shouldering of significant
responsibility, and presents an equally significant
opportunity, by delineating a years' long process of
ensuring compliance with the dictates of federal
disability law. The court understands the Department's
investment in this process to be genuine, and commends
it for it.

The court also, again, recognizes the important
role played by prisoners with mental disabilities in
bringing this litigation, and commends both the named
plaintiffs, as well as the numerous prisoners who
submitted comments, for their advocacy on behalf of
both themselves and others.

Finally, the court would like to extend a special
thank you for the tireless efforts of United States
Magistrate Judge John E. Ott. Without his efforts--and,

indeed, much of his time--the court is convinced that

this agreement would not have been possible.

DONE, this the 25th day of July, 2017.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE