IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| EDWARD BRAGGS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-cv-00601-MHT-TFM |
| | ) | |
| JEFFERSON DUNN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

RESPONSE IN OPPOSITION TO NAMED
PLAINTIFFS' REQUEST FOR DISCOVERY ON AN
EXPEDITED BASIS REGARDING DEFENDANTS'
PROPOSED PLAN TO REMEDY CORRECTIONAL
AND MENTAL HEALTH UNDERSTAFFING

Defendants JEFFERSON DUNN, as Commissioner of the Alabama Department of Corrections ("ADOC"), and RUTH NAGLICH, as Associate Commissioner of the ADOC, (collectively "the State") submit this Response in Opposition to Named Plaintiffs' "Request for Discovery on an Expedited Basis Regarding Defendants' Proposed Plan to Remedy Correctional and Mental Health Understaffing" (Doc. No. 1397, "the Discovery Request").

I.   **INTRODUCTION.**

The State's Phase 2A Remedial Plan on Correctional and Mental Health Staffing (Doc. No. 1374, "the Plan") presents a straight-forward process to address

correctional and mental health staffing.[1]  It is simple.  It is responsive to the Court's concerns in the Liability Order.  It is designed to afford Named Plaintiffs a remedy.   However, Named Plaintiffs' "Response" to the Plan and their contemporaneous Discovery Request propose more litigation and less resolution. (Doc. No. 1408).   To be clear, the State's primary focus is on resolution, not protracted litigation.   Named Plaintiffs' goal remains unclear (at best).   As discussed below, there is no prejudice to Named Plaintiffs by proceeding with the November 13, 2017 hearing without resort to full-blown "discovery."

In their Discovery Request, Named Plaintiffs do not identify for the Court any *specific* type of "discovery" found between Rules 26 and 36 of the Federal Rules of Civil Procedure or, because they claim to need it on an expedited basis, did Named Plaintiffs attach any proposed "discovery" to their Discovery Request. They just say they need "discovery," after inexplicably waiting for a week from the filing of the State's Plan to make their Discovery Request.  Named Plaintiffs' quest

---

[1] A remedial phase is a distinct stage of litigation after a trial on and determination of liability. The Court is considering remedial options to address the staffing-related issues identified in its Phase 2A Liability Opinion and Order on Eighth Amendment Claim (Doc. No. 1285, "the Liability Order").  The Court chose the remedial abstention method of formulating a remedy, whereby the Court limits its involvement in formulation of a remedy by ordering the defendant to produce a plan for judicial evaluation after input from plaintiffs.  There is practical and legal support for remedial abstention as an approach to remedy formulation.  The practical aspect recognizes that a plan devised by the State has the greatest chance of success.  The legal aspect, grounded in federalism and equity practice, recognizes that the Court must minimize the intrusiveness of its intervention into the affairs of the State of Alabama and its institutions.

2

for substantial, wide-ranging "discovery" will needlessly delay any remedy to Named Plaintiffs and the class members.  (Doc. No. 1397 at 2) (emphasis added).

Before delving into the unsubstantiated Discovery Request, the State believes it is necessary to correct the most glaring of the numerous misstatements in the Discovery Request.   Named Plaintiffs state: "[The State's] counsel represented to the Court and Plaintiffs at the September 26 status conference that [the State] had not yet determined whether a staffing analysis would even be part of the plan."  (Doc. No. 1397 at 6).  Apparently, Named Plaintiffs' misunderstood that discussion between the State's counsel and the Court.  The State's counsel made no such representation.

When asked by the Court whether the State's plan included a staffing analysis, the State's counsel responded by stating that the State's Plan had not been formally approved by the various stakeholders and, therefore, the State's counsel could not affirmatively represent to the Court that its Plan did or did not contain a staffing analysis.   However, the State's counsel clearly stated that the State intended to address the concerns raised by the Court in the Liability Order as they relate to correctional and mental health staffing.  Fortunately, there is a transcript of the status conference, confirming this exact exchange.

## II.   NAMED PLAINTIFFS' IMPERMISSIBLY SEEK TO HIJACK THE REMEDIAL PHASE AND RUN THE ALABAMA PRISON SYSTEM.

Named Plaintiffs appear more interested in generating legal fees and slowing the remedial phase than allowing it to proceed as proposed by the State. For example, if Named Plaintiffs simply consented to Russ and Meg Savage (collectively, "the Savages") (*nationally recognized experts* in the area of correctional staffing analysis) to complete their work unobstructed by Named Plaintiffs or their unqualified "expert" Eldon Vail, the Court could move forward with the remedy phase, and the State could implement its Plan. But, Named Plaintiffs apparently cannot do so.

Named Plaintiffs (or their counsel) want this Court to declare them *de facto* ADOC commissioners, personnel board members, and source-selection committee members (as it relates to the pending competition for medical and mental health provider).[2] Notwithstanding the Liability Order, neither Named Plaintiffs nor this Court is permitted by the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA") or applicable Supreme Court or Eleventh Circuit precedent to run the Alabama prison system. See, e.g., Turner v. Safley, 482 U.S. 78, 85 (1987); Bell

---

[2] Named Plaintiffs audaciously indicate a desire to interject themselves into the pending competition for ADOC's medical and mental health provider. (Doc. No. 1397 at 9-10). ADOC has not awarded a contract. It is evaluating proposals received from bidders. As the Court might expect, mental health staffing in this action may affect ADOC's decision-making on how to proceed with the current competition. However, to ensure a fair and open competition, ADOC must keep the details of bids confidential and cannot discuss the status or direction of the competition until it makes an award.

v. Wolfish, 441 U.S. 520, 554 (1979); U.S. v. Sec'y, Fla. Dep't of Corr., 778 F.3d 1223, 1228 (11th Cir. 2015).  The Court recognizes that.[3]  Post-trial, the Court established a process deferential to the State to address correctional and mental health staffing in ADOC facilities through the Phase 2A Remedy Scheduling Order on Eighth Amendment Claim, as amended (Doc. Nos. 1285, 1296, 1357 and 1365, the "Phase 2A Remedy Scheduling Order").

In the Discovery Request, Named Plaintiffs state:  "The Court ordered the Parties to propose a plan to address such the [sic] shortage of correctional and mental health staff.  Doc. [No.] 1357."  (Doc. No. 1397 at 1).  For this proposition, Named Plaintiffs rely on a *prior version* of the Phase 2A Remedy Scheduling Order.  (Id.).  After the September 26, 2017 status conference, the Court made it clear that, "rather than the parties filing a joint proposal to address the issue of understaffing … [the State is] to file a proposal on this issue … and [Named P]laintiffs are to submit a response."  (Doc. No. 1365 at 1-2).

Named Plaintiffs' post-trial role as it relates to the remedial phase is limited. The Court gave Named Plaintiffs an opportunity to respond in writing to the

---

[3] A remedial decree is restricted to eliminating legally offensive conditions and does not order the creation of conditions or obligations that, while socially desirable, are not legally required. Evans v. Buchanan, 555 F.2d 373, 379 (3d Cir. 1977), cert. denied, 434 U.S. 880 (1977) ("A court is not at liberty to issue orders merely because it believes they will produce a result which the court finds desirable.  The existence of a constitutional violation does not authorize a court to seek to bring about conditions that never would have existed even if there had been no constitutional violation.").

State's Plan.  (Id.).  They have done so.  (Doc. No. 1408) (filing an 86-page "Response" without "discovery").    However, Named Plaintiffs claim that "discovery" is the "only way" for this Court to, through the adversarial process, test the State's Plan.  (Doc. 1397 at 2).  But Named Plaintiffs cite no authority holding that "discovery" is needed in the remedial phase, much less that discovery is the "only way" to preserve the adversarial process.

The Phase 2A remedial hearing starting on November 13, 2017 is not a trial for the parties to prove past facts—e.g., the light was red or it was green.  Instead, the Phase 2A remedial process allows the State to propose a plan governing ADOC's future operations and allows Named Plaintiffs an opportunity to comment regarding its adequacy.  Cf. Skinner v. Uphoff, 234 F. Supp. 2d 1208, 1218 (D. Wyo. 2002) (plaintiffs allowed "to comment" on remedial plan; no provision made for discovery).  Because this Court may only approve a plan that is (a) narrowly drawn, (b) extends no further than necessary to correct an ongoing constitutional violation found in the Liability Order, and (c) constitutes the least intrusive means necessary to correct such constitutional violation, Named Plaintiffs did not, and do not now, need "discovery" to effectively comment on the adequacy of the State's Plan.[4]

---

[4]  Again, Named Plaintiffs make only a general request for unspecified (and unlimited) "discovery."  Their failure to attach specific interrogatories, requests for production, deposition

### III.   "DISCOVERY" RELATED TO PHASE 2A IS CLOSED AND, EVEN IF IT REMAINED OPEN, "DISCOVERY" AS TO THE STATE'S CONSULTANTS IS INAPPROPRIATE.

Named Plaintiffs complain that the State did not disclose its consultants by July 5, 2016, or afford them an opportunity for "expert discovery."  (Doc. No. 1397 at 12).   It is now clear that Named Plaintiffs demand enforcement of deadlines when it suits them (such as the deadline for expert disclosures), but seek an exemption from the same types of deadlines when it does not suit them (such as the deadlines for discovery, the disclosure of witnesses, and the amendment of pleadings).  (Doc. Nos. 239, 529, 821, 1397-98).  Nevertheless, Named Plaintiffs' complaint about disclosure of and "discovery" from the State's consultants lacks merit.

The State has not failed to timely disclose the identity of its consultants. Fed. R. Civ. P. 26(a)(2)(A).  The State did not use any of these consultants "at trial to present evidence under Rule 701, 702, 703, or 705 of the Federal Rules of Evidence."  (Doc. No. 529 at 5).[5]  In fact, at the time of the Phase 2A trial, the

---

notices, or subpoenas demonstrates that Named Plaintiffs are engaged in a "fishing expedition" rather than targeting the adequacy of the State's Plan.  Cf. Estate of McDermed v. Ford Motor Co., No. 14-cv-2430-CM-TJJ, 2016 WL 1399263, at *3 (D. Kan. Apr. 8, 2016) ("Plaintiffs are essentially attempting to reopen discovery on vague, broadly and poorly-defined topics well after the discovery deadline. This Court will not allow.").

[5] See Wreal LLC v. Amazon.com, Inc., No. 14-cv-21385, 2015 WL 1281042, at *2-3 (S.D. Fla. Mar. 20, 2015) (testimony at a stage other than the actual trial does not convert a consulting expert into a testifying expert).

State had only retained Catherine Knox ("Knox"), who was disclosed to Named Plaintiffs and for whom it responded to "discovery."[6]  The State specifically hired its consultants (including the Savages, Dr. Jeffrey Metzner ("Dr. Metzner"), Dr. Mary Perrien ("Dr. Perrien"), and Knox) post-trial and post-issuance of the Liability Order (and during or, as to the Savages, immediately after the mediation process) to assist the State with addressing the issues raised during the Phase 2A trial and in the Liability Order.

The State's consultants are truly consulting experts.  They are assisting the State with a staffing analysis (as to correctional staffing) and with determining appropriate staffing ratios (as to mental health staffing).  They will make short-term and long-term recommendations concerning the process and mechanisms to achieve appropriate correctional and mental health staff at each ADOC facility. The State anticipates that the Court will want to hear from one or more of the consultants during the Phase 2A remedial hearing. They will be able to discuss correctional and mental health staffing, an explanation of the process for addressing correctional and mental health staffing identified in the State's Plan, the existing staffing analyses and staffing ratios, the anticipated time and effort to finalize correctional and mental health staffing numbers, and any existing or future

---

[6] The State did not decide to use Knox as a consultant on mental health staffing until after the entry of the Liability Order and during the mediation process.

short-term or long-term recommendations regarding correctional or mental health staffing. And, depending on availability, one or more of the consultants will be present.[7]

The expert witness disclosure obligation in Rule 26(a)(2) and in the Phase 2 Pretrial and Motions Deadline Order (Doc. No. 529) relates to expert witnesses used at the Phase 2A trial (which occurred between December 5, 2016 and February 2, 2017). Fed. R. Civ. P. 26(a)(2)(A). Similarly, the availability of a deposition exists only as to testifying expert witnesses who must be identified and prepare a report under Rule 26(a)(2)(A) and (B). Notwithstanding the lack of a disclosure obligation, the State disclosed a majority of the material information required of a testifying expert under Rule 26(a)(2)(B) in its Plan, including the staffing analysis (as to correctional staffing) and the staffing ratios (as to mental health staffing). (Doc. No. 1374 at 8-12, 16-21, Exs. A, B, and D thereto). More importantly, the staffing analyses and staffing ratios are attached to the Plan. (Id.). Because the State's consultants are nationwide experts on correctional and mental health staffing, and, for example, the Savages literally wrote the book on

---

[7] Between now and the Phase 2A remedial hearing on correctional and mental health staffing, the State's consultants have a number of preexisting obligations. For example, before the State's counsel retained the Savages, the Savages scheduled a multi-week cruise out of the country. The Savages have limited availability between November 5 and November 13, 2017. The State's mental-health consultants are in high demand and have a number of preexisting obligations and, therefore, they have limited availability between now and November 13, 2017.

correctional staffing, there is no shortage of information about the State's consultants.

The Court set a hearing beginning on November 13, 2017 to explore the State's Plan and the processes, analyses, and bases used or relied on by the State and its consultants in arriving at the Plan.  For a variety of reasons, the least of which is the consultants' unavailability between now and November 13, 2017, neither the State nor Named Plaintiffs can complete the wide-ranging discovery sought by Named Plaintiffs.  Certainly, Named Plaintiffs cannot obtain "discovery" from the State and, at the same time, afford "discovery" to the State as to its objections to the Plan in that limited period of time.  Instead, it is becoming abundantly clear that Named Plaintiffs prefer to delay the Phase 2A remedial hearing on correctional and mental health staffing.  Named Plaintiffs have a choice:  proceed with the remedial hearing or request a continuance of the remedial hearing (which the State opposes) to the detriment of Named Plaintiffs and the class.

In sum, any "discovery" from or related to the State's consultants is inappropriate. Rule 26(b)(4)(B) protects the facts known and opinions held by consulting experts from discovery and prevents "discovery" designed to obtain documents and things of consulting experts. Fed. R. Civ. P. 26(b)(4)(B); see also Plymovent Corp. v. Air Tech. Solutions, Inc., 243 F.R.D. 139, 144 (D. N.J. 2007)

(Rule 26(b)(4)(B) applies to all discovery); <u>Terre Haute Warehousing Serv., Inc. v. Grinnell Fire Protection Sys. Co.</u>, 193 F.R.D. 591, 596 (S.D. Ind. 1999); <u>Costal Towing, Inc. v. Novarco, Ltd.</u>, No. 98-cv-492, 1999 WL 970357, at *1-2 (E.D. La. Oct. 21, 1999) (notwithstanding the voluntary disclosure of documents created by a consulting expert, "[defendant] did not waive its rights under Rule 26(b)(4)(B)").[8] "Indeed, some courts have construed [Rule] 26(b)(4)(B) as creating a privilege against disclosure." <u>Plymovent</u>, 243 F.R.D. at 143.  The State hereby objects to any "discovery" from its consultants.  Because it is difficult to anticipate what "discovery" Named Plaintiffs might actually seek from the State or its consultants, the State and its consultants reserve the right to make specific objections if and when any permissible "discovery" is served by Named Plaintiffs on them.

### IV.   NAMED PLAINTIFFS' SEEK "DISCOVERY" IRRELEVANT TO THE STATE'S PLAN.

The State's Plan is not complex or difficult to understand.  As to correctional staffing, the State started, and intends to complete (with the Court's permission), a staffing analysis of ADOC facilities with the assistance of its consultants, the

---

[8] In the Discovery Request, Named Plaintiffs did not even attempt to demonstrate "exceptional circumstances" exist for any specific "discovery."  In fact, Named Plaintiffs cannot carry their heavy burden of demonstrating the existence of exceptional circumstances.  <u>Hartford Fire Ins. Co. v. Pure Air on the Lake Ltd.</u>, 154 F.R.D. 202, 207-08 (N.D. Ind. 1993); <u>In re Shell Oil Refinery</u>, 132 F.R.D. 437, 442 (E.D. La. 1990).  Even if "exceptional circumstances" existed (which is not the case), any documents (including communications) and information prepared for, transmitted to, or received from the State's counsel is protected by the work-product doctrine. Fed. R. Civ. P. 26(b)(3); <u>Hickman v. Taylor</u>, 329 U.S. 495, 510-11 (1947).

Savages.  (Doc. No. 1374 at 8-12).  The State intends, over a two-year period, to address correctional staffing needs at each ADOC facility based on the short-term and long-term recommendations of the Savages.  (Id.).  As to mental health staffing, the State obtained mental health staffing ratios with the assistance of its consultants, Dr. Jeffrey Metzner, Dr. Mary Perrien, and Catherine Knox.  (Id. at 16-22).  The State intends, over a two-year period, to address mental health staffing needs at each ADOC facility based on the staffing ratios.  (Id.).  Of course, there are things that might impact the number and type of correctional and mental health staff needed at any ADOC facility, including, for example, a decision in this action affecting mental health program requirements.  Named Plaintiffs concede this in their Response.  (Doc. No. 1408 at 17 n. 7, 35).

Notwithstanding the simplicity of the Plan, the State furnished the Court insight into how ADOC intended to accomplish an increase in correctional and mental health staffing for ADOC facilities determined by its consultants' analysis to need additional correctional or mental health staff.  Additionally, ADOC described for the Court its independent efforts to accomplish any increase in correctional or mental health staffing, including, for example, the process for ADOC and its consultants to analyze and revise (as necessary) ADOC policies related to compensation, benefits, recruitment, and retention of correctional staff (Doc. No. 1374 at 12-15) and the past and current efforts to address the recruitment

12

of correctional staff (id. at 7-8).  Named Plaintiffs do not need "discovery" on ADOC's independent efforts related to staffing; they are irrelevant, immaterial, and not calculated to lead to the discovery of admissible evidence.

A staffing analysis as to correctional staff and staffing ratios as to mental health staff have been or will be provided by the State's consultants, and those correctional and mental health staff numbers might be adjusted depending on the existence of any changes to programming in this action.  Increased staffing requirements over a period of time certainly have been the subject of Court directives like those of United States District Court Judge Frank M. Johnson, Jr. in Pugh v. Locke, 406 F. Supp. 318, 331-32 (M.D. Ala. 1976).  However, the means or process by which ADOC accomplishes any necessary increase in correctional or mental health staffing at any particular ADOC facility or for any particular job post is immaterial, as recognized in the pre-PLRA Pugh case.  Id.  That is within the sound discretion of ADOC.  Whitley v. Albers, 475 U.S. 312, 321 (1986); Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 128 (1977); Turner, 482 U.S. at 84-85.[9]  Therefore, Named Plaintiffs' demands for "discovery" are

---

[9] Named Plaintiffs contend the State is "attempt[ing] to avoid monitoring." (Doc. No. 1397 at 6 n. 2).  That is untrue.  Monitoring as to correctional and mental health staffing is unnecessary, as plainly stated in the Plan.  (Doc. No. 1374 at 22).  Instead, the State proposed submission of quarterly statistical reports.  (Id. at 22-23).  After the final correctional and mental health staffing numbers are determined, the sole question for compliance is:  Did the ADOC meet or exceed the correctional or mental health staffing for each ADOC facility and job post?  A statistical report will answer that simple question, and afford the Court data to identify progress and trends in

13

unreasonable, because the information they seek is irrelevant to evaluation of the Plan.

## V.   THE STATE IS COMMITTED TO ITS PLAN.

Named Plaintiffs want "discovery" to explore the "willingness and capability" of the State to address correctional and mental health staffing. (Doc. No. 1397 at 7). That is absurd. The State put its Plan in writing and filed it with the Court. (Doc. No. 1374). Named Plaintiffs' unsubstantiated attack upon the integrity of Commissioner Dunn and his staff rest entirely on speculation and conjecture.

Named Plaintiffs' exhibits to the Discovery Request demonstrate the State's willingness and capability to address staffing. (Doc. Nos. 1397-1, 1397-2, 1397-3, 1397-4). They confirm the State's commitment to improving the quality of ADOC services.[10]   Perhaps the most important confirmation of the State's "willingness

---

terms of staffing. That is more than sufficient for the Court to determine if ADOC possesses adequate correctional and mental health staff. Any additional obligation is neither reasonable nor appropriate.

[10] For example, a comparison among the January 2017, June 2017, and July 2017 Monthly Statistical Reports reveals a trend over each of the preceding 12-month periods: ADOC's inmate population fell by 1,793 inmates in January 2017, by 1,943 inmates in June 2017, and by 2,057 in July 2017. (Doc. Nos. 1397-1 at 3, 1397-2 at 3, 1397-3 at 3). Similarly, from January 2017 to June 2017, Ventress Correctional Facility realized a net staffing increase. The total assigned staff members went from 147 to 152, notwithstanding the loss of 14 staff members during that time. (Doc. Nos. 1397-1 at 16, 1397-2 at 16). Additionally, the number of assigned security staff increased from 109 in January 2017 to 113 in June 2017. (Id.)

As of the July 2017 Monthly Statistical Report, ADOC quit incorporating the "Departmental Staffing" section into the Monthly Statistical Report. During the Phase 2A trial and in the

and capability" to address problems is the Monitor's Fourth Compliance Report in the action styled <u>United States of America v. The State of Alabama, <i>et al</i></u>., Case No. 2:15-cv-368-MHT, in the United States District Court for the Northern District of Alabama (the "<u><i>Tutwiler</i> action</u>").  (Doc. No. 1397-4, the "<u><i>Tutwiler</i> Report</u>").

In the <u>Tutwiler</u> Report, the monitor stated,

> During this reporting period, the monitor observed steady, continuing progress by the ADOC and Tutwiler towards reaching full compliance with the terms of the settlement agreement.  In this further compliance report, the monitor has determined that Tutwiler and the ADOC have achieved "substantial compliance" with 40 sections, and have achieved "partial compliance" with 3 sections of the agreement.

(Doc. No. 1397-4 at 6).  ADOC is not out of compliance with any requirement of the settlement agreement in the <u>Tutwiler</u> action.  (<u>Id.</u> at 48-55).  Those are hardly the actions of a recalcitrant ADOC, especially as to staffing.  (<u>Id.</u> at 9-12) (acknowledging the use of "nationally recognized experts" to conduct a staffing analysis and its fundamental importance to "determine the number and type of employees needed to staff Tutwiler").  In fact, "[t]he monitor believes Alabama has a strong foundation for continued progress in reaching all of the goals outlined

---

Liability Order, the Court expressed confusion about information contained in the "Departmental Staffing" section of the Monthly Statistical Report, including, for example, "authorized positions."  (Doc. No. 1285 at 61-62 n. 22).  To avoid any further confusion and because a correctional staffing analysis is underway, ADOC is omitting the "Departmental Staffing" section from its Monthly Statistical Report.  ADOC will rely on the "facility-by-facility determination" in the future.  (<u>Id.</u>).

and compliance terms required in the settlement agreement," because of its organizational strengths, including "strategically focused," "consistent and thoughtful," and "outstanding" leadership from the State, executive team, and wardens.  (Id. at 23).

ADOC has created "a positive culture for change at Tutwiler."  (Id. at 26). That positive change extends to correctional staffing, where changes in the timing of the Physical Agility / Ability Test ("PAAT") resulted in, for "the first time in recent memory[,] … no one, male or female, [being] removed from the basic training course for a PAA[T] failure."  (Id. at 31).  This is indicative of ADOC's "passionate commitment to fully implement the settlement … and demonstrates a commitment to quality improvement."  (Id. at 41).  ADOC is "monitor[ing] and improve[ing]" itself.  (Id.).  Based on the Tutwiler Report alone, Named Plaintiffs' criticisms about the veracity of the State's assertions in the Plan and about the commitment to improve the quality of its services are unfounded.  Instead, it is the veracity of Named Plaintiffs' allegations that lack support.[11]

---

[11]  In their Discovery Request, Named Plaintiffs argue that ADOC's alleged failure to comply with the Partial Settlement regarding razor blades, (see Doc. No. 135-1, Ex. A), supports their Discovery Request, (see Doc. No. 1397 at 11).  It is ironic that Named Plaintiffs are complaining about the State's "lack of commitment" to its Plan, which has yet to be approved, when they have clearly demonstrated their own "lack of commitment" to the terms of the Partial Settlement. As part of the Partial Settlement, Plaintiffs promised that: "In the event that [Named Plaintiffs] become aware of any event or alleged event that they believe reflects [ADOC's] failure to adhere to and abide by the agreements expressed herein, counsel for [Named Plaintiffs] shall provide counsel for [ADOC] with written notification of such failure, referencing the particular time,

## VI.   CONCLUSION.

Named Plaintiffs seek "discovery."   Named Plaintiffs do not specifically identify, among other things, what type of "discovery" they want, from whom they want it, why they need it, when they need to obtain it, how they propose to obtain it, or what legal basis they have to obtain it.   As to any "discovery" related to the State's consultants, Named Plaintiffs fail to demonstrate a substantial need, much less exceptional circumstances, to obtain "discovery" from them.   And, there is no basis to violate the privilege associated with their work for the State.   Named Plaintiffs are grasping at straws because they lack any substantive basis to object to the Plan, as recently demonstrated with the filing of their "Response" to the Plan. (Doc. No. 1408).   This is simply an effort to distract the Court and the parties from a timely implementation of the remedies proposed by the State.   Moreover, Named Plaintiffs' belated request for "discovery" will only delay implementation of a remedy they say is dire.   Named Plaintiffs' generic Discovery Request is therefore due to be denied.

---

location and persons involved or alleged to be involved in such failure."   (Doc. No. 135-1 at ¶ 10).   During the Phase 2A trial, Named Plaintiffs questioned inmates regarding the presence of razor blades at ADOC facilities and seemingly suggested that this violated the Partial Settlement. However, despite having knowledge of conduct that they contend violates the terms of the Partial Settlement, Named Plaintiffs never once provided ADOC with the notice required by paragraph 10 of the Partial Settlement.

Dated: October 25, 2017.

/s/ William R. Lunsford
_____

William R. Lunsford
*One of the Attorneys for the Commissioner*
*and Associate Commissioner*

William R. Lunsford
Matthew B. Reeves
Michael P. Huff
Melissa K. Marler
Stephen C. Rogers
**MAYNARD, COOPER & GALE, PC**
655 Gallatin Street
Huntsville, AL 35801
Telephone: (256) 512-5710
Facsimile: (256) 512-0119
blunsford@maynardcooper.com
mreeves@maynardcooper.com
mhuff@maynardcooper.com
mmarler@maynardcooper.com
srogers@maynardcooper.com

Luther M. Dorr, Jr.
Mitesh B. Shah
Evan P. Moltz
**MAYNARD, COOPER & GALE, PC**
1901 Sixth Avenue North
2400 Regions Harbert Plaza
Birmingham, AL 35203
Telephone: (205) 254-1178
Facsimile: (205) 714-6438
rdorr@maynardcooper.com
mshah@maynardcooper.com
emoltz@maynardcooper.com

/s/ John G. Smith
_____

John G. Smith
*One of the Attorneys for the Commissioner*
*and Associate Commissioner*

John G. Smith
David R. Boyd
**BALCH & BINGHAM LLP**
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (866) 316-9461
jgsmith@balch.com
dboyd@balch.com

Steven C. Corhern
**BALCH & BINGHAM LLP**
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100
Facsimile: (205) 488-5708
scorhern@balch.com

Anne A. Hill
Elizabeth A. Sees
Joseph G. Stewart
**ALABAMA DEPARTMENT OF CORRECTIONS**
Legal Division
301 South Ripley Street
Montgomery, Alabama 36130
Telephone: (334) 353-3884
Facsimile: (334) 353-3891
anne.hill@doc.alabama.gov
elizabeth.sees@doc.alabama.gov
joseph.stewart@doc.alabama.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all attorneys of record in this matter, including without limitation the following, by the Court's CM/ECF system on this the 25th day of October, 2017:

Maria V. Morris
Rhonda C. Brownstein
Latasha L. McCrary
J. Richard Cohen
Brooke Menschel
Caitlin J. Sandley
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
maria.morris@splcenter.org
rhonda.brownstein@splcenter.org
latasha.mccrary@splcenter.org
richard.cohen@splcenter.org
brooke.menschel@splcenter.org
cj.sandley@splcenter.org

William Van Der Pol, Jr.
Glenn N. Baxter
Barbara A. Lawrence
**ALABAMA DISABILITIES ADVOCACY PROGRAM**
University of Alabama
500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
Telephone: (205) 348-6894
Facsimile: (205) 348-3909
wvanderpoljr@adap.ua.edu
gnbaxter@bama.ua.edu
blawrence@adap.ua.edu

Deana Johnson
Brett T. Lane
**MHM SERVICES, INC.**
1447 Peachtree Street NE
Suite 500
Atlanta, GA 30309
Telephone: (404) 347-4134
Facsimile: (404) 347-4138
djohnson@mhm-services.com
btlane@mhm-services.com

Andrew P. Walsh
William G. Somerville III
Patricia Clotfelter
Lisa W. Borden
**BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC**
420 20th Street North
Suite 1400
Birmingham, Alabama 35203
Telephone:  (205) 244-3863
Facsimile:  (205) 488-3863
awalsh@bakerdonelson.com
wsomerville@bakerdonelson.com
pclotfelter@bakerdonelson.com

lborden@bakerdonelson.com

Lonnie J. Williams
**ALABAMA DISABILITIES ADVOCACY PROGRAM**
P. O. Box 870395
Tuscaloosa, AL 35487
Telephone: (205) 348-4928
Facsimile: (205)348-3909
lwilliams@adap.ua.edu

Gregory M. Zarzaur
Anil A. Mujumdar
Diandra S. Debrosse
**ZARZAUR MUJUMDAR & DEBROSSE**
2332 2nd Avenue North
Birmingham, AL 35203
Telephone: (205) 983-7985
Facsimile: (888) 505-0523
gregory@zarzaur.com
anil@zarzaur.com
fuli@zarzaur.com

/s/ William R. Lunsford
*Of Counsel*

21