IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

EDWARD BRAGGS, et al.,           )
                                 )
     Plaintiffs,                 )
                                 )        CIVIL ACTION NO.
     v.                          )        2:14cv601-MHT
                                 )           (WO)
JEFFERSON S. DUNN, in his        )
official capacity as             )
Commissioner of                  )
the Alabama Department of        )
Corrections, et al.,             )
                                 )
     Defendants.                 )


PHASE 2A INVOLUNTARY-MEDICATION SETTLEMENT
FINAL APPROVAL OPINION

I.   INTRODUCTION

This class-action lawsuit brought by a group of
seriously mentally ill prisoners in the custody of the
Alabama Department of Corrections (ADOC or Department)
is before the court on a promised opinion explaining
why, in partial resolution of this litigation, it
previously approved a settlement of the group's claims
challenging the Department's involuntary-medication
policies and procedures.

The plaintiffs in this phase, Phase 2A, of the lawsuit are a group of seriously mentally ill state prisoners and the Alabama Disabilities Advocacy Program (ADAP), which represents mentally ill prisoners in Alabama. The defendants are ADOC Commissioner Jefferson Dunn and the ADOC Associate Commissioner of Health Services Ruth Naglich, who are both sued in only their official capacities.

The plaintiffs claim that the Department's involuntary-medication policies and procedures deprive prisoners of due process of law in violation of the Fourteenth Amendment, as enforced through 42 U.S.C. § 1983. *See* Fifth Amended Complaint (doc. no. 805) at 137–38. Specifically, they contend that the Department's involuntary-medication policies and procedures: (1) deny prisoners subject to involuntary-medication orders substantive due process by requiring them to be medicated absent a recent finding of dangerousness; (2) deny prisoners subject to involuntary-medication orders procedural due process by

failing to provide them with adequate notice of hearings and other protections provided for in the applicable regulation; and (3) deny prisoners who are not subject to involuntary-medication orders substantive and procedural due process by coercing consent to take medications that they otherwise would refuse. The plaintiffs seek injunctive and declaratory relief. Jurisdiction is proper under 28 U.S.C. § 1331 (federal question) and § 1343(a)(3) (civil rights). Following months of negotiations, the parties have settled these claims.

This case has twice been bifurcated for administrative convenience of the court and the parties. In September 2015, this case was divided into two distinct phases: Phase 1, which involves claims under Title II of the Americans with Disabilities Act (codified at 42 U.S.C. § 12131 et seq.) and § 504 of the Rehabilitation Act of 1973 (codified at 29 U.S.C. § 794) (both of which statutes are, for ease of reference, referred to as the ADA), but which claims

are unrelated to mental health; and Phase 2, which involves all other claims. A year later, in September 2016, the court further bifurcated this case into Phase 2A, encompassing an Eighth Amendment claim related to the treatment of prisoners with mental illness, an ADA claim of prisoners with only mental disabilities, and involuntary-medication claims; and Phase 2B, involving Eighth Amendment claims related to medical and dental care. The court has already granted relief on several of the plaintiffs' claims.

In September 2016, the court approved a settlement of the plaintiffs' Phase 1 ADA claims for prisoners with physical disabilities. *See Dunn v. Dunn*, 318 F.R.D. 652 (M.D. Ala. 2016) (Thompson, J.). The court subsequently entered the parties' settlement as a consent decree.

In June 2017, the court found the Department liable on the plaintiffs' Phase 2A Eighth Amendment claim. *See Braggs v. Dunn*, -- F. Supp. 3d --, 2017 WL 2773833 (M.D. Ala. June 27, 2017) (Thompson, J.). Based upon a

veritable mountain of evidence, the court found the Department's provision of mental-health care to be "horrendously inadequate" and constitutionally deficient under the Eighth Amendment. *Id*. at \*68.

In July 2017, the court approved a settlement of the plaintiffs' Phase 2A ADA claim, relating to prisoners with mental disabilities, *see Braggs v. Dunn*, -- F.R.D. --, 2017 WL 3151261 (M.D. Ala. July 25, 2017) (Thompson, J.), which resulted in the court entering a consent decree.

The parties, with the able assistance of United States Magistrate Judge John E. Ott, have now reached a settlement on the plaintiffs' only remaining unaddressed claims for Phase 2A: the involuntary-medication claims. The court had previously certified a class for the plaintiffs' involuntary-medication claims. See Braggs v. Dunn, 317 F.R.D. 634 (M.D. Ala. 2016) (Thompson, J.).

The parties filed a joint motion for preliminary approval of the proposed settlement of the

involuntary-medication claims. After a hearing on the joint motion, the court preliminarily approved the proposed settlement. In its preliminary approval order, the court established a procedure for providing class members with notice of the agreement and an opportunity to object and submit comments on the agreement's fairness.

After receiving written comments from class members, the court held two days of fairness hearings in August 2017. During the first day, the court heard from a representative group of class members--selected by the court with input of the parties--who had submitted comments on the proposed agreement. During the second day, counsel for the parties responded to various witnesses' comments and questions raised by the court.

After the fairness hearings, the court, on September 6, 2017, entered an order granting final approval of the Proposed Phase 2A Involuntary Medication Settlement Agreement and granted the

parties' request to enter their settlement agreement as a consent decree. This opinion discusses the court's reasons for doing so.

## II. DESCRIPTION OF PROPOSED SETTLEMENT

Generally speaking, the proposed settlement is designed to address all disputed issues related to involuntarily medicating ADOC inmates and remedy all claims arising from that process. It is meant to include all procedural and substantive due-process claims. *See* Proposed Phase 2A Involuntary Medication Settlement Agreement (doc. no. 1248-1) at 5.

The agreement includes the following eight substantive provisions:

*Revised Involuntary-Medication Regulation*: The Commissioner agrees to adopt and implement the revised Administrative Regulation (AR) 621, which is the Department's involuntary-medication regulation. The revised regulation contains the following provisions, in relevant part: (1) a policy against threatening or

coercing prisoners to accept psychotropic medications; (2) a requirement that the Department consider and document whether there is a current and substantial likelihood of serious physical harm towards self or others when deciding to place a prisoner on an involuntary-medication order; (3) a requirement that the Involuntary Medication Review Committee find that involuntary-medication is in the patient's best medical interest before deciding to issue an involuntary-medication order; (4) a policy requiring an independent and knowledgeable advisor to review involuntary-medication orders and assist prisoners in challenging an adverse involuntary-medication order, where appropriate; (5) the creation of an involuntary-medication review board, consisting of providers who were not involved in the patient's treatment; and (6) a requirement that a patient be afforded an opportunity to be unmedicated for 30 days if on an involuntary-medication order for 180 days.

*Dismissal of Claims*: **The parties agree, and jointly move, to dismiss plaintiff Quang Bui's claims with prejudice.**

*No Admission of Liability*: **The parties submit that the agreement may not be construed as an admission of liability against Commissioner Dunn, Associate Commissioner Ruth Naglich or the Department. Moreover, nothing in the agreement is to be construed as evidence of liability as to any claim or case against the Department or any of its officials.**

*Placement of Agreement in Law Libraries*: **The Department agrees to place the agreement, including the revised involuntary-medication regulation, in the law library of every major correctional facility.**

*Provision of Mental-Health Records to ADAP*: **The Department will provide information and documentation to ADAP for review on a monthly basis for 24 months, including (1) a roster of all prisoners on involuntary-medication orders; and (2) all medical, mental-health, or other records concerning the**

Department's involuntary-medication proceedings pertaining to up to four prisoners on involuntary-medication orders.

*Collaborative Oversight*: ADAP may then prepare and submit a monthly report to the Department regarding the Department's compliance with this agreement and the revised involuntary-medication regulation, including by providing any recommendations it believes necessary to ensure the Department is in substantial compliance with the agreement or the revised involuntary-medication regulation. The Department may object, comment on, or provide a remedial plan to any suggestions contained in ADAP's monthly report.

*Attorneys' Fees and Expenses*: The Department will pay the plaintiffs' attorneys $ 230,000.00 in fees and costs. This agreement, unlike the parties' settlements of the plaintiffs' ADA claims, does not provide for additional fees for monitoring services or fees associated with any litigation necessary to enforce the agreement or any resulting consent decree.

*Disposition of Claims*: The parties also agree that the settlement fully resolves the plaintiffs' "Third Cause of Action: Deprivation of Due Process Prior to Involuntarily Medicating Prisoners" claims in the Fifth Amended Complaint. As a result, no member of the certified settlement class may bring a claim that the revised involuntary-medication regulation deprives prisoners of procedural due process during the settlement term. Finally, the parties agree that named plaintiff Bui will not to assert a substantive due-process claim seeking prospective injunctive relief against the Department concerning its revised involuntary-medication regulation.

In addition to these substantive provisions, the agreement contains the following "Other Terms and Conditions:"

*No Monetary Compensation*: Nothing in the agreement imposes any obligation to provide any form of monetary payment to any current or future prisoners housed within the Department.

*No Appeal*: The parties have agreed to waive the right to appeal the imposition of the agreement.

*Court's Retention of Jurisdiction*: The parties agree that, after the court's approval of the agreement, the court will retain jurisdiction to enforce it.

*Expiration of Agreement*: The agreement shall expire at 12:00 p.m. on September 6, 2019, two years after the court entered its final approval order.

*No Waiver of Privilege*: The parties agree that the agreement does not constitute a waiver, now or in the future, of any applicable privilege provided by law.

*Stipulation relating to the PLRA*: Although discussed in greater detail below, the parties agree, and jointly stipulate, that this agreement fully complies with the requirements of the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626(a).

*Dispute-Resolution Process*: Prior to seeking review before this court, the parties agree to submit any claims relating to the Department's compliance with the

terms of the agreement or the revised involuntary-medication regulation to mediation before United States Magistrate Judge John E. Ott.

*Modification of Agreement*: The parties may mutually agree to amend the agreement. Otherwise, the parties may not seek to amend or modify this agreement, except to extend the term of the agreement beyond two years.

*Duty to Hire*: The Department is under no obligation to hire additional employees as a result of the agreement, except that the Department must ensure its compliance with the revised involuntary-medication regulation.

*Other*: Finally, the parties agree that the agreement does not--and is not intended to--violate any preexisting court order in this case; that, to the extent possible, the agreement shall be interpreted under the laws of the State of Alabama; that any invalid provision shall be severable from the remainder of the agreement; that the agreement represents the entire understanding and agreement between the parties;

and that all signatures on the agreement constitute an effective signature to the agreement as a whole.

After an exhaustive notice and comment period, followed by a series of fairness hearings, and upon consideration of all the evidence presented in this case related to the Department's involuntary-medication policies and procedures, the court was satisfied that the parties proposed settlement represented a fair, adequate, and reasonable settlement for purposes of the plaintiffs' involuntary-medication claims.

## III. DISCUSSION

Judicial policy favors the settlement of class actions. *See Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). However, "the settlement process is more susceptible than the adversarial process to certain types of abuse and, as a result, a court has a heavy, independent duty to ensure that the settlement is 'fair, adequate, and reasonable.'" *Paradise v. Wells*, 686 F. Supp. 1442, 1444 (M.D. Ala. 1988)

(Thompson, J.) (citation omitted). In addition to analyzing the fairness of the proposed agreement, the court must ensure that it is not illegal, or against public policy. *See id.*

In approving this agreement, the court had to make three determinations. First, the court assessed whether the procedural and substantive protections provided by Rule 23(e) of the Federal Rules of Civil Procedure were satisfied. Second, because the proposed settlement included an award of attorneys' fees to the plaintiffs' counsel, Rule 23(h) required the court to determine whether such a fee award was "reasonable." Finally, the court evaluated the proposed settlement's compliance with the PLRA, which establishes certain requirements for affording prospective relief in cases involving prisons, including when that prospective relief takes the form of a court-enforceable settlement. *See* 18 U.S.C. § 3626(a)(1) & (c)(1).

A. Settlement Approval: Rule 23(e)

Under Rule 23(e), the settlement of a class action requires court approval. Fed. R. Civ. P. 23(e)(1)(A). The court may approve a class action settlement only if it determines that the settlement is "fair, adequate, and reasonable and is not the product of collusion between the parties." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).[1]  In determining whether the settlement is fair, adequate, and reasonable, courts must determine whether notice to the class was adequate, Fed. R. Civ. P. 23(e)(1), and must examine comments and objections from class members as well as the opinion of class counsel. *See Laube v. Campbell*, 333 F. Supp. 2d 1234, 1238 (M.D. Ala. 2004) (Thompson, J.).

---

[1]. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

### 1. Notice to Class Members

Rule 23(e) requires that notice to the class be provided "in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e). "The court must ensure that all class members are informed of the agreement[] and have the opportunity to voice their objections." *Laube*, 333 F. Supp. 2d at 1240; Fed. R. Civ. P. 23(e)(1). In this case, class members were provided adequate opportunities to learn about the proposed settlement and offer objections to or make comments about it.

The court's order preliminarily approving the parties' proposed settlement contained specific procedures for the Department to give notice to members of the certified involuntary-medication class. The order also required the Department to distribute approved notice and comment forms. The notice form included a description of the plaintiffs' involuntary-medication claims; a definition of the certified settlement class; a list of the revisions to

the involuntary-medication regulation; an indication of ADAP's role in monitoring the Department's compliance with the agreement; notice of the provision for attorneys' fees to the plaintiffs' counsel; directions for providing questions or comments on the agreement and the revised involuntary-medication regulation; an announcement of the fairness hearings; and instructions for prisoners to exercise their right to object to or comment about the proposed settlement. The comment form allowed respondents to select from a list of general topics at issue, and to indicate whether they wished to testify about the agreement at a fairness hearing.

The notice form was posted in the law library, dining areas, and mental-health office waiting areas of each ADOC or work-release facility. Notice forms were placed next to the shower area in each residential treatment unit (RTU) or in the infirmaries for prisoners housed in those units. In addition, notice

forms were hand delivered to prisoners on the mental-health caseload in those units.

The notice form was also placed in each living unit in the open RTUs at Tutwiler, Bullock, and Donaldson correctional facilities. A copy of the notice form, the comment form, and a pre-addressed envelope were provided by hand to prisoners in the Intensive Stabilization Units, closed RTUs, semi-open RTUs, or crisis cells. Finally, copies of the agreement were provided upon request to any prisoner lacking access to those areas where notices were located.

The notice and comment forms and copies of the proposed agreement were made available in English, Spanish, Braille, and in large print. Upon request, prisoners were to receive assistance in reading the documents and in writing comments.

A copy of a comment form was to be provided along with a copy of the notice form. The Department was required to keep a roster, by name and AIS number, of all prisoners who had received notice of the agreement.

After distributing the notice and comment forms, the Department collected prisoner comments.  Prisoners were also given the option to submit comments by mail directly to the clerk of court.

Notice of the proposed agreement was posted by June 2, 2017, and prisoners were given until July 17, 2017, to submit comments.  The court received more than 200 prisoner comments by mail or from the facilities themselves, which were thereafter docketed for review.

### 2. Objections and Comments

#### a. Prisoner Comments

Prisoners raised a variety of issues relating to the proposed settlement agreement in their comments submitted to the court.[2]  Moreover, based on the

---

2. To the extent possible, the court construed prisoners' comments as referencing the agreement. However, the court found that only 23 prisoners provided objections or comments that were directly relevant to the agreement or revised involuntary-medication regulation.  The court had to disregard 197 comment forms because they were either incomplete or blank, provided no reason for circling a particular (pre-identified) comment topic, were

suggestions of counsel and the court's own review of the relevant prisoner comments, the court selected 12 prisoners to testify during fairness hearings conducted on August 23, 2017. The hearing were conducted by videoconference due to the impracticability of visiting a large number of prisons or having prisoners appear in-person in court .

The relevant comments and testimony fell into five loosely defined categories: (1) concerns about the Department using coercion to obtain consent to medicate prisoners; (2) suggested revisions to the revised involuntary-medication regulation; (3) doubts about ADAP's role in monitoring the Department; (4) requests related to attorneys' fees; and (5) concerns about procedures for terminating an involuntary-medication order.  Each of these categories is discussed below.

*Coercion*: Five prisoners expressed concerns that the Department might use the revised involuntary-medication regulation to coerce prisoners: indecipherable, or were otherwise irrelevant to the agreement, as a whole.

either that the Department might coerce prisoners to take their medication involuntarily by means other than the involuntary-medication procedure; or that the Department might use the involuntary-medication procedure as a punitive measure to get prisoners to conform to certain behavior.

The revised involuntary-medication regulation directly addresses these concerns, and in several ways. On the first page of the revised regulation, it states: "In no instance shall an inmate be threatened ... with the use of force or a threat of disciplinary actions such as segregation, loss of privileges, or loss of good time, as a means to coerce the inmate to accept psychotropic medications ...." Proposed Phase 2A Involuntary Medication Settlement Agreement (doc. no. 1248-1) at 44. It further, unequivocally, states: "The use of involuntary-medication as a punitive measure is strictly prohibited." *Id.* at 47. Therefore, the court found these prisoners' concerns to be groundless in

light of the terms of the revised involuntary-medication regulation.

*Revision to the Administrative Regulation*: Three prisoners made suggested revisions to the revised involuntary-medication regulation. One prisoner remarked that (some) involuntary-medication orders should not automatically expire after six months or that (some) prisoners should not automatically be taken off of their involuntary-medication regimen, if they still need their medications. Two other prisoners suggested that the revised involuntary-medication regulation should not require prisoners to be taken off of their involuntary-medication orders "cold turkey" in all cases. These concerns, however, are addressed in the revised involuntary-medication regulation.

First, the revised involuntary-medication regulation does not mandate that all prisoners be taken off their involuntary-medication regimens, regardless of circumstances, after six months. Instead, the regulation provides, in Section O, that: "Continuation

of the authorization for involuntary-medication will be re-evaluated after the initial 180-day order to continue to involuntarily medicate the inmate .... An inmate will be given a thirty (30) day respite at the completion of the initial 180 day order to involuntarily medicate." *Id.* at 49.

Second, the revised involuntary-medication regulation does not require prisoners to be taken off their medication 'cold turkey.' The regulation provides, in relevant part, that during the period of respite between involuntary-medication orders, "Should an inmate ... show signs of deterioration in his/her mental health, the treating psychiatrist may order a continuation of the authorization for involuntary medication for a second 180-day interval." *Id.* at 50. And, as is the case for any prisoner, the decision to involuntarily medicate a prisoner must be accompanied by a "[s]tatement that the administration of the contemplated psychotropic medication is in the inmate's best medical interest." *Id.* at 46. Accordingly, the

revised involuntary-medication regulation already addresses these proposed revisions, and the objections on those bases were not well founded.

*Monitoring*: Monitoring was the most frequent topic of the relevant comments about the agreement: eight prisoners commented about ADAP's ability to monitor the Department's compliance with their own administrative regulation effectively and made suggestions for improving the monitoring services provided for in the agreement. One comment, characteristic of the requests for improved monitoring, states, "ADOC does not go by polic[ies] already implemented and will not go by this Administrative Regulation." Others state that monitoring should use an "element of surprise," or that monitoring services should be provided by an independent third-party monitoring group. The agreement addresses each of these concerns.

As the parties note in their Joint Submission Regarding Inmate Comments, the settlement agreement provides for extensive monitoring for a two-year

period. As a part of the arrangement, ADAP is permitted to review four prisoners' records that are subject to involuntary-medication orders during each month of the agreement. ADAP can also submit a monthly report to ADOC regarding ADOC's compliance, and the court retains jurisdiction to enforce the agreement. *See* Joint Submission Regarding Inmate Comments (doc. no. 1317) at 2. In light of the monitoring arrangement, the court found that the agreement sufficiently addresses the prisoners' concerns.

*Attorneys' Fees*: Two prisoners objected specifically to the attorneys' fee provision of the agreement. Both prisoners claimed that, because they are the "victims" of the alleged constitutionally deficient involuntary-medication policies and procedures, they are also entitled to monetary compensation for the pain and suffering they experienced under the former regulation.

However, as the court has remarked on similar comments for both the Phase 1 and Phase 2A ADA

settlements, although the court understands that commenters alleging past harms may feel that they are entitled to damages, the plaintiffs here have sought only injunctive relief for their claims. Moreover, an unnamed class member cannot be precluded from bringing a claim for monetary damages stemming from the same policies or procedures challenged in this class action, since the class representatives sought only injunctive or declaratory relief. *See Fortner v. Thomas*, 983 F.2d 1024, 1031 (11th Cir. 1993) (collecting cases). Therefore, prisoners who wish to seek monetary compensation for violations of due process under the former involuntary-medication policies or procedures are not foreclosed from doing so by the agreement.

*Terminating an Involuntary-Medication Order*: Finally, four prisoners complained generally that they had been on involuntary-medication orders for prolonged periods of time. One prisoner claimed that he has been on an involuntary-medication order for six years; another claimed that he has been on an

involuntary-medication order, without reprieve, for almost 20 years. Construed as a complaint that the revised involuntary-medication regulation should allow prisoners to come off their involuntary-medication order, under certain circumstances, after the initial involuntary-medication order lapses, the court found that the revised involuntary-medication regulation addresses this concern as well.

Section P of the revised involuntary-medication regulation addresses the concerns raised in these comments, as it provides that the procedures set in place by the new regulation must be complied with *before* the continuation of an involuntary-medication order that has been in place for at least 365 days of the past 16 months. Proposed Phase 2A Involuntary Medication Settlement Agreement (doc. no. 1248-1) at 50.

Those procedures require, among other things: documentation of the need to medicate a prisoner involuntarily; evidence that alternatives to or

attempts at treatment other than involuntary-medication are or would be futile; an evaluation by the Involuntary Medication Review Committee to determine whether involuntarily medicating a prisoner is in the prisoner's best medical interest; an opportunity for the prisoner to present evidence against an involuntary-medication regimen; a decision by a majority of the Involuntary Medication Review Committee, including the vote of the psychiatrist; documentation explaining the reasons for the decision to initiate the involuntary-medication order; and an opportunity for the prisoner, with the assistance of an independent advisor, to appeal an adverse involuntary-medication order. *Id.* at 46–49. Therefore, because of the safeguards set in place by the new policies, the prisoners' concerns are unfounded.

*Conclusion*: After a careful review of all the comments and objections filed by class members and the testimony of prisoners at the fairness hearings, the court found that none of the prisoners' comments

seriously called into question the fairness of the agreement, in whole or in part.

### b. Views of Class Counsel

In addition to considering the views of class members, the court considered the opinion of class counsel. *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1215 (5th Cir. 1978); *Gaddis v. Campbell*, 301 F. Supp. 2d 1310, 1315 (M.D. Ala. 2004) (Thompson, J.).

Class counsel contended that the proposed agreement was a fair, adequate, and reasonable resolution of the plaintiffs' Phase 2A involuntary-medication claims. At the fairness hearing on August 24, 2017, counsel argued that the agreement was "rigorously negotiated" and was "reached through a great deal of hard work on a variety of disputed issues." Counsel firmly believed this settlement was advantageous to the certified class and complied with the requirements of *Washington v. Harper*, 494 U.S. 210, 235 (1990).

Additionally, before the fairness hearing, the court requested supplemental briefing on "whether the revised Administrative Regulation 621 creates an avenue for judicial review of an adverse involuntary medication order" and "if the regulation does create an avenue for judicial review, how it does so." Phase 2A Involuntary Medication Settlement Agreement Preliminary Approval Order (doc. no. 1253) at 10–11.

In the parties' joint brief in response, the parties' stated that the "Revised Administrative Regulation 621 (the 'Regulation') contains an avenue for judicial review of an adverse involuntary-medication order. Specifically, Section J of the 'Procedures' section of the Regulation provides that '[t]he inmate shall be informed of the right to appeal any decision to a court of appropriate jurisdiction.' An adverse involuntary medication order falls squarely within 'any decision' that may be appealed to a court of competent jurisdiction." Joint Brief Regarding Judicial Review of an Adverse

Involuntary Medication Order (doc. no. 1318) at 1-2 (internal citations omitted).

The parties further stated that a prisoner may seek judicial review in state court through a petition for a writ of habeas corpus or in federal court by asserting a claim under 42 U.S.C. § 1983, noting that the internal administrative appeal process for appealing an adverse involuntary-medication order constitutes the administrative remedy that must be exhausted under the PLRA in order to pursue a § 1983 claim. *Id.* at 2-3.

Accordingly, the court found that the agreement contained an avenue for judicial review that is consistent with the requirements of *Harper*. *See Harper*, 494 U.S. at 216 (noting that an "inmate may seek judicial review of a committee decision in state court by means of a personal restraint petition or extraordinary writ").

As to the second question--how the regulation provides an avenue for judicial review--the parties stated that, "A prisoner will be informed of the right

to judicial review in the Notice of Involuntary Medication Hearing (ADOC Form MH-029)." Joint Brief Regarding Judicial Review of an Adverse Involuntary Medication Order (doc. no. 1318) at 3, which "informs a prisoner subject to an adverse involuntary medication order of the right '[t]o seek judicial review in a court of appropriate jurisdiction if the administrative appeal is denied.'" *Id.* This, too, is sufficient and consistent with the requirements of *Harper*.

Upon consideration of the views of class counsel, the court found that nothing addressed by the parties seriously called into question the fairness, adequacy, or reasonableness of the agreement.


### 3. Court's Assessment

Based on the evidence and argument presented by the parties and class members, the court determined that the proposed settlement agreement is fair, adequate, and reasonable. *See* Fed. R. Civ. P. 23(e). In making that determination, the court considered a variety of

"[r]elevant factors", including "the stage in the proceedings; the plaintiffs' likelihood of success at trial [on the remaining issues]; the complexity, expense, and likely duration of the lawsuit; and the range of possible recovery." *Laube*, 333 F. Supp. 2d at 1246.

The substantive provisions of the agreement represent a highly favorable result for the plaintiff class. The plaintiffs in this case alleged that the Department's involuntary-medication policies and procedures "f[e]ll far short of what due process requires." Fifth Amended Complaint (doc. no. 805) at 3. The agreement essentially gives the class all of the remedies the plaintiffs sought at the outset of this litigation. Notably, even if the plaintiffs had proceeded to and prevailed at trial on their Phase 2A involuntary-medication claims, the parties would have still been confronted with the task of fashioning a revised Administrative Regulation. Any such regulation

would likely have closely resembled the revised regulation attached to the settlement agreement.

Accordingly, upon an independent review of prisoner comments and the views of class counsel, the court found the agreement to represent a fair, adequate, and reasonable settlement of the plaintiffs' involuntary-medication claims.

### B. Attorneys' Fees: Rule 23(h)

Rule 23(h) provides that, "In a class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). To award attorneys' fees, however, a court must ensure that the parties have complied with the following procedures: (1) the parties filed a motion for attorneys' fees; (2) the class members must be given notice and an opportunity to object to the motion; and (3) the court must find that the award sought is reasonable. *See id.*

The settlement agreement provides that the Department will pay the plaintiffs' counsel $ 230,000.00 in fees and costs, which include any and all costs associated with or generated by class counsel in initiating and litigating the plaintiffs' involuntary-medication claims and fees associated with ADAP's role in monitoring the Department's compliance with the agreement. *See* Proposed Phase 2A Involuntary Medication Settlement Agreement (doc. no. 1248-1) at 28–29.

Because the provision of attorneys' fees was included in the proposed settlement, class members received notice of the plaintiffs' class attorneys' request for attorneys' fees during the comment period. Two prisoners objected to the fee provision; however, as mentioned previously, these prisoners merely argued that the provision of fees to class counsel was unfair, given the fact that they were not also being awarded monetary damages. But again, because the agreement does not foreclose the opportunity for class members to

seek monetary damages for individual claims, and because the plaintiffs have sought only injunctive relief and not damages in this case, this concern is unfounded.

Nevertheless, even when both sides agree to an award of attorneys' fees, the court has an independent obligation to assess its reasonableness, in order to guard against the risk that class counsel might agree to enter into a settlement less favorable to their clients in exchange for inappropriately high fees. *See Piambino v. Bailey*, 757 F.2d 1112, 1144 (11th Cir. 1985) ("When the class attorneys succeed in reaping a golden harvest of fees in a case involving a relatively small recovery, the judicial system and the legal profession are disparaged. ... The practice of awarding attorneys' fees is one that has been delicate, embarrassing and disturbing for the courts. ... This embarrassment is rooted in the fact that the bitterest complaints [about the legal profession] from laymen [are directed at] the windfall fees and featherbedding

that lawyers have managed to perpetuate through ...
their influence with the judiciary. For the sake of
their own integrity, the integrity of the legal
profession, and the integrity of Rule 23, it is
important that the courts should avoid awarding
windfall fees and that they should likewise avoid every
appearance of having done so.") (citations and internal
quotations omitted).

To determine whether an attorneys' fee award is
reasonable, the court uses the lodestar method. It
does so by multiplying the number of hours reasonably
expended by a reasonable hourly rate, *see Norman v.
Hous. Auth. of Montgomery*, 836 F.2d 1292, 1299 (11th
Cir. 1988), and then considering whether an upward or
downward adjustment is warranted in light of the
factors set out in *Johnson v. Georgia Highway Express,
Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974). Those
factors are: (1) the time and labor required; (2) the
novelty and difficulty of the questions; (3) the skill
required to perform the legal services properly;

(4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

In support of the attorneys' fee request, the plaintiffs' counsel submitted evidence that they have incurred, or will incur, approximately $ 230,000.00 in litigation expenses on the Phase 2A involuntary-medication claims and fees associated with ADAP's role in monitoring the Department's compliance with the agreement and revised involuntary-medication regulation. *See* Plaintiffs' Motion for Attorneys' Fees (doc. no. 1346). The plaintiffs' counsel expended over 476.3 total hours of billable time on this portion of

the case as of the date of signing the settlement and "significant time for almost four (4) months" after signing the agreement. *Id.* at 3. It is impossible to determine the exact number of hours that ADAP will spend monitoring the implementation of the new policies under the settlement agreement after final settlement approval and during the settlement term, but the parties jointly agree that the $ 230,000.00 request represents a reasonable fee for litigation of this kind. Moreover, the parties agreed on the record during the fairness hearings that the request for attorneys' fees was reasonable.

After considering the *Johnson* factors, the court found that the fee was reasonable and no adjustment of the lodestar figure was warranted. These settled claims, which have been ongoing since 2014, are extraordinarily large in scope; they concern both current and future prisoners on and subject to involuntary-medication orders; and they sought and achieved a remedial order that mandates a dramatic

transformation in the way the Department treats such prisoners. The range of complex legal and factual questions presented by the plaintiffs' claims, and the amount of time the plaintiffs' attorneys reasonably spent both in preparing these claims for trial and in negotiating and securing approval of the settlement agreement, warrant the sizeable fee award.

## C. PLRA

The PLRA provides that a "court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). In conducting this "need-narrowness-intrusiveness" inquiry, a court is required to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

While the requirement to engage in a need-narrowness-intrusiveness analysis must be met in some circumstances, "[t]he parties are free to make any concessions or enter into any stipulations they deem appropriate" when submitting an initial settlement to the court, and the court does not need to "conduct an evidentiary hearing about or enter particularized findings concerning any facts or factors about which there is not dispute." *Cason v. Seckinger*, 231 F.3d 777, 785 n.8 (11th Cir. 2000).

Here, the parties agreed that the proposed settlement satisfies the need-narrowness-intrusiveness requirements of 18 U.S.C. § 3626(a)(1)(A). Proposed Phase 2A Involuntary Medication Settlement Agreement (doc. no. 1248-1) at 12. Based on the court's independent review of the agreement, the court agreed.

The court further found--and the parties stipulated--that the settlement agreement will not have an adverse effect on public safety or the operation of the criminal justice system. *See* 18 U.S.C.

§ 3626(a)(1)(A). To the contrary, once the Department implements the agreed-upon revised involuntary-medication regulation, prisoners will be afforded more notice and given an increased opportunity to challenge an adverse involuntary-medication order. Furthermore, the documentation that the Department is required to maintain will ensure that reviews of involuntary-medication decisions afford prisoners the process they are due. And, finally, the Department will retain the ability to use involuntary-medication orders to treat prisoners who truly need to be medicated without their consent.

In addition, the PLRA's requirement that any prospective relief order must terminate within two years after court approval (or one year after the court's denial of termination of a prospective relief order) is satisfied. *See* 18 U.S.C. § 3626(b)(1)(A). As explained previously, the agreement is set to terminate two years after the court approved the settlement.

Moreover, the requirements for appointing a special master in a prison case, *see* 18 U.S.C. § 3626(f), are inapplicable here. The parties agreed to the appointment of United States Magistrate Judge John E. Ott to serve as a mediator, not a special master, for any "dispute related to the terms and conditions of ... this Agreement." Proposed Phase 2A Involuntary Medication Settlement Agreement (doc. no. 1248-1) at 13. Finally, to the extent 18 U.S.C. § 3626(f) may still be applicable, the parties have expressly waived the right to challenge Judge Ott's decision or this settlement on that basis.

In sum, the court is satisfied that its entry of a consent decree is in full compliance with the PLRA.


## IV. CONCLUSION

In *Washington v. Harper*, the Supreme Court recognized that prisoners possess "a significant liberty interest in avoiding the unwanted administration of anti-psychotic drugs under the Due

Process Clause of the Fourteenth Amendment." 494 U.S. at 221–22. Nevertheless, the Court has consistently recognized the need to balance its "longstanding adherence to the principle that inmates retain at least some constitutional rights despite incarceration with the recognition that prison authorities are best equipped to make difficult decisions regarding prison administration." *Id.* at 223–24.

The parties' settlement reflects a commitment towards balancing those interests. It also represents years of dedication towards ensuring compliance with the dictates of the Constitution. The court understands both parties' investment in this process to be genuine, and commends them for it.

The court also, again, recognizes the important role played by prisoners, who, in this context, are subject to the Department's involuntary-medication regime, as well as the numerous prisoners who submitted comments, for their advocacy on behalf of themselves and others.

Finally, the court would like to extend a special thank you for the tireless efforts of United States Magistrate Judge John E. Ott. Without his efforts, the court is convinced that this agreement would not have been possible.

For all of the above reasons, the court approved and adopted, as its own partial final judgment, the parties' settlement of the plaintiffs' involuntary-medication claims.

DONE, this the 27th day of November, 2017.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE