IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| EDWARD BRAGGS, et al., | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| JEFFERSON S. DUNN, in his | ) | |
| official capacity as | ) | |
| Commissioner of | ) | |
| the Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
|     Defendants. | ) | |

## PHASE 2A UNDERSTAFFING REMEDIAL OPINION

Previously this court found that the State of Alabama provides inadequate mental-health care in its prisons in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1267 (M.D. Ala. 2017) (Thompson, J.). The court now finds that the State's proposed plan to remedy one overarching aspect of the violation--correctional and mental-health understaffing--is minimally adequate and acceptable, albeit with minor modifications.

## I. Background

### A. Procedural Background

The plaintiffs in this class-action lawsuit include a group of mentally ill prisoners in the custody of the Alabama Department of Corrections (ADOC or Department). The defendants are ADOC Commissioner Jefferson Dunn and the ADOC Associate Commissioner of Health Services Ruth Naglich, who are both sued in only their official capacities. In a liability opinion entered on June 27, 2017, this court found that ADOC's mental-health care for prisoners in its custody was, "[s]imply put, ... horrendously inadequate." *Braggs,* 257 F. Supp. 3d at 1267. The court laid out seven factors contributing to the Eighth Amendment violation. *Id.* at 1267-68. In addition, it found that "persistent and severe shortages of mental-health staff and correctional staff" constitute an "overarching issue[] that permeate[s] each of the ... contributing factors of inadequate mental-health care." *Id.* at 1268. "[G]iven the severity and urgency of the

need for mental-health care explained in [the] opinion," the court emphasized, "the proposed relief must be both immediate and long term." *Id*.

After two months of mediation to develop a comprehensive remedial plan, it became apparent that the remedy was too large and complex to be addressed all at once. The court therefore severed the remedy into several discrete issues, to be addressed seriatim. *See* Phase 2A Revised Remedy Scheduling Order on Eighth Amendment Claim (doc. no. 1357). The court explained: "To be sure, in a sense all of the contributing factors identified in the court's June 27 opinion warrant urgent resolution. Indeed, a continuing Eighth Amendment violation, because it is 'cruel and unusual,' could be viewed as in need of swift and serious attention of both courts and the parties involved. Yet the court is convinced that breaking down the issues in the above manner will, in the long run, result in a more efficient, timely, and full resolution of this aspect of this litigation." *Id.* at 7-8.

Because of the centrality of understaffing to other problems in ADOC's provision of mental-health care, it was determined that this issue "must be addressed at the outset," and that "the earlier the problem is attacked the better." *Id.* at 4-5. Accordingly, on October 9, 2017, the defendants submitted a proposed remedial plan on understaffing, to which the plaintiffs were allowed to respond. The court then held a nine-day evidentiary hearing, and heard oral argument, in late 2017 on whether the plan should be adopted as proposed, and whether a remedial order should be entered at this time. After oral argument, the parties were instructed to submit proposed orders. Because the plan changed in certain respects over the course of this process, the defendants submitted a revised timeline.

## B. Liability Findings as to Understaffing

In addition to the seven "contributing factors" to the Eighth Amendment violation, the court more specifically found that persistent and severe shortages

4

of correctional and mental-health staff have "cascading effects" that "contribute to all of the deficiencies in ADOC's treatment of mentally ill prisoners." *Braggs,* 257 F. Supp. 3d at 1188, 1193. The court noted: "ADOC has maintained mental-health staffing levels that are chronically insufficient across disciplines and facilities. Witness after witness identified significant mental-health staffing shortages as one of the major reasons for ADOC's inability to meet the rising mental-health care needs of prisoners." *Id.* at 1194. Indeed, ADOC Commissioner Dunn described understaffing, along with overcrowding, as a "two-headed monster" facing the prison system. *Id.* at 1184.

Moreover, as the court explained, ADOC's understaffing problem is self-compounding: shortages in mental-health staff lead to unbearably high caseloads for mental-health staff members, which in turn causes turnover and further understaffing, and even higher caseloads. *Id.* at 1196. The Department's lack of correctional staff "leaves many ADOC facilities

incredibly dangerous and out of control" and causes "prisoners and correctional officers alike" to be "justifiably afraid for their safety." *Id.* at 1198. As multiple witnesses testified at the understaffing remedial hearing, this legitimate perception of danger to correctional staff--which is a direct result of understaffing--begets further understaffing: it is a major impediment to recruitment and retention.

The court found that understaffing underlies ADOC's deficient mental-health care in several ways. The shortage of mental-health staff has resulted in "a plethora of issues, including insufficient identification of mental illness at intake and referrals; missed counseling appointments and group sessions; and inadequate monitoring of prisoners in mental-health crises." *Id.* at 1197. Further, the shortage in correctional staffing inhibits the delivery of adequate mental-health care because it prevents ADOC from escorting inmates to their mental-health appointments; hinders correctional officers' ability to supervise

mentally ill prisoners; and diminishes officers' ability to identify and refer potentially mentally ill prisoners for treatment. *Id.* at 1200-04. Correctional understaffing "also has a more direct impact on prisoners' mental health" in that "[t]he combination of overcrowding and understaffing leads to an increased level of violence" in ADOC facilities. *Id.* at 1200. In addition, the court found that the lack of both correctional and mental-health staffing results in inadequate monitoring of prisoners in segregation, and contributes to "a vicious cycle of isolation, inadequate treatment, and decompensation." *Id.* at 1243-45.

## II.  Legal Standard

The Prison Litigation Reform Act (PLRA) provides that a "court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of a Federal right, and is the least intrusive means necessary to correct the violation

of the Federal right." 18 U.S.C. § 3626(a)(1)(A). In conducting this 'need-narrowness-intrusiveness' inquiry, a court is required to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

"As this court has stated before, [prison officials in cases challenging prison conditions] should be given considerable deference in determining an appropriate remedy for the constitutional violations involved." *Laube v. Haley*, 242 F. Supp. 2d 1150, 1153 (M.D. Ala. 2003) (Thompson, J.) (citing *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979)); *see also Turner v. Safley*, 482 U.S. 78, 85 (1987) ("[F]ederal courts have ... reason to accord deference to the appropriate prison authorities.").

Nevertheless, courts retain a responsibility to remedy constitutional violations. *See Brown v. Plata*, 563 U.S. 493, 511 (2011) (citing *Hutto v. Finney*, 437 U.S. 678, 687, n.9 (1978)). "Courts must be sensitive to the State's interest in punishment, deterrence, and

rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals. Courts nevertheless must not shrink from their obligation to enforce the constitutional rights of all 'persons,' including prisoners. Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.* at 511. (quotation marks and citations omitted). Accordingly, the deference afforded prison administrators in remedying constitutional violations must not be "complete." *See King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015) (per curiam) (citing *Plata*, 563 U.S. at 511).

### III. Discussion

#### A. The Defendants' Proposed Remedial Plan

The defendants' proposed remedial plan has evolved in some respects during the course of the evidentiary

hearing and oral argument.  Accordingly, the court now sets out its understanding of the plan, including minor tweaks, which it today adopts.

## 1. Correctional Staffing

a. *The Savages' Staffing Analyses*.  In order to determine how many officers are needed to address ADOC's correctional understaffing problem, the defendants have retained experts Margaret and Merle Savage to conduct comprehensive staffing analyses at each of ADOC's major facilities, with the exception of the Julia Tutwiler Prison for Women.[1]  By the time of the evidentiary

---

1. A staffing analysis of Tutwiler was recently conducted by The Moss Group pursuant to a Consent Decree in *United States v. Alabama*, Case No. 2:15-cv-368-MHT-TFM (M.D. Ala.) (Thompson, J.).  Although that case involved sexual harassment and assault of inmates, rather than mental-health care, the parties have agreed that the analysis provides an adequate basis for determining Tutwiler's current correctional staffing needs, and that the Savages need not conduct a separate staffing analysis of Tutwiler at this time.  The court understands that the Savages will therefore use The Moss Group's analysis in formulating their recommendations for Tutwiler, and-- along with the analyses of other facilities--their recommendations for ADOC's system as a whole.  In addition, to the extent that future remedial orders

hearing, the Savages had already completed preliminary analyses at three facilities: Bibb Correctional Facility, Donaldson Correctional Facility, and Hamilton Aged and Infirmed Center. According to the defendants' plan, the Savages are to complete final staffing analyses for all 15 major facilities except Tutwiler, as well as short- and long-term recommendations for all major facilities including Tutwiler, by May 1, 2018.[2]

require the Savages to reevaluate facilities based on new programmatic needs or other changes in circumstances, any such reevaluations will necessarily include Tutwiler because the current staffing analysis does not account for those changes.

2. In the defendants' proposed remedial plan (doc. no. 1374), in the defendants' pretrial brief (doc. no. 1478), throughout the nine-day evidentiary hearing on understaffing, and during the post-trial oral argument on January 24, 2018, the defendants maintained that the proposed remedy as to understaffing would apply to all 15 major ADOC facilities, with the exception that the Savages would not conduct a staffing analysis at the Tutwiler facility at this time because one has recently been done (as discussed above). However, the defendants' proposed opinion, as an apparent afterthought, suggested that the court limit its supervision of the remedial plan's implementation to six facilities, on the theory that the plaintiffs allegedly had failed to establish a violation based on correctional or mental-health understaffing at the other ADOC facilities. The defendants subsequently admitted that they are "not aware

All parties agree that any dispute related to the
Savages' recommendations should first be put before
United States Magistrate Judge John Ott for mediation and
that, if and when Judge Ott concludes that all or part
of the dispute cannot be successfully mediated, any
party may then put the dispute, to the extent it is not
resolved, to United States Magistrate Judge Gray M.
Borden for consideration pursuant to 28 U.S.C. § 636,
with allowable review, in turn, by this court pursuant
to § 636. (The court, however, reserves the discretion

---

of any section of the Court's liability opinion in which
the Court indicated an intent to limit its liability
findings to [those six facilities]." Response to Court's
February 2, 2018 Order (doc. no. 1595) at 1. Moreover,
as the court and the defendants have repeatedly
recognized, all of ADOC's major prisons--and in
particular the prisons for men--form part of an
interlocking system. The court cannot fully appreciate
what is happening, and what needs to be done, at a subset
of these facilities without receiving a full evidentiary
picture of what is happening in the system overall. For
example, it would make little sense to order increased
staffing at one understaffed prison if the staffing were
to be filled by merely transferring staff from another,
slightly less understaffed facility. It therefore
declines to adopt the suggested limitation, which could
fatally hinder its ability to remedy the constitutional
violation found.

to hear and resolve any dispute itself without the parties having gone through mediation or presented the dispute to Judge Borden for consideration.)

The court finds that the Savages, who have conducted correctional staffing analyses in more than 10 correctional systems, and who each possess over 40 years of experience in prison management and staffing, are qualified to conduct the staffing analysis.

While the plaintiffs do not challenge the Savages' qualifications to conduct a staffing analysis and do not dispute that a staffing analysis must be conducted, they have expressed concerns about how the first three preliminary analyses were conducted. Accordingly, plaintiffs sought to have their correctional expert, Eldon Vail, collaborate with the Savages before the conclusion of the staffing analyses. During the understaffing remedial hearing, the Savages met with Vail and reached an agreement as to how they would collaborate through the remainder of the staffing-analysis process. Per the agreement, as Ms. Savage testified, the Savages

will produce to Vail the post plan, institutional profile, and activities chart for each facility as they are completed for Vail's review and consideration. The Savages will also produce these materials for the three facilities they have already preliminarily assessed: Bibb, Donaldson, and Hamilton. The Savages and Vail will then schedule a conference call to discuss any questions or areas of concern. The Savages will also provide any additional information needed for the conference call discussions. Finally, if Vail deems it necessary, he will travel to one of the facilities at the conclusion of the Savages' visit so that they can walk through their process with him and address any remaining questions or concerns. Neither party objects to the agreement reached by the Savages and Vail. Therefore, the court adopts this agreement as part of the defendants' remedial plan.

b. *Consultant Analyses of Compensation and Recruitment and Retention*. The defendants propose employing consultants to determine how to recruit, hire, and retain more correctional officers. The evidence

presented at the remedial hearing, including the Savages'
preliminary analyses of Bibb, Donaldson, and Hamilton,
plainly indicated that the understaffing remedy will
require ADOC to hire significant numbers of additional
correctional officers.  Yet ADOC, despite its purported
efforts to hire more officers, has in fact continued to
hemorrhage correctional staff since the time of the June
2017 liability opinion--that is, when this court had
already found that "persistent and severe shortages of
... correctional staff" was an "overarching issue[]" that
contributed to the defendants' Eighth Amendment
violation.  *Braggs,* 257 F. Supp. 3d at 1268.  Much of
the problem, then, appears to be not whether but how ADOC
can effectively increase the number of correctional
officers.  Accordingly, the defendants have retained two
consulting firms to aid in the implementation of the
Savages' recommendations, as modified by any agreements
between the parties or orders of the court.

The defendants have retained Troy University's
"Center for Public Service" and Stephen Condrey, Ph.D.,

to "conduct a comprehensive analysis of the compensation and benefits offered by ADOC to correctional staff, including a comparison of ADOC compensation and benefits for correctional staff to the compensation and benefits afforded by law enforcement agencies at the state, county, and local level." Defendants' Phase 2A Proposed Remedial Plan on Correctional and Mental Health Staffing (doc. no. 1374) at 13-14. Condrey is to submit his recommendations by April 1, 2018. Defendants' Timeline for Correctional and Mental Health Staffing (doc. no. 1583) at 1.

Here the court merely observes, as it suggested at the evidentiary hearing, that the level of compensation and benefits required to be on an equal competitive footing with other employers in the same market may differ from that required to hire *expeditiously* a significant number of new staff, as may be required by the ultimate staffing plan. Recommendations aimed at the former may miss the mark in helping the defendants execute their remedial plan. The defendants may

therefore want Condrey to grapple with this potential issue.

The defendants have also retained Brian Bateh and his team at the firm of Warren Averett to "conduct a comprehensive analysis of ADOC's policies, practices, and procedures relating to or affecting the recruitment, employment, and retention of correctional staff." *Id.* at 13. Bateh is to submit his recommendations by November 1, 2018. *Id.* at 2.

The court, having reviewed the qualifications of Bateh and Condrey and heard their testimony at the remedial evidentiary hearing, and seeing no objections from the plaintiffs, finds that they are qualified to perform the above analyses.

## 2. Mental-Health Staffing

The defendants' plan to the extent it addresses mental-health understaffing contains two "centerpieces." Defendants' Phase 2A Proposed Remedial Plan on Correctional and Mental Health Staffing (doc. no. 1374)

at 16.  In the short run, a Request for Proposal ("RFP") issued in July 2017 will nearly double the number of ADOC mental-health staff when implemented.  In the long run, ADOC has retained three consultants to develop mental-health staffing ratios, which will be used along with the Department's caseload numbers to generate an appropriate number of mental-health staff.  In addition, between January 2017 and October 2017, ADOC increased its spending on mental-health staff by approximately five million dollars and added approximately 60 full-time-equivalent positions ("FTEs").

a. *July 2017 Request for Proposal*.  As the first step to address mental-health understaffing, the defendants in July 2017 released an RFP for a new mental-health services vendor.  The RFP is designed to add approximately 125 FTEs, nearly doubling the number of psychiatrists, psychologists, certified registered nurse practitioners, licensed mental-health professionals, and registered nurses.  As such, it represents a significant and commendable start to addressing ADOC's mental-health

understaffing.    Both    sides    to    this    litigation acknowledge, however, that this increase will ultimately be insufficient to remedy the violations shown.

Although, in the past, ADOC has through negotiations with vendors allowed the provision of fewer positions than called for in a given RFP, both Commissioner Dunn and his counsel assured the court at the remedial hearing that the resulting contract will not go below the staffing numbers provided in the July 2017 RFP.    In addition, the defendants' plan provides that "ADOC will require the contractor to fully staff the positions and will impose strict financial penalties if the contractor fails to do so, except for certain delineated support positions." *Id.* at 18.

Under the original timeline published with the RFP, the contract was to be awarded by September 4, 2017, and implemented by January 1, 2018.    On September 1, 2017, the vendor selection date was extended to October 16, 2017, and the implementation date was extended to April 1, 2018.    At the time of the understaffing remedial

hearing in late 2017, the vendor had not yet been selected, though ADOC had informed bidders that it was beginning negotiations with Wexford Health Sources. Commissioner Dunn testified that an award would be made by the end of December 2017, and that he would do everything in his power to meet the implementation date of April 1, 2018. However, under the timeline recently submitted to the court, implementation is merely to *begin* by April 1, 2018, with the RFP positions to be fully filled by July 1, 2018. Although the court today enters a remedial order adopting the defendants' proposed timeline, it notes that it has already deferred to their repeated delays in executing the contract for and implementing the RFP, and there can be no more delays.

b. *Mental-Health Staffing Ratios*. The second, long-run "centerpiece" of the defendants' plan is to develop mental-health staffing ratios, which will be used along with the Department's future caseload numbers to generate an appropriate number of mental-health staff. To produce the ratios, ADOC has retained consultants

Catherine Knox, M.S.N., R.N., CCHP-RN, Jeffrey L. Metzner, M.D., and Mary Perrien, Ph.D.

According to the defendants' proposed timeline, the consultants are to begin work to develop the mental-health ratios on September 1, 2018, in order to allow time for ADOC to implement fully the July 2017 RFP and for new mental-health staff to adjust to their positions. The consultants are to submit finalized mental-health staffing ratios by March 1, 2019.

All parties agree that any dispute related to the ratio recommendations should first be put before United States Magistrate Judge John Ott for mediation and that, if and when Judge Ott concludes that all or part of the dispute cannot be successfully mediated, any party may then put the dispute, to the extent it is not resolved, to United States Magistrate Judge Gray M. Borden for consideration pursuant to 28 U.S.C. § 636, with allowable review, in turn, by this court pursuant to § 636. (The court, however, reserves the discretion to hear and resolve any dispute itself without the parties having

gone through mediation or presented the dispute to Judge Borden for consideration.)

ADOC is then to modify its contract with the mental-health vendor in accordance with the mental-health staffing ratios, as modified by any agreements between the parties or orders of the court, by August 15, 2019. By November 15, 2019, ADOC's vendor is to implement the finalized staffing ratios as required by the modified contract, with all mental-health staffing positions to be filled consistent with the contract by February 15, 2020. Knox, Metzner, and Perrien are to review implementation of the finalized staffing ratios under the modified contract, and to make any recommendations for revising those ratios by January 15, 2020.

The court, having reviewed the qualifications of Knox, Metzner, and Perrien, having heard their testimony at the evidentiary hearing, and seeing no objections from the plaintiffs, finds that they are qualified to produce the mental-health ratios, and to oversee and review their implementation, as described above.

### 3.  Office of Health Services Staffing

ADOC's Office of Health Services (OHS), headed by Associate Commissioner for Health Services Naglich, is "the only ADOC department with responsibility for monitoring mental-health care," *Braggs*, 257 F. Supp. 3d at 1258, which ADOC contracts out to a private, third-party vendor.  As the court found, however, OHS "has done vanishingly little" to exercise oversight, engage in quality improvement, or take corrective measures in response to identified deficiencies in care. *Id.* at 1257-58.  Associate Commissioner Naglich's testimony at the liability trial revealed that these failures were due in significant part to severe understaffing within OHS, and that Naglich and others had unsuccessfully sought additional OHS staff on multiple occasions since 2008.  Naglich further testified that she believes having an independent contract monitor or additional OHS staffing to perform contract monitoring would be beneficial.  Specifically, she testified that

23

OHS needs at least two psychologists, preferably in the regional offices, in addition to David Tytell (OHS's chief psychologist) to monitor and audit the mental-health vendor's contract compliance. During the understaffing remedial hearing, Naglich again testified that more OHS staff is needed.

In preparation for the remedial hearing, the court specifically ordered the defendants to "present evidence of their plan to forthwith and adequately staff the Office of Health Services ..., including benchmarks for the implementation of that plan." Pretrial Order: Phase 2A Correctional Understaffing Issues (doc. no. 1436) at 4. In response to the court's concerns, the defendants submitted a new organizational structure for the mental-health functions within OHS, *see* 2018-2019 OHS Organizational Chart (doc. no. 1478-1), and on November 30, 2017, submitted a timeline for hiring additional OHS personnel, *see* Defs' Ex. 3000 (doc. no. 1515-124).[3]

_____

3. Although the court asked the defendants to submit their OHS staffing plan, Associate Commissioner Naglich testified that the plan was developed in the spring or

24

With regard to mental-health services, the new OHS staffing plan provides for three regional clinical registered nurses who will oversee both medical and mental-health nursing. Those positions are not new. Two of those positions are currently filled. The OHS staffing plan provides for a new ombudsman position, which has not yet been filled. ADOC has received State Personnel Board approval for that position. Commissioner Dunn testified, in November 2017, that ADOC could begin seeking a qualified candidate through the state register within 30 days. Commissioner Dunn projected, consistent with the proposed timeline, that it could take three to four months to fill the position.

The plan provides for a Clinical Director of Psychiatry, a position that is not yet filled. Commissioner Dunn testified, in November 2017, that the position would be appointed and would not require any additional approvals before it could be advertised. He

summer of 2017--that is, perhaps even prior to the liability opinion entered on June 2017.

also testified that he had instructed his staff to begin advertising for this position within seven to 10 days of his testimony. He estimated, consistent with the proposed timeline, that it could take up to nine months to fill this position.

The OHS plan calls for having two psychologists, one in each region, and a Director of Mental Health. Tytell, who currently serves as Director of Psychology, will fill the Northern Regional Psychologist position. The Southern Regional Psychologist Position remains unfilled. Commissioner Dunn estimated in November 2017, consistent with the proposed timeline, that it would take between four and six months to fill this position once the State Personnel Department has approved it.

The Director of Mental Health will be a health services administrator who provides administrative but not clinical oversight. ADOC requested in the late spring or early summer of 2017 that the State Personnel Department create this position. The position remains unfilled. Commissioner Dunn estimated in November 2017,

consistent with the proposed timeline, that it would take between four and six months to fill this position once the State Personnel Department has approved it.

### B. The Plaintiffs' Response
### to the Proposed Plan

In response to the defendants' plan, the plaintiffs raise several serious concerns, including that the number of ADOC correctional officers has precipitously *declined* since the liability trial in late 2016 and early 2017, and, indeed, even since the liability opinion was entered in late June 2017. Moreover, the defendants have repeatedly delayed negotiating, executing, and implementing the July 2017 RFP.

The plaintiffs argue that a remedial order is necessary at this time and is not unduly intrusive, given the severity and urgency of the violations shown, and the defendants' longstanding deliberate indifference to these violations.[4] They therefore request a series of

_____

4. As the liability opinion noted, "This case is likely sui generis in the extent to which the top ADOC

specific measures, many of which are grounded, to a certain extent, in the recommendations of ADOC's own experts and officials. Notably, the plaintiffs argue that a remedial order should require the defendants to meet specific hiring benchmarks for correctional officers at four six-month intervals, based initially on ADOC's own number of already authorized positions, and subsequently on the Savages' recommendations.[5] With regard to mental-health understaffing, the plaintiffs similarly propose that the defendants be immediately ordered to begin increasing staff according to the provisional mental-health staffing ratios developed by Knox, Metzner, and Perrien, *see* ADOC's Provisional Mental

---

officials had personal knowledge of the substantial risks of serious harm posed by its deficient care and has not responded reasonably to those risks." *Braggs*, 257 F. Supp. 3d at 1252.

5. The plaintiffs point out that the Savages' preliminary analyses of three ADOC facilities recommend staffing numbers that are fairly similar to the number of authorized positions, and the plaintiffs therefore argue that a first benchmark could be based on the latter figure before the completion of the Savages' recommendations.

Health Staffing Ratios (doc. no. 1374-4), and that the hiring goals in the order later be adjusted when the consultants develop finalized ratios.[6]

Finally, because, under the PLRA, remedial orders are terminable upon the motion of any party or intervenor after two years, *see* 18 U.S.C. § 3626(b)(1), the plaintiffs expressed concern that the defendants' plan will not remedy the understaffing violation within a two-year time period. However, both defendants and plaintiffs have acknowledged this fact and agreed that the understaffing problem will likely require several years to remedy. Moreover, even when a motion to terminate is made, the PLRA allows the court to extend a remedial order upon specific findings that it remains necessary to correct a current and ongoing violation, and that the order continues to meet the

---

6. The defendants maintained during the evidentiary hearing and at oral argument that these "Provisional Mental Health Staffing Ratios" were not prepared by their mental-health consultants for potential implementation, but were merely examples of what the ultimate work product would consist of, and should therefore not be used as an initial target.

need-narrowness-intrusiveness test. *Id.* § 3626(b)(3);
*see also Cason v. Seckinger* , 231 F.3d 777, 782-83 (11th
Cir. 2000) (holding that, upon a motion to terminate a
remedial order governed by the PLRA, plaintiffs must be
given an opportunity for an evidentiary hearing to
demonstrate a current and ongoing violation).


### C.   The Court's Position

The court agrees with the plaintiffs that, in light
of the serious and longstanding violations shown, and the
lack of progress on understaffing--indeed, in many ways,
regression--since trial, a remedial order is necessary.
The State of Alabama cannot be allowed to kick the can
down the road.

However, as the evidence and argument have
demonstrated, the defendants' proposed plan represents a
serious, albeit concededly minimal, effort to remedy a
complex and difficult problem.   Despite the immediate
need to remedy understaffing, and distressing indications
that the problem may have worsened since the liability

opinion, it may simply not be possible to turn this ship around on a dime.  The defendants will, therefore, be given an opportunity to implement its proposed remedy and to demonstrate that it is producing *meaningful and immediate* results.  The court today, therefore, enters a remedial order adopting the defendants' plan, albeit with some modifications.[7]  With regard to the deadlines adopted, the court emphasizes that the defendants are not to delay implementation until the last minute, but are to begin immediately and swiftly upon receiving the relevant recommendations.

While the court, in deference to the State and in its discretion, today declines to order the recommendations proposed by the plaintiffs, it will not abdicate its constitutional duty "to enforce the constitutional rights of all 'persons,' including prisoners."  *Brown v. Plata*, 563 U.S. 493, 511 (2011).

_____

7. For example, the timeline in the remedial order for hiring additional OHS personnel reflects the outer ranges--that is, the longest--of the estimates provided by the defendants on November 30, 2017. *See* Defs' Ex. 3000 (doc. no. 1515-124).

In overseeing the defendants' implementation of their plan, the court will "not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.* Rather, it will remain poised to step in should the defendants fail to uphold their commitment, or should the plan prove inadequate to remedy, in a timely fashion, the violations shown.

## IV.  PLRA Requirements

Section 3626(a)(1) of the PLRA requires district courts to make particularized findings that each provision of prospective relief ordered satisfies the 'need-narrowness-intrusiveness' requirement. *See United States v. Sec'y, Fla. Dep't of Corr.,* 778 F.3d 1223, 1228 (11th Cir. 2015).  This court now makes such findings, and concludes that the ordered relief complies with the PLRA.

With regard to correctional understaffing, the defendants' plan to use the Savages' staffing analyses

and resulting recommendations will provide the defendants with a comprehensive understanding of the ADOC's correctional staffing needs and with an opportunity for all parties to respond and resolve any disputes that may arise. Further, as the defendants explained, and in light of ample evidence from all parties that ADOC faces a serious and complex problem in hiring and retaining correctional officers, the analyses and recommendations to be prepared by Bateh and Condrey are necessary for the defendants to understand how to implement the Savages' recommendations. The court finds that such relief is narrowly drawn, extends no further than necessary to remedy the constitutional violation found, and is the least intrusive means of doing so.

With regard to mental-health understaffing, all parties recognize that the implementation of the July 2017 RFP constitutes a necessary first step to address ADOC's mental-health understaffing. Further, as the defendants recognize, the mental-health consultants' analyses and recommended ratios will provide the

defendants with a comprehensive understanding of the ADOC's mental-health staffing needs and with an opportunity for all parties to respond and resolve any disputes that may arise. The court finds that such relief is narrowly drawn, extends no further than necessary to remedy the constitutional violation found, and is the least intrusive means of doing so.

As Associate Commissioner Naglich testified extensively at the liability trial and remedial hearing, additional OHS staffing is necessary to monitor and oversee the third-party vendor's provision of mental-health care. The court finds that the proposed relief, which adopts the defendants' proposed OHS structure and outer timeline for hiring those positions, is narrowly drawn, extends no further than necessary to remedy the constitutional violation found, and is the least intrusive means of doing so.

The defendants have proposed quarterly reporting requirements, and the court will enact those requirements in its remedial order. The court finds that the quarterly

reporting requirements comply with the PLRA because ongoing reporting, as proposed by the defendants, is necessary to apprise the court of whether the defendants' plan is addressing ADOC's correctional and mental-health understaffing effectively and as quickly as possible, and to alert the court if additional measures are needed. Thus, the court finds that such relief is narrowly drawn, extends no further than necessary to remedy the constitutional violation found, and is the least intrusive means of doing so.

In addition, the defendants ask that "[n]o quarterly report ... be admissible against the State, ADOC, its employees, contractors, or contractor's employees in any civil action or other proceeding." Defendants' Pretrial Brief and Witness and Exhibit List (doc. no. 1478) at 33. The court cannot agree to this condition, primarily because the purpose of the reports is to inform the plaintiffs and the court about what is occurring, so that they may act on this knowledge as necessary. It is difficult to understand how the parties and the court are

to use the reports to this end if they are not admissible in any civil action, as the proposed language now states. If the defendants, in fact, intended that the reports be admissible in this action *but not in others*, they may again raise that issue later for the court's consideration.

Finally, the court finds that the proposed relief will have no adverse effect on public safety or the operation of the criminal-justice system. *See* 18 U.S.C. § 3626(a)(1)(A). As numerous ADOC officials testified at the liability trial and remedy hearing, and as this court has previously found, correctional understaffing at ADOC facilities has resulted in a dangerous environment for both ADOC staff and inmates. Moreover, ADOC's persistent and severe lack of mental-health staff has resulted in inmates with serious mental-health needs being under-identified and inadequately treated. Requiring the defendants simply to execute their plan to remedy what ADOC officials have acknowledged is a serious and urgent problem can, if anything, be expected to have

a positive impact on public safety and the operation of
the criminal-justice system.

***

For the reasons given above, the court will enter an
order adopting the defendants' proposed plan, with some
modifications, as a remedy for understaffing.

DONE, this the 20th day of February, 2018.

                              /s/ Myron H. Thompson
                         UNITED STATES DISTRICT JUDGE