IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| SHEILA ALLEN; RAYMOND BOSARGE; EDWARD BRAGGS; TEDRICK BROOKS; GARY LEE BROYLES; QUANG BUI; CHANDLER CLEMENTS; CORDARA DUNNER; BRITTANY ELLIS; SERENA ENGLISH; PAUL FOLSOM; CHRISTOPHER GILBERT; DWIGHT HAGOOD; JUSTIN HALL; DALETRICK HARDY; CHERRITHA HARRIS; SYLVESTER HARTLEY; CHARLIE HENDERSON; CHRISTOPHER JACKSON; BRANDON JOHNSON; JOHN MANER; RICK MARTIN; WILLIE MCCLENDON; ROGER MCCOY; JERMAINE MITCHELL; TOMMIE MOORE; MATTHEW MORK; ROGER MOSELEY; ZERRICK NAYLOR; KAREN NORRIS; BRADLEY PEARSON; LEVITICUS PRUITT; TURNER ROGERS; TIMOTHY SEARS; BRIAN SELLERS; AUGUSTUS SMITH; TOMAS SNYDER; WILLIAM SULLIVAN; HUBERT TOLLAR; DANIEL TOOLEY; JOSEPH TORRES; DONALD RAY TURNER; JAMIE WALLACE; VALERIE WHEELER; and ROBERT "MYNIASHA" WILLIAMS, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>v. | Civil Action No. 2:14-cv-00601-MHT-TFM<br><br><br><br>SIXTH AMENDED COMPLAINT – DENTAL CLAIM<br><br>CLASS ACTION COMPLAINT FOR DECLARATORY <u>AND INJUNCTIVE RELIEF</u> |

JEFFERSON DUNN, in his official capacity as Commissioner of the Alabama Department of Corrections; RUTH NAGLICH, in her official capacity as Associate Commissioner of Health Services for the Alabama Department of Corrections; and ALABAMA DEPARTMENT OF CORRECTIONS,

        Defendants.

## NATURE OF THE DENTAL CLAIM[1]

1.     The prisoner PLAINTIFFS and the DENTAL CLASS MEMBERS are incarcerated in Alabama Department of Corrections ("ADOC") prisons. PLAINTIFFS bring this case, in part, to remedy the Defendants'' failure to provide constitutionally adequate dental care to persons in the custody of the ADOC. PLAINTIFFS seek declaratory and injunctive relief for the inhumane and discriminatory practices and conditions they face every day in ADOC custody.

2.     The prisoner PLAINTIFFS and all those in ADOC custody are entirely dependent on DEFENDANTS COMMISSIONER JEFFERSON DUNN and ASSOCIATE COMMISSIONER RUTH NAGLICH (collectively, "DEFENDANTS") for dental care. Yet the system of care provided by

---

[1] The Court severed the dental claim from the other claims in this case and ordered Plaintiffs to file a motion to amend the complaint, limited to the dental claim. Doc. 1366. Plaintiffs maintain and re-allege all the claims in the Fifth Amended Complaint in this action, but, pursuant to the Court's order, include herein only the claims and parties related to the dental claim.

DEFENDANTS DUNN and NAGLICH is grossly inadequate and subjects all prisoners to a substantial risk of serious harm, including unnecessary pain and loss of teeth.

3.     Because of the DEFENDANTS' deliberate indifference to the obvious dental needs of the persons in their custody, PLAINTIFFS and CLASS MEMBERS go for months or years without appropriate diagnosis and treatment of dental conditions. Prisoners wait months to see a dentist for severe tooth pain, have undergone preventable tooth extractions, been prescribed unnecessary antibiotics in lieu of treatment to remove the source of infection, waited months for dental prostheses while experiencing pain and difficulty chewing in the meantime, and faced substantial risk of serious harm due to treatment planning and extractions not informed by recent x-rays and periodontal probing. DEFENDANTS DUNN and NAGLICH violate the prohibition on Cruel and Unusual Punishments in the Eighth Amendment to the Constitution of the United States by providing prisoners with inadequate dental care.

4.     DEFENDANTS DUNN and NAGLICH operate the most overcrowded prisons in the nation and spend among the lowest amount on medical care per prisoner of any state in the nation. They have long been aware of the unconstitutional and discriminatory practices of which the PLAINTIFFS complain.

5.     PLAINTIFFS seek declaratory and injunctive relief to compel DEFENDANTS DUNN and NAGLICH, both sued in their official capacity (sometimes collectively referred to as the "OFFICIAL CAPACITY DEFENDANTS"), to provide constitutionally adequate dental care to all prisoner PLAINTIFFS and the CLASS MEMBERS they represent.

## JURISDICTION

6.     This Court has jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1331 and 1343. PLAINTIFFS seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201 and 2202, and 42 U.S.C. § 1983.

## VENUE

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as the DEFENDANTS reside in the Middle District of Alabama and all DEFENDANTS reside in Alabama, many of the PLAINTIFFS reside in the Middle District of Alabama, and a substantial number of the events or omissions giving rise to the claims occurred in the Middle District of Alabama.

## PARTIES

8.     PLAINTIFF SHEILA ALLEN has been in ADOC custody since 2006. She is currently housed at Tutwiler Prison for Women. During her incarceration PLAINTIFF ALLEN has suffered from delayed urgent dental pain treatment and untreated periodontal disease. PLAINTIFF ALLEN"S dental

treatment plans have not been based on adequate x-rays, likely resulting in underdiagnosis of dental problems. PLAINTIFF ALLEN is being denied adequate dental care.

9.    PLAINTIFF RAYMOND BOSARGE has been in ADOC custody since 1998. He is currently housed at Fountain Correctional Facility. PLAINTIFF BOSARGE has suffered difficulty eating as a result of delayed denture replacements and repairs. PLAINTIFF BOSARGE is being denied adequate dental care.

10.    PLAINTIFF TEDRICK BROOKS has been in ADOC custody since 2011. He is currently housed at Bibb. PLAINTIFF BROOKS has suffered prolonged pain due to delays in receiving urgent dental care. PLAINTIFF BROOKS is being denied adequate dental care.

11.    PLAINTIFF CORDARA DUNNER has been in ADOC custody since 2010. PLAINTIFF DUNNER is currently housed at Staton Correctional Facility. PLAINTIFF DUNNER has suffered prolonged dental pain due to delayed urgent care, been denied routine care, such as dental cleanings, and missed dental appointments due to correctional staff. PLAINTIFF DUNNER is being denied adequate dental care.

12.    PLAINTIFF BRITTANY ELLIS has been in ADOC custody since October 2011. She is housed at Tutwiler Prison for Women. PLAINTIFF ELLIS

has suffered untreated periodontal disease and prolonged tooth pain due to delayed treatment of urgent dental needs. PLAINTIFF ELLIS is being denied adequate dental care.

13.    PLAINTIFF SERENA ENGLISH has been in ADOC custody since September 2013. She is housed at Tutwiler Prison for Women. PLAINTIFF ENGLISH suffers from untreated periodontal disease and delayed cavity treatment. PLAINTIFF ENGLISH is being denied adequate dental care.

14.    PLAINTIFF JUSTIN HALL has served several terms in ADOC custody, beginning in February 2009. PLAINTIFF HALL"S most recent sentence began in 2016. He is currently housed at Alabama Therapeutic Education Facility ("ATEF") and prior to that was housed at Draper Correctional Facility. As with all prisoners housed in ADOC facilities, Corizon and its subsidiary, Correctional Dental Associates of Alabama ("CDAA"), are responsible for providing medical and dental care to prisoners housed at ATEF. PLAINTIFF HALL has suffered from inadequate dental treatment planning and delayed treatment of urgent dental needs, including excruciating pain and abscesses. PLAINTIFF HALL is being denied adequate dental care.

15.    PLAINTIFF CHERRITHA HARRIS has been in ADOC custody since 2007. She is currently housed at Montgomery Women"s Facility. As with all prisoners housed in ADOC facilities, Corizon and CDAA are responsible for

providing medical and dental care to prisoners housed at Montgomery Women"s Facility. Prisoners housed at Montgomery Women"s Facility see sick call nurses at the facility and see dentists, when they are able to, at Tutwiler Prison for Women. PLAINTIFF HARRIS has suffered from untreated periodontal disease, which worsened to cause her teeth to become loose, and ultimately resulted in a periodontal abscess. PLAINTIFF HARRIS has also suffered prolonged pain, bleeding, infection, and difficulty chewing as a result of delayed treatment of urgent dental needs. PLAINTIFF HARRIS is being denied adequate dental care.

16.    PLAINTIFF MATTHEW MORK has been in ADOC custody since 2010. He is currently housed at Holman Correctional Facility. He has also been housed at Kilby, Limestone, and Ventress Correctional Facilities. PLAINTIFF MORK has suffered due to poor dental treatment planning, untreated periodontal disease, and delayed treatment of urgent dental pain. PLAINTIFF MORK is being denied adequate dental care.

17.    PLAINTIFF KAREN NORRIS has been in ADOC custody since 2001. She is housed at Tutwiler Prison for Women. PLAINTIFF NORRIS has suffered due to inadequate dental treatment planning and untimely provision of dentures. PLAINTIFF NORRIS is being denied adequate dental care.

18.    PLAINTIFF LEVITICUS PRUITT has been in ADOC custody since 2001. He is currently housed at Holman Correctional Facility. PLAINTIFF

PRUITT has suffered due to poor dental treatment planning, untreated periodontal disease, and delayed treatment of urgent dental pain. PLAINTIFF PRUITT is being denied adequate dental care.

19.    PLAINTIFF TOMAS SNYDER has been in ADOC custody since 1993. He is currently housed at Draper Correctional Facility. He has suffered due to delayed cavity treatment. PLAINTIFF SNYDER is being denied adequate dental care.

20.    PLAINTIFF WILLIAM SULLIVAN has been in ADOC custody since 1990. He is currently housed at Staton Correctional Facility. PLAINTIFF SULLIVAN has experienced significant delays in obtaining upper and lower dentures. For years, PLAINTIFF SULLIVAN″s upper dentures did not fit properly. PLAINTIFF SULLIVAN has suffered due to inadequate treatment planning, untreated periodontal disease, delayed urgent dental pain treatment, and delayed dentures and dentures repairs. PLAINTIFF SULLIVAN is being denied adequate dental care.

21.    PLAINTIFF VALERIE WHEELER has been in ADOC custody since December 7, 1994. She is housed at Tutwiler Prison for Women. PLAINTIFF WHEELER has not top teeth and no top dentures. She suffers pain and difficulty eating because she has bottom teeth and no top teeth or dentures. PLAINTIFF WHEELER has also suffered due to inadequate treatment planning and

undertreated periodontal disease. PLAINTIFF WHEELER is being denied adequate dental care.

22.     DEFENDANT JEFFERSON DUNN has served as the Commissioner of the ADOC since April 1, 2015, when his predecessor, previously named DEFENDANT BILLY SHARP, resigned his position as ADOC Commissioner.[2] DEFENDANT DUNN is sued herein in his official capacity. The Commissioner of the ADOC is responsible for leading the Alabama Department of Corrections, for the independent direction, supervision and control of the Alabama Department of Corrections, and for approving and issuing administrative regulations and changes. Ala. Code. 1975 § 14-1-1.3. (2010).The Commissioner is responsible for providing constitutional conditions of confinement in all facilities. At all times  relevant hereto, DEFENDANT DUNN and his predecessor have acted under color of state law.

23.     DEFENDANT RUTH NAGLICH is the Associate Commissioner of Health Services for the ADOC. DEFENDANT NAGLICH is sued in her official capacity. As Associate Commissioner, DEFENDANT NAGLICH is responsible for establishing, monitoring, and enforcing system-wide health care policies and practices. She is responsible for supervising the provision of adequate medical,

---

[2] By operation of *Fed. R. Civ. P.* 25(d), DEFENDANT DUNN was "automatically substituted" in place of DEFENDANT BILLY SHARP, who Plaintiffs sued in his official capacity, upon SHARP's resignation.

mental health, and dental care for all prisoners within ADOC custody. At all times relevant hereto, she has acted under color of state law.

## FACTUAL ALLEGATIONS

24.   THE OFFICIAL CAPACITY DEFENDANTS have a policy and practice of failing to provide prisoners with adequate dental care, and are deliberately indifferent to the fact that the systemic failure to do so results in significant injury and a substantial risk of serious harm.

## I.   Defendants Systematically Underfund Dental Care

25.   THE OFFICIAL CAPACITY DEFENDANTS have long underfunded dental care. Since at least the 1990s, DEFENDANTS have outsourced the medical, dental, and mental health care through managed care agreements with private companies that purportedly specialize in correctional care.

26.   Alabama"s focus on reducing the cost of caring for the people in its prisons has sacrificed constitutionally adequate care. By 2003, the ADOC Commissioner acknowledged that Alabama"s "underfunded, understaffed, and overcrowded" prison system had, at that time, "the lowest inmate cost per day in the Country."

27.   In 2006, then-Commissioner of ADOC Richard Allen admitted that one of the major problems facing ADOC was "[s]oaring healthcare costs for inmates." He explained "[t]he cost of inmate health care has spiraled in recent

years," with costs nearly doubling over the three-year period ending in Fiscal Year 2006." Then-Commissioner Allen identified four factors leading costs: "(1) the increased number of inmates incarcerated, (2) an increase in the severity of illness and degenerative diseases of inmates received into the systems as a result of a lack of free world health care coverage, (3) improvement in healthcare services as a result of new medical technology including advanced drug treatments, and mandated access to higher levels of care by litigation in federal courts, and (4) physical plant limitations of the institutional health care units do not allow for onsite longterm or advance care services, resulting in a dependency on costly free world community providers."  These factors remain today.

28.    Focusing on cost control rather than the constitutionality of its care, ADOC, under the direction of DEFENDANT NAGLICH, pursued a new managed healthcare contract premised on a risk model in which ADOC paid a lower contract price in return for the private contractor bearing virtually all of the risk associated with increased healthcare costs, including the costs of offsite care.

29.    By placing the financial responsibility for each instance in which medical, dental, or mental health care is provided on the private providers, DEFENDANTS created a financial incentive for the provider to not provide care.

30.    Unsurprisingly, DEFENDANTS" continual effort to cut costs has ensured that the dental care provided to CLASS MEMBERS is grossly inadequate.

31.     DEFENDANTS track medical and dental care costs. DEFENDANTS require their medical and dental provider to give them monthly reports on a wide variety of metrics. They audit the provision of dental care using audit tools that measure compliance with processes and protocols rather than quality of care.

32.     Since 2007, DEFENDANTS have contracted with Corizon, Inc. k/n/a Corizon, LLC ("Corizon")[3] to provide medical and dental care in the ADOC facilities. DEFENDANTS contract with Corizon to provide medical and dental care to all major prisons as well as work release centers, including the privately run Alabama Therapeutic Education Facility.

33.     Corizon, in turn, contracts with its subsidiary, CDAA, to provide dental care. CDAA's president, Dr. Charles King, serves as Corizon's Regional Dental Director. All of the dentists, dental assistants, and dental hygienists, are recruited and employed by Corizon, directly or through CDAA,[4] with the treatment governed by Corizon and CDAA Policies and Procedures.

34.     In 2012, DEFENDANT DUNN'S predecessor and DEFENDANT NAGLICH released a request for proposal for a new health care contract. Applicants were scored on a 3,000-point scale on a number of different criteria.

_____

[3] At the time of the initial contract, Corizon was known as Correctional Medical Services, Inc. ("CMS"). The corporate name change from CMS to Corizon occurred during the initial contract term in conjunction with a 2011 merger or acquisition involving CMS's corporate parent (Valitás Health Services, Inc.) and the corporate parent of another correctional medical provider.
[4] Under state law, dentists and dental hygienists must be directly employed by CDAA rather than Corizon.

Out of a possible 3,000 points, contract price accounted for a possible 1,350 points in the assessment of the proposal, whereas "Qualifications/Experience/References Medical" counted for only 100 points.

35.   Even though Corizon had failed every major audit and re-audit of its health care operations in Alabama prisons under its first contract with the state and despite Corizon and CDAA"s provision of inadequate dental care, DEFENDANTS extended the contract from 2010 to 2012 and awarded a new three year contract to Corizon in 2012.

36.   Corizon"s contract was again extended for another two years in 2015.

## II.   The Lack of Care Resulting from Underfunding Continues Unabated, Despite Defendants' Knowledge of the Problems

37.   Admissions by ADOC officials confirm budgetary constraints are a continual factor in ADOC"s pervasive dental care inadequacies. Former Deputy Commissioner Vernon Barnett reported in 2008 that, facing budget cuts, ADOC was "in a crisis as how to exactly stay on course and take care of the inmates," with "inmate health care, mental health care, food, utilities and expenses and personnel costs" identified as "[t]he only places that the Department can cut." In 2009, Barnett admitted that ADOC was forced to make "Medical Reductions," in response to additional budget cuts, including eliminating nursing staff at work release facilities, and amending its contract to further reduce its payments to Corizon.

38.     Moreover, despite the inadequacy of the care provided pursuant to the 2007 contract as demonstrated by the high mortality rate and consistently failed audits, DEFENDANT NAGLICH negotiated a new contract that would result in further reductions in the amount and quality of health care for prisoners in the custody of the ADOC. The agreed medical care spending for an optional 4th year of the contract was reduced by approximately $2 million through a contract amendment in or around 2009 and a separate price reduction was agreed with regard to the optional 5th year of the contract. The actual annual contract price was then greatly reduced further under the new Corizon contract executed in 2012, with ADOC saving $12 million dollars in the first year over the 2012 contract price, and nearly $24 million total during the three-year contract period.

39.     PLAINTIFFS" counsel sent DEFENDANT DUNN"S predecessor a letter on April 9, 2014 detailing the failures of medical, dental, and mental health care and the violations of the Americans with Disabilities Act and § 504 of the Rehabilitation Act. PLAINTIFFS' counsel invited DEFENDANT DUNN'S predecessor to enter into discussion regarding how to resolve the issues. Despite the urgency of the issues raised, DEFENDANT DUNN'S predecessor set up a meeting for a month and a half later on May 20, 2014. However, at that meeting, DEFENDANTS had no proposals or plans for resolving any of the issues raised,

only a proposal for further meetings. PLAINTIFFS' counsel agreed, and DEFENDANTS were to schedule these further meetings, but never did.

40.     Fully aware of the serious nature of the federal constitutional deprivations and statutory violations to which PLAINTIFFS are subjected, DEFENDANT DUNN'S predecessor Kim Thomas was reported in the news media to have given Corizon a "vote of confidence" as part of an August 20, 2014 presentation at Alabama Association of County Commissions" annual meeting. With DEFENDANT DUNN'S predecessor having unexpectedly resigned on or about January 27, 2015, DEFENDANTS announced in early February 2015 that Corizon's contract would be renewed for two additional years.

III.    **Defendants' Oversight of the Dental Program Is Inadequate**

41.     DEFENDANTS' auditing and contract monitoring program are minimal, as are Corizon's and CDAA's self-monitoring efforts. By failing to effectively monitor their private contractors" provision of dental care, DEFENDANTS are deliberately indifferent to the inadequate dental care being provided within the ADOC.

   A. **Corizon's and CDAA's quality assurance is minimal**

42.     Corizon's monitoring of its dental subsidiary CDAA and Dr. King's monitoring of the individual Dental Directors at the prisons are superficial, incomplete, and inadequate.

43.     Dr. King conducts peer reviews and performance reviews of all Dental Directors on their anniversary dates each year. The peer review involves the review of 10 records of patients seen over the 2 to 3 weeks prior to the dentist's employment anniversary.

44.     Dr. King has never found any problem or given anything other than a good evaluation to any dentist. Dr. King has never disciplined or terminated anyone based on results from the peer review process.

45.     Dr. King''s performance is monitored by Dr. Hugh Hood, Corizon's Regional Medical Director. While Dr. Hood's review addresses Dr. King's own clinical performance, it does not purport to address CDAA's dental program for which Dr. King is responsible.

## B. Defendants' oversight of the dental care system is nearly non-existent

46.     DEFENDANTS'' monitoring of the ADOC's dental program is ineffective and nearly nonexistent, with actual audits performed rarely and without regard to the quality of care provided.

47.     The ADOC Office of Health Services purports to audit the dental programs, but some prisons were not audited at all during a four-year period and some were audited only once during that time.

48.     Furthermore, when ADOC does audit Corizon's contract compliance, it does not evaluate the *quality* of dental care provided but instead evaluates

compliance with processes and protocols. When ADOC conducts audits, they are done by non-dentists, as ADOC's OHS employs no dentists. The OHS staff does not include even a dental assistant or hygienist. Important clinical elements, such as the adequacy of treatment plans and timeliness of routine and urgent care, are not audited at all. Thus, even passing OHS audit scores do not reflect the quality of care being provided.

49.    The ADOC audits of Corizon and CDAA's performance are substantively deficient. They omit prisons and are inconsistent for those audited. The auditors are not dentists, so the areas audited are limited to those not requiring dental expertise. Because of these deficiencies, ADOC has no knowledge of most important clinical outcomes data and has to rely instead on what Corizon and CDAA say to determine the extent to which they are in compliance with the contract.

50.    DEFENDANTS have the right under the contract with Corizon to review all "files, records, and reports pertinent to the provision of inmate health care", quality assurance documentation, logs, and other documents. DEFENDANTS have the right to fine Corizon if Corizon fails to timely provide such documentation on request. ADOC also has the contractual right to veto any personnel. However, ADOC does not exercise these rights.

51.    DEFENDANTS either intentionally allow or choose to be unaware of

the inadequate and untimely dental care being provided to prisoners. Their failure to provide meaningful oversight allows the constitutionally inadequate dental care to continue, year after year, contract after contract.

## IV.   Defendants Deny Prisoners Adequate Dental Treatment

52.   THE OFFICIAL CAPACITY DEFENDANTS deny prisoners adequate dental care through several policies and practices.

### A. Defendants Routinely and Systematically Fail to Provide Adequate Numbers of Health and Dental Care Professionals

53.   THE OFFICIAL CAPACITY DEFENDANTS have a policy and practice of not providing adequate dental staff to address the needs of prisoners in ADOC custody. In 2012, DEFENDANT DUNN'S predecessor and DEFENDANT NAGLICH put out a request for proposals for the ADOC medical and dental care contract that included a listing of minimum staffing requirements that set the level of staffing at each facility far below what is needed to provide adequate care. The contract ultimately awarded reflected the importance of cost containment and provides inadequate staffing throughout the ADOC system.

54.   The 2012 Corizon Contract required minimum dental staffing levels of: 12.6 dentists, 12.6 dental assistants, and 3.2 dental hygienists. When the contract was extended in 2015, minimum dental staffing levels did not change, though the contract price overall increased.

18

55.    In July 2017, there were 21,556 prisoners in ADOC''s in-house custody.[5] This means that, if all positions allocated under the contract were filled, the prisoner-to-dentist ratio would be 1,711:1 and the prisoner-to-dental hygienist ratio would be 6,736:1.

56.    However, there are a number of dental staffing vacancies. In May 2017, only 8.05 dentist full-time equivalent (FTE) positions were filled.  This means that in May 2017, when the ADOC in-house custody population  was 21,953, the prisoner-to-dentist ratio was 2,727:1.[6]

57.    The extraordinary understaffing for dental services leads to a host of predictable problems with the delivery of dental care, including delays and failures in diagnosing and treating both urgent and routine dental problems.

**B. Defendants Routinely and Systematically Fail to Provide Adequate Clinical Space and Equipment**

58.    DEFENDANTS provide inadequate facilities for the provision of all types of medical care, including dental care. Insufficient space is available to accommodate dental examinations or for any privacy to be afforded for discussion of confidential dental information. Clinical spaces are also unsanitary and cluttered with supplies and records.

---

[5]    ADOC Monthly Statistical Report at 3 (July 2017), *available at* http://www.doc.state.al.us/docs/MonthlyRpts/2017-07.pdf.
[6]    ADOC Monthly Statistical Report at 3 (May 2017), *available at* http://www.doc.state.al.us/docs/MonthlyRpts/2017-05.pdf.

59.     Dental clinics in the ADOC routinely have unmet equipment needs. Facility dental clinics have expressed needs for equipment such as: the installation of a biohazard container, a chair, an autoclave, lights, a panoramic x-ray machine, and an x-ray processor capable of developing panoramic x-rays.

60.     PLAINTIFF BOSARGE experienced a delay in getting his dentures repaired due to a shortage of materials. Several months prior to October 2013, PLAINTIFF BOSARGE saw a dentist about having his dentures repaired. The dental assistant told him they did not have the material to fix his dentures because the health care provider told them to cut back on the material. He was told he would be rescheduled for the repair. PLAINTIFF BOSARGE experienced difficulty eating for several months in 2013 while waiting for his dentures to be repaired.

### C. Correctional Understaffing and Overcrowding Contribute to Delays and Denials of Dental Care

61.     DEFENDANTS maintain a prison system that is grossly overcrowded and understaffed. DEFENDANT DUNN has described this dual problem as a "two-headed monster."

62.     THE OFFICIAL CAPACITY DEFENDANTS have a policy and practice of allowing correctional officers to deny or delay access to dental care,

whether by individual officer's affirmative actions or the systemic understaffing of custodial staff who are necessary to prisoners' access to treatment. THE OFFICIAL CAPACITY DEFENDANTS have not adequately trained security staff about prisoners' dental care needs.

63.    Security understaffing frequently causes prisoners to miss dental appointments. Security understaffing particularly limits access to dental care for prisoners in segregation because they must be escorted by security staff for dental appointments. For example, PLAINTIFF DUNNER has experienced delays in receiving dental care due to security understaffing. PLAINTIFF DUNNER was scheduled for a dental appointment on March 7, 2014 but missed the appointment because security staff did not escort him to the appointment. Security escort was necessary because he was housed in segregation at the time. PLAINTIFF DUNNER was told he would be seen by a dentist before then end of March, but he was not seen again for dental problems until June 7, 2014. PLAINTIFF DUNNER also missed an April 8, 2017 dental appointment for a toothache he described as "needs to be pulled immediately" due to a "security issue."

64.    Furthermore, correctional officers actively hinder dental care by refusing to allow prisoners to go to dental appointments. For example, in October 2016, PLAINTIFF ENGLISH filed a sick call request reporting a cavity. She was scheduled for a dental appointment in December 2016, but a correctional officer

would not allow her to go to the appointment. The officer told her all dental appointments had been cancelled for the day. She was later informed by medical staff that she had been marked as a "no-show" for the appointment she was told had been cancelled.

### D. Screening and diagnosis of dental conditions are inadequate

65.    DEFENDANTS maintain a dental care system that fails to adequately screen and diagnose dental needs.

66.    The inadequacy of the dental staffing, along with other failures, contributes to failure to diagnose and underdiagnosis of dental problems. Dental examinations and screenings are inadequate to determine whether or not treatment is needed.

67.    The Corizon contract requires that dental care be provided consistent with national standards. However, DEFENDANTS allow Corizon, which in turn allows CDAA, to maintain policies and practices of not informing routine examinations and treatment plans with x-rays and periodontal probing, which are at variance with national standards, including those of the National Commission on Correctional Health Care ("NCCHC").

68.    ADOC's dental program does not provide for x-rays of any kind at intake or in conjunction with the formation of an initial treatment plan. This is inadequate.

69.     This policy and practice of performing routine examinations and treatment plans without x-rays results in underdiagnosis of dental caries (cavities) and periodontal disease that subjects prisoners to substantial risk of tooth morbidity, tooth mortality, and gratuitous pain. CDAA dentists even extract teeth without first consulting a recent x-ray, an extremely dangerous practice.

70.     Several PLAINTIFFS have received dental treatment plans that were not based on sufficient x-rays.

71.     Dental providers have created dental treatment plans for PLAINTIFF ALLEN that were not informed by sufficient recent x-rays.

72.     While PLAINTIFF DUNNER received dental treatment plans on October 16, 2014 and May 18, 2016, neither was informed by bite-wing x-rays.

73.     PLAINTIFF HALL did not receive a panoramic ("Panorex") x-ray during his most recent intake in January 2017. No diagnostic x-rays, including bite wing x-rays, were taken to inform his January 4, 2017 treatment plan.

74.     PLAINTIFF HARRIS's January 23, 2012 periodontal diagnosis and treatment plan were not informed by documented bite wing x-rays.

75.     PLAINTIFF MATTHEW MORK's dental treatment plans have not been informed by recent x-rays.

76.     On September 5, 2013, PLAINTIFF NORRIS received a treatment plan that was not informed by appropriate x-rays. When PLAINTIFF NORRIS has

received x-rays, they were taken prior to an extraction or filling rather than at the time of an examination and treatment plan.

77.   PLAINTIFF LEVITICUS PRUITT's dental treatment plans have not been informed by recent x-rays.

78.   PLAINTIFF WILLIAM SULLIVAN's dental treatment plans have not been informed by recent x-rays.

79.   PLAINTIFF WHEELER's treatment plans are not based on sufficient recent x-rays.

80.   Further, because periodontal probing was not done in ADOC before October 2014 and radiographs are still not taken at the intake examination and subsequent examinations in accordance with accepted professional standards, CDAA dentists consistently underdiagnose periodontal disease.

81.   Treatment plans are made without the benefit of periodontal probing. For example, PLAINTIFF DUNNER's October 16, 2014 treatment plan was not informed by periodontal probing.

82.   And PLAINTIFF HARRIS's January 23, 2012 periodontal diagnosis and treatment plan were not informed by documented periodontal probing. Between 2014 and 2016, PLAINTIFF HARRIS was seen several times by dental staff, who noted tooth mobility and bone loss but did not document periodontal probing or plan treatment for advanced periodontal disease.

83.     Dental screening at intake is generally performed by a dental hygienist who may or may not make a referral to a dentist. A dental hygienist may miss significant pathology that a dentist would notice. Furthermore, a dental hygienist is not qualified to make a treatment plan.

84.     After intake, subsequent examinations performed by a dentist are not routinely performed. Instead, only a "screening" that can be performed by any qualified health professional is provided. Screening typically involves someone looking in a person's mouth for any visible signs of dental problems.

85.     The utilization of Licensed Practical Nurses ("LPNs") as gatekeepers to dental care also results in underdiagnosis of dental problems. When a prisoner experiences tooth pain, for example, the first step to accessing dental care is for the prisoner to file a Health Services Request Form, also known as a sick call request. A prisoner is then, typically, seen face-to-face at sick call by an LPN who may determine whether the dental need is urgent (e.g. tooth pain), emergent, or routine (e.g. an asymptomatic tooth). Such a determination is a clinical one and outside the qualifications of an LPN.

86.     Several PLAINTIFFS have been seen for tooth pain at sick call by LPNs and subsequently experienced delays in receiving dental treatment.

87.    In May and June 2014, PLAINTIFF BROOKS was seen by an LPN at sick call regarding dental problems; the LPN's evaluations of his dental condition were not signed off by a registered nurse (RN).

88.    In February 2014, PLAINTIFF DUNNER submitted a sick call request reporting tooth pain. He was seen by an LPN on February 23, 2014 who recorded his pain as a 6 out of 10, determined his dental needs were "routine," explained to him why he could not get his teeth cleaned, and referred him to the dentist. PLAINTIFF DUNNER saw an LPN at sick call again on June 7, 2014. The LPN noted his pain was a 10 out of 10 and again determined his dental problems required only routine intervention. PLAINTIFF DUNNER did not see a dentist for his dental pain until June 26, 2014 – 124 days after his initial sick call request.

89.    In January 2015, PLAINTIFF HARRIS submitted a sick call request stating that she needed her teeth pulled. She was seen by a sick call LPN on January 8, 2015, who documented her current pain as a 6 out of 10, with the pain at its worst as a 10 out of 10. The LPN determined Plaintiff Harris did not have an urgent or emergent dental need and referred her to a practitioner. Plaintiff Harris was not seen by a dentist on August 5, 2015, 209 days after her January 8, 2015 nurse assessment.

## E. Prisoners suffer unnecessary delays in addressing dental pain, prolonging pain and infection

90.    Treatment of prisoners' dental pain and infection is untimely, at best, subjecting the prisoners to preventable pain and unnecessary exposure to antibiotics. Treatment requests are often not identified as urgent or routine, and there are no policies about the timeframes for urgent or routine care.

91.    Prisoners complaining of dental pain are generally offered analgesics, and those with infections are supposed to be referred to a dentist for an antibiotic within a day of submitting a sick call request. However, treatment for dental pain or infection is not complete until the source of the infection is removed; that is, by root canal or extraction.

92.    Patients with urgent dental pain should be evaluated by a dentist within 72 hours. Sources of infection should be removed within 7 to 10 days from the initial request for treatment. In the ADOC, the appointment for extraction is usually scheduled weeks or months in the future.

93.    Corizon and CDAA never perform root canals, one method of removing the source of dental infection.

94.    A number of PLAINTIFFS have experienced delays in receiving dental treatment for tooth pain.

95.    On September 20, 2015, PLAINTIFF ALLEN filed a sick call request reporting the eruption of one of her wisdom teeth. She was seen the next day by a

nurse at sick call and reported pain. PLAINTIFF ALLEN was not scheduled to see the dentist until November 30 2015, 71 days later.

96.     In February 2016, PLAINTIFF ALLEN reported wisdom tooth pain to medical staff and was not seen by a dentist for 21 days.

97.     On November 2, 2013, PLAINTIFF BROOKS submitted a sick call request stating that he had two teeth that needed to be pulled; he was referred for dental services by the sick call nurse. PLAINTIFF BROOKS was seen again by a nurse at sick call on May 24, 2014 for toothache, and another dental referral was made. He submitted another sick call request on May 30, 2014 regarding his teeth, stating that it was difficult for him to eat. He was again seen by nursing on June 2, 2014 and was referred to a physician who ordered a course of antibiotics. PLAINTIFF BROOKS's abscessed teeth were finally extracted 249 days after he began complaining about them. As the result of this untimely dental care, he suffered gratuitous pain over more than 6 months and received an unnecessary course of antibiotics.

98.     PLAINTIFF DUNNER has experienced delays in receiving care for reported pain. On February 22, 2014, PLAINTIFF DUNNER submitted a sick call request reporting tooth pain. He was seen by an LPN on February 23, 2014 who recorded his pain as a 6 out of 10, determined his dental needs were "routine,"

explained to him why he could not get his teeth cleaned, and referred him to the dentist.

99.  PLAINTIFF DUNNER was scheduled for a dental appointment on March 7, 2014 but missed the appointment because security staff did not escort him to the appointment. Security escort was necessary because he was housed in segregation at the time. PLAINTIFF DUNNER reported his missed appointment on March 11, 2014 and again on March 18, 2014.

100.  Though he was told he would be seen by the dentist by the end of March, PLAINTIFF DUNNER was not seen again for dental problems until June 7, 2014 after submitting another sick call request. He was again seen by an LPN at sick call, who noted his pain was a 10 out of 10, and determined his dental pain required only routine intervention. PLAINTIFF DUNNER again submitted an HSRF on June 17, 2017 reporting tooth pain and needing to "see the dentist immediately." PLAINTIFF DUNNER was finally seen by a dentist on June 26, 2014 –124 days after his initial sick call request reporting pain.

101.  On May 12, 2016, PLAINTIFF DUNNER filed a sick call request stating that his tooth needed to be pulled immediately and that he rated his pain as a 10 on a scale of 1 to 10. Plaintiff Dunner was seen by a nurse at sick call the next day, but his tooth was not extracted until six days later on May 18, 2016.

102.  On April 6, 2017, PLAINTIFF DUNNER filed another sick call request reporting tooth pain and reporting a tooth that needed to be pulled immediately. By October 2017, PLAINTIFF DUNNER had not yet seen a dentist about his tooth pain.

103.  Around 2014, PLAINTIFF ELLIS experienced tooth pain and filed several sick call requests for tooth fillings. PLAINTIFF ELLIS's painful teeth were not extracted until around 3 months after she began filing sick call requests.

104.  On July 3, 2015, PLAINTIFF ELLIS submitted a sick call request reporting tooth pain in two teeth, one of which was broken. The sick call request was triaged by a nurse on July 15, 2015. PLAINTIFF ELLIS was scheduled to see the dentist on August 27, 2015, but PLAINTIFF ELLIS's painful and infected teeth were not extracted until September 28, 2015, 56 days after she reported tooth pain and a broken tooth.

105.  On April 18, 2014, PLAINTIFF HALL reported tooth pain. PLAINTIFF HALL was screened and provided antibiotics on April 21, 2014. On May 19, 2014, PLAINTIFF HALL again reported tooth pain and stated that, though he had signed up for dental sick call three times, he had only received antibiotics and naproxen (an analgesic). On May 20, 2014, PLAINTIFF HALL reported he had been prescribed two rounds of antibiotics and still not had his

abscessed tooth extracted. By at least 32 days after PLAINTIFF HALL reported tooth pain, his abscessed tooth had still not been extracted.

106.   On February 16, 2017, PLAINTIFF HALL submitted a sick call request again reporting excruciating tooth pain. He was evaluated by a nurse, but a dental referral was not made. He submitted another sick call request on March 9, 2017, reporting an abscessed tooth and swollen face. PLAINTIFF HALL was seen in the Staton healthcare unit on March 27, 2017 for facial trauma, including an avulsed tooth. He was prescribed an antibiotic for 10 days. PLAINTIFF HALL submitted sick call requests on March 21, March 29, April 3, and June 13, 2017 reporting pain and an abscessed tooth but did not see a dentist. From his February 16, 2017 to his June 13, 2017 request, PLAINTIFF HALL suffered 117 days with a painful abscessed tooth. PLAINTIFF HALL's abscessed tooth was finally extracted in or around June 2017 after he was transferred to Draper.

107.   After PLAINTIFF HALL arrived at Draper, in or around June 2017, he began filing sick call requests about two painful teeth. He filed at least four sick call requests reporting tooth pain. He was prescribed 2 cycles of antibiotics. One of PLAINTIFF HALL's painful teeth was extracted around August or September 2017; by October 2017, the other tooth had not yet been extracted.

108.   In January 2015, PLAINTIFF HARRIS submitted a sick call request stating that she needed her teeth pulled. She was seen by a sick call LPN on

January 8, 2015, who documented her current pain as a 6 out of 10, with the pain at its worst as a 10 out of 10. The LPN determined PLAINTIFF HARRIS did not have an urgent or emergent dental need and referred her to a practitioner.

109.   On July 1, 2015, PLAINTIFF HARRIS submitted another sick call request reporting pain and fillings that needed to be replaced. Four days later, PLAINTIFF HARRIS was seen by a sick call nurse who determined her pain was not an urgent or emergent need and made a dental referral. PLAINTIFF HARRIS was seen by a dentist on August 5, 2015, 209 days after her January 8, 2015 nurse assessment.

110.   On December 7, 2016, PLAINTIFF HARRIS submitted a sick call request stating that she had tooth pain, had some loose teeth, and needed teeth pulled. PLAINTIFF HARRIS was seen by a sick call nurse on December 9, 2016, who noted her toothache and difficulty chewing. The nurse referred her to the dentist.

111.   PLAINTIFF HARRIS filed another sick call request on February 15, 2017, reporting that she had not been called for the dentist after her December sick call and that she was still experiencing tooth pain. PLAINTIFF HARRIS was seen by a sick call nurse on March 3, 2017, who noted a toothache, difficulty chewing, a pain level of 10 out of 10, and swelling, redness, and/or pus around her affected tooth. The nurse did not refer her to a dentist.

112.   On March 9, 2017, PLAINTIFF HARRIS was seen by a non-dentist for an Inmate Periodic Health Assessment. The non-dentist noted PLAINTIFF HARRIS's tooth pain with odor, diagnosed her as having a tooth infection, and prescribed Ibuprofen (an analgesic) and a 10-day course of an antibiotic. A dental referral was not documented. On March 27, 2017, PLAINTIFF HARRIS submitted another sick call request reporting that she need more pain medication and that her mouth was still bleeding and smelled bad. She stated that this dental problem had been ongoing since December 9, 2016. The same day, a sick call LPN noted PLAINTIFF HARRIS's toothache, her pain level as a 10 out of 10, provided Ibuprofen, and referred her to the dentist. The LPN did not indicate that PLAINTIFF HARRIS's condition was determined to be urgent or emergent. From PLAINTIFF HARRIS's December 7, 2016 until she was prescribed antibiotics by a non-dentist, 91 days passed, and from her initial sick call request until she was seen by an LPN on March 27, 108 days passed. During that time, PLAINTIFF HARRIS did not see a dentist to address the source of her pain and infection.

113.   On May 2, 2011, health services staff received a sick call request from PLAINTIFF MORK requesting fillings for two cavities. PLAINTIFF MORK was advised that he had been scheduled for a dental appointment. On May 27, 2011, he repeated his request, mentioning that his cavities were hurting, and was again advised that he would be scheduled to see the dentist. After approximately ten

months passed, on March 2, 2012, PLAINTIFF MORK again filed a sick call request and was advised that he would be scheduled for a dental appointment. On May 14, 2012, PLAINTIFF MORK was "screened for a filling," but his painful tooth was not filled. He made another request on July 9, 2012, and finally received a filling on July 20, 2012. In total, PLAINTIFF MORK waited at least 445 days for his tooth to be filled, and spent much of that time in continuous pain.

114.   On November 5, 2013, PLAINTIFF MORK filed a sick call request reporting that his jaw popped when he ate. PLAINTIFF MORK was not seen by a dentist about his complaint until December 5, 2013, 30 days later. And on November 18, 2013, PLAINTIFF MORK filed a sick call request about a painful cavity, and he was not seen by a dentist for a filling until December 5, 2013, 17 days later.

115.   In December 2009, PLAINTIFF SULLIVAN submitted a request to the medical provider asking that two of his remaining five teeth be filled. A year later, he complained that the teeth still had not been filled and that the filling in a third tooth had fallen out. After two years passed without treatment, he began experiencing pain in his two teeth and asked that both be pulled immediately. The teeth were finally extracted in January 2012.

**F.  Prisoners with cavities or periodontal disease suffer delays in treatment, placing them at risk of tooth morbidity and mortality**

116.   Defendants maintain a dental care system in which dental caries (cavities) and periodontal disease are consistently underdiagnosed. However, even when they have been diagnosed, inadequate treatment or delays in treatment often result in tooth morbidity or mortality, or the loss of teeth.

117.   When periodontal disease is diagnosed in the ADOC, it is rare that treatment other than a prophylaxis (also known as cleaning or "prophy") is planned. When moderate or advanced periodontal disease is identified, the appropriate non-surgical procedure is not ordered. Several PLAINTIFFS have been diagnosed with periodontal disease and not received treatment.

118.   PLAINTIFF ALLEN was diagnosed with gingivitis in April 2011 but no periodontal treatment was planned for her.

119.   On February 5, 2015, PLAINTIFF ELLIS was diagnosed with gingivitis, though the periodontal screening indicated a Periodontal Screening and Record ("PSR") of greater than 3 in all 6 sextants of her mouth, indicating likely chronic or aggressive periodontitis. No periodontal treatment was included in her treatment plan.

120.   PLAINTIFF ENGLISH was diagnosed with gingivitis on October 21, 2013, but no periodontal treatment was planned for her.

121.  On January 24, 2012, PLAINTIFF HARRIS received a dental examination and treatment plan and was diagnosed with gingivitis. No treatment, such as a cleaning, was planned to address her gingivitis.

122.  On July 31, 2013, PLAINTIFF HARRIS submitted a sick call request reporting bleeding gums and painful teeth. She was seen by a dentist on August 15, 2013. The dentist noted bleeding gums and mobile teeth and provided her with a hydrogen peroxide rinse and oral hygiene instruction. The dentist did not document that he performed periodontal probing and did not document the presence of periodontal disease, which would cause mobile teeth.

123.  PLAINTIFF HARRIS was seen on April 11, 2014 for an extraction and on August 15, 2014 for a filling. Again, the dentist did not document periodontal probing or the presence of periodontal disease. In October 2014, PLAINTIFF HARRIS received a periodontal probing, which indicated advanced periodontal disease. Over the next two years, PLAINTIFF HARRIS was seen several times by dental staff, who noted tooth mobility and bone loss but did not document periodontal probing or plan treatment for advanced periodontal disease.

124.  From PLAINTIFF HARRIS's January 2012 gingivitis diagnosis, her disease advanced, unmonitored and untreated, resulting in her teeth becoming mobile and a periodontal abscess.

125.  On August 22, 2013, PLAINTIFF MORK was diagnosed with gingivitis, but no periodontal treatment was planned.

126.  On July 11, 2013, PLAINTIFF PRUITT was diagnosed with gingivitis, but no periodontal treatment was planned. On May 15, 2012, PLAINTIFF PRUITT filed a sick call request reporting bleeding gums; he was not seen by the dentist until July 26, 2012, 72 days later. On February 28, 2013, PLAINTIFF PRUITT filed another sick call request reporting painful, bleeding gums. Thirty-four days later, the only treatment PLAINTIFF PRUITT received for his periodontal disease symptoms was a cleaning.

127.  PLAINTIFF SULLIVAN was diagnosed with chronic periodontitis on January 3, 2012, but no periodontal treatment was planned.

128.  PLAINTIFF WHEELER was diagnosed with gingivitis and chronic periodontitis on November 28, 2012. Her treatment plan included only prophy. Since then, all of PLAINTIFF WHEELER's remaining top teeth have been extracted.

129.  The dental program's failure to inform treatment plans with x-rays and Periodontal Screening and Recording ("PSR") and consistently plan non-surgical treatment for mild to moderate periodontal disease places prisoners at risk of advancing periodontal disease with attendant pain and tooth loss.

130.   When prisoners report cavities, treatment is often delayed, resulting in preventable tooth mortality.

131.   For example, In October 2016, PLAINTIFF ENGLISH filed a sick call request reporting a cavity. She was scheduled for a dental appointment in December 2016, but a correctional officer would not allow her to go to the appointment. PLAINTIFF ENGLISH filed another sick call request regarding her cavity in January 2017. In October 2017, she had still not seen the dentist regarding her cavity.

132.   Several years ago, PLAINTIFF SNYDER received a dental screening during which someone looked in his mouth for a few seconds for visual signs of dental problems. He was told he needed about five cavities filled. He has not yet received five fillings.

133.   On July 3, 2013, PLAINTIFF SNYDER was scheduled for a filling but did not receive it because the x-ray machine was broken. PLAINTIFF SNYDER informed medical and dental staff in September and October 2013 and in January 2014 that his tooth, which had been determined to need a filling, had not yet been filled. He waited at least 6 months from the time he was scheduled for a filling to when his tooth was treated.

134.   PLAINTIFF SNYDER filed a sick call around December 2016 or January 2017, requesting a filling. PLAINTIFF SNYDER was not scheduled for a

dental appointment until June 2017. He was told he would be scheduled for a filling. He had another dental appointment around August 2017. The dentist began drilling on his tooth and then stopped because she said his tooth was loose and needed to be extracted. PLAINTIFF SNYDER could not feel that the tooth was loose and refused to allow the dentist to extract his tooth. The dentist did not complete the filling procedure. PLAINTIFF SNYDER may lose his tooth as a result of the delay in treatment.

### G. Most prisoners are not provided dental cleanings

135.   DEFENDANTS' policy limits dental cleanings to annual cleanings for patients with certain chronic conditions and biennial cleanings for women. Male prisoners who are not in certain chronic care clinics are generally not offered or provided cleanings  at all. Prisoners should  be  provided  dental cleanings upon request at least once a year.

136.   Several PLAINTIFFS have requested dental cleanings and been told they could not have them because they did not meet certain criteria, such as being enrolled in a chronic care clinic.

137.   PLAINTIFF BROOKS has not received a cleaning during his six years in ADOC custody. In 2013, PLAINTIFF BROOKS requested a cleaning for the first time. A nurse in sick call told him that he had to be on the chronic care caseload in order to receive one. Since then, he has twice requested a cleaning.

Both times he was told by nurses that he must be on the chronic care caseload in order to receive one.

138.   On February 23, 2014, PLAINTIFF DUNNER asked for a cleaning while being seen at sick call by an LPN. The LPN explained to him that he could not have a cleaning. On March 23, 2016, PLAINTIFF DUNNER asked for a cleaning. He did not receive one.

139.   PLAINTIFF MORK has submitted about 4 sick call requests for cleanings since he has been in ADOC custody. He has always been denied a cleaning. In 2016, he saw a dentist and asked for a cleaning. The dentist told him that he had to meet certain criteria to be eligible for a cleaning. In or around 2011, when PLAINTIFF MORK was housed at Limestone, he filed a sick call request asking for a cleaning. The nurse told him that only diabetics and people who are HIV positive receive cleanings.

140.   PLAINTIFF PRUITT has asked for cleanings about 6 times in the last 5 years. The most recent time, in 2016, he was told by a nurse that he could not have a cleaning unless he was on the chronic care caseload.

**H. Prisoners in need of new or repaired dental prostheses suffer delays
in obtaining them**

141.   DEFENDANTS maintain a dental care system in which prisoners in need of dental prostheses, such as dentures or partial plates, suffer prolonged discomfort and difficulty eating due to delays in the fabrication of prostheses.

142.   The Corizon contract provides that dental prostheses will  be completed and delivered within ninety (90) days of a "wax-in," or impression. However, the contract does not specify how to expedite dental treatment that must occur before a denture "wax-in."

143.   Several PLAINTIFFS have waited months and even years to receive new or repaired dental prostheses.

144.   Several months prior to October 2013, PLAINTIFF BOSARGE saw a dentist about having his dentures repaired. The dental assistant told him they did not have the material to fix his dentures because the health provider told them to cut back on the material. He was told he would be rescheduled for the repair. On October 10, 2013, PLAINTIFF BOSARGE reported he had not yet been seen for a denture repair, stating his bottom dentures were not fitting properly and he was having difficulty chewing his food. On November 22, 2013, PLAINTIFF BOSARGE again reported that he had not been seen for a denture repair. PLAINTIFF BOSARGE experienced difficulty eating for several months in 2013 while waiting for his dentures to be repaired.

145.   In June 2017, the front teeth of PLAINTIFF BOSARAGE"S bottom denture broke. He filed a sick call request about this in June 2017 and was told there was not a dentist at Fountain. As of October 2017, PLAINTIFF BOSARGE had still not been seen by the dentist about his broken dentures. PLAINTIFF BOSARGE has difficulty eating with broken dentures.

146.   PLAINTIFF NORRIS has suffered delays in obtaining and repairing her lower dentures. As the result of these delays, PLAINTIFF NORRIS has been subjected to gratuitous pain and chewing eating difficulty. As of September 2013, PLAINTIFF NORRIS has no mandibular teeth and was missing maxillary teeth number 1 and numbers 13 through 16. Because PLAINTIFF NORRIS has no lower teeth, when she does not have a denture, her teeth impinge on her gums, making chewing painful and difficult.

147.  In September 2013, a dentist determined PLAINTIFF NORRIS needed bottom dentures. In January 2014, PLAINTIFF NORRIS reported that she had not yet been seen for denture impressions. PLAINTIFF NORRIS was fitted for bottom dentures around May 2014 but had not received them as of September 2014. PLAINTIFF NORRIS did not receive bottom dentures until early 2016.

148.  In October 2016, PLAINTIFF NORRIS's bottom dentures broke. PLAINTIFF NORRIS reported her broken dentures to dental and medical staff several times but did not see a dentist until summer 2017. The dentist told her that

he did not know if he could repair or replace her bottom dentures. PLAINTIFF NORRIS continues to have difficulty eating because her bottom dentures are broken.

149.   PLAINTIFF SULLIVAN came into ADOC custody in 1990 with an upper denture. It was not replaced until September 15, 2016, after years of his reporting that it did not fit properly. The replacement did not fit properly either, and PLAINTIFF SULLIVAN had to file it down himself.

150.   PLAINTIFF SULLIVAN has no bottom teeth. He did not receive bottom dentures until September 15, 2016. After receiving his dentures, he had difficulty chewing, and had to spend two months sanding his bottom and top dentures down himself in order for them to fit properly. Before receiving his bottom dentures, he spent years cutting his food into small pieces to reduce choking, which he nevertheless experienced multiple times a week.

151.   PLAINTIFF WHEELER has been waiting for dentures for about 6 months, since the last of her top teeth were extracted around February 2017. Dental staff have not yet done a mold for dentures. PLAINTIFF WHEELER has experienced difficulty eating since she no longer has top teeth. Her bottom teeth cut into her top gum, making her gums raw. To avoid pain, she eats only soft foods.

**I.  Defendants maintain inadequate dental records**

152.  Defendants' inadequate and chaotic system of maintaining healthcare records makes it almost impossible to deliver minimally adequate care. Volumes of paper records are stored in a variety of haphazard ways, often making them difficult to locate. Records frequently fail to be transferred, in a timely manner or at all, with prisoners who are moved between facilities. Vital documentation is often missing from the records.

## DENTAL CLASS ACTION ALLEGATIONS

421.  PLAINTIFFS   SHEILA   ALLEN,   RAYMOND   BOSARGE, TEDRICK BROOKS, CORDARA DUNNER, BRITTANY ELLIS, SERENA ENGLISH, JUSTIN HALL, CHERRITHA HARRIS, MATTHEW MORK, KAREN NORRIS, LEVITICUS PRUITT, TOMAS SNYDER, WILLIAM SULLIVAN, and VALERIE WHEELER bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of all prisoners (hereinafter "DENTAL CLASS") who are now, or will in the future be, subjected to the dental care policies and practices of the OFFICIAL CAPACITY DEFENDANTS.

### Numerosity: Fed. R. Civ. P. 23(a)(1)

422.  The DENTAL CLASS is so numerous that joinder of all members is impracticable. At the time this lawsuit was commenced and at all times since, there have been in excess of 21,000 prisoners in ADOC''s in-house custody, all of whom

are dependent entirely on the OFFICIAL CAPACITY DEFENDANTS for the provision of dental care.

423.   Every prisoner coming into the system is subjected to the inadequacy of the dental intake examination, with the resulting risk of harm from underdiagnosis. An average of nearly 700 prisoners enter ADOC facilities – and are subject to the inadequate intake examinations – every month.

424.   Plaintiffs" Dental Expert Dr. Jay Shulman reviewed 220 prisoners' dental records and concluded that they consistently document inadequate care.

425.   Due to the policies and practices of the OFFICIAL CAPACITY DEFENDANTS, all 21,000-plus ADOC prisoners receive or are at risk of receiving inadequate dental care while in ADOC prisons. The DENTAL CLASS MEMBERS are identifiable using records maintained in the ordinary course of business by the ADOC.

## Commonality: Fed. R. Civ. P. 23(a)(2)

426.   There are questions of fact and law common to the DENTAL CLASS MEMBERS. Such questions include, but are not limited to:

- whether DEFENDANTS provide adequate dental staff (both in number and qualification);

- whether DEFENDANTS systematically fail to adequately screen and diagnose dental problems in that diagnosis and treatment plans are made without the benefit of x-rays and periodontal probing;

- whether DEFENDANTS systematically fail to provide timely access to dental care by allowing unqualified LPNs to make clinical decisions about whether and how urgently dental care is needed;

- whether DEFENDANTS systematically fail to provide adequate care by failing to timely treat serious dental issues such as periodontal disease or caries;

- whether DEFENDANTS systematically fail to provide timely dental prostheses;

- whether DEFENDANTS systematically fail to adequately and timely address dental pain and infection;

- whether DEFENDANTS systematically deny prisoners adequate dental cleanings;

- whether DEFENDANTS fail to provide appropriate oversight and monitoring for the dental provider;

- whether overcrowding and correctional understaffing significantly contribute to dental care inadequacies.

427.   The OFFICIAL CAPACITY DEFENDANTS are expected to raise common defenses to these claims, including denying that their actions violate the law.

## Typicality: Fed. R. Civ. P. 23(a)(3)

428.   The claims of the named PLAINTIFFS are typical of those of the DENTAL CLASS, because their claims arise from the same policies, practices, and courses of conduct. The named PLAINTIFFS' claims are based on the same theory of law as the DENTAL CLASS's claims.

## Adequacy: Fed. R. Civ. P. 23(a)(4)

429.   The named PLAINTIFFS are capable of fairly and adequately protecting the interests of the DENTAL CLASS because the named PLAINTIFFS do not have any interests antagonistic to the class. The named PLAINTIFFS, as well as the DENTAL CLASS MEMBERS, seek to enjoin the unlawful acts and omissions of the OFFICIAL CAPACITY DEFENDANTS. Finally, the named PLAINTIFFS are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

## Fed. R. Civ. P. 23(b)(1)(A) and (B)

430.   Because the number of DENTAL CLASS members is so large, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for the OFFICIAL CAPACITY DEFENDANTS. Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

## Fed. R. Civ. P. 23(b)(2)

431.   This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because DEFENDANTS' policies, practices, actions, and omissions that form the basis of this complaint are common to and apply generally to all members of the DENTAL CLASS, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the DENTAL CLASS. All state-wide dental care policies are centrally promulgated, disseminated, and enforced from the central headquarters of ADOC by the OFFICIAL CAPACITY DEFENDANTS. Dental care is provided pursuant to a single contract with a single medical provider and its subcontractor with policies and practices that are centrally promulgated, disseminated, overseen and enforced by the health care providers' statewide management team and by the OFFICIAL CAPACITY DEFENDANTS.

The injunctive and declaratory relief sought is appropriate and will apply to all members of the DENTAL CLASS.

## CLAIMS FOR RELIEF

### First Cause of Action: Inadequate Dental Care
All Prisoner PLAINTIFFS and the PLAINTIFF CLASS v.
DEFENDANTS DUNN and NAGLICH
(42 U.S.C. § 1983; Eighth and Fourteenth Amendments, Cruel and Unusual Punishment)

446. PLAINTIFFS reassert and incorporate by reference the allegations contained in Paragraphs 1-445 above.

447. By their policies and practices described herein, the OFFICIAL CAPACITY DEFENDANTS subject PLAINTIFFS and the DENTAL CLASS to a substantial risk of serious harm and injury from inadequate dental care in violation of 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the U.S. Constitution. These policies and practices have been and continue to be implemented by DEFENDANTS and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the PLAINTIFFS' and CLASS MEMBERS' ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

448. The OFFICIAL CAPACITY DEFENDANTS have been and are aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

## PRAYER FOR RELIEF

461. PLAINTIFFS and the DENTAL CLASS they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. PLAINTIFFS have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the OFFICIAL CAPACITY DEFENDANTS, as alleged herein, unless PLAINTIFFS and the DENTAL CLASS they represent are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the United States Constitution and the laws of the United States.

462. WHEREFORE, the named PLAINTIFFS and the CLASS they represent request that this Court grant them the following relief:

A.     Declare that the suit is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(1) and (2);

B.     Adjudge and declare that the acts, omissions, policies, and practices of the OFFICIAL CAPACITY DEFENDANTS, and their agents, employees, officials, and all persons acting in concert with them under color of state law or otherwise, described herein are in violation of the rights of prisoner PLAINTIFFS

and the CLASS they represent under the Cruel and Unusual Punishment Clause of the Eighth Amendment, which grants constitutional protection to the PLAINTIFFS and the CLASS they represent;

C.      Permanently enjoin all DEFENDANTS, their agents, employees, officials, and all persons acting in concert with them under color of state law, from subjecting prisoner PLAINTIFFS and the DENTAL CLASS to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above.

D.      Order the OFFICIAL CAPACITY DEFENDANTS, their agents, employees, officials, and all persons acting in concert with them under color of state law, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that prisoner PLAINTIFFS and members of the DENTAL CLASS suffer due to inadequate dental care. The plan shall include at a minimum the following:

1. Staffing: Dental and Correctional staffing shall be sufficient to provide prisoner PLAINTIFFS and the PLAINTIFF   DENTAL CLASS with timely access to qualified and competent clinicians who can provide adequate dental care;

2. Access: Policies and practices that provide timely access to dental care;

3. Screening, Diagnosis, and Treatment Planning: Policies and practices that reliably screen, diagnose, and plan treatment for dental conditions that need treatment;

5. Quality Assurance: A regular assessment of dental care staff, services, procedures, and activities designed to improve outcomes, and to identify and correct errors or systemic deficiencies;

E.      Award PLAINTIFFS the costs of this suit, and reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988, and other applicable law;

F.      Retain jurisdiction of this case until all DEFENDANTS have fully complied with the orders of this Court, and there is a reasonable assurance that DEFENDANTS will continue to comply in the future absent continuing jurisdiction; and

G.      Award such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 10th day of May, 2018.

/s/ Maria V. Morris
Maria V. Morris
*One of the Attorneys for Plaintiffs*
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104

Rhonda Brownstein (ASB-3193-O64R)
Maria V. Morris (ASB-2198-R64M)
Grace Graham (ASB-3040-A64G)
Latasha L. McCrary (ASB-1935-L75M)
Jonathan Blocker (ASB-6818-G19I)
Caitlin J. Sandley (ASB-5317-S48R)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue

Montgomery, AL 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
rhonda.brownstein@splcenter.org
maria.morris@splcenter.org
grace.graham@splcenter.org
latasha.mccrary@splcenter.org
jonathan.blocker@splcenter.org
cj.sandley@splcenter.org

Lisa W. Borden (ASB-5673-D57L)
William G. Somerville, III (ASB-6185-E63W)
Andrew P. Walsh (ASB-3755-W77W)
Dennis Nabors
Patricia Clotfelter (ASB-0841-F43P)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ PC
420 20th Street North, Suite 1400
Birmingham, AL 35203
Telephone: (205) 328-0480
Facsimile: (205) 322-8007
lborden@bakerdonelson.com
wsomerville@bakerdonelson.com
awalsh@bakerdonelson.com
dnabors@bakerdonelson.com
pclotfelter@bakerdonelson.com

**ATTORNEYS FOR THE PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this 10th day of May, 2018, electronically filed the foregoing with the clerk of court by using the CM/ECF system, which will send a notice of electronic filing to the following:

David R. Boyd, Esq.
John G. Smith, Esq.
John W. Naramore, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, AL  36101-0078
dboyd@balch.com
jgsmith@balch.com
jnaramore@balch.com

William R. Lunsford, Esq.
Matthew Reeves, Esq.
Melissa K. Marler, Esq.
Stephen C. Rogers, Esq.
Alyson L. Smith, Esq.
Maynard, Cooper & Gale, P.C.
655 Gallatin Street, SW
Huntsville, AL  35801
blunsford@maynardcooper.com
mreeves@maynardcooper.com
mmarler@maynardcooper.com
srogers@maynardcooper.com
asmith@maynardcooper.com

William Van Der Pol, Jr., Esq.
Glenn N. Baxter, Esq.
Lonnie Williams, Esq.
Barbara A. Lawrence, Esq.
Andrea J. Mixson, Esq.
Alabama Disabilities Advocacy Program
Box 870395
Tuscaloosa, AL  35487
wvanderpoljr@adap.ua.edu
gnbaxter@adap.ua.edu
lwilliams@adap.ua.edu
blawrence@adap.ua.edu
amixson@adap.ua.edu

Steven C. Corhern, Esq.
Balch & Bingham LLP
Post Office Box 306
Birmingham, AL  35201-0306
scorhern@balch.com

Mitesh Shah, Esq.
Luther M. Dorr, Esq.
Maynard, Cooper & Gale, P.C.
1901 6th Avenue North, Suite 2400
Birmingham, AL  35203
mshah@maynardcooper.com
rdorr@maynardcooper.com

Deana Johnson, Esq.
Brett T. Lane, Esq.
MHM Services, Inc.
1447 Peachtree Street, N.E., Suite 500
Atlanta, GA  30309
djohnson@mhm-services.com
btlane@mhm-services.com

Gregory M. Zarzaur, Esq.
Anil A. Mujumdar, Esq.
Diandra S. Debrosse, Esq.
Denise Wiginton, Esq.
Zarzaur Mujumdar & Debrosse
2332 2nd Avenue North
Birmingham, AL  35203
gregory@zarzaur.com
anil@zarzaur.com
fuli@zarzaur.com
denise@zarzaur.com

Anne Hill, Esq.
Elizabeth A. Sees, Esq.
Joseph G. Stewart, Jr., Esq.
Alabama Department of Corrections
Legal Division
301 South Ripley Street
Montgomery, AL  36104
anne.hill@doc.alabama.gov
elizabeth.sees@doc.alabama.gov
joseph.stewart@doc.alabama.gov

/s/ Maria V. Morris
One of the Attorneys for Plaintiffs