**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| EDWARD BRAGGS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:14-CV-00601-MHT-GMB |
| JEFFERSON DUNN, in his official | ) | |
| capacity as Commissioner | ) | |
| of the Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' FIRST NOTICE OF NON-COMPLIANCE AND MOTION
FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE
HELD IN CONTEMPT**

On February 20, 2018, the Court issued its first remedial opinion and order in this matter. Doc. 1656, 1657. The remedy ordered in the Phase 2A Understaffing Remedial Opinion and Order would, if followed, provide the Defendants, Commissioner Jefferson Dunn and Associate Commissioner Ruth Naglich, with the staff needed to address the "needless pain and suffering" caused by Defendants' "horrendously inadequate" system of mental-health care. *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1186, 1267 (M.D. Ala. 2017).

The Court adopted, with slight modifications, the timeline and process for reaching adequate mental-health staffing levels proposed by Defendants. Doc.

1

1656 at 19-20; Doc. 1657 at 3-4.   The Court noted that it had "already deferred to [defendants'] repeated delays in executing the contract for and implementing the RFP [Request for Proposals], and there can be no more delays."  Doc. 1656 at 20.

Defendants have, nonetheless, failed to meet the first three mental-health staffing deadlines in the Order.  Without enforcement by the Court, neither the understaffing itself, nor the many constitutional violations flowing from it, will be remedied.

## I.    BACKGROUND

The Defendants' plan to address mental health understaffing consisted of two parts:

1. The implementation of a new contract with the staffing levels set forth in a Request for Proposal ("RFP") issued by the Alabama Department of Corrections ("ADOC") in July 2017;

2. The development of mental health staffing ratios – a process that Defendants asserted should not begin until two months after full implementation of the RFP, so that the new mental health staff could adjust to their new positions.

Doc. 1583 at 3; Doc. 1656 at 21.

The Court's order required Defendants to implement the RFP staffing levels according to the following schedule:

2

1. By May 1, 2018, ADOC's new mental-health vendor, shall, in addition to continuing to fill those positions in place at the time of this order, fill at least 65% of the additional mental-health staffing positions provided for in the contract.

2. By June 1, 2018, ADOC's new mental-health vendor, shall, in addition to continuing to fill those positions in place at the time of this order, fill at least 75% of the additional mental-health staffing positions provided for in the contract.

3. By July 1, 2018, ADOC's new mental-health vendor, shall fill the mental-health staffing positions consistent with the contract.

Doc. 1657 at 3-4.

As of July 1, 2018, the contract includes a payback penalty that applies only if the vendor fails to fill 85% of the required FTE hours. However, the staffing levels required by the contract, and thus by the Court's order, are the full complement of staff set out as the "Minimum Staffing Requirements" in the RFP. Ruth Naglich, Nov. 29, 2017, R.D. Trial Tr., 39:12-41:6; Defs. Ex. 2934 at PDF pp. 203-16.

### A. Delays in the Contracting Process and Shortening of Implementation Schedule

On July 14, 2017, shortly after the issuance of the mental-health liability opinion in this case, the ADOC issued an RFP for a Comprehensive Inmate

Healthcare Services contract.  Defs. Ex. 2934.  Under the RFP, ADOC proposed to consolidate medical and mental healthcare into a single contract, ensuring that whichever vendor won the contract would be taking on a significant new area of responsibility.   Further, Commissioner Dunn had never been through the contracting process for the complex healthcare contract with the ADOC.  Comm'r Jefferson Dunn, Nov. 30, 2017 Trial Tr., at 107:8-19.

According to the original schedule in the RFP, vendors would submit proposals by August 17, 2017, with the ADOC conducting interviews of the bidders the week of August 28 and announcing its intended vendor on September 4. *Id.* at PDF p. 129. A final contract would be in place by November 1, and implementation of the new contract would begin two months later on January 1, 2018. *Id*.

The dates for the new contract began to slip immediately.  ADOC issued revised deadlines on July 17, 2017, and again on September 1, 2017.  Ex. 1; Pls. Ex. 1333.  The deadline under the second revision for submission of proposals was extended to September 8, 2017.  Pls. Ex. 1333.  At the same time, the ADOC expanded the amount of time to accomplish each step of the contracting process. *Id*.  It announced that interviews would be done the week of October 2, 2017, and the selected vendor would be announced on October 16, 2017.  *Id*. ADOC would present the contract to the legislative contract review committee at the committee's

November 2, 2017 meeting. *Id*. The implementation date was moved four months to April 1, 2018, allowing roughly five months between the final step of the approval by the committee and implementation. *Id*. Those five months could be used by the vendor to prepare for a smooth transition – including the hiring of staff.

But the delays continued. No vendor had been selected by December 1, 2017. Comm'r Jefferson Dunn, Dec. 1, 2017 Trial Tr., at 106:20-21. Commissioner Dunn testified that he expected to announce the vendor by the end of December, and that he believed this would leave enough time for implementation by April 1, 2018. *Id*. at 106:25-107:9. Unable to bring the contract to the contract review committee until the terms were fully negotiated, ADOC did not present the contract to the committee until its March 2018 meeting. Ex. 2 (Excerpt of March 2018 Contract Review Committee Agenda). The contract was not signed until March 9, 2018 – just 22 days before implementation. Pls. Ex. 1460 (ADOC-Wexford Contract) at ADOC0420258.

The change of implementation from January to April was not just a bureaucratic glitch; it was a four-month delay in the implementation of the staffing requirements of the new contract. Unfortunately, the delays in meeting the staffing requirements of the Court's Order have continued beyond the signing and implementation of the contract.

### B.    Mental-Health Staffing Requirements under the Court's Order

At the end of the last contract, ADOC required MHM Services, Inc. ("MHM"), to have a total of 222.4 FTE (full-time equivalent) mental-health staff members. Pls. Ex. 1312 (4th Amend. to MHM Contract) at ADOC0406013. The RFP required the new vendor, Wexford Health Services, Inc. ("Wexford") to have a total of 263.2 FTE mental-health staff members. Defs. Ex. 2934 (July 2017 RFP) at PDF pp. 204-205.

The total difference in mental-health staff between the two contracts is 40.7 FTE. Going solely by total numbers of FTEs, 65% of that difference is 26.5 FTEs, and 75% is 30.5 FTEs.   Thus, ADOC was required to have the following staff in place by the following dates:

| Date | Total Mental Health Staff Required |
|---|---|
| May 1, 2018 (old contract + 65% of additional staff required by RFP) | 249 |
| June 1, 2018 (old contract + 75% of additional staff required by RFP) | 253 |
| July 1, 2018  (staff required by RFP) | 263.2 |

The staffing requirements for each position, derived from the last MHM contract and the RFP are set forth in Exhibit 3 hereto. For the clinicians in the facility, staffing was to be as follows:

| Position | Required by May 1, 2018 | Required by June 1, 2018 | Required by July 1, 2018 |
|---|---|---|---|
| Psychiatrists | 9.8 | 10.43 | 11.95 |
| Nurse Practitioners (MH) | 10.8 | 11.28 | 12.4 |
| Psychologists | 6.6 | 6.88 | 7.5 |
| MHPs | 47 | 50.89 | 60.65 |

Ex. 3.

## C.    Mental-Health Staffing Levels

As of March 31, 2018, the day before the change in vendor, there were 202.6 FTE mental-health staff.  Doc. 1858-1 at 10.  There were 5.6 FTE psychiatrists, 8.37 mental health nurse practitioners, 2.37 FTE psychologists, 28.98 MHPs, and 23.6 unlicensed MHPs.  *Id*. at 4-10.

On April 1, 2018, Wexford became the new vendor, under the new contract, with the RFP staffing requirements.  *See* Defs. Ex. 2934 (July 2017 RFP); Pls. Ex. 1460 (ADOC-Wexford Contract).

In preparation for the June 2018 remedial trial, Plaintiffs sought, and Defendants were ordered to produce, the April 2018 Wexford staffing report by June 6, 2018, or as soon thereafter as they obtained it from Wexford.   Doc. 1845-1 (Document Request No. 4); Doc. 1857.

Defendants asserted in a pre-trial conference with Judge Thompson on June 1, 2018, that they knew how many mental-health staff are working in the ADOC prisons.  Ex. 4, Excerpt of June 1, 2018 Hearing Tr., at 18:19-25.  But they did not provide that information to Plaintiffs or the Court.

7

On June 6, 2018, the date Defendants were ordered to produce the staffing report to Plaintiffs if they had received it, Defendants informed Plaintiffs that they had received the report, but were going to "audit" the information and produce it to Plaintiffs on Monday, June 11, 2018.  Ex. 5.  Defendants did not produce the report on June 11, 2018, or anytime thereafter.  Plaintiffs have repeatedly requested that the information be provided, to no avail.  Ex. 6.

Plaintiffs have also attempted unsuccessfully to mediate this issue since June 1, 2018.

The Court's order required 263.2 FTE mental-health staff by July 1, 2018. Doc. 1657 at 3-4; Defs. Ex. 2934 (July 2017 RFP) at PDF pp. 204-205; Pls. Ex. 1312 (4th Amend. to MHM Contract) at ADOC0406013.

Defendants have provided no information about mental-health staffing levels since implementation of the contract.  But there is substantial circumstantial evidence that Defendants have not met the mental-health staffing requirements of the Order.

During the Remedial Hearing on Residential Treatment, Dr. Edward Kern, the new ADOC Director of Psychiatry, testified that, as of April 25, 2018, he did not believe any psychiatrists had been added to the staff since Wexford started providing mental health services.  Dr. Edward Kern, Apr. 25, 2018 Trial Tr., at 9:8-25.  Dr. Kern further testified that, to his knowledge, there was one part-time on-

site psychiatrist in the ADOC, and no other psychiatrists who were working on-site in the ADOC.  *Id*. at 11:5-7.  Dr. Kern was certain of just two psychiatrists, one of whom he knew to be part-time, working in the ADOC.  *Id*. at 10:7-10.

Further, to glean more systemic information on mental-health staffing, Plaintiffs have reviewed the open mental-health positions advertised by Wexford in Alabama.  As of July 2, 2018, Wexford was advertising for 101 mental-health positions in ADOC facilities.[1]  *See* Exs. 7 (Wexford Mental-Health Job Postings in ADOC), 8 (Wexford Mental-Health Nursing Job Postings in ADOC), 9 (summary chart of Wexford Mental-Health Job Postings in ADOC); *see also* https://jobs.wexfordhealth.com/search/searchjobs, last visited on July 2, 2018.  Of those 101 positions, 32 are identified as being less than a 40-hour per week position.[2]  Counting an FTE employee as 40 hours per week, the listings thus

---

[1] There are actually 108 positions posted as mental-health positions or nursing positions for mental health.  *See* Ex. 7-9.  However, seven ads are dated from before implementation of the contract.  Three such ads are somewhat general, seeking MHPs, Psychiatrist, or Psychologists, without identifying a location.  Four ads are from late February seeking MHPs for specific locations, but it is impossible to determine if they are the same positions posted after implementation of the contract. Therefore, Plaintiffs have not counted those positions for purposes of this motion. *See* https://jobs.wexfordhealth.com/search/searchjobs, last visited on July 2, 2018.

[2] Where a posting does not indicate the number of hours or that it is part-time, Plaintiffs have assumed 40 hours per week.  Most of the positions listed as part time have a specific number of hours per week indicated.  Three do not.  *See* https://jobs.wexfordhealth.com/search/searchjobs, last visited on July 2, 2018.  For those three, Plaintiffs have assumed 20 hours per week.  Additionally, some of the

suggest that that Wexford has 84.3 FTE open mental-health positions in ADOC. The vacancies for mental-health clinicians represented by the job postings are extraordinary:

| Position | Requirements Under RFP | Number of Job Openings | % Filled* |
|---|---|---|---|
| Director of Psychiatry | 1 | 1 | 0% |
| Psychiatrists | 11.95 | 6.75 | 44% |
| Nurse Practitioners (MH) | 12.4 | 5.5 | 56% |
| Psychologists | 7.5 | 7.1 | 5% |
| MHPs | 60.65 | 28.15 | 54% |

\* Assumes that a position for which no opening has been posted is filled.

The contract and the Court order require 263.2 FTE mental-health staff by July 1, 2018. Doc. 1657 (Understaffing Remedial Order) at 3-4; Defs. Ex. 2934 (July 2017 RFP) at PDF pp. 204-205. Assuming that positions that have not been posted are filled, with 84.3 FTE posted open positions, there are just 178.9 FTE filled positions.

## ARGUMENT

The Court has the inherent authority to enforce its own orders. *See, e.g.*, *Carlisle v. United States*, 517 U.S. 416, 438 (1996) (noting that "[e]xamples of the exercise of the federal courts' inherent powers are abundant in both our civil and our criminal jurisprudence" and collecting cases); *see also Degen v. United States*, 517 U.S. 820 (1996). Courts have the "power to impose . . . submission to their

---

positions listed as full time have a specific number of hours indicated that is less than 40. That reduction of hours has been included in the calculation.

lawful mandates." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (citing *Anderson v. Dunn*, 6 Wheat. 204, 227 (1821)). The inherent authority to hold a party in contempt is "a power 'necessary to the exercise of all others.'" *Mine Workers*, 512 U.S. at 831 (citing *United States v. Hudson*, 7 Cranch 32, 34 (1812)).

Civil contempt requires clear and convincing proof of noncompliance with a court order. *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990); *Newman v. Graddick*, 740 F.2d 1513, 1524 (11th Cir. 1984). Once the moving party makes a prima facie showing of non-compliance with the court order, "the burden of production shifts to the alleged contemnor to show a present inability to comply that goes 'beyond a mere assertion of inability." *Howard Johnson*, 892 F.2d at 1516 (internal citations omitted). In civil contempt proceedings, the court does not look to the "subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue." *Id.* (citing *Jim Walter Resources, Inc. v. Int'l Union, United Mine Workers of America*, 609 F.2d 165, 168 (5th Cir. 1980)). Though "conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance," good faith is not itself an excuse for noncompliance. *Newman*, 740 F.2d at 1524.

11

Defendants were required to have the following mental health staff:

- 249 FTE mental-health staff by May 1, 2018;

- 253 FTE mental-health staff by June 1, 2018; and

- 263.2 FTE mental-health staff by July 1, 2018.

Doc. 1657 (Understaffing Remedial Order) at 3-4; *see supra* at 6 (calculating the Understaffing Remedial Order's mental-health staffing requirements).

Defendants claimed to know how many mental-health staff there were on June 1, 2018, but failed to disclose this information. Ex. 4. They were ordered to provide documents that would have shown the staffing levels as of April 30, 2018, but have failed to do so. Doc. 1857. Despite repeated requests, Defendants have failed to provide any information about mental-health staffing levels since the change in vendor, forcing Plaintiffs to rely on circumstantial evidence to determine the current staffing levels. *See, e.g*., Exs. 5, 6.

Based on Wexford's posted job openings, there are 84.3 FTE mental-health vacancies, indicating that there are currently only 178.9 FTE mental-health staff. Exs. 7-9.

Moreover, Defendants cannot claim to have made substantial progress toward compliance. There are fewer mental-health staff now (178.9) than were required under the prior contract (222.4). And Defendants appear to lost 23.7 FTE mental-health staff since the transition to the new vendor at the beginning of April.

Doc. 1858-1 at 10 (reporting 202.6 FTE mental-health staff at as of March 31, 2018).

In the Understaffing Remedial Opinion, the Court recognized that there had already been significant delays in implementing the increased staffing required under the RFP. Doc. 1656 at 20. The Court informed Defendants there could be no further delays in meeting these initial staffing requirements. *Id.* But there were. And the harms to prisoners who are mentally ill from the lack of professional mental-health staff continue.

Defendants' failure to comply with the initial deadlines in the Court's order will also lead to cascading consequences for compliance with other aspects of the Understaffing Remedial Order. The second major component of Defendants' remedial staffing plan, adopted by the Court, was a mental-health staffing analysis to develop staffing ratios. Doc. 1657 at 4-5. This analysis is scheduled to start on September 1, 2018. *Id.* Dr. Mary Perrien, one of Defendants' mental-health consultants, testified during the understaffing remedial trial that to do the staffing analysis that will be the basis of the staffing ratios, "you [ ] need the program to be sufficiently staffed so that you can get an accurate idea of how long it takes to accomplish those tasks and duties." Dr. Mary Perrien, Dec. 12, 2017 R.D. Trial Tr., at 26:11-13. Dr. Perrien explained that it is necessary to wait for the RFP to take effect and be adequately staffed . . .

> [b]ecause if you're understaffed, if there aren't enough staff there, then you have staff who are either covering multiple positions, and so they're not doing regular duties; or you have staff who are just handling emergencies and crises, so those staff aren't doing regular duties either. So what you end up with is something that's very provisional because you are, again, just sort of estimating what regular duties would be.

*Id*. at 81:17-24.   Thus, not only are Defendants missing current deadlines in the Understaffing Remedial Order, but they are also making it ever more unlikely that they will be able to meet the future deadlines.   Delays in conducting the staffing analysis will, in turn, result in the delays in getting to the level of staffing needed to remedy the constitutional violations that permeate the mental-health care system in the ADOC.

Finally, the Court recognized in the remedial order that "a party may not be able to meet a deadline for reasons outside the party's control or for other good cause."   Doc. 1657 at 9.   The Court instructed Defendants how to request an extension of deadlines.   *Id*.   Requesting an extension would have required Defendants to acknowledge that they were not in compliance.   Defendants did not seek an extension for any of the deadlines that have passed.

Defendants should be ordered to show cause why their failure to comply with this Court's Order is not contempt.

## REQUEST FOR RELIEF

Prisoners   with   mental   illness   in   the   ADOC   continue   to   receive

constitutionally inadequate care.  Increasing the amount of mental-health staff is a necessary part of bringing an end to the constitutional violations found a year ago. The ADOC delayed the start of the new contract and Defendants have failed to comply with the Understaffing Remedial Order to promptly bring the staff up to the levels required under the new contract.  For these reasons, the Court should order Defendants to show cause as to why Commissioner Dunn and Associate Commissioner Naglich should not be found in contempt of the Phase 2A Understaffing Remedial Order.

Dated: July 2, 2018                    Respectfully Submitted,

                                       */s/ Maria V. Morris*
                                       Maria V. Morris
                                       One of the Attorneys for Plaintiffs
                                       Southern Poverty Law Center
                                       400 Washington Avenue
                                       Montgomery, AL 36104

Rhonda Brownstein (ASB-3193-O64R)
Maria V. Morris (ASB-2198-R64M)
Grace Graham (ASB-3040-A64G)
Latasha L. McCrary (ASB-1935-L75M)
Jonathan Blocker (ASB-6818-G19I)
Caitlin J. Sandley (ASB-5317-S48R)
David Clay Washington (ASB-6599-Y42I)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
rhonda.brownstein@splcenter.org
maria.morris@splcenter.org
grace.graham@splcenter.org

15

latasha.mccrary@splcenter.org
jonathan.blocker@splcenter.org
cj.sandley@splcenter.org
david.washington@splcenter.org

William Van Der Pol, Jr. (ASB-2112-114F)
Glenn N. Baxter (ASB-3825-A41G)
Lonnie J. Williams
Barbara A. Lawrence
Andrea J. Mixson
Ashley N. Austin (ASB-1059-F69L)
ALABAMA DISABILITIES ADVOCACY PROGRAM
Box 870395
Tuscaloosa, AL 35487
Telephone: (205) 348-4928
Facsimile: (205) 348-3909
wvanderpoljr@adap.ua.edu
gnbaxter@adap.ua.edu
lwilliams@adap.ua.edu
blawrence@adap.ua.edu
amixson@adap.ua.edu
aaustin@adap.ua.edu

Lisa W. Borden (ASB-5673-D57L)
William G. Somerville, III (ASB-6185-E63W)
Andrew P. Walsh (ASB-3755-W77W)
Dennis Nabors
Patricia Clotfelter (ASB-0841-F43P)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ PC
420 20th Street North, Suite 1400
Birmingham, AL 35203
Telephone: (205) 328-0480
Facsimile: (205) 322-8007
lborden@bakerdonelson.com
wsomerville@bakerdonelson.com
awalsh@bakerdonelson.com
dnabors@bakerdonelson.com
pclotfelter@bakerdonelson.com

*/s/ Anil A. Mujumdar*

Anil A. Mujumdar (ASB-2004-L65M)
One of the Attorneys for Plaintiff
Alabama Disabilities Advocacy Program
2332 2nd Avenue North
Birmingham, AL 35203

Gregory M. Zarzaur (ASB-0759-E45Z)
Anil A. Mujumdar (ASB-2004-L65M)
Diandra S. Debrosse (ASB-2956-N76D)
Denise Wiginton (ASB-5905-D27W)
ZARZAUR MUJUMDAR & DEBROSSE
2332 2nd Avenue North
Birmingham, AL 35203
Telephone: (205) 983-7985
Facsimile: (888) 505-0523
gregory@zarzaur.com
anil@zarzaur.com
fuli@zarzaur.com
denise@zarzaur.com

**ATTORNEYS FOR THE PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 2nd day of July, 2018, electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

David R. Boyd, Esq.
John G. Smith, Esq.
John W. Naramore, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, AL  36101-0078
dboyd@balch.com
jgsmith@balch.com
jnaramore@balch.com

William R. Lunsford, Esq.
Matthew Reeves, Esq.
Melissa K. Marler, Esq.
Stephen C. Rogers, Esq.
Alyson L. Smith, Esq.
Maynard, Cooper & Gale, P.C.
655 Gallatin Street, SW
Huntsville, AL  35801
blunsford@maynardcooper.com
mreeves@maynardcooper.com
mmarler@maynardcooper.com
srogers@maynardcooper.com
asmith@maynardcooper.com

Elizabeth A. Sees, Esq.
Joseph G. Stewart, Jr., Esq.
Alabama Department of Corrections
Legal Division
301 South Ripley Street
Montgomery, AL  36104
elizabeth.sees@doc.alabama.gov
joseph.stewart@doc.alabama.gov

Steven C. Corhern, Esq.
Balch & Bingham LLP
Post Office Box 306
Birmingham, AL  35201-0306
scorhern@balch.com

Mitesh Shah, Esq.
Luther M. Dorr, Esq.
Maynard, Cooper & Gale, P.C.
1901 6th Avenue North, Suite 2400
Birmingham, AL  35203
mshah@maynardcooper.com
rdorr@maynardcooper.com

Deana Johnson, Esq.
Brett T. Lane, Esq.
MHM Services, Inc.
1447 Peachtree Street, N.E., Suite 500
Atlanta, GA  30309
djohnson@mhm-services.com
btlane@mhm-services.com

_/s/ Maria V. Morris_
One of the Attorneys for Plaintiffs

18