## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **EDWARD BRAGGS,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 2:14-cv-00601-MHT-GMB** |
| **v.** | ) | |
| | ) | **District Judge Myron H. Thompson** |
| **JEFFERSON DUNN,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

### THE STATE'S RESPONSE TO PLAINTIFFS' "PROPOSED PRIMA FACIE FINDINGS OF FACT REGARDING MENTAL HEALTH UNDERSTAFFING REMEDIES"

Defendants JEFFERSON DUNN ("Commissioner Dunn") and RUTH NAGLICH ("Naglich" and, collectively with Commissioner Dunn, the "State") hereby submit this response to Plaintiffs' Proposed Prima Facie Findings of Fact Regarding Mental-Health Understaffing Remedies (Doc. No. 1995, "Plaintiffs' Proposed Opinion").

### INTRODUCTION

The State demonstrated that the Alabama Department of Corrections ("ADOC") and its contractor, Wexford Health Sources, Inc. ("Wexford"), continue to work diligently to fill open mental health positions within the ADOC. Wexford continues to offer and pay above-market rates for many mental health professionals. Wexford's extensive recruiting efforts, alone and in collaboration with ADOC,

continue to bear fruit.  Despite these best efforts, Wexford did not recruit and retain enough qualified mental health staff to satisfy the two (2) initial thresholds set forth in the Court's Phase 2A Understaffing Order (Doc. No. 1657, the "Staffing Remedial Order").  Apparently viewing contempt procedures as a game of "gotcha," Plaintiffs seized upon the staffing challenges faced by the State and Wexford as an opportunity to seek contempt sanctions less than four (4) months after the commencement of the State's new contract with Wexford.

The State's Response in Opposition to Plaintiffs' First Notice of Non-Compliance and Motion for Order to Show Cause why Defendants Should not be Held in Contempt (Doc. No. 1936, the "State's Response") demonstrated that: (1)  the State and Wexford have made extensive efforts toward compliance with the Staffing Remedial Order; (2) the present circumstances do not align with the historical threshold for contempt, which often involve long periods of *willful* non-compliance; and (3) Plaintiffs' view of the Staffing Remedial Order as requiring 100% staffing of all positions at all times is incorrect both under the contract between ADOC and Wexford and as a matter of basic employment realities.  The State adopts and incorporates by reference the State's Response as if fully set forth herein.

The State further addresses the following points raised in Plaintiffs' Proposed Opinion:

> (1)    The State and Wexford continue to make all reasonable efforts
>         to comply with the Staffing Remedial Order.  These efforts

2

enabled the State and Wexford to bring staffing levels into substantial compliance with the Staffing Remedial Order.

(2)     Plaintiffs do not clearly articulate the standard that they claim the Staffing Remedial Order requires.  Without a clearly defined standard and/or a vague and ambiguous Staffing Remedial Order, the State cannot be held in contempt.

(3)     Plaintiffs improperly attempt to address non-staffing issues via this contempt proceeding.

The State will demonstrate these facts at the upcoming evidentiary hearing regarding its compliance with the Staffing Remedial Order.

## ARGUMENT

The party seeking a contempt order bears the burden of establishing by clear and convincing evidence "that (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." Georgia Power Co. v. N.L.R.B., 484 F.3d 1288, 1291 (11th Cir. 2007).  In making a contempt determination, courts "will construe any ambiguities or uncertainties in such a court order in a light favorable to the person charged with contempt." Id.  Thus, the threshold for a contempt finding is a high one.

## I.   THE STATE IS IN THE PROCESS OF ACHIEVING FULL COMPLIANCE WITH THE STAFFING REMEDIAL ORDER.

Plaintiffs correctly acknowledge that "[c]ivil contemnors must 'carry the keys of their prison in their own pockets.'"  (Doc. No. 1995 at 4, quoting Shillitani v.

United States, 384 U.S. 364, 368 (1996)).  Plaintiffs also acknowledge that, once a party makes a *prima facie* showing of non-compliance, the alleged contemnor may demonstrate that it was unable to comply with the order despite reasonable, good faith efforts to comply.  (Id. at 5).[1]  Finally, Plaintiffs acknowledge that contempt is "forward-looking."  (Id.).  Thus, Plaintiffs appear to agree that: (1) to the extent the State is unable to comply with portions of the Staffing Remedial Order despite its best efforts, a contempt finding would be inappropriate; and (2) to the extent the State is currently in substantial compliance with the Staffing Remedial Order, a contempt finding would be inappropriate.

The State demonstrated in its Response that: (1) the State and Wexford made all reasonable efforts to comply with the first two (2) benchmarks set forth in the Staffing Remedial Order but were unable to do so; (2) the State and Wexford continue to make all reasonable efforts to raise the number of mental health FTEs to the level required under ADOC's Agreement[2] with Wexford; and (3) Wexford is facing more difficulty than it anticipated in finding qualified candidates to fill some of the mental health positions.  (Doc. No. 1936 at 2-26).

As discussed more fully in the State's Response, Wexford has engaged in a

---

[1] Indeed, as the Eleventh Circuit has held, "inability to comply is a **complete** defense to a contempt citation."  Newman v. Graddick, 740 F.2d 1513, 1525 (11th Cir. 1984) (emphasis added).

[2] Unless otherwise defined in this Response, all capitalized words and terms possess the meaning ascribed to them in the State's Response.

broad, multi-faceted campaign to address the staffing needs under the Agreement. It has six (6) full-time recruiters and one (1) part-time recruiter conducting an exhaustive search, which includes attendance at professional conferences across the country, targeted events throughout Alabama, a nationwide advertising campaign, word-of-mouth initiatives among former employees, direct mail, outreach to nursing programs and professional licensing boards, and cold calls to psychiatrists and psychologists who are licensed in Alabama. (Id. at 4-6). It has an incentive program for referrals, provides sign-on bonuses and relocation assistance to mental-health providers, and generally offers compensation well above market levels. (Id.). And, to ensure mental health services are delivered, Wexford employs locum tenens (or temporary) mental health staff and supports its current mental health staff's working overtime. (Id.).

Since the State filed its Response, Wexford has continued its nationwide search and recruiting efforts. These efforts proved fruitful, attracting additional qualified mental health personnel to work in the ADOC system. In addition, since the State filed its response, ADOC received Wexford's staffing numbers for June 2018. Those numbers demonstrate that Wexford provided approximately 85.1% of the contract hours for June 2018, or 84.6% when calculated on a gross basis. (See June 2018 Staffing Analysis, Pretrial Conference Defendants' Exhibit A). Viewed in terms of the percentage of positions filled, Wexford filled 84.7% of the contract

positions.  (Id.). At the time the State filed its Response, the State and Wexford anticipated that Wexford would be able to provide 85% of the FTEs required under the Agreement by February 1, 2019.  (Doc. No. 1936 at 29).  The State is pleased to report that staffing levels are increasing more quickly than anticipated at the time of its initial Response.  The State now expects that Wexford can substantially comply with the terms of its mental health staffing obligations under the Agreement in the future.   In light of these substantial efforts and the State's current substantial compliance, contempt sanctions are inappropriate.

## II.  PLAINTIFFS' INTERPRETATION OF THE STAFFING REMEDIAL ORDER RENDERS THE ORDER SO VAGUE AND AMBIGUOUS AS TO MAKE COMPLIANCE IMPOSSIBLE.

As noted above, in making a contempt determination, courts "will construe any ambiguities or uncertainties in such a court order in a light favorable to the person charged with contempt." Georgia Power Co., 484 F.3d at 1291.  The Staffing Remedial Order requires staffing "consistent with the contract" between ADOC and Wexford.  (Doc. No. 1657 at 4).  Plaintiffs are not content to look to the actual Agreement, or even to basic employment realities, to determine what this provision means.  Instead, they seek to impose a standard that ignores both the provisions of the Agreement and the nature of the labor market.  Plaintiffs' proposed standard renders the Staffing Remedial Order (a) impossible to meet and (b) too vague for the Court to impose contempt sanctions.

Plaintiffs initially argued that the Staffing Remedial Order means that the State must provide one hundred percent (100%) of the staffing provided in the Agreement, i.e., 263.2 full-time equivalents ("FTEs").  (Doc. No. 1916 at 6; Doc. No. 1945 at 11-14).  Plaintiffs now acknowledge that the Staffing Remedial Order incorporates "an understanding that less than 263.2 FTEs-worth of time will actually be worked because employees take time off for various reasons."  (Doc. No. 1995 at 9).  Plaintiffs do not, however, state at what point below 263.2 FTEs the Court should impose contempt sanctions.  This failure alone renders it impossible for the State to know at what point it would be subject to contempt sanctions.  Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n, 389 U.S. 64, 76 (1967) (reversing contempt finding "based upon a decree too vague to be understood;" contempt appropriate only where party "fully understands [court order's] meaning but chooses to ignore its mandate"); LabMD, Inc. v. Federal Trade Commission, 894 F.3d 1221, 1236 (11th Cir. 2018) (court may not impose contempt sanctions based on one of two competing reasonable interpretations of court order; otherwise, "the court would have effectively modified the injunction at a show cause hearing," thereby denying due process to the alleged contemnor); Doe v. Bush, 261 F.3d 1037, 1062 (11th Cir. 2001) (court may not modify injunction through contempt proceedings).  Under Plaintiffs' reading, the State cannot know at what point it may be subject to contempt sanctions.

Moreover, while Plaintiffs now acknowledge that "less than 263.2 FTEs-worth of time will actually be worked," they continue to insist that "defendants must employ 263.2 FTEs-worth of mental-health staff." (Doc. No. 1995 at 9). In so arguing, Plaintiffs ignore another basic reality of the employment market: employees leave their jobs, voluntarily or otherwise, often with little or no notice to their employer. (See, e.g., Declaration of Brian Bateh, Doc. No. 1936-4, at ¶ 5). The turnover rate in the healthcare industry is approximately twenty percent (20%). (Id. at ¶ 9). The Federal Bureau of Prisons experienced a vacancy rate of seventeen percent (17%) for medical staffing in 2014. (Id. at ¶ 10 and Ex. C). In addition to ordinary employee absences, the high turnover and vacancy rates render it impossible for correctional healthcare employers to maintain 100% staffing. (Id. at ¶ 10). Plaintiffs' interpretation of the Staffing Remedial Order fails to account for this basic economic fact.

Plaintiffs' interpretation is obviously unsustainable. In the immediate aftermath of an employee death, resignation, or involuntary termination, Wexford would necessarily not "employ 263.2 FTEs worth of mental-health staff." (Doc. No. 1995 at 9). In Plaintiffs' view, the State would automatically be in contempt of the Staffing Remedial Order until Wexford replaced that employee. That is simply not a sustainable employment model, nor is it an efficient use of this Court's time to adjudicate contempt disputes each time Wexford loses an employee. Such

employment realities are the precise reason the Agreement provides for staffing paybacks only if staffing falls below eighty-five percent (85%). (Doc. No. 1936 at 30-33; Doc. No. 1936-1, Declaration of Ruth Naglich, at ¶¶ 26-29).[3]  ADOC expects Wexford to maintain as close as possible to the number of FTEs provided in the Agreement, but understands that workplace realities will cause Wexford to fall short of employing the full 263.2 FTEs at all times.

Plaintiffs also complain that only certain positions are subject to the staffing paybacks. (Doc. No. 1995 at 9-10; Doc. No. 1945 at 13).  They suggest that, under the State's interpretation of the Staffing Remedial Order, Wexford "would not be required to employ *any* of the mental-health positions that are exempt from payback provisions."  (Doc. No. 1945 at 13).  According to Plaintiffs, this would have "disastrous effects" because Wexford would not be providing the services that these positions cover. (Doc. No. 1995 at 9).  This argument overlooks the fact that ADOC possesses additional contractual remedies, beyond the staffing paybacks, if Wexford fails to meet these other staffing obligations.  The RFP contains performance measures that Wexford must meet. (Doc. No. 1936-1, ¶ 17, Ex. B (RFP) at 96-99, 114).  If Wexford fails to meet those measures (regardless of how many FTEs it is providing), ADOC may withhold payments under the Agreement. (Doc. No. 1936-

---

[3] Indeed, the State proposed the language "consistent with the contract" as the measure of staffing for July 1, 2018. (Doc. No. 1583 at 3).  In proposing that language, the State intended to account for the 85% staffing payback provision.  It did not intend to require 100% staffing of all positions at all times.

1, ¶ 17, Ex. B (RFP) at 96-99, 114).  Moreover, aside from the staffing payback provisions, ADOC may terminate the Agreement if Wexford fails "to continuously provide staffing."  (Doc. No. 1936-1, Ex. B (RFP) at 149).  Thus, Wexford may not, as Plaintiffs suggest, simply decline to fill positions that are not subject to staffing paybacks.

## III.   PLAINTIFFS IMPROPERLY ATTEMPT TO RAISE ISSUES RELATED TO COMPLIANCE WITH OTHER ORDERS.

Plaintiffs complain that the State purportedly failed to comply with certain aspects of the Phase 2A Order and Injunction on Segregation Remedy (Doc. No. 1965) and the Interim Suicide Prevention Order (Doc. No. 1106-1).  Plaintiffs argue that the State is therefore "establishing a pattern and practice of violating remedial orders, not affirmatively informing the court or plaintiffs of their failures, and not promptly taking corrective action when informed of their failures."  (Doc. No. 1995 at 16).  First, as Plaintiffs acknowledge (id.), the Court already set the issue of remedial monitoring for a separate hearing.  (Doc. No. 1927).  Second, Plaintiffs' Motion for Order to Show Cause argued only that the State failed to comply with the Staffing Remedial Order.  (Doc. No. 1916 at 1).  That Motion did not mention any alleged lack of compliance with any other Court order.  Those issues simply are not within the scope of the evidentiary hearing, which plainly covers only the State's alleged non-compliance with the Staffing Remedial Order.  Moreover, the State cannot be held in contempt where, as here, the State has not been advised of or had

10

an opportunity to respond to the conclusory alleged indirect civil contempt.

## CONCLUSION

Pursuant to this Court's Staffing Remedial Order, the State embarked upon a wholesale reinvention of its mental health services less than six (6) months ago. This reinvention included a transition of mental health services to a new vendor, Wexford. The State acknowledges that Wexford faced unanticipated challenges at the beginning of the contractual period. These challenges unfortunately prevented Wexford from initially providing the staffing levels required under the Agreement and this Court's Staffing Remedial Order. Wexford and the State, however, continue to work diligently to increase mental health staffing levels. As a result of those efforts, the State and Wexford are approaching a sustainable level of mental health staffing that will result in substantial compliance with the Staffing Remedial Order, assuming a reasonable method of measuring staffing levels applies.

The State recognizes the importance of compliance with this Court's orders. It understands that this Court views the staffing levels set forth in the Staffing Remedial Order as necessary for the provision of adequate mental health services. The State remains committed to achieving full compliance with the Staffing Remedial Order. The State and Wexford continue to make all reasonable efforts to do so. As set forth in detail in the State's response and the accompanying declarations, these efforts include a massive nationwide recruiting effort as well as

11

incentives and above-market pay for mental health professionals.  In light of the State's commitment and ongoing efforts to achieve full compliance, the State respectfully submits that contempt sanctions are unnecessary at this time.

Dated: September 10, 2018.

/s/ William R. Lunsford
William R. Lunsford
*Attorney for the Commissioner and Associate Commissioner*

William R. Lunsford
Matthew B. Reeves
Melissa K. Marler
Stephen C. Rogers
Alyson L. Smith
**MAYNARD, COOPER & GALE, PC**
655 Gallatin Street
Huntsville, AL 35801
Telephone: (256) 512-5710
Facsimile: (256) 512-0119
blunsford@maynardcooper.com
mreeves@maynardcooper.com
mmarler@maynardcooper.com
srogers@maynardcooper.com
asmith@maynardcooper.com

Luther M. Dorr, Jr.
Mitesh B. Shah
**MAYNARD, COOPER & GALE, PC**
1901 Sixth Avenue North
2400 Regions Harbert Plaza
Birmingham, AL 35203
Telephone: (205) 254-1178
Facsimile: (205) 714-6438
rdorr@maynardcooper.com
mshah@maynardcooper.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all attorneys of record in this matter, including without limitation the following, by the Court's CM/ECF system on this the 10th day of September, 2018:

Maria V. Morris
Rhonda C. Brownstein
J. Richard Cohen
Caitlin J. Sandley
Grace Graham
Jonathan Blocker
David C. Washington
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
maria.morris@splcenter.org
rhonda.brownstein@splcenter.org
richard.cohen@splcenter.org
cj.sandley@splcenter.org
grace.graham@splcenter.org
jonathan.blocker@splcenter.org
david.washington@splcenter.org

William Van Der Pol, Jr.
Glenn N. Baxter
Barbara A. Lawrence
Andrea J. Mixson
Ashley N. Austin
**ALABAMA DISABILITIES ADVOCACY PROGRAM**
University of Alabama
500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
Telephone: (205) 348-6894
Facsimile: (205) 348-3909
wvanderpoljr@adap.ua.edu
gnbaxter@bama.ua.edu
blawrence@adap.ua.edu
amixson@adap.ua.edu
aaustin@adap.ua.edu

Gregory M. Zarzaur
Anil A. Mujumdar
Diandra S. Debrosse
Denise Wiginton
**ZARZAUR MUJUMDAR & DEBROSSE**
2332 2nd Avenue North
Birmingham, AL 35203
Telephone: (205) 983-7985
Facsimile: (888) 505-0523
gregory@zarzaur.com
anil@zarzaur.com
fuli@zarzaur.com
denise@zarzaur.com

Andrew P. Walsh
William G. Somerville III
Patricia Clotfelter
Lisa W. Borden
**BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC**
420 20th Street North
Suite 1400
Birmingham, Alabama 35203
Telephone:  (205) 244-3863
Facsimile:  (205) 488-3863
awalsh@bakerdonelson.com
wsomerville@bakerdonelson.com
pclotfelter@bakerdonelson.com

lborden@bakerdonelson.com

John G. Smith
David R. Boyd
**BALCH & BINGHAM LLP**
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (866) 316-9461
jgsmith@balch.com
dboyd@balch.com

Deana Johnson
Brett T. Lane
**MHM SERVICES, INC.**
1447 Peachtree Street NE
Suite 500
Atlanta, GA 30309
Telephone: (404) 347-4134
Facsimile: (404) 347-4138
djohnson@mhm-services.com
btlane@mhm-services.com

Steven C. Corhern
**BALCH & BINGHAM LLP**
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100
Facsimile: (205) 488-5708
scorhern@balch.com

Lonnie J. Williams
**ALABAMA DISABILITIES ADVOCACY PROGRAM**
P. O. Box 870395
Tuscaloosa, AL 35487
Telephone: (205) 348-4928
Facsimile: (205) 348-3909
lwilliams@adap.ua.edu

Joseph G. Stewart
**ALABAMA DEPARTMENT OF CORRECTIONS**
Legal Division
301 South Ripley Street
Montgomery, Alabama 36130
Telephone (334) 353-3884
Facsimile (334) 353-3891
joseph.stewart@doc.alabama.gov

*/s/ William R. Lunsford*
Of Counsel

14