IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

EDWARD BRAGGS, et al.,           )
                                 )
     Plaintiffs,                 )
                                 )        CIVIL ACTION NO.
     v.                          )         2:14cv601-MHT
                                 )             (WO)
JEFFERSON S. DUNN, in his        )
official capacity as             )
Commissioner of                  )
the Alabama Department of        )
Corrections, et al.,             )
                                 )
     Defendants.                 )

PHASE 2A OPINION AND ORDER ON PLAINTIFFS' MOTION
TO UNSEAL QUARTERLY STAFFING REPORTS

In June 2017, this court found that the Alabama
prison system's "persistent and severe shortages of
mental-health staff and correctional staff" are a
significant factor causing the State to provide
constitutionally inadequate mental-health care to
prisoners. *See Braggs v. Dunn*, 257 F. Supp. 3d 1171,
1267-68 (M.D. Ala. 2017) (Thompson, J.). As part of
the remedy, the court ordered the Alabama Department of
Corrections (ADOC) to file under seal quarterly

mental-health and correctional staffing reports. *See*
Phase 2A Understaffing Remedial Order (doc. no. 1657)
at 7. The plaintiffs moved to unseal these reports and
the defendants agreed, except as to the *correctional*
staffing statistics *broken down by facility*. The court
held an evidentiary hearing on the sole disputed issue
of whether to unseal the facility-specific correctional
staffing figures. After balancing the public's
interest in accessing these figures against ADOC's
interest in keeping them confidential, the court will
now order that past and future quarterly staffing
reports be disclosed in their entirety, albeit with the
facility-specific correctional data being unsealed five
months after the last day of each quarter.

## I. PROCEDURAL HISTORY

The plaintiffs in this class-action lawsuit include
a group of mentally-ill prisoners in the custody of
ADOC. The defendants are the ADOC Commissioner and
Associate Commissioner of Health Services, who are both

sued in only their official capacities. In a liability opinion entered on June 27, 2017, this court found that ADOC's mental-health care for prisoners in its custody was, simply put, "horrendously inadequate." *Braggs*, 257 F. Supp. 3d at 1267. The court laid out seven factors contributing to the Eighth Amendment violation. *Id.* at 1267-68. Additionally, it found that "persistent and severe shortages of mental-health staff and correctional staff" constitute an "overarching issue[] that permeate[s] each of the ... contributing factors of inadequate mental-health care." *Id.* at 1268.

On February 20, 2018, the court issued a remedial opinion on understaffing, *see Braggs v. Dunn*, 2018 WL 985759, at *1 (M.D. Ala. Feb. 20, 2018) (Thompson, J.), along with a remedial order, *see* Understaffing Remedial Order (doc. no. 1657). The remedial order required the defendants to "submit to the court under seal a 'Correctional Staffing Report' and 'Mental Health Staffing Report' on a quarterly basis, that is, March

3

1, June 1, September 1, and December 1 of each year."
*Id.* at 7. The defendants filed such reports under seal
in March, June, and September.

On September 17, 2018, the plaintiffs moved to
unseal past and future quarterly staffing reports. At
a hearing on the motion on September 18, the defendants
agreed that the *mental-health* staffing figures could be
unsealed. The defendants also acknowledged that, until
June 2017, when the court issued its liability opinion,
ADOC had published correctional staffing figures broken
down by facility every month on its website. Defense
counsel represented that the decision to stop
publishing the *correctional* staff figures was made for
three reasons: (1) concern that the reported figures
were inaccurate; (2) security concerns about disclosing
the number of staff posted at different facilities,
especially given that the staffing numbers were lower
than in the past; and (3) the number of "authorized"
positions in the reports was no longer relevant. *See*

Order Regarding Motion to Unseal (doc. no. 2075) at 1-2.

On September 20, 2018, the defendants agreed to make public the total correctional staffing levels across ADOC, but not to break down those figures by facility. *See* Notice of Filing (doc. no. 2066) at 1-2. The defendants cited "security and other concerns related to unsealing the facility-specific information related to correctional staffing levels." *Id.* at 1.

Accordingly, the only remaining disputed issue from the plaintiffs' motion to unseal is whether to unseal the facility-specific correctional staffing numbers. The court held an evidentiary hearing on this issue on October 23 and 24, 2018, and subsequently heard oral argument to clarify the parties' positions.[1]

---

1. The final transcripts of the proceedings related to the pending issue are not yet ready. The court has, therefore, cited to the "rough transcript" in this opinion.

## II. DISCUSSION

The public has a common-law right to inspect and copy judicial records and documents. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978); *see also Newman v. Graddick*, 696 F.2d 796, 802-04 (11th Cir. 1983) (applying the common-law right to access judicial records in a class action brought by Alabama prisoners). The "test for whether a judicial record can be withheld from the public is a balancing test that weighs the competing interests of the parties to determine whether there is good cause to deny the public the right to access the document." *F.T.C. v. AbbVie Prods., LLC*, 713 F.3d 54, 62 (11th Cir. 2013) (internal quotation marks omitted). This balancing test weighs "the public interest in accessing court documents against a party's interest in keeping the information confidential." *Romero v. Drummond Co.*, 480 F.3d 1234, 1246 (11th Cir. 2007). On the public's side

of the scale is the "presumption ... in favor of public access to judicial records." *Nixon*, 435 U.S. at 602.[2]

Here, to support their motion to unseal, the plaintiffs invoke the public's interest in ensuring both the constitutionality of Alabama's prisons and the "judicious stewardship of taxpayer dollars." Plaintiffs' Pretrial Brief (doc. no. 2100) at 4-6. On the other side of the scale, weighing against unsealing, the defendants assert an interest in "maintaining the safety and security of" ADOC

---

2. The factors courts consider in applying the test include, among others, "whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents," *Romero*, 480 F.3d at 1246, as well as "whether the records are sought for such illegitimate purposes as to promote public scandal or gain unfair commercial advantage, whether access is likely to promote public understanding of historically significant events, and whether the press has already been permitted substantial access to the contents of the records," *Newman*, 696 F.2d at 803.

facilities. Defendants' Pretrial Brief (doc. no. 2102) at 14.

Before examining these asserted interests, it is helpful to identify the points of agreement between the parties, and thereby define more precisely the scope of the dispute before the court. First, the parties agree that the contested statistics need not remain sealed permanently. Instead, they disagree on how long the records should remain under seal.[3] While the plaintiffs argued that disclosing the figures in a quarterly report *five months* after the last day of the period covered in the report would adequately protect the public's access right, the defendants requested that the figures remain under seal for at least 12 months

_____

3. Witnesses for both sides indicated that the degree to which the correctional staffing figures are up to date affects the security risk that they pose. For instance, Eldon Vail, the plaintiffs' expert, testified that he would not want to post a "real-time" roster of who is on shift for a particular day. October 23, 2018, Rough Transcript at 7. Cheryl Price, ADOC's Institutional Coordinator, testified that the more recent the correctional staffing information, the greater concern it poses. *See* October 24, 2018, Rough Transcript at 83.

after the last day of the period covered.[4]  *See* October 24, 2018, Rough Transcript at 94, 125.[5]

Second, neither party disputes that understaffing undermines prison safety.[6]  The major contested security issue here is whether and to what extent the disclosure of statistics showing correctional understaffing poses

---

4.  Defense counsel specified that the 12-month delay would be acceptable unless changed circumstances should arise.  *See* October 24, 2018, Rough Transcript at 94.

5.  Currently, the partially sealed quarterly staffing reports are filed with the court two months after the last day of the period covered by the quarterly report. For example, the defendants filed on June 1, 2018, the quarterly staffing report for the period of January 1 through March 31, 2018.  The plaintiffs would accept unsealing three months after the report is filed--resulting in a total five-month informational delay--and the defendants would accept unsealing ten months after the documents are filed--resulting in a 12-month informational delay.

6.  The court has found that correctional understaffing "leaves many ADOC facilities incredibly dangerous and out of control" and causes "prisoners and correctional officers alike" to be "justifiably afraid for their safety."  *Braggs*, 257 F. Supp. 3d at 1198.

a security danger, *not* whether understaffing itself causes danger.[7]

Third and finally, the defendants have already agreed to make public the aggregate numbers of correctional staff employed at all ADOC facilities. Therefore, the balancing test here must focus on the degree to which publishing facility-specific information affects each party's asserted interests as compared to the publication of the aggregate correctional staffing figures for all ADOC facilities,

_____

7. The defendants contend that "it staggers the imagination" that the plaintiffs and their expert argue that, on the one hand, correctional understaffing increases the risk of violence and other security problems, while, on the other hand, denying that public dissemination of the staffing levels would increase security risks. Defendants' Pretrial Brief (doc. no. 2102) at 10. The defendants' argument ignores a basic principle of American democracy: transparency and public awareness promote accountability and good governance. *See Newman*, 696 F.2d at 801 ("Informed public opinion is critical to effective self-governance."); *cf. Nixon*, 435 U.S. at 597-98 (noting that "the citizen's desire to keep a watchful eye on the workings of public agencies" is an interest underpinning the right to access court records). Simply put, spotlighting government failings can help ensure that they are remedied.

not as compared to a hypothetical situation in which no correctional staffing figures are public.

In sum, the narrow question before the court is whether the benefit to the public's interest that would result from disclosing--with less than the 12-month delay accepted by the defendants--the facility-specific figures (as opposed to the already-public aggregate figures) outweighs the cost in terms of security that would result from such disclosure. As elaborated below, the court finds that the benefit outweighs the cost if a five-month delay is used to balance the competing interests.

## A.   The Public's Interest

The plaintiffs assert two interests that the public has in accessing the disputed staffing figures. First, they argue, the public has a strong interest in ensuring the constitutionality of Alabama's prisons. Second, the public has a strong interest in the "judicious   stewardship   of   taxpayer   dollars."

11

Plaintiffs' Pretrial Brief (doc. no. 2100) at 6. Courts have recognized similar interests in cases concerning public access to judicial and other government records. For example, in *Kelly v. Wengler*, the plaintiff prisoners sought to unseal a series of filings related to defendant Corrections Corporation of America (CCA)'s failure to staff the Idaho Correctional Center adequately. 979 F. Supp. 2d 1243, 1244 (D. Idaho 2013) (Carter, J.). In granting the plaintiffs' motion to unseal, the court reasoned that "Idaho taxpayers pay CCA to operate one of their prisons. With public money comes a public concern about how that money is spent." *Id.* at 1246; *see also Newman*, 696 F.2d at 801 ("This litigation concerning penal administration in Alabama is of paramount importance to the citizens of that state."); *Storm v. Twitchell*, 2014 WL 4926119, at *14 (D. Idaho Sept. 29, 2014) ("Whether conditions at the county jails violate the Eighth Amendment of the United States Constitution is important information for the general public to know.")

12

(Dale, M.J.); *cf. News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1196 (11th Cir. 2007) (holding, in a Freedom of Information Act (FOIA) case, that "the public interest in determining whether FEMA has been a proper steward of billions of taxpayer dollars is undeniable and powerful").

Zooming out, in this case, the plaintiffs' two separate asserted interests appear to be two facets of Alabamians' overarching interest in ensuring the sound and lawful administration of publicly funded government agencies. That is, certain Alabamians may care about correctional understaffing because they care about whether their tax dollars are misspent; others may care about the issue because they do not want their government to violate the Constitution. Either way one looks at it, Alabamians indisputably have a powerful interest in overseeing ADOC's performance.

The big question, then, is to what degree publishing facility-specific--as opposed to overall--correctional staffing figures advances this powerful

interest. Put differently, what is the difference between the public knowing that there are 3,326 assigned correctional officer positions throughout ADOC, of which 1,096 are filled, and, on the other hand, that there are, for example, approximately 270 assigned to prison X, but approximately only 50 filled? *See* June 2018 Quarterly Staffing Report (doc. no. 1858-1) at 2. The court finds that there is a substantial difference.

To start, publishing only the aggregate vacancy rate (67 %, 2,230/3,326) fails to inform the public that the vacancy rate--and thus understaffing problem--is actually much worse at certain facilities, such as, for example, prison X (approximately 81 %, 220/270). *See id.* Furthermore, local and national media outlets have written about understaffing at particular Alabama prisons, which shows that facility-specific understaffing is an issue of significant public concern. *See, e.g.*, Mike Cason, *Chronic Understaffing Grows Worse in Alabama's Tutwiler*

*Prison*, AL.com (Nov. 29, 2017), https://www.al.com/news/index.ssf/2017/11/chronic_under staffing_grows_wo.html; Campbell Roberton, *An Alabama Prison's Unrelenting Descent Into Violence*, N.Y. Times (Mar. 28, 2017), https://www.nytimes.com/2017/03/28/us/alabama-prison-violence.html (describing lawsuit alleging that understaffing leads to violence at St. Clair); Connor Sheets, *Who's Guarding Alabama's Death Row? Holman Prison 'Severely Understaffed,' Internal Documents Show*, AL.com (Jan. 27, 2017), https://www.al.com/news/birmingham/index.ssf/2017/01/wh os_guarding_alabamas_death_r.html.  Finally, something is to be said for the storytelling principle that any good journalist knows: the more detailed a picture of a problem is--and the closer it gets to the human scale--the more vivid, graspable, and thus demanding of public attention it can become.  To hide the details of understaffing is to hinder public oversight of ADOC.

Granted, the defendants do not oppose unsealing the quarterly facility-specific figures 12 months after the last day of the period covered by the report in question. Nevertheless, this court finds that there is a substantial difference between a 12-month delay and the two-month delay with which the quarterly reports are currently published. When this court originally ordered the quarterly reports, it determined that they were "necessary to apprise the court of whether the defendants' plan is addressing ADOC's correctional ... understaffing effectively and as quickly as possible, and to alert the court if additional measures are needed." *Braggs*, 2018 WL 985759, at \*9. Similar reasoning applies here: *up-to-speed* quarterly reports published *without significant delay* are needed to apprise the public of whether the defendants are addressing understaffing "effectively and as quickly as possible," and to alert the public "if additional measures are needed." *Id.*[8]

_____

8. *See Kelly*, 979 F. Supp. 2d at 1245 ("The public

While the public does not need real-time correctional staffing figures, a 12-month delay would seriously hamper its ability to monitor ADOC's staffing efforts.

In sum, unsealing the facility-specific correctional staffing figures with less than a 12-month delay would substantially advance the public's interest in overseeing ADOC's administration of Alabama's prisons.

### B.   Defendants' Interests

#### 1.   *Security and specificity*

On the other side of the scale, the defendants assert their interest in maintaining safety and security within ADOC facilities.  They argue that "clear case law recognizes the compelling interest in maintaining a seal on judicial records ... containing critical correctional staffing information," and cite three cases in particular that "counsel against

has a right, and even a responsibility . . . to monitor the activities and performance of their own government and use this information to implement change if needed." (quoting *Skinner v. Uphoff*, 2005 WL 4089333, at *3 (D. Wyo. Sept. 27, 2005) (Brimmer, J.)).

unsealing." Defendants' Pretrial Brief (doc. no. 2102) at 8. Yet, the three cited cases do little to support maintaining confidentiality here. In fact, upon closer examination, they reveal a principle that supports unsealing: it is disclosing staffing figures for *specific locations within* a prison, not total staffing figures for a prison, that poses a serious security risk.

For example, the defendants cite the FOIA case *Raher v. Fed. Bureau of Prisons*, 749 F. Supp. 2d 1148, 1155 (D. Or. 2010) (Stewart, M.J.), and in a parenthetical describe the court there as finding that "disclosure of correctional staffing information 'could present a security risk.'" *Id.* at 8 (quoting *Raher*, 749 F. Supp. 2d at 1155). However, the full sentence in the *Raher* opinion is actually: "disclosure of certain 'staffing patterns,' such as the specific number of guards in a specific location at a specific time, could present a security risk, *but more general staffing patterns, such as total number of guards*

*employed in a facility, likely does not.*"  *Raher*, 749 F. Supp. 2d at 1155 (emphasis added).  The end of the sentence, omitted by the defendants, directly contravenes their security argument because it states that publishing the information at issue here--the total number of guards employed at a prison--"likely does not" pose a security risk.  *Id.*

The defendants cite a footnote in a second case, *Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1112 n.14 (D. Idaho 2013) (Carter, J.).  In the footnote, the court admitted it had used "vague" language in the opinion by referring to a "handful" of officers posted in a particular area of the prison because the court "agrees with Defendants that publicizing specific staffing assignment numbers could cause security problems for the facility."  *Id.*  Notably, the decision came down just a few months after another ruling in the same litigation, discussed earlier in section II.A of this opinion, where the court granted the plaintiffs' motion to unseal documents relating to correctional

understaffing. *See Kelly*, 979 F. Supp. 2d at 1244. And when the footnote is read in the context of the full opinion, its ostensible support for the defendants' security argument falls apart. This is because the opinion repeatedly refers to statistics showing ongoing correctional understaffing problems at *a particular correctional facility*, which demonstrates that the court had no security qualms with disclosing such data. For instance, the opinion states that there were typically 55 mandatory posts for the day shift at the facility, and 37 for the night shift, and cites evidence that there were more than 4,800 hours over a seven-month period at the facility where a security post was vacant. *See Kelly*, 979 F. Supp. 2d at 1108, 1109 n.5. The court further noted that the understaffing persisted up to the time of the ruling. *Id.* at 1109. Finally, the footnote cited by defendants expressed its hesitation to publish the staffing assignment numbers *in a particular location within a facility*, which is distinct from the defendants'

security concern with posting the *overall figures for an entire facility.  See, e.g.*, *Raher*, 749 F. Supp. 2d at 1155 (explaining that disclosing the number of staff at a specific location at a specific time within a prison could present a security risk, but publicizing the total number of guards employed in a facility likely does not).

A third decision cited by the defendants, *Grassi v. Corr. Corp. of Am.*, is also distinguishable from the case here.  2008 WL 5172154, *1 n.2 (D. Col. Dec. 9 2008) (Krieger, J.).  There, the court granted the defendants' motion to seal a confidential Colorado Department of Corrections (CDOC) policy governing the transportation of inmates, which contained "sensitive security procedures and staffing levels to be used during inmate transportation outside of prison facilities."  *Id.*  The court reasoned that "CDOC's security interests in keeping this material confidential outweighs the public interest in access to court records, particularly because the particular

details of the transportation procedure are of fairly minimal relevance to the issues resolved herein." *Id.* The decision is distinguishable on three grounds. First, the documents at issue there contained staffing levels *and* "sensitive security procedures," not just staffing levels. *Id.* Second and relatedly, the staffing levels pertained to a specific prison procedure--transporting inmates outside of prison--not to the overall staffing within a facility. As discussed above, this more granular staffing information is more likely to present a security risk.[9] Third, the court's reasoning that the procedures the plaintiffs sought to disclose were "of fairly minimal relevance" to the merits of the case does not apply here, given that understaffing is central to this litigation. *See Braggs*, 257 F. Supp. 3d at 1267-68.

---

9. Transporting inmates outside of prison presents unique security risks that are not at issue here.

## 2. *Dangerous deductions?*

The three cases cited by the defendants thus indicate that the prospect of disclosing staffing numbers for a particular location within a prison is what creates significant security concerns. In light of this principle, the testimony of Cheryl Price, ADOC's Institutional Coordinator, is particularly noteworthy, because she suggested that ADOC inmates could use the overall staff numbers for a facility to deduce how many security officers are on post at particular locations within the facility. *See* October 24, 2018, Rough Transcript at 75-76, 81-82. For example, she said, if prisoners were to read a quarterly report and see the number of officers employed at Bibb Correctional Facility during a particular period, they could divide that number by the number of shifts to roughly determine how many officers are on guard at a time.[10] Armed with the knowledge of

---

10. Based on defense counsel's representations about the content of the staffing reports, it appears unlikely that inmates could *accurately* deduce how many

the number of guards on shift, an inmate viewing guards
in his particular location of the prison could estimate
how many are left in the rest of the facility. And if
inmates from different areas of the prison were to
communicate with each other--perhaps using
cellphones--they could deduce the numbers of officers
present in specific remaining areas of the prison.
Price's suggestion that the inmates could deduce
location-specific staffing numbers from a total number
of staff in a facility is concerning.

    Yet, this concern is almost entirely mitigated by
the fact that the types of extrapolations Price fears
would hardly give inmates any more knowledge of
staffing presence than what they can already learn with
their own eyes. As Price admitted, the inmates can see

_____

guards are on shift at a particular time. Counsel said
that the "actual" staffing figures for each facility in
the quarterly reports do not reflect overtime hours.
*See* October 24, 2018, Rough Transcript at 104. If
officers work in excess of their assigned shifts, and
those overtime hours are not reflected in the quarterly
reports, then one cannot determine the number of staff
working on a particular day by dividing the total staff
by the number of shifts.

how many guards are present in different sensitive areas of the prison, such as the towers, perimeter, and yard. *Id.* at 78.[11] In Price's own words, the inmates "already have a visual on our staffing. It's not rocket science to see if you only have 60 officers assigned at Bibb, and you've got four shifts, where those officers are located. Publishing this information *just confirms that fact.*" *Id.* at 61 (emphasis added). Indeed, if prisoners from different areas of a facility can communicate with each other using cellphones, as Price suggested, they could simply share with each other their first-hand observations of how many officers are in each location, without needing to do any extrapolating.

To her credit, Margaret Savage, the defendants' expert, also concedes that "casual observation may lead inmates to the same conclusion" that they would reach by deducing security weaknesses from the total staffing

_____

11. Two ADOC inmates also testified that they could personally observe whether certain security posts are staffed or not. *See* October 24, 2018, Rough Transcript at 13-14, 29-30.

numbers at a particular facility. Savage Affidavit (doc. no. 2104-1) at 5.[12]  Still, Savage conjectures that publishing the figures would make matters worse because "external confirmation may be enough to embolden inmates to attempt" illegal activities. *Id.* This is speculation about what might motivate inmates to act, not evidence that publication of the statistics will broaden inmates' knowledge of security vulnerabilities in prison.

As the *Newman* decision makes clear, the mere possibility of prison violence is not sufficient to justify keeping judicial records confidential. 696 F.2d at 803-04.  There, the Commissioner of the Department of Corrections testified "only that publication [of the court filings] could make prison

---

12. Plaintiffs objected to any consideration of Savage's affidavit, given that she did not testify. *See* October 23, 2018, Rough Transcript at 30.  They requested an opportunity to cross examine her if the court relied on her affidavit.  Because the court is not relying on Savage's affidavit to support any findings in favor of keeping the documents sealed, it is not necessary to allow the plaintiffs to cross examine her.

violence a 'possibility,'" leading the court to conclude that "fear of prisoner unrest ... was not established." *Id.* at 803. The court allowed newspapers to copy the filings. Like in *Newman*, the defendants here have not shown that it is anything more than a "possibility" that external confirmation of what the prisoners already observe about understaffing would embolden them to act. At the end of the day, because prisoners personally witness understaffing, "it is not at all certain from the record that preventing" public viewing of the staffing reports would accomplish the "purpose [of] keeping the information from the prisoners." *Id.*

### 3. *Other prison systems' websites*

The defendants argue that no other department of corrections with staffing levels similar to ADOC's publishes facility-specific staffing information. Defendants' Pretrial Brief (doc. no. 2102) at 11. Savage asserted that she "sampled the websites of

several other departments of correction with low correctional staffing levels" and none of them "regularly publishes facility-specific correctional staffing and vacancy information on their websites." Savage Affidavit (doc. no. 2104-1) at 6. Plaintiffs' counsel, on the other hand, said that facility-specific staffing information is "available for a lot of states," including for Louisiana and Georgia. *See* October 24, 2018, Rough Transcript at 110-11. The court need not resolve the factual dispute of how many other departments of corrections publish the figures, because it is beside the point. The question here is not whether, as a policy matter, ADOC should publish the staffing figures in the ordinary course of business; rather, the issue is whether the public should be allowed to access records filed in this court proceeding. Evidence that other correctional departments do not publish staffing data would only bolster the defendants' security arguments here if the defendants provided proof that these departments

declined to publish the data *based on security concerns*. The defendants offered no such proof, however.

The only evidence the court heard on another department's decision whether to publish such information was the testimony of Eldon Vail, the plaintiffs' expert. He testified that while Secretary of the Washington Department of Corrections, he would provide the public with correctional staffing numbers upon request, but did not routinely publish them on the website because the issue never came up. *See* October 23, 2018, Rough Transcript at 5-6. Vail's testimony thus demonstrates that the absence of correctional staffing figures on other departments' websites does not necessarily mean that the officials there believed publication posed a security risk. In fact, Vail unequivocally opined that publishing the ADOC figures at issue here would not create a security risk. *Id.* at 11.

Perhaps most notably, the evidence the court heard on ADOC's own decision in 2017 to end its more than 15-year practice of publishing the quarterly staffing reports on its website leads the court to conclude that security was at best a minor, and possibly even post-hoc, reason behind the decision. Steve Brown, former chief of staff to the ADOC Commissioner, testified that he and the commissioner made the decision to remove the quarterly staffing information from the website because it was inaccurate. *See* October 23, 2018, Rough Testimony at 49-50. Brown's October 2, 2017, email to his staff instructing them to remove the information confirms as much, as it states that: "We want to pull the personnel chart from the monthly statistical report until the staffing studies are completed and we have accurate data concerning staffing shortages." Brown Email (doc. no. 2091-3) at 1. While Associate Commissioner Grantt Culliver said that he had informally raised some security concerns regarding the publication of the data in 2017, Brown

suggested that Culliver's concerns were basically an afterthought raised after Brown and the commissioner already intended to remove the information due to its inaccuracy. *See* October 23, 2018, Rough Transcript at 50. To be clear, just because security was not the driving force behind the original decision in 2017 to stop publishing the staffing figures does not mean the defendants cannot *now* cite security as a reason not to disclose them. What the defendants' reasoning behind the prior decision does demonstrate--like Vail's testimony--is that a department of corrections' decision not to routinely publish staffing data does not necessarily show that prison officials viewed such publication to be dangerous.

In sum, the court finds that, while publishing facility-specific quarterly correctional staffing data possibly poses some degree of risk, the risk is not significant enough to overcome the strong interest in public disclosure of the information.

## C.  Balancing the Interests

Taking a step back, the court's decision here can be conceptualized as that of picking a point on a graph with two axes.  One axis measures the specificity of the correctional staffing figures, and ranges from publishing the number of staff in a particular post in a prison to publishing the aggregate number of correctional staff in all ADOC facilities.  The other axis measures the delay with which the statistics are published, ranging from disclosing real-time daily staffing statistics, to delaying years, or even permanently sealing them.  The more granular the data, and the more recent it is, the greater the security risk, and the greater its value in informing the public.  Conversely, the less recent and granular the data is, the less security risks and informative value it presents.

The points on the delay-specificity graph that the parties propose are not so far apart.  The defendants currently disclose, with a *two-month delay*, quarterly

reports containing *aggregate* correctional staffing numbers, and have expressed willingness to disclose quarterly *facility-specific* numbers with a *12-month delay*. By contrast, the plaintiffs moved to disclose the quarterly *facility-specific* figures that are filed with a *two-month delay*, and ultimately indicated that they would accept disclosing the figures with a *five-month delay*.

Weighing the public's and the defendants' interests analyzed above, the court finds that disclosing quarterly facility-specific data with a five-month delay--that is, three months after the reports are filed in court--strikes an appropriate balance. Delaying the unsealing of the staffing reports an additional three months sufficiently mitigates the security concerns raised by defendants, while not unduly hampering the public's ability to oversee ADOC's spending as well as its compliance with court orders and the Constitution.

**\*\*\***

Accordingly, it is ORDERED that the plaintiffs'
motion to unseal the defendants' quarterly staffing
reports (doc. no. 2045) is granted to the extent that,
for each past and future quarterly staffing report
filed by the defendants, the defendants are, initially,
to file the facility-specific correctional data under
seal and then, five months after the last day of
quarter covered by the report, to refile the data
unsealed. None of the other information in the
quarterly reports shall be filed under seal.

DONE, this the 2nd day of January, 2019.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE