IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

EDWARD BRAGGS, et al.,           )
                                 )
        Plaintiffs,              )
                                 )        CIVIL ACTION NO.
        v.                       )         2:14cv601-MHT
                                 )            (WO)
JEFFERSON S. DUNN, in his        )
official capacity as             )
Commissioner of                  )
the Alabama Department of        )
Corrections, et al.,             )
                                 )
        Defendants.              )

PHASE 2A SUPPLEMENTAL LIABILITY OPINION AND
ORDER ON PERIODIC MENTAL-HEALTH EVALUATIONS
OF PRISONERS IN SEGREGATION

On June 27, 2017, the court issued a liability

opinion in which it found that the Alabama Department

of Corrections (ADOC)'s provision of mental-health care

to prisoners violates the Eighth Amendment to the U.S.

Constitution. That opinion noted "substantial evidence

... that ADOC is not conducting adequate periodic

mental-health assessments of prisoners in segregation."

*Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1249 (M.D. Ala.

2017) (Thompson, J.). The court, "out of an abundance

of caution and exercising its discretion," reserved its judgment and left the Eighth Amendment finding open as to this discrete issue in order to "solicit more input from the parties." [1] *Id.* After further briefing and oral argument, the court now finds, based on a full reexamination of the record from the liability trial, that ADOC has not been conducting adequate periodic mental-health evaluations of prisoners in segregation, and that this failure has contributed to the ADOC defendants' violation of the Eighth Amendment discussed in the main liability opinion as to prisoners with serious mental-health needs in segregation.[2] *See id.*

---

1. Because the court reserved this issue at the time of entering its liability opinion on June 27, 2017, and because the parties declined to submit additional evidence into the record, it now decides the issue based on the record that existed at the time of the liability opinion.

2. Defendants argued that a separate liability opinion on this issue would be unnecessary because of the court's plan to hold a remedial trial on segregation. *See* Defs.' Response to Pls.' Proposed Opinion (doc. no. 1549) at 3. The court disagrees. Identifying the full scope of the liability finding, including the discrete issue analyzed here, is necessary in order to determine the scope and elements

## I. LEGAL STANDARD

In its June 2017 opinion, the court discussed the applicable Eighth Amendment law at great length, both in the legal standard section and within the findings and facts and conclusions of law. In the interest of brevity, the court refers the reader to that earlier opinion.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before turning to the evidence in the record that goes directly to the narrow issue presented, the court pauses to summarize those findings of fact and conclusions of law from the liability opinion that are most relevant to the decision today. However, this opinion is intended to be read in the context of the earlier liability opinion.

---

of the necessary remedy. Moreover, to the extent that defendants complain of the possibility of "stale evidence," this claim is unavailing given that the parties both declined the opportunity to present additional evidence on this issue.

## A. Serious Mental-Health Needs

To prove an Eighth Amendment claim based on inadequate mental-health care, plaintiffs must show that they have serious mental-health care needs. A serious need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). As this court previously found, "It is clear that a number of prisoners in ADOC's custody have serious mental-health needs, and the issue is undisputed." *Braggs*, 257 F. Supp. 3d at 1190. Because ADOC's contractor for mental-health care places on the mental-health caseload only those prisoners who have been diagnosed with a condition that *requires* treatment, all prisoners on the caseload meet the legal requirement for having a

serious mental-health need. *See Farrow*, 320 F.3d at 1243.[3]

The court found that ADOC systemically "fails to identify and classify appropriately those with mental illnesses," and that the effects of this under-identification "cascade[] through the system." *Braggs*, 257 F. Supp. 3d at 1201. ADOC's under-identification of prisoners results in an artificial, abnormally low number of ADOC prisoners on the mental-health caseload. *Id.* at 1201. Accordingly, the total number of prisoners with serious mental-health needs in ADOC's custody includes both all individuals on the caseload and those additional individuals with serious mental-health needs who ADOC has failed to identify.

---

3. As in the prior liability opinion, when the court refers to 'mentally ill prisoners' in this opinion, it is referring to only those with serious mental-health needs. *See Braggs*, 257 F. Supp. 3d at 1190.

### B. Serious Harm and Substantial Risks of Serious Harm Posed by Inadequate Periodic Mental-Health Evaluations in Segregation

In addition to showing a serious mental-health need, plaintiffs must establish that they have been subjected to either serious harm, or a substantial risk of serious harm--the second part of the 'objective' test under Eighth Amendment jurisprudence--as a result of inadequate mental-health care. Put another way, plaintiffs must show that their serious mental-health need, "if left unattended, 'poses a substantial risk of serious harm.'" *Farrow*, 320 F.3d at 1243 n.13 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1970)).

Defendants may be held liable for "incarcerating prisoners under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

Plaintiffs may bring an Eighth Amendment challenge to a condition to prevent serious harm which is substantially likely to occur in the future--a substantial risk of serious harm. That is, a showing of either actual serious harm or a substantial risk of

serious harm is sufficient to sustain the harm requirement. *See Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) ("a remedy for unsafe conditions need not await a tragic event," because "the Eighth Amendment protects against future harms to inmates," even when the harm "might not affect all of those exposed" to the risk and even when the harm would not manifest itself immediately). In other words, plaintiffs must show "that they have been subjected to the harmful policies and practices at issue, not (necessarily) that they have already been harmed by these policies and practices." *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1123 (M.D. Ala. 2016) (Thompson, J.).

Moreover, multiple policies or practices that combine to deprive a prisoner of a "single, identifiable human need," such as mental-health care, can support a finding of Eighth Amendment liability. *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004); *see also Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575–76 (11th

Cir. 1985) (recognizing 'totality of conditions' approach in prison-conditions cases).

For the following reasons, the court finds, by a preponderance of the evidence, that defendants are conducting inadequate periodic mental-health evaluations of prisoners in segregation, and that this inadequacy subjects prisoners with serious mental-health needs to a substantial risk of serious harm.

### 1. Psychological Harms of Segregation

In order to understand the harm of failing to provide adequate evaluations of the mental health of prisoners in segregation, it is necessary to understand the substantial risk of psychological harm and decompensation posed by extended placement in segregation. Therefore, the court now summarizes its previous findings on the harms posed by segregation.

As mental-health and correctional professionals have recognized, and as this court previously observed,

long-term isolation resulting from segregation or solitary confinement has crippling consequences for mental health. Dr. Hunter, the medical director for ADOC's mental-health contractor, testified that it is "generally recognized" in the profession, including within ADOC, that "prolonged segregation is deleterious to one's psyche and one's mental health function." Hunter Trial Tr. Vol. II at 77:24-78:2. The psychological harm from segregation can lead to symptoms including hallucinations, chest pain, palpitations, anxiety attacks, and self-harm. *See* Burns Trial Tr. Vol. I at 209; *see also Palakovic v. Wetzel*, 854 F.3d 209, 225-26 (3d. Cir. 2017) (summarizing the "robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement," including "anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self-identity," as well as physical harm). "The

potentially devastating effects of these conditions are reflected in the characteristically high numbers of suicide deaths, and incidents of self-harm and self-mutilation that occur in many of these units." Joint Ex. 459, Haney Expert Report (doc. no. 1038-1043) at 130-31. Moreover, the harmful effects of segregation--even apart from suicide--"can be irreversible," and "can persist beyond the time that prisoners are housed in isolation and lead to long-term disability and dysfunction." *Id.*; *see also Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring) (summarizing case law and historical texts that "understood[] and questioned" the "human toll wrought by extended terms of isolation" and observing that "research still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price.").

As experts from both sides testified and the court found, the conditions in ADOC segregation units are not just conducive, but especially so, to psychological

harm and decompensation. "ADOC prisoners receive very little out-of-cell time; they are left idle for almost all hours of the day with very little property allowed in the cell; the physical conditions of the segregation cells are often deplorable; and the design of the cells often makes it difficult to monitor the well-being of the prisoners." *Braggs*, 257 F. Supp. 3d at 1238. The segregation cells are in significant disrepair and are often poorly lit, with little natural light and only small grated windows, if any. *See id*. The segregation units are often filled with the smell of burning paper and urine and some are extremely dirty with what appears to be dried excrement smeared on the walls and floors. Loud noises travel through the segregation units, some of which house between 20 to 50 people on multiple levels. *See id.* These aspects of ADOC's segregation units, the court found, result in a *heightened* risk of decompensation and development of mental illness, and, as plaintiffs' expert Haney

testified, make it more difficult for staff to detect decompensation. *See id.* at 1238-39.

The psychological harms of isolation can affect anyone subjected to segregation, including those who were not previously mentally ill. As Haney testified, citing a study by defendants' consultant, Dr. Jeffrey Metzner, "Isolation can be harmful to any prisoner," threatening "potentially adverse effects ... includ[ing] anxiety, depression, anger, cognitive disturbances, perceptual distortions, obsessive thoughts, paranoia, and psychosis." Joint Ex. 459 at 105; *see also* Burns Trial Tr. Vol. I at 209 (explaining that the physical symptoms of psychological harm in segregation may be experienced even among previously healthy people); Hunter Trial Tr. Vol. III, 72:24-73:1 ("[A]nyone, if they were in segregation long enough, would run the risk of deterioration in their mental health functioning."); Tytell Trial Tr. at 189:9-20 (stating that segregation could trigger psychosis and cause delusions in previously healthy individuals).

Further, as plaintiffs' expert Burns explained, it is impossible to know in advance which prisoners have the kinds of vulnerabilities that will result in psychological harm from segregation. *See* Burns Trial Tr. Vol. I at 209:11-10:2.

Although the serious psychological harms stemming from segregation can affect anyone, they are "even more devastating for those with mental illness." *Braggs*, 257 F. Supp. 3d at 1237. Trial testimony revealed that the risk of decompensation in segregation increases with both the duration of isolation and the severity of the prisoner's mental illness. *See id.* at 1235. As the court noted, "a general consensus among correctional and psychiatric professionals, while not necessarily establishing a constitutional floor, has developed in the last ten years: placement and duration of segregation should be strictly limited for mentally ill prisoners." *Id.* at 1237. For example, the National Commission on Correctional Health Care has issued a position statement declaring that mentally ill

prisoners should not be placed in segregation absent extenuating circumstances, and even in those circumstances, the stay should be shorter than 30 days. Multiple witnesses, including ADOC's chief psychologist, agreed that overwhelming research shows that prolonged isolation has gravely detrimental effects on mental health, especially for those with pre-existing mental illness. Even one of defendants' experts opined that, based on his experience as a correctional administrator, mentally ill prisoners should generally not be placed in segregation; if they are, it should only occur with the explicit approval and hands-on involvement of mental-health staff, and such prisoners should be placed on a fast-track to be moved into more therapeutic settings.

The substantial risk of harm posed by extended placement in segregation is even more acute for the subset of prisoners with serious mental-health needs

who suffer from 'serious mental illness.'[4]  Indeed, the American Correctional Association and the American Psychiatric Association take the position that seriously mentally ill people should not be placed in segregation unless absolutely necessary, and if so, they should only remain for the shortest duration possible and no longer than three to four weeks. American Correctional Association, Restrictive Housing Performance Based Standards, August 2016; American Psychiatric Association, Position Statement on Segregation of Prisoners with Mental Illness (2012). Associate Commissioner Naglich candidly agreed with

---

4. 'Serious mental illness' is a term of art in the field of psychiatry--distinct from the far broader Eighth Amendment concept of 'serious mental-health needs'--that refers to a certain subset of particularly disabling conditions. Serious mental illness is defined by the diagnosis, duration, and severity of the symptoms. Certain diagnoses, such as schizophrenia and disorders accompanied by psychosis, are by definition serious mental illnesses, because they last a lifetime and are accompanied by debilitating symptoms; others, such as major depression and anxiety disorder, may be considered serious mental illnesses depending on the severity of the individual's symptoms.

plaintiffs' expert Burns that placing seriously mentally ill prisoners in segregation is "categorically inappropriate," and that such placement is tantamount to "denial of minimal medical care." Naglich Testimony Vol. V at 73. Given the consensus on the substantial risk of harm of decompensation for these most severely mentally ill prisoners, the court concluded that it is categorically inappropriate to place prisoners with serious mental illness in segregation absent extenuating circumstances; in addition, when extenuating circumstances exist, decisions regarding the placement of such prisoners should be made with the involvement and approval of appropriate mental-health staff, and the prisoners should be moved out of segregation as soon as possible and have access to treatment and monitoring in the meantime.

Despite the significant risks of harm created by segregation and by ADOC's segregation facilities in particular, "overwhelming evidence makes clear that ADOC does not ensure that those with a heightened risk

of serious harm from mental illness are not placed in segregation or that they are not sent there for dangerously long periods." *Braggs*, 257 F. Supp. 3d at 1240. ADOC lacks an effective system for evaluating mental-health risks both when deciding whether to place prisoners in segregation and when determining the length of a segregation placement. The result is that prisoners whose mental illness makes them likely to be harmed by segregation are placed there anyway; indeed, mentally ill prisoners are overrepresented in ADOC segregation units. *See id.* at 1248. Tragically, while the needs of prisoners with mental illness are significantly greater in segregation due to the severe effects of isolation, access to care is "gravely more limited than in general population, and nonexistent at some facilities." *Id.* at 1242. Prisoners in segregation are not allowed to leave their cells for mental-health groups providing therapeutic activities; they also have very little access to individual treatment, due in large part to a shortage of

correctional officers to provide security and escort for segregation prisoners who need mental-health treatment. *See id.* at 1243.

In sum, this court found that long-term isolation in segregation can inflict devastating and sometimes permanent psychological harm; that the harms of isolation can affect anyone placed in segregation, but they can be especially severe for those with mental illness; and that the risk of serious harm is most acute for prisoners with 'serious mental illness,' whom the court concluded it is categorically inappropriate to place in segregation absent extenuating circumstances, and even then only with the involvement of appropriate mental-health staff and for as short a period as possible. It is also important to understand that these findings were made against the backdrop of the additional finding that the risk of harm is especially heightened by the conditions in ADOC's segregation units in particular.

## 2. Previous Findings on Mental-Health Monitoring in Segregation

While the previous liability opinion ultimately reserved judgment on whether the ADOC's provision of certain periodic mental-health evaluations in segregation contributed to the Eighth Amendment violation found at that time, it noted "substantial evidence that [these] evaluations for all prisoners in segregation are inadequate." *Braggs*, 257 F. Supp. 3d at 1249. Before making additional findings based on the parties' subsequent briefing, the court now summarizes its prior findings regarding periodic evaluations and ADOC's mental-health monitoring in segregation more broadly.

ADOC is required by Administrative Regulation § 625 to conduct periodic mental-health evaluations of all prisoners in segregation, whether or not they are on the caseload, 30 days after placement, and at each 90-day interval thereafter. *See* Joint Ex. 127, Admin. Reg. § 625 (doc. no. 1038-150). In addition, the regulation requires ADOC to "evaluate inmates who are

receiving treatment for serious mental illness within one working day of the inmate's placement in a segregation cell." *Id.*[5] (Notably, the regulation does not require ADOC to move the prisoner if the evaluation reveals that continued placement in segregation would be detrimental to the prisoner's mental health. *See id.*) A separate regulation further requires ADOC to

---

5. Defense counsel maintained at oral argument that § 625 requires 30-day and subsequent 90-day evaluations for only inmates receiving treatment for serious mental illness. However, the plain language of the regulation requires such an evaluation "[w]henever *an inmate* is maintained in a segregation cell for longer than thirty days," and "[f]ollowing each ninety-day period thereafter." Joint Ex. 127, Admin. Reg. § 625 (doc. no. 1038-150) (emphasis added). Indeed, defendants' own brief clearly states that "any inmate" in segregation is to receive such evaluations under the regulation, cites testimony to that effect from ADOC psychologist Dr. Scott Holmes, and relies on that understanding *as evidence that ADOC is currently providing adequate evaluations*. *See* Defs.' Response in Opposition to Liability Finding Related to Segregation Monitoring (doc. no. 1418) at 14. This understanding is further evident from ADOC's provision of such evaluations--albeit in an inconsistent and cursory manner--to individuals not identified as having serious mental illness. Finally, defense counsel could produce no evidence at oral argument supporting his then-understanding that § 625 applies to only inmates with serious mental illness. Accordingly, the court concludes that this regulation applies to all inmates held in segregation.

conduct "regular administrative and disciplinary segregation rounds to monitor the mental status of inmates, identify inmates who may be experiencing difficulty in this restrictive environment and to ensure their access to mental health services." Joint Ex. 126, Admin. Reg. § 624 (doc. no. 1038-149). These 'segregation rounds' are to be substantially shorter than the 'evaluations' provided by § 625, consisting primarily of a "brief interview," and are to occur much more frequently than evaluations--at least five times per week on different days, including three times by ADOC staff (one of which is for Segregation Review Board) and two times by contracted mental-health staff.[6] *Id.*

As the court explained, because of the serious risks of psychological harm that extended isolation

_____

6. The court previously misstated that the regulation required segregation rounds occur at least twice per week. However, the regulation in fact required that *ADOC staff* perform these rounds at least twice per week, and that contracted mental-health staff perform rounds an additional two times per week, on days different from those on which ADOC staff did rounds.

poses to prisoners, "it is ... essential to identify those who need mental-health treatment in segregation." *Braggs*, 257 F. Supp. 3d at 1249. While the previous opinion declined to fully reach the issue of periodic mental-health evaluations, it noted evidence that those evaluations were inadequate and that "such assessments at ADOC are cursory at best." *Id*. In particular, the court noted the case of plaintiff R.M.W., a female prisoner who had a segregation mental-health evaluation conducted the same month that she had twice been sent to suicide watch and had multiple incidents of self-injury prior to the evaluation. The evaluation form, however, did not mention her suicide-watch placements or self-injury episodes nor did it include a suicide risk-assessment tool. Instead, it simply had some check marks and stated "inmate appropriate for placement" and "segregation placement not impacting inmate's mental health." *Id.* (citing Joint Ex. 404, March 28, 2014 Review of Segregation Inmates R.M.W. (doc. no. 1038-859) at MR017081).

As to the issue of segregation rounds, the court found that to extent they were occurring, substantial evidence demonstrated that they were cursory in nature and ineffective at identifying signs of mental illness and decompensation. *Id.* at 1243-44. Although these rounds are not meant to replace psychotherapy or periodic evaluations, the court found these rounds "do not adequately serve even the limited purpose they are intended to serve." *Id.* Dr. Hunter described segregation rounds as 'drive-bys,' which sometimes occur even without verbal exchanges between prisoners and staff. Dr. Tytell, who served as an ADOC psychologist at Donaldson Correctional Facility before taking his current position, testified that segregation rounds for over 120 prisoners at Donaldson took between one-and-a-half and two hours, including the time to walk between cell blocks--with the result that no more than one minute was spent per prisoner on average. *See id.* A former counselor at the Bibb facility testified that it would take her 35 minutes to an hour to

complete the rounds at all six housing units with 18 double-celled cells, with the result that she spent one to two minutes per prisoner, including the time to walk between six housing units.

The court found that segregation rounds, in addition to being cursory, do not occur as frequently as they should and likely did not happen at all at some facilities. *See id.* at 1244. A lack of documentation of segregation rounds combined with the acute staffing shortages led defense expert Ayers to express doubt that ADOC was able to conduct segregation rounds as often as required. The site administrator for the Holman facility confirmed Ayers' belief by credibly testifying that insufficient segregation rounds have been a problem at Holman since 2008 due to staffing shortages, and that the problem has only worsened since then. *Id.* According to the site administrator, at Holman, instead of a separate mental-health segregation round, a counselor accompanies the warden and other security officers during a weekly segregation review

board, where the warden and other officials walk from cell to cell to review each segregation prisoner's status and potentially change the prisoner's segregation sentence based on her conduct. Due to the correctional staffing shortage, she (the warden?) is sometimes able to visit only one prisoner in segregation per week.

Moreover, the previous liability opinion found that monitoring by security staff for signs of self-harm and suicide occurred with inadequate frequency due to correctional understaffing. "Correctional expert Vail credibly opined that ADOC lacked enough correctional staff to conduct monitoring rounds in segregation every 30 minutes--the level of monitoring in segregation units necessary to keep prisoners safe from self-harm and suicide." *Id.* Vail saw multiple logs at ADOC that suggested that no segregation checks were done for hours at a time. Defense expert Ayers similarly implied that monitoring was inadequate, noting that

better monitoring of segregation inmates would address the high suicide rates within ADOC.

In addition to significant levels of understaffing, a lack of visibility in ADOC segregation units contributes to the inadequacy of mental-health monitoring. *See id.* 1243 ("'Segregation rounds' ... are of limited utility due to understaffing and visibility issues."). As plaintiffs' expert Haney testified, as a general matter, "it is much more difficult for staff to detect decompensation of prisoners while they are housed in segregation: when prisoners remain in their cells around the clock, mental-health staff have a harder time observing the patient and diagnosing illnesses effectively, and correctional officers and fellow prisoners also lack sufficient regular contact with the prisoner to notice the onset of symptoms of mental illness." *Id.* at 1238-39. In addition, "ADOC segregation units often lack visibility into cells, both because of small windows on the doors, which are often grated or

difficult to see through, and because of the layout of the cells and units." *Id.* These problems exist throughout ADOC facilities. For example, the Easterling facility's segregation unit has tiny windows that do not allow correctional officers to observe inside without being directly in front of the door--which correctional officers often avoid because of a risk of having bodily fluids or food thrown at them through a food slot on the door. The court witnessed firsthand that the Donaldson and St. Clair facilities have very little visibility into the cells from the officers' station due to small windows and dim lighting. Bibb's segregation units "might be the most egregious in terms of visibility," having no line of sight from the central officer station.[7] *Id.* Further, ADOC facilities frequently permit prisoners to cover their cell door windows with papers, which the court

_____

7. Haney recommended that Bibb's segregation units be closed immediately due to a lack of monitoring, which rendered the risk of harm too great. He explained that in four decades of doing this work, he has never recommended any unit to be closed immediately. *See id.*

found "heightens the risk of suicide" by inhibiting the ability of correctional and mental-health staff to observe prisoners. The lack of visibility in ADOC segregation units therefore "makes it even more difficult to provide effective monitoring." *Id.* at 1244.

The inadequacy of ADOC's mental-health monitoring of prisoners in segregation is further aggravated by a lack of privacy in segregation units, which discourages prisoners from having frank discussions about their mental health with mental-health staff. As the court noted, "most ADOC segregation units are not conducive to having a cell-front conversation, due to heavy solid doors and very loud units with dozens of cells in a single unit. As the court saw during its tours of five prisons, none of the units--even the ones at Bibb, where only three cells are in a unit--were conducive to confidential conversations, because of the proximity to other cells and prisoners." *Id.* at 1243 n.71. The lack of a private setting therefore contributes to the

inability of ADOC to detect signs of mental illness and decompensation among prisoners in segregation, who are forced to discuss the status of their mental health in front of other prisoners and correctional staff.

While the previous opinion declined to reach fully the adequacy of periodic mental-health evaluations in segregation, it nevertheless concluded: "the evidence is clear that ADOC's segregation practices--inadequate screening for the impact of segregation on mental health, and inadequate treatment and monitoring--pose a substantial risk of serious harm to prisoners with serious mental-health needs." *Id.* at 1245. Moreover, the court found, "The dearth of individual encounters outside the cell, haphazard cell-front encounters, and inadequate monitoring in ADOC all show that ADOC fails to provide adequate treatment and monitoring." *Id.* at 1245. The opinion concluded more broadly: "ADOC's segregation practices perpetuate a vicious cycle of isolation, inadequate treatment, and decompensation. The skyrocketing number of suicides within ADOC, the

majority of which occurred in segregation, reflects the combined effect of the lack of screening, monitoring, and treatment in segregation units and the dangerous conditions in segregation cells." *Id.* at 1245.

### 3. Additional Findings on Periodic Mental-Health Evaluations in Segregation

Having solicited further briefing from the parties, the court now makes additional findings regarding ADOC's provision of periodic mental-health evaluations to prisoners in segregation. The parties were instructed to "point[] to where the relevant evidence is in the current record on this issue," and "to address whether additional evidence, expert testimony, and an evidentiary hearing are needed." Phase 2A Liability Order Re Segregation (doc. no. 1364) at 2. However, because the parties did not request to submit additional evidence or conduct a further evidentiary hearing, the court now makes its findings based on the evidentiary record as it existed at the time of its previous liability opinion, and with the benefit of

additional briefing and highlighting of information in the quite voluminous record.

Plaintiffs highlighted three categories of evidence in the record that, in conjunction the above evidence, demonstrated, by a preponderance of the evidence, that periodic mental-health evaluations do not occur with adequate frequency, and that even when they do occur the evaluations are so cursory as not to be worth the paper they are written on. First, plaintiffs point to medical records and movement histories for three prisoners who were not on the caseload during extended periods in segregation, and who began to engage in self-harm while in segregation. These prisoners either received no periodic evaluations, or received evaluations that uniformly checked boxes indicating that the prisoners were stable and appropriate for placement, despite previous incidents of self-harm. Second, there are the records of three prisoners who were on the caseload during their time in segregation, but who nevertheless received inadequate periodic

evaluations. Despite being identified as having serious mental-health needs, these prisoners received 'periodic' mental-health evaluations at irregular intervals, and far less often than required by ADOC's own regulation. Like the evaluations of those not on the caseload, and sometimes despite the prisoner having suffered multiple mental-health crises in segregation, each of these forms uniformly indicate that placement in segregation is appropriate and not affecting the prisoner's mental health, and contain no mention or analysis of the prior mental-health crises. Third, plaintiffs point to the psychological autopsies of five prisoners who committed suicide while in segregation between April 2014 and February 2016, who were not on the mental-health caseload and whose suicides were described as "not anticipated" by correctional and mental-health staff. Together, this evidence further supports that periodic mental-health evaluations in ADOC segregation units likely occur irregularly when they occur at all, and in any case are likely a

perfunctory exercise that fails to detect and assess adequately signs of serious psychological harm and decompensation.

The record contains the medical records of three prisoners--R.M.W., L.P., and J.D.--who were in segregation for extended periods of time and who were not on the caseload. Each of these prisoners engaged in self-harm while in segregation, yet received irregular and patently inadequate mental-health evaluations from ADOC, if at all.

The court's previous liability opinion noted the case of R.M.W., a transgender female prisoner who spent 36 days in segregation at the Fountain facility in early 2014. *See* Joint Ex. 181, ADOC0392220-221; Joint Ex. 404, MR016842, MR016932. During this time, she was not on the caseload: although she presented mental-health issues at her intake screening at admission to ADOC custody, ADOC determined at that time that she did not need treatment and therefore declined to place her on the caseload. Beginning three days

after placement in segregation, and over the following two weeks, she engaged in multiple instances of self-mutilation, including lacerations to her arm, shoulder, and ankle. *See* Joint Ex. 404, MR016897, MR016980-985, MR016988-89, MR01700-01. R.M.W. testified at trial that on another occasion while in segregation she attempted to hang herself. *See* R.M.W. Trial Tr. at 17:20-25. She further testified that placement in segregation makes her depressed, and that, while she has suffered from mental illness while not in segregation, she has engaged in self-harm only while in segregation. *See id.* at 13:11-14:5; 17:15-25.

During this stint in segregation, and despite multiple incidents of self-harm, R.M.W. was seen by mental-health staff only twice: once while in the suicide watch cell, and again for a 30-day review. *See* Joint Ex. 404, MR017066-081. The record of the 30-day review reflects that it was quite cursory. The psychological associate conducting the review merely checked several boxes indicating that R.M.W. was in

good condition; wrote "Inmate appropriate for placement"; and circled the portion of the form stating, "Segregation placement not impacting inmate's mental health." *Id.* at MR017081. The review does not mention R.M.W.'s repeated incidents of self-harm while in segregation, nor contain any progress notes in the comments section or additional documentation. *See id.*

L.P. spent over a year in isolation at the Holman facility from July 2013 through August 2014, during which time he went back and forth between segregation and the crisis cell. *See* Joint Ex. 177, ADOC039134-36. He was not on the caseload during this period, despite being placed on suicide watch five times between December 2013 and June 2014, including for ten days or more on two separate occasions. *See* Joint Ex. 272, MR011840; Joint Ex. 177, ADOC039134-36, Joint Ex. 272, MR012076-78. L.P. received a 30-day and 90-day evaluation in 2013, but then received no further mental-health evaluations for the following nine months, despite ADOC Admin Regulation § 625 requiring

an evaluation at each 90-day interval, and despite L.P. being placed on suicide watch five times during that period. *See* Joint Ex. 272, MR012021-093. The two assessments L.P. received have the same boxes checked as R.M.W.'s 30-day evaluation, indicating that he was in good condition, and that segregation placement was not impacting his mental health. The only written comments state that L.P. is "stable," and neither form contains additional progress notes or documentation. *Id.*

Finally, J.D. spent 10 months in segregation at St. Clair from June 2013 through March 2014, during which time he was not on the caseload. *See* Joint Ex. 175, ADOC038841-44; Joint Ex. 244, MR004759, MR004914, MR004918, MR--4922, MR004927, MR004929. After several months in segregation, beginning in September 2013, he engaged in several incidents of serious self-harm, the last of which resulted in his hospitalization. *See id.* at MR004812-13, MR004819, MR004824, MR004854, MR004887. In January 2014 he requested placement in a

mental-health unit, but remained in segregation through March. *See id.* at MR004914. His extensive records contain no indication that he ever received a periodic mental-health evaluation while in segregation, despite the fact that ADOC regulation § 625 would have required at least four such evaluations: at 30 days, 90 days, 180 days, and 270 days.

In sum, the evidence demonstrates that these prisoners, who spent extended periods in segregation, and who were not on the caseload, did not receive mental-health evaluations with sufficient frequency or at all. Moreover, even when periodic evaluations did occur they were done in a pro forma way that failed to detect significant signs of psychological harm and decompensation, even among prisoners engaging in self-harm and experiencing, or on the brink of experiencing, mental-health crises.

The evidence in the record also includes the records of three prisoners on the caseload who spent extended periods in segregation, which similarly

indicate that even those with identified serious mental-health needs do not receive adequate periodic mental-health evaluations.

C.J. recently spent several years in segregation. He spent the entire period from March 2008 through September 2014--six-and-a-half years--ycling between segregation and suicide watch at St. Clair, Donaldson, and Holman correctional facilities. He also spent a subsequent year and 10 months in segregation, from January 2015 through November 2016, except for brief periods in general population in August 2015 and April 2016. *See* Pls. Ex. 1258, ADOC0400233-245; Pls. Dem. Ex. 131. Under ADOC regulation § 625, he should have received approximately 30 periodic mental-health evaluations during these two extended stints, which combined amount to more than eight years in segregation. Yet his medical records contain *only one* periodic evaluation, which occurred on July 19, 2013--over five years after his initial placement in segregation in March 2008. *See* Joint Ex. 163,

MR007796. Moreover, despite the fact that C.J. had been on suicide watch three times in the three months prior to that evaluation, the evaluation has all the same boxes checked as in L.P.'s and R.M.W.'s evaluations, indicating that he was in good condition, has a checkmark next to "segregation placement not impacting inmate's mental health," and in the comments section merely states, "Stable." There is no notation of his three recent placements on suicide watch, nor any indication of his increased vulnerability to psychological harm in segregation based on his identified mental illness, nor any attempt to cohere that fact of those placements with the positive assessments in the form (for instance, by indicating that he had recovered since placement on suicide watch, or that his treatment or conditions of confinement had been modified to help him better cope with segregation).

H.C. was held in segregation at the Holman, St. Clair, and Donaldson facilities from approximately May

2011 to May 2014. *See* Joint Ex. 173, ADOC038881-885.

Over this three-year period, he received only three

periodic evaluations, on November 5, 2012, September

2013 (the record does not indicate a specific date),

and November 5, 2013, despite the fact that ADOC

regulation § 625 would have required approximately 13

such evaluations during that period.[8]  Both assessments

---

8.  Given H.C.'s multiple transfers between segregation and hospital units, across multiple ADOC facilities, the exact duration of each stint in segregation is unclear to the court.  *See* Joint Ex. 173, ADOC038881-885.  Counsel for the plaintiffs maintained at oral argument that H.C. was held in segregation for multiple years during this time, and defense counsel did not challenge this characterization.  In any case it is apparent that H.C. spent significant (even if not continuous) time in segregation during this period.  The court is persuaded, in light of its previous findings regarding the psychological harms of segregation, that even assuming that H.C. was in and out of segregation, three mental-health evaluations over the course of three years are insufficient to determine the appropriateness of segregation placement and any treatment needs during this period.  Moreover, insofar as H.C.'s time in segregation was viewed as "resetting"--for instance, based upon brief placement in a hospital unit--that determination likely should have resulted in *more* evaluations under ADOC regulation § 625, not fewer.  That is, the regulation would have again required a 30-day evaluation after the segregation time was "reset," in addition to an evaluation at 90 days and

40

have boxes checked indicating "Segregation placement not impacting inmate's mental health."  Joint Ex. 222 at ADOC0079816, ADOC007971, ADIC007973.

Finally, K.N. spent time in segregation at Tutwiler prison from August 5 through November 11, 2015.  *See* Joint Ex. 470, ADOC0400169-70.  At the time she was on the caseload, having been diagnosed with bipolar disorder and borderline personality disorder, and prescribed psychotropic medication.  *See, e.g.*, *id.* at AODC0385165, ADOC0385172.  As the court has found, bipolar disorder by definition constitutes a serious mental illness, because it "last[s] a lifetime and [is] accompanied by debilitating symptoms."  *See Braggs*, 257 F. Supp. 3d at 1190 n.11.  During K.N.'s 98-day period in segregation, when she should have received a 30-day and 90-day periodic evaluation, there was only one such evaluation: a "30-day review" conducted on October 19, 2015, 75 days after she was placed in segregation. Joint Ex. 252, ADOC0385201.  The evaluation has all

each 90-day period thereafter--rather than simply at 90-day intervals, had the time not been reset.

41

boxes checked indicating she is in good condition, and the box checked stating "Segregation placement not impacting inmate's mental health." *Id.* The written comments state "None," and do not contain any notation of K.N.'s diagnosed serious mental illness, nor any indication of additional treatment or monitoring that might be necessary in light of her illness.

The records of prisoners on the caseload who spent extended periods in segregation thus confirm that, even for this population, periodic mental-health evaluations occur at infrequent and irregular intervals.

In addition to the medical records of prisoners both on and off the caseload while in segregation, the psychological autopsies of several suicides committed by prisoners in segregation support, with tragic hindsight, a finding of inadequacy as to ADOC's periodic mental-health evaluations. The record contains evidence of five such suicides that occurred between April 2014 and February 2016, which were committed by prisoners not on the mental-health

caseload: C.P., D.H., J.H., J.J., and T.H.  Pls. Ex. 1110 at MHM040806-07 (T.H.), MHM040814-15 (J.J.), MHM040816-18 (J.H.0); Pls. Ex. 1215 at MHM 041802-04 (C.P), MHM041808-10 (D.H.).  Each of these suicides was described in the psychological autopsy report as "not anticipated" by correctional and mental-health staff. Such a significant number of wholly unanticipated suicides in ADOC segregation units further suggests that ADOC's monitoring mechanisms--including periodic mental-health evaluations--are simply failing to detect prisoners' decompensation while in segregation, and exacting a terrible price.

Defendants do not dispute any of the plaintiffs' arguments regarding the existence or content of periodic evaluations conducted in a particular prisoner's case.  Nor do defendants point to other cases in which prisoners either on or off the caseload received periodic evaluations in accordance with ADOC's regulations, or in which such an evaluation caused ADOC to reconsider placement in segregation or to provide

additional mental-health treatment. Instead they assert, without citation to the records of any particular prisoners, that segregation rounds and periodic evaluations "do in fact occur, but the content and conduct of them is not to Plaintiffs' liking." Defs.' Response in Opposition to Liability Finding Related to Segregation Monitoring (doc. no. 1418) at 10.[9]

With regard to the issue of periodic mental-health evaluations--and notwithstanding defense counsel's representations to the contrary at oral argument--defendants point to ADOC Regulation § 625 and

_____

9. To the extent defendants attempt to re-litigate the issue of segregation rounds, which the previous liability opinion already found to be cursory and insufficiently frequent, they ignore both the court's prior findings and its order for additional briefing. That order solicited additional input on the "discrete issue" of whether ADOC is "conducting adequate periodic mental-health assessments of prisoners in segregation." Phase 2A Liability Order Re Segregation (doc. no. 1364) at 1. Because the Eighth Amendment liability finding remained open only as to the issue of periodic evaluations, the court declines to disturb its previous findings on the inadequacy of ADOC's segregation rounds.

testimony from Dr. Scott Holmes, the ADOC psychologist at Tutwiler, to the effect that periodic evaluations are occurring at that facility as required under the regulation. *See* Holmes, Trial Tr. at 62:22-64:20. Holmes's testimony did not cite his knowledge of any particular inmate's case, much less provide supporting medical records; rather, he explained what was occurring at Tutwiler by describing the formal requirements of ADOC regulation § 625. Notably, Holmes also testified that segregation mental-rounds were occurring as written in ADOC regulation, and that he knew of no prisoners in segregation at Tutwiler who had decompensated or were at risk of decompensation. In light of its findings that mental-health rounds were cursory and infrequent; that extended placement in segregation poses a serious risk of psychological harm and decompensation to even previously healthy prisoners; that certain prisoners at Tutwiler have been placed in segregation for extended periods; and, as Holmes acknowledged during his testimony, that

prisoners have attempted suicide while in segregation at Tutwiler, the court finds that Holmes's unwaveringly rosy testimony regarding ADOC's mental-health care of prisoners in segregation at Tutwiler, in the absence of supporting documentation, tends to undermine his credibility.[10]   Therefore, given evidence to the contrary--such as the records of K.N., the Tutwiler prisoner who spent 98 days in segregation, attempted suicide while there, and did not receive the required periodic evaluations in compliance with the ADOC

---

10. In addition, although this opinion is based on the record as existed at the time of the 2017 liability opinion, the court cannot close its eyes to overwhelming and disturbing evidence presented throughout the segregation remedial trial during February-April 2018, that officials of ADOC and its mental-health contractor, throughout the command chain, were consistently unaware of the day-to-day activities occurring in segregation units--including officials who were tasked to monitor one specific facility.   Namely, officials presented testimony as to various policies and practices in segregation units that was wildly inconsistent with one another, with the representations of defense counsel, and with documentary evidence as to what was in fact occurring on the ground.   In this particular context, testimony from Holmes to the effect that segregation mental-health monitoring was occurring exactly as required by regulation, without further supporting evidence, rings particularly hollow.

regulation and the voluminous evidence the court has heard about how understaffing impacts the ability of the mental-health contractors to comply with the regulations--the court declines to infer from the mere existence of a regulation that evaluations are in fact occurring as prescribed, or to credit Holmes's testimony in the absence of any supporting medical records.

In sum, with regard to prisoners both on and off the caseload, the court finds that ADOC's periodic mental-health evaluations are cursory, perfunctory, and inadequate for identifying the serious psychological harms and risk of decompensation that may result from segregation. This conclusion is based on the evaluations' uniform indication that segregation is not affecting a prisoner's mental health, near-uniform indication that prisoners are in good condition, and striking dearth of substantive comments--all despite the serious and well-documented psychological harm inflicted by extended periods of isolation, and despite

documented (and sometimes severe) mental illness and incidents of self-harm among the prisoners in question. In addition, this conclusion is supported by evidence of several wholly unanticipated suicides in ADOC custody, as well as the court's previous findings that the ADOC's other practices of segregation monitoring--namely, mental-health rounds and security rounds--are also cursory, infrequent, and inconsistent. More fundamentally, if the stated purpose of ADOC's periodic evaluations is "[t]o determine if segregation placement is contraindicated by ... [t]he inmate's mental status [or] [t]he potential for significant deterioration in the inmate's functioning by continued placement in the restrictive environment," ADOC regulation § 625.II.C, it is remarkable that not once did an evaluation in these cases--nor in any case cited to the contrary by defendants--determine that placement in segregation *was* impacting a prisoner's mental health, much less appear to result directly in a prisoner's transfer out of segregation. In sum, the

plaintiffs have carried their preponderance-of-evidence burden in demonstrating that periodic mental-health evaluations in ADOC segregation units occur infrequently and irregularly; are largely perfunctory in nature; and are inadequate at identifying signs of psychological harm and decompensation.

### 4. Conclusions of Law Regarding Actual Harm and Substantial Risk of Serious Harm

The evidence in the record amply demonstrates that ADOC's' failure to provide periodic mental-health evaluations of prisoners in segregation poses a substantial risk of serious harm to plaintiffs.

As the previous liability opinion found, extended placement in segregation poses a substantial risk of serious, potentially permanent psychological harm and decompensation. The risk is heightened for prisoners with mental illness. And, for the population with 'serious mental illness,' that risk is so acute that the court concluded that placement of such prisoners in

segregation is categorically inappropriate absent extenuating circumstances, and that even under such circumstances placement should only be made with the consultation of mental-health staff and for as short a period as possible. Because extended isolation may cause mental illness in previously healthy individuals, as well as aggravate existing mental illness, ongoing monitoring is necessary in order to determine the appropriateness of a prisoner's continued placement in segregation in light of the prisoner's current mental-health needs, and to identify any necessary treatment. As the court put simply, given the serious risks of extended isolation, "it is ... essential to identify those who need mental-health treatment in segregation." *Braggs*, 257 F. Supp. 3d at 1249. Further, as Burns testified, mental-health evaluations--separate from mental-health rounds and other monitoring--are important to "catch[] signs of mental illness at its earliest point to be able to intervene." Burns Trial Tr. Vol. I at 212:9-14.

It must also be noted that factual support for, and import of, these conclusions is magnified by the particular conditions in ADOC's segregation units.

The court has before it evidence that three prisoners on the caseload and three prisoners not on the caseload at a range of prisons received periodic evaluations at erratic intervals or not at all, and that those evaluations they received were perfunctory. In addition, the record also contains voluminous evidence that, largely due to correctional and mental-health understaffing, ADOC's mental-health providers have repeatedly failed to provide to prisoners in segregation the mental-health services required by ADOC regulations, such as mental-health rounds and security checks, and that those prisoners receive little in the way of out-of-cell contact with mental-health providers. Moreover, defendants have been unable to point to any medical records reflecting the timely provision of the required evaluations. Thus, while the six prisoners' records might not be

enough in a vacuum to find that ADOC is failing to provide adequate periodic evaluations, in light of the overwhelming evidence that understaffing has prevented the mental-health staff from fulfilling a variety of requirements, and the lack of records showing that prisoners received adequate evaluations in a timely manner, these "[r]epeated examples of delayed or denied medical care" sufficiently demonstrate that ADOC fails to provide adequate periodic evaluations on a systemic basis. *Rogers v. Evans*, 792 F.2d 1052, 1059 (11th Cir. 1986) (holding that "[r]epeated examples of delayed or denied medical care" may reveal systemic deficiencies). The lack of sufficient periodic evaluations is demonstrated by, among other evidence, multiple instances in which staff indicated that segregation placement was not affecting a prisoner's mental health, and that continued placement was appropriate, despite the fact that a prisoner had recently engaged in significant self-harm or suffered a mental-health crisis. *See Gates v. Cook*, 376 F.3d 323, 333 (5th Cir.

2004) (holding that an Eighth Amendment liability finding can be supported by multiple policies or practices combining to deprive a prisoner of a "single, identifiable human need") (citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)). Indeed, in light of the significant number of wholly unanticipated suicides in ADOC segregation units, by individuals who were not on the mental-health caseload, defendants' contention that "the system works" is astonishing. *See* Defs.' Response in Opposition to Liability Finding Related to Segregation Monitoring (doc. no. 1418) at 8.

Defendants raise several objections to a finding of harm, all of which are unavailing.

First, defendants contend that ADOC's written policies regarding segregation rounds, including its administrative regulations, are constitutionally sufficient, and that a finding of liability is further precluded because plaintiffs have not challenged the sufficiency of these policies. This argument misses the mark because plaintiffs' challenge is directed at

ADOC's *actual practices, not the policies*, and, as the record shows, mental-health staff do not in any meaningful way follow policy: compliance is inconsistent, superficial, and frequently nonexistent.

Second, defendants argued that ADOC has already taken substantial steps to address the risk of suicide in its facilities, because of which no inmate in ADOC custody had committed suicide since January 1, 2017. Defs.' Response in Opposition to Liability Finding Related to Segregation Monitoring (doc. no. 1418) at 18; *see* Amended Phase 2A Interim Relief Order Regarding Suicide Prevention Measures (Doc. No. 1106). Therefore, they asserted, there is no current risk of suicide in ADOC facilities.

As an initial matter, since the filing of that brief, the parties have presented evidence of an increasing number of suicides in segregation. However, the court need not rely on that evidence here. For even if defendants were correct that they have eliminated the risk of suicide in segregation, the

potential harms of insufficient mental-health monitoring in segregation are plainly not limited to increased risk of suicide. Rather, as experts from both sides testified, the harms of extended segregation--which are aggravated when placement and treatment are not informed by an accurate understanding of a prisoner's mental-health needs--include "hallucinations, chest pain, palpitations, anxiety attacks, and self-harm," Burns Trial Tr. Vol. I at 209, as well as psychosis and delusions, *see* Tytell Trial Tr. at 189:9-20. Thus, even if it were true that there is no current risk of suicide in ADOC segregation units, the failure to detect psychological harm and decompensation among prisoners in segregation still could result in serious and potentially permanent harm.

Third, defendants assert that plaintiffs impermissibly seek to expand the definition of the plaintiff class by seeking relief on behalf of mentally healthy inmates. They thus argue that because plaintiffs represent a class of prisoners "with a

serious mental-health disorder or illness," a liability finding cannot extend to prisoners without mental-health needs before entering segregation. Similarly, defendants state, "A serious mental health need does not exist as to any mentally healthy inmate." Defs.' Response in Opposition to Liability Finding Related to Segregation Monitoring (doc. no. 1418) at 3. These assertions all misunderstand the nature of the groups subject to ADOC's practices in segregation, as well as the court's power to order relief for those groups.

In light of ADOC's systemic under-identification of individuals with mental illness, and the fact that placement in segregation can cause previously healthy individuals to develop mental illness, there are three categories of prisoners with serious mental-health needs who are subject to ADOC's' care in segregation. First, there are prisoners who are *not on the mental-health caseload* and *do not have a mental illness* prior to placement in segregation, who develop mental

illness requiring treatment because of the conditions in segregation. Second, there are prisoners who are *not on the mental-health caseload* but who have *unidentified mental illness requiring treatment* prior to placement in segregation, whose illness may worsen as a result of placement in segregation. Third, there are prisoners *on the mental-health caseload* (that is, with identified mental illness) prior to placement in segregation, whose illness also may worsen as a result of placement in segregation. In addition, there is a fourth group of prisoners who are *not on the caseload* and who do *not* develop mental illness while in segregation. Groups Two and Three--those with unidentified mental illness and those who are on the caseload--both have serious mental-health needs and are therefore by definition members of the plaintiff class. Group One--prisoners who enter segregation healthy but then become mentally ill in segregation--pass into the plaintiff class when they become ill. Group Four do not have serious mental-health needs, and at no point

develop such needs despite placement in segregation. To the extent that defendants argue that Group Four exists and is not part of the plaintiff class, the court agrees.

Supreme Court precedent makes clear that the court is permitted under the Prison Litigation Reform Act (PLRA) to order relief even for currently healthy prisoners. In *Brown v. Plata*, 563 U.S. 493 (2011), a case challenging the adequacy of medical care provided to prisoners, the Court affirmed a prisoner-release order that covered both unhealthy and healthy inmates. As the Court explained, "Even prisoners with no present physical or mental illness may become afflicted, and all prisoners ... are at risk so long as the State continues to provide inadequate care." 563 U.S. at 531. Because of the fluid nature of the composition of the plaintiff class, "[r]elief targeted only at present members of the plaintiff classes may therefore fail to adequately protect future class members who will develop serious physical or mental illness." *Id.* at

532. Similarly here, the court would not be precluded from ordering relief regarding mental-health monitoring of prisoners who do not have current mental-health needs who, as the Court noted in *Plata*, are "in no sense ... remote bystanders in [the State's] medical care system. They are that system's next potential victims." *Id.*

Moreover, defendants fail to perceive the way in which the inadequacy of their monitoring results precisely in the inability to detect which prisoners have serious mental-health needs and are therefore members of the plaintiff class. Because prisoners in Groups One and Two either develop serious mental-health needs while in segregation or previously had such needs but were unidentified, the only way to discern between these prisoners and those in Group Four is by conducting adequate mental-health evaluations of all prisoners in segregation. Such relief goes "no further than necessary to correct the violation," 18 U.S.C. § 3626(a)(1)(A), despite providing incidental relief to

those who are not in the plaintiff class.  *See Plata*,
563 U.S. at 531.

Defendants' argument that prisoners without serious
mental-health needs are not in the plaintiff class is,
therefore, simply beside the point: today's liability
finding extends to prisoners who enter segregation with
unidentified serious mental-health needs and who
develop such needs in segregation at the point those
needs develop.  To provide relief to these groups
within the plaintiff class, ADOC must provide adequate
evaluations to all prisoners.

Fourth, defendants argue that the risk of harm
posed by inadequate mental-health monitoring in
segregation is too amorphous, obscure, or remote to
support a finding of liability.  They emphasize that
the holding in *Helling v. McKinney*, 509 U.S. 25, 33-34
(1993), was limited to those risks that are "sure or
very likely to cause serious illness and needless
suffering" and that result in "sufficiently imminent
damages."  Defs.' Response in Opposition to Liability

Finding Related to Segregation Monitoring (doc. no. 1418) at 21 (citing *Helling*, 509 U.S. at 33-34). Moreover, defendants cite dicta from a Supreme Court case about access to prison libraries, stating that courts should not allow "a healthy inmate who had suffered no deprivation of needed medical treatment ... to claim violation of his constitutional right to medical care, simply on the ground that the prison medical facilities were inadequate ...." *Lewis v. Casey*, 518 U.S. 343 (1996).

As the court previously observed in response to the above passage from *Casey*, "this pronouncement has no bearing on this case. The plaintiffs here are prisoners with serious mental illnesses, not healthy prisoners." *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1123 (M.D. Ala. 2016). Again, defendants confuse the groups of prisoners at issue. Today's liability opinion extends to prisoners who enter segregation with mental illness (whether previously identified or not), and who develop mental illness while in segregation. In

addition, as the Supreme Court approved in *Plata*, relief here--providing adequate periodic mental-health evaluations to those in in segregation--will necessarily also extend to healthy prisoners. The *Casey* dicta thus has no bearing here.

More fundamentally, however, the risk posed by ADOC's inadequate provision of mental-health evaluations, in conjunction with other inadequate forms of monitoring, is by no means obscure or amorphous. To the contrary, as the court has explained, the severe and potentially permanent harm regularly inflicted by extended segregation is well documented, and monitoring prisoners in segregation for signs of psychological harm and decompensation is essential in order to avoid exposing prisoners to risk of further harm, and to provide any necessary treatment. Experts from both sides testified that this risk extends even to previously healthy individuals, but is significantly heightened for those with existing mental illness, and especially for those with 'serious mental illness.'

Indeed, contrary to defendants' assertion, one need not stretch far to compare the pathogenic agent at issue in *Helling* to ADOC's exposure of prisoners with serious mental-health needs to extended segregation without adequate monitoring.[11]

## C. Deliberate Indifference

The previous liability opinion noted overwhelming evidence that defendants were aware of the harm and risk of harm produced by ADOC's failure to monitor adequately the mental health of prisoners in segregation, and that they disregarded that harm or failed to act reasonably to alleviate it. *See Braggs*,

---

11. Defendants further argue that "No evidence exists in the record that a mentally healthy inmate entered segregation at an ADOC facility and developed a mental illness as a direct result of inadequate monitoring." Defs.' Response in Opposition to Liability Finding Related to Segregation Monitoring (doc. no. 1418) at 3. However, under *Helling*, evidence of such a particular case is unnecessary given overwhelming and uncontradicted testimony from both experts on both sides that even mentally healthy individuals face a significant risk of psychological harm from extended segregation, and that adequate monitoring is necessary in order to identify signs of psychological harm and decompensation.

257 F. Supp. 3d at 1252-55; *see also Thomas v. Bryant*, 614 F.3d 1288, 1312 (11th Cir. 2010) (describing Eighth Amendment deliberate indifference standard). In addition to those findings, the existence of ADOC's regulations providing for segregation rounds and periodic evaluations, in order to detect signs of harm and decompensation, show that ADOC is well aware that placement in segregation poses a substantial risk of serious harm, and that regular monitoring is necessary in order to mitigate that risk and reevaluate continued placement. Accordingly, the court concludes that defendants were deliberately indifferent with regard to their failure to provide adequate periodic evaluations of mental health to prisoners in segregation.

### III. CONCLUSION

For the above reasons, the court finds that ADOC's failure to provide adequate periodic mental-health assessments of prisoners in segregation creates a substantial risk of serious harm for those prisoners,

and that this failure has contributed to the Eighth Amendment violation discussed in the main liability opinion.

Despite having reached this conclusion, the court is uncertain in light of recent developments, which include what appears to be a crisis of suicides in the ADOC, whether an additional remedy is warranted. Accordingly, before the court sets this opinion down for a relief hearing, the parties will be given an opportunity to address this issue.

\*\*\*

Accordingly, it is ORDERED that, by noon on February 18, 2019, counsel for plaintiffs and defendants, after conferring with each other in an attempt to reach agreement, are to file a joint report of suggestions of how proceed as to relief in light of the above opinion. The court recognizes that February

18 is a holiday, but there now appears to be an urgency regarding the resolution of the issue of segregation.

DONE, this the 11th day of February, 2019.

                                    /s/ Myron H. Thompson
                              UNITED STATES DISTRICT JUDGE