# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

EDWARD BRAGGS, *et al.*,     )
                       )
       Plaintiffs,     )
                       )
                       )
v.                      )     CIVIL ACTION NO.
                       )     2:14-cv-00601-MHT-GMB
                       )     Judge Myron H. Thompson
JEFFERSON DUNN, in his official    )
capacity as Commissioner of the    )
Alabama Department of Corrections,    )
*et al.*,                       )
       Defendants.    )
                       )
                       )
                       )

## JOINT REPORT ON OTHER PRISON SYSTEMS' POLICIES REGARDING THE PLACEMENT OF PRISONERS WITH SERIOUS MENTAL ILLNESSES IN RESTRICTIVE HOUSING

On February 14, 2019, the Court ordered the Parties to submit a joint report "(a) identifying other prison systems in the country, including but not limited to systems in Colorado, Pennsylvania, Washington, and North Dakota, that do not place (or significantly limit the placement of) prisoners with SMI [serious mental illnesses] in segregation, and (b) describing how they do so." Doc. 2345 at 6. The Court also ordered the Parties to submit the relevant prison policies. *Id.*

# PLAINTIFFS' POSITION:

Plaintiffs submit the following report in accordance with the Court's order. This report highlights practices pertaining to the placement of prisoners with serious mental illnesses[1] in segregation[2] in Colorado, Maine, North Dakota, Pennsylvania, and Washington.

## I.  Colorado

- Does not place any prisoners in segregation for more than fifteen days.

- Prior to taking this blanket approach: Excluded prisoners with serious mental illnesses from segregation absent "exigent circumstances," and was able to work with them in residential treatment programs or a general population setting without causing the "exigent circumstances" to apply.

In September 2017, the State of Colorado ended the practice of solitary confinement lasting more than fifteen days for all categories of prisoners.[3]

---

[1] Prison systems vary in how they define "serious mental illness," so a prisoner may be considered seriously mentally ill in one system but not in another.

[2] This report uses the terms "segregation," "solitary confinement," and "restrictive housing" interchangeably. The scope of this report does not include segregation practices generally, unless a prison system has taken the blanket approach of restricting the use of segregation for all prisoners.

[3] Rick Raemisch, *Why We Ended Long-Term Solitary Confinement in Colorado*, New York Times (Oct. 12, 2017), https://www.nytimes.com/2017/10/12/opinion/solitary-confinement-colorado-prison.html; *see* Ex. 1 (Colo. Dep't of Corr. Reg. 650-03), at 2 ("Restrictive housing may only be imposed as a condition of confinement for up to a maximum of 15 consecutive days."). The decision was influenced in part by a set of international standards known as the "Nelson Mandela Rules," under which keeping an individual in solitary confinement for more than fifteen days is

Violations are also not to be "stacked"—as in, according to Colorado Department of Corrections Executive Director Rick Raemisch, "no one will be placed in Restrictive Housing for 15 days, removed, then immediately placed back in."[4] Since 2017, solitary confinement has only been used in cases of serious disciplinary violations.[5] "It is the only state in the nation that has limited the use of solitary confinement in this way."[6] According to Raemisch in December 2018:

> Assaults, forced cell entries, and the use of heavy restraints declined by 40 percent. Since September 2017, Colorado's supermax facility has been changed to house prisoners who still pose security issues, but without the use of solitary confinement. Prisoners are now using the gym, day halls, and re-entry units as we undergo a cultural shift away from employing counterproductive punishments. The results of our reforms have been positive for both staff and prisoners.[7]

Prior to eliminating the practice of long-term solitary confinement altogether, Colorado had already implemented reforms to exclude prisoners with

---

considered to be torture. Raemisch, *supra*; *see also UN, international experts urge countries to apply 'Nelson Mandela Rules' in prisons*, UN News (July 18, 2016), https://news.un.org/en/story/2016/07/534632-un-international-experts-urge-countries-apply-nelson-mandela-rules-prisons#.Wd-XmYZry3I (explaining evolution of the Standard Minimum Rules for the Treatment of Prisoners).

[4] Ex. 11 (2018 Report by the Association of State Correctional Administrators and the Liman Center for Public Interest Law at Yale Law School ("2018 ASCA-Yale Report")), at 3.

[5] *Id.*

[6] Rick Raemisch, *Opinion: Long-term solitary in Colorado's prisons*, Detroit News (Dec. 11, 2018), https://www.detroitnews.com/story/opinion/2018/12/12/long-term-solitary-colorados-prisons/2267061002/.

[7] *Id.*

serious mental illnesses from solitary confinement. "In 2014, the Colorado Department of Corrections partnered with the legislature and advocates to facilitate the first ever legislation forbidding the placement of seriously mentally ill offenders in long term isolation, absent exigent circumstances."[8] To implement this new law, Colorado developed and implemented residential treatment programs for mentally ill prisoners that were "designed to provide extra care and support for people with serious mental illness or an intellectual disability, and to ensure that these individuals [we]re not placed in restrictive housing settings."[9] Prisoners in these programs were offered "a minimum of 10 hours for structured therapeutic interventions and 10 hours of non-structured recreational opportunities, per week"[10]—and, eventually, were offered "a minimum of four hours out-of-cell per day for both therapy and recreational opportunities."[11] The department developed incentives for prisoners to participate in treatment programs, including "the

---

[8] Rick Raemisch and Kellie Wasko, *Open the Door – Segregation Reforms in Colorado* 5 (2016), https://drive.google.com/file/d/0B30yLl0I1yBRY2h2UDBCZ0Q5WlE/view; Colo. Rev. Stat. Ann. § 17-1-113.8(1) (2018). The law also established a work group to advise the Department of Corrections "on policies and procedures related to the proper treatment and care of offenders with serious behavioral or mental health disorders in long-term isolated confinement." § 17-1-113.8(2)(b)(I).

[9] *Promising Practices: Diversion for People With SMI*, Vera Inst. of Justice, https://www.safealternativestosegregation.org/promising_practice/diversion-for-people-with-smi/ [hereinafter *Promising Practices: Diversion for People With SMI*].

[10] Raemisch and Wasko, *supra*, at 6.

[11] *Promising Practices: Diversion for People With SMI*, *supra*.

introduction of dogs to attend treatment groups or treatment meetings, the use of de-escalation rooms where offenders can listen to soothing music and change their environment other than their cell and also the ability to participate in art therapy where they can draw and express their thoughts without talking."[12] The department also "designed and built restraint tables that accommodate up to four people restrained together to facilitate group and pro-social interactions with a therapist or clinician."[13]

"By January of 2014, all offenders designated as having a serious mental illness were evaluated and moved out of administrative segregation to either a Residential Treatment Program or a general population setting."[14] By the end of 2015, the department "still ha[d] not identified a patient or situation it was not able to work through that caused the [statute's] exigent circumstances to apply."[15] In a 2018 report by the Association of State Correctional Administrators and the Arthur Liman Center for Public Interest Law at Yale Law School that highlighted nationwide efforts to limit restrictive housing ("2018 ASCA-Yale Report"), Raemisch wrote that in Colorado's two mental health prisons, "assaults, self-harm, and suicides have decreased dramatically," the facilities are "quiet and safer," and

---

[12] Raemisch and Wasko, *supra*, at 6.
[13] *Promising Practices: Diversion for People With SMI*, *supra*; see also Ex. 2 (Colo. Dep't of Corr. Reg. 650-04).
[14] Raemisch and Wasko, *supra*, at 5.
[15] *Id.*

"[s]taff enjoy work more because prisoners are acting in a more positive manner."[16]

**Relevant Policies:**

- Ex. 1 (Colo. Dep't of Corr. Reg. 650-03) (Restrictive Housing).

- Ex. 2 (Colo. Dep't of Corr. Reg. 650-04) (Residential Treatment Programs for Offenders with Mental Illness and Intellectual and Developmental Needs).

## II.   Maine

- Stopped placing prisoners with serious mental illnesses in restrictive housing units following implementation of an Intensive Mental Health Unit for prisoners who have acute or severe mental health needs.

The Maine Department of Corrections (MDOC) has implemented a specialized unit for prisoners with serious mental illnesses as an alternative to segregation. In February 2014, the department opened an Intensive Mental Health Unit (IMHU) in the Maine State Prison for "up to 32 clients of the county jail system and MDOC who suffer from an acute, sub-acute, or chronic mental illness

---

[16] Ex. 11 (2018 ASCA-Yale Report), at 4; *see also* Ex. 12 (Reforming Restrictive Housing: The 2018 ASCA-Liman Nationwide Survey of Time-in-Cell ("2018 ASCA-Liman Survey")) (surveying prison systems nationwide about segregation practices).

and are violent."[17] According to the Vera Institute of Justice, the unit "stabilizes clients with ongoing illness and returns them to their community or housing unit, diverts clients who are not appropriate for correctional settings to appropriate psychiatric community settings, and provides clients with the initial or definitive treatment that the community mental health system has not been able to provide."[18] The unit "provided an opportunity to implement Social Learning Programming—combined with evidence-based programming—through a clinical team in a setting that provides safety, security, and treatment."[19] The unit is staffed by correctional officers trained in mental illness topics and practices, along with a clinical and medical team.[20] The average stay in the unit is 120 days, excluding chronic cases which remain in the unit indefinitely.[21]

There have been several favorable outcomes following the implementation of the Intensive Mental Health Unit. According to the U.S. Department of Justice, Office of the Inspector General, in 2015, Maine "no longer placed inmates with

[17] *Promising Practices: Intensive Mental Health Unit*, Vera Inst. of Justice, https://www.safealternativestosegregation.org/promising_practice/intensive-mental-health-unit/ [hereinafter *Promising Practices: Intensive Mental Health Unit*]; *see* L.D. 1515, 126th Gen. Assembl., 1st Spec. Sess. (Me. 2013); Ex. 3 (Me. Dep't of Corr. Policy 18.6.1).

[18] *Promising Practices: Intensive Mental Health Unit*, *supra*.

[19] *Id.*

[20] *Id.*; *see also* Ex. 3 (Me. Dep't of Corr. Policy 18.6.1), at 2-3.

[21] *Promising Practices: Intensive Mental Health Unit*, *supra*.

serious mental illness in [restrictive housing units] at all."[22] In addition, the unit has experienced significant improvements following a unit evaluation and corrective action plan in 2016-2017[23]:

> [T]he IMHU has seen a shift in Departmental oversight, unit management, staff training and professional development, revised policy and procedure, enhanced communications and reviews, and heightened programming and treatment. The results have been very positive, including increased staff satisfaction, client stabilization and a stronger unit milieu. Additionally, the unit has seen a decrease in fights, assaults, assaults on staff, suicide behavior, self-abuse, use of force, use of restraints, use of weapons, grievances and disciplines.[24]

**Relevant Policies:**

- Ex. 3 (Me. Dep't of Corr. Policy 18.6.1) (Intensive Mental Health Unit).

## III. North Dakota

- Reduced the number of prisoners in segregation with broad reforms, which included diverting prisoners with serious mental illnesses to the Special Assistance Unit for individualized services and contact with staff throughout the day.

---

[22] Office of the Inspector Gen., U.S. Dep't of Justice, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates With Mental Illness* ii (July 2017), https://oig.justice.gov/reports/2017/e1705.pdf [hereinafter OIG Report].

[23] According to the Maine Department of Corrections Associate Commissioner and Regional Behavioral Health Director, this assessment "was taken in response to a lengthy period in which there was a high frequency of incidents and concerns on the unit, including the use of chemical agents, self-injurious behavior, assaults on staff, prisoner disciplines, and grievances." Ryan Thornell and Robyn Hodges, *2017 Intensive Mental Health Unit Report* 1 (2017), https://www.safealternativestosegregation.org/wp-content/uploads/2018/07/MDOC-2017-IMHU-Recap-.pdf.

[24] *Promising Practices: Intensive Mental Health Unit*, *supra*.

North Dakota's Department of Corrections and Rehabilitation has made sweeping changes to its segregation practices, including diversion of prisoners with serious mental illnesses from segregation. North Dakota's Director of Corrections and Rehabilitation and past President of the Association of State Correctional Administrators Leann Bertsch spearheaded these changes,[25] and wrote:

> Since late 2015, the North Dakota Department of Corrections and Rehabilitation (ND DOCR) has maintained an approximately 60–70% reduction in the population of its Administrative Segregation Unit (renamed the Behavioral Intervention Unit or BIU) at the North Dakota State Penitentiary (NDSP). The number of people residing in BIU as of April 5, 2018 was 24. The daily count within this unit has remained under 40 people over more than two years, down from over 100 people in 2015. The average length of stay in BIU has fluctuated between 30 and 60 days, although there are a few people who reside in the unit much longer based on the severity of violence, their expression of continued risk for violence, or their own preference for the BIU setting.
>
> This population reduction has been sustained by continuing to adhere to a multi-faceted screening and assessment process. In fact, NDSP was able to convert one of the tiers within BIU to a preferred housing tier, which is home to 20 of the most consistently pro-social residents within the facility. Another 20-cell unit was converted to the Administrative Transition Unit, where people live when they are in the process of moving from BIU to a general population setting. ND DOCR continues to focus on those who commit any of 10 of the most serious in-custody offenses that may make a person eligible for BIU placement, with some exceptions for fighting and other harmful

[25] Cheryl Corley, *North Dakota Prison Officials Think Outside the Box to Revamp Solitary Confinement*, NPR (July 31, 2018), https://www.npr.org/2018/07/31/630602624/north-dakota-prison-officials-think-outside-the-box-to-revamp-solitary-confineme.

behaviors when they become severe or chronic. ND DOCR also continues to avoid placing people diagnosed with serious mental illnesses in BIU when possible and divert them to the Special Assistance Unit for more individualized services when it is determined that it is not safe to keep them in general population.[26]

The Special Assistance Unit is a housing unit at the James River Correctional Center, a medium-security facility, for prisoners "with mental health problems, self-harmful inclinations, or other unique needs which require greater intervention and services."[27] The unit "provides a structured environment encouraging interaction between staff and residents in a safe and secure setting," with individualized plans developed for each resident.[28] The unit's staff "consists of correctional officers including sergeants, a case manager, human relations counselors, and a psychologist," and staff members "meet with the residents throughout the day."[29]

**Relevant Policies:** Unavailable[30]

---

[26] Ex. 11 (2018 ASCA-Yale Report), at 8; *see also* Corley, *supra* (highlighting North Dakota's reforms to segregation and outcomes).

[27] N.D. Dep't of Corr. & Rehab., *2015-2017 Biennial Report* 43, https://docr.nd.gov/sites/www/files/documents/Biennial%20Report%20Archive/Bi annual%20Report%202015-2017.pdf.

[28] *Id.*

[29] *Id.*

[30] While the North Dakota Correctional Facilities Standards provides that any facility that uses restrictive housing "must have a written policy, procedure and practice for the supervision of inmates while in this status," Ex. 4 (North Dakota Correctional Facilities Standards), at 30, Plaintiffs were unable to access any relevant policies regarding the placement of prisoners with serious mental illnesses in segregation.

## IV.   Pennsylvania

- Restricts the placement of prisoners with serious mental illnesses in segregation absent "exceptional circumstances" that prevent placement in an alternative treatment unit, with zero placements as reported in 2018.

Pursuant to a 2015 settlement agreement, the State of Pennsylvania has made significant changes to its practices around the placement of prisoners with serious mental illnesses in segregation. The agreement provides:

> After the end of the Transition Period,[31] no SMI inmate will be placed in an RHU [Restricted Housing Unit] absent Exceptional Circumstances that prevent placement of the inmate in a DTU [Diversionary Treatment Unit], SRTU [Secure Residential Treatment Unit], RTU [Residential Treatment Unit] or other appropriate unit. In the event of such a placement in an RHU, the Department must timely notify Plaintiffs' counsel of the reasons and expected duration of the placement. Placement of SMI inmates in the RHU will be no longer than the duration of the Exceptional Circumstances. In no event will the placement in the RHU exceed thirty (30) days, and for that period of time, the inmate will be afforded the same privileges available to inmates in the DTU including ten (10) hours of Structured Out-of-Cell Time and ten (10) hours of Unstructured Out-of-Cell Time per week.[32]

In the instant case, Dr. Kathryn Burns explained what she observed while she monitored Pennsylvania's compliance with the settlement agreement for approximately three years:

> [T]he Department of Corrections in Pennsylvania demonstrated a high degree of commitment to creating these diversionary units to

---

[31] For provisions regarding the placement of prisoners with serious mental illnesses in segregation during the transition period, see Ex. 5 (Pennsylvania Settlement), at ¶¶ 28-32.

[32] *Id.* ¶ 7.

segregation for persons with serious mental illness. They got appropriations from the state with respect to budget to hire additional staff. They made a commitment to train everyone in crisis intervention team training who worked with inmates. They did -- they had mental health first aid training for every employee of the department. They created secure residential treatment as well as these diversionary units for inmates that were higher custody levels and potentially at risk of harming themselves or other people and continued to provide treatment in those settings rather than having them in segregation.[33]

On Pennsylvania's exceptional-circumstances provision for when a person with a serious mental illness could be placed in segregation, Dr. Burns explained:

[I]t was really sort of rare things, like an uprising or -- that there had to be some immediate response to a dangerous, life-threatening situation. But it was not -- it was not common, and they had to record it if it ever did happen. But they also created these alternative units so that they were able to separate the person by putting them in a diversion unit as opposed to using segregation for that purpose.[34]

Dr. Burns went on to say that, over the years she spent monitoring the Pennsylvania system, there were "way fewer than even five" prisoners with serious mental illness placed into segregation.[35] In the 2018 ASCA-Yale Report, there were zero prisoners with a serious mental illness reported in segregation in Pennsylvania.[36]

**Relevant Policies**

- Ex. 6 (Pa. Dep't of Corr. Policy DC-ADM 802) (Administrative Custody

---

[33] Kathryn Burns, Feb. 16, 2018 R.D. Trial Tr., at 88:14-89:1.
[34] *Id*. at 89:9-15.
[35] *Id.* at 90:13-16.
[36] Ex. 12 (2018 ASCA-Liman Survey), at 48-49.

Procedures).

- Ex. 7 (Pa. Dep't of Corr. Policy 13.8.1) (Access to Mental Health Care).

## V.     Washington

- Implemented Intensive Treatment Units to divert prisoners with serious mental illnesses from segregation and provide intensive mental health treatment and programming, as well as an Intensive Treatment Program to assist prisoners with chronic behavior problems prepare to return to general population.

The State of Washington also diverts prisoners with serious mental illnesses to intensive mental health treatment. The state has established Intensive Treatment Units at the Monroe Correctional Complex and Washington Corrections Center for Women to address the special needs of prisoners with serious mental illnesses and divert them from segregation.[37] At the Clallam Bay Corrections Center, which houses medium-, close-, and maximum-security prisoners, Washington has an "Intensive Transition Program for incarcerated people with chronic behavior problems who are frequently placed in segregated housing, in which they move through a curriculum in stages, progressively learning self-control and gradually engaging in opportunities to socialize until they are ready to return to the prison's general population."[38]

---

[37] Ex. 8 (Wash. Dep't of Corr. Policy DOC 320.250), at 2.
[38] *FAQ: Frequently Asked Questions*, Vera Inst. of Justice, https://www.safealternativestosegregation.org/faq/.

Mr. Eldon Vail testified in the instant case about Washington's reforms:

> In a long-term partnership with the University of Washington, we finally figured out that what these people [people with mental illnesses] needed was intensive treatment. So we created a unit that can be operated segregation like, depending on the individual case, but it's flush with mental health professionals. And we work with those very difficult prisoners to get them out of their cells at much as possible. Sometimes in restraints and sometimes in restart chairs in group therapy with other inmates, and then work them so that they don't require the restraints in that congregant environment. And ultimately that's what made the system safer.[39]

Notably, the use of program security chairs, which allow prisoners to be safely restrained while in classroom settings,[40] have been described by state officials as a "'game changer' for providing treatment and programming for inmates."[41]

**Relevant Policies**

- Ex. 8 (Wash. Dep't of Corr. Policy DOC 320.250) (Maximum (Max) Custody Placement/Transfer/Release).

- Ex. 9 (Wash. Dep't of Corr. Policy DOC 320.255) (Restrictive Housing).

- Ex. 10 (Wash. Dep't of Corr. Policy DOC 630.500) (Mental Health Services).

## THE STATE'S POSITION:

---

[39] Eldon Vail, Feb. 13, 2018 R.D. Trial Tr., at 219:1-11.
[40] Ex. 9 (Wash. Dep't of Corr. Policy DOC 320.255), at 10-11.
[41] OIG Report, *supra*, at 54.

In accordance with the Court's directive, the State undertook a survey of other states' policies regarding the placement of inmates with an SMI in restrictive housing. Several points quickly became apparent to the State. First, based on the State's review of their policies in the timeframe available to the State, the clear majority of states maintain policies which impose no restrictions whatsoever on placing SMI inmates in restrictive housing or else permit the housing of SMI inmates in restrictive housing under a variety of circumstances. States which permit the housing of SMI inmates in restrictive housing include the following:

> Alaska, Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Montana, Nebraska, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Utah, Virginia, West Virginia, Wisconsin, and Wyoming.[42]

Second, Plaintiffs' characterization of the policies and practices for the correctional systems in Colorado, Maine, North Dakota, Pennsylvania, and Washington is self-serving and based on clearly inadmissible evidence. Plaintiffs write in glowing terms of the purported practices in Colorado and Pennsylvania, but *the policies in both of those states expressly permit housing SMI inmates in restrictive housing*. Plaintiffs also make representations to the Court regarding restrictive housing *practices* in the North Dakota Department of Corrections and

---

[42] For the Court's consideration, the State provides these states' relevant policies as **Exhibit 13** hereto.

Rehabilitation, purportedly based on an article which the Federal Rules of Evidence would not allow as evidence at any hearing, but Plaintiffs cannot point to a single **policy** in North Dakota supporting Plaintiffs' representations. Even assuming *ad arguendo* that Plaintiffs' representations regarding the use of restrictive housing in Colorado, Maine, North Dakota, Pennsylvania, and Washington are correct, these states' practices reflect "best practices" as interpreted by Plaintiffs' counsel, not the constitutional minimum which confines (along with the Prison Litigation Reform Act) this Court's relief.

Third, state correctional systems define "serious mental illness" and "restrictive housing" or "segregation" in a variety of ways. They do not even utilize the same terminology to describe the conditions of confinement generally corresponding to restrictive housing within the Alabama Department of Corrections. The diversity of definitions and terminology among the states demonstrates that an outside observer cannot review a state's restrictive housing policy(ies) in isolation without considering the historical reasons leading to the conditions of confinement within that correctional system. A complete analysis of a state's restrictive housing policy must consider a variety of factors specific to that correctional system which led to the development of that policy. Such factors within a correctional system include the size of the inmate population, the physical layout of the facilities, the incidence of violence and contraband, and the general

characteristics of the inmate population, such as the percentage of the population suffering from mental illness. A court simply cannot extrapolate from the policies and practices in one state and apply them wholesale to another state.

Finally, the consideration of any one correctional system's "policies" on restrictive house without understanding the make-up of their individual physical facilities or the actual practices within those facilities is inappropriate. For example, it appears that Colorado's system includes a large number of single cells in a "Super Max" type facility, though no similar facility exists within the ADOC. It remains unclear how and/or whether Colorado defines its various housing units. Failure to understand these definitional issues will lead to erroneous conclusions. For these reasons and the other reasons stated above, the State requests that the Court avoid consideration of "best practices" as suggested by Plaintiffs or an analysis of any one correctional system's policies without taking into consideration the physical and geographic make-up of these systems and their housing units.

Dated: February 28, 2019.

Respectfully Submitted,

*/s/ Maria V. Morris*
Maria V. Morris
One of the Attorneys for Plaintiffs
Southern Poverty Law Center
400 Washington Avenue

Montgomery, AL 36104

Rhonda Brownstein (ASB-3193-O64R)
Maria V. Morris (ASB-2198-R64M)
Grace Graham (ASB-3040-A64G)
Jonathan Blocker (ASB-6818-G19I)
Caitlin J. Sandley (ASB-5317-S48R)
David Clay Washington (ASB-6599-Y42I)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL  36104
Telephone:  (334) 956-8200
Facsimile:  (334) 956-8481
rhonda.brownstein@splcenter.org
maria.morris@splcenter.org
grace.graham@splcenter.org
jonathan.blocker@splcenter.org
cj.sandley@splcenter.org
david.washington@splcenter.org


Lisa W. Borden (ASB-5673-D57L)
William G. Somerville, III (ASB-6185-E63W)
Andrew P. Walsh (ASB-3755-W77W)
Dennis Nabors
Patricia Clotfelter (ASB-0841-F43P)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ  PC
420 20th Street North, Suite 1400
Birmingham, AL  35203
lborden@bakerdonelson.com
wsomerville@bakerdonelson.com
awalsh@bakerdonelson.com
dnabors@bakerdonelson.com
pclotfelter@bakerdonelson.com


*/s/ Anil A. Mujumdar*
Anil A. Mujumdar (ASB-2004-L65M)
One of the Attorneys for Plaintiffs
Alabama Disabilities Advocacy Program

2332 2nd Avenue North
Birmingham, AL 35203

Gregory M. Zarzaur, Esq. (ASB-0759-E45Z)
Anil A. Mujumdar, Esq. (ASB-2004-L65M)
Diandra S. Debrosse, Esq. (ASB-2956-N76D)
Denise Wiginton, Esq. (ASB-5905-D27W)
ZARZAUR MUJUMDAR & DEBROSSE
2332 2nd Avenue North
Birmingham, AL 35203
Telephone:  (205) 983-7985
Facsimile:  (888) 505-0523
gregory@zarzaur.com
anil@zarzaur.com
fuli@zarzaur.com
denise@zarzaur.com

William Van Der Pol, Jr., Esq. (ASB-2112-114F)
Glenn N. Baxter, Esq. (ASB-3825-A41G)
Lonnie Williams, Esq.
Barbara A. Lawrence, Esq.
Andrea J. Mixson, Esq.
Ashley N. Austin, Esq. (ASB-1059-F69L)
ALABAMA DISABILITIES
ADVOCACY PROGRAM
Box 870395
Tuscaloosa, AL  35487
Telephone:  (205) 348-4928
Facsimile:  (205)  348-3909
wvanderpoljur@adap.ua.edu
gnbaxter@adap.ua.edu
lwilliams@aadap.ua.edu
blawrence@adap.ua.edu
amixson@adap.ua.edu
aaustin@adap.ua.edu

*/s/ William R. Lunsford*

William R. Lunsford
*One of the Attorneys for Defendants*
*Jefferson Dunn and Ruth Naglich*

William R. Lunsford
Matthew Reeves
Melissa K. Marler
Stephen C. Rogers
Alyson L. Smith
Melissa C. Neri
**MAYNARD, COOPER & GALE, PC**
655 Gallatin Street
Huntsville, AL 35801
Telephone: (256) 512-5710
Facsimile: (256) 512-0119
blunsford@maynardcooper.com
mreeves@maynardcooper.com
mmarler@maynardcooper.com
srogers@maynardcooper.com
asmith@maynardcooper.com
mneri@maynardcooper.com

Luther M. Dorr, Jr.
**MAYNARD, COOPER & GALE, PC**
1901 Sixth Avenue North
2400 Regions Harbert Plaza
Birmingham, AL 35203
Telephone: (205) 254-1178
Facsimile: (205) 714-6438
rdorr@maynardcooper.com

John G. Smith
David R. Boyd
**BALCH & BINGHAM LLP**
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (866) 316-9461
jgsmith@balch.com
dboyd@balch.com

Steven C. Corhern
**BALCH & BINGHAM LLP**
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100
Facsimile: (205) 488-5708
scorhern@balch.com

Joseph G. Stewart
Gary Willford, Jr.
**ALABAMA DEPARTMENT OF CORRECTIONS**
Legal Division
301 South Ripley Street
Montgomery, Alabama 36130
Telephone (334) 353-3884
Facsimile (334) 353-3891
joseph.stewart@doc.alabama.gov
gary.willford@doc.alabama.gov