# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **EDWARD BRAGGS,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | )   **Case No. 2:14-cv-00601-MHT-GMB** |
| **v.** | ) |
| | )   **District Judge Myron H. Thompson** |
| **JEFFERSON DUNN,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

## THE STATE'S RESPONSE TO PLAINTIFFS' PROPOSED PHASE 2A OPINION AND ORDER ON <u>IMMEDIATE SUICIDE PREVENTION REMEDIES</u>

# **TABLE OF CONTENTS**

Table of Contents ...................................................................................... i

Table of Authorities .................................................................................. ii

Introduction ............................................................................................... 1

Procedural History ................................................................................... 3

Discussion ................................................................................................. 9

    I.     Plaintiffs' Proposed Opinion Exceeds the Scope of the Initial Evidentiary Hearing and is Inconsistent with the Supplemental Recommendations. ............................................................................. 9

    II.    A Remedial Order Directing ADOC to Implement the Supplemental Recommendations is Unnecessary and Inappropriate. ...................... 13

          A.    Elimination of Mental-Health Observation as a Component of Suicide Prevention. .................................................................. 14

          B.    Follow-up Examinations Following Release from Suicide Watch. .................................................................................... 17

          C.    Referrals to Higher Levels of Care ........................................... 20

          D.    Discharge of Inmates from Suicide Watch to Restrictive Housing. ................................................................................... 22

                  i.    Plaintiffs' Evolving Allegations Regarding "Segregation-Like" Settings. ........................................................... 25

                  ii.    Plaintiffs' Request for Improper Relief Regarding the Discharge of Inmates from Suicide Watch to Restrictive Housing. .......................................................................... 33

          E.    Training for Nursing Staff on Pre-Placement Screenings ........ 35

          F.    Security Checks in Restrictive Housing. ................................... 37

G.    Confidentiality of Mental-Health Clinical Contacts.................43

H.    Immediate Intervention in the Event of a Suicide Attempt ......44

III.    Plaintiffs' Monitoring Proposal Flies in the Face of Clearly-Established Law and Would Create Confusion, Inefficiency, and Conflicting Standards for Reaching Compliance................................45

Conclusion ...................................................................................................48

Certificate of Service ...............................................................................50

ii

## TABLE OF AUTHORITIES

**Cases**

*Cason v. Seckinger* 231 F.3d 777 (11th Cir. 2000) ........................................... 18, 47

*Coral Springs Street Sys., Inc. v. City of Sunrise*
   371 F.3d 1320 (11th Cir. 2004) ......................................................... 17

*Green v. Preemptive Forensic Health Solutions*
   No. 6:14-cv-01402-LSC, 2015 WL 1826191 (N.D. Ala. Apr. 21, 2015) ...... 22, 35

*Los Angeles Cnty. v. Davis*
   440 U.S. 625 (1979) .................................................................. 17, 25

*Skinner v. Lampert*
   457 F. Supp. 2d 1269 (D. Wy. 2006) ...................................................... 47

*Summit Medical Assoc., P.C. v. Pryor*
   180 F.3d 1326 (11th Cir. 1999) ......................................................... 16

*Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*
   382 F.3d 1276 (11th Cir. 2004) .................................................... 17, 25

*U.S. v. Sec'y, Fla. Dept. of Corr.*
   2015 (S.D. Fla. Aug. 12, 2015) ......................................................... 47

Defendants JEFFERSON DUNN ("Commissioner Dunn") and RUTH
NAGLICH ("Naglich" and, collectively with Commissioner Dunn, "the State")
hereby submit this response to Plaintiffs' Proposed Opinion and Order on Immediate
Suicide Prevention Remedies (Doc. No. 2478, the "Plaintiffs' Proposed Opinion").
For the reasons stated more fully below, Plaintiffs are not entitled to an order
providing the relief sought in their Proposed Opinion and "Plaintiffs' Emergency
Motion for a Temporary Restraining Order or a Preliminary Injunction Regarding
Placement of High-Risk Prisoners in Segregation" (Doc. No. 2276, the "Preliminary
Injunction Motion") is due to be denied.

## INTRODUCTION

The State remains committed to maintaining a comprehensive suicide
prevention program within the Alabama Department of Corrections ("ADOC") to
address the ever evolving issue of inmate suicides.  The State has already made
significant progress in implementing key measures geared toward suicide
prevention.   For example, ADOC undertook the enormous task of creating
Structured Living Units ("SLU") at Donaldson as a diversionary housing unit for
inmates with a serious mental illness ("SMI") who would otherwise be placed in
restrictive housing.  In the course of less than a year, ADOC reduced the population
of SMI inmates in restrictive housing from more than two hundred (200) to less than

twenty (20).[1]  ADOC hired "good staff" who understand the Court's remedial expectations and developed policies to implement those expectations.  (Hrg. Tr. (Rough Draft), Apr. 9, 2019, at 214:23-215:6).  The State agreed to and fully engaged in the suicide prevention assessment by the Parties' respective mental-health experts, Drs. Mary Perrien and Kathryn Burns.  The State anticipated that the experts' recommendations might assist ADOC in enhancing its suicide prevention program.

The State agrees with the bulk of the Supplemental Recommendations Regarding Suicide Prevention (Doc. NO. 2416-4, the "Supplemental Recommendations") submitted by Drs. Perrien and Burns, and indeed is already implementing them.  Unfortunately, Plaintiffs' Proposed Opinion demonstrates Plaintiffs' decision to use the recent increase in the number of suicides of inmates in ADOC's custody as an opportunity to revert to seeking attorney-driven relief from the Court.  In doing so, Plaintiffs show disregard for the Court, the State, the Parties' respective mental-health experts, and the agreed-to process for considering on an expedited basis the Supplemental Recommendations submitted by Drs. Perrien and Burns.

---

[1] Until such time as the Court enters an order with respect to compliance oversight or monitoring, the State proposes to continue reporting on the status of SMI inmates in restrictive housing in accordance with the reporting process previously proposed to the Court and implemented by the State.  (Doc. No. 2377).  Plaintiffs' Proposed Opinion does not appear to propose any reporting process, so the State assumes that Plaintiffs no longer oppose the reporting process proposed by the State.

As outlined below, the Court should decline to enter the Plaintiffs' Proposed Opinion and decline to enter any remedial order whatsoever regarding the Supplemental Recommendations for at least the following three (3) reasons:

    a.    Plaintiffs' Proposed Opinion exceeds the scope of the Initial Evidentiary Hearing and is inconsistent with the Supplemental Recommendations;

    b.    A remedial order directing the State to implement the Supplemental Recommendations is unnecessary and inappropriate; and

    c.    Plaintiffs' monitoring proposal flies in the face of clearly-established law and would create confusion, inefficiency, and conflicting standards for reaching compliance.

The State, therefore, respectfully requests that the Court recognize and approve the State's decision to implement the relevant portions of the Supplemental Recommendations and decline to enter Plaintiffs' Proposed Opinion as unnecessary over-reach.

## PROCEDURAL HISTORY

The procedural history of Phase 2A demonstrates the State's continued and enhanced commitment to the remedial process with respect to suicide prevention. During the course of the Phase 2A liability trial, the Parties agreed to ADOC's implementation of suicide prevention measures set forth in the Interim Agreement. (Doc. Nos. 1106, 1106-1). The Court adopted this agreement as the Amended Phase 2A Interim Relief Order Regarding Suicide Prevention Measures (Doc. Nos. 1106,

3

1106-1, the "Interim Order") on January 13, 2017.   ADOC proceeded with implementing the Interim Order's provisions, including the monthly production of documentation and reporting to Plaintiffs regarding inmate suicides and suicide watches.

As detailed in the Liability Order, the Court subsequently found the State liable for providing inadequate mental-health care in seven (7) areas, including suicide prevention. (Doc. No. 1285 at 133-177, 300-301).   The Court directed the State to submit remedial plans pursuant to a schedule set by the Court to address the seven (7) areas of mental-health care identified as inadequate in the Liability Order. (Doc. Nos. 1296, 1357, 1524).   The Court set the issue of suicide prevention as one of the final remedial issues to address during Phase 2A.  (Id.).  Pursuant to the Phase 2A remedial schedule, the State submitted remedial plans to address the concerns expressed in the Court's Liability Order.   The Court held evidentiary hearings with respect to a variety of remedial issues, although the Parties entered into stipulations regarding most of the issues.  The Court adopted those stipulations as court orders.[2]

---

[2] The State expressly reserves and preserves, and does not waive, any rights or obligations under the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e, et seq., with respect to the Phase 2A remedial stipulations and orders, including its right to and the Court's obligation to make particularized findings required under the PLRA for each remedial stipulation and order. The State hereby adopts and incorporates as if fully set forth herein its Statement Regarding the PLRA's "Need-Narrowness-Intrusiveness" Requirements (Doc. No. 2382, the "PLRA Statement").  For the reasons set forth in the PLRA Statement, the State cannot—at this time— admit or concede that the Phase 2A remedial stipulations and orders satisfy the PLRA's need-narrowness-intrusiveness requirements (or any other PLRA requirements).

The State proceeded with implementing the remedial orders, which contained numerous provisions directly related to suicide prevention.  For example, ADOC implemented measures to reduce the population of SMI inmates in restrictive housing.  (See Doc. Nos. 1658, 1855-1, 1861, 1861-1).  These measures included the creation of the 132-bed SLU at Donaldson.  (See Doc. Nos. 1861-1 and 1899-1 at 2, 13-17; (Hrg. Tr. (Rough Draft), Apr. 5, 2019, at 113:1-115:2).  ADOC also created a mechanism for assigning a SMI designation or flag to inmates, instituted a policy to screen inmates for suicide risk during the intake process, and required its mental-health vendor to complete preplacement screenings, periodic assessments, and mental-health rounds for inmates housed in restrictive housing.  (Doc. Nos. 1720; 1794-1 at 7-8; 1815-1 at 1-6).  ADOC's implementation of the remedial orders, as well as the implementation of the Interim Order, appeared to bear fruit:  ADOC's suicide rate significantly declined between January 1, 2017, and August 1, 2018, with the number of completed suicides falling to four (4) during that period of time.

Pursuant to the Court's scheduling of remedial issues, the State initially proposed a remedial plan regarding suicide prevention on August 14, 2018.  (Doc. No. 1951).  After Plaintiffs responded to the State's suicide prevention plan on August 28, 2018 (Doc. No. 1966), the Court set an evidentiary hearing regarding suicide prevention remedies on September 12, 2018.  (Doc. No. 1983).  The Parties' ongoing efforts to resolve remedial issues through mediation preempted the

5

evidentiary hearing.

Prior to the evidentiary hearing set for September 12, 2018, the Parties agreed to, and the Court accepted, a process whereby Drs. Perrien and Burns, the Parties' respective experts, would assess ADOC's suicide prevention efforts and provide recommendations for improving those efforts. (Doc. Nos. 2014, 2020). The Parties agreed to the suicide prevention assessment by Drs. Perrien and Burns with the express hope that their recommendations would assist the Parties to "resolve" the suicide prevention issue short of an adversarial evidentiary hearing. (Doc. No. 2014 at 1).

In keeping with the spirit of the suicide prevention assessment, ADOC and Wexford Health Sources, Inc. ("Wexford"), ADOC's mental-health vendor, offered Drs. Perrien and Burns access to documentation and members of the correctional and mental-health staffs. The State produced more than 13,000 pages of documentation to the experts and Plaintiffs, facilitated site visits to four (4) ADOC facilities, and accommodated confidential interviews with ADOC and Wexford employees. (Doc. No. 2416-1 at 4; see also Doc. Nos. 2014, 2088, 2360).

After Drs. Perrien and Burns began their assessment, but prior to the completion of their report, Plaintiffs filed their Preliminary Injunction Motion on January 18, 2019. (Doc. No. 2276). Plaintiffs expressed concern at an increased number of suicides compared to 2017, although their methodology for calculating

6

ADOC's suicide risk remained fundamentally flawed.  (Id. at 4).  Unfortunately, rather than wait for the experts' recommendations following completion of the suicide prevention assessment, Plaintiffs sought extraordinary relief dictated by Plaintiffs' counsel that would wrest administration of ADOC from its leadership and prevent clinicians on the mental-health staff from exercising their clinical judgment. (Id. at 27-28).  The relief sought by Plaintiffs included a categorical prohibition on housing "any individual who has had an SMI Flag in the last year in segregation." (Id. at 27).  The State denied Plaintiffs were entitled to the requested relief and urged the Court to delay any hearing of Plaintiffs' Preliminary Injunction Motion until Drs. Perrien and Burns submitted their report so the Parties and the Court could consider their recommendations.  (Doc. No. 2409 at 7-9).

Drs. Perrien and Burns submitted their Report and Recommendations on Suicide Prevention (Doc. Nos. 2416, 2416-1, the "Suicide Prevention Report") on March 8, 2019.   The Suicide Prevention Report contains comprehensive recommendations for ADOC's suicide prevention program.  (Doc. No. 2416-1).  At the request of Magistrate Judge John Ott and to assist the Parties in *mediating* a suicide prevention remedy, Drs. Perrien and Burns also submitted the Supplemental Recommendations.  (Doc. No. 2416-4).  Those recommendations reflected the experts' "prioritization of recommendations for immediate implementation while [their] recommendations for a broader, more comprehensive program are being

implemented." (Id. at 1).  Notably, the Supplemental Recommendations did not

include any timeline for implementation of the Supplemental Recommendations.[3]

(Doc. No. 2416-4).

The Court subsequently held an evidentiary hearing (the "Initial Evidentiary

Hearing") between March 27 and April 12, 2019, relating to suicide prevention in

ADOC.  Although the Court initially set the evidentiary hearing to encompass all of

the recommendations in the experts' Suicide Prevention Report as well as Plaintiffs'

Preliminary Injunction Motion, Plaintiffs' failure to constrain their presentation of

evidence to their estimated (or even a reasonable) timeframe forced the Court to

reassess the scope of the hearing.  The Court and the Parties concluded that it would

be impossible to present evidence regarding the full Suicide Prevention Report in

light of Plaintiffs' extended presentation of evidence and the experts' limited

availability to testify.  (Hrg. Tr. (Rough Draft) Apr. 8, 2019, at 109:5-112:3).

Therefore, the Court and the Parties agreed to limit the Initial Evidentiary Hearing

to the Supplemental Recommendations, as well as the narrow issue of allegedly

"segregation-like" settings, and complete an evidentiary hearing at a later date with

---

[3] During the Initial Evidentiary Hearing, Drs. Perrien and Burns clarified this point, and they testified that ADOC could not immediately implement the Supplemental Recommendations. (Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 17:17-24:2).  They testified that implementing certain Supplemental Recommendations might take up to six (6) months. (Id. at 18:17-19:11; id. at 20:20-21:2).  To the extent that the Court enters a remedial order adopting any of the Supplemental Recommendations (it should not), the State requests that the Court afford sufficient time to ADOC to implement those recommendations, including training of staff with respect to the recommendations.

respect to the full scope of suicide prevention, including the recommendations in the Suicide Prevention Report.  (Hrg. Tr. (Rough Draft) Apr. 9, 2019, at 218:13-223:20). The Court and the Parties agreed that any proposed opinion would be limited to the Supplemental Recommendations rather than the entire suicide prevention issue.  (Id. at 219:12-220:20).  With this understanding, the State concluded its presentation of evidence during the Initial Evidentiary Hearing and prepared to respond to Plaintiffs' Proposed Opinion.  (Id. at 220:20-223:20).

## DISCUSSION

I.   **PLAINTIFFS' PROPOSED OPINION EXCEEDS THE SCOPE OF THE INITIAL EVIDENTIARY HEARING AND IS INCONSISTENT WITH THE SUPPLEMENTAL RECOMMENDATIONS.**

In large measure, the relief sought in Plaintiffs' Proposed Opinion exceeds the scope of the Initial Evidentiary Hearing and is due to be denied outright.  **During the course of the Initial Evidentiary Hearing, the Parties expressly agreed to limit the presentation of evidence to the Supplemental Recommendations submitted by Drs. Perrien and Burns as well as the narrow issue of allegedly "segregation-like" settings.**  (Hrg. Tr. (Rough Draft) Apr. 9, 2019, at 218:13-223:20).  The Parties agreed to reserve for a later hearing the full scope of a suicide prevention remedy, including any recommendations from Drs. Perrien and Burns beyond their Supplemental Recommendations.  (Id.).  The Parties discussed this agreement and understanding on the record before the Court.  (Id.).  With this

9

understanding and agreement in place, the State did not present evidence regarding the entire suicide prevention remedy or the experts' recommendations beyond the Supplemental Recommendations.  (Id. at 220:20-223:20).  Accordingly, the State did not present evidence regarding whether any relief sought by Plaintiffs beyond the Supplemental Recommendations complied with the need-narrowness-intrusiveness requirements of the PLRA.

Any relief addressed in Plaintiffs' Proposed Opinion beyond the scope of the Supplemental Recommendations is due to be denied out of hand as inconsistent with the Parties' agreement and unfairly prejudicial to the State.  The State did not receive an opportunity during the course of the Initial Evidentiary Hearing to present evidence with respect to such relief.  Counsel for the State expressed concerns to the Court that if Plaintiffs presented testimony from Dr. Burns on any remedial issue beyond the Supplemental Recommendations, then the State would be forced to re-call Dr. Perrien at a future date to address the broader scope of remedial issues.  (Hrg. Tr. (Rough Draft) Apr. 8, 2019, at 109:25-112:3).  To that end, any relief sought by Plaintiffs with respect to the Interim Order or any other remedial relief beyond the Supplemental Recommendations must be reserved for consideration at the renewed evidentiary hearing set at a future date.  Such requested relief goes to the broader suicide prevention remedy and was expressly reserved for the renewed evidentiary hearing at a future date.

The portions of the relief requested in Plaintiffs' Proposed Opinion exceeding the scope of the Supplemental Recommendations are due to be denied. The immediate relief sought by Plaintiffs exceeding the Supplemental Recommendations include, but are not necessarily limited to, the following:

- Requiring ADOC to staff each major facility with at least one (1) full-time, licensed mental-health professional ("MHP") and staff each treatment hub with at least two (2) full-time licensed MHPs who are on-site for at least eight (8) hours per day every business day. ADOC must staff each treatment hub with at least one (1) licensed MHP on weekends and holidays. (Doc. No. 2478 at 26).

- Ordering "that any employee of ADOC, Wexford, or any other contractor retained to provide medical or mental-health care in ADOC facilities may present a person for assessment for suicide watch … [and] must notify appropriate Wexford staff," including, if appropriate, the on-call staff. "[N]on-mental health staff must refer individuals for assessment or intervention by mental-health staff when they become aware of the need for such assessments for interventions…." (Id. at 29-30).

- Setting limits on when, where, how, and by whom suicide risk assessments may be completed and requiring training related to completion of suicide risk assessments. (Id. at 37-38).

- Directing the State to "immediately" "revise [ADOC's] administrative regulations to be consistent with relief ordered by the court." (Id. at 55-56).

- Requiring that all completed suicide risk assessments "be forwarded to Dr. Kern (or any subsequent Director of Psychiatry) or any Office of Health Services clinician(s) designated by Dr. Kern, and the soon-to-be-hired Director

11

of Psychiatry at Wexford (or any subsequent replacement) or any Wexford regional office clinician(s) designated by Wexford's Director of Psychiatry. These individuals must conduct monthly evaluations of the assessments and issue immediate corrective actions and training if necessary based on the review of those evaluations." (Id. at 59).

- Reinstating "the discharge protocols from the Interim Order" relating to release from suicide watch, including provisions regarding who may a pre-discharge evaluation, how the evaluations must be conducted, and training on how to conduct the evaluations. Furthermore, each inmate "placed on constant watch [must] be reduced to close watch prior to release from suicide watch." (Id. at 63-64).

- Setting requirements with respect to how follow-up mental-health examinations were to be conducted after discharge from suicide watch, who would conduct the examinations, where the examinations could occur, and training for those conducting the examinations. (Id. at 69-70).

- Prohibiting the transfer of inmates from suicide watch "to a segregation or segregation-like unit absent exceptional circumstances." (Id. at 100).

- Defining "exceptional circumstances" as when:

  o "There is no alternative placement immediately available at the facility"; or

  o "There is a security risk at the facility that prevents safe transfer of the prisoner to the alternative placement." (Id.).

- Prohibiting housing an inmate in restrictive housing for more than seventy-two (72) hours in the event that ADOC transfers an inmate from suicide watch to restrictive housing. (Id.).

12

- Ordering that ADOC "provide, immediately, consistently, and for all people in the SLU, the structured therapeutic and unstructured out-of-cell time required by the Phase 2A Psychotherapy Remedial Order for the SLUs." (Id. at 100-101).

To be clear, many of the points of relief requested by Plaintiffs do not appear in either the Supplemental Recommendations or the Suicide Prevention Report. (See, e.g., id. at 26, 37-38, 54-56, 100-101). Furthermore, the Parties and the Court expressly agreed on the record that the Initial Evidentiary Hearing and any proposed opinion would be limited to the Supplemental Recommendations and that any additional relief related to suicide prevention would be reserved for the renewed hearing at a later date. (Hrg. Tr. (Rough Draft) Apr. 9, 2019, at 218:13-223:20). Any order providing relief beyond the scope of the Supplemental Recommendations would unfairly prejudice the State by depriving it of the opportunity to present evidence, include testimony from its expert(s), relating to such relief.

## II.   A REMEDIAL ORDER DIRECTING ADOC TO IMPLEMENT THE SUPPLEMENTAL RECOMMENDATIONS IS UNNECESSARY AND INAPPROPRIATE.

The State does not object to most, although not all, of the Supplemental Recommendations, but an order providing injunctive relief with respect to the Supplemental Recommendations is not necessary.

### a.   Elimination of Mental-Health Observation as a Component of Suicide Prevention.

Drs. Burns and Perrien recommended that ADOC not use mental health observation ("MHO") "as a component of suicide prevention." (Doc. No. 2416-4 at 2). According to Drs. Burns and Perrien, "[t]he only acceptable watches for people with issues related to suicide and/or self-harm are acute and non-acute watch." (Id.). The State agrees with this recommendation. In fact, this recommendation is consistent with existing ADOC policy. Accordingly, it is unnecessary for the Court to include this recommendation in any remedial order.

ADOC's Director of Psychiatry, Dr. Edward Kern, testified that "in our existing policies . . . , nowhere is mental health observation indicated for suicide prevention for acute or nonacute." (Hrg. Tr. (Rough Draft), Mar. 29, 2019, at 106:19-22). Deborah Crook, ADOC's Director of Mental Health Services, testified that MHO "is specifically for individuals that are experiencing a psychosis, a medication change, something – anything, actually, other than suicidality or suicide." (Hrg. Tr. (Rough Draft) Apr. 4, 2019, at 28:23-29:1). ADOC's "policy emphatically says that MHO should not be used for a patient at risk of suicide." (Id. at 29:24-25).

Crook became aware in February of 2019 that Wexford was using MHO for suicide watch in certain circumstances. (Hrg. Tr. (Rough Draft) Apr. 4, 2019, at 29:2-16). On February 15, 2019, Crook sent Wexford a letter expressing, among

14

other concerns, her concerns about Wexford's "[f]ailure to place an inmate on acute suicide watch with constant observation (rather than MHO) when risk factors for potential suicidality are present until a psychologist or psychiatrist is consulted." (Id. at 30:19-24; Plts. Ex. 2170). She also discussed the issue on weekly telephone calls with Wexford personnel. (Id. at 30:23-25; see also Hrg. Tr. (Rough Draft), Mar. 29, 2019, at 111:19-23 (Dr. Kern testifying that "we had conversations within OHS and we had conversations with members of the Wexford executive team to indicate our concerns about this fact"); id. at 106:11-14 ("We are updating our policy on the suicide watch procedures and distinguishing that from [MHO] to make clear that the first is to be used or suicide prevention, the latter is not a part of that prevention protocol."). ADOC personnel met with Wexford personnel the week after Crook sent the letter. (Hrg. Tr. Apr. 4, 2019 (Rough Draft), at 34:7-13). Wexford enacted a formal corrective action plan regarding the misuse of MHO. (Hrg. Tr. (Rough Draft), Apr. 1, 2019, at 57:3-5) ("There was a directive that went out from Wexford to their staff indicating that MHO is inappropriate for suicide watch," and "Wexford is currently on a corrective action plan for suicide watch procedures.")). Crook testified that "we will go back and monitor the things from the corrective action plan after they have completed their corrective action plan to be sure they are in compliance." (Id. at 35:2-4).

Crook testified that since she directed Wexford to stop using MHO as suicide

watch, she has not received any reports suggesting that suicidal inmates are being placed on MHO.  (Hrg. Tr. (Rough Draft) Apr. 4, 2019, at 31:20-23).  Additionally, she has observed "an increase in the [number] of people in acute suicide watch and a decrease in the number of people on MHO."  (Id. at 31:11-13).  She concluded from those numbers "[t]hat MHO is being utilized less as a first placement for crisis cell."  (Id. at 31:18-19).  Dr. Kern testified that "[MHO] is no longer – is no longer being utilized for suicide watch."  (Id. at 109:25-110:2).  Barbara Coe, Wexford's Program Director, testified that "if they say they're suicidal, we're not going to put them on MHO."  (Hrg. Tr. (Rough Draft), Apr. 4, 2019, at 199:24-25).  Thus, it is already ADOC's policy to place suicidal individuals on acute or non-acute watch, and not on MHO.

ADOC is aware of instances in which its vendor did not act in accordance with this policy.  ADOC is both revising the policy and addressing the issue with its vendor, and the vendor is implementing corrective action.  Accordingly, there is no ongoing constitutional violation with respect to the use of MHO, and it is unnecessary for the Court to include this recommendation in a remedial order.  See Summit Medical Assoc., P.C. v. Pryor, 180 F.3d 1326, 1337 (11th Cir. 1999) (recognizing that prospective injunctive relief against a state official in his or her official capacity is only permitted to the extent necessary to correct "ongoing and continuous violations of federal law").

The record demonstrates that the Supplemental Recommendation regarding the use of MHO for suicide watch is moot because ADOC and Wexford voluntarily ceased this practice. See Los Angeles Cnty. v. Davis, 440 U.S. 625, 631 (1979) (holding that controversy became moot during pendency of litigation where defendant voluntarily ceased allegedly illegal conduct and there was "no reasonable expectation" that it would recur). The Eleventh Circuit recognizes that "governmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume [allegedly] illegal activities." Coral Springs Street Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1328-29 (11th Cir. 2004). In fact, "when the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will *not* recur." Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla., 382 F.3d 1276, 1282-83 (11th Cir. 2004). Thus, the voluntary cessation of the practice of using MHO for suicide watch renders this Supplemental Recommendation moot.

**b.    Follow-up Examinations Following Release from Suicide Watch.**

Drs. Burns and Perrien "recommend that upon release from suicide watch, each person will have at least four standard follow-up examinations by mental health." (Doc. No. 2416-4 at 2). Drs. Burns and Perrien further recommend that these follow-up examinations occur on days one, two, three, and ten following release from watch. (Id.). Finally, Drs. Burns and Perrien recommend that the

17

follow-up schedule "be reset" if the inmate is moved before the four follow-ups are complete.

The State agrees that follow-up appointments should occur after an inmate is discharged from suicide watch. However, mandating the precise number and timing of follow-up appointments, as well as mandating a "reset," runs afoul of the PLRA's need-narrowness-intrusiveness test. As the Court is aware, each element of relief in a remedial order must independently meet the PLRA's requirements. Cason v. Seckinger, 231 F.3d 777, 785 (11th Cir. 2000) (PLRA requires "particularized findings, on a provision-by-provision basis, that each requirement imposed by the consent decree satisfies the need-narrowness-intrusiveness criteria"). Dr. Kern testified that requiring follow-ups on days one, two, and three "would be time potentially taken away from other individuals who may need ongoing treatment." (Hrg. Tr. (Rough Draft), Mar. 29, 2019, at 17:7-9). According to Dr. Kern, mandating the follow-ups on particular days "goes further than I would think necessary in terms of removing the clinical autonomy as to whether a person needed to be seen, say, on days one and four." (Id. at 18:12-15). Instead, "clinical judgment needs to be brought to bear at a higher level than would be the case if it was day one, two, and three automatically, because some individuals may not need follow-up at days one, two, and three." (Id. at 18:17-21).

Dr. Perrien agreed that the specific number and timing of follow-ups set out

18

in the Supplemental Recommendations is not absolutely necessary.  (Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 40:13-16 (Dr. Perrien testifying that "I think that you could say three immediate follow-ups were acceptable.  And then I think you could use clinical judgment to determine whether a fourth follow-up is necessary in a case.")).  Dr. Burns agreed that the timing of the fourth follow-up would not necessarily need to be ten (10) days.  (Id. at 42:12-18).  Dr. Perrien testified that, in certain situations involving housing changes, a "reset" of the follow-ups would not be necessary.  (Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 11:13-23 (Dr. Perrien testifying that a move from one general population unit to another would not result in a reset)).

While the State agrees that follow-up care should occur after release from suicide watch, even the experts agree that the specific number and timing of follow-up appointments set forth in the Supplemental Recommendations are not necessary. Moreover, requiring a rigid number of follow-ups on an inflexible schedule interferes with the exercise of clinical judgment with respect to the patient at issue and also interferes with clinicians' ability to care for other patients.  Thus, the method of follow-up care set out in the Supplemental Recommendations is not the least intrusive means of ensuring that follow-up care occurs in a constitutional manner.  Accordingly, the follow-up care standards set forth in the Supplemental Recommendations do not meet the PLRA standard.  Nevertheless, the State remains

committed to providing follow-up care to inmates coming off suicide watch. The State simply asks that the Court permit the mental-health professionals providing the care to do so in accordance with their clinical judgment.

### c.      Referrals to Higher Levels of Care.

Drs. Burns and Perrien provided the following recommendation with respect to referrals to a higher level of care:

> Policy and procedure must include requirements for referrals to higher levels of care for prisoners remaining on watch status for extended periods. We recommend compliance with existing policy requiring inmates on watch for 72 hours be considered for referral to higher levels of care. If not referred, the clinical rationale should be documented in the medical chart, at a minimum, and tracked in the crisis utilization log or similar. If the inmate remains on watch for 168 hours, the treatment team should meet to review a referral to a higher level of care. If the inmate is not referred to a higher level of care, the rationale should be documented in the medical chart, at minimum, and tracked in the crisis utilization log. If the inmate remains on watch for 240 hours or longer, referral to a higher level of care **shall** occur with notification of referral to OHS and vendor regional mental health management. In addition, inmates who are returned to watch status within 30 days of release from a watch and/or who have three watch placements within six months **shall** be referred to a higher level of care; OHS should be immediately notified of any inmates who meet these criteria but are not referred and provided with the clinical rationale.

(Doc. No. 2416-4 at 3) (emphasis added). The State agrees with this recommendation, and already implemented it, with the exception of the two (2)

instances of the word "shall" in bold text above.  Plaintiffs appear to agree that the second bolded "shall" is incorrect.  Instead, Plaintiffs agree that "Prisoners who are returned to watch status within thirty days of release from a watch and/or who have three watch placements within six months must be referred to a higher level of care, **unless clinical staff determine and document a clinical rationale as to why the person should not be referred**."  (Doc. No. 2478 at 87 (emphasis added)).  Drs. Burns and Perrien also agreed that this "shall" is incorrect.  (Hrg. Tr. (Rough Draft) Apr. 9, 2019, at 137:14-138:23 (Dr. Burns testifying, and Dr. Perrien agreeing, that "they shall be unless there's some clinical rationale that makes it so they are not referred")).

With respect to the first bolded "shall," the State maintains the position that requiring the referral in all situations, with no consideration of the inmate's particular clinical circumstances, is not the least intrusive means necessary to ensure compliance with the Constitution.  Instead, such a requirement would limit clinicians' ability to tailor treatment decisions to each inmate's needs.  (See Hrg. Tr. (Rough Draft), Apr. 4, 2019, at 51:16-18 (Crook testifying that "a clinician should make a clinical decision whether an individual is referred to a higher level of care")).  Dr. Perrien agreed with this position.  According to Dr. Perrien, "from my perspective, it was not a shall, but from my perspective it was that consideration would again occur and that notification of the outcome would be done to the

ADOC's OHS and to vendor management, though what we submitted says that the referral shall occur." (Hrg. Tr. (Rough Draft), Apr. 9, 2019, at 134:11-17).

Dr. Perrien's testimony on this point is consistent with permitting clinicians to exercise their clinical judgment. The treatment team will still consider a referral to a higher level of care at 240 hours, but the treatment team retains the flexibility to determine that, in their clinical judgment, a referral is not necessary at that time for a particular inmate. Plaintiffs cannot demonstrate a constitutional right to a referral, as opposed to consideration for a referral. See, e.g., Green v. Preemptive Forensic Health Solutions, No. 6:14-cv-01402-LSC, 2015 WL 1826191, at *3 (N.D. Ala. Apr. 21, 2015) (holding that "a prison medical professional is free to exercise his or her own independent professional judgment, and that an inmate is not entitled to a particular course of treatment"). Thus, requiring a referral based solely on time, with no regard for an inmate's individual clinical circumstances, would extend further than necessary to correct any constitutional violation.

### d. Discharge of Inmates from Suicide Watch to Restrictive Housing.

The March 21, 2019, directive issued by Deputy Commissioner Charles Daniels (the "March 21, 2019, Directive") obviated any need for the Court to enter a remedial order with respect to Drs. Perrien and Burns' recommendation regarding "a multi-pronged approach to RHU inmates who have been placed on suicide watch." (Doc. No. 2416-4 at 3). After beginning his employment with ADOC on

January 7, 2019, Deputy Commissioner Daniels investigated the circumstances of recent inmate suicides in ADOC. (Hrg. Tr. (Rough Draft), Mar. 28, 2019, at 125:22-24; id. at 126:24-127:16). He sought "to know what was going on" with respect to suicides, "determine causes," and "see what [he] could do to help [ADOC] improve in that arena." (Id. at 127:14-16). His investigation included meeting with members of the mental-health staff and ADOC's Office of Health Services to discuss the recent suicides. (Id. at 157:1-15).

Deputy Commissioner Daniels' investigation led him to conclude that ADOC should implement a policy generally prohibiting the transfer of an inmate from suicide watch to a restrictive housing unit. (Id. at 157:8-158:9). Accordingly, Deputy Commissioner Daniels issued the March 21, 2019, Directive that no inmate would go directly from acute suicide watch, non-acute suicide watch, or mental-health observation to a restrictive housing unit. (Id. at 157:20-158:8; Plts. Ex. 2706). Any exception to this prohibition would require his (or his designee's) express approval as Deputy Commissioner of Operations after determining that the inmate posed a danger to others and that ADOC had no other place to house the inmate. (Hrg. Tr. (Rough Draft), Mar. 28, 2019, at 157:25-158:7; Plts. Ex. 2706).

ADOC's implementation of the directive issued by Deputy Commissioner Daniels renders it unnecessary for the Court to enter any order with respect to Drs. Perrien and Burns' recommendation regarding "a multi-pronged approach to RHU

23

inmates who have been placed on suicide watch." (Doc. No. 2416-4 at 3). Both Drs. Perrien and Burns testified that Deputy Commissioner Daniels' March 21, 2019, directive rendered this recommendation "moot." (Hrg. Tr. (Rough Draft), Apr. 9, 2019, at 185:18-25; id. at 185:25-186:1; Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 20:10-11). Dr. Burns testified that she agreed with Deputy Commissioner Daniels' directive and that it served as "the appropriate way to communicate this kind of change or systemic change on this type of issue." (Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 20:12-16).

The unrebutted testimony from multiple ADOC officials confirmed that ADOC is complying with the terms of the March 21, 2019, Directive. (See Hrg. Tr. (Rough Draft), Apr. 4, 2019, at 115:14-118:2 (Warden Deidra Wright testifying that Tutwiler stopped moving inmates from suicide watch to restrictive housing "a few months ago"); Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 74:1-23 (Warden Christopher Gordy testifying that Donaldson complied with the directive); Hrg. Tr. (Rough Draft), Apr. 12, 2019, at 9:24-11:6 (Cheryl Price testifying that ADOC facilities complied with the directive)). Thus, a remedial order with respect to the experts' supplemental recommendation on transferring inmates from suicide watch to restrictive housing is unnecessary. In light of both experts' testimony that the March 19, 2019, Directive mooted this Supplemental Recommendation, as well as the unrebutted testimony that ADOC is complying with the March 19, 2019,

Directive, there is "no reasonable expectation" that the improper transfer of an inmate from suicide watch to restrictive housing will recur.  <u>Los Angeles Cnty.</u>, 440 U.S. at 631; <u>Troiano</u>, 382 F.3d at 1282-83.  The doctrine of voluntary cessation, therefore, renders this Supplemental Recommendation moot.

Evidently refusing to accept the testimony of their own mental-health expert, Plaintiffs demand that the Court impose remedial obligations on ADOC far exceeding the application and scope of their own expert's recommendation.  First, Plaintiffs demand that any remedial provision on suicide prevention relating to restrictive housing units apply equally to allegedly "segregation-like"[4] units.[5] Second, Plaintiffs' demand for relief on transferring inmates from suicide watch to restrictive housing goes well beyond the recommendation of their own expert. Plaintiffs' request for relief with respect to discharging inmates from suicide watch

---

[4] The Court generally defined "segregation-like settings" as a "cell or unit in which prisoners are confined in individualized cells (whether single- or double-celled) for, on average, 22.5 hours or more per day."  (Doc. No. 2282 at 2).  The State continues to express concerns regarding the utility and application of this broad definition because, among other reasons, it does not set a minimum period of time for which the daily out-of-cell time would be calculated and it does not differentiate true restrictive housing from circumstances in which inmates might be confined to their cells for 22.5 hours or more per day but which clearly would not equate to restrictive housing.  These circumstances would include medical isolation, isolation for mental-health purposes including suicide watch, and lockdown.  (Defs. Exs. 3653 and 3654; Hrg. Tr. (Rough Draft), Apr. 12, 2019, at 46:11-48:11; <u>id.</u> at 150:17-22; Hrg. Tr. (Rough Draft), Apr. 3, 2019, at 208:4-8; <u>id.</u> at 209:2-19).

[5] The State largely concurs with Plaintiffs' list of designated restrictive housing units in ADOC but clarifies that, at this time, ADOC designates only the following specified cells as restrictive housing at Limestone, St. Clair, and Ventress: cells C39-76, D1-76, and E1-38 at Limestone; cells B25-48, C1-48, D1-48, and E1-48 at St. Clair; and cells B2, B3, B5, B6, C2, C3, C5, C6, D2, D3, D5, D6, E2, E3, E5, E6, F2, F3, F5, and F6 at Ventress.

to restrictive housing is due to be denied.

### i.    Plaintiffs' Evolving Allegations Regarding "Segregation-Like" Settings.

Despite the consistent testimony of ADOC officials and documentation provided by the State, Plaintiffs continue to misrepresent how ADOC uses certain housing units and the out-of-cell time afforded to inmates in those units. Plaintiffs also continue to change their allegations regarding which housing units are purportedly "segregation like" and why. Prior to and at the outset of the Initial Evidentiary Hearing, Plaintiffs alleged that the following units were "segregation like":

- The cells in Tutwiler's D Unit;

- The cells in M, N, O, and P Units at Kilby;

- Y Unit at Donaldson;

- The "Temporary Holding Unit" at Staton;

- A Unit at St. Clair;

- P1 through P3 cells at Holman; and

- The death row units at Donaldson, Holman, and Tutwiler.

(Doc. No. 2364; Plts. Dem. Ex. 207).

During the course of the Initial Evidentiary Hearing, but before the State introduced any evidence whatsoever regarding the units, Plaintiffs conceded that

Tutwiler's death row unit and St. Clair's A Unit were not "segregation like." (Hrg. Tr. (Rough Draft), Apr. 4, 2019, at 154:14-156:7; id. at 170:22-172:3; Hrg. Tr. (Rough Draft), Apr. 12, 2019, at 48:19-49:14). Plaintiffs also conceded that the cells in Tutwiler's D Unit are not "segregation like" after Warden Wright testified that those cells are being used as a lactation room for new mothers and storage space, respectively. (Hrg. Tr. (Rough Draft), Apr. 4, 2019, at 170:22-172:3). Following the Initial Evidentiary Hearing, Plaintiffs now also acknowledge that the following locations do not meet the Court's definition of restrictive housing: the cells in M and N Units at Kilby; the "Temporary Holding Unit" at Staton; P1 through P3 cells at Holman; and Donaldson's death row unit. (Doc. No. 2478 at 90). Thus, the only units remaining from Plaintiffs' initial list are "Kilby's O unit and P unit isolation cells, Donaldson' Behavior Modification Unit (Unit Y)," and "Holman's death row." (Id.). Inexplicably, Plaintiffs added the SLU at Donaldson to their post-hearing list of allegedly "segregation-like" settings. (Id.).

The evidence in the record confirms that Plaintiffs remain confused regarding the use and purpose of the units on Plaintiffs' (revised) list of allegedly "segregation-like" settings. First, with respect to the Y Unit at Donaldson, the overwhelming evidence demonstrates that inmates receive, on average, more than one and one-half hours out-of-cell time per day. (Hrg. Tr. (Rough Draft), Apr. 5, 2019, at 181:7-8; Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 89:1-10). Inmates housed in the Y Unit at

27

Donaldson engage in a variety of out-of-cell activities, including the following: group classes; exercise; showers; disciplinary hearings; phone calls; haircuts; collecting meal trays; urine tests; pill call; sick call; medical appointments; and mental-health appointments.  (Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 89:21-99:25; Deft. Dem. Ex. 54; see also Plts. Ex. 2500 at ADOC0464398-4403; Plts. Ex. 2501 at ADOC0464404-4407; Plts. Ex. 2502 at ADOC0464408-4411; Plts. Ex. 2557 at ADOC0468138-8139; Deft. Ex. 3665 at ADOC0475825).

In an effort to rebut this evidence, Plaintiffs do nothing more than cite to the documentation of out-of-cell time in the duty post logs for Y Unit for the period February 12-18, 2019.  (Doc. No. 2478 at 91, n. 337 and 338).  However, Warden Gordy testified, and numerous examples in the documentation confirmed, that ***the duty post logs for Y Unit do not, and were never intended to, reflect all of the out-of-cell time for the inmates housed in that unit***.[6]  (Hrg. Tr. (Rough Draft), Apr. 5, 2019, at 200:22-201:1; id. at 212:21-213:12; id. at 224:6-226:19; Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 124:2-7; id. at 126:5-23; id. at 131:17-132:8).  For example, members of the Donaldson correctional staff brought inmate J.A. out of his cell in the Y Unit for a mental-health appointment during the afternoon of February 18,

---

[6] Any review of the documents reflecting out-of-cell time for inmates housed in the Y Unit must consider a variety of records in addition to the duty post logs, including logs maintained in conjunction with Y Unit's duty post logs, duty post logs for other units at Donaldson, medical records, mental-health records, disciplinary records, and inmate movement histories.  (Hrg. Tr. (Rough Draft), Apr. 5, 2019, at 224:6-226:19; Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 130:8-131:6; id. at 140:4-141:5).

2019.  (Plts. Ex. 2557 at ADOC0468138-8139).  Later that same afternoon, the correctional staff transferred J.A. from Y Unit to the SLU.  (Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 89:1-10; Plts. Ex. 2326 at ADOC0462746).  However, Y Unit's duty post log for February 18, 2019, does not mention that J.A. came out of his cell for a mental-health appointment and transferred to a different unit on that date.  (Plts. Ex. 2502 at ADOC0464408-4411).  Plaintiffs' blatant mischaracterization of the purpose and use of the duty post logs does not suffice to contradict the clear evidence that inmates in Donaldson's Y Unit receive more than one and one-half hours of out-of-cell time each day.  Donaldson's Y Unit is not a "segregation-like" setting, and no remedial order with respect to restrictive housing should apply to Y Unit.

Second, the cells in the O and P Units at Kilby do not meet the Court's definition of "segregation-like" settings.  Cheryl Price testified that ADOC uses the cells in O Unit as crisis cells, not for restrictive housing.[7]  (Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 46:11-48:11).  Members of the correctional and mental-health staffs are present in O Unit throughout the day and night.  (Id. at 47:21-48:8).  ADOC defers to the clinical judgment of the mental-health staff to determine how much out-

---

[7] In a joint submission filed on February 21, 2019, the State indicated that, *at that time*, the cells in O Unit at Kilby "may, *based upon its current use* and depending on when and how the average out-of-cell time is evaluated (on a weekly, monthly, quarterly, or yearly basis), fall within the Court's definition of a 'segregation-like' setting."  (Doc. No. 2364 at 1) (emphasis added).  Cheryl Price testified regarding the use and purpose of the O Unit cells approximately two (2) months after the February 21, 2019, filing.  Based upon the current conditions within O Unit, and the use and purpose of the cells in that unit, this unit does not meet the Court's definition of a "segregation-like" setting.

of-cell time is appropriate for inmates housed in the O Unit cells.  (Id. at 47:17-20; id. at 150:17-22).  Plaintiffs agree that the cells in O Unit are crisis cells, but offer no explanation for why they contend that O Unit's cells and none of ADOC's other crisis cells meet the definition of a "segregation-like" setting.  (Plts. Ex. 2400; Plts. Dem. Ex. 207).  The evidence demonstrates that ADOC does not use the cells in Kilby's O Unit as restrictive housing, (Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 48:9-11), and they should not be included in any remedial provision relating to restrictive housing.

The cells in Kilby's P Unit do not meet the Court's definition of a "segregation-like" setting.  P Unit serves as the infirmary for Kilby, and the cells in P Unit are attached to the infirmary.  (Id. at 43:25-44:17).  Members of the Kilby medical staff are present in P Unit "around the clock."  (Id. at 44:6-10).  A nurse's station is located steps away from the P Unit cells, and members of the medical and correctional staffs at Kilby routinely walk down the hallway outside of the cells.  (Id. at 45:6-46:7; Deft. Ex. 3683).  ADOC utilizes the P Unit cells for medical isolation purposes, and the members of the Kilby medical staff determine who should be placed in those cells.  (Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 44:21-45:5).  No remedial order with respect to restrictive housing should apply to the cells in Kilby's P Unit.  (See Hrg. Tr. (Rough Draft), Apr. 3, 2019, at 209:2-9 (Vail testifying that a medical isolation cell would be "probably in a health care clinic" and thus would not

30

be "even relevant" for purposes of determining whether it meets the definition of "segregation like")).

Third, Plaintiffs glaringly failed to prove that Holman's death row unit meets the Court's definition of a "segregation-like" setting. Inmates housed in Holman's death row unit receive, on average, more than two and a half hours of out-of-cell time each day. (Id. at 20:7-13). Inmates on Holman's death row unit leave their cells on a daily basis for a variety of activities, including the following: exercise time on the outside yard; church services; religious activities; accessing the law library; engaging in hobby crafts; accessing the day room; medical appointments; mental-health appointments; dental appointments; and showers. (Id.; Deft. Exs. 3666-3669). The inmates can play basketball and use the weight equipment on the outside yard. (Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 34:10-15; Deft. Ex. 3673). Some inmates serve as runners and spend hours at a time outside of their cells assisting ADOC staff in a variety of tasks related to Holman's death row unit. (Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 20:7-13; id. at 21:3-31:23; Deft. Exs. 3666-3669). As with Donaldson's Y Unit, Plaintiffs solely rely on their mischaracterization of the duty post logs for Holman's death row unit to allege that the unit is "segregation like." Plaintiffs have not created a factual dispute regarding whether inmates in Holman's death row unit are confined to their cells for 22.5 hours or more, on average, per day, and their request to treat that unit as a "segregation-

31

like" setting should be denied.

Finally, contrary to Plaintiffs' allegations, the evidence regarding the SLU at Donaldson does not meet the Court's definition of a "segregation-like" unit. The U, V, and W Units at Donaldson comprise the SLU. (Hrg. Tr. (Rough Draft), Apr. 5, 2019, at 114:6-7). Inmates housed in the SLU receive, on average, "two and a half, three, three and a half hours a day" of out-of-cell time. (Id. at 220:11-13; see also Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 88:6-8). The inmates engage in structured and unstructured activities out of their cell, including playing games, meeting with mental-health providers for individual counseling sessions, engaging in mental-health group sessions, getting exercise, taking showers, and receiving shaves. (Id. at 220:16-22; Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 84:8-22; id. at 88:1-5; id. at 179:25-180:9; id. at 190:20-25). ADOC purchased and installed programming cubicles and programming chairs in the SLU in order to reduce the burden on the correctional staff and to ensure that ADOC complied with the out-of-cell requirements for the SLU. (Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 85:8-86:12; Deft. Exs. 3662 and 3663). The SLU functions differently from a restrictive housing unit in a variety of ways, including the amount of out-of-cell time and mental-health counseling sessions provided to the inmates. (Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 87:22-88:10).

To contest the clear evidence provided by the State demonstrating that the

SLU is not a "segregation-like" setting, Plaintiffs did nothing more than question Warden Gordy regarding documentation of out-of-cell time in the duty post logs covering a single week in February of 2019 for only one (1) of the three (3) units comprising the SLU.  (Doc. No. 2478 at 91-92, n. 340).  Warden Gordy consistently testified that the duty post logs do not serve as the sole source of information regarding out-of-cell time in the SLU.  (Hrg. Tr. (Rough Draft), Apr. 5, 2019, at 220:11-22).  Thus, Plaintiffs do not create a genuine dispute of fact regarding the out-of-cell time for inmates in the SLU, and they are not entitled to an order treating the SLU as a "segregation-like" unit.

### ii.   Plaintiffs' Request for Improper Relief Regarding the Discharge of Inmates from Suicide Watch to Restrictive Housing.

As stated above, the March 21, 2019, Directive renders it unnecessary for the Court to enter an order with respect to the experts' recommendation regarding "a multi-pronged approach to RHU inmates who have been placed on suicide watch." (Doc. No. 2416-4 at 3).  Even if the Court entered a remedial order with respect to this recommendation (it should not do so), the relief sought by Plaintiffs far exceeds the scope of the recommendation proposed by Drs. Perrien and Burns.  For example, Plaintiffs demand that the Court enter an order providing the following relief:

- A prohibition on transferring inmates from suicide watch "to a segregation or segregation-like unit absent exceptional circumstances";

- Defining "exceptional circumstances" as when:

    o   "There is no alternative placement immediately available at the facility"; or

    o   "There is a security risk at the facility that prevents safe transfer of the prisoner to the alternative placement";

- If an inmate is transferred from suicide watch to restrictive housing, a prohibition on housing the inmate in restrictive housing for more than seventy-two (72) hours; and

- A requirement that ADOC "provide, immediately, consistently, and for all people in the SLU, the structured therapeutic and unstructured out-of-cell time required by the Phase 2A Psychotherapy Remedial Order for the SLUs."

(Doc. No. 2478 at 100-101).  However, ***Drs. Perrien and Burns did not recommend any of these provisions in their Supplemental Recommendations or even in the Suicide Prevention Report***.  (See Doc. Nos. 2416-4 at 3 and 2416 at 22).

Regardless of whether the State agrees that the relief sought by Plaintiffs in this regard is appropriate (the State does not agree at this point in time), any order providing this relief would unfairly prejudice the State.  As stated more fully above, the Parties expressly agreed that the proposed opinion on immediate relief related to suicide prevention would only address the Supplemental Recommendations from Drs. Perrien and Burns.  (Hrg. Tr. (Rough Draft) Apr. 9, 2019, at 218:13-223:20). The State only agreed to limit its presentation of evidence at the Initial Evidentiary Hearing, including its examination of the experts, based on this understanding of the

34

scope of the proposed opinion.   (Id. at 220:20-223:20).   Thus, the State never received any notice that Plaintiffs would seek the relief requested with respect to discharging inmates from suicide watch to restrictive housing and never received an opportunity to present evidence with respect to the relief now sought by Plaintiffs. Any order providing the relief sought by Plaintiffs would unfairly prejudice the State at the most fundamental level.   The State must receive the opportunity to present evidence with respect to the relief requested by Plaintiffs, including, if necessary, calling Dr. Perrien to testify.[8]   The relief sought by Plaintiffs regarding discharging inmates from suicide watch to restrictive housing is due to be denied out of hand.

### e.   Training for Nursing Staff on Pre-Placement Screenings.

Drs. Burns and Perrien "recommend training for all nursing staff completing RHU pre-placement screenings."   (Doc. No. 2416-4 at 3).   As the experts acknowledged in their testimony, the Preplacement Order already requires training for nurses conducting pre-placement screening.   (Hrg. Tr. (Rough Draft) Apr. 10, 2019, at 21:7-10; Doc. No. 1815-1, § I.a. (providing that before placement in restrictive housing, "each person shall be screened by an RN or LPN who has been trained in the screening process and is supervised by an RN")).   Crook testified that she does not disagree with requiring training for all nursing staff who complete pre-

---

[8] Among other things, the State must receive the opportunity to present evidence regarding whether this new relief sought by Plaintiffs complies with the PLRA's need-narrowness-intrusiveness requirements.

placement screenings.  (Hrg. Tr. (Rough Draft) Apr. 3, 2019, at 18:12-15).  As Crook

testified, Wexford and ADOC both already provide suicide prevention training.

(Hrg. Tr. (Rough Draft), Apr. 2, 2019, at 15:5-11).  In addition, ADOC adopted a

new policy entitled Restrictive Housing – Pre-Placement Screening in December

2018.  (Deft. Ex. 3647; Hrg. Tr. (Rough Draft), Apr. 4, 2019, at 14:18-25).  This

policy contains detailed instructions on conducting the pre-placement screening.

(Id.).

While the State does not object to this recommendation, it is unnecessary for

the Court to include it in a remedial order, because ADOC and Wexford are already

providing comprehensive training to nurses conducting pre-placement screenings.

There is therefore no ongoing constitutional violation in this area, and entry of a

remedial order would not comply with the PLRA.

### f.    Security Checks in Restrictive Housing.

Plaintiffs' request for a remedial order with respect to the recommendation

that "30-minute custody rounds in segregation must be enforced consistent with

existing policy" is also due to be denied as unnecessary and inappropriate.  Plaintiffs

failed to show an ongoing constitutional violation regarding security checks in

restrictive housing units.  Plaintiffs concede that ADOC maintains a policy requiring

security checks in restrictive housing at no more than 30-minute intervals.  (Doc.

No. 2478 at 111-112, n. 420 (citing Plts. Ex. 1399 (ADOC Admin. Reg. 434))).

Eldon Vail, Plaintiffs' security consultant, testified that ADOC's policy on security checks is "adequate." (Hrg. Tr. (Rough Draft), Apr. 3, 2019, at 141:6-142:2). Dr. Burns also agrees with ADOC's policy regarding security checks in restrictive housing. (Hrg. Tr. (Rough Draft), Apr. 9, 2019, at 37:24-38:6). Furthermore, in reviewing the recent suicides for the Suicide Prevention Assessment, Dr. Burns, Plaintiffs' mental-health expert, did not "identify any suicides that would have been prevented by the 30-minute checks." (Id. at 38:11-14). Thus, ADOC maintains an appropriate policy on security checks in restrictive housing, and Plaintiffs did not show any ongoing constitutional violation with respect to that policy.

The evidence presented at the Initial Evidentiary Hearing demonstrated that the correctional staff at ADOC's major facilities do, in fact, comply with ADOC's policy on security checks in restrictive housing. Warden Wright testified that the members of the Tutwiler correctional staff conduct the "routine" security checks in restrictive housing. (Hrg. Tr. (Rough Draft), Apr. 4, 2019, at 90:4-13). The restrictive housing commander at Tutwiler reviews the duty post logs for restrictive housing on a routine basis to verify that security checks occurred, compares the notations in the logs to the video surveillance recordings if the commander has questions about the logs, and brings any concerns to the commander's supervisor, including, if necessary, to Warden Wright. (Id. at 90:19-92:2).

Warden Gordy testified that the members of the Donaldson correctional staff

comply with ADOC's policy on security checks, although an extraordinary event might prevent a check from occurring within the precise 30-minute intervals. (Hrg. Tr. (Rough Draft), Apr. 5, 2019, at 123:7-12).  Supervisors on the Donaldson correctional staff verify that security checks are occurring by reviewing duty post logs and personally observing the checks by walking through the restrictive housing units. (Id. at 123:13-124:1).  Cheryl Price, ADOC's Institutional Coordinator for the Northern Region, also testified that 30-minute security checks occur as a routine matter in the restrictive housing units at ADOC's facilities. (Hrg. Tr. (Rough Draft), Apr. 12, 2019, at 50:9-51:19).

The evidence demonstrates that ADOC takes appropriate corrective action against correctional officers who do not complete security checks in restrictive housing, who do not properly document the security checks, or who falsify documentation to indicate that security checks occurred when they did not.  ADOC terminated the employment of a correctional officer at Fountain Correctional Facility who failed to conduct security checks in the restrictive housing unit during the relevant period of time but falsified the duty post log to indicate that he completed the checks. (Id. at 102:1-103:3; Plts. Ex. 2403).  ADOC also disciplined other correctional officers for falsifying duty post logs. (Hrg. Tr. (Rough Draft), Apr. 12, 2019, at 105:21-106:9).  When supervisors realize that a correctional officer failed to properly document a security check on a duty post log without intentionally

38

falsifying the log, they will retrain and reeducate the officer on proper documentation of the duty post logs. (Hrg. Tr. (Rough Draft), Apr. 5, 2019, at 162:9-163:16).

In light of the evidence presented at the Initial Evidentiary Hearing regarding the implementation of ADOC's policy requiring security checks in restrictive housing, Plaintiffs' request for a remedial order regarding security checks is due to be denied. Plaintiffs failed to show an ongoing constitutional violation with respect to completion of security checks in restrictive housing units. ADOC maintains an appropriate policy on security checks in restrictive housing; correctional officers complete the checks on a consistent basis; and supervisors take appropriate corrective action upon learning that officers did not complete or document the checks. A remedial order directing ADOC to comply with its own policy on security checks in restrictive housing is, thus, unnecessary because ADOC is already doing so.

Even assuming *ad arguendo* that the Court accepted Plaintiffs' unsupported factual characterization with respect to security checks in restrictive housing (the Court should not do so), an order providing the relief sought by Plaintiffs would still be improper. First, for the reasons set forth above in Section II.d.i, requiring ADOC to conduct 30-minute security checks in the allegedly "segregation-like" units would be improper because those units do not meet the Court's definition of restrictive

39

housing. Requiring ADOC to complete 30-minute security checks for units which are not restrictive housing or "segregation like" would clearly exceed the minimum relief necessary to remedy the alleged constitutional violation with respect to security checks *in restrictive housing*.

Second, a remedial order with respect to *all restrictive housing units throughout ADOC* would not comply with the need-narrowness-intrusiveness requirements of the PLRA. Eldon Vail, Plaintiffs' security consultant, **only reviewed duty post logs for the restrictive housing units at six (6) of the twelve (12) major facilities within ADOC** with a restrictive housing unit.[9] (Doc. No. 2478 at 111-112; Hrg. Tr. (Rough Draft), Apr. 3, 2019, at 145:20-146:1). He testified that the recent duty post logs for two (2) of those facilities, Bullock and Tutwiler, documented security checks in restrictive housing that were "very good" in their frequency and time intervals. (Hrg. Tr. (Rough Draft), Apr. 3, 2019, at 147:14-148:5; id. at 150:9-21). Thus, even taking Plaintiffs' factual characterizations at face value, Plaintiffs

---

[9] Vail reviewed duty post logs for a single week in February of 2019 for the restrictive housing units at the following ADOC facilities: Holman, Kilby, Fountain, Easterling, Bullock, and Tutwiler. (Hrg. Tr. (Rough Draft), Apr. 3, 2019, at 145:20-146:7; id. at 151:15-21). He also reviewed duty post logs from restrictive housing units related to particular suicides and serious suicide attempts. (Id.). In this regard, Vail's review of duty post logs did not encompass all of the restrictive housing units at those facilities, but only the units where the suicides or suicide attempts occurred. (Id. at 145:20-151:21). The State denies that Vail's limited review of one (1), or at most two (2), weeks' worth of duty post logs from certain facilities qualifies him to opine that ADOC is failing to conduct security checks in restrictive housing at those facilities, much less failing to conduct such checks at all of its major facilities. Vail admitted that he could not testify regarding how thoroughly ADOC completed or documented security checks at the facilities for the remaining fifty (50) weeks during the year whose logs he did not review. (Id. at 213:17-214:6).

failed to provide evidence of an ongoing constitutional violation with respect to security checks in restrictive housing at Bibb, Bullock, Donaldson, Hamilton, Limestone, St. Clair, Tutwiler, and Ventress Correctional Facilities.  A remedial order directing ADOC to complete security checks in the restrictive housing units at those facilities would not comport with the limitations set by the PLRA.

Furthermore, Plaintiffs' request for a remedial order directing ADOC to implement a procedure for verifying that the members of the correctional staff are conducting 30-minute security checks in restrictive housing is due to be denied. Such an order is unnecessary because, as discussed above, ADOC already maintains procedures for verifying security checks and taking appropriate disciplinary action when officers do not complete or document the checks.  ADOC previously submitted a proposal to the Court for verifying security checks in restrictive housing.  (Doc. Nos. 2380, 2422).  The State now slightly revises its proposal for verifying security checks, including to explicitly state what the testimony from ADOC officials confirmed ADOC was already doing to verify security checks.  If approved by the Court, the State agrees to continue and/or implement the follow procedures for verifying security checks in restrictive housing units until such time as the Court enters an order with respect to compliance oversight or monitoring:

1.  ADOC will require the restrictive housing commander over each restrictive housing unit at its major facilities to conduct unannounced rounds in each restrictive housing unit, including reviewing the duty post logs and other

41

documentation attached to the duty post logs for the unit. Each restrictive housing commander must certify in writing on a quarterly basis that he or she conducted unannounced rounds in each restrictive housing unit for which he or she serves as the commander. The senior-ranking warden at each major ADOC correctional facility with a restrictive housing unit shall maintain the written certification from the restrictive housing commander at the warden's facility.

2.      ADOC will require the immediate supervisor for each restrictive housing commander to review duty post logs on a quarterly basis for the restrictive housing units under the commander's oversight to determine whether security checks occurred.

3.      Each major ADOC correctional facility will issue a written report on a quarterly basis to Deputy Commissioner Charles Daniels or, if the report is from Tutwiler, to Deputy Commissioner Wendy Williams summarizing the findings from the unannounced rounds in restrictive housing and the review of the duty post logs, as well as summarizing any corrective action with respect to a failure to complete security checks or properly document the checks in the duty post log.

Because the State voluntarily agrees to undertake these procedures, if approved by the Court, a remedial order requiring ADOC to implement procedures for verifying security checks in restrictive housing is unnecessary.

In sum, Plaintiffs' requested relief with respect to 30-minute security checks in restrictive housing is due to be denied because Plaintiffs failed to prove an ongoing constitutional violation with regard to such checks; ADOC maintains and complies with an appropriate policy regarding security checks; ADOC will continue

to verify that security checks in restrictive housing are completed; and the relief requested by Plaintiffs does not comply with the limitations set by the PLRA.

### g.    Confidentiality of Mental-Health Clinical Contacts.

Drs. Burns and Perrien recommended that ADOC "[a]dhere to confidentiality requirements." (Doc. No. 2416-4 at 4). As Plaintiffs acknowledge, two (2) prior remedial orders cover these issues. (Plaintiffs' Proposed Opinion, Doc. No. 2478, at 120 (citing Doc. Nos. 1899, 1899-1, 1900, 1900-1)). Crook testified that this recommendation is "a duplication of what the expectation is in the remedial orders." (Hrg. Tr. (Rough Draft), Apr. 3, 2019, at 19:1-2). Plaintiffs' suggestion that "Crook testified that she does not have any idea of the frequency with which defendants are complying with the confidentiality requirements of the remedial orders," (Doc. No. 2478 at 122), mischaracterizes the testimony. Crook testified that she does "know that individuals are coming out of cell in a confidential setting," but that she does not "know that every time it is being complied with." (Hrg. Tr. (Rough Draft), Apr. 3, 2019, at 19:3-24). At most, Plaintiffs presented evidence that Wexford employees do not always document that interactions occurred in confidential settings or, if they did not, the reasons why.

Once again, the State does not disagree with this recommendation and intends to continue its efforts to ensure compliance with the previous remedial orders. Given that previous remedial orders already cover this issue, entry of an additional remedial

order is unnecessary.  (See Hrg. Tr. (Rough Draft), Apr. 9, 2019, at 201:6-8 (Dr. Perrien testifying that "[i]t's covered in other remedial orders, so I don't know that it's necessary.")).

### h.    Immediate Intervention in the Event of a Suicide Attempt.

Drs. Burns and Perrien recommended "immediate intervention" in a suicide attempt in progress upon the presence of two (2) members of security staff, and they recommend that life-saving measures "continue until a physician declares death." (Doc. No. 2416-4 at 4).  Once again, the State does not disagree with this recommendation.  As Plaintiffs acknowledge, (Doc. No. 2478 at 124), Dr. Kern testified that he agreed with this recommendation.  (Hrg. Tr. (Rough Draft), Mar. 29, 2019, at 129:18-130:8).  Crook also testified that she does not disagree with this recommendation.  (Hrg. Tr. (Rough Draft), Apr. 3, 2019, at 20:1-5).  Thus, there is no need to include this recommendation in a remedial order.

### III.    PLAINTIFFS' MONITORING PROPOSAL FLIES IN THE FACE OF CLEARLY-ESTABLISHED LAW AND WOULD CREATE CONFUSION, INEFFICIENCY, AND CONFLICTING STANDARDS FOR REACHING COMPLIANCE.

The State previously proposed a comprehensive compliance oversight program.  (Doc. No. 2115).  Once the Court enters an order regarding compliance oversight, the compliance oversight team will assume responsibility for overseeing compliance with any remedial order entered by the Court, including any order regarding suicide prevention.  The State believes it would cause confusion to

institute a monitoring system now for suicide prevention, only to have that monitoring system replaced in a matter of months when the comprehensive compliance oversight team is in place.

Dr. Burns initially testified that "I've thought that the department would do some monitoring of those [suicide prevention] remedies.  I hadn't thought through additional monitoring."  (Hrg. Tr. (Rough Draft), Apr. 9, 2019, at 205:14-16).  Dr. Perrien likewise "had not considered [outside monitoring] yet at this time."  (Id. at 206:1-2).  Instead, Dr. Perrien "had, similarly to Dr. Burns, thought that the department would implement, monitor, and report to the Court what they had implemented along with ongoing reporting and monitoring similar to what they had done with, for example, the [I]nterim [O]rder."  (Id. at 206:2-5).  Dr. Perrien testified as follows regarding the ADOC's ability to self-monitor:

> So what I would say is that I've seen ADOC add staff that they didn't have before.  And I've seen them hire good staff, who know what the expectations are, who have reviewed the remedial orders, who have developed policies, not all of them that I saw, but who have developed policies based on those orders, who have done – who have done this on the health care side as well as the operations side.  And what I've seen thus far is, yes, I think that – I've seen people who have the ability to do this.

(Id. at 214:23-215:6).

Dr. Burns later suggested that the Court could "appoint someone to help the department" and "also simultaneously begin to monitor that those things are

happening." (Hrg. Tr., Apr. 9, 2019, at 208:21-209:4).  Dr. Perrien testified that she is concerned that an "interim monitor" would ultimately make things more difficult for the eventual compliance oversight team.  (Id. at 210:1-25).  In response to the Court's question about potentially appointing her as the "interim monitor," Dr. Perrien responded that while she was "particularly flattered and honored" that the Court would consider such an appointment, she believes she would "be best able to help the case and the department" as a consulting expert.  (Id. at 212:1-5).  Despite Dr. Perrien's express testimony that she does not wish to serve as a monitor, Plaintiffs now suggest exactly that.  (Doc. No. 2478 at 128-29).  Plaintiffs' alternative suggestion that, if Dr. Perrien declines the request, the Parties each submit "at least one alternative suitable monitor of their choosing," (id. at 129), ignores the reality that there are very few qualified individuals willing to serve in such a role.  The interim nature of the role, as well as the potential overlap with the compliance oversight team's role, only exacerbates the difficulties in finding a qualified individual willing to serve.

Finally, Plaintiffs do not even suggest that their proposed monitoring scheme complies with the PLRA.  Instead, they continue to insist that the PLRA does not apply to monitoring orders.  (Id. at 128).  This assertion is incorrect as a matter of law.  The Eleventh Circuit requires "particularized findings, on a provision-by-provision basis," that each element of relief meets the need-narrowness-

46

intrusiveness standard.  <u>Cason v. Seckinger</u>, 213 F. 3d 777, 785 (11th Cir. 2000).

Courts routinely subject monitors to the PLRA's need-narrowness-intrusiveness

standard.  <u>See, e.g.</u>, <u>U.S. v. Sec'y, Fla. Dept. of Corr.</u>, 2015 WL 4768247, at \*\*1-2

(S.D. Fla. Aug. 12, 2015) (analyzing each element of proposed monitoring plan

under need-narrowness-intrusiveness standard, and limiting certain aspects of plan

as overly broad); <u>Skinner v. Lampert</u>, 457 F. Supp. 2d 1269, 1285 (D. Wy. 2006)

(finding that PLRA need-narrowness-intrusiveness standard applied to work of joint

expert responsible for reporting compliance to court).  Thus, any monitoring scheme

must comply with the PLRA's requirements.

<u>CONCLUSION</u>

Based upon the foregoing, the State respectfully requests that the Court

decline to enter the Plaintiffs' Proposed Opinion, deny Plaintiffs' Preliminary

Injunction Motion, and enter an order approving the State's continued

implementation of the appropriate portions of the Supplemental Recommendations.

To the extent that the Court decides to enter a remedial order with respect to the

Supplemental Recommendations, the State requests that the Court provide sufficient

time for the State to implement any remedial provisions, including no less than the

timeline for implementing the Supplemental Recommendations outlined by Drs.

Perrien and Burns.  (Hrg. Tr. (Rough Draft), Apr. 10, 2019, at 17:17-24:2).

Dated: April 18, 2019.

47

*/s/ William R. Lunsford*

William R. Lunsford
*Attorney for the Commissioner and*
*Associate Commissioner*

William R. Lunsford
Matthew B. Reeves
Melissa K. Marler
Stephen C. Rogers
Alyson L. Smith
Melissa C. Neri
**MAYNARD, COOPER & GALE, PC**
655 Gallatin Street
Huntsville, AL 35801
Telephone: (256) 512-5710
Facsimile: (256) 512-0119
blunsford@maynardcooper.com
mreeves@maynardcooper.com
mmarler@maynardcooper.com
srogers@maynardcooper.com
asmith@maynardcooper.com
mneri@maynardcooper.com

Luther M. Dorr, Jr.
**MAYNARD, COOPER & GALE, PC**
1901 Sixth Avenue North
2400 Regions Harbert Plaza
Birmingham, AL 35203
Telephone: (205) 254-1178
Facsimile: (205) 714-6438
rdorr@maynardcooper.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served upon all attorneys of record in this matter, including without limitation the following, by the Court's CM/ECF system on this the 18th day of April, 2019:

Maria V. Morris
J. Richard Cohen
Caitlin J. Sandley
Grace Graham
Jonathan Blocker
David C. Washington
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
maria.morris@splcenter.org
richard.cohen@splcenter.org
cj.sandley@splcenter.org
grace.graham@splcenter.org
jonathan.blocker@splcenter.org
david.washington@splcenter.org

Gregory M. Zarzaur
Anil A. Mujumdar
Denise Wiginton
**ZARZAUR MUJUMDAR & DEBROSSE**
2332 2nd Avenue North
Birmingham, AL 35203
Telephone: (205) 983-7985
Facsimile: (888) 505-0523
gregory@zarzaur.com
anil@zarzaur.com
denise@zarzaur.com

William Van Der Pol, Jr.
Glenn N. Baxter
Barbara A. Lawrence
Andrea J. Mixson
Ashley N. Austin
**ALABAMA DISABILITIES ADVOCACY PROGRAM**
University of Alabama
500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
Telephone: (205) 348-6894
Facsimile: (205) 348-3909
wvanderpoljr@adap.ua.edu
gnbaxter@bama.ua.edu
blawrence@adap.ua.edu
amixson@adap.ua.edu
aaustin@adap.ua.edu
Andrew P. Walsh
William G. Somerville III
Patricia Clotfelter
Lisa W. Borden
**BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC**
420 20th Street North
Suite 1400
Birmingham, Alabama 35203
Telephone:  (205) 244-3863
Facsimile:  (205) 488-3863
awalsh@bakerdonelson.com
wsomerville@bakerdonelson.com
pclotfelter@bakerdonelson.com
lborden@bakerdonelson.com

John G. Smith
David R. Boyd
**BALCH & BINGHAM LLP**
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (866) 316-9461
jgsmith@balch.com
dboyd@balch.com


Steven C. Corhern
**BALCH & BINGHAM LLP**
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100
Facsimile: (205) 488-5708
scorhern@balch.com


Gary L. Willford, Jr.
Joseph G. Stewart
Stephanie L. Smithee
**ALABAMA DEPARTMENT OF**
**CORRECTIONS**
Legal Division
301 South Ripley Street
Montgomery, Alabama 36130
Telephone (334) 353-3884
Facsimile (334) 353-3891
gary.willford@doc.alabama.gov
joseph.stewart@doc.alabama.gov
stephanie.smithee@doc.alabama.gov

Deana Johnson
Brett T. Lane
**MHM SERVICES, INC.**
1447 Peachtree Street NE
Suite 500
Atlanta, GA 30309
Telephone: (404) 347-4134
Facsimile: (404) 347-4138
djohnson@mhm-services.com
btlane@mhm-services.com


Lonnie J. Williams
**ALABAMA DISABILITIES ADVOCACY**
**PROGRAM**
P. O. Box 870395
Tuscaloosa, AL 35487
Telephone: (205) 348-4928
Facsimile: (205) 348-3909
lwilliams@adap.ua.edu

*/s/ William R. Lunsford*
Of Counsel

50