```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT OF ALABAMA

 3                      NORTHERN DIVISION

 4   EDWARD BRAGGS, et al.,

 5        Plaintiffs,

 6     vs.                      CASE NO.:  2:14cv601-MHT

 7   JEFFERSON S. DUNN, in his
     official capacity as
 8   Commissioner of the
     Alabama Department of
 9   Corrections, et al.,

10        Defendants.

11                       VOLUME I

12              * * * * * * * * * *

13       REMEDIAL TRIAL ON SUICIDE PREVENTION

14              * * * * * * * * * *

15       BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES

16   DISTRICT JUDGE, at Montgomery, Alabama, on Thursday, March 28,

17   2019, commencing at 9:07 p.m.

18
                            APPEARANCES:
19
     FOR THE PLAINTIFFS:     Ms. Maria V. Morris
20                           Ms. C. J. Sandley
                             Mr. David Washington
21                           Attorneys at Law
                             SOUTHERN POVERTY LAW CENTER
22                           400 Washington Avenue
                             Montgomery, Alabama  36104
23

24

25
```

```
 1                      APPEARANCES, Continued:

 2                           Mr. William Van Der Pol, Jr.
                             Ms. Ashley Austin
 3                           Staff Attorneys
                             ALABAMA DISABILITIES ADVOCACY PROGRAM
 4                           P.O. Box 870395
                             Tuscaloosa, Alabama  35487
 5
                             Mr. Gregory Martin Zarzaur
 6                           Mr. Anil A. Mujumdar
                             Attorneys at Law
 7                           ZARZAUR MUJUMDAR & DEBROSSE
                             2332 Second Avenue North
 8                           Birmingham, Alabama  35205

 9   FOR THE DEFENDANTS:     Mr. William Richard Lunsford
                             Mr. Matthew Reeves
10                           Attorneys at Law
                             MAYNARD COOPER & GALE, P.C.
11                           655 Gallatin Street
                             Huntsville, Alabama  35801
12
                             Mr. Luther M. Dorr
13                           Attorney at Law
                             MAYNARD COOPER & GALE, P.C.
14                           1901 Sixth Avenue North, Suite 2400
                             Birmingham, Alabama  35203
15
                             Ms. Carrie McCollum
16                           Ms. Stephanie D. Smithee
                             Assistant Attorneys General
17                           STATE OF ALABAMA
                             DEPARTMENT OF CORRECTIONS
18                           301 South Ripley Street
                             Montgomery, Alabama  36130
19
                  Proceedings reported stenographically;
20
                    transcript produced by computer.
21
                        * * * * * * * * * * *
22

23

24

25
```

```
 1                     EXAMINATION INDEX

 2   EDWARD KERN

 3       DIRECT BY MS. SANDLEY                          10

 4   CHARLES DANIELS

 5       DIRECT BY MR. ZARZAUR                         120
         CROSS BY MR. LUNSFORD                         219
 6       REDIRECT BY MR. ZARZAUR                       253

 7                  * * * * * * * * * * * *

 8      (The following proceedings were heard before the Honorable

 9      Myron H. Thompson, United States District Judge, at

10      Montgomery, Alabama, on Thursday, March 28, 2019,

11      commencing at 9:07 a.m.:)

12           (Call to Order of the Court)

13           THE COURT:  Court calls the case of Braggs versus Dunn,

14   civil action number 14cv601.  We're here on the issue of

15   suicide.

16           Ms. Morris, how long do you think the hearing will

17   take?

18           MS. MORRIS:  I think it's probably six to seven days on

19   our part.

20           THE COURT:  Does that include the defendants?

21           MS. MORRIS:  That includes the defendants examination

22   of the witnesses that we've put up.

23           THE COURT:  Okay.  What about the examination of the

24   two experts, Burns and Perrien?

25           MS. MORRIS:  That is --
```

```
 1          THE COURT:  Does that include them?

 2          MS. MORRIS:  It includes Burns.  It does not include

 3  Perrien.  And I think I should say seven days.

 4          THE COURT:  Okay.  I've had a chance to consider the

 5  briefs and all the filings so far.  If the allegations are as

 6  the plaintiffs allege, I cannot wait the two or three weeks

 7  after the hearing to enter immediate relief.  I would have to do

 8  so within a day or two after the hearing.  So your suggestion of

 9  your having two weeks and so forth won't work.

10          MS. MORRIS:  Okay.  We will begin preparing it while we

11  are presenting the evidence.

12          THE COURT:  Very good.  And the defendants should be

13  prepared as well.  I think if the evidence is as alleged, I

14  would probably be entering an order within 24 hours of the

15  hearing.

16          MS. MORRIS:  Thank you, Your Honor.  May I approach

17  with a couple of docketing matters?

18          THE COURT:  Yes.

19          MS. MORRIS:  The first thing is that just so you're

20  aware, Donaldson is currently experiencing internet problems.

21  So our plaintiff who ordinarily would be watching from Donaldson

22  is not on, but at some point over the course of the day may be

23  on.

24          Another issue is that Mr. J.A., who is currently

25  scheduled to testify tomorrow, was on a crisis placement earlier
```

1  this week, and we are in discussions with defendants right now

2  about whether it would make sense for -- to either forego his

3  testimony or move it to a later point or possibly put him on

4  tomorrow.  So we're still working through that.

5         And then we have several issues on for oral argument

6  this morning.

7         THE COURT:  Yes.

8         MS. MORRIS:  And I've spoken with Mr. Lunsford, and

9  he's in agreement that it would be better if we could put those

10 off until later in the proceeding.

11        THE COURT:  Very good.

12        Getting back to the immediate relief issue, my

13 understanding is that the plaintiffs are essentially seeking to

14 put into effect the expert's supplemental report.

15        MS. MORRIS:  Correct.  I think -- I think that's almost

16 correct.  I think we also would be asking for as immediate

17 relief reinstatement of the interim remedial order on suicide

18 prevention measures.

19        THE COURT:  What about monitoring?

20        MS. MORRIS:  We think that there should be a monitor in

21 place immediately for these issues.  And we think that it could

22 be without the broader structure that we've talked about as far

23 as overall monitoring.  And we have proposed defendants'

24 consultant.

25        THE COURT:  You proposed the defendants' expert as the

 1  monitor?

 2          MS. MORRIS:  Correct.

 3          THE COURT:  Okay.  So the parameters of the immediate

 4  relief are, really, in large measure the supplemental report of

 5  the plaintiffs' and the defendants' experts.

 6          MS. MORRIS:  Correct.

 7          THE COURT:  So any -- anything you want to get to me

 8  from either side or both sides should basically focus on that

 9  supplemental report and how it would manifest itself in an

10  opinion and an injunction.

11          MS. MORRIS:  Yes, Your Honor.

12          THE COURT:  Including complying with the PLRA.

13          MS. MORRIS:  Yes, Your Honor.

14          THE COURT:  I don't think to do that it would take that

15  long.  I mean, we have the outline of what you want pretty

16  firmly in place, it's just a clarification of some of the

17  issues, is my understanding.  Is that correct?

18          MS. MORRIS:  Yes.

19          THE COURT:  But the relief is pretty clear.

20          MS. MORRIS:  Oh, yes.  Yes.

21          THE COURT:  Okay.  So when do you think you can get

22  something to me that manifests itself in the form of an opinion

23  and judgment?

24          MS. MORRIS:  So currently, the schedule has the doctors

25  testifying the week of the 8th.

```
 1            THE COURT:  I think it should come after they testify

 2  for sure, because they will be filling in many of the blanks.

 3            MS. MORRIS:  Yes.  I think we could get --

 4            THE COURT:  Would you like to get back to me on that?

 5            MS. MORRIS:  Yes.  That would be a good idea.

 6            THE COURT:  And I really do want to get this out as

 7  quickly as I can, if you should prevail.

 8            MS. MORRIS:  That is correct, Your Honor.

 9            THE COURT:  And I think the defendants should move in

10  tandem.  I don't think I'm going to have time for an exchange

11  back and forth.

12            Mr. Lunsford, is that -- do you understand?

13            MR. LUNSFORD:  Your Honor, I understand what you're

14  saying.  I'm not sure how that's going to work out time frame

15  wise.

16            THE COURT:  The bottom line is if the plaintiffs carry

17  the day, I cannot wait weeks to issue an opinion, if not days.

18            MR. LUNSFORD:  Well, certainly, Your Honor, we disagree

19  that there's a need to take --

20            THE COURT:  Right.  I said --

21            MR. LUNSFORD:  -- immediate action.

22            THE COURT:  I said if.

23            MR. LUNSFORD:  Well, Your Honor, I understand that.

24  I'm just making sure you understand our position is that there

25  is no need for immediate action or for monitoring.  And
```

1  certainly we continue to hear things that we've not necessarily

2  heard before.  So as this rolls out, we'll need time to respond.

3  I appreciate you acknowledging that.

4          THE COURT:  That's right.

5          There's still no likelihood that you-all can agree on

6  anything; is that right?

7          MS. MORRIS:  I don't believe there -- I don't believe

8  there is in a fast time frame.

9          THE COURT:  Okay.  Let's proceed.

10          MS. MORRIS:  The one other item for the -- of

11  housekeeping is that Mr. Daniels is scheduled to testify after

12  Dr. Kern today.  Mr. Daniels has some conflicts, and so he's not

13  available after today for several more days.  So we will be sort

14  of gauging where we are by around lunch time.  But at that

15  point, we might want to -- we might ask to interrupt Dr. Kern's

16  testimony to have Mr. Daniels testify.

17          THE COURT:  That will be fine.  We will recess from 4

18  to 4:30 today.  I have another matter to take up.  Other than

19  that, I'm ready to go the full day.

20          MS. MORRIS:  Thank you, Your Honor.

21          THE COURT:  Tomorrow, it ends up that we may be able to

22  start around 10 rather than one.

23          MS. MORRIS:  Okay.  Thank you, Your Honor.

24          THE COURT:  Very good.

25          MS. SANDLEY:  Plaintiffs call Dr. Edward Kern.

1          Your Honor, before we start, we have a couple of

2   demonstratives that I think may be helpful to the Court and the

3   parties as we proceed through this.

4          THE COURT:  What about exhibits?  Do we need to admit

5   any exhibits and so forth?  How have we been handling that?

6          MS. SANDLEY:  In the past you have admitted everything

7   that -- to which there has been no objection.

8          THE COURT:  Okay.

9          MS. SANDLEY:  And we would be fine with that.  If I

10   may --

11          THE COURT:  Do I have a list of the exhibits to which

12   there have been no objection?

13          MR. LUNSFORD:  Your Honor, to clarify, we've been

14   handling exhibits as they come up during the course of the

15   hearing.  We have not been handling them en masse, I would say.

16   So it was our expectation to do it just as we've done it, which

17   is as the witnesses are presented, the exhibits will be

18   presented to them and admitted as --

19          THE COURT:  I think I've been pretty much letting in

20   everything.  So unless I hear an objection, we'll assume

21   everything's admitted.

22          MS. SANDLEY:  Thank you, Your Honor.  And may I

23   approach with these demonstratives?

24          THE COURT:  Yes.

25          MR. LUNSFORD:  Your Honor, particularly as it relates

1   to the demonstratives, just so Your Honor is aware, these are

2   like the demonstratives we've seen in the past, which are

3   extensive.  They include various citations to other documents

4   which purport to already be in the record.  We've begun vetting

5   those as soon as we've received them, but it's going to take us

6   some time with all the other deadlines that are in existence.

7        THE COURT:  Certainly.  And as in the past, if you find

8   errors, bring them to my attention.  And obviously,

9   demonstratives are just that.  They're demonstratives and not

10   the substantive exhibits.

11        MR. LUNSFORD:  Yes, sir.

12                 EDWARD KERN

13     The witness, having first been duly sworn to speak the

14   truth, the whole truth and nothing but the truth, testified as

15   follows:

16              DIRECT EXAMINATION

17   BY MS. SANDLEY:

18   Q.  Good morning, Dr. Kern.  My name is C.J. Sandley, and I'm

19   one of the lawyers for the plaintiffs.

20   A.  Good morning.

21   Q.  Could you please state your name for the record.

22   A.  Yes.  My name is Edward Kern, K-E-R-N.

23   Q.  And you are ADOC's director of psychiatry; correct?

24   A.  That's correct.

25   Q.  You've been in that position for almost a year?

1  A.  Approximately one year.

2  Q.  And could you remind us briefly what your job duties at ADOC

3  are.

4  A.  My job is to oversee the clinical aspects of the mental

5  health program, participating with other members of the Office

6  of Health Services team in activities that would range from

7  working to ensure remedial orders are implemented to developing

8  policies and regulations, to interfacing with vendor staff, with

9  Wexford team, in a variety of capacities.

10  Q.  And who do you report to?

11  A.  Commissioner Naglich.

12  Q.  Previously you were employed by MHM; correct?

13  A.  That's correct.

14  Q.  And MHM was the ADOC's mental health care vendor prior to

15  Wexford; is that right?

16  A.  That's right.

17  Q.  And when you were employed by MHM, you were a psychiatrist

18  stationed at Bullock Correctional Facility; correct?

19  A.  That's correct.

20  Q.  You worked primarily in the mental health unit there?

21  A.  I did on the SU and the RTU.

22  Q.  Now, you've testified in this lawsuit several times;

23  correct?

24  A.  I have.

25  Q.  And you were deposed as well; right?

1  A.  True.

2  Q.  You've never been recognized by this Court as an expert in

3  this case; correct?

4  A.  That's right.

5  Q.  And neither of the parties have asked that you be recognized

6  as an expert; correct?

7  A.  Correct.

8  Q.  Have you been recognized by any court as an expert?

9  A.  No, I have not acted as an expert witness.

10  Q.  Now, you've been a psychiatrist within ADOC for about nine

11  years now?

12  A.  I began working at the Bullock Correctional Facility in

13  2010.

14  Q.  And in June 2017, about seven years into your tenure, the

15  Court found ADOC's mental health care system to be horrendously

16  inadequate; correct?

17  A.  I'm familiar with that finding.

18  Q.  There have been 15 suicides in ADOC since December '17;

19  correct?

20  A.  That is correct.

21  Q.  And 13 of those suicides took place in a celled setting

22  where people were in their cells most of the day; is that

23  right?

24  A.  Correct.

25  Q.  You've testified before that there is overwhelming research

1   to show that prolonged isolation is a severe stress on any

2   individual; correct?

3   A.   That's correct.

4   Q.   And you've also testified that prolonged isolation is a

5   severe stress, particularly on people with mental illness;

6   correct?

7   A.   It is -- there are some individuals who prefer isolation.

8   But overall, it is a stress on individuals with or without

9   mental illness.

10  Q.   Crisis placements are isolating; correct?

11  A.   To a certain extent they are isolating in the sense that a

12  person would be in a cell either individually or at times with

13  another individual in a crisis cell.  But compared to a general

14  population, the answer would be yes.

15  Q.   Does ADOC engage in -- place people on crisis placements

16  with another person?

17  A.   At times.

18  Q.   Now, you've testified before that when someone is in a

19  crisis placement, there's a need to constantly balance the

20  detriment of being in isolation and the benefits of the crisis

21  placement; correct?

22  A.   Correct.

23  Q.   People who have been recently released from suicide watch

24  are at an elevated risk of decompensation; correct?

25  A.   In general, I would agree with that.

1   Q.   Do you recall during the liability trial in this case the

2   Court ordered an interim suicide prevention remedy?

3   A.   Yes.

4   Q.   And that order was entered shortly after Jamie Wallace

5   killed himself?

6   A.   Correct.

7   Q.   You were Jamie Wallace's provider at the time of his

8   suicide; correct?

9   A.   That's correct.

10  Q.   And the interim order was a product of an agreement between

11  the parties in this case; correct?

12  A.   That's my understanding, yes.

13  Q.   Are you familiar with the terms of the interim suicide

14  prevention order?

15  A.   Yes.

16  Q.   The interim order required ADOC to implement a constant

17  watch process for the first time; correct?

18  A.   That's correct.

19  Q.   And constant watch is where people who are acutely suicidal

20  are watched constantly; correct?

21  A.   That's right.

22  Q.   Do you know whether ADOC is still attempting to comply with

23  the interim suicide prevention order?

24  A.   Yes.   The department has an acute suicide watch process.

25  And my observation, discussions with individuals, leads me to

```
 1   believe that there are vigorous attempts to employ acute suicide

 2   watch when appropriate at all the facilities.

 3   Q.  There are other requirements in the interim suicide

 4   prevention order besides constant watch; correct?

 5   A.  True.

 6   Q.  Such as follow-up appointments when people are released from

 7   suicide watch; right?

 8   A.  Correct.

 9   Q.  Do you know if ADOC is attempting to comply with those other

10   requirements as well?

11   A.  Yes, they are attempting to comply with the other

12   requirements.

13   Q.  Has anyone told you that ADOC is going to stop trying to

14   comply with the interim suicide prevention order?

15   A.  No.

16   Q.  Are you familiar with the Court's June 2017 liability

17   opinion from this case?

18   A.  I'm aware of the liability opinion as a document.

19   Q.  Have you read it?

20   A.  I have.

21   Q.  Over the last year, the Court has entered a number of

22   remedial orders in this case; correct?

23   A.  Correct.

24   Q.  And ADOC agreed to almost all of those remedial orders;

25   right?
```

1   A.   Yes.

2   Q.   Did you review the agreements prior to them being submitted

3   to the Court?

4   A.   The agreements -- of course, since I've been in this

5   position, yes, I reviewed those documents prior to when they

6   were submitted.

7   Q.   And did you have the opportunity to weigh in on the

8   requirements of those agreements?

9        MR. REEVES:  I'm going to go ahead and object to the

10  extent this calls for any attorney-client privileged discussion

11  regarding any of the stipulations or which ultimately became

12  remedial orders in this case.

13       THE COURT:  What's your response?

14       MS. SANDLEY:  Not asking for conversations Dr. Kern had

15  with his attorneys.  But if he, for example, relayed information

16  to Commissioner Naglich about the contents of the agreements, we

17  would like to know that.

18       THE COURT:  I'll allow that.  Go ahead.

19  A.   Could you repeat your question, please?

20  Q.   Not asking for anything you may have relayed to your

21  attorneys in this case, but did you provide any commentary or

22  feedback on the requirements of the agreements in this case?

23  A.   To?

24  Q.   To anyone other than your attorneys.

25  A.   I spoke with my attorneys.  It's possible that Ms. Naglich

```
 1  was a part of some conversations, but not necessarily all of
 2  them.
 3  Q.  Did you have any conversations with Ms. Naglich apart from
 4  conversations with your attorneys?
 5  A.  Not that I specifically remember in regard to the content of
 6  these documents.
 7  Q.  So the only conversations you recall were with your
 8  attorneys?
 9  A.  Right.
10  Q.  Okay.  Are you aware that the Court found that ADOC's system
11  for identifying prisoners with mental illness is significantly
12  inadequate?
13  A.  I'm aware of that, yes.
14  Q.  Are you aware that the parties agreed on a remedial order
15  addressing the problems the Court found with regard to ADOC's
16  intake process?
17  A.  Yes.
18  Q.  Do you think the intake process, if implemented, will
19  adequately identify people coming into ADOC with mental health
20  needs?
21  A.  Well, specifically the intake process, which includes the
22  screening by the RN, asks questions that I believe are adequate
23  to capture a history of mental illness or the presence of acute
24  symptoms.
25  Q.  So you do believe that that intake process agreed on by the
```

1    parties will adequately identify people with mental illness

2    coming into ADOC?

3    A.   Right.   I believe it's an adequate screening process for

4    identifying the individuals.

5    Q.   Are you aware that the defendants in this case have

6    represented to the Court that the requirements of the intake

7    remedial order are directly related to suicide prevention?

8    A.   Broadly speaking, I'm aware of the connection.   I can't cite

9    a source, but broadly speaking, it's part of the same

10   conversation.

11   Q.   And would you agree with that?

12   A.   I would agree that an adequate intake process is related to

13   suicide prevention, yes.

14   Q.   Having an adequate referral process would also reduce the

15   risk of suicide; correct?

16   A.   I would agree with that.

17   Q.   And are you aware that the Court found that ADOC's referral

18   process is riddled with delays and inadequacies?

19   A.   I don't remember those specific words, but I'm aware,

20   broadly speaking, again, there were concerns.   I just don't

21   remember those specific words.

22   Q.   And are you aware that the parties in this case agreed on a

23   remedial order to address the problems the Court found with

24   ADOC's referral process?

25   A.   Yes.

1  Q.  Do you think that referral process, if implemented, would

2  enable mental health to respond timely and appropriately to

3  people's mental health needs?

4  A.  I do.  We have implemented a referral process, and I believe

5  it does -- it will allow for adequate response in a timely

6  manner.

7  Q.  And would you agree with the defendant's representation that

8  implementing the referral order will result in an improved

9  crisis care program?

10  A.  I believe that an adequate referral process should include

11  referrals for crisis care when indicated.

12  Q.  Do you agree that an adequate referral process is necessary

13  for an adequate suicide prevention program?

14  A.  I think it's a necessary component.

15  Q.  Are you aware that the Court found that ADOC fails to

16  provide adequate treatment planning?

17  A.  Could you be more specific?

18  Q.  Are you aware that the Court found problems with ADOC's

19  treatment planning?

20  A.  I'm aware that that was one of the issues, yes.

21  Q.  And one of those problems was that the treatment plans were

22  "cookie cutter" was the phrase that was used.  Are you --

23  A.  I do remember that phrase being used.

24  Q.  And are you aware that the parties agreed on a remedial

25  order to address those problems with treatment planning in ADOC?

1  A.   Yes.

2  Q.   Do you believe that the treatment planning order, if

3  implemented, will ensure that ADOC's treatment plans are

4  adequate and individualized?

5  A.   I believe that it will accomplish those goals.

6  Q.   Do you agree with defendants' representation to the Court

7  that implementing the treatment planning order will result in an

8  improved crisis care program?

9  A.   I would agree with that.

10  Q.   Are you aware that the Court found that mental health

11  understaffing, correctional understaffing, the use of

12  unsupervised, unlicensed counselors, and lack of confidentiality

13  undermine psychotherapy provided to prisoners with mental

14  illness?

15  A.   I recall those issues broadly, yes.  I don't recall the

16  specific wording, but I recall the issues broadly.

17  Q.   Are you aware that the Court found that ADOC was providing

18  inadequate group therapy?

19  A.   Yes.

20  Q.   You're aware that the parties agreed on a remedial order

21  that addresses the problems the Court found with psychotherapy

22  in ADOC?

23  A.   That's correct.

24  Q.   Do you believe that that order regarding psychotherapy, if

25  implemented, would ensure that ADOC is providing adequate

1  psychotherapy to prisoners with mental illness?

2  A.  I believe that order would provide for adequate treatment,

3  yes.

4  Q.  And do you agree with defendants' representation to the

5  Court that implementing the psychotherapy order will result in

6  an improved crisis care program?

7            MR. REEVES:  I'm going to go ahead and object to

8  whatever representation that Ms. Sandley is referring to.  To

9  the extent that she wants to show it to the plaintiff and he can

10 look at it and evaluate whether that's a true and accurate

11 representation of the -- of that statement, that's fine.

12           THE COURT:  Now, is your objection that the defendants

13 did not make such a representation, or is your concern --

14           MR. REEVES:  I'm not sure that they did.  I don't know

15 where the representation is coming from.

16           THE COURT:  Where is the representation coming from?

17           MS. SANDLEY:  Defendant's pretrial brief.  It's

18 document 2434.

19           THE COURT:  Why don't you show that to -- well, you

20 just asked him if he's aware of it.  And I guess you can say,

21 are you aware of that representation in the pretrial brief.

22 A.  Sorry.  Could you repeat that question, please?

23 Q.  Are you aware that defendants have represented to the Court

24 that implementing the psychotherapy order will result in an

25 improved crisis care program?

1    A.   Yes.

2    Q.   Do you agree with that?

3    A.   I would agree with that.

4    Q.   You're aware that the Court found that ADOC's current

5    segregation practices pose an unacceptably high risk of serious

6    harm to prisoners with serious mental health needs?

7    A.   I'm aware of that.

8    Q.   Are you aware that the Court found that ADOC lacks a

9    functioning process for ensuring that prisoners with mental

10   illness are not sent to segregation for dangerously long periods

11   of time?

12   A.   I'm aware that was originally a concern.  Are you asking

13   about a particular time frame?

14   Q.   This is from the Court's liability opinion.

15   A.   Okay.  Yes, I'm aware that that was a finding at the time.

16   Q.   And are you aware that the Court found in the liability

17   opinion that ADOC lacks a process for screening out prisoners

18   who should not be placed in segregation at all due to mental

19   illness?

20   A.   That's consistent with what I remember from that document.

21   Q.   And do you remember that the Court also found that it's

22   categorically inappropriate to place prisoners with serious

23   mental illness in segregation absent extenuating circumstances?

24   A.   Correct.  Absent extenuating circumstances.

25   Q.   Now, the parties -- are you aware that the parties have

1    agreed to various remedial orders addressing some of those

2    problems with segregation that the Court found in its liability

3    opinion?

4    A.   Yes.

5    Q.   For example, the parties agreed to requirements for

6    conducting mental health rounds in segregation; right?

7    A.   Correct.

8    Q.   And the parties agreed on a definition of serious mental

9    illness; correct?

10   A.   Correct.

11   Q.   And the parties agreed on a process for prescreening people

12   going into segregation; right?

13   A.   That's correct.

14   Q.   The parties also agreed on a process for conducting periodic

15   mental health assessments of people in segregation; right?

16   A.   True.

17   Q.   Do you think that those agreed-on processes, if implemented,

18   would address the findings the Court made with regard to

19   segregation?

20   A.   I would agree with that, yes.

21   Q.   And would they reduce the risk of suicide in segregation?

22   A.   I think they would have the potential to reduce the risk of

23   suicide.

24   Q.   How?

25   A.   Simply by increased identification of individuals who may be

```
 1   at elevated risk at the time they entered restrictive housing.
 2   Q.  Are you aware that the Court found that ADOC has an
 3   unacceptable practice of disciplining mentally ill prisoners for
 4   behavior that stems from their mental illness?
 5   A.  I'm aware of that finding.
 6   Q.  And are you aware that the Court found that ADOC disciplines
 7   prisoners with mental illness without regard for the
 8   disciplinary sanction's impact on their mental health?
 9   A.  I'm aware of that, that that was a finding at the time, yes.
10   Q.  Are you aware that the parties have agreed on stipulations
11   that, if ordered, would address the problems the Court found
12   with regard to the disciplinary process?
13   A.  Yes.
14   Q.  Do you believe those stipulations, if implemented, would
15   ensure that ADOC is no longer disciplining prisoners with mental
16   illness without regard for the impact on their mental health?
17   A.  I think it would accomplish that.
18   Q.  And do you think it would ensure that ADOC is no longer
19   disciplining prisoners for engaging in self-harm or
20   self-injurious behavior?
21   A.  They are no longer doing that.  That's already been
22   implemented.
23   Q.  The agreement agreed on by the parties has not yet been
24   ordered; correct?
25   A.  Could you clarify?  I want to make sure I'm following your
```

1  question exactly.

2  Q.  Are you aware that the parties' agreement has not yet been

3  entered as an order by the Court?

4  A.  Yes.

5  Q.  And are you aware that the doctors -- well, I'll come back

6  to that.

7     Are you aware that the Court found that ADOC does not

8  provide hospital-level care to patients who need it?

9  A.  I'm aware of that finding at the time, yes.

10 Q.  Are you aware that the parties agreed on stipulations that,

11 if ordered, would address the problems the Court found with

12 ADOC's provision of hospital-level care?

13 A.  Yes.

14 Q.  Do you believe those stipulations, if implemented, would

15 ensure that ADOC provides hospital-level care to those who need

16 it?

17 A.  Yes.

18 Q.  Do you believe providing hospital-level care to those who

19 need it is a component of suicide prevention?

20 A.  It is a component of suicide prevention.

21 Q.  The Court found that Jamie Wallace, for example, had been

22 recommended for transfer to a mental health hospital; correct?

23 A.  Yes.

24 Q.  And he had not been transferred at the time of his suicide;

25 right?

1    A.    That's correct.   He was still on the stabilization unit.

2    Q.    Do you play any role in making sure that the remedial orders

3    in this case are being implemented?

4    A.    Yes.   I play a role on the OHS team ensuring that.

5    Q.    What is your role?

6    A.    My role is to work with other individuals to provide

7    clinical perspective, to interface with Wexford in discussing

8    issues and overcoming barriers that might arise in implementing

9    a particular order, answering questions from clinicians at times

10   about details on a given order such as SMI designation.

11   Q.    We've heard testimony before about a task force for

12   implementing the remedial orders.   Are you familiar with that at

13   all?

14   A.    Yes.

15   Q.    Are you on that task force?

16   A.    Yes.

17   Q.    Does that task force have meetings?

18   A.    There was a task force that -- yes, the task force has had

19   meetings.

20   Q.    When was the last time it met?

21   A.    I don't recall the last day of the last meeting.

22   Q.    Do you know about when?

23   A.    It was last year, perhaps in the fall.

24   Q.    In the fall of last year?

25   A.    Early fall.

1    Q.   Who else is on that task force?

2    A.   There are a number of members from the department.   For

3    example, Mr. Stamper is on the task force.   Ms. Brown, Lynn

4    Brown, is on the task force, and others.

5    Q.   Who is Mr. Stamper?

6    A.   Dennis Stamper is one of the -- he's with the commissioner's

7    office.   I don't know the exact title, but he would be an

8    example of someone who's on that.

9    Q.   And Ms. Brown works within the Office of Health Services?

10   A.   She's Office of Health Services.   Right.

11   Q.   All right.   And you say you don't recall exactly when that

12   task force met, but you think sometime last fall; is that right?

13   A.   Right.   I would -- last fall.

14   Q.   Okay.   And there have been a number of suicides since last

15   fall; correct?

16   A.   That's correct.

17   Q.   Are you aware that plaintiffs' expert, Dr. Kathryn Burns,

18   and ADOC's consultant, Dr. Mary Perrien, recently completed an

19   assessment of ADOC's suicide prevention program?

20   A.   Yes, I am.

21   Q.   Are you aware that the defendants in this case agreed to the

22   process which Dr. Burns and Dr. Perrien used to conduct the

23   assessment?

24   A.   Yes.

25   Q.   Dr. Perrien is employed as a consultant by the Department of

1  Corrections; correct?

2  A.  That's true.

3  Q.  Have you reviewed the doctors' report and recommendations?

4  A.  I have.

5  Q.  Have you reviewed their recommendations for immediate

6  implementation?

7  A.  Yes.

8  Q.  We're going to talk about them in more detail in a few

9  minutes.

10     Have you, Dr. Kern, participated in any meetings about

11  suicides since you became ADOC's director of psychiatry last

12  spring?

13  A.  You mean any meetings at all regarding suicide?

14  Q.  Yes.

15  A.  Yes.

16  Q.  When?

17  A.  Well, there have been a number of meetings, both -- you

18  know, discussions with individuals, both on the Office of Health

19  Services side as well as with Wexford.

20  Q.  Who have you had discussions with?

21  A.  Well, essentially, all of the individuals, starting within

22  OHS.  Ms. Crook, our director of mental health; Ms. Naglich;

23  other members, including Ms. Brown, Ms. Wilson, Mr. Kinard would

24  be examples of individuals on the OHS side.

25     On the Wexford side, I've had discussions that included the

 1   topic of suicide prevention with Mr. Dover, Ms. Coe, Dr. Price,

 2   the psychologist; with their corporate medical director, Dr. Tim

 3   Waller -- or former corporate medical director; and also with

 4   their new corporate medical director, Dr. Kulick, Dr. Ron Brown,

 5   their corporate behavioral health director.

 6   Q.  And were those formal meetings or just informal

 7   conversations?

 8   A.  There have been both.

 9   Q.  And when was the last formal meeting you had to discuss

10   suicide?

11   A.  There was a formal meeting in February at the Wexford state

12   headquarters at which a review of cases was undertaken.  And

13   Dr. Price, the psychologist with Wexford, was the individual

14   presenting clinical facts on those cases.

15   Q.  Have you had any more formal meetings this calendar year?

16   A.  Well, excluding training, I would say that was the one

17   meeting that was devoted specifically to reviewing the cases and

18   discussing suicide prevention.

19   Q.  Okay.  And do you recall what day in February that was?

20   A.  I don't recall the exact day, no.

21   Q.  And you just mentioned training.  Have you had -- have you

22   participated in any trainings this calendar year?

23   A.  I did.  In mid-February, I participated with Dr. Smith in an

24   advanced training on suicide prevention that he did, conducted

25   at a conference hotel in Pelham, specifically for the

 1  psychiatric program managers.

 2  Q.  We're going to come back to that training, but let's talk

 3  about that February meeting about suicide prevention first.  Do

 4  you recall what day that was on?

 5  A.  I don't recall the exact day.

 6  Q.  And you said it was at Wexford headquarters?

 7  A.  That's correct.

 8  Q.  And who else was there?

 9  A.  Other members of the Wexford -- Ms. Coe, as I recall.  I

10  would have to look at a list of attendees.  I don't want to say

11  that someone was there if they were not.  But a number of the

12  members of the Wexford executive team were there.

13  Q.  Was there a list -- a sign-in list?

14  A.  I believe there was.

15  Q.  Was there an agenda?

16  A.  There was, to review the cases.

17  Q.  And that meeting was apart from the training in February;

18  correct?

19  A.  That's correct.  It was a separate meeting.

20  Q.  Was it before the training?

21  A.  I am not certain exact -- on the exact date, so I don't want

22  to say that.

23  Q.  What was discussed at that meeting?

24  A.  Well, we reviewed the cases.  And there was a discussion

25  also of Wexford's continuous quality improvement efforts as they

1  would relate to suicide prevention.

2  Q.  When you say you reviewed the cases, did you review the

3  recent suicides?

4  A.  Right.  Information was presented about the individual cases

5  of suicide.

6  Q.  Okay.  And how was it presented?  Was there a Power Point

7  presentation or handout?

8  A.  Right.  There was a presentation, I remember, you know,

9  projected -- I can't say whether it was done in Power Point or

10  not, but there was a visual.  And the purpose was looking at

11  some of the characteristics of the individual cases.

12  Q.  And you said that Dr. Price did that presentation?

13  A.  Correct.

14  Q.  She is -- tell us who she is.

15  A.  Dr. Tabitha Price is a psychologist employed by Wexford, and

16  she was the individual who reviewed the cases for them from a

17  clinical perspective.

18  Q.  Are you aware that Dr. Burns and Dr. Perrien requested as a

19  part of their review process copies of minutes, notes, or other

20  documentation of meetings, incident reviews, or debriefings with

21  ADOC custody supervisory management staff or Wexford staff to

22  review and/or discuss suicides or serious suicide attempts from

23  January 1st through January 2019?

24  A.  I remember, broadly speaking, that there were document

25  requests.  I can't answer each one of those specifically.  I

```
 1   don't have specific recall of those individual documents.
 2   Q.  Do you know why the presentation in this meeting you were
 3   just discussing wasn't provided to the doctors?
 4   A.  I don't have any information about that.
 5   Q.  Okay.  Now, was there any discussion at this meeting about
 6   corrective action plans?
 7   A.  I do not specifically recall plans as far as -- other than
 8   that there are -- there is -- there was a corrective action plan
 9   that was put out in January.  And that may have come up at that
10   meeting, but I don't have the specific recall of what was said
11   at that meeting about that.
12   Q.  Okay.  So there was a corrective action plan before this
13   February meeting took place?
14   A.  That's correct.
15   Q.  All right.  Well, let's take a look at Plaintiffs' Exhibit
16   2395.  Is this the January 2019 corrective action plan you were
17   just discussing?
18   A.  Yes.
19   Q.  So you've seen this document before?
20   A.  I have seen the document, yes.
21   Q.  And it's dated January 17th, 2019; correct?
22   A.  That's correct.
23   Q.  And are you aware that 12 suicides had occurred in the 13
24   months before this corrective action plan was completed?
25   A.  I'm aware of that, yes.
```

1  Q.  Are you aware that three suicides have occurred since this

2  corrective action plan was completed?

3  A.  I'm aware of that.

4  Q.  Now, who prepared this document?

5  A.  It says prepared by Ken Dover.

6  Q.  And who is Ken Dover?

7  A.  He is with Wexford, and he oversees all of the programs of

8  the Alabama contract.

9  Q.  Is he a clinician?

10  A.  No.  He's an administrator.

11  Q.  Why was this corrective action plan prepared?

12  A.  In response to the suicides.

13  Q.  Was there a meeting that was held before this corrective

14  action plan was prepared?

15  A.  Could you be more specific about a meeting?

16  Q.  Did this corrective action plan come out of a meeting?

17  A.  I don't know if there was a specific meeting that generated

18  it.

19  Q.  All right.  Well, let's look at the first item on this

20  corrective action plan.  Under the column observation finding,

21  it says "Inconsistent compliance with the interim order."  Do

22  you understand that to be referring to the interim suicide

23  prevention order?

24  A.  I do.

25  Q.  Now, what portions of the interim order have been

1  inconsistently complied with?

2  A.  Are you referring to what's indicated on this particular

3  document?

4  Q.  No.  Just to your knowledge.

5  A.  I would have to be more specific in terms of item by item on

6  that.

7  Q.  Can you say now, off the top of your head, what portions of

8  the interim order have been inconsistently complied with?

9  A.  I think -- for example, I think there have been some

10 individual instances -- I can't cite a particular case, but some

11 individual instances of such things as, let's say, prescreenings

12 early on when we rolled that process out not having been

13 completed on some individuals.  That would be one example of the

14 type of thing that was found in an audit and corrected.

15 Q.  Segregation prescreenings?

16 A.  Correct.

17 Q.  Those aren't provided by the interim suicide prevention

18 order; correct?

19 A.  Yes.  You're correct.

20 Q.  All right.  So from this document, there's a finding that

21 there's inconsistent compliance with the interim order; correct?

22 A.  From that, yes, I see that that's written on the document.

23 Q.  And this is a corrective action plan for the whole system;

24 correct?  Not just one facility?

25 A.  That's correct.

1  Q.  All right.  Now, it says under the column corrective action

2  plan, SW -- do you understand that to mean suicide watch?

3  A.  Suicide watch.  That's correct.

4  Q.  Suicide watch reeducation for site MH.  Do you understand

5  that to mean mental health?

6  A.  Correct.

7  Q.  So suicide watch reeducation for site mental health

8  leadership.  Correct?

9  A.  Correct.

10  Q.  And then it lists interim order, restrictive housing, review

11  of deficiencies in recent cases; correct?

12  A.  Correct.

13  Q.  Do you understand recent cases to be referring to the recent

14  suicides?

15  A.  I do.

16  Q.  Do you know why restrictive housing is listed here?

17  A.  I don't know the specific reason that it was put on here,

18  no.

19  Q.  Okay.  But Mr. Dover or someone at Wexford decided that

20  staff needed to be reeducated on the interim order and

21  restrictive housing; correct?

22  A.  According to this document, yes.

23  Q.  Okay.  And where it says review of deficiencies in recent

24  cases, what are some of the deficiencies in the recent suicide

25  cases?

1  A.  If you would like to ask case by case, I think I could give

2  you a better answer on that.

3  Q.  Well, I think we're going to dig into some of the details in

4  a little while.  But if you could just give us a couple of

5  examples that come to mind of deficiencies that have been

6  identified in recent suicides.

7  A.  One potential deficiency would be individuals who were

8  placed on -- at least one individual who was placed on mental

9  health observation where there was a concern about suicide

10  potential.

11  Q.  And that would be a violation of the interim order; correct?

12  A.  Right.

13  Q.  Can you think of another example?

14  A.  That's the only one that comes to mind.

15  Q.  Okay.  Now, under responsible person, it says Elizabeth

16  Harris and Nanci Warren.  Who are those people?

17  A.  Those are the regional managers responsible for Wexford's

18  mental health care in the north and south regions.

19  Q.  And it says the target completion date is January 17th,

20  2019; correct?

21  A.  I see that, yes.

22  Q.  And that was the date this document was prepared; right?

23  A.  Correct.

24  Q.  And then under status, that same date is listed, and it

25  says, education and training held in the Alabama regional office

1   for MH program managers and regional MH staff; correct?

2   A.   I see that, yes.

3   Q.   Was a training held on January 17th for mental health staff?

4   A.   I don't know if that was held that day.

5   Q.   Do you know if a training has been held since January 17th

6   for mental health staff?

7   A.   I don't know specifically if one has been held since the

8   17th.

9   Q.   Let's look at the next observation finding.  Now, this one

10   says "failure to consistently comply with the suicide watch

11   process."  Correct?

12   A.   It does.

13   Q.   And do you know what portions of the suicide watch process

14   have not been consistently complied with?

15   A.   I am not certain which specific items this is referring to.

16   Q.   Okay.  And when did you first see a copy of this corrective

17   action plan?

18   A.   It would have been shortly after it came out.

19   Q.   Okay.  And did you reach out to Wexford to get any more

20   information about this plan?

21   A.   I did not independently do that with this plan.

22   Q.   Have you ever asked anyone at Wexford what parts of the

23   suicide watch process they think are being inconsistently

24   complied with?

25   A.   I haven't asked that specific question.

1  Q.  Now, under the next column, which is the corrective action

2  plan column, it says "Perform suicide watch log review to

3  identify all inmates in suicide watch from December 1st, 2018,

4  to date, both acute and nonacute."  Correct?

5  A.  It does.  Yes.

6  Q.  And do you understand that to mean that someone was going to

7  go through and identify everyone who had been on acute or

8  nonacute suicide watch for that time frame?

9  A.  Yes.

10  Q.  And then it says "Review each chart for required 3/7/30-day

11  follow-up examination."  Correct?

12  A.  Yes.

13  Q.  So do you understand that to mean that someone was going to

14  review those people's mental health records to see if they had

15  received the required follow-up appointments?

16  A.  Yes.

17  Q.  And the interim order requires follow-up appointments at

18  three, seven, and 30-day intervals; correct?

19  A.  Correct.

20  Q.  And then it says "Document findings of compliance, list of

21  patients with simple yes-no compliance with 3/7/30 day follow-up

22  examination."  Correct?

23  A.  Correct.

24  Q.  Do you know if a patient would have received a simple no on

25  this list if he had missed one of the three follow-up

1  appointments?

2  A.  I do not know.

3  Q.  Okay.  So I guess another way to phrase that is would this

4  have been an all or nothing, either yes, they got all three

5  follow-ups, or, no, they didn't.  You don't know.

6  A.  I do not know.

7  Q.  Okay.  Have you seen that list of patients with simple yes

8  or no compliance answers?

9  A.  I don't recall seeing the list.

10  Q.  Have you asked to see it?

11  A.  I have -- I don't recall asking to see that specific list.

12  Q.  And then it says "For all no findings, schedule urgent

13  appointment for suicide watch follow-up examination three day."

14          MS. SANDLEY:  And let's go to the next page.

15  Q.  "Schedule another appointment for suicide watch follow-up

16  examination four days later" -- so that's the seven days -- "and

17  then schedule final appointment for suicide watch examination

18  approximately 30 days from initial appointment."  Correct?

19  A.  Correct.

20  Q.  So do you read that to -- do you understand that to mean

21  that the plan was to make up missed suicide watch follow-up

22  appointments?

23  A.  Can I see the previous page, please?

24  Q.  Yes.

25  A.  It states "For all no findings, schedule the appointments."

1   So it essentially would -- from that day, from the day that that

2   was identified would be to ensure that those appointments were

3   made.

4   Q.   And they were looking at people all the way back to December

5   1st; correct?

6   A.   That's correct.

7   Q.   So for some of those people, these makeup follow-up

8   appointments could have been a month or more after they were

9   actually discharged from suicide watch; right?

10  A.   Right.   That would be approximately the -- the difference

11  between December 1st and January 17th.

12        MS. SANDLEY:   Let's go to the next page.

13  Q.   I'm looking at the next observation finding.   It says

14  "Failure to consistently comply with the suicide watch process."

15  So this is the same as the one we were just looking at; correct?

16  A.   Correct.

17  Q.   And this time under corrective action plan it says "Develop

18  a written process for effectively scheduling and completing

19  post suicide watch follow-up examinations, including a review

20  process to periodically review for process compliance."

21  Correct?

22  A.   Correct.

23  Q.   And have you seen a written process developed for completing

24  post suicide watch follow-up examinations?

25  A.   I don't have specific recall of that.   I'm simply aware that

1    that has been addressed, but I don't have specific recall of

2    that.

3    Q.  So you don't remember seeing something in writing that has

4    been written since January 17 to address this issue?

5    A.  Right.  I just don't have specific recall of that document.

6    Q.  Okay.  And it says "Also perform periodic reviews to assure

7    compliance."  Do you see that?

8    A.  Yes.

9    Q.  And do you know if those are being done?

10   A.  From general conversations -- it is my understanding that

11   Wexford, through its CQI process, is looking at those issues,

12   but I don't have specific knowledge of that.

13   Q.  Have you seen any documentation of those periodic reviews?

14   A.  I have not.

15   Q.  Have you asked for documentation?

16   A.  No.

17   Q.  Let's look at the next one.  Again, "Failure to consistently

18   comply with the suicide watch process."  Do you see that at the

19   bottom of the page?

20   A.  I do.

21   Q.  And in the corrective action plan column, it says "Develop

22   and implement an audit tool specific to the interim order and

23   suicide watch process."  Correct?

24   A.  It does.

25   Q.  Let's look at the next page.  And then the rest of that

1  column at the top of the page there, it says "Add tool to the

2  February 2019 CQI audit calendar."  Correct?

3  A.  Yes.

4  Q.  And develop CAP --

5      Does that stand for corrective action plan?

6  A.  It does.

7  Q.  -- by site as required; correct?

8  A.  Correct.

9  Q.  Let's go back to the previous page.  And a target completion

10 date for this is February 2019; correct?

11 A.  Correct.

12 Q.  Do you know if this task has been completed?

13 A.  They have developed, I believe, an audit tool.  Whether it

14 is completed in its final form, I do not know.

15 Q.  Have you seen the audit tool?

16 A.  I haven't seen the actual audit tool itself, no.

17 Q.  What have you seen?

18 A.  I've seen some results presented from CQI reviews, but the

19 actual audit tool I have not seen.

20 Q.  Have you seen any corrective action plans generated in

21 response to suicide prevention audits from February 2019?

22 A.  No, I've not seen any corrective action plans since the

23 January one we were looking at.

24 Q.  Are you aware that Dr. Burns and Dr. Perrien reviewed some

25 self-audits conducted by Wexford in February 2019?

1  A.  I am aware that -- I would have to say no, I don't have

2  specific knowledge of what they reviewed in that regard.

3  Q.  Are you aware that they wrote in their report and

4  recommendations that issues remain with respect to the type of

5  items audited, presence or absence of documents rather than any

6  measure of quality, completeness, or accuracy, items containing

7  multiple components, making the response unclear in terms of

8  which portion of the items it pertains to?

9  A.  Right.  I do remember that in the report.

10 Q.  And have you done anything to determine whether the audits

11 that Wexford is conducting are actually capturing accurate

12 information about whether there is compliance with the interim

13 suicide prevention order?

14 A.  No, I have not.

15 Q.  You said earlier that you had seen some results from audits;

16 is that correct?

17 A.  I've seen some general results presented, yes.

18 Q.  What do you mean, presented?

19 A.  Presented visually.

20 Q.  How -- have they -- in a chart or --

21 A.  Right.  In a chart form, projected.

22 Q.  Okay.  But the tool, the audit tool itself was not

23 incorporated in that chart?

24 A.  The audit tool would be the tool used to -- so I don't

25 remember the actual tool itself, which is -- as opposed to

1   seeing some presentation that I believe was derived from data

2   collected in the audit.

3   Q.  So you've never seen the questions that were asked in the

4   audit; correct?

5   A.  I don't have specific recall of those questions in the

6   audit.  I'm just aware that they have an audit tool.

7   Q.  Okay.  Then what -- help me understand how the results were

8   presented to you.  What, did they just say good or bad?  How did

9   they -- how were they presented to you?

10  A.  My recollection is simply they have an audit tool that is

11  looking at some of the issues related to the -- I believe the

12  suicide watch procedure, and that some of the -- you know, some

13  of the data presented was related to that in terms of -- but

14  beyond that, I would have to look at the actual data to be more

15  specific.

16  Q.  Okay.  And did you see facility specific data, or was it a

17  compilation of all the facilities?

18  A.  I don't remember specifically on that.

19  Q.  Does the Office of Health Services currently have its own

20  audit tool separate from Wexford's relating to suicide

21  prevention measures?

22  A.  Right.  The department is developing its own tools.  Yes.

23  Q.  Has OHS done any audits of suicide prevention since you've

24  been director of psychiatry?

25  A.  It has -- we have not specifically audited the suicide

1   prevention process to my knowledge.

2   Q.   So no.

3   A.   No.

4   Q.   Are you aware that Dr. Burns and Dr. Perrien recommended

5   that the vendor and ADOC headquarters staff jointly develop the

6   audit instruments so that both parties are clear on

7   expectations, prioritize important measures, and include some

8   assessment of quality, not just quantity?

9   A.   I'm aware of that.

10  Q.   And has there been any conversation with Wexford since the

11  doctors' recommendations came out about jointly developing an

12  audit tool?

13  A.   Yes, that topic has come up.

14  Q.   When?

15  A.   I don't recall the specific date, but there have been

16  conversations with Wexford.  We have weekly conversations via

17  teleconference with Wexford in which that may have -- that may

18  have been the forum in which that came up, but I know that has

19  been discussed.

20  Q.   So it's been discussed.  Have any actions been taken to get

21  that going?

22  A.   I'm not aware of specific actions on that at this time.

23  Q.   Okay.  And going back to this corrective action plan, the

24  next observation finding -- I think we're -- yeah.  It says

25  "Need to improve compliance with suicide prevention measures.

1  Need to better understand aspects of suicide prevention."

2  Correct?

3  A.  Correct.

4  Q.  And then under corrective action plan, it says that

5  "Regional and corporate mental health leadership will develop a

6  case review of recent suicide completions to identify process

7  failures, clinical considerations influencing the event, and

8  pitfalls and barriers."  Correct?

9  A.  Yes.

10  Q.  And it says they're going to hold a case review at the

11  regional office with site-level mental health staff attending;

12  correct?

13  A.  Correct.

14  Q.  And the target completion date here was February 7th, 2019;

15  right?

16  A.  Correct.

17  Q.  Now, under status, it says "January 22, 2019, planning

18  meeting held with Dr. Ron Smith, regional mental health leaders,

19  and CQI."  Date for review scheduled for February 7, tentatively

20  scheduled for February 2019 -- February 19, 2019.  Do you see

21  that?

22  A.  I do.

23  Q.  Was the review scheduled for February 7th, 2019, did that

24  review actually happen?

25  A.  I believe that's referring to the 2/19 -- I see -- it says

1  date for review scheduled for February 7th, tentatively

2  scheduled for February 19th.

3  Q.  Okay.  Now, you talked earlier about a training in February

4  and a meeting in February.

5  A.  Correct.

6  Q.  Did either of those happen on February 7th?

7  A.  I don't recall if it was specifically February 7th.

8  Q.  Did either of those happen on February 19th?

9  A.  I believe the 19th was the -- one of the meetings was, I

10  think, on the 19th.  Again, I don't recall the specific date of

11  either.

12  Q.  And you attended both the training and the review; correct?

13  A.  Yes.

14  Q.  Now, there's nothing here in the date completed column;

15  correct?

16  A.  That's correct.

17  Q.  Let's take a look at Plaintiffs' Exhibit 2624.  Have you

18  seen this document before?

19  A.  Yes, I have.  That's the agenda that Dr. Smith used at the

20  training.  Yes.

21  Q.  Okay.  And who is Dr. Smith?

22  A.  Dr. Ron Smith is Wexford's corporate director of behavioral

23  health.

24  Q.  And did he lead this training?

25  A.  He did.

1  Q.  Who attended this training?

2  A.  The psychiatric program managers.  For a complete list, you

3  would need to see the sign-in sheet, but it was the mental

4  health program managers from the facilities.

5  Q.  From every facility?

6  A.  I can't say that every facility was present, but the room

7  was full and at least most of the facilities were represented.

8  Q.  Okay.  And the program managers, they used to be called site

9  administrators; correct?

10  A.  That's an older term.  Yes.

11  Q.  Could you remind us what their responsibility is at the

12  facility level?

13  A.  Right.  So they oversee the facility-level mental health

14  programming and all of its aspects.  And they report to the HSA,

15  as well as up to the regional director, which would be

16  Ms. Warren or Ms. Harris.

17  Q.  Okay.  So the first topic on this agenda of the training

18  that you attended is overview of a public health framework for

19  suicide prevention; correct?

20  A.  Yes.

21  Q.  And it lists under that that the framework includes primary

22  prevention, secondary prevention, and tertiary prevention;

23  correct?

24  A.  Correct.

25  Q.  What is primary prevention?

1   A.   Primary prevention, also called universal preventions or

2   prevention, would refer to things that you do to potentially

3   reduce suicide risk across an entire population before you

4   attempt to identify individuals who may be at elevated risk.

5   Q.   So those are the things you do before -- to prevent people

6   from going into crisis; is that right?

7   A.   It's population wide.  So that would be things that would

8   apply to, for example, your entire inmate population, without

9   regard to whether they're on the mental health caseload or not.

10  Q.   And would that include implementing a referrals process, for

11  example?

12  A.   A referral process, an orientation process, for example, of

13  how to access referrals.  That could be part of primary

14  prevention.

15  Q.   And an adequate intake process?

16  A.   Correct.  Because that's something that applies to everyone

17  coming in.

18  Q.   What about adequate treatment planning?

19  A.   Treatment planning would not be a part of primary

20  prevention.  That would be what's referred to as selective or,

21  rather -- or actually indicated, which -- in other words, once

22  you've identified a person at risk, now you've moved from

23  primary up to secondary and tertiary prevention.

24  Q.   Okay.  And where does actually providing treatment fall?  Is

25  that primary or secondary?

1  A.  That would fall in the secondary and tertiary realms.

2  Q.  Okay.  And then explain to us what secondary prevention is.

3  A.  Right.  So secondary prevention would essentially be

4  identifying people, for example, at specific elevated risk or

5  otherwise in need of being on the mental health caseload.

6      And then tertiary prevention would include both specific

7  interventions that you do with an individual, as well as

8  interventions that may be intended to reduce such things as

9  copycat effects when it comes to suicide.

10  Q.  So tertiary would include actually monitoring people on

11  suicide watch?

12  A.  Right.  That would -- yes.  Secondary and tertiary

13  prevention, you could say that those two blend together in the

14  sense that once you identify someone as needing secondary -- as

15  high risk because -- with secondary prevention, then you would

16  take certain steps to protect and to provide treatment.  And

17  that goes from secondary into tertiary prevention.

18  Q.  And providing treatment to people who are actually on

19  suicide watch, would that sort of also be in that gray area

20  that --

21  A.  Right.  A set of terms that are equivalent that are also

22  used commonly in the literature would include universal

23  prevention for primary, selected prevention for secondary, and

24  then indicated prevention, which is indicated for an individual.

25  So you go from the universal to the high-risk group to the

1    individual.  And that's a reasonable way of thinking of the

2    primary, secondary, tertiary triad.

3    Q.   Okay.  You talked about preventing copycat behavior.  Could

4    you explain what you mean by copycat behavior.

5    A.   Right.  So that would be one individual developing suicidal

6    ideas, urges, or actions based on the influence of having seen

7    or heard about another individual doing that.

8    Q.   Would one way of preventing that behavior be to debrief

9    prisoners following a suicide?

10   A.   That would be one way, yes.

11   Q.   And what about doing reviews like psychological autopsies?

12   Does that fall into any of these three categories of prevention?

13   A.   That would call in the tertiary area.

14   Q.   Was there training that Dr. Smith did on February 19th in a

15   lecture format?

16   A.   It was -- there was a lecture, but also a good deal of group

17   discussion and questions in which I participated.

18   Q.   Was there a Power Point presentation?

19   A.   There were some slides used, yes.

20   Q.   Were there case studies discussed?

21   A.   There were individual examples.  There was not a discussion

22   of individual named persons, but there were general case

23   examples.

24   Q.   Did this training address specific requirements from the

25   Court's orders in this case?

```
 1   A.   That was part of the overall discussion.
 2   Q.   How?  What was discussed about the Court orders?
 3   A.   Just in terms of the process, for example, of suicide watch
 4   procedures, for example, or doing an SRA.
 5   Q.   What's an SRA?
 6   A.   Suicide risk assessment.
 7   Q.   Now, there are --
 8        MS. SANDLEY:  Let's go to the next page.
 9   Q.   There were some documents attached to this agenda.  Do you
10   recall documents -- some other documents being handed out at the
11   meeting?
12   A.   In general, I remember there were handouts.  I don't
13   specifically remember if this document was part of that or not.
14   Q.   Okay.  Do you recognize what this document is?
15   A.   Yes.
16   Q.   What is it?
17   A.   Mental health programs and services by facility.
18   Q.   And this is from ADOC's request for proposals for the mental
19   health contract; correct?
20   A.   Except it doesn't say RFP on here, but I will accept that
21   that's where that came from.
22   Q.   And the RFP is now a part of the Wexford contract; correct?
23   A.   Right.
24   Q.   Let's scroll through some of these pages here slowly.  And
25   you can see here, there's a section here on intake, reception,
```

```
 1  psychiatric evaluation, social risk assessment.

 2      And we don't need to go through all of them, but do you

 3  recognize these as being from the RFP?

 4  A.  Yes, I do.

 5          MS. SANDLEY:  Now let's go to page 23.  It's Bates

 6  number SPA_13677.

 7  Q.  And what is this document?

 8  A.  That is a suicide prevention program, document MHO 13.

 9  Q.  And is this from Wexford's -- do you see in the corner

10  there, it says behavioral health services guidelines; correct?

11  A.  Correct.

12  Q.  So are these Wexford's policies on suicide prevention?

13  A.  This is a Wexford document.  It's entitled Suicide

14  Prevention Program Guidelines and Procedures.

15  Q.  And why was this provided to the attendees at that training

16  on February 19th?

17  A.  Because of its information relevant to suicide prevention.

18  Q.  And do you know why the portions of the RFP were provided to

19  the attendees?

20  A.  No, I don't know specifically why that was done.

21  Q.  Okay.

22  A.  Other than for general information.

23  Q.  Were either this document or the RFP discussed in any detail

24  at the training?

25  A.  Well, the content of this document certainly captures much
```

1  of the type of conversation that went on during that meeting.

2  It was all about suicide prevention, including many of these

3  clinical issues.

4           MS. SANDLEY:  And let's go to page 26.

5  Q.  And this is ADOC's administrative regulation on inmate

6  suicide prevention program; correct?

7  A.  Right.  That's the inmate suicide prevention program

8  document from 2005.

9  Q.  Right.  And it hasn't been updated since 2005; correct?

10 A.  Correct.

11 Q.  Why was this provided to the training attendees?

12 A.  My understanding, informational purposes.

13          MS. SANDLEY:  Let's go to page 34.

14 Q.  What is this document?

15 A.  The interim agreement.

16 Q.  Okay.  And we've also sometimes called this the interim

17 suicide prevention order; right?

18 A.  That's correct.

19 Q.  And do you know why this was provided to the attendees?

20 A.  Again, information for the attendees.

21 Q.  Now, we've just looked at four different documents:  The

22 RFP, the Wexford guidelines, ADOC's 2005 administrative

23 regulation, and the interim order; correct?

24 A.  Correct.

25 Q.  And they were all provided to these training attendees;

1  right?

2  A.  Yes.

3  Q.  Now, those documents don't use consistent terminology, do

4  they?

5  A.  I would need to ask you to point out any specific terms that

6  you wish me to discuss.

7  Q.  So, for example, the interim order uses the term acute

8  suicide watch or constant watch; correct?

9  A.  Correct.

10 Q.  That's not discussed at all in the administrative regulation

11 from 2005; right?

12 A.  I would have to look at that to be sure, but I'm willing to

13 accept if that exact words are not in there.

14 Q.  You testified earlier that constant watch wasn't a process

15 in effect in ADOC until the interim order.  Do you recall that?

16 A.  That's correct.

17 Q.  Did the training address which document to follow when the

18 documents provided to the attendees were inconsistent?

19 A.  I don't recall any mention that anything would override the

20 interim agreement.  In other words, the interim agreement is

21 both my and I believe everyone's understanding there that that

22 would be the document that holds.

23 Q.  Okay.

24 A.  There was no issue of that not being the case.

25 Q.  So you -- it's your understanding that all the mental health

1  understand that, the interim agreement holds?

2  A.  Correct.

3  Q.  Okay.  Was there any discussion at this training of

4  segregation related practices?

5  A.  Well, in the sense that everyone present understands that

6  restrictive housing is where the majority of suicides occur.  So

7  in that context, yes.

8  Q.  And we can agree -- I know the department uses restrictive

9  housing sometimes, but you understand that to also be the same

10  thing as segregation?

11  A.  That's correct.

12  Q.  Okay.  Were there conversations specifically about the

13  remedial order requirements relating to segregation?

14  A.  Yes, in regard to suicide prevention.

15  Q.  What were those discussions?

16  A.  Really related to essentially every aspect of the process,

17  including the suicide watch protocol and follow-up, so forth.

18  Q.  And of the primary, secondary, and tertiary prevention

19  categories we were just looking at, where would segregation

20  prescreening assessments fall in those?

21  A.  Prescreening assessments would be in the secondary.

22  Q.  What about periodic segregation evaluations?

23  A.  Again, that would be in the secondary.

24  Q.  And what about mental health segregation rounds?

25  A.  That would also be a secondary.

1  Q.  Were the 14 suicides that had occurred at the time of this

2  training discussed at the training?

3  A.  Individual cases were not the focus, but general points

4  that -- you know, topics that were drawn from an understanding

5  of the cases came up.

6  Q.  Can you give an example of something from an individual case

7  that was brought up during this training?

8  A.  Well, again, there were -- what was brought up at the

9  training were issues that were common; for example, the need

10  to -- when interviewing an individual, to not, for example,

11  assume that if an individual denies any suicidal thinking, that

12  that indicated that they were not potentially at suicide risk.

13  That would be a general topic that included an understanding of

14  some of the facts from specific cases, but also more broadly the

15  literature and knowledge on interviewing people about suicide

16  potential.

17  Q.  I want to go back to that corrective action plan we were

18  looking at earlier, Plaintiffs' Exhibit 2395.  And we're on

19  page 3.  Do you see the last observation finding there that says

20  "Need to better understand aspects of suicide prevention"?

21  A.  I see that.

22  Q.  And then under corrective action plan, it says "Conduct SRA

23  training (retraining) for all QMHPs."  Correct?

24  A.  That's correct.

25  Q.  Do you understand what that is referring to?  What is the

1  training?

2  A.  It's my understanding that training will be -- or I will

3  call updated or retraining on SRA will be done with QMHPs.

4  Q.  And, again, SRA is suicide risk assessment?

5  A.  Suicide risk assessment.  That's correct.

6  Q.  And under target completion date it says "TBD."  Correct?

7  A.  That is correct.

8  Q.  Do you know if that retraining has been conducted?

9  A.  I don't know if that's been completed yet.

10  Q.  In looking back at the corrective action plan column, it

11  says "Hold case review of regional office."  And is that what

12  you were referring to earlier that Dr. Adams facilitated in

13  February?

14  A.  Yes.  You mean Dr. Price?

15  Q.  Dr. Price.  I'm sorry.

16      Who is Dr. Adams who's listed here as the responsible

17  person?

18  A.  Dr. Adams is the -- is Wexford's director of training.

19  Q.  And then under status it says "Will implement after January

20  30-31 comprehensive mental health training."  Correct?

21  A.  That's correct.

22  Q.  Do you know what the January 30-31 comprehensive mental

23  health training is referring to?

24  A.  Right.  That's the comprehensive training curriculum that

25  was developed and approved by Dr. Burns -- developed by the

1  department and by Wexford.

2  Q.  You mentioned it was approved by Dr. Burns.  So you're aware

3  that Dr. Burns provided feedback on the training; correct?

4  A.  Correct.

5  Q.  And do you know if all of her feedback was incorporated?

6  A.  Yes.

7  Q.  Do you know if she was sent the final training with her

8  feedback incorporated?

9  A.  I believe she was shown -- once her feedback was

10  incorporated, I believe she was -- a copy of the final form was

11  forwarded to her, I do believe.

12  Q.  Okay.  Was the January -- did a comprehensive mental health

13  training take place on January 30th and 31st?

14  A.  I don't know -- the curriculum is being -- I don't know if

15  training occurred on that date.

16  Q.  Has anyone been trained on the comprehensive mental health

17  training yet?

18  A.  Well, they have a train-the-trainer plan, and I believe the

19  mental health program managers have received that training.  And

20  it will then be -- the strategy is then that they will be

21  responsible for rolling that out at the facility level.

22  Q.  So you don't know if any facility-level staff other than the

23  program managers have been trained, do you?

24  A.  Correct.  Correct.

25  Q.  And you said you understand that Dr. Burns approved the

1    training.  What is that understanding based on?

2    A.  Well, that the training -- you know, the Power Point

3    presentation and the training document was sent to her for her

4    feedback.  And then the changes were made, and then that was

5    submitted to her.

6    Q.  Did you review her feedback?

7    A.  Yes.

8    Q.  And she had quite a few comments on the training; correct?

9    A.  Correct.

10   Q.  Now, this corrective action plan we've just been looking

11   at -- and we can scroll through if it's helpful -- doesn't say

12   anything about segregation, except for there was one bullet

13   point on the first page, I believe, that said restrictive

14   housing.  Did you see any other mention of segregation on this

15   corrective action plan?

16   A.  I don't see any on the page that I'm looking at.

17   Q.  Have you seen any corrective action plans related to

18   segregation?

19   A.  No.

20   Q.  All right.  Let's talk more about training.

21        MS. SANDLEY:  We can take this exhibit down.

22   Q.  Dr. Kern, do you know if all mental health staff who have

23   contact with prisoners received training on CPR in the last

24   year?

25   A.  It is my -- I have not seen a document that verifies that.

1  Q.  Have you received any other information other than a

2  document that verifies that?

3  A.  It's my understanding from verbal conversations that

4  individuals certify in CPR, but I don't have documentation of

5  that.

6  Q.  Who were those verbal conversations with?

7  A.  I just remember the topic coming up.  I don't specifically

8  recall that.

9  Q.  And is it your understanding that all mental health staff

10 who have contact with prisoners have been trained on CPR this

11 year?

12 A.  I haven't asked.  I don't know the answer to that.

13 Q.  Wexford's contract requires annual CPR recertification for

14 all health care personnel; correct?

15 A.  Correct.

16 Q.  Has ADOC done anything to determine if Wexford is complying

17 with that contract requirement?

18 A.  I don't have knowledge of any specific efforts to verify

19 that.

20 Q.  And all correctional officers have to be trained on CPR at

21 the training academy; is that right?

22 A.  That's my understanding, yes.

23 Q.  And are all correctional officers who have contact with

24 prisoners required to be recertified on CPR?

25 A.  It's my understanding that they are.

1    Q.   Is that an annual requirement?

2    A.   I believe so.

3    Q.   Do you know if all correctional staff have, in fact, been

4    recertified within the last year on CPR?

5    A.   I have not seen any verification, so I do not know.

6    Q.   Does anyone within ADOC look at whether correctional staff

7    are up to date on their CPR certification?

8    A.   I don't know the answer to that.

9    Q.   Now, are you aware that Dr. Burns and Dr. Perrien have

10   recommended preservice and annual CPR training for all

11   correctional and mental health staff who have contact with

12   prisoners?

13   A.   In their report, yes.

14   Q.   And so that would be consistent with ADOC's current policy;

15   correct?

16   A.   That's correct.

17   Q.   And with the Wexford contract; correct?

18   A.   Correct.

19   Q.   Are emergency drills that include self-injury or suicide

20   scenarios performed within ADOC?

21   A.   I do not know specifically whether they are performed.

22   Q.   You've been in the department for nine years; correct?

23   A.   Correct.

24   Q.   Have you ever participated in an emergency drill related to

25   a suicide or self-injury scenario?

1  A.  Not a full drill.  When I was visiting Easterling recently,

2  I spoke with the warden about specifically what -- where would

3  the -- if right now someone were hanging, how would we find the

4  cut-down tool?  Where would it be?  And I walked with him over

5  to see exactly where a tool was kept.

6  Q.  So you had a conversation with the warden at Easterling

7  about what would happen in the event of --

8  A.  Right.

9  Q.  Did you talk to any line staff, line correctional staff

10 during that?

11 A.  No.

12 Q.  Okay.  And the warden's not typically on the unit; correct?

13 A.  Not typically.

14 Q.  Okay.  And you're not aware of any emergency drills relating

15 to suicide or self-injury scenarios occurring within ADOC.

16 A.  No, I'm not.

17 Q.  And Dr. Burns and Dr. Perrien recommended quarterly

18 emergency drills on each shift at each facility that includes

19 self-injury/suicide scenarios; correct?

20 A.  Yes.

21 Q.  And the purpose of that is so that staff are prepared to

22 respond to those scenarios; right?

23 A.  Correct.

24 Q.  We talked just a minute ago about the comprehensive mental

25 health training.  Does that training curriculum include suicide

1  prevention?

2  A.  Yes, it does.  That's emphasized in that training.

3  Q.  And is the training to be provided to mental health and

4  correctional staff?

5  A.  Yes.  It's a comprehensive training that will be provided to

6  all.

7  Q.  And you testified that you don't know that any

8  facility-level staff have been trained yet; correct?

9  A.  That's correct.

10  Q.  Do you know if any correctional staff have been trained?

11  A.  I'm not aware of anyone yet being trained on that.

12  Q.  Are you aware of any plans to provide the comprehensive

13  training to correctional staff?

14  A.  Yes, there is a training strategy and plan in place.  Yes.

15  Q.  What is that plan?

16  A.  It includes a plan to train both on the correctional side as

17  well as individuals who work in the facilities.

18  Q.  When will everyone, both mental health and correctional

19  staff, be trained?

20  A.  I don't know the completion.  Basically, the training is

21  intensive.  The training is two days.  The plan is to train

22  every two weeks until everyone has gone through the curriculum.

23  So I'm not certain exactly how long that will take.  I haven't

24  done that math.

25  Q.  And have any of those trainings started yet, to your

1   knowledge?

2   A.   I don't know if any of them have been carried out yet.

3   Q.   ADOC's administrative regulation 607 requires an initial

4   training for all new mental health staff that includes crisis

5   intervention strategies; correct?

6   A.   Correct.

7   Q.   And that regulation also requires mental health staff to

8   attend an annual in-service training; correct?

9   A.   Yes.

10  Q.   And are you aware that those initial and annual training

11  requirements are also built into Wexford's contract?

12  A.   Yes.

13  Q.   Administrative regulation 608 requires an initial mental

14  health in-service training for all correctional staff; right?

15  A.   I will accept that.  I don't remember that specifically

16  from 608.

17  Q.   We can take a look if that's helpful.

18       MS. SANDLEY:  Let's look at Joint Exhibit 98.

19  Q.   Have you seen this regulation before?

20  A.   I have.

21  Q.   We're going to look at the next page, page 2.  So looking at

22  the bottom there, letter E, do you see where it says "Initial

23  in-service training for all correctional staff will include a

24  six to eight-hour module."

25  A.   Yes.

1  Q.  All right.  And this policy also requires annual training on

2  mental health for correctional staff; correct?

3  A.  If you could show me the place in --

4  Q.  I believe it's on the next page.

5  A.  Okay.  I will accept that.

6  Q.  Letter F.  The annual -- do you see where it says "The

7  annual in-service training for all correctional staff will

8  include current mental health information relevant to a

9  correctional environment"?

10  A.  Right.  I see that.

11  Q.  And are you aware that Wexford's contract incorporates these

12  requirements that mental health staff do this training for

13  correctional staff?

14  A.  Yes.  I'm aware of that.

15  Q.  Now, Dr. Burns and Dr. Perrien have recommended preservice

16  and annual training on suicide prevention for all mental health

17  and correctional staff; correct?

18  A.  Correct.

19  Q.  So that would be consistent with ADOC's existing

20  regulations; correct?

21  A.  Yes.

22  Q.  And it would be consistent with the Wexford contract.

23  A.  Yes.

24       MS. SANDLEY:  We can take this exhibit down.

25  Q.  The interim suicide prevention order requires that all

1  mental health professionals and CRNPs or nurse practitioners

2  complete a training on suicide prevention, assessing

3  suicidality, and procedures for suicide watch prior to

4  conducting suicide risk assessments; correct?

5  A.  That's correct.

6  Q.  And the interim order also requires training for all MHPs

7  and CRNPs who provide suicide watch follow-up examinations;

8  correct?

9  A.  Correct.

10  Q.  And it also requires that training be approved by various

11  people within the Office of Health Services and the vendor

12  regional staff; correct?

13  A.  Correct.

14  Q.  It also requires that the training be approved by any agreed

15  upon monitor or the plaintiffs' experts; correct?

16  A.  It does state that.  Yes.

17  Q.  There's been no agreed upon monitor in this case; correct?

18  A.  That's true.

19  Q.  Have you approved the training on suicide risk assessments

20  and suicide watch follow-up appointments?

21  A.  I have seen the training on that.  The document is not

22  specific, I think, about what would constitute approval, but I

23  have seen it and I am completely comfortable with that.

24  Q.  Do you know if those trainings -- are you aware that the

25  training has not been approved by plaintiffs' experts?

1   A.   I don't have any specific knowledge of that.

2   Q.   Okay.  Are you aware that Dr. Burns and Dr. Perrien found

3   that mental health staff began working and providing suicide

4   risk assessments and follow-up appointments prior to receiving

5   the training required by the order?

6   A.   I am aware of that being stated in their report.

7   Q.   Do you know if any action has been taken since their report

8   came out to make sure that everyone who's doing suicide risk

9   assessments and follow-up appointments has already been trained

10  on doing those?

11  A.   I am -- I can't cite a specific conversation on that, but I

12  know in -- there have been -- I recall conversations in which --

13  I have been told that individuals who are doing it do -- or have

14  been through that.  I'm not aware of any individual who has not

15  been through that training.

16  Q.   But the doctors found that there have been individuals who

17  haven't been trained for doing this.

18  A.   I saw that in the report.

19  Q.   Okay.  Mental health staff should receive suicide prevention

20  training from a clinician; correct?

21  A.   That certainly would be important.  That's not to say

22  someone else, for example, an officer, might not be a part of

23  some aspect.  But, yes, of course, a clinician would be the

24  primary person.

25  Q.   Why is it important that the clinician be the primary

1  trainer?

2  A.  Well, because you're talking about clinical aspects such as

3  clinical risk factors, diagnosis, interviewing, and clinical

4  judgment.

5  Q.  It's important that terminology in training curriculum match

6  terminology in policies and court orders; correct?

7  A.  I think that is important, yes.

8  Q.  Why is it important?

9  A.  Well, to avoid confusion.

10 Q.  So, for example, if a court order uses the term "constant

11 watch" but training materials use a term "level-one watch,"

12 staff might be confused about whether those are the same thing;

13 right?

14 A.  That would require explanation, certainly, to clarify what

15 level one exactly means.

16 Q.  And it's important that training materials contain accurate

17 and up-to-date information; correct?

18 A.  That's true.

19 Q.  We're going to shift from talking about staff training.  You

20 talked earlier about orienting prisoners to the mental health

21 program as a part of suicide prevention; correct?

22 A.  Right.

23 Q.  So it's important that prisoners be provided information

24 about mental illness, suicide risk, and how to request mental

25 health care for themselves or others; right?

```
 1  A.  Correct.

 2  Q.  Should prisoners be told upon arriving at a facility how to

 3  request mental health care at that facility?

 4  A.  Yes.  They should -- they would have already received the

 5  general briefing, but, yes, when they arrive at a facility, I

 6  believe they should be informed of any specifics related to that

 7  facility.

 8  Q.  So prisoners receive a briefing during intake at Kilby for

 9  men; correct?

10  A.  Correct.

11  Q.  And at Tutwiler for women; right?

12  A.  Right.

13  Q.  And then when they arrive -- when they leave that intake

14  facility, if they're men, and go to another facility, they

15  should receive facility-specific information about how to access

16  mental health care at that new facility; right?

17  A.  That would be prudent if there are any differences at the

18  facility compared to what they've already learned.

19  Q.  And ADOC's administrative regulation 611 actually requires

20  that that type of information be provided to prisoners; correct?

21  A.  Correct.

22  Q.  Dr. Burns and Dr. Perrien have recommended that ADOC provide

23  prisoners information during orientation regarding mental

24  illness, suicide risk, and how to ask for help for themselves

25  and/or let staff know about concerns for any of their peers upon
```

1    intake and transfer to a new facility; correct?

2    A.   Yes.

3    Q.   And that recommendation would be consistent with ADOC's

4    existing policy; right?

5    A.   Yes.

6    Q.   Let's shift now to talk about identifying people who are at

7    risk of suicide or self-harm.  Are you familiar with the

8    remedial order requirements about segregation preplacement

9    screenings and assessments?

10   A.   Yes, I am.

11   Q.   So before someone is placed in segregation, they must be

12   screened by an RN or an LPN supervised by an RN; correct?

13   A.   Correct.

14   Q.   And within seven days of placement in segregation, everyone,

15   whether they're on the caseload or not, must be assessed by a

16   qualified mental health professional; correct?

17   A.   That's correct.

18   Q.   And people on the mental health caseload who remain in

19   segregation are supposed to receive additional assessments

20   every 30 days; right?

21   A.   That is correct.

22   Q.   People who aren't on the caseload receive additional

23   assessments every 90 days; correct?

24   A.   True.

25   Q.   And that's what's supposed to happen under the segregation

1    remedial order; correct?

2    A.   That's right.

3    Q.   Let's take a look at Plaintiffs' Exhibit 2135.  Now, this is

4    an email from -- that's been forwarded, but I want to look at

5    the bottom portion there.  So there was originally an email from

6    you; correct?

7    A.   That's correct.

8    Q.   And it's dated August 16th, 2018; right?

9    A.   That is correct.

10   Q.   And you sent it to Barbara Coe, Ruth Naglich, and Ken Dover;

11   correct?

12   A.   That's right.  I sent it to Barbara and cc'd the others.

13   Q.   So you recall sending this email?

14   A.   I do.

15   Q.   And the subject line is SMI screening clarification;

16   correct?

17   A.   Yes.

18   Q.   And when we use the acronym SMI, we meant serious mental

19   illness; right?

20   A.   That's correct.

21   Q.   Why did you send this email?

22   A.   I'll need a moment to read this.

23        Right.  I believe that was in response to questions from

24   Ms. Coe as we had -- we were still rolling out the policy in

25   August.  You know, we had started the -- July 1, we had started

1  the restrictive housing prescreening and assessment as well as

2  we had rolled out the SMI policy.  So I continued to get

3  questions about implementation for some weeks afterward, and I

4  believe this was in response to one that Ms. Coe had addressed

5  to me.

6  Q.  Is it fair to summarize what you've written in this email as

7  explaining how the existing regulation about segregation

8  assessments fits in with the remedial order requiring

9  segregation assessments?

10 A.  Right.

11 Q.  Okay.  So you're sort of explaining to staff how you read

12 those two things together; right?

13 A.  That's exactly right.

14 Q.  Okay.

15      MS. SANDLEY:  And let's blow up number one there.

16 Q.  So you're explaining that based on your reading of the

17 regulation and the court order, people who have a serious mental

18 illness and who are placed in segregation must be seen for an

19 out-of-cell clinical evaluation within 24 hours; correct?

20 A.  Right.

21 Q.  And that's because you read the regulation to require

22 that 24 hours; right?

23 A.  Right.

24 Q.  So that's actually sooner than what the order itself would

25 require, isn't it?

```
 1  A.   That's correct.
 2  Q.   Because the order would allow it to happen as long as seven
 3  days after.
 4  A.   True.
 5  Q.   Okay.  Has anything been done to verify that these
 6  assessments are happening either within the 24-hour time frame
 7  required by the regulation or within the seven days required by
 8  the order since you sent this email?
 9  A.   The answer is yes.  I can't cite an exact document to you,
10  but this has been a frequent topic of conversation, you know.
11  And I have also reviewed at times charts, and I have -- I'm not
12  aware of any case in which these were not done.
13  Q.   You haven't, but you haven't seen any document of a sort of
14  systemic evaluation of whether these are being done; correct?
15  A.   Right.  I don't have -- I don't recall a specific document
16  verifying that.
17  Q.   Okay.  But you've looked at a few mental health records.
18  A.   I've looked at a few.  I've had many conversations about the
19  topic.  And it's my understanding that these are being done, and
20  I've not seen instances in which they weren't.
21  Q.   Do you know if anyone has looked at whether these
22  evaluations are reflecting appropriate clinical judgment?
23  A.   Certainly when I look at documents, I'm always looking at
24  the clinical judgment issue.  So, yes, I would say for myself, I
25  have done that.
```

1    Q.  So you've looked at that for the few mental health records

2    you've looked at?

3    A.  Any time I look at a record, that's really probably one of

4    the most important things that I'm looking for is what's the

5    clinical judgment.

6    Q.  Okay.  But you haven't gone about doing a systemwide --

7    A.  Not.

8    Q.  -- look into this; right?

9    A.  No.

10   Q.  Did any of the assessments that you looked at result in

11   someone being removed from segregation?

12   A.  No.

13   Q.  Have you seen any documentation indicating that these

14   assessments, when they're done, result in people being removed

15   from segregation?

16   A.  I don't recall a case in which I saw a document that

17   resulted in them being removed.

18   Q.  Okay.  Now, looking at the text in the brackets under this

19   paragraph, it says, "Since these inmates have already been

20   flagged as SMI, efforts will be underway to quickly divert them

21   to an SLU.  And a continued placement in RH would have to be

22   justified by ADOC as due to exceptional circumstances."

23   Correct?

24   A.  That's correct.

25   Q.  Why did you use the word quickly here?

1   A.   Basically as a way of -- this is a form of educating Wexford

2   as to the process, since this was a fairly new process being

3   rolled out, and I wanted to emphasize that there was a process

4   for diverting individuals with SMI to the SLU.  By quickly, I

5   meant with some urgency.  Within several days.

6   Q.   Within several days is what you meant by quickly?

7   A.   Correct.

8   Q.   How does ADOC define exceptional circumstances?

9   A.   There is not a specific definition of that.  But

10  typically -- and I have had conversations, for example, with

11  various personnel, including some wardens.  Exceptional would be

12  something like an individual who had assaulted an officer,

13  perhaps, causing or threatening serious injury, where the

14  concern was that were that individual not in restrictive

15  housing, they would continue to present a danger to others.

16  Q.   Who determines when there's an exceptional circumstance?

17   A. That would be the security, custody, because it's typically

18  related to security or custody issues.

19  Q.   And are those determinations documented in any way?

20  A.   I don't believe that there is one place where they're

21  required to be documented.

22  Q.   Have you ever seen documentation that someone in the

23  correctional staff decided there was an exceptional

24  circumstance?

25  A.   I have not personally seen that, no.

1  Q.  Are those decisions communicated verbally?

2  A.  Well, I have -- as I said, I have discussed at times during

3  site visits with the warden how they would define that.  And the

4  focus has been on individuals who would present a danger to

5  others were they not in restrictive housing.

6  Q.  Now, you just gave an example of a prisoner who's just

7  assaulted an officer as perhaps being someone who would be an

8  exceptional circumstance; correct?

9  A.  Correct.

10  Q.  And that's because that person needs to be in a

11  high-security setting; right?

12  A.  Correct.

13  Q.  And if there were a housing unit that were high security

14  that also provided additional mental health treatment, would

15  that be an appropriate place to put that person?

16  A.  Well, you would have to look at case by case.  I couldn't

17  make a blanket decision.  But it would be a plausible

18  alternative, again, if that was both consistent with their

19  mental health needs as well as with the needs to protect other

20  people from potentially being harmed.

21  Q.  So it's possible to house people in high security units but

22  still provide them more treatment than they get in segregation;

23  right?

24  A.  As a general guideline, but I -- there could be an

25  exceptional -- again, there could be an exception where an

 1   individual might present such a danger to others, not due to

 2   treatable mental illness but due to other factors, that it would

 3   not be safe to place them in another setting.  That is

 4   plausible.  But that would have to be looked at on a

 5   case-by-case basis.

 6   Q.  But treatment could still be brought to that person --

 7   A.  Absolutely.

 8   Q.  -- in their unit; right?

 9   A.  They're going to -- yes.

10   Q.  Let's go down to the next set of brackets in this email.

11   And do you see where you wrote, "ARs and policies are pending

12   updates on these issues"?

13   A.  Correct.

14   Q.  And AR stands for administrative regulations; right?

15   A.  That's right.

16   Q.  Have any ARs or policies been updated since you wrote this

17   email in August 2018?

18   A.  Yes.

19   Q.  Which administrative regulations have been updated?

20   A.  Off the top of my head, I don't remember the specific

21   numbers on the ARs, but we have updated several.  Most recently

22   I do -- the AR 630, for example, on suicide watch procedures is

23   essentially complete.

24   Q.  Has it been published?

25   A.  I can't say that it's been published, but it is at this

1  point the most recent one that we have completed.

2  Q.  Has it been distributed to staff?

3  A.  I do not believe -- I do not believe that it has been

4  distributed yet, but it is essentially being finalized at this

5  time.

6  Q.  When will it be finalized?

7  A.  In terms of the final formatting and publishing, I don't

8  have an exact date, but it should be very soon.

9  Q.  Okay.  And, again, that regulation hasn't been updated since

10  2005; right?

11  A.  I don't remember the date of the last update on that, but

12  that's one that we are -- that's the most recent one that we

13  have worked on.

14  Q.  Okay.  And this email is about segregation-related

15  practices; right?

16  A.  That's correct.

17  Q.  Have any of the segregation policies been updated since you

18  sent this email?

19  A.  We've updated a number of policies.  I would have to look at

20  the list to make sure in terms of when you say have any

21  segregation related.  We could look at individual policies.

22  Q.  By policy, do you mean regulation?

23  A.  No.  An AR and a policy are two different things.  An AR

24  is -- there's a different and more prolonged process for getting

25  approval for that.  Policies are written at the OHS level and

1   approved just at the OHS level and are more adaptable.

2   Q.   Have any policies written at the OHS level related to

3   segregation been finalized since you wrote this email?

4   A.   Well, certainly there have been a number of policies related

5   to things like -- that would apply to restrictive housing.  You

6   know, referral, for example.  In fact, any mental health policy

7   is going to apply in some way to restrictive housing, simply

8   because you'll have individuals there who are receiving mental

9   health attention.

10  Q.   Have those updated policies been distributed to mental

11  health staff at all facilities?

12  A.   A number of them have, yes.

13  Q.   Can you say specifically which policies have been

14  distributed to mental health staff?

15  A.   I would have to take a look at a list.  There have been

16  quite a number of them.

17  Q.   Have any of them related to preplacement screenings or

18  periodic assessments in segregation?

19  A.   I believe those are included.

20  Q.   So you believe that those policies have been updated, and

21  they've been distributed to mental health staff?

22  A.   Correct.

23  Q.   Do you know when?

24  A.   I don't know the date on that.

25  Q.   Now I want to look at the last paragraph you wrote in this

1    email.  And you wrote:  "An afterthought to share with all, as

2    you think appropriate.  I want to reinforce to all clinical

3    teams that our shared goal is to identify inmates, our patients

4    or potential patients, who are as" -- maybe you meant at --

5    "risk of deterioration or self-harm in restrictive housing, and

6    to intervene on their behalf because that is the right thing to

7    do as mental health clinicians.  We all need to keep in mind

8    that the majority of suicides occur in restrictive housing and

9    that our front-line clinicians have an opportunity to make a

10   difference and even to save lives.  I very much appreciate the

11   efforts of all the Wexford staff and facility teams in stepping

12   up to this challenge."

13        Do you recall writing that?

14   A.  I do.

15   Q.  There have been ten suicides since you wrote this email;

16   correct?

17   A.  True.

18   Q.  And the majority of those took place in segregation; right?

19   A.  Yes.

20        MS. SANDLEY:  Let's take a look at Plaintiffs'

21   Exhibit 2561.

22   Q.  And we've redacted -- we're going to look at several sets of

23   mental health records today, and we've redacted them so that we

24   can show them on the screen.

25        Do you recognize this as a master problem list from

1   someone's mental health records?

2   A.   I do.

3   Q.   And this is a Mr. L.S.?

4   A.   I see that.

5          MS. SANDLEY:   Let's look at page 77.   It's ADOC

6   0468355.

7   Q.   This is a psychiatric progress note; correct?

8   A.   Correct.

9   Q.   And it's dated February 7th, 2019; right?

10  A.   Yes.

11  Q.   Now, do you see in the assessment section there towards the

12  bottom, the diagnosis that's listed as MDD, recurrent, with

13  psychotic features; right?

14  A.   Yes.

15  Q.   And MDD stands for major depressive disorder; correct?

16  A.   That's correct.

17  Q.   And that's a diagnosis that fits within the definition the

18  parties agreed on for serious mental illness; right?

19  A.   That's correct.

20          MS. SANDLEY:   And let's look at page 54, ADOC 0468332.

21  Q.   This is a segregation admission screening form; correct?

22  A.   That's correct.

23  Q.   And that's also -- we also call that the preplacement

24  screening; right?

25  A.   Yes.

```
1    Q.  And it's dated February 14th, 2019; right?

2    A.  It is, yes.

3    Q.  Now there's nothing checked at the top there next to SMI

4    flag, is there?

5    A.  No, there is not.

6    Q.  Okay.  Though we just saw a psychiatric progress note from

7    the week before that showed that this person had an SMI; right?

8    A.  Correct.

9    Q.  And looking at the bottom, do you see where it says regular

10   restrictive housing placement?

11   A.  I do.

12   Q.  And the LPN has circled yes; right?

13   A.  Yes, that's correct.

14   Q.  So this LPN concluded that a regular segregation placement

15   would be appropriate for this person; right?

16   A.  That's correct.

17        MS. SANDLEY:  Let's look at page 97, ADOC 0468375.

18   Q.  And this is another preplacement screening form; right?

19   A.  It is.

20   Q.  And, again, there's nothing checked next to SMI flag;

21   right?

22   A.  That's correct.

23   Q.  And also looking just a little bit further down, do you see

24   where it says "emergency medical care needed"?

25   A.  Yes.
```

```
1   Q.  And then the nurse also didn't check anything there; right?

2   A.  Correct.

3   Q.  And then the first -- there is a series of questions in the

4   next section.  The first one says "Do you feel suicidal or feel

5   like hurting yourself?"  Right?

6   A.  I see that, yes.

7   Q.  And the nurse didn't answer that question; correct?

8   A.  Correct.

9   Q.  And looking at the bottom where it says "regular restrictive

10  housing placement," this nurse circled yes; right?

11  A.  That's correct.

12  Q.  So this LPN decided that a regular segregation placement was

13  appropriate for this person; correct?

14  A.  Right.  The individual circled restrictive housing

15  placement, yes.

16          THE COURT:  Is this still L.S.?

17          MS. SANDLEY:  Yes, sir.

18          Let's look at Plaintiffs' Exhibit 2514.  We're going to

19  go to page 4.

20  Q.  This is another person, a Mr. A.D., whose records we're

21  looking at now.  And this is ADOC 0466383.  And this is another

22  preplacement screening form; correct?

23  A.  That's correct.

24  Q.  And this one's dated February 4th, 2019?

25  A.  That is correct.
```

 1   Q.  Now, next to SMI flag, yes is checked for this person;

 2   right?

 3   A.  It is, yes.

 4   Q.  And then looking at the next section that's got that series

 5   of questions, we see there are four yeses circled; right?

 6   A.  Yes, there are.

 7   Q.  So the nurse here has circled yes to "Are you feeling sad,

 8   hopeless, or depressed?"  Right?

 9   A.  Right.

10   Q.  Yes to "Have you ever intentionally hurt yourself or

11   attempted suicide?"

12   A.  Yes.

13   Q.  Yes to "Do you believe someone or something is out to get

14   you or trying to harm you?"  Correct?

15   A.  Correct.

16   Q.  And yes to "Have you had any serious problem with a

17   significant other, family member, or friend recently?"  Correct?

18   A.  Correct.

19   Q.  Now, the instructions there below this section say "If there

20   are three or more of above questions two through nine marked

21   yes, the mental health/medical staff shall consider initiating

22   crisis status."  Correct?

23   A.  Yes, it says that.

24   Q.  And this LPN circled yes next to regular restrictive housing

25   placement; correct?

```
 1   A.  That's correct.

 2   Q.  And she checked no next to placed on crisis status; correct?

 3   A.  That's correct.

 4   Q.  So we have no indication on this form that the nurse

 5   followed the instructions to consider a crisis placement for

 6   this person; right?

 7   A.  That's true.

 8   Q.  Even though there were four yeses circled; right?

 9   A.  Correct.

10        MS. SANDLEY:  Let's take a look at Plaintiffs' Exhibit

11   2694.

12   Q.  And these are -- this is from the mental health records of

13   Matthew Holmes, one of the people who committed suicide last

14   month.

15        MS. SANDLEY:  We're going to take a look at page 14,

16   ADOC 0473723.

17   Q.  Now, this is a progress note; correct?

18   A.  Yes, it is.

19   Q.  And this is dated February 14th, 2019; right?

20   A.  Correct.

21   Q.  And are you aware that Mr. Holmes killed himself in February

22   2019?

23   A.  Yes, I am.

24   Q.  Now, at the top of this progress note it says "MH OBS."

25   What does that -- what do you understand that to mean?
```

1   A.  Mental health observation.

2   Q.  And then the note itself says "Inmate will be released to

3   DOC per CRNP Grace"; correct?

4   A.  It does.

5   Q.  Do you understand that to mean he's going to be discharged

6   from mental health observation back to DOC custody?

7   A.  Correct.

8           MS. SANDLEY:  Okay.  Let's look at page 5, ADOC

9   0473714.

10  Q.  This is another preplacement screening; correct?

11  A.  That's correct.

12  Q.  And this is dated February 14th, 2019; right?

13  A.  Correct.

14  Q.  So the same date as the progress note we just looked at;

15  correct?

16  A.  True.

17  Q.  Next to SMI flag, yes is checked for Mr. Holmes; right?

18  A.  Yes.

19  Q.  And then looking down at that series of questions, yes is

20  circled for "Are you feeling sad, hopeless, or depressed?"

21  Correct?

22  A.  Correct.

23  Q.  Yes is circled for "Have you ever intentionally hurt

24  yourself or attempted suicide?"  Correct?

25  A.  Correct.

1  Q.  And yes is circled for "Have you had any serious problems

2  with a significant other, family member, or friend recently?"

3  Correct?

4  A.  Yes, it is.

5  Q.  And this LPN circled yes next to regular restrictive housing

6  placement; correct?

7  A.  I see that.

8  Q.  And she checked no next to placed on crisis status; right?

9  A.  That's correct.

10 Q.  And Mr. Holmes killed himself a few days later; correct?

11 A.  Yes, I'm aware of that.

12 Q.  Now, are you aware that Dr. Burns and Dr. Perrien found that

13 the practices of preplacement screening and periodic evaluations

14 are not being consistently implemented, documented, or well

15 understood in terms of their purpose?

16 A.  Well, I'm aware of their statement to that effect.

17 Q.  Okay.  So you're aware that they found that in their report;

18 right?

19 A.  I'm aware that they stated that in their report.

20 Q.  Are you aware that Dr. Burns and Dr. Perrien found that

21 mental health staff misunderstand the preplacement screening to

22 be an assessment of the person's capacity to participate in the

23 disciplinary process?

24 A.  I'm aware they stated that.

25 Q.  Are you aware that they found no instances of prisoners

```
 1   being diverted from segregation or placed on suicide watch as a
 2   result of preplacement screenings?
 3   A.   I'm aware they stated that, yes.
 4   Q.   Are you aware that Dr. Burns and Dr. Perrien found that
 5   segregation mental health evaluations infrequently recommended
 6   removal from segregation, and that it was not possible to
 7   determine from prisoners' records whether they were, in fact,
 8   removed from segregation?
 9   A.   I'm also aware they stated that.
10   Q.   Are you aware that the doctors found no instances of
11   segregation mental health evaluations resulting in increased
12   treatment in terms of frequency, duration, or type of contact?
13   A.   Yes.
14   Q.   Now, you said a few times that you're aware that the doctors
15   stated something.  Is there a distinction in your mind between
16   stated and found?
17   A.   No.  Just acknowledging that I know they stated that, so
18   that implies that they found that.
19   Q.   Okay.
20   A.   Yes.
21             THE COURT:  What do you think of those findings?
22             THE WITNESS:  Your Honor, I certainly cannot explain
23   why this document, for example --
24             THE COURT:  This document is pretty awful, isn't it?
25             THE WITNESS:  When I see --
```

```
 1              THE COURT:  Isn't it pretty awful?

 2              THE WITNESS:  It certainly is -- the information is

 3    inconsistent and leads to --

 4              THE COURT:  I mean, the way it's filled out is awful,

 5    isn't it?

 6              THE WITNESS:  Well --

 7              THE COURT:  That's my lay assessment.  But it's not

 8    just inconsistent.  It's just awful.

 9              THE WITNESS:  Perhaps using --

10              THE COURT:  How would you describe it?

11              THE WITNESS:  I would describe it as clinically

12    inconsistent.  We have --

13              THE COURT:  But it had -- it could have life

14    consequences, could it not?

15              THE WITNESS:  Yes, it could, Your Honor.

16              THE COURT:  And, in fact, it did have life

17    consequences, did it not?

18              THE WITNESS:  It certainly did.

19              THE COURT:  And that's pretty awful, isn't it?

20              THE WITNESS:  I think this -- each suicide is indeed a

21    tragedy.

22              THE COURT:  This one, this document is pretty awful in

23    that context, isn't it?

24              THE WITNESS:  The document certainly did not accomplish

25    what it was intended to do.
```

```
 1              THE COURT:  In fact, it had the opposite, didn't it?
 2   It failed.
 3              THE WITNESS:  I would agree that it did not accomplish
 4   what it intended to do.
 5              THE COURT:  Did it fail?
 6              THE WITNESS:  It failed to do what it was intended to
 7   do.
 8              THE COURT:  Go ahead.
 9   Q.  (Ms. Sandley, continuing:)  Are you aware that Dr. Burns and
10   Dr. Perrien have recommended that ADOC train the nurses who
11   complete these preplacement screenings on their purpose and
12   suicide risk indicators?
13   A.  I'm aware of that.
14   Q.  Are you aware that Dr. Burns and Dr. Perrien have
15   recommended that ADOC train mental health professionals on the
16   purpose of segregation mental health evaluations?
17   A.  I'm aware of that.
18   Q.  And are you aware that the doctors have recommended that
19   ADOC monitor and track completion of preplacement screenings and
20   diversion from segregation as well as placement on suicide?
21   A.  Yes.
22   Q.  What would it look like for ADOC to monitor and track
23   completion of presegregation screenings and diversion from
24   segregation?
25              THE COURT:  Could I ask, before you do that?
```

```
 1            When did you first see this document?

 2            THE WITNESS:  This document?  Shortly after the

 3   inmate's suicide occurred.

 4            THE COURT:  And how did you react to it?

 5            THE WITNESS:  Your Honor, I saw the inconsistencies,

 6   and I was concerned about that and recognized that there was a

 7   problem with that document.

 8            THE COURT:  And what did you do?

 9            THE WITNESS:  We held conversations within the Office

10   of Health Services about this case and concerns that we had

11   about this document in regard to our getting a better

12   understanding of the factors that could contribute to a suicide.

13            THE COURT:  What did you do other than hold meetings?

14   What did you actually do to make sure it didn't happen in the

15   future again?

16            THE WITNESS:  Your Honor, my belief in terms of

17   ensuring that it wouldn't happen again would relate to the

18   training and various conversations that I've had with Wexford in

19   regard to ongoing training of staff.

20            THE COURT:  Was this particular document used in those

21   discussions with Wexford as to what training was needed?

22            THE WITNESS:  I don't recall having a specific

23   conversation about this document.

24            THE COURT:  This would be a document you would want to

25   show up as sort of a poster child for how things could be done
```

 1   wrong, wouldn't it?

 2           THE WITNESS:  I think that in the context of Wexford --

 3   of understanding where there are gaps to be corrected, I

 4   would -- yes.  And I'm aware that they were aware because they

 5   had the records also.

 6           THE COURT:  Do you personally know whether any

 7   corrective action was taken?

 8           THE WITNESS:  Do you mean with the individual LPN?

 9           THE COURT:  Well, yes, as to the individual LPN and as

10   to making sure this doesn't happen again.

11           THE WITNESS:  Right.  I do not know in regard to the

12   LPN.  I do know that, you know, I -- training is where I was

13   focused in terms of intervention to ensure --

14           THE COURT:  Was training done?

15           THE WITNESS:  Well, the ongoing training that Dr. --

16   the training that Dr. Smith did, which was in February, I

17   believe, shortly after this suicide occurred, included

18   addressing issues that relate -- now, that was not specifically

19   targeted at the nurses doing these.

20           THE COURT:  Do you know whether training was done to

21   make sure that this document never happened again?

22           THE WITNESS:  I do not know at this point that every

23   nurse has received updated training regarding this.

24           THE COURT:  So you can't say that this -- that there

25   was training specifically targeted, making sure that this type

1 of event as reflected in this document -- and I'm not sure what

2 exhibit this is -- doesn't happen again?

3          THE WITNESS:  That's correct.  I can say that I am

4 confident that the training plans that are in place will address

5 this type of problem that will essentially ensure greater

6 accuracy in the use of this document.

7          THE COURT:  Why weren't you worried whether the nurse

8 who filled this out -- why weren't you worried about what

9 happened to him or her?

10          THE WITNESS:  I don't really have -- I looked at this

11 more as from the viewpoint of a systemic issue rather than at

12 the specific nurse, Your Honor.

13          THE COURT:  Because it had pretty bad consequences,

14 there was just no concern on your behalf that maybe this nurse

15 didn't get the message or perhaps, even more importantly,

16 couldn't get the message?

17          THE WITNESS:  I certainly was concerned in this and

18 each suicide.  For example, observing that the nurse did record

19 the occurrence of those three items.  But I did not address that

20 specific nurse because I was aware that Wexford was also looking

21 at these documents.

22          THE COURT:  Do you know -- you don't know what Wexford

23 did, if anything?

24          THE WITNESS:  I do not know in the case of that

25 specific --

```
 1              THE COURT:  And the earlier documents -- if I'm

 2    correct, was it S.L.?  Is that right?  Or L.S.  I can't remember

 3    the initials.

 4              THE WITNESS:  Right.  L.S., I believe.

 5              THE COURT:  This isn't S.L., is it?

 6              MS. SANDLEY:  No, sir.  This is Matthew Holmes, who

 7    committed suicide.

 8              THE COURT:  S.L. had an SMI; correct?

 9              THE WITNESS:  I believe that's correct.

10              THE COURT:  And the SMI flag was not checked on the

11    document.

12              THE WITNESS:  That's correct.

13              THE COURT:  When did you see those documents?

14              THE WITNESS:  In each case with an individual who has

15    committed suicide, then I see the documents.

16              THE COURT:  Did S.L. commit suicide?

17              MS. SANDLEY:  No, Your Honor.  Mr. L.S. --

18              THE WITNESS:  So that --

19              THE COURT:  When did you first see L.S.'s documents?

20              THE WITNESS:  I don't know that I saw that document

21    before -- I've only -- the documents, to clarify, that I've seen

22    have been the ones that were brought to my attention following

23    the suicide.

24              THE COURT:  Is there any check to make sure that the

25    events surrounding L.S. -- and I keep -- maybe getting it
```

```
 1   backward, or S.L. -- in the filling out of that document, that
 2   inmate's documents, don't occur again?  Because they were
 3   clearly inaccurate.
 4          THE WITNESS:  Right.  I understand that as a training
 5   issue.  That's the way I've thought about it.  And I'm aware
 6   that given that Wexford is aware of this, that they would
 7   address that as a training issue.
 8          THE COURT:  Go ahead.
 9          Now, you supervise Wexford, don't you?  Or your office
10   does?
11          THE WITNESS:  Right.  Our office does, yes.
12          THE COURT:  Is there any follow-up with Wexford to make
13   sure that training covers these issues?
14          THE WITNESS:  There are frequent conversations, for
15   example, between myself and Barbara and other -- Barbara Coe and
16   other individuals with Wexford regarding a range of issues,
17   including training.  With Dr. Adams.  I've talked with her.
18   We've reviewed the content of the comprehensive curriculum.
19   Those would be examples.
20          THE COURT:  Go ahead.
21   Q.  (Ms. Sandley, continuing:)  You testified earlier that you
22   don't know when all the facility-level mental health staff will
23   receive the comprehensive mental health training.  Do you recall
24   that?
25   A.  Yes.
```

```
1   Q.  Do you know if nurses at each facility will receive training

2   on preplacement screenings and their purpose and suicide risk

3   indicators?

4   A.  I believe that -- I don't have the dates on that training,

5   but I believe that training will occur.

6   Q.  Why do you believe that?

7   A.  Just, again, from just general discussions about training.

8   Q.  You don't know when that training will occur?

9   A.  But I -- I do not know when that training will occur.

10  Q.  Okay.

11          THE COURT:  Considering the number of suicides, don't

12  you think it's a pretty urgent matter?

13          THE WITNESS:  Yes, Your Honor.  I believe it's an

14  urgent matter.  My focus in terms of -- has been on the training

15  at the level of the clinician.  For example, the training that

16  Dr. Smith did.  And that's -- you know, at that level, that's

17  been an ongoing discussion.

18  Q.  And that training that Dr. Smith did was a

19  train-the-trainers training; right?

20  A.  That's correct.

21          THE COURT:  I don't understand that.  What do you mean?

22          THE WITNESS:  Train the trainer is a model in which the

23  mental health program managers from each site are trained and

24  equipped, and then they turn around and train individuals at

25  their site.  There will be within the next approximately two
```

1  weeks a follow-up meeting to that original meeting at which they

2  will come back together again with Dr. Smith, and I'll be at

3  that meeting, to further that training.

4        THE COURT:  Is this training the trainers or training

5  everyone?

6        THE WITNESS:  This particular meeting that I'm

7  referring to is a train-the-trainer meeting.  And the

8  individuals at the next meeting are to bring back their plan and

9  present to Dr. Smith for doing that.

10       THE COURT:  When will the training actually occur,

11 then, of everyone who should be trained?

12       THE WITNESS:  I don't have dates on that at this time.

13 Q.  How could ADOC monitor and track completion of preplacement

14 screenings?

15 A.  Well, to capture that data there would need to be an effort,

16 probably jointly with Wexford, to develop a tool for recording

17 it, a log or an audit instrument, something of that type.

18 Q.  And how could ADOC make sure that not just the forms are

19 getting filled out, but that clinical judgment is being

20 exercised appropriately in the screenings?

21 A.  I think that would be a training issue specifically, for

22 example, with the mental health program managers to ensure that

23 that be done.

24 Q.  How could ADOC make sure the training is effective?

25 A.  I think the forms themselves post training would need to be

1  monitored.

2  Q.  So you would review the forms, not just for completion, but

3  for quality?

4  A.  Correct.

5  Q.  Okay.  Mental health staff are required to conduct mental

6  health rounds once a week in segregation per the segregation

7  remedial order; right?

8  A.  True.

9  Q.  And that remedial order sets out in some detail what those

10 rounds are supposed to look like; right?

11 A.  Yes.

12 Q.  Let's look at it.

13        MS. SANDLEY:  It's Plaintiffs' Exhibit 2245.  And we're

14 going to take a look at page 2.

15 Q.  This is also document 1815-1.

16    Now, do you see at the bottom section two labeled mental

17 health rounds?

18 A.  I do.

19 Q.  Okay.  So it says these terms are to occur at least weekly

20 between the hours of 8:00 a.m. and 4:00 p.m.; correct?

21 A.  Correct.

22 Q.  And they're to be conducted by a qualified mental health

23 professional; right?

24 A.  Correct.

25        MS. SANDLEY:  Let's go to the next page.

1  Q.  And the mental health rounds in segregation are to include a

2  review of duty post logs and segregation unit record sheets for

3  information about inmates' participation in recreation, showers,

4  meal consumption, and sleep patterns; right?

5  A.  That's correct.

6  Q.  And that presumes that those documents, the duty post logs

7  and segregation unit record sheets, will actually contain

8  information about recreation, showers, meals, and sleep; right?

9  A.  Correct.

10  Q.  And the next thing it says is the rounds are supposed to

11  include discussion with the post officer as to whether they have

12  noticed any behavior changes of any inmate; right?

13  A.  Correct.

14  Q.  And then three says the qualified mental health professional

15  is to walk through the restrictive housing units, stopping at

16  every cell and making visual contact with the inmates inside the

17  cell; correct?

18  A.  Correct.

19  Q.  And the mental health professional is to make verbal

20  communication with the inmate, including a brief inquiry into

21  how the inmate is doing, whether he or she needs to talk to

22  mental health privately or has any other mental health need;

23  correct?

24  A.  That's correct.

25  Q.  And the mental health professional is to briefly view the

 1    condition of the inmate's hygiene, behavior, affect, physical

 2    condition, and the condition of the cell; correct?

 3    A.   Correct.

 4    Q.   And then it goes on to explain what the documentation of

 5    these rounds should include.  It says, "Notation of QMHP date

 6    and time of entry and exit from the restrictive housing unit in

 7    the CO duty post log."  Right?

 8    A.   It does.

 9    Q.   And then it says a brief notation about each inmate in

10    restrictive housing on the mental health rounds form.  And if

11    there has been any significant change in the inmate's condition

12    or additional mental health follow-up is indicated, a brief

13    progress note will also be entered in the specific inmate's

14    medical record.  Correct?

15    A.   That is correct.

16    Q.   Are you aware that Dr. Burns, plaintiffs' expert, testified

17    in early December 2018 that she had identified various problems

18    with a recent production of mental health segregation rounds

19    logs?

20    A.   I don't specifically recall that testimony.

21    Q.   Are you aware that there was testimony from Dr. Burns that

22    there were problems with the mental health rounds logs?

23    A.   Right.  I'm aware in general that there were concerns.

24    Q.   And are you aware that those concerns included that they did

25    not include a meaningful brief notation about each prisoner in

1  segregation?

2  A.   Yes.

3  Q.   Has ADOC done anything since early December 2018 to assess

4  whether mental health segregation rounds are being conducted

5  properly?

6  A.   Yes.   That's something that I've personally done.   Starting

7  with -- at Kilby, at Donaldson, at Bullock, at Easterling, and

8  at Ventress, I've personally gone on restrictive housing unit

9  rounds with the clinician within the past roughly a month, along

10 with some other members of the OHS team, where I walked with the

11 QMHP, observed every inmate interaction, and spoke independently

12 with some of the inmates in the process and then watched them as

13 they took notes and completed forms.   So I've observed that

14 entire process at those institutions.

15 Q.   And you said you did that at Kilby, Donaldson, Easterling,

16 Bullock, and Ventress?

17 A.   That's correct.

18 Q.   And you did that within the past month?

19 A.   Approximately one month, yes.

20 Q.   And did you in that process make any recommendations for

21 improvement to the mental health staff who were doing those

22 rounds?

23 A.   I gave some specific feedback at the facility level to

24 individuals.   For example, when I would see an inmate where I

25 felt like there was additional information that could be

1  obtained or needed to be addressed, I pointed that out in

2  several instances.  And I discussed the process with the team,

3  including the QMHP, and on at least one occasion the HSA was

4  there with us, too

5  Q.  Do you have plans to engage in that process at the rest of

6  the major facilities?

7  A.  I do.  I see that as actually perhaps one of the most

8  important initiatives that I will continue forward, because I

9  think that's been a very productive initiative and -- so, yes.

10 Q.  Why do you see that as an important initiative?

11 A.  Because it gives me information that I can only obtain by

12 observation.  It also gives me an opportunity to speak

13 individually in my capacity.  Identify my role with the inmates

14 when I speak with them.  It gives me a chance to actually verify

15 and double check how much -- how accurate the information is

16 that was obtained when the QMHP was making rounds.  And it gives

17 me an opportunity to immediately address issues when I see them

18 come up, for example, if I think there's a need for some

19 additional clinical attention to an issue which came up in

20 several cases.

21 Q.  When are you going to engage in that process at the

22 remaining major facilities?

23 A.  I will -- if I am able to schedule my next one within the

24 next week or two -- it will be an ongoing thing, but I would say

25 within the next two weeks at the most.

1  Q.  And are you aware that Dr. Burns and Dr. Perrien found that

2  mental health rounds appear to be brief and ineffective in terms

3  of identifying prisoners needing follow-up?

4  A.  I'm aware of that statement.

5  Q.  And is that something you're looking at as you go to each

6  facility and walk through those rounds with mental health staff?

7  A.  Very much.

8  Q.  Are you aware that Dr. Burns and Dr. Perrien recommended

9  training mental health professionals on the purpose and proper

10  procedure for conducting those segregation rounds?

11  A.  Yes.

12  Q.  And they recommended, as you've done at some facilities

13  already, that the training not just be didactic, but a more

14  senior mental health professional conducting the rounds with

15  them; correct?

16  A.  That's correct.

17  Q.  Are there plans for a more senior mental health professional

18  at the facility level to --

19          THE COURT:  What do you mean when you say not just

20  didactic?  What does that mean?

21          THE WITNESS:  Not just didactic would mean a senior

22  official would actually go and be where the interaction with the

23  patient occurred and provide feedback, both on what I observed,

24  but also illustrate by doing my own interview, you know, with

25  the QMHP there.  Do some follow-up and demonstrate and discuss

1    that interaction.

2          THE COURT:  So rather than just meeting in a room

3    somewhere with a chalkboard, you need to go out there and hands

4    on show how to do this.

5          THE WITNESS:  Your Honor, exactly.  That is my thinking

6    at this point.  And that's why --

7          THE COURT:  Is that being done?

8          THE WITNESS:  I'm certainly doing that.  As I

9    mentioned, I've been to a number of sites.  And it's my plan to

10   make this essentially an ongoing part of what I do.  I don't

11   see -- it's not going to be something that I do once and stop.

12   It will be just on a rotating schedule.  I think it will be an

13   essential part of what I do going forward.

14         THE COURT:  Go ahead.

15   Q.  (Ms. Sandley, continuing:)  You're just one person; right?

16   A.  That's correct.

17   Q.  Are there plans for more senior mental health staff at each

18   facility to engage in that process of modeling what an adequate

19   mental health round would look like to less senior staff?

20   A.  This will certainly be something that I will be working with

21   Wexford to develop, because I'm in agreement that there needs to

22   be some more senior individuals involved in this process.

23       Wexford -- one person, for example, that I'll be working

24   with will be their state psychiatric director, because they now

25   have a person identified who will likely fulfill that role

```
 1    within several months.  And so that individual and I will be
 2    working closely on this effort.  But we would also be working
 3    with individuals at the facility level to ensure greater
 4    involvement of senior individuals.
 5    Q.  Let's talk about --
 6          THE COURT:  When you say senior individuals, you mean
 7    senior individuals at Wexford, senior individuals in your
 8    office, or both?
 9          THE WITNESS:  That could be both, Your Honor.  But
10    individuals, for example, a psychologist or psychiatrist, or it
11    might be a QMHP that has more years of experience.  But
12    individuals that -- I'm thinking starting with psychologists and
13    psychiatrists to be involved in this process.
14    Q.  And your office, OHS -- correct me.  You're a psychiatrist.
15    There's Dr. Tytell, who is a psychologist?
16    A.  Dr. Tytell?
17    Q.  Yes, sir.  Are there any other more senior mental health
18    professionals within OHS?
19    A.  Yes.  Dr. Julie Dodd is also a psychologist who's joined us
20    this year.  She comes to us after 20 years as a psychologist
21    with the federal BOP.  But, yes, her position is equivalent to
22    that of Dr. Tytell.
23    Q.  Okay.  Let's shift now to talk about referrals.  Are you
24    aware that the interim suicide prevention order provides that
25    any employee of ADOC, MHM, or Corizon or any other contractor
```

 1  retained to provide medical or mental health care in ADOC may

 2  present a person to mental health or medical staff for

 3  assessment for suicide watch?

 4  A.  Yes.

 5  Q.  And are you aware that the parties in this case also agreed

 6  to a remedial order on referrals?

 7  A.  Yes.

 8  Q.  Are you aware that that order requires that when an inmate

 9  informs nonmental health staff, including correctional staff, of

10  the need for mental health care, or nonmental health staff,

11  including correctional staff, recognize the need for mental

12  health assessment or intervention, such nonmental health staff

13  must refer on inmate for assessment or intervention by the

14  mental health staff?

15  A.  Correct.

16  Q.  Correctional staff are not qualified to triage referrals;

17  correct?

18  A.  No, they are not.

19  Q.  And the referrals remedial order the parties agreed on

20  provides that only a nurse who is at least an RN is allowed to

21  triage referrals; correct?

22  A.  That's correct.

23  Q.  So, for example, a correctional officer should not decide

24  for himself that a prisoner who's threatening to harm herself

25  doesn't need to be referred to mental health right away; right?

1  A.   That's true.

2  Q.   Correctional staff ignoring or triaging for themselves

3  prisoners' requests for mental health care can pose a risk of

4  harm to prisoners; right?

5  A.   Yes.

6  Q.   And Dr. Burns and Dr. Perrien noted in their report one

7  incident on November 28th, 2018, of a correctional officer who

8  did not immediately report a prisoner's request to see mental

9  health, and the prisoner was later found hanging, unconscious,

10  in her cell, didn't they?

11  A.   Yes.

12  Q.   That incident occurred at Tutwiler in segregation; correct?

13  A.   Correct.

14  Q.   Correctional officers should not discourage prisoners from

15  seeking mental health care; correct?

16  A.   That's correct.

17  Q.   If someone expresses suicidality to a correctional officer,

18  the officer must make a referral to mental health; correct?

19  A.   That's correct.

20  Q.   And prisoners should not be punished for reporting suicidal

21  ideation; correct?

22  A.   That's true.

23  Q.   Because that would discourage reporting, wouldn't it?

24  A.   Yes, it would.

25  Q.   And Dr. Burns and Dr. Perrien have recommended that

1   correctional staff should not triage inmate requests or engage

2   in behaviors that discourage information sharing; correct?

3   A.   True.

4   Q.   Are you aware that the suicide prevention interim order

5   requires confidential, out-of-cell evaluations after a person is

6   placed on suicide watch?

7   A.   Yes, I am.

8   Q.   And are you aware that the defendants in this case agreed

9   that individual counseling sessions, medication management

10  encounters, and therapeutic groups shall take place out of cell

11  in a setting that provides for confidentiality unless that is

12  not possible due to safety concerns based upon clinical

13  determinations?

14  A.   Yes.

15  Q.   And that's language from one of the remedial orders; right?

16  A.   Correct.

17  Q.   Are you aware that the defendants agreed that if a clinical

18  encounter cannot be provided out of cell in a confidential

19  setting, the reason why must be documented in the patient's

20  mental health records?

21  A.   Yes.

22  Q.   Are you aware that Dr. Burns and Dr. Perrien identified

23  repeated examples of custody staff intrusions into the provision

24  of mental health contacts through their presence during clinical

25  encounters and pressure on clinical staff that minimized inmate

1  concerns and reports of suicidality?

2  A.  Yes.

3  Q.  Are you aware that Dr. Burns and Dr. Perrien recommended

4  that ADOC immediately ensure that mental health clinical

5  contacts are confidential, without the presence of custody

6  staff, unless there is a significant security reason as

7  determined by a clinician?

8  A.  I'm aware of that.

9       THE COURT:  Could you go back?  You said they

10  identified examples of custody staff -- what?

11  Q.  The doctors identified repeated examples of custody staff

12  intrusions into the provision of mental health contacts through

13  their presence during clinical encounters and pressure on

14  clinical staff that minimized inmate concerns and reports of

15  suicidality.

16       THE COURT:  Go ahead.

17  Q.  Are you aware that the doctors recommended that

18  documentation clearly indicate that the contact -- that a

19  clinical contact was in a confidential space or whether it was

20  conducted at cell front and not confidential?

21  A.  Yes.

22  Q.  And are you aware that they recommended that that

23  documentation include why it wasn't confidential if it wasn't?

24  A.  Yes.

25  Q.  So those recommendations would be consistent with the

1    remedial orders the defendants have already agreed to; right?

2    A.   Yes.

3    Q.   Now, defendants have also agreed to require mental health

4    staff to track referrals in a log; correct?

5    A.   Yes.

6    Q.   And that log is required to contain various pieces of

7    information, such as the date and time that the referral was

8    made; right?

9    A.   Yes.

10   Q.   And the date and time the staff member became aware of the

11   need for the referral; right?

12   A.   Yes.

13   Q.   And what the triage determination was for the referral;

14   correct?

15   A.   Yes.

16   Q.   Are you aware that Associate Commissioner Naglich testified

17   in November 2018 about people who were suicidal being designated

18   as routine on mental health referral logs?

19   A.   I don't have specific knowledge of that testimony.

20   Q.   Are you aware of that problem generally?

21   A.   I don't have any knowledge as to -- more than isolated cases

22   if those have been documented.

23   Q.   Are you aware that Dr. Burns testified in December 2018 that

24   she also had identified problems with recently produced referral

25   logs, such as that they did not document that a crisis referral

1    actually happened?

2    A.  I'm aware in general of those concerns.

3    Q.  Has ADOC done anything since November 2018 to address those

4    concerns with mental health referral logs?

5    A.  I can't -- I am not aware of anything that's -- specifically

6    addressed the referral logs as opposed to the referral process.

7    I know at every -- every facility that I visit, that's one of

8    the things that I personally inquire about is the process; how

9    it works.  I go look at the box.  I walk through the steps.  I

10   talk to the individuals who are involved.  So my approach to

11   this has been more of individually looking at the process rather

12   than, you know, drawing conclusions about the logs.

13   Q.  And when you look at the process, do you look at the logs?

14   A.  I have looked at some of the logs.

15   Q.  Where?

16   A.  Kilby I remember looking at the logs.

17   Q.  When did you look at the Kilby logs?

18   A.  That would be perhaps four to six weeks ago, something like

19   that.

20   Q.  Did you identify any problems with the logs?

21   A.  I remember -- you know, when I looked at the logs, I can

22   see -- you know, I don't have specific memory of an individual

23   case.

24   Q.  Have you looked at referral logs at any other facility?

25   A.  I don't recall looking at the log itself at another facility

1  as opposed to having conversations with the individuals there

2  about the process.

3  Q.  Okay.  But the log itself is where it should be documented

4  that a referral was, in fact, triaged; right?

5  A.  That should be filled in.

6  Q.  Are you aware that Dr. Burns and Dr. Perrien have

7  recommended that ADOC maintain mental health referral logs?

8  A.  Yes.

9  Q.  And that would be consistent with what ADOC's already agreed

10  to do; correct?

11  A.  Correct.

12  Q.  Are you aware that the doctors have also recommended that

13  progress notes reflect when the reason for a mental health

14  contact was due to a referral so that referral follow-up can be

15  verified?

16  A.  Yes, I'm aware of that.

17  Q.  Could you explain how you understand that to help

18  verification of the referral process?

19  A.  Well, it indicates that the clinician doing the evaluation

20  is aware that that's how the person got to see them; that it was

21  something other than a scheduled appointment; that there's some

22  new -- something new has happened that brings that person to

23  their attention.

24  Q.  Okay.  And someone who would go in, for example, for a CQI

25  process could see the referral document and then later see the

1   progress note that says it was -- the session was conducted in

2   response to the referral; right?

3   A.   That's correct.

4   Q.   Let's shift to talk a little bit about suicide risk

5   assessments.   Now, what is the purpose of a suicide risk

6   assessment?

7   A.   A suicide risk assessment, the purpose of it is to gather in

8   an organized way information on historical and current risk

9   factors as well as protective factors to assist the clinician in

10  exercising clinical judgment regarding the person's either acute

11  or nonacute suicide risk and using that to make judgments about

12  interventions.

13  Q.   And is one purposes of the risk assessment to determine

14  someone's level of suicidality?

15  A.   It's important to recognize that the risk assessment tool

16  itself is not what we call an actuarial form, by which I mean

17  you can't simply add up -- the form itself doesn't determine

18  anything.   What happens is the form allows the clinician to

19  document information, but the clinician has to use clinical

20  judgment to decide what the risk is.   So you can't draw a direct

21  inference from what's checked without the clinical judgment to

22  the estimate of risk.

23  Q.   The clinician exercises clinical judgment to determine that

24  person's level of acuity; correct?

25  A.   That's correct.

1   Q.   And Wexford has a standardized suicide risk assessment form;

2   correct?

3   A.   That's correct.

4   Q.   And is it standardized so that -- to ensure that all

5   clinicians are at least looking at the necessary information

6   when they're making that clinical judgment?

7   A.   Right.   It ensures that each person is looking at that

8   defined set of known risk and protective factors.

9   Q.   The interim suicide prevention order requires suicide risk

10  assessments when a person is placed on suicide watch; correct?

11  A.   That's correct.

12  Q.   And it requires those to be confidential and out of cell;

13  correct?

14  A.   Correct.

15  Q.   And it requires a confidential, out-of-cell evaluation

16  before someone is discharged from suicide watch; correct?

17  A.   That's true.

18  Q.   Now, the suicide prevention interim order does not

19  specifically address mental health observation; correct?

20  A.   That's correct.

21  Q.   It discusses acute suicide watch and nonacute suicide watch;

22  right?

23  A.   Correct.

24  Q.   The level of suicide watch a person is placed on should

25  correlate to that person's level of risk; correct?

1  A.  Yes, in the context that the most important determination is

2  between acute risk and nonacute risk.  But, yes, it does

3  correlate to that.

4  Q.  So a person who was acutely suicidal should be placed on

5  acute suicide watch; right?

6  A.  That's correct.

7  Q.  And a person who is nonacutely suicidal should be placed on

8  nonacute watch; correct?

9  A.  That's correct.

10  Q.  A person who is acutely suicidal must be placed on constant

11  watch, even if there's not a mental health observer available to

12  watch that person immediately; correct?

13  A.  That's correct.

14  Q.  So the facility staff, correctional staff, or some other

15  mental health staff must do that constant watch until an

16  observer gets there; right?

17  A.  Right.  That is the current practice.

18  Q.  How do you know that's the current practice?

19  A.  From a number of visits to facilities where staff have

20  described to me nurses, program managers, MHPs having served in

21  the observer role when no designated observer was available.

22  Q.  Are you familiar with the National Commission on

23  Correctional Health Care standards?

24  A.  Yes, I am.

25  Q.  All right.  And we'll use the NCCHC for short; okay?

1   A.   That's easier.

2   Q.   NCCHC defines nonacutely suicidal people as those who

3   express current suicidal ideation, e.g., expressing a wish to

4   die without a specific threat or plan, and/or have a recent

5   history of self-destructive behavior; correct?

6   A.   That's correct.

7   Q.   And people who are nonacutely suicidal should be observed at

8   staggered 15-minute intervals; correct?

9   A.   Staggered intervals no less often than every 15 minutes.

10   Q.   Right.  Dr. Burns and Dr. Perrien found multiple examples of

11   inmates displaying very high numbers of risk factors, but then

12   being placed on a low level of watch; correct?

13   A.   That's correct.

14   Q.   The doctors also spoke to staff who said that they had

15   determined patients' level of suicide watch based on the

16   availability of observers; correct?

17   A.   I'm aware that they stated that.

18   Q.   Do you have any reason to doubt that representation on their

19   part?

20   A.   No, I have no reason to doubt that they found instances in

21   which that was reported to them.

22   Q.   Dr. Burns and Dr. Perrien have recommended that supervisors

23   in the CQI peer-review process monitor watch placement to ensure

24   that prisoners are placed on the appropriate level of watch;

25   correct?

1  A.   Correct.

2  Q.   What would implementing that recommendation entail for

3  ADOC?

4  A.   Well, when you say appropriate level of watch, that takes us

5  back to clinical judgment.  The key point here is that you can't

6  look at the number of boxes that are checked on an SRA and use

7  that to say, well, the suicide risk should be a specific thing.

8  For example, there are plenty of cases where an individual may

9  carry many lifetime risk factors:  History of personal suicide

10  attempt, family history, history of drug abuse, so forth.  And

11  there could be six or eight of those, and yet that person may

12  have no acute suicidality.  Those may be background factors that

13  have been with them for years and may well be balanced by

14  important protective factors, such as the presence of a stable

15  family support, for example.

16       On the other hand, you can have an individual who has no

17  prior history of suicidal behavior, no family history of it, and

18  yet who was brought to your attention because they had created a

19  suicide note and were giving away items.  That individual may

20  not even have a diagnosis, and yet they would be clearly at high

21  imminent risk of suicide, even though they might only have one

22  or two risk factors.

23       So that would illustrate why you can't extrapolate from

24  number of boxes checked to what the risk needs to be.  It has to

25  be in context.

1   Q.  So only a clinician could review those SRAs to determine

2   whether clinical judgment is being exercised appropriately;

3   right?

4   A.  That's correct.

5   Q.  And just like you can't determine if clinical judgment is

6   being exercised based on the number of boxes checked, would you

7   agree that you also can't determine whether clinical judgment is

8   being exercised just based on the fact that the form has been

9   filled out?

10  A.  You can make some inferences, again, sometimes depending on

11  what the clinician may have also written on the form.

12  Oftentimes clinicians will write comments.  And if they've

13  explained their reasoning on the form, then sometimes, yes, you

14  will know.  Other times you may have to refer to an associated

15  progress note to understand better.

16  Q.  But, again, a nonclinician could not look and say, yes, this

17  form was completed, clinical judgment was exercised; correct?

18  A.  That's right.

19  Q.  Okay.  So in order to implement the doctor's recommendation

20  to evaluate whether people are being placed on the appropriate

21  level of watch based on their level of risk, a clinician should

22  be reviewing those suicide risk assessments to determine if

23  clinical judgment's being exercised appropriately; correct?

24  A.  That's correct.

25  Q.  Let's talk about treatment plans and psychotherapy now.  We

1  talked earlier about the Court's finding that treatment plans

2  were cookie cutter within ADOC; correct?

3  A.   Right.

4  Q.   And do you understand that term to mean that they were --

5           THE COURT:  Why don't we take our lunch break now, and

6  we'll come back at 15 of one.  Very good.

7      (Recess was taken from 11:44 a.m. until 12:53 p.m., after

8        which proceedings continued, as follows:)

9           THE COURT:  Proceed.  Is this the witness you wish to

10  take out of turn?

11           MR. ZARZAUR:  Yes, Your Honor.  At this time, the

12  plaintiff calls Deputy Commissioner Charles Daniels.

13                        CHARLES DANIELS

14      The witness, having first been duly sworn to speak the

15  truth, the whole truth and nothing but the truth, testified as

16  follows:

17                      DIRECT EXAMINATION

18  BY MR. ZARZAUR:

19  Q.   Mr. Daniels, my name is Greg Zarzaur, and I represent the

20  Alabama Disabilities Advocacy Program in this lawsuit.  I wanted

21  to ask you a few questions.

22      If you could, first of all, just state your name for our

23  record today.

24  A.   Charles Daniels.

25  Q.   And Mr. Daniels, how long have you been working in

```
1   corrections?
2   A.   Roughly 31 years.
3   Q.   And has most of your time in corrections been with the
4   Federal Bureau of Prisons?
5   A.   It has.
6   Q.   And in your tenure at the Federal Bureau of Prisons, were
7   you involved with the development of curriculum for the BOP?
8   A.   In certain areas, yes.
9   Q.   And with certain internal training processes?
10  A.   Yes.
11  Q.   Were you familiar with their suicide prevention program?
12  A.   Yes.
13  Q.   Based on your experience there at the Federal Bureau of
14  Prisons, you understand and appreciate the importance of
15  policies and procedures?
16  A.   Yes.
17  Q.   The import of effective training on those policies and
18  procedures?
19  A.   Yes.
20  Q.   The requirement that those policies actually be implemented
21  into the operations of a correctional facility?
22  A.   The expectation, yes.
23  Q.   Should one expect that to be a requirement as well?
24  A.   Yes.
25  Q.   And that there should be oversight by the administrator or
```

 1   someone with authority to make sure there is ongoing compliance

 2   with those policies and procedures?

 3   A.   Yes.

 4   Q.   Like Commissioner Dunn, you, too, have military experience;

 5   is that correct?

 6   A.   Yes.

 7   Q.   In fact, you were in the Air Force as well.

 8   A.   Yes.

 9   Q.   Did you know Commissioner Dunn before being hired by the

10   Department of Corrections?

11   A.   I did not.

12   Q.   Did you know anyone at the Alabama Department of Corrections

13   before being hired there?

14   A.   Yes.

15   Q.   Who at the Alabama Department of Corrections were you

16   familiar with before taking a job with the Department of

17   Corrections?

18   A.   Deputy Commissioner Stamper.

19   Q.   And how were you familiar with the deputy commissioner?

20   A.   We worked together in the Federal Bureau of Prisons.

21   Q.   And when was your time to work with him in the federal

22   prison system?

23   A.   From sometime in 2012 through 2014.

24   Q.   From your experience in the military, do you appreciate the

25   purpose of the chain of command?

```
 1   A.   Yes.

 2   Q.   And that a leader has responsibilities up and down that

 3   chain and across it?

 4   A.   Yes.

 5   Q.   How long have you been employed with the Alabama Department

 6   of Corrections?

 7   A.   I commenced duty with the Alabama Department of Corrections

 8   on January 7th, 2019.

 9   Q.   And tell me how and when you heard about an opportunity for

10   employment with the Alabama Department of Corrections.

11   A.   I believe back in July of 2018, I was asked -- I received a

12   phone call from Deputy Commissioner Stamper indicating that the

13   Alabama Department of Corrections was seeking a keynote speaker

14   for their executive leadership conference to be held, I believe,

15   in September of 2018.  I shared with him that I would come out

16   if the commissioner would have me.  And so that's -- that was my

17   initiation into the Alabama Department of Corrections.

18   Q.   So back in the summer of '18, you received a call from your

19   old colleague, the deputy commissioner, about being a speaker at

20   the leadership conference for the Alabama Department of

21   Corrections.

22   A.   That is accurate.

23   Q.   What was your understanding as to what you were to speak on

24   at the leadership conference?

25   A.   They wanted me to speak directly to purpose-driven
```

1  leadership, executive excellence, what it looks like, and focus

2  on a transition from transactional leadership to transformative

3  leadership.

4  Q.  And that is a speech within corrections that you've been

5  giving for some time; is that correct?

6  A.  Yes.

7  Q.  I think it's "Getting the Edge"?

8  A.  Yes.

9  Q.  And so you were asked to come down last summer to -- in the

10  fall to give that "Getting the Edge" speech to the leadership of

11  the Alabama Department of Corrections.

12  A.  Yes.

13  Q.  Did you come down and give that speech to the leadership?

14  A.  I did.

15  Q.  At any point prior to giving that speech, was there any

16  discussion about an opportunity for you within the Alabama

17  Department of Corrections?

18  A.  No.

19  Q.  When did you first hear about an opportunity within the

20  Alabama Department of Corrections?

21  A.  It was either mid or late November 2018.

22  Q.  So sometime after you had given the speech?

23  A.  Yes.

24  Q.  And how was it that you became aware of an opportunity in

25  mid to late November 2018 at the Alabama Department of

```
 1   Corrections?
 2   A.  I spoke with Dennis Stamper, who had shared with me there
 3   were some -- there was a situation going on with the current
 4   associate commissioner of operations, Mr. Culliver, and
 5   specifically that he may be leaving the department in the near
 6   future.  And he wanted to know whether or not I would be
 7   interested in that position if it did become available.
 8   Q.  Were you employed at the time that Deputy Commissioner
 9   Stamper reached out to you about the potential opportunity
10   within the Alabama Department of Corrections?
11   A.  I was not.
12   Q.  How long had you been unemployed at that time?
13   A.  I terminated my employment with the New York City Department
14   of Corrections April 5th, 2017.
15   Q.  So about a year and a half time frame since the time you
16   terminated your employment with the New York City Department of
17   Corrections until the time that you hear about a potential
18   opportunity within the Alabama Department of Corrections.
19   A.  Roughly, yes.
20   Q.  Was your reasoning for terminating your relationship with
21   the New York City Department of Corrections in part based on
22   your refusal to falsify documents?
23   A.  Yes.
24   Q.  And tell me why it's so important within a corrections
25   system that documents be accurate and complete.
```

1  A.  If I may, I need to complete the previous answer.

2      It was in part with the documents.  But additionally, I

3  refused to lie in front of city council, and I refused to lie to

4  the First Deputy Mayor of New York City.

5  Q.  As it relates to the documents --

6  A.  Yes.

7  Q.  -- again, why is it so important in a corrections setting

8  that the documents be complete and accurate?

9  A.  There are many reasons why they should be complete and

10 accurate.  But in my avocation, corrections, corrections

11 leadership, I operate under the color of authority and under the

12 color of law.  And I cannot allow my personal character and

13 integrity to be breached by someone's desire to present false

14 information.

15 Q.  Is one of the reasons why documentations in a corrections

16 setting must be complete and accurate for the safety of the

17 people working and housed there?

18 A.  That's one of the reasons, but also transparency.  We need

19 to have accurate data as most of us that are in a leadership

20 capacity in corrections understand that we have to have accurate

21 data to manage that data; to interpret that data.

22 Q.  So that the leaders of a correctional system can't manage

23 the operations of their facilities if the data is inaccurate.

24 A.  You can manage it, but I don't believe that management would

25 be as effective as if you've had accurate data.

1  Q.  That accurate data is a necessary component for effective

2  management.

3  A.  I believe so, yes.

4  Q.  When were you actually hired by the Department of

5  Corrections?  And you may have told me.  January 7th?

6  A.  January 7th, 2019.

7  Q.  So sometime between mid and late November and January 7th,

8  you had an interview for the position?

9  A.  Yes.

10  Q.  And who did you interview with?

11  A.  Commissioner Dunn.

12  Q.  Did you interview with anyone else?

13  A.  I did not.

14  Q.  And what position were you hired for?

15  A.  Deputy commissioner for operations.

16  Q.  What are your responsibilities in that position?

17  A.  I'm responsible for all uniformed services.  Basically, the

18  security services of the Alabama Department of Corrections.

19  Q.  And how do you understand those responsibilities to relate

20  to the placement of high-risk prisoners in segregation within

21  the Department of Corrections?

22  A.  Your question is broad.  Could you narrow it for me?

23  Q.  Well, how do you understand your responsibilities, as far as

24  being over the security services, how do they relate to the

25  placement of high-risk prisoners in segregation within the

1   Alabama Department of Corrections?

2   A.   I have overall responsibility for the safety and security of

3   all staff and inmates, to include those that are in restrictive

4   housing and are otherwise confined.  I am responsible for the

5   complete safety of all of those inmates.

6   Q.   Do you know how many prisoners within the Alabama Department

7   of Corrections have completed suicide since you were hired?

8   A.   I'm not sure of the actual number.  When I arrived, I

9   decided to look into the numbers from March of 2018 through

10  March of 2019, of which there should be 14.

11  Q.   And why did you decide to do that upon your hiring?

12  A.   I wanted to take a snapshot of where we were as related to

13  suicides.  Additionally, I wanted to become familiar with the

14  Braggs lawsuit, as I was briefed upon my arrival that this was

15  extraordinarily important and I should take a deep dive into the

16  numbers and the causes and to understand what was going on

17  specific to the Braggs case.  As the security leader, I would

18  certainly be a part of the process as the litigation moved

19  forward.

20       And then just as a corrections leader running operations,

21  which I've done on several occasions, I wanted to know.  I

22  believed that was my duty to know what was going on and

23  hopefully be able to determine causes and to see what I could do

24  to help improve in that arena.

25  Q.   Prior to taking the position with the Alabama Department of

1    Corrections, did you have any knowledge regarding the Braggs v.

2    Dunn litigation?

3    A.  Not specifically.  I had heard the phrase Braggs, but I had

4    no idea what it actually meant or what it entailed.

5    Q.  Since your hiring what if any information, other than maybe

6    what the lawyers for the commissioners have relayed to you, have

7    you reviewed or looked at to become knowledgeable about the

8    Braggs v. Dunn litigation?

9    A.  I read all information that was provided to me concerning

10   the lawsuit.  I read it.  It was a quite extensive amount of

11   documentation.

12       I went through each and every document, trying to understand

13   what the focus would be and what the Courts were trying to

14   determine of how we manage our inmates that are in restrictive

15   housing, and specifically how we manage inmates who have gone

16   through some type of crisis, whether it be acute or nonacute, or

17   working their way down to mental health observation.  I wanted

18   to see the processes under the Alabama regulations regarding

19   suicide and/or suicide prevention.

20       And I wanted to see how we functioned as an agency.  Did we

21   function collectively?  Were we a team, or did we perhaps

22   function in silos?  And what could I do to immediately have an

23   impact on reducing the amount of suicides?  But I certainly

24   wanted to understand all facets before I started making

25   wholesale change.

1  Q.  Who provided you with the information to review?

2  A.  Legal counsel.

3  Q.  When was that provided to you?

4  A.  I believe I've been provided documentation I believe in late

5  January, and then I was given additional information as time

6  went on.  And they -- the persons passing it on to me thought

7  that, you know, you may need to also familiarize yourself with

8  this and other documents and/or processes and/or procedures.

9  Q.  What documents have you familiarized yourself with?

10  A.  I believe I've read all of the Braggs documentation that has

11  been presented to the Alabama Department of Corrections and all

12  the concerns that the Courts had, as well as some of the expert

13  testimony from some of the consultants.  And, of course, I was

14  provided with other documentation specific to our processes;

15  what our staff should be doing.

16  Q.  This litigation has been going on for some time, and I would

17  ask, if you could, identify specifically what documents you have

18  reviewed if you recall the names of those documents.

19  A.  I don't recall the names of the documents, but I do recall

20  the binders that they were in.  The front referenced the fact

21  that this was Braggs litigation.  And then all of the subsequent

22  follow-ups that were presented to the Alabama Department of

23  Corrections from the bench and all of the documentation that was

24  submitted by the experts or the individuals identified as

25  experts to come in and give guidance and assess what we actually

1  do.

2  Q.  So all of the documents that you have reviewed were provided

3  to you by legal counsel?

4  A.  Yes.

5  Q.  Have you separately requested any particular documents?

6  A.  As I moved forward, I did specifically request data

7  regarding logs.  I knew that if I were going to understand how

8  the processes worked specific to our officers and our

9  lieutenants, our leadership in the field, I needed to be able to

10 review post logs of the inmates -- I'm sorry -- post logs of the

11 staff that were maintained during the suicides, and then I also

12 needed to look at the shift logs.  Those would be most important

13 to me to have a better understanding of not only what the duties

14 were, but were my staff executing those duties.

15 Q.  When did you make the request for those logs?

16 A.  I don't recall when.

17 Q.  How did you make the request for those logs?

18 A.  I'm not sure, because depending on the situation, I may have

19 asked the people that worked below me, which are my institution

20 coordinators, and then I may have also asked the attorneys so

21 that I could take a look at what they had available.  But I know

22 that they were provided to me.  And so to the best of my

23 knowledge, I had roughly 12 hours on each side of each incident

24 to review.

25 Q.  And were logs provided to you by legal counsel?

```
1   A.  I don't recall necessarily who gave me what logs.  I believe

2   that I was seeking the log information from multiple sources,

3   and I cannot tell you specifically who provided me with those

4   logs.

5   Q.  Are you able to access those logs from your desk?

6   A.  No.

7   Q.  How long did it take for you to receive the logs once you

8   requested them?

9   A.  I don't know.

10  Q.  Did you make your request in writing?

11  A.  I did not.

12  Q.  Did you receive a response, other than the logs themselves,

13  in writing?

14  A.  I believe I just received copies of the logs.

15  Q.  What's a shift log?

16  A.  At each facility, each post has a log; however, the

17  institution has a running log, and that's a shift log that's

18  typically maintained by one of the lieutenants that annotates

19  major events of each shift.

20  Q.  That's what it's designed to do?

21  A.  That's what it's designed to do.

22  Q.  In your review of all these logs, did you have any criticism

23  of them?

24  A.  I'm not sure the nature of your question when you say

25  criticism.
```

1  Q.  Did you have any criticism -- were you concerned about the

2  logs and the completeness of them?

3   A. I looked at each log individually, and my assessments were

4  made specific to the identified suicide and then the entries

5  prior and the entries after.  I did not make an assessment as to

6  the completeness of anything else other than what had impacted

7  the suicides.

8  Q.  And as it relates to the suicides and the 12 hours before

9  and after that you reviewed, did you have concerns about those

10  logs?

11  A.  I found that the vast majority of the logs that I reviewed,

12  the staff members actually annotated that they executed their

13  duties in accordance with our regulations.

14  Q.  And for the ones that were not done appropriately, what were

15  your findings and concerns about those?

16  A.  I realized that I needed to not only review the post log, I

17  also needed to review the shift log.  Primarily because of my

18  background, I'm clearly aware that on occasion someone could

19  execute their duties and their tasks without actually annotating

20  that in a log.  So what I decided to do, if -- let's just say

21  there was a round that was not done in the prescribed period of

22  time, the half-hour rounds.  I would then look into the shift

23  log to see if there was another event that was in that unit

24  and/or in the facility that was major, which may have been the

25  reason why the staff member could not complete a round because

1    they were responding to another incident at roughly the same

2    time.

3         And you will find that in -- well, it is my finding in

4    reviewing logs, there's typically a reason why somebody doesn't

5    annotate the log, but that's not always congruent with whether

6    or not they actually executed their duties.  The only other way

7    I know of is you can actually ask that staff member.  But

8    everything I reviewed was much beyond the actual incident, and I

9    did not conduct an interview of any of the staff members.  And

10   if there was any video available, I would have reviewed that as

11   well.

12   Q.  Which suicides did you review the logs for?

13   A.  I reviewed the last 14 suicides.

14   Q.  When did you do that?

15   A.  I reviewed most of them over the last two or three weeks.

16   Q.  And was that in anticipation of being here today?

17   A.  Part of that was in anticipation, but the other part is I

18   believe that I had a duty to review those -- to review those

19   incidents as a part of the routine nature of my job, as I've

20   recently arrived, and I need to educate myself on what was

21   working and what was not working well.  And that was part of

22   that overall process as well.

23   Q.  Did you have any concerns about whether the logs were

24   accurate and truthful?

25   A.  I did not have any concerns.

1  Q.  And can we agree that if the logs are not accurate and

2  complete and truthful, then they're useless?

3  A.  I wouldn't say they're useless if they're not 100 percent

4  accurate.  They may have omitted information as well.  And the

5  omission may appear to be a failure to either appropriately log

6  and/or a failure to actually execute duties.  But that doesn't

7  in and of itself mean that there was a breakdown in our

8  procedure.  It just means that there could have been a failure

9  to appropriately annotate.

10  Q.  Is it ever acceptable to not annotate your logs?

11  A.  Our staff are trained to annotate those logs in a timely

12  manner, particularly after they've completed certain tasks that

13  require those tasks to be annotated.  But I also recognize that

14  there are times when that cannot be done because you may be --

15  as one example, may be dealing with an emergent situation in

16  your unit that requires you to engage in -- maybe a physical

17  altercation with an inmate that may take a little bit more time,

18  or you're assisting another staff member who's engaged with an

19  inmate.

20      So there's multiple reasons why that may not be -- a round

21  per se may not be annotated, but that doesn't mean they didn't

22  conduct the round.  That just means that they were busy doing

23  something else and may not have had an opportunity to annotate

24  that incident.

25  Q.  In your correctional facilities, are your correctional

1    officers required to annotate why they maybe didn't log an entry

2    if there was an emergent situation?

3    A.  I do not know if that's a requirement in the Alabama

4    Department of Corrections.

5    Q.  And am I correct that you were not able to tell from the

6    logs initially why they were incomplete, but on a couple of

7    occasions when you later requested the shift logs, you were able

8    to maybe connect the dots on a few things?

9    A.  First of all, I would say that I didn't find a lot of those

10   instances.  Secondly, although I did review the shift logs, I

11   can't tell you most assuredly I could connect the dots.  I could

12   only make maybe an assumption that because of this, they didn't

13   do that.  But I would not know unless I was able to do two more

14   things:  Primarily interview the staff member and the other

15   members on that shift and/or review any video if there was any

16   video available.

17   Q.  All right.  So as it relates to the suicides that you were

18   looking into within the last couple of weeks, have you talked to

19   any of those staff persons who failed to annotate their logs

20   appropriately?

21   A.  I did not.

22   Q.  And of the suicides that you have looked at in the last two

23   to three weeks, which ones had available video for you to

24   review?

25   A.  I did not request the video.

1    Q.  So you have not reviewed video and have not discussed it

2    with any of the correctional staff responsible for the logs

3    themselves?

4    A.  Correct.

5    Q.  Have you ever read the interim agreement on suicide

6    prevention?

7    A.  By title, I don't know.

8    Q.  Mr. Daniels, on that screen in front of you should be a copy

9    of Plaintiffs' Exhibit 2237.  Do you see it?

10   A.  I do.

11   Q.  Now having seen it, have you reviewed that document ever?

12   A.  I do not recall reading this document.

13   Q.  I'm not going to ask you to read it here today at this

14   hearing, but let me ask you this:  Do you agree that suicide

15   prevention within a prison system like the Alabama Department of

16   Corrections is a collaborative responsibility?

17   A.  When you say collaborative, who do you mean?

18   Q.  Well, it's not just on the mental health providers.

19   A.  Correct.

20   Q.  That that responsibility is also shared by the

21   administrators like the commissioner and deputy commissioners.

22   A.  I agree that all of us should have a level of awareness and

23   seek to collectively protect inmates and come up with procedures

24   that are effective at mitigating anything which we believe is

25   outside a norm.

1   Q.  You agree that all of you share that responsibility.

2   A.  Yes.

3   Q.  And that includes the correctional professionals or

4   custodial staff as well.

5   A.  I believe that all of our staff should participate to the

6   level, irrespective of their job titles and their duties and

7   responsibilities, for the overall safety and welfare for our

8   inmates.  And that includes suicide prevention.

9   Q.  And so, then, you would agree that it is a collaborative

10  responsibility, suicide prevention is?

11  A.  I would agree, based on what I just stated, that if that

12  were to be determined as collaborative, then, yes.

13  Q.  And would you agree that the obligation to implement an

14  adequate suicide prevention program is an obligation and duty on

15  those leading and running the Alabama Department of Corrections?

16  A.  Did you say adequate?

17  Q.  Yes.

18  A.  The answer is yes.

19  Q.  And that obligation would include that there be suicide

20  prevention policies and protocols that have been implemented?

21  A.  Please restate your question.

22  Q.  The obligation that we just talked about that the leadership

23  of the Department of Corrections has as it relates to suicide

24  prevention includes that suicide prevention policies and

25  protocols are actually implemented within the facilities.

1  A.  Are you talking about specific obligations, or are you just

2  talking about in general?

3  Q.  I'm talking specifically about suicide prevention policies

4  and procedures.

5  A.  We should follow the procedures that we have in place.

6  Q.  Again, the leadership has a responsibility to ensure that

7  they have been implemented in the facilities.

8  A.  The leadership has an obligation to develop and implement

9  procedures that are consistent with mitigating suicides.

10  Q.  And if they're not implemented, then essentially they're

11  ineffective.  Can we agree on that?

12  A.  I would say I would have to look at each individual instance

13  that you may be speaking of, because the term ineffective may

14  not necessarily be true.

15  Q.  Well, is it necessary that all staff be trained on suicide

16  prevention policies?

17  A.  In my opinion, yes.

18  Q.  Do you know whether or not all of your staff in the

19  correctional operations department has been trained on suicide

20  prevention policies?

21  A.  I do not.

22  Q.  And I think you've told us earlier, you have not, yourself,

23  as the head of that department reviewed the interim order on

24  suicide prevention within the Alabama Department of Corrections?

25          MR. LUNSFORD:  Objection, Your Honor.  Mischaracterizes

1    prior testimony.

2           THE COURT:  What did you say if that's not what you

3    said?

4           THE WITNESS:  I'm sorry?

5           THE COURT:  Ask your question again and see if it

6    accurately characterizes what you said.

7    Q.  I was asking you about the training as it relates to the

8    correctional staff within the facilities.  And then I

9    specifically wanted to ask you, isn't it true that you just told

10   us today that you have not reviewed the interim order regarding

11   the suicide prevention measures, the exhibit that we looked at

12   earlier that's in front of you now?

13   A.  It is true that I do not recall reading this document.  I

14   read hundreds of documents.  I'm not one hundred percent sure if

15   I did or not.

16   Q.  So as it relates to the import of this document for suicide

17   prevention within the Alabama Department of Corrections, you

18   don't know what importance Plaintiffs' Exhibit 2237 has?

19   A.  My response is I do not recall reading this document.

20          MR. LUNSFORD:  Your Honor, we're going to object to

21   them asking about the import of a document.  They haven't even

22   shown him the whole document.

23          THE COURT:  Show him the whole document.

24          MR. ZARZAUR:  Your Honor, may I approach the witness?

25          THE COURT:  Yes.

```
 1   Q.  Mr. Daniels, if you'll just let me know when you've had a
 2   chance to review it.
 3   A.  My response will not change.  I've seen references that I'm
 4   familiar with, but I cannot tell you in all certainty that I did
 5   or did not read this document.  I can only share with you that I
 6   do not recall whether I read it.
 7   Q.  And so you -- is it a fair thing to say, then, you don't
 8   know what this document requires?
 9   A.  It is fair to say that I cannot tell you that I read every
10   line and I understand the directives outlined in this document.
11   Q.  And would it also be fair to say that you don't know whether
12   or not the suicides that you've reviewed from an operations
13   standpoint are in compliance with this order?
14   A.  I cannot.
15   Q.  Based on your experience in corrections --
16       And it's my understanding that you've served as a warden at
17   least within the federal system; is that correct?
18   A.  Yes.
19   Q.  That the custodial staff, or I think you called them
20   corrections professionals, have a duty or an obligation to
21   recognize signs indicative of potentially suicidal behavior?
22   A.  Provided the scope of their training, if they have been
23   appropriately trained, yes, they should be able to recognize
24   signs of impending self-harm.
25       But going back to the definition of corrections
```

```
 1   professional, I want you to know that the Federal Bureau of
 2   Prisons is different than the Alabama Department of Corrections.
 3   Everyone in the Federal Bureau of Prisons attends the academy.
 4   And everyone, regardless of rank or position or career field,
 5   starts out as a correctional worker first.  No different than in
 6   the military.  Everybody starts out as a soldier or an airman.
 7        And so with that in mind, if everything -- if an emergent
 8   situation arose in the Federal Bureau of Prisons, everyone,
 9   regardless of position, is a corrections worker first.  Thus,
10   the phrase corrections professional.  In the Alabama Department
11   of Corrections, it is somewhat different.
12   Q.  Do you recall speaking at the recent ceremony recognizing
13   the new 35 correctional officers?
14   A.  I do.
15   Q.  Do you recall when you were speaking with those new men and
16   women that are to be employed with the Department of Corrections
17   that you told them that integrity would be the hallmark on which
18   they were known?
19   A.  Correct.
20   Q.  And that they will carry themselves as a beacon of hope in
21   which others will know you are a corrections professional?
22   A.  Yes.
23   Q.  Why is it that integrity was such a central message to those
24   new graduates within the Department of Corrections?
25   A.  Multiple reasons.
```

1   Q.   Can you tell me those.

2   A.   Yes.   I can tell you several of those.

3        Integrity is important.  Anything that you will say and/or

4   write down on a report will be under the authority and the color

5   of the Alabama Department of Corrections and Alabama statute.

6   And you must be beyond reproach.

7        When you communicate an incident, you are literally under

8   oath as you carry that badge.  And you represent law and

9   authority and that you can execute law and order under the

10  auspices of the Alabama -- of all Alabama criminal statutes and

11  any statute that has anything to do with corrections.

12       Because of that, you need to understand how important your

13  word is and that details matter.  You need to ensure that you

14  are truthful, even in the event that truthfulness may show that

15  you were not honest or that you did not necessarily execute your

16  duties as assigned.  The expectation, though, is when you raise

17  your hand and/or write a statement, that that statement is true

18  to the best of your ability.

19       I would also add that it's important that you model

20  behavior -- as a law enforcement official in corrections, you're

21  an APOST certified corrections professional, that you model the

22  behavior that the citizens of Alabama know and understand, and

23  that you model behavior to those inmates that this is how a

24  person who lives a transparent life and that leads a purposeful

25  life would conduct and carry themselves.  And that's a 24/7

1  obligation.

2  Q.  Any other reasons that integrity was a central message,

3  central to your message to those graduates?

4  A.  You stand for something bigger than yourself, and you have

5  an obligation to ensure that your actions do not detract from

6  our stated purpose and our regulatory responsibilities under the

7  Alabama regulatory statutes.

8  Q.  Anything else?

9        THE COURT:  Let me just do a little background.  Your

10  position is what with the ADOC?

11        THE WITNESS:  Your Honor, I currently serve as the

12  deputy commissioner of operations.

13        THE COURT:  What exactly does that entail?

14        THE WITNESS:  That entails that I am responsible for

15  the safety, care, and welfare of all of the inmates and the

16  staff in our employment, but most specifically direct all

17  security-related directives within the agency.  And I also

18  enforce regulations and ensure that our forces are well trained,

19  prepared to execute their duties, and change directives as

20  necessary to improve our ability to safely and in a humane way

21  monitor and maintain these inmates and, obviously, live up to

22  the expectations of the people of Alabama and the governor.

23        THE COURT:  Now, you joined the department when?

24        THE WITNESS:  January 7th, 2019.

25        THE COURT:  Whom did you replace?

```
 1          THE WITNESS:  I replaced Grantt Culliver.  His job

 2  title was associate commissioner.

 3          THE COURT:  I was confused about that.  But yours is a

 4  different job title.

 5          THE WITNESS:  Different only in that I believe the

 6  associate commissioner designation is given to those who came up

 7  through the system; that started out as an Alabama POST

 8  certified corrections official in the state of Alabama.  Those

 9  of us that come in from other organizations, though, because we

10  did not come up through the system, are given the designation of

11  deputy commissioner.

12          THE COURT:  That's an interesting distinction, but

13  thank you.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  But your job duties are the same as

16  Mr. Culliver's?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  I just wanted to be sure, because he's

19  testified before and I wanted to know to what degree your duties

20  overlapped.

21          Now, you received training on things like the interim

22  suicide watch procedures and things like that?

23          THE WITNESS:  Sir, I did not receive specific training

24  in the Alabama Department of Corrections.  Most of my training

25  on suicide prevention was learned while employed in the Federal
```

 1   Bureau of Prisons as a complex warden, as a warden, and as a

 2   senior deputy assistant director.

 3          THE COURT:  Did the ADOC's medical staff -- what's it

 4   called?  It skips my mind right now.  Ms. Naglich and her staff.

 5          MR. ZARZAUR:  Health services.

 6          THE COURT:  Health services.  Did they come to you and

 7   sort of bring you up to snuff as to what the duties and

 8   responsibilities of correctional officers were under the orders

 9   entered by this Court?

10          THE WITNESS:  I do not believe we've had that specific

11   conversation.

12          THE COURT:  So you've had no specific training, then,

13   in what the requirements of the Court orders are, that is, by

14   the department itself, other than reading them yourself?

15          THE WITNESS:  I did not have specific training.  Most

16   of our conversations were, obviously, in response to situations

17   that had occurred.  And they were, obviously, imminent, and we

18   had a response to it.  And being the deputy commissioner of

19   operations, I was apprised of all the suicides that were

20   successful since my tenure.  And we had discussion, and I

21   learned how the organization gathered information and then

22   reviewed the information and then how they established processes

23   and moving forward.

24          So for the ones that happened since I arrived, I was

25   fairly intimately knowledgeable about it.  But most of my

1  knowledge came from the perspective of what were the

2  expectations of the security staff, not necessarily what all of

3  the perspective was from the mental health staff and/or the

4  health services staff, Your Honor.

5          THE COURT:  Go ahead.

6  Q.  (Mr. Zarzaur, continuing:)  When we were last speaking, you

7  talked about -- it may have been in response to the Court's

8  question -- that one of your obligations is to ensure that the

9  staff that you oversee is well trained.

10  A.  Yes.

11  Q.  Do you know what -- well, let me ask you this:  Would a

12  correctional officer that is well trained know how to respond

13  appropriately to prisoners vulnerable to suicide?

14  A.  In this system, in the Alabama Department of Corrections, I

15  do not know because I don't know the scope of their training.  I

16  could speak on my other -- on my former agency, and then the

17  answer would be yes.

18          THE COURT:  Let's follow up on that.  You previously

19  worked for the BOP?

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  And for the New York --

22          THE WITNESS:  New York City Department of Corrections,

23  Your Honor.

24          THE COURT:  And they were trained about handling

25  suicide situations and how to deal with it?

 1           THE WITNESS:  Yes, Your Honor.

 2           THE COURT:  Are you familiar with what training ADOC

 3     staff has received so far, that is, on the corrections side, in

 4     that regard, that is, with regard to suicides?

 5           THE WITNESS:  Your Honor, I am not familiar with the

 6     specific training our officers receive regarding suicide

 7     prevention.

 8           THE COURT:  So no one's contacted you to tell you what

 9     training they should or should not have received?

10           THE WITNESS:  Sir, no one's specifically approached me

11     and identified specific training that the officers receive.

12           THE COURT:  Go ahead.

13  Q.  (Mr. Zarzaur, continuing:)  So, for example, within the

14     federal system that I know you were a part of for a long time,

15     do they at least three times a year have a mock suicide drill?

16  A.  I'm not sure of the regulation, have three mocks per year,

17     but at a minimum there is what we -- we have annual -- we call

18     it annual refresher training, and it's mandated that at a

19     minimum you will have a certain amount of hours in suicide

20     prevention.  I believe at the time I departed the agency, that

21     was roughly four hours at a minimum per year.

22        But most of that was enhanced, depending on your facility.

23     For instance, if you worked at a medical facility and/or a

24     facility where there was -- you had a large population of

25     inmates coded at a higher mental health level than the average

1    inmate, you would have more.

2        And then there were other trainings that were post specific.

3    And I can share with you, for instance, from my last facility

4    that I served as warden, which was in Terre Haute, Indiana, that

5    if you were assigned to a special housing unit, any form of

6    restrictive housing, that training was quarterly and it was

7    mandatory.  You could not assume a post, other than through an

8    emergent situation, in any restrictive housing unless you went

9    through the protocols of suicide prevention training.

10   Q.  But as it relates to the Federal Bureau of Prisons suicide

11   prevention program, you don't know as we sit here today whether

12   or not three mock suicide emergencies per year are part of that

13   training?

14   A.  Sir, I cannot tell you what -- how many times per year on

15   the mock.  I believe the bureau does a great job, but they

16   typically require more than the minimum.  The example I just

17   provided, that far exceeded three mocks.

18   Q.  Why is it important to have these emergency drills related

19   to suicide?

20   A.  It's extraordinarily important.  Part of what we do is

21   vigilance.  Well, your vigilance has to be based on something.

22   Situational awareness.  And if you've had training regarding the

23   triggers of suicide or what to look for, you can identify those

24   signs proactively versus, unfortunately, responding to someone

25   who may have fixed a ligature to a device and are hanging

1    themselves.

2        So it's a collective effort that the individuals who work in

3    an environment in which the inmates would have a greater

4    proclivity to attempt and/or commit suicide, you have to have

5    additional training.

6        And I thought that the Federal Bureau of Prisons did a great

7    job in that arena.  And as a leader of several of the

8    facilities, it was paramount for me as well.

9            THE COURT:  Let me follow up on that.  You say that

10   it's -- I think your words were extraordinarily important to

11   have these emergency drills regarding suicide?

12           THE WITNESS:  It was extraordinarily important to have

13   the training and to ensure that anyone that would be assigned to

14   these high-risk areas would have the training to be able to know

15   what the triggers are; what to look for.  That you don't just

16   have a post and your assigned task.  You have to look at the

17   purpose for what you're assigned, and what is your role in a

18   special housing unit or restrictive housing unit?  The

19   difference is in some organizations, they focus in on the task

20   assigned to the staff members that work there.

21           THE COURT:  You may have misunderstood the original

22   question, which was why is it important to have emergency

23   exercises, I think -- no.  The question was, why is it important

24   to have these emergency drills?  And you said extremely

25   important.  So I thought you were saying that you thought it was

```
 1   extremely important to have emergency drills.  Training, too,
 2   but drills as well.  Did you mean that or not?  Or did you just
 3   misunderstand?
 4         THE WITNESS:  Your Honor, I apologize if I conflated
 5   the two.  My response should have been it is extraordinarily
 6   important to have the training and that it be ongoing.  That's
 7   what's important to me.
 8         THE COURT:  Go ahead.
 9   Q.  And should that training also include emergency drills
10   related to suicide?
11   A.  I would say the drills are important, but the training
12   exceeds that.  I think the importance should be on the training
13   and your ability to assess and recognize potential triggers or
14   decompensation.  I think that's more important than the drills
15   in and of themselves, but your training should encompass the
16   drills.
17         THE COURT:  Oh, I see.  So the drill is important as
18   well, but it should be encompassed in the training?
19         THE WITNESS:  Yes, sir.  Yes, Your Honor.
20         THE COURT:  Do you know whether the Alabama Department
21   of Corrections has both the training and the drills as you've
22   articulated today?
23         THE WITNESS:  Sir, I do not know what training and/or
24   to the extent the training exists, if it does exist.
25         THE COURT:  Or the drills?
```

1           THE WITNESS:  Your Honor, I do not know.

2           THE COURT:  You haven't seen anything in your three or

3    four months there that would bring you up to date on those

4    issues?

5           THE WITNESS:  Your Honor, I've seen quite a bit of

6    documentation, and I would estimate that that's in the thousands

7    of pages of documents and things that I've had to read to catch

8    up because I don't have the necessary muscle memory of having

9    come through a system and lived it day to day.  I have extensive

10   knowledge in the Federal Bureau of Prisons and some knowledge of

11   New York City Department of Corrections and their procedures,

12   but, sir, I am just learning how the Alabama Department of

13   Corrections operates.  And what training they have available and

14   the extensiveness of that training I just don't know.  Once

15   again, I arrived on January 7th.  I am grasping information as

16   diligently and as quickly as possible.  And that is where I am,

17   Your Honor.

18          THE COURT:  Thank you.  That's all I have.

19   Q.   (Mr. Zarzaur, continuing:)  In addition to recognizing some

20   of these indicators that you said the training and drills would

21   help the correctional staff be cognizant of, is it also

22   important as it relates to these drills that the staff would

23   know how to react when they found a prisoner who was attempting

24   suicide?

25   A.   Yes.

```
 1   Q.  And that would also, obviously, include maybe whatever

 2   separate CPR training that is necessary?

 3   A.  Sir, based on my opinion, that would be yes.  You should

 4   know how to -- as a part of your training how to respond.  And

 5   if you find an individual that is actually hanging or attempting

 6   to hurt themselves, you should have the training and knowledge

 7   in terms of how to intervene and hopefully prevent the inmate

 8   carrying through his desire or, worst, to commit suicide.

 9   Q.  And that is important because time would be of the essence

10   in that scenario.

11   A.  I believe that response protocols are important.  I believe

12   that the timing is important as well.

13   Q.  That life-saving measures should be started as soon as

14   practical.

15   A.  I would agree.  Yes.

16   Q.  And that if someone has the training or the drills in place

17   that when one of these situations presents themselves, they're

18   not looking for something to get the person down or who's

19   supposed to be doing the lifesaving measures.  All that has been

20   rehearsed.

21   A.  I can't speak for what has been rehearsed.  But in common

22   practice, in the systems I know, yes, they would know.

23   Q.  And the reason those things are rehearsed and they need to

24   know is because time is of the essence.

25   A.  Yes.
```

```
 1          THE COURT:  What do you mean, time is of the essence?

 2          THE WITNESS:  If someone is actively seeking to harm

 3   themselves, time is a factor.  For instance, if they're hanging,

 4   obviously, flow of oxygen to the brain is an issue.  It's a

 5   timing issue.  Obviously, the longer that there is no oxygen

 6   getting to the brain and/or the heart, it would have a negative

 7   impact as it relates to the ability of that inmate to survive an

 8   event if we do intervene.

 9          Same thing would happen if someone has sliced a wrist

10   and they're bleeding out but maybe are concealing that arm

11   behind a mattress or something of that nature.  The earlier that

12   we recognize that something is going on and/or if it's reported

13   to us, the earlier we can intervene and potentially save that

14   person's life, which would be the ultimate goal.

15   Q.  And we can also agree, at least based on your experience in

16   other correctional settings, that it's well known in your

17   industry that being in isolation or placed in segregation or

18   segregation-like cells increases the risk for suicide.

19   A.  I would not want to say well known, but I would tell you

20   that our training from my other organizations clearly delineates

21   that individuals in restrictive housing of any type are more

22   susceptible to self-harm than those that are in general

23   population.

24   Q.  And would it be important from an operations standpoint

25   within the Department of Corrections that the correctional
```

 1  officers in the facilities know that?

 2  A.  I am not familiar with what is expected in the Alabama

 3  Department of Corrections nor any of the regulations.  But I

 4  would say in general that in any corrections agency, a focal

 5  point of suicide prevention would be in restrictive housing of

 6  any type.

 7  Q.  Well, can we agree, maybe moving forward, that it is part of

 8  your responsibility and the leadership of ADOC to make sure the

 9  correctional officers are aware of that fact?

10  A.  I will tell you that I would have every expectation that's

11  true, but I have not read all of the documentation and/or

12  literature specific to suicide prevention.  And it would be

13  unfair for me to say yes, this is happening, or this is not

14  happening.  I just don't know.

15  Q.  Of those documents that you have reviewed, do you recall

16  receiving recently a report by Dr. Burns and Dr. Perrien?

17  A.  I recall seeing that outline.  But if you would show me the

18  document, I can tell you if I recall it or not.

19  Q.  Looking now at Plaintiffs' Exhibit 2603.  Do you recall --

20  that's the cover page.  Do you recall seeing that?

21  A.  I would have to see more of this to determine.

22      Do I have the ability to scroll through this, or how does

23  this work?

24  Q.  We have a hard copy.

25          MR. ZARZAUR:  Your Honor, may I approach?

```
 1            THE COURT:  It's pretty long.  It's just a summary by
 2    experts regarding this litigation about dealing with suicides.
 3    You're not aware of that report?
 4            THE WITNESS:  Your Honor, I do believe I've read a
 5    summary.
 6            THE COURT:  A summary of it?
 7            THE WITNESS:  Yes, by Drs. Perrien and Burns.
 8            THE COURT:  Was this a summary prepared by the
 9    department, or do you remember?
10            THE WITNESS:  I do not recall who prepared it, but I do
11    recall reading a summary.
12    Q.  Do you recall when you received it?
13    A.  I do not.
14    Q.  Do you recall how you received it?
15    A.  I do not.
16    Q.  Do you know what, if any, measures your employer intends to
17    do with respect to the measures identified in the report?
18    A.  Is the question do I know and/or understand what they've
19    done, or is the question do I understand what they intend to do?
20    Q.  Have they done anything after receiving this report?
21    A.  Counsel, I'm only looking at page 1.
22            MR. ZARZAUR:  Your Honor, may I approach?
23            THE COURT:  Yes.
24    Q.  This is a hard copy of Plaintiffs' Exhibit 2603.
25    A.  Thank you.
```

1    Counsel, if you would direct me to any particular page or

2   anything you would like me to address specifically, I would be

3   more than happy to.  And I would be able to tell you if we have,

4   have not, or I don't know.

5          THE COURT:  I guess the real question is you just

6   remember seeing that report as it appears there.  You just said

7   you saw a summary of it; is that correct?  You don't remember

8   reading that report itself?

9          THE WITNESS:  Sir, I remember a summary.  But, once

10  again, it's not to say I didn't.  I read so many documents,

11  quite frankly, they're running together.  And I would hate to

12  tell you I recall reading something and not be sure, as that

13  would be dishonest, in my opinion, and I would hate to put

14  myself in that position.

15         THE COURT:  I think he's answered your question.

16  Q.  Going back to the logs that you reviewed related to the

17  suicides, did you review administrative correctional reviews of

18  the suicides?

19  A.  I'm not sure if you're discussing maybe the investigation

20  from our intelligence and investigative unit?  Are you speaking

21  of those?

22  Q.  I mean, you, obviously, told us about the shift logs and the

23  duty post logs.

24  A.  Correct.

25  Q.  Did you review the correctional reviews of those suicides,

```
 1  the administrative correctional reviews?
 2  A.  Here's what I can tell you I definitely reviewed, which is
 3  the reports related to the activity or the incident from our
 4  intelligence and investigative unit.  That I can tell you for
 5  sure that I read, as that was provided to me from the chief of
 6  I&I.
 7      As far as any other summaries, I looked at what we call the
 8  incident reports, which are identified also as 302s, which
 9  basically provided a narrative of the incident from when the
10  incident was first announced or the agency indicated that they
11  were aware that there was a suicide attempt and/or a suicide
12  through the conclusion of the actual event.  I did review those.
13          THE COURT:  Now, you're aware that since you've been
14  there, there have been how many suicides?
15          THE WITNESS:  Your Honor, I believe there's been four.
16          THE COURT:  Four since you've been there.
17          THE WITNESS:  Yes, sir.
18          THE COURT:  And there were several within a month or
19  several months before when you got there.  You're aware of that,
20  too?
21          THE WITNESS:  Yes, Your Honor.
22          THE COURT:  Are you aware of any change in policy with
23  regard to how you run your aspect of the department that has
24  resulted from the suicides?
25          THE WITNESS:  Yes.
```

```
1            THE COURT:  What kind of change?

2            THE WITNESS:  Well, specifically I met with the

3  folks -- with the staff from mental health and also with health

4  services.  And one of the issues was we're having these issues

5  when the inmates transition out of acute or nonacute to mental

6  health observation.  And when those inmates were leaving, most

7  of them were put into restrictive housing, and that's where the

8  majority of our suicides happened.

9            So after meeting with both mental health and health

10  services, I decided that we need to ensure collectively with

11  those individuals that these inmates not go to restrictive

12  housing.  If that's where it was happening, we've got to prevent

13  them from going to there.

14            So I met with them, and we decided that maybe the best

15  thing to do was to eliminate sending them -- those inmates that

16  are coming off of acute, nonacute, or mental health observation,

17  eliminate sending them to restrictive housing at all.

18            And so I drafted a directive, and we had it approved by

19  people in our chain of command, that told our people out in the

20  field that in the future, no inmate will go directly from any of

21  the acute, nonacute, or mental health observation into

22  restrictive housing.  And the only way that that could be

23  altered was to have my approval as deputy commissioner of

24  operations.  I would make all final decisions and make that

25  determination if it didn't happen and why.  I needed to know why
```

```
1   we couldn't, why we can't move inmates around, why we can't have

2   an inmate go there.  And if I did, I would approve it based on

3   we had nowhere else to put them, and the inmate was a danger to

4   other inmates.  But other than that, we would find a way to move

5   that inmate.

6           So I took charge of that process.  If we're having all

7   of these events in restrictive housing, they won't go to

8   restrictive housing.

9           THE COURT:  When did you issue that directive?

10          THE WITNESS:  I believe we have that directive

11  somewhere, but I want to say maybe two weeks ago.

12          THE COURT:  Two weeks ago?  Okay.

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  Do you have the directive?

15          MR. ZARZAUR:  No, Your Honor.

16  Q.  Which leads me to my next question:  When did you have this

17  meeting with health services and mental health?

18  A.  I've had ongoing conversations with mental health and health

19  services, specifically Ms. Naglich and Ms. Crook.  And the

20  commissioner had identified one person who's an attorney.  Her

21  name is Mary Coleman -- I can't remember her last name, but she

22  has a first last name -- she has a two-name first name.  I

23  cannot recall, unfortunately, what her last name --

24  Q.  Welcome to the south.  You'll see that a bunch.

25  A.  But we decided we needed to be somewhat proactive.  It
```

1  appeared that almost all of the procedures, from my assessment,

2  that we had in place were pretty much aimed at who to blame.

3  Who to be able to identify didn't do a round.  Who didn't do

4  something.

5      Well, the whole idea around suicide prevention is the word

6  prevention.  And so if you just look at this logically, we're

7  having suicides.  A spike.  I can't call it a crisis, but

8  certainly a spike in suicides.  So what are we doing to mitigate

9  that?  All right.

10      Well, all of these inmates, I believe all of them are coming

11  out of acute, nonacute, or mental health observation and going

12  to restrictive housing, then we should stop them from going to

13  restrictive housing and allowing them to be housed alone.

14  That's the very first obvious thing that you could do.

15      So I said, hey.  I think this would work.  They all agreed.

16  So that's why we drafted the directive and sent it out to the

17  field under my signature.  And so --

18          THE COURT:  Where would they go if they didn't go to

19  restrictive housing?

20          THE WITNESS:  Well, what I would do is look at all the

21  factors.  For instance, what is the security level?  We have all

22  these other programs.  We have SLU.  I believe that's -- I'm

23  still learning the acronyms, but we have an SU, an SLU.  We have

24  all different types of programs that we can put an inmate.

25          For instance, SLU is structured living unit.  SU is

1    safety unit.  So why can't we put these inmates in these units?

2          Well, some of them -- some of the responses were, well,

3    they're full.  Well, why are they full?  Well, these inmates in

4    this particular category, these inmates that are security level

5    five by our regulations, are required to be single celled.

6          So then the next question would be, why?  Why is that a

7    definitive response?  Why is an individual automatically

8    assigned to cell alone, just because they're security level

9    five?  And no one really knew the reason all of this was.  So I

10   said, well, let's change the rule, then.  Those are beds.  Guys,

11   they're in single cells.  If we could otherwise place them

12   because they're not going to hurt the other individual that's

13   coming in, that would provide us more bed space.

14         And so right now I just recently communicated with our

15   associate commissioner of programs, Steve Watson, and I asked

16   him those questions this morning.  Who says we can't house

17   security level five inmates with other inmates?  I said, it

18   doesn't make sense.  Can you tell me the reason why?  He said

19   no.  I said, well, then, let's change it.  Let's rewrite the

20   regulation so that we can now have additional bed space so we

21   can ensure the individuals who are coming off of acute,

22   nonacute, and mental health observation, show that they don't

23   have to be celled alone.  We know that the celling alone is a

24   predictor in and of itself.  So let's put them with someone if

25   they could otherwise be housed with an inmate of similar

```
 1   security level.
 2         So a lot of what I'm finding as I go through, if you
 3   ask a follow-up question such as, well, why?  I'm finding -- and
 4   maybe I'm not speaking with the right people.  I'm finding that
 5   the actual real answer, no one particularly knows.  Or why it
 6   got that way, no one knows, but it does exist and it's
 7   regulatory.
 8         So now we're looking at all of our procedures and
 9   trying to make a determination as to if it doesn't need to exist
10   and there's no legitimate reason why, let's just change our
11   regulations.  We're hamstringing ourselves.
12         So, hence, the very first issue was, let's stop putting
13   inmates in restrictive housing and leaving them alone.  To me,
14   that's logical.  Just plain, flat-out logical.
15         Then the next thing would be, well, we have all these
16   inmates in these specialized units, but we can't put any more.
17   But if you looked at why, it's because there's a lot of single
18   celling.  Well, let's eliminate that as a rule and make it a
19   case-by-case basis based on the threat the inmate that's
20   currently there that's housed alone may pose to others.  So
21   those are two distinctive issues that we're addressing right
22   now.
23         I will tell you, I am dedicated to changing this
24   dynamic.  I understand that it needs to change.  This is what we
25   do.  The safety and the welfare of those inmates that are
```

1  sequestered from the rest of society, that's up to us to ensure

2  that we not only maintain them in a safe, humane environment,

3  but also help prepare them for their eventual reentry back into

4  society.  That is the scope of what we actually should be doing,

5  and I am deeply committed to doing that.

6         So some commonsense changes we're looking at.

7  Obviously, with any of these changes, we're going to have to

8  ensure that I don't draft it in a way which creates another

9  limitation in which I can't successfully move pieces around for

10  the safety of all involved.

11         But I see it through the prism of public safety, staff

12  safety, and inmate safety.  And those are important to me, and I

13  do believe that's one of the reasons I'm here.  I've shared that

14  passion about the safety aspect with the commissioner, and I

15  think we're on the same page.  He's deeply committed.  He wants

16  to make this change.

17         I have seen it in other systems.  And I want to bring

18  to the Alabama Department of Corrections some no-nonsense,

19  simplistic methods of having an impact on the actual core issues

20  of why inmates commit suicide.  We have to be better able to

21  identify the triggers.

22         But the easy button here is, well, if they're all doing

23  this single cell in restrictive housing, guess what we

24  eliminate?  Single cell in restrictive housing unless we just

25  absolutely can't do it.

1         And I said that based on my position, I would be

2    willing to be the person that that rode on.  The buck will stop

3    with me.

4    Q.  We were talking about the suicides you had reviewed.  In

5    that discussion, you referred to some I&I reports that you

6    reviewed.

7    A.  Correct.

8    Q.  So there were I&I reports for these suicides?

9    A.  I believe that I&I conducted an investigation in all of

10   them, because part of the protocol is that an agent from I&I

11   department responds to all the suicides and conducts a

12   preliminary report.

13   Q.  And were any of those reports still open?

14   A.  I believe two were still open.

15   Q.  And the remainder were all closed?

16   A.  The remainder -- they were -- there were two that were

17   listed as still open or incomplete.  And then the rest of them,

18   I'm not sure what language they put in there, but I believe that

19   they were closed.

20   Q.  And that would have been with respect to the 14 suicides

21   that you say you reviewed?

22   A.  Yes.

23   Q.  In advance of issuing their reports, Drs. Burns and Perrien

24   requested certain information.  And I've done my best to review

25   the documents that were produced in response to that, and there

1  are very few documents in which you're on them.  I mean,

2  candidly, there's less than a handful of documents with your

3  name on them.  These meetings that you said you've been having

4  with mental health and with the health services department, how

5  have those come to be?  How --

6  A.  Well, typically in a conversation regarding the suicides.  I

7  can't tell you these were scheduled, formalized meetings with

8  minutes.  They weren't.  They were just a group of corrections

9  professionals coming together, hey, we've got a suicide.  What's

10  going on?  Let's look under the hood.  Could this have been

11  prevented?

12      And then we also -- while talking about it, I'm trying to

13  learn and understand their philosophies and their procedures,

14  and then I'm asking basic questions.  And then what can I do to

15  help?  So many of these meetings were I'm walking by the office,

16  I see Ms. Crook, I see Ms. Naglich, we have a quick conversation

17  about it.  Or after one of the suicides -- at the time when I

18  first got there, we would meet with the chief of staff and just

19  basically give a rundown as to what transpired.

20  Q.  And were there ever any documents created in response to

21  these conversations you would have with mental health and with

22  health services?

23  A.  I did not create any documents other than the document I

24  just explained to you.

25  Q.  The directive?

1   A.  The directive that I issued, no.  This was all growing and

2   learning.

3       I would ask that you understand, I am new.  I'm still

4   learning.  I don't know what they do.  I could not even assess

5   whether or not what they currently do was ineffective or not.  I

6   just didn't know.  And because it was different from maybe what

7   I understood doesn't mean it wasn't effective.

8       So, obviously, as these incidents occurred, I had to learn

9   them on the -- as they went and try to make some sense of it and

10  offer my expertise the best that I knew it.  But that expertise

11  came from another organization.

12  Q.  And you haven't seen anything that health services or mental

13  health has done in response to these impromptu conversations

14  that you've had?

15  A.  I cannot identify, based on documentation, anything that

16  they've done.  I can share with you, I thought their concern was

17  great and that I found that they were very sensitive.  And I'm

18  talking about Ms. Crook.  I'm also talking about Ms. Naglich and

19  some of the other staff.  Dr. Kern.

20      But I can't tell you what came of those, other than we were

21  trying to understand what would be the best way to transition

22  from being reactive -- which, unfortunately, if the suicide

23  happened, it's already -- all you're doing is reacting.  We want

24  to look at ways in which -- I know I wanted to focus on how we

25  could be proactive.  And I think to some extent we really have

1  been thinking this through, trying to come up with sensible

2  methods that we could implement that would actually have an

3  impact on those suicides.

4      And so in talking with my staff, we've got to get ahead of

5  this.  And so our conversation has been about what can we do to

6  get ahead?  I don't want to continue to respond to suicides.  I

7  want to be able to say, hey, we prevented a suicide.  And that

8  was important to me.

9  Q.  Did you review the suicide of Robert Martinez at the

10  St. Clair facility?

11  A.  If it happened within the last -- if it happened since last

12  March, yes.  I did not commit the names and the individual cases

13  to memory.  Once again, I'm still running daily operations, and

14  I knew I needed to familiarize myself and read the documentation

15  that I had available.  But going back to each individual one, I

16  don't believe I would be comfortable and/or confident in stating

17  specifically that I remember the details of each of those cases.

18  Q.  All right.  But as we sit here today, you can't recall

19  anything specifically about the circumstances surrounding

20  Mr. Martinez's suicide that concerned you?

21  A.  No.

22  Q.  Did you review the suicide of Mr. Jeffrey Borden?

23  A.  If it happened since March of 2018, yes.

24  Q.  And the same question.  As we sit here today, you can't

25  recall anything about the circumstances of Mr. Borden's suicide

```
 1  that concerned you?

 2  A.  No.

 3  Q.  Mr. Ross Wolfinger.  Did you review the circumstances of his

 4  suicide?

 5  A.  I read all the documentation I had available to me regarding

 6  his suicide if it happened since March of 2018.

 7  Q.  And as we sit here today, can you recall anything that

 8  concerns you about Mr. Wolfinger's suicide?

 9  A.  No.

10  Q.  Mr. Mark Araujo.  His suicide, I'll represent to you, was

11  also after March of '18.  Would you have reviewed his?

12  A.  If it happened after March '18, I did review it.

13  Q.  And as we sit here today, do you recall anything that

14  concerned you about the circumstances of his suicide?

15  A.  No.

16  Q.  Lastly, Mr. Roderick Abrams, a suicide this year.  Did you

17  review the circumstances surrounding Mr. Abrams' suicide?

18  A.  Yes.

19  Q.  As we sit here today, is there anything you recall about the

20  circumstances surrounding Mr. Abrams' suicide that concerned

21  you?

22  A.  No.

23  Q.  Do you agree that the word integrity, by definition,

24  includes truthfulness and trustworthiness?

25  A.  Yes.
```

1   Q.  Do you agree that an employee earns the trust of his

2   employer by demonstrating that they can be trusted by doing

3   their job and what is expected?

4   A.  Yes.  Among many other things, but, yes.

5   Q.  And that an employer or supervisor can learn that an

6   employee can be trusted by monitoring and reviewing that

7   employee's work?

8   A.  Yes.

9   Q.  You understand that the commissioner and associate

10  commissioner and deputy commissioner positions are in

11  supervisory positions within the Department of Corrections?

12  A.  Yes.

13  Q.  Are you monitoring the work of the officers under your

14  command?

15  A.  I monitor the agency and the data that's gathered.  And I'm

16  looking for trends and I'm looking for situational items

17  specifically and primarily related to violence indicators,

18  suicides, homicides, things of that nature; and also dealing

19  with an extraordinarily unprecedented, in my opinion, situation

20  in which we have a lack of staff and mitigating those factors.

21  So there's a lot going on.

22      And I do have overall responsibility, but I typically would

23  not be in a position to monitor the day-to-day activities of any

24  of my officers or anyone else for that fact.  I need to

25  understand what's going on, the key issues that are related to

1  public safety, staff safety, and inmate safety through that

2  prism.  And based on that data, I target my energy and my

3  efforts towards mitigating it.

4      Which means that, yes, I have to also rely on staff under

5  me.  But I am prepared.  I am talented at what I do.  I'm a

6  professional.

7      Along with that comes the fact that I cannot change what

8  happened prior to my arrival.  I am new.  I believe I've spent

9  an extraordinary amount of time trying to understand what we do

10  and how things got the way they are and then dealing with

11  emergent situations as they arise on -- I would say on a daily

12  basis, but in some respects on an hourly basis.  And that's what

13  I do.

14  Q.  Does the new directive saying an inmate who's discharged

15  from acute or nonacute may not be sent to segregation absent

16  your specific approval apply to any inmate?

17  A.  It applies to any and every inmate coming off of acute,

18  nonacute, or mental health observation.  It is that specific.

19  Q.  Have you made any directives about sending people with SMI

20  to segregation?

21  A.  We are not placing inmates with SMI to segregation.

22  Q.  Have you made any directives about that?

23  A.  I believe that is actually a part of the directive.

24  Q.  The new directive?

25  A.  Yes.  And if it is not in the letter of it, it was certainly

1   the intent.

2   Q.   And can you explain to us what criteria you will use to

3   override a no segregation placement?

4   A.   Yes.   The primary consideration will be that there has to be

5   no other place to put the individual.   And that's due to the

6   fact that the person cannot be maintained safely with another

7   human of his security level.

8        For instance, if he's security level five, if he comes off

9   of acute, nonacute, or mental health observation, but he's posed

10  a danger to others and he is unwilling to accept a roommate or a

11  cellmate, then I will opt to not place him with someone else,

12  with another inmate, if he has indicated he would hurt someone

13  else if placed in that environment.   Or if his history of being

14  around others suggests that we could not safely house him with

15  someone else, then that would be a situation in which I would

16  leave him in restrictive housing.

17  Q.   And are you exclusively the one making those decisions?

18  A.   The mental health experts as well as my operations staff are

19  looking at the reasons as to what and why it's going on.   I get

20  involved only after there is no concurrence as to whether he can

21  be safely placed in another environment with another inmate.

22  But I do not want those inmates in my restrictive housing units

23  anywhere in the agency.   But as circumstances dictate, there may

24  be someone that is either too volatile or too violent to house

25  with another inmate.   Then I will have to default to safety of

1    staff and security of the institutions and the facilities.

2    Q.  Based on this new directive, how do you know that you are

3    not placing persons with serious mental illness in segregation?

4    A.  I believe that information has already been vetted by the

5    time that information comes to me.  There's mental health

6    coding.  And I believe that as long as the folks from mental

7    health are already making that assessment, they will apprise me

8    as to what this individual's status is.  And I will endeavor --

9    regardless of whether it takes me to move this person to another

10   facility, I will endeavor to get that person on the road to get

11   them to the right place.

12   Q.  Do you know as we sit here today if there are still persons

13   with serious mental illness in segregation who were placed there

14   before your new directive?

15   A.  I will tell you, I am committed to ensuring, now that this

16   directive is out, that we do not house inmates that are

17   seriously mentally ill in restrictive housing unless I have no

18   other options.  And I expect to be apprised of it, and I will

19   make that determination and exhaust literally all other reasons

20   and/or rationale for leaving him in restrictive housing.  I will

21   exhaust all of those.

22       I believe in the importance of since we know what types of

23   inmates are more -- have more proclivity to harm themselves, we

24   already know that we need to get ahead of it.  So it is part of

25   what I would consider my due diligence in conjunction with the

 1    mental health experts.  I am not a mental health expert and

 2    don't pretend to be one.  But based on --

 3            THE COURT:  So you actually have to approve the

 4    conclusion that there are no other alternatives, too?

 5            THE WITNESS:  Yes.  Part of the solution would be if,

 6    for whatever reason, we still end up with inmates with an SMI

 7    designation still in restrictive housing, someone's going to

 8    have to own that.  And I made a conscientious decision that I

 9    would be part of the solution.

10            Because typically the person holding the bag is a

11    warden, who doesn't know what to do because we can't get ahold

12    of mental health or they're not -- they're saying, you can't

13    leave them here, but they don't have bed space.  So my

14    institution coordinators, my regional directors, they then have

15    to find a way to get that person somewhere where we can ensure

16    their safety.

17            And I decided that, you know, we could eliminate a lot

18    of indecision and a lot of, well, it's this person's job or that

19    person's job, and just put it on me.  So I accepted that

20    responsibility.

21            THE COURT:  Put it on you, that means --

22            THE WITNESS:  I accept the responsibility of making the

23    final decision.

24            THE COURT:  Personally?

25            THE WITNESS:  Yes.  And/or if I'm not there, the person

1   acting in my capacity.  But that --

2          We've had that discussion in operations.  And so if I'm

3   not available, one of my institution coordinators, depending on

4   where the inmate is, will make that decision and we will -- and

5   they're aware of it.  We've had that discussion.  And I have

6   every expectation that we do not leave inmates in harm's way,

7   and we do not leave those wardens in a no-win situation as to

8   what to do with an inmate when nobody is making a decision.

9          So I said, you know, to move forward in this

10  organization, we need to start clearly delineating who has final

11  decision-making authority.  And then later on we need to adapt

12  the regulation to now what we're saying we're going to do.

13  That's a process that takes a little while.

14         But I am committed to being the individual that says

15  we're moving forward.  We will make decisions based on what's in

16  the best interests of the inmate unless exigent circumstances

17  exist in which I cannot put that person somewhere else in a safe

18  environment.

19  Q.  Mr. Daniels, going back to my questions, can you tell us if

20  there are still people with serious mental illness in

21  segregation who were placed there before your new directive?

22  A.  I don't know.

23  Q.  Are you reviewing those?

24  A.  I get an update from my staff as to -- I don't know if we

25  necessarily have a discussion as to how many or who is still

1   there.   What I want from my staff is to be forward looking.

2   Where are these people coming?   Where are we going to send them?

3   What are we going to do with them?   We're looking forward.   I

4   haven't invested a lot of energy in looking at what has

5   transpired previously.

6   Q.   Well, can we agree that keeping any person in isolation just

7   one day longer than is necessary essentially disregards that

8   predictor in and of itself of an increased risk for suicide?

9   A.   I think that that's situational.   It depends on the

10  individual circumstances with the individual inmate.

11  Q.   Well, can we agree that keeping a prisoner in isolation one

12  day longer than is necessary places them in a situation that is

13  a predictor in and of itself of an increased suicide risk?

14  A.   You would have to define necessary.   And I'm not prepared to

15  discuss all of the nuances that could arise that would have an

16  impact on it.   But I think, in general, I would agree that we

17  should do our best to ensure that those SMI inmates are not in

18  restrictive housing.

19  Q.   How many persons with serious mental illness are currently

20  in segregation within the Department of Corrections?

21  A.   I don't know.

22  Q.   Can you provide to the Court today this new directive?

23  A.   I'm sure I could get ahold of one, yes, a copy of it, the

24  directive itself.

25  Q.   Will you do that?

1  A.   Yes.

2  Q.   Given this spike in suicides and what we know about the risk

3  of suicide with keeping people with serious mental illness, is

4  keeping them out of segregation necessary for suicide

5  prevention?

6  A.   I think we have to look at the nature of the incidents that

7  we've had.  And there's a clear pattern that the vast majority

8  of them, going back at least through March, were inmates that

9  were released out of acute and/or nonacute and/or mental health

10 observation that went to segregation without a cellmate.

11      I think the data suggests that.  So we should look at that

12 and come up with strategies to reduce that type of inmate ending

13 up in restrictive housing.  And I think we've done so.

14 Q.   So, then, am I correct that you agree that given the risk of

15 suicide, in keeping people with serious mental illnesses out of

16 segregation, that that is necessary for suicide prevention?

17 A.   I would say that's an important factor.  But once again,

18 there are some circumstances in which the individual may not be

19 able to be successfully housed outside of restrictive housing.

20 Once again, that's a case-by-case situation and one that I'm

21 able to work with our mental health experts and making -- and

22 ensuring that that's a last resort if we have to keep an SMI

23 inmate in restrictive housing.

24 Q.   Well, given the spike and the risk that we've talked about,

25 is keeping people who have been on suicide watch a necessary --

1    out of segregation a necessary part of suicide prevention?

2    A.   I believe that it's important that we know that that's a

3    factor and that we consider that along with the other factors

4    and do our best to ensure that those inmates are not housed in

5    restrictive housing, barring circumstances that say we can't

6    release them.  And it would clearly be safe to relate it.

7    Q.   When you were talking about your job duties, you talked

8    about a lot of it was reviewing the data.

9    A.   Yes.

10   Q.   Is that correct?  Would it be necessary, then, that the data

11   that you are reviewing be reliable in order for you to make

12   appropriate decisions based on that data?

13   A.   Yes.

14   Q.   Do you know how many persons, since your arrival within the

15   Department of Corrections, have attempted suicide?

16   A.   I do not.

17   Q.   Do you know how you would obtain that data?

18   A.   It would be based on data gathered out of our incident

19   reports, our daily incident reports.  And as each one of those

20   are placed into our daily report that we receive, duty report,

21   we would be able to look at the number of attempted suicides.

22       But there's another issue with that.  What is a suicide

23   attempt versus a suicide gesture?  So I could have some

24   miscategorized.  I could have some that the person who's making

25   that judgment didn't categorize it properly.

1     So we could receive data.  Would that data be 100 percent

2  reliable?  Based on my knowledge of how we report incidents, I

3  cannot tell you with assurety that it's 100 percent reliable.

4  Q.  From an operations standpoint, the correctional officer

5  standpoint, any suicide gesture should be considered a suicide

6  attempt; is that correct?

7  A.  I don't know what the training is in the Alabama Department

8  of Corrections, but there is a distinction in other agencies as

9  to what a gesture is versus what an attempt is.

10  Q.  Do you have the ability to access at your desk the mental

11  health status of the persons in segregation in the various

12  facilities within the Department of Corrections?

13  A.  I have the ability to have my staff gather that data, and I

14  believe that data is being provided to my institution

15  coordinators with regularity.

16  Q.  But from your desk, you can't pull it up.  Is that a fair

17  statement?

18  A.  The answer is I don't know if I can pull it up.  Typically I

19  don't pull up my own reports.

20  Q.  And how long does it typically take for your ICs to get that

21  data to you should you request it?

22  A.  I don't know.

23  Q.  Is it fair to say you have not yet requested that data?

24  A.  It's fair to say that I know it's available.  But

25  understanding the dynamics of my job, I spend quite a bit of

1  time out on the road at my facilities that I'm responsible for.

2  And we do a lot by telephone and discussion, not necessarily

3  data in hand.

4  Q.  Have you had to do any overrides as a part of this new

5  directive?

6  A.  No.

7  Q.  Do you know whether or not, if you ever have to exercise the

8  override, where the documentation of that will be kept or will

9  there be documentation of it?

10  A.  The answer is I don't know if that's been institutionalized

11  in terms of data, who maintains it.  But I'm fairly positive I

12  would be able to have that information recalled.

13  Q.  Does your new directive prohibit putting a discharged active

14  or nonacute -- I mean, acute or nonacute in segregation, or can

15  they be double bunked in segregation?

16  A.  I have the ability to double bunk in segregation because the

17  overriding factor would be, what's more important?  That they're

18  alone or that they're double bunked or that they're in special

19  housing?

20      Ideally, we would move them out of restrictive housing into

21  one of our other types of living space.  However, with no other

22  options, I will double up.  In my opinion, it's more important

23  to have that individual with someone until we can get that

24  person out.

25  Q.  Is there any reason that a person could be safely housed in

1    segregation but can't be safely housed in an SLU?

2    A.   The primary issues, of course, is bed space.  Whether or not

3    we have the space available.  And we're working on methods of

4    trying to mitigate that.  I believe right now our -- the

5    language that we have on our regulations in many respects

6    prohibits us from having those inmates double celled, but we're

7    working diligently on determining whether or not that's a

8    requirement that needs to exist.  And I spoke of that somewhat

9    earlier.  And I'm looking forward to finding the answer out and

10   providing more bed space, more opportunities for those inmates

11   that are SMI that may end up in special housing, that we provide

12   another area for them to be housed in.

13   Q.   Mr. Daniels, I want to talk a little bit about some of the

14   documents that were produced with either you being the recipient

15   or the author of the documents.  It's really just a series of a

16   couple of emails.  The first one --

17          THE COURT:  Do you have a copy of that directive?

18          Any way we can get a copy of the directive,

19   Mr. Lunsford?

20          MR. LUNSFORD:  Yes, sir, we have it.  I just asked

21   somebody to go print it.  It was just issued at the end of last

22   week, so I had just received it.

23          THE COURT:  Do you want to have someone copy it?

24          MR. LUNSFORD:  I have three copies, so I'm happy to

25   hand a copy to Your Honor.

1          THE COURT:  My staff can copy it, too.  Would you like

2     one of them to copy it?

3          MR. LUNSFORD:  That's fine, Your Honor, or you can just

4     have this done and I'll provide a copy to opposing counsel.

5          THE COURT:  That's fine.  Give it to my clerk here, and

6     she can copy it very quickly.  I would like to read it myself.

7     Q.  (Mr. Zarzaur, continuing:)  The first is Exhibit 2583.  It's

8     involving Mr. Gentry's suicide.  It's an email from

9     Mr. Ellington.  Can you identify what his position is within the

10    Department of Corrections?

11    A.  He's an institution coordinator.

12    Q.  Is he the north or south coordinator?

13    A.  The north.

14    Q.  And it's to you and to a Mr. Jeffrey Williams.  And can you

15    identify what Mr. Williams' position is?

16    A.  Mr. Williams is an associate commissioner, and he's

17    primarily responsible for public -- I'm sorry -- for legislative

18    affairs.

19    Q.  And then Ms. Price is copied on this document or this email.

20         MR. LUNSFORD:  Your Honor, we're going to object.

21         Counsel, would you please take it down off the screen?

22    The document is marked as confidential.  Y'all know this is

23    under protective order.  I mean, you can't show this on the

24    screen.

25         THE COURT:  Go ahead.

```
1              MR. ZARZAUR:  Let me provide him with a copy of it.  My
2    apologies to the Court.
3              THE COURT:  Okay.
4    Q.  When you received this email, did you do anything in
5    response to it?
6    A.  I don't recall.
7    Q.  And so you don't -- as part of your job responsibilities
8    within the Department of Corrections, do you feel you have some
9    obligation as the deputy commissioner of operations to respond
10   to a notice such as this?
11   A.  Here's what I can share with you.  This was dated on
12   February 6th.  I started on January 7th.  I worked up until
13   January 24th.  I did not return back to duty until February 5th.
14   I am not one hundred percent sure what happened, as I had just
15   started.  Mr. Williams was actually the one that was acting, and
16   he was responsible for helping me in my transition as he was a
17   senior official.  Although all of these incidents are important,
18   sir, I was new.
19   Q.  Okay.  So, again --
20   A.  And I had hundreds of emails.  Hundreds.  And I can't recall
21   whether I received a phone call or not.  The reason I'm not sure
22   is most of those calls were still going to Mr. Williams, and he
23   was still handling it.
24        But I can tell you this.  I started on January 7th.  My last
25   day of work prior to this was -- well, I was gone between I want
```

1   to say January 25th, January 24th, and I did not return until

2   February 5th.  So there's a possibility that -- I had several

3   hundred emails.  There's a possibility that I did not receive a

4   call.  I was out of the country, because my wife and I were

5   celebrating our fortieth, and we weren't around phones and I

6   wasn't collecting emails.

7       So if that seems somewhat strange that I may not be aware

8   because this is serious, it is serious.  I couldn't even tell

9   you where half my facilities were at this time.  And there's a

10  good chance I had no knowledge of this, but I can't say that

11  assuredly because of the several hundred emails I got when I

12  returned back to the U.S. and my emails populated.

13  Q.  But as we sit here today, you don't know --

14      Let me ask you this.  Have you visited all the facilities

15  within the Department of Corrections?

16  A.  I have not.  I've visited most of the major facilities.  I

17  haven't visited all of them.

18  Q.  Can you tell us which ones you have not visited?  Or

19  whichever list is longer, the ones you have visited or the ones

20  you have not visited.

21  A.  Sir, I don't know.  I don't know which ones I have or

22  haven't.  I've visited the majority of them.

23  Q.  Can you tell us the ones you recall visiting?

24  A.  I can remember off the top of my head that I visited Bibb,

25  that I visited Holman, that I visited Fountain, that I visited

 1  St. Clair, that I visited Easterling, that I visited Donaldson.

 2  I visited our furthest northern one that's near Huntsville.

 3  I've visited Kilby.  I've visited Staton.  And I've visited

 4  several more.  Quite frankly, I visited quite a few, but most of

 5  those were multiple visits.  For instance, Holman, six visits.

 6  St. Clair, seven visits.  You name it, the ones where we had a

 7  lot going on, multiple visits.

 8      So I spent a lot of time on the road.  But I cannot share

 9  with you the complete list off the top of my head.  Quite

10  frankly, I can't even memorize all of the names of the

11  facilities that we have.

12  Q.  In your review of the suicides since March of 2018, I think

13  you talked to us about having reviewed the documentation

14  surrounding those and the incident reports.  I want to show you

15  some additional documents related to a few of those.  These are

16  Plaintiffs' Exhibits 2401, 2402, and 2403.

17          THE COURT:  Those are what, now?

18          MR. ZARZAUR:  Marked as attorney's eyes only.

19  Q.  Out of an abundance of caution, Mr. Daniels, I'm going to

20  ask you to avoid identifying any individual employee by name as

21  we discuss these documents.  But first I want to look at 2401.

22  It's a written reprimand relating to a November 25th, 2018,

23  incident.  So it would have been one of the suicides that you

24  reviewed.  Do you recall looking at this reprimand as part of

25  your review of that suicide?

1  A.  Yes, I recall.

2  Q.  And --

3  A.  Yes.

4  Q.  Can we agree that the conduct demonstrated by the person

5  that ultimately took his life in this situation is the type of

6  thing that can be considered indicative of someone who's

7  suicidal?

8          THE COURT:  We're talking about which one, now?

9          MR. ZARZAUR:  2401.

10  A.  If we're looking at the facts related to the offense, I

11  can't tell you assuredly that those actions are indicative of a

12  suicide.

13  Q.  In your training and experience, have persons that are

14  suicidal sometimes -- have you learned or either been made aware

15  of that persons that are suicidal will often create a disruption

16  as a behavioral cue or a cry for help?

17  A.  I can't say that conclusively.  I think it's situational.

18  Some of the inmates that have an intent on ending their life

19  will never let anyone know, and they will do whatever it takes

20  to hide their desire.  While there's others, in my opinion, that

21  have acted out and then at some point in time decided that

22  committing suicide was in their best interests more than doing

23  anything else.

24  Q.  Well, can we agree that because acting out can be a

25  behavioral cue for suicide, that a correctional officer can't

1    ignore that?

2    A.  I would agree that a correctional officer, once he hears the

3    banging and the -- as it's spelled out here, being disruptive,

4    banging and being disruptive, I would say that that officer

5    needs to get up and find out why.  Absolutely.

6    Q.  And can we agree that one of the reasons why the officer

7    might need to get up and find out why could be because this is a

8    behavioral cue for somebody who may do self-harm?

9    A.  I believe, based on the actions that I'm reading here, that

10   the officer should have gone, regardless of whether he thought

11   it was precipitous of a suicide attempt or whether he was just

12   being disruptive because he wanted his recreation.

13       But what I'm responding to is the fact that under these

14   circumstances, the officer should have gone, regardless of what

15   he thought it was.  This is not the type of place where you idly

16   allow someone to bang and scream and do things of this nature.

17   Q.  So regardless of what it was, but can we agree that

18   especially because of what it could have been, and that is a cry

19   for help?

20   A.  I can't make that nexus.

21            THE COURT:  Where was this inmate being held --

22            THE WITNESS:  Staton.

23            THE COURT:  -- on Exhibit 2401?  Was he in segregation?

24   Can you tell?  Can you tell, yourself?

25            THE WITNESS:  Your Honor, let me look at it one more

1  time.  I initially could not determine, based on what's written

2  here, where this was.  But let me look.

3         Sir, the identifier I see is temporary holding cell,

4  but I don't know whether that holding cell was in restrictive

5  housing or outside of restrictive housing.

6         THE COURT:  Can you tell what the status of the inmate

7  was, like, was he on the mental health rolls or what his mental

8  condition was or anything like that or whether he had any mental

9  health history?

10         THE WITNESS:  Sir, based on this document, I cannot --

11         THE COURT:  Can't tell?

12         THE WITNESS:  -- tell.

13  Q.  Can we agree, though, based on this document, that you feel

14  that the correctional sergeant failed in his duty?

15  A.  I agree that the sergeant should have gone to find out what

16  was going on.  So that's my response.

17  Q.  And do you agree that he failed to follow proper policy and

18  procedures?

19  A.  Sir, I don't know what the policies and procedures state.

20  If they specifically indicate that if an officer calls you, as a

21  sergeant, you have to go, I can't tell you that.  Not that I

22  don't want to.  I just can't tell you because I don't know what

23  the policy or the procedure says.  But I will tell you, good

24  correctional practice, he should have gone.

25  Q.  When you reviewed this as part of your examination of the

1  suicides since March of 2018, clearly the last sentence here

2  indicates that the conclusion was that this particular

3  correctional sergeant failed to follow proper policy and

4  procedures.

5  A.   That is what is stated in this document.

6  Q.   And then when you reviewed this and saw on page 2 of this

7  document that there was no corrective action for that employee,

8  did that cause you any worry or concern?

9  A.   At the time, I can't tell you if it caused me any concern.

10 I can tell you that in the opinion of -- remembering this one

11 specifically -- but while looking at it, I was thinking things

12 may be a little different here in Alabama than what I'm

13 accustomed to.  But this had already been adjudicated prior to

14 my arrival.

15      I would suggest that either I didn't have enough information

16 or that things maybe are just a little different based on

17 Alabama personnel regulations, which would also happen to

18 include penalties for certain sanctions.  Once again, failure to

19 perform your duties, failure to do whatever you're assigned to

20 do, policies, procedures, regulations.  In looking at that, it

21 raised an eyebrow.  As a matter of fact, I remember looking at

22 it and saying, wow.  This is a little different.  But I didn't

23 have anything to base it on, other than I would suggest that the

24 outcome would have been somewhat different in the organizations

25 where I previously worked.

1   Q.  And tell me what the outcome would have been in the previous

2   organizations.

3   A.  If I had full knowledge of the incident and there was

4   nothing outside the scope that would be obvious here, a

5   supervisor, just by virtue of being a supervisor, would have

6   been held to a higher level of scrutiny.  And then the sanction

7   would have been greater than it would have been a line staff

8   member.

9       So at a minimum, once again, based on what I know and the

10  information available to me, this should have at a minimum

11  resulted in a suspension.  But I don't know all the details well

12  enough to say that this was inconsistent with the policies and

13  the procedures and the personnel manual in the Alabama

14  Department of Corrections or state personnel.  So --

15  Q.  Well, if we look here at what the offense charged was, there

16  was a violation of Administrative Regulation 208; is that

17  correct?

18  A.  Yes.

19  Q.  And then, separately, if you would look at Plaintiffs'

20  Exhibit 2402, it's a reprimand regarding the same incident on

21  November 25th, 2018, but involving a separate employee.

22  A.  Yes.

23  Q.  And this is not a supervising employee; is that correct?

24  A.  This individual is listed as a correctional officer.

25  Q.  But this particular individual was suspended; is that

1  correct?

2  A.  Based on what I see, yes.

3  Q.  And even though the underlying violation was different, the

4  administrative regulation that this person was charged with

5  violating was the same; is that correct?

6  A.  Yes, if we're both referring to the fact that both -- it's

7  listed as -- the sentence is, you failed to follow proper policy

8  and procedures.

9  Q.  Are you aware that the individual who took his life in this

10  situation, Mr. Chatter, had been on mental health observation

11  just a few days earlier and that he was still in the same cell?

12  A.  I can't recall that.

13  Q.  Does that information and the information contained in these

14  two reprimands that we've looked at in 2401 and 2402 change your

15  testimony about having any concerns about your review of this

16  particular suicide?

17  A.  No.  My review was to understand what transpired, but I

18  wasn't here to go back and identify and/or readjudicate this

19  based on the discipline at the time and the individuals who made

20  the determination as to what the sanction would be.  I wanted to

21  take a picture -- I wanted to take the scope of what was

22  transpiring with the suicides --

23  Q.  Do you know --

24  A.  -- and understanding.  So my answer would be I wasn't here

25  to readjudicate the sanction.

1   Q.  Do you know if the individual employee in 2401 is still

2   employed with the Department of Corrections in a supervisory

3   capacity?

4   A.  I don't know.

5   Q.  If he is, would it concern you that there has been no

6   corrective action for this reprimand, even if it was just

7   retraining or training?

8   A.  You're asking me to respond to an unknown.  I wasn't here

9   for this.  This happened before my arrival.

10      My review of these documents was primarily getting an

11  understanding of what happens and where does it happen.  And I

12  just wanted to have an understanding of what was going on

13  related to the suicides and to see if there was anything I could

14  bring that would assist me in mitigating the number of suicides

15  that we were having.  I was --

16      It was shared with me, we had a spike in suicides.  Okay.

17  So if it was inconsistent from previous years, all right.  Let's

18  see if we can do a deep dive and figure out what transpired.

19      But my goal was not to go back and look at the disciplinary

20  action taken.  I think that is important to note, but it had

21  already happened.

22  Q.  And did you issue a directive or anything saying that in the

23  future if a same or similar circumstance presents itself, the

24  outcome as it relates to someone under your supervision now

25  needs to be different?

1   A.   Sanctions are governed by -- I believe they call it -- well,

2   they refer to it as state personnel.  And there is a range in

3   which an individual can be sanctioned for each individual

4   occurrence or multiple occurrences.  And there's wide breadth.

5   Each incident that happens, regardless of type, has to be looked

6   at and viewed on its own merits, of which I don't have control

7   over what the state authorizes as a sanction within the scope of

8   any particular violation of policy or procedure.

9   Q.   Let me talk to you about Plaintiffs' Exhibit 2403.  This

10  involves a suicide in segregation in August of 2018.  Did you

11  review this documentation in your review of the suicides that

12  had taken place since March of 2018?

13  A.   I don't know if I looked at this document particularly, but

14  I know I was briefed on this particular instance.  I remember

15  the officer's name.

16  Q.   And, obviously, I don't want you to mention the officer's

17  name, but who would have briefed you on it?

18  A.   I believe the briefing was provided by one of my institution

19  coordinators.

20  Q.   And do you know why in this particular circumstance, even

21  though the suicide was something that occurred prior to your

22  arrival, just like the other one we just looked at, that this

23  incident and this particular employee's circumstances were

24  brought to your attention?

25  A.   I believe at this time I had asked for knowledge of any

1  sanctions any of our staff received, operations staff received,

2  based on failure to perform their duties.  And I think this was

3  part of a general conversation.

4  Q.  Well, then, can we agree, going back to 2401, that even

5  though there was a violation, this would not have appeared on

6  your radar because there was no sanction?

7  A.  Please restate your question.

8  Q.  I think we concluded in looking at 2401, that reprimand,

9  that there was no sanction against that particular employee.

10 A.  Well, unless I'm reading this wrong, I believe this

11 individual received a written reprimand, which is a sanction.

12 Q.  Okay.  So in a request for sanctions, you would have -- even

13 if there's no corrective action, you would have received a copy

14 of this?

15 A.  Well, I would have known if -- well, I believe I would have

16 known whether the individual was terminated, suspended, or

17 received a written reprimand.

18 Q.  And as it relates to the correctional officer's involvement

19 or interaction surrounding all of the suicides that we've looked

20 at, am I correct that the only three disciplinary or reprimands

21 are the ones related to -- two of them related to the November

22 25th, 2018, incident, and the August 22nd, 2018, incident that

23 is the subject of Plaintiffs' Exhibit 2403?

24 A.  It is my recollection that there was a total of three.  Two

25 of them were for the same incident, and then one was separate.

 1   Q.  And can you tell us what the issue was as it relates to

 2   Exhibit 2403?

 3            THE COURT:  We're going to have to take a recess right

 4   now.  Counsel, could I see that document from this morning about

 5   the inmate who committed suicide where the box had been checked

 6   that he was SMI?

 7            MS. SANDLEY:  Yes, Your Honor.

 8            THE COURT:  Could I see that document?

 9            MS. MORRIS:  Do you want the entirety of that record or

10   just that one page?

11            THE COURT:  Just that one form.  Could I see it?

12            MR. ZARZAUR:  I was going to provide you with a copy.

13            THE COURT:  Just that one form.  That's all I want to

14   see.  It was shown up on the monitor.

15            MS. MORRIS:  The highlighting is from plaintiffs.

16            THE COURT:  Pardon me?

17            MS. MORRIS:  The highlighting is from us.

18            THE COURT:  The exhibit number is what?  2694?

19            MS. MORRIS:  Yes, sir.

20            THE COURT:  I'd like the parties to address this

21   suicide where he had an SMI flag, and he was checked, and he

22   could be re-placed in restrictive housing and so forth.

23            I have to admit that I am concerned about the

24   parallelism between this and --

25            What's his name?  The first witness I heard?

```
 1          MS. MORRIS:  Jamie Wallace, Your Honor.

 2          THE COURT:  -- Jamie Wallace, you know, two years

 3  later.

 4          MR. LUNSFORD:  Your Honor, can I ask what you mean by

 5  parallel?

 6          THE COURT:  Well, I have two people who the department

 7  had noticed were SMIs.  Mr. Wallace testified.  And he went

 8  back, and he was allowed to hang himself.  And here we have this

 9  witness, Matthew Holmes.  He's SMI.

10          MR. LUNSFORD:  Your Honor --

11          THE COURT:  I'm just saying, I don't know if there are

12  any parallels or not.  But I would like to address whether there

13  are parallels.  I'm raising the spectre of parallelism, not the

14  conclusion yet.  But I have to admit that there is a concern

15  about deja vu here.

16          Thank you.  We'll take a 15-minute recess.

17     (Recess was taken from 3:07 p.m. until 3:29 p.m., after

18      which proceedings continued, as follows:)

19          THE COURT:  Proceed.

20  Q.  (Mr. Zarzaur, continuing:)  Mr. Daniels, before we broke, we

21  were looking at Plaintiffs' Exhibit 2403 involving a memorandum

22  surrounding a correctional officer and a suicide on August 22nd,

23  2018.  You were telling us that you had been made aware of this

24  incident, even though -- and the circumstances surrounding this

25  correctional officer, even though this had occurred several
```

1   months before your arrival with the Department of Corrections;

2   is that right?

3   A.   Yes.

4           THE COURT:  Before we do that, I'd like to have his

5   memorandum of March 21 or his letter to the governor regarding

6   suicides marked as an exhibit so the record will reflect what

7   document we've been talking about.

8           MR. LUNSFORD:  Your Honor, just to clarify, the letter

9   is not to the governor.

10          THE COURT:  Oh, you're -- it's on her -- it has her

11  name at the top.  That's why I was thinking it was.  But thanks

12  for the clarification.  It actually has the governor's and the

13  commissioner's names at the top.

14          But anyway, I'd like to have it marked.

15          MR. ZARZAUR:  We'll mark it and let Your Honor know the

16  number.

17          THE COURT:  To whom did you really want this memorandum

18  addressed?  Let me ask that.  Or your letter.  Who was the

19  audience for it?

20          THE WITNESS:  Sir?

21          THE COURT:  Who was the audience for your letter?

22          THE WITNESS:  I'm sorry, Your Honor.  It was for the

23  staff in the Alabama Department of Corrections, primarily our

24  wardens.

25          THE COURT:  Okay.  Thank you.  We need to mark it as an

```
 1   exhibit, is the bottom line, though.

 2           MR. ZARZAUR:  It will be Plaintiffs' 2706.

 3           THE COURT:  2706.  Very good.  Now go ahead.

 4   Q.  (Mr. Zarzaur, continuing:)  Mr. Daniels, I think we

 5   established that even though this suicide and the subsequent

 6   memorandum involving the correctional officer's behavior

 7   surrounding that was well before you came on board with the

 8   Department of Corrections, you became aware of it or were made

 9   aware of it; is that correct?

10   A.  Yes.

11   Q.  And specifically, this memorandum that is Plaintiffs'

12   Exhibit 2403; is that correct?

13   A.  Yes.

14   Q.  And if you could, summarize for us what the issue was as it

15   relates to the correctional officer's behavior on August 22nd,

16   2018, that was in violation of numerous policies and procedures.

17   A.  The memorandum cites --

18           THE COURT:  This is 240 what?

19           MR. ZARZAUR:  2403.

20           THE COURT:  Do I have that?  I have 2401 and 2.

21           MR. ZARZAUR:  I've got an extra copy, Your Honor.

22           THE COURT:  I could have it.  Do you have it there?  I

23   have it here.

24   Q.  Go ahead, Mr. Daniels.

25   A.  In looking at the body of this memorandum, it specifically
```

```
 1  states "Charged with failing to conduct required security checks

 2  every 30 minutes, falsifying information in his duty post log,

 3  failing to handcuff or escort inmates who are outside of their

 4  cells, and allowing inmate runners to remain in the lobby and

 5  pass out mail, soap, and tissue on both sides of their tiers

 6  while you remain seated at the desk.  Specifically, you did not

 7  conduct a single security check during your relative time period

 8  or go down either side of the tiers until the pill call nurse

 9  entered the unit.  However, you repeatedly made notations in

10  your log indicating that the required security checks had been

11  conducted and the tiers were secure."

12  Q.  So, obviously, the logs had been falsified.

13  A.  Yes.

14  Q.  And that's an example of the types of data that you would

15  review in determining whether or not the correctional

16  professionals within the facilities in the Department of

17  Corrections are doing their job.

18  A.  Yes.

19  Q.  Am I correct that the only way that this particular

20  falsification of the log was uncovered was by a review of the

21  video?

22  A.  Yes.

23  Q.  Do you agree, then, that a review of the video or monitoring

24  of the log entries is necessary to confirm that the data that

25  you are reviewing is accurate?
```

1    A.   I believe that it's necessary.

2    Q.   And do you agree with the finding that the actions of this

3    particular correctional officer demonstrated poor judgment,

4    dereliction of duty, and resulted in an inmate's death?

5    A.   I believe that it was poor judgment.

6         THE COURT:   Could you just tell me what exactly the

7    correctional officer allegedly falsified?  What exactly was done

8    here?

9         THE WITNESS:   What he did, he signed the post log,

10   indicating that he physically made his rounds.  And those rounds

11   consisted of ensuring the safety and the welfare of the inmates

12   in that unit.

13        THE COURT:   And he was supposed to have done the rounds

14   how often?

15        THE WITNESS:   Every 30 minutes, intermittently, so as

16   to not establish a pattern, but he should have made his rounds

17   once every 30 minutes.

18        THE COURT:   So he was supposed to have made the rounds

19   every 30 minutes, and these were of the segregation units?

20        THE WITNESS:   Yes.  The restrictive housing unit at

21   Fountain Correctional Facility.

22        THE COURT:   Does it say how often, in fact, he did make

23   the rounds?

24        THE WITNESS:   The letter indicates that upon review, he

25   did not conduct a single security check during the relative time

```
 1   period or go down either side of the tiers until the pill call

 2   nurse entered the unit.

 3               THE COURT:  Would that have been just the period of

 4   time when the inmate hanged himself, or would it have been

 5   significant time before and after?  In other words, did he miss

 6   just one round, or was he just not conducting rounds at all?  Or

 7   can you tell?

 8               THE WITNESS:  The memorandum specifically states what

 9   is characterized as a relative time period.

10               MR. ZARZAUR:  Your Honor, if it would be of assistance,

11   we could offer the duty post log, which would show the entries,

12   while false --

13               THE COURT:  Which entries were false?  Were all the

14   entries false?  Is that correct?  Were all the entries false

15   made by this officer?

16               THE WITNESS:  According to this memorandum, that he did

17   not conduct security checks within what they considered to be

18   the relative time period.  I don't know how they're defining

19   relative time period.

20               THE COURT:  Right.  So you don't know exactly what

21   period of time he was falsifying the logs, other than the

22   relative time period.

23               THE WITNESS:  No.  It would be speculative, Your Honor.

24               THE COURT:  But we do know that during this time

25   period, the inmate did hang himself.
```

```
 1              THE WITNESS:  Yes, Your Honor.

 2              THE COURT:  Go ahead.

 3  Q.  (Mr. Zarzaur, continuing:)  Going back to an adequate

 4  suicide prevention program, can we agree that a review of only

 5  the logs in this circumstance would not have revealed the

 6  inadequacy of the correctional officer's performance of his job

 7  which resulted in the death of an inmate?

 8  A.  Please restate your question.

 9  Q.  Can we agree that a review of the logs alone in this

10  particular circumstance would not have revealed the inadequacy

11  of the correctional officer's job performance that resulted in

12  an inmate's death?

13  A.  Yes.

14              THE COURT:  Would addressing any departmental concerns

15  about making sure that the logs are reliable and accurate fall

16  under your auspices or some other administrator or supervisor's

17  responsibility?

18              THE WITNESS:  This would typically be the

19  responsibility of the immediate supervisor.  Typically in this

20  instance it would have been a sergeant, but it potentially could

21  have been a lieutenant.  And then, of course, the captains are

22  there to ensure that the lieutenants and the sergeants are

23  executing their duties.  Then it works its way up to the warden

24  of the facility.

25              THE COURT:  So it would fall under the warden's
```

1    responsibility and not necessarily yours?

2            THE WITNESS:  I am -- the person in my position is

3    overall responsible for ensuring that our staff carry out their

4    duties.  But when you look at each facility and that they have

5    an individual that's in charge of the facility, they're,

6    obviously, responsible.  But ultimately, anything that falls

7    under security in any of our facilities ultimately comes back to

8    the leader of operations, which is the deputy commissioner of

9    operations.

10            THE COURT:  I know you were not there at the time this

11   happened.  You were not --

12            THE WITNESS:  Correct, Your Honor.

13            THE COURT:  Okay.  Can you tell whether there was any

14   determination made that the officer here was just derelict or

15   that he failed to appreciate the seriousness of what his

16   obligations were?  In other words, is this an issue for

17   training, or is this just a bad officer?

18            THE WITNESS:  Your Honor, this is a bad officer.  He

19   was not performing the task that he was paid to perform.

20            THE COURT:  Okay.  Go ahead.

21   Q.  (Mr. Zarzaur, continuing:)  And am I correct that the only

22   way to identify the bad officers would be a review of the video

23   or monitoring of their conduct?

24   A.  No, I wouldn't say that.  I think there's other things that

25   could have been done, obviously, by the local supervisors.  For

1   instance, the person that makes the rounds, the sergeant that's

2   responsible for the block, and the lieutenant could have gone in

3   and asked questions that would have helped determine whether or

4   not the officer was doing his job.

5   Q.  So in your opinion, there were failures beyond just the

6   correctional officer that night.

7   A.  In my opinion -- I wasn't there.  I don't know what else

8   they had to deal with that night.  But there are other ways in

9   which you can determine whether an individual is making their

10  rounds.

11         THE COURT:  What were these other ways?

12         THE WITNESS:  For instance, if nothing else was going

13  on, a sergeant and/or a lieutenant could have gone down there

14  and made rounds themselves.  And then if they had seen

15  something, for instance, that doesn't appear to be right, for

16  instance, lights or strings that are loose --

17         THE COURT:  If what?

18         THE WITNESS:  If there were strings that have been

19  removed, for instance, from bed sheets, and the inmate has

20  created rope and/or string or basically a ligature, if that

21  supervisor sees that, that individual can then say, hey, you've

22  been making your rounds?  Then how long has this ligature been

23  here?  Why didn't you have -- why didn't you take it from the

24  inmate?  If the inmate wouldn't give it to you, why didn't you

25  call me?  There's basic things that you can look at and see.

1          For instance, why are the food trays not -- have they

2     not been collected?  Or if they've been collected, why is there

3     still food in the cell?

4          There's multiple ways a supervisor can walk through and

5     assess whether or not someone's doing their job.  And it also

6     requires you to know your staff.  But the video itself is not

7     the only way.

8     Q.  So if I understand you correctly, the failures were both

9     with the correctional officer and his supervisor?

10    A.  The answer is I don't know specifically at this time,

11    because I don't know what the supervisors were doing.  And they

12    may have been involved in other incidents.  So I can't tell you.

13         THE COURT:  Now, this happened about a month or so --

14    well, month and a half before you arrived on the scene; that is,

15    before you were hired.

16         THE WITNESS:  Yes, sir.  Yes, Your Honor.

17         THE COURT:  Are you aware of any action taken by the

18    Department of Corrections to see whether or not the failure was

19    a bad officer or the failure was at the supervisory level and

20    doing what you've just described as alternative ways to find out

21    whether an officer was, in fact, doing the rounds?

22         THE WITNESS:  Other than the investigation and the

23    subsequent sanction, I am not familiar with or aware of anything

24    else they did.

25         THE COURT:  Does this document here reflect that there

```
1   was any effort to determine whether or not the failure was at a

2   supervisory level as well?  This document.

3            THE WITNESS:  This document does not tell me that.

4   Q.  (Mr. Zarzaur, continuing:)  In light of this document, do

5   you know whether or not the Department of Corrections conducts a

6   random, systematic comparison of videotape surveillance to the

7   rounds that are documented in the logs?

8   A.  I do not.

9   Q.  Because they don't, is there any way to assure this Court

10  that this exact issue is not occurring right now, placing others

11  at risk?

12  A.  I cannot give that assurance.

13           THE COURT:  What should the department do to make sure

14  that this action is not occurring now and will not occur in the

15  future?  In other words, what can you do to give me that

16  assurance?

17           MR. LUNSFORD:  Your Honor, I'm sorry to do this, but,

18  Your Honor, we would object to the fact that we have an

19  obligation based on one instance to prove to this Court that

20  there's not a -- I mean, there's one documented instance --

21           THE COURT:  I overrule this objection.  And this is one

22  instance that resulted in the death of an inmate, didn't it?

23           MR. LUNSFORD:  Your Honor, again, I understand the

24  gravity of the circumstances that we're dealing with.  But,

25  again, I think from just a pure procedural perspective --
```

```
 1            THE COURT:  Well, you can answer me this way.  You can

 2   say that you don't feel you have an obligation to give that type

 3   assurance.  I'll add that to it.  Which will be telling as well.

 4            MR. LUNSFORD:  Your Honor, again, I think there's two

 5   issues here.  One is a legal issue --

 6            THE COURT:  No.  There's a legal issue, but there is an

 7   obligation of the department.  And it's not legal.  I'm just --

 8   he might say the department has no such obligation, which would

 9   be telling as well.  All I'm asking is --

10            Well, why don't I preface it by Mr. Lunsford?  Do you

11   think you have an obligation, as head of operations of the

12   department, to make sure that this does not happen in the future

13   and is not happening now?

14            THE WITNESS:  I have every obligation as the deputy

15   commissioner of operations to do the very best that I can,

16   provided that I have -- I do not have complete authority over

17   all humans as to whether they do or do not execute their duties.

18   I can hold all of them accountable for failing to do their jobs.

19   But the reality of this, I want to spend time and effort on

20   prevention, not a failure, and then responding to the failure in

21   a way in which I can give you assurances.  I would love to give

22   you assurances.

23            THE COURT:  Well, is there any way you could do it, to

24   use your word, to prevent it from happening as best you can

25   within the realm of the fact that we're dealing with humans and
```

1  their imperfections?

2       THE WITNESS:  Your Honor, right now, training,

3  dedication to working as a team is paramount with my staff, as

4  well as with mental health and health services.  The gravity of

5  these situations is enormous, and I want to protect as many

6  inmates as possible.

7       Looking at what happens generally in society and what

8  happens in prison, there are some individuals who will go the

9  extra mile it terminating their life.  It is my goal and

10  endeavor to interdict all of those before that individual gets

11  to that point.  But, Your Honor, I don't know if I can

12  unequivocally tell you I can prevent --

13       THE COURT:  I don't think anybody's asking you to

14  unequivocally prevent.  All I'm asking you is about reasonable

15  measures.  And the question that I'm posing is whether you feel

16  that in light of the events -- you have events here.  We're not

17  talking theoretically.  You have events here -- the department

18  feels that it should take any reasonable measures to make sure

19  that this doesn't happen again.  And in light of what you've

20  just told me, that you don't have to rely on videotapes, you can

21  rely on other alternative things.

22       THE WITNESS:  Your Honor, I believe that I can

23  substantially increase our training and our emphasis on

24  prevention.  I am willing to, to include accepting

25  responsibility for that training and the efforts that we give

1    towards protecting these vulnerable inmates.

2            THE COURT:  Has there been such training or is any such

3    training planned in the future?

4            THE WITNESS:  From my knowledge, extensive training has

5    been planned and, if I'm not mistaken, is ongoing.  And I

6    believe, in communicating with the mental health experts, they

7    are dedicated.  I am also dedicated to ensuring that my staff,

8    the ones that fall under my command, will receive that training

9    and that training will be continuous and ongoing.  And as we

10   learn more, we will train more.  And it will be -- there will be

11   an emphasis on that training on my watch.

12           THE COURT:  Go ahead.

13   Q.  (Mr. Zarzaur, continuing:)  Do you know anything about that

14   training?

15   A.  I don't know the specifics of the training, but I know

16   that -- I do know that there has been communication about the

17   training and development of the training, and it is extensive,

18   and that they are vehement about getting additional training to

19   our staff.

20           THE COURT:  And this training will be provided by your

21   department?

22           THE WITNESS:  From my understanding, the majority of

23   the training will be conducted by mental health experts.  And

24   then we will supplement that training from the mental health

25   experts, from a correctional standpoint, the why the importance

```
 1   of being preventative.  And I will have control and input over

 2   that training.

 3             THE COURT:  Mr. Lunsford, you're going to present me

 4   evidence on the training?

 5             MR. LUNSFORD:  Your Honor, it's already in the record

 6   in terms of the form of an order.  It's already been approved by

 7   the --

 8             THE COURT:  Order and practice can be very different

 9   things.

10             MR. LUNSFORD:  I understand, Your Honor.

11             THE COURT:  Will there be evidence of the training

12   itself?

13             MR. LUNSFORD:  We can certainly present what's been

14   approved by the plaintiffs' expert.

15             THE COURT:  Training and practice are very -- two very

16   different things.  I want to know what training has been done.

17   I'd like to hear evidence on that.

18             MR. LUNSFORD:  Yes, sir.  Understood.

19             THE COURT:  Go ahead.

20   Q.  (Mr. Zarzaur, continuing:)  To your knowledge, has the

21   training of the supervisory officers changed at all in response

22   to this incident?

23   A.  I don't know.

24   Q.  Going back to your new directive of March 21st, 2019, can

25   you tell us how it is or why it is you selected these particular
```

```
 1   alternatives to restrictive housing?

 2   A.   May I see the directive?

 3            THE COURT:  Document number -- is this document 2706?

 4            MR. ZARZAUR:  2706, Your Honor.

 5            THE COURT:  Go ahead.

 6   Q.   I believe in the third paragraph there you identify several

 7   alternatives to restrictive housing, and I'm trying to figure

 8   out how you arrived at the locations that you did as

 9   alternatives.

10   A.   I would like to see a copy of the directive.

11            THE COURT:  Here's your letter.  Now, you're talking

12   about paragraph four or three?

13            MR. ZARZAUR:  Three.

14   A.   I've read the document.  Your question?

15   Q.   Can you tell us why it is you selected these particular

16   alternatives?

17   A.   Because these alternatives are already established units at

18   established locations.  And instead of creating another

19   category, we chose to look at what we already had available and

20   see if we could manipulate the amount of beds we had available

21   to accommodate those inmates that may be in jeopardy.

22   Q.   Are there other alternatives other than those listed in the

23   third paragraph?

24   A.   Do you mean existing alternatives?  The answer is I don't

25   know.
```

1  Q.  Have you been receiving the SMI RHU reports that have been

2  submitted here recently to the Court?

3  A.  I may have.  I receive hundreds of emails.

4       MR. ZARZAUR:  Your Honor, I believe these were filed

5  under seal.

6       THE COURT:  Yes.  You just can't talk about any

7  inmate's name.  If you have to, use initials.

8       MR. ZARZAUR:  Yes, Your Honor.

9  Q.  I believe you're looking at document 2446.  And, again,

10  Mr. Daniels, if you would avoid identifying any individuals

11  listed in that document, but have you been receiving these

12  reports?

13  A.  I cannot read the type.  It's too small with my glasses on.

14  Q.  You're not alone in that.

15       THE COURT:  I think I'm the only person on earth -- I

16  can read molecules.  I am so nearsighted, I can see this

17  perfectly.

18  Q.  So you're unable to tell us whether or not you're receiving

19  these reports.  Let me ask you this:  Do you recall receiving

20  regularly here in the last several weeks reports that identify

21  persons with SMI that are in restrictive housing?

22  A.  I receive multiple reports.  Some may or may not have that

23  information.  But based on what's before me, I can't read it and

24  I can't tell you if I've seen this.

25  Q.  And as we sit here today, you don't -- you can't tell this

```
1    Court whether or not you receive SMI reports -- SMI -- what I
2    call SMI RHU reports identifying who is in restrictive housing
3    with an SMI?
4    A.  I don't know if I receive specific reports.
5    Q.  And is that still the case, despite your March 21st, 2019,
6    directive?
7    A.  I can't read the report.  I can't tell you.
8             THE COURT:  He says he can't read the report.
9             MR. ZARZAUR:  We'd, obviously, offer the exhibits.
10            THE COURT:  Yes.  And also we have to take a recess.
11   Counsel, we will recess for 30 minutes.
12            How are we progressing?  I guess we're behind schedule.
13   We're going to start tomorrow at ten.
14            Yes, Ms. Morris?
15            MS. MORRIS:  I think that probably with starting a
16   little bit earlier tomorrow, we should be able to get back on
17   schedule.
18            THE COURT:  On schedule?  Okay.
19            Can you in any way provide a blowup of this document so
20   that the witness can see it?
21            MS. MORRIS:  Defendants may be able to do that.
22            MR. LUNSFORD:  We'll work with plaintiffs to try to do
23   that, Your Honor.  I don't know that we'll be able to do it
24   during the break, but we'll attempt to.
25            THE COURT:  Okay.  Very good, then.
```

```
 1              Anything else we need to take up before we take a
 2   30-minute break?
 3              MS. MORRIS:  Do we need to clear off the tables?
 4              THE COURT:  I don't think so, but enjoy your 30-minute
 5   break.
 6       (Recess was taken from 4:03 p.m. until 4:46 p.m., after
 7        which proceedings continued, as follows:)
 8              THE COURT:  I understand the witness is in the
 9   restroom?
10              MR. LUNSFORD:  He's on his way.
11              THE COURT:  Very good.
12              Ms. Morris and Mr. Lunsford, have you-all had an
13   opportunity to think about how we can expedite the resolution of
14   this immediately after trial?  That is, getting an opinion out
15   and all that, as to immediate relief?
16              MR. LUNSFORD:  Not yet.
17              THE COURT:  Y'all haven't talked about that?
18              MR. LUNSFORD:  No.
19              MR. ZARZAUR:  Your Honor, defendants were able to give
20   us a larger version of --
21              THE COURT:  Good.  So the witness can read it.  And
22   Mr. Lunsford, you said your report will be filed in 15 minutes?
23              MR. LUNSFORD:  Yes, sir, barring unforeseen
24   circumstances.
25              THE COURT:  Do you have a hard copy?
```

```
1            MR. LUNSFORD:  No, sir, but we can certainly get one to
2   you --
3            THE COURT:  No, no.  My clerks can --
4            MR. LUNSFORD:  And we can email a copy to chambers, if
5   that would be helpful.
6            THE COURT:  That would be great.  Yes, it's -- it's not
7   under seal, is it?
8            MR. LUNSFORD:  No, sir.
9            THE COURT:  Okay.  You know, if you were to email a
10  copy to chambers in Word, it might be helpful.  Then my clerks
11  can just work with it that way.
12            MR. LUNSFORD:  Be happy to do that, Your Honor.
13            THE COURT:  I understand, Ms. Morris, that you're going
14  to respond on their copy as a Word document?
15            MS. MORRIS:  Yes, Your Honor.
16            THE COURT:  Okay.
17  Q.  (Mr. Zarzaur, continuing:)  Mr. Daniels, on the break
18  counsel for the defendants was able to provide us with a larger
19  version of doc 2446.  Do you have a copy of that larger version?
20  A.  I do.
21            MR. ZARZAUR:  Would the Court like a copy of the bigger
22  version?
23            THE COURT:  No, I can read this.  My clerks might not
24  be able to read it.
25  Q.  Again, this is a copy of the March 26th, 2019, SMI RHU
```

1   report.  My original question is, now that you can read this, is

2   this a report that you recall ever receiving?

3   A.  I recall reviewing this.

4   Q.  Okay.  Other than today, have you reviewed this --

5   A.  Yes.

6   Q.  -- prior to today?

7   A.  Yes.

8   Q.  When did you review this?

9   A.  I can't tell you the day, but I --

10         THE COURT:  Is this an exhibit number?

11         MR. ZARZAUR:  It's a document.

12         THE COURT:  Does it have an exhibit number?  I think,

13   for the record, you really need to put exhibit numbers on these

14   things.  Otherwise, it's going to be really hard in the future

15   to tell what document you're talking about.

16         MR. ZARZAUR:  Your Honor, we'll have it marked as

17   Plaintiffs' 2707.

18         THE COURT:  Very good.  Go ahead.

19   Q.  Looking at now Plaintiffs' 2707, when you -- do you recall

20   how you received this?

21   A.  I'm not sure if it was printed for me or if one of the

22   institution coordinators gave this to me.  But I recall this

23   document because it came up in discussion with my institution

24   coordinators.

25   Q.  The document that was filed with the Court was filed on

1  March the 26th.  Do you know whether or not you received a copy

2  of this before or after your directive on March the 21st?

3  A.  I do not recall the date in which I read it, but if it was

4  March 26th --

5  Q.  And after receiving it did you, consistent with your

6  directive, do anything with respect to the inmates listed in

7  restrictive housing with SMIs?

8  A.  I did not.

9  Q.  Did you look over the reasons why those inmates were placed

10  in restrictive housing and why they had not been released?

11  A.  I did.

12          THE COURT:  You did or did not?

13          THE WITNESS:  I did.

14  Q.  And just looking at the first couple here, based on your new

15  directive, should these persons remain in restrictive housing?

16  A.  My conversation with my institution coordinators, who are

17  the ones actually in charge of this, indicated to me that all of

18  these are good reasons why we could not move them out of the

19  status.  And what I learned in this process is that there --

20  they are intimately involved in the rationale for why a person

21  would stay in this status.

22  Q.  I believe you testified earlier today that the only reason

23  that you could imagine that someone with an SMI would need to

24  stay in restrictive housing was that if they could not be with

25  another human being.  Do you recall that?

1    A.  I recall stating something to that effect.

2    Q.  All right.  Looking at the first entry here, do you see any

3    reason why this particular individual has to remain in -- with

4    an SMI has to remain in restrictive housing?

5    A.  My prior response was in context of any new situation.

6    Q.  So moving forward from what date?  Because your directive

7    was on the 21st.  We know doc 2446 was on the 26th.  What date,

8    moving forward, will your directive start to be implemented?

9    A.  We are talking about inmates that are newly released from

10   acute and nonacute crisis as well as mental health.  And for

11   future orientation, these new people can't be put there without

12   my concurrence.  I did not go back and make a determination as

13   to who was still remaining.

14   Q.  So your directive does not apply for individuals who happen

15   to be in restrictive housing prior to March 21st?

16   A.  I can tell you I did not have conversation regarding those

17   inmates specific to them moving out.

18   Q.  Thank you, Mr. Daniels.

19          MR. ZARZAUR:  Your Honor, we would offer the exhibits

20   that were referenced.

21          THE COURT:  Now, this covers what period?

22          MR. ZARZAUR:  I believe --

23          THE COURT:  2707.

24          MR. ZARZAUR:  I believe, with it being filed on the

25   26th, that it would have covered the week prior.

```
 1            THE COURT:  And his -- I'll call it memorandum, 2706,
 2   is March 21?
 3            MR. ZARZAUR:  Yes, Your Honor.
 4            THE COURT:  So none of these inmates would be after
 5   March 21?
 6            MR. ZARZAUR:  Your Honor, I don't know that we can tell
 7   from this when in that week prior they would have been placed
 8   there.  Let's see.  Actually, we might be able to.
 9            THE COURT:  I just looked at it.  I don't think there's
10   anyone here who entered after March 21.
11            MR. ZARZAUR:  There's the 20th, but -- there is one,
12   Your Honor, near -- the fourth from the bottom.
13            THE COURT:  Yes.
14            MR. ZARZAUR:  Appears to be March 22nd.  That's --
15            Never mind.  I apologize.  I'm looking at the wrong
16   date.
17            THE COURT:  You're looking at the date of --
18            MR. ZARZAUR:  That's correct.  I was looking at the
19   wrong column.  My apologies.
20            No further questions, Your Honor.
21                            CROSS-EXAMINATION
22   BY MR. LUNSFORD:
23   Q.  Mr. Daniels, I wanted to start with a couple of questions
24   you just got, and then I want to get in some other general
25   areas.
```

```
 1        First, the question that you just received about the
 2   directive that you issued, March 21st, that's marked as
 3   Plaintiffs' Exhibit 2706.  There are some closing sentences
 4   here, and, in fact, the next to last sentence reads:  "Inmates
 5   who have a serious mental illness, SMI, should be considered for
 6   RTU, SU, or SLU placement if a higher level of care is
 7   indicated, or for general population if clinically appropriate."
 8        My question to you, Mr. Daniels, is did you intend to
 9   communicate to your wardens and your other correctional staff
10   that an inmate with an SMI should never go into restrictive
11   housing?
12   A.  I did not.
13   Q.  So under what circumstances, in your perspective or in your
14   view of the circumstances, should an inmate with an SMI remain
15   in restrictive housing?
16   A.  If he is a danger to others.
17   Q.  So plaintiffs' counsel just had the restrictive housing
18   report in front of you from last week, which I think you still
19   have on the stand, which is marked as Plaintiffs' Exhibit 2707.
20   And there's a variety of inmates that are listed on that
21   particular sheet.  And you're aware that that sheet lists
22   reasons why an inmate with an SMI was placed in restrictive
23   housing; is that correct?
24   A.  Correct.
25   Q.  Does it also include a column for why an inmate with an SMI
```

1    remains in restrictive housing as of the date of the report?

2    A.   Yes.

3    Q.   So applying your directive that's dated March 21st, 2019,

4    would you say that that report -- after the implementation of

5    your directive, that that report would continue in terms of

6    inmates with SMIs still being placed in restrictive housing?

7    A.   Yes.

8    Q.   Would you say that there would be a large number of SMI

9    inmates being placed in restrictive housing?

10   A.   No.

11   Q.   Well, would you say it would be a small number?

12   A.   Twenty, 25.

13   Q.   And why do you believe that there would still be a small

14   number of inmates with an SMI who would remain in restrictive

15   housing, even after your recent directive?

16   A.   Unfortunately, some of these inmates are actually dangerous.

17   And I cannot risk the safety of other inmates and/or staff

18   members when many of these inmates are so dangerous that just

19   them being in a cell with another similar inmate could result in

20   an injury to someone else.

21   Q.   As the new deputy director of operations or deputy

22   commissioner of operations, I believe you testified your

23   institutional coordinators are preparing the document that's

24   marked as Plaintiffs' Exhibit 2707.   Are you going to continue

25   to review the reasons why inmates are being placed in

```
 1  restrictive housing with an SMI?
 2  A.  Yes.
 3  Q.  And can you assure the Court that you'll continue to confirm
 4  that the reasons for that placement are appropriate and
 5  warranted due to the safety and security of your officers and
 6  those inmates?
 7  A.  Yes.
 8  Q.  Thank you.  Let's --
 9          THE COURT:  Can one be a danger to others but still go
10  into, say, something like an SLU or an RTU or an SU?
11          THE WITNESS:  I believe each situation is dependent
12  upon the inmate and the circumstances and the crowding or lack
13  of crowding at that time.  I believe it's situational.
14          THE COURT:  So the fact that the inmate is a danger to
15  someone else doesn't necessarily mean that they should be in
16  restrictive housing.  They still could go to another place that
17  would address their danger but would also provide them with
18  treatment.
19          THE WITNESS:  The goal is to get as many of these
20  inmates out as possible without increasing the risk of others
21  being harmed.  And I believe that will be done on a case-by-case
22  basis.
23          THE COURT:  But those who remain in restrictive
24  housing, such as on Exhibit 2707, has there been any effort to
25  see whether there are alternatives to being in restrictive
```

```
 1   housing but would still address their danger?

 2          THE WITNESS:  My institution coordinators, they vet the

 3   information and provide me with recommendations, Your Honor.

 4          THE COURT:  Do they say that there are -- that there

 5   are alternatives to keeping them in just restrictive housing?

 6   That they could go somewhere else that protected -- that

 7   addressed their danger but still allowed them not to be in

 8   segregation, but perhaps in some other alternative housing which

 9   you've identified, actually, in your memo of March 21, 2019?

10          THE WITNESS:  Your Honor, we have all addressed the

11   future inmates.  However, we've also discussed the status of

12   these inmates.  And my institution coordinators, both who have

13   in excess of 30 years within the organization, have shared with

14   me, based on their knowledge of these inmates that are within

15   their individual regions, that their current placement and

16   sustained placement is appropriate.  I am clearly willing to

17   address these past issues on a regular basis.  I don't see a

18   problem with that.

19          THE COURT:  Go ahead.

20          MR. LUNSFORD:  Thank you, Your Honor.

21   Q.  Mr. Daniels, somewhere in all of this, I think we lost kind

22   of a little bit of your personal history, so I want to go back

23   and go through a little bit of your professional background.

24   Could you start by telling us a little bit about your

25   educational background.
```

1   A.  I attended multiple universities but only completed an

2   associate's degree, Community College of the Air Force, before I

3   started having children and was engaged in my career.

4   Q.  And you were also -- I believe you served in the Air Force;

5   is that correct?

6   A.  Yes.  I served four years in the United States Air Force.

7   Q.  And you were discharged; is that correct?

8   A.  Yes.  I was discharged in 1988.

9   Q.  How was it that you first got involved in corrections?

10  A.  I needed a job after the military.  My job in the military

11  was as a law enforcement specialist.  I served proudly.  And

12  when I got out of the military, I wanted to serve either in one

13  of the police or sheriff departments or in corrections, of which

14  I had experience in all three types of that avocation.

15  Q.  So where did you first work in corrections?

16  A.  I started out in corrections with the Federal Bureau of

17  Prisons in 1988.  And that was at Terminal Island, California,

18  as a correctional officer.

19  Q.  How long were you employed with the Department of

20  Corrections or with the Bureau of Prisons?

21  A.  Roughly 29 years.

22  Q.  Could you just walk us through the various posts or

23  positions that you held within the Bureau of Prisons.

24  A.  Certainly.  I started out as a correctional officer and then

25  shortly after transferred from Terminal Island to Los Angeles,

1   California, as a correctional officer, and then into a job

2   system called inmate systems officer.  It's very similar to the

3   classification officers we have here.

4       I worked up as a supervisor, manager at various facilities.

5   And while -- the systems manager, manager.

6       And then after that, in New York, after transferring to

7   three other facilities, I left the ranks of inmate systems and

8   went into a position called executive assistant to the warden.

9   And that was in Sandstone, Minnesota.  I served in that capacity

10  for several years, and then I promoted out to Los Angeles again

11  as an associate warden of operations and custody.

12      After that I transferred to United States penitentiary in

13  Marion, Illinois, in which I served my second assignment as an

14  associate warden.  I served both in programs and in operations.

15      After that I promoted out to Sheridan, Oregon, as the warden

16  there.  At the time I was the third youngest warden in the

17  history of the Federal Bureau of Prisons, and I was the first

18  warden to start out as something other than a low security

19  and/or an administrative facility.  That was a medium security

20  complex.  And so I was very proud of that distinction.  I spent

21  four years there.

22      Then after completion of that tour of duty, I transferred to

23  our central office.  I was assigned to senior deputy assistant

24  director of industries, education, and vocational training.  I

25  spent several years in Washington.  While there I was also

```
 1   attending joint terrorism task force meetings, representing the
 2   entire Federal Bureau of Prisons.  I was at these task force
 3   meetings with the actual directors at the time of the FBI,
 4   marshal service, DEA, CIA.  You name them, I was a part of all
 5   those task forces.
 6       After my time there, I went back out as warden of the United
 7   States penitentiary in Florence, Colorado.  Most persons have
 8   heard of that facility as a super max.  There's actually two
 9   penitentiaries there.  Both of them are United States
10   penitentiaries.
11       In my facility we had one of the three phases of being a
12   super max physically, and then my facility also served as a
13   special management unit.  In that unit we housed all the inmates
14   that were either incorrigible or could not be managed,
15   behavioral disruptive, national gang leaders.  We housed all of
16   them there at my special management unit.
17       So there's 21 other penitentiaries in the nation, that if
18   they for whatever reason could not manage an inmate, I was the
19   relief valve.  And they would give me a call, and I never turned
20   down an inmate if they were incorrigible or otherwise couldn't
21   be programmed at one of our penitentiaries.
22       After that I left and went to Beaumont, Texas, which was our
23   largest complex at the time.  We had 6,000 inmates.  I
24   supervised multiple wardens there.
25       But the reason I was sent there, it was the only facility in
```

1   the history of the Bureau of Prisons in which the inmates had

2   run such amuck that they actually downgraded a United States

3   penitentiary to a medium security penitentiary.  I was brought

4   in to bring it back to its prominence as a high-security complex

5   with the penitentiary, and I was successful.  In seven months I

6   was able to return it back to its former glory, and it's been

7   maintained in that complex and that configuration since then.

8        I kind of developed as a senior member of our leadership

9   team in the agency also.  I was responsible for training and

10  guidance of most of our new wardens and anyone that made

11  supervisor beyond.  There were several courses that you had to

12  pass, and you could not be promoted unless you passed my

13  courses.  Most of it was based on Principle-Centered Leadership

14  and all of the leadership skills that are involved.

15       After that I transitioned into the warden position, the

16  complex one position in Terre Haute, Indiana.  If you don't know

17  that, Terre Haute, Indiana, houses the Federal Bureau of

18  Prisons' only death row.  It also houses our major terrorist

19  unit.  And many people don't realize we have many, many domestic

20  and international terrorists confined in the Federal Bureau of

21  Prisons.  And I managed that facility until my retirement on

22  December 31st, 2016.

23       I've also served in the position of hostage negotiation team

24  leader at multiple facilities; hostage negotiation trainer,

25  leadership trainer for the agency.  Many, many joint terrorism

1    task force -- key persons, I should say.  A lot of those

2    operations involved international terrorism and ongoing

3    international terrorism.  I served around the nation with that.

4        And I spent a lot of time also traveling around the globe,

5    bringing about -- bringing back inmates.  Led teams to bring

6    back inmates from countries that we had treaty transfers with

7    and would bring them back successfully and bring those inmates

8    back to finish their sentences out in the United States.

9        I had a lot of responsibility, whether it be regional

10   training or so on.  I developed our emergency response models.

11   Dynamic tactical emergency response is one of them.  And there

12   were many other things that I actually developed.  I was in a

13   leadership capacity, which was unheard of, since 2002.  I

14   remained as a warden and/or a senior deputy assistant director

15   in Washington for that entire time.

16   Q.  Would it be safe to say, Mr. Daniels, that you've spent

17   decades dealing with inmates with mental illness?

18   A.  Yes.

19   Q.  Would it be safe to say that you have decades of experience

20   in dealing with suicide prevention in a correctional setting?

21   A.  Yes.  I would go back and add at Terre Haute, we had our

22   highest level mental health inmates also housed there at Terre

23   Haute in addition to my death row and in addition to my

24   terrorist units.  We had a large population of inmates that

25   struggle with mental illness and were categorized at the highest

1    level.

2    Q.  I take it you would agree that the resources you had at hand

3    in the Federal Bureau of Prisons are different than the

4    resources you have at hand today in Alabama; is that accurate?

5    A.  That's accurate.

6    Q.  As a warden at some of the enormous institutions that you've

7    mentioned, did you still experience suicides while you were a

8    warden?

9    A.  Yes.

10   Q.  And did you have experience in investigating those suicides?

11   A.  Yes.

12   Q.  And did you have experience in overseeing an evaluation of

13   the reasons for those suicides?

14   A.  Yes.

15   Q.  When you were with the Federal Bureau of Prisons, did

16   you-all engage in a process of constant watch?

17   A.  Yes.

18   Q.  And you understand that process is ongoing today in Alabama;

19   is that correct?

20   A.  Correct.

21   Q.  But if I understand correctly, in 2016 you retired from the

22   Federal Bureau of Prisons.

23   A.  Correct.

24   Q.  Why did you retire?

25   A.  I believed I had done all I could do within the Federal

```
 1  Bureau of Prisons.  I was extraordinarily happy with my career.
 2  I went out on top.  Highly respected.  There weren't any more
 3  hills to climb for me within the Federal Bureau of Prisons.
 4  Q.  So why did you decide to come to Alabama?
 5  A.  Well, actually, when I retired from the Federal Bureau of
 6  Prisons, I went directly into a position of senior deputy
 7  commissioner of corrections in New York City.  I was brought
 8  there to make a difference.  I was recruited and selected after
 9  a nationwide search.  They had indicated they wanted someone of
10  my stature to help take over operations and turn that operation
11  around.
12  Q.  And we understand from your direct examination -- just for
13  time's sake, I'm not going to run through that, but you
14  voluntarily left your position in New York; is that correct?
15  A.  I did.
16  Q.  And we know that Commissioner Dunn eventually offered you
17  the position formerly held by Mr. Culliver.
18      But to go back to my original question, why in the world
19  would you decide to take a position in Alabama?
20  A.  I wanted to make a difference.  I wanted to be a part of an
21  organization that was transitioning.  They wanted help.  They
22  needed my help.  They wanted my skill set.  And I still want to
23  be relevant.  My skill set is to make change; to move forward.
24      I had that same assignment in New York, but it didn't work
25  out.  Unfortunately, the hierarchy there didn't really want me
```

```
 1    there.  They wanted my name.  They wanted to say that I was a
 2    part of it.
 3        But I rejected the fact that part of that was to -- they
 4    wanted me to lie about statistics and data and analysis, and I
 5    refused.  And I could no longer stay there, working for an
 6    administration, in my opinion, that was corrupt.  So I rejected
 7    all efforts for them to keep me there, and I decided I would
 8    move on.  And I exposed the city.
 9    Q.  Do you believe that you're qualified --
10             THE COURT:  You exposed the City of New York?
11             THE WITNESS:  Yes.
12             THE COURT:  Not the state?
13             THE WITNESS:  Not the state.
14             THE COURT:  So the city has, what, a fairly large penal
15    system?
16             THE WITNESS:  Yes.  Currently they have about 11,000
17    inmates, and they have roughly, believe it or not, about 10,000
18    staff.  But it's robust.  It's boisterous.  There's a lot going
19    on.  We have 14 different facilities just for the city.
20             THE COURT:  It has how many inmates?
21             THE WITNESS:  Roughly 11,000.  Upon my departure, we
22    still had 11,000 inmates.
23             THE COURT:  And how many correctional staff?
24             THE WITNESS:  Roughly 10,000.
25             THE COURT:  10,000?  So 16,000?
```

```
1              THE WITNESS:  Yes, Your Honor.

2              THE COURT:  And did you do the same thing there that

3    you're doing here in Alabama?

4              THE WITNESS:  I attempted to do the same thing there,

5    but I was rebuked by the hierarchy.  Because part of what they

6    wanted me to do was to go along with what they had done

7    previously, such as lie to city council and the mayor about the

8    violence.

9              And so we would have our meetings in which they would

10   say, okay, we planned four meetings downtown.  The public

11   meetings.  They would say, okay, well, these are the numbers,

12   the data that we're going to give.

13             But I would look at the commissioner and say, but this

14   data is inaccurate.  You know this data is inaccurate and I know

15   it's inaccurate.

16             And I refused to go downtown and lie about this data.

17   We're clearly underreporting the data, and it's disingenuous and

18   it's wrong.  And I spent 30 years creating my reputation, and I

19   will not go downtown and impugn myself.  And as soon as this is

20   uncovered, you're going to say that Mr. Daniels delivered the

21   information.  So I said, I will not be a part of it.

22             And this happened on several occasions that I said I

23   won't lie.  But the boss still wanted me to go down there and

24   meet with the first deputy mayor and city council.  And it got

25   to the point where I just refused.  I said, I'm not going to sit
```

```
 1   at the bench and swear, and you still have the expectation that
 2   I will lie so you guys don't look bad.  These are bad numbers.
 3   I refuse.  So you're going to have to do what you have to do.
 4          Then at the very end, they stopped inviting me to the
 5   mayor's meetings, to the first deputy mayor's meetings.  Then
 6   the next thing you know, they gave me one last chance to either
 7   conform or move out, and I said I would move out.
 8          THE COURT:  Would they be housing federal -- I mean,
 9   felony inmates or --
10          THE WITNESS:  Yes.  All type.
11          THE COURT:  So they housed even felony in the city?
12          THE WITNESS:  Oh, yeah.  Absolutely.  Yes, Your Honor.
13          THE COURT:  Go ahead.
14          MR. LUNSFORD:  Anthony, could you flip that our way?
15   Could you flip it to our TrialPad?
16   Q.  So, Mr. Daniels, do you intend to take all this experience
17   that you have elsewhere and apply it to your position here in
18   Alabama?
19   A.  Absolutely.
20   Q.  So I've heard a story -- I actually -- well, I'm just going
21   to ask you about it.  There's a story that's already made its
22   way around about you and a directive about showers --
23   A.  Yes.
24   Q.  -- in the institutions.
25   A.  Yes.
```

1  Q.  Could you tell us a little bit about your directive related

2  to institutional showers.

3  A.  Yes.  I was touring one of our facilities, and I noticed

4  that as I walked in the showers, I determined that they were

5  filthy.  I was distraught that we would actually have inmates

6  housed in this type of facility.

7      We are the keepers.  We as an agency are charged with

8  housing these inmates in safe and humane conditions.  And I was

9  appalled at the amount of mold and mildew and rust and gunk and

10 calcium and you name it.  We had mold of three different colors.

11 Fuzzy white.  We had green.  We had black.

12     And I summoned the warden.  I said, what exactly is going on

13 here?  I said, this is completely unacceptable.

14     Well, you know, we're running short.

15     I said, I couldn't care less.  These inmates, we want them

16 to be able to see that we value them and we respect them.  We

17 will not house them in these conditions.  We're basically saying

18 we don't care.

19     So right now, I'm going to tell you, it's about five p.m.  I

20 expect every shower to be dust free, gunk free, you-name-it free

21 before you go home.  And I don't care if that's midnight or two

22 in the morning.

23     Well, I don't have the supplies.

24     I said, well, Walmart and Home Depot is open.  You're not

25 going home nor your staff until we sanitize this facility.  How

1    dare us try to tell the inmates they should live in a certain

2    way when we don't demand that we house them in a safe and humane

3    manner.

4        So I gave a directive.  And then the following day I made

5    that a directive for the entire agency in which all the wardens

6    had to send in a photo of every single one of their showers in

7    their facility, a before photo, and then I wanted to see one

8    after.  And that's what they did, and we cleaned that up.

9    Q.  So Mr. Daniels, I don't know if you're aware, but I believe

10   there is some evidence that many of the individuals who have

11   committed suicide have a history of drug use.

12   A.  Correct.

13   Q.  Have you done anything to address the amount of contraband

14   that's been inside some of the ADOC facilities?

15   A.  Yes.  I've done some very specific things.

16       The first thing I identified when I got here, in looking at

17   the data, was that the violence was extraordinary; some of the

18   highest violence in the nation.  I said, well, how can this be?

19   We run a corrections organization.  We should be able to

20   interdict almost all of this prior to it happening.

21       After getting continuous reports of violence, homicide, you

22   name it, I made the decision that I needed some help because of

23   our staffing issues.  So I called a meeting of all of the chief

24   law enforcement agencies in the state of Alabama -- state

25   patrol, all the sheriff's departments, all the local police

1    departments -- and I asked them for their help at the meeting.

2        And I said this:  Listen.  Right now, as leaders, I have an

3    outpost that's overrun.  These outposts are my facilities.  I

4    have one that's in St. Clair.  And unfortunately, my staff are

5    outgunned, they're outmanned, and we are not supporting them the

6    way that I believe we should.

7        Having said that, I need your help.  So what I want to do is

8    go up there and actually do a complete shakedown of that

9    facility.  And what I want to do is specifically look for every

10   single weapon we can find, every single cell phone, and I want

11   to look for all of the drugs that we can find.

12       And to do that, I think I'm going to need roughly 300 or

13   more staff of all types to go in there and conduct this mass

14   shakedown.  I want to be able to go there in the middle of the

15   night, roughly all -- everybody get there at three o'clock --

16   I'm sorry -- at two o'clock.  We identified the disruptive

17   inmates that are there.  We're going to grab them and move them

18   to another facility.  And then we're going to shake down --

19   strip search, shake down every single one of these housing units

20   and every single cell, every single bit of the grounds, every

21   single work area, vocational area, programming area.  We're

22   going to have drug dogs run through every single one of them,

23   and then we're going to start putting the drug dogs at the

24   doors.  And so what I want to do is to find everything that we

25   have.

 1      By the end of the day, although we started at roughly

 2    two a.m., there were still some of us there until roughly after

 3    seven p.m.  And we were able to interdict an extraordinary

 4    amount of drugs, weapons, you name it.  It was just an

 5    extraordinary day.

 6      And I was pleased to be able to say, warden, we've got your

 7    back.  We came in here, and your staff were concerned that we

 8    would come in here and make a big fuss and then abandon them.  I

 9    said, absolutely not.  We're going to put in place some

10    procedures that will ensure that you can maintain the level of

11    security and safety for the inmates that don't want to be

12    involved in violence, and we're going to eliminate or get rid of

13    as many of the drugs as possible, and we're going to attack all

14    of this violence.

15      So what I did was the new protocols that I implemented were,

16    number one, we were going to go on controlled movement.  There

17    isn't a single high-security facility around the nation that I'm

18    aware of that doesn't have controlled movement.  So instead of

19    all of the inmates being up and out of their cells all the time,

20    now we only have half the inmates in each cell out.  They go

21    eat, they go recreate, they do whatever they do, and then the

22    other half come in after they're locked in.  What it did, it

23    decreased the amount of inmates that you had to deal with at any

24    given one time, and they were no longer overwhelmed.

25      I also did a deep dive on the analysis of when all the

1   incidents were happening; the violence and so on.  We found that

2   most of it was happening on evening watch.  So I reassigned a

3   warden to the 2 to 10 p.m., and I reassigned a captain to the 2

4   to 10 p.m. shift to make sure we had executive-level coverage

5   the entire day in which inmates would be found.

6        I also instructed those individuals that the primary portion

7   of your day will be spent down in the housing units, not up in

8   the administrative area.  So we added that.

9        We have also brought in drug dogs at the beginning of each

10  shift or prior to the beginning of each shift, and they stay

11  there one hour after shift is over and then the entire time

12  people come to visit.  Visitors come, we have a drug detection

13  dog there each and every time.  The goal there is to minimize

14  the amount of drugs that, unfortunately, bad staff bring in and

15  the visitors bring in.  We also started having the dogs also

16  make a run periodically through the mail room, of course, with

17  sniffing-out methods of introduction of narcotics through the

18  mail system.

19       In addition to that, in our outer work areas, we also have

20  now decided to run the inmates through two metal detectors.  And

21  then we adopted a system in which every second, third, or fourth

22  inmate will be pat searched as well.  So even if an inmate makes

23  a weapon out of something that's not metallic, we can still have

24  a very good shot at trying to find it through the pat downs.

25       So we've implemented multiple methods of insuring that not

1   only are we in charge, we restored order, but we now have,

2   obviously, maintained order.  And the rest of the level fours

3   and fives in any other place that needs it will get the same

4   attention.

5      So those are just some of the things we're doing.  Others

6   are planned.  They will happen.  We're working on a plan right

7   now, which I won't tell you the day nor how many people or

8   agencies are participating, but there's one coming near you.

9   And we will get control of this organization so those inmates

10  that want to can live in an environment in which there's minimal

11  violence, and so they can spend time programming and preparing

12  theirselves for an eventual reentry back into society.

13     Service of your sentence in the Alabama Department of

14  Corrections will be wanted, not just something you have to

15  subscribe yourself to.  At some point in time, I fully expect

16  that the Alabama Department of Corrections will no longer dwell

17  in the lower ends of safety statistics around all of our state

18  competitors.  And it is my goal, and I'm very confident that

19  with the training that we're bringing in and our methodology of

20  programming and managing inmates, I fully expect and we are

21  planning to be in the top 5 percent of all the states as we look

22  at our violence indicators.  And hopefully, we can bring our

23  programming indicators in line with the violence indicators.

24  Q.  So, Mr. Daniels, just a quick question about the

25  intervention that was done at St. Clair.  You mentioned 300

```
 1  officers.  Were those 300 ADOC officers?

 2  A.  No.  We didn't have 300 officers.

 3  Q.  So where did those 300 officers come from?

 4  A.  Alabama state police; ALEA, Alabama Law Enforcement Agency;

 5  eight different sheriff's departments.  We had federal law

 6  enforcement to run forensics.  We wanted to data mine evidence

 7  and we wanted to say, listen.  We're taking this away from you.

 8  You do not get to run a prison like it's a criminal enterprise

 9  headquarters.

10       So we interdicted the inmates.  We intend on doing it more

11  and more.  And we're going to turn the prison system back over

12  to the professionals.  And then the inmates that do come to us,

13  they won't have to worry about their personal safety and/or

14  extortion on the outside.

15  Q.  So switching gears for just a minute on -- I know we could

16  probably talk for a while of the things that you want to do, but

17  I want to talk a little bit about the things you have done.

18       You were asked on direct examination about the review of

19  documents, and I know you've reviewed a lot.  Do you recall

20  whether you reviewed the 300-plus-page liability opinion that

21  the Court issued?

22  A.  I read every word.

23  Q.  You also said you reviewed the shift logs and the duty post

24  logs for the 12 hours before and after every suicide that's been

25  completed since last March; is that correct?
```

1  A.   That is correct.

2  Q.   I want to ask you a little bit about the review of those

3  documents.  In reviewing those documents, did you see evidence

4  that your correctional officers were checking on inmates?

5  A.   For the vast majority, there was clear and compelling

6  evidence that they were at least logging in that they were doing

7  their jobs.  And I was actually pleasantly surprised, because I

8  heard so much negative press, but I wanted to do a deep dive to

9  see, myself, if these officers were doing their jobs.

10      I also went out and spoke with a lot of officers at the

11  various facilities that have the restrictive housing and asked

12  many an officer what the responsibilities are, what do they do,

13  what are they required to do.  And the vast majority knew

14  exactly what their tasks were.

15  Q.   From your experience both from reviewing the logs and

16  talking to these officers, are the officers that work in these

17  restrictive housing units busy?

18  A.   The vast majority of my officers have entirely too many

19  tasks to do.  They are running all over the place because of the

20  shortage of staff, and they're doing multiple jobs.

21  Q.   So with the advent of double celling that you've mentioned

22  also on direct, would that impact the workload on the officers

23  in restrictive housing?

24  A.   You've got to go -- listen.  If you've got to go to a cell,

25  doesn't matter if there's one or two in there.  You have to go

1    to that cell.  You have to check on their safety and welfare.

2         And there's an additional component as well, that part about

3    engaging and knowing your inmate population and knowing the

4    circumstances and being able to understand what the triggers are

5    and some signs of maybe decompensation as inmates obviously

6    decompensate.

7         So that training and that evolvement -- we certainly want

8    more staff, but a cell is a cell, whether it's one inmate or

9    two.  But I think it actually makes that -- those cells -- it

10   actually makes those inmates safer because they're not alone.

11   And being single celled and being by yourself, coming off a

12   seminal event, is a trigger.  And we noticed that when we went

13   back and reconstructed most of these suicides.

14        But I'll tell you, I feel much more comfortable, getting

15   down to the end, of saying, I want him in a cell with another

16   person.  And if I have to waive a current requirement of, well,

17   he's security level five -- if I have to waive that to put a

18   human in with another human, I will, barring that I can

19   reasonably assure that he's not going to harm an inmate when he

20   gets in there.  And those are judgment calls, and that's what I

21   do.

22   Q.  Mr. Daniels, I want to ask you about another document.  You

23   were asked about the interim suicide prevention order, which the

24   plaintiff had marked as Plaintiffs' Exhibit 2237 and which I

25   have up in front of you on your screen.

1    A.   Yes.

2    Q.   And we've blown up paragraph one.  I just want to run

3    through some of this document with you.  The paragraph one of

4    this agreement -- Mr. Zarzaur asked you a lot of questions about

5    it, but paragraph one deals with the hiring of mental health

6    professionals.  Do you see that?

7    A.   I do.

8    Q.   Is that something that falls within your department?

9    A.   No.

10   Q.   Is that something that -- do you feel like there's something

11   as it relates to mental health professionals that you would need

12   to do or be trained on in this particular section of the

13   agreement?

14   A.   No.

15         MR. LUNSFORD:  If we could go to paragraph number two.

16   Q.   So paragraph number two, it talks about employees of ADOC,

17   MHM, or Corizon may present a person to mental health or medical

18   staff for assessment for suicide watch.  Do you see that?

19   A.   I do.

20   Q.   Do you know if that provision is actually covered in other

21   remedial orders?

22   A.   I believe so.  Yes.

23   Q.   And Mr. Daniels, would it surprise you in the Alabama

24   Department of Corrections that one of your custody staff could

25   refer someone for suicide watch?

```
 1   A.   No.

 2   Q.   Is that consistent with the practice in the FBOP?

 3   A.   Yes.

 4   Q.   Does anyone need to train you on that practice?

 5   A.   No.

 6   Q.   Could you train all of the officers at any one of your

 7   institutions how to refer someone or present someone to mental

 8   health for assessment for suicide watch?

 9   A.   Yes.

10   Q.   This also refers to the idea that -- let's see -- that the

11   mental health staff must be contacted when someone has indicated

12   that they're suicidal.

13   A.   Correct.

14   Q.   Does that sound like an unusual standard to you?

15   A.   No.

16   Q.   Is that something that was typically done within the FBOP?

17   A.   Yes.

18            MR. LUNSFORD:  Let's go to the next paragraph,

19   paragraph three.

20   Q.   So then it says that, basically, there's a process for

21   constant watch that's referenced in paragraph three.  Do you see

22   that?

23   A.   Yes.

24   Q.   Do you understand what constant watch is?

25   A.   Yes.
```

```
1   Q.  Is that a practice that you utilized in FBOP?

2   A.  Yes.

3   Q.  Do you need somebody to train you as to what constant watch

4   means?

5   A.  No.

6   Q.  And since you've been employed with the Department of

7   Corrections, were you aware that we were utilizing a constant

8   watch process?

9   A.  Yes.

10          MR. LUNSFORD:  Let's go to the next page.

11          I'm going to get through this quickly because, Your

12  Honor, I know time is short.

13          If you'll blow up all of the numbered -- the lettered

14  paragraphs, Lynette, A through D.

15  Q.  There's a section here on page 2 of Plaintiffs' Exhibit

16  2237.  Do you see that?

17  A.  Yes.

18  Q.  This relates to nurse practitioners and mental health

19  professionals and other evaluations, and it refers to Dr. Tytell

20  and Dr. Woodley and all these other people.  Did any of these

21  people referenced here work under you?

22  A.  No.

23  Q.  Would you be authorized to direct any of the licensed

24  psychiatrists or psychologists to do anything?

25  A.  No.
```

1   Q.  In your prior experience with FBOP, would you ever be

2   trained on what a nurse practitioner could or could not do?

3   A.  No.

4           MR. LUNSFORD:  Paragraph number 10.

5   Q.  Paragraph number 10 says that a person may be discharged

6   from suicide watch following an out-of-cell, confidential

7   evaluation according to the following terms.  Then it goes on

8   the next page.  This idea of evaluating people out of cell and

9   confidentially, is that a concept you're unfamiliar with?

10  A.  No.  I'm familiar with it.

11          THE COURT:  You are or are not?

12  Q.  That was a really bad question.  I'll rephrase the question,

13  because it was kind of bad.

14      Are you familiar with taking people out of their cell and

15  giving them the chance to interact with a mental health

16  professional or personnel in a confidential setting?

17  A.  Yes.

18  Q.  As far as you know, is that fairly standard?

19  A.  Yes.

20  Q.  Would you need anyone to train you as to how to have an

21  out-of-cell, confidential evaluation permitted between an inmate

22  and a member of your staff?

23  A.  No.

24  Q.  But to clarify your testimony, just so there's no question,

25  Mr. Daniels, as you sit here today, you've reviewed a lot of

 1   documents, and you can't say whether you saw this interim

 2   suicide agreement or not, can you?

 3   A.  I believe I saw it, but most of this doesn't apply to me

 4   specifically, and so it would be something I would just read

 5   through and keep moving until I found something that would

 6   impact me as an operations person and/or my staff.

 7   Q.  Okay.  I'm going to next show you a document that you may

 8   not have seen, Mr. Daniels.  It's marked as Plaintiffs'

 9   Demonstrative 208.  And while we preserve our objections with

10   regard to some of the comments here, we think there is a couple

11   of issues with this particular document.  I just want to focus

12   you on the second column of this document that's entitled

13   facility.  Do you see that?

14   A.  Yes.

15   Q.  So if we go down this list --

16        MR. LUNSFORD:  And if you could just blow out that one

17   column of facilities.

18   Q.  And I know that's small, Mr. Daniels, but I want to look at

19   this list.  So if we look at the list of facilities, which is,

20   according to plaintiffs, the list of suicides between December

21   2017 and March of 2019, we see a list of facilities here that

22   includes Limestone, Holman, St. Clair, Fountain, Staton, Kilby,

23   and Donaldson; is that correct?

24   A.  Yes.

25   Q.  So that's seven facilities; right?

```
 1  A.  Yes.
 2  Q.  And I think you know -- you're still working on the names of
 3  all of them, but you know we have 14 major facilities; right?
 4  A.  Yes.
 5  Q.  Do you know the last time we had a suicide at Bibb
 6  Correctional Facility?
 7  A.  I don't.
 8  Q.  Mr. Daniels, do you have any estimation of how much time
 9  we've spent in this very courtroom talking about the restrictive
10  housing units at Bibb Correctional Facility?
11  A.  I don't know how much time you've spent.
12  Q.  Does it surprise you that we've not had a suicide at Bibb
13  correctional facility in the restrictive housing unit since
14  December 2017 at least?  We at least know that long, and
15  possibly it's going back further.
16  A.  It does not surprise me.
17  Q.  Why is that?
18  A.  Number one, it has very limited special housing space.  And
19  then for those units that do have it, we have an officer
20  assigned to those ranges.
21  Q.  Do you double cell at Bibb?
22  A.  I don't know if we double cell -- are you talking about
23  restrictive housing or --
24  Q.  Yes, sir.
25  A.  I'm not sure about restrictive housing.
```

```
 1    Q.  Do you know the last time that ADOC experienced a completed
 2    suicide at Tutwiler correctional facility or Tutwiler Prison for
 3    Women?
 4    A.  I do not.
 5    Q.  Do you know the last time that the Alabama Department of
 6    Corrections experienced a suicide at Hamilton Aged and Infirmed
 7    Correctional Facility?
 8    A.  I do not.
 9    Q.  Do you know the last time that the Alabama Department of
10    Corrections experienced a suicide at Easterling Correctional
11    Facility?
12    A.  I do not.
13    Q.  What about Ventress?
14    A.  I do not.
15    Q.  Were you aware that in 2017 the Alabama Department of
16    Corrections only reported and only experienced one inmate
17    suicide?
18    A.  Yes.
19    Q.  You also mentioned during your direct examination that you
20    had reviewed a summary of the Burns and Perrien report; is that
21    correct?
22    A.  Yes.
23         MR. LUNSFORD:  Your Honor, you're going to see this
24    as -- it's been filed now with the Court, and it's going to be
25    e-mailed to your chambers, a color coded outline that we will
```

```
 1   provide and have provided to opposing counsel.  I just want to
 2   cover a couple of sections of that.
 3              THE COURT:  It's now almost -- in fact, it is 25 of
 4   six.  Is this that annotation?
 5              MR. LUNSFORD:  It is, Your Honor.  The problem we have
 6   is Mr. Daniels has a flight at five a.m. in the morning.
 7              THE COURT:  Oh.
 8              MR. LUNSFORD:  So I'm almost done.  I have five
 9   minutes.
10              THE COURT:  Okay.
11   Q.  I just want to go through a couple --
12              THE COURT:  Before you get to that.  I looked at that
13   filing, the annotated expert reports.  Where does it get into
14   the supplemental report?
15              MR. LUNSFORD:  We did not cover the supplemental
16   report.
17              THE COURT:  Oh, you're --
18              MR. LUNSFORD:  Because the recommendations in that
19   report are in the supplemental report.  The supplemental
20   report -- so imagine that there's 30 recommendations in the
21   original report.  They just pulled some of those recommendations
22   out and said, do these on a different time frame.
23              THE COURT:  Oh, okay.
24              MR. LUNSFORD:  But they didn't explicitly state what
25   the time frame was.
```

```
 1              THE COURT:  So the supplemental report does include --
 2   pardon me.  The main report includes the recommendations in the
 3   supplemental report?
 4              MR. LUNSFORD:  Yes, sir.
 5              THE COURT:  I did see the main report, then.  Go ahead.
 6   Q.  There's just some things in this report I want to cover with
 7   you, Mr. Daniels, because I know you're leaving town and you
 8   have some availability issues.
 9        Dr. Burns and Dr. Perrien recommend emergency drills to be
10   conducted quarterly in each of the facilities as it relates to
11   suicide attempts or self-injury.  Do you have any problem doing
12   that?
13   A.  Not at all.
14   Q.  Do you believe it's a good idea?
15   A.  Yes.
16   Q.  There's also a statement in here about correctional staff
17   shall not engage in behavior which discourages information
18   sharing by inmates.  Do you have -- just on its face, do you
19   have any objection to that?
20   A.  No.
21   Q.  And I'm primarily going to hit the issues that relate to
22   custody, but there's another provision in here.  We talked about
23   cleaning -- about cleaning restrictive housing units or crisis
24   cells -- I'm not sure it's really clear -- between admissions.
25   Do you have any objection to that requirement?
```

1    A.   No objection.

2    Q.   There's also some instructions as it relates to the

3    intervention when an inmate is attempting suicide, how the

4    correctional staff should intervene.  Do you recall some of

5    those recommendations?

6    A.   Yes.

7    Q.   So, for example, on page 29 of the report, Dr. Burns and

8    Dr. Perrien recommend intermediate intervention by custody staff

9    as soon as two officers are present.  Do you have any objection

10   to that?

11   A.   No.

12   Q.   There's another requirement that lifesaving efforts should

13   take priority over preserving the evidence in the scene, and

14   that those efforts should continue until a physician declares

15   the inmate to be deceased.  Do you have any objection to that

16   requirement?

17   A.   No.

18   Q.   There's also another requirement in the same section related

19   to CPR being immediately initiated while the correctional staff

20   eliminates the method of suicide.  Do you have any objection to

21   directing your officers to initiate CPR immediately?

22   A.   No.

23   Q.   There's a requirement in the intervention section of

24   Dr. Burns' and Dr. Perrien's report that appropriate cut-down

25   kits should be maintained in the necessary housing units.  Do

1   you have any objection to that?

2   A.  No objection.

3   Q.  Mr. Daniels, do you believe that your particular personnel

4   that you are currently directing are committed to addressing

5   suicide prevention?

6   A.  Yes.

7   Q.  And do you believe that your staff is committed to putting

8   reasonable protections in place to ensure that inmates, to the

9   extent possible --

10  A.  Yes.

11  Q.  -- are not allowed the opportunity to commit suicide?

12  A.  Yes.

13          MR. LUNSFORD:  Your Honor, that's all we have at this

14  time.

15          MR. ZARZAUR:  Very brief, Your Honor.

16          THE COURT:  Redirect.

17                      REDIRECT EXAMINATION

18  BY MR. ZARZAUR:

19  Q.  Mr. Daniels, you were talking about the showers.  What

20  facility was that where you found the various types of mold in

21  the showers?

22  A.  St. Clair.

23  Q.  And I think you said that it upset you because the

24  facilities need to be run in a safe and humane manner.

25  A.  Yes.

1   Q.   And that you immediately acted upon seeing how disgusting

2   the conditions in the shower were.

3   A.   Yes.

4   Q.   Similarly, when you reviewed the history of contraband

5   within the ADOC facilities, you immediately acted; is that

6   correct?

7   A.   Yes.

8   Q.   And even called in assistance from outside law enforcement.

9   A.   Yes.

10   Q.   Let me ask you about the suicides that you reviewed.   When

11   you were at the various facilities and identified the mold,

12   various types of mold, did you also look to identify the anchor

13   places that were used for those individuals that had committed

14   suicide in those facilities?

15   A.   That information was available, and I noted it.

16   Q.   And did you issue a similar directive that those anchors be

17   removed?

18   A.   I did not.

19   Q.   Can you tell me why it is that you were so quick to demand

20   that the showers be cleaned out, but that the anchors which

21   people had been using to kill themselves in restrictive housing

22   were not addressed?

23   A.   There are multiple ways for an individual to commit suicide.

24   You can commit suicide by having your air cut off through lack

25   of circulation because of a ligature placed or affixed to

 1   something.  But you can also do the same thing without that, and

 2   you can do it on a toilet bowl.  The key -- in my opinion, the

 3   key to getting ahead of suicides is what you do in advance.  Not

 4   after -- what you do after someone has attempted to harm

 5   themselves or has actually done it.

 6       So if I were to cover up, for instance, some of the places

 7   that they could tie a ligature around, they just tie it around

 8   the bar.  If I were to remove that, they'll tie it around the

 9   lights.  If I were to do that, they can do it on a bed post or a

10   bed rail.  I've seen suicides of every nature.

11       So the key, though, when you're dealing with suicides, is

12   the training and having your staff be aware of what some of the

13   triggers are and being able to identify when they need to

14   intervene and/or summon help immediately.

15       But to kill yourself in your cell, as they say, there's a

16   saying out there, a human can find a hundred ways to kill

17   himself in a cell.  And so I would like to spend my effort on

18   ensuring that we are aware of how -- where we're putting inmates

19   that may be at risk, identifying those risks, and staying on top

20   of it.

21       But to make a cell suicide proof would be literally

22   impossible unless the inmate didn't have access to clothes.

23   Even the suicide smocks can be defeated.

24       So where do you put your effort?  Do I engage in a bunch of

25   activity that may work out, or does the inmate just -- what, we

1    wait until he goes to the shower and then he does it?  Or what

2    do we do?  Or do I spend my time and effort on trying to prevent

3    him from doing it?  And that's the methodology I've chosen to

4    embark upon, and I've been fairly successful.  Not perfect,

5    because if a human wants to, they're going to do what they want.

6    But I think we've interdicted many a potential suicide by the

7    training and our awareness and getting the right people at the

8    right place with the right resources and the right training.

9    Q.  Well, is doing correctional officer rounds twice an hour in

10   segregation a necessary part of suicide prevention?

11   A.  I think that that's important, yes.  But it's not a -- but

12   it's not an end all.  It's just one of the things that we do in

13   conjunction with others.

14   Q.  What are you doing to address the supervision of officers at

15   violent facilities?

16   A.  Well, first of all, what do you mean by violence?  Are you

17   talking about inmate-on-staff violence?

18   Q.  Facilities where you identified that you've got a lot of

19   violence that you talked about.

20   A.  First of all, we reviewed the statistical data.  We tried to

21   determine not only what's going on, but where.  Are we having

22   inmates using -- are we having assaults and fights with or

23   without weapons?

24       We're also getting into, okay.  So what is the location?

25   We're looking at what officers are assigned that are in those

1    areas.  We looked at, okay.  So where are -- what is the origin

2    of the weapons?  And we're going back and we're finding the

3    origins of the weapons, and we're sending in search teams to be

4    able to then mark those areas and ensure that we don't have

5    other areas.  We share information now about what we're finding

6    and where we're finding.

7         We're also implementing controlled movement.  Controlled

8    movement makes it easier for us to manage the amount of inmates

9    that are out at one time, and it's much more manageable.  And

10   that's a standard practice around the country, and most

11   facilities use it for the equivalent of level four and five

12   inmates.  And it seems that we didn't do that.  We haven't been

13   doing that within our organization.  So just some of these basic

14   things that we do.

15        Also interdicting how weapons and/or drugs and cell phones

16   get into the facilities.  Control of that is extraordinarily

17   important, because that's what the gang leaders and the inmates

18   that are incorrigible, that's what they use to continue on and

19   facilitate their continuing criminal enterprises.  So we have to

20   interdict that.

21        We've got to know who are our gang leaders, our gang

22   lieutenants, our gang enforcers, and our gang wannabes.  And we

23   have to manage them better so that the other inmates will feel

24   safe and that they don't have to default to the unofficial

25   leadership, the tough guys, and default to us where we are going

1  to help them move forward with their programming.

2  Q.  You've used a term a few times today, bad staff.

3  A.  Yes.

4  Q.  You used it in relation to the suicide we looked at

5  previously.  You used it in relation to the contraband in the

6  various facilities.  What are you doing to supervise the

7  officers in order to maybe identify those staff persons who, as

8  you describe them, are bad?

9  A.  We have very aggressive methodologies now, but I cannot

10  share that in open court what we're doing to interdict the bad

11  staff as those are trade craft, and I don't want to tell the bad

12  guys what I'm getting ready to do or what I'm doing to them.

13  Q.  Well, let me talk to you a little bit about your time in the

14  federal bureau.  I think you talked about being in the super max

15  facility in Colorado; is that right?

16  A.  Yes.

17  Q.  Was that super max facility a part of a class action as it

18  related to the use of segregation with prisoners with mental

19  health issues?

20  A.  Yes.

21  Q.  And was that class action filed during your time there?

22  A.  Yes.

23  Q.  And has it now subsequently been approved for settlement by

24  the Court?

25  A.  I don't know.

1      For clarification, there's two United States penitentiaries

2   in Florence, Colorado, one across the street from the other.

3   The one identified as the super max has two phases.  The one

4   identified at the other penitentiary, which was mine, has one

5   phase.  So collectively, we have the same inmates and we move

6   them around.  But I need to draw that distinction.  Most people

7   think there's one facility.  There isn't.  There's actually four

8   there, but two of them are penitentiaries.

9   Q.   Thank you.  Mr. Lunsford went through the interim suicide

10  prevention order that you and I discussed previously today.

11  A.   Yes.

12  Q.   And he touched on various matters and asked you whether or

13  not you need an explanation for those things.  Do you know

14  whether or not the ADOC uses inmate observers?

15  A.   Yes.

16  Q.   And do they?

17  A.   I'm not aware that they do.

18  Q.   But you're aware of inmate observers from your time in the

19  federal bureau?

20  A.   Yes.

21  Q.   And that's part of their suicide prevention program?

22  A.   Yes.

23  Q.   Similarly, Mr. Lunsford asked you about various provisions

24  in that interim order that you were just using your prior

25  knowledge as the basis for not thinking that it was something

```
 1  that you needed to know about; is that correct?

 2  A.  Restate your question, please.

 3  Q.  Mr. Lunsford walked you through various provisions in that

 4  interim order and just asked you, based on your experience at

 5  the federal bureau, that's not anything you need to know about.

 6  You already knew that; right?

 7          MR. LUNSFORD:  Objection.  That's a little bit of a

 8  mischaracterization of the question, to be fair.  I asked him if

 9  he needed training on those matters.

10          THE WITNESS:  Which question am I answering?

11          THE COURT:  Yes.

12  Q.  So my question to you is, Mr. Lunsford showed you certain

13  portions of the interim order and said, you don't need training

14  on that; right?  Because you've had prior experience in the

15  federal system.

16  A.  Yes.  To some of the questions he did ask that, and my

17  response was yes.

18  Q.  Okay.  But we've just established that there are things

19  within the federal system that don't exist in the Alabama

20  Department of Corrections; isn't that right?

21  A.  Yes.

22  Q.  As far as the suicide prevention?

23  A.  Yes.

24  Q.  And do you know if the word constant watch is part of the

25  Federal Bureau of Prisons suicide prevention program?  Have you
```

1  ever seen that word in there?

2  A.  I don't know if they use the word constant watch.  We use

3  something somewhat similar, like -- I'll think of the phrase

4  here in a moment -- it's -- I don't recall what the actual

5  phrase is, but if someone is on acute -- well, we just call it

6  suicide watch.  That's what we call it.  If the person is on

7  suicide watch, that means that it's nonintermittent watch.

8  There's somebody there the whole time while they're going

9  through being acutely -- being monitored for having acute

10  symptoms.  And then we keep them in that status until the mental

11  health professional says that they can be taken out of that

12  status.

13  Q.  Thank you for your time, Mr. Daniels.

14        MR. LUNSFORD:  No further questions from the state,

15  Your Honor.

16        THE COURT:  Thank you.  You may step down.

17        You said you were willing to go back and review the

18  continued placement of SMIs in segregation as reflected in this

19  Exhibit 2707, but it's the reports --

20        Are these weekly reports?

21        MR. LUNSFORD:  Yes, sir.

22        THE COURT:  Weekly reports.

23        Did I understand you said you would be willing to go

24  back and look at those to see whether your policy -- or to apply

25  your policy in 2706 retrospectively rather than prospectively?

 1          THE WITNESS:  Your Honor, I have no problem with going

 2   back and revisiting all of those.

 3          THE COURT:  Very good.  Anything else?  Thank you.  You

 4   may step down.

 5          THE WITNESS:  Thank you, Your Honor.

 6          MS. MORRIS:  Your Honor, I just wanted to raise two

 7   very small things.  Not with Mr. Daniels.

 8          First is that with regard to the supplemental report

 9   versus the main report, it's true that almost everything in the

10   supplemental recommendations from Drs. Burns and Perrien came

11   directly out of the main report.  There is one provision in the

12   supplemental that is not included in the main report, and that

13   is the -- they have a recommendation of every-30-minute checks,

14   security checks by COs in segregation.

15          THE COURT:  Right.  I was aware of that --

16          MS. MORRIS:  The other thing that I just wanted to

17   bring to your attention is that to the extent that we are able

18   to come to agreement on what should be done, we will only be

19   able to submit to you an order, and you will only be able to

20   enter an order if there's either an agreement on meeting the

21   PLRA findings, or there's evidence in the record that whatever

22   we agree to --

23          THE COURT:  You still might have to put on your

24   evidence --

25          MS. MORRIS:  Yes.  That is what I'm saying.

```
1              THE COURT:  -- in order to find PLRA findings, but it
2     would still be helpful if you did agree upon --
3              MS. MORRIS:  Yes.
4              THE COURT:  -- what the relief should be.
5              MS. MORRIS:  All right.  I just wanted to be clear that
6     we would still need to put on the evidence.
7              THE COURT:  Once you've agreed on the PLRA findings,
8     too.  But any -- any agreement at all is, obviously, helpful,
9     even if it's only partial.
10             What do you suggest we do about the recommendation -- I
11    believe it's for every 30 minutes --
12             MS. MORRIS:  Every 30 minutes.  Correct.
13             THE COURT:  Every 30 minutes for security round checks;
14    is that right?
15             MS. MORRIS:  For security checks in segregation.
16             THE COURT:  In segregation.  Right.
17             MR. LUNSFORD:  Your Honor, I am aware of that
18    requirement.  I actually have a question about that for
19    Dr. Burns.
20             THE COURT:  I actually have questions, too, about it,
21    but I still would like --
22             MR. LUNSFORD:  So it would be yellow in our outline, or
23    it would be an area where we say we have questions or need
24    clarification.  That would be our formal response.
25             THE COURT:  I have questions, too, as to how they
```

```
 1    propose that be assured.  But nonetheless, I think Ms. Morris is
 2    just saying that's one of the things where you should have added
 3    have questions.  Because I know a lot of the parts -- I've
 4    already looked at your document -- you say when you have
 5    questions, you say, need clarification, have questions.
 6              MR. LUNSFORD:  We can supplement what was filed and
 7    have that additional provision and indicate that we have -- we
 8    need clarification there.
 9              THE COURT:  And I'm assuming these will be furnished to
10    the experts in advance so that they can get their answers ready.
11    So you may want to add that in, Mr. Lunsford, to make sure
12    they're aware that you do have questions.
13              MR. LUNSFORD:  Yes, sir.  We can amend that filing and
14    make sure that's in there.  That's our position.
15              THE COURT:  Anything else?
16              MS. MORRIS:  No, Your Honor.
17              THE COURT:  All right.  Very good.  Okay.  We will
18    start tomorrow, then, at ten o'clock.
19         (Proceedings concluded at 5:56 p.m.)
20                   *  *  *  *  *  *  *  *  *  *  *  *
21
22
23
24
25
```

```
 1                   COURT REPORTER'S CERTIFICATE

 2          I certify that the foregoing is a correct transcript

 3  from the record of the proceedings in the above-entitled matter.

 4          This 1st day of May, 2019.

 5

 6                            /s/ Patricia G. Starkie
                              Registered Diplomate Reporter
 7                            Certified Realtime Reporter
                              Official Court Reporter
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```