IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

EDWARD BRAGGS, et al.,          )
                                )
     Plaintiffs,                )
                                )     CIVIL ACTION NO.
     v.                         )     2:14cv601-MHT
                                )        (WO)
JEFFERSON S. DUNN, in his       )
official capacity as            )
Commissioner of                 )
the Alabama Department of       )
Corrections, et al.,            )
                                )
     Defendants.                )

PHASE 2A REMEDIAL OPINION ON IMMEDIATE RELIEF
FOR SUICIDE PREVENTION

In this long-standing lawsuit, the court previously
found that the Alabama Department of Corrections (ADOC)
has failed to provide adequate mental-health care to
inmates in its custody in violation of the Eighth
Amendment to the United States Constitution. *See Braggs
v. Dunn*, 257 F. Supp. 3d 1171 (M.D. Ala. 2017) (Thompson,
J.), *Braggs v. Dunn*, No. 2:14CV601-MHT, 2019 WL
539050, --- F. Supp. 3d --- (M.D. Ala. Feb. 11, 2019)
(Thompson, J.). More recently, in the wake of 15 inmate

suicides in a 15-month period, the plaintiffs asked for immediate suicide-prevention relief. For reasons that follow, the court concludes that these suicides, as well as other evidence in the record, show that ADOC continues to fail to provide adequate suicide-prevention measures and, thus, subjects inmates to a substantial risk of serious harm, including self-harm, continued pain and suffering, and suicide. The risk of suicide is so severe and imminent that the court must redress it immediately. Therefore, the court will grant the plaintiffs' motion for immediate relief by making permanent most provisions of an interim suicide-prevention agreement that the parties reached early in this litigation; by adopting, in large measure, the recommendations proposed by experts for both parties; and by requiring court monitoring that is limited to the immediate relief ordered here. By agreement of the parties, the issue of non-immediate suicide-prevention relief will be resolved by the court later.

## I.  PROCEDURAL BACKGROUND

The plaintiffs in this class-action lawsuit include a group of seriously mentally ill state prisoners and the Alabama Disabilities Advocacy Program (ADAP), which represents mentally ill prisoners in Alabama.  During the liability trial, and in response to the suicide of class member Jamie Wallace just days after he testified, the parties agreed to a series of interim suicide-prevention measures.  *See* Interim Agreement (doc. no. 1106-1).  The court reduced this 'interim agreement' to an order.  *See* Interim Relief Order (doc. nos. 1106, 1106-1).

In June 2017, the court issued a liability opinion in which it found that ADOC's mental-health care for prisoners in its custody was, "[s]imply put, ... horrendously inadequate" and violated the Eighth Amendment.  *Braggs*, 257 F. Supp. 3d at 1267.  The court more specifically found that "ADOC's inadequate crisis care and long-term suicide-prevention measures have created a substantial risk of serious harm, including self-harm, suicide, and continued pain and suffering."

*Id.* at 1220. The "serious" suicide-prevention deficiencies identified by the court included ADOC's failure to provide crisis care to those who need it; placement of prisoners in crisis in dangerous and harmful settings, including unsafe crisis cells; inadequate treatment for prisoners in crisis care; inadequate monitoring of suicidal prisoners; inappropriate release of prisoners from suicide watch; and inadequate follow-up care for prisoners released from suicide watch. *See id.* at 1218-31. Moreover, the court found that these risks are particularly heightened for prisoners with serious mental illnesses. "Serious mental illness" (SMI) is a term of art used in the field of psychiatry which refers to "a subset of particularly disabling conditions ... defined by the diagnosis, duration, and severity of the symptoms." *Id.* at 1246. Certain conditions are always considered SMIs, such as schizophrenia, bipolar disorder, and major depressive disorder. *See id.* at 1186 n.6.

Over a period of months, the court adopted several 'remedial orders' regarding mental-health care that

touched on suicide prevention.[1]  To fashion a comprehensive suicide-prevention remedy, the parties agreed to, and the court accepted, a process whereby Drs. Mary Perrien and Kathryn Burns, the defendants' and plaintiffs' correctional mental-health experts, respectively, would "assess ADOC facilities and operations related to suicide prevention and provide a report with recommendations to resolve the constitutional violation determined by the Court in the Liability Opinion and Order."  Joint Notice (doc. no. 2014) at 1; Order (doc. no. 2020) (adopting the parties' plan for assessing suicide-prevention measures).

On January 18, 2019, before the parties' experts completed their report, and in response to a series of suicides, the plaintiffs filed an emergency motion regarding the placement of high-risk prisoners in

_____

1.  "After two months of mediation to develop a comprehensive remedial plan, it became apparent that the remedy was too large and complex to be addressed all at once.  Therefore, the court severed the remedial phase into discrete issues, to be addressed seriatim." *Braggs v. Dunn*, No. 2:14cv601-MHT, 2018 WL 985759 at * 1 (M.D. Ala. Feb. 20, 2018) (Thompson, J.).

segregation. *See* Motion for Preliminary Injunction (doc. no. 2276) at 1. The court construed it as seeking permanent, albeit immediate, relief. *See* Order (doc. no. 2345).

On March 8, the experts filed (1) a report with recommendations for relief, (2) a report identifying a subsection of those recommendations to be implemented immediately in light of the recent suicide crisis plaguing ADOC, and (3) case summaries of many of the recent suicides. *See* Joint Expert Report and Recommendations, Immediate Relief Recommendations, Joint Expert Case Summaries (doc. nos. 2416-1, 2416-4, 2416-2). Their reports were the product of an extensive and thorough study, in which they reviewed thousands of documents from ADOC, toured multiple facilities, and interviewed both prisoners and staff.

In March and April, the court held a trial to determine whether immediate and non-immediate suicide-prevention relief is needed and, if so, what it should be. The parties and the court decided during the

hearing that the portion of the hearing on non-immediate suicide-prevention relief would be continued to a future date. This opinion addresses only immediate relief in response to the ongoing substantial and pervasive inadequacies in ADOC's suicide-prevention efforts, exemplified by the 15 suicides that have occurred since December 2017.

As immediate relief, the plaintiffs first request that the court enter an order making permanent most of the provisions of the interim agreement. The agreement addressed licensing of mental-health professionals; suicide-watch procedures, including inmates' placement on and discharge from suicide watch, follow-up appointments upon discharge, and documentation requirements; and suicide risk assessments, including a monthly evaluation of assessments.

The plaintiffs also request that the court adopt as an order the experts' second report. This report identifies a subsection of their recommendations that should be implemented on an immediate and permanent

basis.  These 'immediate relief recommendations' address suicide-watch follow-ups, referrals to higher levels of care, preventing discharge from suicide watch to segregation, training for staff, security checks in segregation, confidentiality, and immediate life-saving intervention.  In addition, the plaintiffs seek interim monitoring of the immediate relief.

Finally, the plaintiffs also argue that the defendants are placing mentally ill prisoners in units that, while not labelled as segregation or restrictive housing, impose equally severe restrictions on out-of-cell time, and the same accompanying risk of serious harm, particularly suicide.  Therefore, they contend, the court's relief should extend to these "segregation like" settings.

The court heard substantial evidence suggesting that prisoners in certain units receive very little out-of-cell time.  However, the court needs more time to consider the evidence, and may decide to solicit additional input from the parties before deciding this

critical issue. Therefore, the court's findings remain open as to this discrete issue, and the court will take it up after this opinion is issued.

## II. RECENT SUICIDES[2]

Fifteen men in ADOC custody have committed suicide since December 30, 2017, an average of almost one suicide per month. An examination of their cases illustrates severe and systemic inadequacies in ADOC's suicide-prevention efforts. Many of the inadequacies, detailed in the 15 cases below, are instances of ADOC's pervasive and substantial noncompliance with the interim agreement and other remedial measures that they agreed to implement; that is, they are examples of what ADOC recognized are "systemic failures to comply with court orders." Pls. Ex. 2710 at ADOC0475738.[3] Other

---

2. The court relies upon the record from the liability trial and all prior remedial hearings. However, in the interests of avoiding repetition, the court does not describe that evidence here.

3. On February 15, 2019, Deborah Crook, ADOC's Director of Mental Health Services, wrote to the

9

inadequacies, while not necessarily constituting noncompliance with specific remedial orders to date, show ADOC's failure to live up to its obligations under the Eighth Amendment. In sum, both types of deficiencies summarized in the 15 cases below demonstrate that immediate relief is necessary to address the substantial

department's mental-health vendor, Wexford, complaining of "a number of troubling failures by Wexford." Pls. Ex. 2710 at ADOC0475738. Specifically, she wrote that "ADOC has identified the following systemic failures to comply with court orders in *Braggs*: (1) Failure to input the SMI designation for all inmates into the Health Services Module; (2) Failure to complete the Suicide Risk Assessment (SRA) by a Qualified Mental Health Professional (QMHP) when an inmate is placed in a crisis cell; (3) Failure to place an inmate on acute suicide watch with constant observation (rather than MHO) when risk factors for potential suicidality are present until a psychologist or psychiatrist is consulted; (4) Failure to document consultation with a psychiatrist or psychologist prior to discharging an inmate from crisis placement; and (5) Failure to complete or timely complete pre-placement screenings and 7-day assessments for inmates placed in a restrictive housing unit ('RHU')." *Id.* Crook noted that "Wexford's failures are serious in nature," and "have the potential to contribute to additional harm to inmates in the care and custody of the ADOC." *Id.* As the liability opinion makes clear, Wexford's failures are ADOC's failures. *See Braggs*, 257 F. Supp. 3d at 1188-89, 1193 n.15 ("The State's obligation remains even if it has contracted with private parties to provide medical care.").

risk of serious harm to which prisoners remain exposed.

<em>Rashaud Morrissette</em>

On March 8, 2019, Rashaud Morrissette hanged himself with a belt in the shower of a segregation unit at Fountain prison. *See* Crook Apr. 2, 2019, Trial Tr. (doc. no. 2488) at 184; Pls. Ex. 2661 at ADOC0470542. ADOC's suicide-prevention failures in his case include that before entering segregation, he did not receive a critical preplacement screening for issues such as whether he was at risk of suicide or had a serious mental illness (SMI). *See* Crook Apr. 2, 2019, Trial Tr. (doc. no. 2488) at 185; Burns Apr. 9, 2019, Rough Draft (R.D.) Trial Tr. at 191; *see generally* Pls. Ex. 2692.

<em>Matthew Holmes</em>

Matthew Holmes killed himself on February 14, 2019, roughly 12 hours after being transferred from mental-health observation (MHO) to segregation at Limestone prison. *See* Burns and Perrien Apr. 9, 2019, R.D. Trial Tr. at 169, 186. (MHO is a short-term placement that does not have the same level of

11

protections as suicide watch.)  ADOC's suicide-prevention failures in his case include (1) not placing him in suicide watch despite his being suicidal, and (2) placing him in segregation despite his having a SMI, and without adequately assessing his suicide risk or referring him for the emergency mental-health care he needed. Specifically:

- On February 11, 2019, Holmes was improperly placed in MHO, rather than suicide watch. *See* Defs. Ex. 3613 at SPA_13585.  A "Psychiatrist/CRNP Progress Note" on February 12 indicates that he had recently become suicidal after being placed in segregation, and that he had twice attempted suicide in 2010. *Id.* at SPA_13582.  As acknowledged by Deborah Crook, ADOC's Director of Mental Health Services, Holmes met the National Commission on Correctional Health Care (NCCHC)'s definition of nonacutely suicidal, and therefore, under the interim agreement, should have been placed on at least nonacute suicide watch (rather than MHO), at which point a suicide risk assessment

would have been required.  *See* Crook Apr. 2, 2019, Trial Tr. (doc. no. 2488) at 55.[4]

- Because he was not placed on suicide watch, he did not receive a suicide risk assessment.  *See id.* at 55-56. Furthermore, the parties' experts, Drs. Burns and Perrien, flagged that while in MHO, Holmes's contacts with mental-health staff were conducted inside his cell, "rather than in a confidential area out of cell." Joint Expert Case Summaries (doc. no. 2416-2) at 4; *see also* Defs. Ex. 3613 at SPA_13581-84.

- On February 14, he was ordered released from MHO to segregation per the order of a nurse practitioner who "wrote no note in the chart explaining the rationale for this decision or the level of risk assessed." Joint Expert Case Summaries (doc. no. 2416-2) at 4.  Holmes's February 13 treatment plan review had stated that he

---

4. Dr. Edward Kern, ADOC's Director of Psychiatry, similarly testified that Holmes should have been placed on either acute or nonacute suicide watch rather than MHO.  *See* Kern March 29, 2019, Trial Tr. (doc. no. 2483) at 108.  Crook also recognized that there were areas in Holmes's case that violated the interim agreement.  *See* Crook Apr. 2, 2019, Trial Tr. (doc. no. 2488) at 58.

was "not making progress toward treatment plan goals," Defs. Ex. 3613 at SPA_13577; however, suddenly, the next day, the treatment plan review concluded that he had "completed treatment goal," *id.* at SPA_13576; *see also* Joint Expert Case Summaries (doc. no. 2416-2) at 4.

- The segregation pre-placement screening completed on February 14 at 11:45 a.m. noted that Holmes had a SMI, and that there were "yes" responses to the following three questions: (1) Are you feeling sad, hopeless, or depressed? (2) Have you ever intentionally hurt yourself or attempted suicide? (3) Have you had any serious problems with a significant other, family member or friend recently? *See* Defs. Ex. 3613 at SPA_13571. As noted by the parties' experts, despite these responses, Holmes "was not diverted from segregation placement and an 'urgent' rather than 'emergent' referral to mental health was made." Joint Expert Case Summaries (doc. no. 2416-2) at 4.

- Later that night, he was discovered hanging from an

overhead light fixture in his segregation cell. *See id.*

- Drs. Burns and Perrien concluded that his case "illustrates the problems with use of MHO rather than approved suicide watch levels, poor documentation of rationale for release from watch, failure to generate an emergency referral to mental health in response to a positive pre-placement screen and releasing SMI inmates from watch directly into segregation." *Id.*

### *Daniel Gentry*

Daniel Gentry hanged himself at the Donaldson prison Residential Treatment Unit (RTU) on February 6, 2019. ADOC's suicide-prevention failings include not placing him on suicide watch despite his making clear that he wanted to die, not conducting a suicide risk assessment when indicated, and inadequate review of his suicide. Specifically:

- A few weeks before his death, on January 24, 2019, a mental-health progress note reported that Gentry had asked a correctional officer to kill him. *See* Pls.

Ex. 2314 at SPA_13258.  In response, he was placed in MHO that day.  *See id.*  As plaintiffs' expert Dr. Burns testified, the MHO placement was inappropriate, because "with someone who's actively voicing the wish that someone kill him, you would expect to start a suicide watch, either acute or nonacute, but not just mental health observation status."  Burns Apr. 9. 2019, R.D. Trial Tr. at 94.

- Five days into his MHO placement, Gentry continued to report "auditory hallucinations and a desire for someone to kill him."  Pls. Ex. 2314 at SPA_13275.  His records indicate that he did not receive a suicide risk assessment in relation to his MHO placement.  *See generally* Pls. Ex. 2314.

- On January 31, 2019, Gentry was released from MHO to the RTU at Donaldson.  *See id.* at SPA_13235; Joint Expert Case Summaries (doc. no. 2416-2) at 3.  A week later, on February 6, he was discovered hanging from a light fixture inside his cell during a security check.  *See* Joint Expert Case Summaries (doc. no. 2416-2) at

3. The correctional officers waited several minutes for medical staff, who upon arriving, told them to remove the sheet from his neck and initiated CPR. *See id.* Dr. Burns testified that this intervention was inadequate, as the officers should not have waited for medical staff to arrive before removing the noose and beginning CPR. *See* Burns Apr. 9, 2019, R.D. Trial Tr. at 204. Indeed, both Drs. Burns and Perrien noted with respect to Gentry's suicide that correctional officers "need additional training and drills regarding first aid and responding to hanging attempts." Joint Expert Case Summaries (doc. no. 2416-2) at 3. This observation coincides with the experts' more general recommendation that ADOC policy and practice be revised to ensure that as soon as two security staff are present, "CPR should be immediately initiated while whatever method of suicide is eliminated." Joint Expert Report and Recommendations (doc. no. 2416-1) at 29.

- In carrying out their suicide-prevention assessment,

Drs. Burns and Perrien did not receive any medical or
security reviews of the suicide, *see* Joint Expert Case
Summaries (doc. no. 2416-2) at 3, even though, in their
expert opinion, ADOC must conduct such reviews in cases
of suicides, *see* Joint Expert Report and
Recommendations (doc. no. 2416-1) at 34. Here, and in
the other cases detailed in this section in which Drs.
Burns and Perrien did not receive medical or security
reviews, the court infers from ADOC's failure to
provide the reviews that either the reviews were never
conducted, or that--like the limited sample of
documents reviewing suicides that they did
receive--they were generally inadequate.[5]

_____

5. In response to the plaintiffs' assertion that Drs.
Burns and Perrien did not receive medical or security
reviews in multiple cases, the defendants repeatedly
stated in a post-trial filing that "Drs. Burns and
Perrien requested 'non-privileged' documents.  These
medical reviews were conducted by Wexford, and Wexford
maintains they are privileged documents."  Defendants'
Response to Amended Chart (doc. no. 2500-1) at 4-17.  This
argument is unpersuasive.  To start, it attempts to
excuse only the failure to provide the experts with
medical reviews but says nothing about the failure to
provide security reviews.  And as to the medical reviews,
despite ample opportunity, the defendants provided no

## *Paul Ford*

Paul Ford killed himself in segregation at Kilby prison on January 16, 2019, following two prior suicide attempts in segregation in 2018, and less than a month after being released from suicide watch. *See* Joint Expert Case Summaries (doc. no. 2416-2) at 3. ADOC's suicide-prevention failures in his case include inadequate (1) follow-up mental-health appointments after release from suicide watch, (2) suicide risk assessments, and (3) mental-health assessments while in segregation. Specifically:

- In April 2018, while in segregation, Ford set fire to his cell and attempted to hang himself. *See id.*; Pls. Ex. 2309 at SPA_9757. On July 30, he again attempted to hang himself while in segregation and was placed on suicide watch. *See* Pls. Ex. 2309 at SPA_9741.

---

evidence to support their contention--made after the remedial hearing ended--that (1) Wexford conducted the reviews, or (2) that Wexford had in fact asserted that they were privileged. In short, the defendants make no argument concerning the security reviews, and their privilege argument for the medical reviews is untimely and unsupported.

- Following his release from suicide watch on August 2, he was placed in segregation, but records indicate that, following discharge from suicide watch, he did not receive the required three-, seven-, and 30-day follow-up appointments. *See id.* at SPA_9730; *see generally* Pls. Ex. 2309.

- Ford's initial mental-health assessment in segregation failed to note his history of suicide attempts and left the "assessment" section blank. *See id.* at SPA_9728-29.

- On December 12, he cut his wrist while in segregation, for which he was charged with a disciplinary violation. *See id.* at SPA_9670.

- Ford was placed on suicide watch on December 12. *See id.* at SPA_9702. A suicide risk assessment on December 20 stated that he had no recent "suicidal/self-injurious" behavior or ideation, even though he had cut his wrist just eight days earlier. *Id.* at SPA_9674. He was released from suicide watch around December 21 and placed back in segregation at

Kilby. *See* Pls. Ex. 2352 at ADOC0462881; Joint Expert Case Summaries (doc. no. 2416-2) at 3. Records indicate that, in contravention of the interim agreement, staff did not complete the follow-up appointments after his release from suicide watch. *See generally* Pls. Ex. 2309; Crook Apr. 2, 2019, Trial Tr. (doc. no. 2488) at 108; Burns and Perrien Apr. 9, 2019, R.D. Trial Tr. at 123-24.

- On January 16, 2019, Ford was found hanging from his segregation cell door. *See* Pls. Ex. at SPA_9656. Drs. Burns and Perrien did not receive medical or security reviews of his suicide. *See* Joint Expert Case Summaries (doc. no. 2416-2) at 3. While ADOC conducted a 'quality improvement' (QI) assessment of the case, both Drs. Burns and Perrien testified that it did not constitute an adequate review of the suicide. *See* Burns and Perrien Apr. 10, 2019, R.D. Trial Tr. at 114-15.

### *Roderick Abrams*

Roderick Abrams committed suicide on January 2, 2019,

21

the same day he was placed in segregation. Rampant suicide-prevention failures plagued his case, including failing to place him on suicide watch when he expressed suicidality, repeatedly failing to screen him for mental-health issues prior to placing him in segregation, failing to complete mental-health appointments due to staffing and space shortages, and failing to immediately initiate life-saving measures when he was found hanging in his cell. Specifically:

- Records indicate that Abrams was initially held in segregation between August 23 and December 4, 2018, *see* Pls. Ex. 2346 at ADOC0462894-95, without receiving a segregation preplacement screening, *see generally* Pls. Ex. 2304.

- A nursing record from September 3 reported that Abrams had suicidal thoughts and had told people he was going to hang himself. *See id.* at SPA_9559. Despite being suicidal, Abrams remained in segregation instead of being placed on suicide watch, *see id.* at SPA_9560, and did not receive a suicide risk assessment at that

point, *see* Crook Apr. 2, 2019, Trial Tr. (doc. no. 2488) at 69.

- The segregation initial assessment conducted on September 4--several days after the seven-day timeframe in which it should have been completed--failed to mention that the day before, Abrams had told nursing staff that he was suicidal. *See* Pls. Ex. 2304 at SPA_9582-83.

- Records indicate that, while in segregation, space and security staff shortages prevented Abrams from having his scheduled mental-health appointments on November 20, 27, and 30, and December 4. *See id.* at SPA_9601; Joint Expert Case Summaries (doc. no. 2416-2) at 3.

- On approximately December 21, he was placed on suicide watch after stating that he was suicidal. *See* Pls. Ex. 2304 at SPA_9596, SPA_9599. Apparently, he had gone to the infirmary to have stab wounds checked on, and then felt increased anxiety about returning to a particular prison block. *See id.* A mental-health progress note from December 26 also reported that he

23

had safety concerns and wanted to change institutions because of a conflict he had with gang-affiliated inmates due to his sexuality. *See id.* at SPA_9594. His records do not contain a single crisis treatment plan. *See generally Pls. Ex. 2304.*

- Abrams was released from suicide watch on December 26, *see id.* at SPA_9571, and sometime between then and January 2, he was placed in segregation, *see* Crook Apr. 2, 2019, Trial Tr. (doc. no. 2488) at 181; Defendants' Response to Amended Chart (doc. no. 2500-1) at 14. The records indicate that he did not receive a segregation preplacement screening. *See* Crook Apr. 2, 2019, Trial Tr. (doc. no. 2488) at 181-82; *see generally* Pls. Ex. 2304. Nor did he receive a three-day follow-up after being discharged from suicide watch. *See generally* Pls. Ex. 2304. The parties' experts noted that despite his stay on suicide watch, he was not placed on the mental-health caseload. *See* Joint Expert Case Summaries (doc. no. 2416-2) at 3; Pls. Ex. 2305 at SPA_9791.

- The segregation duty post logs indicate that, during the week running up to his suicide, there were several times where there was an hour, or even two hours, between security checks, *see* Vail Apr. 3, 2019, R.D. Trial Tr. at 149, even though ADOC policy requires that security checks in segregation be conducted every 30 minutes.

- On January 2, 2019, at approximately 7:00 p.m., more than an hour after the last security check, *see id.*, a correctional officer making a security check discovered Abrams hanging from a vent cover inside his cell, *see* Pls. Ex. 2307 at SPA_10451. At 7:11 a.m., he was cut down and medical staff initiated CPR, according to one officer's report. *See id.* at SPA_10452. According to both experts, this emergency response time was "inadequate to save life," as "11 minutes from discovery to cut down is more than enough time for death to occur." Joint Expert Case Summaries (doc. no. 2416-2) at 3.

- Drs. Burns and Perrien did not receive a medical

review.  *See id.* at 3.  ADOC's quality improvement report stated that there were no areas for improvement in mental-health treatment or institutional operation, and recommended no corrective actions.  *See* Pls. Ex. 2305 at SPA_9792-93.[6]

*Ryan Rust*

On December 21, 2018, Ryan Rust was discovered in his segregation cell "sitting on [the] floor with one end of [a] belt around his neck and the other end tied to a bar in the window of the cell."  Joint Expert Case Summaries (doc. no. 2416-2) at 2.  His case illustrates ADOC's failures to complete follow-up appointments after a crisis placement and to conduct timely security checks in segregation in the immediate lead-up to a suicide. Specifically:

• Rust was placed on suicide watch from approximately

_____

6.  The defendants contend that a "final" QI review completed on March 4, 2019, found some shortcomings. Defendants' Response to Amended Chart (doc. no 2500-1) at 14.  However, the defendants never submitted evidence of this "final" review, which, in any case, was completed three months after Abrams's suicide and after three more prisoners had killed themselves.

November 5 to 16, 2018, *see* Pls Ex. 2298 at SPA_9880-81,
but his records indicate that he did not receive any
follow-up appointments after his release, *see generally*
Pls. Ex. 2298.

- Rust attempted to escape and was returned to
  segregation on December 20 or 21. *See id.* at SPA_9869,
  SPA_9872; Joint Expert Case Summaries (doc. no. 2416-2)
  at 2. On December 21, shortly after his segregation
  placement, he was discovered hanging in his cell. *See*
  Joint Expert Case Summaries (doc. no. 2416-2) at 2.

- Prior to his death, Rust had received three separate
  segregation pre-placement screenings on December 20 and
  21. *See* Pls. Ex. 2298 at SPA_9867-74. According to
  Drs. Burns and Perrien, the "reason for three
  pre-placement screenings was not clear. At best, the
  three completed screenings raise questions about
  inefficiencies in the system regarding redundant work
  and/or poor communication among nursing staff; at
  worst, they raise concerns regarding the authenticity
  and validity of the screenings." Joint Expert Case

Summaries (doc. no. 2416-2) at 2. As Dr. Burns elaborated, in the worst-case scenario, it represented "an attempt to say that the screening was done when the screening wasn't done, and still very poorly coordinated because they did it three times." Burns Apr. 9, 2018, R.D. Trial Tr. at 190.

- Based on his review of the duty post logs, plaintiffs' expert Eldon Vail testified that about an hour passed from the last security check to the time Rust was discovered hanging. *See* Vail Apr. 3, 2019, R.D. Trial. Tr. at 151; *see also* Pls. Ex. 2662 at ADOC0469207 (duty post log indicating that more than an hour had passed).

- Drs. Burns and Perrien reported inadequate review of Rust's suicide. Specifically, they stated that they did not receive a medical review, and that the psychological autopsy was "limited" and did "not contain any psychological information." Joint Expert Case Summaries (doc. no. 2416-2) at 2. They did receive a document labeled only "Ryan Chas Rust," whose authorship and purpose was unclear, but did "identify

deficiencies in mental health follow-ups, treatment planning and logistics." *Id.*

*Kendall Chatter*

On November 25, 2018, Kendall Chatter was discovered hanging from the ceiling of his cell in the temporary holding unit at Staton prison. ADOC's failures in his case include not transitioning him from acute to non-acute suicide watch prior to releasing him from suicide watch, not providing follow-up appointments after he was released from suicide watch, and not checking his cell even though he was intensely yelling and banging on his cell in the immediate lead-up to his suicide. Specifically:

- On November 16, 2018, Chatter cut his right wrist, possibly after being sexually assaulted. *See* Defs. Ex. 3577 at SPA_10176-81. He was placed on acute suicide watch that same day, *see id.* at SPA_10180, and then released directly to MHO the next day, without any intervening period on non-acute suicide watch, *see id.* at SPA_10178. He was released from MHO on November

29

20.  *See id.* at SPA_10164; Joint Expert Case Summaries (doc. no. 2416-2) at 2.

- His records indicate that he did not receive three- or seven-day follow-ups after being released from suicide watch.  Crook Apr. 2, 2019, Trial Tr. (doc. no. 2488) at 35.  Director of Mental Health Services Crook said that the failures to do the follow-ups were violations of the interim agreement, but that she did not immediately discover the violations because no one in her office did a detailed review of his mental-health records until February 2019, more than two months after he died.  *See id.* at 35-40.

- On November 25, Chatter loudly and intensely yelled and banged against his cell for a prolonged period of time. *See* Defs. Ex. 3577 at SPA_10200; Joint Expert Case Summaries (doc. no. 2416-2) at 2; Pls. Ex. 2401 at SPA_13483.  The correctional shift supervisor instructed his officer to "just allow him to continue banging and being disruptive and he would get tired and stop," according to a written reprimand of the

supervisor.  Pls. Ex. 2401 at SPA_13483.  Shortly after Chatter started making noise--according to one record, less than an hour later--a correctional officer distributing meals discovered him hanging from the ceiling by a sheet tied around his neck.  *See id.* at SPA_10200-01.

- ADOC's review of the suicide was inadequate.  No medical or security reviews were provided to Drs. Burns and Perrien.  *See* Joint Expert Case Summaries (doc. no. 2416-2) at 2.  Furthermore, according to the experts, the "mental health QI review contained little information and no recommendations for improvement in spite of failing to provide follow-up after watch placement and failure to provide an actual mental health assessment after referral from security 11/14/18. ...  The Psychological Autopsy states both that the treatment plan was up to date and included goals that were implemented but also states that there were no goals on the treatment plan because he wasn't on the mental health caseload."  *Id.*

*Mark Araujo*

Mark Araujo used a sheet to hang himself from a door in his segregation cell at Limestone prison on November 23, 2018. Inadequacies in his case include not properly responding to his request for mental-health attention after he was placed in segregation, and not adequately reviewing his suicide. Specifically:

- On October 29, 2018, during his initial mental-health assessment following placement in segregation, Araujo requested to be placed on the mental-health caseload and begin medication. *See* Pls. Ex. 2291 at SPA_10221-22. Yet, according to Drs. Burns and Perrien, he was not seen by mental-health staff prior to his death almost a month later. *See* Joint Expert Case Summaries (doc. no. 2416-2) at 2.

- Drs. Burns and Perrien noted that the "QI review contains no recommendations" and that the psychological autopsy also "contained little information--and neglected to note that he wanted [mental-health] help and asked for it 10/29/18 when seen in seg[regation]."

*Id.*

*John Barker*

John Barker hanged himself from a vent cover in his cell at St. Clair prison on September 26, 2018. Deficiencies in his case include housing him in segregation despite his serious mental illness (SMI), and inadequate interventions to save his life after he was discovered hanging. Specifically:

- Despite being flagged as having a SMI, major depressive disorder, *see* Pls. Ex. 1758 at SPA_3343-44, Barker had been housed in segregation for several months in the lead-up to his suicide, *see* Joint Expert Case Summaries (doc. no. 2416-2) at 1.

- On September 1, 2018, mental-health personnel recommended his administrative referral for removal from segregation due to his SMI diagnosis, *see* Pls. Ex. 1758 at SPA_3343-44, but records indicate that he was released from segregation on September 24, just two days before his suicide, *see* Joint Expert Case

33

Summaries (doc. no. 2416-2) at 1.[7]

- On September 26 at 6:30 p.m., a correctional officer observed Barker hanging from a vent cover over a toilet in his cell. *See id.* Troublingly, "[n]o actions [were] taken until 6:36 p.m. when medical [staff] arrived at which time [they] entered cell, cut prisoner down and began CPR." *Id.* Drs. Burns and Perrien concluded that the correctional officer response was inadequate because, as explained above, security officers "must intervene and begin life-sustaining efforts rather than waiting for medical," and also because the medical emergency response time of six minutes was inadequate. *Id.*

- Drs. Burns and Perrien did not receive security or medical reviews of the suicide, and the mental-health review "was cursory and found no problems and no areas

_____

7. It is not clear from the records whether he remained in segregation between September 1 and September 24, or rather had been released after the September 1 recommendation for removal, and then readmitted to segregation. *See* Joint Expert Case Summaries (doc. no. 2416-2) at 1.

for improvement." *Id.*

*Ross Wolfinger*

Ross Wolfinger was discovered hanging in his segregation cell at Fountain prison on August 22, 2018, less than a month after cutting his wrist and being placed in acute suicide watch. His case shows ADOC's failure to provide adequate treatment following release from suicide watch to segregation, the falsification of security logs and failure to conduct security checks in segregation in the time immediately leading up to his suicide, and the failure to initiate life-saving measures immediately when he was discovered. Specifically:

- Wolfinger's records state that on July 26, 2018, he was placed on acute suicide watch after attempting suicide by cutting his left wrist with a razor blade. *See* Pls. Ex. 1823 at SPA_4134, SPA_4187-90. He remained on acute suicide watch until July 31, *see id.* at SPA_4167, when he was placed on nonacute suicide watch, *id.* at SPA_4153.

- On August 3, he was discharged from nonacute suicide

35

watch to segregation. *See* Burns Dec. 7, 2018, Trial Tr. (doc. no. 2256) at 117; Pls. Ex. 1823 at SPA_4155, SPA_4163. The records indicate that he did not receive adequate follow-ups after his release from suicide watch. *See* Burns Dec. 7, 2018, Trial Tr. (doc. no. 2256) at 119; *see generally* Pls. Ex. 1823.

- According to Dr. Burns, Wolfinger's suicide risk was elevated by ADOC's failure to provide adequate treatment to him when he was returned to segregation. *See* Burns Dec. 7, 2018, Trial Tr. (doc. no. 2256) at 119.

- The night of Wolfinger's death, the correctional officer assigned to conduct security checks every 30 minutes in Wolfinger's area of segregation not only failed to do a single check, but also put false information in his duty post log indicating that he had completed the required checks, according to an ADOC memorandum discussing disciplinary action against the officer. *See* Pls. Ex. 2403 at SPA_13487. The memorandum states that the correctional officer's

actions "resulted in" Wolfinger's death. *Id.* at SPA_13488.

- On August 22, around 1:00 a.m., Wolfinger was discovered hanging in his cell. *See id.* Drs. Burns and Perrien reported that the immediate intervention was inadequate: he was "discovered hanging at 12:57 a.m.," but "there was no intervention except to call for assistance which arrived at 1:03 a.m. No intervention until others arrived and then he was cut down and taken to HCU [the health care unit], arriving there at 1:08 a.m. LPNs attempted CPR and ambulance was called." Joint Expert Case Summaries (doc. no. 2416-2) at 2.

- Drs. Burns and Perrien also criticized the inadequate reviews of Wolfinger's suicide. No medical review was provided; the QI program review did not make any recommendations; the psychological autopsy provided no additional analysis or information. *See id.*

### Jeffery Borden

On June 3, 2018, Jeffery Borden, who had been

diagnosed with schizoaffective disorder, hanged himself on death row at Holman prison. *See* Pls. Ex. 1643 at ADOC0424844. His case is an example of ADOC failing to adequately intervene with potential life-saving measures and inadequately completing a suicide incident review. Specifically:

- Neither the correctional officers who originally found him hanging nor the nurse that later arrived at the scene attempted CPR or other life-saving efforts. *See* Joint Expert Case Summaries (doc. no. 2416-2) at 1; Pls. Ex. 1760 at SPA_2965.

- Drs. Burns and Perrien did not receive a medical or security review. *See* Joint Expert Case Summaries (doc. no. 2416-2) at 1.

*Timothy Chumney*

On May 12, 2018, "[w]ithin 1 day of being released from MHO to a housing unit where he expressed concern for his safety from other inmates," Timothy Chumney "was discovered hanging in his [segregation] cell having tied a bed sheet to a cell window and then around his neck."

*Id.* ADOC's failures in his case include inadequate treatment planning, not placing him on suicide watch even though he was found to have a moderate risk of suicide, and an inadequate review of his suicide. Specifically:

- On May 7, 2018, Chumney was determined to be at a "moderate" risk for suicide, after telling medical staff that he had suicidal ideation at night and would rather harm himself than have someone else harm him. Pls. Ex. 1646 at ADOC0425086. That same day, however, he was admitted to MHO instead of suicide watch. *See id.* at ADOC0425042.

- On May 11, Chumney was discharged from MHO. *See id.* at ADOC0425011. The next day, at approximately 3:05 a.m., correctional officers conducting security rounds discovered him hanging from his segregation cell window in Limestone prison. *See* Pls. Ex. 1780 at SPA_3144; Joint Expert Case Summaries (doc. no. 2416-2) at 1.

- Dr. Burns and Perrien criticized that no "CPR, actual medical assessment or life-sustaining measures [were] attempted. LPN responding to the emergency said to

39

leave him in the cell on the unit and called the physician to pronounce him dead. Hours later, the deputy coroner arrived and 'confirmed inmate Chumney deceased.'" Joint Expert Case Summaries (doc. no. 2416-2) at 1.

- ADOC also inadequately reviewed his suicide. Drs. Burns and Perrien did not receive medical or security reviews; the mental-health QI program review had no criticism or recommendation for anyone; the psychological autopsy revealed no additional or substantive information. *See id.*

- Drs. Burns and Perrien further criticized that there was "[n]o transitional care planned; treatment plan called only for a monthly contact with treatment coordinator and quarterly appointment with CRNP," and there was "[n]o plan to follow more closely (or intervene to prevent placement in [segregation] based on his anxiety and paranoia)." *Id.*

### *Robert Martinez*

By the time Robert Martinez took his life on March

31, 2018, he had been in segregation at St. Clair prison for more than one year.  Pls. Ex. 1493 at ADOC0420976-77. In his case, ADOC's failures included not conducting security rounds in segregation and not timely cutting him down when he was found hanging.

- Two weeks before his death, he told mental-health staff that he was "doing real bad" and needed to go to a psychiatric ward.  *Id.* at ADOC0421023.  ADOC left him in segregation and failed to connect him with mental-health staff.

- Correctional officers failed to conduct security checks in Martinez's unit for at least two hours during the morning of his suicide.  *See* A.A. Apr. 23, 2018, R.D. Trial Tr. at 203-04.

- When ADOC staff discovered Martinez hanging from a sheet tied to a vent in his cell, they waited more than 30 minutes before cutting him down, a delay that, in the experts' words, was "inexcusable and inhumane."[8]

---

8. A nurse and correctional officer doing pill call in segregation discovered him unresponsive at 12:25 p.m.; medical staff arrived at 12:35 p.m., and he was not cut

Joint Expert Case Summaries (doc. no. 2416-2) at 1.

*Billy Thornton*

Billy Thornton died on March 2, 2018, as the result of a head injury he sustained when attempting to hang himself in segregation at Holman prison on February 26. *See* Joint Expert Case Summaries (doc. no. 2416-2) at 1; Stewart Apr. 23, 2018, Trial Tr. (doc. no. 1797) at 57. The failures by ADOC in his case include not placing him on suicide watch after he was found attempting to hang himself and said he wanted to kill himself, and not completing suicide risk assessments or providing follow-up appointments after releasing him from crisis

---

down until 12:58 p.m. *See* Joint Expert Case Summaries (doc. no. 2416-2) at 1. According to the experts, the "[m]edical emergency response time of 10 minutes is unacceptable" and the "[f]ailure to cut the inmate down for more than 30 minutes after discovery is inexcusable and inhumane." *Id.* The defendants claim that the failure to cut down Martinez's body "was due to the officers' chain of command communication process," and note that the incident occurred the day before Wexford's contract began. Defendants' Response to Amended Chart (doc. no. 2500-1) at 5. The court does not see how this in any way excuses what the experts described as ADOC's "inexcusable and inhumane" failure to cut him down for more than 30 minutes.

watch.

- A nursing record from December 27, 2017 reports that Thornton said he wanted to kill himself, had been found attempting to hang himself, had suicidal thoughts, and auditory hallucinations of "kill, kill yourself." Pls. Ex. 1489 at ADOC0420855. Drs. Burns and Perrien testified that he should have been placed on suicide watch; however, the records show that he was improperly placed on MHO. *See id.* at ADOC0420856; Burns and Perrien Apr. 9, 2019, R.D. Trial Tr. at 89-90.

- The records indicate that no suicide risk assessment was conducted at the time. *See* Burns Apr. 9, 2019, R.D. Trial Tr. at 90; *see generally* Pls. Ex. 1489.

- Records indicate that he did not receive adequate follow-up appointments after release from MHO on January 2 or 3, 2018, given that he actually should have been placed on suicide watch rather than MHO. *See* Joint Expert Case Summaries (doc. no. 2416-2) at 1; Burns and Perrien Apr. 9, 2019, R.D. Trial Tr. at 121; Stewart Apr. 23, 2018, Trial Tr. (doc. no. 1797) at

50-52; *see generally* Pls. Ex. 1489.

- Thornton was again transferred to crisis watch on February 22, and then released back to segregation on February 23. *See* Stewart Apr. 23, 2018, Trial Tr. (doc. no. 1797) at 6-8. The records indicate that Thornton did not receive follow-up attention after his release from crisis watch. *See* Joint Expert Case Summaries (doc. no. 2416-2) at 1.

- On February 26, as a correctional officer was speaking to him in his segregation cell, Thornton "stepped onto his bed put a shoe string around his neck and was hanging from the light fixture," according to an incident report. Pls. Ex. 1488 at ADOC0421089. As the officer reached toward Thornton, the string broke, and Thornton fell and hit his head on the floor. *See id.*

- Officers put Thornton in a wheelchair and took him to the medical unit. *See id.* According to Drs. Burns and Perrien, the "decision to place him in wheelchair after sustaining head/neck injury rather than a back

board and/or calling for medical to respond requires further review and supports need for additional and on-going first aid training for correctional staff." Joint Expert Case Summaries (doc. no. 2416-2) at 1.

- Thornton died on March 2 as a result of the head injury. *See id.*; Stewart Apr. 23, 2018, Trial Tr. (doc. no. 1797) at 57; Pls. Ex. 1488 at ADOC0421089.

- ADOC's review of the incident leading to Thornton's death was inadequate. Drs. Burns and Perrien did not receive a medical or security review; and the mental-health QI review "did not identify any issues with mental health's failure to provide any follow-up to Mr. Thornton after crisis placements." Joint Expert Case Summaries (doc. no. 2416-2) at 1.

- Ultimately, Dr. Burns testified that she believed ADOC's noncompliance with the interim agreement increased Thornton's risk of suicide, "because the risk was never measured and quantified, in spite of multiple crisis placements," and "there doesn't appear to be any effort to reduce that risk." Burns Dec. 7, 2019, Trial

Tr. (doc. no. 2256) at 106.

### *Ben McClure*

On December 30, 2017, Ben McClure jumped to his death from the top tier of a dormitory at Limestone prison. *See* Incident Report (doc. no. 1966-25) at 2; Pls. Ex. 1669 at ADOC0424820. ADOC failed to initiate immediate life-saving measures. Namely, the officers who found McClure did not immediately conduct CPR, but rather waited until Licensed Practice Nurses arrived a few minutes later, according to ADOC reports. *See id.* As stated above, Drs. Burns and Perrien emphasized that CPR should be initiated as soon as two security staff are present, regardless of whether medical staff has arrived. *See* Joint Expert Report and Recommendations (doc. no. 2416-1) at 29.

### III. DISCUSSION

#### A.   Permanent Injunction Requirements

The plaintiffs' emergency motion seeks permanent, albeit immediate, relief.   To obtain a permanent

injunction, plaintiffs must show: (1) actual success on the merits; (2) that irreparable injury will be suffered without an injunction; (3) that the threatened injury outweighs any damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to public interest. *See Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004). As discussed below, the plaintiffs meet all these requirements.

i.  Success on the Merits: Eighth Amendment Violation

The plaintiffs satisfy the first requirement for a permanent injunction because they have succeeded on the merits of their claim. To prevail on an Eighth Amendment challenge, plaintiffs must show that: (1) objectively, prisoners had serious medical needs and either had already been harmed or were subject to a substantial risk of serious harm; and (2) subjectively, the defendants acted with deliberate indifference to that harm or risk of harm; that is, they knew and disregarded an excessive

risk to inmate health or safety. *See Braggs*, 257 F. Supp. 3d at 1189. As the court held in 2017, the plaintiffs met this standard and therefore established an Eighth Amendment violation, given that ADOC's mental-health care for prisoners was, "[s]imply put, ... horrendously inadequate" *Braggs*, 257 F. Supp. 3d at 1267.

The court specifically found that ADOC's inadequate suicide prevention contributed to the Eighth Amendment violation. As the court explained, deficient suicide prevention--both alone and in combination with six other inadequacies--"subject[s] mentally ill prisoners to actual harm and a substantial risk of serious harm." *Id.* at 1193. ADOC's suicide prevention was found to be deficient in multiple ways. These included inadequately identifying prisoners at risk of suicide, providing inadequate treatment and monitoring to at-risk prisoners, as well as inappropriately releasing prisoners from suicide watch and not giving them follow-up care. *See id.* at 1220, 1231. Additionally, the court found that the "skyrocketing number of suicides within ADOC, the

majority of which occurred in segregation," reflected the "combined effect" of inadequate screening for the impact of segregation on mental health, and inadequate treatment and monitoring in segregation units. *Id.* at 1245.

As extensively detailed in the liability opinion, *see id.* at 1194-1200, ADOC's "persistent and severe shortages" of mental-health and correctional staff significantly contributed to all these deficiencies. *Id.* at 1268. Since then, the court has repeatedly reaffirmed the centrality of mental-health and correctional understaffing to ADOC's mental-health care failings, and thus, Eighth Amendment violations. *See Braggs*, 2019 WL 539050, --- F. Supp. 3d --- at *5, 9-10; *Braggs v. Dunn*, 2019 WL 78949, --- F. Supp. 3d --- at *1 (M.D. Ala. Jan. 2, 2019) (Thompson, J.); *Braggs v. Dunn*, 2018 WL 5410915, --- F. Supp. 3d --- at *1 (M.D. Ala. Oct. 29, 2018) (Thompson, J.).

Now, in addition to the liability findings, the court further finds that the substantial and pervasive deficiencies identified in the 15 recent suicides

demonstrate that ADOC's suicide-prevention efforts remain inadequate and continue to contribute to the ongoing Eighth Amendment violation originally found in the liability opinion. ADOC still has serious deficiencies in the identification of prisoners at risk of suicide, as well as in their treatment, monitoring, and follow-up care. The deficiencies include:

- Failing to place suicidal prisoners on suicide watch;

- Failing to conduct suicide risk assessments;

- Failing to appropriately monitor prisoners on suicide watch;

- Failing to put prisoners on the mental-health caseload when appropriate;

- Inadequate treatment planning; and

- Inadequate follow-up treatment after release from suicide watch.

ADOC's segregation practices also continue to suffer from the serious flaws the court found in the 2017 liability opinion, including:

- Inadequate screening of prisoners for suicidality

50

and SMIs prior to placing them in segregation;

- Placing prisoners with SMIs in segregation absent extenuating circumstances;[9] and

- Failing to conduct 30-minute security checks in segregation, and failing to make sure the checks are staggered.

Given these serious inadequacies in segregation practices, it is unsurprising that, similar to the liability opinion's finding in June 2017 that the "majority" of suicides occurred in segregation, *Braggs*, 257 F. Supp. 3d at 1245, ADOC recognized nearly two years later, in March 2019, that the "majority of inmates who committed suicide within ADOC have been men who were alone in a restrictive housing cell,[10] after being released from suicide watch." Pls. Ex. 2706 (Mar. 21,

---

9.   The liability opinion found that "one particular subset of prisoners with serious mental-health needs should never been placed in segregation in the absence of extenuating circumstances: those who suffer from a 'serious mental illness.'" *Id.* at 1245-46.

10. The term "restrictive housing" is simply another name for segregation, and the parties and the court use them interchangeably.

2019, Daniels's memorandum announcing directive).

These continuing deficiencies are compounded by ADOC's repeated failure to initiate immediate life-saving measures. Although not identified in the liability opinion, this problem clearly exacerbates ADOC's inadequate suicide-prevention efforts, and illustrates that prisoners remain at substantial risk of serious harm.

Critically, mental-health and correctional understaffing remains a driving force behind the suicide-prevention deficiencies putting prisons at risk. As of December 2018, ADOC reported that 62 % of correctional officer positions were vacant, *see* March 2019 Quarterly Staffing Report (doc no. 2386-1) at 3, and as of September 2018, 23.6 % of the mental-health positions were vacant, *see* December 2018 Quarterly Staffing Report (doc. no. 2378-1) at 9. Commissioner Dunn admitted that ADOC is currently "struggling" to comply with court orders because of inadequate staffing levels, Dunn Apr. 1, 2019, R.D. Trial Tr. at 145, and

affirmed that understaffing remains one of the problems driving the spike in suicides.  *See id*. at 154-55.

In addition to showing that prisoners remain at a substantial risk of serious harm, the 15 suicides also demonstrate that ADOC continues to act with deliberate indifference.  As found in the liability opinion, "the state of the mental-health care system is itself evidence of ADOC's disregard of harm and risk of harm: in spite of ... notice of the actual harm and substantial risks of serious harm posed by the identified inadequacies in mental-health care, those inadequacies have persisted for years and years."  *Braggs*, 257 F. Supp. 3d at 1256.  Almost two years since the court wrote those words, the inadequacies continue to persist, as evidenced by the problems pervading the recent suicides.

Furthermore, many of the inadequacies in the 15 suicides constitute noncompliance with the interim agreement and other remedial orders that ADOC agreed to implement.  ADOC's continued inability to carry out the terms of the interim agreement and other remedial

measures thus far illustrates "a striking indifference by ADOC to a substantial risk of serious harm." *Id.* at 1264.

Finally, ADOC's inadequate internal review of the 15 suicides shows ongoing deliberate indifference, just like the court originally found deliberate indifference in part because ADOC had "done vanishingly little to exercise oversight of the provision" of mental-health care. *Id.* at 1257. ADOC's ongoing broader failures to self-monitor are also extensively detailed in the monitoring section below.

ADOC has recently adopted some promising measures to improve suicide prevention, such as the March 21, 2019, announcement by ADOC Deputy Commissioner Charles Daniels of a directive generally prohibiting the release of inmates from suicide watch directly to segregation. *See* Pls. Ex. 2706. However, as elaborated below, the measures are insufficient to address the scope of a problem that is many years in the making, and, as they were implemented quite recently, it remains to be seen

whether they will even be effectively implemented.  In any case, several of the key measures came only *after* the spike in suicides had taken more than a dozen lives, and *after* the plaintiffs brought attention the problem by requesting emergency relief.  Put differently, the measures have been too little, too late.

To conclude, while the liability findings by themselves would justify the relief ordered here, the court's additional factual findings concerning inadequate suicide prevention in the 15 recent suicides underscores that the constitutional violation remains ongoing and requires immediate relief.  Accordingly, the plaintiffs satisfy the first requirement for a permanent injunction.

With this in mind, the court will now briefly discuss why the plaintiffs satisfy the remaining requirements for a permanent injunction.

ii.  Remaining Permanent Injunction Requirements

The plaintiffs meet the remaining three requirements

for a permanent injunction. As to the second requirement, the immediate and substantial risk of suicide, as reflected in the recent wave of suicides, satisfies the irreparable harm inquiry. As to the third, the threatened injury absent an injunction--a higher risk of suicides and suffering--outweighs any harm the injunction would cause, particularly because, as discussed below, the defendants agree with or claim to be already enacting most of the measures the plaintiffs seek. Finally, an injunction is not adverse to the public interest, for "the public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019).

### B.    The Defendants' Arguments Against Relief

#### i.    The Defendants' Notice Argument

The defendants contend that any relief based on provisions of the interim agreement would exceed the scope of the evidentiary hearing on this matter, because

they did not have the opportunity to present evidence on the interim agreement at the hearing. *See* Defendants' Response to Plaintiffs' Proposed Opinion and Order (doc. no. 2499) at 13-17. The court rejects this argument. The defendants had adequate notice as to the scope of the requested immediate relief: In the plaintiffs' pretrial brief, the interim agreement was among the provisions that they requested be immediately implemented. *See* Plaintiffs' Pretrial Brief (doc. no. 2435) at 15 (requesting entry of an order for the relief provided in the Interim Order as "immediate permanent relief"). The defendants also had an opportunity to cross Dr. Burns on the interim agreement.

Nevertheless, the court recognizes that the defendants likely were confused as to this issue. During the discussion about restricting the trial to immediate relief, it was not specifically mentioned that the interim agreement was encompassed in the immediate relief the court would be considering, and defense counsel seemed to be focused on the supplemental recommendations.

Furthermore, the defendants' lead attorney was out sick at the time of the discussion, and his associate may not have realized that the immediate relief requested by the plaintiffs encompassed the interim agreement.

Because there is an urgent need for immediate relief, and because the defendants previously agreed to the terms of the interim agreement, the court will issue an order for relief today that includes many of the agreement's provisions.  However, if the defendants disagree with the parts of the order addressing the interim agreement and would like another opportunity to present evidence about it, the court will consider their evidence and modify or vacate the relevant portions of this opinion and order if appropriate.

### ii. The Defendants' Arguments on Mootness and Ongoing and Continuous Violation

The defendants argue that steps they have taken since the start of the litigation to improve suicide prevention render unnecessary many, if not all, aspects of the relief the plaintiffs request.  They frame this argument

in several ways.  First, they contend that their remedial

actions mean that certain requested provisions would fail

to meet the requirement of an "ongoing and continuous"

violation, *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d

1326, 1337 (11th Cir. 1999), a phrase drawn from caselaw

on the *Ex parte Young* exception to Eleventh Amendment

immunity, *see* 209 U.S. 123 (1908).  Second, they contend

that claims to certain requested relief are moot because

they voluntarily ceased the offending conduct.[11]

   As to the first argument, the defendants rely on the

statement in *Summit* that the *Ex parte Young* exception

---

   11. The defendants also contend that certain
provisions are unnecessary in light of improvements ADOC
has made, and thus do not satisfy the
PLRA's needs-narrowness-intrusiveness test.  As
discussed below, the PLRA arguments fail for essentially
the reasons as the mootness and *Ex parte Young*
contentions do.

   To the extent that the defendants rely on the PLRA's
"current and ongoing violation" language, 18 U.S.C.
§ 3626(b)(3), their reliance is misplaced.  The PLRA
refers to an "ongoing" violation in its provision on
terminating relief: "Prospective relief shall not
terminate if the court makes written findings based on
the record" that such relief meets the
needs-narrowness-intrusiveness standard.  *Id*.
Therefore, the "current and ongoing requirement is
distinct from the standard governing the initial entry

"applies only to ongoing and continuous violations of federal law." 180 F.3d at 1337. The plaintiffs in *Summit* sought to enjoin the enforcement of a criminal law, but the defendants argued that the case should be dismissed because there was no ongoing and continuous violation. The court rejected that argument, explaining that "[t]he ongoing and continuous requirement merely distinguishes between cases where the relief sought is prospective in nature, *i.e.*, designed to prevent injury that will occur in the future, and cases where relief is retrospective." *Id.* at 1338. The court further opined that the requirement for ongoing and continuous violations is satisfied "where there is a threat of future enforcement [of the law] that may be remedied by prospective relief." *Id.* Applying that reasoning to the case at hand, the court must answer the question whether the plaintiffs face a threat of being subjected in the future to the challenged prison conditions that may be remedied by

---

of injunctive relief." *Thomas v. Bryant*, 614 F.3d 1288, 1320 (11th Cir. 2010) (internal quotation marks omitted).

prospective relief.  As shown by the earlier discussion of the court's findings, and as detailed below, the court finds that there is a continuing threat of the plaintiffs being subjected in the future to the challenged prison conditions and that this continuing threat may be remedied by prospective relief.

As to their second argument, the defendants cite three cases to support their contention that their remedial actions have mooted certain requested relief. First, the defendants cite *County of Los Angeles v. Davis*, where the Supreme Court reiterated that, "as a general rule, voluntary cessation of allegedly illegal conduct does ... not make the case moot."  440 U.S. 625, 631 (1979) (internal quotation marks omitted).  The Court explained that a case may become moot if two conditions are met: "(1) it can be said with assurance that there is no reasonable expectation ... that the alleged violation will recur ... , and (2) interim relief or events have completely and irrevocably eradicated the

effects of the alleged violation." *Id.* (internal quotation marks omitted).

The defendants also cite two subsequent Eleventh Circuit cases explaining--with respect to voluntary cessation--that when the defendant is a government actor rather than a private citizen, "there is a rebuttable presumption that the objectionable behavior will *not* recur." *Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.*, 382 F.3d 1276, 1283 (11th Cir. 2004) (citing *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328-29 (11th Cir. 2004)). *Troiano* involved a lawsuit for injunctive relief to address a county's alleged failure to make auxiliary audio devices available in voting booths. *See id.* at 1278. The court held that the case was moot based on the defendant's voluntary installation of the audio devices in all precincts and strong evidence that they would be available in all future elections, including the fact that the defendant ended the allegedly illegal practice prior to receiving notice of the litigation. *See id.* at 1285-86. *Coral*

*Springs* involved a challenge to an allegedly unconstitutional city ordinance. *See* 371 F.3d at 1323-24. There, the court clarified that the repeal of an ordinance moots a challenge to it unless the court finds that it is "reasonably likely" to be reenacted or it is replaced with another constitutionally suspect law. 371 F.3d at 1330, 1331 n.9.

Taken together, these mootness cases stand for the following propositions. A claim may become moot through voluntary cessation only if there is no reasonable expectation that the alleged violation will recur, and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. If the defendant is a governmental actor, and the defendant has eliminated the challenged conduct or law, that defendant is entitled to a rebuttable presumption that the conduct or law will not recur.

Two Eleventh Circuit cases not cited by the defendants specifically address the issue of when injunctions targeting Eighth Amendment violations become

unnecessary due to a prison system's remedial efforts. *See Thomas v. Bryant*, 614 F.3d 1288 (11th Cir. 2010); *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993). In these cases, the defendants argued that injunctive relief was unnecessary because they had taken steps to address the challenged condition or practice by the time of trial. Faced with these arguments, the courts "recognized that '[s]ubsequent events, such as improvements in the allegedly infirm conditions of confinement, while potentially relevant, are not determinative' of whether injunctive relief is no longer warranted." *Thomas*, 614 F.3d at 1320 (quoting *LaMarca*, 995 F.2d at 1541).[12] The Eleventh Circuit opined that,

---

12. While not explicitly using the term "moot" in the discussion, the *LaMarca* court clearly had that *jurisdictional* inquiry in mind. In reviewing the applicable standard, the court explained that "*[j]urisdiction* may abate if there is no reasonable expectation the alleged violations will recur and if intervening events have completely and irrevocably eradicated the effects of the alleged violations. To defeat jurisdiction on this basis, however, defendants must offer more than their mere profession that the conduct has ceased and will not be revived." *LaMarca*, 995 F.2d at 1542 (citations omitted) (emphasis added). Furthermore, the *LaMarca* and *Thomas* courts both applied

when defendants attempt to avoid injunctions based on changes they made after a suit started, they "must satisfy the heavy burden of establishing that these such events 'have completely and irrevocably eradicated the effects of the alleged violations.'" *Id.* (quoting *LaMarca,* 995 F.2d at 1542); *compare Cty. of Los Angeles*, 440 U.S. at 631 (reciting same standard). Applying that heavy burden in *Thomas*, for example, the court held that, "[a]lthough DOC's recent reforms may represent affirmative responses to recognized deficiencies in its ability to address the needs of its growing mentally ill inmate population, the defendants have not established that they have eradicated the effects of the constitutional violations found by the district court." *Id.* at 1321 (internal citations omitted).

Applying these precepts, the court holds that the plaintiffs' claims for relief are not moot. As elaborated below, unlike in the cases cited by the

---

the same mootness standard as the *Cty. of Los Angeles* case that the defendants cite. *See* 440 U.S. at 631.

defendants, it is not clear here that the challenged practices have ceased; in other words, the defendants have not satisfied their "heavy burden" of establishing that the steps they have taken have "completely and irrevocably eradicated the effects of the alleged violations." *Thomas*, 614 F.3d at 1321 (quoting *LaMarca*, 995 F.2d at 1542); *see also Cty. of Los Angeles*, 440 U.S. at 631. Because the practices have not ceased, the defendants are not entitled to a rebuttable presumption that those practices will not recur. However, even if the court were to conclude that the unconstitutional conditions had ceased, and the rebuttable presumption therefore applied, the court would still find that it is reasonably likely that those conditions will recur. The voluminous evidence of ADOC's repeated failures to comply with its own policies and the court's orders, and of ADOC's lack of substantial progress in addressing its severe understaffing problem--which lies at the root of its inadequate suicide-prevention measures--overcomes

the "rebuttable presumption that the objectionable behavior will *not* recur." *Troiano*, 382 F.3d at 1283.

Throughout this case and in the suicide-prevention trial, the court has seen time and again compelling evidence of ADOC's inability to ensure that its ground-level staff comply with directives from the top, not to mention with the orders of this court. In the suicide-prevention trial, the court saw ample evidence that the noncompliance continues, as demonstrated by the circumstances surrounding the recent suicides. The history of this case is replete with evidence of directives given and corrective action plans created that have been doomed to irrelevance because of a lack of follow-through to ensure the directives were obeyed and the plans put into action. The heart of the matter is understaffing--the overriding problem that makes all of ADOC's other problems so difficult to solve. Without sufficient staff, ADOC will continue to have great difficulty both with carrying out all of the changes it

needs to make, and with adequately supervising its staff's compliance with its directives.

The court now turns to the defendants' specific mootness and *Ex parte Young*-based challenges to Drs. Burns and Perrien's immediate relief recommendations.

1.   *The Defendants' Efforts to Eliminate Improper Use of Mental-Health Observation*

The defendants argue that it is unnecessary for the court to include in its remedial order the experts' recommendation that mental-health observation (MHO) not be used as a part of suicide prevention, because there is no ongoing and continuous violation of federal law to address, and because ADOC and Wexford voluntarily ceased the practice.   *See* Defendants' Response to Plaintiffs' Proposed Opinion and Order (doc. no. 2499) at 18-21.   They argue that ADOC policy does not authorize the use of MHO for suicidal prisoners and that the policy is being revised to make this clearer; that they have expressed concern about the issue with their vendor and the vendor has taken action; and that some data indicates that the

use of MHO for suicide watch is declining.  *See id.*  They also point to testimony they contend shows that the use of MHO for suicide watch has ended.

ADOC's actions, while commendable, are insufficient to show that the use of MHO for suicidal inmates has been completely and irrevocably eradicated.  Furthermore, the court finds that, even if the use of MHO for suicidal inmates has abated to some extent, there is still a significant threat--and it is reasonably likely--that the dangerous practice will continue.

First, the testimony as to whether MHO has stopped being used for suicidal prisoners is far from conclusive. On February 15, 2019, Crook wrote a letter to Wexford, ADOC's vendor, notifying it of the improper use of MHO, among other "systemic failures to comply with court orders."  Pls. Ex. 2710 at ADOC0475738.  Crook testified that, since sending the letter, she has not received any reports suggesting that MHO is being used for suicidal inmates.  *See* Crook Apr. 4, 2019, Trial Tr. (doc. no. 2487) at 34.  However, it is not clear that she would

receive such reports if this were happening. Crook also testified to seeing an increase in the number of people in acute suicide watch and a decrease in those in MHO. *See id.* at 33. She concluded from those numbers "that MHO is being utilized *less* as a first placement for crisis cell." *Id.* at 34 (emphasis added). Notably, she stopped short of saying the practice had ended. The defendants also point to ADOC Psychiatry Director Kern's belief that MHO is no longer being used for suicide watch. *See* Kern Mar. 29, 2019, Trial Tr. (doc. no. 2483) at 112. But the court does not credit this testimony because the only basis he provided for it was his and his colleagues' verbal communications with Wexford personnel. *See id.* at 112-16. Kern admitted that, in spite of the seriousness of the matter, he had not verified his belief by looking at the appropriate logs. *See id.* at 113. Although Wexford's Program Director for Mental Health Barbara Coe testified that her company would not put suicidal prisoners on MHO, *see* Coe Apr. 4, 2019, R.D. Trial Tr. at 199, the court cannot rely on her promise,

particularly when Wexford was not supposed to be using MHO in that way in the first place, *see LaMarca*, 995 F.2d at 1542 ("[D]efendants must offer more than their mere profession that the conduct has ceased and will not be revived.").

The defendants argue that Wexford has implemented a formal corrective action plan regarding the misuse of MHO. *See* Defendants' Response to Plaintiffs' Proposed Opinion and Order (doc. no. 2499) at 19. Yet, the corrective action plan the defendants submitted as evidence does not even mention MHO. *See* Defs. Ex. 3657 at ADOC0475742-46 (Wexford Suicide Prevention Corrective Action Plan, Initiated January 17, 2019). Crook testified that to fix the MHO problem identified in her letter, Wexford has "given an absolute directive to [its] staff that people will no longer be on MHO if they are declaring suicidality." Crook, Apr. 3, 2019, Trial Tr. (doc. no. 2486) at 51. But she also testified that she had not seen a copy of Wexford's directive. *See id.* at 52. More generally, Crook admitted that she has

insufficient staff to keep up with all of the monitoring
of court orders that ADOC needs to do. *See id.* at 68-69;
Crook Apr. 1, 2019, Trial Tr. (doc. no. 2485) at 11-12.
Thus, the court cannot conclude at this time that she
will be able to ensure compliance with the directive.

Finally, the court rejects the defendants' argument
that there is no longer a violation because their policy
does not authorize the use of MHO for suicidal prisoners.
Crook testified that ADOC's policy prohibiting the use
of MHO for suicidal prisoners has been in place since
2005. *See* Crook Apr. 4, 2019, Trial Tr. (doc. no. 2487)
at 32-33. As ADOC's repeated and admitted placement of
suicidal prisons on MHO shows, however, the existence of
that policy did nothing to stop the practice. While Dr.
Kern testified that ADOC is currently updating the policy
to make it clearer that MHO should not be used for suicide
watch, he said the update was not yet finalized. *See*
Kern Mar. 29, 2019, Trial Tr. (doc. no. 2483) at 108-09.
Even after the updated policy is finalized, it will
provide little assurance that the practice will not

recur: Noncompliance with ADOC policy has been a recurring theme for MHO use and other areas throughout this case, as shown in many of the suicides discussed above.

In sum, the court concludes that there is a continued significant threat of placement of suicidal inmates in MHO that could be remedied by injunctive relief; that the defendants have not established that they have eradicated the effects of the constitutional violations found by the court; and that to the extent ADOC's recent remedial efforts have eliminated the use of MHO for suicidal prisoners, it is reasonably likely that those conditions will recur. Therefore, the requested relief is not moot.

## 2. *The Defendants' Efforts to Eliminate Transfers from Suicide Watch to Segregation*

In a March 21, 2019, memorandum, ADOC Deputy Commissioner of Operations Daniels announced a directive prohibiting the transfer of prisoners from suicide watch to segregation "unless there is no alternative due to well-documented exceptional circumstances or exigent

circumstances arising from an inmate's behavior." Pls.
Ex. 2706. The memorandum states that, if an inmate cannot
be safely discharged to a unit other than segregation,
Daniels or his designee must approve the temporary
segregation placement. *See id.* The defendants argue
that this directive moots and renders unnecessary the
entry of a remedial order enforcing the experts'
recommendations regarding prisoners in segregation who
have been placed on suicide watch.

While promising, the memorandum announcing the
directive is insufficient evidence that ADOC has
completely and irrevocably eradicated the practices
addressed by the experts' recommendation, or that the
practices will not recur. *If followed*, the directive
could largely address the experts' recommendation on this
issue. But it is too soon to tell how well it will be
followed: Daniels issued the memorandum just a week
before the start of the suicide-prevention trial. The
defendants will need to present evidence of sustained
compliance with the directive over a longer period of

time to convince the court that ADOC has successfully ended the practice.[13]

Moreover, as stated earlier, this case is replete with examples of directives and policies being issued but not followed. So long as the correctional understaffing problem continues, measuring and ensuring compliance with directives will remain difficult for ADOC. In addition, the continuing severe correctional staffing shortage creates pressure to use segregation for potentially violent prisoners. Without adequate correctional staffing, fights and misconduct will continue unabated, and segregation will continue to be the first option for managing such prisoners. *See* Vail Dec. 22, 2016, Trial Tr. (doc. no. 1207) at 81, 90 (discussing how overcrowding and understaffing lead to more violence and misconduct, creating a higher need for segregation; and testifying that segregation is "the typical prison response" to violence and misconduct).

---

13. The court would be willing to reconsider the continued need for this relief upon such a showing after a significant period of time has passed.

In sum, the court is not at all convinced that the directive has succeeded in eliminating the problem it seeks to address, and finds that the problem is reasonably likely to recur.[14]

### 3. *Training for Nursing Staff*

The defendants contend that the court should not enter an order on the experts' recommendation to train all nursing staff on how to complete segregation pre-placement screenings. *See* Immediate Relief

---

14. During the suicide-prevention trial, Drs. Burns and Perrien testified that Daniels's directive appeared to render "moot" their recommendation on the placement of inmates after their discharge from suicide watch. *See* Burns and Perrien Apr. 9, 2019, R.D. Trial Tr. at 185-86. Of course, mootness is a legal concept upon which the experts are not qualified to opine; whether a claim is moot is a legal decision for the court. The court interprets their statements to mean that Daniels's directive addresses the concern raised in their recommendation, and that it was an appropriate way to act, but not as an opinion that the directive has already eradicated the problem it addresses. Since Daniels announced the directive after they submitted their report and recommendations to the court, and shortly before their testimony, the experts could not have meant to express an opinion as to the directive's actual impact on practices at the facilities.

Recommendations (doc. no. 2416-4) at 3. While the defendants do not object to the experts' recommendation, they argue that they are already providing comprehensive training to nurses conducting pre-placement screenings, and that a previously issued remedial order already requires such training. *See* Defendants' Response to Plaintiffs' Proposed Opinion and Order (doc. no. 2499) at 39-40. They also assert that they issued a new policy in December 2018 on segregation pre-placement screenings that contains detailed instructions. *See id.* at 40. Accordingly, they contend, there is no ongoing constitutional violation in this area. *See id.* The court disagrees.

As discussed above, the *Ex parte Young* analysis looks at whether there is a threat of future harm from the challenged prison conditions that may be remedied by prospective relief. The answer here is clearly yes. The parties' experts undertook an extensive and thorough investigation of the state of suicide prevention in ADOC, looking at thousands of documents, touring four

facilities, and interviewing prisoners as well as ADOC and Wexford staff. *See* Joint Expert Report and Recommendations (doc. no. 2416-1) at 4. Based on their study, they concluded that training for nurses assessing prisoners going into segregation is insufficient. Specifically, they found that training "should provide greater detail about indicators to look for as well as include how to place someone on immediate watch after hours and how to initiate an emergent referral." Immediate Relief Recommendations (doc. no. 2416-4) at 3. Nurses should be trained on an "easy in" model, meaning that, if a nurse is "uncertain in any way about a case, the inmate is placed on watch." *Id.* The existing remedial order does not address these issues; it simply says that nurses shall be "trained in the screening process." Order and Injunction on Segregation Remedy (doc. no. 1815-1) at 2.

Moreover, Drs. Burns and Perrien's findings about ADOC's deficient preplacement screenings show that, well after the 2017 liability opinion and 2018 segregation

remedy order, nurses still are not well-trained enough to adequately screen inmates. *See* Joint Expert Report and Recommendations (doc. no. 2416 1) at 14-15 (finding "[n]o instances of prisoners being diverted from [segregation] or placed on watch as a result of pre-placement screening ... despite multiple subsequent placements on suicide watch and mental health observation from [segregation]"). Perhaps most notably, the fact--recognized by ADOC--that the majority of suicides by prisoners in its custody are men released from suicide watch into segregation is compelling circumstantial evidence that nurses need to be better trained in screening inmates before they are placed in segregation. *See* Pls. Ex. 2706 (Mar. 21, 2019, Daniels's memorandum announcing directive). For example, Matthew Holmes killed himself within roughly 12 hours of being placed in segregation, after ADOC "fail[ed] to generate an emergency referral to mental health in response to a positive pre-placement screen." Joint Expert Case Summaries (doc. no. 2416-2) at 4.

Finally, while the defendants note that they have promulgated a new policy on preplacement screening, the policy they cited nowhere references any required training. *See* Defs. Ex. 3647. Even if it did, the record has repeatedly shown that ADOC's enactment of a policy often does not translate to ground-level compliance.

In sum, the court concludes that there remains a significant threat of nurses conducting inadequate pre-placement screening of prisoners going into segregation, and that injunctive relief could remedy this threat.

### 4. *Security Checks in Segregation*

The defendants argue that the court should not enter an order implementing the experts' recommendation that "30-minute custody rounds in segregation must be enforced consistent with existing policy," Immediate Relief Recommendations (doc. no. 2416-4) at 4, because the plaintiffs failed to show an ongoing constitutional violation regarding security checks in segregation, *see*

Defendants' Response to Plaintiffs' Proposed Order and Opinion (doc. no. 2499) at 40. The court disagrees.[15]

An ongoing and continuous violation exists for purposes of *Ex parte Young* when there is a threat of future harm from the challenged prison condition that may be remedied by prospective relief. As discussed earlier, the court has found, based on the evidence at the suicide-prevention trial, that inadequate monitoring of prisoners in segregation continues to be a substantial problem in ADOC, so there is a threat of future harm.

To support their ongoing-violation argument, the defendants point to their existing policy requiring 30-minute checks on prisoners in segregation, *see* Pls. Ex. 1399, which, they note, the plaintiffs' experts agree is an appropriate policy, *see* Vail Apr. 3, 2019, R.D. Trial. Tr. at 141; Burns Apr. 9, 2019, R.D. Trial Tr. at 37-38. However, as the evidence has shown, like other policies in ADOC, the existence of the 30-minute policy

---

15. The defendants also argue that relief would violate the PLRA. That argument is addressed in the PLRA section below.

does not mean that it will be followed.[16]  Indeed, the whole purpose of the experts' recommendation is that the policy be *enforced*.

The defendants also cite evidence presented at the suicide-prevention trial that several wardens and their staff have taken steps to ensure that 30-minute checks are regularly conducted in their facilities, and that

---

16. Ross Wolfinger killed himself in segregation during a shift in which the correctional officer assigned to Wolfinger's area of segregation failed to do any 30-minute checks.  *See* Pls. Ex. 2403 at SPA_13487.  An ADOC memorandum about the suicide says the officer's actions "resulted in" Wolfinger's death.  *See id.* at SPA_13488.  Curiously, despite this admission, the defendants highlight that Dr. Burns testified that she did not determine whether 30-minute checks would have prevented any of the suicides she reviewed in her assessment.  *See* Burns Apr. 9, 2019, R.D. Trial Tr. at 38.  This testimony proves little to nothing for the defendants, given that Dr. Burns did not say whether she even set out to determine whether there was a causal connection between the failure to conduct rounds and specific suicides, or that she had the necessary information to make that determination.  In any case, the testimony of the defendants' own expert, Dr. Perrien, indicates that she believed such a causal connection possibly existed in some suicides.  She said that "there were cases where it's possible that if 30-minute rounds were occurring, perhaps those individuals may have been rescued.  May have been identified.  May not have completed suicide."  Perrien, Apr. 9, 2019, R.D. Trial Tr. at 193-94.

certain discovered violations have been corrected. This evidence falls short of establishing that ADOC has "completely and irrevocably eradicated the effects of the alleged violations," let alone that there not a serious threat of the problem recurring. *Thomas*, 614 F.3d at 1321. While it is undeniably important that wardens take appropriate disciplinary action when they discover violations, the evidence did not convince the court that ADOC is catching most violations. Instead, the court came away convinced that ADOC's confirmation of compliance remains insufficient. At the suicide-prevention trial, the court heard ample evidence of substantial and pervasive problems in complying with the policy to conduct security checks every 30 minutes. For example, plaintiffs' expert Vail testified that, based on the segregation duty post logs that he has reviewed, ADOC has not demonstrated a consistent and sustained practice of conducting 30-minute security checks. *See* Vail Apr. 3, 2019, R.D. Trial Tr. at 156. He said that of the six or seven facilities he reviewed,

only one "passed muster." *Id.* Most troublingly, the logs from Holman prison showed two entire (eight- or 12-hour) shifts in which not a single security check was logged, and other days in which more than two hours passed before a security check was logged. *See id.* at 155.

Finally, given the continuing correctional understaffing, the court finds that inadequate checks are likely to be a recurring problem. *See* Perrien Apr. 9, 2019, R.D. Trial Tr. at 195 (testifying that it is her understanding that ADOC is unsure whether it can follow its own segregation-rounds policy in "particularly understaffed facilities"). The evidence fell far short of showing that the problem of inadequate security checks had been eradicated, that the problem poses no threat of future harm to the plaintiffs, or that ADOC has developed a functional system for ensuring that such checks occur in all segregation units. As explained above, substantial and pervasive inadequacies identified by the court remain that may be remedied by injunctive relief.

## C. The Prison Litigation Reform Act

Under the Prison Litigation Reform Act (PLRA), a court cannot order prospective relief addressing prison conditions unless it "finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Whether the relief meets the PLRA's "need-narrowness-intrusiveness" requirement is "determined with reference to the constitutional violations established by the specific plaintiffs before the court." *Brown v. Plata*, 563 U.S. 493, 531 (2011). In making the determination, courts are required to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." 18 U.S.C. § 3626(a)(1)(A).[17]

_____

17. These requirements are consistent with this court's previous statement that courts must remedy constitutional violations, *see Brown v. Plata*, 563 U.S. 493, 511 (2011), even though prison officials in cases challenging prison conditions "should be given considerable deference in determining an appropriate remedy for the constitutional violations involved."

For the following reasons, and based on a comprehensive review of the record,[18] the court concludes that virtually all of the immediate suicide-prevention relief requested here satisfies the PLRA's need-narrowness-intrusiveness requirement. Severe inadequacies in ADOC's suicide-prevention efforts contribute to the ongoing Eighth Amendment violation that the court originally found in the liability opinion, and reaffirms today. The relief ordered is narrowly tailored to address these inadequacies, which relate to, among other areas, identifying inmates at risk of suicide, treating and monitoring them, and providing them follow-up care. Furthermore, as elaborated below, not

---

*Laube v. Haley*, 242 F. Supp. 2d 1150, 1153 (M.D. Ala. 2003) (Thompson, J.) (citing *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979)).

18. The court reviewed the whole record, including the evidence presented during the liability trial as well as the additional remedial phase hearings up to this point. The court has heard testimony from, among others, mental-health experts selected by both parties, ADOC officials, ADOC correctional staff, plaintiff class members, and the defendants Commissioner Dunn and Associate Commissioner Naglich.

only do the opinions of both parties' experts support the need for the relief, but the defendants themselves have at least agreed, or not objected, to many of the relief's provisions, and in some instances have themselves suggested the relief. *See* Interim Agreement (doc. no. 1106-1); Defendants' Response to Plaintiffs' Proposed Opinion and Order (doc. no. 2499) at 13.


### i.  Particularized Findings

As required by the Eleventh Circuit Court of Appeals, the court will make "particularized findings, on a provision-by-provision basis, that each requirement imposed" here meets the PLRA's need-narrowness-intrusiveness requirement. *Cason v. Seckinger*, 231 F.3d 777, 785 (11th Cir. 2000); *see also United States v. Sec'y, Fla. Dept. of Corrs.*, No. 12-22958-CIV, 2015 WL 4768247 at *1 (S.D. Fla. Aug. 12, 2015) (Seitz, J.) (interpreting *Cason*'s application of the "need-narrowness-intrusiveness" requirement to termination proceedings of consent decrees as requiring

"a district court to make particularized findings as to each element" of injunctive relief). In discussing the evidence that supports these findings, the court's analysis will largely focus on a single inquiry: is the provision necessary to correct the constitutional violation established by the plaintiffs? This is for both practical and logical reasons. Logically speaking, if the court determines the relief is necessary to correct the violation found by the court, it follows that the relief is (1) "narrowly drawn," (2) "extends no further than necessary," and (3) "is the least intrusive means necessary to correct the violation." 18 U.S.C. § 3626(a)(1)(A).[19]  Relatedly, and practically speaking,

---

19. To explain: if the ordered relief is necessary to correct the violation, then--by definition--*no* other form of relief would be sufficient to correct it. And if no other form of relief is sufficient correct the violation, then the ordered relief is--by definition--"narrowly drawn" and the "least intrusive means necessary" to correct it; any narrower or less intrusive relief would not be sufficient. 18 U.S.C. § 3626(a)(1)(A). Similarly, if the ordered relief is necessary, then it "extends no further than necessary," because any part of the relief extending further than what is necessary would render it unnecessary. *Id.*

because the three components of the requirement (need, narrowness, intrusiveness) really blend into a single inquiry, evidence showing compliance with one component often also shows compliance with the others. It would make for an excessively redundant and lengthy (more so than it already is) opinion to analyze each component separately and thus frequently repeat the same evidence for why it is satisfied, especially given the redundancy already created by the requirement for provision-by-provision findings.

## ii. The Interim Agreement

The genesis of the interim agreement traces back to the suicide of Jaime Wallace, a plaintiff class member who had severe mental illnesses, as well as intellectual and physical disabilities. *See Braggs*, 257 F. Supp. 3d.

---

However, the court offers these observations as general ones, for the court is reluctant to be so confident as to say there are no exceptions. What the court can say is that there do not appear to be any exceptions insofar as the comments apply here.

at 1184. At the liability trial, he recounted the many times he had tried to kill himself, showed the scars on his arms where he made repeated attempts, and told the court that he had not received enough treatment for his illnesses. Ten days after testifying, he hanged himself in prison and died. Wallace's suicide prompted the court to halt proceedings and allow the parties to mediate immediate, interim measures to prevent future suicides. The parties reached the interim agreement, which the court adopted as an interim order. *See* Interim Agreement and Order (doc. nos. 1106, 1106-1).

For the following reasons the court now finds that the vast majority of the terms of the interim agreement--as modified by Drs. Burns and Perrien's recommendations--are narrowly drawn, extend no further than necessary to correct the defendants' constitutional violation, and are the least intrusive means necessary to correct the violation. In making this finding, the court gives "substantial weight to any adverse impact on public safety or the operation of a criminal justice

system caused by the relief." 18 U.S.C. § 3626(a)(1)(A).

The court will next make particularized findings for each provision, but three overarching reasons in support of the PLRA findings bear emphasizing at the outset. First, where, as here, the provisions of relief ordered by a court are adopted from an agreement jointly drafted and reached by the parties, it is compelling evidence that the provisions comply with the needs-narrowness-intrusiveness criteria. *See Morales Feliciano v. Calderon Serra*, 300 F. Supp. 2d 321, 334 (D.P.R. 2004) (Perez-Gimenez, J.) ("The very fact that the defendants chose to join the plaintiffs in selecting this remedy would seem to mean--and must be taken to mean--that they understood it to be precisely tailored to the needs of the occasion, that it is narrowly drawn and least intrusive—in fact not intrusive at all."); *Benjamin v. Fraser*, 156 F. Supp. 2d 333, 344 (S.D.N.Y. 2001) (Baer, J.) (reasoning that an agreement between the parties that is incorporated into an order "constitutes strong evidence" of compliance with the

need-narrowness-intrusiveness requirement); *cf. Cason*, 231 F.3d at 785 n.8 ("Of course, we do not mean to suggest that the district court must ... enter particularized findings concerning any facts or factors about which there is no dispute."). Indeed, common sense dictates that, as a general proposition, a penal institution would release to a court or other outside entity only as much of its discretion and authority as it believes the law and facts require.

Second, despite agreeing to them, ADOC has consistently failed to comply with the provisions of the interim agreement. And more generally, the ongoing inadequacies in ADOC's suicide-prevention efforts show that the agreement remains urgent and necessary.

Third, in their briefing, the defendants make no specific objections to the interim agreement's requirements. Their arguments against them relate to only notice and mootness. As explained above, those arguments are meritless.

1.  *Licensed Mental-Health Professionals
        at Treatment Hubs*

In the liability opinion, the court found that "[t]he quality of psychotherapy ... suffers due to use of unsupervised, unlicensed counselors, referred to as 'mental health professionals' [(MHPs)]." *Braggs*, 257 F. Supp. 3d at 1211. The lack of supervision for unlicensed MHPs was found to be "a significant, system-wide problem affecting the delivery of mental-health care within ADOC." *Id.*

The interim agreement addresses this problem. The relevant provision requires that each "Major Facility"[20] have at least one full-time licensed MHP,[21] and that the

_____

20. "A Major Facility is defined as all ADOC facilities except any designated community based facility ("work release") or community work center." Interim Agreement (doc. no. 1106-1) at 1 n.2.

21. The agreement defines a licensed MHP as "any individual who has satisfied the licensing requirements promulgated by the Alabama Board of Examiners in Counseling" and "currently holds a valid license from the Alabama Board of Examiners in Counseling." Interim Agreement (doc. no. 1106-1) at 1 n.1. Although the court ordered that, as of June 4, 2018, the term "MHP" in this case "shall refer only to a licensed mental-health professional," and that "unlicensed mental-health

93

treatment hubs--Bullock, Donaldson, and Tutwiler--have at least two full-time licensed MHPs. *See* Interim Agreement (doc. no. 1106-1) at 1. The agreement further requires that two licensed MHPs be on site for at least eight hours per day every business day at each treatment hub, and that at least one MHP be at each treatment hub on the weekends and holidays. *See id*.

The court finds that ordering immediate and permanent implementation of this provision constitutes relief that is narrowly drawn, extends no further than necessary to correct the defendants' constitutional violation, and is the least intrusive means necessary to correct the violation. *See* 18 U.S.C. § 3626(a)(1)(A).

In addition to the original liability findings, evidence presented at the suicide-prevention trial further demonstrates that the provision is necessary.

---

providers may receive other titles, but will no longer be referred to as 'MHPs,'" Order (doc. no. 1864), this opinion uses the term "licensed MHP" to be abundantly clear that these positions should be licensed.

Dr. Burns testified that the required numbers of licensed MHPs in major facilities and treatment hubs are the "minimum numbers of people" that must be available "to provide an adequate suicide prevention program." Burns Apr. 8, 2019, R.D. Trial Tr. at 133. In her view, there is no less intrusive requirement that would still be effective. *See id.* Crucially, MHPs must have the required licensing to be able to work independently, without supervision. *Id.* at 129-30. According to Dr. Burns, they must be available every day, including weekends, to check on inmates, including those who have been placed on suicide watch. *See id.* at 130. Adequate licensed MHP staffing is also needed to complete the suicide risk assessments and follow-up appointments required elsewhere in this opinion. Finally, the defendants agreed to include this requirement in the interim agreement, which is strong evidence that it satisfies the need-narrowness-intrusiveness criteria. *See, e.g., Fraser*, 156 F. Supp. 2d at 344.

2. *Who May Present a Prisoner for Suicide Watch*

The liability opinion found that ADOC fails to "provide suicide-prevention services and crisis care to many prisoners who need it," in part due to "inadequate identification of those who are at heightened risk of suicide." *Braggs*, 257 F. Supp. 3d at 1221. The systemwide understaffing of both mental-health care providers and correctional officers contributes to this problem. *See id.* at 1193.

Against this backdrop, the interim agreement provides that all employees of ADOC and its mental-health and medical-care contractor (currently Wexford) have the authority to "present a person to mental health or medical staff for assessment for suicide watch." Interim Agreement (doc. no. 1106-1) at 1. Whoever places the inmate on watch must notify appropriate Wexford staff.[22] *See id.* If the inmate is identified when no Wexford staff is on-site, the appropriate Wexford on-call staff

_____

22. References to Wexford apply to any subsequent mental-health care contractor that may replace Wexford.

must be notified.  *See id.*

The court finds that ordering immediate and permanent implementation of this provision constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness requirement.  *See* 18 U.S.C. § 3626(a)(1)(A).

Dr. Burns testified that this provision is necessary, given that an adequate suicide-prevention program must have "a low threshold" for putting someone on suicide watch until their risk is fully assessed.  Burns Apr. 8, 2019, R.D. Trial Tr. at 134.  To have the required "low threshold" for suicide-watch placement, both correctional and mental-health staff must have the authority to initiate the referral process by presenting them to mental-health or medical staff for assessment.

Furthermore, correctional and mental-health understaffing remains a serious problem.  As of December 2018, ADOC reported that 62 % of correctional officer positions were vacant, *see* March 2019 Quarterly Staffing Report (doc no. 2386-1) at 3, and as of September 2018,

23.6 % of the mental-health positions were vacant, *see* December 2018 Quarterly Staffing Report (doc. no. 2378-1) at 9. The more understaffed ADOC is, the fewer the eyes on prisoners, and the more necessary it is that the broadest possible scope of employees at the facilities be authorized to identify inmates for a potential placement on suicide watch.

The need to clearly authorize correctional staff to refer inmates for suicide watch is also demonstrated by recent instances in which correctional officers should have referred inmates to mental-health, but did not. For example, as detailed above, less than two weeks after cutting his wrist, being placed on suicide watch, and then returning to segregation, Kendall Chatter loudly yelled and banged on his segregation cell for a sustained period. In response, the correctional shift supervisor instructed his subordinate to let him keep banging and yelling until he tired himself out. Shortly after Chatter started making the noise--according to one record, less than an hour later--he was found hanging.

Finally, the defendants agreed to include this requirement in the interim agreement, which is strong evidence that it satisfies the need-narrowness-intrusiveness standard. *See, e.g., Fraser*, 156 F. Supp. 2d at 344.

### 3. *Constant Watch Until Initial Assessment for Suicide Watch*

As found in the liability opinion, ADOC's monitoring of suicidal prisoners is "woefully inadequate." *Braggs*, 257 F. Supp. 3d at 1229. Unsafe features of crisis cells--such as physical structures that provide opportunities to commit suicide, obstacles to visibility into a cell, and access to dangerous items such as sharp implements--"heighten the importance of monitoring prisoners for signs of decompensation or suicide attempts." *Id*.

The interim agreement provides that, "[u]pon being presented to mental health or medical staff for assessment for suicide watch, each person will be maintained under 'constant watch' at least until they

have been evaluated" using a suicide risk assessment. Interim Agreement (doc. no. 1106-1) at 1. "Constant watch" is a procedure defined in the agreement as ensuring one-on-one visual contact at all times, except to the extent the physical design of the cell gives the observer a continuous unobstructed view of up to two people on watch. *See id.*

The court finds that ordering immediate and permanent implementation of this provision constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A).

Dr. Burns testified that an adequate suicide-prevention program requires that once a prisoner is identified to be assessed for suicide watch, he must remain on constant watch until the assessment is completed. *See* Burns Apr. 8, 2019, R.D. Trial Tr. at 133-34. As she explained, a less intrusive requirement would be insufficient, because if a person is at risk, he must be subject to continuous watch until someone can

"truly assess" the level of risk. *Id.* at 134. Along
similar lines, Dr. Raymond Patterson, the defendants'
correctional mental-health care expert, opined at the
liability trial that suicidal prisoners should be under
direct, constant watch while in suicide-watch cells. *See*
*Braggs*, 257 F. Supp. 3d at 1228. He testified that camera
observation by an officer at a control station "may not
be sufficient, because by the time that officer notices
a suicide attempt, it might be too late," and that, in
any case, "the officer likely has other responsibilities
that would preclude careful monitoring of any single
cell." *Id.*

Furthermore, the defendants agreed to include this
provision in the interim agreement, which also shows that
it satisfies the need-narrowness-intrusiveness standard.
*See, e.g.*, *Fraser*, 156 F. Supp. 2d at 344. At the same
time, however, ADOC has repeatedly failed to comply with
the spirit of the provision, demonstrating the need to
order its immediate implementation. As detailed above,
in several of the recent cases of suicides, ADOC

responded to the men's expressed suicidality by placing them on MHO instead of constant watch. *See also* Pls. Ex. 2710 at ADOC0475738 (Crook's letter to Wexford identifying the systemic "[f]ailure to place an inmate on acute suicide watch with constant observation (rather than MHO) when risk factors for potential suicidality are present until a psychologist or psychiatrist is consulted").

### 4. *Suicide Risk Assessment After Initial Placement on Suicide Watch*

Previously this court found that ADOC's "failure to perform proper suicide risk assessments to identify prisoners with a heightened risk of suicidal behavior places seriously mentally ill prisoners at an 'obvious,' substantial risk of serious harm." *Braggs*, 257 F. Supp. 3d at 1221.

The interim agreement addresses inadequate suicide risk assessments. The relevant provision requires that once an inmate is placed on constant, he must receive a suicide risk assessment to determine whether he is "acutely" or "nonacutely" suicidal. Interim Agreement

(doc. no. 1106-1) at 1-2.  Specifically, the suicide risk assessment must (1) be conducted in an out-of-cell, confidential setting, either by (2) licensed psychiatrists or psychologists (with specific provisions applying if via telepsychiatry),[23] or (3) by Certified Registered Nurse Practitioners (CRNPs) or licensed MHPs if they are in person and afterwards confirmed with a psychiatrist or psychologist, and (4) only if the CRNPs and licensed MHPs have first completed approved training on suicide prevention, assessing suicidality, and suicide watch procedures.  *See id.* at 1-2.[24]

---

23.  It goes without saying that when ADOC uses telepsychiatry for any of the treatment provided pursuant to the ordered provisions of the interim agreement, it must comply with the telepsychiatry requirements set forth in the Psychotherapy and Confidentiality Remedial Order (doc. no. 1899-1) at 8.  That is, in advance of the telepsychiatry session, the psychiatric provider shall be provided with the "inmate-patient's most recent mental health treatment plan, laboratory reports (if applicable), physician orders, problem list, and mental health progress notes for the past six (6) months."  *Id.*

24.  The required qualifications for personnel conducting suicide risk assessments will be considered further in the course of the remedial proceeding on suicide-prevention measures for which the plaintiffs do not seek immediate implementation.  *See* Joint Expert

The court finds that ordering immediate and permanent implementation of this provision constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A).

As explained in the liability opinion, adequate mental-health care requires face-to-face risk assessments by appropriately qualified practitioners:

> "[T]he administration of a suicide risk-assessment and management tool by a qualified provider is widely recognized to be an essential part of mental-health care: it should be used as a part of the intake screening process and whenever a prisoner threatens or attempts to harm himself or actually does so. ... As defense expert Dr. Patterson explained, the suicide risk-assessment tool must be completed in a face-to-face encounter by a high-level provider or a mid-level provider with high-level supervision, because the tool comes with clinical guidelines and requires clinical judgment."

*Braggs*, 257 F. Supp. 3d at 1221.

─────────────

Report and Recommendations (doc. no. 2416-1). While the court herein orders these qualification and training requirements for persons conducting suicide risk assessments, such requirements may be altered in light of evidence presented at the proceeding on the non-immediate remedies.

Consistent with this finding in the liability opinion, Dr. Burns more recently testified that the provision in the interim agreement is necessary for an adequate suicide-prevention program, because it ensures standardized, accurate assessments, and that the evaluators are properly trained--as well as licensed and approved by law--to conduct independent assessments. *See* Burns Apr. 8, 2019, R.D. Trial Tr. at 135. Furthermore, both Drs. Burns and Perrien testified that it is important to have these kinds of mental-health contacts in an out-of-cell, confidential setting, *see* Burns and Perrien Apr. 9, 2019, R.D. Trial Tr. at 11, 199-201, and both recommend that ADOC be required to immediately adhere to confidentiality requirements, *see* Immediate Relief Recommendations (doc. no. 2416-4) at 4.

Director of Mental Health Services Crook testified that she agrees with the provision's qualification requirements, as well as its requirement that the MHPs and CRNPs receive training prior to completing the assessments. *See* Crook Apr. 2, 2019, Trial Tr. (doc. no.

2488) at 17. Indeed, as with the other provisions in the interim agreement, the defendants agreed to include this provision in the interim agreement, which also supports the finding that it satisfies the need-narrowness-intrusiveness standard. *See, e.g.*, *Fraser*, 156 F. Supp. 2d at 344.

Critically, however, ADOC has repeatedly failed to comply with the provision. Crook specifically identified the systemic "[f]ailure to complete the Suicide Risk Assessment (SRA) by a Qualified Mental Health Professional (QMHP) when an inmate is placed in a crisis cell." Pls. Ex. 2710 at ADOC0475738. As detailed above, in several of the recent 15 suicides, ADOC either inadequately conducted risk assessments or altogether failed to do them. Another compliance problem is that, as Drs. Burns and Perrien found, mental-health staff began providing suicide risk assessments prior to receiving the requisite training. *See* Joint Expert Report and Recommendations (doc. no. 2416-1) at 10. Indeed, Dr. Burns was never asked to review and approve

the training, as required by the interim agreement. *See* Burns Apr. 8, 2019, R.D. Trial Tr. at 114.

5. *Applying Definitions of "Acutely Suicidal" and "Nonacutely Suicidal"*

The interim agreement provides that, when conducting the suicide risk assessment to determine if an inmate is "acutely suicidal" or "nonacutely suicidal," mental-health staff must apply those terms as they are defined by the National Commission on Correctional Health Care standard MH-G-04.[25]

The court finds that ordering immediate and permanent implementation of this provision constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A).

---

25. The NCCHC defines "acutely suicidal" prisoners as "those who are actively engaging in self-injurious behavior and/or threaten suicide with a specific plan." Pls. Ex. 2658 at 39. It defines "nonacutely suicidal" prisoners as "those who express current suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) and/or have a recent history of self-destructive behavior." *Id.*

The defendants agreed to include this provision in the interim agreement, which shows that it satisfies the need-narrowness-intrusiveness standard. *See, e.g.,* *Fraser*, 156 F. Supp. 2d at 344.[26] Indeed, ADOC's contract with Wexford requires it to comply with NCCHC standards--providing further evidence that the provision is not intrusive. *See* Pls. Ex. 1302 at 3. Finally, the court heard overwhelming evidence that ADOC has placed prisoners on levels of watch and observation that are incommensurate to their risk of self-harm, and that these erroneous placements affect the level of treatment and monitoring that the inmates receive. Applying these definitions going forward is necessary to ensure consistency and accuracy in identifying suicide risk, so that inmates receive appropriate treatment and monitoring.

---

26. The 2015 NCCHC standards in effect when the interim agreement was reached do not significantly differ from the current standards. *Compare* Pls. Ex. 1463 at 110 (2015 NCCHC standards), *with* Pls. Ex. 2658 at 39 (2018 NCCHC standards).

6.  *Constant Watch for Acutely Suicidal Prisoners*

Previously this court found that, "[f]or the most acutely suicidal, constant--rather than staggered-interval--watch is necessary." *Braggs*, 257 F. Supp. 3d. at 1229.  As the court explained, "correctional systems must have a constant-watch procedure for individuals whose risk of suicide is the highest, due to their engagement in self-injurious behavior or threat of suicide with specific plans: if a prisoner is waiting for an opportunity to kill himself, it is too dangerous to walk away, and he must be constantly observed.  For this reason, the NCCHC standards classify constant-watch procedures as an 'essential' standard." *Id.*

The interim agreement says that "any person who is determined to be acutely suicidal shall be monitored through a constant watch procedure."  Interim Agreement (doc. no. 1106-1) at 2.[27]  The court finds that ordering

_____

27.  As mentioned above, the interim agreement defines the "constant watch" procedure as ensuring one-on-one visual contact at all times, except to the extent the physical design of the cell gives the observer

immediate and permanent implementation of this provision constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A).

To start, the court already concluded that constant watch is "necessary" for inmates who are at the highest risk of suicide. *Braggs*, 257 F. Supp. 3d. at 1229. "Acutely suicidal"-- as opposed to "nonacutely suicidal"--inmates are the ones who have the highest risk. The court also makes the PLRA findings here largely for the same reasons that the court identified above in finding that requiring constant watch until a person receives a suicide risk assessment satisfies the PLRA. If constant watch is necessary to protect a potentially suicidal person whose risk level is not yet determined, *a fortiori* constant watch is necessary when they have already been determined to have the highest possible risk of suicide.

_____

a continuous unobstructed view of up to two people on watch. *See* Interim Agreement (doc. no. 1106-1) at 1 n.3.

The defendants and both parties' experts have widely recognized the necessity of the requirement, given that acutely suicidal individuals are at "imminent risk of self-harm." Perrien Apr. 9, 2019, R.D. Trial Tr. at 82; *see* Burns Apr. 8, 2019, R.D. Trial Tr. at 136 (testifying that constant watch is necessary for acutely suicidal inmates); Kern Mar. 28, 2019, Trial Tr. (doc. no. 2482) at 116 (testifying that an acutely suicidal inmate must be placed on constant watch); Naglich Dec. 20, 2016, Trial Tr. at 232-34 (acknowledging during the liability trial that ADOC's failure to provide constant watch to acutely suicidal inmates was a problem that needed to be addressed immediately--"th[at] afternoon" even--because their lives were at risk). Dr. Burns testified that these same procedures "have been in place in multiple systems for decades." Burns Apr. 8, 2019, R.D. Trial Tr. at 137. And Dr. Perrien testified that it was her understanding that certain components of the interim agreement, including acute watch, "would forever remain in place ... [b]ecause those just are a function of any

suicide prevention program." Perrien Apr. 9, 2019, R.D. Trial Tr. at 58-59.

Furthermore, the defendants agreed to include this provision in the interim agreement, which also shows that it satisfies the need-narrowness-intrusiveness standard. *See, e.g., Fraser*, 156 F. Supp. 2d at 344. Nevertheless, ADOC still has not revised its suicide-prevention policies to require constant watch for acutely suicidal prisoners. *See* Jt. Ex. 132 (ADOC Admin. Reg. 629); Jt. Ex. 133 (ADOC Admin. Reg. 630). Worse yet, ADOC has not adequately complied with the requirement, demonstrating the need to order immediate implementation. For example, while "Person Incarcerated at Tutwiler"[28] was on constant watch, she was seen placing an object in her mouth, and shortly thereafter cutting herself--without any reported intervention. *See* Pls. Ex. 2323 (medical records of Person Incarcerated at Tutwiler). In none of the

---

28. The parties and the court agreed to refer to this individual as "Person Incarcerated at Tutwiler" rather than by her initials due to the uniquely identifiable nature of her initials and to protect her confidentiality.

facilities visited by Drs. Burns and Perrien "were the 'watchers' positioned appropriately to permit full visibility into the safe cells or constant visibility of the inmates being observed." Joint Expert Report and Recommendations (doc. no. 2416-1) at 26.

7.*Close Watch for Nonacutely Suicidal Prisoners*

According to "the standard of care for mental-health care in prisons, suicide-watch checks should take place at staggered, or random, intervals of approximately every 15 minutes, rather than exactly every 15 minutes." *Braggs*, 257 F. Supp. 3d at 1229.

Consistent with this standard of care, the interim agreement requires that any inmate determined to be nonacutely suicidal must be monitored through a "close watch" procedure that "ensures monitoring by ADOC staff at staggered intervals not to exceed every 15 minutes." Interim Agreement (doc. no. 1106-1) at 2.

The court finds that ordering immediate and permanent implementation of this provision constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness

requirement. *See* 18 U.S.C. § 3626(a)(1)(A).

First, as the court explained in the liability opinion, "[s]taggered intervals prevent prisoners from timing their suicide attempts, because otherwise they can predict exactly when checks will occur. Such monitoring procedures are all the more crucial when suicidal inmates are housed in cells that have little visibility: as plaintiffs' expert Vail bluntly stated, without regular checks, '[Y]ou have no idea if they're alive or dead.'" *Braggs*, 257 F. Supp. 3d at 1229. The "unsafe features" of ADOC's suicide watch cells "heighten the importance" of the close watch procedure. *Id.*

Second, Dr. Burns testified that the close-watch procedures are a necessary component of an adequate suicide-prevention program. *See* Burns Apr. 8, 2019, R.D. Trial Tr. at 136. She said that same "close watch procedures have been in place in multiple systems for decades." *Id.* at 137.

Third, the defendants agreed to include the close watch provision in the interim agreement, which also

114

shows that it satisfies the need-narrowness-intrusiveness standard. *See, e.g.,* *Fraser*, 156 F. Supp. 2d at 344.

Fourth, despite agreeing to the requirement, ADOC repeatedly failed to comply with it. Matthew Holmes was placed in MHO instead of suicide watch even though, as Mental Health Services Director Crook admitted, he met the NCCHC's definition of nonacutely suicidal. Less than a week later, he killed himself. Similarly, Timothy Chumney was placed in MHO instead of suicide watch, despite being classified as having a moderate risk of suicide. Like Holmes, he killed himself less than a week later.

### 8. *Suicide Watch Observation Logs*

The interim agreement requires that both constant and close watch be "contemporaneously documented at staggered intervals not to exceed 15 minutes on a record maintained on each individual cell door. Upon discharge from suicide watch, these records will be maintained in

a facility-based suicide watch log and in the individual prisoner's medical record." Interim Agreement (doc. no. 1106-1) at 2.

The court finds that ordering immediate and permanent implementation of this provision constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A). This provision is needed to ensure that ADOC properly implements the constant and close watch procedures, which are essential protections for suicidal inmates. In short, without the required documentation, there is no way to know whether ADOC is carrying out the mandated observation. If the logs are pre-filled--as they have been repeatedly during this litigation--it "makes it impossible to ensure that staggered checks are actually happening." *Braggs*, 257 F. Supp. 3d at 1229. Such a situation would be untenable. ADOC cannot be left to its own devices to comply with court orders. As the court monitoring section below demonstrates, ADOC officials and staff must be held accountable--both internally and to

the court--for carrying out remedial orders, especially the suicide watch requirements, which can have life or death consequences.

That the defendants agreed to include this provision in the interim agreement, yet have had problems complying with it, also demonstrates the need for ordering its immediate implementation. Shortly after the parties reached the agreement, the court found noncompliance:

> "Associate Commissioner Naglich admitted that staff are not permitted to use monitoring logs with pre-printed times, but that some continue to use them. She also testified that officers and staff are not permitted to handwrite times and signatures in advance of, or in lieu of, their actual checks. However, during the post-trial prison tours, the court came across multiple logs where times at 15- or 30-minute intervals had been pre-filled, even though the parties had agreed during the trial to correct this practice, and the court had ordered compliance with the agreement several weeks before the tours. This evidence of non-compliance greatly troubled the court, as it showed that policy changes are not being implemented on the ground even when a court order is involved."

*Braggs*, 257 F. Supp. 3d at 1229. Although the experts recently reported "significant progress" in this area, *see* Joint Expert Report and Recommendations (doc. no.

2416-1) at 26,[29] noncompliance has continued since the liability opinion, *see, e.g.*, Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 144, 147, 165-67 (testifying about unstaggered logs and precalculated times); Pls. Ex. 1823 at SPA_4177 (showing unstaggered logs on acute suicide watch).

### 9. *Administrative Regulations Regarding Suicide Prevention*

The interim agreement required ADOC to revise Administrative Regulation 630--which mandated 15-minute intervals for monitoring on suicide watch--so that it reflects the constant and close watch procedures set forth in the agreement. *See* Interim Agreement (doc. no. 1106-1) at 2. Two years later, the defendants have still not incorporated this requirement into Administrative Regulation 630, which was last updated in 2005. *See* Jt.

---

29. The experts recommend that "[a]ll facilities should have their observation logs reviewed to ensure that the progress observed during the site visits extends beyond those facilities." Joint Expert Report and Recommendations (doc. no. 2416-1) at 27.

Ex. 133 (ADOC Admin. Reg. 630).

The court finds that ordering immediate and permanent implementation of this provision constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A).

As Dr. Burns testified, "the administrative regulation is the department's policy for all intents and purposes ... and needs to contain the information that's also contained in this [interim agreement] with the different levels of watch." Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 128. Put simply, ADOC is more likely to comply with the court's orders if they are incorporated into its own policies. Furthermore, that the defendants agreed to include this provision in the interim agreement shows that it satisfies the need-narrowness-intrusiveness standard. *See, e.g.,* *Fraser*, 156 F. Supp. 2d at 344.


10. *Monthly Evaluations of Suicide Risk Assessments*

The interim agreement requires that all suicide risk

assessments be reviewed monthly by certain clinical staff at ADOC's Office of Health Services (OHS)--which is responsible for overseeing the provision of medical and mental-health care to prisoners--and Wexford.  Based on this review, the clinical staff "will issue immediate corrective actions and training if necessary."  Interim Agreement (doc. no. 1106-1) at 2.

The court finds that ordering immediate and permanent implementation of this provision constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness requirement.  *See* 18 U.S.C. § 3626(a)(1)(A).

Requiring senior clinical staff to review the quality of suicide risk assessments is necessary given that, as found in the liability opinion, ADOC's "failure to perform proper suicide risk assessments ... places seriously mentally ill prisoners at an 'obvious,' substantial risk of serious harm."  *Braggs*, 257 F. Supp. 3d. at 1221.  More recently, Dr. Kern confirmed that clinicians should exercise oversight of suicide risk assessments to determine that clinical judgment is

appropriate.  *See* Kern Mar. 28, 2019, Trial Tr. (doc. no. 2482) at 118.

The defendants agreed to include this provision in the interim agreement, showing that it satisfies the need-narrowness-intrusiveness standard.  *See, e.g.*, *Fraser*, 156 F. Supp. 2d at 344.  But Crook admitted that OHS staff did not begin the required monthly reviews of the suicide risk assessments until March 2019, more than two years after the defendants agreed to do them. *See* Crook Apr. 1, 2019, Trial Tr. (doc. no. 2485) at 43-44.

Finally, the need for review of the assessments is underscored by ADOC's ongoing failure to properly conduct them.  *See, e.g.*, Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 134-35, 137-43, 146-47.  For example, Paul Ford's suicide risk assessment stated that he had no recent "suicidal/self-injurious" behavior or ideation, even though he had cut his wrist just eight days earlier. *See* Pls. Ex. 2309 at SPA_9674.  Shortly after, he was released back into segregation, and killed himself less than a month later.

## 11. *Discharge from Suicide Watch*

In the liability opinion, the court concluded that "[p]risoners are routinely released from suicide watch improperly." *Braggs*, 257 F. Supp. 3d. at 1230. As the defendants' and plaintiffs' experts explained at the time, "suicidal prisoners should be released only with the approval of a psychiatric provider (psychiatrist or nurse practitioner) who has made a face-to-face assessment that their condition was sufficiently stabilized to warrant it." *Id.* But that was not occurring:

> "In 2016, [the then-mental-health care vendor] reported to ADOC that it was discharging patients from suicide watch without a face-to-face assessment; the decisions were based instead on whatever information lower-level mental-health staff communicated over the phone to on-call doctors and nurse practitioners. ... Associate Commissioner Naglich admitted that this practice of authorizing suicide watch release without a face-to-face evaluation was not specific to any particular facilities, but that it reflected a general shortage of psychiatrists; she further agreed that it put the prisoners at risk of premature release. Evidence also showed that prisoners have, on occasion, been released from suicide watch by correctional staff without any mental health assessment at all; this is even

more unacceptable."

*Id.* at 1230-31.

The interim agreement provides the following requirements for discharging a prisoner from suicide watch (also referred to as "discharge protocols"):

"10. A person may be discharged from suicide watch following an out of cell, confidential evaluation according to the following terms.

a. Licensed psychiatrists or licensed psychologists may conduct these evaluations either in person or by telepsychiatry. In the event that they are conducted by telepsychiatry, the person being evaluated will be in a room with a mental health professional (licensed or otherwise), psychological associate (licensed or otherwise), or CRNP.

b. CRNPs may conduct these evaluations but only if they are conducted in person. Upon conducting any such evaluation, a CRNP must confirm their assessment with a psychiatrist or psychologist either in person, by telepsychiatry, or over the phone. The psychiatrist or psychologist must be provided with and review the risk assessment and the notes of the mental health evaluations and counseling that have been conducted in the past 14 days.

c. Once the licensed MHPs are in place at each facility, they may conduct these evaluations but only if they are conducted in person and confirmed with a psychiatrist or psychologist as described in [10].b.

above.

d. A person may not be discharged from suicide watch via telepsychiatry until the person conducting the evaluation has sought input from the MHP or counselor who has been primarily responsible for providing mental health services to the person on suicide watch, except in exceptional circumstances, which shall be documented.

e. Prior to conducting any such evaluations, licensed MHPs and CRNPs must complete a training on suicide prevention, assessing suicidality, and procedures of suicide watch. This training must be approved by Associate Commissioner Ruth Naglich, Dr. David Tytell, Dr. Robert Hunter, Dr. Charles Woodley (or any subsequent replacements), and the agreed-upon monitor or Plaintiffs' experts if the agreed-upon monitor has not yet been retained.

f. Each patient placed on constant watch will be reduced to a close watch prior to release from suicide watch."

Interim Agreement (doc. no. 1106-1) at 2-3.

The court will adopt these requirements, with the slight modification that Drs. Burns and Perrien must approve the training for licensed MHPs and CRNPs.[30] The

---

30. Drs. Burns and Perrien each testified that they would be willing to assist ADOC with any additional

court finds that ordering immediate and permanent implementation of these requirements constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A).

First, the findings and expert testimony from the liability trial cited above concerning the failure to use proper discharge practices show that the ordered protocols are necessary. Dr. Burns also recently testified that the protocols are necessary for an adequate suicide-prevention program, explaining that suicide risk must be assessed by "someone who's independently licensed to exercise their judgment using a standardized assessment to make decisions about the level of risk." Burns Apr. 8, 2019, R.D. Trial Tr. at 137.

Second, although the defendants' agreed to the protocols in the interim agreement, which in and of itself is strong evidence of PLRA compliance, *see*, *e.g.*,

---

training that becomes necessary. *See* Burns and Perrien Apr. 10, 2019, R.D. Trial Tr. at 24.

*Fraser*, 156 F. Supp. 2d at 344, they have repeatedly failed to comply with them since the liability trial. Indeed, Mental Health Services Director Crook identified the systemic "[f]ailure to document consultation with a psychiatrist or psychologist prior to discharging an inmate from crisis placement." Pls. Ex. 2710 at ADOC0475738.

Third, ADOC's acknowledgement that the majority of suicides in its system have involved men released from suicide watch to segregation is compelling evidence of the urgent need to adopt these minimally adequate discharge protocols. *See* Pls. Ex. 2706.

### 12. *Suicide Watch Follow-Up Appointments*

In the liability opinion, the court found that inmates "receive inadequate follow-up care after their release from suicide watch," contributing to a "substantial risk of recurring self-injurious behavior and suicide." *Braggs*, 257 F. Supp. 3d at 1230.

To address this deficiency, the interim agreement

requires that, upon release from suicide watch, each inmate will have at least three confidential and out-of-cell follow-up appointments. *See* Interim Agreement (doc. no. 1106-1) at 3-4. The interim agreement provides that "follow-up examinations do not take the place of otherwise scheduled mental-health appointments, though they may occur in connection with or contiguous with such appointments." *Id.* at 3. The interim agreement also allowed follow-up appointments to be conducted either by licensed psychiatrists or psychologists, or alternatively by CRNPs or licensed MHPs. *See id.* at 4. If CRNPs or MHPs conduct the evaluations, they must do so in person and confirm their assessment with a psychiatrist or psychologist. Prior to conducting any such follow-up examinations, licensed MHPs and CRNPs must complete an approved training on suicide prevention, assessing suicidality, and procedures of suicide watch. *See id.*

The court finds that ordering immediate and permanent implementation of these requirements--as slightly

modified by the experts' recommendations--[31]constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A).

First, in the liability trial, experts on both sides opined that "follow-up care is necessary upon release from suicide watch." *Braggs*, 257 F. Supp. 3d at 1231. As the court found, for prisoners already on the mental-health caseload, follow-ups allow providers to incorporate what they learned from the most recent crisis into the inmate's treatment plans and modify interventions to "address the factors that contributed to the self-injurious behavior or suicidal ideation." *Id.* For inmates not already on the mental-health

_____

        38. In the immediate relief recommendations, Drs. Burns and Perrien recommend modifying the interim agreement's follow-up appointment requirements as to the number and schedule of follow-ups. *See* Immediate Relief Recommendations (doc. no. 2416-4) at 2. They recommend that each person receive a minimum of four, rather than three, follow-up appointments and recommend a different timeframe in which these appointments must occur. *See id.* These recommendations, which the plaintiffs seek to adopt, are discussed below in the section on the immediate recommendations' compliance with the PLRA.

caseload, follow-ups allow "providers to assess whether the prisoner's risk of self-injury remains low, and to determine whether the prisoner should be added to the mental-health caseload to address underlying mental-health issues." *Id.* The court credited Dr. Burns's testimony, as summarized by the court, that "the failure to provide follow-up care that addresses the root of self-injurious behavior creates a substantial risk that the self-injurious behavior will continue and result in serious injury or death." *Id.*[32]

Second, credible testimony from the suicide-prevention trial also supports the need for the follow-up requirements. *See, e.g.*, Perrien Apr. 9, 2019, R.D. Trial Tr. at 113. (testifying that follow-ups are "absolutely necessary"); Naglich Apr. 5, 2019, R.D. Trial Tr. at 99 (testifying that absent a significant security reason, she supports the recommendation for confidential

---

32. This substantial risk is exemplified by the suicide of Jamie Wallace, who was released from suicide watch, received no follow-up care, and committed suicide two days later. *Braggs*, 257 F. Supp. 3d at 1231.

and out-of-cell mental health contacts); Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 130 (testifying that follow-ups needed to be done out of cell and in a confidential setting).

Third, the defendants agreed to the requirements in the interim agreement. *See Fraser*, 156 F. Supp. 2d at 344. Yet, they have repeatedly failed to comply with them, which further shows that they must be implemented immediately. For example, as discussed above, in several of the recent cases of suicides, ADOC failed to complete required follow-ups following release from crisis placements. Furthermore, ADOC's February 2019 Holman Self-Audit states that follow-ups were "completed late due to Site administrators misunderstanding of the frequency of follow-ups." Pls. Ex. 2616.

In the next section, the court will discuss the required number and frequency of the follow-up appointments.

### iii. Expert Recommendations on Immediate Suicide-Prevention Relief

The court now turns to making particularized PLRA findings for each provision in Drs. Burns and Perrien's recommendations for immediate relief. *See* Immediate Relief Recommendations (doc. no. 2416-4). For the reasons that follow, the court, having given substantial weight to any adverse impact on public safety or the operation of the State's criminal justice system as a result of the requested relief, finds that the relief based on these recommendations, as described below, is narrowly drawn, extends no further than necessary to correct the defendants' constitutional violation, and is the least intrusive means necessary to correct that violation. *See* 18 U.S.C. § 3626(a)(1)(A).

Before turning to the individual recommendations, the court pauses to note several factors that support the determination that the relief complies with the demands of the PLRA. First, the recommendations were drafted jointly by both parties' experts, based upon an extensive, thorough, and lengthy study of the state of suicide prevention in ADOC. At trial, the experts testified that

their recommendations, with a few minor exceptions discussed below, are necessary for adequate suicide prevention and are no more intrusive than necessary. Lastly, the defendants for the most part do not take issue with the substance of the recommendations, and often claim to already be implementing them. *See* Defendants' Annotations to the Joint Expert Report and Recommendations (doc. no. 2451); *see generally* Defendants' Response to Plaintiffs' Proposed Opinion and Order (doc. no. 2499). These factors strongly support a finding that this relief complies with the PLRA's need-narrowness-intrusiveness requirements.

### 1. *Eliminating the Inappropriate Use of Mental-Health Observation*

In the liability opinion, the court found that ADOC's monitoring of suicidal prisoners is "woefully inadequate." *Braggs*, 257 F. Supp. 3d at 1229. As discussed earlier, this failure has continued, in part because suicidal prisoners have been placed in mental-health observation (MHO) rather than suicide watch. Drs. Burns and Perrien recommend eliminating the

use of MHO as a component of suicide prevention. *See* Immediate Relief Recommendations (doc. no. 2416-4) at 2. The doctors concluded that "[t]he only acceptable watches for people with issues related to suicide and/or self-harm are acute and non-acute watch." *Id.*

The court finds that ordering immediate and permanent implementation of a ban on the use of MHO for suicidal inmates constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A).

First, both experts testified that this ban is necessary. As both Drs. Burns and Perrien testified, placement of suicidal inmates on MHO status presents several dangers. *See* Burns and Perrien Apr. 9, 2019, R.D Trial Tr. at 79-87. First, prisoners in MHO are monitored only every 30 minutes, as opposed to every 15 minutes for nonacute suicide watch or constant observation for acute suicide watch. "[O]nce every half an hour, ... is not adequate to prevent suicides." Burns Apr. 9, 2019, R.D. Trial Tr. at 79. Second,

prisoners on suicide watch receive a number of critical protections and assessments that those on MHO do not. *See* Burns and Perrien Apr. 9, 2019, R.D Trial Tr. at 79-87. For example, prisoners on suicide watch must be assessed for continued suicidality and risk of self-harm before they can be released from suicide watch, whereas prisoners on MHO are not required to have such an assessment before release. Dr. Perrien explained that, in two completed ADOC suicides she examined, the prisoner had been released from MHO within 12 hours or a day before committing suicide, and there was no record that a suicide risk assessment has been done. "Had they not been placed on MHO status," she explained, "the suicide risk assessment would have been completed prior to them being discharged." *Id.* at 85; *see also id.* (explaining that, had they been on suicide watch, they also would have received appropriate assessments during the watch period, been considered for referral to higher levels of care, and received post-watch follow-up treatment); *id.* at 86 (explaining that prisoners on

suicide watch receive a specialized treatment plan to reduce suicide risk).

Furthermore, in the experts' view, the practice of placing suicidal prisoners on MHO was not limited to a few instances. As Dr. Burns testified for herself and Dr. Perrien, "we were concerned about the numbers of cases we saw in which people who should have been on a more acute level of watch, such as acute suicide watch or nonacute suicide watch, were actually just being maintained on mental health observation status." *Id.* at 79. She also expressed concern that MHO was being used as a proxy for suicide watch *because* of the lesser requirements it imposes on staff. *Id.*

The defendants argue that the recommended action is not necessary because they have already eliminated the use of MHO for suicidal prisoners. For the same reasons set forth in the earlier section on mootness, *see* Section III(B)(ii)(1), the court rejects this argument.

The court further finds that the relief at issue is narrowly tailored and no more intrusive than necessary.

135

Both doctors testified that the recommended prohibition could not be any more limited and still be effective to address the identified risks, and that it was the least intrusive option to address the concern. *See* Burns and Perrien Apr. 9, 2019, R.D Trial Tr. at 87.

### 2. *Suicide Watch Follow-Up Examinations*

As previously discussed, "[t]he follow-up care provided to many prisoners upon their release from suicide watch at ADOC is woefully inadequate." *Braggs*, 257 F. Supp. 3d at 1231. During the liability trial, both parties' experts testified that "follow-up care is necessary upon release from suicide watch both for prisoners on the mental-health caseload and for those who are not." *Id.* The court found that "the failure to provide follow-up care that addresses the root of self-injurious behavior creates a substantial risk that the self-injurious behavior will continue and result in serious injury or death." *Id.*; *see id.* (discussing the lack of follow-up care received by class member Jamie

Wallace).

The parties' interim agreement required at least three follow-up examinations by mental-health staff within three, seven, and 30 days of an inmate's release from suicide watch. *See* Interim Agreement (doc. no. 1106-1) at 3. In their immediate relief recommendations, the experts recommend changes to the number and timing of follow-ups for people released from suicide watch; whereas the interim agreement required three follow-ups, the experts recommend a minimum of four, and they recommend that the series of three examinations restart if the prisoner is transferred before the final examination in the series. *See* Immediate Relief Recommendations (doc. no 2416-4) at 2; Burns and Perrien Apr. 9, 2019, R.D Trial Tr. at 109-110. In their written recommendation, the experts proposed the following schedule for crisis placement follow-up visits:

> "The first three follow-up examinations will occur upon release from watch and upon return to the sending facility or expected housing; these examinations will occur on the three

consecutive days upon release. The fourth
follow-up examination will occur on the tenth
day following release from watch. If the
inmate is placed in temporary housing (e.g.,
housed at Kilby for days one through three
post-watch and then moved to the sending
facility; moved to SLU [Structured Living Unit]
for days one through three post-watch then
moved to RHU [Restrictive Housing Unit, or
segregation]), that will be noted as a
significant post-watch transition impacting the
inmate's post-watch adjustment and risk level,
requiring the post-watch follow-up examination
schedule to be reset; another round of the four
follow-up examinations will take place starting
the day following movement."

*Id.*

The court finds that ordering immediate and
permanent implementation of a modified version of the
experts' recommendation on post-suicide-watch follow-up
examinations constitutes relief that satisfies the
PLRA's need-narrowness-intrusiveness requirement. *See*
18 U.S.C. § 3626(a)(1)(A).

Although the recommendation is quite specific, the
court concludes that it is necessary based on the
testimony of the parties' experts. The doctors based
their recommendation on the specific conditions they saw
in their examination of ADOC, particularly the frequent

138

transfers between prisons of inmates coming off of suicide watch in ADOC. *Id.* at 112. The recommendation was designed to address the pattern of "suicides that occurred shortly after releases from watch, and the need to be sure in a system in which people frequently move that there is adequate follow-up during transitions." Burns Apr. 8, 2019, R.D. Trial Tr. at 114.

As Dr. Burns explained, the first three follow-ups need to occur on a daily basis after release from suicide watch due to the elevated risk of suicide during that time period. *See* Burns Apr. 109, 2019, R.D. Trial Tr. at 10. It is also necessary to reset the clock and provide an inmate with another three consecutive days of evaluations if the inmate is transferred again before the final evaluation: As Dr. Perrien explained, "the period post watch is a vulnerable time" and when "someone is being moved, that increases the stress that an already vulnerable person experiences." *Id.* at 112.

According to Dr. Burns, the prior policy of three follow-ups was insufficient in practice, because

prisoners were frequently transferred to one prison for suicide watch, then transferred to another prison before the required follow-ups had been completed; upon arrival at the new facility, the inmate would not be seen by mental health for another three weeks--too long given the vulnerability of the inmate. *Id.* *See also* Burns Apr. 10, 2019, R.D. Trial Tr. at 29 ("We know more than we did two years ago when the [Interim] [O]rder was initially agreed upon with respect to transition times and how dangerous and vulnerable people are during that time."). Dr. Burns credibly testified that the recommended four follow-up evaluations and repeat follow-ups after transitions are necessary to "to save patient lives." Burns Apr. 9, 2019, R.D Trial Tr. at 28; *see also* Burns Apr. 8, 2019, R.D. Trial Tr. at 140-41 (explaining the recommendation for four follow-ups and that some correctional systems require more follow-ups).

Although the court is convinced of the necessity of the recommended four follow-up examinations to prevent suicide and self-harm, the court concludes that it is

not necessary that the fourth evaluation occur 10 days after release from suicide watch. Both experts agreed that the fourth examination need not occur on the tenth day; all that is needed is to check back in on the prisoner's mental health after the immediate transition period. Accordingly, the court leaves the determination of how many days after release from suicide watch the fourth examination should occur up to ADOC, based on consultation with Dr. Perrien.

With that modification, the court finds that the recommended relief is narrowly tailored and no more intrusive than necessary. As discussed above, the experts tailored their recommendation to the particular practices they found in ADOC. During Drs. Burns and Perrien's joint testimony, Dr. Burns testified that the follow-up requirements could not be any more limited and still effectively address the suicide risk that was identified by the court in the liability opinion, and that the proposal was the least intrusive recommendation that would be appropriate "[i]n this situation"; Dr.

Perrien did not disagree on either point. *See* Burns and
Perrien Apr. 10, 2019, R.D. Trial Tr. at 115.

The defendants argue that this requirement is overly
intrusive because it mandates the precise number and
timing of follow-up appointments, and they contend it
leaves no room for clinical judgment. However, the court
finds that a minimum number of follow-up examinations
needs to be set based on the testimony of the experts.
Dr. Perrien testified that, based on her experience and
expertise a correctional psychologist, "there needs to
be a minimum number" of follow-ups set "in the ADOC."
*See id.* at 114. Furthermore, as Dr. Burns testified,
ADOC frequently did not comply with the earlier
requirement of three follow-ups--thus, the court cannot
simply trust that ADOC will provide an adequate number
of follow-ups without a court order. As for the clinical
judgment issue, both experts rejected the idea that the
proposed relief unduly interferes with the providers'
clinical judgment; they noted that their proposed policy
requires the exercise of clinical judgment in deciding

what actions to take based on the examinations.  In sum,
the recommended relief, as modified, meet the
requirements of the PLRA.

### 3.  *Referrals to Higher Level Care*

In the liability phase, the court observed that
suicidal ADOC prisoners were frequently "kept in crisis
cells for much longer than 72 hours," and that these very
long stays "illustrate that prisoners are not getting the
treatment they need to stabilize and be moved out of
crisis cells, or that ADOC and [the private mental-health
care provider] are leaving these mentally ill prisoners
in extremely isolated environments for longer than
appropriate."  *Braggs*, 257 F. Supp. 3d at 1226.  The
court found that "crisis-cell placement is meant to be
temporary and should not last longer than 72 hours,
because the harsh effects of prolonged isolation in a
crisis cell can harm patients' mental health."  *Id.* at
1226.  However, only a small fraction of the prisoners
in crisis placements that last longer than 72 hours are

transferred to treatment units. *See id.*

To address this issue, Drs. Burns and Perrien recommend the following:

> "We recommend compliance with existing policy requiring inmates on watch for 72 hours be considered for referral to higher levels of care. If not referred, the clinical rationale should be documented in the medical chart, at minimum, and tracked in the crisis utilization log or similar. If the inmate remains on watch for 168 hours, the treatment team should meet to review a referral to a higher level of care. If the inmate is not referred to a higher level of care, the rationale should be documented in the medical chart, at minimum, and tracked in the crisis utilization log. If the inmate remains on watch for 240 hours or longer, referral to a higher level of care shall occur with notification of referral to OHS and vendor regional mental health management. In addition, inmates who are returned to watch status within 30 days of release from a watch and/or who have three watch placements within six months shall be referred to a higher level of care; OHS should be immediately notified of any inmates who meet these criteria but are not referred and provided with the clinical rationale."

Immediate Relief Recommendations (doc. no. 2416-4) at 2-3.

The court finds that ordering immediate and permanent implementation of this recommendation constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness

144

requirement.  *See* 18 U.S.C. § 3626(a)(1)(A).

As the experts explained, the purpose of the recommendation is to ensure that ADOC and mental-health providers consider providing a higher level of mental health care when placement in suicide watch does not resolve a problem over a lengthy period of time, or when a prisoner repeatedly becomes suicidal over a longer period.  The experts' testimony and other evidence in the record establish a clear need for implementation of this recommendation.  Both experts identified this recommendation as needing to be addressed urgently to reduce the risk of suicide in ADOC.  In their assessment of suicide prevention in ADOC, Drs. Burns and Perrien came across multiple instances in which people remained on suicide watch for longer than 72 hours without any indication that they were considered for a higher level of care; this issue appeared repeatedly amongst inmates who subsequently committed suicide.  *See* Burns and Perrien Apr. 9, 2019, R.D. Trial Tr. at 139-40, 148.

While ADOC already has a policy requiring referral

to a higher level of care for prisoners on suicide watch for 72 hours, relief from the court is still necessary. As shown by the experts' findings and other evidence in the record, there is frequent noncompliance with the policy. *See* Pls. Exs. 2371 (Jan. 2019 Bullock Crisis Cell Utilization Log), 2419 (Jan. 2019 St. Clair Crisis Cell Utilization Log) (showing crisis placements longer than 72 hours); Kern Mar. 29, 2019, Trial Tr. (doc. no. 2483) at 84-85 (testifying about crisis cell utilization log showing placements longer than 72 hours).

The court further finds that relief proposed is not unnecessarily intrusive. Dr. Burns credibly testified that the recommendation could not be narrower and still be effective in terms of suicide prevention. *See* Burns and Perrien Apr. 9, 2019, R.D. Trial Tr. at 146-47. Furthermore, the experts' recommendation appears to be less intrusive than the ADOC's own administrative regulation in most respects.[33] The current ADOC

_____

33. Indeed, defendant Naglich testified that she does not disagree with the recommendation of an evaluation after 72 hours on watch for referral to a

regulation states: "If placement on Suicide Watch does not begin to resolve the inmate crisis within 72 hours, the inmate will be transferred to a SU [stabilization unit]."). *See* Jt. Ex. 133 (Admin. Reg. 630) at 4. In other words, the ADOC policy imposes a mandatory referral to a higher level of care at 72 hours unless the prisoner was already assigned to the stabilization unit prior to being placed on suicide watch. In contrast, the experts' recommendation merely requires consideration of referral to a higher level of care, and documentation if the treatment team decides against the referral. The experts' recommendation would not mandate referral to a higher level of care until the inmate has been on suicide watch for a full 10 days.

The experts' recommendation would go beyond ADOC's policy in that it would impose a new requirement of a consideration of referral for a prisoner who has been

---

higher level of care. *See* Naglich, Apr. 5, 2019, R.D. Trial Tr. at 89 90. As explained above, the defendants' agreement to a policy weighs in favor of finding that it is narrowly tailored and is no more intrusive than necessary.

sent to suicide watch three times in the prior six months or returned to suicide watch within 30 days of release. Although the recommendation as written appears to require referral to a higher level of care for such prisoners, the experts both explained in their testimony that the referral should not be mandatory; if the inmate is not referred, the clinicians would merely need to document their reasoning and inform the Office of Health Services. As the recommendation does not require a referral, the court finds that it is narrowly drawn and not more intrusive than necessary.

At trial, Dr. Burns and Dr. Perrien's testimony differed on one issue: whether, after an inmate has remained on suicide watch for 240 hours, ADOC must refer or merely consider referring the inmate to higher level care. Consistent with the immediate relief recommendations, Dr. Burns testified that there should be a mandatory referral to a higher level of care if an individual remained on suicide watch for 240 hours. *See* Burns Apr. 9, 2019, R.D. Trial Tr. at 134. Dr. Perrien

testified that she would recommend that at 240 hours, ADOC be required to again consider a referral to a higher level of care; she would not impose a mandatory referral. *See* Perrien Apr. 9, 2019, R.D. Trial Tr. at 134-35. The court accepts the expert opinion of Dr. Burns as to the need for mandatory referral at 240 hours on suicide watch, because her opinion takes into account the actual conditions in suicide watch in ADOC. Based on the conditions of some of the ADOC suicide watch cells she had seen, she explained, an extended stay in some ADOC suicide watch cells is "frankly, punitive" with "very limited opportunity for mental health treatment." Burns Apr. 9, 2019, R.D. Trial Tr. at 136. An inmate who has been on suicide watch for 240 hours has already spent ten days "with no clothes, on limited diet, limited opportunity for out-of-cell time, and just individual interventions daily for now ten days and ha[s]n't gotten better. ... [T]he point is to either discharge them or to get them to a higher level of care," she explained.

*Id.* at 135-36.[34]  Based on the testimony the court has heard over the course of this case, and the court's own prior observation of ADOC suicide watch cells, the court agrees.

### 4.  *Preventing Discharge from Suicide Watch to Segregation*

ADOC routinely discharges inmates from suicide watch directly to segregation.  For instance, in the month of January 2019 at Easterling prison, 15 inmates were discharged from suicide watch to segregation.  *See* Pls. Ex. 2396 at 4-5 (Jan. 2019 Suicide Watch Report).  Most suicides in correctional facilities, including ADOC, occur in segregation.  *See* Pls. Ex. 2706 (Mar. 21, 2019, Daniels's memorandum announcing directive); Perrien Apr.

---

34. Because Dr. Perrien's opinion did not directly address the impact of the poor conditions in ADOC suicide watch cells, the court gave it less weight than that of Dr. Burns.  Dr. Perrien's disagreement was based on her observation that in some other prison systems she has seen, a 10-day stay in suicide watch might not be unusual. However, she acknowledged that such a stay would be a long time in the ADOC, because the conditions in ADOC cells she saw were "not a great place to be."  Perrien Apr. 9, 2019, R.D. Trial Tr. at 136.

9, 2019, R.D. Trial Tr. at 151 (testifying that most suicides in correctional facilities occur in segregation).

To address the problem of inmates being discharged from suicide watch directly to segregation, Drs. Burns and Perrien recommend a "multi-pronged approach." Immediate Relief Recommendations (doc. no. 2416-4) at 3. First, they recommend that prisoners placed on watch who might be discharged to segregation "be evaluated not only for suicide risk, but also re-evaluated for the presence of a serious mental illness." *Id.* If the person is found to have a serious mental illness (SMI), he or she should be evaluated for referral to higher-level care and sent to the SLU on an expedited basis if mental-health staff determine that a referral to a Residential Treatment Unit (RTU) or Stabilization Unit (SU) is not clinically indicated. *See id.* Second, they recommend that even if an inmate is not on the mental-health caseload but is "determined to be at or above moderate acute or chronic risk of self-harm," he or she "should

be placed on the mental-health caseload to provide increased clinical monitoring and intervention." *Id.*

On March 21, 2019, the week before the suicide-prevention trial, newly hired Deputy Commissioner of Operations Charles Daniels announced a directive prohibiting the discharge of inmates from suicide watch to segregation, "unless there is no alternative due to well-documented exceptional circumstances or exigent circumstances arising from an inmate's behavior." *See* Pls. Ex. 2706 (Mar. 21, 2019, Daniels's memorandum announcing directive). "Instead, these individuals will be placed, based on clinical and security considerations, into a setting where they are less isolated and will be afforded an increased level of mental health services." *Id.* Daniels's memorandum announcing the directive further states that, "If an inmate cannot be safely discharged to any housing unit other than [segregation], the Deputy Commissioner of Operations (or his designee) must approve the temporary [segregation] placement." *Id.*

As Daniels's memorandum shows, ADOC recognizes that it is inappropriate to discharge prisoners from suicide watch to segregation absent exceptional circumstances. *See id.* The court appreciates Daniels's initiative on this matter and is hopeful that his directive will begin to address some of the systemic problems associated with this risk of harm.

The court will combine Deputy Commissioner Daniels's directive with the experts' recommendations and order the following:

(1) Prisoners discharged from suicide watch shall not be transferred to a segregation unit unless there is no alternative due to well-documented exceptional circumstances or exigent circumstances arising from an inmate's behavior.

(2) All inmates who have been placed on suicide watch who are being considered for discharge to segregation shall be evaluated not only for suicide risk, but also evaluated for the presence of a serious mental illness. If found to have a SMI, they must be evaluated for

referral to a higher level of care (RTU or SU). If not referred to the RTU or SU, the clinical rationale must be documented in the medical record and the inmate transferred on an expedited basis to a Structured Living Unit (SLU).  If the inmate is not on the mental-health caseload but is determined to be at or above moderate acute or chronic risk of self-harm, the inmate must be placed on the mental-health caseload and provided increased clinical monitoring and intervention.

(3) Any transfer from suicide watch to segregation must be approved by the Deputy Commissioner of Operations or his designee.

The court finds that ordering immediate and permanent implementation of these requirements constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness criteria.  *See* 18 U.S.C. § 3626(a)(1)(A).

The court makes these findings based on the continued serious risk of harm faced by prisoners discharged to segregation from suicide watch, the immediacy of which

is evident in the recent rash of suicides in ADOC prisons. As Daniels's memorandum recognizes, "[t]he majority of inmates who committed suicide within ADOC have been men who were alone in a restrictive housing cell, after being released from suicide watch." Pls. Ex. 2706.

Sections (1) and (3) of the ordered relief are already required by Daniels's announced directive. The defendants argue that the directive therefore renders the relief unnecessary. The court rejects this argument for essentially the same reasons, detailed in Section III(B)(ii)(2), that the court rejected the defendants' mootness contention. These reasons include, among others, that it is far from safe to assume that the directive will be followed, especially given ADOC's continued understaffing and its repeated failures to effectively implement its own policies at the ground level. Moreover, that the defendants agree with the directive's requirements weighs in favor of finding that they meet the needs-narrowness-intrusiveness criteria.

As for section (2) of the ordered relief, it is

critical that, in the limited cases where a prisoner is being considered for discharge from suicide watch to segregation, that prisoner be provided with extra protection, including re-evaluation and placement on the mental-health caseload if necessary. Furthermore, Dr. Burns and Dr. Perrien testified that this relief is necessary to address ADOC's constitutional violations. *See* Burns and Perrien Apr. 9, 2019, R.D. Trial Tr. at 149-56. Dr. Burns specifically testified that this relief could not be narrower or less intrusive and still address the constitutional violations found by the court.

### 5. *Training for All Nursing Staff on Segregation Preplacement Screenings*

In the liability opinion, the court found that "ADOC's current segregation practices pose an unacceptably high risk of serious harm to prisoners with serious mental-health needs," and that "ADOC lacks a functioning process for screening out prisoners who should not be placed in segregation due to mental

156

illness." *Braggs*, 257 F. Supp. 3d at 1236.

On May 3, 2018, the court issued an order that addressed segregation preplacement screenings. *See* Order and Injunction on Segregation Remedy (Pre-Placement, Mental-Health Rounds, Periodic Evaluations) (doc. nos. 1815, 1815-1). It required ADOC to screen all inmates prior to placement in segregation in order to determine "[w]hether the inmate can be placed into restrictive housing or must be diverted to another location such as placement on crisis status and placement in an infirmary or other diversionary placement." *Id*. (doc. no. 1815-1) at 2.

To address the preplacement screening issues, Drs. Burns and Perrien recommend the following relief: "training for all nursing staff completing [segregation] pre-placement screenings. While the forms indicate when crisis watch should be considered, training should provide greater detail about indicators to look for as well as include how to place someone on immediate watch after hours and how to initiate an emergent referral.

157

The model should be 'easy in;' this means that it should not be difficult to place an inmate on watch. An example would be if nursing is uncertain in any way about a case, the inmate is placed on watch." Immediate Relief Recommendations (doc. no. 2416-4) at 3.

The court will order preplacement-screening training for all nursing staff who perform preplacement screenings in segregation or supervise nurses performing preplacement screenings. This training shall be completed no later than 30 days after entry of this order and nursing staff should be retrained on an annual basis. The training shall provide granular detail about indicators that nurses should look for and include an explanation of the process for placing people on immediate watch after business hours, as well as how to initiate an emergent referral. The training shall also ensure that suicide-watch placement is "easy in," which is to say that if a nurse is uncertain about a prisoner's need for watch, the inmate should be placed on watch preventatively until further evaluation by mental-health

staff. The training module shall be reviewed and approved by Drs. Burns and Perrien, who testified that they would be willing to assist ADOC with training. *See* Burns and Perrien Apr. 10, 2019, R.D. Trial Tr. at 24.

The court finds that this relief satisfies the PLRA's need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A). The ordered relief satisfies the PLRA for essentially the same reasons, detailed above in Section III(B)(ii)(3), that the court rejected the defendants' contention that there is no ongoing constitutional violation in this area. These reasons include, among others, that Drs. Burns and Perrien's findings about ADOC's deficient preplacement screenings show that nurses still are not well-trained enough to adequately screen inmates; *see* Joint Expert Report and Recommendations (doc. no. 2416 1) at 14-15, as well as the fact--recognized by ADOC--that the majority of suicides by prisoners in its custody are men released from suicide watch into segregation, *see* Pls. Ex. 2706 (Mar. 21, 2019, Daniels's memorandum announcing

directive).  These suicides in segregation are compelling circumstantial evidence that nurses need to be better trained.  For example, Matthew Holmes killed himself within roughly 12 hours of being placed in segregation, after ADOC "fail[ed] to generate an emergency referral to mental health in response to a positive pre-placement screen."  Joint Expert Case Summaries (doc. no. 2416-2) at 4.

Additionally, the defendants have agreed that preplacement screenings and training are necessary.  *See* Defendants' Response to Plaintiffs' Proposed Opinion and Order (doc. no. 2499) at 39-40.  Their agreement weighs in favor of a finding that this relief meets the PLRA requirements.

Furthermore, Drs. Burns and Perrien agreed that the training requirement could not be more limited and still address the constitutional violations flowing from inadequate preplacement screenings.  *See* Burns and Perrien Apr. 4, 2019, R.D. Trial Tr. at 192.

6.  *Security Checks in Segregation Every 30 Minutes*

In the liability opinion, the court found that ADOC conducted deficient correctional monitoring in segregation units--also known as segregation checks or rounds. *See Braggs*, 257 F. Supp. 3d at 1244.

To address this ongoing problem, Drs. Burns and Perrien recommend that "30-minute custody rounds in segregation must be enforced consistent with existing policy." Immediate Relief Recommendations (doc. no. 2416-4) at 4. Existing ADOC policy, in turn, provides that "[o]bservation of an inmate in disciplinary segregation shall be conducted at least every thirty (30) minutes and shall be annotated on the duty post log." Pls. Ex. 1399 at 7 (ADOC Admin. Reg. 434(V)(J)(4)(b)). As elaborated below, the court will order the defendants to immediately implement the experts' recommendation.

Drs. Burns and Perrien's recommendation did not detail exactly how ADOC should go about enforcing its existing segregation-rounds policy. *See* Immediate Relief Recommendations (doc. no. 2416-4) at 4. However, at the suicide-prevention trial, they suggested two possible

alternatives: (1) placing logbooks at opposite ends of a unit in order to incentivize walking from one end to the other to fill out the log for each security check, or (2) a guard patrol system, whereby officers carry a device that automatically records their presence at each door as they approach it. *See* Burns and Perrien Apr. 9, 2019, R.D. Trial Tr. at 194-96. As to the first option, Dr. Perrien admitted: "[Y]ou could still ... pre[-]enter times and cells. But the idea is to, as much as possible, get people to complete logs and data, and then you have supervisory staff at the facility who come through those restrictive housing units and look at those logs to make sure that they're not being pre[-]filled out." *Id.* at 195.[35]

The experts' suggestions of placing logs at either end of the unit or utilizing a guard patrol system make

---

35. Both correctional expert Vail and Deputy Commissioner Daniels also recommended having correctional supervisors make rounds in segregation units to confirm whether security checks are happening. *See* Vail Apr. 3, 2019, R.D. Trial Tr. at 162; Daniels Mar. 28, 2019, R.D. Trial Tr. at 200-01.

a great deal of sense, and the court hopes that ADOC will seriously consider implementing one of them. Nevertheless, at this time, the court will not order the defendants to implement either alternative, because, based on the current record, such a requirement would excessively intrude into the details of prison management.

Instead, to ensure ADOC enforces its own policy, the court will order the defendants to adopt the system of supervisory review and confirmation that they proposed in their post-trial brief. *See* Defendants' Response (doc. no. 2249) at 45-46. Specifically, the defendants agreed to implement the following plan until the court enters an order concerning global monitoring:

"1. ADOC will require the restrictive housing commander over each restrictive housing unit at its major facilities to conduct unannounced rounds in each restrictive housing unit, including reviewing the duty post logs and other documentation attached to the duty post logs for the unit. Each restrictive housing commander must certify in writing on a quarterly basis that he or she conducted unannounced rounds in each restrictive housing unit for which he or she serves as the commander. The senior-ranking warden at each major ADOC correctional facility

with a restrictive housing unit shall maintain the written certification from the restrictive housing commander at the warden's facility.

2. ADOC will require the immediate supervisor for each restrictive housing commander to review duty post logs on a quarterly basis for the restrictive housing units under the commander's oversight to determine whether security checks occurred.

3. Each major ADOC correctional facility will issue a written report on a quarterly basis to Deputy Commissioner Charles Daniels or, if the report is from Tutwiler, to Deputy Commissioner Wendy Williams summarizing the findings from the unannounced rounds in restrictive housing and the review of the duty post logs, as well as summarizing any corrective action with respect to a failure to complete security checks or properly document the checks in in the duty post log."

*Id.* The defendants ask the court to approve the proposal.

The court is willing to approve the defendants' proposal. That said, the court has serious concerns it will be insufficient to ensure that overstretched officers do their rounds correctly. The proposal does not contain the experts' suggested measures of placing logs on both ends of the unit or utilizing an electronic guard patrol system. Also troublingly, the proposal does not require review of video evidence where available.

Despite these concerns, the court will defer to the defendants in giving them an opportunity to show that their approach works. In adopting the defendants' proposal, the court relies in good faith on the assumption that ADOC will conduct unannounced rounds on a sufficiently frequent basis to catch noncompliance, and will review logs for irregularities that reveal potential noncompliance, such as 30-minute checks recorded at identical intervals, or time entries added to the same line as another entry, rather than to its own line. The court relies on the wardens and supervisors to address such red flags aggressively.

The court finds that ordering the defendants to immediately implement Drs. Burns and Perrien's recommendation--and to adopt the system of supervisory review and confirmation that they proposed in their post-trial brief--constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A).

Two years have passed since the liability opinion found that inadequate monitoring of prisoners in segregation contributes to the constitutional violations. Substantial evidence presented at the suicide-prevention trial shows that the problem persists. As discussed above, Ross Wolfinger killed himself in segregation during a shift in which the correctional officer assigned to his area of segregation failed to do any 30-minute checks. *See* Pls. Ex. 2403 at SPA_13487. An ADOC memorandum says the officer's actions "resulted in" Wolfinger's death. *See id.* at SPA_13488. Dr. Perrien's testimony indicates that the failure to conduct 30-minute rounds may have also led to suicides in other cases. She said that "there were cases where it's possible that if 30-minute rounds were occurring, perhaps those individuals may have been rescued. May have been identified. May not have completed suicide." Perrien Apr. 9, 2019, R.D. Trial Tr. at 193-94.

Many of the duty post logs presented at the suicide-prevention trial show long periods of time

without security checks. Plaintiffs' security expert Vail reviewed nearly one thousand pages of duty post logs from Holman, Kilby, Fountain, Easterling, Bullock, and Tutwiler prisons that were produced for the suicide-prevention remedial trial. *See* Vail, Apr. 3, 2019, R.D. Trial Tr. at 145. Based on his review, he concluded that, as a system, ADOC continues to struggle to conduct adequate security checks. *See id.* at 147. At Holman prison, Vail identified entire shifts in which not one security check was logged; on other days, there were delays of two to more than three hours between logged checks. *See id.* at 155. Moreover, he testified that the logs from every facility that he reviewed, save for Bullock, had "plenty of problems." *Id.* at 147-48; *see also id.* at 149-59 (explaining the problems he identified at each facility).

A number of logs contained evidence of inaccuracy at best and falsification at worst, indicating that security checks may be happening much less frequently than written. Particularly concerning are security checks

documented as occurring at exact 30-minute intervals, as they were on the night Ross Wolfinger committed suicide. Vail testified that such checks would give him concern because checks are supposed to be staggered and unpredictable. *See id.* at 154. Warden Wright testified that, if she came across logs that listed security checks occurring every 30 minutes on the hour and 30 minutes past the hour, she would definitely need "to check to verify that the rounds were made." Wright Apr. 4, 2019, R.D. Trial Tr. at 101. Nevertheless, the court heard substantial evidence that, between February and late March 2019, security checks repeatedly were logged exactly every 30 minutes to the minute. *See, e.g.*, *id.* at 101-03; Gordy Apr. 5, 2019, R.D. Trial Tr. at 158-59; *see also* Pls. Ex. 2552 (Aug. 16-22, 2018, Fountain Duty Post Logs showing multiple officers on multiple days filling in security logs at :00 and :30 hours).

The court also saw clear evidence of logs being pre-filled. The duty-post log from a segregation unit at Kilby showed security checks at exact intervals, line

after line. On one line, where a 4:30 security check had already been filled in, someone added to the same line a different event at 4:19; later, someone recorded an 8:15 event on the same line showing a security check at 8:00. The most likely explanation is that 30-minute security checks on the half-hour were pre-filled, so there was no room to add other events to the log on their own lines. *See* Price, Apr. 12, 2019, R.D. Trial Tr. at 110-13 (testifying about Pls. Ex. 2588 at ADOC0468652 (Feb. 12, 2019, Kilby Duty Post Logs).

In addition, ADOC has not yet corrected the severe correctional staffing shortage that has been a primary cause of the inadequate monitoring of prisoners in segregation. *See* March 2019 Quarterly Staffing Report (doc. no. 2386-1) at 3 (showing that, as of December 31, 2018, the defendants reported that only 1,083 of the 3,326 assigned correctional officer positions at ADOC were filled). During the liability trial, the court heard extensive evidence tying the inadequate monitoring of prisoners in segregation to ADOC's severe staffing

shortage. When correctional officers have too many responsibilities due to understaffing, corners will inevitably be cut. Given that the staffing shortage has not significantly changed since entry of the liability opinion, and indeed may have gotten worse, the court is confident that the examples of inadequate segregation monitoring presented to the court in the remedial trial are only the tip of the iceberg. *See*, *e.g.*, Perrien Apr. 9, 2019, R.D. Trial Tr. at 195 (testifying that it is her understanding that that ADOC is unsure whether it can follow its own segregation-rounds policy in "particularly understaffed facilities").

Finally, the court disagrees with the defendants' argument that a remedial order requiring them to comply with their segregation-rounds policy or to implement their proposed oversight is unnecessary because they are willing to do so voluntarily. As illustrated by the evidence discussed above, ADOC's oversight to date has failed to ensure that officers consistently comply with the department's segregation-rounds policy, and the

plaintiffs continue to be exposed to an immense threat of future harm due to inadequate monitoring in segregation. Moreover, that the defendants voluntarily agree to enforce and implement oversight of their own policy is further evidence that ordering them to do so satisfies the PLRA's need-narrowness-intrusiveness test. *Cf. Morales Feliciano*, 300 F. Supp. 2d at 334 ("The very fact that the defendants chose to join the plaintiffs in selecting this remedy would seem to mean--and must be taken to mean—that they understood it to be precisely tailored to the needs of the occasion, that it is narrowly drawn and least intrusive--in fact not intrusive at all.").

### 7. *Confidentiality*

In the liability opinion, the court found that "ADOC's provision of psychotherapy often lacks confidentiality." *Braggs*, 257 F. Supp. 3d at 1210. The "lack of confidentiality [] undermine[s] the efficacy and frequency of psychotherapy for mentally ill prisoners

within ADOC.  These conditions have created a substantial risk of serious harm for those who need counseling services." *Id.* at 1212.  In June 2018, the court entered two remedial orders incorporating stipulations by the parties intended to address this problem.  *See* Psychotherapy and Confidentiality Remedial Order (doc. no. 1899-1) at 4; Order and Injunction on Confidentiality (doc. nos. 1900, 1900-1).  Those orders were to be implemented by September 2018.  In addition to those remedial orders, the interim agreement provides that suicide risk assessments and suicide watch follow-up appointments must be conducted in confidential, out-of-cell settings.  *See* Interim Agreement (doc. no. 1106-1) at 1-3.

Evidence presented at the suicide-prevention trial confirmed that the defendants are not in compliance with the obligations in the two remedial orders and interim agreement.  Drs. Burns and Perrien found "repeated examples of custody staff intrusions into the provision of mental health contacts through their presence during

clinical encounters and pressure on clinical staff that minimized inmate concerns and reports of suicidality." Joint Expert Report and Recommendations (doc. no. 2416-1) at 16.

To address this issue, Drs. Burns and Perrien recommend that ADOC adhere to the confidentiality requirements to which it has already agreed, including: (1) "clinical contacts should be confidential without the presence of custody staff unless there is a significant security reason as determined by the clinician," (2) "[e]valuations must be conducted in person, out of cell and in a place offering sound confidentiality," and (3) "[d]ocumentation (e.g. suicide risk assessment, progress note) should clearly indicate that the contact was in a confidential space, conducted at cell front, or other specific non-confidential setting." Immediate Relief Recommendations (doc. no. 2416-4) at 4.

The court finds that ordering immediate and permanent implementation of this recommendation constitutes relief that satisfies the PLRA's

need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A).

The defendants agree with this recommendation but argue that this relief is unnecessary because previous remedial orders already cover this issue. *See* Defendants' Response to Plaintiffs' Proposed Opinion and Order (doc. no. 2499) at 47. The court rejects this argument. The record shows that ADOC continues to violate the terms of previous remedial orders covering this issue. ADOC fails to provide adequate confidentiality during clinical encounters to inmates, comply with the agreements they made with the plaintiffs, and comply with court orders regarding confidentiality.

## 8. *Immediate Life-Saving Measures*

Rapidly responding to a suicide attempt can make the difference between life and death. The experts recommend "IMMEDIATE intervention (upon appropriate number of security staff present; this should be two officers) in the event of suicide in progress--cut down, remove noose,

and begin life-saving measures and continue until a physician declares death." Immediate Relief Recommendations (doc. no. 2416-4) at 4.

The court finds that ordering immediate and permanent implementation of this recommendation constitutes relief that satisfies the PLRA's need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A).

The 15 recent suicides include multiple instances in which ADOC correctional officers discovered inmates hanging in their cells, yet failed to immediately cut them down, remove the noose, and initiate CPR. For example, when ADOC staff discovered Robert Martinez hanging from a sheet tied to a vent in his cell, they waited more than 30 minutes before cutting him down, a delay that, in the experts' words, was "inexcusable and inhumane." Joint Expert Case Summaries (doc. no. 2416-2) at 1; *see also* Joint Expert Report and Recommendations (doc. no. 2416-1) at 8 ("[T]here are very serious delays in the response time of custody and medical staff to

begin CPR, first aid, or to take other life-saving actions (such as cutting down an inmate discovered hanging and removing the noose from around his neck). Delays of 10 minutes or more to respond and take action were not uncommon in the cases reviewed and that is simply too long for preservation of life.")

ADOC's Dr. Kern and Crook testified that they agree with the recommendation. *See* Kern Mar. 29, 2019, (doc. no. 2483) at 132; Crook Apr. 3, 2019, R.D. Trial Tr. at 20. The defendants argue, however, that this relief is not necessary because they already agreed to implement it. The court rejects this argument. As discussed above, that the defendants agree with the recommendation supports the finding that it is not intrusive and meets the PLRA test. Furthermore, despite the defendants' agreement with the recommendation, ADOC has repeatedly failed to timely intervene with life-saving measures.


### D.   Monitoring

In late 2018, the defendants and the plaintiffs each

proposed global monitoring schemes--comprised of both internal and external monitors--to assess ADOC's compliance with the remedial orders in this litigation. Both parties agreed that court monitoring is necessary. The court is considering the parties' proposals and has not yet resolved the issue. In the meantime, the plaintiffs request that the court impose interim monitoring limited to the immediate suicide-prevention relief. For the reasons elaborated below, the court finds that both internal and external monitoring of the immediate relief is urgently needed and will therefore order it here.

### i. The Need for Court Monitoring

There is a dire need for court monitoring of ADOC's compliance with the immediate suicide-prevention relief.

First, this need is demonstrated by the finding in the liability opinion that ADOC fails to self-monitor its provision of mental-health care. *See Braggs*, 257 F. Supp. 3d at 1257-60. As the court explained, ADOC "has

done vanishingly little to exercise oversight of the provision of care to mentally ill prisoners". *Id.* at 1257.

Second, the need for monitoring is shown by the fact that, since the liability opinion, ADOC has consistently failed to identify and correct problems with its suicide-prevention system, including its noncompliance with remedial measures that the defendants agreed to implement. As Dr. Burns testified at the monitoring trial in December 2018, the interim agreement "hasn't been reviewed or acted upon or self-monitored, to my knowledge, in any way in the two years that it's been in place." Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 170.[36] She testified that none of the documents she had thus far received as part of her and Dr. Perrien's assessment of suicide prevention indicated that ADOC had

_____

36. Dr. Burns similarly testified that "there isn't anything to make me think that [ADOC has] done what's required to, for example, implement the suicide interim order--the suicide prevention interim order fully *or to self-monitor it in any way*." Burns Dec. 7, 2018, Trial Tr. (doc. no. 2256) at 209 (emphasis added).

studied whether it was complying with the interim agreement, and that she was generally not aware of ADOC's having identified any instances of noncompliance with the agreement. *See id.* at 169. As of April 2019, Drs. Burns and Perrien said that they had not yet seen ADOC meaningfully self-monitor its ability to comply with its suicide-prevention policies. *See* Burns and Perrien Apr. 9, 2019, R.D. Trial Tr. at 214-15.[37]

One glaring example of ADOC's failure to self-monitor is its inadequate reviews of prisoners' suicides. In December 2018, Dr. Burns testified that ADOC's reviews of suicides and serious suicide attempts that she had received were not adequate. *See* Burns Dec. 7, 2018, Trial Tr. (doc. no. 2256) at 102. This made her concerned that "things that might have been found and corrected still exist and put people at risk." *Id.* Her fears were borne out: Six prisoners killed themselves since she

---

37. Dr. Perrien said that ADOC recently hired staff who she believes can meaningfully monitor, but that she had not yet seen them do it. *See* Perrien Apr. 9, 2019, R.D. Trial Tr. at 214-15.

testified; and, as detailed above, their cases were rife with inadequacies in suicide prevention. As of March 2019, three months after her testimony, both she and Dr. Perrien reported that ADOC's reviews of suicides remained deficient. *See* Joint Expert Report and Recommendations (doc. no. 2416-1) at 7, 34-35 (noting, for example, that "[p]erhaps even more disturbing than [the] delayed response to suicide attempts in progress, was the lack of any documentation that ADOC or the vendor identified this very serious problem or took any steps to address it);[38] Joint Expert Case Summaries (doc. no. 2416-2) at

_____

38. Drs. Burns and Perrien further reported: "We received no reviews completed by custody or medical addressing the clinical mortality and administrative reviews necessary for suicides. ... There was also no documentation that any formal discussion occurred between custody, medical, and mental health (ADOC and their vendor) to review the review by mental health and identify improvements for implementation. In general, QI program reviews were cursory and summarized personal and correctional history but didn't look at or critique the mental health care provided. Even when medical response was untimely (or non-existent), the conclusion was that medical and security responded 'according to policy and standards' and there were no recommendations." Joint Expert Report and Recommendations (doc. no. 2416-1) at 34-35. They also reported that "there were significant areas for improvement" in the "psychological

1-3.

Drs. Burns and Perrien's report also specifically identified problems with internal oversight by Wexford, ADOC's mental-health vendor. *See* Joint Expert Report and Recommendations (doc. no. 2416-1) at 3. For example, they found that Wexford audited "the presence or absence of documents rather than any measure of quality, completeness or accuracy." *Id.* In this same vein, the court was troubled by the testimony of Barbara Coe, Wexford's Program Director for Mental Health, who admitted that none of the vendor's auditors are clinicians, and who was not entirely sure whether Wexford was auditing compliance with the court's orders. *See* Coe Apr. 5, 2019, R.D. Trial Tr. at 14-18.

Perhaps most notably, the testimony of senior ADOC officials confirmed that ADOC is not adequately monitoring suicide-prevention measures. ADOC Psychiatry Director Kern oversees the clinical aspects of the

_____

autopsies/reconstructions," as they were "completed in a cursory manner, did not contain a summary narrative, and contained no findings." *Id.* at 35.

department's mental-health program, and his duties on the OHS team include providing "a clinical perspective" in working to ensure remedial orders are implemented. Kern Mar. 28, 2019, Trial Tr. (doc. no. 2482) at 10, 25. He testified that, to his knowledge, OHS had "not specifically audited the suicide prevention process" since he had become Director of Psychiatry approximately one year ago. *Id.* at 44. Dr. Kern is on a task force charged with implementing the remedial orders, but testified that the last time that team met was early in the fall of 2018. *See id.* at 26. Despite the recent spike in suicides, he said that, overall, in 2019, he had participated in just one formal meeting that was devoted specifically to reviewing suicides and discussing suicide prevention. *See id.* at 29.

ADOC Mental Health Services Director Crook also described deficiencies in internal monitoring of suicide prevention. Quality assurance is a significant aspect of her job. Crook Apr. 1, 2019, Trial Tr. (doc. no. 2485) at 40. Yet, she testified that, prior to February

2019, she had not done anything to determine whether MHO was being used in place of suicide watch. *See* Crook Apr. 4, 2019, Trial Tr. (doc. no. 2487) at 72. She also testified that OHS staff did not begin monthly reviews of suicide risk assessments until March 2019, even though the interim agreement adopted more than two years earlier required such reviews. *See* Crook Apr. 1, 2019, Trial Tr. (doc. no. 2485) at 43-44.[39] Crook further testified that she has not done anything to monitor whether mental-health staff is exercising its authority to tell correctional staff to remove someone from segregation, and whether correctional staff is heeding mental-health staff when asked. *See* Crook Apr. 3, 2019, Trial Tr. (doc. no. 2486) at 9-10.

---

39. In December, Dr. Burns testified that she had not seen any evidence that OHS staff was reviewing the risk assessments. *See* Burns Dec. 7, 2018, Trial Tr. (doc. no. 2256) at 283-84. She said: "I haven't seen, even though the interim order is a year and a half, almost two years old, evidence that there's been corrective action to ensure that the risk assessments are being done at the appropriate times and that they're being reviewed and implemented. And I would have expected at this point, after a couple of years, that those things would be prioritized." *Id.* at 283.

Crook candidly admitted she does not have the staff to monitor all areas of the remedial orders entered thus far in this litigation. *See* Crook Apr. 1, 2019, Trial Tr. (doc. no. 2485) at 11-12; Crook Apr. 3, 2019, Trial Tr. (doc. no. 2486) at 68-69 ("Our team is not large enough to go to every single facility and look at every single aspect of the remedial orders."). As elaborated below, Crook's testimony is consistent with the defendants' proposed global monitoring scheme for all the remedial orders, a separate matter the court is currently considering. Namely, in their global monitoring proposal, the defendants concede that ADOC does not have the internal resources or capacity to effectively monitor, which is why their plan "necessarily requires the initial assistance of" an external monitoring team. Defendants' Proposed Monitoring Plan (doc. no. 2115) at 2. Critically, the defendants' global monitoring proposal also explicitly recognizes that external monitoring meets the PLRA's need-narrowness-intrusiveness requirement, an admission

that further supports finding that external monitoring is necessary for the immediate relief ordered here. *See* Defendants' Pretrial Monitoring Brief (doc. no. 2145) at 36.

To her credit, faced with inadequate resources, Crook said she has prioritized monitoring suicide prevention. *See* Crook Apr. 3, 2019, Trial Tr. (doc. no. 2486) at 10. For example, she testified that, in December 2018 and February 2019, OHS conducted audits of, among other areas, suicide watch assessments, suicide watch discharge, and suicide watch monitoring. *See* Crook Apr. 4, 2019, Trial Tr. (doc. no. 2487) at 67-68. Also to her credit, as mentioned above, on February 15, 2019, she sent a letter to Wexford notifying it of "systemic failures to comply with court orders in *Braggs*." Pls. Ex. 2710 at ADOC0475738. She testified that her letter led Wexford to take action. *See* Crook Apr. 4, 2019, Trial Tr. (doc. no. 2487) at 74. Crucially, however, she also recognized that she sent the letter only after 14 suicides had occurred in 14 months. *See id.* It also

185

bears emphasizing that she sent the letter a month *after* the plaintiffs filed their emergency motion seeking immediate relief on suicide prevention, which raises questions about whether ADOC would have acted when it did without pressure from the plaintiffs and the likelihood of immediate court review. In fact, an inference could be drawn that the timing of Crook's letter is additional proof that outside oversight increases the likelihood of swift compliance with court orders.

Furthermore, while Crook is to be commended for audits related to suicide prevention, it is deeply troubling that Dr. Kern, who provides a "clinical perspective" in monitoring remedial orders, apparently was not even aware that the audits occurred. Kern Mar. 28, 2019, Trial Tr. (doc. no. 2482) at 25, 44. It is also deeply concerning that, as Crook testified, she does not know the degree to which ADOC is currently following the policies it adopted to implement remedial orders-- policies that she agreed are "necessary" for suicide prevention. Crook Apr. 4, 2019, Trial Tr. (doc. no.

2487) at 62-63.

In short, the monitoring efforts have been too little, too late.[40]

Third, the need for monitoring is demonstrated by ADOC's failure to comply with the interim agreement and other remedial measures related to suicide prevention that they also agreed to implement. ADOC's pervasive noncompliance is detailed throughout this opinion, including in the section summarizing recent suicides. Strikingly, ADOC itself has recognized "systemic failures to comply with court orders in *Braggs*." Pls. Ex. 2710 at ADOC0475738; *see also* Burns Dec. 7, 2018, Trial Tr. (doc. no. 2256) at 282-84 (explaining how failures in the area of suicide prevention led her to conclude that she had not seen evidence that ADOC was using its best efforts to comply with remedial orders). Noncompliance with

---

40. *See, e.g.*, *Thomas*, 614 F.3d at 1320-21 (stating that when defendants rely on intervening events occurring after a suit has been filed to argue that injunctive relief is not warranted, they "must satisfy the heavy burden of establishing that these such events have completely and irrevocably eradicated the effects of the alleged violations").

remedial requirements supports the need for court monitoring. *See Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003) (upholding district court's finding that external monitoring satisfied the PLRA's need-narrowness-intrusiveness requirement, "particularly in light of the district court's finding that the City's compliance with its remedial responsibilities has been consistently incomplete and inadequate"), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009). This makes sense: The more someone fails to do something he agreed to do, the bigger the need to supervise whether he does it in the future.

It bears highlighting that correctional understaffing significantly contributes to ADOC's noncompliance with remedial measures, and thus the need for monitoring. The liability opinion found that "persistent and severe" correctional understaffing was an "overarching" issue permeating inadequate mental-health care. *Braggs*, 257 F. Supp. 3d at 1268. Almost two years later, the problem remains dire: As of

December 31, 2018, the defendants reported that only 1,083 of the 3,326 assigned correctional officer positions at ADOC were filled. *See* March 2019 Quarterly Staffing Report (doc. no. 2386-1) at 3. As the plaintiffs' expert Eldon Vail testified, this understaffing means that "there's just not staff available to move [an] offender from a cell to the [mental-health] treatment environment." Vail Apr. 3, 2019, R.D. Trial. Tr. at 113. Because ongoing understaffing continues to contribute to inadequate care and noncompliance with remedial measures, understaffing also shows that monitoring is needed.

Fourth and finally, both Drs. Burns and Perrien testified that it is important for the court to know whether ADOC is implementing the immediate relief. *See* Burns and Perrien Apr. 9, 2019, R.D. Trial Tr. at 206-07.

### ii. Parties' Positions on Monitoring

The plaintiffs propose that the court appoint an interim external monitor to assess ADOC's implementation

of the immediate suicide-prevention relief. *See* Plaintiffs' Proposed Opinion and Order (doc. no. 2478) at 128-29. They further propose that the monitor conduct both document review *and* site visits, as well as use any other method of gathering information that the monitor deems necessary. *Id.* Finally, the plaintiffs propose that the monitor be Dr. Perrien, who is the defendants' expert consultant.

By contrast, the defendants oppose monitoring for immediate relief, essentially arguing that the court should wait to impose a global monitoring scheme that covers all remedial orders. *See* Defendants' Response to Plaintiffs' Proposed Opinion and Order (doc. no. 2499) at 48-50. The defendants previously proposed a global monitoring plan, which the court is currently considering alongside the plaintiffs' proposed plan.

The court rejects the defendants' arguments. Monitoring of the immediate relief ordered here can no more wait for a global monitoring scheme than the immediate relief can wait for the remaining

suicide-prevention relief to be resolved. Both are needed now, as they both go together. For the reasons discussed below, the court will establish an interim external monitor of the immediate relief, whose monitoring activities will consist of both document review *and* site visits. The court will also require ADOC to institute an internal monitoring scheme dedicated to the immediate relief.

### iii. The PLRA and Monitoring

The parties disagree about whether court monitoring is "prospective relief" and therefore subject to the PLRA's need-narrowness-intrusiveness requirement. 18 U.S.C. § 3626(a)(1)(A). The defendants contend that it is. By contrast, the plaintiffs argue that, to the extent monitoring is limited to informing the court whether the defendants comply with court orders, the requirement does not apply, because such monitoring constitutes a *means* to relief, as opposed to "prospective relief" within the

meaning of the PLRA. *Id.*

The caselaw is unclear as to whether the need-narrowness-intrusiveness requirement applies to court monitoring. Some district courts have held that monitoring is a means to relief, rather than "prospective relief," and therefore is not subject to the requirement. *See, e.g.*, *Carruthers v. Jenne*, 209 F. Supp. 2d 1294, 1300-01 (S.D. Fla. 2002) (Hoeveler, J.) ("Clearly monitoring is not an 'ultimate remedy' and only aids the prisoners in obtaining relief."); *Fraser*, 156 F. Supp. 2d at 342-43 (holding that monitoring "cannot be relief" and to find otherwise "would conflate relief with the means to guarantee its provision"). On the other hand, the Second Circuit stated in dictum that it was "somewhat problematic" for the district court in the case before it to conclude that monitoring is not relief within the meaning of the PLRA. *Fraser*, 343 F.3d at 48-49. The appellate court reasoned that placing the monitoring body beyond the reach of the PLRA would "frustrate[e] one of the Act's broad goals of limiting 'the micromanag[ing]

[of] State and local prison systems.'" *Id.* at 49 (quoting 146 Cong. Rec. S 14611, 14626 (Sen. Dole) (1995)). Additionally, because the monitoring body at issue had "substantial responsibilities," there was "no easy distinction between relief itself and the monitoring of relief." *Id.* After making these observations, the Second Circuit refrained from resolving whether monitoring constituted prospective relief, because it held that the district court had made the appropriate need-narrowness-intrusiveness findings. *See id.*

Ultimately, this court need not resolve whether monitoring is "prospective relief" subject to the need-narrowness-intrusiveness requirement, because, as elaborated below, the monitoring ordered here satisfies the requirement. So, to the extent monitoring must meet the requirement, it does.

### iv. Ordered Monitoring Relief

#### 1. *External Monitoring*

The court will establish an *external* monitor. To

the extent that the PLRA applies to court monitoring, external monitoring meets the need-narrowness-intrusiveness requirement. The reasons identified above for why monitoring is necessary also show why *external* monitoring satisfies the requirement. Those include the liability opinion's finding of ADOC's inadequate oversight of mental-health care, ADOC's failure to internally monitor problems with suicide prevention and compliance with remedial orders, as well as ADOC's systematic noncompliance with agreed-to remedial measures related to suicide prevention. *See Fraser*, 343 F.3d at 49 (rejecting the argument that external, rather than internal, monitoring did not satisfy the need-narrowness-intrusiveness requirement particularly given that the defendant's "compliance with its remedial responsibilities has been consistently incomplete and inadequate").

Furthermore, Dr. Burns testified that external monitoring of the immediate relief is necessary, given that "suicide is the worst outcome and requires some

immediate response and attempts to remedy." Burns Apr. 9, 2019, R.D. Trial Tr. at 209. Waiting for ADOC to create its own monitoring plan for immediate relief would simply take too long, she opined. *See id.* at 208.

Granted, Dr. Perrien did not view external monitoring as necessary, and instead endorsed the idea that ADOC come up with its own plan to monitor the immediate relief, potentially with the help of an outside consultant. *See* Perrien Apr. 9, 2019, R.D. Trial Tr. at 211. Her main reason for preferring internal monitoring, however, is unconvincing. Specifically, Dr. Perrien was concerned with a potential lack of continuity between the interim monitor ordered here, and the global monitoring scheme that the court is considering ordering for all the remedial orders--an issue that the court has yet to resolve. *See id.* at 210; Perrien Apr. 10, 2019, R.D. Trial Tr. at 62. Yet Dr. Perrien's concern with continuity actually weighs in favor of external monitoring. This is because under both the defendants' and the plaintiffs' proposed global monitoring plans,

*external* monitors would begin the monitoring process, which would then gradually transition to an internal team. Indeed, the defendants propose that all quarterly evaluations during the first year of monitoring "shall be conducted exclusively" by the external monitoring team, as opposed to the internal team. Defendants' Proposed Monitoring Plan (doc. no. 2115) at 13. Therefore, continuity of monitoring is best assured by having an *external* interim monitor, just as there would be external monitors when global monitoring begins under both the defendants' and the plaintiffs' plans. Finally, the court sees no reason why the interim monitoring plan could not require, to the extent possible, an easy transition to a global monitoring plan.

The defendants have conceded that the external monitoring proposed in their global monitoring plan meets the need-narrowness-intrusiveness requirement, which provides further support for finding that the requirement is met here with respect to external monitoring for immediate relief. *See* Defendants' Pretrial Monitoring

Brief (doc. no. 2145) at 36 ("The ADOC structured the Plan ... so that each requirement meets" the PLRA standard). In their global monitoring plan, the defendants admit that ADOC does not have the internal resources or capacity to effectively monitor, which is why their plan "necessarily requires the initial assistance of" an external monitoring team. Defendants' Proposed Monitoring Plan (doc. no. 2115) at 2. This admission is as much true about the immediate need for interim external monitoring for suicide prevention as it is about global external monitoring.

Finally, the testimony of Crook and Dr. Kern specifically supports the need for external monitoring. Both admitted that OHS does not currently have the capacity to monitor compliance with all the remedial orders. *See* Crook Apr. 3, 2019, Trial Tr. (doc. no. 2486) at 68-69; Kern Mar. 29, 2019, Trial Tr. (doc. no. 2483) at 165. Crucially, Crook said that, given this lack of capacity, the external monitoring that the defendants proposed in their global monitoring plan is

the "direction that we are looking towards." Crook Apr. 4, 2019, Trial Tr. (doc. no. 2487) at 60. Dr. Kern similarly testified that, if there was an external and internal compliance team, as proposed by the defendants for the global scheme, it "would very much help us" to ensure compliance with the remedial orders. Kern Mar. 29, 2019, Trial Tr. (doc. no. 2483) at 165. That two senior ADOC officials charged with compliance oversight view external monitoring as part of the solution to their lack of monitoring capacity convincingly shows the need for external monitoring here. Placing the responsibility for monitoring additional remedial measures ordered here exclusively on ADOC's shoulders would only exacerbate its lack of capacity.

In short, external monitoring satisfies the need-narrowness-intrusiveness requirement because ADOC has proven that it simply is not up to the task.

### 2. *Site Visits and Document Review*

The court will order that the external monitor

conduct both document review *and* site visits. The defendants shall timely furnish all documents and arrange for all site visits requested by the external monitor in the exercise of his or her professional judgment, unless the defendants file an objection with the court to a particular request based on extraordinary circumstances, such as an extreme security risk. (The objection would likely be handled by one of the two magistrate judges involved in this case--the one handling mediation of outstanding issues or the one helping the court handle disputes.)

To the extent that the PLRA applies to court monitoring, the ordered site visits and document review meet the need-narrowness-intrusiveness requirement. The reasons identified above for why monitoring is necessary also show why both document review and site visits satisfy the requirement.

Moreover, both Vail's and Dr. Burns's testimony showed why site visits are essential. Vail testified that, in monitoring, "there's really no substitute for

the ability to be on site." Vail Apr. 3, 2019, R.D. Trial Tr. at 176. Interviews with prisoners reveal "[d]isconnects between what the documentation says and what actually occurred." *Id.* And when a monitor is able to interview officers and prison administrators, "you get a much better picture of what really happens versus what the documentation in the policy says." *Id.* Similarly, Dr. Burns testified that site visits are important because they allow monitors to review many aspects of compliance that pure paperwork does not capture, such as the adequacy of the referral process, whether staff received required training, how mental-health rounds are conducted, whether treatment team meetings are structurally appropriate, and whether observation logs comport with actual practice. *See* Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 52-56, 167. Dr. Burns specifically recommended site visits for monitoring of the immediate relief. *See* Burns Apr. 10, 2019, R.D. Trial Tr. at 61-62.

While Dr. Perrien testified that monitoring of the

immediate relief could be accomplished exclusively based on document review, without site visits, *see* Perrien Apr. 10, 2019, R.D. Trial Tr. at 63,[41] this view is undercut by her and Dr. Burns's joint finding that ADOC's production of documents for their suicide-prevention assessment was plagued with problems, *see* Joint Expert Report and Recommendations (doc. no. 2416-1) at 2-4. Dr. Burns and Perrien's report is worth quoting at length: "Documents produced throughout this process were frequently poorly labeled with no accompanying description of why a particular document was provided or to which request it pertained; multiple files were identified only with Bates numbers and may have been inmate records, monthly reports, crisis logs, training materials or any one of several other materials requested." *Id.* at 3-4. Overall, "production was poorly organized which we believe reflects a similar lack of

---

41. Dr. Perrien acknowledged that "there is value throughout a case in doing site visits as a course of an overall monitoring program." Perrien Apr. 10, 2019, R.D. Trial Tr. at 63.

organization and consistency across institutions that must be corrected to implement a suicide prevention program." *Id.* at 4. The experts' observations are consistent with what this court has observed to be ADOC's repeated inability to timely produce requested documentation throughout the remedial process, which strongly indicates a lack of an organized and well-functioning internal information system. *See, e.g.*, Order Regarding Document Production (doc. no. 2345) at 2 (noting the defendants' failure to timely produce required information about the reasons prisoners with SMIs are placed in segregation and segregation-like settings, which was "surprising in light of the importance of the issue").

In short, if ADOC's document production for the suicide-prevention assessment was so disorganized that the experts found that it "must be corrected," Joint Expert Report and Recommendations (doc. no. 2416-1) at 4, and the court has similarly found serious problems with ADOC's document production, why should the external

monitor be forced to exclusively rely on documents?

Furthermore, the defendants' proposed global monitoring plan provides for initial site visits by the external monitoring team to all facilities not previously visited, and allows the external team to request additional visits based on their professional judgement. *See* Defendants' Proposed Monitoring Opinion (doc. no. 2295) at 13. The defendants' proposed global monitoring plan also gives the external monitoring team the authority to identify what documents to review, *id.*, and places within the external monitoring team's discretion how many documents to review, *id.* at 27. The defendants conceded that both of these aspects of their proposed global monitoring plan meet the need-narrowness-intrusiveness requirement, which provides further support for finding that the requirement is met here with respect to the interim monitor's activities. *See* Defendants' Pretrial Monitoring Brief (doc. no. 2145) at 36.

Finally, the court will impose certain limits on the

site visits to ensure that the relief is narrowly tailored. The defendants can object to a particular site visit (or document request, for that matter), based on extraordinary circumstances. And site visits will be limited to two days at each facility, which ensures they are not overly intrusive. *See* Vail Nov. 29, 2018, Trial Tr. (doc. no. 2340) at 64 (testifying that a site visit by a monitoring team for a few days would not be unnecessarily disruptive, but that a visit for "weeks" might be); Burns Dec. 7, 2018, Trial Tr. (doc. no. 2256) at 242 (testifying that site visits would be disruptive if they lasted 30 days, but not three or four days).

### 3. *Periodic Reports to the Court*

The court will order that the interim external monitor periodically report to the court his or her assessments of ADOC's compliance with the immediate suicide relief. To the extent that the PLRA applies to court monitoring, periodic reporting meets the need-narrowness-intrusiveness requirement. By

definition, court monitors must periodically report their findings to the court; without communicating the information they obtain, they are not monitoring.

### 4. *Duration of Interim External Monitor*

The court will order that the interim external monitor serve in his or her capacity of exclusively monitoring the immediate suicide-prevention relief until the monitor or monitors for a future global monitoring scheme are operating. Alternatively, if the court does not order a global monitoring remedy, or if within two years after the entry of this order the global monitoring scheme has not begun implementation, the court will simply rely on the process set forth by the PLRA for determining when to end the monitoring ordered here. This means that, at any point at least two years after the entry of this order, any party or intervenor may move to terminate the monitoring. *See* 18 U.S.C. § 3626(b)(1)(A)(i). The court will terminate the monitoring unless it finds, after an evidentiary hearing,

that external monitoring remains necessary to correct a current and ongoing constitutional violation, and that the monitoring continues to meet the need-narrowness-intrusiveness test. *See id.* at § 3626(b)(3); *see also Cason*, 231 F.3d at 782-83.

To the extent that the PLRA applies to court monitoring, the ordered duration of monitoring here meets the need-narrowness-intrusiveness requirement. The reasons identified above for why monitoring is necessary also show why the duration ordered here satisfies the requirement. Furthermore, the duration provision simply mirrors the processes set forth in the PLRA for determining when to terminate relief.

### 5. *Internal Monitoring*

The court will require ADOC to establish a formal internal monitoring scheme focused on the immediate suicide-prevention relief ordered here.

To the extent that the PLRA applies to court monitoring, the requirement to establish internal

monitoring meets the need-narrowness-intrusiveness requirement. The reasons identified above for why monitoring is necessary also show why internal monitoring satisfies the requirement.

Moreover, internal monitoring is a component of the defendants' proposed global monitoring structure. The defendants conceded that the internal monitoring in their global monitoring plan meets the need-narrowness-intrusiveness requirement, which provides further support for finding that the requirement is met here. *See* Defendants' Pretrial Monitoring Brief (doc. no. 2145) at 36.

### 6. *Open Components of Monitoring*

The monitoring relief described thus far provides a general structure for monitoring of the immediate suicide-prevention measures. Virtually all the details of the internal monitoring must be filled in. Many details also still need to be filled in for *external* monitoring, including but not limited to the frequency

with which the interim monitor will report to the court, what performance measures and audit tools to use, whether the monitor can make unannounced site visits, and the monitor's authority and restrictions relating to communicating with the parties and ADOC staff. Crucially, the question of who will serve as the interim external monitor also is not resolved here.

The court will order that the parties have 14 days from today's date to meet with Magistrate Judge John Ott to attempt to agree upon the remaining details of the external and internal monitoring schemes. If they cannot reach an agreement, then the defendants shall submit a proposal within 21 days from today's date that includes both external and internal monitoring schemes, and the plaintiffs shall have 28 days from today's date to respond. The proposal and response may include candidates to serve as the interim external monitor. The plans for both external and internal monitoring shall be crafted flexibly to allow, as much as possible, the easiest transition to the anticipated global monitoring

scheme.

To the extent that the PLRA applies to this provision, the ordered process for filling in the remaining details of monitoring meets the need-narrowness-intrusiveness requirement. The reasons identified above for why monitoring is necessary also shows why the remaining details cannot simply be left up to the defendants.

Finally, in finding that each of the ordered monitoring provisions satisfies the need-narrowness-intrusiveness requirement, the court gave "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1)(A). The court finds that there is no such adverse impact; and that in fact, the ordered monitoring provisions, by helping to improve mental-health care for prisoners, will serve only to enhance public safety and the operation of a criminal justice system.

## IV. CONCLUSION

The defendants argue that they cannot prevent all suicides in ADOC.  It is true that, as in the free world, not all suicides can be prevented.  But this reality in no way excuses ADOC's substantial and pervasive suicide-prevention inadequacies.  Unless and until ADOC lives up to its Eighth Amendment obligations, avoidable tragedies will continue.

DONE, this the 4th day of May, 2019.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE