IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

EDWARD BRAGGS, et al.,           )
                                 )
        Plaintiffs,              )
                                 )      CIVIL ACTION NO.
        v.                       )      2:14cv601-MHT
                                 )          (WO)
JEFFERSON S. DUNN, in his        )
official capacity as             )
Commissioner of                  )
the Alabama Department of        )
Corrections, et al.,             )
                                 )
        Defendants.              )

PHASE 2A REMEDIAL JUDGMENT ON IMMEDIATE RELIEF
FOR SUICIDE PREVENTION

In accordance with the opinion entered today, it is

the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) Plaintiffs' motion for immediate relief (doc.

no. 2276) is granted as set forth in this judgment.

(2) Defendants Jefferson Dunn and Ruth Naglich are

ENJOINED and RESTRAINED from failing to comply with the

following requirements, which, for the most part, come

verbatim from the Interim Agreement Regarding Suicide

Prevention Measures (doc. no. 1106-1) between the

plaintiffs and the defendants:

(A) Licensed Mental Health Professionals ("MHPs")[1] will be hired for the mental-health program in the Alabama Department of Corrections ("ADOC"). Each Major Facility[2] will have at least one full time (1 FTE) licensed MHP, and the treatment hubs--Bullock, Donaldson, and Tutwiler--will have at least two (2 FTEs) licensed MHPs. There will be two (2) licensed MHPs on site for at least 8 hours per day every business day at each treatment hub. There will be at least one (1) licensed MHP at each treatment hub on the weekends and holidays.

---

1. A "Licensed Mental Health Professional" means any individual who has satisfied the licensing requirements promulgated by the Alabama Board of Examiners in Counseling, see Ala. Admin. Code Section 255-X-3-.01 et seq., and currently holds a valid license from the Alabama Board of Examiners in Counseling.

2. A "Major Facility" is defined as all ADOC facilities except any designated community-based facility ("work release") or community work center.

(B) Any employee of ADOC or Wexford[3] (or any other contractor retained to provide medical or mental-health care in ADOC facilities) may present an inmate to mental-health or medical staff for assessment for suicide watch. Whoever places an inmate on watch must notify appropriate Wexford staff. If the inmate is identified when no Wexford staff is on site, the appropriate Wexford on-call staff must be notified.

(C) Upon being presented to mental-health or medical staff for assessment for suicide watch, each inmate will be maintained under "constant watch"[4]

---

3. Should ADOC change to a different (or add an additional) provider of prisoner mental-health care during the pendency of this order, all references to "Wexford" in this order shall be construed to apply to the new contract provider(s) for prisoner mental-health care as well.

4. "Constant watch" as used in this order is a procedure that ensures one-on-one visual contact at all times, except to the extent that the physical design allows an observer to maintain an unobstructed line of sight with no more than two people on suicide watch at once. At all times, there will be a person designated

at least until they have been evaluated as described in part D below.

(D) After an inmate's initial placement on suicide watch and referral for mental-health evaluation, each inmate must be evaluated using the Wexford suicide risk assessment to determine if the individual is "acutely suicidal" or "nonacutely suicidal," as these terms are defined in the National Commission on Correctional Health Care standard MH-G-04. These evaluations will be conducted out of cell and in a confidential setting.

(i) Licensed psychiatrists or licensed psychologists may conduct these evaluations either in person or by telepsychiatry.

(ii) In the event that they are conducted by telepsychiatry, the inmate being evaluated will be in a room with a licensed MHP or a

_____

in writing with responsibility for maintaining constant watch. Upon transfer of the watch responsibility from one person to another, the transfer will be documented.

Certified Registered Nurse Practitioner ("CRNP"), and the evaluation must comply with the telepsychiatry requirements set forth in the Psychotherapy and Confidentiality Remedial Order (doc. no. 1899-1) at 8.

(iii) CRNPs and licensed MHPs may conduct these evaluations but only if they are conducted in person. Upon conducting any such evaluation, a CRNP or licensed MHP must confirm their assessment with a psychiatrist or psychologist either in person, by telepsychiatry, or over the phone. The psychiatrist or psychologist must be provided with and review the risk assessment and the notes of the mental-health evaluations and counseling that have been conducted in the past 14 days.

(iv) Prior to conducting any such evaluations, licensed MHPs and CRNPs must

complete a training on suicide prevention, assessing suicidality, and procedures of suicide watch. This training must be approved by plaintiffs' expert Dr. Kathryn Burns and defendants' expert Dr. Mary Perrien, who each testified that she would be willing to assist ADOC with any additional training that becomes necessary.

(E) Any inmate who is determined to be acutely suicidal shall be monitored through a constant watch procedure.

(F) Any inmate who is determined to be nonacutely suicidal shall be monitored through a "close watch procedure" that ensures monitoring by ADOC staff at staggered intervals not to exceed every 15 minutes.

(G) Both constant watch and close watch shall be contemporaneously documented at staggered intervals not to exceed 15 minutes on a record

maintained on each individual cell door. Upon discharge from suicide watch, these records will be maintained in a facility-based suicide watch log and in the individual inmate's medical record.

(H) ADOC Administrative Regulation 630, which currently mandates 15-minute intervals for monitoring on suicide watch, will be revised to reflect the constant watch process and the staggered 15-minute monitoring for inmates deemed nonacutely suicidal.

(I) All suicide risk assessments shall be forwarded to ADOC's Director of Psychiatry or any Office of Health Services clinician(s) designated by said Director, and the Director of Psychiatry at Wexford or any Wexford regional office clinician(s) designated by Wexford's Director of Psychiatry for this purpose. These individuals must conduct monthly evaluations of completed suicide risk assessments and issue immediate corrective actions

and training if necessary based on the review of those evaluations.

(J) An inmate may be discharged from suicide watch following an out-of-cell, confidential evaluation according to the following terms:

(i) Licensed psychiatrists or licensed psychologists may conduct these evaluations either in person or by telepsychiatry. In the event that they are conducted by telepsychiatry, the inmate being evaluated will be in a room with a licensed MHP or CRNP.

(ii) CRNPs may conduct these evaluations but only if they are conducted in person. Upon conducting any such evaluation, a CRNP must confirm her assessment with a psychiatrist or psychologist either in person, by telepsychiatry, or over the phone. The psychiatrist or psychologist must be provided with and review the risk assessment and the

notes of the mental-health evaluations and counseling that have been conducted in the past 14 days.

(iii) When licensed MHPs are in place at each facility, they may conduct these evaluations but only if they are conducted in person and confirmed with a psychiatrist or psychologist as described above.

(iv) An inmate may not be discharged from suicide watch via telepsychiatry until the clinician conducting the evaluation has sought input from the licensed MHP or counselor who has been primarily responsible for providing mental-health services to the inmate on suicide watch, except in exceptional circumstances, which shall be documented.

(v) Prior to conducting any such evaluations, licensed MHPs and CRNPs must complete a training on suicide prevention,

assessing suicidality, and procedures of suicide watch. This training must be approved by plaintiffs' expert Dr. Burns and defendants' expert Dr. Perrien, who both testified that they would be willing to assist ADOC with any additional training that becomes necessary.

(vi) Each inmate placed on constant watch will be reduced to a close watch prior to release from suicide watch.

(K) The following provisions apply to all suicide watch follow-up examinations referenced in section 3(B) below.

(i) All suicide watch follow-up examinations must be conducted out of cell and in a confidential setting. The follow up examinations do not take the place of otherwise scheduled mental health appointments, though they may occur in connection with or contiguous with such appointments. The mental health staff

conducting the follow up examinations shall assess whether the inmate released from suicide watch is showing signs of ongoing crisis, whether the inmate needs further follow-up examinations, and whether the inmate should be added to the mental health caseload or assigned a different mental health code.

(ii)     Licensed psychiatrists or licensed psychologists may conduct these follow-up examinations either in person or via telepsychiatry.  In the event that the follow-up examinations are conducted via telepsychiatry, the inmate being evaluated will be in a room with a licensed MHP or CRNP.

(iii)     CRNPs may conduct these follow-up examinations but only if they are conducted in person.  Upon conducting any such evaluation, a CRNP must confirm her assessment with a psychiatrist or psychologist either in person,

via telepsychiatry, or over the telephone. The psychiatrist or psychologist must be provided with and review the risk assessment and the notes of the mental-health evaluations and counseling that have been conducted in the past 14 days.

(iv) When licensed MHPs are in place at each facility, they may conduct these follow-up examinations but only if they are conducted in person and confirmed with a psychiatrist or psychologist as described in (J)(ii) above.

(v) Prior to conducting any such follow-up examinations, licensed MHPs and CRNPs must complete a training on suicide prevention, assessing suicidality, and procedures of suicide watch. This training must be approved by Dr. Burns and Dr. Perrien, both of whom testified that they are willing to assist ADOC with training.

(3) Defendants Dunn and Naglich are further ENJOINED and RESTRAINED from failing to comply with the following requirements, which, for the most part, come from the experts' Immediate Relief Recommendations (doc. no. 2416-4):

(A) Mental Health Observation ("MHO") shall not be used as a component of suicide prevention. The only acceptable watches for inmates with issues related to suicide and/or self-harm are acute and non-acute watch.

(B) Upon release from suicide watch, each inmate will have at least four standard follow-up examinations by mental health. The first three follow-up examinations will occur upon release from watch and upon return to the sending facility or expected housing; these examinations must occur on the three consecutive days upon release. Regarding the fourth follow-up examination, the defendants shall consult with Dr. Perrien to set a policy on

13

what day or days the fourth follow-up examination shall occur and shall notify plaintiffs' counsel as to what that determination is. If the inmate is placed in temporary housing (for example, housed at Kilby for days one through three post-watch and then moved to the sending facility; moved to SLU for days one through three post-watch then moved to segregation), that will be noted as a significant post-watch transition impacting the inmate's post-watch adjustment and risk level, requiring the post-watch follow-up examination schedule to be reset. Another round of the four follow-up examinations will take place starting the day following movement.

(C) The defendants must comply with existing policy requiring inmates on watch for 72 hours to be considered for referral to higher levels of care.

(i) If the inmate is not referred for a higher level of care, the clinical rationale

14

should be documented in the medical chart and tracked in the crisis utilization log or similar.

(ii) If the inmate remains on watch for 168 hours, the treatment team must meet to review a referral to a higher level of care.  If the inmate is not referred to a higher level of care, the rationale must be documented in the medical chart and tracked in the crisis utilization log.

(iii)   If the inmate remains on watch for 240 hours or longer, referral to a higher level of care must occur with notification of referral to ADOC's Office of Health Services and Wexford's regional mental-health management.

(iv) Inmates who are returned to watch status within 30 days of release from a watch and/or who have three watch placements within six months shall be considered for referral to a higher level of care, unless clinical staff

determine and document a clinical rationale as to why the inmate should not be referred. ADOC's Office of Health Services must be immediately notified of any inmates who meet these criteria but are not referred and shall be provided with the clinical rationale.

(D) Inmates being discharged from suicide watch shall not be transferred to a segregation unit unless there is no alternative due to well documented exceptional circumstances or exigent circumstances arising from an inmate's behavior.

(i) All inmates who have been placed on suicide watch who are being considered for discharge to segregation shall be evaluated not only for suicide risk, but also re-evaluated for the presence of a serious mental illness ("SMI")s. If found to have a SMI, they must be evaluated for referral to a higher level of care (RTU or SU). If not referred to the RTU or SU,

the clinical rationale must be documented in the medical record and the inmate transferred on an expedited basis to a Structured Living Unit (SLU). If the inmate is not on the mental-health caseload but is determined to be at or above moderate acute or chronic risk of self-harm, the inmate must be placed on the mental-health caseload and provided increased clinical monitoring and intervention.

(ii) Any transfer from suicide watch to segregation must be approved by the Deputy Commissioner of Operations or his designee.

(E) Pre-Placement Screening Training is required for all nurses who perform pre-placement screenings for segregation or who supervise nurses performing such screenings. This training shall be completed no later than thirty days after entry of this order and nursing staff should be retrained on an annual basis. The training shall provide granular

detail about indicators that nurses should be looking for and include an explanation of the process for placing inmate on immediate watch after business hours, as well as how to initiate an emergent referral. The training shall also ensure that suicide watch placements be "easy in," which is to say that if a nurse is uncertain about an inmate's need for watch, the inmate should be placed on watch preventatively until further evaluation by appropriate mental-health staff. The training module shall be reviewed and approved by Dr. Burns and Dr. Perrien.

(F) Security checks must be performed every 30 minutes in segregation consistent with existing ADOC policy. As set forth in the opinion entered today, the defendants shall implement the system of supervisory review and confirmation of security checks that they proposed in their post-trial brief.

(G) Mental-health clinical contacts, including but not limited to suicide risk assessments and suicide watch follow-up appointments, must be confidential and conducted without the presence of custody staff, unless there is a significant security reason as determined by the clinician. Evaluations must be conducted in person, out of cell, and in a place offering sound confidentiality. Documentation (e.g., suicide risk assessments and progress notes) should clearly indicate whether the contact was conducted in a confidential space, at cell front, or in another specific non-confidential setting.

(H) The defendants shall ensure that, if and when ADOC or Wexford staff observe an inmate who is attempting or appears to have completed a suicide, those staff immediately call for assistance and implement life-saving measures. Life-saving measures shall continue to be implemented until a

physician declares death or otherwise declares that such measures are no longer necessary.

(4) As set forth in the opinion entered today, the court will establish an interim external monitoring scheme and shall require the defendants to establish a formal internal monitoring scheme. The parties have 14 days from today's date to meet with United States Magistrate Judge John Ott to attempt to agree upon the details of the external and internal monitoring schemes that are not already resolved in the opinion. If they cannot reach an agreement, the defendants shall submit a proposal within 21 days from today's date that includes both external and internal monitoring schemes, and the plaintiffs shall have 28 days from today's date to respond. The proposal and response may include candidates to serve as the interim external monitor. The plans for both external and internal monitoring shall be crafted flexibly to allow, as much as possible, the

easiest transition to the anticipated global monitoring scheme.

(5) The reserved issue of 'segregation-like cells' is set for an in-person status conference in the chambers library on May 14, 2019, at 10:00 a.m.

The clerk of the court is DIRECTED to enter this document on the civil docket as a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

DONE, this the 4th day of May, 2019.

　　　　　　　　　　/s/ Myron H. Thompson
　　　　　　　　　　UNITED STATES DISTRICT JUDGE