IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


EDWARD BRAGGS, et al.,          )
                                )
     Plaintiffs,                )
                                )        CIVIL ACTION NO.
v.                              )        2:14cv601-MHT
                                )           (WO)
JEFFERSON S. DUNN, in his       )
official capacity as            )
Commissioner of                 )
the Alabama Department of       )
Corrections, et al.,            )
                                )
     Defendants.                )


PHASE 2A INPATIENT TREATMENT
REMEDIAL OPINION AND ORDER

        Previously this court found that the State of Alabama

provides inadequate mental-health care in its prisons in

violation of the Eighth Amendment's prohibition against

cruel and unusual punishment. *See Braggs v. Dunn*, 257

F. Supp. 3d 1171, 1267 (M.D. Ala. 2017) (Thompson, J.).

The issue now before the court is whether the defendants'

plan to remedy the deficiencies found in inpatient

treatment--that is, mental-health treatment in the

Residential Treatment Units (RTUs) and Stabilization

Units (SUs)--is adequate.[1]  The court finds that their proposed plan fails to ensure minimally adequate inpatient care in four of nine key disputed areas:  (1) ensuring an adequate number of treatment beds; (2) ensuring adequate treatment space; (3) making SU cells suicide-resistant; and (4) managing high temperatures for patients on psychotropic medication.  Accordingly, the court will order the relief necessary to address these deficiencies and remedy the constitutional violation found.

## I.  BACKGROUND

### A. Procedural Background

The plaintiffs in this class-action lawsuit include inmates with mental illness in the custody of the Alabama

---

1. The court and the parties have sometimes referred to the RTUs and SUs collectively as 'residential treatment units.'  To avoid confusion, the court will instead use the terms 'inpatient care units' or 'mental-health units' to refer to RTUs and SUs collectively.  Meanwhile, the court will refer to care provided in hospital-level settings exclusively as 'hospital-level care.'

Department of Corrections (ADOC).  The defendants are the ADOC Commissioner and the ADOC Associate Commissioner of Health Services, who are both sued in only their official capacities.  In a liability opinion, this court found that ADOC's mental-health care was, "[s]imply put, ... horrendously inadequate."  *Braggs,* 257 F. Supp. 3d at 1267.

After two months of mediation to develop a comprehensive remedial plan to address all of the factors contributing to the Eighth Amendment violation, it became apparent that the remedy was too large and complex to be addressed all at once.  The court therefore severed the remedy into several discrete issues, to be addressed seriatim.  *See* Phase 2A Revised Remedy Scheduling Order on Eighth Amendment Claim (doc. no. 1357).  Two related issues, which the court later consolidated for simultaneous resolution, are "identification and classification of prisoners with serious mental-health needs" and "out-of-cell time and treatment for inmates in need of residential treatment," that is, inpatient

care.  *See* Additional Phase 2A Revised Remedy Scheduling Order on Eighth Amendment Claim (doc. no. 1524) at 2.

In the liability opinion, the court found that ADOC "fails to provide residential-level care to those who need it," as a result of flawed identification processes. *Braggs*, 257 F. Supp. 3d at 1205.  Specifically, the court found ADOC's historically inadequate intake and referral processes led to empty beds in RTUs and SUs, despite the existence of individuals in need of inpatient care.  *See id.*  Those who do make it into the inpatient units, the court found, still fail to receive proper care.  *See id* at 1212.  Instead, the inpatient units operate "almost exactly the same way" as segregation, *id.*, with "a severe lack of out-of-cell time[] and a lack of meaningful treatment activities," *id.* at 1214.  These conditions put patients "at a substantial risk of continued pain and suffering, decompensation, and self-harm."  *Id.*  In short, "ADOC's failure to provide adequate treatment and out-of-cell time in mental-health units forces the most severely mentally ill patients to face yet another risk

**4**

factor for decompensation, even though their placement was for the specific purpose of alleviating the symptoms of their mental illness." *Id.* at 1217.

When the court turned to the remedy for these two related elements of the Eighth Amendment violation, it gave the defendants an opportunity to propose a remedial plan and allowed the plaintiffs to respond. *See* Defendants' Phase 2A Proposed Remedial Plan on Identification, Classification, and Residential Unit Out-of-Cell Time and Treatment (doc. no. 1594); Plaintiffs' Response (doc. no. 1649). The parties then reached agreements, which the court approved, regarding remedies for the first issue--ADOC's deficient classification and identification processes, including both intake and referral. *See* Coding Injunction (doc. no. 1792); Intake Injunction (doc. no. 1794); Referral Injunction (doc. no. 1821).

The court later held a hearing on the issues not resolved by the parties' agreements and whether any remedial order at all should be entered as to inpatient

treatment at this time.  Since the hearing, the parties
have reached additional stipulations regarding
out-of-cell time and treatment in inpatient units:  the
Individualized Treatment Planning Injunction (doc. no.
1865); the Psychotherapy and Confidentiality Injunction
(doc. no. 1899); and the Correctional Officer
Confidentiality Injunction (doc. no. 1900).  These
stipulations include that ADOC must provide 10 hours of
structured and 10 hours of unstructured out-of-cell time
per week in all inpatient units.  *See* Psychotherapy and
Confidentiality Stipulations (doc. no. 1899-1).  The
parties also agreed that the units shall have available
at least psycho-educational groups, individual therapy,
group psychotherapy, pharmacotherapy, and activity
therapy.  *See id* at 2*.*

In March 2020, the court issued an interim injunction
to enforce all of the parties' stipulations until, at the
latest, December 30, 2020.  *See* Interim Injunction (doc.
no. 2793).  Because of the novel coronavirus pandemic,
the issue of whether the stipulations satisfy the

requirements of the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626(a)(1)(A), beyond that date cannot be set for final resolution until the fall, and the court will defer judgment as to whether the measures are warranted until that hearing has occurred.  Regardless, the court relies in this opinion on the defendants' representations that they agreed to the stipulations in good faith and that ADOC intends to continue complying with them.  *See* Mar. 5, 2019, Status Conf. Tr. (doc. no. 2399) at 42 (the defendants stating that "the Department of Corrections negotiated these stipulations in good faith.  And we're still focused on compliance with those orders").  The stipulations affecting today's order on inpatient treatment units are described in detail throughout this opinion.

## B. Factual Background

As stated, ADOC's inpatient care includes two types of units, RTUs and SUs, which together house and treat the most severely mentally ill inmates.  RTUs are

**7**

intended to provide a therapeutic environment to mentally ill inmates in need of intensive and ongoing care.  There are three levels to the RTU: inmates in levels one and two (called 'closed' RTUs) live in individual cells while level three is 'open,' which means that patients live in an open dormitory with other RTU residents.  RTU levels are decreasingly intensive and restrictive from level one to level three, with some patients progressing through the levels as their conditions improve and others remaining at a particular level based on their ongoing conditions and symptoms.

SUs are for patients who are suffering from acute mental-health problems, such as acute psychosis or other conditions causing an acute risk of self-harm, and who have not been stabilized through other interventions. SUs are the most intensive and restrictive units, intended to stabilize patients as quickly as possible so that they can return to a less-restrictive environment. All SU patients are housed in an individual cell.

Three of ADOC's major prison facilities--Bullock, Donaldson, and Tutwiler--serve as 'treatment hubs' for mental-health services and contain RTUs and SUs. In addition to these treatment hubs, Kilby has a limited number of SU beds.

## II. LEGAL STANDARD

The court's remedial order regarding the SUs and RTUs is governed by the PLRA, which provides that a "court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). In conducting this 'need-narrowness-intrusiveness' inquiry, the court is required to "give substantial weight to any

adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

"As this court has stated before, [prison officials in cases challenging prison conditions] should be given considerable deference in determining an appropriate remedy for the constitutional violations involved." *Laube v. Haley*, 242 F. Supp. 2d 1150, 1153 (M.D. Ala. 2003) (Thompson, J.) (citing *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979)); *see also Turner v. Safley*, 482 U.S. 78, 85 (1987) ("[F]ederal courts have ... reason to accord deference to the appropriate prison authorities.").

Nevertheless, this court retains the responsibility to remedy a constitutional violation. *See Brown v. Plata*, 563 U.S. 493, 511 (2011). While a court "must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals," *id.*, it "must not

shrink from [its] obligation to enforce the constitutional rights of all persons, including prisoners." *Id.* (internal quotation marks and citations omitted). It "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.* Accordingly, the deference afforded prison administrators in remedying a constitutional violation must not be "complete." *King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015) (per curiam) (citing *Plata*, 563 U.S. at 511).

## III. DISCUSSION

Though the parties have agreed to many remedial measures to address the constitutional inadequacies in ADOC's inpatient mental-health treatment, significant issues remain in dispute. The plaintiffs ask the court to order relief in nine areas: (1) increasing the number of inpatient treatment beds available; (2) increasing the amount of confidential treatment space; (3) making all

SU cells suicide-resistant; (4) air conditioning all mental-health units; (5) establishing admissions criteria for the different levels of inpatient treatment; (6) defining privileges and rights of patients in the units; (7) increasing natural light; (8) and providing additional training to correctional officers who work in mental-health units.  The plaintiffs also seek a court order regarding (9) monitoring of inpatient treatment.

The defendants, on the other hand, argue that the court should not enter any remedial order at this time. First, they contend that the remedy is limited in scope to out-of-cell time and treatment and that the remedial orders the plaintiffs seek do not fit into either issue. Second, they argue that criticisms of their proposed remedial plan are premature and that the court should give the defendants an opportunity to implement their plan before entering any remedial order.

For the reasons that follow, the court finds the defendants' proposed plan incomplete with regard to the first four of the nine areas listed above.

12

## A. Number of Inpatient Treatment Beds

### i. Findings

In the liability opinion, the court found that "ADOC does not adequately utilize residential treatment unit beds and fails to provide residential-level care to those who need it, leading to persistent or worsening symptoms." *Braggs*, 257 F. Supp. 3d at 1205. In reaching this conclusion, the court credited defense expert Dr. Raymond Patterson's opinion that, based on comparisons to other American prison systems, "roughly 15 % of prisoners on [ADOC's] mental-health caseload should be housed in RTU or intensive stabilization unit settings." *See id.* With 3,439 patients on the mental-health caseload in September 2016, *see* Joint Ex. 344, Sept. 2016 Monthly Operating Report (doc. no. 1038-703) at 1, Dr. Patterson's 15 % estimate meant that "approximately 515 ADOC prisoners should [have been] housed in the RTU or the SU," *Braggs*, 257 F. Supp. 3d at 1205. However, only "310 of the 376 RTU and SU beds were

being used to house prisoners with mental-health needs."
*Id.*   Internal reports from ADOC showed that "[t]his
practice of not filling even existing mental-health unit
beds has persisted for years."   *Id.*

Since the liability opinion, the estimate that 15 %
of the mental-health caseload requires inpatient
treatment has emerged as an expert consensus.   In her
testimony about the defendants' proposed remedial plan,
plaintiff expert Dr. Kathryn Burns agreed with defense
expert Dr. Patterson that "ADOC should have residential
treatment beds of one sort or another for 15 % of the
[mental-health] caseload."   Apr. 27, 2018, Trial Tr.
(doc. no. 2696) at 114.   Defense consultant Dr. Mary
Perrien also agreed with the 15 % estimate.   *See* Dec. 12,
2017, Trial Tr. Rough Draft (R.D.) at 85 ("Q: ... as a
general matter, you anticipate that 15 % of the caseload
would be housed in the RTU or SU; correct?   A: That's
correct.").   Dr. Perrien suggested, however, that 1 % of
the overall caseload should receive either SU *or*
hospital-level care, and thus, the 15 % estimate may

**14**

include those requiring hospital-level settings in addition to those who should be housed in the RTUs and SUs. *See id.* at 87.

The court also found that ADOC, at the same time, systematically under-identifies mentally ill inmates and that, therefore, the mental-health caseload was significantly smaller than would be expected under a functioning intake, classification, and referral system. *See Braggs*, 257 F. Supp. 3d at 1205 n.32. In September 2016, the caseload in major ADOC facilities was approximately 14 % for men and 52 % for women--substantially less than the 20 to 30 % average rate of mental illness for men and 75 to 80 % average for women in correctional systems across the country.[2] *See*

_____

2. In the liability opinion, the court relied on the actual ADOC caseload percentages of between 14 % and 15 % for men and 54 % for women at Tutwiler Prison for Women, which came from ADOC statistics from June 2016. *See Braggs*, 257 F. Supp. 3d at 1201, 1248. However, because the court ultimately relied on the mental-health caseload from the September 2016 monthly report to calculate the estimated need for 515 inpatient beds, the court instead uses the September 2016 mental-health caseload statistics here. In September 2016, the male population in ADOC major facilities was 18,711 with a caseload of 2,696 and

*id.* at 1201.  Thus, the court's estimate of 515 inmates in need of inpatient treatment, based on 15 % of the caseload at that time, likely was significantly less than the reality of the existing need.  *See id.* at 1205 n.32.

### ii. Changes to Identification Procedures

As discussed, the parties have since entered into stipulations to address the issue of under-identification of inmates with mental-health needs.  *See* Intake Injunction (doc. no. 1794); Referral Injunction (doc. no. 1821).  These stipulations, which are aimed at improving the intake and referral processes, and their effects on the mental-health caseload are described below.

### a. Intake

ADOC's failure to utilize adequately its inpatient treatment units is "a problem that starts with the inadequate intake screening process."  *Braggs*, 257 F.

_____

the female population at Tutwiler was 885 with a caseload of 458. *See* Joint Ex. 344, Sept. 2016 Monthly Operating Report (doc. no. 1038-703) at 1.

Supp. 3d. at 1206.  Experts from both sides testified that fundamentally flawed intake procedures led to systematic under-identification of mentally ill inmates, including those in need of inpatient treatment.  *See id.* At the time of the liability trial, the intake process was conducted by unsupervised licensed nurse practitioners (LPNs) who are unqualified "to assess the presence or acuity of mental illness symptoms based on the information obtained during the intake process."  *Id.* at 1202.  Further, the problem of understaffing led to some inmates not even participating in this intake process; without enough mental-health practitioners, inmates were sometimes sent from Kilby, where all male inmates are screened, to other facilities without having received an initial intake.  *See id* at 1203*.*

To remedy the inadequate intake procedures, the parties reached stipulations requiring the following steps, among others, be taken upon an inmate's arrival to ADOC.  *See* Intake Injunction (doc. no. 1794).  As soon as possible and no later than 12 hours after arrival, a

registered nurse (RN) with mental-health training must conduct and document a mental-health intake screening. *See* Intake Stipulations (doc. no. 1794-1) at 1. Using agreed-upon intake tools and metrics, the mental-health RN will determine whether a referral is indicated and, if so, designate whether it is emergent, urgent, or routine, as defined by the parties' agreement. *See id.* at 5. Where a referral has been made to psychiatry, a psychiatrist will evaluate the inmate within seven days of a nonurgent referral and 24 hours of an urgent referral. *See id.* at 10-11.

For every inmate, within 14 days of the intake screening, a psychologist or licensed mental-health professional will conduct an additional mental-health screening including a social-history assessment and suicide-risk assessment. *See id.* at 7-8. A licensed psychologist, psychiatrist, or certified registered nurse practitioner (CRNP) collaborating with a psychiatrist will then assign the individual a mental-health code after review of the intake screening

and assessment results. *See id.* at 8.  The mental-health code assigned to each inmate shall be considered and utilized by ADOC Classification personnel when making institutional assignments.  *See id.* at 13.

### b. Referral

The parties have also agreed to measures to improve referral procedures. *See* Referral Injunction (doc. no. 1821).  As the second mechanism for identifying and classifying inmates with mental illness (intake being the first), the referral process is critical to identifying "prisoners whose mental illnesses develop during their incarceration and prisoners whose mental-health needs were not identified during the intake process." *Braggs*, 257 F. Supp. 3d. at 1203.  During the liability trial, experts from both sides agreed that ADOC's referral process was seriously deficient.  First, the court found ADOC lacked "a system to triage and identify the urgency of each request, and to make referrals according to the level of urgency." *Id.*  Second, the court found that

correctional officers, who were already overburdened due to overcrowding and understaffing, were ill-positioned to identify and refer inmates with mental-health needs. *See id.* at 1203-04.

The parties have since agreed that all ADOC personnel who have direct contact with inmates, including correctional officers, must complete a 'Comprehensive Mental Health Training Curriculum,' to be approved by plaintiff expert Dr. Burns. *See* Referral Stipulations (doc. no. 1821-1) at 1-2. This comprehensive training will include curricula regarding "[t]he early warning signs or symptoms of mental illness"; "[t]he availability of mental health services within the ADOC"; "[t]he nature and extent of mental health services available within the ADOC"; "[t]he process for referring inmates for mental health evaluations," *id.* at 3; and "how to properly characterize what is an emergent, urgent, or routine referral," Additional Stipulations Regarding Referrals (doc. no. 1821-2) at 7. The parties represented at a hearing in December 2019 that development and approval

20

of this training were still in process but would soon be complete.  *See* Dec. 6, 2019, Status Conf. Tr. (doc. no. 2686) at 62.  Upon approval of this training, all staff to receive the training must do so within 30 days of assignment to a major facility.   *See* Additional Stipulations Regarding Referrals (doc. no. 1821-2) at 7.

The parties have also clarified that inmates themselves may request mental-health services and that "[a]ny individual working within ADOC may refer any inmate within a major facility for assessment by mental health personnel."  *Id.* at 1.  The stipulations describe the referral procedures and documentation required for emergent, urgent, and routine referrals.  All referrals must result in a clinical assessment and/or intervention by a mental-health provider, psychologist, mental-health CRNP, or psychiatrist.  *See* Referral Stipulations (doc. no. 1821-1) at 5.  To triage these requests, ADOC has committed to designating one nurse per shift to serve as the triage nurse at every major facility, who must be at least qualified as an RN with mental-health training.

*See* Additional Stipulations Regarding Referrals (doc. no. 1821-2) at 2-3.

### c. Effects of Stipulations

The stipulations regarding intake and referral processes appear to target the deficiencies the court found to contribute to the under-identification of inmates with mental-health needs, including those in need of inpatient treatment. According to plaintiff expert Dr. Burns and ADOC Director of Psychiatry Dr. Edward Kern, once ADOC has functioning identification processes, it should expect its mental-health caseload to substantially increase to reflect the average caseload in American prisons with functioning mental-health care systems. *See* Apr. 27, 2018, Trial Tr. (doc. no. 1817) at 16 (Dr. Burns's testimony that functioning intake will increase the mental-health caseload); Apr. 25, 2018, Trial Tr. (doc. no. 1942) at 46 (Dr. Kern's testimony that the mental-health caseload is expected to increase under functioning intake and classification system). At

the December 2019 hearing, counsel for the plaintiffs represented that, as a result of updated identification procedures, the mental-health caseload is now approaching, but not yet reaching the size the experts expect. *See* Dec. 6, 2019, Hr'g Tr. (doc. no. 2686) at 30. According to a report filed shortly after that hearing, the caseload has reached 21 % of the total male ADOC population (up from 14 %) and 67 % of the female population (up from 52 %). *See* Joint Report Regarding the Mental Health Caseload (doc. no. 2705) (showing a male caseload of 3,543 and a female caseload of 608); Dec. 2019 ADOC Monthly Statistical Report at 4, *available at*

http://www.doc.state.al.us/docs/MonthlyRpts/DMR%2012%20 December%202019PUB.pdf (showing a male population in ADOC major facilities of 16,585 and a female population at Tutwiler of 901). The plaintiffs made the unrefuted representation during the December hearing that the caseload is expected to continue expanding and stabilizing until it reaches a representative proportion

of the ADOC population around October 2020.  *See* Dec. 6, 2019, Hr'g Tr. (doc. no. 2686) at 30.

To be sure, the number of patients in RTUs and SUs has also increased since the liability trial.  As of December 2019, ADOC is housing 387 men and 18 women in inpatient units, *see* Joint Report Regarding the Mental Health Caseload (doc.  no. 2705),[3] up from the 310 men and 14 women housed in these units in 2016, *see* Joint Ex. 344, Sept. 2016 Monthly Operating Report (doc.  no. 1038-703) at 3-4.  However, these numbers reflect only a marginal increase in the overall percentage of the mental-health caseload housed in mental-health units--from 9.4 % in September 2016, *see id.*, to 9.8 % in

---

3.  Importantly, the December filing reports "the total number of inmates *receiving* residential-level mental health treatment in ADOC's residential treatment units and stabilization units," not necessarily all those actually in need of inpatient care.  Joint Report Regarding the Mental Health Caseload (doc.  no. 2705) at 1 n.1 (emphasis added).

December 2019, *see* Joint Report Regarding the Mental
Health Caseload (doc. no. 2705). [4]

### iii. Remaining Areas of Dispute

The defendants argue that the liability opinion does
not mandate any remedial action regarding the number of
inpatient treatment beds available.  According to the
defendants' plan, there are 46 SU beds and 400 RTU beds
available across all facilities for men, and eight SU
beds and 50 RTU beds available for women.  *See* Defendants'
Phase 2A Proposed Remedial Plan on Identification,
Classification, and Residential Unit Out-of-Cell Time and
Treatment (doc. no. 1594) at 24, 26.  The defendants
argue that the 96 beds in the Structured Living Unit

---

**4.** The court reaches these calculations by dividing
the total number of patients in RTUs and SUs by the
mental-health caseload size.  In September 2016, there
were 324 total patients in RTUs and SUs and 3,439 patients
reported on the caseload.  *See* Joint Ex. 344, Sept. 2016
Monthly Operating Report (doc. no. 1038-703) at 1, 3-4.
In December 2019, there were 405 patients in RTUs and SUs
and 4,151 patients on the caseload.  *See* Joint Report
Regarding the Mental Health Caseload (doc.  no. 2705) at
1.

(SLU) at Donaldson should also be included in the total number of beds in the "mental-health units." Defendants' Reply in Support of Proposed Opinion (doc. no. 1849) at 7 n.5. The SLU is "a diversionary outpatient unit for persons with serious mental illness or who are otherwise found to be inappropriate for a restrictive housing placement in lieu of a restrictive housing placement." Psychotherapy and Confidentiality Stipulations (doc. no. 1899-1) at 13.

ADOC does not plan to increase the number of inpatient treatment beds available. Rather, the defendants assert that the existing beds are sufficient to meet the need, demonstrated by the number of beds unused and available in the RTUs and SUs. They further assert that the projected number of inmates in need of inpatient treatment at ADOC prisons is speculative given the possibilities that ADOC will house fewer inmates overall; that some patients will be transferred to hospital-level care; and that, with improvements to other inadequacies in the provision of mental-health care,

fewer inmates will need inpatient treatment. *See* Defendants' Reply in Support of Proposed Opinion (doc. no. 1849) at 19-21; June 18, 2018, Oral Arg. Tr. (doc. no. 1905) at 45-46.

The plaintiffs initially argued that, based on the most conservative calculation of the need for inpatient treatment, the court should order the defendants to "construct, refurbish, or otherwise establish a total of 500 mental-health unit beds for prisoners at men's major facilities and 128 mental-health unit beds for prisoners at women's major facilities." Plaintiffs' Proposed Opinion (doc. no 1840) at 18. More recently, the plaintiffs instead requested that the court order ADOC to "reassess the need for RTU/SU beds once its caseload stabilizes." Joint Report Regarding the Mental Health Caseload (doc. no. 2705) at 3.

The plaintiffs argue that ADOC's continued underutilization of its existing beds is not evidence that more beds will not be needed, but rather that ADOC still fails to identify individuals in need of inpatient

treatment.  The plaintiffs assert that the agreed-upon remedial measures to address under-identification will continue to increase the number of patients on the caseload as well as increase the number of patients identified as needing inpatient care.  They also point to defense expert Dr. Patterson's opinion that vacancies in mental-health units were likely partly due to the lack of treatment provided, which rendered placement in those units minimally useful.  *See* Jan. 31, 2017, Trial Tr. (doc. no. 1277) at 286.  The plaintiffs assert that, when the mental-health units are functioning--that is to say, providing treatment and out-of-cell time and meeting their therapeutic purpose--ADOC will see an increase in the number of inmates referred to and retained in RTUs to receive the level of care they need.

### iv.  The Court's Resolution

The court finds that the defendants' plan fails to account for the number of inpatient treatment beds that will be required once ADOC properly identifies and refers

inmates for necessary inpatient treatment.  For the reasons that follow, the court finds that doing nothing to ensure that ADOC has enough beds to meet the need is unacceptable.  However, the court does not think it is appropriate, at this time, to require the defendants to create a specific number of beds.  Instead, the court will take the more limited approach of ordering them to devise their own plan as to how they will accommodate the increasing need.

The defendants' 'do nothing' approach to the issue of bed space is inadequate for several reasons.  First, basing a remedial plan on the 'actual' caseload and current identified need for inpatient treatment encourages ADOC to continue to under-identify the need and underutilize its mental-health units to avoid creating more beds.  The court has already found these practices contribute to decompensation, self-harm, and pain, in violation of the Eighth Amendment.

Second, the need for additional inpatient treatment beds is not merely "hypothetical" as the defendants

argue.  Defendants' Reply in Support of Proposed Opinion (doc. no. 1849) at 18.  ADOC's present caseload statistics do not change the experts' agreement that the size and needs of the caseload should approximate averages from correctional systems across the country. As discussed, the experts agree that ADOC can anticipate approximately 15 % of the mental-health caseload to need inpatient mental-health treatment.  In its liability findings, the court found no reason to expect a substantial deviation from national averages in ADOC prisons. *Braggs*, 257 F. Supp. 3d at 1201.  The defendants have not presented any evidence to suggest the experts' projections are an overestimate.[5]

Based on the experts' projections, the need for inpatient treatment is due to outgrow the existing

---

5. The court is not persuaded by the defendants' argument that the need for inpatient treatment will not increase because outpatient treatment will improve.  The experts' estimate of 15 % is based on comparisons to other prison systems in the United States that presumably provide at least minimally adequate outpatient mental-health treatment.  Once ADOC's outpatient treatment improves and its identification processes are fully

inpatient treatment units. As ADOC continues to implement the agreed-upon remedial measures, the size of the mental-health caseload has increased and should continue to increase, as should the number of patients referred for inpatient treatment. For men, the caseload has already grown from 14 % to 21 % of the population, slightly exceeding the experts' conservative estimate of 20 %. *See* Dec. 2019 ADOC Monthly Statistical Report at 4, *available at* http://www.doc.state.al.us/docs/MonthlyRpts/DMR%2012%20 December%202019PUB.pdf. Calculating 15 % of the December male caseload results in an estimate of 531 beds required to meet the need for residential-level care--substantially more than the 446 beds ADOC reports are currently available. Though the female caseload had not yet reached the conservative estimate, as of December, it had also grown from 52 % to 67 % of the population. *Id.* The December female prison population

---

functioning, the percentage of inmates identified for inpatient treatment should increase.

of 901, *id.*, yields a conservative projection of a caseload of 676 patients, such that approximately 101 female inmates should be housed in inpatient care units. Even applying the 15 % estimate to the under-representative December 2019 female caseload, ADOC's existing 58 inpatient beds fall short of the approximately 91 female inmates projected to need inpatient treatment. These numbers mean that there are currently enough beds for only 12.6 % of the December male caseload and only 9.5 % of even the under-representative December female caseload--substantially less than 15 %.

Meanwhile, despite the fact that the projected needs significantly exceed the existing capacities of the RTUs and SUs, many inpatient beds remain vacant. The defendants reported in December that only 387 men and, perhaps most concerningly, only 18 women were receiving inpatient care. These vacancies do not support a finding that ADOC has enough treatment beds. Rather, they reflect the substantial likelihood that approximately 144

men and 83 women are still not receiving the inpatient treatment they need.  More than three years after the liability trial, it appears that ADOC continues both to under-identify mental-health needs and underutilize its existing inpatient beds.  This ongoing failure may be explained in part by the fact that, though the intake and referral stipulations have been in place for over two years now, their full implementation has been delayed. First, as of December 2019, when the joint report regarding the caseload statistics was filed, the 'Comprehensive Mental Health Training,' which includes training for correctional staff on identifying mental illness symptoms and making mental-health referrals, had not yet been finalized and implemented.  Second, and most significantly, understaffing is an ongoing obstacle. Without sufficient mental-health and correctional staff to implement the intake and referral processes, remedial measures can go only so far to address the problem of under-identification.  Thus, though ADOC may have updated its policies and procedures and seen some resulting

improvements, the court finds that the status of the
mental-health caseload and inpatient units does not yet
reflect the results expected once ADOC has fully
implemented the identification and staffing remedies.

Nonetheless, in deference to the defendants, the
court declines to order the creation of a specific number
of additional RTU or SU beds to meet the expected need.
Instead, the court will order the defendants to propose
a plan for how it will accommodate the expected increase
in patients referred for inpatient treatment, based on
the experts' projection that this number will be
approximately 15 % of the projected mental-health
caseload.[6] Alternatively, if the defendants contest the
experts' consensus, they may conduct a "needs assessment"
of ADOC's specific system, as posed by defense expert
Dr. Patterson as another way to estimate the need. Jan.
31, 2017, Trial Tr. (doc. no. 1277) at 90-91. Any such
assessment will be subject to the court's later

---

6. The defendants' plan should take into account
that, as of December, the male caseload already exceeded
the experts' conservative projection.

determination of the reliability of the assessment's findings.  The court will allow the defendants to propose a plan based either on the expert consensus or, alternatively, based on the results of an independent needs assessment.

In any case, the defendants may not include in their calculation of existing beds the beds in the Structured Living Unit (SLU), which is an *outpatient* unit created since the start of this litigation as an alternative to segregation for inmates with serious mental illness.  *See* Psychotherapy and Confidentiality Stipulations (doc. no. 1899-1) at 13.  The parties have already agreed that inmates "in need of residential-level care shall not be housed in the SLU."  *Id.*

The court does, however, accept the defendants' assertion that adequate provision of hospital-level care may narrow the gap between the need for and the existing number of SU beds.  ADOC has contracted for 14 hospital-level treatment beds at Citizens Baptist Medical Center.  *See* Joint Report Regarding the Mental Health

Caseload (doc. no. 2705) at 2.   In accordance with the parties' stipulations on hospital-level care, ADOC has also agreed to reassess ADOC's need for hospital beds on an annual basis.   *See* Amended Stipulation Regarding the Provision of Hospital-Level Care (doc. no. 2383-1) at 2. As discussed, defense consultant Dr. Perrien indicated that, when calculating the 15 % of the caseload in need of inpatient treatment she would include inmates in need of hospital-level care, in addition to those housed in RTUs and SUs.   *See* Dec. 12, 2017, Trial Tr. R.D. at 87. Accordingly, the defendants may include in their plan an explanation of how, if at all, these 14 hospital beds affect the number of SU beds needed.

Finally, the defendants' proposed plan should also take into consideration their own expert Dr. Patterson's caution not to simply "throw" more beds into the existing RTUs and SUs: "[I]t trivializes if we just put more beds in, we'll be okay. ... The environment has to be safe. Don't put our officers at risk of being harmed. ... [T]hat's why I'm hesitant to suggest just throwing beds

at it will fix it.  There's much more to it than that."
*See* Jan. 31, 2017, Trial Tr. (doc. no. 1277) at 252-53.


### v. PLRA Findings

Section 3626(a)(1)(A) of the PLRA requires a district
court to make particularized findings that each provision
of prospective relief ordered satisfies the 'need-
narrowness-intrusiveness' requirement.  *See United
States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1228
(11th Cir. 2015).  The court now finds that the
requirement that the defendants plan for how they will
accommodate all those referred for inpatient treatment
under ADOC's improved identification procedures
satisfies the PLRA.  While the defendants take issue with
the contention that ADOC requires more inpatient beds,
the court's remedial order is based on the consensus of
the witnesses, including the defendants' own expert and
consultant.  Ensuring sufficient treatment beds to meet
the needs of ADOC's seriously mentally ill population is
foundational   to   remedying   this   element   of   the

37

constitutional violation: that ADOC fails to provide minimally adequate inpatient mental-health treatment to those who need it.  Without enough RTU and SU beds, inmates in need of inpatient treatment will necessarily continue to be housed in units that do not provide them with the level of treatment they need.  As described in the liability opinion, "these practices also have a downward-spiral effect on the rest of the system: those who do not get needed treatment often end up in crisis cells, frequently receive disciplinary sanctions, and may be placed in segregation, where they have even less access to treatment and monitoring."  *Braggs*, 257 F. Supp. 3d at 1206.  Until ADOC creates and implements a plan to address this need, it will continue to put inmates with mental illness at a substantial risk of serious harm.

The court finds that the requirement that the defendants devise a plan to meet the need for inpatient beds is narrowly drawn, extends no further than necessary

to remedy the constitutional violation found, and is the least intrusive means of doing so.

### B. Treatment Space

#### i. Findings

Treatment space is out-of-cell space where patients housed in mental-health units can participate in counseling appointments and therapeutic group activities.  As discussed, the court previously found that out-of-cell time and treatment activities--both required components of minimally adequate inpatient care--were severely lacking in ADOC's RTUs and SUs.  *See Braggs*, 257 F. Supp. 3d at 1214.  "Without bringing patients out of their cells for counselling sessions, treatment team meetings, group sessions, and activities, placement in a 'mental-health unit' does no good for patients who need the highest level of care; careful observation and treatment cannot happen when confined in a small cell all day."  *Id*.  In the liability phase, the court found that 10 hours of structured therapeutic

activity and 10 hours of unstructured activity per week are the standard in mental-health units in prisons around the country.  *See id.* at 1215.  Although this standard "does not necessarily set the constitutional floor, a substantial deviation from the acceptable professional standard could support a finding of an Eighth Amendment violation."  *Id.*  (internal citation omitted).

The parties have since agreed that ADOC will follow this national standard and provide 10 hours of structured therapeutic out-of-cell time and 10 hours of unstructured out-of-cell time per week to all patients in mental-health units by March 2020.[7]  *See* Psychotherapy and Confidentiality Stipulations (doc. no. 1899-1).  ADOC has also agreed to offer, at a minimum, psychoeducational groups, individual therapy, group therapy, pharmacotherapy, and activity therapy.  *See id.* at 2. Per the parties' agreement, sessions must be held in

---

7. The court does not have up-to-date information regarding the status of implementation of this agreement, but, as stated, assumes that ADOC is complying with all agreements, per defendants' representations to the court. *See* Mar. 5, 2019, Status Conf. Tr. (doc. no. 2399) at 42.

settings that provide for confidentiality, with an exception only where it "is not possible due to safety concerns, based upon clinical determinations." *Id.* at 4-5. The court previously found that confidentiality is "a hallmark of and a necessary condition for mental-health treatment." *Braggs*, 257 F. Supp. 3d at 1210. Inmates "often do not feel safe sharing their mental-health issues in the presence of correctional officers or other prisoners because what they share with the mental-health staff may make it easier for others to exploit them; as a result, the lack of confidentiality undermines the effectiveness and quality of counseling sessions." *Id.* However, the court also found that some ADOC facilities do not have mental-health offices where confidential counseling can occur. *See id.* Plaintiff expert Dr. Burns credibly opined during her testimony on inpatient treatment that therapeutic groups should also be conducted in confidential settings: "it is important that there not be outside bystanders, but the people in the group maintain confidentiality within the group with

one another."  Apr. 27, 2018, Trial Tr. (doc. no. 2696)
at 127.


### ii. Dispute

The plaintiffs assert that the treatment space
currently available at the mental-health treatment hub
prisons is inadequate.  For support, they point to
testimony to that effect by ADOC Director of Psychiatry
Dr. Kern, defense expert Dr. Patterson, and plaintiff
expert Dr. Burns.  During the liability trial, Dr.
Patterson credibly opined that the prisons "don't have
adequate treatment space" and that "[t]here are issues
with confidentiality."  Jan. 31, 2017, Trial Tr. (doc.
no. 1277) at 138.  At the hearing on the defendants'
remedial plan for inpatient treatment, Dr. Kern similarly
opined that an increase in confidential treatment space
for RTU and SU patients is necessary.  *See* Apr. 25, 2018,
Trial Tr. (doc. no. 2695) at 107.  He further stated that
he was unaware of any specific plans by ADOC to remedy
this space problem.  *See id*.  In addition, Dr. Burns

testified specifically about certain examples of insufficient space.  For instance, she credibly opined that the SU at Kilby lacks space for confidential counseling appointments and confidential group therapy. *See* Apr. 27, 2018, Trial Tr. (doc. no. 2696) at 132-33. She also credibly opined that ADOC currently has treatment space for only one confidential group at a time in the Donaldson RTU--which is insufficient to provide 10 hours of structured therapeutic time per week to all 144 inmates housed therein--and for only non-confidential groups in the Bullock SU.[8]  *See id.* at 128-29.  The plaintiffs assert that failure to require ADOC to remedy the lack of adequate treatment space would undermine other remedial measures to improve treatment in the

---

8. Dr. Kern testified that two mental-health groups could occur simultaneously in the Bullock SU, though did not opine on whether such an arrangement could ensure confidentiality. *See* Apr. 25, 2018, Trial Tr. (doc. no. 2695) at 56.  He also testified that the Donaldson RTU has space for "group activity," though did not specify whether that space allows for confidentiality either or whether it allows for enough simultaneous groups to meet ADOC's commitments.  Apr. 24, 2018, Trial Tr. (doc. no. 1939) at 42.

inpatient units.  Proceeding without additional treatment
space, they argue, would set ADOC up to fail.

The defendants' proposal does not include any plans
regarding treatment space at any of the treatment hubs.
The defendants stated at the hearing on inpatient
treatment that the sufficiency of space to accommodate
the programming and out-of-cell requirements to which
they have agreed is "a challenge in terms of scheduling"
but not "necessarily ... a concern" for the defendants.
June 18, 2018, Oral Arg. Tr. (doc. no. 1905) at 54-55.
The defendants further stated that ADOC has acquired
'therapeutic furniture,' which is furniture that
restrains patients during therapy sessions and thereby
allows the sessions to be conducted with fewer
correctional staff.  *Id.* at 54.


### iii.  The Court's Resolution

The court finds the defendants' proposal fails to
address adequately the consensus among expert witnesses
that, overall, the mental-health units lack sufficient

**44**

treatment space.   The court will therefore require the defendants to conduct an assessment as to how much additional treatment space is needed and to propose a plan to address the additional need.

Group therapy, a particularly important form of treatment in correctional institutions with finite resources, *see Braggs*, 257 F. Supp. 3d at 1211, cannot occur unless there is enough space and cannot be effective unless that space allows for confidentiality, *see id.* at 1210.   In accordance with national standards, ADOC has agreed to provide significantly more out-of-cell time than it has previously provided, and in settings that provide for confidentiality.   To fulfill this commitment, ADOC must have enough space in which to do so, but witnesses for both parties testified that currently it does not.

Moreover, the experts' opinions that ADOC lacks sufficient treatment space do not account for the court's requirement today that ADOC prepare for the projected increase in the number of patients referred for inpatient

45

care.  If, as Dr. Patterson, Dr. Kern, and Dr. Burns all testified, the current space is not enough to provide minimally adequate treatment when the existing mental-health units are at capacity, it is certain to be insufficient for the additional inpatient beds required to meet the projected need.

While 'therapeutic furniture,' otherwise called 'restraining desks' or 'restraining chairs,' is a helpful addition to ADOC's mental-health units, the court fails to see how it addresses the issue of sufficiency of space. Therapeutic furniture helps to address lack of staff and reduce "the amount of security" necessary to run treatment groups.  Apr. 25, 2018, Trial Tr. (doc. no. 2695) at 116.  But this would not appear to have significant bearing on the amount of physical space necessary to provide enough confidential treatment to all patients.

The court finds that in order to provide minimally adequate treatment in inpatient units, ADOC must plan for where it will provide that treatment.  Failing to do so

will result in the harm caused by lack of treatment: "without out-of-cell time and effective treatment, housing severely mentally ill prisoners in a mental-health unit is tantamount to 'warehousing' the mentally ill." *Braggs*, 257 F. Supp. 3d at 1214 (citation omitted).   The court cannot tell from the record, however, how much new space is needed; indeed, out of deference, this how-much decision should be first tackled by the defendants.  Accordingly, the court will require the defendants to assess, in consultation with their mental-health experts, how much additional treatment space is needed and to produce a plan as to where ADOC will provide out-of-cell confidential treatment to patients in the SUs and RTUs.  The assessment must account for where all hours of structured out-of-cell treatment per patient per week can occur and how these spaces will provide adequate confidentiality to ensure meaningful treatment in group and individual settings.  It must also include explicit consideration of the projected increase in patients identified for inpatient treatment according

to the expert consensus or according to a new needs assessment the defendants will conduct, as described earlier in this opinion.

### iv. PLRA Findings

The court now finds that this relief satisfies the 'need-narrowness-intrusiveness' requirement of § 3626(a)(1)(A) of the PLRA. Without enough treatment space, ADOC will be unable to provide a minimally adequate amount of therapeutic activities to patients in mental-health units, undermining one of the remedial measures most fundamental to remedying the constitutional violation found. The court anticipates that additional treatment space will be necessary, particularly if the defendants' plan to address the need for inpatient treatment includes adding more beds. However, allowing the defendants considerable deference, the court does not require construction of additional treatment space, and instead takes the narrowest approach of requiring the defendants to conduct their own assessment and propose

their own plan.  The court's requirement is narrowly
drawn, extends no further than necessary to remedy the
constitutional violation found, and is the least
intrusive means of doing so.


## C. Suicide-Resistant Cells

### i. Findings

The court previously found that not all ADOC
mental-health unit cells are suicide-resistant.  *See
Braggs*, 257 F. Supp. 3d at 1227.  Patients in these units
have repeatedly succeeded in hanging themselves from
tie-off points in the cells.  While it may be impossible
to make any cell fully suicide-proof, the court saw
firsthand during its visit to the Bullock SU in February
2017 that "sprinkler heads are located directly above the
sink and the toilet, making it easy for suicidal
prisoners to climb up to tie a ligature on the sprinkler
head."  *Id*.  The serious risk of harm posed by the
construction of these cells was realized when Jamie
Wallace, a mentally ill inmate, took his own life in an

SU cell shortly after testifying in the liability trial. "Wallace was left alone for days in an isolated cell in a treatment unit, where he had enough time to tie a sheet unnoticed; because his cell was not suicide-proof, he was able to find a tie-off point from which to hang himself." *Id.* at 1186.

### ii. Dispute

The dispute regarding the design of SU cells appears to be centered on whether the issue should be addressed now or in a later stage of this litigation. In their briefing, the defendants maintain that this issue is outside the scope of the remedial phase on inpatient treatment. They contend that the topic of suicide-resistant cells in SUs should be addressed when the parties resolve suicide-prevention matters on the whole. *See* Defendants' Reply in Support of Proposed Opinion (doc. no. 1849) at 12. Meanwhile, the plaintiffs seek an order now that all cells used for stabilization placements be made suicide-resistant (that is, without

tie-off points) and have cell door windows measuring at least 24 by 18 inches. *See* Plaintiffs' Proposed Opinion (doc. no. 1840) at 28-29.

On September 6, 2019, the parties filed stipulations regarding suicide-prevention measures. *See* Suicide Prevention Stipulations (doc. no. 2606-1). Among other provisions, the stipulations include that "ADOC will determine, in collaboration with Dr. Mary Perrien, the appropriate number of suicide resistant cells for each ADOC major facility. The number of suicide resistant cells for each ADOC major facility will be subject to the approval of the mental health monitor or, if there is not yet a mental health monitor, Plaintiffs' expert." *Id.* at 6.

During an on-the-record hearing about these stipulations on December 6, 2019, the plaintiffs stated that this provision does not resolve the issue of suicide-resistant cells in SUs. *See* Dec. 6, 2019, Hr'g Tr. (doc. no. 2686) at 74-75. The parties clarified that defense consultant Dr. Perrien's analysis will be limited

to whether ADOC needs to create additional crisis cells, not whether or which of the existing cells must be made suicide-resistant. *See id.* Because many of the SU cells are currently used as crisis cells, and the parties have already agreed that all crisis cells must be suicide-resistant, some SU cells will necessarily be made suicide-resistant. However, whether the court should require that the remaining SU cells--as well as additional SU cells that ADOC may create in the future--be suicide-resistant remains in dispute. Despite the defendants' earlier contention that the suicide-prevention portion of the remedial phase was the proper phase in which to address this issue, the defendants presented no argument or evidence at the December 6 hearing about the parties' suicide-prevention agreements that SU cells need not be suicide-resistant.

### iii. The Court's Resolution

Crediting the opinions of both ADOC Director of Psychiatry Dr. Kern and plaintiff expert Dr. Burns, and

with no contradicting evidence, the court finds that all SU cells must be suicide-resistant. *See* Apr. 25, 2018, Trial Tr. (doc. no. 2695) at 107; Apr. 27, 2018, Trial Tr. (doc. no. 2696) at 126. Neither in this portion of the remedial phase nor in the hearing on suicide-prevention measures generally did defendants make any substantive argument or present any expert testimony that this measure is unnecessary.

SU cells are intended to house patients "who are suffering from acute mental-health problems--such as acute psychosis or other conditions causing an acute risk of self-harm--and have not been stabilized through other interventions." *Braggs*, 257 F. Supp. 3d at 1183. To address the obvious and substantial risk of serious harm to these patients, ADOC must eliminate the structural elements that enable patients to commit suicide while housed in cells intended for intensive treatment. Cells shall be considered suicide-resistant if they meet the requirements to which the parties have already agreed under their suicide-prevention agreement, *see* Suicide

Prevention Stipulations (doc. no. 2606-1) at 6.[9]
Alternatively, the court is willing to consider other
equally effective measures to make SU cells
suicide-resistant, should the defendants have a different
proposal.

### iv. PLRA Findings

This relief satisfies the
'needs-narrowness-intrusiveness' requirement of
§ 3626(a)(1)(A) of the PLRA. Making all SU cells
suicide-resistant is essential to addressing the
substantial risk of fatal harm to patients who are placed
in these cells precisely because they are likely to
engage in self-harm. As discussed, the defendants have
already agreed that SU cells used as suicide watch must

---

9. The suicide-prevention stipulations include that
"[s]uicide watch cells shall be considered suicide
resistant if they meet the requirements set forth in
section III(B) of the ADA Report." Suicide Prevention
Stipulations (doc. no. 2606-1) at 6. This stipulation
references the standards for making cells
suicide-resistant outlined by consultants as part of
their evaluation of ADOC's facilities in Phase I of this
case. *See* ADA Report (doc. no. 2635-1) at 42.

be suicide-resistant.  The relief required is, therefore, narrowly drawn to include only the remaining SU cells as well as any additional SU cells that ADOC proposes to create in response to today's remedial order.  The court also defers to the metrics to which the defendants have already agreed under the suicide-prevention agreement to ensure a cell is suicide-resistant.  *See* Suicide Prevention Stipulations (doc. no. 2606-1) at 6.  As the court has previously held, "where, as here, the provisions of relief ordered by a court are adopted from an agreement jointly drafted and reached by the parties, it is compelling evidence that the provisions comply with the needs-narrowness-intrusiveness criteria." *Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1253 (M.D. Ala. 2019) (Thompson, J.) (citations omitted).  Nonetheless, the court also leaves open the possibility for ADOC to propose alternative measures to meet the same end, allowing even more flexibility.  The court finds that this relief is narrowly drawn, extends no further than

necessary to remedy the constitutional violation found, and is the least intrusive means of doing so.

### D. Heat Management

#### i. Findings

It is undisputed that patients on psychotropic medications are at risk of overheating, as such medications "impact a person's temperature regulation center, and ... make[] them prone to things like heat stroke, heat prostration, and in severe cases, death." Apr. 27, 2018, Trial Tr. (doc. no. 1817) at 120 (Dr. Burns testifying). Plaintiff expert Dr. Burns explained that psychotropic medications cause individuals to overheat without their realizing it, such that "it is difficult to expect that they would be able to recognize when they need to seek assistance ...." *Id.* at 133. The danger of overheating is an "important reason" why ADOC Director of Psychiatry Dr. Kern agreed that RTUs and SUs should be air-conditioned. Apr. 25, 2018, Trial Tr. (doc. no. 2695) at 105. While Tutwiler and Bullock's

mental-health units are apparently air-conditioned, *see* June 18, 2018, Oral Arg. Tr. (doc. no. 1905) at 64-65, Donaldson, the site of mental-health units housing as many as 96 patients total, is not, *see id.* at 66.  It is not clear whether Kilby, which has 16 SU beds, is air-conditioned.

### ii. Dispute

To address this serious risk, the plaintiffs seek an order requiring the defendants to install air conditioning in all inpatient treatment units.  The defendants, however, again argue that the issue of heat management is outside the scope of this remedial phase. The defendants further insist that installing air conditioning is an unnecessarily burdensome task and that inmates experiencing overheating can use the accommodations procedure under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.*, to request and obtain relief.  Through that procedure, the defendants assert, an individual in need of an

accommodation due to their heat sensitivity may make a request for an accommodation. *See Joint Report* (doc. no. 1650) at 1. Upon making such a request, the inmate "should be evaluated by qualified medical clinicians, in consultation with the inmate's mental health provider, to determine if an accommodation is appropriate." *Id.* at 1. If an accommodation is determined to be medically appropriate, "then ADOC should grant and implement that accommodation." *Id.* at 2. The defendants do not give details as to what that accommodation may be.

This procedure, the plaintiffs argue, is inadequate because, as explained by Dr. Burns, patients on psychotropic medications are typically not aware that they are overheating and in need of any accommodation. The plaintiffs further contend that, even if a patient were to utilize the accommodations process, the accommodation may still be inadequate--should a clinician determine the required accommodation is to move that patient out of an inpatient treatment unit to an air-conditioned unit, he or she may no longer receive

residential-level mental-health treatment.  *See* Apr. 27, 2018, Trial Tr. (doc. no. 1817) at 125.  Thus, use of the ADA procedure may require a trade-off between air conditioning and inpatient mental-health treatment. Further, the plaintiffs argue, with nearly 100 % of patients in inpatient treatment units taking psychotropic medication, in the event that all residents are clinically determined to require air-conditioned housing, it is unclear how ADOC would accommodate the need.

In addition to the ADA process, the defendants pointed during the hearing on inpatient treatment to ADOC's existing heat-management policy, which provides for regular monitoring of the temperature in segregation units when the outside temperature is higher than 80 degrees.  Joint Ex. 118, Admin. Reg. § 619 (doc. no. 1038-141) at 2.  Per this regulation, if the cell temperature detected exceeds 90 degrees in a segregation unit, staff must automatically provide accommodations such as using fans to increase ventilation and airflow,

59

providing increased amounts of fluids and ice, and allowing additional showers to provide cooling. *See id*. These requirements do not appear to extend to the mental-health units, however. Instead, the policy broadly states that: "The Director of Treatment and Wardens will ensure that measures to reduce sun/heat exposure risks for inmates taking psychotropic medication are initiated and maintained at all ADOC institutions." *Id*. The policy also requires that nurses conduct inmate education with those on psychotropic medications by informing them of the risks of overheating, and that, in some situations, inmates be provided sunscreen. *Id.* at 2-3.

### iii. The Court's Resolution

As an initial matter, the court rejects the defendants' position that this issue is outside the scope of the inpatient treatment remedy, for maintaining a safe environment for patients is essential to providing minimally adequate care. While the court will not at

this time require ADOC to install air conditioning in all
mental-health units, the court will require the
defendants to create a heat management plan to address
the substantial risk of serious harm to patients on
psychotropic medications in these units.

The court has serious doubts about ADOC's ability to
adequately address the risk to patients through means
less than air conditioning. The court agrees with the
plaintiffs that the ADA process cannot protect
individuals who do not realize when they are overheating
and, thus, do not know to request an accommodation.
Further, with nearly 100 % of patients in mental-health
units taking psychotropic medications, accommodating
individual patients by moving them into air-conditioned
units one by one is both illogical and inadequate if it
results in their loss of inpatient care. In fact, as the
plaintiffs rightly noted, to do so may even be impossible
as it would likely require the rehousing of entire units
of patients.

The court is very concerned about the near certainty of these logistical impediments to ensuring adequate temperatures in these units while simultaneously providing inpatient treatment to all who need it. ADOC's failure to fulfill one of these requirements in pursuit of fulfilling the other will result in additional violations of either the ADA, or of the Eighth Amendment, or both. Nonetheless, in deference to the defendants, the court will order them simply to devise a plan and procedures to address the serious risk posed by high temperatures in the mental-health units. The defendants should specifically address the court's concerns about accommodating individuals who do not know they are overheating, the risk that those accommodated by reassignment to air-conditioned housing will lose access to their inpatient mental-health treatment, and the logistics of providing adequate accommodations to an entire unit at once. To the extent that ADOC intends to rely on measures short of air conditioning, the defendants should give details as to how the measures

they propose will ensure temperatures safe for patients on psychotropic medications. For example, the defendants say that, if a segregation cell temperature exceeds 90 degrees, staff will automatically provide fans, increase amounts of fluids and ice provided to the inmate, and allow additional showers. However, the defendants have provided no information of how ADOC will reliably determine when *a particular cell* exceeds 90 degrees and no information of how ADOC will determine, should a cell exceed 90 degrees, whether the measures it has taken have been adequate to prevent *a particular patient*'s overheating, for, depending on how extreme the weather conditions are, the measures may or may not be adequate to redress the above-90-degree temperature. The defendants should also evaluate the feasibility of installing air conditioning in the mental-health units in any of the new facilities the ADOC plans to construct.

### iv. PLRA Findings

The court now finds that this relief satisfies the 'needs-narrowness-intrusiveness' requirement of § 3626(a)(1)(A) of the PLRA.  First, addressing the risk of overheating is essential to ensuring the safety of those in inpatient units and, through the promulgation of its existing policies, ADOC itself has acknowledged that risk.  Second, ADOC has already adequately addressed the issue of heat management in Tutwiler and Bullock mental-health units by installing air conditioning.  The relief required is therefore limited to the units containing inpatient beds at Donaldson, and possibly at Kilby, and any additional mental-health units ADOC may create at other prisons, including those newly constructed.  Third, the court finds the relief the least intrusive possible as it gives the defendants an opportunity to devise a solution.  The court therefore finds that this relief is narrowly drawn, extends no further than necessary to remedy the constitutional

violation found, and is the least intrusive means of doing so.

### E. Admissions Criteria

#### i. Findings

In the liability opinion, the court credited defense expert Patterson's opinion that the RTU admission (and discharge) process is flawed and that these flaws contribute to under-identification of inmates needing residential treatment. *See Braggs*, 257 F. Supp. 3d at 1205. In particular, inmates repeatedly sent to the SU should be considered for a higher level of care, such as the RTU, to receive longer-term intensive treatment. *See id.* Instead, the court found that ADOC regularly releases these individuals to general population, and they consequently cycle between general population and crisis placements. *See id.* This pattern contributes to ADOC's failure to provide inpatient treatment to those who need it, despite the existence of empty inpatient treatment beds. *See id.*

## ii. Dispute

Since the briefing in this remedial phase, the parties have reached several stipulations addressing this topic.    The   stipulations   about   psychotherapy   and confidentiality (doc. no. 1899-1) appear to directly address the plaintiffs' concerns that the defendants should be clear in their policies about the following: whether inmates can move between the various levels of care, what the possible discharge placements are from each level of care, that inmates can enter into the continuum of inpatient care at any level, that stays in SUs should be brief, that some inmates may remain in RTUs indefinitely, and that prolonged SU placements should lead to a higher level of inpatient care.    These stipulations also outline the types of services patients will receive in SUs and RTUs, including the number of clinical encounters and counseling sessions, and provide processes for ensuring periodic re-evaluation of the appropriateness   of   a   patient's   current   level   of

treatment. *See id.* The parties have also reached other stipulations to improve continuity of care, including, for example, that treatment teams will meet to review and update treatment plans during any movement between, in, or out of any inpatient unit. *See* Individualized Treatment Planning Stipulations (doc. no. 1865-1) at 15.

The remaining dispute under the topic of admissions to mental-health units is about the admissions criteria themselves. The defendants' proposed plan does not include a plan to change the existing criteria. The defendants argue that ADOC's current criteria are adequate because they were not found to be constitutionally deficient. The plaintiffs urge the court to require the defendants to establish new admissions criteria. They argue the existing criteria are inadequate on their face, resulting in the flawed RTU admission management the court described in the liability opinion. *See Braggs*, 257 F. Supp. 3d at 1205. The plaintiffs point to Dr. Burns's testimony that, in general, admissions and discharge criteria in inpatient

care units should be sufficiently clear such that both patients and staff know what to expect in each level. *See* Apr. 27, 2018, Trial Tr. (doc. no. 1817) at 26-27, 30. According to Dr. Burns, clear criteria help staff determine when they should make referrals, who is eligible for transfer to an RTU or SU, how long patients are anticipated to stay in any given environment, and how patients should spend their time in each environment. *See id.* at 26-27. For patients, she opined, clear criteria help them understand what is required for them to move from more restrictive housing placements--SU and the lower RTU levels--to less restrictive environments. *See id.* at 29-31. The plaintiffs assert that ADOC's existing RTU criteria, *see* Joint Ex. 135, Admin. Reg. § 633 (doc. no. 1038-167),[10] are "so vague to be basically

_____

10. The existing administrative regulations provide the following criteria for each RTU level: (1) RTU level one is for patients "experiencing problems in functioning" and/or "demonstrating the inability to control impulses" as well as those admitted to the RTU and awaiting an evaluation; (2) RTU level two is for patients "unable to participate in total RTU program due to limited impulse control" or "cognitive impairment," as well as those "who could benefit from less intensive

meaningless." June 18, 2018, Oral Arg. Tr. (doc. no. 1905) at 77.

The defendants agree with the plaintiffs that ADOC's existing criteria are "loose" and "not detailed." June 18, 2018, Oral Arg. Tr. (doc. no. 1905) at 79. However, they assert that, because the determination of what level of treatment a patient requires is a clinical one, the criteria should have this level of flexibility. *See id.*

### iii. The Court's Resolution

Without expert testimony as to the adequacy of ADOC's existing admissions criteria, the court cannot, at this time, find the criteria inadequate. The court finds credible Dr. Burns's testimony that, to ensure consistency in referral and discharge decisions, the

---

treatment involvement and small group interaction"; and (3) RTU level three is for "[i]nmates able to follow simple concrete instructions," "[i]nmates, with support, able to comprehend and comply with institutional regulations," "inmates able to tolerate low stress activities in group situations" and "inmates [who] have no recent episode of violent behavior toward self or others." Joint Ex. 135, Admin. Reg. § 633 (doc. no. 1038-167) at 18.

criteria should clearly describe what level of functioning and need each level of inpatient care is intended to address. However, the court lacks the clinical expertise to extrapolate from Dr. Burns's opinion as to exactly how ADOC's existing policies are inadequate. The court is unable to determine when consistency must give way to flexibility and vice versa, for the court, using its common sense, sees value in both consistency and flexibility. Therefore, the court declines to enter a remedial order on the issue at this time. The court believes that the plaintiffs are asking the court to delve too much into detailed discretionary clinical judgment. The court also believes it is wise to wait and see how the various stipulations to which the parties have agreed play out, albeit perhaps indirectly, with regard to issue of RTU admission; it may be that the deficiencies the plaintiffs have identified will resolve themselves. Otherwise, monitoring might reveal deficiencies, if any.

### F. Privileges

#### i. Findings

In the liability opinion, the court found that, due to "an unduly harsh and punitive practice limiting property," patients in mental-health units "do not have books to read or other things to keep them engaged while spending the vast majority of their time in their cells." *Braggs*, F. Supp. 3d 1171 at 1214-15.  This practice "makes mental-health units far from therapeutic and exacerbates prisoners' idleness."  *Id.* at 1214.  The court observed firsthand during its visits to Bullock and Donaldson that in the inpatient units, "the majority of prisoners ... were lying in their cells, often in a fetal position and facing the wall" with "no way to engage in any remotely meaningful activity in the cell."  *Id.* at 1215.

### ii. Dispute

The parties again disagree on whether the defendants are obligated to remedy this issue.  The defendants' plan makes no mention of privileges or access to property for patients housed in the mental-health units.  The defendants maintain that the issue is outside the scope of this remedial phase.  The existing administrative regulations provide some guidance as to what privileges patients can expect in each level of the RTU,[11] including regarding the location of meals and medication administration.  *See* Joint Ex. 135, Admin. Reg. § 633 (doc. no. 1038-167) at 18.  The regulations also state that patients in RTU level one may have "[l]imited personal property," in RTU level two may have "[p]roperty greater than that of Level 1 inmates but less than that of Level 3 inmates," and in RTU level three may have "the same property as general population inmates," with possible limitations on cans or caffeinated coffee.  *Id*.

---

11. This regulation includes a level four RTU, which appears to no longer exist.

The plaintiffs argue that the liability findings
support a remedial order that the defendants define the
privileges and access to property to which patients in
the mental-health units are entitled.  The plaintiffs
point to Dr. Burns's testimony that the following issues
should be "thought through ahead of time and spelled
out," *see* Apr. 27, 2018, Trial Tr. (doc. no. 2696) at 63,
for each level of inpatient care: which types of property
patients can have; whether and with what restrictions
patients are entitled to visitation, phone, mail, and
commissary privileges; whether patients can leave their
cells without handcuffs and shackles; which patients must
participate in group activity using therapeutic
furniture; and whether patients are required to eat in
their cells.

### iii.  The Court's Resolution

The court declines to enter the order the plaintiffs
seek requiring the defendants to define privileges in the
inpatient units.  While the court is very concerned about

73

the detrimental effects of in-cell idleness in particular, ADOC already has a policy in place allowing privileges in these units.  In addition, like admissions criteria, the court recognizes that entitlement to privileges must be based on clinical determinations.  As Dr. Burns credibly testified, the privileges to which patients are entitled are based on "level of functioning" and "clinical condition."  Apr. 27, 2018, Trial Tr. at 88.  While the harsh lack of property the court previously observed in mental-health units is deeply concerning, the court assumes that, as part of improved treatment planning in inpatient units, clinicians will now recommend appropriate in-cell activities for patients and that ADOC personnel will carry out these clinical recommendations.  In short, the court believes this issue should, and will, be addressed as part of the overall improved treatment planning that will result from other remedial measures.

As discussed, it is clear that depriving patients of things to do in cell--such as reading and

writing--undermines the therapeutic nature of the units. Without any privileges, the mental-health units will remain 'segregation-like,' which the court has already found to cause worsening symptoms for mentally ill inmates and underutilization of residential treatment. However, the court will not take on the role of mental-health staff by entering extremely detailed remedial orders in this regard.  Instead, to the extent these deficiencies still remain, they could be addressed through monitoring.

### G. Natural Light

#### i. Findings

It is undisputed that access to natural light has positive effects on both mental and physical health. Plaintiff expert Dr. Burns testified during the inpatient treatment hearing that exposure to natural light is "important for mental health and well-being" as well as "for vitamin reasons."  Apr. 27, 2018, Trial Tr. at 126. Dr. Kern testified that it is "a good general plan to

increase natural light" in mental-health units.  Apr. 25, 2018, Trial Tr. (doc. no. 2695) at 106.


### ii. Dispute

Relying on Dr. Burns's testimony, the plaintiffs seek an order requiring the defendants to "ensure that all mental-health units within ADOC have adequate natural lighting."  Plaintiffs' Proposed Opinion (doc. no. 1840) at 28.  The plaintiffs also assert that natural light is important to improve the segregation-like atmosphere in inpatient treatment units.  *See* June 18, 2018, Oral Arg. Tr. (doc. no. 1905) at 62.  The defendants again argue that the issue is outside the scope of the inpatient treatment remedy.


### iii.  The Court's Resolution

As the court held in the liability opinion, patients in mental-health units "are at a higher risk of decompensation ... if their housing environment is not therapeutic."  *Braggs*, 257 F. Supp. 3d at 1212.  Thus,

in renovating existing prisons under the Phase 1 ADA plan and building new ones, ADOC should take into account the important effect of natural light on the overall environment of mental-health units and the health of those residing therein.  The court will not enter a remedial order on this issue, however, as the record does not contain sufficient evidence for the court to find that requiring ADOC to provide more natural light in the units meets the needs-narrowness-intrusiveness requirement of the PLRA, 18 U.S.C. § 3626(a)(1)(A).

## H. Additional Training for Correctional Officers

### i. Findings

As discussed, the court found in the liability opinion that ADOC fails to identify those in need of treatment both during and after the intake process.  A functioning identification system relies, in part, on the ability of correctional officers to observe and identify mental-health symptoms and refer inmates for mental-health care.  *See Braggs*, 257 F. Supp. 3d at

1203-1204.  For this to happen, facilities must have sufficient correctional staffing, but also, officers must know how to recognize behavior related to mental illness. In the liability trial, plaintiff expert Dr. Craig Haney credibly opined that training correctional officers to identify mental-health symptoms and make referrals improves the accessibility of mental-health care.  *See* Jan. 19, 2017, Trial Tr. (doc. no. 1266) at 30-31.  On the other end, plaintiff expert Dr. Burns testified that correctional staff interacting directly with patients who have made it into inpatient units should receive training on specific skills for working in those units.  *See* Apr. 27, 2018, Trial Tr. (doc. no. 2696) at 131-32.

### ii. Dispute

Prior to the hearing on inpatient treatment, the parties agreed to stipulations regarding training for "[a]ll persons working within any ADOC major facility who have any direct contact with inmates."  *See* Referral Stipulations (doc. no. 1821-1) at 1.  Pursuant to these

78

stipulations, ADOC and its mental-health vendor were to develop a 'Comprehensive Mental Health Training Curriculum' to include curricula about identifying mental illness, the mental-health services available within ADOC, and the process for referring inmates for mental health evaluations. *See id.* at 2-3. The agreement requires that plaintiff expert Dr. Burns review this proposal and that ADOC implement the finalized training no later than February 1, 2019. *See id.* at 3. All correctional staff must complete the training within 30 days of assignment to a major ADOC facility. *See id.* at 6-7. In an on-the-record hearing on December 6, 2019, the parties represented that, while this training had not been finalized, it was likely to be approved by Dr. Burns shortly thereafter. *See* Dec. 6, 2019, Status Conf. Tr. (doc. no. 2686) at 62.

In their proposal, filed before this stipulation, the defendants propose training correctional staff in the new mental-health classification system, including about proper documentation in treatment plans and progress

notes.  *See* Defendants' Phase 2A Proposed Remedial Plan
on Identification, Classification, and Residential Unit
Out-of-Cell Time and Treatment (doc. no. 1594) at 21.
This new training would not be implemented until all of
the court's remedial orders have been entered.  In the
interim, the defendants propose continuing to provide the
training prescribed by existing ADOC regulations.  *See*
*id.*  These regulations prescribe a two-day training for
staff routinely assigned to SU, RTU, infirmary, and
segregation units, which includes topics such as "crisis
intervention strategies," "confidentiality," and
"watches and the use of restraints for mental health
reasons."  Joint Ex. 98, Admin. Reg. § 608 (doc. no.
1038-120) at 3-4.

The plaintiffs argue that the training included in
the defendants' original proposal is insufficient because
it does not include additional training for ADOC
correctional staff working in mental-health units.  The
plaintiffs assert that training should ensure staff have
"enhanced interpersonal communication and crisis

80

de-escalation skills," "a better understanding of the symptoms of mental illness" and knowledge of how "to use restraints." Plaintiffs' Proposed Opinion (doc. no. 1840) at 29. Despite the stipulation creating a 'Comprehensive Mental Health Training,' the issue of specific training for officers in mental-health units remains unresolved according to representations made by the plaintiffs during the December 6, 2019, hearing. *See* Dec. 6, 2019, Hr'g Tr. (doc. no. 2686) at 67.

### iii. The Court's Resolution

The court agrees with the plaintiffs that training correctional officers is important to implementing the remedial measures and ensuring a functional mental-health care system. The court fails to see, however, how the existing training and the nearly finalized 'Comprehensive Mental Health Training Curriculum' do not, in combination, address the topics requested by the plaintiffs; assuming the topics in the existing training continue to be included, every topic on which the

plaintiffs assert correctional officers in RTUs and SUs should be trained appears to be included.  The court defers its determination of this issue to when it determines, in the fall of 2020, whether the parties' agreements and stipulations regarding training meet the requirements of the PLRA, 18 U.S.C. § 3626(a)(1)(A).

## I. Monitoring

### i. Dispute

The plaintiffs seek an order appointing a security and a mental-health monitor, to be paid by the defendants, and giving those monitors the authority to "visit the facilities, speak with staff and prisoners, review logs and other documents, as necessary, to determine whether prisoners are being timely referred and transferred to mental-health units; whether there are delays or waitlists for transfers to mental-health units; how long prisoners are staying in mental-health units; to which types of units prisoners are discharged from mental-health units; how long prisoners with serious

mental illness remain in segregation; and whether there are any obstacles to achieving constitutional compliance." Plaintiffs' Proposed Opinion (doc. no. 1840) at 30-31. The plaintiffs propose that the monitors be allowed to conduct a variety of evaluations to assess these issues. The plaintiffs also seek an order requiring ADOC to produce multiple monthly reports, ranging from caseload statistics to duty logs. "To ensure the eventual transition of monitoring" to the Office of Health Services (OHS), the plaintiffs propose including OHS staff in these monitoring processes. *Id.* at 38.

The defendants assert that the court should require no monitoring or reporting because ADOC should be accorded deference in the implementation of changes to inpatient treatment units and because the requirement the plaintiffs seek is overly burdensome.

83

### ii.  The Court's Resolution

The court agrees with the plaintiffs that it is necessary to devise a monitoring scheme to ensure compliance with the remedies the court will order. However, the court will reserve the issue of monitoring at this time for a global monitoring resolution at a later date.

***

Therefore, with regard to inpatient mental-health treatment and as discussed and outlined above, it is ORDERED that, on or before 5:00 p.m. on July 1, 2020, the defendants, with input from their experts, are to submit the following to the court:  (1) a plan to ensure the creation of more and adequate inpatient treatment beds; (2) a plan to ensure the creation of more and adequate treatment space; (3) a plan to make all SU cells suicide-resistant; and (4) a plan to manage high temperatures for patients on psychotropic medication.

DONE, this the 29th day of May, 2020.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE