**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **EDWARD BRAGGS, *et al.*,** | **)** | |
| | **)** | |
| **Plaintiffs,** | **)** | |
| | **)** | **Case No. 2:14-cv-00601-MHT-WC** |
| **v.** | **)** | |
| | **)** | **District Judge Myron H. Thompson** |
| **JEFFERSON DUNN, *et al.*,** | **)** | |
| | **)** | |
| **Defendants.** | **)** | |

**RESPONSE TO PHASE 2A ORDER**
**ON CORRECTIONAL STAFFING TREND**

Defendants JEFFERSON DUNN ("Commissioner Dunn") and RUTH NAGLICH ("Naglich" and, collectively with Commissioner Dunn, "the State") hereby submit this response to the Phase 2A Order on Correctional Staffing Trend (doc. 2834, the "Order"), seeking (a) confirmation as to the accuracy of the Court's correctional staffing calculations, and (b) an explanation about how the State plans to meet the February 20, 2022 deadline for implementation of the correctional staffing recommendations made by Russ and Meg Savage.

## INTRODUCTION

Over the past two (2) years, the State has effectively executed the plan presented to this Court in October of 2017 to implement an unprecedented recruitment and retention strategy designed to increase correctional staffing levels across the state of Alabama. As discussed in great detail in this Response, the raw

employment data reported by the Alabama Department of Corrections ("ADOC") taken in the context of current events demonstrate both (a) the State's commitment to increasing its correctional staffing, and (b) the initial success of the State's efforts in the recruitment and retention of correctional staff. One cannot discount that the impact of the global novel coronavirus disease 2019 ("COVID-19") pandemic on the State's on-going efforts will remain unknown for some time. Nevertheless, as of today, the State has demonstrably reversed a decade of declining correctional staffing and built the infrastructure necessary to recruit, hire, onboard, and retain correctional staff. Through the continuing implementation of the State's recruitment and retention plan, and barring any further unforeseen events (*such as a global pandemic*), the State continues to believe that it can grow its correctional staff ranks to fulfill all mandatory security postings within its facilities.

## THE STATE'S RESPONSE

### I. AN ACCURATE ASSESSMENT OF CORRECTIONAL STAFFING LEVELS WITHIN THE ADOC.

Generally, in terms of accuracy, the Court properly restated the numbers from State's quarterly correctional staffing reports (docs. 2668, 2823-1, 2829-1) and a Joint Notice Regarding the Court's Phase 2A Order on Correctional Staffing Report (doc. 2704).[1] However, the Court did not assess a twelve (12) month period in

[1] It appears in the footnote denoted with an asterisk on page 4 of the Order there is transposition error in a formula in the second sentence: "(1,193 ÷ 8 = 239.125)." (Doc. 2834 at 4). The first number incorrectly appears as "1,193" while it should be "1,913," as reflected in the preceding

evaluating the "second quarter of 2019 through the first quarter of 2020." (Doc. 2834 at 1). Instead, the Court assessed correctional staffing on four (4) individual dates—June 30, 2019, September 30, 2019, December 31, 2019, and March 31, 2020—over a nine (9) month period. Over this 9-month period, the Court correctly stated that ADOC generally increased correctional officers (including basic correctional officers ["BCO"] and correctional cubicle operators ["CCO"]) from 1,301 (as of June 30, 2019) and 1,413 (as of March 31, 2020).

During this same 9-month period, ADOC did *not* experience a loss of forty-six (46) supervisors. Rather, ADOC lost only eight (8) supervisors—basically, one supervisor per month—during this period. (Id. at 1-2). The second quarter 2019 correctional staffing report 2019 (doc. 2668 at 11) included thirty-eight (38) members of the K-9 staff who were not part of the supervisory structure. ADOC removed those K-9 staff members from the third quarter 2019 correctional staffing report (doc. 2673). On June 30, 2019, ADOC employed 321 supervisors, so the overall decrease equals only eight (8) supervisors. Of course, as a general matter, ADOC anticipates increasing its supervisory correctional staff through the promotional process. However, it has been, and will continue to be, intentional and responsible in hiring and promoting quality correctional leaders among its staff into leadership positions. ADOC anticipates supervisory correctional staff will lag

---

sentence. However, the denominator and quotient from the division problem are correct. (Id.).

behind front-line staff to allow it sufficient time to evaluate and train correctional staff for supervisory or leadership positions.

The State holds a more fundamental concern from its review of the Order, because the Order seems to suggest a possible misunderstanding of the Savages' correctional staffing report and the manner in which the State fulfills the staffing plan developed by the Savages. First, the Savages' post plans (doc. 1813-1 at 94, 120-133)[2] rely on full-time equivalents ("FTE(s)") as opposed to a physical headcount of actual persons. As the Court will recall from the dispute related to mental-health staffing, a FTE may be filled in a variety of ways, including, for example, through part-time employees and overtime. Nevertheless, for optimal staffing, the Savages recommended 3,626 FTEs for correctional officers and 500 FTEs for supervisors in their correctional staffing report (doc. 2834 at 3).

As similarly discussed in the context of mental health staffing, an attempt to convert FTEs into individual employees constitutes a futile mixture of apples and oranges. This is particularly true with respect to the Savages' post plans that reflect optimal staffing patterns for ADOC facilities. At best, the hiring data and current employment numbers reported by the State on a quarterly basis provide a rough approximation of staffing levels as of a particular date and demonstrate broad trends

[2] The State is using the CM/ECF page numbers instead of the actual page numbers from the Savages' report for ease of reference.

over a period of months and years. For that reason, ADOC used the "assigned" FTEs for correctional staff and supervisors in the quarterly correctional staffing reports.

Second, in their correctional staffing report, the Savages identified three (3) levels of correctional staffing: (1) optimal staffing (where special project or activities can be approved); (2) normal operations (where all programs and activities are in full operation); and (3) critical minimum (where emergency services and life safety operations are provided). (Doc. 1813-1 at 17). The Savages did not attempt to establish a staffing plan for "normal operations" or "critical minimum" in their facility post plans.[3] Instead, the Savages provided "the optimal staffing patterns … based on [their] observation and operation of similarly constructed and occupied facilities…." (Id. at 100). That is, the Savages created an ideal post plan for each facility, or the most FTEs that might possibly be required by a facility to fulfill its mission. (Id.).

Of course, to fully implement the Savages' recommendations, the State does not need to reach 3,626 FTEs for correctional staff and 500 FTEs for supervisors.[4] Indeed, the Savages would say that full implementation of their recommendations

[3] As to the "critical minimum," the Savages said it is not reflected in the "mandatory" posts (or the lesser "essential" and "important" posts) but must be set by each facility. (Doc. 1813-1 at 17).

[4] For example, at Bibb Correctional Facility, the correctional staffing report identifies 38.72 FTEs for supervisors and 271.89 FTEs for correctional staff. (Doc. 1813-1 at 114). Because the essential correctional staff must be available seventy-five percent (75%) of the time, Bibb only requires the actual FTEs at a rate of 36.425 FTEs for supervisors and 269.15 FTEs for correctional staff for normal operations. (Id.; see also id. at 101).

falls somewhere between the staffing level for "normal operations" and "critical minimum"—lying closer to "normal operations" than "critical minimum." As such, the State's target for correctional staff and supervisors is substantially lower than the optimal staffing levels identified in the Court's Order. (Doc. 2834 at 3). For this reason, the target of 239.125 additional correctional officers per quarter and 23.375 additional supervisors per quarter is not consistent with the Savages' correctional staffing plan. This "target" merely provides a rough order of magnitude to estimate ADOC's proximity to the goal of adequate correctional staffing and proximity to the optimal staffing recommendations from the Savages.

Third, the correctional staffing report does not reflect the events transpiring since the creation of the Savages' report which altered the circumstances within ADOC's facilities. For example, the correctional staffing report predates the decommissioning of a significant portion of Holman Correctional Facility in early 2020 due to infrastructure failures. By closing a significant portion of Holman and changing its mission, the correctional officer and supervisor post plan for Holman will change—likely resulting in a reduction of correctional officers and supervisors—when the modification projects are complete.[5] Holman is not unique; other ADOC facilities have experienced a change in use or mission since the Savages

[5] Due to the COVID-19 pandemic, virtually all modification projects within Holman were temporarily suspended to prevent and mitigate the spread of COVID-19. ADOC will proceed with completion of those modification projects when safe and appropriate to do so.

completed their staffing analysis, which will impact correctional staffing levels at those facilities.

To say the Savages' correctional staffing analysis depicts necessary, or even adequate, correctional staffing within ADOC facilities today or on February 20, 2022 is inaccurate. At best, the Savages' correctional staffing report provided a framework to analyze and guide to understand correctional staffing with ADOC facilities in the past. It is instructive and useful to understand optimal staffing at a point in time in the past. However, it is not currently an accurate yardstick to evaluate the State's distance from the goal of optimal, or even adequate, correctional staffing.

## II. MEETING THE FEBRUARY 22, 2020 IMPLEMENTATION DEADLINE.

The State continues to implement and follow the recommendations from the Savages and Warren Averett concerning the recruiting, hiring, onboarding, and retention of correctional staff. (See, e.g., doc. 2703).[6] For example, as previously reported to the Court, Governor Kay Ivey and the Alabama legislature enacted the most significant single compensation package for any group of state employees in the history of the state of Alabama and ADOC developed and implemented a BCO position. (Id. at 3-22). However, aside from increased pay, a new bonus structure,

[6] Over the past few months, ADOC's recruiting efforts were modified, as necessary, to address and as a result of COVID-19.

and new pathways into ADOC as a member of the correctional staff, ADOC worked before and after entry of the Phase 2A Understaffing Remedial Opinion and Order (docs. 1656, 1657, collectively, the "Staffing Order") to create the infrastructure to recruit, hire, onboard, and retain correctional staff. These efforts cannot be considered in a vacuum. Prior to March of 2020, ADOC's initial recruitment and retention efforts faced major economic headwinds in the form of a booming in-state economy and unprecedented low unemployment numbers. After March of 2020, ADOC's recruitment efforts encountered all of the challenges facing every other employer, including readily available unemployment benefits that undermined efforts to recruit and retain unemployed persons and severe restrictions in recruiting, hiring, and onboarding brought about by and during the stay-at-home and safer-at-home orders associated with the COVID-19 pandemic. Even despite these circumstances, the State continues to maintain an attrition level below neighboring states, an increasing pool of applicants, and a continued focus on conversion of those applicants into correctional staff.

In analyzing ADOC's correctional staffing, Warren Averett emphasizes that recruiting, hiring, and retention are not linear, and they are not as straightforward as dividing the number of employees needed by the time allotted to reach those numbers. Looking at the numbers alone offers a one-dimensional view of a multi-faceted situation. Understaffing causes burn-out, which causes correctional officers

to quit, which worsens understaffing, which causes burnout, which causes more correctional officers to quit, as depicted by the following chart from Warren Averett's report:




(Doc. 2492-1 at 106, Figure 1: Turnover Cycle). Recruiting and retention can pose a vicious cycle—one ADOC experienced for nearly a decade. Addressing and correcting this decade-old problem requires comprehensive, concerted efforts. Despite the difficult circumstances, ADOC worked, and continues to work, diligently to break this cycle and increase correctional officers and supervisors within its facilities.

## RECRUITING EFFORTS

Since beginning to implement Warren Averett's recommendations, ADOC completely restructured its Recruiting Department, including increasing the number of recruiters, separating duties for efficiency, and fostering better coordination with

the State Personnel Department. ADOC hired a new Recruiting Director. Additionally, ADOC now employs four (4) full-time recruiters in the field who attend career fairs, job expositions, and other employment-related events, and they work to establish strong recruiting sources within their communities. Within the Recruiting Department, ADOC relies on three (3) back-office recruiters to focus on increasing the conversion rate of candidates by encouraging and supporting candidates from initial contact—using traditional and digital recruiting mechanism—through the application process. Moreover, ADOC established a separate Recruiting Assistant to process paperwork and monitor an applicant's progress in the hiring process through the new Applicant Tracking System, along with a Recruiting Liaison to coordinate efforts between ADOC's Recruiting Department and the State Personnel Department.

Apart from building a more robust Recruiting Department, ADOC implemented a number of initiatives designed to improve the applicant's recruiting experience. ADOC reviewed, selected, customized, and implemented an Applicant Tracking System (as referenced above). ADOC uses the Applicant Tracking System to work applicants through the hiring process. As part of the Applicant Tracking System, ADOC created a consolidated digital application to make it easier for candidates to apply.

ADOC overhauled its on-site recruiting and hiring events—the traditional

pipeline for recruiting and hiring correctional officers. As a start, ADOC trained staff assisting at an on-site about (among other things) how to interact and engage with candidates. ADOC streamlined the entire application process at an on-site, significantly reducing the time applicants spend at the event. An on-site coordinator for a particular ADOC facility coordinates and takes charge of the on-site event, and the on-site opens with a welcome video from Commissioner Dunn and includes lunch. Before the conclusion of each on-site, ADOC assigns a recruiter to each applicant who the applicant can contact at any time for assistance or questions about the hiring process. Based on feedback, these changes to the on-site process have made them more productive and more enjoyable from an applicant/candidate perspective.

In an effort to make the submission of an application easier, ADOC created an online application process, initially rolling it out for BCO applicants. BCO applicants submit their application online for review and processing by ADOC. Applicants who appear to meet basic hiring criteria are then promptly scheduled for an interview with ADOC's Law Enforcement Services Division (formerly known as Investigations and Intelligence Division). And, those BCO candidates who satisfactorily complete the interview and background investigation are scheduled to start in and ADOC facility as soon as possible.

Of course, building an online recruiting, hiring, and onboarding process for

BCOs from scratch was a complex endeavor. It required ADOC to work through various issues such as data security, capture of original documents, and proper routing to and through the State Personnel Department. Nevertheless, ADOC's diligent work on this new platform ensured candidates can move through the hiring and onboarding process in a timely and efficient manner. Moreover, the initial positive results from this new application process suggest a more workable and efficient process for BCO applicants.

Notably, ADOC launched the online application process for BCOs on March 23, 2020. ADOC's timing was incredibly fortuitous. As a result of the stay-at-home and safer-at-home orders, ADOC was forced to cancel its on-sites, thereby bringing in-person hiring to a complete halt. However, ADOC continued to receive and process BCO applications during the COVID-19 pandemic. Based solely on the availability of an online application process, ADOC anticipates converting a number of the applications received during the COVID-19 pandemic to BCOs.

MARKETING EFFORTS

Since entry of the Staffing Order, ADOC concentrated on aligning its marketing and recruiting strategies. For example, ADOC created a statewide awareness campaign to funnel applicants to on-sites or online to apply for a job with ADOC. ADOC's marketing campaign now relies on a variety of platforms, including digital (Facebook images and videos, YouTube, Google display, Google

search, and career websites), television, radio, direct mail, and email marketing, which ensure it reaches the widest span of applicants possible. ADOC's strategy for lead generation focuses on the vigilant monitoring of metrics associated with each marketing channel. On a weekly basis, ADOC analyzes the effectiveness of the marketing campaign based on data from each marketing channel. That allows ADOC to adjust the marketing approach as needed to optimize lead generation for applicants. Additionally, the marketing team studies industry and marketing trends continuously to ensure the marketing campaigns and messaging are up to date and resonate with the target audience.

COMPENSATION EFFORTS

As the Court is aware, ADOC made historic changes to attract and retain correctional staff. From a compensation perspective, ADOC substantially increased salaries (including making grade changes to increase maximum salaries for each job classification), adopted pay increases at certain intervals (such as a five percent [5%] pay increase when granted status in their class), allowed a payout for up to eighty (80) hours of excess annual leave each year, and implemented recruiting and retention bonuses. To understand the new bonus structure, the State inserted the table below:

| CLASSIFICATION | BONUS #1 ($1,500) | BONUS #2 ($1,500) | BONUS #3 ($1,875) | BONUS #4 ($2,625) |
|---|---|---|---|---|
| **COT** | Academy Graduation (Past or Future) | Attainment of Status as CO | Attainment of Status as CO Sr. | One-year anniversary of Status as CO Sr. (Annual Raise Date) |
| **CO** (probationary) | Academy Graduation (Given for this situation) | Attainment of Status as CO | Attainment of Status as CO Sr. | One-year anniversary of Status as CO Sr. (Annual Raise Date) |
| **CO with status** (entered class June 1, 2016 or later) | Academy Graduation (Given for this situation) | Attainment of Status as CO (Given for this situation) | Attainment of Status as CO Sr. | One-year anniversary of Status as CO Sr. (Annual Raise Date) |
| **CO with status** (entered class prior to June 1, 2016) | Not Applicable unless promoted to class above CO, Sr (Sgt. etc.) | Not Applicable unless promoted to class above CO, Sr (Sgt. etc.) | Attainment of Status as CO Sr. | One-year anniversary of Status as CO Sr. (Annual Raise Date) |
| **Promotional Classes** (Sgt. and higher; entered class June 1, 2016 or later) | Promoted to Existing Class (Given for this situation) | Attainment of Status in current promoted class (Past or Future) | Next anniversary of Status in current promoted class Feb. 1, 2020 or after (Annual Raise Date) | Next Subsequent anniversary — (Annual Raise Date) |
| **Promotional Classes** (Sgt. and higher; entered class prior to June 1, 2016) | Not Applicable unless promoted to class above Current Promotional Class | Not Applicable unless promoted to class above Current Promotional Class | Next anniversary of Status in current promoted class Feb. 1, 2020 or after (Annual Raise Date) | Next Subsequent anniversary— (Annual Raise Date) |

(Alabama Department of Corrections, Guide for New Compensation Plan, July 2019, http://www.doc.state.al.us/docs/ADOC_Full%20Compensation%20Pkge_07032019.pdf (last visited June 11, 2020)). According to Warren Averett, this new compensation structure continues to play a vital role in attracting qualified candidates and will continue to do so into the immediate future—particularly as our state returns to more normal operations.

BCO EFFORTS

As previously explained to the Court (doc. 2703), the early physical fitness test during the law enforcement academy constituted a significant barrier for a number of potential correctional officer applicants. To address this issue, ADOC developed and, in May 2019, implemented the BCO position, with significant coordination and assistance from the State Personnel Department, Alabama Peace Officer Standards and Training Commission, and each ADOC facility (to coordinate integrating the BCO position into its workforce). The BCO position has been a resounding success. Since inception of the BCO position, ADOC has hired 464 new BCOs. Based upon these initial results, ADOC continues to believe that BCOs will be a key component of success in the State's on-going correctional staff recruitment and retention efforts.

RETENTION EFFORTS

Contemporaneously with efforts to improve recruiting, ADOC worked to improve retention of correctional staff. Most significantly, ADOC provided increased compensation and benefits to existing correctional staff, including, for example, retention bonuses. ADOC's efforts positively impacted correctional staff retention. In fiscal year 2019, ADOC had an attrition rate of 12.8%, which is significantly lower that the neighboring states of Florida (29%), Georgia (42%), and Tennessee (42%). (See THE LEDGER, Prison Guards Hired After Age Lowered, Jan.

1, 2020, https://www.theledger.com/news/20200101/prison-guards-hired-after-age-lowered; ATLANTA JOURNAL-CONSTITUTION, Up to 97% Turnover Rates for Some State Jobs Helps Lead Georgia House to Halve Teacher Raise, Mar. 11, 2020, https://www.ajc.com/news/state--regional-govt--politics/turnover-rates-for-some-state-jobs-helps-lead-georgia-house-halve-teacher-raise/CC7rXzjblzGjqCiszGQXFN/; Tennessee Department of Corrections, Statistical Abstract, Fiscal Year 2018, https://www.tn.gov/content/dam/tn/correction/documents/StatisticalAbstract2018.pdf (last visited June 11, 2020)). Now, based upon recent exit surveys from separated employees, compensation no longer represents the key factor resulting in departure from ADOC.

Likewise, ADOC's creation of the BCO position introduced a way for CCOs to advance into a higher paying position with more responsibilities. Prior to the creation of the BCO position, there were no career advancement opportunities for CCOs. Similarly, by creating the Correctional Officer Senior position, correctional officers now have a career path to promotion that comes along with a five percent (5%) salary increase, without necessarily requiring correctional staff to assume a more demanding supervisory position. By affording existing correctional staff new career paths, ADOC has been able to retain them.

CONTINUING EFFORTS

Since the Staffing Order, ADOC spent significant time and effort to fix a

broken hiring system and to build the necessary recruiting, hiring, and onboarding infrastructure to grow and meet the correctional staffing goals. ADOC has made important progress in hiring and retention of correctional staff, notwithstanding a historic ten (10) year correctional staffing decline and low unemployment nationally and in Alabama. (See WSFA, Alabama's Low Unemployment Rate Hits 7th Straight Record, Dec. 20, 2019, https://www.wsfa.com/2019/12/20/alabama-hits-new-record-low-unemployment-th-straight-month/ (last visited on June 11, 2020)). ADOC's efforts, by way of example, significantly increased applications through the online application system and increased attendance at on-site events (as shown below):




Over the past two (2) months, ADOC enjoyed the two (2) best hiring months for fiscal year 2020. Even though building the necessary infrastructure for recruiting, hiring, and onboarding took time, the returns from these efforts are beginning to

show, and ADOC's correctional staffing levels have increased for the first time in nearly ten (10) years:




The COVID-19 pandemic and resulting recession pose a significant challenge to recruiting and retention of correctional staff. While unemployment sharply rose during the COVID-19 pandemic, Alabama unemployment claimants receive generous benefits ($600 per week from the CARES Act of 2020 on top of applicable state benefits). It appears these generous benefits have kept Alabama's unemployed workforce from seeking new employment, opting to wait until those unemployment benefits run out to seek new employment. Additionally, at this point, it appears many Alabama employers are recalling unemployed persons from furlough and rehiring former employees since issuance of the safer-at-home order.

It is particularly impossible in the current environment to project the employment market and the effects of COVID-19 and economic issues on the employment market in the next 18 months. ADOC remains cautiously optimistic

that it can capitalize on current employment-related and economic circumstances. That is, ADOC remains hopeful that the current potential labor pool—more than 550,000 Alabama residents who applied for unemployment from March to May 2020—will consider the opportunity to work as a correctional professional. (ALABAMA NEWS NETWORK, COVID-19 Related Unemployment Claims Fall as People Head Back to Work, June 4, 2020, https://www.alabamanews.net/2020/06/04/covid-19-related-unemployment-claims-fall-as-people-head-back-to-work/ (last visited June 11, 2020)). As of today, ADOC is taking proactive measures to reach these exact individuals. ADOC is currently working with the Alabama Department of Labor ("ADOL") to publicize ADOC's need for correctional staff on ADOL's website, through its mobile application, and by providing flyers to Alabama residents filing for and receiving unemployment benefits. Similarly, ADOC intends to take advantage of an offer to advertise its correctional staff opportunities on the Alabama Works! website (https://alabamaworks.com/). ADOC believes these marketing efforts directed to persons in need of a job will allow it to increase applications and potential candidates for correctional employment opportunities in the coming months.

As depicted below, the prior low employment circumstances constituted a significant hurdle in recruitment of new correctional staff, as the number of job openings is inversely proportional to the number of jobseekers (i.e. demand

exceeded supply):




(U.S. Bureau of Labor Statistics, Number of Unemployed Persons Per Job Opening, Seasonally Adjusted, https://www.bls.gov/charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm (last visited June 11, 2020)). If non-correctional employers do not return to their prior employment levels, Warren Averett believes that ADOC might be able to avoid competition for those potential employees. Nevertheless, prognosticating future employment trends is nothing short of speculative, though the State continues to search out every available, qualified applicant to assist it in fulfilling its employment objectives.

## CONCLUSION

The State appreciates the Court's willingness to assist in its work to increase correctional staffing and supervisors with ADOC facilities. Since entry of the Staffing Order, the State has developed the infrastructure to recruit, hire, onboard, and retain correctional staff and supervisors. Its efforts are bearing fruit. The State remains optimistic that its employment-related processes will enable ADOC to achieve adequate correctional staffing levels by February 20, 2022.

Dated: June 12, 2020.

*/s/ William R. Lunsford*
William R. Lunsford
*Attorney for the Commissioner and Associate Commissioner*

William R. Lunsford
Matthew B. Reeves
Melissa K. Marler
Stephen C. Rogers
Melissa C. Neri
**MAYNARD, COOPER & GALE, PC**
655 Gallatin Street
Huntsville, AL 35801
Telephone: (256) 512-5710
Facsimile: (256) 512-0119
blunsford@maynardcooper.com
mreeves@maynardcooper.com
mmarler@maynardcooper.com
srogers@maynardcooper.com
mneri@maynardcooper.com

Luther M. Dorr, Jr.
**MAYNARD, COOPER & GALE, PC**
1901 Sixth Avenue North
2400 Regions Harbert Plaza
Birmingham, AL 35203

Telephone: (205) 254-1178
Facsimile: (205) 714-6438
rdorr@maynardcooper.com

John G. Smith
David R. Boyd
**BALCH & BINGHAM LLP**
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (866) 316-9461
jgsmith@balch.com
dboyd@balch.com

Steven C. Corhern
**BALCH & BINGHAM LLP**
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100
Facsimile: (205) 488-5708
scorhern@balch.com

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all attorneys of record in this matter, including without limitation the following, by the Court's CM/ECF system on this the 12th day of June, 2020:

Ebony Howard
Lynnette K. Miner
Jaqueline Arando Osorno
Jonathan Blocker
Brock Boone
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
ebony.howard@splcenter.org
lynnette.miner@splcenter.org
Jackie.aranda@splcenter.org
jonathan.blocker@splcenter.org
brock.boone@splcenter.org

Gregory M. Zarzaur
Anil A. Mujumdar
Denise Wiginton
**ZARZAUR**
2332 2nd Avenue North
Birmingham, AL 35203
Telephone: (205) 983-7985
Facsimile: (888) 505-0523
gregory@zarzaur.com
anil@zarzaur.com
denise@zarzaur.com

William Van Der Pol, Jr.
Glenn N. Baxter
Lonnie J. Williams
Barbara A. Lawrence
Andrea J. Mixson
Ashley N. Austin
**ALABAMA DISABILITIES ADVOCACY PROGRAM**
University of Alabama
500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
Telephone: (205) 348-6894
Facsimile: (205) 348-3909
wvanderpoljr@adap.ua.edu
gnbaxter@bama.ua.edu
blawrence@adap.ua.edu

Andrew P. Walsh
William G. Somerville III
Patricia Clotfelter
Lisa W. Borden
**BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC**
420 20th Street North
Suite 1400
Birmingham, Alabama 35203
Telephone: (205) 244-3863
Facsimile: (205) 488-3863
awalsh@bakerdonelson.com
wsomerville@bakerdonelson.com
pclotfelter@bakerdonelson.com
lborden@bakerdonelson.com

lwilliams@adap.ua.edu
amixson@adap.ua.edu
aaustin@adap.ua.edu

Gary L. Willford, Jr.
Joseph G. Stewart
Stephanie L. Smithee
**ALABAMA DEPARTMENT OF CORRECTIONS**
Legal Division
301 South Ripley Street
Montgomery, Alabama 36130
Telephone (334) 353-3884
Facsimile (334) 353-3891
gary.willford@doc.alabama.gov
joseph.stewart@doc.alabama.gov
stephanie.smithee@doc.alabama.gov

Deana Johnson
Brett T. Lane
**MHM SERVICES, INC.**
1447 Peachtree Street NE
Suite 500
Atlanta, GA 30309
Telephone: (404) 347-4134
Facsimile: (404) 347-4138
djohnson@mhm-services.com
btlane@mhm-services.com

*/s/ William R. Lunsford*
Of Counsel