# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| EDWARD BRAGGS, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:14-cv-00601-MHT-JTA |
| | ) | Judge Myron H. Thompson |
| JEFFERSON DUNN, in his official | ) | |
| capacity as Commissioner of the | ) | |
| Alabama Department of Corrections, | ) | |
| et al. | ) | |
| Defendants. | ) | |

## PLAINTIFFS' PRETRIAL BRIEF REGARDING COMPLIANCE OF
## PHASE 2A REMEDIAL ORDERS AND STIPULATIONS
## WITH PRISON LITIGATION REFORM ACT

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

PROCEDURAL HISTORY......................................................................2

LEGAL STANDARD.............................................................................10

DISCUSSION .......................................................................................12

  I.  Defendants Have Waived Their Right to Contest Whether the Phase 2A Remedial Orders and Stipulations Satisfy the PLRA..................................13

  II.  Defendants' Agreement to the Phase 2A Remedial Orders and Stipulations Is Compelling Evidence That They Satisfy the PLRA..................................17

  III.  The Court Need Not Further Define "Substantial Compliance" Before It Makes the Need-Narrowness-Intrusiveness Findings ..................................18

  IV.  The Court Is Not Tasked with Finding a "Current and Ongoing" Constitutional Violation at This Juncture.......................................................24

  V.  None of the Phase 2A Remedial Orders Are Preliminary Injunctions That Terminated by Operation of Law ..................................................................26

RECORD EVIDENCE SUPPORTING PLRA FINDINGS....................27

  I.  SEGREGATION REMEDY (Doc. 1720)....................................................28

    A. Definition of "Serious Mental Illness"....................................................30

    B. Training Mental-Health Staff on Definition of SMI...................................32

    C. Independent SMI Designation.................................................................33

    D. SMI Flag Assignment by Authorized Mental-Health Staff .......................35

  II.  BIBB SEGREGATION REMEDY (Docs. 1751, 1751-1)...........................36

    A. Staffing ..............................................................................................38

    B. Placement and Treatment of People in Bibb's Segregation Units.............40

    C. Out-of-Cell Time for People in Bibb's Segregation Units .......................45

    D. Document and Video Production............................................................46

  III.  CODING REMEDY (Docs. 1792, 1792-1) ...............................................47

    A. Implementation of the SMI Flag ...........................................................49

    B. Revised Mental-Health Coding..............................................................51

  IV.  INTAKE REMEDY (Docs. 1794, 1794-1) ...............................................53

    A. Intake Assessment ...............................................................................55

B. Social History Assessment, Suicide Risk Assessment, and Testing..........58

C. Psychiatric Evaluation and Assignment of Mental-Health Codes.............60

D. Confidentiality...................................................................................63

V. SEGREGATION ROUNDS, ASSESSMENTS, AND EVALUATIONS REMEDY (Docs. 1815, 1815-1)..........................................................64

A. Preplacement Screening ......................................................................65

B. Mental-Health Rounds ........................................................................69

C. Periodic Mental-Health Assessments...................................................71

VI. REFERRAL REMEDY (Docs. 1821, 1821-1, 1821-2) ................................74

A. Comprehensive Mental-Health Training...............................................77

B. Process for Making Referrals ...............................................................78

C. Triage System .....................................................................................81

D. System for Tracking Referrals .............................................................84

VII. TREATMENT PLANNING REMEDY (Docs. 1865, 1865-1)....................86

A. Treatment Team Composition..............................................................89

B. Treatment Team Meetings ...................................................................92

C. Individualized Treatment Plans...........................................................94

D. Continuity of Care ..............................................................................97

1. Treatment Plans Upon Transfer or Provider Change..........................98

2. Mental-Health Progress Notes .........................................................100

VIII. PSYCHOTHERAPY REMEDY (Docs. 1899, 1899-1) ........................102

A. Treatment Modalities ........................................................................104

B. Confidentiality..................................................................................105

C. Documentation Obligations...............................................................109

D. Telepsychiatry Requirements ............................................................112

E. Sick Call Request Triage....................................................................113

F. Treatment Requirements for Prisoners Not on the Mental-Health Caseload and Prisoners on the Outpatient Caseload ...............................115

G. Treatment Requirements for Structured Living Units, Stabilization Units, and Residential Treatment Units....................................................117

IX. CONFIDENTIALITY REMEDY (Docs. 1900, 1900-1, 1900-2) .............123

A. Confidentiality Training for Correctional Officers in Specialized Units..124

B. Signed Confidentiality Agreements ........................................................126

X.   STAFFING CONTEMPT REMEDY (Docs. 2301, 2301-1) ......................127

XI.  HOSPITAL-LEVEL CARE REMEDY (Docs. 2383, 2383-1, 2383-2) .....129

XII. DISCIPLINARY PROCESS REMEDY (Docs. 2433, 2433-1).................134

A. Disciplinary Action Resulting From Self-Harm .......................................136

B. Mental-Health Consultation to the Disciplinary Process ..........................140

C. Disciplinary Action for Prisoners in Crisis and in Mental-Health Units..144

D. Training Regarding Disciplinary Process .................................................146

XIII.   SUICIDE PREVENTION REMEDY (Doc. 2606-1) ............................147

A. Mental-Health Staffing................................................................................150

B. Training ......................................................................................................152

C. Access to Mental-Health Care....................................................................154

D. Intervention in Prisoner Self-Harm ...........................................................155

E. Referral to Suicide Watch ..........................................................................158

F. Suicide Risk Assessment............................................................................160

G. Monitoring Suicidal Prisoners....................................................................163

H. Referral to a Higher Level of Care.............................................................167

I.   Suicide Watch Discharge ..........................................................................168

J.   Treatment and Follow-Up Examinations ..................................................170

K. Mental-Healthcare Policies ......................................................................173

L. Monitoring of Suicide Prevention Measures..............................................174

CONCLUSION ....................................................................................................174

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Austin v. Wilkinson*,
 372 F.3d 346 (6th Cir. 2004), *aff'd in part, rev'd in part and
 remanded on other grounds*, 545 U.S. 209 (2005) ............................................25

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
 492 U.S. 469 (1989) .....................................................................................12

*Benjamin v. Fraser*,
 156 F. Supp. 2d 333 (S.D.N.Y. 2001) ........................................................11, 17

*Benjamin v. Fraser*,
 343 F.3d 35 (2d Cir. 2003), *overruled on other grounds by Caiozzo
 v. Koreman*, 581 F.3d 63 (2d Cir. 2009) ................................................12, 17, 47

*Benjamin v. Schriro*,
 370 F. App'x 168 (2d Cir. 2010) ..................................................................12

*Benjamin v. Schriro*,
 No. 75 Civ. 3073(HB), 2009 WL 3464286 (S.D.N.Y. Oct. 26, 2009) ..............20

*Braggs v. Dunn*,
 257 F. Supp. 3d 1171 (M.D. Ala. 2017) ....................................................*passim*

*Braggs v. Dunn*,
 321 F.R.D. 653 (M.D. Ala. 2017) ...................................................................23

*Braggs v. Dunn*,
 367 F. Supp. 3d 1340 (M.D. Ala. 2019) ..................................................3, 72, 73

*Braggs v. Dunn*,
 383 F. Supp. 3d 1218 (M.D. Ala. 2019) ....................................................*passim*

*Braggs v. Dunn*,
 No. 2:14-cv-601, 2018 WL 7106346 (M.D. Ala. Feb. 20, 2018) .............39, 127

*Braggs v. Dunn*,
  No. 2:14-cv-601-MHT, 2018 WL 985759 (M.D. Ala. Feb. 20,
  2018) ...................................................................................4, 39, 127, 128

*Braggs v. Dunn*,
  No. 2:14cv601-MHT, 2017 WL 5665334 (M.D. Ala. Nov. 27, 2017) ........10, 23

*Braggs v. Dunn*,
  No. 2:14cv601-MHT, 2020 WL 2789880 (M.D. Ala. May 29, 2020)........*passim*

*Brown v. Plata*,
  563 U.S. 493 (2011)...................................................................................11, 12

*Carlos v. York Cty.*,
  No. 1:15-cv-1994, 2019 WL 6699710 (M.D. Pa. Dec. 9, 2019).....................170

*Carruthers v. Jenne*,
  209 F. Supp. 2d 1294 (S.D. Fla. 2002) ..............................................................47

*Cason v. Seckinger*,
  231 F.3d 777 (11th Cir. 2000) ....................................................................*passim*

*Coleman v. Brown*,
  No. 2:90–cv–0520, 2013 WL 4780945 (E.D. Cal. Sept. 5, 2013) ....................46

*Dorse v. Armstrong World Indus., Inc.*,
  798 F.2d 1372 (11th Cir. 1986) .........................................................................14

*Dunn v. Dunn*,
  318 F.R.D. 652 (M.D. Ala. 2016)................................................................10, 23

*Edmo v. Corizon, Inc.*,
  935 F.3d 757 (9th Cir. 2019) .............................................................................26

*Erlenbaugh v. United States*,
  409 U.S. 239 (1972)...........................................................................................11

*Evans v. Jeff D.*,
  475 U.S. 717 (1986)...........................................................................................14

*Gumm v. Ford*,
  No. 5:15-CV-41 (MTT), 2019 WL 2017497 (M.D. Ga. May 7, 2019) .............10

*Haitian Refugee Center v. Civiletti*,
　614 F.2d 92 (5th Cir. 1980) ...............................................................14

*Hallett v. Morgan*,
　296 F.3d 732 (9th Cir. 2002) ..............................................................20

*Henderson v. Thomas*,
　No. 2:11cv224–MHT, 2013 WL 5493197 (M.D. Ala. Sept. 30, 2013)
　(Thompson, J.) ....................................................................................22

*Jeff D. v. Otter*,
　643 F.3d 278 (9th Cir. 2011) ..............................................................19

*Jones v. Gusman*,
　296 F.R.D. 416 (E.D. La. 2013) ...................................................12, 21

*Joseph A. by Wolfe v. N.M. Dep't of Human Servs.*,
　69 F.3d 1081 (10th Cir. 1995) ......................................................19, 20

*Laube v. Campbell*,
　333 F. Supp. 2d 1234 (M.D. Ala. 2004) (Thompson, J.) ...................10

*Leatherwood v. Campbell*,
　7:02-cv-2812-KOB (N.D. Ala. June 24, 2004), ECF No. 165 ...........22

*Little v. Shelby Cty.*,
　No. 96-2520 M1/A, 2003 WL 23849734 (W.D. Tenn. Mar. 25, 2003) .......17, 18

*Morales Feliciano v. Calderon Serra*,
　300 F. Supp. 2d 321 (D.P.R. 2004) ...................................................17

*New York v. Hill*,
　528 U.S. 110 (2000) ...........................................................................14

*R.C. ex rel. Ala. Disabilities Advocacy Program v. Walley*,
　390 F. Supp. 2d 1030 (M.D. Ala. 2005) .......................................19, 20

*Reynolds v. Roberts*,
　202 F.3d 1303 (11th Cir. 2000) ..........................................................19

*Rouser v. White*,
　825 F.3d 1076 (9th Cir. 2016) ............................................................20

*Shores v. Sklar*,
  885 F.2d 760 (11th Cir. 1989) ...........................................................14

*Thomas v. Bryant*,
  614 F.3d 1288 (11th Cir. 2010) .........................................................25

*Trump v. Int'l Refugee Assistance Project*,
  137 S. Ct. 2080 (2017)......................................................................26

*United States v. Alabama*,
  No. 2:15cv368–MHT, 2015 WL 3796526 (M.D. Ala. June 18, 2015) .......10, 23

*United States v. Hardin*,
  139 F.3d 813 (11th Cir. 1998) ...........................................................16

*United States v. ITT Cont'l Baking Co.*,
  420 U.S. 223 (1975)...........................................................................19

*United States v. Mezzanatto*,
  513 U.S. 196 (1995)...........................................................................14

*United States v. Sec'y, Fla. Dep't of Corr.*,
  778 F.3d 1223 (11th Cir. 2015) .........................................................11

*United States v. Sec'y, Fla. Dep't of Corr.*,
  No. 12-22958-CIV-SEITZ/TURNOFF, 2015 WL 4768247 (S.D. Fla.
  Aug. 12, 2015) ..................................................................................11

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981)...........................................................................26

*White v. C.I.R.*,
  776 F.2d 976 (11th Cir. 1985) ...........................................................14

## Federal Statutes

18 U.S.C. § 3626....................................................................*passim*

## Other Authorities

Fed. R. Civ. P. 65(a).............................................................................26

## INTRODUCTION

This Court found that the Alabama Department of Corrections ("ADOC") has violated the Eighth Amendment rights of individuals in its custody in the provision of mental-health care, and declared ADOC's mental-health care to be "horrendously inadequate." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1267 (M.D. Ala. 2017) (hereinafter "Liability Opinion").

In response, the Parties painstakingly negotiated and agreed to relief covering nearly every aspect of mental-health care. They submitted their agreements to the Court to be entered as enforceable orders. Despite the fact that Defendants agreed to the relief and requested that the Court enter that relief as enforceable orders, Defendants now contest whether the relief complies with the Prison Litigation Reform Act ("PLRA"), which requires that prospective relief in prison conditions cases be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right" (otherwise known as the "need-narrowness-intrusiveness requirement"). 18 U.S.C. § 3626(a)(1)(A).

In this brief, Plaintiffs address several legal deficiencies in Defendants' arguments. First, Defendants have waived any ability to argue that the Phase 2A remedial orders and stipulations do not satisfy the PLRA. As a result, the Court need not make particularized findings that these remedies satisfy the PLRA. Second, the

1

Court need not enter its monitoring order or further define "substantial compliance" in that order before making PLRA findings for the remedial orders and stipulations. Third, the Court also need not find a "current and ongoing" constitutional violation under the PLRA at this time, because no such finding is necessary to implement an injunctive remedy under the PLRA. Fourth, none of the remedial orders are preliminary injunctions that terminated by operation of law.

Although the Court need not make particularized findings regarding the remedial stipulations' compliance with the PLRA, Plaintiffs also in this brief present extensive support from case law and the voluminous record in this case for why the remedial orders and stipulations comply with the PLRA. First, the fact that Defendants agreed to the remedial stipulations is compelling evidence that they satisfy the PLRA. Second, the record is replete with testimonial and documentary support for concluding that the remedies are necessary, narrowly drawn, and the least intrusive means necessary to address the constitutional violations identified by this Court. For the reasons set forth herein as well as at the upcoming evidentiary hearing, the Court should conclude that these remedies satisfy the PLRA.

## PROCEDURAL HISTORY

On June 27, 2017, the Court found Defendants in violation of the Eighth Amendment and found that mental-health care in ADOC is "[s]imply put, . . . horrendously inadequate." *Braggs*, 257 F. Supp. 3d at 1267. After

2

withholding judgment on the issue of "whether ADOC is conducting adequate periodic mental-health assessments of prisoners in segregation,"[1] *id.* at 1249, the Court issued a supplemental opinion on March 5, 2019, finding that "ADOC's failure to provide adequate periodic mental-health assessments of prisoners in segregation creates a substantial risk of serious harm for those prisoners, and . . . this failure has contributed to the Eighth Amendment violation discussed in the main liability opinion," *Braggs v. Dunn*, 367 F. Supp. 3d 1340, 1359 (M.D. Ala. 2019) (hereinafter "Supplemental Liability Opinion").

In September 2017, after two months of mediation on developing a comprehensive remedial plan, the Court severed the remedial phase into discrete issues:

> To be sure, in a sense all of the contributing factors identified in the court's June 27 opinion warrant urgent resolution. Indeed, a continuing Eighth Amendment violation, because it is "cruel and unusual," could be viewed as in need of swift and serious attention of both courts and the parties involved. Yet the court is convinced that breaking down the issues . . . will, in the long run, result in a more efficient, timely, and full resolution of this aspect of this litigation.

Doc. 1357 (Phase 2A Revised Remedy Scheduling Order on Eighth Amendment Claim) at 7-8; *see also id.* at 3 ("[B]ecause of the enormity and complexity of the remedy issue, it is better not to attack it all at once but rather to break it down and

---

[1] "The term 'restrictive housing' is simply another name for segregation, and the parties and the court use them interchangeably." *Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1241 n.10 (M.D. Ala. 2019).

approach it piecemeal[]. . . ."). Defendants did not object to that order or otherwise seek reconsideration of it.

Over subsequent months, the Court addressed these discrete issues one at a time. As part of this process, Defendants submitted multiple proposed remedial plans with the position that "[t]he State structured the Plans so that each requirement meets this [PLRA] standard." Doc. 1598 (State's Pretrial Br. Regarding Remedial Hr'g on Hospital-Level Care & Segregation) at 63;[2] *see also* Doc. 1478 (State's Pretrial Br. & Witness & Ex. List) at 41; Doc. 1872 (State's Phase 2A Pretrial Br. Regarding Psychotherapy) at 36; Doc. 1973 (State's Phase 2A Pretrial Br. Regarding Suicide Prevention & Crisis Care) at 41. The Court heard evidence and issued opinions and orders with PLRA findings regarding understaffing and immediate suicide prevention relief. *Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1251-87 (M.D. Ala. 2019); *Braggs v. Dunn*, No. 2:14-cv-601-MHT, 2018 WL 985759, at *8-9 (M.D. Ala. Feb. 20, 2018). The Parties also negotiated and submitted a series of remedial stipulations for the Court to enter as orders. The following remedial orders and stipulations did not include explicit PLRA findings and are at issue at the upcoming evidentiary hearing:

1. Phase 2A Order Re: Segregation Remedy (Doc. 1720) (hereinafter "Segregation Remedy");

---

[2] When internal pagination conflicts with ECF pagination, Plaintiffs refer to the latter. When there is no pagination, Plaintiffs refer to the PDF page number.

2. Phase 2A Order and Injunction and Stipulations Re: Bibb Segregation Remedy (Docs. 1751, 1751-1) (hereinafter "Bibb Segregation Remedy");

3. Phase 2A Order and Injunction and Stipulations on Mental-Health Identification and Classification Remedy (Coding) (Docs. 1792, 1792-1) (hereinafter "Coding Remedy");

4. Phase 2A Order and Injunction and Stipulations on Mental-Health Identification and Classification Remedy (Intake) (Docs. 1794, 1794-1) (hereinafter "Intake Remedy");

5. Phase 2A Order and Injunction and Stipulations on Segregation Remedy (Pre-Placement, Mental-Health Rounds, Periodic Evaluations) (Docs. 1815, 1815-1) (hereinafter "Segregation Rounds, Assessments, and Evaluations Remedy");

6. Phase 2A Order and Injunction, Stipulations, and Additional Stipulations on Mental-Health Identification and Classification Remedy (Referral) (Docs. 1821, 1821-1, 1821-2) (hereinafter "Referral Remedy");

7. Phase 2A Order and Injunction and Stipulations on Mental-Health Individualized Treatment Planning Remedy (Docs. 1865, 1865-1) (hereinafter "Treatment Planning Remedy");

8. Phase 2A Order and Injunction and Stipulations on Mental-Health Psychotherapy and Confidentiality Remedy (Docs. 1899, 1899-1) (hereinafter "Psychotherapy Remedy");

9. Phase 2A Order and Injunction, Stipulations, and Form on Confidentiality (Docs. 1900, 1900-1, 1900-2) (hereinafter "Confidentiality Remedy");

10. Joint Notice of Filing, Amended Stipulations, and Administrative Regulation Regarding the Provision of Hospital-Level Care (Docs. 2383, 2383-1, 2383-2) (hereinafter "Hospital-Level Care Remedy");

11. Joint Notice of Filing, Second Amended Stipulations, and Administrative Regulations Regarding Phase 2A Mental Health Consultation to the Disciplinary Process (Docs. 2433, 2433-1) (hereinafter "Disciplinary Process Remedy"); and

12. Stipulations Regarding Suicide Prevention Measures (Doc. 2606-1)

(hereinafter "Suicide Prevention Remedy").[3]

All of these remedies were negotiated agreements, and all but the last three have been entered by the Court as permanent injunctions at the express request of the Parties, often following lengthy colloquies with the Court.[4]

Each time the Court reviewed the appropriateness of remedial stipulations, the Court either asked the Parties whether the stipulations should be entered as an order or indicated that it would reduce them to an order. In every instance until the Court

_____

[3] Other remedial requirements not included on this list do not require PLRA findings at this time. First, while the Phase 2A Order and Injunction and Stipulations Regarding Stopgap Measures for Removing Inmates with Serious Mental Illness from Segregation (Docs. 1861, 1861-1) (hereinafter "Stopgap Measures") lacked PLRA findings, that order is no longer needed after other remedial orders have gone into effect. Second, the Phase 2A Order and Injunction and Contempt Stipulations Regarding Mental-Health Understaffing (Docs. 2301, 2301-1) (hereinafter "Staffing Contempt Remedy") also lacked PLRA findings, but that order was a clarification of a prior remedy and an agreement regarding enforcement procedures, not a remedy in and of itself. *See infra* Section X (explaining this further). Finally, the mental-health staffing requirements in Doc. 2606 (Notice of Filing of Status of Negotiations & Agreements), and the matrix in Doc. 2618-1 (Mental Health Staffing by Facility), were adopted and ordered in Doc. 2688 (Phase 2A Order & Inj. on Mental-Health Staffing Remedy), Doc. 2688-1 (Stipulations), and Doc. 2688-2 (Mental Health Staffing by Facility). "The parties agreed that these stipulations should be reduced to an order, which they agree will be enforceable under the court's initial understaffing remedial order and opinion containing PLRA findings." Doc. 2688 at 1.

[4] In addition, the Court held an evidentiary hearing and recently entered a remedial opinion and order on Residential Treatment Units and Stabilization Units. *Braggs v. Dunn*, No. 2:14cv601-MHT, 2020 WL 2789880 (M.D. Ala. May 29, 2020). That issue is currently being briefed and set for argument at the upcoming hearing. *See* Doc. 2892 (Phase 2A Revised Remedy Scheduling Order on the Eighth Amendment Claim) at 6-7. The Court has held evidentiary hearings, but has not yet entered full remedial orders, on segregation and monitoring. *See id.* at 4, 6.

considered the Hospital-Level Care Remedy and Disciplinary Process Remedy in early 2019, *see* Feb. 7, 2019 R.D. Hr'g Tr., at 74:21-75:9, Defendants "agreed that the stipulations should be reduced to an enforceable order," Doc. 1751 at 1; Doc. 1792 at 1; Doc. 1794 at 1; Doc. 1815 at 1; Doc. 1821 at 1; Doc. 1865 at 1; Doc. 1899 at 1; Doc. 1900 at 1; *see* Doc. 1720 at 1; Feb. 28, 2018 R.D. Trial Tr., at 3:5-4:11 (presenting Segregation Remedy stipulations in open court).

Eighteen months after this Court instituted the incremental remedial process, despite having repeatedly agreed that stipulated remedies should be entered as enforceable remedial orders, and despite having represented to the Court that they intend to comply with the remedial orders, in March 2019, Defendants stated that they "cannot agree that all of the remedial stipulations previously approved and adopted meet the 'need-narrowness-intrusiveness' requirements" of the PLRA. Doc. 2382 (State's Statement Regarding the PLRA's "Need-Narrowness-Intrusiveness" Requirements) at 1. Similarly, despite having *proposed* several remedial plans that Defendants argued at the time met the PLRA's requirements, *see* Doc. 1598 at 63; Doc. 1478 at 41; Doc. 1872 at 36; Doc. 1973 at 41, Defendants now take the position that "[a]ny evaluation of the PLRA's need-narrowness-intrusiveness requirement cannot occur until the Court enacts the entire scope of the relief to be granted in this matter," Doc. 2382 at 2.

The Court sought clarity on Defendants' current position during the suicide

prevention remedial trial in April 2019:

> THE COURT: Why would the defendants enter into stipulated remedial orders that didn't meet PLRA?
>
> MR. LUNSFORD: Well, we don't know –
>
> THE COURT: As a practical matter, why?
>
> MR. LUNSFORD: Well, as a practical matter, I think the answer would be they could. It's possible they could. It's just we can't say they don't.
>
> THE COURT: Well, I'm just talking about as a practical matter, why would any institution enter into an order that didn't comply with the PLRA? I'm just trying to understand the logic behind that. I'm not saying that it necessarily always follows. It's more of a factual issue than a legal issue. So why would you do it?

Apr. 8, 2019 Trial Tr., at 162:13-162:25; *see also id.* at 163:8-164:11, 166:12-168:6.

On December 20, 2019, while settlement negotiations proceeded, the Parties temporarily agreed that the first eleven of the twelve above-listed stipulated remedies satisfy the PLRA need-narrowness-intrusiveness requirement. Doc. 2706-1 (Agreement) at 2-4. On January 10, 2020, the Court entered an order finding that these stipulated remedies satisfy the PLRA need-narrowness-intrusiveness requirement until May 11, 2020. Doc. 2716 (Phase 2A Op. & Interim Inj. with Regard to 11 Joint Stipulations); Doc. 2717 (Phase 2A Op. & Interim Inj. with Regard to Stipulation on Provision of Hospital-Level Care); Doc. 2724-1 (Stipulations & Administrative Regulation for Hospital-Level Care); Doc. 2718 (Phase 2A Op. & Interim Inj. with Regard to Stipulation on Mental-Health

8

Consultation to the Disciplinary Process); Doc. 2725-1 (Stipulations & Administrative Regulations on Mental-Health Consultation to the Disciplinary Process).[5] Pursuant to a joint request by the Parties after the evidentiary hearing on this issue was continued in light of the COVID-19 pandemic, the Court extended this order regarding temporary compliance with the PLRA "until either the Court's resolution of whether [the remedial orders] comply with the PLRA's need-narrowness-intrusiveness requirement or December 30, 2020, whichever is earlier." Doc. 2793 (Phase 2A Order & Interim Inj. with Regard to Thirteen Stipulations & Associated Orders) at 6.[6] The Court also approved the last of the twelve stipulated remedies at issue—the Suicide Prevention Remedy—"subject to latter consideration of whether [the stipulations] comply with the" PLRA.[7] Doc. 2699 (Phase 2A Order Approving Suicide-Prevention Agreement); Doc. 2699-1 (Suicide Prevention Measures).

The issues now before the Court are (1) whether Defendants can object at this

---

[5] In the Joint Statement of All Orders, Stipulations, and Agreements at Issue for the PLRA Evidentiary Hearing, the Parties listed Docs. 2717 and 2724-1 for the Hospital-Level Care Remedy and Docs. 2718 and 2725-1 for the Disciplinary Process Remedy. Doc. 2776 at 2. The remedial requirements in these filings are the same as in Docs. 2383-1, 2383-2, and 2433-1, which Plaintiffs reference in this brief.

[6] Although the Court made temporary PLRA findings for the Stopgap Measures and Staffing Contempt Remedy, Doc. 2716 at 7; Doc. 2793 at 4-5, the Court need not make additional PLRA findings for those agreements at this time, *see supra* n.3; *infra* Section X.

[7] The unique procedural history leading up to the Suicide Prevention Remedy is discussed below at Section XIII.

stage to the Phase 2A stipulated remedies' compliance with the PLRA's need-narrowness-intrusiveness requirement, and (2) whether the Phase 2A remedial orders and stipulations comply with this need-narrowness-intrusiveness requirement.

## LEGAL STANDARD

When parties agree on remedies in prison conditions litigation, they typically also agree on PLRA findings. *See, e.g.*, *Gumm v. Ford*, No. 5:15-CV-41 (MTT), 2019 WL 2017497, at \*3 (M.D. Ga. May 7, 2019); *Braggs v. Dunn*, No. 2:14cv601-MHT, 2017 WL 5665334, at \*11 (M.D. Ala. Nov. 27, 2017) (approving involuntary medication settlement, including the Parties' PLRA stipulations); *Dunn v. Dunn*, 318 F.R.D. 652, 682-83 (M.D. Ala. 2016) (approving Phase 1 Americans with Disabilities Act ("ADA") settlement, including the Parties' PLRA stipulations); *United States v. Alabama*, No. 2:15cv368–MHT, 2015 WL 3796526, at \*3 (M.D. Ala. June 18, 2015) (Thompson, J.); *Laube v. Campbell*, 333 F. Supp. 2d 1234, 1239 (M.D. Ala. 2004) (Thompson, J.); Jt. Mot. to Enter Consent Agreement, *United States v. Miami-Dade Cnty.*, No. 1:13-cv-21570 (S.D. Fla. May 1, 2013), ECF No. 5 at 2; Consent Decree, *United States v. Clay Cnty.*, No. 4:97-cv-151 (M.D. Ga. Aug. 20, 1997), at 14-15. In such cases, courts need not make *particularized* PLRA findings since need-narrowness-intrusiveness is not in dispute. As the Eleventh Circuit clarified, "Of course, we do not mean to suggest that the district court must

conduct an evidentiary hearing about or enter particularized findings concerning any facts or factors about which there is not dispute. The parties are free to make any concessions or enter into any stipulations they deem appropriate." *Cason v. Seckinger*, 231 F.3d 777, 785 n.8 (11th Cir. 2000).

Courts thus must make particularized findings only where need-narrowness-intrusiveness is in dispute. In such cases, courts must make "particularized findings, on a provision-by-provision basis, that each requirement imposed" meets the PLRA's need-narrowness-intrusiveness mandate. *Id.* at 785 (addressing termination of prospective relief under § 3626(b)(3)); *see United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1228 (11th Cir. 2015) ("We see no reason why the term 'finds' in § 3626(a)(1) does not require the same particularity as the term 'findings' in § 3626(b)(3)." (citing *Cason*, 231 F.3d at 785; *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972))); *see also United States v. Sec'y, Fla. Dep't of Corr.*, No. 12-22958-CIV-SEITZ/TURNOFF, 2015 WL 4768247, at *2-4 (S.D. Fla. Aug. 12, 2015) (making particularized findings). A "provision" for purposes of this analysis is "the paragraph or paragraphs of the [remedial order] that concern a specific . . . condition." *Benjamin v. Fraser*, 156 F. Supp. 2d 333, 343-44 (S.D.N.Y. 2001). "Narrow tailoring requires a fit between the remedy's ends and the means chosen to accomplish those ends." *Brown v. Plata*, 563 U.S. 493, 531 (2011) (internal quotation marks and alteration omitted). That is, the "scope of the remedy

must be proportional to the scope of the violation," *id.*, but "[n]arrow tailoring does not require perfection," *Jones v. Gusman*, 296 F.R.D. 416, 429 (E.D. La. 2013) (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).

"Although the need-narrowness-intrusiveness requirement for prospective relief 'might at first glance seem to equate permissible remedies with constitutional minimums, a remedy may require more than the bare minimum the Constitution would permit and yet still be necessary and narrowly drawn to correct the violation.'" *Benjamin v. Schriro*, 370 F. App'x 168, 170 (2d Cir. 2010) (quoting *Benjamin v. Fraser*, 343 F.3d 35, 54 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009)). "Over-inclusive remedies are permissible when they provide practicable 'means of effectuati[on].'" *Id.* (quoting *Benjamin*, 343 F.3d at 54); *Benjamin*, 343 F.3d at 54 (concluding that comprehensive window repair was necessary and narrowly drawn relief "[g]iven the impracticability of the court examining each window").

The PLRA also requires the Court to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." § 3626(a)(1)(A).

## DISCUSSION

Each of the Phase 2A remedial orders and stipulations before the Court satisfies the PLRA's need-narrowness-intrusiveness requirement. But before

12

Plaintiffs discuss each, there are several points of law that bear emphasizing. First, the Court need not make particularized PLRA findings for the Phase 2A remedial orders and stipulations because Defendants have waived any ability to dispute whether the remedies comply with the PLRA. Second, the fact that all the Phase 2A remedial orders and stipulations were negotiated agreements is compelling evidence that they satisfy the PLRA. Third, the Court need not further define "substantial compliance" before it makes PLRA findings. Fourth, the Court is not required to find a "current and ongoing" constitutional violation to make the PLRA findings. Finally, none of the remedial orders are preliminary injunctions that expired by operation of law.

## I.     Defendants Have Waived Their Right to Contest Whether the Phase 2A Remedial Orders and Stipulations Satisfy the PLRA

The Court need not make particularized PLRA findings for the Phase 2A remedial orders and stipulations because Defendants have waived any ability to dispute whether these remedies comply with the PLRA.

First, Defendants have waived any ability to argue that the first nine remedial orders at issue do not comply with the PLRA because they agreed to the stipulations underlying the remedial orders and agreed that the Court should enter those stipulations as enforceable orders and injunctions. *See* Doc. 1751 at 1; Doc. 1792 at 1; Doc. 1794 at 1; Doc. 1815 at 1; Doc. 1821 at 1; Doc. 1865 at 1; Doc. 1899 at 1; Doc. 1900 at 1; *see* Doc. 1720 at 1; Feb. 28, 2018 R.D. Trial Tr., at 3:5-4:11. Courts

"presume[] that statutory provisions"—like the PLRA's need-narrowness-intrusiveness requirement—"are subject to waiver by voluntary agreement of the parties." *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995) (citing *Evans v. Jeff D.*, 475 U.S. 717, 730-32 (1986)). And "[t]he law is clear" that where "parties have agreed to entry of an order or judgment without any reservation relevant to the issue" that one party later seeks to challenge, "one party may not later seek to upset the judgment, unless lack of actual consent or a failure of subject matter jurisdiction is alleged." *Shores v. Sklar*, 885 F.2d 760, 762 (11th Cir. 1989) (internal quotation marks omitted) (quoting *Dorse v. Armstrong World Indus., Inc.*, 798 F.2d 1372, 1375 (11th Cir. 1986)) (citing *White v. C.I.R.*, 776 F.2d 976 (11th Cir. 1985); *Haitian Refugee Center v. Civiletti*, 614 F.2d 92 (5th Cir. 1980)); *see also, e.g.*, *New York v. Hill*, 528 U.S. 110, 114 (2000) (holding that by "assent[ing] to delay on the applicable time limits" for commencing trial, a criminal defendant waived the right to enforce the deadline). Defendants do not allege that they did not actually consent to the entry of the stipulations as orders. Nor do Defendants allege that this Court lacked subject matter jurisdiction to enter them. Consequently, Defendants cannot now contest whether these remedial orders satisfy the PLRA.

Second, as applied to all the remedial orders and stipulations at issue, Defendants have waived any right to argue their sole stated basis for not agreeing to PLRA findings at this time—namely, that "[a]ny evaluation of the PLRA's need-

14

narrowness-intrusiveness requirement cannot occur until the Court enacts the entire scope of the relief." Doc. 2382 at 2. As mentioned above, Defendants had already requested that the Court enter nine of the remedial stipulations at issue as enforceable orders and injunctions before injecting this argument. Defendants raised no such dispute at the time the Court considered any of those nine stipulations. In addition, as mentioned above, Defendants submitted several proposed remedial plans, asserting that "[t]he State structured the Plans so that each requirement meets this [PLRA] standard." Doc. 1598 at 63; *see also* Doc. 1478 at 41; Doc. 1872 at 36; Doc. 1973 at 41. Since Defendants have already conceded that less than all relief satisfied the PLRA in connection with these proposed plans, the Court should not entertain their current argument contending that relief to which they later agreed cannot satisfy the PLRA. Moreover, Defendants' argument is at odds with Eleventh Circuit precedent regarding particularized findings under the PLRA. *See Cason*, 231 F.3d at 785 (explaining that courts should make "particularized findings, on a provision-by-provision basis, that each requirement imposed" satisfies the PLRA's need-narrowness-intrusiveness requirement when need-narrowness-intrusiveness is in dispute).

Finally, Defendants also have waived any argument that certain specific remedial requirements do not satisfy the PLRA. Defendants have indicated that they may challenge the validity of certain provisions. *See* Doc. 2528 (State's Resp.

15

Regarding Application of the PLRA's Need-Narrowness-Intrusiveness Requirements to the Phase 2A Remedial Issues) at 10. Defendants have waived any ability to do so for the reasons discussed above. In addition, as further discussed below, the remedial orders and stipulations include some requirements that were proposed by Defendants in a remedial plan, and some other requirements that are less intrusive than what Defendants proposed in a remedial plan. Because Defendants argued that their remedial plans satisfied the PLRA, *see* Doc. 1598 at 63; Doc. 1478 at 41; Doc. 1872 at 36; Doc. 1973 at 41, Defendants cannot now argue that the PLRA is not satisfied with respect to these requirements.

Because Defendants have waived their ability to contest whether the remedial orders and stipulations satisfy the PLRA, Plaintiffs need not offer evidence that the remedial orders comply with the PLRA and the Court need not make particularized PLRA findings.[8] *See Cason*, 231 F.3d at 785 n.8; *c.f., e.g.*, *United States v. Hardin*, 139 F.3d 813, 816 (11th Cir. 1998) (holding that a stipulation relieves the government of its burden in a criminal prosecution to introduce evidence on that stipulation). To conclude that a viable dispute exists as to whether the remedial orders and stipulations comply with the PLRA would permit Defendants and other correctional entities to enter into agreements only to then challenge the legal validity

---

[8] In case the Court concludes that it should make particularized PLRA findings, Plaintiffs cite extensively to the record in this case and plan to present additional evidence at the upcoming evidentiary hearing in support of such findings.

of those agreements, invite unnecessary judicial scrutiny of those agreements, and delay implementation of relief. *See Benjamin*, 343 F.3d at 53 (recognizing that PLRA "was intended in part to prevent judicial micro-management").

## II. Defendants' Agreement to the Phase 2A Remedial Orders and Stipulations Is Compelling Evidence That They Satisfy the PLRA

Even if Defendants' current about-face were cognizable as a *legal* matter, as an evidentiary matter, their agreement to the remedial stipulations and orders constitutes compelling evidence that these remedies satisfy the PLRA. All the remedial stipulations and orders listed above and discussed below were negotiated agreements. "[W]here, as here, the provisions of relief ordered by a court are adopted from an agreement jointly drafted and reached by the parties, it is compelling evidence that the provisions comply with the needs-narrowness-intrusiveness criteria." *Braggs*, 383 F. Supp. 3d at 1253 (citing *Morales Feliciano v. Calderon Serra*, 300 F. Supp. 2d 321, 334 (D.P.R. 2004); *Benjamin*, 156 F. Supp. 2d at 344; *Cason*, 231 F.3d at 785 n.8); *see also Little v. Shelby Cty.*, No. 96-2520 Ml/A, 2003 WL 23849734, at *2 (W.D. Tenn. Mar. 25, 2003) ("Where the parties in jail reform litigation agree on a proposed remedy, or modification of a proposed remedy, the Court will engage in *limited* review for the purpose of assuring continued compliance with existing orders and compliance with the Prison Litigation Reform Act." (emphasis added)). "Clearly, the least intrusive means in this case is that advocated by the parties themselves and determined by the parties and the court-

appointed experts as being in the interest of both inmate and public safety." *Little*, 2003 WL 23849734, at *2. "Indeed, common sense dictates that, as a general proposition, a penal institution would release to a court or other outside entity only as much of its discretion and authority as it believes the law and facts require." *Braggs*, 383 F. Supp. 3d at 1253.

The fact that Defendants, in their official capacities, agreed to these remedies is similarly powerful evidence that the remedial orders and stipulations satisfy the PLRA's requirement that a court give substantial weight to any adverse impact on public safety. Here, too, common sense dictates that Defendants would not agree to remedies that would have an undue impact on public safety or the operation of the Alabama criminal legal system of which it is a part.

Ultimately, Defendants agreed to the Phase 2A remedial stipulations and affirmatively requested that the Court enter them as enforceable orders. This is compelling evidence that the remedial orders satisfy the PLRA.

## III.   The Court Need Not Further Define "Substantial Compliance" Before It Makes the Need-Narrowness-Intrusiveness Findings

Defendants have recently taken the position that the Court must issue its monitoring order and specifically define "substantial compliance" in the order before "[a]ny evaluation" of whether the remedial stipulations and orders satisfy the PLRA's need-narrowness-intrusiveness requirement. Doc. 2382 at 2-4 & n.2; *see* Apr. 8, 2019 Trial Tr., at 163:8-164:11. Defendants are incorrect.

"Substantial compliance" is a legal term of art that recurs across a whole body of case law, but "the touchstone of the substantial compliance inquiry is whether Defendants frustrated the purpose of the consent decree – i.e. its essential requirements." *R.C. ex rel. Ala. Disabilities Advocacy Program v. Walley*, 390 F. Supp. 2d 1030, 1044 (M.D. Ala. 2005) (quoting *Joseph A. by Wolfe v. N.M. Dep't of Human Servs.*, 69 F.3d 1081, 1086 (10th Cir. 1995)). This doctrine has its roots in contract law. "As a general matter, the rules [courts] use to interpret a consent decree are the same ones [courts] use to interpret a contract—since a consent decree is a form of contract." *Reynolds v. Roberts*, 202 F.3d 1303, 1312 (11th Cir. 2000). "Because consent decrees have 'many of the attributes of ordinary contracts [and] . . . should be construed basically as contracts,' the doctrine of substantial compliance, or substantial performance, may be employed." *Jeff D. v. Otter*, 643 F.3d 278, 283-84 (9th Cir. 2011) (alteration in original) (citation omitted) (quoting *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 (1975)). Both in contract law and in the interpretation of consent decrees:

> Substantial compliance is: simply a doctrine to assist the court in determining whether conduct should, in reality, be considered the equivalent of compliance under the contract. Judge Cardozo, in the seminal substantial compliance case of *Jacob & Youngs, Inc. v. Kent*, concluded that performance of a contract will not be considered in substantial compliance of the contract if the deviation from the contract requirements in any real substantial measure frustrates the purpose of the contract. Thus, the touchstone of the substantial compliance inquiry is whether Defendants frustrated the purpose of the consent decree – i.e. its essential requirements.

*R.C.*, 390 F. Supp. 2d at 1044 (internal alterations, quotation marks, and citation omitted) (quoting *Joseph A. by Wolfe*, 69 F.3d at 1085-86).

Courts for many decades have been able to assess substantial compliance with these basic precepts in mind. This Court need not further define it. There is no case law supporting the argument that a court must define every detail of "substantial compliance" in a particular instance—much less with a numerical threshold—*before* it can make need-narrowness-intrusiveness findings. And indeed, it would make little sense for the Court to do so, given the PLRA's mandate to assess whether the relief *as written* is the least intrusive means necessary to address the constitutional violations. The question of what degree of performance is substantial compliance arises *after* relief has been entered when compliance is being evaluated, primarily in the context of a motion to terminate a consent decree or consideration of contempt. *See, e.g.*, *Rouser v. White*, 825 F.3d 1076, 1081-82 (9th Cir. 2016) (concluding that district court improperly terminated the consent decree because it "didn't evaluate whether defendants substantially complied with each of the 2011 [Consent] Decree's terms"); *Hallett v. Morgan*, 296 F.3d 732, 749-51 (9th Cir. 2002) (affirming denial of contempt motion on the basis that district court appropriately concluded that prison substantially complied with consent decree requirements to provide proper mental-health and dental services); *Benjamin v. Schriro*, No. 75 Civ. 3073(HB), 2009 WL 3464286, at *4, 12 (S.D.N.Y. Oct. 26, 2009) (granting motion to terminate

based on conclusion that, "while there remain some issues with regard to Defendants' compliance, the record reflects that [the New York City Department of Corrections] has substantially complied with its obligations"). The Parties are not in that posture.

Even when courts do speak of "substantial compliance" before making PLRA findings, they do not define "substantial compliance" in numerical terms. *See, e.g.*, *Jones*, 296 F.R.D. at 462-63, 470 (approving settlement that defines "substantial compliance" as "compliance with most or all components of the relevant provision of the Agreement," over an objection that the definition did not include "objective, quantifiable targets"). Indeed, Plaintiffs' expert Dr. Kathryn Burns testified that, in her experience as a monitor and as someone who has overseen a system subject to monitoring, "the Court has not set out exact percentages with respect to compliance" at the outset of monitoring. Dr. Kathryn Burns, Apr. 10, 2019 Trial Tr., at 19:19-21. To set out such percentages would reduce what is properly a qualitative assessment to a mere counting exercise.

ADOC's own litigation history shows that the Court need not attach a numerical threshold to "substantial compliance" before making need-narrowness-intrusiveness findings, and that such a definition is not necessary for Defendants to agree to such findings. For example, in *Henderson v. Thomas*, the parties, including the then-ADOC Commissioner, entered into a settlement agreement that did not use

21

the term "substantial compliance." Settlement Agreement, *Henderson v. Thomas*, 2:11-cv-224-MHT (M.D. Ala. Aug. 6, 2013), ECF No. 287-1. The settlement agreement included stipulations regarding PLRA need-narrowness-intrusiveness findings. *Id.* at 20. This Court approved the settlement and entered it as an order. *Henderson v. Thomas*, No. 2:11cv224–MHT, 2013 WL 5493197, at \*10 (M.D. Ala. Sept. 30, 2013) (Thompson, J.).

In *Leatherwood v. Campbell*, the parties, including the then-ADOC Commissioner, entered into a settlement agreement that also did not include the term "substantial compliance." Settlement Agreement, *Leatherwood v. Campbell*, 7:02-cv-2812-KOB (N.D. Ala. May 17, 2004), ECF No. 159-1. The settlement agreement included stipulations regarding PLRA need-narrowness-intrusiveness findings. *Id.* at 16-17. The court approved the settlement. *Leatherwood v. Campbell*, 7:02-cv-2812-KOB (N.D. Ala. June 24, 2004), ECF No. 165.

In *United States v. Alabama* (also known as the "Tutwiler case"), the settlement agreement defined "substantial compliance" as "material compliance with most or all components of the relevant provision of the Agreement." Settlement Agreement, *United States v. Alabama*, 2:15-cv-368-MHT (M.D. Ala. May 28, 2015), ECF No. 2-1 at 3. The agreement also stated, "'Material Compliance' requires that, for each provision, ADOC and Tutwiler have developed and implemented a policy incorporating the requirement, trained relevant personnel on the policy, and

22

relevant personnel are complying with the requirement in actual practice." *Id.* The Parties also agreed on PLRA findings. *Id.* at 42. This Court approved the settlement agreement and entered it as an order. *Alabama*, 2015 WL 3796526, at *4-5.

In the involuntary medication settlement in this case, the Parties used the term "substantial compliance" but did not define it. Doc. 1354 (Phase 2A Involuntary Medication Consent Decree) at 10. The Parties also agreed to PLRA findings. *Id.* at 17-18. The Court approved the settlement. *Braggs*, 2017 WL 5665334, at *12.

In the Phase 1 ADA settlement in this case, the Parties agreed to a definition of "substantial compliance" that does not include a precise numerical threshold. Doc. 728 (Consent Decree Concerning Claims Arising Under the Americans with Disabilities Act & § 504 of the Rehabilitation Act of 1973) at 8. The Parties also agreed to PLRA findings. *Id.* at 73. The Court approved the settlement. *Dunn*, 318 F.R.D. at 684. And in the Phase 2A ADA settlement, the Parties used the term "substantial compliance" without defining it. *See* Doc. 1100 (Settlement Agreement Concerning Mental Health Claims Arising Under the Americans with Disabilities Act & § 504 of the Rehabilitation Act of 1973) at 10-11, 20-21. The Parties agreed to PLRA findings. *Id.* at 20. The Court also approved that settlement, agreeing with the Parties that the agreement met the need-narrowness-intrusiveness requirement. *Braggs v. Dunn*, 321 F.R.D. 653, 676 (M.D. Ala. 2017).

As these cases clearly illustrate, Defendants can and have agreed that relief

satisfies the need-narrowness-intrusiveness requirement without assigning numerical values to *how* compliance will be measured. Their present argument to the contrary is unsupported by legal authority or their own practices. The Court need not set a quantifiable definition of "substantial compliance" before making need-narrowness-intrusiveness findings.

## IV.  The Court Is Not Tasked with Finding a "Current and Ongoing" Constitutional Violation at This Juncture

Defendants' argument that the Court must find a "current and ongoing" constitutional violation, *see* Doc. 2528 at 7-10, reflects a fundamental misunderstanding of this case's procedural posture and the PLRA. The Court already has found Defendants liable for violating the Eighth Amendment. In this post-liability remedial posture, the Court need not make additional liability findings to make the need-narrowness-intrusiveness findings. It simply must make PLRA findings to conclude this remedial process.

Defendants' argument confuses the PLRA's separate requirements for the initial entry of injunctive relief and the termination of previously granted relief. The task before the Court—to make need-narrowness-intrusiveness findings—falls under § 3626(a)(1)(A), which governs the *initial* entry of injunctive relief. The section of the PLRA that requires a showing of a "current and ongoing" constitutional violation falls under § 3626(b), which applies to the termination of previously granted relief. *See* § 3626(b)(3) ("Prospective relief shall not terminate if

the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.").

The Eleventh Circuit has explicitly recognized that "the 'current and ongoing' requirement is distinct from the standard governing the *initial* entry of injunctive relief." *Thomas v. Bryant*, 614 F.3d 1288, 1320 (11th Cir. 2010) (emphasis added) (citing *Cason*, 231 F.3d at 784); *see also Austin v. Wilkinson*, 372 F.3d 346, 360 (6th Cir. 2004) (finding that district court did not err in failing to make findings that remedial orders were necessary to correct "current and ongoing" federal violations prior to ordering prospective relief because this "language comes from § 3626(b)(3), governing the *termination* of relief, not from § 3626(a), governing requirements for initial relief"), *aff'd in part, rev'd in part and remanded on other grounds*, 545 U.S. 209 (2005).

In support of their argument that the Court must find a current and ongoing constitutional violation, Defendants cite to *Cason*. But *Cason* supports Plaintiffs' argument; it involved a motion to terminate under § 3626(b)(3), not relief ordered in the first instance under § 3626(a). Doc. 2528 at 7 (citing *Cason*, 231 F.3d at 784-85). There is no connection between the PLRA's need-narrowness-intrusiveness

requirement for prospective relief and the "current and ongoing violation" language in the PLRA provision governing termination of relief.

## V.  None of the Phase 2A Remedial Orders Are Preliminary Injunctions That Terminated by Operation of Law

Defendants' argument that the stipulated remedial orders entered prior to March 2019 are expired preliminary injunctions under § 3626(a)(2), Doc. 2528 at 6, reflects yet another fundamental misunderstanding of this case's procedural posture and the PLRA. Section 3626(a)(2) explicitly governs preliminary injunctive relief, which is issued prior to a liability finding. *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (noting that the purpose of a preliminary injunction "is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward" (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981))); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 783 (9th Cir. 2019) (noting that the PLRA's ninety-day expiration provision in § 3626(a)(2) applies only to preliminary injunctive relief); Fed. R. Civ. P. 65(a). The Court entered the remedial orders after it found Defendants liable under the Eighth Amendment. The remedial orders therefore cannot represent preliminary injunctive relief. Because they are not preliminary injunctions, they did not terminate after ninety days as Defendants claim.

Moreover, the timelines for implementation of relief set out in many of the remedial orders, as well as Defendants' representations to the Court about remedial

26

orders remaining in effect beyond ninety days, belie any argument that the remedial orders are merely preliminary injunctions. *See* Doc. 2520 (Pls. Initial Br. for Upcoming Oral Arg. on May 14, 2019) at 15-16 (expanding on this argument).

## RECORD EVIDENCE SUPPORTING PLRA FINDINGS

During the upcoming evidentiary hearing, Plaintiffs will present testimony from their correctional mental-health expert Dr. Kathryn Burns and correctional administration expert Eldon Vail about whether each remedial agreement is necessary, narrowly drawn, and the least intrusive means of correcting the constitutional violations found by the Court. Dr. Burns is a psychiatrist with extensive experience in correctional systems, including nearly a decade as the chief clinical officer leading mental-health services for the Ohio Department of Rehabilitation and Corrections, and broad experience as clinical expert and monitor in class action litigation. *See* Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 114:9-115:9. Mr. Vail has thirty-five years of experience in juvenile and adult corrections, including as a superintendent (or warden-equivalent) and as the Secretary (or Commissioner-equivalent) of the Washington State Department of Corrections, as a correctional consultant, and as an expert in litigation. *See* Eldon Vail, Dec. 22, 2016 Trial Tr., at 4:22-7:16.

As outlined below, the record from the liability trial[9] and remedial proceedings is already replete with evidence supporting findings that the remedies at issue are necessary, narrowly drawn, and the least intrusive means of addressing Defendants' constitutional violations. This includes testimony by experts and consultants on both sides, including Dr. Burns, Mr. Vail, Plaintiffs' correctional mental-healthcare expert Dr. Craig Haney, Defendants' staffing consultants Meg and Russ Savage, Defendants' correctional administration expert Robert Ayers, Defendants' correctional mental-healthcare expert Dr. Raymond Patterson, and Defendants' correctional mental-healthcare consultant Dr. Mary Perrien. The record supporting need-narrowness-intrusiveness findings also provides support for the Court to conclude that there is no undue "adverse impact on public safety or the operation of a criminal justice system caused by the relief." § 3626(a)(1)(A).

## I.    SEGREGATION REMEDY (Doc. 1720)

In the Liability Opinion, the Court made clear that "prisoners with the most serious mental-health needs—that is, those who have conditions classified as serious mental illnesses" ("SMIs")—are at a "heightened level of danger" posed by segregation. *Braggs*, 257 F. Supp. 3d at 1235; *see also id.* at 1245-47. The Court

---

[9] Due to the large amount of evidence presented at the liability trial that supports the PLRA findings, Plaintiffs have included only highlights of that evidence in this brief. For a fuller compilation of evidence from the liability trial that supports PLRA findings with respect to need and intrusiveness, see Doc. 1140 (Pls. Chart Summarizing Evid.).

also concluded that prisoners with SMIs are particularly vulnerable because "ADOC's mental-health coding system often fails to accurately reflect prisoners' mental-health needs." *Id.* at 1204-05.

To address these findings, the Parties agreed to the Segregation Remedy and stated its provisions on the record on February 28, 2018. Feb. 28, 2018 R.D. Trial Tr., at 3:5-4:15. The Court reduced the stipulations to an order on March 30, 2018. Doc. 1720.

Evidence presented at the liability trial demonstrates that the Segregation Remedy is necessary. For example, Dr. Burns testified that ADOC's coding system at the time of the liability trial failed to identify whether someone had an SMI. Dr. Kathryn Burns, Dec. 12, 2016 Trial Tr., at 65:23-66:9. She also testified that prisoners with SMIs were overrepresented in segregation. *See id.* at 26:16-27:6. Associate Commissioner Ruth Naglich agreed with the Court that "[i]t's a serious matter . . . when the [prisoner with an] SMI is in segregation." Assoc. Comm'r Ruth Naglich, Dec. 22, 2016 Trial Tr., at 68:21-25.

For reasons stated here and reasons to be presented at the upcoming hearing, the Court should find that the Segregation Remedy (Doc. 1720) satisfies the PLRA's need-narrowness-intrusiveness requirement and will not have an undue "adverse impact on public safety or the operation of a criminal justice system." § 3626(a)(1)(A).

### A.    Definition of "Serious Mental Illness"

The Parties agreed to use the definition of "serious mental illness" adopted by the American Correctional Association. Doc. 1720 at 1; Pls. Dem. Ex. 174 (Am. Corr. Ass'n Definition of SMI).

The Parties' agreement on a definition is narrowly drawn to address the Court's determination that "ADOC does not ensure that those with a heightened risk of serious harm from mental illness are not placed in segregation or that they are not sent there for dangerously long periods of time." *Braggs*, 257 F. Supp. 3d at 1240. This relief is narrowly drawn to ensure a collective understanding among mental-health providers of what constitutes an SMI, and in turn, ensure compliance with the Court's holding that prisoners with SMIs should not be placed in segregation "absent extenuating circumstances." *Id.* at 1245-47.

Evidence in the remedial record demonstrates that this relief is necessary. The Court received evidence highlighting widespread confusion among mental-health providers about ADOC's mental-health coding scheme and how people with SMIs should be coded. *See, e.g.*, Assoc. Comm'r Ruth Naglich, Feb. 7, 2018 Trial Tr., at 74:1-81:14 (testimony and colloquy concerning the role of "functionality" in coding SMIs). At the time of the segregation remedial trial in 2018, approximately 900 prisoners with categorical SMIs were miscoded as MH-1. *See* Pls. Dem. Ex. 165 (Prisoners Coded MH-1 Who Have a Categorical SMI). While the number of

prisoners with SMIs in segregation has decreased significantly, ADOC continues to place prisoners with SMIs in segregation. *Compare* Pls. Dem. Ex. 166 (Prisoners with SMI in Segregation in Dec. 2017 and Jan. 2018) (showing 152 prisoners with SMIs in segregation), *with* Doc. 2895 (Report on Prisoners with SMI in Segregation as of August 11, 2020) (showing twenty-eight prisoners with SMIs in segregation).

Also, Dr. Burns testified that ADOC's former definition of "serious mental illness" lacked adequate objective standards to guide clinicians, such that people could fall through the cracks. *See* Dr. Kathryn Burns, Feb. 16, 2018 R.D. Trial Tr., at 36:6-14. She further testified that having clear standards for what constitutes an SMI was particularly necessary in ADOC because of the number of clinicians involved and staff turnover. *See id.* at 36:16-37:21. Having a clear definition of what constitutes an SMI is fundamental for diverting prisoners with SMIs from segregation, and Dr. Burns testified that having a process for keeping prisoners with SMIs out of segregation is necessary for an effective suicide prevention program. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 125:13-126:17.

Defendants' representations to the Court provide support for concluding that this relief is the least intrusive means necessary. The definition is consistent with—and nearly verbatim—what Defendants submitted in their Proposed Remedial Plan on Segregation. *Compare* Doc. 1533 (State's Phase 2A Proposed Remedial Plan on Segregation) at 6, *with* Doc. 1720 at 1, *and* Pls. Dem. Ex. 174. Defendants

31

represented to the Court that this definition is the "most widely accepted definition of what serious mental illness is." Feb. 27, 2018 R.D. Trial Tr., at 127:2-10.

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### B.     Training Mental-Health Staff on Definition of SMI

The Parties also agreed to a process for training mental-health staff on the agreed-upon definition of SMI. Doc. 1720 at 2. The Parties agreed that Dr. Burns and Dr. Perrien should develop the training. *Id.* This relief is narrowly drawn to address the liability findings discussed above.

Evidence in the remedial record demonstrates that this relief is necessary. As evidenced by the historical misapplication of mental-health codes within ADOC discussed above, training for all mental-health staff on the SMI definition is necessary to ensure correct application.

Evidence in the remedial record also demonstrates that this relief is the least intrusive means necessary. In 2018, Grantt Culliver, who was Associate Commissioner of Operations at the time, acknowledged that it was necessary for staff to be trained on what an SMI is in order to keep prisoners with SMIs out of

segregation.[10] *See* Assoc. Comm'r Grantt Culliver, Feb. 8, 2018 Trial Tr., at 37:18-40:13. The fact that Defendants' own consultant was involved in developing the training is further evidence that it is not intrusive. Moreover, the details of the training are left to Defendants' discretion so long as it satisfies the purpose of ensuring that all relevant staff understand what constitutes an SMI.

For these reasons and the reasons outlined above regarding the SMI definition, the Court should find that the SMI definition training requirement is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### C.    Independent SMI Designation

The Parties agreed to separate the SMI designation from ADOC's mental-health coding system by creating a distinct "SMI flag" within ADOC's computer database that identifies which prisoners have SMIs. Doc. 1720 at 2.

This relief is necessary and narrowly drawn to address the Court's liability findings. In particular, the Court found that ADOC's "mental-health coding system is intended to reflect the level of functioning a mental-health patient has and

---

[10] A concession by an ADOC official or official of ADOC's mental-healthcare contractor regarding the adequacy or necessity of a remedial requirement supports—but is not necessary for—concluding that the requirement is the least intrusive means to address the constitutional violations. After all, it is not overly intrusive to require officials to implement relief that they believe is adequate or necessary.

correspond to his or her treatment needs and housing requirements." *Braggs*, 257 F. Supp. 3d at 1204. However, the Court further found that "ADOC's mental-health coding system often fails to accurately reflect prisoners' mental-health needs." *Id.* The separate SMI flag ensures that both correctional and healthcare staff can quickly and easily determine whether someone has been diagnosed with an SMI and should therefore not be placed in segregation absent exceptional circumstances. *See* Doc. 1903 (Phase 2A Order Regarding Segregation Lists) (ordering that Defendants produce weekly segregation lists to Plaintiffs that include a column indicating whether each person has been assigned an SMI flag). It also ensures that confusion about the mental-health coding system is less likely to result in under-identification of people with SMIs.

Evidence in the remedial record demonstrates that this relief is necessary. ADOC's mental-health coding system conflated functioning with diagnosis, which resulted in coding people with SMIs who were currently functioning well as MH-1 even though they should have been coded as MH-2 or higher by virtue of their SMI diagnosis. Dr. Kathryn Burns, Feb. 16, 2018 R.D. Trial Tr., at 58:12-59:3; *see also* Pls. Dem. Ex. 162 (Comparison of ADOC Mental Health Coding Iterations). ADOC Director of Psychiatry Dr. Edward Kern testified that practitioners often coded people with SMIs as MH-1, even though they should have coded them as MH-2, because only people coded as MH-1 were allowed to live at certain facilities,

34

including work release facilities. Dr. Edward Kern, Feb. 8, 2018 R.D. Trial Tr., at 134:8-135:8 (discussing Pls. Dem. Ex. 165).

Defendants' representations to the Court indicate that this relief is the least intrusive means necessary. Defendants acknowledged the "incompatibility of the coding system and this concept of SMI." Feb. 27, 2018 R.D. Trial Tr., at 126:8-25. Defense Counsel explained, "[T]he problem that we faced is that the clinicians are using the coding system to identify SMI. And so those two really are not necessarily compatible." *Id.* at 123:5-7. Defendants represented to the Court that they agreed with the idea of separating the SMI designation from the coding system. *See id.* at 126:8-25.

The Court should therefore conclude that the separate SMI flag is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### D.   SMI Flag Assignment by Authorized Mental-Health Staff

The Parties agreed that only a mental-health staff person who is authorized under Alabama law to diagnose a mental-health condition may assign the SMI flag. Doc. 1720 at 2. Defense Counsel explained that the intent of this requirement is to clarify who is authorized to determine that someone has an SMI and that such authorization is determined by Alabama law. Feb. 27, 2018 R.D. Trial Tr., at 136:21-

137:11. The requirement to comply with Alabama law cannot be less intrusive or more narrowly drawn to address the Court's liability findings discussed above. Moreover, this relief is necessary to ensure that the SMI flags are assigned properly. Therefore, the Court should conclude that this relief, like the relief above, is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## II.    BIBB SEGREGATION REMEDY (Docs. 1751, 1751-1)

The Court found that prisoners in Bibb Correctional Facility's segregation units receive constitutionally inadequate mental-health care. The Court determined that inadequate mental-health care in the Bibb segregation units is particularly dangerous because of Bibb's layout. *See Braggs*, 257 F. Supp. 3d at 1239.

The conditions of Bibb's segregation units have been uniquely challenging among ADOC's segregation units such that the Parties agreed to remedies specifically targeted to it. During the segregation remedial trial, Plaintiffs filed an emergency motion regarding the Bibb segregation units after the Court heard evidence that staff did not adequately monitor those units. Doc. 1614 (Pls. Emergency Mot. for a TRO or a Prelim. Inj. Requiring the Immediate Closure of Bibb Corr. Facility's Segregation Units). The Parties submitted stipulations resolving Plaintiffs' emergency motion on April 6, 2018. Docs. 1748 (Jt. Submission

of Stipulations Regarding Segregation Units at Bibb), 1748-1 (Stipulations Regarding Restrictive Housing Units at Bibb). After a hearing, the Court reduced the stipulations to an order on April 9, 2018. Docs. 1751, 1751-1.

Evidence in the record regarding the particularly egregious conditions in Bibb's segregation units demonstrates that the Bibb Segregation Remedy is necessary and the least intrusive means necessary. Multiple experts have testified that the segregation units at Bibb should be closed "immediately." *Braggs*, 257 F. Supp. 3d at 1239 ("Dr. Haney recommended that Bibb's segregation units be closed immediately: he explained that he has never recommended any unit to be closed immediately in his four decades of doing this work, but he thought the risk of harm was too great at Bibb because so little monitoring is available."); Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 170:23-171:7. Moreover, in their initial 2017 staffing analysis of Bibb, the Savages agreed that Bibb's segregation units should be closed. *See* Pls. Ex. 1466 (Bibb Institutional Profile) at 9. The Bibb Segregation Remedy provides for a way to keep Bibb's segregation units open despite these recommendations from both sides that the units should be closed.

For reasons stated here and reasons to be presented at the upcoming hearing, the Court should find that the Bibb Segregation Remedy (Docs. 1751, 1751-1) satisfies the PLRA's need-narrowness-intrusiveness requirement and will have no

undue "adverse impact on public safety or the operation of a criminal justice system." § 3626(a)(1)(A).

### A.    Staffing

In the Bibb Segregation Remedy, Defendants agreed to fill all mandatory posts in the Bibb segregation units as identified by the Savages by October 2020, and to certain prisoner and staff placement arrangements in the interim. Doc. 1751-1 at 1-2.

This relief is narrowly drawn to address the Court's liability findings regarding understaffing and conditions at Bibb. The Court observed that Bibb's segregation units have unique obstacles for effective monitoring of prisoners:

> Bibb's segregation units might be the most egregious in terms of visibility: each housing unit has its own segregation unit of a few cells shut off from the rest of the unit, down a long hallway and through a door, with no line of sight from the central officer station and officers entering the space to check on the prisoners only periodically. Dr. Haney was surprised that such units were maintained, because prisoners in these cells have no way of alerting officers if anything was going wrong; they are completely dependent for their safety upon periodic trips that officers make from the central officer station. . . . Defense correctional expert Ayers's testimony also raised concerns: he credibly testified to his suspicion that, because of understaffing and safety concerns, correctional officers were not walking down the hallway away from the central cube at Bibb as frequently as they claimed.

*Braggs*, 257 F. Supp. 3d at 1239; *see also id.* at 1198 (crediting Mr. Ayers's testimony that understaffing at Bibb was "not acceptable").

Evidence in the remedial record demonstrates that this relief is necessary. The Savages' 2018 staffing analysis found that Bibb's staffing levels did not provide adequate oversight and recommended that ADOC fill additional posts. *See* Doc. 1813-1 (Assessment of Corr. Staff Needs & Shift Relief Requirements at Facilities Within the ADOC) at 43-46. In 2018, Mr. Vail testified that "these segregation units at Bibb are terrifying and should not be used unless officers are assigned to be directly adjacent to those cells when occupied by inmates." Eldon Vail, Feb. 13, 2018 R.D. Trial Tr., at 155:10-25 (discussing Jt. Ex. 463 (Expert Report of Eldon Vail)). He agreed with the Savages' recommendation of additional staff to oversee the Bibb segregation units. *Id.* at 200:15-201:16. In 2019, Dr. Burns testified that these staffing requirements are necessary for an effective suicide prevention program. *See* Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 171:23-172:6.

Evidence in the remedial record also demonstrates that this relief is the least intrusive means necessary. The relief aligns with recommendations made by Defendants' own staffing consultants. Indeed, this relief requiring compliance with the Savages' recommendations also matches the Phase 2A Understaffing Opinion and Order, which include PLRA findings. *Braggs v. Dunn*, No. 2:14-cv-601, 2018 WL 7106346, at *1 (M.D. Ala. Feb. 20, 2018); *Braggs*, 2018 WL 985759, at *8-9. In addition, Dr. Burns testified that these staffing requirements could not be more limited and still adequately address suicide prevention needs at Bibb, and are the

least intrusive means necessary. *See* Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 172:7-174:10, 236:15-25.

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### B.     Placement and Treatment of People in Bibb's Segregation Units

The Parties agreed to several requirements that govern the transfer of prisoners with SMIs out of segregation, the care for prisoners with SMIs while they are in segregation, and the care for prisoners without SMIs who are on the mental-health caseload[11] while they are in segregation. First, the remedy provides that prisoners with SMIs who are in Bibb's segregation units absent exceptional circumstances be moved to a Residential Treatment Unit ("RTU") or Structured Living Unit ("SLU") within delineated time periods. Doc. 1751 at 2-3; Doc. 1751-1 at 2-5. Second, prisoners with SMIs who remain in segregation at Bibb must receive the same level of mental-health care and out-of-cell time as prisoners in an SLU after they have been housed in segregation for seventy-two hours. Doc. 1751-1 at 5. And third, prisoners without SMIs who are on the mental-health caseload must be

---

[11] Individuals on the mental-health caseload "receive some type of mental-health treatment, such as counseling or psychotropic medications." *Braggs*, 257 F. Supp. 3d at 1181.

provided at least the same level of treatment as what they received outside

segregation. *Id.*

The Court's liability findings demonstrate that this relief is necessary and

narrowly drawn to address the Court's recognition of the inadequacies of mental-

health care for prisoners in segregation, both generally and specifically for prisoners

at Bibb. The Court found:

> As the testimony of experts and defense witnesses made abundantly
> clear, ADOC lacks a functioning process for screening out prisoners
> who should not be placed in segregation due to mental illness or
> ensuring that they are not sent there for dangerously long periods, and
> mentally ill prisoners in segregation receive inadequate treatment and
> monitoring. It is simply undeniable that these practices pose a grave
> danger to many mentally ill prisoners placed in segregation.

*Braggs*, 257 F. Supp. 3d at 1236. The Court recognized that, "[d]ue to counselors'

increasing caseloads and mounting job responsibilities, individual counseling

appointments are frequently canceled or delayed," and specifically noted that a spot

audit of Bibb's mental-health caseload found that "212 out of 213 cases had overdue

counseling appointments." *Id.* at 1209 (citing Pls. Ex. 576 (Dec. 2, 2015 Email from

Ali Davis Walker)). The Court also found that mental-health rounds in segregation

were inadequate, and credited testimony by a former counselor at Bibb who

"testified that it would take her 35 minutes to an hour to complete the rounds at all

six housing units with 18 double-celled cells, meaning one to two minutes per

41

prisoner, including the time to walk between six housing units." *Id.* at 1244. With

regard to prisoners with SMIs in segregation, the Court concluded:

> [I]t is categorically inappropriate to place prisoners with serious mental
> illness in segregation absent extenuating circumstances; even in
> extenuating circumstances, decisions regarding the placement should
> be with the involvement and approval of appropriate mental-health
> staff, and the prisoners should be moved out of segregation as soon as
> possible and have access to treatment and monitoring in the meantime.

*Id.* at 1247.

Other evidence presented at the liability trial further demonstrates the

necessity of this relief. In his expert report, Dr. Haney concluded that Bibb's

segregation units "are wholly inappropriate for the mentally ill prisoners confined in

them" due to the inadequate mental-health care, overuse of segregation, and

"extremely harsh" conditions. Jt. Ex. 459 (Expert Report of Professor Craig Haney)

at 51. He later testified regarding the difficulty for people to access mental-health

care while in segregation at Bibb. Dr. Craig Haney, Jan. 19, 2017 Trial Tr., at 151:3-

18 (noting consistency among interviewees, including people on the mental-health

caseload, describing not being seen by anyone for weeks while they were in

segregation).

Evidence in the remedial record also demonstrates that this relief is necessary,

narrowly drawn, and the least intrusive means necessary. In 2019, Dr. Burns testified

that the process for placing prisoners with SMIs in segregation and the process for

keeping such individuals out of segregation impacts the effectiveness of a suicide

prevention program because of the elevated risk for suicide both within segregation units and for people with SMIs. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 125:19-126:7. She further testified that the relief regarding transfer of prisoners with SMIs out of segregation is a necessary part of an adequate suicide prevention program at Bibb, could not be more limited and still be effective, and is the least intrusive means necessary. *See id.* at 174:11-175:10, 236:15-25.

The necessity of this relief regarding transfers was augmented by a March 2019 directive issued by former Deputy Commissioner Charles Daniels, which states that prisoners will not be discharged from suicide watch to segregation "unless there is no alternative due to well-documented exceptional circumstances or exigent circumstances arising from an inmate's behavior." Pls. Ex. 2706 (Mar. 21, 2019 ADOC Directive) (hereinafter "Daniels Directive"). The directive states, "If an inmate cannot be safely discharged to any housing unit other than the RHU [restrictive housing unit], the Deputy Commissioner of Operations (or his designee) must approve the temporary RHU placement." *Id.* Without this relief from the Bibb Segregation Remedy, the Deputy Commissioner could obstruct a prisoner's diversion from segregation. *See* Dr. Edward Kern, Mar. 29, 2019 Trial Tr., at 73:15-23 (testifying that, under the Daniels Directive, the Deputy Commissioner could override a clinician's decision that a prisoner should be in an SLU).

Dr. Burns testified that the relief regarding the level of treatment for prisoners with SMIs who are in segregation is a necessary part of an adequate suicide prevention program at Bibb because it attempts "to cut down on the numbers of in-cell confinement and give people the opportunity for out-of-cell, therapeutic activities and socialization activities with other people," which reduces the risk of suicide. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 175:11-24. She further testified that this relief could not have been more limited and still be effective for suicide prevention, and that it is the least intrusive means necessary. *See id.* at 175:25-176:21, 236:15-25.

Dr. Burns also testified that providing people in segregation with the same treatment they received prior to placement in segregation is a necessary part of adequate suicide prevention, that it could not be more limited and still be an effective part of suicide prevention, and that it is not intrusive. *Id.* at 165:6-166:4 (discussing similar relief in Segregation Rounds, Assessments, and Evaluations Remedy); *id.* at 236:15-25.

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### C.   Out-of-Cell Time for People in Bibb's Segregation Units

The Parties agreed that all prisoners on the mental-health caseload in segregation at Bibb must have the opportunity to shower every other day and have at least five hours of out-of-cell exercise per week. Doc. 1751-1 at 7. This relief is narrowly drawn to address the Court's liability findings discussed above. The liability findings and evidence discussed above also support the necessity for this relief.

Additional evidence in the remedial record demonstrates that this relief is necessary, narrowly drawn, and the least intrusive means necessary. The Court has received evidence indicating that prisoners in Bibb have not received adequate showers or out-of-cell exercise time. *See, e.g.*, Cheryl Price, Feb. 13, 2018 R.D. Trial Tr., at 122:2-125:11 (discussing Pls. Ex. 1406 (Bibb Segregation Unit Record Sheets)). Mr. Vail testified that the best way to start reducing the risk of harm posed to people with serious mental-health needs in segregation at Bibb is for ADOC to follow its own policies regarding security checks and out-of-cell time. Eldon Vail, Feb. 13, 2018 R.D. Trial Tr., at 201:17-202:6. Indeed, since at least February 2016, ADOC's own policies have required five hours of exercise time per week and showers every other day for people in segregation. Pls. Ex. 1399 (ADOC Admin. Reg. 434) at 3, 6. The fact that this relief mirrors ADOC's own policies is evidence that it is the least intrusive means. Also, Dr. Burns testified that this relief is a

necessary part of adequate suicide prevention, that it could not be any narrower and still be part of an adequate suicide prevention program, and that it is the least intrusive means necessary. *See* Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 176:22-177:24, 236:15-25.

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### D.   Document and Video Production

The Bibb Segregation Remedy provides for document and video production for the purpose of monitoring compliance with the remedy. *See* Doc. 1751-1 at 7-9. Plaintiffs previously briefed the question of whether monitoring is subject to the PLRA's need-narrowness-intrusiveness requirement. *See* Doc. 2144 (Pls. Phase 2A Remedial Monitoring Pretrial Br. Summarizing Evidence and the Impact of the PLRA on Remedies); Doc. 2213 (Pls. Resp. to the Ct.'s Questions Regarding the Applicability of the PLRA Needs-Narrowness-Intrusiveness Requirement to Court-Ordered Monitoring); Doc. 2219 (Pls. Resp. to Defs. Br. Regarding the Application of the PLRA to Court Monitoring).

As Plaintiffs explained in their prior briefing, the Court need not apply the PLRA's need-narrowness-intrusiveness analysis to this monitoring requirement. *See, e.g.*, *Coleman v. Brown*, No. 2:90–cv–0520, 2013 WL 4780945, at *1 (E.D. Cal.

Sept. 5, 2013); *Carruthers v. Jenne*, 209 F. Supp. 2d 1294, 1300 (S.D. Fla. 2002). Monitoring is not itself relief. It is a necessary means to achieve relief from a constitutional violation. There is no need to perform the need-narrowness-intrusiveness analysis. *Id.* To be sure, some other courts have held that if ordered relief meets the need-narrowness-intrusiveness test, and monitoring is needed to ensure compliance with such relief, then monitoring meets the test. *See, e.g.*, *Benjamin*, 343 F.3d at 49; *see also* Doc. 2213. But either way, the endpoint is the same. If the ordered relief meets the PLRA need-narrowness-intrusiveness requirement and monitoring is limited to monitoring of that relief, monitoring does not run afoul of the PLRA.

## III.    CODING REMEDY (Docs. 1792, 1792-1)

In the Liability Opinion, the Court found that ADOC "fails to classify the severity of mental illnesses accurately." *Braggs*, 257 F. Supp. 3d at 1204. The Parties agreed to remedies addressing the need for a new coding system and the implementation of the coding system and SMI flag. Doc. 1779 (Mental Health Coding & SMI Implementation Stipulations). The Parties agreed to clarifications during open court and the Court entered the stipulations as an order on April 25, 2018. Docs. 1792, 1792-1.

Evidence presented during the liability trial showed how ADOC's mental-health coding system was inadequate because it did not clearly identify people with

SMIs and because it coded people based on their housing placements rather than the level of mental-health care they needed. *See* Dr. Kathryn Burns, Dec. 12, 2016 Trial Tr., at 66:3-9; *see also* Dr. Robert Hunter, Dec. 7, 2016 Trial Tr., at 169:10-13 (agreeing that there are prisoners with SMIs in ADOC custody who have not been identified as having an SMI). Dr. Burns testified that she found that prisoners were given a lower mental-health code than their mental-health needs required. Dr. Kathryn Burns, Dec. 12, 2016 Trial Tr., at 66:19-68:4, 72:5-12. She also testified that the number of codes within ADOC's coding system could be confusing. *Id.* at 72:15-73:3.

These problems persisted through the segregation remedial trial in 2018 even though ADOC had amended its mental-health coding system several times since the liability trial. *See* Doc. 1546 (Pls. Resp. to Defs. Proposed Segregation Remedial Plan) at 23-25 (outlining iterations of ADOC's mental-health coding system); Pls. Dem. Ex. 162; Pls. Dem. Ex. 165 (listing 938 prisoners with a categorical SMI who were coded MH-1); Dr. Edward Kern, Feb. 8, 2018 R.D. Trial Tr., at 134:8-136:5 (discussing Pls. Dem. Ex. 165 and testifying about ADOC's regular practice of assigning people lower mental-health codes than their diagnoses might require so that they could have different housing placements).

For reasons stated here and reasons to be presented at the upcoming hearing, the Court should conclude that the Coding Remedy (Docs. 1792, 1792-1) satisfies

the PLRA's need-narrowness-intrusiveness requirement and has no undue "adverse impact on public safety or the operation of a criminal justice system." § 3626(a)(1)(A).

### A.     Implementation of the SMI Flag

As discussed above, in the Segregation Remedy, the Parties agreed to separate the SMI designation from ADOC's mental-health coding system by creating a distinct "SMI flag" within ADOC's computer database that indicates which prisoners have SMIs. *See supra* Section I(C). When the Parties agreed to the creation of the SMI flag, they had not yet agreed to how this designation would be extended beyond prisoners in segregation. In the Coding Remedy, the Parties agreed to an implementation procedure to ensure that all prisoners, not just those in segregation, are evaluated for an SMI. Doc. 1792-1 at 2. The agreement provides that assessments must be conducted on all incoming prisoners during the intake process. *Id.* Defendants agreed to evaluate all prisoners already on the mental-health caseload for an SMI designation prior to September 30, 2018. *Id.* The agreement specifies that individual evaluation is not required for prisoners who are already diagnosed with Psychotic Disorder, Bipolar Disorders, or Major Depressive Disorder. *Id.* Additionally, the Parties agreed that all prisoners on the mental-health caseload must be evaluated for an SMI designation during their first treatment meeting after July 1, 2018. *Id.* at 3. Defendants also agreed to expand screenings for the SMI

49

designation for those already in segregation who were not captured by the segregation preplacement screening developed by Drs. Burns and Perrien. *Id.* Finally, until ADOC could ensure the technological capacity to include the designation within its system, mental-health staff were required to report all individuals with an SMI designation to ADOC on a weekly basis. *Id.* at 3-4.

This relief is narrowly drawn to address the Court's liability findings discussed above that "it is categorically inappropriate to place prisoners with serious mental illness in segregation absent extenuating circumstances." *Braggs*, 257 F. Supp. 3d at 1247; *see supra* Section I.

Evidence in the remedial record shows that this relief is necessary. The SMI flag is necessary relief to prevent placement of prisoners with SMIs in segregation. *See supra* Section I. The relief allowing SMI designation without separate evaluation for people who already have categorical SMI diagnoses, such as Bipolar Disorders, Psychotic Disorders, and Major Depressive Disorders, also is necessary for keeping prisoners with SMIs out of segregation. *See* Dr. Kathryn Burns, Feb. 16, 2018 R.D. Trial Tr., at 34:3-35:6 (explaining that these diagnoses constitute categorical SMIs); *id*. at 39:9-16 (testifying that having an SMI is absolute contraindication for placement in segregation). Furthermore, Dr. Burns testified that SMI tracking is necessary within a suicide prevention system because individuals with SMIs have a

higher rate of suicide than those without. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 124:1-12.

It is necessary and the least intrusive means necessary for everyone on the caseload to receive an SMI designation rather than just those individuals in segregation. It would be more onerous for ADOC to maintain SMI flag designations only for individuals who are in segregation since prisoners constantly move in and out of segregation, and doing so would not serve the purpose of diverting people with SMIs from segregation.

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## B.    Revised Mental-Health Coding

The Parties agreed to an improved mental-health coding system. The Parties agreed that the previous system that used numbers and subsection letters should be replaced by a simpler letter system, consisting of Mental Health Codes A, B, C, and D. Doc. 1792-1 at 4. The Parties agreed that these codes should designate only the level of mental-health care people need, ranging from MH-A for people who are not on the caseload and do not receive ongoing mental-health care to MH-D for people in need of a specialized mental-health housing unit. *Id.* at 4-5. Additionally, the Parties agreed to the implementation of the new coding system at intake, the

51

timeframe of re-coding individuals on the mental-health caseload, and how to treat individuals coded as MH-0 in the previous system. *Id.* at 6.

This relief is narrowly drawn to address the Court's liability finding that the coding system in place at the time of trial, consisting of thirteen different codes, was connected to both housing and treatment requirements but failed to accurately reflect mental-health needs. *Braggs*, 257 F. Supp. 3d at 1204. This failure included the under-coding of individuals with delusions and those with a history of self-harm and suicide attempts. *Id.* at 1204-05.

Evidence presented at the liability trial demonstrates that this relief is necessary. Dr. Burns testified that ADOC's coding system was "confusing" because of "the number of codings and options that are available." Dr. Kathryn Burns, Dec. 12, 2016 Trial Tr., at 72:15-21. As an example, she noted that it would be confusing to train staff on how to use the "oxymoron description" of "stably unstable," which is how Dr. Robert Hunter, a medical director for ADOC's former mental-healthcare contractor, described one code. *Id.* at 72:22-73:1. She testified that a simpler coding system would better ensure that coding was up-to-date and accurate. *Id.* at 70:11-25.

Evidence in the remedial record further demonstrates that this relief is necessary. Despite the Court's liability findings, ADOC stayed committed to its confusing coding system through the segregation remedial proceedings in 2018, proposing another problematic revision to its system and reaffirming its position that

the primary purpose of mental-health codes was to dictate housing placements. Doc. 1533 at 16-20 (proposing revisions to the existing coding system); Assoc. Comm'r Ruth Naglich, Feb. 7, 2018 Trial Tr., at 20:13-16 (testifying that the purpose of mental-health coding is for "housing placement" and that it is "utilized by lay individuals such as security"). The Parties ultimately negotiated the Coding Remedy to replace this system. In 2019, Dr. Burns testified that ADOC needed a reasonable coding system to have an effective suicide prevention program because it would allow staff to monitor individuals' risks for self-harm and develop treatment accordingly. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 123:12-25.

For reasons presented here as well as at the upcoming evidentiary hearing, the Court should find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## IV.   INTAKE REMEDY (Docs. 1794, 1794-1)

In the Liability Opinion, the Court found that "inadequacies in the mental-health system start at the door, with intake screening for prisoners who need mental-health care." *Braggs*, 257 F. Supp. 3d at 1184. The Court went on to find that "likely thousands" of prisoners with mental illnesses had been missed at intake. *Id.* at 1185. As described below, evidence presented during the liability trial highlighted many problems with ADOC's intake system, including the intake assessment process, the

need for social history and suicide risk assessments, the need for a psychiatric screening in some circumstances, and the need to ensure that mental-health codes are assigned properly at intake. *See id.* at 1201-03.

The Parties agreed to remedies addressing these failures in the intake system. Doc. 1780 (Stipulations Regarding Mental Health Intake). The Parties agreed to clarifications during open court and the Court entered the stipulations as an order on April 25, 2018. Docs. 1794, 1794-1.

Evidence in the record demonstrates that the Intake Remedy satisfies the PLRA. The remedy is necessary to address the constitutional violations regarding intake because ADOC's intake system missed so many of those in need of mental-health care at the outset. As Dr. Burns and Dr. Kern testified and the Court recently reiterated, "once ADOC has functioning identification processes, it should expect its mental-health caseload to substantially increase to reflect the average caseload in American prisons with functioning mental-health care systems." *Braggs*, 2020 WL 2789880, at *6 (citing Dr. Kathryn Burns, Apr. 27, 2018 Trial Tr., at 16; Dr. Edward Kern, Apr. 25, 2018 Trial Tr., at 46). This, in turn, would help to ensure that prisoners receive the mental-health care that they need.

For reasons stated here and reasons to be presented at the upcoming hearing, the Court should conclude that the Intake Remedy (Docs. 1794, 1794-1) satisfies the PLRA's need-narrowness-intrusiveness requirement and poses no undue "adverse

impact on public safety or the operation of a criminal justice system." § 3626(a)(1)(A).

### A.    Intake Assessment

The Parties agreed to modify the intake system to ensure that decisions are made by qualified individuals within a timely manner. The Intake Remedy requires that intake assessments be completed by a registered nurse ("RN") with mental-health training using a standardized screening process. Doc. 1794-1 at 1-2. It also requires verification of current medications and/or requests for prior medical records. *Id.* at 3-4. In addition, RNs must make referrals for prisoners who need further mental-health assessment, indicating whether a referral is emergent, urgent, or routine. *Id.* at 5. RNs must make a referral if the prisoner indicates at least one of nine identified risk factors. *Id*. at 3.

This relief is narrowly drawn to address the Court's liability findings regarding intake assessments. As mentioned above, the Court found that a substantial number of individuals with mental illnesses were missed during intake. *Braggs*, 257 F. Supp. 3d at 1185. The Court also found that licensed practical nurses ("LPNs"), "who only have 12 to 15 months of general medical training—very little of which may be related to mental health—are not qualified to assess the presence or acuity of mental illness symptoms based on information obtained during the intake process." *Id.* at 1202. Yet, the Court found, LPNs completed intakes with no

oversight. *Id.* at 1201. The Court also noted that, although LPNs made referrals for further evaluation if symptoms of mental illness were self-reported, intake assessments cannot depend on self-reporting alone. *Id*. at 1202.

Evidence presented at the liability trial confirms that this relief is necessary. Both Parties' experts agreed that identification and classification of mental illnesses at intake were inadequate. *Id.* at 1187. For example, Dr. Burns testified that having LPNs complete intakes and determine who could see a psychiatrist created a risk of harm because of their limited skill and education. Dr. Kathryn Burns, Dec. 12, 2016 Trial Tr., at 61:25-62:5; *see also* Teresa Houser, Jan. 17, 2017 Trial Tr., at 9:14-10:5 (testifying that if a nurse did not refer an individual for psychiatric evaluation during intake, the person would not be placed on the mental-health caseload). Dr. Patterson concurred, testifying that the number of referrals to psychiatrists for evaluation during the intake process may indicate that the LPNs who completed intakes under-referred individuals with possible mental-health needs. *See* Dr. Raymond Patterson, Jan. 31, 2017 Trial Tr., at 45:9-47:19.

Evidence in the remedial record further confirms that this relief is necessary. At the suicide prevention remedial trial, Dr. Burns testified that a correctional system needs an adequate intake process for identifying currently suicidal individuals, those with chronic risks, and those with risks that may reoccur. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 121:22-122:20; *see also* Dr. Edward Kern, Mar. 28, 2019 Trial

Tr., at 48:25-49:9, 49:15-17 (testifying that an adequate intake process is a primary form of suicide prevention, meaning it is a process that could potentially reduce suicide risk across an entire population).

Evidence in the remedial record also confirms that this relief is the least intrusive means necessary. Dr. Kern admitted that this intake process is an adequate screening process for identifying individuals with mental illnesses. Dr. Edward Kern, Mar. 28, 2019 Trial Tr., at 14:11-22. The fact that this relief is either consistent with or less intrusive than what Defendants submitted in a proposed remedial plan is further evidence that it is the least intrusive means necessary. Most of this relief is verbatim what Defendants proposed. *Compare* Doc. 1594 (State's Phase 2A Proposed Remedial Plan on Identification, Classification, & Residential Unit Out-of-Cell Time & Treatment) at 5-9, *with* Doc. 1794-1 at 1-7. The definitions of "emergent," "urgent," and "routine" needs for the purpose of making referrals is even less intrusive than what Defendants proposed because they leave the precise timing of and provider for follow-up to Defendants' discretion. *Compare* Doc. 1594 at 8, *with* Doc. 1794-1 at 5.

As such, the Court should find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

**B.     Social History Assessment, Suicide Risk Assessment, and Testing**

The Intake Remedy includes several requirements governing follow-up assessments after initial intakes. The remedy requires that a psychologist or licensed mental-health professional complete a social history assessment and suicide risk assessment after the initial intake. Doc. 1794-1 at 7-8. The remedy further provides that a licensed psychologist, psychiatrist, or certified registered nurse practitioner ("CRNP") working with a psychiatrist must assign a mental-health code after reviewing the intake screening and assessments. *Id.* at 8. Finally, the remedy provides that all intake screenings and evaluations must be completed before a prisoner is transferred from an intake facility or placed in segregation at an intake facility. *Id.* at 9.

This relief is narrowly drawn to address the Court's liability findings regarding the intake process. In particular, the Court found that suicide risk assessments are "widely recognized to be an essential part of mental-health care" and "should be used as a part of the intake screening process." *Braggs*, 257 F. Supp. 3d at 1221. The Court also found that psychological testing at intake conducted by ADOC's psychological associates occurred on a parallel track and was not integrated into the intake system. *Id.* at 1202 n.27. The assessment and testing requirements of the Intake Remedy address the deficiencies identified by the Court by taking the ability to assign the lowest mental-health code out of the hands of LPNs and placing

58

the responsibility with psychologists, psychiatrists, and CRNPs. This prevents unqualified initial intake staff from only referring individuals who self-report mental-health symptoms for psychiatric evaluation and adds a second step to consider the outcomes of more-thorough assessments. Finally, the Court found that transfers to other facilities before intake assessments were completed could delay the provision of mental-health care for those who need treatment. *Id.* at 1203. By restricting transfers until after an individual completes the assessment stage, individuals needing mental-health care upon intake are less likely to be missed by mental-health professionals.

Evidence presented at the liability trial confirms that this relief is necessary. For example, Dr. Burns testified that a "detailed mental health screen, biopsychosocial assessment, and a diagnostic formulation" are all necessary components of intake. Dr. Kathryn Burns, Dec. 12, 2016 Trial Tr., at 62:18-22. Dr. Patterson testified that suicide risk assessments should be conducted at intake by a high-level provider or a mid-level provider with supervision using a form that includes guidelines. *Braggs*, 257 F. Supp. 3d at 1221; *see also* Jt. Ex. 461 (Expert Report of Dr. Raymond Patterson) at 68 (reporting that suicide risk assessment must be used at all facilities).

Evidence presented in remedial proceedings further confirms the necessity of this relief. Dr. Burns testified at the suicide prevention remedial trial that an intake

process must collect people's social and medical histories so as to identify "people who may be at some risk later on during their period of incarceration, such as people with a mental health history or people that have had a history of having attempted suicide or contemplated suicide in the past." Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 121:25-122:20.

For these reasons, the Court should find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### C.    Psychiatric Evaluation and Assignment of Mental-Health Codes

The Parties agreed that psychiatric evaluations should be completed within a limited timeframe following a referral from the receiving screening or reception mental-health evaluation. Doc. 1794-1 at 10. The Parties further agreed the psychiatric evaluations should include, but not be limited to, the review of mental-health history, medication, medical history, personal history, and risk of violence or suicide. *Id.* at 10-11. Additionally, the Parties agreed that only psychologists, psychiatrists, or CRNPs in collaboration with psychiatrists can assign mental-health codes, and that mental-health staff will share mental-health status information to the classification staff. *Id.* at 12-13.

This relief is narrowly drawn to the Court's liability findings. As noted above, the Court found that LPNs "are not qualified to assess the presence or acuity of mental illness symptoms based on information obtained during the intake process." *Braggs*, 257 F. Supp. 3d at 1202. Yet, as the Court found, the LPNs determined whether prisoners received a psychiatric evaluation and assigned mental-health codes—which determine the level of care a prisoner subsequently receives—during the intake process:

> The intake LPN fills out forms and questionnaires and decides whether to refer a prisoner for further examination by a psychiatrist or a nurse practitioner. If the LPN determines that a prisoner does not need to be referred to a psychiatrist or nurse practitioner, a mental-health code of MH–0, denoting no need for mental-health care, is entered into the system. Prisoners who are designated as MH–0 by an LPN do not receive any further evaluation or any mental-health treatment unless referred to mental-health services later by a staff member or the prisoners themselves. On the other hand, if the LPN refers the prisoner for evaluation, a psychiatric provider completes an evaluation, gives a diagnosis if appropriate, and assigns a mental-health code, which determines the level of care the prisoner subsequently receives and ranges from MH–0 (no mental-health need) to MH–6 (in need of hospitalization).

*Id.* at 1201-02. By integrating psychiatric evaluations into the intake process and requiring a psychiatric evaluation prior to assigning a mental-health code above MH-A, the intake process will more accurately identify individuals' mental-health treatment needs. Limiting the responsibility of assigning the mental-health codes to psychologists, psychiatrists, and CRNPs further prevents the under-identification of individuals with mental-health needs.

61

Evidence presented at the liability trial confirms that this relief is necessary. Multiple class members testified regarding their experiences with Defendants' inadequate intake process. For example, class member M.W. shared during her intake that she was on the mental-health caseload during a prior incarceration, that she had received mental-health treatment in the past, and that she had a history of sexual abuse—yet she was not placed on the mental-health caseload. M.W., Jan. 9, 2017 Trial Tr., at 12:4-13:5. In addition, as Dr. Hunter acknowledged, ADOC's intake process was contrary to the standards and regulations that required psychiatrists to be available at intake to screen for mental-health coding. *See* Dr. Robert Hunter, Dec. 7, 2016 Trial Tr., at 169:14-170:2. The Court also heard evidence that, by reviewing medical and mental-health history, assessment results, and other pertinent details, mental-health staff assigning codes at intake are more likely to designate the proper code for the appropriate level of mental-health treatment needed. *See* Dr. Kathryn Burns, Dec. 12, 2016 Trial Tr., at 62:18-22 (testifying that biopsychosocial assessments should be reviewed at intake).

Evidence from the suicide prevention remedial trial further confirms that this relief is necessary. Dr. Burns testified that it is necessary for an effective suicide prevention program to review prisoners' mental-health history at intake in order to address acute risks, chronic risks, and risks that may recur. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 121:25-122:20.

The fact that some of this relief is consistent with what Defendants proposed further proves that those portions are the least intrusive means necessary. The relief regarding psychiatric evaluations is consistent with—and largely verbatim—what Defendants proposed. *Compare* Doc. 1594 at 10-11, *with* Doc. 1794-1 at 10-12. The requirement to assign a mental-health code at intake also is consistent with what Defendants proposed. *Compare* Doc. 1594 at 6, *with* Doc. 1794-1 at 8-9, 12.

For these reasons, the Court should conclude that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### D.    Confidentiality

The Intake Remedy requires that each step in the intake process be conducted "in a location and manner that provides for confidentiality." Doc. 1794-1 at 13. This relief is narrowly drawn to address the Court's liability findings regarding confidentiality issues surrounding intake. *See Braggs*, 257 F. Supp. 3d at 1203 (noting testimony that there was not enough space to complete intakes); *id.* at 1210 (noting lack of confidential settings in ADOC facilities).

In addition to the lack of confidentiality provided during intake, the Court also found a lack of confidentiality contributing to inadequacy in psychotherapy. *Id.* at 1210. To address this issue, the Parties agreed to confidentiality requirements in the

Psychotherapy Remedy (Docs. 1899, 1899-1) and a stand-alone Confidentiality Remedy (Docs. 1900, 1900-1, 1900-2). As the Intake Remedy does not provide specific requirements for confidentiality beyond the general relief noted above, the Court should conclude that the requirement to conduct intake screenings and assessments in confidential spaces satisfies the PLRA's need-narrowness-intrusiveness requirement for the reasons outlined in the Psychotherapy Remedy and Confidentiality Remedy sections. *See infra* Sections VIII(B), IX.

## V. SEGREGATION ROUNDS, ASSESSMENTS, AND EVALUATIONS REMEDY (Docs. 1815, 1815-1)

The Court made extensive liability findings regarding the inappropriate use of segregation and the inadequate treatment and monitoring of prisoners in segregation. *See Braggs*, 257 F. Supp. 3d at 1235-47; *see also supra* Section II(B). After the Parties presented stipulations, on May 3, 2018, the Court entered the Segregation Rounds, Assessments, and Evaluations Remedy as an order. Docs. 1815, 1815-1.

For reasons stated here and reasons to be presented at the upcoming hearing, the Court should conclude that the Segregation Rounds, Assessments, and Evaluations Remedy (Docs. 1815, 1815-1) satisfies the PLRA's need-narrowness-intrusiveness requirement and will not have an undue "adverse impact on public safety or the operation of a criminal justice system." § 3626(a)(1)(A).

### A.    Preplacement Screening

The Parties agreed to relief requiring a screening prior to a prisoner's placement in segregation to ensure that they are not placed there if it is clinically inappropriate. Doc. 1815-1 at 1-2. Preplacement screenings must be conducted by either an RN or an LPN who has been trained in the screening process and is supervised by an RN. *Id.* at 1. The screening must include an assessment of whether the prisoner has been flagged as having an SMI, whether the prisoner is at imminent risk of suicide or serious self-harm, whether the prisoner exhibits debilitating symptoms of an SMI, and whether the prisoner requires emergency medical care. *Id.* at 1-2. The results of this screening shall be used to determine whether the prisoner must be diverted to another location, such as crisis watch, an infirmary, or other diversionary placement; and whether the prisoner requires a medical and/or mental-health referral. *Id.* at 2. The Parties agreed on a standard form that nurses must use. *Id.*; Doc. 1798 (Stipulations Regarding: Restrictive Housing Pre-Placement Screening, Mental Health Rounds in Restrictive Housing & Periodic Mental Health Assessments in Restrictive Housing) at 6. They agreed that this form cannot be altered in substance without agreement of the Parties. Doc. 1815-1 at 2.

This relief is narrowly drawn to address the Court's liability findings regarding segregation preplacement screenings. The Court recognized the necessity of relief specifically addressing segregation preplacement screenings. *Braggs*, 257

F. Supp. 3d at 1236 ("As the testimony of experts and defense witnesses made abundantly clear, ADOC lacks a functioning process for screening out prisoners who should not be placed in segregation due to mental illness . . . ."). Moreover, the Court found:

> Due to the risks of decompensation created by segregation in general and by ADOC's segregation units in particular, it is critically important that ADOC consider a prisoner's mental health condition when deciding whether to place the prisoner in segregation, and if so, for how long. But here, overwhelming evidence makes clear that ADOC does not ensure that those with a heightened risk of serious harm from mental illness are not placed in segregation . . . .

*Id.* at 1240. The purpose of the screening forms is to determine whether the prisoner must be diverted to another location or receive a medical and/or mental health referral. Doc. 1815-1 at 2. All the information collected in the screening is necessary to determine whether someone must be diverted or given a referral, such that it is narrowly drawn. Without each piece of information, clinicians simply cannot accurately determine whether diversion or referral is necessary.

Evidence in the remedial record demonstrates that this relief is necessary. For example, Dr. Hunter testified that prisoners on the mental-health caseload were placed in segregation unbeknownst to mental-health staff because of inconsistent preplacement screening. *See* Dr. Robert Hunter, Feb. 15, 2018 R.D. Trial Tr., at 100:8-20. Dr. Burns testified that this screening requirement is necessary for suicide prevention. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 159:15-21.

66

The grave harms that have resulted from Defendants' failures to provide adequate preplacement screenings further demonstrates that this relief is necessary. For instance, Rashaud Morrissette hanged himself with a belt in the shower of a segregation unit after being placed there without a preplacement screening. *See Braggs*, 383 F. Supp. 3d at 1229. Matthew Holmes killed himself a few days after a preplacement screening recommended he be placed in segregation despite the fact that it also indicated he had an SMI; he was feeling sad, hopeless, or depressed; he had a history of self-harm; and he had a serious problem with a loved one recently. Dr. Edward Kern, Mar. 28, 2019 Trial Tr., at 86:10-88:11 (discussing Pls. Ex. 2694 (Matthew Holmes Mental-Health Record)); *id.* at 89:24-91:7 (discussing Mr. Holmes's preplacement screening in Pls. Ex. 2694 with Court and acknowledging that it "failed to do what it was intended to do"); *id.* at 91:25-94:25 (addressing Court's concerns regarding Mr. Holmes's preplacement screening prior to his death, testifying to lack of knowledge regarding any corrective action for the LPN who completed the form, and explaining how he could not say that there was any training targeted to ensure similar mistakes do not recur).

Evidence in the remedial record also shows that this relief is the least intrusive means necessary. Dr. Burns testified that "every person needs to be screened," and that this requirement could not be less intrusive and still be effective. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 160:3-5. Dr. Kern acknowledged that diversion from

segregation is "the right thing to do" and can "save lives." Pls. Ex. 2135 (Aug. 16, 2018 Email from Dr. Kern to Ms. Coe) at ADOC0457340. He sent an email to Barbara Coe, program director for Wexford, ADOC's current mental-healthcare provider, explaining the need for screening:

> I want to reinforce to all the clinical teams that our *shared goal* is to identify inmates—our patients or potential patients—who are a[t] risk of deterioration or self-harm in restricted housing, and to intervene on their behalf because that is the right thing to do as mental health clinicians. We all need to keep in mind that the majority of suicides occur in restricted housing, and that our frontline clinicians have an opportunity to make a difference and even to save lives.

Pls. Ex. 2135 at ADOC0457340. Dr. Kern also acknowledged that this preplacement screening requirement "ha[s] the potential to reduce the risk of suicide" by way of "increased identification of individuals who may be at elevated risk at the time they entered restrictive housing." Dr. Edward Kern, Mar. 28, 2019 Trial Tr., at 23:22-24:1; *see also id.* at 22:4-24:1 (agreeing that this relief, if implemented, would address the Court's liability findings with regard to segregation and would reduce the risk of suicide in segregation).

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### B.  Mental-Health Rounds

The Parties agreed to the frequency, content, provision, and documentation of mental-health rounds for prisoners in segregation. Doc. 1815-1 at 2-4. The Parties agreed that mental-health rounds by a Qualified Mental-Health Professional ("QMHP") must occur at least weekly in segregation units. *Id.* at 2. The Parties agreed to what these mental-health rounds must include and how they must be documented. *Id.* at 2-4; Doc. 1798 at 8.

This relief is narrowly drawn to address the Court's conclusion that it was "abundantly clear" that "mentally ill prisoners in segregation receive inadequate treatment and monitoring." *Braggs*, 257 F. Supp. 3d at 1236; *see id.* at 1242 (finding that prisoners in segregation are "not adequately monitored for signs of decompensation").

Evidence in the remedial record demonstrates that this relief is necessary. Dr. Burns explained that the purpose of mental-health rounds in segregation is to have a regular mechanism for identifying people who need further investigation or care or who need to be removed from segregation. Dr. Kathryn Burns, Dec. 7, 2018 Trial Tr., at 169:21-170:8. Dr. Burns also testified that having a way of identifying people in segregation who are decompensating is necessary for an effective suicide prevention program. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 126:8-17. She

further testified that these particular requirements are a necessary part of suicide prevention. *See id.* at 160:6-17.

Evidence in the remedial record also demonstrates that this relief is narrowly drawn and the least intrusive means necessary. ADOC's administrative regulations ("ARs")—which are set by ADOC to govern its operations—already purported to require some of this relief, even though ADOC was not adequately implementing it. *See* Doc. 1533 at 27-29; *see also* Dr. David Tytell, Feb. 14, 2018 R.D. Trial Tr., at 92:7-93:11 (testifying that mental-health rounds are supposed to entail making visual and verbal contact and checking cell conditions). Indeed, the requirement to have mental-health rounds once a week is less intrusive than what Defendants included in their proposed remedial plan. *See* Doc. 1533 at 28 (proposing five mental-health rounds per week). Dr. Burns explained that she recommended that mental-health rounds in segregation be reduced from ADOC's existing policy requiring five rounds a week to once a week because medical staff and correctional officers were already supposed to be in the units daily and so "if there is a robust referral process, then mental health staff shouldn't also have to go and retrace everyone else's steps every single day." Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 129:16-130:12. Dr. Burns also testified that these specific requirements could not be more narrowly tailored than they already have been, and that they are the least intrusive means necessary to be effective. *See id.* at 160:18-161:9. Dr. Kern acknowledged that this relief, if

70

implemented, would address the Court's liability findings with regard to segregation and would reduce the risk of suicide in segregation. Dr. Edward Kern, Mar. 28, 2019 Trial Tr., at 22:4-24:1.

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### C.   Periodic Mental-Health Assessments

The Parties agreed to several stipulations governing periodic mental-health evaluations for prisoners in segregation. Prisoners must be assessed by a QMHP within seven days of their placement in segregation. Doc. 1815-1 at 4. The Parties agreed to what the assessment must include and what form should be used. *Id.* at 4-9. For prisoners with a diagnosed behavioral health disorder, a QMHP must perform a behavioral health assessment at least every thirty days if placement in segregation continues beyond thirty days. *Id.* at 5. For other prisoners, a QMHP must conduct a mental-health assessment at least every ninety days. *Id.* All assessments must be conducted out-of-cell and in a confidential setting. *Id.* In addition, prisoners in segregation must continue to receive at least the same level of treatment they received prior to their placement in segregation. *Id.* The order also grants mental-health staff the authority to remove a prisoner from segregation if it is determined that continued placement is clinically contraindicated. *Id.*

71

This relief is narrowly drawn to address the Court's liability findings. In the Liability Opinion, the Court found that it is "essential to identify those who need mental-health treatment in segregation," *Braggs*, 257 F. Supp. 3d at 1249, and that "ADOC's segregation prisoners have very little access to individual treatment," *id.* at 1243. In the Supplemental Liability Opinion, the Court concluded that "ADOC has not been conducting adequate periodic mental-health evaluations of prisoners in segregation, and that this failure has contributed to the ADOC defendants' violation of the Eighth Amendment discussed in the main liability opinion as to prisoners with serious mental-health needs in segregation." *Braggs*, 367 F. Supp. 3d at 1342. "The inadequacy of ADOC's mental-health monitoring of prisoners in segregation is further aggravated by a lack of privacy in segregation units, which discourages prisoners from having frank discussions about their mental health with mental-health staff." *Id.* at 1349.

Evidence from the liability trial confirms that this relief is necessary. For example, "as Dr. Haney testified, while segregation rounds by mental-health staff are crucial for checking for signs of decompensation or crisis, they cannot replace periodic out-of-cell clinical assessments of prisoners' mental-health status, because it is difficult to observe someone's behavior and accurately assess the prisoner's mental health through cell-front encounters." *Braggs*, 257 F. Supp. 3d at 1243 n.72. "Dr. Haney credibly opined that periodic out-of-cell assessments are necessary not

only to monitor for decompensation among those identified as mentally ill, but also to identify prisoners not on the mental-health caseload who may develop mental illness while in segregation." *Id.* at 1249. He also testified regarding how critical it is to have mental-health evaluations in segregation occur out-of-cell and in a confidential setting. Dr. Craig Haney, Jan. 19, 2017 Trial Tr., at 85:22-87:6; *see also Braggs*, 367 F. Supp. 3d at 1346-55 (discussing factual findings on periodic mental-health evaluations in segregation).

The necessity of this relief is further highlighted by evidence in the remedial record. For example, Dr. Burns testified regarding the importance of prisoners in segregation receiving the same treatment interventions they received prior to their placement in segregation. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 165:6-166:4. She also testified that this relief is necessary to assess and address a prisoner's risk and mental condition in order to have adequate suicide prevention. *See id.* at 161:10-162:11.

Evidence from the remedial record also demonstrates that this relief is narrowly drawn and the least intrusive means necessary. Dr. Burns testified that this relief could not be narrower and still be effective, and that it is not intrusive but actually helpful to identify people who are at-risk early and intervene to reduce risk. *Id.* at 164:14-166:4. Dr. Kern agreed that this relief, if implemented, would address the Court's liability findings with regard to segregation and would reduce the risk of

suicide in segregation. Dr. Edward Kern, Mar. 28, 2019 Trial Tr., at 22:4-24:1; *see also* Pls. Ex. 2135 at ADOC0457340 ("We all need to keep in mind that the majority of suicides occur in restricted housing, and that our frontline clinicians have an opportunity to make a difference and even to save lives."). In addition, this relief is narrower than Defendants' interpretation of their own policies. Dr. Kern testified that ADOC requires prisoners in segregation who have SMIs to receive an out-of-cell clinical evaluation within twenty-four hours of placement in segregation—sooner than this order requires. *See* Dr. Edward Kern, Mar. 28, 2019 Trial Tr., at 73:16-74:4; Pls. Ex. 2135 at ADOC0457340.

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## VI.    REFERRAL REMEDY (Docs. 1821, 1821-1, 1821-2)

Apart from intake, ADOC's mental-health referral process should be the other primary mechanism for identifying and classifying prisoners with mental illness. *Braggs*, 257 F. Supp. 3d at 1203. "The purpose of the referral process is to identify prisoners whose mental illnesses develop during their incarceration and prisoners whose mental-health needs were not identified during the intake process." *Id.* However, the Court found that ADOC's referral process "is riddled with delays and inadequacies" that have resulted in "unnecessary pain and suffering." *Id.* at 1203-

04; *see also id.* (concluding that the referral process was inadequate in part because, due to overcrowding and understaffing, "correctional officers are ill-positioned to notice behavioral changes" and cannot realistically be expected to "identify and refer prisoners who may need mental-health treatment, except perhaps for those prisoners with the most obvious symptoms of mental illness"). The Court found that, without an adequate process for self-referral, prisoners engaged in "increasingly desperate acts" to get the attention of mental-health staff, including self-injury, fire-setting, and suicide attempts. *Id.* at 1204 (quoting Jt. Ex. 460 (Expert Report of Kathryn A. Burns, M.D., M.P.H.) at 29).

The Parties agreed to stipulations to address these inadequacies in the referral system. Doc. 1786 (Stipulation Regarding Mental-Health Referral Process); Doc. 1814 (Additional Stipulations Regarding Mental-Health Referrals). The Parties clarified the stipulations in court and the Court entered the Referral Remedy as an order on May 7, 2018. Docs. 1821, 1821-1, 1821-2.

The Court has heard testimony that the Referral Remedy is a necessary component of a functioning mental-healthcare system. Notably, class member J.A. testified during the liability trial and again two years later during the suicide prevention remedial trial about how difficult it was to get staff to pay attention to his self-referrals. *See Braggs*, 257 F. Supp. 3d at 1204 ("Getting help in prison is harder than getting out of prison."); J.A., Mar. 29, 2019 Trial Tr., at 174:22-175:10

75

(testifying that he asked a correctional supervisor to speak with mental health and was told he would not be allowed out of his cell unless he harmed himself, so he proceeded to harm himself). Dr. Burns testified that a reasonable mental-health referral process is necessary for an effective suicide prevention program and for identifying people who may be experiencing mental-health symptoms other than suicidality. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 122:21-123:11; *see also* Dr. Edward Kern, Mar. 28, 2019 Trial Tr., at 19:7-14, 48:25-49:14 (testifying that having an adequate referral process is necessary for suicide prevention). As mentioned above for the Intake Remedy, *see supra* Section IV, Dr. Burns and Dr. Kern testified that "once ADOC has functioning identification processes, it should expect its mental-health caseload to substantially increase to reflect the average caseload in American prisons with functioning mental-health care systems," *Braggs*, 2020 WL 2789880, at *6 (citing Dr. Kathryn Burns, Apr. 27, 2018 Trial Tr., at 16; Dr. Edward Kern, Apr. 25, 2018 Trial Tr., at 46).

Evidence in the remedial record demonstrates that the Referral Remedy is the least intrusive means necessary. Dr. Kern acknowledged that implementing the Referral Remedy would allow ADOC to respond timely and appropriately to prisoners' mental-health needs. Dr. Edward Kern, Mar. 28, 2019 Trial Tr., at 18:22-19:6.

For reasons stated here and reasons to be presented at the upcoming hearing, the Court should find that the Referral Remedy (Docs. 1821, 1821-1, 1821-2) satisfies the PLRA's need-narrowness-intrusiveness requirement and does not have an undue "adverse impact on public safety or the operation of a criminal justice system." § 3626(a)(1)(A).

A.    **Comprehensive Mental-Health Training**

The Parties agreed to relief requiring comprehensive mental-health training for "all persons working within any ADOC major facility who have any direct contact with inmates." Doc. 1821-1 at 1-3; Doc. 1821-2 at 5-7. The training must include early warning signs of mental illness, the availability of mental-health services in ADOC, the nature and extent of mental-health services in ADOC, and the process for referring prisoners for mental-health evaluations. Doc. 1821-1 at 2-3. It must be approved by Dr. Burns,[12] with any disputes regarding Dr. Burns's edits and approval mediated by Judge John E. Ott. *Id.* at 3. This relief is narrowly drawn to address the Court's extensive liability findings regarding the critical role that mental-health and correctional staff play in prisoners' mental-health care. *See Braggs*, 257 F. Supp. 3d at 1194-1250.

---

[12] As of this date, the comprehensive mental-health training has not been approved by Dr. Burns.

Evidence in the remedial record demonstrates that this relief is necessary, narrowly drawn, and the least intrusive means necessary. During the suicide prevention remedial trial, Dr. Burns testified that providing this training is necessary for suicide prevention, and that "[e]veryone needed to be trained on these things [covered by the training] so that they could be part of the referral process and identify people at risk." Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 202:25-203:9. Mr. Vail testified that training correctional staff, particularly line staff, on the referral process is necessary so that they understand "what their role is and what their limitations are." Eldon Vail, Apr. 3, 2019 Trial Tr., at 109:24-110:12. Dr. Burns testified that this training requirement is narrowly tailored and the least intrusive means necessary. *See* Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 202:25-203:9, 236:15-25. She also testified that the requirement that someone outside of ADOC approve the training is necessary and the least intrusive means necessary. *See id.* at 203:10-21, 236:15-25.

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## B.    Process for Making Referrals

The Parties agreed to relief establishing processes by which staff and prisoners can make mental-health referrals. The Parties agreed that any individual working

78

within ADOC can refer a prisoner for a mental-health assessment. Doc. 1821-2 at 1. The Parties agreed that prisoners can refer themselves for mental-health assessment by communicating with mental-health or correctional staff verbally or in writing. *Id.* at 2. The Parties agreed that non-mental-health staff, including correctional staff, must refer prisoners for assessment or intervention by mental-health staff when they "recognize the need" for assessment or intervention, or upon a prisoner's request for care. *Id.* at 3. Finally, the Parties agreed that the process established by the Referral Remedy will not be used as an alternative to the sick call request or the process for requesting mental-health services. Doc. 1821-1 at 7.

This relief is narrowly drawn to address the Court's liability finding that ADOC "does not have any system of tracking and processing referrals to ensure that urgent requests are actually referred to providers, or that providers are able to handle requests in a timely fashion." *Braggs*, 257 F. Supp. 3d at 1203; *see also id.* at 1248 (making the same finding about Tutwiler specifically).

The remedial record makes clear that this relief is necessary. In 2018, Dr. Burns testified about the importance of having a clear process through which correctional staff can make referrals. *See* Dr. Kathryn Burns, Apr. 27, 2018 Trial Tr., at 13:1-18. In 2019, multiple witnesses testified about correctional officers' role in the referral process. Dr. Burns testified that a process for staff other than mental-health staff and prisoners to make referrals is a necessary component of adequate

suicide prevention. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 206:13-19, 210:8-14. Mr. Vail explained that correctional officers are often first on the scene to observe behavior and therefore should communicate information to mental-health staff. Eldon Vail, Apr. 3, 2019 Trial Tr., at 106:17-107:4. Dr. Kern testified that correctional officers ignoring or triaging a prisoner's requests for mental-health care can pose a risk of harm to the prisoner. Dr. Edward Kern, Mar. 28, 2019 Trial Tr., at 108:2-5.

This relief is also consistent with Dr. Burns's testimony about what a self-referral process for prisoners should look like. Dr. Kathryn Burns, Apr. 27, 2018 Trial Tr., at 9:20-10:20. She testified that the process for self-referrals is necessary to reduce reliance on correctional staff to relay referrals. *Id.* at 11:24-12:10.

Evidence in the remedial record also demonstrates that this relief is narrowly drawn and the least intrusive means necessary. Dr. Burns testified that this relief related to the process for making referrals could not be more limited and still be effective. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 206:7-19. She also testified that these requirements are not intrusive and could not be less intrusive and still be effective. *Id.* at 210:8-211:4. The requirements that any individual working in ADOC can make referrals and any prisoner can self-refer are consistent with what Defendants proposed—providing further support that those requirements are the

least intrusive means necessary. *Compare* Doc. 1594 at 14-15, *with* Doc. 1821-2 at 1-2.

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### C.    Triage System

The Parties agreed on a referral triage system that requires a qualified triage nurse to designate the level of urgency of a referral and ensure timely follow-up by mental-health staff. The agreement defines "emergent," "urgent," and "routine" referrals and mandates the appropriate follow-up for each level, including timelines for such follow-up. Doc. 1821-1 at 4-5. For instance, urgent or emergent referrals must be communicated to mental-health staff verbally or by telephone as soon as possible, but in no case longer than one hour. Doc. 1821-2 at 3.

The agreement also requires that each major facility designate one nurse who is at least an RN with mental-health training to serve as the triage nurse. Doc. 1821-1 at 2-3. The Parties agreed that the designated triage nurse shall "routinely and regularly" check for completed referral forms upon returning from leaving the office unattended and that the designated box for referral forms shall be checked at least hourly and at the end of the triage nurse's shift. *Id.* at 4. The Parties also agreed that the triage nurse shall review each referral, whether written or verbal, within one hour

of receipt, and determine whether the referral is routine, urgent, or emergent. *Id.* at 5. The Parties agreed on how and by when the triage nurse would communicate each level of referral to mental-health staff for follow-up. *Id.* at 5-6.

This relief is narrowly drawn to address the Court's liability finding that ADOC "does not have a system to triage and identify the urgency of each request, and to make referrals according to the level of urgency." *Braggs*, 257 F. Supp. 3d at 1203; *see also id.* at 1248 (making the same finding about Tutwiler specifically).

Evidence from the liability trial demonstrates that this relief is necessary. For example, "According to Dr. Patterson the defense expert, triaging is important because the assessment process enables clinicians to determine appropriate next steps, and delays in doing so pose a risk of untreated symptoms, including a risk of death from critical yet unmet treatment needs." *Braggs*, 257 F. Supp. 3d at 1203. Dr. Patterson explained that he recommended to ADOC in August 2016 that it have "time frames that designate the level of referral" and that it modify "the referral form to include urgent, emergent, and routine." Dr. Raymond Patterson, Jan. 13, 2017 Trial Tr., at 213:5-13, 215:18-216:2. He testified that ADOC responded, "[W]e will do that." *Id.* at 213:5-13. But Dr. Patterson was unaware of any follow-up audit done to confirm that ADOC had in fact implemented such a system, and Defense Counsel confirmed that none had been done. *Id.* at 213:20-214:21.

82

Evidence from the remedial record further confirms that this relief is necessary. During the suicide prevention remedial trial, Dr. Burns testified that having a system of varied urgencies for referrals and follow-up requirements for each level of urgency is a necessary part of a suicide prevention program. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 203:22-204:11. Dr. Burns testified that the triage process requirements agreed to by the Parties are necessary for suicide prevention. *Id.* at 211:5-17, 212:9-14. She also previously testified regarding how correctional staff should handle emergent referrals. Dr. Kathryn Burns, Apr. 27, 2018 Trial Tr., at 10:9-16. The Parties' agreements regarding timelines for reviewing written referrals are necessary to overcome problems such as "issues with the paper getting from point A to point B and the inmate actually getting seen." *Id.* at 11:5-8, 14:18-15:3.

Evidence from the remedial record also confirms that this relief is narrowly drawn and the least intrusive means necessary. Dr. Burns testified that the triage process requirements could not be more limited and still be effective for adequate suicide prevention. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 204:12-17. She also testified that the triage process requirements are the least intrusive means necessary. *See id.* at 211:18-212:8, 236:15-25.

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### D.    System for Tracking Referrals

The Parties also agreed on a system for tracking referrals to ensure that they are triaged and responded to timely and adequately. The agreement specifies a form to be used for written referrals, specifies the information that must be included on the form, and requires that the form be submitted to mental health within two hours of when the need for the referral becomes apparent to the referring individual. Doc. 1821-2 at 3-5. The agreement specifies where blank referral forms should be kept in the major facilities and that completed forms should be placed in a designated location in the mental-health area of a facility. *Id.* at 3-4. The agreement also requires each major facility's mental-health staff to maintain a Mental-Health Referral Log. Doc. 1821-1 at 5-7. Each mental-health referral must be logged immediately upon receipt and updated as necessary after triage. *Id.* at 5-6. Any change to the status of a referral must be noted on the referral log. Doc. 1821-2 at 6.

This relief is narrowly drawn to address the Court's liability finding that ADOC "does not have any system of tracking and processing referrals to ensure that urgent requests are actually referred to providers, or that providers are able to handle

requests in a timely fashion." *Braggs*, 257 F. Supp. 3d at 1203; *see also id.* at 1248 (making the same finding about Tutwiler specifically).

Evidence presented at the liability trial demonstrates that this relief is necessary. For example, Dr. Burns testified that missing referrals could create a substantial risk of harm and that tracking referrals and using the information gathered from tracking referrals to make corrections could reduce the likelihood of missing referrals and improve timeliness of responses. Dr. Kathryn Burns, Dec. 13, 2016 Trial Tr., at 107:2-14.

Evidence presented at the liability trial also demonstrates that this relief is the least intrusive means necessary. Dr. Burns testified that most other state prison systems have referral logs. Dr. Kathryn Burns, Dec. 12, 2016 Trial Tr., at 64:24-25.

Evidence in the remedial record further demonstrates that this relief is necessary. During the suicide prevention remedial trial, Dr. Burns testified that having a system for logging and tracking referrals, urgency levels, and follow-ups to referrals are necessary for a suicide prevention program. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 205:2-7. Both Dr. Burns and Dr. Perrien stated that ADOC should use a tracking log "to track inmate self-referrals and compliance with emergent, urgent, and routine referrals." Doc. 2416-1 (R. & R. of Kathryn Burns, MD, MPH & Mary Perrien, PhD on Suicide Prevention in the ADOC) at 17.

85

Evidence in the remedial record also demonstrates that this relief is narrowly drawn and the least intrusive means necessary. Dr. Burns testified that the Parties' agreed-upon manner of logging and tracking referrals and follow-ups could not be more limited. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 205:8-17. Moreover, Dr. Burns testified that the requirements regarding logging, tracking, and following up on referrals are the least intrusive means of remedying the constitutional violation. *See id.* at 205:18-206:6, 236:15-25.

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## VII.   TREATMENT PLANNING REMEDY (Docs. 1865, 1865-1)

In the Liability Opinion, the Court found that ADOC fails to provide adequate treatment planning. *Braggs*, 257 F. Supp. 3d at 1206. The Court noted that "[t]reatment planning is the foundation of all forms of healthcare" and explained that, during the treatment planning process, "providers involved in the treatment identify the patient's target symptoms, treatment goals, and next steps, and coordinate long-term care as necessary." *Id.* The Court identified many problems with individual treatment planning, including makeup of treatment teams, inadequate treatment team meetings, failure to create individualized treatment plans, the impact of frequent transfers on treatment planning, and the impact of staff

turnover. *Id.* at 1206-08 (summarizing evidence). The Court concluded that, "without the continuity of care and consistent treatment approaches provided through proper treatment planning, providers are substantially hindered from addressing symptoms of mental illness, exposing patients to continued pain and suffering, worsening self-injurious behavior, serious bodily injury, or even death." *Id.* at 1208.

The Parties agreed to remedies addressing the treatment planning failures identified by the Court. *See* Doc. 1865. The Parties agreed to clarifications during open court and the Court entered the Treatment Planning Remedy as an order on June 4, 2018. Docs. 1865, 1865-1.

Evidence presented at the liability trial demonstrates that the Treatment Planning Remedy is necessary. Underscoring the importance of treatment plans, Dr. Patterson testified, "If there's one document that I'm looking for in a medical record that will give me an idea of what's going on currently and what the individual situation or circumstances are at the time, it would be the treatment plan." Dr. Raymond Patterson, Jan. 31, 2017 Trial Tr., at 58:11-14. Dr. Patterson also testified that he found ADOC's treatment planning to be "seriously deficient." *Id.* at 256:25-257:3 (discussing Jt. Ex. 461). His conclusion was confirmed by numerous audits over the years indicating deficiencies in treatment plans. *See* Pls. Ex. 689 (MHM Corrective Action – Donaldson May 2013) at ADOC045465-66; Teresa Houser, Jan.

17, 2017 Trial Tr., at 147:4-148:23 (discussing Pls. Ex. 135 (Corrective Action Plans)). Associate Commissioner Naglich testified regarding deficiencies in treatment planning that she had been informed about since at least 2011. Assoc. Comm'r Ruth Naglich, Dec. 20, 2016 Trial Tr., at 112:1-117:7 (discussing Pls. Ex. 1190 (2011 Clinical Contract Compliance Report), Pls. Ex. 1191 (2012 Clinical Contract Compliance Report), Pls. Ex. 114 (2013 Clinical Contract Compliance Report), Pls. Ex. 105 (2014 Clinical Contract Compliance Report), Pls. Ex. 532 (2015 Clinical Contract Compliance Report), and Pls. Ex. 115 (2016 Clinical Contract Compliance Report)). She also testified that generic treatment plans do not adequately assess or address a prisoner's needs, frustrating the goal of improving a prisoner's treatment and outcome. *See id.* at 117-17-25.

Evidence in the remedial record demonstrates that the Treatment Planning Remedy is the least intrusive means necessary. Dr. Kern acknowledged at the suicide prevention remedial trial that the Treatment Planning Remedy, if implemented, would ensure that ADOC's treatment plans are adequate and individualized and will result in an improved crisis care program. Dr. Edward Kern, Mar. 28, 2019 Trial Tr., at 19:24-20-9.

For reasons stated here and reasons to be presented at the upcoming hearing, the Court should conclude that the Treatment Planning Remedy (Docs. 1865, 1865-1) satisfies the PLRA's need-narrowness-intrusiveness requirement and will not

have an undue "adverse impact on public safety or the operation of a criminal justice system." § 3626(a)(1)(A).

### A. Treatment Team Composition

The Parties agreed to modify the treatment planning process to ensure that treatment teams consist of individuals who would benefit the patients the most, including patients themselves. The Parties agreed that each prisoner on the mental-health caseload must have a designated treatment team. Doc. 1865-1 at 1. The treatment team must include the patient (unless contraindicated), the patient's assigned psychologist or mental-health professional (who will organize and chair the team), and either a psychiatrist or CRNP if the individual has been prescribed mental-health medications. *Id.* at 2. Treatment teams for patients in mental-health housing units must include additional staff. *Id.* at 3-4. Additional team members may be added as clinically determined by the chair of the treatment team. *Id.* at 4. Treatment team meetings must be rescheduled if a clinician or assigned mental-health professional cannot attend. *Id*. at 9-10.

This relief is narrowly drawn to address the Court's liability findings. In particular, the Court found, "When staff from multiple disciplines—for example, psychiatric, psychological, nursing, and even correctional—are involved in a patient's treatment, treatment planning should involve key people from each discipline in order to ensure consistent and informed treatment." *Braggs*, 257 F.

Supp. 3d at 1206. Regarding treatment team meeting attendance, the Court found that treatment team meetings often occurred haphazardly with members of the treatment team missing and signing treatment plans on different days. *Id.* at 1207. The Court also found that treatment team meetings often were not attended by providers with prescribing privileges, resulting in treatment plans developed without the input of a provider with knowledge of psychotropic medications. *Id.*

Evidence from the liability trial demonstrates that this relief is necessary. For example, "[e]xperts from both sides agreed that ADOC's treatment planning without all necessary participants is problematic and falls below the standard of care because it deprives patients of a coherent treatment plan and continuity of care." *Id.*

Evidence in the remedial record further demonstrates that this relief is necessary. Dr. Burns testified that these requirements are necessary for adequate suicide prevention because they address and ameliorate risk. *See* Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 213:6-23. She testified that patients should be part of their treatment team because it promotes empowerment and taking responsibility for one's treatment and recovery. Dr. Kathryn Burns, Apr. 27, 2018 Trial Tr., at 57:18-58:14. Additionally, she emphasized the importance of considering the acuity level of the patient when determining the composition of the treatment team. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 213:24-214:8.

Evidence in the remedial record also demonstrates that this relief is narrowly drawn and the least intrusive means necessary. Dr. Burns testified that these requirements are narrowly tailored and the least intrusive means necessary because they are standard requirements in mental-health care and they permit changes to treatment teams depending on the patient's acuity level. *See id*. at 214:9-22, 236:15-25.

That several parts of the remedy are consistent with Defendants' Proposed Remedial Plan on Psychotherapy and Treatment Planning further demonstrates that those requirements are the least intrusive means necessary. The relief requiring all treatment team members to be present at each treatment team meeting is consistent with what Defendants included in their proposed remedial plan. *Compare* Doc. 1830 (State's Phase 2A Proposed Remedial Plan on Psychotherapy & Treatment Planning) at 13, *with* Doc. 1865-1 at 9. The requirements regarding treatment team composition are also consistent with what Defendants proposed. *Compare* Doc. 1830 at 15, *and* Doc. 1594 at 24-25, *with* Doc. 1865-1 at 2-4.

As such, the Court should find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### B.    Treatment Team Meetings

The Parties agreed that treatment team meetings must include a review of psychotherapy, medication compliance, disciplinary actions, and other events that may be relevant. Doc. 1865-1 at 4. The Parties also agreed on timeframes for conducting treatment team meetings based on acuity level and possible changes in circumstances. *Id.* at 5-7. For example, while outpatient treatment team meetings are only required every nine months, treatment team meetings for individuals in a Stabilization Unit ("SU") must occur at least every three days. *Id*. at 5-6. If certain events occur—including housing changes, changes in mental-health code, or a need for clinicians to consider involuntary medication—the treatment team must meet to review and amend the treatment. *Id*. at 14-18. Additionally, patients must be allowed to attend and participate in meetings unless there is an unreasonable risk or clinical reason. *Id.* at 7-8. However, patients cannot be disciplined for a failure or refusal to attend treatment team meetings. *Id.* at 8. Records of each treatment team meeting must be kept in the patient's mental-health records. *Id*. at 10.

This relief is narrowly drawn to address the Court's liability findings. The requirements regarding the nature and frequency of treatment team meetings are directly tied to the Court's conclusion that treatment plans failed to reflect changes in the patients' treatment environment. *See Braggs*, 257 F. Supp. 3d at 1207. The requirements regarding patient attendance are directly tied to the Court's conclusion

that "prisoners have almost no ability to ensure the consistency of their own treatment" in prisons generally and in ADOC specifically. *See id.* at 1206. In addition, the Court concluded that "haphazard attendance creates a risk of different providers having an inconsistent approach or course of treatment for the same patient because some of the treatment team are unaware that a new treatment plan has been put into effect." *Id.* at 1207.

Evidence from the liability trial confirms that this relief is necessary. For example, Dr. Burns testified that inconsistent approaches to treatment pose a substantial risk of serious harm, such as self-injury. *Id.* The Court also heard testimony that, without coordinated treatment planning, treatment is often ineffective and runs "a substantial risk of prolonging pain and suffering of those who have mental illnesses." *Id.* at 1206.

Evidence from the remedial record further confirms that this relief is necessary, narrowly drawn, and the least intrusive means necessary. Dr. Burns testified that this relief takes into account that individuals with more severe mental-health needs may need to be seen more often than more stable individuals. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 213:20-214:8. Dr. Burns also testified that this relief is necessary to address the risks surrounding inadequate treatment planning, narrowly tailored, and the least intrusive means to remedy the constitutional violation. *See id.* at 214:9-22, 236:15-25.

Additional evidence in the remedial record confirms that this relief is the least intrusive means necessary. Some of this relief is consistent with what Defendants submitted in their proposed remedial plan. The relief regarding the patient's participation in treatment team meetings is consistent with Defendants' proposal. *Compare* Doc. 1830 at 15, *with* Doc. 1865-1 at 7-8. Information that must be reviewed at the treatment team meetings is also consistent with Defendants' proposal. *Compare* Doc. 1830 at 16, *with* Doc. 1865-1 at 4.

For these reasons, the Court should find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## C.    Individualized Treatment Plans

The Parties agreed that every individual on the mental-health caseload will receive a treatment plan after being added to the caseload. Doc. 1865-1 at 11. Treatment plans must be individualized and address changes in goals, timeframes, and any failure to meet a previous goal. *Id.* at 12-13. Treatment plans must include certain information, including explanations for why previous treatment goals were unmet, aftercare plans, and structured and unstructured activities to be provided. *Id.* at 13-14. Treatment plans must be reviewed and amended following circumstances that may reflect a change in mental-health status. The remedy specifically requires

amendments to treatment plans following housing placement changes, including movement to and from RTUs, crisis cells, segregation, or a hospital. *Id.* at 14-16. Treatment plans must also be amended following a change in mental-health code or involuntary medication status. *Id.* at 17-18.

This relief is narrowly drawn to address the Court's liability findings regarding the inadequacies of treatment plans. The Court concluded that "ADOC's treatment plans are not individualized to each prisoner's symptoms and needs." *Braggs*, 257 F. Supp. 3d at 1207. The Court found repeated examples of rote repetition and concluded that "[w]hether the rote repetition results from a lack of follow-through on the plans or mere sloppiness in filling out the plans, both present hazards to prisoners with mental illness." *Id.*

Evidence from the liability trial confirms that this relief is necessary. Much of the Court's findings regarding inadequate treatment plans relied on Dr. Patterson's description of ADOC's treatment plans as "cookie cutter." *Id.*; *see also* Jt. Ex. 461 at 67 ("[T]reatment plans . . . are 'cookie cutter' and have the same problems listed over and over again as well as the same interventions and same objectives despite whatever improvement or lack thereof the individual inmate has experienced."). ADOC's treatment plans often had similar goal statements, such as "identify triggers," repeated in subsequent plans without reflecting any changes to the patient or the patient's environment, even following suicide placements. *Braggs*, 257 F.

Supp. 3d at 1207. Dr. Patterson explained that a "cookie-cutter" treatment plan is inappropriate even if there is a lack of progress because different interventions should be tried. *Id.* "Because written treatment plans are generic, counselors and patients often have to start from scratch when patients are moved from counselor to counselor." *Id.* at 1208.

Evidence from the suicide prevention remedial trial confirms that this relief is necessary, narrowly drawn, and the least intrusive means necessary. Dr. Burns testified that treatment planning is a means of identifying and reducing suicide risks for all individuals on the caseload. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 126:18-25. Dr. Burns also testified that this relief is necessary to address the level of risk a patient presents, narrowly tailored, and the least intrusive means necessary. *See id.* at 214:23-216:12, 236:15-25.

Additional evidence in the remedial record confirms that this relief is the least intrusive means necessary. Some of this relief is consistent with what Defendants included in their proposed remedial plan. The relief providing that treatment plans will be reviewed after a change in mental-health status is largely consistent with what Defendants proposed. *Compare* Doc. 1830 at 5, 14, *with* Doc. 1865-1 at 11, 17-18. The requirements regarding what information must be included in treatment plans are largely consistent with what Defendants proposed. *Compare* Doc. 1830 at 16, *with* Doc. 1865-1 at 13-14.

96

For these reasons, the Court should find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### D.   Continuity of Care

To address issues regarding continuity of care, the Treatment Planning Remedy includes requirements addressing both (1) treatment planning upon a prisoner's transfer to another facility or upon a change in provider, and (2) mental-health progress notes. Doc. 1865-1 at 18-28.

This relief is narrowly drawn to address the Court's finding that both the frequent transfer of prisoners and mental-health staff turnover exacerbate other deficiencies in ADOC's treatment planning. *Braggs*, 257 F. Supp. 3d at 1208. The Court found that continuity of care is vital and that failure to provide continuity of care through treatment planning and detailed progress notes can expose patients to "continued pain and suffering, worsening self-injurious behavior, serious bodily injury, or even death." *Id.*

Evidence from the liability trial demonstrates that this relief is necessary. The Court credited testimony that transfers between providers can adversely affect care because a new provider must build rapport with the patient. *Id.* Furthermore, the poor quality of treatment plans makes it difficult for new providers to continue the course

of treatment. *Id.* These findings were supported by the testimony of Named Plaintiff C.J., who was frequently transferred between facilities and experienced changes in providers. *See* C.J., Dec. 13, 2016 Trial Tr., at 34:12-35:3 (testifying that transfer impacts treatment because of the trust necessary in treatment and explaining that he would not have the same counselor the next time he returned to a facility due to staff turnover).

### 1.  Treatment Plans Upon Transfer or Provider Change

The Parties agreed to relief to address both prisoner transfer and staff turnover. This relief places limits on the transfer of individuals when there are concerns about the continuity of care and require the treatment team to approve some transfers. Doc. 1865-1 at 19-20. Furthermore, this relief outlines requirements for certain information—such as relevant patient background and successful or unsuccessful treatment—to be included in the transfer note for all patients on the mental-health caseload. *Id.* at 20-22. The treatment team at the receiving facility must promptly meet to review the treatment plan and adjust it as needed. *Id.* at 23. To address frequent staff turnover, the Parties agreed that, whenever possible, departing providers should prepare transfer notes for patients under their care before their employment ends. *Id.* at 27-28. And vacancies on a treatment team must be filled on the earlier of thirty days or at least twenty-four hours before the next regularly

scheduled treatment team meeting for that patient. *Id*. at 28. This relief is narrowly drawn to address the Court's liability findings discussed above in this section.

Evidence from the remedial record confirms that this relief is necessary, narrowly drawn, and the least intrusive means necessary. Dr. Burns testified at the suicide prevention remedial trial that the requirements regarding prisoner transfer are necessary to ensure that patients do not fall through the cracks when transferring to a different facility. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 216:13-217:13. Additionally, she testified that the use of a transfer note with all necessary information will assist providers and the patient. *Id.* at 217:13-20. Dr. Burns also stated that these requirements are narrowly tailored and the least intrusive means necessary. *See id.* at 217:21-218:7, 236:15-25.

Regarding the relief related to staff turnover, Dr. Burns stated that a transfer process is necessary not only to preserve continuity of care, but also to prevent risks associated with the patient feeling abandoned in the transition process. *Id.* at 221:4-16. Like the relief regarding prisoner transfer, Dr. Burns testified that this relief regarding the transfer process is narrowly tailored and the least intrusive means necessary. *See id.* at 221:17-222:6, 236:15-25.

For these reasons, the Court should conclude that the relief related to prisoner transfer and staff turnover in the Treatment Planning Remedy is narrowly drawn, extends no further than necessary to correct the constitutional violations found by

the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## 2. Mental-Health Progress Notes

The Parties agreed to relief requiring progress notes for any "significant clinical encounter," as defined by the Parties. Doc. 1865-1 at 24. Progress notes must be kept in patients' mental-health records. *Id.* at 25. They must be sufficiently detailed and contain certain specified information, including treatment, symptoms, date of session, start and stop times of sessions (unless the contact primarily concerns medication management), and whether the session was out-of-cell and confidential. *Id.* at 25-26. They also must correlate with treatment plan goals. *Id.* at 26-27.

This relief is narrowly drawn to remedy the Court's finding that "progress notes often contain insufficient information to enable a different provider to learn about the patient or continue a consistent course of treatment." *Braggs*, 257 F. Supp. 3d at 1208. In particular, the requirement that providers document the start and stop times of clinical encounters other than medication management sessions is narrowly drawn to remedy the Court's finding that "mental-health evaluations are often brief and perfunctory" because it allows ADOC to detect whether the encounters are too brief in its Continuous Quality Improvement ("CQI") process. *Id.* at 1233; *see also id.* at 1209 n.35. In addition, the requirement that progress notes document whether the interaction was out-of-cell and confidential is narrowly drawn to remedy the

Court's findings regarding inadequate confidentiality in ADOC's mental-healthcare services. *Id.* at 1210; *see also infra* Sections VIII(B), IX.

Evidence from the liability trial confirms that this relief is necessary. For example, Dr. Patterson testified that ADOC's progress notes "only contained short descriptions of symptoms, instead of reflecting clinical judgments and overall assessments of the patient's progress." *Braggs*, 257 F. Supp. 3d at 1209.

> Dr. Burns noted that the overwhelming majority of progress notes she reviewed indicated that the patient was 'fine,' had 'no complaints,' or had nothing to talk about. She explained that a short, vague statement like "I'm alright" is not a sufficient indicator of a stable mental-health state: instead of moving on to the next patient simply because the patient's initial self-reporting does not expressly indicate distress, the clinician should probe deeper; notes on asking follow-up questions about medications, mood, job assignments, or disciplinary sanctions would reflect a proper counseling session.

*Id.* The progress note remedial requirements largely track testimony from Dr. Burns and ADOC mental-health staff about the "SOAP note" format, a fundamental mental-healthcare documentation format. *See* Dr. Kathryn Burns, Dec. 12, 2016 Trial Tr., at 239:8-16 (discussing Jt. Ex. 235 (Jamie Wallace Mental-Health Record)); Dr. Robert Hunter, Dec. 7, 2016 Trial Tr., at 73:9-23 (discussing Jt. Ex. 456 (Q.B. Mental-Health Record)); Dr. Robert Hunter, Dec. 8, 2016 Trial Tr., at 13:3-14:8 (discussing Jt. Ex. 232 (Jamie Wallace Mental-Health Record)).

Evidence from the remedial record further confirms that this relief is necessary and the least intrusive means necessary. Dr. Burns testified during the

suicide prevention remedial trial that these requirements are necessary for an adequate suicide prevention program, are not intrusive because they are simply the standard way mental-health professionals communicate, and could not be less intrusive and still be effective. *See* Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 218:8-219:3, 220:9-220:21, 236:15-25. In addition, this relief is largely consistent with what Defendants submitted in their proposed remedial plan. *Compare* Doc. 1830 at 6, 12, *with* Doc. 1865-1 at 24-27.

For these reasons, the Court should find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## VIII. PSYCHOTHERAPY REMEDY (Docs. 1899, 1899-1)

In the Liability Opinion, the Court found that "mental-health understaffing, correctional understaffing, the use of unsupervised, unlicensed counselors, and lack of confidentiality undermine the efficacy and frequency of psychotherapy" in ADOC. *Braggs*, 257 F. Supp. 3d at 1212. In particular, the Court found that "inadequate mental-health staffing combined with the increasing number of prisoners on the mental-health caseload has driven up the number of prisoners on each counselor's caseload. As a result, both the frequency and quality of counseling sessions have suffered over time." *Id.* at 1208. The Court concluded that ADOC's

inadequate psychotherapy placed prisoners with serious mental-health needs at "a substantial risk of serious harm." *Id.* at 1212.

The Parties agreed to remedies addressing psychotherapy. Doc. 1881-1 (Stipulations Regarding Treatment Requirements & Confidentiality). The Parties submitted amended stipulations incorporating some of the clarifications made in court. Doc. 1893-1 (Am. Stipulations Regarding Treatment Requirements & Confidentiality). The Parties agreed to further modifications, and the Court entered the Psychotherapy Remedy as an order on June 19, 2018. Docs. 1899, 1899-1.

Evidence in the remedial record demonstrates that the Psychotherapy Remedy is the least intrusive means necessary. Dr. Kern acknowledged that implementation of the Psychotherapy Remedy would ensure adequate psychotherapy for prisoners with mental illnesses and that implementation of the Psychotherapy Remedy is necessary for suicide prevention. *See* Dr. Edward Kern, Mar. 28, 2019 Trial Tr., at 20:24-22:3.

For reasons stated here and reasons to be presented at the upcoming hearing, the Court should conclude that the Psychotherapy Remedy (Docs. 1899, 1899-1) satisfies the PLRA's need-narrowness-intrusiveness requirement and has no undue "adverse impact on public safety or the operation of a criminal justice system." § 3626(a)(1)(A).

## A. Treatment Modalities

The Psychotherapy Remedy requires ADOC to tailor mental-health treatment to the individual needs of patients. Doc. 1899-1 at 1-4. It also requires ADOC to provide various evidence-based treatment modalities, not just psychotropic medication. *Id.* at 1-3.

This relief is narrowly drawn to address the Court's liability findings regarding treatment modalities. The Court found that individual and group therapy in ADOC were inadequate. *Braggs*, 257 F. Supp. 3d at 1208-11. In particular, the Court found a dearth of group therapy. *See id.* at 1185, 1187, 1196, 1208-09, 1211.

Evidence presented at the liability trial confirms that this relief is necessary. For example, Dr. Burns testified extensively about the importance of providing multiple treatment modalities and that not providing individual or group therapy places prisoners with serious mental-health needs at "a substantial risk of serious harm." *Id.* at 1208.

Evidence presented at the suicide prevention remedial trial further confirms that this relief is necessary, narrowly drawn, and the least intrusive means necessary. Dr. Burns testified that this relief is necessary, narrowly tailored, and the least intrusive means of ensuring an adequate suicide prevention program. *See* Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 223:1-224:13, 236:15-25. She testified that the relief was "specifically tailored to look at the patient's . . . level of need and level

of risk they present and then address that risk and need through different types of interventions and different frequencies and intensities of interventions." *Id.* at 224:1-5. Dr. Kern acknowledged the importance of individualized treatment in the context of suicide watch, testifying that if someone on suicide watch would benefit from group therapy, that should be reflected in their treatment plan and they should be provided group therapy. Dr. Edward Kern, Mar. 29, 2019 Trial Tr., at 9:12-17.

For these reasons, the Court should find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## B.    Confidentiality

The Parties agreed to relief addressing confidentiality in counseling sessions. Doc. 1899-1 at 4-5. Generally, the confidentiality relief in the Psychotherapy Remedy requires that individual counseling sessions, medication management encounters, and therapeutic groups take place out-of-cell in a setting that provides confidentiality. *Id.* Where confidentiality cannot be maintained, based upon a clinical determination, the reason and the actions taken to maximize confidentiality must be documented in progress notes. *Id.* at 5.

This relief is narrowly drawn to address the Court's liability findings regarding inadequate confidentiality in counseling. The Court found that

"confidentiality between providers and patients is a hallmark of and a necessary condition for mental-health treatment," *Braggs*, 257 F. Supp. 3d at 1210, and that the lack of confidentiality contributes to the inadequacy of psychotherapy in ADOC, *see id.* at 1210, 1212, 1216, 1243 n.71. The Court found that correctional officers often stand within earshot of mental-health sessions. *Id.* at 1210. The Court also found that clinical contacts within ADOC frequently occur cell-side, even in the SU, where some of the people with the most severe mental illnesses are housed. *Id.* at 1185, 1216.

Evidence in the remedial record confirms that this relief is necessary. Class member W.B. testified that an officer stands nearby whenever mental-health staff meet with a prisoner and that his mental-health contacts are never confidential. W.B., Feb. 12, 2018 R.D. Trial Tr., at 242:9-20. The Court heard testimony from several witnesses that lack of confidentiality in the provision of mental-health care has a chilling effect on prisoners' willingness to seek mental-health care. *See* Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 127:1-14; Drs. Kathryn Burns & Mary Perrien, Apr. 9, 2019 Trial Tr., at 204:16-205:5; Dr. Craig Haney, Feb. 15, 2018 R.D. Trial Tr., at 233:7-24; Eldon Vail, Feb. 13, 2018 R.D. Trial Tr., at 187:19-188:9. In its remedial order on inpatient units, the Court reiterated the importance of ensuring confidentiality for not only individual therapy but also group therapy. *Braggs*, 2020 WL 2789880, at *10. The Court credited Dr. Burns's testimony that therapeutic

groups should be conducted in confidential settings because "it is important that there not be outside bystanders, but the people in the group maintain confidentiality within the group with one another." *Id.* (quoting Dr. Kathryn Burns, Apr. 27, 2018 Trial Tr., at 127).

Evidence presented at the suicide prevention remedial trial confirms that this relief is necessary, narrowly drawn, and the least intrusive means necessary. Dr. Burns testified that this requirement in the Psychotherapy Remedy is necessary, narrowly tailored, and the least intrusive means to ensuring an adequate suicide prevention program. *See* Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 224:14-226:1, 236:15-25. Moreover, the confidentiality recommendation in Drs. Burns's and Perrien's suicide prevention report and supporting testimony lend further support that this relief satisfies the PLRA. In their report, Drs. Burns and Perrien recommended that ADOC immediately ensure that clinical contacts are out-of-cell and confidential. Doc. 2416-4 (Suppl. Recommendations of Kathryn Burns, MD, MPH & Mary Perrien, PhD Regarding Suicide Prevention in the ADOC) at 4. They recommended this because they observed clinical contacts that were not confidential during their facility tours in 2019, because they were unable to tell from documents whether clinical contacts occurred confidentially, and because the ability to detect and address suicide risk is enhanced if prisoners know their contacts to be confidential. Drs. Kathryn Burns & Mary Perrien, Apr. 9, 2019 Trial Tr., at 202:16-

203:21. Drs. Burns and Perrien testified that the confidentiality relief they recommended is necessary, narrowly drawn, and the least intrusive means to ensure that clinicians have the information they need to accurately assess patients' risk of self-harm. *Id.* at 203:25-204:15. The Court has already ordered Defendants to comply with Drs. Burns's and Perrien's confidentiality recommendation and made PLRA findings as to that requirement. *Braggs*, 383 F. Supp. 3d at 1277 (rejecting Defendants' argument that this relief is unnecessary because it is covered in other remedial orders on the basis that "ADOC continues to violate the terms of previous remedial orders covering this issue").

In addition, this relief is largely consistent with what Defendants submitted in their proposed remedial plan regarding confidentiality—further indicating it is the least intrusive means necessary. *Compare* Doc. 1830 at 5-11, *with* Doc. 1899-1 at 4-5.

The Court should therefore conclude that the confidentiality relief in the Psychotherapy Remedy, which partially overlaps with the suicide prevention confidentiality relief, is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### C.   Documentation Obligations

The Parties agreed to requirements for documenting mental-health services in patients' mental-health records and elsewhere. Doc. 1899-1 at 5-8. More specifically, the Parties agreed that all mental-health contacts must be documented in a patient's mental-health records; all significant clinical interactions must be documented in a progress note, consistent with the Treatment Planning Remedy discussed above; group therapy and activities must be documented in each patient's medical records and on group logs identifying certain specified information; and any determination that an individual or group activity or treatment intervention cannot take place out-of-cell must be documented. *See id.*

This relief is narrowly drawn to address the Court's liability findings regarding psychotherapy. In particular, the Court found that counseling sessions within ADOC were often inadequate, as evidenced by inadequate documentation. *See Braggs*, 257 F. Supp. 3d at 1209, 1244; *see also supra* Section VII(D)(2).

Evidence presented throughout the liability and remedial proceedings demonstrates that documentation is necessary to ensure that mental-health care is provided. Witness after witness have testified that, in corrections and healthcare contexts, "[i]f it's not documented, it didn't happen." Dr. Robert Hunter, Dec. 8, 2016 Trial Tr., at 121:22-122:9; *see* Ali Davis-Walker, Jan. 5, 2017 R.D. Trial Tr., at 162:6-8 (discussing Pls. Ex. 721 (Jan. 28, 2015 MHM Ala. Statewide CQI 4th

Quarterly Meeting)); Dr. Kathryn Burns, Dec. 12, 2016 Trial Tr., at 110:15-23;

Eldon Vail, Jan. 4, 2017 Trial Tr., at 32:23-33:6; *see also* Dr. Edward Kern, Feb. 8,

2018 R.D. Trial Tr., at 129:16-22 (explaining why documentation is important). Dr.

Burns testified that the standard of care requires that every clinical contact be

documented. Dr. Kathryn Burns, Apr. 27, 2018 Trial Tr., at 54:23-55:7.

Evidence from the liability trial demonstrates that documentation is also

necessary to ensure continuity of care from one provider to another. *Braggs*, 257 F.

Supp. 3d at 1190 n.11 ("According to experts on both sides, treatment of serious

mental illnesses requires, at a minimum, multidisciplinary efforts to coordinate and

implement interventions, including psychotherapy or counseling, psychotropic

medications, and monitoring for signs of decompensation or progress. It also

requires careful treatment planning and maintaining medical records in order to

ensure continuity of care."); *id.* at 1204 n.31 ("Dr. Burns explained that inappropriate

classification of mentally ill patients partially stems from a lack of proper

documentation in treatment plans and progress notes. Combined with a high turnover

rate of staff and frequent transfers between facilities, inadequate documentation

means that information about a patient's symptoms and treatment is not well

preserved. As a result, symptoms are evaluated without the context and history of

each patient, leading to a higher risk of under-classifying and underestimating the

acuity of mental illnesses.").

Evidence from the suicide prevention remedial trial further demonstrates that this relief is necessary, narrowly drawn, and the least intrusive means necessary. Dr. Burns testified that this relief is necessary because it "documents the risk as well as the interventions aimed at reducing the risk and communicates that to other people on the treatment team." Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 226:2-21. She further testified that this relief is narrowly drawn and the least intrusive means to create an adequate suicide prevention program because it is "consistent with standard mental health care." *Id.* at 226:22-227:15, 236:15-25. Further, the Court has already ordered Defendants to comply with Drs. Burns's and Perrien's confidentiality recommendation, which includes a documentation requirement, and made PLRA findings as to that requirement based on the significant supporting evidence in the record. *See Braggs*, 383 F. Supp. 3d at 1277.

In addition, the requirements for keeping a log for group activity and therapy is consistent with what Defendants proposed—providing further support that that relief is the least intrusive means necessary. *Compare* Doc. 1830 at 5, *with* Doc. 1899-1 at 6-7.

The Court should therefore conclude that the documentation relief in the Psychotherapy Remedy is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### D.      Telepsychiatry Requirements

The Parties agreed that a psychiatric provider treating a patient via telepsychiatry must receive certain documentation from the patient's mental-health record in advance of the session. Doc. 1899-1 at 8. This relief is narrowly drawn to address the Court's liability findings regarding inadequate documentation discussed above, *see supra* Section VII(D)(2), and necessary for the same reasons documentation is necessary for in-person treatment, *see supra* Section VIII(C).

Evidence in the remedial record demonstrates that this relief is the least intrusive means necessary. ADOC already has provided some mental-health care through telepsychiatry. *See* Assoc. Comm'r Ruth Naglich, Sept. 18, 2018 R.D. Trial Tr., at 129:4-15, 133:23-25, 134:18-23 (discussing Pls. Dem. Ex. 193 (Mental Health Staffing by Position & Facility at the End of Apr. 2018) and testifying that psychiatrist hours are filled by telepsychiatry); *see also* Pls. Ex. 1302 (July 2017 ADOC Request for Proposal for Comprehensive Inmate Healthcare Servs.) at 77, 81 (allowing for mental-health care to be provided by "tele-health"). Indeed, allowing for telepsychiatry under appropriate conditions is a partial solution to the challenges ADOC has faced with recruiting mental-health staff. *See Braggs*, 257 F. Supp. 3d at 1194 (finding that "ADOC has maintained mental-health staffing levels that are chronically insufficient across disciplines and facilities"); Dr. Kathryn Burns, Dec. 15, 2017 R.D. Trial Tr., at 25:9-15 (testifying that telepsychiatry is a partial solution

to understaffing); Dr. Mary Perrien, Dec. 12, 2017 R.D. Trial Tr., at 46:11-22 (testifying that telepsychiatry is a partial solution to mental-health understaffing). Without these remedial provisions providing the flexibility to use telepsychiatry in a minimally adequate fashion, the alternative would be for ADOC to provide all necessary care in-person.

Evidence presented at the suicide prevention remedial trial further demonstrates that this relief is necessary, narrowly drawn, and the least intrusive means necessary. Dr. Burns testified that this requirement is necessary, narrowly drawn, and the least intrusive means to ensure an adequate suicide prevention system. *See* Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 227:16-229:10, 236:15-25. She explained that this relief is necessary to ensure that the telepsychiatry provider has essential background information, such as recent lab results and whether the patient has been on suicide watch. *Id.* at 227:24-228:21.

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### E.   Sick Call Request Triage

The Parties agreed to requirements for the triage of mental-health sick call requests submitted by prisoners. Doc. 1899-1 at 8-9. Sick call requests must be triaged within two working days of receipt according to the triage requirements set

forth in the Referral Remedy. *Id.*; *see also supra* Section VI(C) (discussing Referral Remedy's triage requirements).

This relief is narrowly drawn to address the Court's liability finding that ADOC "does not have a system to triage and identify the urgency of each request [for mental-health care], and to make referrals according to the level of urgency." *Braggs*, 257 F. Supp. 3d at 1203; *see also id.* at 1248 (finding specifically that Tutwiler lacks a triage system).

Evidence presented at the liability trial confirms that this relief is necessary. For example, Dr. Patterson testified that triaging is important "because the assessment process enables clinicians to determine appropriate next steps, and delays in doing so pose a risk of untreated symptoms, including a risk of death from critical yet unmet treatment needs." *Id.* at 1203.

Evidence presented at the suicide prevention remedial trial further confirms that this relief is necessary, narrowly drawn, and the least intrusive means necessary. Dr. Burns testified that this requirement is necessary in a similar way as the referral triage system is necessary, narrowly drawn, and the least intrusive means to ensuring an adequate suicide prevention program. *See* Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 229:11-230:1, 236:15-25.

114

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## F.   Treatment Requirements for Prisoners Not on the Mental-Health Caseload and Prisoners on the Outpatient Caseload

The Parties agreed to base-level treatment requirements for prisoners not on ADOC's mental-health caseload as well as prisoners on the outpatient caseload.[13] Doc. 1899-1 at 9-13. These requirements set minimum frequencies for treatment team meetings, counseling appointments, and psychiatric provider appointments, with the caveat that they may occur more frequently "if clinically indicated." *Id.*

This relief is narrowly drawn to address the Court's liability finding that ADOC's treatment planning, counseling, and psychiatric care are inadequate. The Court found that these are necessary components of an adequate mental-healthcare system. *Braggs*, 257 F. Supp. 3d at 1206, 1208. Yet, as the Court found, ADOC's counseling, treatment planning, and mental-health staffing, including its psychiatric staffing, have been inadequate. *Id.* at 1193-1200, 1206-1212, 1248. These

---

[13] The outpatient caseload constitutes the majority of people on the mental-health caseload. These individuals "receive their care through outpatient services: they live in a unit that is not focused on treatment and ordinarily must go to a different part of the prison to see a mental-health provider." *Braggs*, 257 F. Supp. 3d at 1182. Prisoners not on the mental-health caseload can nevertheless develop a condition requiring placement on the caseload or have a serious mental-health need at a particular time.

inadequacies negatively affect prisoners on the mental-health caseload. Additionally, as ADOC lacks an adequate process for identifying prisoners with mental illnesses, there may be prisoners not on the caseload who need mental-health care and are not receiving it. *Id.* at 1203, 1206, 1248.

Evidence presented at the suicide prevention remedial trial demonstrates that this relief is necessary, narrowly drawn, and the least intrusive means necessary. Dr. Burns testified that these requirements are necessary, narrowly drawn, and the least intrusive means to ensuring an adequate suicide prevention program. *See* Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 230:2-231:21, 236:15-25. She explained that, regardless of whether someone is already receiving mental-health care, they could "be at risk or come to be at risk for suicide" after an adverse event, and that this relief is necessary for treating current conditions as well as surveilling any increase in risks so that the risk can be addressed. *Id.* at 230:22-231:8.

In addition, the requirement that patients on the outpatient caseload be seen by a licensed mental-health professional or psychologist at least every ninety days is the same as what Defendants proposed, providing further support that that requirement is the least intrusive means necessary. *Compare* Doc. 1830 at 6, *with* Doc. 1899-1 at 11.

For these reasons, the Court should find that the Psychotherapy Remedy's treatment requirements for people who are not on the mental-health caseload and for

116

people who are on the outpatient caseload are narrowly drawn, extend no further than necessary to correct the constitutional violations found by the Court, and are the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### G. Treatment Requirements for Structured Living Units, Stabilization Units, and Residential Treatment Units

The Psychotherapy Remedy includes requirements governing base-level mental-health treatment for SLUs, a diversionary outpatient unit, as well as SUs and RTUs, which are inpatient units. Doc. 1899-1 at 13-48. The relief for SLUs specifies requirements regarding initial assessments by nursing, psychiatric, and counseling staff. *Id.* at 14-15. The Parties also agreed to a gradual increase of structured and unstructured out-of-cell time in the SLUs, culminating in a minimum of ten hours of structured and ten hours of unstructured time per week. *Id.* at 15-17. The relief for RTUs and SUs similarly requires initial assessments by nursing, psychiatric, and counseling staff, and also sets minimum frequencies for treatment team meetings, counseling appointments, and psychiatric provider appointments. *Id.* at 17-20, 26-31, 34-39, 41-45. Like the treatment requirements for SLUs, the treatment requirements for RTUs and SUs also mandate a gradual increase of structured and unstructured out-of-cell time, culminating in a minimum of ten hours of structured and ten hours of unstructured time per week. *Id.* at 20-22, 31-33, 39-41, 45-47. Finally, the Parties agreed to limits on the length of stay in the SUs and RTUs to ensure that patients in those units are timely evaluated for transfer to a higher or

117

lower level of care and to prevent bottlenecks and languishing in a more restrictive level of care than is necessary. *Id.* at 22, 33-34, 41, 47-48.

This relief is narrowly drawn to address the Court's liability findings. As noted above, the Court held that "it is categorically inappropriate to place prisoners with serious mental illness in segregation absent extenuating circumstances." *Braggs*, 257 F. Supp. 3d at 1247. The Court also found that prisoners in segregation have less access to care than in general population. *Id.* at 1242. To address the problem of placing prisoners with SMIs in segregation, Defendants created SLUs as an alternative to segregation for prisoners with SMIs. Assoc. Comm'r Ruth Naglich, Feb. 7, 2018 Trial Tr., at 92:18-93:25; *id.* at 50:3-11 (explaining what SLUs are). For SLUs to not be as isolating as segregation, they must provide more out-of-cell time than is provided in segregation. *See Braggs*, 257 F. Supp. 3d at 1235 (defining segregation as confinement in a cell for 22.5 hours or more a day). The relief governing SLUs is narrowly tailored to ensure that these units do not function as segregation and that prisoners in the units obtain the care that they need.

This relief is also narrowly drawn to address the Court's liability findings that ADOC has provided inadequate mental-health care in its inpatient units—namely, the RTUs and SUs. *Id.* at 1212-17. These units have provided inadequate out-of-cell time, programming, and treatment. *Id.* As the Court recently put it in its remedial opinion on inpatient units:

> [T]he inpatient units operate "almost exactly the same way" as
> segregation, [*id.* at 1212], with "a severe lack of out-of-cell time[ ] and
> a lack of meaningful treatment activities," *id.* at 1214. These conditions
> put patients "at a substantial risk of continued pain and suffering,
> decompensation, and self-harm." *Id.*

*Braggs*, 2020 WL 2789880, at *1 (third alteration in original). The Court also found

that there were waitlists for admission to SUs and for transfer to hospital-level care,

creating bottlenecks for people with the most extensive treatment needs. *Braggs*, 257

F. Supp. 3d at 1215, 1217-18. In short, "ADOC's failure to provide adequate

treatment and out-of-cell time in mental-health units forces the most severely

mentally ill patients to face yet another risk factor for decompensation, even though

their placement was for the specific purpose of alleviating the symptoms of their

mental illness." *Id.* at 1217.

Evidence from the liability trial demonstrates that this relief is necessary. For

example:

> [A]s Dr. Haney explained, out-of-cell time is especially important for
> mentally ill prisoners for two reasons. First, mentally ill prisoners
> experience more pressure and stress from a confined environment, and
> they have a more acute need to relieve that type of stress due to their
> vulnerable mental state; in other words, isolation makes it more likely
> that their conditions will deteriorate. In that sense, out-of-cell time is in
> and of itself therapeutic. Second, out-of-cell time ensures that mental-
> health patients' socialization skills do not atrophy to the point that they
> become uncomfortable with human interaction altogether.

*Id.* at 1214.

Evidence from the liability trial also demonstrates that this relief is the least intrusive means. Dr. Patterson testified that the national standard for out-of-cell time in prison mental-health units is "ten hours of structured therapeutic activity and ten hours of unstructured activity per week." *Id.* at 1215.

Evidence in the remedial record further demonstrates that this relief is necessary. Dr. Burns testified that either a psychiatrist or a CRNP under the direction of a psychiatrist should complete the initial assessment at admission into one of these units. Dr. Kathryn Burns, Apr. 27, 2018 Trial Tr., at 51:13-17. She testified that ADOC must have admission criteria for the RTU, and that admission should not be limited to individuals who are in an SU. *Id.* at 70:6-17. She also testified that Defendants' proposed levels of treatment for RTU Level 1 and SUs were inadequate. *Id.* at 75:17-77:4; 85:9-11. Further, Dr. Burns testified that prisoners in SUs should be transferred to a higher level of care after a certain length of time if their condition has not improved. *See* Dr. Kathryn Burns, Dec. 15, 2017 R.D. Trial Tr., at 30:19-31:12, 33:5-15 (discussing Pls. Ex. 1355 (Sept. 2017 ADOC Monthly Operating Report)). She and Mr. Vail testified that mental-health diversionary units like SLUs should provide additional mental-health treatment to address any behavior problems giving rise to the need for removal from general population. *See* Dr. Kathryn Burns., Apr. 27, 2018 Trial Tr., at 108:11-22; *see also* Eldon Vail, Apr. 3, 2019 Trial Tr., at 129:25-130:22 (testifying about high-security mental-health units for prisoners with

SMIs); Dr. Kathryn Burns, Feb. 16, 2018 R.D. Trial Tr., at 71:4-20, 78:1-23, 86:18-87:16 (testifying about segregation alternative units for people with SMIs).

Dr. Burns also testified regarding the importance of providing out-of-cell time in these units. She testified that providing out-of-cell time is essential to keep the units from operating as segregation. *See* Dr. Kathryn Burns, Apr. 27, 2018 Trial Tr., at 108:23-25; *see also id.* at 59:19-60:12 (testifying that two hours of out-of-cell time per day, as Defendants proposed, is tantamount to segregation). She also testified that having the opportunity to go outside is important for mental health. *Id.* at 60:25-61:1.

Evidence from the remedial record further demonstrates that this relief is the least intrusive means necessary. Multiple defense witnesses conceded that providing out-of-cell time is necessary to keep units from operating as segregation. *See* Dr. Edward Kern, Mar. 29, 2019 Trial Tr., at 45:16-19 (testifying that providing additional out-of-cell time is part of what keeps RTUs and SLUs from being segregation); Deborah Crook, Apr. 3, 2019 Trial Tr., at 15:4-12 (testifying that if prisoners in the SLU are not getting out-of-cell time, then the SLU is segregation for people with SMIs). Moreover, Dr. Kern acknowledged that clinical staff, not correctional staff, must be the ones to determine whether a prisoner may leave their cell for clinical interactions. *See* Dr. Edward Kern, Apr. 25, 2018 Trial Tr., at 59:21-60:20.

The fact that some of this relief is consistent with, or less intrusive than, what Defendants proposed in a remedial plan is further support for concluding that that relief is the least intrusive means necessary. Much of the relief for SUs is consistent with what Defendants submitted in their proposed remedial plan. The requirement that a mental-health nurse complete an initial nursing assessment within four hours of a patient's admission to the SU is the same as what Defendants proposed. *Compare* Doc. 1830 at 7, *with* Doc. 1899-1 at 17. The requirement that a licensed mental-health professional or psychologist complete a mental-health assessment within twenty-four hours of a patient's admission to the SU is consistent with what Defendants proposed. *Compare* Doc. 1830 at 7, *with* Doc. 1899-1 at 19. The requirement that a patient have daily interaction with a mental-health nurse also is consistent with what Defendants proposed. *Compare* Doc. 1830 at 8, *with* Doc. 1899-1 at 20. Some of the relief is even less intrusive than what Defendants proposed. Defendants proposed more detailed requirements regarding discharge from the SU and RTU Level 1 than what is included in the remedy. *Compare* Doc. 1594 at 26, 28, *with* Doc. 1899-1 at 25-26, 34.

Evidence presented at the suicide prevention remedial trial further demonstrates that this relief is necessary, narrowly drawn, and the least intrusive means necessary. Dr. Burns testified that these requirements are necessary, narrowly drawn, and the least intrusive means to ensuring an adequate suicide prevention

122

program. *See* Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 233:13-238:11. She explained that the relief for SLUs is necessary for adequate suicide prevention to ensure that they "[don't] just mimic restrictive housing." *Id.* at 234:2-9. She further explained that the relief for RTUs and SUs is necessary for adequate suicide prevention because it provides interventions and movement through the system depending on the level of risk and provides interventions designed to lower the level of risk. *Id.* at 235:23-236:5.

For these reasons, the Court should conclude that the Psychotherapy Remedy's treatment requirements for the SLUs, SUs, and RTUs are narrowly drawn, extend no further than necessary to correct the constitutional violations found by the Court, and are the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## IX.   CONFIDENTIALITY REMEDY (Docs. 1900, 1900-1, 1900-2)

As discussed above in Section VIII(B), the Court found that ADOC failed to provide adequate confidentiality in mental-health contacts. To address these findings, the Parties agreed to the Confidentiality Remedy in addition to the confidentiality relief in the Psychotherapy Remedy. The Court entered the stipulations as an order on June 19, 2018. Docs. 1900, 1900-1, 1900-2.

For reasons stated here and reasons to be presented at the upcoming hearing, the Court should find that the Confidentiality Remedy (Docs. 1900, 1900-1, 1900-

2) satisfies the PLRA's need-narrowness-intrusiveness requirement and has no undue "adverse impact on public safety or the operation of a criminal justice system." § 3626(a)(1)(A).

### A.   Confidentiality Training for Correctional Officers in Specialized Units

The Parties agreed that all correctional officers assigned to medical or mental-health units (including SUs, RTUs, and SLUs), assigned to treatment teams, or who regularly receive protected health information must receive confidentiality training during Specialized Mental-Health Training consistent with ADOC AR 604. Doc. 1900-1 at 1-2. This relief is narrowly drawn to address the Court's liability findings regarding confidentiality discussed above in Section VIII(B).

Evidence in the remedial record demonstrates that this relief is necessary. In order for correctional officers to ensure confidentiality in the provision of mental-health care, they must first understand the importance of confidentiality and the expectation of officers. *See* Eldon Vail, Apr. 3, 2019 Trial Tr., at 112:23-113:11 (testifying regarding role correctional staff should play in protecting confidentiality); Eldon Vail, Nov. 29, 2018 R.D. Trial Tr., at 5:20-23; *see also* Dr. Kathryn Burns, Apr. 27, 2018 Trial Tr., at 127:13-25 (testifying that prison systems generally teach correctional officers about confidentiality when they must be present for group therapy).

The fact that this relief significantly overlaps with long-established ADOC policy is evidence that it is the least intrusive means necessary. AR 604—which has been in effect since 2005, long before this case was filed—provides, "Correctional officers assigned to mental health units and treatment areas will receive additional training in confidentiality during Specialized Mental Health Training. The training will include the legal consequences and the potential impact on an inmate's treatment when confidentiality is breached." Jt. Ex. 93 (ADOC Admin. Reg. 604) at 3. This relief is consistent with existing ADOC policy in requiring confidentiality training for officers assigned to mental-health units and treatment areas. Although the relief additionally requires that officers assigned to treatment teams or who regularly receive protected health information receive confidentiality training, *see* Doc. 1900-1 at 1-2, many of the officers falling within these two categories are officers assigned to mental-health units or treatment areas, *see, e.g.*, Jt. Ex. 94 (ADOC Admin. Reg. 604, Change #1) at 1 (providing that "correctional officers of [SUs and RTUs] will have access to limited mental health information in the context of treatment meetings").

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).).

### B.    Signed Confidentiality Agreements

The Parties agreed that correctional officers must sign a confidentiality agreement after completing the Specialized Mental-Health Training. Doc. 1900-1 at 2-3. The Parties agreed on a form for the confidentiality agreement. Doc. 1900-2. Until the officer signs the confidentiality agreement, the officer may not receive protected health information or be present for the communication of protected health information. Doc. 1900-1 at 2-3. The Parties agreed that copies of the signed confidentiality agreements must be maintained in officers' personnel files as well as in a central location in the medical or mental-health unit at the officer's facility. *Id.* at 3. This relief is narrowly drawn to address the Court's liability findings regarding confidentiality discussed above in Section VIII(B).

This relief is necessary and the least intrusive means necessary. Dr. Burns testified that other prison systems require officers to sign such confidentiality agreements. Dr. Kathryn Burns, Apr. 27, 2018 Trial Tr., at 127:13-25. Documenting that confidentiality training was provided and that officers understand their confidentiality obligations is necessary to ensure that officers are in fact trained and understand their obligations. Moreover, maintaining such documentation in personnel files as well as in the medical or mental-health unit at the facility where an officer is assigned allows administrators, supervisors, and monitors to easily inspect such documentation and take steps to correct any noncompliance.

126

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## X.   STAFFING CONTEMPT REMEDY (Docs. 2301, 2301-1)

The Court need not make any additional PLRA findings with respect to the Staffing Contempt Remedy because of the Court's previously entered orders with respect to staffing. On February 20, 2018, the Court issued the Phase 2A Understaffing Remedial Order requiring ADOC's mental-healthcare vendor to provide mental-health staff consistent with the operative contract by July 1, 2018. *Braggs*, 2018 WL 7106346, at *1. The Court made PLRA findings in the opinion accompanying that order. *Braggs*, 2018 WL 985759, at *8-9. By July 2, 2018, ADOC had not complied with the Understaffing Remedial Order and Plaintiffs initiated contempt proceedings. Doc. 1916 (First Notice of Non-Compliance Motion for Order to Show Cause Why Defendants Should Not Be Held in Contempt). After several additional filings and hearings, the Parties entered mediation and agreed to stipulations related to staffing. The Court reduced the Staffing Contempt Remedy to an enforceable order on January 29, 2019. *See* Docs. 2301, 2301-1.

Plaintiffs briefly address the major requirements of the Staffing Contempt Remedy here because of its inclusion in the Court's recent temporary orders on the PLRA. *See* Doc. 2716 at 7; Doc. 2793 at 5. First, the Staffing Contempt Remedy

requires that ADOC meet minimum staffing requirements as set forth in ADOC's Request for Proposal ("RFP") Staffing Matrix. Doc. 2301-1 at 4, 18-25. This requirement is redundant of the Understaffing Remedial Order and, therefore, contains no new relief to which the PLRA applies. The relief states that "to satisfy § 2(d) of the Understaffing Remedial Order, ADOC must provide mental-health staffing as set forth in [Defendants'] RFP Staffing Matrix." *Id*. at 4. The Staffing Contempt Remedy does not order ADOC to provide any relief that the Understaffing Remedial Order does not specify about mental-health staffing levels. Even if the Court concluded that this requirement contained new relief on staffing, that relief would meet the need-narrowness-intrusiveness requirement because it quantifies required staffing levels as the minimum standards determined by ADOC and included in its RFP for mental-healthcare services. *See* Doc. 1374 (State's Phase 2A Proposed Remedial Plan on Correctional & Mental Health Staffing) at 16 ("These two (2) measures, i.e. the pending RFP for increased mental health staff and the recommendation of ADOC's mental health consultants, serve as the centerpiece of ADOC's proposed plan for mental health staffing."); Assoc. Comm'r Ruth Naglich, Sept. 18, 2018 R.D. Trial Tr., at 38:5-22 (discussing Defs. Ex. 3344 (Doc. 1374)).

Second, ADOC must meet specified quarterly and monthly reporting requirements on staffing levels. Doc. 2301-1 at 5-11. These stipulations describe required content and reporting timeframes for the purpose of monitoring compliance

128

with the Understaffing Remedial Order. *See id.* As Plaintiffs have previously argued, monitoring is not subject to the PLRA's need-narrowness-intrusiveness requirement. *See* Docs. 2144, 2213, 2219. Monitoring is not relief. Rather, it is the means to achieve relief from a constitutional violation. *See supra* Section II(D) (discussing this argument in context of Bibb Segregation Remedy's monitoring requirements). The stipulations on reporting are therefore not subject to the PLRA.

Finally, the Staffing Contempt Remedy provides that the Parties will observe a described resolution process for disputes related to staffing. Doc. 2301-1 at 12-16. This is not relief under the PLRA; it simply sets forth the process for the Parties to observe when resolving litigation disputes on staffing issues. Accordingly, these stipulations are also not subject to the PLRA.

The Court therefore need not make any additional PLRA findings with respect to the Staffing Contempt Remedy.

## XI.   HOSPITAL-LEVEL CARE REMEDY (Docs. 2383, 2383-1, 2383-2)

In its Liability Opinion, the Court found that ADOC "creates a substantial risk of serious harm to prisoners at the most severe end of the mental-health spectrum, because it does not provide hospital-level care or a hospitalization option." *Braggs*, 257 F. Supp. 3d at 1217.

To address this finding, the Parties submitted joint stipulations regarding hospital-level care. Doc. 2292 (Jt. Notice of Filing of Stipulations Regarding the

Provision of Hospital-Level Care); Doc. 2292-1 (ADOC Admin. Reg. 640); Doc. 2292-2 (Stipulations). Following a hearing, the Court ordered the Parties to submit amended stipulations documenting changes agreed upon during the hearing. Doc. 2334 (Phase 2A Revised Remedy Scheduling Order on the Eighth Amendment Claim). On March 1, 2019, the Parties submitted amended stipulations. Docs. 2383, 2383-1, 2383-2. Per the Parties' requests, the Court initially entered the Hospital-Level Care Remedy as an injunction with temporary PLRA findings to expire on May 11, 2020, Docs. 2717, 2724-1, and then extended this order "until either the Court's resolution of whether [the remedial orders] comply with the PLRA's need-narrowness-intrusiveness requirement or December 30, 2020, whichever is earlier," Doc. 2793 at 6.

The Hospital-Level Care Remedy creates a system in which all individuals who need hospital-level mental-health care within ADOC custody have access to it. The Parties agreed that ADOC must implement a new AR focused on providing readily accessible hospital-level care to individuals, regardless of the amount of time left on their sentence. AR 640 (Advanced Inpatient Mental Healthcare) provides this access to hospital-level mental-health care. *See* Doc. 2383-2. AR 640 specifies the number of beds to be provided and requires an annual reassessment of the appropriate number of beds. *Id*. at 3-4. AR 640 further outlines the factors to be considered when determining whether hospital-level care is appropriate. *Id.* at 5.

Additional sections of AR 640 provide for documentation of admission decisions, pre- and post-transfer requirements, continuity of treatment when patients are discharged from hospital-level care, and quality improvement measures. *Id.* at 6-8.

In addition to the new AR, the Parties agreed to several other requirements in the Hospital-Level Care Remedy. The Parties agreed on a method for reassessing the need for hospital beds. Doc. 2383-1 at 2. The Parties also provided for steps to be taken when the individual under consideration for hospital-level care is under sentence of death. *Id.* Defendants agreed to follow certain procedures if the hospital-level provider refuses to accept an individual for treatment or if ADOC misses the timelines for a quick transfer. *Id.* at 2-4.

Evidence from the liability trial demonstrates that this relief is necessary. Dr. Patterson testified that hospital-level care "is an essential part of a continuum of care." Dr. Raymond Patterson, Jan. 31, 2017 Trial Tr., at 49:24-50:9. Much of the testimony about hospital-level care revolved around ADOC's insufficient AR that provided for civil commitment to Taylor Hardin Secure Medical Facility. *See* Jt. Ex. 138 (ADOC Admin. Reg. 634). For example, Dr. Kern testified that the waitlist for transfer to hospital-level care was often six months or more. *Braggs*, 257 F. Supp. 3d at 1217. Additionally, multiple individuals testified that ADOC often limited those who were transferred to hospital-level care to individuals at the end of their

sentence. *Id.* Dr. Patterson testified that ADOC's refusal to transfer individuals until the end of their sentence was simply "wrong." *Id*. at 1218.

The tragedy of Named Plaintiff Jamie Wallace's death served as a poignant example of ADOC's failure to provide hospital-level care. Less than two months before Mr. Wallace's testimony at the liability trial, a clinician working for ADOC's mental-healthcare contractor recommended that ADOC transfer Mr. Wallace to a hospital setting. *Id.* However, ADOC did not transfer him. *Id.* Shortly after his testimony at trial, Mr. Wallace committed suicide in ADOC custody, sparking a discussion about the importance of suicide prevention. *Id.* at 1229-30.

Evidence from the remedial record further demonstrates that this relief is necessary. Mental-health professionals on both sides have agreed that the availability of hospital-level care is necessary for suicide prevention. *See* Drs. Kathryn Burns & Mary Perrien, Apr. 9, 2019 Trial Tr., at 127:17-131:1 (stating that evaluation for higher level of care after extended suicide watch placement should include consideration of inpatient care); *id.* at 139:16-141:1 (stating that multiple suicide watch placements within thirty days requires an evaluation for higher level of care, with a presumption that transfer is appropriate). Dr. Burns testified that the requirements for hospital beds, annual assessment of the need for hospital beds, assessment of prisoners who might need hospital-level care, and admission to hospital-level care are necessary to address the risk of suicide because "[s]ometimes

people's level of risk exceeds that which can be addressed in a prison setting, and they require a more intensive level of care." Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 243:15-244:3. She also testified that the discharge requirements, including that there be no change in medication immediately after discharge, are necessary for continuity of care to address the risk of suicide. *See id.* at 246:16-25.

Evidence in the remedial record also shows that this relief is narrowly drawn and the least intrusive means necessary. Dr. Burns testified that the remedy could not have been narrower and still be effective to address the risk of suicide, and is the least intrusive measure to address the risk. *Id.* at 244:4-14; *see also id.* at 247:1-12 (testifying that the discharge requirements were narrowly drawn and the least intrusive measures). Dr. Kern acknowledged that providing hospital-level care to individuals who need it is part of suicide prevention. *See* Dr. Edward Kern, Mar. 28, 2019 Trial Tr., at 25:7-20.

The fact that many of the remedial requirements are consistent with Defendants' Proposed Remedial Plan on Hospital-Level Care further demonstrates that those requirements are the least intrusive means necessary. The vast majority of the requirements in AR 640 are consistent with—or even verbatim—what Defendants proposed. *Compare* Doc. 2048 (State's Revised Phase 2A Proposed Remedial Plan on Hospital-Level Care) at 199-204, *with* Doc. 2383-2. In addition, the stipulation that ADOC will seek alternative bed space if admission is refused

somewhere is consistent with Defendants' proposed plan. *Compare* Doc. 2048 at 19, *with* Doc. 2383-1 at 2-3.

For reasons stated here and reasons to be presented at the upcoming hearing, the Court should find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## XII.   DISCIPLINARY PROCESS REMEDY (Docs. 2433, 2433-1)

In the Liability Opinion, the Court found "ADOC has an unacceptable practice of disciplining mentally ill prisoners for behavior that stems from their mental illnesses." *Braggs*, 257 F. Supp. 3d at 1231. The Court explained that "[t]hese punitive practices in turn subject mentally ill prisoners to a substantial risk of decompensation and increased suffering." *Id.* at 1232.

The Parties submitted stipulated remedies regarding the disciplinary process, including two ARs that Defendants agreed to adopt and implement. Doc. 2307 (Stipulation Regarding Phase 2A Mental Health Consultation to the Disciplinary Process); Doc. 2307-1 (ADOC Admin. Reg. 403); Doc. 2307-2 (ADOC Admin. Reg. 626). After the Court held a hearing, the Parties filed amended stipulations incorporating changes agreed upon during the hearing. Doc. 2384 (Jt. Notice of Filing Am. Stipulation Regarding Phase 2A Mental Health Consultation to the Disciplinary Process); Doc. 2384-1 (Am. Stipulations); Doc. 2384-2 (ADOC

Admin. Reg. 403); *see* Docs. 2433, 2433-1 (filing second amended stipulations to correct filing error). Per the Parties' requests, the Court initially entered the Disciplinary Process Remedy as an injunction with temporary PLRA findings to expire on May 11, 2020, Docs. 2718, 2725-1, and then extended this order "until either the Court's resolution of whether [the remedial orders] comply with the PLRA's need-narrowness-intrusiveness requirement or December 30, 2020, whichever is earlier," Doc. 2793 at 6.

Evidence from the liability trial demonstrates that the Disciplinary Process Remedy is necessary. For example, Dr. Burns testified that prisoners with mental illness were overrepresented in segregation, "essentially punished for symptoms of their psychiatric illness." Dr. Kathryn Burns, Dec. 12, 2016 Trial Tr., at 27:3-6.

Evidence in the remedial record demonstrates that the Disciplinary Process Remedy is necessary, narrowly drawn, and the least intrusive means necessary. The fact that Defendants have modified their ARs as part of the remedy indicates that they concede the remedy satisfies the PLRA. In addition, Dr. Kern admitted that implementation of the remedy would ensure that ADOC does not discipline prisoners with mental illness without regard for the impact on their mental health. Dr. Edward Kern, Mar. 28, 2019 Trial Tr., at 24:2-17.

For reasons stated here and reasons to be presented at the upcoming hearing, the Court should find that the Disciplinary Process Remedy (Docs. 2433, 2433-1)

satisfies the PLRA's need-narrowness-intrusiveness requirement and will have no undue "adverse impact on public safety or the operation of a criminal justice system." § 3626(a)(1)(A).

### A.   Disciplinary Action Resulting From Self-Harm

The Parties agreed that ADOC will adopt and implement amended AR 403 and AR 626 to ensure prisoners are not disciplined "for symptoms directly related to his or her mental illness," such as by "issuing disciplinaries or applying disciplinary sanctions to inmates for engaging in conduct directly related to self-injurious behavior." Doc. 2433-1 at 14. ADOC also agreed to manually expunge certain Rule 505 violations—that is, violations for "[i]ntentionally creating a security, safety, or health hazard"—for certain prisoners with mental illnesses or intellectual disabilities. *Id.* at 4-5, 31.

This relief is narrowly drawn to address the Court's liability finding that "mentally ill prisoners are routinely disciplined for harming themselves or attempting to do so." *Braggs*, 257 F. Supp. 3d at 1231-32. The Court explained that "imposing disciplinary sanctions on prisoners for engaging in self-injury creates an additional risk of harm beyond that stemming from inadequate treatment." *Id.* at 1232.

Evidence presented during the liability trial demonstrates that this relief is necessary. Multiple class members testified that they received disciplinary action for

136

engaging in self-harm. *See, e.g.*, Jamie Wallace, Dec. 5, 2016 Trial Tr., at 29:2-10 (testifying that he received multiple disciplinaries for cutting himself); M.W., Jan. 9, 2017 Trial Tr., at 15:5-16 (testifying that she was sent to segregation for cutting herself); K.N., Jan. 12, 2017 Trial Tr., at 24:24-25:2 (testifying that she received disciplinaries for intentionally trying to hurt herself). Mr. Vail testified that prisoners should not be disciplined for behavior related to their mental illnesses. Eldon Vail, Jan. 4, 2017 Trial Tr., at 58:1-14. He testified that there should be therapeutic interventions instead. *Id.* Dr. Burns explained that, "because ADOC's practice treats self-injury solely as a behavioral problem rather than a mental-health problem, it fails to address the underlying mental-health issues through treatment; responding to self-harm in this manner is likely to escalate the self-injurious behavior, potentially resulting in serious physical injury or even death." *Braggs*, 257 F. Supp. 3d at 1232. Dr. Burns also "credibly concluded that 'desperate acts to get the attention of [mental-health] staff and necessary services,' including self-injury and suicide attempts, 'often result in disciplinary action and placement in segregation where mental health treatment is even more difficult to access.'" *Id.* at 1233 (quoting Jt. Ex. 460 at 29). Indeed, expungement of certain Rule 505 violations is necessary because these desperate acts to get the attention of mental-health staff have resulted from Defendants' unconstitutional mental-healthcare practices.

Associate Commissioner Naglich and ADOC Chief Clinical Psychologist Dr. David Tytell testified that they were aware that ADOC punished prisoners for engaging in self-harm and that this practice was problematic. *See* Assoc. Comm'r Ruth Naglich, Dec. 19, 2016 Trial Tr., at 130:12-18 (discussing Pls. Ex. 689 (MHM Corrective Action – Donaldson May 2013)); Dr. David Tytell, Jan. 18, 2017 Trial Tr., at 96:16-24. Though responsible for ensuring that the practice ceased, both testified that they had done very little, if anything, to ensure corrective action was taken. *See Braggs*, 257 F. Supp. 3d at 1232-33.

Evidence from the remedial record further demonstrates that this relief is necessary. In 2019, Dr. Burns testified that she was aware that a prisoner was threatened with discipline after engaging in self-harm severe enough to result in hospitalization. Dr. Kathryn Burns, Apr. 9, 2019 Trial Tr., at 77:21-78:11. Drs. Burns's and Perrien's review of suicides showed that Paul Ford had been charged with a disciplinary violation for cutting himself less than a month prior to his suicide. Doc. 2416-2 (Review of 13 Prisoners Who Committed Suicide) at 3.

Dr. Burns also explained how this relief is a necessary part of an adequate suicide prevention program. She explained that involvement with the disciplinary system often leads to a period of confinement in segregation, where most suicides occur. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 127:16-25. She testified that prohibiting punishment for symptoms of mental illness, including self-harm, is a

necessary part of ameliorating the risk of suicide. *Id.* at 242:14-24. She further explained that if people believe that they will be punished for divulging or engaging in self-harm, they will not report the conduct, which necessarily means that the risk of suicide cannot be assessed or addressed. *Id.*

The ramifications of a prisoner's disciplinary record on other aspects of their imprisonment supports concluding that the relief regarding expungement of certain Rule 505 violations is necessary. For example, disciplinary records are used to determine classification levels. *See, e.g.*, Doc. 476-6 (ADOC Classification Manual); Defs. Ex. 1287 (ADOC Admin. Reg. 400) at 4. Under the Phase 1 ADA settlement, ADOC uses disciplinary records to determine whether to "lower an Inmate's security level to allow an Inmate with a disability to access a program or facility (or portion of a facility) to which the Inmate would not otherwise be entitled to access due to that Inmate's security level." Doc. 728 at 36-37. A prisoner's disciplinary record also affects his or her ability to participate in a work program, Defs. Ex. 1319 (ADOC Admin. Reg. 444) at 2, or work release, Defs. Ex. 1314 (ADOC Admin Reg. 410) at 1. A prisoner's disciplinary record also affects their ability to reduce their period of incarceration. *See, e.g.*, Defs. Ex. 1042 (ADOC Admin. Reg. 425) (governing restoration of "good time").

Evidence from the remedial record also supports finding that this relief is narrowly drawn and the least intrusive means. Dr. Burns testified that this relief

could not be narrower and is the least intrusive measure to address the risk of suicide. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 242:25-243:14. The requirements prohibiting disciplinary action for symptoms of mental illness or self-injury are consistent with Defendants' own proposed remedial plan, providing further support that they are the least intrusive means necessary. *See* Doc. 2222 (State's Phase 2A Proposed Remedial Plan on Disciplinary Actions) at 4-5. In addition, the remedy makes clear that Defendants are only required to expunge certain rule violations for certain prisoners on the mental-health caseload—not all rule violations that may relate to self-injurious behavior, or all Rule 505 violations for all prisoners on the mental-health caseload. *See* Doc. 2433-1 at 4-5.

For these reasons, the Court should find that the requirements related to disciplinary action resulting from self-harm are narrowly drawn, extend no further than necessary to correct the constitutional violations found by the Court, and are the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## B.    Mental-Health Consultation to the Disciplinary Process

The Parties agreed to a process to take a prisoner's mental health into consideration during the disciplinary process. ADOC must provide a mental-health consultation for any prisoner with a mental-health code of MH-C or higher, an SMI designation, or an intellectual or developmental disability, or when a prisoner's behavior at the time of the alleged actions giving rise to the disciplinary or at any

time prior to or during the disciplinary process demonstrates signs of psychological distress or mental impairment. Doc. 2433-1 at 52. Mental-health staff must evaluate, among other factors, the prisoner's mental-health diagnosis, recent crisis placements, and the potential impact of disciplinary sanctions on the prisoner's mental state. *Id.* at 52-53. During the evaluation, mental-health staff may identify disciplinary sanctions that are clinically contraindicated and provide alternative disciplinary sanctions. *Id.* at 53. The remedy also provides for mental-health staff involvement during and after the disciplinary hearing as necessary. *Id.* at 53-55. If segregation is an approved sanction, the segregation time must include any time already served in segregation. *Id.* at 22.

This relief is narrowly drawn to address the Court's liability finding that ADOC's process for taking a prisoner's mental health into consideration when facing disciplinary action "falls far short in practice." *Braggs*, 257 F. Supp. 3d at 1233. In particular, this relief directly ties to the Court's findings that "these mental-health evaluations are often brief and perfunctory, and the counselors conducting them understand their role to be limited to an assessment of capacity or knowledge of their infraction, rather than providing input on the mental-health implications of any punishment." *Id.* at 1233-34. The Court explained that "[n]ot taking mental health into consideration when determining appropriate sanctions is dangerous because certain sanctions, such as placement in segregation, expose mentally ill

prisoners to a substantial risk of worsening symptoms and significantly reduced access to monitoring and treatment." *Id.* at 1233.

Evidence from the liability trial demonstrates that this relief is necessary. ADOC already had a regulation requiring mental-health consultations to the disciplinary process since at least 2006. Jt. Ex. 128 (ADOC Admin. Reg. 626). However, the Court heard evidence that, even when these consultations took place, mental-health staff failed to provide meaningful input regarding the effect of punishment on prisoners' mental health. For example, the Court heard testimony regarding six disciplinaries that Mr. Wallace received for engaging in self-harm prior to his suicide. Each time, the mental-health consultation indicated he was competent to participate in the disciplinary hearing, that mental-health issues did not affect his behavior at the time of the charge, that there were no mental-health issues that should be considered in the disposition, and that mental-health staff would not be present during the hearing. Dr. David Tytell, Jan. 18, 2017 Trial Tr., at 101:16-106:19 (discussing Defs. Ex. 910 (Jamie Wallace Records)). ADOC's own studies showed that the "mental-health consultations were often acting as little more than a rubber stamp." *Braggs*, 257 F. Supp. 3d at 1234. Associate Commissioner Naglich testified that even she was unclear on the purpose of the mental-health consultation process but believed it to be generally related to assessing culpability. *See id.*

142

Evidence from the remedial record further demonstrates that this relief is necessary. Dr. Burns testified that the new mental-health consultation process is necessary for ameliorating the risk of suicide because it ensures that people whose mental-health condition may have contributed to their behavior receive treatment instead of being placed in segregation, where there is an increased risk of suicide. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 241:14-24.

Evidence from the remedial record also demonstrates that this relief is the least intrusive means necessary. Dr. Burns, who assisted the Parties with revising the process for mental-health consultations, *id.* at 240:3-8, testified that she focused on limiting the requirements regarding consultations to preserve resources, *id.* at 240:9-24. Previously, every person who received a disciplinary had to receive a mental-health assessment, whereas now only certain prisoners must receive one. *Id.* at 240:15-24. Dr. Burns testified that the new process for mental-health consultations is the least intrusive means of implementing the consultations because ADOC no longer must provide the consultations to every prisoner charged with a disciplinary. *Id.* at 242:4-13. Other aspects of this relief are largely consistent with Defendants' own proposed remedial plan. *See* Doc. 2222 at 6-8. In addition, Associate Commissioner Culliver testified that it was already ADOC policy for mental-health staff to determine whether a disciplinary hearing may proceed for a prisoner with a mental illness. *See* Assoc. Comm'r Grantt Culliver, Feb. 8, 2018 Trial Tr., at 54:25-

55:11. Finally, Mr. Vail testified that a prisoner's time in administrative segregation prior to a disciplinary hearing should be counted toward a disciplinary segregation sentence because it is an American Correctional Association standard to "count the whole time" and not "punish them twice." Eldon Vail, Apr. 3, 2019 Trial Tr., at 135:14-136:16. Indeed, nothing in the record indicates that the conditions of administrative segregation differ from disciplinary segregation in terms of the impact on one's mental health.

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## C.     Disciplinary Action for Prisoners in Crisis and in Mental-Health Units

The Parties also agreed to procedures relating to issuance of disciplinaries or imposition of disciplinary sanctions for prisoners in suicide watch, mental-health observation, RTUs, SUs, and SLUs. First, low-level rule violations by prisoners housed in an RTU, an SU, or a crisis placement must be diverted to the mental-health treatment process rather than the disciplinary process. Doc. 2433-1 at 24-25. Second, mental-health staff must accompany correctional officers when serving notices of disciplinary charges to prisoners in an RTU, SU, or SLU, and must be notified when a prisoner in any of those units is to be informed of any adverse disciplinary outcomes. *Id.* at 14, 22. Third, if a prisoner is on suicide watch or mental-health

observation, disciplinary charges must not be provided until a treatment team approves them. *Id.* at 25. Similarly, disciplinary hearings must not be held while a prisoner is on suicide watch or mental-health observation. *Id.* at 16. Finally, unless approved by mental-health staff, correctional staff cannot inform a prisoner of the outcome of a hearing if the prisoner has been in a crisis placement in the past two weeks. *Id.* at 21, 54-55.

This relief is narrowly drawn to address the Court's liability finding that disciplinary sanctions, particularly placement in segregation, increase the risks of worsening symptoms and suicide. *See Braggs*, 257 F. Supp. 3d at 1233 ("Not taking mental health into consideration when determining appropriate sanctions is dangerous because certain sanctions, such as placement in segregation, expose mentally ill prisoners to a substantial risk of worsening symptoms and significantly reduced access to monitoring and treatment."); *id.* at 1245; *Braggs*, 383 F. Supp. 3d at 1240-41. This relief mitigates these risks by adding additional mental-health involvement—and thus, increased access to critical mental-health treatment— during the disciplinary process for prisoners who are at an elevated risk of harm. *See, e.g.*, Doc. 2433-1 at 22 (establishing that mental-health staff can see certain prisoners "within three (3) hours of being informed of the adverse outcome so that any clinically appropriate therapeutic intervention may occur").

For these reasons, the Court should find that the remedial requirements related to disciplinary action for prisoners in crisis and mental-health units are narrowly drawn, extend no further than necessary to correct the constitutional violations found by the Court, and are the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### D.    Training Regarding Disciplinary Process

The Parties agreed to relief requiring correctional and mental-health staff to receive training on the new disciplinary process, to be developed by ADOC with input from Dr. Burns. Doc. 2433-1 at 3, 51. This relief is narrowly drawn to address the Court's liability findings discussed above in this section.

Evidence from the liability and remedial phases discussed above demonstrates that this relief is necessary. As evidenced by the systemic practice of punishing prisoners for conduct stemming from mental illness despite existing regulations prohibiting such practice, training for all correctional and mental-health staff is necessary to ensure implementation of AR 403 and AR 626.

The fact that this relief is consistent with Defendants' proposed plan supports concluding that it is the least intrusive means necessary. In their proposed remedial plan, Defendants stated that they would "train all persons involved in the disciplinary process (including correctional and mental-health staff)." Doc. 2222 at 5, 9.

146

Defendants also stated that they would be willing to submit the training curriculum related to this remedy to Dr. Burns. *See id.* at 9.

The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## XIII.  SUICIDE PREVENTION REMEDY (Doc. 2606-1)

Suicide prevention relief in this litigation has gone through several iterations, starting with interim relief adopted during the liability trial. Following the suicide of Mr. Wallace during the liability trial, the Parties agreed to a series of interim suicide prevention measures, which the Court reduced to an order. Doc. 1106 (Am. Phase 2A Interim Relief Order Regarding Suicide Prevention Measures); Doc. 1106-1 (Interim Agreement Regarding Suicide Prevention Measures).

Then, in the Liability Opinion, the Court found that "ADOC's inadequate crisis care and long-term suicide prevention measures have created a substantial risk of serious harm, including self-harm, suicide, and continued pain and suffering." *Braggs*, 257 F. Supp. 3d at 1220. ADOC's constitutional inadequacies spanned many aspects of suicide prevention, including the failure to provide crisis care to prisoners who need it, placement of prisoners in crisis in dangerous settings, inadequate treatment for prisoners on suicide watch, unsafe crisis cells, inadequate

147

monitoring of prisoners on suicide watch, and inappropriate practices during and after discharge from suicide watch. *See id.* at 1218-31.

After the Court issued the Liability Opinion, the Parties agreed to fashion a permanent suicide prevention remedy with input from Drs. Burns and Perrien. *See Braggs*, 383 F. Supp. 3d at 1227-28; Doc. 2014 (Jt. Notice Regarding Process for Assessing Suicide Prevention Measures). Before that process could be completed— in the wake of fifteen prisoner suicides in the span of fifteen months—Plaintiffs filed an emergency motion requesting immediate suicide prevention relief to be ordered on a permanent basis. *Braggs*, 383 F. Supp. 3d at 1226-28. Drs. Burns and Perrien then submitted their report—after reviewing thousands of pages of records, touring four facilities, and interviewing prisoners and staff—and made recommendations for how ADOC should "resolve the constitutional violation determined by the Court in the Liability Opinion." Doc. 2416-1 at 2-4.

Following issuance of the doctors' suicide prevention report and recommendations, the Court held an evidentiary hearing to determine whether and what immediate relief was needed, reserving for a later date the issue of non-immediate relief. *Braggs*, 383 F. Supp. 3d at 1227-28. In May 2019, the Court granted Plaintiffs' request for immediate suicide prevention relief, finding that "ADOC continues to fail to provide adequate suicide prevention measures." *Id.* at 1227. The Court ordered a variety of remedies recommended by Drs. Burns and

Perrien, finding that each provision satisfied the PLRA's need-narrowness-intrusiveness requirement. *Id.* at 1251-78.

Later that month, however, the Parties moved to stay this case to pursue a global resolution of the litigation and agreed to various suicide prevention measures to be immediately implemented during the stay. Doc. 2560-1 (Jt. Notice & Mot. to Stay Agreement). In September 2019, the Parties reached a comprehensive suicide prevention agreement encompassing most of the Court's previously ordered relief for which the Court made PLRA findings, as well as long-term suicide prevention relief based on Drs. Burns's and Perrien's recommendations. *See* Docs. 2606,[14] 2606-1. The Court approved these stipulations, subject to later consideration of whether they comply with the PLRA. Docs. 2699, 2699-1.[15]

The grave harms that have resulted from Defendants' failures to provide adequate suicide prevention illustrate the necessity of this relief. At the suicide prevention remedial trial, Plaintiffs presented evidence regarding ADOC's failure to provide much of the relief described below leading up to the suicides of fifteen individuals and serious suicide attempts of two additional individuals. *See* Doc. 2476-1 (Am. Chart of Recent Suicides & Serious Suicide Attempt Inadequacies).

---

[14] As noted above, the mental-health staffing requirements in Doc. 2606 do not need additional PLRA findings. *See supra* n.3.

[15] The remedial requirements in Doc. 2699-1 are the same as in Doc. 2606-1, which Plaintiffs reference in this brief.

The Court credited this as evidence of extensive inadequacies necessitating immediate relief. *See Braggs*, 383 F. Supp. 3d at 1229-40 (describing inadequacies leading up to recent suicides). Plaintiffs recently notified the Court of seven additional suicides that have occurred since the Court's May 2019 remedial opinion, including five deaths in the past four months alone. Doc. 2885 (Notice to the Ct. of Recent Suicides).

Moreover, as further discussed below, the fact that most of these suicide prevention measures are recommended not only by Plaintiffs' expert Dr. Burns but also Defendants' consultant Dr. Perrien is evidence that they are necessary and the least intrusive means necessary.

For reasons stated here and reasons to be presented at the upcoming hearing, the Court should find that the Suicide Prevention Remedy (Doc. 2606-1) satisfies the PLRA's need-narrowness-intrusiveness requirement and will have no undue "adverse impact on public safety or the operation of a criminal justice system." § 3626(a)(1)(A).

### A.    Mental-Health Staffing

In the Suicide Prevention Remedy, the Parties agreed to several requirements governing mental-health staffing. First, ADOC agreed to modify its contract with Wexford consistent with the Parties' agreement on mental-health staffing and suicide prevention. Doc. 2606-1 at 1. Because this relief is necessary for

implementation of relief that, as discussed below, meet the PLRA's need-narrowness-intrusiveness requirement, this relief meets that requirement as well.

Second, the agreement requires that each major facility have at least one full-time licensed mental-health professional. *Id.* Each treatment hub (Bullock, Donaldson, and Tutwiler) must have at least two full-time licensed mental-health professionals on-site at least eight hours a day every business day, and at least one mental-health professional on holidays and weekends. *Id.* The Court previously found that this relief relating to licensed mental-health professional staffing constitutes relief that is narrowly drawn, extends no further than necessary to correct the constitutional violation, and is the least intrusive means necessary to correct the violation. *Braggs*, 383 F. Supp. 3d at 1253-54 (discussing testimony by Dr. Burns and Defendants' agreement to the relief).

Third, the Suicide Prevention Remedy prohibits Associate Licensed Counselors ("ALCs") from completing suicide risk assessments or conducting follow-up examinations on their own. Doc. 2606-1 at 1. ALCs may, however, participate in suicide risk assessments with an appropriately licensed professional as part of their training. *Id.* This relief is narrowly drawn to address the Court's liability finding that the failure to perform proper suicide risk assessments places prisoners at an "obvious" risk of serious harm. *Braggs*, 257 F. Supp. 3d at 1221. Given the critical nature of these assessments, it is imperative that the assessments be

conducted by qualified providers. As Dr. Burns explained at the suicide prevention remedial trial, ALCs "have a license, but they are not independently licensed," meaning that ALCs cannot practice without supervision. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 131:16-24. For that reason, Drs. Burns and Perrien stated that ALCs should not perform suicide risk assessments or follow-up examinations on their own. Doc. 2416-1 at 7.

For these reasons, the Court should find that the staffing requirements of the Suicide Prevention Remedy are narrowly drawn, extend no further than necessary to correct the constitutional violations found by the Court, and are the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## B.  Training

The Parties agreed to requirements regarding a comprehensive training program for correctional and mental-health staff. The Parties agreed to a timeline for staff to complete the comprehensive mental-health training curriculum agreed to in the Referral Remedy. Doc. 2606-1 at 2; *see also supra* Section VI(A). Any person who conducts the suicide prevention training must be, at minimum, a licensed mental-health professional and must complete a "train-the-trainer" program in advance. Doc. 2606-1 at 2. The Parties also agreed to using a mentoring model for training on suicide risk assessments. *Id.* at 1. Additionally, new mental-health professionals must shadow a senior mental-health professional, psychiatrist,

psychologist, or CRNP for three mental-health rounds in segregation prior to independently conducting such rounds. *Id.* at 2. The Parties also agreed to requirements for ongoing and remedial training, as well as additional training for staff working in segregation units. *Id.* at 1-3. Finally, the Parties agreed that ADOC and/or its mental-healthcare vendor will conduct quarterly emergency preparedness drills at each major facility, including scenarios involving self-injury and suicide attempts. *Id.* at 3.

This relief is narrowly drawn to address the Court's extensive liability findings regarding ADOC's inadequate mental-health care, including but not limited to findings regarding staffing, suicide prevention, and segregation. *See Braggs*, 257 F. Supp. 3d at 1194-1200, 1218-31, 1235-47.

Evidence in the remedial record demonstrates that this relief is necessary and the least intrusive means necessary. ADOC's many failures to provide adequate suicide prevention indicate that comprehensive and ongoing training related to suicide prevention is necessary to effectuate the substantive remedial requirements described below. *See Braggs*, 383 F. Supp. 3d at 1227. In addition, this relief is consistent with Drs. Burns's and Perrien's report and recommendations. *See* Doc. 2416-1 at 10-13 (making training recommendations based on findings regarding a variety of problematic training practices). Dr. Burns testified that specialized training on suicide prevention, assessing suicidality, and procedures for suicide

watch are necessary components of a suicide prevention program. Dr. Kathryn Burns, Apr. 8, 2019 Trial Tr., at 136:20-137:11; *see also* Dr. Kathryn Burns, Apr. 9, 2019 Trial Tr., at 51:7-16 (explaining that providing training is important because individuals conducting suicide risk assessments may not have the appropriate level of training or expertise already).

Drs. Burns and Perrien have approved the training materials related to suicide risk assessments, discharge from suicide watch, follow-up examinations, and segregation preplacement screenings. *See* Doc. 2606-1 at 1; *see also* Doc. 2569 (Order on Jt. Mot. to Stay) at 4 (requiring ADOC to develop training materials for Drs. Burns's and Perrien's review and approval). The fact that Defendants' consultant helped develop and approved the training supports a finding that the training program is the least intrusive means necessary.

For these reasons, the Court should find that the training requirements of the Suicide Prevention Remedy are narrowly drawn, extend no further than necessary to correct the constitutional violations found by the Court, and are the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## C.    Access to Mental-Health Care

The Parties agreed to various requirements related to access to mental-health care. At intake, prisoners must be educated on how to access mental-health services. Doc. 2606-1 at 3. After intake, any time a prisoner is transferred to another major

facility, the prisoner must be provided facility-specific information concerning access to mental-health care. *Id.*

This relief is narrowly drawn to remedy the systemic under-identification of prisoners with serious mental-health needs and ADOC's "broken referral process." *See Braggs*, 257 F. Supp. 3d at 1201, 1203-04.

Evidence in the remedial record demonstrates that this relief is necessary and the least intrusive means necessary. For those who are missed at the intake process or who develop mental illness during incarceration, self-referral may be the only mechanism for accessing needed mental-health care. Drs. Burns and Perrien stated that prisoners should receive information during intake on "how to ask for help for themselves and/or to let staff know about concerns for any of their peers." Doc. 2416-1 at 13. Drs. Burns and Perrien also stated that facility-specific information should be provided upon transfer to a new facility. *Id.*

For these reasons, the Court should find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### D.   Intervention in Prisoner Self-Harm

The Suicide Prevention Remedy includes several requirements related to staff intervention during suicide attempts. These measures could very directly make the

difference between someone surviving or dying from a suicide attempt. As such, they are narrowly drawn to remedy the constitutional violations found by the Court with regard to suicide prevention. *See Braggs*, 257 F. Supp. 3d at 1218-19.

First, if staff observe a prisoner attempting or having completed suicide, that staff member must immediately call for assistance. Doc. 2606-1 at 3-4. As soon as there are two correctional officers present, immediate life-saving measures must be performed. *Id.* at 4. This relief is consistent with what the Court previously found satisfies the PLRA. The Court found that requiring immediate life-saving measures—that is, to "cut down, remove noose, and begin life-saving measures and continue until a physician declares death"—constitutes relief that is narrowly drawn, extends no further than necessary to correct the constitutional violation, and is the least intrusive means necessary to correct the violation. *Braggs*, 383 F. Supp. 3d at 1277 (quoting Doc. 2416-4 at 4); *see id.* at 1278 (discussing ADOC's repeated failures to immediately intervene in suicide attempts and Defendants' agreement with the relief). In particular, the Court found, "The 15 recent suicides include multiple instances in which ADOC correctional officers discovered inmates hanging in their cells, yet failed to immediately cut them down, remove the noose, and initiate CPR." *Id.* at 1278.

Second, each ADOC major facility must maintain an appropriate cut-down tool in each housing unit. Doc. 2606-1 at 4. Maintaining cut-down tools in each

housing unit is necessary for performing immediate life-saving measures. As such, this relief satisfies the PLRA for the reasons found by the Court as discussed above. In addition, this requirement mirrors Drs. Burns's and Perrien's report and recommendation that facilities should maintain easily accessible, appropriate cut-down tools in each housing unit, Doc. 2416-1 at 30, further demonstrating that this relief is necessary and the least intrusive means necessary. Dr. Kern also admitted that facility staff should have access to appropriate cut-down tools. *See* Dr. Edward Kern, Mar. 29, 2019 Trial Tr., at 134:18-20.

Third, the Parties agreed that prisoners who attempt suicide must be moved to a medical area, and prisoners who die by suicide must be moved to a private area. Doc. 2606-1 at 4. This is consistent with the doctors' report and recommendations, Doc. 2416-1 at 30-31, which supports finding that this relief is necessary and the least intrusive means necessary. The doctors explained that these measures are necessary to reduce a chilling effect on the rest of the population, as prisoners

> frequently believe that the staff did little or nothing to sa[ve] an inmate and actions such as these [leaving a body for others to see] serve to reinforce that perception. Beliefs such as that can destabilize the inmate population in a way that can create an unsafe environment for inmates and staff.

*Id.* at 31. Further highlighting that this relief is the least intrusive means necessary, Dr. Kern acknowledged that a prisoner should be moved from his or her cell after a suicide attempt. *See* Dr. Edward Kern, Mar. 29, 2019 Trial Tr., at 134:21-135:2. He

also testified that Ryan Rust's body was left in his cell for four hours following his suicide, and acknowledged that leaving a dead body in a housing unit could have a harmful impact on other prisoners in the unit. *See id.* at 135:10-136:16 (discussing Pls. Ex. 2300 (Ryan Rust Duty Officer & Incident Reports)).

Finally, Defendants agreed to provide prisoner and staff debriefing after an attempted or completed suicide, consistent with AR 629. Doc. 2606-1 at 4; *see also* Jt. Ex. 132 (ADOC Admin. Reg. 629) at 7-8. This is also consistent with the doctors' report and recommendations. Doc. 2416-1 at 36. The fact that this relief is consistent with existing ADOC policy further supports a finding that it is the least intrusive means necessary.

For these reasons, the Court should find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### E.    Referral to Suicide Watch

The Parties agreed to various requirements related to referring prisoners to mental health for suicide watch placement.

These requirements specify who may refer a prisoner, who must triage mental-health referrals, and how referrals must be documented. Doc. 2606-1 at 4-5. These

requirements are consistent with the Referral and Treatment Planning Remedies. *See supra* Sections VI, VII.

The measures also require that prisoners be maintained under constant watch from the moment of referral through the suicide risk assessment. Doc. 2606-1 at 4. This relief is consistent with what the Court previously found constitutes relief that is narrowly drawn, extends no further than necessary to correct the constitutional violation, and is the least intrusive means necessary to correct the violation. *Braggs*, 383 F. Supp. 3d at 1254-56. To make these findings, the Court relied on Dr. Burns's testimony that there must be a low threshold for placing a prisoner on suicide watch, ADOC's persistent understaffing, documented instances of correctional staff failing to refer prisoners to mental health, testimony from experts on both sides that prisoners must be on constant watch until the initial suicide risk assessment, and Defendants' agreement to the relief. *Id.*

The Parties also agreed that suicide watch cells will not be designated as segregation, and that suicidal prisoners should not be handcuffed before placement on suicide watch except for security reasons. Doc. 2606-1 at 5. This relief is narrowly drawn to address the Court's liability finding that placement of suicidal prisoners in unsafe environments, including segregation, "increases the risk that prisoners will engage in self-harm, including suicide attempts." *Braggs*, 257 F. Supp. 3d at 1225. The Court recognized that imposing punitive conditions on a potentially suicidal

prisoner would make them more likely to decompensate. *See id.* Drs. Burns and Perrien and Mr. Vail explained the importance of these measures. *See* Doc. 2416-1 at 28 (noting that "crisis cells were tracked as segregation" and that staff could not explain why all the prisoners they interviewed were handcuffed other than the classification of the cell); *id.* at 29 (stating that crisis cells should not be used as segregation and that suicidal prisoners "should only be cuffed if their security level requires it"); Eldon Vail, Apr. 3, 2019 Trial Tr., at 170:10-171:4 (testifying that handcuffing prisoners would be an additional penalty and disincentive to go to suicide watch); *see also* Dr. Edward Kern, Mar. 29, 2019 Trial Tr., at 128:18-24 (testifying that if security staff routinely handcuffed people on suicide watch who would not be cuffed in their normal placement, he would want to know why).

For these reasons, the Court should find that these requirements are narrowly drawn, extend no further than necessary to correct the constitutional violations found by the Court, and are the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### F.   Suicide Risk Assessment

The Parties agreed to a process for evaluating prisoners for placement in suicide watch. This relief is narrowly drawn to address the Court's liability findings regarding ADOC's failure to perform proper suicide risk assessments. *See Braggs*, 257 F. Supp. 3d at 1221.

First, a nurse must examine the prisoner and complete a body chart before placement on suicide watch. Doc. 2606-1 at 5. This relief is consistent with Drs. Burns's and Perrien's report and recommendations, which demonstrates that it is both necessary and the least intrusive means necessary. *See* Doc. 2416-1 at 29. In addition, Dr. Kern acknowledged that it is important for medical staff to perform a body chart when people are placed on suicide watch because they could have physical injuries that are not apparent to staff. *See* Dr. Edward Kern, Mar. 29, 2019 Trial Tr., at 126:6-127:4. This relief was also in Defendants' Proposed Remedial Plan on Suicide Prevention and Crisis Care, which further supports a conclusion that it is the least intrusive means necessary. *See* Doc. 1951 (State's Phase 2A Proposed Remedial Plan on Suicide Prevention & Crisis Care) at 18. For these reasons, the Court should conclude that this relief satisfies the PLRA.

Second, after placement on constant watch, triage by a qualified triage nurse, and referral for an evaluation, a prisoner must be evaluated using a suicide risk assessment. Doc. 2606-1 at 5. The evaluation must be conducted out-of-cell and in a confidential setting; must apply the standard definitions of "acutely suicidal" and "nonacutely suicidal" used by the National Commission on Correctional Health Care ("NCCHC"); and may only be conducted by licensed psychiatrists, licensed psychologists, CRNPs, or licensed mental-health professionals. *Id.* The Court has already found that this relief is narrowly drawn, extends no further than necessary to

161

correct the constitutional violation, and is the least intrusive means necessary to correct the violation. *Braggs*, 383 F. Supp. 3d at 1256-58. The Court relied on Dr. Burns's testimony that this relief is necessary "because it ensures standardized, accurate assessments, and that the evaluators are properly trained--as well as licensed and approved by law--to conduct independent assessments." *Id.* at 1257. The Court relied on both Drs. Burns's and Perrien's testimony regarding the importance of keeping these types of contacts out-of-cell and confidential. *Id.* The Court also found that applying the NCCHC definitions was "necessary to ensure consistency and accuracy in identifying suicide risk, so that inmates receive appropriate treatment and monitoring" and "not intrusive" because Defendants agreed to the relief and included the definitions in its contract with Wexford. *Id.* at 1258; *see also* Doc. 1951 at 22 (proposing consistent definitions of "acutely suicidal" and "nonacutely suicidal"). Additionally, part of this relief is even less intrusive than what Defendants submitted in their proposed remedial plan. *Compare* Doc. 1951 at 18 (proposing that suicide risk assessments be completed within twelve hours of a prisoner's presentation to mental-health staff), *with* Doc. 2606-1 (omitting exact timing of initial suicide risk assessment). For these reasons, the Court should reaffirm the PLRA findings related to these requirements of the Suicide Prevention Remedy. *See* § 3626(a)(1)(A).

### G.    Monitoring Suicidal Prisoners

The Parties agreed to relief related to monitoring prisoners on suicide watch. This relief is narrowly drawn to address the Court's liability findings that ADOC fails to adequately monitor prisoners on suicide watch and has insufficient and unsafe suicide watch cells. *Braggs*, 257 F. Supp. 3d at 1185, 1222-25.

First, the Parties agreed to define the watch levels required for monitoring acute and nonacute suicidality, prohibit the use of mental-health observation for suicide watch, and specify documentation requirements. Doc. 2606-1 at 5-6. The Court has already found that these requirements constitute relief that is narrowly drawn, extends no further than necessary to correct the constitutional violation, and is the least intrusive means necessary to correct the violation. *Braggs*, 383 F. Supp. 3d at 1258-61, 1265-66. The Court found that requiring constant watch for acutely suicidal prisoners satisfied the PLRA based on the fact that it constituted NCCHC standards, testimony by Defendants and both Parties' experts regarding the necessity of the relief, and Defendants' agreement to the relief. *See id.* at 1258-59. The Court found that requiring close watch for nonacutely suicidal prisoners satisfied the PLRA based on the fact that it is the standard of care, expert testimony by Dr. Burns and Mr. Vail regarding necessity of the relief, and Defendants' agreement to the relief. *Id.* at 1259-60. The Court found that the documentation requirements satisfied the PLRA because they are necessary to ensure the implementation of the suicide

163

watch observation measures and to hold staff accountable, and because Defendants agreed to them. *See id.* at 1260-61. The Court found that eliminating the use of mental-health observation for suicide watch satisfied the PLRA based on testimony by Drs. Burns and Perrien regarding dangers of the practice. *See id.* at 1265-66.

Additionally, several aspects of this relief are consistent with Defendants' own proposals, providing further support that they are the least intrusive means necessary. The requirements for how to monitor acutely suicidal and nonacutely suicidal prisoners are consistent with what Defendants proposed. *Compare* Doc. 1951 at 15-16, 23, *with* Doc. 2606-1 at 5. The documentation requirements are largely consistent with what Defendants proposed. *Compare* Doc. 1951 at 21-22, *with* Doc. 2606-1 at 5-6.

Second, the Parties agreed that ADOC's mental-healthcare vendor must evaluate the equipment available to suicide watch observers and ensure that observers are supervised by on-site mental-health staff. Doc. 2606-1 at 6. Evidence in the remedial record demonstrates that this relief is necessary and the least intrusive means necessary. Drs. Burns and Perrien recommended this relief, based on their findings that observers were not positioned appropriately at any of the facilities they visited and that prisoners were sometimes left unattended while they waited to be seen by mental-health staff. Doc. 2416-1 at 26-27. Their findings are consistent with testimony by J.A., who stated that he could not see the observers where they were

sitting from part of his crisis cell. J.A., Mar. 29, 2019 Trial Tr., at 190:9-11. Dr. Kern acknowledged that suicide watch observers need chairs that allow them to look into crisis cells. Dr. Edward Kern, Mar. 29, 2019 Trial Tr., at 87:7-12.

Third, the Parties agreed to several requirements regarding crisis cells. The Parties agreed that all crisis cells must be suicide resistant. The Parties agreed on requirements defining which cells may be used for suicide watch, how many suicide-resistant cells each facility must have, and where prisoners may be temporarily housed if no cells are available. Doc. 2606-1 at 6. The relief also provides for quarterly inspections of crisis cells. *Id.*

Evidence presented at the liability trial confirms that this relief is necessary. The Court heard extensive testimony that ADOC "repeatedly placed suicidal prisoners in dangerous environments due to a lack of available crisis cells." *Braggs*, 257 F. Supp. 3d at 1224; *see id.* at 1224-25. The Court also received evidence that placing suicidal prisoners in segregation is particularly problematic. *Id.* at 1225.

Evidence from the remedial record further confirms that this relief is necessary. During the segregation remedial trial in 2018, Associate Commissioner Naglich admitted that ADOC had a shortage of crisis cells. Assoc. Comm'r Ruth Naglich, Feb. 7, 2018 Trial Tr., at 142:25-143:2. Associate Commissioner Culliver admitted that a prisoner was sometimes placed on suicide watch in a segregation cell

if a crisis cell was not available. Assoc. Comm'r Grantt Culliver, Feb. 9, 2018 R.D. Trial Tr., at 139:17-22.

This relief is consistent with Drs. Burns's and Perrien's report and recommendations, indicating it is both necessary and the least intrusive means necessary. Drs. Burns and Perrien found that not all crisis cells were suicide resistant. *See* Doc. 2416-1 at 23. They stated that ADOC policy "should require every facility come into compliance with the appropriate number of suicide resistant cells for each facility." *Id.* at 24. They stated that ADOC should conduct quarterly physical inspections to ensure that the crisis cells remain suicide resistant. *Id.* They also stated that ADOC should "[e]stablish a hierarchy of less preferred but acceptable areas/cells that an inmate may be temporarily placed into when no crisis cell is available immediately." *Id.*

Part of this relief is even less intrusive than what Defendants proposed, further supporting a conclusion that it is the least intrusive means necessary. *Compare* Doc. 1951 at 20 (providing that prisoners may be placed somewhere other than a crisis cell in an emergency situation for seventy-two hours or less), *with* Doc. 2606-1 at (omitting a seventy-two-hour limit). *Compare* Doc. 1951-1 at 21 ("On a daily basis, or more often if requested by the mental health staff, a correctional officer will search the crisis cell or area for contraband and materials that can be used for self-harm."), *with* Doc. 2606-1 (omitting such a requirement).

For these reasons, the Court should find that the requirements that do not already have PLRA findings are narrowly drawn, extend no further than necessary to correct the constitutional violations found by the Court, and are the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

### H.   Referral to a Higher Level of Care

The Parties agreed to relief requiring consideration for referral to a higher level of care for prisoners who remain on suicide watch for prolonged periods of time. Doc. 2606-1 at 7. Prisoners who return to suicide watch within thirty days of release from a prior placement or who have had three watch placements in the past six months must also be considered for referral to a higher level of care. *Id.*

The Court has already found that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violation, and is the least intrusive means necessary to correct the violation. *Braggs*, 383 F. Supp. 3d at 1268-70. To make these findings, the Court relied on testimony by Drs. Burns and Perrien explaining why they recommended this relief and the fact that the relief is largely less intrusive than what ADOC's own regulation required. *Id.* at 1269-70. As such, the Court should reaffirm the PLRA findings related to these requirements. *See* § 3626(a)(1)(A).

## I.    Suicide Watch Discharge

The Parties agreed to a process for discharging a prisoner from suicide watch. A prisoner may be discharged from suicide watch following an out-of-cell, confidential evaluation. Doc. 2606-1 at 7. As with preplacement suicide risk assessments, discharge evaluations may only be conducted by licensed psychiatrists, licensed psychologists, CRNPs, or licensed mental-health professionals. *Id.* The Parties also agreed that prisoners discharged from suicide watch shall not be transferred to segregation absent documented exceptional or exigent circumstances. *Id.* at 8. Such a transfer must be approved by the Deputy Commissioner of Operations (for men's facilities) or Deputy Commissioner of Women's Services (for women's facilities). *Id.* Finally, the Parties agreed that ADOC will perform thirty-minute security rounds in segregation and implement a system of supervisory review and confirmation of security checks. *Id.*

This relief is consistent with relief the Court has already found is narrowly drawn, extends no further than necessary to correct the constitutional violation, and is the least intrusive means necessary to correct the violation. *Braggs*, 383 F. Supp. 3d at 1262-63, 1270-72. When making PLRA findings regarding discharge evaluations, the Court relied on evidence from the liability trial demonstrating ADOC's "failure to use proper discharge practices," Dr. Burns's testimony that the relief is necessary for an adequate suicide prevention program, and "ADOC's

acknowledgement that the majority of suicides in its system have involved men released from suicide watch to segregation." *Id.* at 1263. When considering relief preventing discharge from suicide watch to segregation, the Court similarly relied on the "serious risk of harm faced by prisoners discharged to segregation from suicide watch," testimony by Drs. Burns and Perrien regarding the necessity of the relief, as well as the fact that the relief is largely consistent with the Daniels Directive discussed above. *Id.* at 1272; *see supra* Section II(B). When considering security rounds in segregation, the Court relied on ADOC's failure to conduct rounds around the time of Ross Wolfinger's suicide in segregation, testimony by Mr. Vail based on an extensive review of duty post logs that ADOC failed to adequately conduct security checks, evidence that duty post logs "contained evidence of inaccuracy at best and falsification at worst," ADOC's persistent understaffing, and the fact that the relief is consistent with ADOC's own policy. *Braggs*, 383 F. Supp. 3d at 1275-76.

In addition, the relief regarding discharge protocols is largely consistent with what Defendants submitted in their proposed remedial plan, providing further support that it is the least intrusive means necessary. *Compare* Doc. 1951 at 26-28, *with* Doc. 2606-1 at 7-8.

As such, the Court should conclude that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court,

and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## J. Treatment and Follow-Up Examinations

The Parties agreed to requirements related to treatment during and after a suicide watch placement, including the type, frequency, and timing of care that a prisoner must receive. Doc. 2606-1 at 8-10. The agreement prohibits the use of "safety contracts,"[16] except in rare circumstances. *Id.* at 3. It also specifies the clothing, meals, hygiene products, and privileges a prisoner must be provided during a placement, and requires that suicide watch cells be cleaned between admissions. *Id.* at 9. The Parties also agreed that prisoners on suicide watch must be considered for placement on the mental-health caseload. *Id.* Finally, the Parties agreed to requirements related to screening and evaluations for prisoners in segregation. *Id.* at 8-9.

This relief is narrowly drawn to address the Court's liability findings. In particular, the Court found that "care provided to prisoners on suicide watch

---

[16] In a "safety contract," a prisoner gives some written or verbal assurance that they will not commit suicide. *See Carlos v. York Cty.*, No. 1:15-cv-1994, 2019 WL 6699710, at *11 (M.D. Pa. Dec. 9, 2019) (citing U.S. Department of Homeland Security report stating that the practice of contracting for safety "is problematic and should be discontinued because '[w]hile there may be some positive therapeutic aspects to safety contracts, most experts agree that once a patient becomes suicidal, their written or verbal assurances are no longer sufficient to counter suicidal impulses'").

is . . . grossly inadequate." *Braggs*, 257 F. Supp. 3d at 1225. The Court also concluded that "[p]risoners are routinely released from suicide watch improperly and receive inadequate follow-up care after their release from suicide watch," which "create a substantial risk of recurring self-injurious behavior and suicide." *Id.* at 1230. The segregation-specific relief is narrowly drawn to address the Court's liability findings regarding the harms of segregation discussed elsewhere in this brief. *See supra* Sections I, II, V.

The Court previously found that requiring four suicide watch follow-up examinations in a confidential out-of-cell setting constitutes relief that is narrowly drawn, extends no further than necessary to correct the constitutional violation, and is the least intrusive means necessary to correct the violation. *Braggs*, 383 F. Supp. 3d at 1263-64, 1266-68. The Court relied on expert testimony from both sides at the liability trial regarding the necessity of follow-up care after release from suicide watch; testimony by Drs. Burns and Perrien regarding the need for this relief, including the particular number and timing of follow-up appointments; testimony by Associate Commissioner Naglich acknowledging the importance of providing confidential out-of-cell follow-ups; and the fact that Defendants previously agreed to provide follow-up appointments. *Id.* at 1264, 1266-68.

Evidence in the remedial record demonstrates that the remaining requirements relating to treatment while on suicide watch are necessary and the least intrusive

means necessary. These requirements are consistent with Drs. Burns's and Perrien's report and recommendations. Doc. 2416-1 at 21 (stating that "safety contracts" should be prohibited because they "have little to no clinical utility in this environment" and that treatment should focus on "addressing the dynamic risk factors that were identified during the suicide risk assessment(s)"); *id.* at 22 (stating that "inmates who are determined to have been suicidal, engaged in a suicidal gesture, or demonstrated self-injurious behavior [should] be placed on the mental health caseload"); *id.* at 23-25 (stating that hygiene products and footwear should be available to prisoners on suicide watch and crisis cells should be cleaned based on findings that "facilities were not consistent in maintaining appropriate health and safety standards"); *id.* at 23, 25 (stating that regular meals should be provided with suicide-resistant trays and utensils based on findings that prisoners on suicide watch were given the same sack meal for all three meals, which was "not nutritionally sound and appeared punitive"); *id.* at 25 (stating that prisoners on suicide watch should be afforded the same privileges they received in their prior placement to "maintain stability" and provide protective support). During the suicide prevention remedial trial, Dr. Kern testified that he agreed with the doctors' recommendations to provide privileges, hygiene products, and regular meals to people on suicide watch and to clean crisis cells between placements. Dr. Edward Kern, Mar. 29, 2019 Trial Tr., at 82:15-83:25, 85:20-87:6. Mr. Vail testified that these measures are necessary,

172

in part to ensure that suicide watch is not punitive and also to encourage people to report suicidality. Eldon Vail, Apr. 3, 2019 Trial Tr., at 141:23-145:5. He testified that he agreed with the doctors' recommendations and explained how to ensure prisoner and staff safety when providing property and privileges to people on suicide watch. *Id.*

For these reasons, the Court should conclude that the requirements that do not already have PLRA findings are narrowly drawn, extend no further than necessary to correct the constitutional violations found by the Court, and are the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## K.    Mental-Healthcare Policies

The Parties agreed that ADOC will publish, promulgate, and maintain a single authoritative set of comprehensive policies and procedures related to the provision of mental-health care, including policies and procedures related to suicide prevention. Doc. 2606-1 at 10. ADOC must also mandate that the provision of mental-health care by third-party vendors complies with these policies and procedures. *Id.* at 10-11. Finally, ADOC will update its Inmate Handbook consistent with the Suicide Prevention Remedy. *Id.* at 10. This relief is narrowly drawn to address the Court's liability findings discussed elsewhere in this brief.

Given the number of orders and agreements over the course of this litigation, maintaining a single set of policies and procedures is necessary to eliminate

confusion and ensure compliance with the remedial requirements. In addition, it is the least intrusive means necessary to address the Court's liability findings—this relief does not require ADOC to do anything other than update documents it already maintains and distributes. Dr. Burns described the adoption of revised policies reflecting the remedial orders as "low-hanging fruit" in terms of implementation and compliance. Dr. Kathryn Burns, Dec. 7, 2018 Trial Tr., at 209:17-25. Additionally, the Court found, "Put simply, ADOC is more likely to comply with the court's orders if they are incorporated into its own policies." *Braggs*, 383 F. Supp. 3d at 1261. The Court should therefore find that this relief is narrowly drawn, extends no further than necessary to correct the constitutional violations found by the Court, and is the least intrusive means necessary to correct such violations. *See* § 3626(a)(1)(A).

## L.    Monitoring of Suicide Prevention Measures

Finally, the Parties agreed to interim monitoring of suicide prevention measures, including monitoring of suicide risk assessments, discharge from suicide watch to segregation, and thirty-minute security checks in segregation. Doc. 2606-1 at 6-8, 11. As explained above in Section II(D), the Court need not apply the PLRA's need-narrowness-intrusiveness analysis to these monitoring requirements.

## CONCLUSION

For the reasons set forth herein as well as reasons to be presented at the upcoming evidentiary hearing, the Court should conclude that the Phase 2A

174

stipulated remedial agreements and orders satisfy the PLRA's need-narrowness-intrusiveness and public safety requirements in § 3626(a)(1)(A).

Dated: August 24, 2020                    Respectfully Submitted,

                                          /s/ Ebony Howard
                                          Ebony Howard
                                          One of the Attorneys for Plaintiffs


Ebony Howard
Lynnette K. Miner
Jaqueline Aranda Osorno
Jonathan Barry-Blocker
Brock Boone
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, AL  36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
ebony.howard@splcenter.org
lynnette.miner@splcenter.org
jaqueline.aranda@splcenter.org
jonathan.blocker@splcenter.org
brock.boone@splcenter.org


Lisa W. Borden
William G. Somerville, III
Patricia Clotfelter
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ  PC**
420 20th Street North, Suite 1400
Birmingham, AL  35203
lborden@bakerdonelson.com
wsomerville@bakerdonelson.com
pclotfelter@bakerdonelson.com


William Van Der Pol, Jr.
Glenn N. Baxter

Lonnie Williams
Barbara A. Lawrence
Andrea J. Mixson
Ashley N. Austin
**ALABAMA DISABILITIES**
**ADVOCACY PROGRAM**
Box 870395
Tuscaloosa, AL  35487
Telephone: (205) 348-4928
Facsimile: (205) 348-3909
wvanderpoljr@adap.ua.edu
gnbaxter@adap.ua.edu
lwilliams@adap.ua.edu
blawrence@adap.ua.edu
amixson@adap.ua.edu
aaustin@adap.ua.edu

Rhonda Brownstein
**ALABAMA DISABILITIES**
**ADVOCACY PROGRAM**
400 South Union Street, Suite 425
Montgomery, AL 36104
Telephone: (205) 579-4976
Facsimile: (334) 240-0996
rbrownstein@adap.ua.edu

/s/ Anil A. Mujumdar
Anil A. Mujumdar
One of the Attorneys for Plaintiffs
Alabama Disabilities Advocacy Program

Anil A. Mujumdar
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, AL 35213
Telephone: (205) 729-8445
Facsimile: (205) 809-7899
anil@dagneylaw.com

Gregory M. Zarzaur
**ZARZAUR**
2332 2nd Avenue North
Birmingham, AL 35203
Telephone: (205) 983-7985
Facsimile: (888) 505-0523
gregory@zarzaur.com


**ATTORNEYS FOR THE PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this 24th day of August, 2020 electronically filed the foregoing with the clerk of court by using the CM/ECF system, which will send a notice of electronic filing to the following:

David R. Boyd, Esq.
John G. Smith, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, AL  36101-0078
dboyd@balch.com
jgsmith@balch.com

Steven C. Corhern, Esq.
Balch & Bingham LLP
Post Office Box 306
Birmingham, AL  35201-0306
scorhern@balch.com

William R. Lunsford, Esq.
Matthew Reeves, Esq.
Melissa K. Marler, Esq.
Stephen C. Rogers, Esq.
Dustin D. Key, Esq.
Kenneth S. Steely, Esq.
Maynard, Cooper & Gale, P.C.
655 Gallatin Street, SW
Huntsville, AL  35801
blunsford@maynardcooper.com
mreeves@maynardcooper.com
mmarler@maynardcooper.com
srogers@maynardcooper.com
dkey@maynardcooper.com
ksteely@maynardcooper.com

Joseph G. Stewart, Jr., Esq.
Gary L. Willford, Jr., Esq.
Stephanie Lynn Dodd Smithee, Esq.
Alabama Department
Of Corrections
Legal Division
301 South Ripley Street
Montgomery, AL  36104
joseph.stewart@doc.alabama.gov
gary.willford@doc.alabama.gov
stephanie.smithee@doc.alabama.gov

Philip Piggott, Esq.
Webster Henry
Two Perimeter Park South
Suite 445 East
Birmingham, AL 35243
ppiggott@websterhenry.com

Luther M. Dorr, Jr., Esq.
Maynard, Cooper & Gale, P.C.
1901 6th Avenue North, Suite 2400
Birmingham, AL  35203
rdorr@maynardcooper.com

Deana Johnson, Esq.
Brett T. Lane, Esq.
MHM Services, Inc.
1447 Peachtree Street, N.E., Suite 500
Atlanta, GA  30309
djohnson@mhm-services.com
btlane@mhm-services.com

 /s/ Ebony Howard
One of the Attorneys for Plaintiffs