# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| **EDWARD BRAGGS, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 2:14-cv-00601-MHT** |
| **v.** | ) | |
| | ) | **Honorable Judge Myron Thompson** |
| **JEFFERSON DUNN, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## THE STATE'S PRETRIAL BRIEF
## FOR THE PHASE 2A PLRA EVIDENTIARY HEARING

# TABLE OF CONTENTS

Table of Contents ..........................................................................................................i

Table of Authorities ................................................................................................... iii

Introduction ..................................................................................................................1

Procedural Background.................................................................................................5

Legal Standard ...........................................................................................................15

Argument....................................................................................................................19

I.      The State Preserved its Right to Identify the Failures of the Remedial Order and Stipulations to Satisfy the PLRA .......................................19

II.     The State's Agreement to Certain Provisions Years Ago does not Equate to Compliance with the PLRA Today.....................................24

III.    The State Cannot Agree that the Remedial Order Meet the PLRA Standard before it Considers the Scope of any Compliance Oversight or Monitoring Obligations...................................................................25

IV.    The PLRA Expressly Requires a Current and Ongoing Constitutional Violation ...............................................................................................29

V.     The Remedial Orders Constitute Preliminary Injunctions that Expired by Operation of Law...........................................................................33

The State's Position Regarding the Remedial Orders' Compliance with the PLRA...........................................................................................................................34

I.      The State Generally Agrees that Certain Remedial Provisions May Meet the PLRA's Requirements, Subject Only to the Court's Compliance Oversight Opinion...........................................................34

II.     Several Provisions within the Remedial Orders Cannot Meet the PLRA Need-Narrowness-Intrusiveness-Requirements.......................38

        A.     Certain Remedial Orders Contain Outdated Requirements .....38

B.    Certain Remedial Orders Contain Requirements that Experience
      and/or Changed Circumstances Demonstrated are
      Unworkable ............................................................................... 41

C.    Certain Remedial Orders Contain Overly Intrusive
      Requirements and/or Vague Requirements that Fail to
      Adequately Put the State on Notice of What it Must Do .......... 44

D.    Plaintiffs Cannot Present Evidence that the Remedial Orders
      Meet the PLRA's Requirements as to all Facilities .................. 46

E.    Certain Remedial Orders Impose Restrictions that Go Beyond
      Alabama Law ............................................................................ 48

Motion to Terminate and/or Modify ........................................................ 50

Conclusion ............................................................................................... 52

Certificate of Service .............................................................................. 55

Addendum A ............................................................................................ 57

# TABLE OF AUTHORITIES

## Cases

*Braggs v. Dunn,*
   2020 WL 2789880 (M.D. Ala. May 29, 2020))................................................... 32

*Browning v. Peyton*,
   918 F.2d 1516 (11th Cir. 1990)............................................................................ 23

*Ernie Haire Ford, Inc. v. Ford Motor Co.*,
   260 F.3d 1285 (11th Cir. 2001)............................................................................ 23

*Fortson v. Quality Restaurant Concepts*,
   No. 2:13-cv-426-WKW (M.D. Ala. July 17, 2015)............................................. 23

*Gilmore v. Calif.*,
   220 F.3d 987 (9th Cir. 2000)................................................................................ 16

*Grant v. Preferred Research, Inc.*,
   885 F.2d 795 (11th Cir. 1989)............................................................................. 20

*Hegel v. First Liberty Ins. Corp.*,
   778 F.3d 1214 (11th Cir. 2015)............................................................................ 23

*Henderson v. Thomas*,
   No. 2:11-cv-224-MHT (M.D. Ala. Sept. 30, 2013)...................................... 27, 28

*Hope v. Warden York Cnty. Prison*, -- F.3d --, 2020 WL 5001785 (3d Cir. Aug.
   25, 2020).............................................................................................................. 42

*Inmates of Suffolk Cnty. Jail v. Rouse*,
   129 F.3d 649, 655 (1st Cir. 1997)........................................................................ 16

*John H. Harland Co. v. Clarke Checks, Inc.*,
   711 F.2d 966 (11th Cir. 1983)....................................................................... 27, 45

*Leatherwood v. Campbell*,
  No. 7:02-cv-2812-KOB (N.D. Ala. June 2, 2004)............................................. 28

*Milliken v. Bradley*,
  433 U.S. 267 (1977)........................................................................................... 15

*Newman v. Ala.*,
  683 F.2d 1312 (11th Cir. 1982).......................................................................... 15

*Swain v. Junior*,
  961 F.3d 1276 (11th Cir. 2020)..................................................................... 41, 42

*Thomas v. Bryant*,
  614 F.3d 1288 (11th Cir. 2010).................................................................... 30, 39

*U.S. v. Sec'y, Fla. Dep't of Corr.*,
  778 F.3d 1223 (11th Cir. 2015)............................................................. 16, 17, 33

*U.S. v. Sec'y, Fla. Dept. of Corr.*,
  Case No 12-22958-CIV, 2015 WL 4768247, at *4 (S.D. Fla. Aug. 12, 2015).. 18

*United States v. Alabama*,
  No. 2:15-cv-368-MHT (M.D. Ala. May 28, 2015)............................................. 28

*Wilson v. Williams*,
  961 F.3d 829 (6th Cir. 2020)............................................................................... 42

## Statutes

18 U.S.C. § 3626............................................................................................. passim

## Rules

Fed. R. Civ. P. 65 ........................................................................................... 27, 28

Defendants JEFFERSON DUNN ("Commissioner Dunn"), in his official

capacity as Commissioner of the Alabama Department of Corrections ("ADOC"),

and RUTH NAGLICH ("Associate Commissioner Naglich"), in her official

capacity as ADOC's Associate Commissioner for Health Services (collectively, the

"State"), hereby submit this Pretrial Brief for the Phase 2A PLRA Evidentiary

Hearing.[1]

## INTRODUCTION

Over the last three (3) years, Plaintiffs repeatedly chose a course of conduct

akin to driving one's car the wrong way on the interstate. The State warned

Plaintiffs repeatedly of the confusion and legal ramifications of separately

negotiating each piece of a potential remedy. The State warned Plaintiffs of the

mandates of the Prison Litigation Reform Act (the "PLRA"). Despite the warnings,

Plaintiffs pursued a litigious, inefficient, and ill-informed remedial process over

repeated requests for collaboration and cooperation from the State. Plaintiffs

refused to cooperate with the State (*as almost every other known litigant has done

in the past*) to resolve the remaining remedial issues in this action. Rather than

working with the State, Plaintiffs clung to a disjointed remedial process and

---

[1] The State expressly preserves any and all objections to the Court's Liability Opinion and Order as to Phase 2A Eighth Amendment Claim (Doc. No. 1285, the "Liability Order"), and nothing contained in this Pretrial Brief shall be construed as an admission by the State or a waiver of any objection the State may have to the Liability Order. Nothing in this Pretrial Brief shall be construed as an admission of any kind by the State that ADOC's current or historical provision of mental-health care is or was unconstitutional or deficient in any way.

demanded that this Court impose unsubstantiated standards against the State (*such as "perfection" in mental-health staffing levels*). Now, Plaintiffs' insistence upon an adversarial Phase 2A remedial process leaves the State with no alternative but to return to this Court to seek adherence to the Constitution, federal law, and reasonable standards for performance to remedy the concerns identified by the Court.[2]

As forewarned by the State, Plaintiffs have now collided full-speed with the well-known, undeniable requirements of federal law, i.e. the PLRA. In predictable fashion, rather than acknowledging well-known, long-standing federal law, Plaintiffs ask the Court to save them from the requirements of the PLRA. Fortunately (for the State), Plaintiffs cannot escape the clear mandates of the PLRA or their obligation to demonstrate that the remedies sought in this action are narrowly tailored to resolve ongoing constitutional violations without unnecessarily intruding upon the authority and discretion afforded ADOC.

For the upcoming hearing, the central question is:  Do the Remedial Orders[3]

---

[2] If nothing else, Plaintiffs' Pretrial Brief confirms the total unwillingness of Plaintiffs to establish a collaborative remedial process with the State and their dedication to a "gotcha" remedial scheme focused on scrutiny and failure, not cooperation and collaboration.

[3] The State's use of the term "Remedial Orders" includes the following Orders and related Stipulations:  Doc. Nos. 1657 (Staffing Remedial Order); 1720 (Segregation Remedy); 1751 and 1751-1 (Bibb Segregation); 1792 and 1792-1 (Coding); 1794 and 1794-1 (Intake); 1815 and 1815-1 (Pre-Placement); 1821, 1821-1, and 1821-2 (Mental Health Referral); 1865 and 1865-1 (Treatment Planning); 1899 and 1899-1 (Psychotherapy); 1900 and 1900-1 (Supplemental Confidentiality); 2301 and 2301-1 (Mental Health Staffing); 2688 and 2688-1 (Attachment A to MH Staffing Stipulation); 2699 and 2699-1 (Suicide Prevention Measures); 2717 and 2717-1

satisfy the PLRA need-narrowness-intrusiveness requirements?  As discussed in greater detail below, significant portions of the existing Remedial Orders might satisfy the PLRA need-narrowness-intrusiveness requirements if applied in an appropriate manner under an appropriate compliance oversight structure.  However, several categories of remedial provisions cannot satisfy the PLRA need-narrowness-intrusiveness requirements (*regardless of the method of compliance oversight*) for the following reasons:

> (1)   Many provisions in the Remedial Orders are outdated (i.e. the deadlines for performance expired);
>
> (2)   ADOC completely performed a litany of requirements in the Remedial Orders years ago;
>
> (3)   The Remedial Orders include duplicative, overlapping requirements;
>
> (4)   Unforeseen obstacles and changed factual conditions such as the COVID-19 pandemic render performance of certain remedial provisions impracticable, unreasonable, detrimental to the public interest, and even impossible;
>
> (5)   ADOC agreed to undertake certain actions and to implement certain modifications to its mental-health services as a measure of good faith to Plaintiffs, but which the State knew, and Plaintiffs should have known, were not narrowly tailored to resolve any purported constitutional violation;[4] and

---

(Hospital-Level of Care); and 2718 and 2718-1 (MH Consultation to Disciplinary Process).

[4] The State allowed certain modifications to its mental-health services and system in the Stipulations to reach a resolution; however, because those remedial provisions exceed

(6)    The Remedial Orders cannot apply universally to
every facility within the ADOC system.

For these reasons, the Remedial Orders must be modified, assuming they are not

terminated altogether.  Separately, even if the PLRA need-narrowness-intrusiveness

requirements were potentially met, because a current, ongoing constitutional

violation does not exist as to each and every remedial provision, the Remedial

Orders must be terminated.

Nothing in this Pretrial Brief should be misunderstood.  The State fully

appreciates the plethora of challenges plaguing its prison system.  The dedicated

men and women who report to ADOC facilities every day, notwithstanding these

challenges, stand ready to tackle these challenges and to demonstrate to the public

their ability to address every challenge in a lasting and meaningful way.  However,

neither Plaintiffs nor any third-party monitor should be permitted to create

impossible requirements and measurements that far exceed any constitutional

standard, obfuscate ADOC's compliance efforts, and render it impossible for the

State to "reach the end game of this litigation" when "federal courts don't …

interject themselves" in ADOC's operations.  (Hrg. Tr., Apr. 23, 2018, at 3:22-4:6).

Indeed, the PLRA safeguards this very guarantee.  The State therefore respectfully

---

constitutional requirements, it is inappropriate to make those remedial provisions enforceable by
contempt or to monitor compliance with them.  Because these requirements do not relate to any
underlying constitutional violation, the State must be afforded substantial leniency in terms of
compliance and monitoring.

requests that the Court, in consideration of the totality of the entire remedial relief, only grant such relief as is necessary and only that relief which does not unnecessarily intrude on the discretion afforded the State and its officials.

## PROCEDURAL BACKGROUND

The Phase 2A remedial period began over three (3) years ago, after the Court issued its Liability Opinion and Order as to Phase 2A Eighth Amendment Claim (Doc. No. 1285, the "Liability Opinion") on June 27, 2017. As detailed in the Liability Opinion, the Court found the State liable for providing constitutionally inadequate mental-health care in seven (7) areas:

> (1) Identification and classification of inmates with serious mental-health needs;
>
> (2) Failing to provide "individualized treatment plans";
>
> (3) Failing to provide "psychotherapy by qualified and properly supervised mental-health staff and with adequate frequency and sound confidentiality";
>
> (4) Provision of "insufficient out-of-cell time and treatment to those who need residential treatment … and failing to provide hospital-level care to those who need it";
>
> (5) Suicide prevention;
>
> (6) Disciplining mentally ill inmates "for symptoms of their mental illness" and "without regard for the impact of sanctions on prisoners' mental health"; and

5

(7)    Placing inmates with a serious mental illness ("SMI") in restrictive housing "without extenuating circumstances and for prolonged periods of time"; placing inmates "with serious mental-health needs in" restrictive housing without adequately considering the impact of that housing on their mental health; and "providing inadequate treatment and monitoring in" restrictive housing.

(Id. at 300-301).  The Court also held that, in its view, "shortages of mental-health staff and correctional staff, combined with chronic and significant overcrowding," constituted "overarching issues" permeating these seven (7) areas of mental-health care.  (Id. at 301).  Upon issuance of the Court's Liability Opinion, the Phase 2A proceedings immediately transitioned into a "remedial" phase in which the State anticipated a single remedial trial. (Doc. No. 1304 at 43-45).

Before the Court initiated adversarial proceedings as part of the remedial process, the Parties attempted to reach a global resolution of all Phase 2A remedial issues through mediation before United States Magistrate Judge John E. Ott.  (See Doc. No. 1304 (Plaintiffs' counsel acknowledging on July 12, 2017, the Parties were working to resolve the "[o]verall remedial plan for all of mental health . . . to address the entirety of the case."); Doc. No. 1444).  As part of the early discussions with Plaintiffs, the State expressed its willingness to consider waiving the PLRA need-narrowness-intrusiveness requirements in the context of the sought-after global resolution.  However, Plaintiffs cast aside this potential concession along with the concept of a global resolution, electing to pursue a piecemeal remedial

process.[5]   Despite repeated warnings from the State about the complications, conflicts, and confusion inherent in this piecemeal remedial process, Plaintiffs insisted on, and the Court subsequently entered, scheduling orders setting the various remedial issues for multiple hearings.  (Doc. No. 1506).

The Court first scheduled remedial hearings on the issues of staffing, hospital level of care, and restrictive housing.  (Id.).  Notably, the initial remedial hearings did not set a separate hearing to address the issue of monitoring.  Moreover, Plaintiffs did not request that this Court set any specific hearing on the issue of monitoring.  (Id.).  As the Court modified scheduling orders over the twelve (12) months following the Liability Opinion (i.e. from June 2017, through July 2018), Plaintiffs never made any request for a remedial hearing focused entirely upon monitoring.  (Doc. Nos. 1524, 1552, 1604, 1631, 1675, 1685, 1694, 1763, 1818, 1860, 1926).  Indeed, as the Court will recall, the issue of monitoring did not even become a formal issue for resolution through an adversarial remedial hearing until the issuance of a revised scheduling order on July 19, 2018.  (Doc. No. 1928).

The circumstances leading up to the July 19, 2018, revised scheduling order

---

[5] In fairness to Plaintiffs' former lead counsel, she initially acknowledged the difficulty of taking a piecemeal approach to settlement, describing to the Court in September 2017 the difficulty of settling the case in "discrete parts" as "a large water balloon that if you squeeze one part, it's going to have an effect on some other part."  (Doc. No. 1362 at pp. 4-5).  Plaintiffs' counsel later expressed these same doubts about piecemeal settlement "because of the impact of one part on another part."  (Id.).  Nevertheless, the September 2017 hearing devolved into a discussion of purportedly "urgent" matters and, within less than one (1) week after the hearing, the Phase 2A remedial structure broke into disjointed pieces.

further reflect the absence of monitoring or compliance oversight from the Court's overall remedial plans. For example, when the State submitted its Phase 2A Proposed Remedial Plan on Correctional and Mental-Health Staffing in October 2017, it did not even mention a monitor or a monitoring process, but proposed a specific reporting process. (Doc. No. 1374). Additionally, the Court's Phase 2A Understaffing Remedial Order (Doc. No. 1657) did not mandate any formal monitoring mechanism.

A review of the State's remedial plans submitted prior to the July 19, 2018, scheduling order also demonstrates the State's then-position that monitoring remained unnecessary. (Doc. Nos. 1478 [Pretrial Brief on staffing]; 1514 [hospital level of care]; 1533 [restrictive housing]; 1594 [identification, classification, and residential treatment]; 1830 [treatment planning and psychotherapy]). The State expressly stated in its Phase 2A Proposed Remedial Plan on Restrictive Housing (filed in January 2018) that "[a]t this stage, formal 'monitoring' or other intrusive oversight is unnecessary.…" (Doc. No. 1533 at 39-40). Alternatively, the State proposed that ADOC internally oversee the efforts of its mental-health staff in its Phase 2A Proposed Remedial Plan on Psychotherapy and Treatment Planning (filed May 2018). (Doc. No. 1830 at 16). Even after the Court set the issue of monitoring for hearing, the State continued to voice its objection to any type of "formal monitoring" in its Phase 2A Proposed Remedial Plan on Suicide Prevention and

Crisis Care (filed August 2018).  (Doc. No. 1951 at 34).

While consistently maintaining and repeatedly stating its objection to any

"formal monitoring," the State participated in good faith with the Court's piecemeal

remedial schedule, which included numerous lengthy mediation sessions before

Judge Ott as to each piece of the overall remedial structure.  By the time the Court

entered the July 19, 2018, scheduling order, the Parties had submitted to the Court

eleven (11) Stipulations on remedial topics ranging from suicide prevention to

confidentiality.[6]  (Doc. Nos. 1106-1 (Interim Suicide Prevention Measures); 1720

(Segregation Remedy); 1751-1 (Bibb Segregation); 1792-1 (Coding); 1794-1

(Intake); 1815-1 (Pre-Placement); 1821-1/1821-2 (MH Referral and Supplemental

MH Referral); 1861-1 (Stop-Gap Segregation); 1865-1 (Treatment Planning);

1899-1 (Psychotherapy); 1900-1 (Supplemental Confidentiality)).  Each Stipulation

reflected the entirety of agreed-upon terms regarding that remedial topic.  None –

not one – of those Stipulations contained (a) any provision, stipulation, language,

---

[6] The various Stipulations submitted by the Parties to the Court followed closely the process
utilized by the Court to resolve issues and disputes, even prior to the conclusion of the liability
trial.  Even before issuing its Liability Opinion, the Court began this process of ordering the
Parties to mediate discrete remedial issues while – at the same time – preparing for or conducting
trial and then enacting the agreed-upon remedy without making any PLRA findings.  For example,
during the course of the liability trial, Plaintiffs filed an emergency motion for temporary
restraining order.  (Doc. No. 1075).  In the midst of the liability trial, the Court –ordered the State
to immediately respond to Plaintiffs' motion while also ordering the Parties to complete
mediation.  (Doc. Nos. 1079, 1082).  The Parties' mediation efforts in the midst of trial resulted
in the submission of the Interim Agreement Regarding Suicide Prevention Measures, which
notably did not include any admission of any kind related to the PLRA.  (Doc. Nos. 1106-1).
Moreover, when the Court entered this interim relief as an order (Doc. No. 1106), it made no
findings related to the PLRA.

9

or waiver related to the PLRA; (b) any particular provision related to monitoring; or (c) any provision mandating statewide application of the Stipulation or monitoring.  (Id.).  As evident on the face of each Stipulation, Plaintiffs never conditioned any Stipulation, the postponement of any remedial hearing, or the resolution of any the piecemeal remedial issue on the State's abandonment of its rights under the PLRA.  Moreover, the State maintained publicly throughout the course of the Phase 2A remedial process that each Stipulation must survive the Court's application of the PLRA.[7]

None of Plaintiffs' counsel can legitimately claim surprise over the application of the PLRA need-narrowness-intrusiveness requirements to the Remedial Orders.  As early as October 2017 (i.e. *nearly three (3) years ago*), the State raised its concerns about the limitations imposed by the PLRA need-narrowness-intrusiveness requirements on the remedial relief entered by the Court. (Doc. No. 1374 at 24).  Alternatively, any claimed lack of awareness by Plaintiffs' counsel of the PLRA need-narrowness-intrusiveness requirements raises questions about their appointment as class counsel in this action at best, or – at worst – may require the State to call Judge Ott to testify concerning exchanges during mediation

---

[7] While the Parties resolved a number of remedial issues in the Stipulations, the Court did hold a number of remedial hearings on other unresolved remedial issues.  (See, e.g., Doc. No. 1451 (correctional and mental health staffing); Doc. No. 1522 (restrictive housing); Doc. No. 1694 (residential unit out-of-cell time and treatment); Doc. No. 2077 (compliance oversight); Doc. No. 2440 (suicide prevention).

related to these very issues.

Throughout the Phase 2A remedial process, the State routinely raised the PLRA's mandates for remedial relief to Plaintiffs.  The absence of any agreement concerning the application of the PLRA as to any Stipulation or remedial relief became abundantly apparent to the Court in February 2019.  During a hearing on the Stipulations related to hospital-level care and disciplinary sanctions on February 7, 2019, the Court inquired about the existence of any agreement among the Parties concerning the compliance of these Stipulations, along with the prior Stipulations approved by the Court and entered as Remedial Orders, with the PLRA need-narrowness-intrusiveness requirements.  (Hrg. Tr. (Rough Draft), Feb. 7, 2019, at 74:21-76:1).   Plaintiffs stated that, in their opinion, the Parties' Stipulations regarding hospital-level care and disciplinary sanctions, as well as all of the other Stipulations adopted as Remedial Orders by the Court, satisfied the PLRA need-narrowness-intrusiveness requirements.  (Id. at 75:17-76:14).  Counsel for the State indicated that the State would need to deliberate further before it could inform the Court whether the Stipulations, including those relating to hospital-level care and disciplinary sanctions, complied with the PLRA.  (Id. at 76:2-20).  As evident from this exchange, the concept of the State conceding the PLRA need-narrowness-intrusiveness requirements constituted an issue not addressed in the underlying Stipulations, requiring undersigned counsel to confer with the State.

11

In a February 11, 2019, order, the Court directed the State to inform the Court whether it agreed "that all of the remedial stipulations previously approved and adopted by the court meet the PLRA's 'need-narrowness-intrusiveness' requirements." (Doc. No. 2333 at 1).  The State responded:

> At this time, the State cannot agree that all of the remedial stipulations previously approved and adopted meet the "need-narrowness-intrusiveness" requirements contained in the [PLRA]. . . . Any evaluation of the PLRA's need-narrowness-intrusiveness requirements cannot occur until the Court enacts the entire scope of the relief to be granted in this matter.

(Doc. No. 2382 at 1-2).  At that time, the State continued to assert that it could not evaluate whether any remedial provision of a Stipulation complied with the PLRA need-narrowness-intrusiveness requirements until the State learned the full scope of remedial relief, including the scope of compliance oversight.  (Id. at 1-5).

On May 31, 2019, the Parties agreed to a stay of proceedings in order to pursue a global resolution of all pending remedial issues.  (Doc. No. 2560-1).  In connection with the agreement, the Parties agreed "that the stipulated remedial orders in this case satisfy the PLRA need-narrowness-intrusiveness requirements for a period of 90 days."  (Id. at 4).  The State expressly entered into this agreement without prejudice to its position that the Remedial Orders did not and could not meet the PLRA need-narrowness-intrusiveness requirements beyond the term of the agreement.  (Id. at 4-5).  On this point, the Parties' agreement provided as follows:

12

No one can or will use the fact of this agreement, any aspect of this agreement, and/or that ADOC has implemented and/or performed any portion of the suicide prevention measures or stipulated remedial orders to argue or to find that the suicide prevention measures or remedial orders should continue and/or satisfy the PLRA requirements generally and/or on a permanent basis. Additionally, no Party may ask the Court to use the fact of this agreement or any aspect of this agreement in making a determination on PLRA findings.  For example, this agreement is made in the absence of any order on compliance oversight or monitoring and, therefore, the State takes the position that it cannot stipulate, waive, or concede the PLRA needs-narrowness-intrusiveness requirements have been or can be met without knowing any compliance requirements related to the applicable remedial relief.  Notwithstanding anything in this agreement, the State shall not be interpreted to stipulate, waive, or concede the PLRA needs-narrowness-intrusiveness requirements have been met beyond the initial and any subsequent 90-day period agreed to consistent with paragraph 6.A or the PLRA needs-narrowness-intrusiveness requirements can be met at all beyond the term of this agreement.

(Doc. No. 2560-1 at 4-5).  The Court stayed the proceedings based on the Parties' agreement, and subsequently continued the stay.  (Doc. Nos. 2569, 2608, 2716, and 2793).

As the Parties requested extensions of the stay, they continued to include the above-quoted language in their requests.  (Doc. No. 2706-1 at 4; Doc. No. 2790 at 3-4).  In December 2019, this Court asked the Parties, "Does this language refer to the parties or does it also intend to bind the court?"  (Doc. No. 2709 at 4).  The Parties responded:

13

> ***The language quoted by the Court is intended to bind the Parties and the Court.  It is, and has always been, an essential and fundamental basis for the State entering into the agreement*** (doc. 2706-1).  Essentially, the Parties agreed to avoid a situation where the Court makes findings regarding PLRA need-narrowness-intrusiveness requirements by citing to and relying upon the temporary agreement that the stipulations and stipulated remedial orders temporarily satisfy the PLRA.  ***If the Court could not agree to be bound by the Parties' agreement, then the State would not have agreed to the remedial aspects of the agreement or entered into the stay of proceedings.***

(Doc. No. 2712 at 3-4) (emphasis added).

Following this clarification by the Parties, the Court granted the Parties' joint motion to continue the stay and never suggested that it did not view the Parties' agreement as binding on the Court.  (Doc. No. 2716).  The Court agreed that the Remedial Orders the Court entered "lacked PLRA findings."  (Id. at 3).  Ultimately, based on the Parties' agreements containing the same limiting language quoted above, making clear that the State did not waive its PLRA arguments, the Court found that the Remedial Orders temporarily satisfy the "need-narrowness-intrusiveness" requirements "until either the Court's resolution of whether they comply with the PLRA's need-narrowness-intrusiveness requirement or December 30, 2020, whichever is earlier."  (Doc. No. 2793 at 6, granting Parties' Joint Request to Extend Phase 2A Remedial Orders (Doc. No. 2790)).

Despite its well-known position regarding the PLRA, the State continued to work to fulfill the provisions of the Remedial Orders.  (See generally Hrg. Tr.

14

(Rough Draft), Mar. 29, 2019, at 52:22-55:9 (Dr. Edward Kern testifying to ADOC's efforts to provide care consistent with the Remedial Orders)).   In fact, ADOC implemented and satisfied a number of provisions of the Remedial Orders, such that those provisions no longer remain necessary.   For example, and as further discussed below, ADOC implemented the SMI flag required under the Segregation Remedial Order (Doc. No. 1720), and largely satisfied the provisions of the Coding Order (Doc. No. 1792) and the Intake Order (Doc. No. ).   Given the State's efforts on a variety of fronts and based upon the contents of the Remedial Orders, the State now moves to terminate all outdated requirements and other requirements which do not satisfy the PLRA's needs-narrowness-intrusiveness requirement.

## LEGAL STANDARD

Even before Congress enacted the PLRA, courts recognized that "[a] federal court, when fashioning a remedy to redress constitutional violations in a prison, must recognize that it is ill-equipped to involve itself intimately in the administration of the prison system."   Newman v. Ala., 683 F.2d 1312, 1320 (11th Cir. 1982).   "Because of th[e] inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution …."   Milliken v. Bradley, 433 U.S. 267, 281-82 (1977) ("The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court

15

decrees must directly relate to the constitutional violation itself."). Congress

enacted the PLRA to codify this "hands-off" approach. Gilmore v. Calif., 220 F.3d

987, 991 (9th Cir. 2000) ("It is clear that Congress intended the PLRA to revive the

hands-off doctrine."); Inmates of Suffolk Cnty. Jail v. Rouse, 129 F.3d 649, 655

(1st Cir. 1997) ("Congress passed the PLRA in an effort, in part, to oust the federal

judiciary from day-to-day prison management.")

As the Court is aware, the PLRA imposes clear and significant limitations

upon the scope and extent of any prospective relief. In this respect, the PLRA

mandates:

> Prospective relief in any civil action with respect to prison
> conditions shall extend no further than necessary to correct the
> violation of the Federal right of a particular plaintiff or
> plaintiffs. *The court shall not grant or approve any prospective
> relief unless* the court finds that such relief is *narrowly drawn,
> extends no further than necessary to correct the violation of
> the Federal right, and is the least intrusive means necessary to
> correct the violation of the Federal right*. The court shall give
> substantial weight to any adverse impact on public safety or the
> operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A) (emphasis added). Courts refer to these requirements as

the "need-narrowness-intrusiveness findings." U.S. v. Sec'y, Fla. Dep't of Corr.,

778 F.3d 1223, 1227-28 (11th Cir. 2015). The need-narrowness-intrusiveness

criteria mean that the prospective relief must not be tailored to best practices,

national standards, or other industry-created norms, but instead must narrowly

address only the issues identified in the Liability Opinion. Moreover, a defendant

16

"shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence" of the court making findings that the relief satisfied the need-narrowness-intrusiveness criteria. 18 U.S.C. § 3626(b)(2). To avoid termination in such a circumstance, a plaintiff must demonstrate "that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3).

Plaintiffs generally agree that a court imposing relief "must make 'particularized findings, on a provision-by-provision basis, that each requirement imposed' meets the PLRA's need-narrowness-intrusiveness mandate." (Doc. No. 2899 at 19) (quoting Cason v. Seckinger, 231 F.3d 777, 785 (11th Cir. 2000)); Sec'y, Fla. Dep't of Corr., 778 F.3d at 1227-28 (court imposing relief must make "'particularized findings … that each requirement imposed by the [relief] satisfies the need-narrowness-intrusiveness criteria'") (quoting Cason, 231 F.3d at 785) (addressing identical language in Section 3626(b)(3)). "It is not enough to simply state in conclusory fashion that the requirements of the [relief] satisfy those criteria. Particularized findings, analysis, and explanations should be made as to the application of each criterion to each requirement imposed by" the relief. Id. (quoting Cason, 231 F.3d at 785).

17

Despite Plaintiffs' general agreement that the Court must make PLRA findings as to each provision of relief, Plaintiffs continue to argue that the PLRA need-narrowness-intrusiveness requirements do not apply to relief that amounts to "monitoring." (Doc. No. 2899 at 54-55). A variety of courts across the country (including courts in the Eleventh Circuit) demonstrate the scrutiny required of monitoring provisions under the PLRA's requirements. See, e.g., U.S. v. Sec'y, Fla. Dept. of Corr., Case No 12-22958-CIV, 2015 WL 4768247, at *4 (S.D. Fla. Aug. 12, 2015) (subjecting monitoring provisions to need-narrowness-intrusiveness requirements and narrowing provisions regarding monitors' access to facilities because plaintiffs' proposal exceeded requirements); Benjamin v. Fraser, 343 F.3d 35, 48-49 (2d Cir. 2003) (noting that it would be "problematic" if monitoring were not considered prospective relief subject to need-narrowness-intrusiveness requirements, because a monitor's "substantial responsibilities permit no easy distinction between relief itself and the monitoring of relief"). Accordingly, the Court must make particularized written findings that each aspect of the Phase 2A relief, including compliance oversight, meets the PLRA need-narrowness-intrusiveness requirements.

## ARGUMENT

**I. THE STATE PRESERVED ITS RIGHT TO IDENTIFY THE FAILURES OF THE REMEDIAL ORDERS AND STIPULATIONS TO SATISFY THE PLRA.**

In Plaintiffs' Pretrial Brief, they argue, "[t]he Court need not make particularized findings for the Phase 2A remedial orders and stipulations because Defendants have waived any ability to dispute whether these remedies comply with the PLRA." (Doc. No. 2899 at 21). Plaintiffs' argument of waiver further confirms their continuing miscomprehension of the PLRA. In essence, Plaintiffs claim that the State waived the right to insist upon this Court fulfilling its obligations under the PLRA. The necessary findings for the PLRA need-narrowness-intrusiveness constitute an obligation of the Court, not an obligation of the parties. 18 U.S.C. § 3626(a)(1)(A) ("*The court shall not grant or approve* any prospective relief unless the court finds" that need-narrowness-intrusiveness requirements are satisfied) (emphasis added); Cason, 231 F.3d 777, 780 (holding that the PLRA "prescribed limits on the scope of prospective relief that *a court has the authority to enter*" and "*limits a court's authority to continue to enforce* previously entered prospective relief in prison litigation reform cases") (emphasis added). As practical matter, the State cannot "waive" the Court's obligations. Moreover, even in the context of affirmative defenses that Rule 8(c) requires a party to "affirmatively state" in a response to a pleading, the Eleventh Circuit has held that the defense is not waived where the "plaintiff receives notice of [it] by some means other than

19

pleadings." Grant v. Preferred Research, Inc., 885 F.2d 795, 797 (11th Cir. 1989). The course of negotiations between the Parties and the repeated references to these requirements throughout the State's filings demonstrates that Plaintiffs were well aware of the State's position on the PLRA throughout the remedial process.

Plaintiffs claim that the State "waived any ability to argue that the first nine remedial orders at issue do not comply with the PLRA because [the State] agreed to the stipulations underlying the remedial orders and agreed that the Court should enter those stipulations as enforceable orders and injunctions." (Id.). Plaintiffs' argument ignores the entire history of negotiations between the Parties and directly contradicts their clear representations to this Court.[8] Plaintiffs have long known the State's position regarding the PLRA. Indeed, throughout the negotiation process, the State refused to include PLRA findings in any of the Stipulations because it cannot agree to the findings in a piecemeal fashion, and it repeatedly informed Plaintiffs of this fact. Moreover, the State continued to insist on, and Plaintiffs continued to agree to, language making clear that "the State shall not be interpreted

---

[8] This argument does not constitute the first occasion in which Plaintiffs have attempted to manipulate the mediation process to their benefit while at the same time demonstrating their disinterest in building any level of trust with the State. By virtue of this argument, Plaintiffs have (a) violated their agreement with the State, (b) contradicted prior representations to the Court, and (c) forced the State into a position of being required to present evidence about the events of mediation in which Plaintiffs were well-aware of the State's position on the application of the PLRA to the Stipulations.

to stipulate, waive, or concede the PLRA need-narrowness-intrusiveness requirements can be met." (Doc. Nos. 2560-1 at 4-5, 2706-1 at 4, 2790 at 3-4). Plaintiffs even agreed with the State that this language "is intended to bind the Parties and the Court." (Doc. No. 2712 at 3). In other words, Plaintiffs expressly agreed that the State preserved its right to raise any objections it possessed under the PLRA, and their willingness to openly defy their agreements with the State demonstrate their (a) lack of good faith, and (b) willingness to completely ignore the record before this Court. In light of these repeated agreements and Plaintiffs' open acknowledgement of the same, Plaintiffs' new "waiver" arguments defy logic. In short, Plaintiffs' waiver arguments are entirely frivolous and interjected for no legitimate purpose.

Plaintiffs next argue that the State waived its right to contest the Remedial Orders' compliance with the PLRA by stating that its own remedial plans complied with the PLRA. (Doc. No. 2899 at 23). According to Plaintiffs, "[s]ince [the State] ha[s] already conceded that less than all relief satisfied the PLRA in connection with these proposed plans, the Court should not entertain [the State's] current argument contending that relief to which [it] later agreed cannot satisfy the PLRA." (Id.). This argument makes no sense. Indeed, the very language Plaintiffs cite from the State's Pretrial Briefs makes this point for the State. Plaintiffs quote the State's statement that "'[t]he State structured the Plans so that each requirement meets this

21

[PLRA] standard.'"  (Id. (quoting Doc. No. 1598 at 63, Doc. No. 1478 at 41, Doc. No. 1872 at 36, and Doc. No. 1973 at 41)).  Plaintiffs omit the very next sentence from each of those briefs: ***"To go any further runs afoul of the PLRA's need-narrowness-intrusiveness requirement."***  (Doc. No. 1598 at 63; Doc. No. 1478 at 41; Doc. No. 1872 at 36; and Doc. No. 1973 at 41) (emphasis added).  It is difficult to imagine a more incomplete and misleading argument by Plaintiffs.

In addition to the language conveniently omitted by Plaintiffs, each of the State's Plans contained the following reservation:

> The State expressly preserves any and all objections to the Court's Liability Opinion and Order as to Phase 2A Eighth Amendment Claim (Doc. No. 1285, the "Liability Order") and nothing contained in this Plan shall be construed as an admission by the State or a waiver of any objection the State may have to the Liability Order.

(Doc. Nos. 1374 at 1 n. 1; 1514 at 2 n. 1; 1533 at 3 n. 3; 1594 at 2 n. 1; 1830 at 2 n. 1; 1951 at 2 n. 2; 2048 at 2 n. 1; 2115 at 31 n. 4; 2222 at 2 n. 1).  Finally, in its first Remedial Plan (relating to staffing), the State included seven (7) pages of objections to the Court's liability findings, which it incorporated into each of its subsequent Plans.  (Doc. No. 1374 at 25-32; 1514 at 2 n. 1; 1533 at 3 n. 3; 1594 at 2 n. 1; 1830 at 2 n. 1; 1951 at 2 n. 2; 2048 at 2 n. 1; 2115 at 31 n. 4; 2222 at 2 n. 1).  Thus, the State expressly and repeatedly put Plaintiffs and the Court on notice of its view that any relief inconsistent with or beyond the proposals set forth in the State's Plans would not comply with the PLRA.  There existed no basis for Plaintiffs to conclude

that the State "waived" its objections to the PLRA by structuring its remedial plans to comply with the PLRA.[9]

Finally, Plaintiffs argue that "the remedial orders and stipulations include some requirements that were proposed by [the State] in a remedial plan, and some other requirements that are less intrusive than what [the State] proposed in a remedial plan." (Doc. No. 2899 at 24). According to Plaintiffs, the State "cannot now argue that the PLRA is not satisfied with respect to these requirements." (Id.). Even if one assigns any merit to this agreement, the State's agreement years ago that certain specific provisions of the Remedial Orders (*which clearly excluded any monitoring by any outside parties*) would comply with the PLRA does not mean

---

[9] Indeed, this argument, i.e. the State's alleged waiver of its objections based upon the sheer existence of each Stipulation, represents an improper attempt by Plaintiffs to unilaterally alter the terms of the Remedial Orders. As the Court already found, none of the Stipulations contain any waiver language. In other words, such a reading of the Stipulations would fundamentally alter their meaning. "[I]t is a fundamental principle of contracts that in order for a contract to be binding and enforceable, there must be a meeting of the minds on all the essential terms an obligations of the contract." Browning v. Peyton, 918 F.2d 1516, 1521 (11th Cir. 1990); see also Fortson v. Quality Restaurant Concepts, No. 2:13-cv-426-WKW, 2015 WL 4426258 (M.D. Ala. July 17, 2015) (finding no settlement agreement existed when there was no meeting of the minds as to all essential terms). The Parties agreed to specific Stipulations, but no "meeting of the minds" occurred with respect to the PLRA. Accordingly, Plaintiffs may not ask this Court to rewrite the Parties' Stipulations to insert a waiver that the Parties did not agree to include. "[C]ourts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." Hegel v. First Liberty Ins. Corp., 778 F.3d 1214, 1222 (11th Cir. 2015). Moreover, "…it is well settled that when the terms of a voluntary contract are clear and unambiguous, … the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties." Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F.3d 1285, 1290 (11th Cir. 2001) (citations omitted) (internal quotations omitted)). Thus, to impose any terms the State did not agree to the Parties' agreements would render the Stipulations void and run contrary to established principles of contract.

23

that those provisions continue to comply with the PLRA – especially with the addition of any monitoring structure.  In any event, as further set forth below, the State does agree that certain relief (including but not limited to certain relief proposed in the State's Plans) may generally comply with the PLRA, subject to further evaluation in light of the Court's future monitoring requirements.

## II.     THE STATE'S AGREEMENT TO CERTAIN PROVISIONS YEARS AGO DOES NOT EQUATE TO COMPLIANCE WITH THE PLRA TODAY.

Plaintiffs also argue that the State's "agreement to the remedial stipulations and orders constitutes compelling evidence that these remedies satisfy the PLRA." (Doc. No. 2899 at 25).  However, the Parties agreed to many of the Stipulations long ago.  For example, the Court entered the Segregation Order, the Bibb Segregation Order, and the Coding Order approximately two-and-a-half (2 ½) years ago.  (Doc. No. 1720, entered Feb. 28, 2018; Doc. Nos. 1751, 1751-1, entered Apr. 9, 2018; Doc. Nos. 1792, 1792-1, entered Apr. 25, 2018).  Moreover, the State does not yet know whether the compliance oversight structure the Court adopts will be consistent with the State's compliance oversight proposal.  In addition, as more fully set forth below, the current COVID-19 pandemic and other events since entry of the Remedial Orders present material changes in circumstances that the State could not and did not anticipate when it entered into the Stipulations.  Thus, the fact that the State agreed to the Stipulations years ago does not relieve Plaintiffs of their obligation to demonstrate that the relief currently meets the PLRA's requirements.

24

## III. THE STATE CANNOT AGREE THAT THE REMEDIAL ORDERS MEET THE PLRA STANDARD BEFORE IT CONSIDERS THE SCOPE OF ANY COMPLIANCE OVERSIGHT OR MONITORING OBLIGATIONS.

The State repeatedly informed Plaintiffs and the Court that "[a]ny evaluation of the PLRA's need-narrowness-intrusiveness requirements cannot occur until the Court enacts the entire scope of the relief to be granted in this matter." (Doc. No. 2382 at 2). The State's position remains the same: the State "cannot agree that the remedial stipulations meet the PLRA's need-narrowness-intrusiveness requirements until it considers the scope of any compliance oversight or monitoring obligations entered by the Court." (Id.; see also Doc. No. 2521 at 10 ("Most critically, the State cannot agree that the Remedial Stipulations meet the PLRA's need-narrowness-intrusiveness requirements until the Court specifies the compliance oversight obligations that will apply to the remedial orders."); Doc. No. 2528 at 4 ("It is prejudicial, as well as impossible from a practical standpoint, to require the State to take a position on the need-narrowness-intrusiveness of the individual remedies before they know the complete scope of Phase 2A remedial relief or the details of the applicable compliance standards.")). As the State previously informed the Court:

> [T]he State may be able to agree that a particular Stipulation meets the PLRA's requirements if it only applies at certain facilities or if the compliance thresholds are appropriate. However, for example, if the final order requires the State to be in 100% compliance at all times at all facilities (potentially including work release facilities),

25

> and/or permits an excessive number of site visits to
> oversee compliance, then the State cannot agree that the
> Stipulation meets the PLRA's standards.

(Doc. No. 2528 at 4). As evident in the record before this Court, these important

questions surrounding compliance oversight remain unresolved even today.

Plaintiffs now argue that the Court need not define "substantial compliance"

in numerical terms and cite other cases in which courts did not do so. (Doc. No.

2899 at 29). This argument ignores the complexity and unique circumstances of

this case; indeed, Plaintiffs' former lead counsel once likened this case to "a large

water balloon that if you squeeze one part, it's going to have an effect on some other

part." (Doc. No. 1362 at 4-5). Instead of involving a single discrete issue and/or a

limited class, this case involves seven (7) broad areas in which the Court found

constitutional violations in 2017, and the class consists of "all persons with a serious

mental illness who are, or will be, confined within ADOC's facilities." (Doc. No.

1285 at 6, 300-301).

Furthermore, expert testimony provided during the course of the evidentiary

hearing regarding the State's Compliance Oversight Plan indicated that the

appropriate substantial compliance percentage may differ depending on the nature

of each remedial requirement. For example, Dr. Kathy Burns, Plaintiffs' mental-

health expert, testified that "[t]here should be 100 percent compliance with" certain

aspects of mental-health care, including provisions relating to treatment planning

26

and suicide prevention. (Hrg. Tr., Dec. 7, 2018, at 122:21-123:21). Similarly, Dr. Robert Stern, a psychiatrist proposed by the State to serve as a member of the External Compliance Team ("ECT"), testified that the ECT would review each performance measurement and determine the appropriate percentage for reaching substantial compliance on that measurement. (Hrg. Tr. (Rough Draft), Nov. 27, 2018, at 110:24-111:15). Dr. Stern testified that performance measurements "critical to safety" might require a percentage above eighty-five percent (85%) for substantial compliance. (Id.). Thus, until the State learns what percentage it must reach for noncompliance, partial compliance, and substantial compliance with respect to each provision of the Remedial Orders, it cannot agree that the Remedial Orders meet the PLRA's need-narrowness-intrusiveness requirements. See generally Fed. R. Civ. P. 65(d)(1)(C) ("Every order granting an injunction and every restraining order must . . . describe in reasonable detail . . . the act or acts restrained or required."); John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 984 (11th Cir. 1983) (vacating injunction that failed to "specifically describe[] the acts which are prohibited").

None of the cases cited by Plaintiffs involved close to the wide-ranging scope of remedial requirements that this case entails. Henderson v. Thomas involved "a class of all current and future HIV-positive" inmates in ADOC custody (including less than 300 current inmates), and the narrow claims related solely to allegations

27

regarding ADOC's policies surrounding the housing of HIV-positive inmates. Henderson v. Thomas, No. 2:11-cv-224-MHT, 2013 WL 5493197, at \*1 (M.D. Ala. Sept. 30, 2013). In approving the settlement agreement, the Court specifically noted "the agreement's short time frame and its application to only a limited number of the ADOC's facilities." Id. at \*8. Leatherwood v. Campbell, No. 7:02-cv-2812-KOB (N.D. Ala. June 2, 2004), ECF No. 163, likewise involved a much smaller class of less than 300 inmates, a single facility, and much narrower claims relating to medical care for HIV-positive inmates. Similarly, United States v. Alabama, No. 2:15-cv-368-MHT (M.D. Ala. May 28, 2015), involved a discrete number of security-related issues pertaining to a limited class of female inmates at a single facility. Those cases did not involve wide-ranging remedial requirements that, by their very nature, may require different thresholds by which to measure "substantial compliance."[10]   The compliance threshold for Phase 2A (only a portion of the overall action), by contrast, will constitute an important metric by which the Court puts the State on notice of its legal obligations. Fed. R. Civ. P. 65(d)(1)(C) .  For these reasons, the absence of any clarity on the issue of monitoring remains a severe impediment to completion of the PLRA need-narrowness-intrusive analysis.

---

[10] Previous settlements of discrete issues in this action (discussed in Plaintiffs' Brief, Doc. No. 2899 at 31), likewise did not require varying compliance percentages for specific obligations given the clear, narrow parameters of monitoring and the narrow focus of the issues.

28

## IV.   THE PLRA EXPRESSLY REQUIRES A CURRENT AND ONGOING CONSTITUTIONAL VIOLATION.

Plaintiffs previously conceded that the Remedial Orders are at the very least "immediately terminable upon motion by" the State. (Doc. No. 2520 at 14, citing 18 U.S.C. § 3626(b)(2)). As Plaintiffs acknowledged, "a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(b)(2) .. In the context of a motion to terminate, the "relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct *a current and ongoing violation of the Federal right*, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3) . (emphasis added).

Plaintiffs attempt to avoid the "current and ongoing" requirement by arguing that "[t]he Eleventh Circuit has explicitly recognized that 'the current and ongoing requirement is distinct from the standard governing the *initial* entry of injunctive relief.'" (Doc. No. 2899 at 33 (quoting Thomas v. Bryant, 614 F.3d 1288, 1230 (11th Cir. 2010)). Plaintiffs' argument suffers from the fatal flaw that the current

situation, of course, does not involve the "initial entry" of injunctive relief.  Instead, it involves orders that the Court ***already entered*** over more than two-and-a-half (2 ½) years.  The Court indisputably entered those orders without making the requisite PLRA findings.

Even if this case did involve the "initial entry" of injunctive relief, the Eleventh Circuit never suggested that a court may base "initial entry" of injunctive relief upon violations the court found existed years earlier.  Instead, the Eleventh Circuit noted that the "current and ongoing violation" for purposes of termination "'***is a violation that exists at the time the district court conducts the § 3626(b)(3) inquiry, and not a potential future violation***.'"  Thomas, 614 F.3d at 1320 (quoting Cason, 231 F.3d at 784) (emphasis added).  In other words, a court may not decline to terminate injunctive relief based on the potential for future violations, but must instead find that a current, ongoing violation continues to exist at the time of the motion to terminate.  Id.  The Eleventh Circuit distinguished that situation from the initial entry of injunctive relief, holding that "injunctive relief is available in the first instance 'to prevent a substantial risk of serious injury from ripening into actual harm,' i.e., to prevent future harm."  Id. (quoting Farmer v. Brennan, 511 U.S. 825, 845 (1994)).

Thus, even for initial entry of injunctive relief, a plaintiff must at the very least demonstrate a ***then-existing*** "substantial risk of serious harm."  Id.  Plaintiffs

make no effort to meet this standard. Plaintiffs possess full knowledge of the State's current compliance with and complete fulfillment of a variety of the terms of the Remedial Orders. Instead of acknowledging the State's progress on these issues, Plaintiffs ignore that progress and focus solely on stale evidence in areas in which no risk of future harm, much less current and ongoing constitutional violation, exists. For example, the Court entered the Segregation Remedy (Doc. No. 1720) on March 30, 2018 – almost two-and-a-half (2 ½) years ago. Plaintiffs argue that "[e]vidence presented at the liability trial demonstrates that the Segregation Remedy is necessary," because "ADOC's coding system at the time of the liability trial failed to identify whether someone had an SMI." (Doc. No. 2899 at 37). Plaintiffs spend two (2) full pages of their brief arguing the necessity of the SMI flag (id. at 41-43), but nowhere do they acknowledge that the State implemented the SMI flag years ago. Similarly, the Court entered the Coding Order (Doc. Nos. 1792, 1792-1) on April 25, 2018 – well over two (2) years ago. Plaintiffs fail to acknowledge that the State already implemented these provisions as well. Plaintiffs assert no basis for the Court to complicate future compliance oversight with these completed items.

The Intake Order (Doc. No. 1794) provides another stark example of Plaintiffs' refusal to acknowledge the State's progress. Indeed, Plaintiffs actually couch their arguments regarding the Intake Order in the past tense: they claim that

"ADOC's intake system *missed so many of those in need of mental-health care at the outset.*" (Doc. No. 2899 at 62). Plaintiffs quote this Court's statement that, according to Dr. Burns and Dr. Kern, "'once ADOC has functioning identification processes, it should expect its mental-health caseload to substantially increase to reflect the average caseload in American prisons with functioning mental-health care systems.'" (Id. (quoting Braggs v. Dunn, 2020 WL 2789880, at \*6 (M.D. Ala. May 29, 2020)). In that opinion, the Court went on to acknowledge a substantial increase in ADOC's mental-health caseload. 2020 WL 2789880, at \*6. Indeed, the Court noted that, during a December 2019 hearing, "[t]he plaintiffs made the unrefuted representation . . . that the caseload is expected to continue expanding and stabilizing until it reaches a representative proportion of the ADOC population around October 2020." Id. Thus, Plaintiffs previously argued to the Court that the State will soon achieve the goals set forth in the Intake Order, but they now argue that a Remedial Order incorporating the Intake Order currently remains "necessary" to correct constitutional violations.[11]

The State anticipated that Plaintiffs would file a focused Pretrial Brief attempting to argue that certain provisions of certain Remedial Orders – *not the entirety of every Remedial Order* - meet the PLRA need-narrowness-intrusiveness

---

[11] Indeed, ADOC's mental-health caseload is currently in line with the expectations of Drs. Burns and Patterson. (See Doc. No. 2705).

requirements based on current circumstances. Instead, Plaintiffs ignored current circumstances and argued that the Remedial Orders meet the PLRA need-narrowness-intrusiveness requirements based upon evidence presented at the liability trial *over three (3) years ago*. Plaintiffs' argument remains inconsistent with the law and unwarranted in light of the facts.

## V. THE REMEDIAL ORDERS CONSTITUTE PRELIMINARY INJUNCTIONS THAT EXPIRED BY OPERATION OF LAW.

The PLRA provides that "[p]reliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the end of the 90-day period." 18 U.S.C. § 3626(a)(2); U.S. v. Sec'y, Fla. Dep't of Corr., 778 F.3d 1223, 1228 (11th Cir. 2015) (preliminary injunction "expired by operation of law" where court did not make need-narrowness-intrusiveness findings or make order final). Plaintiffs claim that the Remedial Orders "cannot represent preliminary injunctive relief" because they Court entered them after finding liability. (Doc. No. 2899 at 34). The very nature of the Parties' negotiations demonstrates that the Remedial Orders cannot function as permanent relief, but can only constitute preliminary relief in the absence of a final order from the Court encompassing all Phase 2A relief.[12]  The State negotiated

---

[12] See Fed. R. Civ. P. 65(d).

the Stipulations with that understanding in mind, and it would violate the spirit of

the Parties' agreements to hold otherwise.

## THE STATE'S POSITION REGARDING
## THE REMEDIAL ORDERS' COMPLIANCE WITH THE PLRA

At the upcoming evidentiary hearing, the State intends to provide exhaustive

evidence, provision-by-provision, of its specific objections as to the Remedial

Orders, which do not comport with the PLRA need-narrowness-intrusiveness

requirement.  The various ways in which the Remedial Orders fail under the PLRA

need-narrowness-intrusiveness test fall into discrete categories – each of which the

State will discuss in greater detail below.

## I.    THE STATE GENERALLY AGREES THAT CERTAIN REMEDIAL PROVISIONS MAY MEET THE PLRA'S REQUIREMENTS, SUBJECT ONLY TO THE COURT'S COMPLIANCE OVERSIGHT OPINION.

As the State previously informed the Court, the State remains unable to

complete its evaluation of the Remedial Orders' compliance with the PLRA need-

narrowness-intrusiveness requirements until the Court and any purported monitor or

monitoring team enumerate the entirety of the remedial scheme in this matter.  (See,

e.g., Doc. Nos. 2382, 2521).  Stated differently, the greatest shortcoming of the

current Remedial Orders (when analyzing them through the PLRA's framework)

remains the vast uncertainties surrounding the monitoring of these provisions and

the methodology to be employed to evaluate compliance.  As discussed on a number

of occasions before this Court, the manner in which a court-appointed monitor,

34

acting at the direction of this Court, defines, mandates, and measures compliance with any single requirement of the Remedial Orders constitutes a total unknown at this point.  For this reason, the State continues to maintain any analysis of the Remedial Orders under the PLRA need-narrowness-intrusiveness analysis cannot be completed until the resolution of these open questions.  Consistent with the impracticability of this analysis at this stage, the State cannot agree that any single remedial order complies with the PLRA need-narrowness-intrusiveness requirements given the unknowns surrounding monitoring.  Nevertheless, the State identified additional areas that – regardless of the monitoring scheme employed – do not pass muster under the PLRA.

Subject to and without waiving in any way the State's objections based on the eventual compliance oversight structure, the State can generally agree that certain provisions of the Remedial Orders may comply with the PLRA under an appropriate compliance system.  For example, subject to compliance oversight and the ADOC facilities subject to the Remedial Orders, the State generally agrees that many of the terms of the Pre-Placement Order (Doc. No. 1815),[13] the Confidentiality Order (Doc.

---

[13] As discussed further below, the State maintains limited objections to the Pre-Placement Order independent of its monitoring-based objections.  However, many of the Pre-Placement Order's provisions remain acceptable if coupled with an appropriate compliance oversight structure.

No. 1900),[14] the Mental-Health Staffing Order (Doc. No. 2301),[15]  and the Disciplinary Process Order (Doc. No. 2433) comply with the PLRA if and only if appropriate, fair, and unobstructive compliance oversight is employed.

The State, however, cannot agree without knowing the specifics of the monitoring process that every provision of these Remedial Orders complies with the PLRA or that the Remedial Orders should apply to every major ADOC facility.  As one example, the Pre-Placement Order contains a number of provisions that may prove overly intrusive, depending on the monitoring structure.  The Pre-Placement Order provides for certain assessments to be "conducted out-of-cell, in a space offering sound confidentiality." (Doc. No. 1815-1 at 5).  If this Pre-Placement Order provision or the compliance oversight program permits providers to exercise clinical judgment when security or safety concerns prevent these assessments from occurring out-of-cell, then the State may be able to agree to this provision.  However, if the compliance oversight process with respect to this single provision within the Pre-Placement Order does not provide any flexibility to providers, mandates 100%

---

[14] Plaintiffs suggest, "[t]he fact that this relief significantly overlaps with long-established ADOC policy is evidence that it is the least intrusive means necessary."  (Doc. No. 2899 at 133).  The fact that ADOC policies already require certain actions does not mean that those actions represent the least intrusive means necessary to correct constitutional violations.  Nevertheless, subject to the Court's monitoring order and appropriate limitation of the facilities subject to the Order, the State agrees that many of the provisions contained in the Confidentiality Order may comply with the PLRA.

[15] Plaintiffs misleadingly refer to this stipulation as the "Staffing Contempt Remedy."  (Doc. No. 2899 at 135).  Plaintiffs withdrew their contempt motion in connection with the Mental-Health Staffing Stipulation.  (Doc. Nos. 2301 at 2-3; 2301-1 at 5.1).

compliance regardless of the circumstances or otherwise creates mandates rendering compliance unnecessarily difficult, elusive or impossible, then the provision would remain overly intrusive and would excessively interfere with the ADOC's operations. Furthermore, application of the Pre-Placement Order to every major facility would unquestionably run afoul of the PLRA need-narrowness-intrusiveness requirements.

As an additional example, the Pre-Placement Order sets forth detailed requirements for the content and documentation of mental-health rounds. (Doc. No. 1815-1 at 2-3). To the extent that the Court's compliance oversight order permits a monitor to second-guess clinical judgment, interject his or her personal preference or burden the mental-health staff to undertake measures unrelated to the underlying constitutional claims in this matter, these provisions also would clearly violate the PLRA. In addition, the Disciplinary Process Order also required expungement of certain Rule 505 violations. (Doc. No. 2433 at 4-5). ADOC completed this process, and, therefore, it should not be subject to compliance oversight.

Thus, subject to the monitoring structure and the facilities subject to the Remedial Orders, a substantial portion of the relief set forth in many of the Remedial Orders may very well comply with the PLRA without further disputes among the Parties. Attached hereto as Addendum A is a list of the provisions that may be

37

acceptable if monitored in accordance with the State's compliance oversight proposal.

## II.   SEVERAL PROVISIONS WITHIN THE REMEDIAL ORDERS CANNOT MEET THE PLRA NEED-NARROWNESS-INTRUSIVENESS REQUIREMENTS.

A number of the Remedial Orders cannot comply with the PLRA need-narrowness-intrusiveness requirements for reasons that the State will demonstrate at the upcoming evidentiary hearing.  Plaintiffs' failure to acknowledge and dismiss these provisions within their Pretrial Brief demonstrate their failure to review and consider the existing Remedial Orders and the requirements of the PLRA. Plaintiffs' failure to acknowledge the inapplicability of these provisions and the lack of any legal basis for the Court to continue these Remedial Orders demonstrates their haphazard view of the entire remedial phase of this case.  As discussed, below certain requirements of the Remedial Orders represent requirements which cannot be renewed by the Court beginning September 14, 2020.

### A.   CERTAIN REMEDIAL ORDERS CONTAIN OUTDATED REQUIREMENTS.

As set forth above, the State already implemented the SMI flag consistent with the Segregation Remedial Order (Doc. No. 1720) and the Coding Order (Doc. No. 1792), and largely satisfied the other provisions of the Coding Order and the Intake Order (Doc. No. 1794).  According to their Pretrial Brief, Plaintiffs simply refuse to acknowledge this reality.  For example, Plaintiffs spend over two (2) pages

38

of their Pretrial Brief arguing that the SMI flag meets the PLRA standard, but nowhere do they acknowledge that the State implemented the SMI flag years ago. (Doc. No. 2899 at 41-43).  Thus, assuming the PLRA's termination standard applies to this provision, Plaintiffs cannot establish that an order regarding the SMI flag "remains necessary to correct a current and ongoing violation of [a] Federal right," 18 U.S.C. § 3626(b)(3).  Even assuming the current procedural posture somehow constitutes "initial entry" of an order the Court initially entered almost two-and-a-half (2 ½) years ago, Plaintiffs also cannot establish that an order requiring the SMI flag remains necessary 'to prevent a substantial risk of serious injury from ripening into actual harm,' i.e., to prevent future harm." Thomas v. Bryant, 614 F.3d 1288, 1230 (11th Cir. 2010) (quoting Farmer v. Brennan, 511 U.S. 825, 845 (1994)). Plaintiffs cannot cite any evidence, nor does any exist, suggesting that the State intends to abolish the SMI flag if the Court does not incorporate it into a future order.  Indeed, the State will present testimony at the upcoming evidentiary hearing demonstrating the amount of time, energy, and resources devoted to the implementation of the SMI flag over the last two (2) years and the State's commitment to retain the SMI flag even in the absence of an order requiring it.  In these circumstances, Plaintiffs cannot demonstrate that a remedial order incorporating the SMI flag, or monitoring of its implementation, would comply with the PLRA.

39

The same remains true of many of the other provisions of the Coding (Doc. No. 1792) and Intake (Doc. No. 1794) Orders.  For example, the Coding Order required that, "[o]n or before April 1, 2019, all inmates on the mental health caseload shall be re-coded pursuant to the Revised Mental Health Coding System." (Doc. No. 1792-1 at 6-7).  On March 29, 2019, Dr. Kern testified that he "monitored the implementation of the new coding system to ensure that we hit 100 percent compliance by watching those numbers come in at the facility-by-facility level over the last few weeks to ensure that we have – meet that April 1st deadline."  (Hrg. Tr. (Rough Draft), Mar. 29, 2019, at 54:17-20).  Ignoring the fact that ADOC fully implemented the revised coding system and made laborious and significant changes to its digital record system more than eighteen (18) months ago, Plaintiffs base their entire argument on this point on an old coding system that existed at the time of the liability trial.  (Doc. No. 2899 at 59-61).  As with the SMI flag, Plaintiffs not only fail to establish any current violation, but they also fail to suggest that ADOC possesses any intention to abandon the revised coding system, which it spent substantial time and resources implementing.  Plaintiffs therefore cannot establish either an ongoing constitutional violation or any substantial risk of serious harm stemming from ADOC's coding system.  Accordingly, Plaintiffs cannot establish that any future order should contain provisions relating to coding, or that the Court's eventual compliance oversight plan should address coding.

40

Aside from these (and other) provisions that the State already fully implemented, a number of the Remedial Orders contain deadlines that already lapsed.  As a matter of logic, the Court cannot issue an order today requiring that the State do something in the past.  For example, the Bibb Segregation Order (Doc. No. 1751) contained requirements that only applied during specified periods between May and August 2018.  (Doc. No. 1751-1 at 2-3).  It would be illogical for the Court to issue an order now that contained those provisions.

At the evidentiary hearing, the State will provide the Court with a full list of all completed and/or outdated provisions, along with testimony and documentation supporting the State's position.

### B.   CERTAIN REMEDIAL ORDERS CONTAIN REQUIREMENTS THAT EXPERIENCE AND/OR CHANGED CIRCUMSTANCES DEMONSTRATED ARE UNWORKABLE.

As the Court is aware, ADOC, along with the rest of the world, continues to operate in the midst of the global COVID-19 pandemic.  Indeed, the pandemic already delayed the evidentiary hearing and converted it from a live hearing to a virtual hearing.  As the Eleventh Circuit recently recognized, the pandemic "has changed everything from the way that friends and families interact to the way that business and schools operate to the way that courts hear and decide cases.  The virus, though, poses particularly acute challenges for the administration of the country's jails and prisons."  Swain v. Junior, 961 F.3d 1276, 1280 (11th Cir. 2020).

41

For example, a number of courts have recognized the propriety of changes to prison operation such as suspension of inmate visitation and wellness screenings for staff and inmates during the COVID-19 pandemic.  Id. at 1281; Hope v. Warden York Cnty. Prison, -- F.3d --, 2020 WL 5001785, at \*10 (3d Cir. Aug. 25, 2020); Wilson v. Williams, 961 F.3d 829, 841 (6th Cir. 2020).

It goes without saying that the Parties did not anticipate the COVID-19 pandemic when they negotiated many of the Stipulations more than two (2) years ago.  However, despite filing their Pretrial Brief in the midst of the pandemic, Plaintiffs simply pretend that COVID-19 does not exist within ADOC's system. For example, Plaintiffs' Pretrial Brief argues that, at the liability trial, "the Court found a dearth of group therapy."  (Doc. No. 2899 at 112).  The Psychotherapy Order provides that "[g]roup psychotherapy shall be offered on topics such as medication management, cognitive retraining, stress management, social skills, and anger management in sufficient quantity to accommodate the treatment services prescribed for the population of each facility."  (Doc. No. 1899-1 at 2).  Aside from the fact that this general statement provides no clear metric by which to measure compliance, the existence of COVID-19, and consequent social distancing recommendations and requirements, obviously hamper in the most significant way the State's ability to provide group therapy.

42

Case 2:14-cv-00601-MHT-JTA   Document 2908   Filed 08/31/20   Page 48 of 66


Plaintiffs also seek to impose strict limitations upon ADOC's use of telepsychiatry through a variety of the Remedial Orders, including the Psychotherapy Order (Doc. No. 1899-1). For example, the Psychotherapy Order requires that a provider treating a patient via telepsychiatry must receive six (6) months of mental-health records in advance of the session. COVID-19 has demonstrated the necessity and appropriateness of telepsychiatry for mental-health care of inmates – including some inmates who might not even have six (6) months of mental-health records. Moreover, aside from the fact that no clinical or legal basis supports this requirement as a constitutional minimum, the ongoing pandemic renders it even more unnecessary and intrusive. In short, Plaintiffs' Pretrial Brief entirely fails to acknowledge the massive increase in telepsychiatry services throughout the country during the pandemic.[16] Instead, Plaintiffs insist that outdated restrictions the Psychotherapy Order imposes on ADOC's ability to utilize telepsychiatry remain necessary, with no mention of COVID-19. (Doc. No. 2899 at 120-121).

COVID-19 also impacts other remedial requirements. For example, COVID-19 limits ADOC's ability to provide out-of-cell assessments under the Pre-Placement Order (Doc. No. 1815) and out-of-cell time under the Psychotherapy

---

[16] Indeed, among other professional organizations, the American Psychiatric Association updated its guidance regarding telepsychiatry in light of COVID-19. (See https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/blog/apa-resources-on-telepsychiatry-and-covid-19).

Order (Doc. No. 1899) and the Bibb Segregation Order (Doc. No. 1751). COVID-19 may also impact ADOC's ability to comply with the requirements set forth in the Intake Order (Doc. No. 1794) if an inmate tests positive for COVID-19 or requires quarantine upon intake. If the compliance oversight program takes into account COVID-19 (as well as potential future unforeseen emergency situations), then the State may be able to agree that certain provisions generally comply with the PLRA. However, Plaintiffs' complete refusal to acknowledge the reality of COVID-19 remains troubling.

At the evidentiary hearing, the State intends to provide the Court with a full list of each provision that the State maintains the COVID-19 pandemic or other circumstances render unworkable, along with testimony and documentation supporting the State's position.

### C. CERTAIN REMEDIAL ORDERS CONTAIN OVERLY INTRUSIVE REQUIREMENTS AND/OR VAGUE REQUIREMENTS THAT FAIL TO ADEQUATELY PUT THE STATE ON NOTICE OF WHAT IT MUST DO.

The State expects to present evidence at the evidentiary hearing that certain Remedial Orders contain overly intrusive requirements that interfere with both mental-health and custody operations within ADOC's facilities. For example, while the State agrees that, if properly monitored, many provisions of the Pre-Placement Order (Doc. No. 1815) may meet the PLRA's requirements, the Pre-Placement Order requires mental-health rounds in restrictive housing to occur "between the

44

hours of 8:00 AM and 4:00 PM." (Doc. No. 1815-1 at 2). This restriction unnecessarily limits staff and plainly exceeds constitutional requirements. Similarly, the Intake Order requires that a psychiatrist conduct reception psychiatric evaluations. (Doc. No. 1794-1 at 10). The State expects to provide testimony at the upcoming hearing indicating that CRNPs may constitutionally perform these evaluations. Accordingly, this requirement cannot qualify as "necessary" to remedy a constitutional violation.

The State also objects to the extent the Remedial Orders eliminate or infringe upon clinical autonomy. For example, the Treatment Planning Order (Doc No. 1865) attempted to eliminate all clinical discretion as to the timing and frequency of treatment team meetings and treatment planning. (Doc. No. 1865-1 at 11-18). It attempted to dictate every piece of paper a treatment team member must review. (Id.). Similarly, the Psychotherapy Order attempted to limit the admission to and discharge of inmates from residential-level mental-health units. (Doc. No. 1899-1 at 10-48). And, while these Remedial Orders may reflect "good practices," they remain, from a PLRA perspective, unnecessary, overly broad, and intrusive.

Certain other Remedial Orders contain vague requirements that fail to "describe in reasonable detail . . . the acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C); <u>John H. Harland Co. v. Clarke Checks, Inc.</u>, 711 F.2d 966, 984 (11th Cir. 1983) (vacating injunction that failed to "specifically describe[] the acts which

are prohibited").  For example, the Supplemental Mental Health Referral Order provides that "[t]he designated triage nurse shall routinely and regularly monitor the designated area for completed forms upon every return from leaving the office unattended.  The box shall be checked a minimum of every hour and at the end of each triage nurse's shift."  (Doc. No. 1821-2).  This provision is unclear as to who may check the box – i.e., whether individuals other than the triage nurse may check it.  Thus, this Remedial Order fails to put the State on notice of what it does and does not require.

Again, these provisions serve as representative examples of overly intrusive and/or vague provisions.  At the evidentiary hearing, the State will identify and demonstrate the totality of the provisions within the Remedial Orders that are overly intrusive or vague, along with testimony and documentation supporting the State's position.

### D.   PLAINTIFFS CANNOT PRESENT EVIDENCE THAT THE REMEDIAL ORDERS MEET THE PLRA'S REQUIREMENTS AS TO ALL FACILITIES.

Plaintiffs continue to incorrectly assume that the Remedial Orders apply to every single ADOC facility and will be subject to oversight at every single facility.  Moreover, Plaintiffs failed to provide any evidence that any of the Remedial Orders meet the PLRA's standards as applied in this universal manner.  See Lewis v. Casey, 518 U.S. 343, 392-3, 116 S. Ct. 2174, 2200 (U.S. 1996) (THOMAS, J., concurring)

("Systemwide relief is never appropriate in the absence of a systemwide violation, and even then should be no broader and last no longer than necessary to remedy the discrete constitutional violation."). For example, Plaintiffs' evidence at the liability trial indicated few, if any, issues of any significance regarding the scope and quality of mental-health care services provided at Limestone, Hamilton, St. Clair, Easterling, Ventress, Kilby, Bullock, and Tutwiler. (See, e.g., Naglich Tr. Test., Dec. 22, 2016, at 5-82:5-5-83:15). Indeed, the two (2) women who testified about mental-health care at Tutwiler during the liability trial (only one of whom was a then-current inmate) underscored the fact that Tutwiler inmates receive more than adequate mental-health care. (See, e.g., K.N. Tr. Test. (Rough Draft), Jan. 12, 2017, at 110:9-111:19; 132:18-24; C.C. Tr. Test. (Rough Draft), Dec. 5, 2016, at 167:1-3). Even Plaintiffs' expert testified that the Tutwiler RTU provides "an appropriate level of care." (Burns Tr. Test. (rough draft), Dec. 13, 2016, at 201:18-21). Dr. Wendy Williams, ADOC's Deputy Commissioner for Women's Services, explained at the liability trial that Tutwiler was operating under a consent decree with the U.S. Department of Justice, and the monitor under that consent decree approved of ADOC's practices regarding restrictive housing and placement of inmates in Tutwiler's RTU and SU. (Williams Tr. Test. (rough draft), Jan. 30, 2017, at 199:19-212:19). Thus, Plaintiffs certainly cannot demonstrate that any of the Remedial Orders satisfy the PLRA as to Tutwiler.

47

The Court may impose remedial requirements only to the extent Plaintiffs demonstrate an ongoing constitutional violation (or, at the very least, a current risk of harm) at each facility.  The State intends to provide testimony and documentation demonstrating that, to the extent the Remedial Orders meet the PLRA requirements at all, they do so only as to certain limited issues at certain facilities.

## E.   CERTAIN REMEDIAL ORDERS IMPOSE RESTRICTIONS THAT GO BEYOND ALABAMA LAW.

Under the PLRA, "[t]he court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless – (i) Federal law requires such relief to be ordered in violation of State or local law; (ii) the relief is necessary to correct the violation of a Federal right; and (iii) no other relief will correct the violation of the Federal right."   18 U.S.C. § 3626(a)(1)(B); Doe v. Cook Cnty Illinois, 798 F.3d 558, 567 (7th Cir. 2015) (consent decree that required violation of state law regarding employee rights violated PLRA where trial court failed to make these findings).  The Intake Order violates this provision of the PLRA because it improperly restricts the duties and responsibilities of Certified Registered Nurse Practitioners ("CRNPs").  Under Alabama law, CRNPs may perform the following duties:

- Arrange inpatient admissions, transfers and discharges in accordance with established guidelines/standards developed within the collaborative practice; perform rounds and record

appropriate patient progress notes; compile detailed narrative and case summaries; complete forms pertinent to patients' medical records;

- Perform complete, detailed, and accurate health histories, review patient records, develop comprehensive medical and nursing status reports, and order laboratory, radiological, and diagnostic studies appropriate for complaint, age, race, sex, and physical condition of the patient;

- Perform comprehensive physical examinations and assessments; and

- Formulate medical and nursing diagnoses and institute therapy or referrals of patients to the appropriate health care facilities and/or agencies; and other resources of the community or physician.

See Alabama Board of Nursing and Alabama Board of Medical Examiners Psychiatric and Mental Health, Psychiatric and Mental Health Certified Registered Nurse Practitioner, Standard Protocol, Revised March 2019; see also Ala. Admin. Code r. 610X-5-.11, and Ala. Admin Code r. 540-X-8-.10.  The Intake Order, however, prohibits CRNPs from assigning mental health codes without first "collaborating with a psychiatrist."  (Doc. No. 1794-1 at 8).  Assignment of a mental-health code falls well within the scope of practice for CRNPs under Alabama law.  Plaintiffs did not and cannot demonstrate any necessity to go beyond the requirements of Alabama law with this provision, and it accordingly fails to comply with the PLRA.

49

## MOTION TO TERMINATE AND/OR MODIFY

The State hoped Plaintiffs would acknowledge its accomplishments over the years, and would not insist upon PLRA findings as to outdated provisions of the Remedial Orders and provisions the State already implemented.  Unfortunately, despite recognizing the reality that the Remedial Orders remain "immediately terminable" upon the State's motion (Doc. No. 2520 at 14, citing 18 U.S.C. § 3626(b)(2) (assuming they did not already terminate by operation of law), Plaintiffs persist in refusing to agree that the Court must find a current and ongoing constitutional violation.  Instead, Plaintiffs appear to believe that the Court may make the PLRA findings based upon the state of affairs more than three (3) years ago, at the time of the liability trial.  This is simply not the law.  Moreover, the position is entirely illogical.

In addition, to the extent that "'a significant change in facts or law warrants revision'" of the Remedial Orders and "'the proposed modification is suitably tailored to the changed circumstance,'" the State moves to modify the Remedial Orders.  (Doc. No. 2816 at 7 (quoting Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367, 393 (1992)).  As the Parties jointly argued in connection with the modification of the ADA Consent Decree, Rufo "set out three circumstances in which a consent decree may be modified: (1) when changed factual conditions make compliance substantially more onerous, (2) when a decree becomes unworkable

50

because of unforeseen circumstances, or (3) when enforcement without modification would be detrimental to the public interest." (Doc. No. 2641 at 4 (citing Rufo, 502 U.S. at 384)). Each of these three (3) circumstances exist, requiring modification (at the very least) of the Remedial Orders.

To the extent the COVID-19 pandemic affects the State's ability to act in accordance with any of the Remedial Orders, the State meets all three (3) conditions set forth above. For example, as discussed above, COVID-19 rendered compliance with telepsychiatry, group therapy, intake, and out-of-cell requirements both "substantially more onerous" and, in some cases, simply "unworkable." Moreover, it would certainly be "detrimental to the public interest" to require compliance with these provisions at the risk of exposing inmates and mental-health and correctional staff members to COVID-19. Aside from the considerable health risk to these individuals, staff members may unknowingly contribute to further community spread of COVID-19 outside of ADOC facilities.

Aside from the COVID-19 issues, enforcement of many of the Remedial Orders' provisions are "unworkable because of unforeseen circumstances" and "without modification would be detrimental to the public interest." (Id.). For example, when the State modified its mental-health services and system consistent with the Remedial Orders, it demonstrated the unworkable and inappropriate nature of many of the provisions for ADOC's system, such as the limitations on licensed

51

MHPs and CRNPs and the limitations created by the provisions regarding the retrieval and triage of mental-health referrals. Similarly, while the State agreed to implement certain provisions statewide for administrative convenience, Plaintiffs provided no evidence of constitutional violations at many facilities. Accordingly, the Court should not retain jurisdiction to enforce the Remedial Orders at those facilities, nor should those facilities be subject to monitoring. Requiring the State to pay for monitoring at facilities where Plaintiffs did not demonstrate constitutional violations would obviously be "detrimental to the public interest," in that it would amount to an unnecessary expenditure of public funds.

Accordingly, the State hereby moves to terminate each and every provision of each and every Remedial Order to the extent Plaintiffs cannot demonstrate an ongoing constitutional violation justifying the relief. In addition, the State moves to modify each and every provision of each and every Remedial Order to the extent the requirements set forth in Rufo apply to each provision. At the conclusion of the evidentiary hearing, the State will provide a post-hearing brief identifying each provision as to which Plaintiffs failed to demonstrate an ongoing violation and/or as to which circumstances warrant modification.

## CONCLUSION

For the foregoing reasons, and in accordance with the evidence and testimony the State will present at the upcoming evidentiary hearing, the State respectfully

52

requests that the Court limit the Remedial Orders to comply with the PLRA, and

terminate and/or modify the Remedial Orders as set forth above.

Dated: August 31, 2020.

Respectfully submitted,

*/s/ William R. Lunsford*

William R. Lunsford
*Attorney for the Commissioner and
Associate Commissioner*

William R. Lunsford
Matthew B. Reeves
Melissa K. Marler
Stephen C. Rogers
Kenneth S. Steely
**MAYNARD, COOPER & GALE, PC**
655 Gallatin Street
Huntsville, AL 35801
Telephone: (256) 512-5710
Facsimile: (256) 512-0119
blunsford@maynardcooper.com
mreeves@maynardcooper.com
mmarler@maynardcooper.com
srogers@maynardcooper.com
ksteely@maynardcooper.com

Luther M. Dorr, Jr.
**MAYNARD, COOPER & GALE, PC**
1901 Sixth Avenue North
2400 Regions Harbert Plaza
Birmingham, AL 35203
Telephone: (205) 254-1178
Facsimile: (205) 714-6438
rdorr@maynardcooper.com

John G. Smith
David R. Boyd

**BALCH & BINGHAM LLP**
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (866) 316-9461
jgsmith@balch.com
dboyd@balch.com

Steven C. Corhern
**BALCH & BINGHAM LLP**
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100
Facsimile: (205) 488-5708
scorhern@balch.com

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all attorneys of record in this matter, including without limitation the following, by the Court's CM/ECF system on this the 31st day of August, 2020:

Ebony Howard
Lynnette K. Miner
Jaqueline Arando Osorno
Jonathan Blocker
Brock Boone
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
ebony.howard@splcenter.org
lynnette.miner@splcenter.org
Jackie.aranda@splcenter.org
jonathan.blocker@splcenter.org
brock.boone@splcenter.org

Gregory M. Zarzaur
Anil A. Mujumdar
Denise Wiginton
**ZARZAUR**
2332 2nd Avenue North
Birmingham, AL 35203
Telephone: (205) 983-7985
Facsimile: (888) 505-0523
gregory@zarzaur.com
anil@zarzaur.com
denise@zarzaur.com

William Van Der Pol, Jr.
Rhonda Brownstein
Glenn N. Baxter
Lonnie J. Williams
Barbara A. Lawrence
Andrea J. Mixson
Ashley N. Austin
**ALABAMA DISABILITIES ADVOCACY PROGRAM**
University of Alabama
500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
Telephone: (205) 348-6894
Facsimile: (205) 348-3909
wvanderpoljr@adap.ua.edu
rbrownstein@adap.ua.edu

Andrew P. Walsh
William G. Somerville III
Patricia Clotfelter
**BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC**
420 20th Street North
Suite 1400
Birmingham, Alabama 35203
Telephone:  (205) 244-3863
Facsimile:  (205) 488-3863
awalsh@bakerdonelson.com
wsomerville@bakerdonelson.com
pclotfelter@bakerdonelson.com

55

gnbaxter@bama.ua.edu
blawrence@adap.ua.edu
lwilliams@adap.ua.edu
amixson@adap.ua.edu
aaustin@adap.ua.edu

Gary L. Willford, Jr.
Joseph G. Stewart
Stephanie L. Smithee
**ALABAMA DEPARTMENT OF**
**CORRECTIONS**
Legal Division
301 South Ripley Street
Montgomery, Alabama 36130
Telephone (334) 353-3884
Facsimile (334) 353-3891
gary.willford@doc.alabama.gov
joseph.stewart@doc.alabama.gov
stephanie.smithee@doc.alabama.gov

Deana Johnson
Brett T. Lane
**MHM SERVICES, INC.**
1447 Peachtree Street NE
Suite 500
Atlanta, GA 30309
Telephone: (404) 347-4134
Facsimile: (404) 347-4138
djohnson@mhm-services.com
btlane@mhm-services.com

*/s/ William R. Lunsford*
Of Counsel

## ADDENDUM A

### Staffing Remedial Order
### (Doc. No. 1657)

(4)(a)
(4)(b)
(4)(c)
(4)(d)
(4)(e)
(4)(f)
(5)

### Segregation Remedial Order
### (Doc. No. 1720)

(4)

### Mental Health Intake Order
### (Doc. No. 1794-1)*

I(A)
I(B)
I(C)
I(D)
I(E)
I(F)(1)
I(F)(2)
I(F)(3)
I(F)(4)
I(F)(7)
I(F)(8)
I(F)(9)
I(I)
I(J)
I(K)
I(L)
I(M)
I(O)
I(O)(1)
I(O)(2)
I(O)(3)
I(O)(4)

I(O)(5)
I(O)(6)
II(B)
III(C)(1)
III(C)(2)
III(C)(3)
III(C)(4)
III(C)(5)
III(C)(6)
III(C)(7)
III(C)(8)
III(C)(9)
III(C)(10)
III(C)(11)
III(C)(12)
III(C)(13)

### Pre-Placement Order
### (Doc. No. 1815-1)

I(a)
I(b)(1)
I(b)(2)
I(b)(3)
I(b)(4)
I(c)(1)
I(c)(2)
I(d)
II(c)(2)
II(c)(3)
II(c)(4)
II(c)(5)
II(e)
II(f)
III(b)
III(g)
III(h)

**Mental Health Referral Order**
**(Doc. No. 1821-1)**

1.1
1.2
1.2.1
1.2.2
1.2.3
1.2.4
2.1
2.1.1
2.2
2.3
3.1
3.2
3.3
3.3.1
3.3.5
3.3.6
3.3.7
3.3.8
3.3.9
3.3.10
3.3.11

**Supplemental Mental Health Referral**
**Order (Doc. No. 1821-2)**

1.1
1.2
1.3
2.2
2.3.1
2.3.3.1
2.3.3.2
2.3.3.3
2.3.3.6
2.3.3.8
2.4.1
2.4.2
2.5
2.6

**Treatment Planning Order**
**(Doc. No. 1865-1)**

1.1
1.2
1.3.1.1
1.3.1.2
1.3.1.3
1.3.1.4
1.3.2
1.3.2.1
1.3.2.2
1.3.2.3
1.3.2.4
1.4.31.1
1.4.3.1.2
1.4.3.2
1.4.3.3
1.4.4
1.4.4.1
1.4.5
1.4.5.1
1.4.5.2
1.4.5.3
1.4.5.4
2.1
2.2 (excluding subsections)
2.3
2.4
2.4.1
2.4.2
2.4.3
2.4.5
2.5.3
2.6
2.7
3.1
3.2.3.1
3.3
4.1.1
4.1.2
4.1.3
4.1.3.1

4.1.3.2
4.1.3.3
4.1.3.4
4.1.3.5
4.1.3.6
4.1.3.7
4.1.4
4.1.5
4.1.6

**Psychotherapy and Confidentiality Order**
**(Doc. No. 1899)**

(4)

**Psychotherapy and Confidentiality Order**
**(Doc. No. 1899-1)**

1.1.7
1.2.1
1.3.4
1.3.5
1.5.1
2.1.1
2.2.2.1
2.2.3.1
2.3.2
2.3.2.1
2.3.3.1
3.1
3.3.1
3.3.2
3.3.3
4.1.1.1
4.1.1.2
4.1.1.3
4.1.1.3.2
4.1.1.3.2.1
4.1.1.3.2.2
4.1.1.4
4.1.2.5
4.1.2.7
4.1.2.8
4.2.1.1

4.2.1.2.1
4.2.1.2.2
4.2.1.2.2.2
4.2.1.2.2.2.1
4.2.1.2.2.2.2
4.2.1.2.3
4.2.1.4
4.2.2.5
4.2.2.8
4.2.2.9
4.3.1.1
4.3.1.2.5
4.3.1.4
4.3.2.5
4.3.2.6
4.3.3.1
4.4.1.3
4.4.2.5.2
4.4.2.6
4.4.2.7
4.4.3.1

**Supplemental Confidentiality Order**
**(Doc. No. 1900-1)**
Entire Order

**Mental Health Staffing**
**(Doc. No. 2301-1)**

1.1
2.1
2.2.1
2.2.2.1
2.2.2.2
2.2.2.3
2.2.2.4
2.2.2.5
2.2.2.6
2.2.2.7
2.3.1
2.3.2
3.1
3.2

59

3.3

3.4

3.5

4.1

4.1.1.2

4.1.1.4

4.1.1.5

4.1.2

4.2

4.3

4.4

4.4.,

4.4.2

4.4.3

**Attachment A to Mental Health Staffing Order (Doc. No. 2688-1)**

A.

A(1)

A(2)

A(2)(a)

A(2)(b)

A(2)(c)

C

F

G

**Suicide Prevention Order (Doc. No. 2699-A)**

2.1

2.2

2.4

2.5

2.6

2.8

2.9

2.9.1

2.9.2

3.3

4.1

4.2

4.4

4.6

5.6

6.2

6.3.1

7.1

7.2

7.4

7.10

7.11

8.1

8.2

8.4

9.1

9.1.5

9.2

9.3

10.6.1

10.6.2

10.6.3

10.6.5

10.7

10.8

10.8.1

10.8.3

**Order on Mental-Health Consultation to the Disciplinary Process (Doc. No. 2718-1)**

1

1(a)

1(b)

2 (excluding subsections)

3

6

7

8

**Hospital Level of Care (Doc. No. 2724-1)**

1

2.1

3

\*Paragraphs in the original Attachment were not lettered.  Lettering is included for ease of reference.