IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| EDWARD BRAGGS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| JEFFERSON S. DUNN, in his | ) | |
| official capacity as | ) | |
| Commissioner of | ) | |
| the Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

PHASE 2A OPINION AND ORDER
ON MONITORING OF EIGHTH AMENDMENT REMEDY

Previously, this court found that the State of
Alabama provides inadequate mental-health care in its
prisons in violation of the Eighth Amendment's
prohibition against cruel and unusual punishment. *See*
*Braggs v. Dunn*, 367 F. Supp. 3d 1340 (M.D. Ala. 2019)
(Thompson, J.); *Braggs v. Dunn*, 257 F. Supp. 3d 1171
(M.D. Ala. 2017) (Thompson, J.).  The issue now before
the court is the development of a plan to monitor
compliance with the court's orders to remedy that

constitutional violation.  The court will adopt in large part the defendants' plan--substantial portions to which the plaintiffs have agreed--with some alterations.  Most significantly, the court will adopt the defendants' overarching proposal that, in light of their own admission that they lack the capacity to self-monitor, outside experts will initially monitor compliance and will draw on their expertise to develop many of the details of the monitoring plan.  *See* Defs.' Response (doc. no. 2295) at 14.  Those outside experts will train and eventually hand control over to an internal monitoring team, building the capacity of the Alabama Department of Corrections (ADOC) to regulate itself.  The court hopes that this monitoring scheme will help the ADOC attain timely, meaningful, and sustainable compliance with the court's remedial orders on mental-health care and bring this litigation to an end as soon as is reasonably possible.

## I. PROCEDURAL BACKGROUND

The plaintiffs in this class-action lawsuit are ADOC inmates who have mental illness and the Alabama Disabilities Advocacy Program, which represents mentally ill inmates in Alabama. The defendants are the ADOC Commissioner and the ADOC Associate Commissioner of Health Services, who are both sued in only their official capacities. In a liability opinion, this court found that ADOC's mental-health care was, "[s]imply put, ... horrendously inadequate." *Braggs*, 257 F. Supp. 3d at 1267. The court laid out seven factors contributing to the Eighth Amendment violation, in addition to the "overarching" problems of understaffing and overcrowding. *Id.* at 1267-68. After two months of mediation to develop a comprehensive remedial plan, it became apparent that the remedy was too large and complex to be addressed all at once. The court therefore severed the remedy into the various contributing factors, to be addressed seriatim. *See* Phase 2A Revised Scheduling Order (doc. no. 1357).

3

The court has now issued remedial opinions and orders regarding, among other things, understaffing, *see Braggs v. Dunn*, No. 2:14cv601-MHT, 2018 WL 985759 (M.D. Ala. Feb. 20, 2018) (Thompson, J.), and inpatient treatment, *see Braggs v. Dunn*, No. 2:14cv601-MHT, 2020 WL 2789880 (M.D. Ala. May 29, 2020) (Thompson, J.). The court has also issued several remedial orders temporarily adopting the parties' stipulations regarding other contributing factors, *see, e.g.*, *Braggs, v. Dunn*, No. 2:14cv601-MHT, 2018 WL 2168705 (M.D. Ala. Apr. 25, 2018). In March 2020, based on the parties' agreement that their stipulations temporarily satisfy the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626(a)(1)(A), the court issued an interim injunction extending these orders until, at the latest, December 30, 2020. *See* Interim Injunction (doc. no. 2793). The issue of whether the stipulations satisfy the requirements of the PLRA beyond that date is set for a hearing in September, and the court will defer judgment as to whether the measures are warranted until that hearing has occurred.

**4**

Throughout the process of resolving each remedial issue, the question of monitoring compliance with the court's orders has repeatedly arisen. The issue of monitoring "raises important questions regarding, on the one hand, the duty of courts to avoid overly intruding into the executive matter of prison administration, and on the other hand, the duty of courts to ensure that the constitutional violations they find are effectively remedied in a timely fashion." Phase 2A Order on Monitoring (doc. no. 1927) at 2-3. In pursuit of the proper balance of these important interests, the court opted to resolve the issue of monitoring separately from all substantive remedial orders and on a global scale, rather than as to each individual order.[1]  *See id.*

---

1. As part of its order for immediate relief for suicide prevention, the court established an interim external monitoring scheme and required ADOC to establish a formal internal monitoring scheme. *See Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1282 (M.D. Ala. 2019) (Thompson, J.). Both forms of monitoring were narrowly focused on the immediate suicide-prevention relief. *See id.* However, at the request of the parties, the court stayed that order and substituted the parties' voluntary agreement. *See* Order (doc. no. 2569) at 2. At this point, the order remains stayed pending the court's

The court also suggested to the parties that the scheme for court monitoring should include not only 'external' monitoring by experts (an 'external-monitoring team' or EMT) but eventual 'internal' monitoring by ADOC itself (an 'internal-monitoring team' or IMT).  In other words, for part of the period of monitoring, the court substituted internal monitoring for external monitoring.  As explained in more detail later, the model would divide the traditional period of monitoring into three parts, bringing ADOC into the process earlier and in a more substantive role than usual.  In the first phase, the EMT will assess and monitor ADOC's compliance with the court's remedial orders; next, the EMT, as part of its monitoring, will train the ADOC, through its IMT, how to monitor itself; and, finally, ADOC, through its IMT, will monitor itself.

---

determination of whether the parties' agreement complies with the PLRA.  *See* Phase 2A Revised Scheduling Order (doc. no. 2784) at 5.

The court adopted this model in the hope that it would facilitate a more effective, less intrusive process and avoid an indeterminate period of external monitoring. External monitoring and internal monitoring complement each other: external monitors offer an outside perspective on ongoing issues, while internal monitors have more familiarity with and investment in the remediation efforts. External monitoring will also provide valuable information for ADOC, allowing it to more effectively implement its own system of internal monitoring.

The court further believed that self-monitoring would help ADOC develop internal buy-in, resulting in more active cooperation and timely compliance. This method invites ADOC to be directly involved in the monitoring effort, encouraging collaboration and investment in reform rather than an adversarial posture. The internal monitoring team will work with and learn from the external monitoring team, building ADOC's

capacity and making the eventual termination of court oversight more seamless.

Finally, in light of the fact that the ultimate goal of this litigation is not just monitoring *of* ADOC but adequate monitoring *by* ADOC, this model should build ADOC's internal capacity and help it sustain compliance over the long term. Ultimately, the court hopes that this hybrid monitoring process will finally bring to an end the history of repeated litigation ADOC has confronted over its mental-health care since the 1970s, as described in the final section of this opinion. Both the plaintiffs and the defendants have agreed to this model, should the court order external monitoring.

When the court reached the monitoring issue, it first gave the defendants an opportunity to propose an overall plan and allowed the plaintiffs to respond. *See* Defs.' Proposed Monitoring Plan (doc. no. 2115); Pls.' Response (doc. no. 2133). The court then held a hearing on the defendants' proposed monitoring plan in which it heard testimony from plaintiffs' correctional psychiatry

**8**

expert Dr. Kathryn Burns; plaintiffs' correctional administration expert Eldon Vail; Executive Director of the Alabama Disabilities Advocacy Program James Tucker; ADOC Associate Commissioner for Health Services Ruth Naglich; ADOC Commissioner Jefferson Dunn; and four individuals the defendants proposed as the external monitoring team: Larry Linton, MargaRita Pauley, psychiatrist Dr. Robert Stern, and psychologist Dr. David Clayman.

In April 2019, following the hearing and the parties' subsequent briefing on the monitoring issue, the United States Department of Justice (DOJ) issued a findings letter regarding unsafe conditions in ADOC facilities, including due to understaffing, overcrowding, and violence. *See* DOJ Findings Letter (Pls.' Ex. 2739); SPLC Letter to Governor Ivey and Commissioner Dunn (doc. no. 2472). The parties subsequently filed a joint motion--which the court granted--to stay all matters under submission in this litigation, including the monitoring issue, for 90 days to allow the parties to

pursue a global resolution, via mediation, between the parties as well as with DOJ. *See* Joint Notice and Mot. to Stay (doc. no. 2560); Order (doc. no. 2569). This stay was twice extended upon joint motions of the parties to allow for further mediation. *See* Order (doc. no. 2608); Phase 2A Revised Scheduling Order (doc. no. 2720). On March 25, 2020, the parties informed the court during an on-the-record conference call that they had been unable to reach an agreement on the monitoring issue in their negotiations and that the issue was thus again submitted to the court for resolution. *See* Phase 2A Revised Scheduling Order (doc. no. 2784). Today's opinion fully resolves the remedial monitoring issue.

Though the remedies for all seven factors contributing to the constitutional violation have not yet been reduced to final orders with PLRA findings, and though there remain some additional remedial issues for resolution (for example, segregation and inpatient treatment), the court need not wait to issue those orders prior to resolving the monitoring issue. This is because

the court's order today is not specific to any particular remedial measures in that it does not set up the means of measuring compliance; rather, the court's order establishes an overarching monitoring structure and scheme, the details of which the court leaves to be filled in by the experts, as both sides agree is appropriate.

## II. THE MONITORING SCHEME

The parties are to be commended for reaching significant areas of agreement on the issue of monitoring. They agree that the monitoring scheme here has two fundamental goals: (1) to oversee compliance with the court's remedial orders and (2) to build ADOC's capacity to exercise sustainable internal oversight of mental-health care--that is, to identify and correct problems. They also agree on the overarching structure of this monitoring. Specifically, they agree that the scheme should: (1) include the EMT; (2) consist of three phases, with the EMT teaching--and then ultimately handing the reins over to--the IMT; (3) empower the EMT

to determine many of the details of how to carry out monitoring, including fashioning performance measures and audit tools; and (4) consist of a number of essential components of monitoring, including document review, observation, feedback, consultation, and handoff to ADOC to monitor itself going forward.

At the same time, there are some disagreements regarding specifics under each broader point of agreement.  These areas of dispute are outlined below. The court will first summarize each area of dispute and then explain the court's resolution.

Overall, the defendants assert that the court should approve their plan without entering any order on monitoring because ADOC should be allowed to "voluntarily undertake culture change."  Defs.' Response (doc. no. 2295) at 9.  But, as described in detail in the final section of this opinion, ADOC's record as set forth in the liability opinion--and inadequate implementation of remedial orders in this case--shows that Alabama's prison officials are unable to change their system without

monitoring. While the court is encouraged by Commissioner Dunn's own admission that monitoring is needed, *see* Dunn Nov. 26, 2018, Trial Tr. (doc. no. 2250) at 16 ("The Court desires to see certain outcomes in the department. I desire to see certain outcomes in the department. And there's a way in which we can create a monitoring structure, if you will, that will enable us to do that."), it shares the plaintiffs' concerns about allowing the defendants to implement their plan without a court order; "[m]id-litigation assurances are all too easy to make and all too hard to enforce, which probably explains why the Supreme Court has refused to accept them." *W. Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310, 1328 (11th Cir. 2018) (affirming an injunction despite a non-binding clarification from the State), *cert. denied sub nom. Harris v. W. Alabama Women's Ctr.*, --- U.S. ----, 139 S. Ct. 2606 (2019); *see also Stenberg v. Carhart*, 530 U.S. 914, 940 (2000) (cautioning against accepting an Attorney General's non-binding interpretation of a state law).

13

The court agrees with the defendants that it is critical for ADOC to "buy in" to the process of attaining compliance with the court's remedial orders.  However, this does not require that the defendants be given unfettered discretion to drive the monitoring process--buy-in can be achieved by implementing much of the defendants' plan as proposed, involving ADOC staff in monitoring efforts from the beginning, and appointing monitors in which all parties have faith.[2]  These priorities are reflected in the monitoring plan described below.

But before turning to these specific areas of dispute, the court must turn to the question whether the court's monitoring order is governed by the PLRA.  This statute provides that a "court shall not grant or approve any prospective relief unless the court finds that such

_____

     2. Significantly, the court's order today does not involve a receivership and does not infringe on the autonomy of ADOC any more than the Constitution requires.  Ultimately, it is ADOC that is responsible for carrying out its obligations under the Constitution, and the court's order does not shift that responsibility.

relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). The plaintiffs say that, with an exception or two, the PLRA does not apply, while the defendants say that it applies fully. As explained later in this opinion, however, the court need not resolve this issue, for, whether the PLRA is applicable or not, the court finds that the monitoring scheme it has fashioned fully complies with the statute.

In discussing why each part of the court's order satisfies the PLRA's need-narrowness-intrusiveness requirement, 18 U.S.C. § 3626(a)(1)(A), the court in its analysis will largely focus on a single inquiry: Is the monitoring provision necessary to correct the constitutional violation found? As the court has discussed in prior opinions, this single inquiry is distilled from the three requirements of the PLRA--that the relief is (1) "narrowly drawn," (2) "extends no

further than necessary," and (3) "is the least intrusive means necessary to correct the violation," 18 U.S.C. § 3626(a)(1)(A)--and allows for a more streamlined analysis. *See Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1252 (M.D. Ala. 2019) (Thompson, J.). "[I]f the ordered relief is necessary to correct the violation, then--by definition--*no* other form of relief would be sufficient to correct it. And if no other form of relief is sufficient [to] correct the violation, then the ordered relief is--by definition--'narrowly drawn' and the 'least intrusive means necessary' to correct it; any narrower or less intrusive relief would not be sufficient." *Id.* at 1252 n.19 (citing 18 U.S.C. § 3626(a)(1)(A)). Similarly, if the ordered relief is necessary, then it 'extends no further than necessary,' because any part of the relief extending further than what is necessary would render it unnecessary." *Id.*

## A. External Monitoring Team

The parties agree that the monitoring scheme should involve, from the outset, an EMT, but disagree about the composition of the EMT, the process for selecting its members, the status of its members, and the rules regarding conflicts of interest.

### 1. Composition

### a. Dispute

Both the plaintiffs and the defendants propose that the EMT consist of at least one psychiatrist, one psychologist, and one nurse to represent the professional perspectives of the members of ADOC's treatment teams. The plaintiffs also assert that the EMT should have an expert in correctional administration (whom they call a "security monitor"); a counselor or social worker, as would also be included in treatment teams; and a data monitor with expertise in collection and processing. The defendants contend that a correctional administration expert is unnecessary because the court already receives

quarterly correctional staffing reports.  *See* Defs.'
Response (doc. no. 2295) at 38-39.


### b. The Court's Resolution

The court will adopt the parties' common proposal
that the EMT must include at least one psychiatrist, one
psychologist, and one nurse.  The court will also require
the inclusion of a correctional administration expert,
in accordance with the opinions of both of the
plaintiffs' experts.

As plaintiffs' correctional expert Eldon Vail
credibly testified, improving ADOC's mental-health care
requires the cooperation and compliance of not just
mental-health staff, but of correctional staff as well.
*See* Vail Nov. 29, 2018, Trial Tr. (doc. no. 2340) at 7.
For example, Vail testified that: "Access to treatment
is dependent oftentimes on the ability of correctional
staff to escort people, make sure that they get there.
Once they get there, there's issues of confidentiality
that need to be understood by the correctional staff and

honored in the context of them doing their security job."
*Id*. at 8.  Correctional officers also play an important
role in ensuring that self-referrals by inmates are
communicated to mental-health staff.  *See id*.

A correctional administration expert is also
necessary to evaluate, for example, whether "extenuating
circumstances" exist to require the placement of an
inmate with a serious mental illness (SMI) in
segregation--the only scenario in which such placement
is permissible.  *See Braggs v. Dunn*, 257 F. Supp. 3d
1171, 1245-46 (M.D. Ala. 2017) (Thompson, J.).  The
judgments of correctional staff regarding whether
circumstances are "extenuating" cannot be fully evaluated
by mental-health experts on the EMT, for they may lack
expertise in correctional management and would be unable
to ascertain whether such security-related judgments are
reasonable.  By contrast, as Vail testified, a
corrections expert would be able to ask staff: "What is
exceptional about this situation, and were there other
ways that you could handle it?  And by the way, here's a

way that you might have been able to handle it.  Would
that have worked?"  Vail Nov. 29, 2018, Trial Tr. (doc.
no. 2340) at 23.  Commissioner Dunn also agreed that the
remedial orders contain security-related matters that
require the participation of correctional staff.  *See*
Dunn Nov. 26, 2018, Trial Tr. (doc. no. 2250) at 201-202.
Because of the intricate involvement of correctional
staff in provision of care, some security-related
matters, which are part of the court's remedial orders
must be monitored as part and parcel of mental-health
monitoring.  The need for a corrections expert on the EMT
clearly follows.

Plaintiffs' experts Vail and Dr. Burns both testified
that it is particularly necessary to include a
corrections expert on the EMT in light of the ongoing
challenges posed by correctional understaffing at ADOC.
In the liability opinion, the court found understaffing
problematic not in isolation, but as an issue that
"permeate[s] each of the ... identified contributing
factors of inadequate mental-health care."  *Braggs*, 257

F. Supp. 3d at 1268.  While the quarterly staffing reports submitted to the court are critical to understanding ADOC's progress on the understaffing issue, the reports alone do not provide any information as to whether custody staff are supporting and implementing the required improvements to mental-health care; in other words, they do not reflect the critical impact understaffing (which impact could be significantly and adversely changing if there is a significant adverse change in overcrowding) might be having on the delivery of mental-health care.  A correctional administration expert is necessary for the EMT to be able to evaluate whether, based on the availability of officers in overcrowded conditions, correctional staff are being deployed properly to both "keep[] people safe" *and* "mak[e] sure that prisoners get mental health treatment"--a compliance issue that cannot be ascertained by simply reviewing the total number of staff reported. Vail Nov. 29, 2018, Trial Tr. (doc. no. 2340) at 18; *see*

*also* Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 112-13.

At the same time, the court will not initially require the inclusion of the other members proposed by the plaintiffs on the EMT--a counselor or social worker, and a data expert--but will instead leave it to the EMT, which would be more knowledgeable than the court about such matters, to determine whether additional members or support staff are necessary.  If it so determines, the EMT may ask the court to appoint additional members, either on an ad hoc or permanent basis.  Accordingly, the court adds only one additional member to the defendants' proposed monitoring team structure.

The composition of the EMT, largely proposed by the defendants, meets the PLRA's need-narrowness-intrusiveness requirement.  *See* 18 U.S.C. § 3626(a)(1)(A).  As described, the addition of a correctional administration expert is necessary to ensure that officers and clinical staff alike are complying with the court's remedial orders.  Particularly in light of

22

ADOC's continued difficulties with understaffing, the court must be sure that ADOC is doing all that it can to comply with the court's orders by properly training and deploying the limited staff that it has.

The court believes there should also be a head of the EMT with the administrative abilities to coordinate monitoring efforts and to serve as a liaison with the court. Before deciding who this person should be, the court will solicit input from the parties. This additional, administrative provision meets the PLRA's need-narrowness-intrusiveness requirement because the team requires a leader to manage its operations effectively and to coordinate with the court. *See* 18 U.S.C. § 3626(a)(1)(A).

### 2. Selection Process

#### a. Dispute

While the defendants contend that the EMT members should be selected from a pool of candidates that was exclusively proposed by them at the monitoring hearing,

the plaintiffs argue that there should be a collaborative selection process between the plaintiffs and the defendants. The defendants propose two alternative teams of external monitors: one led by individuals previously affiliated with Corizon Correctional Healthcare, the former medical care provider for ADOC, and one comprised of individuals employed by PSIMED, Inc., a company that subcontracts with Wexford Health Sources, Inc. to provide mental-health care in West Virginia prisons. *See* Pls.' Proposed Opinion (doc. no. 2260) at 13. The defendants further assert that members of the EMT must be licensed in Alabama if they are to make recommendations based on clinical judgment that would require a license. Defs.' Proposed Monitoring Plan (doc. no. 2115) at 28. They contend that the plaintiffs essentially waived the opportunity to participate in the selection of the EMT members by failing to propose candidates during the remedial hearing. *See* Defs.' Response (doc. no. 2295) at 27-28.

By contrast, the plaintiffs argue that there should be a collaborative selection process between the plaintiffs and the defendants, under which the parties first attempt to reach an agreement on the EMT members, and then, if they cannot, submit proposed candidates to the court for selection. The EMT members, the plaintiffs contend, should not be limited to those licensed in Alabama.


### b. The Court's Resolution

The court will adopt the plaintiffs' proposal for a joint selection process, with the condition that the court will have ultimate authority to approve the experts agreed upon by the parties. The court will not limit the pool of candidates for the EMT to those licensed in Alabama.

The court finds it both unwise and unfair for the plaintiffs to have no role in selecting the EMT members; joint selection is necessary to ensure impartiality of the EMT and trust by all parties and the court in their

monitoring work. The court believes that such collaboration is necessary to ensure that both parties, not just the defendants, buy into the process. The court was also not impressed by the monitors proposed by the defendants, some of whom had no court monitoring experience and some of whom presented serious questions about possible conflicts of interest.[3] Meanwhile, the court finds it unnecessarily restrictive to require that the experts be licensed in Alabama, though, as described in the section below on qualitative review, the court

---

3. At the time of the monitoring trial, PSIMED was employed in the West Virginia Department of Corrections as a subcontractor of Wexford Health Sources, Inc., ADOC's current provider of mental-health care. This business relationship between the proposed EMT members and ADOC's vendor could create, at a minimum, a perceived conflict of interest, which the defendants themselves sought to avoid under their proposed monitoring plan. *See* Defs.' Proposed Monitoring Plan (doc. no. 2115) at 24. Even more concerningly, the owner of PSIMED was also involved in a corruption charge brought by the West Virginia Ethics Commission against the former Commissioner of the West Virginia Department of Corrections. *See* Stern Nov. 27, 2018, Trial Tr. (doc. no. 2415) at 68-73. Other individuals proposed by the defendants had previously worked for ADOC's prior healthcare contractor, Corizon Correctional Healthcare, another possible conflict of interest.

will authorize the EMT to evaluate clinical judgments. Such an eligibility requirement could unnecessarily limit the pool of available candidates. Finally, members should be chosen based on their background and expertise--with a preference for those with monitoring experience--which should make clear their qualification for the role.

The court will give the parties a reasonable period of time to reach an agreement about the composition of the EMT. If the parties are unable to agree on all EMT members, the court will select any missing members of the EMT or will come up with a means for selection. This process will also extend to the replacement of an EMT member who is removed or resigns. Removal of an EMT member for good cause may be proposed by either party and will be subject to the court's approval.

The requirements for selection and qualifications of the EMT meet the PLRA's need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A). The cornerstone of the defendants' proposed monitoring plan,

which the court will largely adopt, is that the EMT will be responsible for filling in key details based on its members' expertise. The choice of experts, therefore, is a critical issue to ensure the success of the monitoring phase of this case, and thus ADOC's ability to provide constitutionally adequate mental-health care in the long-term. Still, the court's resolution again gives the defendants an opportunity to suggest potential experts, who will be appointed if they are satisfactory to both the plaintiffs and the court. Under this collaborative process, the defendants can work to ensure that staff members will not "come to resent" each expert chosen "as an outside critic who is not invested in the department's mission." *See* Defs.' Response (doc. no. 2295) at 7.

### 3. Status of EMT Members

#### a. Dispute

The defendants propose that the EMT members serve as independent contractors of ADOC but that ADOC shall not

"possess any supervisory authority over the [EMT's] activities, reports, findings, or recommendations." Defs.' Proposed Monitoring Plan (doc. no. 2115) at 11. Despite this, the defendants assert that ADOC should have the power to negotiate each EMT member's fees, expenses, and budget for monitoring. *See id.* at 10. By contrast, the plaintiffs contend that, for the monitors to remain "neutral and independent, they should be court-appointed under Federal Rule of Evidence 706 and paid by through the court's registry rather than directly by ADOC." Pls.' Proposed Opinion (doc. no. 2260) at 23.

### b. The Court's Resolution

The court will not order the EMT to be paid by the defendants through the court's registry pursuant to Federal Rule of Evidence 706. The court believes that the most efficient and least intrusive arrangement is for ADOC to pay the EMT directly, rather than through the court, which would be complex and likely more expensive. Therefore, the court will allow the defendants to

negotiate the fees, expenses, and budgets of the EMT, subject to the court's approval in the event a dispute arises. (The court has found, from past experience, that the State has been fair in such negotiations, and hopes that it will continue to be the same here. *See, e.g.*, Consent Decree (doc. no. 11) at 114, *United States v. Alabama*, No. 2:15cv368-MHT (M.D. Ala. June 18, 2015) (Thompson, J.)). And though ADOC will pay the EMT directly, EMT members should be introduced to ADOC employees and any other parties as neutral and totally independent. The EMT members will not be under ADOC's supervision, but under the direction of the court. (The court finds, again from past experience, that monitors of state institutions can be fair and neutral despite being paid by the state. *See, e.g.*, *id*.) The court finds this resolution satisfies the PLRA's need-narrowness-intrusiveness requirement, as it is substantially in line with the defendants' proposal. *See* 18 U.S.C. § 3626(a)(1)(A).

## 4. Conflict of Interest Rules

### a. Dispute

The defendants' proposal includes a restriction that EMT members may not "testify in any other civil action or proceeding concerning or relating to any act or omission of ADOC or its employees, contractors, or agents, or testify regarding any subject or matter that any [EMT] member learned, or might have learned, as a result of his or her performance as a member of the [EMT], or serve as a non-testifying expert regarding any subject or matter that any [EMT] member learned, or might have learned, as a result of his or her performance as a member of the [EMT]." Defs.' Proposed Monitoring Plan (doc. no. 2115) at 29. The defendants contend that such a rule is necessary to ensure ADOC employees and contractors feel the EMT members are "on their side" and will not be gathering evidence against them. Defs.' Response (doc. no. 2295) at 36. The plaintiffs assert that this strict limitation would deter otherwise willing potential experts and that instead, possible conflicts of interests

31

of EMT members should be reviewed on a case-by-case
basis.

### b. The Court's Resolution

The court agrees with the defendants that to ensure
cooperation between the EMT and those implementing the
remedial measures, some limitation on participation in
future actions against the State and its contractors is
necessary.  However, the rules proposed by the defendants
are overly restrictive, and there is a serious question
as to whether they are even enforceable by this court--in
particular, with regard to limitations on participation
in another court proceeding, state or federal.  The court
will restrict EMT members from providing *paid* testimony
or serving as *paid* non-testifying experts in any action
against ADOC or its employees or against an ADOC
contractor in an action the subject matter of which
pertains to ADOC facilities specifically.  As many prison
healthcare providers are active in multiple states, the
court will not issue a blanket ban on EMT members

testifying or serving as experts in actions involving
ADOC contractors outside of Alabama.  The parties may
raise concerns about conflicts of interest in such cases
on a case-by-case basis.

The defendants have not provided any legal basis to
restrict or prevent the EMT experts from otherwise
testifying in other cases if subpoenaed to do so.  The
court will therefore not impose that limitation.

The court finds the adoption of some restrictions on
the ability of EMT members to testify, largely proposed
by the defendants, meets the
need-narrowness-intrusiveness requirement.  *See* 18
U.S.C. § 3626(a)(1)(A).  The court's resolution loosens
the defendants' proposed restriction only to the extent
necessary to ensure that the parties can jointly recruit
qualified experts who may otherwise be deterred by their
inability to find other work if they accept appointment
in this case.

## B. Measuring Compliance

### 1. Establishing Performance Measures

#### a. Dispute

The parties agree that the monitoring scheme should empower the EMT members, who are the experts here, to determine many of the details of how to carry out monitoring, including determining what performance measures to use. Performance measures are the metrics by which the monitors are to evaluate whether the defendants are complying with the court's remedial orders. *See* Defs.' Proposed Monitoring Plan (doc. no. 2115) at 2-3. In their initial proposed monitoring plan, the defendants proposed 259 potential performance measures to evaluate compliance with then-existing remedial orders. *Id*. For example, proposed performance measure number 37 states that "[i]ntake RN [registered nurses] shall conduct intake MH [mental-health] screening in a confidential location," Defs.' Proposed Monitoring Plan (doc. no. 2115-1) at 3, and is meant to measure compliance with one of the court's orders regarding

**34**

identification of inmates in need of mental-health
treatment.  *See* Identification Order (doc. no. 1794-1).
Despite having initially proposed these performance
measures, it is clear from testimony that Commissioner
Dunn and Associate Commissioner Naglich understand the
defendants' proposal to allow for the EMT to modify the
259 measures proposed as it deems appropriate.  *See* Dunn
Nov. 26, 2018, Trial Tr. (doc. no. 2250) at 148
(testifying that if the EMT determines the performance
measures fail to adequately address the remedial orders,
the EMT members "have the ability to create measures that
do"); Naglich Nov. 7, 2018, Trial Tr. (doc. no. 2249) at
180-82 (testifying that the EMT should be allowed to
develop and change performance measures and that there
is nothing wrong with the EMT coming up with the
performance measures in the first place, "as long as
they're reflective of" the remedial orders).

This point of agreement is emblematic of the overall
theme of the defendants' monitoring plan, in which they
acknowledge that the EMT "must drive the process of

filling in the open components" of the plan.  Defs.'
Response (doc. no. 2295) at 14.  The defendants
"intentionally left open certain aspects" of their
proposed plan so that the EMT could "guide ADOC in filling
in these remaining details."  *Id.*  The defendants seek
to empower the EMT to fill out the details of the plan
because of the EMT's "expertise."  *Id.* at 15.  The
plaintiffs agree it is appropriate to give the EMT
significant authority to determine how to conduct
monitoring, including as to the performance measures
used.

### b. The Court's Resolution

The court will adopt the defendants' plan to give
the EMT authority to modify the 259 initially proposed
performance measures, including by removing them,
changing their language, or creating entirely new
performance measures.  The EMT, in exercise of its unique
expertise, recognized by the defendants, is to create the
performance measures necessary to evaluate the

defendants' compliance with the court's remedial orders. Once the performance measures are established but before monitoring begins, the parties will be given an opportunity to raise objections to any of the proposed measures through a standard dispute resolution process: the objection must be raised first with the EMT, then via mediation, and finally with the court if still unresolved.

The court finds that allowing the experts, rather than the court, to establish the performance measures necessary to monitor compliance meets the need-narrowness-intrusiveness requirement. *See* 18 U.S.C. § 3626(a)(1)(A). Because the performance measures will be limited to the court's remedial orders, which must also satisfy the PLRA, they will be narrowly tailored to evaluate only ADOC's progress with regard to the remedies ordered in this case.

## 2. Self-Correction

### a. Dispute

The plaintiffs seek a provision requiring ADOC to create corrective action plans when monitoring reveals noncompliance. Pls.' Response (doc. no. 2133) at 75-78. The plaintiffs concede that the PLRA applies to this proposed order because it does not have the goal of informing the court of ongoing violations but is intended to improve ADOC's internal capacity to comply with all remedial orders. *Id*. at 54. They assert, however, that creation and auditing of corrective action plans is absolutely necessary to ensure compliance. *Id*. The plaintiffs also urge the court to require ADOC to designate a "Compliance Coordinator" to oversee the creation and implementation of corrective action plans and other monitoring activities, and to designate additional clinical staff who are dedicated solely to internal monitoring. *Id*. at 52-53, 60-61.

The defendants state that they expect corrective action planning to be part of ADOC's response to findings

of noncompliance.  *See* Defs.' Response (doc. no. 2295)
at 38 n.4.   However, they assert that, "[w]hile
corrective action is constitutionally required in the
face of a constitutional violation, a specific corrective
action *plan* is not."   *Id.* at 38.   They argue that a
requirement that ADOC create corrective action plans
would        therefore        not        meet        the
need-narrowness-intrusiveness requirement of the PLRA.
*See* 18 U.S.C. § 3626(a)(1)(A).

### b. The Court's Resolution

The court will not order ADOC to create corrective
action plans, though the court agrees with both parties
that doing so will likely be a necessary step toward
achieving compliance.   In the event of finding a
deficiency, the EMT should provide instruction to ADOC
as to what corrective action should be taken, suggest how
to plan for that action, and monitor whether that action
has been taken.   Nonetheless the court will accept, for
now, Commissioner Dunn's assertion that "common sense"

will lead ADOC to self-correct when presented with evidence of its noncompliance. Dunn Nov. 26, 2018, Trial Tr. (doc. no. 2250) at 153-54. Common sense will also dictate that the court will be very concerned to learn through the monitoring process that ADOC has failed, absent a valid reason, to take corrective actions suggested by the EMT. As the defendants have repeatedly acknowledged, "self-identification and self-correction of systemwide problems is the best long-term solution." Defs.' Proposed Monitoring Plan (doc. no. 2115) at 6. Plaintiffs' expert Dr. Burns credibly testified that self-correction "is kind of the definition of continuous quality improvement: That you self-monitor, identify deficiencies, study the problem, prepare a solution, apply the solution, restudy the issue to see that it has been resolved." Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 89. The capacity to self-monitor necessarily includes an understanding of "how a system needs to change in response to internal experience." *Id.* at 90. The court will not be convinced that external monitoring

is no longer needed until ADOC has demonstrated that it has the capacity to engage in both of these twin elements of self-monitoring.  The experts on the EMT are best positioned to help ADOC develop this capacity and may do so through the "feedback" and "consultation" processes described below.  The court finds that this resolution is narrowly tailored and meets the need-narrowness-intrusiveness requirement of the PLRA. *See* 18 U.S.C. § 3626(a)(1)(A).

The court will also not order ADOC to designate a "Compliance Coordinator" or otherwise dictate how ADOC organizes and manages its internal monitoring staff.  For now, the court will defer to ADOC to establish an IMT as it deems appropriate.  The defendants have informed the court that they plan to appoint to the IMT one psychiatrist, one psychologist, two registered nurses, and any other staff deemed necessary to complete quarterly reports.  *See* Defs.' Proposed Monitoring Plan (doc. no. 2115) at 12.  While the court understands the plaintiffs' concern that appointing members of the IMT

41

who already have clinical duties may mean they are
stretched too thin, the provisions plaintiffs seek are
overly intrusive.   The issue of whether the IMT
established by ADOC has sufficient expertise and capacity
to monitor compliance will be properly before the court
when the court considers whether to terminate external
monitoring, as described in the "Handoff" section of this
opinion.


### 3. Qualitative Review

#### a. Dispute

Though initially a point of concern for the
plaintiffs, it now appears the parties agree that in
assessing whether ADOC is complying with the performance
measures, and thus remedial orders, the EMT can make
"qualitative assessments relating to clinical
decision-making." Defs.' Response (doc. no. 2295) at 30;
*see also* Pls.' Proposed Opinion (doc. no. 2260) at 26.
The defendants urge that such assessments may not
constitute second-guessing of the reasonable judgment of

clinicians, but acknowledge, based on the testimony of
Dr. Robert Stern, one of their own proposed external
monitors, that assessment of many performance measures
will "require[] a clinical perspective." Stern Nov. 27,
2018, Trial Tr. (doc. no. 2415) at 116. For example, Dr.
Stern testified that the EMT should be able to determine
whether a counseling progress note contains merely
"gibberish," rather than clinical observations, or
whether a referral decision is within the range of
appropriate actions. *Id.* at 150. According to Dr. Stern,
there would be "something wrong" if a monitoring plan did
not allow for this type of qualitative review. *Id.* at
123; *see also* Burns Dec. 6, 2018, Trial Tr. (doc. no.
2254) at 92-93 (testifying that that monitors must be
able to assess clinical judgment).


### b. The Court's Resolution

Based on the parties' agreement, the EMT will have
authority to make qualitative assessments of whether
clinicians are making reasonable clinical judgments.

This assessment will often entail evaluating whether the clinicians based their judgment on clinically relevant information, as well as evaluating the documented reasons for making the judgment. As described by plaintiffs' expert Dr. Burns, the EMT's role is not to second-guess clinicians' clinical judgments, but to see "if there's a rationale involved for the choices that are made and the interventions that are provided." Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 93. As such, the EMT cannot find that the defendants did not satisfy a performance measure because a clinician made a decision that was reasonable, but different from the decision the EMT would have made.

The court finds this resolution satisfies the need-narrowness-intrusiveness requirement of the PLRA. *See* 18 U.S.C. § 3626(a)(1)(A). Reviewing clinical judgment is necessary to assess compliance with remedial orders because practitioners cannot comply with remedial orders while engaging in clinically unreasonable judgment. For example, if clinicians systematically fail

to diagnose people with SMIs despite clear indicators, ADOC will be unable to attain compliance with the court's remedial orders regarding identification of people in need of mental-health care.   The parties' agreement regarding qualitative evaluations and the testimony of witnesses from both sides support the court's finding that this resolution satisfies the PLRA.   *See* 18 U.S.C. § 3626(a)(1)(A); *see also Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1253 (M.D. Ala. 2019) (Thompson, J.) (finding the defendants' agreement to a remedial provision is strong evidence of PLRA compliance).

## 4. Audit Tools

### a. Dispute

In order to perform qualitative review, the parties agree that the EMT shall have the authority to develop "audit tools."   *See* Pls.' Proposed Opinion (doc. no. 2260) at 27; Defs.' Response (doc. no. 2295) at 17-18. While the term "audit tool" has not been precisely defined by either party, it essentially refers to the

method or procedure by which the EMT members assess
compliance with the performance measures. *See* Defs.'
Proposed Monitoring Plan (doc. no. 2115) at 15-16; Burns
Dec. 7, 2018, Trial Tr. (doc. no. 2256) at 242-43. For
example, the defendants' proposed performance measure 45
is that "any referral by the intake [registered nurse]
must be designated as emergent, urgent, or routine."
Defs.' Proposed Monitoring Plan (doc. no. 2115-1) at 4.
The proposed audit tool for that performance measure--
referred to as a "Method of Measurement" in the
defendants' performance measures chart--is to "review a
minimum of 10 charts for inmates referred for evaluation
by the intake RN [registered nurse] during the applicable
quarter for each identified facility." *Id.*

Just as both parties propose empowering the EMT to
develop performance measures, they also propose
empowering the EMT to develop audit tools for evaluating
compliance with their performance measures. It is not
clear, however, whether the defendants agree that the
EMT's authority to create the audit tools should be

**46**

complete or whether their proposal would require final approval from ADOC.

Overall, the defendants' plan also limits the EMT to evaluating no more than three facilities per quarter. This would seem to mean that only 12 of the 14 major facilities would be evaluated even once in a year.

### b. The Court's Resolution

The court will order that the EMT will have the authority and discretion to develop and adjust audit tools as it deems appropriate to evaluate compliance with the performance measures and ADOC's developing ability to self-correct. Since the audit tools are another important element of the monitoring plan to be filled in, the defendants acknowledge that the EMT should devise them, in light of their expertise. *See* Defs.' Proposed Monitoring Plan (doc. no. 2115) at 18. As with the performance measures, the audit tools will be limited to assessing ADOC's progress as to the court's limited remedial orders and its capacity to self-monitor. And,

as with the performance measures, the parties will be given an opportunity to raise objections to any of the proposed audit tools before monitoring begins, first with the EMT, then via mediation, and finally with the court if still unresolved.

The court will also leave it to the experts to decide how many and which facilities to evaluate on a quarterly basis within the constraints of the rest of today's order.  It is in the interest of all parties and the court for ADOC to achieve compliance and attain the capacity to self-monitor as swiftly and effectively as possible.  Though seemingly aimed to minimize the intrusion to ADOC facilities, arbitrarily limiting the number of facilities to be evaluated each quarter could have the opposite effect, slowing ADOC's progress toward termination of the court's remedial orders and extending the duration of external monitoring.

The court finds that this resolution satisfies the PLRA's need-narrowness-intrusiveness requirement.  *See* 18 U.S.C. § 3626(a)(1)(A).  Allowing the EMT to create

the tools and schedule it deems necessary to evaluate
compliance is essential to ensure the EMT's expertise
shapes and drives the overall monitoring scheme.

### 5. Contempt and Dispute Resolution

#### a. Dispute

The defendants' plan includes a significant
limitation on the ability of the plaintiffs to initiate
contempt proceedings, allowing for the plaintiffs to do
so only where the monitoring team has issued three
consecutive quarterly reports finding noncompliance with
respect to the same performance measurement and the
plaintiffs have exhausted "all reasonable efforts to
resolve any sustained noncompliance through the dispute
resolution process."   Defs.' Proposed Monitoring Plan
(doc. no. 2115) at 21.   Under the defendants' plan, the
plaintiffs must first raise concerns about noncompliance
with the EMT and the defendants, then engage in mediation
to resolve any disputes prior to filing a contempt
motion.   The plaintiffs assert that such a limitation

unduly limits their ability to timely raise concerns
about noncompliance with remedial orders, including those
that are a matter of life or death.

### b. The Court's Resolution

The court will not adopt in full the defendants'
proposed limitation on the plaintiffs' ability to
initiate contempt or other proceedings, which the court
finds an unwarranted restriction.  The court understands
the plaintiffs' concern that three quarters is simply too
long for some forms of noncompliance to continue
unremedied.  For example, because the risk of suicide is
"so severe and imminent," *see Braggs v. Dunn*, 383 F.
Supp. 3d 1218, 1227 (M.D. Ala. 2019), the remedial
measures on suicide prevention must be complied with
100 % of the time, *see* Burns Dec. 7, 2018, Trial Tr.
(doc. no. 2256) at 122-23.

However, following the court's prior practice in this
case, *see, e.g.*, Order (doc. no. 1926) (directing parties
to mediate before the defendants would be ordered to

respond to the plaintiffs' contempt motion), the court will order that, absent an extraordinary urgency, the plaintiffs must initially mediate their concerns before initiating contempt proceedings.  This restriction balances the defendants' interest in having the opportunity to correct noncompliance without litigation with the plaintiffs' concern about the need to ensure complete and immediate compliance with some remedial orders.  The court finds this provision satisfies the need-narrowness-intrusiveness requirement of the PLRA. *See* 18 U.S.C. § 3626(a)(1)(A).

Logically, even in the absence of this restriction, it would be more difficult for the plaintiffs to succeed on a non-urgent contempt motion brought prematurely in the monitoring process.  And the court expects that other elements of this order will obviate the need perceived by the plaintiffs to initiate contempt proceedings early on.  By ensuring the plaintiffs have a role in selecting the EMT members, who will fill in many of the details within the monitoring structure, the plaintiffs will have

greater trust in the monitoring plan to address ADOC's deficiencies. Meanwhile, improvements to ADOC's efforts and ability to self-correct will help to assure the plaintiffs that ADOC is taking meaningful steps toward compliance.

### C. Components of Monitoring

The parties are in agreement as to the overall structure and phases of monitoring, and the court will order that the monitoring scheme comport with this agreement. This includes that the monitoring scheme will consist of three phases, with an external monitoring team teaching--and then ultimately handing the reins over to--an internal monitoring team; that the IMT should consist of professionals with clinical expertise who are exclusively chosen and employed by ADOC; and that the monitoring scheme should consist of five essential components of monitoring outlined above and described in detail below.

The parties disagree, however, about the timeline for the phases of monitoring, as well as various components within this broader structure. The court will describe and resolve each disagreement in turn.

### 1. Document Review

#### a. Dispute

The parties agree that ADOC must produce documentation to the EMT, and that the EMT shall have ultimate authority to identify which documents to review. However, the parties disagree as to the sample size that must be reviewed. The defendants propose requiring a minimum sample size of documents to be reviewed for each performance measure (generally 10 documents), while the plaintiffs contend that the sample size should be left to the EMT's discretion. Once the responsibility for monitoring has been transferred to the IMT, the plaintiffs propose that the IMT cannot reduce or change the amount of documentation identified for review by the

EMT unless ADOC has been found in compliance with respect to a particular order.

The plaintiffs also propose that documents produced to the EMT or IMT be produced to plaintiffs' counsel, while the defendants argue that the plaintiffs should receive only "all of the documentation that the Compliance Teams actually rely upon in evaluating compliance." Defs.' Response (doc. no. 2295) at 29. Finally, the plaintiffs propose a list of types of documents to serve as a starting point for review, in addition to any others requested by the EMT. *See* Pls.' Proposed Opinion (doc. no. 2260) at 67.

### b. The Court's Resolution

With regard to document review, the court will again leave much to be decided by the experts. The parties appear to agree that the EMT may review an unlimited number of documents. Rather than set a minimum number of documents, as the defendants propose, the court will leave it to the EMT to decide both how many and which

documents to review.  While the court acknowledges the defendants' concern that a review of too few documents may result in an unrepresentative and unfair sample, this is an issue that the qualified experts on the EMT will be capable of recognizing and addressing as appropriate. The court will not adopt the plaintiffs' proposed requirement that the IMT follow precisely the choices for document review made by the EMT.  The issue of how to review an adequate number or scope of documents is one on which the court expects the EMT will train the IMT, as discussed below.  Evidence that the IMT is failing to follow that training may support a finding that external monitoring continues to be necessary.

The court declines to adopt the plaintiffs' proposal that all documents produced to the EMT or IMT also be produced to plaintiffs' counsel.  The court is unsure whether, in practice, there will be a meaningful difference between the parties' proposals on this point. Therefore, though willing to revisit the issue if this resolution proves unworkable, the court will first adopt

the defendants' narrower position that plaintiffs' counsel receive "all of the documentation that the Compliance Teams actually rely upon in evaluating compliance." *See* Defs.' Response (doc. no. 2295) at 29. Because the court has difficulty defining in the abstract the exact meaning of "actual reliance," the court will initially leave it to the defendants to interpret this language and will simply address any issues as they arise. In accordance with the defendants' proposed EMT member Dr. Stern's testimony, the EMT must also retain all documents it reviews in the event its findings are contested by either party. *See* Stern Nov. 27, 2018, Trial Tr. (doc. no. 2415) at 111.

The court finds that this requirement regarding document review is inherently narrow, as it is adopted in large part from the defendants' proposal and the parties' agreements and again gives discretion to the experts to determine what is necessary. Thus, the court finds it meets the need-narrowness-intrusiveness requirement of the PLRA. *See* 18 U.S.C. § 3626(a)(1)(A).

## 2. Observation

### a. Dispute

The parties agree that site visits should be part of monitoring.  In broad strokes, the key difference is that, while the defendants propose that the EMT conduct site visits *upon its request*, the plaintiffs want to *require* at least yearly site visits to each facility at the start of monitoring.

The defendants propose that, within 60 days of the entry of this order, any EMT member who has not visited ADOC facilities should visit as many facilities as he or she deems necessary to become familiar with them. Subsequently, under the defendants' plan, EMT members may request a site visit to any facility, but if any party disputes such a request or deems it unnecessary or inappropriate, such request shall be resolved through mediation.

By contrast, the plaintiffs propose *requiring* that, in the first phase of monitoring, each major ADOC

57

facility be visited by the EMT members at least once, but no more than twice, per year, unless extraordinary circumstances require more visits. *See* Pls.' Proposed Opinion (doc. no. 2260) at 41-42. As facilities come into compliance, the plaintiffs propose, the members may reduce the frequency of visits. With regard to scheduling site visits, the plaintiffs propose that the EMT determine the schedule of visits in consultation with the defendants, and that prior to each quarter, the EMT notify the defendants of the facilities to be visited during that quarter with at least two weeks' notice before any site visit.

The plaintiffs also propose limiting each site visit to no more than five full business days at any facility with inpatient treatment units or intake processing, and no more than three full business days at any other facility, unless explicitly agreed to by the parties or permitted by the court upon the EMT's request. The defendants do not have a proposal regarding the duration

of site visits but have repeatedly raised concerns that site visits may be distracting and intrusive.

The defendants similarly do not have a proposal regarding the scope of observation of the EMT members allowed during site visits.  The plaintiffs propose that monitors be allowed to (1) observe processes, including treatment, with the permission of patients; (2) inspect areas where inmates are housed and where mental-health services and programming are performed; (3) conduct confidential interviews with inmates who receive or request mental-health services; (4) speak with correctional and mental-health staff as needed, in a way that limits as much as possible the impact on the provision of care; (5) have access to documents they request either on site or within 10 days after a visit; and (6) have, to the extent possible, a confidential setting in which to conduct interviews.  Finally, the plaintiffs propose that each party be allowed to send a single attorney each day for site visits.  The defendants do not appear to have a position on this issue.

### b. The Court's Resolution

The court will order regular site visits by the EMT throughout the monitoring process, rather than just at the outset.  However, the court will not dictate the precise number required and will leave that decision to the EMT.  The court credits the testimony of plaintiffs' experts Dr. Burns and Vail as well as the defendants' own witness Dr. Stern, who all agreed that site visits are necessary to help understand and verify ADOC's documentation, to catch issues that are undetectable through document review, to foster collaboration between the EMT and ADOC staff, and to allow for the teaching and cultural shift required for ADOC to eventually self-monitor.  *See* Stern Nov. 27, 2018, Trial Tr. (doc. no. 2415) at 152-53; Vail Nov. 29, 2018, Trial Tr. (doc. no. 2340) at 21; Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 64.

As proposed by the defendants, it will be up the EMT to determine the exact frequency of visiting each

facility, including prior to the start of monitoring.  In recognition of the defendants' concern that overly frequent site visits may be disruptive to the facilities' operation, however, the court will limit the number of site visits by the EMT to no more than two per facility per year, unless explicitly agreed to by the parties or permitted by the court upon the monitors' request.  This requirement is based on the testimony of both Dr. Burns and Vail, who stated that they would expect the EMT to conduct two site visits per facility per year, at least to start, with an emphasis on those facilities "that have the most involvement in carrying out all of the remedial plans," such as the mental-health treatment hubs.  Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 64; *see also* Vail Nov. 29, 2018, Trial Tr. (doc. no. 2340) at 25-28.  Because it is up to the EMT which facilities to visit and how often, it is possible, and perhaps likely, that fewer than two visits to some facilities will occur in a year.

The court will require the EMT to determine the schedule for site visits in consultation with the

defendants and to inform the defendants of a proposed
visiting schedule on a quarterly basis, giving no less
than two weeks of notice prior to any visit.  The court
finds the defendants' proposal that ADOC may dispute any
site visit as "unnecessary or inappropriate" overly
broad.  Instead, there will be a presumption that a site
visit will occur as deemed appropriate by the EMT--a
presumption that may be overcome based on extraordinary
circumstances, such as an extreme security risk.  The
court expects that scheduling disputes will be resolved
between the EMT and the defendants; however, any disputes
that cannot be resolved are to be submitted for mediation
and then to the court if the parties are still unable to
resolve the matter.

Though the court will leave the issue of duration of
site visits to the EMT, the court will do so with the
restriction that site visits may last no more than four
full business days at any facility with inpatient
treatment units or intake processing, and no more than
three full business days at any other facility, unless

explicitly agreed to by the parties or permitted by the court upon the monitors' request.  The court adopts this proposal as an assurance to the defendants and based on testimony by plaintiffs' expert Dr. Burns that site visits could be disruptive "if they lasted 30 days ... but the plan would be that you would design this to last probably three or four days at a given site." Burns Dec. 7, 2018, Trial Tr. (doc. no. 2256) at 242.

The court will also adopt the plaintiffs' proposal regarding the extent of access by the EMT during the site visits.  The court finds this level of access minimally required for monitors to ensure a meaningful and accurate review of ADOC's compliance.  Dr. Burns credibly testified that site visits provide insight that cannot be gathered from reviewing the paperwork, particularly regarding how various processes work together in the context of each facility. *See* Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 57.

Observing processes in person is also useful to determine whether they are being done "as intended to be

done in terms of all the various components." *Id.* at 56.
For example, Dr. Burns testified that compliance with the
remedial order requiring that suicide-watch checks be
made at staggered intervals cannot be fully evaluated
without a site visit. *See id.* at 165-67. The available
documents regarding this remedial measure are the
observation logs kept by staff. Upon review of these
logs from the months prior to the monitoring trial, Dr.
Burns testified that the logs noted checks at staggered
times, but repeated at precisely the same times over
multiple logs in different months. *See id.* The
explanation Dr. Burns suggested was that the logs were
likely filled in, in advance. *See id.* However, without
a site visit "to observe the observers and their logs
contemporaneous with the observation" and to watch the
actual practice of staff, monitors would be left unsure
of when the checks actually happened and whether the logs
are trustworthy. *Id.* at 167. Plaintiffs' expert Vail
testified that allowing the monitors to interview ADOC
staff will also increase the monitors' understanding of

staff actions and decisions before they reach a
conclusion regarding compliance. *See* Vail Nov. 29, 2018,
Trial Tr. (doc. no. 2340) at 15-16.

Both Vail and Dr. Burns agreed that interviewing
inmates is another important way to detect patterns of
compliance or noncompliance with remedial measures. For
example, Dr. Burns testified that interviewing inmates
is sometimes necessary to investigate issues such as how
quickly patients are being evaluated in response to their
requests for mental-health treatment and whether they are
seen by mental-health staff in a confidential space. *See*
Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 55.

The court will leave the issue of including attorneys
during site visits up to the EMT. While Dr. Burns
credibly testified that the presence of multiple
attorneys during visits can be disruptive, she also
stated that the presence of counsel during exit
interviews could be appropriate. *See id.* at 48. The
court believes the EMT members are best positioned to

65

evaluate when and whether to invite a limited number of attorneys from both parties to be present.

The court finds that these provisions meet the need-narrowness-intrusiveness requirement of the PLRA. *See* 18 U.S.C. § 3626(a)(1)(A). The requirement regarding site visits balances the defendants' concerns about disruptions caused by in-person monitoring with the need for monitors to achieve a complete understanding of ADOC's operations and its progress toward constitutional compliance. As plaintiffs' experts and defendants' own witness Dr. Stern testified, some site visits, particularly initial visits, "are absolutely necessary." Stern Nov. 27, 2018, Trial Tr. (doc. no. 2415) at 102; *see also* Vail Nov. 29, 2018, Trial Tr. (doc. no. 2340) at 25 (agreeing that site visits are "necessary to establish the working relationships with the people in the system, and it's also necessary to be able to see and feel the progress that's occurring or lack of progress"). However, the court agrees with plaintiffs' expert Vail that, "beyond a required ... visit [to] each facility, I

66

think [the issue of site visits] should be left up to the judgment of the monitors."  Vail Nov. 29, 2018, Trial Tr. (doc. no. 2340), at 59.

The court's relief embraces the defendants' logic that site visits should occur as deemed necessary by the experts.  It also limits the intrusion into ADOC's operations by capping the duration of each visit and allowing a total of only two visits per facility per year, absent the consent of all parties or the court's approval.  As facilities demonstrate their compliance with remedial orders, logically the EMT should find that less monitoring is required and thus the number of site visits will diminish.

### 3. Feedback

Citing Dr. Burns, the plaintiffs and defendants both list "feedback" and "consultation" as two of the five components of monitoring.  Given the similarity between these two concepts, it is important to define the difference between them.  The court refers to "feedback"

as activity by the monitors to inform the court and parties of the defendants' *compliance* with remedial orders and the Constitution.  As part of this process, they may also advise defendants on best practices, policy, and more.[4]  "Consultation," by contrast, refers to actions taken to *teach* ADOC how to self-monitor.

### a. Dispute

In broad strokes, whereas the defendants propose that feedback essentially be limited to the quarterly reports produced by the EMT, the plaintiffs contend that feedback should also include face-to-face meetings.

_____

4.  Dr.  Burns  testified  that  as  part  of "consultation," the parties can advise the defendants on policy development, such as suggesting that ADOC look at model  policies  or  practices  from  other  States  or suggesting certain ADOC facilities consult with one another.  *See* Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 68-69.  However, for purposes of the analysis here,  the  court  will  treat  this  type  of  advising  as "feedback," and "consultation" as exclusively related to teaching about monitoring. This is because advising on policies and practices is more closely related to giving feedback  about  compliance  with  orders  and  the Constitution than it is with consulting about monitoring.

With regard to the written reports, the parties agree that quarterly monitoring reports should be submitted to the court, and that both parties should have the opportunity to contest the reports or to provide feedback to the EMT.   However, the parties' proposals include three minor discrepancies: (1) the plaintiffs propose that, during the second phase, the IMT, in addition the EMT, produce quarterly reports to learn how to do so; (2) the defendants propose that all quarterly monitoring reports as well as supporting documentation be kept under seal and treated as confidential; and (3) the defendants propose that "[n]o Quarterly Evaluation Report, or finding or recommendation of the [EMT] and/or [IMT] within a Quarterly Evaluation Report, is admissible against ADOC, its employees, contractors, or contractor's employees in any other civil action or other proceeding." Defs.' Proposed Monitoring Plan (doc. no. 2115) at 20-21.

With regard to the face-to-face feedback, the plaintiffs propose that for each site visit, there be an entrance and exit interview between the monitoring team

and the institutional staff as well as any party representatives that are present.

Finally, the plaintiffs also propose that the EMT be able to communicate with the plaintiffs and the defendants (and presumably their representatives), separately or together, at its discretion, outside of the context of a site visit. By contrast, the defendants' proposal provides for regular communication (outside of quarterly reports) only between the EMT and ADOC and prohibits the EMT from informing one party "of any decision, recommendation, or report in advance of the time it is given to all parties." Defs.' Proposed Monitoring Plan (doc. no. 2115) at 21. Specifically, the defendants' proposal provides that the EMT "may convene conference calls on a monthly or otherwise regular basis with ADOC to discuss implementation of the Remedial Orders, to obtain updates, and to address questions or concerns." *Id.*

### b. The Court's Resolution

The court will largely adopt the parties' agreement that the EMT must issue its quarterly reports to the parties within 30 days of the conclusion of each quarter to provide an opportunity to object or provide feedback prior to submission to the court. *See* Defs.' Response (doc. no. 2295) at 10.  In its reports, the EMT shall identify the basis for its findings (documentation, interviews, etc.).  As to when the reports are to be filed, the court will make that decision after it has input from the EMT.

Once filed, in light of the strong presumption in favor of public access to judicial records, there will not be a blanket seal on the reports; rather, the either party or the EMT may move to seal prior to the EMT's filing of the reports on a case-by-case basis. *See Braggs v. Dunn*, 382 F. Supp. 3d 1267, 1270 (M.D. Ala. 2019) (Thompson, J.) (finding that "[t]he public has a common-law right to inspect and copy judicial records and documents" (citing *Nixon v. Warner Commc'ns, Inc.*, 435

U.S. 589, 597 (1978) & *Newman v. Graddick*, 696 F.2d 796, 802-04 (11th Cir. 1983)).   As this court has stated, "Alabamians indisputably have a powerful interest in overseeing ADOC's performance."   *Id*. at 1272.   The defendants' proposal that the reports be inadmissible in other proceedings is due to be rejected, as the defendants do not identify any legal basis for such a requirement.   The court will address in the "Consultation" section below the parties' disagreement regarding the IMT's participation in producing quarterly reports.

With regard to the face-to-face feedback, the EMT has authority, upon its request, to conduct entrance or exit interviews with ADOC personnel.   ADOC shall comply with these requests, absent extenuating circumstances, such as an extreme security risk.   As described, if the EMT deems participation of the parties' lawyers appropriate during these interviews, the court will permit such participation.   Plaintiffs' expert Dr. Burns testified that these in-person meetings are important to

provide immediate feedback to ADOC regarding the monitor's findings and for the monitors to make suggestions of improvements where appropriate. *See* Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 66-67. Vail testified that on-the-ground feedback *from ADOC to the monitors* is also important to ensure that the monitors have an accurate impression of ADOC's activities and to correct any misunderstandings prior to the writing of the monitoring reports. *See* Vail Nov. 29, 2018, Trial Tr. (doc. no. 2340) at 15. This two-way feedback, he testified, helps the monitoring process because "the people on the ground in any state know the details of their system better than an outsider ever will, no matter how good the monitor is." *Id.*

Finally, with regard to communication between the parties and the EMT, the court will allow the EMT to meet with and otherwise communicate with the parties, including ADOC staff, at its discretion, separately or together. Fluid communication will aid the two-way delivery of feedback. The defendants' own proposed

monitor Dr. Stern also testified that communication between the EMT and counsel for all parties is important during the monitoring process. *See* Stern Nov. 27, 2018, Trial Tr. (doc. no. 2415) at 54. However, if the monitors rely on information from these communications in the quarterly reports, they must cite the communication in the report. Consistent with the defendants' proposal, the court will order that the EMT may not provide the quarterly report to one party ahead of the other.

The court finds that these provisions regarding feedback meet the need-narrowness-intrusiveness requirement of the PLRA. *See* 18 U.S.C. § 3626(a)(1)(A). Once again, the parties' agreement regarding the filing of quarterly reports is strong evidence of PLRA compliance. *See Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1253 (M.D. Ala. 2019) (Thompson, J.). Allowing the EMT discretion to request face-to-face feedback when they believe it is necessary will help to ensure swift and productive collaboration between the EMT and ADOC--a critical feature of this monitoring scheme. Such

74

meetings will be limited to what is necessary, as determined by the experts on the EMT, to limit the intrusion into ADOC's operations.

### 4. Consultation

#### a. Dispute

As used here, "consultation" refers to the EMT's actions to teach the defendants how to self-monitor. Consultation differs from "feedback" in that it is not focused on informing the parties and the court about compliance.  In broad strokes, the parties agree that teaching should be a big part of the monitoring scheme. The parties' disagreement lies in how this teaching and capacity-building will take place.  The distinctions in the proposed division of labor between the EMT and IMT--including the EMT's supervisory role over the IMT--reflect the parties' different proposed processes by which the EMT will teach the IMT how to monitor.

In the first phase, the parties agree that the EMT will exclusively conduct monitoring.  However, the

parties' proposals differ slightly in that the plaintiffs propose that the IMT observe the EMT during the first phase, *see* Pls.' Proposed Opinion (doc. no. 2260) at 72, whereas the defendants simply propose that the EMT make the results of its quarterly evaluations available to the IMT, *see* Defs.' Proposed Monitoring Plan (doc. no. 2115) at 13.

In the second phase, the plaintiffs propose that the IMT observe the EMT and participate only "as appropriate," Pls.' Proposed Opinion (doc. no. 2260) at 72, whereas the defendants propose that the EMT and IMT jointly conduct the evaluations, *see* Defs.' Proposed Monitoring Plan (doc. no. 2115) at 13-14. Unlike the defendants, the plaintiffs also propose that the IMT produce separate draft quarterly evaluations during the second phase (in addition to the evaluations produced by the EMT), which the EMT would review for accuracy, thoroughness, and efficacy. This way, according to plaintiffs, the EMT "will be able to teach the Internal Monitoring Team the skills they need to take the lead in

monitoring and will be able to evaluate the progress of the Internal Monitoring Team in developing the capacity to take over the monitoring process." *See* Pls.' Proposed Opinion (doc. no. 2260) at 74. Another crucial difference, discussed in the "Handoff" section below, is that defendants propose that the second phase automatically end after two years of monitoring.

In the third phase, the plaintiffs propose that the EMT continue to observe the IMT and retain the authority to return monitoring to the second phase. By contrast, the defendants want monitoring in the third phase to be exclusively conducted by the IMT, without EMT supervision.

### b. The Court's Resolution

The court will order that the IMT's responsibilities and involvement will be largely driven by what the EMT members, who are the experts, believe is necessary. During the first and second phases, the EMT shall be allowed to invite the IMT to observe the EMT in its

monitoring activities, unless there is an activity that
the EMT requests to conduct without being observed, such
as a confidential interview.  During the second phase,
the EMT shall retain primary responsibility for
monitoring and producing the quarterly reports; however,
the IMT shall participate in those activities to the
extent the EMT deems appropriate.  The court will not
adopt the plaintiffs' proposal that, during the second
phase, in addition to the EMT-produced report, the IMT
produce a separate draft report for the sole purpose of
training.  Instead, the court will leave it to the EMT
to determine how best to involve the IMT in drafting
reports and other monitoring activities as it deems
necessary for training and capacity-building.  Finally,
the court will order that, during the third phase, the
EMT shall remain available for consultation with the IMT,
the parties, and the court, should any issues or disputes
arise.

    The court finds these steps necessary to ensure that
the IMT not only receives the necessary training, but

also that it is capable of executing the work of monitoring in accordance with that training.  Allowing for collaboration between the EMT and IMT in every phase of monitoring is essential to ensure that, one day, ADOC will have the capacity to self-monitor.  The court also expects that involving the IMT from the very beginning of monitoring will help to improve the working relationship between the EMT and ADOC and help develop the IMT into a "cultural force" for institutional change. Vail Nov. 29, 2018, Trial Tr. (doc. no. 2340) at 69.

This provision satisfies the need-narrowness-intrusiveness requirement of the PLRA. *See* 18 U.S.C. § 3626(a)(1)(A).  The consultation element of monitoring is particularly critical in light of the admission of the defendants that ADOC lacks the "training" to self-monitor.  Defs.' Proposed Monitoring Plan (doc. no. 2115) at 2.  Commissioner Dunn himself testified that he instructed his staff to develop a monitoring plan that focused "on training, education, and building internal capacity."  Dunn Nov. 26, 2018, Trial

Tr. (doc. no. 2250) at 7.  Consultation is "one of the
ways in which the monitor helps the agency develop the
internal knowledge and skill set to be able to assume
responsibility for internal monitoring, ongoing,
continuous quality improvement process."  Burns Dec. 6,
2018, Trial Tr. (doc. no. 2254) at 68.  The court's order
limits the consultation element of monitoring to only
what is necessary to ensure that ADOC develops the
ability to self-monitor, rather than requiring the
redundant reporting by the IMT in the second phase or the
intrusive supervision over the IMT in the third phase
sought by the plaintiffs.  Consultation, like all
elements of the court's monitoring order, is also limited
in scope to the requirements of this court's remedial
orders and is thus narrowly tailored to redress the
violations found by this court.


### 5. Handoff to ADOC

The "handoff" to ADOC involves two central issues.
First, when does the EMT transfer primary monitoring

responsibilities to the IMT, that is, when does monitoring move from phase two to phase three? Second, when does court monitoring terminate? The parties disagree on both issues.

### a. Timing of Monitoring Phases

### i. Dispute

As to the first issue of transition from phase two to phase three of monitoring, the defendants propose automatic termination of the EMT and transition to phase three after two years of monitoring--four quarters in phase one and four quarters in phase two. By contrast, the plaintiffs contend that the EMT "cannot automatically disband after two years." Pls.' Proposed Opinion (doc. no. 2260) at 52. The plaintiffs propose that the EMT conduct monitoring until the EMT determines that the IMT "has developed the competence to lead the monitoring efforts," *id.* at 72, or until the defendants demonstrate to the court "that the remedies being monitored can be terminated because they are no longer necessary to remedy

ongoing constitutional violations," *id.* at 52.   The
plaintiffs further assert that, in the third phase of
monitoring, the EMT should continue to exercise oversight
of the IMT's monitoring, including directing which
facilities are to be audited.

The defendants take issue with the fact that the
plaintiffs "do not propose any clear point in time for
transitioning from the [EMT] to the [IMT]."   Defs.'
Response (doc. no. 2295) at 33.   Under the plaintiffs'
plan, they complain, the determination of when the IMT
is prepared to assume primary monitoring responsibilities
would be left "entirely to the subjective opinion of the
[EMT] without holding the [EMT] accountable for training
and mentoring the [IMT]."   *Id.*   The defendants argue that
the EMT would have no incentive to conclude its work and
allow ADOC to take over monitoring.


## ii. The Court's Resolution

The court will adopt the defendants' proposal that
after one year, monitoring will automatically shift from

phase one to phase two.  However, the court will order
that monitoring will move from phase two to phase
three--that is, the IMT will assume responsibility for
monitoring--when *the court* determines, after a hearing,
that the IMT is sufficiently competent that monitoring
by the EMT is no longer necessary.  Of course, in phase
three, monitoring by the court would continue, albeit by
way of the IMT, until monitoring is no longer needed.

The defendants' critique and proposal suffer from
two key problems.  First, the defendants' plan would in
no way incentivize the IMT or ADOC to build its internal
monitoring capacity.  The fixed, two-year cut off sends
the message that, regardless of the IMT's monitoring
capacity after two years, the IMT would take over and
external monitoring will end at that time.  Second, and
perhaps more importantly, a fixed two-year cut-off would
mean that external monitoring would end regardless of the
status of compliance by ADOC.  As plaintiffs' expert Dr.
Burns stated, under the defendants' proposal, the
transition would occur "based on the passage of time, not

necessarily improvements in the system." Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 51.  As explained above, external monitoring is *necessary* to address ongoing constitutional violations.  This is because ADOC has failed to self-identify and self-correct problems with its provision of mental-health services to inmates, *see Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1257 (M.D. Ala. 2017) (Thompson, J.), and because this failure has continued since the liability opinion, demonstrated by ADOC's ongoing failure to self-monitor compliance with remedial orders, as described in the final section of this opinion.  Therefore, external monitoring will continue to be *necessary* until the defendants have the capacity to self-monitor; that is, until the IMT has built and demonstrated its competency both to identify and correct deficiencies, or rather, ADOC itself has built and demonstrated such.  The court has no reason to believe that ADOC, via the IMT, will automatically obtain competency after two years of monitoring, that is, that it will have a documented, substantial track record of

identifying *and* successfully correcting deficiencies. *Cf.* Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 116 (estimating that in the best-case scenario, ADOC will reach constitutional compliance in five years).

The court shares the defendants' concern that monitoring may extend indefinitely. Therefore, the court will rely on the process set forth by the PLRA for making the determination that the IMT is ready to assume responsibility for monitoring--an approach that ensures external monitoring continues only as long as it is truly necessary. Accordingly, at any point at least two years after the entry of this order, any party may move to terminate the monitoring by the EMT. *See* 18 U.S.C. § 3626(b)(1). (After all, ADOC itself may conclude, after two years of experience with the EMT and in light of then-current conditions, that it then realizes that it is not quite ready for self-monitoring.) Pursuant to that motion, the court will terminate the EMT's monitoring and hand it over to the IMT unless the plaintiffs demonstrate, at an evidentiary hearing, that

external monitoring remains necessary to correct a current and ongoing constitutional violation, and that the monitoring order continues to meet the need-narrowness-intrusiveness test. *See* 18 U.S.C. § 3626(b)(3); *see also Cason v. Seckinger*, 231 F.3d 777, 782-83 (11th Cir. 2000). In the event of such a hearing, the court will consider, among other evidence, the opinions of the members of the EMT as to whether the IMT has developed the capacity to assume monitoring responsibilities and engage successfully in self-correction. The court expects that, through the various mechanisms in this process designed to build the IMT's capacity, once monitoring shifts into phase three, the IMT will take over monitoring for the remaining duration of the court's oversight. However, the court will reserve the authority to return monitoring to phase two and re-engage the EMT experts as primary monitors if the court determines, upon the motion of either party and after an evidentiary hearing, that the IMT is no longer fulfilling its obligations.

The court understands the defendants' concern that the experts on the EMT, who are paid for their work, may have competing interests with regard to handing over the reins to ADOC.  However, this concern is insufficient to support automatic and arbitrary termination of external monitoring after two years.  And regardless of the EMT's motivations, the court's resolution will provide ADOC the opportunity to show the court that it is ready to take over monitoring.

All that said, the court agrees with the defendants that the IMT would benefit from having clear goals and criteria for determining whether it has the ability to assume responsibility for monitoring.  Students should know what their teachers require for a passing grade. Accordingly, in phase one, the EMT will develop and provide the IMT with criteria--much like performance measures--for eventually assessing whether it is able to assume the reins of monitoring.  The IMT's performance in meeting these criteria would serve as evidence, in a future hearing to terminate phase two, of whether the IMT

has the capacity to take over monitoring.  To continue with the teaching metaphor, members of the EMT can testify about whether the IMT has a passing grade; the defendants and IMT can always disagree and argue for a better grade.  Ultimately, it will be the court that determines whether the IMT has the passing grade to graduate and take over monitoring.  As stated, the court will not adopt the plaintiffs' proposal that the EMT continue to exercise a supervisory role over the IMT once the IMT takes over monitoring.  Instead, the court will require that the EMT remain available for consultation with the court and the parties as needed.

The court's resolution satisfies the need-narrowness-intrusiveness requirement of the PLRA. *See* 18 U.S.C. § 3626(a)(1)(A).  The entire exercise of monitoring would be just that, an exercise, if the EMT's oversight and consultation were to end before ADOC has gained the capacity to self-monitor.  However, under this scheme, the EMT will exist only as long as it is necessary to help ADOC achieve that end.

Moreover, the court would emphasize that this case may be unique in that the monitoring scheme adopted here does not consist exclusively of external monitoring. Instead, the court has substituted internal monitoring for part of the external monitoring that would otherwise be imposed. To this extent, the monitoring scheme is less intrusive than it otherwise would be.

### b. Termination of Court Monitoring

#### i. Dispute

The defendants assert that court monitoring--as well as the underlying remedial orders--should terminate when there is "sustained substantial compliance" with performance measures. *See* Defs.' Proposed Monitoring Plan (doc. no. 2115) at 30. By contrast, the plaintiffs propose that court monitoring continue until the *underlying remedial orders* are terminated based on a finding, under the PLRA, that they are no longer necessary to correct a current and ongoing violation. *See* Pls.' Proposed Opinion (doc. no. 2260) at 28, 75.

The defendants further assert that when ADOC achieves "sustained substantial compliance" with respect to a single performance measure, all court monitoring of that particular performance measure should cease, and the portion of the court's remedial order related to that performance measure should also terminate.  Defs.' Proposed Monitoring Plan (doc. no. 2115) at 21.  They propose that, "[a]s a general matter, the Compliance Teams should use eighty-five percent (85 %) as the threshold for substantial compliance," and many of their proposed performance measures specify 85 % as the threshold.[5]  *Id.* at 18.  Crucially, however, the

_____

5. For example, the defendants' proposed performance measure number 139 is that "[a] member of the MH staff will complete a MH Progress Note for each inmate participating in a group activity or therapy and place the note in the inmate's record."  Defs.' Proposed Monitoring Plan (doc. no. 2115-1) at 15.  Their proposed audit tool is to "[r]eview a minimum of 10 charts for inmates on the MH caseload who participated in a group activity or therapy during the applicable quarter for each identified facility."  *Id.*  Their proposal states that "substantial compliance" shall be 85 % or greater.  *See id.*  Accordingly, to achieve substantial compliance with this performance measure, at least 85 % of the reviewed charts must show that a member of the

defendants maintain that the EMT has the authority under their plan to modify the proposed compliance percentage for a particular performance measure and make it higher. *See* Defs.' Response (doc. no. 2295) at 21-23.

According to the defendants, "sustained substantial compliance" occurs with respect to a particular performance measure when the EMT determines that ADOC has substantially complied with that performance measure for three quarters at *any* ADOC facility or facilities. Defs.' Proposed Monitoring Plan (doc. no. 2115) at 9-10. The substantial compliance need not be for three *consecutive* quarters, as long as there is no intervening quarter with a finding of noncompliance (generally less than 65 % compliance) as to that performance measure. *Id*. Consequently, under the defendants' plan, it would appear that termination of monitoring of a performance measure at *all* ADOC facilities--as well as the termination of the corresponding portion of the remedial

---

mental-health staff completed a mental-health progress note.

order--can be based on a finding of substantial compliance in just a few facilities, or even a *single* one, in three, not necessarily consecutive, quarters.

The defendants propose that, even though court monitoring of a performance measure will end once there is sustained substantial compliance, ADOC will continue to monitor compliance with the performance measure at least on an annual basis as part of its ongoing continuous quality improvement activities (CQI). *See id*. at 14. Of course, the results of this CQI self-oversight would not be reported to the court or the plaintiffs. Under the defendants' plan, all court monitoring and the court's remedial orders would end as soon as sustained substantial compliance is achieved for every performance measure.

The plaintiffs disagree with the defendants' definition of substantial compliance. Their main objections are that the defendants' definition is purely numerical, rather than also qualitative, and that, as their expert Dr. Burns and the defendants' proposed

92

monitor Dr. Stern testified, some remedial measures must
be complied with 100 % of the time, rather than 85 % of
the time, to be effective. *See* Burns Dec. 7, 2018, Trial
Tr. (doc. no. 2256) at 123; Stern Nov. 27, 2018, Trial
Tr. (doc. no. 2415) at 156.   Instead, the plaintiffs
propose that the court adopt the definition of
substantial compliance utilized in the opinion adopting
the *United States v. Alabama* settlement agreement
regarding conditions at Tutwiler prison.   *See* No.
2:15cv368-MHT, 2015 WL 3796526 (M.D. Ala. June 18, 2015)
(Thompson, J.) (opinion adopting settlement agreement).[6]
They thus propose that the EMT "may identify a numerical
threshold for any remedial requirement they deem
appropriate, but the monitors must also consider whether

_____

6.   Specifically, plaintiffs propose that
"'[s]ubstantial [c]ompliance' indicates that defendants
have achieved material compliance with most or all
components of the relevant remedial requirement." Pls.'
Proposed Opinion (doc. no. 2260) at 64.   "Material
[c]ompliance," in turn, "requires that, for each remedial
requirement, defendants have developed and implemented a
policy incorporating the requirement, trained relevant
personnel on the policy, and relevant personnel are
complying with the requirement in actual practice as
measured both quantitatively and qualitatively."   *Id.*

policies are developed, staff are trained, and the policies are followed." Pls.' Proposed Opinion (doc. no. 2260) at 53. Another area of disagreement is that the plaintiffs insist that substantial compliance as well as sustained substantial compliance be measured on a facility-by-facility basis. This differs from the defendants' proposal that sustained substantial compliance for *all* facilities can be found based on substantial compliance in just one or a few facilities.

Even though the plaintiffs propose a different definition of substantial compliance, their proposal does not make clear the immediate relevance of substantial compliance. Unlike the defendants, they do not tie the end of monitoring of each performance measure to the achievement of substantial compliance. Instead of connecting the termination of court monitoring to substantial compliance, the plaintiffs propose that, under the PLRA, "the defendants may move to terminate the court's remedial orders (and thus any concomitant monitoring) after two years, and the court will order

such if the evidence shows that the remedial orders are no longer necessary to correct current and ongoing violations."  *Id*. at 75.


ii. The Court's Resolution

The court will adopt the same approach as above with regard to the second "handoff" issue of termination of court monitoring.  That is, the court will simply rely on the process set forth by the PLRA for determining when to terminate relief.  Accordingly, at any point at least two years after the entry of this order, any party or intervenor may move to terminate court monitoring altogether.  *See* 18 U.S.C. § 3626(b)(1).  The court will terminate court monitoring unless the plaintiffs demonstrate, at an evidentiary hearing, that court monitoring remains necessary to correct a current and ongoing constitutional violation, and that court monitoring continues to meet the need-narrowness-intrusiveness test.  *Id.* § 3626(b)(3); *see also Cason v. Seckinger*, 231 F.3d 777, 782-83 (11th

Cir. 2000).  In the event of such a hearing, the inquiries will be whether ADOC is complying with the remedial orders and whether the IMT has the ability to identify and successfully correct problems without court oversight.

Accordingly, crucial evidence for determining whether court monitoring remains necessary will be whether ADOC has achieved substantial compliance with the performance measures.  As both parties agree, the EMT will have the authority to define substantial compliance for each performance measure.  This could include, if the EMT so determines, the ability to take into account more qualitative criteria, such as "whether policies are developed, staff are trained, and the policies are followed."  Pls.' Proposed Opinion (doc. no. 2260) at 53. As proposed by the defendants, even after monitoring is transferred from the EMT to the IMT, the IMT must continue to use the EMT's definitions of substantial compliance,

unless a change is approved by the plaintiffs or the court.[7]

There is merit to the defendants' argument that "loose and subjective standards" risk having ADOC and its mental-health vendor "feel that they [are] aiming at a moving target." Defs.' Response (doc. no. 2295) at 13-14. Dr. Burns agreed that the expectations for the mental-health staff's performance should be very clear. *See* Burns Dec. 7, 2018, Trial Tr. (doc. no. 2256) at 220, 251. These concerns are adequately taken into account by allowing the EMT to create a definition of substantial compliance that includes both quantitative percentages, as well as consideration of whether policies are developed, staff are trained, and the policies are followed. These assessments can be objectively and empirically determined. And, by clarifying from the

---

7. The defendants proposed that, "[u]nlike the [EMT], the [IMT] shall not deviate from the substantial compliance and partial compliance percentages utilized by the [EMT] during the Phase I and Phase II evaluations, unless such deviation is approved by (a) Plaintiffs or (b) the Court." Defs.' Proposed Monitoring Plan (doc. no. 2115) at 18.

outset that substantial compliance will be crucial evidence for showing that court monitoring is no longer necessary, the defendants receive "fair notice of what standard they must reach" to terminate monitoring. Defs.' Response (doc. no. 2295) at 13.

The court need not resolve whether, as proposed by the plaintiffs, substantial compliance must be shown on a facility-by-facility basis for each performance measure, or whether sustained substantial compliance at a few facilities is sufficient to terminate monitoring of the performance measure for all facilities, as proposed by the defendants. This is because the question presented at the hearing to terminate court monitoring will be whether court monitoring remains necessary. Obviously, if the defendants present evidence of sustained substantial compliance in just one or two facilities for a performance measure, that evidence may be less compelling than if they present evidence of sustained substantial compliance throughout the system.

The EMT experts shall have the authority, without a hearing, to stop evaluating a particular performance measure at a particular facility, or stop evaluating a facility altogether, based on their own determination of sustained substantial compliance. As with the defendants' proposal that the IMT must continue to use the definitions of substantial compliance developed by the EMT, the IMT must also continue to evaluate the performance measures and facilities that the EMT is still assessing at time of transition to the IMT. The IMT may only stop assessing them upon a determination, after a hearing, that they are no longer necessary, or by consent of the parties. Because the duration of court monitoring is tied to the status of compliance and capacity of the IMT, rather than an arbitrary schedule, monitoring will only "intrude" as long as necessary to report and correct the constitutional violation.

Finally, the underlying remedial orders do not terminate just because monitoring of them ends; the underlying remedial orders will terminate separately

based on the same procedure set forth in the PLRA--that is, when, after a hearing, they are determined to be no longer necessary.  18 U.S.C. § 3626(b)(3); *see also Cason v. Seckinger*, 231 F.3d 777, 782-83 (11th Cir. 2000).  As Dr. Burns testified, the inquiries for terminating monitoring and terminating the remedial orders are different; even if ADOC is not yet in adequate compliance with all of the court's remedial orders, if "there's a plan in place and the internal team and the department ha[ve] demonstrated that they know how to take that information, develop a plan of correction, implement it, and change things," then external monitoring may no longer be necessary.  Burns Dec. 6, 2018, Trial Tr. (doc. no. 2254) at 74.  Of course, the evidence of substantial compliance to show that monitoring is no longer necessary will also be directly relevant to proving that the underlying remedial order is no longer necessary.  Thus, there may be overlap between when court monitoring and underlying remedial orders end.

100

### III. MONITORING AND THE PLRA

It is a complicated question whether the PLRA's requirements apply to the court's order regarding monitoring.   With regard to some of the court's monitoring provisions adopted today, the parties appear to agree that the PLRA governs.   The plaintiffs admit that, "[w]here the remedy includes setting up internal processes for self-monitoring and self-correction, courts must determine whether the [PLRA's] requirement is met."  Pls.' Response Regarding PLRA (doc. no. 2213) at 3.  As stated, the parties disagree, however, about whether *external* monitoring is "prospective relief" and therefore subject to the PLRA's need-narrowness-intrusiveness requirement.   18 U.S.C. § 3626(a)(1)(A).  The defendants contend that it is.  By contrast, the plaintiffs argue that, to the extent monitoring is limited to informing the court whether the defendants comply with court orders, the requirement does not apply because such monitoring constitutes a *means* to

relief, as opposed to "prospective relief" within the meaning of the PLRA. *Id*.

The caselaw is unclear as to whether the need-narrowness-intrusiveness requirement applies to court monitoring. Some district courts agree with the plaintiffs that monitoring is a *means* to relief, rather than "prospective relief," and therefore is not subject to the requirement. *See, e.g.*, *Carruthers v. Jenne*, 209 F. Supp. 2d 1294, 1300 (S.D. Fla. 2002) (Hoeveler, J.) ("Clearly monitoring is not an 'ultimate remedy' and only aids the prisoners in obtaining relief."); *Benjamin v. Fraser*, 156 F. Supp. 2d 333, 342–43 (S.D.N.Y. 2001) (Baer, J.) (holding that monitoring "cannot be relief" and "[t]o find otherwise would conflate relief with the means to guarantee its provision"), *aff'd in part, vacated in part on other grounds*, 343 F.3d 35 (2d Cir. 2003). On the other hand, the Second Circuit stated in dictum that it was "somewhat problematic" for the district court in the case before it to conclude that monitoring is not relief within the meaning of the PLRA.

*Benjamin v. Fraser*, 343 F.3d 35, 48-49 (2d Cir. 2003),
*overruled on other grounds by Caiozzo v. Koreman*, 581
F.3d 63 (2d Cir. 2009).  The appellate court reasoned
that placing the monitoring body beyond the reach of the
PLRA would "frustrat[e] one of the Act's broad goals of
limiting 'the micromanag[ing] [of] State and local prison
systems.'"  *Id*. at 49 (citing 146 Cong. Rec. S14611,
14626 (1995) (statement of Sen. Dole)).  Additionally,
because the monitoring body at issue had "substantial
responsibilities," there was "no easy distinction between
relief itself and the monitoring of relief."  *Id*.  After
making these observations, the Second Circuit refrained
from     resolving     whether     monitoring     constituted
prospective relief, because it held that the district
court        had        made        the        appropriate
need-narrowness-intrusiveness findings.  *See id*.

Ultimately, this court need not resolve whether
external monitoring is "prospective relief" subject to
the PLRA's need-narrowness-intrusiveness requirement,
because, as elaborated above, the monitoring ordered here

satisfies the requirement.  So, to the extent monitoring must meet the requirement, it does.

Several courts have indicated that in applying the need-narrowness-intrusiveness requirement, a history of non-compliance helps justify an intrusive remedy.  *See Benjamin*, 343 F.3d at 49 (finding that an independent monitoring body with substantial responsibilities satisfied the need-narrowness-intrusiveness requirements in part because of the district court's finding that "the nearly twenty year history of incomplete compliance with the consent decrees amply attests to the need for external monitoring" (citation omitted)); *see also Benjamin v. Schriro*, 370 Fed. App'x 168, 171 (2d Cir. 2010) (unpublished) ("The needs-narrowness-intrusiveness requirement of the PLRA notwithstanding, we find that nearly a half-decade of untruthfulness, non-compliance and inaction constitutes sufficient justification for the intrusiveness of a subsequent order to compel compliance with an original order entered pursuant to the PLRA that has been ignored."); *Clark v. California*, 739 F. Supp.

2d 1168, 1233-35 (N.D. Cal. 2010) (Breyer, J.) (stating
that, in fashioning relief, courts "may take into account
a history of noncompliance with prior orders," and
finding that further orders satisfied the
need-narrowness-intrusiveness requirements in part
because of evidence of non-compliance with prior orders
and because "defendants have demonstrated an inability
to take remedial steps absent court intervention").
Thus, the evidence of ADOC's failure to comply with the
remedial orders in this case, described in detail in the
final section of this opinion, would likely justify even
a far more intrusive monitoring order than the court
enters today.

Nonetheless, the monitoring scheme that the court
orders today is the least intrusive possible as it is
largely drawn from the defendants' own plan. And the
fact that the defendants agree that some degree of both
external and internal monitoring is necessary, *see, e.g.*,
Dunn Nov. 26, 2018, Trial Tr. (doc. no. 2250) at 35
(Commissioner Dunn testifying: "Q. Have you ever taken

the position that the state should not be subject to monitoring or oversight on these issues?   A.  No."), further supports the court's finding that the overall monitoring scheme satisfies the PLRA, *see* 18 U.S.C. § 3626(a)(1)(A); *Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1253 (M.D. Ala. 2019) (Thompson, J.) (finding the defendants' agreement to a remedial provision is strong evidence of PLRA compliance).

### IV. WHY COURT-ORDERED MONITORING IS NEEDED

The defendants argue that ADOC should be allowed to "voluntarily undertake culture change" without a court order.[8]  Defs.' Response (doc. no. 2295) at 9.  But ADOC

---

8. Overall, the court is not persuaded by the defendants' central critique of what they call the "historical," "coercive" model of court-ordered monitoring, which they claim has failed. Defs.' Response (doc. no. 2295) at 7.  Though the defendants never explicitly define what they consider the "historical" approach, in their critiques they refer to monitoring schemes that involve court-appointed external monitors and termination of monitoring based on progress rather than a set schedule. *See* Dunn Nov. 26, 2018, Trial Tr. (doc. no. 2250) at 9-14.  According to the defendants, this approach "'is basically based on compulsion [with] someone looking over your shoulder all the time and

has had ample opportunity, in this litigation and for

decades prior, to correct voluntarily its failings

regarding the mental-health care in its prisons, and its

conduct during the course of this case has been

_____

coming in and, in effect, taking over a core function of
the department...,' i.e. the continuous quality
improvement ("CQI") process of improving the delivery of
mental-health care." Defs.' Response (doc. no. 2295) at
7 (quoting Dunn Nov. 26, 2018, Trial Tr. (doc. no. 2250)
at 9). The court is unpersuaded by this argument because
the defendants presented absolutely no evidence of the
failure of this "historical" model. They highlight that,
as described below, there has been repeated litigation
over prison conditions in Alabama. But that is not
evidence that it was the *monitoring* that led to the
recurrence of unconstitutional prison conditions. It is
an equally plausible explanation--and, indeed, the court
finds it is more likely--that the lack of effort or
resources invested by ADOC to make sustainable change led
to the recurrence.

The defendants also rely *exclusively* on Commissioner
Dunn's testimony at the monitoring hearing to contend
that external monitoring in California prisons has failed
under the "historical" model. But Dunn's testimony is
based on a few conversations he had with California
prison officials. This evidence is unpersuasive--it is
a hearsay account of one side of the story (the prison
officials') for why there has been protracted prison
litigation in California. Again, the reason for
protracted litigation in California may have nothing to
do with the monitoring order in that case, and everything
to do with failures on the part of California prison
officials or other factors.

consistent with its historical failures to do so.  While prison officials in cases challenging prison conditions "should be given considerable deference in determining an appropriate remedy for the constitutional violations involved," *Laube v. Haley*, 242 F. Supp. 2d 1150, 1153 (M.D. Ala. 2003) (Thompson, J.) (citing *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979)), the court retains a responsibility to remedy constitutional violations found, *see Brown v. Plata*, 563 U.S. 493, 511 (2011) (citing *Hutto v. Finney*, 437 U.S. 678, 687, n.9 (1978)). The monitoring scheme the court orders today has indeed largely been determined by the prison officials responsible for remedying the constitutional violations involved.  However, the court simply cannot leave it to those officials to implement this scheme without a court order.  *Cf. W. Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310, 1328 (11th Cir. 2018) (cautioning against accepting assurances made during litigation).  For the reasons described below, court-ordered monitoring is necessary to ensure ADOC's compliance with the remedial

orders in this case and thus for the court to fulfill its responsibility.

## A. Liability Finding

First, the court's monitoring order is supported by the finding in the liability opinion that ADOC fails to self-monitor its provision of mental-health care. *See Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1257-60 (M.D. Ala. 2017) (Thompson, J.). As this court described: "On a global level, the state of the mental-health care system is itself evidence of ADOC's disregard of harm and risk of harm: in spite of countless reports, emails, and internal documents putting ADOC on notice of the actual harm and substantial risks of serious harm posed by the identified inadequacies in mental-health care, those inadequacies have persisted for years and years." *Id.* at 1256. ADOC's lack of internal capacity or willingness to respond to deficiencies, even about which it is aware, supports the court's finding that, without a period of

external monitoring, ADOC will simply continue to subject mentally ill inmates to unconstitutional conditions.

**B. Failure to Self-Monitor Since Liability Finding**

Second, even since this court's liability finding three years ago, ADOC has *still* not adequately monitored its provision of mental-health care.  This includes a failure to identify and correct noncompliance *even with remedial measures to which the defendants have agreed*. For example, in January 2017, the court entered as an order an interim agreement by the parties regarding suicide prevention measures, including that suicide risk assessments and suicide watch follow-up appointments must be conducted in confidential, out-of-cell settings.  *See* Interim Agreement (doc. no. 1106-1) at 1-3.  In June 2018, the court entered two remedial orders incorporating stipulations by the parties that also aimed to improve confidentiality in treatment.  *See* Psychotherapy Remedial Order (doc. nos. 1899-1) at 4; Confidentiality Remedial Order (doc. no. 1900-1).  In May 2019, however, the court

110

found "**repeated examples of custody staff intrusions into the provision of mental health contacts through their presence during clinical encounters and pressure on clinical staff that minimized inmate concerns and reports of suicidality.**" *See Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1277 (M.D. Ala. May 4, 2019) (Thompson, J.) (quoting Joint Expert Report and Recommendations (doc. no. 2416-1) at 16). Accordingly, the court found that "**ADOC continues to violate the terms of previous remedial orders covering this issue.   ADOC fails to provide adequate confidentiality during clinical encounters to inmates, comply with the agreements they made with the plaintiffs, and comply with court orders regarding confidentiality.**" *Id.*

At that time, ADOC itself also recognized various other serious and "**systemic failures to comply with court orders.**"   *Id.* at 1229 (quoting Pls. Ex. 2710 at ADOC0475738).   These included systemic failures to properly document inmates' SMI designations, properly complete suicide risk assessments, place inmates on acute

suicide watch when indicated, document consultation with
a psychiatrist or psychologist prior to discharging an
inmate from crisis placement, and complete pre-placement
screenings and seven-day assessments of inmates placed
in segregation. *See id.* at 1229 n.3 (quoting Pls. Ex.
2710 at ADOC0475738).

Unfortunately, ADOC's detection of these failures
appears to be a rare example of its effort to
self-monitor. Much more common in this litigation are
examples of ADOC's continued failure to uncover its own
noncompliance. For example, the court previously adopted
as an order the parties' agreement that ADOC start
assessing every person placed in segregation to determine
whether they have a serious mental illness by July 1,
2018. *See* Identification Remedial Order (doc. no.
1792-1) at 2. However, ADOC apparently did not inquire
as to whether its mental-health vendor was conducting
these assessments until after the plaintiffs raised the
issue with the defendants, a full month after the
assessments were to begin. *See* Joint Notice (doc. no.

1965) at 3, 5.   Similarly, even after this court found ADOC's   suicide-prevention   practices   "woefully inadequate," *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1229 (M.D. Ala. 2017) (Thompson, J.), ADOC continued to fail to properly review inmates' suicides and serious suicide attempts.   Plaintiffs' expert Dr. Burns testified in December 2018 about her concerns that problems "that might have been found and corrected [via these reviews] still exist and put people at risk."   *Braggs*, 383 F. Supp. 3d at 1279 (citing Burns Dec. 7, 2018, Trial Tr. (doc. no. 2256) at 102).   Tragically, "[h]er fears were borne out: Six prisoners killed themselves since she testified;   and   ...   their   cases   were   rife   with inadequacies in suicide prevention."   *Id.*

*Even after court intervention*, ADOC has been unable or unwilling to take necessary steps to monitor its own practices.   These failures serve as evidence that this monitoring order is necessary.   *See Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003) (upholding district court's finding that external monitoring satisfied the

PLRA's need-narrowness-intrusiveness requirement, "particularly in light of the district court's finding that the City's compliance with its remedial responsibilities has been consistently incomplete and inadequate"), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009).  As this court has stated, "[t]he more someone fails to do something he agreed to do, the bigger the need to supervise whether he does it in the future." *Braggs*, 383 F. Supp. 3d at 1281.

To be sure, understaffing has posed a significant impediment both to compliance with many of the court's remedial orders and to self-monitoring.  Plaintiffs' expert Dr. Burns testified that it would indeed have been a challenge for ADOC to comply with the ordered timelines of all remedial orders given "limited resources in terms of staffing." Burns Dec. 7, 2018, Trial Tr. (doc. no. 2256) at 205-208.  However, Dr. Burns also testified she would have at least expected to see "a plan that identified those most significant, high-risk areas, and

focus[ed] on those, as opposed to some of the lower risk things." *Id.* at 206.   Instead, ADOC had not even implemented the remedial measures that Dr. Burns characterized as "the low-hanging fruit." *Id.* at 209.


### C. ADOC's Own Acknowledgment

The defendants' open admission that some degree of external and internal monitoring is necessary further supports the court's order.   As Commissioner Dunn testified, "we all want to get at some point in the future to a place where the department has the capacity to self-correct and to address these issues in a way that not only is satisfactory to the Court, but, more importantly, is just simply what we should do."   Dunn Nov. 26, 2018, Trial Tr. (doc. no. 2250) at 22.   At the same time, the defendants acknowledge that ADOC currently does not "possess the internal resources to fulfill the significant oversight functions mandated" by their proposed monitoring plan, and "necessarily requires the initial assistance of a team of mental health experts"

to develop ADOC's capacities.  Defs.' Proposed Monitoring Plan (doc. no. 2115) at 2; *see also* Dunn Nov. 26, 2018, Trial Tr. (doc. no. 2250) at 35.  The court's order today is narrowly tailored to achieve constitutional compliance with precisely the goal of sustainability in mind.  *Cf. Newman v. Alabama*, 559 F.2d 283, 290 (5th Cir. 1977) (requiring the installation of a monitor at each prison to observe and inform the court of ADOC's progress), *cert. granted in part, judgment rev'd in part on other grounds sub nom. Alabama v. Pugh*, 438 U.S. 781 (1978).

Finally, the court would again emphasize that this case may be unique in that the court has substituted internal monitoring for part of the external monitoring that would otherwise be imposed, and that, to this extent, the monitoring scheme is less intrusive than it otherwise would be.[9]

---

9. In adopting self-monitoring as a part of court monitoring, the court has taken into consideration the defendants' critique that monitoring "'is basically based on compulsion [with] someone looking over your shoulder all the time and coming in and, in effect, taking over a core function of the department...,' i.e. the continuous quality improvement ("CQI") process of improving the

116

## D. Half-Century History of Litigation Regarding Inadequate Mental-Health Care

Finally, ADOC's long history of repeated litigation regarding the inadequacy of its mental-health care is independent evidence of its inability to sustain improvements without the type of oversight ordered today. This history serves as evidence of why court monitoring is necessary.  It also serves as a driving force behind the emphasis in this order on building ADOC's capacity to self-monitor and self-correct in the long term.  *See* Dunn Nov. 26, 2018, Trial Tr. (doc. no. 2250) at 24-25 (acknowledging the need for internal capacity-building to "truly reform the system for the long term").

As early as 1972, ADOC's mental-health care was found by a district court to be constitutionally inadequate. *See Newman v. Alabama*, 349 F. Supp. 278, 284 (M.D. Ala. 1972) (Johnson, C.J.) ("[T]he large majority of mentally

---

delivery of mental-health care."  Defs.' Response (doc. no. 2295) at 7 (quoting Dunn Nov. 26, 2018, Trial Tr. (doc. no. 2250) at 9).

disturbed prisoners receive no treatment whatsoever. It is tautological that such care is constitutionally inadequate."), *vacated in part on other grounds*, 522 F.2d 71 (5th Cir. 1975).  Four years later, in 1976, the court found that still "nothing ha[d] been done" to address the court's findings, and that ADOC continued to violate the Eighth Amendment by failing to provide adequate mental-health care.  *Pugh v. Locke*, 406 F. Supp. 318, 324 (M.D. Ala. 1976) (Johnson, C.J.), *aff'd and remanded sub nom. Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977), *cert. granted in part, judgment rev'd in part on other grounds sub nom. Alabama v. Pugh*, 438 U.S. 781 (1978). At that time, the district court appointed a state-funded "Human Rights Committee" to monitor compliance with the court's remedial order to address the violation found. *Id.* at 331.  Finding the district court's order overly intrusive, however, the former Fifth Circuit Court of Appeals instead required the installation of a monitor at each prison to observe and inform the court of ADOC's progress.  *Newman v. Alabama*, 559 F.2d 283, 290 (5th Cir.

1977), *cert. granted in part, judgment rev'd in part on other grounds sub nom. Alabama v. Pugh*, 438 U.S. 781 (1978).   In 1979, the district court again found that, despite monitoring, "nothing ha[d] been done to correct the situation." *Newman v. Alabama*, 466 F. Supp. 628, 631 (M.D. Ala. 1979) (Johnson, C.J.).   The court stated, in a finding nearly identical to this court's finding 40 years later in the present litigation:

> "There is now some effort at identification of those with mental problems.   But the record of housing and treatment of such persons is one of total failure and non-compliance.   What defendants deem the best facility for housing those with severe emotional and mental problems is the same 12 cell area at Kilby that was in use at the time of this Court's original hearing. Many of those with mental problems at Fountain, Holman, and Tutwiler are housed in segregation cells and in punitive isolation.
>
> ...
>
> In light of the clear mandate of the Court in this area, the minimal efforts at compliance by the Board reflect an attitude of deliberate indifference to the mental health needs of the inmate population."

*Id.* at 631-32.   Finding a "lack of any significant progress," despite monitoring, the court then placed ADOC into a receivership.   *Id.* at 635.

Finally, in 1988, after 16 years of the court's jurisdiction over ADOC's mental-health care, the court found ADOC had achieved the objectives of the court's remedial orders and no longer required court supervision. *See* Memorandum Opinion (doc. no. 2133-1) at 20, *Newman v. Alabama*, Civil Action No. 3501-N, (M.D. Ala. Dec. 28, 1988) (Varner, J.) (dismissing case with prejudice).

Just four years after the court's oversight terminated, however, a new complaint was filed, *again* alleging unconstitutional conditions for mentally ill inmates in ADOC's custody.   *See* Complaint (doc. no. 1), *Bradley v. Haley*, No. 2:92cv70-WHA (M.D. Ala. Jan. 15, 1992) (Albritton, J.).   Through a settlement reached in 2000, the *Bradley* litigation again significantly improved ADOC's provision of mental-health care.   By the end of the agreed-upon duration of monitoring in that case, the monitor concluded that ADOC had achieved "remarkable"

120

progress over three years, making significant strides on issues such as staffing, the capacity of mental-health units, and intake and referral processes.  *See* Bradley Final Monitoring Report (doc. no. 2133-3) at 1, 4, 6, *Braggs v. Dunn*, No. 14cv601-MHT (M.D. Ala. Oct. 25, 2018) (Thompson, J.).  And yet, as the plaintiffs point out here, nine of the 11 areas in which ADOC had been found by the *Bradley* monitor to have improved by 2003--intake, classification, discipline, suicide prevention, segregation, psychotherapy, inpatient treatment, and monitoring, *see id.* at 6-7--were found by this court in 2017 to again be seriously deficient.  *See generally Braggs v. Dunn*, 257 F. Supp. 3d 1171 (M.D. Ala. 2017) (Thompson, J.).

"The history of federal litigation in Alabama is replete with instances of state officials who could have chosen one of any number of courses to alleviate unconstitutional conditions of which they were fully aware, and who chose instead to do nothing." *Newman v. Alabama*, 466 F. Supp. 628, 635–36 (M.D. Ala. 1979)

(Johnson, C.J.).  With the monitoring scheme created by the court's order today--largely drawn from the defendants' own proposal--the court joins the State in hoping that this will be "the last ... chapter in the history of court oversight of ADOC."  Defs.' Response (doc. no. 2295) at 40.


### V. CONCLUSION

In finding that each of the above monitoring provisions satisfies the need-narrowness-intrusiveness requirement--both individually and in concert--the court gave "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."  18 U.S.C. § 3626(a)(1)(A).  The court finds that there is no such adverse impact and that, in fact, the court-ordered monitoring provisions, by helping to improve mental-health care for inmates, will serve only to enhance public safety and the operation of a criminal justice system.

122

It is clear that the court and the parties share the same goal for monitoring in this case: that ADOC acquire the tools, resources, and capacity to provide constitutionally adequate mental-health care to those in its custody *without* court supervision. As this court has previously stated: "[T]he real success would be that it will no longer be needed for this court or any federal court to interject itself in [Alabama's] prison system.... I look forward to the day when not only I'm not necessary, but no federal court is necessary." Thompson Apr. 23, 2018, Trial Tr. (doc. no. 2689) at 4. With the defendants' own proposal and the parties' agreements forming the basis of this monitoring scheme, today's order is an important step in that direction.

**\***

Therefore, it is ORDERED as follows:

(1) The monitoring scheme, as described above, is adopted as the order of the court.

(2) The court will, over time, issue a series of orders to enforce this monitoring scheme, beginning with an order for the selection and appointment of members of the external monitoring team.

DONE, this the 2nd day of September, 2020.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE