# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **EDWARD BRAGGS,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:14-cv-00601-MHT** |
| | ) | |
| **JEFFERSON DUNN,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>DECLARATION OF DR. CARL J. KELDIE</u>

I, DR. CARL J. KELDIE, pursuant to 28 U.S.C. § 1746, hereby make the following Declaration under penalty of perjury, and declare that the statements made below are true, and state as follows:

1.      My name is Carl J. Keldie, M.D.  I am over the age of nineteen (19) years and have personal knowledge of the information contained in this Declaration.

2.      I am a licensed physician in the states of Florida, North Carolina, Michigan, Pennsylvania, Colorado and Maine, with emergency pandemic licensure in Massachusetts.  I have been board certified in Emergency Medicine since 1979, and I am a fellow of the American College of Emergency Medicine.  A true and correct copy of my curriculum vitae is attached hereto as **Exhibit A**, although this copy does not show that this week I received full licensure in the state of Maine.

3.      I possess over four (4) decades of clinical and administrative medical experience, and have provided direct patient care, in primary care, urgent care, and emergency medicine in civilian, department of defense, and correctional medicine settings.  Since October 2019, I have served as the Senior Vice President of Clinical Affairs for Wellpath, Inc. ("Wellpath") – a competitor of Wexford Health Sources, Inc., the current medical services vendor for the Alabama Department of Corrections ("ADOC").  Among other services, Wellpath contracts with a variety of federal, state, and local entities to provide medical care within correctional and detention facilities.

4.      As Wellpath's Senior Vice President of Clinical Affairs, my duties include overseeing and supervising the medical services provided by Wellpath within the various facilities where Wellpath has contracted to provide those medical services.  In addition, I assist in the development of policies and procedures relating to the medical services provided by Wellpath clinicians within the various correctional and detention facilities.  I also provide direct patient care, as necessary, to fill vacancies on Wellpath's facility staffs, including vacancies created by physicians contracting SARS-CoV-2, the virus causing the novel coronavirus disease 2019 (COVID-19).  Thus, in my role with Wellpath, I have experience with developing and implementing policies and procedures for combating the

introduction and spread of COVID-19 within a correctional facility, and I agree with Ruth Naglich's declaration that it could "overwhelm the current health care system".

5.      I obtained extensive experience in correctional medicine prior to assuming my current position with Wellpath.  I previously served as the Chief Medical Officer for the entity previously known as Prison Health Services, Inc. ("PHS"), serving in that capacity from September 2000 to June 2, 2011.  I subsequently worked as the Chief Medical Officer for Corizon, LLC ("Corizon") from December 2011 to March 2013.  From May 2015 to September 2019, I served as the Chief Clinical Officer of Correct Care Solutions, LLC.  In my positions with PHS and Corizon, I supervised the provision of medical care for a variety of statewide correctional departments, including ADOC.

6.      I have also served as a medical expert in over ten (10) cases in the field of correctional medicine, including matters related to medical care for COVID-19.  For example, I provided an expert report and affidavit on behalf of the State in this lawsuit (the Braggs v. Dunn action) and was also deposed by Plaintiffs.  I inspected a variety of ADOC facilities as part of the process of developing my expert opinions in this matter, including Bullock Correctional Facility ("Bullock"), Donaldson Correctional Facility ("Donaldson"), Kilby Correctional Facility ("Kilby"), and Julia Tutwiler Prison for Women ("Tutwiler").  I previously became familiar with those facilities and other ADOC facilities during my time with PHS and Corizon.

7.    Throughout my career, I have regularly and routinely reviewed a large volume of peer-reviewed medical and scientific data, literature, studies, articles, treatises, and the like, to stay abreast of developments and trends relevant to my practice and to the diagnosis and treatment of medical conditions affecting the correctional facility population, which conditions encompass COVID-19.  Notably, on March 23, 2020, the United States Centers for Disease Control and Prevention (the "CDC") issued an "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-2019) in Correctional and Detention Centers" (the "CDC Guidance"). The CDC Guidance offers guidelines for correctional and detention facilities in responding to the health risk presented by the COVID-19 pandemic.  I have reviewed (on numerous occasions) and am familiar with the CDC Guidance, including the most recently updated version of the CDC Guidance.  A true and correct copy of the current version of the CDC Guidance is attached to this Declaration as **Exhibit B**.

8.    I received and reviewed a copy of the Plaintiffs' Proposed Protocol for Facility Inspections (Doc. No. 2974, the "Proposed Protocol"), Plaintiffs' Motion to Require Onsite Prison Inspections (Doc. No. 2986, "Plaintiffs' Motion") and the attached Declaration of Dr. Kathryn Burns (Doc. No. 2986-1, "Dr. Burns's Declaration").  From my review of Plaintiffs' Motion and Dr. Burns' Declaration, I understand that Plaintiffs ask the Court to approve the Proposed Protocol for Dr. Burns to conduct site visits to Bullock, Donaldson, Kilby, and Tutwiler (the

"Inspection Proposal").  I am deeply concerned that the Inspection Proposal presents an extraordinary, and preventable, health risk to the incarcerated individuals in ADOC's custody and the staff working within ADOC's facilities.

9.    As is now well known, COVID-19 is a highly contagious infectious disease.  No cure or vaccine currently exists for COVID-19.  While symptoms may vary in those who have COVID-19, serious medical complication from the disease, including death, occurs at a much higher rate than for influenza.  Furthermore, individuals with COVID-19 may remain asymptomatic (i.e., they are not aware of any symptoms of the disease).  The currently prevailing view within the medical community is that asymptomatic individuals with COVID-19 can transmit the virus to other people.

10.    As noted in the CDC Guidance, the staff and incarcerated individuals within correctional and detention facilities remain uniquely vulnerable to COVID-19.  The disease can spread easily within incarcerated populations because individuals housed within correctional facilities, such as ADOC's facilities, have difficulty in maintaining the social distancing possible in the free world.  In many instances, the physical layout of correctional facilities prevents individuals from maintaining the recommended six (6) feet of social distancing.

11.    The CDC Guidance provides a variety of recommendations for correctional departments such as ADOC to consider implementing to combat the

5

spread of COVID-19 within their systems. The CDC Guidance includes the following recommendations for correctional facilities relevant to the Inspection Proposal:

- "Implement social distancing strategies to increase the physical space … (ideally 6 feet between all individuals, regardless of symptoms)";

- "[M]inimize mixing of individuals from different housing units";

- "Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities … unless necessary for medical evaluation, medical isolation/quarantine, health care, extenuating security concerns, release, or to prevent overcrowding";

- Limit interactions and movements between facilities and housing units to prevent transmission;

- "Limit the number of operational entrances and exits to the facility";

- "Consider suspending or modifying visitation programs";

- "[P]rovide access to virtual visitation options where available";

- "Restrict non-essential vendors, volunteers, and tours from entering the facility";

- Require staff, incarcerated individuals, and visitors to use appropriate personal protection equipment (PPE); and

- Conduct contact tracing when feasible to do so.

(Ex. B).

12.     The Inspection Proposal runs directly contrary to the CDC Guidance. As an initial matter, the Inspection Proposal would involve at least three (3) individuals, including counsel for ADOC, who are ***non-essential*** to the operation of ADOC's facilities, conducting ***multi-day, facility-wide tours of four (4) facilities on consecutive days***.  In other words, not only does the Inspection Proposal increase the risk of introducing COVID-19 into a single ADOC facility by involving multiple non-essential visitors, but it also risks transmitting the virus throughout multiple facilities.  The Inspection Proposal directly undermines the CDC Guidance's recommendation to limit movement across facilities and across housing units.

13.     Plaintiffs' proposed protocol for the requested inspections involves ineffective infection control and prevention measures.  It is physically impossible to maintain social distancing while undertaking certain of the activities which Dr. Burns states she must complete as part of her inspection and which supposedly justify an in-person tour.  For example, Dr. Burns states that she intends to "speak directly and confidentially with inmates" in the restrictive housing cells at Kilby and Tutwiler.  (Doc. No. 2986-1 at ¶¶ 4-5).  But these cells are open-front, barred cells. It would be impossible for Dr. Burns to remain six (6) feet away from an inmate and speak confidentially to him or her, i.e., without the inmates in the adjoining cells overhearing the conversation.

14.    Dr. Burns also claims that she must conduct in-person facility tours so that she can "smell the smells."  (Id. at ¶ 6).  This statement remains baffling.  If someone is properly wearing an N95 mask, it would be difficult, if not impossible, to smell.  Dr. Burns's statements raise the concern that either (1) she does not know how to properly use an N95 mask or (2) she does not intend to continue wearing it the entire time she would be in the facilities.

15.    Dr. Burns also states that she is willing to undergo daily COVID-19 testing during the facility inspections, but only if ADOC staff are required to do so. The current state of rapid COVID-19 tests remains far from perfect.  The rapid COVID-19 tests check for the presence of COVID-19 viral particles referred to as antigens.  There are several rapid tests being used which have a range of sensitivities between 84% and 97.6%. Per the CDC's Interim Guidance for Rapid Antigen Testing for SARS-CoV-2 using Antigen Tests, updated September 4, 2020, this translates to between 2.5% and 16% of the time the screened person could have COVID-19. In other words, **Dr. Burns might test negative for COVID-19 but transmit the virus to the inmates and staff within ADOC's facilities**.

16.    Moreover, if anyone on the tours had COVID-19, the Inspection Proposal would render it almost impossible for ADOC to undertake contact tracing. Medical consensus recognizes that contact tracing represents one of the most effective infection control and prevention measures for COVID-19.  The Inspection

Proposal would involve multiple non-essential individuals conducting multi-day tours throughout four (4) facilities on consecutive days.  In other words, the individuals involved in the tours would interact with a large number of staff and inmates in a compressed timeframe.  If anyone involved in the tour had COVID-19 or was exposed to COVID-19, ADOC could not determine the scope of exposure.

17.    Furthermore, the Inspection Proposal threatens to undermine the extensive measures undertaken by ADOC to combat the introduction and spread of COVID-19 within its facilities.  I received and reviewed a copy of the Declaration of Ruth Naglich.  The Inspection Proposal would directly contravene the measures implemented by ADOC to restrict visits by non-essential persons, maintain social distancing, and limit movement of staff and inmates between facilities.

18.    The enormous health risks presented by the Inspection Proposal far outweigh the advantages of in-person facility visits, as described in Dr. Burns's Declaration.  As stated above, it remains impossible for Dr. Burns to undertake many of the activities which she states can only be accomplished in person while also practicing the protocol proposed by Plaintiffs.  Furthermore, telemedicine plays an increasingly common role in correctional healthcare.  Dr. Burns could undertake virtually all the activities proposed in the Inspection Proposal through remote means via telehealth technology, including inmate interviews. I have had the honor of conducting both telehealth and point of care medicine during the current pandemic.

19.    All of my opinions in this Declaration are expressed to a reasonable degree of medical certainty.  My opinions in this Declaration are based on: (1) my education, training, and experience as a board-certified physician practicing and specializing in correctional healthcare and emergency medicine; (2) my review of and familiarity with relevant literature within correctional medicine, including the CDC Guidance; (3) my review of Plaintiffs' Proposed Protocol, Plaintiffs' Motion, and Dr. Burns' Declaration; (4) my familiarity with and knowledge of ADOC's system, including the facilities which Plaintiffs request for Dr. Burns to visit; and (5) my review of the Declaration of Ruth Naglich.

I declare under penalty of perjury that the foregoing is true and correct.  I understand that a false statement in this Declaration will subject me to penalties for perjury.

Date: 9.27.2020

Carl J. Keldie, M.D.

10

# Exhibit A

# CARL J. KELDIE, MD, FACEP,FACCP

## CONTACT INFORMATION

Home Address:
6326 Wescates Court
Brentwood TN 37027
Cell Phone: 615-483-2057
Email: Carl.Keldie@gmail.com; ckeldie@wellpath.us

## BACKGROUND

I have four decades of clinical and administrative experience and was responsible for providing direct patient care in primary care, urgent care and emergency medicine which encompassed civilian, department of defense and correctional medicine settings.
I am a fellow of the American College of Emergency Medicine and Board Certified by the American Board of Emergency Medicine.
I developed, adapted and deployed Information Technology applications in Emergency Medicine and Correctional Care Medicine for almost 3 decades and served as the Lead Physician for deployment of a Meaningful Use 2 Certified EHR for over 80 hospitals for Community Health System, Inc.  CHS, Inc.is one of the nation's leading operators of general acute care hospitals.

## EDUCATION

- Flexible Internship, Carraway Methodist Medical Center, Birmingham, AL, 1978 – 1979
- Doctor of Medicine, University of South Florida College of Medicine, 1975 – 1978
- BA, Biology, University of South Florida, 1971 – 1975

## PROFESSIONAL EXPERIENCE

- **Senior Vice President Clinical Affairs, Wellpath October 2019 – Current**
- **Chief Clinical Officer for Wellpath Inc. and Correct Care Solutions May 2015 to September 2019**
- **Correctional Healthcare Consultant September 2013 – Current**
- **Clinical Assistant Professor, Department of Surgery,Division of Correctional Medicine Nova Southeaster University, College of Osteopathic Medcine October 2013 - 2019**
- **Health IT Physician Consultant: December 2013- September 2014**: Electronic Medical Record Deployment for Community Health Services.
- **Clinical Reviewer/Physician Liaison Vanderbilt University Medical Center for Patient and Professional Advocacy October 2013 – April 2014**
  Providing physician overview for coding and analyzing surveillance data in PARS, the Patient Advocacy Reporting System, to identify unnecessary variation in safety and quality outcomes.
- **Chief Medical Officer, Corizon, Brentwood, TN December 2011 – March 2013.**
  Chief Medical Officer of one of the nation's largest inmate healthcare providers, supervises and directs healthcare delivery for contracts covering over 300,000 inmates in 29 states.
- **Chief Medical Officer Prison Health Services, Inc., Brentwood, TN, October 2000 – June 2011.**
  Coordinated an extensive CQI program including the review of over 3,000 sentinel events, standardizing the reporting of process measures and recruiting and placing a Physician Patient Safety Officer .
  Developed and deployed a credentialing program which became URAC certified.
  Launched a Disease Management program for Medical, Psychiatry, and Infectious Diseases with a focus on Hepatitis C and HIV disease program.

Shaped a utilization management program using InterQual software to provide prospective, concurrent and retrospective Utilization Management.

Chaired the multidisciplinary Pharmacy and Therapeutics Committee responsible for formulary management of over 250,000 inmate patients over a 10 year period.

Provided oversight for telemedicine service at over 120 facilities in 15 states.

- **InPhyNet Hospital Services (formerly Emergency Medical Services Associates, Inc.), Ft. Lauderdale, FL, 1982 – 2000.**
  Provided point of care emergency medicine in 14 states. Provided supervision for care delivered in over 20 states.

  Supervised service provided to Department of Defense beneficiaries in Army, Navy, Air Force and Marine facilities.

  Regional Medical Director for South Broward Hospital District in Hollywood Florida providing direct patient care and supervising care for over 200,000 ED visits per year at 3 Adult Emergency Departments, 2 Pediatric Emergency Departments and an Acute Psychiatric facility.

- **National Health Service Corps: Rural Manpower, Shortage Area, Smithfield, NC, 1979 – 1982.**


## PROFESSIONAL LICENSES AND CERTIFICATIONS

- Medical Licensure in Florida, North Carolina, Michigan, Pennsylvania and Colorado with emergency pandemic licensure in Maine and Massachusetts
- American Board of Emergency Medicine, Re-Certification in 2000 and 2011: Current through December 2021
- Certified Correctional Health Professional, 2008
- American Society of Professionals in Patient Safety (ASPPS)
- Just Culture Certification
- DEAx Waiver Ceritifed

## PROFESSIONAL ASSOCIATIONS

- Fellow American College of Emergency Physicians
- Fellow American College of Correctional Physicians
- American Medical Association
- Society of Correctional Physicians
- American Correctional Association
- National Commission on Correctional Health Care

# Exhibit B



## Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities
## Guidance for Correctional & Detention Facilities

Updated July 22, 2020          <u>Print</u>

## Coronavirus Disease 2019 (COVID-19)          

> The US Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the CDC website periodically for updated interim guidance.
>
> This document provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors. Recommendations may need to be revised as more information becomes available.

# Who is the intended audience for this guidance?

This document is intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities (including but not limited to federal and state prisons, local jails, and detention centers), law enforcement agencies that have custodial authority for detained populations (i.e., U.S. Immigration and Customs Enforcement and U.S. Marshals Service), and their respective health departments, to assist in preparing for potential introduction, spread, and mitigation of SARS-CoV-2 (the virus that causes Coronavirus Disease 2019, or COVID-19) in their facilities. In general, the document uses terminology referring to correctional environments but can also be applied to civil and pre-trial detention settings.

This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes.

**The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.** Facilities should contact CDC or their state, local, territorial, and/or tribal public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.

# Why is this guidance being issued?

Correctional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for control of SARS-CoV-2 transmission among incarcerated/detained persons, staff, and visitors. Consistent application of preparation, prevention, and management measures can help reduce the risk of transmission and severe disease from COVID-19.

- Incarcerated/detained persons live, work, eat, study, and participate in activities within congregate environments, heightening the potential for SARS-CoV-2 to spread once introduced.
- In most cases, incarcerated/detained persons are not permitted to leave the facility.
- Many opportunities exist for SARS-CoV-2 to be introduced into a correctional or detention facility, including daily staff movements; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members.

- Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to SARS-CoV-2 in the surrounding community or other regions.

- Persons incarcerated/detained in a particular facility often come from a variety of locations, increasing the potential to introduce SARS-CoV-2 from different geographic areas.

- The ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent hand washing) may be limited and is determined by the supplies provided in the facility and by security considerations. Many facilities restrict access to soap and paper towels and prohibit alcohol-based hand sanitizer and many disinfectants.

- Social distancing options within correctional and detention settings may be limited due to crowded living conditions.

- Incarcerated/detained persons may hesitate to report symptoms of COVID-19 or seek medical care due to co-pay requirements, stigma and fear of isolation.

- Incarcerated/detained persons and staff may have underlying medical conditions that increase their risk of severe illness from COVID-19.

- Options for medical isolation for people with COVID-19 are limited and vary depending on the type and size of facility, as well as the current level of available capacity, which is partly based on medical isolation needs for other conditions.

- Adequate levels of custody and healthcare staffing must be maintained to ensure safe operation of the facility, and options to practice social distancing through work alternatives such as working from home or reduced/alternate schedules are limited for many staff roles.

- Correctional and detention facilities can be complex settings that may include both government and private employers. Each employer is organizationally distinct and responsible for its own operational, personnel, and occupational health protocols and may be prohibited from issuing guidance or providing services to other employers or their staff within the same setting. Similarly, correctional and detention facilities may house individuals from multiple law enforcement agencies or jurisdictions subject to different policies and procedures.

- Because limited outside information is available to many incarcerated/detained persons, unease and misinformation regarding the potential for SARS-CoV-2 to spread may be high, potentially creating security and morale challenges.

CDC has issued separate COVID-19 guidance addressing healthcare infection control and clinical care for individuals with COVID-19 as well as their close contacts in community-based settings. Where relevant, community-focused guidance documents are referenced in this document and should be monitored regularly for updates, but they may require adaptation for correctional and detention settings.

This guidance document provides additional recommended best practices specifically for correctional and detention facilities. At this time, different facility types (e.g., prison vs. jail) and sizes are not differentiated. Administrators and agencies should adapt these guiding principles to the specific needs of their facility.

# What topics does this guidance include?

The guidance below includes detailed recommendations on the following topics related to COVID-19 in correctional and detention settings:

- Operational and communications preparations for COVID-19

- Enhanced cleaning/disinfecting and hygiene practices

- Social distancing strategies to increase space between individuals in the facility

- Strategies to limit transmission from visitors

- Infection control, including recommended personal protective equipment (PPE) and potential alternatives during PPE shortages

- Verbal screening and temperature check protocols for incoming incarcerated/detained individuals, staff, and visitors

- Testing considerations for SARS-CoV-2

- Medical isolation of individuals with confirmed and suspected COVID-19 and quarantine of close contacts, including considerations for cohorting when individual spaces are limited

- Healthcare evaluation for individuals with suspected COVID-19

- Clinical care for individuals with confirmed and suspected COVID-19

- Considerations for people who are at increased risk for severe illness from COVID-19

# Definitions of Commonly Used Terms

**Close contact of someone with COVID-19** – Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient). The definition of close contact does not change if the infected individual is wearing a mask or cloth face covering.

**Cloth face covering** – Cloth face coverings cover the nose and mouth and are intended to help prevent people who have the virus from transmitting it to others, even if they do not have symptoms. CDC recommends wearing cloth face coverings in public settings where other social distancing measures are difficult to maintain. Cloth face coverings prevent the person wearing the covering from spreading respiratory droplets when talking, sneezing, or coughing. If everyone wears a cloth face covering in congregate settings, the risk of exposure to SARS-CoV-2 can be reduced. Anyone who has trouble breathing, or is unconscious, incapacitated, younger than 2 years of age or otherwise unable to remove the mask without assistance should not wear a cloth face covering (for more details see Guidelines on how to safely wear cloth face coverings). **Cloth face coverings are a type of "source control," intended to help slow the spread of COVID-19 and are not personal protective equipment (PPE).** Individuals working under conditions that require PPE should not use a cloth face covering when a surgical mask or N95 is indicated (see Table 1). Surgical masks and N95 respirators should be reserved for situations where the wearer needs PPE. Detailed recommendations for wearing cloth face coverings can be found here.

**Cohorting** – In this guidance, cohorting refers to the practice of isolating multiple individuals with laboratory-confirmed COVID-19 together or quarantining close contacts of an infected person together as a group due to a limited number of individual cells. While cohorting those with confirmed COVID-19 is acceptable, cohorting individuals with suspected COVID-19 is not recommended due to high risk of transmission from infected to uninfected individuals. See Quarantine and Medical Isolation sections below for specific details about ways to implement cohorting as a harm reduction strategy to minimize the risk of disease spread and adverse health outcomes.

**Community transmission of COVID-19** – Community transmission of SARS-CoV-2 occurs when individuals are exposed to the virus through contact with someone in their local community, rather than through travel to an affected location. Once community transmission is identified in a particular area, correctional facilities and detention centers are more likely to start seeing infections inside their walls. Facilities should consult with local public health departments if assistance is needed to determine how to define "local community" in the context of SARS-CoV-2's spread. However, because all states have reported cases, all facilities should be vigilant for the virus's introduction into their populations.

**Confirmed vs. suspected COVID-19** – A person has **confirmed COVID-19** when they have received a positive result from a COVID-19 viral test, but they may or may not have symptoms. A person has **suspected COVID-19** if they show symptoms of COVID-19 but either have not been tested via a viral test or are awaiting test results. If their test result is positive, suspected COVID-19 is reclassified as confirmed COVID-19.

**Incarcerated/detained persons** – For the purpose of this document, "incarcerated/detained persons" refers to persons held in a prison, jail, detention center, or other custodial setting. The term includes those who have been sentenced (i.e., in prisons) as well as those held for pre-trial (i.e., jails) or civil purposes (i.e., detention centers). Although this guidance does not specifically reference individuals in every type of custodial setting (e.g., juvenile facilities, community confinement facilities), facility administrators can adapt this guidance to apply to their specific circumstances as needed.

**Medical isolation** – Medical isolation refers to separating someone with confirmed or suspected COVID-19 infection to prevent their contact with others and to reduce the risk of transmission. Medical isolation ends when the individual meets pre-established clinical, time-based, and/or testing criteria for release from isolation, in consultation with clinical providers and public health officials. In this context, isolation does NOT refer to punitive isolation for behavioral infractions within the custodial setting. Staff are encouraged to use the term "medical isolation" to avoid confusion, and should ensure that the conditions in medical isolation spaces are distinct from those in punitive isolation.

**Quarantine** – Quarantine refers to the practice of separating individuals who have had close contact with someone with COVID-19 to determine whether they develop symptoms or test positive for the disease. Quarantine also reduce the risk of transmission if an individual is later found to have COVID-19. Quarantine for COVID-19 should last for a period of 14 days after the exposure has ended. Ideally, each quarantined individual should be quarantined in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, and/or a quarantined individual receives a positive viral test result for SARS-CoV-2, the individual should be placed under medical isolation and evaluated by a healthcare professional. If symptoms do not develop during the 14-day period and the individual does not receive a positive viral test result for SARS-CoV-2, quarantine restrictions can be lifted. (NOTE: Some facilities may also choose to implement a "routine

result for SARS-CoV-2, quarantine restrictions can be lifted. (NOTE: Some facilities may also choose to implement a "routine intake quarantine," in which individuals newly incarcerated/detained ("new intakes") are housed separately or as a group for 14 days before being integrated into general housing. This type of quarantine is conducted to prevent introduction of SARS-CoV-2 from incoming individuals whose exposure status is unknown, rather than in response to a known exposure to someone infected with SARS-CoV-2.)

**Social distancing** – Social distancing is the practice of increasing the space between individuals and decreasing their frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them). Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19. People who have been infected with SARS-CoV-2 but do not have symptoms can still spread the infection, making social distancing even more important. Additional information about social distancing, including information on its use to reduce the spread of other viral illnesses, is available in this CDC publication . Examples of potential social distancing strategies for correctional and detention facilities are detailed in the guidance below.

**Staff** – In this document, "staff" refers to all public or private-sector employees working within a correctional facility (e.g., including private healthcare or food service workers). Except where noted, "staff" does not distinguish between healthcare, custody, and other types of staff, including private facility operators.

**Symptoms** – Symptoms of COVID-19 include cough, shortness of breath or difficulty breathing, fever, chills, muscle pain, sore throat, and new loss of taste or smell. This list is not exhaustive. Other less common symptoms have been reported, including nausea and vomiting. Like other respiratory infections, COVID-19 can vary in severity from mild to severe, and pneumonia, respiratory failure, and death are possible. COVID-19 is a novel disease, therefore the full range of signs and symptoms, the clinical course of the disease, and the individuals and populations at increased risk for severe illness are not yet fully understood. Monitor the CDC website for updates on symptoms.

# Facilities with Limited Onsite Healthcare Services

Although many large facilities such as prisons and some jails employ onsite healthcare staff and have the capacity to evaluate incarcerated/detained persons for potential illness within a dedicated healthcare space, many smaller facilities do not. Some of these facilities have access to on-call healthcare staff or providers who visit the facility every few days. Others have neither onsite healthcare capacity nor onsite medical isolation/quarantine space and must transfer ill patients to other correctional or detention facilities or local hospitals for evaluation and care.

The majority of the guidance below is designed to be applied to any correctional or detention facility, either as written or with modifications based on a facility's individual structure and resources. However, topics related to healthcare evaluation and clinical care of persons with confirmed and suspected COVID-19 infection and their close contacts may not apply directly to facilities with limited or no onsite healthcare services. It will be especially important for these types of facilities to coordinate closely with their state, local, tribal, and/or territorial health department when they identify incarcerated/detained persons or staff with confirmed or suspected COVID-19, in order to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed. The guidance makes note of strategies tailored to facilities without onsite healthcare where possible.

Note that all staff in any sized facility, regardless of the presence of onsite healthcare services, should observe guidance on recommended PPE in order to ensure their own safety when interacting with persons with confirmed and suspected COVID-19 infection.

# COVID-19 Guidance for Correctional Facilities

Guidance for correctional and detention facilities is organized into 3 sections: Operational Preparedness, Prevention, and Management of COVID-19. Recommendations across these sections should be applied simultaneously based on the progress of the outbreak in a particular facility and the surrounding community.

- **Operational Preparedness.** This guidance is intended to help facilities prepare for potential SARS-CoV-2 transmission in the facility. Strategies focus on operational and communications planning, training, and personnel practices.
- **Prevention.** This guidance is intended to help facilities prevent spread of SARS-CoV-2 within the facility and between the community and the facility. Strategies focus on reinforcing hygiene practices; intensifying cleaning and disinfection of the

facility; regular symptom screening for new intakes, visitors, and staff; continued communication with incarcerated/detained persons and staff; social distancing measures; as well as, testing symptomatic and asymptomatic individuals in correctional and detention facilities.(refer to the Interim Guidance on Testing for SARS-CoV-2 in Correctional and Detention Facilities for more information on how to implement testing in correctional and detention settings).

- **Management.** This guidance is intended to help facilities clinically manage persons with confirmed and suspected COVID-19 inside the facility and prevent further transmission of SARS-CoV-2. Strategies include medical isolation and care of incarcerated/detained persons with COVID-19 (including considerations for cohorting), quarantine and testing of close contacts, restricting movement in and out of the facility, infection control practices for interactions with persons with COVID-19 and their quarantined close contacts or contaminated items, intensified social distancing, and cleaning and disinfecting areas where infected persons spend time.

# Operational Preparedness

Administrators can plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and the importance of reporting those symptoms if they develop. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, training staff on proper use of personal protective equipment (PPE) that may be needed in the course of their duties, and communicating clearly with staff and incarcerated/detained persons about these preparations and how they may temporarily alter daily life.

# Communication and Coordination

- **Develop information-sharing systems with partners.**
  - Identify points of contact in relevant state, local, tribal, and/or territorial public health departments before SARS-CoV-2 infections develop. Actively engage with the health department to understand in advance which entity has jurisdiction to implement public health control measures for COVID-19 in a particular correctional or detention facility.
  - Create and test communications plans to disseminate critical information to incarcerated/detained persons, staff, contractors, vendors, and visitors as the pandemic progresses.
  - Communicate with other correctional facilities in the same geographic area to share information including disease surveillance and absenteeism patterns among staff.
  - Where possible, put plans in place with other jurisdictions to prevent individuals with confirmed and suspected COVID-19 and their close contacts from being transferred between jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release, or to prevent overcrowding.
  - Stay informed about updates to CDC guidance via the CDC COVID-19 website as more information becomes known.
- **Review existing influenza, all-hazards, and disaster plans, and revise for COVID-19.**
  - Train staff on the facility's COVID-19 plan. All personnel should have a basic understanding of COVID-19, how the disease is thought to spread, what the symptoms of the disease are, and what measures are being implemented and can be taken by individuals to prevent or minimize the transmission of SARS-CoV-2.
  - Ensure that **separate** physical locations (dedicated housing areas and bathrooms) have been identified to 1) isolate individuals with confirmed COVID-19 (individually or cohorted), 2) isolate individuals with suspected COVID-19 (individually – do not cohort), and 3) quarantine close contacts of those with confirmed or suspected COVID-19 (ideally individually; cohorted if necessary). The plan should include contingencies for multiple locations if numerous infected individuals and/or close contacts are identified and require medical isolation or quarantine simultaneously. See Medical Isolation and Quarantine sections below for more detailed cohorting considerations.
  - Facilities without onsite healthcare capacity should make a plan for how they will ensure that individuals with suspected COVID-19 will be isolated, evaluated, tested, and provided necessary medical care.
  - Make a list of possible social distancing strategies that could be implemented as needed at different stages of transmission intensity.
  - Designate officials who will be authorized to make decisions about escalating or de-escalating response efforts as the disease transmission patterns change.
- **Coordinate with local law enforcement and court officials.**
  - Identify legally acceptable alternatives to in-person court appearances, such as virtual court, as a social distancing measure to reduce the risk of SARS-CoV-2 transmission.

- ○ Consider options to prevent overcrowding (e.g., diverting new intakes to other facilities with available capacity, and encouraging alternatives to incarceration and other decompression strategies where allowable).
- Encourage all persons in the facility to take the following actions to protect themselves and others from COVID-19. Post signs throughout the facility and communicate this information verbally on a regular basis. Sample signage and other communications materials are available on the CDC website. Ensure that materials can be understood by non-English speakers and those with low literacy and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or have low-vision.
  - ○ For all:
    - Practice good cough and sneeze etiquette: Cover your mouth and nose with your elbow (or ideally with a tissue) rather than with your hand when you cough or sneeze, and throw all tissues in the trash immediately after use.
    - Practice good hand hygiene: Regularly wash your hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing your nose; after using the bathroom; before eating; before and after preparing food; before taking medication; and after touching garbage.
    - Wear face coverings, unless PPE is indicated.
    - Avoid touching your eyes, nose, or mouth without cleaning your hands first.
    - Avoid sharing eating utensils, dishes, and cups.
    - Avoid non-essential physical contact.
  - ○ For incarcerated/detained persons: the importance of reporting symptoms to staff; social distancing and its importance for preventing COVID-19; the purpose of quarantine and medical isolation
  - ○ For staff: stay at home when sick; if symptoms develop while on duty, leave the facility as soon as possible and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms including self-isolating at home, contacting their healthcare provider as soon as possible to determine whether they need to be evaluated and tested, and contacting their supervisor.

# Personnel Practices

- **Review the sick leave policies of each employer that operates within the facility.**
  - ○ Review policies to ensure that they are flexible, non-punitive, and actively encourage staff not to report to work when sick.
  - ○ Determine which officials will have the authority to send symptomatic staff home.
- **Identify duties that can be performed remotely.** Where possible, allowing staff to work from home can be an effective social distancing strategy to reduce the risk of SARS-CoV-2 transmission.
- **Plan for staff absences.** Staff should stay home when they are sick, or they may need to stay home to care for a sick household member or care for children in the event of school and childcare dismissals.
  - ○ Identify critical job functions and plan for alternative coverage.
  - ○ Determine minimum levels of staff in all categories required for the facility to function safely. If possible, develop a plan to secure additional staff if absenteeism due to COVID-19 threatens to bring staffing to minimum levels.
  - ○ Review CDC guidance on safety practices for critical infrastructure workers (including correctional officers, law enforcement officers, and healthcare workers) who continue to work after a potential exposure to SARS-CoV-2.
  - ○ Consider increasing keep on person (KOP) medication orders to cover 30 days in case of healthcare staff shortages.
- **Consider offering revised duties to staff who are at** increased risk for severe illness from COVID-19. Persons at increased risk may include older adults and persons of any age with serious underlying medical conditions including lung disease, moderate to severe asthma, heart disease, chronic kidney disease, severe obesity, and diabetes. See CDC's website for a complete list and check regularly for updates as more data become available.
  - ○ Consult with occupational health providers to determine whether it would be allowable to reassign duties for specific staff members to reduce their likelihood of exposure to SARS-CoV-2.
- **Make plans in advance for how to change staff duty assignments to prevent unnecessary movement between housing units during a COVID-19 outbreak.**
  - ○ If there are persons with COVID-19 inside the facility, it is **essential** for staff members to maintain a consistent duty assignment in the same area of the facility across shifts to prevent transmission across different facility areas.
  - ○ Where feasible, consider the use of telemedicine to evaluate persons with COVID-19 symptoms and other health conditions to limit the movement of healthcare staff across housing units.

- Offer the seasonal influenza vaccine to all incarcerated/detained persons (existing population and new intakes) and staff throughout the influenza season. Symptoms of COVID-19 are similar to those of influenza. Preventing influenza in a facility can speed the detection of COVID-19 and reduce pressure on healthcare resources.
- Reference the Occupational Safety and Health Administration website ⧉ for recommendations regarding worker health.
- Review CDC's guidance for businesses and employers to identify any additional strategies the facility can use within its role as an employer, or share with others.

# Operations, Supplies, and PPE Preparations

- Ensure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available and have a plan in place to restock as needed.
  - Standard medical supplies for daily clinic needs
  - Tissues
  - Liquid or foam soap when possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing
  - Ensure a sufficient supply of soap for each individual
  - Hand drying supplies
  - Alcohol-based hand sanitizer containing at least 60% alcohol (where permissible based on security restrictions)
  - Cleaning supplies, including EPA-registered disinfectants effective against SARS-CoV-2 ⧉ , the virus that causes COVID-19
  - Recommended PPE (surgical masks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls). See PPE section and Table 1 for more detailed information, including recommendations for extending the life of all PPE categories in the event of shortages, and when surgical masks are acceptable alternatives to N95s. Visit CDC's website for a calculator to help determine rate of PPE usage.
  - Cloth face coverings
  - SARS-CoV-2 specimen collection and testing supplies
- Make contingency plans for possible PPE shortages during the COVID-19 pandemic, particularly for non-healthcare workers.
  - See CDC guidance optimizing PPE supplies.
- Consider relaxing restrictions on allowing alcohol-based hand sanitizer in the secure setting, where security concerns allow. If soap and water are not available, CDC recommends cleaning hands with an alcohol-based hand sanitizer that contains at least 60% alcohol. Consider allowing staff to carry individual-sized bottles for their personal hand hygiene while on duty, and placing dispensers at facility entrances/exits and in PPE donning/doffing stations.
- Provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing. (See Hygiene section below for additional detail regarding recommended frequency and protocol for hand washing.)
  - Provide liquid or foam soap where possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing, and ensure that individuals do not share bars of soap.
- If not already in place, employers operating within the facility should establish a respiratory protection program as appropriate, to ensure that staff and incarcerated/detained persons are fit-tested for any respiratory protection they will need within the scope of their responsibilities.
- Ensure that staff and incarcerated/detained persons are trained to correctly don, doff, and dispose of PPE that they will need to use within the scope of their responsibilities.
  - See Table 1 for recommended PPE for incarcerated/detained persons and staff with varying levels of contact with persons with COVID-19 or their close contacts.
  - Visit CDC's website for PPE donning and doffing training videos and job aids 🔴 .
- Prepare to set up designated PPE donning and doffing areas outside all spaces where PPE will be used. These spaces should include:
  - A dedicated trash can for disposal of used PPE
  - A hand washing station or access to alcohol-based hand sanitizer
  - A poster demonstrating correct PPE donning and doffing procedures
- Review CDC and EPA guidance for cleaning and disinfecting of the facility.

# Prevention

Cases of COVID-19 have been documented in all 50 US states. Correctional and detention facilities can prevent introduction of SARS-CoV-2 and reduce transmission if it is already inside by reinforcing good hygiene practices among incarcerated/detained persons, staff, and visitors (including increasing access to soap and paper towels), intensifying cleaning/disinfection practices, and implementing social distancing strategies.

Because many individuals infected with SARS-CoV-2 do not display symptoms, the virus could be present in facilities before infections are identified. Good hygiene practices, vigilant symptom screening, wearing cloth face coverings (if able), and social distancing are critical in preventing further transmission.

Testing symptomatic and asymptomatic individuals and initiating medical isolation for suspected and confirmed cases and quarantine for close contacts, can help prevent spread of SARS-CoV-2.

## Operations

- Stay in communication with partners about your facility's current situation.
  - State, local, territorial, and/or tribal health departments
  - Other correctional facilities
- Communicate with the public about any changes to facility operations, including visitation programs.
- Limit transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release, or to prevent overcrowding.
  - Consider postponing non-urgent outside medical visits. Use telehealth to the extent possible as a social distancing measure within the facility and to help minimize movement between the facility and the community.
  - If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for suspected COVID-19 infection – including giving the individual a cloth face covering (unless contraindicated), if not already wearing one, immediately placing them under medical isolation, and evaluating them for SARS-CoV-2 testing.
  - Ensure that the receiving facility has capacity to properly quarantine or isolate the individual upon arrival.
  - See Transportation section below on precautions to use when transporting an individual with confirmed or suspected COVID-19.
- Make every possible effort to modify staff assignments to minimize movement across housing units and other areas of the facility. For example, ensure that the same staff are assigned to the same housing unit across shifts to prevent cross-contamination from units where infected individuals have been identified to units with no infections.
- Consider suspending work release and other programs that involve movement of incarcerated/detained individuals in and out of the facility, especially if the work release assignment is in another congregate setting, such as a food processing plant
- Implement lawful alternatives to in-person court appearances where permissible.
- Where relevant, consider suspending co-pays for incarcerated/detained persons seeking medical evaluation for possible COVID-19 symptoms.
- Limit the number of operational entrances and exits to the facility.

Where feasible, consider establishing an on-site laundry option for staff so that they can change out of their uniforms, launder them at the facility, and wear street clothes and shoes home. If on-site laundry for staff is not feasible, encourage them to change clothes before they leave the work site, and provide a location for them to do so. This practice may help minimize the risk of transmitting SARS-CoV-2 between the facility and the community.

## Cleaning and Disinfecting Practices

- Even if COVID-19 has not yet been identified inside the facility or in the surrounding community, implement intensified cleaning and disinfecting procedures according to the recommendations below. These measures can help prevent spread of SARS-CoV-2 if introduced, and if already present through asymptomatic infections.

- **Adhere to** CDC recommendations for cleaning and disinfection during the COVID-19 response**. Monitor these recommendations for updates.
  - Visit the CDC website for a tool to help implement cleaning and disinfection.
  - Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, telephones, and computer equipment).
  - Staff should clean shared equipment (e.g., radios, service weapons, keys, handcuffs) several times per day and when the use of the equipment has concluded.
  - Use household cleaners and EPA-registered disinfectants effective against SARS-CoV-2, the virus that causes COVID-19 ⧉ as appropriate for the surface.
    - Follow label instructions for safe and effective use of the product, including precautions that should be taken when applying the product, such as wearing gloves and making sure there is good ventilation during use, and around people.
    - Clean according to label instructions, including for pre-cleaning steps, product dilution, contact time, and potable water rinse directions, if applicable, in order to ensure the product is effective and does not present an undue risk to users and others. The contact time is the amount of time the surface needs to be treated for the product to work. Many product labels recommend keeping the surface wet for a specific amount of time.
- **Consider increasing the number of staff and/or incarcerated/detained persons trained and responsible for cleaning common areas to ensure continual cleaning of these areas throughout the day.**
- **Ensure adequate supplies to support intensified cleaning and disinfection practices and have a plan in place to restock rapidly if needed.**

# Hygiene

- **Encourage all staff and incarcerated/detained persons to wear a** cloth face covering **as much as safely possible, to prevent transmission of SARS-CoV-2 through respiratory droplets that are created when a person talks, coughs, or sneezes ("source control").**
  - Provide cloth face coverings at no cost to incarcerated/detained individuals and launder them routinely.
  - Clearly explain the purpose of cloth face coverings and when their use may be contraindicated. Because many individuals with COVID-19 do not have symptoms, it is important for everyone to wear cloth face coverings in order to protect each other: "My mask protects you, your mask protects me."
  - Ensure staff know that cloth face coverings should not be used as a substitute for surgical masks or N95 respirators that may be required based on an individual's scope of duties. Cloth face coverings are not PPE, but are worn to protect others in the surrounding area from respiratory droplets generated by the wearer.
  - Surgical masks may also be used as source control but should be conserved for situations requiring PPE.
- **Reinforce** healthy hygiene practices**, and provide and continually restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms and waiting rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).**
- **Provide incarcerated/detained persons and staff no-cost access to:**
  - **Soap** – Provide liquid or foam soap where possible. If bar soap must be used, ensure that it does not irritate the skin, as this would discourage frequent hand washing, and ensure that individuals are not sharing bars of soap.
  - **Running water, and hand drying machines or disposable paper towels** for hand washing
  - **Tissues** and (where possible) no-touch trash receptacles for disposal
  - Cloth face coverings
- **Provide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions.** Consider allowing staff to carry individual-sized bottles to maintain hand hygiene.
- **Communicate that sharing drugs and drug preparation equipment can spread SARS-CoV-2 due to potential contamination of shared items and close contact between individuals.**

# Testing for SARS-CoV-2

Correctional and detention facilities are high-density congregate settings that present unique challenges to implementing testing for SARS-CoV-2, the virus that causes COVID-19. Refer to Testing guidance for details regarding testing strategies in correctional settings.

# Prevention Practices for Incarcerated/Detained Persons

- Provide cloth face coverings (unless contraindicated) and perform pre-intake symptom screening and temperature checks for all new entrants in order to identify and immediately place individuals with symptoms under medical isolation. Screening should take place in an outdoor space prior to entry, in the sally port, or at the point of entry into the facility immediately upon entry, before beginning the intake process. See Screening section below for the wording of screening questions and a recommended procedure to safely perform a temperature check. Staff performing temperature checks should wear recommended PPE (see PPE section below).
  - If an individual has symptoms of COVID-19:
    - Require the individual to wear a cloth face covering (as much as possible, use cloth face coverings in order to reserve surgical masks for situations requiring PPE). Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a cloth face covering.
    - Ensure that staff who have direct contact with the symptomatic individual wear recommended PPE.
    - Place the individual under medical isolation and refer to healthcare staff for further evaluation. (See Infection Control and Clinical Care sections below.)
    - Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective medical isolation and necessary medical care. See Transport section and coordinate with the receiving facility.
  - If an individual is an asymptomatic close contact of someone with COVID-19:
    - Quarantine the individual and monitor for symptoms at least once per day (ideally twice per day) for 14 days. (See Quarantine section below.)
    - Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective quarantine and necessary medical care.
- Implement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of symptoms), and to minimize mixing of individuals from different housing units. Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities. Example strategies with varying levels of intensity include:
  - **Common areas:**
    - Enforce increased space between individuals in holding cells as well as in lines and waiting areas such as intake (e.g., remove every other chair in a waiting area)
  - **Recreation:**
    - Choose recreation spaces where individuals can spread out
    - Stagger time in recreation spaces
    - Restrict recreation space usage to a single housing unit per space (where feasible)
  - **Meals:**
    - Stagger meals in the dining hall (one housing unit at a time)
    - Rearrange seating in the dining hall so that there is more space between individuals (e.g., remove every other chair and use only one side of the table)
    - Provide meals inside housing units or cells
  - **Group activities:**
    - Limit the size of group activities
    - Increase space between individuals during group activities
    - Suspend group programs where participants are likely to be in closer contact than they are in their housing environment
    - Consider alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out
  - **Housing:**
    - If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.)
    - Arrange bunks so that individuals sleep head to foot to increase the distance between their faces
    - Minimize the number of individuals housed in the same room as much as possible
    - Rearrange scheduled movements to minimize mixing of individuals from different housing areas

- - Rearrange scheduled movements to minimize mixing of individuals from different housing areas

  - ○ **Work details:**
    - Modify work detail assignments so that each detail includes only individuals from a single housing unit.

  - ○ **Medical:**
    - If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit. If this is not feasible, consider staggering individuals' sick call visits.
    - Stagger pill line, or stage pill line within individual housing units.
    - Identify opportunities to implement telemedicine to minimize the movement of healthcare staff across multiple housing units and to minimize the movement of ill individuals through the facility.
    - Designate a room near the intake area to evaluate new entrants who are flagged by the intake symptom screening process before they move to other parts of the facility.

- **Note that if group activities are discontinued, it will be important to identify alternative forms of activity to support the mental health of incarcerated/detained persons.**
- **Provide** up-to-date information about COVID-19 **to incarcerated/detained persons on a regular basis.** As much as possible, provide this information in person and allow opportunities for incarcerated/detained individuals to ask questions (e.g., town hall format if social distancing is feasible, or informal peer-to-peer education). Updates should address:
  - ○ Symptoms of COVID-19 and its health risks
  - ○ Reminders to report COVID-19 symptoms to staff at the first sign of illness
    - Address concerns related to reporting symptoms (e.g., being sent to medical isolation), explain the need to report symptoms immediately to protect everyone, and explain the differences between medical isolation and solitary confinement.
  - ○ Reminders to use cloth face coverings as much as possible
  - ○ Changes to the daily routine and how they can contribute to risk reduction

# Prevention Practices for Staff

- **Remind staff to stay at home if they are sick.** Ensure staff are aware that they will not be able to enter the facility if they have symptoms of COVID-19, and that they will be expected to leave the facility as soon as possible if they develop symptoms while on duty.
- See strategies for testing of asymptomatic incarcerated or detained individuals and staff without known SARS-CoV-2 exposure for early identification of SARS-CoV-2 in correctional and detention facilities.
- **Perform verbal screening and temperature checks for all staff daily on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.
  - ○ In very small facilities with only a few staff, consider self-monitoring or virtual monitoring (e.g., reporting to a central authority via phone).
  - ○ Send staff home who do not clear the screening process, and advise them to follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.
- **Provide staff with** up-to-date information about COVID-19 **and about facility policies on a regular basis, including:**
  - ○ Symptoms of COVID-19 and its health risks
  - ○ Employers' sick leave policy
- **If staff develop a fever or other** symptoms of COVID-19 **while at work**, they should immediately put on a cloth face covering (if not already wearing one), inform supervisor, leave the facility, and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

If a staff member has a confirmed SARS-CoV-2 infection, the relevant employers should inform other staff about their possible exposure in the workplace but should maintain the infected employee's confidentiality as required by the Americans with Disabilities Act ☐ .

Follow guidance from the Equal Employment Opportunity Commission ☐ when offering testing to staff. Any time a positive test result is identified, ensure that the individual is rapidly notified, connected to appropriate medical care, and advised how to self-isolate.

- **Staff identified as close contacts of someone with COVID-19 should self-quarantine at home for 14 days, unless a shortage of critical staff precludes quarantine.**

shortage of critical staff precludes quarantine.

- Staff identified as close contacts should self-monitor for symptoms and consider seeking testing.
- Refer to CDC guidelines for further recommendations regarding home quarantine.
- **To ensure continuity of operations, critical infrastructure workers (including corrections officers, law enforcement officers, and healthcare staff) may be permitted to continue work following potential exposure to SARS-CoV-2 , provided that they remain** <u>asymptomatic</u> **and additional precautions are implemented to protect them and the community.**
  - **Screening:** The facility should ensure that temperature and symptom screening takes place daily before the staff member enters the facility.
  - **Regular Monitoring:** The staff member should self-monitor under the supervision of their employer's occupational health program. If symptoms develop, they should follow CDC guidance on isolation with COVID-19 symptoms.
  - **Wear a Cloth Face Covering:** The staff member should wear a cloth face covering (unless contraindicated) at all times while in the workplace for 14 days after the last exposure (if not already wearing one due to universal use of cloth face coverings).
  - **Social Distance:** The staff member should maintain 6 feet between themselves and others and practice social distancing as work duties permit.
  - **Disinfect and Clean Workspaces:** The facility should continue enhanced cleaning and disinfecting practices in all areas including offices, bathrooms, common areas, and shared equipment.
- Staff with confirmed or suspected COVID-19 should inform workplace and personal contacts immediately. These staff should be required to meet CDC criteria for ending home isolation before returning to work. Monitor CDC guidance on discontinuing home isolation regularly, as circumstances evolve rapidly.
- When feasible and consistent with security priorities, encourage staff to maintain a distance of 6 feet or more from an individual with COVID-19 symptoms while interviewing, escorting, or interacting in other ways, and to wear recommended PPE if closer contact is necessary.
- Ask staff to keep interactions with individuals with COVID-19 symptoms as brief as possible.

# Prevention Practices for Visitors

- If possible, communicate with potential visitors to discourage contact visits in the interest of their own health and the health of their family members and friends inside the facility.
- Require visitors to wear cloth face coverings (unless contraindicated), and perform verbal screening and temperature checks for all visitors and volunteers on entry. See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.
  - Staff performing temperature checks should wear recommended PPE.
  - Exclude visitors and volunteers who do not clear the screening process or who decline screening.
- Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas.
- Provide visitors and volunteers with information to prepare them for screening.
  - Instruct visitors to postpone their visit if they have COVID-19 symptoms.
  - If possible, inform potential visitors and volunteers before they travel to the facility that they should expect to be screened for COVID-19 (including a temperature check), and will be unable to enter the facility if they do not clear the screening process or if they decline screening.
  - Display signage outside visiting areas explaining the COVID-19 symptom screening and temperature check process. Ensure that materials are understandable for non-English speakers and those with low literacy.
- Promote non-contact visits:
  - Encourage incarcerated/detained persons to limit in-person visits in the interest of their own health and the health of their visitors.
  - Consider reducing or temporarily eliminating the cost of phone calls for incarcerated/detained persons.
  - Consider increasing incarcerated/detained persons' telephone privileges to promote mental health and reduce exposure from direct contact with community visitors.
- Consider suspending or modifying visitation programs, if legally permissible. For example, provide access to virtual visitation options where available.
  - If moving to virtual visitation, clean electronic surfaces regularly after each use. (See Cleaning guidance below for instructions on cleaning electronic surfaces.)

- Inform potential visitors of changes to, or suspension of, visitation programs.
- Clearly communicate any visitation program changes to incarcerated/detained persons, along with the reasons for them (including protecting their health and their family and community members' health).
- If suspending contact visits, provide alternate means (e.g., phone or video visitation) for incarcerated/detained individuals to engage with legal representatives, clergy, and other individuals with whom they have legal right to consult.

NOTE: Suspending visitation should only be done in the interest of incarcerated/detained persons' physical health and the health of the general public. Visitation is important to maintain mental health. If visitation is suspended, facilities should explore alternative ways for incarcerated/detained persons to communicate with their families, friends, and other visitors in a way that is not financially burdensome for them.

- **Restrict non-essential vendors, volunteers, and tours from entering the facility.**

# Management

If there is an individual with suspected COVID-19 inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), begin implementing Management strategies while test results are pending. Essential Management strategies include placing individuals with suspected or confirmed COVID-19 under medical isolation, quarantining their close contacts, and facilitating necessary medical care, while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

Testing symptomatic and asymptomatic individuals (incarcerated or detained individuals and staff) and initiating medical isolation for suspected and confirmed cases and quarantine for close contacts, can help prevent spread of SARS-CoV-2 in correctional and detention facilities. Continue following recommendations outlined in the Preparedness and Prevention sections above.

# Operations

- **Coordinate with state, local, tribal, and/or territorial health departments.** When an individual has suspected or confirmed COVID-19, notify public health authorities and request any necessary assistance with medical isolation, evaluation, and clinical care, and contact tracing and quarantine of close contacts. See Medical Isolation, Quarantine and Clinical Care sections below.
- Implement alternate work arrangements deemed feasible in the Operational Preparedness section.
- Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release), unless necessary for medical evaluation, medical isolation/quarantine, health care, extenuating security concerns, release, or to prevent overcrowding.
- Set up PPE donning/doffing stations as described in the Preparation section.
- If possible, consider quarantining all new intakes for 14 days before they enter the facility's general population (separately from other individuals who are quarantined due to contact with someone who has COVID-19). This practice is referred to as **routine intake quarantine.**
- Consider testing all newly incarcerated/detained persons before they join the rest of the population in the correctional or detention facility.
- Minimize interactions between incarcerated/detained persons living in different housing units, to prevent transmission from one unit to another. For example, stagger mealtimes and recreation times, and consider implementing broad movement restrictions.
- Ensure that work details include only incarcerated/detained persons from a single housing unit, supervised by staff who are normally assigned to the same housing unit.
  - If a work detail provides goods or services for other housing units (e.g., food service or laundry), ensure that deliveries are made with extreme caution. For example, have a staff member from the work detail deliver prepared food to a set location, leave, and have a staff member from the delivery location pick it up. Clean and disinfect all coolers, carts, and other objects involved in the delivery.
- Incorporate COVID-19 prevention practices into release planning.
  - Consider implementing a release quarantine (ideally in single cells) for 14 days prior to individuals' projected release date.

- Consider testing individuals for SARS-CoV-2 before release, particularly if they will be released to a congregate setting or to a household with persons at increased risk for severe illness from COVID-19.

- Screen all releasing individuals for COVID-19 symptoms and perform a temperature check (see Screening section below.)

  - If an individual does not clear the screening process, follow the protocol for suspected COVID-19 – including giving the individual a cloth face covering, if not already wearing one, immediately placing them under medical isolation, and evaluating them for SARS-CoV-2 testing.

  - If the individual is released from the facility before the recommended medical isolation period is complete, discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning. Make direct linkages to community resources to ensure proper medical isolation and access to medical care.

  - Before releasing an incarcerated/detained individual who has confirmed or suspected COVID-19, or is a close contact of someone with COVID-19, contact local public health officials to ensure they are aware of the individual's release and anticipated location. If the individual will be released to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation or quarantine as needed.

- **Incorporate COVID-19 prevention practices into re-entry programming.**
  - Ensure that facility re-entry programs include information on accessing housing, social services, mental health services, and medical care within the context of social distancing restrictions and limited community business operations related to COVID-19.

    - Provide individual about to be released with COVID-19 prevention information, hand hygiene supplies, and cloth face coverings.

    - Link individuals who need medication-assisted treatment for opioid use disorder to substance use, harm reduction, and/or recovery support systems ⬚ . If the surrounding community is under movement restrictions due to COVID-19, ensure that referrals direct releasing individuals to programs that are continuing operations.

    - Link releasing individuals to Medicaid enrollment and healthcare resources ⬚ , including continuity of care for chronic conditions that may place an individual at increased risk for severe illness from COVID-19.

    - When possible, encourage releasing individuals to seek housing options among their family or friends in the community, to prevent crowding in other congregate settings such as homeless shelters. When linking individuals to shared housing, link preferentially to accommodations with the greatest capacity for social distancing.

## Hygiene

- Continue to ensure that hand hygiene supplies are well-stocked in all areas of the facility (see above).
- Continue to emphasize practicing good hand hygiene and cough etiquette (see above).

## Cleaning and Disinfecting Practices

- Continue adhering to recommended cleaning and disinfection procedures for the facility at large (see above).

- Reference specific cleaning and disinfection procedures for areas where individuals with COVID-19 spend time (see below).

## Management of Incarcerated/Detained Persons with COVID–19 Symptoms

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space for medical isolation should coordinate with local public health officials to ensure that individuals with suspected COVID-19 will be effectively isolated, evaluated, tested (if indicated), and given care.

- Staff interacting with incarcerated/detained individuals with COVID-19 symptoms should wear recommended PPE (see Table 1).

- If possible, designate a room near each housing unit for healthcare staff to evaluate individuals with COVID-19 symptoms, rather than having symptomatic individuals walk through the facility to be evaluated in the medical unit.
- Incarcerated/detained individuals with COVID-19 symptoms should wear a cloth face covering (unless contraindicated) and should be placed under medical isolation immediately. See Medical Isolation section below.
- Medical staff should evaluate symptomatic individuals to determine whether SARS-CoV-2 testing is indicated. Refer to CDC guidelines for information on evaluation and testing See Infection Control and Clinical Care sections below as well. Incarcerated/detained persons with symptoms are included in the high-priority group for testing in CDC's recommendations due to the high risk of transmission within congregate settings.
  - If the individual's SARS-CoV-2 test is positive, continue medical isolation. (See Medical Isolation section below.)
  - If the SARS-CoV-2 test is negative, the individual can be returned to their prior housing assignment unless they require further medical assessment or care or if they need to be quarantined as a close contact of someone with COVID-19.
- Work with public health or private labs, as available, to access testing supplies or services.

# Medical Isolation of Individuals with Confirmed or Suspected COVID-19

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity, or without sufficient space to implement effective medical isolation, should coordinate with local public health officials to ensure that individuals with confirmed or suspected COVID-19 will be appropriately isolated, evaluated, tested, and given care.

  - As soon as an individual develops symptoms of COVID-19 or tests positive for SARS-CoV-2 they should be given a cloth face covering (if not already wearing one and if it can be worn safely), immediately placed under medical isolation in a separate environment from other individuals, and medically evaluated.
  - Ensure that medical isolation for COVID-19 is distinct from punitive solitary confinement of incarcerated/detained individuals, both in name and in practice. Because of limited individual housing spaces within many correctional and detention facilities, infected individuals are often placed in the same housing spaces that are used for solitary confinement. To avoid being placed in these conditions, incarcerated/detained individuals may be hesitant to report COVID-19 symptoms, leading to continued transmission within shared housing spaces and, potentially, lack of health care and adverse health outcomes for infected individuals who delay reporting symptoms. Ensure that medical isolation is *operationally* distinct from solitary confinement, even if the same housing spaces are used for both. For example:
    - Ensure that individuals under medical isolation receive regular visits from medical staff and have access to mental health services.
    - Make efforts to provide similar access to radio, TV, reading materials, personal property, and commissary as would be available in individuals' regular housing units.
    - Consider allowing increased telephone privileges without a cost barrier to maintain mental health and connection with others while isolated.
    - Communicate regularly with isolated individuals about the duration and purpose of their medical isolation period.

- Keep the individual's movement outside the medical isolation space to an absolute minimum.
  - Provide medical care to isolated individuals inside the medical isolation space, unless they need to be transferred to a healthcare facility. See Infection Control and Clinical Care sections for additional details.
  - Serve meals inside the medical isolation space.
  - Exclude the individual from all group activities.
  - Assign the isolated individual(s) a dedicated bathroom when possible. When a dedicated bathroom is not feasible, do not reduce access to restrooms or showers as a result. Clean and disinfect areas used by infected individuals frequently on an ongoing basis during medical isolation.
- Ensure that the individual is wearing a cloth face covering if they must leave the medical isolation space for any reason, and whenever another individual enters. Provide clean masks as needed. Masks should be washed routinely and changed when visibly soiled or wet.
- If the facility is housing individuals with confirmed COVID-19 as a cohort:
  - Only individuals with laboratory-confirmed COVID-19 should be placed under medical isolation as a cohort. Do not cohort those with confirmed COVID-19 with those with suspected COVID-19, or with close contacts of individuals

with confirmed or suspected COVID-19.

- Do not house individuals with undiagnosed respiratory infection (who do not meet the criteria of suspected COVID-19) with individuals with suspected COVID-19.
- Ensure that cohorted groups of people with confirmed COVID-19 wear cloth face coverings whenever anyone (including staff) enters the isolation space. (Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a cloth face covering.)
- Use one large space for cohorted medical isolation rather than several smaller spaces. This practice will conserve PPE and reduce the chance of cross-contamination across different parts of the facility.

- **If the facility is housing individuals with confirmed COVID-19 as a cohort, use a well-ventilated room with solid walls and a solid door that closes fully.**
- **If possible, avoid transferring infected individual(s) to another facility unless necessary for medical care. If transfer is necessary, see** Transport **section for safe transport guidance.**
- **Staff assignments to isolation spaces should remain as consistent as possible, and these staff should limit their movements to other parts of the facility as much as possible.** These staff should wear recommended PPE as appropriate for their level of contact with the individual under medical isolation (see PPE section below) and should limit their own movement between different parts of the facility.
  - If staff must serve multiple areas of the facility, ensure that they change PPE when leaving the isolation space. If PPE supplies necessitate reuse, ensure that staff move only from areas of low to high exposure risk while wearing the same PPE, to prevent cross-contamination. For example, start in a housing unit where no one is known to be infected, then move to a space used as quarantine for close contacts, and end in an isolation unit. Ensure that staff are highly trained in infection control practices, including use of recommended PPE.
- **Minimize transfer of individuals with confirmed or suspected COVID-19 between spaces within the facility.**
- **Provide individuals under medical isolation with tissues and, if permissible, a lined no-touch trash receptacle.** Instruct them to:
  - **Cover** their mouth and nose with a tissue when they cough or sneeze
  - **Dispose** of used tissues immediately in the lined trash receptacle
  - Wash hands immediately with soap and water for at least 20 seconds. If soap and water are not available, clean hands with an alcohol-based hand sanitizer that contains at least 60% alcohol (where security concerns permit). Ensure that hand washing supplies are continually restocked.
- **Maintain medical isolation at least until CDC criteria for discontinuing home-based isolation have been met. These criteria have changed since CDC corrections guidance was originally issued and may continue to change as new data become available. Monitor the sites linked below regularly for updates.** This content will not be outlined explicitly in this document due to rapid pace of change.
  - CDC's recommended strategy for release from isolation can be found here.
  - Detailed information about the data informing the symptom-based strategy, and considerations for extended isolation periods for persons in congregate settings including corrections, can be found here.
  - If persons will require ongoing care by medical providers, discontinuation of transmission-based precautions (PPE) should be based on similar criteria found here.

## Cleaning Spaces where Individuals with COVID-19 Spend Time

- **Ensure that staff and incarcerated/detained persons performing cleaning wear recommended PPE.** (See PPE section below.)
- **Thoroughly and frequently** clean and disinfect **all areas where individuals with confirmed or suspected COVID-19 spend time.**
  - After an individual has been medically isolated for COVID-19 close off areas that they have used prior to isolation. If possible, open outside doors and windows to increase air circulation in the area. Wait as long as practical, up to 24 hours under the poorest air exchange conditions (consult CDC Guidelines for Environmental Infection Control in Health-Care Facilities for wait time based on different ventilation conditions) before beginning to clean and disinfect, to minimize potential for exposure to respiratory droplets.
  - Clean and disinfect all areas (e.g., cells, bathrooms, and common areas) used by the infected individual, focusing especially on frequently touched surfaces (see list above in Prevention section).
  - Clean and disinfect areas used by infected individuals frequently on an ongoing basis during medical isolation.
- **Hard (non-porous) surface cleaning and disinfection**

- If surfaces are soiled, they should be cleaned using a detergent or soap and water prior to disinfection.

- Consult the list of products that are EPA-approved for use against the virus that causes COVID-19 ⧉ . Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).

- If EPA-approved disinfectants are not available, diluted household bleach solutions can be used if appropriate for the surface. Unexpired household bleach will be effective against coronaviruses when properly diluted.
  - Use bleach containing 5.25%–8.25% sodium hypochlorite. Do not use a bleach product if the percentage is not in this range or is not specified.
  - Follow the manufacturer's application instructions for the surface, ensuring a contact time of at least 1 minute.
  - Ensure proper ventilation during and after application.
  - Check to ensure the product is not past its expiration date.
  - Never mix household bleach with ammonia or any other cleanser. This can cause fumes that may be very dangerous to breathe in.

- Prepare a bleach solution by mixing:
  - 5 tablespoons (1/3rd cup) of 5.25%–8.25% bleach per gallon of room temperature water

    OR
  - 4 teaspoons of 5.25%–8.25% bleach per quart of room temperature water

- Bleach solutions will be effective for disinfection up to 24 hours.

- Alcohol solutions with at least 70% alcohol may also be used.

- **Soft (porous) surface cleaning and disinfection**
  - For soft (porous) surfaces such as carpeted floors and rugs, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:
    - If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.
    - Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 ⧉ and are suitable for porous surfaces.

- **Electronics cleaning and disinfection**
  - For electronics such as tablets, touch screens, keyboards, and remote controls, remove visible contamination if present.
    - Follow the manufacturer's instructions for all cleaning and disinfection products.
    - Consider use of wipeable covers for electronics.
    - If no manufacturer guidance is available, consider the use of alcohol-based wipes or spray containing at least 70% alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

  Additional information on cleaning and disinfection of communal facilities such can be found on CDC's website.

- **Food service items.** Individuals under medical isolation should throw disposable food service items in the trash in their medical isolation room. Non-disposable food service items should be handled with gloves and washed following food safety requirements. Individuals handling used food service items should clean their hands immediately after removing gloves.

- **Laundry from individuals with COVID-19 can be washed with other's laundry.**
  - Individuals handling laundry from those with COVID-19 should wear disposable gloves and gown, discard after each use, and clean their hands immediately after.
  - Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air. Ensure that individuals performing cleaning wear recommended PPE (see PPE section below).
  - Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.
  - Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

# Transporting Individuals with Confirmed and Suspected COVID-19 and Quarantined Close Contacts

- Refer to CDC guidance for Emergency Medical Services (EMS) on safely transporting individuals with confirmed or suspected COVID-19. This guidance includes considerations for vehicle type, air circulation, communication with the receiving facility, and cleaning the vehicle after transport.
  - If the transport vehicle is not equipped with the features described in the EMS guidance, at minimum drive with the windows down and ensure that the fan is set to high, in non-recirculating mode. If the vehicle has a ceiling hatch, keep it open.
- Use the same precautions when transporting individuals under quarantine as close contacts of someone with COVID-19.
- See Table 1 for the recommended PPE for staff transporting someone with COVID-19.

## Quarantining Close Contacts of Individuals with COVID‑19

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space to implement effective quarantine should coordinate with local public health officials to ensure that close contacts of individuals with COVID-19 will be effectively quarantined and medically monitored.

- To determine who is considered a close contact of an individual with COVID-19, see definition of close contact above and the Interim Guidance on Developing a COVID-19 Case Investigation and Contact Tracing Plan 🔗 for more information.
- Contact tracing can be a useful tool to help contain disease outbreaks. When deciding whether to perform contact tracing, consider the following:
  - Have a plan in place for how close contacts of individuals with COVID-19 will be managed, including quarantine logistics.
  - Contact tracing can be especially impactful when:
    - There is a small number of infected individuals in the facility or in a particular housing unit. Aggressively tracing close contacts can help curb transmission before many other individuals are exposed.
    - The infected individual is a staff member or an incarcerated/detained individual who has had close contact with individuals from other housing units or with other staff. Identifying those close contacts can help prevent spread to other parts of the facility.
    - The infected individual is a staff member or an incarcerated/detained individual who has recently visited a community setting. In this situation, identifying close contacts can help reduce transmission from the facility into the community.
  - Contact tracing may be more feasible and effective in settings where incarcerated/detained individuals have limited contact with others (e.g., celled housing units), compared to settings where close contact is frequent and relatively uncontrolled (e.g., open dormitory housing units).
  - If there is a large number of individuals with COVID-19 in the facility, contact tracing may become difficult to manage. Under such conditions, consider broad-based testing in order to identify infections and prevent further transmission.
- Incarcerated/detained persons who are close contacts of someone with confirmed or suspected COVID-19 (whether the infected individual is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days (Refer to the Interim Guidance on Developing a COVID-19 Case Investigation and Contact Tracing Plan 🔗 for more information):
  - If the close contact is tested for SARS-CoV-2 and tests positive for SARS-CoV-2, the individual should be medically isolated rather than quarantined.
  - If quarantined individual is tested during quarantine and they test negative, they should continue to quarantine for a full 14 days after last exposure and follow all recommendations of public health authorities.
  - If an individual is quarantined due to contact with someone with suspected COVID-19 who is subsequently tested and receives a negative result, they can be released from quarantine and retesting should be considered. See Interim Guidance on Testing for SARS-CoV-2 in Correctional and Detention Facilities for more information about testing strategies in correctional and detention settings.
  - Testing is recommended for all close contacts 🔗 of persons with SARS-CoV-2 infection, regardless of whether the close contacts have symptoms.
    - Medically isolate those who test positive to prevent further transmission.
    - Asymptomatic close contacts testing negative should still quarantine for 14 days from their last exposure
  - Keep a quarantined individual's movement outside the quarantine space to an absolute minimum.
    - Provide medical evaluation and care inside or near the quarantine space when possible.
    - Serve meals inside the quarantine space.

■ Serve meals inside the quarantine space.

- Exclude the quarantined individual from all group activities.

- Assign the quarantined individual a dedicated bathroom when possible. When a dedicated bathroom is not feasible, do not reduce access to restrooms or showers as a result.

- **Staff assignments to quarantine spaces should remain as consistent as possible, and these staff should limit their movements to other parts of the facility.** These staff should wear recommended PPE as appropriate for their level of contact with the individuals under quarantine (see PPE section below) and should limit their own movement between different parts of the facility.
  - If staff must serve multiple areas of the facility, ensure that they change PPE when leaving the quarantine space. If PPE supplies necessitate reuse, ensure that staff move only from areas of low to high exposure risk while wearing the same PPE, to prevent cross-contamination.

- **Facilities should make every possible effort to individually quarantine cases of confirmed COVID-19, and close contacts of individuals with confirmed, or suspected COVID-19.** Cohorting multiple quarantined close contacts could transmit SARS-CoV-2 from those who are infected to those who are uninfected. Cohorting should only be practiced if there are no other available options.
  - If cohorting of close contacts under quarantine is absolutely necessary, symptoms of all individuals should be monitored closely, and individuals with symptoms of COVID-19 or who test positive for SARS-CoV-2 should be placed under medical isolation immediately. If an individual is removed from the cohort due to COVID-19 symptoms and tests positive (or is not tested), the 14-day quarantine clock should restart for the remainder of the quarantined cohort.
  - If an entire housing unit is under quarantine due to contact with an individual from the same housing unit who has COVID-19, the entire housing unit may need to be treated as a cohort and quarantine in place.
  - Some facilities may choose to quarantine all new intakes for 14 days before moving them to the facility's general population as a general rule (not because they were exposed to someone with COVID-19). **Under this scenario, avoid mixing individuals quarantined due to exposure someone with COVID-19 with individuals undergoing routine intake quarantine.**
  - Do not add more individuals to an existing quarantine cohort after the 14-day quarantine clock has started.

- **If cohorting close contacts is absolutely necessary, be especially mindful of** those who are at increased risk for severe illness from COVID-19. Ideally, they should not be cohorted with other quarantined individuals. If cohorting is unavoidable, make all possible accommodations to reduce exposure risk for the increased-risk individuals. (For example, intensify social distancing strategies for increased-risk individuals.)

- **If single cells for isolation (of those with suspected COVID-19) and quarantine (of close contacts) are limited, prioritize them in rank order as follows to reduce the risk of further SARS-CoV-2 transmission and adverse health outcomes:**
  - Individuals with suspected COVID-19 who are at increased risk for severe illness from COVID-19
  - Others with suspected COVID-19
  - Quarantined close contacts of someone with COVID-19 who are themselves at increased risk for severe illness from COVID-19
  - Other quarantined close contacts

- **In order of preference, multiple quarantined individuals should be housed:**
  - **IDEAL:** Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully
  - Separately, in single cells with solid walls but without solid doors
  - As a cohort, in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least 6 feet of personal space assigned to each individual in all directions
  - As a cohort, in a large, well-ventilated cell with solid walls and at least 6 feet of personal space assigned to each individual in all directions, but without a solid door
  - As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells creating at least 6 feet of space between individuals. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)
  - As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section to maintain at least 6 feet of space between individuals housed in the same cell.
  - As a cohort, in individuals' regularly assigned housing unit but with no movement outside the unit (if an entire housing unit has been exposed). Employ social distancing strategies related to housing in the Prevention section above to maintain at least 6 feet of space between individuals.

- Safely transfer to another facility with capacity to quarantine in one of the above arrangements. (See Transport section.)
  (NOTE – Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

If the ideal choice does not exist in a facility, use the next best alternative as a harm reduction approach.

- **Meals should be provided to quarantined individuals in their quarantine spaces.** Individuals under quarantine should throw disposable food service items in the trash. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands immediately after removing gloves.

- **If quarantined individuals leave the quarantine space for any reason, they should wear cloth face coverings (unless contraindicated) as source control, if not already wearing them.**
  - Quarantined individuals housed as a cohort should wear cloth face coverings at all times.
  - Quarantined individuals housed alone should wear cloth face coverings whenever another individual enters the quarantine space.
  - Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a cloth face covering.

- **Staff who have close contact with quarantined individuals should wear recommended PPE if feasible based on local supply, feasibility, and safety within the scope of their duties** (see PPE section and Table 1).
  - Staff supervising asymptomatic incarcerated/detained persons under routine intake quarantine (with no known exposure to someone with COVID-19) do not need to wear PPE but should still wear a cloth face covering as source control.

- **Quarantined individuals should be monitored for COVID-19 symptoms at least once per day (ideally twice per day) including temperature checks.**
  - If an individual develops symptoms or tests positive for SARS-CoV-2, they should be moved to medical isolation (individually, and separately from those with confirmed COVID-19 and others with suspected COVID-19) immediately and further evaluated. (See Medical Isolation section above.)
  - See Screening section for a procedure to perform temperature checks safely on asymptomatic close contacts of someone with COVID-19.

- If an individual who is part of a quarantined cohort becomes symptomatic:
  - **If the individual is tested for SARS-CoV-2 and tests positive:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.
  - **If the individual is tested for SARS-CoV-2 and tests negative:** the 14-day quarantine clock for this individual and the remainder of the cohort does not need to be reset. This individual can return from medical isolation to the quarantined cohort for the remainder of the quarantine period as their symptoms and diagnosis allow.
  - **If the individual is not tested for SARS-CoV-2:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.

- **Restrict quarantined individuals from leaving the facility (including transfers to other facilities) during the 14-day quarantine period, unless released from custody or a transfer is necessary for medical care, infection control, lack of quarantine space, or extenuating security concerns.**

- **Quarantined individuals can be released from quarantine restrictions if they have not developed COVID-19 symptoms during the 14-day quarantine period.**
  - Place any individuals testing positive under medical isolation, and if the individual testing positive was part of a quarantine cohort, restart the 14-day quarantine clock for the remainder of the cohort.
  - Consider re-testing individuals in quarantine cohort every 3-7 days to identify and isolate infected individuals and to minimize the amount of time infected individuals spend with the rest of the cohort.

- **Laundry from quarantined individuals can be washed with other's laundry.**
  - Individuals handling laundry from quarantined persons should wear disposable gloves and gown, discard after each use, and clean their hands immediately after.
  - Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.
  - Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.
  - Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

# Management Strategies for Incarcerated/Detained Persons without COVID-19 Symptoms

- Provide clear information to incarcerated/detained persons about the presence of COVID-19 within the facility, and the need to increase social distancing and maintain hygiene precautions.
  - As much as possible, provide this information in person and allow opportunities for incarcerated/detained individuals to ask questions (e.g., town hall format if social distancing is feasible, or informal peer-to-peer education).
  - Ensure that information is provided in a manner that can be understood by non-English speaking individuals and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or have low-vision.
- If individuals with COVID-19 have been identified among staff or incarcerated/detained persons anywhere in a facility, consider implementing regular symptom screening and temperature checks in housing units that have *not* yet identified infections, until no additional infections have been identified in the facility for 14 days. Because some incarcerated/detained persons are hesitant to report symptoms, it is very important to monitor for symptoms closely even though doing so is resource intensive. See Screening section for a procedure to safely perform a temperature check.
- Consider additional options to intensify social distancing within the facility.

## Management Strategies for Staff

- Provide clear information to staff about the presence of COVID-19 within the facility, and the need to enforce use of universal cloth face coverings (unless contraindicated) and social distancing and to encourage hygiene precautions.
  - As much as possible, provide this information in person (if social distancing is feasible) and allow opportunities for staff to ask questions.
- Staff identified as close contacts of someone with COVID-19 should be tested for SARS-CoV-2 and self-quarantine at home for 14 days, unless a shortage of critical staff precludes quarantine of those who are asymptomatic (see considerations for critical infrastructure workers). Refer to the Interim Guidance on Developing a COVID-19 Case Investigation and Contact Tracing Plan 🔒 for more information about close contact tracing.
  - Close contacts should self-monitor for symptoms and consider seeking testing.
  - Refer to CDC guidelines for further recommendations regarding home quarantine.
- Staff who have confirmed or suspected COVID-19 should meet CDC criteria for ending home isolation before returning to work. Monitor CDC guidance on discontinuing home isolation regularly, as circumstances evolve rapidly.

# Infection Control

Infection control guidance below is applicable to all types of correctional and detention facilities. Individual facilities should assess their unique needs based on the types of exposure staff and incarcerated/detained persons may have with someone with confirmed or suspected COVID-19.

- All individuals who have the potential for direct or indirect exposure to someone with COVID-19 or infectious materials (including body substances; contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air) should follow infection control practices outlined in the CDC Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings. Monitor these guidelines regularly for updates.
  - Implement the above guidance as fully as possible within the correctional/detention context. Some of the specific language may not apply directly to healthcare settings within correctional facilities and detention centers, or to facilities without onsite healthcare capacity, and may need to be adapted to reflect facility operations and custody needs.
  - Note that these recommendations apply to staff as well as to incarcerated/detained individuals who may come in contact with contaminated materials during the course of their work placement in the facility (e.g., cleaning).
- Staff should exercise caution and wear recommended PPE when in contact with individuals showing COVID-19 symptoms. Contact should be minimized to the extent possible until the infected individual is wearing a cloth face covering (if not already wearing one and if not contraindicated) and staff are wearing PPE.
- Refer to PPE section to determine recommended PPE for individuals in contact with individuals with COVID-19, their

close contacts, and potentially contaminated items.

- Remind staff about the importance of limiting unnecessary movements between housing units and through multiple areas of the facility, to prevent cross-contamination.
- Ensure that staff and incarcerated/detained persons are trained to doff PPE after they leave a space where PPE is required, as needed within the scope of their duties and work details. Ideally, staff should don clean PPE before entering a different space within the facility that also requires PPE.
  - If PPE shortages make it impossible for staff to change PPE when they move between different spaces within the facility, ensure that they are trained to move from areas of low exposure risk ("clean") to areas of higher exposure risk ("dirty") while wearing the same PPE, to minimize the risk of contamination across different parts of the facility.

# Clinical Care for Individuals with COVID-19

- Facilities should ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms.
  - If a facility is not able to provide such evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital (including notifying the facility/hospital in advance). See Transport section. The initial medical evaluation should determine whether a symptomatic individual is at increased risk for severe illness from COVID-19. Persons at increased risk may include older adults and persons of any age with serious underlying medical conditions, including chronic kidney disease, serious heart conditions, and Type-2 diabetes. See CDC's website for a complete list and check regularly for updates as more data become available to inform this issue.
  - Based on available information, **pregnant people seem to have the same risk of COVID-19 as adults who are not pregnant.** However, much remains unknown about the risks of COVID-19 to the pregnant person, the pregnancy, and the unborn child. Prenatal and postnatal care is important for all pregnant people, including those who are incarcerated/detained. Visit the CDC website for more information on pregnancy and breastfeeding in the context of COVID-19.
- Staff evaluating and providing care for individuals with confirmed or suspected COVID-19 should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) and monitor the guidance website regularly for updates to these recommendations.
- Healthcare staff should evaluate persons with COVID-19 symptoms and those who are close contacts of someone with COVID-19 in a separate room, with the door closed if possible, while wearing recommended PPE and ensuring that the individual being evaluated is wearing a cloth face covering.
  - If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having symptomatic individuals walk through the facility to be evaluated in the medical unit.
- Clinicians are strongly encouraged to test for other causes of respiratory illness (e.g., influenza). However, presence of another illness such as influenza does not rule out COVID-19.
- When evaluating and treating persons with symptoms of COVID-19 who do not speak English, use a language line or provide a trained interpreter when possible.

# Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons

- Ensure that all staff (healthcare and non-healthcare) and incarcerated/detained persons who will have contact with infectious materials in their work placements have been trained to correctly don, doff, and dispose of PPE relevant to the level of contact they will have with individuals with confirmed and suspected COVID-19. Ensure strict adherence to OSHA PPE requirements.
  - Ensure that staff and incarcerated/detained persons who require respiratory protection (e.g., N95 respirator) for their work responsibilities have been medically cleared, trained, and fit-tested in the context of an employer's respiratory protection program. If individuals wearing N95s have facial hair, it should not protrude under the respirator seal, or extend far enough to interfere with the device's valve function (see OSHA regulations ⬚ ).
  - For PPE training materials and posters, visit the CDC website on Protecting Healthcare Personnel.
- Ensure that all staff are trained to perform hand hygiene after removing PPE.
- Ensure that PPE is readily available where and when needed, and that PPE donning/doffing/disposal stations have been set up as described in the Preparation section.
- **Recommended PPE for incarcerated/detained individuals and staff in a correctional facility** will vary based on the type of contact they will have with someone with COVID-19 and their close contacts (see Table 1). Each type of recommended PPE is

contact they have with someone with COVID-19 and their close contacts (see Table 1). Each type of recommended PPE is defined below. **As above, note that PPE shortages are anticipated in every category during the COVID-19 response.**

- ○ **N95 respirator**
  See below for guidance on when surgical masks are acceptable alternatives for N95s. N95 respirators should be prioritized when staff anticipate contact with infectious aerosols or droplets from someone with COVID-19.

- ○ **Surgical mask**
  Worn to protect the wearer from splashes, sprays, and respiratory droplets generated by others. (NOTE: Surgical masks are distinct from cloth face coverings, which are not PPE but are worn to protect others in the surrounding area from respiratory droplets generated by the wearer.)

- ○ **Eye protection**
  Goggles or disposable face shield that fully covers the front and sides of the face

- ○ **A single pair of disposable patient examination gloves**
  Gloves should be changed if they become torn or heavily contaminated.

- ○ **Disposable medical isolation gown or single-use/disposable coveralls, when feasible**
  - ■ If custody staff are unable to wear a disposable gown or coveralls because it limits access to their duty belt and gear, ensure that duty belt and gear are disinfected after close contact with an individual with confirmed or suspected COVID-19, and that clothing is changed as soon as possible and laundered. Clean and disinfect duty belt and gear prior to reuse using a household cleaning spray or wipe, according to the product label.
  - ■ If there are shortages of gowns, they should be prioritized for aerosol-generating procedures, activities where splashes and sprays are anticipated, and high-contact activities that provide opportunities for transfer of pathogens to the hands and clothing of staff.

- Note that shortages of all PPE categories have been seen during the COVID-19 response, particularly for non-healthcare workers. Guidance for optimizing the supply of each category (including strategies to reuse PPE safely) can be found on CDC's website:
  - ○ Strategies for optimizing the supply of N95 respirators
    - ■ Based on local and regional situational analysis of PPE supplies, **surgical masks are an acceptable alternative when the supply chain of respirators cannot meet the demand.** During this time, available respirators should be prioritized for staff engaging in activities that would expose them to respiratory aerosols, which pose the highest exposure risk.
  - ○ Strategies for optimizing the supply of surgical masks
    - ■ Reserve surgical masks for individuals who need PPE. Issue cloth face coverings to incarcerated/detained persons and staff as source control, in order to preserve surgical mask supply (see recommended PPE).

  - ○ Strategies for optimizing the supply of eye protection
  - ○ Strategies for optimizing the supply of gowns/coveralls
  - ○ Strategies for optimizing the supply of disposable medical gloves

## Table 1. Recommended Personal Protective Equipment (PPE) for Incarcerated/Detained Persons and Staff in a Correctional or Detention Facility during the COVID–19 Response

| Classification of Individual Wearing PPE | N95 respirator | Surgical mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| **Incarcerated/Detained Persons** | | | | | |
| Asymptomatic incarcerated/detained persons (under quarantine as close contacts of someone with COVID-19*) | Use surgical masks or cloth face coverings as source control (NOTE: cloth face coverings are NOT PPE and may not protect the wearer. Prioritize cloth face coverings for source control among all persons who do not meet criteria for N95 or surgical masks, and to conserve surgical masks for situations that require PPE.) | | | | |
| Incarcerated/detained persons who have confirmed or suspected COVID-19, or showing symptoms of COVID-19 | | | | | |

| Classification of Individual Wearing PPE | N95 respirator | Surgical mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| Incarcerated/detained persons handling laundry or used food service items from someone with COVID-19 or their close contacts | | | | X | X |
| Incarcerated/detained persons cleaning an area where someone with COVID-19 spends time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | X | X |
| **Staff** | | | | | |
| Staff having direct contact with asymptomatic incarcerated/detained persons under quarantine as close contacts of someone with COVID-19* (but not performing temperature checks or providing medical care) | Surgical mask, eye protection, and gloves as local supply and scope of duties allow. | | | | |
| Staff performing temperature checks on any group of people (staff, visitors, or incarcerated/detained persons), or providing medical care to asymptomatic quarantined persons | | X | X | X | |
| Staff having direct contact with (including transport) or offering medical care to individuals with confirmed or suspected COVID-19 (See CDC infection control guidelines). For recommended PPE for staff performing collection of specimens for SARS-CoV-2 testing see the Standardized procedure for SARS-CoV-2 testing in congregate settings. | X** | | X | X | X |
| Staff present during a procedure on someone with confirmed or suspected COVID-19 that may generate infectious aerosols (See CDC infection control guidelines) | X | | X | X | X |
| Incarcerated/detained persons handling laundry or used food service items from someone with COVID-19 or their close contacts | | | | X | X |
| Staff cleaning an area where someone with COVID-19 spends time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | X | X |

Classification of Individual Wearing PPE

\* If a facility chooses to routinely quarantine all newly incarcerated/detained intakes (without symptoms or known exposure to someone with COVID-19) before integrating into the general population, surgical masks are not necessary. Cloth face coverings are recommended.

\*\*A NIOSH-approved N95 respirator is preferred. However, based on local and regional situational analysis of PPE supplies, surgical masks are an acceptable alternative when the supply chain of respirators cannot meet the demand. During this time, available respirators should be prioritized for procedures that are likely to generate respiratory aerosols, which would pose the highest exposure risk to staff.

# Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

The guidance above recommends verbal screening and temperature checks for incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention facilities, as well as incarcerated/detained persons who are transferred to another facility or released from custody. Below, verbal screening questions for COVID-19 symptoms and contact with known cases, and a safe temperature check procedure are detailed.

- **Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions:**
  - *Today or in the past 24 hours, have you had any of the following symptoms?*
    - *Fever, felt feverish, or had chills?*
    - *Cough?*
    - *Difficulty breathing?*
  - *In the past 14 days, have you had close contact with a person known to be infected with the novel coronavirus (COVID-19)?*
- **The following is a protocol to safely check an individual's temperature:**
  - Perform hand hygiene
  - Put on a surgical mask, eye protection (goggles or disposable face shield that fully covers the front and sides of the face), gown/coveralls, and a single pair of disposable gloves
  - Check individual's temperature
  - **If performing a temperature check on multiple individuals, ensure that a clean pair of gloves is used for each individual and that the thermometer has been thoroughly cleaned in between each check.** If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check. If non-contact thermometers are used, they should be cleaned with an alcohol wipe (or isopropyl alcohol on a cotton swab) between each individual.
  - Remove and discard PPE

Last Updated July 22, 2020