IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| EDWARD BRAGGS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| JEFFERSON S. DUNN, in his | ) | |
| official capacity as | ) | |
| Commissioner of | ) | |
| the Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER ON A PROCESS FOR FINALIZING
THE PHASE 2A REMEDIAL ORDERS

In the current phase of this longstanding litigation
about the provision of mental-health care in Alabama's
prisons, the court has entered a series of agreed-upon
remedial orders, which are now in effect pending
resolution of whether they comply with the Prison
Litigation Reform Act (PLRA).   After substantial
litigation regarding these orders, the issue of how to
determine their compliance with the PLRA evolved into a
broader question of how to put in place a durable remedial

framework to conclude a significant part of this phase of the litigation beyond the orders at issue.

Now before the court are the parties' proposals regarding a process for finalizing this relief.  The court has carefully considered the parties' submissions. For the reasons set forth below, the court will not adopt either proposal in its entirety, although it has drawn primarily on the defendants' proposal to develop the plan it lays out in this opinion.

## I.   BACKGROUND

### A.   Procedural History

This court found in 2017 that the State of Alabama provides inadequate mental-health care in its prisons in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  *See Braggs v. Dunn*, 257 F. Supp. 3d 1171 (M.D. Ala. 2017) (Thompson, J.); *see also Braggs v. Dunn*, 367 F. Supp. 3d 1340 (M.D. Ala. 2019) (Thompson, J.) (supplemental liability opinion on periodic mental-health evaluations of prisoners in

2

segregation).  Over the years since the court's initial liability opinion, the parties have agreed to a series of stipulations resolving significant aspects of the sprawling remedial disputes present in this phase of the litigation.  For each stipulation, the court held an on-the-record hearing, reviewing in detail and clarifying the terms of the agreement.  At the request of the parties, the court then entered these stipulations as orders.

At the time it entered these orders, the court believed that the agreements met the 'need-narrowness-intrusiveness' requirements of the PLRA, 18 U.S.C. § 3626(a)(1)(A).  *See Cason v. Seckinger*, 231 F.3d 777, 785 n.8 (11th Cir. 2000) ("[W]e do not mean to suggest that the district court must conduct an evidentiary hearing about or enter particularized findings concerning any facts or factors about which there is not dispute.  The parties are free to make any concessions or enter into any stipulations they deem appropriate.").  However, the orders generally did not

3

contain findings that the provisions of the stipulations met the PLRA's requirements.

In February 2019, the defendants raised as an issue the possibility that these orders did not comply with the PLRA because they did not have PLRA findings.  The court then scheduled a set of evidentiary hearings to determine whether the stipulations met the 'need-narrowness-intrusiveness' standard of the PLRA.  In the meantime, by agreement of the parties, the court found that each of the orders "temporarily satisf[ied] the requirements of the PLRA," pending a final determination after the scheduled hearings.  Phase 2A Opinion and Interim Injunction (doc. no. 2716) at 4.

These hearings were continued multiple times.  They were first continued at the parties' joint request so that the parties could attempt to negotiate a resolution of the remedial disputes addressed by the stipulations in light of the newly raised PLRA concern.  During that process, the parties successfully negotiated certain remedial agreements related to suicide prevention.  *See*

**4**

Joint Notice and Motion to Stay (doc. no. 2706) at 2-3. After a lengthy period of mediation, the parties ultimately informed the court on March 20, 2020, that the negotiations on the remaining disputes had not been successful. *See* Joint Notice Regarding Monitoring and PLRA Negotiations (doc. no. 2775) at 1. The court scheduled the hearings to begin on April 13, 2020. *See* Phase 2A Revised Remedy Scheduling Order (doc. no. 2778) at 5.

The day the parties informed the court that their negotiations had failed, the Alabama State Health Officer suspended all public gatherings of 25 or more people due to the onset of the novel coronavirus (COVID-19) pandemic in Alabama and across the country. *See State Health Officer Issues Amended Health Order Suspending Public Gatherings*, https://www.alabamapublichealth.gov/news/2020/03/20.htm l (Mar. 20, 2020). Five days later, the first confirmed death of an Alabama resident due to COVID-19 was announced. *See Alabama Announces First Death of a State*

5

*Resident Who Tested Positive for COVID-19*,
https://www.alabamapublichealth.gov/news/2020/03/25b.ht
ml (Mar. 25, 2020).  On April 3, the State Health Officer
issued a stay-at-home order requiring "every person in
Alabama to stay at his or her place of residence except
as necessary to perform essential activities." *Order of
the State Health Officer*,
https://governor.alabama.gov/assets/2020/04/Final-State
wide-Order-4.3.2020.pdf (Apr. 3, 2020).

As the threat of COVID-19 became apparent, the
parties each moved to continue the April 13 hearings.
*See generally* Defs.' Unopposed Motion to Continue (doc.
no. 2779); Pls.' Motion to Continue (doc. no. 2780).  In
their motion, the defendants aptly explained that, while
"the medical and scientific community continues to
analyze the nature of COVID-19, this global pandemic
represents an unprecedented threat to public health due
to its contagious nature and rate of mortality for those
at significant risk for complications." Defs.' Unopposed
Motion to Continue (doc. no. 2779) at 2.  They requested

6

a continuance to "protect the health of the inmates in the custody of the Alabama Department of Corrections." *Id.* at 3.

The hearings were eventually rescheduled to start on September 14, 2020, with the duration of the temporary PLRA findings on the stipulated remedial orders extended to December 30. *See* Phase 2A Opinion and Order Regarding Long-Term Suicide Prevention Stipulations (doc. no. 2977), 2020 WL 5658886 (M.D. Ala. 2020)  at 5.  Just before the hearings were set to begin, at the close of the defendants' pretrial brief, the defendants indicated an intent to move under the PLRA, 18 U.S.C. § 3626(b)(1) & (b)(2), to terminate some or all of the orders scheduled for consideration. *See* Defs.' Pretrial Memorandum (doc. no. 2908) at 55-57.  The court requested clarification of the defendants' intent, and the defendants filed a formal motion to terminate. *See generally* Defs.' Motion to Terminate (doc. no. 2924).

Under the PLRA, the defendants' motion to terminate placed the burden on the plaintiffs to show that the

7

stipulated remedial orders remained necessary to correct a "current and ongoing violation" of federal law. *See* 18 U.S.C. § 3626(b)(3); *see also* Opinion and Order Regarding the "Current and Ongoing Violation" Issue (doc. no. 2954), 2020 WL 5517262 (M.D. Ala. 2020). The statute also required the court to rule on the motion within 30 days, extendable to 90 days for good cause, or else a mandatory stay of prospective relief would go into effect. *See generally* Phase 2A Opinion and Order on Good Cause (doc. no. 2984), 2020 WL 5735086 (M.D. Ala. 2020). The plaintiffs therefore moved that they be allowed to conduct immediate on-site prison inspections to develop the evidence of current conditions that would be necessary for the court to be able to consider the remedies under this standard and in this abbreviated timeframe. *See generally* Pls.' Motion to Require Onsite Prison Inspections (doc. no. 2986).

The court held an evidentiary hearing on the plaintiffs' motion on September 30, during which it heard testimony by experts for both parties about whether

**8**

on-site visits were necessary and the degree to which the inevitable risks involved in conducting these visits could be mitigated.  All of the experts testified that on-site visits were necessary, disagreeing mainly about the appropriate duration of the visits.  *See* Order Granting Motion for On-Site Prison Inspections (doc. no. 3000) at 3, 2020 WL 5909086 (M.D. Ala. 2020).  After considering this testimony, the court granted the plaintiffs' motion while recognizing the significant concerns raised by the defendants.  The court explained that, although "the coronavirus pandemic is most serious and that it is impossible to eliminate all risks of COVID-19 transmission from the proposed site visits," the court had to balance this risk against "the grave issue of the provision of mental-health care in the Alabama prison system" and the need for the plaintiffs, in the context of the motion to terminate, to be able to determine how mental-health care in the prisons is currently operating.  *Id.* at 2-3.

In response, the defendants withdrew their motion to terminate.  *See* Oral Motion to Withdraw (doc. no. 3004); Order (doc. no. 3005).  While allowing the defendants to withdraw their motion, the court emphasized that it nevertheless took seriously the issues that had prompted the motion.  It explained that it would "continue to address, with reasonable speed, which items in the remedial orders at issue may be terminated or modified, either by agreement or court action, as part of the resolution of the PLRA findings or otherwise."  Order (doc. no. 3005) at 1-2.  The parties have since agreed to extend the duration of the current remedial orders until their PLRA compliance is resolved.  See Joint Request to Extend Phase 2A Remedial Orders (doc. no. 3076) at 1-2; Phase 2A Revised Remedy Scheduling Order (doc. no. 3077).

In the meantime, the court issued an opinion setting forth a plan for monitoring the State's compliance with the court's orders once those orders are finalized.  *See generally Braggs v. Dunn*, -- F. Supp. 3d. ---, 2020 WL

10

5231302 (M.D. Ala. Sept. 2, 2020) (Thompson, J.).  The
monitoring scheme described by that opinion involves a
panel of outside experts functioning as an external
monitoring team (EMT), which over time "will train and
eventually hand control over to an internal monitoring
team, building the capacity of the [ADOC] to regulate
itself."  *Id.* at *1.  The members of the EMT--a
psychiatrist, a psychologist, a nurse, and a correctional
administrator--have been appointed.  *See* Order (doc. no.
3066).

At the court's request, the parties have now each
proposed a process for re-evaluating and finalizing all
of the relief ordered in this phase of the litigation.
The court sought these proposals to help it consider the
weighty and complex issues involved in charting a path
forward from this litigation's current posture, keeping
in mind both the court's findings of serious deficiencies
in the State's provision of mental-health care in ADOC
facilities and the exigencies of the coronavirus
pandemic, which has seized and disrupted the progress of

this suit as it has the quotidian rituals of all of our lives.  Although the nascent rollout of COVID-19 vaccines provides reason to hope that the effects of the pandemic may begin to wane in the coming months, finalizing the disputed remedies remains an urgent task.  Today the court considers the parties' proposals and sketches out a plan to help conclude its entry of relief in this phase of the litigation.


### B.   The Plaintiffs' Proposals

The plaintiffs presented the court with two proposals.  The court describes each in turn.


### 1.   The Plaintiffs' Proposal #1

The plaintiffs' first proposal is that the court begin with the PLRA hearing it originally scheduled after the defendants raised this issue in early 2019, determining whether the relief ordered in the stipulated remedies is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right,

and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). This provision of the PLRA governs the initial entry of prospective relief, and so the plaintiffs say the relevant time period for evidence showing that the relief meets this 'need-narrowness-intrusiveness' test would be the time of the court's liability opinion in June 2017. *See* Pls.' Proposal for Finalizing Phase 2A Remedial Orders (hereinafter "Pls.' Proposal") (doc. no. 3032) at 3-4; *see also* Opinion and Order on the "Current and Ongoing Violation" Issue (doc. no. 2954), 2020 WL 5517262 (M.D. Ala. 2020) (finding that § 3626(a)(1)(A), unlike § 3626(b)(3), contains no statutory requirement that the court find a "current and ongoing violation" of federal law). As such, there would be no need for the plaintiffs to conduct on-site inspections before the hearings. *See* Pls.' Clarification Regarding Site Visits (doc. no. 3036) at 1.

Once these hearings concluded and
'need-narrowness-intrusiveness' findings were entered,
the court could hold a second hearing if the defendants
sought to modify or vacate any of these orders. *See*
Pls.' Proposal (doc. no. 3032) at 4.  The modifications
that the court would consider at this stage would include
only permanent changes to the orders based on claims that
they were no longer necessary in light of current
conditions; the court would not consider any temporary
modifications that the defendants may request based on
the effects of COVID-19 on their capacity to comply with
certain orders during the pandemic. *See id.*  The
plaintiffs would seek site visits before this
modification hearing. *See id.; see also* Pls.'
Clarification Regarding Site Visits (doc. no. 3036) at
1.

After this second hearing, the plaintiffs say that
the court would have the full scope of remedial relief
in place.  It could then pass the orders it had entered
to the EMT, which would develop performance measures and

14

audit tools to track the defendants' compliance with these orders. *See* Pls.' Proposal (doc. no. 3032) at 5. The EMT would also consider any temporary modifications related to COVID-19 in consultation with an infectious disease expert. *Id.* at 5-6.

The plaintiffs propose that the initial PLRA hearings would take 20-25 days and that the court could issue its 'need-narrowness-intrusiveness' findings on the remedial orders about one month after the hearings concluded. The parties would then conduct several weeks of discovery leading up to the hearing on permanent modifications. Throughout this time, the EMT would begin developing its monitoring tools and considering COVID-related modifications. *See id.* at 6-7.

## 2.   The Plaintiffs' Proposal #2

In the alternative, the plaintiffs suggest that the process should begin with their expert Dr. Kathryn Burns and the defendants' expert Dr. Mary Perrien jointly reviewing the stipulated remedial orders, proposing

15

alterations to the orders to remove unnecessary provisions, and recommending any other changes they believe are appropriate. The court would then hold an evidentiary hearing on the experts' recommendations and would determine whether the orders met the 'need-narrowness-intrusiveness' requirement of the PLRA with the alterations suggested by the experts, or whether alternative or additional changes were necessary. As in the plaintiffs' first proposal, the court would not consider temporary modifications due to COVID-19 at this initial step; those again would be left to the EMT.

The review by Drs. Burns and Perrien would not involve site visits. The experts would instead "consult with ADOC clinicians and review whatever documents they deemed appropriate." Pls.' Clarification Regarding Site Visits (doc. no. 3036) at 1-2. The court understands that the plaintiffs do not seek site visits because Drs. Burns and Perrien would be considering whether the experts' recommended remedies were necessary to correct the violations found in the court's 2017 liability

16

opinion, not whether they were necessary in light of current conditions in ADOC facilities. *See* Pls.' Proposal (doc. no. 3032) at 10-11. Under the plaintiffs' second proposal, the review by Drs. Burns and Perrien would take six weeks, with a 15-day hearing on the recommendations following immediately thereafter. *See id.* at 12.

### C.   The Defendants' Proposal

The defendants' plan is distinguished from the plaintiffs' largely by the greater and earlier role it gives the EMT in revising the remedial orders. Under the State's proposal, the plaintiffs would initiate the process by submitting a proposed omnibus remedial order encapsulating the relief contained in the all of the remedial orders issued in this phase of the litigation, as well as addressing outstanding issues such as inpatient treatment and segregation-like conditions. *See* Defs.' Proposal for Finalizing the Phase 2A Remedial Orders (hereinafter "Defs.' Proposal") (doc. no. 3031)

17

at 5.   In developing this proposed omnibus order, the
plaintiffs would consider the concerns raised by the
defendants and the court in the course of the proceedings
on the motion to terminate, as well as the impact of
COVID-19 on ADOC's capacity to comply with the orders.
*See id.*   The plaintiffs would not have the opportunity
to propound discovery while developing their proposal.

Following a brief period of negotiation between the
parties to attempt to resolve any disputes arising from
the proposed omnibus order, the plaintiffs' proposed
order would be distributed to the EMT for review.   The
team would begin "deliberations" on the proposed order,
*id.* at 6, during which time it would have access to
various documents that have been filed on the record in
this case, as well as "any other documentation that they
might request in order to complete their review," Defs.'
Response to the Court's Order (doc. no. 3037) at 6-7.
After several weeks of deliberations, the EMT would
submit to the court recommendations for a new proposed
omnibus remedial order, and the court would issue a

proposed order based on those recommendations. *See* Defs.' Proposal (doc. no. 3031) at 6.

The court would hold a hearing to consider whether this omnibus remedial order complied with the PLRA only if a party objected to the order. *See id.* at 7. The defendants preserve their continued argument that § 3626(a)(1)(A) would require the court to find a "current and ongoing violation" of federal law before entering PLRA findings on this omnibus order. *See id.* at 6 n.7. Also, no site visits would take place before the hearing. *See* Defs.' Response to the Court's Order (doc. no. 3037) at 4 ("[T]he State's Proposal does not provide for site visits by Plaintiffs or the EMT because the Court ruled that it did not need to find a 'current and ongoing' constitutional violation when entering a final remedial order.").

Once the court entered a final omnibus remedial order, either after the hearing or without one if neither party objected to the court's proposed order, the EMT would develop its audit tools and performance metrics and

19

would begin site visits in the course of its monitoring duties.  *See* Defs.' Proposal (doc. no. 3031) at 7.  The timeline for these site visits is left to be determined. *See id.*

## II. DISCUSSION

### A. The Court's Concerns with the Proposals

Ultimately, the court will not adopt either party's proposal wholesale, although it derives much of the plan outlined below from the defendants' proposal.  Before discussing the plan the court adopts, it pauses to explain why it does not follow either party's recommendation in its entirety.

The court is concerned that the plaintiffs' proposal largely sidelines the EMT, an invaluable source of expertise for the development of appropriate relief in this case and a central player in this litigation as the current phase moves into monitoring.  The EMT will play a vital role in developing the performance measures and audit tools by which the defendants' progress toward

compliance with the ordered relief will be tracked.  The
input of the EMT members will be critical in helping the
court determine the shape of the omnibus remedial order.
Moreover, receiving this input during the development of
the order will provide for a smoother transition into
monitoring as the team members will build familiarity
with the remedies and the complex facts of this case.
The court hopes that this will head off any subsequent
need to modify the orders due to difficulties monitoring
the relief.

Under both proposals in the plaintiffs' plan, the
EMT would be relegated to a mostly passive role.  The
team would receive the orders from the court and would
be responsible for just two circumscribed aspects of
putting them into effect: proposing temporary
modifications due to COVID-19 and developing the tools
that the team would use to monitor the State's compliance
with the orders.  This is too limited a role for such an
important and knowledgeable actor in this litigation,
particularly one on whom so much of the State's capacity

to succeed in installing constitutionally adequate mental-health care will depend.

For similar reasons, the court agrees with the defendants that excluding the EMT from the process of developing an omnibus remedial order would be inefficient. The court believes it is critical that the EMT members begin engaging in the case as quickly as possible. To be effective monitors, the team members must develop deep familiarity with the proceedings in this case and the facts surrounding the provision of mental-health care in ADOC facilities. The proceedings and facts in this phase of the litigation are extraordinarily nuanced; creating the remedial scheme has been a three-plus-year endeavor of the court and the parties. The court agrees with the defendants that the sooner the monitors can begin to educate themselves about the case and build trust with all parties, the better.

Moreover, the court finds significant practical problems with the plaintiffs' proposals. In short, the court is concerned that the bulk of the process outlined

by the plaintiffs--everything prior to the potential modification hearings--would leave the court in no different a position than it currently stands. After a series of hearings and a possible six-week review by Drs. Perrien and Burns, the court would be left still with no information either about whether the remedial orders were appropriately tailored to current conditions in ADOC facilities or about the impacts of COVID-19 on the present feasibility of complying with the orders.

All that said, the court does not adopt either party's plan in its entirety for a simple reason. Both plans fail to take sufficient account of the need to gather evidence of current conditions in ADOC facilities in order to develop an omnibus remedial order with appropriately tailored relief, as well as the possibility that gathering this evidence may require site visits.

The court has an obligation under the PLRA to ensure that whatever relief it enters meets the statute's 'need-narrowness-intrusiveness' requirement: that it is necessary to correct a constitutional violation, and that

it is narrowly tailored and the least intrusive means of doing so.  In the absence of a motion to terminate, there is no statutory requirement that the court find a "current and ongoing violation" of federal law before entering this relief.  *See Thomas v. Bryant*, 614 F.3d 1288, 1319-20 (11th Cir. 2010); *see also* Opinion and Order Regarding the "Current and Ongoing Violation" Issue (doc. no. 2954), 2020 WL 5517262 (M.D. Ala. 2020).  But the procedural circumstances of this case leave the court with grave concerns about implementing relief without ensuring that it is necessary under current conditions.

Years have passed since the liability trial and opinion.  As discussed above, each individual protraction of this delay has been understandable, arising first from stays sought by both parties for the purposes of mediation and then out of the crisis caused by the COVID-19 pandemic.  Still, because so much time has passed, the court agrees with the defendants that it would be inappropriate to enter a final remedy resolving this phase of the litigation without finding that the

**24**

relief is still necessary in light of the State's now years-long efforts to improve the provision of mental-health care in ADOC facilities. *See, e.g.*, Defs.' Pretrial Br. for the Phase 2A PLRA Evidentiary Hearing (doc. no. 2908) at 35-38; Defs.' Br. Regarding the *Thomas v. Bryant* Opinion (doc. no. 2981) at 6-7. Even apart from the statutory mandates under which this litigation operates, compliance with the PLRA does not displace the court's duty under Eighth Amendment law to find a "substantial risk of serious injury" before entering injunctive relief. *Thomas*, 614 F.3d at 1320 (quoting *Farmer v. Brennan*, 511 U.S. 825, 845 (1994)).

Both parties' experts have said that site visits are necessary to determine the reality of conditions in ADOC facilities. *See* Tr. of Sept. 30, 2020, Hr'g on Pls.' Motion for In-Person Site Visits (doc. no. 3019) at 17-18 (plaintiffs' expert Dr. Burns); *id.* at 182-83 (defendants' expert Dr. Keldie); *id.* at 229-30, 250-51 (judge noting the agreement of the experts, and defense counsel concurring that the major issue is conducting the

25

visits as safely and expeditiously as possible).  In
*United States v. Alabama,* which addressed conditions at
ADOC's Tutwiler facility, the monitor, who was appointed
pursuant to a settlement of the case, *see United States
v. Alabama*, No. 2:15cv368-MHT, 2015 WL 3796526 (M.D.
Ala. June 18, 2015) (Thompson, J.) (opinion adopting
settlement agreement), and who is a neutral third party,
expressed the same to the court during a status
conference in that case at which defense counsel in this
suit was present.  *See* Tr. of Sept. 29, 2020, Status
Conference (doc. no. 3049) at 27-28.

However, as the court has said before, it is deeply
concerned about the COVID-19 risks associated with site
visits.  The parties should make every possible effort
to develop the necessary evidence of current conditions
without on-site inspections.  But the court cannot at
this time rule out the reasonable possibility that site
visits will be necessary, as both parties' experts and
the Tutwiler monitor have said that site visits are
critical to understanding current conditions in prison

facilities.  If site visits are necessary at some point in this process, the court is hopeful that increasing COVID-19 vaccinations may help such visits become safer in the coming months.

The court has reluctantly ordered site visits before in response to the defendants' now-withdrawn motion to terminate.  The process by which the court intends to move forward on finalizing the remedial orders, as set forth below, is both slower and more deliberative than was possible in the expedited time frame required by the PLRA for reviewing motions to terminate.  For this reason, if any site visits ultimately must happen, they could be done in ways that mitigate some of the most acute safety concerns the defendants expressed when the court considered this issue before, such as minimizing the number of hours on-site per day and avoiding successive visits to multiple facilities within a short period of time.

B.   The Court's Plan

The court largely adopts the defendants' plan for moving forward, albeit with some modifications to preserve the flexibility of the process and to ensure that the relief entered is appropriate in light of current conditions.

First, the plaintiffs will propose an omnibus remedial order that addresses at least the defendants' concerns about the need for clarification and modification of various stipulations as outdated, duplicative, overly intrusive, or otherwise incompatible with the PLRA, as well as the outstanding issues related to inpatient treatment and segregation-like conditions.

The proposed order should also take into account the impact of COVID-19. Because the order is meant to last for the duration of the monitoring of this case, the plaintiffs' proposal should separately indicate what remedies will apply after the COVID-19 pandemic ends, how these remedies should be modified during the pendency of the pandemic, and how and when to transition from the

modified relief to the permanent order as the pandemic winds down. The purpose of separating out these stages of relief is so that the parties do not have to return to the court for modifications as the pandemic begins to abate.

After the plaintiffs have submitted their proposed order, the defendants will submit their own proposed omnibus remedial order, responding to the plaintiffs' proposals and addressing the same issues described above. This approach will have the practical benefit of yielding proposals by both parties that encompass the entire scope of relief at issue, which is the shortest path toward concluding this phase of the litigation and providing the EMT a single, coherent remedial structure to monitor.

Both parties will have the opportunity to seek discovery while developing their proposed omnibus remedial orders. As explained above, the omnibus orders they propose should be tailored to the actual needs of people in ADOC custody today, and the parties will be able to propound the discovery necessary to construct

such orders.   While the court considered ordering the parties to propose these orders prior to discovery, the court ultimately believes that the parties already have sufficient information to be able to tailor discovery adequately, based on the litigation of the defendants' motion to terminate, the liability trial, and the current remedial orders.   Furthermore, the court is concerned that if the parties were to propose omnibus orders prior to discovery, their proposals would add little to what was already discussed during the termination proceedings and would simply insert an unhelpful extra step into the process of shaping the remedial scheme.

The court will therefore order the parties to develop a joint discovery plan that will allow them to gather the evidence they need to prepare their proposed omnibus remedial orders.   The court anticipates that this discovery may take two or three months.   In light of the current pandemic, the discovery will initially be limited to methods that avoid on-site inspections, such as document production.   If either party or the court comes

to believe that site visits are necessary to obtain the requisite information about current conditions or proper remedies, the court will consider arguments from both parties about the risks and value of such visits. Finally, if any site visits are warranted, they will be limited in duration and scope and will be narrowly targeted to gathering essential information.

After the parties have filed their proposed orders, the court will hold a single evidentiary hearing to consider these proposals and will then create a final omnibus remedial order resolving all of the outstanding issues discussed in this opinion.  Both parties will be able to present evidence and testimony at this hearing in support of their proposals, including expert testimony, and the court may also consult an infectious disease specialist to assist with its consideration of the effects of COVID-19.  The court will also consult with the EMT about how to formulate the omnibus remedial order, though exactly how the EMT will participate in the hearing will be resolved as the process moves forward.

Involving the EMT will allow the team members to begin to familiarize themselves with the case and will help inform the court about what proposed remedial provisions might function better as performance metrics or audit tools rather than court orders.  This will also give the EMT the opportunity to begin developing these metrics during the course of the hearing.

The goal of the hearing will be to assemble an omnibus remedial order that is not overly intrusive, both provision-by-provision and when considered as a whole.  This order will also account for any adjustments necessary during the COVID-19 pandemic.  It will be made with the particularized 'need-narrowness-intrusiveness' findings required by the PLRA, and it will replace all of the currently operational remedial stipulations.  Developing this omnibus order will be a difficult and complex process.  But the court has an obligation to proceed deliberately and carefully in developing a final remedy that addresses the serious constitutional

violations it has found and that will be a durable
solution for the monitors to help ADOC implement.

                          * * *

    Accordingly, it is ORDERED that:

    (1) By 5:00 p.m. on January 15, 2021, the parties
should file a joint discovery plan tailored to developing
their proposals for the omnibus remedial order described
above.  This discovery should include evidence of current
conditions in ADOC facilities, including the effects of
COVID-19.  The plan should initially limit discovery to
methods that avoid on-site inspections, but it should
provide a process for the parties to request that the
court order site visits during the course of discovery
if such visits become necessary.

    (2) By 5:00 p.m. on April 21, 2021, the plaintiffs
should file their proposed omnibus remedial order, as
described above.

(3) By 5:00 p.m. on May 5, 2021, the defendants should file in response their proposed omnibus remedial order.  The plaintiffs will have until 5:00 p.m. on May 12, 2021, to reply to the defendants' proposed order.

(4) The court will hold a pretrial conference with the parties regarding their proposed omnibus remedial orders at 10:00 a.m. on May 17, 2021, by videoconferencing.

(5) An evidentiary hearing on the parties' proposed omnibus remedial orders will begin at 10:00 a.m. on May 24, 2021.  The court will determine later whether the hearing will be in person, by videoconferencing, or a combination of both.

DONE, this the 29th day of December, 2020.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE