# **EXHIBIT A**

# TREATMENT GUIDE

## CHAPTER 1 - DEFINITIONS

ADOC major facility means one or more of the major adult correctional facilities operated on behalf of ADOC (including Bibb County Correctional Facility, Bullock Correctional Facility, Donaldson Correctional Facility, Draper Correctional Facility, Easterling Correctional Facility, Elmore Correctional Facility, Fountain Correctional Facility, Hamilton Aged and Infirmed Center, Holman Correctional Facility, Kilby Correctional Facility, Limestone Correctional Facility, St. Clair Correctional Facility, Staton Correctional Facility, Tutwiler Prison for Women, and Ventress Correctional Facility) or one of more major adult facilities built or used for the purpose of housing prisoners who would otherwise have been housed in one of the above facilities. "ADOC major facility" excludes any community-based facilities and community work centers.

Clinically relevant documents include documents related to the current condition of the patient. Examples of clinically relevant documents include, but are not limited to, most recent treatment plan, any treatment plan less than thirty (30) days old, list of currently prescribed medication, documentation showing medication compliance within the last thirty (30) days, progress notes from the last thirty (30) days, and any other clinically relevant document determined necessary by the reviewing individual to inform clinical judgment.

Effective Date means thirty (30) days after the Court enters the final omnibus remedial order.

Emergent need means there has been a determination that there is an imminent risk of injury to the prisoner or others or that the need for mental health services is otherwise emergent. Suicide ideation and/or suicide attempts are emergent needs.

Exceptional Circumstances refer to a circumstance when ADOC is unable to provide an appropriate alternative placement (e.g., SLU or RTU) due to a lack of bed space for a prisoner who needs to be placed in a closed cell for disciplinary, protective, or due to an institutional emergency under which the prisoner cannot be immediately transferred to an SLU or RTU, but whose placement in general population would create an unacceptable risk to the safety of any person.

Mental Health Code A (MH-A): individuals who are not on the caseload and not receiving ongoing mental health services.

Mental Health Code B (MH-B): individuals who require outpatient mental health services at intervals of 90 to 120 days, have demonstrated stable coping skills for a period of six months or

more, and can be housed in facilities that do not provide daily on-site coverage by mental health staff.

Mental Health Code C (MH-C): individuals who require outpatient mental health services at intervals of 30 to 60 days, have any diagnosed mental disorder (excluding substance use disorders) currently associated with an impairment in psychological, cognitive, or behavioral functioning that substantially interferes with the person's ability to meet the ordinary demands of living, and must be housed in facilities that provide daily on-site coverage by mental health staff.

Mental Health Code D (MH-D): individuals who are receiving chronic or acute mental health services and require placement in a designated mental health treatment unit.

Mental health treatment hub means one or more ADOC major facility housing prisoners with inpatient mental health needs (including Bullock Correctional Facility, Donaldson Correctional Facility, and Tutwiler Prison for Women).

Mental health vendor means the entity contractually responsible for providing mental health services to prisoners in ADOC custody. At the effective date, the mental health vendor is Wexford Health Sources, Inc. In the event a new entity is provided a contract for providing mental health services prior to termination of this Order, all requirements of this order apply unless specifically stated otherwise.

Qualified Mental Health Professional means a psychiatrist, psychologist, certified registered nurse practitioner, or other independently licensed mental health professional. A "qualified mental health professional" does not include a registered nurse.

Residential Treatment Unit is a specialized housing placement for treating patients with mental illness who are at risk for psychiatric deterioration in a less restrictive setting. This may be a short-term residential placement for patients to resolve crises or may be a long-term residential placement for those patients with chronic limitations in their functioning.

Routine need means there has been a determination that the prisoner requires assessment on a routine basis.

Serious Mental Illness as adopted and published by the American Correctional Association means "Psychotic Disorders, Bipolar Disorders, and Major Depressive Disorder; any diagnosed mental disorder (excluding substance use disorders) currently associated with serious impairment in psychological, cognitive, or behavioral functioning that substantially interferes with the person's ability to meet the ordinary demands of living and requires an individualized treatment plan by a qualified mental health professional(s)."

Stabilization Unit is a mental health inpatient treatment center designed to provide intensive treatment to patients experiencing acute mental health problems when brief crisis interventions at

other ADOC institutions have been unsuccessful in assisting the prisoner in achieving prior levels of functionality.

Structured Living Unit is an outpatient diversionary unit that provides an alternative to a Restrictive Housing Unit for patients flagged as having a serious mental illness. Patients who are clinically determined for a higher level of mental health care, including a Residential Treatment Unit or Stabilization Unit, are not eligible for the Structured Living Unit.

Urgent need means there has been a determination that mental health services should be provided in the near future but are not immediately necessary.

# CHAPTER 2 - ACRONYMS

ADOC – Alabama Department of Corrections

ALC – Associate Licensed Counselor

ASW – Acute Suicide Watch

CRNP – Certified Registered Nurse Practitioner

GP – General Population

LPN – Licensed Practical Nurse

MH – Mental Health

MHP – Independently Licensed Mental Health Professional

NASW – Non-acute suicide watch

NCCHC – National Commission on Correctional Healthcare

OHS – Office of Health Services

QMHP – Qualified Mental Health Professional

RHU – Restrictive Housing Unit

RN – Registered Nurse

RTU – Residential Treatment Unit

SLU – Structured Living Unit

SMI – Serious Mental Illness

SU – Stabilization Unit

# CHAPTER 3 - GENERAL MENTAL HEALTH SERVICES

## SECTION 1 - INTAKE

### 3.1.1 - INTAKE ASSESSMENT

Each prisoner entering or returning to ADOC custody must receive a mental health receiving screening as soon as possible, but no later than twelve (12) hours after their arrival. Mental health receiving screening must be completed before the prisoner is placed in a housing area that does not provide constant correctional officer observation.

Prior to conducting the mental health receiving screening, transfer medical documentation must be revied to optimize available information about the prisoner's mental health status or treatment. All mental health receiving screenings must be conducted in areas permitting prisoner confidentiality and encouraging self-reporting.

An RN with mental health training must conduct the screening in accordance with the NCCHC standard M-E-02. The RN must document the screening on ADOC Form MH-011, Reception Mental Health Screening Evaluation. The form must be filed in the prisoner's medical record. The screening process must include a suicide risk screening.

The RN with mental health training must also receive training on how to make the required observations (including identifying prisoners at risk of self-harm or potentially in need of immediate mental health assistance), how to determine the appropriate disposition of a prisoner based on responses to questions and observations, and how to document findings on the receiving screening form.

The RN must refer the prisoner for a mental health evaluation if the prisoner reports any of the following:

- Current prescription for psychiatric medications;
- Any in-patient mental health hospitalization within the last three (3) years;
- Mental health treatment within the last year;
- Past or current suicidal acts or ideation;
- Hallucinations or delusions or;
- When the prisoner's presentation suggests the need for a mental health evaluation.

All mental health staff should report suspected abuse of a prisoner to the appropriate authority. Prisoners arriving with signs of recent trauma should be referred immediately for medical observation and treatment.

If the prisoner reports a current prescription for psychiatric medications, ADOC must attempt to verify with the transferring jail, outpatient prescriber or pharmacy within twelve (12) hours of

the intake screening and ensure continuity of medication. If the prescription cannot be verified within twelve (12) hours, a bridge order of up to 14 days to continue the current prescription if approved by the reception psychiatrist or CRNP may be issued to bridge the period of time between reception and psychiatric evaluation in order to preserve continuity of care.  The psychiatric evaluation in this instance should be scheduled as soon as possible, but no later than 14 days after the prisoner's arrival.

If the prisoner reports receiving mental health services, and can correctly report the prior mental health provider, a records request from the prior provider must be made within seventy-two (72) hours of the intake screening. If the prisoner reports receiving mental health services and cannot remember or correctly identify the prior mental health provider, the mental health staff must reasonably attempt to locate their prior records.

All health records from the prior facility of incarceration must be requested within the seventy-two (72) hour time frame if they are not presented at intake.

The mental health RN performing the intake screening must triage the mental healthcare needs of the prisoner. When a referral is indicated, the mental health nurse must designate if the need is emergent, urgent, or routine, and follow the referral procedures as defined in this Treatment Guide Chapter 3, Section 3.

## 3.1.2 - RECEPTION MENTAL HEALTH EVALUATION AND CODING

A QMHP must evaluate prisoners referred from the receiving screening for a reception mental health evaluation. For prisoners determined to need an immediate mental health evaluation, this evaluation must occur within twenty-four (24) hours of the referral. Non-immediate evaluations must be completed within fourteen (14) days of the referral, unless clinically indicated as needed to occur sooner.

The evaluations must include review of the prisoner's medical record and direct examination of the prisoner. The evaluation must include, but is not limited to, the following:

- Current complaint;
- Psychiatric history;
- Prior mental health treatment;
- Prior use of psychotropic medication;
- Pertinent medical history (including history of head injuries with or without loss of consciousness);
- Substance abuse history;
- Pertinent personal history (including education, victimization, history of trauma or abuse);
- Pertinent family history (including family history of mental illness);

6

- Mental status examination;
- Risk for suicide and violence;
- Brief social history;
- DSM 5 diagnosis; and
- Psychiatric input for treatment plan.

Following the mental health evaluation, the QMHP must assign a mental health code (A, B, C or D) and determine whether an SMI designation is appropriate for all prisoners in accordance with AR 613. The QMHP must review the required completed intake screening and assessment results prior to assigning a mental health code or SMI designation.

Any mental health or intellectual disability test results that are not available at the time of the mental health evaluation must be reviewed by the QMHP within fourteen (14) days of when the complete battery of test becomes available. If, in the QMHP's clinical judgment, the test results are clinically significant and may indicate a different assessment than the initial mental health evaluation, the QMHP must re-evaluate the prisoner within fourteen (14) days of reviewing the tests.

Following the determination of an appropriate code, the QMHP must complete and sign the ADOC Mental Health Coding form in accordance with AR 613.

Mental health coding must be captured in the OHS Healthcare module and documented in the prisoner's medical record. The SMI designation must be independent from the ADOC's mental health coding system and must be identified by a flag or a warning signal, or a signal somewhere else within the electronic system. The mental health clerk or other trained support staff may enter the assigned mental health code and SMI designation into the OHS module as transcribed by the licensed professional on the coding form.

If the need for psychotropic medication is indicated following the mental health evaluation, the patient must be referred for a psychiatric evaluation.

## 3.1.3 - ADDITIONAL ASSESSMENTS AND ORIENTATION

Within fourteen (14) days of the intake screening, a psychological associate or LPN must conduct a Social History Assessment (SHA) of every prisoner. The screener must use a standardized SHA available within the OHS module.

If information on the SHA indicates the need for a mental health evaluation, the individual should be referred to a QMHP for evaluation for placement on the mental health caseload.

Mental health professionals must provide pertinent mental health status information to the ADOC Classification Supervisor. ADOC Classification personnel must consider and use the prisoner's mental health code in the institutional assignment.

While at the intake/receiving facility, staff must provide the prisoner an initial description of the mental health services available in the ADOC, how to access these services and the grievance process for mental health related complaints.

### 3.1.4 - TRANSFERRING AWAY FROM INTAKE

Before a prisoner is transferred from Kilby Correctional Facility, Tutwiler Prison for Women, or other intake facility following their initial intake or before a prisoner is placed in a RHU at Kilby Correctional Facility or Tutwiler Prison for Women immediately following their initial intake, the initial screening, SHA, testing, and any mental health or psychiatric evaluation, if referred, must be completed.. If ADOC seeks to place an incoming prisoner into an RHU immediately, the prisoner must be placed on mental health observation until such time as the prisoner is evaluated by a QMHP to determine if the prisoner has an SMI.

If the prisoner has been transferred to another facility prior to completion of the mental health or psychiatric evaluation, the receiving facility QMHP must document the need for a reevaluation on the ADOC Intra-system Inmate Healthcare Communication Form. The receiving facility healthcare staff must review, sign, and schedule the required follow-up.

When a prisoner is transferred to another ADOC major facility after intake, the prisoner must be provided any facility-specific information concerning mental health services and the way to access these services.

## SECTION 2 - CONFIDENTIALITY

Confidentiality in mental health treatment and assessment must be a priority to promote self-reporting of mental health needs.

Individual counseling sessions, medication management encounters, periodic assessments related to placement in an RHU, suicide risk assessments, and therapeutic groups must take place out-of-cell in a setting that provides for confidentiality, unless that is not possible due to safety concerns, based upon clinical determinations. If confidentiality is not possible, then that fact, the reason, and the actions taken to maximize confidentiality must be documented in the progress note. A "medication management encounter" means a discussion between a physician or CRNP and a patient about medication recommendations, informed consent, efficacy, adherence, side effects, or other related topics.

## SECTION 3 - REFERRALS

### 3.3.1 - SELF-REFERRALS

Prisoners may express concerns regarding their mental health condition or may request mental health services, verbally to a correctional officer or mental health staff, or in writing by completing a sick call request slip.

### 3.3.2 - STAFF REFERRALS

When a prisoner informs non-mental health staff (including correctional staff) of the need for mental health care, or non-mental health staff (including correctional staff) recognize the need for mental health assessment or intervention, such non-mental health staff must refer the prisoner for assessment or intervention by the mental health staff.

Any individual working within ADOC may refer any prisoner within a major facility for assessment by mental health personnel, including for suicide watch placement.

When referring prisoners for suicide watch placement, the referring person must ensure that staff maintain constant, line-of-sight observation of the prisoner who is being referred until they are either transferred to appropriate correctional, medical, or mental health staff who takes over the responsibility to ensure an assessment by a triage nurse occurs or the prisoner is assessed by a triage nurse on an emergent referral.

Referrals may be submitted to the facility's triage nurse using the Mental Health Referral Form, or by directly contacting the triage nurse or mental health staff.

Blank Mental Health Referral Forms must be available in the health care unit, mental health care unit, and in designated shift offices in each ADOC major facility. Completed forms must be placed in the same location for which medical referrals are deposited.

Mental Health Referral Forms must include the following information:

- The prisoner's name;
- The prisoner's AIS number;
- The prisoner's housing assignment, if known;
- The name and job title of the referring individual; and
- The date and time the referral form was completed.

Referral forms must also include the following information, which will be completed by the triage nurse following the triage process:

- Identification of the triage nurse;

- The date and time the triage was conducted by the triage nurse; and
- The triaging nurse's determination as to whether the referral is emergent, urgent, or routine.

### 3.3.3 - TRIAGE PROCESS

Correctional staff must not triage mental health referrals.

Each Major Facility must designate one (1) nurse to serve as the triage nurse on each shift. The assigned triage nurse may be the same triage nurse responding to medical referrals. The designated triage nurse must be at least an RN with mental health training, including a general knowledge of mental health issues and psychiatric medications.

The designated triage nurse must routinely and regularly monitor the designated area for completed referral forms. The box must be checked a minimum of once a shift. Following review of the referral form or direct notification from staff, the triage nurse must determine whether the referral is for a medical or mental health need. For all mental health referrals, the triage nurse must determine if the referral is emergent, urgent, or routine, as defined in this Treatment Guide.

If the triage nurse determines that the referral is emergent or urgent, the triage nurse must initiate contact with the on-call MHP or psychologist within one (1) hour of receipt of the referral. The on-call MHP or psychologist must determine whether further referral to the psychiatrist is warranted or whether a change in the status of the referral is warranted.

- Following an emergent referral, including referrals for suicide watch, custody or mental health staff must maintain constant, line of sight, observation of the prisoner until assessed by a QMHP. This assessment must occur as soon as possible but no more than 3 hours from the triage nurse's determination that the referral is emergent.
- Urgent referrals must result in a clinical assessment and/or intervention by a QMHP within 24 hours of referral.

Routine referrals must be communicated to the mental health staff on the next business day by leaving the referral form in a designated location. Routine referrals must result in a clinical assessment and/or intervention by a QMHP within 14 calendar days of referral.

### 3.3.4 - REFERRAL LOGS

The mental health staff within each major ADOC facility must maintain a Mental Health Referral Log for all referrals forwarded by the triage nurse or direct contact.

Each referral made to mental health staff must be logged immediately after receipt of the referral and updated as necessary after triage. The Site Administrator or that person's designee must be responsible for logging of the information into the Mental Health Referral Log.

The information set forth in the Mental Health Referral Log must include the following:

- Name of the prisoner, including AIS number, and housing location of prisoner referred;
- Identification of the referral source (i.e., correctional staff, medical, mental health, other, or self-referral) as well as date and time referral was written;
- Identification of the triage nurse who triaged the referral, along with date and time of the triage;
- Designation of referral by the triaging nurse (i.e., emergent, urgent or routine);
- Identification of staff to whom referral was assigned;
- Date and time of the initial mental health clinical contact in response to the referral; and
- Disposition of referral.

## SECTION 4 - TREATMENT REQUIREMENTS

### 3.4.1 - TREATMENT TEAM

Each patient on the mental health caseload must have a designated treatment team.

Treatment teams must meet at regular intervals as mandated by the patient's assigned mental health code and appropriate level of psychotherapy in order to formulate/revise the patient's treatment plan, review progress notes, discuss the condition of the patient, and address the patient's progress.

Each patient's assigned Mental Health Code must be reviewed and revised, as appropriate, by the patient's treatment team at each treatment team meeting.

Treatment teams must be composed of mental health staff responsible for providing care (including the AT if the patient is in a RTU), correctional staff (if the patient resides in mental health housing, SLU, or RHU), and the patient. The make-up of each treatment team differs by the patient's assigned mental health code and appropriate level of psychotherapy.

Each treatment team must be organized and chaired by the patient's assigned MHP.

The senior clinician or the chair may add additional members to the team if clinically indicated and appropriate.

The patient must be allowed to attend all treatment team meetings, unless contraindicated for one of the following reasons:

> o   The patient poses an unreasonable risk to mental health or correctional staff; or

o  If information is to be discussed about the patient would be psychologically detrimental for the patient, then this information may be discussed without the presence of the patient, either at the beginning or the end of the treatment team meeting.

In the event that the patient's presence is not allowed, the reason must be documented in the patient's mental health records, and the portion of the meeting from which the patient was excluded must be identified.

Patients must not be disciplined for failure or refusal to attend treatment team meetings.

Patients must be encouraged, but not forced, to attend treatment team meetings.

Treatment team meetings must include a review of progress notes, participation in out-of-cell or out-of-housing unit activity including group therapy and activity groups, medication compliance, crisis placements, disciplinary actions, recent traumatic events, and other information as appropriate.

Whenever possible, all members of the treatment team must attend each team meeting, either in person or via videoconferencing. All members must have access to clinically relevant documents, as defined in this document.

The length of any given treatment team meeting is based on whether or not there have been any significant clinical changes in the patient's condition since the last treatment team meeting. If the patient is not making progress towards the defined goals of the active treatment plan, this may indicate the need for re-evaluation of the goals and intervention strategies within the treatment plan.

In the event that the psychiatrist, the patient's MHP, or the patient is unable to attend a treatment team meeting, the meeting must be postponed and rescheduled for the next business day in which the psychiatrist, the patient's MHP, and the patient are available. If someone other than the psychiatrist, the patient's MHP, or the patient is unable to attend, the meeting must occur. Any member of the team who did not attend the meeting must review the notes of the meeting at least one day before the next regularly scheduled treatment team meeting and add any additional modifications to the plan as clinically appropriate.

Records of each treatment team meeting must be kept in the respective patient's mental health record and must consist of the following:

- The date of the treatment team meeting;
- The attendees of the treatment team meeting;
- Notes about each treatment team meeting; and
- Any changes to the patient's treatment plan as a result of the treatment team meeting.

## 3.4.2 - TREATMENT PLAN

Each patient on the mental health caseload must have a treatment plan created within the appropriate timeframe following his or her addition to the caseload, or more frequently if clinically appropriate. This treatment plan must be amended and updated as necessary until the patient is either removed from the mental health caseload or leaves ADOC custody.

Each treatment plan must be individualized to each patient. Treatment plans must reflect changes in goals, plans to achieve goals, changes in mental health status/symptoms, and amended timeframes to reach goals. For any unmet goal, the treatment plan will identify the unmet goal and any adjustment or plan to assist the patient in reaching the unmet goal.

Treatment plans must include the following information:

- The patient's age, mental health code, current Earliest Possible Release Date or Minimum Eligibility Parole Date, current housing assignment type and custody level;
- All diagnoses from the current Diagnostic and Statistical Manual of Mental Disorders, identified problems, and treatment goals in objective, measurable terms;
- Treatment services and other institutional services designed to impact the identified problems and achieve individual treatment objectives on both a long-term and short-term basis, as appropriate, and who is responsible for providing the service;
- Specific structured activities and unstructured activities for the minimum number of hours provided for each treatment level, unless otherwise clinically indicated, and who is responsible for providing the service;
- An identification of unmet treatment goals and an explanation why those treatment goals were not met;
- Frequency and duration of services to be provided; and
- Aftercare and clinical pre-release plans, including identification of the staff member responsible for creation of those plans.

Treatment teams must meet to review and update treatment plans promptly following major events during the patient's incarceration, including, but not limited to, the following situations:

- Movement in and out of an SU, within two (2) working days;
- Movement in and out of an RTU, within three (3) working days;
- Movement within levels of an RTU;
- Movement in and out of an SLU, within three (3) working days;
- Movement to and from an RHU, within three (3) working days;
- Movement to and form a crisis cell, for suicide watch or mental health observation, within two (2) working days;
- Placement on or removal from mental health observation, within two (2) working days; or

13

- Return from hospitalization for a mental health need, within two (2) working days.

Amendments after placement or release from these housing units must focus on continuing treatment, responding to the effects of the housing changes, and assisting in the patient's immediate needs, and planning for reintegration into lower level treatment if clinically appropriate.

Treatment plans must be reviewed and amended, if necessary, contemporaneously with a change in the patient's mental health code.

Treatment plans must be amended contemporaneously with the treatment team's decision to pursue involuntary medication, need for emergency administration of psychotropic medications, or decision to discontinue all mental health medication. Treatment plans need not be amended in the event that the dosage or frequency of medication is changed or when some, but not all, mental health medications are discontinued. Instead, routine changes in medication, including the change in dosage and frequency, must be addressed at periodic treatment team meetings.

## 3.4.3 - TREATMENT MODALITIES

The relative timing of the appointments with the psychiatric provider and the counselor must be determined by clinical judgment based on the needs of the patient. Minimum expectations for treatment frequency are set out by level of care.

Each patient will have access to the treatment modalities prescribed by his or her treatment team.

Placement in an RHU must not be a basis for denying or delaying the patient's access to the interventions prescribed in his or her treatment plan or for deferring prescription of such interventions until after the patient is released from the RHU.

The minimum treatment requirements for care at the various levels of care outlined in the respective sections for each treatment level or housing placement.  The amount of treatment required by each patient must be determined by his or her treatment team, based on their clinical judgment.

Mental health treatment services must be tailored to adequately meet the clinical needs of each patient considering the functional level, readiness for treatment, insight into mental illness, and motivation for treatment.

SU, RTU, and SLU units must have available at least: psychoeducational groups, individual therapy, group psychotherapy, pharmacotherapy, and activity therapy.

Facilities with solely outpatient mental health care must have available, at least: psycho-educational groups, individual therapy, group psychotherapy, and pharmacotherapy.

Psychotherapy must be evidence-based.

Group psychotherapy must be offered on topics such as medication management, cognitive retraining, stress management, social skills, and anger management in sufficient quantity to accommodate the treatment services prescribed for the population of each facility.

If an intervention or program that is set forth in the treatment plan is not offered in the facility in which the patient is housed, either the patient will be moved to allow the patient to participate in that intervention, or the intervention will be offered in the facility where the patient is housed. However, no patient in need of residential care may be moved to a facility not offering residential care. If an ADOC facility offering residential care does not have a given program or intervention, then that program or intervention must be provided at the facility with residential care capacity.

A psychiatric provider treating a patient via telepsychiatry must be provided clinically relevant documents, as defined in this document, in advance of the telepsychiatry session.

## SECTION 5 - TRANSFER OF PATIENTS RECEIVING MENTAL HEALTH CARE

### 3.5.1 - PHYSICAL TRANSFER

In order to ensure continuity of care, the patient's mental health code and condition must be considered in making determinations concerning transfer.

In the event of a transfer of a patient on the mental health caseload, there must be a transfer note written by the patient's MHP at the transferring facility to the patient's new MHP at the receiving facility.

This transfer note will include a discussion of the patient's mental health background, current needs, and the next steps for treatment the transferring facility would have taken if not for the transfer.

The transfer note for patients coded MH-D must be sent to the receiving facility prior to the patient's transfer.

The transfer note for patients coded MH-B or MH-D must occur within five (5) business days of the patient's transfer.

The transfer note must be on the Mental Health Transfer Form. The purpose of the Mental Health Transfer Form is to eliminate, as much as possible, disruption in the patients care.

The Mental Health Transfer Form must include, at a minimum, the following information:

- Any individualized treatment or compliance strategies that have been successful;

- Individualized treatment or compliance strategies that have been unsuccessful;
- Clinically relevant information about the patient's background, such as prior history of abuse, family history, or difficulties in the course of treatment or compliance; and
- Any other information which may assist a new mental health provider in gaining insight and rapport with the patient.

The treatment team at the receiving facility of a patient transfer must meet promptly following the transfer of the patient in order to review the existing treatment plan, address the impact of a facility change on the patient, and adjust structured activity goals based on available programming in the receiving facility. Timelines for review are determined by the patient's level of care.

This transfer note requirement does not apply to patients being moved within the same ADOC facility or from one ADOC facility's holding cell to another ADOC facility's crisis cell. However, if a patient is transferred while on suicide watch, then mental health staff at the sending facility must communicate with mental health staff at the receiving facility consistent with the transfer note requirements.

## 3.5.2 - CHANGES WITHIN THE TREATMENT TEAM

If a member of a patient's treatment team, other than correctional staff, provides or is provided fourteen (14) days or more notice of voluntary resignation or involuntary termination, then the employee must, to the extent possible, prepare transfer notes on Mental Health Transfer Form for any patients under their care. This applies to providers conducting group treatment sessions.

It is the responsibility of the Mental Health Manager to ensure that departing employees complete transfer notes when required by the preceding paragraph. This responsibility includes reviewing completed Mental Health Transfer Forms.

Vacancies in treatment team members due to staff turnover, must be filled on the earlier of: a) thirty (30) days, or b) at least 24 hours before the date and time of the next regularly scheduled treatment team meeting for that patient.

## SECTION 6 - RECORD KEEPING

Mental Health Progress Notes must be made each time there is a significant clinical encounter between a patient and a member of the patient's Treatment Team or other member of the mental health staff. A "significant clinical encounter" means any communication and interaction between a patient and any member of the mental health staff involving an exchange of information used in the treatment of the patient, excluding any casual exchanges, administrative communications, or other communications which do not relate to the patient's mental condition or the ongoing mental health treatment.

All Mental Health Progress Notes are to be kept in the patient's mental health record and available to all other members of the patient's treatment team.

Notes must be in "SOAP" (Subjective, Objective, Assessment, Plan) format, and include the following information:

- Name and position of the individual making the note;
- Date, start and stop time of the interaction with the patient;
- Nature of the interaction;
- Reason for the interaction (including, for example, if the interaction resulted from a mental health referral);
- Notes about the interaction;
- A summary of any conclusions drawn or actions or recommendations taken as a result of the interaction; and
- Any changes in mental health medication, including dosage, frequency, and prescription.

The person making the note must print and sign their name on the note.

The note must be sufficiently detailed so that a treating mental health provider would be able to continue treatment using the information provided in the note.

For persons housed in cells, if any mental health encounters, out-of-cell counseling, group activities, or other treatment interventions cannot safely be accommodated out-of-cell and in a confidential setting, based on a clinical determination, such determination must be included in the documentation of the encounter (progress note or log), including the fact that the determination was made, the basis for such determination, and the person who made the determination. The psychiatric provider, counselor, or group facilitator can make this determination.

Progress notes must address one or more problems identified in the patient's treatment plan, how the encounter addressed the particular problem(s), and the progress in resolving the problem(s).

All progress notes made after the most recent treatment plan or amendment must be considered when the treatment plan is reviewed at the next treatment team meeting or treatment plan amendment.

An Individual Group Participation Progress Note will be prepared for each patient participating in a group activity or therapy and will be maintained in each patient's medical record. Additionally, all group activities and therapy will be recorded in a log identifying the date, start and stop time, the leader or facilitator of the activity or therapy, the participants, the nature of the activity or therapy, and whether it is counted as a structured therapeutic activity or as an unstructured activity.

## CHAPTER 4 - LEVELS OF CARE

## SECTION 1 – OUTPATIENT CARE

### 4.1.1 - TREATMENT PLANS

Initial treatment plans must be finalized within fourteen (14) working days of a patient's placement on the mental health caseload, unless otherwise indicated due to a clinical necessity.

### 4.1.2 - TREATMENT TEAM MEETINGS

Treatment teams for patients receiving outpatient care must include at least the following individuals:

- A Psychiatrist or CRNP (if the patient is on mental health medications);
- The patient's assigned psychologist or MHP; and
- A member of the medical staff (when the mental health provider determines that the presence of a primary medical provider is necessary in order to address the impact of a medical condition on the patient's treatment plan); and
- The patient.

Treatment team meetings for patients in outpatient care must occur at intervals not to exceed six (6) months in order to formulate/revise the patient's treatment plan, review progress notes, discuss the condition of the patient, revise the patient's mental health code (if appropriate), and address the patient's progress.

### 4.1.3 - TRANSFER OF PATIENTS

Decisions regarding transfer of outpatient patients (MH Code B and C) will not occur without consultation with the treatment team. The treatment team must weigh the reason for the transfer against concerns about continuity of care.

Patients with an SMI flag may only be transferred upon approval of the patient's treatment team.

In the event that a patient on the outpatient caseload is transferred, the patient's new treatment team must meet within fourteen (14) calendar days of the patient's transfer.

### 4.1.3 - TREATMENT

Treatment services for patients on the outpatient caseload are determined based on assigned mental health code and clinical need.

### 4.1.3.1 - MH-A

Patients who are not on the mental health caseload must be seen by mental health staff (either ADOC staff or vendor staff) in the event of a mental health crisis, after receipt of a mental health referral, or for follow up, as clinically indicated.

### 4.1.3.2 - MH-B

After the initial treatment plan is developed, the patient's treatment team will review the patient's treatment plan at intervals not to exceed six (6) months, and more often if clinically indicated.

If the patient is prescribed psychiatric medications, then the patient will have an opportunity to see his or her psychiatric provider (psychiatrist or CRNP) at intervals not exceeding ninety (90) days and more often if clinically indicated.

For patients assigned to work release, after six (6) months and two (2) appointments with the psychiatric provider during the period at work release, the treatment team may evaluate the patient and, if clinically appropriate, reduce the frequency for seeing the psychiatric provider to intervals not exceeding one hundred twenty (120) days.

Each patient will have an opportunity to see his or her counselor (MHP or psychologist) at intervals not exceeding ninety (90) days and more often if clinically indicated.

For patients assigned to work release, after six (6) months and two (2) appointments with the counselor during the period at work release, the treatment team may evaluate the patient and, if clinically appropriate, reduce the frequency for seeing the counselor to intervals not exceeding one hundred twenty (120) days.

### 4.1.3.3 - MH-C

After the initial treatment plan is developed, the patient's treatment team will review the patient's treatment plan at intervals not to exceed six (6) months, and more often if clinically indicated.

If the patient is prescribed psychiatric medications, then the patient will have an opportunity to see his or her psychiatric provider (psychiatrist or CRNP) at intervals not exceeding ninety (90) days and more often if clinically indicated.

Each patient will have an opportunity to see his or her counselor (MHP or psychologist) at an interval of thirty (30) to sixty (60) days and more often if clinically indicated.

## SECTION 2 - STRUCTURED LIVING UNIT (SLU)

### 4.2.1 - PLACEMENT

An SLU is a diversionary outpatient unit for persons with an SMI or who are otherwise found to be inappropriate for placement in an RHU. Patients in need of residential-level care must not be housed in the SLU.

Placement of any patient in the SLU must be based on clinical judgment. Prisoners assigned to restrictive housing, but not counter-indicated for RHU placement, are prohibited from being placed in SLU.

Within twenty-four (24) hours of a patient's arrival in the SLU, an RN must assess each patient to ensure continuity of medication and determine whether the patient has any urgent or emergent medical or mental health needs.

An RN must complete an initial nursing assessment within seventy-two (72) hours of a patient's arrival in the SLU.

A psychiatrist or CRNP (in collaboration with a psychiatrist who will review the initial psychiatric assessment performed by the CRNP) must complete the initial psychiatric assessment of patient within three (3) working days of a patient's arrival in the SLU.

A counselor (a psychologist or licensed MHP) must complete an initial assessment within seventy-two (72) hours of a patient's arrival in the SLU.

### 4.2.2 - TREATMENT PLANS

Preliminary treatment plans must be created within three (3) working days of a patient's placement in an SLU and finalized within fourteen (14) days, unless otherwise indicated due to a clinical necessity.

### 4.2.3 - TREATMENT TEAM MEETINGS

Each patient in the SLU must have a designated treatment team consisting of the following individuals:

- A psychiatrist or CRNP (if the patient is on mental health medications);
- The patient's assigned psychologist or MHP;
- A mental health nurse;
- An activity technician for the patient's assigned mental health unit;
- A member of the correctional staff regularly assigned to the patient's housing unit;

- A member of the medical staff (when the mental health provider determines that the presence of a primary medical provider is necessary in order to address the impact of a medical condition on the patient's treatment plan); and
- The patient.

Treatment team meetings for patients in SLU must occur at intervals not to exceed ninety (90) days in order to formulate/revise the patient's treatment plan, review progress notes, discuss the condition of the patient, revise the patient's mental health code (if appropriate), and address the patient's progress.

## 4.2.4 - TREATMENT

Frequency of treatment team meetings as well as sessions with psychiatric providers and counselors for patients in the SLU must be determined based on minimal mental health code treatment expectations in the "Outpatient Care" chapter.

Patients in the SLU must have ten (10) hours of structured, therapeutic out-of-cell time and ten (10) hours of unstructured out-of-cell time per week, unless clinically contraindicated.

Any individual out-of-cell interactions with the treatment team, psychiatric provider (psychiatrist or CRNP), counselor (psychologist or licensed MHP), or group facilitator or therapeutic groups will count towards the applicable structured, therapeutic out-of-cell time.

The provision of unstructured out-of-cell time must begin immediately upon arrival at the SLU, without waiting for the initial treatment team meeting.

## 4.2.5 - TRANSFER OF PATIENTS

Decisions regarding transfer of outpatient patients (MH Code B and C) will not occur without consultation with the treatment team. The treatment team must weigh the reason for the transfer against concerns about continuity of care.

Patients with an SMI flag may only be transferred upon approval of the patient's treatment team.

In the event that a patient housed in an SLU is transferred to a different facility, the patient's treatment team must meet within three (3) weekdays of the patient's transfer.

## SECTION 3 – RESIDENTIAL TREATMENT UNIT (RTU)

### 4.3.1 - PLACEMENT

Placement of any patient in the RTU must be based on clinical judgment. Prisoners assigned to restrictive housing, who are not in need of RTU level care, are prohibited from being placed in the RTU.

### 4.3.2 - TREATMENT PLANS

Preliminary treatment plans must be created within three (3) working days of a patient's placement in an RTU and finalized within fourteen (14) days, regardless of level of placement, unless otherwise indicated due to a clinical necessity.

### 4.3.3 - TRANSFER OF PATIENTS

The transfer of patients in the RTU will be permitted to accommodate a patient's change in level of care occasioned by an improvement or deterioration in mental health condition. Transfers to other facilities having the same level of care as the patient's current facility will not occur without approval of the treatment team. The treatment team must weigh the reason for the transfer against concerns about continuity of care.

Patients with an SMI flag may only be transferred upon approval of the patient's treatment team.

In the event that a patient housed in an RTU is transferred to a different facility, the patient's treatment team must meet within three (3) weekdays of the patient's transfer.

### 4.3.4 - RTU LEVEL 1

#### 4.3.4.1 - PLACEMENT

A patient may be admitted to the RTU Level 1 from any ADOC facility or from an inpatient hospital.

If a patient is admitted to the RTU Level 1 from another level of the RTU or from the SU and any member of the patient's treatment team changes, the new member(s) of the treatment team must review the patient's mental health record and meet with the patient prior to the first treatment team meeting in the RTU Level 1.

Initial assessments are not required for patients admitted from another level of the RTU or from the SU.

If a patient is admitted directly to the RTU Level 1 from any location other than the RTU or the SU, an initial assessment must be completed as follows:

- A nurse must complete the initial nursing assessment within twenty-four (24) hours of a patient's arrival in the RTU Level 1.
- A psychiatrist or CRNP (in collaboration with a psychiatrist who will meet with the patient, review and approve or modify the initial psychiatric assessment performed by the CRNP) must complete the initial psychiatric assessment:
    o If a patient's RTU Level 1 admission occurs between 7 a.m. on Monday and 3 p.m. on Friday, then the psychiatric assessment will occur within twenty-four (24) hours of a patient's admission to the RTU Level 1; or
    o If a patient's RTU Level 1 admission occurs after 3 p.m. on a Friday or on a weekend or holiday, then:
        ▪ a psychiatrist or CRNP (in collaboration with the psychiatrist) will enter initial orders for the patient based upon a telephone consultation with a mental health nurse after the nursing assessment; and
        ▪ the psychiatric assessment will occur on the next business day following the date of the patient's RTU Level 1 admission.
- A counselor (a psychologist or licensed MHP) must complete an initial assessment within twenty-four (24) hours of a patient's arrival in the RTU Level 1.

## 4.3.4.2 - TREATMENT TEAM

Each patient in the RTU Level 1 must have a designated treatment team consisting of the following individuals:

- A psychiatrist;
- A CRNP (if the CRNP conducts more than 50% of the weekly encounters with the patient);
- The patient's assigned psychologist or MHP;
- A mental health nurse;
- An activity technician for the patient's assigned mental health unit;
- A member of the correctional staff regularly assigned to the patient's housing unit;
- A member of the medical staff (when the mental health provider determines that the presence of a primary medical provider is necessary in order to address the impact of a medical condition on the patient's treatment plan); and
- The patient.

Treatment team meetings for patients on the RTU Level 1 must occur at intervals not to exceed three (7) days in order to formulate/revise the patient's treatment plan, review progress notes,

discuss the condition of the patient, revise the patient's mental health code (if appropriate), and address the patient's progress.

### 4.3.4.3 - TREATMENT

The patient must have at least three (3) confidential, out-of-cell clinical encounters each week with a psychiatrist or CRNP. At least every other week, at least one (1) encounter must be with the psychiatrist.

The patient must have at least two (2) interactions per week with a mental health nurse.

The patient must have at least three (3) confidential, out-of-cell counseling sessions each week with the assigned psychologist or licensed MHP.

Patients in the RTU Level 1 must have ten (10) hours of structured, therapeutic out-of-cell time and ten (10) hours of unstructured out-of-cell time per week, unless clinically contraindicated. Any individual out-of-cell interactions with the treatment team, psychiatric provider (psychiatrist or CRNP), counselor (psychologist or licensed MHP), or group facilitator or therapeutic groups will count towards the applicable structured, therapeutic out-of-cell time.

### 4.3.4.4 - LENGTH OF STAY

A patient's length of stay must be clinically determined.

If a patient stays on RTU Level 1 for thirty (30) days, the treatment team and the mental health vendor's psychiatric director must have a case conference to determine the reasons for the patient's failure to stabilize sufficiently to progress to RTU Level 2. Such case conference must be repeated every thirty (30) days thereafter until the patient is sufficiently stabilized to progress to RTU Level 2 or is transferred to a higher level of care.

The number of people remaining in RTU Level 1 longer than thirty (30) days must be reviewed and considered in the CQI process.

### 4.3.4.5 - DISCHARGE FROM RTU LEVEL 1

From the RTU Level 1, a patient may be discharged to a SU, a RTU (any level), an inpatient psychiatric hospital, or to general population.

## 4.3.5 - RTU LEVEL 2

### 4.3.5.1 - PLACEMENT

A patient may be admitted to the RTU Level 2 from any ADOC facility or from an inpatient psychiatric hospital.

If a patient is admitted to the RTU Level 2 from another level of the RTU or from the SU and any member of the patient's treatment team changes, the new member(s) of the treatment team must review the patient's mental health record and meet with the patient prior to the first treatment team meeting in the RTU Level 2.

Initial assessments are not required for patients admitted from another level of the RTU or from the SU.

If a patient is admitted directly to the RTU Level 2 from any location other than the RTU or the SU, an initial assessment must be completed as follows:

- Within twenty-four (24) hours of in patient's arrival in the RTU, a nurse must assess each patient to ensure continuity of medication and determine whether the patient has any urgent or emergent medical or mental health needs.
- A nurse must complete the initial nursing assessment within forty-eight (48) hours of a patient's arrival in the RTU Level 2.
- A psychiatrist or CRNP (in collaboration with a psychiatrist) must complete the initial psychiatric assessment as follows:
    - o If a patient's RTU Level 2 admission occurs between 7 a.m. on Monday and 3 p.m. on Friday, then the psychiatric assessment will occur within twenty-four (24) hours of a patient's admission to the RTU Level 2; or
    - o If a patient's RTU Level 2 admission occurs after 3 p.m. on a Friday or on a weekend or holiday, then:
        - ▪ a psychiatrist or CRNP (in collaboration with the psychiatrist) will enter initial orders for the patient based upon a telephone consultation with a mental health nurse after the nursing assessment; and
        - ▪ the psychiatric assessment will occur on the next business day following the date of the patient's RTU Level 2 admission.
    - o A counselor (a psychologist or licensed MHP) must complete an initial assessment within twenty-four (24) hours of a patient's arrival in the RTU Level 2.

## 4.3.5.2 - TREATMENT TEAM

Each patient in the RTU Level 2 must have a designated treatment team consisting of the following individuals:

- A psychiatrist or CRNP (if the patient is on mental health medications);
- The patient's assigned psychologist or MHP;
- A mental health nurse;
- An activity technician for the patient's assigned mental health unit;
- A member of the correctional staff regularly assigned to the patient's housing unit;
- A member of the medical staff (when the mental health provider determines that the presence of a primary medical provider is necessary in order to address the impact of a medical condition on the patient's treatment plan); and
- The patient.

Treatment team meetings for patients on the RTU Level 2 must occur at intervals not to exceed fourteen (14) days in order to formulate/revise the patient's treatment plan, review progress notes, discuss the condition of the patient, revise the patient's mental health code (if appropriate), and address the patient's progress.

## 4.3.5.3 - TREATMENT

The patient must have at least weekly confidential, out-of-cell clinical encounters with the psychiatrist or CRNP.

The patient must have at least weekly confidential, out-of-cell counseling with the assigned psychologist or licensed MHP.

A daily interaction with a mental health nurse documented in the patient's mental health record. The daily interaction with a mental health nurse will take place outside the patient's cell in a location that provides for confidentiality.

Patients in the RTU Level 2 must have ten (10) hours of structured, therapeutic out-of-cell time and ten (10) hours of unstructured out-of-cell time per week, unless clinically contraindicated. Any individual out-of-cell interactions with the treatment team, psychiatric provider (psychiatrist or CRNP), counselor (psychologist or licensed MHP), or group facilitator or therapeutic groups will count towards the applicable structured, therapeutic out-of-cell time.

## 4.3.5.4 - LENGTH OF STAY

A patient's length of stay must be clinically determined.

## 4.3.5.5 - DISCHARGE FROM RTU LEVEL 2

From the RTU Level 2, a patient may be discharged to SU, a RTU (any level), an inpatient psychiatric hospital, or to general population.

## 4.3.6 - RTU LEVEL 3

### 4.3.6.1 - PLACEMENT

A patient may be admitted to the RTU Level 3 from an RTU Level 1 or 2, or from an SU.

If a patient is admitted to the RTU Level 3 from another level of the RTU or from the SU and any member of the patient's treatment team changes, the new member(s) of the treatment team must review the patient's mental health record and meet with the patient prior to the first treatment team meeting in the RTU Level 3.

### 4.3.6.2 - TREATMENT TEAM

Each patient in the RTU Level 3 must have a designated treatment team consisting of the following individuals:

- A psychiatrist or CRNP (if the patient is on mental health medications);
- The patient's assigned psychologist or MHP;
- A mental health nurse;
- An activity technician for the patient's assigned mental health unit;
- A member of the correctional staff regularly assigned to the patient's housing unit;
- A member of the medical staff (when the mental health provider determines that the presence of a primary medical provider is necessary in order to address the impact of a medical condition on the patient's treatment plan); and
- The patient.

Treatment team meetings for patients on the RTU Level 3 must occur at intervals not to exceed thirty (30) days in order to formulate/revise the patient's treatment plan, review progress notes, discuss the condition of the patient, revise the patient's mental health code (if appropriate), and address the patient's progress.

### 4.3.6.3 - TREATMENT

The patient must have confidential clinical encounters with the psychiatrist or CRNP at intervals not to exceed fourteen (14) days for the first six (6) weeks on RTU Level 3. After six (6) weeks, if clinically appropriate, the psychiatrist or CRNP can reduce to the frequency of encounters to intervals not to exceed thirty (30) days. To the extent patients in RTU Level 3 are housed in cells, these clinical encounters will not take place at the patient's cell.

The patient must have confidential counseling session with the assigned psychologist or licensed MHP at intervals not to exceed fourteen (14) days for the first six (6) weeks on RTU Level 3. After six (6) weeks, if clinically appropriate, the counselor can reduce to the frequency of encounters to intervals not to exceed thirty (30) days. To the extent patients in RTU Level 3 are housed in cells, these counseling sessions will not take place at the patient's cell.

A daily interaction with a mental health nurse documented in the patient's mental health record. To the extent patients in RTU Level 3 are housed in cells, these interactions will not take place at the patient's cell.

For patients who are determined to need to stay in the RTU indefinitely, after six (6) months on the RTU Level 3, the following minimum treatment requirements can be reduced as follows, consistent with clinical judgment:

- A patient will be seen by a psychiatrist or CRNP for a psychiatric evaluation at intervals not exceeding ninety (90) days.
- A patient will have an interaction with a counselor (licensed MHP or psychologist) at intervals not to exceed thirty (30) days.

Patients in celled RTU Level 3 units must have ten (10) hours of structured, therapeutic out-of-cell time and ten (10) hours of unstructured out-of-cell time per week, or the same amount of unstructured out-of-cell time as other prisoners of the same security level, whichever is greater. Any individual out-of-cell interactions with the treatment team, psychiatric provider (psychiatrist or CRNP), counselor (psychologist or licensed MHP), or group facilitator or therapeutic groups will count towards the applicable structured, therapeutic out-of-cell time.

Patients housed in a dormitory-style RTU Level 3 must have the same amount of time outside their dormitory as prisoners of the same security level who are not mentally ill.

## 4.3.6.4 - LENGTH OF STAY

A patient's length of stay must be clinically determined. Some patients may require extended placement in RTU Level 3 due to vulnerability in general population settings.

## 4.3.6.5 - DISCHARGE FROM RTU LEVEL 3

From the RTU Level 3, a patient may be discharged to a SU, RTU (any level), an inpatient psychiatric hospital, or to general population.

## SECTION 4 - STABILIZATION UNIT (SU)

### 4.4.1 - PLACEMENT

Placement of any patient in the SU must be based on clinical judgment. Prisoners assigned to restrictive housing but are not in need of SU level care are prohibited from being placed in the SU units.

A patient may be admitted to the SU from any ADOC facility or an inpatient hospital.

A mental health nurse must complete the initial nursing assessment within four (4) hours of a patient's admission to the SU.

A psychiatrist or CRNP (in collaboration with the psychiatrist who will meet with the patient, review and approve or modify the initial psychiatric assessment performed by the CRNP) must complete the initial psychiatric assessment as follows:

- If a patient's SU admission occurs between 7 a.m. on Monday and 3 p.m. on Friday, then the psychiatric assessment will occur within twenty-four (24) hours of a patient's admission to the SU; or
- If a patient's SU admission occurs after 3 p.m. on a Friday or on a weekend or holiday, then:
  - a psychiatrist or CRNP (in collaboration with the psychiatrist) will enter initial orders for the patient based upon a telephone consultation with a mental health nurse after the nursing assessment; and
  - the psychiatric assessment will occur on the next business day following the date of the patient's SU admission.

A counselor (licensed MHP or psychologist) must complete a mental health assessment within twenty-four (24) hours of a patient's admission to the SU.

### 4.4.2 - TREATMENT PLANS

Initial treatment plans must be finalized within two (2) working days of a patient's placement in an SU, unless otherwise indicated due to a clinical necessity.

### 4.4.3 - TREATMENT TEAM MEETINGS

Each patient in the SU must have a designated treatment team consisting of the following individuals:

- A psychiatrist;
- A CRNP (if the CRNP conducts more than 50% of the weekly encounters with the patient);
- The patient's assigned psychologist or MHP;
- A mental health nurse;
- An activity technician for the patient's assigned mental health unit;
- A member of the correctional staff regularly assigned to the patient's housing unit;
- A member of the medical staff (when the mental health provider determines that the presence of a primary medical provider is necessary in order to address the impact of a medical condition on the patient's treatment plan); and
- The patient.

Treatment team meetings for patients in the SU must occur at intervals not to exceed three (3) days in order to formulate/revise the patient's treatment plan, review progress notes, discuss the condition of the patient, revise the patient's mental health code (if appropriate), and address the patient's progress.

## 4.4.4 - TREATMENT

At least three (3) times per week, the patient must have a confidential, out-of-cell clinical encounter with the psychiatrist or CRNP. At least one (1) of these three (3) weekly encounters will be with the psychiatrist.

The patient must have daily (7 days a week) interaction with a mental health nurse.

The patient must have daily (7 days a week) confidential, out-of-cell counseling with the assigned psychologist or licensed MHP.

Patients in the SU must have ten (10) hours of structured, therapeutic out-of-cell time and ten (10) hours of unstructured out-of-cell time per week, unless clinically contraindicated. Any individual out-of-cell interactions with the treatment team, psychiatric provider (psychiatrist or CRNP), counselor (psychologist or licensed MHP), or group facilitator or therapeutic groups will count towards the applicable structured, therapeutic out-of-cell time.

## 4.4.5 - TRANSFER OF PATIENTS

In order to ensure continuity of care, the patient's mental health code and condition must be considered in making determinations concerning transfer.

The transfer of patients in the SU will be permitted to accommodate a patient's change in level of care occasioned by an improvement or deterioration in mental health condition. Transfers to other facilities having the same level of care as the patient's current facility will not occur

without approval of the treatment team. The treatment team must weigh the reason for the transfer against concerns about continuity of care.

Patients with an SMI flag may only be transferred upon approval of the patient's treatment team.

In the event that a patient housed in an SU is transferred to a different facility, the patient's treatment team must meet within three (3) calendar days of the patient's transfer.

## 4.4.6 - LENGTH OF STAY

On a patient's thirtieth (30th) day in the SU, if the patient has not stabilized sufficiently to be transferred to the RTU or general population, then the treatment team and the mental health vendor's psychiatric director must consider hospitalization and may recommend hospitalization if clinically appropriate.

Reconsideration of hospital-level care must occur at least every fifteen (15) days thereafter, including the participation of the mental health vendor's psychiatric director, with such reconsideration documented in the patient's medical record. A copy of the documentation related to the case conference will be transmitted to the ADOC Director of Psychiatry for administrative oversight purposes.

ADOC's mental health vendor must maintain a log identifying all patients who have resided in the SU more than thirty (30) days. The log must include the dates and participants of the psychiatric evaluations required in the preceding paragraphs.

The number of people remaining in the SU longer than thirty (30) days must be reviewed and considered in the continuous quality improvement (CQI) process.

## 4.4.7 - DISCHARGE FROM STABILIZATION UNIT

From the SU, a patient may be discharged to an RTU (any level), an inpatient psychiatric hospital, or to general population.

## SECTION 5 - HOSPITAL-LEVEL CARE

Assessment and treatment requirements for patients awaiting or returning from hospital level care are outlined in AR 640, included within the Appendix.

# CHAPTER 5 - SPECIAL SERVICES AND POPULATIONS

## SECTION 1 - DISCIPLINARY SANCTIONS

Mental health consultation responsibilities related to patients facing disciplinary sanctions are outlined in AR 626, included within the Appendix.

## SECTION 2 - RESTRICTIVE HOUSING

### 5.2.1 - PLACEMENT

Prisoners assigned to housing in the RHU must not be placed in the RTU, SU, or SLU unless clinical need and/or SMI status requires that level of care.

Prior to placement in RHU, each person must be screened by an RN or LPN who has been trained in the screening process and is supervised by an RN. This screening must be conducted in person. The screening must include an assessment of:

- Whether the patient has been flagged as SMI;
- Whether the patient is at imminent risk of suicide or serious self-harm;
- Whether the patient exhibits debilitating symptoms of an SMI; and
- Whether the patient requires emergency medical care.

The results of the screening must be used to determine whether the patient can be placed into restrictive housing or must be diverted to another location (crisis placement, infirmary, RTU/SU, or SLU) and whether the patient requires a medical and/or mental health referral.

Patients with an SMI may not be placed in an RHU unless exceptional circumstances, as defined in this Guide, apply.

Mental health staff have the authority to veto any prisoner's placement in an RHU if placement is contraindicated based on the screening.

The screener must use and document the assessment on the Segregation Admission Screening Form.

### 5.2.2 - MENTAL HEALTH ROUNDS

To ensure any changes in mental health needs are identified, mental health rounds must occur in each RHU at least weekly. Mental health rounds must occur between the hours of 7:00 AM and 7:00 PM. Mental health rounds are to be completed by a QMHP.

Prior to conducting mental health rounds independently, new MHPs must shadow a senior MHP, psychiatrist, psychologist, or CRNP for three (3) mental health rounds the RHU. They must also receive training related to the purpose and proper procedure for conducting RHU rounds, along with their role in the referral process and the role of mental health staff in the evaluation of risk.

Mental health rounds must include:

- A review of duty post logs and segregation unit record sheets for information about prisoners' participation in recreation, showers, meal consumption and sleep patterns;
- Discussion with the post officer(s) as to whether they have noticed any behavior changes of any prisoner;
- Walking through the RHU, stopping at every cell and making visual contact with the prisoner(s) inside the cell;
- Verbal communication with the prisoner including a brief inquiry into how the prisoner is doing, whether they need to talk to mental health privately or have any other mental health need; and
- Briefly viewing the condition of the prisoner's hygiene, behavior, affect, physical condition and the condition of the cell (neat and orderly, trash, food, bodily fluids, smoke, etc.).

Documentation of Mental Health rounds require notation of the date and time of entry and exit of the professional conducting the mental health round on the RHU Correctional Officer Duty Post Log. Mental health professionals must also log a brief notation about each patient in the RHU on the Mental Health Rounds Form. If there has been any significant change in the prisoner's condition or additional mental health follow-up is indicated, a brief progress note will also be entered in the specific prisoner's medical record. The mental health rounds forms must be chronologically filed and maintained by the mental health manager.

## 5.2.3 - PERIODIC MENTAL HEALTH ASSESSMENTS

Within 7 days of placement in an RHU, each person will be assessed by a QMHP using the Mental Health Assessment/Report Form. Periodic mental health assessments may be conducted via telehealth.

The assessment must include a review of the person's past response to having been in restrictive housing and inquiry into:

- Whether the prisoner has a present suicide ideation;
- Whether the prisoner has a history of suicidal behavior;
- Whether the prisoner is presently prescribed psychotropic medication;
- Whether the prisoner has a current mental health complaint;
- Whether the prisoner is being treated for mental health problems;

- Whether the prisoner has a history of inpatient or outpatient psychiatric treatment; and
- Whether the prisoner has a history of treatment for substance abuse.

The assessment must include a mental status examination, including consideration of general appearance and behavior, evidence of abuse and/or trauma, and current symptoms of psychosis, depression, anxiety, and/or aggression.

Each assessment must include a final disposition of one of the following:

- No mental health referral;
- Routine referral to mental health;
- Emergency referral requiring assessment with an hour; or
- Referral for removal from segregation.

Additional assessments are required during continued placement in an RHU. Assessments must be completed on the following timelines, unless clinically indicated for more frequent assessment:

- At least every 30 days for patients coded MH-B or MH-C
- At least every 90 days for patients coded MH-A

If a prisoner's RHU placement continues after a periodic mental health assessment, then the clinical rationale for his or her continued placement will be included on the Mental Health Assessment/Report form.

## 5.2.4 - TREATMENT TEAM

Each prisoner in the RHU on the mental health caseload must have a designated treatment team consisting of the following individuals:

- A psychiatrist or CRNP (if the patient is on mental health medications);
- The patient's assigned psychologist or MHP;
- A mental health nurse;
- An activity technician for the patient's assigned mental health unit;
- A member of the correctional staff regularly assigned to the patient's housing unit;
- A member of the medical staff (when the mental health provider determines that the presence of a primary medical provider is necessary in order to address the impact of a medical condition on the patient's treatment plan); and
- The patient.

## 5.2.5 - TREATMENT

Placement in an RHU must not be a basis for denying or delaying the patient's access to the interventions prescribed in their treatment plan or for deferring prescription of such interventions until after the patient is released from the RHU. Patients confined in restrictive housing must continue to minimally receive the same treatment interventions they received prior to placement in an RHU, or more frequent/intensive interventions if clinically indicated.

## 5.2.6 - REMOVAL FROM RESTRICTIVE HOUSING UNIT

Mental health staff have the authority to have any prisoner removed from an RHU if it is determined that continued placement is contraindicated as evidenced by changes in the prisoner's mental state and functioning.

If a prisoner in an RHU has a newly diagnosed SMI as a result of the assessment or a QMHP determines that their continued placement in the RHU is contraindicated, then that prisoner must be removed from the RHU within 72 hours. Removal must occur sooner if the mental health professional determines the need is more urgent or an emergency. The prisoner must be placed into housing appropriate to their mental health needs (i.e., RTU, SU, SLU).  A prisoner with a SMI into an SLU must take priority over a prisoner without a SMI.

## SECTION 3 - SUICIDE PREVENTION

## 5.3.1 – RESPONSE TO SUICIDE ATTEMPT

If mental health staff observe a prisoner attempting suicide or after completion of suicide, then such staff member must immediately call for assistance. Staff must immediately respond to a suicide threat with efforts to interrupt the behavior or attempt.

Immediate life-saving measures must be performed as soon as there are two (2) correctional officers present and must continue until either paramedics arrive and assume care, or a physician declares such measures are no longer necessary.

## 5.3.2 - PLACEMENT

Prisoners admitted to suicide watch must be considered for placement on the mental health caseload. If a prisoner admitted to suicide watch is not placed on the mental health caseload, then the clinical rationale must be documented in the prisoner's medical chart.

Before a prisoner is placed on suicide watch, a nurse must examine the prisoner and complete a body chart.

After a patient's initial placement on constant observation, triage by a triage nurse, and referral for mental health evaluation, each patient must be evaluated using a suicide risk assessment to determine if the individual is not suicidal or is "acutely suicidal" or "nonacutely suicidal". "Acutely suicidal" or "nonacutely suicidal" is defined by the NCCHC standard MH-G-04:

### Acutely Suicidal (Active)

Acutely suicidal patients are those who engage in self-injurious behavior or threaten suicide with a specific plan. These patients should be placed on constant observation.

### Nonacutely Suicidal (Potential or Inactive)

Nonacutely suicidal patients are those who express current suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) and/or have a recent prior history of self-destructive behavior. In addition, patients who deny suicidal ideation or do not threaten suicide but demonstrate other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury should be placed on suicide precautions and observed at staggered intervals not to exceed every 15 minutes (e.g., 5, 10, 7 minutes)

A suicidal prisoner must not be handcuffed before placement on suicide watch, unless the prisoner's security level requires it or they are engaged in serious disruptive and dangerous activity that makes it unsafe to bring the prisoner out-of-cell without mechanical restraints.

Suicide watch cells must not be designated as a RHU cell.

## 5.3.3 - LEVELS OF SUICIDE WATCH

Any patient who is initially or subsequently determined to be acutely suicidal must be monitored through a constant watch procedure.

Any patient who is initially or subsequently determined to be nonacutely suicidal must be monitored through a "close watch procedure" that ensures monitoring by the mental health vendor's staff at staggered intervals not to exceed every 15 minutes.

Both constant observation and close watch must be contemporaneously documented at staggered intervals not to exceed 15 minutes on a record maintained on each individual cell door. Upon discharge from suicide watch, these records must be maintained in the individual patient's medical record.

ADOC's mental health vendor must evaluate equipment available to observers to ensure they can conduct appropriate observation of patients on suicide watch and MHO. ADOC's mental health

vendor must ensure the routine oversight of observers by onsite MHPs and/or mental health management.

## 5.343 - TREATMENT PLANS

Initial treatment plans must be finalized within one (1) working day of a patient's placement in a crisis or mental health observation cell on acute suicide watch, non-acute suicide watch, mental health observation, or any other kind of crisis placement, unless otherwise indicated due to a clinical necessity.

## 5.3.5 - TREATMENT TEAM MEETINGS

Treatment teams for patients receiving outpatient care must include at least the following individuals:

- A Psychiatrist or CRNP (if the patient is on mental health medications);
- The patient's assigned psychologist or MHP; and
- A member of the medical staff (when the mental health provider determines that the presence of a primary medical provider is necessary in order to address the impact of a medical condition on the patient's treatment plan); and
- The patient.

Treatment team meetings for patients on acute suicide watch, non-acute suicide watch, mental health observation, or any other kind of crisis placement must occur at intervals not to exceed three (3) days in order to formulate/revise the patient's treatment plan, review progress notes, discuss the condition of the patient, revise the patient's mental health code (if appropriate), and address the patient's progress

## 5.3.6 - TREATMENT AND CONDITIONS

Mental health treatment services must be tailored to adequately meet the clinical needs of each patient). Treatment for patients on suicide watch must consider and factor in the dynamic risk factors identified in the SRA, along with any other relevant clinical factors.

Unless clinically indicated otherwise, patients on suicide watch must be provided the following:

- Shower shoes or other footwear for movement outside their suicide watch cell;
- A flexible thumbprint, flexible finger, or similar toothbrushes that will be returned after each use twice daily, or a no-shank fingertip toothbrush that will be maintained in individual containers or bags for later use;
- Shampoo, hair combs or brushes, hair grease, lotion, and feminine hygiene products; and
- Socks to wear inside the suicide watch cell.

Patients on suicide watch must receive the same privileges (e.g., visits, phone calls, mail) afforded by the patient's last housing assignment (e.g., population, RHU).

Patients on suicide watch must a regular meal offered on a silicone or pressed cardboard tray with a thumb-handle miniature spork or a paper/cardboard eating utensil (if the patient has misused regular cutlery on suicide watch). If a sack meal is necessary, then a menu with items approved by a dietician for nutritional content and variation must be provided. Sack meals may be provided only so long as necessary to manage a patient with acute suicide risk.

Patients housed in crisis cells or medical cells/infirmary must be provided appropriate out-of-cell activity after 72 hours, unless contraindicated and the clinical rationale for not providing the activity is documented in the medical record.

## 5.3.7 - REFERRAL TO HIGHER LEVEL OF CARE

If a patient remains on watch for 72 hours, then they must be considered for referral to a higher level of care (which includes a RTU, SU, or inpatient hospitalization, as clinically appropriate). If the patient is not referred for a higher level of care, the clinical rationale must be documented in the medical chart and tracked in the crisis utilization log.

If a patient remains on watch for 168 hours, the treatment team must meet to review a referral to a higher level of care. If the patient is not referred to a higher level of care, the clinical rationale must be documented in the medical chart and tracked in the crisis utilization log.

If a patient remains on watch for 240 hours or longer and does not meet the criteria for discharge to outpatient mental health care, then the patient must be referred to a higher level of care as clinically appropriate.

Patients who are returned to watch status within thirty (30) days of release from a watch and/or who have three watch placements within six (6) months must be considered for referral to a higher level of care. If the patient is not referred to a higher level of care, the clinical rational must be documented and immediately provided to ADOC's OHS.

## 5.3.8 - DISCHARGE FROM SUICIDE WATCH

### 5.3.8.1 - DISCHARGE EVALUATION

Each patient placed on constant watch must be reduced to a close watch prior to release from suicide watch, unless a clinician determines and documents the propriety of discharging a patient to a less restrictive setting to avoid unnecessarily continuing the confinement of the patient.

Prior to being discharged from suicide watch, a patient must receive an out-of-cell, confidential evaluation. If an out-of-cell, confidential evaluation is not possible due to documented clinical concerns, staff must consider if referral to a higher level of care is appropriate.

## 5.3.8.2 - DISCHARGE TO RHU

Patients discharged from suicide watch must not be transferred to an RHU, unless there is a documented exceptional circumstance, as defined in this Guide.

Any transfer from suicide watch to a RHU must be approved by the Deputy Commissioner of Operations (male-designated facilities), Deputy Commissioner of Women's Services (female-designated facility), or their designee.

## 5.3.9 - FOLLOW-UPS

Mental health staff must conduct four (4) suicide watch follow-up examinations, one on each of the first three days following discharge from suicide watch, and the 10th day following discharge.

Each follow-up examination must be conducted out-of-cell in a confidential setting, unless such an examination is not possible due to documented clinical concerns resulting in the patient being transferred to a higher level of care.

Follow-up examinations must not take the place of otherwise scheduled mental health appointments, though they may occur in connection with or contiguous with such appointments.

The mental health staff conducting the follow-up examinations must assess whether the patient released from suicide watch is showing signs of ongoing crisis, whether the patient needs further follow-up examinations, and whether the patient should be added to the mental health caseload or assigned a different mental health code.

ADOC may not discharge and transfer of a patient from suicide watch to another institution for ten (10) days, except to return a patient from suicide watch to his sending institution or another non-significant transfer prior to the commencement of the follow-up examinations, without restarting the four (4) follow ups. For example, a prisoner transferred from Holman to Fountain for suicide watch may return to Holman on the date of his discharge from suicide watch at Fountain. After completion of the four (4) follow-ups, a prisoner may be transferred to any ADOC facility without any further need for suicide watch follow-ups, unless clinically indicated.

## 5.3.10 - MENTAL HEALTH STAFFING

QMHPs, as defined above, may conduct suicide risk assessments, discharge evaluations, and follow-up examinations either in person or by telehealth. In the event that they are conducted by telehealth, the prisoner being evaluated must be in a room with an RN.

An ALC working toward their licensure as a Licensed Professional Counselor ("LPC") cannot complete suicide risk assessments or conduct follow-up examinations on their own. The ALC can participate in suicide risk assessments conducted by a QMHP, as a part of the ALC's training.

# CHAPTER 6 - TRAINING

## SECTION 1 - SUICIDE RISK ASSESSMENT TRAINING

CRNPs, MHPs, and nurses must be timely trained on the training materials approved by Drs. Perrien and Burns related to suicide risk assessments, discharge from suicide watch, follow-up examinations, and preplacement screening. A CRNP or MHP must be trained before conducting a suicide risk assessment.

For the training on conducting suicide risk assessments, ADOC's mental health vendor must use the mentoring model recommended by Drs. Perrien and Burns, with a CRNP or MHP (a) observing a previously trained mental health staff member conduct a suicide risk assessment on three (3) separate occasions, (b) conducting a suicide risk assessment on three (3) separate occasions with supervision, and (c) conducting a suicide risk assessment on three (3) separate occasions unsupervised but with the completed suicide risk assessments reviewed and approved by a previously trained mental health staff member. This same mentoring process must be used for ALCs when they attain independent licensure status.

Within two (2) years of the Effective Date and every two (2) years thereafter during the applicability of this Order, a psychiatrist or psychologist (as to CRNPs) and psychiatrist, psychologist, or CRNP (as to MHPs) must review the documentation for three (3) suicide risk assessments and observe as the CRNP or MHP conducts one (1) suicide risk assessment. If the CRNP's or MHP's reviewer determines, or if a supervisor otherwise separately determines, that the CRNP or MHP did not accurately, completely, or appropriately document and exercise reasonable clinical judgment related to the suicide risk assessments, then the CRNP or MHP must receive remedial training consistent with the paragraph preceding this one.

## SECTION 2 - CORRECTIONAL RISK FACTORS

Psychiatrists, psychologists, CRNPs, and MHPs must receive additional training on the importance of correctional risk factors such as safety concerns, recent disciplinary actions, and secondary gain; the use of constant observation and close watch depending on a prisoner's level of risk; the proper placement of and privileges for prisoners on Mental Health Observation ("MHO"); the level of observation necessary for prisoners on MHO; and the development and implementation of safety plans to address short- and long-term individualized interventions.

## SECTION 3 - OBSERVER TRAINING

Observers must receive additional training related to observation obligations; access to medical, mental health, and correctional staff; conflict resolution; and facility-specific processes and procedures (including how to access assistance in an emergency, obtain observation relief for a break, and communicate with supervisory staff during nontypical work hours).

## SECTION 4 – SMI DESIGNATION TRAINING

QMHPs must receive training on the implementation of the SMI designation and the application and implementation of the American Correctional Association's definition of SMI must be in place until the termination of this Order.

## CHAPTER 7 - APPENDIX

**Appendix A** – Administrative Regulation 640
              Advanced Inpatient Mental Healthcare


**Appendix B** – Administrative Regulation 626
              Mental Health Consultation to the Disciplinary Process

# Appendix A

Administrative Regulation 640

Advanced Inpatient Mental Healthcare



# State of Alabama
# Department of Corrections

Alabama Criminal Justice Center
301 South Ripley Street
P. O. Box 301501
Montgomery, AL 36130-1501
(334) 353-3883



**KAY IVEY**
GOVERNOR

**Jefferson Dunn**
COMMISSIONER

August 20, 2020

ADMINISTRATIVE REGULATION                    OPR:  HEALTH SERVICES
NUMBER       640

## ADVANCED INPATIENT MENTAL HEALTHCARE

I.  **GENERAL**

This Alabama Department of Corrections (ADOC) Administrative Regulation (AR) establishes the responsibilities, policies, and treatment procedures for inmates whose mental health treatment needs exceed the capabilities available within the prison system.  Neither this Administrative Regulation nor anything contained in this Administrative Regulation shall be construed to create or recognize any liberty or property interest in advanced inpatient mental healthcare or any other terms, condition, or provisions in this Administrative Regulation.

II.  **POLICY**

It is ADOC's policy, by means of its contracted health services vendor, to appropriately diagnose, treat, and manage inmates with serious mental health needs in a humane, safe environment that is sensitive and responsive to each inmate's mental health needs. When the mental health needs of an inmate require an advanced inpatient level (or "hospital-level") care, ADOC will secure such care at a mental health inpatient treatment center.

III.  **DEFINITION(S) AND ACRONYM(S)**

Refer to AR 602 (amended) *Mental Health Definitions and Acronyms*.

A.  **ADOC Director of Psychiatry (DOP):**  A board-certified psychiatrist within the ADOC Office of Health Services, whose responsibilities include oversight of mental health treatment services provided to persons incarcerated within the ADOC system.

B.  **Diagnostic and Statistical Manual of Mental Health Disorders (DSM):** The widely-used diagnostic classification system published by the American Psychiatric Association.  ADOC uses the most recent version (the DSM-5).  Some older records may reference the previous version (the DSM-IV).

C.   **Facility Medical Director (FMD):** An Alabama licensed physician (medical doctor or doctor of osteopathy), employed by ADOC's contracted health services vendor, who acts as the primary treating physician for all inmates housed within an ADOC facility and who is designated as the "Health Authority."

D.   **Imminent Danger:** The existence of a substantial likelihood that the inmate will act to harm herself / himself or others in the immediate foreseeable future.

E.   **Stabilization Unit (SU):**  A mental health inpatient treatment center designed to provide intensive treatment to inmates experiencing acute mental health problems when brief crisis interventions at other ADOC institutions have been unsuccessful in assisting the inmate in achieving prior levels of functionality.

F.   **Mental Health Inpatient Treatment Center (MHITC):** A licensed ADOC or private mental health inpatient treatment center, with the capability to provide comprehensive mental health treatment (including hospital-level care) to inmates in ADOC's custody.

G.   **Qualified Mental Health Professional (QMHP):** Licensed psychiatrists, psychologists, licensed counselors, psychiatric social workers, psychiatric nurses, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients.

H.   **Residential Treatment Unit (RTU):** A specialized housing placement for treating inmates with mental illness who are at risk for psychiatric deterioration in a less restrictive setting.   This may be a short-term residential placement for inmates to resolve crises, or may be a long-term residential placement for those inmates with chronic limitations in their mental functioning.

I.   **Serious Mental Illness (SMI):** Psychotic Disorders, Bipolar Disorders, and Major Depressive Disorder; any diagnosed mental disorder (excluding substance use disorders) currently associated with serious impairment in psychological, cognitive, or behavioral functioning that substantially interferes with the person's ability to meet the ordinary demands of living and requires an individualized treatment plan by a qualified mental health professional(s). (American Correctional Association, *Restrictive Housing Expected Practices, January, 2018*)

J.   **Structured Living Unit (SLU):** An outpatient diversionary unit that provides an alternative to a Restrictive Housing Unit (RHU) for inmates flagged as having a SMI.  Inmates who are clinically determined to require a higher level of mental health care (RTU or SU) are not eligible for the SLU.

K.   **Director of Psychiatric Services (DPS):** An Alabama licensed physician who is board certified in the healthcare specialty of psychiatry, employed by ADOC's contracted health services vendor.

## IV.    RESPONSIBILITIES

A.    The DOP is responsible for potentially confirming the need for advanced inpatient mental health treatment, performing the annual assessment of beds for advanced inpatient mental health care, and reviewing inmates at a MHITC.

B.    The mental health vendor, including its DPS, FMD, and treating psychiatrists, are responsible for confirming the need for advanced inpatient mental health treatment, pursuing admission of inmates to a MHITC, complying with the pre- and post-transfer and post-discharge requirements, and quality improvement review and tracking procedures.

C.    The MHITC is responsible for providing advanced inpatient mental health care and other goods and services consistent with this Administrative Regulation and its contract with ADOC.

## V.    PROCEDURES

A.    **Access to Advanced Inpatient Hospital-Level Care**

1.    Advanced Inpatient Hospital-Level of Care. Advanced inpatient mental health treatment represents the most intensive level of psychiatric care. A multidisciplinary assessment and multimodal intervention is provided within a 24-hour skilled, secure, protected, and psychiatrically supervised treatment environment. Twenty-four (24) hour skilled psychiatric nursing care, daily medical care, and structured treatment milieu are provided. The goal of advanced inpatient mental health care is to stabilize inmates who display acute psychiatric disorders associated with a relatively sudden onset and a short, severe course, or a marked exacerbation of symptoms associated with a more persistent, recurring psychiatric disorder. Typically, the inmate poses an imminent danger to herself / himself or others, or displays a severe psychological dysfunction. Additionally, the inmate has been evaluated by a psychiatrist, demonstrated symptomology consistent with her or his DSM diagnosis, and can be reasonably expected to respond to therapeutic intervention.

2.    Current Access to MHITC. An inmate with a SMI occasionally requires advanced inpatient mental health care. ADOC secured advanced inpatient mental health care at one (1) or more MHITCs.

3.    Obligations on ADOC's Contracted MHITC. ADOC's contracted MHITC will (among other things):

a.    Collaborate with the inmate's current mental health provider and treatment team in its initial evaluation;

b.    Provide all appropriately licensed program and treatment staff necessary to provide advanced inpatient mental health services and treatment programs;

c.   Provide all mental health services and treatments found to be appropriate by the treatment team;

d.   Provide all necessary facilities, equipment, materials, and supplies necessary for the advanced inpatient mental health care;

e.   Administer all medications prescribed to the inmate;

f.   Perform standard medical and psychiatric diagnosis procedures;

g.   Supervise inmate's movement;

h.   Provide basic housekeeping and food services;

i.   Contact the FMD if an inmate develops a medical condition after admission to the MHITC; and

j.   Collaborate with the FMD to evaluate the assessment, diagnosis, and treatment of inmate while at the MHITC.

k.   Notwithstanding Sections a. through i. above, ADOC's contracted MHITC may resolve medical emergencies without collaboration with the FMD, provided, however, that ADOC's contracted MHITC must report the medical emergency, explain the medical care provided, the inmate's diagnosis and prognosis, and provide all medical records evidencing the emergency medical care within twenty-four (24) hours of the onset of the medical emergency.

l.   If the transfer of an inmate from the MHITC is necessary to provide a level of medical care that cannot be provided at the MHITC, then the FMD must be contacted for approval and disposition of the case.

m.   If the medical condition affecting the inmate interferes with her or his psychiatric care, the inmate must be discharged to ADOC's contracted medical provider assigned by ADOC to resolve the medical condition.

4.   Annual Reassessment of Need for Additional MHITC or Advanced Inpatient Beds. ADOC (through its DOP and others) will annually reassess its need for MHITCs and/or beds for advanced inpatient mental health care at existing MHITCs for inmates in ADOC's custody. ADOC's reassessment will include a consideration of, among other things, the frequency of use and vacancy of beds, the timeliness or delay associated with an admission to a MHITC or advanced inpatient mental health care facility, the refusal of admission to any MHITCs, and the types of services and treatment options available for ADOC inmates. The assessment and considerations shall be in writing. If ADOC determines that its needs have changed for MHITCs and/or advanced inpatient beds at existing MHITCs, then ADOC will revise or pursue an agreement with the new or existing MHITCs. Notwithstanding the foregoing, for the period of at least two (2)

years from the date of this AR, ADOC will have at least fourteen (14) dedicated beds for ADOC inmates.

5. <u>Admission to Additional MHITCs or Advanced Inpatient Beds.</u> ADOC may admit inmates for advanced inpatient mental health care to facilities in addition to those it currently possesses a contract with, provided that the facility meets the requirements contained in this AR.

6. <u>Involuntary Commitment.</u> Notwithstanding anything to the contrary in this AR, ADOC hereby reserves the right to and may initiate involuntary commitment proceedings pursuant to Administrative Regulation 634 (as amended by Administrative Regulation 634-1) and Alabama Code § 22-52-1.1, *et seq.*

**B.   Evaluation and Confirmation of Need**

1. <u>Evaluation of Inmate's Need.</u> In evaluating an inmate's need for advanced inpatient mental health care, a treating and/or consulting psychiatrist will evaluate the existence or occurrence of one or more of the following events and/or conditions:

    a.   An inmate housed in a SU who (consistent with the timeframes and processes set out in Section 4.1.3 of the Psychotherapy Order [Doc. No. 1899-1]) has not stabilized sufficiently to be transferred to a RTU or general population;

    b.   An inmate presents a sustained, imminent danger to herself / himself or others due to acute psychosis or other psychiatric symptoms or dysfunction that does not respond to intervention within ADOC's mental health treatment venues;

    c.   An inmate requires continuous skilled observation, evaluation, and/or treatment available only in an advanced inpatient environment;

    d.   An inmate requires intensive treatment, protection, and a safe therapeutic environment for herself / himself and/or the protection of others;

    e.   An inmate expresses suicidal ideations, engages in repeated self-mutilation, or engages in assaultive threats or behavior with risk of escalation or future repetition;

    f.   An inmate experiences persistent command hallucinations directing harm to himself /herself or others;

    g.   An inmate engages in disordered or bizarre behavior or psychomotor agitation that interferes with the activities of daily living to such a degree that the inmate cannot function at a less intensive level of care;

    h.    An inmate demonstrates disorientation or memory impairment, which is due to a DSM diagnosis, that endangers the welfare of himself / herself or others; or

    i.    An inmate experiences severe side-effects of atypical complexity from using therapeutic psychotropic drugs warranting continuous monitoring while undergoing titration of medication before initiation of new medication therapy.

    j.    Notwithstanding Sections a. through i. above, the evaluation of an inmate's need for, and decision to transfer that inmate to advanced inpatient mental health care relies upon the clinical judgment of the treating and/or consulting psychiatrist.

2.    <u>Confirmation of Inmate's Need.</u> The DPS and/or treating psychiatrist will confirm that the inmate meets the needs for admission to a MHITC. To do so, the DPS and/or treating psychiatrist will, at a minimum, review the inmate's medical and mental health record, conduct a clinical face-to-face interview with the inmate, and document the basis for the decision to transfer the inmate to a MHITC on Form MH-078.

## C. Admission Decisions

1.    The DPS and/or the inmate's treating psychiatrist will identify inmates on the mental health caseload and with a mental health diagnosis housed within a SU (consistent with the timeframes and processes set out in Section 4.1.3 of the Psychotherapy Order [Doc. No. 1899-1]), RTU, or SLU who may benefit from advanced inpatient mental health care.

2.    For any inmate identified who may benefit from advanced inpatient mental health care, the inmate's treating psychiatrist will:

    a.    Complete a psychiatric evaluation in conformance with Administrative Regulation 615 (as amended by Administrative Regulation 615-1); and

    b.    Complete ADOC Form MH-078, including documenting the evaluating psychiatrist's findings, and place the original, completed ADOC Form MH-078 in the inmate's medical record and send a copy to the DOP within one (1) working day of completion.

3.    Within seventy-two (72) hours of receipt of a complete ADOC Form MH-078, the DPS will review the inmate's medical record and assessment.

4.    The DPS will determine if admission to a MHITC is in the best interest of the inmate and, within eight (8) hours of her or his review, prepare a request for admission to a MHITC or document a recommendation of postponement of admission for an additional forty-eight (48) hours.

5.   If the DPS defers a decision pending further review, then his or her decision to either admit the inmate to a MHITC (and the preparation of an order for admission to a MHITC) or to deny the inmate admission to a MHITC (and documentation of that decision) must be made within forty-eight (48) hours of the recommendation to hold pending further review. A decision to hold pending further review shall be documented, including the clinical reason for the decision to hold pending further review.

### D.   Pre-Transfer Requirements

1.   Between the time when an inmate presents for consideration of a transfer to a MHITC and a decision is made, and during any wait pending transfer to a MHITC, an inmate will have access to psychotherapy consistent with the *Braggs v. Dunn* Phase 2A Order and Injunction on Mental Health Psychotherapy and Confidentiality Remedy (Doc. No. 1899-1) and treatment team meetings and plans consistent with the *Braggs v. Dunn* Phase 2A Order and Injunction on Mental Health Individualized Treatment Planning Remedy (Doc. No. 1865-1).

2.   Before transferring an inmate to a MHITC and/or advanced inpatient mental health care facility, the DPS and inmate's treating physician will collaborate with the FMD to assess the inmate's current medical needs and treatment to obtain a medical clearance for transfer to a MHITC.

3.   An inmate determined by ADOC's mental health vendor to need advanced inpatient mental health care at a MHITC will be transported to a MHITC within three (3) business days of such determination by the DPS and/or treating psychiatrist. A decision to admit an inmate to a MHITC will be made by the MHITC, relying solely on the MHITC's determination of the inmate's clinical need. If a MHITC decides not to admit an inmate, then the MHITC must explain in writing the rationale for its decision and identify all admission criteria that the inmate fails to meet. A copy of the MHITC's denial of admission will be placed in the inmate's mental health record. For any denial of admission due to an error in paperwork alone, ADOC will provide the corrected paperwork to the MHITC expeditiously, but in no case longer than eight (8) hours after ADOC is notified of the error.

4.   Prior to transfer to a MHITC, the DPS and the inmate's treating psychiatrist will ensure pertinent medical records, including, for example, psychological evaluations, psychological evaluation updates, treatment plans, treatment plan reviews, progress notes, psychotropic medication reports, and a transfer note (consistent with Section 3.2 of the Treatment Planning Order [Doc. No. 1865-1]), are collected, copied, and sent to the MHITC prior to the inmate's arrival or at the time of transport to ensure the continuity of medical and mental health care upon transfer to an MHITC.

E.   **Post-Transfer Requirements**

1.   An inmate admitted to a MHITC may not be transferred to a different MHITC or another advanced inpatient mental health care facility, unless a clinically significant reason exists for the transfer. All clinically significant reasons for an inmate's transfer to a different MHITC or another advanced inpatient mental health care facility must be documented in the inmate's chart.

2.   If an inmate refuses to take his or her medications, then a MHITC that does not possess an involuntary medication process similar to the notice and hearing obligations contained in the Phase 2A Involuntary Medication Consent Decree (Doc. No. 1354), or otherwise possess a procedure compliant with *Washington v. Harper*, 494 U.S. 210 (1990), will either (i) discharge and return the inmate to a ADOC facility to complete the process contained in the *Braggs v. Dunn* Phase 2A Involuntary Medication Consent Decree, or (ii) complete the process contained in the Phase 2A Involuntary Medication Consent Decree at the MHITC. Any inmate discharged to ADOC custody who remains in need of advanced inpatient mental health care will be readmitted to a MHITC or another advanced inpatient mental health care facility after completing the IVM process.

F.   **Post-Discharge Requirements**

1.   Following an inmate's discharge from MHITC placement, the DPS and the inmate's treating psychiatrist will:

   a.   Ensure pertinent medical records for treatment obtained while at a MHITC, including, for example, psychological evaluations, psychological evaluation updates, treatment plans, treatment plan reviews, progress notes, psychotropic medication reports, and a discharge note (consistent with Section 3.11(e) of RFP No. 2018-04]), are copied, and sent with the inmate at the time of return to an ADOC facility or as soon as possible thereafter to ensure the continuity in care;

   b.   Assist the inmate with reintroduction into an ADOC facility; and

   c.   Facilitate the continuity of all medical and mental health care after the inmate is reintroduced to an ADOC facility.

2.   For a period of ninety (90) days after an inmate returns from a MHITC, the inmate must continue to receive the same medications prescribed on the date of discharge from the MHITC, including any non-formulary medications, so long as the inmate is clinically stable. An inmate's medication may be changed, as clinically appropriate, after such 90-day period with the clinical rationale for the decision documented in the inmate's chart. The clinical rationale for a medication change after the initial 90-day period may not

consider if the currently prescribed medication is formulary or non-formulary.

**G.   Quality Improvement and Tracking**

1.   The DPS or her / his designee will gather statistical data for each inmate admitted to a MHITC and prepare a monthly report to include the following information for each inmate:

a.   the date of the submission of ADOC Form MH-078;

b.   the admission diagnoses;

c.   the date of admission to a MHITC;

d.   the length of stay at a MHITC; and

e.   the date of discharge from a MHITC.

2.   The monthly report will be maintained by ADOC's contracted health care services vendor and provided to the DOP and ADOC's Associate Commissioner of Health Services or their designee.

3.   The DOP and DPS will, at a minimum, meet quarterly to review the status of each inmate at an MHITC, review her or his treatment, identify any issues of concern, and communicate any issues of concern with ADOC's contracted MHITC.

4.   The DOP and/or Associate Commissioner of Health Services may designate additional QMHPs to attend the quarterly meetings and provide input as to an inmate's assessment, diagnosis, and treatment at an MHITC.

**VI.   DISPOSITION**

Refer to AR 601 (as amended) *Mental Health Forms and Disposition*.

**VII.   FORMS**

Refer to AR 601 (as amended) *Mental Health Forms and Disposition* for any ADOC Form(s) used in this Administrative Regulation.

**VIII.   SUPERCEDES**

This is a new Administrative Regulation and, therefore, it does not supersede any other Administrative Regulation.

IX.     **PERFORMANCE**

This Administrative Regulation is published under the authority of the National Commission of Correctional Health Care: Standards for Health Services in Prisons 2015 (MH-D-05, MH-D-09) and the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

_____
                 Jefferson Dunn,
                 Commissioner

# Appendix B

Administrative Regulation 626

Mental Health Consultation to the
Disciplinary Process




# State of Alabama
# Department of Corrections

Alabama Criminal Justice Center
301 South Ripley Street
P. O. Box 301501
Montgomery, AL 36130-1501
(334) 353-3883

**KAY IVEY**
GOVERNOR

**Jefferson Dunn**
COMMISSIONER

August 20, 2020

**ADMINISTRATIVE REGULATION**                  **OPR:  HEALTH SERVICES**
**NUMBER        626**

### MENTAL HEALTH CONSULTATION TO THE DISCIPLINARY PROCESS

I.      **GENERAL**

This Alabama Department of Corrections (ADOC) Administrative Regulation (AR) establishes the responsibilities, policies, and procedures for the mental health consultation to the disciplinary process. Neither this Administrative Regulation nor anything contained in this Administrative Regulation shall be construed to create or recognize any liberty or property interest in a mental health consultation or any other terms, condition, or provisions in this Administrative Regulation.

II.     **POLICY**

Inmates in ADOC custody must comply with its rules and regulations. If an inmate violates ADOC's rules and regulations, then he or she will be subject to discipline consistent with AR 403. However, ADOC does not discipline an inmate for symptoms directly related to his or her mental illness, including but not limited to issuing a disciplinary or applying disciplinary sanctions to inmates for conduct directly related to engaging in self-injurious behavior. To avoid inappropriate disciplinary sanctions, a mental health consultation is provided during the disciplinary process to evaluate whether the inmate's behavior resulting in an ADOC rule or regulation violation is directly related to his or her mental illness and to make recommendations about the efficacy of disciplinary sanctions (including confinement to restrictive housing) and the impact of disciplinary sanctions on the inmate's mental illness.

III.    **DEFINITION(S) AND ACRONYM(S)**

Refer to AR 602 (amended) *Mental Health Definitions and Acronyms* and AR 403, *Procedures for Inmate Rule Violations*.

IV.     **RESPONSIBILITIES**

A.      ADOC's mental health vendor and its staff are responsible for training staff involved in the disciplinary process, performing the mental health consultation to the disciplinary process, participating in the disciplinary process, engaging inmates after the disciplinary process, completing documentation related to the mental health consultation and a disciplinary sanction of confinement to restrictive housing, determining when an inmate on suicide watch may receive information regarding a disciplinary sanction, and providing mental health services during a placement in restrictive housing.  A decision by an appropriate

mental health provider concerning contraindication of restrictive housing for certain rule violations will be outcome-determinative.

B.   ADOC staff involved in the disciplinary process are responsible for informing mental health staff of the need for a mental health consultation, ensuring the mental health consultation is completed, obtaining the presence of mental health staff at a disciplinary hearing if and when necessary, considering the mental health evaluation as it relates to the disciplinary sanction, and completing documentation related to the disciplinary process.

## V.   **PROCEDURES**

A.   **Training Correctional and Mental Health Staff.**

1.   All persons working within any ADOC major facility involved with the disciplinary process must complete the Comprehensive Mental Health Training Curriculum required by Section 1 of the Phase 2A Order and Injunction on Mental Health Identification and Classification Remedy (Referral) (Doc. Nos. 1821, 1821-1).

2.   All persons working within any ADOC major facility involved with the disciplinary process must complete training associated with ADOC's disciplinary process, sanctions (including sanctions other than restrictive housing), and mental health consultations to ensure they understand the applicable ARs and how to apply them consistently.

3.   All wardens, division directors, disciplinary hearing officers, and mental health staff must participate in annual training on the disciplinary process and mental health consultations to the disciplinary process.

B.   **Initiating a Mental Health Consultation.**

1.   Any person involved with the disciplinary process may initiate a mental health consultation through ADOC's computer module.

2.   A mental health consultation may be sought at the time of the rule or regulation violation or after review of the disciplinary report. A mental health consultation must be sought if the inmate is on the mental health caseload and has a mental health code of C or higher and/or an SMI designation; or, even if the inmate has a lower mental health code or is not on the mental health caseload, where the inmate has an intellectual or developmental disability, or the inmate's behavior at the time of the alleged actions giving rise to the disciplinary or at any time prior to or during the disciplinary process demonstrates signs of psychological distress or mental impairment.

3.   If a mental health consultation is initiated as a result of behavior demonstrated during a disciplinary hearing, then the disciplinary hearing will be postponed so that the process set forth in this AR can be completed before continuing the disciplinary process and ADOC Form 403-D, *Notice of Postponement of Disciplinary Hearing* will be completed.

C.   **Process Following Initiation of a Mental Health Consultation.**

1.   An arresting officer, disciplinary hearing officers, or other person seeking a mental health consultation will complete the computer module to begin the

process.

2. A copy of the mental health consultation request or an ADOC Form MH-041, *Mental Health Consultation to the Disciplinary Process* and a copy (or draft) of ADOC Form 302-A, *Incident Report* must be provided to the inmate's treatment team chairperson—a mental health professional (MHP)— within one (1) working day of initiation of the mental health consultation.

3. For an inmate on the mental health caseload, a psychiatrist, psychologist, certified registered nurse practitioner (CRNP), or MHP performing the mental health consultation to the disciplinary process before the disciplinary hearing may not be a member of the inmate's treatment team, except when no psychiatrist, psychologist, CRNP, or MHP who is not a member of the treatment team is available within the period during which the consult must be conducted. For an inmate not on the mental health caseload, any psychiatrist, certified registered nurse practitioner, psychologist, or MHP will perform the mental health consultation to the disciplinary process before the disciplinary hearing.

   a. A mental health staff member performing the mental health consultation will evaluate:

      (1) an inmate's current and then-existing (at the time of the incident) mental state, including the inmate's capacity to proceed with a disciplinary hearing;

      (2) an inmate's mental health diagnosis or, for an inmate not previously diagnosed, the presence of mental illness;

      (3) an inmate's treatment and medication (including any compliance issues) over the past six (6) months;

      (4) any crisis placements over the past six (6) months;

      (5) whether the inmate's behavior resulting in an ADOC rule or regulation violation is the direct result of or related to his or her mental illness;

      (6) the likely impact of confinement to restrictive housing on an inmate's mental health and, based on the likely impact, if confinement to restrictive housing for a medium- or high-level rule violation is contraindicated;

      (7) the potential impact of other disciplinary sanctions on the inmate's mental state, including whether any specific disciplinary sanction is clinically contraindicated for the inmate and, in such instances, what alternative sanctions are not clinically contraindicated; and

      (8) the need for mental health staff to be present during the disciplinary hearing.

   b. The mental health consultation will be conducted out-of-cell in a setting that provides for confidentiality, unless that is not possible due to safety concerns, based upon clinical determinations. If confidentiality is not

possible for a mental health consultation, that fact, the safety concerns, and the actions taken to maximize confidentiality will be recorded in the ADOC computer module.

c.    If the mental health staff member performing the mental health consultation determines that conferring with a psychologist, psychiatrist, mental health professional or certified registered nurse practitioner on the inmate's treatment team would be beneficial, then he or she may confer with a member of the inmate's treatment team prior to the mental health consultation.

d.    The mental health staff member performing the mental health consultation will document his or her evaluation and provide any comments, notes, and recommendations in the ADOC computer module. A mental health staff member may identify disciplinary sanctions that are contraindicated for the inmate and any appropriate alternative disciplinary sanctions. A copy of the mental health consultation evaluations and recommendations will be (a) provided to the disciplinary hearing officer for consideration and to maintain with the inmate's disciplinary action file, and (b) placed in the inmate's mental health record to ensure the inmate's treatment team may receive and review it.

**D.   Mental Health Staff Involvement During the Disciplinary Hearing.**

1.    If a member of the inmate's treatment team determines the presence of a mental health staff member is necessary during the disciplinary hearing to assist the inmate, then the disciplinary hearing officer will coordinate the date and time of the disciplinary hearing (or continued disciplinary hearing) with the mental health staff to ensure a mental health staff member is present during the disciplinary hearing. The date and time for a disciplinary hearing (or continued disciplinary hearing) where a mental health staff member must be present should be a weekday between 8 a.m. and 4 p.m.

2.    A disciplinary hearing will be suspended or postponed if mental health staff determine the inmate lacks the capacity to participate in the disciplinary hearing because, for example, the inmate's mental health is decompensating or the inmate is on acute or non-acute suicide watch or mental health observation.

a.    ADOC Form 403-D, *Notice of Postponement of Disciplinary Hearing* will be completed.

b.    A psychiatrist or psychologist will advise the disciplinary hearing officer when, based on the psychiatrist's or psychologist's clinical judgment, the inmate possesses the capacity to participate in the disciplinary hearing and the disciplinary hearing may proceed.

c.    If the inmate is not capable of participating in the disciplinary hearing within (30) thirty days, then all information concerning or relating to the rule or regulation violation and the fact of the inmate's inability to proceed with the disciplinary hearing will be documented in a ADOC Form 302-A, *Incident Report* by the disciplinary hearing officer. A copy of the ADOC Form 302-A, *Incident Report* will be filed in the inmate's institutional file. Any ADOC Form 403-A, *Disciplinary Report* and/or ADOC Form 403-B, *Disciplinary Report (Continued)*

will be removed from the inmate's institutional file. No further action will be taken as it relates to this rule or regulation violation.

3.   During the disciplinary hearing and/or before the disciplinary officer adjudicates the disciplinary action, the disciplinary officer must consider the mental health consultation, including any evaluation, comments, or recommendations, in deciding an inmate's guilt or innocence and, if guilty, in imposing any disciplinary sanctions.

   a.   If the mental health staff member performing the mental health consultation concludes that the rule or regulation violation was a direct result of the inmate's mental illness, then the disciplinary hearing officer must find the inmate not guilty of the disciplinary action.

   b.   If the mental health staff member performing the mental health consultation concludes that the rule or regulation violation was related to, but not the direct result of, the inmate's mental illness, then the disciplinary hearing officer must take that conclusion into consideration in imposing any disciplinary sanctions.

4.   If an inmate is found guilty of a rule or regulation violation, then the disciplinary hearing officer may impose disciplinary sanctions consistent with AR 403 and Appendix B to AR 403, *Rule Violations Authorized Sanctions Table*. However, if the mental health staff member who conducted the mental health consultation determined that any specific disciplinary sanction is clinically contraindicated for the inmate, including confinement to restrictive housing for a medium- or high-level rule or regulation violation, then the decision of the mental health staff member who performed the mental health consultation will be outcome-determinative and binding on the disciplinary hearing officer, except where exceptional circumstances exist. Where any specific disciplinary sanction has been determined to be contraindicated, the disciplinary hearing officer may impose other disciplinary sanctions authorized in Appendix B to AR 403, *Rule Violations Authorized Sanctions Table*.

5.   A disciplinary hearing officer must contact mental health staff if he or she has any questions about the evaluation, comments, or recommendations made after the mental health consultation.

6.   A disciplinary hearing officer must document his or her consideration of the results of the mental health consultation.

E.   **Mental Health Involvement After the Disciplinary Hearing.**

1.   After the disciplinary hearing is complete and the warden, division director, or a designee approves or disapproves the disciplinary report, the inmate will be provided a copy of ADOC Form 403A, *Disciplinary Report* and any ADOC Form 403-B, *Disciplinary Report (Continued)*. However, if the inmate is currently on acute or non-acute suicide watch or mental health observation, then ADOC Form 403-A, *Disciplinary Report* and any ADOC Form 403-B, *Disciplinary Report (Continued)* will not be provided to the inmate unless and until a member of the inmate's treatment team approves it. Where appropriate, a mental health staff member may assist in delivery and explanation of the disciplinary report and any disciplinary sanctions.

2.    If confinement to restrictive housing is an approved disciplinary sanction, then the inmate will receive the preplacement screening, mental health rounds and periodic assessments consistent with the Phase 2A Order and Injunction on Segregation Remedy (Pre-Placement, Mental Health Rounds, Periodic Evaluations) (Doc. Nos. 1815, 1815-1).

3.    Aside from the inmate's institutional file, a copy of ADOC Form 403-A, *Disciplinary Report* and any ADOC Form 403-B, *Disciplinary Report (Continued)* will be placed in the inmate's mental health record.

## VI.    DISPOSITION

Refer to AR 601 (as amended) *Mental Health Forms and Disposition*.

## VII.    FORMS

Refer to AR 601 (as amended) *Mental Health Forms and Disposition* for any ADOC Form(s) used in this Administrative Regulation.

## VIII.    SUPERCEDES

This AR supersedes AR 626, dated October 20, 2006.

## IX.    PERFORMANCE

This Administrative Regulation is published under the authority of the National Commission of Correctional Health Care: Standards for Health Services in Prisons 2015.

Jefferson Dunn,
Commissioner