IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| EDWARD BRAGGS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| JEFFERSON S. DUNN, in his | ) | |
| official capacity as | ) | |
| Commissioner of | ) | |
| the Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

PHASE 2A OMNIBUS REMEDIAL OPINION

PART I.

I.  INTRODUCTION                                         2

II. BACKGROUND                                          8

III.  LEGAL STANDARD                                   27

    A.  The "Current and Ongoing Violation" Standard    30

    B.  Burdens of Proof                                37

    C.  The "Facility-by-Facility" Issue                39

    D.  Monitoring of the Proposed Remedies             46

## I.   INTRODUCTION

The plaintiffs in the current phase of this longstanding class-action lawsuit are a group of seriously mentally ill state prisoners and the Alabama Disabilities Advocacy Program (ADAP), which represents mentally ill prisoners incarcerated in Alabama.  The defendants are the Commissioner of the Alabama Department of Corrections (ADOC) and ADOC's Interim Associate Commissioner of Health Services.  They are sued in their official capacities for injunctive and declaratory relief.

Four years ago, the court found that ADOC failed to provide minimally adequate mental-health care to inmates in its custody, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.  *See Braggs v. Dunn*, 257 F. Supp. 3d 1171 (M.D. Ala. 2017) (Thompson, J.).  Since then, the parties have engaged in a series of court proceedings and negotiations to develop the relief necessary to remedy this constitutional violation. Certain remedies have been entered by agreement of the

2

parties; others have been ordered following adversarial proceedings.  And, most recently, the parties presented additional evidence at a series of omnibus remedial hearings between May 24 and July 9, 2021.

This opinion, which the court will issue in three parts, and the accompanying order represent the culmination of these efforts and mark the point at which the claims presented in this phase of the litigation transition into the period of monitoring.  They establish an omnibus remedial framework that will govern this phase of the litigation moving forward—a "remedy that addresses the serious constitutional violations" found by the court "and that will be a durable solution for the monitors to help ADOC implement." *Braggs v. Dunn*, No. 2:14cv601-MHT, 2020 WL 7711366, at *8 (M.D. Ala. Dec. 29, 2020) (Thompson, J.).

The court has divided the opinion into three parts primarily for the convenience of the recently created monitoring team.  The first part discusses the history of the litigation leading up to this point, and the legal

3

standards governing the court's provision of relief. The second part discusses ways in which conditions in ADOC facilities have changed since the time of the liability opinion. The third part discusses the parties' proposed provisions, the relief that the court orders and its reasons for doing so, and the court's findings under the Prison Litigation Reform Act or PLRA, 18 U.S.C. § 3626(a)(1)(A). While the monitoring team may wish to read the first and second parts, it is the third part that they will find most useful. The court anticipates that they may use it as a reference guide to better understand the intricacies of the remedial order, which will be their touchstone in determining the defendants' compliance.

While the opinion is long, its length is due in significant part to the fact that in the years leading up to the omnibus remedial proceedings, ADOC addressed some of the problems identified in the liability opinion. The court describes that progress in detail, both to give ADOC due credit and to explain why certain relief that

**4**

the plaintiffs request, and which may have been necessary at the time of the liability opinion, is no longer needed. In fact, a significant portion of the present opinion is devoted to contextualizing the court's decision to decline to adopt relief.  The court's omnibus remedial order does not address certain violations identified in the liability opinion, and it was important to the court that readers, including the parties and the men and women incarcerated in ADOC facilities, understand why.

The opinion is also lengthy because many deeply serious problems remain unresolved, and the court took seriously both its obligation to provide adequate relief and its PLRA obligation to explain why it adopted each of the various remedial provisions it did.  When Jamie Wallace took his own life during the course of the liability hearing, the court called it "powerful evidence of the real, concrete, and terribly permanent harms that woefully inadequate mental-health care inflicts on mentally ill prisoners in Alabama." *Braggs*, 257 F.3d at 1186.  In the four years since, at least 27 more men in

ADOC's custody have died by suicide--including one immediately after the conclusion of the omnibus remedial hearings.

The common thread among these tragedies is ADOC's lack of correctional staff.  As its own mental-health vendor has noted: "No one disputes that the ADOC has a *severe shortage of Correctional Officers* (COs), as documented in an April 2019 US Department of Justice report as well as in multiple quotes from ADOC staff to the media."  Wexford Health Response to the February 14, 2020 ADOC Letter on Performance Deficiencies (P-3323) at 2 (emphasis in original).  This deficiency in correctional staff is nearly unchanged in its severity and impact since the court's liability opinion four years ago.  Indeed, ADOC has *never* reported an increase in the number of correctional supervisors in any quarterly correctional staffing report since it started filing them in 2018.  And as at the time of the liability trial and opinion, the lack of correctional staff undermines the department's ability to meet the mental-health needs of

its prisoners in numerous, insidious ways. Prisoners do not receive adequate treatment and out-of-cell time because of insufficient security staff to supervise these activities. They are robbed of opportunities for confidential counseling sessions because there are too few staff to escort them to treatment, forcing providers to hold sessions cell-side. They decompensate, unmonitored, in restrictive housing units, and they are left to fend for themselves in the culture of violence, easy access to drugs, and extortion that has taken root in ADOC facilities in the absence of an adequate security presence. The resulting sky-high rates of suicidality divert scarce mental-health resources from treatment provision to crisis management, exacerbating the deficiencies in care.

Shortly after it released the liability opinion in 2017, the court warned the parties that, because staffing is so key to the provision of mental-health care, it "must be addressed at the outset" and "fully remedied before almost anything else can be fully remedied."

Phase 2A Revised Remedy Scheduling Order on Eighth Amendment Claim (Doc. 1357) at 4. The defendants now ask to extend the deadline by which ADOC must attain an appropriate level of correctional staffing even further than previously agreed, from February 2022 to July 2025. It is against this backdrop--four years of severe understaffing and the likelihood of four more--that the court considers what relief is necessary today to bring Alabama's prison system into constitutional compliance.


## II. BACKGROUND

In its June 2017 liability opinion, the court found that ADOC's mental-health care system violated the United States Constitution in seven ways:

"(1) Failing to identify prisoners with serious mental-health needs and to classify their needs properly;

"(2) Failing to provide individualized treatment plans to prisoners with serious mental-health needs;

"(3) Failing to provide psychotherapy by qualified and properly supervised mental-health staff and with adequate frequency and sound confidentiality;

"(4) Providing insufficient out-of-cell time and treatment to those who need residential treatment; and failing to provide hospital-level care to those who need it;

"(5) Failing to identify suicide risks adequately and providing inadequate treatment and monitoring to those who are suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis;

"(6) Imposing disciplinary sanctions on mentally ill prisoners for symptoms of their mental illness, and imposing disciplinary sanctions without regard for the impact of sanctions on prisoners' mental health; [and]

"(7) Placing seriously mentally ill prisoners in segregation without extenuating circumstances and for prolonged periods of time; placing prisoners with serious mental-health needs in segregation without adequate consideration of the impact of segregation on mental health; and providing inadequate treatment and monitoring in segregation."

*Braggs*, 257 F. Supp. 3d at 1267-68 (footnote omitted).[1]

————————————

1. As the court noted in the liability opinion, "only prisoners with serious mental-health needs have a cognizable Eighth Amendment claim." *Braggs*, 257 F. Supp. 3d at 1191. "The concept of 'serious mental-health need' in the Eighth Amendment context should not be confused with 'serious mental illness,' a term of art in the mental-health care field." *Id.* at 1190 n.11. To avoid confusion, where this opinion refers to mentally ill prisoners or prisoners with mental-health needs, the court emphasizes that it refers to those with *serious* mental-health needs.

The court further found that "persistent and severe shortages of mental-health staff and correctional staff, combined with chronic and significant overcrowding, are the overarching issues that permeate each of the above-identified contributing factors of inadequate mental-health care."  *Id.* at 1268.  Two years later, following additional briefing and argument, the court issued a supplemental liability opinion, finding that "ADOC has not been conducting adequate periodic mental-health evaluations of prisoners in segregation, and that this failure has contributed to the ADOC defendants' violation of the Eighth Amendment."  *Braggs v. Dunn*, 367 F. Supp. 3d 1340, 1342 (M.D. Ala. 2019) (Thompson, J.).

In the years following these liability opinions, the parties agreed to a series of stipulations resolving most of the remedial disputes generated by the court's liability findings, with a few significant exceptions that will be discussed below.  For each of these agreed-upon stipulations, the court held an on-the-record

hearing, reviewing in detail and clarifying the terms of the agreement.  At the request of the parties, the court then entered these stipulations as orders.

At the time it entered these orders, the court believed that the agreements met the "need-narrowness-intrusiveness" requirements of the PLRA. *See* 18 U.S.C. § 3626(a)(1)(A); *see also Cason v. Seckinger*, 231 F.3d 777, 785 n.8 (11th Cir. 2000) ("[W]e do not mean to suggest that the district court must conduct an evidentiary hearing about or enter particularized findings concerning any facts or factors about which there is not dispute.  The parties are free to make any concessions or enter into any stipulations they deem appropriate.").  However, the orders generally did not contain findings that the provisions of the stipulations met the PLRA's requirements.

In February 2019, the defendants raised as an issue the possibility that these orders did not comply with the PLRA because they did not have PLRA findings.  The court then scheduled a set of evidentiary hearings to determine

11

whether    the    stipulations    met    the 'need-narrowness-intrusiveness' standard of the PLRA.  In the meantime, by agreement of the parties, the court found that each of the orders "temporarily satisf[ied] the  requirements  of  the  PLRA,"  pending  a  final determination after the scheduled hearings.  Phase 2A Opinion and Interim Injunction (Doc. 2716) at 4.

These hearings were continued several times.  They were first continued at the parties' joint request so that the parties could attempt to negotiate a resolution of the remedial disputes addressed by the stipulations in light of the newly raised PLRA concern.  During that process,  the  parties  successfully  negotiated  certain remedial agreements related to suicide prevention.  *See* Joint Notice and Motion to Stay (Doc. 2706) at 2-3.  After a lengthy period of mediation, the parties ultimately informed  the  court  on  March  20,  2020,  that  the negotiations on the remaining disputes had not been successful.  *See* Joint Notice Regarding Monitoring and PLRA Negotiations (Doc. 2775) at 1.  The court scheduled

the hearings to begin on April 13, 2020. *See* Phase 2A Revised Remedy Scheduling Order (Doc. 2778) at 5.

The day the parties informed the court that their negotiations had failed, the Alabama State Health Officer suspended all public gatherings of 25 or more people due to the onset of the novel coronavirus (COVID-19) pandemic in Alabama and across the country. *See State Health Officer Issues Amended Health Order Suspending Public Gatherings*, https://www.alabamapublichealth.gov/blog/2020/03/20.html (Mar. 20, 2020). Five days later, the first confirmed death of an Alabama resident due to COVID-19 was announced. *See Alabama Announces First Death of a State Resident Who Tested Positive for COVID-19*, https://www.alabamapublichealth.gov/blog/2020/03/25b.html (Mar. 25, 2020). On April 3, the State Health Officer issued a stay-at-home order requiring every person in Alabama "to stay at his or her place of residence except as necessary to perform" essential activities. *Order of the State Health Officer*,

13

https://governor.alabama.gov/assets/2020/04/Final-State
wide-Order-4.3.2020.pdf (Apr. 3, 2020).

As the threat of COVID-19 became apparent, the
parties each moved to continue the April 2020 hearings.
*See generally* Defs.' Unopposed Motion to Continue (Doc.
2779); Pls.' Motion to Continue (Doc. 2780).  In their
motion, the defendants aptly explained that, while "the
medical and scientific community continues to analyze the
nature of COVID-19, this global pandemic represents an
unprecedented threat to public health due to its
contagious nature and rate of mortality for those at
significant risk for complications."  Defs.' Unopposed
Motion to Continue (Doc. 2779) at 2.  They requested a
continuance to "protect the health of the inmates in the
custody of the Alabama Department of Corrections."  *Id.*
at 3.

The hearings were eventually rescheduled to start on
September 14, 2020, with the duration of the temporary
PLRA findings on the stipulated remedial orders extended
to December 30.  *See* Phase 2A Opinion and Order Regarding

**14**

Long-Term Suicide Prevention Stipulations (Doc. 2977) at 5. Just before the hearings were set to begin, at the close of the defendants' pretrial brief, the defendants indicated an intent to move under the PLRA, 18 U.S.C. § 3626(b)(1), (b)(2), to terminate some or all of the orders scheduled for consideration. *See* Defs.' Pretrial Memorandum (Doc. 2908) at 55-57. The court requested clarification of the defendants' intent, and the defendants filed a formal motion to terminate. *See generally* Defs.' Motion to Terminate (Doc. 2924).

Under the PLRA, the defendants' motion to terminate placed the burden on the plaintiffs to show that the stipulated remedial orders remained necessary to correct a "current and ongoing violation" of federal law. *See* 18 U.S.C. § 3626(b)(3); *see also Braggs v. Dunn*, No. 2:14cv601-MHT, 2020 WL 5517262, at *2 (M.D. Ala. Sept. 14, 2020) (Thompson, J.) ("Opinion and Order Regarding the 'Current and Ongoing Violation' Issue"). The statute also required the court to rule on the motion within 30 days, extendable to 90 days for good cause, or else a

mandatory stay of prospective relief would go into effect. *See generally Braggs v. Dunn*, No. 2:14cv601-MHT, 2020 WL 5735086, at *2 (M.D. Ala. Sept. 24, 2020) (Thompson, J.). The plaintiffs therefore moved that they be allowed to conduct immediate on-site prison inspections to develop the evidence of changed circumstances that would be necessary for the court to be able to consider the remedies under this standard and in this abbreviated timeframe. *See generally* Pls.' Motion to Require Onsite Prison Inspections (Doc. 2986).

After the court granted the plaintiffs' motion for prison inspections, the defendants withdrew their motion to terminate. *See* Defs.' Oral Motion to Withdraw (Doc. 3004); Order (Doc. 3005). While allowing the defendants to withdraw their motion, the court emphasized that it nevertheless took seriously the issues that had prompted the motion. It explained that it would "continue to address, with reasonable speed, which items in the remedial orders at issue may be terminated or modified, either by agreement or court action, as part of the

16

resolution of the PLRA findings or otherwise." Order (Doc. 3005) at 1-2.

The court solicited proposals from the parties about how to proceed in determining whether and to what extent the stipulated remedial orders complied with the PLRA. After receiving these proposals, the court determined that the "shortest path toward concluding this phase of the litigation" was for each party to submit a proposed omnibus remedial order encompassing the entire scope of relief at issue and for the court to hold "a single evidentiary hearing to consider these proposals," after which it would "create a final omnibus remedial order resolving all of the outstanding issues" in this phase of the litigation. *Braggs*, 2020 WL 7711366, at *7-8. This omnibus remedial order would be entered with the need-narrowness-intrusiveness findings required by the PLRA, and the parties would be afforded discovery and the opportunity to present evidence as to whether the disputed remedies met that standard in light of the current conditions in ADOC facilities. *See id.* at *7.

17

The parties agreed to extend the duration of the stipulated remedial orders until that omnibus order was entered.  *See* Joint Request to Extend Phase 2A Remedial Orders (Doc. 3076) at 1-2; Phase 2A Revised Remedy Scheduling Order (Doc. 3077).

Discovery proceeded, and a series of evidentiary hearings were held in May, June, and July 2021.  Now, per the process set forth by the court and in the parties' agreements, the omnibus remedial order that accompanies this opinion replaces all of the stipulated remedies entered in this case, and, for the most part, will be the remedial order and injunction that governs this phase of the litigation henceforth.

In the time since the liability opinions, several of the most complicated remedial issues have proceeded on different tracks from the negotiation and stipulation process described above.  Chief among these are the issues of correctional staffing, suicide prevention, and monitoring, each of which has been the subject of adversarial proceedings resulting in remedial orders,

rather than negotiated agreements. In addition, the remedial issues related to segregation, units not designated as restrictive housing that nonetheless functioned as segregation, and inpatient treatment had each also been the subject of adversarial proceedings, but no remedial order had yet been issued when the shift was made to the present omnibus remedial process. The procedural circumstances differ for each of these issues in significant ways, as follows.

*First*, perhaps the least procedurally complex of the issues was the matter of the monitoring scheme that will apply to the claims in this phase of the litigation following the close of the remedial process. The court requested a proposed plan from the defendants about how compliance with the court's remedial orders should be monitored, and it gave the plaintiffs the opportunity to respond to the defendants' proposal. The court then held a hearing on the defendants' proposed monitoring plan in which it heard testimony from experts, from the then-ADOC Commissioner and the then-Associate Commissioner of

19

Health Services, and from four individuals whom the defendants proposed as potential members of a monitoring team. *See Braggs v. Dunn*, 483 F. Supp. 3d 1136, 1141-42 (M.D. Ala. 2020) (Thompson, J.).

After staying proceedings on the issue of monitoring for about a year at the parties' request while they endeavored unsuccessfully to mediate the issue, the court issued an opinion and order resolving the parties' disputes and establishing a three-phase monitoring plan. Under this monitoring plan, an external monitoring team will first begin monitoring the defendants' compliance with the remedial orders, then will train an internal monitoring team housed within ADOC itself to take on this monitoring role, and finally will transition the monitoring duties entirely to ADOC to monitor itself. *See id.* at 1141. The object of this approach was to "help ADOC develop internal buy-in, resulting in more active cooperation and timely compliance," and to create "a more effective, less intrusive process and avoid an indeterminate period of external monitoring." *Id.*

The monitoring opinion and order were entered in September 2020 with PLRA findings.  The defendants filed a motion to alter or amend the order, and the court denied that motion.  *See Braggs v. Dunn*, No. 2:14cv601-MHT, 2020 WL 6152367 (M.D. Ala. Oct. 20, 2020) (Thompson, J.).  The defendants did not appeal.  Because there was a recent order resolving the monitoring issue that was entered with PLRA findings, this issue--unique among the remedial disputes in this phase of the litigation--was not among the matters that the omnibus remedial hearings were planned to address.  *See Braggs v. Dunn*, No. 2:14cv601-MHT, 2021 WL 83410, at *1 (M.D. Ala. Jan. 7, 2021) (Thompson, J.) (setting forth "the entirety of what will be considered during the omnibus remedial process").

*Second*, the issues of correctional and mental-health staffing, which the court found to be "overarching issues that permeate each of the" court's liability findings, *Braggs*, 257 F. Supp. 3d at 1268, were also the subject of a remedial opinion and order entered with PLRA findings after adversarial proceedings.  *See Braggs v.*

21

*Dunn*, No. 2:14cv601-MHT, 2018 WL 985759 (M.D. Ala. Feb. 20, 2018) (Thompson, J.).  Unlike the court's monitoring opinion and order, however, the understaffing opinion and order were entered more than three years ago, shortly after the court made its original liability findings. Because of the amount of time that had elapsed, and because the court agreed with the defendants' concerns "about implementing relief without ensuring that it is necessary" in light of changes in conditions, *Braggs*, 2020 WL 7711366, at *6, the parties' disputes regarding what remedies related to staffing should apply to ADOC moving forward were incorporated into this omnibus remedial process.

Both parties acknowledged that correctional staffing levels in particular have not significantly increased since the entry of the court's understaffing remedial opinion and order.  The central remaining provision of the correctional understaffing relief was a deadline of February 2022 for ADOC to achieve the staffing levels recommended by the defendants' own staffing experts,

22

Margaret and Merle Savage, a deadline that both parties understood would have to be modified given ADOC's slow pace of progress in filling many of its correctional positions.  Accordingly, the parties agreed that the posture of this issue differed somewhat from that of the issues covered by the parties' stipulated remedial orders.  While the question as to the latter issues was whether the relief proposed by the plaintiffs satisfied the need-narrowness-intrusiveness standard of the PLRA, the question as to correctional staffing was whether and how the existing remedy should be modified in light of changed circumstances--such as the effects of the COVID-19 pandemic--and in recognition of the existing deadline's implausibility at this juncture.  In addition, ADOC has significantly changed the type of correctional officers it uses.

The question as to mental-health staffing was also whether the existing remedial order should be modified or ended.  But, in contrast to correctional staffing, the defendants asserted that mental-health staffing levels

have improved considerably since the court's
understaffing opinion and order was issued. They brought
forth evidence during the omnibus proceedings purporting
to show that several facilities are at or near the levels
sufficient to allow for adequate care, based on the
staffing ratios developed by their consultants.
Accordingly, the central issue for the court was whether
the evidence in fact reflected the improvements claimed
by the defendants, and whether to modify or lift the
current relief related to mental-health staffing if so.

*Third*, the remedies related to suicide prevention
have been the subject of both adversarial proceedings and
negotiated agreements. In May 2019, after receiving
expert reports and holding a trial on the need for suicide
prevention relief, the court issued an opinion and order
requiring ADOC to take various immediate steps to
mitigate the risk of suicide faced by mentally ill
prisoners in ADOC's custody. *See Braggs v. Dunn*, 383 F.
Supp. 3d 1218 (M.D. Ala. 2019) (Thompson, J.). This
opinion included PLRA findings. *See, e.g.*, *id.* at 1254.

**24**

Soon thereafter, the parties entered a short-term agreement on the suicide remedies and requested that the court stay its mandates and impose the stipulated short-term remedy instead. *See* Joint Notice and Motion to Stay (Doc. 2560 & Doc. 2560-1). The court did so, adopting the parties' agreement, as with the other stipulated remedies, that the terms of the agreement met the PLRA's need-narrowness-intrusiveness requirement pending a final determination after a hearing on PLRA compliance. *See* Order (Doc. 2569); Order (Doc. 2698).

The parties later reached a separate, long-term agreement on suicide prevention remedies. *See* Joint Filing of Agreements on Suicide Prevention Measures and Mental Health Staffing (Doc. 2606 & Doc. 2606-1). The court approved this agreement but did not issue an associated injunction, instead putting the enforceability of its order on hold pending a determination of whether the long-term agreement complied with the PLRA. *See* Phase 2A Order Approving Suicide-Prevention Agreement (Doc. 2699) at 1-2. The

25

short-term stipulations remained in effect pending the results of the omnibus remedial hearings.

The upshot of this posture was that, while the proposed remedial provisions related to suicide were part of the omnibus proceedings and were assessed for their compliance with the PLRA's need-narrowness-intrusiveness requirement, the court's stayed opinion and order regarding suicide provisions would go into effect if the court found that the proposed provisions did not comply with the PLRA. However, because the suicide remedies addressed in the stayed opinion were approved by the court in May 2019--two years prior to the beginning of the omnibus remedial proceedings--the stayed relief would be arguably immediately terminable under the PLRA by motion of the defendants if it went into effect following the omnibus hearings. *See* 18 U.S.C. § 3626(b)(1)(A)(i).

*Finally*, there were additional issues that had been litigated by the parties but were under submission with the court at the time of the omnibus remedial proceedings. These included the relief related to ADOC's

26

segregation or restrictive housing units (also known as
RHUs), non-RHUs that were nonetheless functioning as
segregation units, and inpatient treatment.  Because no
relief had been entered by the court as to these issues,
the proposed remedial provisions related to these matters
were situated no differently for purposes of the omnibus
proceedings than were the proposed remedies related to
the matters covered by the parties' stipulated remedial
orders.  The court proceeds now to discuss the legal
standard under which it assessed these provisions.

### III. LEGAL STANDARD

The PLRA requires that, before entering prospective
relief to redress constitutional or federal statutory
injury in any civil suit regarding prison conditions, a
trial court must find that the relief is "narrowly drawn,
extends no further than necessary to correct the
violation of the Federal right, and is the least
intrusive means necessary to correct the violation of the
Federal right."  18 U.S.C. § 3626(a)(1)(A).  The Eleventh

27

Circuit Court of Appeals has explained that this means the court must make "particularized findings that each requirement" of the relief "satisfies each of the need-narrowness-intrusiveness criteria." *United States v. Sec'y, Fla. Dep't of Corrs.*, 778 F.3d 1223, 1228 (11th Cir. 2015).

The 2021 omnibus remedial hearings from which this opinion results were directed toward determining the appropriate scope of prospective relief to be entered, so this particularized need-narrowness-intrusiveness mandate applied. The defendants in this case have argued that the court must also make a global finding that the relief as a whole meets the need-narrowness-intrusiveness standard; while it is not apparent from the text of the PLRA that this is correct, the court will make such a global finding as well.

The legal standard under which these hearings operated differed in one further way from the need-narrowness-intrusiveness standard that generally governs remedial proceedings in litigation regarding

prison conditions.  As the court explained in its opinion
setting forth the process by which the omnibus remedy
would be developed, the length of time that has passed
since the liability opinion issued gave the court "grave
concerns about implementing relief without ensuring that
it is necessary under current conditions."  *Braggs*, 2020
WL 7711366, at *6.  The specific relief necessary to
remedy the constitutional deficiencies found in the
court's liability opinion may have changed since the time
of that opinion.  On some issues, sustained improvements
in ADOC's provision of mental-health care may have
rendered some relief inappropriate.  In other areas,
progress may have been partial, making certain relief
that would have been essential at the time of the
liability opinion now unnecessary.  Also, personnel
changes (for example, the introduction of Basic
Correctional Officers (BCOs) and Correctional Cubicle
Operators (CCOs) to take on some of the duties of
correctional officers) might warrant changes in relief.
As a matter of equity, the court therefore determined

that it would consider changes in circumstances in ADOC facilities--rather than looking only to the circumstances that existed at the time of the liability trial, as the plaintiffs suggested the court should do--to decide whether the relief proposed by the parties was necessary to remedy the violations that the court has found. *See id.*[2]

Although the parties agreed that the PLRA's need-narrowness-intrusiveness mandate applied, their proposed remedial orders each raised issues about how this standard should apply to various aspects of the relief under consideration.  The court addresses these arguments below.


A.   The "Current and Ongoing Violation" Standard

_____

2. Although this assessment of changed circumstances principally affected the necessity prong of the need-narrowness-intrusiveness inquiry, the court also considered whether conditions had changed such that the proposed relief was either not narrowly tailored to the violations found by the court or not the least intrusive way of correcting those violations.

30

The defendants argued prior to the hearings and continued to argue during the proceedings that the court needed also to find a "current and ongoing violation" of federal law before entering relief. *See, e.g.*, Defs.' Pretrial Br. (Doc. 3219) at 9-10. As a result, they argued, the plaintiffs were required to "demonstrate that the State acts with deliberate indifference to Plaintiffs' serious mental-health needs." *Id.* at 10. This "current and ongoing violation" requirement appears in the PLRA in § 3626(b)(3), "which governs the termination of prospective relief by motion of a party." *Sec'y, Fla. Dep't of Corrs.*, 778 F.3d at 1227. That section of the statute comes into play when a party files a motion to terminate an injunction previously entered in a prison conditions suit, and the statute describes elsewhere in § 3626(b) the circumstances in which a party is empowered to file such a termination motion. *See* 18 U.S.C. § 3626(b)(1)(A), (b)(2).

As the court explained in its opinion setting forth the process by which the remedial hearings would be

conducted, "In the absence of a motion to terminate, there is no statutory requirement that the court find a 'current and ongoing violation' of federal law before entering" relief. *Braggs*, 2020 WL 7711366, at *6. This follows from the text of the PLRA, which places the "current and ongoing violation" requirement in the provision applicable to proceedings on a motion to terminate and excludes this requirement from the provision that governs the entry of prospective relief. *See* 18 U.S.C. § 3626(a)(1)(A), (b)(3). It also is required by Eleventh Circuit precedent. The circuit court in *Thomas v. Bryant*, 614 F.3d 1288 (11th Cir. 2010), considered the argument that although § 3626(b)(3) "governs termination proceedings," nonetheless "the 'current and ongoing' violation requirement should inform [the court's] inquiry" when entering prospective relief outside of the context of a motion to terminate. *Id.* at 1319-20. The court held "that the 'current and ongoing' requirement is distinct from the standard" prescribed by § 3626(a)(1)(A). *Id.* at 1320. The

32

"need-narrowness-intrusiveness limitation governs the initial entry of an injunctive relief in prison litigation cases," while "[w]hether there is a 'current and ongoing' constitutional violation sufficient to avoid termination of the current injunction is a matter to be considered upon motion by either party in a termination proceeding." *Id.*

As discussed above, the defendants filed a motion to terminate in September 2020 but withdrew the motion thereafter. There was no motion to terminate before the court in the remedial hearings preceding this opinion. For this reason, the need-narrowness-intrusiveness standard of § 3626(a)(1)(A) rather than the "current and ongoing violation" standard of § 3626(b)(3) provided the statutory requirements for the hearings, and the plaintiffs were not required to demonstrate current and ongoing deliberate indifference by the defendants.[3]

---

3. The evidence in the record demonstrates, and the court so finds, that the plaintiffs crafted their case to conform with this understanding of the legal standard. During the 2021 omnibus relief hearings, the plaintiffs stated explicitly that, if the court had required them

33

Although they recognized that no termination motion was pending at the time of the remedial hearings, the defendants argued that the requirement of § 3626(a)(1)(A) for the court to find that the relief "extends no further than necessary to correct the violation of the Federal right" and is "the least intrusive means necessary to correct the violation of the Federal right" incorporates the "current and ongoing" requirement. The defendants argued, in other words, that the requirement that the relief be tied to "the violation of the Federal right" raises the question of precisely what violation the relief must address, and they said the answer must be a current violation ongoing at the time of the entry of relief. Therefore, plaintiffs requesting prospective

---

to prove a current and ongoing violation, they would have sought further discovery from the defendants and presented more and different evidence. *See* June 4, 2021, R.D. Trial Tr. at 195-96. Moreover, the court finds that the current record is inadequate to resolve the question of whether ADOC remains deliberately indifferent on a current and ongoing basis. If the court has incorrectly decided this issue, then upon remand the court will allow the parties to engage in the discovery that was disallowed on the issue and the court will resolve the issue based on the evidence presented.

relief must show that the violation they seek to address is a "current and ongoing" violation at the time the court enters the relief.

This argument is not without some persuasive force. But ultimately it cannot be squared with the text of the PLRA. The termination provision of § 3626(b)(3) requires a court to find that the relief at issue "remains necessary to correct a current and ongoing violation of the Federal right," and that it is narrowly tailored and the least intrusive means of doing so. 18 U.S.C. § 3626(b)(3). That provision requires *both* a "current and ongoing violation" and that the relief meet the need-narrowness-intrusiveness finding as to that ongoing violation. By contrast, § 3626(a)(1)(A) requires only that the relief "extends no further than necessary to correct the violation of the right" and is narrowly drawn and the least intrusive means to address the violation. The absence of the "current and ongoing" language from § 3626(a)(1)(A), which otherwise duplicates the standard of § 3626(b)(3), is conspicuous and must be given

interpretive significance.    And interpreting the
need-narrowness-intrusiveness requirement to subsume the
"current and ongoing violation" standard would make the
latter language in § 3626(b)(3) redundant.[4]

---

4.   Again in their post-trial brief, the defendants
pressed the argument that the court must find current and
ongoing deliberate indifference at this stage of the
proceedings.   This, they said, is due not only to the
PLRA--based on the misinterpretation of that statute
addressed above--but also because the Eleventh Amendment
grants the defendants immunity against the plaintiffs'
claims unless the court makes liability findings again.
*See* Defs.' Post-Trial Br. (Doc. 3367) at 37.

In cases both simple and complex, courts routinely
make liability findings before making remedial findings.
Courts taking that approach do not need to re-do their
liability findings at the remedial stage.   In that sense,
this court is no differently situated than any other.
Contrary to the defendants' position, neither the PLRA
nor the Eleventh Amendment invalidates that run-of-
the-mill procedural tack.

The defendants base their additional argument in
significant measure on a single sentence in the court's
December opinion describing the omnibus remedial process,
in which the court said that "compliance with the PLRA
does not displace the court's duty under Eighth Amendment
law to find a 'substantial risk of serious injury' before
entering injunctive relief."   *Braggs*, 2020 WL 7711366,
at *6.   But nothing whatsoever in that opinion--including
the stray sentence the defendants now claim undermines
and supersedes everything else the court said before,
after, and within its December opinion about the legal
standard applicable to the omnibus proceedings--suggests

36

## B.   Burdens of Proof

Plaintiffs seeking prospective relief related to prison conditions generally bear the burden of showing that their proposed remedies satisfy the need-narrowness-intrusiveness standard discussed above. The plaintiffs here, however, argued that by agreeing to the terms of the various stipulated remedial orders that the court had entered, the defendants had either waived or forfeited their argument that any proposed relief that reiterated the provisions of these orders did not comply with the PLRA, or that the defendants were estopped from making such an argument. *See* Pls.' Pretrial Br. (Doc. 3220) at 24-33.

The court rejected the plaintiffs' waiver, estoppel, and forfeiture arguments under the particular procedural circumstances presented here.   It also rejected the

that a new showing of deliberate indifference is required before entering remedies to address constitutional violations for which the court has already found the defendants deliberately indifferent.

plaintiffs' fallback position that the defendants' agreement to the stipulated orders shifted the burden of proof in the proceedings, placing the onus on the defendants to show why the plaintiffs' proposed remedies did not meet the need-narrowness-intrusiveness requirement.  *See id.* at 24.

When the court determined that omnibus remedial proceedings were "the shortest path toward concluding this phase of the litigation," it instructed the parties to re-assess nearly the totality of the remedies entered in this case, including the stipulated orders, and to compile proposals for what relief is now necessary in light of changed circumstances in ADOC facilities. *Braggs*, 2020 WL 7711366, at *7-8.[5]  Not unexpectedly, some of the provisions included in each party's proposal were drawn from the stipulated remedial orders.  But the 2021 omnibus proceedings were not simply a delayed version of the PLRA hearings that had been scheduled for

_____

5.   The exceptions to this broad re-assessment, as discussed above, were the provisions of the court's monitoring opinion and order.

September 2020 before the defendants filed their motion to terminate.  They were not directed at assessing the PLRA compliance of the stipulated orders.  Rather, the omnibus proceedings were a new process to consider the PLRA compliance of new proposed remedies--remedies which, once entered, would "replace all of the currently operational remedial stipulations." *Id.*  While the court considered similarities between the terms of the stipulated orders and the parties' proposed provisions, it was the plaintiffs who were requesting that the court enter their proposed remedies as orders; they therefore bore the burden of demonstrating that their proposals comported with the standards of the PLRA.[6]

C.  The "Facility-by-Facility" Issue

---

6.  As noted above, the staffing remedy was somewhat differently situated because the dispute there was how the deadline for compliance should be adjusted in light of changed circumstances.  Each party therefore bore the burden of demonstrating that its proposed modifications to the understaffing order were tailored to the changed circumstances.

In the defendants' pretrial brief and proposed omnibus remedial order, they raised the argument that a "one-size-fits-all remedy ... remains inappropriate" for the ADOC system because the major prison facilities "present a diversity of circumstances, housing configurations, personnel and capabilities, and each facility possesses its own strengths and its own challenges." Defs.' Pretrial Br. (Doc. 3219) at 12. The defendants made three main arguments in support of this position. First, that relief targeted at particular kinds of units (for instance, remedies pertaining to stabilization units) should not apply in facilities without such units. Second, that certain facilities have improved more than others in particular remedial areas (for instance, in mental-health staffing levels), so relief that is necessary at one facility on a specific issue may not be necessary at another. And third, that any new facilities ADOC may build in the coming years cannot be subject to whatever relief is set in place today because the court cannot make findings as to the

necessity, narrowness, or intrusiveness of imposing relief at those facilities until they are constructed.

The first argument seems to be merely a matter of semantics. Any relief that prescribes the conditions or treatment that must be provided on a particular kind of unit plainly does not apply to other kinds of units and therefore has no bearing at a facility without such units. As an example, the plaintiffs' proposed treatment requirements for residential treatment units (RTU) by their terms apply to only residential treatment units; a prison without an RTU would not be subject to them and need not be monitored for compliance with them. *See, e.g.*, Pls.' Proposed Treatment Guide (Doc. 3206-1) at 23 ("Preliminary treatment plans must be created within three (3) working days of a patient's placement in an RTU ....").   The same holds true when particular conditions of the provision do not apply to a certain location. For example, a requirement that treatment take place in a confidential, out-of-cell location would be implemented differently in a celled facility than it

would in a dormitory-style facility.  The plaintiffs do not argue to the contrary, and the court finds that no clarifying provision is necessary to set down in words what is facially apparent: A remedial obligation specific to a particular type of unit does not apply to facilities without such a unit.  As Dr. Burns explained, these provisions "require the exercise of some common sense about what's applicable and what's not."  June 10, 2021, R.D. Trial Tr. at 170-71.  The court is confident that ADOC and the EMT will exercise such common sense in implementing the relief ordered today.

The defendants' second argument raises an evidentiary question about how pervasive the evidence of problems must be to support findings of systemwide deficiency and the need for systemwide relief.  It is clear, as the cases cited by the defendants in support of this argument reflect, that a finding of harm to only one or two inmates is insufficient to support a systemwide remedy without evidence that other prisoners have experienced the same injury.  *See Lewis v. Casey*,

518 U.S. 343, 359-60 (1996) (a finding that two inmates were harmed was inadequate, without more, to conclude that a systemwide violation existed); *Thomas v. Bryant*, 614 F.3d 1288, 1324 (11th Cir. 2010) (because "[t]he district court held that the DOC violated the constitutional rights of only two inmates," a non-systemic injunction was appropriate). It is equally clear that systemic relief does not require a finding that every prisoner at every prison facility has been harmed by the policy or practice that is the subject of the court's order.

The court's liability findings in this case were systemic. *See Braggs*, 257 F. Supp. 3d at 1267-68; *see also* Defs.' Response to Court's February 2, 2018, Order (Doc. 1595) at 1 (acknowledging that the court's liability findings were systemwide, not limited to certain facilities). To the extent that the court proceeds to discuss harm to individual inmates in individual prisons, it must be remembered that it does so against the backdrop of those findings--findings that

43

were supported by far more than isolated incidents of harm, and that the defendants have not challenged.

For the most part, the relief that remains necessary to correct those systemic violations is also systemic. As the court has held in previously rejecting the defendants' suggestion that relief be limited to certain facilities, "all of ADOC's major prisons--and in particular the prisons for men--form part of an interlocking system." *Braggs*, 2018 WL 985759, at *3 n.2. Focusing relief on only a few facilities "could fatally hinder its ability to remedy the constitutional violation found." *Id*.

Moreover, as Dr. Burns credibly testified based on the information she reviewed before the omnibus hearings, serious violations exist at every major facility. *See* May 26, 2021, R.D. Trial Tr. at 138. The frequent movement of inmates throughout the prison system also makes facility-by-facility discrepancies in the relief imposed largely inappropriate. *See id.* at 33-34. As the court pointed out in the liability opinion, "mentally ill

**44**

prisoners are subject to a substantial risk of serious harm from practices that are common in ADOC facilities no matter where they are housed currently, because they may be housed in any of these facilities in the future due to ADOC's frequent and unpredictable transfers of prisoners across facilities." *Braggs*, 257 F. Supp. 3d at 1193 n.16.[7]

As to certain issues, however, the evidence may show either that the problems are sufficiently limited to particular prisons that only those facilities should be

---

7. The defendants' expert Dr. Metzner suggested that, at least as to some areas of relief, the court should limit its order to certain specific facilities. However, he emphasized that ADOC's policies in these areas should still apply systemwide and noted the "assurances" he had received from ADOC that this would be the case. July 1, 2021, R.D. Trial Tr. at 56; *see also* June 30, 2021, R.D. Trial Tr. at 156-57. For the reasons discussed below regarding ADOC's history of failing to follow the court's orders and its own policies, however, the court does not have confidence in ADOC's assurances and will not currently limit its order on that basis. The court is open to revisiting the scope of its order in the future if there is evidence of systemic improvements. And in the meantime, the court trusts that the monitoring team will make appropriate decisions about whether, how, and how often to monitor the various facilities in light of the team's findings about the scope of deficiencies at each prison.

subject to relief in that area, or that particular prisons have sufficiently distinguished themselves from the remainder of the system that they should be excluded from the relief.  This may be true particularly in remedial areas related to the physical environments of the prisons--issues that are by nature facility-specific to a degree.  In sum, while system-wide relief is typically necessary for the system-wide violations found in this case, the court will limit relief to specific facilities when the evidence demonstrates that such limitation is appropriate.  Similarly, the court will consider whether the relief it has entered should apply to any new major facilities constructed by ADOC if and when such facilities are built, based on whether the evidence shows that the relief should include those facilities.


### D.  Monitoring of the Proposed Remedies

Although the monitoring process for the proposed remedies was not among the remedial matters at issue in

**46**

the omnibus proceedings, *see Braggs*, 2021 WL 83410, at
*1, the defendants raised two arguments related to
monitoring during the proceedings. First, their proposed
order included a series of provisions that, if adopted,
would establish a monitoring scheme different from the
one put in place by the court in its September 2020
monitoring opinion and order. Because the monitoring
opinion and order were entered with PLRA findings and
were not slated for re-litigation in these proceedings,
*see id.*, the court declined to adopt the defendants'
proposed monitoring provisions.

Second, the defendants argued that various
provisions of the plaintiffs' proposed order did not
comply with the PLRA because they did not include
restrictions on how the external monitoring team (EMT)
might decide to monitor the orders. In effect, the
defendants took the position that proposed remedial
provisions could comply with the PLRA only if the scope
of discretion afforded the monitoring team as to how it
would monitor those provisions was set forth in the

provisions themselves and constrained by them.  For instance, the defendants expressed the concern that monitoring could be excessively costly for ADOC if the EMT took particular approaches to monitoring the provisions of the omnibus order, and the defendants argued that the plaintiffs' proposed provisions did not comply with the PLRA because the provisions did not address how they would be monitored or reject the overly expensive monitoring processes envisioned by the defendants.

The scope of the EMT's authority was established by the monitoring opinion and order.  The appropriate point at which to raise concerns about the potential intrusiveness of monitoring was during the course of litigation that preceded that opinion and order.  And indeed, the defendants did raise these concerns during that litigation--including, according to defense counsel, its concern about the costs of monitoring.  *See* June 21, 2021, R.D. Trial Tr. at 132-34, 271-72.  The court considered the concerns raised by the defendants

at the time, and it found that the monitoring scheme it adopted complied with the need-narrowness-intrusiveness mandate of the PLRA. *See Braggs*, 483 F. Supp. 3d at 1168. The court therefore declined to re-evaluate how the provisions of the proposed omnibus orders might be monitored or to impose a requirement that the provisions themselves expressly prescribe their own monitoring regimes, both of which would amount to re-litigation of an issue recently decided by the court after extensive adversarial proceedings and with particularized PLRA findings.

***

This concludes the first part of the court's omnibus remedial opinion. Two parts follow.

DONE, this the 27th day of December, 2021.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

49