IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| EDWARD BRAGGS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| JEFFERSON S. DUNN, in his | ) | |
| official capacity as | ) | |
| Commissioner of | ) | |
| the Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

PHASE 2A OMNIBUS REMEDIAL OPINION

PART II.

I. INTRODUCTION                                      2

II. CHANGED CIRCUMSTANCES IN ADOC FACILITIES        3

   A.  The Court's Liability Findings               5

   B.  Recent Suicides                             33

       1.  Laramie Avery                           33
       2.  Jaquel Alexander                        36
       3.  Casey Murphree                          44
       4.  Charles Braggs                          48
       5.  Gary Campbell                           52

    6.   Tommy McConathy                          55
C.  Changed Circumstances in Areas of Liability   61

    1.   Correctional Staffing                    63
    2.   Mental-Health Staffing                   78
    3.   Restrictive Housing                      90
    4.   Intake                                   97
    5.   Coding                                  101
    6.   Referral                                106
    7.   Confidentiality                         113
    8.   Treatment Teams and Plans               119
    9.   Psychotherapy                           131
    10.   Suicide Prevention                     142
    11.   Higher Levels of Care                  149
    12.   Discipline                             156
    13.   Training                               160
D.  Failure to Comply with Orders and Policies   165

E.  Timeframes                                   175

F.  The Effects of COVID-19                      179

## I.   INTRODUCTION

As stated previously, this opinion is divided into three parts.  This is the second part, which discusses the ways in which conditions in ADOC facilities have changed since the time of the liability opinion.

## II. CHANGED CIRCUMSTANCES IN ADOC FACILITIES

Before addressing the PLRA compliance of the particular remedial provisions that the court will impose, it is necessary to discuss where the conditions of mental-health care in the ADOC system have changed or improved since the liability trial and where they continue to fall short.  Certain aspects of the provision of mental-health care in ADOC facilities are better than they were at the time of the liability trial.  Such improvements do not necessarily categorically preclude the need for remedies in those areas, but they do alter the appropriate scope of relief and make certain provisions proposed by the plaintiffs unnecessary to ensure sustained constitutional compliance by the department with regard to these issues.

Other parts of ADOC's mental-health care system have not improved since the liability trial.  To illustrate these continued shortcomings, the court will first discuss in detail the findings of the liability trial and

3

then will proceed to discuss several recent suicides in the ADOC system in which some of the problems that have been ongoing since the time of the liability findings played a role.  To be clear, not every problematic area was a factor in each suicide.  But while not every prisoner experienced every problem, the problems are systemic nonetheless.  The circumstances of these deaths stand as examples of particularly serious failures in the ADOC's provision of mental-health care and demonstrate the potential consequences of these inadequacies.

Furthermore, while evidence was presented as to each of the 12 suicides that occurred at ADOC between September 2019 and the 2021 hearings, the court now discusses only six of these suicides that show most plainly where mental-health care at ADOC remains below the constitutional floor, although all 12 reflect deficiencies that warrant relief.  And finally, the court keeps in mind that failures of mental-health care that result in suicides are not the only serious lapses in treatment.  Luck can be the difference between a suicide

4

attempt and a completed suicide.  It would be a morbid kind of reactivity to find that inadequacies in the ADOC's mental-health care system require a remedy only when they have resulted in death.

## A. The Court's Liability Findings

In its liability opinion, the court identified a host of systemic deficiencies in ADOC's provision of mental-health care to inmates.  These issues were interrelated:  failures at each step of the process of identifying and treating inmates snowballed to produce a mental-health care system that was "horrendously inadequate" when taken as a whole. *Braggs*, 257 F. Supp. 3d 1171, 1267 (M.D. Ala. 2017) (Thompson, J.).  And as witnesses and experts from both sides acknowledged, these issues were only exacerbated by the "two-headed monster" of ADOC's struggles with overcrowding and understaffing, which presented a significant challenge to improving any part of the system.  *Id*. at 1184.

ADOC's failure to meet the minimum standard of care required by the Constitution "start[ed] at the door," with an inadequate intake process for inmates entering the department's custody. *Id*. The court found that ADOC relied on unsupervised licensed practical nurses (LPNs) to conduct mental-health screening, despite the fact that they lacked the training or qualifications to assess inmates for symptoms of mental illness. See *id.* at 1202. This issue was "compounded by insufficient mental-health staffing," which led to some inmates being transferred to other facilities without having received an intake screening at all. *Id.* at 1203. The department's purported percentage of mentally ill prisoners--one of the lowest in the country--was a clear reflection of the deficiency of this process. As the court concluded, it was the result not of Alabama having fewer mentally ill prisoners than other systems or of providing better mental-health care, but "because a substantial number-- likely thousands--of prisoners with mental illness" were being missed at intake. *Id.* at 1185. Because of this

6

failure to identify inmates' mental-health needs, seriously mentally ill prisoners were "languish[ing] and decompensat[ing] in ADOC without treatment, ending up in crisis care and engaging in destructive--sometimes fatal--self-harm." *Id*. at 1201.

Even when inmates' mental-health needs were identified, referrals for additional follow-up were routinely ignored, leaving inmates without the treatment they needed. The court found that ADOC's referral process was "riddled with delays and inadequacies" at the time of the liability opinion. *Id*. at 1203. Unlike in "a functioning system," ADOC lacked any mechanism for triaging referrals and identifying the urgency of each request, despite the issue being flagged for years in internal audits. *Id*. As a result, there was no way to ensure that even urgent requests would be processed in a timely manner or actually referred to providers. See *id*. Correctional officers, stretched thin by inadequate staffing, were "ill-positioned" to circumvent the broken referral system by noticing inmates' behavioral changes

**7**

and getting them the help they needed.  *Id*. at 1203-04.
Indeed, inmates were so desperate to get the attention
of mental-health staff that they engaged in self-injury,
fire setting, suicide attempts, and other destructive
behavior.  *See id*. at 1204.

ADOC also failed to properly classify and track those
with mental-health needs.  At the liability trial,
multiple witnesses and experts testified about cases in
which ADOC's coding system "fail[ed] to accurately
reflect prisoners' mental-health needs."  *Id*.  For
example, inmates who had been placed on suicide watch
repeatedly for self-harm and suicide attempts remained
coded as an MH-0, or an individual "not having any
mental-health treatment needs."  *Id*. at 1205.  Lack of a
functioning classification system made it impossible for
the department to flag those in need of help and ensure
they received it.  As with failures at intake, the result
was that seriously mentally ill prisoners were left to
"languish and decompensate in ADOC without treatment."
*Id*. at 1201.

**8**

Even when inmates with mental-health needs did receive care, the court found that their treatment was so deeply flawed as to be constitutionally inadequate. Experts on both sides described treatment planning as "the foundation of all forms of health care" because it is necessary to ensure that treatment is consistent and informed. *Id*. at 1206. The need for treatment plans is heightened in prisons, where inmates have little ability to manage their own care, and "even more crucial" in the chaotic context of ADOC facilities. *Id*. However, the court found that ADOC provided only "'cookie-cutter' plans" that were not individualized to each prisoner's symptoms and needs, failed to account for changes in the prisoner's mental-health state, and did not reflect changes in the prisoner's treatment environment. *Id.* at 1207. These plans were developed during "haphazardly" run treatment-team meetings, where lack of attendance by and coordination between members led to conflicting treatment plans being signed into action within days of each other. *Id.* The court determined that this

disorganized, pro forma treatment planning process failed "to provide a meaningful and consistent course of treatment" that could actually help address inmates' needs. *Id.* at 1185. As a result, ADOC provided less effective care and ran a "substantial risk of prolonging pain and suffering of those who have treatable mental illnesses." *Id.* at 1206.

The type of treatment that inmates received was no less inadequate. The court concluded that, while "[c]onstitutionally adequate mental-health care in prisons requires more than simply providing psychotropic medications to mentally ill prisoners," ADOC had failed to provide sufficient counseling or psychotherapy to inmates with serious mental-health needs. *Id.* at 1208. Shortages in both mental-health and correctional staffing undermined "the availability and quality of individual and group counseling sessions." *Id.*

As the court noted, at the time of the liability opinion there were too few mental-health staff to care for the number of prisoners on the mental-health

10

caseload, a problem that was only growing worse as the caseload grew. *See id*. Staff members' caseloads were sometimes "twice as much as they should be": Counselors were expected to care for 80-90 inmates, while nurse practitioners were expected to see 20-25 inmates per day. *See id*. As a result, providers were "continually getting behind," and counseling sessions would frequently be canceled or delayed. *Id.* (internal quotation marks omitted). And when the sessions did occur, they "[did] not amount to much." *Id.* at 1209. Experts' review of medical records revealed that progress notes from counseling sessions were cursory and vague, and they did not reflect actual clinical judgments or overall assessments of the patients. *Id.*

The lack of adequate correctional staff also interfered with inmates' treatment. Because ADOC did not have enough correctional officers to escort inmates to counseling sessions and to provide security for those sessions, care was frequently disrupted. *Id.* at 1185. Providers testified that not being allowed to see

patients due to a lack of correctional staffing was a "persistent problem" that had only gotten worse over the years.  Id. at 1210.  Inmates in segregation were particularly harmed by the staffing shortage, since they had to be escorted from their cells by correctional officers.  *See id.* at 1209.  As a result, "the frequency of counseling sessions for those in segregation [was] especially low."  *Id.*

While experts testified that group therapy could be a helpful tool for the treatment of those receiving inadequate individual therapy, the court concluded that "ADOC's provision of group therapy [was] also inadequate."  *Id.* at 1211.  Group therapy was equally affected by the staffing shortages within the department, leading sessions to be canceled or simply not to happen.  Id.  As a result, inmates in ADOC custody were left with "little access to group therapy," or indeed to treatment of any kind.  *Id.*

Workaround solutions adopted in the face of these staffing shortages only compounded the inadequacy of

care. Mental-health providers testified that, when inmates could not be escorted to counseling sessions, they would sometimes "go to the cells themselves and attempt to talk to their patients at the cell-front." *Id.* at 1210. But as experts explained, these non-confidential "cell-front check-ins are insufficient as counseling and do not constitute actual mental-health treatment." *Id.* Indeed, based on personal visits to ADOC facilities, the court found that "[c]onducting a counseling session across the door in these loud spaces seemed nearly impossible." *Id.*

The court further determined that ADOC consistently failed to ensure the confidentiality of psychiatric contacts, which "undermine[d] the effectiveness and quality of counseling sessions." *Id.* at 1210. While expert witnesses testified that "confidentiality between providers and patients is a hallmark of and a necessary condition for mental-health treatment," inmates were frequently receiving check-ins during which they could be heard by correctional officers or other inmates. *See*

13

*id.* Even when sessions were not held cell-front, they were not necessarily confidential. Many ADOC facilities, the court found, lacked a confidential setting for treatment sessions altogether. *See id.* Other facilities lacked offices with windows and doors that would have allowed security without sacrificing confidentiality, so correctional officers had to be stationed close enough to overhear sessions. *See id.* As a result, prisoners reported that they did not "feel safe sharing their mental-health issues," which made it difficult for providers to provide useful counseling. *Id.*

Untrained providers presented another hurdle to adequate treatment of inmates. When there were too few mental-health staff to provide care, ADOC often relied on "unsupervised, unlicensed counselors, referred to as 'mental health professionals,'" to take their place. *Id.* at 1211. The court identified the lack of supervision for these individuals as "a significant, system-wide problem affecting the delivery of mental-health care,"

**14**

which violated both state regulations and the standard of care for mental-health patients.  *Id.*

The result of ADOC's inadequate provision of psychotherapy was care that utterly failed to address the needs of mentally ill inmates.  ADOC's failure to provide adequate treatment increased the "substantial risk of serious harm" to inmates, "leaving them at a greater risk for continued pain and suffering, self-injurious behavior, suicidal ideation, and ... disciplinary actions."  *Id.* at 1212.

These problems, the court found, became "even more pronounced for prisoners in mental-health units, where ADOC houses the most severely mentally ill prisoners in its custody."  *Id*.  Inmates in these units, the court found, were "warehous[ed], rather than treat[ed]."  *Id.* at 1216.  Despite ADOC's knowledge of these prisoners' acute mental-health needs, it provided them "grossly inadequate care," housing these severely ill individuals in units that operated "almost exactly the same way" as

15

segregation, with minimal out-of-cell time and little treatment. *Id.* at 1212.

Not only was ADOC operating these inpatient treatment units under conditions comparable to segregation, it was also using the units as extra segregation cells to house inmates without mental-health needs. This "persistent and long-standing practice of placing segregation inmates without mental-health needs in mental-health units" compromised the provision of treatment on those units by creating a safety risk to the mentally ill inmates on the unit, by diverting the attention of the scarce correctional officers, and by preventing programming from taking place. *Id.* at 1212-13. Placing segregation inmates in inpatient cells also contributed to a shortage of such cells for prisoners who needed them. *See id.* at 1213.

The "segregation-like atmosphere" of ADOC's inpatient units and the gross inadequacy of the care offered there was also caused by "a severe lack of out-of-cell time" and the "lack of meaningful treatment

16

activities." *Id.* at 1214.   As the court found, the "careful observation and treatment" that prisoners needing inpatient care require "cannot happen when confined in a small cell all day.   In fact, without out-of-cell time and effective treatment, housing severely mentally ill prisoners in a mental-health unit is tantamount to 'warehousing' the mentally ill."   *Id.* (quoting Wyatt v. Aderholt, 503 F.2d 1305, 1309 n.4 (5th Cir. 1974)[1]).   Inmates housed in ADOC's inpatient units received "a vanishingly small amount of time outside their cells": 30 minutes of individual therapy and 2.5 hours of non-therapeutic group activity per week for those housed in the men's stabilization unit (SU) at Bullock, and little more in the residential treatment units (RTUs).   *Id.* at 1215.

Along with minimal out-of-cell time, prisoners in the inpatient units received "little treatment except for

_____

1. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

psychotropic medication due to staffing level shortages of both treatment and custody staff." *Id.* at 1214. Group activities were often cancelled, and mental-health staff were forced to man the laundry and showers instead of providing mental-health care because there "were not enough correctional officers to perform those basic duties." *Id.* at 1216. Individual psychiatric contacts often had to be provided as cell-front check-ins because there was insufficient correctional staff to be able to take inmates out of their cells, "negat[ing] the therapeutic utility of these contacts" due to a lack of confidentiality and resulting in "cursory" and "gravely inadequate" psychiatric contacts. *Id.*

Finally, ADOC consistently failed to provide hospital-level care to inmates who needed it. When ADOC's available mental-health interventions proved unsuccessful to stabilize or treat a prisoner, the department's regulations required that the inmate be considered for transfer to a psychiatric hospital. Despite those regulations, the court found that "ADOC

18

virtually never transfer[red] patients to hospitals, except in the case of prisoners nearing the end of their sentence." *Id*. at 1217. "As Dr. Burns put it, waiting for an unstable patient's end of sentence to transfer him or her to a hospital is akin to 'someone with chest pain who has to wait until they're released from prison to get taken to a hospital to have the chest pain treated.'" *Id*. at 1218.

ADOC's process for identifying inmates at risk of suicide and providing "meaningful therapeutic contact to alleviate suicide risk" similarly "suffer[ed] from serious deficiencies." *Id*. at 1218-19. The department's approach to risk assessment was "too limited to adequately identify those at high risk," and acutely suicidal prisoners often did "not receive crisis care because of a severe shortage of crisis cells and staffing, and due to a culture of skepticism towards threats of suicide." *Id*. at 1220. ADOC's crisis cells were unsafe, containing tie-off points and dangerous items that could be used for self-injury. *See id*.

Suicidal prisoners received inadequate monitoring and treatment, and inappropriate releases from suicide watch and a lack of post-release follow-up care "push[ed] suicidal prisoners back into crises again and again." *Id*.

At the time of the court's liability opinion, ADOC and its mental-health vendor had only recently begun using a suicide risk-assessment tool--a tool that is "widely recognized to be an essential part of mental-health care"--during prisoner intake, and the department continued not to perform such assessments when prisoners threatened or engaged in self-harm or were placed in crisis cells. *Id*. at 1221. Even acutely suicidal inmates often could not get appropriate intervention due to a lack of crisis cells. "[T]he number of crisis cells in each of the 15 major facilities within ADOC [was] insufficient," and this deficiency was exacerbated by backlogs for admission to the SU, causing suicidal inmates to linger in crisis cells designed for short-term placement. *Id*. at 1222. Without enough cells

to provide crisis intervention to everyone who needed it, ADOC would "gamble on which prisoners to put in [the crisis cells] and frequently discount prisoners' threats of self-harm and suicide." *Id*. Staff of ADOC's mental-health vendor frequently suggested that "prisoners who are claiming suicidality and self-harm tendencies are in fact malingering or seeking 'secondary gains'--such as getting out of a segregation cell, or getting away from an enemy, or debt problems." *Id*. at 1223. Despite instructions not to presume that expressions of suicidality were not genuine, mental-health staff "continued to write off prisoners' threats of self-harm as motivated by inmate-to-inmate debt or secondary gains, rather than conducting a proper assessment." *Id*.

The lack of crisis cells also resulted in acutely suicidal inmates being placed in unsafe environments such as shift offices or non-suicide watch cells. As experts for both parties agreed, "housing a suicidal inmate in a space like a shift office is quite dangerous: not only

are these places full of items that can be used for
self-harm, but, depending on where the prisoner is
placed, such placements can also cut off suicidal
prisoners from the treatment that they desperately need."
*Id*. at 1225.   For instance, one expert found an inmate
during a prison tour who had been housed in a
mental-health office for more than a day without any
treatment or access to a bathroom.   *See id*. at 1225 &
n.49.   Moreover, even the crisis cells themselves were
unsafe; the court found that the cells were "ridden with
physical structures that provide easy opportunities to
commit suicide." *Id*. at 1226.   Despite the fact that the
overwhelming majority of recent suicides at ADOC had
happened by hanging, "many of ADOC's crisis cells [had]
easily accessible tie-off points, such as sprinkler
heads, hinges, fixtures, and vents, making them
incredibly dangerous for suicidal prisoners."   *Id*. at
1227.   Certain features of the cells--such as grates over
the cell windows--also made it very difficult to see into
them, increasing the risk that suicide attempts in the

cells would not be interrupted in time to save the inmate's life. *See id*.

Inmates in crisis also received "woefully inadequate" treatment and monitoring, exacerbating the risk of harm. *Id*. at 1229. With respect to treatment, inmates on suicide watch did not consistently receive out-of-cell counseling appointments and were often kept in crisis cells for extended periods of time. "As experts on both sides agreed, crisis-cell placement is meant to be temporary and should not last longer than 72 hours, because the harsh effects of prolonged isolation in a crisis cell can harm patients' mental health." *Id*. at 1226. Nonetheless, mental-health staff "considered transferring prisoners in crisis to treatment units only in a small fraction of the crisis placements that last[ed] longer than 72 hours." *Id*.

As for monitoring, prior to the liability trial, ADOC had not conducted constant watch even for the most acutely suicidal prisoners. Failing to provide this level of watch places those inmates at the highest risk

23

of suicide in grave danger; "if a prisoner is waiting for an opportunity to kill himself, it is too dangerous to walk away, and he must be constantly observed." *Id*. at 1229. Instead, ADOC provided suicide watch checks at 15-minute intervals. But while these checks were supposed to be staggered or random to make them unpredictable to a prisoner who might be looking for a chance to attempt suicide, experts reviewing ADOC's monitoring logs found that they often had "pre-filled times at exact intervals," making it "impossible to ensure that staggered checks are actually happening." *Id*. This practice continued even after the parties agreed to correct it and the court ordered compliance with that agreement. *See id*.

Finally, the court found that prisoners were routinely released from suicide watch improperly--that is, without a face-to-face assessment by a psychiatric provider--and that they received grievously inadequate follow-up care. Experts "observed multiple instances of prisoners who were released directly from crisis cells

**24**

back into segregation, with little or no follow-up treatment in subsequent weeks." *Id*. at 1231.  This led to "a pattern of cycling between crisis cells and segregation with little follow-up treatment after crisis cell-release." *Id*.

The court also found that "ADOC ha[d] an unacceptable practice of disciplining mentally ill prisoners for behavior that stems from their mental illnesses and doing so without adequate regard for the disciplinary sanctions' impact on mental health." Id.  Among other problems, the court found that ADOC had a "common and system-wide" practice of "punishing prisoners for engaging in self-harm." *Id*. at 1232.  This practice persisted despite an ADOC regulation purporting to forbid it. *See id*.  Not only did this "fail[] to address the underlying mental-health issues," it also resulted in segregation placements for mentally ill prisoners, further increasing the risk of harm. *Id*.

This problem was exacerbated by ADOC's failure to consider inmates' mental-health when imposing

disciplinary sanctions.  As the court found, failing to do so is "dangerous because certain sanctions, such as placement in segregation, expose mentally ill prisoners to a substantial risk of worsening symptoms and significantly reduced access to monitoring and treatment."  *Id*. at 1233.  At the time, ADOC's regulations required consultation with mental-health staff during disciplinary actions involving prisoners on the mental-health caseload.  But, as the court found, "the system [fell] far short in practice."  *Id*. Evaluators conducted superficial assessments, did not understand that they were supposed to assess whether the prisoner's conduct was connected to mental illness, and did not make recommendations about how the inmate's mental health should be considered in the process or what punishments were contraindicated for the inmate for mental-health reasons. *See id*. at 1233-34. As a result, these consultations operated as "little more than a rubber stamp" for the disciplinary process.  *Id*. at 1234. This yielded "frequently egregious" consequences:

mentally ill prisoners who attempted to hurt or kill
themselves routinely received segregation placements as
punishment, further heightening their risk of self-harm
and suicide. *Id*. Some prisoners "bounced between
segregation units and suicide-watch cells over lengthy
periods of time" and were "never put on the mental-health
caseload despite repeated instances of self-harm." *Id*.
at 1241.

While there are "inherent psychological risks of
segregation," particularly for people with serious mental
illness, the conditions in ADOC's segregation units
compounded the risk of harm. *Id*. at 1238. Inmates in
segregation experienced a "lack of any meaningful
activity or social contact" due to non-existent
programming and minimal time out-of-cell; then-Associate
Commissioner Culliver testified that ADOC tries to give
inmates in restrictive housing five hours per week
out-of-cell, "which means that even when ADOC officers
are able to meet their goal, prisoners spend on average
over 23 hours per day inside of a cell." *Id*. "[W]hen

prisoners remain in their cells around the clock, mental-health staff have a harder time observing the patient and diagnosing illnesses effectively, and correctional officers and fellow prisoners also lack sufficient regular contact with the prisoner to notice the onset of symptoms of mental illness." *Id*. at 1239.

Thus, though the extreme isolation made the mental-health needs of inmates in segregation "considerably greater," the court found that "due to staffing shortages, mental-health treatment and monitoring in segregation are gravely more limited than in general population, and nonexistent at some facilities." *Id*. at 1242. Prisoners in segregation lacked access to mental-health groups and therapeutic activities and had minimal access to individual treatment "because of ADOC's failure to bring inmates out of their segregation cells for treatment" due to a lack of correctional staff. *Id*. at 1243. As in the inpatient units, without enough correctional officers to provide the security and escorts necessary to get inmates out of

their cells, mental-health staff had to make do with "cell-front check-ins, instead of actual treatment sessions"--brief, non-confidential interactions that "cannot replace individual counseling sessions." *Id*. Mental-health rounds in segregation were even more "cursory"; one ADOC doctor described them as "drive-bys," often taking a minute or two per prisoner, and "sometimes even without verbal exchanges." *Id*. at 1244.

The lack of correctional staff also led to inadequate monitoring of inmates in segregation. Most troubling was ADOC's failure to perform monitoring rounds in segregation every 30 minutes, "the level of monitoring in segregation units necessary to keep prisoners safe from self-harm and suicide." *Id*. Plaintiffs' expert Vail "saw logs at ADOC that suggested that no segregation checks were done for multiple hours." *Id*. This lack of adequate monitoring, combined with the lack of suicide resistance of the segregation cells, created extremely dangerous conditions for prisoners in restrictive housing. *See id*. at 1244-45. In that context, both

parties' experts "were alarmed by ADOC's systematic
overuse of segregation for mentally ill prisoners, who
are most vulnerable to the risk of deterioration in such
an isolated environment."  *Id*. at 1242.

The most acute risk of harm from these segregation
practices was felt by prisoners with a serious mental
illness: The court found "overwhelming[]" evidence that
this "subset of prisoners ... should never be placed in
segregation in the absence of extenuating circumstances."
*Id*. at 1245-46.  As the then-Associate Commissioner of
Health Services testified, "placing seriously mentally
ill prisoners in segregation is 'categorically
inappropriate' ... [and] is tantamount to 'denial of
minimal medical care.'"  *Id*. at 1246.  The program
director of ADOC's mental-health vendor at the time
"agreed with the bright-line rule against placing
prisoners with serious mental illness ins segregation."
*Id*.  The Associate Commissioner further testified that
ADOC's then-new mental-health coding system, once fully
implemented, would ensure that "no seriously mentally ill

inmate would be housed in a segregation setting." *Id*. (quoting Naglich Testimony at vol. 5, 67). But with a lack of evidence at the time that ADOC had implemented this bright-line policy of excluding inmates with serious mental illness from segregation, the court found that "it is categorically inappropriate to place prisoners with serious mental illness in segregation absent extenuating circumstances," and that "even in extenuating circumstances, decisions regarding the placement should be with the involvement and approval of appropriate mental-health staff, and the prisoners should be moved out of segregation as soon as possible and have access to treatment and monitoring in the meantime." *Id*. at 1247.

At the time of the liability trial and opinion, the court also found "substantial evidence ... that ADOC [was] not conducting adequate periodic mental-health assessments of prisoners in segregation to identify those who become mentally ill while in segregation." *Id*. at 1249. After further briefing and argument from the

parties, the court issued a supplemental liability opinion finding that ADOC's failure to conduct adequate periodic mental-health evaluations of all prisoners in segregation contributed to the Eighth Amendment violation found in the original liability opinion. *See Braggs*, 367 F. Supp. 3d 1340, 1342 (M.D. Ala. 2019) (Thompson, J.). The court found that these periodic evaluations of inmates both on and off the mental-health caseload "do not occur with adequate frequency, and that even when they do occur the evaluations are so cursory as not to be worth the paper they are written on." *Id*. at 1350. It concluded that these periodic assessments were "inadequate at identifying signs of psychological harm and decompensation," placing both mentally ill and non-mentally ill inmates in segregation at substantial risk of harm. *Id*. at 1355.

The court proceeds now to discuss several of the suicides that have taken place in ADOC facilities since the court issued its liability opinion. As became apparent during the course of the omnibus proceedings,

many of the liability findings described above appear again in the circumstances of these deaths, evidencing continued problems in these areas.  Again, as the court found, "persistent and severe" understaffing permeated many of these deficiencies, *Braggs*, 257 F. Supp. 3d at 1268; as will be discussed below, understaffing continues to impede the provision of adequate mental-health care throughout the ADOC system.

### B. Recent Suicides

#### 1.   Laramie Avery

Laramie Avery was 32 years old when he hanged himself in the restrictive housing unit at Bullock Correctional Facility on April 14, 2020.  He had been incarcerated in the ADOC system for 15 months at the time and had never been on ADOC's mental-health caseload nor flagged as a person with a serious mental illness (SMI).

Avery was placed in restrictive housing, or segregation, for the first time in February 2020.  During his pre-placement mental-health screening, he appeared

intoxicated and confused, and he told the screener that he didn't "have much to live for." Pls. Ex. 3302 at ADOC518578. An urgent mental-health referral was made, and he was designated as contraindicated for placement in segregation. *See* Pls. Ex. 3301 at ADOC518513. Avery was placed in the restrictive housing unit despite the contraindication.

In late March, Avery was referred again for mental-health services after asking to see a mental-health provider because of his "documented history of mental illness." *Id*. at ADOC518504. He was never seen for this referral. He was referred again for mental-health services on April 11 and was not seen before his death.

At 9:28 a.m. on April 14, Avery was discovered hanging from the ceiling vent of his cell by a correctional officer during pill call. *See* Pls. Ex. 3299 at ADOC504208. One minute later, a second officer arrived at the cell, and the cell door was opened. Two minutes later, a doctor and two more officers arrived.

At that point, Avery was cut down and placed on a stretcher to be taken to the health care unit.   Nine minutes later, Avery arrived at the health care unit, and CPR began.   Ten minutes after that, Avery was pronounced dead.

In total, 12 minutes passed between the time when Avery was found hanging in his cell and the initiation of CPR.   Two minutes passed between the arrival of a second officer at the cell and the officers' decision to cut Avery down from where he hung.   Before cutting Avery down, the officers took a photograph of him hanging from the ceiling of his cell.   *See* Pls. Ex. 3406 at ADOC572292. At the time of Avery's death, the stipulated remedial order related to suicide prevention required that "immediate life-saving measures shall be taken after there are two (2) correctional officers present."   Order (Doc. 2569) at 17.

## 2.   Jaquel Alexander

Jaquel Alexander hanged himself in his cell at the Donaldson structured living unit (SLU) on May 17, 2020, when he was 26 years old.  The SLU is a diversionary unit for inmates with serious mental illnesses to avoid placing the inmates in segregation.

Alexander had been in ADOC custody since 2016.  It appears from his records that he was first placed in a restrictive housing unit in October 2019.  He was placed in restrictive housing again in December 2019, and he acknowledged "considering self-harm or suicide" in a pre-placement mental-health assessment.  Pls. Ex. 3298 at ADOC539034.  He did not receive a suicide risk assessment or further evaluation.  *See id*.

During that placement, he submitted a request to see a mental-health provider because he was "having really bad dreams of being killed and suicidal thoughts of hurting myself."  *Id*.  He was placed on acute suicide watch on December 15 and found to be at high risk of suicide.  He was discharged from suicide watch on

**36**

December 23 but put back on watch on December 25 after
he told a mental-health provider during a restrictive
housing screening that he was feeling "depressed" and
"suicidal." *Id*. at ADOC539035. He was released from
suicide watch again the next day.

At this point, Alexander was not on the mental-health
caseload and was not flagged as having a serious mental
illness. Despite the series of suicide watch placements
in December 2019, he did not receive a full mental-health
assessment and was not placed on the caseload.

On January 2, 2020, a nursing progress note indicated
that Alexander had been "choked out" by his cell mate
while in a crisis cell at Fountain Correctional Facility.
*Id*. He was transferred to Holman Correctional Facility
that day and placed again on suicide watch. The next
day, he was removed from suicide watch and sent back to
Fountain, where he was placed immediately in restrictive
housing. At the time, both an agreed-upon court order
and ADOC policy prohibited moving inmates directly from
suicide watch to restrictive housing absent documented

exceptional or exigent circumstances.  *See* Order (Doc. 2569) at 16; Pls. Ex. 3180 ("Daniels Directive").  There is no indication in Alexander's records of what circumstances justified this placement.

Alexander was moved from Fountain to Ventress Correctional Facility on January 7; in a meeting with a mental-health provider prior to the transfer, he was "tearful" and said he "just need[ed] MH meds."  Pls. Ex. 3298 at ADOC539035.  He was put on suicide watch again two days later after expressing suicidal thoughts during a screening before another placement in restrictive housing.  On January 15, during another pre-placement screening before another restrictive housing placement, he said he felt "sad, hopeless or depressed," and he acknowledged cutting his wrist.  *Id*.

On January 23, Alexander was seen for the first time for a psychiatric evaluation.  He was diagnosed with major depressive disorder, placed on the mental-health

caseload with a code of MH-C,[2] and flagged as having a serious mental illness.  See id.  His records do not indicate that he ever received a treatment-team meeting or that a treatment plan was ever developed for him. *See* May 24, 2021, R.D. Trial Tr. at 68-69.

Alexander was placed on suicide watch twice more in February and early March--in February after he expressed

---

2. Since the time of the liability trial, ADOC has created a coding system under which inmates are assigned one of four lettered codes.  *See* Joint Stipulation for the Evidentiary Hearing Regarding the Phase 2A Remedial Order (Doc. 3288) at 8.  A code of A indicates that the inmate is not on the mental-health caseload and is not receiving ongoing mental-health services.  A code of B indicates that the inmate requires outpatient mental-health services at intervals of 90 to 120 days, has demonstrated stable coping skills for a period of six months or more, and can be housed in facilities that do not provide daily on-site coverage by mental-health staff.  A code of C indicates that the inmate requires outpatient mental-health services at intervals of 30 to 60 days, has a diagnosed mental disorder (excluding a substance use disorder) currently associated with an impairment in psychological, cognitive, or behavioral functioning that substantially interferes with his or her ability to meet the ordinary demands of living, and must be housed in facilities that provide daily on-site coverage by mental-health staff.  A code of D indicates that the inmate receives chronic or acute mental-health services and requires placement in a designated mental-health treatment unit.

suicidality during a screening before placement in segregation, and in March when he cut his wrist with a razor. *See* Pls. Ex. 3298 at ADOC539035-36. On March 12, he was again placed in restrictive housing after his pre-placement screening mistakenly failed to note that he had a serious mental illness and was therefore contraindicated for segregation placement. *See id*. at ADOC539036. Six days later, he attempted to hang himself with a towel in his segregation cell. *See id*.

These suicidal acts appeared to be connected to fears of being hurt or killed by other inmates. During his pre-placement screening on March 12, he said that he had been "getting away from a hit," and in subsequent interactions with mental-health providers he said he had "enemies all over this camp" and that he felt unsafe in most of the general population dorms of Ventress. *Id*. On March 29, he was placed again on constant suicide watch after a pre-placement screening for restrictive housing. Throughout these suicide watch placements, he was never referred for a higher level of mental-health

care such as placement in a mental-health stabilization unit.

On April 8, 2020, Alexander tried to jump the fence at Ventress. He received a disciplinary infraction for attempting to escape. A mental-health consultation form was provided to his disciplinary hearing officer, but the form had an error code in the box indicating whether Alexander was on the mental-health caseload. *See* Pls. Ex. 3296 at ADOC517817. The consultation form indicated that there were no mental-health issues that needed to be considered if Alexander was found guilty. *See id*. Alexander was found guilty of the violation and sentenced to 45 days in segregation. *See id*. at ADOC517819. He remained in segregation for at least 22 days in spite of his serious mental illness designation.

On May 13, Alexander was moved from Ventress to Donaldson and was placed in the Donaldson structured living unit. His transfer documents incorrectly indicated that he did not have a serious mental illness. *See* Pls. Ex. 3298 at ADOC539037. He received a routine

41

mental-health referral and was scheduled to meet with a mental-health provider on May 15.  *See* Pls. Ex. 3297 at ADOC518193.

Early on the morning of May 16, he asked to be placed in a crisis cell and received an urgent mental-health referral.  *See id.* at ADOC518191.  The on-call mental-health provider was not notified for more than 12 hours. [3]  *See id.*  Alexander met with a nurse instead of the mental-health provider--with a correctional officer present as well--and told the nurse that he was suicidal.

---

3. Under the stipulated order then in effect, "An emergent or urgent mental-health referral must be communicated verbally, in person or by telephone, to the mental-health staff as soon as possible, but in no case longer than one (1) hour."  Phase 2A Order and Injunction on Mental Health Identification and Classification Remedy, Attachment A (Doc. 1821-1) at § 2.2.  If the staff member who made the referral did not recognize the referral as urgent and the referral was not recognized as urgent until it was triaged, then it is possible that the 12-hour delay before the referral was triaged and a mental-health provider was subsequently notified would not violate the stipulated order.  But, if that was the case, the court is concerned that an inmate "[r]equesting to be placed in a crisis cell" could be understood, even initially, to require only a routine referral.  Pls. Ex. 3297 at ADOC518191.

*See id.* at ADOC518184.   The nurse called the mental-health provider, who, without speaking to Alexander at that time,[4] told the nurse to have him returned to his cell and said that she would check on him in the morning.   *See id.*

Alexander was sent back to his cell and was not placed on suicide watch.  He hanged himself a few hours later.  Per the psychological autopsy conducted by ADOC's mental-health vendor Wexford Health Sources, "[a]n opportunity for crisis intervention was missed on the day prior to his death when an MHP [mental-health provider] failed to follow suicide prevention protocol and place the inmate in crisis housing."   Pls. Ex. 3298 at ADOC539039.  There is no evidence that the mental-health provider was disciplined for this failure or that any other action was taken by the department to prevent such failures from being repeated in the future.

---

4. According to the note for this interaction, the provider "verbalized that she spoke with inmate earlier today."   *Id.; see also id.* at ADOC518193 (routine referral that resulted in an appointment scheduled for the morning of May 15).

### 3. Casey Murphree

The day after Jaquel Alexander's death, Casey Murphree, age 49, hanged himself in a restrictive housing cell at Bullock Correctional Facility.  He was on the mental-health caseload at the time with a code of MH-B, and he was flagged as having a serious mental illness due to his bipolar disorder.

Murphree had been incarcerated in ADOC since 1996. For a period of time, he was coded MH-C, but his code was changed to MH-B in April 2019.  Under ADOC's mental-health coding system, MH-B and MH-C are the codes reflecting that a prisoner is on the mental-health caseload and is receiving treatment on an outpatient basis; inmates coded MH-C are those who have more significant treatment needs and who therefore meet more frequently with mental-health providers.  Murphree's records indicate that he was re-classified to MH-B at his request, not because of a change in his clinical needs

44

but because he wanted to be able to get a job.[5]  *See* Pls.
Ex. 3281 at ADOC518569.

On February 10, 2020, Murphree met with a
mental-health provider for an individual counseling
session, which lasted 10 minutes.  *See* Pls. Ex. 3280 at
ADOC518070.  The provider noted that Murphree was
rambling, had "irrational thinking," and was "somewhat
delusional."  *Id*.  The plan articulated on Murphree's
progress note from the counseling session was for the
provider to follow up with him within 30 days.  *See id*.
There is no indication in Murphree's records that he was
ever seen for this follow-up appointment.

At about 6:35 a.m. on May 17, 2020, Murphree received
a mental-health referral prior to placement in

---

5.  It is unclear why Murphree believed he could not
get a job with a code of MH-C.  In general, employment
opportunities in State prisons may not be denied based
on an inmate's mental-health status if reasonable
accommodations would allow the prisoner to perform the
work.  *See Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206,
210 (1998) (holding that Title II of the Americans with
Disabilities Act, 42 U.S.C. § 12131 *et seq.*, bars States
from denying the "benefits" of "vocational 'programs'"
to qualified prisoners with a disability).

restrictive housing.  *See id*. at ADOC518063.  The nurse who filled out the referral form noted that Murphree had multiple altercations over the previous 24 hours and gave him an emergent referral, which under the then-effective stipulated remedial order required that he be seen within three hours.[6]  *See id*.  On a pre-placement screening completed at the same time, Murphree was listed as clinically contraindicated for restrictive housing due to his serious mental illness.  *See id*. at ADOC518064.

Murphree was placed in restrictive housing notwithstanding his contraindication for segregation. There is no evidence in his records that any consideration was given to an alternative placement for him.  *See* Pls. Ex. 3281 at 1.  He was never seen by mental-health staff for the emergent referral made prior to his segregation placement.

At 3:40 a.m. on May 18, 2020, about 20 hours after Murphree entered segregation, he was found dead in his

_____

6.  As Dr. Burns credibly testified, bellicosity and uncooperativeness can be symptoms of bipolar disorder. *See* May 24, 2021, R.D. Trial Tr. at 79.

cell with a ligature around his neck. *See id*. By the time he was found, rigor mortis had set in, a process that Dr. Kathryn Burns testified takes several hours. *See* May 24, 2021, R.D. Trial Tr. at 80-81. Under ADOC's administrative regulations, officers must conduct cell-by-cell security checks in restrictive housing every 30 minutes, 24 hours a day. As plaintiffs' expert Eldon Vail credibly testified, these security checks are among the highest priorities of any safety measures in correctional facilities because the risk of suicide for inmates housed in segregation is so extreme. *See, e.g.*, June 1, 2021, R.D. Trial Tr. at 107.

In addition to these 30-minute security checks by correctional staff, nurses conduct daily rounds in segregation to provide medication and to check whether prisoners need to request medical or mental-health assistance. In Murphree's records, the nurse conducting these rounds in the Bullock restrictive housing unit initialed that she visited him on May 19, 20, and 21, the

47

three days after his death.   *See* Pls. Ex. 3280 at
ADOC518091.[7]


### 4.   Charles Braggs

Charles Braggs was 28 years old when he hanged
himself on July 27, 2020, in his cell in the restrictive
housing unit at St. Clair Correctional Facility, where
he had been living for more than two years.  He was not
on the mental-health caseload.  At the time of his death,
Braggs was 6'4", weighed 131 pounds, and had
methamphetamine in his system.   *See* Pls. Ex. 3282 at
PL9916, PL9921.  He had been in restrictive housing for

_____

7. At the omnibus remedial hearings, defense counsel
represented that, according to his understanding, these
round sheets were stored "separate from [an inmate's
individual] medical records."  May 28, 2021, R.D. Trial
Tr. at 12.  According to defense counsel, after Murphree
committed suicide, his cell was occupied by a new
occupant, but "Murphree's sheet remained in the stack of
sheets that the medical nurse signs off."  *Id.* at 13.
There is no evidence in the record to indicate that this
is what actually happened, so the court does not know
whether to credit it as true.  But even if this is what
happened, it leaves the court with serious concerns about
whether rounds are performed as required and about the
reliability and credibility of ADOC's recordkeeping.

all but one month since his incarceration at ADOC began in 2011.

Inmates like Braggs who are in restrictive housing and are not on the mental-health caseload are supposed to receive mental-health assessments every 90 days to ensure that the stress of segregation has not caused them to need increased mental-health care. In the time Braggs spent in his cell at the St. Clair restrictive housing unit, he received two such assessments: one in December 2018, and one in March 2019. During these assessments, according to Wexford's review of his death, "he reported auditory hallucinations, sleep disturbances, and reported possible paranoid/delusional thought content and exhibited blunted affect and disheveled appearance." Pls. Ex. 3284 at ADOC539022. In spite of this, "[t]here is no evidence that consideration was given to removing him from the [restrictive housing unit] or that he was referred to or evaluated by the mental health provider." *Id.*

Under the stipulated segregation remedial order then in effect, ADOC was required to conduct mental-health rounds in restrictive housing at least weekly, stopping at each inmate's cell to determine whether the inmate might require mental-health care.  The last documented round conducted in the St. Clair restrictive housing unit was on May 21, 2020, more than two months before Bragg's died.  *See* Pls.' Ex. 4119 at 2.  Lack of adequate correctional staff was the reason given for this string of missed rounds.  *See id.*

On the morning of July 27, 2020, the day Braggs died, he placed a medical request on a sick call form to see a nurse because he had been "having seizures lately."  Pls. Ex. 4118 at ADOC590774.  He was not seen for this request.  According to a prisoner in the cell next to his, who was interviewed by ADOC's chief psychiatrist after Braggs's death, Braggs had been asking for mental-health services for two weeks before he died.  *See* Pls. Ex. 4119 at 2.

After speaking with Braggs during medical rounds on the evening of July 27, the nurse asked a correctional

officer at 7:15 p.m. to have Braggs brought to the infirmary. *See* Pls. Ex. 4118 at ADOC590777. At 7:25 p.m., the nurse asked the officer again to bring Braggs to the infirmary and was told that Braggs couldn't be brought over "because he didn't have any clothes." *Id.* At 8:00 p.m., the nurse asked the captain on duty to instruct his officers to bring Braggs to the infirmary. *See id.* At 8:15 p.m., the officers found Braggs dead in his cell. *See id.* at ADOC590778.

In the months leading up to his death, Braggs routinely had scheduled out-of-cell time canceled for lack of correctional staff. Inmates in restrictive housing cells are supposed to be allowed out of their cells for five hours each week for exercise; as Dr. Burns testified, the purpose of this requirement is to ensure "a change of scenery, so they're not locked in that same space 24 hours a day, seven days a week." May 24, 2021, R.D. Trial Tr. at 106. In the seven months before his death, Braggs rarely received these required five hours per week out of his cell. In some weeks, records indicate

that he received no time at all out of his cell due to understaffing, except for occasional showers or health-care appointments. *See, e.g.*, Pls. Ex. 3921 at ADOC517731.


### 5. Gary Campbell

Gary Campbell hanged himself in his restrictive housing cell at Limestone Correctional Facility on November 27, 2020, at the age of 43. He was not on the mental-health caseload and was not flagged as having a serious mental illness. He had been living in the cell where he died for more than two years at the time of his death, after being placed in restrictive housing at his own request. During that time, Campbell had received none of the required 90-day mental-health assessments.

In November 2019, Campbell received a mental-health referral after he mailed two letters that were "tangential and disorganized," which the referring officer noted was "[n]ot normal for Campbell." Pls. Ex. 3291 at ADOC546285. In these letters, according to the

notes of Nina Tocci, one of ADOC's regional psychologists, Campbell declared that he "is the Wisdom and Power of G-d." Pls. Ex. 3267 at 1. He took "a threatening tone about the ungodly people in the world ('others') and those that 'talk against me,'" and he expressed "that his character was being 'assassinated.'" *Id.*

The following month, he was seen by a mental-health provider in response to this referral. The meeting took place cell-side because Campbell refused to come out of his cell. *See* Pls. Ex. 3291 at ADOC546286. According to the progress note of that session, Campbell denied suicidal or homicidal ideation but explained that "he [was] content being in his cell because he has God. [Campbell] reports he knows he will be released from prison eventually and will continue to be a vessel to do God[']s work." *Id.* There was no evidence of any follow-up from this session in his records.

In June 2020, Campbell was seen again by a mental-health provider after being referred by the

Limestone Warden for another "bizarre letter."  *Id.* at
ADOC546288.  He refused again to come out of his cell for
the session, denied suicidal or homicidal ideation, said
he was "still content with being in his RH cell," and
asked for paper and puzzles.  *Id.*  There was no evidence
of further follow-up or evaluation.

Early in the morning on November 27, 2020, Campbell
was found hanging in his cell by correctional officers
"after an undetermined amount of time."  Pls. Ex. 3292
at ADOC546327.  The officers cut Campbell down and called
for medical assistance, but they did not remove the sheet
from his neck or begin CPR.  After nursing staff arrived,
Campbell was moved to the medical unit, where CPR was
started.  At 6:34 a.m., he was pronounced dead.  *Id.*

As Wexford staff explained in their review of
Campbell's death, "[i]t cannot be ruled out whether ...
Campbell was exhibiting symptoms of psychosis as there
is not sufficient evidence or a psychiatric evaluation
to make that determination."  *Id.* at ADOC546328.
Campbell "spent two years in an isolated environment,

with minimal psychological stimulation." *Id.* Per Tocci's notes, he "lived isolated from others because he was allowed to. He did not come out of [restrictive housing unit] for two years. That was stressful and he was not even aware that talking to someone could have been helpful." Pls. Ex. 3267 at 1.

In sum, Campbell asked to live by himself for years in a small segregation cell, and ADOC granted his request. It checked on him twice when his rambling and religiously obsessive letters raised alarms, but these cell-side assessments were brief and perfunctory, and they were never followed up with a full mental-health evaluation. At some point, he decompensated further; no one knows when or why because no one was paying attention. Then, one morning, he hanged himself. Sometime later, he was found, cut down, moved to the medical unit, and declared dead.

### 6.   Tommy McConathy

Tommy McConathy, age 32, hanged himself from a ventilation grate in his cell in the stabilization unit at Bullock Correctional Facility on March 2, 2021. When he died, McConathy had a mental-health code of MH-D, indicating inpatient placement, and he was flagged as seriously mentally ill with diagnoses of major depressive disorder and post-traumatic stress disorder.

The Bullock SU has a unique history in this litigation. The stabilization units--the men's unit at Bullock and the women's unit at Tutwiler--are inpatient units "for patients who are suffering from acute mental-health problems--such as acute psychosis or other conditions causing an acute risk of self-harm--and have not been stabilized through other interventions." *Braggs*, 257 F. Supp. 3d at 1183. During the liability trial, a prisoner named Jamie Wallace, who was housed on that unit and who suffered from severe mental illness, testified "that he had tried to kill himself many times, showed the court the scars on arms where he made repeated attempts, and complained that he had not received

sufficient treatment for his illness." *Braggs*, 257 F. Supp. 3d at 1184. "Because of his mental illness, he became so agitated during his testimony that the court had to recess and reconvene to hear his testimony in the quiet of the chambers library and then coax him into completing his testimony as if he were a fearful child." *Id.* Ten days after his testimony, while the trial was ongoing, Wallace hanged himself in his cell in the Bullock SU. *See id.*

Ultimately, the court ordered ADOC to make all SU cells suicide-resistant. In a filing in July 2020, the defendants informed the court that it had complied with this requirement and retrofitted all of its SU cells to be suicide-resistant. *See* Response to Phase 2A Order on Inpatient Treatment (Doc. 2880) at 4-5. According to the defendants' filing, suicide resistance requires the "removal of all tie-off points." *Id.* at 4.

McConathy hanged himself in the Bullock SU by tying a bed sheet to a ventilation grate located above the sink in his cell. The grate could be reached by standing on

the sink.  *See* May 24, 2021, R.D. Trial Tr. at 154. According to defense expert Dr. Jeffrey Metzner, who said he had seen a photograph of McConathy's cell, the ventilation grate was of a type that would generally be suicide-resistant except that a corner of the grate was broken, creating a tie-off point that allowed McConathy to kill himself.  *See* July 1, 2021, R.D. Trial Tr. at 2-3.  Metzner did not know how long the grate had been broken before McConathy hanged himself from it.  *See id.*

Before his death, McConathy's incarceration was characterized by frequent, pervasive sexual and physical violence.  As he told a mental-health provider during a therapy session at Kilby Correctional Facility in September 2020, he was being trafficked by a gang and forced to perform sex acts to pay off the gang's debt. *See* Pls. Ex. 3310 at ADOC546530.  He told the provider that he would kill himself if he had to go back to Easterling Correctional Facility, where this trafficking had apparently happened.  *See id.*  Easterling was not the only source of his fear, however; as he said in a crisis

counseling meeting a few days later, he had been to five different facilities and "all the inmates are out to harm him." *Id.* at ADOC546541. During a session at the Bullock SU the following month, he told his counselor that this was his "last try. I want help but I will not let them hurt me again. I will die first." *Id.* at ADOC546648. The provider noted that McConathy was "adamant about his desire to die" if placed in a position where he would be raped again. *Id.*

Six days after that, McConathy was transferred from the Bullock SU to the residential treatment unit, an inpatient unit that at Bullock is a dormitory environment. *See id.* at ADOC546668. The following month, he reported another sexual assault and told his crisis counselor that he "can't function on the RTU!" *Id.* at ADOC546690. At that point, he had been on repeated suicide watches since December 2019. The day after he reported his assault on the RTU, a mental-health provider found McConathy to be "at high risk for continued suicide

watch until [his] safety needs are addressed." *Id.* at ADOC546712.

Although the provider indicated that McConathy would be considered for referral to Citizens Hospital, a hospital that has a small number of inpatient beds available for ADOC inmates who have not been successful with any of the levels of care offered in ADOC facilities, McConathy was not transferred to Citizens until 30 days later on January 13, 2021. Safe at the hospital, he stabilized significantly, although he "continued to report fear of returning to a setting in which he would be physically and sexually assaulted." Pls. Ex. 3312 at ADOC589249. His medications were adjusted, and he was found to be "calm[] and pleasant." *Id.*

On February 18, 2021, McConathy was discharged from Citizens Hospital back to the Bullock SU. On March 1, McConathy was seen by a mental-health provider and said that he "learned a great deal about his mental health at Citizens," but that "he feels people still want to harm him." Pls. Ex. 3310 at ADOC546887. In the progress

note, the plan given was to continue providing therapy
and medication, but to release McConathy from the SU.
*See id.*   His treatment team recommended that he be
discharged to the Donaldson RTU, a celled environment
where they hoped he might be safer than the dormitory
setting of the Bullock RTU.   *See* Pls. Ex. 3312 at
ADOC589250.

At around 12:30 p.m. the next day, McConathy was
found hanging in his SU cell.   He was cut down and CPR
was initiated.   About 10 minutes later, he was pronounced
dead.

### C.  Changed Circumstances in Areas of Liability

Based on the totality of the evidence presented
during the omnibus remedial proceedings, the court
proceeds to discuss its findings with regard to the
changed circumstances in ADOC facilities related to each
of the areas of liability previously found by the court.
Serious problems with the provision of mental-health care
in ADOC facilities persist in many of the remedial areas

discussed below; others show some improvement, and a few show that ADOC has taken significant steps forward since the time of the court's liability opinion.  To be clear, the fact that significant deficiencies persist with regard to a particular aspect of the mental-health care offered by ADOC does not mean that every remedial provision proposed by the parties is necessary to correct those deficiencies.  Nor does the absence of broad, ongoing deficiencies as to another part of the mental-health care system mean that no relief is necessary:  ADOC may be exceeding the constitutional minimum in most but not all elements of a given part of its mental-health care system, and some narrow relief may still be needed to remedy the points at which it continues to fall short.  But the general degree of improvement or lack of improvement in the areas of relief that were the subject of the omnibus proceedings will inform the court's determination of precisely what remedies remain necessary in each area and what modes of providing that

relief are the most narrowly tailored and least intrusive ways of correcting the violations at issue.

### 1.   Correctional Staffing

As the court found in its liability opinion in 2017, ADOC's severe staffing shortages, "combined with chronic and significant overcrowding, are the overarching issues that permeate each of the" failures of ADOC's mental-health care system that contributed to the court's finding of constitutional deficiency. *Braggs*, 257 F. Supp. 3d at 1268. For that reason, when the court split the remedial phase of this suit into component elements to make developing relief a more manageable task, the court declared that "the understaffing issue must be addressed at the outset." Phase 2A Revised Remedy Scheduling Order on Eighth Amendment Claim (Doc. 1357) at 4. Staffing, the court explained, "must be fully remedied before almost anything else can be fully remedied." *Id.* This approach, the court said, was an act of "triage," *id.*--that is, the act of responding to

a disaster "according to a system of priorities designed to maximize the number of survivors," *Triage*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/triage (last visited December 20, 2021). Because having too few staff to provide adequate care to its prison population lay at the heart of all of the court's other findings of constitutional inadequacy, the problem of understaffing had to be addressed first in order to maximize the number of lives saved.

Understaffing was therefore the first of the court's liability findings subjected to remedial proceedings and a long-term remedial order. *See* Phase 2A Understaffing Order (Doc. 1657).[8]  In that order, the court instructed the defendants, *inter alia*, to obtain a correctional

---

8.   The defendants have long disputed the adequacy of the PLRA findings in the opinion accompanying the understaffing remedial order and raised this issue again during the omnibus remedial proceedings.  The defendants' recourse for these complaints was either to appeal the court's order at the time it was issued or to file a motion to modify or terminate that order, under the PLRA or otherwise.   Whatever the merits of the defendants' concern may be, the defendants remained obligated to comply with the order absent modification, termination, or reversal.

staffing analysis from the firm of Margaret ("Meg") and Merle Savage by May 2018 and, by February 20, 2022, to "have fully implemented the Savages' correctional staffing recommendations," as modified by any subsequent agreements or orders. *Id.* at 2-3.

The Savages timely completed and submitted their staffing analysis and recommendations to ADOC on May 1, 2018. *See* Savages' Report (Doc. 1813-1) at 2. They recommended that ADOC maintain, in total, 3,826 full-time equivalent correctional officer positions between what are termed "mandatory" and "essential" posts. "Essential" posts are those that are "needed for normal operations but may be temporarily interrupted." *Id.* at 106. As Meg Savage testified during the omnibus proceedings, so-called "normal operations" are "the situation where activities are being conducted routinely as prescribed in all policy and procedures," which includes "such things as programming, recreation activities, vocational and educational systems, all up and running, supervised appropriately." June 16, 2021,

R.D. Trial Tr. at 41-42.  These positions must be filled 75 % of the time; that degree of interruption does not cause "significant impact" to the operations of the prisons.  Savages' Report (Doc. 1813-1) at 106.

"Mandatory" posts, which comprise the vast majority of the 3,826 positions recommended by the Savages, are those that "cannot be left unfilled without jeopardizing safety and security." *Id.*  As Meg Savage testified, "in a fully functional agency staffing unit," the number of "mandatory" posts would match the numbers of another designation--"critical minimum" posts--which are those positions that, if they are not staffed at a particular time, should cause a facility to "immediately lock down and make sure that everything is safe, because you've reached a critical level."  June 15, 2021, R.D. Trial Tr. at 122-24, 129.  These "critical minimum" positions are, in Savage's terms, "the practical application of [the] post plan" from the staffing analysis at an individual facility:  They may be subject to certain changes on the ground as the responsibilities or units in a particular

prison shift, but any changes should be regularly reconciled with the post plan to ensure that they match the "mandatory" posts described there. *Id.* at 126. Because prisons cannot safely operate in a non-lockdown status without these "mandatory" or "critical" posts filled, much less provide the level of programming and recreation prescribed by prison policy, these posts must be manned 100 % of the time. *See id.* at 126-27. Leaving such posts unfilled would yield what Meg Savage called "unacceptable" consequences for safety, such as housing units with no supervision, *id.*; as the Savages explained in their staffing analysis, "[a]ny time staffing falls below Critical Minimum an emergency should be declared, inmates locked down, and steps taken to resolve the problem." Savages' Report (Doc. 1813-1) at 22.

Instead of declaring emergencies and locking down, the evidence demonstrates that ADOC operates daily at staffing levels well below what the Savages considered necessary, and that the system has made only slight progress toward minimally adequate staffing in the three

years since the court's understaffing remedial order. The first report on correctional staffing levels that ADOC filed with the court after receiving the Savages' assessment showed that, at the end of March 2018, the system had filled 1,467 of the 3,826 total correctional staff positions. *See* Quarterly Staffing Report (Doc. 1858-1) at 2. The last staffing report before the omnibus remedial hearings, filed exactly three years later, showed that ADOC has now filled 1,830.5 correctional staff positions. *See* Quarterly Staffing Report (Doc. 3246-1) at 4. This number excludes 90 so-called "Correctional Cubicle Operators," who "are not certified officers" and "can have no inmate contact," and who therefore were not included in the Savages' staffing recommendations. Savages' Report (Doc. 1813-1) at 13, 38. In total, ADOC has gained 459.5 correctional officers and lost 96 supervisors since the Savages submitted their staffing analysis in May 2018. ADOC continues to have filled less than half of the mandatory and essential positions listed in the staffing analysis.

At the present pace of improvement--363.5 positions in three years--ADOC is on track to achieve sufficient staffing to safely conduct normal operations sometime in mid-2037.[9]

_____

9. The defendants have argued that the posts listed in the Savages' staffing analysis in fact reflected "optimal" staffing levels rather than the levels necessary to safely conduct normal operations. *See, e.g.*, Defs.' Post-Trial Br. (Doc. 3367) at 56-57. Meg Savage made several statements to that effect during her testimony. *See, e.g.*, June 15, 2021, R.D. Trial Tr.R.D. Trial Tr. at 46, 80-81; *see also* Savages' Report (Doc. 1813-1) at 105. Just as often, however, Savage said the opposite in unequivocal terms. *See, e.g.*, June 16, 2021, R.D. Trial Tr. at 50, 54-55. Moreover, the notion that the Savages' analysis described optimal levels is belied by the terms of the analysis itself. "Essential" posts, along with "mandatory posts," are defined as the positions "needed for normal operations." Savages' Report (Doc. 1813-1) at 106. "Normal operations," in turn, are defined as a level between optimal staffing and critical minimum staffing. *See id.* at 22. So too, there exists a third kind of post--"important" posts--and as Meg Savage explained, filling these "important" posts is what allows a prison system to reach optimal levels. *See* June 16, 2021, R.D. Trial Tr. at 50. The Savages' staffing analysis contained no "important" posts in its facility post plans. *See* Savages' Report (Doc. 1813-1) at 121-33. Accordingly, considering all of the evidence, the court finds that the Savages' staffing analysis reflected the posts necessary for ADOC to safely conduct normal operations, not the posts necessary to achieve optimal staffing levels. And regardless, the gist of the Savages' testimony was clear: ADOC's correctional staffing is woefully inadequate.

The evidence presented in the omnibus hearings made clear how this grievous systemwide understaffing is felt daily at ADOC facilities.  On a representative week at Donaldson Correctional Facility, the prison managed at most to fill 61 of the 97 mandatory posts at the prison one day on one shift.  *See* Pls. Ex. 3860 at ADOC588188-90. In the inpatient RTU and SLU units at Donaldson that week, ADOC filled at most seven of the 13 mandatory posts. *See id.*  These were maximum numbers; on other shifts during the week, Donaldson had as few as 21 of the 97 mandatory posts filled prison-wide and only one post filled across the RTU and SLU: a single officer in the control room for those units and no one on the floor. *See id.* at ADOC588208, 217-18.

Donaldson was not an outlier among ADOC facilities in its degree of understaffing.  During similarly representative weeks at Bullock, St. Clair, and Easterling, ADOC again did not fill all of the mandatory posts on a single shift at any of the facilities, even counting correctional cubicle officers and trainees.  Nor

are these facilities the worst of the system; according
to the defendants' most recent quarterly staffing report
prior to the omnibus remedial hearings, Bibb, Kilby, and
Ventress Correctional Facilities all had correctional
staff vacancy rates of over 50 %.  *See* Quarterly Staffing
Report (Doc. 3246-1) at 3.  Only the Hamilton Aged and
Infirmed Center had adequate correctional staffing as
reflected in that report, and otherwise only the Tutwiler
Prison for Women had a vacancy rate of less than 40 %.
*See id.*

ADOC began a pilot program at Easterling, Hamilton,
and Tutwiler to begin tracking the fill rate of critical
minimum posts at those facilities.  *See* June 15, 2021,
R.D. Trial Tr. at 112-13.  But instead of an honest
assessment of the facilities' critical staffing needs,
ADOC elected simply to leave off every mandatory five-day
post from the Savages' staffing analysis, including only
the mandatory seven-day posts instead.  *See* June 17,
2021, R.D. Trial Tr. at 7-8.  This across-the-board
decision appears both baseless and arbitrary, and it is

out of keeping with Meg Savage's testimony that mandatory and critical posts should generally be identical, absent some reason why a particular post might become non-critical based on specific changes at the facility. *See* June 15, 2021, R.D. Trial Tr. at 122-24. Savage testified that she did not know why ADOC had, as she said, "excluded" all mandatory five-day posts in creating these rosters. June 17, 2021, R.D. Trial Tr. at 8.

Of course, necessary staffing levels are always relative to prison population. Incarcerating more prisoners requires more staff; incarcerating fewer requires fewer. What staff are needed may also vary with changes in the responsibilities of a facility, or structural changes such as the opening or closing of particular units. For that reason, among the Savages' recommendations that the court's understaffing order required the department to "fully implement[]," Phase 2A Understaffing Remedial Order (Doc. 1657) at 3, were that "another staffing analysis ... be conducted for every facility starting in January 2019" to re-assess the

prisons' needs and that an "agency staffing unit" be created to "implement[] and enforce[] ... any changes resulting from this analysis," Savages' Report (Doc. 1813-1) at 20, 100. Among its responsibilities, this agency staffing unit would set critical minimum levels for each facility and ensure that those levels matched the mandatory posts in the staffing analysis. *See id.* at 22; *see also* June 15, 2021, R.D. Trial Tr. at 122-24.

Despite the court's order to implement the Savages' recommendations, ADOC has done nothing in the intervening three years to update the Savages' staffing analysis. Nor has the department established the agency staffing unit; until the absence of this unit came up in Meg Savage's testimony during the omnibus proceedings, ADOC had taken no steps to set up the staffing unit or hire an agency staffing head. As a result of ADOC's failure to implement these recommendations, Savage testified that she did not know whether the number of correctional staff positions currently needed for the system to operate safely is higher or lower than the number she and her

husband found in their 2018 analysis.  *See* June 16, 2021,
R.D. Trial Tr. at 9-14.

That said, ADOC's population figures do not suggest
that the systemwide number of necessary correctional
staff should be radically different going forward than
it was at the time of the court's understaffing order.
While the system's in-house population has fallen
somewhat since that time, nearly all of the decrease is
due to the dramatic drop-off of admissions starting in
April 2020 as the COVID-19 pandemic took hold.  *Compare*
Pls. Ex. 4033 at 3, *with*, Joint Stipulation (Doc. 3288)
at 2.  Those un-admitted people did not simply disappear;
as the parties' joint evidentiary stipulation shows, the
decline in admissions has been accompanied by a
sustained, coordinate rise in what ADOC terms "County
Jail Population: On-The-Way."  Joint Stipulation (Doc.
3288) at 2.  When those inmates arrive, the correctional
staffing needs of ADOC will only increase.

Right now, the lack of correctional staff continues
to have profound consequences for the safety of prisoners

incarcerated in the ADOC system. Tommy McConathy was raped in the Bullock RTU, where duty post logs show that the entire dormitory was at times staffed by a single correctional cubicle officer in the control room and no one on the dormitory floor. *See* Pls. Ex. 3403 at ADOC558777; May 28, 2021, R.D. Trial Tr. at 157-58. Charles Braggs's records indicated that he was offered out-of-cell exercise time on only four days in the six months he spent in segregation before his death, and the entries in his file frequently note staff shortages as the reason why his required out-of-cell exercise time was cancelled. *See* Pls. Ex. 3921 at ADOC517730-58. Representative duty post logs from St. Clair showed multiple restrictive housing units staffed with a single officer in the control room and no one on the unit floor. *See* Pls. Ex. 4269 at ADOC588534. Because two officers are required to take an inmate out of his cell, Savage testified that she "honestly d[id] not know" how ADOC could get any of the prisoners on those units out if needed in the case of a mental-health emergency. June

16, 2021, R.D. Trial Tr. at 195.  Audits of ADOC's restrictive housing units routinely found compliance levels with the required 30-minute security checks below 20 %; the extraordinary degree to which non-compliance with this requirement puts inmates at risk was illustrated by the case of Casey Murphree, who was not found for hours after his death, after rigor mortis had set in.

Moreover, a candid March 2020 letter from Wexford to ADOC's then-Associate Commissioner of Health Services explained how continued, extreme correctional understaffing undermines the adequacy of mental-health care in ADOC facilities across the board.  The absence of correctional staff and the resulting violence and stress among ADOC inmates resulted in decompensation and suicidality, leading to skyrocketing demand for suicide watch--more than 4,000 % above the suicide watch hours anticipated in Wexford's contract.  *See* Pls. Ex. 3323 at 1-2.  As a result, Wexford has had to divert its mental-health resources *en masse* to suicide watch,

yielding a system of crisis response in lieu of mental-health care. *See id.* In Wexford's words:

> "No one disputes that the ADOC has a *severe shortage of Correctional Officers* (COs), as documented in an April 2019 US Department of Justice report as well as in multiple quotes from ADOC staff to the media. Furthermore, no one disputes that this lack of security presence is a major contributing factor to the *ongoing and excessively high levels of contraband, inmate drug use, and inmate-on-inmate violence* the ADOC has experienced over the past several years.
>
> "With many prison units lacking COs to protect against aggressive and/or predatory troublemakers, many inmates are afraid for their lives, resulting in *unprecedented levels of stress, anxiety, and panic disorders among the ADOC inmate population*. In many cases, the hostile prison conditions lead inmates to suicidal thoughts or acts. This has greatly increased the number of patients Wexford Health must place on suicide watch: fewer security staff enables greater violence; which increases fear and suicidal thinking; which increases the need for suicide watch hours. The dramatic increase in suicide watch volume has left us with no choice but to *replace the performance of routine mental health tasks*—which comprise a large part of the audits—with *providing crisis-level services*, to ensure the safety of our patients."

*Id.* at 2 (emphasis in original).

Taken as a whole, the evidence presented at the omnibus remedial hearings reflected a beleaguered and dysfunctional system where still-egregious correctional staffing deficiencies make providing constitutionally adequate mental-health care impossible.  In light of this evidence, the court finds that continued correctional understaffing in all ADOC facilities except the Hamilton Aged and Infirmed Center and Tutwiler prison for women places mentally ill inmates in ADOC custody at substantial risk of serious harm, including decompensation, victimization, self-injury, and death.[10]

### 2.   Mental-Health Staffing

---

10. Because of the nearly unchanged severity of ADOC's correctional understaffing and the degree to which it continues to "permeate" the entirety of the department's mental-health care system, *Braggs*, 257 F. Supp. 3d at 1268, this understaffing creates a substantial risk of serious harm regardless of any other continued deficiencies.  However, as will be discussed below, the correctional understaffing is exacerbated by ongoing problems in many of the other areas in which the court has previously found liability.

In contrast to its minimal efforts to increase correctional staffing, ADOC has made significant, albeit incomplete, progress toward increasing mental-health staffing in ADOC facilities to constitutionally acceptable levels.

In its 2017 liability opinion, the court surveyed levels of mental-health staffing across ADOC disciplines and facilities and found them "chronically insufficient." *Braggs*, 257 F. Supp. 3d at 1194. ADOC's prisoner population had become more mentally ill over the preceding decade, "both in terms of the number of individuals who need[ed] mental-health care and in terms of the acuity of mental-health care needs." *Id.* at 1194. Yet ADOC had hired fewer and fewer mental-health providers--far fewer than it was authorized to hire under its contract with its mental-health vendor. *Id.* at 1194–95. The resulting understaffing caused "a plethora of issues, including insufficient identification of mental illness at intake and referrals; missed counseling appointments and group sessions; and inadequate

monitoring of prisoners in mental-health crises." *Id.* at 1197.

To remedy those issues, the defendants proposed a plan with short-run and long-run components. *See* Phase 2A Understaffing Remedial Opinion (Doc. 1656) at 17–18. The short-run component called for ADOC, in the course of slightly more than a year, to double the number of psychiatrists, psychologists, certified nurse practitioners, licensed mental-health professionals and registered nurses employed at ADOC facilities. *Id.* at 18–20. In addition, the defendants proposed that ADOC must fill certain existing positions in its Office of Health Services (OHS)--the ADOC department responsible for monitoring the provision of mental-health care--and create and fill others. *Id.* at 23–27.

The long-run component of the defendants' plan called for ADOC to employ a team of three mental-health consultants to develop ratios for determining the number of mental-health staff of various types needed per inmate. The defendants proposed to apply those ratios

to ADOC caseload numbers, and thereby determine an appropriate number of mental-health staff for each facility and discipline. *Id.* at 20–22. ADOC would then modify its contract with its mental-health vendor to provide the recommended number of staff.

The court found the defendants' proposed plan "minimally adequate" to remedy the constitutional violations identified in its 2017 liability opinion, and ordered its adoption, with slight modifications. Phase 2A Understaffing Remedial Opinion (Doc. 1656) at 1; Phase 2A Understaffing Remedial Order (Doc. 1657) at 1. The court supported this order with PLRA findings. *See* Phase 2A Understaffing Remedial Opinion (Doc. 1656) at 33-37.

To implement the short-run component of the defendants' plan, the court ordered ADOC to hire, by July 1, 2018, the full number of mental-health professionals available to it under its then-existing contract with its mental-health vendor. *See* Phase 2A Understaffing Remedial Order (Doc. 1657) at 4. The court also ordered ADOC to fill the positions of Clinical Director of

Psychiatry and Ombudsman in the ADOC Office of Health
Services, and to create and fill the positions of
Director of Mental Health Services and Southern Regional
Psychologist. *See id.* at 6–7.

To implement the long-run component of the
defendants' plan, the court ordered ADOC to meet a series
of deadlines. First, it ordered the defendants' mental-
health consultants--Catherine Knox, Jeffrey L. Metzner,
and Mary Perrien--to begin to develop mental-health
staffing ratios by September 1, 2018. *See id.* at 4-5.
Second, it ordered that the defendants' consultants
submit finalized mental-health staffing ratios to the
defendants to be filed with the court by March 4, 2019.
*See id.* at 5. Third, it ordered that ADOC modify its
contract with its mental-health vendor to provide the
positions required by the staffing ratios by August 15,
2019. *See id.* Fourth, it ordered that the defendants'
consultants review implementation of the staffing ratios
and make recommendations, if necessary, for revising
them, by January 15, 2020. *See id.* at 5-6. Finally, it

ordered that ADOC's mental-health vendor fill the mental-health staffing positions consistent with the contract by February 15, 2020.  *See id*. at 6.

In the months following the entrance of the court's Phase 2A Understaffing Remedial Order, ADOC seemed to the plaintiffs to be dragging its feet, and in July, 2018, the plaintiffs moved to hold the defendants in contempt, alleging that ADOC had failed to meet certain deadlines imposed by the understaffing order, and that it had withheld data concerning its compliance.  *See* Pls. First Notice of Non-Compliance and Motion for Order to Show Cause Why Defendants Should Not be Held in Contempt (Doc. 1916).  The defendants opposed the motion, *see* Defs. Response in Opposition (Doc. 1936), and after a series of hearings on the nature of ADOC's obligations regarding mental-health staffing, the parties agreed to resolve their dispute by stipulating to various modifications of the court's Phase 2A Understaffing Remedial Order, *see* Amended Stipulations Regarding Mental Health Staffing (Doc. 2283-1).  Under the parties' stipulations, which

83

the court entered as an enforceable order, *see* Order
(Doc. 2301), ADOC agreed to provide mental-health
staffing consistent with certain minimum staffing
requirements until such time as its consultants finalized
their staffing ratios, and to submit quarterly staffing
reports to the court and monthly reports to the
plaintiffs.

ADOC proceeded to make significant progress. Its
consultants completed their recommended mental-health
staffing ratios in February, 2019, *see* Recommended
Staffing Ratios for Mental Health Services (Doc. 2385-
1), and in September of the same year the parties jointly
filed a mental-health staffing matrix, based on those
staffing ratios, specifying the number of
full-time-equivalent staff to be hired at each ADOC
facility, *see* Mental-Health Staffing Matrix (Doc.
2618-1). The court approved that staffing matrix in
December 2019, together with stipulations by the parties
regarding the manner in which ADOC was to comply with its
consultants' recommendations, and incorporated the

staffing matrix and stipulations into an enforceable order.   *See* Phase 2A Order and Injunction on Mental-Health Staffing Remedy (Doc. 2688).   ADOC then modified its contract with Wexford to hire mental-health staff according to those stipulations and the staffing matrix.   *See* P-3321.   Those modifications went into effect on October 1, 2020.   *See id.* at ADOC528698.

Since then, ADOC has hired a significant number of new mental-health staff.   While ADOC has yet to meet the targets set forth in the December 2019 staffing matrix, its consultant, Dr. Metzner, testified that several ADOC facilities have sufficient mental-health staff to provide a constitutionally permissible level of care to their current inmate populations, including Easterling Correctional Facility, Fountain Correctional Facility, Holman Correctional Facility, Kilby Correctional Facility, and Limestone Correctional Facility, *see* June 30, 2021, R.D. Trial Tr. at 123–32,   and that certain positions at St. Clair Correctional Facility and Staton

Elmore Correctional Facility are adequately staffed, *id.* at 141–42.[11]

Nevertheless, while change has come faster in this area than others, its pace has been slower than ordered, and serious deficiencies in mental-health staffing remain. The court's 2018 remedial staffing order set a deadline of August 15, 2019, for ADOC to modify its contract with its mental-health vendor to provide the positions required by the staffing matrix. ADOC failed to meet that deadline, and it has not caught up. Its consultants have not revised their ratios, as they were required to do by January 15, 2020. And although ADOC has made encouraging progress at some facilities, no facility is in complete compliance with the court's 2018 remedial staffing order and the parties' staffing matrix.

---

11. Dr. Metzner later testified that he misread a staffing chart prepared by Wexford and overestimated the extent to which the ADOC facilities were staffed by up to 15 %. *See* July 1, 2021, R.D. Trial Tr. at 7; July 5, 2021, R.D. Trial Tr. at 65–66. Still, the court does not question that ADOC has made great progress in staffing at the facilities that Dr. Metzner identified.

In fact, according to the most recent staffing report in the record, at only seven of its facilities has ADOC staffed even a single type of position in accordance with the requirements of the staffing matrix. *See* Quarterly Mental-Health Staffing Report (Doc. 3227-1) at 3–4 (reporting that ADOC has fully staffed the positions of mental-health observer, at Bibb Correctional Facility; mental-health observer, at Bullock Correctional Facility; mental-health observer, at Donaldson Correctional Facility; mental-health licensed nurse practitioner, at Fountain Correctional Facility; mental-health observer, at Holman Correctional Facility; mental-health licensed nurse practitioner, at Kilby Correctional Facility; and mental-health observer, at Limestone Correctional Facility at the levels provided in the staffing matrix.). At no facility has it staffed more than one type of position in accordance with the requirements of the staffing matrix. *See id.*

That several ADOC facilities may have enough mental-health staff to serve their current populations

is an encouraging development, but not necessarily a
permanent one.   In response to the COVID-19 pandemic,
ADOC largely stopped conducting intake from local jails,
and, as a result, its inmate population has fallen below
the levels that the staffing matrix was designed to
accommodate.   *See, e.g.*, June 30, 2021, R.D. Trial Tr.
at 122 (testimony of Dr. Metzner, estimating that ADOC's
caseload has decreased by 3,000 inmates due to COVID-19).
Both parties agree that, when the pandemic abates, ADOC
will likely see a substantial and rapid increase in its
inmate population.   *See* Joint Stipulation For Evidentiary
Hearing (Doc. 3288) at 2; Pls. Dem. Ex. 236; Pls. Exs.
3224–3232;   June 30, 2021, R.D. Trial Tr. at 111
(testimony of Dr. Metzner); July 5, 2021, R.D. Trial Tr.
at 76 (testimony of Dr. Metzner).   It remains to be seen
whether the ADOC facilities that are sufficiently staffed
today will stay that way, or whether the requirements of
the staffing matrix--which ADOC has not met--are accurate
indicators of the quantity of staff needed to provide a

constitutionally permissible standard of care once intake
from local jails resumes.

More troubling still, ADOC's shortage of
correctional staff calls into question the adequacy of
mental-health staffing even in those facilities where
ADOC has made the most progress.  Dr. Metzner based his
testimony that certain ADOC facilities have sufficient
mental-health staff to serve their current populations
on the mental-health staffing ratios; given the number
of mental-health staff employed at each facility, he used
the ratios to determine the maximum number of inmates
those staff could treat.  At certain facilities with
lower-than-predicted inmate populations, the ratios
projected current staffing levels to be adequate.  The
ratios, however, are based on a set of assumptions,
including the assumption that "[t]here will be adequate
correctional staffing."  *See* Doc. 2385-1 at 2.
Unfortunately, that assumption has proven false and is
projected to remain false for years.  ADOC has failed to
provide adequate correctional staffing, and that failure

has had a direct impact on the ability of mental-health staff to treat inmates efficiently.  As explained above, extreme correctional understaffing has prevented mental-health staff from treating inmates simply because there are insufficient correctional staff to escort inmates to and from their cells.  *See supra* at 73-76; Pls. Ex. 3310 at ADOC546882; May 25, 2021, R.D. Trial Tr. at 140-44; Pls. Ex. 3347 at ADOC553738.  It has also resulted in a proliferation of violence, causing a massive increase in suicide watch hours that has required mental-health staff to "replace the performance of routine mental health tasks ... with providing crisis-level services."  *Supra* at 76 (quoting Pls. Ex. 3323 at 2).  It is therefore almost certain that mental-health staff are unable to treat inmates as efficiently as the staffing ratios assume, and it is likely that more mental-health staff are currently needed even in those facilities where the defendants have made the most progress.

### 3.  Restrictive Housing

The court discussed above and will discuss in more detail below the current risks to inmates in ADOC's restrictive housing units that are the direct result of the system's ongoing dearth of correctional officers. These problems include, for instance, insufficient out-of-cell time and the inadequate provision of the 30-minute security checks necessary to interrupt decompensation and suicide. The court will not further elaborate those problems here. Instead, it notes several additional, serious problems with the mental-health care provided to inmates in ADOC's restrictive housing units that are discussed less elsewhere in this opinion.

First, ADOC continues to lack a functioning process for diverting individuals from segregation who are contraindicated for placement there due to suicide risk, serious mental illness, or other significant mental-health issues. Part of this is due to the deficiencies in the disciplinary process discussed above, which should help prevent inmates who are clinically contraindicated for segregation from receiving

segregation sentences. But the pre-placement screening process also is intended to divert inmates from segregation when necessary, and it, too, fails almost categorically to do so. In other words, if ADOC's mental-health care system were functioning adequately, there would at least two layers of protection (the disciplinary process and the pre-placement screening process) to prevent inmates with serious mental illnesses from being placed in segregation for disciplinary reasons, and one layer of protection (the pre-placement screening process) to prevent inmates with serious mental illnesses from being placed in segregation for non-disciplinary reasons. But neither works in practice, and suicidal inmates and those with serious mental illness are routinely placed in segregation as a result.

ADOC has improved its practice of conducting pre-placement screenings for prisoners entering segregation to assess them for contraindications to restrictive housing, although there is some evidence that these screenings too often miss contraindications.

Dr. Burns, for instance, testified about her review of the records of an inmate the parties called D.R., who received pre-placement screenings that "continually said there were no contraindications for [restrictive housing unit] placement, even though he was a person with a serious mental illness."  May 25, 2021, R.D. Trial Tr. at 87.

More troubling is that, as of the time of the liability trial, ADOC staff regularly ignore the results of pre-placement screenings.  Laramie Avery and Casey Murphree both were flagged in pre-placement screenings as clinically contraindicated for segregation due to mental-health concerns.  *See* Pls.' Ex. 3302 at 518578; Pls.' Ex. 3280 at ADOC518064.  Both were placed in restrictive housing anyway, and both died there, Murphree within a day of his arrival.  Two mental-health staff members told correctional officers that another inmate referred to as A.J. should not be placed in segregation because of his mental-health; they eventually had to refer him for suicide watch even though he did not need

it because the captain with whom they were communicating said he was going to place A.J. in segregation anyway. *See* May 25, 2021, R.D. Trial Tr. at 27.

Although the court found in the liability opinion that "it is categorically inappropriate to place prisoners with serious mental illness in segregation absent extenuating circumstances," *Braggs*, 257 F. Supp. 3d at 1247, ADOC has never developed a working definition of these "extenuating circumstances"--often now called "exceptional circumstances." *See* July 1, 2021, R.D. Trial Tr. at 225-26, 233. Under ADOC policy and the orders of this court, inmates coming directly from suicide watch also cannot be placed in restrictive housing in the absence of exceptional circumstances due to the risk that the conditions of isolation may cause them to relapse into suicidality. But with no definition in place, ADOC instead sends these prisoners to segregation, as one provider put it, as "a matter of course," Pls. Ex. 3320 at 1, obtaining pro forma authorizations in minutes with no evidence that

alternative placements were considered or that the circumstances were exceptional under any plausible definition of the term.

Within the restrictive housing units, the provision of mental-health rounds has become more consistent. Although Charles Braggs received no weekly mental-health rounds for more than two months before his death, recent audits of almost all of the major facilities show significant compliance with these rounds. *See* Pls.' Ex. 3255 (Bibb); Pls.' Ex. 3258 (Bullock); Pls.' Ex. 3264 (Easterling); Pls.' Ex. 3269 (Fountain); Pls' Ex. 3270 (Kilby); Pls.' Ex. 3272 (Limestone); Pls.' Ex. 3276 (St. Clair); Pls.' Ex. 3318 (Tutwiler); Pls. Ex. 3320 (Ventress). This is a recent improvement in many cases, but it is a commendable one.

Periodic mental-health assessments, on the other hand, continue to be conducted sporadically if at all, particularly for inmates who are not on the mental-health caseload. Braggs received only two assessments in the two years he had been in his segregation cell at St.

Clair before he died.  Gary Campbell lived in restrictive housing for nearly three years without a single periodic assessment.  When these assessments or other contacts lead to mental-health referrals, mental-health staff often fail to follow up on them appropriately.  Laramie Avery received two referrals in the weeks before his death and was not seen.  Jaquel Alexander received an urgent referral the day before he died, and the mental-health provider was not notified of the referral for 12 hours.  Casey Murphree received an emergent referral less than 24 hours before his death--the most acute referral level possible, which requires that the inmate be seen within three hours.  He was not seen for the referral before he died.  As a result of the failure to follow up on referrals appropriately, inmates who are psychologically deteriorating in segregation are missed, do not receive the mental-health treatment they need, and too often decompensate to the point of self-harm and suicidality.  Combined with the dearth of correctional staff, these conditions continue to make ADOC's

segregation    units    dangerous    for    inmates    with
mental-health needs housed in them.


### 4.   Intake

The court recognizes the hard work ADOC has put into
improving the intake process and ensuring that every
inmate receives a mental-health screening upon entering
ADOC custody.  The parties agree that ADOC has completely
overhauled its intake process since the time of the
liability opinion, and the evidence is clear that every
inmate who enters the system is currently receiving this
screening.  Moreover, the rate of identified mental
illness in ADOC facilities has increased, and it now
falls within the expected range for both male and female
prison populations.  This is an encouraging turnabout
from the low rates found during the liability trial.

While ADOC has made admirable improvements to intake
generally, there are nevertheless issues remaining that
require current relief.  As Dr. Burns noted, ADOC's own
mental-health care provider recommended a variety of

changes to the intake process in response to failures identified during reviews of inmate suicides. In particular, ADOC seems to have struggled to document and follow up on the results of the intake screening. For example, the psychological autopsy Wexford conducted after Laramie Avery committed suicide noted that, while inmates were receiving psychological testing during intake, "there is no interpretation of the results and it's not incorporated into the inmate's treatment during his incarceration." June 2, 2021, R.D. Trial Tr. at 108. After Charles Braggs committed suicide months later, Wexford reiterated that recommendation, writing that, "Psychological Assessments are highly recommended to be interpreted at intake and assessed for any potential risk factors or indicators the inmate may experience an underlying mental health problem that needs further evaluation by a mental health provider." Charles Braggs Psychological Autopsy (P-3284) at ADOC539024. Dr. Burns also noted these issues, expressing her concern that, "although the tests were administered, the results were

not being interpreted and used in the treatment of the patients." June 7, 2021, R.D. Trial Tr. at 107.

Nor has the department consistently made an effort to ensure that all of an inmate's previous mental-health records, which may contain important information to facilitate the inmate's treatment, are received and assessed so that providers can accurately determine who is in need of care and what care is needed. This makes it more likely that prisoners who should be on the caseload will be missed and that providers will make treatment decisions without access to information about an inmate's mental-health history that may be vital to identify the inmate's current mental-health needs. This problem was realized in the treatment of Marquell Underwood. In the course of a routine referral soon after his intake screening, Underwood stated that he had been treated for bipolar disorder prior to his incarceration and reported "an increase in mood swings, including depression and irritability." May 24, 2021, R.D. Trial Tr. at 56. In response, his records were not

requested and he was not placed on the mental-health caseload.  *Id.* at 56-57.  Roughly 18 months later, he committed suicide, without ever having been placed on the mental-health caseload.  In his psychological autopsy, Wexford noted its failure to request documents that may have been relevant for his treatment, recommending that in the future there be "[i]mproved continuity of care ... between county jail and ADOC for any mental health patients or inmates who may have presented with suicidal ideations or self-harming prior to transport."  Marquell Underwood Psychological Autopsy (P-3316) at ADOC518596.

Also a concern is ADOC's continued reliance on unsupervised LPNs to help conduct the intake screenings. The court found in the liability opinion that LPNs lacked adequate training and medical knowledge to conduct intake and that utilizing them in that role contributed to ADOC's under-identification of prisoners with mental illness.  However, Dr. Burns testified that she had seen LPNs continue to conduct intake screenings even after the liability trial.  *See* June 2, 2021, R.D. Trial Tr. at

100

206. While these LPNs were supposed to be supervised by RNs, Dr. Burns noted that for some of the records she reviewed, it appeared that the RN had signed off on the screening before it was even completed. *Id.*

While it is admirable that ADOC now appears to be conducting intake for all inmates, that alone is not enough. The department's continued failure to adequately track, interpret, and follow up on the results of the intake screening contributes to the same inability to identify inmates noted in the liability opinion, leaving them without the care they need.


### 5. Coding

It is clear that ADOC has made enormous progress in improving its coding system since the time of the liability opinion. Experts from both sides agreed that ADOC had completely replaced its old number-based system and that all inmates were now receiving the new codes—indeed, the parties themselves stipulated to this. *See* Joint Stipulation for the Evidentiary Hearing Regarding

the Phase 2A Remedial Order (Doc. 3288) at 8; *see also* note 2, *supra*.  ADOC also created an SMI designation flag for the first time, and both parties agree that the flag is being used for inmates.  It is clear that the department has invested significant resources in creating and implementing this new system, and the court notes with approval the improvements in identifying and tracking inmates that have resulted.

However, the plaintiffs provided extensive evidence that the documentation of codes and SMI flags is inconsistent at best, which creates an opportunity for inmates to fall through the cracks.  Dr. Burns credibly testified that she had found inconsistent documentation in her review of inmates' charts, including charts that continued to reflect outdated codes, *see* June 8, 2021, R.D. Trial Tr. at 29, coding that included "not applicable" notations, *see* June 2, 2021, R.D. Trial Tr. at 205-06, and forms that failed to include inmates' SMI designations, *see* May 24, 2021, R.D. Trial Tr. at 70; May 25, 2021, R.D. Trial Tr. at 33; *id*. at 42.  Indeed, on

one form she reviewed, "both yes and no [were] circled for SMI," making it impossible to tell what the provider intended to communicate.  June 9, 2021, R.D. Trial Tr. at 32.   ADOC's internal audit of its mental-health provider indicated an ongoing problem with codes on the Master Problem List not matching codes listed on other documents or in the Office of Health Services database. *See* June 10, 2021, R.D. Trial Tr. at 113.  As Dr. Burns testified, without accurate and consistent documentation of inmates' mental-health codes, it is difficult for providers to "know where the mental-health caseload is, who needs what sorts of services," or which inmates might need special attention.  June 2, 2021, R.D. Trial Tr. at 229-30.

The court also finds that providers in ADOC are not always coding inmates appropriately to their needs.  Dr. Burns presented extensive testimony about the failure of providers to add inmates to the mental-health caseload or increase their codes even in the face of overwhelming evidence that they were in crisis.  For example, Laramie

103

Avery was referred to mental-health several times before his suicide, but he was never added to the mental-health caseload. *See* May 24, 2021, R.D. Trial Tr. at 50. Marquell Underwood bounced back and forth between restrictive housing and suicide watch and reported a history of bipolar disorder, but he too was never placed on the caseload before his suicide. *See id*. at 57. Jaquel Alexander was not added to the caseload until after the "fifth or [sixth] time" he was placed on suicide watch, *id*. at 68, and inmate M.H. was actually downcoded from MH-D to MH-B despite the fact that he had had several recent incidents in which he cut himself and was placed on watch*, see* May 25, 2021, R.D. Trial Tr. at 45. Wexford flagged these failures as an issue in several separate psychological autopsies, but there is no evidence that any action was ever taken to improve the coding process and ensure that inmates were receiving the appropriate codes. *See* May 24, 2021, R.D. Trial Tr. at 61, 70.

Dr. Burns also pointed to several incidents in which providers made decisions about an inmate's mental-health

code based on inappropriate factors.  For example, Marco
Tolbert was downcoded from MH-D to MH-C simply because
he asked for it, despite the fact that he appeared
disheveled and depressed.  *See id*. at 19.  Casey Murphree
also successfully sought to be downcoded because he
thought that it would help him get a job, even though he
gave vague responses to questioning about auditory
hallucinations and the provider had records showing that
he was not fully compliant with his medications.  *See id.*
at 74.  Dr. Burns testified that ability to get a job is
not an appropriate clinical factor to consider in
determining an inmate's mental-health status and that she
saw no evidence that the team had discussed any proper
factors before Murphree was downcoded.  *See id*. at 74-75.
There were similar issues with the SMI flags.  Dr. Burns
identified a few inmates with categorial SMIs, a
designation that is based on the type of mental illness
a person is suffering from and which one "would not expect
to be discontinued," but the flags would disappear
without explanation.  *See id*. at 173-77; May 25, 2021,

105

R.D. Trial Tr. at 35-36; *id*. at 40.  These failures seriously call into question ADOC's ability to accurately identify, label, and track inmates' mental-health needs, even despite the department's overhaul of its coding system.

### 6.  Referral

Referrals are the key means by which inmates who are not on the caseload or who need additional care are flagged for further evaluation by mental-health professionals.  As experts for both parties reported, inmates depend on referrals to get care--"[i]t's not like they can pick up the phone and make an appointment with somebody" themselves.  June 3, 2021, R.D. Trial Tr. at 18.  Referrals may be made by prison staff or by the inmates themselves, and ADOC has adopted regulations that lay out the process by which both groups may make a referral.  Evidence presented at the omnibus remedial hearings included several referrals made by both groups, indicating that they are aware of and actively using the

referral system.  While there is some evidence that this process is not always used by inmates--Braggs, for example, had been asking for mental-health services for two weeks before his suicide, according to the inmate in the cell next to his, *see* May 24, 2021, R.D. Trial Tr. at 119-20--it is encouraging that ADOC has created a process that both inmates and staff feel comfortable using as a means to request needed care.

At the time of the liability opinion, ADOC did not have a system to triage and identify the urgency of each referral, which is vital to ensuring that requests are met in a timely fashion and to avoid unnecessary delays in the provision of care.  Since that time, however, ADOC has made impressive progress in developing a triage process and implementing it throughout the prison system. Most of the referrals viewed during the omnibus remedial hearings had been triaged by a mental-health staff member in a timely fashion, which is a major improvement for a system that lacked any sort of triage process only a few years ago.  ADOC has made real, important progress, and

the court is confident that the department will continue
its commitment to ensuring that triage is completed
quickly and thoroughly so that inmates can receive the
treatment they need. While ADOC has done an admirable
job in ensuring that referrals can be made, the system
falls apart at the follow-up stage.  Over the course of
the omnibus remedial hearings, the court received
evidence of numerous troubling incidents in which
referrals were made but inmates did not receive care
within the required timeframes, if at all.  In some
instances, referrals were not received in a timely
fashion. *See* May 25, 2021, R.D. Trial Tr. at 53-54
(noting late receipt of referrals made for inmate T.M.);
June 2, 2021, R.D. Trial Tr. at 100 (explaining that
there were seven days between when a referral for
Marquell Underwood was made and when it was received).
In other cases, it was unclear whether there was a
documentation error or a failure to provide care.
Dr. Burns testified that there were "multiple episodes
in which the referral forms ... don't show if there was

a mental-health follow-up" at all, leaving her uncertain
about whether it had occurred.  May 26, 2021, R.D. Trial
Tr. at 17.  In the vast majority of cases, however, the
problem was that mental-health staff did not timely
respond to the referrals, leaving the inmates
waiting--sometimes for months--on care.

During the triage process, referrals are separated
into three categories, each of which requires a different
level of urgency of response.  The evidence presented at
the omnibus remedial hearings indicates that in practice,
the categories mean little.

Emergent referrals indicate, as Dr. Burns explained,
that "the nurse has determined there's an imminent risk
of injury or some otherwise necessary and immediate need
for mental-health services."  June 3, 2021, R.D. Trial
Tr. at 25.  According to the defendants' expert, the
common requirement in corrections is that these types of
referrals should be responded to within four hours.  *See*
June 29, 2021, R.D. Trial Tr. at 221.  However, inmate
R.J. was not seen for three days after he received an

emergent referral because mental-health staff were told that there was no security to bring him out for the assessment.  In the interim, he was not put on watch, nor is there any indication that mental-health staff attempted to go see him.  *See* May 25, 2021, R.D. Trial Tr. at 118-20.

Urgent referrals indicate that "there is an urgent need, like an urgent care center type need."  June 3, 2021, R.D. Trial Tr. at 26.  Dr. Burns testified that such a need "doesn't have to be responded to instantly, as in the immediate, or as soon as possible, like an emergency need, but it does need to be responded to ... within 24 hours."  *Id*.  In ADOC, though, inmate T.M. did not receive an assessment for three weeks after he set himself on fire and received an urgent referral.  *See* May 25, 2021, R.D. Trial Tr. at 52.

Routine referrals are made "for some nonemergency purpose," and Dr. Burns stated that mental-health staff should have 14 days to respond.  June 3, 2021, R.D. Trial Tr. at 26.  But frequently the timeframes were much

110

longer.  Inmate A.J. was referred on February 28, 2020, but he was not seen until May of that year.  *See* May 25, 2021, R.D. Trial Tr. at 27.  Inmate W.S. received an assessment by an MHP within two weeks, but that assessment resulted in a referral to the CRNP that was not followed up on for two more months.  *Id*. at 178.  And at times, ADOC staff failed to respond at all.  For example, Laramie Avery received no response to either of the routine referrals that were made in the weeks before his suicide.  *See* May 24, 2021, R.D. Trial Tr. at 45-47. Repeated efforts to access care seemed to do nothing to speed up the process.  Inmate K.W. had five referrals in less than a month, two of which were urgent, but there were still 22 days between the first referral and when he was seen, longer than would be acceptable under any time frame.  *See* June 10, 2021, R.D. Trial Tr. at 12, 17.

ADOC itself found low compliance scores with the response timeframes for all three levels during its internal audits.  Despite the department's awareness of the problem, however, there is no evidence that ADOC has

111

made progress in avoiding delays and ensuring that referrals are addressed within a reasonable period.

As Dr. Burns testified, these failures to respond are a "red flag" about the state of ADOC's referral system. May 26, 2021, R.D. Trial Tr. at 95. The point of a referral is to get an inmate the care they need in the timeframe in which they need it. Delayed or inadequate follow-up undermines the efficacy of the entire referral process. Indeed, without follow-up, referrals are essentially useless, and referrers are doing nothing more than shouting into the void. And failure to ensure that inmates are seen can have tragic, irreversible consequences. When mental-health staff did not respond to the emergent referral for Casey Murphree on the day it was made, he did not receive any care until "he was found hanging" approximately 20 hours later. May 24, 2021, R.D. Trial Tr. at 76-77.

### 7.  Confidentiality

Confidentiality is, as the court found in its liability opinion and Dr. Burns testified during the omnibus remedial hearing, an "absolutely necessary condition" for the adequate provision of mental-health care.  June 3, 2021, R.D. Trial Tr. at 14.  Inmates must feel safe enough to speak freely with mental-health staff and disclose personal, sensitive information that is relevant to their treatment.  Confidentiality is particularly vital in the prison setting, where inmates may "become vulnerable later to some taunting or blackmail or extortion" if staff or other inmates can overhear their sessions with mental-health staff.  *Id*. However, evidence from the omnibus remedial hearings indicated that the department still struggles to provide confidential spaces for treatment and to ensure that treatment consistently occurs in a confidential setting.

It would not be fair to ADOC to say that inmates never receive confidential mental-health services.  In fact, the court was encouraged to note that many of the

113

sessions discussed during the trial occurred in out-of-cell, confidential settings. However, given the importance of confidentiality to effective mental-health treatment, the court remains concerned about the number of instances of non-confidential sessions raised during the hearing. As Dr. Burns testified, some facilities have extensive confidential treatment space close to where inmates are housed, which is useful for holding sessions with inmates. *See, e.g.*, May 25, 2021, R.D. Trial Tr. at 155 (describing the confidential area at St. Clair); June 7, 2021, R.D. Trial Tr. at 65 (describing the confidential treatment space in Bullock). However, out-of-cell spaces are not always used in ways that maintains confidentiality. Dr. Burns discussed several inmates whose sessions were interrupted, destroying confidentiality. For example, inmate DR was seen in an office, but "people were in and out of the office," making it difficult for him to talk openly with his counselor. May 25, 2021, R.D. Trial Tr. at 88. And inmate A.E. reported that, because he saw his counselor at the same

114

time that he saw the doctor, he had not had a
confidential, one-on-one session in years. *See id*. at
90.

Several progress notes described sessions held in
what were referred to as "semi-confidential" settings,
where the participants were in a setting where they could
be overheard but were directed to speak quietly to
maintain privacy. Tommy McConathy received crisis
counseling "behind a screen" where he and the provider
simply talked "with low voices." *Id*. at 6. Progress
notes for inmate A.J. indicate that he was seen for
treatment in spaces where he and his mental-health
provider had to "sp[eak] quietly to ensure
confidentiality." *Id*. at 26-27. This does not actually
ensure confidentiality, and it is not sufficient to meet
the court's directive. As Dr. Burns explained, it is not
appropriate to think of confidentiality as "partial or
semi. It's either all or none." May 24, 2021, R.D.
Trial Tr. at 156-57. And it is particularly vital that
ADOC make every effort to provide confidentiality for

115

treatment sessions given the tragic consequences that can result when inmates do not receive effective treatment. The court reiterated the importance of confidentiality during the suicide prevention hearing, and Dr. Burns noted that she had seen the issue of confidentiality arise in a number of recent suicides and serious suicide attempts. *See id.*

Nor is it appropriate for ADOC to give up on providing confidential treatment to inmates who are hesitant or unwilling to leave their cells. Several of the instances of non-confidential sessions involved inmates who refused to come out of their cells, which the court acknowledges can be difficult for staff to address. For example, Gary Campbell repeatedly refused to come out of his cell for sessions and had only cell-side interactions with mental-health staff in the months before his suicide. *See* May 24, 2021, R.D. Trial Tr. at 128-29. However, the responsibility to get inmates the care they need, even in the face of their noncompliance, rests with ADOC. Dr. Burns convincingly testified that

there was more that the staff could have done to try to ensure confidentiality, including coming back on another day or asking a higher-ranking staff member to make the request. *See id.* at 131-33. As ADOC's own regional psychologist noted in reflecting on Campbell's suicide, he remained in his restrictive housing unit cell for two years "because he was allowed to ... That was stressful and he was not even aware that talking to someone could have been helpful." Email from Nina Tocci Regarding Gary Campbell's Suicide, P-3267 at 1.

The court is also troubled by the impact understaffing continues to have on the provision of confidentiality. Even in facilities with confidential treatment spaces, out-of-cell interactions require sufficient staff to escort inmates to their sessions and stand watch to address any safety issues. When there are not enough staff to transport and monitor inmates, mental-health staff are forced to go to the inmates and hold sessions cell-side, which are not at all confidential. There were a number of instances discussed

117

during the omnibus remedial hearings in which inmates
were not being removed from their cells for counseling
sessions.  Inmate M.W. received "many cell-side contacts"
during his stay in the Bullock SU, May 25, 2021, R.D.
Trial Tr. at 40, and inmate A.C. reported that he was not
offered any confidential treatment while in the same
unit, but that "the counselor came to the door to see him
a couple of times a week," June 2, 2021, R.D. Trial Tr.
at 69.  Inmates that Dr. Burns spoke to at St. Clair
reported that they were not always removed from their
cells for counseling sessions.  *See* June 7, 2021, R.D.
Trial Tr. at 86.  And inmate Danny Tucker received a
follow-up session after he was released from suicide
watch that was held cell-side, just hours before he
committed suicide in that same cell.  *See* June 24, 2021,
R.D. Trial Tr. at 16.

ADOC's own audits highlighted the problems with
confidentiality at many facilities.  Though Dr. Burns
described some of the issues with the audits, including
small sample sizes, the court is still concerned that the

results, taken as a whole, show an overwhelming failure to provide treatment in confidential spaces.  Multiple facilities received compliance scores below 50 % on confidentiality, including Bibb, Easterling, Donaldson, and Limestone.  *See* Bibb Audit Report (P-3256) at 5 (scoring 30.77 % compliance with confidentiality); Easterling Audit Report (P-3266) at 5-6 (26.09 %); Donaldson Audit Report (P-3263) at 6-7 (22.54 %); Limestone Audit Report (P-3273) at 6 (14.81 %).  No facility scored above 70 % on the audit.  Even accounting for the flaws in the audits, these numbers are troubling, and they indicate a widespread and ongoing issue with ensuring confidential treatment for inmates.

### 8.   Treatment Teams and Plans

Since the court found in the liability opinion that ADOC's treatment planning process was inadequate and resulted in incomplete, generalized, or nonexistent plans, the department has made encouraging progress. Neither the plaintiffs' expert nor the defendants' expert

could identify an inmate on the mental-health caseload who lacked a designated treatment team, a reflection of the department's commitment to ensuring that every inmate receives consistent, individualized treatment planning. ADOC has also created new forms for treatment-team meetings to assist mental-health staff in determining who needs to attend the meetings and the timeframes in which they must be completed.  Based on the treatment plans discussed during the omnibus remedial hearings, it seems that the forms have been successful in ensuring that individuals who should attend meetings are actually in attendance and that those who must miss a meeting are prompted to review the minutes and remain current on the inmate's treatment status.  Though the results of ADOC's own audits of treatment teams indicate only mixed levels of compliance with the requirements that each inmate have a specified treatment team and that the team consist of all relevant staff members, it appears that ADOC has made significant progress in ensuring that inmates are

assigned treatment teams made up of relevant staff members.

However, there has been less consistent improvement in ensuring that treatment teams are meeting frequently enough to address inmates' changing needs.  Treatment teams provide no benefit if they are not actually meeting to check on inmates' progress and adjust their treatment as necessary.  The need for treatment-team meetings is linked to inmates' mental states:  It is even more vital that the team meet, and that they do so more frequently, for inmates who are housed in more intensive units, because those inmates tend to be "more unstable" and may need their care to be fine-tuned.  June 3, 2021, R.D. Trial Tr. at 161.  Testimony from the omnibus remedial hearings revealed a worrying pattern of treatment teams not meeting to discuss inmates for months at a time.  One inmate, M.M., did not have any treatment-team meetings for eight months, from July 2020 to March 2021.  *See* June 9, 2021, R.D. Trial Tr. at 211.  By the time Dr. Burns spoke with him, in March 2021, she reported that "it was

apparent that he needed more frequent contact and monitoring of his condition."  May 25, 2021, R.D. Trial Tr. at 97.  This held true even for inmates who were housed in intensive inpatient units.  For example, when inmate A.E. was housed in the residential treatment unit, he should have had treatment-team meetings once a month. *See* June 9, 2021, R.D. Trial Tr. at 206.  But his treatment records indicate that the team instead met only once every four months.  *See id*. at 191.  When a treatment team fails to meet at sufficient intervals, inmates may end up failing to get the level of care they need.  And the consequences can be tragic--as documented in Wexford's own psychological autopsy, there was no indication that Jaquel Alexander's treatment team met a single time after he was placed on the caseload.  *See* May 24, 2021, R.D. Trial Tr. at 70.  He committed suicide just two months later.  *See id*. at 68.

When treatment teams do meet, evidence presented at the omnibus remedial hearings suggests that they may not always meet for long enough to have a substantive

122

discussion.   Dr. Burns testified to seeing records of treatment-team meetings that lasted "[o]ne minute, three minutes, six minutes maybe."   May 25, 2021, R.D. Trial Tr. at 110.  And several of these meetings were combined with other treatment sessions, leaving even less time for the team members to review the inmate's progress and determine if adjustments were necessary.  For example, one team meeting that was listed as lasting for six minutes included a simultaneous medication management session.  *See id.*  A meeting that lasts mere minutes is not sufficient to allow for careful, thorough review of an inmate's file.  As Dr. Burns testified, she would expect even a normal, follow-up treatment-team meeting, when "there are no changes and things are going just fine" to last at least 15 to 20 minutes. *Id.* at 135.  It is difficult to imagine that the treatment team could discuss an inmate in any real detail in less than half that time.

Treatment teams also frequently lack the information they need to make accurate decisions about inmates'

mental-health needs and the care they should be receiving. Dr. Burns detailed dozens of examples of major events that were not included in inmates' files. For example, Casey Murphree had a treatment plan review in October 2019, around the same time as he was involved in "at least five violent altercations resulting in injury." May 24, 2021, R.D. Trial Tr. at 82. However, these altercations were "not reflected in any of the mental-health documentation during this period." *Id*. As a result, Dr. Burns testified, "the people providing his care were unaware that these things were happening, which would have been a trigger to potentially increase their level of contact or nominally look at his medication compliance to see how he was doing." *Id*. Without access to this information about Murphree's clear deterioration, it was impossible for the treatment team to provide an accurate assessment of Murphree's progress or develop a treatment plan that would actually address his needs.

This pattern was repeated over and over again. There was poor documentation of inmates' behavioral outbursts,

as when inmate Travis Jackson set fire to his cell and received a crisis assessment, but the information was not added to his mental-health record. *See id*. at 145. There was poor documentation of medical issues that could be relevant to an inmate's mental-health treatment, as when inmate J.F. was hospitalized and diagnosed with atrial fibrillation, but there were "no notes or any indication in discharge planning that medical ... became part of his treatment team to talk about things like medication prescriptions or follow-up." May 25, 2021, R.D. Trial Tr. at 37. These widespread issues with documentation made it difficult for the treatment teams to get a clear picture of the inmates they were caring for, resulting in missed opportunities for additional care or needed interventions.

As a result of these issues, many treatment plans remain inadequate to address the needs of inmates. ADOC's own audit of its treatment planning process found that "master treatment plans and treatment plans following an inmate's discharge from suicide watch are

frequently omitted." May 26, 2021, R.D. Trial Tr. at 17-
18. When the audit team was able to find and inspect
treatment plans, it found that they "were often of poor
quality, were left incomplete, or otherwise lacked
necessary documentation." *Id*. Compliance percentages
at various facilities were low, to the point that the
auditor heralded as "progress" the fact that Fountain had
"recent treatment plans for about half of the charts
reviewed" during a spot audit. *Id*. at 115. Jaquel
Alexander serves as a sobering example of the outcome of
these inadequate treatment plans. Alexander, whose long
history of self-injury and suicide watch placements
indicated that he was in desperate need of treatment, was
not provided with a treatment plan at all once he was
added to the caseload. *See* May 24, 2021, R.D. Trial Tr.
at 68. At the time he killed himself, four months later,
there was no indication that his treatment team had ever
met. *See id*.

Not only are treatment plans frequently inadequate,
they are also not being amended to address changes in

inmates' needs or circumstances.  Treatment planning is
particularly crucial at transition points, when the risk
is highest that information may be lost and that the
consistency of care may be interrupted.  However, Dr.
Burns testified that in her review of patient records,
she found that there were "not always ... treatment plan
changes when there's a significant event, like removal
or placement off watch or discharge into outpatient from
a residential treatment unit."  May 26, 2021, R.D. Trial
Tr. at 18.  For instance, when inmate Marco Tolbert was
released from the residential treatment unit to an
outpatient unit, his treatment plan was not updated.  *See*
June 2, 2021, R.D. Trial Tr. at 97.  He committed suicide
three months later, without having been seen by
mental-health staff once since his release.  *See id.* at
96.  ADOC's internal audits of various facilities'
compliance with the requirement to update treatment plans
after major events also showed low rates of compliance.
Several facilities scored in the single digits.  *See*
Bullock RTU and SU Audit Results (P-3260) at 9 (showing

127

11.39 % compliance on major event movements); Bullock Outpatient Audit Results (P-3263) at 10-11 (2.92 % compliance); St. Clair Audit Results (P-3277) at 7 (7.14 % compliance). Dr. Burns expressed particular concern about these results, noting that it was "worrisome" that inmates in need of care would have the opportunity simply to fall through the cracks. May 26, 2021, R.D. Trial Tr. at 103.

Indeed, ADOC's transfer process is haphazard and poorly documented, exacerbating the inadequacies of the treatment plans. As the court found in the liability opinion, the transfer experience can be particularly difficult for mentally ill inmates, since they often struggle to adjust to their new environment and develop trust with a new set of providers. *See Braggs*, 257 F. Supp. 3d at 1241 n.67. In ADOC, mentally ill inmates are moved between units and facilities frequently, often without any documented consideration of the impact these moves might have on their mental state or care. When inmate T.M. was sent to the residential treatment unit,

there was "no transfer note indicating why" or explaining
what kind of treatment he needed.   May 25, 2021, R.D.
Trial Tr. at 53.   When he was released from that unit,
the same thing happened--he was released without a
"discharge note or transfer note" to notify his new unit
that he was coming.   *Id*.   Inmate J.F. bounced around from
Kilby to Bullock to Bibb to Donaldson and then back to
Bullock, all without any transfer notes or discharge
plans.   *See id*. at 36.   Inmate M.W. was also transferred,
in his case from the stabilization unit to an outpatient
level of care, with no "discharge notice or transitional
note to the outpatient team."   *Id*. at 39-40.   In fact,
the psychiatrist who directed the discharge was told that
it happened by the inmate himself--there was either no
notice of it in the inmate's chart or the psychiatrist
did not have the chart.   *See id*.

The transfer documentation that does exist is not
always accurate.   For example, when Jaquel Alexander was
transferred from Ventress to Donaldson days before his
death, the transfer form incorrectly indicated that he

had no SMI designation. *See* Jaquel Alexander Psychological Autopsy (P-3298) at ADOC539037. The lack of clear and consistent communication between units means that relevant information is lost, impacting patient care. The mental-health staff member who completed Alexander's risk assessment after his transfer, who indicated no familiarity with his prior risk factors, identified him as a "low" risk of harm to self. *Id*. And sometimes, inmates themselves simply get lost in the shuffle. For example, when inmate M.H. was released to the residential treatment unit from suicide watch, his records indicate that he was not seen by mental-health staff for a week, despite his obviously fragile state. *See id*. at 44. This lack of adequate communication between providers further disrupts the continuity of inmates' care, leaving staff members without the information they need to provide proper treatment.

## 9.   Psychotherapy

Even when inmates are assessed and identified as in need of care, assigned a treatment team, and provided with a plan to address their particular mental-health concerns, they frequently find themselves without most or all of the treatment they have been prescribed.   At the time of the liability opinion, the court made clear that ADOC's treatment modalities--that is, the types of interventions that are provided to inmates with mental-health needs--were insufficient to meet the constitutionally required standard of care. Unfortunately, the court has not seen much improvement in ADOC's provision of mental-health treatment since that time.   Though the court recognizes that ADOC has dealt with enormous challenges in trying to continue treatment during the COVID-19 pandemic, these deficiencies were present even before facilities began to lock down. Inmates in ADOC custody are regularly being denied access to the care they needed, an ongoing violation of their constitutional rights.

In some cases, there are logistical problems that prevent inmates from receiving certain forms of care at all. Several inmates reported to Dr. Burns that they were not being notified when treatment like group therapy or pill call was available, causing them to miss it. *See* May 25, 2021, R.D. Trial Tr. at 28; *id.* at 142. In other cases, inmates received their prescribed treatment, but far less frequently than they should have. This was true even in the units that should be providing heightened levels of care: Dr. Burns testified that inmates have insufficient access to treatment across ADOC's residential treatment units, stabilization units, structured living units, and outpatient units. *See id.* at 192; May 26, 2021, R.D. Trial Tr. at 16. Inmate A.E. had been without a single counseling session for six months, even though he was in a residential treatment unit and psychotherapy was included in his treatment plan. *See* May 25, 2021, R.D. Trial Tr. at 89. Inmate D.R. said that he was "really only seen very infrequently for counseling sessions," *id.* at 87, while inmate M.M.

132

said that he only "sees his counselor every once in a
blue moon," *id*. at 97.   Perhaps most concerningly,
several of the men who recently committed suicide were
receiving less care than their treatment plan called for.
Marco Tolbert, for example, was not seen by mental-health
staff for the three months he was in general population
after being released from the RTU.   *See* May 24, 2021,
R.D. Trial Tr. at 22.   Casey Murphree's provider made a
note to follow up with him in 30 days to monitor his
depression, anxiety, and attention deficit disorder, but
he was not seen.   *See id*. at 76.   And one of the
recommendations     included     in     Jamal     Jackson's
psychological autopsy was that mental-health staff should
actually follow up with all patients "as written on the
treatment plans," which they had failed to do for him.
June 2, 2021, R.D. Trial Tr. at 112.

When they do occur, counseling sessions are often
far too short for any real treatment to occur.   Dr. Burns
identified a disturbing pattern of counseling sessions
that lasted only "[a] matter of minutes."   May 25, 2021,

133

R.D. Trial Tr. at 53; *see also id*. at 82 ("[S]ome of those notes were just really a minute or two long in length in terms of an individual session."); *id*. at 110 ("The individual contacts that are documented in the records for people in the SLU by mental-health staff were extraordinarily brief so that, again, these are two or three minute sort of discussions."); *id*. at 129 ("[T]hat's been [a] recurrent theme about people having ... very little time with their counselor ...."). As she explained, sessions that brief cannot really be considered counseling:  "[Y]ou wouldn't be able to cover any information in the space of two minutes about what the counseling is about.  If it's about family stress or if it's about grief counseling or if it's about trauma counseling, you barely have any time to discuss not only what the inmate patient's feelings are, but also to provide any guidance or suggestions for how to make things improve. Two minutes just isn't enough time." *See id*. at 135-36.  Indeed, Dr. Burns testified that these sessions did not even last as long as she would expect a

check-in or "supportive kind of chat" to be, let alone a therapeutic treatment session. *Id*. at 136. The defendants' expert, Dr. Metzner, echoed Dr. Burns, noting that he would have "concerns, significant concerns" about any counseling session that lasted only three minutes. July 1, 2021, R.D. Trial Tr. at 168.

ADOC has particularly struggled to consistently provide group therapy. Many of the records discussed during the omnibus remedial hearings involved recent cancellations of groups, which are attributable in large part to the COVID-19 pandemic. ADOC largely shut down group treatment for several months at the start of the pandemic, a decision that was in line with CDC recommendations and which Dr. Burns agreed was appropriate under the circumstances. *See* June 21, 2021, R.D. Trial Tr. at 93, 101-02. And there is evidence that ADOC has begun to reinstitute groups at many facilities as it loosens its lock down. *See id*. at 89-90, 93. However, even before the pandemic hit, inmates reported that groups were sparsely offered and frequently

cancelled.   Based on her extensive review of patient records, as well as conversations with inmates and Wexford's monthly client reports, Dr. Burns concluded that "people are not getting the number of groups in the residential treatment unit.   They're not getting the groups in SLU.   They're not getting the groups in SU ... there are ... not enough groups, not enough structured therapeutic activity going on."   May 26, 2021, R.D. Trial Tr. at 56-58.   ADOC itself came to the same conclusion. In a letter the department sent to Wexford before the pandemic, ADOC concluded that group therapy was not being provided at a sufficient level in RTU, SU, or SLU units. *See id.* at 16.

Beyond the lack of groups, inmates housed in ADOC's inpatient units are not receiving sufficient out-of-cell time in general.   Dr. Burns called it a "common theme" among inmates she talked to that they were not receiving an appropriate amount of structured or unstructured out-of-cell time.   May 25, 2021, R.D. Trial Tr. at 192. "[R]ecords and interviews" from the Bullock SU revealed

that inmates are not receiving sufficient structured or unstructured time. *Id*. at 85-86.  There are similar issues in the Tutwiler RTU and SU, *see id*. at 70-71, the Bullock RTU, *see id*. at 99-101, the Donaldson RTU, *see id*. at 110, and the Donaldson SU, *see id.* at 140.  Indeed, the investigator looking into Tommy Lee Rutledge's death in Donaldson's RTU reported that "inmates never leave their cells."  *Id*. at 149.  And insufficient out-of-cell time in mental-health units is particularly egregious given that it undermines the purpose of the units, which is to provide inmates with more intensive treatment and support.  Without any out-of-cell activities, these units instead end up functioning very much like restrictive housing units instead.  *See id*. at 219.

This inadequate out-of-cell time cannot be blamed on COVID-19 restrictions, though the court does note that the pandemic may have exacerbated the problem.  Dr. Burns testified to having seen "months and weeks of operation" before the pandemic in which inmates were not receiving the proper amount of out-of-cell time.  May 25, 2021,

R.D. Trial Tr. at 218. Defendants' expert Dr. Metzner agreed, reporting that while inmates are "not getting 10 and 10, you know, related to COVID issues," it also "wasn't happening" pre-pandemic. June 1, 2021, R.D. Trial Tr. at 202-03.

This finding applies with equal force to the SLU. Although it is not an inpatient unit, the SLU is intended to provide a more supportive, treatment-based alternative to segregation for inmates with mental illness. However, the current lack of programming in ADOC's SLUs means that they are functionally indistinguishable from the restrictive housing units. Indeed, plaintiffs' expert Vail testified that inmates in the Donaldson SLU were getting less out-of-cell time as they should have gotten in the restrictive housing units. *See* May 28, 2021, R.D. Trial Tr. at 78-80.

Problems with the provision of care are not limited to inmates on the mental-health caseload. Inmates who are not on the caseload but who are in need of mental-health care must be still be provided with adequate treatment,

138

and it is just as urgent that they receive the care they need as it is for inmates who are on the caseload. Decompensation in prison is common, and emergent mental-health needs must be taken seriously. A review of recent suicides in ADOC custody demonstrates the stakes--several of the men who killed themselves were not on the mental-health caseload, and despite warning signs, they did not receive appropriate interventions in time. Laramie Avery reported both a history of mental-health treatment and symptoms of mental-health issues, and he received numerous referrals. *See* May 24, 2021, R.D. Trial Tr. at 50. Nevertheless, mental-health staff never responded or performed a more comprehensive assessment. *See id.* Jamal Jackson presented with psychotic symptoms in December, but by the time he committed suicide in May, mental-health staff had not followed up with him once. *See id.* As Dr. Burns reported from interviews she performed at Donaldson, inmates in general population find it difficult to get a response from mental-health staff, let alone a timely response, leaving them without

139

anyone to talk to about their concerns. *See* May 25, 2021, R.D. Trial Tr. at 110.

Finally, documentation of the treatment that does occur is frequently inconsistent or incomplete, making it difficult to ensure that an inmate is receiving appropriate treatment and to effectively maintain continuity of care. For example, progress notes sometimes contained outdated or incorrect information or failed to explain major changes in an inmate's care. Inmate JF's file contained progress notes that "appeared to be pre-written" and contained inaccurate information, such as concluding that he should stay on watch when he had already been taken off watch. May 25, 2021, R.D. Trial Tr. at 34-35. And there was no explanation in Danny Tucker's record for the fact that his SMI flag was removed, *see* May 24, 2021, R.D. Trial Tr. at 178-79, or why he was downcoded to MH-A, *see id*. at 181. Dr. Burns explained that without any information about why these treatment decisions were made, it would be difficult for

other providers to verify whether they were appropriate. *See id*. at 178-79.

In some cases, it appeared that no progress note was written at all. A note on a referral for inmate W.S. indicated that he was seen by a mental-health provider, but there was not "an actual note describing that interaction with him in the chart. Just that he was seen by the MHP on that date." May 25, 2021, R.D. Trial Tr. at 178. This issue was also flagged in Marquell Underwood's psychological autopsy, which recommended that "anytime an inmate is seen by MH for a referral, it is recommended a note, other than writing on the referral form, is generated. This note is recommended to include the plan, referral to other providers, and any further course of action taken with the inmate." Underwood Psychological Autopsy (P-3316) at 15.

ADOC itself acknowledges the deficiencies in the care being provided.  In a letter to Wexford, the department chastised the company for the "pattern of failure of mental-health staff to meet with their patients at

required intervals and to conduct group therapies on a routine basis." May 26, 2021, R.D. Trial Tr. at 16. This letter was sent before ADOC facilities began to lock down because of the COVID-19 pandemic, further diminishing the amount of care being offered. However, in the years since the liability opinion, ADOC has failed to demonstrate any real, lasting improvement, even in the face of overwhelming evidence that inmates are receiving a level of care that is constitutionally inadequate.

### 10. Suicide Prevention

At the time of the liability trial, ADOC had just begun using suicide risk assessments to identify prisoners at risk of self-harm. Today, the provision of those assessments has improved substantially; they are broadly used during the intake process and are frequently employed elsewhere in ADOC's mental-health treatment system. The availability of crisis cells has increased as well, and monitoring of inmates in crisis cells appears generally adequate. ADOC no longer seems to be

using pre-filled forms to indicate the times of checks for inmates on close watch. *See* June 8, 2021, R.D. Trial Tr. at 90. ADOC has also implemented a constant watch procedure for acutely suicidal inmates, a critical component of suicide prevention.

These are significant steps for which the department should be applauded. Where ADOC continues to fall badly short in its provision of mental-health care to suicidal inmates, however, is in the areas of assessment, discharge, and follow-up from suicide watch. Inmates placed on suicide watch too often do not receive suicide risk assessments. Recent audits of Donaldson, Hamilton, Bullock, and Ventress found moderate or poor compliance with requirements to conduct these suicide risk assessments--assessments that defendants' expert Dr. Metzner testified were "dangerous" not to do well. July 1, 2021, R.D. Trial Tr. at 158; *see also* Pls. Ex. 3559 (Donaldson); Pls. Ex. 3562 (Hamilton); Pls. Ex. 3558 (Bullock); Pls. Ex. 3626 (Ventress). Equally troubling, ADOC often fails to ensure that prisoners requiring

suicide watch are considered for placement on the mental-health caseload, even those with repeated suicide watch placements in a short period of time.  Marquell Underwood, Jaquel Alexander, and Travis Jackson all had repeated suicide watches before their deaths without being considered for the mental-health caseload, and only Alexander was eventually placed on the caseload after a series of suicide watches.

Moreover, in spite of longstanding ADOC policy and this court's orders, prisoners are routinely discharged from suicide watch directly to restrictive housing with no evident consideration or documentation of exceptional circumstances justifying the placement.  One provider at Ventress was chastised for candidly admitting during a spot audit of the facility that prisoners are sent from suicide watch to segregation as "a matter of course"; she was instructed to discuss the facility's practices in less blunt terms.  Pls. Ex. 3320 at 1.  Emails authorizing segregation placements for prisoners coming from suicide watch indicated that the transfers are often approved in

a matter of minutes after a request is made.  Pls. Dem.
Ex. 268.   This continued practice was implicated in
several of the recent suicides.  *See, e.g.*, May 24, 2021,
R.D. Trial Tr. at 139-40 (discussing Travis Jackson).

Finally, inmates discharged from suicide watch still
receive inadequate follow-up assessments and treatment
to ensure that they do not decompensate and relapse into
suicidality.   During the suicide prevention trial,
defense expert Dr. Perrien testified that follow-up
evaluations in the days immediately after a person is
discharged from suicide watch are "absolutely necessary."
*Braggs*, 383 F. Supp. 3d at 1264.   But ADOC continues to
struggle to conduct the follow-up assessments required
on each of the first three days after inmates are
discharged from suicide watch.   For example, inmate J.B.
attempted suicide by overdose, was placed on acute
suicide watch, and was moved to non-acute suicide watch
all in the course of a single day, but he received no
follow-ups at all once his suicide watch was discontinued
the next day.   *See* May 25, 2021, R.D. Trial Tr. at 49-51.

Audits of ADOC facilities show problems with this obligation as well; Bullock, for instance, was found in March 2020 to have only 40-50 % compliance with any of the follow-ups required after a prisoner is discharged from suicide watch. *See* Pls. Ex. 3558 at 1.

These ongoing inadequacies in ADOC's system of suicide prevention are exacerbated by the broader problem of correctional understaffing in the prisons. As discussed above, Wexford has identified the "lack of security presence" as "a major contributing factor to the ongoing and excessively high levels of contraband, inmate drug use, and inmate-on-inmate violence," which in turn "increases fear and suicidal thinking" among inmates. Pls. Ex. 3323 at 2 (emphasis removed). This has led to a "dramatic increase in suicide watch volume" of 4,348 % over the hours anticipated in Wexford's contract, leaving Wexford, in its words, "with no choice but to replace the performance of routine mental-health tasks...with providing crisis-level services, to ensure the safety of our patients." *Id.*

**146**

The court reiterates these findings in part because they shape the court's consideration of an issue hotly disputed between the parties during the omnibus remedial hearings: the rate of suicides in ADOC facilities in recent years relative to rates in other state prison systems. The parties presented contrary data on this question, each with its own set of flaws. The plaintiffs' figures, which purported to show that ADOC's suicide rates are much higher than the national average among prison systems, were based on a cross-year comparison that, according to Dr. Metzner, distorted the numbers. *See* June 30, 2021, R.D. Trial Tr. at 72-73. The defendants' data, which they claimed showed that Alabama prisons have a very low rate of suicides, in fact appeared to demonstrate the opposite: the defendants presented a report showing that the average annual rate of suicide in ADOC prisons from 2001 to 2018 was among the lowest in the country--far lower than the annual rate of suicide in ADOC facilities from 2018 to 2020--suggesting that suicide rates at ADOC have risen dramatically in recent

147

years.  *Compare* Pls. Ex. 3223 at 19, *with*, Pls. Dem. Ex. 265.[12]

Deaths by suicide are the very worst outcomes of deficiencies in a prison system's mental-health care, but they are also rare events, both in Alabama and elsewhere. A few instances of good or bad luck during serious suicide attempts can make the difference in a given year between a high suicide rate and a low one. *See* June 30, 2021, R.D. Trial Tr. at 7-8.  More important to the court's assessment of ADOC's current suicide prevention system was Wexford's compelling explanation that whatever suicides ADOC prevents, it does not by successfully identifying and addressing the mental-health needs of suicidal inmates, but by the brute force tactic of pouring an unsustainable number of man-hours into close and constant watch, to the exclusion of other critical

---

12. The defendants did not contest that the plaintiffs' calculation of the annual suicide rate in ADOC facilities from 2018 to 2020 was accurate.  They claimed instead that the plaintiffs' comparison of that rate to the national suicide rate across prison systems was skewed.  *See* Defs.' Post-Trial Br. (Doc. 3367) at 104.  The court does not rely on that comparison here.

mental-health services.  This is not a suicide prevention system; it is a crisis management system.  Wexford's decision to pile its resources into the watch procedures as a last-ditch means of averting suicide does not mean that ADOC is performing adequately in the area of suicide prevention.  To the contrary, its suicide prevention system remains badly broken, ultimately provides little but constant and close watch to prevent death, and cannot realistically be fixed without sufficient correctional staff to make it possible for Wexford to start moving mental-health resources into other aspects of care.

## 11.  Higher Levels of Care

Within ADOC, two kinds of units are available offering an inpatient level of care: the residential treatment units, or RTUs, which are short- or long-term placements for inmates with very significant mental-health needs who are at risk of decompensation in less restrictive settings; and the stabilization units, or SUs, which are designed to provide intensive treatment

to inmates with acute needs when a crisis cell--which is
designed for short-term stays--proves insufficient.   In
addition, inmates with the most serious mental-health
needs for whom even these inpatient units have been
unsuccessful   may   be   referred   for   hospital-level
treatment, which is currently provided via 14 beds at
Citizens Baptist Medical Center in Talladega.

   The provision of hospital-level care appears to have
improved since the time of the liability trial.   The
plaintiffs   agree   that   the   14   beds   ADOC   currently
maintains   at   Citizens   are   adequate   for   the   system's
mental-health caseload.   It is no longer true that ADOC
"virtually never transfers patients to hospitals, except
in   the   case   of   prisoners   nearing   the   end   of   their
sentence," as the court found in the liability opinion.
*Braggs*, 257 F. Supp. 3d at 1217.   That said, some problems
with timely access to hospital-level care remain.   After
Tommy   McConathy   was   raped   on   the   RTU,   a   mental-health
provider   reported   that   he   would   be   considered   for
referral   to   Citizens,   but   McConathy   did   not   get   to

150

Citizens for more than a month after that. *See* Pls. Ex. 3312 at 4. A prisoner whom the parties called M.H., after a series of incidents of serious self-harm and unsuccessful treatment in RTU and SU settings, still waited 10 days after a referral to Citizens before he was sent to the hospital. *See* May 25, 2021, R.D. Trial Tr. at 43-44.

The status of the inpatient units within ADOC is somewhat more problematic. The court found in its May 2020 remedial opinion on inpatient treatment, which included PLRA findings, that there was an "expert consensus" that ADOC needed residential treatment beds sufficient to accommodate 15 % of the mental-health caseload. *Braggs v. Dunn*, No. 2:14cv601-MHT, 2020 WL 2789880, at *4 (M.D. Ala. May 29, 2020) (Thompson, J.). The court further found that the necessary number of beds could not be based on the "current identified need for inpatient treatment," because doing so "encourages ADOC to continue to under-identify the need and underutilize its mental-health units to avoid creating more beds."

*Id.* at \*8.  At the time, ADOC had 446 inpatient beds for men and 58 inpatient beds for women, enough to cover only 12.6 % of the male caseload and 9.5 % of the female caseload.  *See id.*  But even with that shortfall, many of the inpatient beds remained unfilled, indicating that ADOC was continuing to fail to identify people who needed inpatient levels of care.  *See id.*

Little has changed in this regard since the court's May 2020 inpatient treatment opinion.  At the end of March 2021, a Wexford report found that ADOC had a total of 433 inpatient beds between its men's and women's facilities, including totals of 391 RTU beds and 42 SU beds.  *See* Defs.' Ex. 4079 at 43-44.  Adding the 14 hospital beds at Citizens brings ADOC's residential treatment capacity to 447 beds, a significant decrease from the number of beds available at the time of the court's inpatient treatment opinion.  These beds remain underutilized as well; only 30 SU beds and 346 RTU beds were occupied at the end of March 2021, according to the Wexford report.  *See id.*

This decline in treatment beds does not reflect an equivalent decline in the mental-health caseload.  To the contrary: In March 2021, the mental-health caseload stood at 4,564, meaning that ADOC now has inpatient beds for less than 10 % of its caseload.  *See id.* at 42.  With the anticipated rise in admissions in the wake of the COVID-19 pandemic, this deficit is likely to grow even more severe.[13]

---

13. During the litigation leading up to the court's inpatient treatment opinion, the defendants maintained that structured living unit (SLU) beds should be counted toward the inpatient total.  *See Braggs*, 2020 WL 2789880, at *7.  Because the SLU is an "*outpatient* unit" that serves "as an alternative to segregation for inmates with serious mental illness," and because prisoners needing inpatient-level care are prohibited from being housed in the SLU, the court rejected this argument.  *Id.* at *9 (emphasis in original).  Notwithstanding the court's resolution of this issue, the defendants pressed it again in the omnibus remedial hearings, this time by misrepresenting the testimony of their expert Dr. Metzner to suggest that he agreed that these units should be counted toward the inpatient total.  *See, e.g.*, Defs.' Post-Trial Br. at 109-10.  But Metzner's testimony was clear: He opined that, while the SLUs are not inpatient units now and should not be counted as such, he believed that converting some or all of those units to inpatient treatment spaces and finding an alternative site for outpatient diversionary unit might be the best way for ADOC to meet the inpatient bed requirements.  *See* July 1, 2021, R.D. Trial Tr. at 130-34.  Metzner did not

Even for inmates who need inpatient treatment and are lucky enough to be identified as such and placed in one of ADOC's available beds, there remains the problem of temperature regulation.   In its May 2020 remedial opinion, the court found that ADOC had failed to adequately regulate the temperatures of its inpatient treatment units.   *See Braggs* 2020 WL 2789880, at *14. High temperatures in inpatient treatment units pose a significant threat to inmates' safety, because nearly 100 % of inmates in mental-health units take psychotropic medications, which thwart the body's ability to regulate its own temperature and prevent inmates from realizing when they are overheating and seeking help.   To ensure that ADOC did not needlessly subject inmates to risk of heat stroke, heat prostration, and hyperthermia, the court ordered the defendants to "devise a plan and

---

testify either that the SLUs currently help fulfill ADOC's need for inpatient beds or that those units could be double-counted as both inpatient units and outpatient diversionary units, as the defendants seek to do.   *See id.*

procedures to address the serious risk posed by high temperatures in the mental-health inmates." *Id.* at 15.

In July 2020, the defendants reported that ADOC had completed installation of HVAC systems in all mental-health treatment units, thereby eliminating the need for any remedial order addressing the issue. *See* Response to Phase 2A Order of Inpatient Treatment (Doc. 2880) at 5-6. On December 7, 2020, however, Tommy Lee Rutledge died of hyperthermia in the Donaldson RTU. The temperature in his cell was between 101 and 104 degrees. *See* May 25, 2021, R.D. Trial Tr. at 144-45. Rutledge's death makes it abundantly clear that ADOC has not adequately addressed the problem of heat management.

Accordingly, the court finds that while the provision of hospital-level care has improved since the liability trial, problems remain with timely access to hospital-level care, the number of inpatient beds in ADOC facilities remains inadequate to meet the needs of mentally ill prisoners in ADOC custody, and ADOC has failed to mitigate the risk of overheating.

One significant deficiency found by the court in its liability opinion does appear to have been corrected, however: The evidence does not show that segregation inmates without mental illness are currently being housed in ADOC's inpatient units.   The department is to be commended for fixing this "persistent and long-standing practice."  Braggs, 257 F. Supp. 3d at 1212.

## 12. Discipline

ADOC has taken strides since the liability opinion to avoid disciplining prisoners for engaging in self-harm.  In January 2020, ADOC removed from its list of infractions the so-called Rule 505 violation it previously used to discipline inmates for self-injurious behavior.  *See* June 14, 2021, R.D. Trial Tr. at 32.  The defendants also assert, and the plaintiffs do not dispute, that ADOC also expunged Rule 505 violations from the records of inmates on the mental-health caseload and those with a serious mental illness or intellectual disability.  *See* Joint Stipulation (Doc. 3288) at 9-10.

Where ADOC's disciplinary process continues to fall grievously short, however, is in the area of mental-health consultations to the disciplinary process to ensure that an inmate's mental-health needs and contraindications are considered when assigning punishment for misconduct. After correctional understaffing, this appears to be one of the remedial area where the least progress has been made since the liability opinion.

As Mr. Vail credibly testified, based on his review of several hundred disciplinary reports, the mental-health consultations provided to hearing officers are wholly useless in almost all cases. Regardless of the prisoner's circumstances or mental-health needs, hearing officers receive superficial, check-box forms almost uniformly indicating that the prisoner is competent to take part in the hearing, that mental illness didn't affect his or her behavior, that there is nothing to consider with regard to mental-health when meting out punishment, and that the mental-health staff

member will not be present for the hearing.  *See* May 27,
R.D. Trial Tr. at 10.  The forms frequently display an
error code in the space provided for the consultant to
indicate whether the prisoner is on the mental-health
caseload.  *See, e.g.*, Pls.' Ex. 2953 at ADOC492463.  There
is no box on the form for the consultant to indicate
whether the inmate has a serious mental illness.  *See id.*
Across the hundreds of disciplinary reports Vail
reviewed, he found only eight that included any comment
on the inmate's mental-health beyond a notation that
there were no mental-health issues to consider.  *See* May
26, 2021, R.D. Trial Tr. at 209-10.

As the court once said of periodic mental-health
evaluations in segregation, these consultations are not
"worth the paper they are written on."  *Braggs*, 367 F.
Supp. 3d at 1350.  This is true even in cases where the
prisoner has serious mental-health needs that cry out for
consideration.  For example, the consultation to Jaquel
Alexander's disciplinary proceeding in April 2020, after
he attempted to jump the fence at Ventress, was as useless

as most others: It listed an error code where it should have indicated that he was on the mental-health caseload; it said that his behavior was unrelated to any mental-health issues; it declared that nothing related to mental-health need be considered in determining his sentence; and it informed the hearing officer that mental-health staff would not be present for the hearing. *See* Pls. Ex. 3296 at ADOC517817. Although by that time Alexander had been diagnosed with a serious mental illness, no indication that he had an SMI appeared on the consultation. *See id.* With no information to suggest that a restrictive housing placement might be harmful to Alexander, the hearing officer sentenced him to 45 days in segregation, where he hanged himself three weeks later.

This will not do. Based on the evidence presented at the omnibus remedial hearings, the court finds that ADOC's system of mental-health consultations is still extraordinarily dysfunctional, with egregious consequences for inmates with mental-health needs. *See*

*Braggs*, 257 F. Supp. 3d at 1234.  The consultations remain "little more than a rubber stamp" for the disciplinary process.  *Id.*  The dysfunction of this system continues to expose mentally ill inmates facing disciplinary proceedings to serious harm.


### 13. Training

Finally, it appears that the issue of training could be largely a success story.  The evidence presented at the omnibus remedial hearings suggested that ADOC has taken real steps forward in its implementation of the trainings previously developed by experts for both parties.  Dr. Burns testified that ADOC has implemented the comprehensive mental-health training, the suicide prevention training, the suicide risk assessment training, and several other training curriculums that it was ordered to conduct, and that current and newly hired staff appear to receive these trainings.  *See* June 22, 2021, R.D. Trial Tr. at 48, 50-51, 53-55; June 23, 2021, R.D. Trial Tr. at 225-26.

There are admittedly still some reasons for concern. In deposition testimony, Cheryl Price, ADOC's Assistant Deputy Commissioner for Operations, said that she herself had not received the comprehensive mental-health training and that she did not know if the training had been provided to all staff members who were required to receive it. *See* June 1, 2021, R.D. Trial Tr. at 42. Under the stipulated remedial orders currently in effect, all staff who have any direct contact with inmates are required to receive this training. *See* Phase 2A Order and Injunction on Mental-Health Identification and Classification Remedy, Attachment A (Doc. 1821-1) at § 1.1. That order has been in place for more than three years; that Price had not received this training and did not know who still needed to receive it gives cause for concern about the extent to which training is provided.

Similarly, a March 2021 spot audit of Ventress noted that the facility's site program manager "would benefit from training on the Suicide Risk Assessment." Pls. Ex. 3626 at ADOC565532. As Dr. Burns credibly testified,

161

this is "somewhat worrisome because that person will be overseeing the other people and kind of setting the tone." May 26, 2021, R.D. Trial Tr. at 137-38; *see also id.* at 54 (explaining that site program managers are "in charge of mental-health services at a given facility"). The evidence also raised questions about the current sufficiency of ADOC's emergency preparedness drills for suicide prevention; several psychological autopsies following recent suicides recommended that training should be reinforced through emergency preparedness drills, also known as "man-down" drills. *See* Pls. Ex. 3295 at ADOC518575; Pls. Ex. 3302 at ADOC518581; *see also* Pls. Ex. 3263 at 83 (December 2019 audit of Donaldson indicating that the audit team recommended Wexford "begin planning and implementing man-down drills").

More broadly, documentation of trainings has been a significant challenge.  Wexford acknowledged as much in a March 2020 letter to the former Associate Commissioner of Health Services.  *See* Pls. Ex. 3323 at 5.  According to Wexford, "a lack of time and resources" placed it in

a position where it was able to train its staff but unable to document this training. *See id.* (emphasis omitted). This lack of documentation creates serious problems for the tracking and monitoring of training, and it must be corrected; without reliable documentation, ADOC and Wexford run the risk that individuals who have not received necessary training will fly under the radar until after prisoners are harmed.

The trainings at issue are too important to go undocumented; they are foundational to the proper function of ADOC's system of mental-health care and critical to prepare staff to make decisions in what could be life-or-death situations. For some trainings, the connection is immediately apparent: Emergency preparedness drills are necessary to prepare staff to intervene in suicide attempts and take life-saving action in a moment when every second counts. *See* June 4, 2021, R.D. Trial Tr. at 64-65. Other trainings are necessary to minimize the risk that mentally ill prisoners ever reach this point. Comprehensive mental-health training,

163

suicide prevention training, and suicide risk assessment training all operate to instruct staff to recognize prisoners' mental-health needs in order to facilitate a response that is proportionate to the urgency and severity of those needs. *See id.* at 22-23, 54-55, 57. Recent failures to respond appropriately to indicators of current mental-health needs, particularly signs of possible suicidality, reflect an ongoing need for this training to be received and reinforced. *See, e.g.*, May 24, 2021, R.D. Trial Tr. at 66 (the day before he committed suicide, Jaquel Alexander was not placed on suicide watch after he verbalized suicide ideation); *id.* at 44-45 (Laramie Avery was not placed on suicide watch or diverted from segregation after he twice stated that he did not have much to live for). In light of the need for training to provide a stable foundation for the provision of mental-health care across all other areas of liability, the court will order a few remedial provisions in this area, most notably with regard to documentation. But for the most part, the court finds

the evidence presented at the omnibus remedial hearings encouraging.

   D.   Failure to Comply with Orders and Policies

   The defendants argue that ADOC staff should be given broad discretion to determine how best to bring the system into constitutional compliance. The court recognizes the importance, both under the PLRA and in ensuring that relief is practical, of deferring to those who know the system best and building flexibility into the remedy. However, in certain areas, the plaintiffs have presented compelling evidence of years of ongoing constitutional violations and ADOC's failure to make any progress towards compliance. In those areas, the court cannot risk leaving unfettered discretion to the department. Experience has proven that ADOC either cannot or will not take the steps necessary to improve in these areas, a history that demands that the court enter more intrusive relief.

**165**

The relevant question in considering whether relief ordered under the PLRA is overly intrusive is "whether the same vindication of federal rights could have been achieved with less involvement by the court in directing the details of defendants' operations." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1071 (9th Cir. 2010). That a defendant has previously failed to comply with its own policies, or with the court's orders, may indicate that the answer is no.

ADOC has a long history of failing to comply with the remedial orders in this case.  In the liability opinion, the court noted that the department had demonstrated deliberate indifference to the state of its mental-health care system for years, "in spite of countless reports, emails, and internal documents putting ADOC on notice of the actual harm and substantial risks of serious harm posed by the identified inadequacies in mental-health care." *Braggs*, 257 F. Supp. 3d at 1256. Indeed, ADOC failed to act to improve its provision of mental-health care until directly prompted by the court,

166

even while claiming credit for actions it had not taken. During the course of the liability trial, the then-Associate Commissioner of Health Services claimed that "a new mental-health coding system prohibiting placement of seriously mentally ill prisoners in segregation was in the middle of a roll-out at the time of her testimony in December 2016." *Id*. at 1262. However, this turned out to be untrue--"her representation was disputed by the testimony of two of her colleagues, who explained that [the Office of Health Services] moved ten mentally ill prisoners out of segregation into the Donaldson RTU only after her testimony, and that there was no official policy change." *Id*.

Two years later, in the suicide prevention opinion, the court found "ample evidence" that ADOC's noncompliance continued. *Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1246 (M.D. Ala. 2019) (Thompson, J.). It pointed out that ADOC had consistently failed to comply even with the remedial measures "the defendants agreed to

implement," *id*. at 1278, and that it had demonstrated "time and again" that it was unable "to ensure that its ground-level staff comply with directives from the top, not to mention with the orders of this court," *id.* "The history of this case," the court concluded, "is replete with evidence of directives given and corrective action plans created that have been doomed to irrelevance because of a lack of follow-through to ensure the directives were obeyed and the plans put into action." *Id*.

These failures have continued through the omnibus remedial hearings.  Indeed, the defendants' own witness, Meg Savage, testified to what the court considers one of their more egregious failures:  she explained that in the three years that had passed since the court had ordered the defendants to establish an agency staffing unit, they had taken no steps whatsoever toward doing so, despite the fact that without the agency staffing unit, the defendants could not determine the number of correctional staff positions currently needed for ADOC's facilities

to operate safely--a necessary precondition for hiring sufficient staff. *See* June 16, 2021, R.D. Trial Tr. at 9-14.

In other areas, too, ADOC has declined to remedy shortcomings of which it was plainly aware. Dr. Burns identified a number of recommendations made prior to the suicide prevention hearing that were repeated nearly verbatim in the most recent reviews. And even with regard to the earliest psychological autopsies, she testified that there was no indication that ADOC had incorporated their recommendations into its subsequent practice or, indeed, made any effort to do so. *See* May 24, 2021, R.D. Trial Tr. at 199.[14]

---

14. While the court does not rely on ADOC's decades-long history of inadequate mental-health care to support the need for relief in this case, that history is nevertheless noteworthy. As the court documented in its previous monitoring opinion, *see Braggs*, 483 F. Supp. 3d 1136, 1171-72 (M.D. Ala. 2020) (Thompson, J.), ADOC's mental-health care was found by a district court to be constitutionally inadequate all the way back in 1972. *See Newman v. Alabama*, 349 F. Supp. 278, 284 (M.D. Ala. 1972) (Johnson, C.J.), *vacated in part on other grounds*, *Newman v. Alabama*, 522 F.2d 71 (5th Cir. 1975) ("The large majority of mentally disturbed prisoners receive no treatment whatsoever. It is tautological that such

The cumulative result of all these failures, as the court made clear during the omnibus remedial hearing, is that the court is unable to rely on ADOC's willingness and ability to self-correct.   *See* June 29, 2021, R.D.

---

care is constitutionally inadequate").   In a separate decision four years later, the court lamented that "nothing ha[d] been done" to address the identified deficiencies and that ADOC continued to violate the Eighth Amendment by failing to provide adequate mental-health care. *See* Pugh v. Locke, 406 F. Supp. 318, 324 (M.D. Ala. 1976) (Johnson, C.J.), *aff'd and remanded sub nom.* Newman v. Alabama, 559 F.2d 283 (5th Cir. 1977), *cert. granted in part, judgment rev'd in part on other grounds, and remanded sub nom.*, *Alabama v. Pugh*, 438 U.S. 781 (1978).   In 1979, the district court again found that, despite monitoring, "nothing ha[d] been done to correct the situation" and placed ADOC into a receivership that lasted until 1988. *Newman v. State of Ala.*, 466 F. Supp. 628, 631 (M.D. Ala. 1979) (Johnson, C.J.).   Just four years after the court's oversight terminated, however, yet another complaint was filed alleging that the conditions for mentally ill inmates in ADOC's custody had deteriorated to the point of unconstitutionality. *See* Complaint (Doc. 1), *Bradley v. Haley*, No. 2:92cv70-WHA (M.D. Ala. 1992) (Albritton, J.). And though by the end of monitoring in that case, the monitor concluded that ADOC had achieved "remarkable" progress, *see* Bradley Final Monitoring Report (Doc. 2133-3) at 1, 4, 6, *Braggs v. Dunn*, No. 14cv601-MHT (M.D. Ala. 2018) (Thompson, J.), the court in this case identified deficiencies in nine of the 11 areas in which ADOC had been found by the *Bradley* monitor to have improved.   *See generally Braggs*, 257 F. Supp. 3d at 1171.

170

Trial Tr. at 133.  Instead, for at least those areas that remain the most problematic, the court finds it necessary to order more detailed and specific provisions.  As the court said before, paraphrasing Dr. Burns's testimony, such specificity is necessary "when you're dealing with a gross failure to comply or failure to comply over a long period of time."  June 2, 2021, R.D. Trial Tr. at 181.

Similarly, the court finds that provisions requiring documentation are particularly important in light of the longstanding nature of ADOC's noncompliance.  The defendants have argued that some of the deficiencies that the court identified may well have been "documentation issue[s]" rather than failures to comply.  June 29, 2021, R.D. Trial Tr. at 96.  As both Dr. Burns and Mr. Vail have explained, however, "in corrections, if you didn't write it down, it didn't occur."  May 27, 2021, R.D. Trial Tr. at 121-22; *see also* May 24, 2021, R.D. Trial Tr. at 102.  If ADOC really is making progress, adequate

documentation is necessary for it to get credit for its improvement.

The history of this case also demonstrates that there is a disconnect between policies that are implemented at a system-wide level and what is actually happening on the ground in ADOC facilities.  Indeed, the court at one point described ADOC's failure to comply not only with the court's directives, but with its own policies, as "a severe, ongoing dysfunction in the system."  *Braggs*, 257 F. Supp. Ed at 1264.  To give just one example:  in March 2019, ADOC Deputy Commissioner Charles Daniels announced a directive generally prohibiting the release of inmates from suicide watch directly to segregation, *see Braggs* 383 F. Supp. 3d 1218, 1273 (M.D. Ala. 2019) (Thompson, J.), yet a mental-health provider later reported to an auditor at Ventress Correctional Facility that inmates were sent to suicide watch to segregation "as a matter of course."  Pls.' Ex. 3320 at 1.

Adequate documentation is necessary to correct this disconnect.  As Vail testified, "documentation provides

172

for accountability." June 1, 2021, R.D. Trial Tr. at 46. "[I]f you're trying to figure out if ADOC is making progress," it is vital that you have records of the actions that were taken and decisions that were made, when, and by whom. *Id*. Without adequate documentation, the court believes that the department will continue to struggle to ensure that remedies are being successfully implemented.

Finally, ADOC's persistent shortage of correctional staff raises doubts as to whether it is capable of implementing relief in multiple areas simultaneously, thereby heightening the need for thorough documentation. ADOC's shortage of staff has reduced it and its mental-health vendor to a constant state of 'robbing-Peter-to-pay-Paul' borrowing; to implement relief in one area, it must divert staff from another, all with the goal of triaging--that is, maximizing the number of surviving inmates. As Wexford explained to ADOC, when it "had resources available to conduct training--but not enough to document the training--we

went ahead and trained anyway, prioritizing educated, competent staff above recordkeeping." March 2, 2020, letter from Wexford to ADOC (P-3323) at 5. Similarly, in order to provide adequate crisis monitoring, Wexford diverted staff from other tasks, "disrupt[ing] all routine mental-health caseload activities to address the immediate and more serious needs of inmates in crisis." *Id.* at 3. Given this history, the court is concerned as to whether ADOC can sustain the progress it has made in certain areas while also implementing the court's orders designed to address deficiencies in other areas. In other words, it is simply not enough for ADOC to say that it has achieved compliance in one area; the critical question, as stated, is whether it can achieve and sustain adequate compliance in various areas simultaneously. The history of this case strongly suggests that, because of longstanding and severe understaffing, it cannot. Documentation may therefore be necessary even in areas where ADOC has made the most

174

progress, so as to ensure that that progress does not
erode once ADOC turns its attention to other matters.


### E.   Timeframes

Closely related to the defendants' request for broad
discretion is the issue of timeframes.  In a number of
areas of liability, one or both of the parties propose
provisions requiring that certain actions be taken within
definite timeframes.  The court rejects these proposals
in many instances, even when they come from both parties.
In a few instances, however, it does adopt specific
timeframes.  While the provisions containing these
timeframes  may be more intrusive than ones with more
open-ended language, such as "as soon as possible,"
"within a reasonable timeframe," or indeed no temporal
restriction at all, the court finds them to be necessary,
narrowly tailored, and the least intrusive means that
will correct the constitutional violation at issue.

Numerous factors support the court's finding that
the few provisions it orders containing specific

timeframes are necessary, narrowly tailored, and minimally intrusive.

*First*, most, if not all, of the provisions in question are adopted from interim orders to which the defendants have previously agreed and, in some cases, which the defendants again propose in their proposed remedial order. "[W]here ... the provisions of relief ordered by a court are adopted from an agreement jointly drafted and reached by the parties, it is compelling evidence that the provisions comply with the needs-narrowness-intrusiveness criteria." *Braggs*, 383 F. Supp. 3d at 1253. The fact that the defendants had a hand in drafting and fashioning the language of a provision when it was stipulated, while not dispositive, is certainly an indicator that the provision is necessary, narrowly tailored, and minimally intrusive.

*Second*, although the defendants maintain that these provisions are no longer necessary, evidence of current conditions reflects that the defendants have not complied with these provisions consistently. Many prisoners

**176**

continue not to receive care within the timeframes required by court order and ADOC's own policies.  ADOC's failures to comply with these provisions while ordered to do so is significant evidence that these failures would continue in the absence of an order.  Moreover, as explained above, ADOC's severe shortage of correctional staff has hampered its ability to implement and sustain relief in multiple areas at the same time.  Therefore, even assuming that ADOC were to improve the timeliness of its responses in certain areas, the question would remain as to whether it could sustain that progress while making improvements in other areas despite severe staffing shortages.  No resort to 'robbing-Peter-to-pay-Paul.'

*Third*, credible expert testimony offered by either or both sides underscores the necessity of compliance with these provisions and ties ADOC's observed failures to apply these provisions to substantial harms to prisoners with mental illness and to the constitutional violations that the court has found.

177

In sum, where the court orders that the defendants must comply with specific timeframes, it does so only after careful consideration of the history of this case, evidence of ADOC's recent practices, and the expert testimony of both sides and a determination that no less intrusive means would be sufficient to redress ADOC's constitutional violations. Moreover, the court anticipates that its specification of these timeframes will allow the defendants to obtain relaxation or termination of the ordered provisions earlier than it would otherwise. This is for two reasons. First, a specific timeframe better enables the monitoring team to determine whether ADOC is in compliance with a given provision, and makes it more difficult for the plaintiffs to dispute compliance. If the compliance team is able to report with reasonable certainty that ADOC is compliant with a provision and can sustain that compliance, the court will, upon request, take up the issue immediately. Second, a specific timeframe provides clear notice to the defendants of what, exactly, is

required of them, thereby ensuring that there will be no
period during which ADOC struggles to determine what
constitutes a reasonable amount of time for taking
required action, and no possibility that it will be
caught unaware by a determination by the EMT that it is
out of compliance with the provision.  Moving forward,
the clarity of these provisions will best enable the
monitoring team to monitor the extent of ADOC's failures
and successes and allow the court and the parties to take
appropriate action.

### F.   The Effects of COVID-19

In the December 2020 opinion setting out the process
for the omnibus remedial hearings, the court noted that
it would consider "the effects of COVID-19" in
determining the omnibus remedy. *Braggs*, 2020 WL 7711366,
at *8.  As the court said then, the outbreak of the
COVID-19 pandemic "seized and disrupted the progress of
this suit as it has the quotidian rituals of all of our
lives," and it was necessary to take this disruption into

account both in the procedures by which the final remedy for this phase of the litigation was determined and in the substance of that remedy. *Id.* at \*3. The court recognized that the pandemic had not only affected the litigation history leading up to these proceedings, but also had the potential to affect the appropriate scope of relief or to require certain temporary alterations of the remedy during the course of the pandemic.

In practice, COVID-19 had two principal effects on the omnibus remedial proceedings themselves, both of which created complicated evidentiary issues related to the court's consideration of whether particular proposed remedial provisions were necessary under current conditions. The first was a problem with the discovery of evidence for the proceedings. Because of ADOC's concerns about the transmission risk involved in conducting site visits and inmate interviews, the plaintiffs' expert Dr. Burns was sharply limited in the extent to which she could conduct these forms of evidence gathering. By agreement of the parties, Burns was the

only plaintiffs' expert permitted to conduct site visits,
and she was limited to visiting four facilities for short
periods of time: up to eight hours each at Donaldson and
Bullock, and generally up to four hours each at St. Clair
and Tutwiler.  *See* Joint Discovery Plan (Doc. 3098) at
2-3; Facility Inspection and Inmate Interview Protocol
(Doc. 3098-1) at 1.   While on-site, the only inmate
interviews permitted were three- or five-minute
cell-front interviews through a cell door with
appropriate social distancing, although Burns was allowed
to identify prisoners during her visits for follow-up
interviews by videoconference.  *See* Facility Inspection
and Inmate Interview Protocol (Doc. 3098-1) at 2-4.

The defendants argued, and their expert Dr. Metzner
testified, that, through no fault of Dr. Burns, these
limitations precluded her from developing credible
opinions about the provision of mental-health care across
the ADOC system, which Metzner said he believed required,
among other things, three-day site visits.  *See* July 1,
2021, R.D. Trial Tr. at 43.  Given the particular history

181

of this litigation, the court disagrees; indeed, it found Burns's testimony generally credible and reliable, including her opinions regarding the provision of mental-health care in ADOC facilities on a systemic level.  That is because the evidentiary record of this case was not a *tabula rasa* when the omnibus hearings began.  The court found long-standing and systemic deficiencies in its liability opinion, and it reaffirmed in various subsequent remedial opinions that many of these problems continued to exist.  On top of those persistent deficiencies, as discussed above, there is the alarming history of ADOC's failure to follow the court's orders and its own policies and regulations.  The recurrence of these same system-wide problems in the facilities Burns visited and the records of the prisoners she interviewed amounted to compelling evidence that these issues continue to plague ADOC's provision of mental-health care.  The fact that correctional understaffing "permeate[s]" the inadequacies in ADOC's mental-health care system and continues to be a grave

problem at every major facility except Tutwiler and Hamilton further supported the credibility of Burns's opinions that the deficiencies she witnessed were emblematic rather than isolated. *Braggs*, 257 F. Supp. 3d at 1268.

The second evidentiary problem that the COVID-19 pandemic caused had to do with the question of what evidence was most helpful for understanding how conditions in ADOC facilities will change as the pandemic wanes. Since March or April 2020, ADOC, like many institutions, has been operating in some ways rather differently from what it did before. For instance, group therapy sessions and face-to-face counseling became more complicated to conduct safely, and they may have been all but impossible in the early stages of the pandemic when little was known about the virus and the availability of vaccines was a distant hope. But pre-pandemic evidence, at this juncture, is increasingly out of date: several of the ADOC Office of Health Services' facility-wide audits, which the plaintiffs argued need updating because

of the amount of time that has passed, were conducted in
late 2019.  *See, e.g.*, Pls. Ex. 3271 (Kilby OHS Audit
from November 2019).  In other words, the court faced the
question of how to assess current conditions given that
nearly the last year-and-a-half were conditions under
COVID-19.

That is a question without an easy answer.  The court
therefore adopted what it believed to be a reasonable
approach.  As to a given remedial area, when conditions
during the pandemic appeared similar to the conditions
that existed before the outbreak of COVID-19, the court
took recent conditions as indicating how that aspect of
ADOC's mental-health care is likely to operate in the
future.  But when conditions appeared to have worsened
during the pandemic, the court considered whether
pre-pandemic conditions suggested that the worsening was
due to COVID-19, and if so whether the problem would
likely be resolved as the pandemic wanes.  As a
hypothetical example, the court would be hesitant to find
that the provision of individual counseling remained

184

deficient based solely on evidence that counseling sessions were inconsistently provided in November 2020 without evidence that they were also provided inconsistently in November 2019. This hesitancy gave appropriate flexibility and deference to ADOC in responding to the exceptional threat that the COVID-19 pandemic posed to prison inmates and staff.

That said, this flexibility has certain limits. COVID-19 does not grant ADOC *carte blanche* to provide inadequate mental-health care for the duration of the pandemic. The Eighth Amendment does not have a *force majeure* clause. Events since March 2020 have not lessened the mental-health needs of prisoners in ADOC's custody; indeed, the stress and uncertainty caused by the pandemic have likely heightened those needs. Though it may be more difficult to provide certain kinds of mental-health treatment under such conditions, a prison system could not constitutionally pause such treatment for the length of the pandemic, which has now lasted well

185

over a year and which has no end clearly in sight.[15]  Thus, while the weight given to evidence of conditions during the pandemic varied depending on how those conditions compared to pre-pandemic mental-health care in the ADOC system, the court in all instances looked to the totality of the evidence--including evidence of recent conditions--to determine whether each particular remedial provision was necessary under current circumstances.

***

This concludes the second part of the court's omnibus remedial opinion.  One part follows.

DONE, this the 27th day of December, 2021.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

---

15.  For similar reasons, the court declined to adopt the defendants' request that it grant the monitoring team power to waive remedial provisions during a pandemic or similar unforeseen circumstances.  Instead, the difficulties posed by these circumstances should be taken into account when assessing ADOC's compliance with these provisions and whether any non-compliance under such conditions requires further remedial action.