IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| EDWARD BRAGGS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| JEFFERSON S. DUNN, in his | ) | |
| official capacity as | ) | |
| Commissioner of | ) | |
| the Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

PHASE 2A OMNIBUS REMEDIAL OPINION

PART III.

I. INTRODUCTION                                          4

II. REMEDIAL PROVISIONS AND PLRA FINDINGS               5

  A.  Correctional Staffing                            5
  B.  Mental-Health Staffing                          27
  C.  Restrictive Housing                             39
    1.  Exceptional Circumstances                     40
    2.  Screening for Serious Mental Illnesses        53
    3.  Mental-Health Rounds                          64
    4.  Mental-Health Assessments                     73
    5.  Out-Of-Cell Time                              82

6.   Security Checks                                    87

7.   Restrictive Housing Cells                          91

8.   Other Provisions Regarding Segreation            100

D.   Intake                                             101

1.   Use of LPNs to Conduct Intake                   102

2.   Documentation of Intake Screening               105

3.   Inmates' Previous Records                        107

4.   Other Provisions Regarding Intake               114

E.   Coding                                             116

1.   Assignment of Codes                             117

2.   Documentation of Codes                          120

F.   Referral                                           123

1.   Making of Referrals                             125

2.   Response to Referrals                           130

3.   Communication of Emergent or Urgent Referrals 138

4.   Communication of Routine Referrals              143

5.   Triage of Referrals                             146

6.   Observation in Response to Emergent Referrals
and Referrals for Suicide Watch                      153

7.   Other Provisions Regarding Referrals            157

G.   Confidentiality                                    159

H.   Treatment Teams and Plans                          165

1.   Frequency of Treatment-Team Meetings            166

2.   Length of Treatment-Team Meetings               169

3.   Lack of Pertinent Information                   171

4.   Nonexistent or Vague Treatment Plans            175

5.   Failure to Update Treatment Plans               179

6.   Coordination of Transfers and Treatment         183

7.   Other Provisions Regarding Treatment Teams and
Planning192

I.   Psychiatric and Therapeutic Care                   198

2

   1.  Access to Treatment                              199

   2.  Insufficient Out-Of-Cell Time                    210

     3.  Monitoring of Inmates Not on the Mental-Health

                                                  Caseload218

   4.  Inadequate Progress Notes                       220

     5.  Other Provisions Regarding Psychiatric and
Therapeutic Care                                      226

J.  Suicide Prevention                                 229

   1.  Immediate Response to Suicide Attempts           231

   2.  Suicide Watch Placement                         241

   3.  Suicide Watch Cells                             249

   4.  Observation                                     261

   5.  Suicide Watch Conditions                        269

   6.  Referral to Higher Level of Care                275

   7.  Discharge                                       284

   8.  Follow-Up                                       292

   9.  Other Provisions Regarding Suicide Prevention 302

K.  Higher Levels of Care                              305

   1.  Timely Access to Hospital-Level Care            306

   2.  Inpatient Beds                                  312

   3.  Temperature Regulation                         321

   4.  Other Provisions Regarding Higher Levels of Care
                                                   325

L.  Discipline                                         327

     1.  Mental-Health Consultations to the Disciplinary
                                                 Process 329

   2.  Consideration of Mental-Health Consultations 337

   3.  Other Provisions Regarding Discipline           349

M.  Training                                           352

   1.  Documentation of Training                       356

   2.  Emergency Preparedness Drills                   360

3

     3.  Training for Mental-Health Observers          365

III.  GLOBAL PLRA FINDINGS                            369

IV. CONCLUSION                                        371

## I.   INTRODUCTION

As stated previously, this opinion is divided into three parts.  This is the third part, which discusses the parties' proposed provisions, the relief that the court orders and its reasons for doing so, and the court's PLRA findings.  The court anticipates that the monitoring team may use this part as a reference guide to better understand the intricacies of the order.  Both deal with the following areas of liability, in the following order: correctional staffing; mental-health staffing; restrictive housing; intake; coding; referral; confidentiality; treatment teams and plans; psychiatric and therapeutic care; suicide prevention; higher levels of care; discipline; and training.[1]

---

     1. This part of the opinion also discusses ADOC's promulgation of policies--an area in which the court declines to order relief.

4

## II.  REMEDIAL PROVISIONS AND PLRA FINDINGS

### A. Correctional Staffing

The currently operative 2017 understaffing remedial order requires the ADOC to have "fully implemented the Savages' correctional staffing recommendations" by February 20, 2022.  Phase 2A Understaffing Remedial Order (Doc. 1657) at 3.   As discussed previously, the recommendations that must be "fully implemented" by that date include:  (1) hiring for the 3,826 full-time-equivalent correctional staffing positions necessary to fill the "mandatory" and "essential" posts described in the staffing analysis; (2) undertaking "another staffing analysis ... for every facility"; and (3) creating an "agency staffing unit" to "implement[] and enforce[]...any changes resulting from" the Savages' analysis.   Savages' Report (Doc. 1813-1) at 20, 100, 121-33.   It is clear at this point that at least the first of these requirements is out of reach.   Overall correctional staffing numbers in ADOC's system have

5

barely increased in three years, and the system has filled less than half of the positions necessary to meet the requirement of 3,826 full-time-equivalent officers. This failure must be considered in the context that, despite the court's instruction in 2018 that "the defendants are not to delay implementation until the last minute, but are to begin immediately and swiftly upon receiving" the Savages' recommendations, the defendants had, at the time of the 2021 omnibus hearings, taken no steps whatsoever toward complying with the second and third requirements. *Braggs*, No. 14cv601-MHT, 2018 WL 985759, at *8 (M.D. Ala. Feb. 20, 2018) (Thompson, J.).

### a.  The Parties' Proposed Provisions

To remedy ADOC's continued, extraordinary correctional understaffing, the plaintiffs propose mainly that the court maintain the existing February 2022 deadline. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 2.1.1.  In the alternative, if the court modifies this deadline, the plaintiffs ask that

benchmarks be imposed on the ADOC's compliance to ensure that another three-plus years do not pass with minimal progress made and with no intervening points at which that lack of progress might be reviewed by the court. *See* Pls.' Post-Trial Br. (Doc. 3370-1) at 342-44.   The plaintiffs propose that these benchmarks should prioritize correcting the staffing deficiencies at ADOC's mental-health hubs, intake facilities, and restrictive housing units first, but they do not propose specific benchmarks beyond that general suggestion of structure. *See id.*

The defendants propose that no relief is necessary. *See* Defs.' Post-Trial Br. (Doc. 3367) at 58-59.   In the alternative, they propose two modified deadlines for fixing its correctional staffing deficiencies, as well as new intervening dates for creating the agency staffing unit and completing the updated staffing analysis.   *See* Defs.' Revised Correctional Staffing Proposal (Doc. 3351) at §§ 2.1.1-2.1.7.   The first of these deadlines would require the ADOC to reach critical minimum staffing by,

**7**

at the latest, December 31, 2023. *See id.* at 6.  The
latter of the deadlines would require the ADOC to fill
85 % of the mandatory posts described in the updated
staffing analysis by July 1, 2025. *See id.*  In light of
Meg Savage's testimony that meeting critical minimum
staffing should generally mean filling all mandatory
posts, *see* June 15, 2021, R.D. Trial Tr. at 122-27, it
is unclear how these two deadlines would work together:
Filling critical minimum posts should require more staff
than filling 85 % of mandatory posts.  The ADOC's proposal
contains no timeline for it to fill any of the essential
posts—the positions necessary for "normal operations."
June 16, 2021, R.D. Trial Tr. at 41-42.  It also does not
include any adjustments to the operation of ADOC
facilities during the four years before it would under
its proposal achieve 85 % of the staffing level at which,
according to Savage, the prisons could safely operate in
a non-lockdown status.


b.  The Court's Ordered Relief

The court will adopt a hybrid of the timelines proposed by the defendants and the plaintiffs. In light of ADOC's minimal progress toward correcting its severe correctional understaffing in the four years since the liability opinion, the court will extend to July 1, 2025, the deadline for filling all mandatory and essential posts prescribed in the most recent staffing analysis in effect at that time.[2] This extension grants the defendants' request for another four years from the time of the omnibus remedial hearings to achieve the level of staffing necessary to safely conduct normal operations, including programming, recreation, and other activities "as prescribed in all policy and procedures." June 16, 2021, R.D. Trial Tr. at 41-42. Given the exceptionally slow pace of progress the ADOC has made over the past

---

2. As explained in the Savages' staffing analysis and in Meg Savage's testimony, for an essential post to be filled, it need only in fact be occupied 75 % of the time. *See* Savages' Staffing Analysis (Doc. 1813-1) at 106. In addition, per the parties' stipulations, compliance with this deadline and with the benchmarks below will not be monitored at Hamilton or Tutwiler absent further order of this court. *See* Joint Stipulation (Doc. 3288) at 3.

four years, the court finds that this deadline is the earliest date with which it is realistic to expect the department may be able to comply.

However, when the amount of work (much of which should have been done years ago) ADOC must put into achieving adequate correctional staffing is considered, July 2025 is just around the corner. Time is of the essence. Every week and month is dear. The court, therefore, agrees with the plaintiffs that it is necessary to impose certain intermediate benchmarks--that is, "point[s] of reference" against which ADOC's progress may be assessed. *Benchmark*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com /dictionary/benchmark (last visited December 21, 2021). In deference to the ADOC, the court will not attempt to prescribe these benchmarks itself. Instead, it will order the defendants, in consultation with the Savages, to propose realistic benchmarks for the level of correctional staffing ADOC will attain by December 31 of 2022, 2023, and 2024. These benchmarks should be

10

achievable for ADOC, should appropriately prioritize filling mandatory posts and staffing the mental-health hubs and intake facilities, and should put the ADOC on track to comply with the court's order to fill all mandatory and essential posts by July 1, 2025. Once imposed, ADOC will be required to submit status reports to the court regarding its progress towards meeting them.

The benchmarks need not be enforceable. They are merely meant as a means of measuring ADOC's progress towards filling its mandatory and essential posts by 2025, so that the court and the parties can determine if ADOC is falling behind and take appropriate action immediately. By assessing ADOC's progress against the benchmarks, the court and the parties will decrease the chances that, come four years from the omnibus remedial hearings, they will have to scramble to ensure that ADOC complies with the court's correctional staffing order or, worse, to extend the deadline for doing so by another four years. It is unfortunate that, in all likelihood, eight years will pass from the time of the court's

11

liability opinion before ADOC achieves the staffing it needs to provide inmates the care that the constitution requires.   Twelve years would be beyond the pale.

To facilitate meeting these deadlines and benchmarks, ADOC should also create its agency staffing unit and work with the Savages to update the staffing analysis as soon as possible after the issuance of this order.[3]  The defendants' prosal also contains a provision requiring ADOC to revise the format of its correctional staffing reports; while this may be necessary, the court will not order ADOC to do so now.  If the monitoring team determines that alterations to the format of ADOC's reports would aid the oversight of its compliance with these deadlines, the court anticipates that the defendants will work collaboratively with the monitoring team to make those adjustments.  Per the Savages' analysis from March 2021, Basic Correctional Officers (BCOs) should not fill and may not be counted for any

---

3. The court will require the defendants, within 21 days of the effective date, to submit to the court a proposal for specific dates by which this may be done.

armed post, and so-called Correctional Cubicle Operators (CCOs) should not fill and may not be counted for any position other than "secure control room posts with no direct inmate contact." Assessment of Posting Assignments (Doc. 3151-1) at 6, 8.


c.  PLRA Findings

The deadlines and benchmarks described above are necessary to correct ADOC's extreme correctional understaffing, which continues to place mentally ill prisoners in ADOC's care at a substantial risk of serious harm for the reasons discussed above. Because these deadlines require only that ADOC fill the positions that its staffing expert Meg Savage credibly testified are necessary for safe, normal prison operations, they are narrowly tailored to correcting the understaffing violation found by the court. And because the benchmarks are not requirements, but merely reference points intended to facilitate the defendants' compliance with the court's order, they are the least intrusive way of

ensuring that the violation is corrected.  Accordingly, the court finds that the deadlines and benchmarks set forth above are narrowly drawn, extend no further than necessary to correct the correctional understaffing violation found by the court, and are the least intrusive means necessary to correct that violation.  *See* 18 U.S.C. § 3626(a)(1)(A).

However, while these deadlines and benchmarks are necessary to correct the understaffing violation, the court finds that they are not sufficient to do so.  As explained above, ADOC has had four years to fix its correctional officer deficiencies since the court found that ADOC's "severe" understaffing, "combined with chronic and significant overcrowding," was an "overarching issue[] that permeate[s] each of the" court's other liability findings.  *Braggs*, 257 F. Supp. 3d at 1268.  In that time, the system-wide staffing numbers have barely moved.  Less than half of the mandatory and essential posts identified by the Savages are currently filled.  ADOC remains far from filling even

the mandatory positions, which comprise the vast majority
of the mandatory and essential posts described in the
Savages' staffing analysis and which, per that analysis
and Meg Savage's testimony, are so critical that
facilities should lock down if they are not filled 100 %
of the time. *See* June 15, 2021, R.D. Trial Tr. at 127-29.

The consequences of this extreme understaffing have
been catastrophic, just as they were four years ago at
the time of the court's liability opinion. Suicide watch
hours have shot up more than 4,000 % above the levels
anticipated in the mental-health vendor's contract
because the absence of security staff causes terrifying
conditions to proliferate in the prisons, leading to
anxiety, psychological deterioration, and ultimately
suicidality. Inmates in celled environments, including
treatment environments like the SU and SLU, cannot get
out of their cells and are unable to receive necessary
mental-health interventions due to a lack of correctional
staff. *See*, e.g., Pls.' Ex. 3310 at ADOC546882; May 25,
2021, R.D. Trial Tr. at 140-44; *see also* Pls.' Ex. 3347

15

at ADOC553738.   The resulting degree of isolation in these units is akin to or worse than segregation is meant to be under ADOC policy and the court's orders—a disquieting irony as the SLU in particular is intended to provide a diversionary unit for mentally ill inmates to avoid subjecting them to the harm caused by segregation.   At the same time, dormitory environments are unsafe even in the most intensive treatment units: Tommy McConathy was raped in the grievously understaffed RTU at Bullock, which sometimes operated with no officers whatsoever on the dormitory floor.   *See* Pls.' Ex. 3403 at ADOC558777; May 28, 2021, R.D. Trial Tr. at 157-58.

Perhaps the most dangerous effects of this severe understaffing are in the restrictive housing units, where most suicides in ADOC facilities occur.   Inmates go weeks without any out-of-cell exercise time at all, exacerbating the mental-health effects of isolation. *See, e.g.*, Pls.' Ex. 3921 at ADOC517730-58.   Officers at St. Clair acknowledged that this lack of out-of-cell time was due to insufficient correctional staff.   *See* May 27,

**16**

2021, R.D. Trial Tr. at 118; May 28, 2021, R.D. Trial Tr. at 186-87.  Units operate without enough officers to get an inmate out of his cell even in the event of a mental-health emergency.  *See* Pls.' Ex. 4269 at ADOC588534; *see also* June 16, 2021, R.D. Trial Tr. at 195.  This problem was reflected in the death of Charles Braggs, who hanged himself in his cell an hour after a nurse asked correctional officers to bring him to the infirmary.  *See* Pls.' Ex. 3284 at 5.  Mental-health treatment is nearly non-existent, including for inmates with serious mental illness, in part due to the lack of correctional staff.  Clinical encounters are missed for lack of correctional officers to bring inmates to appointments.  *See, e.g.*, May 25, 2021, R.D. Trial Tr. at 158-59.

Moreover, experts for both parties testified that the only way to operate segregation units safely given the known risk of decompensation and suicide on those units is to have correctional staff perform cell-by-cell security checks twice an hour, 24 hours per day, for

every occupied segregation cell to check on the
inhabitant.  The court explained in the liability opinion
that these checks are "necessary to keep prisoners safe
from self-harm and suicide," and it based its finding of
constitutional deficiencies in segregation in part on
Vail's assessment of ADOC logs "that suggested that no
segregation checks were done for multiple hours."
*Braggs*, 257 F. Supp. 3d at 1244.  Vail credibly testified
in the omnibus remedial hearings that this security-check
requirement is one of the most important obligations of
correctional administration because of how essential it
is to keeping inmates safe.  *See* May 27, 2021, R.D. Trial
Tr. at 206-07.[4]

_____

4.  The defendants' expert Dr. Metzner agreed with
Vail that these security checks are "good correctional
practice," but did not appear from his testimony to agree
with Vail's view about the degree of criticality of these
checks.  June 30, 2021, R.D. Trial Tr. at 181.  However,
as Metzner acknowledged, he is an expert in correctional
psychiatry, not an expert in correctional administration
and security like Vail.  *See id.* at 180.  Accordingly,
and based on the evidence that missed security checks
played a role in several of the recent suicides, although
the court gave due weight to Metzner's opinion on these
security checks, it found Vail's testimony on the
importance of security checks more persuasive.  Moreover,

At its current staffing levels, ADOC cannot consistently conduct these checks.  As in the liability trial, Vail again found many logs indicating gaps of multiple hours between security checks.  *See* May 27, 2021, R.D. Trial Tr. at 159-61.  Audits of ADOC's restrictive housing units have routinely found compliance levels with the required 30-minute security checks below 20 %.  The extraordinary degree to which non-compliance with this requirement puts inmates at risk was illustrated by the case of Casey Murphree, who was not found for hours after his death until rigor mortis had begun.  Had security checks been conducted as required by ADOC policy and this court's orders, Murphree's attempt to hang himself might have been noticed and interrupted.

Considering the evidence discussed above and the totality of the evidence presented during the 2021

---

ADOC is falling short of the security-check requirement under either expert's view of the necessary compliance rate.  On this issue, the defendants are missing the mark by yards, not inches.

omnibus remedial hearings, the court now finds that--with the exception of the restrictive housing unit at Tutwiler--ADOC's restrictive housing units are unsafe for prisoners with mental-health needs,[5] and that while the segregation provisions in the parties' proposed omnibus remedial orders outline a plausible long-term framework for the operation of restrictive housing units once correctional staffing levels rise, neither proposal is adequate to address the serious risk of harm faced *now* by inmates in segregation. No matter what provisions the court might order regarding security checks, mental-health evaluations, out-of-cell time, and other areas in which ADOC has failed to provide adequate care, there is a substantial likelihood that ADOC will be unable to comply fully until it hires significantly more correctional staff—an object that, by ADOC's projection,

---

5. Nor are the restrictive housing units unsafe only for inmates on ADOC's mental-health caseload. As illustrated by the deaths of Gary Campbell and Charles Braggs, ADOC does not have sufficient staff to be able to consistently identify people who decompensate and develop mental-health needs in segregation, making the units unsafe for inmates both on and off the caseload.

is years away.  Until then, ADOC's pattern of past
noncompliance offers little reason to expect that ADOC
will implement the provisions that the court orders with
the consistency that is necessary to protect inmates in
restrictive housing, where ADOC's compliance or
noncompliance is a matter of life-and-death.

In light of this finding, the court considered
ordering the defendants to close some or all the
restrictive housing units at its men's facilities until
correctional staffing levels improve enough to make it
possible for ADOC to operate those units safely.
However, in deference to ADOC and to ensure that the
remedy intrudes no further into the operations of the
prison than is necessary to address the risk of harm to
inmates in segregation caused by the system's present
staffing levels, the court will instead order that ADOC
must take additional precautions to protect against the
most severe and immediate dangers to inmates in
restrictive housing in the event that ADOC fails to
comply with the court's orders regarding security checks,

mental-health evaluations, out-of-cell time, and other areas in which ADOC has failed to provide adequate care. This is not to excuse noncompliance; it is simply to be realistic about the extreme risks that ADOC's understaffing poses to inmates in restrictive housing.

At this time, the court will not dictate all of the additional steps ADOC must take. Rather, because the parties were not afforded the opportunity to address this issue during the omnibus remedial hearing, it will allow them to submit proposals as to what interim measures are necessary until correctional staffing increases. Possible measures might include hiring temporary observers to monitor inmates in restrictive housing until ADOC hires a sufficient level of correctional staff, or temporarily reducing the number of inmates that ADOC keeps in restrictive housing.

The parties' proposals should also consider how the safety needs of prisoners who require protective custody will be addressed, and they should further discuss how ADOC should manage the dangers posed by prisoners who

would present a significant safety or security risk in general population. Part of the court's hesitation to order the closure of any of ADOC's male restrictive housing units stemmed from concern over what would happen with these two groups of prisoners—at the moment, ADOC uses restrictive housing for both groups. The proposals should also suggest means of ensuring that any prisoners moved out of the restrictive housing units do not end up in functionally identical units: that is, units that offer equivalently deficient levels of monitoring, out-of-cell time, and treatment. In considering the parties' proposals, the court will also adopt a plan for how the relief it orders may be modified if ADOC meets the staffing benchmarks set forth above. The goal is for ADOC to obtain sufficient correctional staff to be able to safely run its prisons, including segregation units if it so chooses. If ADOC's staffing levels begin to improve such that it is able to meet the benchmarks, its capacity to oversee restrictive housing units in a way

that does not subject those housed there to a serious
risk of harm should accordingly improve as well.

The court will order, however, that at least until
its correctional staffing improves, ADOC must take
certain steps to ensure that its stabilization unit,
suicide watch, and restrictive housing cells remain
suicide-resistant. Specifically, the court will order
that ADOC must check such cells for suicide-resistance
before they receive new occupants, and that it must
conduct a thorough check of all such cells at least once
per quarter to verify that they satisfy every element of
Lindsay M. Hayes's Checklist for the "Suicide Resistant"
Design of Correctional Facilities (Doc. 3206-5), which
the court discusses in more detail below, and which the
parties previously agreed to use as a means of gauging
suicide-resistance. In addition, the quarterly check
must be documented.

The court finds this relief necessary given the
unfortunate reality that, until correctional staffing
improves, there will likely be lapses in the observation

**24**

of inmates in the stabilization unit, suicide watch, and restrictive housing cells.  These inmates already face a heightened risk of decompensation and suicide, and therefore require an additional layer of protection.  The checks are also narrowly tailored and minimally intrusive.  In recognition of ADOC's limited resources, the court does not require it to conduct a documented check of every element of the Hayes checklist each time a stabilization unit, suicide watch, or restrictive housing cell receives a new occupant; rather, a more cursory examination of the cell for tie-off points, visibility, and potentially dangerous items will suffice.

To be clear, precautionary measures in addition to the segregation provisions proposed by the parties are necessary in light of the specific claims presented in this case and the scope of the court's remedial responsibilities with respect to those claims.  That does not mean that such measures are the only adjustments that should be made immediately at this juncture to align ADOC's operations with the staffing levels it has, rather

25

than the levels it hopes to attain.  Other claims could require other adjustments; alleviating the risk of harm to inmates with mental-health needs in ADOC's segregation units is only what this court can do to address this vast and multifaceted problem.

This also is the only adjustment that is necessary *today*.  The court takes no position at this point on what further remedies may be necessary in the years to come if ADOC does not improve its correctional staffing.  The court emphasizes, however, that, if progress on staffing continues to be elusive, the defendants will have to consider other modifications to ADOC's operations to make the system capable of adequately protecting and treating prisoners with mental illness.  When a State incarcerates some of its citizens, it accepts a coordinate obligation to provide them a certain minimum of mental-health care. As experts for both parties testified, there are ultimately two ways to fix the problem of having too few staff to provide this minimal care to an inmate population: staffing can be increased, or the population

can be reduced. *See* May 28, 2021, R.D. Trial Tr. at 198-99; June 17, 2021, R.D. Trial Tr. at 98-100. ADOC has options about how to proceed. But one option it does not have is to throw up its hands and declare the staffing challenges too insurmountable for minimally adequate mental-health care to be possible. The Constitution affords ADOC great latitude in the operation of its prisons, but it does not permit that.


## B. Mental-Health Staffing

Although ADOC has made more progress towards remedying mental-health understaffing than it has towards remedying correctional understaffing, its progress is incomplete. According to the staffing ratios developed by ADOC's consultants, which indicate the minimum number of staff needed to treat any given number of inmates, five of ADOC's 15 facilities have enough mental-health staff to treat their current inmate populations. Yet no facility is staffed at the levels called for by the December 2019, mental-health staffing matrix, which the

parties developed, using the ratios, to indicate the levels of mental-health staff ADOC could expect to require in the coming years.  This discrepancy is the result of the COVID-19 pandemic, in response to which ADOC reduced intake from local jails, thereby reducing its inmate population to abnormally low levels.  When intake resumes, ADOC will almost certainly require more staff in each of its facilities to provide a constitutionally permissible standard of care.

Moreover, ADOC's lack of correctional staff has prevented its mental-health staff from treating inmates as efficiently as its consultants assumed when developing the staffing ratios. Therefore, even in those facilities where ADOC has provided the number of mental-health staff called for by the staffing ratios, more mental-health staff are likely needed.

### a.  The Parties' Proposed Provisions

In light of ADOC's limited progress in hiring mental-health staff, the plaintiffs propose that ADOC

must maintain levels of mental-health staffing consistent with or greater than those called for by its consultants' staffing ratios, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 2.2.3.2, subject to the following adjustments and qualifications:

- Staffing levels shall not be less than those set forth in ADOC's October 1, 2020, contract with Wexford.  *See id.* at § 2.2.2.

- ADOC must change the staffing ratios for all mental-health positions other than Program Managers and Clerks to ensure that they are filled even when staff are absent on vacations or sick leave.  *See id.* at §§ 2.2.3.2.1-2.2.3.2.2.

- ADOC must keep filled the positions of Clinical Director of Psychiatry, Director of Mental-Health Services, Northern Regional Psychologist, Central Regional Psychologist, Southern Regional Psychologist, and Ombudsman, *see id.* at § 2.2.1.

- "Each ADOC major facility must have at least one (1) full-time equivalent ("FTE") licensed Professional ("MHP").  Each treatment hub—Bullock Correctional Facility, Donaldson Correctional Facility, and Tutwiler Prison for Women—must have at least two (2) FTE MHPs.  Each treatment hub must have two (2) MHPs on-site for at least eight (8) hours per day every business day, and at least one (1) MHP on the weekends and holidays."  *Id.* at § 2.2.3.1.

- "The ratio of CRNPs to psychiatrists must be 1.25:1 on a statewide bases, but not on a facility-by-facility basis."  *Id.* at § 2.2.3.2.3.

29

- All CRNPs working as mental-health staff must be certified to work in psychiatry. *Id.* at § 2.2.3.2.4.

- ADOC's mental-health vendor may consider an [associate licensed counselor] as a [qualified mental-health professional] for 18 months after the start of his or her employment, provided that the [associate licensed counselor] is working towards licensure as an [licensed professional counselor]. During that time, the [associate licensed counselor] can participate, as part of her training, in suicide risk assessments conducted by an independently licensed [qualified mental-health professional] or another independently licensed mental-health professional such as a psychiatrist, psychologist, or CRNP. The [associate licensed counselor] cannot, however, complete suicide risk assessments or conduct follow-up examinations alone. The [associate licensed counselor's] progress toward licensure must be assessed every six months. If the [associate licensed counselor] has not reached 600 hours of supervised time toward licensure by the six-month assessment, 1,200 hours by the 12-month assessment, or achieved licensure by the 18-month assessment, the [associate licensed counselor] must no longer be considered or counted as an [qualified mental-health professional]. At all times, no more than 10 % of [qualified mental-health professionals]can be [associate licensed counselors] working towards their licensure as [licensed professional counselors]. *See id.* at § 2.2.3.2.5.

- All activity technicians to work two shifts per day during the week and at least one shift on weekends, *id.* at § 2.2.3.2.6.

- "ADOC and its mental-health vendor may substitute [qualified mental-health professionals] for psychologists on a facility-by-facility basis, provided that the total number of [qualified mental-health professionals] and psychologists is equal to or greater than the number would be if applying the consultants' ratios." *Id.* at § 2.2.3.2.7.

- "Implementation of the mental-health staffing ratios must be reviewed by appropriately qualified experts agreed upon by the parties or selected by the EMT, with input and participation of the EMT as it deems appropriate.  Upon completion of such review, the experts will make recommendations, if necessary, for revising those staffing ratios.  The recommendations will be provided to the EMT and to the Parties.  The EMT will receive input from the Parties and will determine whether and to what extent the experts' recommendations are to be implemented." *Id.* at § 2.2.2.2.


The defendants propose that, because of the progress they have already made, no remedial relief is necessary--including the relief that the court has already ordered--and that "[a]ny oversight of mental-health staffing through reevaluation of mental-health staffing, reporting, and monitoring must also end."  Defs.' Post-Trial Br. (Doc. 3367) at 60–64, 64.

In the alternative, they propose that ADOC's "mental-health vendor will fill the mental-health staffing positions at each ADOC major facility, by program, consistent with the mental-health staffing ratios recommended by [ADOC's consultants], within one hundred [and] twenty (120) days of the Effective Date [of the court's Phase 2A omnibus remedial order]" and that "[b]eginning one (1) year from the initiation of monitoring, the EMT shall review the assigned mental-health staffing ratios for the ADOC major facilities under monitoring ... and make recommendations, if necessary, for revising those staffing ratios." *Id.* at 60, 64–65.

Finally, both parties propose that ADOC shall continue to submit quarterly mental-health staffing reports to the court, and monthly reports to the plaintiffs, as required by the Phase 2A Order and Injunction on Mental-Health Understaffing. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at

§§ 15.1-15.2; Defs.' Proposed Phase 2A Remedial Order
(Doc. 3215) at §§ 2.2.2-2.2.3.


### b.  The Court's Ordered Relief

The court will order, as both sides propose, that
ADOC must maintain levels of mental-health staffing
consistent with or greater than those called for by its
consultants' staffing ratios.  To ensure that the ratios
are accurate, the court will order, as the defendants
propose, that the EMT must review the ratios beginning
one year from the initiation of monitoring and, if
necessary, make recommendations for revising them.[6]  In
reviewing ADOC's compliance with the staffing ratios, the
court notes that the EMT may allow ADOC to substitute
qualified mental-health professionals for psychologists,

---

6. The court does not order, as the plaintiffs
propose, that "[i]mplementation of the mental-health
stiffing ratios must be reviewed by appropriately
qualified experts agreed upon by the parties or selected
by the EMT."  Pls.' Post-Trial Br. (Doc. 3370 at 74).
The monitoring team's familiarity with ADOC's
mental-healthcare system will better position it to
evaluate the staffing ratios than any outside expert.

and associate licensed counselors for qualified
mental-health professionals, subject to the conditions
that the plaintiffs propose.[7]   The court credits Dr.
Burns's testimony that these substitutions will not

_____

7. ADOC's consultants explained that they intended
the term "qualified mental-health professional," or QMHP,
to refer to professionals who are "appropriately licensed
to practice (assess for the presence of mental illness,
evaluate for the risk of suicide, provide therapy)
independently with no supervision required," but not to
"associate licensed counselor[s], licensed bachelor[s]
of social work, [or] licensed marriage and family
therapist[s]." *See* Recommended Staffing Ratios (Doc.
2385-1) at 3.   They further explained that "[t]he
requirements for QMHPs [would be] generally the same as
for psychologists," *id.* at 12, that QMHPs in the
restrictive housing units would "provide one 90-minute
therapy group" per day, *id.* at 11, and that QMHPs in the
SUs would provide "structured therapeutic activity," *id.*
at 13.

The parties disagreed as to the term's precise
meaning, with the defendants proposing to define the term
differently depending on whether it was used in the
staffing ratios or in their proposed remedial provisions.
Thus, the court was confronted with three different
definitions--one from the plaintiffs, and two from the
defendants.   Much confusion ensued.

For now, suffice it to say that the court assumes
that the EMT, in monitoring ADOC's compliance with the
staffing ratios, will count as qualified mental-health
professionals only those professionals who are qualified
to provide therapy.

34

hamper the provision of care. *See* June 4, 2021 R.D. Trial Tr. at 48-51.

The court will also order that ADOC must achieve the staffing levels set forth in the staffing matrix previously approved by the court by June 1, 2025, *see* Phase 2A Order and Injunction on Mental-Health Staffing Remedy (Doc. 2688), subject to any subsequent modifications. The court orders this relief because, although in some of its facilities ADOC has, according to the staffing ratios, enough mental-health staff to serve its current inmate population, the evidence presented at the omnibus remedial hearings indicates that it will need more when intake returns to pre-pandemic levels, and that it may well need more currently, given its lack of correctional staff.

Finally, in order to provide the defendants with as much flexibility as possible while still providing a meaningful opportunity for oversight, the court will order ADOC to work with the EMT to develop report formats for mental-health staffing, and to submit reports to the

court and the EMT on at least a quarterly basis.  However,
given the paramount importance of adequate mental-health
staffing to remedying the violations found in the
liability opinion, the court cannot allow ADOC to put
oversight on hold as it reformulates its reports.
Accordingly, until ADOC and the EMT have finalized a new
report format or else concluded that the existing report
format is adequate, ADOC shall continue providing
mental-health staffing reports as required by the Phase
2A Order and Injunction on Mental-Health Understaffing
(Doc. 2301 and Doc. 2301-1).

The court declines to adopt the majority of the
plaintiffs' proposed provisions because it does not find
them necessary on the basis of the current record.  There
is no evidence, for instance, that the staffing ratios
fail to account for absences due to vacation or sick
leave; that the CRNPs currently working as mental-health
staff are not certified to work in psychiatry; that the
positions of Clinical Director of Psychiatry, Director
of Mental-Health Services, Northern Regional

Psychologist, Central Regional Psychologist, Southern Regional Psychologist, and Ombudsman are not currently filled; or that there are not two full-time-equivalent qualified mental-health professionals at each treatment hub.  That said, the court takes seriously the concerns that motivate the plaintiffs' proposals--particularly the concern that there must be sufficient qualified mental-health professionals at each treatment hub to perform mental-health evaluations for all inmates who need them, and the concern that there must be sufficient activity technicians in each facility to facilitate the provision of out-of-cell time--and trusts that should they prove prescient, the EMT will bring the issue to its attention.

### c.  PLRA Findings

The court finds it necessary to order ADOC to maintain levels of mental-health staffing consistent with or greater than those called for by its consultants' staffing ratios because those ratios indicate the minimum

number of staff required to treat any given inmate
population.  While ADOC has provided mental-health
staffing at the levels called for by the ratios in five
of its 15 facilities, its limited progress does not
obviate the need for relief, especially because its lack
of correctional staff has prevented its mental-health
staff from treating inmates as efficiently as ADOC's
consultants assumed.

It is not enough, however, that ADOC maintain
sufficient staff to treat its current, abnormally low
population; it must also take steps to prepare for the
increase in its inmate population that will occur when
intake resumes to pre-pandemic levels.  Therefore, the
court finds it necessary to order ADOC to continue to
work towards providing mental-health staffing at levels
consistent with the staffing matrix, which the parties
developed as an estimate of ADOC's long-term
mental-health staffing needs.

Finally, the court finds it necessary to order ADOC
to submit mental-health staffing reports on at least a

quarterly basis so that the court and the EMT can effectively monitor its progress, and reduce the relief ordered today as appropriate.

Each of these provisions is also narrowly tailored and minimally intrusive. While ADOC must comply with the staffing ratios, the court affords it as much leeway as possible in making hiring decisions by allowing it to substitute qualified mental-health professionals for psychologists and associate licensed counselors for qualified mental-health professionals, as the plaintiffs propose. And while ADOC must work towards complying with the staffing matrix, it need not achieve compliance immediately. Finally, while the court requires ADOC to continue to submit quarterly mental-health staffing reports, it allows it the opportunity to work with the EMT to modify the format of those reports.

## C.   Restrictive Housing

ADOC's use of restrictive housing remains seriously problematic. The department has failed to define clearly

**39**

the "exceptional circumstances" that, as its own policies require, must exist if an inmate with a serious mental illness is to be kept in restrictive housing. It thereby keeps inmates with serious mental illnesses in segregation under any circumstances it sees fit. Moreover, ADOC lacks a functioning process for identifying inmates as contraindicated for restrictive housing, and even when it does successfully identify signs of contraindication, it fails to take them into account when deciding whether to place inmates in restrictive housing. Then, once inmates are in segregation, it fails to provide sufficient out-of-cell time and does not conduct routine mental-health rounds, security checks, or periodic mental-health assessments as required by court order and internal policy. For all of these reasons, inmates in ADOC's restrictive housing units currently face an unacceptably high risk of decompensation, self-harm, and suicide.

## 1. Exceptional Circumstances

The concept of so-called "exceptional" or "extenuating" circumstances appears at various points in the parties' proposals and in the provisions adopted by the court today. Most importantly, it describes the circumstances in which an individual may be placed in segregation directly from suicide watch or despite a clinical contraindication for restrictive housing placement, including a serious mental illness. Beyond the definition of exceptional circumstances, there are further questions as to how long a person may remain in segregation when exceptional circumstances permit such placement and what conditions of confinement are required during that placement; those issues will be discussed below.

a.  The Parties' Proposed Provisions

The parties' final proposals for the definition of exceptional circumstances are as follows:

*Plaintiffs*: "'Exceptional Circumstance' refers to a circumstance in which ADOC is unable to provide an

appropriate alternative placement to restrictive housing
(e.g., an SLU), due to a lack of bed space, for a prisoner
with an SMI who needs to be placed in a closed cell for
disciplinary, investigative, or preventative reasons,
and whose placement in general population would create
an unacceptable risk to the safety of any person." Pls.'
Updated Proposed Omnibus Remedial Order (Doc. 3342) at
§ 1.9.

*Defendants*: "'Extenuating circumstance(s)' means,
as an exception to the general rule disfavoring the
placement of an inmate with a diagnosed SMI in
restrictive housing, a situation where: (a) a safety or
security issue exists preventing placement of the inmate
in alternative housing (such as a SU, RTU, or SLU); or
(b) a non-safety or non-security issue exists and
transfer or transportation to alternative housing (such
as a SU, RTU, or SLU) is temporarily unavailable.
Examples of safety and security issues include an
inmate's known or unknown enemies in alternative housing
or the inmate's creation of a dangerous environment (to

**42**

the inmate, other inmates, and/or staff) by his or her
presence in alternative housing.  An inmate placed in a
[restrictive housing unit] for safety and security issues
for seventy-two (72) hours or longer will be offered at
least three (3) hours of out-of-cell time per day (which
may be congregate out-of-cell time) while he or she
remains in a [restrictive housing unit].  An inmate
placed in a [restrictive housing unit] for non-safety or
non-security issues should be removed from the
[restrictive housing unit] within seventy-two (72)
hours."  Defs.' Revised Definition of "Extenuating
Circumstances" (Doc. 3314-1) at 2.

Both parties propose that inmates with serious mental
illnesses may not be placed in restrictive housing absent
an exceptional circumstance, *see* Pls.' Updated Proposed
Omnibus Remedial Order (Doc. 3342) at § 12.2.1; Defs.'
Proposed Phase 2A Remedial Order (Doc. 3215) at § 12.2,
and the plaintiffs offer the following additional
provisions:

43

- **"When a prisoner with an SMI is placed in [a restrictive housing unit] due to an Exceptional Circumstance, the person must be transferred to an SLU, or to a mental health inpatient bed (RTU or SU) if clinically indicated, within five (5) calendar days."**  *Id.* at § 12.2.2.

- **"If a prisoner has an SMI and the need for placement in restrictive housing arises, but no Exceptional Circumstance exists, the prisoner must remain out of restrictive housing or be moved to Mental Health Observation in a crisis cell until transport can be arranged to an SLU, or to a mental health inpatient bed (RTU or SU) if clinically indicated.   This transport must occur within five (5) calendar days."**  *Id*. at § 12.2.3.

### b.   The Court's Ordered Relief

The court will adopt the defendants' proposed definition of exceptional circumstances, subject to certain modifications, and will order, as both parties propose, that inmates with a serious mental illness may not be placed in segregation unless an exceptional circumstance applies.

The court reaches this conclusion after considerable discussion with the parties and with defense expert Dr. Metzner, during which it became clear that both parties' proposed definitions would yield identical results in

**44**

most instances.  When a diversionary bed is available to the inmate at issue--that is, when there is a bed free, when immediate transportation to that bed is possible, and when placing the inmate in that diversionary unit would not present a safety or security risk--both parties' definitions would require the prisoner to be diverted from segregation.  Alternatively, when no safe diversionary placement is readily available and the inmate presents a safety or security risk in his or her current housing, both parties would find that exceptional circumstances exist permitting temporary placement in segregation.

The main point of difference between the definitions would arise when no diversionary placement is available but it is safe to leave the inmate in their current housing—for example, when an inmate has enemies in the only diversionary unit with an available bed but could stay in general population without safety or security risk.  In that situation, the plaintiffs' proposal would have the inmate remain in place until a different

diversionary bed became available, while the defendants'
proposal would permit ADOC to place the inmate in
restrictive housing during that time.  The reason for
this disagreement, in Dr. Metzner's view, was the need
for "accountability" for prisoners' misconduct.  July 2,
2021, R.D. Trial Tr. at 5-9.  As Metzner put it, "I don't
think it's acceptable to say, okay.  We know you did a
rule violation.  You just stay in your normal housing
until we can get you to alternative housing.  That's a
free pass."  *Id.* at 8.

An additional distinction is that the defendants'
definition, unlike the plaintiffs', includes what is in
effect an order:  It requires that all segregation
placements not caused by safety or security issues--for
instance, placements resulting from the lack of
immediately available transportation to a diversionary
unit--be limited to 72 hours.  *See* Defs.' Revised
Definition of "Extenuating Circumstances" (Doc. 3314-1)
at 2.  Furthermore, ADOC would have to provide three
hours of out-of-cell time per day to any inmate placed

in segregation for safety- or security-related issues who remained there longer than 72 hours, in effect transforming the conditions of confinement to non-segregation. *See id.* Dr. Metzner testified that the rationale for these limitations was that he believes 72 hours is the amount of time that a person with serious mental illness can remain in segregation conditions without suffering serious psychological harm, although he also testified that inmates who are otherwise clinically contraindicated for segregation should not be placed there even "for one minute." July 1, 2021, R.D. Trial Tr. at 170-71.

It is difficult to square Dr. Metzner's testimony that inmates with serious mental illness are not harmed by segregation placements up to 72 hours with the circumstances surrounding the death of Casey Murphree, who had a serious mental illness and killed himself within a day of his placement in restrictive housing. The court also notes that plaintiffs' expert Eldon Vail testified that the accountability that Metzner described

**47**

would become less important as correctional staff received more training. As he explained, "officers want to see people held accountable for bad behavior," and "[i]f they don't understand what drives that bad behavior in the case of someone who is mentally ill," they may resent diversionary measures and "feel like people aren't being held accountable. But the more they understand what goes on in treatment, which is accountability in some ways at a level that is far more powerful than putting someone in segregation, then they're going [to] ... have a better understanding of what the range of their job has now become." June 1, 2021, R.D. Trial Tr. at 35-36.

Still, the court takes seriously Dr. Metzner's concern about ensuring accountability for misconduct. As such, the court will generally adopt the defendants' proposal, including the 72-hour time limit for placements unrelated to safety concerns and the requirement to offer at least three hours of out-of-cell time to any inmate to whom safety- or security-related exceptional

**48**

circumstances apply who remains in restrictive housing longer than 72 hours.   While this does not place a specific outer limit on the amount of time that a prisoner may stay in segregation under exceptional circumstances, the duration will of course be limited by the nature of the circumstance itself—once the exceptional circumstance is resolved, there is no further justification for keeping the inmate in segregation.

In addition, the court will require significant documentation of the out-of-cell time offered to prisoners who remain in restrictive housing longer than 72 hours under exceptional circumstances.   Every week, ADOC will be required to file with the court and the monitoring team individual reports on each prisoner who has been in restrictive housing for longer than 72 hours under exceptional circumstances during that week.   These individual reports should indicate the amount of out-of-cell time offered to the prisoner each day, the nature of the out-of-cell time (i.e., exercise, group therapy, etc.), the exceptional circumstance justifying

**49**

the prisoner's continued segregation placement, and the date by which ADOC expects that exceptional circumstance to be resolved.  The court frankly has serious doubts about ADOC's ability to offer the three hours of daily out-of-cell time required by the defendants' proposal given its present level of correctional understaffing, as ADOC is currently unable to consistently offer even the five hours of weekly out-of-cell required for all inmates in segregation.  Close observation of this requirement is necessary to ensure that it does not become—like many of ADOC's existing obligations to inmates it houses in segregation—a right enjoyed on paper but not in practice.

The court does not adopt the plaintiffs' proposal that, "If a prisoner has an SMI and the need for placement in restrictive housing arises, but no Exceptional Circumstance exists, the prisoner must remain out of restrictive housing or be moved to Mental-health Observation in a crisis cell," *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 12.2.3, because

it is unnecessary in light of the court's present order that inmates with serious mental illnesses must remain out of restrictive housing absent an exceptional circumstance.

The court also does not adopt the plaintiffs' proposal that seriously mentally ill prisoners who are placed in restrictive housing due to an exceptional circumstance must be transferred to an SLU within five calendar days, because it is made largely redundant by the defendants' proposed definition of "exceptional circumstances." Although the defendants' definition allows seriously mentally ill prisoners who are placed in restrictive housing for exceptional circumstances related to safety to stay there for longer than five days, it also requires those prisoners to receive at least three hours of out-of-cell time per day—an amount of time that, according to Mr. Vail, alleviates the risk of decompensation significantly. *See* May 28, 2021, R.D. Trial Tr. at 24. Indeed, Vail testified that, when inmates receive more than two hours of out-of-cell time

51

per day, they are not functionally in segregation.  *See id.* at 18–19.

### c.  PLRA Findings

For all of the reasons discussed above, including ADOC's continued practice of transferring inmates from suicide watch to segregation and placing inmates in segregation when they are clinically contraindicated for such placement due to serious mental illness or otherwise, as well as the role this practice repeatedly played in recent suicides in ADOC facilities, the court finds that this definition and provision are necessary to correct the segregation violations found by the court in its liability opinion.  Because the defendants' definition of "exceptional circumstances" allows segregation placements for the maximum amount of time that the defendants' expert testified that he believed is safe, the court finds that it is narrowly tailored to correcting these violations.  And because the definition and provision allow ADOC to continue placing inmates in

segregation for reasons of accountability—again, the only point of disagreement between the parties with respect to the definition of exceptional circumstances—the court finds that the remedy it adopts is the least intrusive means of correcting the violations.  Finally, because of the court's grave concerns about whether ADOC can in fact offer the three hours of daily out-of-cell time the defendants propose given the severity of its correctional understaffing, the court finds that the documentation requirement it imposes is necessary to correct the segregation violations, narrowly tailored to correcting those violations, and the least intrusive means of doing so.

### 2.  Screening for Serious Mental Illnesses

#### a. The Parties' Proposed Provisions

With respect to ADOC's failure to identify inmates with serious mental illnesses and divert them from restrictive housing, both sides propose that prior to placement in a restrictive housing unit, each inmate must

be screened by an RN or LPN who has been trained in the
screening process, and that the screening must assess
whether the inmate has been flagged as seriously mentally
ill; whether the inmate is at imminent risk of suicide
or serious self-harm; whether the inmate exhibits
debilitating symptoms of a serious mental illness; and
whether the inmate requires emergency medical care. *See*
Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342)
at §§ 12.1.1; Defs.' Proposed Phase 2A Remedial Order
(Doc. 3215) at §§ 12.1.1–12.1.2.

The plaintiffs propose, additionally, that any LPN
conducting screening must be supervised by an RN, *see*
Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342)
at § 12.1.1; and that mental-health staff must have the
authority to veto any inmate's placement in a residential
housing unit if such placement is contraindicated by the
inmate's screening, *id.* at § 12.1.3.

The parties agree that the results of the screening
must be used to determine whether the inmate can be placed
into restrictive housing or must be diverted to another

location, and whether the inmate requires a medical and/or mental-health referral.  *See id.* at § 12.1.2; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 12.1.3.

They agree, too, that there should be some mechanism for the removal of inmates who have become contraindicated for restrictive housing since their placement there, or who were put there by mistake.  To that end, they propose the following provisions:

*Plaintiffs*:

- "Mental health staff have the authority to have any prisoner removed from a [restrictive housing unit] if it is determined that continued placement is contraindicated as evidenced by changes in the prisoner's mental state and functioning."  Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 12.3.1.

- "ADOC will affirmatively inform psychiatrists, psychologists, licensed mental health professionals, certified registered nurse practitioners, and registered nurses, in a manner that is documented, (1) that they have both the authority AND the obligation to inform corrections when they have determined that a prisoner's likelihood of decompensation requires a transfer to an RTU, SLU, or SU; and (2) that such a determination is not merely giving advice to corrections, but that it will

55

trump any decision to the contrary and will be carried out promptly." *Id.* at § 12.3.2.

- "If a prisoner in a [restrictive housing unit] has a newly diagnosed SMI or a [qualified mental-health professional] determines that continued placement in the [restrictive housing unit] is contraindicated, that prisoner must be removed from the [restrictive housing unit] within 72 hours.  Removal must occur sooner if clinically indicated.  The prisoner must be placed into housing appropriate to their mental health needs (i.e., RTU, SU, SLU).  Placement of a prisoner with an SMI into an SLU must take priority over a prisoner without an SMI." *Id.* at § 12.3.3.

*Defendants*:

- "Mental-health staff may advise correctional staff to remove an inmate from the [restrictive housing unit] if mental-health staff determines that continued placement of the inmate in restrictive housing is contraindicated as evidenced by changes in the inmate's mental state and functioning.  In this situation, the inmate must be removed from the [restrictive housing unit] within seventy-two (72) or sooner if a psychiatrist, psychologist, CRNP, or counselor determines the need for removal of the inmate from the [restrictive housing unit] is urgent. An inmate removed by mental-health staff from the [restrictive housing unit] as a result of decompensation or contraindication will be transferred to a mental-health setting appropriate for the level of mental-health services required by the inmate." Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 12.5.7.

56

### b.  The Court's Ordered Relief

The court will order that, prior to placement in a restrictive housing unit, inmates must be screened by an appropriately trained RN, or an LPN under an appropriately trained RN's supervision, and that the screening must assess the topics proposed by the parties. The court will also order that the results of the screening must be used to determine whether the inmate should be placed in restrictive housing and whether the inmate requires a medical and/or mental-health referral, and that an inmate flagged by mental-health staff as contraindicated for restrictive housing must not be placed in restrictive housing absent documented exceptional circumstances.  Finally, the court will adopt the defendants' proposed provision regarding the removal of inmates from the restrictive housing unit, with the caveat that ADOC need not remove an inmate from restrictive housing if an exceptional circumstance exists.

57

The court orders that inmates must be screened, and
that the screening must assess certain topics, because
it is seriously concerned by the evidence that screenings
continue to miss signs of contraindication.  Granted,
ADOC has made progress in ensuring that inmates receive
screenings prior to being placed in restrictive housing
units.  Given the heightened importance of ensuring that
inmates with contraindications are not inadvertently
placed in restrictive housing, however, and the fact that
ADOC's progress, while encouraging, is a recent
development, the court finds that it must require ADOC
to conduct an adequate screening of each inmate entering
restrictive housing.  The court agrees that the screening
must cover the topics proposed by the parties, because,
according to Dr. Burns's uncontradicted testimony, those
topics must be covered if the screening is be effective.
*See* June 3, 2021, R.D. Trial Tr. at 171-73.  And in light
of the evidence that LPNs have been unable to conduct
adequate screenings of prisoners entering the general
population, where the stakes are much lower, the court

agrees with the plaintiffs that LPNs may not conduct screenings of prisoners entering segregation unless supervised.  If ADOC sustains its progress with respect to screenings, however, the court may revisit this order at a later time.

The court orders that the results of the screening must be used to determine whether the inmate should be placed in restrictive housing and whether the inmate requires a medical and/or mental-health referral, in light of the evidence, described in the opinion on changed circumstances, that ADOC staff routinely ignore the results of screenings and place inmates in segregation despite documented contraindications.  The screenings are intended to keep contraindicated inmates out of restrictive housing, and to ensure that mentally ill inmates receive the care that they need.  They can fulfill neither purpose if they are ignored.

Out of deference to ADOC, however, the court will not grant mental-health staff veto power over decisions to place inmates in restrictive housing.  Rather, it will

order that an inmate flagged by mental-health staff as contraindicated for restrictive housing may nevertheless be placed in restrictive housing, but only if correctional staff determine that an exceptional circumstance exists and document their reasons for reaching that decision. The court orders that such decisions be documented because, given the evidence that correctional staff routinely ignore the results of screenings and the recommendations of mental-health staff, the court finds that it must impose some mechanism for the EMT to monitor decisions by correctional staff to place inmates flagged as contraindicated in restrictive housing.

The court adopts the defendants' proposed provision regarding the removal of inmates from the restrictive housing unit because it agrees with both parties that, given the heightened risk of decompensation faced by inmates in restrictive housing and the imperfections inherent in even the best screening systems, there must be some mechanism for removing inmates from restrictive

housing due to decompensation or an error in the initial screening process.  Again, however, in an effort to provide ADOC with maximum flexibility, it will not provide mental-health staff with complete authority to determine the facilities in which inmates may be housed, but will instead order that ADOC may keep an inmate in restrictive housing over the objections of mental-health staff provided that an exceptional circumstance exists. For the same reasons as before, that decision, and the reasons for it, must be documented.

Finally, the court does not adopt the plaintiffs' proposal that ADOC must affirmatively inform its mental-health professionals that they are required to inform corrections when they determine that a prisoner should be removed from restrictive housing, because there is little evidence that ADOC's mental-health professionals are failing to flag individuals as contraindicated for restrictive housing because they do not understand that they have a duty to do so.  Rather, the evidence demonstrates that the ADOC's mental-health

professionals are failing to flag individuals as contraindicated for restrictive housing because they do not conduct regular follow-up examinations. If the monitoring team finds that mental-health staff fail to flag inmates as contraindicated for restrictive housing because they do not know that they are supposed to, however, the court may revisit the issue.

### c.   PLRA Findings

The court finds these provisions necessary for the reasons given above: Despite ADOC's progress in ensuring that inmates receive mental-health screening before entering restrictive housing, screenings continue to miss signs of contraindication, and their results are routinely ignored. To remedy these failures, and to account for the inevitable risk of decompensation in restrictive housing, the court finds that it must (1) order that each inmate receive a comprehensive screening that is performed by a competent mental-health professional, (2) order that correctional staff use the

results of the screening to determine whether the inmate should be placed in restrictive housing and whether the inmate requires a medical and/or mental-health referral, and (3) order that mental-health staff may recommend the removal of inmates from restrictive housing who were put there by mistake or who have decompensated since their initial screening.

These provisions are narrowly tailored, because each is designed to address only ADOC's failure to screen contraindicated inmates from restrictive housing, and to account for the risk of decompensation. They are also minimally intrusive. While the court requires that each screening address certain topics, it finds that, in light of Dr. Burns's uncontroverted testimony that screenings must address those topics, and the extreme risk that restrictive housing poses to seriously mentally ill inmates, it can order no less. And while the court orders that ADOC must use the results of the screening to determine whether inmates may be placed in restrictive housing, and that it must generally follow

recommendations by mental-health staff to remove inmates from restrictive housing, it allows ADOC the flexibility to override recommendations by mental-health staff so long as it can document the existence of an exceptional circumstance.

### 3.   Mental-Health Rounds

#### a.   The Parties' Proposed Provisions

Both sides propose that mental-health rounds must be conducted by a qualified mental-health professional in each restrictive housing unit at least weekly, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 12.5.1; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 12.4.1, and that the rounds must include the following:

- A discussion with the post officer(s) concerning any behavior changes of an inmate in the restrictive housing unit;

  A walk through the restrictive housing unit, stopping at each occupied cell to make visual contact with the inmate inside the cell;

- **Attempts to verbally communicate with the inmate, including a brief inquiry into how the inmate is doing and whether the inmate has mental-health needs or a desire to speak with mental-health staff privately; and**

- **A brief assessment of the inmate's hygiene, behavior, affect, physical condition, and the condition of his or her cell (such as cleanliness, trash, food, bodily fluids, smoke, etc.).**

*See* **Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at §§ 12.5.3, 12.5.3.2-12.5.3.5; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 12.4.2.  The plaintiffs would require, additionally, that the rounds must include a review of duty post logs and segregation unit record sheets for information about prisoners' participation in recreation, showers, meal consumption and sleep patterns,** *see* **Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 12.5.3.1, and that prior to conducting mental-health rounds independently, new MHPs must shadow a senior MHP, psychiatrist, psychologist, or CRNP for three  mental-health rounds in the restrictive housing unit,** *see id.* **at § 12.5.2, and receive certain training,** *see id.* **at § 13.4.**

Both sides also agree that the rounds must be documented, and propose the following provisions:

*Plaintiffs*:

- "Documentation of Mental Health rounds requires notation of the date and time of entry and exit of the professional conducting the mental health round on the [restrictive housing unit] Correctional Officer Duty Post Log.  Mental health professionals must also log a brief notation about each inmate in the [restrictive housing unit] on the Mental Health Rounds Form."  *Id.* at § 12.5.4.

- "If there has been any significant change in the prisoner's condition or additional mental health follow-up is indicated, a brief progress note will also be entered in the specific prisoner's medical record.  The mental health rounds forms must be chronologically filed and maintained by the mental health manager."  *Id.* at § 12.5.5.

*Defendants*:

- "A mental-health round will be documented on ADOC Form MH-038, *Mental-Health Rounds Log* (as amended), which will contain a notation about any mental-health needs expressed by an inmate in the [restrictive housing unit] or concerns identified by the [qualified mental-health professional] as to any inmate during the mental-health round.  Each *Mental Health Rounds Log Form* completed during a mental-health round will be chronologically filed and maintained by the mental-health manager or other designated mental-health staff member."  Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 12.4.3.

### b.   The Court's Ordered Relief

The court will order that mental-health rounds must be conducted by a qualified mental-health professional in each restrictive housing unit at least weekly, and that they should generally include the kinds of interactions, inquiries, and assessments that both sides propose.  It will also order, as the plaintiffs propose, that the rounds should include a review of duty post logs and segregation unit record sheets for information about prisoners' participation in recreation, showers, meal consumption and sleep patterns.  Finally, the court will order that the rounds must be accurately and contemporaneously documented, and that that documentation must be filed chronologically and maintained by the mental-health manager or other designated mental-health staff member.  Should ADOC continue its progress in conducting mental-health rounds, the court may revisit whether this relief is necessary.

67

The court orders that mental-health rounds must be conducted at least weekly in light of the heightened need for rounds in ADOC's understaffed facilities, and the fact that ADOC has yet to sustain its recent progress in conducting rounds. The rounds are an essential mechanism for ensuring that inmates receive the care they need in a timely fashion, and for identifying inmates who are deteriorating in segregation. *See* June 3, 2021, R.D. Trial Tr. at 176-78 (testimony of Dr. Burns); June 30, 2021, R.D. Trial Tr. at 68-69 (testimony of Dr. Metzner). If conducted properly, they can allow ADOC to prevent crises before they occur, and thereby allocate its resources more efficiently.

Although ADOC has made encouraging progress in ensuring that rounds occur regularly, it has yet to sustain that progress for any significant time. Indeed, until quite recently, its provision of mental-health rounds was seriously deficient. When Charles Braggs killed himself in July 2020, for instance, two months had passes since ADOC had conducted mental-health rounds in

St. Clair. *See* Pls.' Ex. 4119 at 2. The reason given
was "Lack of Security Staff." *Id.* Given the expectation
that correctional understaffing will continue to inhibit
the performance of mental-health duties in this area as
in others, the court finds that it must order the
performance of these rounds to ensure that they will, in
fact, be conducted.

The court orders that the rounds *should generally*
include the kinds of interactions, inquiries, and
assessments that both sides propose, as well as a review
of duty post logs and segregation unit record sheets for
information about prisoners' participation in
recreation, showers, meal consumption and sleep patterns,
in light of Dr. Metzner's testimony that these measures
are generally necessary to identify and address an
inmate's mental-health needs and to gauge effectively
whether an inmate's mental-health has deteriorated. *See*
June 30, 2021, R.D. Trial Tr. at 68-69. It does not
order that the rounds *must* entail these kinds of
interactions, inquiries, and assessments, because it

**69**

credits Dr. Metzner's testimony that the appropriate nature of the interactions involved in the mental-health rounds may vary according to how well the mental-health professional conducting the rounds knows the prisoners she is monitoring, and how familiar the prisoners are with the process. *See id*. at 68.  Dr. Metzner explained, for instance, that, if an inmate who has lived in the segregation unit for some time flashes a thumbs up sign, and the mental-health professional conducting the rounds knows that to be a sign that the inmate does not need assistance, the mental-health professional need not attempt to communicate verbally with the inmate. *See id.* He also explained, however, that a mental-health round must consist of "more than just walking by the cells and getting the thumbs up."  July 2, 2021 R.D. Trial Tr. at 27.  That is, if the mental-health provider conducting the rounds decides to forego verbal communication with an inmate, she cannot also forego discussions with post officers, a review of the post log, and observations of

the inmate's hygiene, behavior, affect, physical condition.

Finally, the court orders that mental-health rounds must be documented accurately and contemporaneously, and that that documentation be filed chronologically, in order to provide some means of monitoring ADOC's progress, and to ensure that ADOC is able to track inmates' needs and mental-health statuses over time. Documentation is particularly appropriate in light of its past practice of conducting rounds that did not involve stops at each cell. *See* June 3, 2021 Trial Tr. at 183 (testimony of Dr. Burns). By tracking the time spent on each round, ADOC will provide the EMT with a means of ensuring that these "drive by" rounds no longer occur.

The court does not order, as the plaintiffs propose, that, "[p]rior to conducting mental health rounds independently, new MHPs must shadow a senior MHP, psychiatrist, psychologist, or CRNP" for three rounds, Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 12.5.2, or that they receive other training related

specifically to the conduct of rounds, *see id.* at § 13.4, because there is no evidence in the record to suggest that the mental-health professionals who conduct mental-health rounds are insufficiently trained. It also declines to adopt the plaintiffs' proposal that, "[i]f there has been any significant change in the prisoner's condition or additional mental health follow-up is indicated, a brief progress note will also be entered in the specific prisoner's medical record," because it is rendered redundant by the court's order that a progress note be created after every significant clinical encounter.

### c. PLRA Findings

The court finds the provisions that it orders necessary because, as explained above, it is particularly important that ADOC conducts regular mental-health rounds, especially while its restrictive housing units remain understaffed, so that it can identify inmates who are decompensating and allocate its scare resources to

avert crises before they occur.  Although ADOC has made recent progress in conducting rounds, it has yet to sustain its progress for long enough to obviate the need for monitoring.  Additionally, the rounds generally must cover the topics proposed by both parties if they are to be consistently effective, and they must be documented so that the EMT can monitor ADOC's progress, and to ensure that ADOC is able to track inmates' mental-health needs and mental-health statuses over time.

These provisions are also narrowly tailored and minimally intrusive.  While the court orders that the rounds should generally entail the kinds of interactions, inquiries, and assessments proposed by both sides, it allows ADOC the flexibility to forego verbal interactions when appropriate, and it does not require that the mental-health professionals conducting the rounds be trained in any particular way.

### 4.  Mental-Health Assessments

#### a.  The Parties' Proposed Provisions

73

With respect to ADOC's provision of mental-health assessments, both sides propose that inmates must receive a mental-health assessment by a psychiatrist, psychologist, CRNP, or counselor within seven days of placement in a restrictive housing unit, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 12.6.1; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 12.5.1; that the assessment must be documented on ADOC's Mental-Health Assessment/Report form, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 12.6.1; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 12.5.4; and that the assessments must include a review or examination of the following topics:

- The inmate's past response to restrictive housing;
- The inmate's general appearance or behavior;
- Whether the inmate has a present suicidal ideation;
- Whether the inmate has a history of suicidal behavior;
- Whether the inmate is presently prescribed psychotropic medication;
- Whether the inmate has a current mental-health complaint;
- Whether the inmate is currently receiving treatment for a diagnosed mental illness;

74

- **Whether the inmate has a history of ininmate and outpatient psychiatric treatment;**
- **Whether the inmate has a history of treatment for substance abuse;**
- **Whether the inmate has a history of abuse or trauma; and**
- **Whether the inmate is presently exhibiting symptoms of psychosis, depression, anxiety, or aggression.**

*See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at §§ 12.6.2-12.6.3; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 12.5.5.  Both sides also propose that inmates coded as  mental-health code A must receive additional assessments at least every 90 days, and that inmates coded as mental-health code B or C must receive additional assessments at least every 30 days. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 12.6.5; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at §§ 12.5.2-12.5.3.

The plaintiffs propose, additionally, that each assessment must include a final disposition of one of the following: "(1) No mental health referral; (2) Routine referral to mental health; (3) Emergency referral requiring assessment within an hour; or (4) Referral for

removal from segregation." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 12.6.4. The defendants, by contrast, would simply require that "the psychiatrist, psychologist, CRNP, or counselor [conducting the assessment] will consider the need for a mental-health referral and, if a mental-health referral is made, the priority of such mental-health referral (i.e., emergent, urgent, or routine)." Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 12.5.6.

The plaintiffs also propose that, "[i]f a prisoner's [restrictive housing unit] placement continues after a periodic mental health assessment, then the clinical rationale for his or her continued placement must be documented." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 12.6.6.

b.  The Court's Ordered Relief

The court will order that inmates must receive a mental-health assessment by a psychiatrist, psychologist, CRNP, or counselor within seven days of

placement in a restrictive housing unit; that inmates must receive additional, periodic assessments at intervals consistent with their mental-health codes, as the parties propose; that assessments must be adequately documented; and that they must include a review or examination of the topics that the parties propose. It will also order, as the defendants propose, that the psychiatrist, psychologist, CRNP, or counselor conducting the assessment must consider the need for a mental-health referral and, if applicable, the priority of such referral.

The court orders that ADOC must conduct periodic mental-health assessments because, as it has previously found, "periodic out-of-cell assessments are necessary not only to monitor for decompensation among those identified as mentally ill, but also to identity prisoners not on the mental-health caseload who may develop mental illness while in segregation." *Braggs*, 257 F. Supp. 3d at 1249. Although mental-health rounds fulfill a similar purpose, it is not true, as Dr. Metzner

suggested during the omnibus remedial hearings, that the mental-health assessments and mental-health rounds are duplicitous. *See* June 30, 2021 R.D. Trial Tr. at 66. Rather, as the court explained in the liability opinion, "while segregation rounds by mental-health staff are crucial for checking for signs of decompensation or crisis, they cannot replace out-of-cell clinical assessments of prisoners' mental-health status, because it is difficult to observe someone's behavior and accurately assess the prisoner's mental health through cell-front encounters." *Id.* at 1243 n.72.

Despite this finding, ADOC has persistently failed to provide periodic assessments. As explained in the court's findings on changed circumstances, Charles Braggs received only two assessments in the two years prior to his death, and Gary Campbell went for three years without receiving any. And while Dr. Burns testified that some inmates reported receiving initial mental-health assessments within seven days, *see* June 23, 2021 R.D. Trial Tr. at 208-09, spot audits in several facilities

found that inmates continue to go without initial or follow-up mental-health assessments at alarming rates, *see, e.g.*, Pls.' Ex. 3258 (Bullock, 57.41 % compliance with 30- and 90-day assessments); Pls.' Ex. 3270 (Kilby, 68.60 % compliance); Pls.' Ex. 3276 (St. Clair; 66.29 % compliance); Pls.' Ex. 3320 (Ventress, 32.08 % compliance); Pls.' Ex. 3272 (Limestone, 77.19 % compliance; noting that "[f]ollow-up of the 30/90 day assessments and treatment plans for inmates on the caseload need improvement").

The court therefore finds that it must order some relief, and it credits Dr. Burns' testimony, which accords with the recommendations of the American Correctional Association, that the topics proposed by the parties must be addressed if the assessments are to fulfill their intended purpose, and that the initial 7-day assessments and the periodic 30- or 90-day assessments proposed by both parties are necessary measures to keep inmates safe when they are initially placed in segregation and when they remain in segregation

for protracted periods of time.  *See* June 3, 2021 R.D.
Trial Tr. at 188-91 (testimony of Dr. Burns).

The court also agrees with both parties that the
mental-health assessments must include a determination
of whether the inmate requires a referral—and, if so, how
urgently—given the evidence that, when inmates do receive
referrals based on the periodic mental-health
assessments, mental-health staff often fail to follow up
on them appropriately.  A requirement that the
evaluations conclude with clear recommendations will make
it harder for mental-health staff to ignore their
findings, and easier for the EMT to monitor ADOC's
progress in putting the evaluations to good use.

The court declines, however, to order that, if ADOC
keeps a prisoner in the [restrictive housing unit] after
the prisoner has received a mental-health assessment, it
must document its clinical rationale for doing so.  Of
course, if an inmate is found to be contraindicated for
placement in restrictive housing, ADOC must document the
existence of an exceptional circumstance if it is to keep

him there.  But requiring ADOC to provide a clinical rationale for keeping inmates without contradictions in restrictive housing is not necessary to address the violations identified in the liability opinion.


### c.  PLRA Findings

The court finds these provisions necessary given the evidence that ADOC has largely failed to ensure that inmates in restrictive housing units receive periodic mental-health assessments, despite the court's previous finding that those assessments are essential for preventing decompensation and suicide, and that, when inmates do receive assessments, the results of those assessments are often ignored.  Moreover, to provide adequate protection to prisoners with mental-health needs in restrictive housing, including those who develop said needs during their time in segregation, these assessments must address the topics identified by both parties and occur at least as frequently as the parties propose.

These provisions are narrowly tailored and minimally intrusive to ensure that mental-health assessments adequately address the needs of prisoners in segregation. Although the court requires that the assessments cover certain topics and be conducted at certain intervals, it can order no less.  As Dr. Burns credibly explained, these topics must be addressed if the assessments are to fulfill their intended purpose, and the intervals represent the minimum frequencies with which inmates can safely go without receiving assessments.

### 5.  Out-Of-Cell Time

#### a.  The Parties' Proposed Provisions

With respect to ADOC's failure to provide inmates in restrictive housing units with sufficient out-of-cell time, the plaintiffs propose that all inmates in restrictive housing must have the opportunity to exercise outside of their cells for at least five hours per week, during which time they may be shackled only if ADOC can identify a specific threat to institutional safety

82

necessitating the shackling.  *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at §§ 12.7.2-12.7.2. The plaintiffs also propose that this time must be offered regardless of inclement weather, and that ADOC must document (1) all days and times that out-of-cell time is offered, (2) any prisoner's decision to refuse out-of-cell time, and (3) the specific threat to institutional safety or security necessitating any use of shackles.  *See id.*  The defendants propose no provision regarding out-of-cell time for inmates in restrictive housing.

### b.  The Court's Ordered Relief

The court will order that all inmates in restrictive housing must have the opportunity to exercise outside of their cells for at least five hours per week, and that ADOC must document all days and times that out-of-cell time is offered, and any inmate's decision to refuse out-of-cell time.  The court will also order that ADOC may refrain from offering out-of-cell time due to

83

inclement weather, but only if a safe, alternative space for inmates to exercise is unavailable.

The court orders ADOC to offer all inmates in restrictive housing at least five hours of out-of-cell time per week because, as experts for both sides testified, five hours per week is the minimum amount of out-of-cell time that must be provided to inmates in restrictive housing to prevent decompensation. *See* June 4, 2021 R.D. Trial Tr. at 179-180 (testimony of Dr. Burns); June 30, 2021 R.D. Trial Tr. at 175-76 (testimony of Dr. Metzner). It is also the minimum amount of out-of-cell time recommended by the American Correctional Association and currently required by ADOC regulations. *See* June 4, 2021 R.D. Trial Tr. at 179-180.

Despite the importance of out-of-cell time to preventing decompensation, the evidence indicates that inmates in restrictive housing scarcely receive it. As explained previously, in the six months prior to his death, Charles Braggs was offered out-of-cell time on only four occasions. This was not an isolated

**84**

occurrence; Dr. Vail testified that in reviewing the records for a total of 412 weeks of segregation time, he found only seven weeks during which an inmate received five hours of out-of-cell time.  May 27, 2021 R.D. Trial Tr. at 111-12.  The court must therefore order ADOC to comply with its own regulation.[8]

In order to provide ADOC flexibility in responding to the weather, the court does not require ADOC to offer outdoor out-of-cell time when inclement weather makes it impossible to do so safely.  But to the extent that ADOC can offer out-of-cell time in alternative, safe spaces—for instance, in a gymnasium—inclement weather will not excuse it from doing so.

---

8. During the omnibus remedial proceedings, the defendants' counsel suggested that the court may not order ADOC to provide out-of-cell time to all inmates in segregation, but "only to individuals with mental health illness."  June 30, 2021 R.D. Trial Tr. at 176.  The court rejects this argument, and directs defendants' counsel to its previous explanation of why it may order relief intended to prevented inmates who are not currently mentally-ill from becoming mentally-ill due to ADOC's failure to provide adequate care.  *See Braggs*, 367 F. Supp. 3d 1340, 1357-58 (M.D. Ala. 2019) (Thompson, J.).

Finally, because out-of-cell time is so important to preventing decompensation, and because ADOC has persistently failed to provide it, the court finds that it must order ADOC to document each time it offers out-of-cell time, so that the EMT can effectively monitor its progress.  It is also essential that each inmate's treatment team know whether that inmate has not been offered out-of-cell time or, perhaps more importantly, refused it.

The court does not order, as the plaintiffs propose, that inmates may not be shackled during out-of-cell time, because there is insufficient evidence that inmates are currently being shackled.


c.  PLRA Findings

The court finds these provisions necessary for the reasons given above:  it must order ADOC to offer inmates in restrictive housing a minimum of five hours of out-of-cell time per week because that is the minimum amount of out-of-cell time necessary to prevent

decompensation, and it must order ADOC to document its provision of out-of-cell time so that the EMT can monitor its progress, and so that treatment teams can effectively monitor inmates' mental-health.   The court also finds these provisions to be narrowly tailored and no more intrusive than necessary, because they require no more than the minimum among of out-of-cell time necessary, and allow ADOC the flexibility to not offer out-of-cell time when inclement weather makes it impossible to do so.

### 6.   Security Checks

#### a.   The Parties' Proposed Provisions

With respect to ADOC's failure to provide cell-by-cell security checks, the plaintiffs propose the following provisions:

- "ADOC must ensure that appropriate ADOC staff conduct security checks of every prisoner in restrictive housing by direct observation at least twice per hour, but no more than 40 minutes apart, on an irregular schedule. These security checks must be annotated on the duty post log.

- ADOC must ensure that such security checks are documented accurately and contemporaneously, and

that correctional supervisors regularly verify that
security checks are being conducted as required.

- The EMT will develop a process for supervisory review
  and confirmation of security checks, including
  documentation of such review and confirmation."

*See* Pls.' Updated Proposed Omnibus Remedial Order (Doc.
3342) at §§ 12.9.1-12.9.4.  The defendants propose simply
that "[a] member of the correctional staff will conduct
a security round in a [restrictive housing unit] at least
every thirty (30) minutes and document such security
round in a duty post log."  Defs.' Proposed Phase 2A
Remedial Order (Doc. 3215) at § 12.3.


### b.   The Court's Ordered Relief

The court orders that the security checks must be
conducted at least twice per hour, but no more than 40
minutes apart, in light of Mr. Vail's testimony that the
checks are most effective in preventing suicide and
self-harm when conducted on an irregular schedule.  *See*
May 27, 2021 R.D. Trial Tr. at 179.  It does not order
that the checks *must* be completed on an irregular

88

schedule, because it credits Vail's testimony that "doing them 30 minutes or twice an hour … is close enough to … a reasonable standard."  May 27, 2021 R.D. Trial Tr. at 154-155.  But it encourages ADOC to conduct the checks irregularly, and to that end ADOC will not be found in violation if it allows inmates in restrictive housing to go more than 30 minutes (but less than 40) without receiving a security check.

The court orders that the checks must be documented accurately and contemporaneously, and that correctional supervisors regularly verify that security checks are conducted as required, in light of the ample evidence that ADOC is not conducting the checks as required, and that correctional officers are pre-filling their duty logs.  ADOC's own audits reveal that security checks are scarcely conducted in a troubling number of facilities.  *See* May 27, 2021 R.D. Trial Tr. at 154-189 (testimony of plaintiffs' expert Vail, describing results of audits of Donaldson, Easterling, Holman, Limestone, and St. Clair); *see also* Pls.' Exs. 2927, 2972, 3010, 3177, 4067.  More

89

worrying still, many of ADOC's duty logs seem to have been pre-filled, and may be inaccurate. *See id.* at 178-79 (testimony of plaintiffs' expert Vail). Thus, to the extent that ADOC's audits rely on data from the duty logs, they may have overestimated the frequency with which the check are conducted. Current relief is therefore necessary, and although the court leaves it to ADOC to determine the exact means by which it will ensure that the checks are documented accurately and contemporaneously, it will trusts that the EMT will monitor ADOC's documentation and raise any concerns with the court.

The court does not order the EMT to develop a process for supervisory review and confirmation of security checks, because it has already tasked the EMT with devising procedures for monitoring ADOC's compliance with the court's orders.

c.   PLRA Findings

90

The court finds these provisions to be necessary because, as explained above, ADOC has failed to ensure that security checks are conducted at least twice per hour, or that security checks are accurately and contemporaneously documented, thereby jeopardizing the lives of inmates in every unit that functions as restrictive housing. They are also narrowly tailored and minimally intrusive. The court does not require relief that goes beyond remedying ADOC's failure to provide security checks, and it does not specify the exact means by which ADOC must ensure that the checks are documented accurately and contemporaneously.

### 7. Restrictive Housing Cells

#### a. The Parties' Proposed Provisions

In addition to the provisions discussed above, the plaintiffs also propose several provisions regarding the physical condition of cells in the restrictive housing units. These include a provision that would require ADOC to clean every restrictive housing unit within one month

of the entrance of the court's remedial order, to clean restrictive housing cells before they receive new occupants, and to provide individuals in restrictive housing cells with access to cleaning supplies to ensure that the cells are cleaned at least every two weeks, see Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 12.8.1; a provision requiring the EMT to "evaluate the condition of the [restrictive housing units] with respect to the adequacy of natural light, square footage, … the need for painting … [and] the adequacy of access to out of cell exercise space during inclement weather, ... [and to] determine what steps should be taken to correct any deficiencies they identify," id. at § 12.8.2.2; and the following provisions regarding suicide resistance:

- "Within three months of this Order, ADOC must retain a consultant to evaluate whether ADOC's restrictive housing cells qualify as anti ligature and provide sufficient visibility for adequate monitoring as well as to make recommendations for correcting any problems identified, including the existence of tie off points, inadequate visibility, and any other unreasonably dangerous condition identified in the course of the assessment.  The consultant's findings

and recommendations must be set forth in a written report completed within three months of ADOC's retention of the consultant.  ADOC must provide to the court and the plaintiffs the consultant's written report, which must include findings and recommendations regarding the existence of tie off points, inadequate visibility, and any other unreasonably dangerous conditions identified in the course of the assessment."  Id. at § 12.8.2.

• "No later than three months after preparation of the consultant's report as required above, ADOC must ensure that there adequate visibility into restrictive housing cells, that all restrictive housing cells have anti ligature fixtures, that no restrictive housing cell has an open bar door and that any unreasonably dangerous condition identified in the reports has been corrected."  Id. at § 12.8.2.1.

The defendants propose only one provision regarding the physical condition of cells in the restrictive housing units:  that within one year of the effective date, it must repair or replace any damaged restrictive housing unit cell door or window that materially inhibits the observation of any inmate.  Defs.' Proposed Omnibus Remedial Order (Doc. 3215) at § 12.6.

b.  The Court's Ordered Relief

93

The court will order ADOC to clean the cells in the restrictive housing units within three months of the effective date, to clean restrictive housing cells before they receive new occupants, and to provide individuals in restrictive housing cells with access to cleaning supplies to ensure that the cells are cleaned at least every two weeks.  It finds this relief necessary in light of its finding in the 2017 liability opinion that cells in the restrictive housing units were "often filled with the smell of burning paper and urine," and "extremely dirty with what appears to be dried excrement on the walls and floors," contributing to "a heightened risk of decompensation for mentally ill prisoners and a heightened risk of developing serious mental health needs for those who were initially healthy."  Braggs, 257 F. Supp. 3d at 1238.   There is little evidence that ADOC has improved the cleanliness of the cells since then. While the parties stipulated prior to the hearings that, "[a]ccording to Cheryl Price, ADOC's Assistant Deputy Commissioner for Operations, ADOC cleans or allows

inmates to clean [restrictive housing units] units ... [and] cleans crisis cells between inmate placements," Joint Stipulation for the Evidentiary Hearing Regarding the Phase 2A Remedial Order (Doc. 3288) at ¶ 45, the plaintiffs refused to stipulate to the accuracy of Ms. Price's assertion, see June 14, 2021, R.D. Trial Tr. at 38, and the court heard no sworn testimony from Ms. Price on this matter. Moreover, at various points during the omnibus remedial hearings the court heard testimony from high level ADOC officials that turned out not to accurately reflect conditions on the ground. It therefore cannot conclude on the basis of Ms. Price's unsupported assertion that there have been any significant changes to the cleanliness of the restrictive housing units, and it finds that it must order ADOC to take steps to ensure that the cells in the restrictive housing units are clean. However, if the EMT determines that ADOC is in compliance with this provision, the court will not hesitate to remove it.

The court also agrees with the plaintiffs that
something must be done to render cells in the restrictive
housing units suicide resistant, including by ensuring
that there is adequate visibility into the cells.  As the
court found in the liability opinion, visibility into the
cells in the restrictive housing units is lacking, and
"[m]any segregation cells have grates, sprinkler heads,
and other structures that could be used as tie off points.
Furthermore, during the facility tour, the court saw many
segregation prisoners with ropes hanging across their
cells as clothes lines."  Braggs, 257 F. Supp. 3d at
1244.  For inmates in restrictive housing, who already
face a heightened risk of decompensation, such conditions
can be deadly, especially because ADOC lacks sufficient
correctional staff to effectively monitor inmates in
segregation.  Of the twelve men who recently committed
suicide in ADOC facilities, eight did so by hanging
themselves in a cell in a restrictive housing unit.  See
May 27, 2021 R.D. Trial Tr. at 147 149 (testimony of

Eldon Vail).  At least one of those men had obscured his cell window with paper before doing so.  Id. at 150 51.

Rather than ordering ADOC to retain a consultant, however, the court will order that within six months of the effective date, ADOC must ensure that all cells in the restrictive housing units comply with the conditions set forth in the checklist developed by Lindsay M. Hayes (Doc. 3206 5).  This checklist, which the parties previously agreed to the use to ensure that cells are suicide resistant, provides for the elimination of tie off points and other structural elements that facilitate suicide attempts, as well as the maintenance of adequate visibility into the cell to allow monitoring.  See Suicide Prevention Stipulations (Doc. 2606 1) at 6 (providing that "[s]uicide watch cells shall be considered suicide resistant if they meet the requirements set forth in section III(B) of the ADA Report"); ADA Transition Plan for Programs and Services Provided to Inmates (Doc. 2635 1) at 41 ("All crisis cells ... are to comply with the checklist developed by

Lindsay M. Hayes.").  The court finds the checklist to provide a sufficient set of criteria for determining whether a cell is suicide resistant, and it finds it necessary to order ADOC to comply with the checklist in light of the heightened risk of suicide in the restrictive housing units.  While monitoring and security checks can reduce the risk of suicide, they cannot eliminate it, and additional measures must be taken to ensure that inmates do not kill themselves when observed.

The court declines, however, to order the EMT to "evaluate the condition of the [restrictive housing units] with respect to the adequacy of natural light, square footage, … the need for painting ... [and] the adequacy of access to out of cell exercise space during inclement weather, ... [and to] determine what steps should be taken to correct any deficiencies they identify." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 12.8.2.2.  While fresh paint, additional natural light, square footage, and access to exercise space may be desirable, the plaintiffs have failed to

demonstrate that such measures are necessary to correct the constitutional violations identified in the liability opinion. Moreover, requiring such relief would be highly intrusive indeed, it is unclear whether ADOC could provide additional natural light and space in its restrictive housing units without substantial, highly costly modifications to its facilities.

### c. PLRA Findings

The court finds these provisions necessary for the reasons given above: ADOC has failed to make the cells in its restrictive housing units suicide resistant, and it has failed to demonstrate any change in their cleanliness. As a result, inmates face an unacceptably high risk of suicide. These provisions are also narrowly tailored and minimally intrusive. ADOC has previously agreed to use the Hayes checklist which indicates that the checklist is not unduly onerous and while the court orders ADOC to clean restrictive housing unit cells, it will not hesitate to rescind this requirement should the

EMT conclude that ADOC is, in fact, regularly cleaning the cells.

### 8.   Other Provisions Regarding Segreation

The plaintiffs also propose various provisions designed to ensure that inmates who live in units that function as segregation, but are not designated as such, receive the same care that ADOC is required to provide to inmates living in restrictive housing units.   While the court acknowledges the plaintiffs' concern, it declines to order this relief.   Elsewhere in its order, the court requires that inmates in the SU, RTU, and SLU receive 10 hours of structured, therapeutic out-of-cell time and 10 hours of unstructured out-of-cell time per week, unless clinically contraindicated.   The court therefore expects that very few inmates outside the restrictive housing units will be in housed in conditions that are functionally equivalent to segregation.   Should the its expectation prove wrong, the court trusts that

the EMT will say so, and it will take appropriate action at that time.

## D.   Intake

Like its progress with respect to mental-health staffing, ADOC's progress in reforming its intake system is both commendable and incomplete.  As described previously, ADOC has put great effort into ensuring that every inmate receives a mental-health screening at intake, and, as indicated this section, the court has declined to adopt a significant number of the plaintiffs' proposals for relief.  Still, there are three issues remaining that require current relief.  First, ADOC has persisted in using LPNs to conduct intake without supervision, despite the court's finding that LPNs are not qualified to conduct intake and have consistently failed to detect mental illnesses in inmates.  Second, ADOC has failed to ensure that records of inmates' intake screenings are made available to mental-health providers within its facilities.  And, third, ADOC has failed to

ensure that records relating to inmates' prior mental-health treatment are received and assessed by ADOC mental-health staff in a timely fashion, if at all.

### 1.   Use of LPNs to Conduct Intake

#### a.   The Parties' Proposed Provisions

With respect to ADOC's continued use of LPNs to conduct intake, the plaintiffs propose that "an RN with mental health training must conduct the screening in accordance with the [National Commission on Correctional Healthcare (NCCHC)] standard M-E-02." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 3.1.5; *see also* Pls.' Post-Trial Br. (Doc. 3370-1) at 88. The defendants propose the same, except that it would allow any qualified mental-health professional, and not just an RN, to perform the intake screening. *See* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at §§ 3.1.1, 3.1.2; *see also* Defs.' Post-Trial Br. (Doc. 3367) at 65.

### b.   The Court's Ordered Relief

The court will order that all intake screening be conducted by qualified mental-health professionals, including RNs with mental-health training, but excluding LPNs.  As the experts agreed, intake is a key component of a functioning mental-health care system; "[i]t starts everything," and it is vital that it be done and done well. (Dr. Burns testimony on 6/2, pg. 207-08 of the rough draft).  Intake is also a function that, at least at ADOC, LPNS have proven unable to perform.  Because ADOC has persisted in using LPNs to conduct intake, the court finds that it must forbid ADOC from doing so in order to correct the violations found in its liability opinion.

The court will not order, however, that only RNs may conduct intake screening, as the plaintiffs suggest.  The current NCCHC standards allow screening to be conducted by any qualified mental-health professional.  In deference to the NCCHC's judgment, and so as to provide ADOC maximum flexibility in staffing intake, the court

will allow any qualified mental-health professional
besides an LPN to conduct intake.  The court also will
not require that intake be conducted according to NCCHC
standard M-E-02, or any other standard.  In the absence
of any evidence indicating that ADOC is not complying
with NCCHC standards or is otherwise conducting intake
in an inadequate fashion (besides, that is, for its
continued use of LPNs), and in light of testimony from
Dr. Metzner that NCCHC standards are regularly updated,
the court finds that any requirement that ADOC conduct
intake according to a particular standard would be
unnecessary and, in all likelihood, quickly outdated.


                    c.   PLRA Findings

     The court finds this provision necessary for the
reasons given above: because intake screening is a
critical step in the provision of mental-health care,
because LPNs have proven unable to identify inmates with
mental illnesses, and because ADOC has proven unable to
ensure that LPNs conducting screening are adequately

                            **104**

supervised, the court must forbid ADOC from using LPNs to conduct intake screening. The provision is also narrowly tailored and minimally intrusive because it excludes only LPNs from conducting intake, but no other mental-health professionals, and imposes no additional procedural requirements.

### 2. Documentation of Intake Screening

#### a. The Parties' Proposed Provisions

With respect to ADOC's failure to ensure that records of inmates' intake screenings are made available to mental-health providers within its facilities, the plaintiffs propose that an ADOC Form MH-011 indicating the results of each inmate's intake screening be filed in the inmate's medical record. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 3.1.5.1. The defendants propose that the results of the intake screening be documented on the same form, but would not explicitly require that the form be filed in the inmate's

medical record.  *See* Defs.' Proposed Phase 2A Remedial
Order (Doc. 3215) at § 3.1.2.


### b.  The Court's Ordered Relief

The court will substantially adopt both parties'
proposed provisions, and order that documentation of each
inmate's intake screening--including an interpretation
of the results of any psychological assessment--be filed
in the inmate's medical record.  Without such
documentation, mental-health providers who later
encounter the inmate cannot utilize the results of the
intake screening to provide treatment.  The inability of
mental-health providers to access the results of intake
screenings, including interpretations of any
psychological tests, can have fatal consequences.
Indeed, Wexford itself identified the failure to
incorporate properly the results of intake screenings in
inmates' treatment as a central concern in the autopsies
it conducted after the suicides of Laramie Avery and
Charles Braggs.

c. PLRA Findings

The court finds this provision necessary for the reasons given above: without documentation of an inmate's intake screening, mental-health providers who later encounter the inmate cannot effectively provide treatment. The provision is also narrowly drawn and minimally intrusive because it does not require mental-health providers to use the results of intake screenings in any particular way, but merely that the results of intake screenings be documented and made available for future use.

3. Inmates' Previous Records

a. The Parties' Proposed Provisions

With respect to ADOC's failure to ensure that records relating to inmates' prior mental-health treatment are received and assessed by ADOC mental-health staff in a timely fashion, the plaintiffs propose the following provision:

**107**

"If the inmate reports receiving mental health services, and can correctly report the prior mental health provider, a records request from the prior provider must be made within three working days of the intake screening.  If the inmate reports receiving mental health services and cannot remember or correctly identify the prior mental health provider, the mental health staff must reasonably attempt to locate their prior records."

Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 3.1.12.  The plaintiffs also propose that all health records from each inmate's prior facility of incarceration be requested within 72 hours if they are not presented at intake.  *See id.* at § 3.1.13.  The defendants propose essentially the same provisions, except they do not propose that mental-health staff be required to reasonably attempt to locate the prior records of inmates receiving mental-health services who cannot remember or correctly identify their prior mental-health provider.  *See* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 3.1.9.

b.   The Court's Ordered Relief

108

The court will adopt the plaintiffs' first proposed provision with the added requirement that a records request or reasonable effort to obtain records must be made if, either during *or after* intake, the inmate reports having previously received mental-health services. If the inmate reports having previously received mental-health services after intake, and can correctly report the prior provider, the records request must be made within three working days of the time the intake reported having previously received mental-health services. The court will also adopt the plaintiffs' second proposed provision--that all health records from each inmate's prior facility of incarceration be requested within three working days if they are not presented at intake.

The court adopts the plaintiffs' first proposed provision because the evidence demonstrates that ADOC is failing to obtain the records of all inmates who have received prior mental-health treatment, and that this failure contributes to the violations found in the

liability opinion in two ways.  First, it has caused ADOC to fail to identify a substantial number of inmates with mental illnesses, including several who ultimately committed suicide.  *See* June 2, 2021, R.D. Trial Tr. at 204 (testimony of Dr. Burns).  Second, it has prevented ADOC from effectively treating those inmates that it has correctly identified as having mental illnesses, because, as Dr. Burns testified, "mental health diagnoses [and] conditions change over time, and you need to look at the longitudinal course of a person's illness to arrive at the correct diagnosis and then subsequently treatment." *Id.* at 218.

The evidence also demonstrates that inmates do not always report their prior treatment at intake.  *See, e.g.*, May 24, 2021, R.D. Trial Tr. at 56–57 (testimony of Dr. Burns, noting that Marquell Underwood, who eventually committed suicide, reported prior treatment for bipolar disorder during a referral after intake). Therefore, the court finds it necessary to require ADOC to request records of an inmate's prior treatment, or to

make a reasonable effort to obtain such records, if the inmate reports having received such treatment after intake has already been completed.

The court adopts the plaintiffs' second proposed provision for essentially the same reasons that it adopts the first. Wexford's own evaluation indicates that it does not consistently ensure that inmates' health records from the prior facility of incarceration are received and assessed at intake, despite the fact that those records often contain information about inmates' mental illnesses and mental-health treatment. *See* Marquell Underwood Psychological Autopsy, P-3316, at 15 (recommending "[i]mproved continuity of care ... between county jail and ADOC for any mental health patients or inmates who may have presented with suicidal ideations or self-harming prior to transport"); June 2, 2021, R.D. Trial Tr. at 220 (testimony of Dr. Burns, explaining the importance of receiving an inmate's records from the prior facility of incarceration). To the extent that such records indicate inmates' mental illnesses and the

111

"longitudinal course" of inmates' treatment, June 2, 2021, R.D. Trial Tr. at 218 (testimony of Dr. Burns), they are essential for identifying and treating inmates' mental illnesses, and ADOC must obtain them in a timely fashion in order to remedy the violations identified in the liability opinion.

### c.   PLRA Findings

The court finds that the plaintiffs' first provision--with the added requirement that ADOC request records of an inmate's prior treatment if the inmate reports having received such treatment after intake has already been completed--is necessary for the reasons given above:  records of prior treatment, which ADOC is currently failing to obtain, are essential for identifying and treating inmates' mental illnesses.  The provision is also narrowly drawn and minimally intrusive because it merely requires ADOC to seek the outside treatment records where possible. While the three-day time frame is specific, the court finds that it meets the

112

need-narrowness-intrusiveness test because, given ADOC's continued failure to obtain these records within a reasonable time, setting a clear time frame is necessary to ensure compliance. It is also the time frame suggested by the defendants--a strong indication that it is reasonable and not overly intrusive.

The court finds the plaintiffs' second proposed provision to be necessary, given ADOC's failure to obtain health records from prior facilities of incarceration, despite the fact that those records often pertain to mental-health treatment. Like the first proposed provision, the plaintiffs' second proposed provision is narrowly tailored and minimally intrusive because it merely requires ADOC to request records. And again, although the three-day time frame is specific, it is necessary, narrowly tailored, and minimally intrusive in light of ADOC's continued failure to obtain these records within a reasonable timeframe. Also, as before, it is the time frame suggested by the defendants.

### 4.   Other Provisions Regarding Intake

The parties propose additional provisions unrelated, or indirectly related, to the three issues identified above.   These include the following proposals by the plaintiffs:

- Each inmate entering or returning to ADOC custody must receive a mental-health screening no later than 12 hours after his or her arrival, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 3.1.1;

- Each inmate must receive a mental-health screening before being placed in a housing area that does not provide constant correctional officer observation, *see id.* at § 3.1.2;

- Mental-health staff conducting intake must review an inmate's transfer documentation before performing any screening evaluation, *see id.* at § 3.1.3;

- Intake evaluations must cover certain topics, *see id.* at §§ 3.2.2, 3.2.4;

- Mental-health screenings must be conducted in areas permitting inmate confidentiality and encouraging self-reporting, *see id.* at § 3.1.4;

- Intake must include a suicide risk screening, *see id.* at § 3.1.6;

- ADOC must take certain steps to ensure that inmates who are identified at intake as having mental-health needs are referred for treatment and appropriately

**114**

placed within ADOC institutions, *see id.* at §§ 3.1.8, 3.1.14, 3.2.2, 3.2.3, 3.2.7, 3.3.1;

- Mental-health staff must report suspected abuse of inmates, *see id.* at § 3.1.9;

- Inmates arriving with trauma must be referred for appropriate treatment, *see id.* at § 3.1.10;

- ADOC must take certain steps to ensure that inmates prescribed mental-health medication prior to their arrival at ADOC facilities continue to receive such medication, *see id.* at § 3.1.11;

- Inmates must be provided at intake with certain information regarding mental-health services available in ADOC, *see id.* at §§ 3.3.2; 3.4.3; and

- Inmates must not be transferred to another facility before receiving a full intake screening or else must receive a full screening upon transfer, *see id.* at § 3.4.1, 3.4.2.

The court declines to adopt these provisions because the record does not show them to be necessary at this time.  In fact, the record demonstrates that ADOC has made marked progress in preventing certain problems that these provisions are designed to remedy.  For instance, Dr. Burns testified that intake staff were performing more comprehensive assessments of incoming inmates' suicide risk than she believed necessary.  *See* June 7,

2021, R.D. Trial Tr. at 106-07.  And, while there are obvious problems, as discussed previously, with the process of referring inmates for more thorough evaluations after intake, there is no evidence that those problems stem from failures by the staff members conducting intake to make referrals where necessary. Indeed, Dr. Burns indicated that she had seen evidence that inmates were being referred upon the identification of potential mental-health needs. *See id.* at 108.

In declining to adopt these provisions, however, the court assumes that ADOC is prepared to sustain its progress as COVID-19 wanes and thousands of inmates currently housed in city jails enter its facilities. Should that assumption prove unfounded, the court expects the EMT to raise the matter with the court.  At that point, the court may consider additional relief.


### E.  Coding

While ADOC has put great effort into redesigning its coding system in the time since the liability opinion,

**116**

two problems remain with how that system is used to track inmates.  First, the evidence demonstrates that inmates are not always assigned mental-health codes and SMI indicators according to their needs.  Second, even when inmates are coded appropriately, their codes are inconsistently and sometimes erroneously documented, making it difficult for providers who encounter inmates to discern accurately their mental-health needs.

### 1.   Assignment of Codes

#### a.   The Parties' Proposed Provisions

To address the problem of inmates not being assigned mental-health codes and SMI indicators according to their needs, the plaintiffs propose that all inmates on the mental-health caseload must be coded and, if appropriate, assigned SMI flags, as required by the Revised Mental-Health Coding System.  *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 4.1.  The defendants propose two similar provisions.  First, they propose that ADOC or its mental-health vendor must assess

all inmates through intake and/or through clinical encounters such as counseling sessions and treatment-team meetings and, to the extent clinically indicated, assign them SMI designations. *See* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 4.1. Second, they propose that all inmates entering the system must be assigned mental-health codes. *See id.* at § 4.2. Under this proposal, a code of MH-A may be assigned by a qualified mental-health professional; a code of MH-B or above must be assigned by a psychiatrist, psychologist, or CRNP. *See id.*

### b.   The Court's Ordered Relief

The court, in substantial agreement with both parties, will order that all inmates be assigned mental-health codes and, if necessary, an SMI flag that is appropriate to address their mental-health needs, as determined by clinical judgment. The court adopts this provision because it is uncontroverted that the coding system must accurately reflect inmates needs if it is to

function as an effective way to track mentally ill inmates and facilitate care.  Yet, as the court found in the liability opinion, ADOC "fails to classify the severity of mental illnesses accurately." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1204 (M.D. Ala. 2017) (Thompson, J.).  This failure manifests in two forms. First, some inmates simply do not receive codes at all. Second, some inmates receive codes that do not reflect clinical judgment.  Indeed, Dr. Burns testified that she had seen instances of providers assigning inmates codes based on what the inmate requested or on the inmate's desire to seek employment, rather than on appropriate clinical factors.  *See* May 23, 2021, R.D. Trial Tr. at 19; *id.* at 74–75.  This provision addresses both failures:  it ensures that inmates receive codes, and that codes reflect clinical judgment.

The court will not, however, attempt to prescribe the manner in which mental-health providers exercise their judgment when assigning codes.  Nor will it dictate which mental-health providers may assign which codes, as

the defendants propose, because the record does not
suggest that ADOC's failure to code inmates appropriately
is related to the professional qualifications of those
individuals tasked with assigning codes (except, that is,
to the extent that LPNs continue to conduct intake).


### c.  PLRA findings

The court finds this provision necessary because, as
explained above, ADOC has persistently failed to assign
inmates codes and to do so according to clinical
judgment.  The provision is narrowly drawn and no more
intrusive than necessary because it simply directs ADOC
to ensure that providers are drawing on their clinical
judgment to code each inmate appropriately, while leaving
it to ADOC to determine how it achieves that result.


### 2.  Documentation of Codes

### a.  The Parties' Proposed Provisions

To address the problem of inmates' mental-health
codes and SMI designations being incorrectly and

inconsistently documented, the plaintiffs propose that each inmate's mental-health code must be documented in the inmate's medical record. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 3.2.6.   The plaintiffs also propose that each inmate be given an SMI designation separate from his or her mental-health code, and that that designation be indicated by a flag, warning signal, or some other type of signal within the electronic system. *See id.* The defendants propose no provisions addressing the manner in which it documents inmates' mental-health codes and SMI indicators.

### b.   The Court's Ordered Relief

Much as the plaintiffs suggest, the court will order that each inmate's mental-health code and SMI designation must be accurately and consistently indicated throughout all documents related to his or her care.   The court orders this relief in light of the evidence that inmates' mental-health codes and SMI designations are often undocumented or inaccurately documented.   That failure,

in turn, undermines ADOC's entire system of treatment planning and provision; if treatment teams and mental-health providers are to perform their intended functions, they must be aware of inmates' mental-health statuses.  Inmates with serious mental illnesses must also be easily identifiable as such, particularly when they are transferred between facilities, so that appropriate precautions may be taken to avoid self-harm or suicide.

c.  PLRA Findings

The court finds this provision necessary for the reasons given above:  inmates' mental-health codes and SMI designations must be accurately documented for ADOC's system of treatment planning and provision to function, and inmates with serious mental illnesses must be easily identifiable as such so that staff will be alert to their needs.  Because ADOC has failed to ensure accurate documentation, the court must order relief.  This provision is also narrowly drawn and no more intrusive

than necessary because it simply directs ADOC to ensure
that documentation is done correctly, without mandating
a specific process for doing so.

### F.   Referral

As stated earlier, ADOC has made notable progress
implementing a system by which both inmates and staff are
equipped to refer inmates for mental-health services.
ADOC has made similarly important progress in its
development and implementation of a triage process to
identify the urgency of requests for care.  In light of
ADOC's progress with respect to the making and triage of
referrals, there are several areas in which the parties
propose remedial provisions but the court will order no
relief at this time.

At a high level, ADOC's referral process is a chain
that begins with the identification of an inmate's need
for mental-health services and should result in a
clinical assessment or intervention by mental-health
staff.  Each referral is classified as either emergent,

urgent, or routine, depending on the urgency of the inmate's need for responsive care.  An "emergent" need means that there is "an imminent risk of injury to the inmate or others" or that mental-health services are "otherwise immediately necessary." Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 1.10; *see also* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 1.8.  An "urgent" need "means mental-health services should be provided in the near future, but not immediately."  Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 1.39; *see also* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 1.33.  And a "routine" need "means that mental-health services should be provided in the ordinary course of business."  Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 1.31; *see also* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 1.27.

Despite ADOC's progress, persistent failures in this process deny many inmates access to necessary mental-health care within acceptable timeframes.

Sometimes a failure is attributable to errors or delays
by the staff member making the referral.  Most often,
though, a referral is made, its urgency is identified,
and then follow-up care is delayed far beyond what is
acceptable—indeed, what is required by court order and
ADOC's own policy—if it even happens at all.  Because a
failure at one link in the chain denies inmates access
to timely—and in some cases, any—mental-health care
irrespective of ADOC's improvements at other stages of
the referral process, the court must order relief.

### 1.  Making of Referrals

Both parties propose provisions for inmates to have
the ability to complete self-referrals for mental-health
services verbally or in writing.  *See* Pls.' Updated
Proposed Omnibus Remedial Order (Doc. 3342) at § 5.1.1;
Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at
§ 5.2.2.  While there is extensive evidence that
self-referrals are an essential component of the referral
system, *see, e.g.*, June 3, 2021, R.D. Trial Tr. at 18-19

**125**

(testimony of Dr. Burns); May 26, 2021, R.D. Trial Tr. at 175-77 (testimony of Mr. Vail); June 29, 2021, R.D. Trial Tr. at 82-83 (testimony of Dr. Metzner), ADOC has already implemented a system for self-referrals, *see* June 23, 2021, R.D. Trial Tr. at 66-67 (testimony of Dr. Burns).   Although Dr. Burns highlighted the troubling report that, in the two weeks prior to Charles Braggs's death, he requested mental-health services without a referral occurring, *see* May 24, 2021, R.D. Trial Tr. at 119-20, the mental-health records presented to this court reflect that inmates generally have been able to take this initial step toward receiving mental-health care.

This is also the case with respect to the staff-referral system.   Both parties propose provisions for non-mental-health staff to refer inmates to mental-health staff for an assessment or intervention when a prisoner has informed the non-mental-health staff of a need for mental-health services or the non-mental-health staff has recognized such a need.   *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342)

126

at §§ 5.2.1, 5.2.2, 5.2.3; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at §§ 5.2.1, 5.2.3.  As with self-referrals, ADOC has implemented a staff-referral system, and evidence at the omnibus remedial hearings suggested that it is being successfully used.  Dr. Burns noted multiple instances in which ADOC staff referred an inmate for mental-health services.  *See, e.g.*, May 25, 2021, R.D. Trial Tr. at 177 (testimony of Dr. Burns, noting several recorded staff-referrals of inmate W.S.); June 8, 2021, R.D. Trial Tr. at 56-57 (testimony of Dr. Burns, noting that a warden and a classification specialist had referred Gary Campbell); June 10, 2021, R.D. Trial Tr. at 15-16 (testimony of Dr. Burns, noting that an ADOC employee had referred inmate K.W. for an evaluation).  In light of these referrals, the evidence does not presently indicate that ADOC has failed to inform staff of their ability, and indeed responsibility, to refer inmates in need of mental-health services.  Whether staff consistently notice and appropriately recognize mental-health needs is a critical but distinct

127

issue, which is not addressed by the parties' proposed provisions regarding the referral process and may be incapable of being addressed completely until ADOC's understaffing is corrected.  As Mr. Vail testified at the omnibus remedial hearings, reaffirming his testimony at the liability trial, without "enough staff to properly supervise the inmates," correctional staff will "miss a lot of behavior, including behavior related to mental illness."  *See* May 26, 2021, R.D. Trial Tr. at 180-81. Presently, the court will not order relief with respect to the staff-referral system.

With respect to written referrals by both inmates and staff, both parties propose provisions requiring blank mental-health referral forms to be available in the healthcare unit, the mental-health unit, and designated shift offices within each ADOC major facility and designating locations for completed mental-health referral forms to be submitted.  *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 5.2.4; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at

§ 5.4.   Dr. Burns testified that making the forms available in these enumerated locations is necessary "so that people know where to get them" and "can access them when necessary," and that the plaintiffs' proposed drop-off location, the box for medical referrals, would "simplif[y] the process ... so there's not different types of mailboxes all over the institution."   June 3, 2021, R.D. Trial Tr. at 22.   But Dr. Burns acknowledged that placing the forms in any central location would be "helpful" as long as "inmates have access to that central location," June 23, 2021, R.D. Trial Tr. at 69, and there is no evidence that ADOC's current locations for these forms are inadequate.   The court finds that there is no need to order the proposed relief at this time.

The plaintiffs also propose multiple provisions specifying the information that must be included in these referral forms, including identifying information for the inmate, the referring individual, and the triage staff, the date and time that the referral form was completed and triaged, and the triage staff's determination as to

**129**

whether the referral is emergent, urgent, or routine. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at §§ 5.2.5, 5.2.6.    However, Dr. Burns acknowledged that this information is already incorporated in the referral form currently used by ADOC. *See* June 23, 2021, R.D. Trial Tr. at 70.  Although Dr. Burns noted "multiple episodes in which the referral forms weren't completed," May 26, 2021, R.D. Trial Tr. at 17, most of the referral forms admitted in evidence did contain the information required by the plaintiffs' proposed provisions.    Should the incomplete referral forms highlighted by Dr. Burns turn out to be, or become, a systemic problem, the court expects that the EMT will be able to flag the issue for the court.   But at this point, the court is confident that ADOC will continue to encourage its staff to engage in thorough documentation and ensure that these forms are fully completed.

### 2.   Response to Referrals

#### a.  The Parties' Proposed Provisions

130

With respect to all referrals, the defendants propose generally, "[a]n emergent, urgent, or routine referral will result in a timely clinical assessment and/or intervention by a psychiatrist, psychologist, CRNP, or counselor." Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 5.1.

With respect to emergent referrals, the plaintiffs propose that an assessment by a qualified mental-health professional "must occur as soon as possible but no more than 3 hours from the triage staff's determination that the referral is emergent." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 5.3.5.1. In their definition of "emergent," the defendants propose that mental-health services will be provided "typically[] within four (4) hours." Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 1.10.

The plaintiffs propose that "[u]rgent referrals must result in a clinical assessment and/or intervention by a [qualified mental-health professional] within 24 hours of referral." Pls.' Updated Proposed Omnibus Remedial

Order (Doc. 3342) at § 5.3.5.2.   Likewise, the defendants' proposed definition of "urgent" states that mental-health services should be provided "typically[] within twenty-four (24) hours."  Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 1.39.

The plaintiffs propose that "[r]outine referrals must result in a clinical assessment and/or intervention by a [qualified mental-health professional] within 14 calendar days of referral."   Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 5.3.6. Similarly, the defendants' proposed definition of "routine" states that mental-health services "should be provided in the ordinary course of business—typically, within fourteen (14) days."   Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 1.31.

### b.  The Court's Ordered Relief

In light of the parties' proposals, the court will adopt the following provisions:  A referral must result in a timely clinical assessment and/or intervention by a

psychiatrist, psychologist, CRNP, or counselor.  Emergent referrals must result in a clinical assessment and/or intervention as soon as possible but no more than four hours from the determination that the referral is emergent.  Urgent referrals must result in a clinical assessment and/or intervention within 24 hours of the time the referral was made.  Routine referrals must result in a clinical assessment and/or intervention within 14 calendar days of the time the referral was made.

The court is concerned with the ongoing pattern of missed or unanswered referrals at all levels of urgency, which delay care and leave inmates to deteriorate without the treatment they need.  ADOC's failures have affected inmates waiting on all levels of referrals.  *See, e.g.*, May 25, 2021, R.D. Trial Tr. at 118-20 (inmate R.J. was not seen in response to an emergent referral for three days due to lack of staff to bring him out for an assessment); *id.* at 52 (inmate T.M. was not seen by a CRNP until three weeks after he set himself on fire and

133

received an urgent referral); *id.* at 27 (inmate A.J. was not seen until May 2020 for a routine referral that was made in February 2020). These failures have persisted since the time of the liability trial in spite of a court order to which the defendants stipulated, *see* Phase 2A Order and Injunction on Mental-Health Identification and Classification Remedy (Referral), Attachment A (Doc. 1821-2) at §§ 2.1-2.3, and ADOC's own regulations and policies. While ADOC's implementation of a triage system is admirable, it clearly is not sufficient to address the problem if the identified level of urgency does not correspond with the actual time in which responsive care is provided. The court finds it necessary to require that mental-health staff respond to referrals in a timely manner. Moreover, given ADOC's inability to improve even in the face of the liability finding, and in light of the unreasonable delays in care that have persisted in violation of a court order and ADOC's policy, it is necessary for the court to impose specific and concrete

timeframes for mental-health staff to respond to referrals.[9]

With respect to the time to respond to emergent referrals, the court adopts the language of the plaintiffs' provision but incorporates the defendants' proposed timeframe. Dr. Burns and Dr. Metzner gave conflicting testimony as to whether a three- or four-hour timeframe for responding to an emergent referral is necessary and reflective of the accepted standard of care. *See* May 25, 2021, R.D. Trial Tr. at 54 (testimony of Dr. Burns); June 3, 2021, R.D. Trial Tr. at 25, 33 (same); June 29, 2021, R.D. Trial Tr. at 83, 151, 204-05 (testimony of Dr. Metzner). In light of the distinct requirement that mental-health staff still must respond

---

9. The court discusses these timeframes that it will impose in its order against the backdrop of the court's general discussion of timeframes in Section II.E of Part II of the Phase 2A Omnibus Remedial Opinion. ADOC's history of noncompliance with these timeframes even after the defendants stipulated to be enjoined to comply with them, together with the testimony of experts for both sides, discussed below, strongly supports the necessity, narrowness, and minimal intrusiveness of these particular timeframes.

to an emergent referral "as soon as possible," the court will defer to the defendants' expert, Dr. Metzner, and adopt the four-hour timeframe.

With respect to urgent and routine referrals, Dr. Burns and Dr. Metzner agreed on the appropriate timeframes for mental-health staff to respond:  24 hours for urgent referrals and 14 days for routine referrals. *See* May 25, 2021, R.D. Trial Tr. at 54 (testimony of Dr. Burns); June 3, 2021, R.D. Trial Tr. at 26, 33 (same); June 29, 2021, R.D. Trial Tr. at 83, 151, 204-05 (testimony of Dr. Metzner).  ADOC's continued failures and delays in providing mental-health services in response to these referrals, as well as emergent referrals, necessitate specific timeframes for an assessment or intervention following a referral.  The court adopts the timeframes agreed upon by Dr. Burns and Dr. Metzner.

c.  PLRA Findings

136

This relief is necessary to correct a referral process that remains "riddled with delays and inadequacies." *Braggs*, 257 F. Supp. 3d at 1203. ADOC still is not providing care to inmates in an acceptable timeframe after they have been referred, and the result is that the department's referral process, a cornerstone of its system for providing mental-health care, remains deficient. In light of ADOC's failure to correct this deficiency on its own, specific timeframes are necessary, narrowly tailored, and minimally intrusive to ensure ADOC's compliance and prevent further harms.

ADOC's longstanding violation in this area and the timeframes that the court finds necessary to correct this problem inform the court's consideration of the parties' other proposed provisions. Although failures to follow up on mental-health referrals appear to be the critical defect in ADOC's referral process, the evidence makes clear that problems earlier in the referral process have the same harmful effect of delaying necessary care, and additional relief is required.

### 3.  Communication of Emergent or Urgent Referrals

#### a.  The Parties' Proposed Provisions

To ensure that emergent or urgent referrals are communicated to mental-health providers with appropriate speed, the defendants propose that "[a]n emergent or urgent referral must be communicated verbally, in person or by telephone, to the mental-health staff as soon as possible, but in no case longer than (1) hour absent unusual circumstances which detain staff for an extended period of time such as a medical emergency or an incident involving safety or security of staff or inmates." Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 5.1.  During a conference call following the omnibus remedial hearings, defense counsel clarified that this provision would apply to a referring staff member who makes a preliminary determination that an inmate's mental-health need is emergent or urgent.  At that time, the referring staff would have one hour, absent unusual

circumstances, to communicate the referral directly (verbally or in person) to the triage staff.

The plaintiffs propose the following provision regarding the communication of emergent or urgent referrals by triage staff:

> "If the triage staff is an RN and they determine that the referral is emergent or urgent, they must initiate contact with the on-call MHP or psychologist within one (1) hour of receipt of the referral. If the triage staff is a [qualified mental-health professional] and is not the on-call MHP or psychologist, they must initiate contact with the on-call MHP or psychologist within one (1) hour of receipt of the referral. The on-call MHP or psychologist must determine whether further referral to the psychiatrist is warranted or whether a change in the status of the referral is warranted."

Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 5.3.5.

### b. The Court's Ordered Relief

The court will adopt the defendants' proposed provision and order that an emergent or urgent referral must be communicated verbally, in person or by telephone, to the appropriate mental-health staff as soon as

139

possible, but in no case longer than one hour from the
time the referral is first identified as emergent or
urgent, absent unusual circumstances which detain staff
for an extended period of time such as a medical emergency
or an incident involving safety or security of staff or
inmates.

The court concludes that it must order compliance
with this one-hour timeframe to ensure that emergent or
urgent referrals lead to assessments or interventions
within the timeframes that it has found necessary.
Despite the urgency of these categories of referrals,
they are not consistently received, much less responded
to, in a timely manner, especially when they are
initiated via written referral forms, rather than direct,
verbal contact with mental-health staff. For instance,
on the day before Jaquel Alexander committed suicide, a
medical staff member made a written referral for him
after he "[r]equested to be placed in a crisis cell."
Pls.' Ex. 3297 at ADOC518191. The form was not received
by the triage nurse for over 12 hours. *See id.* Although

Alexander, due to a previous referral, met with a mental-health provider that morning, the 12-hour delay before triage staff even received a referral that was ultimately identified as urgent and that requested placement on suicide watch is a troubling sign that relief is necessary.

However, while emergent or urgent referrals must be communicated to mental-health staff with urgency, the court finds that it is appropriate for this provision to account for unusual circumstances that may make compliance with a strict one-hour requirement impossible. The court expects that the EMT, in monitoring ADOC's compliance with this provision, will evaluate whether ADOC applies this exception overbroadly.

The court will not order compliance with the plaintiffs' proposed provision at this time. The evidence presented at the omnibus remedial hearings reflected that, after triage staff received emergent or urgent referrals from the referring staff, they generally triaged the referrals and notified appropriate

141

mental-health staff within the plaintiffs' proposed timeframe.

### c. PLRA Findings

The provision that the court orders is necessary to ensure that mental-health staff are notified promptly about the most time-sensitive referrals in order to provide urgent or emergent care to inmates without inappropriate delay. The evidence at the omnibus remedial hearings made clear that Alexander's referral was not unique in the delay before it was received and triaged. Subjecting emergent or urgent referrals to this delay prior to triage risks leaving inmates in potentially acute distress as they await necessary treatment or intervention for hours or longer. Requiring that such referrals be communicated to mental-health staff directly and with appropriate urgency is narrowly tailored to protect mentally ill inmates from this substantial risk of harm. And, by affording flexibility to staff in the event of unusual

142

circumstances, this relief is the least intrusive means that will address the violation.

### 4.   Communication of Routine Referrals

#### a.   The Parties' Proposed Provisions

The plaintiffs propose that "[r]outine referrals must be communicated to the mental health staff on the next business day by leaving the referral form in a designated location." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 5.3.6. The defendants' proposed provision is substantially the same, except that it uses permissive language. *See* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 5.1.

#### b.   The Court's Ordered Relief

The court will adopt the parties' proposed provisions with a slight modification and order that routine referrals must be communicated to the mental-health staff by the next shift by leaving the referral form in a designated location. As with emergent or urgent

referrals, the court finds that relief is necessary with respect to routine referrals in light of the unreasonable delays in response times.  These delays are exacerbated by the fact that referrals are frequently lost or delayed before they are ever communicated to mental-health staff, as Dr. Burns described with respect to the seven-day delay before a referral for Marquell Underwood was even received by mental-health staff.  *See* June 2, 2021, R.D. Trial Tr. at 100.  This provision is designed to address the problem by ensuring that referrals are communicated in a timely and reliable fashion.

### c.  PLRA Findings

As with the court's ordered relief regarding emergent and urgent referrals, this provision is necessary to address another facet of ADOC's deficient referral process.  Inmates are not currently receiving responses to their routine referrals in a timely manner, and delays in communicating the referrals to mental-health staff contribute to that deficiency.  Although routine

**144**

mental-health needs generally do not pose the same immediate risks of injury as emergent or urgent needs, the failure to address them—especially over the protracted delays that currently infect ADOC's process for handling routine referrals—subjects inmates with mental-health needs to the risk of worsened symptoms or decompensation. Delays in handling routine referrals are particularly concerning in light of the risk that emergent or urgent needs may initially be misclassified as routine needs, leaving inmates with such needs to suffer without an intervention far longer than is acceptable. Indeed, failures in ADOC's provision of routine care have contributed to the inadequacy of care received by numerous inmates who committed suicide since the court's suicide prevention opinion.

A specific timeframe in which staff must communicate routine referrals is necessary to address the violation, given that ADOC has failed to self-correct in this area. And the timeframe specified provides ADOC with ample time to fulfill the requirement. This provision is narrowly

tailored to address only the underlying issue causing the violation.  And it is no more intrusive than is necessary to ensure that delays are sufficiently short to ensure timely treatment of emergent or urgent needs that initially may be understood as routine needs.  The provision preserves ADOC's flexibility to manage the means by which it will comply with this requirement, including its discretion to decide where routine referrals should be submitted and who should review them.

### 5.   Triage of Referrals

#### a.   The Parties' Proposed Provisions

Both parties propose a number of provisions relating to the process to triage referrals.  The plaintiffs propose a provision requiring that triage not be completed by correctional staff.  *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 5.3.1. They further propose additional provisions regarding triage responsibility:

- **Each ADOC major facility must designate one triage staff per shift, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 5.3.2;**

- **The triage staff must regularly monitor the designated area for completed mental-health referral forms and check the box for such forms at least once per shift, *see id.* at § 5.3.3; and**

- **The triage staff must determine whether each mental-health referral is emergent, urgent, or routine, *see id.* at § 5.3.4.**

The defendants propose similar provisions, with the key distinctions being that their proposal would allow for multiple designated triage staff on a given shift and would require triage staff to check for completed referral forms at least once per business day rather than once per shift. *See* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at §§ 5.4, 5.5.1, 5.5.2, 5.5.3.


b.   The Court's Ordered Relief

The court will not order that correctional staff cannot triage mental-health referrals, nor will it order that each ADOC major facility must designate one triage staff per shift.  There is no evidence that, since ADOC's

**147**

current triage system was developed, any triage was performed by correctional staff, so this relief is unnecessary. And while Dr. Burns testified that assigning triage responsibility to one person on a shift would avoid the confusion of "having multiple people trying to sort" the referrals, June 3, 2021, R.D. Trial Tr. at 23, the evidence at the omnibus remedial hearings did not reflect that ADOC's current allocation of responsibility for triage has caused such problems.

Similarly, although the parties' proposals that triage staff must determine whether each mental-health referral is emergent, urgent, or routine undoubtedly reflect a necessary and foundational component of the referral process, *see, e.g.*, June 29, 2021, R.D. Trial Tr. at 152 (testimony of Dr. Metzner, observing that "all referrals need to be triaged to determine whether they're urgent, emergent, or routine"); June 3, 2021, R.D. Trial Tr. at 33 (testimony of Dr. Burns, explaining that "[i]t is the standard of care that there be a triage person, that there be these referral levels"), the mental-health

148

records admitted in evidence at the omnibus remedial hearings tended to show that, when referrals were received, they generally were assigned an urgency level by the triage staff in a timely manner. The more systemic problems were that referrals were not timely communicated and received prior to triage and did not lead to timely follow-up afterward. The court will not order this proposed relief. Even without this provision, the court fully expects that the EMT will review triage of referrals extensively and bring persistent issues to the court's attention if further relief is necessary.

However, the court will adopt the plaintiffs' proposed provision requiring the triage staff to monitor regularly the designated area for completed mental-health referral forms, at a minimum frequency of once per shift. The court credits Dr. Burns's testimony that that this frequency of monitoring for completed referral forms is necessary to ensure that written referrals, particularly those that may actually be emergent or urgent, are received, classified, and acted upon with appropriate

**149**

speed. *See* June 3, 2021, R.D. Trial Tr. at 28.  Although
Dr. Metzner testified that triaging referrals once per
day is sufficient if staff are properly trained that
emergent or urgent referrals "ought to be done by phone
to alert people," June 29, 2021, R.D. Trial Tr. at 221;
*see also id.* at 151 (testimony of Dr. Metzner, explaining
that he would "require that emergent and urgent referrals
be transmitted verbally as well as in writing," so that
"you are not waiting for someone to pick up the referral
slip"), the court finds that ADOC has not yet reached the
point at which Dr. Metzner's reasoning is applicable.
Because ADOC staff do not yet recognize inmates' emergent
or urgent needs with the consistency to ensure that such
referrals are transmitted directly to triage staff, the
protection that the plaintiffs propose is necessary to
avoid subjecting inmates in need of "immediate" or
"urgent care center type" needs, *see* June 3, 2021, R.D.
Trial Tr. at 25-26 (testimony of Dr. Burns), to long
delays—longer than the court finds are permissible to go
without an assessment or intervention—before their

referrals are even picked up by a mental-health staff member.

### c.   PLRA Findings

Requiring that triage staff monitor the designated area for completed referral forms at least once per shift is necessary to protect inmates whose emergent or urgent needs may be initially misidentified by referring non-mental-health staff members prior to triage.  While the court's ordered provision requiring the verbal communication of emergent or urgent referrals, combined with ongoing mental-health training of ADOC staff, may offer partial protection to these inmates, it is not yet sufficient to keep inmates with pressing mental-health needs from falling through the cracks long enough to suffer decompensation, self-injury, or worse.  Especially while severe understaffing continues to present the danger that correctional staff will miss or misidentify behavior related to mental illness, this additional safeguard is necessary to ensure that inmates receive

timely treatment relative to their mental-health needs. Even this provision may not offer entirely adequate protection for inmates who could require intervention in as little as four hours.  For comparison, ADOC's stated policy since 2018 requires triage staff to check for completed forms "a minimum of every hour and at the end of each triage nurse's shift."  MH E-05.5 (D-3646) at ADOC475712.   In  light  of  ADOC's  progress  in  the development and implementation of its triage process, however,  the  court  will  order  this  less  restrictive provision, with the expectation that improvements to staffing, training, and the remainder of ADOC's referral process  will  all  be  necessary  to  provide  adequate protection to inmates who experience emergent or urgent needs for mental-health services.  The provision that the court orders is narrowly tailored and minimally intrusive to ensure that these inmates receive adequate protection and access to treatment.

6.  Observation in Response to Emergent Referrals and

Referrals for Suicide Watch

a.  The Parties' Proposed Provisions

The plaintiffs propose that, "[f]ollowing an emergent referral, including referrals for suicide watch, custody or mental health staff must maintain constant, line of sight, observation of the prisoner until assessed by a [qualified mental-health professional]."  Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 5.3.5.1.  In the context of intake, the defendants propose the similar provision that, "[i]f a psychiatrist or CRNP is not available to evaluate an inmate with an emergent need, then the inmate will be placed on constant observation or close watch (as appropriate) until the inmate may be evaluated."  Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 3.1.12.

With respect to referrals for suicide watch in particular, the plaintiffs propose the additional provision that, "[w]hen referring prisoners for suicide watch placement, the referring person must ensure that

153

staff maintain constant, line-of-sight observation of the prisoner who is being referred until they are either transferred to appropriate correctional, medical, or mental health staff who takes over the responsibility to ensure an assessment by a triage nurse occurs or the prisoner is assessed by a triage nurse on an emergent referral." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 5.2.2.1.

### b.   The Court's Ordered Relief

The court will adopt the plaintiffs' first proposed provision.  As discussed in the previous sections, ADOC has continued to perform inadequately in providing responsive care to inmates within acceptable timeframes following mental-health referrals.  This failure is particularly unacceptable, and particularly dangerous, when the inmate has been identified as having an emergent need for mental-health care, including possible suicidality.  To reiterate, an emergent referral indicates that an inmate is at serious and imminent risk

of injury or other harm.  *See* June 3, 2021, R.D. Trial Tr. at 25.  However, even though the generally accepted standard in these cases is to provide care within three or four hours, there is evidence that these inmates must wait days to be seen—and that some are never seen at all. In at least one case that Dr. Burns identified, the inmate was not put on watch or given any additional support while waiting to be seen.  *See* May 25, 2021, R.D. Trial Tr. at 118-20 (discussing the failure to place inmate R.J. on watch while he waited three days for an assessment following an emergent referral).  Leaving inmates in such acute distress without taking any steps to ensure their safety is plainly inadequate.  When this failure is combined with delays in responding to the referral, as was the case for Casey Murphree, the result can be deadly. *See* May 24, 2021, R.D. Trial Tr. at 76-77.  The court finds that this provision is necessary to address this grave danger and ensure that inmates remain safe while waiting to receive the basic care that they need.

155

However, the court will not adopt the plaintiffs'
second proposed provision, which would place initial
responsibility for ensuring this observation on the
referring individual until the appropriate correctional,
medical, or mental-health staff can assume that
responsibility.  While it is possible that this is an
important practice in order to maintain constant
supervision of inmates who have been referred for a
suicide watch assessment, Dr. Metzner testified that this
provision could have the effect of imposing
responsibility for maintaining constant watch on an
individual without the authority, ability, or
qualifications to monitor the inmate properly.  *See* June
29, 2021, R.D. Trial Tr. at 220-21.  And there was no
evidence presented at the omnibus remedial hearings that
this requirement would be effective or necessary to
protect inmates beyond the relief that the court does
order, which still requires constant line-of-sight
observation while preserving ADOC's discretion as to how
to comply with this requirement.

### c.   PLRA Findings

The provision that the court adopts is necessary to address the dangers to inmates with emergent mental-health needs that are neglected, and indeed aggravated, as a result of the unconstitutional delays in ADOC's referral process.  It is narrowly tailored to the dangers that ADOC's violations cause; it only imposes a requirement for constant observation until mental-health staff can initiate an assessment or intervention to determine the next steps that are appropriate.  While the defendants  And it is the least intrusive means to protect the safety of inmates while they are awaiting necessary mental-health services.

### 7.   Other Provisions Regarding Referrals

Finally, both parties propose provisions requiring the maintenance of a log of all mental-health referrals at each ADOC major facility.  *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at §§ 5.4.1, 5.4.2;

**157**

Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at
§ 5.3.  The plaintiffs' proposal further prescribes
information that must be included in these mental-health
referral logs.  *See* Pls.' Updated Proposed Omnibus
Remedial Order (Doc. 3342) at § 5.4.2.1.  However, Dr.
Burns testified that ADOC is already keeping referral
logs, and, because she did not review the most recent
logs, she was unable to provide evidence as to whether
these logs are deficient.  *See* June 23, 2021, R.D. Trial
Tr. at 75.  Therefore, the court sees no reason to order
relief at this time.  However, given Dr. Metzner's
testimony that these logs would be important to the EMT
in fulfilling its monitoring responsibilities, *see* June
29, 2021, R.D. Trial Tr. at 224; July 1, 2021, R.D. Trial
Tr. at 12-13, the court anticipates that the EMT may flag
for the court any defects or other concerns regarding how
these logs are being maintained should any deficiencies
inhibit monitoring or impede the quality or continuity
of mental-health care.

158

### G.  Confidentiality

As described previously, and as its own audit recognized, ADOC continues to struggle to provide inmates with the confidential treatment that is an "absolutely necessary condition" for the adequate provision of mental-health care.  June 3, 2021, R.D. Trial Tr. at 14 (testimony of Dr. Burns).  While the evidence shows that some prisoners do receive confidential treatment, too many do not.  Out-of-cell spaces for confidential treatment are not always used, even when available. Inmates who refuse to leave their cells are simply not provided confidential treatment, and a lack of staff prevents inmates who do wish to leave their cells from being escorted to confidential-treatment spaces.

### a.  The Parties' Proposed Provisions

To remedy ADOC's failure to provide confidential treatment, the plaintiffs propose that "[c]onfidentiality in mental health treatment and assessment must be a priority," Pls.' Updated Proposed

**159**

Omnibus Remedial Order (Doc. 3342) at § 6.1, and that "[i]ndividual counseling sessions, medication management encounters, periodic assessments related to placement in an [restrictive housing unit], suicide risk assessments, and therapeutic groups must take place out-of-cell in a setting that provides for confidentiality, unless that is not possible due to safety concerns, based upon clinical determinations," *id.* at § 6.2.  The plaintiffs further propose that, "[i]f confidentiality is not possible, then that fact, the reason, and the actions taken to maximize confidentiality must be documented in the progress note," and that all correctional staff will undergo certain training on confidentiality.  *Id.*

The defendants offer similar provisions.  They propose that "assessments, evaluations, examinations, individual counseling sessions, medication management encounters, therapeutic groups, and other mental-health services provided in this Phase 2A Remedial Order will take place out-of-cell in a setting that provides for confidentiality, unless that is not possible due to

safety concerns or otherwise not appropriate (for example, psychoeducational groups may not necessarily need to be confidential and mental-health rounds in the [restrictive housing unit] may be appropriately conducted "cell-front"), based upon clinical determinations." Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 6.1. And, like the plaintiffs, the defendants propose that if confidentiality is not possible, "then the [qualified mental-health professional] will document that fact, the reason, and the actions taken to maximize confidentiality in a progress note for that individual counseling session, medication management encounter, or therapeutic group." *Id.*; *see also id.* at 8.2.3 ("If a significant clinical encounter is at a cell-front, then the progress note should so indicate.").

Both parties also propose provisions concerning training on confidentiality. The plaintiffs would require all correctional staff members to be trained on confidentiality in a manner consistent with ADOC Administrative Regulation 604. *See* Pls.' Updated

Proposed Omnibus Remedial Order (Doc. 3342) at § 6.2.
The defendants, too, would require correctional staff to
be trained in a manner consistent with Regulation 604,
but would limit the requirement to correctional staff
members assigned to medical or mental-health units or
treatment teams, or who regularly receive protected
health information.   *See* Defs.' Proposed Phase 2A
Remedial Order (Doc. 3215) at § 6.2.   The defendants
would also require correctional staff to sign a
confidentiality agreement at the conclusion of the
training in order to be assigned to a medical or
mental-health unit or treatment team, or to receive
protected health information.   *See id.*

### b.   The Court's Ordered Relief

In substantial agreement with both parties, the court
will order that individual counseling sessions,
medication-management encounters, periodic assessments
related to placement in restrictive housing, suicide-risk
assessments, and therapeutic groups must take place in a

setting that provides for confidentiality and that, if applicable, is out-of-cell. These services may be provided in a non-confidential location if confidentiality is not possible due to safety concerns or is otherwise not appropriate. The question whether confidentiality is not appropriate for reasons other than safety concerns must be made answered according clinical determinations. If confidentiality is not possible, then that fact, the reason for it, and the actions taken to maximize confidentiality must be documented in the progress note.

The court orders that mental-health treatment be conducted in confidential settings because, as it found in the liability opinion, such treatment is generally ineffective unless confidential. The court recognizes, however, that it is not always possible to provide mental-health services in a confidential setting. It will therefore allow ADOC to provide mental-health services in a non-confidential setting, but only when it is necessary to do so because of safety needs or other

163

considerations.  Such other considerations might arise, for instance, when an inmate refuses to come out of his or her cell, or when the need for mental-health care is urgent and confidentiality cannot be achieved rapidly. Because determinations about the necessity of non-confidential treatment under such circumstances will necessarily involve some analysis of inmates' mental-health needs, such determinations must be made according to clinical judgment.  Finally, the court orders that providers document instances in which confidentiality is impossible, and the reason(s) that it is, because such information is highly relevant to inmates' care, and must be made available to treatment teams if they are to effectively monitor the course of each inmate's treatment.

The court declines, however, to adopt either of the parties' proposals concerning training.  The evidence simply does not show that ADOC's failure to provide confidential treatment is caused by a lack of training, and so the court cannot find such relief necessary.

Moreover, it assumes that ADOC and its mental-health vendor will inform their staff of their obligations regarding confidentiality, and that the EMT will notify it if they do not.

### c.  PLRA findings

The court finds this provision necessary because, as explained above, confidentiality is essential for the effective provision of mental-health services, and yet at no ADOC facility is treatment consistently provided in confidential settings.  The court also finds this provision to be narrowly tailored and no more intrusive than necessary because it focuses specifically on remedying the violation of confidentiality that was described in the liability opinion and continues today, and because it allows ADOC the flexibility to hold sessions in nonconfidential settings when necessary or appropriate.

### H.  Treatment Teams and Plans

**165**

Since the court's liability findings, ADOC has made much progress in ensuring that every inmate has a treatment team.   However, as discussed previously, treatment teams often do not meet frequently enough, and when they do meet, they lack pertinent information and do not meet for long enough to substantively discuss inmates' needs and progress.  As a result, the treatment plans that those teams are tasked with curating are often nonexistent or so vague as to be insufficient to address inmates' individual needs.  Moreover, treatment plans are often not amended to address changes in inmates' needs and circumstances, a shortcoming that is exacerbated by the haphazard and poorly documented nature of ADOC's transfer process.

### 1.   Frequency of Treatment-Team Meetings

#### a.   The Parties' Proposed Provisions

With respect to the infrequency with which treatment teams meet, the plaintiffs propose that "treatment teams must meet at regular intervals as mandated by the

patient's assigned mental-health code and appropriate level of psychotherapy in order to formulate/revise the patient's treatment plan, review progress notes, discuss the condition of the patient, and address the patient's progress." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 7.2.1.    The defendants propose, similarly, that "treatment team meetings will occur at regular or clinically indicated intervals or after a major clinical event to prepare or to revise the inmate's treatment plan." Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 7.2.   Both parties also propose that treatment teams meet according to prescribed timeframes. *See id.*; Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at App'x A, Table 2.

### b.  The Court's Ordered Relief

The court will adopt a hybrid of the parties' proposals, and order that treatment teams meet at regular intervals, to be determined based on the team chair's clinical judgment of what is appropriate given the

inmate's assigned mental-health code, housing unit, and level of psychotherapy. As the court found in the liability opinion, treatment planning is essential to the provision of mental-health care, especially in the prison context, and it cannot occur absent regular meetings by treatment teams. *See Braggs*, 257 F. Supp. 3d at 1206. Because ADOC has failed to ensure that treatment teams meet regularly, the court must do so now to ensure that inmates receive the minimal level of care required by the Constitution.

The court omits from its order the plaintiffs' language regarding the substance of treatment-team meetings because there is no evidence that meetings fail to address necessary issues when they do occur and last long enough to be productive.

The court also declines to adopt the parties' proposed timeframes for treatment-team meetings. At this point, such a provision does not appear necessary. ADOC should have the opportunity to comply with the court's order for regular meetings before the court imposes such

a granular scheduling requirement.  The court is also confident that the EMT will monitor the frequency of treatment-team meetings and will alert the court if meetings continue to occur so infrequently as to prevent effective care.

### c.  PLRA Findings

The court finds this provision necessary for the reasons given above:  treatment planning is vital to the provision of mental-health care, and it cannot occur absent regular meetings.  The court also finds that this provision is narrowly tailored and no more intrusive than necessary because it leaves the decision of what to discuss during treatment-team meetings, and the decision of exactly how frequently to hold meetings, up to the chair of the team, thereby ensuring that ADOC maintains maximum flexibility to structure its operations.

### 2.  Length of Treatment-Team Meetings

169

### a.   The Parties' Proposed Provisions

With  respect  to  ADOC's  failure  to  ensure  that
treatment-team meetings last long enough to be effective,
the plaintiffs propose that the length of any given
treatment-team meeting must be "based on whether there
have  been  any  significant  clinical  changes  in  the
patient's  condition  since  the  last  treatment  team
meeting." Pls.' Updated Proposed Omnibus Remedial Order
(Doc.  3342)  at  §  7.2.4.   The  defendants  propose  no
provision  regarding  the  length  of  treatment-team
meetings.


### b.   The Court's Ordered Relief

The court will order simply that each treatment team
meeting must last for an adequate period of time, based
on the chair's clinical judgment.  The court orders this
relief  in  light  of  the  evidence  that  treatment-team
meetings for some inmates are lasting between one and six
minutes, despite the fact that, as Dr. Burns testified,
a  normal  follow-up  treatment-team  meeting,  when  "there

170

are no changes and things are going just fine," should last at least 15 to 20 minutes.  May 25, 2021, R.D. Trial Tr. at 135.  Because the evidence also demonstrates that the appropriate length of treatment-team meetings will vary depending on inmates' needs, however, the court does not prescribe any particular length for treatment-team meetings.

### c.   PLRA Findings

The court finds this provision necessary because, as explained above, treatment teams are currently meeting for less time than is required to ensure that each inmates' treatment plan and progress are meaningfully analyzed.  It is also narrowly tailored and no more intrusive than necessary because it leaves the decision of exactly how long each meeting should last to the team chair, provided that the decision is based on clinical judgment.

### 3.   Lack of Pertinent Information

171

a.   The Parties' Proposed Provisions

With respect to treatment teams' frequent lack of pertinent information, the plaintiffs propose that "[a]ll members [of the treatment team] must have access to clinically relevant documents."  Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 7.2.6.   The plaintiffs define "clinically relevant documents" as "documents related to the current condition of the patient," including the "most recent treatment plan, any treatment plan less than thirty (30) days old, [a] list of currently prescribed medication, documentation showing medication compliance within the last thirty (30) days, progress notes from the last thirty (30) days, and any other clinically relevant document determined necessary by the reviewing individual to inform clinical judgment."  *Id.* at § 1.5.   The defendants propose no provision regarding treatment teams' access to information.

b.   The Court's Ordered Relief

**172**

The court will order that all members of the treatment team must have access to clinically relevant documents related to the inmate, with "clinically relevant documents" defined as all documents related to the current and past condition of the inmate--including documents related to the inmate's housing status, disciplinary history, and interactions with other inmates--that are necessary to inform clinical judgment. The court orders this relief in light of the evidence that pertinent information about inmates' statuses has been consistently omitted from the files to which treatment teams have access, including information regarding violent interactions with other inmates and attempts at self-harm that could have alerted treatment teams to the suicidality of several inmates who eventually killed themselves. For treatment teams to function adequately and prepare comprehensive treatment plans, they must remain informed of their patients' conditions and life circumstances. This provision is

173

therefore needed to ensure that inmates receive adequate care.

To provide ADOC maximum flexibility, however, the court will not enumerate various types of clinically relevant documents, as the plaintiffs propose. Instead, the court will leave it to ADOC's mental-health providers to determine what documents are necessary to inform clinical judgment. The court trusts that the EMT will monitor treatment teams' access to documents, and that the EMT will alert the court if it becomes apparent that treatment teams are deprived of pertinent information.

### c. PLRA Findings

The court finds this provision necessary for the reasons given above: treatment teams cannot function effectively without access to information concerning inmates' past and current conditions, and yet ADOC has failed to ensure that treatment teams have access to such information. Accordingly, the court must order relief. The provision is also narrowly tailored and minimally

intrusive because it simply directs ADOC to ensure that treatment teams have access to clinically relevant documents, while allowing ADOC's mental-health providers the flexibility to determine which particular documents are needed.

### 4. Nonexistent or Vague Treatment Plans

#### a. The Parties' Proposed Provisions

With respect to the nonexistence of treatment plans and the lack of detail and individualization in treatment plans that do exist, the plaintiffs propose that "[e]ach patient on the mental-health caseload must have a treatment plan created within the appropriate timeframe following his or her addition to the caseload, or more frequently if clinically appropriate," Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 7.3.1; *see also id.* at § 7.7.1, and that "each treatment plan must be individualized to each patient," *id.* at § 7.3.2. The plaintiffs also propose a list of specific

**175**

information to be included in each treatment plan.  *See*
*id.* at § 7.3.3–7.3.3.5.

The defendants propose substantially similar
provisions.  They would require that each inmate have a
finalized treatment plan within a prescribed timeframe,
*see* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215)
at § 7.4.1, and that treatment plans be "individualized
for each inmate," *id.* at § 7.4.2.  And, like the
plaintiffs, they propose specific information to be
included in each treatment plan.  *See id.*; *see also id.*
at § 7.4.2.1–4 (proposing various categories of
information that treatment plans "may" include).


b.  The Court's Ordered Relief

The court will order that each inmate on the
mental-health caseload must have a treatment plan that
is adequately detailed and individualized to address his
mental-health needs, based on clinical judgment.  The
court orders this relief in light of ADOC's ongoing
failure to provide treatment plans that are sufficiently

detailed and individualized to facilitate treatment.  *See*
May 26, 2021, R.D. Trial Tr. at 17–18 (testimony of Dr.
Burns, describing letter from ADOC to Wexford indicating
that treatment plans available for inspection "were often
of poor quality, were left incomplete, or otherwise
lacked necessary documentation"); *id.* at 155 (reporting
that a recent audit of Fountain Correctional Facility
found that there were only treatment plans for about half
of the charts reviewed).  This was a major violation
identified in the liability opinion, and the court is
seriously concerned that it continues today.

Just as it will not attempt to enumerate various
types of clinically relevant documents, however, the
court will not attempt to dictate the specific contents
of treatment plans.  Rather, it will leave it to ADOC's
mental-health providers to determine the information to
be included in each treatment plan.  Individual inmates'
treatment plans may differ in their contents, for, as Dr.
Metzner testified, "the nature of the individualized
treatment plan [and its] comprehensiveness ...  is going

to significantly vary [based] on the level of care . . .
assigned."   June 29, 2021, R.D. Trial Tr. at 158.
Regardless of the level of care assigned to any
particular inmate, however, ADOC must ensure that
treatment plans are thorough enough to provide
comprehensive portraits of inmates' mental-health needs,
treatment history, and treatment goals.  The court trusts
that the EMT will monitor the contents of treatment
plans, and that the EMT will alert the court if it appears
that treatment plans continue to lack sufficient detail
to fulfill their intended purpose.

Similarly, the court does not order, as the parties
propose, that treatment plans be created within certain
timeframes.   The evidence does not indicate that
treatment plans are not created promptly when they are
created; rather, it indicates that too often, plans are
not created at all.  The court trusts that in following
its order that each inmate have an individualized
treatment plan, that ADOC will ensure that treatment
plans are created within a reasonable timeframe, and that

the EMT will bring the issue to the court's attention if it fails to do so.

### c.   PLRA Findings

The court finds this provision necessary given ADOC's ongoing failure to ensure that treatment plans are sufficiently individualized and detailed so as to facilitate the provision of an informed and consistent course of treatment.   It is also narrowly tailored and minimally intrusive because it does not mandate the specific contents of treatment plans, nor the timeframe in which treatment plans must be completed.

### 5.   Failure to Update Treatment Plans

#### a.   The Parties' Proposed Provisions

With respect to ADOC's failure to update treatment plans when needed, the plaintiffs propose several provisions that would require ADOC to ensure that treatment plans are regularly amended to reflect changes in inmates' needs and circumstances.   *See* Pls.' Updated

Proposed Omnibus Remedial Order (Doc. 3342) at § 7.3.1 (proposing that each treatment plan must be "amended and updated as necessary until the patient is either removed from the mental health caseload or leaves ADOC custody"); *id.* at § 7.3.2 (proposing that "[t]reatment plans must reflect changes in goals, plans to achieve goals, changes in mental health status/symptoms, and amended timeframes to reach goals"); *id.* at § 7.4.2 (proposing that "treatment plans must be reviewed and amended, if necessary, contemporaneously with a change in the patient's mental health code"); *id.* at § 7.4.3 (proposing that "treatment plans must be amended contemporaneously with the treatment team's decision to pursue involuntary medication, [the] need for emergency administration of psychotropic medications, or [the] decision to discontinue all mental health medication").

The defendants propose that treatment plans must reflect "changes in treatment goals, ... changes in mental-health status or symptoms, and any revised timeframes for reaching treatment goals," Defs.' Proposed

Phase 2A Remedial Order (Doc. 3215) at § 7.4.2, and that treatment plans may include information regarding "any effect of recent housing changes on the inmate's mental-health needs," *id.* at § 7.4.2.4. They also propose that treatment teams review and revise inmates' mental-health codes as clinically appropriate. *See id.* at § 4.3.

b.   The Court's Ordered Relief

In substantial agreement with both parties, the court will order that treatment teams must review and revise each inmate's mental-health code as clinically appropriate, and must review and amend, if necessary, each inmate's treatment plan after changes in the inmate's mental-health code, transfer to a new housing unit, or any other circumstance resulting from or likely to affect an inmate's mental health in a significant way. The court orders this relief in light of ADOC's internal audits of its own facilities, which reveal that treatment plans were rarely updated after major events, *see* Bullock

181

RTU and SU Audit Results (P-3260) at 9 (showing 11.39 %
compliance on major event movements); Bullock Outpatient
Audit Results (P-3263) at 10-11 (2.92 % compliance); St.
Clair Audit Results (P-3277) at 7 (7.14 % compliance),
and by Dr. Burns's testimony to the same effect, *see* May
26, 2021, R.D. Trial Tr. at 18 (explaining that according
to her review of inmate records, there were "not always
[] treatment plan changes when there's a significant
event, like removal or placement off watch or discharge
into outpatient from a residential treatment unit").  In
the liability opinion, the court noted that it is vital
that treatment plans be regularly updated to address new
developments in an inmate's conditions and circumstances.
A treatment plan is ineffective if it does not address
an inmate's current needs, and "rote repetition" of goals
without acknowledgement of changes that have occurred
presents a real "hazard[] to prisoners with mental
illness." Braggs, 257 F. Supp. 3d at 1207.  Because ADOC
has failed to ensure that treatment plans are
appropriately updated the court must order that it do so.

c.   PLRA Findings

The court finds this provision necessary for the reasons given above:  treatment teams continue to produce plans that do not reflect relevant changes in inmates' individual circumstances, and therefore cannot fulfill their intended purpose.  This provision is also narrowly tailored and minimally intrusive because, for the most part, it leaves it entirely to treatment teams to determine the circumstances under which treatment plans must be updated.  While it does require that treatment plans be reviewed under two specific circumstances--changes in housing and changes in mental-health codes--it imposes that requirement only because the evidence demonstrates that treatment planning must address changes in housing and mental-health codes to be effective.

6.   Coordination of Transfers and Treatment

183

a.   The Parties' Proposed Provisions

With respect to ADOC's failure to coordinate the transfer of prisoners among facilities with prisoners' treatment planning, the plaintiffs propose the following provisions:

- "In order to ensure continuity of care, the patient's mental health code and condition must be considered in making determinations concerning transfer." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 7.5.1.

- "Decisions regarding transfer of outpatient patients (MH Code B and C) will not occur without consultation with the treatment team.  The treatment team must weigh the reason for the transfer against concerns about continuity of care.  Patients with an SMI flag my only be transferred upon approval of the patient's treatment team.  The transfer of patients in the RTU or SU will be permitted to accommodate a patient's change in level of care occasioned by an improvement or deterioration in mental health condition."  Id. at § 7.5.2.

- "In the event of a transfer of a patient on the mental health caseload, there must be a transfer note written by the patient's MHP at the transferring facility to the patient's new MHP at the receiving facility.  This transfer note will include a discussion of the patient's mental health background, current needs, and the next steps for treatment the transferring facility would have taken if not for the transfer.  The transfer not for patients coded MH-D must be sent to the receiving facility prior to the patient's transfer.  The

184

transfer note for patients coded MH-B or MH-C must occur within five (5) business days of the patient's transfer." *Id.* at § 7.5.3.

- "The transfer note must be on the Mental Health Transfer Form. The purpose of the Mental Health Transfer Form is to eliminate, as much as possible, disruption in the patient's care. The Mental Health Transfer Form must include, at a minimum, the following information: (1) Any individualized treatment or compliance strategies that have been successful; (2) Individualized treatment or compliance strategies that have been unsuccessful; (3) Clinically relevant information about the patient's background, such as prior history of abuse, family history, or difficulties in the course of treatment or compliance; and (4) Any other information which may assist a new mental health provider in gaining insight and rapport with the patient." *Id.* at § 7.5.3.1.

- This transfer note requirement does not apply to patients being moved within the same ADOC facility or from one ADOC facility's holding cell to another ADOC facility's crisis cell. However, if a patient is transferred while on suicide watch, then mental-health staff at the sending facility must communicate with mental-health staff at the receiving facility consistent with the transfer note requirements. *Id.* at § 7.5.3.2.

The defendants propose no provision regarding coordination of prisoners' transfers with treatment planning.

### b.   The Court's Ordered Relief

The court will order, as the plaintiffs propose, that ADOC must consider inmates' mental-health codes and symptoms in making decisions concerning transfer between facilities.  The court orders this provision in light of the evidence that transfer between facilities can be particularly destabilizing for inmates on the caseload, *see Braggs*, 257 F. Supp. 3d at 1241 n.67, and that such transfers are excessively frequent and disorganized, *see* May 25, 2021, R.D. Trial Tr. at 36, 39–40, 53 (testimony of Dr. Burns, describing frequent transfers for no apparent or documented reason).  While the court recognizes that transfers are vital to the functioning of a prison system--and in some cases even mandated by other provisions of this remedial order--ADOC's current approach demonstrates insufficient consideration of the effect transfers may have on mentally ill inmates. Accordingly, the court must order ADOC to consider inmates' mental-health codes and conditions when making determinations concerning transfers, so as to ensure that

186

mental-health treatment is effective and not needlessly disrupted.

The court will also largely adopt the plaintiffs' third proposed provision, and order that in the event of a transfer of an inmate on the mental-health caseload, the staff member in charge of the inmate's care at the transferring facility must send a transfer note to the staff member in charge of the inmate's care at the receiving facility within a reasonable time after the transfer is initiated.[10]  The court orders this provision in light of the evidence that mentally ill inmates are frequently transferred between facilities with no notice,

_____

10. Because the court orders that transfer notes must be written and sent only in the event that an inmate is transferred from one facility to another, it finds the plaintiffs' proposal that the "transfer note requirement does not apply to patients being moved within the same ADOC facility" to be unnecessary.  The court does not limit its order, however, to exclude transfers from one ADOC facility's holding cell to another ADOC facility's crisis cell, as the plaintiffs suggest.  For the reasons given above, it is essential that pertinent information regarding an inmate's mental health follow him or her from facility to facility, regardless of what type of cell he or she is in.  The staff in charge of the inmate must be aware of the inmate's needs and vulnerabilities, particularly if the inmate is suicidal.

or insufficient notice, given to the receiving facilities about the inmates' diagnoses and treatment. As a result, these inmates do not receive continuous care and they decompensate, sometimes to disastrous effect. When Jaquel Alexander was transferred between facilities, for instance, his transfer form incorrectly indicated that he had no SMI designation, and the staff member who completed Alexander's risk assessment after his transfer, who indicated no familiarity with his prior risk factors, identified him as a "low" risk of harm to self. Alexander Psychological Autopsy, (P-3298) at 6. Days later, he killed himself. *Id.* Similarly, when inmate TM was sent to the RTU after setting himself on fire and threatening to do so again, there was "no transfer note indicating why" or explaining what kind of treatment he needed. May 25, 2021, R.D. Trial Tr. at 52–53. Thus, while it may be true, as Dr. Metzner testified, that the providers at the receiving facility are supposed to review an inmate's file upon his or her transfer and ask clarifying questions of his or her previous providers, *see* June 30,

2021, R.D. Trial Tr. at 23–24, that procedure has proven either inadequate or unfollowed.  Because ADOC has failed to ensure that pertinent information about mentally ill inmates follows them from facility to facility, the court must order that transfer notes be written and sent.

The court will not order, as the plaintiffs propose, that the treatment team be involved in all discussions concerning transfers or that it have veto power over transfers.  Such a provision has not yet proven necessary; so long as ADOC follows the court's order and ensures that inmates' mental-health codes and conditions are factored into decisions about transfers, the court sees no reason to require that any particular entity make those decisions.  However, the court notes that such additional relief may be necessary if the EMT determines that ADOC is continuing to transfer inmates in ways that harm their mental health.

The court also declines to order that transfer notes include any particular information. Rather, the court will leave the decision as to what information to

include, which will no doubt vary according to the individual needs of each inmate, to the clinical judgment of ADOC's mental-health providers.   Nor will it order that transfer notes be written on Mental Health Transfer Forms.   The evidence does not demonstrate that such relief is necessary at this time, and the court trusts that ADOC will be able to determine itself the manner in which transfer notes must be prepared.   Again, however, if the EMT finds, after a period of monitoring, that transfer notes continue to contain insufficient information, the court may choose to revisit the issue and order additional relief.

c.   PLRA Findings

The court finds that its first ordered provision--that ADOC must consider inmates' mental-health codes and symptoms in making decisions concerning transfers between facilities--is necessary for the reasons given above:   inmates are currently transferred between facilities in a frequent and

190

haphazard fashion, despite the court's previous finding that such transfers can be detrimental to mental-health treatment.  This provision is also narrowly tailored and minimally intrusive because it merely mandates that ADOC consider certain factors, but does not control ADOC's ultimate decisions regarding transfers.

The court finds that its second ordered provision--that in the event of a transfer of an inmate on the mental-health caseload, the staff member in charge of the inmate's care at the transferring facility must send a transfer note to the staff member in charge of the inmate's care at the receiving facility within a reasonable time after the transfer is initiated--is necessary because, as described above, ADOC has failed to ensure that pertinent information about mentally-ill inmates follows them from facility to facility, resulting in decompensation and death.  This provision, too, is narrowly tailored and minimally intrusive because it asks no more of ADOC than what is necessary to ensure that inmates receive continuous care.  It does not, for

instance, require ADOC to prepare and send the transfer notes within any particular timeframe, so long as it does so within a reasonable time after the decision to transfer the inmate.  And it does not require the transfer notes to include any particular information.

### 7.  Other Provisions Regarding Treatment Teams and Planning

Besides for the provisions discussed above, the plaintiffs propose several other provisions that the court does not adopt because there is insufficient evidence that they are currently necessary.

The first is elemental: the plaintiffs propose a provision requiring each inmate on the mental-health caseload to have a designated treatment team.  *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 7.1.1.  Neither party's experts, however, identified any inmates on the caseload without a treatment team.

Second, the plaintiffs propose that the makeup of each treatment team be determined according to the

inmate's assigned mental-health code and appropriate level of psychotherapy, *see id.* at § 7.1.2, and that, "[w]henever possible, all members of the treatment team must attend each team meeting, either in person or via videoconferencing," *id.* at § 7.1.2. The record does not indicate, however, that relevant personnel are not assigned to treatment teams, or that treatment-team members fail to attend meetings. To the contrary, ADOC has created new forms for treatment-team meetings that reinforce its policies on who should attend those meetings and appear to have been largely successful in ensuring that relevant staff are included. Also, Dr. Burns's review of treatment-team records indicated that most meetings are attended by all relevant staff members.

The court is concerned, however, by ADOC's contention, at oral argument, that it may be appropriate for the treatment-team coordinator to speak with team members separately instead of convening a meeting. See July 7, 2021, R.D. Trial Tr. at 261. While conditions may sometimes prevent the team from meeting or require a

decision before a full meeting can be assembled, this should not be common practice. Indeed, as the court found in the liability opinion, failing to have full treatment-team meetings "creates a risk of different providers having an inconsistent approach or course of treatment for the same patient because some of the treatment team are unaware that a new treatment plan has been put into effect." Braggs, 257 F. Supp. 3d at 1207. Once again, the court is confident that the EMT will carefully monitor the performance of treatment teams and will alert the court if further action appears necessary.

Third, the plaintiffs propose that inmates must be allowed to attend treatment-team meetings barring certain exceptions. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 7.2.5. The record does not indicate, however, that inmates are currently being excluded from their treatment-team meetings, particularly if they want to attend.

Fourth, the plaintiffs propose that "in the event the psychiatrist or CRNP (if applicable), the patient's

**194**

MHP, or the patient is unable to attend a treatment team meeting, the meeting must be postponed and rescheduled for the next business day on which the prescriber, the patient's MHP, and the patient are available." *Id.* at § 7.2.7. As explained above, however, the record does not show that either inmates or staff members are absent from meetings.

Fifth, the plaintiffs propose that "[e]ach treatment team must be organized and chaired by the patient's assigned MHP or psychiatrist." *Id.* at § 7.1.3. While the court remains concerned about ensuring that treatment plans are individualized and carefully compiled, there is no evidence that the identity of the chair of the meeting has any bearing on whether that outcome is achieved.

Sixth, the plaintiffs propose that "[r]ecords of each treatment team meeting must be kept in the respective patient's mental-health record and must consist of the following: (1) The date of the treatment team meeting; (2) The attendees of the treatment team meeting; (3)

**195**

Notes about each treatment team meeting; and (4) Any changes to the patient's treatment plan as a result of the treatment team meeting." *Id.* at § 7.2.8.  There is insufficient evidence, however, that ADOC is not currently keeping adequate records of treatment-team meetings.

Seventh, the plaintiffs propose that, "[i]f a member of a patient's treatment team, other than correctional staff, provides or is provided fourteen (14) days or more notice of voluntary resignation or involuntary termination, then the employee must, to the extent possible, prepare transfer notes on Mental Health Transfer Form for any patients under their care." *Id.* at § 7.6.1.  While it is true that the departure of mental-health staff can be just as disruptive to an inmate's mental-health care as a transfer, there is insufficient evidence to suggest that staff departures are currently disrupting care.  Also, as the defendants note, progress notes should already be written after every encounter, and in the event of a staff member's

departure they should equip the replacement provider with enough information to continue the inmate's treatment without unnecessary disruption.

Eighth, and finally, the plaintiffs propose that "[v]acancies in treatment team members due to staff turnover, must be filled on the earlier of: a) thirty (30) days, or b) at least 24 hours before the date and time of the next regularly scheduled treatment team meeting for that patient." *Id.* at § 7.6.2. Without a doubt, ADOC should make every effort to fill vacant positions as soon as possible. However, while mental-health understaffing in general has an impact on the provision of care, there is no evidence that suggests that vacancies on treatment teams are persisting for excessive lengths of time or interrupting care.

Although it declines to adopt the above provisions, the court trusts that the EMT will be cognizant of the problems that they are meant to address, and will monitor ADOC's performance accordingly.

197

## I.   Psychiatric and Therapeutic Care

The provision of psychiatric and therapeutic care is one of the areas of liability in which ADOC has made the least progress since the court's 2017 liability opinion. As described previously, ADOC's provision of such care is deficient in at least four respects.  First, inmates have insufficient access to treatment.  They often do not receive the treatment they are prescribed, and even when they do receive some treatment, group therapeutic sessions are not sufficiently accessible and individual therapeutic sessions are not held frequently enough, or long enough, to be effective.  Second, inmates housed in ADOC's inpatient units receive insufficient out-of-cell time.  Confined to their cells for extended periods, they decompensate and their social skills atrophy, thereby undermining the efficacy of any treatment they receive. Third, inmates not on the mental-health caseload who report or display symptoms are not given access to treatment.  Fourth, progress notes are often incomplete, inconsistent, or nonexistent, making it more difficult

**198**

for treatment teams to monitor inmates' progress, and preventing counselors from building on progress made in previous sessions.

### 1.   Access to Treatment

#### a.   The Parties' Proposed Provisions

With respect to ADOC's general failure to provide inmates with psychiatric and therapeutic care, the plaintiffs propose minimum frequencies with which each inmate must meet with psychiatrists, CRNPs, counselors, and mental-health nurses.   *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 8.1.3.

In addition to these minimum requirements, the plaintiffs propose that each inmate, including inmates in restrictive housing, must have access to the treatment prescribed by his or her treatment team.   *See id.* at §§ 8.1.2, 8.1.5.   To that end, the plaintiffs propose that each outpatient mental-health facility must offer psychoeducational groups, individual therapy, group psychotherapy, and pharmacotherapy, *see id.* at § 8.1.9.1;

that each SU, RTU, and SLU must offer those types of treatment in addition to activity therapy, *see id.* at § 8.1.9.2; and that "group psychotherapy must be offered on topics such as medication management, cognitive retraining, stress management, social skills, and anger management in sufficient quantity to accommodate the treatment services prescribed for the population of each facility," *id.* at § 8.1.9.3. The plaintiffs also propose that, "[i]f an intervention or program that is set forth in the treatment plan is not offered in the facility in which the patient is housed, either the patient will be moved to allow the patient to participate in that intervention, or the intervention will be offered in the facility where the patient is housed," provided that "no patient in need of residential care may be moved to a facility not offering residential care." *Id.* at § 8.1.10.

The defendants contend that, in general, no relief is warranted with respect to the provision of psychiatric and therapeutic care. In support of this position, they

point to the fact that ADOC has hired more mental-health staff since the court's liability opinion, *see* Defs.' Post-Trial Br (Doc. 3367) at 93; that it has hired qualified staff, *see id.* at 94; and that Dr. Burns, "in reviewing records and instances of care in advance of the PLR hearing, observed instances of 'good' mental-health care," *id.* at 94-95, and evidence of inmates routinely receiving counseling sessions, *see id.* at 94.

Alternatively, the defendants propose that the court "approve[] [a] mental-health treatment guidance--a term of art in the medial and mental-health communities for a document aimed at guiding decisions and strategies in a particular practice area--[] for the provision of mental-health treatment to inmates in ADOC custody." Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 8.1. ADOC includes a model mental-health treatment guidance in its proposed order that suggests certain types and quantities of care for inmates depending on whether they are housed in an SU, RTU, SLU, or whether they are outpatients. *See id.* at § 8.4.  It emphasizes,

however, that "[t]he type, time, frequency, and location of any admission, appointment, assessment, discharge, evaluation, length of stay, and psychotherapy or treatment for an inmate by a qualified mental-health professional or treatment team should be determined by clinical judgment based on the needs of the inmate." *See id.* at § 8.3.2.

b.   The Court's Ordered Relief

The court will order that each inmate must receive a certain minimal level of treatment according to his or her treatment category (*e.g.*, SU, RTU, etc.) and mental-health code.  To that end, the court will adopt the defendants' proposed mental-health treatment guidance, set forth in Appendix A, establishing minimum frequencies with which inmates must meet with RNs, psychologists, counselors, psychiatrists, and CRNPs.  The court will also order that treatment sessions must last for an adequate period of time, to be determined according to the clinical judgment of the inmate's

202

mental-health provider; that, in addition to the minimal levels of treatment described above, each inmate--including those in restrictive housing--must receive any additional care prescribed by his or her treatment team; and that each housing unit must offer appropriate types and numbers of treatment groups.  To the requirement that each inmate must receive any additional care prescribed by his or her treatment team, the court will add one caveat: while ADOC must provide inmates in restrictive housing with any medication or individual therapy prescribed by their treatment team, it need not provide inmates in segregation with other forms of care if they cannot be provided safely in the restrictive housing environment.

The court rejects the defendants' proposal to do nothing because, while ADOC has made encouraging progress in its hiring of mental-health staff, the evidence demonstrates that it is still failing to ensure that inmates have access to the care they need.  Although Dr. Burns testified that, in her review of ADOC's records,

she observed at least one instance of good mental-health care, *see* June 7, 2021, R.D. Trial Tr. at 105, she did not testify, as the defendants suggest, that most--or even a substantial number--of inmates who were identified as needing counseling routinely received it. Rather, she testified that "there were progress notes labeled counseling sessions" in some inmates' records, but that "some of them were really very brief interactions, a matter of moments," *id.* at 109, and that many inmates who were prescribed psychotherapy did not receive it at all, *see* May 25, 2021, R.D. Trial Tr. at 82, 87, 90, 192. ADOC itself has also recognized its inadequate provision of treatment; in a February 2020 letter to Wexford, it reported that its own audit of its mental heal units "indicate[d] a pattern of failure of Mental Health staff to meet with their patients at required intervals and to conduct group therapies on a routine bases." P-3322 at 2.

The court orders that each inmate must receive a certain minimal level of treatment, according to the guidance proposed by the defendants, because the evidence

indicates that across ADOC facilities inmates are, in the words of Dr. Burns, "falling through the cracks."  June 3, 2021, R.D. Trial Tr. at 106–107 (testimony of Dr. Burns).  This provision ensures that even if an inmate does not have a treatment plan (perhaps because the inmate has only recently been placed on the mental-health caseload), or has a treatment plan that does not specify the exact frequency with which the inmate must receive counseling, he will receive enough care to protect him from bodily injury or death.  It also ensures that ADOC is able to provide care in a predictable and consistent fashion, thereby further reducing the risk that inmates are inadvertently deprived of life-saving treatment.  As Dr. Metzner explained, "guardrails"--*i.e.*, set treatment frequencies--are necessary to provide the mental-health staff in each unit "a clear expectation of what's required of them … [and] how to prioritize their time," and to allow ADOC to effectively create staffing plans.  June 2, 2021, R.D. Trial Tr. at 173-174; *see also* June 23, 2021 R.D. Trial Tr. at 130-31.  At the same time,

205

this provision does not deprive treatment teams of their discretion to set the level of care that each inmate receives. Should a treatment team determine that an inmate needs less care than what his or her treatment category requires under the guidance, the treatment team need only adjust the inmate's mental-health code, or recommend that the inmate be moved to a different treatment category, to reduce his or her level of care.

The court orders that treatment sessions must last for an adequate period of time, to be determined according to the clinical judgment of the inmate's mental-health provider, because the evidence demonstrates that, when inmates do receive counseling sessions, many of them are extremely short, lasting only a few minutes. Experts for both sides agreed that such truncated meetings prevent the effective provision of care. See May 25, 2021, R.D. Trial Tr. at 135-36; July 1, 2021, R.D. Trial Tr. at 168. Because this pattern persisted throughout the sessions reviewed in the omnibus remedial hearing, and because ADOC shows no signs of

being able or willing to correct it, the court must order this relief to ensure that sessions last long enough to provide substantive treatment.

Finally, the court orders that each inmate must receive any additional care prescribed by his or her treatment team in light of the evidence that numerous inmates, including several who eventually killed themselves, were not receiving some or all of the care ordered by their treatment teams. The court is particularly concerned by evidence that, across different facilities and units, inmates continue to be deprived of access to group therapeutic treatment. Accordingly, it specifies that ADOC must ensure that it offers the different types of treatment groups that the treatment teams deem necessary, and that it offers them with sufficient frequency so that all inmates who need them can attend.

It is especially important that inmates in restrictive housing receive the care prescribed by their treatment teams because, as Dr. Metzner testified, the

207

effects of isolation make the need for continuous therapeutic treatment all the more urgent. *See* July 2, 2021 R.D. Trial Tr. at 10. At the same time, however, the court credits Dr. Metzner's testimony that it may be impossible to provide inmates in restrictive housing with certain kinds of care, like group therapy or extended periods of exercise time. *See id.* at 12-13; June 30, 2021 R.D. Trial Tr. at 18. The court will therefore order that ADOC must provide inmates in restrictive housing with any medication or individual therapy prescribed by their treatment team, but that it need not provide other forms of care prescribed by an inmate's treatment team if those kinds of care cannot be provided safely in the restrictive housing environment. That is not to imply, however, that ADOC may reflexively deny care to inmates in restrictive housing; rather, ADOC must provide the care prescribed by each inmate's treatment team to the fullest extent possible.

c.   PLRA Findings

208

The court finds this provision necessary given ADOC's failure to provide psychiatric and therapeutic care in a timely manner (or, in some cases, at all); to provide counseling that last long enough to be effective; and to provide group therapeutic sessions.  The court also finds this provision to be narrowly tailored and minimally intrusive.  While the court requires ADOC to provide inmates with certain minimal levels of care, it does not infringe on the discretion of treatment teams to prescribe treatment--if an inmate's treatment team wishes to decrease his or her level of care, it can do so by altering the inmate's mental-health code or recommending that the inmate be moved to a different treatment location.  And, while the court requires treatment sessions to last for an adequate amount of time, it leaves the question of exactly how long each session should last to the inmate's mental-health provider.  Finally, while the court orders that ADOC must provide inmates with the care prescribed by their treatment team, it does not dictate the manner in which ADOC does so, and it orders

no more care than what each inmate's treatment team determines to be necessary.

## 2.   Insufficient Out-Of-Cell Time

### a.   The Parties' Proposed Provisions

To remedy ADOC's failure to ensure that inmates housed in its inpatient units receive sufficient out-of-cell time, the plaintiffs propose that inmates in the SU, SLU, and RTU Level One and Two must receive 10 hours of structured, therapeutic out-of-cell time and 10 hours of unstructured out-of-cell time per week, unless clinically contraindicated; and that inmates in the RTU Level Three must receive 10 hours of structured, therapeutic out-of-cell time and 10 hours of unstructured out-of-cell time per week, or the same amount of unstructured out-of-cell time as other inmates of the same security level who are not mentally ill, whichever is greater.  *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at §§ 8.3.1, 8.3.2.  The plaintiffs would make an exception to this requirement for inmates

in the RTU Level Three who are housed in open dormitories rather than cells, and therefore cannot receive in-cell treatment. *See id.* at § 8.3.2. Those inmates, the plaintiffs propose, must receive the same amount of time outside their dormitory as inmates of the same security level who are not mentally ill. *See id.* The plaintiffs would also require that, for inmates arriving in the SLU, the provision of unstructured out-of-cell time must begin immediately. *See id.* at § 8.3.1.

The defendants propose no required amount of out-of-cell time of any type, but their proposed mental-health treatment guidance suggests that inmates in the SU and inmates in the RTU and SLU who are confined to a celled environment for more than 22.5 hours per day should receive 10 hours of structured and 10 hours of unstructured out-of-cell time per week, unless clinically contraindicated. *See* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 8.4.

Both sides agree that an inmate's out-of-cell appointments with his or her treatment team, psychiatric

provider, counselor, or a therapeutic group will count towards the applicable structured, therapeutic out-of-cell time. *See id.*; Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 8.3.3.

### b.   The Court's Ordered Relief

The court will order that inmates in the RTU, SU, and SLU must have 10 hours of structured, therapeutic out-of-cell time and 10 hours of unstructured out-of-cell time per week, unless clinically contraindicated. Inmates in the RTU Level Three who are housed in open dormitories rather than cells, however, need not receive 10 hours of unstructured out-of-cell time per week. Also, as both sides agree, an inmate's appointments with his or her treatment team, psychiatric provider, counselor, or a therapeutic group will count as structured, therapeutic out-of-cell time.

The court orders this provision in light of ADOC's continued failure to provide inmates in the RTU, SU, and SLU with either structured or unstructured out-of-cell

time.  As Dr. Burns testified, and as the court has previously recognized, inmates in the RTU, SU, and SLU must receive both kinds of out-of-cell time if those units are to fulfill their intended therapeutic purposes. Structured out-of-cell time provides inmates with necessary support in managing their symptoms, and a respite from idleness. *See Braggs*, 257 F. Supp. 3d at 1214-15; May 25, 2021, R.D. Trial Tr. at 84-85. Unstructured out-of-cell time alleviates the intense pressure and stress that a highly regimented, celled environment can impose on mentally-ill inmates. *See id.* And both provide inmates the opportunity to practice socializing. *See id.* Without sufficient amounts of either type of time, inmates in the RTU, SU, and SLU are warehoused rather than treated, and face an unacceptable risk of decompensation. *See Braggs*, 257 F. Supp. 3d at 1214. The court therefore finds that it must order some relief, and it is convinced by Dr. Burns's testimony that 10 hours of each type of out-of-cell time is the minimum amount necessary--a recommendation bolstered by ADOC's

mental-health treatment guidance, as well as the evidence presented at the liability hearing (by ADOC's mental-health expert, Dr. Patterson) that 10 hours of each type of out-of-cell time is standard practice in prisons throughout the country, *see* Braggs, 257 F. Supp. 3d at 1215.

The court recognizes that Dr. Metzner did not agree with the recommendations of Dr. Burns, Dr. Patterson, and ADOC's mental-health treatment guidance. He testified that inmates in the SLU should not be required to receive 10 hours of structured out-of-cell time because the SLU is an outpatient, rather than inpatient, facility, *see* June 30, 2021, R.D. Trial Tr. at 48, and that inmates in the SU should not be required to receive 10 hours of structured out-of-cell time because they are seldom in the SU long enough to benefit significantly from such treatment, and because they are often experiencing acute mental-health crises, and therefore may be unable to participate safely in structured group activities, *see*

June 29, 2021, R.D. Trial Tr. at 163; June 30, 2021, R.D.
Trial Tr. at 60-61.

While the court takes these concerns seriously, it
does not find them convincing.  As to Dr. Metzner's first
concern, while the SLU is not an inpatient unit, the
court finds that it should nevertheless be included in
this provision. If inmates in the SLU were to receive
only minimal out-of-cell time, there would be no
practical distinction between the SLU and restrictive
housing, despite the fact that the SLU is designed to be
a diversionary space for the treatment of inmates with
mental-illnesses.  As to Dr. Metzner's second concern,
the court agrees that 10 hours of structured out-of-cell
time may be inappropriate for some inmates in the SU.  In
light of the other experts' testimony that 10 hours is
generally the minimum amount of structured out-of-cell
time necessary for the effective treatment of inmates in
the SU, however, it finds that the best way to address
the problem by allowing ADOC to provide less than 10

hours of structured out-of-cell time if 10 hours is clinically contraindicated.

The court does not order that inmates arriving in the SLU must be provided with unstructured out-of-cell time immediately, as the plaintiffs propose, because there is no evidence that, when ADOC does provide inmates with unstructured out-of-cell time, it provides it too late. Nor does it order that inmates in the RTU Level Three must receive the same amount of unstructured out-of-cell time as other inmates of the same security level who are not mentally ill, if that amount is greater than 10 hours; or that inmates in the RTU Level Three who are housed in open dormitories must receive the same amount of time outside their dormitory as other inmates of the same security level who are not mentally ill. The evidence indicates that 10 hours of unstructured out-of-cell time is necessary for effective treatment, but not more, and there is no evidence that inmates must receive a particular amount of time outside their

dormitories.   The court therefore cannot conclude that such relief is warranted.

### c.  PLRA Findings

The court finds this provision necessary for the reasons given above:  despite its finding that "ADOC's mental-health units often fail to serve their therapeutic purpose due to insufficient out-of-cell time and scarce programming for their patients," *see* Braggs, 257 F. Supp. 3d at 1213-14, ADOC has done nothing to ensure that inmates in the RTU, SU, and SLU receive the out-of-cell time they need.  In light of this failure, the court finds that it must order ADOC to provide inmates with some amount of structured and unstructured out-of-cell time, and it defers to the view of the majority of the experts that 10 hours of structured out-of-cell time and 10 hours of unstructured out-of-cell time is the minimum amount necessary to protect inmates from decompensation, self-harm, and suicide.  This provision is also narrowly tailored and minimally intrusive, because although it

makes 10 hours of structured out-of-cell time and 10 hours of unstructured out-of-cell time the default requirement, it allows ADOC to provide less out-of-cell time to inmates on a case-by-case basis, based on clinical judgement. Also, ADOC's own Mental Health guidance proposes that inmates in the RTU, SU, and SLU receive 10 hours of structured out-of-cell time and 10 hours of unstructured out-of-cell time--a strong indication that the provision is not overly intrusive.

### 3.   Monitoring of Inmates Not on the Mental-Health Caseload

#### a.   The Parties' Proposed Provisions

With respect to ADOC's failure to provide treatment to inmates not on the mental-health caseload who report or display symptoms, the plaintiffs propose that "[p]atients who are not on the mental health caseload must be seen by mental health staff (either ADOC staff or vendor staff) in the event of a mental health crisis, after receipt of a mental health referral, or for follow

up, as clinically indicated." Pls.' Updated Proposed
Omnibus Remedial Order (Doc. 3342) at § 8.1.1. The
defendants propose no corresponding provision.


       b.   The Court's Ordered Relief

       The court will order, as the plaintiffs propose, that
inmates who are not on the mental-health caseload must
be seen by mental-health staff in the event of a
mental-health crisis or after receipt of a mental-health
referral, as clinically indicated. The court orders this
relief in light of Dr. Burns's testimony that ADOC has
persistently failed to respond to requests for
mental-health care by inmates in the general population,
*see* May 25, 2021, R.D. Trial Tr., and the evidence that
several of the recent suicides in ADOC facilities were
by inmates in the general population who had exhibited
warning signs but received no attention from
mental-health staff.

**219**

c.  PLRA Findings

The court finds this provision necessary because deterioration is a risk for all inmates, and because there are undoubtedly inmates in ADOC's general population who should be on the mental-health caseload but were missed at intake.  ADOC must therefore ensure that inmates in the general population have access to care when they need it.  This provision is also narrowly tailored and minimally intrusive.  It simply orders ADOC to respond to inmates' demonstrated mental-health needs, but does not require it to follow any particular process or provide any particular care.

4.  Inadequate Progress Notes

a.  The Parties' Proposed Provisions

With respect to ADOC's failure to provide adequate progress notes, the parties propose that after "significant clinical encounters," progress notes must be created and placed in inmates' mental-health record. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc.

**220**

3342) at §§ 8.4.1, 8.4.2; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 8.2.1.

The parties agree that a clinical encounter is significant, and therefore requires a progress note, if it consists of a "communication or interaction … involving an exchange of information used in the treatment of the inmate, excluding any causal exchanges, administrative communications, or other communications which do not relate to the patient's mental condition or the ongoing mental health treatment." *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 1.29; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 1.33.

They disagree, however, as to whether the encounter must be between an inmate and a qualified mental-health professional--*i.e.*, a mental-health professional who is qualified to provide therapy, counseling, or psychiatric services--to count as significant. The plaintiffs would define the term "significant clinical encounter" to include encounters between inmates and any mental-health

221

staff, qualified mental-health professional or not. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 1.29.  In their view, if a nurse interacts with an inmate while conducting routine charting duties and receives information implicating the inmate's treatment, that information should be recorded.  The defendants, wary that the plaintiffs' approach would result in a deluge of unnecessary progress notes and disrupt the provision of care, would define the term to include only encounters between inmates and mental-health staff who are qualified mental-health professionals.  *See* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 1.33.

Both sides also propose that the progress note must be written in one of two specified formats, and that it include several specific pieces of information, including the name and signature of its author.  *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at §§ 8.4.3, 8.4.4; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 8.2.2.  The plaintiffs propose, additionally, that "[t]he note must be sufficiently detailed so that a

treating mental health provider would be able to continue treatment using the information provided in the note," *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 8.4.5, and that it address one or more problems identified in the inmate's treatment plan, *see id.* at § 8.5.

### b.   The Court's Ordered Relief

The court will adopt the defendants' definition of significant clinical encounter, and will order, as the defendants propose, that for each significant clinical encounter between an inmate and a qualified mental-health professional, a progress note must be created and placed in the inmate's mental-health record.  It will also order that the note must be sufficiently detailed to facilitate treatment and ensure continuity of care.

The court orders ADOC to create progress notes and file them in inmates' medical records because ADOC has persistently failed to do so, despite the fact that documentation of inmates' care and symptoms is essential

for treatment planning, which, in turn, is essential for the effective provision of care. It adopts the defendants' definition of significant clinical encounter because it anticipates that progress notes documenting interactions between inmates and qualified mental-health professionals, who both treat inmates and monitor their symptoms, will provide a sufficient bases for treatment planning. Although inmates might occasionally provide information about their symptoms to mental-health staff members who are not qualified mental-health professionals, the plaintiffs have presented no evidence that they do so frequently, or that, when they do so, the information is not relayed to a qualified mental-health professional. (Should the EMT discover such evidence, the court trusts that it will bring it to its attention.)

The court declines to order that progress notes be written in a particular format or contain particular information. Such a provision has not yet been proven necessary; so long as ADOC ensures that progress notes are sufficiently detailed so as to fulfill their intended

purpose, the court need not dictate their precise contents. The court trusts that the EMT will monitor the contents of progress notes, and that the EMT will alert the court if ADOC continues to pre-write progress notes, or to produce progress notes that are so inaccurate and incomplete as to stymie the effective provision of care.

### c.   PLRA Findings

The court finds these provisions necessary for the reasons given above:  thorough documentation of inmates' care and symptoms is essential for the effective provision of care, and yet ADOC has failed to provide it. To remedy that failure, the court must order that ADOC create progress notes that document inmates' care and symptoms, that the notes contain a minimal level of detail, and that the notes be filed in inmates' mental-health records, where they can be found and utilized.  These provisions are also narrowly tailored and minimally intrusive.  They do not require ADOC to document encounters between inmates and all mental-health

staff, but only encounters between inmates and qualified mental-health professionals, and they allow ADOC flexibility to determine the exact information contained in each progress note.

5.   Other Provisions Regarding Psychiatric and

Therapeutic Care

The plaintiffs also propose additional provisions that the court declines to adopt.   These include the following:

- The relative timing of appointments with the psychiatric provider and the counselor must be determined by clinical judgment based on the needs of the inmate, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 8.1.4;

- Placement in a restrictive housing unit must not be a basis for denying or delaying the inmate's access to the interventions prescribed in his or her treatment plan or for deferring prescription of such interventions until after the inmate is released from the restrictive housing unit, *see id.* at § 8.1.5;

- Mental-health treatment services must be tailored to adequately meet the clinical needs of each inmate considering the functional level, readiness for treatment, insight into mental illness, and motivation for treatment, *see id.* at § 8.1.6;

226

- Treatment for inmates on suicide watch must consider and factor in the dynamic risk factors identified in the suicide risk assessment, along with any other relevant clinical factors, *see id.* at § 8.1.7;

- A psychiatric provider treating an inmate via telepsychiatry must be provided clinically relevant documents, as defined in this document, in advance of the telepsychiatry session, *see id.* at § 8.1.8;

- Placement of any inmate in the RTU or SU must be based on clinical judgment. Inmates assigned to restrictive housing who are not in need of RTU or SU level care are prohibited from being placed in the RTU or SU, *see id.* at § 8.2.1;

- Determinations regarding admissions to the RTU, SU, and SLU, lengths of stay, and discharge must accord with certain restrictions, *see id.* at §§ 8.2.2, 12.4.1; and

- Initial mental-health assessments must be conducted according to certain timeframes, *see id.* at § 8.2.3.

The court declines to adopt the provisions regarding the provision of treatment to inmates in restrictive housing units (§ 8.1.5), tailoring of mental-health services (§ 8.1.6), and treatment for inmates on suicide watch (§ 8.1.7), because the problems that these provisions are meant to address are dealt with in the sections of the court's omnibus remedial order concerning

treatment planning, psychiatric and therapeutic care, and suicide prevention.

The court declines to adopt the remaining provisions because the evidence does not show them to be necessary. There is no indication that counselors and psychiatrists are not coordinating their care (§ 8.1.4); that providers of telepsychiatry are not currently provided with clinically relevant documents (§ 8.1.8); that inmates are currently being placed in the RTU, SU, or SLU for disciplinary, rather than clinical, reasons[11] (§§ 8.2.1, 12.4.1), or otherwise admitted inappropriately (§§ 8.2.2, 12.4.1); that ADOC is failing to promptly assess inmates upon their arrival in treatment unit (§ 8.2.3); or that inmates are being kept in the RTU or SU

---

11. In its liability opinion, the court found that ADOC routinely placed inmates without mental-health needs in its residential treatment units instead of placing them in restrictive housing. *See Braggs*, 257 F. Supp. 3d at 1212-13. According to Dr. Burns, ADOC has ceased this practice. *See* June 23, 2021, R.D. Trial Tr. at 170. The court commends it for doing so.

for inappropriate periods of time, or discharged to inappropriate locations (§ 8.2.2).[12]

## J. Suicide Prevention

Suicide prevention is one of the areas in which failures to provide constitutionally adequate care and protection inflict the most drastic and visible harm on inmates with serious mental-health needs. Under the court's order requiring compliance with the parties' interim suicide prevention agreement (Doc. 2560-1), ADOC has made important progress in this area. ADOC's more consistent use of constant observation and close watch represents a critical improvement in its system for immediate suicide prevention. Likewise, ADOC's development and implementation of suicide risk assessments is an important step to identify inmates whose risk of self-harm requires intervention.

---

12. Under the relief ordered today, inmates with serious mental illnesses may not be discharged from the RTU or SU into a restrictive housing unit absent an exceptional circumstance.

Where ADOC's system remains grievously inadequate is in the provision of care outside the relatively narrow windows of constant observation or close watch.  Inmates' serious mental-health needs do not materialize and vanish with their placement on suicide watch and subsequent discharge.  Neither should their mental-health care. Suicide risk assessments, discharge evaluations, and follow-up examinations are vital steps to ensure that inmates who have been placed on suicide watch are not then haphazardly (or worse, as a matter of course) thrown into circumstances that neglect their continued mental-health issues.  And, when clinically indicated, referrals to higher levels of care and placements on the mental-health caseload are necessary to facilitate treatment that is commensurate with the seriousness of inmates' needs.  ADOC's deficiencies in each of these processes inflict needless suffering on inmates with serious mental-health needs and effectively gamble that those who have demonstrated risk factors for suicidal behavior will not decompensate or attempt suicide or

230

other self-injurious behavior during gaps between episodes of crisis treatment.

### 1.   Immediate Response to Suicide Attempts

#### a.   The Parties' Proposed Provisions

Both parties propose similar provisions that, if staff observe an inmate who is attempting suicide or who is unresponsive after apparently attempting or completing suicide, the staff must "immediately call for assistance." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.1.1; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at §§ 9.6.2.1, 9.6.2.2. They additionally propose that staff must "immediately respond" to an observed suicide threat or attempt "with efforts to interrupt the behavior or attempt." *Id.* The plaintiffs clarify these provisions with the proposed requirement that "[i]mmediate life-saving measures" must begin "as soon as there are two (2) correctional officers present and must continue until either paramedics arrive and assume care, or a physician declares such measures

231

are no longer necessary." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.1.2.  The defendants' proposal sets the same endpoint for the performance of life-saving measures but would leave discretion for staff to start performing these measures "as soon as it is deemed safe by correctional staff to do so (typically, when at least two (2) correctional officers are present)."  Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.6.2.3.

To facilitate immediate responses to attempted hangings, the most commonly attempted suicide method in the evidence before the court, *see* June 7, 2021, R.D. Trial Tr. at 143, both parties propose provisions requiring the maintenance of cut-down tools, bladed instruments that can cut down individuals who have attempted to hang themselves and that are designed to be "safe but effective" in correctional facilities.  May 28, R.D. Trial Tr. at 121 (testimony of Mr. Vail).  The plaintiffs propose the requirement that a cut-down tool be maintained in each housing unit of each ADOC major

232

facility, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.1.3, whereas the defendants would limit this requirement to each restrictive housing unit, stabilization unit, residential treatment unit, structured living unit, and crisis unit of each ADOC major facility, *see* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.6.2.4.

The plaintiffs also propose that, "[u]nless medically contraindicated, and when ADOC staff may safely proceed, after intervention during a suicide attempt, the prisoner must be moved to the medical or healthcare unit at the ADOC major facility for access to appropriate medical equipment and privacy." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.1.4. They further propose that, "[i]f a prisoner dies as [a] result of a suicide, his or her body must be moved to a private area outside of any occupied housing unit and outside the view of other prisoners as soon as possible." *Id.* at § 9.1.5.

233

### b.   The Court's Ordered Relief

In substantial agreement with both parties' proposals, the court will order that, if staff observe an inmate who is attempting suicide or who is unresponsive after apparently attempting or completing suicide, the staff must immediately call for assistance, and, if staff observe a suicide threat or attempt, the staff must immediately respond with efforts to interrupt the behavior or attempt.  The most recent suicides at ADOC facilities reflect systemwide failures to take necessary steps in the first minutes after discovering suicide attempts—minutes that are crucial to life-saving efforts.  When Laramie Avery was discovered hanging in his cell, there was a 12-minute delay before CPR was initiated.  *See* Incident Report (P-3299) at ADOC0504208.  When a nurse and a correctional officer discovered Jamal Jackson hanging during a pill call, the nurse was dismissed from the scene before being called back three minutes later, contributing to a 12-minute delay before Jackson was even cut down.  *See* Pls.' Ex. 3274.  In both

**234**

instances, correctional staff delayed cutting down the individual in order to take pictures. *See* May 24, 2021, R.D. Trial Tr. at 49; Pls.' Ex. 3274.  And when ADOC staff cut down Gary Campbell, nursing staff subsequently arrived to find that the officers had not removed the ligature from his neck or initiated CPR. *See* Gary Campbell Psychological Autopsy (P-3292) at ADOC0546324. ADOC's failures in this regard are too widespread and longstanding to be dismissed as failures by individual staff, rather than a systemic problem. *See, e.g.*, *Braggs*, 383 F. Supp. 3d at 1231 (in January 2019, correctional officers waited minutes for medical staff to arrive before removing the noose from around Daniel Gentry's neck and initiating CPR); *id.* at 1233-34 (in January 2019, 11 minutes passed between when staff discovered Roderick Abrams hanging in his cell and when staff cut him down); *id.* at 1238 (in March 2018, ADOC staff waited more than 30 minutes to cut down Robert Martinez after he was found hanging).

With respect to the initiation and performance of life-saving measures, the court will order compliance with the defendants' proposed provision with a minor alteration.   While every moment of delay carries monumental significance in responding to a suicide attempt, the court recognizes that it cannot predict all immediate safety risks that could require delay even after two correctional officers are present.   With the understanding that the EMT will intently scrutinize ADOC's responses to any suicide attempts and its justifications for any delays due to immediate safety risks, the court will adopt ADOC's language that life-saving measures must begin as soon as possible, typically, rather than always, once two correctional officers are present.   With respect to the duration of life-saving measures, Mr. Vail observed that specifically requiring "paramedics" to assume care may not be appropriate in all instances.   May 28, 2021, R.D. Trial Tr. at 118.  With that in mind, the court substitutes the less restrictive term "paramedics or other appropriate

medical personnel" in its adoption of the defendants'
proposed provision.

The court will also order that each ADOC major
facility must maintain an appropriate cut-down tool in
each restrictive housing unit, stabilization unit,
residential treatment unit, structured living unit, and
crisis unit.  Because the risk of suicide is most serious
for inmates in these units, the court will limit relief
to these units.  Although the evidence does not indicate
whether facilities currently lack cut-down tools, Dr.
Burns and Mr. Vail both testified that maintenance of
these tools is vital to saving the lives of inmates who
attempt suicide by hanging.  May 28, 2021, R.D. Trial Tr.
at 121-22; June 4, 2021, R.D. Trial Tr. at 68-69.  Due
to the special importance of this issue and the fact that
ADOC is still struggling with the procedure for
interrupting suicides in progress, it is necessary to
require ADOC to maintain these tools.  That said, the
evidence suggests that ADOC's compliance with this
provision should be a straightforward process.  The court

237

expects that monitoring this will be a minimal burden if ADOC maintains these tools where they are needed.

The court will adopt a modified version of the plaintiffs' proposal regarding the movement of inmates after suicide attempts.  The court will order that, when continued medical care is necessary, an inmate who has attempted suicide must be moved to the medical or healthcare unit for continued medical care as soon as ADOC staff may safely move them, unless medically contraindicated.  Dr. Burns testified that inmates in need of continued care should be moved to the infirmary, where there is greater access to medical equipment.  *See* June 4, 2021, R.D. Trial Tr. at 69.  However, Dr. Metzner noted that not all suicide attempts may require medical interventions.  *See* June 30, 2021, R.D. Trial Tr. at 151. In light of his testimony, the court narrows the plaintiffs' proposed provision to tailor relief to the circumstances in which this measure is needed, when an inmate requires such care.

238

The court will adopt the plaintiffs' proposed provision that, if an inmate dies as a result of a suicide, his or her body must be moved to a private area outside of any occupied housing unit and outside the view of other inmates as soon as possible.  Tommy McConathy's body remained in his cell within the stabilization unit for nearly five hours after he was pronounced dead.  *See* May 24, 2021, R.D. Trial Tr. at 169; Incident Report (P-3308) at ADOC546330.  This was "long enough that the rest of the institution knew that he was there, dead in his cell, and that he was being taken out by the coroner's office."  June 22, 2021, R.D. Trial Tr. at 79 (testimony of Dr. Burns).  Dr. Burns credibly testified that allowing a deceased inmate's body to remain longer than necessary in the same unit with inmates who may have known that individual risks "traumatizing" those other inmates.  June 4, 2021, R.D. Trial Tr. at 70.  Requiring the body to be moved to a more private area as soon as possible is necessary to mitigate this risk of inflicting

needless psychological harm and potentially prompting
other suicidal behavior.


> ### c.   PLRA Findings

In addition to constant and close watch, quick
intervention in suicide attempts is one of the most
critically needed procedures to prevent suicides.  Relief
is necessary to correct ADOC's unjustifiable delays in
performing potentially life-saving actions with
appropriate urgency.   Although Dr. Burns identified
several attempted interventions that appeared
appropriate based on the available documentation, *see*
June 7, 2021, R.D. Trial Tr. at 188-89; June 8, 2021,
R.D. Trial Tr. at 159, this is not something that ADOC
can afford to get right only some of the time, let alone
with ADOC's current level of inconsistency.

The relief that the court orders is necessary and
narrowly tailored to correct persistent problems in
ADOC's immediate responses to suicide attempts.  The
ordered provisions narrowly address procedures in which

the evidence reflects persistent delays: cutting down prisoners who have attempted suicide by hanging, initiating life-saving measures such as CPR, and moving prisoners or their bodies to locations that will facilitate medical care as needed and greater privacy. These provisions are the least intrusive means that can protect the life and safety of prisoners with serious mental-health needs when they or prisoners around them attempt suicide or other serious self-injurious behavior.

## 2.   Suicide Watch Placement

### a.   The Parties' Proposed Provisions

In order to evaluate the needs of inmates who are placed on suicide watch, both parties propose that, following an inmate's initial placement on constant observation, the inmate must be evaluated using a suicide risk assessment to determine whether the individual is acutely suicidal, nonacutely suicidal, or not suicidal. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc.

**241**

3342) at § 9.2.3; Defs.' Proposed Phase 2A Remedial Order
(Doc. 3215) at § 9.1.3.2.  The plaintiffs further propose
the requirement that inmates admitted to suicide watch
must be considered for placement on the mental-health
caseload and that, if they are not placed on the caseload,
their medical chart must document the clinical rationale
for that determination.  *See* Pls.' Updated Proposed
Omnibus Remedial Order (Doc. 3342) at § 9.2.1.

With respect to the procedure for placing inmates on
suicide watch, both parties propose the restriction that
a suicidal inmate must not (or should not, in the
defendants' proposed provision) be handcuffed before such
placement, unless the inmate's security level requires
it or the inmate is engaged in "serious disruptive and
dangerous activity" that requires the use of mechanical
restraints.  Pls.' Updated Proposed Omnibus Remedial
Order (Doc. 3342) at § 9.2.4; Defs.' Proposed Phase 2A
Remedial Order (Doc. 3215) at § 9.1.3.1.  The plaintiffs
propose the additional requirement that, "[b]efore a
prisoner is placed on suicide watch, a nurse must examine

242

the prisoner and complete a body chart." Pls.' Updated

Proposed Omnibus Remedial Order (Doc. 3342) at § 9.2.2.


### b.   The Court's Ordered Relief

In agreement with the parties' proposals, the court
will order that after each inmate's initial placement on
constant observation, he or she must be evaluated using
a suicide risk assessment.   These assessments are a
critical component of a functional system for suicide
prevention.   As Dr. Burns explained, they are necessary
to place an inmate on a level of watch corresponding to
his or her level of risk.   *See* June 3, 2021, R.D. Trial
Tr. at 201.   Dr. Metzner emphasized that it is "too
dangerous" not to complete these assessments or to
conduct them poorly.   July 1, 2021, R.D. Trial Tr. at
158.

Yet ADOC's completion of these suicide risk
assessments is inconsistent, even in the face of a court
order requiring compliance.   Completed suicide risk
assessments were not found in the mental-health records

of Jaquel Alexander for all 11 of his placements on suicide watch. *See* May 24, 2021, R.D. Trial Tr. at 69-71; Jaquel Alexander Psychological Autopsy (P-3298) at ADOC0539039. Travis Jackson was not placed on suicide watch and did not receive a suicide risk assessment after he set his cell on fire. *See* May 24, 2021, R.D. Trial Tr. at 137; Travis Jackson Mental-Health Records (P-3314) at ADOC0547155; Travis Jackson Psychological Autopsy (P-3315) at ADOC0547208. The same was true for inmate T.M. after he set himself on fire. *See* May 25, 2021, R.D. Trial Tr. at 52, 54. Coupled with the failure to place inmates on constant observation prior to completion of the assessment, the problem of inconsistent, incomplete, or delayed suicide risk assessments permits inmates to be placed and remain in clinically inappropriate environments. In the absence of a suicide risk assessment after he set his cell on fire, Jackson was placed in segregation several days later, where he committed suicide the next month. *See* May 24, 2021, R.D. Trial Tr. at 144-46. And when Alexander verbalized

244

suicidal ideation and mental-health staff decided to assess him the following morning, he was returned to his cell without any precautions, and he committed suicide hours later. *See id.* at 65-67. In light of the expert testimony and the harms that have resulted from delays and failures in this process, the court finds it necessary to order the completion of suicide risk assessments to address ADOC's failures to provide adequate protection to inmates with serious mental-health needs.

The court will also adopt the plaintiffs' proposed provision requiring that inmates admitted to suicide watch must be considered for placement on the mental-health caseload and that, if he or she is not placed on the caseload, the clinical rationale must be documented in his or her medical chart. Just as the court found in the suicide prevention opinion, *see Braggs*, 383 F. Supp. 3d at 1281, ADOC persists in its failure to consider suicidal inmates for placement on the mental-health caseload. Dr. Burns highlighted multiple

**245**

inmates who were not placed on the caseload, even temporarily, after multiple placements on suicide watch. Marquell Underwood was placed on acute suicide watch twice in the 6 months before he committed suicide, without any indication that he was considered for placement on the mental-health caseload. *See* May 24, 2021, R.D. Trial Tr. at 57. Travis Jackson was never placed on the caseload despite multiple suicide watch placements and the attempt to set fire to his cell. *See* June 2, 2021, R.D. Trial Tr. at 126-27. Jaquel Alexander was not added to the caseload until his fifth or sixth placement on suicide watch. *See* May 24, 2021, R.D. Trial Tr. at 68. Dr. Burns credibly testified that requiring the documented consideration of suicidal inmates for placement on the mental-health caseload is necessary to minimize the risk that inmates' serious mental-health needs will be neglected, despite potentially repeated mental-health crises. *See* June 3, 2021, R.D. Trial Tr. at 197-98.

The court will order compliance with the plaintiffs' proposal that, before an inmate is placed on suicide watch, a nurse must examine the inmate and complete a body chart. This examination is necessary to identify and address the immediate medical needs, as well as the mental-health needs, of an inmate who is placed on suicide watch. As Dr. Burns testified, inmates placed on suicide watch may be experiencing a number of medical issues that require attention, including overdose, substance use, or injuries from self-harm. *See id.* at 199. Completion of a body chart is necessary both to treat any such issues and to identify them for consideration in the inmate's mental-health care. Absent a body chart, the evidence reflects that these issues sometimes go undocumented for prisoners placed on suicide watch. For instance, Dr. Burns testified that a body chart completed the day after Danny Tucker was released from nonacute suicide watch identified a wrist laceration that had required 10 staples, which was not reflected in any prior mental-health records. *See* May 24, 2021, R.D.

247

Trial Tr. at 193-94.  Because it is dangerous not to complete these body charts consistently, the court finds that relief is necessary.

The court will not order compliance with the parties' proposed provisions limiting the handcuffing of inmates prior to placement on suicide watch.  While it is important to avoid punishing mentally ill inmates for accurately reporting their suicidality, which may discourage them from seeking appropriate care and protection, *see* June 3, 2021, R.D. Trial Tr. at 202 (testimony of Dr. Burns), the evidence presented to the court does not indicate what ADOC's current practice is or whether it is harming inmates with mental-health needs.

### c.  PLRA Findings

The ordered relief is necessary to ensure that inmates expressing suicidality are safely placed on suicide watch, that the level of monitoring and treatment they receive is sufficient to meet their risk of

248

self-harm, and that they are considered for more regular
mental-health care to address the risk of recurrent
self-harmful behaviors.  This relief is narrowly tailored
and minimally intrusive to correct ADOC's failures to
address adequately inmates' immediate suicidality and
underlying mental-health needs.

### 3.   Suicide Watch Cells

#### a.   The Parties' Proposed Provisions

With respect to the physical condition of suicide
watch cells, the plaintiffs propose the requirement that
ADOC must make all suicide watch cells suicide-resistant.
*See* Pls.' Updated Proposed Omnibus Remedial Order (Doc.
3342) at § 9.7.1.  They propose the same requirement for
cells in stabilization units.  *See id.* at § 10.4.  Under
their proposal, the EMT would have the discretion to
determine whether cells are suicide-resistant, but cells
that satisfy the conditions specified in Lindsay M.
Hayes's Checklist for the "Suicide-Resistant" Design of
Correctional Facilities (Doc. 3206-5) would necessarily

meet this requirement. *See id.* at § 9.7.1.   They further propose that ADOC must physically inspect all suicide watch cells on a quarterly basis to ensure that they remain suicide-resistant, *see id.* at § 9.7.3, and that, between inmate admissions, ADOC must clean and inspect these cells to eliminate biohazards and confirm that no contraband is present, *see id.* at § 9.7.5.   The defendants propose no provisions regarding the condition and maintenance of suicide watch cells.

To ensure the availability of a sufficient number of suicide watch cells, the plaintiffs propose that ADOC must determine the appropriate number of suicide-resistant cells for each ADOC major facility and submit its numbers to the EMT for approval. *See id.* at § 9.7.2.   To accommodate the possibility that more cells will be needed than are available, the plaintiffs propose that "ADOC may designate areas or cells where a prisoner could be temporarily placed when a suicide watch cell is unavailable, provided that the prisoner is on 'constant observation,' regardless of level of watch." *Id.* at

§ 9.7.4.  The defendants similarly propose that ADOC may designate areas or cells for this temporary placement when a suicide watch cell is unavailable, except that constant observation would only be required for acutely suicidal inmates and close watch would be required for non-acutely suicidal inmates.  *See* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.1.2.

### b.  The Court's Ordered Relief

The court will order that all suicide watch and stabilization unit cells must be suicide-resistant.  As explained in the court's discussion of ADOC's chronic understaffing, this will require that ADOC must physically inspect these cells for suicide-resistance prior to each use and conduct a more comprehensive inspection every three months to ensure that the cells remain suicide-resistant.  Cells shall be deemed suicide-resistant if they meet the requirements set forth in Lindsay M. Hayes's Checklist for the "Suicide

Resistant" Design of Correctional Facilities (Doc. 3206-5).

It is effectively axiomatic that suicide watch and stabilization unit cells must be suicide-resistant. Suicide watch cells house individuals who are acutely or non-acutely suicidal. Stabilization units are designed to house "patients who are suffering from acute mental-health problems," including "conditions causing an acute risk of self-harm," and who "have not been stabilized through other interventions." *Braggs*, 257 F. Supp. 3d at 1183. The failure to ensure that these cells are suicide-resistant poses a grave danger to individuals who are experiencing suicidality or other serious mental-health issues.

In the absence of any proposal by ADOC to define what it means for cells to be suicide-resistant, the court finds that compliance with the conditions contained in the checklist developed by Lindsay M. Hayes (Doc. 3206-5) is sufficient for a cell to be considered suicide-resistant. This checklist provides for the

elimination of tie-off points and other structural
elements that facilitate suicide attempts, as well as the
maintenance of adequate visibility into the cell to allow
monitoring.  The parties previously agreed to the use of
this set of conditions to ensure that cells are
suicide-resistant.  *See* Suicide Prevention Stipulations
(Doc. 2606-1) at 6 (providing that "[s]uicide watch cells
shall be considered suicide resistant if they meet the
requirements set forth in section III(B) of the ADA
Report"); ADA Transition Plan for Programs and Services
Provided to Inmates (Doc. 2635-1) at 41 ("All crisis
cells ... are to comply with the checklist developed by
Lindsay M. Hayes.").

The death of Tommy McConathy makes clear that
suicide-resistance is not a one-time task.  Roughly seven
months after ADOC certified that it had "effectively
retrofitted all [stabilization unit] cells to ensure
suicide resistance," Resp. to Phase 2A Order on Inpatient
Treatment (Doc. 2880) at 4, McConathy hanged himself from
the ventilation grate above the sink in his stabilization

unit cell, *see* May 24, 2021, R.D. Trial Tr. at 153-54. Although Dr. Metzner testified, based on information reported to him by an ADOC official, that the grate had been suicide-resistant but for the fact that it was broken, creating a tie-off point, he could not say how long the grate was broken prior to McConathy's death. *See* July 1, 2021, R.D. Trial Tr. at 2-4.   Even if McConathy broke the grate himself, it is deeply troubling that ADOC could place him in a cell that was required to be suicide-resistant without affirmative confirmation that there were no existing tie-off points.   Moreover, even if prior inspection of the cell might not have prevented his death, it could have provided ADOC with crucial information about what happened and helped it to take remedial measures that would appropriately address the problem in the future.

With this evidence in mind, the court credits Dr. Burns's testimony that quarterly inspections are necessary to ensure that suicide watch and stabilization unit cells remain suicide-resistant over time and that

changes that jeopardize the safety of the cell are addressed.  *See* June 4, 2021, R.D. Trial Tr. at 78-79. But the court also agrees with Mr. Vail:  "[E]very time" an occupant is changed out, an inspection prior to the next placement is the only way "to make sure that the last person didn't somehow compromise that cell" by creating a tie-off point or introducing another potential hazard.   May 28, 2021, R.D. Trial Tr. at 131. Independently, neither inspection is sufficient to correct the systemic problem that ADOC and this court must confront:  At least with ADOC's continued severity of understaffing, preplacement inspections cannot feasibly occur with the necessary completeness, and quarterly inspections inherently do not occur with the necessary frequency.

Due to the nature of these inspections, the court will order that the quarterly inspections, but not the preplacement inspections, must be documented. Documentation of quarterly inspections, beyond verifying that the inspections occur, will enable ADOC and the EMT

to track the hazards that are detected—hazards which, the court expects, may be less readily apparent than those that can be identified immediately prior to a placement.

With respect to preplacement inspections, the court will further order that, before placing an inmate in a stabilization unit or suicide watch cell, ADOC must clean the cell and remove any contraband. During the omnibus remedial proceedings, the court heard evidence of inmates in suicide watch cells who had access to contraband with which they could harm themselves. After cutting his arm and receiving sutures for the laceration, inmate M.H. was able to use a razor blade to reopen the wound while on acute suicide watch. *See* May 25, 2021, R.D. Trial Tr. at 43-44. Similarly, inmate M.W. cut himself with a razor blade that he brought into his crisis cell when he was placed on nonacute suicide watch. *See* May 25, 2021, R.D. Trial Tr. at 38. Dr. Burns also testified that multiple inmates informed her that they had been placed in crisis cells that contained the bodily fluids of previous inhabitants. *See* June 22, 2021, R.D. Trial Tr.

at 90.  This evidence reflects the need for ADOC to
ensure that suicide watch and stabilization unit cells
do not contain contraband with which an individual could
engage in self-injurious behavior or unclean conditions
that are dangerous or could otherwise cause adverse
clinical consequences for an occupant's mental health.

The court will not order relief with respect to the
quantity of suicide-resistant cells in each ADOC major
facility.  While it is necessary for suicide-resistant
cells to be available at every ADOC major facility, *see*
June 4, 2021, R.D. Trial Tr. at 77-78 (testimony of Dr.
Burns), current evidence does not reflect the "chronic
shortage of crisis cells" that the court found in the
liability opinion, *Braggs*, 257 F. Supp. 3d at 1222.  As
with the issue of inspections, the court is open to
revisiting this area if ADOC stops having enough
suicide-resistant cells to accommodate the need for them
or if the monitoring team finds that prisoners are not
being placed in safe suicide watch cells when they need

to be.   But the evidence before the court does not necessitate relief at this time.

The court will adopt the plaintiffs' proposal allowing ADOC to designate areas or cells where an inmate could be temporarily placed when a suicide watch cell is unavailable, provided that the inmate remains on constant observation during this time.   For the most part, this provision is permissive rather than constraining. Consistent with both parties' proposals, the provision preserves ADOC's discretion in the temporary placement of an inmate awaiting the availability of a suicide-resistant cell.   Where the parties disagree is whether inmates who are not acutely suicidal may be left in these areas on only close watch, rather than constant observation.   For many of the same reasons that constant observation is necessary to protect inmates awaiting responses to emergent referrals, the court agrees with the plaintiffs that constant observation is necessary here as well.   Even the temporary placement of a suicidal inmate in an environment that is not suicide-resistant

is "quite dangerous." *Braggs*, 257 F. Supp. 2d at 1225.
Until the inmate can be placed in a cell that is
suicide-resistant, constant observation is essential to
protect the inmate's safety in the event that he or she
decompensates or his or her mental-health needs prove
more serious than initially assessed. *See* June 4, 2021,
R.D. Trial Tr. at 79-80 (testimony of Dr. Burns).


### c.   PLRA Findings

Suicide watch cells and stabilization unit cells
house inmates when they are particularly vulnerable and
in need of heightened protection.  The relief that the
court orders is necessary to protect the safety of these
inmates when they are suicidal or otherwise at a serious
risk of self-harm.  Before an inmate is placed in a
suicide watch or stabilization unit cell, ADOC must be
able to state confidently that the cell is, and remains,
safe and suicide-resistant.  The court finds that
comprehensive quarterly inspections, coupled with visual
preplacement inspections, are necessary to ensure that

259

suicide watch and stabilization unit cells are suicide-resistant when they need to be. And, because potential hazards to an inmate's safety and mental health extend beyond the physical features of the cell itself to also its contents, including the presence of contraband or unsanitary conditions, preplacement cleaning and removal of contraband is necessary as well. The provisions that the court adopts are narrowly tailored to correct ADOC's failures to protect inmates against this range of dangers, from decompensation and self-harm through suicide attempts and death. These provisions are the least intrusive means that will sufficiently address these dire needs.

When an inmate is awaiting placement in a suicide-resistant cell, constant observation is necessary to protect against the same dangers that suicide-resistant cells are meant to protect against. Requiring constant observation is narrowly tailored to protect the inmate's safety until structural safeguards may permit a lower degree of monitoring as appropriate.

This requirement is the least intrusive means that will suffice to keep inmates who may be experiencing varying levels of suicidality safe in a space that has not been specifically designed to be suicide-resistant.

### 4.  Observation

#### a.  The Parties' Proposed Provisions

Both parties propose that any inmate determined to be acutely suicidal must be monitored through a "constant observation" procedure, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 1.3 (defining "acutely suicidal"); Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.1.4.1, and that any inmate determined to be nonacutely suicidal must be monitored through a "close watch" procedure that ensures monitoring at staggered intervals not to exceed 15 minutes, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 1.20 (defining "nonacutely suicidal"); Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.1.4.2.  In addition to these provisions, the

defendants specify that mental-health observation "will not be used as an alternate placement for inmates who should be placed on suicide watch." Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.1.1.

Both parties propose that constant observation and close watch must be contemporaneously documented at staggered intervals not to exceed 15 minutes and that, upon an inmate's discharge from suicide watch, these observation records must be included in the inmate's medical record. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.3.1; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.2. Additionally, the defendants' proposal provides for the creation of a "post-suicide watch summary" based on these records. *See* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.2.

Both parties also propose that the mental-health staff must ensure the routine oversight of observers. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.3.2; Defs.' Proposed Phase 2A Remedial Order

(Doc. 3215) at § 9.1.4.3.   The plaintiffs' proposal
further specifies that the mental-health staff must
evaluate the equipment that is available to observers to
ensure that appropriate observation can occur.   *See* Pls.'
Updated Proposed Omnibus Remedial Order (Doc. 3342) at
§ 9.3.2.


### b.   The Court's Ordered Relief

The court will order that acutely suicidal inmates
must be monitored through constant observation and
non-acutely suicidal inmates must be monitored through
close watch at staggered intervals not to exceed 15
minutes.   Observation is the last line of defense to
protect inmates in crisis from attempting suicide or
serious self-harm.   Unequivocally, failure at this stage
can be a matter of life or death.   Consequently, as Dr.
Metzner testified, it is "too risky" for these
observation procedures not to happen "100 percent of the
time."   June 29, 2021, R.D. Trial Tr. at 142; *see also*
July 2, 2021, R.D. Trial Tr. at 134-35.

263

Evidence presented at the omnibus remedial hearings reflects that ADOC has made improvements to the consistency of its observation practices. Internal audits of multiple facilities reflected positive changes in the area of "suicide watch monitoring," and the court received numerous observation logs that reflected observations on close watch at appropriately staggered intervals, *see* June 8, 2021, R.D. Trial Tr. at 90-92 (testimony of Dr. Burns). Even so, it remains necessary for the court to order compliance with these provisions to address the failures that do occur and to prevent reversion of ADOC's relatively recent progress. ADOC's progress in the area of observation is relatively recent, and, applying the compliance measure of ADOC's own expert, it remains incomplete. Moreover, according to Wexford, the improvements that have been made in this area have required it to divert resources away from the routine treatment of inmates with less acute needs, "disrupt[ing] all routine mental health caseload activities." Pls.' Ex. 3323 at 3 (emphasis omitted).

While this tradeoff may be necessary in the short-term to avert some of the most severe harms, it surely does not reflect that ADOC has "completely and irrevocably eradicated" the constitutional violation of failing to protect suicidal prisoners. *Thomas v. Bryant*, 614 F.3d 1288, 1321 (11th Cir. 2010) (quoting *LaMarca v. Turner*, 995 F.2d 1526, 1542 (11th Cir. 1993)).  In light of the need for ADOC reliably to apply constant observation and close watch procedures and the risk that ADOC's progress will not be sustained in the absence of a court order, the court finds that relief remains necessary.

The court need not, however, order compliance with the defendants' proposed provision barring the use of mental-health observation as a substitute for suicide watch.  Although ADOC's misuse of mental-health observation was a significant problem previously, Dr. Burns testified that she had not seen recent instances in which inmates in crisis were placed on mental-health observation instead of suicide watch.  *See* June 8, 2021, R.D. Trial Tr. at 166.  Moreover, this proposed provision

265

is effectively redundant with the provisions that the court does order requiring suicidal prisoners to be monitored via constant observation or close watch.

Consistent with the parties' proposals and with the overall importance of ensuring that these observation procedures are followed, the court will order that both constant observation and close watch must be contemporaneously documented. In addition to confirming that these procedures are followed, contemporaneous documentation that is included in an inmate's medical file is necessary to ensure that information about the inmate's behavior can be factored into clinical decisions about treatment and appropriate levels of care. *See* June 3, 2021, R.D. Trial Tr. at 204-05 (testimony of Dr. Burns). However, the court will not order that this contemporaneous documentation must be accompanied by a post-watch summary, as the defendants propose. These proposed summaries may prove useful to both the monitoring team and inmates' treatment teams, but the

266

court does not find that ordering completion of these summaries is necessary.

Finally, the court will order that ADOC must take appropriate steps to ensure that observers who monitor inmates on suicide watch perform their duties as required.  In the suicide prevention opinion, the court found that, "[i]n none of the facilities" visited by experts for both sides "were the 'watchers' positioned appropriately to permit full visibility into the safe cells or constant visibility of the inmates being observed."  *Braggs*, 383 F. Supp. 3d at 1259 (internal quotation marks omitted).  While the court expects that continued training of observers will help to address this concern the court will also order that ADOC take other appropriate steps—such as routine oversight, *see* June 8, 2021, R.D. Trial Tr. at 93 (testimony of Dr. Burns, noting that "direct supervision of the observers" contributed to improvements in the consistency of staggered watches at the facilities she toured), or examination of the equipment available to observers, *see* June 3, 2021, R.D.

267

Trial Tr. at 205 (testimony of Dr. Burns, noting that the chairs available to observers at some facilities she toured did not provide observers with "an unobstructed view" into the cells)—to ensure that observation is performed correctly.

### c. PLRA Findings

Consistently applied constant observation and close watch procedures are fundamental to constitutionally adequate crisis-level care. Current relief is necessary to bring ADOC into full compliance with these essential requirements and to ensure that ADOC sustains compliance as it addresses the constitutional violations that have persisted throughout other facets of its system of mental-health care. Requiring ADOC to apply and document these procedures is narrowly tailored and minimally intrusive to protect suicidal inmates' immediate safety and to ensure their access to adequately informed treatment and care.

268

### 5.   Suicide Watch Conditions

#### a.   The Parties' Proposed Provisions

The plaintiffs propose the requirement that, unless clinically indicated otherwise, inmates on suicide watch must be provided with shower shoes or other footwear, socks, suicide-resistant toothbrushes, other specified hygiene products, and regular or sack meals with approved nutritional content and suicide-resistant eating utensils. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.3.3.  They further propose that inmates on suicide watch must receive the same privileges, such as visits, phone calls, or mail, afforded by their most recent housing assignment, as clinically appropriate. *See id.* at § 9.3.4.  Finally, they propose that inmates housed in crisis cells or medical units must be provided appropriate out-of-cell activity after 72 hours, unless such activity is contraindicated and the clinical rationale is documented in the medical record. *See id.* at § 9.3.5.

269

b.   The Court's Ordered Relief

The court will order that inmates on suicide watch must receive suicide-resistant footwear, hygiene products, and nutritionally appropriate meals as clinically appropriate.  During facility tours prior to the suicide prevention trial, experts for both parties saw that some inmates on suicide watch were not provided shower shoes for out-of-cell movement, forcing them to walk around prisons with bare feet.  *See* June 3, 2021, R.D. Trial Tr. at 210 (testimony of Dr. Burns).  Dr. Burns also noted that inmates on suicide watch were provided the same sack meal, or in some cases one of two sack meals, for every daily meal.  *Id.* at 211.  As Dr. Burns explained, these deprivations caused extended placements on suicide watch to be "frankly, punitive." *Braggs*, 383 F. Supp. 3d at 1270 (internal quotation marks omitted).

Requiring that inmates on suicide watch receive appropriate footwear, hygiene products, and meals as clinically indicated is necessary to prevent conditions

270

in suicide watch cells from harming inmates' mental health during an important crisis intervention.   The court credits Dr. Burns's testimony that these items are an important part of the "therapeutic" care that inmates on suicide watch receive.   June 3, 2021, R.D. Trial Tr. at 211.   Rather than require the provision of specific items, however, the court orders simply that the mental-health providers who are better positioned to assess an inmate's mental-health needs and risks must exercise appropriate clinical judgment with respect to the items that are provided.

For the same reasons, the court finds it necessary to order that inmates on suicide watch must receive the same privileges afforded by their last housing assignment as clinically appropriate.   As Dr. Burns explained, these privileges may have therapeutic value in the treatment of inmates who are placed on suicide watch, or they may have the potential to be harmful.   *See* June 3, 2021, R.D. Trial Tr. at 211-12; June 23, 2021, R.D. Trial Tr. at 216-17.   By assigning the determination of which

privileges an inmate should and should not receive to the clinical discretion of treating mental-health staff, this provision ensures that the treatment of inmates on suicide watch will be adequately responsive to their individual mental-health needs.

The court will also order that inmates housed in crisis cells, medical cells, or the infirmary must be provided appropriate out-of-cell activity after 72 hours, unless such activity is clinically contraindicated. As observed in the context of restrictive housing, the experts for both parties, the American Correctional Association, and ADOC's own regulations all recognize the importance of out-of-cell time to prevent decompensation and other harms to prisoners' mental health. When crisis cells are functioning as designed, placements are generally short in duration, reducing the need for out-of-cell time. As experts for both sides explained at the liability trial, "crisis-cell placement is meant to be temporary and should not last longer than 72 hours, because the harsh effects of prolonged isolation in a

crisis cell can harm patients' mental health." *Braggs*, 257 F. Supp. 3d at 1226. However, ADOC's use of crisis cells and medical cells frequently runs beyond 72 hours, amplifying the potential adverse effects of isolation. *See id.* During the suicide prevention trial, experts for both sides identified many inmates who remained on suicide watch for longer than 72 hours, in spite of an ADOC policy requiring referral to a higher level of care. *See Braggs*, 383 F. Supp. 3d at 1269. In such situations where an inmate remains on suicide watch for longer than 72 hours, as in the context of restrictive housing, the court credits Dr. Burns's testimony that out-of-cell activity is a necessary component of the inmate's mental-health care, except when it is clinically contraindicated. *See* June 3, 2021, R.D. Trial Tr. at 212-13. However, the court will not order compliance with the plaintiffs' proposed requirement to document the clinical rationale when activity is not provided. The court finds that there is insufficient evidence to impose this additional requirement at this time.

### c.   PLRA Findings

Relief regarding the conditions of prisoners placed on suicide watch is necessary in light of the length of time that many inmates remain on suicide watch without being referred to a higher level of care and the potential for adverse mental-health consequences when inmates experiencing mental-health crises are subjected to clinically inappropriate conditions for extended periods of time.  Some restriction on inmates' access to items and activities is appropriate, and indeed necessary, for suicide watch to function properly.  Indiscriminate deprivation is not.  The provisions that the court orders are necessary to redress the inadequate treatment of inmates with serious mental-health needs during crisis placements, when they have been identified as experiencing a heightened risk of self-harm.  By deferring to the clinical judgment of mental-health staff, the provisions are narrowly tailored to require that inmates receive these basic items and privileges

only to the extent that mental-health staff determine to be clinically appropriate.  These provisions are the least intrusive means that will address the problem, as they avoid intruding on the details of prison administration beyond what is necessary to ensure that inmates on suicide watch receive adequate treatment.

### 6.  Referral to Higher Level of Care

#### a.  The Parties' Proposed Provisions

The plaintiffs propose the requirement that an inmate on suicide watch must be considered for referral to a higher level of care, such as a residential treatment unit, stabilization unit, or inpatient hospitalization, after remaining on watch for 72 hours and again after remaining on watch for 168 hours.  *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.4.1. They further propose, "If a patient remains on watch for 240 hours or longer and does not meet the criteria for discharge to outpatient mental health care, then the patient must be referred to a higher level of care as

275

clinically appropriate." *Id.*   The defendants propose similar provisions, except that they would limit these requirements to inmates on constant observation, rather than suicide watch generally.  *See* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at §§ 9.3.1, 9.3.2, 9.3.3. Their proposal also uses the phrase "*different* or higher level of care." *Id.* (emphasis added).  Both parties propose that the clinical rationale for a decision not to refer an inmate to a higher level of care at each of these stages must be documented.  *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.4.1; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at §§ 9.3.1, 9.3.2, 9.3.3.  The defendants further propose that documentation of a decision not to refer an inmate after 240 hours must be submitted to the mental-health vendor's director of psychiatry for review and evaluation.  *See* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.3.3.

Both parties additionally propose that any inmate who returns to suicide watch within 30 days of discharge

from a previous watch or who receives 3 watch placements within 6 months must be considered for referral to a higher level of care. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.4.2; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.3.4.  If the inmate is not referred to a higher level of care, documentation of the clinical rationale must be provided to OHS immediately, under the plaintiffs' proposal, or within 72 hours, under the defendants' proposal.  *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.4.2; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.3.4.

### b.   The Court's Ordered Relief

The court will adopt provisions requiring that inmates be considered for referral to a different or higher level of care at the times identified by both parties.  As noted previously, ADOC's placement of inmates on suicide watch for extended periods of time without consideration for referrals to a higher level of

277

care has been a longstanding problem.  In the liability
opinion, the court found that inmates were considered for
transfer to treatment units "only in a small fraction of
the crisis placements that last longer than 72 hours."
*Braggs*, 257 F. Supp. 3d at 1226.  This problem continued
to the time of the suicide prevention trial, where
experts for both sides identified "multiple instances in
which people remained on suicide watch for longer than
72 hours without any indication that they were considered
for a higher level of care."  *Braggs*, 383 F. Supp. 3d at
1269.   More recently, Dr. Burns and Dr. Metzner
interviewed one inmate who spent almost a week on crisis
placement in December 2020 without any indication that
he was considered for referral to a higher level of care;
he reported that 3 or 4 other inmates were housed in the
crisis cell with him during that time.  *See* May 25, 2021,
R.D. Trial Tr. at 87-88; see also Pls.' Ex. 3943 at
ADOC0540559.

Dr. Burns explained that this failure to consider
referring inmates to a higher level of care contributes

278

to long stays in "very restrictive" settings that may be clinically inappropriate to treat inmates' mental-health needs.   June 3, 2021, R.D. Trial Tr. at 214.   It also inhibits inmates' access to more meaningful, longer-term interventions that may be required to treat adequately their serious mental-health needs.   *See id.* at 214-15.

To address this inadequate treatment of inmates on suicide watch, the court will order that, if an inmate remains on suicide watch for 72 hours, and again after 168 hours and 240 hours, he or she must be considered for referral to a different or higher level of care.   In each instance, the clinical rationale for a decision not to refer the inmate to a different or higher level of care must be documented in the medical chart and tracked in the crisis utilization log or a similar tracking mechanism.   The court will also adopt the defendants' proposal that such decisions after 240 hours must also be sent to the mental-health vendor's director of psychiatry for evaluation.

In most respects, the plaintiffs' and defendants' proposals impose identical obligations.  Both proposals preserve clinical discretion at each of the three milestones for consideration of referral to a different or higher level of care and require documentation of decisions not to make this referral.[13]  The most substantial distinction is that the plaintiffs' proposal measures time on suicide watch, whereas ADOC's proposal measures time on constant observation.  Because constant observation and close watch both place inmates in restrictive settings, and because long-term placement on suicide watch in either form signals that an inmate may have substantial mental-health needs that are not being adequately addressed, the court finds that the plaintiffs' broader requirement is necessary.

---

13. Although the defendants use "different or higher level of care" and the plaintiffs specify "higher level of care," both parties offer the same three examples for their respective proposals—the residential treatment unit, the stabilization unit, and inpatient hospitalization or hospital-level care.

The court will also adopt the provision proposed by both parties that any inmate who returns to suicide watch within 30 days of discharge from a previous watch or who receives 3 watch placements within 6 months must be considered for referral to a different or higher level of care, and that the clinical rationale for a decision not to refer an inmate to a higher level of care must be documented.   This provision is necessary to address ADOC's failure to identify and adequately treat suicidal prisoners.   As Dr. Burns explained, repeated crisis placements are a warning sign that an inmate's current level of care may be insufficient to meet his or her mental-health needs.   *See* June 3, 2021, R.D. Trial Tr. at 216-17.   Currently, however, this warning all too often goes unheeded.   For instance, in addition to the delays in placing Jaquel Alexander on the mental-health caseload, he was never referred for a higher level of care despite his 11 crisis placements within a period of 6 months.   *See* May 24, 2021, R.D. Trial Tr. at 68-70. Similarly, Marquell Underwood, Travis Jackson, and Danny

Tucker also experienced multiple placements on suicide watch in the months before their deaths, without any indication that they were considered for referral to a higher level of care.

In ordering this provision, the court will adopt the defendants' language requiring that the clinical rationale for a decision not to refer an inmate to a different or higher level of care must be provided to ADOC's Office of Health Services within 72 hours of the decision.  The court finds that there is insufficient evidence to impose the plaintiffs' proposed requirement for documentation to be provided immediately.

### c.  PLRA Findings

Current relief is necessary to correct the inadequate treatment of inmates who are placed on suicide watch, often repeatedly or for long periods of time.  Suicide watch is an essential component of crisis intervention for suicidal inmates, but it is not a substitute for adequate mental-health treatment.  Evidence since the

liability trial reflects that failures to consider referring suicidal inmates for a different or higher level of care have contributed to the inadequate treatment of many mentally ill inmates, including some who later committed suicide.

The provisions that the court orders are necessary to address this violation. The ordered provisions mirror the proposals of both parties with respect to the events that trigger the need to consider referral to a higher level of care. At the suicide prevention trial, experts for both parties agreed that these same events—placement on suicide watch for 72, 168, and 240 hours and two placements within 30 days or three placements within six months—necessitate consideration of referral to a higher level of care. *See Braggs*, 383 F. Supp. 3d at 1268-70. The court agrees. And in light of ADOC's history of violations and the need for continuity of care, the court finds that the requirement to document decisions not to refer is necessary as well. By requiring only that mental-health staff exercise their clinical discretion

283

in response to these concrete warning signs that an inmate in crisis may require more intensive treatment and care, the ordered provisions are narrowly tailored and minimally intrusive to correct the ADOC's failure to provide adequate treatment to inmates on suicide watch.

### 7.  Discharge

#### a.  The Parties' Proposed Provisions

The plaintiffs propose the provision, "Each patient placed on constant watch must be reduced to a close watch prior to release from suicide watch unless a clinician determines and documents the propriety of discharging a patient to a less restrictive setting to avoid unnecessarily continuing the confinement of the patient." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.5.1.1.  They further propose that, prior to an inmate's discharge from suicide watch, the inmate must receive a confidential, out-of-cell evaluation or, if such an evaluation is not possible due to documented clinical concerns, mental-health staff must consider

284

whether referral to a higher level of care is appropriate. *See id.* at § 9.5.1.2. The defendants propose the similar provision, "An inmate may be discharged from suicide watch after an out-of-cell, confidential evaluation by a psychiatrist, psychologist, CRNP, or counselor, unless such evaluation is not possible due to documented clinical concerns which may result in the inmate being discharged from suicide watch to a different or higher level of care." Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.4.1.

The plaintiffs propose that an inmate discharged from suicide watch must not be transferred to a restrictive housing unit unless there is a documented exceptional circumstance. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.5.2.1. Both parties propose that any such transfer must be approved by either the Deputy Commissioner of Operations for male-designated facilities, the Deputy Commissioner of Women's Services for female-designated facilities, or their designee. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342)

285

at § 9.5.2.2; Defs.' Proposed Phase 2A Remedial Order
(Doc. 3215) at § 9.4.2.


### b.   The Court's Ordered Relief

The court will order that, prior to discharge from
suicide watch, an inmate must receive a confidential,
out-of-cell evaluation by a psychiatrist, psychologist,
CRNP, or counselor, or, when such an evaluation is not
possible due to documented clinical concerns, the
evaluating mental-health staff must consider whether
referral to a different or higher level of care is
appropriate.  At the liability trial, experts for both
parties explained that "suicidal prisoners should be
released only with the approval of a psychiatric provider
(psychiatrist or nurse practitioner) who has made a
face-to-face assessment that their condition was
sufficiently stabilized to warrant it." *Braggs*, 257 F.
Supp. 3d at 1230.  As with the initial suicide risk
assessment, this evaluation is necessary to identify
continued suicide risks and inform decisions regarding

treatment and monitoring.  *See* June 3, 2021, R.D. Trial
Tr. at 218 (testimony of Dr. Burns).

ADOC's completion of this assessment prior to
discharge remains a problem.  Internal audits of numerous
ADOC major facilities indicate that these assessments
still are not completed for many prisoners.  *See, e.g.*,
Pls.' Ex. 3558 at 1, 25 (audit of Bullock, noting that 4
out of 16 inmates reviewed in March 2020 and 1 of 10 in
November 2020 did not receive a discharge evaluation
before release from suicide watch); Pls.' Ex. 3562 at 1
(audit of Hamilton, noting that 2 out of 6 inmates
reviewed in March 2020 did not receive this evaluation);
Pls.' Ex. 3626 at 1 (spot audit of Ventress, noting that
the facility's compliance rate in the area of "suicide
watch discharge" dropped from 76.5 % in December 2020
to 31.1 % in March 2021).  While numerous audits reflect
recent progress, *see, e.g.*, Pls.' Ex. 3559 at 1, 18, 28
(audit of Donaldson, finding that 7 of 20 inmates
reviewed in March 2020 did not receive a discharge
evaluation, but all inmates in the November 2020 and

287

March 2021 samples did), the court remains concerned about the failures that have occurred despite a court-ordered obligation to conduct these evaluations. In light of the importance of these evaluations to ensure the adequate treatment of recently suicidal inmates and to prevent their placement in inappropriate settings, the court finds that it must continue to order that these discharge evaluations occur.

The court will not, however, order compliance with the plaintiffs' provision for the stepdown of inmates from constant observation to close watch before discharge.   Dr. Metzner testified that, while this stepdown process is "generally a good practice," it is not necessary in all cases.   June 30, 2021, R.D. Trial Tr. at 79.   Dr. Burns similarly emphasized that the purpose of the provision is not to set a hard rule, but to "allow clinical discretion on whether a patient needs to be stepped down ... before being discharged."   June 3, 2021, R.D. Trial Tr. at 217.   Because there is no evidence that mental-health staff do not recognize or

288

exercise their clinical discretion in the decision to discharge an inmate from suicide watch, the plaintiffs' proposed provision is unnecessary.

With respect to the discharge of inmates directly from suicide watch to segregation, the court will adopt both of the plaintiffs' provisions, one of which the defendants also propose.   The court will order that inmates discharged from suicide watch must not be transferred to segregation unless there is a documented exceptional circumstance and the transfer has been approved by the applicable ADOC official or a designee. Whatever may be said of ADOC's progress in the performance of discharge evaluations, in this area, ADOC persists in its unflinching failure to follow the court's order and its own policy, both of which already prohibit the discharge of inmates from suicide watch to a segregation unit absent an exceptional circumstance. After each of Travis Jackson's placements on suicide watch in 2019 and 2020, ADOC returned him directly to the restrictive housing unit without any documented

exceptional circumstance. *See* May 24, 2021, R.D. Trial Tr. at 139-40. The psychological autopsy found that Jackson's depression and suicidal thoughts "appeared to coincide with [restrictive housing unit] placements" until he ultimately committed suicide in a restrictive housing unit in February 2021. Travis Jackson Psychological Autopsy (P-3315) at ADOC0547209. In a sample of emails approving discharge directly to segregation for 23 out of 24 inmates, Dr. Burns found that almost none of the emails included mention of purported exceptional circumstances or consideration of alternative placements. *See* May 26, 2021, R.D. Trial Tr. at 81. Many of these emails approved transfers to segregation within minutes of the request. Current evidence vindicates the assessment of a provider at Ventress: Inmates are transferred from suicide watch to segregation as "a matter of course." Pls.' Ex. 3320 at 1. ADOC's practice since the liability trial makes clear that nothing short of a court order, coupled with

aggressive monitoring, will suffice to obtain ADOC's
compliance with these necessary protections.


c.   PLRA Findings

Discharge from suicide watch represents a critical
juncture in inmates' mental-health treatment.  If handled
without appropriate regard for their mental-health needs,
discharge throws still vulnerable inmates into dangerous
settings without adequate treatment or monitoring.  The
risk posed by these failures is at its apex when suicidal
inmates are discharged directly to segregation, where
most suicides occur.  *See* June 29, 2021, R.D. Trial Tr.
at 101 (testimony of Dr. Metzner, noting the nationwide
trend).

The ordered provisions are necessary and narrowly
tailored to correct ADOC's continued failures to provide
adequate treatment to inmates being released from suicide
watch and to avoid discharging inmates from suicide watch
to restrictive housing in the absence of exceptional
circumstances.  Requiring that discharge evaluations

291

occur is the least intrusive means that will ensure the adequate placement and treatment of inmates who are discharged from suicide watch. And the combined protection of requiring that exceptional circumstances justifying placement in restrictive housing must be documented and approved is the least intrusive means that will correct ADOC's persistent failures to divert recently suicidal inmates away from segregation and toward safer alternatives.

### 8. Follow-Up

#### a. The Parties' Proposed Provisions

The plaintiffs propose that, upon an inmate's discharge from suicide watch, mental-health staff must conduct a follow-up examination with the inmate on each of the first three days after discharge, followed by a fourth follow-up on the tenth day. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.6.1.1. The defendants propose that the inmate will receive follow-up mental-health examinations as clinically

292

indicated.  *See* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.5.1.  Both parties propose that these follow-up examinations must not take the place of other scheduled mental-health appointments but "may occur in connection with or contiguous with such appointments." *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.6.1.2; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.5.2.  They further propose that these follow-up examinations must assess whether the inmate released from suicide watch is showing signs of ongoing crisis, whether he or she needs further follow-up examinations, and whether he or she should be added to the mental-health caseload or assigned a different mental-health code.  *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.6.1.3; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.5.2.  The plaintiffs propose the further requirement that these examinations "must be conducted out-of-cell in a confidential setting, unless such an examination is not possible due to documented clinical concerns resulting

293

in the patient being transferred to a higher level of care."   Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.6.1.1.

With respect to the transfer of inmates following suicide watch, the plaintiffs propose that, for 10 days following an inmate's discharge, ADOC may not transfer the inmate to another institution, except to return him or her from suicide watch to his or her sending institution prior to the commencement of follow-up examinations, without restarting the four follow-up examinations.   *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.6.1.4.   After the four follow-up examinations have been completed, the plaintiffs propose that ADOC may transfer the inmate to any ADOC facility without the requirement for further follow-up examinations, unless clinically indicated.   *See id.*

b.   The Court's Ordered Relief

294

The court will order that, upon an inmate's discharge from suicide watch, mental-health staff must conduct a follow-up examination on each of the first three days after discharge, unless there is a documented clinical determination that the inmate was not suicidal at the time he or she was placed on suicide watch and did not become suicidal during the watch placement. These follow-up examinations must assess the substantive issues identified by the parties' proposals. They must occur in a confidential, out-of-cell setting, unless such an examination is not possible due to documented clinical concerns. And, consistent with the parties' proposals, the court will order that these examinations must not take the place of other scheduled mental-health appointments, although they may occur in connection with or contiguous with such appointments.

ADOC's current crisis-management approach to suicide prevention frequently neglects this crucial component of treatment for inmates with acute mental-health needs. For instance, inmate M.W. waited four days after his

transfer from suicide watch before he received his first follow-up examination. *See* June 9, 2021, R.D. Trial Tr. at 39-40.  Inmate J.B. received no follow-up at all after he attempted to overdose on antidepressants he had stockpiled, was placed on acute suicide watch with multiple identified suicide risk factors, and was taken off suicide watch the next day. *See* May 25, 2021, R.D. Trial Tr. at 50-52.  Similar failures plagued the experiences of inmates who subsequently committed suicide. *See, e.g.*, May 24, 2021, R.D. Trial Tr. at 140-41 (Travis Jackson missed numerous follow-up examinations after his multiple crisis placements).  In recognition of this problem, ADOC observed in a February 2020 letter to Wexford that "follow-up examinations were not conducted consistently at the required intervals." *See* Pls.' Ex. 3322 at 3.

These failures pose serious dangers to inmates who are discharged from suicide watch.  An inmate's mental-health needs do not dissipate the moment he or she is discharged from suicide watch.  Much to the contrary,

as Dr. Burns testified, the initial transition period following suicide watch is a "dangerous" time for inmates who must adapt to more infrequent contact with mental-health staff. June 3, 2021, R.D. Trial Tr. at 222-23; *see also Braggs*, 383 F. Supp. 3d at 1267 (noting consistent testimony of ADOC's mental-health expert, Dr. Perrien, at the suicide prevention trial that "the period post watch is a vulnerable time"). Dr. Burns credibly testified that ADOC's persistent failures to provide follow-up examinations contributed to the inadequate treatment of inmates who later committed suicide. *See id.* at 152 (testimony of Dr. Burns, connecting these failures to the inadequacy of mental-health care received by Travis Jackson).

Current conditions mandate relief to ensure that inmates discharged from suicide watch receive constitutionally adequate care. The court finds that the specificity of the plaintiffs' proposal is necessary to address ADOC's continued failures to conduct follow-up examinations consistently. Even under a court order

297

requiring compliance with the same timeframes proposed by the plaintiffs—timeframes which originated in the joint recommendations of both parties' experts at the suicide prevention trial, *see Braggs*, 383 F. Supp. 3d at 1266-67—ADOC has continued to allow inmates being discharged from suicide watch to fall through the cracks at a particularly "dangerous" and "vulnerable" time. As the court observed in its suicide prevention opinion, it "cannot simply trust that ADOC will provide an adequate number of follow-ups without a court order." *Id.* at 1268. Requiring follow-up examinations in the days immediately following an inmate's release from suicide watch is necessary to correct ADOC's continued violations.

Still, the court's ordered relief narrows that requested by the plaintiffs in two ways. First, the court incorporates Dr. Metzner's testimony that a documented clinical determination that an inmate was not and is not suicidal obviates the need for follow-up examinations. *See* June 30, 2021, R.D. Trial Tr. at 75-76.

298

Second, the court does not order compliance with the requirement to conduct a fourth follow-up examination on the tenth day after discharge.  Although Dr. Burns credibly testified that a follow-up examination after the immediate transition period is important to ensure that the inmate is "stable" after adjusting to a different environment, June 21, 2021, R.D. Trial Tr. at 63-64, she conceded that the "days immediately after release" from suicide watch present the most serious risk, June 23, 2021, R.D. Trial Tr. at 220.  In light of this testimony, as well as the relatively limited evidence to support the requirement to conduct a follow-up examination specifically on the tenth day following discharge, the court leaves the provision of additional follow-up care after the first three examinations to the clinical judgment of ADOC's mental-health staff.

The court will further adopt the plaintiffs' proposal that an inmate's transfer from suicide watch to another institution prior to the completion of the three ordered follow-up examinations restarts the requirement to

complete follow-up examinations on each of the three days following the transfer.  ADOC's frequent transfers of prisoners with serious mental-health needs may be disruptive in any case, but the dangers are most pronounced immediately following an inmate's discharge from suicide watch.  *See Braggs*, 383 F. Supp. 3d at 1267 (noting ADOC's expert's testimony that, when "someone is being moved, that increases the stress that an already vulnerable person experiences").  Transfers between facilities continue to jeopardize the continuity of mental-health care received by inmates immediately following their discharge from suicide watch.  For example, Dr. Burns testified that many of Travis Jackson's post-suicide watch follow-up examinations were missed as a result of his transfers between prisons.  *See* May 24, 2021, R.D. Trial Tr. at 140-41.  To address the dangers to inmates with serious mental-health needs when their follow-up care is interrupted, the court must require that ADOC's obligation to provide the three ordered follow-up examinations is reset when an inmate

is transferred to another facility prior to completion
of these examinations.

    c.   PLRA Findings

Meaningful follow-up care is a critical element of
the protection and treatment of inmates who have
expressed suicidality.  The follow-up examinations that
the court orders are necessary to protect vulnerable
inmates in the dangerous transition period after their
release from suicide watch into an environment in which
their contacts with mental-health staff are more
infrequent and there are fewer safeguards in place to
prevent them from attempting suicide or other self-harm.
By excluding inmates who are clinically determined not
to have been suicidal, the ordered provisions are
narrowly tailored to correct ADOC's ongoing failures to
provide this necessary follow-up care to the inmates who
require it.  This relief is the least intrusive means
that will ensure that inmates who are discharged from
suicide watch receive adequate follow-up examinations to

evaluate and treat any continued mental-health needs and to ensure that they remain stable following discharge.

9.   Other Provisions Regarding Suicide Prevention

Both parties propose that suicide watch cells must not be designated as restrictive housing unit cells. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.2.5; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.1.1.  The placement of segregation inmates in designated mental-health units was a "recurring" problem at the time of the liability opinion, undermining the usefulness of these units to treat prisoners with serious mental-health needs. *Braggs*, 257 F. Supp. 3d at 1212-13.  Recently, however, there is not evidence that ADOC has continued this harmful practice.  Consequently, this relief is unnecessary.

Consistent with § V.J of ADOC Administrative Regulation 629, the plaintiffs propose the requirement that "ADOC and/or its vendor must debrief staff and prisoners after a completed suicide or self-injurious

302

behavior that would have resulted in death if there had been no intervention."  Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.1.6.  There is evidence to support the importance of this practice.  Dr. Burns explained that suicides are "traumatic" for inmates and responding staff alike.  June 22, 2021, R.D. Trial Tr. at 80.  However, ADOC has already adopted this policy as a regulation, and there is evidence that ADOC has implemented this policy in its responses to at least some completed suicides.  *See id.*  The court will not order this relief at this time.

The defendants propose the provision that, after intake and after an inmate is transferred from one ADOC major facility to another, "the inmate will be provided any facility-specific information concerning mental-health services and the way to access those services for himself/herself or for another inmate." Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 9.6.1.  The court agrees that dissemination of this information is fundamental to inmates' ability to request

and receive adequate mental-health care.  However, given the lack of evidence that ADOC has not meaningfully informed inmates regarding access to mental-health services, the court need not order this relief.

The plaintiffs propose the provision that qualified mental-health professionals "may conduct suicide risk assessments, discharge evaluations, and follow-up examinations either in person or by telehealth."  Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.8.  When these examinations are conducted by telehealth, the plaintiffs propose that an RN must be in the room with the inmate. *See id.*  While the court is sensitive to the limitations of telehealth, *see* June 3, 2021, R.D. Trial Tr. at 229-30 (testimony of Dr. Burns), there is no evidence that, to the extent ADOC uses telehealth, its practice is inappropriate.  Requiring a mental-staff member to be in the room with an inmate during telehealth sessions may be an important measure to prevent mental-health providers from missing important observations of an inmate's behavior or lacking

**304**

information from an inmate's medical chart, but the court will not order this relief at this time.

The plaintiffs further propose that associate licensed counselors working toward licensure may not conduct suicide risk assessments or follow-up examinations on their own, although they may participate in suicide risk assessments conducted by qualified mental-health professionals. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 9.8.   ADOC's mental-health vendor at the time of the liability trial employed mental-health providers who were not independently licensed, *see* June 4, 2021, R.D. Trial Tr. at 47-48.   However, there is insufficient evidence as to whether ADOC or its current vendor employs associate licensed counselors and, if so, what tasks these associate licensed counselors currently perform to warrant relief at this time.


K.   Higher Levels of Care

As described previously, ADOC has made progress in its provision of hospital-level care in general, although problems with timely access to care remain.  Its progress with respect to inpatient units, however, is less encouraging; its supply of inpatient beds has decreased since the court's May 2020 inpatient treatment opinion, and it has failed to address the issue of heat management in inpatient facilities.

### 1.   Timely Access to Hospital-Level Care

#### a.   The Parties' Proposed Provisions

To remedy the lack of timely access to hospital-level care, the plaintiffs propose that the ADOC must comply with its own regulation regarding access to hospital-level care, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 10.1.1; that in the event a hospital refuses to admit an inmate referred for care, ADOC must attempt to obtain admission of the inmate at an alternative hospital, *see id.* at § 10.1.4; and that, until the EMT conducts its first audit, ADOC must notify

the plaintiffs' counsel when there are delays in the provision of hospital-level care, *see id.* at § 10.1.4.

The ADOC regulation to which the plaintiffs refer--AR 640, Advanced Inpatient Mental Healthcare (Doc. 3206-6)--imposes a series of deadlines for the provision of hospital-level care, including, but not limited to, the following:  if an inmate is identified as possibly requiring hospital-level care, his treating physician must complete a certain form and send it to the director of psychiatry within one working day of completion; within 72 hours of receiving the form, a separate administrator--the director of psychiatry services--must review the inmate's medical record and assessment; if the director of psychiatry services determines that hospital-level care is in the inmate's best interests, she must prepare a request for admission within eight hours, or document a recommendation of postponement of admission for an additional 48 hours; if the director of psychiatry prepares a request for admission, the inmate must be transported to a hospital within three business

days.   The regulation also requires ADOC to complete, in writing, an annual reassessment of its need for hospital beds, and to contract for more beds if necessary.   The plaintiffs propose that ADOC must provide them with a copy of this annual reassessment.   *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 10.1.2.

The defendants propose no provision concerning the lack of timely access to hospital-level care.


b.   The Court's Ordered Relief

The court will order that ADOC must ensure that inmates who require hospital-level care receive it within a reasonable period of time, as determined by clinical judgment.   The court orders this relief in light of the evidence that since its liability opinion, ADOC has failed to ensure that inmates who require hospital-level care receive it promptly enough to prevent them from harming or killing themselves.   Tommy McConathy's case provides a particularly stark example of this failure. In the last few months of his life, he found respite from

acute suicidality only during the few weeks he spent in
Citizens Hospital.   Prior to his transfer to Citizens,
McConathy had been on repeated suicide watches since
December 2019, and saw no improvements in his mental
health even in the most intensive care units offered in
ADOC's facilities.  He reported his "adamant . . . desire
to die" while in Bullock's SU, *see* Pls.' Ex. 3310 at
ADOC546648, and he was sexually assaulted in Bullock's
RTU and reported that he could not function there, *see
id.* at ADOC546690.  ADOC was not ignorant of McConathy's
needs--after his sexual assault in Bullock, a
mental-health provider assessed McConathy as "at high
risk for continued suicide watch until [his] safety needs
are addressed," and indicated that he would be considered
for referral to Citizens.  *See id.*  Yet it took 30 days
after that for McConathy to be transferred to Citizens.
Inmate M.H. experienced a similar delay--he was referred
to Citizens after cutting himself repeatedly and spending
several stints in the Bullock SU, but waited 10 days
before he was actually transferred to the hospital.  *See*

309

May 25, 2021, R.D. Trial Tr. at 43–44.  For inmates whose mental-illnesses are so acute as to require hospital-level care, such prolonged delays pose a needless and grave danger.

The court will not order, however, that ADOC must comply with the requirements of its own regulation regarding access to hospital-level care.  While the detailed timing requirements imposed by the regulation might be desirable, the evidence does not show them to be necessary.  As long as ADOC can ensure that inmates who require hospital-level care receive it promptly enough so that their health and lives are not jeopardized, the court need not dictate the precise manner in which it does so.  The court also trusts that if ADOC proves unable to ensure timely access to hospital-level care, the EMT shall bring the matter to its attention.

As for the requirement that ADOC reassess its need for hospital beds, there is little evidence that ADOC's failure to provide timely access to hospital-level care

310

is caused by a shortage of beds--indeed, as described previously, the plaintiffs agree that the 14 beds ADOC currently maintains at Citizens are adequate for the system's mental-health caseload.   Rather, the problem seems to lie with ADOC's failure to ensure that inmates who require hospital-level care are timely transferred to available beds.

Nor will the court order that, in the event that a hospital refuses to admit an inmate referred for care, ADOC must attempt to admit the inmate to an alternative hospital.   The record does not show that inmates whom ADOC has referred for hospital-level care are regularly turned away.

Finally, the court will not order that, until the EMT conducts its first audit, ADOC must notify the plaintiffs' counsel when there are delays in the provision of hospital-level care.  Although prompt access to hospital-level care is a matter of utmost urgency that cannot be neglected prior to the EMT's first audit, the

311

court trusts that ADOC will comply with the terms of its order.

### c. PLRA Findings

The court finds this provision necessary for the reasons given above:  ADOC has failed to ensure that inmates who require hospital-level care receive it in a timely fashion, despite the fact that without such care, those inmates are at serious risk of harming or killing themselves.  This provision is also narrowly tailored because it is exclusively focused on the problem of unreasonable delays in care, and minimally intrusive because it leaves it entirely to ADOC to determine how it ensures that there are no unreasonable delays.

### 2. Inpatient Beds

### a.  The Parties' Proposed Provisions

To remedy ADOC's lack of inpatient beds, the plaintiffs propose that at all times ADOC must maintain enough beds to accommodate 15 % of its mental-health

312

caseload, measured initially against the June 2020 caseload numbers. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 10.2.1. The plaintiffs also propose that ADOC must add new beds annually, if necessary, to reflect changes in its mental-health caseload, *see id.*; that it must provide new treatment space if it is needed to accommodate additional beds, *see id.* at § 10.3.1; and that all treatment spaces used to house inpatient beds must provide for confidentiality, *see id.*

The defendants maintain that no relief is necessary in light of Dr. Metzner's testimony that between 10 and 15 % of inmates on the mental-health caseload can be expected to require inpatient beds, and the fact that ADOC currently has 433 beds available--enough to accommodate nearly 10 % of its June 2020 mental-health caseload.[14]  *See* Defs.' Post-Trial Br. (Doc. 3367) at 105-106.

---

14. The defendants claim that ADOC's inpatient beds, combined with the 14 hospital beds available to it at Citizens Hospital, are enough to accommodate 10.2 % of

In the alternative, the defendants propose that
within 180 days of the effective date ADOC must have
enough beds to accommodate 10 % of its June 2020 caseload,
and that within one year of the effective date it must
reassess whether it needs more beds.  *See* Defs.' Proposed
Phase 2A Remedial Order (Doc. 3215) at §§ 10.2-3.  The
defendants also propose that ADOC's reassessment be based
on the mental-health caseload as it existed at the end
of the sixth month after the effective date, and that,
if ADOC or any third-party has started construction on
any prison facilities that will house mental-health beds,
the EMT will take that fact into account in reassessing
the need for more beds.  *See id.* at § 10.3.


        b.   The Court's Ordered Relief

The court will order that ADOC must initially supply
enough beds to accommodate 10 % of its mental-health

---

its June 2020 mental-health caseload.  The beds at
Citizens, however, are not among ADOC's *inpatient* beds,
and should not be counted towards the 10 % target set by
Dr. Metzner.

caseload at the time of the effective date.   However,
ADOC must, on at least an annual basis, collaborate with
the EMT to reassess (1) the number of inmates on its
mental-health caseload, and (2) whether 10 % is in fact
an   accurate   estimate   of   the   percentage   of   the
mental-health caseload requiring inpatient treatment.   If
ADOC determines that more than 10 % of the inmates on the
mental-health caseload require inpatient beds, or that
the mental-health caseload has grown, or both, it must
adjust its number of inpatient beds accordingly.   It must
also ensure that inpatient beds are housed in treatment
spaces   that   allow   for   confidentiality,   including   by
creating new treatment spaces if necessary.

The court orders ADOC to ensure that it has enough
beds   to   accommodate   10   %   of   the   inmates   on   its
mental-health caseload in light of Dr. Metzer's testimony
that, at any given time, ADOC should expect at least 10
% of the inmates on its mental-health caseload to require
access to inpatient beds.   *See* June 30, 2021, R.D. Trial
Tr. at 165.   Despite this testimony from its own expert,

ADOC has yet to provide enough beds to accommodate 10 % of the inmates on its mental-health caseload.  Nor is it progressing towards that goal.  When the court issued its remedial opinion, ADOC had 504 inpatient beds available for a caseload of 4,151 inmates.  *See Braggs*, 2020 WL 2789880 at *6 n.4, *7 (using December, 2019 caseload numbers).  Since then, ADOC has allowed the number of inpatient beds to decrease, from 504 to 433.  *See* Defs.' Post-Trial Br. (Doc. 3367) at 105.  Meanwhile, as predicted, ADOC's mental-health caseload has grown, from 4,151 in December 2019, *see* Joint Report (Doc. 2705), to 4,564 in March 2021, *see* Defs.' Ex. 4079 at 43-44.  That growth can be expected to continue, both because ADOC's capacity to recognize inmates who should be on its mental-health caseload will improve as it implements the court's orders regarding intake, and because admissions are expected to increase as the COVID-19 pandemic wanes. The need for more beds is therefore even more urgent today than it was at the time of the court's remedial opinion.

The court orders ADOC to use the caseload numbers at the time of the effective date as an initial reference point, as opposed to the June 2020 caseload numbers, to ensure that ADOC begins to make progress immediately. ADOC's March 2021 caseload was significantly larger than its June 2020 caseload (which, according to ADOC's estimates, was approximately 4,382, *see* Defs.' Post-Trial Br. (Doc. 3367) at 105), and its caseload is only expected to grow. Were the court to allow ADOC to use its June 2020 caseload as an initial reference, it would allow ADOC to continue its insufficient provision of inpatient beds for up to a year. That will not do. At the same time, however, the court suspects that its order will be significantly more manageable for ADOC than the plaintiffs' proposal--that ADOC be required to provide enough beds to accommodate 15 % of its June 2020 caseload. The plaintiffs estimate that their proposal would require ADOC to add 222 beds initially. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 10.2.1. The court cannot say how many beds its order will require

317

ADOC to add initially, because the mental-health caseload at the time of the effective date has yet to be determined.   But it will almost certainly be fewer than 222 by a large margin.   To accommodate 10 % of its March, 2021 caseload, for example, ADOC would have to add only 23 beds.   The number of additional beds needed to accommodate 10 % of ADOC's caseload at the time of the effective date will likely be far closer to 23 than 222.[15]

The court orders ADOC to regularly reassess the adequacy of its supply of inpatient beds because, although it orders today that ADOC need only provide enough beds to accommodate 10 % of the inmates on its mental-health caseload, it is seriously concerned that ADOC may in fact require more beds to correct the constitutional violations found in the court's 2017

_____

15. While ADOC may convert its SLU beds to serve as inpatient beds, it bears repeating that the SLUs do not currently help meet ADOC's need for inpatient beds, and ADOC may not double-count them as both inpatient units and outpatient diversionary units in the event that it converts them to inpatient units.   Rather, if it chooses to convert the SLUs to inpatient units, it must find alternative facilities for outpatient diversion.

liability opinion.  Experts for both parties previously testified that approximately 15 % of inmates on the mental-health caseload will require inpatient beds at any given time.  *See Braggs*, 2020 WL 2789880 at *4.  Only Dr. Metzner testified otherwise. The court now defers to his expertise, but given the conflicting testimony on the number of beds needed, it finds that ADOC must be prepared for the possibility that more than 10 % of its mental-health caseload will require inpatient beds.  ADOC must also be cognizant of its historic failure to identify mentally ill inmates and place them on the mental-health caseload, and the high likelihood that as it implements the provisions of the court's present order regarding intake, its mental-health caseload will grow. Whatever number of beds are sufficient to accommodate ADOC's mental-health caseload at the time of the effective date may therefore soon prove inadequate.

Finally, the court orders that inpatient beds are housed in treatment spaces that allow for confidentiality because mental-health treatment must be confidential if

it is to be effective.  Indeed, the defendants themselves propose that treatment must take place in a setting that provides for confidentiality, *see* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 6.1, and their expert testified as to his agreement with this provision, *see* June 30, 2021, R.D. Trial Tr. at 168 (testimony of Dr. Metzner); his only reservation was that he found it to state the obvious, *see id.*  Because of the importance of this issue and the longstanding problems with confidential treatment space, however, the court finds it necessary to make clear what should be self-evident.

### c.   PLRA Findings

The court finds this provision necessary given the pivotal importance of the inpatient-bed supply to ADOC's entire mental-health system.  As described in the liability opinion and reiterated in the remedial opinion, ADOC's lack of inpatient beds has "a downward-spiral effect on the rest of the system:  those who do not get needed treatment often end up in crisis cells, frequently

receive disciplinary sanctions, and may be placed in segregation, where they have even less access to treatment and monitoring." *Braggs*, 2020 WL 2789880 at *38 (quoting *Braggs*, 257 F. Supp. 3d at 1206). Ensuring adequate beds is therefore foundational to remedying the constitutional violations identified in the liability opinion, and, as described above, to the extent that beds are used for mental-health treatment, they must be housed in spaces that allow for confidentiality if that treatment is to be effective. This provision is also narrowly tailed and minimally intrusive because it requires ADOC to provide only the absolute minimum number of beds necessary, according to the lowest estimate given by any of the parties' experts.

### 3.   Temperature Regulation

#### a.   The Parties' Proposed Provisions

To remedy ADOC's failure to ensure that its inpatient treatment units are suitably temperature-regulated, the plaintiffs propose that "ADOC must create a year-round

heat management plan to address the risk of overheating by inmates in inpatient treatment units who are on psychotropic medications." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 10.2.1. The defendants propose no provision concerning temperature regulation.

### b.   The Court's Ordered Relief

In agreement with the plaintiffs, that court will order that ADOC must devise a plan and procedures to address the serious risk posed by high temperatures in the mental-health units, which it must submit to the court by May 2, 2022. In its May 2020 remedial opinion and order, the court imposed the same requirement, which it found to satisfy the requirements of the PLRA. *See Braggs*, 2020 WL 2789880 at *15. In a July, 2020 filing, the defendants purported to have complied with the court's requirement by installing HVAC systems in all of ADOC's mental-health treatment units. *See* Doc. 2880 at 4-5. Since then, however, Tommy Lee Rutledge died of

hyperthermia in his cell in the Donaldson RTU, where the temperature reached 104 degrees.  *See* May 25, 2021, R.D. Trial Tr. at 144–45.  Plainly, ADOC has not done enough to ensure that temperatures in its inpatient treatment units do not become dangerously high.  The court therefore must reiterate its May, 2020 order.

ADOC should specifically address how it happened that Rutledge's cell reached 104 degrees, causing him to die of hyperthermia, in a unit that was supposedly air conditioned, and how it will prevent that from ever occurring again.  The latter inquiry will require ADOC to address, additionally, how it plans to determine whether a particular cell has reached dangerously high temperatures, and should such a finding be made, what measures it will take to ensure its occupant's safety. Because Rutledge died in a unit that was supposedly air conditioned, these inquiries must pertain to all mental-health units, regardless of whether they are airconditioned.  (In this respect, the court's present order differs from its May 2020 order, which did not

require ADOC to address heat management in the air
conditioned mental-health units in Tutwiler and Bullock.
*See Braggs*, 2020 WL 2789880 at *15.)


### c.   PLRA Findings

The court finds this provision necessary because
addressing the risk of overheating is essential to
ensuring the safety of inmates in inpatient units.  *See
Braggs*, 2020 WL 2789880 at *15.  ADOC itself recognizes
as much--its own regulations require the Director of
Treatment and Wardens to "ensure that measures to reduce
sun/heat exposure risks for inmates taking psychotropic
medication are initiated and maintained at all ADOC
institutions."  Joint Ex. 118, Admin. Reg. § 619 (Doc.
1038-141).  This provision is also narrowly drawn and
minimally intrusive, because it does not require ADOC to
adopt any particular plan or implement any particular
procedure.  So long as ADOC can mitigate the risk of
overheating, the manner in which it does so shall remain
completely within its discretion.  Finally, although the

order requires ADOC to devise a heat management plan for facilities that are currently air conditioned, it extends no further than necessary, because as Rutledge's death illustrates, overheating remains a risk in all units, air conditioned or not.

### 4. Other Provisions Regarding Higher Levels of Care

In addition to the provisions described above, the plaintiffs propose two provisions that the court will not adopt, but will address briefly below.[16]

First, the plaintiffs propose that, if an inmate under a sentence of death is determined to be a candidate for hospital-level mental-health care, ADOC must notify the plaintiffs' counsel, who must then notify the attorney responsible for that inmate's post-conviction appeal, if one exists. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 10.1.3. The

---

16. The plaintiffs also propose that all stabilization unit cells must be suicide-resistant. The court addresses this provision in its discussion of the parties' proposed provisions regarding suicide prevention.

court will not order this relief because the record does not show it to be necessary to remedy ADOC's failure to provide inmates with timely access to hospital-level care.  To the extent the provision is intended to provide external oversight of ADOC's provision of care, it is redundant; oversight is the bailiwick of the EMT.  To the extent the provision is intended to facilitate the development of post-conviction legal claims, it is beyond the scope of the Phase 2A omnibus remedial order.

Second, the plaintiffs propose that "ADOC must ensure that any new facilities are designed to include adequate mental health treatment space, including an adequate number of inpatient beds and confidential treatment space," and that in designing new facilities, ADOC should solicit input from "the health services staff, the [mental-health] vendor, and the EMT."  *See id.* at § 10.3.2.  The court will not order the first part of this provision, concerning treatment space in new facilities, because it is redundant.  As explained above, the court will order that ADOC must maintain enough

inpatient treatment beds to accommodate 10 % of its
mental-health caseload, and that those beds must be
housed in spaces that allow for confidential treatment.
That order applies to future and existing facilities
alike--if ADOC chooses to house inpatient beds in a new
facility, it must ensure that those beds are housed in
such a manner so as to allow for confidential treatment.
The court will not order second part of the plaintiffs'
proposed provision--that ADOC be required to consult the
health services staff, its mental-health vendor, and the
EMT when designing new facilities--because the plaintiffs
have not shown it to be necessary.  Absent evidence that
ADOC cannot comply with the court's order, the court
finds that whom ADOC consults regarding the construction
of new facilities should be entirely up to ADOC.


### L.  Discipline

Despite some progress, ADOC continues to discipline
inmates without due regard for their mental-health needs.
While ADOC appears to have curtailed its unacceptable

practice of punishing inmates for self-harm, its continued failure to obtain remotely meaningful mental-health consultations to the disciplinary process subjects inmates with serious mental-health needs to inappropriate sanctions that create the substantial risk of decompensation, worsened symptoms, and restricted access to necessary care.

ADOC's August 20, 2020, revision of Administrative Regulation 403 (Doc. 3206-7), regarding the procedures for handling rule violations, and Administrative Regulation 626 (Doc. 3206-8), regarding mental-health consultations to the disciplinary process, represents one important step toward correcting ADOC's deficiencies. The plaintiffs propose a provision requiring ADOC to comply with both updated regulations. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 11.1. However, the court declines to follow the plaintiffs' approach. Considered in their entirety, the two regulations address numerous issues that are disconnected from the constitutional violations before the court and

contain provisions for which there is not sufficient evidence to find that ordering compliance would comply with the PLRA.

Instead of requiring across-the-board compliance, the court will consider relief that requires ADOC to comply with specific provisions of these regulations. By reviewing individual provisions, the court will better account for changed circumstances pertaining to inmate discipline and order relief that is necessary, narrowly tailored, and minimally intrusive in light of those conditions.

## 1. Mental-Health Consultations to the Disciplinary Process

### a. The Relevant Provisions

Section V.B.2 of ADOC Administrative Regulation 626 provides:

"A mental health consultation may be sought at the time of the rule or regulation violation or after review of the disciplinary report. A mental health consultation must be sought if the inmate is on the mental health caseload and has a mental health code of C or higher and/or an SMI designation; or, even

if the inmate has a lower mental health code or is not on the mental health caseload, where the inmate has an intellectual or developmental disability, or the inmate's behavior at the time of the alleged actions giving rise to the disciplinary or at any time prior to or during the disciplinary process demonstrates signs of psychological distress or mental impairment."

Section V.C.3.a lists the matters that the consulting mental-health staff must evaluate, including the inmate's current and then-existing mental state, the inmate's mental-health diagnosis or the presence of mental illness, the inmate's recent treatment history and medication, the inmate's recent crisis placements, whether the inmate's violative behavior directly resulted from or is related to mental illness, the likely impact of confinement to restrictive housing and whether such confinement is contraindicated, the potential impact of other disciplinary sanctions and whether any such sanctions are contraindicated, alternative sanctions that are not contraindicated, and the need for mental-health staff to be present during the disciplinary hearing.  And § V.C.3.d requires the documentation of the evaluation and its recommendations, including

disciplinary sanctions that are contraindicated and
alternative sanctions that are appropriate, to be
provided to the disciplinary hearing officer and the
inmate's treatment team.

### b.   The Court's Ordered Relief

The court will order that ADOC must comply with these
provisions of Administrative Regulation 626.   The
mental-health consultation process remains badly broken,
and the court finds this relief necessary in light of
ADOC's longstanding use of mental-health consultations
as rubber stamps for the disciplinary process, to the
grave detriment of inmates with serious mental-health
needs.

Just as the court found in the liability opinion,
the mental-health consultations are still limited to the
point of meaninglessness.   In the overwhelming majority
of the hundreds of disciplinary reports that Mr. Vail
reviewed, input by mental-health staff consisted of four
yes/no answers: whether the inmate was competent, whether

mental-health issues affected the inmate's behavior, whether mental-health issues needed to be considered in the disposition, and whether mental-health staff would be present at the hearing (always answered "no," *see* May 26, 2021, R.D. Trial Tr. at 203).  *See, e.g.*, Pls.' Ex. 2953 at ADOC492463.

These formalities are sufficiently perfunctory that consulting mental-health staff routinely fail to ensure that basic (and critical) information, such as whether the inmate is on the mental-health caseload, what the inmate's mental-health code is, and whether the inmate has an SMI, is actually reported.  As noted in the section on current conditions, the box on the consultation form to indicate whether an inmate is on the mental-health caseload is frequently marked with an error code, and there is no designated space to indicate that an inmate has a serious mental illness.  Even when an inmate's mental-health status is appropriately noted, the cursory comment rarely offers the slightest indication of how the inmate's mental-health issues may be affected by possible

sanctions, much less an affirmative recommendation that specific sanctions are appropriate or inappropriate.  As Vail described one comment that "[inmate] has an SMI flag and has recently engaged in self-injurious behavior," such a comment "doesn't give the hearing officer sufficient information to really know what to do."  May 26, 2021, R.D. Trial Tr. at 213-14.

Furthermore, discrepancies and omissions continue to plague these consultations, causing real harms to inmates by exposing them to sanctions that are inappropriate in light of their mental-health needs.  In "one of the better comments" that Vail reviewed, May 26, 2021, R.D. Trial Tr. at 220, a consulting mental-health staff member noted, "[Inmate] has a serious mental illness diagnosis. Long-term restrictive housing assignment contraindicated."  Pls.' Ex. 2953 at ADOC492423.  While this "better" comment still suffers from a lack of specificity as to the meaning of "long-term," *see* May 26, 2021, R.D. Trial Tr. at 220, the inmate was not sentenced to disciplinary segregation for the corresponding

333

disciplinary report, *see* Pls.' Ex. 2953 at ADOC492425.
Less than a month later, however, a consultation to a
subsequent disciplinary proceeding for that inmate
answered that there were no mental-health issues to
consider, *see* Pls.' Ex. 2953 at ADOC492463, and the
inmate was sentenced to 45 days in disciplinary
segregation, *see id.* at ADOC492465.

The gravity of this issue is perhaps most apparent
in the case of Jaquel Alexander, whose consultation had
nothing to say about his serious mental illness, his
previous contraindications for restrictive housing, *see*
Jaquel Alexander Mental-Health Records (P-3297) at
ADOC518254, ADOC518487, or his suicide attempt one month
earlier, *see id.* at ADOC518247.  *See* Jaquel Alexander
Institutional File (P-3296) at ADOC517817.  As Vail
observed, the consultation contained "no indication that
this was anything out of the ordinary other than the fact
that the person was on the caseload."  May 27, 2021, R.D.
Trial Tr. at 15.  This consultation, identical to
countless others in all but name and date, gave the

334

hearing officer a green light to sentence Alexander to segregation, where he committed suicide.

ADOC's adoption of revised regulations is no answer to this sustained dysfunction. Even at the time of the liability opinion, ADOC had regulations in place pertaining to these consultations. ADOC has failed to improve this process at all in the four years since the liability opinion. As Vail testified, "[t]his process is far from being fully implemented." June 1, 2021, R.D. Trial Tr. at 44. Because ADOC has shown itself to be incapable of following its own regulations—it failed to do so in 2017 and it is failing to do so today—it is necessary for the court to order ADOC to comply with the central provisions of its regulations regarding the provision of adequate mental-health consultations to the disciplinary process. This area should be monitored especially closely by the EMT.

c. PLRA Findings

335

The provisions that the court orders are necessary to ensure that mental-health consultations are adequately informative to facilitate consideration of inmates' mental-health issues in the disciplinary process. Substantive mental-health consultations must occur, and they must provide the hearing officer with the necessary context of an inmate's mental-health status and history. A sequence of checkboxes that are filled out with variable accuracy is no substitute for meaningful deliberation and documentation by the consulting mental-health staff, including comments and recommendations regarding appropriate and inappropriate punishments.

This relief is narrowly drawn to correct ADOC's continued deficiencies in the protection of inmates with the most serious mental-health needs in the disciplinary process. And it is the least intrusive means that will ensure that hearing officers are aware of necessary information regarding inmates' mental-health issues and their implications.

## 2.   Consideration of Mental-Health Consultations

### a.   The Relevant Provisions

Section V.D.3 of Administrative Regulation 626 provides that "the disciplinary officer must consider the mental health consultation, including any evaluation, comments, or recommendations, in deciding an inmate's guilt or innocence and, if guilty, in imposing any disciplinary sanctions." Section V.D.6 further requires that the hearing officer must document this consideration of the mental-health consultation.

With respect to determinations of guilt, § V.A.1.a of Administrative Regulation 403 prohibits the discipline of an inmate "for symptoms directly related to his or her mental illness, including but not limited to issuing disciplinaries or applying disciplinary sanctions to inmates for engaging in conduct directly related to self-injurious behavior." Both parties propose provisions defining "symptoms directly related to [an inmate's] mental illness" to include "behaviors that

337

would otherwise give rise to disciplinary proceedings or behavior citations but for the fact that they were directly caused by the inmate's mental illness," such as "violence toward other people, defiance of correctional staff, destruction of property, self-harm, and possession of contraband for the purpose of self-harm." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 11.2.1; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 11.2. They likewise propose provisions defining "conduct directly related to self-injurious behavior" to include "engaging in self-harm; attempting suicide; possessing tools or instruments, such as razors, other sharp objects, and rope, for the purpose of using them to engage in self-harm; and destroying property, such as ripping apart a mattress or causing fire damage to a cell, in the process of self-harming or attempting suicide." Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 11.2.2; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 11.3. Additionally, § V.D.3.a of Administrative Regulation 626 specifies

338

that, "[i]f the mental health staff member performing the
mental health consultation concludes that the rule or
regulation violation was a direct result of the inmate's
mental illness, then the disciplinary hearing officer
must find the inmate not guilty of the disciplinary
action."

With respect to punishment, § V.D.3.b of
Administrative Regulation 626 provides that, "[i]f the
mental health staff member performing the mental health
consultation concludes that the rule or regulation
violation was related to, but not the direct result of,
the inmate's mental illness, then the disciplinary
hearing officer must take that conclusion into
consideration in imposing any disciplinary sanctions."
Section V.D.4 adds, in relevant part, that, "if the
mental health staff member who conducted the mental
health consultation determined that any specific
disciplinary sanction is clinically contraindicated for
the inmate, including confinement to restrictive housing
for a medium- or high-level rule or regulation violation,

then the decision of the mental health staff member who performed the mental health consultation will be outcome-determinative and binding on the disciplinary hearing officer, except where exceptional circumstances exist."

### b.  The Court's Ordered Relief

The court will order that ADOC must comply with §§ V.D.3 and V.D.3.b, and the provision of § V.D.4 quoted above, of Administrative Regulation 626.  With respect to the punishment of disciplinary violations, Dr. Burns, Dr. Metzner, and Mr. Vail all stressed the importance of considering an inmate's mental illness and mental-health needs.  *See* June 4, 2021, R.D. Trial Tr. at 135-36, 154-56 (testimony of Dr. Burns); May 26, 2021, R.D. Trial Tr. at 207 (testimony of Mr. Vail); June 29, 2021, R.D. Trial Tr. at 178, 180-81 (testimony of Dr. Metzner).  As explained previously, robust mental-health consultations are a necessary step in communicating this information to the hearing officers tasked with determining

340

sanctions.   But without meaningful consideration by hearing officers, mental-health consultations accomplish nothing, and mentally ill inmates are left without protection from inappropriate disciplinary sanctions.

Currently, hearing officers continue to discipline inmates without due regard for their mental illnesses and mental-health needs.  While the continued inadequacy of the mental-health consultations that are provided plays a considerable role in perpetuating these violations, the evidence also indicates that hearing officers' consideration of the consultations that are provided is insubstantial.  Vail testified that he has not seen documentation that a hearing officer ever contacted mental-health staff with any questions about the consultation, even when the consultation identifies relevant mental-health issues, *see* May 27, 2021, R.D. Trial Tr. at 14; the only documentation that a consultation was considered is an unexplained "yes," *see id.* at 15-16.  The absence of any documented reasoning tying hearing officers' decisions to the mental-health

341

consultations raises serious concerns that the consultations are received and promptly disregarded.

The need for meaningful consideration of the mental-health consultation is at its most dire when mental-health staff have determined that certain sanctions, most notably segregation, are clinically contraindicated. Dr. Burns testified that, in light of the mental-health staff's understanding of "the impact that disciplinary sanctions might have on [an inmate's] mental health" and "the impact of restrictive housing on persons with mental illness," it is necessary for mental-health staff to have the clear authority to divert inmates with serious mental-health needs from contraindicated punishments, particularly segregation. June 4, 2021, R.D. Trial Tr. at 135. Dr. Metzner similarly endorsed the ability for mental-health staff to veto placements in segregation. *See* June 29, 2021, R.D. Trial Tr. at 116 (testimony of Dr. Metzner). Currently, however, as Dr. Burns and Mr. Vail testified, the evidence reflects that mental-health staff do not

342

recognize or do not exercise this authority in the disciplinary context. *See* May 26, 2021, R.D. Trial Tr. at 214-15 (testimony of Vail, stating the general conclusion); May 27, 2021, R.D. Trial Tr. at 6-7, 57 (testimony of Vail, noting the absence of any unequivocal contraindications of segregation in the consultations he reviewed); May 25, 2021, R.D. Trial Tr. at 41-42, 203-04 (testimony of Dr. Burns, discussing this lack of meaningful input by mental-health staff generally and with respect to the repeated failure to divert inmate T.C. from disciplinary segregation, despite her diagnosis with bipolar disorder); June 22, 2021, R.D. Trial Tr. at 124 (testimony of Dr. Burns, noting the absence of any recommendations for alternative sanctions in the consultations she reviewed). One incident outside of the consultation process that ADOC cites to rebut this testimony is telling. A progress note reviewed by Dr. Burns and Vail reported that, when two mental-health staff did determine that placement in segregation was contraindicated for an inmate, a captain responded that

the inmate would be placed in the restrictive housing unit anyway. *See* May 25, 2021, R.D. Trial Tr. at 27, 204; May 27, 2021, R.D. Trial Tr. at 58-60. That the mental-health staff ultimately succeeded in diverting the inmate by placing him on suicide watch is not, as ADOC contends, evidence that diversion is functioning properly. If anything, the incident is a sign that correctional staff are resistant to the few attempts to divert inmates from contraindicated punishments that do occur.

The current superficiality of the consultation process necessitates relief with respect to the conduct of both consulting mental-health staff and hearing officers. For mental-health consultations not to be useless, the court must order that they be considered as well as provided. And for clinical contraindications of sanctions not to be toothless, the determination of mental-health staff regarding contraindicated sanctions must be outcome-determinative in the absence of

exceptional circumstances, *see supra* at 41-49 (defining "exceptional circumstances").

At this time, however, the court will not order relief with respect to § V.A.1.a of Administrative Regulation 403 or § V.D.3.a of Administrative Regulation 626 regarding the conduct that may not be disciplined. Although there is evidence that ADOC continued to discipline inmates for self-injurious behavior after the liability opinion, *see, e.g.*, May 25, 2021, R.D. Trial Tr. at 38 (inmate M.W. lost 6 months of good time for cutting himself in November 2018), ADOC has more recently taken concrete steps toward correcting this problem. ADOC removed the Rule 505 violation that explicitly provided for the discipline of inmates who engaged in self-harm, and it asserts without contradiction that it has expunged such violations from the records of inmates with serious mental illnesses or intellectual disabilities. *See* June 9, 2021, R.D. Trial Tr. at 34 (testimony of Dr. Burns, noting that she was unaware of any inmate who received a Rule 505 violation after it was

345

eliminated); June 22, 2021, R.D. Trial Tr. at 126-28 (testimony of Dr. Burns, noting that she had not seen evidence that undermines ADOC's assertion that expungement is occurring). In itself, this change does not prevent the use of other rules to punish conduct related to self-injurious behavior; shortly after the Rule 505 violation was removed, an officer initiated a disciplinary action for failure to obey an order against an inmate who was standing on his toilet with a piece of sheet tied around his neck and refused to untie the sheet and step down. *See* Pls.' Ex. 4181 at ADOC529996-ADOC529998; *see also* May 27, 2021, R.D. Trial Tr. at 47-49 (testimony of Vail, characterizing the disciplinary action as a "back handed way of punishing someone for a self harm attempt"). And it also does not address discipline for other behaviors directly related to an inmate's mental illness; Vail discussed one disciplinary report against an inmate for not taking her mental-health medication. *See* May 26, 2021, R.D. Trial Tr. at 217. But generally, it appears that ADOC's recent

progress in this area is meaningful. Even without ordering relief with respect to these provisions, the court is confident that the EMT, in its review of the ongoing problems in mental-health consultations to the disciplinary process, will be able to flag for the court whether ADOC fails to adhere to its policy consistently moving forward.

Although Vail highlighted the hollowness of the current practice of documenting the hearing officer's consideration of the mental-health consultation in a single-word answer, always "yes," *see* May 27, 2021, R.D. Trial Tr. at 15-16, the court will not order compliance with § V.D.6 of Administrative Regulation 626. Instead, in light of Vail's testimony that such documentation will be "critical" to the EMT, June 1, 2021, R.D. Trial Tr. at 47, the court will leave to the EMT the task of determining what documentation is necessary to monitor ADOC's compliance with the relief that the court does order regarding the provision and consideration of substantive consultations.

### c.  PLRA Findings

The relief that the court orders is necessary to avoid imposing inappropriate and dangerous sanctions on inmates with serious mental-health needs.  Absent meaningful consideration of the mental-health consultations, hearing officers will continue to make disciplinary decisions affecting the placement and punishment of vulnerable inmates without appropriate regard for or understanding of their mental-health needs. And when the consulting mental-health staff concludes that certain sanctions are contraindicated by an inmate's mental-health issues, it is critical to the mental health and safety of the inmate that the hearing officer abide by that determination in all but exceptional circumstances.  This relief, which preserves ADOC's discretion in such exceptional circumstances, is narrowly tailored to ensure that the disciplinary sanctions imposed on inmates are not medically inappropriate and do not subject them to the substantial risk of

**348**

decompensation and worsened symptoms of mental illness. Ordering ADOC to comply with these regulations is the least intrusive means that will afford this necessary protection to inmates with serious mental-health needs in the disciplinary context.

### 3. Other Provisions Regarding Discipline

Administrative Regulations 403 and 626 include a number of other provisions addressing the consideration of mental-health issues in the disciplinary process.

Administrative Regulation 403 contains provisions for low-level rule violations by certain inmates to be addressed outside of the formal disciplinary process or behavioral citation process. Sections V.E.4 and V.F.3 provide that such violations by inmates in a stabilization unit, residential treatment unit, or crisis placement "shall be handled in the mental health treatment planning process." Sections V.E.5 and V.F.4 provide that such violations by inmates in a structured living unit "may be handled through the [formal

disciplinary process or behavior citation process] unless the mental health staff member performing the mental health consultation determines that the use of [that process] is clinically contraindicated," in which case the violation will be addressed through the mental-health treatment planning process.   However, there is no evidence that ADOC has failed to follow these procedures. Accordingly, the court will not order compliance with these provisions.

Section V.B.2.i of Administrative Regulation 403 and § V.D.1 of Administrative Regulation 626 provide that mental-health staff may attend the disciplinary hearing to assist the inmate.  Although mental-health staff never attended the disciplinary hearings in the cases that Vail reviewed, *see* May 26, 2021, R.D. Trial Tr. at 203, there is no evidence that mental-health staff are prevented from attending.  Rather, the evidence reflects that in the cursory mental-health consultations, the consulting mental-health staff routinely, if not always, decide that they will not be attending.  Thus, to the extent that the

350

failure of mental-health staff to attend disciplinary hearings contributes to the harms suffered by inmates with serious mental-health needs, these provisions do not address the root cause of these harms, so the court will not order compliance.

Other provisions of Administrative Regulation 403 that specifically address inmates with mental-health needs include:

- Sections V.A.1.e and V.A.1.f, which state when and how inmates with certain mental-health issues shall be provided notice of a disciplinary report;

- Section V.A.7.b, which states when disciplinary hearings must be postponed for inmates on suicide watch or other crisis placements; and

- Sections V.B.2.n and V.C.2.c, which state when and how inmates with certain mental-health issues shall be notified of the outcome of a disciplinary proceeding.

Dr. Burns and Vail credibly testified that these provisions protect inmate safety by involving mental-health staff in the disciplinary process to minimize the risk that aspects of the process will exacerbate an inmate's mental-health issues. *See* June

4, 2021, R.D. Trial Tr. at 117-21, 125-26 (testimony of

Dr. Burns); May 27, 2021, R.D. Trial Tr. at 18-21, 25-28,

33-34 (testimony of Vail).   However, there is limited

evidence that ADOC is currently failing to apply these

provisions.   *See* June 1, 2021, R.D. Trial Tr. at 54-57,

73-74 (testimony of Vail, conceding that he was unaware

of recent violations of multiple of these provisions);

June 22, 2021, R.D. Trial Tr. at 107-10 (testimony of Dr.

Burns, noting that she had not seen recent violations of

several of these provisions).   Accordingly, the court

will not order this additional relief.


### M.   Training

ADOC's recent work with Dr. Burns and Dr. Perrien to

implement numerous trainings represents a significant

improvement over prior conditions.   Since ADOC developed

training   curriculums   in   coordination   with   its

consultants, Dr. Burns confirmed that it has provided

comprehensive mental-health training, suicide prevention

training, and suicide risk assessment training to current

and newly hired staff. *See* June 22, 2021, R.D. Trial Tr. at 48, 50-51, 53-55; June 23, 2021, R.D. Trial Tr. at 225-26. However, despite its major strides to ensure that current and newly hired staff are adequately trained, the evidence presented during the omnibus remedial hearings reflects lingering problems that require redress.

First, there is some evidence that ADOC's provision of training is incomplete. ADOC's Assistant Deputy Commissioner for Operations Cheryl Price testified in a deposition that she personally had not received the comprehensive mental-health training that stipulated remedial orders have required since 2018 for all staff who have any direct contact with inmates. *See* June 1, 2021, R.D. Trial Tr. at 42; Phase 2A Order and Injunction on Mental-Health Identification and Classification Remedy, Attachment A (Doc. 1821-1) at § 1.1. Moreover, as recently as March 2021, a spot audit of Ventress reflected that the facility's site program manager, who, as Dr. Burns testified, is "in charge of mental health

services at [the] facility," May 26, 2021, R.D. Trial Tr. at 54, had not received the suicide risk assessment training. *See* Pls.' Ex. 3626 at ADOC565532.

Second, and more to the point, ADOC's failure to document its provision of training consistently renders it virtually impossible to know the extent of ADOC's progress. During her deposition, Assistant Deputy Commissioner of Operations Price further conceded that she did not know if everyone who required the comprehensive mental-health training had received it. *See* June 1, 2021, R.D. Trial Tr. at 42. Even Wexford, has acknowledged that its documentation of court-ordered trainings has been inconsistent. *See* Pls.' Ex. 3323 at 4-5. This lack of dependable documentation poses a challenge for ADOC in providing necessary training to new and current staff, and it suggests that the EMT may face similar challenges in monitoring ADOC's provision of this training.

As with nearly every area of liability, ADOC's provision of training and its related challenges are

inseparable from its chronic correctional understaffing. To come into compliance with the court's omnibus remedial order and provide a constitutionally adequate standard of mental-health care, ADOC will need to hire significantly more correctional officers in the next three-and-a-half years.  More officers means more training, more documentation, and more opportunities for staff to fall through the cracks.  ADOC's slapdash approach to tracking which staff receive which trainings will not do.  The trainings that ADOC has implemented in coordination with its consultants are the foundation for much of the relief that the court orders today, from adequate identification of inmates' mental-health needs at intake and through referrals, to appropriate placement of inmates with mental-health needs, to proper monitoring of inmates in segregation and crisis placements.  They also represent a means of bridging the persistent gap between ADOC's policies and on-the-ground practice.  The court, the EMT, the men and women in ADOC's facilities,

and ADOC itself must be sure that they are being carried
out.

### 1.   Documentation of Training

### a.   The Parties' Proposed Provisions

As an initial matter, the defendants assert that no
relief is necessary with respect to training.  *See* Defs.'
Post-Trial Br. (Doc. 3367) at 134.   The plaintiffs
propose, and the defendants propose in the alternative,
the following provisions requiring ADOC to provide
training on:

- The Comprehensive Mental Health Training
  Curriculum, see Pls.' Updated Proposed Omnibus
  Remedial Order (Doc. 3342) at § 13.1; Defs.'
  Proposed Phase 2A Remedial Order (Doc. 3215) at
  § 14.1;

- Suicide prevention, *see* Pls.' Updated Proposed
  Omnibus Remedial Order (Doc. 3342) at § 13.2;
  Defs.' Proposed Phase 2A Remedial Order (Doc. 3215)
  at § 14.3.5;

- Confidentiality, *see* Pls.' Updated Proposed
  Omnibus Remedial Order (Doc. 3342) at §§ 13.3.1,
  13.3.1.1; Defs.' Proposed Phase 2A Remedial Order
  (Doc. 3215) at § 6.2;

- Mental-health rounds in restrictive housing units, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 13.4; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 14.3.5.1;

- Emergency preparedness, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 13.5; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 14.3.6;

- Discipline, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 13.6; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 14.2.1;

- Suicide risk assessments, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at §§ 13.7.1-13.7.3; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at §§ 14.3.1, 14.3.2;

- Correctional risk factors, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 13.8; Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 14.3.5.2; and

- Observation on suicide watch, *see* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 13.9.

The defendants further propose that, within six months of the effective date, "ADOC and/or its mental health vendor will create or revise, as appropriate, any training materials required by this Phase 2A Remedial Order," subject to the approval of the compliance team.

357

Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at §
14.4.


### b.   The Court's Ordered Relief

The court will order that ADOC must document its
provision of training.   Even though some evidence
reflects that ADOC has implemented these trainings and
provided them to current and new staff, the department's
recent, and still-imperfect, implementation of these
trainings does not provide assurance that ADOC will
provide these trainings as it hires additional staff.
Documenting these trainings is critical to facilitate
monitoring of the steps that ADOC takes to train its
staff to comply with the omnibus remedial order, and to
gauge the extent to which ADOC's successes and failures
in implementing certain provisions provide reason for the
court to revisit them.


### c.   PLRA Findings

Requiring ADOC to document the training that it provides is necessary to enable the EMT to monitor training adequately and to ensure that the department actually does what it says it will do and trains new staff as they are hired. Without this documentation, the extent to which ADOC has implemented these trainings--trainings that form the foundation for much of the other relief the court orders--will be unknowable.

The court cannot simply rely on the fact that ADOC has conducted these trainings recently to conclude that it will continue to do so in the absence of monitoring. In light of ADOC's grievous understaffing, and the fact that adding new staff will actually *increase* rather than decrease the initial demands on current staff in this area, ADOC's contention that it has achieved compliance is illusory until its practices reflect that it can sustain compliance. The court must also make sure that training does not fall victim to the ADOC's practice of "robbing Peter to pay Paul," that is, the practice that,

due to severe staffing shortage, it must divert staff from one remedy to address another.

Requiring merely that ADOC document the trainings that it says it will conduct is narrowly tailored to monitor ADOC's provision of training and to ensure that ADOC's staff are adequately and appropriately trained to implement the other relief that the court orders, all of which is necessary, narrowly tailored, and minimally intrusive to correct ADOC's violations.  Moreover, this documentation requirement preserves ADOC's discretion in the manner by which it conducts these trainings, and so is the least intrusive means that will monitor that these trainings occur.

### 2.  Emergency Preparedness Drills

#### a.  The Parties' Proposed Provisions

With respect to emergency preparedness drills for suicide prevention, the plaintiffs propose the following provision:

"For training purposes, on a quarterly basis, ADOC and/or its mental-health vendor must conduct

emergency preparedness drills at each ADOC major facility, including scenarios involving self-injury and suicide attempts. During the emergency preparedness drills, the trainers must evaluate the correctional and medical staff response time to the emergency code and their preparedness for the emergency code (including, as appropriate, presence of an emergency bag, automatic external defibrillator (AED), and cut-down tool). Additionally, the emergency preparedness drill must include role-playing for participants to practice the response to an emergency, including, for example, using a cut-down tool, rendering first aid, and performing cardiopulmonary resuscitation (CPR)."

Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at § 13.5. The defendants propose essentially the same provision, except that they propose that these drills be required on an annual, rather than quarterly, basis and that the provision apply only to ADOC major facilities where the plaintiffs have proved that the emergency preparedness drills are necessary. *See* Defs.' Proposed Phase 2A Remedial Order (Doc. 3215) at § 14.3.6.

### b. The Court's Ordered Relief

The court will adopt the plaintiffs' proposed provision. As emphasized in the court's discussion of relief for suicide prevention, ADOC's immediate responses

361

to suicide attempts continue to be plagued by delays in taking vital, potentially life-saving measures.  ADOC's recurrent failures pose a grave danger to the life and safety of inmates with acute mental-health needs.

To address these problems, it is not enough for the court to order that ADOC's immediate responses to suicide attempts be carried out correctly.  An adequate response to suicide attempts begins not in the moment that an attempt is detected, but well before that, when staff are trained and retrained on how to respond appropriately in an emergency situation.  *See* May 28, 2021, R.D. Trial Tr. at 138 (testimony of Mr. Vail).  Training is the foundation for immediate responses to suicide attempts, and overwhelming evidence supports the necessity of emergency preparedness, or "man-down," drills to prepare staff for these critical interventions.  Dr. Burns testified that these drills are necessary to respond appropriately to suicide attempts in progress.  *See* June 4, 2021, R.D. Trial Tr. at 64-65.  Vail elaborated that performing these drills regularly is "very important"

362

because "the training doesn't really take until you're in a role playing situation."  May 28, 2021, R.D. Trial Tr. at 138.  The testimony of both experts echoes the recommendations in several recent psychological autopsies for inmates who committed suicide in ADOC facilities; the psychological autopsy of Jamal Jackson, for instance, recommended that "[a]ll correctional and healthcare staff must be trained on this vital issue and training must be reinforced frequently through education and 'Man-Down' drills."  Jamal Jackson Psychological Autopsy (P-3295) at ADOC0518575; *see also* Laramie Avery Psychological Autopsy (P-3302) at ADOC0518581; Casey Murphree Psychological Autopsy (P-3281) at ADOC0518572.

Citing to records of emergency preparedness drills dating back to October 2020, the defendants argue that ADOC's implementation of these drills obviates the need for a court order.  *See* Defs.' Response to Pls.' Post-Trial Br. (Doc. 3378) at 281.  The court disagrees.  While these recent efforts represent an important step for ADOC, they do not undermine the need for relief to

363

address the years of failures that the court has found in ADOC's immediate responses to suicide attempts.  *See* May 25, 2021, R.D. Trial Tr. at 8, 11 (testimony of Dr. Burns, noting connections between the failures in the immediate responses to suicides that occurred before and after the suicide prevention opinion).  Because effective training depends on regularity and consistency, relief remains necessary not only to bring ADOC into compliance, but to sustain compliance as ADOC contends with the continued challenges of understaffing.

        c.   PLRA Findings

    ADOC's persistent failure to respond appropriately to suicide attempts in progress is a systemic problem, and it demands systemic relief.  Requiring ADOC to conduct regular emergency preparedness drills is necessary to correct this longstanding threat to the safety of inmates who attempt suicide or other serious self-injurious behavior.

In light of the magnitude of this problem and the severity of its consequences, the court finds that quarterly, rather than annual, drills are necessary to address the violation.  Vail credibly testified that a quarterly frequency provides "reasonable" time to plan these drills, *see* May 28, 2021, R.D. Trial Tr. at 138-39, and the court finds that quarterly drills are narrowly tailored and the least intrusive means that will correct ADOC's widespread failures in this area.  Finally, and again, the court must also make sure that the emergency drills requirement does not fall victim to the ADOC's practice of "robbing Peter to pay Paul," that is, the practice that, due to severe staffing shortage, it must divert staff from one remedy to address another.

### 3.   Training for Mental-Health Observers

#### a.   The Parties' Proposed Provisions

With respect to the training of observers who conduct constant observation and close watch of inmates who are

on suicide watch, the plaintiffs propose the follow

provision:

> "Observers must receive additional training related
> to observation obligations; access to medical,
> mental health, and correctional staff; conflict
> resolution; and facility-specific processes and
> procedures (including how to access assistance in an
> emergency, obtain observation relief for a break,
> and communicate with supervisory staff during
> nontypical work hours)."

Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342)

at § 13.9. The defendants propose no equivalent

provision.


####    b.   The Court's Ordered Relief

The court will order that observers must receive

additional training related to their observation

obligations--including where they are to stand and

sit--and how to obtain assistance if an inmate requires

medical care or in the event of an emergency. The court

finds this relief necessary in light of Dr. Burns's and

Dr. Perrien's finding, upon inspecting ADOC facilities

in 2019, that "[i]n none of the facilities ... were the

'watchers' positioned appropriately to permit full

visibility into the safe cells or constant visibility of the inmates being observed." *Braggs*, 383 F. Supp. 3d at 1259 (quoting Report and Recommendations on Suicide Prevention in the Alabama Dep't of Corrections (Doc. 2416-1) at 26).  Rather, the experts noted that observers were "seated far removed from the crisis cell, ... obscuring their view into the cell and of the inmate. This occurred even though the door and food/cuff port were closed and there was no apparent risk to the observer."  Report and Recommendations on Suicide Prevention in the Alabama Dep't of Corrections (Doc. 2416-1) at 10.  They further found that inmates on suicide watch reported having trouble accessing medical care and that "mental health staff ... were not notified timely when a serious suicide attempt or suicide occurred." *Id.* at 28.  The court finds it troubling that these practices continued to occur well after its finding, in 2017, that ADOC's monitoring of suicidal prisoners was "woefully inadequate." *Braggs*, 257 F. Supp. 3d at 1229.

c.   PLRA Findings

The court finds this provision necessary because it is dangerous not to provide adequate monitoring of inmates on suicide watch.  Observers do not fulfill their purpose to protect the safety of inmates experiencing mental-health crises if they cannot actually see the inmates they are tasked with monitoring.  Furthermore, inmates on suicide watch are denied adequate treatment and protection when observers fail to notify mental-health staff when inmates who they are monitoring require medical attention, especially when the event giving rise to the need for medical attention is a suicide or serious suicide attempt.  This provision is narrowly tailored and minimally intrusive, requiring only that observers receive training specifically to address the problems that Dr. Burns and Dr. Perrien identified in ADOC's current monitoring of inmates on suicide watch. Finally, and again, the court must make sure that the observers requirement does not fall victim to the ADOC's practice of "robbing Peter to pay Paul," that is, the

practice that, due to severe staffing shortage, it must divert staff from one remedy to address another.

### III. GLOBAL PLRA FINDINGS

Just as the areas of inadequacy identified in the court's 2017 liability opinion are interconnected, *see Braggs*, 257 F. Supp. 3d at 1192-93, so too are the remedial provisions the court enters today.   Each addresses a failure that compounds with other failures; often, absent one provision, other provisions will not function adequately to protect prisoners' safety.

The experiences of the men who committed suicide since the court's liability opinion exemplify the multifaceted character of ADOC's deficiencies.   For many of these individuals, the timeline of their incarceration reflects not a single moment in which ADOC failed them, but a string of serial failures that cumulatively denied them access to minimally adequate mental-health treatment and care and culminated in their tragic loss of life.   No

single provision could have saved them.  An appropriate mental-health referral accomplishes nothing when it does not result in follow-up care.  A clinical contraindication of placement in restrictive housing offers no protection if it is disregarded without exceptional circumstances.  And without adequate correctional and mental-health staffing, the whole system collapses in on itself.  Because of this interdependence, no provision that the court adopts today necessarily renders any other provision unnecessary, and no subset of the provisions offers a constitutionally sufficient substitute for the ordered relief.

ADOC's severe shortage of correctional staff further underscores the need for the entirety of the relief that the court orders today.  As explained previously, ADOC's lack of staff has reduced it and its mental-health vendor to a constant state of "robbing Peter to pay Paul"; to implement relief in one area, it must divert staff from another, all with the goal of triaging--that is, maximizing the number of surviving inmates.  Given this

history, the court finds that, despite ADOC's progress in some areas, it is an open and critical question whether it can not only achieve but also sustain adequate compliance in various areas *simultaneously*, and that all of the provisions it orders today are therefore necessary.

Thus, taken as a whole, as well as individually, and set against the backdrop of what ADOC is doing and failing to do to meet its constitutional obligations overall, the court finds that the provisions it enters today are necessary, narrowly tailored, and the least intrusive means to correct ADOC's systemic violations of the constitutional rights of prisoners with serious mental-health needs.

## IV. CONCLUSION

Four years ago, this court found the mental-health care provided by the Alabama Department of Corrections "horrendously inadequate" for seven independent but interrelated reasons. *Braggs*, 257 F. Supp. 3d at 1267. It further found that "persistent and severe shortages

of mental-health and correctional staff, combined with chronic and significant overcrowding, are the overarching issues that permeate each of the above-identified contributing factors of inadequate mental-health care." *Id.* at 1268.

Since then, ADOC's mental-health staffing has improved. Its correctional staffing has not. What was true four years ago is no less true today: ADOC does not have enough correctional staff to provide constitutionally adequate mental-health care to prisoners who need it.

The continued dearth of correctional staff is the fault at the heart of ADOC's system of mental-health care. The absence of security staff prevents people who need treatment from accessing it, stops those whose mental health is deteriorating from being caught before they lapse into psychosis or suicidality, and fosters an environment of danger, anxiety, and violence that constantly assaults the psychological stability of people with mental illness in ADOC custody.

372

It is therefore imperative that ADOC work with the EMT to develop realistic benchmarks for the level of correctional staffing it will attain in each of the next four years, with the goal of achieving in four years the level of staffing necessary to conduct normal operations safely.  ADOC must also create its agency staffing unit and work with the Savages to update its staffing analysis as quickly as it can, and it must develop a proposal for its restrictive housing to function safely until it hires more correctional staff.  These steps cannot wait.  So long as ADOC's current staffing levels persist, people with serious mental-health needs are not safe in Alabama's prisons, but are at daily serious risk of deprivation, decompensation, and death.

With respect to the other constitutional violations identified in the court's liability opinion, ADOC's track record is mixed.  In certain areas it has made great progress; in others, less.  The critical question is whether it can sustain that progress, given its severe

shortage of correctional staff, as it implements relief in other areas.

On the whole, though, the court is hopeful that in the not too distant future many, if not all, of the provisions it orders today may prove unnecessary.  As ever, the endgame for everyone should be both achieving and sustaining adequate compliance and bringing this phase of the litigation to a close as soon as is reasonably possible.  Towards this end, the court will hold status conferences about every four months with the parties to discuss their progress and to make sure nothing falls through the cracks.  As stated, when the amount of work ADOC must now put into achieving and sustaining adequate compliance is considered, the July 2025 deadline--when the department must meet the critical and core correctional staffing deadline--is just around the corner. Time is of the essence.

DONE, this the 27th day of December, 2021.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

**374**

# Appendix A

## The Defendants' Mental-Health Treatment Guidance

| Treatment Category | Initial Assessment | Subsequent Care |
| --- | --- | --- |
| SU | An RN will assess the inmate on an emergent basis after arrival to the SU and make any necessary arrangements on an emergent, urgent, routine, or another basis for a psychiatric assessment and/or counseling assessment. | Typically, structured, out-of-cell activities during each week will include a daily interaction with a RN, psychologist, or counselor and more than one clinical encounter with a psychiatrist or CRNP. |
| RTU (Levels 1-3) | An RN will assess the inmate on an urgent basis after arrival to the RTU and make any necessary arrangements on an emergent, urgent, routine, or another basis for a psychiatric assessment and/or counseling assessment. | Typically, structured, out-of-cell activities during each week will include multiple interactions with an RN, psychologist, or counselor and a clinical encounter with a psychiatrist or CRNP. |
| SLU | An RN will assess the inmate on an urgent basis after arrival to the SLU and make any necessary arrangements on an emergent, urgent, routine, or another basis for a psychiatric assessment and/or counseling assessment. | Typically, structured, out-of-cell activities during each week will include multiple interactions with an RN, psychologist, or counselor and a clinical encounter with a psychiatrist or CRNP based on clinical judgment. |
| Outpatient | A treatment team member will assess the inmate on a routine basis. | Psychiatrist or CRNP: Every 90 days, unless otherwise clinically indicated.<br><br>Psychologist or counselor:  Every 90 days, unless otherwise clinically indicated. |