IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| EDWARD BRAGGS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| JEFFERSON S. DUNN, in his | ) | |
| official capacity as | ) | |
| Commissioner of | ) | |
| the Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### PHASE 2A OMNIBUS REMEDIAL ORDER

In accordance with the three remedial opinions entered today, it is the ORDER, JUDGMENT, and DECREE of the court that defendants Jefferson S. Dunn and Deborah Crook, in their official capacities, are ENJOINED and RESTRAINED from failing to do the following:

1. Definitions

   1.1. "ADOC" refers to the Alabama Department of Corrections.  While the court refers to the ADOC often in this order, its order is directed to the

defendants; thus, when the court says that "ADOC" shall take a certain action, it means that the defendants must ensure that it takes that action.

1.2. "ADOC major facility" refers to one or more of the major adult correctional facilities operated by or on behalf of ADOC, excluding any community-based facilities and community work centers. ADOC major facilities presently include Bibb County Correctional Facility, Bullock Correctional Facility, Donaldson Correctional Facility, Draper Correctional Facility, Easterling Correctional Facility, Elmore Correctional Facility, Fountain Correctional Facility, Hamilton Aged and Infirmed Center, Holman Correctional Facility, Kilby Correctional Facility, Limestone Correctional Facility, St. Clair Correctional Facility, Staton Correctional Facility, Tutwiler Prison for Women, and Ventress Correctional Facility.

1.3. "Effective date" refers to 42 days after the entry of this omnibus remedial order.

2. **Staffing**

2.1.  **Correctional Staffing**

2.1.1.  **In accordance with the court's previous order (Doc. 1657) directing it to comply with the recommendations of Margaret and Merle Savage (Doc. 1813-1), ADOC must create an agency staffing unit that will "write policy, enforce the staffing decisions mandated by the court's order, and take steps so that another staffing analysis can be conducted for every facility," Doc. 1813-1 at 100.**

2.1.2.  **ADOC must work with the Savages to update its staffing analysis.**

2.1.3.  **Within 21 days of the effective date, the defendants are to submit to the court a proposal for specific dates by which each of the above two provisions can be accomplished.**

2.1.4.  **By July 1, 2025, ADOC must fill all mandatory and essential posts at the level indicated in the most recent staffing analysis at that time.**

2.1.5.   **By May 2, 2022, the defendants must develop in collaboration with the Savages, and submit to the court, realistic benchmarks for the level of correctional staffing ADOC will attain by December 31 of 2022, 2023, and 2024.   These benchmarks must prioritize filling mandatory posts and staffing the mental-health hubs and intake facilities, and must put ADOC on track to fill all mandatory and essential posts by July 1, 2025.**

2.1.6.   **ADOC must submit correctional staffing reports to the court and the EMT on at least a quarterly basis.   It may work with the EMT to develop the format of these reports.   However, until ADOC and the EMT have finalized a new report format or else concluded that the existing report format is adequate, ADOC shall continue to provide mental-health staffing reports according to the format currently in place.**

2.1.7.   **Ameliorating the Effects of Understaffing**

2.1.7.1.   ADOC must check SU, suicide watch, and RHU cells for suicide resistance whenever such cells receive new occupants.

2.1.7.2.   ADOC must conduct a thorough check of all SU, suicide watch, and RHU cells at least once per quarter to verify that they satisfy every element of the Hayes checklist (Doc. 3206-5).  These checks must be documented.

2.1.7.3.   By May 2, 2022, the parties must submit proposals that will allow ADOC's RHUs--with the exception of the RHU at Tutwiler--to function safely with the correctional staff that ADOC currently employs.  These proposals must address the following:

2.1.7.3.1.   How ADOC shall address the serious risk of harm to inmates in restrictive housing caused by correctional staffing deficits so severe that the consistent provision of security checks, out-of-cell

time and mental-health treatment is simply impossible.

2.1.7.3.2.   How ADOC will ensure that any inmates moved out of the RHUs do not end up in functionally identical units--that is, units that offer equivalently deficient levels of monitoring, out-of-cell time, and treatment.

2.1.7.3.3.   How ADOC will ensure the safety of inmates in the RHUs who require protective custody, and, if it chooses to reduce the number of inmates in the RHUs, how it will manage the dangers posed by inmates who would present a significant safety or security risk in general population.

2.1.7.3.4.   How this relief may be modified if ADOC meets the benchmarks for correctional staffing set forth above.

2.1.8.   Correctional Staff Positions

2.1.8.1. Basic Correctional Officers (BCOs) cannot staff positions requiring firearms training, including, but not limited to, tower posts, perimeter posts, perimeter patrol posts, transportation posts, and armory posts.

2.1.8.2. Cubicle Correctional Operators (CCOs) cannot staff any position other than secure control room posts with no direct inmate contact.

2.2. Mental-Health Staffing

2.2.1. ADOC must maintain levels of mental-health staffing consistent with or greater than those called for by the staffing ratios developed by its consultants, subject to any subsequent modifications.

2.2.2. The EMT shall review the staffing ratios beginning one year from the initiation of monitoring and, if necessary, make recommendations for revising them.

2.2.3.   **ADOC must achieve the staffing levels set forth in the staffing matrix previously approved by the court, *see* Phase 2A Order and Injunction on Mental-Health Staffing Remedy (Doc. 2688), subject to any subsequent modifications, June 1, 2025.**

2.2.4.   **ADOC must submit mental-health staffing reports to the court and the EMT on at least a quarterly basis.   It may work with the EMT to develop the format of these reports.   However, until ADOC and the EMT have finalized a new report format or else concluded that the existing report format is adequate, ADOC shall continue to provide mental-health staffing reports according to the format currently in place.**

3. **Restrictive Housing Units**

   3.1.   **Exceptional Circumstances**

      3.1.1.   **Inmates with serious mental illnesses may not be placed in the RHUs unless a documented exceptional circumstance applies.**

3.1.1.1.   An "exceptional circumstance" exists where: (a) a safety or security issue prevents placement of the inmate in alternative housing (such as a SU, RTU, or SLU); or (b) a non-safety or non-security issue exists and transfer or transportation to alternative housing is temporarily unavailable.  Examples of safety and security issues include an inmate's known or unknown enemies in alternative housing or the inmate's creation of a dangerous environment (to the inmate, other inmates, and/or staff) by his or her presence in alternative housing.

3.1.2.   An inmate placed in a RHU for safety or security issues for 72 hours or longer will be offered at least three hours of out-of-cell time per day (which may be congregate out-of-cell time) while he or she remains in the RHU.

3.1.3.   An inmate placed in a RHU for non-safety or non-security issues must be removed from the RHU within 72 hours.

3.1.4.   Every week, ADOC must file with the court and the monitoring team reports on each prisoner who has been in restrictive housing for longer than 72 hours under exceptional circumstances during that week.  These reports must indicate the amount of out-of-cell time offered to the prisoner each day, the nature of the out-of-cell time (*i.e.*, exercise, group therapy, etc.), the exceptional circumstance justifying the prisoner's continued segregation placement, and the date by which ADOC expects that exceptional circumstance to be resolved.

3.2.   Screening for Serious Mental Illnesses

3.2.1.   Before being placed in a RHU, each inmate must be screened by an RN, or an LPN under an RN's supervision.  The screening must assess whether the inmate has been flagged as seriously mentally

ill; whether the inmate is at imminent risk of suicide or serious self-harm; whether the inmate exhibits debilitating symptoms of a serious mental illness; and whether the inmate requires emergency medical care. The results of the screening must be used to determine whether the inmate should be placed in restrictive housing and whether the inmate requires a medical and/or mental-health referral.

3.2.2.  If mental-health staff determine that an inmate who has yet to be placed in restrictive housing is contraindicated for restrictive housing, that inmate must not be placed in restrictive housing absent a documented exceptional circumstance.

3.2.3.  If mental-health staff determine that an inmate who has already been placed in restrictive housing is contraindicated for continued placement there, as evidenced by changes in the inmate's mental state and functioning, that

inmate must be removed from restrictive housing within 72 hours--or sooner, if a psychiatrist, psychologist, CRNP, or counselor determines that the need for removal of the inmate from restrictive housing is urgent--absent a documented exceptional circumstance.

3.3.  Mental-Health Rounds

3.3.1.  Mental-health rounds must be conducted by a qualified mental-health professional in each RHU at least weekly, and should generally include a discussion with the post officer(s) concerning any changes in the behavior of inmates in the RHU; a review of duty post logs and segregation unit record sheets for information about inmates' participation in recreation, showers, meal consumption and sleep patterns; a walk through the RHU, with stops at each occupied cell to make visual contact with the inmate inside the cell; attempts to verbally communicate with each inmate, including a brief inquiry into how the

inmate is doing and whether the inmate has mental-health needs or a desire to speak with mental-health staff privately; and a brief assessment of each inmate's hygiene, behavior, affect, and physical condition, and the condition of his or her cell.

3.3.2. Mental-health rounds must be appropriately documented. Such documentation must contain a notation of any mental-health needs expressed by inmates, or concerns identified by the qualified mental-health professional conducting the round as to any inmate. Documentation of rounds must be chronologically filed and maintained by the mental-health manager or other designated mental-health staff member.

3.4. Mental-Health Assessments

3.4.1. Each inmate must receive a mental-health assessment by a psychiatrist, psychologist, CRNP, or counselor within seven days of his or her placement in restrictive housing. Inmates coded

as mental-health code A must receive additional assessments at least every 90 days, and inmates coded as mental-health code B or C must receive additional assessments at least every 30 days.

3.4.2. Each mental-health assessment must be appropriately documented.

3.4.3. Each mental-health assessment must include an examination or discussion of the following topics: the inmate's past response(s) to restrictive housing, if applicable; the inmate's general appearance or behavior; whether the inmate has a present suicidal ideation; whether the inmate has a history of suicidal behavior; whether the inmate is presently prescribed psychotropic medication; whether the inmate has a current mental-health complaint; whether the inmate is currently receiving treatment for a diagnosed mental-illness; whether the inmate has a history of inpatient or outpatient psychiatric treatment; whether the inmate has a history of

treatment for substance abuse; whether the inmate has a history of abuse and/or trauma; and whether the inmate is presently exhibiting symptoms of psychosis, depression, anxiety, and/or aggression.

3.4.4.  Each mental-health assessment must include a determination of whether the inmate requires a referral and, if so, how urgently.

3.5.  Out-Of-Cell Time

3.5.1.  All inmates in RHUs must have the opportunity to exercise outside of their cells for at least five hours per week, subject to the following exception:

3.5.1.1.  ADOC may refrain from offering out-of-cell time due to inclement weather, but only if a safe, alternative space for inmates to exercise--such as a gymnasium--is unavailable.

3.5.2. **The days and times that out-of-cell time is offered, and any inmate's decision to refuse out-of-cell time, must be documented.**

3.6. **Security Checks**

3.6.1. **ADOC must perform security checks in RHUs at least twice per hour, but no more than 40 minutes apart.**

3.6.2. **Security checks must be documented accurately and contemporaneously.**

3.6.3. **Correctional officers must regularly verify that security checks are conducted as required.**

3.1. **Restrictive Housing Cells**

3.1.1. **Within three months of the effective date, the cells in the RHUs must be cleaned.**

3.1.2. **Cells in the RHUs must always be cleaned before they receive new occupants, and inmates must be provided access to cleaning supplies at least every two weeks.**

3.1.3. **Within six months of the effective date, all cells in the RHUs must comply with the conditions**

set forth in the checklist developed by Lindsay
M. Hayes (Doc. 3206-5).

4. Intake

4.1.   Each intake screening must be conducted by a
qualified mental-health professional.

4.2.   Documentation   of   each   inmate's   intake
screening--including   an   interpretation   of   the
results   of   any   psychological   assessment--must   be
filed in the inmate's medical record.

4.3.   Inmates' Previous Records

4.3.1.   If, either during or after intake, an inmate
reports   having   previously   received   mental-health
services   and   can   correctly   report   the   prior
mental-health provider, a records request to the
prior provider must be made within three working
days   of   the   time   the   inmate   reported   having
previously   received   mental-health   services.   If
the   inmate   reports   having   previously   received
mental-health   services   and   cannot   remember   or
correctly   identify   the   prior   mental-health

provider, the mental-health staff must reasonably attempt to locate records of the inmate's prior treatment.

4.3.2.   All health records from each inmate's prior facility of incarceration must be requested within three working days of intake if they are not presented at intake.

5. Coding

5.1.   Each inmate must be assigned a mental-health code and, if necessary, an SMI flag, that is appropriate to address his or her mental-health needs, as determined by clinical judgment.

5.2.   Each inmate's mental-health code and SMI flag must be accurately and consistently indicated throughout all documents related to his or her care.

6. Referral

6.1.   A referral must result in a timely clinical assessment and/or intervention by a psychiatrist, psychologist, CRNP, or counselor.   Emergent referrals must result in a clinical assessment

and/or intervention as soon as possible but no more than four hours from the determination that the referral is emergent.  Urgent referrals must result in a clinical assessment and/or intervention within 24 hours of the time the referral was made.  Routine referrals must result in a clinical assessment and/or intervention within 14 calendar days of the time the referral was made.

6.2.  Communication of Referrals

6.2.1.  An emergent or urgent referral must be communicated verbally, in person or by telephone, to the appropriate mental-health staff member or members as soon as possible, but in no case longer than one hour from the time the referral is identified as emergent or urgent, absent unusual circumstances which detain staff for an extended period of time such as a medical emergency or an incident involving safety or security of staff or inmates.   The mental-health staff member or members   to   whom   the   referral   should   be

communicated will be determined by the mental-health staff.

6.2.2. Routine referrals must be communicated to the appropriate mental-health staff member or members, as indicated above, by the next shift by leaving the referral form in a location that ADOC has designated to the correctional and mental-health staff, and inmates, as appropriate. The monitoring team may alert the court if ADOC fails to clearly designate the location.

6.3. An appropriate triage or mental-health staff member or members must regularly monitor any designated location for completed referral forms. Said staff must review and triage the completed referral forms at least once per shift.

6.4. After an inmate has received an emergent referral, including a referral for suicide watch, correctional or mental-health staff must maintain constant, line-of-sight observation of the inmate

until the inmate has been assessed by an appropriate mental-health provider.

7. Confidentiality

7.1.  Individual counseling sessions, medication-management encounters, periodic mental-health assessments of inmates in RHUs, suicide-risk assessments, and therapeutic group sessions must take place in settings that provide for confidentiality and that, if applicable, are out-of-cell, subject to the following exception:

7.1.1. Such services may be provided in a non-confidential setting if confidentiality is not possible due to safety concerns or is otherwise not appropriate.  The question whether confidentiality is otherwise not appropriate must be answered according to clinical determinations.

7.1.2. If confidentiality is not possible, then that fact, the reason for it, and any actions taken to maximize confidentiality must be documented in a progress note.

8. **Treatment Teams and Plans**

8.1.   Treatment teams must meet at regular intervals, to be determined based on the team chair's clinical judgment, taking into account each inmate's assigned mental-health code, housing unit, and level of psychotherapy.

8.2.   Each treatment team meeting must last for an adequate period of time, based on the team chair's clinical judgment.

8.3.   All members of each inmate's treatment team must have access to clinically relevant documents.

8.3.1.   Clinically relevant documents are all documents related to the current and past condition of the inmate--including documents related to the inmate's housing status, disciplinary history, and interactions with other inmates--that are necessary to inform clinical judgment.

8.4.   Each inmate on the mental-health caseload must have a treatment plan that is adequately detailed

and individualized to address his or her mental-health needs, based on clinical judgment.

8.5. Treatment teams must review and revise each inmate's mental-health code as clinically appropriate, and must review and amend, if necessary, each inmate's treatment plan after changes in the inmate's mental-health code, transfer to a new housing unit, or any other circumstance resulting from or likely to affect an inmate's mental-health in a significant way.

8.6. Coordination of Transfers and Treatment

8.6.1. ADOC must consider inmates' mental-health codes and symptoms in making decisions concerning transfer between facilities.

8.6.2. In the event of a transfer of an inmate on the mental-health caseload, the staff member in charge of the inmate's care at the transferring facility must send a transfer note to the staff member in charge of the inmate's care at the

receiving facility within a reasonable time after the transfer is initiated.

9. Psychiatric and Therapeutic Care

9.1.  Access to Treatment

9.1.1.  ADOC must comply with the Mental-Health Treatment Guidance set forth in Appendix A.

9.1.2.  In addition to the Mental-Health Treatment Guidance set forth in Appendix A, each inmate must receive any additional care prescribed by his or her treatment team, subject to the following exception:

9.1.2.1.  While ADOC must provide each inmate in restrictive housing with any medication or individual therapy prescribed by his or her treatment team, it need not provide other forms of care prescribed by an inmate's treatment team if those kinds of care cannot be provided safely in the restrictive housing environment.

9.1.3.   Each treatment session must last for an adequate period of time, according to clinical judgment.

9.1.4.   Each housing unit must offer appropriate types and numbers of therapeutic groups to accommodate the inmates housed there.

9.2.   Out-Of-Cell Time

9.2.1.   Inmates in the RTU, SU, and SLU must receive ten hours of structured, therapeutic out-of-cell time and ten hours of unstructured out-of-cell time per week, unless clinically contraindicated, subject to the following exception:

9.2.1.1.   ADOC need not provide ten hours unstructured out-of-cell time per week to inmates in the RTU Level Three who are housed in open dormitories rather than cells.

9.2.2.   An inmate's out-of-cell appointments with his or her treatment team, psychiatric provider, counselor, or therapeutic group will count as structured, therapeutic out-of-cell time.

9.3.  Inmates who are not on the mental-health caseload must be seen by mental-health staff in the event of a mental-health crisis or after receipt of a mental-health referral, as clinically indicated.

9.4.  Progress Notes

9.4.1.  For each significant clinical encounter between an inmate and a member of his or her treatment team, or any qualified mental-health professional, a progress note must be created and placed in the inmate's mental-health record.

9.4.1.1.  A significant clinical encounter consists of a communication or interaction between an inmate and qualified mental-health professional involving an exchange of information used in the treatment of the inmate, excluding any casual exchanges, administrative communications, or other communications which do not relate to the inmate's mental condition or ongoing mental-health treatment.

9.4.2.   Progress notes must be sufficiently detailed to facilitate treatment and ensure continuity of care

10. Suicide Prevention

10.1.  Immediate Response to Suicide Attempts

10.1.1. If ADOC or mental-health vendor staff observe an inmate who is attempting suicide or who is unresponsive after apparently attempting or completing suicide, the staff must immediately call for assistance.

10.1.2. If ADOC or mental-health vendor staff observe a suicide threat or attempt, the staff must immediately respond with efforts to interrupt the behavior or attempt.

10.1.3. Immediate life-saving measures must be performed by ADOC or vendor staff as soon as it is deemed safe by correctional staff to do so (typically, when at least two correctional officers are present), and must continue until paramedics or other appropriate medical personnel

arrive and assume care or a physician declares such measures are no longer necessary.

10.1.4. Each ADOC major facility must maintain an appropriate cut-down tool in each RHU, SU, RTU, SLU, and crisis unit.

10.1.5. When continued medical care is necessary, an inmate who has attempted suicide must be moved to the medical or healthcare unit at the ADOC major facility for continued medical care as soon as ADOC staff may safely move the inmate, unless medically contraindicated.

10.1.6. If an inmate dies as a result of a suicide, the inmate's body must be moved as soon as possible to a private area outside of any occupied housing unit and outside the view of other inmates.

10.2. Suicide Watch Placement

10.2.1. After each inmate's initial placement on constant observation, the inmate must be evaluated using a suicide risk assessment to

determine if the inmate is not suicidal or is either acutely suicidal or non-acutely suicidal.

10.2.2. An inmate who is admitted to suicide watch must be considered for placement on the mental-health caseload.

10.2.3. If an inmate admitted to suicide watch is not placed on the mental-health caseload, the clinical rationale for that decision must be documented in the inmate's medical chart.

10.2.4. Before an inmate is placed on suicide watch, a nurse must examine the inmate and complete a body chart.

10.3. Suicide Watch Cells

10.3.1. All suicide watch and stabilization unit cells in ADOC major facilities must be suicide-resistant. On a quarterly basis during the term of this order, all suicide watch cells in ADOC major facilities must be physically inspected to determine whether they remain suicide-resistant.

10.3.1.1.  Cells shall be deemed suicide-resistant if they meet the requirements set forth in Lindsay M. Hayes's Checklist for the "Suicide Resistant" Design of Correctional Facilities (Doc. 3206-5).

10.3.1.2.  Before an inmate is placed in an SU or suicide watch cell, the cell must be cleaned and any contraband must be removed from the cell.

10.3.2.  ADOC may designate areas or cells where inmates could be temporarily placed when a suicide watch cell is unavailable, provided that the inmate remains on constant observation during this time.

10.4.  Observation

10.4.1.  Any inmate determined to be acutely suicidal must be monitored through a constant observation procedure.

10.4.2.  Any inmate determined to be non-acutely suicidal must be monitored through a close watch

procedure that ensures monitoring at staggered intervals not to exceed 15 minutes.

10.4.3. During constant observation or close watch, an observer must contemporaneously document his or her observations at staggered intervals not to exceed 15 minutes.  Upon an inmate's discharge from suicide watch, his or her observation records must be maintained in his or her medical record.

10.4.4. ADOC must take appropriate steps to ensure that observers perform their duties as required.

10.5. Suicide Watch Conditions

10.5.1. Unless clinically contraindicated, inmates on suicide watch must be provided adequate suicide-resistant implements for hygiene and eating as clinically appropriate.

10.5.2. Inmates on suicide watch must receive the same privileges afforded by their last housing assignment as clinically appropriate.

10.5.3. Inmates housed in crisis cells, medical cells, or the infirmary must be provided

appropriate   out-of-cell   activity,   unless clinically contraindicated, after 72 hours.

10.6.  Referrals to Higher Levels of Care

10.6.1.  If an inmate remains on suicide watch for 72 hours, then he or she must be considered for referral to a different or higher level of care based on clinical judgment.  If the inmate is not referred to a different or higher level of care, then the clinical rationale must be documented in the inmate's medical chart and tracked in the crisis utilization log or a similar tracking mechanism.

10.6.2.  If an inmate remains on suicide watch for 168 hours, then the he or she must be considered for referral to a different or higher level of care based on clinical judgment.  If the inmate is not referred to a different or higher level of care, then the clinical rationale must be documented in the inmate's medical chart and

tracked in the crisis utilization log or a similar tracking mechanism.

10.6.3.  If an inmate remains on suicide watch for 240 hours or longer and does not meet the criteria for discharge to outpatient mental-health care, then he or she must be considered for referral to a different or higher level of care based on clinical judgment.  If the inmate is not referred to a different or higher level of care, then the clinical rationale must be documented in the inmate's medical chart and tracked in the crisis utilization log or a similar tracking mechanism, and documentation of the decision must be sent to the mental-health vendor's director of psychiatry for review and evaluation.

10.6.4.  Any inmate who is returned to suicide watch within 30 days of discharge from a suicide watch and/or who has three suicide watch placements within six months must be considered for referral to a different or higher level of care based on

clinical judgment.  If the inmate is not referred to a different or higher level of care, the clinical rationale must be documented, and mental-health staff must notify OHS of the decision and provide the clinical rationale to OHS within 72 hours.

## 10.7. Discharge

### 10.7.1. Discharge Evaluation

10.7.1.1. Prior to being discharged from suicide watch, an inmate must receive an out-of-cell, confidential evaluation by a psychiatrist, psychologist, CRNP, or counselor, unless such evaluation is not possible due to documented clinical concerns.

10.7.1.2. If an out-of-cell, confidential evaluation is not possible due to documented clinical concerns, staff must consider whether referral to a different or higher level of care is appropriate.

### 10.7.2. Discharge to RHU

10.7.2.1. An inmate discharged from suicide watch must not be transferred to an RHU, unless there is a documented exceptional circumstance.

10.7.2.2. Any transfer of an inmate from suicide watch to an RHU must be approved by the Deputy Commissioner of Operations (for male facilities) or Deputy Commissioner of Women's Services (for female facilities) or their designee.

10.8. Follow-Up

10.8.1. After an inmate's discharge from suicide watch, mental-health staff must conduct a follow-up mental-health examination with the inmate on each of the first three days following discharge, unless there is a documented clinical determination that the inmate was not suicidal at the time the inmate was placed on suicide watch and did not become suicidal during the watch placement.

10.8.2.  **Follow-up mental-health examinations must not take the place of other scheduled mental-health appointments, although they may occur in connection with or contiguous with such appointments.**

10.8.3.  **Follow-up mental-health examinations must occur in a confidential, out-of-cell setting, unless such examination is not possible due to documented clinical concerns.**

10.8.4.  **During the follow-up mental-health examinations, the mental-health staff conducting such follow-up mental-health examinations must assess whether the inmate released from suicide watch is showing signs of ongoing crisis, whether the inmate needs further follow-up mental-health examinations, and whether the inmate should be added to the mental-health caseload or assigned a different mental-health code.**

10.8.5.  **An inmate's transfer from suicide watch to another institution prior to the completion of**

the three ordered follow-up examinations restarts the requirement to complete a follow-up mental-health examination on each of the three days following the transfer.

11. **Higher Levels of Care**

11.1. ADOC must ensure that inmates who require hospital-level care receive it within a reasonable period of time, as determined by clinical judgment.

11.2. **Inpatient Beds**

11.2.1. ADOC must supply enough beds to accommodate 10 % of its mental-health caseload at the time of the effective date.

11.2.2. In collaboration with the EMT, ADOC must, on at least an annual basis, reassess (1) the number of inmates on ADOC's mental-health caseload, and (2) whether 10% is in fact an accurate estimate of the percentage of the mental-health caseload requiring inpatient treatment. If ADOC determines that more than 10 % of the inmates on the mental-health caseload require

inpatient beds, or that the mental-health caseload has grown, or both, it must adjust its number of inpatient beds accordingly.

11.2.3. At all times, ADOC must ensure that inpatient beds are housed in treatment spaces that allow for confidentiality, including by creating any new treatment spaces if necessary.

11.3. ADOC must devise a plan and procedures to address the serious risk posed by high temperatures in the mental-health units, which it must submit to the court by May 2, 2022. The plan and procedures must address, specifically, how it happened that Tommy Lee Rutledge's cell reached 104 degrees, causing him to die of hyperthermia, in a unit that was supposedly air conditioned, and how the ADOC will prevent that from ever occurring again. The plan and procedures must also address how ADOC plans to determine whether cells in each of its facilities have reached dangerously high temperatures, and should such a

finding be made, what measures ADOC will take to ensure their occupants' safety.

12. Discipline

  12.1. ADOC must comply with §§ V.B.2, V.C.3.a, and V.C.3.d of ADOC Administrative Regulation 626, all of which are set forth in Appendix B.

  12.2. ADOC must comply with §§ V.D.3 and V.D.3.b, and the excerpted provision of § V.D.4, of ADOC Administrative Regulation 626, all of which are set forth in Appendix B.

13. Training

  13.1. ADOC must document its provision of training regarding the Comprehensive Mental-Health Curriculum, suicide prevention, confidentiality, mental-health rounds in restrictive housing units, emergency preparedness, discipline, suicide risk assessments, correctional risk factors, and observation on suicide watch.

  13.2. For training purposes, on a quarterly basis, ADOC and/or its mental-health vendor must conduct

emergency preparedness drills at each ADOC major facility, including scenarios involving self-injury and suicide attempts. During the emergency preparedness drills, the trainers must evaluate the correctional and medical staff response time to the emergency code and their preparedness for the emergency code (including, as appropriate, presence of an emergency bag, automatic external defibrillator (or AED), and cut-down tool). Additionally, the emergency preparedness drills must include role-playing for participants to practice the response to an emergency, including, for example, using a cut-down tool, rendering first aid, and performing cardiopulmonary resuscitation (or CPR).

13.3. Observers must receive additional training related to their observation obligations, including where they must be positioned and how to access assistance if an inmate requires medical care or there is an emergency.

## 14. Unforeseen Circumstances

14.1. "Unforeseen circumstances" refer to a situation in which an event or series of events (such as a natural disaster, fire, medical epidemic, pandemic, or outbreak, and lockdown) make performance under this omnibus remedial order inadvisable, impracticable, illegal, impossible, detrimental to the health and/or safety of inmates and/or staff, or detrimental to the public interest.

14.2. In monitoring ADOC's compliance with this omnibus remedial order, the EMT shall consider unforeseen circumstances, their effects on ADOC's ability to comply with the remedial order, and ADOC's efforts to mitigate the effects of those circumstances.

15. This order is not final and remains open in that the parties must still submit proposals for further and/or different relief and monitoring may warrant consideration and reconsideration of issues. The court also retains jurisdiction.

DONE, this the 27th day of December, 2021.

        /s/ Myron H. Thompson

UNITED STATES DISTRICT JUDGE

# Appendix A

## The Defendants' Mental-Health Treatment Guidance

| Treatment Category | Initial Assessment | Subsequent Care |
| --- | --- | --- |
| SU | An RN will assess the inmate on an emergent basis after arrival to the SU and make any necessary arrangements on an emergent, urgent, routine, or another basis for a psychiatric assessment and/or counseling assessment. | Typically, structured, out-of-cell activities during each week will include a daily interaction with a RN, psychologist, or counselor and more than one clinical encounter with a psychiatrist or CRNP. |
| RTU (Levels 1-3) | An RN will assess the inmate on an urgent basis after arrival to the RTU and make any necessary arrangements on an emergent, urgent, routine, or another basis for a psychiatric assessment and/or counseling assessment. | Typically, structured, out-of-cell activities during each week will include multiple interactions with an RN, psychologist, or counselor and a clinical encounter with a psychiatrist or CRNP. |
| SLU | An RN will assess the inmate on an urgent basis after arrival to the SLU and make any necessary arrangements on an emergent, urgent, routine, or another basis for a psychiatric assessment and/or counseling assessment. | Typically, structured, out-of-cell activities during each week will include multiple interactions with an RN, psychologist, or counselor and a clinical encounter with a psychiatrist or CRNP based on clinical judgment. |
| Outpatient | A treatment team member will assess the inmate on a routine basis. | Psychiatrist or CRNP: Every 90 days, unless otherwise clinically indicated.<br><br>Psychologist or counselor:  Every 90 days, unless otherwise clinically indicated. |

Appendix B

*ADOC Administrative Regulation 626, § V.B.2*:

"A mental health consultation may be sought at the time of the rule or regulation violation or after review of the disciplinary report.  A mental health consultation must be sought if the inmate is on the mental health caseload and has a mental health code of C or higher and/or an SMI designation; or, even if the inmate has a lower mental health code or is not on the mental health caseload, where the inmate has an intellectual or developmental disability, or the inmate's behavior at the time of the alleged actions giving rise to the disciplinary or at any time prior to or during the disciplinary process demonstrates signs of psychological distress or mental impairment."

*ADOC Administrative Regulation 626, § V.C.3.a*:

"A mental health staff member performing the mental health consultation will evaluate: (1) an inmate's current and then-existing (at the time of the incident) mental state, including the inmate's capacity to proceed with a disciplinary hearing; (2) an inmate's mental health diagnosis or, for an inmate not previously diagnosed, the presence of mental illness; (3) an inmate's treatment and medication (including any compliance issues) over the past six (6) months; (4) any crisis placements over the past six (6) months; (5) whether the inmate's behavior resulting in an ADOC rule or regulation violation is the direct result of or related to his or her mental illness; (6) the likely impact of confinement to restrictive housing on an inmate's mental health and, based on the likely impact, if confinement to restrictive housing for a medium- or high-level rule violation is contraindicated; (7) the

potential impact of other disciplinary sanctions on the inmate's mental state, including whether any specific disciplinary sanction is clinically contraindicated for the inmate and, in such instances, what alternative sanctions are not clinically contraindicated; and (8) the need for mental health staff to be present during the disciplinary hearing."

*ADOC Administrative Regulation 626, § V.C.3.d*:

"The mental health staff member performing the mental health consultation will document his or her evaluation and provide any comments, notes, and recommendations in the ADOC computer module.  A mental health staff member may identify disciplinary sanctions that are contraindicated for the inmate and any appropriate alternative disciplinary sanctions.  A copy of the mental health consultation evaluations and recommendations will be (a) provided to the disciplinary hearing officer for consideration and to maintain with the inmate's disciplinary action file, and (b) placed in the inmate's mental health record to ensure the inmate's treatment team may receive and review it."

*ADOC Administrative Regulation 626, § V.D.3*:

"During the disciplinary hearing and/or before the disciplinary officer adjudicates the disciplinary action, the disciplinary officer must consider the mental health consultation, including any evaluation, comments, or recommendations, in deciding an inmate's guilt or innocence and, if guilty, in imposing any disciplinary sanctions."

*ADOC Administrative Regulation 626, § V.D.3*.b:

"**If the mental health staff member performing the mental health consultation concludes that the rule or regulation violation was related to, but not the direct result of, the inmate's mental illness, then the disciplinary hearing officer must take that conclusion into consideration in imposing any disciplinary sanctions.**"

*ADOC Administrative Regulation 626, § V.D.4*:

"**[I]f the mental health staff member who conducted the mental health consultation determined that any specific disciplinary sanction is clinically contraindicated for the inmate, including confinement to restrictive housing for a medium- or high-level rule or regulation violation, then the decision of the mental health staff member who performed the mental-health consultation will be outcome determinative and binding on the disciplinary hearing officer, except where exceptional circumstances exist.**"

3