IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | |
|---|---|
| EDWARD BRAGGS, et al.,    ) | |
|                          ) | |
|     Plaintiffs,          ) | |
|                          ) | CIVIL ACTION NO. |
|     v.                   ) | 2:14cv601-MHT |
|                          ) |     (WO) |
| JOHN HAMM, in his        ) | |
| official capacity as     ) | |
| Commissioner of          ) | |
| the Alabama Department of ) | |
| Corrections, et al.,     ) | |
|                          ) | |
|     Defendants.          ) | |

ORDER

On December 27 and 28, 2021, the court entered the
Phase 2A Omnibus Remedial Opinion and Order.  Almost a
month later, late in the day on January 24, 2022 (that
is, at 5:00 p.m.), the defendants filed, along with a
notice of appeal, a motion to stay, and requested
resolution of the stay motion by January 27 at 5:00 p.m.

For the reasons given below, the court rejects this
rushed resolution and, instead, will allow for a more
considered and orderly, but prompt, resolution of the
motion that offers a fair opportunity for all parties and

the court to address the issues raised in the motion. The court will order that the plaintiffs shall have until February 3, 2022, to file a response; that the defendants shall have until February 7 to file a reply; and that the court shall resolve the motion by February 14. The court is mindful of the deadlines set by the omnibus remedial order and will take appropriate measures to ensure that no party is unfairly prejudiced by this resolution process.

## I. Most Recent Procedural History

On December 27 and 28, 2021, after a series of lengthy hearings stretching from May 29 through July 9, 2021, the court entered the Phase 2A Omnibus Remedial Opinion and Order. *See Braggs v. Dunn*, No. 2:14cv601-MHT, 2021 WL 6112444 (M.D. Ala. Dec. 27, 2021) (Thompson, J.) ("Phase 2A Omnibus Remedial Opinion Part I"); *Braggs v. Dunn*, No. 2:14cv601-MHT, 2021 WL 6117939 (M.D. Ala. Dec. 27, 2021) (Thompson, J.) ("Phase 2A Omnibus Remedial Opinion Part II"); *Braggs v. Dunn*, No. 2:14cv601-MHT, 2021 WL 6116913 (M.D. Ala. Dec. 27, 2021)

(Thompson, J.) ("Phase 2A Omnibus Remedial Opinion Part III"); *Braggs v. Dunn*, No. 2:14cv601-MHT, 2021 WL 6125044 (M.D. Ala. Dec. 27, 2021) (Thompson, J.) ("Phase 2A Omnibus Remedial Opinion Part III Supplement"); *Braggs v. Dunn*, No. 2:14cv601-MHT, 2021 WL 6128418 (M.D. Ala. Dec. 27, 2021) (Thompson, J.) ("Phase 2A Omnibus Remedial Order").

On January 7, 2022, the court held a status conference to discuss implementation of the Remedial Order, at which the parties informed the court that they were in negotiations, mediated by Magistrate Judge John Ott, regarding certain steps to be taken towards implementing the order, and that they were simultaneously considering whether to appeal the order or request modification. The defendants' progress in this latter regard was somewhat delayed, through no fault of their own, by the fact that the Alabama Department of Corrections had recently received a new Commissioner, who needed to be brought up to speed on the history of the litigation and the contents of the court's opinion and order. The defendants did inform the court, however,

that they did not expect to be able to comply with the provision of the order requiring cells in the restrictive housing units to be suicide-resistant, because it would require them to demolish and rebuild a substantial number of cells in a short period of time, at great expense. The court informed the defendants that it would be willing to reconsider that provision of its order, particularly because it had not been presented with evidence regarding the number of cells that would need to be demolished and rebuilt.  The court also explained that, given the complexity of the order, it expected that both parties might request clarification or modification of certain provisions.  It therefore requested that the defendants present the court with a full list of the provisions that they wished it to reconsider, so that the plaintiffs might have an opportunity to respond.

On January 21, the court held a second status conference.  The parties informed the court that they were still negotiating, but were making progress toward establishing an external monitoring team to oversee implementation of the order.  The court indicated that

**4**

it wished to take up, at a later date, the issue of whether to modify certain reporting requirements regarding inmates housed in the restrictive housing units under exceptional circumstances.

On January 24 at 5:00 p.m. (despite the court's observation at the January 7 status conference that, given the complexity of the order, it expected that both parties might request clarification or modification of certain provisions), the defendants filed their notice of appeal, accompanied by a motion to stay, and requested resolution of the January 24 stay motion by January 27 at 5:00 p.m.  The following day, the plaintiffs filed their notice of appeal.

On January 25, the court held a third status conference to discuss the defendants' request that the court resolve their motion by January 27.  The court asked the defendants why they had waited so late to file their motion, given the remedial order's February 7 effective date.  The defendants informed the court that the parties had negotiated over the course of the preceding three weeks regarding alternatives to an

5

appeal, but had been unable to resolve their differences. The defendants asserted that the negotiations had stalled due to the plaintiffs' dilatory tactics. The court reiterated to the parties that it would be willing to reconsider the provisions of its order implicated in the defendants' notice of appeal and motion for a stay. The court suggested that the parties turn their negotiation efforts to coming up with a fair, orderly process for prompt resolution of the stay motion, and informed the parties that it would be willing to extend any dates of the order, including the February 7 effective date, to facilitate those negotiations.

On January 26, the court held a fourth status conference, at which the parties informed the court that they had engaged in extensive negotiations during the preceding day and night before Judge Ott, but had reached no agreement regarding how to proceed on the defendants' motion for a stay, with the result that the motion would need to be resolved today, if the defendants' deadline were to be met.

6

## II. Discussion

The court believes that the process it adopts for the resolution of the stay is best for a number of reasons.

First, as is obvious, this case is exceptionally complicated.  The court's omnibus remedial order covers a number of complex issues and represents the culmination of over seven years of litigation and extensive evidentiary hearings.  Second, the stay motion presents a number of complicated issues, some of which the court had indicated, before the filing of the motion, it was willing to revisit and, after the filing of the motion, it might now be willing to put on hold, and others of which will need to be clarified before the court may decide how to proceed.

Among the foremost issues that the court needs to address before it can rule on the motion is the defendants' objection to the provisions of the omnibus remedial order requiring suicide watch, stabilization unit (SU), and restrictive housing unit (RHU) cells to comply with the Lindsay M. Hayes Checklist for the

7

"Suicide-Resistant" Design of Correctional Facilities (Doc. 3206-5).[1]  *See* Phase 2A Omnibus Remedial Order, 2021 WL 6128418, at §§ 2.1.7.2, 3.1.3.  At the January 7 status conference, the defendants raised their concerns with respect to RHU cells specifically; their motion to stay extends this objection to suicide watch and SU cells.  The defendants object to the breadth of this requirement, particularly as applied to ADOC's over 800 RHU cells, emphasizing the cost of bringing cells into compliance with these conditions and the impossibility of meeting the deadline set by the order.  The defendants complain that this burden of compliance is unwarranted in light of the state of Alabama's construction of two new prison facilities.

During the January 7 status conference, the court explained that it was willing to reconsider or clarify

_____

        1.  This checklist identifies structural features that increase the risk that inmates may be able to attempt and complete suicides in celled environments--most notably, protrusions that can be used as anchoring devices for attempted suicides by hanging and obstructions of visibility into cells--and sets forth architectural design elements that mitigate this risk.

the requirement for RHU cells, taking into consideration the issues raised by the defendants. *See* January 7, 2022, R.D. Tr. at 11-12.[2]  The court remains prepared to do so.  With respect to the issue of suicide watch and SU cells subsequently raised by the defendants, the court would benefit from clarification as to which requirements of the Hayes checklist ADOC's suicide watch and SU cells currently do and do not meet.  While the defendants represent that the court's order would "require ADOC to almost totally reconstruct all 952 of its suicide watch, SU, and RHU cells across the State," Defs.' Mem. in Support of Mot. to Stay (Doc. 3490) at 21, previously in this litigation, the defendants represented that ADOC had "effectively retrofitted all SU cells to ensure suicide-resistance," Defs.' Resp. to Phase 2A Order on Inpatient Treatment (Doc. 2880) at 4, and entered into suicide-prevention stipulations requiring suicide watch

---

2. During that status conference, the court drew a distinction between the "breadth of the requirement," which it would consider, and the "cost factor," which it would not.  *Id.* at 12.  The court unwisely drew that distinction between the cost and the breadth of the requirement on the spot.

9

cells to comply with the Hayes checklist, *see* Suicide Prevention Measures (Doc. 2606-1) at 6; ADA Transition Plan (Doc. 2635-1) at 41-45.

Nevertheless, rather than asking for reconsideration, as suggested by the court, the defendants appealed and filed a motion to stay, along with declarations presenting additional evidence to the court. The court must now consider how to proceed on its concerns in light of the appeal and the presentation of more evidence, to which the plaintiffs have not yet had an opportunity to respond.

The defendants' stay motion also implicates the provisions of the remedial order requiring the defendants to supply mental-health staff consistent with certain staffing ratios by the time of the effective date, and to work towards supplying mental-health staff consistent with a certain staffing matrix by 2025. *See* Phase 2A Omnibus Remedial Order, 2021 WL 6128418, at §§ 2.2.1, 2.2.3. The defendants contend that these deadlines are unrealistic because "[t]he staffing ratios ... require a higher level of staffing than the staffing matrix ... yet

the Order requires compliance with the ratios by the
Effective Date, and compliance with the matrix by ...
2025." Defs.' Mot. to Stay (Doc. 3489) at 5. To be
candid, the court is confused by the nature of this
objection. It needs time for the parties to assist it
in even understanding the objection, before deciding
whether a stay is appropriate or not as to this issue.[3]

---

3. The court is puzzled by the defendants' contention
that the staffing ratios require a greater number of
staff than the staffing matrix. The staffing ratios
indicate the number of mental-health staff needed to
treat ADOC's current inmate population. By contrast, the
staffing matrix indicates the number of mental-health
staff needed to treat ADOC's average inmate population,
as estimated by the parties prior to the COVID-19
pandemic. Because intake from local jails has slowed
since the COVID-19 pandemic began, ADOC's inmate
population has fallen below the levels that the parties
estimated when making the staffing matrix. The staffing
matrix therefore sets forth the number of staff needed
to treat an inmate population that is larger than ADOC's
current population.

The court is also puzzled by the defendants'
contention that the staffing matrix "permits associate
licensed counselors to work as and count toward the
mental-health professional requirement, and substitutes
MHPs for psychologists," while the ratios do not. *See*
Defs.' Mem. in Support of Mot. to Stay (Doc. 3490) at 16.
As the court explained in its opinion, "[i]n reviewing
ADOC's compliance with the staffing ratios, ... the EMT
may allow ADOC to substitute qualified mental-health
professionals for psychologists, and associate licensed
counselors for qualified mental-health professionals."

The court also notes that the defendants have filed new evidentiary submissions regarding this issue, to which the plaintiffs, in fairness, should be given time to respond.

The defendants also object to the provisions of the omnibus remedial order requiring them to "supply enough [inpatient] beds to accommodate 10 % of [ADOC's] mental-health caseload at the time of the effective date." Phase 2A Omnibus Remedial Order, 2021 WL 6128418, at § 11.2. They take issue, in particular, with the court's decision to exclude beds in the Structured Living Units and the beds for which ADOC contracts at Citizens Baptist Medical Center from the beds counted as inpatient

_____

Phase 2A Omnibus Remedial Opinion Part III, 2021 WL 6116913, at *8.

Finally, to the extent that the defendants contend that the staffing matrix "contains different shift relief factors," they do not explain how the difference in shift relief factors renders the staffing ratios more onerous than the staffing matrix. Nor did they bring this concern to the court's attention during the omnibus remedial proceedings. In fact, it was the plaintiffs who requested that the court modify the shift relief factors contained in the staffing ratios. See Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at §§ 2.2.3.2.1-2.2.3.2.2.

12

beds.  Excluding those beds, the defendants maintain, would require ADOC to engage in substantial construction on its existing facilities, which "would be particularly unreasonable in light of the fact that the Alabama Legislature passed, and Governor Kay Ivey signed, legislation authorizing and setting aside funding for the construction of two (2) new male facilities, to begin later this year." Defs.' Mot. To Stay (Doc. 3489) at 5.

The court has some concerns regarding its decision to exclude the beds for which ADOC contracts at Citizens Baptist Medical Center from those counted as inpatient beds, and would benefit from input by both parties regarding on the issue. As for the defendants' request that the court consider the construction of new prisons, this development was not before the court during the omnibus remedial proceedings, and the court will need assistance from the parties on how to consider it, if it can, in ruling on the stay motion.[4]  Moreover, the

_____

4. The court notes that the omnibus remedial order does not exclude inpatient beds in newly constructed facilities from those beds counted towards the 10 % requirement.  If the defendants' contention is that they

defendants have, again, filed new evidentiary submissions regarding the issue of inpatient beds, to which the plaintiffs should have an opportunity to respond.

The defendants also ask the court to stay the provision of the omnibus remedial order requiring that "[a]n inmate placed in a RHU for safety or security issues for 72 hours or longer will be offered at least three hours of out-of-cell time per day."  Phase 2A Omnibus Remedial Order, 2021 WL 6128418, at § 3.1.2.  Based on a comment by the court during the January 21 status conference, the defendants believe this requirement extends to all inmates, and contend that it is therefore overbroad.

The court believes that the defendants may have simply misunderstood the scope of this provision.  While the omnibus remedial order states that "[a]n inmate placed in a RHU for safety or security issues for 72

_____

would have to engage in additional construction in order to comply with the February 7 deadline for meeting the 10 % requirement, and that such construction may be unduly burdensome in light of the construction currently planned, the court will need to engage with the parties on how to consider this contention.

hours or longer will be offered at least three hours of
out-of-cell time per day," *id.*, that requirement applies
only to inmates who have been placed in restrictive
housing under so-called "exceptional circumstances."
Exceptional circumstances must exist if an inmate with a
serious mental illness, or an inmate who has been
determined to be contraindicated for segregation, is to
be placed in restrictive housing. *See id.* §§ 3.1.1,
3.2.2-3.2.3. The requirement in question therefore
applies only to inmates with serious mental illnesses and
inmates who are contraindicated for placement in
restrictive housing.

The court did not mean to suggest otherwise during
the January 21 status conference. Rather, the court was
concerned that a previous reporting requirement, which
required the defendants to report on the number of
inmates with serious mental illnesses kept in restrictive
housing for longer than 72 hours, may need to be modified
to include inmates that are contraindicated for placement
in restrictive housing and yet have been kept there for
longer than 72 hours. In light of the confusion that was

15

caused by its earlier comments, the court believes that more time is necessary to engage the parties on this issue, which may be one of simple misunderstanding.

The defendants' motion also presents the question of how to handle the issue of monitoring.  The defendants request "that the Court stay the [omnibus remedial order] (and any other remedial order or opinion the Court considers applicable after entry of the Order, including but not limited to the Phase 2A Opinion and Order on Monitoring of Eighth Amendment Remedy (doc. no. 2915))." Defs.' Mot. to Stay (Doc. 3489) at 3.  If the defendants' motion is granted in whole or in part, it raises the complicated matter of what to do with the monitoring team, which is waiting in the wings.  The monitoring team has already been appointed, and the parties are already in the process of negotiating contracts with the members, negotiations which the court ordered to begin in November 2020.  The court is concerned about injecting further delays into the process of finalizing these contracts. During the January 7 and January 21 status conferences, the defendants indicated that, even without a stay, the

16

earliest date by which contracts with the monitoring team could be finalized would be in mid-April.  The parties had no projected date by which the monitoring team could be finalized.  Further delays in finalizing the monitoring team increase the very serious risk of losing members and erasing much of the progress that the parties have made in selecting members of the team and bringing them up to speed on this complicated case.

The defendants' motion also raises serious questions as to the effect of their request on relief regarding correctional staffing.  It is unclear whether the motion even addresses this issue.  If it does so implicitly, *see* Defs.' Mot. to Stay (Doc. 3489) at 3 (requesting that the court stay the omnibus remedial order "and any other remedial order or opinion the Court considers applicable after entry of the Order"), then not only does that issue need to be made explicit, but the defendants need to explain why such a central and critical issue to this litigation was not explicit in the motion and why the defendants did not make it explicit at the January 21 status conference when the court and the parties

17

discussed the stay motion and its reach.  If the motion does not include correctional staffing, then the parties and the court need to address what impact the motion will have on correctional staffing in light of the centrality of correctional staffing to this case, ADOC's egregious failures to comply with ordered relief in this area, and the harms that these failures cause.

In its 2017 liability opinion, the court found that "persistent and severe shortages of mental-health staff and correctional staff" permeated all factors contributing to ADOC's inadequate mental-health care. *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1268 (M.D. Ala. 2017) (Thompson, J.).  In light of the significance of severe and chronic understaffing to the entirety of this case, in February 2018, the court entered an opinion (with PLRA findings) and order requiring the defendants to have "fully implemented" the correctional staffing recommendations of *their own experts* by February 20, 2022. *Braggs v. Dunn*, No. 2:14cv601-MHT, 2018 WL 7106346, at *1 (M.D. Ala. Feb. 20, 2018) (Thompson, J.) ("Phase 2A Understaffing Remedial Order"); *see also*

18

*Braggs v. Dunn*, No. 2:14cv601-MHT, 2018 WL 985759 (M.D. Ala. Feb. 20, 2018) (Thompson, J.) ("Phase 2A Understaffing Remedial Opinion"). The defendants did not appeal from that opinion and order.

At the omnibus remedial hearings in May, June, and July of 2021, the evidence reflected that, between 2018 and those hearings, ADOC's system-wide correctional staffing numbers "barely moved." Phase 2A Omnibus Remedial Opinion Part III, 2021 WL 6116913, at *4. ADOC's "continued dearth of correctional staff" remains "the fault at the heart of ADOC's system of mental-health care." *Id.* at *89. Nonetheless, despite the "catastrophic" consequences of ADOC's ongoing, extreme understaffing, *id.* at *4, the omnibus remedial order *extended* the deadline for ADOC to fill all mandatory and essential posts to July 1, 2025. *See* Phase 2A Omnibus Remedial Order, 2021 WL 6128418, at § 2.1.4. If the defendants are seeking a stay of the December 2021 relief (including a stay of the extension from February 2022 to July 2025 given to ADOC) but not a stay of the relief ordered in 2018, they need to explain what the court and

19

the parties are to do now that the February 2022 deadline is upon us and noncompliance is essentially undisputed; if the defendants are seeking a stay of the 2018 correctional staffing order too, then they need to explain how their appeal is timely in 2022 and why a stay of relief is appropriate.

The court also notes that the defendants object to the court's decision to rely its previous finding of deliberate indifference, as opposed to requiring the plaintiffs to prove deliberate indifference anew, and its decision to enter relief on a system-wide basis. While the court understands that the defendants seek appellate review of these issues, it believes that the Court of Appeals would be in a better position to resolve the appeal if all issues have been clarified as outlined above.

Finally, there is the issue of deadlines. While the order's effective date of February 7 is just around the corner, the court does not hold the fact that defendants filed their motion for a stay so soon before the effective date against either party. As explained above, the

parties engaged in extensive negotiations over the past few weeks in an attempt to forestall an appeal. The court was not involved in those negotiations, and cannot assign blame to either party for the fact that they were not successful. The court is therefore now suspending the February 7 effective date as well as any other deadlines that will pass between now and the expected resolution of the stay motion on February 14. In addition, the court will afford the parties an opportunity to identify any other deadlines beyond that time period that may need to be extended.

In conclusion, the court finds, for the reasons given above, that it and the parties should be given the opportunity for a considered and orderly, but prompt, resolution of the stay motion. The complexity of the case and the varied nature of the issues raised in the stay motion demand careful consideration. The motion is also not an all-or-nothing matter; the court may find a stay warranted with respect to some of the issue raised by the defendants, but not others. It will therefore need time to parse the issues, and to consider how they

21

interrelate.  The motion is also in need of much clarification.  It is unclear whether the motion reaches back beyond the December 2021 opinion and order, and, if so, how far back, to what orders and opinions, and why and on what basis.  The defendants have also presented new evidence to the court on a number of issues; this evidence includes apparently that the State is now to build new prisons.  Not only must the plaintiffs, in fairness, be given an opportunity to respond to this evidence, but the court needs assistance from the parties in how to consider this evidence, if it can consider it. By affording itself and the parties the opportunity to consider the stay motion in a deliberate manner, the court also intends to ensure that the appellate court may have an adequate and accurate basis on which to review any stay motion that may be presented to it, as well as an adequate and accurate basis on which to consider the appeal itself.

***

Accordingly, it is ORDERED that the motion to stay (Doc. 3489) is to be briefed as follows:  the plaintiffs

are to file a response by February 3, 2022, at 5:00 p.m.; the defendants are to file a reply by February 7, at 5:00 p.m.; and the court shall resolve the motion by February 14.

It is further ORDERED that the deadlines in the omnibus remedial order (Doc. 3464) that fall between now and February 14, 2022, are suspended pending resolution of the stay motion.  In their filings, the parties should address how the court should reset those deadlines, as well as any other deadlines that may need to be reset.

DONE, this the 27th day of January, 2022.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE