IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| EDWARD BRAGGS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| JOHN HAMM, in his | ) | |
| official capacity as | ) | |
| Commissioner of | ) | |
| the Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER ON STAY MOTION

This longstanding case is before the court on the
defendants' motion to stay the Phase 2A omnibus remedial
order pending their interlocutory appeal.[1]  For reasons

---

1.  The apparent bases for the defendants'
interlocutory appeal are discussed in this opinion.  The
plaintiffs have filed an interlocutory cross-appeal.  *See*
Pls.' Notice of Interlocutory Appeal (Doc. 3491).  Based
on representations at oral argument, the apparent basis
for the plaintiffs' interlocutory cross-appeal is the
plaintiffs' argument that they previously had received
through negotiated stipulations--and now are entitled
to--more relief than the court ordered in the December
2021 omnibus remedial order.  *See* Feb. 9, 2022, R.D.
Hearing Tr. at 48.

that follow, the motion will be granted in part and denied in part.

In an omnibus remedial opinion entered on December 27 and 28, 2021, the court set forth the history of this litigation through those dates, which included approximately two years of disruption caused by the COVID-19 pandemic. *See Braggs v. Dunn*, No. 2:14cv601-MHT, 2021 WL 6112444, at *2-7 (M.D. Ala. Dec. 27, 2021) (Thompson, J.) ("Phase 2A Omnibus Remedial Opinion Part I"). And, on January 27, 2022, the court set forth the more recent history leading up to the stay motion. *See Braggs v. Dunn*, No. 2:14cv601-MHT, 2022 WL 264873, at *1-2 (M.D. Ala. Jan. 27, 2022) (Thompson, J.). The court will assume the reader is familiar with those two opinions and will not repeat what is in them, insofar as the background history is concerned.

Against this historical background, as well as other past opinions and orders that the court will reference, the court will, after setting forth the standard for

relief, take up the arguments made in the defendants'
stay motion.

## I.   Legal Standard

A stay pending appeal pursuant to Federal Rule of
Civil Procedure 62(d) "is not a matter of right, even if
irreparable injury might otherwise result." *Nken v.
Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry.
Co. v. United States*, 272 U.S. 658, 672 (1926)). Rather,
the issuance of a stay is "an exercise of judicial
discretion," based upon "the circumstances of the
particular case." *Id.* (quoting *Virginian Ry. Co.*, 556
U.S. at 672-73). In exercising this discretion, a court
must consider "(1) whether the stay applicant has made a
strong showing that he is likely to succeed on the merits;
(2) whether the applicant will be irreparably injured
absent a stay; (3) whether issuance of the stay will
substantially injure the other parties interested in the
proceeding; and (4) where the public interest lies." *Id.*
at 425-26 (2009) (quoting *Hilton v. Braunskill*, 481 U.S.

770, 776 (1987)).  The party requesting a stay bears the burden to demonstrate that the particular circumstances justify it; "[i]t is not enough that the chance of success on the merits be 'better than negligible'" or that there is "some 'possibility of irreparable injury.'"  *Id.* at 434 (citations omitted).

In evaluating the motion to stay, the court declines to adopt the all-or-nothing approach urged by the defendants in their filings and during oral argument.  As a matter of law, it is perfectly permissible for the court to take up areas of relief individually.  Indeed, the former Fifth Circuit Court of Appeals followed this approach in at least two cases arising in the context of state prison operations.  *See generally Ruiz v. Estelle*, 650 F.2d 555 (5th Cir. Unit A June 1981) (granting in part and denying in part defendants' motion to stay injunctive relief);[2] *see also Williams v. Edwards*, 547

---

2. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

F.2d 1206, 1208 (5th Cir. 1977) (noting that the appellate court granted a partial stay of one area of injunctive relief pending appeal). And as a practical matter, the various areas of relief addressed in the omnibus remedial order come before the court in different postures and present different issues as to the four factors the court must consider in its evaluation of the defendants' motion. Even the two arguments on the merits that the defendants raise against the entire omnibus remedial order--that the court erroneously did not re-find deliberate indifference in the December 2021 omnibus remedial opinion, and that the evidence did not support the court's determination that most relief needed to be systemwide--present different questions as applied to different areas of relief. These distinctions are even more pronounced with respect to the equities and the parties' arguments as to the harms that will fall upon the defendants if certain provisions are not stayed or upon the plaintiffs if they are.

## II. Correctional Staffing

The correctional staffing provisions of the December 2021 omnibus remedial order that the defendants appeal and seek to stay perhaps epitomize the need for the court to consider the propriety of a stay as to individual areas of relief.  Although the defendants' motion to stay is silent on correctional staffing, despite requesting a stay of all relief, *see* Defs.' Mot. to Stay (Doc. 3489) at 3, the court found, and again finds, that correctional staffing is too sizeable and central a problem in this litigation not to be addressed specifically.  *See* January 2022 Order, 2022 WL 264873, at *5.  Additionally, as the court and the parties recognized at the outset of the 2021 omnibus remedial hearings, the posture of this issue differs from that of most other areas covered by the omnibus remedial order.  The court entered injunctive relief as to correctional and mental-health understaffing in February 2018.  *See Braggs v. Dunn*, No. 2:14cv601-MHT, 2018 WL 985759 (M.D. Ala. Feb. 20, 2018) (Thompson, J.) ("Phase 2A Understaffing Remedial Opinion"); *Braggs v.*

6

*Dunn*, No. 2:14cv601-MHT, 2018 WL 7106346 (M.D. Ala. Feb. 20, 2018) (Thompson, J.) ("Phase 2A Understaffing Remedial Order"). To the extent that relief was modified in the December 2021 omnibus remedial order, it was to extend deadlines for the defendants' compliance, making the existing relief *less* onerous for the defendants.

The court is left with some uncertainty as to the precise contours of the defendants' motion to stay.[3] The

_____

3. The defendants have been less than clear as to which of the court's orders they seek to stay and appeal, and on what basis they seek to do so. In their motion to stay, they seem to suggest that they seek a stay of any and all opinions and orders entered in the course of Phase 2A of this multiyear litigation. *See* Defs.' Mot. to Stay (Doc. 3489) at 3 (requesting that the court stay the December 2021 omnibus remedial order "and any other remedial order or opinion the Court considers applicable after entry of the Order"). Their notice of appeal is similarly broad. *See* Defs.' Notice of Interlocutory Appeal (Doc. 3488) at 1 (noticing appeal from the December 2021 omnibus remedial opinion and order, the June 2017 liability opinion and order, "all underlying orders and opinions," and "any other Phase 2A liability opinion or order"). The apparent breadth of the defendants' motion to stay makes the practical implications of their motion difficult to ascertain. Further complicating matters, the defendants asserted during a status conference that they do not seek a stay of the court's February 2018 understaffing remedial order because they consider that order voided by the December 2021 omnibus remedial order, *see* Feb. 9, 2022, Status

defendants request a stay of all remedial obligations but disavow any need to stay the February 2018 understaffing remedial order.  They justify this request, it appears, by recasting the court's December 2021 extension of prior deadlines at the defendants' request as brand-new relief for the plaintiffs, related to the court's February 2018 understaffing remedial order only to the extent that it renders the previous relief a legal nullity that cannot be "revive[d]."  Defs.' Reply in Support of Mot. to Stay (Doc. 3514) at 7-8; *see also* Feb. 9, 2022, Status Conference R.D. Tr. at 23 (confirming the court's reading of the defendants' motion to stay).  Because the court finds that this is a mischaracterization of the December 2021 omnibus remedial order and because the defendants have not met their burden to show that the circumstances justify a stay, the court will deny the defendants' motion as to correctional staffing.

---

Conference R.D. Tr. at 23-24, though this purported oral clarification of what is not sought to be stayed is not in their written filings.

**8**

Roughly eight months after the court found that the defendants were violating the Eighth Amendment rights of the plaintiffs and that "persistent and severe shortages of mental-health staff and correctional staff" permeated the problems with ADOC's provision of mental-health care, *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1268 (M.D. Ala. 2017) (Thompson, J.) ("Phase 2A Liability Opinion"), the court entered its Phase 2A understaffing remedial opinion and order. Therein, the court adopted, with some modifications, the defendants' proposed remedial plan on correctional and mental-health understaffing and declined to order the plaintiffs' proposal. *See* February 2018 Phase 2A Understaffing Remedial Opinion, 2018 WL 985759, at *8. With respect to correctional understaffing, the court ordered, among other provisions, that by May 1, 2018, the defendants' staffing experts "shall complete the staffing analyses for each of ADOC's 15 major facilities ... and shall submit their final staffing analyses and recommendations to ADOC," and by February 20, 2022, "the defendants shall have fully

9

implemented [the experts'] correctional staffing recommendations, as modified by any agreements between the parties or orders of this court." February 2018 Phase 2A Understaffing Remedial Order, 2018 WL 7106346, at *1. In largely deferring to the defendants, the court cautioned that "the defendants are not to delay implementation until the last minute, but are to begin immediately and swiftly upon receiving the relevant recommendations." February 2018 Phase 2A Understaffing Remedial Opinion, 2018 WL 985759, at *8. The court found that the ordered relief and the corresponding deadlines complied with the Prison Litigation Reform Act (PLRA). *See id.* at *8-9. The defendants did not appeal.

The defendants' experts timely completed their staffing analyses and recommendations and submitted them to the court in May 2018. *See* Correctional Staffing Analysis Report (Doc. 1813-1). The experts recommended that ADOC maintain a total of 3,826 full-time equivalent correctional officer positions between what they termed "mandatory" and "essential" posts. "Essential" posts are

10

those that are "needed for normal operations but may be temporarily interrupted without significant impact." *Id.* at 106. "Mandatory" posts, which comprised the bulk of the 3,826 positions, are those that "cannot be left unfilled without jeopardizing safety and security." *Id.* The experts also recommended that ADOC "create an agency staffing unit that will be responsible for the implementation and enforcement of any staffing changes resulting from this analysis." *Id.* at 20.

By the time of the 2021 omnibus remedial hearings, however, ADOC had taken no steps to create the agency staffing unit that was recommended to implement the experts' other recommendations and to update their staffing analyses. *See Braggs v. Dunn*, No. 2:14cv601-MHT, 2021 WL 6117939, at *18 (M.D. Ala. Dec. 27, 2021) (Thompson, J.) ("Phase 2A Omnibus Remedial Opinion Part II"); *Braggs v. Dunn*, No. 2:14cv601-MHT, 2021 WL 6116913, at *2 (M.D. Ala. Dec. 27, 2021) (Thompson, J.) ("Phase 2A Omnibus Remedial Opinion Part III"). Nor were minimally adequate correctional staffing

levels within reach; based on the experts' determinations of the number of mandatory and essential staff posts at each facility, ADOC was "on track to achieve sufficient staffing to safely conduct normal operations sometime in mid-2037." December 2021 Phase 2A Omnibus Remedial Opinion Part II, 2021 WL 6117939, at *17.

Accordingly, the question before the court during the 2021 omnibus remedial proceedings was not whether to enter new relief, but "whether and how the existing remedy should be modified in light of changed circumstances--such as the effects of the COVID-19 pandemic--and in recognition of the existing [February 2022] deadline's implausibility at this juncture." December 2021 Phase 2A Omnibus Remedial Opinion Part I, 2021 WL 6112444, at *6. Although the court rejected the defendants' preferred approach to find no relief necessary and extinguish all staffing obligations, the court granted the defendants' alternative request to extend the then-looming February 2022 deadline for compliance to July 2025. *See Braggs v. Dunn*, No.

2:14cv601-MHT, 2021 WL 6128418, at § 2.1.4 (M.D. Ala. Dec. 27, 2021) (Thompson, J.) ("Phase 2A Omnibus Remedial Order"); December 2021 Phase 2A Omnibus Remedial Opinion Part III, 2021 WL 6116913, at *2 (noting that the defendants proposed "two modified deadlines for fixing [ADOC's] correctional staffing deficiencies" and explaining that the court would "extend to July 1, 2025, the deadline for filling all mandatory and essential posts prescribed in the most recent staffing analysis in effect at that time").  As the court made explicit with respect to the requirement that ADOC create an agency staffing unit as recommended by the defendants' experts in May 2018, the correctional staffing provisions of the December 2021 omnibus remedial order were "[i]n accordance with" the February 2018 understaffing remedial order.  December 2021 Phase 2A Omnibus Remedial Order, 2021 WL 6128418, at § 2.1.1.[4]  To the extent the court

_____

        4. To whatever extent the December 2021 omnibus remedial opinion and order were unclear that the omnibus remedial order granted an extension of the defendants' obligations under the February 2018 understaffing order, the court emphasizes that this was its intent.  It

13

also adopted the plaintiffs' proposal to require the
defendants to develop intermediate benchmarks, the court
emphasized that these benchmarks were "not requirements,
but merely reference points to facilitate the defendants'
compliance with" the extended deadline.  December 2021
Phase 2A Omnibus Remedial Opinion Part III, 2021 WL
6116913, at *3.

     The court finds that the defendants have not made a
sufficient showing that they are likely to succeed on the
merits of a challenge to the provisions of the December
2021 omnibus remedial order regarding correctional
staffing.  As a threshold matter, the court finds that
the defendants are unlikely to succeed in any challenge
to injunctive relief that the court entered in the
February 2018 understaffing remedial order that was not
appealed and that was modified by the December 2021
omnibus remedial order to the extent that the court
extended the deadline by which the defendants needed to

---

certainly did not intend to vacate the February 2018
understaffing order sub silentio.

achieve compliance.  *See* 28 U.S.C. § 2107(a) ("Except as otherwise provided in this section, no appeal shall bring any judgment, order or decree in an action, suit or proceeding of a civil nature before a court of appeals for review unless notice of appeal is filed, within thirty days after the entry of such judgment, order or decree.").  And to the extent that the defendants' motion to stay is limited to the December 2021 omnibus remedial order, the court doubts that the defendants seek a stay of the extension, the effect of which would be to stick the defendants with the original February 2022 deadline that they have not met.

Even if the court sets aside this apparent timeliness problem, the court is left with the defendants' considerable request to stay all relief related to correctional staffing in this case.  On the merits, the defendants' silence as to this area of relief leaves the court to consider only the defendants' global arguments that the court failed to re-find deliberate indifference in the December 2021 omnibus remedial opinion and order

15

and that the evidence fails to support systemwide relief.
As to the second argument, the court found that its
liability findings amply supported the need for
systemwide relief in the February 2018 understaffing
remedial order, which the defendants did not appeal, *see*
February 2018 Phase 2A Understaffing Remedial Opinion,
2018 WL 985759, at *3 n.2.  The findings in the December
2021 omnibus remedial opinion only reinforced those
earlier findings.  For instance, according to the most
recent quarterly staffing report completed prior to the
omnibus remedial hearings, only two ADOC major facilities
had vacancy rates for mandatory posts of less than 40 %.
*See* December 2021 Phase 2A Omnibus Remedial Opinion Part
II, 2021 WL 6117939, at *18.[5]

The court also finds that the defendants are unlikely
to succeed on the merits of their deliberate-indifference
argument.  To the extent that the defendants raise this

---

5. Per stipulation, the court did not subject these
two facilities to monitoring of the correctional staffing
provisions.  *See* December 2021 Phase 2A Omnibus Remedial
Opinion Part III, 2021 WL 6116913, at *2 n.2.

16

argument with respect to the December 2021 omnibus remedial order--an order that extended previously imposed deadlines at the defendants' suggestion, and which the defendants did not appeal--the defendants would seem to suggest an absurdity:  that a court that has already entered relief, supported by PLRA findings and not appealed, must find deliberate indifference again before it may *relax* that relief to the defendants' benefit.  To the extent that the defendants raise this argument with respect to the February 2018 understaffing remedial order, the court emphasizes that it had found the defendants deliberately indifferent a mere eight months before entering that order, in its 2017 liability opinion, and that its 2018 order adopted relief that the defendants themselves had suggested. *See* June 2017 Phase 2A Liability Opinion, 257 F. Supp. 3d at 1250-62 (finding deliberate indifference); February 2018 Phase 2A Understaffing Remedial Opinion, 2018 WL 985759, at *7 n.4 (reiterating that "[t]his case is likely sui generis in the extent to which the top ADOC officials had personal

17

knowledge of the substantial risks of serious harm posed by its deficient care and has not responded reasonably to those risks"); *id.* at *8 (explaining that the court would adopt the understaffing remedy proposed by the defendants and reject the plaintiffs' proposals).

The court further finds that the defendants will not be irreparably injured absent a stay of this relief. The defendants' comparison to *Swain v. Junior*, 958 F.3d 1081 (11th Cir. 2020), for the proposition that this relief overly intrudes on ADOC's discretion to administer its prisons is misplaced. The December 2021 omnibus remedial order is essentially an extension of the deadline to comply with the February 2018 understaffing remedial order, which largely reflected the defendants' proposal. Under this remedial plan, the defendants retain significant discretion in implementation. The December 2021 omnibus remedial order requires ADOC, in conjunction with the defendants' own experts, to conduct an updated staffing analysis as to the correctional staffing needs of each facility. *See* December 2021 Phase 2A Omnibus

**18**

Remedial Order, 2021 WL 612418, at §§ 2.1.1-2.1.3.
Although it sets a date by which all mandatory and
essential posts contained in the most recent staffing
analysis must be filled, it leaves to the defendants the
determination of how to fill those posts and which posts
to prioritize.[6]   And to the extent the December 2021
omnibus remedial order goes beyond the February 2018
understaffing remedial order to impose benchmarks for
ADOC's progress, the court entrusts the development of
these nonbinding benchmarks to the defendants and their
experts.   *See* December 2021 Phase 2A Omnibus Remedial
Order, 2021 WL 612418, at § 2.1.5.   These provisions do
not intrude on the defendants' discretion any more than
is necessary to prevent the defendants from "throw[ing]
up [their] hands and declar[ing] the staffing challenges
too insurmountable for minimally adequate mental-health

_____

6. To the extent the December 2021 omnibus remedial
order imposes two limitations on who may fill certain
posts, *see* *id.* at §§ 2.1.8.1-2.1.8.2, these mild
constraints are rooted in the analysis conducted by the
defendants' experts, *see* December 2021 Phase 2A Omnibus
Remedial Opinion Part III, 2021 WL 6116913, at *3.

care to be possible."  December 2021 Phase 2A Omnibus
Remedial Opinion Part III, 2021 WL 6116913, at *6.  They
certainly do not rise to the level of imposing
irreparable harm.

By contrast, the plaintiffs stand to suffer grievous
injuries if the court stays relief as to correctional
staffing, for which the plaintiffs have waited years and
for which, even absent a stay, they are virtually certain
to wait years more.  Extensive evidence at the 2021
omnibus remedial hearings demonstrated the effects of a
dearth of correctional staff.  *See, e.g.*, December 2021
Phase 2A Omnibus Remedial Opinion Part III, 2021 WL
6116913, at *4-6.  It prevents inmates from receiving
necessary mental-health interventions, as when Charles
Braggs hanged himself in his segregation cell an hour
after a nurse asked correctional officers to escort him
to the infirmary.  It leaves inmates in dormitory
environments vulnerable to violence, as when Tommy
McConathy was raped in a residential treatment unit that
sometimes operated with no officers on the dormitory

floor.  And it leads to regular gaps in security checks
of inmates in segregation, leaving Casey Murphree to hang
in his cell for hours of missed checks until his body was
discovered only after rigor mortis had begun.  Even where
understaffing resulted in less visible harms than these,
the evidence compelled the court's conclusion that "[s]o
long as ADOC's current staffing levels persist, people
with serious mental-health needs are not safe in
Alabama's prisons, but are at daily serious risk of
deprivation, decompensation, and death." *Id.* at *89.  In
short, the evidence wholly belies defense counsel's
contention that the dangers the plaintiffs fear amount
to "rank speculation."  Feb. 9, 2022, Status Conference
R.D. Tr. at 27.  The balance of the equities weighs
overwhelmingly against a stay.

Essentially, the defendants are asking to be relieved
of compliance with the requirements of the February 2018
understaffing remedial order, as modified to their
benefit by the December 2021 omnibus remedial order.
This request arrives before the court without any showing

that the defendants have reasonably met their 2018 obligations and, in fact, in the face of considerable affirmative evidence that they have not. *See, e.g.*, December 2021 Phase 2A Omnibus Remedial Opinion Part III, 2021 WL 6116913, at *2 (observing that ADOC's correctional staffing levels "barely increased in three years" and that this failure to meet one of the three recommendations of the defendants' experts must be understood in light of the fact that, at the time of the omnibus remedial proceedings, the defendants had "taken no steps whatsoever toward complying" with the other two recommendations). All fairness dictates that further delay not be allowed.[7]

---

[7]. In the event that the defendants move for a stay before the appellate court and the appellate court grants a stay, in whole or in part, this court respectfully requests that the appellate court be specific as to which orders are stayed--the 2018 understaffing order, the December 2021 omnibus remedial order, or both--so that this court will be able to comply fully with that court's decision without uncertainty as to its scope.

### III. Mental-Health Staffing

The defendants move to stay the provisions of the December 2021 Phase 2A omnibus remedial order requiring them to supply mental-health staff consistent with certain staffing ratios, and to work towards supplying mental-health staff consistent with a certain staffing matrix by 2025. *See* December 2021 Phase 2A Omnibus Remedial Order, 2021 WL 6128418, at §§ 2.2.1, 2.2.3. These provisions, like those regarding correctional staffing, stand in a different posture than other provisions that the defendants now appeal. The court had entered relief regarding mental-health staffing prior to the December 2021 order, and so the question before the court during the omnibus remedial proceedings was not whether to enter new relief, but "whether to modify or lift the current relief related to mental-health staffing." December 2021 Phase 2A Omnibus Remedial Opinion Part I, 2021 WL 6112444, at *7. Despite the fact that the defendants had not complied with the court's previous staffing order--which was based largely on the

23

defendants' own suggestions, and which they did not appeal--the court, in an abundance of caution, decided to modify its previously entered relief to make it less burdensome for the defendants.

The defendants now suggest, as they did with regard to correctional staffing, that the court's December 2021 omnibus remedial order extinguished the obligations imposed by its 2018 understaffing remedial order, and that a stay of the December 2021 order would therefore result in a stay of all mental-health staffing obligations. Defs.' Reply in Support of Mot. to Stay (Doc. 3514) at 7-8; *see also* Feb. 9, 2022, Status Conference R.D. Tr. at 23. The court disagrees with the defendants' contention that the December 2021 order extinguished, rather than extended, the deadlines imposed the 2018 understaffing remedial order, and therefore doubts that a stay of the December 2021 omnibus remedial order--if that is all that the defendants seek--would benefit the defendants. In any case, even if the defendants seek a stay of all relief regarding

**24**

mental-health staffing, the court finds that they have not made a sufficient showing that they are likely to succeed on the merits of their appeal. The court further finds that they would not be irreparably harmed in the absence of a stay, and that a stay would work great harm on the plaintiffs.  The court will therefore deny the defendants' motion as to mental-health staffing.

In its 2017 liability opinion, the court surveyed levels of mental-health staffing across ADOC disciplines and facilities and found them "chronically insufficient." June 2017 Phase 2A Liability Opinion, 257 F. Supp. 3d at 1194.  The court solicited proposals from the parties as to an appropriate remedy, and the defendants proposed to employ a team of three mental-health consultants to develop ratios for determining the number of mental-health staff of various types needed per inmate. The defendants further proposed to use those ratios to develop a "staffing matrix" setting forth the number of mental-health staff of various disciplines needed at each ADOC facility, based on an estimate of what ADOC's inmate

population would be in the coming years.  December 2021
Phase 2A Omnibus Remedial Opinion Part II, 2021 WL
6117939, at *20-22.

The court found the defendants' proposed plan
"minimally adequate" to remedy the constitutional
violations identified in its 2017 liability opinion, and
ordered its adoption, with slight modifications.  *See*
February 2018 Phase 2A Understaffing Remedial Order, 2018
WL 7106346, at *1-2.  The court set a deadline of February
15, 2020, for the defendants to supply mental-health
staff consistent with the staffing matrix, *see id.* at *2,
and supported its order with PLRA findings, *see* Phase 2A
Understaffing Remedial Opinion, 2018 WL 985759, at *8-9.

The defendants proceeded to hire a team of
consultants, who developed recommended mental-health
staffing ratios, according to the defendants' proposed
plan, in February 2019.  *See* Recommended Staffing Ratios
for Mental Health Services (Doc. 2385-1).  The parties
then estimated ADOC's inmate population for the coming
years and applied the staffing ratios to develop a

26

staffing matrix setting forth the number of mental-health staff of various types needed to treat that population. *See* Mental-Health Staffing Matrix (Doc. 2618-1); December 2021 Phase 2A Omnibus Remedial Opinion Part II, 2021 WL 6117939, at *21-22.  The court approved the staffing matrix in December 2019.   *See* Phase 2A Order and Injunction on Mental-Health Staffing Remedy (Doc. 2688).

At the time of the omnibus remedial proceedings, in May, June, and July of 2021, the defendants had failed to meet the February 2020 deadline for complying with the staffing matrix.   According to the staffing ratios, however, they had hired the requisite number of staff per inmate in five of their 15 facilities.   That the defendants were able to comply with the staffing ratios in certain facilities while simultaneously failing to comply with the staffing matrix was due to the COVID-19 pandemic.   The pandemic had slowed intake from local jails, causing ADOC's inmate population to fall below the levels that the parties estimated when making the staffing matrix.   The matrix, therefore, indicated the

number of staff necessary to treat an inmate population
that turned out to be larger than ADOC's actual inmate
population.

In light of their progress in hiring mental-health
staff, and the fact that they had enough staff, according
to the staffing ratios, to treat the unusually low inmate
populations in certain facilities, the defendants
proposed during the omnibus remedial proceedings that no
relief with regard to mental-health staffing was
necessary. *See* Defs.' Post-Trial Brief (Doc. 3367) at
62-63. In the alternative, they proposed that "ADOC's
mental-health vendor will fill the mental-health staffing
positions at each ADOC facility, by program, consistent
with the mental-health staffing ratios." *Id.* at 60. The
plaintiffs, meanwhile, proposed that the defendants be
required at all times to maintain staffing levels
consistent with or greater than those called for by the
staffing ratios, *see* Pls.' Updated Proposed Omnibus
Remedial Order (Doc. 3342) at § 2.2.3.2, subject to the
condition that staffing levels should never be less than

those set forth in the staffing matrix, *see id.* at
§ 2.2.2.

The court adopted the defendants' alternative
proposal and ordered them to supply mental-health staff
consistent with the mental-health staffing ratios. *See*
December 2021 Phase 2A Omnibus Remedial Order, 2021 WL
6128418, at § 2.2.1. Because the evidence indicated that
ADOC's inmate population was likely to increase in the
near future as intake from local jails resumed, and
because ADOC's lack of correctional staff rendered its
mental-health staff less efficient than the creators of
the staffing ratios had assumed, the court also ordered
the defendants to work towards supplying mental-health
staff consistent with the staffing matrix, but it
extended the deadline for doing so to 2025. *See id.* at
§ 2.2.3; December 2021 Phase 2A Omnibus Remedial Opinion
Part III, 2021 WL 6116913, at *9.

The defendants now move to stay these provisions of
the court's order on three grounds: (1) the court failed
to find deliberate indifference again before entering

relief; (2) the court should have ordered relief with respect to mental-health staffing on a facility-by-facility basis; and (3) "the ratios require a higher level of staffing than the matrix, yet the Order appears to require compliance with the ratios by the Effective Date, but allows ADOC until ... 2025 to comply with the matrix." Defs.' Mem. in Support of Mot. to Stay (Doc. 3490) at 16-17.  In support of this last point, the defendants contend that the ratios are more onerous than the matrix because the matrix "contains different shift relief factors, permits associate licensed counselors to work as and count toward the mental-health professional requirement, and substitutes MHPs for psychologists," while the ratios do not.  *Id.* at 16.

The court notes, initially, that the defendants are unlikely to succeed in appealing the court's 2018 understaffing order almost four years after its issuance, if that is in fact their intent.  *See* 28 U.S.C. § 2107(a). Even if the defendants could appeal all relief regarding

mental-health staffing, however, the court would still reject their arguments in favor of a stay.

With respect to the defendants' deliberate-indifference argument, the court notes that, as in the context of correctional staffing, the argument is complicated by the fact that the December 2021 omnibus remedial order merely relaxed obligations that the court had previously imposed on the defendants. If the defendants suggest that the court was required to find deliberate indifference before modifying previously entered relief to their benefit, they offer no argument in support of that highly implausible proposition.

As for the defendants' second argument, the court reiterates that its liability findings amply supported the need for systemic relief. Indeed, the court explained as much in its 2018 understaffing remedial opinion, *see* February 2018 Phase 2A Understaffing Remedial Opinion, 2018 WL 985759, at *3 n.2, which the defendants did not appeal. The court's findings in its December 2021 omnibus remedial opinion reaffirmed that

need.  Although the defendants had provided mental-health staffing at the levels called for by the ratios in five of their 15 facilities, the court found that more staff were needed in all facilities in light of the fact that ADOC's inmate population was likely to increase in the near future, and because its lack of correctional staff prevented its mental-health staff from treating inmates as efficiently as the creators of the staffing ratios had assumed.  *See* December 2021 Phase 2A Omnibus Remedial Opinion Part III, 2021 WL 6116913, at *9.

As for their third argument, the defendants are incorrect that the staffing ratios require more staff than the staffing matrix.  To repeat, the staffing ratios indicate the number of mental-health staff of various types needed per inmate.  The number of staff that the defendants must hire to comply with the staffing ratios will therefore depend on the size of ADOC's inmate population.  When ADOC has a relatively small inmate population, as it does now, compliance with the staffing ratios will require fewer staff than when it has a

relatively large inmate population.  The staffing matrix,
by contrast, sets forth a fixed number of mental-health
staff.  That number happens to be larger than the number
needed to treat ADOC's current, abnormally low population
according to the staffing ratios.  Compliance with the
staffing ratios therefore requires fewer mental-health
staff than compliance with the staffing matrix.  Indeed,
counsel for the defendants attested to the relative ease
of complying with the staffing ratios, as opposed to the
matrix, during a recent on-the-record status conference,
where counsel explained that, at Holman Correctional
Facility, "if you took the current population which is
relatively low--currently close to I think a hundred or
just slightly north of a hundred--those ratios would
result in a much, much, much smaller mental health
compliment than was proposed in the matrix."  Feb. 9,
2022, Status Conference R.D. Tr. at 33.[8]

_____

        8.  The court also notes that the defendants
themselves proposed that they be required to abide by the
staffing ratios, rather than the matrix.  *See* Defs.'
Post-Trial Brief (Doc. 3367) at 60 ("ADOC's mental-health
vendor will fill the mental-health staffing positions at

That the ratios require fewer staff than the matrix is made no less true by the fact that the matrix permits associate licensed counselors to count toward the mental-health professional requirement, and MHPs to be substituted for psychologists. As the court explained in its December 2021 omnibus remedial opinion, the staffing ratios permit the same. *See* December 2021 Phase 2A Omnibus Remedial Opinion Part III, 2021 WL 6116913, at *8 ("In reviewing ADOC's compliance with the staffing ratios, ... the EMT may allow ADOC to substitute qualified mental-health professionals for psychologists, and associate licensed counselors for qualified mental-health professionals.").

Finally, to the extent that the defendants contend that the staffing ratios contain different shift relief factors than the staffing matrix, they do not explain how the difference in shift relief factors renders the staffing ratios more onerous than the staffing matrix.

each ADOC facility, by program, consistent with the mental-health staffing ratios.").

34

Nor did they bring this concern to the court's attention during the omnibus remedial proceedings. In fact, it was the plaintiffs who requested that the court modify the shift relief factors contained in the staffing ratios. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at §§ 2.2.3.2.1-2.2.3.2.2.

The court further finds that the defendants will not be irreparably injured absent a stay. The court's 2018 understaffing order was based on the defendants' own proposals and was narrowly tailored so as to require no more staff than necessary to correct the violations identified in the 2017 liability opinion. Moreover, the court has since relaxed the requirements imposed by its 2018 understaffing order--again, at the defendants' suggestion--and has made every effort to ensure that the defendants are afforded flexibility in the pace of their hiring. Indeed, in light of the defendants' past progress with regard to mental-health staffing, the court did not even impose the minimal requirement that the defendants devise nonbinding benchmarks, as it did with

35

regard to correctional staffing.  And as it indicated in
the December 2021 omnibus remedial opinion, it is open
to the possibility of the defendants modifying the
staffing levels set in the matrix should they prove
unnecessarily high.  *See* December 2021 Phase 2A Omnibus
Remedial Opinion Part III, 2021 WL 6116913, at *9.

The plaintiffs, however, would be seriously injured
by a stay of the provisions regarding mental-health
staffing.  Again, the evidence indicates that even in the
five facilities where the defendants have made the most
progress, more staff are needed in light of the lack of
correctional staff, which renders mental-health staff
less efficient than the creators of the staffing ratios
assumed, and the impending increase in intake from local
jails.  *See id.*

The effects of ADOC's lack of mental-health staff
were well documented during the 2021 omnibus remedial
hearings.  Inmates with serious mental illnesses will go
undiagnosed, like Gary Campbell, who had never received
a psychiatric evaluation during the over two years that

36

he spent in restrictive housing, and who was not on the mental-health caseload or flagged as having a serious mental illness at the time of his suicide. *See* December 2021 Phase 2A Omnibus Remedial Opinion Part II, 2021 WL 6117939, at *14. Inmates who require mental-health referrals will not receive them, like Charles Braggs, who was never referred to or evaluated by a mental-health provider during the time he spent in the St. Clair Correctional Facility, despite reporting auditory hallucinations and exhibiting "blunted affect and disheveled appearance," and who had been asking for mental-health services, to no avail, for two weeks before he killed himself. *Id.* at *13. And inmates who are referred for follow-up care will go unseen, like Laramie Avery, who was referred for mental-health care twice, but never seen, before he hanged himself in his cell. *See id.* at *8. In light of the deaths of Campbell, Braggs, and Avery, among others, all of which occurred since the court's liability opinion, and all of which were due in part to ADOC's lack of mental-health staff, the court

37

finds that the equities weigh overwhelmingly against a stay.


IV.  Suicide-Resistant Cells

The defendants specifically challenge and seek to stay provisions of the December 2021 omnibus remedial order requiring suicide watch, stabilization unit (SU), and restrictive housing unit (RHU) cells to comply with Lindsay M. Hayes's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities."  *See* December 2021 Phase 2A Omnibus Remedial Order, 2021 WL 6128418, at §§ 2.1.7.1, 2.1.7.2, 3.1.3,[9] 10.3.1, 10.3.1.1.  This checklist identifies "architectural and environmental issues" that increase the risk that inmates may be able to attempt and complete suicides in "cells utilized to house potentially suicidal inmates"--most notably protrusions that can be used as anchoring devices for

_____

9. Due to a numbering error, § 3.1 repeats in the December 2021 omnibus remedial order.  As used in this section, § 3.1.3 refers to the provision under "Restrictive Housing Cells."

attempted suicides by hanging and obstructions of
visibility into cells--and identifies design elements
that mitigate this risk.   ADA Transition Plan (Doc.
2635-1) at 42-45 (reproducing the Hayes checklist).   In
support of their motion to stay, the defendants argue
that the application of these requirements to all suicide
watch, SU, and RHU cells fails to comport with the PLRA.
With regard to suicide watch and SU cells, the defendants
argue that relief is unnecessary and that the Hayes
checklist reflects best practices rather than a
constitutional minimum.   With regard to RHU cells, they
contend that the requirements of the Hayes checklist are
inapposite and unduly burdensome.   In support of these
arguments, the defendants present declarations
containing some evidence that was before the court at the
omnibus remedial hearings and some that was not,
including estimates of the costs of compliance with the
ordered provisions and statements of ADOC's intent to
build new men's prison facilities.

Between the issuance of the Phase 2A liability opinion in June 2017 and the start of the omnibus remedial hearings in May 2021, at least 27 inmates committed suicide while in ADOC's custody. *See* December 2021 Phase 2A Omnibus Remedial Opinion Part I, 2021 WL 6112444, at *2. Seventeen hanged themselves in their segregation cells. These deaths are far from the only harms associated with the failure to provide minimally adequate mental-health care, but they do represent the worst outcomes. While the defendants correctly note that not every suicide reflects a failure to provide minimally adequate care, evidence of the circumstances of many of these suicides brought into sharp relief failures across multiple areas of ADOC's provision of mental-health treatment: warnings that went unheeded and protection that went unprovided. As to some of these contributing factors, ADOC has made meaningful progress, as the December 2021 omnibus remedial opinion notes and, indeed, as the provisions of the omnibus remedial order reflect. As to others--above all, ADOC's severe and persistent

**40**

shortage of correctional staff--the constitutional floor
tragically appears to be years out of reach.   These
failures expose the plaintiffs to "a substantial risk of
serious harm," even where they have not always culminated
in suicide.   June 2017 Phase 2A Liability Opinion, 257
F. Supp. 3d at 1192 (citing *Helling v. McKinney*, 509 U.S.
25, 33-34 (1993), for the proposition that "a remedy for
unsafe conditions need not await a tragic event"); *see
also* December 2021 Phase 2A Omnibus Remedial Opinion Part
II, 2021 WL 6117939, at *1 ("Luck can be the difference
between a suicide attempt and a completed suicide.   It
would be a morbid kind of reactivity to find that
inadequacies in the ADOC's mental-health care system
require a remedy only when they have resulted in
death."). ADOC's progress, and lack thereof, necessarily
informs the measures that are needed to protect inmates
with serious mental-health needs:   both those inmates
whose needs have been identified and those whose have
not. *See* December 2021 Phase 2A Omnibus Remedial Opinion
Part III, 2021 WL 6116913, at *5 n.5.   On consideration

of these issues and the arguments in support of the
defendants' motion, the court will stay the provisions
of the omnibus remedial order requiring RHU cells to
comply with the Hayes checklist, but it will not stay the
provisions as to suicide watch or SU.

At the onset of the liability trial in 2017, the
inadequacy of ADOC's measures to protect inmates with
serious mental-health needs became almost immediately
apparent when Jamie Wallace, the plaintiffs' opening
witness, committed suicide by hanging in his SU cell ten
days after his testimony and after the court had
expressed extreme concerns about the fragility of his
mental health. *See* June 2017 Phase 2A Liability Opinion,
257 F. Supp. 3d at 1184. Prison visits by the plaintiffs'
experts reflected that tie-off points for ligatures were
"easily accessible" even in cells specifically used to
house inmates on suicide watch, despite years of evidence
that mental-health staff had repeatedly expressed
concerns about the safety of these cells. *See id.* at
1227. Cell doors provided minimal visibility into these

**42**

cells, impairing observation of suicidal inmates and further subjecting these inmates to the danger that any suicide attempts would go unnoticed until too late. *See id.* at 1227-28.

In September 2019, the parties entered into an agreement that included a plan to make all suicide watch cells suicide-resistant and to inspect them on a quarterly basis to ensure that they remain so. *See Suicide Prevention Measures* (Doc. 2606-1) at §§ 7.5, 7.7, 7.9. Per this agreement, suicide watch cells were considered suicide-resistant if they complied with § III(B) of the parties' ADA Transition Plan, which provided that "[a]ll crisis cells ... are to comply with the checklist developed by Lindsay M. Hayes." ADA Transition Plan (Doc. 2635-1) at 41. The court entered these stipulations as an order subject to latter consideration of whether they complied with the PLRA. *See Phase 2A Order Approving Suicide-Prevention Agreement* (Doc. 2699).

**43**

Subsequently, in May 2020, the court credited uncontradicted testimony to find that SU cells, which are "intended to house patients 'who are suffering from acute mental-health problems--such as acute psychosis or other conditions causing an acute risk of self-harm--and have not been stabilized through other interventions,'" also must be suicide-resistant "[t]o address the obvious and substantial risk of serious harm to these patients." *Braggs v. Dunn*, No. 2:14cv601-MHT, 2020 WL 2789880, at *13 (M.D. Ala. May 29, 2020) (Thompson, J.) ("Phase 2A Inpatient Treatment Remedial Opinion and Order") (quoting June 2017 Phase 2A Liability Opinion, 257 F. Supp. 3d at 1183). The court ordered that SU cells were considered suicide-resistant if they met the requirements to which the parties had previously agreed, citing to both the suicide-prevention stipulations and the Hayes checklist contained within the parties' ADA transition plan. *See id.* at *13 & n.9. The court supported this order with PLRA findings. *See id.* at *13. In the alternative, however, the court invited the defendants to propose

**44**

"other equally effective measures to make SU cells suicide-resistant." *Id.*

In response to this order, the defendants represented that ADOC had "effectively retrofitted all SU cells to ensure suicide resistance." Defs.' Resp. to Phase 2A Order on Inpatient Treatment (Doc. 2880) at 4. They elaborated:

> "For a cell to qualify as 'suicide resistant,' the cells must satisfy the terms of the Suicide Prevention Stipulations, which requires removal of all tie-off points and windows on the cell doors measuring 24 by 18 inches. (Doc. No. 2606-1). ADOC satisfied these exact requirements, mooting the issue. ADOC retrofitted all thirty-eight (38) SU cells ... by removing tie-off points and installing at least one (1) large window on all cell doors."

*Id.* at 4-5 (footnote omitted).

Roughly seven months after this representation, Tommy McConathy hanged himself from the ventilation grate above the sink in his SU cell. *See* December 2021 Phase 2A Omnibus Remedial Opinion Part III, 2021 WL 6116913, at *60. At the omnibus remedial hearings, the defendants' expert testified, based on information reported to him by an ADOC official, that the grate had

45

been suicide-resistant but for the fact that it was broken, creating a tie-off point. However, he could not state how long the grate may have presented such a tie-off point prior to McConathy's death. *See id.*

During the omnibus remedial proceedings, the plaintiffs proposed provisions requiring that suicide watch and SU cells must be suicide-resistant and that suicide watch cells must be checked on a quarterly basis to verify that they remain suicide-resistant. *See* Pls.' Updated Proposed Omnibus Remedial Order (Doc. 3342) at §§ 9.7.1, 9.7.3, 10.4. Cells that satisfy the Hayes checklist would be deemed to satisfy the suicide-resistance requirement. *See id.* With respect to RHU cells, the plaintiffs proposed that ADOC must retain a consultant to evaluate these cells and make recommendations to correct "the existence of tie-off points, inadequate visibility, and any other unreasonably dangerous condition identified in the course of the assessment" and that ADOC must then correct these

46

conditions. *Id.* at §§ 12.8.2, 12.8.2.1. As to all cells, the defendants argued that no relief was necessary.

Incorporating the Hayes checklist, as the parties had in their previous stipulations regarding suicide watch cells and as the court had in its prior order regarding SU cells, the court ordered that suicide watch, SU, and RHU cells must be suicide-resistant and that ADOC must verify that the cells remain suicide-resistant on a quarterly basis and when the cells receive new occupants. *See* December 2021 Phase 2A Omnibus Remedial Order, 2021 WL 6128418, at §§ 2.1.7.1, 2.1.7.2, 3.1.3, 10.3.1, 10.3.1.1. With respect to RHU cells in particular, the court ordered that, "[w]ithin six months of the effective date, all cells in the RHUs must comply with the conditions set forth in" the Hayes checklist. *Id.* at § 3.1.3.

Looking first to the requirements that suicide watch and SU cells be suicide-resistant, the court will not stay these provisions of the December 2021 omnibus remedial order. For the reasons explained below, the

**47**

court does not find that the defendants are likely to
succeed in their overarching challenges to the omnibus
remedial order.  Likewise, the court does not find that
the defendants have made a sufficient showing that they
are likely to succeed in arguing that these provisions
do not comply with the PLRA.  Evidence presented at the
liability trial, the hearings on inpatient treatment, and
the omnibus remedial hearings strongly supports the need
for suicide watch and SU cells to be suicide-resistant
in order to address the substantial risk of death or
serious harm to inmates with acute mental-health needs
who are housed in those cells.  *See, e.g.*, May 2020 Phase
2A Inpatient Treatment Opinion and Order, 2020 WL
2789880, at *13; December 2021 Phase 2A Omnibus Remedial
Opinion Part III, 2021 WL 6116913, at *60.  Against the
backdrop of the court's liability findings regarding the
dangerous condition of ADOC's crisis cells, the evidence
supported relief not only to make suicide watch and SU
cells suicide-resistant, but to ensure that they remain
so.  As the testimony by the plaintiffs' experts and the

**48**

death of McConathy reflected, "suicide-resistance is not a one-time task."  December 2021 Phase 2A Omnibus Remedial Opinion Part III, 2021 WL 6116913, at *60-61. The same evidence also illustrates the danger that the plaintiffs would be substantially injured by a stay of these provisions:  placing inmates known to be experiencing acute mental-health needs into suicide watch and SU cells without knowledge as to whether those cells remain suicide-resistant subjects them to "a substantial risk of serious harm."  June 2017 Liability Opinion, 257 F. Supp. 3d at 1192; *see also* December 2021 Phase 2A Omnibus Remedial Opinion Part II, 2021 WL 6117939, at *15 (noting that the defendants' information could not determine how long a tie-off point may have been present in the SU cell where McConathy committed suicide).

Turning to RHU cells, the court reiterates a finding that pervaded its December 2021 omnibus remedial opinion: the need for change in ADOC's RHUs is stark.  As previously noted, a majority of the suicides in ADOC major facilities since the court's 2017 liability opinion

**49**

were hangings within individual segregation cells.  Many
of these suicides were closely intertwined with ADOC's
grievous understaffing, as discussed above.  The harms
that this understaffing inflicts within RHUs are only
compounded by the great extent to which inmates are
regularly placed and kept in RHUs without consideration
of their serious mental-health needs.  *See, e.g.*,
December 2021 Phase 2A Omnibus Remedial Opinion Part II,
2021 WL 6117939, at \*23 (finding that ADOC "continues to
lack a functioning process for diverting individuals from
segregation who are contraindicated for placement there
due to suicide risk, serious mental illness, or other
significant mental-health issues"); *id.* at \*24 (observing
that periodic mental-health assessments to identify
inmates who may be decompensating in segregation remain
"sporadic[]"); *id.* at \*34 (agreeing with the assessment
of one provider at Ventress that inmates are discharged
from suicide watch to segregation as "a matter of
course").  To the extent the defendants seek to draw a
categorical distinction between ADOC's RHU cells and its

suicide watch and SU cells on the basis that only the
latter house "potentially suicidal inmates," Defs.' Mem.
in Support of Mot. to Stay (Doc. 3490) at 14 (quoting
Hayes Checklist (Doc. 3206-5) at 2), the current state
of ADOC's system of mental-health care does not permit
such a clear-cut division.

Upon further reflection, however, the court finds
that it needs to revisit the provisions that it entered
requiring RHU cells to comply with the Hayes checklist
within six months.   The plaintiffs' proposed relief
outlined a process that would involve the defendants in
the design of a solution to dangerous conditions in
ADOC's RHUs.   The court adopted a similar approach where
it required the parties to "submit proposals that will
allow ADOC's RHUs ... to function safely with the
correctional staff that ADOC currently employs."
December 2021 Phase 2A Omnibus Remedial Order, 2021 WL
6128418, at §§ 2.1.7.3, 2.1.7.3.1-2.1.7.3.4.   The court
finds that it was inappropriate to forgo this approach
in applying the Hayes checklist to all RHU cells and,

furthermore, that the six-month deadline that it set for compliance was unrealistic.  The defendants should have an opportunity to participate in fashioning what relief is appropriate with respect to the physical condition of ADOC's RHU cells in light of ADOC's ongoing understaffing problem and the threat that it poses to inmates with serious mental-health needs in segregation.  They should further have an opportunity to address the reasonableness of any timeframe for such relief.  And, of course, the plaintiffs should have an opportunity to respond.

Accordingly, the court will stay compliance with the provisions of the December 2021 omnibus remedial order requiring RHU cells to comply with the Hayes checklist. But while the court stays this relief, it does so with recognition that the need remains urgent; inmates in ADOC's RHUs remain at "an unacceptably high risk of decompensation, self-harm, and suicide."  December 2021 Phase 2A Omnibus Remedial Opinion Part III, 2021 WL 6116913, at *10.  The court adds, as it explained to the parties during the January 7, 2022, status conference

shortly after the omnibus remedial order was entered, that it remains ready and willing to revisit or reconsider the plaintiffs' proposed relief and arguments by the defendants that such relief is unwarranted or that less burdensome relief will suffice, together with any new evidence that is properly brought before the court as evidence of a changed circumstance. *See* Jan. 7, 2022, Status Conference R.D. Tr. at 11-12; *see also* January 2022 Order, 2022 WL 264873, at *3. The court has no occasion to do so at this juncture, but an urgent need persists. It is the court's belief that a remand to this court to address this issue prior to the appellate court's full review on the merits would both allow the parties to address this need and facilitate the most efficient resolution of this case.

## V.  Monitoring

The defendants move to stay the court's 2020 opinion and order on monitoring. The court declines to stay its monitoring order because the defendants have presented

no compelling reason to do so, and because, not only
would the plaintiffs suffer irreparable harm, but a stay
at this time would disrupt the orderly progress of this
litigation toward an end, to the detriment of all
parties.

In September 2020, the court issued an opinion and
order, supported by PLRA findings, establishing a plan
for monitoring compliance with court's remedial orders.
*See Braggs v. Dunn*, 483 F. Supp. 3d 1136 (M.D. Ala. 2020)
(Thompson, J.) ("Phase 2A Monitoring Opinion").  The
plan, which was largely based on proposals by the
defendants, consisted of three phases.  During the first
phase, an external monitoring team would monitor the
defendants' compliance with the remedial orders; during
the second phase, the external monitoring team would
train an internal monitoring team housed within ADOC to
take on this monitoring role; in the third phase,
monitoring duties would transfer entirely to the internal
monitoring team.  *See id.* at 1141.  The object of this
approach was to "help ADOC develop internal buy-in,

**54**

resulting in more active cooperation and timely compliance," and to create "a more effective, less intrusive process and avoid an indeterminate period of external monitoring." *Id.*

The defendants filed a motion to alter or amend the court's September 2022 order, which the court denied. *See Braggs v. Dunn*, No. 2:14cv601-MHT, 2020 WL 6152367 (M.D. Ala. Oct. 20, 2020) (Thompson, J.). The defendants did not appeal.

The parties proceeded to select members of the external monitoring team in a process mediated by magistrate judge John Ott. By November 2020, they had chosen a team, and the court ordered the defendants to begin negotiating contracts for the team members. *See* November 6, 2020, Order (Doc. 3054). During an on-the-record status conference on January 7, 2022, the parties represented that, even without a stay, the earliest date by which contracts with the monitoring team could be finalized would be in mid-April. *See* Jan. 7, 2022, Status Conference R.D. Tr. at 9.

The defendants now move to stay the monitoring opinion and order.  *See* Defs.' Mot. to Stay (Doc. 3489) at 3 ("[T]he State ... respectfully requests that the Court stay the [December 2021 omnibus remedial order] (and any other remedial order or opinion the Court considers applicable after entry of the Order, including but not limited to the Phase 2A Opinion and Order on Monitoring of Eighth Amendment Remedy (doc. no. 2915))." In support of this aspect of their motion, the defendants argue that "as a practical matter, if the Court stays the Order, there will, during the stay, exist nothing to 'monitor,'" Defs.' Reply in Support of Mot. to Stay (Doc. 3514) at 8-9.

Because the court refuses to stay the omnibus remedial order in its entirety, it need not address the defendants' argument that a stay of the monitoring order would be necessitated by a stay of the omnibus remedial order.  Furthermore, the court suspects that were it to grant a stay of the monitoring order, much of the progress that the parties have already made would dissolve.  The

monitoring team members have already exhibited admirable patience, but they cannot be expected to wait in the wings forever.

A collapse of the monitoring team would be detrimental to the plaintiffs. As the court detailed in its 2020 monitoring opinion, the defendants have an extensive history of failing to monitor their own provision of mental-health care and compliance with remedial measures, even after court intervention. *See* September 2020 Phase 2A Monitoring Opinion, 483 F. Supp. 3d at 1168-73. In light of that history, and the defendants' own admission that they could not effectively self-correct their deficient provision of mental-health care without assistance from outside experts, the court found the monitoring team necessary to remedy the Eighth Amendment violations identified in the 2017 liability opinion. *See id*. at 1169. That conclusion still stands today, and is indeed bolstered by the defendants' failure to document treatment for inmates and required trainings for staff since the entrance of the monitoring order.

*See, e.g.*, December 2021 Phase 2A Omnibus Remedial Opinion Part II, 2021 WL 6117939, at *33, 39.  Absent external monitoring, the defendants are highly unlikely to implement any of the relief the court has already ordered, or that it might order in the future, and the constitutional violations that the court identified in the 2017 liability opinion will almost certainly continue unabated.

Finally, the collapse of the monitoring process would be detrimental to the ADOC.  The court has explained: "The defendants' open admission that some degree of external and internal monitoring is necessary further supports the court's [monitoring] order. As Commissioner Dunn testified, 'we all want to get at some point in the future to a place where the department has the capacity to self-correct and to address these issues in a way that not only is satisfactory to the Court, but, more importantly, is just simply what we should do.'  Dunn Nov. 26, 2018, Trial Tr. (doc. no. 2250) at 22.  At the same time, the defendants acknowledge that ADOC currently

58

does not 'possess the internal resources to fulfill the
significant oversight functions mandated' by their
proposed monitoring plan, and 'necessarily requires the
initial assistance of a team of mental health experts'
to develop ADOC's capacities.  Defs.' Proposed Monitoring
Plan (doc. no. 2115) at 2; *see also* Dunn Nov. 26, 2018,
Trial Tr. (doc. no. 2250) at 35."  September 2020 Phase
2A Monitoring Opinion, 483 F. Supp. 3d at 1171.  The
court not only set up a three-phase process to do this,
but also included a timeframe.  *See, e.g.*, *id.* at 1162
(adopting defendants' proposal that the external
monitoring team will begin training the internal
monitoring team after one year; ordering that the
internal monitoring team will take over when the court
determines, after a hearing, that it is sufficiently
competent).

The endgame of the monitoring scheme is to end court
supervision.  *Id.* at 1173 ("It is clear that the court
and the parties share the same goal for monitoring in
this case: that ADOC acquire the tools, resources, and

capacity to provide constitutionally adequate mental-health care to those in its custody *without* court supervision....") (emphasis in original).  The team of experts agreed upon by the parties is in place and poised to carry out this endgame.  Now is not the time to interrupt and jettison, by putting on indefinite hold, all that has been accomplished toward achieving this goal.  A stay is not warranted as to this issue.


## V. Out-of-Cell Time

In its omnibus remedial order, the court ordered that "[a]n inmate placed in a RHU for safety or security issues [under exceptional circumstances] for 72 hours or longer will be offered at least three hours of out-of-cell time per day."  December 2021 Phase 2A Omnibus Remedial Order, 2021 WL 6128418, at § 3.1.2.  "Exceptional circumstances" refer to circumstances that justify segregation for inmates with serious mental illnesses, or inmates who have been determined to be contraindicated for segregation.  *See id.* §§ 3.1.1, 3.2.2-3.2.3.

The defendants move to stay this provision, arguing that it is overbroad because it applies to all inmates, whether class members or not.  The defendants base their belief that the provision applies to all inmates on a comment by the court during a January 21 status conference.

The court denies this request for a stay, because it believes that the defendants have simply misunderstood the scope of the provision.  While the omnibus remedial order states that "[a]n inmate placed in a RHU for safety or security issues for 72 hours or longer will be offered at least three hours of out-of-cell time per day," that requirement applies to only inmates who have been placed in restrictive housing under so-called "exceptional circumstances."  *Id.*  Exceptional circumstances must exist if an inmate with a serious mental illness, or an inmate who has been determined to be contraindicated for segregation, is to be placed in restrictive housing.  *See id.* §§ 3.1.1, 3.2.2-3.2.3.  The requirement in question therefore applies to only inmates with serious mental

illnesses and inmates who are contraindicated for placement in restrictive housing.

The court did not mean to suggest otherwise during the January 21 status conference. Rather, the court merely intended to clarify that the provision of the December 2021 omnibus remedial order requiring the defendants to submit weekly reports on inmates kept in segregation for longer than 72 hours under exceptional circumstances referred to inmates who are contraindicated for placement in restrictive housing but still placed there, as well as inmates with serious mental illnesses. *See id.* § 3.1.4. The court may have said this inartfully, but it did not mean to modify substantively the omnibus remedial order--assuming that it could even do so orally during a conference call. A stay is not warranted as to this issue.

## VI. Inpatient Beds

In its December 2021 omnibus remedial order, the court ordered the defendants to "supply enough

[inpatient] beds to accommodate 10 % of [ADOC's] mental-health caseload at the time of the effective date." December 2021 Phase 2A Omnibus Remedial Order, 2021 WL 6128418, at § 11.2.   In the accompanying opinion--but not in the order--the court noted that the 14 beds that ADOC currently reserves at Citizens Hospital should not count towards its inpatient beds.   *See* December 2021 Phase 2A Omnibus Remedial Opinion Part III, 2021 WL 6116913, at \*74 n.14.   It also clarified that ADOC may not double-count beds in its Structured Living Units as both inpatient and outpatient beds, *see id.* at \*75 n.15.

The defendants now move to stay the provision of the omnibus remedial order requiring them to supply enough beds to accommodate 10 % of their mental-health caseload, arguing that they are likely to prevail in appealing this provision because the court erred in excluding the beds at Citizens Hospital and in the SLUs from the total number of inpatient beds.

After conferring with the parties, the court agrees with the defendants that it erred in indicating to the EMT that the beds at Citizens Hospital should be excluded from the total number of inpatient beds. Those beds are used to provide an inpatient level of care, and should be counted as such. The court will therefore modify its opinion to indicate to the EMT that it may count the 14 beds at Citizens Hospital towards the total number of inpatient beds. Because the court's erroneous comment regarding the beds at Citizens Hospital was not part of the order, however, the court finds that it need not stay any part of the order to grant the defendants the relief they seek. The order stands as is, and the court simply retracts its earlier comment.

The court does not find, however, that it erred with regard to the SLU beds. Rather, it believes that the defendants have misconstrued its instruction regarding those beds. The court never meant to indicate that the defendants may not count the beds in the SLUs towards the total number of inpatient beds. Indeed, they may. What

they may not do, however, is double-count those beds as
both inpatient and outpatient beds.  The court based this
prohibition on the testimony of the defendants' own
expert, Dr. Metzner, who explained during the omnibus
remedial hearings that the defendants could use the SLUs
to house inmates requiring inpatient care if they wanted
to--in which case the beds in the SLUs would count as
inpatient beds--but that if they did that they would have
to find another place to house the current occupants of
the SLUs, who do not require inpatient care.  *See* July
1, 2021, R.D. Trial Tr. at 132-33. That is all that the
court meant to convey.  If the defendants wish to count
the beds in the SLUs as inpatient beds, they have to
actually make them available for inmates requiring
inpatient care by ensuring that their current
occupants--who do not require inpatient care--have
somewhere else to go.  A stay is not warranted as to
this issue.

## VII. Effective Date

In support of various aspects of their motion to stay, the defendants raise the specter of being held in contempt should they not complete all of the requirements of the omnibus remedial order by the effective date, which was originally set for February 7, 2022, but has since been suspended pending resolution of the stay motion. *See* January 2022 Order, 2022 WL 264873, at *6. The court believes that the defendants' concern is based on a misunderstanding of the meaning of the term "effective date," which does not refer to the date by which the defendants must bring themselves into full compliance with the terms of the remedial order, but rather to the date on which the order takes effect and the defendants must begin to make good faith efforts to comply with its terms in order to avoid being held in contempt. *See* Black's Law Dictionary, 8th ed. ("effective date" means "[t]he date on which [an order] becomes enforceable or otherwise takes effect"); *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1516 (11th

Cir. 1990) (a party who makes a good faith effort to comply with an enforceable court order may avoid civil contempt).  So long as the defendants begin on the effective date to take good faith efforts to bring themselves into compliance with the remedial order, they will not be held in contempt.  The effective date is not the date on which the defendants must be *instantly* in full compliance with obligations tied to that date under the order, without consideration of a common-sense reasonable period of time to obtain compliance.  A stay is not warranted as to this contention.

## VIII.  Deliberate Indifference

The defendants argue that they are likely to succeed on the merits of each of their challenges to the court's December 2021 omnibus remedial order because "the Court erred in determining that it need not find current deliberate indifference to order relief," and therefore could not find a current and ongoing constitutional violation, as the defendants contend it must have before

entering relief.    Defs.' Mot. to Stay (Doc. 3489) at
3-4.  The court rejects this basis for a stay for several
reasons.

First, the defendants' argument is foreclosed by
Eleventh Circuit precedent.  As the court has previously
explained, the Eleventh Circuit, in *Thomas v. Bryant*, 614
F.3d 1288 (11th Cir. 2010), considered and rejected the
argument that a court is required to find a current and
ongoing constitutional violation before entering relief
under the PLRA.  *See* December 2021 Phase 2A Omnibus
Remedial Opinion Part I, 2021 WL 6112444, at *9; *see also*
*Braggs v. Dunn*, No. 2:14cv601-MHT, 2020 WL 7711366, at
*6 (M.D. Ala. Dec. 29, 2020) (Thompson, J.) ("Opinion and
Order on a Process for Finalizing the Phase 2A Remedial
Orders").  The "current and ongoing violation" standard,
the Circuit explained, comes into play in only
termination proceedings, and not when the court initially
orders relief.  *Thomas*, 614 F.3d at 1320.

Second, even absent the holding in *Thomas*, the
circumstances presented in this case belie the

defendants' contention that the court needed to re-find deliberate indifference for all the remedial relief contained in the December 2021 omnibus remedial order. As the court explained with regard to correctional and mental-health staffing, it seems highly implausible that it was required to find deliberate indifference to support those provisions of its December 2021 order that extended and relaxed the requirements it had entered in 2018. The provisions of the December 2021 order regarding suicide prevention also stand in a unique posture, as they were largely based on provisions contained in the court's 2019 suicide prevention opinion, in which the court explicitly found ongoing deliberate indifference by the defendants, and which the defendants did not appeal. *See Braggs v. Dunn*, No. 2:14cv601-MHT, 383 F. Supp. 3d 1218, 1242 (M.D. Ala. 2019) (Thompson, J.) ("Phase 2A Suicide Prevention Opinion").

Third, set against the history of this litigation, the defendants' broad contention that a court, after making a finding of deliberate indifference, as this

court did in its liability opinion in 2017, needs to re-find deliberate indifference when it addresses the issue of remedy raises the important question of when and how often it might need to do so.  Not only when it initially fashions a remedy but each and every time it tinkers with that remedy, such that, in much institutional prison litigation, the parties would need to redo and redo the liability phase?  For practical reasons this surely cannot be the case.  The defendants do not answer that question.[10]

Fourth, Congress has already addressed the concern just mentioned.  In the PLRA, it carefully crafted an orderly and detailed scheme governing when a court, after finding liability and fashioning a remedy, needs to

---

10. If the appellate court were to find that this court was required to find deliberate indifference to support the provisions of its December 2021 omnibus remedial order regarding staffing, this court would benefit from some clarification as to when it is required to find deliberate indifference when modifying relief in the future, and how long its deliberate findings (with respect to modifications or newly entered relief) can stand before they must be updated. In short, this court respectfully asks for an answer to the question of when and how often it must find deliberate indifference.

revisit the issue of deliberate indifference.  The PLRA places the "current and ongoing violation" requirement in the provision applicable to proceedings on a motion to terminate, but excludes it from the provision that governs the entry of prospective relief.  *See* 18 U.S.C. § 3626(a)(1)(A), (b)(3).  (The defendants should be well aware of this.  In 2020, shortly before the start of the omnibus remedial hearings, they moved to terminate all outstanding remedial orders, thereby triggering the plaintiffs' burden to demonstrate ongoing deliberate indifference.  *See* December 2021 Omnibus Remedial Opinion Part I, 2021 WL 6112444 at *4-5.  The defendants withdrew their motion shortly thereafter, but they are free to move to terminate again.)  The court sees no need to layer onto the PLRA's intricate statutory structure the additional obligation to find deliberate indifference that the plaintiffs now propose.  Indeed, the absence of the "current and ongoing" language from § 3626(a)(1)(A), which otherwise duplicates the standard of § 3626(b)(3), is  conspicuous  and  must  be  given  interpretive

significance.                    To        interpret        the
need-narrowness-intrusiveness requirement to subsume the
"current   and   ongoing   violation"   standard,   as   the
defendants propose, would make the latter language in
§ 3626(b)(3) redundant.

Finally, in support of their contention that the
court   must   re-find   deliberate   indifference,   the
defendants rely on *Farmer v. Brennan*, 511 U.S. 825,
845-46 (1994).  The court is also aware of the case of
*Dockery v. Cain*, 7 F.4th 375 (5th Cir. 2021).  Those
cases, however, address the need for a finding of
deliberate indifference to establish liability, and do
not confront the question presented here of whether, and
perhaps how often, a court needs to re-find deliberate
indifference in the course of fashioning and modifying a
remedy   for   an   already   established   constitutional
violation.

## IX. Systemwide Relief

The defendants also contend that the court erred by entering relief on a systemwide basis.  Time and again throughout this litigation, the court has rejected the notion that the effects of the defendants' constitutional violations are anything less than systemic, and it will now reiterate only briefly what it has said before.

In its liability opinion, the court found ADOC's provision of mental-health care "horrendously inadequate" on a systemwide basis.  *See* June 2017 Phase 2A Liability Opinion, 257 F. Supp. 3d at 1267-68; *see also* Defs.' Resp. to Court's February 2, 2018 Order (Doc. 1595) at 1 ("The State is not aware of any section of the Court's liability opinion in which the Court indicated an intent to limit its liability findings to [particular facilities].").  The court then reaffirmed in its 2018 understaffing opinion and in its 2019 suicide-prevention opinion, neither of which the defendants appealed, that ADOC's provision of mental-health care falls below the constitutional floor across all of its facilities.  *See*

73

February 2018 Phase 2A Understaffing Remedial Opinion, 2018 WL 985759, at *3 n.2 (explaining that ADOC maintained insufficient correctional and mental-health staffing across all facilities, and that "it would make little sense to order increased staffing at one understaffed prison if the staffing were to be filled by merely transferring staff from another, slightly less understaffed facility"); May 2019 Phase 2A Suicide Prevention Opinion, 383 F. Supp. 3d at 1241 (identifying "substantial and pervasive" deficiencies in ADOC's suicide-prevention measures). After hearing the evidence in the omnibus remedial proceedings, the court again found ADOC's provision of mental-health care inadequate on a systemwide basis, even in those areas where the defendants had made the most progress. *See* December 2021 Phase 2A Omnibus Remedial Opinion Part I, 2021 WL 6112444, at *10-12.

In short, the court previously found systemic violations, and those findings served as the bases of orders that the defendants did not appeal. Far from

**74**

indicating that the court's previous findings were out-of-date, the evidence presented in the omnibus remedial hearings showed that "serious violations exist[ed] at every major facility." *Id.* at *10-12. In light of this history, the court continues to stand by its decision to enter relief on a systemwide basis.[11]

\*\*\*

Accordingly, for the above reasons, it is the ORDER, JUDGMENT, and DECREE of the court that:

(1) The defendants' motion to stay the Phase 2A omnibus remedial order pending their interlocutory appeal (Doc. 3489) is granted to the extent that the court stays §§ 2.1.7.1-2.1.7.2 and 3.1.3 of the Phase 2A Omnibus Remedial Order (Doc. 3464) insofar as that those

---

11. During oral argument on the stay motion, defense counsel complained that some of the standards the court set in its omnibus remedial order were too strict and therefore interfered with ADOC's discretion. However, counsel had also previously argued that the standards should not be so lax as to provide no guidance for determining when there has been compliance. The court has had to wrestle with this coming-and-going argument. *See* December 2021 Phase 2A Omnibus Remedial Opinion Part II, 2021 WL 6117939, at *42 (discussing why the court adopted certain timeframes).

provisions require RHU cells to comply with the Hayes checklist and be checked for compliance with the Hayes checklist.  The court grants this stay with the hope that it will have the opportunity to take up the issue of relief regarding dangerous conditions in ADOC's RHU cells due to chronic understaffing with the urgency that said issue compels.

    (2) Said motion is denied in all other respects.

    DONE, this the 14th day of February, 2022.

                    /s/ Myron H. Thompson
                  UNITED STATES DISTRICT JUDGE