## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

EDWARD BRAGGS, et al.   )
          )
   Plaintiffs,   )
          )
v.         )  CIVIL ACTION NO.
          )  2:14-cv-00601-MHT-JTA
JOHN Q. HAMM, in his official )  Judge Myron H. Thompson
capacity as Commissioner of the )
Alabama Department of Corrections, )
et al.        )
          )
   Defendants.  )

## PLAINTIFFS' PROPOSALS REGARDING MECHANISMS TO ADDRESS PRISONER SAFETY IN RESTRICTIVE HOUSING UNITS IN THE ABSENCE OF ADEQUATE STAFFING

Pursuant to this Court's December 27, 2021 Phase 2A Omnibus Remedial Order (Doc. 3464, the "Order"), at § 2.1.7.3 and subsections, Plaintiffs hereby submit their Proposals Regarding Mechanisms to Address Prisoner Safety in Restrictive Housing Units in the Absence of Adequate Staffing ("Plaintiffs' Proposals") and would respectfully show the Court as follows:

### I.  BACKGROUND FACTS

As this Court noted in Part I of its December 27, 2021 Phase II Omnibus Remedial Opinion (the "ORO"), the "common thread among [the at least 27 prisoner suicides in ADOC custody since the liability hearing] is ADOC's lack of correctional

1

staff." ORO, I:6.[1]  The Court further noted that "[t]his deficiency in correctional staff is nearly unchanged in its severity and impact since the court's liability opinion four years ago." *Id*.

Because of correctional staffing deficiencies, prisoners, among other things: (1) "do not receive adequate treatment and out-of-cell time," (2) "are robbed of opportunities for confidential counseling sessions," and (3) "decompensate, unmonitored, in restrictive housing units, and . . . are left to fend for themselves in the culture of violence, easy access to drugs, and extortion that has taken root in ADOC facilities in the absence of an adequate security presence." ORO, I:7.  The problems in the restrictive housing units are so acute that, of the twelve prisoner suicides that occurred in ADOC facilities between September 2019 and May 2021, eight occurred in restrictive housing and three occurred in conditions functionally equivalent to those in restrictive housing.  May 24, 2021 R.D. Tran. 10:4-11:5.[2] Adequate staffing is so key to providing constitutionally adequate mental health care in the restrictive housing units and in ADOC generally that, shortly after issuing its 2017 liability opinion, this Court admonished that staffing "must be addressed at the

---

[1] Citations to the Omnibus Remedial Opinion in Plaintiffs' Proposals include the part number followed by the page number.

[2] *See also* June 24, 2021 R.D. Tran. 41:5-7 (quoting Daniels directive (Plaintiffs' Exhibit 3180 from Omnibus Remedial Trial) as follows: "The majority of inmates who committed suicide within ADOC have been men who were alone in a restrictive housing cell after being released from suicide watch.")

outset" and "fully remedied before almost anything else can be fully remedied." *Id*. (citing Phase 2A Revised Remedy Scheduling Order on Eighth Amendment Claim (Doc. 1357) at 4).

Despite ADOC's pervasive staffing problems and the need to address staffing deficiencies in order to remedy the constitutional violations this Court found in its 2017 liability opinion, "[b]oth parties [have] acknowledged that correctional staffing levels in particular have not significantly increased since the entry of the court's understaffing remedial opinion and order." ORO, I:22. As this Court found, "[a]t the present pace of improvement . . . ADOC is on track to achieve sufficient staffing to safely conduct normal operations sometime in mid-2037." ORO, II:69.[3] In light

---

[3] In fact, the actual staffing situation is even worse. The numbers from ADOC's March 1, 2021 Quarterly Staffing Report (Plaintiff's Exhibit 3184 in the Omnibus Remedial Trial) showed that ADOC's correctional staff number (Actual correctional officers – Actual CCOs + Actual correctional supervisors; *see* June 2, 2021 R.D. Tran. 42:24-46:23) as of December 31, 2020, was more than 200 higher than it was a year later, as reflected in its April 8, 2022 Quarterly Staffing Report (Doc. 3551). In other words, over the course of calendar year 2021, ADOC actually lost significant correctional staff. The facilities with the most restrictive housing cells also had some of the biggest increases in staffing vacancy rates in 2021 (Donaldson: an increase of 10.2%; Kilby: an increase of 4.4%; Limestone: an increase of 12.2%; St. Clair: an increase of 0.5%). Fountain, which has 66 restrictive housing cells and in which Travis Jackson committed suicide, (May 24, 2021 R.D. Tran. 137:7-151:16), showed a dramatic 17.8% increase in correctional staff vacancy rate. Moreover, almost a quarter of correctional officers have now been employed less than one year (Actual correctional officers – Staff with ADOC in excess of 12 months ÷ Actual correctional officers).

Far from improving its correctional staffing situation since the Liability Trial—when this Court found that ADOC's staffing deficiencies "create[d] a substantial risk of serious harm to mentally ill prisoners, including continued pain

of these continued staffing deficiencies and in light of its determination to allow ADOC until "July 1, 2025, [to] fill all mandatory and essential posts at the level indicated in the most recent staffing analysis at that time" (Order, at § 2.14),[4] this Court ordered the parties to "submit proposals that will allow ADOC's RHUs—with the exception of the RHU at Tutwiler—to function safely with the correctional staff that ADOC currently employs."   The Court further ordered that these proposals address the following:

<blockquote>

2.1.7.3.1   How ADOC shall address the serious risk of harm to inmates in restrictive housing caused by correctional staffing deficits so severe that the consistent provision of security checks, out-of-cell time and mental-health treatment is simply impossible.

2.1.7.3.2   How ADOC will ensure that any inmates moved out of the RHUs do not end up in functionally identical units—that is, units that offer equivalently deficient levels of monitoring, out-of-cell time, and treatment.

2.1.7.3.3   How ADOC will ensure the safety of inmates in the RHUs who require protective custody, and, if it chooses to reduce the

</blockquote>

---

and suffering, decompensation, self-injury, and suicide," (*Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1200 (M.D. Ala. 2017))—ADOC's correctional staffing levels have actually dropped.  *See* ADOC Monthly Statistical Report for June 2017 (Def. Exh. 2983) (showing 1442 correctional officers and correctional officer trainees along with 383 correctional supervisors, for a total of 1825—a number higher than those reflected above).

[4] Plaintiffs continue to urge this Court to impose enforceable correctional staffing benchmarks, as explained in Plaintiffs' Post-Trial Brief in Support of Omnibus Remedial Order, filed on July 23, 2021, at 341-3.  Despite repeated admonitions from this Court, Defendants have failed and continue to fail to improve correctional staffing or to remedy the unconstitutional prison conditions that exist without adequate correctional staffing.  Given these repeated failures, this Court should impose enforceable staffing benchmarks.

number of inmates in the RHUs, how it will manage the dangers posed by inmates who would present a significant safety or security risk in the general population.

2.1.7.3.4    How this relief may be modified if ADOC meets the benchmarks for correctional staffing set forth above.

The Court itself gave two examples of potential interim measures: "Possible measures might include hiring temporary observers to monitor inmates in restrictive housing until ADOC hires a sufficient level of correctional staff, or temporarily reducing the number of inmates that ADOC keeps in restrictive housing." ORO III:22. Pursuant to this Court's Order, Plaintiffs provide their Proposals in Section III below, subject to the proviso in Section II.

## II.    PROVISO

Consistent with the positions they have taken both in the 2017 liability proceedings and at the 2021 omnibus remedial trial, Plaintiffs maintain that it is impossible for ADOC's RHUs—with the exception of the RHU at Tutwiler—to function safely with the correctional staff that ADOC currently employs. The correctional staff that ADOC currently employs is insufficient to ensure the safe functioning of any ADOC housing area. It does not meet even the "critical minimum" standard put forward by Defendants' own expert, Margaret Savage, and, according even to that expert, should require ADOC to invoke emergency protocols and lockdown prisoners until the problem is resolved. ORO, II:65-67. Plaintiffs therefore make their proposals subject to the caveat that, even if ADOC implements

5

these proposals (other than that detailed in Section III.A below), ADOC RHUs will continue to be unsafe and prisoners with serious mental illnesses housed in RHUs will continue to face unconstitutional conditions and the potentially fatal consequences that arise from such conditions.  By making these proposals as directed by the Court, Plaintiffs do not acquiesce in the continued unconstitutional operation of ADOC's restrictive housing units.[5]

### III.   PROPOSALS

Subject to the proviso articulated in Section II above, Plaintiffs submit the following proposal pursuant to the Order.  Plaintiffs discuss the two suggestions this Court put forward as well as other interim mechanisms for possible improvement.

### A.   Mechanisms to Address Serious Harm to Prisoners in Restrictive Housing

### 1.   Reduction in Total Prison Population

Even without increasing its critically low staffing levels, ADOC can most effectively allow its RHUs to function safely with the correctional staff it currently

---

[5] Consistent with the proviso articulated above, Plaintiffs expressly preserve any and all objections and available legal and equitable arguments in response to any order or opinion of this Court and any argument or representation of Defendants in this matter.  Nothing contained in this filing shall be construed as an admission by Plaintiffs, a waiver of any objection or argument, or a waiver of Plaintiffs' cross-appeal in this matter.  Nothing in this filing shall be construed as an admission of any kind that ADOC's restrictive housing units can be made safe without adequate staffing.

employs by decreasing its total prison population.[6]  After all, as this Court has noted, "necessary staffing levels are always relative to prison population."  ORO, II:72. Even ADOC's own experts provided evidence supporting that principle, as this Court further observed: "As experts for both parties testified, there are ultimately two ways to fix the problem of having too few staff to provide this minimal care to an inmate population: staffing can be increased, or the population can be reduced." ORO III:26-27.

Thus, while this Court has not yet expressed a current intention to require ADOC to reduce its total prison population, doing so is the only way to make the conditions of confinement of prisoners with serious mental  illness constitutional without adequate staffing.  If ADOC both maintains its current prison population and continues to fail to provide adequate correctional staffing, conditions will remain unconstitutional, as they have throughout the entire course of this litigation.

### 2.    Closure of Restrictive Housing Units

With or without reducing its total prison population, ADOC could make RHUs function more safely by closing (1) a certain proportion of such units, (2) all the restrictive housing units in particular facilities, or (3) specific restrictive housing

---

[6] While reducing its total prisoner population would not automatically lead to safe restrictive housing conditions, such a reduction would likely lead to fewer prisoners confined in RHUs and, by decreasing the burdens on staff generally, could also allow more staff to be allocated to RHUs, if necessary.

cells within particular facilities.[7]  While such closures, whether individually or in combination, cannot make up for the lack of adequate staffing, they would likely improve conditions directly impacted by staffing shortages.  In fact, the Court has already considered this measure: "In light of [its finding that—with the exception of the restrictive housing unit at Tutwiler—ADOC's restrictive housing units are unsafe for prisoners with mental-health needs] the court considered ordering the defendants to close some or all [of] the restrictive housing units at its men's facilities until correctional staffing levels improve enough to make it possible for ADOC to operate those units safely."  ORO III:21.  Plaintiffs maintain that this Court could appropriately consider such measures now.[8]

ADOC could likely close a significant percentage of its RHUs if it adopted the following procedures.  First, ADOC would need to implement a rigorous set of

_____

[7] Plaintiffs' proposals are in response to this Court's order to make recommendations about how ADOC can address safety issues in restrictive housing units without adequate staffing levels.  To the extent these proposals differ from proposals Plaintiffs put forward at the Omnibus Remedial Trial, they do so because Plaintiffs' proposals at trial were premised on ADOC providing adequate staffing.  If ADOC objects that any of Plaintiffs' current proposals are overly intrusive, ADOC can obviate the need to comply with them by providing adequate staffing.  Plaintiffs also propose that the independent monitors oversee a review by the parties' experts of these proposals and the appropriate mechanisms to operationalize them.

[8] In determining not to order the closure of any restrictive housing units, this Court may have taken some comfort from the fact that it ordered that all such units be made suicide resistant.  *See* ORO III:97.  However, the Court has since stayed that provision of its Omnibus Remedial Order.  *See* February 14, 2022 Opinion and Order on Stay Motion (Doc. 3526), at 52-53, 75-76.

criteria for determining whether to transfer a prisoner into or maintain a prisoner in restrictive housing and make no exceptions that would loosen such criteria.[9]  Second, ADOC would need to gather and to analyze information detailing the precise circumstances under which the prisoners currently confined in restrictive housing were first transferred there and are now maintained there.  Third, ADOC would need either to have a central authority or a contract with an independent entity or individual to review ADOC determinations about prisoners in restrictive housing and to ensure the criteria are applied objectively.  Fourth, ADOC would need to transfer prisoners promptly out of restrictive housing if they do not meet the criteria for staying there.   Fifth, ADOC would need to consolidate the prisoners appropriately in restrictive housing into the units most appropriate for such consolidation and close the remaining units, except as necessary for temporary transitions, as discussed below.  Each of these steps individually can help ADOC reduce its restrictive housing population, as described further below.  Implemented together, these steps can allow ADOC to close a significant percentage of its restrictive housing cells. Doing so would improve the conditions for those prisoners who remain in RHUs because having fewer RHUs will allow the limited available staff to provide the necessary security checks, out-of-cell time, and the like.

---

[9] The individual components are discussed further below.  Individually, or in some combination, they can reduce the population of prisoners in restrictive housing. Together, they might reduce it sufficiently to allow closure of some such housing.

Aside from closing a numerical proportion of its RHUs, ADOC could close all the units in select facilities, except as noted below.  Bibb Correctional Facility would be a good facility at which to do so. As explained during the Omnibus Remedial Trial, the restrictive housing cells at Bibb are, with respect to their design and location, "very problematic.  They are behind two locked doors [and] several steps away from the actual living unit . . . ."  May 28, 2021 R.D. Tran. 82:20-21. Thus, Bibb's RHU is "very dangerous" (*id.*, at 82:23) in part because "[y]ou can't see back there [and] [y]ou have to go through locked doors to get there" (*id.*, at 83:20-21).

Although closing Bibb's RHU might seem problematic if a Bibb resident needs to be in restrictive housing for security reasons, ADOC could solve these problems by reserving one unit as temporary restrictive housing for transitional purposes. If ADOC determines that a prisoner at Bibb constitutes such an immediate threat to himself or others that restrictive housing is necessary, ADOC could house that prisoner in the temporary restrictive housing unit for up to 24 hours until transferring him to one of the nearby facilities (Donaldson—distance of 54 miles, 1 hour and 17 minutes; St. Clair—distance of 89 miles, 1 hour and 28 minutes; or Kilby—distance of 87.6 miles, 1 hour and 40 minutes).[10]  Furthermore, ADOC could

---

[10] The stipulation reached between the parties in connection with the Bibb Segregation Remedy (Doc. 1751-1) had similar provisions.

contract for the transport of prisoners housed at Bibb, thus allowing its own correctional officers to remain and work at the Bibb facility.

ADOC could also close specific restrictive housing units within select facilities without closing all such units. Kilby Correctional Facility, for example, "is a high custody facility but not a location where Restrictive Housing can be easily managed." May 1, 2018 Assessment of Correctional Staff Needs and Shift Relief Requirements at Facilities within the Alabama Department of Corrections, by Savage Corrections Consulting LLC (Doc. 1813-1, the "Savages' Report"), at 45. As noted, Plaintiffs propose that the independent monitors oversee review of such housing units by the parties' experts to determine which units might be appropriate candidates for closure.

This Court has expressed that part of its "hesitation to order the closure of any of ADOC's male restrictive housing units stemmed from concern over what would happen with . . . two groups of prisoners[:]" (1) "prisoners who require protective custody[,]" and (2) "prisoners who would present a significant safety or security risk in general population." ORO, III:22-23. Plaintiffs address issues concerning these two prisoner groups in Section III.C below. Plaintiffs maintain that adopting their proposals as articulated in that Section can alleviate any concerns this Court may have in ordering the closure of certain restrictive housing units.

11

### 3.    Reduction of Restrictive Housing Population

ADOC could also make RHUs function more safely by reducing its restrictive housing population as a whole.  Some states, such as Washington,[11] have eliminated disciplinary segregation altogether.  Even while doing so, these states have been able to maintain security, in part because of the considerations detailed in Section III.C below.

### a.    Change of Criteria for Transfer into or out of RHUs

One way ADOC could reduce the total restrictive housing population is to employ more stringent criteria for placing a prisoner into restrictive housing and/or more relaxed criteria for permitting a prisoner to leave restrictive housing.[12]

---

[11] *See* Press Release: Washington State Department of Corrections Ends Disciplinary Segregation (October 1, 2021), available at https://www.doc.wa.gov/news/ 2021/09302021p.htm (last reviewed on June 1, 2022) (noting that "[t]he agency's data indicates that disciplinary segregation as a disciplinary action has not been proven to be an effective sanction or deterrent to negative behavior.  As a result, on September 16, 2021, DOC ceased the use of disciplinary segregation throughout the agency.").

[12] Critically, ADOC must not only adopt such criteria but must also have personnel and mechanisms prepared to implement those criteria rigorously.  As explained in the Omnibus Remedial Trial, for example, ADOC has on paper required central authority review of placements of prisoners discharged from suicide watch into restrictive housing, but that review has proved meaningless and ineffectual in practice.  *See, e.g.*, May 26, 2021 R.D. Tran. 67:13-84:7 (discussing Charles Daniels memorandum requiring review by deputy commissioner of operations or designee from suicide watch to restrictive housing and pointing to numerous examples in which the review process proved empty and uninformed); May 24, 2021 R.D. Tran. 67:25-69:5 (discussing suicide victim Jaquel Alexander's transfers back and forth from suicide watch to restrictive housing without proper monitoring or review); May

For example, ADOC could employ heightened criteria for the "exceptional circumstances" in which a prisoner with serious mental illness can be retained in restrictive housing for any length of time.[13]  ADOC could also employ heightened criteria for any prisoner considered for restrictive housing, with or without mental illness.[14]  For example, in line with recent Nebraska legislation concerning youth in correctional facilities, a prisoner might be placed in restrictive housing only if that prisoner is an imminent physical threat to himself or others and be removed as soon as he is no longer an imminent physical threat, with notification of his attorney and/or family[15] within 24 hours, and with increased monitoring of any individual confined to restrictive housing.

---

25, 2021 R.D. Tran. 51:14-54:15 (discussing prisoner TM's transfers back and forth from suicide watch to restrictive housing without proper monitoring or review).

[13] Significantly, ADOC has repeatedly placed prisoners with serious mental illness in restrictive housing without observing the "exceptional circumstances" criteria put forward even by its own expert, Dr. Metzner. *See, e.g.*, July 1, 2021 R.D. Tran. 224:5-240:12 (evidencing numerous occasions in which ADOC placed prisoners with serious mental illness in restrictive housing under circumstances which Dr. Metzner did not view as "exceptional" under his criteria).  During the Omnibus Remedial Trial, this Court questioned "why these people should be in segregation one day longer since their mental health is at stake." July 2, 2021 R.D. Tran. 1:8-22.

[14] While Defendants' expert, Dr. Metzner, expressed concerns about prisoner accountability, such concerns can be addressed without using restrictive housing, as discussed in Section III.C below.

[15] For many prisoners, an attorney or family members may not exist or may not serve as appropriate contacts for a variety of reasons.  An independent ombudsman might serve the necessary role under such circumstances.  This is provided as an example of creative solutions utilized in other states to address concerns regarding the impact and safety of restrictive housing units.

If solutions such as these were adopted to address issues with ADOC, it might at first seem that increased monitoring would further burden an already overburdened staffing situation.  However, it would force ADOC decision-makers to devote scarce staffing resources to confinement in restrictive housing only for individual prisoners it views as absolutely requiring such confinement.  Given that ADOC has systematically confined prisoners to restrictive housing for whom such confinement is not necessary or even appropriate, as shown in the Omnibus Remedial Trial (*see, e.g.*, May 27, 2021 R.D. Tran. 81:21-89:24 (discussing ADOC's inappropriate housing of prisoners with serious mental illness in restrictive housing for having been sent suboxone in the mail, for having pounded on a cell door and refused to obey an order to stop, and even for having themselves been the victims of sexual assault[16])),[17] these heightened criteria and accompanying requirements would ultimately lighten the burden on the staffing situation.

---

[16] Victims of sexual assault by other prisoners continue to be held in restrictive housing even now.  *See, e.g.*, May 3, 2022 Notice of Filing Under Seal Weekly Report of SMI Inmates in Restrictive Housing (Doc. 3566), Exh. A. (prisoners JCA, CAB, HMT, and ADW held in restrictive housing because they alleged sexual assault by another prisoner).

[17] *See also, e.g.*, May 24, 2021 R.D. Tran. 70:14-72:13, 78:2-11, 79:22-80:5 (discussing ADOC's failures to consider alternative placements other than restrictive housing for prisoners with serious mental illness who ultimately committed suicide); May 24, 2021 R.D. Tran. 121:13-21 (discussing failure of ADOC to consider removal of prisoner from restrictive housing, despite the fact that he had been confined there for the better part of ten years and was exhibiting signs and symptoms of worsening mental health and ultimately committed suicide), May 25, 2021 R.D.

14

ADOC also has other ways to reduce the population of prisoners in restrictive housing, as detailed further below.  As discussed in Section III.A.5 below, ADOC can improve its antiquated classifications systems and thus move prisoners out of restrictive housing more quickly through more efficiently assessing the locations of possible "enemies."  As discussed in Section III.A.6 below, ADOC can develop and employ protective custody housing to protect the safety of particularly vulnerable prisoners who would risk substantial harm in general population, such as victims of sexual assault.  As discussed in Section III.A.3.f below, ADOC can develop and implement programs for those in restrictive housing to make incremental progress toward returning general population. Furthermore, as detailed in Section III.A.3.c below, making the independent monitors or individuals with whom ADOC specifically contracts  responsible for determining which prisoners are in RHUs will both increase the decision-makers' level of expertise and decrease their disincentives to make the appropriate decisions.  These and other possible ways to reduce the ADOC restrictive housing population are described more fully below.

### b.    Absolute Cap on Population in RHUs

An absolute cap on the total population in restrictive housing would force personnel to make better decisions and to improve tracking of who is confined in

---

Tran 221:2-16 (discussing failure of ADOC to move prisoners with serious mental illness from the restrictive housing units to SLUs).

such housing, why, and for how long.  As discussed above, the evidence presented at the Omnibus Remedial Trial indicates that prisoners with or without mental illness are frequently confined in restrictive housing without good reason.  An absolute cap would provide an additional incentive to ADOC decision-makers to evaluate the need to keep any particular prisoner confined there.

ADOC's utilization rate for its restrictive housing cells has trended upwards from 80% in January 2021 to 87% in March 2022—a full 1,016 prisoners were in restrictive housing in March 2022.  *See* Exh. 1.  This trend demonstrates that ADOC overuses restrictive housing beds, regardless of whether they are necessary.

Comparing ADOC's restrictive housing population with its total prison population numbers further shows ADOC's overuse of RHUs.  In their Defendants' Exhibit 3979, Time-in-Cell 2019: A Snapshot of Restrictive Housing, referenced in the Omnibus Remedial Trial as the "Liman Report," Defendants asked this Court to consider their own self-reported numbers on restrictive housing.  This report as revised on September 4, 2020,[18] (for convenience, Plaintiffs continue to refer to the report as the "Liman Report") shows a self-reported 2019 total prisoner population of 20,673 and a restrictive housing population of 670, or 3.2% of the total.  Liman Report, at 9, Table 1.  With the March 2022 total prisoner population of 19,710, such

---

[18]https://law.yale.edu/sites/default/files/area/center/liman/document/time-in-cell_2019.pdf (last reviewed May 23, 2022).

a percentage would have yielded a restrictive housing number of 631. Instead, as indicated above, the actual number was 1,016. Defendants could have no plausible explanation for an increase in the percentage of prisoners in restrictive housing, particularly in light of this Court's orders to move mentally ill prisoners out of such housing expeditiously. Actually reducing the March 2022 restrictive housing population to the expected number of 631 would have constituted a reduction of over 37%, allowing a commensurate closure of restrictive housing space.[19] Even if ADOC reduced its restrictive housing number to the national average reported in the Liman Report, at 10, Table 1, of 3.8%, this would have allowed a reduction of over 26% from 1,016 to 749. These numbers alone suggest that ADOC can reasonably close a minimum of 25% of its restrictive housing.[20]

Imposing an absolute cap would curb ADOC's tendency to overuse restrictive housing and would force ADOC to remove from restrictive housing those prisoners

_____

[19] In fact, if ADOC imposed an absolute cap on restrictive housing, it could also close the amount of restrictive housing space currently unused, thus allowing an even greater reduction than the referenced 37%. This additional reduction is possible because, even though ADOC's usage of restrictive housing beds is excessive, they continue to have beds which are unoccupied, and hence not necessary for the operations of the Department.

[20] In fact, in The State's Witness and Exhibit List for the Final Phase 2A Evidentiary Hearing (Doc. 3225), Defendants indicated they might call John Wetzel, who was Secretary of Corrections in Pennsylvania until October 2021. Under Wetzel, Pennsylvania reduced its restrictive housing population to 2.0%, with 918 prisoners in restrictive housing (fewer than the 1,016 Alabama restrictive housing prisoners in March 2022) out of a total prison population of 45,174 (more than double Alabama's total prison population of 19,710 in March 2022). Liman Report, at 10, Table 1.

whom ADOC could house elsewhere.  An absolute cap of this kind would thus encourage ADOC to change its restrictive housing criteria, as proposed in Section III.A.3.a above.  After all, if an absolute cap is imposed that allows fewer prisoners in restrictive housing than are currently housed there, ADOC must necessarily select certain prisoners for transfer to alternative housing to meet the cap; once it meets the restrictive housing cap, ADOC can transfer another prisoner into restrictive housing only if it simultaneously transfers another prisoner out.  Under such circumstances, ADOC would have no choice but to heighten the criteria for transfer into restrictive housing and to lower the criteria for transfer out of restrictive housing.

### c.     Change in Allocation of Responsibility for Decision-Making

Currently, ADOC staff has exclusive responsibility for determining whether individual prisoners are transferred into or out of restrictive housing units.  As demonstrated by the evidence presented at the Omnibus Remedial Trial in 2021, ADOC staff has historically failed to take appropriate account of the length of time particular prisoners have remained in restrictive housing and the grounds for their confinement in such housing.  *See, e.g.*, May 27, 2021 R.D. Tran. 81:21-91:16; 102:20-103:18; July 1, 2021 R.D. Tran. 209:10-220:9.  Such failures suggest the need for other, more independent individuals or entities to assume responsibility for making decisions about prisoner transfer into or out of restrictive housing— individuals or entities who have no disincentives rooted in other aspects of their

work for ADOC. As Plaintiffs' expert, Eldon Vail, testified at the Omnibus Remedial Trial, custody staff in a prison facility often view confinement to restrictive housing in punitive terms, confining prisoners in an emotional response to violations those prisoners are viewed as having committed. May 27, 2021 R.D. Tran. 74:12-20. Such emotionally punitive motivations do not give rise to rational decision-making that will keep numbers in restrictive housing low. Independent decision-makers would have a greater ability to maintain the appropriate objectivity.[21]

One potential decision-maker is already in line to address ADOC's correctional practices as they relate to mental health care: independent monitors will soon begin working to ensure ADOC compliance with this Court's orders. These monitors will be reviewing ADOC restrictive housing units and examining the degree to which ADOC is employing effective criteria in transferring prisoners into or out of restrictive housing. These monitors will be well versed in the standards employed in other systems across the country for this purpose, including those

---

[21] As noted in the U.S. Department of Justice Report and Recommendations Concerning the Use of Restrictive Housing, January 2016, (the "DOJ Report"), available at https://www.justice.gov/archives/dag/file/815551/download (last reviewed on May 21, 2022), at 94, "[c]orrectional systems should always be able to articulate the specific reason[s] for an inmate's placement and retention in restrictive housing. The reason(s) should be supported by objective evidence. Inmates should remain in restrictive housing for no longer than necessary to address the specific reason(s) for placement."

promulgated by the American Correctional Association, and could help bring ADOC's standards in line with them.  For example, Rick Raemisch, the External Monitoring Team's Correctional Expert, was the Executive Director of the Colorado Department of Corrections and received numerous awards for his work in implementing reforms in the use of restrictive housing, including the International Corrections and Prisons Association Head of Service Award in 2018, the Tom Clements Award by the Correctional Leadership Association in 2017,  and the Sam Cochran Award by the National Alliance on Mental Illness in 2016.[22]  It would be a relatively small step for such a monitor to employ that knowledge of and familiarity with relevant standards and the grounds for those standards to assist in reviewing the requisite placement decisions or at a minimum to train and to oversee ADOC centralized authorities in reviewing such decisions.

ADOC could also employ an independent individual or entity contracted for the express purpose of making decisions concerning the transfer of prisoners into or out of restrictive housing.[23]  ADOC could contract with an individual or entity who, like the monitors referenced above, know and are familiar with relevant standards employed in other systems for this purpose.  By having such an independent

---

[22] *See, e.g.*, http://www.falconinc.com/leadership/rick-raemisch/ (last reviewed on May 22, 2022).

[23] As discussed above in connection with other aspects of these proposals, the independent monitors can oversee a review by the parties' experts in determining the precise role such independent individuals or entities might play in this regard.

decision-maker, focused entirely on the situations and factors affecting the decisions at issue and unaffected by competing motivations arising from other aspects of ADOC employment, ADOC could substantially increase the likelihood that any prisoner considered for transfer into restrictive housing will not ultimately be transferred there unless it is necessary and that prisoners already in restrictive housing will be transferred out as quickly as it is possible and appropriate to do so.

If ADOC staff continue to make the determinations concerning prisoner transfer into or out of restrictive housing, it is critical that ADOC require facility management to justify the placement or maintenance of a prisoner in such housing. For this purpose, a designated central office authority with RHU oversight responsibilities would need to conduct reviews with facility management on a weekly basis at a minimum to consider the validity of the justifications management offered for the restrictive housing placements. Such weekly review meetings should include multi-disciplinary participation to ensure that perspectives from each discipline carry weight in the analysis and determinations.[24]

---

[24] As explained in the DOJ Report, at 95, "[a]n inmate's initial and ongoing placement in restrictive housing should be regularly reviewed by a multi-disciplinary staff committee, which should include not only the leadership of the institution where the inmate is housed, but also medical and mental health professionals."

### d.    Change in Mechanisms for Review

ADOC need not limit itself to allocating decision-making responsibilities for prisoner transfer into or out of restrictive housing to someone other than those currently tasked with such decisions.  ADOC can also improve the mechanisms decision-makers use for such determinations.  As discussed in Section III.A.5 below, ADOC can modernize the antiquated classification system it currently uses in assigning prisoners to classification units.   Such modernization could greatly improve the ability to make and to implement effective decisions about alternative housing for prisoners currently in or considered for restrictive housing.   ADOC could also ensure that length of time a prisoner spent in restrictive housing is clearly reflected in his record, rather than having time-based review mechanisms restarted every time a prisoner leaves restrictive housing or when a prisoner finishes a stint in restrictive housing and starts a new one for ostensibly separate grounds.   As evidenced in the Omnibus Remedial Trial, such issues have posed difficulties for ADOC in the past and have led to the confinement of prisoners in restrictive housing for longer than necessary or appropriate, apparently without a review of the actual total length of time prisoners spent in restrictive housing.  *See, e.g.*, May 27, 2021 R.D. Tran. 81:21-91:16, 102:20-103:18; July 1, 2021 R.D. Tran. 209:10-220:9.

### e.   Absolute Cap on Length of Time in RHUs

ADOC could also place an absolute cap on the length of time that any prisoner can spend in restrictive housing, including in multiple stints predicated on ostensibly separate grounds. Colorado has, for example, imposed a fifteen-day maximum on such segregation, as explained by Rick Raemisch in "Why We Ended Long-Term Solitary Confinement in Colorado," a contemporaneous discussion of Colorado's reforms in this area.[25] With an absolute cap on such length of time for any individual prisoner, ADOC would have to come up with alternative housing options for prisoners who would otherwise exceed the maximum length of time in restrictive housing. Thus, ADOC would not only reduce the number of prisoners in restrictive housing by removing those prisoners who would exceed the time limits, it would also expand its range of housing options generally, which could lead to the use of such options for other prisoners, even if they have not reached the restrictive housing time limit.

ADOC could also incrementally intensify its criteria for entry into restrictive housing and incrementally relax its criteria for exit out of restrictive housing as it approaches or exceeds certain population thresholds. In other words, if population in restrictive housing exceeds a particular prescribed limit, ADOC would heighten

---

[25]Available at https://www.nytimes.com/2017/10/12/opinion/solitary-confinement-colorado-prison.html (last reviewed May 24, 2022).

its criteria for any further transfers into restrictive housing and would lower its criteria for any transfers out of restrictive housing until the population in that housing returned below the limit at issue.  ADOC might put several such thresholds in place, such that at the highest population levels ADOC could transfer a prisoner into restrictive housing or keep the longest tenured prisoners in restrictive housing only if no other options could be found.

### f.    Programs Facilitating Prisoner Transfer out of RHUs

To the extent that those tasked with relevant decision-making do not deem particular prisoners in restrictive housing units suitable candidates for immediate transfer to general population or to a less restrictive environment, whether because of perceived security risks or for some other reason, programs could be designed  to promote incremental progression towards such environments.  For example, as Plaintiff's expert Eldon Vail testified in the Omnibus Remedial Trial, multiple jurisdictions operate step-down programs, in which prisoners can move gradually and with careful monitoring from restrictive housing into double-celled environments and then into general population.  May 27, 2021 R.D. Tran. 143:8-145:18.[26]     Because such arrangements require highly sophisticated prison

---

[26] The DOJ Report, at 95, recommends that "[f]or every inmate in restrictive housing, correctional staff should develop a clear plan for returning the inmate to less restrictive conditions as promptly as possible."  Thus, as with the New York CAR Program described later, ADOC should begin focusing on mechanisms for

management (*id.*, at 146:7-19), ADOC could only operate such programs if it brought in personnel trained to implement and to monitor them effectively.  Thus, ADOC would have to combine this proposal with the proposal detailed in Section III.A.3.c above.

New York has developed such programs as part of its Correctional Alternative Rehabilitation Program, described in its 2017 CAR Program Manual, attached as Exhibit 2.  As described in the CAR Program Manual, at 5, "[t]he CAR Program provides evaluation, interventions and supportive rehabilitation services for any [applicable] inmate meeting admission criteria.  The program's goal is to assist inmates with developing skills and providing supports that will facilitate, upon completion of [Special Housing Unit] sanctions, integration into the general prison population or a special program."  Rather than waiting an indefinite period to determine the status of prisoners housed in restrictive housing, New York implements "[t]he discharge planning process in the CAR program . . . immediately upon admission."  CAR Program Manual, at 6.

## 4.    Use of Alternative Staffing Sources

ADOC can use alternative staffing sources to address the problems in its restrictive housing environments.  Of course, using alternative sources can pose its

---

discharge from restrictive housing the moment a prisoner enters restrictive housing in the first place.

own difficulties.  As this Court has noted, "ADOC's shortage of staff has reduced it and its mental-health vendor to a constant state of 'robbing-Peter-to-pay-Paul' borrowing; to implement relief in one area, it must divert staff from another, all with the goal of triaging—that is, maximizing the number of surviving inmates."  ORO II:173.  However, because restrictive housing is a prisoner environment in which staffing shortages have had particularly fatal consequences (*see, e.g.*, May 24, 2021 R.D. Tran. 10:4-11:5), ADOC should draw on available staffing sources to ensure the safety of prisoners housed there.

As this Court itself suggested, one possible measure might involve "hiring temporary observers to monitor inmates in restrictive housing until ADOC hires a sufficient level of correctional staff."  ORO III:22.  Even if such observers limited themselves only to monitoring prisoners in restrictive housing and did not intervene in any events occurring there, such monitoring can save lives.  The evidence shows that some prisoners lost their lives in restrictive housing at least in part because they were left completely unmonitored for extended periods of time.  *See, e.g.*, June 2, 2021 Final Tran. 123:25-124:15; 128:2-129:3; 131:2-24.  While such monitoring cannot always save lives when effective intervention is unavailable (*see, e.g.*, May 24, 2021 R.D. Tran 53:1-54:13 (discussing the death of Jamal Jackson by hanging because of the delay of correctional officers in reaching him); May 25, 2021 R.D. Tran. 8:14-17 (same); June 2, 2021 Final Tran. 116:2-117:19 (same); May 25, 2021

R.D. Tran. 10:22-11:18 (comparing Jamal Jackson's death to prior suicide of prisoner by hanging because correctional staff took eleven minutes to cut him down due to security issues)), an effective monitoring presence in restrictive housing can help improve conditions until ADOC reaches appropriate staffing levels. After all, the training requirements for contract staff hired for monitoring only would be much less than those for a correctional officer. However, as discussed above, such contract staff monitoring will offer no added safety, if correctional staff are not quickly available to open cells and to intervene.

### 5.    Modernization of Antiquated Classification Systems

ADOC could also convert and modernize its antiquated classification systems. ADOC currently employs classification systems that are extremely slow and unwieldy. For example, to make a determination regarding the appropriate transfer of a prisoner out of restrictive housing, ADOC staff must evaluate whether that prisoner has any "enemies" in the housing unit under consideration as a potential destination for that prisoner. *See, e.g.*, June 29, 2021 R.D. Tran. 91:1-10. Thus, if the classification system that reflects which prisoners are enemies to one another is antiquated and unwieldy, it becomes an arduous task for staff members to make the requisite determinations. As a result, it takes a great deal of time for these determinations to be made, so prisoners remain in restrictive housing longer than they should. In fact, with staffing resources stretched well beyond their limits, the

least burdensome path for a staff member tasked with such decisions is often simply to do nothing at all and to keep the prisoners at issue housed in restrictive housing units. *See, e.g.*, May 27, 2021 R.D. Tran. 86:22-89:15 (discussing ADOC's placement of prisoners in restrictive housing simply because they were victims of sexual assault). Quite apart from the damaging effects this approach has on the prisoners whose stay is directly prolonged in this fashion, it also increases the total population of prisoners housed in restrictive housing by delaying or entirely blocking the transfer of prisoners out of such housing. By artificially keeping the population levels high in restrictive housing, ADOC's current approach makes it more difficult for it to ensure any of the prisoners there have constitutionally adequate conditions of confinement. While modernizing the classification systems will not lead to constitutionally adequate conditions of confinement without the requisite staffing levels, it can help to improve conditions until such staffing levels are reached.

### 6. Creation and Increased Use of Protective Custody Units

As of the time of the Omnibus Remedial Trial, ADOC continued to confine a significant number of prisoners in restrictive housing who posed no threat to other prisoners, simply because they were deemed vulnerable to such threats from others. *See, e.g.*, May 27, 2021 R.D. Tran. 86:22-88:25. Protective custody units are well suited to house prisoners who may not have committed any disciplinary violation,

28

but who are at significant risk of harm—such as, for example, rape—at the hands of other prisoners. *See, e.g.*, May 27, 2021 R.D. 106:7-24. Georgia, for example, has protective custody units for this purpose. *Id*. ADOC itself has cells devoted to "Protective Restrictive Housing" in its Limestone facility. *See* Savages' Report, at 85.

Protective custody units are not restrictive in the same manner as restrictive housing units, at least if they are designed and operated in accordance with the standards of the American Correctional Association. May 27, 2021 R.D. Tran. 105:18-21. Operated properly, protective custody units should operate similarly to general population units, except that services are provided at the unit—individuals do not leave the unit to seek services elsewhere. *Id.*, 105:22-106:6. The development and use of protective custody units, if done properly, should ultimately provide prisoners housed there substantially better conditions than they would experience in restrictive housing, including more out-of-cell time and less extreme isolation. *See, e.g.*, May 25, 2021 R.D. Tran. 67:20-69:13 (explaining the importance of access to protective custody, particularly for prisoners with serious mental illness).

### 7.    Change in Security Policies

ADOC could temporarily change some security policies in an effort to make more efficient use of available staff. For example, ADOC currently requires two

29

correctional officers to escort a prisoner in restrictive housing to make use of out-of-cell time.  May 27, 2021 R.D. Tran. 109:23-110:10.  The use of two correctional officers for this purpose has been long-standing practice in segregation units around the country, although some have suggested it may not be necessary.  *Id*.  If ADOC could use one correctional officer for this purpose, it would free staff for other purposes, such as ensuring that other prisoners receive their out-of-cell time.  While such a temporary policy change might carry security risks with it, ADOC could consult with the independent monitors as to appropriate circumstances in which the benefits would outweigh such potential risks.

ADOC could also use Wexford personnel to help transport prisoners to medical or counseling appointments.  This could free some correctional officers to perform other functions.  Again, while such a temporary change could carry some risk, ADOC could consult with monitors to assess circumstances in which such a re-allocation of personnel might prove appropriate.

### 8.      Re-Alignment of Administrative Priorities

ADOC might also realign its administrative priorities and assign certain functions entirely to another entity or group of individuals, thus conserving its own correctional officers for their most critical roles.  ADOC could, for example, assign security checks in restrictive housing entirely to Wexford or other individuals or entities with whom ADOC could enter into a contract for this purpose.  As discussed

in Section III.A.4 above, if Wexford personnel or individuals other than correctional officers perform security checks, they would still have to reach out to correctional officers in the event of an emergency situation with potentially fatal consequences. In this context, therefore, ADOC would need to ensure the presence of trained rapid response teams designated as emergency responders with a response time of four minutes or less when Wexford or other individuals had an emergency situation and summoned assistance.

**B.      Avoidance of Transfer to Units Functionally Identical to RHUs**

To avoid transferring prisoners to units functionally identical to restrictive housing units, ADOC must first identify any such units and either change the conditions under which they operate such that they are no longer functionally identical to restrictive housing units or categorize them as restrictive housing units so that ADOC can apply the other temporary remedial measures discussed above. The independent monitors can assist with both these functions.

**C.      Mechanisms to Promote the Safety of Those Requiring Protective Custody and the Security of General Population if RHU Numbers Are Reduced**

As discussed in Section III.A.6 above, ADOC does not appear to have sufficient functional protective custody units.  Thus, to promote the safety of prisoners currently housed in restrictive housing units who require protective custody, ADOC should design and create an adequate number of protective custody

31

units. Appropriate candidates for protective custody units are prisoners who do not also pose a security threat to other prisoners. Consequently, the best way to promote the safety of those requiring protective custody under current circumstances is to provide housing units designed for that purpose and operated as protective custody units, rather than having such prisoners forced unjustifiably into restrictive housing.

With respect to the issue of promoting the security of prisoners in general population if ADOC reduces the numbers of prisoners housed in its restrictive housing units, Plaintiffs note as an initial matter that (1) as discussed above, not all prisoners currently housed in restrictive housing units pose any threat to other prisoners, meaning that reducing the population in restrictive housing would not necessarily entail any danger to others, (*see, e.g.*, May 27, 2021 R.D. Tran. 86:22-88:25); and (2) even those prisoners who might pose a threat to some other prisoners do not necessarily pose a threat to all other prisoners, so modernizing the classification systems to separate "enemies" effectively (more fully discussed in Section III.A.5 above) would allow ADOC to reduce its restrictive housing population without endangering other prisoners. Furthermore, as explained at the Omnibus Remedial Trial, ADOC can enforce security in general population with measures other than segregation in restrictive housing. *See, e.g.*, June 29, 2021 R.D. Tran. 180:19-25.

**D.      Potential Modifications if ADOC Meets Staffing Benchmarks**

If ADOC meets staffing benchmarks and thus gradually moves closer to an adequate level of staffing,[27] most of the remedial measures outlined above should remain in place.  Other jurisdictions have employed these measures to positive effect without compromising security, and many of these measures are entrenched in nationwide standards, including the standards of the American Correctional Association.  In particular, even as ADOC reaches relevant staffing benchmarks, it should still employ heightened criteria in evaluating which prisoners should move into restrictive housing; maintain constantly updated information concerning the prisoners confined to restrictive housing; have decisions regarding restrictive housing reviewed by an individual or entity capable of objective assessment; employ sophisticated review mechanisms in this context; cap the length of time any individual prisoner remains in restrictive housing; continue modernizing its classification systems; and continue improving its capacity to provide protective custody arrangements to those who require them.  The need for these measures will not fall away when the staffing situation improves.  On the other hand, as it reaches appropriate staffing benchmarks, ADOC should be able gradually to reduce any need

---

[27] Plaintiffs continue to maintain that this Court should order ADOC to meet staffing benchmarks instead of leaving those benchmarks merely aspirational.  Doing so would mean that this Court could use appropriate remedial devices if ADOC fails to meet those benchmarks, as it has done throughout the history of this litigation.

33

to draw on alternative staffing sources or to adjust its security policies with respect, for example, to the management of security checks or the accompaniment of prisoners to out-of-cell time.

Dated: June 1, 2022                          Respectfully Submitted,
                                             */s/ Ashley N. Austin*
                                             Ashley N. Austin
                                             One of the Attorneys for Plaintiffs

Ashley N. Austin
Lisa W. Borden
Susanne Cordner*
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
ashley.austin@splcenter.org
lisa.borden@splcenter.org
susanne.cordner@splcenter.org
*Admitted pro hac vice*

Leslie Faith Jones*
**SOUTHERN POVERTY LAW CENTER**
111 East Capitol Street, Suite 280
Jackson, MS 39201
Telephone: (601) 948-8882
Facsimile: (334) 956-8281
leslie.jones@splcenter.org
*Admitted pro hac vice*

Bruce Hamilton*
**SOUTHERN POVERTY LAW CENTER**
201 St. Charles Avenue
Suite 2000
New Orleans, LA 70170

Telephone: (504) 352-4398
Facsimile: (504) 809-7899
*Admitted pro hac vice*

William G. Somerville, III
Patricia Clotfelter
**BAKER,   DONELSON,   BEARMAN,
CALDWELL & BERKOWITZ  PC**
420 20th Street North, Suite 1400
Birmingham, AL 35203
wsomerville@bakerdonelson.com
pclotfelter@bakerdonelson.com

William Van Der Pol, Jr.
Lonnie Williams
Barbara A. Lawrence
Andrea J. Mixson
**ALABAMA DISABILITIES
ADVOCACY PROGRAM**
University of Alabama
500 Martha Parham West
Box 870395
Tuscaloosa, AL  35487
Telephone: (205) 348-4928
Facsimile: (205) 348-3909
wvanderpoljr@adap.ua.edu
lwilliams@adap.ua.edu
blawrence@adap.ua.edu
amixson@adap.ua.edu

Catherine E. Stetson*
Neal K. Katyal*
Jo-Ann T. Sagar*
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
cate.stetson@hoganlovells.com
neal.katyal@hoganlovells.com
jo-ann.sagar@hoganlovells.com

*Admitted pro hac vice*

Mark Whitburn*
**WHITBURN & PEVSNER, PLLC**
2000 East Lamar Boulevard, Suite #600
Arlington, TX  76006
Telephone: (817) 672-5453
Facsimile: (817) 653-4477
mwhitburn@whitburnpevsner.com
*Admitted pro hac vice*

Joshua C. Toll*
**KING & SPALDING LLP**
1700 Pennsylvania Avenue NW, 2nd Floor
Washington, DC 20006-4707
Telephone: (202) 227-6138
Fascimile: (202) 626-3737
jtoll@kslaw.com
*Admitted pro hac vice*

Evan Diamond*
**KING & SPALDING LLP**
185 Avenue of the Americas, 34th Floor
New York, NY 10036
Telephone: (212) 556-2297
Fascimile: (212) 556-2222
ediamond@kslaw.com
*Admitted pro hac vice*

Edward A. Bedard*
**KING & SPALDING LLP**
1180 Peachtree Street NE, Suite 1600
Atlanta, GA 30309
Telephone: (404) 572-3127
Fascimile: (404) 572-5100
ebedard@kslaw.com
*Admitted pro hac vice*

Rachel Rubens*
**KING & SPALDING LLP**
50 California Street, Suite 3300

San Francisco, CA 94111
Telephone: (415) 318-1210
rrubens@kslaw.com
*Admitted pro hac vice*

**ATTORNEYS FOR THE PLAINTIFFS**

/s/ Anil A. Mujumdar
_____
Anil A. Mujumdar
Attorney for Plaintiff
Alabama Disabilities Advocacy Program

Anil A. Mujumdar
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, AL 35213
Telephone: (205) 590-6986
Facsimile: (205) 809-7899
anil@dagneylaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this 1st day of June, 2022 electronically filed the foregoing with the clerk of court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Anne A. Hill
Deputy Attorney General
State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36104
Anne.Hill@AlabamaAG.gov

William R. Lunsford, Esq.
Matthew Reeves, Esq.
Stephen C. Rogers, Esq.
Kenneth S. Steely, Esq.
La Keisha W. Butler, Esq.
Maynard, Cooper & Gale, P.C.
655 Gallatin Street, SW
Huntsville, AL 35801
blunsford@maynardcooper.com
mreeves@maynardcooper.com
srogers@maynardcooper.com
ksteely@maynardcooper.com
lbutler@maynardcooper.com

Stephanie L. Smithee, Esq.
Alabama Department of Corrections
Legal Division
301 South Ripley Street
Montgomery, AL 36104
stephanie.smithee@doc.alabama.gov

Luther M. Dorr, Jr., Esq.
Maynard, Cooper & Gale, P.C.
1901 6th Avenue North, Suite 2400
Birmingham, AL 35203
rdorr@maynardcooper.com

Philip Piggott, Esq.
Webster Henry
Two Perimeter Park South
Suite 445 East
Birmingham, AL 35243
ppiggott@websterhenry.com

Deana Johnson, Esq.
Brett T. Lane, Esq.
MHM Services, Inc.
1447 Peachtree Street, N.E., Suite 500
Atlanta, GA 30309
djohnson@mhm-services.com
btlane@mhm-services.com

  /s/ *Ashley N. Austin*
One of the Attorneys for Plaintiffs