This Preliminary Official Statement and the information herein is subject to change, completion, and amendment without notice. A definitive Official Statement will be made available prior to the delivery of these securities. See "INTRODUCTION— Charges to the Preliminary Official Statement". Under no circumstances shall this Preliminary Official Statement constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of these securities in any jurisdiction in which such offer, solicitation, or sale would be unlawful prior to registration or qualification under the securities laws of such jurisdiction.

**PRELIMINARY OFFICIAL STATEMENT DATED JUNE 21, 2022**

NEW ISSUE – BOOK-ENTRY ONLY

RATINGS:
**Fitch AA**
**Moody's Aa2**
**S&P AA-**
(See "RATINGS" herein)

*In the opinion of Bond Counsel, under existing law, interest on the Series 2022A Bonds (i) will be excludable from gross income for federal income tax purposes if each of the Alabama Corrections Institution Finance Authority and the State of Alabama, acting by and through the Alabama Department of Corrections, complies with all requirements of the Internal Revenue Code that must be satisfied subsequent to the issuance of the Series 2022A Bonds in order that interest thereon be and remain excludable from gross income, and (ii) will not be an item of tax preference for purposes of the federal alternative minimum tax. Bond Counsel is also of the opinion that, under existing law, interest on the Series 2022A Bonds will be exempt from State of Alabama income taxation. See "TAX MATTERS" herein for further information and certain other tax consequences arising with respect to the Series 2022A Bonds.*

**$725,000,000\***
# ALABAMA CORRECTIONS INSTITUTION FINANCE AUTHORITY
### Revenue Bonds, Series 2022A

**Dated: Date of delivery**

**Due: As shown on the inside cover page**

The Series 2022A Bonds are issuable as fully registered bonds and, when issued, will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York, as described more particularly herein. Interest will be payable on the Series 2022A Bonds each January 1 and July 1, beginning January 1, 2023.

**The Series 2022A Bonds are special, limited obligations of the Issuer, payable solely from, and secured by a pledge of, the revenues and receipts derived by the Issuer from the leasing of certain facilities described herein. Such facilities will be leased to the State of Alabama, acting by and through the Alabama Department of Corrections, pursuant to a lease agreement. Under the lease agreement, and as further described herein, the sole source of funds for lease payments will be amounts appropriated by the Alabama Legislature to the Alabama Department of Corrections. The lease agreement may be terminated at the end of any fiscal year of the State of Alabama if the Alabama Legislature fails to appropriate funds to make the rental payments set forth therein. The Series 2022A Bonds will not constitute an indebtedness of the State of Alabama or political subdivisions or instrumentalities thereof, or give rise to a pecuniary liability or charge against the general credit or taxing powers of the State of Alabama or political subdivisions or instrumentalities thereof. See "SECURITY AND SOURCE OF PAYMENT".**

The Series 2022A Bonds will be subject to redemption prior to their respective maturities as described herein.

**For a description of certain risk factors and other considerations involved in an investment in the Series 2022A Bonds, see "RISK FACTORS" and "DISCLAIMERS AND OTHER MISCELLANEOUS MATTERS".**

———————————

**FOR MATURITIES, AMOUNTS, RATES, PRICES, YIELDS, AND CUSIP NUMBERS, SEE INSIDE COVER.**

———————————

The Series 2022A Bonds are offered when, as and if issued, subject to approval of validity by Bond Counsel, Maynard, Cooper & Gale, P.C., Birmingham, Alabama. For a description of certain other legal matters that will be passed on by counsel in connection with the issuance of the Series 2022A Bonds, see "LEGAL MATTERS". It is expected that the Series 2022A Bonds in definitive form will be available for delivery through the facilities of The Depository Trust Company in New York, New York on or about _____.

This cover page contains certain information for quick reference only. It is not a summary of this issue. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision.

# Stephens Inc.

# Frazer Lanier

**Raymond James**

**Wells Fargo Securities**

**Blaylock Van Llc**  **San Blas Securities, Llc**  **Securities Capital Corporation**  **Thornton Farish**

The date of this Official Statement is.

———————————
\* Preliminary; subject to change.

**$725,000,000**[*]
**Alabama Corrections Institution Finance Authority**
**Revenue Bonds, Series 2022A**

_____

**MATURITIES, AMOUNTS, RATES, PRICES, YIELDS, AND CUSIP NUMBERS**

| Maturity | Principal Amount | Interest Rate | Price | Yield[**] | CUSIP[***] | Maturity | Principal Amount | Interest Rate | Price | Yield[**] | CUSIP[***] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/01/2022[****] | $29,795,000 | | | | | 07/01/2039 | $22,995,000 | | | | |
| 07/01/2023 | 28,610,000 | | | | | 07/01/2040 | 24,140,000 | | | | |
| 07/01/2026 | 12,195,000 | | | | | 07/01/2041 | 25,350,000 | | | | |
| 07/01/2027 | 12,805,000 | | | | | 07/01/2042 | 26,615,000 | | | | |
| 07/01/2028 | 13,445,000 | | | | | 07/01/2043 | 27,945,000 | | | | |
| 07/01/2029 | 14,115,000 | | | | | 07/01/2044 | 29,345,000 | | | | |
| 07/01/2030 | 14,820,000 | | | | | 07/01/2045 | 30,810,000 | | | | |
| 07/01/2031 | 15,560,000 | | | | | 07/01/2046 | 32,350,000 | | | | |
| 07/01/2032 | 16,340,000 | | | | | 07/01/2047 | 33,970,000 | | | | |
| 07/01/2033 | 17,160,000 | | | | | 07/01/2048 | 35,670,000 | | | | |
| 07/01/2034 | 18,015,000 | | | | | 07/01/2049 | 37,450,000 | | | | |
| 07/01/2035 | 18,915,000 | | | | | 07/01/2050 | 39,325,000 | | | | |
| 07/01/2036 | 19,860,000 | | | | | 07/01/2051 | 41,290,000 | | | | |
| 07/01/2037 | 20,855,000 | | | | | 07/01/2052 | 43,355,000 | | | | |
| 07/01/2038 | 21,900,000 | | | | | | | | | | |

$_____ ___% Term Bonds maturing on July 1, 20__ (Price: _____/Yield: _____), CUSIP No._____

$_____ ___% Term Bonds maturing on July 1, 20__ (Price: _____/Yield: _____), CUSIP No._____

_____

---

[*] Preliminary; subject to change.

[**] The yield on these Series 2022A Bonds was computed to the _____ ___, 20___ optional redemption date.

[***] CUSIP® is a registered trademark of the American Bankers Association. CUSIP Global Services (CGS), is managed on behalf of the American Bankers Association by S&P Capital IQ. Copyright© 2018 CUSIP Global Services. All rights reserved. CUSIP® data herein is provided by CUSIP Global Services. This data is not intended to create a database and does not serve in any way as a substitute for the CGS database. CUSIP® numbers are provided for convenience of reference only. The Issuer and the Underwriter are not responsible for the selection, uses, or correctness (as listed above) of, or subsequent changes to, CUSIP numbers assigned to the Series 2022A Bonds.

[****] The 2022 maturity is on September 1, 2022; interest will be paid at maturity.

**ALABAMA CORRECTIONS INSTITUTION FINANCE AUTHORITY**

Kay E. Ivey, Member & President, Governor
John Hamm, Member & Vice President, Commissioner of the Alabama Department of Corrections
Bill Poole, Secretary & Member, State Director of Finance
Representative Steve Clouse, Member, Chair of the House Ways and Means General Fund Committee
Senator Greg Albritton, Member, Chair of the Senate Finance and Taxation General Fund Committee
Senator Bobby Singleton, Member, Joint Appointee House Minority Leader and Senate Minority Leader
Cam Ward, Member, Director of Bureau of Pardons and Paroles
Young Boozer, Non-Member Treasurer, Treasurer of the State of Alabama

**FINANCIAL ADVISOR**

PFM Financial Advisors LLC
Huntsville, Alabama

**BOND COUNSEL AND DISCLOSURE COUNSEL**

Maynard, Cooper & Gale, P.C.
Birmingham, Alabama

**UNDERWRITERS' COUNSEL**

Bradley Arant Boult Cummings LLP
Birmingham, Alabama


[THIS PAGE INTENTIONALLY LEFT BLANK.]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................................1
   General...........................................................................................................................................1
   Relationship Between the State of Alabama and the Alabama Department of Corrections........................2
   Changes to the Preliminary Official Statement ...............................................................................2

GLOSSARY OF TERMS USED IN OFFICIAL STATEMENT ...............................................................2

DESCRIPTION OF THE SERIES 2022A BONDS ...............................................................................3
   General Provisions .........................................................................................................................3
   Method and Place of Payment........................................................................................................4
   Redemption Prior to Maturity .......................................................................................................4
   Registration and Exchange.............................................................................................................5
   Right of ADOC to Exercise Rights and Options with Respect to Terms of the Series 2022A Bonds........6
   Provision for Payment ...................................................................................................................6
   Delegation of Certain Duties by Treasurer of the State of Alabama .................................................6
   Certain Other Provisions of the Indenture ......................................................................................6
   Book-Entry Only System ...............................................................................................................6
   Rights of Underwriters to Consent to Indenture Amendments .........................................................6
   Authority for Issuance...................................................................................................................6

SECURITY AND SOURCE OF PAYMENT ........................................................................................7
   General..........................................................................................................................................7
   Non-Foreclosable Mortgage Lien on the Bond-Financed Facilities...................................................7
   Issuance of Additional Bonds .........................................................................................................7
   No Reserve Fund for Series 2022A Bonds ......................................................................................7
   No State of Alabama Indebtedness..................................................................................................8
   Non-Substitution ...........................................................................................................................8
   Remedies.......................................................................................................................................8
   The United States Bankruptcy Code ...............................................................................................8

THE STATE OF ALABAMA APPROPRIATIONS PROCESS ...............................................................9
   Background....................................................................................................................................9
   Appropriations  Process .................................................................................................................9
   Balanced Budget Requirement......................................................................................................10
   Summary of Legislative Process ...................................................................................................10
   Alabama Legislature's Appropriations Process and the Lease Agreement .......................................11

THE PLAN OF FINANCING............................................................................................................11

SOURCES AND USES OF FUNDS ..................................................................................................12

DEBT SERVICE REQUIREMENTS .................................................................................................13

ALABAMA CORRECTIONS INSTITUTION FINANCE AUTHORITY ..............................................14

ALABAMA DEPARTMENT OF CORRECTIONS .............................................................................14
   Information on the State of Alabama .............................................................................................14
   General Overview of ADOC..........................................................................................................14
   ADOC Inmate Population .............................................................................................................17
   Strategic Plan .............................................................................................................................18
   Litigation and Proposed New Corrections Facilities ......................................................................18
   ADOC Historical Revenues and Expenditures...............................................................................20

ADOC Appropriations for Fiscal Years Ended September 30, 2022 and 2023 ....................................20

LITIGATION RELATING TO THE SERIES 2022A BONDS ..................................................................20

RISK FACTORS ......................................................................................................................................21
    General....................................................................................................................................................21
    Limited Obligations ...............................................................................................................................21
    Cancellation Right of ADOC .................................................................................................................21
    Appropriation Risk.................................................................................................................................21
    Sovereign Immunity...............................................................................................................................22
    Cybersecurity .........................................................................................................................................22
    Political, Litigation, and Community Risks ...........................................................................................22
    COVID-19 and Other Public Health Epidemics or Outbreaks ..............................................................23
    Materials, Labor, Supply Chain, and Related Risks to Completion of the Bond-Financed Facilities.....................23
    Use of ARPA Funds for the Bond-Financed Facilities..........................................................................23
    The United States Bankruptcy Code ......................................................................................................23
    Tax-Exempt Status of Series 2022A Bonds ..........................................................................................24

LEGAL MATTERS ..................................................................................................................................24

LEGAL INVESTMENTS AND SECURITY FOR DEPOSIT ..............................................................25

TAX MATTERS........................................................................................................................................25
    General....................................................................................................................................................25
    Original Issue Discount..........................................................................................................................25
    Premium..................................................................................................................................................26
    Collateral Tax Consequences .................................................................................................................26

UNDERWRITING.....................................................................................................................................26

CONTINUING DISCLOSURE ................................................................................................................27
    General....................................................................................................................................................27
    Compliance with Prior Undertakings .....................................................................................................28

RATINGS ..................................................................................................................................................29

FINANCIAL ADVISOR ...........................................................................................................................29

DISCLAIMERS AND OTHER MISCELLANEOUS MATTERS .........................................................29

ADDITIONAL  INFORMATION ............................................................................................................31


Appendix A - Certain Information Regarding the State of Alabama
Appendix B - Book-Entry Only System
Appendix C - Proposed Opinion of Bond Counsel
Appendix D - Form of the Indenture and the Lease Agreement

<div align="center">

**OFFICIAL STATEMENT**

**Regarding**
**$725,000,000**[*]
**Revenue Bonds, Series 2022A**
**of the**
**Alabama Corrections Institution Finance Authority**

**INTRODUCTION**

</div>

**General**

    This Official Statement is furnished in connection with the issuance of the Series 2022A Bonds referred to above (the "Series 2022A Bonds") by the Alabama Corrections Institution Finance Authority (the "Issuer").

    The Issuer is a public corporation organized under the laws of the State of Alabama. The Series 2022A Bonds will be issued pursuant to a Trust Indenture, dated the date of issuance of the Series 2022A Bonds (the "Indenture"), between the Issuer and Regions Bank (the "Trustee"). Certain provisions of the Indenture are described herein under "DESCRIPTION OF THE SERIES 2022A BONDS" and "SECURITY AND SOURCE OF PAYMENT". For a description of certain other provisions of the Indenture, see "Appendix D – Form of the Indenture and the Lease Agreement".

    The Series 2022A Bonds are special, limited obligations of the Issuer, payable solely from, and secured by a pledge of, the revenues and receipts derived by the Issuer from the leasing of facilities described herein; such facilities will be leased to the State of Alabama, acting by and through the Alabama Department of Corrections, ("ADOC"), pursuant to a Lease Agreement, dated the date of issuance of the Series 2022A Bonds (the "Lease Agreement"). The Lease Agreement may be terminated at the end of any fiscal year of the State of Alabama if the Alabama Legislature fails to appropriate funds to make the rental payments set forth therein. The Series 2022A Bonds will not constitute indebtedness of the State of Alabama or political subdivisions or instrumentalities thereof, or give rise to a pecuniary liability or charge against the general credit or taxing powers of the State of Alabama or political subdivisions or instrumentalities thereof. Moreover, no appropriations from the Alabama Legislature, other than appropriations to ADOC, will be used or otherwise available for payments under the Lease Agreement. See "SECURITY AND SOURCE OF PAYMENT".

    Pursuant to the Indenture, the Issuer will assign and pledge to the Trustee all the Issuer's rights under the Lease Agreement to secure the payment of debt service on the Series 2022A Bonds. See "SECURITY AND SOURCE OF PAYMENT".

    For information regarding the tax treatment of the Series 2022A Bonds, see "TAX MATTERS".

    The Series 2022A Bonds are being issued for the purpose of (i) financing various capital improvements of the Issuer to be leased to ADOC, (ii) financing capitalized interest, and (iii) paying the costs of issuing the Series 2022A Bonds. See "THE PLAN OF FINANCING".

    The Series 2022A Bonds are subject to redemption at the times and under the circumstances set forth herein. See "DESCRIPTION OF THE SERIES 2022A BONDS - Redemption Prior to Maturity". The Series 2022A Bonds are being offered in the denomination of $5,000 or any multiple thereof and may be transferred and exchanged subject to certain terms and conditions set forth herein. See "DESCRIPTION OF THE SERIES 2022A BONDS".

---

[*] Preliminary; subject to change.

**For a description of certain risk factors and other considerations involved in an investment in the Series 2022A Bonds, see "RISK FACTORS" and "DISCLAIMERS AND OTHER MISCELLANEOUS MATTERS".**

ADOC has covenanted to undertake certain continuing disclosure pursuant to Rule 15c2-12 of the Securities and Exchange Commission. See "CONTINUING DISCLOSURE".

This Official Statement speaks only as of its date, and the information contained herein is subject to change. This introduction contains certain information for quick reference only. It is <u>not</u> a summary of this issue. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision.

### Relationship Between the State of Alabama and the Alabama Department of Corrections

The State (that is, the State of Alabama) was admitted as the twenty-second state of the United States of America on December 14, 1819. Under the Constitution of Alabama of 1901, as amended, the powers of the government of the State of Alabama are legislative, executive, and judicial. The Constitution of Alabama of 1901, as amended, and the Code of Alabama (1975) organize the executive powers of the State of Alabama into various administrative departments and agencies, with the supreme executive power of the State vested in the Governor of the State of Alabama. ADOC (that is, the Alabama Department of Corrections) is the administrative department responsible for administering and exercising the direct and effective control over penal and corrections institutions throughout the State of Alabama. When used in this Official Statement, the terms "State" and "State of Alabama" mean the government of the State of Alabama in its entirety, and the terms "ADOC" and "Alabama Department of Corrections" mean only that portion of the government of the State of Alabama that administers control over penal and corrections institutions throughout the State of Alabama, as described more particularly under "THE STATE OF ALABAMA APPROPRIATIONS PROCESS" and "ALABAMA DEPARTMENT OF CORRECTIONS".

### Changes to the Preliminary Official Statement

This Preliminary Official Statement and the information herein are subject to change, completion, and amendment. A final, definitive Official Statement will be made available prior to the delivery of the Series 2022A Bonds.

For purposes of this Preliminary Official Statement, selling compensation, delivery dates, and certain other information dependent on pricing of the Series 2022A Bonds have been omitted. Further, for purposes of this Preliminary Official Statement, offering prices, interest rates, aggregate principal amount, principal amount per maturity, and certain other information dependent on pricing of the Series 2022A Bonds have been estimated. Actual information dependent on pricing will be established after pricing of the Series 2022A Bonds and will be reflected in the final Official Statement. Such actual information will vary from the estimates.

Investors should check under the heading "INTRODUCTION–Changes to the Preliminary Official Statement" in the final Official Statement for guidance regarding information dependent on pricing of the Series 2022A Bonds and for guidance regarding other information that is changed between the date of this Preliminary Official Statement and the date of the final Official Statement.

## GLOSSARY OF TERMS USED IN OFFICIAL STATEMENT

Certain capitalized terms used frequently in this Official Statement are defined in this section of the Official Statement. In addition, certain capitalized terms used in this Official Statement and not defined in this section are defined in "Appendix D – Form of the Indenture and the Lease Agreement".

"**Additional Bonds**" means those bonds described more particularly under "SECURITY AND SOURCE OF PAYMENT".

"**ADOC**" means the State of Alabama, acting by and through the Alabama Department of Corrections, as described more particularly under "INTRODUCTION–Relationship Between the State of Alabama and the Alabama

Department of Corrections", "THE STATE OF ALABAMA APPROPRIATIONS PROCESS", and "ALABAMA DEPARTMENT OF CORRECTIONS".

"**Bonds**" means any bonds issued pursuant to the Indenture, including Series 2022A Bonds and any Additional Bonds.

"**Bond-Financed Facilities**" means those facilities described more particularly under "SECURITY AND SOURCE OF PAYMENT".

"**Elmore Men's Prison Facility**" means the facility described more particularly under "SECURITY AND SOURCE OF PAYMENT" and "THE PLAN OF FINANCING".

"**Escambia Men's Prison Facility**" means the facility described more particularly under "SECURITY AND SOURCE OF PAYMENT" and "THE PLAN OF FINANCING".

 "**Indenture**" means the Trust Indenture, dated the date of issuance of the Series 2022A Bonds, between the Issuer and the Trustee pursuant to which the Series 2022A Bonds will be issued.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Issuer**" means the Alabama Corrections Institution Finance Authority, a public corporation under the laws of the State of Alabama.

"**Lease Agreement**" means the Lease Agreement, dated the date of issuance of the Series 2022A Bonds, between the Issuer and ADOC relating to the Bond-Financed Facilities.

"**Series 2022A Bonds**" means the Issuer's $725,000,000* Revenue Bonds, Series 2022A, which are being offered by this Official Statement.

"**State**" or "**State of Alabama**" means the State of Alabama, which was admitted as the twenty-second state of the United States of America on December 14, 1819.

"**State Treasurer**" means the Treasurer of the State of Alabama.

"**Trustee**" means Regions Bank, including its successors and permitted assigned, in its capacity as trustee, paying agent and registrar under the Indenture for the Series 2022A Bonds.

## DESCRIPTION OF THE SERIES 2022A BONDS

**General Provisions**

The Series 2022A Bonds will be fully registered bonds in the denomination of $5,000 or any multiple thereof, will be dated their date of issuance, and will be numbered separately from 1 upward.

The Series 2022A Bonds will mature annually on July 1 (except as noted on the inside cover page hereof) in the amounts and years set forth on the inside cover page hereof. The Series 2022A Bonds will bear interest at the applicable per annum rates set forth on the inside cover page hereof. All Series 2022A Bonds with the same maturity will bear interest at the same rate. Interest shall be computed on the basis of a 360-day year with 12 months of 30 days each. Interest on the Series 2022A Bonds will be payable on each January 1 and July 1, beginning January 1, 2022 (except as noted on the inside cover page hereof).

The Series 2022A Bonds will be issued pursuant to the Indenture. Certain provisions of the Indenture are described herein under "DESCRIPTION OF THE SERIES 2022A BONDS" and "SECURITY AND SOURCE OF

---

* Preliminary; subject to change.

PAYMENT". For a description of certain other provisions of the Indenture, see "Appendix D – Form of the Indenture and the Lease Agreement".

**Method and Place of Payment**

The Series 2022A Bonds will be issued in book-entry only form, as described below under "Book-Entry Only System", and the method and place of payment will be as provided in the book-entry only system. The provisions set forth in this section below will apply in the event that the use of the book-entry only system for the Series 2022A Bonds is discontinued.

Payment of interest due on each interest payment date will be made by check or draft mailed on such interest payment date to the persons who were registered holders of the Series 2022A Bonds on the regular record date for such interest payment date, which will be the 15th day of the month preceding such interest payment date. Payment of the principal of (and premium, if any, on) the Series 2022A Bonds and payment of accrued interest due upon redemption on any date other than an interest payment date will be made only upon surrender of the Series 2022A Bonds at the principal office of the Trustee (Regions Bank) in Birmingham, Alabama.

The holder of Series 2022A Bonds in an aggregate principal amount of $1,000,000 or more may, upon the terms and conditions of the Indenture, request payment of debt service by wire transfer to an account of such holder maintained at a bank in the continental United States or by any other method providing for payment in same-day funds that is acceptable to the Trustee.

**Redemption Prior to Maturity**

*Optional Redemption*. Series 2022A Bonds maturing on July 1, ___ or thereafter, or any smaller principal amount of such Series 2022A Bonds that is a multiple of the smallest authorized denomination, may be redeemed at the option of the Issuer on July 1, ____or any date thereafter at a redemption price equal to 100% of the principal amount to be redeemed plus accrued interest to the redemption date.

*Mandatory Redemption of Term Bonds*. The Series 2022A Bonds maturing on July 1, ___ (the "Term Bonds") are subject to mandatory redemption, by lot, at a redemption price equal to 100% of the principal amount thereof to be redeemed plus accrued interest thereon to the redemption date, on July 1 in years and principal amounts (after credits as provided below) as follows:

| Year | Amount |
|------|--------|
|      |        |

$_____of the Term Bonds will be
retired at maturity

Not less than 45 or more than 60 days prior to each mandatory redemption date with respect to Term Bonds, the Trustee shall proceed to select for redemption, by lot, Term Bonds or portions thereof in an aggregate principal amount equal to the amount required to be redeemed and shall call such Term Bonds or portions thereof for redemption on such mandatory redemption date. The Issuer may, not less than 60 days prior to any such mandatory redemption date, direct that any or all of the following amounts be credited against the Term Bonds scheduled for redemption on such date: (i) the principal amount of Term Bonds delivered by the Issuer to the Trustee for cancellation and not previously claimed as a credit; (ii) the principal amount of Term Bonds previously redeemed (other than Term Bonds redeemed pursuant to this paragraph) and not previously claimed as a credit; and (iii) the principal amount of Term Bonds otherwise deemed paid in full and not previously claimed as a credit.

***Optional Redemption Upon Occurrence of Certain Calamities.*** All or a portion of the Series 2022A Bonds may be redeemed at the option of the Issuer, at a redemption price equal to 100% of the principal amount to be redeemed plus accrued interest thereon to the redemption date, within 180 days after any of the following shall have occurred:

(i) the Bond-Financed Facilities shall have been damaged or destroyed to such extent that, in the opinion of ADOC, they cannot be restored within a period of 6 months to substantially the condition thereof immediately prior to such damage or destruction or ADOC is thereby prevented from carrying on its normal operations at the Bond-Financed Facilities for a period of not less than 6 months; or

(ii) the taking by eminent domain of all or substantially all the Bond-Financed Facilities or of any part, use or control of the Bond-Financed Facilities that, in the opinion of ADOC, results in ADOC being thereby prevented from carrying on its normal operations at the Bond-Financed Facilities for a period of not less than 6 months.

***Other Matters Related to Redemption Prior to Maturity.*** Except in the case of mandatory redemption of Term Bonds, if less than all Series 2022A Bonds outstanding are to be redeemed, the particular Series 2022A Bonds to be redeemed may be specified by the Issuer by written notice to the Trustee, or, in the absence of timely receipt by the Trustee of such notice, shall be selected by the Trustee by lot or by such other method as the Trustee shall deem fair and appropriate; provided, however, that (i) the principal amount of Series 2022A Bonds of each maturity to be redeemed must be a multiple of the smallest authorized denomination of Series 2022A Bonds, and (ii) if less than all Series 2022A Bonds with the same stated maturity are to be redeemed, the Series 2022A Bonds of such maturity to be redeemed shall be selected by lot by the Trustee.

Any redemption will be made upon at least 30 days' notice by first-class mail to the holders of Series 2022A Bonds to be redeemed. A notice of optional redemption may state that the redemption of Series 2022A Bonds is contingent upon specified conditions such as receipt of a specified source of funds or the occurrence of specified events. If the conditions for such redemption are not met, the Issuer shall not be required to redeem Series 2022A Bonds (or portions thereof) identified in such notice.

If a trust is established for payment of less than all Series 2022A Bonds of a particular maturity, the Series 2022A Bonds of such maturity to be paid from the trust shall be selected by the Trustee within 7 days after such trust is established and shall be identified by a separate CUSIP number or other designation satisfactory to the Trustee. The Trustee shall notify holders whose Series 2022A Bonds (or portions thereof) have been selected for payment from such trust and shall direct such holders to surrender their Series 2022A Bonds to the Trustee in exchange for Series 2022A Bonds with the appropriate designation.

Upon any partial redemption of a Series 2022A Bond, such Series 2022A Bond shall be surrendered to the Trustee in exchange for one or more new Series 2022A Bonds in authorized form for the unredeemed portion of principal.

Any Series 2022A Bond (or portion thereof) which is to be redeemed must be surrendered to the Trustee for payment of the redemption price. Series 2022A Bonds (or portions thereof) duly called for redemption will cease to bear interest after the redemption date, unless the Issuer defaults in payment of the redemption price.

## Registration and Exchange

The Series 2022A Bonds will be issued in book-entry only form, as described below under "Book-Entry Only System", and the method for registration and exchange of the Series 2022A Bonds will be as provided in the book-entry only system. The provisions set forth in this section below will apply in the event that the use of the book-entry only system for the Series 2022A Bonds is discontinued.

The Series 2022A Bonds are transferable only on the bond register maintained at the principal office of the Trustee. Upon surrender of a Series 2022A Bond to be transferred, properly endorsed, a new Series 2022A Bond will be issued to the designated transferee.

The Series 2022A Bonds will be issued in denominations of $5,000 or any multiple thereof and, subject to the provisions of the Indenture, may be exchanged for a like aggregate principal amount of Series 2022A Bonds, of any authorized denominations and of the same maturity, as requested by the holder surrendering the same.

No service charge shall be made for any transfer or exchange, but the Issuer may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

**Right of ADOC to Exercise Rights and Options with Respect to Terms of the Series 2022A Bonds**

For a description of certain rights of ADOC under the Indenture and related documents, see "Appendix D – Form of the Indenture and the Lease Agreement".

**Provision for Payment**

For a description of the defeasance provisions of the Indenture relating to the Series 2022A Bonds, see "Appendix D – Form of the Indenture and the Lease Agreement".

**Delegation of Certain Duties by Treasurer of the State of Alabama**

In order to facilitate the payment, registration and transfer provisions of the Indenture, the Issuer, the State Treasurer, and the Trustee will enter into a fiscal agent agreement.

**Certain Other Provisions of the Indenture**

For a description of other provisions of the Indenture relating to the Series 2022A Bonds, see "Appendix D – Form of the Indenture and the Lease Agreement".

**Book-Entry Only System**

The Series 2022A Bonds are issuable as fully registered bonds and, when issued, will be registered in the name of Cede & Co., as nominee of The Depository Trust Company ("DTC"), New York, New York, to which debt service payments on the Series 2022A Bonds will be made so long as Cede & Co. is the registered owner of the Series 2022A Bonds. Individual purchases of the Series 2022A Bonds will be made in book-entry only form, and individual purchasers ("Beneficial Owners") of the Series 2022A Bonds will not receive physical delivery of bond certificates.

So long as DTC or its nominee is the registered owner of the Series 2022A Bonds, disbursement of debt service payments to DTC is the responsibility of the Trustee, disbursement of debt service payments to DTC Participants is the responsibility of DTC, and disbursement of debt service payments to the Beneficial Owners is the responsibility of DTC Participants or Indirect Participants as more fully described herein.

For more details on DTC and the book-entry only system, see Appendix B to this Official Statement.

**Rights of Underwriters to Consent to Indenture Amendments**

The Indenture provides that underwriters of Additional Bonds issued after the issuance of the Series 2022A Bonds may, on behalf of any Additional Bonds issued after the issuance of the Series 2022A Bonds (and without notice to or consent of holders of any Additional Bonds issued after the issuance of the Series 2022A Bonds), consent to any amendment of the Indenture other than an amendment to the Indenture that requires the consent of all holders of Bonds issued under the Indenture.

**Authority for Issuance**

The Series 2022A Bonds are being issued by the Issuer under the authority of the constitution and laws of the State of Alabama, including particularly Chapter 2 of Title 14 of the Code of Alabama (1975).

## SECURITY AND SOURCE OF PAYMENT

**General**

The Series 2022A Bonds are special, limited obligations of the Issuer, payable solely from, and secured by a pledge of, the revenues and receipts derived by the Issuer from the leasing of the Bond-Financed Facilities, which are described below. The Series 2022A Bonds will not constitute an indebtedness of the State of Alabama or political subdivisions or instrumentalities thereof, or give rise to a pecuniary liability or charge against the general credit or taxing powers of the State of Alabama or political subdivisions or instrumentalities thereof.

A portion of the proceeds of the Series 2022A Bonds will be used for the purpose of financing the acquisition and construction of those facilities described in "THE PLAN OF FINANCING" (the "Bond-Financed Facilities"), which will be owned by the Issuer. On or prior to the date of issuance of the Series 2022A Bonds, the Issuer expects to procure a title insurance policy in the amount of $10 million, insuring its ownership interest in the realty on which the Bond-Financed Facilities will be situated.

The Bond-Financed Facilities will be leased to ADOC pursuant to a lease agreement (the "Lease Agreement"). The Lease Agreement has an initial stated term ending on September 30, 2022, plus multiple renewal terms of one year each, as described more particularly in "Appendix D – Form of the Indenture and the Lease Agreement". The Lease Agreement provides that the amounts required to be paid by ADOC to the Issuer shall not constitute a debt of the State of Alabama, and ADOC shall have the right to terminate the Lease Agreement in the event the Alabama Legislature fails to appropriate funds to ADOC to make the rental payments for any fiscal year; the term of the Lease Agreement will be deemed automatically renewed under those circumstances described in "Appendix D – Form of the Indenture and the Lease Agreement". **If ADOC elects to terminate the Lease Agreement at the end of any fiscal year as therein provided, the Issuer will have no funds with which to pay the principal of and interest on the Series 2022A Bonds.**

For a description of certain other provisions of the Indenture and the Lease Agreement, see "Appendix D – Form of the Indenture and the Lease Agreement".

**Non-Foreclosable Mortgage Lien on the Bond-Financed Facilities**

As additional security for the payment of the Series 2022A Bonds and all other obligations under the Indenture, the Issuer will grant to the Trustee, pursuant to the Indenture, a non-foreclosable mortgage lien on the Bond-Financed Facilities. The mortgage will not be subject to foreclosure and will not be construed so as to compel the sale of the Bond-Financed Facilities or any part thereof in satisfaction of the Series 2022A Bonds.

**Issuance of Additional Bonds**

In the Indenture, the Issuer will reserve the right to issue bonds ("Additional Bonds") for any lawful purpose at either the Elmore Men's Prison Facility or the Escambia Men's Prison Facility. These Additional Bonds will be payable from and secured by a pledge of the Trust Estate equally and ratably with the Series 2022A Bonds. Prior to the issuance of such Additional Bonds, the Issuer must deliver to the Trustee certain prescribed documents, which are described more particularly in "Appendix D – Form of the Indenture and the Lease Agreement". After issuance of the Series 2022A Bonds, as described more particularly under "ALABAMA DEPARTMENT OF CORRECTIONS", under present law, the Issuer will have the legal authority to issue $124 million of Additional Bonds (preliminary; subject to change). Also, the Issuer could obtain additional legislative authorization from the Alabama Legislature to issue Additional Bonds after exhaustion of the $124 million. See "Appendix A – Certain Information Regarding the State of Alabama – INDEBTEDNESS – Limited Obligation Bonds Authorized and Unissued".

**No Reserve Fund for Series 2022A Bonds**

The Issuer and the Trustee will not establish any fund or account (including without limitation any reserve fund) or hold any cash, cash equivalents, or other liquid asset as security or a source of payment of any of the Series 2022A Bonds.

**No State of Alabama Indebtedness**

No obligation of ADOC under the Lease Agreement to pay any amounts owed by ADOC to the Issuer, including ADOC's obligation to make payments under the Lease Agreement, shall constitute a debt of the State of Alabama as prohibited by Section 213 of the Constitution of Alabama of 1901, as amended. The obligation of ADOC to make such payments to the Issuer does not constitute a pledge of the faith, credit, or taxing power of ADOC, the State of Alabama, or any political subdivision thereof within the meaning or application of any constitutional provision or limitation. The Issuer has no right to have taxes levied or to compel appropriations by the Alabama Legislature for any lease payment or other amounts owed by ADOC to the Issuer under the Lease Agreement. Moreover, ADOC will not be permitted to use or otherwise apply funds appropriated to ADOC in any future fiscal year for the payment of debt service not paid during any preceding fiscal year in which such debt service first became due, and no appropriations from the Alabama Legislature, other than appropriations to ADOC, will be used or otherwise available for payments under the Lease Agreement.

**Non-Substitution**

To the extent permitted by law, throughout the term of the Lease Agreement, ADOC will not procure, construct, purchase, acquire, lease, or otherwise utilize any other correctional facility if doing so would result in the effective replacement of the Bond-Financed Facilities, or a material reduction in, or substantial modification of, ADOC's need to utilize the Bond-Financed Facilities; provided, however, that the foregoing restriction shall not prohibit ADOC from initiating the process of procuring, constructing, acquiring, leasing, or otherwise seeking to utilize another correctional facility within the final 5 years of the term of the Lease Agreement. However, nothing in the Lease Agreement will prevent ADOC from procuring, constructing, purchasing, acquiring, leasing, or utilizing other correctional facilities for programmed uses that are different from those of the Bond-Financed Facilities (including for housing female inmates) or for purposes of managing its inmate population, including to manage overcrowding, to comply with its federal and state constitutional and legal obligations, or to provide work release programs or other programs not planned for the Bond-Financed Facilities as of the date of issuance of the Series 2022A Bonds, which other facility will not substantially negatively impact ADOC's need to occupy the Bond-Financed Facilities.

**Remedies**

In the event of any default in the payment of the principal of or interest on the Series 2022A Bonds, (i) the officers and directors of the Issuer are, under existing law, subject to mandamus to compel the performance of their duties with respect to the use of funds for the payment of the Series 2022A Bonds and for the performance of the agreements of the Issuer contained in the Indenture and the Lease Agreement, and (ii) the officials of ADOC are, under existing law, subject to mandamus to compel the performance of their duties with respect to the payment of the lease payments under the Lease Agreement. Rights of the holders of the Series 2022A Bonds and the enforceability thereof may also be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights and the exercise of judicial discretion in appropriate cases, including the law-imposed requirement that ADOC may first use its taxes and other revenues to pay the expenses of providing necessary governmental services before paying debt service on the Series 2022A Bonds.

**The United States Bankruptcy Code**

Chapter 9 of the United States Bankruptcy Code permits political subdivisions and public agencies or instrumentalities of a state that are insolvent or unable to meet their debts as they come due to file petitions for relief in the federal bankruptcy courts if it is specifically authorized to do so by state law and can satisfy certain statutory requirements related to pre-filing negotiations with their creditors. While the matter is not entirely free from doubt, prospective purchasers of the Series 2022A Bonds should assume that existing Alabama statutes do <u>not</u> authorize the Issuer, the State, or ADOC to file a petition for relief. However, the United States Bankruptcy Code or Alabama law could be changed during the life of the Series 2022A Bonds to permit the Issuer, the State, and ADOC to file such a petition for relief.

Bankruptcy proceedings by the Issuer, the State, or ADOC could have adverse effects on holders of the Series 2022A Bonds, including (i) a loss of the revenues and properties pledged to them under the Indenture upon the initiation of bankruptcy proceedings, (ii) delay in the receipt of scheduled payments during such proceedings,

(iii) delay in the enforcement of their remedies, (iv) subordination of their claims to the claims of those supplying goods and services to ADOC after the initiation of bankruptcy proceedings and to the administrative expenses of bankruptcy proceedings, and (v) imposition without their consent of a plan for the adjustment of ADOC's debts reducing or delaying payment on the Series 2022A Bonds. Such a plan of adjustment, when confirmed by the bankruptcy court, binds all creditors who had timely notice or actual knowledge of the petition or plan, even if they vote against the plan, and discharges all claims against the political subdivision debtor unless excepted from discharge by the plan or the order confirming the plan. Among other conditions for confirmation, the plan must either be accepted by each class of claims or interests that is impaired under the plan, or be accepted by at least one impaired class if the plan is otherwise confirmable, does not discriminate unfairly, and is fair and equitable. An impaired class accepts a plan only if it has been accepted by at least 2/3 in amount and more than 50% in number of the allowed claims of such class that vote to accept or reject the plan.

## THE STATE OF ALABAMA APPROPRIATIONS PROCESS

**Background**

ADOC is the administrative department responsible for administering and exercising the direct and effective control over corrections institutions throughout the State of Alabama. ADOC is headed by and under the independent direction, supervision, and control of the Commissioner of the Alabama Department of Corrections (the "Commissioner"), who is appointed by the Governor and holds office at the pleasure of the Governor; the Commissioner does not serve for a specific term, and his appointment is not subject to legislative confirmation. All the powers, authority, and duties vested in ADOC are exercised by the Commissioner.

**Appropriations Process**

Section 72 of the Constitution of Alabama of 1901, as amended, provides that no money shall be paid from the State Treasury except upon appropriations made by law. Appropriations are made by the Alabama Legislature through the adoption of annual budgets for each of the General Fund and the Education Trust Fund; ADOC's budget is included in the General Fund budget. Typically, ADOC receives appropriations as program (or block) appropriations, which are not designated to specific line items or projects. Alabama employs incremental budgeting whereby explanations for requests are only required for increases or decreases from current budgeted expenditures. Thus, the Commissioner generally has significant discretion to determine where funds will be expended in any given year so long as the expenditures fall within the description of the appropriation made by the Alabama Legislature, despite what may have been requested in the budget for such fiscal year.

The appropriations process, in short, is as follows: (i) approximately ninety days before the beginning of the legislative session, state departments and agencies submit budget requests to the Department of Finance; (ii) the Department of Finance makes a recommendation and proposes a tentative budget to the Governor; (iii) after public hearings on the budget to allow department and agency heads the opportunity to discuss their budget requests with the Governor and/or the Finance Director, the Governor formulates recommendations for the Alabama Legislature; (iv) the Governor submits the recommended budget to the Alabama Legislature; (v) each of the House and the Senate conducts hearings, submits amendments, and approves appropriation bills; (vi) the Governor approves the appropriation bills; and (vii) the Governor allocates the funds to the various state departments and agencies.

Once the General Fund budget (which includes ADOC's budget) has been passed, the Accounting Division of ADOC will create an operational plan (the "Operational Plan") for those funds (generally in the month of July), which will be provided to the Executive Budget Office. This Operational Plan will divide the appropriated funds into various broad category cost codes (for example, salaries, leases, supplies, utilities), based upon the needs of the department or agency, contractual obligations of ADOC, and the actual funding available for each fiscal year. With the exception of salaries as required by the State Comptroller, no one cost code or payment is given a priority over others. If changes need to be made after the Operational Plan has been put in place, such changes are administrative in nature and will be achieved by the ADOC Accounting Division and the Executive Budget Office working together to make that change.

If the Alabama Legislature does not pass a budget prior to the beginning of a fiscal year, the previous year's budget and appropriations do not automatically roll over to the new fiscal year, and the government will "shut

down". Further, the executive branch does not have the ability to enact a budget by executive order. The initial budget bills and amendments or supplements thereto can be taken up in regular or special sessions.

**Balanced Budget Requirement**

The State of Alabama has enacted certain laws to create a balanced budget designed to prevent shortfalls in revenues to cover appropriations. Each spring before an upcoming fiscal year, projections for a total budget are determined in accordance with Alabama law. The executive branch and the legislative branch each project the expected revenues for the upcoming fiscal year. If the two projections are not identical, set rules prescribe how an average is determined and revisions are made, and the resulting projection becomes the total budget for the upcoming fiscal year. Total appropriations made by the Alabama Legislature for the upcoming fiscal year (i.e., among all State of Alabama departments and agencies, including ADOC) cannot exceed said total budget.

Amendment 448 to the Constitution of Alabama of 1901, as amended (the "Budget Isolation Amendment"), states "the duty of the legislature at any regular session to make the basic appropriations for any budget period that will commence before the first day of any succeeding regular session shall be paramount." The Budget Isolation Amendment incentivizes the Alabama Legislature to pass the budgets early in the session because, until the budgets have been passed, any significant legislation generally may only pass with a three-fifths majority vote.

In the event of a shortfall in budgeted revenues in any given fiscal year, the Governor declares proration. Though certain essential services, including constitutionally required expenditures, have been found by the Supreme Court of Alabama to not be subject to proration, it is not clear that lease payments for a prison facility would be deemed "essential services" so as to be protected from proration. Further, because of certain obligations of ADOC incident to the management and operation of correctional functions, ADOC may not be able to prioritize lease payments over its other expenditures. If there are not sufficient funds available in a fiscal year to pay an obligation incurred in such fiscal year, the obligation may not be paid from revenues derived in a subsequent fiscal year. If the revenues are higher than anticipated during the budget process, the Alabama Legislature can pass supplemental appropriation bills, which must be for a single purpose and must provide the source of revenue necessary to pay the appropriation.

**Summary of Legislative Process**

The Alabama Legislature convenes in regular annual sessions on the first Tuesday in February, except (i) in the first year of the four-year term, when the session will begin on the first Tuesday in March, and (ii) in the last year of a four-year term, when the session will begin on the second Tuesday in January. The length of the regular session is limited to 30 meeting days within a period of 105 calendar days. There are usually two meeting or "legislative" days per week, with other days devoted to committee meetings. In a regular session, bills may be enacted on any subject.

The regular legislative session begins on the following dates during each four-year term:

Year 1 – First Tuesday in March

Year 2 – First Tuesday in February

Year 3 – First Tuesday in February

Year 4 – Second Tuesday in January

A new four-year legislative Term (or legislative quadrennial) began in 2019.

The Governor may call special sessions of the Alabama Legislature at any time by proclamation, which must detail the subjects which the Governor wishes considered. Special sessions are limited to 12 legislative days within a 30-calendar-day span. In a special session, only legislation on those subjects that the Governor included in her proclamation may be passed, unless such other legislation not so covered receives a two-thirds vote of each house, in which case it may also be enacted.

**Alabama Legislature's Appropriations Process and the Lease Agreement**

Each year, the Commissioner will submit his or her budget requests for consideration by the Governor, and the Governor will set forth his or her recommendations to the Alabama Legislature for the ADOC budget within his or her proposed General Fund budget. The Alabama Legislature will consider the Governor's recommendations and then must approve appropriations bills for each of the funds held in the State Treasury, and ADOC cannot expend funds in excess of the amount appropriated by the Alabama Legislature for its account. Pursuant to the Lease Agreement, ADOC will use its best efforts to cause the Alabama Legislature to appropriate all amounts sufficient to enable ADOC have funds sufficient to pay amounts owed by ADOC to the Lessor under the Lease Agreement. To the extent permitted by law, ADOC will, prior to the satisfaction of its other obligations, prioritize and apply all funds appropriated by the Alabama Legislature for the benefit of ADOC, as well as such other funds lawfully available to ADOC, to satisfy ADOC's obligations under the Lease Agreement, except to the extent that such prioritization would adversely impact ADOC's ability to comply with (i) ADOC's federal and state constitutional and/or statutory obligations and/or obligations arising out of common law; (ii) court orders or consent decrees; and/or (iii) settlement agreements entered into by ADOC in response to allegations or claims relating to its constitutional and/or statutory obligations and/or obligations arising out of common law.

For more information, see "Appendix A – Certain Information Regarding the State of Alabama".

## THE PLAN OF FINANCING

The Series 2022A Bonds are being issued for the purpose of (i) financing various capital improvements of the Issuer (namely, the Bond-Financed Facilities), (ii) financing interest on a portion of the Series 2022A Bonds through the period ending _____, 2025, and (iii) paying the costs of issuing the Series 2022A Bonds.

As described more particularly under "ALABAMA DEPARTMENT OF CORRECTIONS—Litigation and Proposed New Corrections Facilities", the Alabama Legislature has appropriated certain funds for the Bond-Financed Facilities.

The Bond-Financed Facilities comprise two men's correctional facilities, (i) a men's correctional facility in Elmore County, Alabama, on certain real property owned or to be owned by the Issuer and consisting of buildings and improvements designed to house approximately 4,000 male inmates with intake capability, and with designated space for enhanced medical, mental health, and other health care, substance abuse and addiction treatment, and educational and other programming services to inmates (the "Elmore Men's Prison Facility"); and (ii) a men's correctional facility in Escambia County, Alabama, on certain real property owned or to be owned by the Issuer and consisting of buildings and improvements designed to house approximately 4,000 male inmates with intake capability (the "Escambia Men's Prison Facility").

## SOURCES AND USES OF FUNDS

The expected sources and uses of funds for the plan of financing are as follows (rounded to the nearest whole dollar):

<u>Sources of Funds</u>

Principal amount of Series 2022A Bonds.......................................................................................................
Plus: original issue premium ........................................................................................................................
State of Alabama appropriations ...................................................................................................................

Total      .......................................................................................................................................................

<u>Uses of Funds</u>

Capitalized        interest  .............................................................................................................................
Capital   improvements...................................................................................................................................
Expenses of issuance (including underwriters'
        discount, legal, accounting and other
        issuance expenses) ..............................................................................................................................

Total      .......................................................................................................................................................

# DEBT SERVICE REQUIREMENTS

The following table contains the scheduled debt service requirements on the Series 2022A Bonds:

| Fiscal Year Ending September 30 | Principal[1][2] | Interest[2][3] | Total |
|---|---|---|---|
| 2022 | $29,795,000 | $202,772 | $29,997,772 |
| 2023 | 28,610,000 | 33,698,131 | 62,308,131 |
| 2024 | - | 33,329,750 | 33,329,750 |
| 2025 | - | 33,329,750 | 33,329,750 |
| 2026 | 12,195,000 | 33,329,750 | 45,524,750 |
| 2027 | 12,805,000 | 32,720,000 | 45,525,000 |
| 2028 | 13,445,000 | 32,079,750 | 45,524,750 |
| 2029 | 14,115,000 | 31,407,500 | 45,522,500 |
| 2030 | 14,820,000 | 30,701,750 | 45,521,750 |
| 2031 | 15,560,000 | 29,960,750 | 45,520,750 |
| 2032 | 16,340,000 | 29,182,750 | 45,522,750 |
| 2033 | 17,160,000 | 28,365,750 | 45,525,750 |
| 2034 | 18,015,000 | 27,507,750 | 45,522,750 |
| 2035 | 18,915,000 | 26,607,000 | 45,522,000 |
| 2036 | 19,860,000 | 25,661,250 | 45,521,250 |
| 2037 | 20,855,000 | 24,668,250 | 45,523,250 |
| 2038 | 21,900,000 | 23,625,500 | 45,525,500 |
| 2039 | 22,995,000 | 22,530,500 | 45,525,500 |
| 2040 | 24,140,000 | 21,380,750 | 45,520,750 |
| 2041 | 25,350,000 | 20,173,750 | 45,523,750 |
| 2042 | 26,615,000 | 18,906,250 | 45,521,250 |
| 2043 | 27,945,000 | 17,575,500 | 45,520,500 |
| 2044 | 29,345,000 | 16,178,250 | 45,523,250 |
| 2045 | 30,810,000 | 14,711,000 | 45,521,000 |
| 2046 | 32,350,000 | 13,170,500 | 45,520,500 |
| 2047 | 33,970,000 | 11,553,000 | 45,523,000 |
| 2048 | 35,670,000 | 9,854,500 | 45,524,500 |
| 2049 | 37,450,000 | 8,071,000 | 45,521,000 |
| 2050 | 39,325,000 | 6,198,500 | 45,523,500 |
| 2051 | 41,290,000 | 4,232,250 | 45,522,250 |
| 2052 | 43,355,000 | 2,167,750 | 45,522,750 |
| **Total:** | **$725,000,000** | **$663,081,653** | **$1,388,081,653** |

---

[1]    For purposes of this table the principal amount of Series 2022A Bonds to be retired in a fiscal year pursuant to mandatory redemption provisions is shown as maturing in that fiscal year.

[2]    For purposes of this Preliminary Official Statement, principal and interest requirements have been estimated based on an assumed principal amount and principal maturities as shown and certain assumed interest rates. Actual principal amounts and maturities and actual interest rates will be established after pricing of the Series 2022A Bonds and will be reflected in the final Official Statement. Actual debt service payments will vary from this estimate.

[3]    Interest on a portion of the Series 2022A Bonds through the period ending on or about _____, 2025 will be deposited in one or more funds established under the Indenture. Further, as described more particularly in "ALABAMA DEPARTMENT OF CORRECTIONS", in 2022, the Alabama Legislature appropriated directly to the Issuer $30 million for FY2022 debt service and $30 million for FY2023 debt service; the Issuer expects to use these appropriations to pay all or a portion of FY2022 and FY2023 debt service on the Series 2022A Bonds.

# ALABAMA CORRECTIONS INSTITUTION FINANCE AUTHORITY

The Issuer (that is, Alabama Corrections Institution Finance Authority) is a public corporation of the State of Alabama. For information on the State of Alabama, see "Appendix A – Certain Information Regarding the State of Alabama". The information on the State of Alabama included in Appendix A has been included for general information purposes only. The Series 2022A Bonds will not constitute general obligations of the Alabama Corrections Institution Finance Authority or the State of Alabama. The Series 2022A Bonds are special, limited obligations of the Issuer, payable solely from, and secured by a pledge of, the revenues and receipts derived by the Issuer from the leasing of certain facilities described herein. See "SECURITY AND SOURCE OF PAYMENT".

# ALABAMA DEPARTMENT OF CORRECTIONS

## Information on the State of Alabama

ADOC (that is, the Alabama Department of Corrections) is a department of the State of Alabama. For information on the State of Alabama, see "Appendix A – Certain Information Regarding the State of Alabama".

## General Overview of ADOC

The mission of ADOC is to provide public safety through the safe and secure confinement, rehabilitation, and successful re-entry of offenders. ADOC seeks to fulfill this mission by confining, managing and providing rehabilitative programs for convicted felons in a safe, secure and humane environment, utilizing professionals who are committed to public safety and to positive re-entry of offenders into society. In order to fulfill its mission, the objectives of ADOC include (i) administering sentences of the courts by confining offenders while respecting the constitutional and human rights of the person, (ii) aiding in preparing committed offenders for return to society, and (iii) conducting the business of ADOC in the most effective and economical manner.

ADOC is a medium-size correctional system employing approximately 3,000 employees with an inmate population at ADOC-operated facilities of approximately 18,000 prisoners for fiscal year 2021.

ADOC's executive leadership consists of the following members and positions:

| NAME | TITLE |
|------|-------|
| John Hamm | Commissioner |
| Greg Lovelace | Chief Deputy Commissioner of Corrections |
| Dr. Wendy Williams | Deputy Commissioner - Men's Services Operations |
| Dr. Elizabeth Mautz | Deputy Commissioner – Women's Services Operations |
| Jeffery Williams | Deputy Commissioner-Governmental Relations |
| Mark Fassl | Inspector General |
| William Lawley | Associate Commissioner – Administrative Services |
| Glen Casey | Associate Commissioner-Plans and Programs |
| Deborah Crook | Deputy Commissioner-Health Services |
| Carrie McCollum | General Counsel |
| Arnaldo Mercado | Director-Law Enforcement Services Division |
| Jenny Abbott | Director-Facilities Management Division |
| Jo Wood | Chief Financial Officer |

The following organizational chart depicts how ADOC is organized.



ADOC currently manages 15 major correctional facilities, 11 community-based facilities and has a contract to provide intensive therapeutic, educational, and vocational services at a privately owned and operated facility. The map below shows the current locations of such facilities.



**ADOC Inmate Population**

The following table and graph depict the inmate population as of the last month (September) for fiscal years 2012 through 2021.

| INMATE POPULATION | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| Jurisdictional[1] | 32,493 | 32,467 | 31,961 | 31,162 | 29,651 | 27,803 | 26,790 | 27,815 | 25,994 | 25,186 |
| Custody[2] | 26,762 | 26,604 | 26,029 | 25,201 | 23,759 | 21,563 | 20,585 | 21,680 | 18,573 | 18,279 |
| In-House[3] | 25,374 | 25,340 | 25,340 | 24,191 | 23,328 | 21,213 | 20,087 | 20,953 | 18,421 | 17,769 |



Source: ADOC.

<div style="font-size:smaller">

(1) ADOC Jurisdictional population includes all inmates serving time within ADOC facilities/programs, as well as in the custody of other correctional authorities, such as county jails, other state departments of corrections, community correction programs, federal prisons, and privately leased facilities. Includes ADOC Custody population.

(2) ADOC Custody population includes In-House population plus those housed in other ADOC leased facilities and special programs.

(3) ADOC In-House population inmates are housed within correctional facilities owned and operated by ADOC; this includes transient inmates between correctional facilities.

</div>

**Strategic Plan**

In 2019, ADOC published its Strategic Plan 2019-2022, which laid out a comprehensive plan to transform ADOC into an organization that reduces recidivism through effective rehabilitation and provides for long-term safety, security and integrity of the State of Alabama's correctional system. The Strategic Plan has four pillars or focus areas:

(i) **Staffing**: To be fully staffed with high-quality professionals working in the security, medical and other non-security fields; recruit, retain and grow ADOC's workforce through better compensation and improved workplace conditions;

(ii) **Infrastructure**: To upgrade ADOC infrastructure to improve the working conditions for staff and living conditions for the inmates by pursuing short and medium-term repairs and the construction of new facilities;

(iii) **Programming**: To improve the delivery of research and evidence-based rehabilitative programs; and

(iv) **Culture**: To improve the professional operating environment within ADOC facilities.

The construction of the Elmore Men's Prison Facility and the Escambia Men's Prison Facility will help ADOC achieve its infrastructure goal noted above. The Elmore Men's Prison Facility will have a significant focus on the delivery of mental health and medical health services, which will each address the aged and infirmed population that is increasing in the Alabama prison population. The Elmore Men's Prison Facility and the Escambia Men's Prison Facility will enable the State of Alabama to replace beds and provide improved conditions of confinement with infrastructure that supports programming, vocational training and other rehabilitative initiatives. Such improvements are expected to help to address issues raised in the Department of Justice litigation regarding prison conditions.

**Litigation and Proposed New Corrections Facilities**

*General*. The State of Alabama's prisons are the subject of (i) a pending class action lawsuit filed by the Southern Poverty Law Center and the Alabama Disability Advocacy Program (asserting claims of constitutionally inadequate medical, dental, and mental health care); (ii) a lawsuit seeking class certification on behalf of a proposed class of inmates at St. Clair Correctional Facility brought by the Equal Justice Initiative; and (iii) a lawsuit brought by the United States Department of Justice (asserting claims of inmate on inmate physical assault and sexual abuse, officer on inmate excessive use of force, and conditions of confinement). For a summary of each case, see "Appendix A – Certain Information Regarding the State of Alabama – Litigation – ADOC".

Most of ADOC's existing facilities are over 30 years old and have significant deferred maintenance, which hinders security and operational safety. Additionally, the facilities' conditions and locations have presented a challenge to ADOC's efforts to recruit and retain professional staff.

In an effort to modernize the correctional facilities of the State of Alabama, improve safety and security at facilities for the benefit of incarcerated persons and staff, and address certain allegations in the litigation described above, since 2013 the both the Legislative and Executive Branches of the State of Alabama and ADOC have implemented a number of legislation and programs, including sentencing reform and the Alabama Prison Program, of which the Bond-Financed Facilities are an integral part.

*Criminal Justice Policy and Sentencing Reform*. Alabama has implemented numerous reform efforts in the past ten years, including a statewide framework for pretrial diversion in 2013, creation of the Prison Reform Task Force in 2014, nonviolent drug and property crime sentencing reform passed in 2015, and additional legislation related to parole and end-of-sentence reform in 2021. In part as a result of these reform efforts, the inmate population has declined approximately 30% over the past ten years as shown in the table above. The Legislature also has supported an increase in ADOC appropriations over the past five years to help with reform efforts, and in 2019, the Governor's Study Group on Criminal Justice Policy resulted in a new commitment to reducing recidivism.

*Population of Incarcerated Persons*. As a result of efforts by the State of Alabama, including sentencing reform, the in-custody population of ADOC has steadily decreased since 2012, from more than 25,000 to just over

18,000 in 2021. ADOC is intent on improving facilities and programing for those who do come into its custody. Further, for the over 95% of the ADOC population who will return to the community, a focus by ADOC on rehabilitative programming, including access to mental health services, is essential to reducing recidivism, which will continue to decrease the population of incarcerated persons in the State of Alabama. As discussed in detail below, the primary purposes of the Bond-Financed Facilities are in furtherance of these goals.

The Bond-Financed Facilities will <u>not</u> create additional correctional facility capacity for the State of Alabama. Instead, it is a bed-replacement program and will constitute an upgraded environment for the incarcerated individuals who are moved to the Elmore Men's Prison Facility and the Escambia Men's Prison Facility.

*New Proposed Corrections Facilities.* After Governor Ivey and ADOC engaged in conversations with the Alabama Legislature to review all options for building new facilities, in September 2021 Governor Ivey called a special session of the Alabama Legislature with the goal of enacting new legislation to assist in such efforts. The primary act adopted in the special session provides for, among other things, (i) the construction of two men's correctional facilities to replace existing facilities (namely, the Elmore Men's Prison Facility and the Escambia Men's Prison Facility described herein), (ii) the closure of such existing facilities within a year of the completion of the new facilities, (iii) the construction of a new women's facility and (iv) the renovation of three additional existing men's correctional facilities. The act also provides for such construction and renovation of (i) above to be financed with proceeds of bonds issued by the Alabama Corrections Institution Financing Authority (that is, the Issuer) of up to $785 million (which represents increased bond authority for such authority). Supplemental appropriations acts were also adopted to appropriate $400 million in funds from the American Rescue Plan Act, as well as up to $135 million in appropriations from the State of Alabama General Fund for the construction of the initial two men's correctional facilities. These supplemental appropriations, which aggregate $535 million, will be deposited into the Capital Improvement Fund established under the Indenture on the date of issuance of the Series 2022A Bonds; a portion of these supplemental appropriations may already have been expended prior to issuance of the Series 2022A Bonds. The Alabama Legislature also passed legislation providing for the purchase of an existing correctional facility by the Alabama Bureau of Pardons and Paroles. Finally, in 2022, the Alabama Legislature appropriated directly to the Issuer $30 million for FY2022 debt service and $30 million for FY2023 debt service; the Issuer expects to use these appropriations to pay all or a portion of FY2022 and FY2023 debt service on the Series 2022A Bonds.

The Bond-Financed Facilities are the State of Alabama's first step toward addressing the infrastructure needs of ADOC. Both the Elmore Men's Prison Facility and the Escambia Men's Prison Facility will be designed and constructed to meet the latest in corrections standards and to utilize upgraded correctional technology, all while lowering operational expenses. The Bond-Financed Facilities are being designed to improve safety in the facilities for both inmates and staff.

The Bond-Financed Facilities will have dedicated multipurpose space to increase programing specifically geared toward improving mental health and promoting rehabilitation. In addition to the multipurpose space and recreational areas, inmates will have access to new confidential meeting rooms, which can be used for meetings with mental health providers and rehabilitative programming providers. Notably, the Elmore Men's Prison Facility will also include extensive healthcare infrastructure, which is particularly helpful in supporting an aging incarcerated population. Approximately 1,500 of the beds in the Elmore Men's Prison Facility are specifically dedicated medical and mental health beds.

Not only will the Bond-Financed Facilities meet the goals of the ADOC Strategic Plan regarding infrastructure; the increase in safety from the new design of the facilities and the technology integrated therein is expected to help ADOC attract and retain high quality staff for the facilities. In accordance with the objectives of ADOC, ADOC will have control over and will solely operate the Bond-Financed Facilities.

Governor Ivey also established the Alabama Prison Repurposing Commission to conduct a thorough evaluation of ADOC's existing male prison facilities. The Alabama Prison Repurposing Commission was created to make recommendations as to which ADOC facilities should be retained and renovated as major correctional facilities, which could be renovated and repurposed for another use by ADOC, and which should be repurposed to serve a new function, whether by another public entity or the private sector.

## ADOC Historical Revenues and Expenditures

ADOC's total historical revenues and expenditures (unaudited) for fiscal years 2017-2021 were as follows.

| | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|
| **REVENUES** | | | | | |
| State General Fund | $408,389,931 | $443,179,882 | $468,290,663 | $499,307,120 | $549,102,561 |
| ADOC Generated Funds | 38,280,648 | 40,772,300 | 35,151,406 | 37,815,187 | 42,690,800 |
| Coronavirus Relief Funds | - | - | - | 22,400,227 | 40,592,663 |
| Work Release Fees | 11,214,418 | 8,962,598 | 8,587,654 | 6,037,768 | 21,205 |
| County Drug Conviction Fees | 1,635,014 | 1,749,655 | 1,923,860 | 1,626,448 | 2,838,378 |
| Federal Grant Funds | 680,680 | 305,851 | 1,015,427 | 474,982 | - |
| **Total Revenues** | **$460,200,691** | **$494,970,286** | **$514,969,010** | **$567,661,732** | **$635,245,607** |
| **EXPENSES** | | | | | |
| Health Care and Other Professional Services | $134,444,681 | $165,453,899 | $172,636,081 | $202,082,205 | $222,853,089 |
| Personnel Costs | 167,544,400 | 168,368,258 | 183,638,796 | 177,234,735 | 208,211,251 |
| Employee Benefits | 63,334,624 | 65,660,713 | 69,869,841 | 78,284,735 | 78,064,238 |
| Supplies and Operating Expenses | 31,302,090 | 30,990,415 | 32,953,328 | 43,000,294 | 39,274,966 |
| Utilities and Communications | 16,495,019 | 16,519,399 | 17,413,397 | 17,780,110 | 17,245,895 |
| Community Corrections and Other Grants | 9,182,440 | 9,865,964 | 9,654,524 | 9,832,835 | 8,088,931 |
| Rentals and Leases | 9,412,729 | 9,091,716 | 9,296,192 | 3,373,644 | 3,332,404 |
| Repairs and Maintenance | 4,183,939 | 7,603,290 | 7,165,071 | 7,028,901 | 10,971,526 |
| Equipment Purchases | 6,661,900 | 5,848,011 | 6,336,358 | 6,487,923 | 25,035,798 |
| Transportation | 3,750,386 | 3,621,100 | 3,919,296 | 3,467,400 | 2,937,867 |
| Travel | 581,833 | 726,373 | 1,541,939 | 1,319,505 | 790,812 |
| Capital Outlay | 13,306,650 | 11,221,148 | 544,187 | 11,732,713 | 12,197,047 |
| Debt Service[1] | - | - | - | 6,036,765 | 6,241,783 |
| **TOTAL EXPENSES** | **$460,200,691** | **$494,970,286** | **$514,969,010** | **$567,661,732** | **$635,245,607** |

Source:  ADOC.  Note, chart above excludes the Alabama Correctional Industries, which operates under a separate revolving fund.

(1)   Represents payments with respect to energy performance/lease purchase agreements that were included under "Rentals and Leases" for fiscal years 2016-2019.

## ADOC Appropriations for Fiscal Years Ended September 30, 2022 and 2023

For the Fiscal Year ended September 30, 2022, ADOC received an original appropriation of $570,575,435 from the General Fund (plus $87,161,718 in earmarked funds, for a total of $657,737,153).  As detailed above, additional supplemental appropriations were made by the Alabama Legislature and signed into law to support the construction of the Bond-Financed Facilities.  In early 2022, the Alabama Legislature appropriated $594,647,303 from the General Fund (and combined with $104,837,629 in earmarked funds, a total of $699,484,932) to ADOC for the Fiscal Year ended September 30, 2023.  Additionally, if, on the first day of the Fiscal Year ended September 30, 2023, the balance in the General Fund is greater than $147,003,142, the first $50,000,000 in excess of such $147,003,142 is appropriated to certain funds held by ADOC for capital improvements and facility maintenance.

## LITIGATION RELATING TO THE SERIES 2022A BONDS

There is no litigation pending or, to the knowledge of the Issuer or ADOC, threatened questioning the validity of the Series 2022A Bonds, the proceedings under which they are to be issued, the security for the Series 2022A Bonds provided by the Indenture, the consummation of the transactions contemplated by the Indenture, the organization of the Issuer or ADOC, or the election or qualification of the Issuer's or ADOC's officers.  For certain additional information concerning litigation relating to ADOC and the State of Alabama, see Appendix A.

# RISK FACTORS

**General**

An investment in the Series 2022A Bonds involves certain risks which should be carefully considered by investors. The sufficiency of revenues to pay debt service on the Series 2022A Bonds may be affected by events and conditions relating to, among other things, population trends, weather conditions and economic developments in the State of Alabama, the nature and extent of which are not presently determinable.

Holders of the Series 2022A Bonds should be aware that their rights and the enforceability thereof may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights and the exercise of judicial discretion in appropriate cases.

Each prospective investor should carefully examine his own financial condition in order to make a judgment as to his ability to bear the risk of an investment in the Series 2022A Bonds.

The risk factors discussed herein should be considered in evaluating the Issuer's ability to make payments of the principal of and interest due on the Series 2022A Bonds. This discussion of risk factors is not intended to be exhaustive and should be read in conjunction with all other parts of this Official Statement, including Appendix A hereto.

**Limited Obligations**

The Series 2022A Bonds are special, limited obligations of the Issuer, payable solely from, and secured by a pledge of, the revenues and receipts derived by the Issuer from the leasing of certain facilities described herein. The Issuer does not have any taxing power. The Series 2022A Bonds will not constitute general obligations of the Issuer, ADOC, or the State of Alabama. See "SECURITY AND SOURCE OF PAYMENT".

**Cancellation Right of ADOC**

The Lease Agreement may be terminated at the option of ADOC at the end of any fiscal year of the State of Alabama if the Alabama Legislature fails to appropriate funds to ADOC to make the rental payments set forth therein; the term of the Lease Agreement will be deemed automatically renewed under those circumstances described in "Appendix D – Form of the Indenture and the Lease Agreement". ADOC is a department of the State of Alabama, and as such ADOC is dependent on annual appropriations by the Alabama Legislature for funds with which to conduct its operations. Prospective purchasers of the Series 2022A Bonds should assume that, unless the Alabama Legislature makes annual appropriations to or for the benefit of ADOC in future years, ADOC will not have adequate funds with which to make payments of rent to the Issuer under the Lease Agreement. No constitutional provision requires the Alabama Legislature to make such annual appropriations to or for the benefit of ADOC.

**Appropriation Risk**

All payments to be made by ADOC pursuant to the Lease Agreement are subject to appropriation by the Alabama Legislature. Accordingly, payments will not be made by ADOC in any year if there is no appropriation, or an insufficient appropriation. ADOC will not incur any monetary obligations under the Lease Agreement unless an appropriation has been made by the Alabama Legislature for funds to be used to make payments under the Lease Agreement. Nothing contained in the Lease Agreement will be construed to obligate ADOC to any current or future expenditure of funds in excess or advance of the availability of appropriations from the Alabama Legislature. During each state budgetary cycle, ADOC will seek a legislative appropriation from the Alabama Legislature in an amount sufficient to cover all payments expected to be made under the Lease Agreement. The inability of the State of Alabama to timely pass a budget and provide the appropriations to ADOC to allow ADOC to make timely payments under the Lease Agreement could affect the timeliness and ability of payment of debt service coming due on the Series 2022A Bonds, as well as whether the Lease Agreement is terminated prior to the scheduled final maturity of the Series 2022A Bonds. See "SECURITY AND SOURCE OF PAYMENT" and "Appendix A – Certain Information Regarding the State of Alabama".

## Sovereign Immunity

Under the doctrine of sovereign immunity a state of the United States of America cannot be sued by its own citizens. Under the United States Constitution a state cannot be sued by citizens of another state of the United States of America or by citizens or subjects of a foreign state. The doctrine of sovereign immunity applies to the State of Alabama, and the issuance of indebtedness by the State of Alabama does not constitute express consent by the State of Alabama to be sued by the holders of such indebtedness. Section 14 of the Alabama Constitution provides that the State of Alabama shall never be made a defendant in any court of law or equity. The Supreme Court of Alabama has held that the immunity granted by Section 14 cannot be waived by the Alabama Legislature or any State of Alabama authority. This constitutional prohibition of suits against the State of Alabama extends to officers of the State of Alabama acting in their official capacities, subject to certain limited exceptions, such as actions to compel state officials to perform ministerial acts.

The Supreme Court of Alabama held in Wheeler v. George, 39 So. 3d 1061 (Ala. 2009), that the Alabama Incentives Finance Authority, a public corporation of the State of Alabama (the "AIFA"), is a state agency for purposes of state immunity due to the character of the power delegated to the AIFA, the AIFA's relationship to the State of Alabama, and the nature of the functions AIFA performs. It is unclear whether or not a court would treat the Issuer as a state agency for purposes of state immunity, but if so there can be no assurance that holders of the Series 2022A Bonds would have any right of action against the Issuer to enforce the obligations of the Issuer under the Series 2022A Bonds in the event the Issuer fails to make timely payment of principal or interest on the Series 2022A Bonds. Certain officers of the Issuer, however, under existing law, are subject to mandamus in the event that they have funds available for payment of debt service on the Series 2022A Bonds and do not apply such funds as and to the extent provided in the Indenture.

## Cybersecurity

Despite the implementation of network security measures by ADOC and the other departments and agencies of the State of Alabama, the State of Alabama's information technology systems may be vulnerable to breaches, hacker and ransomware attacks, computer viruses, physical or electronic break-ins, and other similar events or issues. State and local governments have recently been subject to such attacks.

The foregoing events or issues could lead to the inadvertent disclosure of confidential information, ransomware attacks holding critical information and operations hostage or could have an adverse effect on the State of Alabama's ability to provide a continuity of services. Any breach or cyberattack that compromises data could result in negative press and substantial fines or penalties for violation of privacy laws. Despite efforts of the State of Alabama, no assurances can be given that the State of Alabama's measures will prevent cybersecurity attacks, and no assurances can be given that any cybersecurity attacks, if successful, will not have a material adverse effect on the operations or financial condition of the State of Alabama.

## Political, Litigation, and Community Risks

As is the case with the development of many major infrastructure projects, no assurance can be given that any future efforts to oppose the Bond-Financed Facilities, including efforts by future Alabama Legislatures, will not be successful, and if successful, that such efforts would not materially delay, impair or preclude debt service being paid on the Series 2022A Bonds.

In addition to political and community actions or pressures that could have a direct effect on the Bond-Financed Facilities or on ADOC, political pressure affecting ADOC could have an adverse effect on the ability to timely pay debt service on the Series 2022A Bonds. For example, future state and/or federal budget, tax or expenditure limitations or otherwise could have direct and substantial effects on the amount of funds available to ADOC for the Bond-Financed Facilities and payments under the Lease Agreement, such payments to be used by the Issuer for debt service on the Series 2022A Bonds. The current Alabama Legislature cannot bind future Alabama Legislatures. No assurance can be given that ADOC will always have sufficient resources to perform its monetary and other obligations under the Lease Agreement. If appropriations sufficient to make payments under the Lease Agreement are not made, the Issuer will not be able to repay the Series 2022A Bonds in full, and the Lease Agreement will not be renewed for subsequent fiscal years.

**COVID-19 and Other Public Health Epidemics or Outbreaks**

The outbreak of COVID-19, a respiratory disease caused by a novel strain of coronavirus, has been declared a pandemic by the World Health Organization. Since its discovery in late 2019, it has spread globally, including throughout the United States. In the United States, there has been a focus on containing COVID-19 by prohibiting non-essential travel and limiting person-to-person contact. Throughout 2020 and 2021, states and local governments issued "stay at home" and "shelter in place" orders, which limited businesses and activities to essential functions. The rate of infection has declined significantly in Alabama, and over 30% of Alabamians have been fully vaccinated for COVID-19. Alabama's statewide mask mandate ended on April 9, 2021, and the state of emergency issued in Alabama ended July 6, 2021. (Orders issued by the State of Alabama may be viewed at https://covid19.alabama.gov/.) The extent to which the coronavirus impacts the State of Alabama's operations and its financial condition will depend on future developments, which are highly uncertain and cannot be predicted with confidence, including the duration of the outbreak, the extent of future outbreaks, the development and spread of variant strains of coronavirus, the actions to contain the virus, new information which may emerge concerning the severity of the coronavirus, and vaccination efforts within the State of Alabama. The continued spread of the coronavirus in the United States could have a material adverse effect on the State of Alabama's operations and its financial condition, including a negative impact on the revenues available to the Issuer to pay debt service on the Series 2022A Bonds. For information on the effect of COVID-19 on the State of Alabama, see "Appendix A – Certain Information Regarding the State of Alabama".

**Materials, Labor, Supply Chain, and Related Risks to Completion of the Bond-Financed Facilities**

Completion of the Bond-Financed Facilities involves many risks common to construction projects such as shortages or delays in the availability of materials and labor, work stoppages, labor disputes, contractual disputes with contractors or suppliers, weather interferences, construction accidents, delays in obtaining legal approvals, unforeseen engineering, archeological or environmental problems and unanticipated cost increases, any of which could give rise to significant delays or cost overruns. In addition to the risks noted above, the ongoing COVID-19 pandemic and continued mitigation efforts to prevent the spread of COVID-19 worldwide also could cause delays in the construction of the Bond-Financed Facilities.

**Use of ARPA Funds for the Bond-Financed Facilities**

Pursuant to the American Rescue Plan Act of 2021 ("ARPA"), the State of Alabama was allocated approximately $2.1 billion in State Fiscal Recovery Fund ("SFRF") proceeds. Pursuant to ARPA, the SFRF proceeds must be obligated by December 31, 2024, and must be expended by December 31, 2026. Additionally, the SFRF proceeds may only be expended on eligible uses, including for the provision of government services to the extent of the reduction in revenue due to the COVID-19 public health emergency relative to revenues collected in the most recent full fiscal year prior to the emergency. The State of Alabama must adhere to reporting requirements of ARPA, and, if SFRF proceeds are expended on prohibited uses, such misused SFRF proceeds are subject to recapture by the United States.

The sources for the Bond-Financed Facilities include $400 million in SFRF proceeds received by the State of Alabama in 2021 and appropriated by the Legislature in fall 2021 to be used for Bond-Financed Facilities (the "Project SFRF Proceeds"). The Issuer cannot be assured that (i) ARPA will not be amended or (ii) the United States Department of the Treasury will not promulgate additional rules regarding the use of SFRF proceeds. If a change to the permitted uses of SFRF proceeds were to become effective prior to the Issuer's expenditure of the Project SFRF Proceeds, there can be no assurances that the Project SFRF Proceeds would be available for the Bond-Financed Facilities. If the Project SFRF Proceeds are not available for constructing and equipping the Bond-Financed Facilities, the Issuer may not be able to obtain alternative funding, and the Bond-Financed Facilities may not be completed. The Project SFRF Proceeds are not legally available to pay debt service on the Series 2022A Bonds.

**The United States Bankruptcy Code**

Information describing the applicability of the United States Bankruptcy Code to the Issuer, the State, ADOC, and the Series 2022A Bonds is set forth in this Official Statement under the caption "SECURITY AND SOURCE OF PAYMENT".

**Tax-Exempt Status of Series 2022A Bonds**

It is expected that the Series 2022A Bonds will qualify as tax-exempt obligations for federal income tax purposes as of the date of issuance. See "TAX MATTERS". It is anticipated that Bond Counsel will render an opinion substantially in the form attached hereto as Appendix C, which should be read in its entirety for a complete understanding of the scope of the opinions and the conclusions expressed therein. A legal opinion expresses the professional judgment of the attorney rendering the opinion as to the legal issues explicitly addressed therein. By rendering a legal opinion, the opinion giver does not become an insurer or guarantor of that expression of professional judgment, of the transaction opined upon, or of the future performance of parties to the transaction. Nor does the rendering of an opinion guarantee the outcome of any legal dispute that may arise out of the transaction.

The tax status of the Series 2022A Bonds could be affected by post-issuance events. There are various requirements of the Internal Revenue Code of 1986, as amended, that must be observed or satisfied after the issuance of the Series 2022A Bonds in order for the Series 2022A Bonds to qualify for, and retain, tax-exempt status. These requirements include appropriate use of the proceeds of the Series 2022A Bonds, use of the facilities financed by the Series 2022A Bonds, investment of bond proceeds, and the rebate of so-called excess arbitrage earnings. Compliance with these requirements is the responsibility of the Issuer and ADOC.

The Internal Revenue Service conducts an audit program to examine compliance with the requirements regarding tax-exempt status. Under current IRS procedures, in the initial stages of an audit with respect to the Series 2022A Bonds, the Issuer would be treated as the taxpayer, and the owners of the Series 2022A Bonds may have limited rights to participate in the audit process. The initiation of an audit with respect to the Series 2022A Bonds could adversely affect the market value and liquidity of the Series 2022A Bonds, even though no final determination about the tax-exempt status has been made. If an audit results in a final determination that the Series 2022A Bonds do not qualify as tax-exempt obligations, such a determination could be retroactive in effect to the date of issuance of the Series 2022A Bonds.

In addition to post-issuance compliance, a change in law after the date of issuance of the Series 2022A Bonds could affect the tax-exempt status of the Series 2022A Bonds or the effect of investing in the Series 2022A Bonds. For example, the United States Congress could eliminate or limit the exemption for interest on the Series 2022A Bonds, or it could reduce or eliminate the federal income tax, or it could adopt a so-called flat tax. It cannot be predicted whether or in what form any such change in law may be enacted or whether, if enacted, any such change in law would apply to the Series 2022A Bonds.

The Indenture does not require the Issuer or ADOC to redeem the Series 2022A Bonds and does not provide for the payment of any additional interest or penalty if a determination is made that the Series 2022A Bonds do not comply with the existing requirements of the Internal Revenue Code of 1986, as amended, or if a subsequent change in law adversely affects the tax-exempt status of the Series 2022A Bonds or the effect of investing in the Series 2022A Bonds.

## LEGAL MATTERS

The legality and validity of the Series 2022A Bonds will be approved by Bond Counsel, Maynard, Cooper & Gale, P.C., Birmingham, Alabama. Bond Counsel has been employed primarily for the purpose of preparing certain legal documents and supporting certificates, reviewing the transcript of proceedings by which the Series 2022A Bonds have been authorized to be issued, and rendering an opinion in conventional form as to the validity and legality of the Series 2022A Bonds and the exemption of interest thereon from federal and State of Alabama income taxes. Bond Counsel also served as Disclosure Counsel and assisted in the preparation of this Official Statement.

It is anticipated that Bond Counsel will render an opinion substantially in the form attached hereto as Appendix C. In connection with the rendering of such opinion, Bond Counsel is serving as counsel to the Issuer. Certain legal matters will be passed upon for the Underwriters by their counsel, Bradley Arant Boult Cummings LLP, Birmingham, Alabama.

The various legal opinions to be delivered concurrently with the delivery of the Series 2022A Bonds express the professional judgment of the attorneys rendering the opinions as to the legal issues explicitly addressed therein. By rendering a legal opinion, the opinion giver does not become an insurer or guarantor of that expression of professional judgment, of the transaction opined upon, or of the future performance of parties to the transaction. Nor does the rendering of an opinion guarantee the outcome of any legal dispute that may arise out of the transaction.

## LEGAL INVESTMENTS AND SECURITY FOR DEPOSIT

Chapter 2 of Title 14 of the Code of Alabama (1975) provides that (i) any surplus in any state fund and any retirements or trust fund, where the investment thereof is permitted or required by law, may be invested in the Series 2022A Bonds, and (ii) unless otherwise directed by the court having jurisdiction thereof or the document which is the source of authority, a trustee, executor, administrator, guardian, or one acting in any other fiduciary capacity may, in addition to any other investment powers conferred by law and with the exercise of reasonable business prudence, invest trust funds in the Series 2022A Bonds.

## TAX MATTERS

### General

In the opinion of Bond Counsel, under existing law, interest on the Series 2022A Bonds will be excludable from gross income for federal income tax purposes if each of the Issuer and ADOC complies with all requirements of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), that must be satisfied subsequent to the issuance of the Series 2022A Bonds in order that interest thereon be and remain excludable from gross income. Failure to comply with certain of such requirements could cause the interest on the Series 2022A Bonds to be included in gross income, retroactive to the date of issuance of the Series 2022A Bonds. Each of the Issuer and ADOC has covenanted to comply with all such requirements.

Bond Counsel is also of the opinion that, under existing law, interest on the Series 2022A Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax.

Bond Counsel will express no opinion regarding federal tax consequences arising with regard to the Series 2022A Bonds other than the opinions expressed in the two preceding paragraphs. The form of Bond Counsel's opinion is expected to be substantially as set forth in Appendix C to this Official Statement.

Bond Counsel is also of the opinion that, under existing law, interest on the Series 2022A Bonds will be exempt from State of Alabama income taxation.

### Original Issue Discount

In the opinion of Bond Counsel, under existing law, the original issue discount in the selling price of a Series 2022A Bond, to the extent properly allocable to each owner of such Series 2022A Bond, is excludable from gross income for federal income tax purposes with respect to such owner. The original issue discount is the excess of the stated redemption price at maturity of such Series 2022A Bond over the initial offering price to the public, excluding underwriters and other intermediaries, at which price a substantial amount of the Series 2022A Bonds of such maturity were sold.

Under Section 1288 of the Internal Revenue Code of 1986, as amended, original issue discount on tax-exempt bonds accrues on a compound basis. The amount of original issue discount that accrues to an owner of a Series 2022A Bond during any accrual period generally equals (i) the issue price of such Series 2022A Bond plus the amount of original issue discount accrued in all prior accrual periods, multiplied by (ii) the yield to maturity of such Series 2022A Bond (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period), less (iii) any interest payable on such Series 2022A Bond during such accrual period. The amount of original issue discount so accrued in a particular accrual period will be considered to be received ratably on each day of the accrual period, will be excludable from gross income for federal income tax

purposes, and will increase the owner's tax basis in such Series 2022A Bond. Any gain realized by an owner from a sale, exchange, payment or redemption of a Series 2022A Bond will be treated as gain from the sale or exchange of such Series 2022A Bond.

**Premium**

An amount equal to the excess of the purchase price of a Series 2022A Bond over its stated redemption price at maturity constitutes premium on such Series 2022A Bond. A purchaser of a Series 2022A Bond must amortize any premium over such Series 2022A Bond's term using constant yield principles, based on the purchaser's yield to maturity. As premium is amortized, the purchaser's basis in such Series 2022A Bond is reduced by a corresponding amount, resulting in an increase in the gain (or decrease in the loss) to be recognized for federal income tax purposes upon a sale or disposition of such Series 2022A Bond prior to its maturity. Even though the purchaser's basis is reduced, no federal income tax deduction is allowed. Purchasers of any Series 2022A Bonds at a premium, whether at the time of initial issuance or subsequent thereto, should consult with their own tax advisors with respect to the determination and treatment of premium for federal income tax purposes and with respect to state and local tax consequences of owning such Series 2022A Bonds.

**Collateral Tax Consequences**

Except as expressly stated above, Bond Counsel expresses no opinion regarding any other federal or state tax consequences of acquiring, carrying, owning, or disposing of the Series 2022A Bonds. Prospective purchasers of the Series 2022A Bonds should consult their tax advisors regarding the applicability of any collateral tax consequences of owning the Series 2022A Bonds, which may include original issue discount, original issue premium, purchase at a market discount or at a premium, taxation upon sale, redemption or other disposition, and various withholding requirements.

## UNDERWRITING

The Series 2022A Bonds are being purchased from the Issuer by Stephens Inc., The Frazer Lanier Company Incorporated, Raymond James & Associates, Inc., Wells Fargo Bank, National Association, Blaylock Van LLC, San Blas Securities, LLC, Securities Capital Corporation and Thornton Farish Inc. (the "Underwriters"). The Underwriters have agreed to purchase the Series 2022A Bonds for an aggregate purchase price of $_____ (which represents the face amount of the Series 2022A Bonds less underwriters' discount of $_____ and original issue discount of $_____) plus accrued interest. The initial public offering price set forth on the inside cover page may be changed by the Underwriters, and the Underwriters may offer and sell the Series 2022A Bonds to certain dealers (including dealers depositing the Series 2022A Bonds into investment trusts) and others at prices lower than the offering price set forth on the inside cover page. The Underwriters will purchase all the Series 2022A Bonds if any are purchased.

Wells Fargo Corporate & Investment Banking (which may be referred to elsewhere as "CIB," "Wells Fargo Securities" or "WFS") is the trade name used for the corporate banking, capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Bank, National Association ("WFBNA"), a member of the National Futures Association, which conducts its municipal securities sales, trading and underwriting operations through the Wells Fargo Bank, N.A. Municipal Finance Group, a separately identifiable department of WFBNA, registered with the U.S. Securities and Exchange Commission as a municipal securities dealer pursuant to Section 15B(a) of the Securities Exchange Act of 1934.

WFBNA, acting through its Municipal Finance Group, one of the underwriters of the Series 2022A Bonds, has entered into an agreement (the "WFA Distribution Agreement") with its affiliate, Wells Fargo Clearing Services, LLC (which uses the trade name "Wells Fargo Advisors") ("WFA"), for the distribution of certain municipal securities offerings, including the Series 2022A Bonds. Pursuant to the WFA Distribution Agreement, WFBNA will share a portion of its underwriting or remarketing agent compensation, as applicable, with respect to the Series 2022A Bonds with WFA. WFBNA has also entered into an agreement (the "WFSLLC Distribution Agreement") with its affiliate Wells Fargo Securities, LLC ("WFSLLC"), for the distribution of municipal securities offerings, including the Series 2022A Bonds. Pursuant to the WFSLLC Distribution Agreement, WFBNA pays a portion of

WFSLLC's expenses based on its municipal securities transactions. WFBNA, WFSLLC, and WFA are each wholly-owned subsidiaries of Wells Fargo & Company.

## CONTINUING DISCLOSURE

### General

ADOC has covenanted for the benefit of the holders of the Series 2022A Bonds to provide the Municipal Securities Rulemaking Board's Electronic Municipal Market Access System ("EMMA") with (i) certain financial information and operating data of the State of Alabama on an annual basis (the "Annual Financial Information") on or prior to June 30 following the end of its fiscal year, so long as its fiscal year continues to end on September 30, and (ii) notices ("Material Event Notices") of the occurrence of the following events in a timely manner not in excess of 10 business days after the occurrence of the event:

1. A delinquency in payment of principal of or interest on the Series 2022A Bonds.

2. Non-payment related defaults under the proceedings of the Issuer or ADOC authorizing the Series 2022A Bonds, whether or not such defaults constitute an event of default thereunder, if material.

3. Unscheduled draws on any debt service reserve fund reflecting financial difficulties of the Issuer or ADOC.

4. Unscheduled draws on any credit enhancement or liquidity facility with respect to the Series 2022A Bonds reflecting financial difficulties of the Issuer or ADOC.

5. Substitution of a credit enhancer for the one originally described in the Official Statement (if any), or the failure of any credit enhancer respecting the Series 2022A Bonds to perform its obligations under the agreement between the Issuer or ADOC and such credit enhancer.

6. The existence of any adverse tax opinion with respect to the Series 2022A Bonds, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701 TEB) or other material notices or determinations with respect to the tax status of the Series 2022A Bonds, or other material events affecting the tax status of the Series 2022A Bonds.

7. Any modification of the rights of the registered owners of the Series 2022A Bonds, if material.

8. Redemption of any of the Series 2022A Bonds prior to the stated maturity or mandatory redemption date thereof, if material, and tender offers with respect to the Series 2022A Bonds.

9. Defeasance of the lien of any of the Series 2022A Bonds or the occurrence of circumstances which, pursuant to such authorizing proceedings, would cause the Series 2022A Bonds, or any of them, to be no longer regarded as outstanding thereunder.

10. The release, substitution or sale of the property securing repayment of the Series 2022A Bonds, if material.

11. Any changes in published ratings affecting the Series 2022A Bonds.

12. Bankruptcy, insolvency, receivership or similar event of the Issuer or ADOC.

13. The consummation of a merger, consolidation, or acquisition involving the Issuer or ADOC or the sale of all or substantially all of the assets of the Issuer or ADOC, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material.

14.     Appointment of a successor or additional trustee or the change of name of a trustee, if material.

15.     Incurrence of a financial obligation of the Issuer or ADOC, if material, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of a financial obligation of the Issuer or ADOC, any of which affect security holders, if material.

16.     Default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a financial obligation of the Issuer or ADOC, any of which reflect financial difficulties.

In addition, ADOC has covenanted to provide in a timely manner to EMMA notice of ADOC's failure to provide the Annual Financial Information on or before the date specified herein. Finally, if the State of Alabama's fiscal year should be changed, ADOC will provide the Annual Financial information to EMMA within 275 days after the end of the new fiscal year.

As used above in paragraphs (15) and (16), the term "financial obligation" means a: (i) debt obligation; (ii) derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation; or (iii) guarantee of a debt obligation or such a derivative instrument; the term "financial obligation" does not include municipal securities as to which a final official statement has been provided to the Municipal Securities Rulemaking Board consistent with Rule 15c2-12 of the Securities and Exchange Commission.

Each year the State of Alabama prepares an Annual Comprehensive Financial Report (the "ACFR"). The ACFR includes financial information and operating data of the State of Alabama of the type found in "Appendix A – Certain Information Regarding the State of Alabama" to this Official Statement. The ACFR includes audited financial statements prepared in accordance with generally accepted accounting principles. The filing of the ACFR will satisfy the covenants of ADOC to the holders of the Series 2022A Bonds to provide the Annual Financial Information.

ADOC shall never be subject to money damages for its failure to comply with its obligations to provide the required information. The only remedy available to the holders of the Series 2022A Bonds for breach by ADOC of its obligations to provide the required information shall be the remedy of specific performance or mandamus against appropriate officials of ADOC. The failure by ADOC to provide the required information shall not be an event of default with respect to the Series 2022A Bonds under the Indenture. A failure by ADOC to comply with its obligations to provide the required information must be reported as described above and must be considered by any broker, dealer, or municipal securities dealer before recommending the purchase or sale of the Series 2022A Bonds in the secondary market. Consequently, such a failure may adversely affect the transferability and liquidity of the Series 2022A Bonds and their market price.

No person other than ADOC shall have any liability or responsibility for compliance by ADOC with its obligations to provide information. The Trustee has not undertaken any responsibility with respect to any required reports, notices or disclosures.

ADOC retains the right to modify its obligations described above as long as such modification is done in a manner consistent with Rule 15c2-12 of the Securities and Exchange Commission as supported by the opinion of nationally recognized counsel.

**Compliance with Prior Undertakings**

The State of Alabama and certain of its departments, commissions, and public corporations agreed in prior continuing disclosure agreements to file on EMMA Annual Financial Information in the form of the State of Alabama's Annual Comprehensive Financial Report. The following table shows (i) when the State of Alabama's audited Annual Comprehensive Financial Report was released by the auditor, (ii) when the State of Alabama filed its audited Annual Comprehensive Financial Report with EMMA, and (iii) when the State of Alabama filed its unaudited draft Annual Comprehensive Financial Report with EMMA, if applicable.

| Fiscal Year Ended September 30 | Date Financial Statements Were Released by Auditor | Date Audited Annual Comprehensive Financial Report was Filed with EMMA | Date Unaudited Draft Annual Comprehensive Financial Report was Filed with EMMA |
|---|---|---|---|
| 2021 | March 31, 2022 | March 31, 2022 | N/A |
| 2020 | March 31, 2021 | March 31, 2021 | March 29, 2021[1] |
| 2019 | March 31, 2020 | March 31, 2020 | March 27, 2020 |
| 2018 | March 29, 2019 | March 29, 2019 | N/A |
| 2017 | November 20, 2018 | November 21, 2018 | March 30, 2018[2] |

[1] Although the State of Alabama's FY2020 Annual Comprehensive Financial Report was filed by the filing deadline contained in certain prior continuing disclosure agreements, certain operating data required to be filed with EMMA under terms of such prior continuing disclosure agreements (and not contained in the FY2020 Annual Comprehensive Financial Report) was filed fifteen (15) days late.

[2] The State of Alabama filed a notice on March 26, 2018 advising that it would not be able to provide its audited Annual Comprehensive Financial Report or annual financial information by the filing deadline contained in certain continuing disclosure agreements.

## RATINGS

Fitch Ratings, Inc., Moody's Investors Service, Inc., and S&P Global Ratings, a division of Standard & Poor's Financial Services LLC, have assigned ratings to the Series 2022A Bonds as indicated on the cover page.

Any definitive explanation of the significance of any such ratings may be obtained only from the appropriate rating agency. The Issuer furnished to each rating agency the information contained in this Official Statement and certain other information respecting the Issuer and the Series 2022A Bonds. Generally, rating agencies base their ratings on such materials and information, as well as on their own investigations, studies and assumptions.

The above ratings are not recommendations to buy, sell or hold the Series 2022A Bonds, and any such ratings may be subject to revision or withdrawal at any time by any such rating agency. Any downward revision or withdrawal of any or all of such ratings may have an adverse effect on the market price of the affected Series 2022A Bonds. Except as may be required in connection with the obligations described under the heading "CONTINUING DISCLOSURE", neither the Issuer nor the Underwriters have undertaken any responsibility either to bring to the attention of the Series 2022A Bondholders any proposed revision, suspension or withdrawal of a rating or to oppose any such revision, suspension or withdrawal.

## FINANCIAL ADVISOR

PFM Financial Advisors LLC, Huntsville, Alabama, is serving as financial advisor (the "Financial Advisor") to the Issuer with respect to the sale of the Series 2022A Bonds. The Financial Advisor assisted in the preparation of this Official Statement and in other matters relating to the planning, structuring and issuance of the Series 2022A Bonds and provided other advice. The Financial Advisor will not participate in underwriting any of the Series 2022A Bonds.

## DISCLAIMERS AND OTHER MISCELLANEOUS MATTERS

This Official Statement is not to be construed as a contract or agreement between the Issuer and the purchasers or holders of any of the Series 2022A Bonds.

All quotations from and summaries and explanations of provisions of laws and documents herein do not purport to be complete, and reference is made to such laws and documents for full and complete statements of their provisions.

The order and placement of material in this Official Statement, including its appendices, are not to be deemed a determination of relevance, materiality or importance, and all material in this Official Statement, including its appendices, must be considered in its entirety.

The information in this Official Statement has been obtained from sources which are considered dependable and which are customarily relied upon in the preparation of similar official statements, but such information is not guaranteed as to accuracy or completeness.

The delivery of this Official Statement at any time does not imply that any information herein is correct as of any time subsequent to the date of this Official Statement.

All estimates and assumptions contained herein are believed to be reliable, but no representation is made that such estimates or assumptions are correct or will be realized.

No person, including any broker, dealer or salesman, has been authorized to give any information or to make any representation other than those contained in this Official Statement, and if given or made, such other information or representations must not be relied upon as having been authorized by the Issuer.

The Series 2022A Bonds will not be registered under the Securities Act of 1933, as amended, or any state securities laws and will not be listed on any stock or other securities exchange, and neither the Securities and Exchange Commission nor any federal, state, municipal or other governmental agency will pass upon the accuracy, completeness or adequacy of this Official Statement. Any representation to the contrary is a criminal offense. The Indenture has not been qualified under the Trust Indenture Act of 1939, as amended.

Any information or expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale hereunder shall under any circumstances create an implication that there has been no change as to the affairs of the Issuer since the date hereof.

This Official Statement may contain forward-looking statements. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based only on the Issuer's current beliefs, expectations, and assumptions regarding the future of the Issuer's operations, future plans and strategies, projections, anticipated events and trends, the economy, and other future conditions. Forward-looking statements can be identified by words such as: "anticipate", "intend", "plan", "goal", "seek", "believe", "project", "estimate", "expect", "strategy", "future", "likely", "may", "should", "will", and similar references to future periods. Because forward-looking statements relate to the future, they are subject to inherent uncertainties, risks, and changes in circumstances that are difficult to predict and many of which are outside of the Issuer's control. The Issuer's actual results and financial condition may differ materially from those indicated in the forward-looking statements. Therefore, prospective investors should not place undue reliance on these forward-looking statements. Important factors that could cause the Issuer's actual results and financial condition to differ materially from those indicated in the forward-looking statements include, among others, population trends and political and economic developments that could adversely impact the collection of revenues and those factors described in this Official Statement under "RISK FACTORS". Any forward-looking statement made by the Issuer in this Official Statement is based only on information currently available to the Issuer and speaks only as of the date on which it is made. The Issuer undertakes no obligation to publicly update any forward-looking statement whether as a result of new information, future developments, or otherwise.

In connection with this offering, the Underwriters may over allot or effect transactions which stabilize or maintain the market price of the Series 2022A Bonds offered hereby at a level above that which might otherwise prevail in the open market, and such stabilizing, if commenced, may be discontinued at any time. The prices and other terms of the offering and sale of the Series 2022A Bonds may be changed from time to time by the Underwriters after the Series 2022A Bonds are released for sale, and the Series 2022A Bonds may be offered and sold at prices other than the initial offering prices, including sales to dealers, without prior notice.

The Underwriters have provided the following sentence for inclusion in this Official Statement: The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

This Official Statement is being provided to prospective purchasers either in bound printed format or in electronic format. This Official Statement may be relied upon only if it is in its bound printed format or as printed in its entirety in such electronic format.

## ADDITIONAL INFORMATION

For further information during the initial offering period with respect to the Series 2022A Bonds, contact Director of Finance, State of Alabama, State Capitol Complex, N-200, 600 Dexter Avenue, Montgomery, Alabama 36130 (telephone: (334) 242-7160).



[THIS PAGE INTENTIONALLY LEFT BLANK.]

**APPENDIX A**

**CERTAIN INFORMATION REGARDING**
**THE STATE OF ALABAMA**



[THIS PAGE INTENTIONALLY LEFT BLANK.]

<h1 align="center">TABLE OF CONTENTS</h1>

<div align="right"><b>Page</b></div>

GENERAL INFORMATION ........................................................................................ 1
  Annual Comprehensive Financial Report ..........................................................1
  Reporting Entity – Annual Report......................................................................1
  Budgetary Controls............................................................................................1
  Certain Financial Information ............................................................................2
  Population............................................................................................................2

ECONOMY ............................................................................................................ 4
  General ................................................................................................................4
  Personal Income .................................................................................................5
  Employment ........................................................................................................6
  Real Gross Domestic Product (formerly Real Gross State Product)...................13
  Transportation.....................................................................................................15
  Utilities ...............................................................................................................16
  Education .............................................................................................................17

GOVERNMENTAL ORGANIZATION AND SERVICES ................................... 18
  Legislative Branch..............................................................................................18
  Executive Branch................................................................................................19
  Judicial Branch ...................................................................................................20

INDEBTEDNESS.................................................................................................... 20
  Limitations on Debt............................................................................................20
  General Obligation Debt.....................................................................................21
  Limited Obligation Bonds of State Departments and Certain State Authorities.......22
  General Obligation Bonds Authorized and Unissued .........................................26
  Limited Obligation Bonds Authorized and Unissued .........................................27
  Interest Rate Hedging Agreements......................................................................27

MAJOR OPERATING FUNDS .............................................................................. 27
  The General Fund................................................................................................28
  The Education Trust Fund ...................................................................................29
  The Public Road and Bridge Fund .....................................................................31
  Unemployment Compensation Trust Fund .........................................................33

THE BUDGETARY PROCESS AND FINANCIAL CONTROLS ......................... 33
  The Budgetary Process .......................................................................................33
  General Fund and Education Trust Fund Budgetary Status for Fiscal Years 2021 and
    2022.................................................................................................................33
  Financial Controls ..............................................................................................35

RECEIPTS, DISBURSEMENTS, TAXES AND REVENUES.................................. 39
  General ................................................................................................................39
  State Taxes and Other Major Sources of Revenues and Income..............................43

<div align="center">A-i</div>

Recently Enacted Legislation ....................................................................................................54

STATE RETIREMENT PROGRAMS................................................................................. 56
   General .....................................................................................................................................56
   Benefits Provided ...................................................................................................................59
   DROP Program.......................................................................................................................59
   PLOP Program........................................................................................................................60
   Annual Valuation and Unfunded Accrued Liability ..............................................................60
   Teachers' Retirement System.................................................................................................62
   Employees' Retirement System .............................................................................................63
   Judicial Retirement Fund........................................................................................................64
   Total Unfunded Liability of System.......................................................................................66
   Employer Contributions .........................................................................................................66
   Future Increases in Benefits ...................................................................................................68
   Solvency Tests........................................................................................................................68
   Other Post Employment Benefits (OPEB) ............................................................................70
   Additional Information ...........................................................................................................76

LITIGATION........................................................................................................................ 76
   General ...................................................................................................................................76
   ADOC .....................................................................................................................................77


Table 1. Population .................................................................................................................. 3

Table 2. Urban-Rural Population............................................................................................. 4

Table 3. Alabama Personal Income and Comparison of Alabama Per Capita Personal
   Income to the Southeast and the United States ..................................................................... 5

Table 4. Civilian Labor Force Trends...................................................................................... 9

Table 5. Annual Average Nonagricultural Employment ........................................................ 10

Table 6. Alabama's Top Ten Employers 2021 ....................................................................... 11

Table 7. Alabama's Manufacturers based on Employment ..................................................... 12

Table 8. Alabama's Real Gross Domestic Product.................................................................. 13

Table 9. Rates of Change in Real Gross Domestic Product Alabama and the United States ....... 14

Table 10.  Port of Mobile Cargo Tonnage, 2002-2020.......................................................... 15

Table 11. Educational Attainment for the Population 25 Years and Older .............................. 18

Table 12. State of Alabama General Obligation Debt ............................................................. 21

Table 13. Limited Obligation Bonds of State Departments and ................................................. 23

Certain State Authorities Outstanding ....................................................................................... 23

Table 14. Debt Service on All Bonds Outstanding ...................................................................... 25

Table 15. Debt Ratios ................................................................................................................. 26

Table 16. General Fund Summary of Receipts and Disbursements ............................................ 29

Table 17.  Education Trust Fund Summary of Receipts and Disbursements (Cash Basis) .......... 30

Table 18. Public Road and Bridge Fund Summary of Receipts and Disbursements .................... 32

Table 19. Condition of Funds ..................................................................................................... 34

Table 20. History of General Fund and Education Trust Fund Proration ..................................... 37

Table 21.   Schedule of Receipts and Disbursements (Cash Basis) Governmental Fund
Types (State Treasury Funds Only) ........................................................................................ 40

Table 22. Summary of Revenues by Principal Sources (Cash Basis) Governmental Funds
in State Treasury ................................................................................................................... 41

Table 23. Assessed Valuation of Property Subject to Ad Valorem Taxation by Categories[1]
................................................................................................................................................. 44

Table 24. Fund Balance of Assets in the Alabama Trust Fund ................................................... 46

Table 25.  Participating Employers by System ........................................................................... 58

Table 26. Number of Active and Retired Members..................................................................... 59

Table 27. Pension Assumption Method ...................................................................................... 61

Table 28. Historical Funded Status Teachers' Retirement System.............................................. 62

Table 29. History of Additions and Deductions Teachers' Retirement System   (dollar
amounts in millions) ............................................................................................................. 62

Table 30. Historical Funded Status Employees' Retirement System – Total All Groups ............ 63

Table 31. History of Additions and Deductions Employees' Retirement System........................ 63

Table 32. Unfunded Accrued Liability – Employees' Retirement System .................................. 64

Table 33. Historical Funded Status  Judicial Retirement Fund ................................................... 65

Table 34. History of Additions and Deductions Judicial Retirement Fund ................................. 65

Table 35. Pension Unfunded Accrued Liability .......................................................... 66

Table 36. Employer Retirement Contributions ........................................................... 67

Table 37. Teachers' Retirement System of Alabama Solvency Test 2015-2020 ......... 68

Table 38. Employees' Retirement System of Alabama Solvency Test 2015-2020 ...... 69

Table 39. Judicial Retirement Fund Solvency Test 2015-2020 ................................... 70

Table 40. Number of Active and Retired Employees .................................................. 71

Table 41. OPEB Assumptions .................................................................................... 73

Table 42. Schedule of OPEB Funding Progress ........................................................ 74

Table 43. OPEB Unfunded Actuarial Accrued Liability ............................................ 75

Table 44. OPEB Annual Required Contribution ........................................................ 76

# APPENDIX A

## CERTAIN INFORMATION REGARDING THE
## STATE OF ALABAMA

## GENERAL INFORMATION

### Annual Comprehensive Financial Report

The Annual Comprehensive Financial Report (sometimes referred to herein as the "Annual Report") of the State of Alabama (the "State") for the fiscal year ended September 30, 2021, can be found online at http://www.emma.msrb.org.

### Reporting Entity – Annual Report

The Annual Comprehensive Financial Report of the State of Alabama presents financial information on all of State government as a single reporting entity. While State law allows many State organizations to operate largely independent of the daily central control and scrutiny of the Department of Finance, State Auditor and State Treasurer, the Annual Report combines the financial data of all State organizations in order to present a comprehensive picture of State finances. The numerous departments, agencies, elected officials, boards, commissions, authorities, colleges, universities and other organizational units of the State are included in the Annual Report in accordance with standards established by the Governmental Accounting Standards Board. These standards make a distinction between organizations that are considered to be part of the primary government of the State and those that are component units. A component unit is defined as a legally separate corporate entity for which the State is considered to be financially accountable. The criteria used to determine financial accountability include the appointment of a majority of the governing board, the ability of the State to impose its will on the organization and the potential for the organization to be a financial benefit or financial burden to the State.

The State is also considered financially accountable for any organization having an independently appointed board if that organization is fiscally dependent on the State. An organization is fiscally dependent if it is unable to adopt a budget, set rates or charges or issue bonded debt without the approval of the State. Component units can be reported as if they are a part of the primary government ("blended presentation") if they provide services solely to the government or if their debt is repaid solely by the government, but many of the State's component units do not and are therefore presented separately ("discrete presentation") in these financial statements. The largest of the blended component units includes the Public School and College Authority, Department of Mental Health, and the Federal Aid Highway Finance Authority. The major discretely presented component units are the University of Alabama, Auburn University, the University of South Alabama, the Alabama Housing Finance Authority, the Public Education Employees' Health Insurance Board, and the Alabama Community College System. Reference is made herein to the notes to the Annual Comprehensive Financial Report for a more complete description of the State's reporting entities.

### Budgetary Controls

Budgetary control is exercised through the Executive Budget Office of the Department of Finance pursuant to the annual appropriation acts of the Alabama Legislature (the "Appropriation

Acts"). The Appropriation Acts include legally adopted budgets for the General Fund, the Education Trust Fund, and other budgeted funds. The Appropriation Acts identify the source of funding and the programmatic (functional) areas for which expenditures are authorized. Both the Constitution of Alabama of 1901, as amended (the "State Constitution"), and Alabama statutes require a balanced budget for annual financial operations. In the event revenue collections do not meet budget projections, the Governor is required to prorate appropriations and restrict allotments to prevent an overdraft in any fiscal year for which appropriations are made. Allotments of appropriations are made quarterly based on plans of operations submitted by the departments and agencies. These appropriations and allotments are enforced by automated edits that prevent allotments in excess of appropriations and expenditures in excess of allotments. Encumbrance accounting is utilized as purchase orders are issued to ensure that purchase orders plus expenditures do not exceed allotment balances. The Budget Office further tightens controls at fiscal-year end by verifying that the total of purchase orders plus expenditures plus any obligations (accounts payable) incurred against fiscal year appropriations do not exceed allotments. Moreover, the Budget Office confirms that remaining allotments do not exceed cash in the State Treasury. For further information on the budgetary process, see "The Budgetary Process and Financial Controls – Financial Controls" below.

**Certain Financial Information**

The financial information contained in this Official Statement regarding the State is extracted from reports or information prepared by the State Treasurer, the Department of Revenue, the Alabama Department of Transportation, the Retirement System of Alabama, the Alabama State Employees' Insurance Board and the State Department of Finance. The Department of Examiners of Public Accounts, an arm of the Alabama Legislature, examines and audits the books, accounts and records of all State departments and agencies.

The fiscal year of the State extends from October 1 of a given calendar year to September 30 of the ensuing year. All references to State financial information in this Official Statement (unless specifically noted to the contrary) are to fiscal years of the State.

Alabama statutes mandate the use of the cash basis of accounting for budgetary purposes. Under the cash basis, revenues and expenditures are recorded at the time cash is received or disbursed in accordance with the Appropriation Acts. Unless otherwise noted, financial tables in this report are on the cash basis.

**Population**

According to the 2021 estimate released by the U.S. Census Bureau, the State had a total population of 5,039,877 as of July 2021. The population density of the State in 2010 (the year of the most recent federal Census information available) was approximately 94.4 persons per square mile for each of its 50,645 square miles of land area, as compared to 87.4 persons per square mile for the United States. The following tables demonstrate population trends in the State as compared to the United States for the years indicated.

**Table 1.**
**Population**

| Year | Alabama | | United States | |
| | Population | Change Over Preceding Period | Population | Change Over Preceding Period |
|---|---|---|---|---|
| 1990 | 4,040,389 | 3.8% | 248,709,873 | 9.8% |
| 2000 | 4,447,100 | 10.1% | 281,421,906 | 13.2% |
| 2001 | 4,464,034 | 0.4% | 285,081,556 | 1.3% |
| 2002 | 4,472,420 | 0.2% | 287,803,914 | 1.0% |
| 2003 | 4,490,591 | 0.4% | 290,326,418 | 0.9% |
| 2004 | 4,512,190 | 0.5% | 293,045,739 | 0.9% |
| 2005 | 4,545,049 | 0.7% | 295,753,151 | 0.9% |
| 2006 | 4,597,688 | 1.2% | 298,593,212 | 1.0% |
| 2007 | 4,637,904 | 0.9% | 301,579,895 | 1.0% |
| 2008 | 4,677,464 | 0.9% | 304,374,846 | 0.9% |
| 2009 | 4,708,708 | 0.7% | 307,006,550 | 0.9% |
| 2010 | 4,779,736 | 1.5% | 308,745,538 | 0.6% |
| 2011 | 4,803,689 | 0.5% | 311,587,816 | 0.9% |
| 2012 | 4,822,023 | 0.4% | 313,914,040 | 0.7% |
| 2013 | 4,833,722 | 0.2% | 316,128,839 | 0.7% |
| 2014 | 4,849,377 | 0.3% | 318,857,056 | 0.9% |
| 2015 | 4,858,979 | 0.2% | 321,418,820 | 0.8% |
| 2016 | 4,863,300 | 0.1% | 323,127,513 | 0.5% |
| 2017 | 4,874,747 | 0.2% | 325,719,178 | 0.8% |
| 2018 | 4,887,871 | 0.3% | 327,167,434 | 0.4% |
| 2019 | 4,903,185 | 0.3% | 328,239,523 | 0.3% |
| 2020 | 5,024,279 | 2.5% | 331,449,281 | 1.0% |
| 2021 | 5,039,877 | 0.3% | 331,893,745 | 0.1% |

Note: 1990, 2000, 2010 and 2020 are Federal Decennial Census data; 2001 to 2009, 2011 to 2019 and 2021 are estimates.

Source: US Census Bureau

**Table 2.**
**Urban-Rural Population**

| | Alabama | | United States | |
|---|---|---|---|---|
| Year | Urban % of Total Population | Rural % of Total Population | Urban % of Total Population | Rural % of Total Population |
| 1970 | 58.6 | 41.4 | 73.6 | 26.3 |
| 1980 | 60.0 | 40.0 | 73.7 | 26.3 |
| 1990 | 60.3 | 39.7 | 75.2 | 24.8 |
| 2000 | 55.4 | 44.6 | 79.0 | 21.0 |
| 2010 | 59.0 | 41.0 | 80.7 | 19.3 |

Source: US Census Bureau

## ECONOMY

**General**

Despite the COVID-19 pandemic beginning in early 2020, Alabama's economy has shown resilience in the face of challenges triggered by the global public health crisis. After the initial shocks caused profound disruptions for Alabama's manufacturing sector, many industrial companies were able to put enhanced safety measures in place and resume production. In fact, many manufacturers have announced growth projects in Alabama during 2021 and 2022. These include The J.M. Smucker Co., which launched a $1.1 billion project to open a manufacturing facility and distribution hub with 750 jobs in Jefferson County, and Austal, which opened a $100 million shipbuilding facility in Mobile to construct steel vessels for the U.S. Navy and other customers. Overall, Alabama's labor market has demonstrated the same resilience. After spiking as high as 13.8% in April 2020, Alabama's unemployment rate showed sustained improvement, falling below 2.9% in March 2022, tying the state's all-time record law jobless rate. Over the year, wage and salary employment in Alabama increased by 40,100, with the civilian labor force topping 2.2 million. Retail sales, another important barometer of the state's economy, set new records in late 2021. The Alabama Retail Association reported that sales for November and December totaled $17 billion, the highest figure ever recorded. That represented a gain of 15.4% from the traditional holiday period in 2020, and the second consecutive year for a double-digit increase in holiday sales. Alabama's sales tax collections for all of 2021 surged more than 17% from the previous year, according to the group.

Looking forward, there are indications that Alabama's economy will continue along a growth trajectory. In early 2022, AIDT, the state's primary workforce development agency, announced that it was working with 139 companies that are hiring Alabamians in 36 of the state's 67 counties, representing 29,400 job opportunities. Business leaders surveyed by the University of Alabama's Center for Business and Economic Research (CBER) indicated they expect to see Alabama's Gross Domestic Product (GDP) rise 2.5% in 2022. This growth rate trails 2021's 4.1% rebound, but it's a continuation of the rebound from the 3.2% drop in the state's GDP in 2020. CBER also projects that employment in Alabama will increase by 1.5% in 2022, while total tax receipts will increase 12% for Fiscal 2022.

Alabama is naturally susceptible to the effects of extreme weather events and natural disasters, including floods, droughts, tornadoes and hurricanes. The occurrence of such events can produce significant ecological, environment and economic impacts. Such impacts can be exacerbated by a longer-term shift in the climate over several decades (commonly referred to as climate change) including increasing global temperatures and rising sea levels. Such events, as potentially exacerbated by climate change, increase the potential of considerable financial loss to the State, including, without limitation, substantial losses in tax revenues. In addition, many residents, business and government operations could be severely disabled for significant periods of time or displaced, and the State could be required to mitigate those effects at a potentially material cost.

**Personal Income**

The State's total personal income increased 7.1% from 2020 to 2021, as compared with a nationwide increase of 7.4% during the same period. The State's per capita personal income increased 6.8% from 2020 to 2021, compared to a nationwide increase of 7.3% during the same period.

The following table shows total personal income and per capita personal income in the State as compared to the Southeast region and the United States for the years indicated.

**Table 3.**
**Alabama Personal Income and Comparison of**
**Alabama Per Capita Personal Income to the Southeast and the United States**

| Year | Alabama Total Personal Income[1] | Per Capita Personal Income | | |
|---|---|---|---|---|
| | | Alabama | Southeast[2] | United States |
| 1980 | $31,037 | $7,957 | $8,802 | $10,180 |
| 1990 | 64,240 | 15,861 | 17,472 | 19,621 |
| 2000 | 108,215 | 24,306 | 27,337 | 30,672 |
| 2010 | 162,531 | 33,946 | 36,774 | 40,683 |
| 2011 | 168,474 | 35,010 | 38,365 | 42,747 |
| 2012 | 173,362 | 35,824 | 39,729 | 44,548 |
| 2013 | 175,185 | 36,014 | 39,605 | 44,798 |
| 2014 | 181,079 | 37,055 | 41,459 | 46,887 |
| 2015 | 189,115 | 38,531 | 43,171 | 48,725 |
| 2016 | 192,364 | 39,014 | 43,951 | 49,613 |
| 2017 | 199,336 | 40,252 | 45,748 | 51,573 |
| 2018 | 207,054 | 41,607 | 47,633 | 53,817 |
| 2019 | 215,930 | 43,157 | 49,414 | 55,724 |
| 2020 | 228,749 | 45,524 | 52,213 | 59,147 |
| 2021 | 244,976 | 48,608 | 56,118 | 63,444 |

Note (1)    In millions of dollars.

Note (2)    Includes Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Virginia and West Virginia.

Source:    U.S. Department of Commerce, Bureau of Economic Analysis; Last updated: March 23, 2022 – preliminary statistics for 2021; revised statistics for 2010-2020.

**Employment**

Prior to the emergence of COVID-19, Alabama's economy had demonstrated growth over several years, with employment levels reaching all-time highs and unemployment rates plumbing new lows. Despite a brief period of disruption in 2020, Alabama's economy has regained its momentum. In March 2022, Alabama's economy supported over 2 million non-farm jobs, while the number of unemployed persons totaled just 65,485, a record low figure. Despite COVID-19's persistence, Alabama's economy steadily improved throughout 2021 and into early 2022. The March unemployment rate of 2.9% was down from March 2021's rate of 3.7%, according to the Alabama Department of Labor.

Meanwhile, developments in many of Alabama's traditional industries during 2021 are setting the stage for future growth. Alabama's auto sector continues to attract new investment, including more than $536 million in announced projects during 2021, creating 1,426 anticipated jobs, according to data from the Alabama Department of Commerce. The same data show that the state's distribution/logistics sector will see $590 million in investment from growth projects announced in 2021, generating 2,384 jobs. In addition, projects announced in 2021 in Alabama's metals and advanced materials sector involve investments totaling $978 million and 1,100 jobs, according to Alabama Department of Commerce projections. Companies in other core industrial sectors such as forest products, food production and chemicals have also announced growth projects that will generate significant economic activity.

Economic development activity has remained strong across Alabama, with new facility and expansion projects involving more than $40 billion in new capital announced between 2015 and 2021. Projects in 2021 alone involved over $7.7 billion in new capital investment, with thousands of jobs being created in key industries. Alabama remains a magnet for foreign direct investment, with 44 FDI projects valued at $1.1 billion and projected to create over 1,700 jobs announced in 2021, according to data from the Alabama Department of Commerce. Since 2013, Alabama has benefited from $19.8 billion in FDI in projects expected to create over 33,000 jobs.

Before COVID-19, Alabama's manufacturing climate was thriving, with steady gains in employment, rising productivity, and increasing sophistication among manufacturers. The pandemic did little to change that trajectory. In March 2022, a total of 267,000 Alabamians worked in manufacturing, a figure that rose 3,600 positions over the course of 12 months, according to Alabama Department of Labor data. Manufacturing remains a core of Alabama's economy, accounting for 13% of Alabama's total workforce. The state ranks No. 5 among U.S. states in the concentration of manufacturing employment. Alabama manufacturers generate output that is equal to 16.8% of the state's annual GDP figure. Those figures are higher than the average for the U.S., with manufacturing accounting for 10.9% of the nation's total economic output and 8.6% of total employment. Overall, manufacturing output in Alabama has risen from less than $28 billion in 2010 to $38.4 billion in 2019, according to the latest available data from the National Association of Manufacturers.

Alabama's auto industry remains a dynamic growth engine for the state's economy, overcoming challenges posed by the pandemic. The production launch at Mazda Toyota Manufacturing in Huntsville in 2021 represents an important milestone in the history of Alabama's auto industry. This project will not only bring up to 4,000 direct jobs but also a fifth global automaker, Mazda, to Alabama. An additional $830 million in capital investment was announced

in August 2020, pushing the total investment in the facility to more than $2.3 billion. In addition, a dozen Mazda Toyota suppliers, logistics firms and support companies have pinpointed sites in Alabama for locations that will create over 2,000 new auto-sector jobs, most of them in the Huntsville area. Combined, their investment tops $725 million.

Developments in the electric vehicle space are adding spark to the sector's growth trajectory in 2022. Hyundai, for instance, is adding 200 jobs at its Montgomery facility with a $300 million investment to begin production of the electrified Genesis GV70 and an electric hybrid version of the Santa Fe sport utility vehicle. Mercedes-Benz, meanwhile, is moving toward completion of a $1 billion project that will see the automaker assemble two all-electric luxury sport utility vehicles at its Tuscaloosa County plant, supported by a new battery plant that opened just miles away. Toyota also plans to invest $222 million at its Huntsville engine plant, where it will create a four-cylinder line capable of producing combustion and electric hybrid powertrains.

While the aerospace/aviation sector has been impacted by the pandemic, the potential for growth in this important Alabama industrial sector remains strong. In 2021, the U.S. Air Force announced that it had selected Huntsville as the preferred location for the headquarters of the new U.S. Space Command, a decision that will bring thousands of jobs to the city if it is upheld. This development could add fuel to North Alabama's aerospace industry, which continues to grow. Space flight company Blue Origin has begun manufacturing rocket engines for the United Launch Alliance's next-generation Vulcan rocket, which is being assembled in nearby Decatur. Lockheed Martin is growing in the region through its flagship location for work on hypersonic technologies. In Mobile, Airbus has added the A220 aircraft to the production lineup at its only U.S. manufacturing center, where A320 Family passenger jets have been assembled since 2016. Employment in Alabama's aerospace manufacturing sector remained solid throughout the year, totaling 13,000 in March 2022, according to the Alabama Department of Labor. Data from the Alabama Department of Commerce shows that growth projects announced during 2021 in the aerospace/aviation sector will bring $220 million in new investment, along with 667 anticipated jobs.

While at times overlooked, Alabama's bioscience industry delivers a major financial impact for the state. Alabama is home to 780 bioscience establishments employing nearly 18,000 people earning average annual salaries exceeding $67,000, according to an analysis conducted by researchers at The University of Alabama on behalf of BioAlabama, an industry trade group. The report emphasized that Alabama possesses key strengths in life sciences segments such as medical research, drug discovery, genomic medicine, and medical devices. Another study, from the Biotechnology Innovation Organization (BIO) and TEConomy Partners LLC, found that Alabama ranked in the top 10 nationally for the concentration of academic bioscience research and development expenditures. The University of Alabama at Birmingham (UAB), in particular, is a research powerhouse, receiving nearly $849 million in research awards and extramural awards in Fiscal 2021, an increase of $211 million from the previous year. UAB said the extraordinary one-year increase of 33% included two pandemic-related awards totaling $201 million. In addition, UAB is constructing a $78 million facility, the Altec/Styslinger Genomic Medicine and Data Sciences Building, to advance its leadership in precision medicine, genomic science and biomedical research.

A key priority expressed in Accelerate Alabama 2.0, the state's updated strategic economic development growth plan, is fostering the growth of technology-focused jobs in fields including R&D, engineering, and design. Companies including Evonik (medical devices), GKN Aerospace (composite aerostructures) and New Flyer (electric buses) have all joined Boeing (aerospace technologies) in setting up R&D centers in Alabama in recent years. Another high-level priority for Alabama is to expand information technology jobs in the state. A notable success during 2021 was the recruitment of Landing, a technology-focused company creating a model for flexible apartment living that relocated its headquarters from San Francisco to Birmingham, where it is creating over 800 jobs. The Alabama Innovation Corporation, a public-private partnership, is a new initiative created to support statewide entrepreneurship, rural businesses, R&D at existing companies, and access to advanced technical skills that will drive a future workforce.

[remainder of this page intentionally left blank]

The following table depicts the overall level of employment in the State (not seasonally adjusted) for the following years.

**Table 4.**
**Civilian Labor Force Trends**

| | Alabama (in thousands) | | | Unemployment Rates (%) | | |
|---|---|---|---|---|---|---|
| Year | Labor Force | Employed | Unemployed | Alabama | East South Central[1] | United States |
| 2002 | 2,113 | 1,988 | 125 | 5.9 | 5.7 | 5.8 |
| 2003 | 2,129 | 2,002 | 127 | 6.0 | 5.9 | 6.0 |
| 2004 | 2,138 | 2,019 | 120 | 5.6 | 5.6 | 5.5 |
| 2005 | 2,140 | 2,045 | 95 | 4.4 | 5.7 | 5.1 |
| 2006 | 2,170 | 2,083 | 87 | 4.0 | 5.2 | 4.6 |
| 2007 | 2,180 | 2,092 | 88 | 4.1 | 4.9 | 4.6 |
| 2008 | 2,177 | 2,050 | 127 | 5.8 | 6.4 | 5.8 |
| 2009 | 2,157 | 1,939 | 218 | 10.1 | 10.2 | 9.3 |
| 2010 | 2,197 | 1,969 | 228 | 10.4 | 10.1 | 9.6 |
| 2011 | 2,202 | 1,991 | 211 | 9.6 | 9.4 | 8.9 |
| 2012 | 2,179 | 2,001 | 178 | 8.2 | 8.2 | 8.1 |
| 2013 | 2,172 | 2,013 | 159 | 7.3 | 7.8 | 7.4 |
| 2014 | 2,165 | 2,019 | 146 | 6.7 | 6.7 | 6.2 |
| 2015 | 2,152 | 2,020 | 132 | 6.1 | 5.8 | 5.3 |
| 2016 | 2,156 | 2,029 | 127 | 5.9 | 5.3 | 4.9 |
| 2017 | 2,203 | 2,104 | 100 | 4.5 | 4.4 | 4.4 |
| 2018 | 2,240 | 2,153 | 87 | 3.9 | 4.0 | 3.9 |
| 2019 | 2,272 | 2,200 | 72 | 3.2 | 3.8 | 3.7 |
| 2020 | 2,268 | 2,121 | 147 | 6.5 | 7.0 | 8.1 |
| 2021 | 2,247 | 2,170 | 77 | 3.4 | 4.3 | 5.3 |
| 2022 [2] | 2,282 | 2,225 | 57 | 2.5 | 3.2 | 3.8 |

Note (1)    Includes Alabama, Kentucky, Mississippi, and Tennessee.

Note (2)    Preliminary, as of March 2022.

Source:    U.S. Department of Labor, Bureau of Labor Statistics.

[remainder of this page intentionally left blank]

The table below depicts the areas in which the State's nonagricultural labor force is employed.

**Table 5.**
**Annual Average Nonagricultural Employment**

**(in thousands)**

| | **2018** | | **2019** | | **2020** | | **2021** | | **2022*** | |
| | **Employees** | **% of total** | **Employees** | **% of total** | **Employees** | **% of total** | **Employees** | **% of total** | **Employees** | **% of total** |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 2,046.3 | -- | 2,077.6 | -- | 1,994.3 | -- | 2,039.7 | -- | 2,065.0 | -- |
| Mining & logging | 10.0 | 0.5 | 10.2 | 0.5 | 9.6 | 0.5 | 8.6 | 0.4 | 8.4 | 0.4 |
| Construction | 89.2 | 4.4 | 93.7 | 4.5 | 92.8 | 4.7 | 94.6 | 4.6 | 98.4 | 4.8 |
| Manufacturing | 266.9 | 13.0 | 268.9 | 12.9 | 258.3 | 13.0 | 263.7 | 12.9 | 266.9 | 12.9 |
| Trade, transportation & utilities | 383.6 | 18.7 | 387.7 | 18.7 | 383.2 | 19.2 | 394.1 | 19.3 | 401.7 | 19.5 |
| Information | 21.1 | 1.0 | 21.3 | 1.0 | 19.3 | 1.0 | 20.0 | 1.0 | 20.8 | 1.0 |
| Financial Activities | 96.3 | 4.7 | 96.5 | 4.6 | 96.6 | 4.8 | 98.0 | 4.8 | 96.2 | 4.7 |
| Professional & business services | 244.2 | 11.9 | 249.7 | 12.0 | 241.0 | 12.1 | 250.7 | 12.3 | 252.7 | 12.2 |
| Education & health services | 245.2 | 12.0 | 250.1 | 12.0 | 238.6 | 12.0 | 239.2 | 11.7 | 239.5 | 11.6 |
| Leisure & hospitality | 206.0 | 10.1 | 208.5 | 10.0 | 178.0 | 8.9 | 188.2 | 9.2 | 192.0 | 9.3 |
| Other services | 97.1 | 4.7 | 99.3 | 4.8 | 92.8 | 4.7 | 95.1 | 4.7 | 98.0 | 4.7 |
| Government | 386.8 | 18.9 | 391.9 | 18.9 | 384.2 | 19.3 | 387.7 | 19.0 | 390.4 | 18.9 |

Source: U.S. Department of Labor, Bureau of Labor Statistics.

*Preliminary, as of March 2022.

[remainder of this page intentionally left blank]

The following tables list (i) the largest employers in the State by number of employees and (ii) the largest manufacturing employees in the State by number of employees and product and/or industry.

**Table 6.**
**Alabama's Top Ten Employers 2021**

| Employer | Employment Range | Rank | % of Total State Employment |
|---|---|---|---|
| Wal Mart Associates Inc. | 40,000-49,999 | 1 | 2.33% |
| Army | 20,000-29,999 | 2 | 1.29 |
| Publix Alabama LLC | 10,000-19,999 | 3 | 0.78 |
| University of Alabama – Birmingham | 5,000-9,999 | 4 | 0.39 |
| Huntsville Hospital | 5,000-9,999 | 5 | 0.39 |
| US Postal Service | 5,000-9,999 | 6 | 0.39 |
| UAB Hospital Management LLC | 5,000-9,999 | 7 | 0.39 |
| Mobile Education Board | 5,000-9,999 | 8 | 0.39 |
| Regions Bank | 5,000-9,999 | 9 | 0.39 |
| Veterans Affairs Administration | 5,000-9,999 | 10 | 0.39 |
| Totals | 105,000-169,990 | | 7.13% |

[remainder of this page intentionally left blank]

# Table 7.
## Alabama's Manufacturers based on Employment

| Employees | Company | Product/Industry |
|---|---|---|
| 3,000 + | Vulcan Materials | Construction materials |
| | Drummond Co. Inc. | Mining bituminous coal; foundry coke |
| | EBSCO Industries Inc. | Diversified business services, manufacturing & real estate; publishing |
| | Anniston Army Depot | Combat vehicles & small arms for Dept. of Defense |
| | Motion Industries Inc. | Bearings, power transmissions, electric motors, pumps, hoses |
| | Honda Manufacturing of Alabama LLC | Automobile manufacturing, V-6 engines |
| | Austal USA | Ship building; two high-speed, high performance Navy ships |
| | Science Applications International Corp. Huntsville | Physical research & development |
| | Intergraph Corp. | Spatial information management software; computer peripheral equipment |
| | M1 Support Services | Aircraft maintenance |
| | Mercedes Benz US International Inc. | Automobile manufacturing |
| | Boeing Co. – Huntsville | Missile defense, space exploration, missile systems |
| 2,500 – 2,999 | Hyundai Motor Manufacturing Alabama LLC | Automobile manufacturing, automotive engines |
| | United States Steel Corp. | Hot-rolled, cold-rolled & coated sheet steel, seamless tubular steel |
| 2,000 - 2,499 | Brasfield & Gorrie | General contractors – nonresidential |
| | Buffalo Rock Co. | Soft drink beverages & food |
| | Southern Energy Homes Inc. | Manufactured homes |
| | Adtran Inc. | High speed digital communication devices |
| 1,500 – 1,999 | Michelin North America/BF Goodrich | Tire manufacturing (aftermarket) |
| | Maples Industries | Scatter rugs, bath rugs |
| | Lockheed Martin Missiles/Space | Missiles & space vehicles; commercial physical & biological research |
| | Northrop Grumman Corp. | Autonomous systems, cyber, C4ISR, space, strike and logistics |
| | MOBIS Alabama LLC | Motor vehicle chassis, plastic parts, distribution |
| | North American Lighting | Automotive lighting fixtures |
| | AM/NS Calvert | Premium carbon steel processing |
| | Goodyear Tire & Rubber Co.[1] | Radial tires |
| | American Cast Iron Pipe Co. | Fire hydrants, valves, ductile iron pipe, steel pipe |
| | Thompson Tractor Co. Inc.. | Construction equipment distribution |
| 1,000 - 1,499 | Cinram International Inc. | Integrated audio disks production & distribution |
| | B L Harbert International | Commercial & heavy construction |
| | AlaTrade Foods LLC | Poultry processing; headquarters |
| | ECS Federal Inc. | IT, financial management, cost analysis, program management |
| | American Apparel | Military apparel |
| | Yulista Holding LLC | Business management |
| | GE Appliances | Refrigerators |
| | Koch Foods | Poultry Processing |
| | Generics International (US) Inc. | Pharmaceutical preparations |
| | Shaw Industries Inc. | Carpet fiber |
| | Equity Group Eufaula Division | Poultry processing |
| | TDG Operations LLC | Carpet & rugs |
| | Great Southern Wood Preserving | Pressure treated lumber |
| | Wayne Farms | Poultry processing |
| | Collins Aerospace, A United Technologies company | Aircraft nacelle manufacturing & MRO |
| | New South Express LLC | Automotive supplier |
| | Rehau Automotive LLC | Bumpers, molding |
| | Rheem Water Heaters | Residential & commercial water heaters; headquarters |
| | Sara Lee Food & Beverage | Processed meats |
| | Colsa Corp. | Engineering services |
| | VT MAE | Aircraft maintenance |
| | KBRWyle | Research & development |
| | Dynetics Inc. | Aerospace, defense |
| | Pilgrim's Pride | Poultry processing |
| | Cavalier Home Builders LLC | Manufactured homes |
| | Tyson Foods Inc. | Chicken processing |
| | Toyota Motor Manufacturing Alabama | V6 & V8 engines, 4-cylinder engines |
| | Constellium | Aluminum & sheetmetal fabricating |
| | Mando America Corp. | Braking, steering & suspension systems |
| | Albertville Quality Foods | Food processing |

Source: *Business Alabama,* June 2019, https://assets.businessalabama.com/uploads/2019/05/BAJune2019_Largest
Manufacturers_CompleteListForWeb.pdf?_ga=2.95103900.1441044771.1595523794-1841964789.1595523794

Note (1): Manufacturing employment numbers in Alabama have declined since June 2019 and Goodyear announced that it would
close its plant in Gadsden in April 2020

## Real Gross Domestic Product (formerly Real Gross State Product)

Real Gross Domestic Product ("RGDP") is a comprehensive measure of economic performance for the State and is the State's counterpart of the nation's gross domestic product. Alabama's RGDP is defined as the total value of all final goods and services produced in the State in constant dollar terms. Hence, changes in RGDP reflect changes in final output. From 2014 to 2021, the State's RGDP increased 7.9%.

The following table compares the State's RGDP by industry for the years indicated.

**Table 8.**
**Alabama's Real Gross Domestic Product**

**(in millions of chained 2012 dollars)\***

| Industry | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | % Change 2014-2021 |
|---|---|---|---|---|---|---|---|---|---|
| Agriculture, forestry | 2,591 | 3,185 | 2,782 | 3,070 | 3,230 | 2,663 | 2,020 | 2,006 | -22.6% |
| Mining | 2,409 | 2,309 | 2,230 | 2,933 | 2,712 | 2,568 | 2,491 | 2,168 | -10.0% |
| Utilities | 5,255 | 5,338 | 5,772 | 5,558 | 5,442 | 5,675 | 5,726 | 5,370 | 2.2% |
| Construction | 6,363 | 6,335 | 6,644 | 6,832 | 7,089 | 7,508 | 7,412 | 7,473 | 17.4% |
| Manufacturing | 32,770 | 32,210 | 33,470 | 34,362 | 35,413 | 35,313 | 34,675 | 37,639 | 14.9% |
| Wholesale trade | 11,017 | 11,180 | 11,539 | 11,740 | 11,881 | 11,819 | 11,708 | 11,980 | 8.7% |
| Retail trade | 12,691 | 12,964 | 13,627 | 13,878 | 14,250 | 14,771 | 14,515 | 14,560 | 14.7% |
| Transportation and warehousing | 4,719 | 4,657 | 4,751 | 5,041 | 5,282 | 5,042 | 4,759 | 4,901 | 3.9% |
| Information | 4,306 | 4,626 | 4,654 | 4,819 | 5,095 | 5,435 | 5,315 | 5,793 | 34.5% |
| Finance and insurance | 11,404 | 11,388 | 10,545 | 10,174 | 9,938 | 9,678 | 9,236 | 9,707 | -14.9% |
| Real estate and leasing | 21,910 | 22,033 | 21,966 | 21,731 | 21,843 | 22,573 | 22,208 | 22,804 | 4.1% |
| Professional and business services | 17,853 | 18,080 | 18,588 | 19,703 | 20,580 | 21,318 | 20,876 | 22,429 | 25.6% |
| Educational services and health care | 15,007 | 15,526 | 15,871 | 15,998 | 16,453 | 17,180 | 15,669 | 16,599 | 10.6% |
| Arts, entertainment and recreation | 5,569 | 5,697 | 5,790 | 5,845 | 5,838 | 5,886 | 4,817 | 5,561 | -0.1% |
| Other services | 4,776 | 4,720 | 4,618 | 4,592 | 4,778 | 4,676 | 4,267 | 4,436 | -7.1% |
| Government | 31,194 | 31,116 | 31,441 | 31,766 | 31,583 | 31,793 | 31,655 | 32,220 | 3.3% |
| **Total State Real GDP** | 189,886 | 191,335 | 194,284 | 197,567 | 200,801 | 203,384 | 196,906 | 204,885 | 7.9% |

\* Columns may not add due to elimination of de minimis categories. The use of chained dollars adjusts for inflation over time, with 2012 as the base year.
N/A = Not available.

Source: U.S. Department of Commerce, Bureau of Economic Analysis; Last updated: March 31, 2022 – preliminary statistics for 2021.

[remainder of this page intentionally left blank]

The following table compares the actual growth of the gross domestic product for the State to the actual growth of the gross domestic product of the United States over the past ten years.

**Table 9.**
**Rates of Change in Real Gross Domestic Product**
**Alabama and the United States**

| Year | Alabama Gross Product | Annual Percentage Change | United States Gross Product | Annual Percentage Change |
|------|----------------------|--------------------------|----------------------------|--------------------------|
| 2011 | $187.61 | 1.6% | $15,891.53 | 1.5% |
| 2012 | 189.25 | 0.9% | 16,253.97 | 2.3% |
| 2013 | 191.37 | 1.1% | 16,553.35 | 1.8% |
| 2014 | 189.89 | -0.8% | 16,932.05 | 2.3% |
| 2015 | 191.34 | 0.8% | 17,390.30 | 2.7% |
| 2016 | 194.28 | 1.5% | 17,680.27 | 1.7% |
| 2017 | 197.57 | 1.7% | 18,079.08 | 2.3% |
| 2018 | 200.80 | 1.6% | 18,606.79 | 2.9% |
| 2019 | 203.38 | 1.3% | 19,032.67 | 2.3% |
| 2020 | 196.91 | -3.2% | 18,384.69 | -3.4% |
| 2021 | 204.88 | 4.1% | 19,427.29 | 5.7% |

*Millions of chained 2012 dollars. The use of chained dollars adjusts for inflation over time, with 2012 as the base year.
Source: U.S. Department of Commerce, Bureau of Economic Analysis; Last updated: March 31, 2022 – preliminary statistics for 2021.

[remainder of this page intentionally left blank]

**Transportation**

    *Water Transportation*. Alabama contains one of the largest networks of inland river systems in the nation. The waters of four major rivers flow from the northern section of the State down to the Gulf of Mexico, offering barge transportation to industries and businesses that depend on the movement of large, heavy or bulky cargoes.

    The Port of Mobile was ranked as the 14th largest seaport in the nation in total tonnage for 2020. The Port of Mobile is the second largest container port on the Gulf of Mexico by imports, behind only the Port of Houston, and the third largest for exports, after the Ports of Houston and New Orleans. The Port of Mobile handled the cargo tonnage shown in the following table.

**Table 10.**
**Port of Mobile Cargo Tonnage, 2002-2020**

**(thousands of short tons)**

| Year | Approximate Tonnage |
|------|---------------------|
| 2002 | 46,022 |
| 2003 | 50,214 |
| 2004 | 56,212 |
| 2005 | 57,665 |
| 2006 | 59,832 |
| 2007 | 64,494 |
| 2008 | 67,636 |
| 2009 | 52,219 |
| 2010 | 55,713 |
| 2011 | 55,552 |
| 2012 | 54,888 |
| 2013 | 53,993 |
| 2014 | 64,288 |
| 2015 | 58,595 |
| 2016 | 58,024 |
| 2017 | 58,157 |
| 2018 | 58,636 |
| 2019 | 56,894 |
| 2020 | 53,207 |

Source: U.S. Army Corps of Engineers, Navigation Data Center, Waterborne Commerce of the United States.

    The facilities of the Alabama State Port Authority (the "Port Authority"), formerly known as the Alabama State Docks Department, were first developed by the State during the 1920s. The earnings from the Port Authority have generally been reinvested into the development of the facilities, resulting in continued growth in cargo handling and in net revenues derived from operations.

Under the direction of the Tennessee-Tombigbee Waterway Development Authority, a 234-mile waterway (the Tennessee-Tombigbee Waterway) was constructed to connect the Tennessee River with the Tombigbee River and thereby connect the waterways of mid-America with the Gulf of Mexico through the Port of Mobile.

To complement its river system, Alabama has built a system of 8 inland docks located throughout the State which are owned by the Port Authority. At several locations, grain elevators have been constructed to provide storage for Alabama agricultural products.

The Port Authority, in conjunction with the United States Army Corps of Engineers, is making various capital improvements to the Port of Mobile Ship Channel, including the widening and deepening of the Ship Channel. The overall project investment exceeds $350 million and is funded through a combination of federal funds and an issuance by the Alabama Highway Finance Corporation (the "AHFC") of $118,460,000 in Special Obligation Revenue Bonds, Series 2020A. Improvements to the Port of Mobile through this capital improvement program are expected to be completed in early 2025, and will enable New Panamax or Neopanamax ships to utilize the port. The Port Authority anticipates that the upgrades to the Port of Mobile will primarily serve coal and containerized shippers.

Further, to support the strong, and growing, automotive industry in Alabama and the southern United States, the Port of Mobile has recently completed a state-of-the-art, $60 million vehicle roll-on/roll-off (RO/RO) terminal including a vehicle processing center.

*Railroads.* Five Class I railroads and 20 Class III, or short line, railroads operate more than 3,700 miles of track within Alabama, linking the State to the nation's major markets. The main line railroads include Norfolk Southern Corporation, Burlington Northern/Santa Fe Railway, CSX Transportation, Canadian National Railway Company, and Kansas City Southern. Five Class I railroads and a Class III rail ferry service to Mexico serve the Port of Mobile, four major railroads converge on the manufacturing and distribution center of Birmingham and two lines serve the capital city of Montgomery. The railroad network serves 65 of Alabama's 67 counties.

*Airports.* Seven major airports provide commercial passenger airline service in Alabama. Air cargo service is provided by five airports, which have designated Foreign Trade Zones.

*Highway System (Road and Bridge).* Approximately 80,000 miles of all-weather state and local roads are anchored by 23,500 miles of federal highways. Six interstate highways and a network of four-lane divided highways link major Alabama cities to national markets.

**Utilities**

Electrical generation service in Alabama is provided by Alabama Power Company, the Tennessee Valley Authority, electric cooperatives and municipal electric systems, utilizing primarily coal, natural gas, hydroelectric and nuclear facilities.

Natural gas is supplied from several sources. Although an increasingly significant quantity is supplied from the natural gas and crude oil fields of Alabama, the majority of the statewide gas requirements are provided from out-of-state sources via interstate gas transmission lines. Transmission companies with gas lines into or through Alabama include: Alabama-Tennessee Natural Gas Company, American Midstream (Alabama Intrastate) LLC, American Midstream

(Bamagas Intrastate) LLC, American Midstream (Tennessee River) LLC, East Tennessee Natural Gas Company, Florida Gas Transmission Company, Genesis Pipeline Alabama, LLC, Southcross Alabama Pipeline LLC, Southern Gas Transmission Company, Southern Natural Gas Company, Tennessee Gas Transmission Corporation, Texas Eastern Transmission Corporation, Transcontinental Gas Pipe Line Corporation and United Gas Pipe Line Company.

Gas distribution companies or gas districts distribute natural gas. The larger distribution companies include Spire (formerly, Alabama Gas Corporation and the Mobile Gas Service Corporation), Wheeler Basin Natural Gas Company, and Huntsville Utilities.

## Education

Alabama provides a mix of public and private educational opportunities. The State Board of Education establishes policies and exercises general control over the public school system. The Board is comprised of elected representatives from eight districts plus the Governor as its president. The Board and the State Department of Education oversee 1,348 public schools in Alabama serving almost 730,000 students. The State has approximately 143 school districts, each with its own local board and superintendent of education.

For the high school graduating class of 2021 (the most recent year available), Alabama's state average score on the ACT college entrance exam was 18.6. This compares with the national average score of 20.3. Public school students who took the SAT college entrance exam scored above national averages in both subject areas (math and evidence-based reading and writing).

Alabama has moved from an assessment system based on multiple standards to a focused and linear system, the primary function of which is ensuring the State produces graduates that are college and career ready. It includes the following: *Dynamic Indicators of Basic Early Literacy Skills* assessment (Grades K-2); the *ACT Aspire* assessment (Grades 3-8 and 10); the *ACT QualityCore* End-of-Course assessments (English 9 or 10 and Algebra I); the *ACT with Writing* (Grade 11); and the *ACT WorkKeys* (Grade 12). The *Alabama Alternate Assessment* is administered to students with significant cognitive disabilities working on the Alabama Extended Standards. *ACCESS for ELLs 2.0* is administered annually to students in Grades K-12 who are identified as English language learners. The *Alternate ACCESS for ELLs* is administered to English language learners with significant cognitive disabilities. Alabama has also purchased a statewide license from Scantron that provides access to Performance Series (online computer adaptive) and Achievement Series (online criterion referenced) tests for every K-12 student in the State.

Historically, all students had to pass the Alabama High School Graduation Exam in order to receive a diploma. Students took a pre-graduation exam in the spring of the tenth grade as a checkpoint leading to the Alabama High School Graduation Exam. A student had four opportunities, if needed, to pass each subject area test before exiting school. The Alabama High School Graduation Exam is now phased out. The last cohort that had the Alabama High School Graduation Exam as a diploma requirement was the group of students that entered the ninth grade for the first time in 2011-2012. In conjunction with the transition from the graduation exams, Alabama moved to the 4-Year Cohort Graduation Rate. The State's Cohort Graduation Rate increased from 72% in 2011 to 90.7% in 2021.

Increasing the graduation rate and ensuring more graduates are college and career ready are two primary focuses of Plan 2020, Alabama's strategic plan for educational improvement. For that to happen, students must have a plan for high school. Alabama requires that an online four-year plan for all students be completed prior to the spring of their ninth-grade year. The State has purchased a license for Kuder and provided students and educators with access to that platform for this purpose. Though the plan is required by the spring of the ninth-grade year, best practice suggests that they be completed by the end of the eighth-grade year. The Kuder platform includes three career interest assessments, meant to be given in the sixth, seventh, and eighth grades, to assist in the development of the four-year plans.

The following table indicates the estimated level of education in Alabama as compared to the United States as a whole.

**Table 11.**
**Educational Attainment for the Population**
**25 Years and Older**

| Level of Education | Alabama | United States |
|---|---|---|
| High school graduate or higher | 86.9% | 88.5% |
| Bachelor's degree or higher | 26.2% | 32.9% |

Source: US Census Bureau, American Fact Finder: 2016-2020 American Community Survey 5-Year Estimates.

## GOVERNMENTAL ORGANIZATION AND SERVICES

Under the State Constitution, the powers of the State government are divided into three distinct branches – the legislative, executive and judicial.

### Legislative Branch

The legislative power is vested in the Alabama Legislature, which consists of the Senate and the House of Representatives. The Senate consists of 35 members elected by popular vote from 35 senatorial districts, and the House of Representatives consists of 105 members elected by popular vote from 105 House of Representatives districts. Legislative members are elected for four-year terms by general election and take office on the day after the general election in which they are elected. An organizational session of the Legislature is held in January following the general election and annual sessions commence in March of the first year, in February of the second and third years and in January of the fourth year. Special sessions may be called by the Governor for the limited purpose of enacting legislation on the subjects specified by the Governor in the call of such sessions. The Legislature may, by a vote of two-thirds of each house, also enact legislation at special sessions on matters not included in the Governor's call. A full-time staff, which is augmented by a part-time staff, assists the Legislature.

The legislative branch also includes (i) the Legislative Council, whose purpose is to suggest research studies to the Legislative Reference Service and to recommend legislation to the Legislature; (ii) the Legislative Services Agency, consisting of the Legal Division, Fiscal Division, and Law Revision Division; and (iii) the Examiners of Public Accounts, whose purpose is to examine and audit the books, accounts and records of all State and county offices, officers,

bureaus, boards, commissions, corporations, departments and agencies, including all State institutions of higher education.

**Executive Branch**

The State Constitution provides that the elected officers of the State shall be the Governor, Lieutenant Governor, Attorney General, State Auditor, Secretary of State, State Treasurer and Commissioner of Agriculture and Industries. The individuals now serving as such officers were elected at the general election in November 2018 and will hold office until January 2023.

The supreme executive power of the State is vested in the Governor, who has the constitutional responsibility for ensuring that laws are faithfully executed, providing the Legislature with information on the condition of the government, presenting the budget and recommending to the Legislature such measures as he or she may deem expedient. The Governor is also empowered to convene special sessions of the Legislature and to veto bills, but the Legislature may, in the manner provided by the State Constitution, reconsider and reenact measures vetoed by the Governor. Broad appointive and investigative powers are conferred upon the Governor by State statute.

The Lieutenant Governor serves as president of the Senate and becomes Governor in case of the inability of the Governor to exercise the powers and perform the duties of his or her office.

The Attorney General is the chief law enforcement officer of the State. His duties include providing legal advice and representation for the State and its officers. The Attorney General represents the State before all federal and State courts in all cases in which the State is a party and institutes proceedings to enforce the statutes, rules and regulations of the State.

The State Auditor is responsible for post-auditing the accounts and records of the Department of Finance and the State Treasurer. The State Auditor makes an annual report showing all receipts and disbursements and conducts a continuous monthly audit of the State Treasurer's Office, reconciling all accounts with the State Comptroller's records.

The Secretary of State is responsible for the custody and use of the Great Seal of the State, for certifying and distributing public documents, and for performing other duties as prescribed by law.

The State Treasurer is responsible for the custody of all State funds and other funds deposited with the State and for the payment of debt of the State and its agencies. The office of the State Treasurer is the State's central banking agency.

The Commissioner of Agriculture and Industries is responsible for regulatory control over certain products and industries involving matters of food safety, weights and measures and pesticide application, as well matters involving agriculture, livestock and poultry.

The Department of Finance is a statutory department established in 1939 to manage, control and supervise all matters pertaining to fiscal affairs of the State and its departments, boards, bureaus, commissions, agencies, offices and institutions. The Director of Finance, who is appointed by the Governor, manages the Department of Finance. The Director of Finance acts as chief financial officer of the State and is directly responsible for the following divisions of the Department of Finance:  Executive Budget Office, Control and Accounts (Comptroller's Office),

Debt Management and Capital Planning, Purchasing, Information Services, Indigent Defense Services, Space Management, State Business Systems, Risk Management, Services, Legal, Personnel, Real Property Management and Accounting & Administration.

The State Department of Revenue was created in 1939 and is responsible for supervising and controlling the valuation, equalization, assessment and collection of certain taxes assigned to it for collection. The Governor appoints the Commissioner of Revenue.

## Judicial Branch

The judicial power of the State is vested in a unified judicial system consisting of a Supreme Court, a Court of Criminal Appeals, a Court of Civil Appeals, trial courts of general jurisdiction known as circuit courts, trial courts of limited jurisdiction known as district courts and such municipal courts as are provided for by law. Additional judicial functions are performed by the State's probate courts.

The Supreme Court exercises jurisdiction as the highest court of the State for appeals and consists of nine Justices (the Chief Justice and eight Associate Justices). The Court of Criminal Appeals has exclusive appellate jurisdiction of all appeals in criminal cases. The Court of Civil Appeals hears appeals from certain decisions of civil trial courts. The circuit courts have exclusive jurisdiction in certain civil and criminal cases as provided by law, and by de novo proceedings they exercise appellate jurisdiction of civil, criminal and juvenile cases which have first been tried in district courts.

In addition to the State's system of courts, there is a Judicial Inquiry Commission, which reviews complaints received against judges, conducts field investigations and prosecutes cases before the Court of the Judiciary.

## INDEBTEDNESS

### Limitations on Debt

Pursuant to Section 213 of the State Constitution, as amended by Amendment 26 thereto (the "Constitutional Budget Amendment"), the State is constitutionally prohibited from incurring debt, and the only method by which general obligation debt of the State can be incurred is by an amendment to the State Constitution. Although conventions proposed by the Legislature and approved by the electorate may be called for the purpose of amending the State Constitution, all amendments have historically been adopted through a procedure which requires them to be proposed by a favorable vote of three-fifths of all the members of each house of the Legislature and thereafter approved by a majority of the voters of the State voting in a statewide election.

The Supreme Court of Alabama has held that the debt prohibition contained in the Constitutional Budget Amendment does not apply to obligations incurred for current operating expenses payable during the current fiscal year, debts incurred by separate public corporations functioning as instrumentalities of the State, or State debt incurred to repel invasion or suppress insurrection. The State may also make temporary loans not exceeding $300,000 to cover deficits in the State Treasury. Limited obligation debt payable solely out of certain taxes and other revenues may be authorized by the Legislature without an amendment to the State Constitution. The State has followed the practice of financing certain capital improvement programs, principally for

highways, education and improvements to the facilities of the Alabama State Port Authority, through the issuance of limited obligation bonds payable solely out of certain taxes and other revenues specifically pledged for their payment and not from the general revenues of the State. Such limited obligation bonds are not general obligations of the State, and the full faith and credit of the State have not been pledged to the payment thereof. See Table 13 ("Limited Obligation Bonds of State Departments and Certain State Authorities Outstanding at the Close of Business on June 1, 2022") herein.

**General Obligation Debt**

As of June 1, 2022, eight series of general obligation bonds of the State, aggregating $501,795,000, remain outstanding. The full faith and credit of the State are pledged for the payment of each of those issues. The State has historically paid from the General Fund the principal of and interest on those of its general obligation bonds for which no moneys or taxes are specifically appropriated or earmarked, and is authorized to use funds from the Alabama Capital Improvement Trust Fund for the payment of principal and interest on certain general obligation bonds. Currently, the Alabama Capital Improvement Trust Fund is paying a portion of the debt service on the State's General Obligation Bonds 2013-A, General Obligation Bonds 2013-B, General Obligation Bonds 2014-A, General Obligation Bonds 2016-B and General Obligation Bonds 2018-C.

The following table sets forth the principal amount of general obligation debt of the State outstanding as of the close of business on June 1, 2022.

**Table 12.**
**State of Alabama General Obligation Debt**

| Issue | Dated | Outstanding Principal Amount |
|-------|-------|------------------------------|
| Series 2013-A | August 1, 2013 | 40,005,000 |
| Series 2013-B | August 1, 2013 | 22,690,000 |
| Series 2014-A | August 6, 2014 | 111,585,000 |
| Series 2016-A | March 8, 2016 | 89,410,000 |
| Series 2016-C | October 6, 2016 | 105,140,000 |
| Series 2018-A | December 13, 2018 | 98,360,000 |
| Series 2018-B | December 13, 2018 | 24,575,000 |
| Series 2018-C | December 13, 2018 | 10,030,000 |
| **Total** | | **$501,795,000** |

Source: Department of Finance

[remainder of this page intentionally left blank]

**Limited Obligation Bonds of State Departments and Certain State Authorities**

The State has created public corporations and authorities of the State for the purpose of financing certain projects and programs such as public highways, public education facilities, judicial facilities, industrial site preparation grants and surveys, single and multifamily housing and agricultural development loans. The obligations of such public corporations and authorities are not general obligations of the State, but are rather limited obligations of the issuer, payable solely from the revenues pledged for the obligations of each such issuer including, in some cases, earmarked tax revenues and, in other cases, revenues from the projects or programs financed.

The following table shows the principal amount of limited obligation bonds outstanding as of the close of business on June 1, 2022, which are payable from tax revenues or other State funds.

[remainder of this page intentionally left blank]

**Table 13.**
**Limited Obligation Bonds of State Departments and**
**Certain State Authorities Outstanding**

**at the Close of Business June 1, 2022**

| Principal Outstanding | Title of bonds (security/pledged revenues) | Final Maturity [1] |
|---|---|---|
| 145,880,000 | Alabama Public School and College Authority Special Obligation Bonds, Series 2009-D Capital Improvement Pool Qualified School Construction Bonds Tax Credit Bonds (sales, use taxes, utility gross receipts and utility service taxes) | 2026 |
| 154,727,000 | Alabama Public School and College Authority Special Obligation Bonds, Capital Improvement Pool Qualified School Construction Bonds, Direct Loan Bonds (sales, use taxes, utility gross receipts and utility service taxes) | 2027 |
| 51,270,000 | Alabama Public School and College Authority Special Obligation Bonds, Qualified Zone Academy Bonds, Series 2011-A (sales, use, utility gross receipts and utility service taxes) | 2026 |
| 4,780,000 | Alabama Public School and College Authority Bonds, Series 2012-A Pool Refunding Bonds (sales, use taxes, utility gross receipts and utility service taxes) | 2024 |
| 17,695,000 | Alabama Public School and College Authority, Series 2012-B Capital Improvement, Economic Development and Training Refunding Bonds (sales, use, utility gross receipts and utility service taxes) | 2024 |
| 640,000 | Alabama Public School and College Authority Series 2012-C Fleet Renewal Bonds (sales, use taxes, utility gross receipts and utility service taxes) | 2023 |
| 3,230,000 | Alabama Public School and College Authority Series 2012-D Fleet Renewal Taxable Bonds (sales, use taxes, utility gross receipts and utility service taxes) | 2023 |
| 18,200,000 | Alabama Public School and College Authority Capital Improvement Pool Bonds Series 2013-A (sales, use taxes, utility gross receipts and utility service taxes) | 2025 |
| 1,695,000 | Alabama Public School and College Authority Capital Improvement Pool Bonds Series 2013-B (sales, use taxes, utility gross receipts and utility service taxes) | 2024 |
| 31,115,000 | Alabama Public School and College Authority Capital Improvement Bonds Series 2013-C (sales, use taxes, utility gross receipts and utility service taxes) | 2028 |
| 6,115,000 | Alabama Public School and College Authority Capital Improvement Pool Bonds Series 2013-D Taxable (sales, use taxes, utility gross receipts and utility service taxes) | 2026 |
| 27,895,000 | Alabama Public School and College Authority Capital Improvement Pool Refunding Bonds Series 2014-A (sales, use taxes, utility gross receipts and utility service taxes) | 2026 |
| 322,945,000 | Alabama Public School and College Authority Capital Improvement Refunding Bonds Series 2014-B (sales, use taxes, utility gross receipts and utility service taxes) | 2027 |
| 14,445,000 | Alabama Public School and College Authority Capital Improvement Refunding Bonds Series 2015-A (sales, use taxes, utility gross receipts and utility service taxes) | 2024 |
| 33,220,000 | Alabama Public School and College Authority Bonds, Series 2015-B Pool Refunding Bonds (sales, use taxes, utility gross receipts and utility service taxes) | 2029 |
| 19,335,000 | Alabama Public School and College Authority Special Obligation Bonds, Series 2015-C Pool Bonds (sales, use taxes, utility gross receipts and utility service taxes) | 2030 |
| 22,840,000 | Alabama Public School and College Authority Special Obligation Bonds, Series 2016-A Pool Bonds (sales, use taxes, utility gross receipts and utility service taxes) | 2036 |

| Principal Outstanding | Title of bonds (security/pledged revenues) | Final Maturity [1] |
|---|---|---|
| 15,910,000 | Alabama Public School and College Authority Special Obligation Bonds, Series 2017-A Pool Bonds (sales, use taxes, utility gross receipts and utility service taxes) | 2038 |
| 23,355,000 | Alabama Public School and College Authority Special Obligation Bonds, Series 2019-A Pool Bonds (sales, use taxes, utility gross receipts and utility service taxes) | 2039 |
| 1,274,750,000 | Alabama Public School and College Authority Special Obligation Bonds, Series 2020-A Capital Improvement and Refunding Social Bonds (sales, use taxes, utility gross receipts and utility service taxes, and lease taxes) | 2041 |
| 22,670,000 | Alabama Public School and College Authority Special Obligation Bonds, Series 2020-B Capital Improvement Refunding Social Bonds (sales, use taxes, utility gross receipts and utility service taxes, and lease taxes) | 2022 |
| 141,085,000 | Alabama Public School and College Authority Special Obligation Bonds, Series 2020-C Capital Improvement Pool Refunding Social Bonds (sales, use taxes, utility gross receipts and utility service taxes, and lease taxes) | 2035 |
| 36,565,000 | Alabama Public School and College Authority Capital Improvement Pool Bonds, Series 2022-A (sales, use taxes, utility gross receipts and utility service taxes) | 2042 |
| 7,115,000 | Alabama Building Renovation Finance Authority, Series 2010 (lease payments from various State agencies to Authority) | 2024 |
| 53,760,000 | Alabama Incentives Financing Authority, Series 2009-B (TVA in-lieu-of-taxes) | 2029 |
| 17,540,000 | Alabama Incentives Financing Authority, Series 2019-A Refunding Bonds (TVA in-lieu-of-taxes) | 2029 |
| 129,870,000 | Alabama Incentives Financing Authority, Series 2019-B (TVA in-lieu-of -taxes) | 2042 |
| 2,095,000 | Alabama Mental Health Finance Authority, Series 2012 (cigarette taxes and Liquor Tax) | 2023 |
| 51,075,000 | Alabama Public Health Care Authority, Series 2015 (lease payments from Department of Public Health) | 2044 |
| 17,780,000 | Alabama Public Health Care Authority, Series 2016 (lease payments from Department of Public Health) | 2035 |
| 20,440,000 | Alabama Federal Aid Highway Finance Authority, Tax-Exempt Special Obligation Revenue Bonds Series 2021-A (Anticipation of Federal Grant Revenues and Gasoline Tax) | 2037 |
| 1,496,170,000 | Alabama Federal Aid Highway Finance Authority, Taxable Special Obligation Revenue Bonds Series 2021-B (Anticipation of Federal Grant Revenues and Gasoline Tax) | 2037 |
| 102,335,000 | Alabama Highway Finance Corporation Series 2020-A Limited Obligation Bonds (Gasoline Tax) | 2040 |
| 10,066,000 | Alabama Revolving Loan Fund Authority, Series 2021 (privilege and license tax on providers of cellular radio telecommunications services) | 2030 |
| 80,925,000 | Alabama Economic Settlement Authority Series 2016-A Special Revenue Bonds (BP Settlement) | 2033 |
| 425,005,000 | Alabama Economic Settlement Authority Series 2016-B Special Revenue Bonds (BP Settlement) | 2032 |
| 5,080,000 | Alabama Transportation Infrastructure Bank (AITB) Series 2022-A (loan program with pledged revenues from local entity; state revenues pledged under AITB master indenture) | 2037 |

**$4,809,618,000**    **Total Outstanding**

(1) Final Maturity in the State's Fiscal Year

Source: Department of Finance, State of Alabama

### Table 14.
### Debt Service on All Bonds Outstanding
### as of Close of Business June 1, 2022 [1]

| Fiscal Year Ending September 30 | General Obligation Bond Debt Service | Limited Obligation Bond Debt Service | Total Debt Service |
|---|---|---|---|
| 2022 | $45,934,354 | $227,188,218 | $273,122,572 |
| 2023 | 72,271,973 | 464,500,003 | 536,771,976 |
| 2024 | 72,123,768 | 456,111,545 | 528,235,313 |
| 2025 | 66,769,277 | 436,885,495 | 503,654,772 |
| 2026 | 56,456,055 | 427,938,079 | 484,394,134 |
| 2027 | 53,445,866 | 413,714,091 | 467,159,957 |
| 2028 | 30,444,171 | 393,537,897 | 423,982,069 |
| 2029 | 30,386,221 | 325,617,044 | 356,003,265 |
| 2030 | 30,333,171 | 318,546,510 | 348,879,681 |
| 2031 | 30,287,234 | 317,062,596 | 347,349,830 |
| 2032 | 30,244,515 | 317,051,584 | 347,296,099 |
| 2033 | 20,782,640 | 316,944,127 | 337,726,767 |
| 2034 | 18,372,675 | 247,257,659 | 265,630,334 |
| 2035 | 18,370,900 | 247,226,402 | 265,597,302 |
| 2036 | 18,366,500 | 243,888,584 | 262,255,084 |
| 2037 | 18,368,125 | 240,658,826 | 259,026,951 |
| 2038 | 10,651,875 | 128,208,820 | 138,860,695 |
| 2039 | 10,654,875 | 126,913,807 | 137,568,682 |
| 2040 | | 124,977,314 | 124,977,314 |
| 2041 | | 117,122,624 | 117,122,624 |
| 2042 | | 19,599,922 | 19,599,922 |
| 2043 | | 4,818,000 | 4,818,000 |
| 2044 | | 4,819,500 | 4,819,500 |
| **Total** | **$634,264,196** | **$5,920,588,647** | **$6,554,852,843** |

(1) This table excludes annual debt service on any outstanding bonds which have been refunded and for which an escrow trust fund has been established.

[remainder of this page intentionally left blank]

**Table 15.**
**Debt Ratios**

**as of the Close of Business June 1, 2022**

| | Principal Amount | Debt Per Capita [1] | Debt to Assessed Valuation [2] | Debt to Personal Income [3] |
|---|---|---|---|---|
| General Obligation Bonds | $501,795,000 | $99.56 | 0.58% | 0.22% |
| Limited Obligation Bonds[4] | $4,809,618,000 | $954.31 | 5.57% | 2.08% |
| **Total** | **$5,331,413,000** | **$1,053.88** | **6.15%** | **2.30%** |

(1) Based on 2021 population of 5,039,877

(2) Based on 2021 estimated gross assessed valuation of $86,343,145,000

(3) Based on 2021 personal income of $230,861,000,000

(4) Does include the Series 2022A Bonds being issued.

Source: Department of Finance, State of Alabama

## General Obligation Bonds Authorized and Unissued

Pursuant to Amendment 666 of the State Constitution, the State was initially authorized to sell and issue up to $350 million aggregate principal amount of general obligation bonds in one or more series for various purposes specified therein without any additional legislative or voter approval. Amendment 666 was later amended by Amendment 796, ratified June 5, 2007, which increased the aggregate principal authorization to $750 million. Amendment 880, ratified November 1, 2012, (i) provides that the authority of the State to issue general obligation bonds pursuant to Amendments 666 and 796 is not subject to the aggregate principal amount limitations contained in those amendments; provided that at no time shall the aggregate principal amount of general obligation bonds (including, without limitation, general obligation refunding bonds) issued pursuant to the provisions of those amendments be outstanding in excess of $750 million, and (ii) allows the issuance by the State of general obligation refunding bonds under the authority of Amendment 666, subject to certain minimum savings thresholds and limitations of maximum average maturity. As of June 1, 2022, there was $491,765,000 in aggregate principal amount outstanding under the authority of Amendment 666, as amended.

Pursuant to Amendment No. 887 to the State Constitution ("Amendment 887"), the State may issue up to an additional $50,000,000 of general obligation bonds in order to finance the construction and maintenance of Alabama National Guard armories. The State has issued the maximum amount of general obligation bonds authorized pursuant to Amendment 887.

Further, on May 24, 2022, Alabama voters passed an amendment to the State Constitution permitting the State to issue an additional $85,000,000 par amount of general obligation bonds to finance improvements, renovation, equipping, acquisition, provision, construction, and maintenance of Alabama state parks under the jurisdiction of the Department of Conservation and Natural Resources, as well as public historical sites and public historical parks under the jurisdiction of the Alabama Historical Commission.

**Limited Obligation Bonds Authorized and Unissued**

As of June 1, 2022, limited obligation bonds payable from State revenues, which have been authorized but are unissued include: Alabama Public School and College Authority in the principal amount of $102,290,000; Alabama Public Health Finance Authority in the principal amount of $45,000,000; the Alabama Parking Deck Authority in the amount of $13,000,000; State Industrial Development Authority in the principal amount of $100,000,000, of which only $40,000,000 can be outstanding at any one time; Farmers Market Authority in the principal amount of $10,000,000; the Alabama Corrections Institution Finance Authority in the aggregate principal amount of $849,000,000; the Alabama Highway Finance Corporation in the aggregate principal amount of $56,540,000 ($31,540,000 under the Rebuild Alabama Act for certain improvements to the Port of Mobile and $25,000,000 in other issuance authority); the Alabama Mental Health Finance Authority in the aggregate principal amount of $18,250; the Alabama Highway Authority is unlimited; the Garrett Coliseum Redevelopment Corporation in the principal amount of $100,000,000; the Alabama Public Health Care Authority is unlimited; the Alabama Toll Road, Bridge and Tunnel Authority is unlimited based on the Authority's construction of toll roads and bridges; the Alabama Transportation Infrastructure Bank is unlimited; and the Alabama Federal Aid Highway Finance Authority is based on the amount of federal funds received and gasoline taxes collected. Additionally, the Alabama Public School and College Authority has unlimited authority to issue pool bonds on behalf of local boards of education which are secured by certain utility, sales and use taxes (though typically paid from leveraged funds to be received by such local boards of education from the State of Alabama Public School Fund).

**Interest Rate Hedging Agreements**

*State Policy*. The State's Finance Director adopted a policy for the State in June of 2004 to provide criteria for the State in assessing and implementing hedging agreements in conjunction with the State's management of its assets and liabilities. The policy outlines procedures for entering into interest rate swap agreements ("Swaps"), permitted uses, counterparty credit standards, risk management considerations and reporting requirements for Swaps entered into by the State. The policy provides that the State will track and regularly report on the financial implications of its hedging transactions. In addition to or in connection with monitoring and reporting required by rating agencies and Governmental Accounting Standards Board ("GASB") compliance, an annual report will be prepared by the State Finance Director that will include the mark-to-market value of Swaps entered into by the State.

*Swap Agreements Related to Limited Obligation Bonds*. Separate interest rate swap agreements have been entered into by public corporations or authorities created by the State for the purpose of financing certain projects and programs such as public highways, public education facilities, judicial facilities, student loans, industrial site preparation grants and surveys, single and multi-family housing and agricultural development loans, the obligations of which are not general obligations of the State but are limited obligations of the issuer payable solely from the revenues pledged for the obligations of each such issuer.

## MAJOR OPERATING FUNDS

The allocation of revenues among the various funds and other financial accounting practices of the State are controlled to a large extent by constitutional and statutory provisions that allocate or earmark revenues. Most major revenue sources of the State are required to be deposited

into special funds either by the State Constitution or by continuing appropriations of the Legislature. Appropriations are made out of the separate funds for the purposes for which the revenue sources were allocated.

There are five major operating funds of the State: the General Fund, the Alabama Education Trust Fund (the "Education Trust Fund" or "ETF"), the Public Road and Bridge Fund, the Special Mental Health Trust Fund and the Public Welfare Trust Fund.

Taxes from approximately 36 sources are deposited into the General Fund. These taxes are described below under "Receipts, Disbursements, Taxes and Revenues – State Taxes and Other Major Sources of Revenues and Income." The largest revenue sources allocated to the General Fund are the insurance company premium tax, interest on State deposits, interest on the Alabama Trust Fund, oil and gas lease and production taxes, cigarette taxes, ad valorem taxes and net profits from the operations of the Alabama Alcoholic Beverage Control Board. Nine tax sources are allocated to the Education Trust Fund, the largest of which are the income tax, the sales tax, the utility tax and the use tax. Revenues from income taxes and sales taxes constitute an average of approximately 85% of the Education Trust Fund's annual revenues. Nine tax sources are allocated to the Public Road and Bridge Fund, the largest of which are the gasoline and gasoline excise taxes, automobile and truck license fees and motor fuel taxes. The Special Mental Health Trust Fund is funded by three major tax sources, which are the public utilities tax, contractors' gross receipts taxes, distiller's tax and whiskey tax profits. The major revenue sources for the Public Welfare Trust Fund are the whiskey tax and net profits from the operation of the Alabama Alcoholic Beverage Control Board, sales taxes, franchise taxes and beer taxes.

The three largest operating funds of the State are the General Fund, the Education Trust Fund and the Public Road and Bridge Fund. Details of these funds are set forth on Tables 16 through 18.

The information contained in this Official Statement as to the various taxes and revenues paid into the above-described funds, and the constitutional or statutory provisions respecting their use, is illustrative only and does not summarize all of the provisions of the State Constitution and statutes respecting allocation of revenues.

Historically there has been no inter-fund borrowing or commingling of funds. The Legislature, however, has the authority to transfer the responsibility of funding various agencies between funds. Transfers of this type have been made infrequently.

**The General Fund**

The General Fund is one of three primary funds of the State. Revenues credited to the General Fund are used for the ordinary expenses of the executive, legislative and judicial departments of the State, for other functions of the government, for debt service on certain general obligation bond issues and for capital outlay. Revenues for the General Fund are appropriated by the Legislature on an annual basis. Certain appropriations from the General Fund are subject to proration. The State Constitution requires that the State have a balanced budget. (See "The Budgetary Process And Financial Controls - Financial Controls," below).

[remainder of this page intentionally left blank]

**Table 16.**
**General Fund**
**Summary of Receipts and Disbursements**

**(Cash Basis) (in thousands)**

| Fiscal year ended September 30 | 2021 | 2020 | 2019 | 2018 | 2017 |
|---|---|---|---|---|---|
| **Receipts** | | | | | |
| Investment Income | $ 19,643 | $ 51,525 | $ 63,037 | $ 31,615 | $ 13,562 |
| Insurance Premium Tax | 464,503 | 393,255 | 368,285 | 333,665 | 304,909 |
| Excise, Sales & Use Taxes | 1,062,062 | 870,926 | 807,785 | 730,590 | 706,064 |
| Corporation Taxes | 98,127 | 95,828 | 95,257 | 95,476 | 74,876 |
| Liquor Taxes, Licenses, & ABC Profits | 156,733 | 139,932 | 122,600 | 116,130 | 100,624 |
| Drivers & Motor Vehicle Licenses | 81,043 | 79,413 | 79,996 | 77,620 | 77,788 |
| Property Taxes | 182,201 | 173,618 | 164,661 | 158,296 | 154,430 |
| Oil & Gas Production Taxes | 21,847 | 18,844 | 32,211 | 34,109 | 33,943 |
| Other Taxes | 149,103 | 125,383 | 115,002 | 110,747 | 108,924 |
| Other Licenses, Permits, Fees | 88,942 | 78,011 | 79,656 | 78,226 | 76,148 |
| Other Revenues | 113,752 | 157,487 | 119,236 | 132,861 | 170,526 |
| Alabama Trust | 123,577 | 114,946 | 104,229 | 96,783 | 98,040 |
| **Total Receipts** | **$2,561,533** | **$2,299,168** | **$2,151,955** | **$1,996,118** | **$1,919,834** |
| | | | | | |
| **Disbursements** | | | | | |
| Economic Development | 18,156 | 16,274 | 15,966 | 14,633 | 13,488 |
| Educational & Cultural | 7,162 | 5,337 | 4,463 | 4,542 | 4,031 |
| Natural Resources & Recreation | 6,903 | 7,386 | 4,301 | 4,036 | 6,000 |
| Health - Physical & Mental | 966,899 | 922,197 | 950,935 | 807,353 | 873,074 |
| Social Services | 130,253 | 115,032 | 101,777 | 94,711 | 94,022 |
| Protection of Persons and Property | 868,514 | 771,873 | 730,876 | 662,939 | 618,459 |
| General Government | 306,792 | 301,580 | 237,581 | 218,839 | 207,226 |
| Debt Service | 46,515 | 43,056 | 38,362 | 36,503 | 40,847 |
| **Total Disbursements** | **$2,351,194** | **$2,182,735** | **$2,084,261** | **$1,843,556** | **$1,857,147** |
| | | | | | |
| **Net Increase (Decrease) in Cash Balance** | **$210,339** | **$116,433** | **$67,694** | **$152,562** | **$62,687** |
| | | | | | |
| Beginning Cash Balance, Oct. 1 | 567,967 | 451,534 | 383,840 | 231,278 | 168,591 |
| | | | | | |
| **Ending Cash Balance, Sept 30** | **$778,306** | **$567,967** | **$451,534** | **$383,840** | **$231,278** |

Source: State Comptroller's Office

## The Education Trust Fund

The Education Trust Fund is the largest operating fund of the State. Revenues credited to the Education Trust Fund are used for the support, maintenance and development of public education and capital improvements relating to educational facilities. Moneys on deposit in the Education Trust Fund are appropriated by the Legislature on an annual basis.

**Table 17.**
**Education Trust Fund**
**Summary of Receipts and Disbursements (Cash Basis)**

**For the Last Five Fiscal Years**
**($ in 000s)**

| | 2021 | 2020 | 2019 | 2018 | 2017 |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| General Sales Tax | $2,320,781 | $2,084,983 | $2,013,911 | $1,908,439 | $1,811,654 |
| General Use Tax | 266,446 | 230,108 | 184,992 | 177,141 | 165,058 |
| Income Tax | 5,643,876 | 4,657,167 | 4,548,471 | 4,208,362 | 3,892,526 |
| Utilities Tax | 379,593 | 387,247 | 401,312 | 395,433 | 387,966 |
| Insurance Companies | - | 30,993 | 30,993 | 30,993 | 30,993 |
| Beer Tax | 23,444 | 20,595 | 22,595 | 21,872 | 22,232 |
| Hydroelectric Companies | 1,153 | 508 | 401 | 412 | 474 |
| Chain Store License | 87 | 73 | 94 | 114 | 87 |
| Transfers and Reversions | 103 | 316,665 | 53 | 18 | 125 |
| Other | 8,330 | 12,896 | 12,454 | 10,703 | 16,212 |
| **Total Revenues** | **$8,643,813** | **$7,741,235** | **$7,215,276** | **$6,753,487** | **$6,327,327** |
| **Expenditures:** | | | | | |
| Administrative Office of Courts | $    787 | $    723 | $    692 | $    502 | $      - |
| Commerce | 67,504 | 65,328 | 58,476 | 56,699 | 55,124 |
| Education (K-12) | 4,687,670 | 4,647,815 | 4,382,075 | 4,269,293 | 4,233,004 |
| Forestry Commission | 30 | 60 | 42 | 42 | - |
| Finance | 474 | 417 | 650 | - | - |
| Public Health | 17,887 | 18,691 | 19,006 | 18,353 | 19,513 |
| Youth Services | - | 9,174 | 52,416 | 54,416 | 53,997 |
| Legislature | 3,064 | 2,214 | 2,699 | 3,024 | 2,636 |
| Archives And History | 5,594 | 6,643 | 6,483 | 5,623 | 4,519 |
| Examiners Of Public Accounts | 9,463 | 8,479 | 6,359 | 6,516 | 6,266 |
| Geological Survey | 518 | 518 | 511 | 499 | 495 |
| Legislative Fiscal Office | - | - | - | 5 | 838 |
| Legislative Reference Service | - | - | - | 5 | 727 |
| Public Library Service | 12,717 | 12,159 | 8,248 | 7,221 | 7,944 |
| Veterans Affairs | 45,369 | 62,940 | 62,127 | 90,591 | 74,257 |
| American Legion Scholarships | 76 | 83 | 77 | 85 | 88 |
| ETF Direct Disbursements | - | - | - | - | - |
| Debt Service And Reserve | 32,762 | 34,418 | 28,457 | 31,897 | 21,129 |
| Governors Office of Volunteer Services | 311 | 296 | 285 | 235 | 297 |
| Economic and Community Affairs | 126 | 816 | - | - | - |
| Alabama Community College System | 430,663 | 417,468 | 398,293 | 364,340 | 358,267 |
| Early Childhood Education | 134,639 | 123,338 | 95,020 | 78,612 | 73,237 |
| Lieutenant Governor | 89 | 176 | 12 | - | - |
| Supreme Court Law Library | 143 | 297 | 461 | 283 | 241 |
| Rehabilitation Services | 50,594 | 46,133 | 46,011 | 41,934 | 41,460 |
| High School Of Math and Science | 8,693 | 8,217 | 7,534 | 6,870 | 6,785 |
| State Exec Comm Serv Grants Comm | 9,027 | 14,022 | 7,957 | 6,467 | 6,000 |
| Knight vs. Alabama Financial Obligation | - | - | - | - | - |
| Sickle Cell Oversight Commission | 1,445 | 1,458 | 1,442 | 1,355 | 1,302 |
| Alabama Innovation Fund | 3,220 | 3,620 | 2,548 | 3,076 | 2,090 |
| Auburn University - Agricultural Experiment Station | 34,355 | 33,681 | 32,071 | 31,190 | 31,190 |
| Auburn University - Ala Cooperative Extension Service | 36,075 | 35,367 | 33,439 | 32,520 | 32,520 |
| Alabama Institute for the Deaf and Blind - Adult Program | 15,281 | 20,322 | 13,230 | 12,553 | 11,853 |
| Alabama Institute for the Deaf and Blind - Industries | 9,683 | 9,522 | 8,835 | 8,577 | 9,577 |
| Finance - Teacher Unused Sick Leave | 1,935 | 1,267 | 1,130 | 321 | 1,866 |
| Talladega College | 947 | 927 | 883 | 883 | 883 |
| Tuskegee University | 12,677 | 11,502 | 10,954 | 10,595 | 10,595 |
| Lyman Ward Military Academy | 367 | 357 | 340 | 340 | 310 |
| Endowments | 82 | 82 | 82 | 82 | 82 |

| Expenditures (continued): | 2021 | 2020 | 2019 | 2018 | 2017 |
|---|---|---|---|---|---|
| Educational Television Commission | 7,060 | 8,798 | 7,897 | 8,126 | 6,804 |
| Alabama Law Institute | - | - | - | 9 | 788 |
| Council on the Arts | 5,950 | 5,298 | 5,490 | 4,800 | 4,236 |
| Commission on Higher Education | 38,612 | 35,663 | 29,376 | 26,834 | 24,762 |
| Nursing Board | 616 | 541 | 551 | 586 | 382 |
| Physical Fitness Commission | 1,874 | 1,740 | 1,603 | 1,422 | 1,340 |
| Peace Officer Standards and Training | 1,249 | 1,280 | 596 | 596 | 539 |
| State Law Enforcement | - | - | - | - | - |
| Legislative Services | 4,974 | 2,962 | 2,879 | 2,635 | - |
| Alabama Commission on the Services | 526 | 456 | - | - | - |
| University of Alabama - Tuscaloosa | 181,308 | 174,480 | - | 154,836 | 154,836 |
| University of Alabama - Birmingham | 309,114 | 300,895 | 160,609 | 272,082 | 272,082 |
| University of Alabama - Huntsville | 54,389 | 52,715 | 281,746 | 47,833 | 47,833 |
| Alabama A&M University | 43,908 | 42,862 | 40,211 | 38,629 | 38,629 |
| Alabama State University | 49,399 | 48,799 | 45,585 | 42,946 | 42,946 |
| Auburn University - Auburn | 192,057 | 184,895 | 173,723 | 167,700 | 167,700 |
| Auburn University - Montgomery | 26,000 | 25,490 | 24,036 | 22,995 | 22,995 |
| Jacksonville State University | 43,764 | 42,664 | 39,973 | 38,359 | 38,209 |
| University of West Alabama | 20,051 | 18,477 | 16,903 | 16,147 | 16,147 |
| University of Montevallo | 22,863 | 22,113 | 20,684 | 19,778 | 19,778 |
| University of North Alabama | 34,567 | 32,766 | 29,912 | 28,186 | 28,186 |
| University of South Alabama | 112,464 | 118,799 | 111,074 | 107,285 | 107,285 |
| Troy University | 57,907 | 56,396 | 51,547 | 49,303 | 49,303 |
| Alabama Institute for the Deaf and Blind | 38,707 | 36,205 | 33,546 | 32,624 | 31,574 |
| ETF Non-State | - | - | - | - | - |
| Optometric Scholarships Awards | 180 | 165 | 150 | 135 | 135 |
| Medical Scholarships Awards Board | 1,740 | 1,569 | 1,253 | 1,418 | 1,727 |
| Dental Scholarships Awards Board | 731 | 231 | 191 | 191 | 191 |
| Space & Science Exhibit Commission & Finance Auth | 1,400 | 1,260 | 1,130 | 1,055 | 1,025 |
| Music Hall of Fame | 146 | 143 | - | - | - |
| School of Fine Arts | 8,847 | 8,647 | 8,265 | 7,527 | 7,500 |
| Marine Environmental Sciences Consortium | 7,203 | 6,203 | 4,955 | 4,505 | 4,505 |
| Athens State University | 15,935 | 14,935 | 13,040 | 12,422 | 12,422 |
| Fire College and Personnel Standards Commission | 5,548 | 5,392 | 4,738 | 4,383 | 4,233 |
| Alabama School of Cyber Technology and Engineering | 5,800 | 5,400 | - | | |
| ETF Appropriated Transfers | 730,441 | 1,142,597 | 501,428 | 156,440 | 269,041 |
| **Total Expenditures** | **$7,669,597** | **$7,999,366** | **$6,951,675** | **$6,416,791** | **$6,446,225** |
| Cash Balance, October 1 | $415,243 | $673,374 | $409,773 | $73,079 | $191,977 |
| | | | | | |
| Cash Balance, September 30 | 1,389,549 | 415,243 | 673,374 | 409,773 | 73,079 |
| Cash Reserve for Obligations | 58,676 | 40,303 | 58,855 | 58,766 | 66,160 |
| | | $374,940 | $614,519 | $351,007 | $6,919 |
| **Unobligated Cash Balance September 30** | **$1,330,783** | | | | |

Source: State Comptroller's Office

## The Public Road and Bridge Fund

The Public Road and Bridge Fund is the general operating fund for the Department of Transportation and receives all State revenues, federal aid reimbursements and miscellaneous receipts for the Department of Transportation. The State Constitution provides that no moneys derived from any fees, excises, or license taxes levied by the State, relating to registration, operation or use of vehicles upon the public highways, except a vehicle use tax imposed in lieu of a sales tax, and no moneys derived from any fee, excises, or license taxes levied by the State relating to fuels used for propelling such vehicles, except pump taxes, shall be expended other than for the cost of administering such laws, statutory refunds and adjustments allowed therein, the cost of construction, reconstruction, maintenance and repair of public highways, rights-of-way, the

payment of highway obligations, the cost of traffic regulation, and the expense of enforcing State traffic and motor vehicle laws. The Department of Transportation has historically operated out of these revenues and, when available, federal moneys. The Department of Transportation has previously received only nominal amounts from the General Fund, and no longer receives any funds from the General Fund.

**Table 18.**
**Public Road and Bridge Fund**
**Summary of Receipts and Disbursements**

**Fiscal Years Ended September 30**

| | 2021 | 2020 | 2019 | 2018 | 2017 |
|---|---|---|---|---|---|
| **Cash on Hand, 10/1\*** | $161,244,238 | $ 209,783,483 | $ 269,262,451 | $ 360,939,528 | $ 349,557,357 |
| | | | | | |
| **Receipts:** | | | | | |
| Gasoline Excise Tax - $0.05 | 98,817,044 | 95,132,971 | 102,143,286 | 100,444,485 | 100,507,583 |
| Gasoline Excise Tax - $0.04 | 46,292,160 | 44,566,307 | 47,850,382 | 47,054,556 | 47,084,115 |
| Motor Fuel Tax - $0.04 | 47,479,486 | 43,738,070 | 44,116,588 | 42,620,492 | 40,737,034 |
| LP Gas Vehicle Permits | 42,941 | 46,354 | 50853 | 52,490 | 55,819 |
| Motor Vehicle License Taxes | 115,932,374 | 105,578,173 | 107,976,079 | 105,795,451 | 104,825,111 |
| Gasoline Excise Tax - $.07 | 79,148,719 | 76,198,510 | 81,813,338 | 80,451,653 | 80,506,488 |
| Lubricating Oil Tax | 485,863 | 472,795 | 592,020 | 605,898 | 523,376 |
| Oversize Hauling Permits | 4,378,710 | 4,268,727 | 4,928,757 | 4,266,820 | 4,118,636 |
| Motor Fuel Tax - $.13 | 107,791,045 | 99,307,201 | 100,099,268 | 96,618,126 | 92,516,773 |
| Truck Identification Decals | 1,092,948 | 951,874 | 1,052,640 | 1,069,701 | 984,082 |
| Petroleum Products Inspection Fees | 43,924,151 | 42,931,629 | 45,512,795 | 44,944,016 | 44,740,079 |
| Outdoor Advertising Permits | 58,493 | 62,923 | 62,343 | 63,595 | 63,493 |
| Motor Carrier Tax | 476,197 | 480,373 | 494,606 | 546,869 | 434,180 |
| Motor Vehicle Excise Tax | 298,879 | 300,718 | 286,447 | - | - |
| Federal Aid | 960,303,732 | 920,212,148 | 1,005,533,713 | 927,143,828 | 812,656,904 |
| County Aid & Miscellaneous | 27,119,141 | 42,969,573 | 54,505,884 | 59,335,537 | 356,620,858 |
| Industrial Access | 109,095 | 961,638 | 633,199 | 867,984 | 608,660 |
| Transfer from Bond Accounts | 74,723,309 | 155,681,878 | 280,612,708 | 394,971,700 | - |
| **Total Receipts** | **$1,608,474,287** | **$1,633,861,862** | **$1,878,264,906** | **$1,906,853,201** | **$1,686,983,191** |
| | | | | | |
| **Disbursements:** | | | | | |
| Construction | 1,085,536,659 | 1,284,901,104 | 1,508,599,023 | 1,633,077,915 | $1,286,955,836 |
| Maintenance | 222,738,240 | 189,400,583 | 204,894,469 | 191,215,247 | 175,942,545 |
| Equipment Purchase | 16,954,689 | 14,115,511 | 15,611,062 | 14,192,238 | 13,924,371 |
| Administration | 116,881,025 | 118,632,065 | 91,517,360 | 80,075,597 | 100,831,266 |
| Debt Service | 56,038,663 | 53,551,653 | 51,183,105 | 48,923,710 | 34,897,958 |
| Other Expenditures | 35,373,792 | 21,800,191 | 65,938,855 | 31,045,572 | 63,049,044 |
| **Total Disbursements** | **$1,533,523,068** | **$1,682,401,107** | **$1,937,743,874** | **$1,998,530,279** | **$1,675,601,020** |
| | | | | | |
| **Cash on Hand, 9/30\*** | **$236,195,457** | **$161,244,238** | **$209,783,483** | **$269,262,451** | **$360,939,528** |

\*Beginning and ending balances are on a cash basis and include encumbered funds. Columns may not add due to rounding.
Source: Alabama Department of Transportation.

[remainder of this page intentionally left blank]

**Unemployment Compensation Trust Fund**

The unemployment compensation benefits in the State are paid through unemployment compensation taxes levied against employers and employees. Moneys collected from these taxes are transferred to a trust fund in Washington, D.C., the trustee of which is the Secretary of the Treasury of the United States. The moneys in such special trust fund are transferred back to the State at the State's request to pay unemployment compensation benefits. The moneys received are deposited in the State's Unemployment Compensation Trust Fund and are disbursed therefrom for the payment of benefits.

## THE BUDGETARY PROCESS AND FINANCIAL CONTROLS

**The Budgetary Process**

The Executive Budget Office of the Finance Department is by statute responsible for preparing the initial information concerning the State's budget and its execution, revenue estimates, review of Appropriation Acts and fiscal analysis. The Executive Budget Office also assists the Director of Finance and the Governor in duties relating to the formulation of the budget; correlating and revising the estimates of revenues and requests for appropriations of all budgeted agencies; and investigating, supervising and coordinating the expenditures and other fiscal operations of such agencies. The budget document, as finally developed by the Governor, is published and transmitted to the Legislature on or before the second legislative day of each regular session. Appropriation recommendations are subject to alteration by the Legislature.

**General Fund and Education Trust Fund Budgetary Status for Fiscal Years 2021 and 2022**

From the information that the Executive Budget Office accumulates on revenues and expenditures, certain schedules are prepared. The following table sets forth beginning and ending balances and activity for the General Fund and the Education Trust Fund.

[remainder of this page intentionally left blank]

**Table 19.**
**Condition of Funds**

**General Fund and Education Trust Fund**

| | Actual Fiscal Year 2021 | | Budgeted Fiscal Year 2022[(1)]* | |
| | General Fund | Education Trust Fund | General Fund | Education Trust Fund |
|---|---|---|---|---|
| Beginning Balance | $446,035,109 | $34,438,145 | $489,699,351 | $1,330,783,131 |
| Revenues | 2,562,158,281 | 7,741,237,483 | 2,552,698,957 | 8,010,408,056 |
| **Total Funds Available** | **$3,008,193,390** | **$7,775,675,628** | **$3,042,398,308** | **$9,341,191,187** |
| Expenditures | 2,496,196,555 | 7,401,463,042 | 2,796,269,084 | 7,720,064,830 |
| **Ending Balance** | **$511,996,835** | **$374,212,586** | **$246,129,224** | **$1,621,126,357** |
| Transfer to Budget Reserve | 22,297,484 | | 48,005,772 | - |
| Transfer to Stabilization Fund | - | 75,000,000 | - | - |
| Transfer to Advancement & Tech. Fund | - | 65,000,000 | - | - |
| **Balance Carried Forward** | **$489,699,351** | **$1,330,783,131** | **$198,123,452** | **$1,621,126,357** |

Note (1) - FY 22 Budgeted data is as of January 31, 2022
Source: Department of Finance, Executive Budget Office, State of Alabama

* Unaudited

[remainder of this page intentionally left blank]

## Financial Controls

*General*.  An appropriation for a department, agency or program of the State is initially authorized by one of the appropriation bills enacted by the Legislature.  Before any moneys may be disbursed pursuant to an appropriation, the department, board, bureau, commission, agency, office or institution of the State for which the appropriation was made must submit to the Finance Department a requisition for an allotment of the amount estimated to be necessary to carry on its work during the period for which the allotment is to be made.  Allotments are made for such length of time as may be determined to be appropriate and convenient by the Department of Finance with the approval of the Governor, but no allotment (except for the acquisition of land, permanent improvements or other capital projects) shall, in any event, be for a period of longer than three months. The Department of Finance must examine each such requisition and, with the approval of the Governor, make such allotment or modification thereof as may be necessary.

The State Comptroller is required to establish all allotments on his books and is prohibited from paying to or for any agency amounts in excess of such allotment. The Department of Finance, with the approval of the Governor, may subsequently modify any allotment either upon the written request of the head of the agency or institution concerned or upon the initiative of the Department of Finance or the Governor. After the Comptroller records an allotment, the moneys represented thereby may be expended or encumbered upon request of the head of the agency or institution for which such moneys are appropriated.

State moneys, which are appropriated and allotted, are subject to disbursement by the State Treasurer. Each disbursement of such moneys for payment of vouchers submitted by an agency or an institution must be made pursuant to a warrant drawn upon the State Treasury by the Comptroller. Each warrant presented to the State Treasurer by the Comptroller must specify the particular fund from which it is payable. The Comptroller is responsible for keeping an account in connection with each appropriation and allotment. No warrant may be issued by the Comptroller or paid by the State Treasurer in excess of the available balance of the applicable account or funds on hand in the State Treasury. The State Treasurer is required to honor all warrants properly drawn by the Comptroller.

It is unlawful for any agency official to expend any appropriation for any purpose other than that for which the money was originally appropriated, budgeted and allotted.  If the Governor ascertains that funds are being spent unlawfully, the Governor has the power to suspend all appropriations and allotments to such agency or institution until such amounts diverted or wrongfully expended have been replaced.

Unencumbered balances of appropriations lapse at the end of each fiscal year unless otherwise provided by statute. Appropriations for the purchase of land, the erection of buildings, new construction or Department of Transportation maintenance of roads and bridges on the State highway system continue in force until the attainment of the object or the completion of work for which such appropriations were made is accomplished.

An appropriation may be made payable in full only in the event that the estimated revenues during the fiscal year for which the appropriation is made are sufficient to pay all appropriations for such fiscal year in full. To prevent an overdraft or deficit in any fiscal year, the Governor is required to restrict allotments by prorating, without discrimination, the available revenues in a particular fund among the various departments, boards, bureaus, commissions, agencies, offices and institutions of the State. Such restrictions ensure that each appropriation shall be payable in

such proportion as the amount of total revenues estimated by the Department of Finance to be available in the fiscal year for which such appropriation was made bears to the total sum of all appropriations made for such fiscal year.

Under the State Constitution, if, at the end of any fiscal year, the moneys in the State Treasury are not sufficient for the payment of all proper claims presented to the Comptroller, then, as of the end of the fiscal year, the Comptroller is required to issue warrants only for that proportion of each such claim equal to the percentage of the amount of such claim relative to the total of all claims. Alabama courts have interpreted this provision to require the annual financial operations of the State to be on a balanced budget and to prevent any department of the State from creating State debt. Consequently, in the event of a deficit, the available moneys are to be prorated among all claims presented for payment. At the end of the fiscal year all excess unpaid appropriations which exceed the moneys in the State Treasury after proration become null and void.

The Supreme Court of Alabama has held that certain expenses of the State necessary for essential functions of government are not subject to proration. It has been determined by the Supreme Court and subsequent advisory opinions of the Alabama Attorney General that such expenses include fixed salaries, other fixed expenses and payment of debt service on outstanding general obligation bonds of the State. Nonetheless, there can be no assurance that the Supreme Court of Alabama will not, upon further consideration of the issue, modify its earlier decisions and rule that debt service payments on the bonds of the State may be made subject to proration. Consequently, it is not possible to determine what effect, if any, proration with respect to the State's General Fund may have on the payment of the principal of or interest on bonds of the State. Previous proration (which has occurred from time to time since 1933) has not, however, resulted in any default in the payment of the bonds of the State.

[remainder of this page intentionally left blank]

The following table provides historical data concerning General Fund and Education Trust Fund proration.

**Table 20.**
**History of General Fund**
**and Education Trust Fund Proration**
**1963-Present**

| Fiscal Years | General Fund | | Education Trust Fund | |
|---|---|---|---|---|
| | Percent | Amount | Percent | Amount |
| 1963-1964 to 1977-1978[1] | - | $- | - | $- |
| 1978-1979 | - | - | 2.9811% | 29,670,397 |
| 1979-1980 | - | - | 6.1406% | 60,887,044 |
| 1980-1981 | - | - | 3.5681% | 39,988,286 |
| 1981-1982[1] | - | - | - | - |
| 1982-1983 | 15.0000% | 55,292,355 | - | - |
| 1983-1984 to 1984-1985[1] | - | - | - | - |
| 1985-1986 | 3.0000% | 16,240,969 | 4.2133% | 79,645,728 |
| 1986-1987 to 1989-1990[1] | - | - | - | - |
| 1990-1991 | 2.6000% | 19,970,302 | 6.5000% | 165,768,993 |
| 1991-1992 | 5.5000% | 41,745,530 | 3.0000% | 73,428,415 |
| 1992-1993 | 3.2000% | 24,532,925 | - | - |
| 1993-1994 to 1999-2000[1] | - | - | - | - |
| 2000-2001 | - | - | 6.2000% | 263,826,397 |
| 2001-2002[1] | - | - | - | - |
| 2002-2003[2] | - | - | 4.4100% | 185,067,841 |
| 2003-2004 to 2007-2008[1] | - | - | - | - |
| 2008-2009[3] | - | - | 17.9000% | 1,134,872,220 |
| 2009-2010[4] | 20.5164% | 153,709,068 | 9.5000% | 542,084,273 |
| 2010-2011 | 15.0000% | 250,152,394 | 3.0000% | 164,039,534 |
| 2011-2012 | 10.6200% | 186,989,003 | - | - |
| 2012-2013 to 2020-2021[1] | - | - | - | - |

Note (1)   No proration in either fund

Note (2)   Funds from the ETF Rainy Day Account were used to offset a portion of proration in the ETF during 2002-2003. See "Alabama Trust Fund" under Receipts, Disbursements, Taxes and Revenues in this Appendix A.

Note (3)   Funds from the ETF Rainy Day Account and the Proration Prevention Account were used to offset a portion of the 17.90%, resulting in an effective rate of 11%.

Note (4)   No funds were available in the ETF Rainy Day Account or the Proration Prevention Account to offset the shortage in the ETF. Funds from the General Fund Rainy Day Account were used to offset a portion of the 20.5164%, resulting in an effective rate of 10%.

Source:  Department of Finance, Executive Budget Office, State of Alabama

*Rolling Reserve Act.* In March 2011, the Legislature passed and the Governor signed into law The Education Trust Fund Rolling Reserve Act (as amended, the "Rolling Reserve Act"). The Rolling Reserve Act is designed to reduce the risk of proration in the State's education budget. Proration in the Education Trust Fund occurs when budgeted education spending must be cut mid-year due to lower-than-expected revenues. The education budget process has historically been based on projecting the annual change in Education Trust Fund revenues. The sources of revenue that fund the Education Trust Fund are highly sensitive to changes in the economy and the range of total revenues varies widely from year to year. As a result, accurately projecting the Education Trust Fund revenues each year in order to prepare a workable education spending budget has been difficult. The inability to make accurate revenue projections has led to increased instances of proration in the education budget.

The Rolling Reserve Act caps the education spending budget using a growth rate equal to the average growth rate based on the 14 highest of the 15 most recently completed fiscal years as

applied to actual recurring revenues for the prior fiscal year. The budget cap under the Rolling Reserve Act also includes amounts appropriated to the Prepaid Affordable College Tuition Trust Fund and certain nonrecurring revenues. Pursuant to Amendment No. 803 to the State Constitution, the State Finance Director and the Legislative Fiscal Officer are each required to estimate the available revenue for the Education Trust Fund at the beginning of each regular session of the Legislature. If the average estimated available revenue is less than the amount determined under the Rolling Reserve Act cap described above, the Legislature may not appropriate more than the average of the estimated available revenue. The budget process required by the Rolling Reserve Act was implemented beginning with the 2013 fiscal year budget.

Under the Rolling Reserve Act, Education Trust Fund revenues over and above the budgeted amount are to be transferred to the Education Trust Fund Rainy Day Account (the "Rainy Day Account") until the Rainy Day Account has been reimbursed in full for any prior withdrawals. The Rainy Day Account currently gives the State the power to temporarily transfer money from the Alabama Trust Fund to prevent proration of the Education Trust Fund, but the money must be reimbursed within 6 years of its transfer. There is not currently an amount outstanding to be repaid to the Education Trust Fund Rainy Day Account.

Once the Rainy Day Account has been fully repaid, any remaining revenues will be transferred to a savings account established by the Rolling Reserve Act, the Education Trust Fund Budget Stabilization Fund (the "Budget Stabilization Fund"). Money in the Budget Stabilization Fund may be withdrawn only to prevent proration in the Education Trust Fund. If any revenues remain in the Education Trust Fund at the end of a fiscal year, an amount up to 1% of the prior year's appropriations shall be transferred to the Budget Stabilization Fund annually until the Budget Stabilization Fund reaches 7.5% of the prior year's appropriations from the Education Trust Fund. If any such revenues remain after the transfer described in the preceding sentence, such remaining funds are to be transferred to the Education Trust Fund Advancement and Technology Fund. The Education Trust Fund Advancement and Technology Fund was established for repairs and deferred maintenance of public education facilities, instructional support, transportation, insuring facilities, and purchasing education technology and equipment.

Act No. 2015-538 amended the Rolling Reserve Act as follows: (a) changed the calculation of the average growth rate by basing the calculation on the 14 highest of the last 15 completed fiscal years; (b) removed the provision to add 40% of the increase in recurring revenues to the cap if the percentage in recurring revenues deposited for the last completed fiscal year exceeded the 15 year average growth rate; (c) included the amounts required to be appropriated from the Education Trust Fund to the Prepaid Affordable College Tuition (PACT) in the cap; (d) provided that any excess revenues remaining at the end of the fiscal year ending September 30, 2015, up to 2% of the previous year's appropriations from the Education Trust Fund, shall be transferred to the Education Trust Fund Budget Stabilization Fund and thereafter, an amount up to 1% of the previous year's appropriations shall be transferred to the Education Trust Fund Budget Stabilization Fund annually until the Fund reaches 7 ½% of the previous year's appropriations from the Education Trust Fund; and (e) provided that funds in excess of the Education Trust Fund Budget Stabilization Fund transfer be transferred to the Education Trust Fund Advancement and Technology Fund. These funds can be appropriated for repairs or deferred maintenance of facilities, classroom instructional support, insuring facilities, transportation, and for the acquisition and/or purchase of education technology equipment. More recently, Act No. 2018-544 allows Education Trust Fund Budget Stabilization Funds to be used for school safety measures.

A transfer of $301,665,743 was made from the Budget Stabilization Fund into the Education Trust Fund on March 27, 2020. This transfer was made for cash flow purposes due to the extension of sales and income tax filings. On August 27, 2020, $301,665,743 was transferred from the Education Trust Fund back into the Budget Stabilization Fund.

## RECEIPTS, DISBURSEMENTS, TAXES AND REVENUES

**General**

Revenues are collected by nearly every State entity. Table 21 shows the total receipts and disbursements only for those governmental and expendable trust funds operating from the State Treasury. Table 21 does not include the activities of funds operating outside the State Treasury, such as the Alabama State Port Authority, the Alabama Housing Finance Authority, or the various colleges and universities. Table 21 also does not include the activities of any agency funds, proprietary funds or similar pension and nonexpendable trust funds. Agency funds involve moneys held for other funds or individuals and thus do not generate revenues or expenditures for the State. Proprietary funds generally involve functions that are financed by charges to the governmental funds for services such as the motor pool, print shop or self-insurance funds for State property and employee's health insurance. Pension trust funds are financed partly by charges to the governmental funds and partly by investment earnings. The net effect of some proprietary and similar trust funds is included in Table 21. The taxes and licenses collected by the Alcoholic Beverage Control Board ("ABC") are recognized in governmental funds, and the net profits are required by law to be transferred to various governmental funds. Therefore, the net earnings generated by ABC are included in Table 21. Similarly, the Alabama Trust Fund transfers to the General Fund a portion of 5% of the invested assets' average market value from the three previous fiscal years plus 33% of the Oil & Gas payments received for the fiscal year ending one year prior, and this transfer is reflected in Table 21 as an Other Financing Source. Because the State records its revenues on a modified cash basis, the information includes encumbered funds, cash owed to local governments, the federal government and other items which are already obligated. It should also be noted that only a small portion of the receipts shown in Tables 21 and 22 are deposited into the General Fund.

[remainder of this page intentionally left blank]

**Table 21.**
**Schedule of Receipts and Disbursements (Cash Basis)**
**Governmental Fund Types (State Treasury Funds Only)**
**(amounts in thousands)**

| Receipts: | 2021 | % | 2020 | % | 2019 | % | 2018 | % | 2017 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Taxes | $11,553,601 | % | $11,553,601 | 37.8% | $11,182,962 | 46.8% | $10,475,449 | 41.9% | $9,902,384 | 38.1% |
| Licenses, Permits and Fees | 851,970 | % | 851,970 | 2.8% | 921,893 | 3.9% | 735,755 | 2.9% | 744,082 | 2.9% |
| Fines and Forfeits | 191,726 | % | 191,726 | 0.6% | 219,285 | 0.9% | 202,300 | 0.8% | 193,476 | 0.8% |
| Federal Funds | 12,193,245 | % | 12,193,245 | 39.9% | 9,836,870 | 41.2% | 9,139,126 | 36.6% | 8,860,485 | 34.1% |
| Investment Income | 61,190 | % | 61,190 | 0.2% | 312,431 | 1.3% | 49,764 | 0.2% | 24,997 | 0.1% |
| Other Revenues | 1,160,020 | % | 1,160,020 | 3.8% | 1,224,602 | 5.1% | 1,178,879 | 4.7% | 1,126,451 | 4.3% |
| Other Financing Sources | 4,563,700 | % | 4,563,700 | 14.9% | 208,546 | 0.9% | 3,220,146 | 12.9% | 5,111,163 | 19.7% |
| **Total Receipts** | **$30,575,452** | **%** | **$30,575,452** | **100.0%** | **$23,906,589** | **100.0%** | **$25,001,419** | **100.0%** | **$25,963,038** | **100.0%** |
| **Disbursements:** | | | | | | | | | | |
| Economic Development & Regulation | 276,830 | % | 223,505 | 0.8% | 151,081 | 0.7% | 196,468 | 0.8% | 151,218 | 0.6% |
| Education and Cultural Resources | 9,557,938 | % | 9,256,655 | 32.1% | 7,882,291 | 33.9% | 7,481,148 | 29.7% | 7,435,433 | 30.8% |
| Natural Resources and Recreation | 249,648 | % | 234,664 | 0.8% | 170,193 | 0.7% | 173,440 | 0.7% | 194,178 | 0.8% |
| Health - Physical and Mental | 10,003,789 | % | 9,240,120 | 32.1% | 7,877,621 | 33.9% | 8,526,528 | 33.8% | 8,335,921 | 34.5% |
| Social Services | 3,832,396 | % | 3,005,295 | 10.4% | 2,258,662 | 9.7% | 2,377,593 | 9.4% | 2,339,355 | 9.7% |
| Protection of Person and Property | 3,003,873 | % | 2,106,215 | 7.3% | 1,278,467 | 5.5% | 1,396,874 | 5.5% | 1,182,810 | 4.9% |
| Transportation | 2,162,785 | % | 2,255,776 | 7.8% | 1,935,520 | 8.3% | 2,494,253 | 9.9% | 2,129,788 | 8.8% |
| General Government | 1,618,528 | % | 1,537,381 | 5.3% | 1,032,049 | 4.4% | 1,288,498 | 5.1% | 1,078,412 | 4.5% |
| Capital Outlay | 1,835,247 | % | 287,351 | 1.0% | 48,790 | 0.2% | 537,678 | 2.1% | 418,841 | 1.7% |
| Debt Service | 1,014,834 | % | 683,038 | 2.4% | 594,905 | 2.6% | 726,153 | 2.9% | 897,362 | 3.7% |
| **Total Disbursements** | **$33,555,868** | **100.0%** | **$28,830,000** | **100.0%** | **$23,229,579** | **100.0%** | **$25,198,633** | **100.0%** | **$24,163,318** | **100.0%** |

Source: State Comptroller's Office.

.

# Table 22.
## Summary of Revenues by Principal Sources (Cash Basis)
## Governmental Funds in State Treasury
## (amounts in thousands)

| Taxes: | 2021 | 2020 | 2019 | 2018 | 2017 |
|---|---|---|---|---|---|
| General Sales Tax (4% on gross retail sale of merchandise) | $2,904,879 | $2,531,188 | $2,475,661 | $2,377,633 | $2,277,526 |
| General Use Tax | 747,087 | 625,711 | 504,051 | 439,201 | 399,035 |
| Income Tax (2% to 5% personal, 6.5% net corporate income) | 5,687,912 | 4,701,203 | 4,590,864 | 4,250,755 | 3,941,573 |
| Property Tax Relief | 60,764 | 58,137 | 55,600 | 53,254 | 51,707 |
| General Property Tax | 412,709 | 392,905 | 372,183 | 358,484 | 349,686 |
| Gasoline Taxes  (.16 per gallon; .03 aviation;  .01 jet) | 633,703 | 564,042 | 440,139 | 471,467 | 432,214 |
| Utilities Tax  (6% telephone, 4% other) | 394,506 | 402,160 | 416,225 | 410,346 | 402,879 |
| Insurance Premium Tax (1% to 6%) | 470,041 | 429,722 | 404,774 | 370,029 | 341,082 |
| Liquor & Wine Tax (totals 56%, collected by ABC stores) | 191,825 | 166,452 | 150,139 | 140,418 | 132,629 |
| Tobacco  &  Cigarette  Taxes  (21.25 mills  per cigarette | 170,402 | 172,702 | 173,652 | 180,254 | 187,374 |
| Corporation Taxes (privilege, 25 cents to $1.75 per $1,000 net worth) | 130,121 | 129,814 | 129,519 | 129,211 | 108,913 |
| State Beer Tax (.05 per 12 oz.) | 58,610 | 51,487 | 56,487 | 54,680 | 55,580 |
| Public Utilities (2.2%) | 154,173 | 160,256 | 162,094 | 150,573 | 151,165 |
| Motor Fuel Tax (diesel .17 per gallon) | 239,401 | 205,457 | 156,499 | 161,330 | 148,237 |
| Tennessee Valley Authority (payments in-lieu of all state taxes) | 80,128 | 78,617 | 85,937 | 87,445 | 87,706 |
| Leasing / Renting Tangible Personal Property - (4% most items) | 91,707 | 83,801 | 82,463 | 78,556 | 77,298 |
| Production Privilege Tax (Oil & Gas Severance) | 29,538 | 23,882 | 41,018 | 45,529 | 44,131 |
| Financial Institutions Excise Tax (6.5% of net income) | 184,335 | 74,007 | 81,126 | 55,393 | 50,781 |
| Documentary Filing Taxes (auto title, deed, mortgage, securities, etc) | 112,457 | 88,449 | 77,364 | 74,467 | 72,716 |
| Coal Severance Tax (0.335 per ton) | 3,372 | 3,738 | 5,011 | 4,562 | 4,050 |
| Forestry Severance Tax | 5,858 | 5,665 | 5,703 | 5,936 | 6,323 |
| Inheritance Tax (amount of federal credit) | - | 10 | - | - | - |
| Contractors Gross Receipts Tax (5% or gross receipts) | 33,116 | 42,719 | 48,832 | 51,546 | 41,049 |
| Lodgings Tax (4% or 5% of charge) | 87,406 | 69,209 | 81,480 | 74,239 | 68,973 |
| Hydroelectric Companies (tax on 2/5 mill per KWH, 2.2%/dollar | 2,745 | 5 | 955 | 980 | 1,128 |
| Lubricating Oil Tax (.06 per gallon) | 1,639 | 1,588 | 1,992 | 2,187 | 1,756 |
| Pari-mutuel Betting (1 or 2% on pari-mutuel pools) | 4,112 | 2,179 | 1,298 | 1,146 | 1,226 |
| Court Cost Taxes | 20,949 | 18,663 | 21,058 | 21,847 | 22,887 |
| Medicaid Taxes | 432,794 | 421,191 | 396,315 | 374,245 | 377,704 |
| Cellular Telephones (6%) | 20,663 | 26,741 | 33,103 | 28,546 | 45,051 |
| Ground Materials Severance Tax | 100 | - | - | 128 | - |
| Vapor Products | 2,807 | 2,199 | 2,256 | 1,396 | 1,362 |
| Miscellaneous Taxes | 20,039 | 19,705 | 19,617 | 19,666 | 18,643 |
| | | | | | |
| **Total Taxes** | **$13,389,898** | **$11,553,601** | **$11,073,415** | **$10,475,449** | **$9,902,384** |
| **Licenses, Permits and Fees** | | | | | |
| Conservation Licenses (fishing, hunting, boat registration, etc) | 38,530 | 34,959 | 30,099 | 29,387 | 31,261 |
| Drivers Licenses & Fees | 65,327 | 65,388 | 66,312 | 64,363 | 65,835 |
| Petroleum Products Inspection Fees | 58,935 | 57,021 | 60,880 | 64,925 | 56,045 |
| Agricultural License, Permits, Fees | 17,044 | 17,306 | 15,174 | 17,069 | 16,337 |
| Wholesale Oil Company License | 8,212 | 7,936 | 8,891 | 8,509 | 8,383 |
| Motor Vehicle Licenses | 204,762 | 183,112 | 183,730 | 183,299 | 176,091 |

| | | | | | |
|---|---|---|---|---|---|
| Privilege License | 136,608 | 119,566 | 116,485 | 113,012 | 105,590 |
| Court Fees | 70,559 | 65,215 | 73,397 | 72,767 | 73,795 |
| Alcoholic Beverage Licenses | 2,595 | 4,540 | 2,553 | 2,609 | 2,647 |
| Insurance Corporation Licenses and Fees | 1,398 | 1,326 | 1,403 | 1,349 | 1,328 |
| Miscellaneous License, Permits, Fees | 336,018 | 295,601 | 221,984 | 178,466 | 206,770 |
| **Total Licenses, Permits and Fees** | **$939,988** | **$851,970** | **$780,908** | **$735,755** | **$744,082** |
| **Fines & Forfeitures:** | | | | | |
| Court Fines & Forfeits | 21,811 | 17,779 | 18,796 | 19,188 | 20,593 |
| Tobacco Settlement | 115,905 | 103,383 | 107,924 | 114,088 | 93,739 |
| Miscellaneous Fines & Forfeits | 113,485 | 70,564 | 86,031 | 69,024 | 79,144 |
| **Total Fines and Forfeitures** | **$251,201** | **$191,726** | **$212,751** | **$202,300** | **$193,476** |
| **Federal Funds** | **$13,898,260** | **$12,193,245** | **$9,632,518** | **$9,139,126** | **$8,860,485** |
| **Investment Income** | **$26,057** | **$61,190** | **$85,155** | **$49,764** | **$24,997** |
| **Other Revenues** | **$1,117,795** | **$1,160,020** | **$1,226,505** | **$1,178,879** | **$1,126,451** |
| | | | | | |
| **Total Revenues** | **$29,623,199** | **$26,011,752** | **$23,011,252** | **$21,781,273** | **$20,851,875** |

[remainder of this page intentionally left blank]

## State Taxes and Other Major Sources of Revenues and Income

The following is a description of the major State taxes and other major sources of revenues and income. Not all of the taxes or revenues are deposited into the General Fund. No assurance can be made that any of these specific sources or revenues or income will be available in the future.

***Ad Valorem Taxes***. Ad valorem taxes in Alabama are computed by multiplying the tax rate by an assessed value for the taxable property. This assessed value is determined by the tax assessor or revenue commissioner of the county in which such property is located (or by the State Department of Revenue in the case of railroad property and utility property) as a specified percentage (the "Assessment Ratio") of the fair and reasonable market value of such property or, in certain circumstances, its current use value. The assessment of property in Alabama for ad valorem taxes has been significantly affected by several judicial decisions and two amendments to the State Constitution — the first adopted in 1973 and the second adopted in 1978 — which have caused significant differences from year to year in the determination of the assessed value of property. Since revenues from ad valorem taxes approximate only 2% of all taxes raised annually by the State, the changes in the method of determining assessed valuation have not significantly affected the revenues of the State.

Under current law, all property is divided into four classes, and the Assessment Ratio applicable to each class of property for purposes of State taxation is as follows:

| | | |
|---|---|---|
| Class I | All property owned by utilities | 30% |
| Class II | All property not otherwise classified | 20 |
| Class III | All agricultural, forest and single-family, owner-occupied residential property and historic buildings and sites | 10 |
| Class IV | Private passenger automobiles and pickup trucks owned and operated by an individual for personal or private use | 15 |

An owner of Class III property may elect to have such property appraised for assessment at its "current use value" rather than its "fair and reasonable market value."

The following table shows the assessed valuation by categories of property taxed for the fiscal years indicated. Valuation of motor vehicles is for the preceding year. Assessed valuation used in computing penalties for late payment of taxes is not included in the values shown for any category of property. The total market value of all assessed property in the State in the Tax Year ended September 30, 2020 was $561,573,953,347.

[remainder of this page intentionally left blank]

**Table 23.**
**Assessed Valuation of Property**
**Subject to Ad Valorem Taxation by Categories[1]**
**(in thousands)**

| Tax Year | Real Property | Personal Property | Public Utilities | Motor Vehicles | Total Assessed Valuation |
|---|---|---|---|---|---|
| 2000 | $24,142,191 | $5,210,608 | $3,510,138 | $4,999,654 | $37,862,591 |
| 2001 | 25,228,677 | 5,487,577 | 3,618,070 | 5,379,308 | 39,713,632 |
| 2002 | 27,283,157 | 5,890,665 | 3,755,679 | 5,742,699 | 42,672,200 |
| 2003 | 30,310,804 | 6,329,063 | 3,835,294 | 5,605,939 | 46,081,100 |
| 2004 | 34,715,112 | 6,586,647 | 3,868,265 | 5,814,154 | 50,984,178 |
| 2005 | 37,149,155 | 6,408,984 | 4,054,282 | 6,773,304 | 54,385,725 |
| 2006 | 39,485,222 | 6,646,981 | 4,061,896 | 7,021,626 | 57,215,725 |
| 2007 | 44,050,761 | 7,341,829 | 4,134,522 | 7,047,504 | 62,574,616 |
| 2008 | 46,865,127 | 7,759,521 | 4,249,245 | 7,161,765 | 66,035,658 |
| 2009 | 48,706,712 | 7,995,156 | 4,325,584 | 6,493,688 | 67,521,140 |
| 2010 | 48,708,186 | 8,257,105 | 4,318,576 | 5,824,778 | 67,108,645 |
| 2011 | 48,194,416 | 8,653,940 | 4,355,528 | 6,621,229 | 67,825,113 |
| 2012 | 47,743,321 | 8,693,690 | 4,531,874 | 7,124,065 | 68,092,950 |
| 2013 | 48,292,454 | 9,013,350 | 4,669,297 | 7,409,028 | 69,384,129 |
| 2014 | 48,201,732 | 9,050,392 | 4,690,593 | 7,247,616 | 69,190,333 |
| 2015 | 49,428,796 | 8,822,824 | 4,790,676 | 7,591,191 | 70,633,487 |
| 2016 | 50,965,077 | 9,791,802 | 4,903,096 | 8,074,544 | 73,734,519 |
| 2017 | 52,734,517 | 9,922,057 | 5,081,063 | 7,819,825 | 75,557,462 |
| 2018 | 55,208,427 | 10,162,755 | 5,096,533 | 7,119,140 | 77,586,855 |
| 2019 | 59,026,902 | 10,704,890 | 5,187,788 | 7,597,282 | 82,516,862 |
| 2020 | 61,856,336 | 11,163,586 | 5,304,353 | 8,018,870 | 86,343,145 |

Total Market Value for Tax Year 2020 = $561,573,953,347

(1) Amounts in this table are compiled from unaudited abstract reports submitted by local revenue offices.

*Alabama Trust Fund*. The State Lands Division manages oil, gas and mineral interests owned by the State. Alabama authorizes the Commissioner of Conservation and Natural Resources to lease, upon such terms as he or she may approve, certain waters of the State, adjacent land and submerged lands in the Gulf of Mexico, for the exploration, development and production of oil, gas and other minerals. All lands proposed to be leased by the Lands Division must be leased only upon the basis of competitive bids.

Currently, the State owns oil and gas interests on small upland tracts, submerged river bottoms and in an offshore area. The most significant are the natural gas reserves lying within the three-mile offshore area of Mobile and Baldwin Counties. Major discoveries of natural gas in the 1980s led to the development of an array of natural gas reservoirs which occur some 19,000 feet below sea level. Most of these "deep discoveries" were developed by major natural gas producers. However, more recently, "shallow reserves" at between 3,000 and 7,000 feet below sea level are being developed. While the magnitude of the shallow reserves is not as significant as the deeper production, shallow gas production is economical partly because it requires less treatment to

remove impurities. Alabama recently completed a new oil and gas reserve and resource study to more accurately determine the gas reserves in the State waters of Mobile Bay and the Gulf of Mexico. This study will periodically be updated to reflect the most recently available geological, geophysical and engineering data.

Originally, revenues generated from the lease of any submerged lands in the Gulf of Mexico, less the cost of administration referred to below, were paid by the Commissioner of Conservation and Natural Resources to the State Treasurer to become a part of the General Fund. The Lands Division was entitled to 10% of all revenues, including royalties, as the cost of administration.

Pursuant to an amendment to the State Constitution adopted in 1982, an irrevocable permanent trust fund named the Alabama Heritage Trust Fund (the "Heritage Trust Fund") was created into which there was to be deposited the proceeds received by the State from January 1, 1981, through October 31, 1981, for the rights to explore and drill for oil and gas in any offshore area. A subsequent amendment to the State Constitution adopted in 1985 created a new trust fund known as the Alabama Trust Fund and provided for the dissolution of the Heritage Trust Fund and the transfer of its assets into the Alabama Trust Fund.

In addition to the funds transferred from the Heritage Trust Fund, the initial trust capital of the Alabama Trust Fund consisted of an amount equal to the sum of all proceeds of any oil and gas capital payments paid to the State pursuant to sealed bids received on August 14, 1984, plus certain other revenues payable to the State for the lease of State lands. The Division of Lands was entitled to 4% of the $347,483,000 which was received by the State pursuant to the sealed bids awarded on August 14, 1984. The Alabama Trust Fund is augmented by all proceeds of any oil and gas capital payments, as defined in the constitutional amendment pursuant to which the Alabama Trust Fund was created (the "Amendment") subsequent to August 14, 1984; provided, however, that the Division of Lands of the Department of Conservation and Natural Resources is entitled to 1% of all proceeds of any oil and gas capital payments, as defined in the Amendment, subsequent to August 14, 1984. "Oil and Gas Capital Payment" is defined in the Amendment as follows: "any payment, including any royalty payment, received after August 1, 1984, by the State or any agency or instrumentality thereof as all or part of the consideration for the sale, leasing or other disposition by the State or any agency or instrumentality thereof of any right to explore and drill for or to produce oil, gas or other hydrocarbon minerals in any area on the water side of the high water mark of Mobile Bay or in any other offshore area and shall include any revenue received by the State from federal oil and gas leases off the coast of Alabama. Any royalty or other payment, with the exception of any taxes heretofore or hereafter levied that is based upon or determined with respect to, the production of oil, gas or other hydrocarbon minerals and that is paid to the State or any agency or instrumentality thereof regardless of the time of such payment shall be considered an oil and gas capital payment." The Amendment provided that the trust capital is to be held in perpetual trust and may not be appropriated by the Legislature or expended or disbursed for any purpose other than to acquire eligible investments in accordance with the provisions of the Amendment. Any trust income derived from the investment of trust capital is to be paid directly into the General Fund and is subject to appropriation and withdrawal by the Legislature. The Amendment required that 10% of trust income be reinvested in the Alabama Trust Fund. However, a subsequent amendment to the State Constitution, pursuant to which the Forever Wild Land Trust was created, redirected the 10% of income from the Alabama Trust Fund to the Forever Wild Land

Trust, up to a maximum of $15 million in any one fiscal year. (See Alabama Trust Fund Distributions and Education Trust Fund Rainy Day Account later in this section for subsequent changes to the Alabama Trust Fund.)

The following table sets forth the fund balance of assets in the Alabama Trust Fund for the fiscal years shown.

**Table 24.**
**Fund Balance of Assets in the Alabama Trust Fund**

**(in Millions)**

| Fiscal year ending Sept 30 | Fund Balance |
|---|---|
| 2000 | $1,421 |
| 2001 | 1,749 |
| 2002 | 2,176 |
| 2003 | 2,265 |
| 2004 | 2,460 |
| 2005 | 2,704 |
| 2006 | 2,975 |
| 2007 | 3,302 |
| 2008 | 2,982 |
| 2009 | 2,951 |
| 2010 | 3,130 |
| 2011 | 3,127 |
| 2012 | 2,984 |
| 2013 | 2,923 |
| 2014 | 2,884 |
| 2015 | 2,627 |
| 2016 | 2,733 |
| 2017 | 3,194 |
| 2018 | 3,283 |
| 2019 | 3,334 |
| 2020 | 3,439 |
| 2021 | 3,922 |

Source: State of Alabama; State Treasurer's Office

***Alabama Trust Fund Distributions***. To provide a more steady and reliable revenue stream to the State General Fund, rather than relying on unstable capital gains from the Alabama Trust Fund, the Legislature passed, the Governor signed, and the people approved Constitutional Amendment 856 to the State Constitution. Prior to this change, Amendment 666 to the State Constitution stated that in any year when trust income exceeded $60,000,000, 10% shall be transferred to the Municipal Government Capital Improvement Trust Fund, 10% shall be transferred to the County Government Capital Improvement Trust Fund, up to 10%, but no more than $15,000,000, shall be transferred to the Forever Wild Land Trust, one-fourth of 1% (increasing one-fourth of 1% each fiscal year), but no more than $5,000,000, shall be transferred to the Senior Services Trust Fund, with the remainder to the State General Fund. Oil and gas

royalties were to be distributed as follows: 1% to the Land Division of the Department of Conservation and Natural Resources, of the 99% remainder, 65% to the Alabama Trust Fund, 28% to the Capital Improvement Trust Fund, and 7% to be split 50% to the Municipal Government Capital Improvement Trust Fund and 50% to the County Government Capital Improvement Trust Fund. In addition, the Alabama Trust Fund Board, with a majority of members present making a quorum, and with majority vote of members present, could transfer up to 75% of realized and unrealized capital gains, with 10% each transferred to the Municipal Government Capital Improvement Trust Fund and the County Governmental Capital Improvement Trust Fund and the remainder (80%) to the State General Fund.

Amendment 856 changed the distribution of 33% of the oil and gas capital payments paid into the Alabama Trust Fund for the fiscal year ending one year prior to the beginning of the fiscal year for which the distribution is being made plus 5% of the average market value of the invested assets of the Alabama Trust Fund as of the end of the three fiscal years ending prior to the beginning of the fiscal year for which distribution being made. Such funds are now distributed as follows: 10% to the County Government Capital Improvement Trust Fund, 10% to the Municipal Government Capital Improvement Trust Fund; 10%, but not more than $15,000,000 in any one year, will go to the Forever Wild Land Trust, 1%, but not more than $5,000,000 in any one year, will go to the Senior Services Trust Fund, with the remainder to the State General Fund. The distributions may be reduced (either a smaller percentage of oil and gas payments, a smaller percentage of average amount of invested assets, or both) due to detrimental financial or market conditions if approved by a two-thirds vote of the entire board membership.

Amendment 856 also allowed for three transfers from the Alabama Trust Fund to the State General Fund for each of the fiscal years 2013 through 2015 in the amount of $145,796,943 annually.

Pursuant to Act No. 2013-6 duly adopted during the 2013 Regular Session of the Alabama Legislature, the Legislature shall provide for the repayment of all funds transferred from the Alabama Trust Fund to the State General Fund pursuant to Amendment 856 not later than September 30, 2026.

Act No. 2016-469 created the Alabama Economic Settlement Authority and allowed the Authority to issue bonds repayable from the State's economic settlement with BP. A portion of the proceeds from any such bonds were required to be used to repay amounts owed by the State to the General Fund Rainy Day Account and to the Alabama Trust Fund. The Act also amended the People's Trust Act to modify the repayment schedule required by that Act. All amounts owed to the Alabama Trust Fund will now be repaid no later than September 30, 2033.

***Education Trust Fund Rainy Day Account***. Amendment 709 to the State Constitution established an Education Trust Fund Rainy Day Account within the Alabama Trust Fund in 2002. The Amendment authorized a one-time transfer from the Alabama Trust Fund to the Education Trust Fund Rainy Day Account of up to six percent of the Education Trust Fund's appropriation for the fiscal year ended September 30, 2002. Amendment 709 was repealed by Amendment 803 in November 2008.

On June 17, 2002, a transfer of approximately $248 million was made from the Alabama Trust Fund to the Education Trust Fund Rainy Day Account. During fiscal year 2003, proration in

the Education Trust Fund was declared and $179,993,229 was transferred from the Education Trust Fund Rainy Day Account to the Education Trust Fund to lessen the effects of proration. These funds were fully repaid prior to the end of fiscal year 2007.

Amendment 803 to the State Constitution, ratified in November 2008, repealed Amendment 709 and established an Education Trust Fund Rainy Day Account and a General Fund Rainy Day Account within the Alabama Trust Fund. In any year in which the Governor declares that proration would occur, the Education Trust Fund Rainy Day Account or the General Fund Rainy Day Account shall be credited with funds from the Alabama Trust Fund. However, withdrawals from the Education Trust Fund Rainy Day Account are limited to 6.5 percent of the previous fiscal year's appropriations, less any previous withdrawals not repaid, and the General Fund Rainy Day Account withdrawals are limited to 10 percent of the previous fiscal year's appropriations, less any previous withdrawals not repaid. The Education Trust Fund Rainy Day Account must be repaid within six years and the General Fund Rainy Day Account must be repaid within ten years.

The Education Trust Fund Rainy Day Account was depleted in fiscal year 2009, and as of July 2015, the entire balance had been repaid to the Account. The General Fund Rainy Day Account was depleted in fiscal year 2010. As of December 15, 2016, the entire balance had been repaid to the General Fund Rainy Day Account.

***General Fund Budget Reserve Fund***. The General Fund Budget Reserve Act, created by Act 2020-115, establishes the General Fund Budget Reserve Fund. Beginning on October 1, 2020, and on October 1 of each fiscal year thereafter, 20% of the ending balance in the General Fund from the previous fiscal year that was unanticipated and unappropriated by the Legislature as a beginning balance in the current fiscal year shall be dedicated to the fund. The Director of Finance shall transfer 20% of this balance by November 15 of each year and shall be made each year when the balance in the General Fund Budget Reserve Fund at the end of a fiscal year is less than $100 million. The bill authorizes withdrawals to be made from the General Fund Budget Reserve Fund in the event of proration in the General Fund. The Governor must certify to the State Comptroller and notify the Legislature that proration would occur in the General Fund. Any amount in excess of the amount necessary to avoid proration shall be repaid within 30 days after the end of the fiscal year in which withdrawals are made. In addition, amounts in the General Fund Budget Reserve Fund may be withdrawn through an independent supplemental appropriation bill enacted with a recorded vote of at least two-thirds of the membership of each legislative chamber to provide funding necessary for any of the following: (1) to offset a reduction in estimated revenues to the General Fund for the current fiscal year; (2) to fund state employee pay raises or bonuses; (3) to provide funding for unanticipated obligations. However, no funds may be appropriated until the balance of the General Fund Budget Reserve Fund at the end of the previous fiscal year equals or exceeds $50 million.

***Alcoholic Beverage Control Board Revenue***. Licenses and associated filing fees are required of distillers, manufacturers, wholesalers and retailers for the privilege of distributing alcoholic beverages within the State. Annual license fees vary with an original application filing fee of $50. The Alabama Alcoholic Beverage Control Board collects licenses, fees, and liquor, beer, and table wine taxes. Spirituous and vinous liquors are taxed at 56% of cost plus a 35% markup as set by the State, and the taxes, as well as the profits of the Alabama Alcoholic Beverage Control Board, are distributed to the General Fund, the Department of Human Resources, the

Special Mental Health Trust Fund, and municipalities and counties in which the sale of alcoholic beverages is permitted by law. The last tax increase was passed in 1988.

***Beer Tax and County Licenses***.  Excise taxes are levied on the sale, storage, or receipt of malt or brewed beverages for the purpose of distribution. The taxes total 5 cents per 12 fluid ounces or fractional part thereof and are collected by the Alabama Alcoholic Beverage Control Board for distribution to the General Fund, the Department of Human Resources, the Alabama Education Trust Fund, and counties in which the sale of alcoholic beverages is permitted by law.

***Business Licenses.***  The State levies, at varying rates, a business privilege license fee on persons, firms, corporations, companies, associations, receivers, or trustees engaged in certain business, vocation, or profession. After distribution to any required regulatory boards and the cost of collection, the receipts are distributed 50% to the General Fund and 50% to the respective counties where such receipts are collected.

***Business Privilege Tax***. The business privilege tax is levied for the privilege of being organized under the laws of Alabama or doing business in Alabama (if organized under the laws of another state or country). This is an annual tax calculated on taxable Alabama net worth (net worth plus additions, minus exclusions, times the apportionment factor, less deductions). The tax is administered by the State Department of Revenue. A portion of the Business Privilege Tax is distributed to each county and the remainder is distributed to the General Fund.

***Cigarette and Tobacco Taxes***. A privilege and use tax on tobacco products, including a tax of 33.75 mills per cigarette ($0.675 per pack), is levied on the sale, storage or distribution of cigarettes by wholesalers and retailers, and varying rates on other tobacco products. This reflects an increase of 12.50 mills per cigarette effective October 1, 2015. The revenues from the 12.50 mill increase are required to be deposited in the General Fund for the Medicaid program. The remaining proceeds derived from the tax levied upon cigarettes are divided among the State Public Welfare Trust Fund, State Medicaid programs, the Special Mental Health Trust Fund, the State Park Fund, the State Health Department, the General Fund and the State Treasurer's Office for payment of maturities of principal and interest on: (1) certain bonds issued by the State Industrial Development Authority, and (2) certain bonds issued by the State or the Alabama Mental Health Finance Authority for the acquisition and construction of mental health facilities.  The proceeds derived from the tax levied on tobacco products other than cigarettes are deposited into the General Fund.

***Corporation Fees***. Fees are charged by the Secretary of State and probate judges for filing documents, issuing certificates, and other services on behalf of corporations. Funds collected by the Secretary of State are divided between the Corporations Fund and the General Fund. Collections by counties are deposited in the county treasuries.

***Driver's License Fees, Transcripts and Duplicates***. County probate judges collect fees for four-year driver's licenses, eight-year non-driver's identification cards for those less than 62 years of age, transcripts, duplicates and learner's permits. Of the $36.25 fee for each driver's license, non-drivers identification card, or learner's permit issued, $1.50 is retained by the county, $20.76 is deposited into the Public Safety Fund for the Alabama Law Enforcement Agency, $0.05 to the Alabama Veterans Living Legacy Trust Fund, and the remainder is deposited into the State General Fund.

*Federal Funds*. Federal funds provided revenues to the State in prior years as shown in Table 21. Federal funds received in recent fiscal years provided the citizens of the State with aid in the areas of health, welfare, education, highways, employment services, disaster recovery, planning, energy and many routine government operations. No assurance can be made that federal funds will continue to be allocated to the State in the amounts received during prior years.

*Financial Institutions Excise Tax*. A 6.5% excise tax is levied on the net income of any bank, credit union, banking association, trust company, loan company or association, or person or institution coming into competition with the business of national banks. The funds remaining after deducting administrative costs and 0.5% which is distributed to the General Fund, are deposited 25% into the General Fund, 25% to the respective counties and 50% to the respective cities.

*Gasoline Tax*. Not including the additional tax imposed by the Rebuild Alabama Act (see "Recently Enacted Legislation – Rebuild Alabama Act Gasoline and Diesel Sales Tax" below), a total of $0.18 per gallon is now charged on the sale, consumption, distribution, storage or withdrawal from storage of gasoline in the State. After the cost of collection is deducted, the proceeds are distributed in three portions: $0.07, $0.05 and $0.06. A minor portion is distributed to State's Water Safety Fund and the Seafood Fund, and the remainder is divided between the Public Road and Bridge Fund and to the counties. The State Department of Revenue also collects an aviation gasoline tax on the sale, consumption, distribution or storage of gasoline for use as a fuel to propel aircraft. The proceeds, after a deduction for the cost of collection, are allocated to the Alabama Department of Transportation and to political subdivisions operating airports.

*Hazardous Waste Fees*. The State collects a per ton levy on operators of commercial sites for the disposal of hazardous substances for each ton of hazardous waste or hazardous substance received for disposal and disposed of at such sites, with a portion of the amount collected going to the State's General Fund and a portion going to the county in which the site is located.

*Hydroelectric Companies Tax*. The State levies a privilege tax on the manufacture and sale of hydroelectric power within the State. The tax is assessed at 2/5 of a mill (0.04%) upon each kilowatt-hour of hydroelectric power and is allocated 42% to the Alabama Education Trust Fund and 58% to the Special Mental Health Trust Fund.

*Income Tax*. The State levies a personal income tax at a maximum of 5% after specified exemptions and deductions (including federal income taxes paid). Corporate income remaining after the subtraction of statutory deductions (including federal income taxes paid) is taxed at the rate of 6.5%. After deducting costs of collections, and current year refunds, the State Department of Revenue allocates a portion of the income tax revenues to the General Fund, the Soldier's Relief Fund, and the Public School Fund for reimbursement for homestead and other ad valorem tax exemptions and any balance remaining is transferred to the State Treasurer for credit to the Education Trust Fund to be used for payment of public school teachers salaries only.

*Insurance Company Licenses and Premium Tax*. A license tax, at varying rates, is levied for the purposes of providing insurance within the State, and a premium tax is imposed on the amount of premiums written by an insurer. Capped amounts of $30,993,296 and $4,525,338 from Insurance Premium Tax are distributed to the Education Trust Fund and the Special Mental Health Trust Fund, respectively, and the remainder goes to the State General Fund. License renewal fees, Insurance Fraud unit assessments and Title insurance fees are wholly deposited into the Insurance

Department Fund. Company fees, producer fees, retaliatory taxes and miscellaneous services collections are split evenly between the Insurance Department Fund and the State General Fund.

***Interest on State Deposits***. Interest earned by the State Treasurer through the investment of State funds is paid to the State Treasury and, unless otherwise provided for by law, is credited to the General Fund. Because these amounts are not considered to be derived from tax revenues, they are not reflected in Table 21.

***Leasing or Renting of Tangible Personal Property***. A privilege tax is levied upon persons engaging in leasing or renting tangible personal property. The tax rates are as follows: 4% of gross proceeds from leasing or renting tangible personal property; 1.5% of gross proceeds from renting or leasing automotive vehicles, trucks, semi-trailers or house trailers; and 2% of gross proceeds from renting or leasing linens and garments. All of the proceeds of this tax are distributed to the General Fund.

***Lodgings Tax***. A privilege tax is levied upon every person or firm that rents or furnishes lodgings or accommodations to transients for a period of less than 180 days for a fee. The tax is levied at the rate of 5% of the charges for accommodation in counties of the geographic region comprising the Alabama mountain lakes area and 4% of the charges for accommodations in all other Alabama counties. One fifth of the 5% tax collected in the Alabama mountain lakes area counties is distributed 50% to the Alabama Mountain Lakes Tourist Association and 50% to the respective 16 counties where the tax is collected for the promotion of tourism and recreation. The balance of the tax collected in the mountain lakes area counties as well as the entire proceeds from the 4% tax levy collected in all other Alabama counties is distributed as follows: 75% to the General Fund and 25% to the Department of Tourism and Travel.

***Mortgage Recording Tax***. A license tax is collected by the probate judge of each county for filing a mortgage, deed of trust, contract of conditional sale, or similar instrument given to secure payment of any debt incurred in connection with the conveyance or transfer of any real or personal property in the State, or any security agreement or financing statement provided for by the Alabama Uniform Commercial Code. The tax rate is $0.15 for each $100 of indebtedness, or fraction thereof. Out of the total amount collected, 5% is retained by the Judge of Probate to cover costs of collection. Two thirds of the net amount collected is deposited into the General Fund and one third into the county treasury.

***Motor Fuels Tax***. An excise tax is levied upon the sale, consumption, distribution, storage or withdrawal from storage of any motor fuel (primarily diesel) used in the operation of a motor vehicle upon State highways. The State collects two levies ($0.13 and $0.06) which total $0.19 per gallon. The State Department of Revenue collects this tax and, after the cost of collection is deducted, the $0.13 tax is used for the repayment of Alabama Highway Authority Bonds, if any are outstanding, and the construction and maintenance of roads and bridges. The $0.06 tax is distributed 4.69% equally among the 67 counties for public road and bridge purposes, 0.93% to incorporated municipalities and the balance to the Department of Transportation for highway purposes.

***Motor Vehicle Registrations***. An annual license tax or registration fee is required for each motor vehicle operated on the public highways of Alabama. Registration fees are collected by the Judge of Probate of each county and are set at $23.00 for each passenger automobile, $15.00 for

each motorcycle, $47.50 to $210.00 for each motor bus, $13.00 to $500.00 for motor homes and $13.00 to $890.00 for each commercial car, truck or truck tractor.  Fees for buses are based on city population and seating capacity. After the deduction of administrative costs and certain additional amounts collected on cars, trucks and truck tractors, 72% of the proceeds is deposited into the Public Road and Bridge Fund, 21% is distributed to the county or municipality in which the vehicle is located and 7% is distributed by the State Treasurer to the 67 counties on the basis of vehicle registrations. Additional amounts collected on truck and truck tractors are distributed as follows: 64.75% to the Public Road and Bridge Fund and 35.25% among the 67 counties of the State.  Also, $10 in additional fees on private passenger automobiles and trucks are deposited into the General Fund for Department of Public Safety purposes.

*Oil and Gas Privilege Tax*. The State Department of Revenue collects an annual privilege tax on all persons engaged in the business of producing or severing oil or gas from beneath soil or water. Well units are taxed at a percentage of the gross value of the oil or gas at the point of production. The privilege tax rate varies according to type of well (offshore or onshore), permit date, and well classification (discovery, replacement, development, or occluded gas). The amount collected is divided between the General Fund and the counties where the oil and gas is produced (and the municipalities, if applicable).

*Oil and Gas Production Tax*. An oil and gas production tax is levied on the production of oil or natural gas severed from any well in Alabama. The tax is 2% of gross value at the point of production. The tax on offshore production, produced from depths greater than 8,000 feet below mean sea level is 1.66% of gross proceeds attributed to the offshore production. Revenues are collected by the Department of Revenue and distributed to the General Fund.

*Pari-Mutuel Tax*. A 1% tax is levied for businesses operating a dog or horse track, based upon the total amount wagered on all pari-mutuel races (both live and simulcast). In pari-mutuel races, individuals who wager on winners divide the total amount wagered in proportion to their individual wagers, after deduction of authorized taxes, fees, and management expenses. Pari-mutuel tax is collected by the Department of Revenue, and once the cost of collection is deducted, all proceeds are deposited into the State General Fund.

*Public Utilities Tax*. The State levies a 2.2% tax on each dollar of gross receipts for the preceding year on all persons operating a public utility except railroads, express companies, telephone and telegraph companies. After a deduction for costs of collection, the public utilities tax is distributed as follows: 15% to the General Fund and 85% to the Special Mental Health Trust Fund.

*Sales and Use Taxes*. The sales tax is a tax imposed on the gross proceeds from the sale of tangible personal property within the State. The use tax is an excise tax on the storage, use or other consumption within the State of tangible personal property purchased outside the State.

After the deduction of collection costs for the sales tax, $189,000 is distributed to the 67 counties on the basis of population; $189,000 is distributed to the 67 counties equally; to the extent not replaced from income tax proceeds, the replacement in the public school fund and in the General Fund of amounts lost by exemption of homesteads from ad valorem tax; $1,322,000 is distributed to the Department of Human Resources for general welfare purposes; varying amounts are distributed to the Department of Conservation and Natural Resources and to the General Fund

from the increase in tax receipts due to the cap on license holder discounts; a varying amount for the administration of the Food Stamp Program is distributed to the Department of Human Resources; to the credit of the General Fund of 42% of the tax levied on sales of automotive vehicles, truck trailers, semitrailers, house trailers, and mobile home set-up materials and supplies, and 50% of the tax levied on sales of motorboats not collected by the seller; beginning January 1, 2016, for deposit into the State Treasury to the credit of the State General Fund the tax levied on consumable vapor products; and the balance is deposited into the Education Trust Fund.

After deduction of collection costs for the use tax, (i) 42% of the use tax proceeds on automotive vehicles, truck trailers, semi-trailers, house trailers and mobile homes is deposited into the General Fund and 58% is deposited into the Education Trust Fund, (ii) 50% of the tax proceeds on uses of motorboats not collected by the seller is deposited into the General Fund and 50% are deposited into the Education Trust Fund, (iii) 75% of the remote use tax amounts (collected from out-of-state vendors who do not have nexus in the State and from consumers on individual tax returns) is deposited into the General Fund and 25% is deposited into the Education Trust Fund, and (iv) 53% of the remaining use tax proceeds is deposited into the General Fund and 47% are deposited into the Education Trust Fund. Effective January 1. 2016, per Act 2015-535, taxes collected through the sales of consumer vapor products are deposited 100% into the State General Fund. See "RECEIPTS, DISBURSEMENTS, TAXES AND REVENUES - State Taxes and Other Major Sources of Revenues and Income – *Remote Sales/Use Tax*" herein for information regarding the distribution of remote sales/use tax proceeds.

An act passed during the 2006 Regular Session of the Alabama Legislature created a sales tax holiday that exempts from the State sales tax the purchase of selected products (computers, clothes, school supplies, etc.) up to a maximum cost, for the first weekend in August each year.

***Tennessee Valley Authority Payments***. The Tennessee Valley Authority ("TVA") makes payments in lieu of all taxes to the states where its power properties and operations are located. TVA pays 5% of its gross revenues from the sale of power in the preceding fiscal year to such states on a proportionate basis. The amounts received by the State from TVA's payments in lieu of taxes are distributed as follows: 83% to counties served by TVA and the remainder to the State. The State's share is required to be deposited into a special fund held by the State Treasurer (the "Special Fund") for the Alabama Incentives Financing Authority Bonds. If directed by a resolution of the Board of Directors of the Alabama Incentives Financing Authority, the State Treasurer must transfer from the Special Fund to the General Fund moneys and securities the Board of Directors determines are not needed to meet obligations of the Alabama Incentives Financing Authority.

***Utility Gross Receipts Tax and Utility Service Use Tax***. The State Department of Revenue collects a privilege tax on every utility furnishing utility services in the State. For every utility furnishing electricity, domestic water or natural gas, the tax rate is 4% on the first $40,000 of monthly sales, 3%, on the next $20,000 of monthly sales and 2% on all monthly sales above $60,000. For every utility furnishing telegraph or telephone services, the rate is 6% on all monthly sales. After a deduction for cost of collection and $14,600,000 for deposit into the Special Mental Health Trust Fund, the proceeds from this tax are deposited into the Education Trust Fund. The Utility Service Use Tax, complementary to the Utility Gross Receipts Tax, is levied on the sales price of utility services stored, used or otherwise consumed in Alabama, regardless of whether the utility is engaged in business in Alabama, at the same rates as the Utility Gross Receipts Tax. After

a deduction for cost of collection, the proceeds of this tax are deposited into the Education Trust Fund.

**Recently Enacted Legislation**

*Alabama Accountability Act*. The Alabama Accountability Act of 2013 (Act No. 2013-64, 2013-265, 2015-434), which, among other things, (1) allows for flexibility contracts between the State Board of Education and local public school districts in order to enhance innovation in Alabama public schools, (2) creates income tax credits for families with students in a failing school to attend a nonpublic school or non-failing public school, and (3) creates income tax credits for taxpayers who donate to a nonprofit organization that provides scholarships for students to attend a nonpublic school or non-failing public school.

The income tax credits for families with students in a failing school are refundable tax credits, which means that, if the Alabama income taxes owed by the family are less than the total credit allowed under the act, the family is entitled to a refund or rebate equal to the balance of the unused credit. The act provides that these refunds or rebates are to be paid out of sales tax collections of the Education Trust Fund. In the fiscal year ended September 30, 2021, $71,645 was paid from sales tax collections. The act provides for no limit on these tax credits. The income tax credits for taxpayers who donate to nonprofit scholarship organization are not refundable tax credits; further, the act limits these tax credits to $30,000,000 per year.

*Remote Sales/Use Tax*. Under Act No. 2012-599 of the Alabama Legislature, if any national agreement for the collection of sales and use taxes from remote sellers establishes a national tax rate or requires the State to establish a single statewide rate on remote sales, the distribution of remote sales and use tax proceeds would be as follows: 50% to the State (with 75% thereof deposited into the State General Fund and 25% thereof deposited into the Education Trust Fund); 25% to the municipality in which the delivery was made, if the delivery is made within a municipality; and the remainder to the county in which the delivery is made.

Act No. 2015-448 of the Alabama Legislature allows all remote sellers who make retail sales into Alabama to enter into voluntary agreements with the State, under which they would agree to collect and pay to the State a flat 8% sellers use tax on all sales made into Alabama. The amounts collected pursuant to these agreements are distributed 50% to the State, 25% among the counties in the State and 25% among the municipalities in the State. The State's share of the amounts collected pursuant to these agreements is deposited 75% to the State General Fund and 25% to the Education Trust Fund.

Effective January 1, 2019, Act 2018-539 of the Alabama Legislature establishes the distribution of the proceeds from the Simplified Sellers Use Tax Remittance Program's statewide 8% tax. The proceeds of such tax will be distributed as follows: 50% to the State (with 75% thereof deposited into the State General Fund and 25% thereof deposited into the Education Trust Fund); 30% to Alabama municipalities, based on census population percentages; and 20% to Alabama counties, based on census population percentages. Also effective January 1, 2019, a cap of $8,000 will be placed on the discount for timely remittance of the Simplified Sellers Use Tax collections.

*Rebuild Alabama Act Gasoline and Diesel Tax*. Pursuant to Act No. 2019-2 of the Alabama Legislature, the tax on gasoline and diesel fuel will increase by (1) $0.06 on each net gallon of gasoline and diesel fuel on September 1, 2019, (2) an additional $0.02 on each net gallon

of gasoline and diesel fuel on October 1, 2020 (i.e., an aggregate increase of $0.08 per net gallon) and (3) an additional $0.02 on each net gallon of gasoline and diesel fuel on October 1, 2021 (i.e., an aggregate increase of $0.10 per net gallon). Beginning October 1, 2023, and on July 1 of every other year thereafter, the tax rate will be adjusted by the percentage change in the yearly average of the National Highway Construction Cost Index (NHCCI) for the most recent period ending December 31, compared to the base year average, which is the average for the 12-month period ending December 31, 2020 and rounded to the nearest whole cent. The maximum amount or increase or decrease in the tax rate will not exceed $0.01 per net gallon and will take effect every other year. Up to $750,000 per month of the additional gasoline tax and up to $230,000 per month of the additional diesel tax will be distributed to pay debt service on bonds to be issued by Alabama Highway Finance Corporation in a par amount not to exceed $150,000,000. The remaining proceeds from the additional taxes will be distributed (1) 66.67% to the Alabama Department of Transportation to be used various transportation infrastructure projects, (2) 25% among the counties of the State to be used various transportation infrastructure projects and (3) 8.33% among the municipalities of the State to be used various transportation infrastructure projects.

*Battery Electric Vehicle License Tax*. Pursuant to Act No. 2019-2 of the Alabama Legislature, an annual license tax and registration fee of $200 is imposed on each battery electric vehicle operate on the public highways of the State and an annual license tax and registration fee of $100 is imposed on each plug-in hybrid electric vehicle operated on the public highways of the State. Such fees are effective January 1, 2020. Beginning July 1, 2023 and every fourth year thereafter, the additional annual license tax and registration fee will increase by $3. Such fees are subject to reduction in the event certain federal surcharge or registration fees are imposed on such vehicles and such amounts are used solely for highway transportation purposes in the State. The first $150 collected from the annual license tax and registration fee on each battery electric vehicle and the first $75 collected from the annual license tax and registration fee on each plug-in hybrid electric vehicle will be distributed 66.67% to the State, 25% among the counties of the State and 8.33% among the municipalities of the State for public road, highway and bridge projects. The remainder of the annual fees collected will be deposited in the Rebuild Alabama Fund and used by the Alabama Department of Transportation to fund electric vehicle transportation charging infrastructure until the number of registrations of battery electric vehicles and plug-in hybrid electric vehicles reaches 4% of the total annual registration of motor vehicles in the State, at which point the annual fees will be reduced to $150 and $75, respectively.

[remainder of this page intentionally left blank]

# STATE RETIREMENT PROGRAMS

## General

The State is one of many participants in three statewide retirement pension benefit programs provided through the Retirement Systems of Alabama ("RSA" or the "Systems") and two healthcare benefit programs. Teachers' Retirement System ("TRS" or the "Teachers' System"), Employees' Retirement System ("ERS" or the "Employees' System"), and Judicial Retirement Fund ("JRF") operate under common management and are collectively referred to as RSA. Each of the three retirement pension programs is a defined benefit program, whereby the investment risk of the program is borne by the employer.

The Systems are funded by (1) employee contributions, (2) appropriations by the Legislature from the Education Trust Fund, the General Fund and other funds from local units who are responsible for employer contributions, and (3) earnings on investments. Active members participate in the Systems as a condition of employment with concurrent contributions made on their behalf by their respective employer.

The TRS, a cost-sharing multiple-employer public employee retirement plan, was established as of September 15, 1939, under the provisions of Act 419 of the Legislature of 1939 for the purpose of providing retirement allowances and other specified benefits for qualified persons employed by State-supported educational institutions. The responsibility for the general administration and operation of the TRS is vested in its Board of Control.

The ERS, an agent multiple-employer public employee retirement plan, was established as of October 1, 1945, under the provisions Act 515 of the Legislature of 1945 for the purpose of providing retirement allowances and other specified benefits for state employees, State Police, and on an elective basis, to all cities, counties, towns, and quasi-public organizations. The responsibility for the general administration and operation of the ERS is vested in its Board of Control.

The JRF, a cost-sharing multiple-employer public employee retirement plan, was established as of September 18, 1973, pursuant to Act 1173 of the Legislature of 1973 (codified at Title 12, Chapter 18 of the Code of Alabama (1975)) for the purpose of providing retirement allowances and other specified benefits for any Justice of the Supreme Court of Alabama, Judge of the Court of Civil Appeals, Judge of the Court of Criminal Appeals, Judge of the Circuit Court, or office holder of any newly created judicial office receiving compensation from the State Treasury. Act 1205 of the Legislature of 1975 (codified at Title 12, Chapter 19, Articles 3 and 4 of the Code of Alabama (1975)) enlarged the scope and coverage of the JRF to include District and Probate Judges. Act 498 of the Legislature of 2015 (codified at Title 12, Chapter 18, Article 7 of the Code of Alabama (1975)) established the Judges' and Clerks' Plan within the JRF for any Judge or Clerk who was first elected or appointed on or after November 8, 2016, and was not a member of the JRF or the Clerks' and Registers' Supernumerary Fund prior to that date. Act 498 of the Legislature of 2015 (codified at Section 12-17-22 of the Code of Alabama (1975)) established the District Attorneys' Plan with the JRF for any District Attorney serving in the capacity of District Attorney on or after November 8, 2016. The responsibility for the general administration and operation of the JRF is vested in the Board of Control of the ERS.

The TRS, ERS, and JRF provide retirement benefits as well as death and disability benefits as established by state law. Changes to benefits, including ad hoc cost of living adjustments, must be established by statute. For employees hired prior to January 1, 2013 (Tier 1), benefits for TRS and ERS members vest after 10 years of creditable service. Tier 1 teachers and state employees who retire after age 60 (52 for State Police) with 10 years of creditable service or with 25 years of service (regardless of age) are entitled to an annual retirement benefit, payable monthly for life. Service retirement benefits are based on a guaranteed minimum or a formula method with the member receiving payment under the method which yields the highest monthly benefit. Under the formula method, Tier 1 members of TRS and ERS (except State Police) are allowed 2.0125 percent of their average final compensation (highest 3 of the last 10 years) for each year of service. State Police are allowed 2.875 percent for each year of State Police service in computing the formula method. Disability retirement benefits are calculated in the same manner.

Act 377 of the Legislature of 2012 established a new tier of benefits (Tier 2) for members hired on or after January 1, 2013. Tier 2 TRS and ERS members are eligible for retirement after age 62 (56 for State Police) with 10 years or more of creditable service and are entitled to an annual retirement benefit, payable monthly for life. Service and disability retirement benefits are based on a formula method, with the member receiving payment under the method that yields the highest monthly benefit. Under the formula method, Tier 2 members of the TRS and ERS (except State Police) are allowed 1.65% of their average final compensation (highest 5 of the last 10 years) for each year of service. State Police are allowed 2.375% for each year of State Police service in computing the formula method.

[remainder of this page intentionally left blank]

At September 30, 2021, the number of participating employers in each system was as follows.

**Table 25.**
**Participating Employers by System**
**As of September 30, 2021**

|  | TRS | ERS | JRF |
|---|---|---|---|
| Cities | - | 304 | - |
| Counties | - | 65 | 67 |
| Other Public Entities | - | 510 | - |
| Universities | 13 | - | - |
| Postsecondary Institutions | 25 | - | - |
| City and County Boards of Education | 138 | - | - |
| State Agencies and Other | 39 | 1 | 1 |
| **Total** | **215** | **880** | **68** |

Source: Retirement Systems of Alabama's Annual Comprehensive Financial Report for the Fiscal Year Ended September 30, 2021.

[remainder of this page intentionally left blank]

The following table shows the number of active and retired members in the various state and local participating units of the Systems.

**Table 26.**
**Number of Active and Retired Members**
**As of September 30, 2020**

| | | | | | ERS | | |
| | TRS | ERS | JRF | Total Members | State Employees | State Police | Local Member |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Retirees and beneficiaries receiving benefits | 100,866 | 54,367 | 456 | 155,689 | 24,655 | 943 | 28,769 |
| Terminated employees entitled to benefits but not yet receiving benefits | 24,655 | 21,758 | 16 | 46,429 | 5,552 | 56 | 16,150 |
| Non-vested inactive members who have not contributed for more than 5 years | 30,490 | 20,091 | 25 | 50,606 | 20,091 | - | - |
| Active Members | 132,707 | 85,485 | 365 | 218,557 | 28,193 | 826 | 56,466 |
| **Total** | **288,718** | **181,701** | **862** | **471,281** | **78,491** | **1,825** | **101,385** |

Source: Retirement Systems of Alabama's Annual Comprehensive Financial Report for the Fiscal Year Ended September 30, 2021.

## Benefits Provided

The Systems provide retirement, disability, and death benefits. The benefits are available to members at varying times during their creditable service. For Tier 1 members, retirement benefits are available after 25 years of creditable service or after 10 years of creditable service and attainment of age 60. Tier 1 members of the Systems are vested after accumulating ten (10) years of creditable service.

Tier 2 members are also provided retirement, disability and death benefits. For Tier 2 members, retirement benefits are available after ten (10) years of creditable service and attainment of age 62. Tier 2 members of the Systems are vested after accumulating ten (10) years of creditable service.

Members are eligible to participate in one of two health insurance plans. For a discussion of health benefits provided, see "Other Post Employment Benefits" below.

## DROP Program

Operation of the State's Deferred Retirement Option Program ("DROP") commenced in June 2002. DROP was a retirement program designed to keep highly experienced employees from taking early retirement. DROP allowed state and education employees who were eligible for retirement to defer receipt of their retirement allowance and continue employment for a period of not less than 3 years nor more than 5 years. At the end of the period, the member could withdraw from active service and receive his or her normal retirement benefit calculated at the time of enrollment in DROP, plus a lump sum payment comprised of the deferred retirement benefits, employee contributions made while participating in DROP, and interest earned on DROP deposits. DROP participation was available to eligible members who had at least twenty-five years of

service (exclusive of sick leave), were at least 55 years of age, and were eligible for service retirement.

In March 2011, the Alabama Legislature voted to repeal DROP and the Governor signed Act No. 2011-27 effecting the repeal. The repeal of DROP was effective March 24, 2011, with no new participants allowed to enter DROP with an effective participation date after June 1, 2011.

**PLOP Program**

Act 316 of the Legislature of 2019 established the Partial Lump Sum Option Plan (PLOP) in addition to the annual service retirement benefit payable for life for Tier 1 and Tier 2 members of the TRS and ERS.  A member can elect to receive a one-time lump sum distribution at the time that they receive their first monthly retirement benefit payment.  The member's annual retirement benefit is then actuarially reduced based on the amount of the PLOP distribution which is not to exceed the sum of 24 months of the maximum monthly retirement benefit that the member could receive.  Members are eligible to receive a PLOP distribution if they are eligible for a service retirement benefit as defined above from the TRS or ERS on or after October 1, 2019.  A TRS or ERS member who receives an annual disability retirement benefit or who has participated in DROP is not eligible to receive a PLOP distribution.

**Annual Valuation and Unfunded Accrued Liability**

The Code of Alabama (1975) requires an annual actuarial valuation of TRS, ERS, and JRF by a competent actuary. Valuations are released approximately one year after the valuation date. The System actuary is currently Cavanaugh Macdonald Consulting, LLC ("Cavanaugh"). Cavanaugh prepared actuarial valuations as of September 30, 2020, for TRS, ERS, and JRF and provided those results to RSA in Spring 2021.

In connection with the Systems' pension programs, the State is pooled with certain local governments and municipalities, universities, colleges and community colleges, boards and authorities, non-profit agencies, parks, libraries and other affiliated groups. Because the Systems' assets and liabilities are pooled on a program-wide basis, the State is pooled with all Alabama local governments in connection with the Systems.

An employer's unfunded actuarial liability ("UAL") is the excess of the actuarially determined present value of the employer's benefit obligations to employees over the existing actuarially determined assets available to pay those benefits. The actuarial reports for each annual valuation contain information about periodic adjustments to valuation methods used for determining UAL.

The following methods and assumptions adopted by the RSA are the basis for the actuarial valuations of the related pension benefit programs.

[remainder of this page intentionally left blank]

**Table 27.**
**Pension Assumption Method**

| | |
|---|---|
| Actuarial Cost Method: | |
| TRS | Entry Age Normal |
| ERS | Entry Age |
| JRF | Entry Age Normal |
| UAL Amortization Method: | |
| TRS | Level Percent Closed |
| ERS State & Local Employees | Level Percent Closed |
| ERS State Police | Level Percent Closed |
| JRF[3] | Level Percent Closed |
| Amortization Period [1]: | |
| TRS | 27.1 years (blended) |
| ERS State Employees | 26.7 years (blended) |
| ERS State Police | 20.5 years (blended) |
| ERS Local Employees | Within 30 years - varies by employer |
| JRF | 18.4 years |
| Asset Valuation Method: | Five-Year Market Related Value |
| Investment Rate of Return[1]: | |
| TRS | 7.700% |
| ERS | 7.700% |
| JRF | 7.650% |
| Payroll Growth Rate [2]: | |
| TRS | 3.250% - 5.000% |
| ERS State & Local Employees | 3.250% - 5.000% |
| ERS State Police | 4.500% |
| JRF | 3.250% - 3.500% |
| Inflation Level: | |
| TRS and ERS | 2.750% |
| JRF | 2.750% |
| Cost of Living Adjustments: | |
| TRS and ERS | None |
| JRF | 3.000% per year for certain members hired prior to July 30, 1979, and for spouses benefits subject to increase |

Note (1) See actuarial reports for additional information.
Note (2) Includes inflation.
Note (3) For the District Attorneys' Plan, the amortization method is level percent open.

Sources: Actuarial reports for ERS, TRS, and JRF, as of 9/30/2020.

State law provides that the RSA Boards of Control engage an actuary to prepare an annual valuation of the assets and liabilities of each of the various retirement plans. The actuary determines the "unfunded actuarial liability."

On June 25, 2012, GASB approved two new standards with respect to pension accounting and financial reporting standards for state and local governments and pension plans. The new standards are set forth in GASB Statements 67 and 68. The changes impact the accounting treatment of most pension plans in which state and local governments participate. While these new accounting standards change financial statement reporting requirements, they do not impact the funding requirements for members, employers or the State. The impact of the new GASB financial reporting requirements are reflected in the RSA's Annual Comprehensive Financial Report for the fiscal year ended September 30, 2021.

**Teachers' Retirement System**

*Actuarial Valuations*. The table below reflects the unfunded actuarial accrued liability, actuarial value of assets and funded ratio of the TRS as of the actuarial valuation dates shown.

**Table 28.**
**Historical Funded Status**
**Teachers' Retirement System**
**(includes non-State obligated portion)**
**(dollar amounts in millions)**

| Valuation Date (September 30) | Actuarial Value of Assets (a) | Actuarial Accrued Liability (b) | Unfunded Actuarial Accrued Liability (b-a) | Funded Ratio (%) (a/b) |
|---|---|---|---|---|
| 2020 | $26,681 | $37,753 | $11,072 | 70.7% |
| 2019 | 25,821 | 37,215 | 11,394 | 69.4% |
| 2018[1] | 25,006 | 35,628 | 10,622 | 70.2% |
| 2017[1] | 23,887 | 34,688 | 10,801 | 68.9% |
| 2016[2] | 22,646 | 33,144 | 10,498 | 68.3% |
| 2015 | 21,740 | 31,845 | 10,105 | 68.3% |

Note (1)   Reflects changes in actuarial assumptions.

Note (2)   Reflects changes in actuarial assumptions and methods.

Source:   Teachers' Retirement System of Alabama - Report of the Actuary on the Annual Valuation prepared as of September 30, 2020.

*Cash Flow Analysis*.  The table below reflects a cash flow analysis for the Teachers' System for the fiscal years shown below.

**Table 29.**
**History of Additions and Deductions**
**Teachers' Retirement System**
**(dollar amounts in millions)**

| | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|---|---|
| Employee Contributions | 525.7 | 515.0 | 522.9 | 493.5 | 489.6 | 476.0 | 477.9 |
| Employer Contributions | 874.4 | 862.5 | 869.3 | 802.6 | 782.7 | 751.9 | 737.7 |
| Investment Income | 5,727.8 | 1,374.4 | 614.4 | 2,264.2 | 2,636.1 | 2,199.4 | 261.5 |
| Other Income/Transfers | 0.4 | 0.6 | -- | 24.7 | -- | -- | -- |
| Total Additions | 7,128.3 | 2,752.5 | 2,006.6 | 3,585.0 | 3,908.4 | 3,427.3 | 1,477.1 |
| Total Deductions [1] | 2,512.8 | 2,425.5 | 2,322.7 | 2,289.8 | 2,193.3 | 2,238.7 | 2,156.1 |
| Net Increase (Decrease) | 4,615.5 | 327.0 | (316.1) | 1,295.2 | 1,715.1 | 1,188.6 | (679.0) |

Note (1)  Includes payments to retirees and beneficiaries, as well as administrative expenses.

Note:  Totals may not add due to rounding.

Source: RSA's Annual Comprehensive Financial Report for the fiscal year ended September 30, 2021.

**Employees' Retirement System**

*Actuarial Valuations*.  The table below reflects the unfunded actuarial accrued liability, actuarial value of assets and funded ratio of the ERS as of the actuarial valuation dates shown.

**Table 30.**
**Historical Funded Status**
**Employees' Retirement System – Total All Groups**
**(includes non-State obligated portion)**
**(dollar amounts in millions)**

| Valuation Date (September 30) | Actuarial Value of Assets[1] (a) | Actuarial Accrued Liability (b) | Unfunded Actuarial Accrued Liability (b-a) | Funded Ratio (%) (a/b) |
|---|---|---|---|---|
| 2020[1] | $13,491 | $19,786 | $6,295 | 68.2% |
| 2019 | 12,646 | 18,544 | 5,898 | 68.2% |
| 2018[2] | 12,241 | 17,830 | 5,589 | 68.7% |
| 2017[2] | 11,691 | 17,251 | 5,560 | 67.8% |
| 2016[2] | 11,082 | 16,728 | 5,646 | 66.2% |
| 2015 | 10,589 | 15,724 | 5,135 | 67.3% |
| 2014 | 10,135 | 15,138 | 5,003 | 66.9% |

Note (1)  Reflects impact of Act No. 2019-132.
Note (2)  Reflects changes in actuarial assumptions and methods.
Source: Employees' Retirement System of Alabama - Report of the Actuary on the Annual Valuation prepared as of September 30, 2020.

*Cash Flow Analysis*.  The table below reflects a cash flow analysis for the Employees' System for the fiscal years shown below.

**Table 31.**
**History of Additions and Deductions**
**Employees' Retirement System**

**(dollar amounts in millions)**

| | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|---|---|
| Employee Contributions | 286.4 | 324.3 | 254.4 | 241.7 | 233.9 | 238.0 | 229.3 |
| Employer Contributions | 516.4 | 810.8 | 467.6 | 426.3 | 426.2 | 435.1 | 410.9 |
| Investment Income | 2,861.0 | 723.6 | 320.6 | 1,098.4 | 1,402.2 | 1,053.0 | 126.5 |
| Other Income & Transfers | 0.3 | 0.4 | -- | -- | -- | -- | -- |
| Total Additions | 3,663.9 | 1,859.1 | 1,048.6 | 1,766.4 | 2,062.3 | 1,726.1 | 766.7 |
| Total Deductions [1] | 1,335.1 | 1,277.1 | 1,194.5 | 1,194.5 | 1,116.9 | 1,101.0 | 1,086.8 |
| Net Increase (Decrease) | 2,328.9 | 582.0 | (151.9) | 571.9 | 945.4 | 625.1 | (320.1) |

Note (1)  Includes payments to retirees and beneficiaries, as well as administrative expenses
Note:  Totals may not add due to rounding
Source: RSA's Annual Comprehensive Financial Report for the fiscal year ended September 30, 2021.

*Unfunded Accrued Liability – State and Local Obligations*.  The statute creating the ERS, which allows covered local government employees to elect to participate in the ERS, provides that, notwithstanding anything to the contrary, the ERS shall not be liable for the payment of any pensions or other benefits on account of employees of any local government, whether active or retired, for which reserves have not been previously created from funds contributed by each such local government for the employees of that local government.  For that reason, among others, the following table separately reflects the unfunded accrued liability of the ERS, as determined by the actuary, for state employees and State Police and the total unfunded accrued liability for all covered employees, as of the annual valuation dates shown.

**Table 32.**
**Unfunded Accrued Liability – Employees' Retirement System**

**(dollar amounts in millions)**

| Valuation Date (September 30) | Unfunded Liability for State Employees and State Police | Unfunded Liability for All Groups |
|---|---|---|
| 2020 | 3,371 | 6,295 |
| 2019 | 3,293 | 5,898 |
| 2018 | 3,115 | 5,589 |
| 2017 | 3,095 | 5,560 |
| 2016 | 3,079 | 5,646 |
| 2015 | 2,901 | 5,135 |
| 2014 | 2,791 | 5,003 |

Source:  Reports of the Actuary on the Actuarial Valuation of Employees' Retirement System of Alabama prepared as of September 30, 2020.

The funded status of the pension programs may change depending on the market performance of the securities that RSA is invested in, future changes in compensation and benefits of covered employees, demographic characteristics of members and methodologies and assumptions used by the actuary in estimating the assets and liabilities of RSA. Additionally, the market value of the investments held by RSA is determined using various sources.  For descriptions of the methodologies applied to determine the market value of RSA's investments, refer to the Retirement Systems of Alabama's Annual Comprehensive Financial Report. No assurance can be given that the UAL of the pension programs and the State's contribution rates will not materially increase.

## Judicial Retirement Fund

*Actuarial Valuations*.  The table below reflects the unfunded actuarial accrued liability, actuarial value of assets and funded ratio of the JRF as of the actuarial valuation dates shown.

[remainder of this page intentionally left blank]

**Table 33.**
**Historical Funded Status**
**Judicial Retirement Fund**
**(includes non-State obligated portion)**

**(dollar amounts in millions)**

| Valuation Date (September 30) | Actuarial Value of Assets | Actuarial Accrued Liability | Unfunded Actuarial Accrued Liability | Funded Ratio (%) |
|---|---|---|---|---|
| | (a) | (b) | (b-a) | (a/b) |
| 2020 | 319 | 482 | 165 | 66.1% |
| 2019 | 311 | 476 | 165 | 65.3% |
| 2018[1] | 305 | 458 | 153 | 66.7% |
| 2017[2] | 293 | 448 | 155 | 65.4% |
| 2016[1] | 280 | 447 | 167 | 62.6% |
| 2015 | 267 | 428 | 161 | 62.5% |

Note (1)  Reflects changes in actuarial assumptions and methods.

Note (2)  Reflects changes in benefit structure beginning November 8, 2016.

Source:    Alabama Judicial Retirement Fund - Report of the Actuary on the Annual Valuation prepared as of September 30, 2020.

*Special Payments*.  In addition to these contributions to the Judicial Retirement Fund, there are certain supernumerary and other eligible persons, who are receiving special payments which are, or might be construed to be, pensions.  The present total of all such payments is not considered to be material to the State.

*Cash Flow Analysis*.   The table below reflects a cash flow analysis for the Judicial Retirement Fund for the fiscal years shown below.

**Table 34.**
**History of Additions and Deductions**
**Judicial Retirement Fund**
**(dollar amounts in millions)**

| | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|---|---|
| Employee Contributions | 4.3 | 4.2 | 4.1 | 3.9 | 4.0 | 3.7 | 3.7 |
| Employer Contributions | 18.3 | 18.1 | 18.0 | 17.2 | 17.4 | 17.5 | 15.1 |
| Investment Income | 63.7 | 23.2 | 11.0 | 27.6 | 32.7 | 28.3 | (1.0) |
| Other Income & Transfers | -- | -- | -- | -- | -- | -- | -- |
| Total Additions | 86.3 | 45.5 | 33.1 | 48.7 | 54.1 | 49.5 | 17.8 |
| Total Deductions (1) | 39.5 | 39.4 | 37.9 | 33.9 | 33.6 | 31.4 | 30.9 |
| Net Increase (Decrease) | 46.8 | 6.1 | (4.8) | 14.8 | 20.6 | 18.1 | (13.1) |

Note (1)  Includes payments to retirees and beneficiaries, as well as administrative expenses

Note:  Totals may not add due to rounding

Source:  RSA's Annual Comprehensive Financial Report for the fiscal year ended September 30, 2021.

## Total Unfunded Liability of System

The following table depicts the unfunded actuarial accrued liability ("UAAL") for both the State-obligated and non-State obligated portions for the Systems.

**Table 35.**
**Pension Unfunded Accrued Liability**

**As of September 30, 2020**

| | State | Local | Total |
|---|---|---|---|
| TRS[1] | | | $11,071,566,401 |
| JRF[2] | | | 163,189,620 |
| ERS: [3] | | | |
|    Employees | 3,072,685,989 | - | 3,072,685,989 |
|    Local Government | - | 2,924,015,651 | 2,924,015,651 |
|    State Policemen | 298,594,604 | - | 298,594,604 |
| **Total Unfunded Actuarial** | | | |
| **Accrued Liability** | | | **$ 17,530,052,265** |

Note (1)  The TRS State and Local Amounts are based on the 9/30/2020 TRS Valuation

Note (2)  The JRF State and Local Amounts are based on the 9/30/2020 JRF Valuation

Note (3)  The JRF State and Local Amounts are based on the 9/30/2020 ERS Valuation

## Employer Contributions

*Sufficiency of Contributions*.  As required by the Code of Alabama (1975), the TRS, ERS, and JRF provide for employer contributions at actuarially determined rates (expressed as percentages of annual covered payroll) that accumulate sufficient assets to pay benefits when due. The employer contributions required to support the benefits of each system are determined following a level funding approach and consist of a normal contribution, an accrued liability contribution, and a portion to finance administrative costs. At the end of each fiscal year, the latest actuary-provided valuations determine employer contribution rates, which are effective for the following year. The employer contributions are made from funds on deposit in the Education Trust Fund, the General Fund, earmarked State funds, and from other funds provided by local units.


[remainder of this page intentionally left blank]

*Contribution Rates*.  The following table shows the State's employer contribution rates expressed as a percentage of the actuarially determined covered payroll for System pension costs.

### Table 36.
### Employer Retirement Contributions

| Fiscal Years | Teachers [1] Tier 1 | Teachers [1] Tier 2 | State Employees [1] Tier 1 | State Employees [1] Tier 2 | State Police [1] Tier 1 | State Police [1] Tier 2 | Judicial [2] Groups 1 & 2 | Judicial [2] Group 3 Judges & Clerks | Judicial [2] Group 3 District Attys |
|---|---|---|---|---|---|---|---|---|---|
| 2022 | 12.43% | 11.32% | 14.83% | 14.44% | 52.22% | 42.86% | 42.10% | 37.47% | 19.77% |
| 2021 | 12.36% | 11.22% | 14.64% | 14.24% | 51.75% | 42.89% | 40.80% | 35.61% | 19.77% |
| 2020 | 12.43% | 11.34% | 15.24% | 14.87% | 52.29% | 45.56% | 40.40% | 35.05% | 19.77% |
| 2019 | 12.41% | 11.35% | 14.51% | 14.14% | 50.08% | 43.43% | 41.40% | 34.32% | 19.77% |
| 2018 | 12.24% | 11.01% | 13.94% | 13.29% | 44.44%* | 39.29%* | 40.09% | 34.32% | 19.77% |
| 2017 | 12.01% | 10.82% | 13.89% | 13.25% | 57.25% | 53.55% | 40.65% | 34.32% | 19.77% |
| 2016 | 11.94% | 10.84% | 14.57% | 14.09% | 42.61% | 38.98% | 40.98% | | |
| 2015 | 11.71% | 11.05% | 13.45% | 13.31% | 38.37% | 32.45% | 35.24% | | |
| 2014 | 11.71% | 11.08% | 12.02% | 11.96% | 35.81% | 29.52% | 35.24% | | |
| 2013 | 10.08% | 9.44% | 10.12% | 10.04% | 31.61% | 25.32% | 32.06% | | |
| 2012 | 10.00% | | 9.42% | | 29.92% | | 24.35% | | |
| 2011 | 12.51% | | 11.94% | | 30.57% | | 24.20% | | |
| 2010 | 12.51% | | 11.94% | | 30.57% | | 24.20% | | |
| 2009 | 12.07% | | 11.88% | | 30.99% | | 23.23% | | |
| 2008 | 11.75% | | 10.26% | | 30.42% | | 23.23% | | |
| 2007 | 9.36% | | 7.78% | | 24.12% | | 22.50% | | |
| 2006 | 8.17% | | 6.77% | | 21.36% | | 21.93% | | |
| 2005 | 7.03% | | 5.57% | | 18.03% | | 21.93% | | |
| 2004 | 6.56% | | 4.19% | | 13.87% | | 21.93% | | |
| 2003 | 5.02% | | 3.95% | | 9.24% | | 21.19% | | |
| 2002 | 5.96% | | 3.95% | | 9.24% | | 21.19% | | |
| 2001 | 6.38% | | 4.08% | | 9.45% | | 21.19% | | |
| 2000 | 6.38% | | 4.08% | | 9.45% | | 21.19% | | |

Note (1)     Act  No. 2012-377 created a Tier 2 defined benefit plan for all TRS and ERS members hired on or after 1/1/13.  New members and their employers will pay lower contribution rates.  However, new members will not be able to draw a retirement benefit until they reach age 62.  State Police, law enforcement, firefighters and correctional officers will be able to draw a benefit at age 56.

Note (2)     Act 2015-498 established a new group (Group 3) of members within JRF, which consists of all Justices, Judges and Circuit Clerks first elected or appointed, and District Attorneys serving in the capacity of District Attorney, on or after November 8, 2016, Group 3 members are eligible for retirement at age 62 with 10 or more years of creditable service and are entitled to an annual retirement benefit, payable monthly for life.

  *          Amortization method has been revised since the 2015 valuation to level percent of payroll to reflect the impact of Act 2017-360.

Source:     Actuarial reports for TRS, ERS, and JRF.

## Future Increases in Benefits

There is, of course, no guarantee that future legislation will not provide further increases in benefits without providing for either corresponding increases in member contributions or increases in taxes to fund the increased level of benefits, the net effect of which could be the disbursement of a higher proportion of the State's assets to fund the Systems than that represented by the contributions by the State for the most current fiscal year.

## Solvency Tests

Tables 38, 39 and 40 that follow reflect a 6-year history of solvency for each of the Teachers' System, the Employees' System, and the Judicial Retirement Fund.

### Table 37.
### Teachers' Retirement System of Alabama
### Solvency Test
### 2015-2020

**(dollar amounts in thousands)**

| | Aggregate Accrued Liabilities for | | | | Portion of Accrued Liabilities Covered by Reported Assets [3] | | |
| Valuation Date (September 30) | (1) Active Member Contributions | (2) Retirants and Beneficiaries | (3) Active Members (Employer Financed Portion) | Reported Assets | A | B | C |
|---|---|---|---|---|---|---|---|
| 9/30/2020 | $6,356,922 | $21,781,149 | $9,614,729 | $26,681,239 | 100.0% | 93.0% | 0.0% |
| 9/30/2019 | 6,100,489 | 21,093,665 | 10,021,316 | 25,821,326 | 100.0% | 93.0% | 0.0% |
| 9/30/2018[1] | 5,788,187 | 20,511,811 | 9,328,400 | 25,006,419 | 100.0% | 94.0% | 0.0% |
| 9/30/2017[1] | 5,504,125 | 19,886,016 | 9,297,737 | 23,887,077 | 100.0% | 92.0% | 0.0% |
| 9/30/2016[2] | 5,197,469 | 19,257,160 | 8,689,205 | 22,645,512 | 100.0% | 91.0% | 0.0% |
| 9/30/2015 | 4,894,145 | 18,621,250 | 8,329,448 | 21,740,280 | 100.0% | 90.0% | 0.0% |

Note (1) Reflects changes in methods actuarial assumptions.

Note (2) Reflects changes in actuarial assumptions and methods.

Note (3) Column A represents the percentage of Active Member Contributions, as shown in (1), covered by the Reported Assets. Column B represents the percentage of the amounts owed to Retirants and their Beneficiaries covered by Reported Assets after accounting for the payment of amounts constituting Active Member Contributions, as shown in (1) (for example, for the valuation date of 9/30/15: ($21,740,280-$4,894,145)/$18,621,250). Column C represents the percentage of amounts owed to Active Members covered by Reported Assets after accounting for the payment of amounts constituting Active Member Contributions, as shown in (1), and amounts owed to Retirants and their Beneficiaries, as shown in (2) (for example, for the valuation date of 9/30/15: ($21,740,280-$4,894,145-$18,621,250)/$8,329,448).

Source:  Actuarial Valuation for TRS as of 9/30/20.

[remainder of this page intentionally left blank]

**Table 38.**
**Employees' Retirement System of Alabama**
**Solvency Test**
**2015-2020**

**(dollar amounts in thousands)**

| Valuation Date (September 30) | Aggregate Accrued Liabilities for | | | Reported Assets | Portion of Accrued Liabilities Covered by Reported Assets [3] | | |
|---|---|---|---|---|---|---|---|
| | (1) Active Member Contributions | (2) Retirants and Beneficiaries | (3) Active Members (Employer Financed Portion) | | A | B | C |
| 9/30/2020 [2] | $3,207,392 | $10,984,539 | $5,594,541 | $13,991,176 | 100.0% | 94.0% | 0.0% |
| 9/30/2019 | 3,038,594 | 10,300,063 | 5,204,885 | 12,645,789 | 100.0% | 93.0% | 0.0% |
| 9/30/2018 [1] | 2,922,432 | 9,944,503 | 4,962,800 | 12,240,597 | 100.0% | 93.0% | 0.0% |
| 9/30/2017 [1] | 2,817,368 | 9,567,278 | 4,866,189 | 11,690,952 | 100.0% | 93.0% | 0.0% |
| 9/30/2016 [1] | 2,707,129 | 9,209,857 | 4,811,023 | 11,082,280 | 100.0% | 91.0% | 0.0% |
| 9/30/2015 | 2,591,066 | 8,666,490 | 4,466,164 | 10,589,258 | 100.0% | 92.0% | 0.0% |

Note (1) Reflects changes in actuarial assumptions and methods.

Note (2) Reflects impact of Act No. 2019-132.

Note (3) Column A represents the percentage of Active Member Contributions, as shown in (1), covered by the Reported Assets. Column B represents the percentage of the amounts owed to Retirants and their Beneficiaries covered by Reported Assets after accounting for the payment of amounts constituting Active Member Contributions, as shown in (1) (for example, for the valuation date of 9/30/13: ($10,589,258- $2,591,066)/$8,666,490). Column C represents the percentage of amounts owed to Active Members covered by Reported Assets after accounting for the payment of amounts constituting Active Member Contributions, as shown in (1), and amounts owed to Retirants and their Beneficiaries, as shown in (2) (for example, for the valuation date of 9/30/15: ($10,589,258- $2,591,066)/$4,466,164).

Source: Actuarial Valuation for ERS as of 9/30/20.

[remainder of this page intentionally left blank]

# Table 39.
## Judicial Retirement Fund
## Solvency Test
## 2015-2020

### (dollar amounts in thousands)

| | | | Aggregate Accrued Liabilities for | | | | |
| Valuation Date (September 30) | (1) Active Member Contributions | (2) Retirants and Beneficiaries | (3) Active Members (Employer Financed Portion) | Reported Assets | Portion of Accrued Liabilities Covered by Reported Assets [2] | | |
| | | | | | A | B | C |
| 9/30/2020 | $43,899 | $338,492 | $99,472 | $318,673 | 100.0% | 81.0% | 0.0% |
| 9/30/2019 | 40,993 | 338,734 | 96,102 | 310,689 | 100.0% | 80.0% | 0.0% |
| 9/30/2018 [1] | 48,609 | 296,550 | 112,675 | 305,397 | 100.0% | 87.0% | 0.0% |
| 9/30/2017 | 44,792 | 296,231 | 107,423 | 293,090 | 100.0% | 84.0% | 0.0% |
| 9/30/2016 [1] | 45,900 | 280,836 | 120,184 | 279,807 | 100.0% | 83.0% | 0.0% |
| 9/30/2015 | 42,745 | 272,624 | 112,222 | 267,414 | 100.0% | 82.0% | 0.0% |

Note (1) Reflects changes in actuarial assumptions and methods.

Note (2) Column A represents the percentage of Active Member Contributions, as shown in (1), covered by the Reported Assets. Column B represents the percentage of the amounts owed to Retirants and their Beneficiaries covered by Reported Assets after accounting for the payment of amounts constituting Active Member Contributions, as shown in (1) (for example, for the valuation date of 9/30/15: ($267,414-$42,745)/$272,642). Column C represents the percentage of amounts owed to Active Members covered by Reported Assets after accounting for the payment of amounts constituting Active Member Contributions, as shown in (1), and amounts owed to Retirants and their Beneficiaries, as shown in (2) (for example, for the valuation date of 9/30/15: ($267,414-$42,745-$272,642)/$112,222).

Source: Actuarial Valuation for JRF as of 9/30/20.

## Other Post Employment Benefits (OPEB)

The State Employees' Health Insurance Plan ("SEHIP") provides health insurance benefits for active and retired State employees, State Police and local participating entities and is governed by the SEHIP Board of Control (the "SEHIP Board"). The Public Education Employees' Health Insurance Plan ("PEEHIP") provides health insurance benefits for active and retired education employees and is governed by the PEEHIP Board of Control (the "PEEHIP Board"). Employees covered under these two plans who retire from active service and begin receiving monthly benefits from the Employees' System or from the Teachers' System may elect to continue coverage under the group insurance plan by consenting to have deducted from their monthly benefit payment the difference in the total cost of their insurance coverage and the portion authorized to be expended by the SEHIP or the PEEHIP for coverage of such retired employees.

The State established the Alabama Retired State Employees' Health Care Trust and the Alabama Retired Education Employees' Health Care Trust Fund for the purposes of accumulating assets to fund retiree and Other Post Employment Benefits ("OPEB"). The education employee trust is a multiple employer cost-sharing plan while the State employees' trust is a single employer plan.

The Code of Alabama (1975) authorizes the employer contributions to SEHIP and PEEHIP. The Legislature is not legally required to follow the recommendations of the actuaries or the Governor in determining the State's contribution to the plans. The Legislature sets the amounts employers pay on behalf of each active member in the annual appropriations bills. A portion of the premium is used to assist in funding retiree and dependents' benefits. The Fiscal year 2021 rates are $930 per active member per month for SEHIP and $800 per active member per month for PEEHIP.

PEEHIP received $15,380,000 and SEHIP received $6,971,447 from the State of Alabama through the Federal Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") in fiscal year 2021.

The following table lists the number of participants by status.

### Table 40.
### Number of Active and Retired Employees
### As of September 30, 2021

|  | PEEHIP | SEHIP | Total |
|---|---|---|---|
| Active Members | 130,228 | 21,558 | 151,786 |
| Retired Members | 92,352 | 1,594 | 93,946 |
| Inactive Members[1] | 6,468 | 1,110 | 7,578 |
| Spouses/Survivors | 2,046 | 31,439 | 33,485 |
| Total | 231,094 | 55,701 | 286,795 |

(1) Entitled to, but not yet receiving benefits.
Sources: GASB Statements No. 74 for PEEHIP and for SEHIP prepared as of
September 30, 2021 using actuarial valuation date of September 30, 2020.

The cost of retired teachers' health care benefits is recognized as an expenditure to PEEHIP as claims are incurred. The cost of benefits is paid from the regular appropriations made to individual education entities. As of the latest GASB Statement No. 74, the total members including active and retirees numbered approximately 231,094.

The retired employee allocation is funded through the active employee premium. Of the active employee premium, approximately $104.00 was on behalf of retired members of PEEHIP for fiscal year 2021. Retirees who are eligible for Medicare benefits must pay $25.00 per month for the Hospital/Medical coverage while those who are not eligible for Medicare must pay $170.00 per month for the coverage. Additionally, premiums are paid for dependents. Retirees have the option to use this insurance to purchase two plans of insurance offered by PEEHIP with no out-of-pocket cost. Total premiums paid to PEEHIP by retirees for insurance coverage was $1,141,800,000 for fiscal year 2021 to cover themselves and their dependents. The State may also make additional contributions. No funds were contributed for the fiscal years 2009 through 2021.

In 2011, the Alabama Legislature signed into law Act No. 2011-704, which establishes changes to the retiree sliding scale premium calculation for PEEHIP members retiring on or after January 1, 2012. The law requires an employee who retires with less than 25 years of service to pay 4% of the employer share for each year under 25 years of service (years of service premium)

instead of the 2% under the previous law. The law also requires an employee who retires before becoming eligible for Medicare to pay 1% of the employer share for each year less than age 65 (age premium) and to pay the net difference between the active employee subsidy and the non-Medicare eligible retiree subsidy (subsidy premium). The additional premium amounts for members retiring on or after January 1, 2012, was phased in over a five-year period. For 2012, the subsidy premium amount was $97.65 per month. For 2016, the subsidy premium amount was $147.52 per month. For 2017, the subsidy premium was $157.42 per month. For 2018, the subsidy premium amount was $172.81 per month. Once the retiree becomes eligible for Medicare, the age and subsidy premium will no longer apply. However, the years of service premium will continue to be in effect throughout retirement.

The State provides healthcare benefits for retired State employees through SEHIP. The cost of benefits is recognized as an expense in the month in which it is incurred, including an estimate of claims incurred but not reported. For retirees who retired prior to October 1, 2005, the State pays 100 percent of the premium for a retiree who is over 65 and eligible for Medicare. The State pays a portion of the premium for a retiree who is under 65. Under the SEHIP statute, the State contribution per month per retiree is funded on a pay-as-you-go basis through the active employee premiums each agency pays for its active employees. For retirees who retired after September 30, 2005 through December 31, 2011, the State went to a sliding scale premium structure based on the years of service. For employees retiring with 25 years of service, the State pays 100% of the State's share premium. For each year of service less than 25, the State share is reduced by 2% and the retiree share is increased accordingly. For each year of service more than 25, the State share is increased by 2% and the retiree share is reduced accordingly.

In 2011, the Alabama Legislature signed into law Act No. 2011-698, which is similar to the PEEHIP law, and states that all SEHIP participants retiring after December 31, 2011 will be subject to a sliding scale premium calculation based on years of creditable coverage in SEHIP. For each year of creditable coverage less than 25, the State share is reduced by 4% and the retiree share is increased accordingly. For each year of creditable coverage more than 25, the State share is still increased 2% and the retiree share is reduced accordingly. The law also states that employees retiring after December 31, 2011, will be subject to a sliding scale premium calculation based on the difference between the age of the employee at retirement and the Medicare entitlement age.

Cavanaugh Macdonald Consulting, LLC provides to the Alabama State Employees' Insurance Board and to the Alabama Public Education Employees' Health Insurance Board reports on the actuarial valuations of the retiree medical plans by fiscal year. The most recently available PEEHIP Actuarial Study and GASB Statement No. 74 are available at www.rsa-al.gov. The most recently available SEHIP Actuarial Study and GASB Statement No. 74 are available at www.alseib.org.

*Actuarial Assumptions*. The following methods and assumptions are the basis for the actuarial valuations of the related OPEB programs.

**Table 41.**
**OPEB Assumptions**

|  | PEEHIP | SEHIP |
|---|---|---|
| Actuarial Cost Method | Entry Age Normal | Projected Unit Credit |
| Amortization Method | Level percent of payroll | Level of percent pay, open |
| Remaining Amortization Period | 22 years, closed | 30 years |
| Asset Valuation Method | Market Value of Assets | |
| Actuarial Assumptions: | | |
|     Investment Rate of Return | 5.00% | 5.00% |
|     Medical Cost Trend Rate: | | |
|         Medicare Eligible | Note (1) | 5.50% |
|         Pre-Medicare | 6.75% | 7.00% |
|     Ultimate Trend Rate: | | |
|         Medicare Eligible | 4.75% in 2024 | 4.75% |
|         Pre-Medicare | 4,75% in 2027 | 4.75% |
|     Inflation Assumption | 2. 75% | 2.75% |
|     Year of Ultimate Trend Rate | | |
|         Pre-Medicare | 2027 | 2026 |
|         Medicare Eligible | 2024 | 2024 |
|     Dental Trend Rate | --(2) | 4.50% |
|     Vision Trend Rate | --(2) | N/A |

Note (1)  Initial Medicare claims are set based on scheduled increases through plan year 2022..
Note (2)  Not provided in PEEHIP GASB Statement No. 75.
Sources:  PEEHIP GASB Statement No. 75 and SEHIP GASB Statement No. 75 both prepared as of September 30, 2020 for financial reporting as of September 30, 2021.

In response to changes in GASB statements 43 and 45 and to recent actuarial valuations, the State pursued options to establish both a statutory trust fund and a constitutional trust fund for each health plan to fund its liabilities. The Director of Finance formed a committee from his senior staff to work with the insurance board staffs and outside legal counsel to draft a plan and legislation that was presented to and approved by the two boards and the Legislature (Act No. 2007-11). The legislation involved both a bridge trust fund and a constitutional trust fund for each health plan. All monies for funding this liability would initially be deposited into a bridge trust fund created

by statute and later transferred into an irrevocable and permanent trust fund created by constitutional amendment.  Each health board was given power and responsibility for managing its bridge and permanent funds.

*Actuarial Valuations*.  The funded status of each plan (including non-State obligated) as of the latest actuarial valuations (September 30, 2020) is as follows.

**Table 42.**
**Schedule of OPEB Funding Progress**

**(Dollar Amount in Thousands)**

| Actuarial Valuation Date (September 30) | Actuarial Value of Plan Assets (a) | Actuarial Accrued Liability (AAL) Entry Age (b) | Unfunded AAL (UAAL) (b-a) | Funded Ratio (a/b) |
|---|---|---|---|---|
| **Public Education Employees' Health Insurance Plan** | | | | |
| 2020 | $1,601,750 | $6,016,482 | $4,414,732 | 26.60% |
| 2019 | 1,477,077 | 5,758,609 | 4,281,532 | 25.60% |
| 2018 | 1,428,803 | 8,666,972 | 7,238,169 | 16.50% |
| 2017 | 1,348,563 | 8,481,844 | 7,133,281 | 15.90% |
| 2016 | 1,240,200 | 7,919,752 | 6,679,552 | 15.70% |
| 2015 | 1,154,392 | 7,462,934 | 6,308,542 | 15.50% |
| 2014 | 1,208,401 | 9,523,792 | 8,315,291 | 12.70% |
| 2013 | 1,074,940 | 8,993,967 | 7,919,027 | 12.00% |
| 2012 | 930,278 | 8,957,154 | 8,026,876 | 10.40% |
| 2011 | 777,933 | 9,081,334 | 8,303,401 | 8.60% |
| 2010 | 750,384 | 11,584,965 | 10,834,581 | 6.50% |
| **State Employees' Health Insurance Plan** | | | | |
| 2019 | $190,855 | $1,547,639 | $1,356,784 | 12.33% |
| 2018 | 184,178 | 1,547,765 | 1,363,587 | 11.90% |
| 2017 | 168,278 | 2,430,351 | 2,262,073 | 6.92% |
| 2016[1] | 150,388 | 2,346,946 | 2,196,558 | 6.41% |
| 2015 | 149,258 | 2,948,052 | 2,798,793 | 5.06% |
| 2014 | 156,837 | 3,072,700 | 2,915,862 | 5.10% |
| 2013 | 142,685 | 3,465,784 | 3,323,098 | 4.12% |
| 2012 | 126,670 | 3,215,956 | 3,089,286 | 3.94% |
| 2011[2] | 108,723 | 3,369,897 | 3,261,173 | 3.23% |
| 2010[3] | 97,485 | 4,162,276 | 4,064,792 | 2.34% |

Note (1) – Reflects the impact of the Medicare Advantage plan and five year experience study.

Note (2) - Reflects the impact of the EGWP + Wrap and five-year experience study.

Note (3) - Reflects Act 2011-27, which closed the DROP Program to new participants effective March 24, 2011 and Act 2011-698, which increases retiree premiums for retiring members on or after January 1, 2012.

Sources - Actuarial Reports for PEEHIP and SEHIP as of September 30, 2020.

Sections 36-36-1 through 36-36-11 of the Code of Alabama (1975), authorize and direct the SEHIP Board and the PEEHIP Board to create irrevocable trusts for the purpose of holding, investing, and distributing assets to be used for certain post-employment health care benefits. Constitutional Amendment No. 798, which was ratified on June 5, 2007, further protects the trust funds and requires they be used exclusively for the purpose of providing health care benefits to retired State and education employees. The PEEHIP Board made transfers totaling $621 million into the Alabama Retired Education Employees' Health Care Trust Fund. The net assets of the trust fund at September 30, 2021, were $1,922.1 million. The SEHIP Board has made transfers of $96.75 million into the Alabama Retired State Employees' Health Care Trust Fund as of September 30, 2013. The fair market value of the trust fund at September 30, 2019 was $190.9 million. Because of the establishment of and deposits to the trust funds, the discount rate used beginning with the September 30, 2006 valuations was increased from 4% to 5%. The discount rate for both trust funds remains at 5%.

***Unfunded Accrued Liability***. The actuarially-determined total UAAL calculation of each plan (including non-State obligated) as of the latest actuarial valuation (September 30, 2020) is as follows.

### Table 43.
### OPEB Unfunded Actuarial Accrued Liability
### As of latest actuarial valuation (September 30, 2020)

|  | Total |
|---|---|
| PEEHIP | $4,414,731,756 |
| SEHIP | 1,356,783,664 |
|  | $5,771,515,420 |

As of the latest actuarial valuation (September 30, 2020), the total OPEB-related UAAL was $5,771,515,420.  A portion of such UAAL is attributed to local governments and other participants.

***Annual Required Contribution***. The State's annual OPEB expense is based on the annual required contribution (ARC), an amount actuarially determined in accordance with the parameters of GASB Statement No. 45. The ARC represents a level of funding that, if paid on an ongoing basis, is projected to cover normal cost each year and to amortize any unfunded actuarial liabilities over thirty years. Significant assumptions used in the actuarial valuation are described above.

The actuarially determined total ARC calculation of each plan (including non-State obligated) as of the latest actuarial valuations (September 30, 2020) is as follows.

[remainder of this page intentionally left blank]

**Table 44.**
**OPEB Annual Required Contribution**

**As of latest actuarial valuations (September 30, 2020)**

|  | **Total** |
|---|---|
| PEEHIP | $431,223,535[1] |
| SEHIP | 97,801,316[2] |
|  | $529,024,851[3] |

(1) Contribution for FY 2023.
(2) Contribution for FY 2021.
(3) Contributions blended for FY 2023 and FY 2021.

As of the latest actuarial valuations (September 30, 2020), the total OPEB-related ARC obligation was $506,540,824. A portion of such required contribution is attributed to local governments and other participants.

## Additional Information

Additional information respecting the Retirement Systems of Alabama, including Annual Reports and Annual Comprehensive Financial Reports, may be viewed and downloaded at the Retirement Systems website: http://www.rsa-al.gov.

# LITIGATION

## General

No litigation is pending or threatened to restrain or enjoin the authorization, sale or delivery of the Bonds. The Attorney General's Office has reviewed the status of pending lawsuits and reports that, except as described below, an adverse decision in any one of the pending cases would not expose the State to liability of $20,000,000 or more.

*Greenetrack, Inc. v. State of Alabama Department of Revenue*, Circuit Court of Greene County, CV 2019-900056; Alabama Tax Tribunal No. S. 11-422-JP.

Greenetrack appealed a final assessment of more than $72.5 million involving the State Amusement tax and the State Consumer Use tax to the Alabama Tax Tribunal in 2011. At issue in the case is whether the proceeds from Greenetrack's operation of electronic bingo machines and other concessions was exempt from the state's amusement tax and/or consumer use tax. In August 2019, the Tribunal entered a final order finding that Greenetrack's operations were statutorily exempt from amusement tax and consumer use tax and it directed the Department to void the assessments.

The Office of the Attorney General, on behalf of the Department, appealed the Tribunal's decision to the Greene Circuit Court in September 2019. The parties filed cross motions for

summary judgment and the circuit court, on August 2, 2021, entered summary judgment in favor of Greenetrack, upholding the Tribunal's final order. The Office of the Attorney General, on behalf of the Department, has appealed the circuit court's decision to the Alabama Supreme Court. The appeal remains pending.

**ADOC**

The State of Alabama's prisons are the subject of (i) a pending class action lawsuit filed by the Southern Poverty Law Center ("SPLC") and the Alabama Disability Advocacy Program ("ADAP") (asserting constitutional claims of inadequate medical, dental, and mental health care, as well as violations of the Americans with Disabilities Act ("ADA")); (ii) a lawsuit seeking class certification on behalf of a proposed class of inmates at St. Clair Correctional Facility brought by the Equal Justice Initiative ("EJI"); and (iii) a lawsuit brought by the United States Department of Justice ("DOJ") (asserting claims of inmate on inmate physical assault and sexual abuse, officer on inmate excessive use of force, and conditions of confinement). Below is a summary of each case.

*Edward Braggs, et al. v. John Hamm, et.al*, 2:14-cv-00601-MHT-TFM, United States District Court for the Middle District of Alabama, is a partially-certified class action lawsuit filed by the SPLC and the ADAP. This system-wide lawsuit brought on behalf of inmates throughout the Alabama Department of Corrections ("ADOC") system alleges inadequacies in the provision of medical, dental, and mental healthcare, as well as ADA claims. Plaintiffs seek declaratory and injunctive relief. The parties settled the ADA claims, and the court found liability against the ADOC regarding mental health treatment. On December 27, 2021, the court entered a remedial order regarding the mental health treatment liability findings, and the ADOC appealed the decision. The appeal remains pending. Additionally, Plaintiffs' claims for constitutionally inadequate medical and dental care remain pending. Potential State liability in Braggs is not easily quantified, but involves costs to increase correctional and mental health staffing, revisions to current mental health practices and procedures and improvements to existing facilities. The State continues to maintain that no legal basis for the entry of any legal relief in this matter is warranted.

*Mark Duke, et al. v. Commissioner John Hamm, et al.*, 4:14-cv-1952-VEH-JHE, United States District Court for the Northern District of Alabama, is a putative class action lawsuit filed by the Equal Justice Initiative on behalf of inmates housed at St. Clair Correctional Facility. The Duke Plaintiffs' claims apply only to this single facility and allege failures to protect inmates from harm, excessive uses of force, generalized unconstitutional conditions of confinement, and a lack of programming for inmates at the facility. Plaintiffs seek declaratory and injunctive relief. Potential State of Alabama liability in Duke is also not capable of any reasonably certain calculation, but may involve costs related to correctional staffing, facility conditions and inmate programming. On July 31, 2020, the parties filed a joint motion to stay the Duke litigation until January 1, 2021. In January 2021, the Plaintiffs filed an unopposed motion to reinstate the case. The matter was reinstated, and the parties are negotiating issues related to discovery. The State fully intends to vigorously defend against the claims asserted in this action.

*USA v. State of Alabama and Alabama Department of Corrections*, Civil No. 2:20-cv-01971-RDP, United States District Court for the Northern District of Alabama is an action seeking an injunction relating to the operation of all major male prison facilities (except Hamilton A & I). The DOJ issued a Findings Letter on April 2, 2019, pursuant to the Civil Rights of Institutionalized

Persons Act, 42 U.S.C. §§ 1997 et seq. ("CRIPA"). The letter acknowledges that, "[The United States Department of Justice] does not serve as tribunal authorized to make factual findings and legal conclusions binding on, or admissible in, any court, and nothing in this Notice Letter should be construed as such. Accordingly, this Notice is not intended to be admissible evidence and does not create any legal rights or obligations." However, the April 2019 Findings Letter is a publicly available document that alleges the State allegedly fails to:

    i.        Protect inmates from inmate-on-inmate physical and sexual abuse; and

    ii.       Provide inmates with proper conditions of confinement.

On July 23, 2020, the DOJ issued a second findings letter, also a publicly available document, alleging certain instances of use of excessive force by correctional staff on inmates rising to the level of a constitutional violation. The same limitations regarding the effect of issuance of a findings letter apply equally to the July 2020 Findings Letter.

On December 9, 2020, the DOJ filed suit against ADOC and the State of Alabama, based upon the same allegations in the findings letters. Between February 1, 2021 and December 20, 2021, the United States District Court for the Northern District of Alabama granted multiple motions to dismiss filed by the State of Alabama. DOJ filed its second amended complaint on November 19, 2021. The State of Alabama denies the material allegations in the second amended complaint and, more particularly, the State of Alabama denies that it acted with deliberate indifference to the rights of the incarcerated population at the involved facilities. At present, the State continues to proceed through the discovery process. The case is currently on track to be trial ready in November 2024.

The State continues to believe and will maintain that DOJ's allegations constitute a significantly inaccurate description of current circumstances and an improper use of DOJ's authority under CRIPA.

06252972.9

**APPENDIX B**

**Book-Entry Only System**

[THIS PAGE INTENTIONALLY LEFT BLANK.]

*The information contained in this section concerning The Depository Trust Company and its book-entry only system has been obtained from materials furnished by The Depository Trust Company to the Issuer. The Issuer and the Underwriters do not make any representation or warranty as to the accuracy or completeness of such information.*

The Depository Trust Company ("DTC"), New York, New York, will act as securities depository for the Series 2022A Bonds. The Series 2022A Bonds will be issued as fully-registered securities registered in the name of Cede & Co., DTC's partnership nominee or such other name as may be requested by an authorized representative of DTC. One fully-registered Series 2022A Bond certificate will be issued for each maturity of the Series 2022A Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a Standard & Poor's rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of Series 2022A Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2022A Bonds on DTC's records. The ownership interest of each actual purchaser of each Series 2022A Bond (a "Beneficial Owner") is in turn to be recorded on the Direct Participants' and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct Participant or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2022A Bonds are to be accomplished by entries made on the books of Direct Participants and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Series 2022A Bonds, except in the event that use of the book-entry system for the Series 2022A Bonds is discontinued.

To facilitate subsequent transfers, all Series 2022A Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other name as may be requested by an authorized representative of DTC. The deposit of Series 2022A Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 2022A Bonds. DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2022A Bonds are credited, which may or may not be the Beneficial Owners. The Direct Participants and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

**Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Series 2022A Bonds may wish to take certain**

steps to augment the transmission to them of notices of significant events with respect to the Series 2022A Bonds, such as redemptions, tenders, defaults, and proposed amendments to the documents governing the terms of the Series 2022A Bonds. For example, Beneficial Owners of Series 2022A Bonds may wish to ascertain that the nominee holding the Series 2022A Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the Trustee and request that copies of notices be provided to them directly.

Redemption notices shall be sent to DTC. If less than all of the Series 2022A Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Series 2022A Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an "Omnibus Proxy" to the Issuer as soon as possible after the record date. The "Omnibus Proxy" assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series 2022A Bonds are credited on the record date (identified in a listing attached to the "Omnibus Proxy").

Principal, premium and interest payments on the Series 2022A Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon receipt of funds and corresponding detail information, in accordance with their respective holdings shown on DTC's records. Payments by Direct Participants and Indirect Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name", and will be the responsibility of Direct Participants and Indirect Participants and not of DTC, the Trustee, the State Treasurer, or the Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time. Payments of principal, premium (if any) and interest to Cede & Co. (or such other DTC nominee as may be requested by an authorized representative of DTC) is the responsibility of the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct Participants and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Series 2022A Bonds at any time by giving reasonable notice to the Issuer and the Trustee. Under such circumstances, in the event that a successor depository is not obtained, certificates for the Series 2022A Bonds are required to be printed and delivered. The Issuer may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, certificates for the Series 2022A Bonds will be printed and delivered to DTC.

**The Issuer, the Trustee, the State Treasurer and the Underwriters cannot and do not give any assurances that DTC, the Direct Participants or the Indirect Participants will distribute to the Beneficial Owners of the Series 2022A Bonds (1) payments of principal, redemption price or interest on the Series 2022A Bonds; (2) certificates representing an ownership interest or other confirmation of beneficial ownership interests in Series 2022A Bonds; or (3) redemption or other notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Series 2022A Bonds, or that they will do so on a timely basis or that DTC, Direct Participants or Indirect Participants will serve and act in the manner described in this Official Statement. The current "rules" applicable to DTC are on file with the United States Securities and Exchange Commission, and the current "procedures" of DTC to be followed in dealing with DTC participants are on file with DTC.**

**Neither the Issuer, the Trustee, the State Treasurer nor the Underwriters will have any responsibility or obligation to any Direct Participant, Indirect Participant or any Beneficial Owner or any other person with respect to: (1) the Series 2022A Bonds; (2) the accuracy of any records maintained by DTC or any Direct Participant or Indirect Participant; (3) the payment by DTC or any Direct Participant or Indirect Participant of any amount due to any Beneficial Owner in respect of the principal or redemption price of or interest on the Series 2022A Bonds; (4) the delivery by DTC or any Direct Participant or Indirect Participant of any notice to any Beneficial Owner which is required or permitted under the terms of the Indenture to be given to holders of the Series 2022A Bonds; (5) the selection of the Beneficial Owners to receive payment in the event of any partial redemption of the Series 2022A Bonds; or (6) any consent given or other action taken by DTC as a holder of the Series 2022A Bonds.**

**APPENDIX C**

**Proposed Opinion of Bond Counsel**

[THIS PAGE INTENTIONALLY LEFT BLANK.]

[Closing Date]

Holders of the Series 2022A Bonds
    referred to below

**Re:    $725,000,000\* Revenue Bonds, Series 2022A, issued by the Alabama Corrections Institution Finance Authority**

We have acted as bond counsel in connection with the issuance of the above-referenced bonds (the "Series 2022A Bonds") by Alabama Corrections Institution Finance Authority, a public corporation organized under the laws of the State of Alabama (the "Issuer"). In such capacity, we have examined such law and such certified proceedings, certifications, and other documents as we have deemed necessary to render this opinion.

The Series 2022A Bonds are being issued pursuant to a Trust Indenture, dated the date of issuance of the Series 2022A Bonds (the "Indenture"), between the Issuer and Regions Bank, an Alabama banking corporation (the "Trustee").

The Series 2022A Bonds are being issued to provide financing for the State of Alabama, acting by and through the Alabama Department of Corrections ("ADOC"). Simultaneously with the issuance of the Series 2022A Bonds, the Issuer will lease the facilities being financed with the Series 2022A Bonds to ADOC pursuant to a Lease Agreement dated the date of issuance of the Series 2022A Bonds (the "Lease Agreement"), between the Issuer and ADOC. Pursuant to the Lease Agreement, ADOC will make rental payments to the Issuer in amounts sufficient to pay debt service on the Series 2022A Bonds.

As to various questions of fact material to our opinion, we have relied upon the certified proceedings and other certificates of public officials and others furnished to us without undertaking to verify the same by independent investigation. In connection with the rendering of this opinion, we have served as counsel to the Issuer.

Based on the foregoing, we are of the opinion that, under existing law:

1.      The Issuer has been duly organized and is validly existing as a public corporation under Chapter 2 of Title 14 of the Code of Alabama (1975).

2.      The Issuer has power and authority to enter into and perform its obligations under the Lease Agreement and the Indenture and to issue and deliver the Series 2022A Bonds. The execution, delivery and performance by the Issuer of its obligations under the Lease Agreement and the Indenture and the issuance and delivery of the Series 2022A Bonds by the Issuer have been duly authorized by all requisite action, and the Lease Agreement, the Indenture and the Series 2022A Bonds have been duly executed and delivered by the Issuer.

3.      ADOC has power and authority to enter into and perform its obligations under the Lease Agreement. The execution, delivery and performance by ADOC of its obligations under the Lease Agreement have

---

\* Preliminary; subject to change.

been duly authorized by all requisite action, and the Lease Agreement has been duly executed and delivered by ADOC.

4.      The Series 2022A Bonds constitute legal, valid and binding limited obligations of the Issuer payable as to principal, premium (if any) and interest solely out of payments by ADOC pursuant to the Lease Agreement.

5.      The Indenture and the Lease Agreement constitute legal, valid and binding obligations of the Issuer and are enforceable against the Issuer in accordance with the terms of such instruments, and the Lease Agreement constitutes a legal, valid and binding obligation of ADOC and is enforceable against ADOC in accordance with the terms of such instrument.

6.      Interest on the Series 2022A Bonds is excludable from gross income for federal income tax purposes and is not an item of tax preference for purposes of the federal alternative minimum tax. The opinion set forth in the preceding sentence is subject to the condition that the Issuer and ADOC comply with all requirements of the Internal Revenue Code of 1986, as amended, that must be satisfied subsequent to the issuance of the Series 2022A Bonds in order that interest thereon be, or continue to be, excludable from gross income for federal income tax purposes. The Issuer and ADOC have covenanted to comply with all such requirements. Failure to comply with certain of such requirements may cause interest on the Series 2022A Bonds to be included in gross income for federal income tax purposes retroactive to the date of issuance of the Series 2022A Bonds.

7.      Interest on the Series 2022A Bonds is exempt from State of Alabama income taxation.

We express no opinion regarding any federal or state tax consequences of acquiring, carrying, owning, or disposing of the Series 2022A Bonds, other than the opinions expressed in paragraphs 6 and 7 above. Owners of the Series 2022A Bonds should consult their tax advisors regarding the applicability of any collateral tax consequences of owning the Series 2022A Bonds, which may include original issue discount, original issue premium, purchase at a market discount or at a premium, taxation upon sale, redemption or other disposition, and various withholding requirements.

The rights of the holders of the Series 2022A Bonds and the enforceability of the Series 2022A Bonds, the Indenture and the Lease Agreement may be limited by (1) the valid exercise of the constitutional powers of the United States of America and the sovereign and police powers of the State of Alabama or political subdivisions or instrumentalities thereof, (2) bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights, and (3) general principles of equity, including the exercise of judicial discretion in appropriate cases.

We express no opinion herein as to the accuracy, adequacy or completeness of the Official Statement relating to the Series 2022A Bonds.

This opinion is rendered solely for your benefit. It is not to be relied upon by any other person or for any other purpose. This opinion is given as of the date hereof and we assume no obligation to update, revise or supplement this opinion to reflect any facts or circumstances that may hereafter come to our attention or any changes in law that may hereafter occur.

Faithfully yours,

**APPENDIX D**

**Form of the Indenture and the Lease Agreement**

[THIS PAGE INTENTIONALLY LEFT BLANK.]

**TRUST INDENTURE**


**Dated [Date]**


**Between**


**ALABAMA CORRECTIONS INSTITUTION FINANCE AUTHORITY**


**and**


**REGIONS BANK**


**Relating to the issuance of**
**[Amount]**
**Revenue Bonds, Series 2022A**
**by**
**Alabama Corrections Institution Finance Authority**

**TABLE OF CONTENTS**

**PAGE**

Parties..............................................................................................................................................1

Recitals.............................................................................................................................................1

ARTICLE 1 Definitions and Other Provisions of General Application ...........................................2
    SECTION 1.1    Definitions.................................................................................................2
    SECTION 1.2    General Rules of Construction ...................................................................7
    SECTION 1.3    Ownership of Bonds; Effect of Action by Bondholders ...........................8
    SECTION 1.4    Effect of Headings and Table of Contents ................................................8
    SECTION 1.5    Separability Clause....................................................................................8
    SECTION 1.6    Governing Law..........................................................................................8
    SECTION 1.7    Counterparts..............................................................................................8
    SECTION 1.8    Designation of Time for Performance........................................................8

ARTICLE 2 Source of Payment ......................................................................................................8
    SECTION 2.1    Source of Payment of Bonds and Other Obligations.................................8
    SECTION 2.2    Sponsoring Entity Exempt From Liability ................................................9
    SECTION 2.3    Officers, Directors, etc. Exempt from Individual Liability .......................9

ARTICLE 3 Security for Payment....................................................................................................9
    SECTION 3.1    Pledge and Assignment ............................................................................9
    SECTION 3.2    Separate Security for Bonds ...................................................................11

ARTICLE 4 Registration, Exchange and General Provisions Regarding the Bonds.......................11
    SECTION 4.1    Registration, Transfer and Exchange ......................................................11
    SECTION 4.2    Mutilated, Destroyed, Lost and Stolen Bonds.........................................12
    SECTION 4.3    Payment of Interest on Bonds; Interest Rights Preserved .......................12
    SECTION 4.4    Persons Deemed Owners.........................................................................13
    SECTION 4.5    Trustee as Paying Agent .........................................................................13
    SECTION 4.6    Payments Due on Non-Business Days .....................................................13
    SECTION 4.7    Cancellation............................................................................................13
    SECTION 4.8    Book-Entry Only Bonds .........................................................................13

ARTICLE 5 General Provisions Regarding Redemption of Bonds.................................................13
    SECTION 5.1    Specific Redemption Provisions .............................................................13
    SECTION 5.2    Mandatory Redemption...........................................................................14
    SECTION 5.3    Election to Redeem .................................................................................14
    SECTION 5.4    Selection of Bonds to be Redeemed........................................................14
    SECTION 5.5    Notice of Redemption.............................................................................14
    SECTION 5.6    Deposit of Redemption Price ..................................................................15
    SECTION 5.7    Bonds Payable on Redemption Date .......................................................15
    SECTION 5.8    Bonds Redeemed in Part .........................................................................16

ARTICLE 6 Specific Terms for Series 2022A Bonds ....................................................................16
    SECTION 6.1    Specific Title and Terms .........................................................................16
    SECTION 6.2    Book-Entry Only System; Payment Provisions ......................................18
    SECTION 6.3    Execution, Authentication, Delivery and Dating .....................................19
    SECTION 6.4    Proceeds From Sale of Series 2022A Bonds and Other Proceeds.............20

SECTION 6.5    Description of Bond-Financed Facilities ...................................................... 20

ARTICLE 7 Additional Bonds ............................................................................................ 20
SECTION 7.1    Additional Bonds—In General ............................................................... 20
SECTION 7.2    Conditions Precedent to Issuance of Additional Bonds ........................... 21

ARTICLE 8 Indenture Funds .............................................................................................. 22
SECTION 8.1    Debt Service Fund .................................................................................. 22
SECTION 8.2    Costs of Issuance Fund ........................................................................... 22
SECTION 8.3    Capitalized Interest Fund ........................................................................ 22
SECTION 8.4    Acquisition Fund .................................................................................... 23
SECTION 8.5    Capital Improvement Fund ...................................................................... 23
SECTION 8.6    Money for Bond Payments to be Held in Trust; Repayment of Unclaimed
               Money .................................................................................................... 23

ARTICLE 9 Investment of Indenture Funds ........................................................................ 24
SECTION 9.1    Investment of Indenture Funds ................................................................ 24
SECTION 9.2    Application of Funds After Indenture Indebtedness Fully Paid ................ 24

ARTICLE 10 Representations and Covenants ...................................................................... 24
SECTION 10.1   General Representations ......................................................................... 24
SECTION 10.2   No Encumbrance on Trust Estate ........................................................... 25
SECTION 10.3   Payment of Bonds .................................................................................. 25
SECTION 10.4   Inspection of Records ............................................................................. 25
SECTION 10.5   Advances by Trustee ............................................................................... 25
SECTION 10.6   Corporate Existence; Merger, Consolidation, Etc. .................................. 25
SECTION 10.7   Compliance with the Tax Certificate and Agreement .............................. 26

ARTICLE 11 Defaults and Remedies .................................................................................. 26
SECTION 11.1   Events of Default .................................................................................... 26
SECTION 11.2   Remedies ................................................................................................ 26
SECTION 11.3   Application of Money Collected .............................................................. 27
SECTION 11.4   Trustee May Enforce Claims without Possession of Bonds ...................... 28
SECTION 11.5   Limitation on Suits ................................................................................. 28
SECTION 11.6   Unconditional Right of Bondholders to Receive Principal, Premium and
               Interest .................................................................................................. 29
SECTION 11.7   Restoration of Positions .......................................................................... 29
SECTION 11.8   Delay or Omission Not Waiver ................................................................ 29
SECTION 11.9   Control by Bondholders .......................................................................... 29
SECTION 11.10  Waiver of Past Defaults .......................................................................... 30
SECTION 11.11  Suits to Protect the Trust Estate .............................................................. 30

ARTICLE 12 The Trustee ................................................................................................... 30
SECTION 12.1   Certain Duties and Responsibilities of Trustee ........................................ 30
SECTION 12.2   Notice of Defaults .................................................................................. 31
SECTION 12.3   Certain Rights of Trustee ........................................................................ 31
SECTION 12.4   Not Responsible for Recitals ................................................................... 32
SECTION 12.5   May Hold Bonds .................................................................................... 32
SECTION 12.6   Money Held in Trust ............................................................................... 32
SECTION 12.7   Compensation and Reimbursement ......................................................... 32
SECTION 12.8   Corporate Trustee Required; Eligibility ................................................... 33

SECTION 12.9   Resignation and Removal; Appointment of Successor ............................................. 33
SECTION 12.10 Acceptance of Appointment by Successor ................................................................. 34
SECTION 12.11 Merger, Conversion, Consolidation or Succession to Business ................................ 34

ARTICLE 13 Amendment of Bond Documents ........................................................................................ 35
SECTION 13.1   General Requirements for Amendments .................................................................. 35
SECTION 13.2   Amendments Without Consent of Bondholders....................................................... 35
SECTION 13.3   Amendments Requiring Consent of All Affected Bondholders................................ 36
SECTION 13.4   Amendments Requiring Majority Consent of Bondholders..................................... 36
SECTION 13.5   Discretion of Trustee ............................................................................................... 36
SECTION 13.6   Trustee Protected by Opinion of Counsel ............................................................... 36
SECTION 13.7   Amendments Affecting Trustee's Personal Rights .................................................. 37
SECTION 13.8   Effect on Bondholders............................................................................................. 37
SECTION 13.9   Reference in Bonds to Amendments ........................................................................ 37
SECTION 13.10 Amendments Not to Affect Tax Exemption............................................................. 37
SECTION 13.11 Rights of Underwriters to Consent to Indenture Amendments ................................ 37

ARTICLE 14 Defeasance ......................................................................................................................... 37
SECTION 14.1   Payment of Indenture Indebtedness; Satisfaction and Discharge of Indenture ......... 37
SECTION 14.2   Trust for Payment of Debt Service .......................................................................... 38

ARTICLE 15 ADOC and the Lease Agreement....................................................................................... 39
SECTION 15.1   Right to Exercise Rights and Options With Respect to Terms of the Bonds ............. 39
SECTION 15.2   Performance by Issuer Under Lease Agreement ...................................................... 39
SECTION 15.3   Rights of ADOC With Respect to Defaults by Issuer ............................................. 39
SECTION 15.4   Remedies Under Lease Agreement .......................................................................... 39
SECTION 15.5   Amendment of Bond Documents ............................................................................. 39
SECTION 15.6   Benefits of Indenture for ADOC ............................................................................. 39

ARTICLE 16 Miscellaneous.................................................................................................................... 40
SECTION 16.1   Notices..................................................................................................................... 40
SECTION 16.2   Notices to Bondholders; Waiver .............................................................................. 40
SECTION 16.3   Successors and Assigns ............................................................................................ 40
SECTION 16.4   Benefits of Indenture ............................................................................................... 40

Testimonium ........................................................................................................................................... 41
Signatures................................................................................................................................................ 41
Acknowledgments.................................................................................................................................... 42

EXHIBIT 3.1(b)     -     Description of Bond-Financed Facilities
EXHIBIT 6.1(c)     -     Form of Bonds
EXHIBIT 6.2(a)     -     Letter of Representations
EXHIBIT 8.2(b)     -     Requisition from Cost of Issuance Fund or Acquisition Fund
EXHIBIT 8.5(b)     -     Requisition from Capital Improvement Fund
EXHIBIT 16.1(a)    -     Notices

# TRUST INDENTURE

**THIS TRUST INDENTURE** dated [Date] is entered into by **ALABAMA CORRECTIONS INSTITUTION FINANCE AUTHORITY**, an Alabama public corporation (the "Issuer"), and **REGIONS BANK**, an Alabama banking corporation, as trustee (the "Trustee").

## Recitals

A.    The Issuer has duly authorized the issuance of its [Amount] aggregate principal amount of Revenue Bonds, Series 2022A (the "Series 2022A Bonds") pursuant to this Indenture.  The Series 2022A Bonds and any additional bonds issued pursuant to Article 7 of this Indenture are collectively referred to as the "Bonds".

B.    The Series 2022A Bonds are being issued to provide financing for the State of Alabama, acting by and through the Alabama Department of Corrections ("ADOC").  Proceeds of the Series 2022A Bonds will be used to pay the costs of acquiring and constructing certain corrections institution facilities (as further defined herein, the "Bond-Financed Facilities").

C.    The Bond-Financed Facilities will be owned by the Issuer and will be leased to ADOC pursuant to a Lease Agreement dated [Date] (the "Lease Agreement").  Pursuant to the Lease Agreement ADOC will agree to pay rentals at times and in amounts sufficient to pay debt service on the Series 2022A Bonds.

D.    The Series 2022A Bonds and all other payment obligations under this Indenture shall be limited obligations of the Issuer payable solely out of the Trust Estate, including certain payments made by ADOC pursuant to the Lease Agreement.

E.    As security for the payment of the Bonds and all other obligations under this Indenture, the Issuer shall, pursuant to this Indenture, assign and pledge all the Issuer's rights under the Lease Agreement, except for certain rights relating to indemnification, reimbursement of expenses and receipt of notices and other communications.

F.    As additional security for the payment of the Bonds and all other obligations under this Indenture, the Issuer shall grant, pursuant to this Indenture, a non-foreclosable mortgage lien on the Bond-Financed Facilities to the Trustee.

G.    In order to facilitate the payment, registration and transfer provisions of this Indenture, the Issuer, the State Treasurer, and the Trustee will enter into a Fiscal Agent Agreement dated [Date] (the "Fiscal Agent Agreement").

H.    All things have been done which are necessary to make the Bonds, when executed by the Issuer and authenticated and delivered by the Trustee hereunder, the valid obligations of the Issuer, and to constitute this Indenture a valid trust indenture for the security of the Bonds, in accordance with the terms of the Bonds and this Indenture.

## NOW, THEREFORE, THIS INDENTURE WITNESSETH:

It is hereby covenanted and declared that all the Bonds are to be authenticated and delivered and the property subject to this Indenture is to be held and applied by the Trustee, subject to the covenants, conditions and trusts hereinafter set forth, and the Issuer does hereby covenant and agree to and with the Trustee, for the equal and proportionate benefit (except as otherwise expressly provided herein) of all Bondholders as follows:

# ARTICLE 1

## Definitions and Other Provisions
## of General Application

**SECTION 1.1     Definitions**

For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires, the following terms shall have the meaning indicated:

"**Acquisition Costs**", when used with respect to the Series 2022A Bonds, shall mean costs of acquiring, constructing and installing the Bond-Financed Facilities, including any rebate or yield reduction payments due to the United States Treasury with respect to the Series 2022A Bonds pursuant to Section 148 of the Internal Revenue Code.

"**Acquisition Fund**" shall mean the fund established pursuant to Section 8.4.

"**Act of Bankruptcy**" shall mean the filing of a petition in bankruptcy (or the other commencement of a bankruptcy or similar proceeding) by or against a person under any applicable bankruptcy, insolvency, reorganization, or similar law, now or hereafter in effect.

"**Act No. 2021-547 Account**" shall mean the account created pursuant to Section 8.5.

"**Act No. 2021-548 Account**" shall mean the account created pursuant to Section 8.5.

"**Additional Bonds**" shall mean a series of Bonds issued pursuant to Article 7 and the related Supplemental Indenture.

"**ADOC**" shall mean the State of Alabama, acting by and through the Alabama Department of Corrections, until a successor shall have become such pursuant to the applicable provisions of the Lease Agreement, and thereafter "ADOC" shall mean such successor.

"**Affiliate**" of any specified person shall mean any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person.  For purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Authorized ADOC Representative**" shall mean any officer or agent of ADOC authorized by the governing body of ADOC to act as "Authorized ADOC Representative" for purposes of the Bond Documents.

"**Authorized Issuer Representative**" shall mean any officer or agent of the Issuer authorized by the governing body of the Issuer to act as "Authorized Issuer Representative" for purposes of the Bond Documents.

"**Authorized DCM Representative**" shall mean any officer or agent of the Alabama Department of Construction Management authorized to act as "Authorized DCM Representative" for purposes of the Bond Documents.

"**Authorized Denominations**" shall have the meaning assigned in Section 6.1 for the Series 2022A Bonds and shall have the meaning assigned in the related Supplemental Indenture for any series of Additional Bonds.

"**Beneficial Owner**" shall have the meaning assigned in Section 6.2 for the Series 2022A Bonds and shall have the meaning assigned in the related Supplemental Indenture for any series of Additional Bonds.

"**Bond**" shall mean any bond issued pursuant to this Indenture, including Series 2022A Bonds and any Additional Bonds.

"**Bond Documents**" shall mean the Bonds, the Indenture, the Lease Agreement, and the Fiscal Agent Agreement.

"**Bond-Financed Facilities**" shall mean the Escambia Men's Prison Facility and the Elmore Men's Prison Facility being financed by the Series 2022A Bonds, each as more particularly described in *Exhibit A* to the Lease Agreement.

"**Bond Payment Date**" shall mean each date (including any date fixed for redemption of Bonds) on which Debt Service is payable on the Bonds.

"**Bond Register**" shall mean the register or registers for the registration and transfer of Bonds maintained by the Issuer pursuant to Section 4.1.

"**Book-Entry Only System**" shall have the meaning assigned in Section 6.2 for the Series 2022A Bonds and shall have the meaning assigned in the related Supplemental Indenture for any series of Additional Bonds.

"**Business Day**" shall mean any day other than a Saturday, a Sunday or a day on which the Trustee is authorized to be closed under general law or regulation applicable in the place where the Trustee performs its business with respect to the Indenture.

"**Capital Improvement Fund**" shall mean the fund established pursuant to Section 8.5.

"**Capital Improvement Payment**" shall mean the aggregate amount to be deposited into the Act No. 2021-547 Account and the Act No. 2021-548 Account of the Capital Improvement Fund pursuant to Section 6.4(b) of this Indenture and Section 4.4 of the Lease Agreement.

"**Capitalized Interest Fund**" shall mean the fund established pursuant to Section 8.3.

"**Capitalized Interest**" shall mean interest accruing on the Series 2022A Bonds until the earlier of (a) the date that is six months after the Bond-Financed Facilities are placed in service and (b) the date that is three years after the issuance date of the Series 2022A Bonds.

"**Capitalized Interest Period**" shall mean the period beginning on the date of issuance of the Series 2022A Bonds and ending on the earlier of the (a) date that is six months after the Bond-Financed Facilities are placed in service and (b) the date that is three years after the date of issuance of the Series 2022A Bonds.

"**Continuing Disclosure Agreement**" shall mean that certain Continuing Disclosure Agreement entered into by ADOC in connection with the issuance of the Series 2022A Bonds.

"**Costs of Issuance**" shall mean the expenses incurred in connection with the issuance of the Bonds, including legal, consulting, accounting and underwriting fees and expenses.

"**Costs of Issuance Fund**" shall mean the fund established pursuant to Section 8.2.

"**Debt Service**" shall mean the principal, premium (if any) and interest payable on the Bonds.

"**Debt Service Fund**" shall mean the fund established pursuant to Section 8.1.

"**Defaulted Interest**" shall have the meaning assigned in Section 4.3.

"**DTC**" shall have the meaning assigned in Section 6.2 for the Series 2022A Bonds and shall have the meaning assigned in the related Supplemental Indenture for any series of Additional Bonds.

"**Enabling Law**" shall mean Chapter 2 of Title 14 of the Code of Alabama (1975).

"**Favorable Tax Opinion**" shall mean an Opinion of Counsel stating in effect that the proposed action, together with any other changes with respect to the Bonds made or to be made in connection with such action, will not cause interest on the Bonds to become includible in gross income of the Holders for purposes of federal income taxation.

"**Federal Securities**" shall mean noncallable, nonprepayable, direct obligations of, or obligations the full and timely payment of which is guaranteed by, the United States of America, excluding unit investment trusts and mutual funds.

"**Financing Participants**" shall mean the Issuer, ADOC, the State Treasurer and the Trustee.

"**Fiscal Agent Agreement**" shall mean that certain Fiscal Agent Agreement dated [Date], by and among the Issuer, the State Treasurer and the Trustee.

"**Fiscal Year**" shall mean the fiscal year of the State of Alabama

"**Fully Paid**", when used with respect to Indenture Indebtedness, shall have the meaning stated in Section 14.1.

"**Holder**" or "**Bondholder**" when used with respect to any Bond shall mean (1) if the Book-Entry Only System is not in effect, the person in whose name such Bond is registered in the Bond Register and (2) if the Book-Entry Only System is in effect, the Beneficial Owner of such Bond on the records maintained pursuant to the Book-Entry Only System.

"**Indenture**" shall mean this instrument as originally executed or as it may from time to time be supplemented, modified or amended by one or more indentures or other instruments supplemental hereto entered into pursuant to the applicable provisions hereof.

"**Indenture Default**" shall have the meaning stated in Article 11. An Indenture Default shall "exist" if an Indenture Default shall have occurred and be continuing.

"**Indenture Funds**" shall mean any fund or account established pursuant to this Indenture.

"**Indenture Indebtedness**" shall mean all indebtedness of the Issuer at the time secured by this Indenture, including (a) all Debt Service on the Bonds and (b) all reasonable fees, charges and disbursements of the Trustee for services performed and disbursements made under this Indenture.

"**Interest Payment Date**", when used with respect to any installment of interest on a Bond, shall mean the date specified herein and in such Bond as the date on which such installment of interest is due and payable.

"**Issuer**" shall mean Alabama Corrections Institution Finance Authority, an Alabama public corporation, until a successor corporation shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "Issuer" shall mean such successor corporation.

"**Lease Agreement**" shall mean that certain Lease Agreement dated [Date], between the Issuer and ADOC.

"**Lease Default**" shall have the meaning stated in Article 8 of the Lease Agreement. A Lease Default shall "exist" if a Lease Default shall have occurred and be continuing.

"**Lease Payments**" shall mean payments by ADOC pursuant to the Lease Agreement.

"**Maturity**", when used with respect to any Bond, shall mean the date specified herein and in such Bond as the date on which principal of such Bond is due and payable.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Obligor Bonds**" shall mean Bonds registered in the name of (or in the name of a nominee for) the Issuer, ADOC, or any Affiliate of the Issuer or ADOC. The Trustee may assume that no Bonds are Obligor Bonds unless it has actual notice to the contrary.

"**Office of the State Treasurer**" shall mean the office of the State Treasurer for hand delivery of notices and other documents, as specified pursuant to Article 16.

"**Office of the Trustee**" shall mean the office of the Trustee for hand delivery of notices and other documents, as specified pursuant to Article 16.

"**Opinion of Counsel**" shall mean an opinion from an attorney or firm of attorneys with experience in the matters to be covered in the opinion. Except as otherwise expressly provided in this Indenture, the attorney or attorneys rendering such opinion may be counsel for one or more of the Financing Participants.

"**Outstanding**" when used with respect to Bonds shall mean, as of the date of determination, all Bonds authenticated and delivered under this Indenture, except:

        (a)    Bonds cancelled by the Trustee or delivered to the Trustee for cancellation;

        (b)    Bonds for whose payment or redemption money in the necessary amount has been deposited with the Trustee in trust for the Holders of such Bonds, provided that, if such Bonds are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made; and

        (c)    Bonds in exchange for or in lieu of which other Bonds have been authenticated and delivered under this Indenture;

provided, however, that in determining whether the Holders of the requisite principal amount of Bonds Outstanding have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Obligor Bonds shall be disregarded and deemed not to be Outstanding. Obligor Bonds which have been pledged in good faith may be regarded as Outstanding for such purposes if the pledgee

establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Bonds and that Bonds registered in the name of such pledgee as beneficial owner would not be considered Obligor Bonds.

"**Permitted Encumbrances**" shall mean:

(a)　　this Indenture;

(b)　　the Lease Agreement;

(c)　　liens for taxes, assessments and other governmental charges that are not delinquent or that are being contested in good faith by appropriate proceedings;

(d)　　mechanics', materialmen's or other similar liens arising in the ordinary course of business, securing obligations that are not delinquent or that are being contested in good faith by appropriate proceedings;

(e)　　liens in respect of judgments or awards with respect to which an appeal or other proceedings for review are being prosecuted in good faith and with respect to which a stay of execution pending such appeal or proceedings for review has been secured;

(f)　　restrictions, exceptions, reservations, conditions, limitations, interests and other matters identified in Schedule B of the owner's and/or leasehold title insurance policy issued by _____ (Policy No. _____-_____) having a policy date of _____, 20___, to the extent only that such restrictions, exceptions, reservations, conditions, limitations, interests and other matters refer expressly to instruments recorded against, or otherwise specifically affect, the property and not to any general, standard, or similar exceptions that may appear in said policy; and

(g)　　restrictions, exceptions, reservations, conditions, limitations, interests and other matters which, individually or in the aggregate, do not materially detract from the value of the property affected thereby and do not materially impair the use of such property for the purposes for which it is held by the Issuer and used and occupied by ADOC.

"**Pledged Indenture Funds**" shall mean all Indenture Funds except the Capital Improvement Fund.

"**Qualified Investments**" shall mean those investments permitted by the Enabling Law.

"**Rating Agency**" shall mean Moody's, S & P and any other nationally recognized securities rating agency.

"**Regular Record Date**" shall have the meaning assigned in Section 6.1 for the Series 2022A Bonds and shall have the meaning assigned in the related Supplemental Indenture for any series of Additional Bonds.

"**S & P**" shall mean Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc.

"**Series 2022A Bond**" shall mean the series of Bonds issued pursuant to Article 6 of this Indenture.

"**Special Record Date**" for the payment of any Defaulted Interest on the Bonds means a date fixed by the Trustee pursuant to Section 4.3.

"**State Treasurer**" shall mean the Treasurer of the State of Alabama.

"**Supplemental Indenture**" shall mean an instrument supplementing, modifying or amending this Indenture.

"**Tax Certificate and Agreement**" shall mean that certain Tax Certificate and Agreement entered into by the Issuer and ADOC in connection with the issuance of the Series 2022A Bonds.

"**Trust Estate**" shall have the meaning stated in Article 3.

"**Trustee**" shall mean Regions Bank, an Alabama banking corporation, until a successor Trustee shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "Trustee" shall mean such successor.

"**Wire Transfer**" shall mean a transfer of funds by electronic means between banks that are members of the Federal Reserve system, or such other method of transferring funds for same-day settlement or credit as shall be acceptable to the Trustee.

## SECTION 1.2    General Rules of Construction

For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(a)     Defined terms in the singular shall include the plural as well as the singular, and vice versa.

(b)     The definitions in the recitals to this instrument are for convenience only and shall not affect the construction of this instrument.

(c)     All accounting terms not otherwise defined herein have the meanings assigned to them, and all computations herein provided for shall be made, in accordance with generally accepted accounting principles.    All references herein to "generally accepted accounting principles" refer to such principles as they exist at the date of application thereof.

(d)     All references in this instrument to designated "Articles", "Sections" and other subdivisions are to the designated Articles, Sections and subdivisions of this instrument as originally executed.

(e)     The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision.

(f)     All references in this instrument to a separate instrument are to such separate instrument as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(g)     The term "person" shall include any individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization and any government or any department, agency or political subdivision thereof.

(h)     The term "including" means "including without limitation" and "including, but not limited to".

### SECTION 1.3     Ownership of Bonds; Effect of Action by Bondholders

(a)     The ownership of Bonds shall be proved by the Bond Register.

(b)     Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Bond shall bind every future Holder of the same Bond and the Holder of every Bond issued upon the transfer thereof or in exchange therefor or in lieu thereof, in respect of anything done or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Bond.

### SECTION 1.4     Effect of Headings and Table of Contents

The Article and Section headings herein and in the Table of Contents are for convenience only and shall not affect the construction hereof.

### SECTION 1.5     Separability Clause

If any provision in this Indenture or in the Bonds shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

### SECTION 1.6     Governing Law

This Indenture shall be construed in accordance with and governed by the laws of the State of Alabama.

### SECTION 1.7     Counterparts

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.

### SECTION 1.8     Designation of Time for Performance

Except as otherwise expressly provided herein, any reference in this Indenture to the time of day shall mean (a) if the Book-Entry Only System is in effect, the time of day in the city where DTC maintains its place of business for the performance of its obligations under the Book-Entry Only System or (b) if the Book-Entry Only System is no longer in effect, the time of day in the city where the Trustee maintains its place of business for the performance of its obligations under this Indenture.

## ARTICLE 2

## Source of Payment

### SECTION 2.1     Source of Payment of Bonds and Other Obligations

(a)     The Bonds and all other payment obligations under this Indenture are limited obligations of the Issuer payable solely out of the Trust Estate, including certain payments by ADOC pursuant to the Lease Agreement, and shall never be deemed a general obligation of the Issuer or the State of Alabama secured by the full faith and credit of the Issuer or the State of Alabama.

(b)　　This Indenture shall not constitute or effect a pledge or assignment of, or any other type of security interest in, the property, taxes or revenues of the Issuer other than the property specifically identified by this Indenture as part of the Trust Estate.

### SECTION 2.2　　Sponsoring Entity Exempt From Liability

The Bonds and any other payment obligations under this Indenture do not constitute or give rise to an indebtedness or a pecuniary liability of, and do not constitute a charge against the general credit or taxing powers of, the Issuer, ADOC, or the State of Alabama.

### SECTION 2.3　　Officers, Directors, etc. Exempt from Individual Liability

No recourse under or upon any covenant or agreement of this Indenture, or of any Bonds, or for any claim based thereon or otherwise in respect thereof, shall be had against any past, present or future incorporator, officer or member of the governing body of the Issuer, or of any successor, either directly or through the Issuer, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly understood that this Indenture and the Bonds issued hereunder are solely corporate obligations, and that no personal liability whatever shall attach to, or is or shall be incurred by, any incorporator, officer or member of the governing body of the Issuer or any successor, or any of them, because of the issuance of the Bonds, or under or by reason of the covenants or agreements contained in this Indenture or in any Bonds or implied therefrom.

## ARTICLE 3

## Security for Payment

### SECTION 3.1　　Pledge and Assignment

To secure the payment of Debt Service on the Bonds and all other Indenture Indebtedness and the performance of the covenants herein and in the Bonds contained, and to declare the terms and conditions on which the Bonds are secured, and in consideration of the premises and of the purchase of the Bonds by the Holders thereof, the Issuer hereby pledges and assigns to the Trustee, and grants to the Trustee a security interest in, the following property:

(a)　　**Pledged Indenture Funds**.　Money and investments from time to time on deposit in, or forming a part of, the Pledged Indenture Funds.

(b)　　**Bond-Financed Facilities**.　The following Bond-Financed Facilities:

(1)　　The real property and interests therein described in ***Exhibit 3.1(b)*** attached hereto, together with all easements, permits, licenses, rights-of-way, contracts, leases, tenements, hereditaments, appurtenances, rights, privileges and immunities pertaining or applicable to said real property and interests therein.

(2)　　All buildings and structures now or hereafter located on such real property, including the buildings and structures to be constructed, altered or improved as part of the Bond-Financed Facilities financed in whole or in part by the Series 2022A Bonds.

(3)　　The following personal property and fixtures:　(i) all personal property and fixtures to be acquired and installed on such real property as part of the Bond-Financed Facilities financed in whole or in part by the Series 2022A Bonds, including the

personal property and fixtures described in ***Exhibit 3.1(b)*** to this Indenture, (ii) all personal property and fixtures acquired by (or in the name of) the Issuer and installed on such real property as a substitute or replacement for personal property or fixtures transferred or otherwise disposed of pursuant to the terms of the Lease Agreement, and (iii) all personal property and fixtures acquired by (or in the name of) the Issuer and installed on such real property with the proceeds of any insurance or condemnation award pursuant to the terms of the Lease Agreement.

   (4) All awards or payments, including all interest thereon, together with the right to receive the same, that may be made to the Issuer with respect to the Bond-Financed Facilities as a result of the exercise of the right of eminent domain, any damage to or destruction of the Bond-Financed Facilities or any part thereof, or any other injury to or decrease in the value of the Bond-Financed Facilities, and all right, title and interest of the Issuer in and to any policies of insurance with respect to any damage to or destruction of the Bond-Financed Facilities.

   (c) **Lease Payments and Lease Agreement**.  All Lease Payments by ADOC and all right, title and interest of the Issuer in and to the Lease Agreement; provided, however, that:

   (1) The Issuer shall retain the right to payments under Sections 4.3(b) and 8.4 of the Lease Agreement.

   (2) The Issuer shall retain the right to receive notices and other communications to be sent to it under the Lease Agreement.

   (3) Nothing contained in this Indenture shall impair, diminish or otherwise affect the Issuer's obligations under the Lease Agreement or impose any of such obligations on the Trustee.

   (d) **Other Property**.  Any and all property of every kind or description which may, from time to time hereafter, by delivery or by writing of any kind, be subjected to the lien of this Indenture as additional security by the Issuer or anyone on its part or with its consent, or which pursuant to any of the provisions hereof may come into the possession or control of the Trustee or a receiver appointed pursuant to this Indenture; and the Trustee is hereby authorized to receive any and all such property as and for additional security for the obligations secured hereby and to hold and apply all such property subject to the terms hereof.

  **TO HAVE AND TO HOLD** all such property, rights and privileges (collectively called the "Trust Estate") unto the Trustee and its successors and assigns;

  **BUT IN TRUST, NEVERTHELESS**, for the equal and proportionate benefit and security of the Holders from time to time of the Bonds (without any priority of any such Bond over any other such Bond).

  **PROVIDED, HOWEVER**, that (a) money and investments in the Pledged Indenture Funds may be applied for the purposes and on the terms and conditions set forth in this Indenture, (b) the security interest in the Bond-Financed Facilities shall be subject to the Permitted Encumbrances, and (c) the mortgage herein granted on that portion of the Trust Estate constituting the Bond-Financed Facilities shall not be subject to foreclosure and shall not be construed so as to compel the sale of the Bond-Financed Facilities or any part thereof in satisfaction of Bonds issued hereunder and secured hereby.

**SECTION 3.2     Separate Security for Bonds**

The Issuer may deliver to the Trustee a separate credit facility (a letter of credit, insurance policy, standby purchase agreement, guaranty agreement or other credit enhancement) solely for the benefit of specified Bonds issued under this Indenture, which may be all or any portion of one or more series of Bonds.  Such credit facility will not be considered part of the Trust Estate.  The terms of the Supplemental Indenture authorizing the issuance of the secured Bonds (1) may grant to the obligor under such credit facility the right to exercise certain rights or powers, or to grant or withhold any consent, on behalf of the Holders of Bonds secured by such credit facility and (2) may provide that such obligor shall be subrogated to the rights of the Holders of Bonds secured by such credit facility if, and to the extent that, such obligor is not paid or reimbursed for amounts paid to Holders of Bonds secured by such credit facility.

## ARTICLE 4

### Registration, Exchange and
### General Provisions Regarding the Bonds

**SECTION 4.1     Registration, Transfer and Exchange**

(a)     The Issuer shall cause to be kept at the Office of the Trustee a register (herein sometimes referred to as the "Bond Register") in which, subject to such reasonable regulations as it may prescribe, the Issuer shall provide for the registration of Bonds and registration of transfers of Bonds entitled to be registered or transferred as herein provided.  The Trustee is hereby appointed as agent of the Issuer for the purpose of registering Bonds and transfers of Bonds as herein provided.

(b)     Upon surrender for transfer of any Bond at the Office of the Trustee, the Issuer shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Bonds of the same series and Maturity, of any Authorized Denominations and of a like aggregate principal amount.

(c)     At the option of the Holder, Bonds may be exchanged for other Bonds of the same series and Maturity, of any Authorized Denominations and of a like aggregate principal amount, upon surrender of the Bonds to be exchanged at the Office of the Trustee.  Whenever any Bonds are so surrendered for exchange, the Issuer shall execute, and the Trustee shall authenticate and deliver, the Bonds which the Bondholder making the exchange is entitled to receive.

(d)     All Bonds surrendered upon any exchange or transfer provided for in this Indenture shall be promptly cancelled by the Trustee.

(e)     All Bonds issued upon any transfer or exchange of Bonds shall be the valid obligations of the Issuer and entitled to the same security and benefits under this Indenture as the Bonds surrendered upon such transfer or exchange.

(f)     Every Bond presented or surrendered for transfer or exchange shall contain, or be accompanied by, all necessary endorsements for transfer.

(g)     No service charge shall be made for any transfer or exchange of Bonds, but the Issuer may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange of Bonds.

(h)     The Issuer shall not be required (1) to transfer or exchange any Bond during a period beginning at the opening of business 15 days before the day of the mailing of a notice of redemption of Bonds and ending at the close of business on the day of such mailing, or (2) to transfer or exchange any Bond so selected for redemption in whole or in part.

### SECTION 4.2     Mutilated, Destroyed, Lost and Stolen Bonds

(a)     If (1) any mutilated Bond is surrendered to the Trustee, or the Issuer and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any Bond, and (2) there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Issuer or the Trustee that such Bond has been acquired by a bona fide purchaser, the Issuer shall execute and upon its request the Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Bond, a new Bond of like tenor and principal amount, bearing a number not contemporaneously outstanding.

(b)     Upon the issuance of any new Bond under this Section, the Issuer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith.

(c)     Every new Bond issued pursuant to this Section in lieu of any destroyed, lost or stolen Bond shall constitute an original additional contractual obligation of the Issuer, whether or not the destroyed, lost or stolen Bond shall be at any time enforceable by anyone, and shall be entitled to all the security and benefits of this Indenture equally and ratably with all other Outstanding Bonds.

(d)     The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Bonds.

### SECTION 4.3     Payment of Interest on Bonds; Interest Rights Preserved

(a)     Interest on any Bond which is payable, and is punctually paid or duly provided for, on any Interest Payment Date shall be paid to the person in whose name that Bond is registered at the close of business on the Regular Record Date for such Interest Payment Date.

(b)     Any interest on any Bond which is payable, but is not punctually paid or duly provided for, on any Interest Payment Date (herein called "Defaulted Interest") shall forthwith cease to be payable to the Holder on the relevant Regular Record Date solely by virtue of such Holder having been such Holder; and such Defaulted Interest shall be paid by the Issuer to the persons in whose names such Bonds are registered at the close of business on a special record date (herein called a "Special Record Date") for the payment of such Defaulted Interest, which shall be fixed in the following manner.  The Issuer shall notify the Trustee of the amount of Defaulted Interest proposed to be paid on each Bond and the date of the proposed payment (which date shall be such as will enable the Trustee to comply with the next sentence hereof), and at the same time the Issuer shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the persons entitled to such Defaulted Interest as in this subsection provided and not to be deemed part of the Trust Estate.  Thereupon the Trustee shall fix a Special Record Date for the payment of such Defaulted Interest which shall be not more than 15 nor less than 10 days prior to the date of the proposed payment and not less than 10 days after the receipt by the Trustee of the notice of the proposed payment.  The Trustee shall promptly notify the Issuer of such Special Record Date and, in the name and at the expense of the Issuer, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first-class postage

prepaid, to each Holder of a Bond at his address as it appears in the Bond Register not less than 10 days prior to such Special Record Date.  Notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor having been mailed as aforesaid, such Defaulted Interest shall be paid to the persons in whose names the Bonds are registered on such Special Record Date.

(c)     Subject to the foregoing provisions of this Section, each Bond delivered under this Indenture upon transfer of or in exchange for or in lieu of any other Bond shall carry all the rights to interest accrued and unpaid, and to accrue, which were carried by such other Bond and each such Bond shall bear interest from such date that neither gain nor loss in interest shall result from such transfer, exchange or substitution.

### SECTION 4.4     Persons Deemed Owners

The Issuer and the Trustee may treat the person in whose name any Bond is registered as the owner of such Bond for the purpose of receiving payment of Debt Service on such Bond and for all other purposes whatsoever whether or not such Bond is overdue, and, to the extent permitted by law, neither the Issuer nor the Trustee shall be affected by notice to the contrary.

### SECTION 4.5     Trustee as Paying Agent

The Debt Service on the Bonds shall, except as otherwise provided herein, be payable at the Office of the Trustee.  The Trustee is hereby appointed agent of the Issuer for the purpose of paying Debt Service on the Bonds.

### SECTION 4.6     Payments Due on Non-Business Days

If any payment on the Bonds is due on a day which is not a Business Day, such payment may be made on the first succeeding day which is a Business Day with the same effect as if made on the day such payment was due.

### SECTION 4.7     Cancellation

All Bonds surrendered for payment, redemption, transfer or exchange, shall be promptly cancelled by the Trustee.  The Trustee may destroy cancelled certificates.  No Bond shall be authenticated in lieu of or in exchange for any Bond cancelled as provided in this Section, except as expressly provided by this Indenture.

### SECTION 4.8     Book-Entry Only Bonds

The provisions of this Indenture authorizing any series of Bonds may provide that such Bonds shall be issued in book-entry only form.

## ARTICLE 5

## General Provisions Regarding Redemption of Bonds

### SECTION 5.1     Specific Redemption Provisions

The terms of this Indenture authorizing any series of Bonds shall specify the specific redemption provisions with respect to such series.

### SECTION 5.2    Mandatory Redemption

Bonds shall be redeemed in accordance with the applicable mandatory redemption provisions without any direction from or consent by the Issuer.  Unless the date fixed for such mandatory redemption is otherwise specified by this Indenture, the Trustee shall select the date for mandatory redemption, subject to the provisions of this Indenture with respect to the permitted period for such redemption.

### SECTION 5.3    Election to Redeem

The election of the Issuer to exercise any right of optional redemption shall be evidenced by notice to the Trustee from an Authorized Issuer Representative.  The notice of election to redeem must be received by the Trustee at least 60 days prior to the date fixed for redemption (unless a shorter notice is acceptable to the Trustee) and shall specify (a) the principal amount of Bonds to be redeemed (if less than all Bonds Outstanding are to be redeemed pursuant to such option) and (b) the redemption date, subject to the provisions of this Indenture with respect to the permitted period for such redemption.

### SECTION 5.4    Selection of Bonds to be Redeemed

(a)    Except as otherwise provided in the specific redemption provisions for the Bonds, if less than all Bonds Outstanding are to be redeemed, the principal amount of Bonds of each series and Maturity to be redeemed may be specified by the Issuer by notice delivered to the Trustee not less than 60 days before the date fixed for redemption (unless a shorter notice is acceptable to the Trustee), or, in the absence of timely receipt by the Trustee of such notice, shall be determined in accordance with the Book-Entry Only System or, if the Book-Entry Only System is no longer in effect, shall be selected by the Trustee by lot or by such other method as the Trustee shall deem fair and appropriate; provided, however, that the principal amount of Bonds of each Maturity to be redeemed may not be larger than the principal amount of Bonds of such Maturity then eligible for redemption and may not be smaller than the smallest Authorized Denomination.

(b)    Except as otherwise provided in the specific redemption provisions for the Bonds, if less than all Bonds with the same series and Maturity are to be redeemed, the particular Bonds of such series and Maturity to be redeemed shall be selected by the Trustee not less than 30 nor more than 60 days prior to the redemption date from the Outstanding Bonds of such series and Maturity then eligible for redemption in accordance with the Book-Entry Only System or, if the Book-Entry Only System is no longer in effect, by lot or by such other method as the Trustee shall deem fair and appropriate and which may provide for the selection for redemption of portions (in Authorized Denominations) of the principal of Bonds of such Maturity of a denomination larger than the smallest Authorized Denomination.

(c)    The Trustee shall promptly notify the Issuer of the Bonds selected for redemption and, in the case of any Bond selected for partial redemption, the principal amount thereof to be redeemed.

(d)    For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to the redemption of Bonds shall relate, in the case of any Bond redeemed or to be redeemed only in part, to the portion of the principal of such Bond which has been or is to be redeemed.

### SECTION 5.5    Notice of Redemption

(a)    Unless waived by the Holders of all Bonds then Outstanding to be redeemed, notice of redemption shall be given by first-class mail, or registered or certified mail, mailed not less than 30 nor more than 60 days prior to the redemption date, to each Holder of Bonds to be redeemed, at his address appearing in the Bond Register.

(b)     All notices of redemption shall state:

(1)     the redemption date,

(2)     the redemption price,

(3)     the principal amount of Bonds to be redeemed, and, if less than all Outstanding Bonds are to be redeemed, the identification (and, in the case of partial redemption, the respective principal amounts) of the Bonds to be redeemed,

(4)     that on the redemption date the redemption price of each of the Bonds to be redeemed will become due and payable and that the interest thereon shall cease to accrue from and after said date,

(5)     the place or places where the Bonds to be redeemed are to be surrendered for payment of the redemption price, and

(6)     any conditions to such redemption specified in accordance with the provisions of Section 5.5(e).

(c)     Notice of redemption of Bonds to be redeemed at the option of the Issuer shall be given by the Issuer or, at the Issuer's request, by the Trustee in the name and at the expense of the Issuer. Notice of redemption of Bonds in accordance with the mandatory redemption provisions of the Bonds shall be given by the Trustee in the name and at the expense of the Issuer.

(d)     The Issuer and the Trustee shall, to the extent practical under the circumstances, comply with the standards set forth in Securities and Exchange Commission's Exchange Act Release No. 23856 dated December 3, 1986, regarding redemption notices, provided that their failure to do so shall not in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed in this Section.

(e)     A notice of optional redemption may state that the redemption of Bonds is contingent upon specified conditions such as receipt of a specified source of funds or the occurrence of specified events. If the conditions for such redemption are not met, the Issuer shall not be required to redeem Bonds (or portions thereof) identified in such notice, and any Bonds surrendered on the specified redemption date shall be returned to the Holders of such Bonds.

**SECTION 5.6     Deposit of Redemption Price**

On the applicable redemption date, an amount of money sufficient to pay the redemption price of all the Bonds which are to be redeemed on that date shall be deposited with the Trustee. Such money shall be held in trust for the benefit of the persons entitled to such redemption price and shall not be deemed to be part of the Trust Estate.

**SECTION 5.7     Bonds Payable on Redemption Date**

(a)     Notice of redemption having been given as aforesaid, the Bonds to be redeemed shall, on the redemption date, become due and payable at the redemption price therein specified and from and after such date (unless the Issuer shall default in the payment of the redemption price) such Bonds shall cease to bear interest. Upon surrender of any such Bond for redemption in accordance with said notice such Bond shall be paid by the Issuer at the redemption price. Installments of interest due on or prior to the

redemption date shall be payable to the Holders of the Bonds registered as such on the relevant Record Dates according to the terms of such Bonds.

(b)     If any Bond called for redemption shall not be paid upon surrender thereof for redemption, the principal (and premium, if any) shall, until paid, bear interest from the redemption date at the rate specified in the Series 2022A Bonds.

**SECTION 5.8     Bonds Redeemed in Part**

Unless otherwise provided herein, any Bond which is to be redeemed only in part shall be surrendered at the Office of the Trustee with all necessary endorsements for transfer, and the Issuer shall execute and the Trustee shall authenticate and deliver to the Holder of such Bond, without service charge, a new Bond or Bonds of the same series and Maturity and of any Authorized Denomination or Denominations as requested by such Holder in aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Bond surrendered.

**ARTICLE 6**

**Specific Terms for Series 2022A Bonds**

**SECTION 6.1     Specific Title and Terms**

(a)     **Title and Amount**.  The Series 2022A Bonds shall be entitled "Revenue Bonds, Series 2022A".  The aggregate principal amount of the Series 2022A Bonds which may be authenticated and delivered and Outstanding is limited to [Amount].

(b)     **Authorized Denominations**.  The Series 2022A Bonds shall be issued in denominations of $5,000 or any multiple thereof.

(c)     **Form and Number**.  The Series 2022A Bonds shall be issuable as registered bonds without coupons in Authorized Denominations.  The Series 2022A Bonds shall be numbered separately from 1 upward.  The Series 2022A Bonds and the certificate of authentication shall be substantially as set forth in ***Exhibit 6.1(c)***, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture.

(d)     **Maturities and Interest Rates**.  The Series 2022A Bonds shall mature on _____ 1 in the years _____ through _____ and _____ 1 in the years _____ through _____.  All Series 2022A Bonds with the same Maturity shall bear interest at the same rate.  The principal amount of Series 2022A Bonds maturing on each Maturity date and the applicable rate of interest for the Series 2022A Bonds of each Maturity are as follows:

| Year of Maturity | Principal Amount Maturing | Applicable Interest Rate |
|---|---|---|

(e)     **Date**.  The Series 2022A Bonds shall be dated [Date].

(f)     **Interest Payment Dates**.  Interest on the Series 2022A Bonds shall be payable on January 1 and July 1 in each year, beginning _____ 1, _____.

(g)     **Regular Record Date**.  The interest due on any Interest Payment Date for the Series 2022A Bonds shall be payable to the Holder as of the Regular Record Date for such Interest Payment Date.  The Regular Record Date for interest payable on any Interest Payment Date for the Series 2022A Bonds shall be the 15th day (whether or not a Business Day) of the month next preceding such Interest Payment Date.

(h)     **Computation of Interest Accrued**.  The Series 2022A Bonds shall bear interest from their date, or the most recent date to which interest has been paid or duly provided for, until the principal thereof shall become due and payable, at the applicable rate per annum set forth in Section 6.1(d).  Interest shall be computed on the basis of a 360-day year with 12 months of 30 days each.

(i)     **Interest on Overdue Payments**.  Interest on overdue principal and premium and (to the extent legally enforceable) on any overdue installment of interest on any Series 2022A Bond shall be payable at the interest rate borne by such Bond.

(j)     **Redemption Provisions**.  The Series 2022A Bonds shall be subject to redemption prior to Maturity as follows:

(1)     **Optional Redemption**.  Series 2022A Bonds maturing on _____ or thereafter may be redeemed in whole or in part at the option of the Issuer on or after _____ 1, _____ at a redemption price equal to 100% of the principal amount to be redeemed plus accrued interest to the redemption date.

(2)     **Scheduled Mandatory Redemption of ____ Term Bonds**.  The Series 2022A Bonds maturing in ____ ("____ Term Bonds") shall be redeemed, at a redemption price equal to 100% of the principal amount to be redeemed plus accrued interest thereon to the redemption date, on _____ in years and principal amounts (after credit as provided below) as follows:

| Year | Amount |
|------|--------|
|      |        |

_____

$_____ of the ____ Term Bonds
is scheduled to be retired at Maturity.

Not less than 45 or more than 60 days prior to each such scheduled mandatory redemption date with respect to ____ Term Bonds, the Trustee shall proceed to select for redemption, by lot, ____ Term Bonds or portions thereof in an aggregate principal amount equal to the amount required to be redeemed and shall call such ____ Term Bonds or portions thereof for redemption on such scheduled mandatory redemption date.  The Issuer may, not less than 60 days prior to any such scheduled mandatory redemption date, direct that any or all of the following amounts be credited against the principal amount of ____ Term Bonds scheduled for redemption on such date:  (A) the

principal amount of _____ Term Bonds delivered by the Issuer to the Trustee for cancellation and not previously claimed as a credit; (B) the principal amount of _____ Term Bonds previously redeemed (other than _____ Term Bonds redeemed pursuant to this paragraph) and not previously claimed as a credit; and (C) the principal amount of Term Bonds otherwise deemed "Fully Paid" and not previously claimed as a credit.

        (3)      **Optional Redemption Upon Occurrence of Certain Calamities**.  All or a portion of the Series 2022A Bonds may be redeemed at the option of the Issuer, at a redemption price equal to 100% of the principal amount to be redeemed plus accrued interest thereon to the redemption date, within 180 days after any of the following shall have occurred:

        (A)      the Bond-Financed Facilities shall have been damaged or destroyed to such extent that, in the opinion of ADOC, they cannot be restored within a period of 6 months to substantially the condition thereof immediately prior to such damage or destruction or ADOC is thereby prevented from carrying on its normal operations at the Bond-Financed Facilities for a period of not less than 6 months; or

        (B)      the taking by eminent domain of all or substantially all the Bond-Financed Facilities or of any part, use or control of the Bond-Financed Facilities that, in the opinion of ADOC, results in ADOC being thereby prevented from carrying on its normal operations at the Bond-Financed Facilities for a period of not less than 6 months.

### SECTION 6.2      Book-Entry Only System; Payment Provisions

        (a)      The registration and payment of Series 2022A Bonds shall be made pursuant to the Book-Entry Only System (the "Book-Entry Only System") administered by The Depository Trust Company ("DTC") in accordance with the Letter of Representations attached to and incorporated by reference in this Indenture as *Exhibit 6.2(a)* (the "Letter of Representations") until such System is terminated pursuant to Section 6.2(c).

        (b)      While Series 2022A Bonds are in the Book-Entry Only System the following provisions shall apply for purposes of this Indenture and shall supersede any contrary provisions of this Indenture:

        (1)      Notwithstanding the fact that DTC may hold a single physical certificate for each stated maturity for purposes of the Book-Entry Only System, the term "Series 2022A Bond" shall mean each separate Security (as defined in the Letter of Representations) issued pursuant to the Book-Entry Only System, and the term "Holder" shall mean the person identified on the records of DTC as the owner of the related Security.

        (2)      The terms and limitations of this Indenture with respect to each separate Series 2022A Bond shall be applicable to each separate Security registered under the Book-Entry Only System.

        (3)      All notices under this Indenture to Holders of Series 2022A Bonds from any other Financing Participant shall be delivered by such Financing Participant to DTC for distribution by DTC in accordance with the Letter of Representations.  All notices under this Indenture to or from a Financing Participant other than a Holder of a Series 2022A Bond shall be delivered directly to the Financing Participant as provided in this Indenture and shall not be delivered through DTC or the Book-Entry Only System.

        (4)      All payments of Debt Service on the Series 2022A Bonds shall be made by the Trustee to DTC and shall be made by DTC to the Participants (as such term is defined in the

Letter of Representations) as provided in the Letter of Representations. All such payments shall be valid and effective fully to satisfy and discharge the Issuer's obligations with respect to such payments.

(5)     The Beneficial Owners (as such term is defined in the Letter of Representations) of the Series 2022A Bonds, by their acquisition of any beneficial interest in a Series 2022A Bond or Series 2022A Bonds, and the Participants severally agree that the Issuer and the Trustee shall not have any responsibility or obligation to any Participant or any Beneficial Owner with respect to (1) the accuracy of any records maintained by DTC or any Participant; (2) the payment by DTC or any Participant of any amount due to any Beneficial Owner in respect of the principal of, purchase price of, premium (if any) and interest on the Series 2022A Bonds; (3) the delivery or timeliness of delivery by DTC or any Participant of any notice due to any Beneficial Owner which is required or permitted under the terms of this Indenture to be given to Beneficial Owners; (4) the selection of the Beneficial Owners of the Series 2022A Bonds to receive payment in the event of any partial redemption of the Series 2022A Bonds; or (5) any consent given or other action taken by DTC or its nominee, as owner.

(c)     If the Issuer and the Trustee concur that it would be in the best interests of the Holders of the Series 2022A Bonds for the Book-Entry Only System to be discontinued (in whole or in part), such Book-Entry Only System shall be discontinued (in whole or in part) in accordance with the provisions of the Letter of Representations. In addition, the Book-Entry Only System may be discontinued (in whole or in part) at any time by any Financing Participant acting alone in accordance with the Letter of Representations.

(d)     If the Book-Entry Only System is discontinued, except as otherwise provided in this Section with respect to Wire Transfer rights, payment of interest on the Series 2022A Bonds which is due on any Interest Payment Date shall be made by check or draft mailed by the Trustee to the persons entitled thereto at their addresses appearing in the Bond Register. Such payments of interest shall be deemed timely made if so mailed on the Interest Payment Date (or, if such Interest Payment Date is not a Business Day, on the Business Day next following such Interest Payment Date). Payment of the principal of (and premium, if any, on) the Series 2022A Bonds and payment of accrued interest on the Series 2022A Bonds due upon redemption on any date other than an Interest Payment Date shall be made only upon surrender thereof at the Office of the Trustee.

(e)     Upon the written request of the Holder of Series 2022A Bonds in an aggregate principal amount of not less than $1,000,000, the Trustee will make payment of the Debt Service due on such Series 2022A Bonds by Wire Transfer, provided that:

(1)     such request contains adequate instructions for the method of payment, and

(2)     payment of the principal of (and redemption premium, if any, on) such Series 2022A Bonds and payment of the accrued interest on such Series 2022A Bonds due upon redemption on any date other than an Interest Payment Date shall be made only upon surrender of such Series 2022A Bonds to the Trustee.

**SECTION 6.3     Execution, Authentication, Delivery and Dating**

(a)     The Series 2022A Bonds shall be executed on behalf of the Issuer by its President or Treasurer under its corporate seal reproduced thereon and attested by its Secretary. The signature of any of these officers on the Series 2022A Bonds may be manual or, to the extent permitted by law, facsimile. Series 2022A Bonds bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Issuer shall bind the Issuer, notwithstanding that such individuals or any of them

shall have ceased to hold such offices prior to the authentication and delivery of such Series 2022A Bonds or shall not have held such offices at the date of such Series 2022A Bonds.

(b)     At any time and from time to time after the execution and delivery of this Indenture, the Issuer may deliver Series 2022A Bonds executed by the Issuer to the Trustee for authentication and the Trustee shall authenticate and deliver such Series 2022A Bonds as in this Indenture provided and not otherwise.

(c)     No Series 2022A Bond shall be secured by, or be entitled to any lien, right or benefit under, this Indenture or be valid or obligatory for any purpose, unless there appears on such Series 2022A Bond a certificate of authentication substantially in the form provided for herein, executed by the Trustee by manual signature, and such certificate upon any Series 2022A Bond shall be conclusive evidence, and the only evidence, that such Series 2022A Bond has been duly authenticated and delivered hereunder.

### SECTION 6.4     Proceeds From Sale of Series 2022A Bonds and Other Proceeds

(a)     The proceeds from the sale of the Series 2022A Bonds to the original purchaser or purchasers thereof shall be applied as follows:

(i)     $_____ shall be deposited in the Cost of Issuance Fund.

(ii)     $_____ shall be deposited in the Capitalized Interest Fund.

(iii)     The balance of such proceeds shall be deposited in the Acquisition Fund.

(b)     The Capital Improvement Payment shall be deposited in the Capital Improvement Fund as follows:

(i)     $_____ shall be deposited in the Act No. 2021-547 Account.

(ii)     $_____ shall be deposited in the Act No. 2021-548 Account.

### SECTION 6.5     Description of Bond-Financed Facilities

(a)     The Bond-Financed Facilities are described in ***Exhibit A*** of the Lease Agreement.

(b)     ADOC may cause changes or amendments to be made in the description of the Bond-Financed Facilities and may add items to, or delete items from, the list of Bond-Financed Facilities contained in the Lease Agreement; provided that (1) ADOC delivers to the Trustee a resolution adopted by the Issuer's governing body specifying such changes, amendments, additions or deletions, (2) such action will not change the nature of the Bond-Financed Facilities to the extent that they would not qualify for financing under the Enabling Law, and (3) ADOC delivers to the Trustee a Favorable Tax Opinion.

## ARTICLE 7

### Additional Bonds

### SECTION 7.1     Additional Bonds—In General

The Issuer may at any time and from time to time, if no Indenture Default exists, issue Additional Bonds within the limitations of and upon compliance with the provisions of this Article for any lawful purpose at either the Elmore Men's Prison Facility or the Escambia Men's Prison Facility.

**SECTION 7.2     Conditions Precedent to Issuance of Additional Bonds**

(a)     Prior to the issuance of any Additional Bonds, the Issuer shall deliver to the Trustee the Additional Bonds proposed to be issued, duly executed and accompanied by the following:

(1)     **Proceedings**.  A certified copy of the proceedings taken by the Issuer authorizing such Additional Bonds and the Supplemental Indenture providing therefor, which shall include the following:  (A) a representation that no Indenture Default exists, (B) the purpose or purposes for which such Additional Bonds are being issued, and (C) the person or persons to whom such Additional Bonds are to be sold and the purchase price to be paid therefor.

(2)     **Supplemental Indenture**.  A Supplemental Indenture duly executed on behalf of the Issuer and containing (to the extent applicable) (A) a description of the Additional Bonds proposed to be issued, including the aggregate principal amount, the series designation, the Maturity or Maturities of principal of such Additional Bonds, the interest rate or rates (or provisions for the determination thereof), the due dates of interest on such Additional Bonds, the redemption provisions with respect to such Additional Bonds, and the form of such Additional Bonds, (B) a statement of the purpose or purposes for which such Additional Bonds are to be issued, and (C) any other matters deemed appropriate by the Issuer and not inconsistent with the terms of this Indenture.

(3)     **Supplement to Lease Agreement**.  A supplement to the Lease Agreement duly executed on behalf of the Issuer and ADOC and containing (to the extent applicable) (A) a description of the facilities to be financed by the issuance of such Additional Bonds, (B) an agreement by ADOC to make Lease Payments at times and in amounts sufficient to pay Debt Service on the Additional Bonds, and (C) any other matters deemed appropriate by the Issuer and ADOC and not inconsistent with the terms of the Lease Agreement or this Indenture.

(4)     **Opinion of Counsel for the Issuer**.  An Opinion of Counsel for the Issuer stating in effect (with such qualifications and assumptions as the Trustee may deem appropriate) that (A) such Additional Bonds are valid and binding obligations of the Issuer in accordance with their terms and are entitled to the benefit and security of this Indenture equally and proportionately with all other Bonds Outstanding under the Indenture and (B) the Indenture (as so supplemented) and the Lease Agreement (as so supplemented) constitute valid and binding obligations of the Issuer in accordance with their terms.

(5)     **Opinion of Counsel for ADOC**.  An Opinion of Counsel for ADOC stating in effect (with such qualifications and assumptions as the Trustee may deem appropriate) that the Lease Agreement (as so supplemented) constitutes a valid and binding obligation of ADOC in accordance with its terms.

(b)     Upon receipt of the documents required by the provisions of this Section to be furnished to it, the Trustee shall, unless it has cause to believe that any of the statements set out in such documents is incorrect, thereupon execute and deliver the Supplemental Indenture so presented and shall authenticate such Additional Bonds and deliver the same upon written order executed by an Authorized Issuer Representative.  Any Additional Bonds issued pursuant to and in compliance with the terms of this Indenture shall be entitled to the benefit and protection of this Indenture equally and proportionately with all other Bonds issued hereunder.

## ARTICLE 8

### Indenture Funds

**SECTION 8.1     Debt Service Fund**

(a)     There is hereby established with the Trustee, as depository duly appointed by the State Treasurer, a trust fund which shall be designated the "Debt Service Fund".

(b)     On each Bond Payment Date money in the Debt Service Fund shall be applied by the Trustee to pay Debt Service on the Bonds.

(c)     During the term of the Lease Agreement, ADOC is required by Section 4.2 of the Lease Agreement (subject to Section 4.7 of the Lease Agreement) to make Lease Payments at times and in amounts sufficient to pay Debt Service on the Bonds.  Such Lease Payments are to be deposited in the Debt Service Fund.

**SECTION 8.2     Costs of Issuance Fund**

(a)     There is hereby established with the Trustee, as depository duly appointed by the State Treasurer, a trust fund which shall be designated the "Revenue Bonds, Series 2022A Costs of Issuance Fund".  A deposit to the Costs of Issuance Fund is to be made pursuant to Section 6.4.

(b)     Money in the Costs of Issuance Fund shall be transferred by the Trustee to cover the payment of Costs of Issuance with respect to the Series 2022-A Bonds upon delivery to the Trustee of a requisition substantially in the form attached as ***Exhibit 8.2(b)***, executed by an Authorized Issuer Representative.

(c)     After an Authorized Issuer Representative certifies to the Trustee that money remaining in the Costs of Issuance Fund is not needed to pay Costs of Issuance with respect to the Series 2022A Bonds, any balance remaining in the Costs of Issuance Fund shall be deposited in the Acquisition Fund.

**SECTION 8.3     Capitalized Interest Fund**

(a)     There is hereby established with the Trustee, as depository duly appointed by the State Treasurer, a trust fund which shall be designated the "Revenue Bonds, Series 2022A Capitalized Interest Fund".  A deposit to the Capitalized Interest Fund is to be made pursuant to Section 6.4.

(b)     On each Interest Payment Date during the Capitalized Interest Period, the Trustee shall transfer from the Capitalized Interest Fund to the Debt Service Fund an amount sufficient, when added to the amount already on deposit therein, to pay the interest due on the Interest Payment Date.

(c)     If the amount on deposit in the Capitalized Interest Fund exceeds the amount required to pay the remainder of the Debt Service due on the Series 2022A Bonds during the Capitalized Interest Period, such excess may be transferred to the Acquisition Fund upon direction of an Authorized Issuer Representative.

(d)     After the Capitalized Interest Period, any balance remaining in the Capitalized Interest Fund shall be deposited in the Acquisition Fund.

**SECTION 8.4    Acquisition Fund**

(a)    There is hereby established with the Trustee, as depository duly appointed by the State Treasurer, a trust fund which shall be designated the "Revenue Bonds, Series 2022A Acquisition Fund". A deposit to the Acquisition Fund is to be made pursuant to Section 6.4.

(b)    Money in the Acquisition Fund shall be paid out by the Trustee from time to time for the purpose of paying Acquisition Costs (including reimbursement of the Issuer or ADOC for any such costs paid by it) upon delivery to the Trustee of a requisition substantially in the form attached as ***Exhibit 8.2(b)***, executed by an Authorized ADOC Representative, an Authorized Issuer Representative and an Authorized DCM Representative.

(c)    After an Authorized ADOC Representative provides to the Issuer the certificate required by Section 3.5 of the Lease Agreement and after an Authorized Issuer Representative certifies to the Trustee that remaining proceeds of the Series 2022A Bonds are not needed to pay Acquisition Costs, any balance remaining in the Acquisition Fund shall be deposited in the Debt Service Fund and shall be applied to the payment of Debt Service on the Series 2022A Bonds on the next ensuing Bond Payment Date.

**SECTION 8.5    Capital Improvement Fund**

(a)    There is hereby established with the Trustee, as depository duly appointed by the State Treasurer, a trust fund which shall be designated the "Revenue Bonds, Series 2022A Capital Improvement Fund" and within such fund two accounts, which shall be designated the "Act No. 2021-547 Account" and the "Act No. 2021-548 Account". A deposit to each of the Act No. 2021-547 Account and the Act No. 2021-548 Account is to be made pursuant to Section 6.4.

(b)    Money in the Capital Improvement Fund shall be paid out by the Trustee from time to time for the purpose of paying Acquisition Costs (including reimbursement of the Issuer or ADOC for any such costs paid by it) upon delivery to the Trustee of a requisition substantially in the form attached as ***Exhibit 8.5(b)***, executed by an Authorized ADOC Representative, an Authorized Issuer Representative and an Authorized DCM Representative.

(c)    After an Authorized ADOC Representative provides to the Issuer the certificate required by Section 3.5 of the Lease Agreement and after an Authorized Issuer Representative certifies to the Trustee that money remaining in the Capital Improvement Fund is not needed to pay the Acquisition Costs of the Bond-Financed Facilities, any balance remaining in the Capital Improvement Fund shall be transferred to ADOC.

(d)    The Capital Improvement Fund is not part of the Trust Estate and is not pledged or available to pay Debt Service on the Series 2022A Bonds.

**SECTION 8.6    Money for Bond Payments to be Held in Trust; Repayment of Unclaimed Money**

(a)    If money is on deposit in the Debt Service Fund on any Bond Payment Date sufficient to pay Debt Service on the Bonds due and payable on such Date, but the Holder of any Bond that matures on such Date or that is subject to redemption on such Date fails to surrender such Bond to the Trustee for payment of Debt Service due and payable on such Date, the Trustee shall segregate and hold in trust for the benefit of the person entitled thereto money sufficient to pay the Debt Service due and payable on such Bond on such Date. Money so segregated and held in trust shall not be a part of the Trust Estate and

shall not be invested, but shall constitute a separate trust fund for the benefit of the persons entitled to such Debt Service.

(b)     Any money held in trust by the Trustee for the payment of Debt Service on any Bond pursuant to this Section and remaining unclaimed for 3 years after such Debt Service has become due and payable shall be paid in accordance with applicable Alabama law relating to unclaimed property.

## ARTICLE 9

### Investment of Indenture Funds

**SECTION 9.1     Investment of Indenture Funds**

(a)     Except as otherwise expressly provided in this Indenture, any money held as part of an Indenture Fund shall be invested or reinvested in Qualified Investments by the Trustee in accordance with the instructions of the Issuer, to the extent that such investment is, in the opinion of the Trustee, feasible and consistent with the purposes for which such Fund was created.  Any investment made with money on deposit in an Indenture Fund shall be held by or under control of the Trustee and shall be deemed at all times a part of the Indenture Fund where such money was on deposit, and the interest and profits realized from such investment shall be credited to such Fund and any loss resulting from such investment shall be charged to such Fund.

(b)     Any investment of money in the Indenture Funds may be made by the Trustee through its own bond department, investment department or other commercial banking department providing investment services.

(c)     The Trustee shall follow the instructions of the Issuer with respect to investments of the Indenture Funds as provided in this Section, but the Trustee shall not be responsible for (1) determining that any such investment complies with the arbitrage limitations imposed by Section 148 of the Internal Revenue Code, or (2) calculating the amount of, or making payment of, any rebate due to the United States under Section 148 of the Internal Revenue Code.

(d)     Any cash balances remaining in an Indenture Fund shall be kept continuously secured by holding on deposit as collateral security therefor Federal Securities having a market value at least equal at all times to the amount to be secured thereby, unless such cash is kept on deposit in U.S. dollar denominated deposit accounts and certificates of deposit with banks or savings associations that are qualified public depositories under Chapter 14A of Title 41 of the Code of Alabama 1975.

**SECTION 9.2     Application of Funds After Indenture Indebtedness Fully Paid**

After all Indenture Indebtedness has been Fully Paid, any money or investments remaining in the Pledged Indenture Funds or otherwise constituting part of the Trust Estate shall be distributed to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

## ARTICLE 10

### Representations and Covenants

**SECTION 10.1     General Representations**

The Issuer makes the following representations and warranties as the basis for the undertakings on its part herein contained:

(a) Under the provisions of the Enabling Law and its certificate of incorporation, it has the power to consummate the transactions contemplated by the Bond Documents to which it is a party.

(b) The Bond Documents to which it is a party constitute legal, valid and binding obligations and are enforceable against it in accordance with the terms of such instruments, except as enforcement thereof may be limited by (1) bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights and (2) general principles of equity, including the exercise of judicial discretion in appropriate cases.

### SECTION 10.2    No Encumbrance on Trust Estate

The Issuer will not create or permit the creation of any pledge, lien, charge or encumbrance of any kind on the Trust Estate or any part thereof prior to or on a parity of lien with this Indenture.

### SECTION 10.3    Payment of Bonds

(a) The Issuer will duly and punctually pay, or cause to be paid, the Debt Service on the Bonds as and when the same shall become due and will duly and punctually deposit, or cause to be deposited, in the Indenture Funds the amounts required to be deposited therein, all in accordance with the terms of the Bonds and this Indenture.

(b) The Issuer will not extend or consent to the extension of the time for payment of Debt Service on the Bonds, unless such extension is consented to by the Holder of the Bond affected.

### SECTION 10.4    Inspection of Records

The Issuer will at any and all times, upon the request of the Trustee, afford and procure a reasonable opportunity for the Trustee by its representatives to inspect any books, records, reports and other papers of the Issuer relating to the performance by the Issuer of its covenants in this Indenture, and the Issuer will furnish to the Trustee any and all information as the Trustee may reasonably request with respect to the performance by the Issuer of its covenants in this Indenture.

### SECTION 10.5    Advances by Trustee

If the Issuer shall fail to perform any of its covenants in this Indenture, the Trustee may, but shall not be required, at any time and from time to time, to make advances to effect performance of any such covenant on behalf of the Issuer.  Any money so advanced by the Trustee shall be repaid upon demand and such advances shall be secured under this Indenture prior to the Bonds.

### SECTION 10.6    Corporate Existence; Merger, Consolidation, Etc.

(a) The Issuer will do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

(b) To the extent permitted by law, the Issuer may consolidate with or merge into any other public corporation or transfer its property substantially as an entirety to another person if:

(1) the public corporation formed by such consolidation or into which the Issuer is merged or the person which acquires by conveyance or transfer the Issuer's property substantially as an entirety (the "Successor") shall execute and deliver to the Trustee an instrument in form recordable and acceptable to the Trustee containing an assumption by such Successor of the due and punctual payment of the Debt Service on the Bonds and the performance and observance of

every covenant and condition of the Bond Documents to be performed or observed by the Issuer; and

(2)     the Issuer shall deliver to the Trustee a Favorable Tax Opinion.

(c)     Upon any consolidation or merger or any conveyance or transfer of the Issuer's property substantially as an entirety in accordance with this Section, the Successor shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer under this Indenture with the same effect as if such Successor had been named as the Issuer herein.

### SECTION 10.7     Compliance with the Tax Certificate and Agreement

The Issuer will comply with the covenants and agreements on its part contained in the Tax Certificate and Agreement.

## ARTICLE 11

### Defaults and Remedies

### SECTION 11.1     Events of Default

Any one or more of the following shall constitute an event of default (an "Indenture Default") under this Indenture (whatever the reason for such event and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     failure to pay (1) the interest on any Bond when such interest becomes due and payable, or (2) the principal of (or premium, if any, on) any Bond when such principal (or premium, if any) becomes due and payable, whether at its stated Maturity, by declaration of acceleration or call for redemption or otherwise; or

(b)     default in the performance, or breach, of any covenant or warranty of the Issuer in this Indenture (other than a covenant or warranty a default in the performance or breach of which is elsewhere in this Section specifically dealt with), and continuance of such default or breach for a period of 30 days after notice of such default or breach, stating that such notice is a "notice of default" hereunder, has been given to the Issuer by the Trustee, or to the Issuer and the Trustee by the Holders of at least 25% in principal amount of the Outstanding Bonds, unless, in the case of a default or breach that cannot be cured by the payment of money, the Issuer initiates efforts to correct such default or breach within 30 days from the receipt of such notice and diligently pursues such action until the default or breach is corrected; or

(c)     the Lease Agreement has been terminated pursuant to Section 4.8 of the Lease Agreement or a Lease Default shall occur and be continuing.

### SECTION 11.2     Remedies

(a)     **Acceleration of Maturity**.  If an Indenture Default exists, then and in every such case, the Trustee or the Holders of not less than 25% in principal amount of the Bonds Outstanding may declare the principal of all the Bonds and the interest accrued thereon to be due and payable immediately, by notice to the Issuer (and to the Trustee, if given by Bondholders), and upon any such declaration such Debt Service shall become immediately due and payable.  At any time after such a declaration of acceleration has been made pursuant to this Section, the Holders of a majority in principal amount of the

Bonds Outstanding may, by notice to the Issuer and the Trustee, rescind and annul such declaration and its consequences if

> (1)     the Issuer has deposited with the Trustee a sum sufficient to pay
>
> > (A)     all overdue installments of interest on all Bonds,
> >
> > (B)     the principal of (and premium, if any, on) any Bonds which have become due otherwise than by such declaration of acceleration and interest thereon at the rate or rates prescribed therefor in such Bonds,
> >
> > (C)     to the extent that payment of such interest is lawful, interest upon overdue installments of interest at the rate or rates prescribed therefor in the Bonds, and
> >
> > (D)     all sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and
>
> (2)     all Indenture Defaults, other than the non-payment of the principal of Bonds which has become due solely by such declaration of acceleration, have been cured or have been waived as provided in Section 11.10.

No such rescission and annulment shall affect any subsequent default or impair any right consequent thereon.

(b)     **Suits at Law or in Equity**.  The Trustee is empowered, (i) to sue on the Bonds, (ii) by mandamus, suit or other proceeding, to enforce all agreements of the Issuer herein contained, (iii) by action or suit in equity, to require the Issuer to account as if it were the trustee of an express trust for the Holders of the Bonds, and (iv) by action or suit in equity, to enjoin any action or things which may be unlawful or a violation of the rights of the Holders of the Bonds.

(c)     **Rights and Remedies Cumulative**.  No right or remedy herein conferred upon or reserved to the Trustee or to the Bondholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

(d)     **Remedies Subject to Applicable Law**.  All rights, remedies and powers provided by this Article may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law in the premises, and all the provisions of this Article are intended to be subject to all applicable mandatory provisions of law which may be controlling in the premises and to be limited to the extent necessary so that they will not render this Indenture invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law.

### SECTION 11.3     Application of Money Collected

Any money collected by the Trustee pursuant to this Article and any other sums then held by the Trustee as part of the Trust Estate, shall be applied in the following order, at the date or dates fixed by the Trustee and, in case of the distribution of such money on account of principal (or premium, if any) or interest, upon presentation of the Bonds and the notation thereon of the payment if only partially paid and upon surrender thereof if fully paid:

(a)     **First**:  To the payment of all undeducted amounts due the Trustee under Section 12.7;

(b)     **Second**:  To the payment of the whole amount then due and unpaid upon the Outstanding Bonds for principal (and premium, if any) and interest, in respect of which or for the benefit of which such money has been collected, with interest (to the extent that such interest has been collected by the Trustee or a sum sufficient therefor has been so collected and payment thereof is legally enforceable at the respective rate or rates prescribed therefor in the Bonds) on overdue principal (and premium, if any) and on overdue installments of interest; and in case such proceeds shall be insufficient to pay in full the whole amount so due and unpaid upon such Bonds, then to the payment of such principal (and premium, if any) and interest, without any preference or priority, ratably according to the aggregate amount so due; provided, however, that payments with respect to Obligor Bonds shall be made only after all other Bonds have been Fully Paid; and

(c)     **Third**:  To the payment of the remainder, if any, to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

### SECTION 11.4    Trustee May Enforce Claims without Possession of Bonds

All rights of action and claims under this Indenture or the Bonds may be prosecuted and enforced by the Trustee without the possession of any of the Bonds or the production thereof in any proceeding relating thereto, and any such proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust.  Any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Holders of the Bonds in respect of which such judgment has been recovered.

### SECTION 11.5    Limitation on Suits

No Holder of any Bond shall have any right to institute any proceeding, judicial or otherwise, under or with respect to this Indenture, or for the appointment of a receiver or trustee or for any other remedy hereunder, unless

(a)     such Holder has previously given notice to the Trustee of a continuing Indenture Default;

(b)     the Holders of not less than 25% in principal amount of the Outstanding Bonds shall have made request to the Trustee to institute proceedings in respect of such Indenture Default in its own name as Trustee hereunder;

(c)     such Holder or Holders have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)     the Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(e)     no direction inconsistent with such request has been given to the Trustee during such 60-day period by the Holders of a majority in principal amount of the Outstanding Bonds;

it being understood and intended that no one or more Holders of Bonds shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the lien of this Indenture or the rights of any other Holders of Bonds, or to obtain or to seek to

obtain priority or preference over any other Holders or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all Outstanding Bonds.

### SECTION 11.6 Unconditional Right of Bondholders to Receive Principal, Premium and Interest

Notwithstanding any other provision in this Indenture, the Holder of any Bond shall have the right which is absolute and unconditional to receive payment of the principal of (and premium, if any) and interest on such Bond on the Maturity date expressed in such Bond (or, in the case of redemption, on the redemption date) and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

### SECTION 11.7 Restoration of Positions

If the Trustee or any Bondholder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason or has been determined adversely to the Trustee or to such Bondholder, then and in every such case the Issuer, the Trustee and the Bondholders shall, subject to any determination in such proceeding, be restored to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Bondholders shall continue as though no such proceeding had been instituted.

### SECTION 11.8 Delay or Omission Not Waiver

No delay or omission of the Trustee or of any Holder of any Bond to exercise any right or remedy accruing upon an Indenture Default shall impair any such right or remedy or constitute a waiver of any such Indenture Default or an acquiescence therein. Every right and remedy given by this Article or by law to the Trustee or to the Bondholders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Bondholders, as the case may be.

### SECTION 11.9 Control by Bondholders

The Holders of a majority in principal amount of the Outstanding Bonds shall have the right, during the continuance of an Indenture Default,

(a) to require the Trustee to proceed to enforce this Indenture, either by judicial proceedings for the enforcement of the payment of the Bonds or otherwise, and

(b) to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee hereunder, provided that

(1) such direction shall not be in conflict with any rule of law or this Indenture,

(2) the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction, and

(3) the Trustee shall not determine that the action so directed would be unjustly prejudicial to the Holders not taking part in such direction.

### SECTION 11.10  Waiver of Past Defaults

(a)      Before any judgment or decree for payment of money due has been obtained by the Trustee, the Holders of not less than a majority in principal amount of the Outstanding Bonds may, by notice to the Trustee and the Issuer, on behalf of the Holders of all the Bonds waive any past default hereunder or under any other Bond Document and its consequences, except a default

      (1)      in the payment of Debt Service on any Bond, or

      (2)      in respect of a covenant or provision hereof which under Article 13 cannot be modified or amended without the consent of the Holder of each Outstanding Bond affected.

(b)      Upon any such waiver, such default shall cease to exist, and any Indenture Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

### SECTION 11.11  Suits to Protect the Trust Estate

The Trustee shall have power to institute and to maintain such proceedings as it may deem expedient to prevent any impairment of the Trust Estate by any acts which may be unlawful or in violation of this Indenture and to protect its interests and the interests of the Bondholders in the Trust Estate and in the rents, issues, profits, revenues and other income arising therefrom, including power to institute and maintain proceedings to restrain the enforcement of or compliance with any governmental enactment, rule or order that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with such enactment, rule or order would impair the security hereunder or be prejudicial to the interests of the Bondholders or the Trustee.

## ARTICLE 12

## The Trustee

### SECTION 12.1    Certain Duties and Responsibilities of Trustee

(a)      Except during the continuance of an Indenture Default,

      (1)      the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

      (2)      in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture.

(b)      If an Indenture Default exists, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

(c)      No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that

(1)     this subsection shall not be construed to limit the effect of Section 12.1(a);

(2)     the Trustee shall not be liable for any error of judgment made in good faith, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(3)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(4)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it; and

(5)     the Trustee shall have no obligation to file financing statements.

(d)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section.

### SECTION 12.2   Notice of Defaults

(a)     If a notice event described in Section 12.2(b) exists, the Trustee shall notify Bondholders of such event within 30 days after the Trustee becomes aware of its existence; provided, however, that the Trustee shall be protected in withholding such notice if (1) the notice event has been cured or waived or otherwise ceases to exist before such notice is given; or (2) the Trustee determines in good faith that the withholding of such notice is in the interest of Bondholders.

(b)     For purposes of this Section the following shall constitute "notice events":

(1)     the occurrence of an Indenture Default; and

(2)     any event which is, or after notice or lapse of time or both would become, an Indenture Default.

### SECTION 12.3   Certain Rights of Trustee

Except as otherwise provided in Section 12.1:

(a)     the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, coupon or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)     any request or direction of the Issuer mentioned herein shall be sufficiently evidenced by a certificate or order executed by an Authorized Issuer Representative;

(c)     whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the

absence of bad faith on its part, rely upon a certificate executed by an Authorized Issuer Representative;

(d)     the Trustee may consult with counsel and the written advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by the Trustee hereunder in good faith and in reliance thereon;

(e)     the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Bondholders pursuant to this Indenture, unless such Bondholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction;

(f)     the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, coupon or other paper or document but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books and records of the Issuer, personally or by agent or attorney; and

(g)     the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

### SECTION 12.4     Not Responsible for Recitals

The recitals contained herein and in the Bonds, except the certificate of authentication on the Bonds, shall be taken as the statements of the Issuer, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representations as to the value or condition of the Trust Estate or any part thereof, or as to the title of the Issuer thereto or as to the security afforded thereby or hereby, or as to the validity or sufficiency of this Indenture or of the Bonds.

### SECTION 12.5     May Hold Bonds

The Trustee in its individual or any other capacity, may become the owner or pledgee of Bonds and may otherwise deal with the Issuer with the same rights it would have if it were not Trustee.

### SECTION 12.6     Money Held in Trust

Money held by the Trustee in trust hereunder need not be segregated from other funds except to the extent expressly provided in this Indenture or required by law.  The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise provided in Article 9.

### SECTION 12.7     Compensation and Reimbursement

(a)     The Issuer agrees

(1)     to pay to the Trustee from time to time reasonable compensation for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust); and

(2)     except as otherwise expressly provided herein, to reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable compensation and the expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to the Trustee's negligence or bad faith.

(b)     As security for the performance of the obligations of the Issuer under this Section the Trustee shall be secured under this Indenture by a lien prior to the Bonds, and for the payment of such compensation, expenses, reimbursements and indemnity the Trustee shall have the right to use and apply any money held by it as a part of the Trust Estate.

## SECTION 12.8    Corporate Trustee Required; Eligibility

There shall at all times be a Trustee hereunder which shall (1) be a commercial bank or trust company organized and doing business under the laws of the United States of America or of any state and having capital and surplus of not less than $50,000,000, (2) be authorized under such laws to exercise corporate trust powers, and (3) be subject to supervision or examination by federal or state authority.

## SECTION 12.9    Resignation and Removal; Appointment of Successor

(a)     No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Trustee under Section 12.10.

(b)     The Trustee may resign at any time by giving notice thereof to the Issuer.  If an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)     The Trustee may be removed at any time by the Holders of a majority in principal amount of the Outstanding Bonds by notice delivered to the Trustee and the Issuer.  If no Indenture Default exists, the Trustee may be removed at any time by the Issuer by notice delivered to the Trustee.

(d)     If at any time:

(1)     the Trustee shall cease to be eligible under Section 12.8 and shall fail to resign after request therefor by the Issuer or by any Bondholder who has been a bona fide Holder of a Bond for at least 6 months, or

(2)     the Trustee shall become incapable of acting or shall be adjudged a bankrupt or insolvent or a receiver of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case, (A) the Issuer by a resolution of its governing body may remove the Trustee, or (B) any Bondholder who has been a bona fide Holder of a Bond for at least 6 months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Trustee for any cause, a successor Trustee shall be appointed by the Issuer.  In case all or substantially all of the Trust Estate shall be in the possession of a receiver or trustee lawfully

appointed, such receiver or trustee may similarly appoint a successor to fill such vacancy until a new Trustee shall be so appointed by the Bondholders. If, within 1 year after such resignation, removal or incapability or the occurrence of such vacancy, a successor Trustee shall be appointed by the Holders of a majority in principal amount of the Outstanding Bonds, the successor Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Trustee and supersede the successor Trustee appointed by the Issuer or by such receiver or trustee. If no successor Trustee shall have been so appointed by the Issuer or the Bondholders and accepted appointment in the manner hereinafter provided, any Bondholder who has been a bona fide Holder of a Bond for at least 6 months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)     The Issuer shall give notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing notice of such event by first-class mail, postage prepaid, to the Holders of Bonds as their names and addresses appear in the Bond Register. Each notice shall include the name of the successor Trustee and the address of the Office of the Trustee.

### SECTION 12.10  Acceptance of Appointment by Successor

(a)     Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Issuer and to the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the estates, properties, rights, powers, trusts and duties of the retiring Trustee; but, on request of the Issuer or the successor Trustee, such retiring Trustee shall, upon payment of its charges, execute and deliver an instrument conveying and transferring to such successor Trustee upon the trusts herein expressed all the estates, properties, rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder, subject nevertheless to its lien, if any, provided for in Section 12.7. Upon request of any such successor Trustee, the Issuer shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such estates, properties, rights, powers and trusts.

(b)     No successor Trustee shall accept its appointment unless at the time of such acceptance such successor Trustee shall be qualified and eligible under this Article, to the extent operative.

### SECTION 12.11  Merger, Conversion, Consolidation or Succession to Business

Any corporation into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such corporation shall be otherwise qualified and eligible under this Article, to the extent operative, without the execution or filing of any paper or any further act on the part of any of the parties hereto. In case any Bonds shall have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Bonds so authenticated with the same effect as if such successor Trustee had itself authenticated such Bonds.

# ARTICLE 13

## Amendment of Bond Documents

### SECTION 13.1    General Requirements for Amendments

The Trustee may, on behalf of the Bondholders, from time to time enter into, or consent to, an amendment of any Bond Document only as permitted by this Article.

### SECTION 13.2    Amendments Without Consent of Bondholders

An amendment of the Bond Documents for any of the following purposes may be made, or consented to, by the Trustee without the consent of the Holders of any Bonds:

(a)    to correct or amplify the description of any property at any time subject to the lien of any Bond Document, or better to assure, convey and confirm unto any secured party any property subject or required to be subjected to the lien of any Bond Document, or to subject to the lien of any Bond Document, additional property; or

(b)    to evidence the succession of another person to any Financing Participant and the assumption by any such successor of the covenants of such Financing Participant (provided that the requirements of the related Bond Document for such succession and assumption are otherwise satisfied); or

(c)    to add to the covenants of any Financing Participant for the benefit of Bondholders and to make the occurrence, or the occurrence and continuance, of a default in any of such additional covenants an event of default under the specified Bond Documents permitting the enforcement of all or any of the several remedies provided therein; provided, however, that with respect to any such covenant, such amendment may provide for a particular period of grace after default (which period may be shorter or longer than that allowed in the case of other defaults) or may provide for an immediate enforcement upon such default or may limit the remedies available upon such default; or

(d)    to surrender any right or power conferred upon any Financing Participant other than rights or powers for the benefit of Bondholders; or

(e)    to cure any ambiguity or to correct any inconsistency, provided such action shall not adversely affect the interests of the Holders of the Bonds; or

(f)    to appoint a separate agent of the Issuer or the Trustee to perform any one or more of the following functions:  (1) registration of transfers and exchanges of Bonds, or (2) payment of Debt Service on the Bonds; provided, however, that any such agent must be a bank or trust company with long-term obligations, at the time such appointment is made, in one of the three highest rating categories of at least one Rating Agency; or

(g)    to conform the text of any Bond Document to any description or summary of such Bond Document in any official statement or other offering document with respect to the Bonds to the extent that such description or summary was intended to be a verbatim recitation of a provision of a Bond Document.

### SECTION 13.3    Amendments Requiring Consent of All Affected Bondholders

An amendment of the Bond Documents for any of the following purposes may be entered into, or consented to, by the Trustee only with the consent of the Holder of each Bond affected:

        (a)      to change the stated Maturity of the principal of, or any installment of interest on, any Bond, or reduce the principal amount thereof or the interest thereon or any premium payable upon the redemption thereof, or change the coin or currency in which, any Bond, or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated  Maturity thereof (or, in the case of redemption, on or after the redemption date); or

        (b)      to reduce the percentage in principal amount of the Outstanding Bonds, the consent of whose Holders is required for any amendment of the Bond Documents, or the consent of whose Holders is required for any waiver provided for in the Bond Documents; or

        (c)      to modify or alter the provisions of the proviso to the definition of the term "Outstanding"; or

        (d)      to modify any of the provisions of this Section or Section 11.10, except to increase any percentage provided thereby or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Bond affected thereby; or

        (e)      to permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any of the Trust Estate or terminate the lien of this Indenture on any property at any time subject hereto or deprive the Holder of any Bond of the security afforded by the lien of this Indenture; or

        (f)      to eliminate, reduce or delay the obligation of ADOC to make Lease Payments at times and in amounts sufficient to pay Debt Service on the Bonds.

### SECTION 13.4    Amendments Requiring Majority Consent of Bondholders

An amendment of the Bond Documents for any purpose not described in Sections 13.2 or 13.3 may be entered into, or consented to, by the Trustee only with the consent of the Holders of a majority in principal amount of Bonds Outstanding.

### SECTION 13.5    Discretion of Trustee

The Trustee may in its discretion determine whether or not any Bonds would be affected by any amendment of the Bond Documents and any such determination shall be conclusive upon the Holders of all Bonds, whether theretofore or thereafter authenticated and delivered hereunder.  The Trustee shall not be liable for any such determination made in good faith.

### SECTION 13.6    Trustee Protected by Opinion of Counsel

In executing or consenting to any amendment permitted by this Article, the Trustee shall be entitled to receive, and, subject to Section 12.1, shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Indenture.

**SECTION 13.7  Amendments Affecting Trustee's Personal Rights**

The Trustee may, but shall not be obligated to, enter into any amendment that affects the Trustee's own rights, duties or immunities under the Bond Documents.

**SECTION 13.8  Effect on Bondholders**

Upon the execution of any amendment under this Article, every Holder of Bonds theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

**SECTION 13.9  Reference in Bonds to Amendments**

Bonds authenticated and delivered after the execution of any amendment under this Article shall, if required by such amendment or by the Trustee, bear a notation in form approved by the Trustee as to any matter provided for in such amendment.  New Bonds so modified as to conform to any such amendment shall, if required by such amendment or by the Trustee, be prepared and executed by the Issuer and authenticated and delivered by the Trustee in exchange for Outstanding Bonds.

**SECTION 13.10  Amendments Not to Affect Tax Exemption**

No amendment may be made to the Bond Documents unless the Trustee receives a Favorable Tax Opinion.

**SECTION 13.11  Rights of Underwriters to Consent to Indenture Amendments**

Underwriters of any Additional Bonds issued after the issuance of the Series 2022A Bonds may, on behalf of all Holders of any Additional Bonds issued after the issuance of the Series 2022A Bonds (and without notice to or consent of the Holders of any Additional Bonds issued after the issuance of the Series 2022A Bonds), consent to any amendment of this Indenture other than an amendment to this Indenture that requires the consent of all Holders of Bonds issued under this Indenture.

# ARTICLE 14

## Defeasance

**SECTION 14.1  Payment of Indenture Indebtedness; Satisfaction and Discharge of Indenture**

(a)      Whenever all Indenture Indebtedness has been Fully Paid, then (1) this Indenture and the lien, rights and interests created hereby shall cease, determine and become null and void (except as to any surviving rights of transfer or exchange of Bonds herein or therein provided for), and (2) the Trustee shall, upon the request of the Issuer, execute and deliver a termination statement and such instruments of satisfaction and discharge as may be necessary and pay, assign, transfer and deliver to the Issuer or upon the order of the Issuer, all cash and securities then held by it hereunder as a part of the Trust Estate.

(b)      A Bond shall be deemed "Fully Paid" if

(1)      such Bond has been cancelled by the Trustee or delivered to the Trustee for cancellation, or

(2)      such Bond shall have matured or been called for redemption and, on such Maturity date or redemption date, money for the payment of Debt Service on such Bond is held by the Trustee in trust for the benefit of the person entitled thereto, or

(3)     such Bond is alleged to have been destroyed, lost or stolen and has been replaced as provided in Section 4.2, or

(4)     a trust for the payment of such Bond has been established in accordance with Section 14.2.

(c)     Indenture Indebtedness other than Debt Service on the Bonds shall be deemed "Fully Paid" whenever the Issuer has paid, or made provisions satisfactory to the Trustee for payment of, all such Indenture Indebtedness.

### SECTION 14.2     Trust for Payment of Debt Service

(a)     The Issuer may provide for the payment of any Bond by establishing a trust for such purpose with the Trustee and depositing therein cash and/or Federal Securities which (assuming the due and punctual payment of the principal of and interest on such Federal Securities, but without reinvestment) will provide funds sufficient to pay the Debt Service on such Bond as the same becomes due and payable until the Maturity or redemption of such Bond; provided, however, that:

(1)     Such Federal Securities must not be subject to redemption prior to their respective maturities at the option of the issuer of such Securities.

(2)     If such Bond is to be redeemed prior to its Maturity, either (A) the Trustee shall receive evidence that notice of such redemption has been given in accordance with the provisions of this Indenture and such Bond or (B) the Issuer shall confer on the Trustee irrevocable authority for the giving of such notice on behalf of the Issuer.

(3)     If the interest rate on such Bond is not fixed until the Maturity or redemption date of such Bond, such trust must provide for the payment of interest on such Bond at the maximum rate permitted by this Indenture for any period when interest is not fixed.

(4)     Prior to the establishment of such trust the Trustee must receive a Favorable Tax Opinion.

(5)     Prior to the establishment of such trust the Trustee must receive verification satisfactory to the Trustee demonstrating that the principal and interest payments on the Federal Securities in such trust, without reinvestment, together with the cash balance in such trust remaining after purchase of such Securities, will be sufficient to make the required payments from such trust.

(b)     Any trust established pursuant to this Section may provide for payment of less than all Bonds outstanding or less than all Bonds of any remaining series or Maturity.

(c)     If any trust provides for payment of less than all Bonds of a series and Maturity, the Bonds of such series and Maturity to be paid from the trust shall be selected by the Trustee by lot by such method as shall provide for the selection of portions (in Authorized Denominations) of the principal of Bonds of such series and Maturity of a denomination larger than the smallest Authorized Denomination. Such selection shall be made within 7 days after such trust is established.  This selection process shall be in lieu of the selection process otherwise provided with respect to redemption of Bonds.  After such selection is made, Bonds that are to be paid from such trust (including Bonds issued in exchange for such Bonds pursuant to the transfer or exchange provisions of this Indenture) shall be identified by a separate CUSIP number or other designation satisfactory to the Trustee.  The Trustee shall notify Holders whose Bonds (or portions thereof) have been selected for payment from such trust and shall direct such

Bondholders to surrender their Bonds to the Trustee in exchange for Bonds with the appropriate designation. The selection of Bonds for payment from such trust pursuant to this Section shall be conclusive and binding on the Financing Participants.

(d)     Cash and/or Federal Securities deposited with the Trustee pursuant to this Section shall not be a part of the Trust Estate but shall constitute a separate, irrevocable trust fund for the benefit of the Holder of the Bond to be paid from such fund.


# ARTICLE 15

## ADOC and
## the Lease Agreement

### SECTION 15.1     Right to Exercise Rights and Options With Respect to Terms of the Bonds

The Issuer may exercise all such rights and options with respect to the Bonds without notice to or consent of ADOC.

### SECTION 15.2     Performance by Issuer Under Lease Agreement

The Issuer will perform and observe all covenants required to be performed and observed by it under the Lease Agreement.

### SECTION 15.3     Rights of ADOC With Respect to Defaults by Issuer

Without relieving the Issuer from the responsibility for performance and observance of the agreements and covenants required to be performed and observed by it hereunder, ADOC, on behalf of the Issuer, may perform any such covenant or agreement.

### SECTION 15.4     Remedies Under Lease Agreement

(a)     The Trustee shall have the right, in its own name or on behalf of the Issuer, to declare any default and exercise any remedies under the Lease Agreement.

(b)     Any money collected by the Trustee pursuant to the exercise of any remedies under the Lease Agreement shall be applied as provided in Article 11.

### SECTION 15.5     Amendment of Bond Documents

If no Lease Default exists, no amendment may be made to the Bond Documents without the consent of ADOC.

### SECTION 15.6     Benefits of Indenture for ADOC

This Indenture shall also be for the benefit of ADOC to the extent provided herein.

# ARTICLE 16

## Miscellaneous

### SECTION 16.1    Notices

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other document provided or permitted by this Indenture to be made upon, given or furnished to, or filed with, any of the Financing Participants must (except as otherwise expressly provided in this Indenture) be in writing and be delivered by one of the following methods:  (1) by personal delivery, (2) by first-class, registered or certified mail, or (3) by facsimile transmission.  Any specific reference in this instrument to "written notice" shall not be construed to mean that any other notice may be oral, unless oral notice is specifically permitted by this instrument under the circumstances.  If this instrument permits any oral notice to the Trustee, such notice must be delivered or given to a corporate trust officer to be effective.  The hand delivery address, mailing address and (if applicable) facsimile transmission number for receipt of notice or other documents by such parties are set forth in ***Exhibit 16.1(a)***.  Any of such parties may change the address or number for receiving any such notice or other document by giving notice of the change to the other parties named in this Section.

(b)    Any notice or other document shall be deemed delivered when actually received by the party to whom directed at the address or number specified pursuant to this Section, or, if sent by mail, 3 days after such notice or document is deposited in the United States mail, addressed as provided above.

### SECTION 16.2    Notices to Bondholders; Waiver

(a)    Where this Indenture provides for giving of notice to Bondholders of any event, such notice must (unless otherwise herein expressly provided) be in writing and mailed, first-class postage prepaid, to such Bondholder at the address of such Bondholder as it appears in the Bond Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice.

(b)    In any case where notice to Bondholders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Bondholder shall affect the sufficiency of such notice with respect to other Bondholders.  Where this Indenture provides for notice in any manner, such notice may be waived in writing by the person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Bondholders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

### SECTION 16.3    Successors and Assigns

All covenants and agreements in this Indenture by the Issuer shall bind its successors and assigns, whether so expressed or not.

### SECTION 16.4    Benefits of Indenture

Nothing in this Indenture or in the Bonds, express or implied, shall give to any person, other than the parties hereto and their successors hereunder and the Holders of the Outstanding Bonds any benefit or any legal or equitable right, remedy or claim under this Indenture.

**IN WITNESS WHEREOF**, the Issuer and the Trustee have caused this instrument to be duly executed, and, if applicable, their respective corporate seals to be hereunto affixed and attested.

**ALABAMA CORRECTIONS INSTITUTION FINANCE AUTHORITY**

By:_____

Title:_____

[S E A L]

Attest:

By:_____

Title:_____

**REGIONS BANK**

By:_____

Title:_____

[S E A L]

Attest:

By:_____

Title:_____

This instrument was prepared by:
[Insert address]

**STATE OF ALABAMA**

_____ **COUNTY**

I, _____, a Notary Public in and for said County in said State, do hereby certify that _____, whose name as _____ of Alabama Corrections Institution Finance Authority, an Alabama public corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand this the _____ day of _____, 2022.


_____
Notary Public

NOTARIAL SEAL

My commission expires: _____

**STATE OF ALABAMA**

_____ **COUNTY**

I, _____, a Notary Public in and for said County, in said State, hereby certify that _____, whose name as _____ of Regions Bank, an Alabama banking corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said banking corporation.

Given under my hand this the _____ day of _____, 2022.


_____
Notary Public

NOTARIAL SEAL

My commission expires:_____

**EXHIBIT 3.1(b)**

**Description of Bond-Financed Facilities**


The Bond-Financed Facilities include the following components:

**A.**     <u>**Elmore Men's Prison Facility**</u>

1.     **Real Property**.  The following real property located in Elmore County, Alabama:

*[Insert description.]*

2.     **Buildings and Structures**.  The following buildings and structures to be constructed, altered or improved on the real property described above:

*[Insert description.]*

3.     **Personal Property and Fixtures**.  The following personal property and fixtures to be acquired and installed on the real property described above:

*[Insert description.]*


**B.**     <u>**Escambia Men's Prison Facility**</u>

1.     **Real Property**.  The following real property located in Escambia County, Alabama:

*[Insert description.]*

2.     **Buildings and Structures**.  The following buildings and structures to be constructed, altered or improved on the real property described above:

*[Insert description.]*

3.     **Personal Property and Fixtures**.  The following personal property and fixtures to be acquired and installed on the real property described above:

*[Insert description.]*

Exhibit 3.1(b), Page 1 of 1

<div align="center">

**EXHIBIT 6.1(c)**

**Form of Series 2022A Bonds**

</div>

**NOTICE:  Unless this bond is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC"), to Alabama Corrections Institution Finance Authority or its agent for registration of transfer, exchange, or payment, and any bond issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.**

<div align="center">

**Alabama Corrections Institution Finance Authority**

**Revenue Bonds, Series 2022A**

</div>

**No. _____**                                                                              **$_____**

**Maturity Date: _____**          **Interest Rate: _____%**          **CUSIP: _____**


      **ALABAMA CORRECTIONS INSTITUTION FINANCE AUTHORITY**, an Alabama public corporation (the "Issuer", which term includes any successor corporation under the Indenture hereinafter referred to), for value received, hereby promises to pay to

<div align="center">

_____,

</div>

or registered assigns, the principal sum of

<div align="center">

_____

**AND NO/100 DOLLARS**

**($_____)**

</div>

on the Maturity Date specified above and to pay interest hereon from the date hereof, or the most recent date to which interest has been paid or duly provided for, until the principal hereof shall become due and payable, at the applicable per annum rate of interest specified above.  Interest shall be payable on January 1 and July 1 in each year, beginning _____ 1, _____, and shall be computed on the basis of a 360-day year with 12 months of 30 days each.

      The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in the Indenture hereinafter referred to, be paid to the person in whose name this bond is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day (whether or not a Business Day) of the month next preceding such Interest Payment Date.  Any such interest not so punctually paid or duly provided for shall forthwith cease to be payable to the registered Holder on such Regular Record Date, and shall be paid to the person in whose name this bond is registered at the close of business on a Special Record Date for the payment of such defaulted interest to be fixed by the Trustee, notice of such Special Record Date being given to Holders of the Bonds not less than 10 days prior to such Special Record Date.

      Interest shall be payable on overdue principal (and premium, if any) on this bond and (to the extent legally enforceable) on any overdue installment of interest on this bond at the rate borne by this bond.

<div align="center">

Exhibit 6.1(c), Page 1 of 5

</div>

Payment of Debt Service on this bond shall be made by the applicable method specified in the Indenture. All such payments shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for the payment of public and private debts.

This bond is one of a duly authorized issue of bonds of the Issuer, aggregating [Amount] in principal amount, designated "Revenue Bonds, Series 2022A" (the "Series 2022A Bonds") and issued under and pursuant to a Trust Indenture dated [Date] (the "Indenture"), between the Issuer and Regions Bank, an Alabama banking corporation (the "Trustee", which term includes any successor trustee under the Indenture). The Series 2022A Bonds and all other bonds issued pursuant to the Indenture are collectively referred to as the "Bonds". Capitalized terms not otherwise defined herein shall have the meaning assigned in the Indenture.

The Series 2022A Bonds are being issued to provide financing for the benefit of the State of Alabama, acting by and through the Alabama Department of Corrections (the "ADOC"). The Bond-Financed Facilities financed with proceeds of the Series 2022A Bonds have been leased to ADOC pursuant to a Lease Agreement dated [Date] (the "Lease Agreement").

Pursuant to the Indenture the Issuer has granted to the Trustee a non-forecloseable mortgage lien on the Bond-Financed Facilities as security for the payment of the Bonds.

**The Bonds and all other payment obligations under the Indenture are limited obligations of the Issuer payable solely out of certain payments by ADOC pursuant to the Lease Agreement.**

**The Series 2022A Bonds do not constitute or give rise to an indebtedness or a pecuniary liability of, and do not constitute a charge against the general credit or taxing powers of, the State of Alabama.**

Copies of the Bond Documents are on file at the Office of the Trustee, and reference is hereby made to such instruments for a description of the properties pledged and assigned, the nature and extent of the security, the respective rights thereunder of the Holders of the Bonds and the Financing Participants, and the terms upon which the Series 2022A Bonds are, and are to be, authenticated and delivered.

In the manner and with the effect provided in the Indenture, the Series 2022A Bonds will be subject to redemption prior to Maturity as follows:

*[Insert redemption provisions*
*from Section 6.1(j)]*

If less than all Series 2022A Bonds Outstanding are to be redeemed pursuant to the applicable optional redemption provisions, the principal amount of Series 2022A Bonds of each Maturity to be redeemed may be specified by the Issuer by written notice to the Trustee, or, in the absence of timely receipt by the Trustee of such notice, shall be selected by the Trustee by lot or by such other method as the Trustee shall deem fair and appropriate; provided, however, that the principal amount of Series 2022A Bonds of each Maturity to be redeemed must be in an Authorized Denomination.

If less than all Series 2022A Bonds with the same Maturity are to be redeemed, the particular Series 2022A Bonds of such Maturity to be redeemed shall be selected by the Trustee by lot or by such other method as the Trustee shall deem fair and appropriate and which may provide for the selection for redemption of portions (in Authorized Denominations) of the principal of Series 2022A Bonds of such Maturity of a denomination larger than the smallest Authorized Denomination.

Exhibit 6.1(c), Page 2 of 5

Upon any partial redemption of any Series 2022A Bond the same shall, except as otherwise permitted by the Indenture, be surrendered in exchange for one or more new Series 2022A Bonds of the same series and Maturity and in authorized form for the unredeemed portion of principal. Series 2022A Bonds (or portions thereof as aforesaid) for whose redemption and payment provision is made in accordance with the Indenture shall thereupon cease to be entitled to the lien of the Indenture and shall cease to bear interest from and after the date fixed for redemption.

Any redemption shall be made upon at least 30 days' notice in the manner and upon the terms and conditions provided in the Indenture.

If an "Indenture Default", as defined in the Indenture, shall occur, the principal of all Bonds then Outstanding may become or be declared due and payable in the manner and with the effect provided in the Indenture.

The Indenture permits the amendment of the Bond Documents and waivers of past defaults under such instruments and the consequences of such defaults, in certain circumstances without consent of Bondholders and in other circumstances with the consent of all Bondholders or a specified percentage of Bondholders. Any such consent or waiver by the Holder of this bond shall be conclusive and binding upon such Holder and upon all future Holders of this bond and of any bond issued in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this bond.

The Holder of this bond shall have no right to enforce the provisions of the Indenture, or to institute any action to enforce the covenants therein, or to take any action with respect to any default thereunder, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Indenture.

As provided in the Indenture and subject to certain limitations therein set forth, this bond is transferable on the Bond Register maintained at the Office of the Trustee, upon surrender of this bond for transfer at such office, together with all necessary endorsements for transfer, and thereupon one or more new Series 2022A Bonds of the same series and Maturity, of any Authorized Denominations and for a like aggregate principal amount, will be issued to the designated transferee or transferees.

As provided in the Indenture and subject to certain limitations therein set forth, the Series 2022A Bonds are exchangeable for other Series 2022A Bonds of the same series and Maturity, of any Authorized Denominations and of a like aggregate principal amount, as requested by the Holder surrendering the same.

No service charge shall be made for any transfer or exchange hereinbefore referred to, but the Issuer may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Issuer and the Trustee may treat the person in whose name this bond is registered as the owner hereof for the purpose of receiving payment as herein provided and for all other purposes, whether or not this bond is overdue, and neither the Issuer nor the Trustee shall be affected by notice to the contrary.

No covenant or agreement contained in this bond or the Indenture shall be deemed to be a covenant or agreement of any officer, agent or employee of the Issuer, and neither any member of the governing body of the Issuer nor any officer executing this bond shall be liable personally on this bond or be subject to any personal liability or accountability by reason of the issuance of this bond.

Exhibit 6.1(c), Page 3 of 5

It is hereby certified, recited and declared that all acts, conditions and things required to exist, happen and be performed precedent to and in the execution and delivery of the Indenture and issuance of this bond do exist, have happened and have been performed in due time, form and manner as required by law.

Unless the certificate of authentication hereon has been executed by the Trustee by manual signature, this bond shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Issuer has caused this bond to be duly executed under its corporate seal.

Dated: [Date].

<div align="right">

**ALABAMA CORRECTIONS INSTITUTION FINANCE AUTHORITY**

By:_____
[Title]

</div>

[SEAL]

Attest:

_____
Secretary

<div align="center">

**Certificate of Authentication**

</div>

This is one of the Series 2022A Bonds referred to in the within-mentioned Indenture.

Date of authentication:_____

<div align="right">

**REGIONS BANK**, as Trustee

By_____
Authorized Officer

</div>

<div align="center">

**Assignment**

</div>

For value received, _____ hereby sell(s), assign(s) and transfer(s) unto [Please insert name and taxpayer identification number] _____ this bond and hereby irrevocably constitute(s) and appoint(s) _____ attorney to transfer this bond on the books of the within named Issuer at the office of the within named Trustee, with full power of substitution in the premises.

Exhibit 6.1(c), Page 4 of 5

Dated: _____

_____

**NOTE**: The name signed to this assignment must correspond with the name of the payee written on the face of the within bond in all respects, without alteration, enlargement or change whatsoever.

Signature Guaranteed:

_____
      (Bank or Trust Company)

By_____
      (Authorized Officer)

*Signature(s) must be guaranteed by an eligible guarantor institution which is a member of the recognized signature guarantee program, i.e., Securities Transfer Agents Medallion Program (STAMP), Stock Exchanges Medallion Program (SEMP), or New York Stock Exchange Medallion Signature Program (MSP).

Exhibit 6.1(c), Page 5 of 5

**EXHIBIT 6.2(a)**

**Letter of Representations**


A Blanket Letter of Representations is on file with The Depository Trust Company.

Exhibit 6.2(a), Page 1 of 1

**EXHIBIT 8.2(b)**

**Acquisition Fund/Costs of Issuance Fund Requisition**

To:     Regions Bank, as trustee under
        the Indenture referred to below                    No. _____

Re:     [Amount] Revenue Bonds, Series 2022A, issued by Alabama Corrections Institution Finance
        Authority pursuant to a Trust Indenture dated [Date] (the "Indenture")

        Capitalized terms not otherwise defined herein shall have the meanings assigned in the Indenture.

**Request for Payment by the Issuer**

The Issuer hereby requests payment from

                [   ]      the Acquisition Fund, or

                [   ]      the Costs of Issuance Fund

                        of $_____

                                to

Name of payee:_____

Address of payee:_____

_____

        Such payment will be made for the following purpose(s):

_____

_____

_____

                (Describe purpose in reasonable detail.)

        The Issuer hereby certifies that:  (a) such payment is for (in the case of payments from the
Acquisition Fund) Acquisition Costs or (in the case of payments from the Costs of Issuance Fund) Costs
of Issuance, (b) no Indenture Default exists, and (c) such payment will not cause or result in the violation
of any covenant contained in the Tax Certificate and Agreement.

        Dated:  _____.

                                **ALABAMA    CORRECTIONS    INSTITUTION
                                FINANCE AUTHORITY**

                                By:_____
                                        Authorized Issuer Representative

Exhibit 8.2(b), Page 1 of 2

## Approval by Alabama Department of Corrections

Alabama Department of Corrections hereby approves the foregoing requisition.

Dated: _____.

<div align="right">

**ALABAMA DEPARTMENT OF CORRECTIONS**

By: _____
Authorized ADOC Representative

</div>

## Approval by Alabama Department of Construction Management

Alabama Department of Construction Management hereby approves the foregoing requisition.

Dated: _____.

<div align="right">

**ALABAMA DEPARTMENT OF CONSTRUCTION MANAGEMENT**

By: _____
Authorized DCM Representative

</div>

Exhibit 8.2(b), Page 2 of 2

**EXHIBIT 8.5(b)**

**Act No. 2021-547 Account/Act No. 2021-548 Account Requisition**

To:    Regions Bank, as trustee under
       the Indenture referred to below              No. _____

Re:    [Amount] Revenue Bonds, Series 2022A, issued by Alabama Corrections Institution Finance Authority pursuant to a Trust Indenture dated [Date] (the "Indenture")

    Capitalized terms not otherwise defined herein shall have the meanings assigned in the Indenture.

**Request for Payment by the Issuer**

The Issuer hereby requests payment from

        [  ]    the Act No. 2021-547 Account, or

        [  ]    the Act No. 2021-548 Account

            of the Capital Improvement Fund

            of $_____

               to

Name of payee:_____

Address of payee:_____

_____

Such payment will be made for the following purpose(s):

_____

_____

_____

(Describe purpose in reasonable detail.)

    The Issuer hereby certifies that:  (a) such payment is for Acquisition Costs, (b) such payment is (in the case of payments from the Act No. 2021-547 Account) payable in accordance with Act No. 2021-547 or (in the case of payments from the Act No. 2021-548 Account) payable in accordance with Act No. 2021-548, and (c) no Indenture Default exists.

    Dated:  _____.

               **ALABAMA    CORRECTIONS    INSTITUTION FINANCE AUTHORITY**

               By:_____
                    Authorized Issuer Representative

Exhibit 8.5(b), Page 1 of 2

**Approval by Alabama Department of Corrections**

Alabama Department of Corrections hereby approves the foregoing requisition.

Dated: _____.

                      **ALABAMA DEPARTMENT OF CORRECTIONS**

                      By:_____
                             Authorized ADOC Representative

**Approval by Alabama Department of Construction Management**

Alabama Department of Construction Management hereby approves the foregoing requisition.

Dated: _____.

                      **ALABAMA DEPARTMENT OF CONSTRUCTION MANAGEMENT**

                      By:_____
                             Authorized DCM Representative

Exhibit 8.5(b), Page 2 of 2

**EXHIBIT 16.1(a)**

**Notices**

**Issuer**

By hand:

By mail:

By facsimile:

**ADOC**

By hand:

By mail:

By facsimile:

Exhibit 16.1(a), Page 1 of 2

**Trustee**

By hand:

By mail:

By facsimile:

**State Treasurer**

By hand:

By mail:

By facsimile:

Exhibit 16.1(a), Page 2 of 2

**LEASE AGREEMENT**

**Dated [Date]**

**Between**

**ALABAMA CORRECTIONS INSTITUTION FINANCE AUTHORITY**

**and**

**STATE OF ALABAMA,**
**ACTING BY AND THROUGH THE ALABAMA DEPARTMENT OF CORRECTIONS**

**Relating to the issuance of**
**[Amount]**
**Revenue Bonds, Series 2022A**
**by**
**Alabama Corrections Institution Finance Authority**

# TABLE OF CONTENTS

**Page**

Parties...........................................................................................................................................1
Recitals.........................................................................................................................................1

ARTICLE 1 Definitions and Other Provisions of General Application .....................................1

    SECTION 1.1    Definitions ...................................................................................................1
    SECTION 1.2    General Rules of Construction.....................................................................1
    SECTION 1.3    Effect of Headings and Table of Contents...................................................2
    SECTION 1.4    Separability Clause ......................................................................................2
    SECTION 1.5    Governing Law ............................................................................................2
    SECTION 1.6    Counterparts ................................................................................................2
    SECTION 1.7    Entire Agreement ........................................................................................2

ARTICLE 2 Demising Clause ......................................................................................................2

ARTICLE 3 Acquisition of the Bond-Financed Facilities...........................................................3

    SECTION 3.1    Agreement to Acquire..................................................................................3
    SECTION 3.2    Withdrawals from Acquisition Fund and Capital Improvement Fund........4
    SECTION 3.3    No Warranty; ADOC to Complete Bond-Financed Facilities ....................4
    SECTION 3.4    Remedies Against Contractors, etc. .............................................................5
    SECTION 3.5    Completion of the Bond-Financed Facilities ..............................................5

ARTICLE 4 Lease Term and Lease Payments .............................................................................5

    SECTION 4.1    Lease Term ...................................................................................................5
    SECTION 4.2    Basic Lease Payments..................................................................................5
    SECTION 4.3    Additional Lease Payments .........................................................................6
    SECTION 4.4    Capital Improvement Payment ....................................................................6
    SECTION 4.5    Overdue Payments .......................................................................................6
    SECTION 4.6    Unconditional Obligation of ADOC ...........................................................6
    SECTION 4.7    No Indebtedness of State of Alabama...........................................................7
    SECTION 4.8    Appropriations. ............................................................................................7

ARTICLE 5 Concerning the Series 2022A Bonds, the Indenture and the Trustee.......................8

    SECTION 5.1    Assignment of Lease Agreement and Lease Payments by Issuer ...............8
    SECTION 5.2    Redemption of Series 2022A Bonds............................................................8
    SECTION 5.3    Amendment of Bond Documents .................................................................8
    SECTION 5.4    The Indenture Funds ....................................................................................8
    SECTION 5.5    Effect of Full Payment of Indenture Indebtedness......................................9

ARTICLE 6 The Bond-Financed Facilities .................................................................................9

    SECTION 6.1    Possession and Use of Bond-Financed Facilities........................................9
    SECTION 6.2    Maintenance and Other Operating Expenses ..............................................9
    SECTION 6.3    Taxes, Assessments, Etc. .............................................................................9
    SECTION 6.4    Improvements, Alterations, Etc. ................................................................10
    SECTION 6.5    Utility Easements .......................................................................................10
    SECTION 6.6    Transfer or Encumbrance Created by Issuer..............................................10

SECTION 6.7     Assignment, etc. of Leasehold Interest ....................................................... 10
SECTION 6.8     Disposition and Substitution of Personal Property and Fixtures ............................. 10
SECTION 6.9     ADOC's Personal Property and Fixtures ..................................................... 10
SECTION 6.10    Insurance ............................................................................................. 11
SECTION 6.11    Damage and Destruction .......................................................................... 11
SECTION 6.12    Condemnation ....................................................................................... 11

ARTICLE 7 Representations and Covenants ................................................................ 12

SECTION 7.1     General Representations ............................................................................ 12
SECTION 7.2     Eligibility of Bond-Financed Facilities for Financing ..................................... 12
SECTION 7.3     Existence, Etc. ....................................................................................... 12
SECTION 7.4     Inspection of Records .............................................................................. 13
SECTION 7.5     Advances by Issuer or Trustee ................................................................... 13
SECTION 7.6     Compliance with Tax Certificate and Agreement ........................................... 13
SECTION 7.7     Compliance with Continuing Disclosure Agreement ....................................... 13
SECTION 7.8     Non-Substitution .................................................................................... 13

ARTICLE 8 Lease Default; Remedies ........................................................................ 13

SECTION 8.1     Events of Default .................................................................................... 13
SECTION 8.2     Remedies on Default ............................................................................... 14
SECTION 8.3     No Remedy Exclusive ............................................................................. 15
SECTION 8.4     Agreement to Pay Attorneys' Fees and Expenses .......................................... 15
SECTION 8.5     No Additional Waiver Implied by One Waiver .............................................. 15
SECTION 8.6     Remedies Subject to Applicable Law ......................................................... 15

ARTICLE 9 Options ............................................................................................. 15

SECTION 9.1     Option to Terminate ................................................................................ 15
SECTION 9.2     Option to Renew .................................................................................... 15
SECTION 9.3     Option to Purchase Bond-Financed Facilities ............................................... 16
SECTION 9.4     Disposition of Portions of Bond-Financed Facilities While Series 2022A Bonds are Outstanding .......................................................................... 16
SECTION 9.5     Conveyance on Exercise of Option to Purchase ............................................ 16

ARTICLE 10 Miscellaneous .................................................................................... 17

SECTION 10.1    Issuer's Liabilities Limited ....................................................................... 17
SECTION 10.2    Corporate Existence of Issuer ................................................................... 17
SECTION 10.3    Notices ................................................................................................ 17
SECTION 10.4    Successors and Assigns ........................................................................... 18
SECTION 10.5    Benefits of Lease Agreement .................................................................... 18

Testimonium .................................................................................................... 19
Signatures ....................................................................................................... 19
Acknowledgments .............................................................................................. 20

EXHIBIT A - Description of Bond-Financed Facilities
EXHIBIT B - Agreement Among ADOC, ACIFA, and DCM

# LEASE AGREEMENT

**THIS LEASE AGREEMENT** dated [Date] is entered into by **ALABAMA CORRECTIONS INSTITUTION FINANCE AUTHORITY**, a public corporation organized under the laws of the State of Alabama (the "Issuer"), and the **STATE OF ALABAMA, ACTING BY AND THROUGH THE ALABAMA DEPARTMENT OF CORRECTIONS** ("ADOC").

## Recitals

This Lease Agreement is being entered into in connection with the issuance by the Issuer of its [Amount] aggregate principal amount of Revenue Bonds, Series 2022A pursuant to a Trust Indenture dated [Date] (the "Indenture") between the Issuer and Regions Bank, an Alabama banking corporation (the "Trustee"). The purpose of this Lease Agreement and of related financing documents is described in the recitals to the Indenture.

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants hereinafter contained, the parties hereto covenant, agree and bind themselves as follows:

## ARTICLE 1

### Definitions and Other Provisions
### of General Application

**SECTION 1.1 Definitions**

For all purposes of this Lease Agreement, except as otherwise expressly provided or unless the context otherwise requires, capitalized terms not otherwise defined herein shall have the meaning assigned in the Indenture.

**SECTION 1.2 General Rules of Construction**

For all purposes of this Lease Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a) Defined terms in the singular shall include the plural as well as the singular, and vice versa.

(b) The definitions in the recitals to this instrument are for convenience only and shall not affect the construction of this instrument.

(c) All accounting terms not otherwise defined herein have the meanings assigned to them, and all computations herein provided for shall be made, in accordance with generally accepted accounting principles. All references herein to "generally accepted accounting principles" refer to such principles as they exist at the date of application thereof.

(d) All references in this instrument to designated "Articles", "Sections" and other subdivisions are to the designated Articles, Sections and subdivisions of this instrument as originally executed.

(e)     The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Lease Agreement as a whole and not to any particular Article, Section or other subdivision.

(f)     All references in this instrument to a separate instrument are to such separate instrument as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(g)     The term "person" shall include any individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization and any government or any department, agency or political subdivision thereof.

(h)     The term "including" means "including without limitation" and "including, but not limited to".

### SECTION 1.3     Effect of Headings and Table of Contents

The Article and Section headings herein and in the Table of Contents are for convenience only and shall not affect the construction hereof.

### SECTION 1.4     Separability Clause

If any provision in this Lease Agreement shall be held invalid, illegal or unenforceable by any court of competent jurisdiction, the validity of such provision shall be deemed and construed to be severable from the remaining provisions of this Lease Agreement, with the intended result that the validity, legality and enforceability of the remaining provisions of this Lease Agreement shall not in any way be affected or impaired thereby.

### SECTION 1.5     Governing Law

This Lease Agreement shall be construed in accordance with and governed by the laws of the State of Alabama.

### SECTION 1.6     Counterparts

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.

### SECTION 1.7     Entire Agreement

This Lease Agreement contains the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior oral or written agreements, including commitments or understandings with respect to such matters.

## ARTICLE 2

## Demising Clause

For and in consideration of the performance and observance by ADOC of the agreements and covenants of this Lease Agreement to be performed and observed by ADOC, the Issuer does hereby lease

and demise to ADOC, and ADOC does hereby lease, take and hire from the Issuer the following property constituting the Bond-Financed Facilities subject to this Lease Agreement:

## I.

### Real Property

The real property and interests therein described in *Exhibit A* attached hereto, together with all easements, permits, licenses, rights-of-way, contracts, leases, tenements, hereditaments, appurtenances, rights, privileges and immunities pertaining or applicable to said real property and interests therein.

## II.

### Buildings and Structures

All buildings and structures now or hereafter located on such real property, including the buildings and structures to be constructed, altered or improved as part of the Bond-Financed Facilities financed in whole or in part by the Series 2022A Bonds.

## III.

### Personal Property and Fixtures

The following personal property and fixtures: (i) all personal property and fixtures to be acquired and installed on such real property as part of the Bond-Financed Facilities financed in whole or in part by the Series 2022A Bonds, including the personal property and fixtures described in *Exhibit A* to this Lease Agreement, (ii) all personal property and fixtures acquired by (or in the name of) the Issuer and installed on such real property as a substitute or replacement for personal property or fixtures transferred or otherwise disposed of pursuant to the terms of this Lease Agreement, and (iii) all personal property and fixtures acquired by (or in the name of) the Issuer and installed on such real property with the proceeds of any insurance or condemnation award pursuant to the terms of this Lease Agreement.

**SUBJECT, HOWEVER**, to the Permitted Encumbrances.

## ARTICLE 3

### Acquisition of the Bond-Financed Facilities

**SECTION 3.1     Agreement to Acquire**

(a)     The real property that constitutes part of the Bond-Financed Facilities has been acquired by the Issuer in accordance with the instructions of ADOC is described in *Exhibit A* to this Lease Agreement.

(b)     The Issuer shall use proceeds of the Series 2022A Bonds and funds provided by ADOC as a Capital Improvement Payment to construct buildings and structures on such real property in accordance with the instructions of ADOC. The buildings and structures to be constructed as part of the Bond-Financed Facilities are described in *Exhibit A* to this Lease Agreement.

(c)     The Issuer shall use the proceeds of the Series 2022A Bonds to acquire and install personal property and fixtures on such real property in accordance with the instructions of ADOC. The

personal property and fixtures to be acquired and installed as part of the Bond-Financed Facilities are described in *Exhibit A* to this Lease Agreement.

(d)	Subject to *Exhibit B*, ADOC shall be solely responsible for the planning and design of the Bond-Financed Facilities, the preparation of contracts and purchase orders for the Bond-Financed Facilities, and the supervision of the work on the Bond-Financed Facilities.  The acquisition and construction of the Bond-Financed Facilities shall be in accordance with all applicable zoning, planning and building restrictions, and ADOC shall obtain all necessary governmental permits, licenses, certificates, authorizations and approvals necessary therefor and for the operation of the Bond-Financed Facilities.

(e)	The Issuer shall, at the request of ADOC, enter into, assume or accept, as the case may be, the assignment of such contracts and purchase orders for the Bond-Financed Facilities as ADOC shall request in writing.  The Issuer has appointed ADOC as its agent for acquisition and construction of the Bond-Financed Facilities, and does hereby confirm such appointment.  ADOC, as agent of the Issuer, may enter into, assume and accept the assignment of contracts and purchase orders for the Bond-Financed Facilities.  The obligations of the Issuer under all such contracts and purchase orders (whether entered into directly by the Issuer or by ADOC as agent of the Issuer) shall be limited as provided in Section 10.1 hereof, and the Issuer's limited liability thereunder shall be plainly and conspicuously stated thereon.  At the request of ADOC, the Issuer shall execute such instruments, directions, certifications, notices and other documents as shall be necessary or appropriate to confirm ADOC's status as agent of the Issuer with respect to the acquisition and construction of the Bond-Financed Facilities.

(f)	The Issuer shall cooperate with ADOC in the acquisition  and construction of the Bond-Financed Facilities in order that the Bond-Financed Facilities may be completed and placed in service as soon as practicable.

(g)	ADOC may cause changes or amendments to be made in the plans and specifications for the Bond-Financed Facilities, provided such changes or amendments will not change the nature of the Bond-Financed Facilities to the extent that they would not qualify for financing under the Enabling Law.

## SECTION 3.2	Withdrawals from Acquisition Fund and Capital Improvement Fund

ADOC may cause withdrawals to be made from the Acquisition Fund and the Capital Improvement Fund in accordance with the provisions of the Indenture for the payment of Acquisition Costs (including reimbursement to the Issuer or ADOC for any such costs paid directly by the Issuer or ADOC), but only if no Lease Default exists and no event has occurred and is continuing which, with notice or lapse of time or both, would constitute a Lease Default.

## SECTION 3.3	No Warranty; ADOC to Complete Bond-Financed Facilities

(a)	ADOC recognizes that since the plans, specifications and directions for acquiring and constructing the Bond-Financed Facilities have been, or will be, furnished by it, the Issuer makes no warranty, either express or implied, with respect to the Bond-Financed Facilities and does not offer any assurances that the Bond-Financed Facilities will be suitable for ADOC's purposes or needs or that the proceeds derived from the sale of the Series 2022A Bonds will be sufficient to pay in full all Acquisition Costs and Costs of Issuance.

(b)	If the proceeds derived from the sale of the Series 2022A Bonds, plus the Capital Improvement Payment, are insufficient to pay in full all Acquisition Costs and Costs of Issuance, the Issuer shall complete the acquisition and construction of the Bond-Financed Facilities and ADOC shall

pay the Issuer for such additional Acquisition Costs and Costs of Issuance incurred by the Issuer to complete the Bond-Financed Facilities as Additional Lease Payments.

**SECTION 3.4     Remedies Against Contractors, etc.**

If any vendor, contractor or subcontractor shall default under any contract or purchase order in connection with the acquisition or construction of the Bond-Financed Facilities, the Issuer shall follow the written instructions of, and shall cooperate in good faith with, ADOC in the pursuit of any remedies that may be available under the circumstances.

**SECTION 3.5     Completion of the Bond-Financed Facilities**

The completion of the Bond-Financed Facilities shall be evidenced to the Issuer by a certificate signed by an Authorized ADOC Representative stating that

(a)     the acquisition and construction of the Bond-Financed Facilities has been completed in accordance with the plans and specifications therefor (including any changes or amendments to such changes pursuant to Section 3.1), and

(b)     all amounts due for labor, materials, supplies and other costs incurred in connection with the acquisition and construction of the Bond-Financed Facilities have been paid.

**ARTICLE 4**

**Lease Term and Lease Payments**

**SECTION 4.1     Lease Term**

Subject to the options to renew provided for in Section 4.8 and Section 9.2, the term of this Lease Agreement shall begin on the date of the delivery of this Lease Agreement and, unless renewed and extended in accordance with the terms of this Lease Agreement, shall continue until midnight of September 30, 2022.

**SECTION 4.2     Basic Lease Payments**

(a)     Prior to 12:00 noon on (i) August 15, 2022, and (ii) on each June 15 and December 15, beginning on December 15, 2022, ADOC shall make payments ("Basic Lease Payments") to the Trustee, for the account of the Issuer, in an amount equal to the Debt Service on the Series 2022A Bonds due on such Bond Payment Date.

(b)     ADOC shall receive a credit against the Basic Lease Payments as follows:

(1)     Investment income and profits deposited or retained in the Debt Service Fund shall be credited against monthly Basic Lease Payments due after receipt of such income and profits as directed by ADOC.

(2)     Any other money held by the Trustee and available, under the terms of the Indenture and this Lease Agreement, for the payment of Debt Service on the Series 2022A Bonds (including money held by the Trustee in the Debt Service Fund and the Capitalized Interest Fund) shall be credited against Basic Lease Payments as directed by ADOC. Such directions must be

consistent with any mandatory provision of the Indenture and this Lease Agreement with respect to the required use of such money.

(c)     All Basic Lease Payments shall be made in funds immediately available at the Office of the Trustee on the due date of such Payments.

(d)     ADOC acknowledges that Basic Lease Payments required by this Section have been calculated to provide amounts which will be sufficient to pay Debt Service on the Series 2022A Bonds as the same matures and comes due.  If on any Bond Payment Date the amount on deposit in the Debt Service Fund is not sufficient to pay Debt Service on the Series 2022A Bonds due and payable on such Date, ADOC shall immediately deposit the amount of such deficiency in the Debt Service Fund.

### SECTION 4.3     Additional Lease Payments

ADOC shall make additional payments ("Additional Lease Payments") as follows:

(a)     Within 10 days after receipt by ADOC of an invoice therefor, ADOC shall pay to the Trustee (1) the acceptance fee of the Trustee, (2) the normal fees, charges and expenses of the Trustee, and (3) any amount to which the Trustee may be entitled under Section 12.7 of the Indenture.

(b)     Within 10 days after receipt by ADOC of an invoice therefor, ADOC shall pay to the Issuer the reasonable expenses of the Issuer incurred (1) at the request of ADOC, (2) in the performance of the Issuer's duties under any of the Bond Documents, (3) in connection with any litigation which may at any time be instituted involving the Bond-Financed Facilities or the Bond Documents, or (4) in the pursuit of any remedies under the Bond Documents.

### SECTION 4.4     Capital Improvement Payment

On the Effective Date, ADOC shall make an initial lease payment to the Issuer, in the amount set forth in Section 6.4(b) of the Indenture, representing a portion of the costs of the Bond-Financed Facilities (the "Capital Improvement Payment", and together with the Basic Lease Payments, the Additional Lease Payments and all other payments by ADOC pursuant to this Lease Agreement, the "Lease Payments"). Any portion of the Capital Improvement Payment that is not needed to complete the Bond-Financed Facilities shall be refunded to ADOC pursuant to the Indenture.

### SECTION 4.5     Overdue Payments

Any overdue Basic Lease Payment shall bear interest from the related Bond Payment Date until paid at the rate specified in the Series 2022A Bonds.  Any overdue Additional Lease Payment shall bear interest from the date due until paid at a variable rate equal to the Trustee's prime rate, computed on the basis of a 365 or 366-day year, as the case may be, for actual days elapsed.

### SECTION 4.6     Unconditional Obligation of ADOC

Subject to Sections 4.7 and 4.8 hereof, ADOC's obligation to make the payments required by this Lease Agreement and to perform and observe the other agreements and covenants on its part herein contained shall be absolute and unconditional, irrespective of any rights of set-off, recoupment or counterclaim it might otherwise have against the Issuer or any other Financing Participant.  ADOC will not suspend or discontinue any such Lease Payment or fail to perform and observe any of its other agreements and covenants contained herein or terminate this Lease Agreement for any cause whatsoever, including, without limiting the generality of the foregoing, (a) failure to complete the Bond-Financed

Facilities, (b) any acts or circumstances that may constitute an eviction or constructive eviction, (c) failure of consideration or commercial frustration of purpose, (d) the invalidity of any provision of this Lease Agreement or the other Bond Documents, (e) any damage to or destruction of the Bond-Financed Facilities or any part thereof, (f) the taking by eminent domain of title to, or the use of, all or any part of the Bond-Financed Facilities, (g) any change in the laws or regulations of the United States of America, the State of Alabama or any other governmental authority, or (h) any failure of any of the Financing Participants to perform and observe any agreement or covenant, whether express or implied, to be performed or observed by them under any of the Bond Documents.

### SECTION 4.7    No Indebtedness of State of Alabama.

No obligation of ADOC under this Lease Agreement to pay any amounts owed by ADOC to the Issuer hereunder, including ADOC's obligation to make Lease Payments under this Article 4, shall constitute a debt of the State of Alabama as prohibited by Section 213 of the Constitution of Alabama of 1901, as amended. The obligation of ADOC to make Lease Payments to Issuer does not constitute a pledge of the faith, credit, or taxing power of ADOC, the State, or any political subdivision thereof within the meaning or application of any constitutional provision or limitation. The Issuer has no right to have taxes levied or to compel appropriations by the State Legislature for any payment of Lease Payments or other amounts owed by ADOC to Issuer under this Lease Agreement.

### SECTION 4.8    Appropriations.

(a)    All ADOC monetary obligations under the Bond Documents are subject to appropriation by the Legislature of the State of Alabama (the "State Legislature").

(b)    ADOC shall make best efforts to cause the State Legislature to appropriate all amounts sufficient to enable ADOC to pay amounts owed by ADOC to the Issuer under this Lease Agreement. Further, ADOC hereby represents, warrants, and covenants that it shall perform all actions lawfully within its power to obtain and maintain funds from which to make all payments owed by ADOC to the Issuer hereunder, including formulating budget proposals and making timely requests for appropriation, in amounts sufficient to make such payments, to the State Legislature in accordance with applicable law, and to obtain, designate, or use any other lawfully available funds that are not funds appropriated by the State Legislature. To the extent permitted by law, ADOC shall, prior to the satisfaction of its other obligations, prioritize and apply all funds appropriated by the State Legislature for the benefit of the Issuer, as well as such other funds lawfully available to ADOC, to satisfy ADOC's obligations under this Lease Agreement, except to the extent that such prioritization would adversely impact ADOC's ability to comply with (i) ADOC's federal and state constitutional and/or statutory obligations and/or obligations arising out of common law; (ii) court orders or consent decrees; and/or (iii) settlement agreements entered into by ADOC in response to allegations or claims relating to its constitutional and/or statutory obligations and/or obligations arising out of common law.

(c)    If, by June 30th of any Fiscal Year, the State Legislature fails to appropriate or otherwise provide lawfully available funds sufficient to permit ADOC to satisfy its obligations under this Lease Agreement to make the full amount of all Lease Payments reasonably anticipated to be payable under this Lease Agreement during the next succeeding Fiscal Year (a "Non-Appropriation Event"), ADOC shall promptly undertake best efforts to cause the State Legislature to make sufficient appropriations in accordance with subsection 4.8(b) above. If a Non-Appropriation Event has not been cured by ADOC through sufficient appropriations by the State Legislature by October 1st of the Fiscal Year following the Non-Appropriation Event (i.e., by the start of the Fiscal Year for which insufficient appropriation has been made), this Lease Agreement will not be renewed for such Fiscal Year, and ADOC shall commence the process of vacating the Bond-Financed Facilities in accordance with applicable law. If ADOC cures

such Non-Appropriation Event by causing the State Legislature to appropriate sufficient funds (for the full amount of all Lease Payments and other amounts reasonably anticipated to be payable under this Lease Agreement during such Fiscal Year) no later than December 15th of the Fiscal Year following the Non-Appropriation Event (the "Non-Appropriation Final Cure Date"), the vacation process commenced under this subsection shall cease and ADOC may renew this Lease Agreement for such Fiscal Year.

<div align="center">

**ARTICLE 5**

**Concerning the Series 2022A Bonds,
the Indenture and the Trustee**

</div>

**SECTION 5.1     Assignment of Lease Agreement and Lease Payments by Issuer**

(a)     Simultaneously with the delivery of this Lease Agreement, the Issuer shall, pursuant to the Indenture, assign and pledge to the Trustee all right, title and interest of the Issuer in and to the Lease Payments and the Lease Agreement.  ADOC hereby consents to such assignment and pledge.

(b)     Until all Indenture Indebtedness has been Fully Paid, the Trustee may exercise all rights and remedies herein accorded to the Issuer, and any references herein to the Issuer shall be deemed, with the necessary changes in detail, to include the Trustee; provided, however, that the Issuer shall retain the rights to indemnification and reimbursement of expenses granted to it by this Lease Agreement.

**SECTION 5.2     Redemption of Series 2022A Bonds**

The Issuer will cause the Trustee to redeem any or all of the Series 2022A Bonds in accordance with the redemption provisions of the Series 2022A Bonds without any direction from or consent by ADOC.

**SECTION 5.3     Amendment of Bond Documents**

The Issuer will not cause or permit the amendment of the Bond Documents without the prior written consent of ADOC.

**SECTION 5.4     The Indenture Funds**

(a)     The Issuer shall cause any money held as part of an Indenture Fund to be invested or reinvested by the Trustee in accordance with the terms of the Indenture.

(b)     The Issuer shall be solely responsible for (1) determining that any such investment of Indenture Funds under the Indenture complies with the arbitrage limitations imposed by Section 148 of the Internal Revenue Code, and (2) calculating the amount of, and making payment of, any rebate due to the United States under Section 148(f) of the Internal Revenue Code.

(c)     As security for the performance by ADOC of the covenants hereunder, ADOC hereby assigns and pledges to the Issuer, and grants to the Issuer a security interest in, all right, title and interest of ADOC in and to all money and investments from time to time on deposit in, or forming a part of, the Indenture Funds, subject to the provisions of this Lease Agreement and the Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein and in the Indenture. ADOC acknowledges that the rights of the Issuer created by this Section shall be assigned by the Issuer to the Trustee pursuant to the Indenture.

**SECTION 5.5    Effect of Full Payment of Indenture Indebtedness**

(a)    After the Indenture Indebtedness is Fully Paid, all references in this Lease Agreement to the Series 2022A Bonds, the Indenture and the Trustee shall be ineffective and neither the Trustee nor the Holders of the Series 2022A Bonds shall thereafter have any rights hereunder, except those rights that shall have theretofore vested.

(b)    After all Indenture Indebtedness is Fully Paid, any money or investments remaining in the Indenture Funds shall be delivered as provided in the Indenture.

(c)    If all Indenture Indebtedness is Fully Paid prior to the expiration of the term of this Lease Agreement, ADOC shall be entitled to the use and occupancy of the Bond-Financed Facilities until the expiration of the term of this Lease Agreement without the payment of any further Basic Lease Payments, but otherwise subject to all the terms and conditions hereof, except that ADOC shall no longer be required to perform and observe the agreements and covenants of this Lease Agreement that are for the sole benefit of the Trustee or the Holders of the Series 2022A Bonds.

## ARTICLE 6

## The Bond-Financed Facilities

**SECTION 6.1    Possession and Use of Bond-Financed Facilities**

(a)    So long as no Lease Default exists, ADOC shall be permitted to possess, use, manage, operate and enjoy the Bond-Financed Facilities without hindrance on the part of the Issuer, subject, however, to all the terms and conditions of this Lease Agreement.

(b)    The Issuer shall be permitted such possession of the Bond-Financed Facilities as shall be necessary and convenient for it to construct and install the Bond-Financed Facilities in accordance with the terms of this Lease Agreement.

**SECTION 6.2    Maintenance and Other Operating Expenses**

ADOC will, at its own expense, (a) maintain the Bond-Financed Facilities in good condition, repair and working order, (b) make all necessary repairs, renewals, replacements and improvements to the Bond-Financed Facilities, and (c) pay all gas, electric, water, sewer and other charges for the operation, use and upkeep of the Bond-Financed Facilities.

**SECTION 6.3    Taxes, Assessments, Etc.**

ADOC will pay all taxes, assessments and other governmental charges lawfully levied or assessed or imposed upon the Bond-Financed Facilities or any part thereof or upon any income therefrom, and also all taxes, assessments and other governmental charges lawfully levied, assessed or imposed upon the lien or interest of the Trustee or of the Bondholders in the Trust Estate; provided, however, that ADOC shall not be required to pay and discharge any such tax, assessment or governmental charge to the extent that the amount, applicability or validity thereof shall currently be contested in good faith by appropriate proceedings.

### SECTION 6.4    Improvements, Alterations, Etc.

ADOC may, at its own expense, make additions, improvements or alterations to the buildings and structures constituting a part of the Bond-Financed Facilities.  At the written request of ADOC, the Issuer will enter into a contract for such additions, improvements, or alterations, subject, however, to the requirements of Section 10.1.

### SECTION 6.5    Utility Easements

The Issuer will, upon request of ADOC, grant utility and other similar easements over, across or under the real property constituting part of the Bond-Financed Facilities.

### SECTION 6.6    Transfer or Encumbrance Created by Issuer

Without the prior written consent of ADOC, the Issuer (a) will not sell, transfer or convey the Bond-Financed Facilities or any part thereof, except as provided in this Lease Agreement, and (b) will not create or permit any mortgage, lien, charge or encumbrance on the Bond-Financed Facilities or any part thereof.

### SECTION 6.7    Assignment, etc. of Leasehold Interest

ADOC may not assign its rights under this Lease Agreement or mortgage its leasehold interest in the Bond-Financed Facilities, or sublease the Bond-Financed Facilities or any part thereof, without the prior written consent of the Issuer.

### SECTION 6.8    Disposition and Substitution of Personal Property and Fixtures

(a)    If no Lease Default exists, ADOC shall have the right, from time to time, in the name and on behalf of the Issuer, without any release from or consent by the Issuer or the Trustee, to sell or otherwise dispose of any item of the personal property or fixtures constituting part of the Bond-Financed Facilities that may have become obsolete or unfit for use or no longer useful, necessary or profitable in the conduct of the business carried on by ADOC at the Bond-Financed Facilities.  The Issuer shall not be required to replace such personal property and fixtures.  ADOC may, if it so chooses, replace such personal property and fixtures at its own expense.  At the request of ADOC, the Issuer will enter into contracts and purchase orders for the acquisition of replacement items, provided that (1) ADOC shall pay all costs of such acquisition with its own funds and (2) the Issuer's liability under any such contract or purchase order is limited as provided in Section 10.1.  Any replacement items so acquired by the Issuer shall become a part of the personal property and fixtures subject to this Lease Agreement.

(b)    The Issuer will cooperate with ADOC in good faith in the exercise of the rights and privileges granted by this Section and shall, from time to time, execute a written instrument to confirm any action taken by ADOC under this Section, upon receipt by the Issuer of (1) a certificate signed by an Authorized ADOC Representative requesting the same and expressing any required opinions and (2) an Opinion of Counsel that such action was duly taken by ADOC in conformity with such provisions and that execution of such written instrument is appropriate to confirm such action under this Section.

### SECTION 6.9    ADOC's Personal Property and Fixtures

(a)    ADOC may, at its own expense, install at the Bond-Financed Facilities any personal property or fixtures which, in ADOC's judgment, are necessary or desirable for the conduct of the business carried on by ADOC at the Bond-Financed Facilities.  Any such personal property or fixtures

which are installed at ADOC's expense and which do not constitute a part of the personal property and fixtures subject to this Lease Agreement shall be and remain the property of ADOC and may be removed by ADOC at any time while no Lease Default exists; provided, that any damage to the Bond-Financed Facilities occasioned by such removal shall be repaired by ADOC at its own expense.

(b)        If any personal property or fixtures described in this Section are leased by ADOC or ADOC shall have granted a security interest in such property in connection with the acquisition thereof by ADOC, then the lessor of such property or the party holding a security interest therein, as the case may be, may remove such property from the Bond-Financed Facilities even though a Lease Default shall then exist or this Lease Agreement shall have been terminated following a Lease Default hereunder; provided, that the foregoing permission to remove shall be subject to the agreement by such lessor or secured party to repair at its own expense any damage to the Bond-Financed Facilities occasioned by such removal.

### SECTION 6.10    Insurance

The Issuer shall not be required to maintain any insurance with respect to damage or destruction of the Bond-Financed Facilities.  ADOC shall maintain insurance (including self-insurance or self-insurance pools or trusts) covering such risks and in such amounts as, in its judgment, is adequate to protect it and the Bond-Financed Facilities.  Such insurance shall insure the Issuer as well as ADOC.

### SECTION 6.11    Damage and Destruction

If the Bond-Financed Facilities are damaged or destroyed by fire or other casualty, the Issuer shall not be required to repair or replace the Bond-Financed Facilities damaged or destroyed.  ADOC may, if it so chooses, repair or replace such Bond-Financed Facilities at its own expense.  At the request of ADOC, the Issuer will enter into contracts or purchase orders for the repair or replacement of the Bond-Financed Facilities, provided that (a) ADOC shall pay all costs of such repair or replacement with its own funds and (b) the Issuer's liability under any such contract or purchase order shall be limited as provided in Section 10.1.  Any property acquired by the Issuer in connection with such repair or replacement shall become a part of the Bond-Financed Facilities subject to this Lease Agreement.

### SECTION 6.12    Condemnation

(a)        If title to, or the use of, the Bond-Financed Facilities or any part thereof shall be taken by the exercise of the power of eminent domain, the entire proceeds of any related award shall be paid to ADOC.  The Issuer shall not be required to replace the property so taken.  ADOC may, if it so chooses, replace such property at its own expense.  At the request of ADOC, the Issuer will enter into contracts or purchase orders for replacement of the Bond-Financed Facilities so taken, provided that (1) ADOC shall pay all costs of such replacement with its own funds and (2) the Issuer's liability under any such contract or purchase order shall be limited as provided in Section 10.1.  Any property acquired by the Issuer in connection with such replacement shall become a part of the Bond-Financed Facilities subject to this Lease Agreement.

(b)        The Issuer shall cooperate in good faith with ADOC in the conduct of any condemnation proceeding with respect to the Bond-Financed Facilities and will, to the extent it may lawfully do so, permit ADOC to appear in such proceeding in the name and on behalf of the Issuer.  The Issuer will not settle, or consent to the settlement of, any condemnation proceeding without the prior written consent of ADOC.

# ARTICLE 7

## Representations and Covenants

### SECTION 7.1    General Representations

ADOC makes the following representations and warranties as the basis for the undertakings on its part herein contained:

    (a)    It is a department of the State of Alabama.

    (b)    It has the power to consummate the transactions contemplated by the Bond Documents to which it is a party.

    (c)    By proper action it has duly authorized the execution and delivery of the Bond Documents to which it is a party and the consummation of the transactions contemplated therein.

    (d)    It has obtained all consents, approvals, authorizations and orders of governmental authorities that are required to be obtained by it as a condition to the execution and delivery of the Bond Documents to which it is a party.

    (e)    The execution and delivery by it of the Bond Documents to which it is a party and the consummation by it of the transactions contemplated therein will not (1) conflict with, be in violation of, or constitute (upon notice or lapse of time or both) a default under its charter or bylaws, or any agreement, instrument, order or judgment to which it is a party or is subject, or (2) result in or require the creation or imposition of any lien of any nature upon or with respect to any of its properties now owned or hereafter acquired, except as contemplated by the Bond Documents.

    (f)    The Bond Documents to which it is a party constitute legal, valid and binding obligations and are enforceable against it in accordance with the terms of such instruments, except as enforcement thereof may be limited by (1) bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights and (2) general principles of equity, including the exercise of judicial discretion in appropriate cases.

### SECTION 7.2    Eligibility of Bond-Financed Facilities for Financing

    (a)    ADOC represents and warrants that the Bond-Financed Facilities are eligible for financing under the Enabling Law.

    (b)    So long as this Lease Agreement is in effect, ADOC will not make any use of the Bond-Financed Facilities prohibited by the terms of the Enabling Law.

### SECTION 7.3    Existence, Etc.

ADOC will do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights and franchises.

### SECTION 7.4 Inspection of Records

ADOC will at any and all times, upon the reasonable written request of the Issuer or the Trustee and subject to applicable law, permit the Issuer or the Trustee by their representatives to inspect the Bond-Financed Facilities and any books, records, reports and other papers of ADOC relating to the Bond-Financed Facilities.

### SECTION 7.5 Advances by Issuer or Trustee

If ADOC shall fail to perform any of its covenants in this Lease Agreement, the Issuer or the Trustee may, at any time and from time to time, after written notice to ADOC, make advances to effect performance of any such covenant on behalf of ADOC. Any money so advanced by the Issuer or the Trustee shall be repaid upon demand.

### SECTION 7.6 Compliance with Tax Certificate and Agreement

The Issuer and ADOC will comply with the covenants and agreements on their part contained in the Tax Certificate and Agreement.

### SECTION 7.7 Compliance with Continuing Disclosure Agreement

ADOC will comply with the covenants and agreements on its part contained in the Continuing Disclosure Agreement.

### SECTION 7.8 Non-Substitution

To the extent permitted by law, throughout the term of this Lease Agreement, ADOC will not procure, construct, purchase, acquire, lease, or otherwise utilize any other correctional facility if doing so would result in the effective replacement of the Bond-Financed Facilities, or a material reduction in, or substantial modification of, ADOC's need to utilize the Bond-Financed Facilities; *provided, however,* that the foregoing restriction shall not prohibit ADOC from initiating the process of procuring, constructing, acquiring, leasing, or otherwise seeking to utilize another correctional facility within the final five years of the term of this Lease Agreement. However, nothing in this Section 7.7 shall prevent ADOC from procuring, constructing, purchasing, acquiring, leasing, or utilizing other correctional facilities for programmed uses that are different from those of the Bond-Financed Facilities (including for housing female inmates) or for purposes of managing its inmate population, including to manage overcrowding, to comply with its federal and state constitutional and legal obligations, or to provide work release programs or other programs not planned for the Bond-Financed Facilities as of the date of issuance of the Series 2022A Bonds, which other facility will not substantially negatively impact ADOC's need to occupy the Bond-Financed Facilities.

## ARTICLE 8

### Lease Default; Remedies

### SECTION 8.1 Events of Default

Any one or more of the following shall constitute an event of default (a "Lease Default") under this Lease Agreement (whatever the reason for such event and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     default in the payment of any Basic Lease Payment when such Basic Lease Payment becomes due and payable; or

(b)     an Act of Bankruptcy by ADOC or the State of Alabama; or

(c)     default in the performance, or breach, of any covenant or warranty of ADOC in this Lease Agreement (other than a covenant or warranty, a default in the performance or breach of which is elsewhere in this Section specifically dealt with), and the continuance of such default or breach for a period of 30 days after there has been given, by registered or certified mail, to ADOC by the Issuer or by the Trustee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "notice of default" hereunder; or

(d)     the occurrence of an event of default, as therein defined, under the Indenture, and the expiration of the applicable grace period, if any, specified therein.

The Continuing Disclosure Agreement contains the exclusive remedies for breach by ADOC of the covenants on its part contained in such agreement, and no such breach shall constitute a Lease Default or an event of default under any other Bond Document.

## SECTION 8.2     Remedies on Default

If a Lease Default occurs and is continuing, the Issuer may exercise any of the following remedies:

(a)     reenter the Bond-Financed Facilities, without terminating this Lease Agreement, and, upon 10 days' prior written notice to ADOC, relet the Bond-Financed Facilities or any part thereof for the account of ADOC, for such term (including a term extending beyond the term of this Lease Agreement) and at such rentals and upon such other terms and conditions, including the right to make alterations to the Bond-Financed Facilities or any part thereof, as the Issuer may deem advisable, and such reentry and reletting of the Bond-Financed Facilities shall not be construed as an election to terminate this Lease Agreement nor relieve ADOC of its obligations to make payments required by this Lease Agreement and to perform and observe any of its other agreements and covenants under this Lease Agreement, all of which shall survive such reentry and reletting, and ADOC shall continue to make all payments required by this Lease Agreement until the end of the term of this Lease Agreement, less the net proceeds, if any, of any reletting of the Bond-Financed Facilities after deducting all of the Issuer's expenses in connection with such reletting, including all repossession costs, brokers' commissions, attorneys' fees, alteration costs and expenses of preparation for reletting;

(b)     terminate this Lease Agreement, exclude ADOC from possession of the Bond-Financed Facilities and, if the Issuer elects so to do, lease the same for the account of the Issuer, holding ADOC liable for all payments due under this Lease Agreement up to the date of such termination; and

(c)     take whatever legal proceedings may appear necessary or desirable to collect the payments under this Lease Agreement then due, whether by declaration or otherwise, or to enforce any obligation or covenant or agreement of ADOC under this Lease Agreement or by law.

### SECTION 8.3    No Remedy Exclusive

No remedy herein conferred upon or reserved to the Issuer or the Trustee is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Lease Agreement or now or hereafter existing at law or in equity or by statute. No delay or omission to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver thereof but any such right or power may be exercised from time to time and as often as may be deemed expedient.

### SECTION 8.4    Agreement to Pay Attorneys' Fees and Expenses

If ADOC should default under any of the provisions of this Lease Agreement and the Issuer or the Trustee should employ attorneys or incur other expenses for the collection of payments due under this Lease Agreement or the enforcement of performance or observance of any agreement or covenant on the part of ADOC herein contained, ADOC will on demand therefor pay to the Issuer or the Trustee (as the case may be) the reasonable fee of such attorneys and such other expenses so incurred.

### SECTION 8.5    No Additional Waiver Implied by One Waiver

In the event any agreement contained in this Lease Agreement should be breached by either party and thereafter waived by the other party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder.

### SECTION 8.6    Remedies Subject to Applicable Law

All rights, remedies and powers provided by this Article may be exercised only to the extent the exercise thereof does not violate any applicable provision of law in the premises, and all the provisions of this Article are intended to be subject to all applicable mandatory provisions of law which may be controlling in the premises and to be limited to the extent necessary so that they will not render this Lease Agreement invalid or unenforceable.

## ARTICLE 9

## Options

### SECTION 9.1    Option to Terminate

If no Lease Default exists, ADOC shall have the option to cancel or terminate this Lease Agreement at any time after the Indenture Indebtedness has been Fully Paid, by giving the Issuer notice in writing of such termination. Such termination shall become effective 10 days after such notice is given.

### SECTION 9.2    Option to Renew

If no Lease Default exists, ADOC shall have the right and option to renew the term of this Lease Agreement for additional one-Fiscal-Year terms, the last of which expiring on midnight of _____ ___, 2052. Such option shall be deemed exercised by ADOC unless ADOC notifies the Issuer in writing that ADOC elects not to have this Lease Agreement renew for such additional term and provides the Issuer with evidence that the State Legislature has not appropriated sufficient funds to ADOC to make Lease Payments for the applicable Fiscal Year.

### SECTION 9.3    Option to Purchase Bond-Financed Facilities

If no Lease Default exists, ADOC shall have the option to purchase the Bond-Financed Facilities for a purchase price of $1.00 after the Indenture Indebtedness has been Fully Paid.  Such option may be exercised by ADOC prior to the termination of this Lease Agreement upon written notice to the Issuer.  Such option shall be deemed automatically exercised on the date of termination of this Lease Agreement unless ADOC notifies the Issuer in writing that it does not intend to exercise such option.  The closing for such purchase shall take place on (a) a Business Day designated by ADOC that is not less than 7 days nor more than 21 days from the date of such notice, or the date of termination of this Lease Agreement, as the case may be, or (b) such other date as shall be mutually acceptable to the Issuer and ADOC.

### SECTION 9.4    Disposition of Portions of Bond-Financed Facilities While Series 2022A Bonds are Outstanding

(a)    If no Lease Default exists, ADOC shall have the right, from time to time, in the name and on behalf of the Issuer, without any release from or consent by the Issuer or the Trustee, to sell or otherwise dispose of any portion of the Bond-Financed Facilities, whether or not any Series 2022A Bonds are Outstanding.

(b)    No disposition effected pursuant to this Section shall result in any reduction or abatement of Basic Lease Payments; provided, however, that if any such disposition will effectively result in the disposition of all remaining portions of the Bond-Financed Facilities, then (i) prior to or simultaneously with such disposition provisions must be made for the payment of all Outstanding Series 2022A Bonds in accordance with the terms of Article 14 of the Indenture, and (ii) ADOC shall take all action necessary for the termination of this Lease Agreement as of the date of such disposition.

(c)    The Issuer will cooperate with ADOC in good faith in the exercise of the rights and privileges granted by this Section and shall, from time to time, execute a written instrument to confirm any action taken by ADOC under this Section, upon receipt by the Issuer of (i) a certificate or certificates signed by an Authorized ADOC Representative requesting the same and expressing any required opinions and stating that such action was duly taken in conformity with this Section and (ii) an Opinion of Counsel that such action was duly taken by ADOC in conformity with such provisions and that execution of such written instrument is appropriate to confirm such action under this Section.

### SECTION 9.5    Conveyance on Exercise of Option to Purchase

Upon the exercise of any option to purchase granted herein, the Issuer will deliver to ADOC documents conveying to ADOC the property with respect to which such option was exercised, as such property then exists, subject to the following:  (a) all easements or other rights, if any, required to be reserved by the Issuer under the terms and provisions of the option being exercised by ADOC; (b) those liens and encumbrances, if any, to which title to said property was subject when conveyed to the Issuer; (c) those liens and encumbrances created by ADOC or to the creation or suffering of which ADOC consented; and (d) those liens and encumbrances resulting from the failure of ADOC to perform or observe any of the agreements or covenants on its part contained in this Lease Agreement.

# ARTICLE 10

## Miscellaneous

### SECTION 10.1    Issuer's Liabilities Limited

(a)    The covenants and agreements contained in this Lease Agreement and in any contract, purchase order or other agreement entered into pursuant to this Lease Agreement shall never constitute or give rise to a personal or pecuniary liability or charge against the general credit of the Issuer, and in the event of a breach of any such covenant or agreement, no personal or pecuniary liability or charge payable directly or indirectly from the general assets or revenues of the Issuer shall arise therefrom.  Nothing contained in this Section, however, shall relieve the Issuer from the observance and performance of the covenants and agreements on its part contained herein.

(b)    No recourse under or upon any covenant or agreement of this Lease Agreement or of any contract or other agreement entered into pursuant to this Lease Agreement shall be had against any past, present or future incorporator, officer or member of the governing body of the Issuer, or of any successor corporation, either directly or through the Issuer, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly understood that this Lease Agreement is solely a corporate obligation, and that no personal liability whatever shall attach to, or is or shall be incurred by, any incorporator, officer or member of the governing body of the Issuer or any successor corporation, or any of them, under or by reason of the covenants or agreements contained in this Lease Agreement.

(c)    The liability of the Issuer for the payment of any money due under any contract or purchase order entered into by it, or for any other costs incurred in connection with the acquisition, construction or improvement of, or other work on, the Bond-Financed Facilities shall be limited solely to (1) the available proceeds of the Issuer's revenue bonds, if and when issued for the Bond-Financed Facilities, (2) any money made available to the Issuer for such purpose by ADOC, and (3) any revenues or other receipts derived by the Issuer from the Bond-Financed Facilities, subject to prior encumbrances. The limited liability of the Issuer shall be plainly and conspicuously stated on each such contract or purchase order.

### SECTION 10.2    Corporate Existence of Issuer

The Issuer shall not consolidate with or merge into any other corporation or transfer its property substantially as an entirety, except as provided in Section 10.6 of the Indenture.

### SECTION 10.3    Notices

(a)    Any request, demand, authorization, direction, notice, consent, or other document provided or permitted by this Lease Agreement to be made upon, given or furnished to, or filed with, the Issuer, ADOC, or the Trustee must (except as otherwise expressly provided in this Lease Agreement) be in writing and be delivered by one of the following methods:  (1) by personal delivery at the hand delivery address specified pursuant to Section 16.1 of the Indenture, (2) by first-class, registered or certified mail, postage prepaid, addressed as specified pursuant to Section 16.1 of the Indenture, or (3) if facsimile transmission facilities for such party are identified in Section 16.1 of the Indenture or pursuant to a separate notice from such party, sent by facsimile transmission to the number specified in Section 16.1 of the Indenture or in such notice.  Any of such parties may change the address for receiving any such notice or other document by giving notice of the change to the other parties named in this Section.

(b)     Any such notice or other document shall be deemed delivered when actually received by the party to whom directed (or, if such party is not an individual, to an officer, partner or other legal representative of the party) at the address or number specified pursuant to this Section, or, if sent by mail, 3 days after such notice or document is deposited in the United States mail, addressed as provided above.

**SECTION 10.4     Successors and Assigns**

All covenants and agreements in this Lease Agreement by the Issuer or ADOC shall bind their respective successors and assigns, whether so expressed or not.

**SECTION 10.5     Benefits of Lease Agreement**

Nothing in this Lease Agreement, express or implied, shall give to any person, other than the parties hereto and their successors hereunder, the Trustee, and the Holders of the Series 2022A Bonds, any benefit or any legal or equitable right, remedy or claim under this Lease Agreement.

**IN WITNESS WHEREOF**, the Issuer and ADOC have caused this instrument to be duly executed and their respective corporate seals to be hereunto affixed and attested.

<u>**ISSUER:**</u>

<u>ALABAMA CORRECTIONS INSTITUTION FINANCE AUTHORITY</u>

[Full Name]
[Title]                              /        /
                                        date

<u>**APPROVED:**</u>

[Full Name], [Title]
State of Alabama                      /        /
                                        date

[Full Name], [Title]
Alabama Department of Finance         /        /
                                        date

<u>**APPROVED AS TO FORM:**</u>

[Full Name], [Title]
AL Dept. of Finance, Legal
Division                              /        /
                                        date

[Full Name], [Title]
Real Property Management             /        /
                                        date

[Full Name], [Title]
Division of Leasing Mgmt.            /        /
                                        date

<u>**ADOC:**</u>

<u>ALABAMA DEPARTMENT OF CORRECTIONS</u>

[Full Name]
[Title]                              /        /
                                        date

[Full Name]
[Title]l                             /        /
                                        date

Received:                    Received:

19

This instrument was prepared by:
[Insert address]


**STATE OF ALABAMA**

**_____ COUNTY**

I, _____, a Notary Public in and for said County in said State, hereby certify that _____, whose name as _____ of the Board of Directors of Alabama Corrections Institution Finance Authority, an Alabama public corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand this the _____ day of _____, 2022.

_____
Notary Public

[NOTARIAL SEAL]

My commission expires:_____


**STATE OF ALABAMA**

**_____ COUNTY**

I, _____, a Notary Public in and for said County in said State, hereby certify that _____, whose name as _____ of the State of Alabama, acting by and through the Alabama Department of Corrections, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said department.

Given under my hand this the _____ day of _____, 2022.

_____
Notary Public

[NOTARIAL SEAL]

My commission expires:_____

# EXHIBIT A

## Description of Bond-Financed Facilities

The Bond-Financed Facilities subject to this Lease Agreement include the following components:

**A.**   <u>**Elmore Men's Prison Facility**</u>

    1.   **Real Property**.  The following real property located in Elmore County, Alabama:

*[Insert description.]*

    2.   **Buildings and Structures**.  The following buildings and structures to be constructed, altered or improved on the real property described above:

*[Insert description.]*

    3.   **Personal Property and Fixtures**.  The following personal property and fixtures to be acquired and installed on the real property described above:

*[Insert description.]*

**B.**   <u>**Escambia Men's Prison Facility**</u>

    1.   **Real Property**.  The following real property located in Escambia County, Alabama:

*[Insert description.]*

    2.   **Buildings and Structures**.  The following buildings and structures to be constructed, altered or improved on the real property described above:

*[Insert description.]*

    3.   **Personal Property and Fixtures**.  The following personal property and fixtures to be acquired and installed on the real property described above:

*[Insert description.]*

**EXHIBIT B**

**Agreement Among ADOC, ACIFA, and DCM**

See attached.

ALABAMA CORRECTIONS INSTITUTION FINANCE AUTHORITY • Revenue Bonds, Series 2022A



**Mixed Sources**
Product group from well managed forests, controlled sources and recycled wood or fibres.

Printed by: ImageMaster, LLC
www.imagemaster.com