IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| EDWARD BRAGGS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| JOHN HAMM, in his official capacity as Commissioner of the Alabama Department of Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER ON MEDIATION OF PLANS
TO ADDRESS CORRECTIONAL STAFFING LEVELS

By order entered on July 19, 2022, the court required the parties to submit reports on "what the most recent quarterly correctional staffing reports to the court reflect" and set the matter for discussion at the status conference on August 15, 2022. Phase 2A Revised Remedy Scheduling Order on the Eighth Amendment Claim (Doc. 3664) at 3-4. The court left to the plaintiffs' discretion "how far back to reference." *Id.* at 3. The plaintiffs included in their report, and the defendants

**addressed in their response, the quarterly staffing reports filed between June 2021--the last report preceding the 2021 omnibus remedial hearings--and June 2022--the most recent report at the time of the plaintiffs' submission. These reports reflect ADOC's correctional-staffing levels and trends between March 31, 2021, and March 31, 2022. *See* Quarterly Correctional Staffing Reports (Doc. 3406-1, Doc. 3443-1, Doc. 3551-1, Doc. 3618-1 & Doc. 3625-1).**

**In response to the court's directive, and based on the defendants' quarterly staffing reports, the plaintiffs observed that ADOC's level of correctional staffing has decreased every quarter since March 2021, resulting in an approximate 19 % reduction in correctional-staffing levels over the course of one year. *See* Pls.' Analysis of Quarterly Staffing Reports (Doc. 3712) at 5. Without agreeing to all aspects of the plaintiffs' calculation, the defendants acknowledged that "correctional staffing at major male facilities decreased from March 31, 2021, to March 31, 2022." Defs.'**

Response to Pls.' Report Regarding Quarterly Staffing Reports (Doc. 3751) at 2.*

In light of the above, the plaintiffs reiterated a request they have made previously that the court impose "mandatory correctional staffing benchmarks" on the defendants. Pls.' Analysis of Quarterly Staffing Reports (Doc. 3712) at 3; *see* Aug. 15, 2022, R.D. Status Conference Tr. 20. At the August 15 status conference, the defendants objected that the plaintiffs' requested benchmarks would act merely as "arbitrary numbers between here and the finish line." Aug. 15, 2022, R.D. Status Conference Tr. 42. Despite ADOC's falling levels of correctional staffing, the defendants highlighted steps they had taken and were pursuing to improve recruitment and retention, including hiring consulting companies, successfully negotiating changes to physical standards

---

* If the court were to incorporate the defendants' proposed change to include correctional cubicle officers (CCOs) in the calculation, the decline in correctional staffing would actually increase in magnitude by about half a percent.

for entry-level correctional-officer positions, and, in 2018, implementing pay adjustments. *See id.* at 34-37.

Based on the parties' representations and because of the court's concern that the correctional staffing picture is not only not improving but hemorrhaging again, the court determined that the appropriate approach should involve two tasks. First, the defendants shall formally propose, and the parties shall attempt to develop jointly, a plan to increase ADOC's correctional-staffing levels. Second, the parties shall develop a method to measure periodically the effectiveness of the plan and to assess whether and to what extent it needs to be modified.

First, a concrete plan or combination of plans remains critical to get ADOC on track toward positive staffing trends and, ultimately, constitutionally adequate levels of correctional staffing. As the court explained at the August 15 status conference, it is one thing to establish mandatory staffing benchmarks, but there must be "a plan in place to actually achieve the

benchmarks." *Id.* at 21. The court finds that the defendants should formally propose a plan to address correctional understaffing, with the input and involvement of the plaintiffs throughout the process. The defendants appeared to be receptive to this strategy for moving forward. *See id.* at 37-38 ("[W]e are open to all ideas. And I would certainly be open to having a long discussion with plaintiffs' counsel about any ideas that they want us to discuss."). Moreover, in addition to involving both parties, the court agrees with the defendants that the development of this plan should also include either the EMT, as soon as it is operative, or at least Rick Raemisch, whom the parties unanimously selected to serve as the EMT's correctional administrator. *See id.* at 41.

Second, the court, the parties, and the EMT require a method to measure whether any plan they implement is working. The parties, again with the input of the EMT generally or of Mr. Raemisch specifically, should attempt to develop jointly a method for measuring the

effectiveness of any plan developed through the above process. The purpose of this measurement is functional: to provide "an opportunity for assessment [and reassessment] rather than purely one for achieving." *Id.* at 42.

The court has already required the defendants to "develop ..., and submit to the court, realistic benchmarks for the level of correctional staffing ADOC will attain by December 31 of 2022, 2023, and 2024." Phase 2A Omnibus Remedial Order (Doc. 3464) at § 2.1.5. These benchmarks are, and remain, due to be submitted by December 1, 2022. *See* Phase 2A Revised Remedy Scheduling Order on the Eighth Amendment Claim (Doc. 3667) at 6. In ordering the defendants to develop and submit benchmarks, the court emphasized:

> "The benchmarks need not be enforceable. They are merely meant as a means of measuring ADOC's progress towards filling its mandatory and essential posts by 2025, so that the court and the parties can determine if ADOC is falling behind and take appropriate action immediately. By assessing ADOC's progress against the benchmarks, the court and the parties will decrease the chances that, come four years from the omnibus remedial hearings, they will have to

> **scramble to ensure that ADOC complies with the court's correctional staffing order or, worse, to extend the deadline for doing so by another four years."**

***Braggs v. Dunn*, 562 F. Supp. 3d 1178, 1260-61 (M.D. Ala. 2021) (Thompson, J.).**

**At this time, it is premature for the court to determine whether the parties' joint efforts to develop a method of measuring the effectiveness of any plan or plans to address ADOC's current levels of understaffing will supplant or supplement the benchmarks that the court has already ordered the defendants to develop. That issue will be something for the court to revisit later.**

**To accomplish the two tasks articulated above, the parties agreed that mediation before Judge Ott is the appropriate next step in developing a workable plan and the means of measuring whether that plan is working. *See id.* at 44-47. Given the need to mediate the additional issue of the safe function of ADOC's RHUs with the current levels of correctional staffing, the parties proposed to submit to the court by August 23, 2022, a schedule or timeline to discuss and address these issues. *See id.***

**at 59-60. The court adopts this deadline for the parties to submit to the court a joint proposal on a schedule or timeline for the process articulated above.**

*** * ***

**Accordingly, it is ORDERED that, by August 23, 2022, at 5:00 p.m., the parties shall file with the court a joint proposal on a schedule to mediate the issues identified above regarding the development of a plan to address ADOC's correctional staffing levels and a method to assess and reassess over time the effectiveness of the steps taken pursuant to that plan.**

**DONE, this the 22nd day of August, 2022.**

**/s/ Myron H. Thompson**
**UNITED STATES DISTRICT JUDGE**