**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **EDWARD BRAGGS, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 2:14-cv-00601-MHT** |
| **v.** | ) | |
| | ) | **District Judge Myron H. Thompson** |
| **JOHN HAMM, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' RESPONSE TO ORDER FOR STATE TO SUBMIT
REALISTIC BENCHMARKS FOR CORRECTIONAL STAFFING LEVELS**

In response to the Court's directive for Defendants to propose "realistic benchmarks for the level of correctional staffing ADOC will attain by December 31 of … 2023, and 2024," (Doc. 3464 at p. 4) Defendants filed their response providing their proposal (Doc. 3901).[1]  The Court indicated that Plaintiffs should respond to the Defendants' benchmarks, and Plaintiffs' response is contained herein.  To best understand Plaintiffs' position, it is beneficial to again bring to the Court's attention ADOC's abject failure to address its "persistent and severe shortages of . . . correctional staff" which the Court concluded was an "overarching issue  . . . that permeate[s] each of the . . .contributing factors of inadequate mental-health care"

---

[1] The original requirement was to include a benchmark for December 31, 2022.  As noted throughout this Response, ADOC squandered the first year and in fact has fewer, not more officers in year one of the extension.

and further described as "horrendously inadequate." *Braggs v. Dunn*, 257 F. Supp. 3rd 1171, 1267 – 68 (M.D. Ala. 2017).

## I.    HISTORICAL CONTEXT

In the intervening more than five and a half years since the Court's Liability finding on June 2017, and the almost five years since the Court issued its "Phase 2A Understaffing Remedial Order" on February 20, 2018, ADOC has made no progress in addressing its severe understaffing issue.    Today, ADOC has far fewer correctional officers than at either previous period, or for that matter at any period for which data is readily available. A review of ADOC Monthly Statistical Reports as far back as January 2000 showed no period in which correctional officer staffing was as low as it is now.

In June 2017, ADOC employed at its Major Facilities, 1,442 CO/COT's, and 383 supervisory staff, total 1,825.[2]    By February 2018, ADOC was no longer publishing this data point.    However, the Court concluded in its February 2018 staffing remedial opinion, based on testimony, that "despite its efforts to hire more officers, [ADOC] has in fact continued to hemorrhage correctional officer staff since the time of the June 2017 liability opinion." (Doc. 1656).    This fact was confirmed in the first Quarterly Correctional Officer staffing report (Doc. 1685) filed nine days

---

[2] See archive for June 2017 contained at http://www.doc.state.al.us/StatReports

later on March 1, 2018, showing a total of 1,548 correctional officers and supervisors. (Doc. 1688)

The Court ordered the parties to file proposed remedial plans to correct the violation. Defendants' plan (Doc. 1374) set out a timeline for ADOC to hire a full complement of staff, to be completed by 2022. The Court ultimately adopted the Defendants' plan "with some modifications," none of which changed the final date of compliance. (Doc. 1657, 1658) As a part of that order, the Court required Defendants to file Quarterly Reports of the number of currently employed security staff.

Table 1 recapitulates those numbers since the filing of the first report through

Total Security Staff
(Correctional Officers + Supervisors - Cubicle Control Opertors)

current.[3]

---

[3] Starting with the fourth quarter of 2019, ADOC began including Cubicle Control Operators in the Quarterly Staffing Reports. As the updated Staffing Analysis concludes, the posts in the Report, and hence to be filled, "will only identify certified correctional officers and basic correctional officers as incumbents in these posts." Staffing Analysis and

As is clear from Table 1, ADOC currently employs far fewer correctional officers than at any time since the liability finding. Without counting Cubical Control Officers, which the new Staffing Analysis concedes cannot fill any post in the plan, (*see* p. 4) ADOC has more than 200 fewer Correctional Officers and Supervisors than at the time of the Liability Order, and more than 100 fewer than during the period before pay increases went into effect.  ADOC has lost 240 officers in the last three quarters.

As part of the plan put forward by Defendants in 2017, Defendants hired experts in the areas of retention, compensation, and recruitment.  Defendants hired the Warren Averett firm, which compiled a report and recommendations on how ADOC could accomplish hiring the required security staff, available at: http://doc.alabama.gov/docs/ADOC_Warren Averett Report.pdf.  While ADOC did implement some of the recommendations in part, ADOC fell woefully short in implementing all of the recommendations in the report: http://www.doc.state.al.us/docs/ADOC_Full_Compensation_Pkge_07032019.pdf Comparing and contrasting the recommendations to the actual plan effectuated by the state concerning newly hired Correctional Officers shows the inadequacy of the response.

---

Facilities Shift Relief Requirements for the Alabama Department of Corrections, at p. 4.  Cubicle Control Operators are neither.  Hence, Plaintiffs have subtracted CCO's from Table 1.

COMPENSATION

| Recommended by Warren Averett | Implemented by ADOC | Net Difference |
|---|---|---|
| $36,500 - $38,500 | $33,081 | -$3,418 - $5,419 |
| +15 – 20% graduation from APOST | $34,761 + $1,500 (8.8%) | -6.2 – 11.2% |
| Min $41,975 – Max $43,800 | $36,261 | -$5,714 - $7,539 |

For a short period after the pay increase, the total correctional staff at ADOC rose. However, over time, the advance decreased, disappeared, and eventually reversed itself. Based on this trend, ADOC never implemented the discarded recommendations of Warren Averett and has wasted year after year watching correctional officer staffing numbers plummet without significant intervention. That reality continued until the time of the remedial hearing, at which time ADOC requested an additional three years to accomplish the task of hiring officers, which it failed to do by the original deadline of 2022, extending the deadline until 2025. In ADOC's remedial plan, ADOC suggested hiring sufficient staff to fill all "Critical Minimum Correctional Staffing" posts within 18 months of the completion of the new staffing analysis, and enough staff to fill "85% of the F.T.Es for mandatory posts" six months thereafter. The proposal contained nothing about staffing Essential level posts. (*See* Doc 3215, pages 17-18)

## II.   INADEQUATE STAFF HAS HAD FATAL CONSEQUENCES

The total number of completed suicides since the liability finding has been extraordinary.  They have occurred almost wholly in restricted housing or enhanced mental health hubs.  With few exceptions, a root contributing cause was a lack of adequate correctional officer staffing. In the Court's Remedial Order (Part II, Doc. 3462) the Court emphasized the fatal consequences of ADOC's failure, noting the tragic events of the suicides of Laramie Avery, Jaquel Alexander, Casey Murphree, Charles Brass, Gary Campbell, and Tommy McConathy.  (Doc 3462 at 33-60).  For instance, Murphree when found had been dead so long that rigor mortis had set in. Braggs' mental health records indicate a plethora of missed mental health appointments due to lack of correctional staff.  Campbell was found hanging in his cell "after an undetermined period of time." McConathy was found hanging in his Stabilization Cell (which was supposed to be inspected for tie-off points but was evidently not) because he feared being returned to the Bullock RTU, an Open Dormitory Unit which has been habitually understaffed.

These, unfortunately, were not all the victims of ADOC's abject failure to supervise inmates in Restricted Housing due to lack of correctional staff.  (*See* Docs. 2468, 2476, 2885).  These tragic events have two overarching facts that tie almost all of them together: the lack of sufficient correctional officer staffing, and failure to learn lessons from, and reduce the risk of, future suicides in restricted housing.

Despite the lethal specter of dwindling staff, ADOC had done little or nothing to reduce the number of RHU beds, or to augment staff in those units. As the Court found in its remedial order, ADOC was unable to fully staff any facility for any of three shifts for a full week. As the Court saw, many of those staffing shortages occurred in RHU and RTU housing facilities, with many being totally unstaffed and unsupervised for significant periods of time. A continuation of these practices, as will undoubtedly occur if the Court approves the paltry number of additional correctional officers in defendant's plan, will lead to additional deaths.

## III. THE UPDATED STAFFING PLAN HAS ALMOST NO EFFECT ON THE TOTAL NUMBER OF OFFICERS ADOC MUST HIRE

Despite suggestions that a new staffing analysis might drastically alter the number of correctional officers ADOC needs to hire, those beliefs came to naught. Subtracting the officers no longer necessary at Holman Correctional Facility, because much of the facility was closed and prisoners moved, the total number of staff required remains almost unchanged from the 2017 requirements. The total number of FTEs in the 2017 report was 3,826. The total number of FTEs in the 2022 report (removing the reduction attributable to Holman Correctional Facility of 130.63 FTE) is 3,802.76, a net difference 23.34 FTEs, or a 0.6 % overall decrease.

## IV. ADOC'S PLAN CONTAINS A LIST OF EXCUSES WHY IT CANNOT, HAS NOT, AND WILL NOT COMPLY WITH THE COURT'S ORDER IN THE FORESEEABLE FUTURE

Not surprisingly, ADOC's plan contains its usual excuses, caveats and explanations for past, current, and future failures. (*See* Doc. 3901 pp. 2-3). Defendants point to the usual suspects: low unemployment rates; lack of funds from the Legislature; competition for appropriate staff; and location and conditions of their facilities, as reasons why they need more time to hire staff. None of those explanations changes the reality of, nor does any modify or negate, the constitutional requirements of adequate mental health care for prisoners housed within its control.

Focusing on the total number of, or percentage of, currently unemployed individuals in the State is misplaced. ADOC's misplaced focus and attempt to solve its staffing problems, solely on the back of hiring currently unemployed individuals, will undoubtedly fail. Rather than focusing on the 3% of the population that does not currently have a job, ADOC should focus on, and come up with a plan for, recruiting and hiring from the 97% of the population that does have a job. ADOC never fully implemented the pay recommendation of Warren Averett, nor has it timely considered whether a much higher figure is now required to hire the number of staff needed. Instead, ADOC has chosen to focus almost entirely on a plan for new facilities, many years in the future, rather than an investment in its facilities now, or for that matter, for decades.[4] ADOC has not pivoted from a clearly failed

---

[4] Since as far back as 2017, Defendants have been claiming that the building of new prisons will significantly reduce the understaffing woes of the Department. (*See, e.g.*, Doc 1374, "The State's Phase 2A Remedial Plan on Correctional and Mental Health Staffing").

8

plan to hire and retain officers, something that is all the clearer with 5 years of stagnant or decreasing security staff levels.

## V.    DEFENDANTS' PLAN

Defendants' current plan represents more of the same.  If approved, it would enshrine inadequate staffing for a sixth year since the Court's liability finding. Moving to 2024 and 2025, ADOC asks the Court to set staffing benchmarks with a "33% overtime rate."  This rate has been conjured from thin air without a whiff of empirical data to suggest it is reasonable, sustainable, and will not adversely affect the very problems ADOC currently faces recruitment and retention.  Even Warren Averett noted that staff leaving ADOC frequently cited the requirement of forced overtime as a reason for departure.  As far back 2016, Plaintiffs explained that excessive overtime has an "alarming" effect on "individual officer's performance and overall institutional safety" and excessive hours "impact the ability of officers "to be alert" and "exercise the patience and restraint necessary to supervise inmates" and impact the ability to "respond to crisis and emergencies".  (see Doc 555-2, at 43-44 Expert Report of Eldon Vail)  Such an ambitious overtime guesstimate serves only one purpose: to lower the total number of staff ADOC needs to hire without a concurrent promise that this lesser number will in fact be able to fill all the Mandatory and Essential posts as required by the Court.

ADOC claims that the Court's agreement to extend the deadline to fill positions was occasioned by the need "to complete the 2022 Staffing Analysis." (*See* Doc. 3901 at 4). This narrative is false. The original 2017 Staffing Plan created by the Savages noted the need for an annual reassessment of staffing needs (an updated Staffing Plan) annually. As with much else, ADOC simply ignored the opinions of its own experts, never created an internal entity capable of doing such an update, and allowed staffing deficiencies to fester unchecked. By the time that the update was done (which had nearly no effect of the total number of officers which ADOC needs to fill all the Mandatory and Essential Posts), the time to comply with the Court's order to hire staff had long since passed. The Court, in setting a later date, was merely acknowledging the reality of ADOC's abject failures. Given the additional three years to comply since that extension, ADOC has accomplished nothing. Staffing levels are substantially lower, not higher than when the Court granted ADOC an additional three years to accomplish the task of hiring sufficient staff so that the lack of staff "contributed to" and "permeated" the very fabric of constitutionally adequate care. Taken in the light most favorable to Defendants, what they have done is hire new consultants to "study" how they can avoid the failed policies and actions of the past but have not taken any proactive steps to reduce the burden on current staff by, for instance, reducing Restrictive Housing units or beds. Restrictive Housing Units have the most staff intensive requirements (*see* Table 2, page 8, Staffing Analysis

10

and Facilities Shift Relief Requirements for the Alabama Department of Corrections, October 31, 2022) and have been the location where almost all the unprecedented number of suicides have occurred.

Defendants' proposed overtime assumption is not supported by anything other than what was written. However, past practices suggest that ADOC's assumption may be wildly inaccurate. According ADOC's own Annual Report, in 2020 a total of $202,082,205.00 was spent on "personnel costs" (*see* http://www.doc.state.al.us/docs/AnnualRpts/2020 Annual Report.pdf, p. 25) while a separate report, citing data provided by the Alabama State Department of Personnel, indicated that only $33,377,359 (*see* https://aldailynews.com/lawmakers-new-prisons-to-help-adoc-staffing-shortages-overtime-expenses/ -:~:text=The%20Alabama%20Department%20of%20Corrections,shifts%20in%20its%20understaffed%20prisons.) was spent on overtime for the same calendar year. If both are accurate, 16.5% of the total personnel cost was overtime. However, since overtime costs 1½ times regular pay, the $33 million+ of overtime, covers only $22 million+ of real correctional officer coverage, lowering the effective rate to just over 11%.

Additionally, in Defendants' proposed Omnibus Remedial Order, ADOC only contended to utilize 15% overtime to fill correctional officer posts, suggesting that the 33% figure it now seeks to use is wildly inappropriate. (*See* Doc. 3215, p. 18).

While the plan set forth in the Defendants' proposed Remedial Order seems to only contemplate filling "Mandatory" level posts, it is important to remember that almost 91% of the posts contained in the new Staffing Plan are Mandatory level. Hence, even if the unspoken plan was to fill 100% of the Essential level posts with overtime, that would only yield a 24% overtime utilization rate.

V.   PLAINTIFFS' RESPONSE TO PROPOSED BENCHMARKS

Plaintiffs believe that the benchmarks must be much more robust than those proposed by Defendants.  If the Court approves Defendants' benchmarks, another year will pass in which ADOC has fewer officers than at the time the Court found that the lack of correctional officers was a contributing and permeating factor in constitutionally inadequate mental health care. More deaths will likely follow. Another year of the status quo is simply unacceptable, particularly since this is not Year One since this finding, it is *Year Five*.  Defendants' proposed benchmark would not even replace the officers it has lost in the previous three quarters.

At an absolute minimum, the benchmark for the end of 2023 must be at least the level of correctional officer staffing present in June 2017 (1,548), which the Court admittedly found inadequate.  However, Plaintiffs believe that the Court must impose a more robust requirement.  Plaintiffs request that the Court, at a minimum, set the required number of correctional officers which ADOC must hire by December 31, 2023, equal to the highest level ADOC has been able to achieve since

12

2017, or 1,817.5. (*See* table 1). While such a number is still clearly inadequate and will continue to result in RHUs being staffed at unsafe levels, and care being impacted on an unconstitutional manner, this number represent what Plaintiffs believe is a palatable down payment on hiring adequate staff, considering the recent historical trend of not just hemorrhaging correctional officers, but near exsanguination.

Contrary to the wildly unsupported assumptions built into Defendants' plan concerning what level of overtime to factor in, Plaintiffs believe that this Court should not speculate but require hard facts in making such a determination. ADOC has every incentive to seek to insert a totally unrealistic, and unsustainable, level of overtime into the calculation, since overtime reduces the total number of staff ADOC must hire to comply with the Court's Order. The Court need not reach a conclusion of what is an appropriate level of overtime to factor in 2023. Absent a historically unprecedented increase in staff, ADOC will not be able to fill all Mandatory and Essential posts by the end of 2023, even with 33% overtime added.

Plaintiffs believe that the question of overtime factoring into benchmarks is complex and largely unknown. The Court need not cross this bridge without real evidence as to the history of, sustainability of, and impact of, significant overtime in crafting the final two years of benchmarks, designed to employ enough staff so that ADOC can in fact fill all the required posts. As the Warren Averett report noted,

staff leaving ADOC often cited overtime as a significant factor. (*See* http://doc.alabama.gov/docs/ADOC_Warren Averett Report.pdf pp. 106-109)

Plaintiffs propose that rather than setting artificially supported benchmarks for 2024 and 2025, that the Court set a hearing, after an appropriate period for discovery, when the Court can receive evidence rather than self-serving statements and unproven assumptions. If the Court were to set such a hearing in late 2023 or early 2024, it would provide sufficient time for the parties to fully provide the Court with briefing and evidence from which the Court can make conclusions without delaying the completion date of 2025.

Respectfully submitted,

Date: January 27, 2023

/s/ *William Van Der Pol, Jr.*

William Van Der Pol, Jr
*One of the Attorneys for the Plaintiffs*

Ashley N. Light
Lisa W. Borden
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
ashley.austin@splcenter.org
lisa.borden@splcenter.org

Leslie Faith Jones*
**SOUTHERN POVERTY LAW CENTER**
111 East Capitol Street, Suite 280
Jackson, MS 39201
Telephone: (601) 948-8882
Facsimile: (334) 956-8281
leslie.jones@splcenter.org
*Admitted pro hac vice*

Bruce Hamilton*
**SOUTHERN POVERTY LAW CENTER**
201 St. Charles Avenue
Suite 2000
New Orleans, LA 70170
Telephone: (504) 352-4398
Facsimile: (504) 809-7899
*Admitted pro hac vice*

William G. Somerville, III
Patricia Clotfelter
**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ  PC**
420 20th Street North, Suite 1400
Birmingham, AL 35203
wsomerville@bakerdonelson.com
pclotfelter@bakerdonelson.com

William Van Der Pol, Jr.
Lonnie Williams
Barbara A. Lawrence
Andrea J. Mixson
Larry G. Canada
**ALABAMA DISABILITIES
ADVOCACY PROGRAM**
University of Alabama
2008 12th Street
Box 870395
Tuscaloosa, AL  35487
Telephone: (205) 348-4928
Facsimile: (205) 348-3909
wvanderpoljr@adap.ua.edu

lwilliams@adap.ua.edu
blawrence@adap.ua.edu
amixson@adap.ua.edu
lcanada@adap.ua.edu

Catherine E. Stetson\*
Neal K. Katyal\*
Jo-Ann T. Sagar\*
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
cate.stetson@hoganlovells.com
neal.katyal@hoganlovells.com
jo-ann.sagar@hoganlovells.com
*Admitted pro hac vice*

Mark Whitburn\*
**WHITBURN & PEVSNER, PLLC**
2000 East Lamar Boulevard, Suite #600
Arlington, TX  76006
Telephone: (817) 672-5453
Facsimile: (817) 653-4477
mwhitburn@whitburnpevsner.com
*Admitted pro hac vice*

Joshua C. Toll\*
**KING & SPALDING LLP**
1700 Pennsylvania Avenue NW, 2nd Floor
Washington, DC 20006-4707
Telephone: (202) 227-6138
Facsimile: (202) 626-3737
jtoll@kslaw.com
*Admitted pro hac vice*

Evan Diamond\*
**KING & SPALDING LLP**
185 Avenue of the Americas, 34th Floor
New York, NY 10036

Telephone: (212) 556-2297
Facsimile: (212) 556-2222
ediamond@kslaw.com
*Admitted pro hac vice*

Edward A. Bedard*
**KING & SPALDING LLP**
1180 Peachtree Street NE, Suite 1600
Atlanta, GA 30309
Telephone: (404) 572-3127
Facsimile: (404) 572-5100
ebedard@kslaw.com
*Admitted pro hac vice*

Rachel Rubens*
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1210
rrubens@kslaw.com
*Admitted pro hac vice*

**ATTORNEYS FOR THE PLAINTIFFS**

*/s/  Anil A.Mujumdar*
Anil A. Mujumdar

Anil A. Mujumdar
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, AL 35213
Telephone: (205) 590-6986
Facsimile: (205) 809-7899
anil@dagneylaw.com

**ATTORNEY FOR PLAINTIFF ALABAMA DISABILITIES ADVOCACY PROGRAM**

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 27th day of January, 2023 electronically filed the foregoing with the clerk of court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Anne A. Hill
Deputy Attorney General
State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36104
Anne.Hill@AlabamaAG.gov

William R. Lunsford, Esq.
Matthew Reeves, Esq.
Kenneth S. Steely, Esq.
La Keisha W. Butler, Esq.
Maynard, Cooper & Gale, P.C.
655 Gallatin Street, SW
Huntsville, AL 35801
blunsford@maynardcooper.com
mreeves@maynardcooper.com
ksteely@maynardcooper.com
lbutler@maynardcooper.com

Stephanie L. Smithee, Esq.
Alabama Department of Corrections
Legal Division
301 South Ripley Street
Montgomery, AL 36104
stephanie.smithee@doc.alabama.gov

Luther M. Dorr, Jr., Esq.
Maynard, Cooper & Gale, P.C.
1901 6th Avenue North, Suite 2400
Birmingham, AL 35203
rdorr@maynardcooper.com

Philip Piggott, Esq.
Webster Henry
Two Perimeter Park South
Suite 445 East
Birmingham, AL 35243
ppiggott@websterhenry.com

Deana Johnson, Esq.
Brett T. Lane, Esq.
MHM Services, Inc.
1447 Peachtree Street, N.E., Suite 500
Atlanta, GA 30309
djohnson@mhm-services.com
btlane@mhm-services.com

/s/ *William Van Der Pol, Jr.*
One of the Attorneys for Plaintiffs

18

19