IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

EDWARD BRAGGS, et al.,          )
                                )
        Plaintiffs,             )
                                )      CIVIL ACTION NO.
        v.                      )      2:14cv601-MHT
                                )          (WO)
JOHN HAMM, in his               )
official capacity as            )
Commissioner of                 )
the Alabama Department of       )
Corrections, et al.,            )
                                )
        Defendants.             )

OPINION AND ORDER ON SEVEN
MONITORING ISSUES RAISED BY PARTIES

The parties have presented to the court seven
monitoring-related issues. *See* Joint Status Report on
Potentially Resolvable Monitoring-Related Issues
(Doc. 4046).  This opinion responds to each.


I. BACKGROUND

Over the past seven years, the court has written to
this case many times.  Of these prior writings, three
major opinions interlock to create the guiding framework
for approaching the parties' monitoring-related issues.

The relevant opinions, with accompanying orders, are the 2017 Liability Opinion,[1] the 2020 Monitoring Opinion,[2] and the 2021 Omnibus Remedial Order.[3]

## A. The 2017 Liability Opinion

In 2017, after an extensive trial, this court entered the Liability Opinion finding that the State of Alabama provides inadequate mental-health care in its prisons in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1267 (M.D. Ala. 2017) (Thompson, J.) ("Simply put, ADOC's mental-health care is horrendously inadequate."). The court laid out seven specific factors

---

1. On the court docket as Liability Opinion and Order as to Phase 2A Eighth Amendment Claim (Doc. 1285)), published at *Braggs v. Dunn*, 257 F. Supp. 3d 1171 (M.D. Ala. 2017) (Thompson, J.).

2. On the court docket as Phase 2A Opinion and Order on Monitoring of Eighth Amendment Remedy (Doc. 2915), published at *Braggs v. Dunn*, 483 F. Supp. 3d 1136 (M.D. Ala. 2020) (Thompson, J.).

3. On the court docket as Phase 2A Omnibus Remedial Opinions and Order (Doc. 3461, Doc. 3462, Doc. 3463, & Doc. 3464), published at *Braggs v. Dunn*, 562 F. Supp. 3d 1178 (M.D. Ala. 2021) (Thompson, J.).

contributing to the Eighth Amendment violation, and found that mental-health and correctional understaffing, in conjunction with overcrowding, permeated each of the contributing factors. *See id.* at 1267-68. Though the court found the ADOC liable in this 2017 opinion, it did not issue any remedy at that time. Rather, after emphasizing the urgency for "immediate and long term" prospective relief, the court ordered that the case enter the remedial phase. *Id.* at 1268.

## B. The 2020 Monitoring Opinion

In September 2020, the court entered the Monitoring Opinion, adopting a monitoring scheme to be implemented as part of the remedy for the court's finding that the State of Alabama provides inadequate mental-health care in its prisons in violation of the Eighth Amendment. *See Braggs v. Dunn*, 483 F. Supp. 3d 1136 (M.D. Ala. 2020) (Thompson, J.). At that time the court had already issued, as described in the Monitoring Opinion, "remedial opinions and orders regarding, among other things, understaffing, ..., and inpatient treatment...." *Id.* at

3

1140 (citations omitted).  The court had "also issued several remedial orders temporarily adopting the parties' stipulations regarding other contributing factors...." *Id.* (citation omitted)

In considering the proper monitoring scheme, the court received proposals from both sides.  Ultimately, the court adopted the defendants' plan in large part, with some alterations.  "Most significantly, the court ... adopt[ed] the defendants' overarching proposal that, in light of their own admission that they lack the capacity to self-monitor, outside experts will initially monitor compliance and will draw on their expertise to develop many of the details of the monitoring plan." *Id*.

Monitoring is to occur in roughly three phases: first, monitoring by an external monitoring team (EMT); second, external monitoring alongside internal monitoring by ADOC; and, third, internal monitoring by ADOC itself (with court oversight until monitoring is generally terminated).  *See id.* at 1142.

Thus, the Monitoring Opinion authorized the creation of an EMT that will initially monitor the ADOC's

**4**

compliance with the court's remedial orders until the EMT can hand the "reins over to [the ADOC's] internal monitoring team." *Id.* at 1153. The EMT's monitoring would be based largely on the EMT's "performance measures" and "audit tools." Performance measures "are the metrics by which the monitors are to evaluate whether the defendants are complying with the court's remedial orders," while the term audit tool "essentially refers to the method or procedure by which the EMT members assess compliance with the performance measures." *Id.* at 1148-52.

The Monitoring Opinion also outlined two structural features concerning the EMT's authority and limitations. First, the court adopted the defendants' plan "to empower the EMT to fill out the details of the [monitoring] plan because of the EMT's 'expertise.'" *Id*. at 1149.[4]   As

---

4. More specifically, the court adopted the "defendants' plan to give the EMT authority to modify the 259 initially proposed performance measures (including by removing them, changing their language, or creating entirely new performance measures"), using its unique expertise to create measures necessary to evaluate the defendants' compliance with the court's remedial orders. *Id.*

ADOC officials testified, the EMT should "have the ability to create measures that" adequately address the remedial orders and should be allowed to develop and change performance measures as needed, "'as long as they're reflective' of the remedial orders." *Id.* (quoting then-Commissioner Dunn and then-Associate Commissioner Naglich). In other words, the defendants acknowledged that the EMT "must drive the process of filling in the open components" and details of the monitoring scheme. *Id.*

Second, while it embraced the defendants' request that the EMT have the authority to create and modify performance measures and audit tools, the Monitoring Opinion made clear that the EMT's authority and discretion to create measures and tools is cabined by the remedial orders, and that the EMT lacks the authority to monitor matters beyond the scope of those orders. In sum, the EMT's ability to monitor extends only as far as needed to evaluate the "defendants' compliance with the court's remedial orders." *Id.*

6

In the monitoring opinion, the court also addressed the Prison Litigation Reform Act (PLRA). Under the statute, "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C § 3626(a)(1)(A). The statute directs that a district court "shall not grant or approve any prospective relief unless the court *finds* that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* (emphasis added). These three findings are known as the PLRA's need-narrowness-intrusiveness requirements. *See United States v. Sec'y, Fla. Dep't of Corr.,* 778 F.3d 1223, 1227 (11th Cir. 2015). "[E]ach requirement imposed" as prospective relief must be supported by "particularized findings" that the relief satisfies the need-narrowness-intrusiveness requirements. *Id.* "It is not enough to simply state in conclusory fashion that the

**7**

requirements of [the prospective relief] satisfy those criteria." *Id.*

The PLRA itself, and the caselaw interpreting it, leave unclear whether external monitoring qualifies as prospective relief and therefore is subject to the need-narrowness-intrusiveness requirement. *See Braggs*, 483 F. Supp. 3d at 1168 (surveying the arguments for and against monitoring as prospective relief under the PLRA). The court did not resolve this issue in the Monitoring Opinion and does not do so now. Rather, in the Monitoring Opinion, the court made extensive need-narrowness-intrusiveness findings on monitoring in case such findings should be later viewed as necessary. *See id.* ("[T]o the extent monitoring must meet the [PLRA's] requirement[s], it does.").

The court's PLRA findings were both global and specific. The court found that that "each of the ... monitoring provisions satisfies the need-narrowness-intrusiveness requirement--both individually and in concert." *Id.* at 1173. As to performance measures and audit tools, the court found

that allowing the EMT to establish the measures and tools necessary to monitor compliance meets the need-narrowness-intrusiveness requirement because they "will be limited to the court's remedial orders," which must independently satisfy the PLRA. *Id.* at 1149-52.

Ultimately, through the Monitoring Opinion, the court adopted the defendants' monitoring scheme in large part, issued PLRA findings on the specific components of that scheme as well as the scheme as a whole, and explicitly determined that the EMT's authority to create measures and tools--as limited by the scope of the remedial orders--meets the PLRA's need-narrowness-intrusiveness requirements. *Id.*

The Monitoring Opinion also addressed two other aspects of monitoring relevant here: (1) the EMT's authority to discontinue monitoring of certain provisions or facilities and (2) the EMT's definitions of compliance.

First, as set forth in the Monitoring Opinion, the court vested the EMT experts with the "authority, without a hearing, to stop evaluating a particular performance

9

measure at a particular facility, or stop evaluating a facility altogether, based on their own determination of sustained substantial compliance." *Id.* at 1166.  The parties cannot force the EMT to decide whether sustained substantial compliance has been met at any given time. On the other hand, the parties are not prohibited from asking the EMT to make its own determination of sustained substantial compliance.  Thus, the EMT has the discretion to monitor--or to discontinue monitoring based on its own determination of sustained substantial compliance--any non-terminated remedial provision.

Second, the Monitoring Opinion (with the agreement of the parties) vested the EMT with "the authority to define substantial compliance for each performance measure," using both quantitative metrics and qualitative assessments such as "consideration of whether policies are developed, staff are trained, and the policies followed." *Id*. at 1165–66.  The court found that giving the EMT authority to define compliance for its monitoring purposes in this way satisfied the PLRA.  *Id.*

Therefore, the cornerstone of this monitoring scheme is the EMT, which will draw on its members' expertise to determine many of the details of monitoring and to assist in developing ADOC's capacity for sustainable internal monitoring and oversight.

As explained at length in the Monitoring Opinion:

> "[E]xternal monitoring is *necessary* to address ongoing constitutional violations. This is because ADOC has failed to self-identify and self-correct problems with its provision of mental-health services to inmates, and because this failure has continued since the liability opinion, demonstrated by ADOC's ongoing failure to self-monitor compliance with remedial orders ... Therefore, external monitoring will continue to be *necessary* until the defendants have the capacity to self-monitor; that is, until the [ADOC] has built and demonstrated its competency both to identify and correct deficiencies."

*Id.* at 1162 (internal citations omitted).

### C. The 2021 Omnibus Remedial Order

A year after issuing the Monitoring Opinion, the court entered a comprehensive Omnibus Remedial Opinion and Order. *See Braggs v. Dunn*, 562 F. Supp. 3d 1178, 1259 (M.D. Ala. 2021) (Thompson, J.) (hereinafter the "Omnibus Remedial Order"). The order contains dozens of

remedial provisions.  These remedial provisions create in large part the substantive framework that will be monitored pursuant to the Monitoring Opinion.  In the opinion (as supplemented by earlier opinions providing for remedial relief and addressing the PLRA), each ordered remedy is supported by written, particularized findings that the specific provision satisfies the PLRA's requirements.  *See id.* at 1259–1359.

During the proceedings leading to the Omnibus Remedial Order, the defendants raised two arguments "related to monitoring."  *Id.* at 1204.  First, they attempted to have the court adopt a different monitoring scheme.  Second, fearing costs related to monitoring, they sought to "impose a requirement that the [remedial] provisions themselves expressly prescribe their own monitoring regimes."  *Id.* at 1205.

The court squarely rejected both of these arguments, first, because the court had "considered the concerns raised by the defendants at the [monitoring phase of the litigation], and it found that the monitoring scheme it adopted complied with the need-narrowness-intrusiveness

mandate of the PLRA." *Id.* *S*econd, the court explained, re-evaluating "how the provisions of the proposed omnibus orders might be monitored or to impose a requirement that the provisions themselves expressly prescribe their own monitoring regimes," would amount to "relitigation of an issue recently decided by the court after extensive adversarial proceedings and with particularized PLRA findings." *Id.* Summing up, the court reemphasized that the "scope of the EMT's authority was established by the monitoring opinion and order. ... The appropriate point at which to raise concerns about the potential intrusiveness of monitoring was during the course of litigation that preceded that opinion and order." *Id.*


### D. Summary

Collectively, the three prior opinions clearly lay out the following.

First, each remedial order in this case has been supported by written, particularized findings as to the PLRA's need-narrowness-intrusiveness requirements. *See Braggs*, 562 F. Supp. 3d at 1259-1359.

13

Second, though arguably unnecessary, the monitoring scheme set forth in the Monitoring Opinion is supported by written, particularized findings that the scheme's components, both individually and in concert, meet the PLRA's need-narrowness-intrusiveness requirements. *See Braggs*, 483 F. Supp. 3d at 1143.

Third, and more specifically, the monitoring scheme's approach to the performance measures and audit tools used to monitor ADOC's compliance with the PLRA-compliant remedial orders is also independently supported by written, particularized findings as to the PLRA's need-narrowness-intrusiveness requirements. *Id.* at 1149-52.

Fourth, the Monitoring Opinion provides that the performance measures and audit tools are to be created by the EMT. But, while the EMT's discretion and authority to create and modify those measures and toolsare broad, it is limited to creating measures and tools that evaluate compliance with the court's remedial orders. The EMT, in its monitoring, cannot go beyond evaluating compliance with the remedial orders.  Accordingly, the

EMT cannot, through monitoring, create any new
prospective relief.  Only the court can issue prospective
relief.

Fifth, the parties may object, after mediation, to
the EMT's proposed performance measures and audit tools,
and the court will resolve those objections.  *See id.* at
1149, 1152.

And, sixth, in light of this framework, the court
has already rejected attempts by the parties to revisit
the scope of the EMT's authority because that authority
was "established by the monitoring opinion," and the
"appropriate point at which to raise concerns about the
potential intrusiveness of monitoring was during the
course of litigation that preceded [the monitoring]
opinion and order."  *Braggs*, 562 F. Supp. 3d at 1204.


## II. MONITORING ISSUES AND RESOLUTION

It took several years to form the EMT, which consists
of four members.  In 2023, the EMT began its initial
work.  Since then, it has been in what it calls the
"pre-monitoring phase," wherein it has been gearing up

15

to begin monitoring ADOC's compliance with the court's remedial orders. That is, nearly four years after the Monitoring Opinion, monitoring still has not begun--but "pre-monitoring" has. As stated above, imperative to this pre-monitoring phase is the EMT's development of the performance measures and audit tools that it will use to assess and monitor ADOC's compliance with the court's remedial orders. *See* Supplemental Joint Report (Doc. 3918) at 2 (outlining all "pre-monitoring activities"). The EMT cannot begin monitoring in earnest until its performance measures and audit tools are finalized.

The EMT has been working hard to develop the measures and tools that it will use to conduct such monitoring. The Monitoring Opinion, however, provides that, before monitoring begins, the parties will be given an opportunity to raise objections to any of the EMT's proposed measures and tools. *See Braggs*, 483 F. Supp. 3d at 1149, 1152.

At this point, the EMT is near the end of its process of establishing its measures and tools, and the parties

are deciding whether to object to any of them.  However,
the parties have asked the court--and the court has
agreed--to take up several monitoring-related issues
before the submission of any such objections to the EMT's
measures and tools.  *See* Joint Status Report on
Potentially  Resolvable  Monitoring-Related  Issues
(Doc. 4046); *see also* Order on Monitoring Matters
(Doc. 4081) ("The parties' ultimate objections to the
measures and tools will not be due until after the court
makes  an  attempt  to  resolve  the  monitoring-related
issues.").  Each of these issues has been fully briefed.
*See* Briefs on Monitoring Issues (Doc. 4063, Doc. 4070, &
Doc. 4076).

The seven issues are as follows:

- "Who holds the burden of proof concerning any
  hearing on objections to the EMT's performance
  measures and audit tools?

- "Does  the  Prison  Litigation  Reform  Act
  ('PLRA')  require  the  Court  to  conduct  a
  needs-narrowness-intrusiveness  analysis  of
  the EMT's performance measures and audit tools
  generally or to the extent they differ from or
  expand  the  Phase  2A  Omnibus  Remedial  Order
  (Doc. 3464, the 'Remedial Order')?

17

- "If and to the extent the PLRA requires a needs-narrowness-intrusiveness analysis for the EMT's performance measures and audit tools, will the analysis require a determination topic-by-topic (i.e., confidentiality, coding, etc.), performance-measure-by-performance-measure, or by each section of each performance measure?

- "Does the EMT possess the authority to define compliance (whether substantial or some other measure), as full compliance at 100%?

- "Does the EMT possess the authority under the Phase 2A Opinion and Order on Monitoring of Eighth Amendment Remedy (Doc. 2915) to require ongoing compliance (whether substantial or some other measure), with all requirements at all facilities rather than discontinuing monitoring of 'a particular performance measure at a particular facility, or stop evaluating a facility altogether, based on [the EMT's] determination of sustained substantial compliance'? (Doc. 2915 at 99).

- "Does the EMT possess the authority to create performance measures for items not explicitly required by the Remedial Order?

- "Should the EMT monitor completed provisions of the Remedial Order, including Sections 2.1.1, 2.1.2, 2.1.3, 2.1.5, 2.1.7.3, 3.1.12, 3.1.3 and 11.3?"

Joint Status Report on Potentially Resolvable Monitoring-Related Issues (Doc. 4046) at 2-3.

18

The issues are relayed above in the order and way the parties framed them in their Joint Status Report on Potentially Resolvable Monitoring-Related Issues. *See id*. However, the court will address them in the order that seems more appropriate to the court. Likewise, in the discussion below, the court frames some of the questions slightly differently because the parties' briefing at times frames the questions in ways that depart from the initial framing provided above.[5]

Before delving into each issue, it is helpful to explain the two types of objections the defendants

---

5. Perhaps the most instructive framing of the questions in the briefing comes from the defendants' ultimate request for relief. In their response brief, the defendants request an order that: (1) provides that the plaintiffs' bear the burden of proof on any objections to the measures and tools; (2) restricts the EMT from creating performance measures and audit tools that expand beyond the remedial orders; (3) requires the EMT to define compliance at less than 100 %; (4) requires the EMT to create a mechanism by which the State can have the EMT stop monitoring performance measures based on sustained substantial compliance; and (5) instructs the EMT not to monitor certain remedial provisions that the State has completed but which have not been formally terminated. Def.'s Response to Pl.'s Brief Regarding Potentially Resolvable Monitoring Issues (Doc. 4070) at 25 (hereafter "Def.'s Response").

anticipate bringing against the EMT's proposed performance measures and audit tools: (1) objections that a measure or tool "purport[s] to impose obligations beyond those imposed by the Remedial Order;" and (2) objections that the EMT's definitions of certain compliance thresholds violates the PLRA. *Id.* at 7–8.

With this background in mind, as well as the three earlier opinions summarized above, the court turns to the issues presented by the parties.

  i. *Does the PLRA require written need-narrowness-intrusiveness findings for the EMT's performance measures and audit tools?*

Under this heading the court responds to the second and third bulleted questions presented in the parties' Joint Status Report on Potentially Resolvable Monitoring-Related Issues.

As stated in the Monitoring Opinion, whether the EMT's performance measures and audit tools qualify as "prospective relief" that requires need-narrowness-intrusiveness findings is an issue that the court has not and need not resolve because the court previously found that the EMT's authority to create

20

measures and tools satisfies the PLRA so long as those measures and tools are within the scope of the remedial orders. *See Braggs*, 483 F. Supp. 3d at 1167–68. ("[T]o the extent monitoring must meet [the need-narrowness-intrusiveness] requirement, it does.").

Any measures or tools that are outside the scope of the remedial orders (that is, measures and tools that are *not* targeted at evaluating, assessing, and monitoring compliance with the remedial orders) are not permitted by the Monitoring Opinion and are therefore not supported by the court's previous PLRA findings.

ii. *Does the EMT possess the authority to create performance measures for items not explicitly required by the court's remedial orders?*

The court is hesitant to answer this question in a vacuum. In broad terms, the EMT's authority to monitor ADOC's compliance with the court's remedial orders is derivative of the remedial orders. The EMT cannot "monitor" something that has no relationship to monitoring compliance with the court's remedial orders. The EMT's authority to create performance measures and audit tools extends only so far as needed to evaluate

21

ADOC's progress and compliance "with regard to the remedies ordered in this case." *Braggs*, 483 F. Supp. 3d at 1149. That said, the remedial orders provide for many items of many different types. Some orders are very precise while some are more general. Whether a performance measure or audit tool is within the scope of monitoring a certain remedial order is context dependent. However, the court reiterates that EMT's authority to create measures and tools is limited to evaluating, assessing, and monitoring compliance with the court's remedial orders.

### iii. Does the EMT possess the authority to define compliance as full compliance at 100 %?

The EMT, in exercise of its unique expertise, possesses the broad authority to "create the performance measures" and "define substantial compliance for each performance measure." *Braggs*, 483 F. Supp. 3d at 1149, 1162. Importantly though, the EMT possesses no *binding* ability to determine compliance with any remedial order. Only the court can determine ultimate compliance under the remedial orders and the strictures of the PLRA. The

EMT's definition of compliance does not bind the court in any way. It is simply evidence, albeit "crucial" evidence, that the court can use when it ultimately evaluates whether external monitoring or a remedial provision should be terminated. *Id.* at 1165.

While substantial compliance and 100 % or complete compliance are, by definition, not the same, the court is concerned that there *may be* circumstances where, as a practical matter, one is either in full compliance or not, that is, where, by the nature of the thing being assessed, there is no such thing as partial compliance. The court does not possess the EMT's varied expertise, and it is reluctant to render some broad opinion on the issue presented without input from the EMT and without a concrete circumstance before it. The court, therefore, will not now blindly bind the EMT to a bright-line quantitative range for all measures prior to the court having seen the measure or heard from the EMT as to why it defined substantial compliance at a given level for a given measure.

> *iv.  Who bears the burden of proof on any objections to the EMT's performance measures and/or audit tools?*

This question presumes that evidence will have to be presented to resolve any objections to the EMT's performance measures and audit tools.  The court anticipates that the objections (if any) will target whether a performance measure or audit tool exceeds the bounds of monitoring compliance with the remedial orders and the Monitoring Opinion.  Resolving such an objection may not require any evidence, rather only interpretation of the language of the remedial orders.  *See Braggs*, 483 F. Supp. at 1149 ("Because the performance measures will be limited to the court's remedial orders, ... they will be narrowly tailored to evaluate only ADOC's progress with regard to the remedies ordered in this case."); *id.* at 1152 ("As with the performance measures, the audit tools will be limited to assessing ADOC's progress as to the court's limited remedial orders and its capacity to self-monitor.").  Until and if such time that evidence is actually necessary to resolve an objection to the EMT's measures and tools, the court will not determine

24

who bears the burden of proof for that as-of-yet unseen objection.

> ***v. Should the defendants have a procedural mechanism that allows them to force the EMT to discontinue monitoring of a particular measure/facility?***

The parties do not have the power to compel, force, or otherwise make the EMT discontinue its role as monitor of the various remedial provisions.

As the Monitoring Opinion lays out, the EMT has general authority to monitor ADOC's compliance with the court's remedial orders. *See Braggs*, 483 F. Supp. 3d at 1142–44.  The EMT also has the specific authority to "stop evaluating a particular performance measure at a particular facility, or stop evaluating a facility altogether, based on their own determination of sustained substantial compliance." *Id.* at 1166.  The authority to discontinue external monitoring of a specific facility or provision based on the EMT's own determination of sustained substantial compliance is soundly within the discretion of the EMT.

However, that said, the Monitoring Opinion likewise does not prohibit the defendants from simply requesting that the EMT discontinue monitoring a particular provision or facility based on sustained substantial compliance. The EMT may very well choose to do so upon request. If the defendants believe the EMT's decision not to discontinue monitoring a facility or provision is not supported by what is before the EMT, there is nothing to prevent the defendants from using the mechanism that has historically governed resolution of disputes in this litigation: first seek mediation before Judge John Ott, and, if that fails, then present the the specific matter to the court for resolution.

### vi. Should the EMT monitor remedial provisions that the defendants say have been completed?

The EMT should monitor to the best of its ability and expertise all of the court's ordered relief absent court termination of monitoring or other prospective relief, or the EMT's own determination of sustained substantial compliance at a particular facility or with a particular provision.

The defendants assert that several remedial provisions, many of which they label "one-time actions," have been completed.[6]  Def.'s Response (Doc. 4070) at 25. They request that the court order the EMT to "disregard these [provisions]," and not create performance measures or audit tools concerning these provisions.  *Id.*

The court does not think it prudent to sideline the EMT on the question of whether there has been substantial compliance at a particular facility or with a particular provision.  The EMT may very well agree with defendants as to a facility or with a provision, and that will be the end of that.

### III. CONCLUSION AND ORDER

This opinion does not break any new ground.  The questions submitted by the parties are either answered by the court's previous opinions or are raised

---

6. In their briefing, the defendants say that they have completed the following sections of the remedial order: 2.1.1, 2.1.2, 2.1.3, 2.1.5, 2.1.7.3, 3.1.1, and 11.3.  *See* Def.'s Response (Doc. 4070) at 22-23 (citing Omnibus Remedial Order).

prematurely.    The court reminds the parties of the monitoring scheme's two fundamental, and agreed upon, goals: (1) to oversee compliance with the court's remedial orders and (2) to build ADOC's capacity to exercise sustainable internal oversight of mental-health care--that is, to identify and correct problems.  *See Braggs*, 483 F. Supp. 3d at 1142.   To do so, as the defendants have previously acknowledged, requires external monitoring.   *See id.* at 1171.   And, as the defendants previously requested, it is the EMT that needs to "determine many of the details of how to carry out monitoring, including fashioning performance measures and audit tools."  *Id.* at 1142.

Accordingly, it is ORDERED that the parties' unresolved objections, if any, to the EMT's performance measures and audit tools shall be submitted by a date to be determined at the triannual status conference on March 1, 2024.   The EMT's finalized proposed versions of the performance measures and audit tools, and any objections thereto, shall be formatted and filed in a manner

consistent with the court's previous Opinion and Order

on Monitoring (Doc. 4029).

DONE, this the 29th day of February, 2024.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE