# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **EDWARD BRAGGS,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 2:14-cv-00601-MHT** |
| **v.** | ) | |
| | ) | **District Judge Myron H. Thompson** |
| **JOHN HAMM,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## JOINT STATEMENT REGARDING MONTHLY <u>RESTRICTIVE HOUSING UNIT REPORT TRENDS</u>

Plaintiffs Edward Braggs, *et al.* ("<u>Plaintiffs</u>") and Defendants John Hamm ("<u>Commissioner Hamm</u>"), in his official capacity as Commissioner of the Alabama Department of Corrections ("<u>ADOC</u>"), and Deborah Crook, in her official capacity as ADOC's Deputy Commissioner, Office of Health Services ("<u>Deputy Commissioner</u>" and, collectively with Commissioner Hamm, the "<u>State</u>," and, together with Plaintiffs, the "<u>Parties</u>"), hereby submit this Joint Statement Regarding Monthly Restrictive Housing Report Trends in response to the Court's Order Approving RHU Plan and Adopting Monthly RHU Reports (Doc. 4082),[1] regarding

---

[1] The State submits this filing in response to the Court's Order Approving RHU Plan and Adopting Monthly RHU Reports. (Doc. 4082), the Court's Phase 2A Omnibus Remedial Opinion (Doc. Nos. 3461, 3462, 3463, 3465), Phase 2A Omnibus Remedial Order (Doc. 3464), any other Phase 2A remedial orders, and the Court's liability opinions and orders in this action, including without limitation, the Court's Liability Opinion and Order as to Phase 2A Eighth Amendment Claim (Doc. 1285) and Phase 2A Supplemental Liability Opinion and Order on Periodic Mental-Health

(i) the data in the Monthly Restrictive Housing Report for the month of April 2025 ("April 2025 Report," Doc. 4352-1); (ii) the changes in Restrictive Housing Unit data relative to the Monthly RHU Report for the month of March 2025 ("March 2025 Report," Doc. 4344-1); (iii) whether the April 2025 RHU Report reflects progress towards the goals outlined in ADOC's proposed plan for operating Restrictive Housing Units ("RHU") with current staffing in the Joint Statement on Restrictive Housing Operations (Doc. 4061) approved by the Court (Doc. 4082); and (iv) other information revealed by the April 2025 RHU Report.

---

Evaluations of Prisoners in Segregation (Doc. 2332). In doing so, the State expressly preserves any and all objections and all available legal and equitable arguments in response to the Court's Phase 2A Omnibus Remedial Opinion (Docs. 3461, 3462, 3463, 3465), Phase 2A Omnibus Remedial Order (Doc. 3464), any other Phase 2A remedial orders, and the Court's Liability Opinion and Order as to Phase 2A Eighth Amendment Claim (Doc. 1285) and Phase 2A Supplemental Liability Opinion and Order on Periodic Mental-Health Evaluations of Prisoners in Segregation (Doc. 2332). Nothing contained in this filing shall be construed as an admission by the State, a waiver of any objection to any opinion or order in this action, or a waiver of the State's pending appeal related to Phase 2A (see Doc. 3488). Nothing in this filing shall be construed as an admission of any kind by the State that ADOC's current or historical staffing or provision of mental-health care is or was unconstitutional or deficient in any way. Moreover, the State contends the Phase 2A Omnibus Remedial Order expired by operation of law (see 18 U.S.C. § 3626(a)(2)), and all interim Phase 2A remedial orders similarly expired by operation of law and/or were vacated. This issue remains on appeal before the United States Court of Appeals for the Eleventh Circuit. The State intends to continue working in good faith with Plaintiffs and this Court until it receives a ruling vacating the Phase 2A Remedial Order or otherwise declaring it inoperative.

## I.  THE DATA IN THE MONTHLY RESTRICTIVE HOUSING REPORT FOR THE MONTH OF APRIL 2025.

### A.  THE STATE'S POSITION.

The April 2025 Restrictive Housing Report shows 806 of the 942 beds in RHU held inmates,[2] with only four inmates in RHU designated as transitional and 155 inmates in RHU for disciplinary purposes.  Additionally, less than 13.5% of the RHU population consisted of severely mentally ill ("SMI") inmates, with 109 inmates designated SMI remaining in RHU on April 30, 2025.  (Doc. 4356-1).  Further, the April 2025 Report shows 258 inmates with fewer than 30 days in RHU on April 30, 2025, indicating at least 258 inmates entered RHU during the month of March 2025.

ADOC continues effectively managing the SMI population in RHU.  Inmates placed in RHU receive an initial mental health evaluation and mental health staff conduct rounds weekly to monitor inmates.  The median RHU stay for SMI inmates of twenty-eight days remains significantly lower than the median RHU stay of sixty-four days for non-SMI inmates.  The median RHU stay for SMI inmates in RHU for reasons other than inmate safety (preventative) or voluntary placements (alternative) remains even lower at only twenty days.  As the data in the April 2025 RHU Report indicates, ADOC continues to manage RHU housing to transition inmates

---

[2] The 806 inmates in RHU in the April 2025 Report represent a decrease of 20.7% from 1,016 inmates in RHU in March 2022.  (Doc. 3623-1).

effectively and efficiently through the RHU process and safely transition inmates out of RHU.

**B.    PLAINTIFFS' POSITION.**

For April 2025, the RHU had a total of 806 occupied beds, a decrease of twenty-four (24) beds since March 2025. Plaintiffs remain concerned by the ADOC's continued overreliance on the RHU. The number of occupied beds has fluctuated slightly upward and downward over the last year with no long-term significant improvement—April 2024 (810 beds), May 2024 (803 beds), June 2024 (812 beds), July 2024 (818 beds), August 2024 (817 beds), September 2024 (787 beds), October 2024 (814 beds), November 2024 (837 beds), December (831), January 2025 (842 beds), February (818 beds), and March (830). There are about as many occupied beds in April of 2025 as there were in April of 2024.

Despite the decrease in occupied beds in April 2025, the SMI population in the ADOC RHU increased by sixteen (16) persons (from 93 individuals or 11.20% of the RHU population in March 2025 to 109 individuals or 13.52% of the RHU population in April 2025). The number of SMI individuals in the RHU is much higher than it was in 2021—when this Court issued its Omnibus Remedial Order. In 2021, ADOC reported only 34 men (3.9% of the male restrictive housing population) and two (2) women (40% of the women restrictive housing population) with SMI

4

designations living in restrictive housing.[3] The number is also higher than it was in April of 2024 when there were sixty-eight (68) individuals (or 8.40%) with SMI diagnoses in the RHU. Now, more than 13% of the RHU is comprised of those suffering from an SMI. If the Mental Health Code C (MH-C)[4] population is added to the SMI population, then there would be thirteen (13) additional individuals, or a total of (122) individuals, who are mentally ill and in restrictive housing. This is alarming, given that ADOC has slightly decreased its overall RHU population since 2021 (879 occupied RHU beds in 2021 compared to 806 in April 2025) but still significantly increased the number of persons with SMI housed in the RHU.[5] The increase in the number of incarcerated individuals with SMI over the last four (4) years substantially raises the possibility of adverse consequences. It also suggests that there may be a substantial decrease in the quality of mental health care provided to persons in the RHU and therefore higher levels of decompensation among the RHU population. This provides strong evidence that ADOC is exhibiting conduct consistent with being aware that their actions are placing seriously mentally ill inmates at a substantial risk of serious harm, and ADOC's action (or, in this case,

---

[3] See Association of State Correctional Administrators, The Arthur Liman Public Interest Program & Yale Law School, Aiming to Reduce Time-In-Cell: A 2021 Snapshot of Restrictive Housing (August 2022), Table 22 at 53-54, law.yale.edu/sites/default/files/area/center/liman/document/time_in_cell_2021.pdf ("Arthur Liman Center Survey")

[4] See Section II(B), infra.

[5] Arthur Liman Center Survey at 95.

inaction) is not a reasonable response. *See Wade v. McDade*, 106 F.4th 1251, 1261 (11th Cir. 2024) (finding that "a deliberate indifference plaintiff must demonstrate that the defendant was actually aware that his own conduct caused a substantial risk of serious harm to the plaintiff."). Despite ADOC's reported efforts to address the total number of individuals in the RHU by creating a unit (the Protective Housing Reintegration Unit or "PHRU") designed to get long term residents out of segregation, this new unit has essentially no effect, as the number of individuals in the RHU has either grown, remained steady, or decreased only slightly during recent quarters. Nineteen (19) PHRU beds remain unfilled in April 2025.

## II. CHANGES IN RESTRICTIVE HOUSING UNIT DATA FROM THE MARCH 2025 RHU REPORT.

### A. THE STATE'S POSITION.

The April 2025 Report shows continued progress in several areas from the March 2025 Report.  ADOC experienced a decrease in its RHU population from 830 inmates in March 2025 to 806 inmates in April 2025.  With this decrease, ADOC continues to operate its RHUs well under total capacity.  Five facilities— Bullock Correctional Facility ("Bullock"), William E. Donaldson Correctional Facility ("Donaldson"), Hamilton Aged & Infirmed ("Hamilton"), Holman Correctional Facility ("Holman"), and the Julia Tutwiler Prison for Women ("Tutwiler")—operate at or under 75% capacity.  Hamilton operates at 25% capacity and Holman operates at 50% capacity.  An additional two facilities— Kilby Correctional Facility

6

("Kilby") and Easterling Correctional Facility ("Easterling")—operate under 84% capacity.

ADOC also continues to move inmates effectively and efficiently through the RHU process. ADOC reported moving at least 282 inmates out of RHU during the month of April 2025.[6] (Doc. 4344-1; Doc. 4352-1). ADOC also removed at least seven inmates with long-term RHU placements of more than ninety days from the RHU in April 2025. (Doc. 4352-1). ADOC continues to minimize the length of RHU stays (if and when possible).

Additionally, ADOC continues to minimize the number of inmates housed in RHU for transitional purposes with only four inmates under transitional status as of April 30, 2025. (Id.).

### B.    PLAINTIFFS' POSITION

The SMI population currently exceeds 13% of the population in the RHU. The SMI population in RHU increased in April 2025, and is the highest it has been in at least a year.

| Month | SMI Population in RHU | Occupied Beds in RHU | % SMI RHU Population |
|---|---|---|---|
| April 2024 | 68 | 810 | 8.40% |

---

[6] ADOC likely moved significantly more inmates through the RHU process during April 2025. This figure only accounts for the data on the March 2025 Report and the April 2025 Report. Inmates entering RHU after March 31, 2025, and exiting before April 30, 2025, would not appear on either report.

| May 2024 | 77 | 803 | 9.59% |
| June 2024 | 73 | 812 | 8.99% |
| July 2024 | 83 | 818 | 10.15% |
| August 2024 | 91 | 817 | 11.14% |
| September 2024 | 80 | 787 | 10.17% |
| October 2024 | 91 | 814 | 11.18% |
| November 2024 | 106 | 837 | 12.66% |
| December 2024 | 94 | 831 | 11.31% |
| January 2025 | 104 | 842 | 12.35% |
| February 2025 | 85 | 818 | 10.39% |
| March 2025 | 93 | 830 | 11.20% |
| April 2025 | 109 | 806 | 13.52% |

Plaintiffs continue to be concerned with the size of the MH-C population within the RHU. According to Administrative Regulation 403, individuals with this

designation "require outpatient mental health services at a major facility" and "have [a] diagnosed mental disorder associated with functional impairment that interferes with their ability to meet the ordinary demands of living."[7] The SMI and MH-C populations in the RHU both increased from March 2025 to April 2025—the SMI population increased by sixteen (16) individuals and the MH-C population by six (6) individuals. The MH-C population in the RHU now stands at 63.[8] While there are 109 individuals flagged as having an SMI in the RHU, an additional thirteen (13)[9] RHU residents are designated as MH-C. This means that 122 represents the full cadre of individuals who are at greatest risk of decompensation in the RHU. As a result, the true percentage of individuals at-risk in April 2025 was 15.14% (up from 13.37% in March 2025), not just the 13.52% (up from 11.20% in March) designated as SMI.

In theory, a seriously mentally ill individual who commits an act that would result in their transfer to the RHU if they were not seriously mentally ill should be transferred to the SLU. The fact that the number of individuals in RHU who are designated SMI and MH-C remain high suggests one or more of the following: that (1) the SLU beds are not being used, (2) there are not enough SLU beds, (3) the SLU

---

[7] ADOC Administrative Regulation 403(III)(I)(3), https://doc.alabama.gov/docs/AdminRegs/ar403.pdf

[8] Note that this number represents both those who do and do not have an SMI diagnosis.

[9] This number represents those who are designated MH-C but who are not also SMI.

beds are always full and, therefore, there can be no movement out of the RHU to the SLU, and/or (4) there is no movement out of the SLU to general population, which results in no beds being available in the SLU. Any one or combination of these possibilities troubles Plaintiffs. Plaintiffs request the Court require data for the SLU—the same type of information as in the RHU report—to determine what is causing this problem so that the EMT can evaluate and offer a solution. See Phase 2A Omnibus Remedial Order, Section 8.5 at 23.

The population held in the RHU beyond 91 days decreased in April by seven (7) individuals.

| Month | Population Over 91 days in RHU | Occupied Beds in RHU | % RHU Population Over Three Months |
|---|---|---|---|
| April 2024 | 308 | 810 | 38.02% |
| May 2024 | 309 | 803 | 38.48% |
| June 2024 | 298 | 812 | 36.70% |
| July 2024 | 304 | 818 | 37.16% |
| August 2024 | 271 | 817 | 33.17% |
| September 2024 | 285 | 787 | 36.21% |

| October 2024 | 297 | 814 | 36.49% |
| November 2024 | 285 | 837 | 34.05% |
| December 2024 | 294 | 831 | 35.38% |
| January 2025 | 328 | 842 | 38.95% |
| February 2025 | 358 | 818 | 43.77% |
| March 2025 | 346 | 830 | 41.69% |
| April 2025 | 339 | 806 | 42.06% |

Plaintiffs remain concerned about the number of individuals who are held in the RHU though they have done nothing to warrant discipline—i.e. those held on "preventative" and "alternative" statuses. The "preventative" designation "concerns inmates posing a threat to the safety or security of the institution," while the "alternative" designation "is designed to protect an inmate from a real or perceived threat within the prison. The inmate is typically placed in RHU for an indeterminate term and returned to the general population or transferred to another facility. This type of RHU placement will typically be used for inmates who report they are in fear for their safety or refuse general population." (Doc. 4334. at 2-3). Those individuals

who now fall into alternative status would previously have been grouped with those designated preventative status.

Of the 806 occupied RHU beds in April 2025, 389 (48.26%) of those individuals were preventative status and another 152 (18.86%) of them were alternative status. ADOC continued its trend of housing more people on preventative and alternative status (541 or 67.12%) than on disciplinary status (155 or 19.23%) in RHUs. Monitoring is critical for understanding why such a large number of people are in the RHU on preventative and alternative status and for identifying potential ways ADOC can reduce its RHU population.

## III. ADOC's PROGRESSION TOWARDS THE GOALS OF ADOC'S PLAN FOR OPERATING RHUs WITH CURRENT STAFFING.

### A. THE STATE'S POSITION.

ADOC continues to adequately operate its RHUs with improving staffing levels and the continued use of alternatives to RHU housing. Since March 2023, ADOC added 322.5 additional correctional staff at the major facilities for a system-wide increase in correctional staffing of 24%. (Doc. 4325-1; Doc. 3973-1). As for alternative housing, the Protective Housing and Reintegration Units ("PHRU") at Limestone Correctional Facility ("Limestone") and St. Clair Correctional Facility ("St. Clair") serve as two examples of alternative housing. These PHRUs allow inmates seeking separation from the general population to receive programing in

secure housing areas designed to assist with reintegration into the general population.

ADOC's use of PHRU beds reduces the number of RHU beds required for housing inmates placed in RHU. The PHRUs allow ADOC to move inmates designated as SMI and inmates in preventative status out of RHU housing. As of April 30, 2025, Limestone operated seventy-six PHRU beds and, due to ongoing renovations, St. Clair operated twenty-four PHRU beds.[10] (Doc. 4352-1 at 2). Limestone maintained 89% occupancy for the PHRU, and St. Clair held a total of thirteen inmates on April 30, 2025. (Id.). ADOC remains confident that it will continue to effectively operate its RHUs with creative measures, such as the PHRU and SLU.

The RHU Teams at Limestone, St. Clair, and Donaldson continue to proactively monitor and facilitate the operations of the RHU at these facilities. In April 2025, the Limestone RHU Team facilitated 164 medical, mental health, and dental appointments. (Doc. 4352-1 at 3). Additionally, Limestone completed 324 searches of the RHU and assisted with two full facility searches during April 2025. (Id.). The St. Clair RHU Team facilitated 431 medical/mental-health escorts with no backlogs and conducted a full search of each RHU dorm. (Id. at 4-5). The

---

[10] Due to necessary repairs and renovations to A Dorm of the RHU, St. Clair temporarily relocated the inmates to one side of E Dorm until the renovations are complete.

13

Donaldson Team facilitated 143 medical, mental health, dental, eye clinic, physicals, and sick call appointments with no backlogs and conducted twenty-four restrictive housing searches in April 2025. (Id. at 7). The RHU Teams continued to facilitate the orderly operation of the RHUs in April 2025.

ADOC continues to provide effective management of its RHUs through centralized leadership and streamlining efficiency in RHUs across facilities by establishing RHU teams. The RHU Teams at Limestone, Donaldson, and St. Clair experienced continued success through implementation of the RHU management program.

## B.    PLAINTIFFS' POSITION.

ADOC has not made progress towards its plan for operating RHUs with current staffing levels. On October 27, 2023, in response to Section 2.1.7.3 of the Omnibus Remedial Order (Doc. 3464, § 2.1.7.3), the parties filed a "Joint Statement on Restrictive Housing Operations." (Doc. 4061). This document contained "The State's Plan for Operating RHUs with Current Staffing." Id. at 4. Part of the State's plan was to address the concern of prisoners with SMI who request RHU "due to fear (whether valid or not) of living in general population." Id. at 7. The PHRU was to focus on those who were then designated "preventative" (now designated "alternative") and diagnosed with a SMI, but any prisoner in the RHU designated "preventative" would be eligible for the PHRU. Id. at 7-8. The purpose of the PHRU

14

is to "achieve reintegration of PHRU inmates into general population over a 90-day period," though it may take prisoners more or less time to achieve the results. Id at 8. ADOC planned to reduce the RHU population by more than twelve percent (12%) and bring the total number of PHRU beds to 124 with seventy-six (76) beds at Limestone and forty-eight (48) beds at St. Clair. Id. at 8.

Less than 90 days after the "Joint Statement on Restrictive Housing Operations" was filed, ADOC filed its RHU report (in substantially the same format that it is filed today). (Doc. 4112). That report showed there were 942 RHU beds available with 738 of them occupied. (Doc. 4112-1). Fifty-five (55) of the beds were occupied by prisoners with SMI, and 307 people had been in the RHU over 91 days. Id. Between St. Clair and Limestone, 124 PHRU beds were available. Id. The 76 PHRU beds at Limestone were full, while twenty-six (26) of forty-eight (48) beds at St. Clair were occupied, for a total of 102 occupied PHRU beds. Id.

As of April of 2025, there are twenty-four (24) fewer available PHRU beds than there were in 2023. Of the PHRU beds that exist, only eighty-one (81) of them are occupied (down from 102 occupied beds in 2023). Further, ADOC is far from reducing the RHU population by more than twelve percent (12%), as the number of occupied beds in the RHU has actually increased from 738 in December of 2023 to 806 in April of 2025. The number of occupied beds in the RHU has not fallen as low as the 2023 number for at least a year. Further, both the number of SMI designated

15

individuals and the percentage of SMI individuals in the RHU has increased (from 55 individuals to 109 individuals, and from 7.45% of the RHU population to 13.52% of the RHU population).

Plaintiffs' position regarding the necessity for increased staffing remains unchanged—considerably more mental health and correctional staffing is needed. Individuals remaining more than three (3) months in the RHU comprise over 40% of the RHU population. Defendants must continue to make significant progress towards a meaningful reduction in the number of RHU beds, as well as the number of days that individuals remain in those beds. It is unclear to Plaintiffs as to why there are so many SMI designated individuals still in the RHU while the SLU exists, and while open beds remain in the PHRU. At any rate, ADOC has failed to reduce the number of prisoners in the RHU and, importantly, it has failed to reduce the number of SMI designated individuals in the RHU.

Furthermore, while the gross combined number of individuals designated as SMI and/or MH-C has risen over the course of a year, the number of some critical mental health staff[11] has dropped, flatlined, or at best, increased only slightly during recent quarters (Doc. No. 4330, p. 4-6; Doc. No. 4330-1, Plaintiffs' Exhibit 1). As a result, it is probable that individuals designated SMI are not receiving the required

---

[11] Here, Plaintiffs refer specifically to the positions that provide actual therapeutic care.

"10 and 10"[12] they would be receiving if they were in the SLU. Particularly, it seems nearly impossible for ten (10) hours of therapeutic time to be provided to every individual designated SMI given ADOC's current, depleted mental health workforce. Plaintiffs are unaware of any proven system in place to alert staff as to which RHU residents are and are not eligible for this enhanced treatment.

The Exceptional Circumstances Reports appear to confirm that SMI designated prisoners in RHU are not receiving ten (10) hours of out-of-cell therapeutic time. As an example, A.D., an individual in the Limestone RHU who is designated SMI (and also MH-C) has a status of "alternative." Due to "fear for [his] safety," he requested to be in the RHU—he was not being disciplined and was not deemed to pose a threat within the facility. (Docs. 4345, Exhibit G; 4347, Exhibit G; 4349, Exhibit G; 4350, Exhibit G; and 4351, Exhibit G). The Exceptional Circumstances reports for the weeks of March 31, April 7, April 14, April 21, and April 28 reveal that A.D. was only given fifteen (15) minutes of out-of-cell health or mental health care (which is coded "H").[13] Id. It is not possible to tell from the reports which type of care—health or mental health care—A.D. received during

---

[12] Under the Phase 2A Omnibus Remedial Order, individuals designated as SMI are entitled to 10 hours of therapeutic time outside their cells per week, and 10 hours of unstructured time out of their cells per week. (Doc No. 3464, Section 9.2.1, p. 25).

[13] Counsel for Plaintiffs have conferred with counsel for Defendants who confirmed that, although the Limestone reports that were submitted for the weeks of March 31, 2025 and April 7, 2025 are titled "February 24-March 2," this was inadvertent and the data contained in the reports reflects the weeks of March 31 and April 7, respectively.

those fifteen (15) minutes but, even assuming that A.D. did receive out-of-cell mental health care, fifteen (15) minutes is insufficient, as he would be entitled to 10 hours of out-of-cell therapeutic care if he were in the RTU or SLU. Id. There is a different code used by ADOC, "T", that indicates "therapy or group therapy". Id. A.D. was not offered therapy or group therapy during the five-week period, according to the reports. Id.

A.D. is not an outlier. It appears none of the RHU residents at Limestone were offered therapy or group therapy during the five-week period, despite the fact that the April RHU Report shows there were twenty-eight (28) prisoners with SMI in the Limestone RHU during the month of April 2025. Id.; Doc. 4352-1. There were several individuals, in addition to A.D. who were offered and received fifteen (15) minutes of either health or mental health care during the five-week period. Two individuals received fifteen (15) minutes of health or mental health care on two different days for a total of half an hour, and one individual received fifteen (15) minutes of health or mental health care on three different days for a total of forty-five (45) minutes.  (Docs. 4345, Exhibit G; 4347, Exhibit G; 4349, Exhibit G; 4350, Exhibit G; and 4351, Exhibit G).

According to the Exceptional Circumstances Reports, every prisoner in Limestone RHU was offered three (3) hours of recreation each day. Id. Interestingly, all of the RHU prisoners refused recreation every day during the five-week period

except Tuesdays and Thursdays, and most of the prisoners refused recreation on those days as well; no one took any recreation time on a day that was not a Tuesday or Thursday. Id. The Weather Channel website shows the only days that saw any rain during this five-week period were April 10, April 22-25, and May 1-4—nine (9) out of thirty-five (35) days (Plaintiff's Exhibit 1), so an inclement weather exception could not have applied to all but Tuesday and Thursday of every week.[14] No RHU resident received any recreation time the week of April 21, as the report shows every single one of them refused recreation every day (not only the days when there was rain). (Doc. 4350, Exhibit G). According to the reports, A.D. took out-of-cell recreation time on Tuesday, April 8 and on Tuesday and Thursday of the week of April 28 for a total of nine (9) hours out of five weeks. Id. This issue highlights the critical need for the EMT to begin monitoring the ADOC to determine how the RHU is functioning with current mental health staff and to offer solutions, if needed.

## IV. OTHER INFORMATION REVEALED BY THE MONTHLY RESTRICTIVE HOUSING TRENDS REPORT FOR THE MONTH OF APRIL 2025.

### A. THE STATE'S POSITION.

The April 2025 Report revealed that ADOC's RHU population remains focused mainly on inmates under disciplinary and preventative status.  Of the 806

---

[14] This Court has ordered that "All inmates in the RHUs must have the opportunity to exercise outside of their cells for at least five hours per week, subject to the following exception: ADOC may refrain from offering out-of-cell time due to inclement weather, but only if a safe, alternative space for inmates to exercise--such as a gymnasium--is unavailable." Doc 3464 § 3.5.1 and 3.5.1.1.

inmates in RHU, 106 inmates remained in RHU under investigative status and only four under transitional status as reflected in the April 2025 Report, with the remainder comprised of disciplinary, preventative, and alternative placements. The efficient transition of inmates through the RHU process, allows ADOC to maximize the utilization of the available RHU beds.

Plaintiffs continue to push for ADOC to substantially reduce the RHU population and contend that the State should "consider whether long-term RHU placement and/or preventative status remains necessary" without acknowledging the reality that some inmates pose an inherent danger to the safety of other prisoners and the security of the facility ADOC cannot mitigate any other way. (Doc. 4168 at 12). ADOC continues to manage RHU housing effectively and efficiently by transitioning inmates through the RHU process and out of RHU (if and when possible). In doing so, ADOC must also balance the safety and security risk posed by certain violent inmates.

As the Court knows, the crux of this case remains mental health care. ADOC continues to prioritize minimizing both the total number of SMI inmates placed in RHU and the length of stay for SMI inmates, considering the safety and security of its facilities and the inmates within its custody. SMI inmates constitute less than 13.5% of RHU placements in the April 2025 Report. More importantly, ADOC places SMI inmates in RHU only when necessary, and moves them through the RHU

20

process quickly.  On the April 2025 Report, of the 109 SMI inmates in RHU, fifty-seven inmates–or 52%–entered RHU in April 2025.  Nearly every month, the majority of the SMI population in RHU comprises new entries within the reporting month.  In February 2025, over 42% of SMI inmates in RHU entered in the previous thirty days.  (Doc. 4333-1 at 6).  Similarly, in January 2025, over 54% of SMI inmates in RHU entered within the previous thirty days.  (Doc. 4319-1).  Thus, ADOC continues to receive, process, and move SMI inmates through the RHU efficiently.

ADOC's efficiency and prioritization in moving SMI inmates through the RHU process as quickly and safely as possible becomes evident when comparing the length of RHU stays for SMI and non-SMI inmates.  The median RHU stay for SMI inmates remains at twenty-eight days which is significantly lower than the median RHU stay of sixty-four days for non-SMI inmates.  Importantly, many inmates, including SMI inmates, request RHU placement.  These inmates who request RHU placement fall into the alternative designation. At least forty inmates remain in RHU at their own request. The median RHU stay for SMI inmates who request placement in RHU is forty-three days.  On the April 2025 Report, over 36.7% of SMI inmates in RHU remain at their request under an alternative designation.

Plaintiffs continue to highlight the most extreme cases, referencing isolated examples where SMI inmates remain in RHU for an extended period.  As of April

30, 2025, ADOC housed only twenty SMI inmates in RHU for more than ninety days.  ***Eleven of those inmates requested RHU placement and remain in RHU voluntarily.***  The other remaining inmates who did not request RHU placement remain under close custody status due to their involvement in a serious incident that threatened the life of other inmates and correctional staff.  These inmates (like all inmates in RHU) continue to receive mental health evaluation and treatment.  Moreover, Plaintiffs' focus on MH-C inmates in RHU remains misplaced.  Any non-SMI inmate with an MH-C code received an evaluation by mental health professionals who determined the inmate should not be designated SMI.[15]  The narratives spun by Plaintiffs' regarding SMI inmates in RHU remain patently false.  Donaldson and Hamilton continue to hold no SMI inmates in RHU.  (Doc. 4352-1).  Donaldson's elimination of SMI inmates in RHU remains especially remarkable, as the third largest RHU across all ADOC institutions.

---

[15] Plaintiffs' reference to out-of-cell time in Section III.B above mischaracterizes the out-of-cell time required under the Remedial Order and ignores the out-of-cell time the State provides to SMI inmates in RHU.  First, Section 9.2.1 of the Remedial Order requires inmates **housed** in the RTU, SU, and SLU to receive "ten hours of structured, therapeutic out-of-cell-time and ten hours of unstructured out-of-cell time per week."  (Doc. 3464, Section 9.2.1).  This requirement relates to inmates housed in these specialty units, **not inmates designated SMI or MH-C**.  Second, Plaintiffs ignore the out-of-cell time offered to all SMI inmates housed in RHU.  ADOC offers SMI inmates housed in RHU, as shown through the weekly Exceptional Circumstances Reports, at least three hours per day of out-of-cell time, exceeding the twenty hours per week for inmates housed in the RTU, SU, or SLU.  Because of Plaintiffs' misunderstanding or mischaracterization, the Court can ignore Plaintiffs' entire observations about out-of-cell time in Section III.B.

Plaintiffs' evaluation of numbers alone and demands for RHU reductions reflects an overly simplistic analysis and argument. As the Court knows, ADOC's RHUs operate efficiently and continue to show marked improvement when compared to times in the past. Evaluating the data concerning RHU stays individually, considering the specific risk factors involved in each placement, (instead of collectively) demonstrates the propriety of ADOC's RHU operations. Certainly, ADOC's RHU operations continue to comply with constitutional standards.

## B.    PLAINTIFFS' POSITION.

The April report reveals over one-third (42.06%) of all individuals in RHU beds were held in the RHU for more than three months. Defendants' RHU data for April 2025 reveals twenty-four (24) individuals remain in the RHU (compared to twenty-six (26) individuals in March 2025) on either preventative, alternative, or investigative status for 500 days or more.

| Institution | Current RHU Status | RHU Start Date | Days in RHU | SMI |
|---|---|---|---|---|
| Holman | PREVENTATIVE | 08/21/2023 | 618 | N |
| Holman | PREVENTATIVE | 11/05/2022 | 907 | N |
| Kilby RCC | PREVENTATIVE* | 01/12/2022 | 1204 | N |
| Kilby RCC | PREVENTATIVE | 10/30/2023 | 548 | Y** |

23

| Kilby RCC | PREVENTATIVE | 12/12/2023 | 505 | N |
|---|---|---|---|---|
| Limestone | ALTERNATIVE | 11/27/2023 | 520 | N |
| Limestone | ALTERNATIVE | 01/10/2023 | 841 | N |
| Limestone | PREVENTATIVE | 08/15/2023 | 624 | N |
| Limestone | PREVENTATIVE | 10/04/2023 | 574 | N |
| Limestone | PREVENTATIVE | 10/19/2023 | 559 | N |
| Limestone | PREVENTATIVE | 03/01/2023 | 791 | N |
| Limestone | PREVENTATIVE | 10/17/2022 | 926 | N |
| Limestone | PREVENTATIVE | 11/13/2023 | 534 | N |
| Limestone | PREVENTATIVE | 11/01/2023 | 546 | N |
| Limestone | PREVENTATIVE | 12/01/2023 | 516 | N |
| Limestone | PREVENTATIVE | 10/19/2023 | 559 | N |
| St. Clair | PREVENTATIVE | 10/02/2023 | 576 | N |
| St. Clair | PREVENTATIVE | 12/12/2022 | 870 | N |
| St. Clair | PREVENTATIVE | 07/27/2023 | 643 | N |
| St. Clair | ALTERNATIVE | 11/16/2023 | 531 | N |


indication of mental health decompensation while in restrictive housing. Of the five individuals listed below, three are designated preventative, one is designated alternative, and one is designated disciplinary.

| Facility | Name | RH Status | RHU Start Date | Days in RHU | MH-C Start Date | Days RH with MH-C |
|----------|------|-----------|----------------|-------------|------------------|-------------------|
| Bullock | B.S. | PREVENTATIVE | 12/28/2024 | 123 | 03/11/2025 | 50 |
| Kilby RCC | J.B. | PREVENTATIVE | 10/30/2023 | 548 | 05/24/2022 | 548 |
| Limestone | J.M. | DISCIPLINARY | 01/23/2025 | 97 | 09/21/2021 | 97 |
| Limestone | A.D. | ALTERNATIVE | 11/04/2024 | 177 | 11/20/2024 | 161 |
| Limestone | F.M. | PREVENTATIVE | 11/26/2024 | 155 | 07/28/2023 | 155 |

The following individuals have not been designated SMI but are designated MH-C and have been in RHU for more than 90 days. One of the three individuals listed below—L.F.—was designated MH-C after they entered the RHU, an indication of mental health decompensation while in restrictive housing. None of the individuals below requested to be in restrictive housing.

| Facility | Name | RH Status | RHU Start Date | Days in RHU | MH-C Start Date | Days RH with MH-C |
|----------|------|-----------|----------------|-------------|------------------|-------------------|
| Kilby | L.F. | PREVENTATIVE | 09/20/2024 | 222 | 10/01/2024 | 211 |
| Limestone | A.D. | PREVENTATIVE | 05/06/2024 | 359 | 10/17/2023 | 359 |

| Limestone | J.M. | DISCIPLINARY | 01/23/2025 | 97 | 09/21/2021 | 97 |

The State argues that some mentally ill individuals are in restrictive housing because they prefer it (e.g. Doc. 4201, p. 4-5). While this may be the case, Plaintiffs' concern with the increase in the number of RHU residents remains. Inadequate staffing at the prisons makes for a dangerous environment that might very well contribute to incarcerated persons' fear regarding the safety of their surroundings. A person who feels unsafe is more likely to request restrictive housing.

Consequently, Plaintiffs remain concerned about the Defendants' continued overreliance on the RHU, especially when incarcerated people designated SMI and/or MH-C are housed there for lengthy periods of time.

Dated:  May 22, 2025

/s/ William J. Cranford
William J. Cranford III
*One of the Attorneys for the State*

William R. Lunsford
Kenneth S. Steely
William J. Cranford III
Daniel J. Chism
**BUTLER SNOW LLP**
200 West Side Square, Suite 100
Huntsville, AL 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651
bill.lunsford@butlersnow.com
kenneth.steely@butlersnow.com
will.cranford@butlersnow.com
dan.chism@butlersnow.com

**ATTORNEYS FOR THE STATE**

*/s/ Julia T. Mudd*

Julia T. Mudd
*One of the Attorneys for Plaintiffs*

Latasha L. McCrary
Lisa W. Borden
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
latasha.mccrary@splcenter.org
lisa.borden@splcenter.org

Emily B. Lubin*
Julia T. Mudd*
**SOUTHERN POVERTY LAW CENTER**
201 St. Charles Ave. Suite 2000
New Orleans, LA 70170
Telephone: (504) 401-2291
Facsimile: (504) 809-7899
**Admitted pro hac vice*

William G. Somerville, III
**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**
420 20th Street North, Suite 1400
Birmingham, AL 35203
wsomerville@bakerdonelson.com
pclotfelter@bakerdonelson.com

Larry Canada
Lonnie Williams
Barbara A. Lawrence
Andrea J. Mixson
**ALABAMA DISABILITIES ADVOCACY
PROGRAM**

28

University of Alabama
500 Martha Parham West
Box 870395
Tuscaloosa, AL  35487
Telephone: (205) 348-4928
Facsimile: (205) 348-3909
lcanada@adap.ua.edu
lwilliams@adap.ua.edu
blawrence@adap.ua.edu
amixson@adap.ua.edu

Catherine E. Stetson*
Neal K. Katyal*
Jo-Ann T. Sagar*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
cate.stetson@hoganlovells.com
neal.katyal@hoganlovells.com
jo-ann.sagar@hoganlovells.com
*Admitted pro hac vice

Joshua C. Toll*
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
2nd Floor
Washington, DC 20006-4707
Telephone: (202) 227-6138
Facsimile: (202) 626-3737
jtoll@kslaw.com
*Admitted pro hac vice

**ATTORNEYS FOR THE
PLAINTIFFS**

Anil A. Mujumdar
DAGNEY JOHNSON LAW GROUP
2170 Highland Avenue, Suite 250

29

Birmingham, AL 35213
Telephone: (205) 590-6986
Facsimile: (205) 809-7899
anil@dagneylaw.com

**ATTORNEY FOR PLAINTIFF
ALABAMA DISABILITIES
ADVOCACY PROGRAM**