**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith                                                    For rules and forms visit
Clerk of Court                                                   www.ca11.uscourts.gov

June 24, 2026

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  22-10292-HH
Case Style:  Edward Braggs, et al v. Commissioner, Alabama Department of Corrections, et al
District Court Docket No:  2:14-cv-00601-MHT-JTA

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing.

Costs
Each party to bear own costs.

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion

**FOR PUBLICATION**

In the

# United States Court of Appeals

For the Eleventh Circuit

———————————

No. 22-10292

———————————

JOSHUA DUNN, et al.,

*Plaintiffs,*

EDWARD BRAGGS,
  on behalf of himself and all others similarly situated,
TEDRICK BROOKS,
  on behalf of himself and all others similarly situated,
GARY LEE BROYLES,
  on behalf of himself and all others similarly situated
et al.,

*Plaintiffs-Appellees-*
*Cross Appellants,*

*versus*

COMMISSIONER, ALABAMA DEPARTMENT OF
CORRECTIONS,
DEPUTY COMMISSIONER, OFFICE OF HEALTH SERVICES,
ALABAMA DEPARTMENT OF CORRECTIONS,

2                    Opinion of the Court                    22-10292

*Defendants-Appellants-*
*Cross Appellees,*

ASSOCIATE COMMISSIONER OF HEALTH SERVICES FOR
THE
ALABAMA DEPARTMENT OF CORRECTIONS, et al.,

*Defendants.*

_____

Appeals from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:14-cv-00601-MHT-JTA

_____

Before JORDAN, LAGOA, and TJOFLAT, Circuit Judges.

JORDAN, Circuit Judge:

Between 2015 and 2016 alone, the rate of suicide for inmates imprisoned in the Alabama Department of Corrections' various prisons was more than double the national average among state and federal correctional facilities. During one 15-month period of this litigation, 15 Alabama inmates killed themselves.

The plaintiffs contend that these staggering numbers are due largely in part to the Department of Corrections' deliberate indifference to the serious mental healthcare needs of its inmates in violation of the Eighth Amendment to the United States Constitution. After years of litigation, the district court agreed and issued comprehensive, system-wide injunctive relief to remedy the constitutional deprivations as to mental healthcare treatment in the Alabama prison system.

Managing this litigation was no small feat. The district court painstakingly outlined thousands of pages of documentary evidence, held two seven-week bench trials, and issued orders containing nearly 1,000 pages of liability and remedial findings. Its efforts were thorough and commendable.

We have said federal courts do not sit as "super-wardens" over the day-to-day operations of the country's prison systems. *See Pesci v. Budz*, 935 F.3d 1159, 1166 (11th Cir. 2019) ("[C]ourts do not sit as super-wardens, . . . and prison officials, rather than judges, will make the difficult judgments concerning institutional operations.") (internal citation omitted). This principle has generally been codified by Congress in the Prison Litigation Reform Act, 18 U.S.C. § 3626. The federal courts "nevertheless must not shrink from their obligation to 'enforce the constitutional rights of all persons, including prisoners.' [They] may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011) (internal quotation marks and citations omitted). And sometimes system-wide relief is appropriate under the PLRA. *See id.* at 539–45 (upholding, under the PLRA, the remedial order of a three-judge district court requiring California to reduce its overall prison population to 137.5% of capacity (by reducing the population by 38,000 to 46,000 persons) within two years).

Today we must decide whether the district court properly ordered certain permanent prospective relief under the PLRA and the Eighth Amendment.

4                    Opinion of the Court                    22-10292

## I

This appeal deals with the culmination of only one phase of nearly a decade of class action litigation against the Alabama Department of Corrections for its alleged violation of federal law and alleged deliberate indifference to the mental and physical health of the inmates housed in its facilities. To deal with the magnitude of this litigation, the district court trifurcated the case into three "phases": Phase 1, Phase 2A, and Phase 2B. Phase 1 involved claims brought under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and the Rehabilitation Act, 29 U.S.C. 794, asserting discrimination based on physical disabilities and a failure to accommodate those disabilities. Phase 2A involved Eighth Amendment, ADA, Rehabilitation Act, and due process claims regarding inadequate mental healthcare. Phase 2B, which is still pending, involved Eighth Amendment claims based on inadequate medical and dental care. We deal only with the Eighth Amendment claims in Phase 2A.[1]

The plaintiffs in Phase 2A are a group of seriously mentally ill Alabama prisoners and the Alabama Disabilities Advocacy Program. Seeking declaratory and injunctive relief, they sued John Hamm, the Commissioner of the Alabama DOC and Ruth Haglitch, the Associate Commissioner of Health Services for the DOC, in their official capacities, asserting that the DOC provided

---

[1] The parties settled the Phase 2A ADA, Rehabilitation Act, and due process claims.

22-10292                Opinion of the Court                5

constitutionally inadequate mental healthcare in its prison facilities.[2]

Following years of litigation, dozens of attempted mediations, and multiple bench trials, the district court ultimately concluded that the DOC was liable for violations of the Eighth Amendment based on its deliberate indifference to the mental healthcare of its inmates. The court then, again after a number of mediations and a seven-week evidentiary hearing, issued system-wide and permanent remedial injunctive relief.

Before we dive headlong into the thousands of pages of documentary and testimonial evidence, and the factual findings and legal conclusions of the district court, we outline the contextual framework of the Eighth Amendment and the PLRA.

### A

"The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'" *Glossip v. Gross*, 576 U.S. 863, 876 (2015). Under these Amendments, the "[f]ederal and state governments . . . have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration." *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991). Specifically, the Supreme Court has held that prison officials violate the Eighth Amendment when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97,

---

[2] We usually refer to the defendants collectively as the "DOC."

104 (1976). As relevant here, the "[f]ailure to provide basic psychiatric and mental health care" may constitute "deliberate indifference to the serious medical needs of prisoners." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986). *See also Greason v. Kemp*, 891 F.2d 829, 833–34 (11th Cir. 1990) (collecting cases and holding that prisoners have a clearly established constitutional right to psychiatric care).

To prove an Eighth Amendment violation, a plaintiff must establish two elements. *See Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc). First, "the deprivation alleged must be, objectively, 'sufficiently serious.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Second, "a prison official must have a sufficiently culpable state of mind"—i.e., must be deliberately indifferent. *See id.* (citations and quotations omitted).

Deliberate indifference itself has two components—one subjective and one objective. *See id.* at 1262. A plaintiff must demonstrate that the defendant acted with "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839. "[T]o do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff." *Wade*, 106 F.4th at 1262. "[E]ven if the defendant 'actually knew of a substantial risk to inmate health or safety,' he 'cannot be found liable under the [Eighth Amendment]' if he 'responded reasonably to the risk.'" *Id.* (quoting *Farmer*, 511 U.S. at 844–45). So "a plaintiff must show both that the defendant actually (subjectively) knew that an inmate faced a substantial risk of serious harm and

22-10292          Opinion of the Court                    7

that the defendant disregarded that known risk by failing to re-spond to it in an (objectively) reasonable manner." *Mosley v. Zachery*, 966 F.3d 1265, 1270 (11th Cir. 2020) (cleaned up). Whether a prison official has subjective knowledge of a substantial risk "is a question of fact subject to demonstration in the usual ways, includ-ing inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

**B**

Congress enacted the PLRA, 18 U.S.C. § 3626, in 1996. The PLRA "imposes limits on the scope and duration of preliminary and permanent injunctive relief[.]" *Nelson v. Campbell*, 541 U.S. 637, 650 (2004). It thus "altered the landscape of prison reform litigation in two primary respects." *Cason v. Seckinger*, 231 F.3d 777, 780 (11th Cir. 2000).

First, the PLRA limits the scope of prospective relief that a federal court has authority to enter, directing that prospective relief shall not be entered "unless the court finds that such relief is nar-rowly drawn, extends no further than necessary to correct the vio-lation of the [f]ederal right, and is the least intrusive means neces-sary to correct the violation of the [f]ederal right." § 3626(a)(1)(A). These are referred to as "need-narrowness-intrusiveness" findings. *See United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1228–29 (11th Cir. 2015). Where a court enters prospective relief under the PLRA, it must provide "particularized findings, on a provision-by-provision basis," meaning that such "[p]articularized findings,

8                    Opinion of the Court                    22-10292

analysis, and explanations should be made as to the application of each criteria to each requirement imposed" by the court. *See Cason*, 231 F.3d at 785. *See also Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1278–79 (11th Cir. 2020) (noting that boilerplate recitations of the PLRA's requirements are insufficient, even where the court issues a lengthy order that carefully considers each requested form of relief on the merits).

Second, "the PLRA limits a court's authority to continue to enforce previously entered prospective relief in prison litigation reform cases." *Cason*, 231 F.3d at 780. But the expiration of prospective relief under the PLRA can depend on whether an injunction is preliminary or permanent. *See* § 3626(a)(2) (governing preliminary injunctive relief); § 3626(b) (governing permanent injunctive relief).

The PLRA specifically mandates that preliminary injunctive relief automatically expires 90 days after its entry, unless the court makes requisite need-narrowness-intrusiveness findings and "makes the order final before the expiration of the 90-day period." § 3626(a)(2). On the other hand, permanent prospective injunctive relief is generally terminable upon a party's motion two years after its entry or one year after the court has entered an order denying termination of the prospective relief. *See* § 3626(b)(1)(A). A party moving for termination of permanent injunctive relief is entitled to "immediate termination" if the relief was granted without requisite need-narrowness-intrusiveness findings. *See* § 3626(b)(2). But permanent prospective relief shall not terminate—even upon

motion—"if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation" of the federal right and otherwise meets the need-narrowness-intrusiveness requirements. *See* § 3626(b)(3).[3]

## C

With this legal landscape in mind, the district court endeavored to determine whether the DOC was deliberately indifferent to the serious medical healthcare needs of the class of inmates, and if so, to craft an appropriate remedy under the PLRA. The evidence and procedural history of this case is lengthy and tumultuous, so we endeavor to succinctly outline those aspects pertinent to the district court's findings and conclusions.

## 1

When the plaintiffs initiated this action, the DOC operated 14 male prisons (Bibb, Bullock, Donaldson, Draper, Easterling, Elmore, Fountain, Hamilton, Holman, Kilby, Limestone, St. Clair, Staton, and Ventress), and one major women's prison (Tutwiler). These prisons collectively house around 19,500 inmates, with approximately 3,400 of them receiving some type of mental health treatment, such as counseling or psychotropic medications.

Bullock, Donaldson, and Tutwiler contain mental-health treatment units, including "Stabilization Units" and "Residential Treatment Units." Stabilization Units ("SUs") are for patients who

---

[3] The parties may also agree to end or modify the prospective relief before it is terminated. *See* § 3626(b)(1)(B).

"are suffering from acute mental-health problems—such as acute psychosis or other conditions causing an acute risk of self-harm." All SU patients are housed in individual cells. Residential Treatment Units ("RTUs") are reserved for patients with "moderate impairment in mental health functioning" that puts them at risk in a general-population setting. These two types of units, together referred to as "mental-health units," house and treat the most severely mentally ill prisoners in Alabama. Inmates on the mental-health caseload but not housed in the mental-health units receive their care through outpatient services.

The DOC is responsible for providing mental health services at its prisons and does so by contracting with a private provider. During the liability trial, MHM Correctional Services, Inc., served as the DOC's mental-health contractor.

**2**

In November of 2016, the district court certified a Phase 2A class "of all persons with a serious mental illness who are, or will be, confined within [the DOC's prisons], excluding Tutwiler Prison for Women and the work-release centers."

From December of 2016 through February of 2017, the district court held a bench trial on the DOC's liability under the Eighth Amendment. The court heard seven weeks' worth of testimony from numerous witnesses, including inmates, the then-Commissioners, and various experts, and also received thousands of pages of documentary evidence regarding mental healthcare within the DOC. At the close of this trial, the court issued its Phase 2A

Liability Opinion and Order finding that the Commissioners, in their official capacities, were liable for violations of the Eighth Amendment. *See* D.E. 1285 ("Liability Order"). The 302-page Liability Order outlined (at considerable length) the court's factual findings and conclusions of law. In sum, the court found that the DOC's mental healthcare is, "[s]imply put, . . . horrendously inadequate." *Id.* at 299. Specifically, the court found seven factors contributing to the Eighth Amendment violation, in addition to the "overarching" problems of understaffing and overcrowding. Those seven factors were as follows:

(1) Failing to identify prisoners with serious mental-health needs and to classify their needs properly;

(2) Failing to provide individualized treatment plans to prisoners with serious mental-health needs;

(3) Failing to provide psychotherapy by qualified and properly supervised mental-health staff and with adequate frequency and sound confidentiality;

(4) Providing insufficient out-of-cell time and treatment to those who need residential treatment; and failing to provide hospital-level care to those who need it;

(5) Failing to identify suicide risks adequately and providing inadequate treatment and monitoring to those who are suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis;

(6) Imposing disciplinary sanctions on mentally ill prisoners for symptoms of their mental illness, and

imposing disciplinary sanctions without regard for the impact of sanctions on prisoners' mental health; [and]

(7) Placing seriously mentally ill prisoners in segregation without extenuating circumstances and for prolonged periods of time; placing prisoners with serious mental-health needs in segregation without adequate consideration of the impact of segregation on mental health; and providing inadequate treatment and monitoring in segregation.

*Id.* at 300–01. The court further found that "persistent and severe shortages of mental-health staff and correctional staff, combined with chronic and significant overcrowding, are the overarching issues that permeate each of the above-identified contributing factors of inadequate mental-health care." *Id.* at 301.

**D**

After two months of mediation to develop a comprehensive remedial plan, it became apparent that the matter of the appropriate remedy was too large and complex to be addressed all at once. The district court therefore severed the remedy into the various contributing factors, to be addressed seriatim. *See* Phase 2A Revised Scheduling Order, D.E. 1357.

Later in 2018, after many months of negotiations, the parties reached a series of agreements regarding remedies for the DOC's Eighth Amendment violations. These stipulated remedies were reduced to a series of enforceable court orders on many matters,

including segregation, treatment and monitoring of prisoners in segregation, administrative coding for prisoners with mental illness, mental-health screening during intake, the mental-health referral process, individualized mental healthcare plans, and psychotherapy and confidentiality during counseling sessions.

The district court reviewed each of the parties' stipulations before it reduced them to enforceable orders. And when the court reviewed the stipulations, the DOC agreed that they should be reduced to enforceable orders.

But in early 2019 the district court spotted a significant problem related to the stipulated orders—it had never made PLRA findings in writing. The court raised this issue with the parties during a hearing on February 7, 2019.

The DOC argued that the stipulated orders were unenforceable because they lacked particularized PLRA need-narrowness-intrusiveness findings for each provision. The plaintiffs disagreed, arguing that the DOC had waived these findings by agreeing to the stipulations in the first instance. But the district court overruled those objections.

Because the stipulated orders "lacked PLRA findings," in May of 2019 the district court scheduled "an evidentiary hearing on whether the stipulations previously reduced to orders and the stipulations pending before the court complied with the PLRA." But the evidentiary hearing regarding the remedial orders was not completed until July 9, 2021, in large part due to the COVID-19 pandemic and the sensitive nature of the operation of prison

14                    Opinion of the Court                    22-10292

facilities during a public health crisis. The court issued its Omnibus Remedial Opinion and Order—with PLRA findings—on December 27, 2021. *See* D.E. 3461–D.E. 3464. *See also* D.E. 3465.

### E

Several months before the district court issued its Omnibus Remedial Opinion and Order, it released its Monitoring Order. The court chose to "resolve the issue of monitoring separately from all substantive remedial orders and on a global scale, rather than as to each individual order."

In the Monitoring Order, the district court adopted the DOC's "overarching proposal that, in light of [its] own admission that [it] lack the capacity to self-monitor, outside experts will initially monitor compliance and will draw on their expertise to develop many of the details of the monitoring plan." Additionally, "[t]hose outside experts will train and eventually hand control over to an internal monitoring team, building the capacity of the DOC to regulate itself."

Throughout the Monitoring Order, the district court repeatedly made need-narrowness-intrusiveness findings as required by the PLRA. A couple of the findings are of particular note. First, the court explained that "[t]he consultation element of monitoring is particularly critical in light of the admission of the defendants that ADOC lacks the 'training' to self-monitor." Second, the court highlighted that the ADOC had a long history of failing to comply with its interim remedial orders, and "[s]everal courts ha[d] indicated that in applying the need-narrowness-intrusiveness requirement, a

history of non-compliance helps justify an intrusive remedy." Finally, and perhaps most importantly, the court emphasized that the entire goal of the Monitoring Order was to equip and permit the DOC to comply with its orders *without* court supervision." In other words, the remedy was meant to be as narrow and least intrusive as possible by equipping the DOC to one day monitor itself.

## F

Eventually, the district court determined that the "shortest path toward concluding this phase of the litigation" was for each side to submit a proposed omnibus remedial order encompassing the entire scope of relief at issue and for it to hold "a single evidentiary hearing to consider these proposals." After that the court would "create a final omnibus remedial order resolving all of the outstanding issues" in Phase 2A of the litigation.

The district court followed that course and held a series of evidentiary hearings in May, June, and July of 2021—lasting nearly seven weeks in total. The court then entered its Phase 2A Omnibus Remedial Order and accompanying Phase 2A Omnibus Remedial Opinion, containing nearly 1,000 pages of findings of fact and conclusions of law, including need-narrowness-intrusiveness findings.

These hearings were necessary because, as noted, the district court had failed to make particularized need-narrowness-intrusiveness findings when entering the stipulated orders. During the hearings, the court was able to formulate remedies for the violation it found in its 2017 Liability Opinion, and to make particularized

16                    Opinion of the Court                    22-10292

findings regarding how these remedies satisfied the need-narrow-ness-intrusiveness requirement under § 3626(a)(1) of the PLRA.

The Omnibus Remedial Order was a 46-page injunction lay-ing out the relief ordered by the district court. The Order addressed each area of deficiency discussed in the 2017 Liability Opinion.

Part I of the Omnibus Remedial Opinion discussed the case's procedural history and the legal standards governing the ordered relief.

Part II of the Remedial Opinion examined whether circum-stances had improved in any of the areas of deficiency that the dis-trict court found in its 2017 Liability Opinion. This allowed the dis-trict court to ensure that it could make sufficiently informed PLRA findings. As the court explained, "the general degree of improve-ment or lack of improvement in the areas of relief that were the subject of the omnibus proceedings will inform the court's deter-mination of precisely what remedies remain necessary in each area and what modes of providing that relief are the most narrowly tai-lored and least intrusive ways of correcting the violations at issue."[4]

This section of the Remedial Opinion also recounted the de-tails of six of the 12 suicides that had occurred since the 2017 Lia-bility Opinion—many of which were shocking. For example, on

---

[4] Specifically, the district court examined changed circumstances regarding correctional staffing, mental-health staffing, restrictive housing, intake, cod-ing, referral, confidentiality, treatment teams and plans, psychotherapy, sui-cide prevention, higher levels of care, discipline, and training.

April 14, 2020, a correctional officer discovered Laramie Avery hanging from a ceiling vent during pill call. Officers did not cut Mr. Avery down until two minutes after they discovered him, and they took a picture of him hanging from the ceiling before they cut him down. Additionally, they waited 12 minutes after finding Mr. Avery to initiate CPR. The case of Casey Murphree provided another poignant example. Mr. Murphree had a long history of mental-health problems and had been incarcerated in the DOC since 1996. Throughout early 2020, Mr. Murphree showed signs of a deteriorating mental state and was seen by nurses who worked for the DOC. Notwithstanding his mental-health problems, Mr. Murphee was sent to segregation on May 17, 2020. About 20 hours after entering segregation, Mr. Murphree was found dead in his cell with a ligature around his neck. By the time he was discovered, rigor mortis had set in, which is a process that takes several hours.

Part III of the Remedial Opinion was 375 pages long, and it addressed each kind of relief awarded in the Remedial Order. The district court painstakingly addressed the need-narrowness-intrusiveness requirement with respect to every form of relief awarded in the Remedial Order, providing specific reasons why the relief was necessary, narrow, and least intrusive.

## G

The DOC then appealed the Phase 2A Remedial Order—claiming it to be a permanent injunction—as well as various "interim" orders that it contends we have pendent jurisdiction over. The plaintiffs cross-appealed, arguing that the district court erred

18                    Opinion of the Court                    22-10292

in not finding that the DOC waived various arguments regarding the scope of remediation necessary to comply with the PLRA.

One week before oral argument—and over two years after it initially appealed—the DOC filed a Rule 28(j) letter, asserting that the Phase 2A Remedial Order was actually preliminary and thus subject to the PLRA's 90-day expiration requirements for preliminary injunctions granting prospective relief.

We begin by assuring ourselves of our appellate jurisdiction.

## II

We first summarize the general rules of appellate jurisdiction under 28 U.S.C. §§ 1291 and 1292. We then explain why the Phase 2A Omnibus Remedial Order is an injunction subject to appellate review under § 1292(a)(1). We will finish by explaining why the DOC's mootness argument regarding the so-called "non-final" or "preliminary" nature of the Phase 2A Remedial Order is incorrect.

## A

Under § 1291, we "have jurisdiction of appeals from all final decisions of the district courts of the United States[,]" and "[a] final decision is 'one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Positano Place at Naples I Condo. Assoc., Inc. v. Empire Indemnity Ins. Co.*, 84 F.4th 1241, 1248 (11th Cir. 2023) (citing *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1368 (11th Cir. 1983)) (internal citation omitted). Generally, "an order adjudicating fewer than all of the claims in a

suit, or adjudicating the rights and liabilities of fewer than all of the parties, is not a final judgment from which an appeal may be taken[.]" *Supreme Fuels Trading FZA v. Sargeant*, 689 F.3d 1244, 1246 (11th Cir. 2012) (brackets omitted).

When "a district court anticipates that further proceedings on substantive matters may be required, any order it makes to facilitate those further proceedings is necessarily not final." *Broussard v. Lippman*, 643 F.2d 1131, 1133 (5th Cir. Unit A 1981). The Phase 2A Omnibus Remedial Order is not a "final" order as contemplated by § 1291. And neither party asserts that it is. *See* Appellants' Rule 28(j) Letter (Mar. 12, 2024) ("The Court had jurisdiction at the time the Commissioners perfected appeal under 28 U.S.C. § 1292(a)(1)."); Appellees' Resp. to Juris. Question. at 15 (Mar. 2, 2022) ("Here, as [Alabama] concedes, there is no final order on appeal. Instead, the parties have cross-appealed an interlocutory order granting an injunction and invoke this Court's jurisdiction under 28 U.S.C. § 1292(a)(1)").[5]

## B

Under § 1292(a)(1), we have jurisdiction to review certain interlocutory orders, such as those "granting, continuing, modifying,

---

[5] At oral argument, the discussion on finality necessarily dovetailed into a discussion about whether a Rule 54(b) certification was required to permit appellate jurisdiction over the Phase 2A Omnibus Remedial Order. But, as discussed below, Rule 54(b) is not needed when an injunction is appealable under § 1292(a)(1)—which the Phase 2A Omnibus Remedial Order is.

refusing or dissolving injunctions, or refusing to dissolve or modify injunctions[.]" This statutory provision creates a narrow exception to the "long-established policy against piecemeal appeals." *Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478, 480 (1978). "In determining what is an appealable order under 28 U.S.C. [§] 1292(a)(1), courts look not to terminology, but to the 'substantial effect of the order made.'" *McCoy v. La. State Bd. of Educ.*, 345 F.2d 720, 721 (5th Cir. 1965) (internal citation omitted).

To be appealable under § 1292(a)(1), "the interlocutory order appealed must have the first two elements of an injunction," i.e., "it must be: (1) a clearly defined and understandable directive by the court to act or to refrain from a particular action; and (2) enforceable through contempt, if disobeyed." *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1128 (11th Cir. 2005). The order must also give "some or all of the substantive relief sought in the complaint" and generally should have a "direct or irreparable impact on the merits of the controversy." *Id.* at 1128–29. *See also Birmingham Fire Fighters Ass'n 117 v. Jefferson Cnty.*, 280 F.3d 1289, 1292 (11th Cir. 2002) (explaining that there must be a decree "'of an injunctive character'") (citation omitted).

Here, the Phase 2A Omnibus Remedial Order is an injunction subject to appeal under § 1292(a)(1), as it both commands the DOC to undertake a number of actions and is enforceable under the district court's inherent civil contempt power. *See Nken v. Holder*, 556 U.S. 418, 428 (2009) ("[An injunction] is a means by which a court tells someone what to do or not to do. When a court

employs 'the extraordinary remedy of injunction' . . . it directs the conduct of a party, and does so with the backing of its full coercive powers.") (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). *See also* Black's Law Dictionary 937 (11th ed. 2019) (defining "injunction" as "[a] court order commanding or preventing an action"); 1 Howard C. Joyce, A Treatise on the Law Relating to Injunctions § 1, at 2 (1909) ("In a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating *in personam* by which, upon certain established principles of equity, a party is required to do or refrain from doing a particular thing.").

On its face, the Phase 2A Omnibus Remedial Order states that it "enjoin[s] and restrain[s]" the DOC and its officials, *see* D.E. 3464 at 1, thereby constituting an order "granting" an injunction under § 1292(a)(1). And, taking the "functional approach," *Birmingham Fire Fighters Ass'n 117*, 280 F.3d at 1293, the effect of the Phase 2A Omnibus Remedial Order is to compel the DOC to implement wide-ranging, substantive changes at its facilities.

As to the second element, no party doubts that the Phase 2A Omnibus Remedial Order is enforceable via the district court's inherent contempt power. And we agree with their collective assessment on this point.

Importantly, "[i]f an injunction is ordered, appeal is available under § 1292(a)(1) even though other issues of remedy remain open, and the determination of liability is subject to review." 16

22                    Opinion of the Court                    22-10292

Wright & Miller, Fed. Prac. & Proc. Juris. § 3915.2 (3d. ed. & Sept. 2025 update) (collecting cases). This proposition is generally accepted by our circuit and others. *See, e.g.*, *Simmons v. Block*, 782 F.2d 1545, 1549 (11th Cir. 1986) (an appeal could be taken under § 1292(a)(1) from a permanent injunction entered on summary judgment, even though a crossclaim remained pending and no Rule 54(b) certification was entered); *Triad Sys. Corp. v. Southeastern Exp. Co.*, 64 F.3d 1330, 1334 (9th Cir. 1995) (an appeal could be taken from preliminary injunction entered after phase one of bifurcated litigation, even where phase two included unresolved additional claims), *superseded by statute on other grounds*, 17 U.S.C. § 17(c); *United States v. Humboldt County*, 615 F.2d 1260, 1261 (9th Cir. 1980) (an appeal could be taken from a judgment that entered a permanent injunction as to part of the claims presented, even though other claims remained pending); *Brennan v. Western Union Tel. Co.*, 561 F.2d 477, 479–80 (3d Cir. 1977) (an order that determined overtime pay liability but not amount of damages was not final, but it could be appealed because it enjoined future violations). *Cf. Graff v. City of Chicago*, 9 F.3d 1309, 1313 (7th Cir. 1993) (an appeal could be taken under § 1292(a)(1) from an order that denied a preliminary injunction and dismissed some counts of the complaint but left one count standing).

Significantly, § 1292(a)(1) also alleviates any necessity for a Rule 54(b) certification. *See Simmons*, 782 F.2d at 1549; *Cable Holdings of Battlefield, Inc. v. Cooke*, 764 F.2d 1466, 1470–71 (11th Cir. 1985). Indeed, the provisions of Rule 54(b), which "govern[s] the finality of orders that finally dispose of less than all the claims as to

all of the parties in multiclaim or multiparty litigation, do not limit appeals under § 1292(a)(1). . . ." 16 Wright & Miller, Fed. Prac. & Proc. Juris. § 3921 (3d. ed. & Sept. 2025 update). *See also DeJohn v. Temple Univ.*, 537 F.3d 301, 308 (3d Cir. 2008) (appellate jurisdiction existed where the district court granted partial summary judgment and enjoined a university from enforcing its sexual harassment policy and no attempt was made to certify under Rule 54(b)); *Coastal States Gas Corp. v. Dep't of Energy*, 644 F.2d 969, 974 n.14 (3d Cir. 1981) (noting that Rule 54(b) does not affect the appealability of orders granting injunctions); *Humboldt Cnty.*, 615 F.2d at 1261 (failure to direct entry of final judgment under Rule 54(b) did not defeat the appeal where, after a trial on the merits, the district court entered an injunction prohibiting the enforcement of several ordinances challenged by the plaintiffs, but did not rule on two other ordinances).

In sum, we have statutory appellate jurisdiction pursuant to § 1292(a)(1) because the district court's Phase 2A Omnibus Remedial Order granted injunctive relief against the DOC.

## C

This does not, however, end the inquiry. In its last-ditch Rule 28(j) letter, filed only one week before oral argument, the DOC "advised" us that the appeal may be moot because the Phase 2A Omnibus Remedial Order was an expired "preliminary injunction" under the PLRA. *See* § 3626(a)(2). Generally, the expiration of an injunction challenged on appeal moots the appeal. *See United States*, 778 F.3d at 1228–29. Accordingly, although § 1292(a)(1)

permits appeals of either preliminary or permanent injunctions, we must determine whether the district court's Phase 2A Omnibus Remedial Order constitutes a "final" or "preliminary" injunction under the PLRA. As explained below, we conclude that it constitutes a permanent injunction and thus has not expired pursuant to the PLRA's 90-day provision.

"Recognizing that district courts might enter preliminary injunctive relief in prison cases under Federal Rule of Civil Procedure 65(a), Congress set out additional requirements for such relief" under the PLRA, including § 3626(a)(2). *See Ga. Advocacy Off. v. Jackson*, 4 F.4th 1200, 1206 (11th Cir. 2021), *vacated upon settlement*, 33 F.4th 1325 (11th Cir. 2022). That provision states that "[p]reliminary injunctive relief shall automatically expire . . . 90 days after its entry, unless the court makes [need-narrowness-intrusiveness] findings . . . and makes the order final before the expiration of the 90-day period." § 3626(a)(2). But the Phase 2A Omnibus Remedial Order was not "preliminary" under either Rule 65 or the PLRA. Therefore, it was not subject to the PLRA's 90-day expiration provision.

We start with the DOC's own acknowledgements that this Order was in fact permanent prior to its about-face on the cusp of oral argument. Of course, we are not bound by a party's litigation position when reviewing our jurisdiction, but a party can be held to its admissions on jurisdictional facts. *See Durbois v. Deutsche Bank Nat'l Tr. Co. as Tr. of Holders of AAMES Mortg. Inv. Tr. 20054 Mortg. Backed Notes*, 37 F.4th 1053, 1060 (5th Cir. 2022) (collecting cases).

As the Supreme Court has put it, the "[c]onsent of parties cannot give the courts of the United States jurisdiction, but the parties may admit the existence of facts which show jurisdiction, and the courts may act judicially upon such an admission." *Ry. Co. v. Ramsey*, 89 U.S. 322, 327 (1874).

For years (and up until one week before oral argument), the DOC operated pursuant to an understanding—both below and on appeal—that the district court's Phase 2A Omnibus Remedial Order constituted a permanent injunction. Indeed, one of the DOC's jurisdictional premises for its appeal of the district court's "interim orders" is based on the merger doctrine—which requires that the Phase 2A Omnibus Remedial Order be permanent. The examples are numerous, but a few will suffice to demonstrate the DOC's consistent understanding:

- **Appellants' Br. at xiii**: "This Court possesses jurisdiction over the Interim Phase 2A Remedial Orders because they merged into the Remedial Order. An order that adjudicates fewer than all claims, or the rights and liabilities of fewer than all parties, does not constitute an appealable final order. *When a permanent injunction incorporates the same relief as a preliminary injunction, the two merge*, and a party properly appeals from the permanent injunction. The Remedial Order incorporates relief in the same areas as the Interim Orders and, accordingly, the Interim Orders merged into it." (internal citations omitted).

26                    Opinion of the Court                    22-10292

- **Appellants' Br. at 55**: "This Court reviews 'the district court's entry of a *permanent injunction* for an abuse of discretion.'" (internal citations omitted).

- **Appellants' Resp. to Juris. Q. at 17**: "Moreover, when a *permanent injunction incorporates the same relief as a preliminary injunction, the two 'merge,' and an appeal is properly taken from the permanent injunction.* The same principle applies here. Although the Staffing Order was not a 'preliminary' injunction, it was a 'non-final' injunction. Thus, the relief granted in the non-final Staffing Order merged into the December 2021 Order for purposes of appeal." (internal citations omitted).

- **Appellants' Resp. to Juris. Q. at 19**: "Instead, the State *awaited a 'final' resolution of Phase 2A in an attempt to bring all of its Phase 2A concerns* to this Court in a single appeal. The only reason the December 2021 Order does not qualify as a 'final' order is the pendency of the Phase 2B claims, which at this point constitute essentially a separate case that remains to be litigated from the beginning."

- **Appellants' Mot. to Stay, D.E. 3490 at 7–8**: "*For a court to grant permanent injunction relief*, it must find (1) an irreparable injury; (2) no adequate remedy at law; (3) an equitable remedy is warranted considered the balance of the hardships between plaintiff and defendant; and (4) and permanent injunction will disserve the public interest . . . ."[A] district court *should only consider permanent*

*injunctive relief* 'if the defendant fails to implement reforms or implements half-baked or impermanent reforms.'" (internal citations omitted).

Although perhaps these statements are not jurisdictional "facts" in the traditional sense, they leave us skeptical of the DOC's newfound realization that the district court's Phase 2A Omnibus Remedial Order should now be considered a preliminary injunction given its repeated assertions to the contrary.[6]

In any event, we independently conclude that the Phase 2A Omnibus Remedial Order reflects all the traditional requirements of a permanent injunction. It was issued after full findings of liability on the Eighth Amendment claims premised on inadequate mental health treatment throughout the DOC's facilities. These findings were made after a seven-week trial on liability and an additional seven-week evidentiary hearing on remedies pursuant to the findings of liability (after years of mediation on remedies). The DOC asserts that the Order was "preliminary" because it stated, in part, that it "is not final." Appellants' Rule 28(j) Letter (Feb. 27,

---

[6] If the DOC really believed that the Order was only a preliminary injunction, we are confident that it would have told the district court that it expired after 90 days or would have sought dismissal of the appeal on mootness grounds months earlier. "We remind counsel that, as officers of the court, they have a duty to raise alleged defects in subject-matter jurisdiction when they first become apparent, not merely when doing so becomes strategically expedient." *I.L. v. Alabama*, 739 F.3d 1273, 1284 n.6 (11th Cir. 2014). *See Aves ex rel. Aves v. Shah*, 997 F.2d 762, 767 (10th Cir. 1993) ("[W]hile subject matter jurisdiction enjoys a special status . . . as an officer of the court, candor and honesty are not only expected, they are demanded.").

2024) (citing D.E. 3464 at 41). But this is only half true. The Order must be read in its entirety and in context, and the function of the Order takes precedence over its form. *See Birmingham Fire Fighters Ass'n 117*, 280 F.3d at 1292.

The Phase 2A Omnibus Remedial Order states as follows: "This order is not final and remains open *in that the parties must still submit proposals for further and/or different relief and monitoring may warrant consideration and reconsideration of issues.*" D.E. 3464 at 41 (emphasis added). Read in this context—and together with the district court's 500+ pages of additional findings in the Phase 2A Omnibus Opinion—it is apparent that the Order "remains open" regarding potential modification and/or termination pursuant to, among other things, the PLRA's statutory termination and modification procedures, and the district court's monitoring scheme. *See* § 3626(b)(1)(B), (b)(4) (termination and modification provisions). Indeed, the district court contextualized the entire Phase 2A Omnibus Remedial Order in this way:

> After receiving [the parties' remedial] proposals, the court determined that the shortest path toward *concluding this phase of the litigation* was for each party to submit a proposed omnibus remedial order *encompassing the entire scope of relief at issue* and for the court to hold a single evidentiary hearing to consider these proposals, after which it would *create a final omnibus remedial order resolving all of the outstanding issues* in this phase of the litigation.

D.E. 3461 at 17 (emphasis added and internal quotations omitted). Regarding the previously entered and stipulated "interim" orders, the court further explained that the parties agreed to extend the duration of those stipulated preliminary orders—pursuant to the PLRA's 90-day requirement—"until this final, omnibus order was entered." *Id.* (citing Joint Request to Extend Phase 2A Remedial Orders, D.E. 3076 at 1–2). The parties and the district court understood—and in our opinion, continue to understand—that the Phase 2A Omnibus Remedial Order is a permanent injunction. Thus, looking at both its text and "function," the Order is permanent.

As further evidence of its permanency, the Phase 2A Omnibus Remedial Order was not issued under the preliminary injunction standard insofar as that standard requires a finding of a *"likelihood* of success on the merits." Rather, again looking to its functional effect, the Order contained full findings on liability—i.e., *actual success* on the merits. *Cf. Ga. Advocacy Off.*, 4 F.4th at 1207 (noting that the district court did not treat the preliminary-injunction hearing as a trial on the merits and therefore could not have entered a permanent injunction).[7]

---

[7] To the extent that the DOC argues that the entire case must be finalized for an injunction to be considered permanent it is mistaken for reasons we will explain. *See also* 16 Wright & Miller, Fed. Prac. & Proc. Juris. § 3921 (3d. ed. & Sept. 2025 update) ("An interlocutory order that grants a permanent injunction can be appealed [under § 1292(a)(c)].").

The Ninth Circuit has held that a similar injunction under the PLRA was permanent as opposed to preliminary for purposes of determining whether it had expired as a matter of law under § 3626(a)(2). *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 783–84 (9th Cir. 2019). That case did not even involve a full trial on the merits of liability; instead, it involved a three-day evidentiary hearing, which "effectively converted th[o]se proceedings into a final trial on the merits of the plaintiff's request for permanent injunctive relief." *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1122 n.1 (D. Idaho 2018). In this regard, the Ninth Circuit's decision in *Edmo* makes sense and we find it persuasive.

The DOC really does not make much of an argument regarding *why* the Phase 2A Omnibus Remedial Order is preliminary, other than the brisk language discussed above. And though it takes issue with the need-narrowness-intrusiveness findings, it does not contend that the district court failed to make such findings. It instead asserts that those findings are inadequately tailored and temporally insufficient. That other claims remain pending does not abate the Order's permanency for § 3626(a)(2) purposes. *See* 16 Wright & Miller, Fed. Prac. & Proc. Juris. § 3924 (3d. ed. & Sept. 2025 update).

## D

In short, we have appellate jurisdiction over the appeal of the district court's Phase 2A Omnibus Remedial Order as an injunctive decree under § 1292(a)(1). And we do not lose such jurisdiction on statutory mootness grounds under § 3626(a)(2) of the PLRA

because the Phase 2A Omnibus Remedial Order is a permanent injunction not generally subject to expiration after 90 days.

## III

Although we conclude that we have appellate jurisdiction over the Phase 2A Omnibus Remedial Order, we must still determine the full scope of that jurisdiction. Specifically, the parties dispute whether and to what extent we may exercise pendent appellate jurisdiction over certain additional orders, including the district court's Understaffing Order, the Suicide-Prevention Order, and the Monitoring Order.

The DOC asserts that we should exercise our discretionary pendent jurisdiction over the Monitoring Order and that all other "interim" orders, including the Understaffing Order and the Suicide-Prevention Order, "merged" into the Phase 2A Omnibus Remedial Order. The plaintiffs, on the other hand, maintain that these orders are not appealable under either the pendent jurisdiction doctrine or the "merger" doctrine because review of the orders is unnecessary to determine the validity of the Phase 2A Omnibus Remedial Order and the merger doctrine only applies to final judgments.

We conclude that we may properly exercise pendent appellate jurisdiction over the Liability and Monitoring Orders but will not exercise jurisdiction over the Understaffing and Suicide Prevention Orders. We explain why below.

32                     Opinion of the Court                     22-10292

## A

Pendent appellate jurisdiction allows us to "address [otherwise] nonappealable orders if they are inextricably intertwined with an appealable decision or if review of the former decision [is] necessary to ensure meaningful review of the later." *Jones v. Fransen*, 857 F.3d 843, 850 (11th Cir. 2017) (quoting *Hudson v. Hall*, 231 F.3d 1289, 1294 (11th Cir. 2000)). "'Matters may be sufficiently intertwined . . . when they implicate[ ] the same facts and the same law.'" *Id.* (quoting *Smith v. LePage*, 834 F.3d 1285, 1292 (11th Cir. 2016)). "[T]he critical inquiry is whether the appealable issue can be resolved without reaching the merits of the nonappealable issues." *In re MDL-1824 Tri-State Water Rights Litig.*, 644 F.3d 1160, 1179 (11th Cir. 2011).

Here, both parties submit that the Liability Orders, which are otherwise nonappealable, are inextricably intertwined with the Phase 2A Omnibus Remedial Order (the appealable order). We agree. We cannot meaningfully review the appropriate scope and form of the district court's permanent injunction under the PLRA without also reviewing the constitutional violations set out in the Liability Orders, as they are interdependent pieces of the mental-health care phase of this litigation.

We think the same is true of the Monitoring Order. That Order, which "establishe[d] an overarching monitoring structure and scheme" to ensure "compliance with the court's remedial orders on mental-health care," is "inextricably intertwined" with the Phase 2A Omnibus Remedial Order. As the district court's primary

tool to enforce the DOC's compliance, it is an integral part of the comprehensive remedial scheme mandated by the permanent injunction.

The plaintiffs' assertion that the 124-page Monitoring Order is merely a "case management order" is unpersuasive. The Monitoring Order bears no resemblance to a run-of-the-mill scheduling order. Rather, it provides a detailed plan for monitoring the DOC's compliance with the remedial orders *and* building the DOC's capacity to self-monitor. The Monitoring Order establishes an external monitoring team, which will train and eventually hand over responsibility to an internal monitoring team within the DOC. It details the composition of that team, how team members will be selected, and what rules will govern them. Given the Monitoring Order's role in the district court's "multifaceted remedial plan," we will exercise pendent appellate jurisdiction to review it.

**B**

The DOC next asserts that the Understaffing Order and the Suicide-Prevention Order have merged into the Phase 2A Omnibus Remedial Order and are therefore appealable. As we explain below, we need not decide whether the DOC is correct.

Generally, when a district court enters a permanent injunction, any previous preliminary injunction ceases being effective. *See M.H. by and through Lynah v. Commn'r of the Ga. Dep't of Community Health*, 111 F.4th 1301, 1311 (11th Cir. 2024). As such, "[a] permanent injunction order *moots* interlocutory review of a corresponding preliminary injunction order[.]" *In re Chiquita Brands Int'l, Inc.*,

34                    Opinion of the Court                    22-10292

965 F.3d 1238, 1245 (11th Cir. 2020) (emphasis added). "When a permanent injunction order and a preliminary injunction order raise the same questions, . . . the preliminary order is best viewed as merging with the final order, as both orders speak to the merits of whether the requested injunctive relief is appropriate." *Id. See also Assoc. Builders & Contractors Fla. E. Coast Chapter v. Miami-Dade County*, 594 F.3d 1321, 1323–24 (11th Cir. 2010) ("Once an order of permanent injunction is entered, any preliminary injunction merges with it, and appeal may be had only from the order of permanent injunction.").

The DOC submits that the Understaffing and Suicide-Prevention Orders were not "preliminary" injunctions but were instead "non-final" injunctions. We do not know what the DOC means, for a preliminary injunction is non-final by its very nature. But we need not address the issue, because the DOC did not substantively appeal or challenge the Understaffing and Suicide-Prevention Orders in its merits briefing. As a result, we decline to opine on our jurisdiction over abandoned challenges to the merits of those Orders. "We have long held that an appellant abandons a claim when [it] either makes only passing references to it or raises it in a perfunctory matter without supporting arguments and authority." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). *Cf. United States v. Hayes*, 762 F.3d 1300, 1310 (11th Cir. 2014) ("Our cases . . . are replete with the rule that we do not have a duty to raise and decide issues—even constitutional ones—not mentioned by the parties.").

## V

The challenges mounted by the DOC are numerous. The plaintiffs assert that we need not address those challenges because the stipulated *interim* orders—which were issued prior to the Phase 2A Omnibus Remedial Order—should be reinstated to the extent they differ from the latter. Specifically, they argue that the DOC waived its right to contest the Liability Orders and the stipulated remedial orders, and that the district court abused its discretion in excusing that waiver.[8]

Because the plaintiffs' waiver argument, if successful, would largely resolve the DOC's challenges to the respective orders, we discuss that argument first.

## A

The plaintiffs contend that the DOC waived its right to challenge the district court's failure to make particularized need-narrowness-intrusiveness findings when entering the Stipulated Orders. This is because, the plaintiffs say, (1) waiver is legally possible under the text of the PLRA and controlling precedent, and (2) the

---

[8] As noted, the plaintiffs filed a cross-appeal to assert that the district court abused its discretion in allowing the DOC to challenge the orders on appeal because the DOC waived its objections below. But the plaintiffs did not need to cross-appeal to raise the waiver argument because through that argument they are only defending the orders and do not seek to enlarge their rights. *See Jennings v. Stephens*, 574 U.S. 271, 276 (2015) ("An appellee who does not take a cross-appeal may 'urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court.'") (citation omitted).

36                    Opinion of the Court                    22-10292

DOC agreed that the district court should enter the stipulations as enforceable orders. In the alternative, they argue that the DOC should be judicially estopped from challenging the stipulated orders. In response, the DOC asserts that the plaintiffs have forfeited their waiver argument by conceding to the district court that PLRA findings were necessary and unwaivable.

We review a district court's application of waiver and judicial estoppel for abuse of discretion. *See Smith v. R.J. Reynolds Tobacco Co.*, 880 F.3d 1272, 1280 (11th Cir. 2018) (waiver); *Stephens v. Tolbert*, 471 F.3d 1173, 1177 (11th Cir. 2006) (judicial estoppel). The abuse of discretion standard is deferential and gives the district court a "wide range of choice." *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 217 (2025). (internal quotation marks and citation omitted). Thus, we will reverse only if the district court applies the "wrong legal standard" or committed a "clear error of judgment." *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc). Though we are sympathetic to the plaintiffs'—and district court's—apparent initial understanding that all parties believed the stipulated orders to be enforceable, we see no abuse of discretion.

The provision of the PLRA which deals with settlements provides as follows:

> In any civil action with respect to prison conditions, the court shall not enter or approve a consent decree unless it complies with the limitations on relief set forth in subsection (a).

18 U.S.C. § 3626(c)(1). And § 3626(a) requires the district court to make "particularized" need-narrowness-intrusiveness findings when granting prospective relief. The court must ensure that "*each* requirement imposed by the preliminary injunction satisfies each of the need-narrowness-intrusiveness criteria." *United States*, 778 F.3d at 1228 (emphasis added). If the court fails to make particularized need-narrowness-intrusiveness findings, "a defendant or intervener shall be entitled to the *immediate* termination of any prospective relief[.]" § 3626(b)(2) (emphasis added).

Though parties are free to enter "a private settlement agreement that does not comply with the limitations on relief set forth in subsection (a)," the district court may not "enforce [ ]" "the terms of that agreement" in the event of breach. *See* § 3626(c)(2). Instead, the court's only option is to "reinstate[ ]" "the civil proceeding that the agreement settled." *Id.*

The Fourth Circuit has rejected the argument that a state, by accepting the terms of a consent decree, "waived the right [under the PLRA] to findings of fact and conclusions of law" regarding the claims of the inmates who had filed suit. *See Cagle v. Hotto*, 177 F.3d 253, 257 (4th Cir. 1999). That argument, it explained, would render § 3626(b)(2) a "virtual nullity." *Id.*

Given the Fourth Circuit's decision in *Cagle*, we do not believe the district court abused its discretion in rejecting the plaintiffs' waiver argument here. Although a litigant is normally allowed to waive (or can forfeit) statutory rights, *Clement v. U.S. Atty. Gen.*, 75 F.4th 1193, 1201 (11th Cir. 2023) (noting that "[s]tatutory rights

are presumptively subject to waiver and forfeiture"), the PLRA can also be seen as a limitation on the remedial authority of a court to mandate prospective relief, and if seen in this light waiver may not be on the table. *See* Brief for the United States as Intervenor in *Gates v. Rowlands*, No. 96-16537, 1997 WL 33484937, at *5 (9th Cir. 1997).

The plaintiffs' reliance on *Cason v. Seckinger*, 231 F.3d 777 (11th Cir. 2000), *Hoffer v. Secretary, Florida Department of Corrections*, 973 F.3d 1263, 1278 n.7 (11th Cir. 2020), and *Thomas v. Bryant*, 614 F.3d 1288, 1323 & n.33 (11th Cir. 2010), is unavailing.

The plaintiffs first point to footnote 8 of *Cason*, which stated:

Of course, we do not mean to suggest that the district court must conduct an evidentiary hearing about or enter particularized findings concerning *any facts* or *factors* about which there is not dispute. The parties are free to make any concessions or enter into any stipulations they deem appropriate.

231 F.3d at 785 n.8 (emphasis added). But it is important to note what *Cason* said in the text of the opinion before this footnote: "Only if the court makes written findings on the record that the relief satisfies the above need-narrowness-intrusive standards can the prospective relief be continued." *Id.* at 785. The *Cason* footnote is thus not as broad as the plaintiffs claim; it does not definitively say that the parties can impliedly waive the need-narrowness-intrusiveness requirement simply by agreeing to stipulated orders. Rather, *Cason* instructs that parties can obviate the need for a hearing or certain factfinding by intentionally and expressly stipulating to

certain *facts* supporting a need-narrowness-intrusiveness finding. The district court may not simply assume a *remedy* fulfills the need-narrowness-intrusiveness requirement because the parties present it with a stipulated agreement. What's more, *Cason* involved a termination motion under § 3626(b)(3), and not the initial entry of a consent order under § 3626(c)(1), which is the critical provision implicated in this case. *See* 231 F.3d at 781.

The other two cases also fail to support the plaintiffs' position. *Hoffer* rejected the argument made by the dissent in that case, based on footnote 8 of *Cason*, that because the Florida Department of Corrections had "conceded" that the district court's injunction satisfied the PLRA's need-narrowness-intrusiveness requirement, the district court was not obligated to make particularized findings. *See Hoffer*, 973 F.3d at 1278 n.7. And in *Thomas*, which did not involve a consent decree, settlement, or stipulated order the district court *did* make need-narrowness-intrusiveness findings to support its injunction. *See Thomas*, 614 F.3d at 1323 n.33. The issue was not whether the parties could do away with the need for need-narrowness-intrusiveness findings through a stipulated order. Rather, the case addressed whether the parties could abandon their objection to the sufficiency of the district court's need-narrowness-intrusiveness findings. *See id.*[9]

---

[9] We do not address whether parties are prohibited from waiving judicial findings required by the PLRA. We conclude only that, given the legal landscape, the district court did not abuse its discretion in rejecting the plaintiffs' waiver argument.

40          Opinion of the Court          22-10292

**B**

Nor should the DOC be judicially estopped from challenging the stipulated orders. The district court did not abuse its discretion in concluding that judicial estoppel should not be applied.

Judicial estoppel is a doctrine intended to prevent "the perversion of the judicial process." *United States v. Munoz*, 112 F.4th 923, 934 (11th Cir. 2024) (quotation omitted). Generally, under the doctrine a party that "assumes a certain position in a legal proceeding" and "succeeds in maintaining that position" may not thereafter "assume a contrary position" "simply because his interests have changed." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). Three factors inform the decision to apply judicial estoppel. *Id.* at 750–751. "First, the party's two positions must be clearly inconsistent. Second, the party must have succeeded in persuading a court to accept its earlier position. Third, the party must derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Munoz*, 112 F.4th at 935 (internal quotation marks and citations omitted).

None of these factors are in play here.

First, the DOC's later position is not clearly inconsistent with its earlier one. The DOC agreed to the stipulations and asked the district court to reduce them to enforceable orders. That is not the same as telling the court it was not required to make need-narrowness-intrusiveness findings under the PLRA in order to enforce the orders. The PLRA provides that the court "shall not enter or

approve a consent decree" without making need-narrowness-intrusiveness findings. 18 U.S.C. § 3626(c)(1). So the DOC could agree to the orders and assume that the court would independently make the required particularized PLRA findings.

Second, we are not convinced that the DOC persuaded the district court of anything. The DOC asked the court to reduce the stipulations to enforceable orders. It never, to our knowledge or understanding, told the court it did not have to make PLRA findings when doing so.

Third, the DOC has not derived an unfair advantage or imposed any unfair detriment on the plaintiffs. Without need-narrowness-intrusiveness findings, the DOC is entitled to "immediate termination" of the ordered relief. *See* § 3626(b)(2). That the plaintiffs were required to prepare for an evidentiary hearing to prove that the relief they requested complied with the PLRA later in the litigation does not constitute an unfair detriment.

In sum, we cannot say that the district court abused its discretion by declining to judicially estop the DOC from challenging the stipulated orders below.

## VI

On then, finally, to the merits. Courts considering whether to grant a permanent injunction to plaintiffs who have prevailed on the merits ask whether they have demonstrated that: "(1) [they] ha[ve] suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the

42                     Opinion of the Court                     22-10292

plaintiff[s] and defendant[s], a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008).

We review the entry of a permanent injunction for an abuse of discretion. *See Thomas*, 614 F.3d at 1303. "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *Collegiate Licensing Co. v. Am. Cas. Co. of Reading, Pa.*, 713 F.3d 71, 77 (11th Cir. 2013). As noted, the abuse of discretion standard "allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." *Frazier*, 387 F.3d at 1259 (quotation omitted).

We review the district court's underlying legal conclusions that there were Eighth Amendment violations *de novo*. *See Thomas*, 614 F.3d at 1303. But "[s]ubsidiary issues of fact," such as a district court's subjective deliberate indifference findings, are reviewed only for clear error. *See id.* Under the clearly erroneous standard, "[i]f the district court's view of the evidence is plausible in light of the entire record, an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687 (2021). In other words, "[a] finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Cooper v. Harris*, 581 U.S. 285, 293 (2017).

**A**

We turn first to the Liability Orders. The DOC challenges the district court's finding of Eighth Amendment deliberate indifference on two grounds. First, it contends that the court could not properly enter relief in 2021 based on its finding of Eighth Amendment violations in 2017 without making renewed liability findings. Second, it argues that the court erred in finding deliberate indifference in the Liability Orders because the evidence did not support a finding of "subjective deliberate indifference—i.e., reckless behavior," or of conscience-shocking care. We reject both arguments.

**1**

The DOC insists that the district court was required by both Supreme Court precedent and the PLRA to find that the constitutional violation it had found in 2017 was "current and ongoing" in 2021 before ordering relief. According to the DOC, the court "erred by entering relief in 2021 based on its finding of constitutional violations in 2017" during the liability phase of the trial and should have made a *new* deliberate indifference finding in 2021 at the outset of the remedial phase of the trial. That is not so.

First, the text of the PLRA contains no such requirement. If a district court has already made a deliberate-indifference finding during the first phase of a bifurcated trial, nothing in § 3626(a) requires it to make *another* liability finding during the remedial phase, which may take place later. As we've explained earlier, § 3626(a) applies to the entry of "[p]rospective relief in any civil action with respect to prison conditions" and requires only that "such relief [be]

44                    Opinion of the Court                    22-10292

narrowly drawn, extend[ ] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right[.]" § 3626(a)(1)(A).

The DOC pulls the "current and ongoing" language from § 3626(b) of the PLRA—which governs only the *termination* of already-ordered relief. In relevant part, § 3626(b)(3) states:

> Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a *current and ongoing violation* of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

 (emphasis added).

Both § 3626(a) and § 3626(b) require need-narrowness-intrusiveness findings, but only the latter requires the violation at issue to be "current and ongoing." And "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*, 563 F.3d 1205, 1209 (11th Cir. 2009). Simply put, "when Congress uses different language in similar sections, it intends different meanings." *United States vs. Pate*, 84 F.4th 1196, 1203 (11th Cir. 2023) (quoting *Freemanville*, 563 F.3d at 1209)).

What's more, the PLRA expressly contemplates that trials may be bifurcated. *See* § 3626(f) (discussing appointment of a special master "during the remedial phase of the action"). Given this possibility, if Congress wanted § 3626(a) to be applied differently in bifurcated trials we would expect that it would have said so. *See Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1217 (11th Cir. 2015) ("Where Congress knows how to say something but chooses not to, its silence is controlling."). We "presume that Congress said what it meant and meant what it said." *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002) (en banc). And Congress simply did not require a district court to find that a constitutional violation for relief under § 3626(a) be "current and ongoing" at the time of the remedies phase before ordering appropriate relief.

Second, the DOC's argument conflicts with binding precedent. In *Thomas*, a 2010 decision, we rejected the argument that the "current and ongoing" requirement in § 3626(b)(3) applied to the entry of prospective relief under § 3626(a). In that case, the defendants argued that the district court was required to find a "current and ongoing" violation before entering injunctive relief. *See Thomas*, 614 F.3d at 1319–1320. We were not persuaded, holding that "the 'current and ongoing' requirement is distinct from the standard governing the initial entry of injunctive relief." *Id.* at 1320. There was "no indication in the PLRA, its legislative history, or the case law to suggest that the 'current and ongoing' requirement was intended by Congress to amend the well-established law that injunctive relief is available in the first instance 'to prevent a substantial risk of serious injury from ripening into actual harm,' i.e., to

46                    Opinion of the Court                    22-10292

prevent future harm." *Id.* (quoting *Farmer*, 511 U.S. at 845). We thus concluded that only the "PLRA's need-narrowness-intrusiveness limitation" governs the entry of prospective relief in prison litigation cases. *See id.* "Whether there is a 'current and ongoing' constitutional violation" is a matter to be considered only "in a termination proceeding, at least two years after the district court's initial award of relief." *Id.*

To be sure, a district court should account for changes in circumstances before imposing a remedy under the PLRA. And changed circumstances will necessarily impact the court's need-narrowness-intrusiveness findings. *See* 18 U.S.C. § 3626(a)(1)(A). If the defendants have made significant improvements after the liability trial, the court's remedy must be narrowed accordingly. But, as explained above, nothing in the text of the PLRA requires the court to make new findings of *liability* at the remedial phase.

Here the district court dedicated more than 180 pages of its Remedial Opinion to considering the impact of changed circumstances in the DOC's prisons. *See* D.E. 3462 at 3–186. Though the DOC had made some "improvements," the court found that it continued to fall short of the constitutional minimum in many other areas. *See id.* at 3. The court acknowledged that "[s]uch improvements do not necessarily categorically preclude the need for remedies in those areas, but they do alter the appropriate scope of relief." *Id. See also LaMarca v. Turner*, 995 F.2d 1526, 1541 (11th Cir. 1993) ("Subsequent events, such as improvements in the allegedly infirm conditions of confinement, while potentially relevant, are

not determinative. When a defendant corrects the alleged infirmity after suit has been filed, a court may nevertheless grant injunctive relief unless the defendant shows that absent an injunction, the institution would not return to its former, unconstitutionally deficient state."). That was all the district court was required to do by the PLRA.

The DOC made no showing of materially changed circumstances. Rather, it demonstrated "a long history of failing to comply with the remedial orders in this case." D.E. 3462 at 166. In one particularly egregious misrepresentation, the then-Associate Commissioner of Health Services claimed during her 2016 testimony that the DOC was rolling out "a new mental-health coding system prohibiting placement of seriously mentally ill prisoners in segregation." *Id.* at 167. But this turned out to be untrue, as two of her colleagues testified that the DOC "moved ten mentally ill prisoners out of segregation . . . only after her testimony, and that there was no official policy change." *Id.* Given this lack of candor, the district court understandably felt it was "unable to rely on [DOC's] willingness and ability to self-correct." *Id.* at 170.

The district court did not err by entering relief in 2021 during the remedial phase of the trial in this case based on its findings of deliberate indifference in 2017 during the liability phase of the trial. We thus proceed to review of the Liability Order.

**2**

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. And because

48                     Opinion of the Court                     22-10292

such punishments would "result in pain and suffering which no one suggests would serve any penological purpose," the Supreme Court has held that a prison official's deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). Federal and state governments thus "have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration." *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991).

Our precedents make clear that this obligation extends to inmates' psychiatric and mental health care. *See id.* at 1505. *See also Rogers*, 792 F.2d at 1058 ("Failure to provide basic psychiatric and mental health care states a claim of deliberate indifference to the serious medical needs of prisoners."); *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996) ("[I]t is established that psychiatric needs can constitute serious medical needs and that the quality of psychiatric care one receives can be so substantial a deviation from accepted standards as to evidence deliberate indifference to those serious psychiatric needs."). No one disputes this general proposition.

We have, however, emphasized that "the Eighth Amendment doesn't require [prisoners' mental health care] to be 'perfect, the best obtainable, or even very good.'" *Hoffer*, 973 F.3d at 1271. (quoting *Harris*, 941 F.2d at 1510). Rather, only treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" violates the Eighth Amendment. *Keohane v. Fla. Dept. of Corr. Sec'y*, 952 F.3d 1257, 1277–78 (11th Cir. 2020) (citation omitted).

22-10292                 Opinion of the Court                       49

A prison official violates the Eighth Amendment when he is "deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020) (citation and internal quotation marks omitted). The standard for establishing liability on an Eighth Amendment deliberate-indifference claim is as follows:

> 1. *First*, of course, the plaintiff must demonstrate, as a threshold matter, that he suffered a deprivation that was, "objectively, 'sufficiently serious.'"
>
> 2. *Second*, the plaintiff must demonstrate that the defendant acted with "subjective recklessness as used in the criminal law," and to do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff—with the caveat, again, that even if the defendant "actually knew of a substantial risk to inmate health or safety," he "cannot be found liable under the Cruel and Unusual Punishments Clause" if he "responded reasonably to the risk."

*Wade,* 106 F.4th at 1261–62 (citations omitted).[10]

This case of course involves Eighth Amendment claims at an institutional and system-wide level. In "institutional level challenges to prison health care," we have explained that "systemic

---

[10] Whether an official failed with the requisite knowledge to respond in a reasonable manner is analyzed under an objective standard. *See, e.g., Mosley*, 966 F.3d at 1270; *Swain*, 958 F.3d at 1088.

deficiencies can provide the basis for a finding of deliberate indifference" when those deficiencies "in staffing, facilities, equipment, or procedures" are so extreme "that the inmate population is effectively denied access to adequate medical care." *Harris*, 941 F.2d at 1505.

The district court found seven contributing factors that gave rise to its finding of liability under the Eighth Amendment: First, the DOC fails to identify prisoners with serious mental-health needs in the first place. Second, the DOC does not provide individualized treatment plans to prisoners with serious mental-health needs. Third, the DOC does not provide frequent and confidential psychotherapy by mental-health staff who are adequately trained and supervised. Fourth, the DOC fails to provide hospital-level care and sufficient out-of-cell time to those who need it. Fifth, the DOC fails to adequately identify suicide risks, and fails to adequately monitor and treat those who are suicidal or engaging in self-harm. Sixth, the DOC imposes disciplinary sanctions on mentally ill prisoners for symptoms of their mental illness and imposes disciplinary sanctions without regarding to how they might impact prisoner's mental health. Seventh, the DOC placed mentally ill prisoners in segregation without adequate monitoring or adequate consideration regarding how segregation might impact their mental health. All of these problems are exacerbated by prison overcrowding combined with pervasive shortages of mental-health staff and correctional staff. And in the 2019 Supplemental Liability Opinion, the court found that the DOC fails to "conduct[] adequate periodic

mental-health evaluations of prisoners in segregation," which "contribute[s] to the [DOC's] violation of the Eighth Amendment."

Critically, the DOC does not contend that any of these factual findings by the district court were clearly erroneous.

### 3

The DOC claims that the district court erred by ruling that it acted with deliberate indifference by focusing solely on the risk of harm to inmates, without addressing the standard's subjective component. Specifically, with respect to overcrowding and understaffing, the court supposedly "bypassed evidence of the Commissioners' efforts to increase correctional staffing" and "neglected" to explain what they could have done to remedy the problem. Reviewing for clear error, *see Thomas*, 614 F.3d at 1312, we disagree.

The district court explained that "the current levels of mental-health and correctional understaffing and overcrowding . . . illustrates [the DOC's] disregard of risk of harm." The court reasoned that the DOC's response to overcrowding and understaffing had been "objectively insufficient" because "systemic and gross deficiencies" had persisted "for years and years."

It is true that officials "may be found free from [Eighth Amendment] liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Swain*, 961 F.3d at 1287. But we have also recognized that "in institutional level challenges to prison health care . . . systemic deficiencies can provide the basis for a finding of deliberate indifference." *Harris*, 941 F.2d at 1505. "Deliberate indifference to inmates' health needs may be shown,

52                    Opinion of the Court                    22-10292

for example, by proving that there are 'such systemic and gross deficiencies, or procedures that the inmate population is effectively denied access to adequate medical care'" *Id.* (citation omitted). And that is what the court found here—known systemic deficiencies that had persisted for years that prevented the DOC from meeting the constitutional floor for minimally adequate mental health care. The court found that the deficiency exists, and that the DOC, through its unreasonable response, has effectively denied the inmate population access to constitutionally adequate medical care. *See id.*[11]

The DOC also insists that the district court improperly traced the Eighth Amendment violation caused by overcrowding in its prison facilities to the DOC's "historical indifference" instead of the "personal indifference" of Commissioners Naglich and Dunn. This argument ignores that this is an official-capacity § 1983 suit, under *Ex Parte Young*, 209 U.S. 123 (1908), meaning it is "in all

---

[11] Other circuits agree that deliberate indifference can be shown on an "institutional level, when the prison's system of medical care is so seriously inadequate as to cause unwarranted suffering[.]" *Cruz v. Ward*, 558 F.2d 658, 662 (2d Cir. 1977). *Accord Ruiz v. Estelle*, 679 F.2d 1115, 1126 (5th Cir. 1982) ("We affirm the district court's finding that [the Texas Department of Corrections] imposes cruel and unusual punishment on inmates in its custody as a result of the totality of conditions in its prison."), *modified in part*, 688 F.2d 266 (5th Cir. 1982); *Dunaley v. Carnahan*, 132 F.3d 1234, 1245 (8th Cir. 1997) ("A number of individuals and isolated incidences of medical malpractice or negligence do not amount to deliberate indifference without some specific threat of harm from a related system wide deficiency[.]"); *Disability Rights Montana, Inc. v. Batista*, 930 F.3d 1090, 1097 (9th Cir. 2019) (acknowledging that a deliberate indifference claim can be brought based on "systemwide deficiencies").

22-10292                    Opinion of the Court                         53

respects other than name, to be treated as a suit against the entity."
*Kentucky v. Graham*, 473 U.S. 159, 166 (1985). And our precedent
quickly disposes of the DOC's contention. In *LaMarca*, we held that
even where a new superintendent "appear[ed] to be a dedicated
public servant who is trying very hard to make [the defendant
prison system] an efficient and effective correctional institution,"
what mattered in an official-capacity suit was the institution's "his-
torical indifference." 995 F.2d at 1542. Without a showing that the
institution's "past wrongs would not be repeated," a finding of lia-
bility against the entity was warranted—despite the new superin-
tendent's efforts. *See id.*

Finally, the DOC briefly argues (in no more than two para-
graphs) that the district court applied the wrong standard when as-
sessing the mental healthcare inmates received: The DOC says that
the care it provided may not have been good, but it was not con-
science-shocking. And it points out, several inmates received ade-
quate care. But it's the DOC that has the standard wrong.

The district court made a finding of "systemic deficiencies"
that were "interrelated: failures at each step of the process of iden-
tifying and treating inmates snowballed to produce a mental-health
care system that was 'horrendously inadequate' when taken as a
whole." D.E. 3462 at 5. The question is not, as the DOC asserts,
whether each individual contributing factor that the court found
was, in and of itself, conscience-shocking. Rather, we must ask
whether—when all seven factors (plus overcrowding and under-
staffing) are taken together—the deficiency is so extreme that "the

54                    Opinion of the Court                    22-10292

inmate population is effectively denied access to adequate medical care." *Harris*, 941 F.2d at 1505. Based on the court's extensive factual findings, which are not clearly erroneous, that is exactly what happened in Alabama's prison system.[12]

Moreover, the district court detailed several practices that are grossly inadequate all on their own. For instance, the DOC regularly fails to properly monitor suicidal inmates. Acutely suicidal inmates are often sent to segregation (and sometimes crisis cells specifically intended for suicidal inmates) and held—largely unmonitored—in cells with tie off points. The court found that many of these cells contain "grates, sprinkler heads," and "ropes" that are used as clothes lines—all of which "can be easily used to commit suicide." D.E. 1285 at 222.

When taken together, all contributing factors detail a prison system that failed as a whole to care for its inmates. The failures started "at the door." D.E. 1285 at 71. The DOC's prisons suffer from severe and chronic overcrowding—in 2016 they had an occupancy rate of over 175%. The prisons have also dealt with severe understaffing of mental health providers since at least 2013. *See id.*

---

[12] Admittedly the Liability Opinion could have been clearer that it was making a *systemic* finding and applying that legal standard, but we think the district court said enough throughout its various opinions and orders to make this clear. After all, we can "infer[] from [the] district court's explicit factual findings and conclusion implied factual findings that are consistent with its judgement although unstated." *United States v. $242,484.00*, 389 F. 3d 1149, 1154 (11th Cir. 2004) (en banc).

22-10292    Opinion of the Court    55

at 49. Despite these longstanding problems, multiple budget cuts and the DOC's refusal to increase the authorized number of mental-health positions meant the caseload per provider continued to increase. Due to shortages of qualified staff the DOC regularly relied on "unsupervised, unlicensed counselors" known as "mental health professionals" to treat inmates. *See id.* at 105. Its failure to identify inmates with serious mental-health needs led to the DOC having one of the lowest purported percentages in the country of mentally ill prisoners, while simultaneously having a high number of suicides. *See* D.E. 3462 at 6. And a combination of inadequate treatment planning, psychotherapy, inpatient care, and crisis care rendered treatment in the prisons wholly inadequate.

When the system is viewed as a whole, we detect no error—factual or legal—in the district court's finding of deliberate indifference.

**B**

Having determined that the district court properly found the DOC was deliberately indifferent during the liability phase of the trial, we turn to review of the relief ordered during the remedial phase. In its three-part Phase 2A Omnibus Remedial Opinion, the court dedicated 375 pages to making PLRA findings and ordering appropriate relief. The DOC raises two issues with the Remedial Opinion. First, it says, the Remedial Opinion violated the PLRA by applying an incorrect legal standard and ordering greater relief than necessary. Second, it asserts that the district court improperly

56                    Opinion of the Court                    22-10292

ordered a system-wide remedy. With respect to each argument we agree in part and disagree in part with the DOC.

1

The DOC begins by challenging the district court's Remedial Opinion on the ground that it failed to satisfy the PLRA's need-narrowness-intrusiveness requirement. It advances two points. The first is that the district court "relied on an incorrect legal standard" because it found relief necessary for "some reason other than to correct a constitutional violation." The second is that the district court awarded greater relief than necessary to correct the DOC's Eighth Amendment violation. We reject the DOC's first argument. But because its second argument is correct as to *some* of the relief that the court awarded, partial reversal is warranted.

The first argument lacks merit, and reveals—once again—that the DOC misunderstands how the PLRA functions with respect to the Eighth Amendment violation. When a district court analyzes the matter of remedy under § 3626(a)(1), it must make "particularized findings" that "each requirement imposed" by the remedial order satisfies each element of the need-narrowness-intrusiveness standard. *See United States*, 778 F.3d at 1227–28 (quoting *Cason*, 231 F.3d at 785). "It is not enough to simply state in conclusory fashion that the requirements" of the remedial order "satisfy those criteria." *Id.* (quoting *Cason*, 231 F.3d at 785). "Even where . . . a district court issues a lengthy order that carefully considers each requested form of relief on the merits, it cannot just append a rote, catch-all assertion that" its remedy "satisfies" the

need-narrowness-intrusiveness requirement. *See Hoffer*, 973 F.3d at 1278–79.

Part III of the Omnibus Remedial Opinion devoted 375 pages to discussing the relief that the district court awarded and analyzing whether each kind of relief satisfied the need-narrowness-intrusiveness requirement of the PLRA. The court's analysis was particularized and was not conclusory. For example, in analyzing whether its correctional-staffing remedy satisfied the PLRA, the court spent 14 pages discussing each prong of the need-narrowness-intrusiveness requirement.

Attempting to parry, the DOC insists that much of this careful work was wrong because the district court did not tie its remedies to the constitutional violation it found. But that misunderstands the Eighth Amendment violation at issue. As we've already explained, the district court found the DOC liable for *systemic deficiencies* that meant inmates at its facilities were essentially denied access to mental healthcare. There were seven deficient factors that contributed to the violation—in addition to overcrowding and understaffing—and the court found that each aspect of relief that the DOC takes issue with was necessary to correct an issue that contributed to one of those seven factors. That is all the court was required to do.

The DOC's second argument—that the district court awarded greater relief than necessary to correct the Eighth Amendment violation—in part has more heft. Again, the PLRA requires the district court's remedy to be "narrowly drawn," extend "no

58                      Opinion of the Court                      22-10292

further than necessary to correct the violation of the Federal right," and be "the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). But a narrow and proper remedy for a constitutional violation is *not* "invalid simply because it will have collateral effects." *Brown*, 563 U.S. at 531. The "particular plaintiff or plaintiffs" language in § 3626(a)(1)(A) "means only that the scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court." *Id.* Because of the PLRA's limits on the scope of relief, the court's remedy must do nothing other than correct the Eighth Amendment violation at issue. In other words, the remedy must seek to raise the DOC's mental healthcare to a level where it is not "grossly inadequate." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *Harris*, 941 F.2d at 1505 (quoting *Rogers*, 792 F.2d at 1058).

The DOC challenges a number of provisions in the Remedial Order where, it says, the district court's remedy extended further than the PLRA allows. As to two of these provisions, we agree. As to the rest, we do not.

The district court's mandate that the DOC suicide-proof all stabilization units, restricted housing units, and suicide-watch cells according to the Hayes Checklist—which "provides for the elimination of tie off points and other structural elements that facilitate suicide attempts, as well as the maintenance of adequate visibility into the cell to allow monitoring"—goes too far. *See* D.E. 3463 at 97. Dr. Jeffry Metzner—one of the DOC's experts—characterized

22-10292                Opinion of the Court                59

the Hayes Checklist as a set of "best practices" for suicide-proofing a cell. But the Eighth Amendment does not guarantee "best" practices—it merely prohibits "grossly incompetent" practices that result in denial of treatment. *See Hoffer*, 973 F.3d at 1271. The court required *all* stabilization units and restricted housing units to comply with the Hayes Checklist, *even if* they were not used to house potentially suicidal inmates. Yet, as all three of the plaintiffs' experts conceded, there is no other system in the country where *every* restricted housing unit is suicide-proofed. The court's requirement that all of these cells comply with the Hayes Checklist thus does far more than raise the DOC's suicide-prevention practices above the constitutional floor.

A second remedial provision related to staffing also exceeds the requirements of the PLRA. The district court ordered that "[b]y July 1, 2025," the DOC "must fill all mandatory and essential posts at the level indicated in the most recent staffing analysis at that time." D.E. 3464 at 3. That requirement is in a section discussing "correctional staffing" for the entire prison system and it is not limited to mental-health units. In the court's own words, "essential" posts are those "that are needed for normal operations but may be temporarily interrupted." D.E. 3462 at 65. According to the court, "normal operations" includes "recreation activities" and "vocational and educational systems." *Id.* Because of this broad understanding of "essential posts," the remedy requires the DOC to fill posts that don't appear to be necessary for, and indeed seem to have little to do with, the provision of mental healthcare. Under

the PLRA, that remedy therefore goes beyond correcting constitutionally deficient mental healthcare. *See Hoffer*, 973 F.3d at 1271.

That said, the other provisions the DOC objects to do not violate the PLRA.

The district court ordered the DOC not to place "[i]nmates with serious mental illness in" restrictive housing absent "a documented exceptional circumstance." Inmates placed in an RHU "for safety and security issues for 72 hours or longer" must be offered at least three hours of out-of-cell time per day. Inmates placed in an RHU "for non-safety or non-security issues must be removed from the RHU within 72 hours."

The Remedial Opinion failed, the DOC says, to cite evidence tying the 72-hour limit to the Eighth Amendment violation. We see several problems with the DOC's argument. First of all, the DOC requested this relief—the district court simply adopted the DOC's own proposal here. Second, the court *did* cite evidence substantiating the remedy: Dr. Jeffrey Metzner—the DOC's own expert—"testified that the rationale for these limitations was that he believes 72 hours is the amount of time that a person with serious mental illness can remain in segregation conditions without suffering serious psychological harm." [This relief, therefore, was necessary given the DOC's "continued practice of transferring inmates from suicide watch to segregation and placing inmates in segregation when they are clinically contraindicated for such placement." And it was narrowly tailored because it went no further than the DOC requested—allowing segregation placements "for the

22-10292                    Opinion of the Court                    61

maximum amount of time that the defendants' expert testified that he believed" to be safe. Finally, because it allowed the DOC to continue placing inmates in segregation "for reasons of accountability," it was the least intrusive means of correcting the violation. The court did not abuse its discretion or otherwise err.

Next, the DOC takes issue with the provisions requiring the cleaning of RHU cells. The district court ordered that all RHU cells be cleaned within three months of the effective date of the Remedial Order, and that these cells always be cleaned before they receive new occupants. The DOC says this is an example of "micromanag[ment]." But the DOC concedes that this remedy is not "a tremendously burdensome requirement."

The district court found this relief necessary considering its finding that

> [c]ells in the restrictive housing units were often filled with the smell of burning paper and urine, and extremely dirty with what appears to be dried excrement on the walls and floors, contributing to a heightened risk of decompensation for mentally ill prisoners and a heightened risk of developing serious mental health needs for those who were initially healthy.

D.E. 3463 at 94 (citation and internal quotation marks omitted). Though the DOC tried to suggest improvements were made to the cleanliness of the RHU cells between the liability and remedial phases of trial, the court made a credibility determination, to which we owe deference, that this was not so. *See id.* at 94–95.

62                    Opinion of the Court                    22-10292

Accordingly, we don't think this remedy went beyond the constitutional floor or transgressed the PLRA.

Finally, the DOC complains that the Remedial Order grants relief to non-class members, specifically referencing the remedial provision requiring that "[a]n inmate placed in a RHU for safety or security issues for 72 hours or longer will be offered at least three hours of out-of-cell time per day (which may be congregate out-of-cell time) while he or she remains in the RHU." The DOC argues that this requirement applies to all prisoners, not just prisoners with serious mental illnesses. But the DOC simultaneously concedes that the court later clarified several times that this provision applies only to prisoners with a serious mental illness. Given the court's repeated clarifications, the DOC's objection lacks merit.

In sum, two of the challenged remedies went beyond the scope of relief permitted by the PLRA. As to these two remedies, we reverse. Because the other challenged remedies complied with the PLRA, we affirm as to them.

**2**

The DOC argues that because the Liability Opinion highlighted "only isolated issues at certain prisons," the systemwide relief ordered in the Remedial Order violates the PLRA. According to the DOC, the district court "lack[ed] evidence to support systemwide relief" and should have made "prison-specific PLRA

findings." We reject this argument as well, with the exception of the DOC's objections regarding Tutwiler.[13]

The Supreme Court's 2011 decision in *Brown* essentially forecloses the DOC's claim that, in a case like this one, the district court was required to make prison-specific findings. In *Brown*, the Supreme Court affirmed a three-judge district court's order requiring the release of 46,000 prisoners—across the *entire* California prison system—in two years. *See* 563 U.S. at 500–02. The court's order applied to two separate class actions: *Coleman v. Brown* and *Plata v. Brown*. *See id.* at 500. The *Coleman* class action dealt with mental healthcare, while the *Plata* class action dealt with medical care. *See id.*

At the time of the district court's order in *Brown*, California's prisons were operating at nearly 200% of their capacity, leading to several Eighth Amendment violations, including inadequate

---

[13] We reject yet another waiver argument from the plaintiffs. The plaintiffs say that the DOC waived its systemwide-relief argument by raising it "too late" in litigation to be fairly heard by the district court. The plaintiffs' only record citation for this proposition is a footnote in the court's Understaffing Opinion. But the Understaffing Opinion was issued in February of 2018; nearly four years before the court issued its Omnibus Remedial Order in December of 2021. As the plaintiffs are aware, the DOC's challenge is to the systemwide relief awarded in the 2021 Omnibus Remedial Order, not the 2018 Understaffing Opinion. The court noted that the DOC had raised this argument in its pretrial brief and proposed relief. Thus, even assuming that the DOC waived a challenge to the systemwide-relief ordered in the 2018 Understaffing Order, it did not waive its systemwide-relief argument with respect to the 2021 Omnibus Remedial Order.

64    Opinion of the Court    22-10292

medical and mental healthcare. *See id.* at 501. The Supreme Court rejected California's argument that the remedial order was overbroad because under the PLRA it did not account for varying problems in different California prisons:

> The order also is not overbroad because it encompasses the entire prison system, rather than separately assessing the need for a population limit at every institution. The *Coleman* court found a systemwide violation when it first afforded relief, and in *Plata* the State stipulated to systemwide relief when it conceded the existence of a violation. Both the *Coleman* Special Master and the *Plata* Receiver have filed numerous reports detailing systemwide deficiencies in medical and mental health care. California's medical care program is run at a systemwide level, and resources are shared among the correctional facilities.

*Id.* at 532.

The Supreme Court in *Brown* held that the district court could order systemwide relief because it made findings about systemwide deficiencies. *See id.* Under *Brown*, and given the district court's extensive factual findings, systemwide relief was an appropriate exercise of discretion and consistent with the PLRA.[14]

---

[14] We note that though the plaintiffs rely on *Brown* in their briefs the DOC never cites—much less discusses—this seminal case in either of its briefs. That failure speaks volumes.

22-10292                Opinion of the Court                65

After a seven-week liability trial, the district court made findings about systemwide failures in the DOC's facilities, noting that "the evidence from both sides (including testimony from Commissioner Dunn and Associate Commissioner Naglich as well as that of all experts) extensively and materially supported the plaintiffs' claim." The court based its review on hundreds of hours of witness testimony and "thousands of pages of documentary evidence." It cited evidence from five expert witnesses who visited many of the DOC's 15 prisons. Two visited six prisons, two visited seven prisons, and one visited nine prisons. These experts also reviewed documents from across the prison system, including audits, regulations, policies and procedures, medical records, deposition transcripts, and statistical reports. And they personally interviewed hundreds of prisoners. Further, during the liability phase of trial, the court heard testimony from prison staff, the Commissioner of the DOC, the Associate Commissioner of Health Services, and several prisoners—both named plaintiffs and class members. Given the sheer breadth of evidence that the court reviewed, we detect no clear error in its factual findings or legal error in its conclusions about the DOC's systemwide deficiencies.

We are thus not persuaded by the DOC's contention that the district court lacked sufficient evidence to order systemwide relief. The Liability Order identified a systemic Eighth Amendment violation. In Part II of the Omnibus Remedial Opinion, the court spent 186 pages analyzing mental healthcare "in the [DOC] system" and making findings regarding "systemic" deficiencies in the [DOC's] facilities. It made these findings after remedial hearings

that lasted from May 24, 2021, to July 9, 2021. Considering this extensive evidence, we reject the DOC's unsubstantiated claim that the problems the court identified were "isolated" to "certain prisons." The "scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The court could properly impose a systemwide remedy based on its findings of systemwide liability. *See Brown*, 563 U.S. at 532.

The DOC points out that the plaintiffs stipulated in 2021 that Hamilton (one of the DOC's prisons) "is adequately staffed with correctional staff and supervisors." And the district court also recognized that Easterling, Fountain, Holman, Kilby, and Limestone "have enough mental-health staff." But the district court imposed systemwide staffing requirements anyway.

For two reasons, however, the DOC's argument about these institutions is generally unavailing.

First, the district court did not abuse its discretion in concluding that a system-wide remedy was necessary to fix the system-wide problem (i.e., the Eighth Amendment violation) *as a whole*, and there is no claim that inmates with mental-health problems are only housed in certain institutions. The court found that because the DOC's prisons "form part of an interlocking system," "focusing relief on only a few facilities could fatally hinder its ability to remedy the constitutional violation found." As the plaintiffs aptly note, "[i]f the Remedial Order were limited to some subset of DOC facilities, DOC could 'remedy' deficiencies at covered facilities by

overcrowding and diverting resources from other facilities without regard for the consequences that would inevitably follow." Under *Brown*, that possibility is sufficient to satisfy the need-narrowness-intrusiveness requirement. *See Brown*, 563 U.S. at 532 (upholding system-wide relief under the PLRA because "California's medical care program is run at a system-wide level, and resources are shared among the correctional facilities").

Second, although the district court found that the staffing levels at Easterling, Fountain, Holman, Kilby, and Limestone were sufficient in 2021, that was largely due to reduced intake from local jails during the COVID-19 pandemic. The court noted that "[b]oth parties agree[d] that, when the pandemic abates, [the DOC] will likely see a substantial and rapid increase in its inmate population." And "[w]hen intake resumes, [the DOC] will almost certainly require more staff in each of its facilities to provide a constitutionally permissible standard of care." This is because, as the court correctly explained, "necessary staffing levels are always relative to prison population."

The one exception to this analysis is the district court's application of the Remedial Order to Tutwiler, the DOC's only facility for women. The court partially excepted Tutwiler from its findings of system-wide deficiencies. The court found that "inadequate identification and classification of mental-health needs, inadequate screening for suicide risk, and inadequate psychotherapy create a substantial risk of serious harm to mentally ill prisoners at Tutwiler." D.E. 1285 at 235–36. But it noted the lack of evidence that

Tutwiler's "number of crisis cells, suicide-watch placements, segregation placements, and treatment and monitoring available in segregation" posed a substantial risk of harm to Tutwiler's prisoners. *See id.* at 236. The last suicide at Tutwiler occurred in 2004, and the one Tutwiler inmate who testified at trial acknowledged that she had been treated by a capable psychiatrist at Tutwiler for 13 years. The court also observed that "both sides presented affirmative evidence that the care being provided in the Tutwiler [residential treatment unit] is adequate, or close to adequate." Tutwiler, thus, did not suffer from the same factors that led to the court's liability finding against the DOC.

Despite the district court's limited liability findings as to Tutwiler, the Remedial Order only exempts Tutwiler from the correctional staffing remedial provision. Tutwiler must otherwise comply with every other aspect of the district court's injunctive decree. As a general matter, "[c]ourts have no power to presume and remediate harm that has not been established." *Lewis v. Casey*, 518 U.S. 343, 360 n.7 (1996). And under the PLRA, the district court may not award relief beyond what is necessary to correct the constitutional violation at issue. *See* § 3626(a)(1)(A). As to Tutwiler, we set aside the remedial provisions about monitoring, mental healthcare in segregation, the number of crisis cells, residential treatment units, and suicide-watch placements.

### 3

In sum, we reject the DOC's challenge to the system-wide nature of the Omnibus Remedial Opinion. The district court

22-10292              Opinion of the Court                    69

identified problematic system-wide practices, and did not err (factually or legally) in doing so. And because the court found a system-wide violation, under *Brown* it could remedy that violation on a system-wide basis while still satisfying the PLRA. We reverse only as to some of the remedial provisions applicable to Tutwiler.

### C

Finally, the DOC challenges the district court's Monitoring Order on the grounds that it does not meet the PLRA's need-narrowness-intrusiveness requirements. The Monitoring Order, released in September of 2020 before the Omnibus Remedial Opinion, was designed to help the DOC "attain timely, meaningful, and sustainable compliance with the court's remedial orders on mental-health care." In the Monitoring Order, the court adopted the DOC's "overarching proposal that, in light of its own admission that [it] lack[s] the capacity to self-monitor, outside experts will initially monitor compliance and will draw on their expertise to develop many of the details of the monitoring plan." The external monitoring team would "train and eventually hand control over to an internal monitoring team, building the capacity of the [DOC] to regulate itself."

For their part, the plaintiffs respond that the Monitoring Order need not comply with the need-narrowness-intrusiveness requirement because it is not "prospective relief" under § 3626(a)(1)(A) (applying only to "*[p]rospective* relief in any civil action with respect to prison conditions") (emphasis added). This is a question of first impression in this Circuit.

The plaintiffs give us little to go on, citing only one district court decision squarely holding that monitoring is not "prospective relief" under the PLRA. *See Carruthers v. Jenne*, 209 F. Supp. 2d 1294, 1300 (S.D. Fla. 2002) (holding that "monitoring cannot be considered 'prospective relief' under the PLRA" because "monitoring is not an 'ultimate remedy' and only aids the prisoners in obtaining relief"). But the Second Circuit has said otherwise, albeit in dicta. *See Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009). In *Benjamin*, the Second Circuit opined that the PLRA probably applies to monitoring orders. It explained that, in the PLRA context, monitoring is used as a functional part of the district court's prospective relief such that there is "no easy distinction between [prospective] relief itself and the monitoring of relief." *Id.* It also noted that failure to subject monitoring orders to the PLRA would "frustrat[e] one of the Act's broad goals of limiting the 'micromanag[ing] [of] State and local prison systems.'" *Id.* (quoting 141 Cong. Rec. S. 14611, 14626 (Sen. Dole) (1995)). Because we affirm the Monitoring Order even if assuming the court was obligated to make PLRA findings, we assume without deciding that it constitutes prospective relief to which the PLRA applies.

The DOC advances a number of arguments as to why the Monitoring Order runs afoul of the PLRA. For starters, the DOC claims that the Monitoring Order failed to include adequate PLRA findings and collapsed the need-narrowness-intrusiveness analysis into a single inquiry, asking only whether relief was necessary. That approach, it says, directly conflicts with this Court's

instructions in *Hoffer* that the district court must make "particularized findings . . . as to the application of *each* criteria" of the need-narrowness-intrusiveness standard. *See Hoffer*, 973 F.3d at 1278 (emphasis added) (quoting *Cason*, 231 F.3d at 785). The DOC next argues that the court failed to impose certain "guardrails" that it proposed, and that the "lack" of these guardrails will allow "the [external monitoring team] to essentially replace [the DOC]'s professionals as the administrators of [the DOC]'s prisons." Finally, the DOC takes issue with the power of the correctional administration expert—a member of the external monitoring team—"to tell [the DOC] whether 'correctional staff are being deployed properly.'"

Starting with the first argument, the Monitoring Order satisfies the PLRA's need-narrowness-intrusiveness requirement, even though the district court misstated the need-narrowness-intrusiveness standard. In its discussion of the standard, the district court made the following statement:

> In discussing why each part of the court's order satisfies the PLRA's need-narrowness-intrusiveness requirement, 18 U.S.C. § 3626(a)(1)(A), the court in its analysis will largely focus on a single inquiry: Is the monitoring provision necessary to correct the constitutional violation found?

D.E. 2915 at 15. Though the court was pointing out that the three requirements are all interrelated, *Hoffer* does require the district court to separately analyze each criterion of the PLRA's standard. *See Hoffer,* 973 F.3d at 1278 (quoting *Cason*, 231 F.3d at 785). That said, despite having *misstated* the standard, the district court *applied*

72                    Opinion of the Court                    22-10292

it correctly, so its misstatement was harmless. *See, e.g., Copeland v. Georgia. Dep't of Corr.*, 97 F.4th 766 (11th Cir. 2024) (explaining that a district court's use of an incorrect legal standard can be harmless error).

The Monitoring Order is replete with need-narrowness-intrusiveness findings that analyze each criterion separately. The district court largely adopted the DOC's own proposals, making revisions only where necessary. As the court explained, the entire point of the Monitoring Order was to subject the DOC to external monitoring for as short of a time as possible, ensuring a "less intrusive process." The "goal for monitoring" is "that [the DOC] acquire[s] the tools, resources, and capacity to provide constitutionally adequate mental-health care to those in its custody *without* court supervision." Accordingly, the court gave the external monitoring team "the authority, without a hearing, to stop evaluating a particular performance measure at a particular facility, or stop evaluating a facility altogether, based on their own determination of sustained substantial compliance." The Monitoring Order complies with the PLRA in both form and substance.

The DOC's other arguments fare no better. The sheer breadth of a remedy is not, on its own, enough to show that it fails the PLRA. Sometime drastic remedies are the least intrusive and yet necessary means of correcting an Eighth Amendment violation. *See, e.g., Brown*, 563 U.S. at 541. That is the case here. The district court imposed external monitoring partially because the DOC admitted that it lacked the capacity to monitor its own compliance

with the court's orders. Furthermore, the court highlighted the DOC's previous failure to comply with its interim remedial orders, which suggested that it was unable "to take" effective "remedial steps absent court intervention." Finally, under the court's order, the goal of the external monitoring team was to "train and eventually hand control over to an internal monitoring team, building the capacity of the [DOC] to regulate itself." We think therefore there is thus little danger that the external team will "replace [the DOC's] professionals," as the DOC claims.

Because the Monitoring Order satisfies the PLRA's need-narrowness-intrusiveness standard, we affirm its issuance.

## VII

We affirm the Liability Order and Monitoring Order. We affirm most of the Omnibus Remedial Opinion and the Omnibus Remedies Order but reverse it in certain limited respects. On remand the district court is to modify the injunctive relief consistent with our opinion.

**AFFIRMED IN PART AND REVERSED IN PART.**