**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **EDWARD BRAGGS,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 2:14-cv-00601-MHT** |
| **v.** | ) | |
| | ) | **District Judge Myron H. Thompson** |
| **GREG LOVELACE,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' PRE-ARGUMENT BRIEF CONCERNING
THE PHASE 1 REVISED TRANSITION PLAN**

On July 2, 2026, the Court ordered the Parties to submit pre-argument briefs concerning the Defendants' revised Transition Plan. Docs. 4523. The Court asked the Parties to address three (3) issues:

(1) The status of the new Elmore County and Escambia County facilities.

(2) The status of the revised ADA transition plan, including but not limited to: how close to completion the plan is; an overview of the parties' remaining disputes, as well as the ADA consultant's perspective on them; and the ADA consultant's outstanding tasks, if any.

(3) Whether the revised transition plan is required to be the product of only the defendants or of both the defendants and plaintiffs (that is, a plan agreed upon by both sides) and, if the latter, whether a disputed plan should be filed and how any dispute between the parties should be resolved.

Plaintiffs begin with a brief overview of the relevant history for Phase 1.

**Brief History**

1

Ten years ago, Plaintiffs and the Alabama Department of Corrections (ADOC) agreed to a class action settlement to resolve claims arising under the American with Disabilities Act (ADA) and §504 of the Rehabilitation Act of 1973. The settlement was approved by the Court and entered as an enforceable Consent Decree (hereafter "Consent Decree") on September 9, 2016. See Doc. 728. The Consent Decree outlined substantive provisions that were "designed to provide for care, services, accommodations, programs and activities" for inmates with disabilities and "intended to ensure that [i]nmates are not, on the basis of disability, exposed to substantial harm and…discrimination." Id. at 11. The first set of provisions required ADOC to conduct an architectural survey of its facilities and "complete a Transition Plan describing how ADOC intends to effectuate compliance with the Acts concerning housing assignments and program access." Id. at 12-13. The Transition Plan was to be completed within fifteen (15) months following approval of the Consent Decree. Id. Under the ADA, inmates with disabilities must be provided equal access to every form of program available within ADOC. Hence, the parties agreed that the Transition Plan must be consistent with the provisions of 28 C.F.R. 35.150 (d) and list:

> any improvements and changes necessary in the Programs, activities, and services ADOC provides or makes available to Inmates; all of ADOC's policies and practices regarding Inmates; and Inmates' access to and within ADOC's facilities necessary to ensure that ADOC complies with the provisions of the Acts

and the decree. Id. at 19.

After the Consent Decree was finalized and approved, ADOC retained Gina Hilberry, an architect and ADA consultant. Ms. Hilberry was hired to conduct an architectural survey to help ADOC identify a sufficient number of facilities that could be remediated to bring ADOC's system into ADA architectural compliance. See Doc. 2641 at 6. On May 20, 2019, the first Transition Plan was completed and filed under seal. Doc. 2635-1. The plan revealed that ADOC needed to architecturally modify "nearly all of its existing major facilities" to reach systematic compliance with the law. Id. at 7-8. Due to the scope of work, the parties moved to modify the Consent Decree in September 2019 and provided briefing to the Court over the subsequent months. See Docs. 2605, 2629, 2641 and 2752. The parties agreed that the original deadlines for completion of the Transition Plan and ADA Alterations had expired (Doc. 2629 at 4) and requested that the deadline for completion of all ADA Alterations be extended from May 1, 2019, to November 1, 2027. Doc. 2641 at 9. The parties also changed the original provision requiring completion of the Transition Plan within fifteen (15) months, meaning that it would be finished by December 2017; and agreed that ADA Alterations would be completed in three (3) phases. Doc. 2752 at 2-3. The first phase created a timeline for completion of alterations at Birmingham Work Release and Frank Lee Work

Release as well as completion of the "Expedited List."[1] Id.; Doc. 2629 at 8-10. The deadlines set for completion of expedited work were June 1, 2021, and January 1, 2023. Doc. 2752 at 5. "Plaintiffs reserve[d] the right to object to an extension" if ADOC failed to meet those timelines. Doc. 2629 at 10. The second phase required ADOC to identify alterations for three (3) major facilities and up to two (2) additional work release facilities no later than September 1, 2020, and request that the facility owners of ISTC Tutwiler and ISTC Frank Lee make required alterations. Doc. 2752 at 3. The final phase, which included any remaining work needed to bring ADOC into compliance, was to be identified no later than September 1, 2021. Doc. 2752 at 3. On May 12, 2020, the Court approved the Parties' modifications and ordered the Defendants to comply with the Consent Decree as modified. Doc. 2817.

The parties acknowledged that the final Transition Plan would need to consider the impact of new correctional facilities *if* the new prisons had an executed contract to build or were approved by the legislature to build *before* September 1, 2021. Doc. 2629 at 3. While Plaintiffs do not agree that Escambia meets the agreed upon exception for new prisons, the Plaintiffs have in good faith worked with the Defendants to address concerns about remediating existing facilities considering ADOC's "design" contract for a new facility in Escambia. The Plaintiffs have,

---

[1] The Expedited List included alterations at Bullock, Donaldson, Hamilton A&I, Kilby, Limestone, St. Clair, and Tutwiler. Id.

however, insisted that the Defendants complete items from the expedited list included in the modified consent decree and 2019 Transition Plan. Doc. 4335 at 9-11. For example, the Plaintiffs asked the Defendants to fix items such as shower grab bars, shower seats, a toilet paper shelf and the height of a telephone and pill call service window at Bullock. These are all items that Ms. Hilberry agrees can be fixed now and are not substantially impacted by New Elmore or Escambia.

The Parties are now before the Court because ADOC failed to meet its deadline to file a revised Transition Plan in January 2024 and the extended deadline in January 2025, and instead moved to extend the deadline yet again, this time without Plaintiffs' agreement. Doc. 4305. The Defendants also refused to complete work from the expedited list. See Doc. 4331 at 12-13. The Parties are sixteen (16) months from the extended deadline to complete all ADA Alterations and very little work has been done. Meanwhile, the completion of the new Elmore County facility has continuously been delayed, and phase one of Escambia is not projected for completion until 2029.[2]

Plaintiffs turn to the three (3) issues outlined by the Court.

## I.    The Status of the Elmore County and Escambia County Facilities.

---

[2] Alexander Willis, *Records show new Escambia prison could be done in 2 phases; funding remains uncertain*, Alabama Daily News, Dec. 13, 2024, https://aldailynews.com/records-show-new-escambia-prison-could-be-done-in-2-phases-funding-remains-uncertain/.

The completion dates for ADOC's new prisons remain ambiguous. The Defendants have promised to build new mega prisons since this litigation began. In 2015, ADOC introduced the Alabama Prison Transformation Initiative (APTI). Under APTI, ADOC planned to "consolidate 14 high and medium custody level prisons into four large scale" prisons.[3] The plan proposed three 4,000-bed male prisons and one 1,200-bed women's prison, as a "fix" to ADOC's problems.[4] Early timelines proposed the completion of the first prison in the Fall of 2020 and completion of all prisons in the Fall of 2021.[5] As this Court is aware, after more than a decade, ADOC has yet to complete even one new prison.

The current plan for new prisons does not involve closing 14 existing facilities. Although AL-2021 HB 4 governs the order in which prisons are authorized to close, the legislation does not mandate closures. In addition, the first prisons are not authorized to close until *one year after Escambia prison is complete*. Plaintiffs are not aware of any scheduled completion date for the final phase of Escambia. Moreover, there are looming concerns about whether the State will be able to close any prisons. Earlier this year, the Alabama Reflector reported that "[l]awmakers are increasingly pessimistic about the possibility of closures" due to an increasing prison

---

[3] ADOC. *Alabama Prison Transformation Initiative*, Information Paper, at 3.
https://www.doc.state.al.us/docs/AlabamaPrisonTransformationInitiative.pdf.
[4] Id.
[5] ADOC. *The Alabama Prison Transformation Initiative*, at 31.
https://www.doc.state.al.us/docs/Alabama%20Prison%20Transformation%20Initiative%20Infor
mation%20Booklet.pdf.

population.[6] Recently, the Alabama Sentencing Commission predicted that ADOC's population will increase by 31% between 2021 and 2030.[7] The population has already increased by nearly 3,500 individuals between 2021 and 2024. ADOC's former Commissioner John Hamm also admitted that new prisons will not add capacity.[8] Consequently, the new prisons are not expected to address the rising population.[9] If existing prisons fail to close, old facilities will need to be remediated, despite the construction of new prisons.

Currently, Plaintiffs have very little information regarding the completion of prisons in Elmore and Escambia Counties, and Defendants are obviously better positioned to inform the Court on this subject. The last information that publicly

---

[6] States representatives are also concerned about whether there will be political support for closing prisons, due to the economic impact on certain districts. Ralph Chapoco, *Alabama prison closures, key to new construction plan, seem far off,* Alabama Reflector, Feb. 9, 2026, https://alabamareflector.com/2026/02/09/alabama-prison-closings-key-to-new-construction-seem-far-off/.

[7] Ralph Chapoco, *Alabama state prison population could rise by a third by 2030*, Alabama Reflector, Sept. 29, 2025, https://alabamareflector.com/2025/09/29/alabama-state-prison-population-could-rise-by-a-third-by-2030/.

[8] Ralph Chapoco, *Alabama prison closures, key to new construction plan, seem far off*, Alabama Reflector, Feb. 9, 2026, https://alabamareflector.com/2026/02/09/alabama-prison-closings-key-to-new-construction-seem-far-off/.

[9] ADOC originally claimed that the "increased design capacity" of new prisons "coupled with recent prison reform legislation" would reduce prison occupancy rates from 125% over five years. ADOC. *The Alabama Prison Transformation Initiative*, at 37. https://www.doc.state.al.us/docs/Alabama%20Prison%20Transformation%20Initiative%20Information%20Booklet.pdf. The most current ADOC monthly report available—for April 2026—shows an occupancy rate of 175%. ADOC, *Monthly Statistical Report for April 2026*, at 2. https://doc.alabama.gov/docs/MonthlyRpts/April%202026.pdf. The occupancy rate in 2016 was approximately 180%. See ADOC. Monthly Statistical Report for June 2016, at 3.

reported was that the new Elmore facility will open in October 2026.[10] Defendants have not confirmed whether that timeline has changed. If unchanged, Plaintiffs are concerned that the Transition Plan will not be complete before the new Elmore facility opens. The Transition Plan addresses ADA bed counts for each facility. The plan will specifically evaluate the number of ADA beds allowed in each dorm at the new Elmore County facility. These numbers impact where individuals with disabilities can be housed and the need for remediations at other facilities throughout the system.

As for the facility in Escambia County, on December 19, 2024, Defendants informed Plaintiffs that ADOC executed a contract for the design of a new prison in Escambia. The draft schedule projected construction would begin at end of January 2026 and for Phase 1 to be completed by January 2029.[11] Construction has not yet begun. Doc. 4528-1 at ¶ 16.

## II.    The Status of the Revised Transition Plan.

According to ADA expert Gina Hilberry, the Transition Plan can be completed in less than three months. Her estimate contemplates Defendants scheduling a timely

---

[10] Andrea Tinker, *Elmore County prison opening delayed; state may borrow money for Escambia prison*, Alabama Reflector, . Nov. 11, 2025, https://alabamareflector.com/2025/11/11/elmore-county-prison-opening-delayed-state-may-borrow-money-for-escambia-prison/.

[11] Alexander Willis, *Records show new Escambia prison could be done in 2 phases; funding remains uncertain*, Alabama Daily News, Dec. 13, 2024, https://aldailynews.com/records-show-new-escambia-prison-could-be-done-in-2-phases-funding-remains-uncertain/.

call with ADOC's team[12], the Parties' review of the final draft and time to resolve any disagreements.

While Defendants' motion to extend the deadline for filing the Transition Plan has been pending, the Parties have continued to work with Ms. Hilberry to address the Defendants' demand that the Escambia County facility be included in the revised plan.[13] In December 2025, the Plaintiffs asked Magistrate Judge Ott to assist the Parties, given increasing concerns that the Defendants were not on a path to finalize the plan. Since then, Ms. Hilberry has coordinated with the Defendants to resolve questions about ADA bed counts. Ms. Hilberry has answered multiple sets of questions from ADOC, produced revised bed counts and the parties have met with her jointly on several occasions. As of July 2, 2026, Ms. Hilberry reported that Defendants responded to her most recent bed count spreadsheet with questions about a dorm at the new Elmore facility, a question about access programs, and a request to include Escambia County in the final tally of bed counts. She relayed that "all seem to be manageable." She described the remaining process as follows:

1. Defendants will schedule program calls with Hilberry and ADOC staff.

2. Hilberry will check bed counts for Escambia and the dorm at new Elmore.

---

[12] Ms. Hilberry made this request in June 2026.
[13] Defendants notified the Plaintiffs that ADOC signed a design contract for Escambia just weeks before the revised Transition Plan was due.

3. Hilberry will draft a memo on programs and individuals housed in two dorms at new Elmore.

4. Hilberry will produce a draft of the revised Transition Plan. She anticipates that some parts of her October 2024 draft will remain the same but other parts will need to be updated.

5. Hilberry will circulate the draft for comments from the Parties. If a unified draft is possible, she will complete the edits following the Parties' comments. If a unified draft is impossible, she will revise and account for the Parties' differences (e.g. create two proposed timelines for the schedule of work).

### III.   Whether the Revised Transition Plan is Required to be a Product of the Defendants or both the Defendants and Plaintiffs.

An ADA Transition Plan is a strategic roadmap to assist agencies, like ADOC, with achieving full accessibility in compliance with the ADA. A transition plan consists of:

1. A list of the physical barriers that limit the accessibility of programs, activities, or services.

2. The methods to remove the barriers and make the facilities accessible.

3. The schedule to get the work completed; and

4. The name of the official(s) responsible for the plan's implementation.[14]

While the Consent Decree does not affirmatively require Defendants to consult with Plaintiffs in the development of the Transition Plan, it does require Defendants to comply with 28 C.F.R. § 35.150(d). Doc. 728 at 13 ¶ D. That regulation states that a

---

[14] 28 C.F.R. § 35.150(d)(3).

"public entity shall provide an opportunity for interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the development of the transition plan by submitting comments." Here, the Parties have worked together during the creation of the 2019 Transition Plan and the revised plan to minimize later disputes. In practice, ADOC has worked directly with Ms. Hilberry to develop the plan. After the plan (or parts of the plan) was drafted, the Plaintiffs have been able to review and comment on its provisions. And to the extent that the Transition Plan maps out ADOC's proposed course of action for remediating the substantive deficiencies in its programs covered by other sections of the Consent Decree, participation by Plaintiffs may forestall later need to invoke the Dispute Resolution Process. See Doc. 728 at 70 ¶¶ 19-24.

The decree is clear that "ADOC will complete a Transition Plan." Doc. 728 at 3. Plaintiffs, however, maintain an interest in the timely creation, filing and execution of the plan. The development of the Transition Plan is integral to the Consent Decree. It is necessary to effectuate the Parties' agreement and enforceable by the Court. Id. at 73. The Parties agreed to clear deadlines in both the original and modified consent decrees. Id at 3; Doc. 2752 at 2-3. Plaintiffs also note here that whether or not the Transition Plan itself has been completed, Defendants retain their obligations to meet other deadlines set out in the modified Consent Decree, but they have not done so. Defendants failed to meet the original deadline for creating the

11

Transition Plan and have yet to complete the expedited list outlined in phase one of the modified decree. See id. Under the terms of the decree, Plaintiffs are well within their rights to seek enforcement of the decree but have continuously worked with the Defendants to alleviate unnecessary court disputes. The decree states that the "Parties will work in good faith to achieve Substantial Compliance with *all* terms and conditions" of the agreement "within the time parameters" set forth in the agreement. Doc. 728 at 74 ¶ 31. The Plaintiffs have done just that.

Regarding disputes, the Consent Decree outlines a process for dispute resolution. Id. at 70-72. That process allows the Plaintiffs to raise issues of non-compliance with the Defendants. If Plaintiffs are "not satisfied with ADOC's response, the Parties will negotiate in good faith to resolve the issue(s)." Id. at 70. If the Parties are unable to resolve the issue(s), the matter should be presented to Magistrate Judge Ott. Id. at 71. If Judge Ott or the Court finds that ADOC failed to comply with the agreement, "ADOC will submit a plan to remedy the deficiencies identified within thirty (30) days of the decision." Id. If ADOC does not remedy the deficiencies in a timely manner, the Court has authority to enforce the agreement. Id. at 71-72. Here, the Parties have been working with Judge Ott since, at least, December 2025.

/s/ Latasha McCrary Dejarnett
Latasha McCrary Dejarnett
*One of the Attorneys for Plaintiffs*

Lisa W. Borden
Aaron E. Butler
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
lisa.borden@splcenter.org
latasha.dejarnett@splcenter.org
aaron.butler@splcenter.org

Emily B. Lubin*
Julia T. Mudd*
**SOUTHERN POVERTY LAW CENTER**
201 St. Charles Ave. Suite 2000
New Orleans, LA 70170
Telephone: (504) 401-2291
Facsimile: (504) 809-7899
emily.lubin@splcenter.org
julia.mudd@splcenter.org
*Admitted pro hac vice*

Andrew G. Udelsman*
**SOUTHERN POVERTY LAW CENTER**
2 S. Biscayne Boulevard, Suite 3200
Miami, FL 33131
Telephone: (786) 742-9397
andrew.udelsman@splcenter.org
*Admitted pro hac vice*

William G. Somerville, III
**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**
420 20th Street North, Suite 1400
Birmingham, AL 35203
wsomerville@bakerdonelson.com
pclotfelter@bakerdonelson.com

Larry Canada
Lonnie Williams
Barbara A. Lawrence

13

Andrea J. Mixson
**ALABAMA DISABILITIES ADVOCACY PROGRAM**
University of Alabama
500 Martha Parham West
Box 870395
Tuscaloosa, AL  35487
Telephone: (205) 348-4928
Facsimile: (205) 348-3909
lcanada@adap.ua.edu
lwilliams@adap.ua.edu
blawrence@adap.ua.edu
amixson@adap.ua.edu

Catherine E. Stetson*
Neal K. Katyal*
Jo-Ann T. Sagar*
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
cate.stetson@hoganlovells.com
neal.katyal@hoganlovells.com
jo-ann.sagar@hoganlovells.com
*Admitted pro hac vice*

Joshua C. Toll*
**KING & SPALDING LLP**
1700 Pennsylvania Avenue NW, 2nd
Floor
Washington, DC 20006-4707
Telephone: (202) 227-6138
Facsimile: (202) 626-3737
jtoll@kslaw.com
*Admitted pro hac vice*
**ATTORNEYS FOR THE PLAINTIFFS**

Anil A. Mujumdar
**DAGNEY JOHNSON LAW GROUP**

14

2170 Highland Avenue, Suite 250
Birmingham, AL 35213
Telephone: (205) 590-6986
Facsimile: (205) 809-7899
anil@dagneylaw.com

**ATTORNEY FOR PLAINTIFF
ALABAMA DISABILITIES
ADVOCACY PROGRAM**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all attorneys of record in this matter, including without limitation the following, on this 9th day of July 2026:

William R. Lunsford
Kenneth S. Steely
Daniel J. Chism
Lynette E. Potter
Megan M. Everett
**BUTLER SNOW LLP**
200 West Side Square
Suite 100
Huntsville, AL 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651
bill.lunsford@butlersnow.com
kenneth.steely@butlersnow.com
daniel.chism@butlersnow.com
lynette.potter@butlersnow.com
megan.everett@butlersnow.com

Philip Piggott, Esq.
**WEBSTER HENRY**
Two Perimeter Park South
Suite 445 East
Birmingham, AL 35243
ppiggott@websterhenry.com


Deana Johnson*
Brett T. Lane
**MHM SERVICES, INC.**
1447 Peachtree Street NE
Suite 500
Atlanta, GA 30309
Telephone: (404) 347-4134
Facsimile: (404) 347-4138
djohnson@mhm-services.com
btlane@mhm-services.com
*Admitted pro hac vice*


*/s/ Latasha McCrary Dejarnett*
One of the Attorneys for Plaintiffs