**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **EDWARD BRAGGS,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 2:14-cv-00601-MHT** |
| **v.** | ) | |
| | ) | **District Judge Myron H. Thompson** |
| **GREG LOVELACE,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' ADDITIONAL BRIEFING ON OBJECTIONS TO
PERFORMANCE MEASURES 3.2.2, 3.3.1, AND 3.4.2**

On August 4, 2026, after oral argument regarding the External Monitoring Team's ("EMT's") performance measures and audit tools, the Court issued an order requiring Plaintiffs to provide additional briefing related to performance measures 3.2.2, 3.3.1, and 3.4.2. Doc. 4555. Specifically, the Court's order requires:

1. Measure 3.2.2: "the plaintiffs should advise the court on whether there is evidence that the court was concerned with providing follow-up care to inmates contraindicated for the RHU." Id. at 1.

2. Measure 3.3.1: "the plaintiffs should advise whether there was evidence that ADOC staff, during RHU mental-health rounds, need to assess inmates outside of their cells in a confidential setting if the inmates exhibit signs of distress or decline." Id. at 2.

3. Measure 3.4.2: "the plaintiffs should advise whether the court was concerned

with documentation or quality when it comes to mental health assessments in the RHU." Id.

Plaintiffs hereby submit the following in response to the Court's order.

I.    **Performance Measure 3.2.2: Whether There Is Evidence the Court Was Concerned with Providing Follow-up Care to Inmates Contraindicated for the RHU.**

The Court's Omnibus Remedial Order ("Remedial Order") requires that "[i]f mental-health staff determine that an inmate who has yet to be placed in restrictive housing is contraindicated for restrictive housing, that inmate must not be placed in restrictive housing absent a documented exceptional circumstance." Doc. 3464 at 11.

In section 5 of performance measure 3.2.2, the EMT proposes to monitor this order, in part, as follows:

> If a qualified mental health staff person determines, prior to placement in an RHU, that a [sic] inmate must not be placed in a RHU; ADOC should track inmates not placed in RHU who do not have a documented exceptional circumstance report. Patients deemed [inappropriate][1] for RHU and not placed in RHU should be tracked for the safety of the patient and others and if not currently on a mental health caseload determine if the inmate is suffering from mental illness.

---

[1] The performance measure as drafted by the EMT reads "appropriate." After discussion during the hearing on August 4, 2026, the Court and the parties agreed that this is likely an error, and the EMT intended this measure to apply to patients deemed inappropriate for the RHU.

Doc. 4373-1 at 8. The Court inquired as to whether the record indicates that the Court was concerned with providing follow-up care to inmates contraindicated for the RHU.[2]

The Phase 2A Omnibus Remedial Opinion ("Remedial Opinion") contains some evidence that the Court was concerned about contraindicated individuals receiving follow-up care when they are not assigned to the RHU. When discussing the need for mental health screenings prior to placement in RHU, the Court found that:

> the results of the screening must be used to determine whether the inmate should be placed in restrictive housing and whether the inmate requires a medical and/or mental-health referral, in light of the evidence, described in the opinion on changed circumstances, that ADOC staff routinely ignore the results of screenings and place inmates in segregation despite documented contraindications. The screenings are intended to keep contraindicated inmates out of restrictive housing, **and to ensure that mentally ill inmates receive the care that they need**. They can fulfill neither purpose if they are ignored.

Doc. 3463 at 59 (emphasis added). The Court sees proper screening as a mechanism for ensuring both appropriate housing placement and, separately, necessary care for individuals with mental illness. This suggests the EMT's inclusion of follow-up care in this performance measure is within the scope of relief the Court envisioned.

---

[2] Plaintiffs understand the Court's inquiry to be only about those who are not placed in the RHU because they are contraindicated for the RHU and no exceptional circumstances exist.

This reading is particularly warranted given that the liability trial adduced evidence that ADOC very rarely placed people outside of the RHU due to contraindication.[3] The Court found that at time of trial, evaluators at the Alabama Department of Corrections ("ADOC") were conducting "brief and perfunctory" evaluations, and they "did not make recommendations about how the inmate's mental health should be considered in the process or what punishments were contraindicated for the inmate for mental health reasons." Doc. 1285 at 185; Doc. 3462 at 26. The consultations were "little more than a rubber stamp" for the disciplinary process. Doc. 1285 at 187; Doc. 3462 at 26. Further, ADOC staff "regularly ignore[d] the results of pre-placement screenings." Doc. 3462 at 93.

Because of these deficiencies in screening, "mentally ill prisoners who attempted to hurt or kill themselves routinely received segregation placements as punishment, further heightening their risk of self-harm and suicide." Id. at 27. The Court concluded that "ADOC continues to lack a functioning process for diverting individuals from segregation who are contraindicated for placement there due to suicide risk, serious mental illness, or other significant mental-health issues." Id. at 91. The standard expressed in 3.2.2 goes directly to this issue: follow-up care for

---

[3] MHM counselor Sharon Trimble testified that she was only aware of one instance in five years in which a prisoner was not sanctioned because his behavior was considered a result of his mental illness. Doc. 1285 at 188.

individuals who are contraindicated for the RHU is necessary to ensure diversion from future segregation placements and mental health deterioration.

Further, it is clear that the Court has been concerned with ADOC's inadequate follow-up with individuals who are released from suicide watch to segregation or general population. Doc. 1285 at 20, see also Doc. 3462 at 145 ("inmates discharged from suicide watch still receive inadequate follow-up assessments and treatment to ensure that they do not decompensate and relapse into suicidality."). There is no reason to believe that ADOC's follow-up process with contraindicated individuals not placed in RHU is any more robust.

Based on these findings, Plaintiffs urge the Court to adopt section 5 of the EMT's performance measure for 3.2.2. Though the population of individuals section 5 of the performance measure targets was all but non-existent at the time of the liability and remedial trials, the Court was clearly concerned with ensuring care for individuals inside and diverted from the RHU. Plaintiffs are hopeful that number of contraindicated individuals that ADOC decides not to put in the RHU has grown. If it has, this population should be monitored for follow-up, as ADOC has failed to conduct adequate follow-up in other areas so it is appropriate to monitor follow-up in these instances as well.

II.    **Performance Measure 3.3.1: Whether There Was Evidence That ADOC Staff, During RHU Mental-Health Rounds, Need to Assess Inmates Outside of Their Cells in a Confidential Setting if the Inmates Exhibit Signs of Distress or Decline**

The Remedial Order states:

Mental-health rounds must be conducted by a qualified mental-health professional in each RHU at least weekly, and should generally include a discussion with the post officer(s) concerning any changes in the behavior of inmates in the RHU; a review of duty post logs and segregation unit record sheets for information about inmates' participation in recreation, showers, meal consumption and sleep patterns; a walk through the RHU, with stops at each occupied cell to make visual contact with the inmate inside the cell; attempts to verbally communicate with each inmate, including a brief inquiry into how the inmate is doing and whether the inmate has mental-health needs or a desire to speak with mental-health staff privately; and a brief assessment of each inmate's hygiene, behavior, affect, and physical condition, and the condition of his or her cell.

Doc. 3464 at 12.

In its performance measure, the EMT proposes to monitor this order, in part,

as follows:

4. Each quarter, for identified facilities, the EMT will observe mental health rounds in RHU and will review a) duty post logs and segregation unit record sheets for information about inmates' participation in recreation, showers, meal consumption and sleep patterns b) observe the walk thru in the unit and what stops are made c) assess if attempts to verbally communicate with each inmate were made d) and if there was a brief assessment of each inmate's hygiene, behavior, affect, and physical condition, and the condition of his or her cell e) **If there is an effort to assess inmates further outside of his cell in a confidential [setting], if there are signs of distress or decline.**

Doc. 4373-1 at 9 (emphasis added).

6

Though the Court did not make specific findings that inmates should be assessed in a confidential setting outside their cell during rounds, the Court's order requires that qualified mental health professionals performing mental health rounds are to conduct walk throughs in the RHU and make "attempts to verbally communicate with each inmate, including a brief inquiry into how the inmate is doing and whether the inmate has mental-health needs or a desire to speak with mental-health staff privately." Doc. 3464 at 12-13. The disputed section of the performance measure is warranted and is an appropriate measure of the Court's order. The EMT's proposed performance measure ensures that the responses the individual gives is acted upon and that there is no gap in the continuity of care.

The Court found ADOC fails to timely communicate urgent or emergent referrals and ordered that "[e]mergent referrals must result in a clinical assessment and/or intervention as soon as possible but no more than four hours from the determination that the referral is emergent. Urgent referrals must result in a clinical assessment and/or intervention within 24 hours of the time the referral was made." Doc. 3463 at 133. While this language appears in section 6, the section that addresses referrals, there is nothing in section 6 that adequately addresses what should happen when a mental health professional performing rounds encounters a person in distress. It is appropriate under measure 3.3.1. for a mental health professional in this position

7

to make inquiries of the individual, confidentially and out of cell, so that the professional may make a proper referral or conduct an adequate assessment.

Further, periodic assessments related to placement in restrictive housing and suicide risk assessments "must take place in a setting that provides for confidentiality and . . . if applicable, is out-of-cell." Doc. 3463 at 162-63. See also id. at 77 ("The court orders that ADOC must conduct periodic mental-health assessments [in RHU]").

There is, therefore, ample evidence that mental health staff need to assess individuals outside of their cells in a confidential setting when they witness the individual in distress or decline in the RHU.

To the extent that the Court specifically finds that performance measure 4(e) is duplicative of section 6 regarding referrals and section 7 regarding confidentiality and that those sections encompass the requirements for out-of-cell, confidential follow-ups when required based on an inmate's presentation during rounds, Plaintiffs do not object to its removal from section 3.

III.   **Performance Measure 3.4.2: Whether the Court Was Concerned with Documentation or Quality When It Comes to Mental Health Assessments in the RHU.**

The Remedial Order requires that "[e]ach mental-health assessment must be appropriately documented." Doc. 3464 at 14. In its performance measure, the EMT proposes to monitor this order, in part, as follows: "2. Using the same process and

8

charts reviewed for 3.4.1, the EMT will assess the documentation of all mental health assessments, and determine its appropriateness." Doc. 4373-1 at 10.

In their objections, Defendants state they requested clarification regarding "appropriateness" and the EMT responded: "[a]ppropriateness is defined as the clinician's ability to follow established standard of care and make appropriate decisions about the inmate's status, needs, and take the proper course of action or intervention." Id.

In its orders, the Court was concerned with both documentation and quality when it comes to mental health assessments in the RHU. Broadly, the Court found ADOC:

> largely failed to ensure that inmates in restrictive housing units receive periodic mental-health assessments, despite the court's previous finding that those assessments are essential for preventing decompensation and suicide, and that, when inmates do receive assessments, the results of those assessments are often ignored.

Doc. 3463 at 81.

One of the Court's concerns was ensuring the assessments take place at all, and reviewing documentation is one way to confirm that the assessments are happening. However, the Court also concluded, "[a] requirement that the evaluations conclude with clear recommendations will make it harder for mental-health staff to ignore their findings, and easier for the EMT to monitor ADOC's progress in putting the evaluations to good use." Id. at 80. Here the Court is directly speaking to the

quality of the assessments. This language also suggests that the Court anticipated that the EMT would not just check a box that the assessment was complete but would also look at the content of the documented assessment. The EMT's definition of "appropriateness" above reflects a reasonable way for it to ensure that the effect of the assessments amounts to more than just checking a box.

The Court's concern about the quality of assessments is also evidenced by its order regarding the content of the assessments. Specifically, the parties proposed and the Court adopted the following as topics to be included in the assessments: (1) The inmate's past response to restrictive housing; (2) The inmate's general appearance or behavior; (3) Whether the inmate has a present suicidal ideation; (4) Whether the inmate has a history of suicidal behavior; (5) Whether the inmate is presently prescribed psychotropic medication; (6) Whether the inmate has a current mental-health complaint; (7) Whether the inmate is currently receiving treatment for a diagnosed mental illness; (8) Whether the inmate has a history of [inpatient] and outpatient psychiatric treatment; (9) Whether the inmate has a history of treatment for substance abuse; (10) Whether the inmate has a history of abuse or trauma; and (10) Whether the inmate is presently exhibiting symptoms of psychosis, depression, anxiety, or aggression. Id. at 74-75, 77 ("The court will order that . . .[assessments] must include a review or examination of the topics that the parties propose.").

10

Though the content of the assessment is monitored under section 3.4.3, not 3.4.2, it provides additional evidence that the Court was concerned with quality.

Additionally, the Phase 2A Opinion and Order on Monitoring of Eighth Amendment Remedy ("Monitoring Order") is instructive regarding qualitative review as it will be generally applied in this case:

> [The] parties agree that in assessing whether ADOC is complying with performance measures, and thus remedial orders, the EMT can make "qualitative assessments relating to clinical decision-making." The defendants urge that such assessments may not constitute second-guessing of the reasonable judgment of clinicians, but acknowledge, based on the testimony of Dr. Robert Stern, one of their own proposed external monitors, that assessment of many performance measures will "require [] a clinical perspective." For example, Dr. Stern testified that the EMT should be able to determine whether a counseling progress note contains merely "gibberish," rather than clinical observations, or whether a referral decision is within the range of appropriate actions. According to Dr. Stern, there would be "something wrong" if a monitoring plan did not allow for this type of qualitative review.

Doc. 2915 at 42-43 (citations omitted). Based on parties' agreement, the Court gave authority to the EMT "to make qualitative assessments of whether clinicians are making reasonable clinical judgments." Id. The Court credited Plaintiffs' expert, Dr. Burns, in explaining that the EMT's role is not to second-guess "but to see 'if there's a rationale involved for the choices that are made and the interventions that are provided.'" Id. at 44 (quoting Burns, Dec. 6, 2018 Trial Tr. (Doc. 2245) at 93). Further, the Court found that the resolution satisfied the need, narrowness, and intrusiveness requirement of the PLRA.

For the foregoing reasons, Plaintiffs believe the EMT's definition of "appropriateness" is valid as it pertains to performance measure 3.4.2.

Dated: August 6, 2026

Respectfully submitted,

/s/ *Julia T. Mudd*

Julia T. Mudd
*One of the Attorneys for Plaintiffs*

Lisa W. Borden
Latasha L. McCrary
Aaron E. Butler
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
lisa.borden@splcenter.org
latasha.dejarnett@splcenter.org
aaron.butler@splcenter.org

Emily B. Lubin*
Julia T. Mudd*
**SOUTHERN POVERTY LAW CENTER**
201 St. Charles Ave. Suite 2000
New Orleans, LA 70170
Telephone: (504) 401-2291
Facsimile: (504) 809-7899
emily.lubin@splcenter.org
julia.mudd@splcenter.org
*\*Admitted pro hac vice*

Andrew G. Udelsman*
**SOUTHERN POVERTY LAW CENTER**
2 S. Biscayne Boulevard, Suite 3200
Miami, FL 33131

Telephone: (786) 742-9397
andrew.udelsman@splcenter.org
*Admitted pro hac vice

William G. Somerville, III
**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**
420 20th Street North, Suite 1400
Birmingham, AL 35203
wsomerville@bakerdonelson.com
pclotfelter@bakerdonelson.com

Larry Canada
Lonnie Williams
Barbara A. Lawrence
Andrea J. Mixson
**ALABAMA DISABILITIES ADVOCACY
PROGRAM**
University of Alabama
500 Martha Parham West
Box 870395
Tuscaloosa, AL  35487
Telephone: (205) 348-4928
Facsimile: (205) 348-3909
lcanada@adap.ua.edu
lwilliams@adap.ua.edu
blawrence@adap.ua.edu
amixson@adap.ua.edu

Catherine E. Stetson*
Neal K. Katyal*
Jo-Ann T. Sagar*
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
cate.stetson@hoganlovells.com
neal.katyal@hoganlovells.com
jo-ann.sagar@hoganlovells.com

13

*Admitted pro hac vice*

Joshua C. Toll*
**KING & SPALDING LLP**
1700 Pennsylvania Avenue NW, 2nd
Floor
Washington, DC 20006-4707
Telephone: (202) 227-6138
Facsimile: (202) 626-3737
jtoll@kslaw.com
*Admitted pro hac vice*

**ATTORNEYS FOR THE
PLAINTIFFS**

Anil A. Mujumdar
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, AL 35213
Telephone: (205) 590-6986
Facsimile: (205) 809-7899
anil@dagneylaw.com

**ATTORNEY FOR PLAINTIFF
ALABAMA DISABILITIES
ADVOCACY PROGRAM**

14

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all attorneys of record in this matter, including without limitation the following, on this 6th day of August 2026:

William R. Lunsford
Kenneth S. Steely
Daniel J. Chism
Lynette E. Potter
Megan M. Everett
**BUTLER SNOW LLP**
200 West Side Square, Suite 100
Huntsville, AL 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651
bill.lunsford@butlersnow.com
kenneth.steely@butlersnow.com
daniel.chism@butlersnow.com
lynette.potter@butlersnow.com
megan.everett@butlersnow.com

Deana Johnson*
Brett T. Lane
**MHM SERVICES, INC.**
1447 Peachtree Street NE
Suite 500
Atlanta, GA 30309
Telephone: (404) 347-4134
Facsimile: (404) 347-4138
djohnson@mhm-services.com
btlane@mhm-services.com
*Admitted pro hac vice*

Philip Piggott, Esq.
**WEBSTER HENRY**
Two Perimeter Park South
Suite 445 East
Birmingham, AL 35243
ppiggott@websterhenry.com

*/s/ Julia T. Mudd*
Julia T. Mudd

15