**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **EDWARD BRAGGS, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 2:14-cv-00601-MHT** |
| **v.** | ) | |
| | ) | **District Judge Myron H. Thompson** |
| **GREG LOVELACE, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**JOINT STATEMENT ON CORRECTIONAL STAFFING TRENDS**

Plaintiffs and Defendants Greg Lovelace ("Commissioner Lovelace"), in his official capacity as Commissioner of the Alabama Department of Corrections ("ADOC"), and Deborah Crook, in her official capacity as Deputy Commissioner of the Office of Health Services ("Deputy Commissioner Crook," and, collectively with Commissioner Lovelace, the "State," and, collectively with Plaintiffs, the "Parties"), hereby submit this Joint Status Report on Correctional Staffing Trends, regarding (i) the data in the Second Quarter 2026 Correctional Staffing Report;[1] (ii) the net

[1] The State provides the Second Quarter 2026 Correctional Staffing Report and its positions in this Joint Statement on Correctional Staffing pursuant to the Court's order. (Doc. 3464, the Phase 2A Omnibus Remedial Order ("Remedial Order"); Docs. 3994 & 4258 at 7, cell III.B.2). However, the State maintains that the Eleventh Circuit reversed Remedial Order § 2.1, which discusses correctional staffing. See Dunn v. Comm'r, Ala. Dept. of Corr., 179 F.4th 1277, 1323 (11th Cir. 2026). The State understands that this Court will take further action regarding Remedial Order § 2.1; the State will continue to provide the quarterly correctional staffing reports and corresponding trends report pending further action from this Court. The State in no way waives any objection to or in any way stipulates to providing correctional staffing data following entry of a further order by this Court.

increase in total staffing relative to the First Quarter 2026 Correctional Staffing Report in both raw numbers and as a percentage; (iii) whether the Second Quarter 2026 Correctional Staffing Report reflects a progression that places ADOC on track to meet the July 1, 2025, correctional staffing deadline; (iv) other retrospective trends and prognosis the report indicates; and (v) other information revealed by the Second Quarter 2026 Correctional Staffing Report. Docs. 3994 & 4258 at 7, cell III.B.2.

## I. THE DATA IN THE SECOND QUARTER 2026 CORRECTIONAL STAFFING REPORT.

### A. THE STATE'S POSITION.

The State filed, under seal, the April 1, 2026 to June 30, 2026, Quarterly Staffing Report on September 1, 2026. (Doc. 4586-1, the "Second Quarter 2026 Report"). The data during the second quarter of 2026 indicates continuing increases in correctional staffing across ADOC facilities.[2] Between the first quarter of 2026 and the second quarter of 2026, ADOC expanded its correctional staff (excluding supervisors) by 1.12% and increased total correctional staff (including supervisors) by 0.45%. (Id.). The vacancy rate for statewide correctional staffing at ADOC's fourteen major facilities also dropped by 0.3%, reducing the overall vacancy rate to

[2] The State will refer to increases and decrease in staffing at the major facilities without providing specific numbers, as the April 2026 to June 2026 Quarterly Correctional Staffing Report remains under seal.

45.3% for the second quarter of 2026.[3] (Id.). ADOC increased total staffing from 2,003 to 2,012 from April 1, 2026, to June 30, 2026. (Id.). This continues thirteen consecutive quarters of growth and represents the highest staffing number since reporting began in 2018.

During the second quarter of 2026, security staff numbers grew at many of ADOC's fourteen major facilities. (Id.). As shown below in *Table 1*, six facilities increased correctional staff. (Id.). Notably, Limestone Correctional Facility ("Limestone") increased correctional staff by thirteen, and Bullock Correctional Facility ("Bullock") increased correctional staff by nine and one-half. (Id.).

[3] For the sake of clarification, ADOC reports its vacancy rate on a "statewide" basis across the specific prisons consistent with the Parties' 2018 agreement on these reports in the format and with the content previously approved by the External Monitoring Team. The vacancy rate listed in the "Quarterly Correctional Staffing Report[s]" does *not* report or reflect the vacancy rate for "mandatory and essential posts." Moreover, as articulated previously by the State, the "Quarterly Correctional Staffing Report[s]," as ordered by the Court in February 2018 in the "Phase 2A Understaffing Remedial Order," Doc. 1657 (i.e. prior to the Remedial Order and other key events), fails to account for additional security staff working in the relevant institutions and inappropriately the complete elimination of all overtime for security staff. Notably, the Remedial Order as it pertains to "fill[ing]… mandatory and essential post" does not prohibit the State from assigning correctional staff working overtime to such posts. As such, the State expressly reserves all of its objections with respect to the methodology of measurement and/or the reported measurement of historic and/or current correctional staffing levels within the relevant institutions.

*Table 1*

| Correctional Facility | Quarter 1 2026 | Quarter 2 2026 | Increase in Staff |
|---|---|---|---|
| **Bullock** | 95 | 104.5 | 9.5 |
| **Easterling** | 83.5 | 85.5 | 2 |
| **Elmore** | 92.5 | 94.5 | 2 |
| **Kilby** | 186.5 | 192 | 5.5 |
| **Limestone** | 264 | 277 | 13 |
| **St. Clair** | 216 | 219 | 3 |
| **Donaldson** | 201.5 | 204.5 | 3 |

As noted in the First Quarter 2026 Report, ADOC employed 426 Correctional Officer Trainees ("COT"), and during the second quarter of 2026, ADOC employed 401 COTs. (Id.). During the first quarter of 2025, ADOC graduated the largest graduating class on record, graduating 144 Correctional Officers on April 3, 2025.[4] Ninety-two Correctional Officers graduated on June 18, 2025, 101 Correctional Officers graduated on September 11, 2025, and 136 Correctional Officers graduated on December 11, 2025.[5] In total, ADOC graduated 473 Correctional Officers in 2025, the highest number of graduates in a single calendar year in ADOC's history. ADOC's first graduating class of 2026 occurred in April 2026, graduating 132

[4] See ADOC Graduating Largest Correctional Officer Class on Record at https://doc.alabama.gov/NewsRelease.aspx?article=ADOC+GRADUATING+LARGEST+CORRECTIONAL+OFFICER+CLASS+ON+RECORD#:~:text=MONTGOMERY%2C%20Ala.,increased%20graduating%20officers%20since%202023.

[5] See ADOC Sets Record in 2025 for Graduating Officers Academy Class 2025-04 to Graduate 136 Correctional Officers – Total 473 for 2025 at https://doc.alabama.gov/NewsRelease.aspx?article=ADOC+SETS+RECORD+IN+2025+FOR+GRADUATING+OFFICERS%0D%0AACADEMY+CLASS+2025-04+TO+GRADUATE+136+CORRECTIONAL+OFFICERS+%E2%80%94+TOTAL+473+FOR+2025#:~:text=ADOC%20SETS%20RECORD%20IN%202025,MONTGOMERY%2C%20Ala.

Correctional Officers and beginning the year with continued growth.[6] ADOC's second graduating class of 2026 occurred in July 2026, graduating eighty-nine Correctional Officers continuing the growth demonstrated in prior classes.[7] Including second quarter 2026, ADOC increased correctional staffing for thirteen consecutive quarters. (Doc. 4586-1). These sustained gains demonstrate ADOC's ongoing and consistent investment in expanding and strengthening its correctional workforce.

### B. PLAINTIFFS' POSITION.

After twelve (12) years of litigation, ADOC remains critically understaffed.[8] On September 1, 2026, defendants reported that, at the end of the second quarter of 2026, ADOC had a vacancy rate of 45.3%. By ADOC's own calculations, in a system that imprisons more than 21,000 individuals, they can.[9] The severe

---

[6] See Gov. Ivey Hosts First ADOC Graduating Class of 2026, WSFA 12 NEWS (Apr. 20, 2026), https://www.wsfa.com/2026/04/21/gov-ivey-hosts-first-adoc-graduating-class-2026/.

[7] See ADOC Academy Class 2026-02 to Graduate 89 Correctional Officers at https://www.doc.alabama.gov/2026/08/06/adoc-academy-class-2026-02-to-graduate-89-correctional-officers/.

[8] This lawsuit was filed on June 17, 2014 (Doc. 1). In June 2017, the Court issued its liability opinion (Doc. 1285). Shortly after issuing the liability opinion, the Court advised Defendants that understaffing "must be addressed at the outset" and "fully remedied before almost anything else can be fully remedied." Phase 2A Revised Remedy Scheduling Order on Eighth Amendment Claim (Doc. 1357) at 4.

[9] Alabama Dep't of Corr., ADOC Monthly Statistical Report 3 (April 2026). https://www.doc.alabama.gov/wp-content/uploads/2026/06/April-2026.pdf. For more than a decade, ADOC has publicly reported its population in monthly statistical reports. It recently redesigned its website and reports for May to August 2026 as well as reports for 2025 are no longer available online.

understaffing reported by ADOC leaves individuals within their custody vulnerable. Yet even those numbers do not reflect the true staffing deficits within ADOC.

ADOC's report inflates its staffing rates in three ways. It includes correctional cubicle operators (CCOs), correctional security guards (CSGs and Sr. CSGs), and part-time staff (CO-Hourly and PT). These positions account for 470 reported positions. None of these positions meet the requirements in ADOC's staffing analysis. Without these positions, ADOC fills 1,522 of the 3,680.73 correctional staffing positions assigned, leaving them with a true vacancy rate of 59 percent. The vacancy rates for each male mental health hub also exceeds 50 percent.

| | **Actual Vacancy Rate** | **ADOC's Reported Vacancy Rate** |
|---|---|---|
| Kilby | 51.5% | 40.7% |
| Donaldson | 61.3% | 49.9% |
| Bullock | 79.2% | 67.6% |

ADOC's mental health hubs house the most vulnerable of ADOC's population, as it relates to mental illness. These are facilities where individuals have acute mental health concerns, which require increased monitoring, more frequent transportation for treatment and increased risk of harm. ADOC's mental health hubs must be adequately staffed. Bullock has the worst staffing deficits in the entire system. ADOC reported 104.5 correctional staff (across all shifts) overseeing a population

of 1,471 individuals.[10] Only 67 of these positions meet the staffing analysis criteria. Bullock, which houses individuals in both the Stabilization Unit ("SU") and Residential Treatment Unit ("RTU"), should have a total of 322.17 officers.[11]

**Altogether, ADOC has a shortage of 2,158.73 officers.** This number excludes CCOs, CSGs, and part-time officers—positions that do not count per the staffing analysis. Of the filled positions that satisfy the staffing analysis, 26 percent of ADOC's officers are in training. Finally, 50 percent of ADOC's reported staff have been employed for less than 12 months.[12]

## II. THE NET CHANGE IN TOTAL CORRECTIONAL STAFFING FROM THE FIRST QUARTER 2026 REPORT.

### A. THE STATE'S POSITION.

In March 2023, ADOC obtained approval to increase the starting salary for new officers to $50,712.00 at minimum custody facilities, $53,244.80 at medium

[10] Alabama Dep't of Corr., ADOC Monthly Statistical Report 3 (April 2026). https://www.doc.alabama.gov/wp-content/uploads/2026/06/April-2026.pdf.

[11] The SU "provides the highest level of intensive mental health services within the ADOC for inmates who either are experiencing severe psychiatric symptoms or remain at acute risk of harming themselves." ADOC Administrative Regulation 602, https://www.doc.alabama.gov/wp-content/uploads/2026/02/AR602.pdf at 15 (last visited Sept. 3, 2026). The RTU is a "specialized housing placement for treating inmates with serious mental illness who are at risk for psychiatric deterioration in a less-restrictive setting." Id. at 13.

[12] Length of employment is important for understanding staff training. ADOC provides annual training for security staff. The training should include training on mental health services. Alabama Dep't of Corr., ADOC Administrative Regulation 608, https://doc.alabama.gov/docs/AdminRegs/AR608.pdf at 7 (last visited Mar. 9, 2026). Theoretically, an employee with more years of training should receive more training on mental health.

custody facilities, and $55,855.20 at maximum custody facilities. Effective September 1, 2023, ADOC secured additional authority to raise those starting salaries again to $51,727.20, $54,290.40, and $56,971.20 respectively. Additionally, correctional officers are eligible for a 27% pay increase after eighteen months with ADOC, resulting in potential annual earnings of up to $65,693.54 for minimum custody facilities, $68,948.80 for medium custody facilities, and $72,353.42 at maximum custody facilities. (Doc. 4088 at 8).

Between 2019 and 2023, state correctional systems nationwide experienced an aggregate staffing decline of approximately twelve percent.[13] Since Fiscal Year 2023, ADOC invested $9,746,568 in recruitment and retention bonuses with approximately 660 employees eligible to receive up to an additional $1,800,000 in bonus compensation.[14] Following implementation of the approved compensation increases in April 2023, "Correctional officer resignations declined by an annual average of over 4%," and voluntary turnover among COTs dropped by more than five percent per year.[15] Additionally, ADOC reported a correctional staff turnover rate of 5.4% in the second quarter of 2026.

---

[13] See "A Study of the Correctional Officer Recruitment and Retention Efforts" Alabama Commission on the Evaluation of Services at https://evidence.alabama.gov/publications/correctional-officer-recruitment-retention-efforts/.

[14] Id.

[15] Id.

In 2023, ADOC collaborated with Rick Raemisch ("Raemisch") to identify strategies for increasing correctional staffing levels. On October 27, 2023, the Parties filed the Joint Statement on Correctional Staffing Recruiting and Retention outlining Raemisch's recommendations. (Doc. 4062). ADOC subsequently described the measures implemented in accordance with those recommendations, including retaining recruiting and retention consultants, participating in job fairs, hosting state-wide recruiting events, launching targeted digital marketing campaigns, and conducting weekly hiring events at four regional locations. ADOC also established regional recruitment teams focused on hiring COTs and Correctional Security Guards ("CSGs"). (Doc. 4062 at 9). ADOC held ninety-four total hiring events in 2023, compared to nineteen in 2022. (Doc. 4182). These efforts corresponded with a substantial increase in hiring activity. In 2024, ADOC held 125 hiring events across the state in various locations. In 2025, ADOC conducted 127 hiring events, and from the 2025 hiring events, ADOC hired 462 applicants. During the first quarter of 2026, ADOC held nineteen hiring events, with a total turnout of 775 attendees. In the second quarter of 2026, ADOC held nineteen hiring events, with a total turnout of 642 attendees. These hiring events underscore ADOC's sustained commitment and dedication to recruiting and strengthening its workforce.

ADOC's combined recruiting initiatives and compensation increases yielded measurable results during the second quarter of 2026. The April to June 2023 Quarterly Correctional Staffing Report dated September 1, 2023 ("Second Quarter 2023 Report"), documented ADOC's first net gain in correctional staff since the first quarter of 2021. (Doc. 4094-1). The July to September 2023 Quarterly Correctional Staffing report, filed December 1, 2023 ("Third Quarter 2023 Report"), showed a net gain of thirty-nine and one-half correctional staff over the second quarter of 2023. (Doc. 4141-1). ADOC achieved another net gain of forty-four correctional staff in the fourth quarter of 2023, as reflected in the October to December 2023 Quarterly Correctional Staffing Report filed on March 1, 2024 ("Fourth Quarter 2023 Report"). (Doc. 4183-1).

ADOC continued its positive trajectory throughout 2024 and 2025, achieving substantial gains in correctional staffing. From January to March 2024, ADOC recorded a net gain of eighty-six and one-half correctional staff, as reflected in the First Quarterly Correctional Staffing Report filed on June 3, 2024 ("First Quarter 2024 Report"). (Doc. 4223-1). In the April to June 2024 Quarterly Correctional Staffing report filed on September 3, 2024 ("Second Quarter 2024 Report"), ADOC reported another net gain of sixty-five and one-half correctional staff. (Doc. 4266-1). This positive trend continued with a net gain of nineteen and one-half correctional staff as reported in the Third Quarter 2024 Report. (Doc. 4324-1).

During the Fourth Quarter of 2024, ADOC increased correctional staffing by twenty-three and one-half correctional staff. (Doc. 4401-1).

The First Quarter 2025 Report reflects a net gain of thirty-six and one-half correctional staff. (Doc. 4360-1). ADOC then recorded a substantial increase of 136 correctional staff in the second quarter of 2025, followed by a further gain of sixty-nine in the third quarter of 2025. (Doc. 4451-1). During the fourth quarter of 2025, ADOC added 113 correctional staff. (Doc. 4471-1). During the first quarter of 2026, ADOC added twenty-seven and a half correctional staff. (Doc. 4506-1). Lastly, in the second quarter of 2026, ADOC added nine correctional staff. (Doc. 4586-1). In total, these increases amount to a net gain of more than 716 correctional staff since the first quarter of 2023, capping off thirteen consecutive quarters of growth in ADOC's correctional staffing levels. (Id.).

Despite losing 189 officers with experience exceeding twelve months, as pointed out by Plaintiffs, ADOC recorded a net gain of nine correctional officers. ADOC's ability to absorb the loss of staff and still record a positive net change demonstrates the durability and success of the State's approach to recruiting and hiring correctional staff. Plaintiffs continue to discount both the extensive steps ADOC undertakes to strengthen correctional staffing, and the tangible outcomes of ADOC's efforts, as reflected in the reported staffing data. During the second quarter of 2026, ADOC increased correctional staff in the following positions: Correctional

Officers increased by six and Senior Correctional Officers increased by twenty-six. ADOC experienced a slight decrease in Correctional Cubicle Officers by five. Despite this limited reduction, the net increase in correctional staffing during the second quarter of 2026 demonstrates the continued effectiveness of ADOC's statewide recruitment and retention efforts.

### B. Plaintiffs' Position.

At the end of the second quarter, ADOC reported critical losses. First, the total number of officers who satisfy the staffing analysis decreased from 1,545 to 1,522, a loss of 23 qualifying positions. Doc. 4588, Exh. A. ADOC also lost a significant number of experienced officers. The number of officers employed with ADOC, in excess of 12 months, decreased from 1,198.5 to 1,009.5, a loss of 189 experienced officers. Id. Of those experienced officers, ADOC lost ten (10) supervisors. In the past two quarters, ADOC lost a total of 16 long-term supervisors. Id.

## III. ADOC's Progression Towards the July 1, 2025, Correctional Staffing Deadline.

### A. The State's Position.

As of June 30, 2026, ADOC employed 2,012 correctional staff at its major facilities, an increase of 573.5 staff since March 31, 2023. As discussed above, ADOC achieved thirteen consecutive quarters of positive growth in its correctional staffing levels and continues its efforts to increase its correctional workforce.

ADOC continues to develop and refine its recruitment and retention initiatives through regular meetings with key personnel, including the Deputy Commissioner for Administrative Services and staffing consultants, to identify opportunities to improve hiring efficiency and bolster employee retention.

In 2024, ADOC implemented a Field Training Officer ("FTO") Program to support COTs as they prepare for and complete the ADOC training academy. By the fourth quarter of 2025, ADOC filled all FTO positions and assigned all COTs a Field Training Sergeant ("FTS") to guide COTs from their start date through completion of the training academy. ADOC also launched the ACTIVATE career readiness program in 2024 and graduated twenty-three students in the inaugural class.[16] The ACTIVATE program represents a joint initiative between ADOC and the Alabama Community College System that provides a no-cost preparation course to prepare applicants for a career as a correctional officer.[17] The ACTIVATE program assists prospective correctional officers who need additional physical conditioning or academic preparation to successfully complete academy

[16] See Alabama Department of Corrections and Alabama Community College System Celebrate Inaugural Graduation of Activate Career Readiness Program at https://doc.alabama.gov/NewsRelease.aspx?article=ALABAMA+DEPARTMENT+OF+CORRECTIONS+AND+ALABAMA+COMMUNITY+COLLEGE+SYSTEM+CELEBRATE+INAUGURAL+GRADUATION+OF+ACTIVATE+CAREER+READINESS+PROGRAM#:~:text=ACTIVATE%2C%20a%20joint%20initiative%20between,necessary%20to%20join%20the%20profession.

[17] Id.

requirements and meet ADOC's professional standards.[18] ADOC partnered with Jefferson State Community College in Birmingham, Alabama, and Reid State Technical College in Evergreen, Alabama, to offer the six-week program.[19] During the second quarter of 2026, ADOC hired twenty Correctional Officers through the ACTIVATE program.

Plaintiffs' conclusory assertion that ADOC fails to "adequately staff its facilities" ignores the manner in which correctional staff are deployed across ADOC facilities. Plaintiffs' analysis depends solely on aggregate staffing figures and generalized allegations without addressing how ADOC utilizes correctional staff in practice. Contrary to Plaintiffs' assertions, ADOC continues to deploy sufficient staff to maintain the safe and secure operation of its facilities. Importantly, the Remedial Order requires ADOC to "fill all mandatory and essential posts," rather than maintain a specified number of correctional staff. (Doc. 3464 at § 2.1.4). In accordance with that requirement, ADOC continues to utilize overtime for correctional staff. ADOC also continues to aggressively recruit, hire, and retain new correctional staff through ongoing compensation increases, and improvements to the hiring process. Collectively, these efforts reflect the continued positive progress of ADOC's staffing initiatives.

---

[18] Id.

[19] Id.

### B. PLAINTIFFS' POSITION.

Plaintiffs expect the Court to modify its Omnibus Phase 2A Remedial Order in accordance with the Eleventh Circuit's opinion and mandate. USCA11 Case: 22-10292 Docs. 139, 142. Modifications will likely affect the Court's correctional staffing requirements and deadline. Therefore, Plaintiffs do not address ADOC's progression towards the July 1, 2025, deadline.

## IV. OTHER RETROSPECTIVE TRENDS AND PROGNOSIS IN THE SECOND QUARTER 2026 CORRECTIONAL STAFFING REPORT.

### A. THE STATE'S POSITION.

Other retrospective trends further demonstrate positive outcomes from ADOC. Compared to the First Quarter 2026 Report, Limestone experienced the largest net increase by adding thirteen new correctional staff. Donaldson, Bullock, Easterling, Elmore, and St. Clair also recorded increases of correctional staff, by three, nine and one-half, two, two, and three respectively. ADOC also continues to maintain a strong pipeline of COTs, with 401 COTs currently employed. The number of trainees reflects both the continued success of ADOC's recruiting efforts and the effective conversion of applicants into ADOC employees.

### B. PLAINTIFF'S POSITION.

At the end of the second quarter, the defendants need more than 2,158.73 officers to satisfy the staffing levels set forth in the staffing analysis. Even if the Court considered CCOs, CSGs, and part-time staff, the defendants would still need

more than 1,600 officers to comply. As this Court is aware, ADOC's failure to adequately staff its facilities "hinders the delivery of mental-health care and poses a substantial risk of harm to prisoners who need mental-health care." Doc. 1285 at 59-60. Class members assert that the lack of correctional staff continues to affect their ability to seek care and to obtain out-of-cell time. For example, in Donaldson's Residential Treatment Unit ("RTU"), a class member reported that officers rarely take him out of his cell for recreation or therapy. In Donaldson's RHU, another class member reported that he frequently asks to speak to mental health staff but is denied. Class members routinely report that they are disregarded when expressing feelings of suicide or self-harm. Yet suicides continue to occur. For 2023, ADOC's quarterly reports show that suicides occurred every month except May.[20] In some months, there were multiple suicides. For 2024, ADOC reported one suicide in January, three in March, and one in November. For 2025, there was one suicide in February and two in December. There was another suicide in February 2026. Plaintiffs are aware of at least three suicides in April and May 2026. One occurred in the RHU and another in the Structured Living Unit (a specialized mental health dorm). Death investigations for 2025 and 2026 remain open.

---

[20] ADOC's Quarterly Reports can be found at https://www.doc.alabama.gov/data-reports/statistical-reports/ (Last visited Sept. 3, 2026).

## V. OTHER REVEALED INFORMATION BY THE SECOND QUARTER 2026 CORRECTIONAL STAFFING REPORT.

### A. THE STATE'S POSITION.

The Second Quarter 2026 Report reflects the efforts and investments that ADOC and the State made to increase correctional staffing. ADOC enhanced its recruitment and retention initiatives by obtaining additional guidance from recruiting and retention consultants, while the State implemented unprecedented compensation increases for correctional staff. Together, these coordinated actions demonstrate the State's ongoing commitment to increasing the correctional workforce. The Second Quarter 2026 Report further confirms the effectiveness of these initiatives. In the thirteen quarters following the most recent pay increases, ADOC achieved improvements across nearly every key staffing metric, including increases in correctional staffing levels and corresponding declines in vacancy rates.

Plaintiffs raise concerns regarding a projected future increase in the inmate population based upon estimates prepared by the Alabama Sentencing Commission. In doing so, however, Plaintiffs disregard the State's proactive efforts to evaluate and plan for potential population trends, efforts that should be viewed as responsible planning rather than grounds for criticism. Moreover, neither Plaintiffs nor the Sentencing Commission can predict with certainty the *actual* inmate population four years into the future, particularly considering the evolving legislative landscape and the many variables that may influence prison population levels in 2026, 2030, and

beyond. For example, the impact of occupancy at newly constructed facilities on ADOC's overall staffing needs remains uncertain, including both the timing and extent of any such impact.

Plaintiffs conclude ADOC "will not be able to adequately staff its facilities any time soon," relying on a statement by Senator Greg Albritton ("Senator Albritton") that ADOC will utilize funds initially set aside for hiring for the construction of Elmore and Escambia. Senator Albritton however did not suggest that ADOC would discontinue the funding of hiring new correctional staff, simply that ADOC would utilize stale funds to assist in the construction of the new facilities.

Plaintiffs' reliance on projected future population estimates likewise ignores the governing requirements imposed by the Remedial Order, which ADOC continues to comply with in good faith through the efforts described above. The Remedial Order provides that, "ADOC must fill all mandatory and essential posts at the level indicated in the most recent staffing analysis at that time." (Doc. 3464 at 3). It does not require ADOC to maintain staffing levels based on speculative future projections. In accordance with the Remedial Order, ADOC conducts a comprehensive staffing analysis every two years, specifically considering changes in available inmate beds and corresponding facility-specific staffing needs. The Remedial Order therefore already provides a structured mechanism for addressing any future need for additional correctional staff should circumstances warrant.

Moreover, the Prison Litigation Reform Act ("PLRA") limits any prospective relief to correct a "current and ongoing violation." See 18 U.S.C. § 3626(b)(3). The PLRA does not permit relief based on speculation regarding future circumstances or projected population shifts. Rather, relief must be supported by evidence of present conditions. By emphasizing hypothetical future projections instead of current conditions, Plaintiffs disregard both the governing legal standard and the substantial evidence demonstrating ongoing progress. As detailed in the Second Quarter 2026 Report, ADOC continues to achieve measurable staffing improvements while maintaining a sustained institutional commitment to strengthening correctional operations throughout its facilities.

### B. PLAINTIFFS' POSITION.

This quarter's report once again shows that ADOC is far from addressing correctional understaffing issues that directly impact the provision of mental health care within its facilities. The real implications of these deficiencies extend far beyond statistical data and rest in the lives of incarcerated individuals throughout ADOC. The outcome for plaintiffs with serious mental health needs is clear. There are not enough officers to perform critical functions such as conducting thorough mental health rounds, transporting and supervising inmates during mental health appointments and programs, and ensuring adequate out-of-cell time.

Although Defendants project the construction of two new prisons in Elmore and Escambia counties, Defendants have not presented any information to Plaintiffs or the Court demonstrating that the new facilities will necessitate fewer correctional staff. According to the state legislature, the new prisons will replace (not decrease) existing beds, leaving a need for similar correctional staff.[21] Furthermore, the two facilities combined will only house 8,000 individuals, less than half of ADOC's total in-house population (21,169).[22] The remaining 13,000 individuals will remain at other facilities that require the same staffing needs. Moreover, Elmore's prison which was previously projected to open in October 2026, will likely be delayed once again.[23] Assuming there are no delays, Escambia's projected completion date for Phase One is January 2029.[24] In the meantime, the need for more than 2,000 correctional officers remains.

---

[21] Mike Cason, Bill to Let Alabama Borrow Another $500 Million for Prison Construction Advances, AL.COM (Feb. 18, 2024), https://www.al.com/news/2025/02/bill-to-let-alabama-borrow-another-500-million-for-prison-construction-advances.html.

[22] Alabama Dep't of Corr., ADOC Monthly Statistical Report 3 (April 2026), https://www.doc.alabama.gov/wp-content/uploads/2026/06/April-2026.pdf. The in-house population varies from month-to-month but has been consistently more than 20,000 individuals for at least a year.

[23] Ralph Chapoco. Alabama Department of Corrections: "Reasonable concern" $1.25 billion prison will be delayed. ALABAMA REFLECTOR (July 28, 2026), https://alabamareflector.com/2026/07/28/alabama-department-of-corrections-reasonable-concern-1-25-billion-prison-will-be-delayed/.

[24] Alexander Willis, Funding for Alabama's Second 4,000-Bed Prison 60% Secured, Leaders Say, ALABAMA DAILY NEWS (Jan. 22, 2025), https://aldailynews.com/funding-for-alabamas-second-4000-bed-prison-60-secured-leaders-say/.

Moreover, Alabama's Sentencing Commission forecasts that the state prison population may increase by 33% within four years. "The commission, working with Applied Research Services, a research firm that studies criminal justice, estimated the population in custody of Alabama Department of Corrections could grow from 21,753 to between 24,000 and 28,00 inmates."[25] Such a dramatic increase will necessitate more staff.

Finally, it is important to note that ADOC will partially fund its new prisons by diverting funds set aside for hiring correctional officers, leaving less money to staff them.26 When discussing how the state will fund its second new prison, Alabama Senator Greg Albritton revealed, "We have been able, in our fat years, to capture monies in accounts, mostly conditionals and such; for example, we have been trying to hire people (for the Alabama Department of Corrections), and we haven't been able to…But every year we've been setting aside $40-$50 million to fund hiring new people. So we've been putting that away for the intention of hiring. Well, we haven't been able to hire any folks, so I'm not going to let that sit there, so we scraped that in[to]" the construction budget.27 This statement suggests

[25] Ralph Chapoca, Alabama state prison population could rise by a third by 2030, ALABAMA REFLECTOR (Sept. 29, 2025), https://alabamareflector.com/2025/09/29/alabama-state-prison-population-could-rise-by-a-third-by-2030/.
[26] Alexander Willis, Funding for Alabama's Second 4,000-Bed Prison 60% Secured, Leaders Say, ALABAMA DAILY NEWS (Jan. 22, 2025), https://aldailynews.com/funding-for-alabamas-second-4000-bed-prison-60-secured-leaders-say/.
[27] Id.

that, with funds redirected from hiring to construction, ADOC will not be able to adequately staff its facilities any time soon.

Dated: September 8, 2026.

*/s/ Daniel J. Chism*
Daniel J. Chism
*One of the attorneys for the State*

William R. Lunsford
Daniel J. Chism
Lynette E. Potter
Megan M. Everett
**BUTLER SNOW LLP**
200 West Side Square
Huntsville, AL 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651
bill.lunsford@butlersnow.com
daniel.chism@butlersnow.com
lynette.potter@butlersnow.com
megan.everett@butlersnow.com

**ATTORNEYS FOR THE STATE**

*/s/ Latasha McCrary Dejarnett*
Latasha McCrary Dejarnett
*One of the attorneys for the Plaintiffs*

Latasha L. McCrary Dejarnett
Lisa W. Borden
Aaron E. Butler
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
latasha.dejarnett@splcenter.org

lisa.borden@splcenter.org
aaron.butler@splcenter.org

Emily B. Lubin*
Julia T. Mudd*
**SOUTHERN POVERTY LAW CENTER**
201 St. Charles Ave. Suite 2000
New Orleans, LA 70170
Telephone: (504) 401-2291
Emily.Lubin@splcenter.org
Julia.Mudd@splcenter.org
**Admitted pro hac vice*

Andrew Udelsman*
**SOUTHERN POVERTY LAW CENTER**
2 South Biscayne Blvd.
Suite 3750
Miami, FL 33131
Telephone: (786) 742-9397
Andrew.udelsman@splcenter.org
**Admitted pro hac vice*

Lonnie J. Williams
Barbara A. Lawrence
Andrea J. Mixson
Larry G. Canada
**ALABAMA DISABILITIES**
**ADVOCACY PROGRAM**
2008 12th Street
Tuscaloosa, AL 35401
Telephone: (205) 348-6894
lcanada@adap.ua.edu
lwilliams@adap.ua.edu
blawrence@adap.ua.edu
amixson@adap.ua.edu

Catherine E. Stetson*
Neal K. Katyal*
Jo-Ann T. Sagar*

**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
cate.stetson@hoganlovells.com
neal.katyal@hoganlovells.com
jo-ann.sagar@hoganlovells.com
**Admitted pro hac vice*

Joshua C. Toll*
**KING & SPALDING LLP**
1700 Pennsylvania Avenue NW
2nd Floor
Washington, DC 20006-4707
Telephone: (202) 227-6138
Facsimile: (202) 626-3737
jtoll@kslaw.com
**Admitted pro hac vice*

Deana Johnson*
Brett T. Lane
**MHM Services, Inc.**
1447 Peachtree Street NE
Suite 500
Atlanta, GA 30309
Telephone: (404) 347-4134
djohnson@mhm-services.com
btlane@mhm-services.com
**Admitted pro hac vice*

**ATTORNEYS FOR THE PLAINTIFFS**

Anil A. Mujumdar
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, AL 35213
Telephone: (205) 590-6986
Facsimile: (205) 809-7899

anil@dagneylaw.com

**ATTORNEY FOR PLAINTIFF**
**ALABAMA DISABILITIES**
**ADVOCACY PROGRAM**