**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **EDWARD BRAGGS, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 2:14-cv-00601-MHT** |
| **v.** | ) | |
| | ) | **District Judge Myron H. Thompson** |
| **GREG LOVELACE, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**THE STATE'S STATUS REPORT ON IMPLEMENTATION OF THE PHASE 2A OMNIBUS REMEDIAL OPINIONS AND ORDER**

Greg Lovelace ("Commissioner Lovelace"), in his official capacity as Commissioner of the Alabama Department of Corrections ("ADOC"), and Deborah Crook ("Deputy Commissioner Crook" and, collectively with Commissioner Lovelace, the "State"), in her official capacity as ADOC's Deputy Commissioner, Office of Health Services, hereby submit this status report for the October 1, 2026, status conference as directed by the Court's February 24, 2026, order (Doc. 4466 at 19, the "Order;" and Doc. 4519 (setting the October 1, 2026 triannual status conference)).

## I. STATUS OF THE REMEDIAL ORDER.

This Status Report provides updated information developed since the filing of "The State's Status Report on Implementation of the Phase 2A Omnibus Remedial Opinions and Order" on February 5, 2026. (Doc. 4460). The Court issued the Phase

2A Omnibus Remedial Order (Doc. 3464, the "Remedial Order") on December 27, 2021, establishing certain obligations and deadlines for the State to implement. The Eleventh Circuit Court of Appeals ("Eleventh Circuit") issued its opinion on June 24, 2026, in which it reversed three aspects of the Remedial Order: (1) the Remedial Order's directive for modifications of cells in stabilization units, restricted housing units, and suicide-watch cells to be suicide-proofed consistent with the Hayes Checklist; (2) the Remedial Order's injunction as to correctional staffing; and (3) the Remedial Order's inclusion of remedial provisions related to monitoring, mental healthcare in segregation, the number of crisis cells, residential treatment units, and suicide-watch placements as to Julia Tutwiler Prison for Women ("Tutwiler"). Dunn v. Comm'r, Ala. Dept. of Corr., 179 F.4th 1277 at 1316, 1320 (11th Cir. 2026). The State and Plaintiffs (collectively, the "Parties") briefed various issues related to this aspect of the Eleventh Circuit's decision at the request of the Court and such matters remain pending with the Court at this time.

## II. THE STATE'S PROGRESS IN COMPLIANCE WITH THE REMEDIAL ORDER.

The State continues to meet and/or exceed constitutional standards for operations and mental health care at the prisons subject to the Remedial Order. Following additional briefing, the Parties await the Court's decision on the proposals of the External Monitoring Team ("EMT") and the Parties' respective objections and concerns related to the EMT's proposals.

### A. The Activities of the EMT.

The EMT began its work in October 2022, holding its first meeting on October 17, 2022. The EMT consists of four members: (1) Dr. Elizabeth Falcon in the role of psychologist; (2) Dr. Raymond Reeves Jr., in the role of the psychiatrist; (3) Rick Raemisch as the correctional administrator; and (4) Karen Rea in the role of the nurse. (Doc. 3988 at 3). The EMT appointed Dr. Elizabeth Falcon to serve as the team's administrative head. From that point forward, the EMT regularly met with the Parties in an attempt to develop performance measures and create monitoring tools to monitor the relevant ADOC facilities. Consistent with the terms of the Remedial Order, ADOC also identified the members of the Internal Monitoring Team ("IMT"), and the State facilitated meetings between the EMT and the IMT to coordinate efforts.

On September 12, 2023, the EMT provided a revised set of proposed performance measures, and, on November 4, 2023, the Parties received the corresponding, proposed audit tools. The Parties submitted objections to the performance measures and audit tools to the EMT on April 8, 2024, in which the Parties outlined a multitude of concerns with the EMT's proposals. The Parties worked with the EMT and United States Magistrate Judge (retired) John Ott ("Judge Ott"), and the EMT submitted their last version of proposed performance measures and audit tools on December 20, 2024 (the "Proposed Performance Measures").

In response to the State's objections, the EMT proposed an increase to the annual monitoring budget from $1,400,000 to $8,430,600 and an additional four psychiatrists, four psychologists, four nurses, and four correctional professionals. The EMT asserted these additional staff would be necessary to conduct monitoring under the current performance measures and audit tools.[1]

On January 10, 2025, the Parties filed remaining objections to the finalized Proposed Performance Measures and audit tools. (Doc. 4289-2; Doc. 4289-3; Doc. 4290). On January 10, 2025, the Parties also submitted proposals as to how the Court should resolve objections to the Proposed Performance Measures and audit tools. (Doc. 4288; Doc. 4289-1). Both Parties proposed a hearing to resolve remaining objections to the Proposed Performance Measures and audit tools. (Doc. 4288; Doc. 4289-1).

After the triannual status conference held on January 24, 2025, the Court ordered the Parties to participate in mediation with the EMT to try and reach a resolution concerning the objections. The Parties participated in multiple mediation sessions over the course of several weeks regarding the EMT's Proposed

[1] The State objects to the EMT's monumental request for additional resources for multiple reasons, including the EMT's clear failure to adhere to the mandates of the Prison Litigation Reform Act, 18 U.S.C. § 3626. The EMT seeks an approximately 402 percent increase in the annual monitoring budget. This represents a material and unreasonable change in circumstances and, if ordered, mandates additional PLRA findings. Regardless, this substantial increase in monetary demands of the EMT would result in a substantial hardship on the State to fund the EMT at that level, compromising the State's funding of ADOC operations and improvements, such as the ADA alterations contemplated in Phase I of this action.

Performance Measures and the number of charts and documentation the EMT request for each. Although the Parties and the EMT resolved and clarified some of the issues regarding the Proposed Performance Measures, many remain unresolved. Therefore, the Parties submitted their objections to the EMT's Proposed Performance Measures and audit tools on June 28, 2025. (Doc. 4374). The State's objections centered around five key issues:

1. The EMT's proposed performance measures and audit tools require unduly burdensome document production exceeding the scope of the Remedial Order and in violation of the Prison Litigation Reform Act ("PLRA");

2. The EMT's compliance levels exceed substantial compliance in violation of the PLRA and the Monitoring Order;

3. The EMT exceeded its authority under the Monitoring Order in its proposed schedule and procedure for transferring monitoring to the Internal Monitoring Team ("IMT");

4. The EMT's proposed performance measures and audit tools require monitoring of issues outside the scope of the Remedial Order provisions; and

5. The EMT's proposed performance measures and audit tools fail to define with particularity the documents required to assess compliance and how specifically the EMT will measure compliance.

(Id. at 3-4). On July 2, 2026, the Court issued an order directing the Parties to participate in oral argument concerning "the parties' finalized objections to the

EMT's performance measures and audit tools" on July 29, 2026. (Doc. 4524 at 1, the "July 2, 2026, Order"). The July 2, 2026, Order additionally directed the State to file additional briefing "on the EMT's request for additional funding" by July 20, 2026, and allowed for the Plaintiffs to respond by July 24, 2026. (Id. at 1-2). The State filed its briefing on the EMT's request for additional funding (doc. 4539) which argued: (1) the EMT's desire to expand the EMT exceeds the scope of this Court's Monitoring Order (doc. 2915); (2) no record evidence exists to support the PLRA findings required for an expansion of the EMT's membership or budget; and (3) the EMT must reassess its needs and request for additional members and funding in light of the narrowed scope of monitoring under the Eleventh Circuit's recent opinion. (Doc. 4539 at 2).

Following oral argument, the Court issued an order directing the Parties to file a joint proposed order "that directs the EMT to submit a formal request for support staff and additional funding to the court." (Doc. 4550 at 1). After negotiating, with the aid of Judge Ott, the Parties agreed to and filed their "Order for Formal EMT Request for Support Staff and Additional Funding" on August 26, 2026. (Doc. 4584-1, the "Joint EMT Order"). The Joint EMT Order directed the EMT to submit to the Court a "single written request identifying all additional personnel, resources and funding it requests" and provided a series of instructions directing what information

should be included in the EMT's request. (Doc. 4584-1). The Parties await further instruction from the Court regarding the EMT's request for additional funding.

Moreover, concerning the EMT's Proposed Performance Measures, the Court issued a series of orders following oral argument directing the Parties to file additional briefing on certain outstanding objections. On August 10, 2026, the State filed its "Response to Plaintiffs' Additional Briefing on Objections to Performance Measures 3.2.2, 3.3.1, and 3.4.2." (Doc. 4567, the "State's Response on Performance Measure 3.2.2, 3.3.1, and 3.4.2"). In the State's Response on Performance Measure 3.2.2, 3.3.1, and 3.4.2, the State affirmed its position concerning its outstanding objections to the Proposed Performance Measures, and established why Proposed Performance Measures 3.2.2, 3.3.1, and 3.4.2 "convert the language in the Remedial Order into duties not contemplated by the Remedial Order." (Id. at 3). Further, on August 11, 2026, the State filed its "Response to the Plaintiffs' Additional Briefing on Objections to Performance Measure 10.7.1.1." (Doc. 4570, the "State's Response on Performance Measure 10.7.1.1"). In the State's Response on Performance Measure 10.7.1.1, the State clearly demonstrated why the Court should decline to implement a standard-of-care component into Performance Measure 10.7.1.1 as the EMT proposed and established why the Court should decline to adopt Plaintiffs' suggested definition of "documented clinical concerns." (Id. at 6). The Parties await the Court's decision following the additional

briefing on the outstanding objections to the Proposed Performance Measures. Additionally, the Court directed the Parties to file further briefing on Proposed Performance Measures 6.2.2 and 8.4. The State filed its "Notice on Performance Measure 6.2.2" on August 11, 2026, in which it stated that:

> Based on discussions with the EMT member responsible for Performance Measure 6.2.2, the Parties understand that, for purposes of Performance Measure 6.2.2, the EMT intends the term "confidential" to require that the referrals in Performance Measure 6.2.2 be maintained in a secure storage area where the referrals remain inaccessible to inmates.

(Doc. 4569 at 2). The State further maintained its objection that insertion of the requirement that the designated location be confidential exceeds the scope of the Remedial Order. (Id.). The Parties filed the "Joint Notice of Proposed Revision to Performance Measure 8.4" on August 11, 2026. (Doc. 4571, the "Joint Notice on 8.4"). In the Joint Notice on 8.4, the Parties presented Dr. Falcon's revised version of part two of Proposed Performance Measure 8.4. The Parties await further guidance from the Court concerning Proposed Performance Measures 6.2.2 and 8.4.

### B. The State's Continued Efforts regarding Staffing.

#### 1. ADOC continues to increase the number of correctional staff and mental health staff within its facilities.

In compliance with Provision 2.1.1 of the Remedial Order, ADOC created the Resource Planning Unit ("RPU") and adopted Administrative Regulation 238 ("AR

238") regarding conducting and maintaining a staffing analysis. Pursuant to Provision 2.1.2 of the Remedial Order, the State filed the RPU's 2022 Staffing Analysis on November 1, 2022. (Doc. 3849).[2] In compliance with Provision 2.1.5 of the Remedial Order, the State submitted non-enforceable "realistic benchmarks for the level of correctional staffing" for the State to achieve by December 31, 2023, and 2024. (Doc. 3901). As required by AR 238, the RPU Coordinator facilitated a review to update ADOC's staffing analysis at regular intervals of no greater than two years. The State confirmed review of the 2022 Staffing Analysis on December 1, 2023. (Doc. 4097). Additionally, the Parties filed the Joint Status Report on the Ongoing Process to Update the Staffing Analysis on June 28, 2024, updating the Court on the status of the State's updated staffing analysis. (Doc. 4195). ADOC completed an updated staffing analysis in November 2024.

The State filed the 2026 second quarter Quarterly Correctional Staffing Report on September 1, 2026. (Doc. 4586-1, the "Second Quarter Correctional 2026 Report").[3] The data showed continued progress for correctional staffing. From the

---

[2] Plaintiffs raised concerns regarding the 2022 Staffing Analysis (Doc. 3880), and the Parties filed a Joint Report (Doc. 3927) and an updated 2022 Staffing Analysis (Doc. 3928) on February 24, 2023.

[3] The State submitted the Second Quarter Correctional 2026 Report and accompanying Correctional Staffing Trends Report (docs. 4586-1, 4593). However, the State maintains that the Eleventh Circuit reversed Remedial Order § 2.1, which discusses correctional staffing. See Dunn v. Comm'r, Ala. Dept. of Corr., 179 F.4th 1277, 1323 (11th Cir. 2026). The State understands that the Court will take further action regarding Remedial Order § 2.1 in light of the Eleventh Circuit's directive. The State in no way waives an objection to or in any way stipulates to providing correctional staffing data following entry of a further order from this Court.

first quarter of 2026 to the second quarter of 2026, ADOC increased total correctional staff[4] by 1.12%. (Id.). The First Quarter 2026 Report showed ADOC employed 464 Correctional Officer Trainees ("COT"), and during the second quarter of 2026, ADOC employed 401 COTs. (Doc. 4507-1; Doc. 4586-1). The table below details the increase in staff at seven major facilities between the first quarter of 2026 and the second quarter of 2026, illustrating ADOC's dedication to increasing staff. (Id.).

*Table 1*

| Correctional Facility | Quarter 1 | Quarter 2 | Increase in Staff |
|---|---|---|---|
| **Donaldson** | 201.5 | 204.5 | 3 |
| **Easterling** | 83.5 | 85.5 | 2 |
| **Bullock** | 95 | 104.5 | 9.5 |
| **Elmore** | 92.5 | 94.5 | 2 |
| **Limestone** | 264 | 277 | 13 |
| **St. Clair** | 216 | 219 | 3 |
| **Kilby** | 186.5 | 192 | 5.5 |

Since the first quarter of 2023, ADOC added 720.5 additional correctional staff at the major facilities, which resulted in a 55.79% increase in system-wide correctional staffing. (Doc. 4586-1; Doc. 3973-1). On July 9, 2026, eighty-nine correctional officers graduated from the Academy Peace Officers' Standards and Training

[4] Correctional Staffing includes Correctional Cubicle Operators, Correctional Security Guards, Senior Correctional Security Guards, Correctional Officers, Correctional Officer Trainees, Part Time, and Senior Correctional Officers.

Commission ("APOSTC").[5] Overall, ADOC continues to make meaningful progress in increasing correctional staffing across its facilities.

The State filed the 2026 second quarter Quarterly Mental Health Staffing Report on September 1, 2026. (Doc. 4587-1, the "Second Quarter Mental Health 2026 Report"). During the second quarter of 2026, mental health staff provided a total of 121,264.27 hours of mental health services. (Doc. 4587-1).[6]

*Table 2*

| POSITION | HOURS |
|---|---|
| Psychiatrist | 4,513.85 |
| Psychologist | 2,315.64 |
| CRNP | 6,087.27 |
| Registered Nurse (RN) | 10,461.18 |
| Licensed Practical Nurse (LPN) | 16,656.76 |
| Mental Health Professional (MHP) | 22,448.76 |

These actions demonstrate ADOC's good-faith efforts and demonstrates its ongoing compliance with the Court's Remedial Order.

**2. ADOC continues to invest in a diverse and innovative series of recruiting and retention activities and initiatives for Correctional Staff.**

ADOC treats correctional staffing as a central operation priority. When John Hamm became Commissioner on January 1, 2022, he identified correctional staffing

[5] https://www.doc.alabama.gov/2026/08/06/adoc-academy-class-2026-02-to-graduate-89-correctional-officers/.

[6] NaphCare, ADOC's new mental health staffing provider, began supplying ADOC with mental health staff on May 3, 2026. Thus, this total represents the number of hours of mental health services provided by NaphCare between May 3, 2026, and June 30, 2026.

as his "number one priority" and ADOC's "number one issue." (United States of America v. State of Alabama, *et al.*, In the United States District Court for the Northern District of Alabama, Southern Division; Case No. 2:20-cv-01971-HDM ("DOJ Action") (Doc. 379 at 42-43 ¶¶ 143-144). In March 2023, ADOC increased the starting salary for new correctional officers to $50,712.00 at minimum custody facilities, $53,244.80 at medium custody facilities, and $55,855.20 at maximum custody facilities. As of September 1, 2023, the starting salaries for COTs increased to $51,727.20 for minimum custody facilities, $54,290.40 for medium custody facilities, and $56,971.20 for maximum custody facilities. Additionally, ADOC offered a 27% available pay increase after eighteen months for qualifying correctional officers. ADOC also substantially increased the number of hiring events it holds across the state. The Department of Justice's retained staffing expert, Kenneth Ray, acknowledged that ADOC nearly doubled correctional officer salaries, a trajectory that Ray characterized as "very positive." Id. at 58 ¶ 247. Ray also acknowledged that ADOC's pay increases produced positive recruitment and retention results. Id. at 58 ¶ 248. ADOC supplemented correctional officer pay raises through its retention of RippleWorx to assist with retention and employee engagement, including efforts to increase correctional staff comfortability with raising concerns and believing that ADOC would hear and address correctional staff concerns. Id. at 57 ¶¶ 240-241.

ADOC hired a new Personnel Director, Renee Minor ("Minor") in June 2023; in the role of Personnel Director, Minor oversees personnel transactions, a team dedicated to hiring security personnel, and the recruiting division. Id. at 48 ¶¶ 176-177. Commissioner Hamm assigned Minor the responsibility of improving the efficiency of ADOC's hiring process and administering the correctional-staff bonus program. Id. at 48 ¶ 177. Commissioner Hamm directed the Personnel Director to make hiring Correctional Security Guards ("CSG") and COTs her personnel priority and instructed her "to hire as many officers as quickly as we can." (Id. 48 ¶ 178). As of January 2024, ADOC's recruiting operation included a Recruiting Director, four Recruiting Lieutenants assigned to different regions of Alabama, and a Talent Acquisition Manager. Id. at 49-50 ¶ 181. ADOC also retained an outside consulting firm, Horizon Point Consulting, to assist with recruitment efforts. Id. at 49 ¶ 184. Horizon Point helped ADOC launch ApplicantPro a hiring technology that allows ADOC to post COT and CSG on Indeed.com ("Indeed"). Id. 49-50 ¶¶ 187-189. ADOC recruiting personnel follow up with candidates in ApplicantPro, assist candidates through the initial application steps for COT and CSG positions, attend job fairs, and conduct hiring events throughout Alabama. Id. at 50 ¶ 191. ADOC also worked to remove other administrative barriers that can derail applicants. For example, ADOC entered into a Memorandum of Understanding with the Alabama Department of Public Health that allows ADOC to obtain birth certificates for

Alabama-born applicants and pay the associate cost. Id. at 55 ¶ 230. ADOC also coordinated with its Office of Heath Services to make a mobile medical unit available for on-site medical examinations at hiring events. Id. at 56 ¶ 233.

In another effort to improve recruitment of correctional staff, ADOC expanded the means through which it reaches potential applicants, including targeted digital campaigns using social media, email, text messages, billboards, television, radio, newspapers, public billboards, Indeed, ADOC's website, and digital advertisements. Id. at 44, 54 ¶¶ 154–156, 223-224. ADOC also uses sponsored Indeed advertisements targeted geographically around its facilities and uses Indeed matching and artificial-intelligence tools to identify potential applicants. Id. at 54 ¶¶ 223-224. In 2024, ADOC rebranded its social-media recruiting campaigns, which produced a 12.5% increase in total engagements, a 7.1% increase in total impressions, and a 24.5% increase in net audience growth during a thirty-day period compared with the preceding thirty-day period. Id. at 55 ¶ 226. ADOC also developed a recruiting project tracker and Recruiting Style Guide in 2024 to coordinate and standardize its marketing resources. Id. at 55 ¶ 227.

Over the last three years, ADOC continued to increase the number of hiring events across Alabama. In 2022, ADOC held nineteen hiring events. In 2023, ADOC held ninety-four hiring events and in 2024, ADOC held 125 hiring events. Further, ADOC held 127 hiring events for 2025. (Doc. 4451 at 8). Through the

second quarter of 2026, ADOC hosted thirty-eight hiring events. (Doc. 4593 at 9). These hiring events provide potential applicants with greater access to hiring information and opportunities to complete applications and requirements for becoming a correctional officer trainee. In addition to increasing the number of hiring events, ADOC began the ACTIVATE Career Readiness Program, a partnership with the Alabama Community College system. ACTIVATE provides the applicant with a no-cost six-week program to assist individuals facing physical and educational barriers to meet the requirements to become correctional officers. The first ACTIVATE class graduated twenty-three students, all of whom qualified to attend the Academy in 2024.[7] Moreover, twenty students graduated from ACTIVATE as part of the ADOC Academy Class 2026-02.[8] As a result of the increased hiring events and innovative programs like ACTIVATE, ADOC experienced increased Academy class sizes, a record-breaking graduating class, and an increase in the number of officers in ADOC facilities. (Doc. 4586-1). ADOC expanded ACTIVATE beyond its initial locations at Reid State Technical College

---

[7] See Alabama Department of Corrections and Alabama Community College System Celebrate Inaugural Graduation of Activate Career Readiness Program at https://doc.alabama.gov/NewsRelease.aspx?article=ALABAMA+DEPARTMENT+OF+CORRECTIONS+AND+ALABAMA+COMMUNITY+COLLEGE+SYSTEM+CELEBRATE+INAUGURAL+GRADUATION+OF+ACTIVATE+CAREER+READINESS+PROGRAM#:~:text=ACTIVATE%2C%20a%20joint%20initiative%20between,necessary%20to%20join%20the%20profession.

[8] https://www.doc.alabama.gov/2026/08/06/adoc-academy-class-2026-02-to-graduate-89-correctional-officers/.

and Jefferson State Community College to additional community colleges. DOJ Action, Doc. 379 at 60 ¶ 258. Between August 12 and September 20, 2024, ACTIVATE produced twenty newly hired correctional officers assigned to Bibb (3), Donaldson (4), Easterling (1), Fountain (4), Holman (3), Limestone (1), St. Clair (3), and Staton (1). Id. at 60 ¶ 259. Between December 16, 2024, and January 24, 2025, ACTIVATE produced another twenty-one newly hired correctional officers assigned to Bibb (1), Donaldson (3), Limestone (7), St. Clair (4), Staton (3), and Kilby (3). Id. at 60 ¶ 260. The efforts discussed above demonstrate ADOC's continued commitment and efforts to increase staffing in general at all facilities.

The State continues to deploy reasonable and authorized efforts to increase correctional staffing levels and supervision within the relevant Facilities and continues to show progress in correctional staffing at all relevant Facilities.

### C. THE OPERATION OF RESTRICTIVE HOUSING UNITS.

The Remedial Order sets out certain mandates for the State to comply with regarding the operation of Restrictive Housing Units ("RHU"). These include (1) documenting of exceptional circumstances, (2) screening for serious mental illness, (3) conducting mental-health rounds, (4) conducting mental health assessments, (5) providing out-of-cell time, and (6) performing security checks. (Doc. 3464 at 8-6). To assist with creating a proposal that "will allow ADOC's RHUs with the exception of the RHU at Tutwiler to function safely with the correctional staff that ADOC

currently employs," the Parties consulted with EMT member Rick Raemisch. (Doc. 3464, § 2.1.7.3).

Mr. Raemisch provided the Parties with his RHU Proposal on July 14, 2023. The Parties filed the Joint Statement on Restrictive Housing Unit Operations on October 27, 2023. (Doc. 4061). The State highlighted the following objectives:

(1) Centralizing RHUs under a single Regional Director;

(2) Creating RHU Teams at certain facilities;

(3) Making expansion plans for the Preventative Housing Reintegration Units ("PHRU"); and

(4) Increasing staffing at all major facilities through recruiting efforts and the State's historical pay raise.

(Id. at 4-10). Plaintiffs recognized the implementation of some of Raemisch's recommendations. (Doc. 4061 at 12). For example, ADOC established RHU Teams at Limestone, St. Clair, and Donaldson to oversee the completion of routine activities in the RHUs. (Doc. 4061 at 6). In addition, ADOC created PHRUs at both Limestone and St. Clair, which reduce the RHU population by 12% and bring the total number of PHRU beds to 124. (Id. at 8). ADOC also maintains ongoing recruitment and retention efforts to support increased RHU staffing.

The Parties attended the November 3, 2023, conference, where Plaintiffs requested the State produce a status report on the RHUs. The Parties developed the RHU Report's format and filed the Joint Notice of Filing Proposed Restrictive

Housing Unit Report on November 17, 2023. (Doc. 4075). The Court approved the RHU plan on November 21, 2023, ordering the State to file monthly RHU reports. (Doc. 4082). The State filed monthly RHU Reports for the months of December 2023 through July 2026. (Doc. 4112; Doc. 4126; Doc. 4152; Doc. 4165; Doc. 4178; Doc. 4190; Doc. 4199; Doc. 4216; Doc. 4230; Doc. 4237; Doc. 4260; Doc. 4276; Doc. 4292; Doc. 4319; Doc. 4333; Doc. 4344; Doc. 4352; Doc. 4368; Doc. 4381; Doc. 4393; Doc. 4408; Doc. 4419; Doc. 4444;Doc. 4452; Doc. 4464; Doc. 4482; Doc. 4492; Doc. 4500; Doc. 4515; Doc. 4531; and Doc. 4576). The Parties filed the Joint Statements Regarding Monthly Restrictive Housing Unit Trends Report for December 2023 through July 2026. (Doc. 4115; Doc. 4134; Doc. 4157; Doc. 4168; Doc. 4181; Doc. 4190; Doc. 4201; Doc. 4220; Doc. 4232; Doc. 4242; Doc. 4264; Doc. 4284; Doc. 4297; Doc. 4322; Doc. 4339; Doc. 4346; Doc. 4354; Doc. 4370; Doc. 4385; Doc. 4395; Doc. 4410; Doc. 4423; Doc. 4446; Doc. 4455; Doc. 4467; Doc. 4485; Doc. 4494; Doc. 4503; Doc. 4517; Doc. 4541; and Doc. 4583). The State provided these filings to the EMT.

The latest Joint Statements Regarding RHU Trends Report reflects ADOC's continued systemwide management of RHU operations. The Monthly Restrictive Housing trends report for the month of July 2026 (July 2026 Report") indicates 855 of the 960 beds in RHU held inmates. (Doc. 4583-1 at 2). Of the 855 inmates housed in RHU, 138 inmates designated SMI remained in RHU on July 31, 2026. (Id.). Of

those 138, fifty-one requested placements in RHU. (Id.). Further, the July 2026 Report shows 346 inmates with fewer than thirty-one days in RHU on July 31, 2025, suggesting at least 346 inmates entered RHU during the month of July 2026. (Id.). Thus, ADOC continues to receive, process, and move SMI inmates through RHUs at the relevant Facilities, while also monitoring inmates' mental health status.

## III. The Parties' Additional Filings.

Additionally, the Court requested briefing on how the Eleventh Circuit's mandate impacts the Remedial Order. The State maintains that the Eleventh Circuit reversed three components of the Remedial Order: (1) the Remedial Order's directive for modifications of cells in stabilization units, restricted housing units, and suicide-watch cells to be suicide-proofed consistent with the Hayes Checklist; (2) the Remedial Order's injunction as to correctional staffing; and (3) the Remedial Order's inclusion of remedial provisions related to monitoring, mental healthcare in segregation, the number of crisis cells, residential treatment units, and suicide-watch placements as to Tutwiler. Dunn v. Comm'r, Ala. Dept. of Corr., 179 F.4th 1277 at 1316, 1320 (11th Cir. 2026).

On August 17, 2026, the State filed its "Response Regarding the Remedial Order as it Relates to Tutwiler." (Doc. 4578, the "State's Tutwiler Response"). In the State's Tutwiler Response, the State urged the Court to remove Tutwiler from all provisions of the Remedial Order, due to the Eleventh Circuit's decision to "set

aside remedial provisions about monitoring." (Doc. 4578 at 3 (quoting Dunn, 179 F.4th at 1320)). In the alternative, the State presented a list of particular provisions of the Remedial Order that the Court should set aside as to Tutwiler at a minimum.

Furthermore, on August 18, 2026, the State filed its "Response to Plaintiffs' Brief on the Omnibus Remedial Order Revision Process." (Doc. 4579, the "State's Revision Response"). In the State's Revision Response, the State called for the Court to remove, and not stay, the provisions of the Remedial Order reversed by the Eleventh Circuit and advised that should the Court make new modified remedial relief the Court must make specific provision-by-provision PLRA findings before introducing altered remedial relief. (Doc. 4579 at 9). The Parties await the Court's direction concerning both the Tutwiler specific provisions of the Remedial Order and the process by which the Court plans to revise the Remedial Order.

## IV. CONCLUSION

ADOC continues to provide constitutionally adequate conditions and mental health care. These on-going efforts emphasize ADOC's focus on measurable results that improve safety and increase access to care. ADOC recruits, trains, and retains correctional staff, which improves post coverage to reduce overtime strain and support consistent operations. ADOC and its provider deliver substantial mental-health service hours and staff key clinical positions to meet the Remedial Order's adjusted FTE-hour expectations. Additionally, ADOC also operates RHUs under

the framework the Court approved, assigns RHU Teams, expands PHRU capacity, evaluates and monitors inmates with serious mental illness, and reports monthly trends to the Court and the EMT. These actions demonstrate ADOC's good-faith compliance efforts and sustained progress toward the Remedial Order's objectives.

Dated: September 17, 2026.

*/s/ Daniel J. Chism*
Daniel J. Chism
*One of the Attorneys for the State*

William R. Lunsford
Daniel J. Chism
Lynette E. Potter
Megan M. Everett
John R. Alford, Jr.

**BUTLER SNOW LLP**
200 West Side Square
Huntsville, AL 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651
bill.lunsford@butlersnow.com
daniel.chism@butlersnow.com
lynette.potter@butlersnow.com
megan.everett@butlersnow.com
john.alford@butlersnow.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all attorneys of record in this matter, including without limitation the following, by the Court's CM/ECF system on this 17th day of September 2026:

Lisa W. Borden
Latasha L. McCrary Dejarnett
Aaron Butler
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 956-8200
lisa.borden@splcenter.org
latasha.dejarnett@splcenter.org
aaron.butler@splcenter.org

Deana Johnson (*Pro Hac Vice*)
Brett T. Lane
**MHM SERVICES, INC.**
1447 Peachtree Street NE
Suite 500
Atlanta, GA 30309
Telephone: (404) 347-4134
djohnson@mhm-services.com
btlane@mhm-services.com

Emily B. Lubin (*Pro Hac Vice*)
Julia T. Mudd (*Pro Hac Vice*)
**SOUTHERN POVERTY LAW CENTER**
201 St. Charles Avenue
Suite 2000
New Orleans, LA 70170
Telephone: (504) 401-2291
Emily.Lubin@splcenter.org
Julia.Mudd@splcenter.org

Anil A. Mujumdar
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue
Suite 250
Birmingham, AL 35213
Telephone: (205) 410-1185
anil@dagneylaw.com

Andrew G. Udelsman (*Pro Hac Vice*)
**SOUTHERN POVERTY LAW CENTER**
2 South Biscayne Boulevard
Suite 3750
Miami, FL 33131
Telephone: (786) 742-9397
Andrew.udelsman@splcenter.org

Joshua C. Toll (*Pro Hac Vice*)
**KING & SPALDING LLP**
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
Telephone: (202) 737-8616
jtoll@kslaw.com

Catherine E. Stetson (*Pro Hac Vice*)
Neal K. Katyal (*Pro Hac Vice*)
Jo-Ann T. Sagar (*Pro Hac Vice*)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street
Washington, DC 20004
Telephone: (202) 637-5600
cate.stetson@hoganlovells.com
neal.katyal@hoganlovells.com
jo-ann.sagar@hoganlovells.com

Lonnie J. Williams
Barbara A. Lawrence
Andrea J. Mixson
Larry G. Canada
**ALABAMA DISABILITIES ADVOCACY PROGRAM**
2008 12th Street
Tuscaloosa, AL 35401
Telephone: (205) 348-6894
lwilliams@adap.ua.edu
blawrenc@adap.ua.edu
amixson@adap.ua.edu
lcanada@adap.ua.edu

*/s/ Daniel J. Chism*
Of Counsel