IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| EDWARD BRAGGS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| GREG LOVELACE, in his | ) | |
| official capacity as | ) | |
| Commissioner of | ) | |
| the Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

PHASE 2A OPINION AND ORDER ON
OBJECTIONS TO EXTERNAL MONITORING TEAM'S PERFORMANCE
MEASURES AND AUDIT TOOLS

The parties have submitted to the court their finalized objections to the 'performance measures' and 'audit tools' developed by the External Monitoring Team (EMT). This opinion addresses these objections.

## I. BACKGROUND

Phase 2A of this case concerns the provision of mental-health care in Alabama's prisons.[1] The plaintiffs are a class of state prisoners with serious mental illnesses and the Alabama Disabilities Advocacy Program, an organization representing mentally ill prisoners. They sued officials of the Alabama Department of Corrections (ADOC) for injunctive and declaratory relief. In 2017, after an extensive trial, this court found that ADOC's provision of mental-health care to prisoners is "horrendously inadequate," in violation of the Eighth Amendment. *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1267 (M.D. Ala. 2017) (Thompson, J.), *aff'd in part and rev'd*

1. Phase 1, which involved claims of disability discrimination under Title II of the Americans with Disabilities Act, settled in 2016. *See Dunn v. Dunn*, 318 F.R.D. 652 (M.D. Ala. 2016) (Thompson, J.). Phase 2B, which focuses on medical- and dental-care claims under the Eighth Amendment, is stayed per a January 15, 2020 order. *See* Phase 2B Order Extending Stay (Doc. 2728).

***in part sub nom. Dunn v. Comm'r, Ala. Dep't of Corr.*****, 179 F.4th 1277, 1314 (11th Cir. 2026).**

**There are three opinions that provide the framework for remediating ADOC's constitutionally inadequate mental-health care. The first of these is the Liability Opinion, which lays out the court's reasoning for finding an Eighth Amendment violation.** ***See generally Braggs v. Dunn (Liability Opinion)*****, 257 F. Supp. 3d 1171, 1267 (M.D. Ala. 2017) (Thompson, J.),** ***aff'd sub nom. Dunn v. Comm'r, Ala. Dep't of Corr.*****, 179 F.4th 1277, 1314 (11th Cir. 2026). The second is the Monitoring Opinion, which establishes that ADOC operations need to be monitored to ensure compliance with the court's remedial orders.** ***See Braggs v. Dunn (Monitoring Opinion)*****, 483 F. Supp. 3d 1136, 1140 (2020) (Thompson, J.),** ***aff'd sub nom. Dunn*****, 179 F.4th 1277. The third is the Omnibus Remedial Opinion and Order, which describes the comprehensive, system-wide remedial scheme.** ***See Braggs v. Dunn (Omnibus Remedial Opinion and Order)*****, 562 F. Supp. 3d 1178 (2021)**

(Thompson, J.), *aff'd in part and rev'd in part sub nom. Dunn*, 179 F.4th 1277. As the name indicates, the Omnibus Remedial Opinion and Order has two parts: an opinion and an order. The opinion portion contains, among other things, comprehensive findings about the factors that contribute to ADOC's systemically inadequate mental-health care. The order portion separates the relief ordered throughout the opinion into numbered provisions.

The Eleventh Circuit Court of Appeals affirmed the entirety of the Liability Opinion and the Monitoring Opinion. It also affirmed the Omnibus Remedial Order, except for three limited aspects. First, it found "the district court's mandate that [A]DOC suicide-proof all stabilization units, restricted housing units, and suicide watch cells according to the Hayes

Checklist ... goes too far." *Dunn*, 179 F.4th at 1316.[2] Second, it "set aside" certain remedial provisions as applied to the Julia Tutwiler Prison for Women. *Id.* at 1320. Third, it found that the staffing requirement to "fill all mandatory and essential [correctional staffing] posts" by July 1, 2025, "exceeds the requirements of the PLRA." *Id.* at 1316. The circuit declined to stay any provisions of the Omnibus Remedial Order while the appeal was pending, so the court's order remained in effect for the past approximately four and a half years. *See* District Court Copy of Circuit Order Denying Stay (Doc. 3537) at 2. Upon issuing its decision, the Eleventh Circuit ordered this court to "modify the injunctive relief consistent with [its] opinion." *Dunn*,

---

2. This court had previously acknowledged that it "need[ed] to revisit the provisions that it entered requiring RHU cells to comply with the Hayes checklist within six months." *Braggs v. Hamm*, No. 2:14cv601-MHT 2022 WL 466998, at *12 (M.D. Ala. Feb. 14, 2022) (Thompson, J.).

179 F.4th at 1323. In a separate order, the court will clarify which provisions of the remedial order have been affected by the Eleventh Circuit's ruling.[3]

Although it has been eight years since this court found ADOC liable for failing to provide constitutionally adequate mental-health care, almost six years since it authorized monitoring, and more than four years since it completed the remedial scheme, this case is still far from over.

This is not to say that no progress has been made in the interim. After issuing the Liability Opinion, the court initially determined remedies on an issue-by-issue basis. This approach allowed the court to act swiftly when presented with pressing violations but led to a confusing array of individual stipulations and orders. Therefore, recognizing the need for a holistic remedy,

---

3. How the court will modify the affected provisions in light of the Eleventh Circuit's ruling is an issue reserved for another day.

the court engaged in a multi-year effort to combine all the existing stipulations and orders into a single comprehensive order supported by detailed findings, published in the Omnibus Remedial Opinion and Order. Since the issuance of the Omnibus Remedial Opinion and Order, the parties and the court have selected the members of the team that will monitor the relief, and that team, in turn, has been preparing for monitoring in what it calls a pre-monitoring phase. Notably, the COVID-19 pandemic caused significant disruptions to this case. Additionally, both sides filed appeals to the Eleventh Circuit, which the circuit court has now resolved. *See generally Dunn v. Comm'r, Ala. Dep't of Corr.*, 179 F.4th 1277 (11th Cir. 2026).

*But the key to closing this case is monitoring, and monitoring has still not begun.* Until monitoring begins in earnest, this case will continue to drag on with no end in sight. Today's opinion resolving the parties' objections to the monitoring plan is a vital step toward

getting monitoring up and running. Once the court resolves the parties' objections, monitoring is one step closer to finally beginning, and this litigation will be one step closer to coming to an end.

### A. The Monitoring Opinion

Before delving into the parties' objections, the court will provide some background on the monitoring scheme. The Monitoring Opinion lays out the framework for how monitoring will happen. There are three key features of the opinion.

First, monitoring is divided into three phases. During phase one, an external monitoring team composed of outside experts, also known as the EMT, "will assess and monitor ADOC's compliance with the court's remedial orders"; second, the EMT "will train the ADOC" on "how to monitor itself" by working with an internal monitoring team (IMT) composed of ADOC employees; and, finally, "ADOC, through its IMT, will monitor itself." *Monitoring Opinion*, 483 F. Supp. 3d at 1141. ADOC acknowledged it

"lack[ed] the capacity to self-monitor." *Id.* at 1140. But rather than order only external monitoring, the court chose to start with external monitoring and then transition to an internal monitoring team in the hope that this approach would "facilitate a more effective, less intrusive process," "avoid an indeterminate period of external monitoring," and "help ADOC develop internal buy-in" for implementing the vital changes identified throughout the monitoring plan. *Id.* at 1141. External monitoring will necessarily be intrusive to start. But the initial intrusion will build a foundation for internal monitoring, and result in a less intrusive process overall. *See id.* at 1165-66.

The second key aspect of the Monitoring Opinion is that it describes a framework, not a detailed plan, for what monitoring will look like. The court delegated detailed plan development to the members of the EMT because, as the experts, they are best situated to "determine many of the details of how to carry out

monitoring." *Id.* at 1148. This was done at the parties' behest; they agreed that the EMT members should be able to "draw on their expertise" to develop the plan details. *Id.* at 1140. As the defendants have previously stated, the EMT "'must drive the process of filling in the open components' of the plan." *Id.* at 1149 (quoting Defs.' Response (Doc. 2295) at 14). Accordingly, the opinion gives significant deference to the EMT on what monitoring should look like.

Third, the opinion contains findings made under the Prison Litigation Reform Act (PLRA). Although arguably not necessary, the court made particularized findings that the monitoring plan meets the PLRA's need-narrowness-intrusiveness requirements.[4] *See id.* at

---

4. The PLRA dictates that district courts "shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). This provision is colloquially known

1168. These findings were both global and specific, meaning they applied to each individual aspect of the monitoring plan and to the monitoring scheme as a whole. *See id.* at 1173 ("[E]ach of the above monitoring provisions satisfies the need-narrowness-intrusiveness requirement--both individually and in concert ...."). The Eleventh Circuit recently affirmed that the

---

as 'the need-narrowness-intrusiveness requirement,' and findings made under its ambit are often shorthanded to 'PLRA findings.' While the court previously noted that it is "unclear whether external monitoring qualifies as prospective relief and therefore is subject to the need-narrowness-intrusiveness requirement," it opted not to resolve that question in the Monitoring Opinion and instead made "extensive need-narrowness-intrusiveness findings on monitoring in case such findings should be later viewed as necessary." *Braggs v. Hamm (Interim Order on Seven Monitoring Issues)*, No. 2:14cv601-MHT, 2024 WL 866532, at *3 (M.D. Ala. Feb. 29, 2024) (Thompson, J.) (citing Monitoring Opinion, 483 F. Supp. 3d at 1168). On appeal, the Eleventh Circuit Court of Appeals affirmed the monitoring plan without deciding the issue. *See Dunn*, 179 F.4th at 1321 ("Because we affirm the Monitoring Order even if assuming the court was obligated to make PLRA findings, we assume without deciding that it constitutes prospective relief to which the PLRA applies.").

monitoring scheme comports with the PLRA. *See Dunn*, 179 F.4th at 1322.

Moreover, a critical aspect of this monitoring scheme is that it includes duties beyond those that would be assigned to a typical monitor. The scope of external monitoring in this case includes the equally vital functions of oversight and teaching. *See* Monitoring Opinion, 483 F. Supp. 3d at 1160 ("In broad strokes, the parties agree that teaching should be a big part of the monitoring scheme."). In its oversight role, the EMT must obtain the information necessary for the court to assess whether ADOC has made sufficient progress in curing the long-standing constitutional defects at the heart of this litigation. And in its role as teacher, the EMT must "ensure that the IMT not only receives the necessary training, but also that it is capable of executing the work of monitoring in accordance with that training." *Id.* at 1161.

In the six years since the Monitoring Opinion was issued, the parties assembled the members of the EMT and worked with them to fill in the details of the monitoring plan during a pre-monitoring phase. Those details are called performance measures and audit tools, and they are the subject of this opinion.

### B. Performance Measures & Audit Tools

The EMT has crafted performance measures and audit tools corresponding to each numbered provision of the Omnibus Remedial Order. Performance measures are the "metrics" the monitoring team will use "to evaluate whether the defendants are complying with the court's remedial orders." *Monitoring Opinion*, 483 F. Supp. 3d*.* at 1148. Audit tools are "the method or procedure by which the EMT members [will] assess compliance with the performance measures." *Id.* at 1152. In other words, "the performance measures are 'what' the EMT is measuring, while the audit tools are 'how' the EMT assesses the measures." *Braggs v. Hamm (Interim Order*

*on Dispute Resolution)*, No. 2:14cv601-MHT, 2023 WL 5984279, at *1 (M.D. Ala. Sept. 14, 2023) (Thompson, J.). When the IMT eventually takes over from the EMT, it should be able to use the same measures and tools.

The EMT divided each performance measure into six parts: (1) the relevant remedial order provision number; (2) the text of the relevant remedial order provision; (3) the names of the EMT members responsible for the performance measure; (4) a description of the obligations of ADOC and the EMT ("the description"); (5) a compliance expectation benchmark, which usually lists a percentage representing how often the monitoring team expects ADOC to comply with the court's orders; and (6) an indication of how many patient charts the EMT will review in connection with the performance measure (if any).

The following is an example of a performance measure:

| # | REMEDIAL ORDER #2 | ASSIGNED EMT MEMBER | DESCRIPTION | COMPLIANCE EXPECTATIONS (BENCHMARK) | NUMBER OF CHARTS NEEDED |
|---|---|---|---|---|---|
| **3.1.** | **Exceptional Circumstances** | | | | |
| 3.1.1 | Inmates with serious mental illnesses may not be placed in the RHUs unless a documented exceptional circumstance applies. | Raemisch (L)<br>Reeves (S)<br>Rea (S) | 1. ADOC will provide documentation via existing policies, memos, or any other documentation that show that staff is aware of this remedial order.<br>2. ADOC will continue providing an Exceptional Circumstances report to the EMT who will review this monthly.<br>3. On a quarterly basis, the EMT will randomly select ten RTU inmates charts and will evaluate if the inmates situation establishes exceptional circumstances, and whether circumstances are reasonable. The EMT will tour the RTU and interview these same inmates to corroborate the information found in the charts. | 90% compliance is required. | The EMT will, on a quarterly basis from each facility with a RHU, randomly select 10 charts (if there are that many) of inmates from a list of inmates in the RHU with serious mental illness. |

Measure 3.1.1, Finalized Proposed Performance Measures (Doc. 4291-1) at 9.

The description is the meat of the performance measure. It lays out what both ADOC and the monitoring team should do (for example, provide documentation, observe clinical interactions, review patient charts) to assess whether ADOC is complying with the Omnibus

Remedial Order. Most performance measure descriptions contain multiple numbered parts.

For most performance measures, the EMT developed corresponding audit tools. Audit tools have five parts: (1) the relevant remedial order provision, copied over from the accompanying performance measure; (2) the description, also copied verbatim from the performance measure; (3) a list of questions related to the description; (4) space to mark answers to the questions and make notes; and (5) numbers for scoring compliance. Below is the audit tool that corresponds to the performance measure shown above:

FACILITY AUDIT TOOL (PATIENT INTERVIEWS) - ADOC
3. RESTRICTIVE HOUSING

Sample Inmate (10)

| | |
|---|---|
| Date of Review: | |
| Reviewer's Name and Credentials: | |
| Facility: | |
| Other: | |

| REMEDIAL ORDER | PERFORMANCE MEASURE | INMATE QUESTIONS | Yes | No | NA | Observation | Yes 1 - 10 | No 1 - 10 | NA 1 - 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **3.1.1** Inmates with serious mental illnesses may not be placed in the RHUs unless a documented exceptional circumstance applied. | On a quarterly basis, the EMT will randomly select ten RTU inmates charts and will evaluate if the inmates situation establishes exceptional circumstances, and whether circumstances are reasonable.The EMT will tour the RTU and interview 3 of these same inmates to corroborate the information found in the charts. | Were you assessed by a Psychiatrist or Psychologist prior to placement in the RTU? (Note: Obtain information from chart if patient can't answer.) | | | | | 9 | 9 | 9 | 27 |
| | | Has anyone spoken to you about a plan to transition you out of RTU? | | | | | 9 | 9 | 9 | 27 |
| | | | | | | | 9 | 9 | 9 | 27 |
| | | | | | | | 9 | 9 | 9 | 27 |

Tool 3.1.1, Finalized Proposed Audit Tools (Doc. 4291-2) at 45.

Just like the description is the meat of the performance measure, the questions are the meat of the audit tool. They provide the monitoring team with guidance on what to look for.

Using the examples above, a reader can see how these pieces function together. Performance measure 3.1.1 deals with ADOC's use of restrictive housing units (RHUs). Restrictive housing (better known as segregation or solitary confinement) "generally refers to the correctional practice of keeping a prisoner in a cell for 22.5 hours or more a day, usually in a single-person cell, only letting the prisoner out for brief 'yard' time and showers." *Liability Opinion*, 257 F. Supp. 3d at 1235. The court forbade ADOC from placing inmates with serious mental illnesses in RHUs "unless a documented exceptional circumstance applies." Measure 3.1.1, Finalized Proposed Performance Measures (Doc. 4291-1) at 9. The description calls for ADOC to submit documentation showing that staff have been educated on

the policy and a weekly report showing which inmates with serious mental illnesses are in the RHU under exceptional circumstances. It also calls for the monitoring team to review patient charts and speak with inmates to corroborate the exceptional circumstances reports. The audit tool then provides additional guidance related to the last part of the performance measure description about interviewing inmates. The tool lists sample questions the monitoring team should ask, such as whether anyone has spoken to the inmate about a plan to transition out of the RHU. *See* Tool 3.1.1, Finalized Proposed Audit Tools (Doc. 4291-2) at 45. While the questions in audit tool 3.1.1 are designed to be posed to inmates during a facility audit, other audit tools list questions for the monitors to ask themselves while observing activities or reviewing documents.

Together, the performance measures and audit tools detail the methodology the EMT, and eventually the IMT, will use when 'grading' ADOC on its compliance with the

court's order, much like the 'rubric' an English professor might use when scoring student essays. Both the monitors and ADOC have access to this rubric so that ADOC knows what is expected of it and the monitors know how to conduct oversight. In total, there are 120 proposed performance measures and 78 proposed audit tools.

These performance measures and audit tools should not be viewed in isolation, but rather within the dynamic context for which they were developed. As such, the court construes each one as supplemental to and supportive of the others--individual tiles that together form the mosaic that is effective monitoring.

### C. Parties' Objections to the Performance Measures & Audit Tools

The parties were given the opportunity to object to the proposed performance measures and audit tools. *See Interim Order on Dispute Resolution*, 2023 WL 5984279, at

*1. They also had the opportunity to resolve those objections before asking for input from the court. *Id.*

First, the EMT created a draft set of measures and tools. The parties then provided feedback to the EMT, and the EMT made revisions. After the EMT completed its revisions, the parties reviewed the revised draft measures and tools and submitted formal questions to the EMT. The EMT responded to those questions in writing, and then the parties finalized their objections and submitted them to the court. Throughout this entire back-and-forth process, the parties and the EMT engaged in mediation. This court remained largely uninvolved in this initial objection-resolution process, apart from issuing two interim opinions: one providing guidance on how disputes about the measures and tools would be resolved, and the other addressing, at the parties' request, seven issues related to monitoring. *See Interim Order on Dispute Resolution*, 2023 WL 5984279 (providing guidance on dispute resolution); *Braggs v. Hamm (Interim*

*Order on Seven Monitoring Issues)*, No. 2:14cv601-MHT, 2024 WL 866532 (M.D. Ala. Feb. 29, 2024) (Thompson, J.) (addressing seven issues related to monitoring).

The parties submitted a first set of finalized objections in January 2025, then a revised version following additional mediation in June 2025. The objections are now ripe for resolution.

Even after party input, mediation, several rounds of revision, and interim guidance from the court, there are still more than 200 objections. Seven objections are from the plaintiffs. The rest are from the defendants.[5] Many of the defendants' objections are repeated across multiple performance measures. Many also concern issues the court has addressed previously. Today's opinion will

---

5. The Appendix attached to this opinion contains a comprehensive list of each type of objection that the defendants made, an example of what each objection looks like, and the list of each objection and its corresponding performance measure(s). The Appendix is a helpful tool for cross-referencing the rulings in this opinion with the individual objections.

not re-litigate settled issues. At this phase, the court "anticipate[d] that the objections (if any) w[ould] target whether a performance measure or audit tool exceeds the bounds of monitoring compliance with the remedial order[] and the Monitoring Opinion." *Interim Order on Seven Monitoring Issues*, 2024 WL 866532 at *8. In other words, the court expected that most, if not all, objections would deal with whether the measures exceed the scope of the remedial order, what the court will call the 'scope' issues. However, most of the parties' objections are not about scope, but rather about what the court will call 'non-scope' issues, such as that the measures are allegedly vague or overly burdensome. Both types of issues are addressed today.

This opinion proceeds in three parts. First, it will dispose of the defendants' objections that have already been addressed. Second, it will address the defendants'

objections that raise new issues. Third, it will resolve the plaintiffs' seven objections.[6]

Where the record and the evidence provide guidance, the court has endeavored to issue a clear ruling. But some of the objections raise hypothetical disputes that are best suited for real world resolutions rather than for parsing words on a page. This is animated by two underlying principles: the importance of empowering the monitoring team as experts and the goal of reaching realistic resolutions to concrete problems.

The parties long ago agreed that "the monitoring scheme should empower the EMT members, who are the experts here, to determine many of the details of how to carry out monitoring." *Monitoring Opinion*, 483 F. Supp.

6. Two additional issues related to monitoring are also before the court: when training of the IMT will begin, and whether the EMT's request for additional funds and support staff exceeds the limits of their authority under the Monitoring Opinion. The court will address these issues in a future opinion.

3d at 1148. Having the court weigh in on the minutiae of monitoring before the EMT has even gone for a test drive does not empower the EMT.

For disputes that boil down to 'what ifs' about situations that *could* occur after monitoring begins, the court will sometimes turn the question back on the parties for realistic resolution. They should work together to find a solution *once a concrete problem arises*. This is not unlike a discovery dispute. As with many discovery disputes, the court notes that these types of disagreements tend to work themselves out in practice.

This is not to say that the court will not review or assess the measures in determining both the scope and non-scope issues. Rather, the court has decided, as a part of this review and assessment process, to make the EMT's enforcement of its measures and tools conditional for a period of two quarters, after which, the court will then revisit the monitoring plan to resolve any remaining scope and non-scope issues. As explained later in more

detail in this opinion when certain objections are discussed, there are a few measures and tools that need to be subject to real world, practical application before final resolution can be made. During this two-quarter period, the court will not hold against the defendants any misunderstandings of their obligations based on good-faith beliefs.

The court understands that the mediator in this litigation, Magistrate Judge John Ott, already meets almost weekly with the attorneys for the parties to attempt to resolve disputes so that they do not have to come to the court. Judge Ott has agreed, as part of this existing mediation process and during the two quarters of conditional implementation, to help the parties, with input from the EMT as needed, work though the few sticky scope and non-scope issues identified in this opinion as well as any other sticky issues that may arise as a result of implementation of the measures and tools in general.

Similarly, this real world context will be the basis for the approach the court will use when it later assesses the reports from the EMT and ADOC's compliance with the court's remedial order. The court will not itself engage in, nor should the parties engage in, a game of "gotcha." This is not a game at all. Instead, the court's guiding purpose in this opinion is to pave the way for monitoring to finally begin, albeit with an effort to iron out the kinks as they develop. The sooner the EMT begins monitoring, the sooner it can begin training the internal monitoring team, the sooner ADOC can begin self-monitoring to ensure plaintiffs receive constitutionally adequate mental-health care, and the sooner this court can bring federal oversight of Alabama's prisons to an end. Any speedbumps that arise along the way shall be worked out within their appropriate context, with appropriate deference to the experts: the EMT. The court expects good-faith collaboration between ADOC and the EMT in achieving

constitutionally adequate mental-health care for those incarcerated in ADOC.

## II. DEFENDANTS' OBJECTIONS TO PREVIOUSLY ADDRESSED ISSUES

Many of the defendants' objections have already been addressed by the court in earlier opinions and orders. These objections fall into three categories: disputes over compliance benchmarks; concerns that monitoring will be overly burdensome; and objections to the EMT using inmate interviews as a source of information. At bottom, these are attempts to re-litigate the scope of the EMT's authority--an issue this court has twice made clear it will not revisit. *See, e.g.*, *Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1204–05 (declining to "re-evaluate" two issues relating to monitoring because doing so "would amount to re-litigation of an issue recently decided by the court after extensive adversarial proceedings and with particularized PLRA findings"); *see also Interim Order on Seven Monitoring Issues*, 2024 WL

866532, at *5 ("[T]he court has already rejected attempts by the parties to revisit the scope of the EMT's authority.").

A. Compliance Benchmarks

The defendants' most common objection is to the EMT's designated compliance benchmarks.[7] Alongside each performance measure, the EMT has included a compliance benchmark, or the success rate ADOC must achieve for the EMT to deem ADOC 'compliant' with the terms of that measure and the corresponding remedial order. In most cases, the EMT has said it expects ADOC to be 90 % compliant, though there is some variation. The defendants object, arguing that a compliance rate of more than 85 % violates the PLRA. They contend that the PLRA

---

7. In total, the defendants object to 94 of the 120 performance measures because the measures have a compliance benchmark greater than 85 %. For 15 performance measures, this is the defendants' only objection. To view a complete list of which performance measures this objection applies to, see Chart 1 of the Appendix.

authorizes monitoring only until “no ongoing constitutional violation remains,” which, they say, this court has said is when “substantial compliance” is achieved. Defs.’ Position Statement (Doc. 4374) at 7. By the defendants’ standards, substantial compliance tops out at an 85 % success rate. *See id.*

However, the question that needs to be resolved today is not the ultimate issue of what percentage (if any) equals ‘substantial compliance.’ The issue on the table is the narrower question of whether the EMT has the authority to offer a definition of substantial compliance and set compliance benchmarks accordingly. The court has written on this precise issue twice before: once in the Monitoring Opinion, and again more recently in an opinion and order addressing seven monitoring issues. Both times, the court emphasized that “the EMT will have the authority to define substantial compliance for each performance measure,” and found that doing so did not violate the PLRA. *Monitoring Opinion*, 483 F. Supp. 3d

at 1165–66; *see also Interim Order on Seven Monitoring Issues*, 2024 WL 866532, at *3 (quoting the same). The Eleventh Circuit recently declared that the Monitoring Opinion, which includes this ruling, does not violate the PLRA. *See Dunn*, 179 F.4th at 1321-22. In the more recent order, this court even explicitly addressed whether the EMT could define compliance at a rate higher than 85 %. It held that it could. *See Interim Order on Seven Monitoring Issues*, 2024 WL 866532, at *7. The EMT has "broad authority to 'create the performance measures' and 'define substantial compliance for each performance measure.'" *Id.* (citing *Monitoring Opinion*, 483 F. Supp. 3d at 1149, 1162).

Again, the issue today is not how to define substantial compliance. The issue is whether the EMT may offer a definition. The court has written previously: "[T]he EMT possesses *no binding* ability to determine compliance with any remedial order. Only the court can determine ultimate compliance under the remedial orders

and the strictures of the PLRA." *Id.* Thus, any EMT-defined compliance expectation--whether it is set at 85 %, 90 %, or higher--"does not bind the court in any way" and serves simply as "evidence, albeit 'crucial' evidence, that the court can use when it ultimately evaluates whether external monitoring or a remedial provision should be terminated."[8] *Id.*

---

8. On a more practical note, the meaning of 'substantial compliance' will likely differ depending upon the required remedial action. An 85 % compliance rate does not work for everything; some actions by their very nature may require a 100 % success rate. *See Interim Order on Seven Monitoring Issues*, 2024 WL 866532, at *7 ("[T]here *may* be circumstances where, as a practical matter, one is either in full compliance or not, that is, where, by the nature of the thing being assessed, there is no such thing as partial compliance."). An example this court has discussed before is illustrative: a requirement that a facility install a locked cabinet for storing medication could not be complied with just 85 % of the time because a medicine cabinet with a lock either exists or it does not. If it does not, the consequences could be deadly. Thus, substantial compliance would have to be 100 % compliance. Even if the court were to take up in this opinion what substantial compliance means, it could not set a uniform definition.

The scope of the EMT's authority to define substantial compliance and set compliance benchmarks is, therefore, well-settled. The defendants are either belatedly attempting to revise the scope of the EMT's authority or prematurely arguing over what the definition of substantial compliance should be. Either way, their objections are ill-timed. All objections to compliance benchmarks exceeding 85 % are therefore overruled.

The defendants also make three related, but slightly different, objections about compliance benchmarks and constitutional limits. They object to performance measures 2.1.4, 2.2.3, and 11.2.1 because they believe that those measures do not reflect constitutionally required standards. *See* Measures 2.1.4, 2.2.3, 11.2.1, Joint Modified Objections (Doc. 4373-1) at 2, 5, 36. Measure 11.2.1, for example, requires ADOC to "supply enough [inpatient] beds to accommodate 10 % of its mental

health caseload." *Id.* at 36.[9] The defendants argue that the inpatient-bed ratio does not represent "constitutional levels of care." *Id.* However, the 10 % requirement the defendants object to was set by the court, not the EMT. *See Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1346 (ordering ADOC to "initially supply enough [inpatient] beds to accommodate 10 % of its mental-health caseload" and to annually collaborate with the EMT thereafter to determine whether the ratio needs to be increased).[10] The requirement was supported by PLRA findings and upheld by the Eleventh

---

9. Measures 2.1.4 and 2.2.3 concern requirements for correctional and mental-health staffing levels, respectively.

10. Notably, when the court crafted this remedial order, it declined to impose an even higher percentage (15 %), despite being "seriously concerned that ADOC may in fact require more beds to correct the constitutional violations found in the court's 2017 liability opinion." *Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1347.

Circuit. *See id.* at 1348, *aff'd Dunn*, 179 F.4th at 1322. The EMT did not change the court's order in the performance measure.[11] The court's remedial order is not up for reconsideration.

Accordingly, the defendants' objections to compliance benchmarks and constitutional benchmarks are overruled.

B. Logistical Burden of Monitoring

The defendants object to many of the performance measures because, in their view, the measures are unduly burdensome. Broadly speaking, they argue that the EMT is exceeding its authority under the Monitoring Opinion by asking for too many documents from too many facilities. These objections take a few different forms,

---

11. Nor did the EMT change the remedial order for measures 2.1.4 and 2.2.3. Again, the defendants take issue with the order itself rather than the proposed method for monitoring the order. The proper avenue for this concern was an appeal. Measure 2.1.4 is before the court separately because of the defendants' appeal.

but, most commonly, the defendants contend that a given measure is "unduly burdensome and exceed[s] the minimum means necessary to determine compliance" because it "requires multiple sample sets where consolidation with samples of other performance measures is possible." *E.g.*, Measure 3.2.1, Joint Modified Objections (Doc. 4373-1) at 8. Sometimes, when the EMT has specified a number of 'charts'--meaning inmate charts--that it will review, the defendants additionally object that the performance measure is "unduly burdensome, individually and cumulatively," because it requires ADOC to produce a large number of charts each quarter. *Id.* These chart-production objections also typically include a request that the EMT limit its review to "no more than three facilities per quarter." *Id.* In essence, the defendants argue that, individually and cumulatively, the performance measures are too intrusive and burdensome.

The court sees two distinct concerns here: one legal and one practical. The legal concern--that the EMT has exceeded the scope of its authority by asking to review too many documents and facilities--has already been addressed. The Monitoring Opinion grants the EMT the authority "to decide both how many and which documents to review." *Monitoring Opinion*, 483 F. Supp. 3d at 1154. Indeed, at the time the opinion was issued, "[t]he parties appear[ed] to agree that the EMT may review an *unlimited number* of documents." *Id.* (emphasis added). The Monitoring Opinion also gave the monitoring team the authority "to decide how many and which facilities to evaluate on a quarterly basis." *Id.* at 1152. Also, the opinion explicitly rejected the defendants' request that the EMT evaluate no more than three facilities per quarter. *See id.* at 1152, 1156 (capping site visits to

no more than two per facility per year).[12] When the defendants have brought these issues up before, the court

---

12. The court has already explained at length why the EMT has broad authority to dictate document production and facility review. It has also made PLRA findings on the matter, which were affirmed on appeal.

For document productions, the defendants themselves requested that the court "leave much to be decided by the experts." *Monitoring Opinion*, 483 F. Supp. 3d at 1154. Initially, and ironically, the defendants were concerned that the EMT would not review *enough* documents. They worried that small sample sizes could be unrepresentative. *See id.* They therefore requested that the court set a *minimum* number of documents for the EMT to review. The court declined to do so and instead gave the EMT discretion to determine its needs. *See id.* The PLRA findings emphasized that the relief was narrow because it "was adopted in large part from the defendants' proposal and the parties' agreements and again gives discretion to the experts to determine what is necessary." *Id* at 1154-55.

For facility evaluations, the court explained that limiting review to just three facilities per quarter would result in "only 12 of the 14 major facilities [being] evaluated even once in a year." *Id.* at 1152. While review limits are "seemingly aimed to minimize intrusion," they could have the opposite effect because "arbitrarily limiting the number of facilities to be evaluated each quarter could slow ADOC's progress toward termination of the court's remedial orders and extend the duration of external monitoring." *Id.* (cleaned up). The

has stated that "[t]he appropriate point at which to raise concerns about the potential intrusiveness of monitoring was during the course of litigation that preceded [the Monitoring Opinion]." *Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1204-05.

However, the court takes seriously the defendants' practical concerns that monitoring will be immensely burdensome. The EMT has requested many documents (an average of about 2,400 per quarter). Regularly compiling such large numbers of documents could be a tax on ADOC's resources. But part of the reason why external monitoring is so initially intrusive is to help ADOC build the systems and capacity it will need for self-monitoring, which will be less intrusive in the long run. Moreover, the court does not wish to delay monitoring any further by encouraging ADOC and the EMT

---

PLRA findings again emphasized deference to the EMT over judicial micromanagement. *See id.*

to nickel and dime one another based on hypothetical assumptions about what specific documents are needed. Both sides will have a much better understanding of the issues after they get some experience with the day-to-day task of monitoring.

For the two-quarter period of conditional implementation of monitoring, ADOC may make document productions in accordance with any 'chart-sharing' and other document-sharing opportunities it identifies. In other words, it may use one set of documents produced for one performance measure to satisfy additional, relevant measures. In their objections, the defendants identified some opportunities for doing this. For example, in their objection to performance measure 3.1.2, the defendants note that "the EMT could use the same charts required for Section 3.1.1 to evaluate compliance with Section 3.1.2." Measure 3.1.2, Joint Modified Objections (Doc. 4373-1) at 7. The defendants identify a few

possible places where this could occur.[13] During the first two quarters of monitoring, the court encourages ADOC to act on these chart-sharing proposals, and to identify additional opportunities to reduce its production burden.

More specifically, when making productions incorporating its chart-sharing and document-sharing ideas, ADOC is to inform the EMT of which performance measures it believes can share documents. For each document or group of documents it believes satisfies multiple performance measures, ADOC shall clearly

13. In their brief, the defendants note that they themselves asked the EMT to do the legwork, but the EMT declined to do so. *See* State's Position Statement (Doc. 4374) at 5–6. However, nothing prevented ADOC itself from proactively suggesting more opportunities for chart-sharing to the EMT. Indeed, ADOC taking that initiative would have been more in line with the court's orders than asking the EMT to do the work. *See Interim Order on Dispute Resolution*, 2023 WL 5984279, at *3 ("*A critical concern is that the parties should assure that the resolution process places the least burden possible on the individual members of the EMT and their schedules.*").

identify which documents satisfy which measures. The court leaves it up to ADOC to decide how it will communicate this information to the EMT, but stresses that both must act in good faith. The EMT can then review that production to determine whether the chart-sharing suggestions work or whether supplemental information is needed. If the EMT needs additional information, it should request it in writing, while also identifying which chart-sharing options work and which ones do not. ADOC shall then provide the requested information. The EMT shall not use this mechanism to request documents or information beyond what is described in the current performance measures. Additionally, during the first two quarters of monitoring, the EMT shall not penalize ADOC for any perceived deficiencies in an initial production where ADOC is making suggestions for chart-sharing opportunities. However, if the EMT rejects a chart-sharing suggestion, and ADOC refuses to supplement

with what the performance measure calls for, then the EMT may take reasonable steps to bring ADOC into compliance.

Again, the court asks the parties to prioritize real world resolution of concrete problems. The court is confident that, with repetition, document production will become more streamlined and less arduous, especially as ADOC develops new documentation protocols, centralizes data, and comes into compliance with provisions of the remedial order and monitoring on those provisions ceases. The defendants' objections about the burden of monitoring are overruled at this time.[14]

Finally, the defendants make an additional objection to the EMT's proposed production deadline. Productions are to occur quarterly, and the EMT has requested that all documents be submitted by the fifth day of the month following the end of each quarter. *See, e.g.*, Measure

14. For a full list of objections that fall under this ruling, see Chart 2 of the Appendix.

13.2, Joint Modified Objections (Doc. 4373-1) at 39. The defendants say this is not enough time because, if any of the first five days of the month fall on a weekend, that would leave ADOC "only three business days to gather and produce" documents. State's Position Statement (Doc. 4374) at 5.

The court again shares the defendants' practical concerns. However, this is another issue to work out directly with the EMT should this hypothetical scenario arise in practice. The parties and the EMT should communicate and resolve this issue among themselves. As stated earlier, this is the reason that the court's approval today is conditional: the first two quarters of monitoring will be a trial phase where ADOC and the EMT can together iron out the kinks of the performance measures and identify areas where adjustment is needed.

C. Use of Inmate Interviews

The defendants object to four performance measures because the measures call for the monitoring team to

"determin[e] compliance based on inmate interviews."[15] Measure 7.1, Joint Modified Objections (Doc. 4373-1) at 17. Performance measure 7.1 provides a good example. The relevant remedial order provision requires that counseling sessions and other treatment activities "take place in settings that provide for confidentiality." *Id.* To assess compliance, the description dictates that, during site visits, the monitoring team will observe two patient encounters and "may also speak to inmates if observation is not available on the unit to inquire if their visits are confidential." *Id.* The defendants object because they are "concerned with the reliability of inmate interviews." *Id.*

The court has already spoken on this issue. The Monitoring Opinion emphasized that "interviewing inmates is [an] important way to detect patterns of compliance

---

15. For the complete list of which performance measures the defendants applied this objection to, see Chart 3 of the Appendix.

or noncompliance with remedial measures." *Monitoring Opinion*, 483 F. Supp. 3d at 1157. Indeed, giving the EMT access to inmates was one of the reasons that the court authorized site visits. *See id.* Moreover, the court itself has relied on information from inmates, including about the very issue of confidentiality. *See Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1210 (discussing the testimony of the plaintiffs' expert, who stated that he learned from speaking to several inmates that confidentiality was often destroyed by session interruptions or never existed because sessions were held cell-side). The court therefore declines to break new ground on what types of information may or may not be relied on in this case.

Relatedly, under performance measures 7.1.1 and 3.1.1, the defendants additionally argue that because "the EMT appears to exclude [inmate] interviews from 'Compliance Expectations,'" interviews are not necessary to determine compliance. Measures 7.1.1 & 3.1.1, Joint

Modified Objections (Doc. 4373-1) at 17, 7. The 'compliance expectation' for both measures simply notes that the EMT expects ADOC to be 90 % compliant with the corresponding remedial requirement. The remedial provisions for measures 7.1.1 and 3.1.1 require, respectively, providing confidential settings for treatment, and diverting inmates with serious mental illnesses away from RHUs absent documented exceptional circumstances. *See id* at 17,7. Just because the EMT did not use the phrase 'inmate interviews' in the compliance benchmark for these measures does not mean that interviews are irrelevant or unnecessary to assessing compliance. Rather, it should be self-evident that interviews are "another important way to detect patterns of compliance or noncompliance with remedial measures." *Monitoring Opinion*, 483 F. Supp. 3d at 1157. The objections are overruled.

## III. DEFENDANTS' OBJECTIONS TO NEW ISSUES

The defendants also object to several issues that have not been squarely resolved by the court before. They generally fall into three categories: objections that words or phrases are vague; objections that certain performance measures do not require independent monitoring because each one describes an exception to the preceding measure; and, finally, objections that certain performance measures are not supported by the remedial order--that is, that some aspect exceeds the scope of the EMT's authority under the Monitoring Opinion and the Omnibus Remedial Order, an aspect earlier identified in this opinion as a 'scope' issue. The court will address each of these in turn.

### A. Vagueness

The defendants object that many of the performance measures are vague. The majority of these objections are nearly identical and take issue with a single word repeated in 30 measures: 'sorted.' There are also 17

specific objections to words or phrases unique to one or a couple of measures.[16]

There is a common anxiety animating all the defendants' vagueness objections: that ADOC will misunderstand what the EMT wants, provide the wrong document or do the wrong thing, and the EMT will find ADOC noncompliant with the court's order for unintentional errors. For example, regarding the objection to the word 'sorted,' the EMT has instructed ADOC to "make available charts/documentation sorted to allow the EMT to conduct a valid and efficient review" and stated that "presentation of unsorted charts is unacceptable." *E.g.*, Measure 7.1.1, Joint Modified Objections (Doc. 4373-1) at 17. The defendants object that this is "vague in failing to provide clear benchmarks for compliance" because it "orders ADOC to

---

16. For a full list of the defendants' vagueness objections, see Chart 4 of the Appendix.

provide charts and documents 'sorted' without providing information or direction on what documents to sort or how the documents/charts should be sorted." *Id.* Another example: for performance measure 3.2.2, the defendants argue ADOC must "guess or speculate as to the meaning" of the phrase 'more intensive mental health interventions,' which makes compliance an unclear target. *Id* at 8. And for eleven performance measures,[17] the defendants object that the EMT was vague about what documentation to provide because it left it up to ADOC to determine what would appropriately show compliance.

The court understands the defendants' concerns and agrees they are entitled to fair notice of what is expected of them throughout the monitoring phases. The court further agrees that ADOC needs to know what the EMT

---

17. Specifically, the defendants object to performance measures 3.6.1, 8.3, 8.6.1–6.2, 10.1.3, 10.5.1–5.3, 10.7.2.2, and 12.1–2 for being vague about what documentation ADOC should provide.

means by 'sorted,' 'more intensive mental health interventions,' and the other phrases it found vague. Only with clarity will the defendants know when they have succeeded and when they have fallen short. But the solution is to ask the EMT for clarification. The same is true for the confusion about what counts as appropriate documentation. As discussed, ADOC should exercise reasonable judgment and produce documents it reasonably believes are responsive. If there is disagreement, then ADOC and the EMT should work on resolving that disagreement in good faith.

As monitoring progresses, similar issues about terminology and appropriate documentation will likely arise. But the measures are not meant to be set in stone. Rather than get bogged down litigating what strict compliance with the technical language of each measure must look like before any monitoring has even begun, the court instead elects to conditionally approve the performance measures for two quarters of implementation

with the understanding--indeed, the expectation--that they will likely evolve in response to real-time feedback and learning as monitoring gets under way. Only in their appropriate context can many of these issues be resolved; in fact, many may prove far more easily resolved than anticipated.

For this reason, the court gave substantial deference to the EMT "to develop and change performance measures as needed, 'as long as they're reflective of the remedial orders.'" *Interim Order on Seven Monitoring Issues*, 2024 WL 866532, at *2 (quoting *Monitoring Opinion*, 483 F. Supp. 3d at 1149). As these types of issues about terminology and confusion over meaning arise, ADOC and the EMT should communicate with one another about what is expected. The process should be iterative, meaning it should take a cyclical, trial-and-error approach centered around continuous learning and improvement. This means the parties should not wait for the end of an entire remedial phase to go back to the drawing board if

they find that a particular tool or directive is obviously failing to achieve its intended result.

Given the significant interest ADOC has in ensuring effective monitoring, the court encourages ADOC to take initiative and propose solutions to the EMT in real time where relevant. If a terminology concern persists after internal communication, the parties can, as suggested earlier in this opinion, then consult Judge Ott in mediation.

Finally, the court notes that these concerns about future findings of noncompliance based on possible document disputes are entirely hypothetical. Extended litigation over supposed situations that have not yet happened (and may never happen) is premature and just causes further delay. If such an issue ever does arise, then the defendants--after attempting to resolve the issue directly with the EMT--can bring it to the court's attention with a fully developed record upon which the court can make an informed decision.

Indeed, this is the precise rationale behind the court's conditional approval of implementation of the performance measures for the first two quarters of monitoring. Until the first two quarters of good-faith monitoring have elapsed and the court undertakes its initial review, the defendants are to refrain from further formal disputes over hypothetical issues. Instead, the defendants should focus on cooperating with the EMT to find workable solutions to issues that play out in real time, when they in fact play out.

B. Exceptions to Monitoring

The court moves now to the second group of the defendants' new objections: objections that some performance measures describe an exception to the preceding performance measure and therefore do not require independent assessment. There are four such objections.

Performance measures 3.5.1 and 3.5.1.1 provide a good example of the dynamic the defendants object to. All the

measures contained in Section 3.5 concern the court's order to provide out-of-cell time to inmates in restrictive housing. Remedial order provision 3.5.1 states: "All inmates in RHUs must have the opportunity to exercise outside of their cells for at least five hours per week, subject to the following exception." Measure 3.5.1, Joint Modified Objections (Doc. 4373-1) at 11. The "following exception" referenced is outlined in the following performance measure, 3.5.1.1: "ADOC may refrain from offering out-of-cell time due to inclement weather, but only if a safe, alternative space for inmates to exercise--such as a gymnasium--is unavailable." Measure 3.5.1.1, Joint Modified Objections (Doc. 4373-1) at 11.

The defendants object to measure 3.5.1.1. They argue that, because 3.5.1.1 describes an exception to 3.5.1, it does not require independent assessment. *See id.*

The defendants are wrong. The exception should be monitored to ensure it is used correctly. This is

especially true for a vital issue like out-of-cell time in restrictive housing. Adequate out-of-cell time is essential to preventing decompensation. *See Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1282. In fact, it is "so important to preventing decompensation" that, when crafting the remedial order, the court specifically said that "inclement weather will not excuse" ADOC from offering out-of-cell time when there is indoor space available. *Id.* at 1283. The court took time and care not just to define the weather exception, but also to restrict its use to prevent ADOC from circumventing the court's intent. The exception is just as much a part of the court's remedial order as the general rule. It should be monitored.

The same reasoning applies to the defendants' objections to performance measures 3.1.1.1, 9.1.2.1, and

10.3.1.1.[18] Each of those performance measures seeks to assess compliance with an exception or a definition that is part of the Omnibus Remedial Order. To the extent that the defendants are worried that these measures will require cumulative document production, the court's ruling in Section II.B should resolve this concern. Under that ruling, ADOC may be able to use the same documents to satisfy both a general rule and an exception, subject to the EMT's approval.

### C. Scope of Remedial Order

The court now turns, at last, to the type of objection it anticipated receiving--objections related to whether a performance measure accurately reflects the scope of the EMT's authority under the Omnibus Remedial Order, that is, scope issues.

---

18. The court notes that measure 10.3.1.1 is affected by the Eleventh Circuit opinion and will be addressed separately.

Previously, this court addressed the question of whether "the EMT possess[es] the authority to create performance measures for items not explicitly required by the court's remedial orders." *Interim Order on Seven Monitoring Issues*, 2024 WL 866532, at *7 (emphasis added). The court answered that: "The court is hesitant to answer this question in a vacuum. In broad terms, the EMT's authority to monitor ADOC's compliance with the court's remedial orders is derivative of the remedial orders. The EMT cannot 'monitor' something that has *no relationship* to monitoring compliance with the court's remedial orders. The EMT's authority to create performance measures and audit tools extends only so far as needed to evaluate ADOC's progress and compliance 'with regard to the remedies ordered in this case.' That said, the remedial orders provide for many items of many different types. Some orders are very precise while some are more general. Whether a performance measure or audit tool is within the scope of monitoring a certain remedial

order is *context dependent*. However, the court reiterates that EMT's authority to create measures and tools is limited to evaluating, assessing, and monitoring compliance with the court's remedial orders." *Id.* (emphasis added) (citing *Monitoring Opinion*, 483 F. Supp. 3d at 1149). In some instances, the measure may need to be explicitly required by the remedial requirement, and in others, the measure may only need to be related. It all depends on the nature of the requirement (including whether it is more specific or general, and how it might relate to other requirements), the wording of the measure and how it might relate to other measures, and the overall context. If the performance measure or audit tool at issue "is limited to evaluating, assessing, and monitoring compliance with the court's remedial orders," then it is within the scope of those orders. *Id.* Conversely, "any measures or tools that are outside the scope of the remedial orders (that is, measures and tools that are *not* targeted at evaluating, assessing, and

monitoring compliance with the remedial orders) are not permitted by the Monitoring Opinion and are therefore not supported by the court's previous PLRA findings."[19] *Id.* Finally, as stated previously, these scope issues should be resolved, where warranted, in the real world, practical context.

### 1. Performance Measure 2.1.1: Correctional Staffing Unit

The remedial order provision for performance measure 2.1.1 requires ADOC to create "an agency staffing unit that will 'write policy, enforce the staffing decisions mandated by the court's order, and take steps so that another staffing analysis can be conducted for every

---

19. The court considered holding an evidentiary hearing as part of the process to resolve these objections. However, because of the approach the court has taken--resting not only on "interpretation of the language of the remedial orders," but also considering the full context and treating the resolution as conditional--the court finds that an evidentiary hearing is unnecessary at this time. *Interim Order on Seven Monitoring Issues*, 2024 WL 866532, at *8.

facility.'" Measure 2.1.1, Joint Modified Objections (Doc. 4373-1) at 2 (quoting Doc. 1813-1 at 100). Part two of the description references the Savage Report (an expert report produced by correctional staffing experts Megan and Russ Savage) and calls for ADOC to "submit documentation to EMT on the progress made in reaching the recommendations of the Savage report." *Id.* The defendants argue that this request exceeds the scope of the remedial order because "2.1.1 does not require reaching the recommendations of the Savages staffing analysis." *Id.* In their view, the court's remedial order merely requires ADOC to produce a staffing analysis, but not necessarily to comply with all the Savages' recommendations.

The Eleventh Circuit ordered this court to revise its order to fill all "mandatory and essential" correctional staffing posts. 'Mandatory' and 'essential' are technical terms that the Savages used in their

report. The court reserves resolving this issue at this time.

### 2. Performance Measure 2.2.3: Mental-Health Staffing Deadline

The remedial order provision for performance measure 2.2.3 requires ADOC to "achieve the [mental-health] staffing levels set forth in the staffing matrix." Measure 2.2.3, Joint Modified Objections (Doc. 4373-1) at 5. The description calls for ADOC to provide quarterly documentation that conveys the "status of their plan to achieve staffing levels set forth in the staffing matrix ... complete with timelines and milestones achieved" and that includes "reports on ongoing progress of all staffing levels required." *Id.* The defendants argue this exceeds the scope of the remedial order because the order "contains no requirements that ADOC submit documentation 'on the status of their plan to achieve staffing levels set forth in the staffing matrix'

or 'reports on ongoing progress of all staffing levels required.'" *Id.*

The defendants' objection is overruled for two reasons. First, contrary to the defendants' contention, the Omnibus Remedial Order *does* call for periodic progress reports on mental-health staffing. The court ordered ADOC to "work with the EMT to develop report formats for mental-health staffing, and to submit reports ... on at least a quarterly basis." *Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1268. It found that such reports are necessary "so that the court and the EMT can effectively monitor [ADOC's] progress." *Id.* at 1269. Second, even putting aside the fact the court ordered ADOC to produce progress reports, the EMT is still within its discretion to ask for reports in the absence of a specific requirement from the court. The EMT has discretion to develop performance measures targeted at "evaluating, assessing, and monitoring compliance" with the court's remedial orders. *Interim*

*Order on Seven Monitoring Issues*, 2024 WL 866532, at *7. A request for progress reports is targeted at "evaluating, assessing, and monitoring compliance" with the mental-health staffing provision. *Id.* Performance measure 2.2.3, therefore, does not exceed the scope of the EMT's authority, and the defendants' objection is overruled.

### 3. Performance Measure 2.2.4: Mental-Health Staffing Reports

The defendants make an additional objection to mental-health staffing progress reports in performance measure 2.2.4. The remedial order provision for this measure requires ADOC to "submit mental health staffing reports to the court and the EMT on at least a quarterly basis" and says ADOC "may work" with the EMT to develop the format of these reports. Measure 2.2.4, Joint Modified Objections (Doc. 4373-1) at 6. The description says, "ADOC will ... work with the EMT to determine if the existing reporting format is adequate," and if not

**adequate, sets a 30-day deadline to create a new format. *Id.***

**The defendants argue that this performance measure exceeds the scope of the remedial order for two reasons. First, they contend the EMT overstepped its authority because the remedial order uses permissive language (ADOC "may work with the EMT"), while the measure description uses mandatory language ("ADOC will ... work with the EMT"). *Id.* Second, they object to the 30-day timeline. They contend that both are "requirements that appears [sic] nowhere in the Remedial Order." *Id.***

**Turning first to whether ADOC <u>must</u> cooperate with the EMT on report formatting: the defendants are correct that the EMT cannot compel ADOC to cooperate. Although the Omnibus Remedial Opinion and Order uses conflicting language in different places--the body of the opinion says "the court *will* order ADOC to work with the EMT" whereas the order says ADOC "*may* work with the EMT"--the order ultimately controls. *Compare Omnibus Remedial***

*Opinion and Order*, 562 F. Supp. 3d at 1268 (emphasis added), *with id.* at 1368 (emphasis added). Thus, while the defendants are correct that the EMT cannot *force* ADOC to collaborate in developing a new report format, the court used the word "may" because it assumed that the ADOC would want to be involved in the formatting, and the court wanted to make explicit that ADOC had such a 'right.' The court read the measure as simply acknowledging that right. However, while the ADOC may decline to exercise that right, the court is baffled as to why it would want to do so. The court reminds the defendants of the EMT's twin goals of oversight and teaching, and being involved in the development of reports would appear to be important to the latter.

The defendants' second objection is to the 30-day deadline to develop a new report format. The defendants are correct that the remedial order does not contain a deadline. In fact, the remedial order seems to contemplate that revising the report format may take

longer than a single month. *See id.* at 1368 (ordering ADOC to continue filing mental-health staffing reports every quarter, that is, every third month, "until ADOC and the EMT have finalized a new report format"). However, just because the remedial order does not mention a 30-day deadline does not mean the EMT automatically exceeded the scope of its authority here. Setting a deadline is a necessary part of the EMT's evaluation capabilities. Nevertheless, the court appreciates that the defendants may be concerned about missing a quick deadline. Therefore, the court will, with the above clarification, leave the wording of the performance measure unchanged but expects the EMT to work diligently with the parties on creating a new report format, if needed. The EMT shall not hold *reasonable* delays in finalizing the format against ADOC so long as ADOC is acting in good faith and taking demonstrable steps to implement revisions. With the above understanding, the defendants' objections are overruled.

### 4. Performance Measure 3.1.1: RHU Exceptional Circumstances

The remedial order provision for performance measure 3.1.1 forbids ADOC from placing or keeping inmates with serious mental illnesses in RHUs "unless a documented exceptional circumstance" permits placement in segregation. Measure 3.1.1, Joint Modified Objections (Doc. 4373-1) at 7. There are two categories of exceptional circumstances. The first category is a "safety and security issue" that prevents placement of the inmate in alternative housing. *See Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1368. Examples of safety and security issues include putting two enemies in the same housing unit, or the inmate behaving dangerously. *See id.* at 1368-69. The second category is a "non-safety or non-security issue" combined with the unavailability of transfer or transportation alternative housing. *See id.* Both categories thus require not only the occurrence of the particular kind of issue, but also

the unavailability of meaningful alternatives to segregation.

The measure description calls for the EMT to review a sample of patient charts and "evaluate if the inmate['']s situation establishes exceptional circumstances, and whether circumstances are reasonable." Measure 3.1.1, Joint Modified Objections (Doc. 4373-1) at 7. The defendants object to the phrase "whether circumstances are reasonable." They acknowledge that the EMT may evaluate "whether a particular inmate's situation establishes exceptional circumstances." *Id.* However, they argue it may not "make a separate determination about 'whether circumstances are reasonable.'" *Id.* And, more generally, they argue that the remedial order does not authorize the EMT to make a determination about reasonableness. *See id.*

In the Omnibus Remedial Opinion and Order, the court noted that ADOC often "keeps inmates with serious mental illnesses in segregation under any circumstances it sees

fit." *Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1269. The court therefore sought to define what circumstances permit ADOC to keep mentally ill inmates in segregation. *See id.* It ultimately adopted the defendants' definition and ordered ADOC to document each application of exceptional circumstances so their use could be evaluated. *See id.* at 1269-71.

Likewise, the court has spoken, in general, to the proper scope of the EMT's authority when performing these evaluations. The need for monitors to assess whether ADOC's "security-related judgments are *reasonable*" in applying its own definition of exceptional circumstances is the very reason the court heeded the recommendation of correctional expert Eldon Vail and appointed a correctional administration expert to the EMT. *See Monitoring Opinion*, 483 F. Supp. 3d at 1144 (citing Vail Nov. 29, 2018, Trial Tr. (Doc. 2340) at 23) ("The judgments of correctional staff regarding whether circumstances are 'extenuating' cannot be fully evaluated

by mental-health experts on the EMT, for they may lack expertise in correctional management and would be unable to ascertain whether such security-related judgments are *reasonable*.") (emphasis added). The court explained that adding "[a] correctional administration expert" was "necessary" so that the EMT could properly "evaluate, for example, whether 'extenuating circumstances' exist to require the placement of an inmate with a serious mental illness (SMI) in segregation." *Monitoring Opinion*, 483 F. Supp. 3d at 1144. The corrections expert "would be able to ask staff: 'What is exceptional about this situation, and were there other ways that you could handle it? And by the way, here's a way that you might have been able to handle it. Would that have worked?'" *Id.* at 1144-45. This back-and-forth clearly falls within the scope of the monitoring team's' authority and *is itself a process for determining the reasonableness* of someone's placement in segregation.

For this reason, the court finds it difficult to conjure a scenario in which the EMT would find that an exceptional circumstance (as defined by the defendants and adopted by the court) validly applies, and yet simultaneously that such an application is unreasonable. The court, therefore, understands why there might be a question as to whether the phrase "whether circumstances are reasonable" adds anything material to this performance measure. Evaluating "whether a particular inmate's situation establishes exceptional circumstances" necessarily includes, from what the court can discern, assessing whether ADOC reasonably applied its own definition. The latter appears implicit in the former. Therefore, contrary to what the defendants assert, the measure authorizes a reasonableness determination even without the phrase "whether circumstances are reasonable."

Nevertheless, having said all this, the court must note that it has not heard from the EMT on this issue.

Thus, it may be that with the added phrase the EMT was attempting to address something else, and perhaps something important. The court doesn't know. The wise course, therefore, is to suspend application of the added phrase pending hearing from the EMT. During the period of the conditional enforcement of the measures and tools, the parties should ask the EMT for clarification and provide that clarification to the court. Upon receipt of the clarification, the court can then revisit the issue of the need for the added language. With the above understanding, the court overrules the defendant's objections to this measure.

### 5. Performance Measure 3.1.2: RHU Out-of-Cell Time

The remedial order provision for performance measure 3.1.2 requires ADOC to "offer at least three hours of out-of-cell time per day" to any inmate placed in an RHU for 72 hours or longer because of a safety or security issue. Measure 3.1.2, Joint Modified Objections

(Doc. 4373-1) at 7. The description calls for the monitoring team to review a random sample of patient charts to "evaluate whether there is documentation" of the offer. *Id.* The defendants argue this exceeds the scope of the remedial order because "Section 3.1.2. contains no requirement that out-of-cell time be documented on an inmate's chart." *Id.*

As discussed previously, a performance measure is within the scope of the remedial order if it is related to "evaluating, assessing, and monitoring compliance" with the corresponding remedial order. *Interim Order on Seven Monitoring Issues*, 2024 WL 866532, at *7. The remedial order here requires ADOC to offer at least three hours of out-of-cell time per day. *See Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1272. Asking ADOC to document each time it offers out-of-cell time is a logical way for the EMT to evaluate and assess compliance with this order.

It seems that the anxiety animating the defendants' objection is fear of producing superfluous documents. The defendants argue that rather than select a random sample of inmate charts, the EMT "can evaluate compliance with this performance measure with the Exceptional Circumstances Report" or "the State can submit '434' forms, which document out-of-cell time for a given day." Measure 3.1.2, Joint Modified Objections (Doc. 4373-1) at 7. Under the court's earlier ruling in Section II.B, ADOC has been granted the authority to make alternative document review recommendations to the EMT such as the one described here. However, the EMT retains ultimate discretion to decide whether a chart notation is needed to properly assess compliance. The defendants' objection is overruled.

### 6. Performance Measure 3.2.1: RHU Intake Screening

The remedial order provision for performance measure 3.2.1 requires ADOC to screen each inmate being placed

in an RHU for serious mental illness, "imminent risk of suicide or serious self-harm," "debilitating symptoms of a serious mental illness," and need for "emergency medical care." Measure 3.2.1, Joint Modified Objections (Doc. 4373-1) at 8. The description calls for the monitoring team to review a random sample of charts to evaluate whether those inmates were satisfactorily screened. *See id.* The defendants argue that the monitoring team is authorized "only to determine whether the screening contains the elements required" and they therefore object "[t]o the extent the EMT believes it possesses authority to second-guess the clinical judgment of the medical professional conducting the screening." *Id.*

The defendants are mistaken. The EMT has authority to evaluate clinical judgments made by ADOC's mental-health staff. The defendants themselves agreed to this: under their monitoring proposal, which the court adopted, the monitoring team has the "authority to make

qualitative assessments of whether clinicians are making reasonable clinical judgments." *Monitoring Opinion*, 483 F. Supp. 3d at 1151.

However, there are two important limitations to this power. First, the monitoring team is limited to assessing whether decisions are in the *realm of clinical reasonableness*. It cannot substitute its judgment for that of the clinician under review. "[A] decision that was reasonable, but different from the decision the EMT would have made" is not a basis for a finding of noncompliance. *Id.* Second, the monitoring team may engage in this clinical reasonableness review only when the court has found that existing practices are constitutionally deficient. In other words, either the evidence from the record or the PLRA findings from the Omnibus Remedial Opinion and Order demonstrate that staff, at a systemic level, have historically failed to reach reasonable clinical conclusions, thus necessitating qualitative clinical monitoring.

**Performance measure 3.2.1 does not exceed either of these limitations. In their objection, the defendants collapse the distinction between an objective reasonableness review and a subjective substituted judgment. There is nothing in the measure indicating the EMT will go beyond reasonableness review to second-guess provider decisions. And, in the Omnibus Remedial Opinion and Order, the court found that RHU intake-screening results were deficient because "screenings continue to miss signs of contraindication, and their results are routinely ignored."** ***Omnibus Remedial Opinion and Order*****, 562 F. Supp. 3d at 1276. Performance measure 3.2.1 is therefore supported by the court's order. The defendants' objection is overruled.**

### 7. Performance Measure 3.2.2: Inmates Contraindicated for Placement in RHU

**The remedial order provision for performance measure 3.2.2 reads: "If mental health staff determine that an inmate who has yet to be placed in restrictive housing**

is contraindicated for restrictive housing, that inmate must not be placed in restrictive housing absent a documented exceptional circumstance." Measure 3.2.2, Joint Modified Objections (Doc. 4373-1) at 8. The description has a number of requirements, including that ADOC (1) track where inmates contraindicated for the RHU are placed; (2) provide a weekly report about inmates contraindicated for restrictive housing that includes "a list of patients that were *not* sent to the RHU and referred and sent elsewhere"; and (3) provide a quarterly "Quality Management" report that keeps track of RHU "patients who required more intensive mental health interventions and w[ere] not moved due to exceptional circumstances." *Id.*

The defendants argue this performance measure exceeds the scope of the remedial order because the specific corresponding remedial order provision, 3.2.2, does not explicitly say ADOC must (1) document where contraindicated inmates were placed, if not in an RHU;

(2) track those inmates; or (3) provide quarterly quality management reports about inmates in the RHU who have not been moved despite the need for more intensive mental health interventions. *See id.*

The defendants view the EMT's authority under this provision too narrowly. The performance measures and the remedial order must be viewed as a whole and interpreted in light of the court's factual and PLRA findings. *See Interim Order on Dispute Resolution*, 2023 WL 5984279, at *2 ("The court does not see how it is feasible or practicable to resolve any discrete issues related to the measures/tools without having a holistic view of the measures/tools."). Performance measure 3.2.2 is one of three measures that address how ADOC should screen for serious mental illness before placing an inmate in restrictive housing. It should therefore be viewed in the context of related provisions 3.2.1 and 3.2.3.

Reading all three provisions in tandem shows that RHU screenings serve a dual purpose. They are meant to

"keep contraindicated inmates out of restrictive housing, and to ensure that mentally ill inmates receive the care that they need." *Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1275. Provision 3.2.1 stresses that "the results of the screening must be used to determine whether the inmate should be placed in restrictive housing *and whether the inmate requires a medical and/or mental-health referral.*" *Id.* at 1369 (emphasis added). The court stressed that screenings "can fulfill *neither* purpose if they are ignored." *Id.* at 1275 (emphasis added).

Given the dual concerns highlighted in the Omnibus Remedial Opinion and Order, performance measure 3.2.2 does not exceed the scope of the order. Because RHU screenings are meant to "ensure that mentally ill inmates receive the care that they need," whether or not those inmates are sent to the RHU, *id.*, it is appropriate for the monitoring team to examine where contraindicated inmates are placed even when they are diverted away from

restrictive housing. This allows the EMT to evaluate whether those inmates were properly referred for additional services. It also noteworthy that it enables the EMT to better grasp the universe and efficacy of *potential alternatives to segregated housing*, which in turn will improve the quality of problem-solving dialogue between the EMT and ADOC, *see, e.g.*, Section III.C.4, and iterative monitoring overall. In sum, the EMT's request for ADOC to track where inmates contraindicated for the RHU are placed, and to produce a weekly report of the data, is related to evaluating whether inmates receive appropriate care. These actions are therefore within the scope of the EMT's authority.

It is also within the scope of the Omnibus Remedial Order for the EMT to require quarterly Quality Management reports about RHU inmates who require more intensive interventions. While remedial order provision 3.2.2 does not discuss inmates who require more intensive interventions, provision 3.2.3 does. To the extent that

the defendants are concerned about producing superfluous material, the court's ruling in Section II.B covers that issue.

As a final matter, the court believes, and the parties agree, that the phrase "Patients deemed appropriate for RHU and not placed in RHU ..." in part four of the performance measure description should instead read "Patients deemed inappropriate for RHU and not placed in RHU ...." The EMT is to revise the description accordingly. The objection is otherwise overruled.

8. Performance Measure 3.3.1 & Audit Tool 3.3.1: RHU Mental-Health Rounds Content

The remedial order provision for performance measure 3.3.1 outlines general requirements for the weekly mental-health rounds that must be conducted in RHUs. *See* Measure 3.3.1, Joint Modified Objections (Doc. 4373-1) at 9. It instructs that rounds "should generally include a discussion with the post officer(s) concerning any

changes in the behavior of inmates in the RHU; a review of duty post logs and segregation unit record sheets for information about inmates' participation in recreation, showers, meal consumption and sleep patterns; a walk through the RHU, with stops at each occupied cell to make visual contact with the inmate inside the cell; attempts to verbally communicate with each inmate, including a brief inquiry into how the inmate is doing and whether the inmate has mental health needs or a desire to speak with mental health staff privately; and a brief assessment of each inmate's hygiene, behavior, affect, and physical condition, and the condition of his or her cell." *Id.*

The description calls for ADOC to provide documentation showing it conducted mental-health rounds and both the measure and the audit tool call for the monitoring team to observe providers conducting mental-health rounds. *See id.* As is relevant here, the description specifically instructs ADOC to provide "a

list of inmates identified as having mental health complaints that prompted a 1:1 assessment with the mental health clinician," and the EMT to monitor "efforts to assess inmates [outside of their cells,] in a confidential setting, if there are signs of distress or decline." *Id.*

The defendants argue the measure's last two requirements exceed the scope of the Omnibus Remedial Order. In their view, "the Remedial Order concerns only mental-health rounds, not any follow-up mental-health treatment." *Id.* For the same reason, the defendants object to the corresponding audit tool. *See* Tool 3.3.1, Joint Modified Objections (Doc. 4373-2) at 2.

The court instructed that mental-health rounds "*should generally include*" actions such as inquiring about how an inmate is doing and if they wish to speak to mental-health staff privately. *Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1278. The court's list of what should be included is therefore suggestive

and non-exhaustive. It left it up to the EMT what to add to the list and what to delete, as necessary. The EMT cannot add and delete from the court's list without knowing whether the requirements listed are achieving the desired results, and it cannot make that determination without looking at the actual results.

As the court observed, "long-term isolation resulting from segregation, or solitary confinement, has crippling consequences for mental health ... even [for] those who are not mentally ill...." *Liability Opinion*, 257 F. Supp. 3d at 1236, *aff'd sub nom. Dunn*, 179 F.4th 1277. Indeed, people who enter a segregated housing unit "mentally healthy" are vulnerable to developing "anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self-identity" while held in isolation. *Id.* at 1236-37 (internal citations omitted). Unsurprisingly, because of the profoundly "devastating effects of these conditions," there have been "high

numbers of suicide deaths, and incidents of self-harm and self-mutilation that occur in many of these units." *Id.* at 1236. Due largely to ADOC's inadequate screening, triage, and treatment of individuals kept in solitary confinement for prolonged periods (over 72 hours), "[t]he majority of suicides in ADOC are committed by prisoners who are not on the mental-health caseload, which means that many of the prisoners' needs were never identified through the intake or referral process, and no intervention happened before their deaths." *Id.* at 1221 (internal citations omitted).

Therefore, the purpose of the rounds, and their requirements, is twofold. First, the purpose of rounds is to monitor those who have serious mental illnesses who are put in segregation to ensure they receive the treatment they need and do not decompensate. See, e.g., *Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1369 (Provision provides3.2.3: "If mental-health staff determine that an inmate who has already been placed in

restrictive housing is contraindicated for continued placement there, as evidenced by changes in the inmate's mental state and functioning, that inmate must be removed from restrictive housing within 72 hours--or sooner, if a psychiatrist, psychologist, [Certified Registered Nurse Practitioner], or counselor determines that the need for removal of the inmate from restrictive housing is urgent--absent a documented exceptional circumstance.”). Second, the purpose of rounds is to monitor the conditions of people who enter a segregated housing unit “mentally healthy” to ensure they receive mental-health treatment to the extent needed should they develop serious mental illness or otherwise deteriorate. *See, e.g., id.*

Whether the general, non-exhaustive list of actions provided by the court needs modification (additions or deletions) cannot be determined without seeing whether the suggested requirements are achieving the desired purpose. Assessing follow-up treatment by instructing

ADOC to provide "a list of inmates identified as having mental health complaints that prompted a 1:1 assessment with a mental health clinician," and the EMT to monitor "efforts to assess inmates [outside of their cells,] in a confidential setting, if there are signs of distress or decline" would be in the range of what the EMT would need to know in determining whether the suggestions need modification. Measure 3.3.1, Joint Modified Objections (Doc. 4373-1) at 9. For this reason, it does not exceed the scope of the remedial order. The objections are overruled.

### 9. Performance Measure 3.3.2: RHU Mental-Health Rounds Documentation

The remedial order provision for performance measure 3.3.2 requires ADOC to appropriately document mental-health rounds, which means that rounds notes "must contain a notation of any mental health needs expressed by inmates, or concerns identified by the qualified mental health professional conducting the round."

**Measure 3.3.2, Joint Modified Objections (Doc. 4373-1) at 9. The description calls for the monitoring team to review RHU rounds forms, the format of which should be approved by the EMT and should "include areas for: concerns expressed, disposition and planning."** ***Id.*** **The defendants argue this exceeds the scope of the remedial order because "the Remedial Order contains no requirement for the EMT to approve an RHU rounds form, nor does it contain a requirement for the documentation to include 'disposition and planning.'"** ***Id.***

**The Remedial Order is silent on what the format should be for RHU rounds documents. However, the EMT, as part of its duty to assess compliance with the court's orders, possesses some ability to dictate content. As long as the EMT's formatting requests are directed at "evaluating, assessing, and monitoring compliance" with the court's remedial order, they are permissible.** ***Interim Order on Seven Monitoring Issues*****, 2024 WL 866532, at *7. The question then is whether the remedial order**

authorizes the EMT to require disposition and planning sections on rounds forms.

In discussing rounds forms, the Omnibus Remedial Order does not use the precise words 'disposition' and 'planning,' but stresses that the purpose of documenting mental-health rounds is, in part, "to ensure that ADOC is able to track inmates' needs and mental-health statuses over time." *Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1278. The proposed 'disposition' and 'planning' sections of the form are tailored to achieve this goal. The disposition section will help ADOC and the monitoring team recognize changes in an inmate's mental-health status over time. The planning section will ensure that providers are responding in real time to inmate needs.

ADOC still has a fair amount of latitude to create a rounds form that suits its needs. However, the EMT has the authority to set some formatting requirements to ensure it has sufficient information to conduct a

meaningful assessment. The defendants' objection is overruled.

### 10. Performance Measure 3.4.2: RHU Mental-Health Assessments Documentation

The remedial order for performance measure 3.4.2 requires that "[e]ach mental health assessment [of inmates in the RHU] must be appropriately documented." Measure 3.4.2, Joint Modified Objections (Doc. 4373-1) at 10. The description calls for the monitoring team to review ADOC's documentation and "determine its appropriateness." *Id.* The defendants asked the EMT to clarify what 'appropriateness' means in this context, and the EMT responded: "[a]ppropriateness is defined as the clinician's ability to follow established standard of care and make appropriate decisions about the inmate's status, needs, and take the proper course of action or intervention." *Id.* As applied in this context, that means the EMT would assess the clinician's ability and decision making. The defendants argue this exceeds the

scope of the remedial order because it "pertains to procedural appropriateness--whether mental health assessments are documented appropriately--not the substantive appropriateness of the assessment itself." *Id.*

The court agrees with the defendants. As discussed above, the EMT has the authority to assess whether provider actions are within the realm of clinical reasonableness where the court has made findings that clinical judgments were deficient. *See supra*, Section III.C.6 at 75–76. Here, there is no finding that providers reached unreasonable conclusions when they performed mental-health assessments in the RHU. The court stressed that ADOC often failed to conduct assessments altogether, and that on the occasions when assessments occurred, the results were often ignored. *See Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1281. Further, the EMT's capacity to evaluate a clinician's decision making is supported by the

immediately preceding and following performance measures, 3.4.1, 3.4.3, and 3.4.4, which entail the thoroughness of mental health assessments and resulting dispositions or referrals. The defendants themselves accept that the surrounding sections facilitate evaluation of the content of the mental-health assessments and resulting clinical determinations. *See* Defs.' Resp. to Pls.' Add'l Br. on Objections to Performance Measures 3.2.2, 3.3.1 and 3.4.2 (Doc. 4567) at 10. The plaintiffs were correct in their assertion that the court is concerned about both the existence and quality of assessments. *See* Pls.' Add'l Br. on Objections to Performance Measures 3.2.2, 3.3.1 and 3.4.2 (Doc. 4561) at 10. That is why the performance measures are complementary and mutually reinforcing metrics with which "to evaluate whether the defendants are complying with the court's remedial orders." *Monitoring Opinion*, 483 F. Supp. 3d. at 1148.

Thus, when assessing for 'appropriateness' here, the monitoring team should focus on whether the mental-health assessment occurred, its content, and whether it was properly documented. The EMT is not to be prevented from viewing the provider's conclusion. However, the EMT shall clarify that 'appropriateness' in part two of the description refers to the content of assessment documentation and not the substantive conclusion.

### 11. Performance Measure 3.5.2:
### RHU Out-of-Cell Time Documentation

The remedial order provision for performance measure 3.5.2 requires ADOC to document "[t]he days and times that out-of-cell time is offered" and "any inmate's decision to refuse out-of-cell time." Measure 3.5.2, Joint Modified Objections (Doc. 4373-1) at 11. Part two of the description calls for ADOC to submit documents "that demonstrate that out-of-cell time is being offered and that any decision to refuse an inmate out of cell time is being documented." *Id.* The defendants argue

this exceeds the scope of the remedial order because the order "requires documentation of an *inmate's* decision to refuse out-of-cell time, not *ADOC staff members* refusing out-of-cell time for an inmate." *Id.* (emphasis added).

The court finds that, as written, the performance measure description does not match what the remedial order calls for. The Omnibus Remedial Order authorized the EMT to monitor when out-of-cell time is offered to inmates and when inmates opt to refuse it. *See Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1282 ("ADOC must document all days and times that out-of-cell time is offered, and any inmate's decision to refuse out-of-cell time."). However, the description calls for documentation of when *staff* decide to refuse out-of-cell time to an inmate, on top of regular documentation of each time out-of-cell time is offered.

The parties agree to revise the measure as follows:

> "Compliance with this order will be achieved by submitting standardized documentation that demonstrates that out-of-cell time is being

> offered and that any refusal of out-of-cell time by an inmate is being documented. This will be submitted to the EMT quarterly."

Joint Notice of Proposed Revision to 3.5.2 (Doc. 4560) at 2. The EMT is to revise accordingly.

### 12. Performance Measure 3.7.2: RHU Cell Cleaning

The remedial order provision for performance measure 3.7.2 requires ADOC to clean all RHU cells between occupants and to provide inmates with access to cleaning supplies at least every two weeks. *See* Measure 3.7.2, Joint Modified Objections (Doc. 4373-1) at 12. The description calls for ADOC to "submit documentation that demonstrate[s] they are in compliance with this order." *Id.* The defendants initially claimed the measure exceeds the scope of the remedial order because "[t]he Remedial Order does not require ADOC to utilize a checklist to clean the cells." *Id.*

However, measure 3.7.2 does not reference any checklist. Rather, it requires ADOC to clean cells and

provide cleaning supplies. During oral argument, the defendants agreed that this objection was misplaced. *See* Tr. of Aug. 4 Oral Arg. (Doc. 4559) at 40:1-8 (2026). It is therefore overruled.

### 13. Performance Measure 6.2.2: Location for Mental-Health Referrals

The remedial order provision for performance measure 6.2.2 requires ADOC to communicate routine referrals to an appropriate mental-health staff member by the next shift "by leaving the referral form in a location that ADOC has designated to the correctional and mental health staff, and inmates." Measure 6.2.2, Joint Modified Objections (Doc. 4373-1) at 15. The description calls for ADOC to "designate a confidential area to place routine referrals" and for the EMT to "examine these areas during facility visits." *Id.*

The defendants have two objections. First, they argue that the remedial order "does not require ADOC designate a '*confidential*' area to place referrals," only

that it "clearly designate" some kind of area. *Id.* (emphasis added). Second, they object to the monitoring team examining the designated area during site visits because, in their view, the remedial order "does not provide for any evaluation or monitoring of the effectiveness of the location, only that ADOC clearly designate a location for routine mental health referrals." *Id.*

As to the defendants' first objection about confidentiality, it seemed at oral argument as though the parties mutually agreed that 'confidential area' could refer to a drop box that is locked or some other secure repository in which inmates and guards could place referral forms. *See* Tr. of Aug. 5 Oral Arg. (Doc. 4563) at 10:13-11:6 (2026). Nevertheless, the defendants still object to the word 'confidential.'

The parties filed separate statements explaining their positions. They agree on the following. First, referral forms must be kept confidential. *See id.*

Second, "the EMT intends the term 'confidential' to require that the referrals referenced in Performance Measure 6.2.2 be maintained in a secure storage area where the referrals remain inaccessible to inmates." Defendants' Notice on Performance Measure 6.2.2 (Doc. 4569) at 2. Finally, ADOC *is currently using* locked drop boxes to comply with the remedial order. *See* Pls.' Notice on Performance Measure 6.2.2 (Doc. 4568) at 3; Tr. of Aug. 5 Oral Arg. (Doc. 4563) at 10:13-14 (2026).

Yet the defendants maintain that the confidentiality requirement exceeds the scope of the remedial order because the specific remedial provision, 6.2.2, does not use the word 'confidential.' This argument is meritless. Elsewhere in the remedial opinion, the court stressed that "confidentiality is essential for the effective provision of mental-health services." *Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1305. The performance measure must be read in full context—and with common sense. The objection is overruled.

**The defendants' second objection is also overruled. It is within the scope of the Omnibus Remedial Order for the EMT to evaluate the effectiveness of the referral location. In the Omnibus Remedial Opinion and Order, the court found that referrals experience "unreasonable delays in response times" in part because they are "frequently lost."** ***Omnibus Remedial Opinion and Order*****, 562 F. Supp. 3d at 1299. Indeed, the introductory provision to provision 6.2.2, that is, remedial order provision 6.1, provides: "A referral must result in a timely clinical assessment and/or intervention by a psychiatrist, psychologist, [Certified Registered Nurse Practitioner], or counselor."** ***Id*** **at 1372. To ensure that referrals are not lost and are acted upon in a timely manner, the EMT may gauge the effectiveness of the referral location. Such a measure is aimed at "evaluating, assessing, and monitoring compliance" with the court's remedial orders, and is therefore within the**

scope of the EMT's authority. *Interim Order on Seven Monitoring Issues*, 2024 WL 866532, at *7.

### 14. Performance Measure 8.4: Individualized Treatment Plans

The remedial order provision for performance measure 8.4 requires ADOC to "have a treatment plan that is adequately detailed and individualized to address [the] mental health needs" of "each inmate on the mental health caseload." Measure 8.4, Joint Modified Objections (Doc. 4373-1) at 19. Although the order is concerned with the content of treatment plans, part two of the description deals with treatment team meetings. It calls for the monitoring team to review randomly selected charts to "assess if treatment teams meet at regular intervals" and whether meeting "timeframes are based on the team chair's clinical judgment." *Id.* The defendants object because "[t]he performance measure seeks to assess timing of treatment team meetings" when the corresponding

section of the remedial order has to do with creating individualized treatment plans. *Id.*

The parties agree that the description does not align with the corresponding remedial order provision. They consulted with the EMT and agreed to revise part two of the description as follows:

> "On a quarterly basis, the EMT will review MH treatment plans and charts of ten randomly selected inmates at each identified facility and assess if each treatment plan is adequately detailed and individualized to address the inmate's mental health needs, based on clinical judgment."

Joint Notice of Proposed Revision to Performance Measure 8.4 (Doc. 4571) at 2. The EMT is to revise the measure accordingly.

### 15. Performance Measure 10.7.1.1: Suicide-Watch Discharge Evaluations

The remedial order for performance measure 10.7.1.1 requires that, "[p]rior to being discharged from suicide watch, an inmate must receive an out-of-cell, confidential evaluation by a psychiatrist, psychologist,

[Certified Registered Nurse Practitioner], or counselor, unless such evaluation is not possible due to documented clinical concerns." Measure 10.7.1.1, Joint Modified Objections (Doc. 4373-1) at 32. The performance measure calls for the monitoring team to assess randomly selected charts of patients released from suicide watch to determine whether a pre-discharge evaluation was conducted, and if so, whether it was performed out-of-cell, confidentially, and by an appropriate provider. *Id.* If any of these requirements is lacking, the monitoring team is directed to then look at whether there is a documented "clinical concern that led to the exception," and, if so, whether "the reasoning" provided in the chart falls "within the standard of care." *Id.*

The defendants argue the last directive authorizing qualitative assessment of the providers' reasoning exceeds the scope of the remedial order. In their view, the remedial order merely "permits the EMT to assess whether mental health staff documented a clinical

concern," but does not permit the EMT to "evaluate whether the EMT believes the clinical concern is in the standard of care." *Id.*

The defendants' objection raises a point requiring clarification: What is the meaning of a 'documented clinical concern' here? After all, existence of a 'documented clinical concern' permits staff to forgo a suicide-watch discharge evaluation. The question is then, What kind of clinical concerns could prevent a suicide-watch discharge evaluation from being completed, or at least from being completed in the proscribed manner? The court asked for briefing on this matter. The plaintiffs assert that a documented clinical concern is "a determination--by a psychiatrist, psychologist, [Certified Registered Nurse], or counselor ("practitioner")--that an individual's mental health situation is so acute as to require a reassessment of whether that individual should be considered for release from suicide watch, or instead transferred to a different

or higher level of care." *See* Pls.' Br. on Measure 10.7.1.1 (Doc. 4566) at 7. The defendants do not offer a definition but merely repeat their objection to "a new affirmative duty." Defs.' Resp. to Pls.' Add'l Br. on Objections to Performance Measure 10.7.1.1 (Doc. 4570) at 5.

The court will adopt plaintiffs' definition for 'documented clinical concern,' as it is consistent with the court's interpretation in the remedial order. The Omnibus Remedial Opinion and Order states, "prior to discharge from suicide watch, an inmate must receive a confidential, out-of-cell evaluation by a psychiatrist, psychologist, [Certified Registered Nurse Practitioner], or counselor, or, *when such an evaluation is not possible due to documented clinical concerns, the evaluating mental-health staff must consider whether referral to a different or higher level of care is appropriate.*" *Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1338 (emphasis added). Thus, a 'documented clinical

concern' is a determination that a person who would otherwise be assessed for discharge from suicide watch presents symptoms so acute that they must remain on suicide watch or be transferred to a higher level of care.

With that understanding in mind, the court now turns to the objection. The court finds that under measure 10.7.1.1, the EMT may look for documentation of a clinical concern--meaning documentation of a decision that the patient required the same or a higher level of care--when staff forgo all or part of a suicide-watch discharge evaluation. Both sides agree on this. *See* Measure 10.7.1.1, Joint Modified Objections (Doc. 4373-1) at 32.

However, they disagree on whether the EMT may evaluate the documented clinical concern for conformity with the standard of care. The defendants say the EMT must stop after determining documentation exists and should not assess whether the provider's decision to

elevate care was reasonable. *See* Defs.' Resp. to Pls. Add'l Br. on Objections to Performance Measure 10.7.1.1 (Doc. 4570) at 3. The plaintiffs disagree. They say that because 'a documented clinical concern' is an exception to completing discharge evaluations, "evaluation of this exception is critical, considering ADOC's history of failing to provide assessments to incarcerated individuals before release from suicide watch." Pls.' Br. on Measure 10.7.1.1 (Doc. 4566) at 7.

The exception encompassed by 'documented clinical concern' is very narrow. The Omnibus Remedial Opinion and Order was concerned by evidence that ADOC routinely discharges people from suicide watch *to segregation* without any evaluations. *See Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1339. It was not concerned with discharge to a higher level of care because there was no evidence that ADOC improperly discharges people from suicide watch to hospitals. Accordingly, the court finds that there is no need for the EMT to evaluate such

**decisions for conformity with the standard of care. To be clear, however, when staff forgo all or part of an evaluation, the EMT may still evaluate whether a clinical concern was documented that explains their decision.**

**The court understands the plaintiffs' concern about keeping a close eye on exceptions here but interprets their argument as addressing a different issue--that is, monitoring what happens *after* the finding of a documented clinical concern to ensure staff do not misuse the exception to cloak non-compliance with measure 10.7.1.1. This issue is an important one, and it is covered in the subsequent performance measure. *See* Measure 10.7.1.2, Joint Modified Objections (Doc. 4373-1) at 33 ("If an out-of-cell, confidential evaluation is not possible due to documented clinical concerns, staff must consider whether referral to a different or higher level of care is appropriate."). Measure 10.7.1.2 permits the monitor to collect the documentation needed to "ensure the adequate treatment of recently suicidal inmates and to**

prevent their placement in inappropriate settings." *Omnibus Remedial Opinion and Order*, 562 F. Supp. 3d at 1339.

The defendants' objection is sustained with the understanding that 'documented clinical concern' refers specifically to a finding of acute mental health needs necessitating reassessment for continued suicide watch or discharge to a higher level of care. The EMT is to revise the measure accordingly.

### 16. Performance Measure 11.1: Referrals to Hospital-Level Care

The remedial order provision for performance measure 11.1 instructs ADOC to "ensure that inmates who require hospital-level care receive it within a reasonable period of time, as determined by clinical judgment." Measure 11.1, Joint Modified Objections (Doc. 4373-1) at 36. The description calls for ADOC to provide two rosters of inmates: one listing those referred for hospital-level care, and one listing those on suicide watch for seven

to ten days, or on repeated watch, who have *not* been referred for hospitalization. *Id.* As for the first roster (those referred for hospital-level care), the description calls for the monitoring team to review patient charts to assess whether a higher level of care "was received within a reasonable period of time which the EMT determines as three days from the date of referral." *Id.* As for the second roster (those who have been on suicide watch for seven to ten days, or who are on repeated watch, but not referred to a hospital), the monitoring team is supposed to "determine if the clinical decision to not hospitalize met the standard of care." *Id.* The defendants argue the second roster exceeds the scope of the remedial order because "it transforms a provision aimed at timeliness into a mechanism to second guess treatment determinations." *Id.*

The court disagrees with the defendants' basis for their objection (that monitoring the determination exceeds the scope of the remedial order) but notes that

the second roster may duplicate another performance measure. Remedial order 11.1 deals with how swiftly an inmate receives hospital-level care once that need is identified. It does not describe what should happen when ADOC overlooks someone who ought to be referred to a higher-level of care. Other sections of the Omnibus Remedial Order address that issue, and the EMT made performance measures that correspond to those orders. *See* Measures 10.6.1–6.4, Joint Modified Objections (Doc. 4373-1) at 31–32 (describing the time intervals at which assessments of inmates on suicide watch must occur, including at seven days and ten days). As the defendants note, it appears the EMT has included aspects of remedial provisions 10.6.3 and 10.6.4 in its performance measure for provision 11.1. If it sees fit, the EMT may revise parts two and three of the description for 11.1 to avoid duplication. However, it is not required to do so if it has reasonable justification. The objections is overruled.

### 17. Performance Measures 13.2 & 13.3: Training Requirements

The remedial order provisions for performance measures 13.2 and 13.3 deal with training requirements. Provision 13.2 covers emergency preparedness drills and provision 13.3 covers mental-health observer training. Emergency preparedness drills must occur quarterly, cover "scenarios involving self-injury and suicide attempts," and involve role-playing so that staff may "practice the response to an emergency, including, for example, using a cut-down tool, rendering first aid, and performing [CPR]." Measure 13.2, Joint Modified Objections (Doc. 4373-1) at 39. Mental-health observers must receive "additional training related to their observation obligations, including where they must be positioned and how to access assistance if an inmate requires medical care or there is an emergency." Measure 13.3, Joint Modified Objections (Doc. 4373-1) at 39. Both measures call for the EMT to be provided with the training curriculum so that the monitoring team can ensure

training meets court-ordered requirements. *See* Measure 13.2 and Measure 13.3, Joint Modified Objections (Doc. 4373-1) at 39.

The defendants argue both measures exceed the scope of the remedial order because "[t]he Remedial Order grants no authority for the EMT to set the training requirements" or "evaluate the curriculum." *Id.* At oral argument, the defendants clarified that they take issue with the "EMT modifying any of the training measures the court set out." Tr. of Aug. 5 Oral Arg. (Doc. 4563) at 20:10-11 (2026). However, nothing in either measure indicates that the EMT is attempting to do so. Both measures merely call for the monitor to evaluate the curriculum and to observe live trainings to ensure conformity with the court's remedial order. The defendants' objections are therefore overruled.

At oral argument, the defendants raised an additional concern about timing related to one obligation in measure 13.2. Measure 13.2 calls for ADOC to provide the EMT

with training schedules by the fifth day of each quarter. *See* Measure 13.2, Joint Modified Objections (Doc. 4373-1) at 39. The defendants read this as requiring that they *complete* training by the fifth day of each quarter. *See* Tr. of Aug. 5 Oral Arg. (Doc. 4563) at 24:19-21 (2026). They objected that this is too little time to complete training. However, the court finds that the EMT was clear in its request for "times and dates of the training[s]," not training completions. Measure 13.2, Joint Modified Objections (Doc. 4373-1) at 39. Indeed, the measure goes on to explain that the EMT plans to observe some trainings, which explains why they would need schedules. *See id.* To the extent any confusion remains, ADOC can ask for clarification directly from the EMT. The defendants' objections are overruled.

## IV. PLAINTIFFS' OBJECTIONS

The plaintiffs made seven total objections, but only two are outstanding. Four have been affected by the

Eleventh Circuit's ruling and thus will be addressed separately by the court in a future decision.[20] The plaintiffs also voluntarily withdrew their objection to another measure.[21] *See* Tr. of Aug. 5 Oral Arg. (Doc. 4563) at 32:24-25 (2026).

The plaintiffs' remaining two objections request additions to the performance measures based on either the EMT's clarifications or the court's order. The court will address each one individually.

---

20. Specifically, measures 2.1.4 (staffing 'mandatory and essential' posts), 2.1.7.1 (checking cells between occupants for suicide resistance), 2.1.7.2 (checking cells quarterly using Hayes checklist), and 3.7.3 (complying with Hayes checklist) will be addressed separately in a future decision.

21. Plaintiffs withdrew their objection to measure 10.8.5 (restarting three-day clock for mandatory daily mental-health examinations post-transfer from suicide watch).

## A. Performance Measure 4.3.1: Locating Mental-Health Records

The remedial order provision for performance measure 4.3.1 requires ADOC to "reasonably attempt to locate" mental-health records for any inmate who indicates he has received prior mental-health treatment. Measure 4.3.1, Joint Modified Objections (Doc. 4373-1) at 13. The description calls for the monitoring team to assess patient charts for evidence of records requests to outside providers or "reasonable attempts to locate records" if the inmate could not recall the name of his former provider. *Id.* The plaintiffs request that the EMT explicitly define 'reasonable attempt' in the performance measure. *Id.* The plaintiffs previously asked the EMT to define 'reasonable attempt,' and the EMT responded: "reasonable attempt is defined as documentation demonstrating that there was at least 1 attempt within 3 working days." *Id.* The plaintiffs request that this definition be included in the performance measure. *See id.*

This is for the EMT to decide. The court, at the parties' behest, imbued the EMT with "the authority to *create* and *modify* performance measures." *Interim Order on Seven Monitoring Issues*, 2024 WL 866532, at *2 (emphasis added). The EMT has the authority to define 'reasonable attempt.' But the court takes no position on inclusion or exclusion of this definition in the language of the performance measure. The objection is overruled.

### B. Performance Measure 10.8.4: Suicide-Watch Discharge Follow-Up Evaluations

The excerpted provision in performance measure 10.8.4 requires that, when ADOC conducts follow-up mental-health examinations of inmates released from suicide watch, it must assess for "signs of ongoing crisis," and the need for "further follow-up mental health examinations." Measure 10.8.4, Joint Modified Objections (Doc. 4373-1) at 35. ADOC should also assess "whether the inmate should be added to the mental health

caseload or assigned a different mental health code." *Id.* The description calls for the monitoring team to review patient charts to determine whether "the clinician documented" his or her assessment for each of these factors. *Id.*

The plaintiffs object that the performance measure limits the monitoring team to evaluating only whether ADOC looked for these issues and stops short of calling for the team to independently assess the clinical reasonableness of the provider's substantive decisions. *See id.* The plaintiffs repeat this objection for performance measure 10.8.5 because it incorporates the same perceived flaw from performance measure 10.8.4. *See* Measure 10.8.5, Joint Modified Objections (Doc. 4373-1) at 35.

The Omnibus Remedial Order does not call for the relief that the plaintiffs request, that is, for the monitoring team to assess whether follow-up session determinations are clinically reasonable. *See Omnibus*

*Remedial Opinion and Order*, 562 F. Supp. 3d at 1341 (emphasizing that ADOC struggles with consistency, timing, and number of follow-up examinations, but does not address whether ADOC reaches the right conclusion when the examinations occur). The plaintiffs acknowledge this. They argue that "[a]lthough the remedial provision appears silent on this issue, the plaintiffs believe that the monitoring order makes clear that the EMT should be making qualitative assessments ... 'of whether clinicians are making reasonable clinical judgments.'" Pls.' Position Statement (Doc. 4375) at 5 n.5 (quoting *Monitoring Opinion*, 483 F. Supp. 3d at 1151). The plaintiffs are correct that the monitoring order authorizes the monitoring team to assess clinical reasonableness. However, the court cannot say that the EMT's decision not to extend that assessment to these circumstances was improper. The objection is overruled.

## V. CONCLUSION

Although this opinion is granular and often firmly grounded in the unique particulars of this case, the overarching issue is one that jurists confront every day. That is, how should a court balance finality and clear rules with the need for responsive oversight that adapts to the every-day complexities of addressing constitutional violations across a state prison system?

On the one hand, clear rules provide clear guidance. With a clear rule, a person knows precisely what to do and what not to do. But inevitably, situations will arise where the clear rule, when implemented, produces an unjust result and requires modification. However, if the standard is constantly changing then it loses meaning and a person is left without instruction.

ADOC argues in many objections that it needs clear guidance on what is required for compliance. In others, it says that the guidance provided is too restrictive and will create untenable obligations. The defendants'

proposed approach is for the court to abstractly resolve each possible standards-based dispute before monitoring ever starts.[22]

But resolving everything in abstraction is not possible, nor is it desirable. Concrete problems should be addressed with real solutions, and EMT's dual role as a monitor and teacher is designed with this in mind. The performance measures ensure the court has the information it needs to assess whether ADOC has made sufficient progress in curing the long-standing constitutional defects at the heart of this litigation. The iterative, adaptive process ensures that the internal monitoring team has the training it needs to capably take over and address ever changing needs.

---

22. To be clear, not every objection implicates this question. Objections to compliance benchmarks, to inmate interviews, and even to some of the disputes over the scope of the remedial order were easily resolved based on the record.

Thus, as explained throughout this opinion, the court, in grappling with how to balance finality with the need for resolution in the real world, has chosen to create an interim monitoring period that will last two quarters; the resolutions ordered by the court today are to be considered conditional. After a decade of litigation, it is finally time for monitoring to begin.

Accordingly, it is ORDERED that the parties' objections to performance measures and audit tools are resolved as indicated in this opinion.

DONE, this the 22nd day of September, 2026.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

# APPENDIX

The following are six charts based on the six types of objections that the defendants made to the EMT's performance measures. For each type of objection, there is a list of performance measures that the defendants applied the objection to. Types of objections appear in the order in which they are addressed in the opinion so that the parties may cross-reference these charts with the opinion to easily determine which objections are covered by which ruling.

| 1.Compliance Benchmarks (II.A) | |
|---|---|
| **Sample Objection** | **Performance Measures Applied To** |
| "The State objects to requiring compliance at levels exceeding 85%." | 2.1.4, 2.1.8.1, 2.1.8.2, 2.2.1, 2.2.2, 2.2.3, 2.2.4, 3.1.1, 3.1.1.1, 3.1.2, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1, 3.3.2, 3.4.1, 3.4.2, 3.4.3, 3.4.4, 3.5.1, 3.6.1, 3.6.2, 3.6.3, 3.7.2, 4.1, 4.2, 4.3.1, 5.1, 5.2, 6.1, 6.2.1, 6.2.2, 6.3, 6.4, 7.1, 7.1.1, 7.1.2, 8.1, 8.2, 8.3, 8.4, 8.5, 8.6.1, 8.6.2, 9.1.1, 9.1.2, 9.1.3, 9.1.4, 9.2.1, 9.3, 9.4.1, 9.4.2, 10.1.1, 10.1.2, 10.1.3, 10.1.4, 10.1.5, 10.1.6, 10.2.1, 10.2.2, 10.2.3, 10.2.4, 10.3.1, 10.3.1.2, 10.3.2, 10.4.1, 10.4.2, 10.4.3, 10.4.4, 10.5.1, 10.5.2, 10.5.3, 10.6.1, 10.6.2, 10.6.3, 10.6.4, 10.7.1.1, 10.7.1.2, 10.7.2.1, 10.7.2.2, 10.8.1, 10.8.2, 10.8.3, 10.8.4, 10.8.5, 11.1, 11.2.1, 11.2.3, 12.1, 12.2, 12.3, 12.4, 12.5, 13.1, 13.2, 13.3 |
| "The State objects that [x] is required to meet constitutional" standards. | 2.1.4: "The State objects that filling all mandatory and essential posts is required to meet constitutional levels of staffing. The State further objects that "85% of filling vacancies" is required to monitor compliance with this section of the Remedial Order. The EMT should also consider posts filled |

| | |
|---|---|
| | with overtime and contract security staff. |
| | 2.2.3: "The State objects that the staffing matrix represents the staffing levels required for constitutional care." |
| | 11.2.1: "The State objects that requiring ADOC to "supply enough beds to accommodate 10% of its mental health caseload" meets constitutional levels of care." |

***See* Joint Modified Objections (Doc. 4373-1).**

| 2.Burden of Monitoring (II.B) | |
|---|---|
| **Sample Objection** | **Performance Measures Applied To** |
| "The State objects to this performance measure as unduly burdensome and exceeding the minimum means necessary to determine compliance with this section to the extent it requires multiple sample sets where consolidation with samples of other performance measures is possible." | 3.1.1, 3.1.2, 3.2.1, 3.2.3, 3.3.1, 3.3.2, 3.4.1, 3.4.2, 3.4.3, 3.4.4, 3.5.1, 3.6.1, 3.6.2, 3.6.3, 3.7.2, 6.1, 7.1.1, 7.1.2, 8.1, 8.2, 8.4, 8.5, 8.6.1, 8.6.2, 9.1.1, 9.1.2, 9.2.1, 9.3, 9.4, 9.4.1, 10.1.1, 10.1.2, 10.1.5, 10.2.1, 10.2.2, 10.2.3, 10.2.4, 10.3.1.2, 10.4.1, 10.4.2, 10.4.3, 10.4.4, 10.5.3, 10.6.1, 10.6.2, 10.6.3, 10.6.4, 10.7.1.1, 10.7.1.2, 10.8.1, 10.8.2, 10.8.3, 10.8.4, 10.8.5, 12.1, 12.2 |
| "The State objects to this performance measure as unduly burdensome, individually and cumulatively, requiring ADOC to produce [x many charts or documents for y many performance measures]. The State requests the EMT to develop a schedule that would require review of no more than three facilities per quarter to reduce the burden on ADOC." | 2.1.8.1, 2.1.8.2, 3.1.2, 3.2.1, 3.2.3, 3.3.1, 3.3.2, 3.4.1, 3.4.2, 3.4.3, 3.4.4, 3.5.1, 6.1, 7.1.1, 8.1, 8.2, 8.4, 8.5, 8.6.1, 9.1.1, 9.1.2, 9.1.2.1, 9.1.3, 9.2.1, 9.3, 9.4.1, 10.1.1, 10.1.2, 10.1.5, 10.2.1, 10.2.2, 10.2.3, 10.2.4, 10.4.1, 10.4.2, 10.4.3, 10.6.1, 10.6.2, 10.6.3, 10.6.4, 10.7.1.1, 10.7.1.2, 10.8.1, 10.8.2, 10.8.3, 10.8.4, 10.8.5, 11.1, 12.1, 12.2<br><br>2.1.8.1, 2.1.8.2, 3.2.1, 3.2.3, 3.3.1, 3.3.2, 3.4.1, 3.4.2, 3.4.3, 3.4.4, 3.5.1, 6.1, 8.1, 8.2, 8.4, 8.5, 8.6.1, 9.1.1, 9.1.1, 9.1.2.1., 9.1.3, 9.2.1, 9.3, 9.4.1, 10.1.1, 10.1.2, 10.1.5, 10.2.1, 10.2.2, 10.2.3, |

| | |
|---|---|
| | 10.2.4, 10.4.1, 10.4.2, 10.4.3, 10.6.1, 10.6.2, 10.6.3, 10.6.4, 10.7.1.1, 10.7.1.2, 10.8.1, 10.8.2, 10.8.3, 10.8.4, 10.8.5, 11.1, 12.1 and 12.2 also contain a request to limit review to three facilities per quarter. |

***See* Joint Modified Objections (Doc. 4373-1).**

| 3. Inmate Interviews (II.C) | |
|---|---|
| **Sample Objection** | **Performance Measures Applied To** |
| "The State objects to the EMT determining compliance based on inmate interviews. The State remains concerned with the reliability of inmate interviews."<br><br>**3.1.1 & 7.1 also contain this language:**<br>"Further the EMT appears to exclude such interviews from 'Compliance Expectations.' As such, it remains unclear the necessity of conducting inmate interviews regarding this performance measure." | 3.1.1, 7.1, 9.1.4, 9.2.1, 10.8.3 |

***See* Joint Modified Objections (Doc. 4373-1).**

| **4.Vagueness (III.A)** | |
|---|---|
| **Sample Objection** | **Performance Measures Applied To** |
| "The State objects to this performance measure as vague in failing to provide clear benchmarks for compliance with this section of the Remedial Order. The performance measure remains vague to the extent it orders ADOC to provide charts and documents "sorted" without providing information or direction on what documents to sort or how the documents/charts should be sorted."<br><br>"The State remains unclear as to what charts/documentation the EMT requires, as well as how these charts/documents will be utilized to evaluate compliance with Section [x]." | 7.1, 7.1.1, 7.1.2, 8.4, 8.6.1, 8.6.2, 9.1.1, 9.1.2, 9.1.2.1, 9.1.3, 9.1.4, 9.2.1, 9.3, 9.4.1, 9.4.2, 10.2.1, 10.2.2, 10.2.3, 10.3.1.1, 10.3.1.2, 10.5.1, 10.5.2, 10.5.3, 10.6.1, 10.6.2, 10.6.3, 10.6.4, 10.7.1.1, 10.7.1.2, 10.8.1, 10.8.2, 10.8.4, 10.8.5, 12.1, 12.2 |
| Specific objections | 3.1.1 "whether circumstances are reasonable" |
| | 3.2.2: "more intensive mental health interventions" |
| | 3.3.2: "at each facility in each setting in RHU" |
| | 3.6.1: "ADOC will submit documentation that demonstrate [sic] they are in compliance with this order"; "5 random samples per quarter evidencing required |

| | |
|---|---|
| | security checks will be requested by the EMT and submitted" for "failing to define the scope of the sample (days, cells, etc.)" |
| | 5.2: "The State seeks clarity regarding the set of documents to be reviewed. The performance measure states 'a random sample of patients form the mental health caseload,' and the number of charts needed section states, '10 charts from each intake facility'" |
| | 8.3: "quarterly reports to demonstrate progress and compliance" |
| | 8.6.1-6.2: the performance measure fails "to provide information sufficient for the State to evaluate ADOC's requirements for achieving compliance" and "fails to identify what information or documents will be evaluated" |
| | 10.1.3: "documentation for #2 [that 10.1.3 has been followed]" |
| | 10.3.1.1: "thorough cell examinations" |
| | 10.3.1.2: the performance measure "fails to define scope or sample to be evaluated" |
| | 10.5.1-5.3, 10.7.2.2: "ADOC will submit documentation that ADOC has complied with this order" |
| | 12.1-2: "charts to review" |

| **5. Exception / Definition (III.B)** | |
|---|---|
| **Sample Objection** | **Performance Measures Applied To** |
| "The State objects to independent monitoring of this Section. Section [x] constitutes an exception to/definition of [y] and does not require independent assessment." | 3.1.1.1, 3.5.1.1, 9.1.2.1, 10.3.1.1 |

| **6. Scope of Remedial Order (III.C)** | |
|---|---|
| **Sample Objection** | **Performance Measures Applied To** |
| "The State objects to this performance measure to the extent it exceeds the scope of the Remedial Order...." | 2.1.1, 2.2.3, 2.2.4, 3.1.1, 3.1.1.1, 3.1.2, 3.2.1, 3.2.2, 3.3.1, 3.3.2, 3.4.2, 3.5.2, 3.7.2, 6.2.2, 8.4, 10.7.1.1, 11.1, 13.2, 13.3, |

***See* Joint Modified Objections (Doc. 4373-1).**