IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| EDWARD BRAGGS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv601-MHT |
| | ) | (WO) |
| COMMISSIONER OF THE ALABAMA DEPARTMENT OF CORRECTIONS, in his/her official capacity, et al., | ) | |
| | ) | |
| Defendants. | ) | |

PHASE 2A ORDER CLARIFYING THE REMEDIES REVERSED BY THE ELEVENTH CIRCUIT PERTAINING TO TUTWILER

This matter is before the court pursuant to the parties' joint motion for clarification (Doc. 4626).

One of the three issues the parties have asked this court to resolve is which remedial provisions pertaining to the Julia Tutwiler Prison for Women were reversed or set aside by the Eleventh Circuit Court of Appeals in *Dunn v. Comm'r, Ala. Dep't of Corr.*, 179 F.4th 1277 (11th Cir. 2026) (Doc. 4520). Specifically, the parties

requested clarification as to "how the Eleventh Circuit's opinion impacts Tutwiler [and] what remedies pertaining to Tutwiler were reversed and remanded." Motion for Clarification (Doc. 4626) at 2.

## I. BACKGROUND

On June 24, 2026, the Eleventh Circuit ruled on the appeal and cross-appeal in this case. *See generally Dunn,* 179 F.4th 1277. The appeals court affirmed in whole the Liability Opinion, which finds that the Alabama Department of Corrections (ADOC) provision of inadequate mental-health care violates the Eighth Amendment. *See generally Braggs v. Dunn (Liability Opinion)*, 257 F. Supp. 3d 1171, 1267 (M.D. Ala. 2017) (Thompson, J.), *aff'd sub nom. Dunn*, 179 F.4th at 1314. It also affirmed the Monitoring Opinion, which establishes that ADOC operations require monitoring to ensure compliance with the court's remedial orders. *See Braggs v. Dunn (Monitoring Opinion)*, 483 F. Supp. 3d 1136, 1140 (M.D.

Ala 2020) (Thompson, J.), *aff'd sub nom. Dunn*, 179 F.4th 1277.

Finally, the Eleventh Circuit affirmed the Omnibus Remedial Opinion and Order, except for three limited aspects of the prospective relief. *See id.* at 1323. These provisions fall under the Prison Litigation Reform Act (PLRA), which dictates that district courts "shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). This provision is colloquially known as the 'need-narrowness-intrusiveness' requirement.

One of the limited ways in which the circuit found that this court exceeded the PLRA was by failing to exempt the Julia Tutwiler Prison for Women from the remedial provisions regarding "monitoring, mental healthcare in segregation, the number of crisis cells, residential

treatment units, and suicide-watch placements." *Dunn*, 179 F.4th at 1320.

In the wake of the Eleventh Circuit's ruling, this court directed the parties to file a joint enumerated list of remedial order provisions that they believe the circuit set aside. *See* Order (Doc. 4549). If the parties were unable to agree on a joint list, this court directed them to file separate lists, briefing the disputed provisions. The two lists diverged significantly.

The plaintiffs believe that only a subset of remedial provisions were set aside by the Eleventh Circuit, identifying the following as falling directly within the "five discrete categories of remedial provisions" that the circuit found to be insufficiently supported by liability findings: 3.1.1, 3.2.1, 3.2.2, 3.2.3, 3.3.1, 3.3.2, 3.4.1, 3.4.2, 3.4.3, 3.4.4, 3.6.1, 3.6.2, 3.6.3, 9.2.1, 9.2.1.1, 9.2.2, 10.2.1, 10.2.2, 10.2.3, and 10.2.4. *See* Pls.' Br. on Tutwiler (Doc. 4577) at 3-5.[1]

---

1. The plaintiffs also identify the following provisions as reversed by the Eleventh Circuit, but note that they apply to ADOC as a whole and are not specific

The defendants offer a more reaching interpretation of the Eleventh Circuit's opinion as it affects Tutwiler, arguing that the court should remove Tutwiler from the remedial order altogether. *See* Defs.' Br. on Tutwiler (Doc. 4578) at 3 (quoting *Dunn*, 179 F.4th at 1320). They note that the circuit "expressly 'set aside the remedial provisions about monitoring, mental healthcare in segregation, the number of crisis cells, residential treatment units, and suicide-watch placements' as applied to Tutwiler," and contend that, because "monitoring" is one of the five categories of remedial provisions that the circuit set aside, "no monitoring may proceed as it relates to Tutwiler." Defendants then infer that if no monitoring may proceed, nor may any provision in the remedial order because the remedial and monitoring schemes are "necessarily intertwined." *Id.* at 4. In the alternative, defendants contend that this court should remove provision three of the remedial order in its

---

to Tutwiler: 2.1.4, 2.1.5, 2.1.7.1, 2.1.7.2, 3.7.3, 10.3.1, 10.3.1.1.

entirety, as well as additional remedial provisions listed in the footnote below.[2]

In summary, the only remedial provisions that both sides agree are currently to be aside are: 3.1.1, 3.2.1, 3.2.2, 3.2.3, 3.4.1, 3.3.1, 3.3.2, 3.4.2, 3.4.3, 3.4.4, 3.6.1, 3.6.2, 3.6.3, 9.2.1, 9.2.1.1, 10.2.1, 10.2.2, 10.2.3, 10.2.4.

The court now turns to analyzing the Eleventh Circuit's mandate to modify as applied to Tutwiler.

## II. THE ELEVENTH CIRCUIT'S MANDATE REGARDING TUTWILER

### A.

To understand what the Eleventh Circuit's mandate to "modify the injunctive relief consistent with [its] opinion," *Dunn*, 179 F.4th at 1323, means for Tutwiler, the proper inquiry begins with where the Eleventh Circuit

2. 7.1, 9.1.2.1, 9.2.1, 9.2.1.1, 10.1.4, 10.2.1, 10.2.2, 10.2.3, 10.2.4, 10.3.1, 10.3.1.1, 10.3.1.2, 10.3.2, 10.4.1, 10.4.2, 10.4.3, 10.4.4, 10.5.1, 10.5.2, 10.5.3.3 10.6.1, 10.6.2, 10.6.3, 10.6.4, 10.7.1.1, 10.7.1.2, 10.7.2.1, 10.7.2.2, 10.8.1, 10.8.2, 10.8.3, 10.8.4, and 10.8.5.

found that this court's "limited liability findings as to Tutwiler" failed to establish harms to be remediated. *Dunn*, 179 F.4th at 1320.

The inquiry then turns to where this court awarded relief that thus went "beyond what is necessary to correct the constitutional violation at issue." *Dunn*, 179 F.4th at 1320 (citing § 3626(a)(1)(A)).

The Eleventh Circuit identified five discrete categories where there is a lack of evidence of a substantial risk of harm to Tutwiler's prisoners, the 'lack-of-evidence list': "number of crisis cells, suicide-watch placements, segregation placements, and treatment and monitoring available in segregation." *Id.* at 1320. It then set aside five discrete categories of remedial provisions as applied to Tutwiler, the 'set-aside list': "monitoring, mental healthcare in segregation, the number of crisis cells, residential treatment units, and suicide-watch placements." *Id.*

Because the lack-of-evidence list is the predicate for the the set-aside list, the court reads the two lists

together to clarify where the Tutwiler relief exceeded the bounds of the PLRA. Comparing the language in the lack-of-evidence list to the set-aside list illuminates the direct relationship between the two.

| Lack-of-evidence list | Set-aside list |
|---|---|
| (1) "number of crisis cells" | (1) "number of crisis cells" |
| (2) "suicide-watch placements" | (2) "suicide-watch placements" |
| (3) "segregation placements" | (3) "residential treatment units" |
| (4) "treatment ... available in segregation" | (4) "mental healthcare in segregation" |
| (5) "monitoring available in segregation" | (5) "monitoring" |

*Id.*

The following two categories appear verbatim in both lists: the "number of crisis cells" and "suicide-watch placements."[3] That leaves three categories where the

3. The Eleventh Circuit accurately quotes this court's finding in the Liability Opinion that, while this court was "concerned about the number of crisis cells," this court did "not have sufficient evidence to find that [area] pose[d] a substantial risk of serious harm to Tutwiler's prisoners." *Liability Opinion*, 257 F. Supp. 3d at 1248. This court notes, however, that the remedial scheme currently does not impose any requirements regarding the number of crisis cells, either to Tutwiler

circuit appears to have used slightly different language in the respective lists. The court believes that it is nonetheless not difficult to match up the three. "[S]egregation placements" in the lack-of-evidence list and "residential treatment units" in the set-aside list are one and the same as they both focus on placement in forms of housing, rather than the provision of treatment. "[T]reatment ... available in segregation" in the lack-of-evidence list is the same as "mental healthcare in segregation" in the set-aside list, for both categories focus on treatment or care in segregation. And, of course, "monitoring available in segregation" in the lack-of-evidence list and "monitoring" in the

or any other ADOC facility. Defendants concede as much, writing "the Remedial Order contains no direct numerical requirement for a minimum number of crisis cells," but suggest that this encompasses "directives regarding crisis-cell or crisis-unit operations," including remedial provision 10.5.3. Defs' Br. on Tutwiler (Doc. 4578) at 11 n.3. The court reserves judgment on this argument at this time. However, the parties need to address this discrepancy at the upcoming evidentiary hearing.

set-aside list are one and the same, for both focus on monitoring.

The idea that a lack of evidence about "segregation placements" is specifically about "residential treatment units" is further reinforced by the circuit's citation of this court's observation that both sides "presented affirmative evidence that the care being provided in the Tutwiler [residential treatment unit] is adequate, or close to adequate." The circuit clearly intended to set aside all relief related to placement in residential treatment units.

Moreover, if the word "monitoring" in the set-aside list referred to monitoring of the other four categories in the list (or to the entirety of the remedial order as applied to Tutwiler, as defendants contend), not only would the words "monitoring available in segregation" in the lack-of-evidence list not have a specific match when it came to what the Eleventh Circuit listed as set-aside, it would make no logical sense for the circuit to say the evidence was lacking only as to "monitoring available in

segregation", and then to set aside an expansive swath of monitoring or monitoring in general. When read together, therefore, the two lists clearly indicate that the "monitoring" the Eleventh Circuit set aside is specifically the monitoring of people in segregation at Tutwiler.

B.

The court next moves to the limited areas in which the Eleventh Circuit noted that this court *did* make the requisite liability findings, namely: "inadequate identification and classification of mental-health needs, inadequate screening for suicide risk, and inadequate psychotherapy." *Dunn*, 179 F.4th at 1320. While the parties may disagree about the breadth of the set-aside relief, the court is confident that the Eleventh Circuit's directive to modify does not implicate these three categories of relief. Based on this logic, the court believes that there is a direct nexus between

the existing liability findings and a subset of remedial provisions, such that they were *not* set aside.

Ultimately, then, the court responds to the parties' request for clarification regarding "how the Eleventh Circuit's opinion impacts Tutwiler [and] what remedies pertaining to Tutwiler were reversed and remanded" in three ways. Motion for Clarification (Doc. 4626) at 2. First, by identifying the provisions that both sides agree were set aside, as applied to Tutwiler. Second, by identifying the provisions that are clearly *not* reversed or set-aside for Tutwiler. And finally, the court identifies the provisions that remain contested, about which the court cannot confidently provide clarification absent additional party input about whether the existing Tutwiler findings support a remedy under the PLRA.

## III. REMEDIAL PROVISIONS

The court agrees that the following remedial provisions were set-aside by the Eleventh Circuit as to Tutwiler, as do both sides of this case. The court has

summarized each provision briefly below, rather than reproducing it in full.

- 3.1.1 – Prohibiting placement of inmates with serious mental illnesses in the RHUs absent a documented exceptional circumstance.

- 3.2.1 – Mandating screening of inmates by an RN, or an LPN under an RN's supervision prior to their placement in the RHU.

- 3.2.2 – Prohibiting placement in restrictive housing of people that mental health professionals find are contraindicated for restrictive housing, absent a documented exceptional circumstance.

- 3.2.3 – Mandating removal within 72 hours of people from restrictive housing if mental-health staff find they are contraindicated for continued placement there, absent a documented exceptional circumstance.

- 3.3.1 – Setting requirements for the content of mental-health rounds in the RHU, which are to be conducted by a qualified mental-health professional and occur at least weekly.

- 3.3.2 – Setting requirements for the appropriate documentation of mental-health rounds in the RHU.

- 3.4.1 – Mandating that each inmate receive a mental-health assessment by a psychiatrist, psychologist, CRNP, or counselor within seven days of placement in restrictive housing and setting additional requirements for those with mental-health codes.

- 3.4.2 – Requiring each mental-health assessment in the RHU to be appropriately documented.

- 3.4.3 – Setting requirements for the substance of mental-health assessments in the RHU.

- 3.4.4 – Requiring each mental-health assessment in the RHU to include a determination of whether the inmate requires a referral.

- 3.6.1 – Setting requirements for ADOC’s security checks in the RHU.

- 3.6.2 – Requiring accurate and contemporaneous documentation of security checks in the RHU.

- 3.6.3 – Mandating correctional officers to regularly verify security checks.

- 9.2.1 – Mandating that inmates in the RTU, SU, and SLU receive minimum structured, therapeutic out-of-cell time and unstructured out-of-cell time each week, subject to exceptions.

- 9.2.1.1 – Setting the exceptions to minimum out-of-cell time for inmates in RTU Level Three who are housed in open dormitories.

- 10.2.1 – Requiring that people placed on suicide watch be evaluated using a suicide risk assessment.

- 10.2.2 – Mandating that inmates admitted to suicide watch be considered for placement on the mental-health caseload.

- 10.2.3 – Requiring documentation of clinical rationale for inmates admitted to suicide watch but not placed on the mental-health caseload.
- 10.2.4 – Mandating that a nurse examine someone before they are placed on suicide watch.

The court is confident that the Eleventh Circuit did not set aside the following provisions as applied to Tutwiler in *Dunn v. Comm'r, Ala. Dep't of Corr.* This is either because they have a direct nexus to this court's limited liability findings regarding "inadequate identification and classification of mental-health needs, inadequate screening for suicide risk, and inadequate psychotherapy," because they are part of the system-wide remedy for inadequate mental-health staffing, or because they fall clearly outside of the categories of set aside relief. *Dunn*, 179 F.4th at 1320. The court also notes that this does not include the remedial provisions that the parties agree that the Eleventh Circuit reversed systemwide, which pertain to 'mandatory and essential' staffing requirements and to the requirement to suicide proof cells according to the

Lindsay M. Hayes Checklist. *See id.* at 1318. The list of provisions that remain in force is as follows:

- 1.1-1.3 – Providing relevant definitions.
- 2.1.1-2.1.3; 2.1.6, 2.1.7.3-2.1.8.2[4] – Setting systemwide staffing and associated reporting requirements and identifying appropriate staffing.
- 2.2.1-2.2.4 – Setting mental-health staffing and associated reporting requirements.
- 4.1-4.3.2 – Setting intake screening requirements and requiring records requests for people who previously received mental-health services.
- 5.1-5.2 – Setting mental-health coding requirements.
- 6.1-6.4 – Setting requirements for assessments and observation following referrals and for communication about referrals.
- 8.1-8.6.2 – Setting requirements for treatment teams, plans, and transfers.
- 9.1.1, 9.1.3-9.1.4 – Setting requirements for mental-health treatment and therapeutic groups.
- 9.3-9.4.2 – Requiring mental-health assessments after referral and setting requirements for

4. The court notes that remedial provisions 2.1.7.3.1 through 2.1.7.3.4 already exempt Tutwiler, so were clearly not set-aside.

progress notes in inmates' mental-health records.

- 10.1–10.1.3 – Setting suicide prevention requirements.

- 10.1.5-10.1.6 – Setting requirements after suicide attempts or deaths resulting from suicide.

- 11.1-11.3 – Setting requirements regarding higher levels of care, adequate mental-health beds, and preventing dangerously high temperatures.

- 12.1-14.2 – Setting systemwide discipline, training, and unforeseen circumstances requirements.

Finally, the court identifies the following provisions as those about which it cannot confidently provide clarification, absent input from the parties at the forthcoming evidentiary hearings. The court notes that several of the following provisions sit at a particular area of tension: While the Eleventh Circuit set aside relief pertaining to Tutwiler related to "suicide-watch placements" as exceeding the PLRA, it noted that this court made findings about "inadequate screening for suicide risk." *Dunn*, 179 F.4th at 1320.

The “contested” provisions are reproduced in their entirety.

- 3.1.1.1. An "exceptional circumstance" exists where: (a) a safety or security issue prevents placement of the inmate in alternative housing (such as a SU, RTU, or SLU); or (b) a non-safety or non-security issue exists and transfer or transportation to alternative housing is temporarily unavailable. Examples of safety and security issues include an inmate's known or unknown enemies in alternative housing or the inmate's creation of a dangerous environment (to the inmate, other inmates, and/or staff) by his or her presence in alternative housing.

- 3.1.2. An inmate placed in a RHU for safety or security issues for 72 hours or longer will be offered at least three hours of out-of-cell time per day (which may be congregate out-of-cell time) while he or she remains in the RHU.

- 3.1.3. An inmate placed in a RHU for non-safety or non-security issues must be removed from the RHU within 72 hours.

- 3.1.4. Every week, ADOC must file with the court and the monitoring team reports on each prisoner who has been in restrictive housing for longer than 72 hours under exceptional circumstances during that week. These reports must indicate the amount of out-of-cell time offered to the prisoner each day, the nature of the out-of-cell time (*i.e.*, exercise, group therapy, etc.), the exceptional circumstance justifying the prisoner's continued segregation placement, and the date by which ADOC expects that exceptional circumstance to be resolved.

- 3.5.1. All inmates in RHUs must have the opportunity to exercise outside of their cells for at least five hours per week, subject to the following exception:
    - 3.5.1.1. ADOC may refrain from offering out-of-cell time due to inclement weather, but only if a safe, alternative space for inmates to exercise--such as a gymnasium--is unavailable.
- 3.5.2. The days and times that out-of-cell time is offered, and any inmate's decision to refuse out-of-cell time, must be documented.
- 3.7.1. Within three months of the effective date, the cells in the RHUs must be cleaned.
- 3.7.2. Cells in the RHUs must always be cleaned before they receive new occupants, and inmates must be provided access to cleaning supplies at least every two weeks.
- 7.1. Individual counseling sessions, medication-management encounters, periodic mental-health assessments of inmates in RHUs, suicide-risk assessments, and therapeutic group sessions must take place in settings that provide for confidentiality and that, if applicable, are out-of-cell, subject to the following exception:
    - 7.1.1. Such services may be provided in a non-confidential setting if confidentiality is not possible due to safety concerns or is otherwise not appropriate. The question whether confidentiality is otherwise not appropriate must be answered according to clinical determinations.
    - 7.1.2. If confidentiality is not possible, then that fact, the reason for it, and any actions

taken to maximize confidentiality must be documented in a progress note.[5]

- 9.1.2. In addition to the Mental-Health Treatment Guidance set forth in Appendix A, each inmate must receive any additional care prescribed by his or her treatment team, subject to the following exception:

  - 9.1.2.1. While ADOC must provide each inmate in restrictive housing with any medication or individual therapy prescribed by his or her treatment team, it need not provide other forms of care prescribed by an inmate's treatment team if those kinds of care cannot be provided safely in the restrictive housing environment.[6]

- 9.2.2. An inmate's out-of-cell appointments with his or her treatment team, psychiatric provider, counselor, or therapeutic group will count as structured, therapeutic out-of-cell time.[7]

---

5. The court notes that defendants believe that 7.1 was set aside as applied to Tutwiler because it "impose[s] mental-health requirements based upon restrictive-housing placements." Defs.' Br. on Tutwiler (Doc. 4578) at 7. The court reads that to be inclusive of 7.1.1 and 7.1.2.

6. Defendants identify provision 9.1.2.1 of the Remedial Order as set-aside because it "specifically regulates medication and individual treatment provided to inmates in restrictive housing." *Id.* Because 9.1.2.1 is an exception to 9.1.2., the court includes both here.

7. Plaintiffs identify provision 9.2.2 as set aside because it relates to residential treatment units at Tutwiler but the defendants do not. The court requests clarification on this point.

- 10.1.4. Each ADOC major facility must maintain an appropriate cut-down tool in each RHU, SU, RTU, SLU, and crisis unit.

- 10.3.1.2. Before an inmate is placed in an SU or suicide watch cell, the cell must be cleaned and any contraband must be removed from the cell.

- 10.3.2. ADOC may designate areas or cells where inmates could be temporarily placed when a suicide watch cell is unavailable, provided that the inmate remains on constant observation during this time.

- 10.4.1. Any inmate determined to be acutely suicidal must be monitored through a constant observation procedure.

- 10.4.2. Any inmate determined to be non-acutely suicidal must be monitored through a close watch procedure that ensures monitoring at staggered intervals not to exceed 15 minutes.

- 10.4.3. During constant observation or close watch, an observer must contemporaneously document his or her observations at staggered intervals not to exceed 15 minutes. Upon an inmate's discharge from suicide watch, his or her observation records must be maintained in his or her medical record.

- 10.4.4. ADOC must take appropriate steps to ensure that observers perform their duties as required.

- 10.5.1. Unless clinically contraindicated, inmates on suicide watch must be provided adequate suicide-resistant implements for hygiene and eating as clinically appropriate.

- 10.5.2. Inmates on suicide watch must receive the same privileges afforded by their last housing assignment as clinically appropriate.

- 10.5.3. Inmates housed in crisis cells, medical cells, or the infirmary must be provided appropriate out-of-cell activity, unless clinically contraindicated, after 72 hours.

- 10.6.1. If an inmate remains on suicide watch for 72 hours, then he or she must be considered for referral to a different or higher level of care based on clinical judgment. If the inmate is not referred to a different or higher level of care, then the clinical rationale must be documented in the inmate's medical chart and tracked in the crisis utilization log or a similar tracking mechanism.

- 10.6.2. If an inmate remains on suicide watch for 168 hours, then the he or she must be considered for referral to a different or higher level of care based on clinical judgment. If the inmate is not referred to a different or higher level of care, then the clinical rationale must be documented in the inmate's medical chart and tracked in the crisis utilization log or a similar tracking mechanism.

- 10.6.3. If an inmate remains on suicide watch for 240 hours or longer and does not meet the criteria for discharge to outpatient mental-health care, then he or she must be considered for referral to a different or higher level of care based on clinical judgment. If the inmate is not referred to a different or higher level of care, then the clinical rationale must be documented in the inmate's medical chart and tracked in the crisis utilization log or a similar tracking mechanism, and documentation of the decision must be sent to the mental-health vendor's director of psychiatry for review and evaluation.

- 10.6.4. Any inmate who is returned to suicide watch within 30 days of discharge from a suicide watch and/or who has three suicide watch placements within six months must be considered for referral to a different or higher level of care based on clinical judgment. If the inmate is not referred to a different or higher level of care, the clinical rationale must be documented, and mental-health staff must notify OHS of the decision and provide the clinical rationale to OHS within 72 hours.

- 10.7.1.1. Prior to being discharged from suicide watch, an inmate must receive an out-of-cell, confidential evaluation by a psychiatrist, psychologist, CRNP, or counselor, unless such evaluation is not possible due to documented clinical concerns.

- 10.7.1.2. If an out-of-cell, confidential evaluation is not possible due to documented clinical concerns, staff must consider whether referral to a different or higher level of care is appropriate.

- 10.7.2.1. An inmate discharged from suicide watch must not be transferred to an RHU, unless there is a documented exceptional circumstance.

- 10.7.2.2. Any transfer of an inmate from suicide watch to an RHU must be approved by the Deputy Commissioner of Operations (for male facilities) or Deputy Commissioner of Women's Services (for female facilities) or their designee.

- 10.8.1. After an inmate's discharge from suicide watch, mental-health staff must conduct a follow-up mental-health examination with the inmate on each of the first three days following discharge, unless there is a documented clinical determination that the inmate was not suicidal at the time the inmate

was placed on suicide watch and did not become suicidal during the watch placement.

- 10.8.2. Follow-up mental-health examinations must not take the place of other scheduled mental-health appointments, although they may occur in connection with or contiguous with such appointments.

- 10.8.3. Follow-up mental-health examinations must occur in a confidential, out-of-cell setting, unless such examination is not possible due to documented clinical concerns.

- 10.8.4. During the follow-up mental-health examinations, the mental-health staff conducting such follow-up mental-health examinations must assess whether the inmate released from suicide watch is showing signs of ongoing crisis, whether the inmate needs further follow-up mental-health examinations, and whether the inmate should be added to the mental-health caseload or assigned a different mental-health code.

- 10.8.5. An inmate's transfer from suicide watch to another institution prior to the completion of the three ordered follow-up examinations restarts the requirement to complete a follow-up mental-health examination on each of the three days following the transfer.

***

Accordingly, it is ORDERED that:

(1) The parties' joint motion for clarification (Doc. 4626) is granted as to Tutwiler.

(2) The defendants' contention that the Eleventh Circuit set aside monitoring of Tutwiler altogether is rejected.

(3) The parties shall prepare to present testimony regarding the list of remedial provisions related to Julia Tutwiler Prison for Women that remains contested at the upcoming evidentiary hearing.[8]

DONE, this the 2nd day of November, 2026.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

---

8. In this opinion, the court has had to consider a large and varied number of remedial provisions. If the parties believe the court has inadvertently overlooked a relevant provision that warranted comment, one way or the other, from the court, they should bring the provision or provisions to the court's attention within 14 days.